# COOK DEFENDANTS'
# PROPOSED AGREED ORDER ON
# ELECTRONICALLY STORED INFORMATION
# AND DOCUMENT PRODUCTION PROTOCOL

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE:  COOK MEDICAL, INC., IVC
FILTERS MARKETING, SALES PRACTICES
AND PRODUCT LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates to All Actions

## AGREED ORDER ON ELECTRONICALLY STORED INFORMATION AND DOCUMENT PRODUCTION PROTOCOL

**A.     Scope**

1.     <u>General</u>.  The procedures and protocols outlined herein govern the production of electronically stored information ("ESI") and paper documents by the Parties during the pendency of this litigation.  The production formats for any other materials will be addressed by the Parties after a meet and confer regarding the specific item or category of items.  Nothing in this protocol will be interpreted to require disclosure of documents or information protected from disclosure by the attorney-client privilege, the work-product doctrine, the insurer-insured privilege or any other applicable privilege, or in violation of Danish law or European Union law regarding data privacy.  Discovery of ESI in Denmark is addressed more specifically and is further governed by Exhibit B – Supplement to Order on Electronically Stored Information and Document Production Protocol as to Non-U.S. Data.

2.     <u>Limitations and Non-Waiver</u>.  This protocol provides a general framework for the production of ESI and paper documents on a going forward basis.  The Parties and their attorneys do not intend by this protocol to waive their rights to the work-product doctrine or any applicable privilege, and it shall not extend to other matters or information not specifically described herein.  All Parties preserve their attorney client privileges and other privileges and

there is no intent by the protocol, or the production of documents pursuant to the protocol, to in any way waive or weaken these privileges.

**B.      ESI Preservation**

1.      The Parties issued litigation hold notices to those persons identified as most likely to have potentially relevant information.  The Defendants contacted the following recipients to preserve all potentially relevant information in electronic and hard copy form:  See  list of See Cook Defendants' Initial Disclosures served in *Sumner v. Cook Medical Incorporated,* 1:13-cv-01845-RLY-TAB

2.      All reasonably identifiable processes and procedures which would result in the elimination, or transfer to a less accessible medium, of any unpreserved data and associated metadata which would otherwise be required to be preserved or produced have been suspended by the Parties.  This does not imply the Parties have an obligation to preserve data and associated metadata which is greater than what the Federal Rules of Civil Procedure require.

3.      Custodians:  For each Custodian identified by Plaintiffs who may possess relevant information, including but not limited to each named plaintiff in this litigation, Plaintiffs have preserved all potentially relevant data from such Custodians' personal and business computers and tablets, from all removable media including, PDA's/Smart Phones, and from cloud storage services.  For each Custodian identified by Plaintiffs:

a.      The personal computer(s) hard drive(s) of each Custodian has been, or in the case of subsequently identified Custodians, will be, preserved by the creation of a full forensic, bit-for-bit image. Each such image preserves both the active file spaces of the target computer, as well as the unallocated file spaces, including file system metadata.

b.      The entire email box for each Custodian, for each email service used (i.e., Yahoo, Gmail, etc.) has been forensically or, in the case of subsequently identified Custodians,

will be, preserved in whole, including all folder structures and the trash bins.

        c.     Removable media, including PDA's, tablets, I-pads, Smart Phones, will be preserved and processed when responsive information not contained on another collected source is identified by the Custodian.

        d.     Potentially relevant data stored on all cloud storage services will be preserved and processed when responsive information not contained on another collected source is identified by the Custodian.

        e.     All data, information, photographs, texts, postings, Tweets, messages, images, profile information, or any other content of any type or nature on the personal webpage(s), blogs, and/or social media sites of the Custodian, including but not limited to Facebook, Linked In, Twitter, and Pinterest, has been and will be preserved.

        f.     Plaintiffs understand and will meet the preservation obligations under the Federal Rules of Civil Procedure.

    4.     For each Custodian identified in section D below by Defendants, and subject to the further guidelines in Exhibit B regarding non-U.S. data:

        a.     The hard drives of such Custodian have been or, in the case of subsequently identified custodians, will be, preserved by the creation of a full forensic, bit-for-bit image of any computer where relevant work was performed by such Custodian. Each such image preserves both the active file spaces of the target computer, as well as the unallocated file spaces, including file system metadata. In cases where Custodians possess unusually large personal hard drives coupled with small and/or less relevant data sets, the logical files will be collected in a forensically sound manner, avoiding the undue burden of creating a full (bit-by-bit) forensic image. For subsequently identified Custodians, hard drives will be preserved in the

manner stated above only if the Custodian indicates that the custodian maintains potentially responsive information on the Custodian's hard drive that is not otherwise maintained on a network user share.  The personal or network storage areas for each such Custodian have been or, in the case of subsequently identified Custodians, will be, preserved in whole.

        b.     The entire email box for each such Custodian has been forensically or, in the case of subsequently identified Custodians, will be, preserved in whole, including all folder structures and the trash bins.

        c.     Removable media, including PDA/Smart Phones, will be collected, preserved and processed when responsive information not contained on another collected source is identified by the Custodian.  However, any such media in Denmark shall be handled consistent with Cooks' legal obligations under applicable local laws, as per Exhibit A.

        d.     The Defendants understand and will meet the preservation obligations they have under the Federal Rules of Civil Procedure.

**C.**      **Sources**

        1.     The following are Defendants' data sources identified to date that are most likely to contain relevant information:

**User-Generated Document Sources**

Microsoft Exchange Servers in Denmark, Bloomington, Indiana and West Lafayette, Indiana

File Servers in Denmark, Bloomington, Indiana and West Lafayette, Indiana

Web Office in Bloomington, Indiana

**Databases, System-Generated ESI Sources, and Other Structured Data**

Livelink in Denmark, Bloomington, Indiana and West Lafayette, Indiana

Trackwise Database in Bloomington, Indiana

Coursemill Training Databases in Bloomington, Indiana

Digital Asset Management Database in Bloomington, Indiana

PDM Link in the U.S.

Marketing Project Tracker

Regulatory Project Tracker

Engineering Project Tracker

JBase Database in Denmark and Bloomington, Indiana

Navision System in Denmark and Bloomington, Indiana

Business Objects

      2.     ESI reasonably identified from these areas will be preserved consistent with Defendants' obligations under the Federal Rules of Civil Procedure.

      3.     Defendants understand their continuing obligations under the Federal Rules of Civil Procedure regarding subsequently identified databases, document stores, repositories and application data.

**D.    Custodians**

      1.     The following are "Key" Defense Custodians who have been identified to date as most likely to have information relevant to this litigation.  For these Custodians, data is being preserved from e-mail systems, computer systems, relevant removable storage media, and physical files that are in the possession, custody, and control of Defendants.  These Key Defense Custodians include:   Darrell Talbert, Mark Frey, Molly Busenbark, Brian Choules, Tony Ragheb, Jennifer Brown, Mark Breedlove, Rob Lyles, Arne Moelgaard Nielsen, Camilla Wamberg Munkesoe, Annette Luneborg, Henrik Gyllun, Per Hendriksen, Anna Bjerg Jessen, Torben Anderson, Mette Neiendam Nielsen and Bruce Fleck.

2.      The Parties understand their continuing obligations under the Federal Rules of Civil Procedure to identify Custodians whom they believe are reasonably likely to have relevant information and handle the custodians' ESI consistent with those obligations.

**E.      Departmental / Project / Collaboration / Shared Storage Spaces:**

1.      The following are departmental / project / collaboration / shared storages areas of the Defendants which have been identified to date as likely to have information relevant to this litigation.  Potentially relevant ESI from these areas will be preserved pending identification of data to be produced into this litigation.

Document File Servers in Denmark, Bloomington, Indiana and West Lafayette, Indiana.

2.      Defendants understand their continuing obligations under the Federal Rules of Civil Procedure to disclose the identity of other document file servers that Defendants subsequently identify as being reasonably likely to contain relevant information.

**F.      ESI and Record Retention Policies**

1.      Defendants will endeavor to identify all ESI and Record Retention Policies and Procedures, including those pertaining to back-up and/or disaster recovery systems and associated policies, processes and procedures, including those related to the deletion or removal of data.

**G.      ESI Search**

1.      The Parties continue to negotiate a protocol for searching user generated files to identify documents for potential review by the Parties for relevancy and responsiveness.

2.      The Parties agree that Defendants will search User-Generated files, after de-nisting and deduplication, to identify a set of potentially relevant documents for review by Defendants.  Furthermore, the Parties agree to exclude the following file types from the search and review:

BINARY

BINHEXENCODEDTEXT

BITMAPBEGIN

[BLANK]

EPSTIFF

EXECUTABLE

FFT

FLASH6

FLASH9

IGES

JAVACLASS

PARADOX4

POSTSCRIPT

TNEF

VCAL

WIN COMPILEDHELP

WIN SHORTCUT

WINDOWSICON

**H.      Electronically Stored Information**

      1.     The Parties agree that data or documents from User-Generated and System-Generated Document Sources (see above,) that is produced is for the purpose of responding to discovery requests. The Parties shall meet and confer to work out any issues concerning production and access to System-Generated Document Sources where production of such sources will place an unreasonable burden on Cook's ongoing business and/or IT operations.

    2.    <u>User-Generated Document Sources:</u>  The Parties will produce the following User-Generated Document Sources in "Native Format" (with accompanying placeholder TIFFs as described in paragraph 2.d), and provide a load file of extracted metadata and OCR/full text:  (1) spreadsheets (.xls files); (2) PowerPoint presentations (.ppt files); (3) Word documents; (4) audio and video formats such as mp3s, wavs, megs.  All other User-Generated Document Sources, except as described in paragraph 3 (System-Generated Document Sources), will be produced as TIFFs, created data and extracted metadata and text.

    a.  <u>Natives</u>: "Native Format" as referenced Paragraph 2 above is defined as document files in the file format in which the item was collected with internal and system metadata intact.  For example, the native format of a Microsoft Office WORD document is as a .doc or .docx file.  Native files will be produced in their complete original condition, and may not be altered in any way for litigation purposes, except for as noted herein related to privilege.

    b.  <u>Load Files</u>: The load files will include an image load file in Opticon or IPRO format as well as a data (.DAT) file with the created data and metadata fields identified in Exhibit A on the document level to the extent available.  The producing party shall also identify for each document, the request(s) (by set and number) to which the document is responsive at the time the document is produced or provide the filepath which shows how the document is maintained in the ordinary course of business.

    c.  <u>ESI Processing Dates</u>:  All documents shall be produced so as to show the metadata date in Eastern Standard Time.  Reasonable efforts will be made to display all dates displayed in documents being TIFF'ed, .e.g, emails, in Eastern Standard Time.

    d.  <u>Production of TIFF's for Native Format Documents that are Impractical to</u>

Convert to TIFF:   The following ESI types do not lend themselves well to the TIFF format:  spreadsheets (.xls files); PowerPoint presentations (.ppt files); audio and video formats such as mp3s, wavs, megs.   A Bates-stamped placeholder TIFF, bearing the legend "This document has been produced in native format" shall be produced for such documents; these placeholders will be Bates Numbered in the same way as any other TIFF and the BatesNumber of that single page shall be used as the BEGINBATES and ENDBATES of the associated document.

3.   System-Generated Document Sources:   The Parties acknowledge that certain categories of ESI, such as databases or application data, are structurally complex and do not lend themselves to easy production as native format documents.   Only the portions of a database that are responsive to requests will be produced (as tabular data, e.g., as database, CSV or Excel files, including all associated fields, and, when the database includes documents, as native files with database and system metadata intact).   Databases that are entirely responsive will be produced in their entirety.   Defendants have provided a list of Cook System-Generated Document Sources, which integrate databases and data stores in a structurally complex way.   The Parties will make reasonable efforts to preserve, identify, collect, process/assemble, review and produce responsive information based on specific requests for document production.   After review, if the requesting party believes that any of these types of sources contain additional responsive ESI is in this category, counsel should initiate a meet and confer to address production issues and additional data or means to provide data can be provided.   Reasonable effort will be made by the producing party to provide the ESI as close as possible to its database form, including native files that are generated by or easily made a part of the system.   These documents will be produced accompanied with a Bates number and MD-5 hash value.

4.      The load files will include an image load file in Opticon or IPRO format as well as a data (.DAT) file with the created data and metadata fields identified in Exhibit A on the document level to the extent available.   The producing party shall also identify for each document the request(s) (by set and number) to which the document is responsive at the time the document is produced or provide the filepath which shows how the document is maintained in the ordinary course of business.

**I.      Documents That Exist Only in Paper Format**

1.      Documents that only exist in paper form shall be scanned and produced as TIFF's with the same load files and metadata fields as provided for ESI, to the extent that said metadata exists, along with OCR'ed text.

2.      <u>Unitization</u>:   Unitization and the parent/child relationships of such documents shall be preserved and provided in the load files, for newly scanned documents and, to the extent that it exists, for previously existing scanned image sets (for example, hard copy documents scanned prior to the commencement of the litigation that no longer exist in hard copy will be produced with "as is" unitization).

3.      <u>Metadata</u>:   To the extent that it is available to or has been derived by the producing party, the producing party shall provide metadata for such documents in accordance with paragraph H.4.above.   At a minimum, the production load file should include custodian information, the document's redaction status, and the document's confidentiality status.

4.      <u>OCR</u>:   Industry standard multipage OCR text shall be provided for each paper document.  Page breaks shall be preserved within the OCR text.  OCR text files shall match the respective bates number of its document, with a file extension of "txt."

**J.     Additional Production Specifications**:

1.     <u>TIFFs</u>:  All TIFFs produced by any party in this matter will be single page Group IV TIFF format, <u>300</u> dpi quality or better.   Image file names will be identical to the corresponding bates numbered images, with a ".tif" file extension.   TIFF versions of ESI produced pursuant to this section shall include visible and legible images of comments and hidden text contained within the underlying ESI.

2.     <u>Bates Numbers</u>:

a.     All bates numbers will consist of an  Alpha Prefix, followed immediately by an 8 digit numeric:  [alpha prefix]########.  There must be no spaces in the bates number. Any numbers with less than 8 digits will be front padded with zeros to reach the required 8 digits.

b.     The producing party will brand all TIFF images in the lower right-hand corner with its corresponding bates number, using a consistent font type and size.  The Bates number must not obscure any part of the underlying image.  If the placement in the lower right-hand corner will result in obscuring the underlying image, the Bates number should be placed as near to that position as possible while preserving the underlying image.

3.     <u>Confidentiality Treatment</u>:   The Parties  will be entering into one or more Protective Orders in this matter, which will specify various confidentiality treatment levels for use in this matter for documents and data produced.

a.     The confidentiality treatment level for any item will be provided with the review created data provided by the Producing Party for that item, in the field entitled "Confidentiality".  For items with no confidentiality requirements, the field will be left blank.

b.     The producing party will brand any confidentiality endorsements in a corner of any TIFF images representing the produced item.  Those endorsements must be in a

consistent font type and size, and must not obscure any part of the underlying image or Bates number.

    4.    <u>Redaction</u>:

        a.    No agreement has been reached between the Parties concerning redaction of non-privileged information that is deemed non-responsive within a document that also contains responsive information.  The Parties will meet and confer to resolve any disputed redaction.  In the event that the Parties are unable to agree about a redaction, the Party seeking to redact a portion of the otherwise responsive document, shall arrange the Court's assistance to resolve the dispute via a telephone conference with the Magistrate.  Nothing in this paragraph shall prevent either Party from moving to compel production of all responsive documents without redaction or seeking protective order allowing redaction of the portions of all responsive documents that reference non-responsive matters.

        b.    All items redacted for privilege, whether paper documents or ESI, will be produced as TIFFs unless they are structured data produced in tabular format.  No native ESI items will be produced for redacted items.  However, to the extent that the text is searchable in the native format, the producing party must provide searchable text for those portions of the document that have not been redacted.

        c.    The TIFF and/or underlying metadata for a redacted item will bear labels identifying the area of each redaction and the basis for the redaction.

        d.    For redacted items which were originally ESI, all unredacted metadata fields will be provided and will include all non-redacted data.

        e.    Redacted documents shall be identified as such in the load file provided with the production.  A document's status as redacted does not relieve the producing party from

providing all of the metadata required herein.

     5.    <u>De-duplication</u>:  De-duplication will occur to promote efficiencies in the collection and review process.  Copies of a document with the same MD5 hash values need be produced only once, provided that any document which is part of a document family (i.e., has the same BEGATTACH and ENDATTACH) which includes a produced document will not be withheld as a duplicate.  Email MD5 hash values will be calculated for entire email families, including attachments.  The CaseData™ fields that will be used to create the MD5 hash value for an email include:

     a.    MAPPED_RECIPIENTS.  MD5 Hash performed on coalesce of:  mail_to; to; sendto; displayto; recipientsdisplay.

     b.    MAPPED_CC.  MD5 Hash performed on coalesce of:  mail_cc; cc; copyto; displaycc.

     c.    MAPPED_BCC.  MD5 Hash performed on coalesce of:  mail_bcc; bcc; blindcopyto.

     d.    MAPPED_AUTHOR.  MD5 Hash performed on coalesce of: mail_creator_name; mail_from; from; primaryauthor; author; lastsavedby; mail_last_modifier_name; chair; last_saved_by; sendername.

     e.    MAPPED_AUTHOREMAIL.  MD5 Hash performed on coalesce of: mail_sender_email_address; from; senderemailaddress.

     f.    MAPPED_SUBJECT.  MD5 Hash performed on coalesce of: mail_subject; subject; normalizedsubject.

     g.    MAPPED_SENTDATE.  MD5 Hash performed on coalesce of: Delivereddate;  Posteddate;  Sent;  Senton;  mail_client_submit_time;  client_submit_time;

clientsubmittime; deliverytime.

Emails will be de-duplicated at a family level, with the MD5 hash values for a family being calculated on the concatenated MD5 hash values of an email and all its attachments. With each production, Defendants will provide a de-duplication report, as an Excel or Concordance .dat overlay file, listing the custodian, file path or email folder for each document withheld as a duplicate as well as the Bates number of the produced document of which it is a duplicate.

6. <u>Color</u>: Paper Documents and ESI reduced to TIFF shall be produced in black and white in the first instance. If a paper document or redacted ESI contains color and that color is necessary to decipher the meaning, context, or content of the document, the producing party shall honor reasonable requests for either the production of the original document for inspection and copying or production of a color image of the document.

7. <u>Load Files</u>: The load file format for productions shall be in .dat format.

8. <u>Encrypted or Password-Protected ESI</u>: For any ESI that exists in encrypted format or is password-protected, the producing party will provide the receiving party a means to gain access to those native files (for example, by supplying passwords.) If the password cannot be found through reasonable efforts, the Parties will meet and confer to determine a process for handling password protected documents.

9. <u>Production Media</u>: The Parties will use the appropriate electronic media (CD, DVD or hard drive) for ESI production, and will cooperate in good faith to use the highest-capacity available media to minimize associated overhead. The producing party will label the physical media with the producing party, production date, media volume name, and document number range. Any replacement Production Media will cross-reference the original Production

Media, clearly identify that it is a replacement and cross-reference the Bates Number range that is being replaced.

      10.    <u>Metadata in Extracted Text</u>:  Defendants agree to insert the "To, From, DATERCVD" fields extracted from the metadata for emails into the Extracted Text field for all email documents.

**K.**    **Timing**

      1.    The Parties will use their reasonable efforts to produce ESI in a timely manner consistent with the Court's discovery schedule.

      2.    The Parties will produce ESI on a rolling basis.

**L.**    **General Provisions**

      1.    Any practice or procedure set forth herein may be varied by agreement of the Parties, and first will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of electronic data.

      2.    Should any Party subsequently determine it cannot in good faith proceed as required by this protocol, the Parties will meet and confer to resolve any dispute before seeking Court intervention.

      3.    The Parties agree that e-discovery will be conducted in phases and the Parties will meet and confer regarding discovery of data sources not listed herein.

      4.    Regardless of the foregoing, the Parties, subject to objections asserted pursuant to the Federal Rules of Civil Procedure, retain the obligation to produce all responsive non-privileged documents of which they are aware.

      5.    Because negotiations are ongoing between the Parties as to search methodology and other ESI issues, Defendants reserve the right to request that the Court issue limitations upon discovery, and/or cost shifting, under the principles of proportionality under Fed. R. Civ. P.

26(b)(2)(C).

**M.      Documents Protected From Discovery**

1.      Pursuant to Fed. R. Evid. 502(d), the production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding.  For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

2.      Privilege and/or work product communications that are responsive to a discovery request involving trial counsel and the client that post-date February 23, 2010 related to litigation involving IVC Filter cases need not be placed on a privilege log.  Earlier communications may be identified on a privilege log by category, rather than individually, if appropriate.

**N.      Clawback**

1.      The Parties acknowledge the requirements of Federal Rule of Civil Procedure 26(b)(5)(B) in the event of the inadvertent production of documents, files or information subject to the protection of any applicable privilege or the work product doctrine. In the event that a document protected by the attorney-client privilege, the attorney work product doctrine or other applicable privilege or protection is unintentionally produced by any party to this proceeding, the producing party may request that the document be returned.  In the event that such a request is made, all parties to the litigation and their counsel shall promptly return all copies of the document in their possession, custody, or control to the producing party and shall not retain or make any copies of the document or any documents derived from such document.   The producing party shall promptly identify the returned document on a privilege log.   The unintentional disclosure of a privileged or otherwise protected document shall not constitute a waiver of the privilege or protection with respect to that document or any other documents

involving the same or similar subject matter.

      2.       The Parties agree to specifically extend this clawback procedure to also include any inadvertent production of documents, files or information subject to data privacy laws of Denmark and/or the European Union.

      IT IS SO ORDERED:_____

                                   _____

                                   Judge, United States District Court for the Southern District of Indiana Indianapolis Division

Date: _____

_/s/ John A. Dalimonte_
John A. Dalimonte, Esq.
KARON & DALIMONTE LLP
85 Devonshire Street, Suite 1000
Boston, MA 02109
Tel: (617) 367-3311
Fax: (617) 742-9130
Email: johndalimonte@kdlaw.net
Email: rhovde@hovdelaw.com

Attorneys for Plaintiffs

Date: _____

_/s/ Douglas B. King_
Douglas B. King, Esq.
Kip S. M. McDonald, Esq.
WOODEN & MCLAUGHLIN LLP
211 North Pennsylvania Street
One Indiana Square, Suite 1800
Indianapolis, IN 46204-4208
Tel:    (317) 639-6151
Fax:    (317) 639-6444
Email: dking@woodmclaw.com
Email: kmcdonald@woodmclaw.com

Attorneys for Cook Defendants

**Exhibit A**

| Field | Definition | Doc Type |
|-------|-----------|----------|
| SOURCE | Name of party producing the document | All |
| CUSTODIAN | Name of person or other data source (non-human) from where documents/files are produced.  *Where redundant names occur, individuals should be distinguished by an initial which is kept constant throughout productions (e.g., Smith, John A. and Smith, John B.)* | All |
| BEGBATES | Beginning Bates Number (production number) | All |
| ENDBATES | End Bates Number (production number) | All |
| PGCOUNT | Number of pages in the document | All |
| FILESIZE | File Size of either the original or expanded/uncompressed file | All |
| APPLICAT | Commonly associated application category for the specified file type. | All |
| FILEPATH | Original file/path of the location where the item was located at the time of collection.  This should include location, file name, and file extension. | E-document |
| NATIVEFILELINK | For documents provided in native format only | All |
| TEXTPATH | File path for OCR or Extracted Text files | All |
| MSGID | Email system identifier assigned by the host email system.  This value is extracted from parent message during processing | E-mail |

| PST/OST filename | PST/OST filename. | E-Mail |
|---|---|---|
| Folder | Folder location of the e-mail within the PST/OST. mailbox or file | E-mail |
| FROM | Sender | E-mail |
| TO | Recipient | E-mail |
| CC | Additional Recipients | E-mail |
| BCC | Blind Additional Recipients | E-mail |
| SUBJECT | Subject line of e-mail | E-mail |
| CONVERSATIONINDEX | Email Thread Identification | E-mail |
| ATTACHBATES | Bates number from the first page of each attachment | E-mail |
| BEGATTACH | First Bates number of family range (i.e. Bates number of the first page of the parent e-mail) | E-mail |
| ENDATTACH | Last Bates number of family range (i.e. Bates number of the last page of the last attachment) | E-mail |
| ATTACHCOUNT | Number of attachments to an e-mail | E-mail |
| ATTACHNAMES | Names of each individual Attachment, separated by semi-colons | E-mail |
| DATESENT (mm/dd/yyyy hh:mm:ss AM) | Date Sent | E-mail |
| DATERCVD (mm/dd/yyyy hh:mm:ss AM) | Date Received | E-mail |
| E-mail Outlook Type | Type of Outlook item, e.g., e-mail, calendar item, contact, note, task | Outlook or similar system |

| HASHVALUE | MD5 hash value | All |
|---|---|---|
| TITLE | Title provided by user within the document | E-document |
| AUTHOR | Creator of a document | E-document |
| DATECRTD (mrn/dd/yyyy hh:mm:ss AM) | Creation Date | E-document |
| FSDATECRTD | File system date created | E-document |
| LAST MODIFIED BY | Last person who modified (saved) a document | E-document |
| LASTMODD (mrn/dd/yyyy hh:mm:ss AM) | Last Modified Date | E-document |
| FSLASTMODD | File system date modified | E-document |
| DocumentType | Descriptor for the type of document: "**E-document**" for electronic documents not attached to e-mails; "**E-mail**" for all e-mails; "**E-attachment**" for files that were attachments to e-mails; and "**Physical**" for hard copy physical documents that have been scanned and converted to an electronic image. | All |
| Importance | High Importance - indicates Priority E-mail message | E-mail |
| Redacted | Descriptor for documents that have been redacted. "Yes" for redacted documents; "No" for un-redacted documents. | All |
| RedactionReason | Basis of redaction.  If more than one, separate reasons by semi-colons | |
| ProdVol | Name of media that data was produced on. | All |
| Confidentiality | Confidentiality level if assigned pursuant to any applicable Protective Order or stipulation. | All |

## <u>CERTIFICATE OF SERVICE</u>

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

IN RE: COOK MEDICAL, INC. IVC FILTERS
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates to All Actions

## EXHIBIT B

## AGREED ORDER ON ELECTRONICALLY STORED INFORMATION AND

## DOCUMENT PRODUCTION PROTOCOL – DENMARK ESI

## I.    Introduction

As described below, certain categories of potentially relevant ESI are held by Defendant William Cook Europe ("WCE") in Denmark.  Denmark, as member of the European Union ("EU"), implemented the EU's Directive 95/46 EC ("Directive") which dictates strict rules and limitations for the processing and transfer of data of individuals within EU member nations. Denmark implemented the Directive's rules by adopting its own law titled the Act on Processing of Personal Data ("Denmark's Act").

### A.    Denmark's Act - Processing Data

Denmark's Act applies to the processing of data, including personal data.[1]  "Personal Data" is defined as "any information relating to an identified or identifiable natural person" (the "Data Subject").[2]  "Processing" is "any operation or set of operations which is performed upon

---

[1] Title I, Ch. 1, Sec. 1.(1), (2).
[2] Title I, Ch. 2, Sec. 3.(1)1.

personal data, whether or not by automatic means."[3]  Data to be processed must be "relevant and

not excessive in relation to the purposes for which the data are collected and the purposes for

which they are subsequently processed."[4]  Personal Data may be processed only if it meets one

of the delineated justifications, which includes "compliance with a legal obligation to which the

[data] controller is subject."[5]

Three special categories of more sensitive Personal Data are proscribed in Denmark's

Act. (Hereafter collectively, "Sensitive Data") First, Section 7(1) of the Act states "[n]o

processing may take place of personal data revealing racial or ethnic origin, political opinions,

religious or philosophical beliefs, trade union membership, or data concerning health or sex

life."[6]  An exception is provided if processing is **necessary** for the establishment, exercise or

defense of legal claims.[7]  (Emphasis added)

Second, Personal Data regarding "criminal offences, serious social problems and other

purely private matters than those mentioned in section 7(1)" can be processed if the conditions in

Section 7 are satisfied.[8]  But **disclosure** of this category of data is prohibited unless one of the

following exceptions is met:

1.   The data subject has given his explicit consent to such disclosure; or

2.   Disclosure takes place for the purpose of pursuing private or public interests
     which clearly override the interests of secrecy, including the interests of the
     person to whom the data relate; or

3.   Disclosure is necessary for the performance of the activities of an authority or
     required for a decision to be made by the authority; or

---

[3] Title I, Ch. 2, Sec. 3.(1)2.
[4] Title II, Ch. 4, Sec. 5.(3).
[5] Title II, Ch. 4, Sec. 6.(1) 3.
[6] Title II, Ch. 4, Sec. 7.(1).
[7] Title II, Ch. 4, Sec. 7.(2)4.
[8] Title II, Ch. 4, Sec. 8.(1), (6).

4.      Disclosure is necessary for the performance of tasks for an official authority by a person or a company.[9]

Third, processing data concerning "identification numbers" by private individuals and bodies can only take place if specific exceptions apply.[10]   The exceptions are when it is permitted by law or regulation, explicit consent is obtained, or it is carried out for solely scientific or statistical purposes.[11]

B.      Denmark's Act - Transfer of Data

Transfer of data out of Denmark to another country may take place only if the other country in question ensures an adequate level of protection.[12]   And, the transfer of data must satisfy one of the specific justifications in the Act, which includes it being necessary or legally required for the establishment, exercise or defense of legal claims.[13]   Denmark's Act provides for monetary and criminal penalties for failure to comply.[14]

II.      **Scope of ESI Discovery in Denmark and General Principles**

Complying with Denmark's Act makes the burden and cost on Defendants of producing ESI from Denmark higher than for U.S. data.   Defendants cannot send ESI to the U.S. for initial review if the data could potentially contain Personal or Sensitive Data.   Therefore, to an unknown extent, Defendants are faced with reviewing ESI in Denmark, a significant but undetermined percentage of which will be in Danish.

In order to ensure the burden upon Defendants is not unreasonable and to avoid delaying the progress of MDL 2570 as a whole due to ESI disputes, the Parties submit to the following process.   The Parties recognize their shared responsibility to comply with Danish law regarding

---

[9] Title II, Ch. 4, Sec. 8.(2).
[10] Title II, Ch. 4, Sec. 11.(1).
[11] Title II, Ch. 4, Sec. 11.(2).
[12] Title II, Ch. 7, Sec. 27.(1).
[13] Title II, Ch. 7, Sec. 27.(3)4.
[14] Title VI, Ch. 18, Sec. 70.(1).

data privacy, but also to meet their obligations under the Federal Rules of Civil Procedure, and therefore outline herein the steps to be taken to accomplish the needed discovery.

In order to minimize the conflict of laws and accomplish the goals stated above, the Parties agree to limit the scope of discovery in Denmark to that which is relevant and *necessary* to support a claim or defense.[15]  That limitation to data which is relevant and necessary will minimize any potential impact upon the Data Subjects, show due respect for Danish law, and reduce any unreasonable burden upon Defendants that would result from having to produce unnecessary ESI from Denmark.[16]

To implement the Parties' intentions, the following guidelines will apply:

1.  ESI productions in MDL 2570 will begin with responsive data and/or documents from U.S. sources.

2.  Discovery from Denmark will be completed in phases to allow responsive information not subject to privacy laws to be identified and produced first, thereby minimizing the amount of protected data that may need to be processed.

3.  Discovery that calls for data, information or documents held in Denmark must be narrowly tailored to that which is relevant and necessary to Plaintiffs' claims.

4.  To the extent necessary, Defendants may interpret narrowly any discovery requests from Plaintiffs to the extent such requests may implicate Personal and/or Sensitive Data.

5.  In responding to any discovery that may or does call for data, information or documents held in Denmark, Defendants may substitute alternative, substantially similar documents or data available from non-protected sources located in North America.  To the extent any such substitution would not be obvious, Defendants shall disclose such substitution at the time of production.

6.  Personal Data relating to relevant WCE employees who possess personal knowledge regarding the facts at issue in this litigation will be produced, to the extent it is called for by a discovery request.  Other Personal Data is not relevant to

---

[15] This comports with discovery principles under FRCP 26(b)(1) and (2).  Furthermore, under FRCP 26(b)(2)(C), discovery should be made from the source that is most convenient, least burdensome, and least expensive.
[16] The Sedona Conference, International Principles on Discovery, Disclosure & Data Protection: Best Practices, Recommendations & Principles for Addressing the Preservation Discovery of Protected Data in U.S. Litigation, 2011, Principle 3.

this litigation nor reasonably calculated to lead to the discovery of admissible evidence and will not be produced and/or will be redacted.

7. Sensitive Data is not relevant to this litigation and will not be produced and/or will be redacted.

8. The Parties will use only service providers, contractors, or outside businesses that are Safe Harbor certified by the U.S. Department of Commerce to assist them with ESI originating from WCE/Denmark.

## III.   Phased Discovery

A. Phase 1  – Documents and Sources Unlikely To Contain Protected Data

In responding to discovery requests that call for ESI held in Denmark, Defendants will first produce responsive documents from categories unlikely to have protected data.  Documents that fall within the following categories should not contain Personal or Sensitive Data, and therefore, to the extent such documents are responsive to a discovery request and are not otherwise subject to an objection, they will be produced during Phase One:

     a. Quality System Documents
     b. Manufacturing Specifications
     c. Design Documents
     d. Regulatory Communications
     e. Other categories of responsive documents at WCE from non-structured sources that are determined to be unlikely to contain protected data

B. Phase 2 – Documents from Targeted Custodians and Sources

1. Initial Custodians

Processing of Denmark ESI for potential production shall be initially limited to a select group of highly relevant custodians, as opposed to a larger group with only marginally relevant data.  The data sources processed for these custodians will also be initially limited to those portions of their relevant user shares unlikely to contain protected data.  *Sources and file folders identified by these custodians as likely to contain irrelevant and Personal or Sensitive Data will be excluded from term searching.*  This will minimize the volume and breadth of data protection issues.

At this time, Defendants have identified the individuals listed below as the key Denmark custodians.  Additional custodians may be added later by agreement of the Parties or by direction of the Court.  The Defendants will supply an agreed upon set

of search terms and search methodology to identify responsive documents. Responsive documents from the following custodians will be produced:

  a. Arne Mølgaard-Nielsen
  b. Camilla Wamberg Munkesoe
  c. Annette Lüneborg
  d. Henrik Gyllun
  e. Per Hendriksen
  f. Anna Bjerg Jessen
  g. Torben Peter Andersen
  h. Mette Neiendam Nielsen

2. Other Targeted Sources

Shared folders, relevant and responsive departmental folders and other specifically identified shared WCE sources identified by WCE as potentially having responsive information and unlikely to have protected data will be searched for responsive documents or data.

Phase 3 – Structured Data

To the extent there is structured data in Denmark that is responsive to a specific discovery request by Plaintiffs, and which is not duplicative of data/documents already produced to Plaintiffs and not available to be produced to Plaintiffs in a less burdensome format, portions of the responsive structured data will be produced subject to redaction to remove protected data.

Phase 4 – Filtering for Further Documents/Data

A. Key Denmark Custodians' Email, User Shares, Department Folders

Defendants will apply a process in Denmark, aimed at culling out protected data, to: 1) the exchange server data, and remaining portions (beyond those portions already processed in Phase 2) of the user shares, belonging to the limited group of key Denmark custodians listed above; and, 2) the remaining shared folders, relevant and responsive departmental folders and other specifically identified shared WCE sources identified by WCE as potentially having responsive information which were not already processed in Phase 2. Responsive ESI will be

6

produced with protected data handled in a manner consistent with Denmark's Act and the Federal Rules of Civil Procedure.

      B.  Further Filtering

Searching data sources in Denmark using search terms qualifies as "processing data" under Danish law, and accordingly, searching broad portions of file servers, exchange servers housing emails, and other non-targeted sources based only upon the possibility that such sources might contain non-duplicative relevant document should be kept to a minimum as a good faith effort to comply with Danish law.   Otherwise, conducting such widespread searching risks processing Personal and Sensitive Data inadvertently without legal justification.

The Parties further acknowledge the burden of searching sources beyond those identified above due to the fact that all filtering out of protected data must occur in Denmark, and review of documents that may contain potentially protected data and redaction of same must also occur in Denmark.   Therefore, the Parties agree to the following guidelines regarding ESI beyond the sources noted specifically herein:

1. Defendants shall notify Plaintiffs when Defendants complete Phase 3.

2. With their notice, Defendants will disclose any and all sources and categories of data or documents Defendants intend to yet produce.

3. Plaintiffs shall then have 30 days to notify Defendants in writing of the specific additional documents or data housed in Denmark which Plaintiffs believe are responsive to discovery but have not been produced.

4. The Parties will meet and confer as to disagreement as to additional ESI.  Because broader discovery of sources may implicate data privacy, and impart a burden upon Defendants, Plaintiffs will provide a detailed explanation for why the additional categories of ESI are necessary to litigating their claims.

5. If the Parties cannot resolve any disputes over such discovery, they must first arrange for a telephonic conference with Magistrate Baker before filing a motion with the Court to address said disputes.

**JOINTLY SUBMITTED BY:**

Irwin B. Levin, Esq.
COHEN & MALAD LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Tel:   (317) 636-6481
Fax:   (317) 636-2593
ilevin@cohenandmalad.com

Lead Counsel for Plaintiffs

Douglas B. King, Esq., Lead Counsel
James M. Boyers, Esq.
Christopher D. Lee, Esq.
John C. Babione, Esq.
Sandra L. Davis, Esq.
Kip S. M. McDonald, Esq.
WOODEN & McLAUGHLIN LLP
One Indiana Square, Suite 1800
Indianapolis, IN 46204-4208
Tel:   (317) 639-6151
Fax:   (317) 639-6444
dking@woodmclaw.com
jboyers@woodmclaw.com
clee@woodmclaw.com
jbabione@woodmclaw.com
sdavis@woodmclaw.com
kmcdonald@woodmclaw.com

Counsel for Defendants Cook Group
Incorporated, Cook Incorporated, Cook
Medical Incorporated and William Cook
Europe Aps

8