UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE:  COOK MEDICAL, INC.,  ) CAUSE NO. 1:14-ml-2570-RLY-TAB
IVC FILTERS MARKETING, SALES ) MDL No. 2570
PRACTICES AND PRODUCTS       ) Indianapolis, Indiana
LIABILITY LITIGATION         ) Thursday, September 8, 2016
                             ) 10:12 o'clock a.m.


Before the
HONORABLE RICHARD L. YOUNG, CHIEF JUDGE


TRANSCRIPT OF CASE MANAGEMENT PLAN
REGARDING STATUS CONFERENCE

APPEARANCES:
FOR THE MDL PLAINTIFFS:   Riley Williams & Piatt, LLC
                          By:  Joseph N. Williams
                          301 Massachusetts Avenue
                          Indianapolis, Indiana 46204

                          Heaviside Reed Zaic
                          By:  Michael W. Heaviside
                          910 17th Street, NW, Suite 800
                          Washington, D.C. 20006

                          The Law Offices of Ben C. Martin
                          By:  Ben C. Martin
                          3710 Rawlins Street, Suite 1230
                          Dallas, Texas 75219

FOR THE MDL DEFENDANTS:   Wooden & Mclaughlin LLP
                          By:  Douglas B. King and
                          James McGinnis Boyers
                          One Indiana Square
                          Suite 1800
                          Indianapolis, Indiana 46204-2019

                          Faegre Baker Daniels LLP
                          By:  Andrea Roberts Pierson and
                          John T. Schlafer
                          300 North Meridian Street
                          Suite 2700
                          Indianapolis, Indiana 46204

COURT TRANSCRIBER:      Jean A. Knepley, RDR, CRR, CRC, FCRR
                        46 East Ohio Street, Room 309
                        Indianapolis, Indiana 46204


            PROCEEDINGS TAKEN BY ELECTRONIC RECORDING

3

1                    (In open court.)

2          THE CLERK:  All rise.

3          THE COURT:  Good morning.  Good to see all of you

4    again.  We are here today in In Re:  Cook Medical IVC Filters

5    Marketing, Sales Practices and Products Liability Litigation.

6    This is MDL-2570, and we are here on a status, monthly status

7    conference.  And there has been an agenda filed, and I have

8    been requested from court staff in submitting your agendas if

9    you can do that seven days in advance of our hearing, of our

10   status conference, that would be much appreciated.

11         Here on behalf of the Plaintiffs are Joe Williams,

12   Michael Heaviside, and Ben Martin; and all representing Cook

13   is Doug King, Andrea Pierson, John Schlafer, and Jim Boyers.

14         I checked this morning, and there are 918 cases in the

15   MDL now.  Andrea, is that your --

16         MS. PIERSON:  I think that is pretty close to

17   correct, Your Honor.  We put together just a couple of slides

18   to illustrate so you can see where we are in terms of total

19   numbers, product breakdown, and I wanted to give you a bigger

20   picture too of what it looks like in state courts as well.  So

21   with Your Honor's permission, just a couple of things that we

22   will show you.

23         First, here is the breakdown of cases --

24         THE COURT:  Hold on, I am not turned on up here --

25         MS. PIERSON:  No problem.

1          THE COURT:  -- and I don't know how to do that.

2  Okay.

3          MS. PIERSON:  May I approach, Your Honor?

4          THE COURT:  You may.  Thank you.

5          MS. PIERSON:  So this is what the filings look like

6  in total, 906 Plaintiffs in this MDL, 186 in state court

7  cases.  There are a couple of multi-Plaintiff cases in

8  Illinois that make up a lot of the 186 there, and then we have

9  four Plaintiffs and other federal courts that are awaiting --

10          THE COURT:  In the state cases, where in Illinois

11  are those?

12          MS. PIERSON:  In St. Louis County.

13          THE COURT:  Okay.

14          MS. PIERSON:  Your Honor.

15          THE COURT:  Southern.

16          A VOICE:  That is --

17          MS. PIERSON:  I am sorry, Missouri, Missouri.  Thank

18  you.  Before you, Your Honor, is how the cases break out

19  between states, just so you can get a feel of where

20  jurisdictionally these are.

21          THE COURT:  Uh-huh.

22          MS. PIERSON:  And then we go to the next slide, just

23  a couple of slides that help you understand where we are in

24  terms of the product division.  You remember we talked about

25  that at the bellwether selection argument.

1        So this is the count, by product, in the MDL.  The

2   proportion between Tulip and Celect is about the same as it

3   was when I talked to you the last time, maybe a little more on

4   the Tulip side than we had previously.

5              THE COURT:  Yes, appears to be.

6              MS. PIERSON:  Forty-one percent of the cases are

7   Tulip.  Fifty-three percent of the cases are Celect.  The

8   Celect Platinum number there at 11 is a little bit deceiving,

9   Your Honor.  Although we don't have all of the PFSs on those,

10  we know that a significant number of those are cases where the

11  product was implanted actually before the Platinum was even on

12  the market.  So it is -- it is likely that those Plaintiffs

13  are confused as to what product that they had, but Celect

14  Platinum continues to be a very, very small number.

15             THE COURT:  Uh-huh.

16             MS. PIERSON:  Then go to the next slide just so

17  you --

18             THE COURT:  What is the unknown?

19             MS. PIERSON:  It is Plaintiffs who filed and haven't

20  identified yet what product was implanted in them, so we don't

21  yet know.  Do they have a Tulip or a Celect, not identified in

22  their short form complaint, and more than likely we don't have

23  a PFS from them yet that identifies the product.

24             THE COURT:  Okay.

25             MS. PIERSON:  Then if you combine what I have shown

1    you so far, that is just what is on the slide before you, Your

2    Honor.  We look across the MDL cases and across the state

3    court cases.  You can see how the breakdown goes between

4    products.

5        The difference between Celect and Tulip in the state

6    court cases is very similar to what you are seeing here in the

7    MDL.  As I said, in the MDL the division is 41 percent Tulip,

8    53 percent Celect.  And the state court cases, Tulip is

9    33 percent, and Celect is 50 percent.  But there is a higher

10   number of unknown products in the state court cases than there

11   are in the MDL.

12       And then one last slide for you, Your Honor, just so you

13   know what the MDL is shaping up like in terms of filing

14   trends.  This is a graph that I have shown you before that

15   shows filing trends per month, and really, I think the most

16   telling part for our purposes is the last fourth of that graph

17   on the right-hand side of the page.

18       You can see that we had a big spike in filings in May.

19   We talked last time, at least our view, is that is attributed

20   to we believe that some people thought there was a trigger for

21   statute of limitations that caused a big spike.  Since that

22   time, filings have slowed, but they certainly continue at a

23   significant clip.

24       So where this MDL lines up by the end of 2016, I think,

25   is not yet known.  Now the question is, do the filings

7

1   continue at this pace beyond the third quarter of this year or

2   not?

3       As Your Honor knows, just by virtue of filing a new case,

4   there is a heavy burden that is placed on Cook in terms of

5   production of documents and other things, and Plaintiffs have

6   that burden as well, obviously.  I mention that not to suggest

7   that the burden is disproportionate in some respect, but to

8   say that there is a lot of work that is going on behind the

9   scenes with all of these new filings and the work that has to

10  be done with the new filings, that is happening really

11  separate and apart from the work that the parties are doing

12  currently on bellwether trial preparation.

13          THE COURT:  Uh-huh.

14          MS. PIERSON:  So a lot of people involved --

15          THE COURT:  Sure.

16          MS. PIERSON:  -- doing a lot of different things to

17  meet the demands of these Plaintiffs.

18      Any questions, Your Honor?

19          THE COURT:  No, not really.

20          MS. PIERSON:  Thank you.  That is all we have in

21  terms of an overview of the MDL.

22          THE COURT:  Okay.  Gentlemen?  Joe?  Ben?  Mike?

23          MR. HEAVISIDE:  (Inaudible) overview of the MDL.

24          THE COURT:  All right.  All right.  Motion for state

25  court coordination is the next item I see.

8

1          MS. PIERSON:  Thank you.  Your Honor, if you don't

2    mind, I will go first with Cook's motion.  We filed a motion

3    outlining the reasons why we think state court coordination is

4    appropriate.

5          THE COURT:  Yes.

6          MS. PIERSON:  And as Your Honor knows -- John, could

7    you take that slide down?

8          As Your Honor knows, it is quite common in MDLs for a

9    judge in your position to issue an order that encourages

10   coordination between the MDL and state court cases.  Certainly

11   all of the treatises that deal with best practices for MDL

12   encourage coordination with state courts.  We have cited in

13   our papers a number of other MDLs in which courts have entered

14   similar orders to what we have proposed to you.

15         The order that we have submitted to the Court is based on

16   the order that was entered by Judge Pallmeyer in the Nexgen

17   MDL, but it also tracks very closely with the order that has

18   been entered by Judge Kennelly in the testosterone MDL.

19         And you can find similar orders in the Actos MDL and

20   Syngenta, in the Durom MDL, and a number of others.  There is

21   a lengthy list of MDLs in which courts have entered similar

22   orders that are cited in our brief.

23         Cook acknowledges in our brief in here that, of course,

24   this Court does not have the ability to dictate what happens

25   in state, state courts and vice, vice versa.

9

1           THE COURT:  Being a former state court judge, I

2   understand that.

3           MS. PIERSON:  And we are not asking you to do

4   something that you can't do.  We won't ask them to do

5   something that they can't do, but the purpose of coordination,

6   obviously, is to encourage efficiency between the cases.  And

7   efficiency and fair treatment of the claims ought to be a goal

8   of both our state and federal courts.

9           THE COURT:  Do you have any knowledge on any of the

10  state cases, their status?  Are any of them on the eve of

11  trial?

12          MS. PIERSON:  Yes.

13          A VOICE:  Your Honor, if I may, there is a case

14  called Kennington, which is a Cincinnati --

15          THE COURT:  Sure.

16          A VOICE:  -- which has a trial setting for next

17  June.  That is the only case to my knowledge that is set.

18  That is a case, the reason it can't be removed is they sued

19  the doctors as well --

20          THE COURT:  I see.

21          A VOICE:  I think that is the only case that is set.

22          MS. PIERSON:  That's correct, and actually, that

23  makes the timing of this coordination order, I think,

24  particularly appropriate to issue an order like this and to

25  encourage communication between you and the state court judges

1    and the parties in that litigation.  It, it -- it best happens

2    if it happens early in the process.  And that is really where

3    we are, both in this MDL and in the state court proceedings in

4    terms of scheduling.

5        The order that we have proposed would allow Cook and the

6    Plaintiffs in those cases to access the documents that have

7    been produced in the MDL so that there is an efficiency in

8    terms of discovery.  It would encourage the state court judges

9    to encourage the parties to work cooperatively to use and

10   access both the written discovery and the depositions that

11   have occurred thus far in the MDL.

12         THE COURT:  Has any of that occurred yet just

13   voluntarily between you and any of the state court --

14         MS. PIERSON:  Where there is overlap between the

15   attorneys, the cases aren't far enough along for that to have

16   happened yet.  But I would say where there is overlap in the

17   attorneys, we certainly expect that the parties will work

18   cooperatively.

19         THE COURT:  Okay.

20         MS. PIERSON:  There are a number of state court

21   cases that have been filed by attorneys who don't have any

22   cases in the MDL.  So to their benefit, it would allow them

23   access to materials in depositions that we use in the MDL.  We

24   would be working together to the extent that depositions were

25   taken in one proceeding or the other that they could be used

1  in both proceedings.

2      So it gives really the parties the opportunity, and the

3  order encourages the judges in those proceedings to encourage

4  the parties in state court to work cooperatively and achieve

5  efficiencies between the two proceedings.

6      As mentioned in our brief, there are some things that

7  have happened already in the MDL that suggests the Plaintiffs

8  are open to coordination, and certainly, their responsive

9  brief indicates that they are in isolated circumstances.  Our

10 view is that dealing with issues of coordination on a one-off

11 basis from now until this MDL concludes is really not the

12 correct approach, but that instead, it would be more

13 appropriate for you now to send a letter to the state court

14 judges indicating the presence of the MDL and a desire to work

15 together.

16     If there are specific tasks that the parties and you

17 believe will be appropriate for coordination that are not

18 covered in this order, there is nothing that prevents this

19 Court and the parties from agreeing later to do a more, a

20 second communication to state court judges or to work

21 cooperatively independently.  This is really the opening salvo

22 to state court judges to encourage those courts to work with

23 this MDL and to encourage the litigants in those courts to

24 work together.

25     I have had a chance to look at the Plaintiffs' response

12

1    brief, and I will just make a couple of comments.  The primary

2    argument from the Plaintiffs' perspective seems to be that

3    there is an issue of due process somehow, but there is nothing

4    about coordination that in any way violates the Plaintiffs'

5    rights to due process.

6        Of course, a state court judge could choose to enter a

7    schedule that doesn't track the schedule in this MDL.  Of

8    course, the state court judge could choose to order Cook to

9    put witnesses up for second depositions in the state court

10   proceeding when they have already been put up in this

11   proceeding.  There is nothing about this order that is

12   mandatory.  So, of course, there is no way that a Plaintiffs'

13   state court due process right could be violated by the order.

14       You know, in addition to all of that, the manuals that I

15   have mentioned, the manual for complex litigation, there is

16   this very good article out of Duke that talks about best

17   practices in MDLs.  All of those treatises, and many of the

18   courts who have entered similar coordination orders, they have

19   addressed this question of due process and have come to the

20   conclusion rightfully so that there is nothing about

21   coordinating that isn't some way violative of a plaintiffs'

22   rights in state court.  Rather, quite to the contrary, it

23   ensures that plaintiffs have access to materials that are, are

24   produced and handled in the MDL and vice versa so that there

25   is efficiencies on both sides.

13

1          I would say just one last thing, Your Honor, about the
2     response.  The Plaintiffs' response does not include any
3     notations of courts in circumstances similar to yours that
4     have refused coordination, and there is a reason for that.
5     The reason is that judges in your position, if the parties do
6     what they should do, which is to present the issue to you
7     early on and at a time when coordination can still be
8     beneficial, it, it is the right thing to do.

9          It is the right thing to do in terms of fairness for the
10    parties in state and federal court and the right thing to do
11    in terms of achieving efficiencies both for the parties and
12    for the courts that are overseeing these matters.  That is my
13    belief why coordination is routinely entered, and we would
14    ask, Judge Young, that you do the same here.

15              THE COURT:  Thank you.  Mr. Williams?

16              MR. WILLIAMS:  May it please the Court.  The state
17    court plaintiffs already have access to everything that is
18    going on in this MDL.  Back in March, Judge Baker signed a
19    common benefit -- signed a common benefit order which allows
20    state court plaintiffs access to the discovery materials in
21    this case as long as they sign on to the protective order in
22    the common benefit agreement.

23         So I think we need to look at what Cook's true motivation
24    is here, and I think they tell us in their brief on page 5
25    when they tout the reasons coordination is necessary.  They

1   say, "The parties may spend significant time and resources

2   testing claims and defenses of specific state court cases that

3   are not easily applied to the litigation as a whole.  While

4   the limited resources of the parties and is most often

5   important in these matters, the witnesses are diverted from

6   the bellwether process."  I think what that broadcasts is what

7   Cook wants to do is effectuate something from this Court that

8   will have state courts have their trial courts -- or trial

9   schedules stand down in favor of the bellwether process.

10      And while the statement that "no due process is violated

11   in these situations," it makes me think of when this Court

12   ruled on the bellwether selections.  The Court was very

13   deliberate in finding cases that were selective -- or

14   selecting cases that were representative of the cases of the

15   whole.  Not looking for outliers, not looking for cases where

16   injuries or damages were far too low or injury or damages were

17   far too high looking for representative cases.

18      So what do we tell then, for example, Andrew Kuhn who has

19   a state court case in Pennsylvania who couldn't participate in

20   this MDL because he has viable claims against his treating

21   physician and there was no diversity, who has what Cook would

22   call an "outlier injury."

23      He was 22 years old, had a strut that broke, got lodged

24   in his heart.  He had one open heart surgery.  The physicians

25   couldn't retrieve the strut or find it, and they have told him

1  now that that strut is most likely going to have to stay in

2  his heart because it is too dangerous to reopen.

3       What Cook wants to say, I think, is I am sorry, but there

4  are cases in several states away that you couldn't participate

5  in because you have claims against your doctor, so you are

6  going to have to wait a year, maybe two years before you get

7  your day in court.  Andrew Kuhn -- in fact, all the state

8  court plaintiffs have due process rights to have their cases

9  heard and have them heard on a schedule that is dictated by

10 the state courts.

11      But if Cook is right in their motion, I think that right

12 goes away.  And how that happens is because Judge Young,

13 respectfully, the state courts will listen to you.  They will

14 follow your guidance, whether that guidance is express or

15 implicit.  They know that the JP, MDL asked you to shepherd

16 what is now over 900 cases in this federal system through the

17 pretrial and bellwether trial process.

18      If you look at the letter that Cook drafted for Your

19 Honor, that they want Your Honor to send to the state courts,

20 it says that there have been 18 corporate depositions so far,

21 that there are 900,000 documents that were produced, and I

22 think Cook meant to say 900,000 pages.

23      There have been multiple case management orders entered.

24 There has been multiple protective orders entered, there has

25 been privilege designations, there has been bellwether trials

16

1  that have been set.  Respectfully, what I think the state

2  court judges will hear when they read that letter is, we have

3  got this case under control in the federal courts, and we

4  would like -- we would like you to fall in line with the

5  schedule that we are proposing.

6      Just a couple months ago I was appearing in a state court

7  case against Cook for a filter issue over in Marion County in

8  front of Judge Osborn.  And, of course, that case couldn't

9  have been filed here because it was an Indiana resident, and

10  Cook being an Indiana defendant, there was no diversity.

11  Rather than entering a case management order in that case,

12  Judge Osborn asked, well, let's wait and see what happens in

13  the federal court settlement conference that was held before

14  Judge Baker several months ago.

15      And I think if this letter gets sent, that is what the

16  state court judges are going to do, they are going to defer to

17  this case and to this Court.  And we know that that is what

18  Cook wants to do because they told us that on page 5 of their

19  brief.

20          THE COURT:  Well, that was the purpose of my

21  question earlier as to what was the status of some of these

22  state court cases, whether they are on the eve of trial or

23  what.  I mean, at least my position would be, if I was a state

24  court judge, if I had a trial that -- a Cook case that was

25  ready to go to trial, I would try it no matter what was going

17

1   on in the federal court.  I don't think if I —— if I do follow

2   what Cook wants to do and send out a coordination order and

3   letter, I will certainly include in something like that that

4   this is not intended in any way to disrupt any type of trial

5   schedule in the state court system.

6           MR. WILLIAMS:  And Your Honor, that brings up a good

7   point.  The Plaintiffs are not, in concept, adverse to

8   coordination.  In fact, we have already agreed to do it with

9   regard to discovery, but when we enter —— if we were to

10  enter —— the Court would enter what Cook wants as kind of

11  general discovery, general discovery —— general coordination

12  order, that suggests and is, I think, intended to encourage

13  the state courts to pull back and allow the bellwether cases

14  in this, in this MDL to proceed.  You know, a general

15  coordination order raises some other problems too, because

16  these state court cases are governed under different

17  procedural rules.

18      You know, I think in their motion they talk about, you

19  know, maybe joint hearings and the order that they have

20  proposed to Your Honor mandates the Plaintiffs' counsel may

21  then, Mike and David, stay in continuous contact with all

22  state court lawyers and advise them of motions, hearings,

23  scheduling issues in this case.

24      Just, for example, in Indiana, which there is going to

25  be —— there is already, I think, 15 or so cases in state

1  courts in Indiana with Indiana residents as plaintiffs.  You

2  know, a couple of years ago Chief Justice Rush said in her

3  Hughley decision, "Indiana's summary judgment procedure is the

4  opposite of what summary judgment procedure is in federal

5  court.  It is much more adverse to the entry of summary

6  judgment."

7       In Indiana, our courts have said that we are not bound

8  by Daubert and its progeny.  In fact, our courts have said

9  there is no specific test on the admission of expert

10 testimony.  So I question what utility held in joint hearings

11 in those types of situations would yield.

12      So what I think what the Plaintiffs would suggest that we

13 do and what we can coordinate on is, for example, discovery,

14 which we have already done.  And there is no need to enter a

15 separate order on that, and it is in all of our interests to

16 assist each other.  In fact, considering that we have got a

17 lot of these state court cases ourselves and speaking

18 ourselves to the PSC to facilitate and ease in the discovery

19 process in those cases.

20      We don't need another order for that, we already have

21 one.  We can still cross-notice depositions in state court

22 cases and federal court cases, which is done in MDLs all the

23 time.  Rather than a general coordination order, we think

24 these issues should be dealt with one at a time.  If Cook

25 believes or if the Plaintiffs believe that there is a specific

1   issue that would benefit from federal state court

2   coordination, we should raise that issue one at a time and

3   allow, particularly the Plaintiffs' counsel, to evaluate the

4   issue in context and say, is this really beneficial to the

5   state court plaintiffs that we represent?

6          THE COURT:  For example?

7          MR. WILLIAMS:  For example, if they were to say

8   well, you know, we are going to move to exclude a causation

9   expert, and then we could come in and analyze that situation

10  and say, well, the state court is at issue here.  We may be

11  using this same expert, apply wholly different standards.

12  There are different facts and issues that are necessary for

13  the state court judges to make that decision, and there is no

14  utility.  There is no, there is no assistance in that type of

15  coordination.  I think to do anything else will chip away at

16  the due process rights of the state court plaintiffs and the

17  notions of federalism.

18      There is a mention of the Actos MDL that Judge Doherty

19  had or still has, I believe, and in an opinion that is cited

20  in Cook's brief, she quotes the United States Supreme Court.

21  It says:  "The national Government will fare best if the

22  states and their institutions are left free to perform their

23  separate functions in separate ways," which I know is not a

24  concept that Your Honor would disagree with.  But I think that

25  keeping that in mind, we can't request efficiency when it

20

1    costs the sacrifice of due process or fundamental rights of

2    those folks who had their claims in state court.

3         And so before I conclude, Your Honor, there was just one

4    more thing I needed to mention.  In the order, another reason

5    we -- this order that Cook proposes shouldn't be entered, it

6    places the -- they attempt to place a very large discovery

7    burden on the PSC, meaning Mike -- I am sorry, Mr. Heaviside,

8    Mr. Martin, Mr. Matthews, and myself.  They request the Court,

9    in that order, to order us, as lead counsel, to respond to

10   discovery requests that are served to Cook in the state

11   courts.

12        They suggest that they tell the PSC, the four of us, what

13   they want to produce in response to state court discovery

14   requests, and then the burden would be on Plaintiffs' counsel

15   to respond to that discovery.  And before I sit down I just

16   wanted to say that we have a specific objection to handling

17   their state court discovery.  But unless Your Honor has any

18   other questions, we would ask that the motion be denied.

19             THE COURT:  All right.  Thank you, Mr. Williams.

20             MS. PIERSON:  Final reply, Your Honor?

21             THE COURT:  Sure.  Reply, Ms. Pierson?

22             MS. PIERSON:  Just a couple of points in response to

23   Mr. Williams.  First, Mr. Williams mentions a couple of times

24   that because there is a common benefit order, that somehow we

25   don't need a coordination order.  It is probably not a

1  surprise to you to know that the common benefit order does not

2  benefit Cook in any way.  The common benefit order benefits

3  only the Plaintiffs' lawyers.

4       So while it allows them to essentially tax one another in

5  state court or federal court to the extent that materials are

6  used and shared between those lawyers, there is nothing about

7  the common benefit order that enables Cook to in any way

8  achieve any efficiencies between the cases.  A coordination

9  order is entirely different than a common benefit order.

10      A coordination order like this would give Cook the

11  ability to say to the state court, look, to the extent that

12  there have been depositions taken in the MDL proceeding and

13  those depositions have not been cross-noticed, we would ask

14  that you, state court, allow the Plaintiffs to use these

15  depositions if they choose to use them.  The state court could

16  allow the Plaintiffs in those cases to take a second

17  deposition if they want to, but it really encourages the use

18  of discovery that we have already done in this MDL.

19      Likewise, absent a coordination order -- or speaking of

20  the common benefit order, the common benefit order, for

21  example, doesn't do anything to address the issue that Cook

22  will face, which is redundant discovery between this

23  proceeding and state court proceedings.

24      Could a state court judge still allow a plaintiff to

25  serve redundant discovery if they choose to?  Yes, they could.

22

1   But informing state court judges of the fact that there exists

2   discovery that has already been taken and that plaintiffs have

3   access to that discovery, it helps to encourage the parties to

4   work together and with the state court to avoid redundant

5   discovery.

6          THE COURT:  Well, wouldn't that be done in any case,

7   if you are defending a state court, in a state court case and

8   plaintiff requests a deposition, couldn't you tell and inform

9   the state court judge that, hey, this deposition has already

10  been taken and they are free to have it?

11         MS. PIERSON:  We could, on a one-by-one individual

12  basis issue by issue by issue by issue.  And we will still

13  have to address some of those issues individually.  All the

14  coordination order asks you to do, Your Honor, is to send a

15  letter to state court judges letting them know this is out

16  there.  This MDL is out there.  Here is what has been done,

17  and issues may come up from time to time in your litigation

18  where there is the ability and need to think about what has

19  already been done.  It is the opening salvo.  It is not the be

20  all, end all of what happens with respect to coordination.

21         The primary argument that I heard Mr. Williams make was

22  that coordination order is just simply too heavy handed with

23  state court judges, and I disagree.  If you look at the

24  content of the letter, it is not at all heavy handed, and

25  candidly, there is no one in this courtroom that can make a

1  state court judge do anything that they choose or don't choose

2  to do.

3      The act of somebody else, great example of that, although

4  there was a coordination order and a very positive

5  coordination there.  In fact, the court there noted that

6  coordination is advised, encouraged, and welcomed by both the

7  federal and state courts.

8      There were still state court cases that proceeded to

9  trial during the pendency of the MDL.  So a Louisiana state

10  court judge chose to do just that.  So there is nothing that

11  prevents state court judges from advancing their own trials if

12  they choose to.  We are early in the process, so we have the

13  opportunity to reap the benefits of efficiency, and while

14  Mr. Williams' description of Mr. Kuhn is very dramatic, the

15  fact of the matter is that an answer has not even been filed

16  in that case yet.  It is incredibly early in the process, and

17  the judge there can decide to advance the Kuhn case ahead of

18  this MDL or for it to follow the MDL.  He, he will make the

19  decision that is right for Mr. Kuhn and for Cook in that case.

20  I trust that well.

21      Your sending a letter to judges informing them of the

22  existence of this MDL and where the MDL stands, I believe,

23  will be interpreted as it is intended, which is informative,

24  opening the lines of communication between you and those

25  judges and encouraging all of us to think globally about how

24

1    can we be efficient, and how can we be fair?

2        Just a couple of last points, Your Honor.  There are nine

3    Indiana state court cases today, a slightly different number

4    than what Mr. Williams mentioned.  The difference between nine

5    and 15 is not the point, but I say that to tell you there are

6    nine plaintiffs in Indiana.  Remember, there were 186 total

7    across the state court cases.  So mini coordination in the

8    State of Indiana, that alone will not solve the issue.  There

9    really is a need to open a channel of communication nationwide

10   as it relates to this litigation.

11       When Mr. Williams raises the point of handling issues,

12   issue by issue, things like Daubert, we will still have to

13   handle those issue by issue.  If either party thinks that

14   joint Daubert hearings, for example, are a good thing, this

15   order doesn't prevent that.  But instead, it opens the door so

16   that the first time a state court judge hears from you about

17   maybe we should have a joint Daubert hearing.  It is not 12

18   months down the road, but instead, is today.  Our hope is that

19   there will be communication between you and the judges and the

20   state court proceedings, and to the extent that the letter

21   that we proposed in your view is somehow heavy handed, you can

22   modify that letter, of course.

23       The Plaintiffs' response includes no specific changes to

24   the letter or to the order whatsoever, but Your Honor has the

25   ability to modify that.  The letter includes the status of

25

1   this MDL in terms of what discovery has been taken,

2   depositions and documents produced.  But if Your Honor views

3   that as too heavy handed, take that part out.

4        Instead, Cook will inform this, each of the state courts

5   about that, but I think the state court judges would

6   appreciate hearing from you and your position as to what the

7   status of the MDL is.  Those are just facts.  They are not

8   conveyed in the letter in any kind of heavy handed way.  Thank

9   you, Your Honor.

10             THE COURT:  All right, thank you.

11        Mr. Williams?

12             MR. WILLIAMS:  Your Honor?  In suggesting that the

13   state courts are free to do whatever they want to do because

14   they have, you know, they are judges of a separate sovereign,

15   I think in concept, is fine.  The order that they ask this

16   Court to enter says the court encourages state courts with

17   actions to adopt this order or a similar order.  The Court

18   also encourages the parties in those state court actions to

19   agree to abide by the terms of this order.

20        Those statements, in conjunction with a letter coming

21   from Your Honor, I think respectfully will be interpreted by

22   state court judges as if even out of a notion of comity or

23   respect amongst judges, Judge Young is running his MDL, and it

24   seems to be going well.  I am not going to do anything at this

25   point because I don't want to frustrate the hard work that is

1   going on in the federal courts.

2       And while that is a good -- it can be considered a

3   laudable notion in some respects, that is when the rubber

4   meets the road with regard to individual plaintiffs and their

5   rights to press their cases and get before a jury so that

6   their claims can be heard.

7           THE COURT:  What would the harm be if I sent a

8   letter to the state court judges just informing them, bringing

9   them up to date on the MDL, 918 cases?  We are coordinating

10  all of these cases in the MDL, this is some of the stuff, some

11  of the procedures that we have already implemented in this

12  MDL, and I am writing to advise you of what we are doing and

13  take a look at these procedures and case management plans and

14  other things that we have done.  If it looks good to you,

15  happy to have you do it.  If you have got your own procedures

16  in place and you want to use those, that is fine, too.

17      Just wanted to open up a line of conversation here

18  between us.  If you have got concerns about your cases and I

19  have got concerns about mine or the lawyers on either side

20  would sit down and discuss, certainly understand.  I can tell

21  them I was a former state court judge myself, that I

22  understand that they run their docket, and certainly any

23  suggestion of the MDL taking precedent or asking the state

24  court cases to stand down is not intended, something along

25  those lines just to -- what would that hurt?

27

1          MR. WILLIAMS:  If that communication, Your Honor, I
2     think came by way of a phone call, I don't know that it would
3     hurt.
4          THE COURT:  I am not going to make that.
5          MR. WILLIAMS:  No, I understand, I understand.  But
6     there is something about a letter coming from the federal
7     court and the federal judge in charge of this MDL that
8     has -- if this order gets entered, states that you are --
9          THE COURT:  I am not saying that I would issue that
10     particular order.
11          MR. WILLIAMS:  My, my fear is that any written
12     document from this Court talking about what is happening here
13     will be read -- no matter what, no matter what I -- and this
14     is just what I believe.
15          THE COURT:  You are not saying it would give state
16     court judges an excuse not to work on the case, right?
17          MR. WILLIAMS:  That is not what I am saying at all.
18          THE COURT:  Okay.  All right.
19          MR. WILLIAMS:  But if, if the state court judge is
20     aware that the federal judge in this case is managing almost a
21     million pages worth of documents and tens upon tens of
22     depositions and all of these other complicated issues, they
23     may very well be inclined to see how that case develops rather
24     than push their case to trial even if that is the plaintiffs'
25     desire.

1          THE COURT:  Yes, give them an excuse not to work on

2    it.

3          MR. WILLIAMS:  That is it -- that is not -- I

4    appreciate Your Honor's insight.  If I can have one moment,

5    Your Honor.

6          THE COURT:  Sure, sure.

7          MR. WILLIAMS:  That is all I have, Your Honor.

8          THE COURT:  All right, thank you.

9          MS. PIERSON:  Your Honor?  (Inaudible)coordination

10   orders from other (inaudible) you would be welcome to look at.

11         THE COURT:  Sure.  Please.  Okay.  Is that all on

12   this?

13         MS. PIERSON:  That is all.

14         THE COURT:  Okay, all right.  I will take a look at

15   all this and get something out.  Okay, thank you.

16         A VOICE:  Your Honor?

17         THE COURT:  Yes.

18         A VOICE:  If you wouldn't mind reading to me the

19   docket entry on the Syngenta GM2 orders?

20         MS. PIERSON:  I will do that.

21         A VOICE:  Okay.  I just want to make sure we have

22   them.

23         MS. PIERSON:  (Inaudible).

24         THE COURT:  Okay.

25         MS. PIERSON:  The next issue I will present, Your

1 Honor (inaudible).

2        THE COURT:  Yes, proposed case management plan.

3        MS. PIERSON:  Your Honor —— couple slides that lay

4 out the deadline.  We can do that (inaudible) case management

5 plan by e-mail (inaudible).

6        THE COURT:  I have got, I have an e-mail from you I

7 think from this morning ——

8        MS. PIERSON:  Yes.

9        THE COURT:  —— regarding some corrections.

10        MS. PIERSON:  Yes.  We conferred late yesterday.  So

11 we have not yet supplied to the Court the actual text of the

12 order, but we will do that after the hearing today.

13        THE COURT:  Okay.

14        MS. PIERSON:  We were able to reach agreement on

15 what the schedule ought to look like for Hill, but we can use

16 some direction from Your Honor as it relates to the Gage and

17 Brand cases.  So I have put together in just a quick couple of

18 slides so Your Honor can see an overview of what we are going

19 to be doing in the Hill case in the next few months.  We will

20 spend this fall doing fact discovery, written discovery,

21 depositions of Plaintiffs.

22     We are in the process of collecting medical records

23 currently for Miss Hill, and then there will be depositions of

24 the treaters and fact witnesses.  These, these cases, unlike

25 some, some others that Your Honor may have handled or that I

30

1   have handled, these cases have a lot of fact witnesses.

2        They are frequently multiple doctors from different

3   disciplines who treated the plaintiffs in these cases.  The

4   Hill case is a good example.  There are nine different doctors

5   who will testify on core issues in the case and may cross a

6   number of different disciplines.

7        So we will spend this fall doing that good work.  The

8   Plaintiffs would disclose their experts in January.  We will

9   disclose our experts and request IMEs in February and March.

10  Our hope is that we will be able to take the Plaintiffs'

11  experts' depositions between January and March, and then

12  between March and May the Plaintiffs will be taking the expert

13  witnesses of Cook.

14       Again, just to give you a picture of what will be

15  happening during that period of time, Your Honor, our estimate

16  is that the Cook side will have probably between six and ten

17  different experts in these cases.  I can't speak for

18  Plaintiffs.  I know that the Bard Plaintiffs, in requesting

19  the creation of an MDL there indicated they believe that those

20  cases would take ten expert witnesses on the Plaintiffs' side.

21  But these fine lawyers probably have an ability to streamline

22  their side more than that, but I will let them speak to it.

23       Regardless, we are talking about a lot of experts and a

24  lot of expert depositions that have to happen in the two,

25  60-day time periods that are described here.  Cook

1  will -- both sides have the ability to file motions for

2  summary judgment and Daubert, of course, and that will happen

3  by June the 9th, really, a very quick turnaround from the time

4  that expert discovery closes.

5       So under the local rules of this Court, briefing will be

6  complete on motions for summary judgment and Daubert on July

7  the 29th.  Presumably the Court will order a hearing on those

8  motions which are likely to be very extensive, and then the

9  case should be trial ready by October of 2017.

10      That gives Your Honor 90 days to address the motions in

11  this case, which as I indicated at the last hearing, we

12  anticipate will be extensive, particularly for the first

13  bellwether trial.  So sorry about that in advance, and

14  hopefully 90 days will be enough for you to do the good work

15  that you need to do.  That is the schedule that we have agreed

16  to in Hill.

17            THE COURT:  Okay.

18            MS. PIERSON:  Okay.  As it relates to Gage and --

19            THE COURT:  Mr. Williams or Mr. Martin, anything to

20  add to that?

21            A VOICE:  Yes, Your Honor.

22            THE COURT:  Okay.

23            MS. PIERSON:  Sorry.

24            A VOICE:  So with respect to, with respect to this,

25  there are several aspects, Your Honor.  Shall I just start

1    from the beginning?

2          THE COURT:  Well, Miss Pierson said this is what the

3    parties have agreed to, and I -- when I asked you if you had

4    anything to add, I thought you would say, Judge, that is our

5    agreement.

6          A VOICE:  No.  I -- and I don't want to -- we do

7    have an agreement on a lot of dates.

8          THE COURT:  Okay.

9          A VOICE:  We don't have agreement on a couple of

10   very important issues that -- I don't want the Court to be

11   under the misunderstanding that we are agreeing -- that, for

12   instance -- I will give the Court a for instance.  That Hill

13   case management plan, we don't agree that this should be the

14   Hill case management plan.  We believe this should be the

15   Hill, the Brand, and the Gage case management plan because all

16   three of those cases need to be worked up over the next year.

17         THE COURT:  All right.

18         A VOICE:  Not just Hill, and there, there are

19   numerous reasons for it.  First would be if Hill happens to

20   settle or it -- now, and I believe that Cook will tell the

21   Court and has told us we are not going to settle Hill, but

22   things do change.  We don't know what is going to happen in

23   the next year with Mr. Hill.  I think it is Mr. Hill; is

24   that -- Elizabeth Hill.  Okay.

25         We don't know how, how she is either going to or not

33

1   going to go forward to the end.  Now, we believe that it will

2   be tried, and we believe that at this point there is no reason

3   to believe that it will not.  However, it could go away.

4        Secondly, it -- we are already suggesting now a court

5   date in October.  Now, I guess it is 13 months, 13 months

6   away.  And if we work up that one case, and Hill is a defense

7   pick, and it was the one that was ordered to be the first

8   trial, then we are essentially giving up a year of, of being

9   able to work those two cases up.  And it is not going to be

10  that much more significant work, it is just work that needs to

11  be done.

12       It would be, I think, a travesty if we got -- well, it

13  would be a travesty if we got there and Hill was no longer the

14  case.  We would have nothing to back us up.  Now secondly, and

15  I think it is going to be said, you know --

16            THE COURT:  I don't mean to interrupt, but if I set

17  aside three or four weeks to try Hill and it, and it is

18  resolved, I am going to want to have something ready to go to

19  fill that three or four weeks.  Because, on my docket, to find

20  you another three or four weeks, would put you probably in

21  the mid-to-late 2018.

22            A VOICE:  Right, if we start over.

23            THE COURT:  Right, yes.  So I understand what you

24  are saying, and certainly, I would want to make sure that if

25  we do have set aside basically October to try Hill, that if

1    that case is not ready to go or is not going for whatever

2    reason, I would want something in this MDL to fill that time

3    slot.

4             A VOICE:  Right.

5             THE COURT:  Our docket is just too busy to, to give

6    up three or four weeks of schedule.

7             A VOICE:  To further give the Court some comfort

8    that it would be efficient and fairly simple to do this, to

9    prepare all --

10            THE COURT:  Remember the old days in federal court

11   when some of the judges would ride the circuit because there

12   wasn't a resident judge in that courthouse, and the judge from

13   Dallas or wherever would go down to wherever and say okay, we

14   have got six cases here that are set for trial.  If this one

15   settles, you are going to try this one.  If this one settles,

16   you are going to try this one.  You have to use your time

17   efficiently.

18            MR. MARTIN:  I think that is largely from where I

19   practice in Dallas, it is largely how the state courts even do

20   it, you know.

21            THE COURT:  Yes.

22            MR. MARTIN:  One goes away, you have the next one

23   up.

24            THE COURT:  Right, right.

25            MR. MARTIN:  But I think further comfort is the fact

35

1   that there are, and we are agreeing to some limitations on the

2   numbers of witnesses, the fact witnesses to be deposed.  I

3   think that the, that the --

4           THE COURT:  Stipulations?

5           MR. MARTIN:  -- two fact witnesses, you know --

6           THE COURT:  Surely there will be a bunch of

7   stipulations here, I would imagine.

8           MR. MARTIN:  Yes.  We have got very limited

9   discovery on case specific.  We will have, you know, an

10  implanting physician and a sales representative probably and

11  maybe a regional manager or something.  And we have -- and

12  then there will be the damages witnesses for that, particular

13  experts for that particular case if there are any damages

14  testimony such as economic damages and economists or a life

15  care planner.  There may not even be an economist and a life

16  care planner in these cases, given what these cases are about.

17      However, I can, I can foresee that in Gage there might be

18  a life care planner and things, but anyway, largely -- well, I

19  want to point out that largely the experts that we will have

20  and we will name and we will provide reports on will be

21  general -- they will write a general report.  And then with

22  respect to the experts, for instance, it might be an

23  interventional radiology expert that is going to talk globally

24  about these things, about whatever their opinions are about

25  the product and to the extent that they have knowledge about

1   those particular areas.

2        There may be, for instance, a hematologist that may talk

3   about -- those are going to be probably not only these three

4   cases will benefit from them all but can be named -- will be

5   named in all three.  But they will have probably precisely the

6   exact same report on each case on the general area.

7        In case specific the way I have seen it done and the way

8   I know it is being done in the TVM litigation, I have taken

9   some recent depositions myself in those cases of the case

10  specific experts.  What happens is, the expert will draw up a

11  report.  If he has an opinion as to -- I am talking about

12  defense experts now -- defense experts that I will be deposing

13  will draw up a report, and then it will say, this is my

14  general report.

15       And then if there is -- if he or she is going to testify

16  as to that case, a case, bellwether case, then they will have

17  an addendum.  I would call it an addendum on the report or a

18  separate report that is literally called case specific report.

19  So the only ones we have, because we only have three trial

20  cases, then it should work very easily.

21       Your Honor, you know, and I believe this is covered

22  within the agenda.  We do have three cases.  The first one is

23  a Plaintiffs' pick, and when the Court is making its

24  determination as to which case should go next, either after

25  Hill or possibly in place of Hill if something happens to

1  Hill, we believe that it should be the Plaintiffs' pick,

2  Brand, and we believe that would be a fair way to -- because I

3  think we are going to need to look at it pretty quickly if not

4  now.  Put the Plaintiff pick next, and the third case is

5  another defense pick.

6       So if we know that Brand and Gage would go in that order,

7  then we can also then talk, talk about -- or whatever the

8  order is, we can also then maybe talk about how to go about if

9  Hill does get tried, okay?  And we presume that it will, then

10 when will the next trial setting be?

11      If we have worked these cases up such that they are all

12 going to be ready in case Hill does not go or settles or

13 dismisses his case, then there is no reason why to, we

14 believe, to have a significant difference and a significant

15 lag in time until the next trial.  If October, for instance,

16 is Hill and it goes -- and I don't think it will be a

17 four-week trial, but, you know, it might.  Maybe it will be a

18 two-week trial, could be three.  I don't think it will be a

19 four-week trial, but whatever it is.

20      Then we get through the holidays and maybe have the next

21 one up November, December, January, have that one teed up and

22 try it in January, and then try the next one in April.  I, I

23 think that kind of a quick one, two, three, if they all go,

24 and I think everybody expects them all to, we can really make

25 some progress in putting a value on the case as a whole, which

1  I think is, is the purpose of the bellwether trials in an MDL

2  anyway.

3      So that would be kind of my suggestion, Your Honor, that

4  we -- we work them all up, and we have got plenty of folks to

5  do it.  We have, I think 23, 24 folks on the Plaintiffs

6  steering committee that are chomping at the bit to do

7  something, and their law firms are chomping at the bit to help

8  and are enthusiastic about these things.  And, of course, we

9  know -- we know the abilities and the numbers that Cook has

10  two different law firms that are fine law firms and have a lot

11  of lawyers already on these cases.

12      We can certainly work up three cases at the same time so

13  we don't end up wasting a year if something happens.

14          THE COURT:  Thank you.

15          MR. MARTIN:  Even if Hill goes, if we don't work up

16  the other ones, we are not going to be able to try another

17  one, you know, fairly soon thereafter.  So thank you for your

18  free time this morning, Your Honor.

19          THE COURT:  Sure.

20          MS. PIERSON:  Your Honor?  I promise, Your Honor,

21  this is the last issue I will address, and then you will hear

22  from one of the finer lawyers on this side of the table or

23  multiple.  Just a couple of responses.  The reason I raise

24  this issue with you today, Your Honor, as here is the schedule

25  that we have agreed to in Hill, but we would ask for some

1  direction on the other, other cases and what your preferences

2  are.  And even what you have said so far is very helpful.

3      I think that the best solution coming out of today, once

4  we, with Your Honor's permission, once we understand what your

5  preferences are, is for the two sides to confer again and do

6  much like we did in Hill and come up with a schedule that we

7  think is workable.

8      A couple of just points as, as an opening matter, though,

9  Your Honor.  We are not suggesting that Your Honor set the

10  Hill case for trial, wait around until October of 2017 and

11  then all of a sudden we work up another case for trial.  It

12  wouldn't be efficient for the Court, it wouldn't be efficient

13  for the parties.  It is not at all what we have in mind, but

14  the fact of the matter is, that these are big cases.  They,

15  they are important cases to both sides, and they are very,

16  very fact intensive.

17      As I mentioned to you, the numbers that we were talking

18  about on Hill in terms of nine different disciplines of

19  doctors, potentially ten experts on each side.  You have got

20  six fact witnesses that are involved in addition to the

21  doctors.  The numbers, when you look at Gage and Brand, are

22  also very similar.  So preparing one of these cases, even just

23  for the summary judgment stage and expert stage, that will be

24  a tremendous amount of work.  I mean, it literally is not

25  possible for Cook to simultaneously do discovery in these,

1  these three cases on the same schedule.

2      It is possible, though, and we are prepared to put all

3  the manpower and resources that we need to do this.  It is

4  possible for us to run parallel tracks of discovery on the

5  three cases with staggered deadlines just as Your Honor would

6  try these cases presumably in a staggered fashion.  And, you

7  know, my experience in some other MDLs has been that the

8  first -- the break between the first bellwether trial and the

9  second bellwether trial is helpful for the parties and the

10  Court.

11      It gives Your Honor an opportunity to rule on motions or

12  consider issues, get your staff a chance to catch up on the

13  other matters on their, on their own docket, and it gives the

14  parties a chance to streamline their cases so that we all

15  learn from the first bellwether trial.  And we will all do a

16  better job in the second bellwether trial by virtue of having

17  done the first bellwether trial.  It forces all of us to

18  narrow the issues and think about what witnesses do you really

19  need and not need.

20      So setting the gap between the first trial and the second

21  trial, particularly if the first trial is in October and then

22  we run into Thanksgiving and Christmas, that gap probably

23  needs to be about six months.  I don't know if that is

24  workable on Your Honor's schedule, but if it is, that is

25  likely what it will take to do the intensive trial preparation

1  that happens between the first and the second trial.

2      That doesn't mean we are sitting around on the second

3  trial until then, quite to the contrary.  The deadlines for

4  the second trial and my experience in some other MDLs has been

5  that those deadlines are staggered by a few months, three

6  months or two months, something that gives the parties an

7  opportunity to do the good and thoughtful work that they need

8  to do.

9      You know, contrary to what Mr. Martin said, the experts

10 in these cases are not likely to be identical between the

11 cases.  The cases present individual facts, different issues.

12 Some of the Plaintiffs have had spinal surgery, others have

13 not.  It is possible that there may be experts related to that

14 procedure that are called in one case that are not.

15     The other issue that we have in any medical products case

16 is that both the experts and the fact witnesses, the vast

17 majority of them are doctors, and good luck getting a doctor,

18 even an expert that you are paying to basically clear a

19 six-month period of time so that he can prepare or she can

20 prepare expert reports in multiple cases, be deposed in

21 multiple cases, potentially testify at trial in multiple

22 cases.  It is, frankly, just not possible to get any physician

23 to do that with his schedule unless the only thing the

24 physician does is testify, and I don't think either side wants

25 an expert like that in these proceedings that require really

1   thoughtful testimony.

2       What Cook would propose, and if you could, John, go to

3   the next slide.  What Cook would propose is this, that

4   now -- now that we know that Your Honor's preference is to

5   stagger these trials somewhat, if you can tell us based on

6   your schedule the amount of time that you would like to see

7   between the trials that we, in turn, work together to come up

8   with a schedule to try those cases, and it would be a

9   discovery schedule that is not in parallel to but is working

10  side by side the schedule with Hill.

11      There were a couple of other things that Mr. Martin said

12  that I just want to comment on.  A couple of times I heard Mr.

13  Martin say we need to have these cases simultaneously

14  scheduled for trial in October of 2017 so that it is kind of a

15  next-man-up situation if one case goes away, and I heard

16  him -- I heard him suggest that these cases might go away for

17  whatever reason.

18      You know, let me be clear to you as I have been clear to

19  the Plaintiffs.  Cook will not settle these three cases.  We

20  will try these three cases, so if these cases are to go away,

21  they will go away for only one reason, and that is because the

22  Plaintiff dismisses these cases.

23      The fact that Mr. Martin is suggesting to Your Honor now

24  the possibility that Hill and Gage can go away --

25              THE COURT:  It is a little bit -- I am worried

43

1    about, as we all know, certainly in Northern District of

2    Illinois this is happening.  That on the eve of trial, these

3    cases are dismissed, and then the schedule, three, four weeks

4    of blank are on a schedule, and it -- although you can

5    backfill it in a little bit, but it is difficult.

6              MS. PIERSON:  Yes.  So here is how Judge Pallmeyer

7    dealt with that, and fortunately, we did not have dismissals

8    on the eve of trial.  But there were dismissals around the

9    middle of discovery or towards the end of discovery.  What

10   Judge Pallmeyer ultimately -- eventually she entered a Lone

11   Pine order, but before that what she did was to enter an order

12   that told the Plaintiffs directly by this date, you will tell

13   the Court and the other side whether you are going to dismiss

14   or not.

15        Now, it is reasonable for Cook and this Court to know at

16   some months before the trial whether the Plaintiffs intend to

17   prosecute it to trial or not, and I have talked to Mr. Martin

18   and Mr. Williams about this.  I understand the Plaintiffs'

19   perspective that things can happen in discovery.  You get a

20   Plaintiff who turns out to be a train wreck in deposition or

21   something is said in a physician deposition that you don't

22   anticipate.  I understand that that happens, but plaintiffs

23   always have an obligation to screen their the cases under Rule

24   11, and there is a date by which during discovery that the

25   Plaintiff should be able to assess whether they intend to

44

1  proceed with the case or not.

2      This Court should, in its case management order, include

3  a date by which the Plaintiffs have to affirm to you and to

4  us, will they proceed or will they not proceed?  And if on

5  that date the Plaintiffs tell Your Honor or Cook it is our

6  intent to dismiss the case, then we can adjust the schedule to

7  move up the second case that will be tried.

8      You know, we -- we are talking about trial plans for

9  these three cases, but we are fully prepared to adjust the

10  second and the third case if the Plaintiff should dismiss the

11  case.  But what would not be fair would be for the Plaintiffs

12  to do that after all the work has been done on all the experts

13  and all of the depositions and on the eve of trial.

14      The order that Plaintiffs provided to the Court, the

15  language that deals with this section, it literally proposes

16  that the Plaintiffs could decide the day before the Hill trial

17  that they are going to dismiss and all of a sudden we should

18  stand up and be ready to try the next case up, whatever it is.

19  That is impossible.  It just won't work.

20      I can't get physicians, and Plaintiffs won't be able to

21  get physicians to hold dates on their schedule.

22          THE COURT:  I agree with that.

23          MS. PIERSON:  It won't work.

24          THE COURT:  I agree with that.

25          MS. PIERSON:  The other place that it becomes very

45

1    complicated for Your Honor and your staff is when it comes to
2    deciding motions for summary judgment, Daubert, and the
3    parties briefing those motions.  It won't make sense to brief
4    Daubert motions and motions for summary judgment and for you
5    to be forced to decide those simultaneously in three cases.
6    You know, the paper would fill your office, if that is what we
7    were asked to do.  So we particularly need to have staggered
8    deadlines for the three trials for that significant motion
9    practice.

10        So that is a long way of saying, Your Honor, this:  Trust
11    us to work out a schedule for these two cases and how they can
12    proceed.  I believe we can do it.  We conferred well together
13    yesterday, come to agreement on this.

14        What we need to hear from you, Your Honor, is your
15    preference as to the amount of time that you want between the
16    trials, and our recommendation is that you schedule six months
17    between the first trial and the second trial and you could
18    shorten that time between the second trial and the third
19    trial.  If you give us that direction, I think we can do the
20    heavy lifting from there, Your Honor, and come up with a joint
21    proposal that would be helpful.

22        Mr. Martin made this comment at the end, and I feel like
23    I need to address about what the second trial should be and
24    which case Your Honor should hear second.  Your Honor doesn't
25    need to decide that issue today, and I think that is an issue

46

1    that the parties ought to be entitled to brief.  And we may be

2    able to reach agreement on it, but that is something that

3    really deserves some time and attention and thought.

4        You know, our thought right now is that the Gage case

5    really ought to go second, that it represents a different

6    class of product and the Tulip product and that it will be

7    important for Your Honor to address the significant issues

8    related to the Tulip product which are different from the

9    significant issues related to Celect.  And that if Your Honor

10   were to issue rulings on motions for summary judgment or

11   Daubert in those cases, it could impact significant groups of

12   cases in the MDL and really help to win the issues or even the

13   number of cases in the MDL.

14       So that is our position, but we think that is something

15   that is worth conferring about and then submitting a paper to

16   you on that point.  But there is no reason the Court has to

17   decide the issue today.

18           THE COURT:  You know, I would -- I am inclined to

19   follow Mr. Martin's suggestion here.  Hill is the defense

20   pick.  The other case, Brand is Plaintiffs' case.  More than

21   likely I would -- you know, I can change my mind, but at this

22   point I would think that might be the best way to do it.

23           MS. PIERSON:  Well, we, of course, defer to your

24   judgment, Your Honor, on the order of trials.  Certainly the

25   process that we went through to get to the bellwether

47

1  selection we believe makes these picks the Court's picks and

2  not the picks of the Plaintiff or Defendant.

3         THE COURT:  I understand.

4         MS. PIERSON:  That kind of logic about who picked it

5  isn't really, what we believe, is a thoughtful logic about how

6  to approach what is the second case that will decide issues

7  most likely to influence the number of cases in the MDL.  But

8  we defer to whatever Your Honor decides.

9         THE COURT:  Absolutely.  I am just telling you what

10 I am inclined -- not whether I will do it, but I am inclined.

11        MS. PIERSON:  Understood.  We would ask for an

12 opportunity to brief that issue but, of course, will defer to

13 your judgment.

14        THE COURT:  Sure.

15        MS. PIERSON:  Thank you, Your Honor.

16        THE COURT:  Mr. Martin.

17        MR. MARTIN:  Yes.  I would suggest, Your Honor, that

18 we have briefed that and to each case and gave its relative --

19 the facts of the relative merits, and that -- that briefing is

20 the briefing from which the Court made its order.  So I would

21 simply suggest that that briefing has been done, and if the

22 Court needs to look at what is the Brand case, what is the

23 Gage case, certainly I don't think there is anything more that

24 could be said than being specific about each case as we were.

25 So I think it, it is ripe for the Court's ruling on that.

48

1    I would also -- I would simply want to now respond to

2  this.  This has been brought up on this portion of the

3  argument.  On the parties to confer on schedule, I can tell

4  the Court that we did -- we have conferred on the schedule,

5  and we can agree.

6    And I can tell you what we -- and I believe that is ripe

7  for the Court to decide, and I don't need to go into detail

8  because I think the Court has already heard.  And I think we

9  should have a short period of time, not a long period of time

10  between trials, especially, especially when -- if what is

11  meant by counsel the discovery schedule to parallel Hill.

12    So, and I think that is a good thing if we are talking

13  about parallel, parallelling Hill, that the discovery schedule

14  parallel, that means working them all up under the, under the

15  deadlines and that we are going to be doing hopefully over the

16  next 13 months before trial.  So if that is the case, yes,

17  discovery schedule to parallel Hill, that is what we want too,

18  Brand and Gage.

19    And then finally on the, on the -- and we would suggest

20  that if we do that, Your Honor, there is not much left to do

21  if, you know.  I mean, what are be going to be doing for six

22  months if the discovery is complete and all of our experts

23  have been deposed and, you know, with nothing to do but sit

24  around?  And I guess maybe have a motion in limine heard or

25  something, but I know there is stuff to do, but not six

1   months.  And finally on the --

2        THE COURT:  You understand that I have got other

3   cases on my docket as well, so I am not going to be sitting

4   around for that period of time.

5        MR. MARTIN:  Well, that is my suggestion -- well,

6   no, I didn't suggest the Court would be sitting around.  I am

7   suggesting that the parties, with respect to the prep, any

8   further preparation for the cases, not the Court.  The Court

9   has plenty of trials going on, but the parties will be -- we

10  won't be sitting around either.  I am simply saying it doesn't

11  take six months to prepare a trial after all of the discovery

12  has been done and after all of the depositions have been taken

13  and you have prepared the case for trial, six months to, you

14  know, get your opening statements ready or, you know, those

15  types of things.  That is what I am suggesting, Your Honor.

16  So we would suggest more like, more like a two-month after.  I

17  think it would benefit the MDL.

18      As to the deadline, I can affirm right now because Mike

19  Heaviside is the lawyer on Hill, along with Joe Johnson in the

20  Hill case, and they intend to try that case.  Mike gave

21  me -- you know, certainly if it doesn't go for whatever

22  reason, if it is dismissed or settled, I don't think there

23  ought to be punishment for maybe that just happening.  But I

24  can affirm right now, so this will be my deadline if they want

25  a deadline.  Right now I can affirm that there is an intent to

50

1   proceed to trial, having spoken to Mike Heaviside and having

2   spoken to Joe Johnson, the lead lawyers on that case.  They

3   intend to do it in 13 months, if the Court does that.

4        So that -- here is a little note from Mike.  "Ben, if my

5   client tells me to dismiss her case, ethically what do I do,

6   force her to try it?"  And so this sort of affirmation

7   business isn't probably going to benefit anyone, and it

8   creates some ethical problems anyway.  So thank you, Your

9   Honor.

10           THE COURT:  All right, thank you.

11           MS. PIERSON:  Just a couple of responses (inaudible)

12   if the lawyers for Hill are saying now they will try this

13   case, and we are telling you we will not settle this case, we

14   have asked for staggered deadlines.  We know we are going to

15   try the Hill case in October.  We will work up a schedule that

16   gives us staggered deadlines.  The only issue is when do you

17   want to try the second case, and when do you want to try the

18   third case?

19        But this point that Mr. Martin is making about, you know,

20   what do I do if my client wants to dismiss?  The whole, the

21   whole point of including in a plan a date by which they have

22   to dismiss is that they have that conversation with Mrs. Hill

23   now and have the conversation with Mr. Gage now and have the

24   conversation with Mrs. Brand now about whether they intend to

25   proceed or not.

51

1      I have suggested that we create a date that is somewhere

2 in the middle of discovery so that they have some time to hear

3 the important witnesses and assess their case.  It is more

4 than what the Plaintiffs are asking for, but it seems very

5 reasonable to me to have a deadline by which there is a forced

6 conversation between the lawyer and the client about will they

7 pursue their case to trial or not.

8             THE COURT:  Okay.

9             MS. PIERSON:  Is there anything else?  Thank you,

10 Your Honor.

11            THE COURT:  Thank you.

12            MR. BOYERS:  Your Honor?  Jim Boyers on behalf of

13 the Cook Defendants.  I would open with some statistics that I

14 will share on the status of discovery.

15            THE COURT:  All right.

16            MR. BOYERS:  May I approach?

17            THE COURT:  You may.

18            MR. BOYERS:  Your Honor, I will open, and Mr. King

19 will close on this status report.  But initially I wanted to

20 go over the written discovery and ESI status, which was

21 addressed somewhat in the briefing on the coordination order.

22 But, Your Honor, we have responded to three sets of general

23 written discovery served by the Plaintiff, their

24 master -- their initial master set in April of 2015 and more

25 recently, their second set and third set of requests for

52

1   production in June and May.

2       So at this point, we have produced over 941,000 pages of

3   documents.  That includes 173,000, almost 174,000 actual

4   documents.  The total pages is likely more than the 941,000

5   because many documents were produced natively.  So, for

6   example, a 50-page PowerPoint would only get one Bates number

7   because it is produced as a native, one document, one Bates

8   number.

9       The total gigabytes is now approaching 160, and we have

10  produced 25 custodial files chosen by the Plaintiffs for

11  general corporate discovery.  And in the course of discovery

12  pool, discovery, we have produced five custodial files from

13  district managers or sales representatives.  And to further

14  that point, we also responded to case specific discovery in

15  the discovery pool cases as well.

16      So we have gone beyond custodial files, we have done

17  productions from databases.  We have done productions from

18  nonindividual custodial files through the course of discovery.

19  We think we are getting to the end of general corporate

20  discovery.  It has been a lot of work, and we have had a lot

21  of discussions.

22      And one point I wanted to raise on that, Your Honor, is

23  we think it would be helpful to the process if we had

24  discovery liaison counsel on the Plaintiffs' side and the

25  defense side.  Mr. King and I have served in that role on

53

1  discovery issues not formally but in practice, and we have had

2  some discussions recently where -- and not just recently but

3  dating back into the litigation we had an issue where we went

4  back and forth with Mr. Heaviside's partner, Miss Reed Zaic,

5  on a particular issue.  We had some correspondence over

6  several months, and then it was quiet.  Then we heard from

7  another attorney on that issue, a Mr. Stoller out of Arizona,

8  and we had correspondence back and forth on that.

9       And more recently, I have talked to Mr. Schultz out of

10 Florida on discovery issues.  And I think something gets lost

11 in translation every time because it is a new person getting

12 involved and not having updated information.

13      We have also been working more recently on modifying Case

14 Management Order No. 4 dealing with the Plaintiff Profile Form

15 Defendant Fact Sheet, and I have worked with three different

16 attorneys from the Plaintiffs' side on trying to reduce the

17 burden for both of us on doing that discovery in nonbellwether

18 cases.  And I think in that correspondence, issues have been

19 lost between the different people that I have been

20 communicating with on those issues, so we would ask that the

21 Court direct the Plaintiffs to select two point people for

22 them on discovery issues so that we can avoid repeat

23 conversations on those issues.  And I think it would add

24 efficiency to the process going forward.

25           THE COURT:  All right.  Mr. Martin?  Any thoughts

54

1    about that?

2         MR. MARTIN:  Yes.  And, you know, I don't want to

3    appear to be fighting with the Court on every point, but I do

4    have to inform the Court.  I have asked since this question of

5    they want a liaison or two to be, I guess, the spokespeople

6    for any issue regarding the case.

7         Number 1, that is an impossibility because what -- what

8    that would entail are two people out of a group of 25 plus

9    their law firms dealing with separate aspects of issues in

10   this case.  That is a great thing about having a steering

11   committee, but if every time we speak with Cook about a

12   sub-issue that one of our folks like Matt Schultz is the guy

13   who has been dealing with now, is the point person, and I told

14   them he would be the point person.  But he got to the point of

15   being the point person for the Defense Profile Forms and now

16   the changes that are being suggested and made in the

17   Plaintiffs' fact sheets and profile forms too.

18        So I, I certainly don't want to be the person that has to

19   have knowledge of all of the sub-issues.  No one person should

20   be able to, very inefficient.  And I would simply suggest

21   also, I have asked for some specificity by counsel.  I asked

22   yesterday again.  I have not seen that this is an issue.

23        Nobody has ever given me any details on -- that would

24   have come to me, I think, and suggest or Mr. Heaviside or

25   Mr. Williams to come to us and tell us if there is a specific

55

1   problem as you have got with somebody's, somebody's lines

2   being crossed.

3       I think, I think the real issue is we do have a small

4   group of people that we have put in charge of, you know,

5   looking at the discovery, finding out what has not been

6   responded to, going ahead and moving for, moving for, to

7   compel, if necessary, just getting this discovery in order.

8   And I don't know if that is the impetus for this, but I, I

9   don't think anything is broke, and as Darrell Royal would have

10  said, "If it ain't broke, don't fix it."  And I don't think it

11  is broken, and I  have not once been told any of the

12  specifics, and I am still not hearing specifics, really.

13          THE COURT:  Mr. Boyers?

14          MR. BOYERS:  Your Honor, I can give specifics.  In

15  fact, I did.  I did -- the one example would be with Miss Reed

16  Zaic addressing an issue, having it sit for months and then

17  having Mr. Stoller come and raise a similar issue with me on

18  the same topic.  And it was no coordination between them, but

19  more recently, and I would expect Mr. Martin to be familiar

20  with this because we had an exchange last week.

21      I negotiated with Mr. Williams on Defendant Profile Forms

22  and Case Management Order No. 4 and the changes we are trying

23  to implement together, and we were working very well together.

24  And then Mr. Martin took issue with some of our exchange, and

25  then it shifted from Mr. Martin to Mr. Schultz coming into the

1  fore.  And Mr. Schultz and I had a very productive

2  conversation yesterday, but I had to have three different

3  discussions where I talked about the same things, the same

4  points three times.  That is the problem, Your Honor.  It is a

5  burden on us when there is a lack of coordination on their

6  side, and that is why we are asking for a point person or, or

7  point persons.

8           THE COURT:  I think Mr. Martin has just indicated

9  that Mr. Schultz will be the point person.

10          MR. BOYERS:  On all?  Just on --

11          MR. MARTIN:  On the order.

12          MR. BOYERS:  Or on other issues?

13          MR. MARTIN:  As we go, as we go specifically with an

14  issue, the issue of the change in the Defense Profile Form and

15  the changes in the Plaintiffs' fact sheets and profile forms,

16  Mr. Schultz is now the -- we can call him the liaison on that

17  issue.  If there is another issue that comes up, I am certain

18  that there will be a point person for that, but this isn't the

19  only issue that is going to come up.

20      And Matt doesn't have time to be the point person on

21  every discovery issue.  That, that is the problem.  We have

22  got a big group, and we want to use our group.  Now, I will

23  say this.  I will certainly go back to our group, and I will

24  have a conversation that there has been a suggestion that

25  maybe the lines are getting crossed.

1            THE COURT:  Yes.

2            MR. MARTIN:  And if that is the case, whether it is

3    or not from here forward, let's make sure that we, we, that we

4    have our bases covered on that, guys.  And I think that will

5    solve any problem.  We have got some normal order that I or

6    whoever is going to be in charge of having these

7    conversations, but I can't do it.

8            THE COURT:  Mr. Boyers?

9            MR. BOYERS:  Your Honor, if they narrow the field

10   and define who is going to be responsible for issues, the

11   issue I see is, I recently received correspondence from five

12   different people who were identified who would be talking

13   about written discovery issues.  Five people is a lot of

14   people to talk to, and who has the final word?

15       Am I going to get down the line in discussions and then

16   suddenly there is a sharp turn to the left or to the right?

17   That is what we are looking for is a liaison point person to

18   be involved in those discussions so that we can be efficient.

19   I am dealing with a lot of different people.  Thank you, Your

20   Honor.

21           MR. MARTIN:  Let me have my conversation with my

22   folks, and if there truly is a problem that develops, by all

23   means, I --

24           THE COURT:  What Mr. Boyers is saying, I think, is

25   legitimate concern, and if you would address your group on

58

1   that.  And if we continue to have problems at our monthly

2   status conferences we can address that, but it makes sense to

3   me not to have Mr. Boyers discussing the same issue with four,

4   five different people.

5           MR. MARTIN:  If there is a problem, we will get that

6   solved.

7           THE COURT:  Okay, good.

8           MR. MARTIN:  Thank you, Your Honor.

9           THE COURT:  Okay.  Mr. King, you have been waiting

10  patient.

11          MR. KING:  Your Honor, I will just briefly report to

12  the Court on the status that is summarized under section Roman

13  Numeral No. 2.

14      As Jim pointed out, he has been basically our point

15  person when it comes to written discovery and document

16  production, and I have been basically the point person when it

17  comes to depositions.  And Mr. Martin and I have worked

18  together to schedule those without really any incidence so far

19  as I am aware.

20      We have produced, at this juncture, 18 Cook employees for

21  corporate depositions.  Seven of those were, I think, noticed

22  as 30(b)(6), 11 not noticed as 30(b)(6), I guess individually.

23  And we have got a 19th scheduled for September 27th and a 20th

24  scheduled for -- well, we are trying to schedule that.  And,

25  in fact, we are bringing back Mr. Molgaard-Nielsen from

59

1  Denmark to complete his deposition, and also the Plaintiffs

2  have asked for more time beyond the seven hours that are

3  allowed by Case Management No. 2 and the rule, and we have

4  agreed to that.  They wanted five, I proposed three, we have

5  compromised on four.  So we are getting along pretty well, I

6  think, on depositions.

7          THE COURT:  Great.

8          MR. KING:  They have asked to take a few more, and

9  we are talking about whether we will agree to anymore or not.

10  And that is under discussion, but we have been getting along,

11  I think, pretty well.  And I would echo Mr. Boyers' comments,

12  we appear to be pretty close to being done, at least in my

13  mind, with general discovery on Cook, general depositions.  We

14  have done quite a bit.

15          THE COURT:  All right.

16          MR. KING:  Thank you, Your Honor.

17          THE COURT:  Mr. Martin?

18          MR. MARTIN:  You know, I will say that what has gone

19  extraordinarily smoothly so far is our dealings with Doug and

20  my dealings with Doug on the depositions.  That has worked out

21  beautifully, and I commend to the extent that it, it means

22  anything, I certainly commend Mr. King in the way he has

23  worked with us.  And, Your Honor, I wanted to tell, tell you,

24  Doug, that deposition, just because it is on, on the sheet and

25  I want to clarify --

60

1          MR. KING:  Sure.

2          MR. MARTIN:  -- that 20th deposition on regulatory

3    reporting, we are thinking about pulling that one down and

4    just not doing 30(b) -- another 30(b)(6) and maybe replacing

5    one with -- but we will talk about that.  We, we will chat

6    about that.

7          THE COURT:  Okay.

8          MR. KING:   (Inaudible).

9          THE COURT:  Well, I appreciate very much your -- the

10   high level of cooperation you are showing here.  It is

11   gratifying to the Court to see, to see that.  You are all very

12   professional and highly competent lawyers, and we want to get

13   these matters resolved.  I think Plaintiffs do and Defendants

14   do as well, and we are going to push into that October 2017

15   trial date.  And hopefully that cooperation will continue.

16     Ben, you will talk to your folks about the discovery

17   issues raised by Mr. Boyers?

18          MR. MARTIN:  I sure will.  I will follow it up with

19   an e-mail to Jim.

20          THE COURT:  Right.  And then I want you to work,

21   continue your good cooperation in working up a case management

22   schedule for, for these trials.  I think a four-month interval

23   between trials would work, and I do have -- as I mentioned

24   earlier, I do have concern here about getting close to trial

25   and the case being dismissed.  So I want you to discuss

61

1  how -- and you are right, Mike.  If your client tells you to

2  dismiss it, you have got to dismiss.  I mean, you can't say

3  no, you are going to go to trial.  You can't -- so that is

4  something that --

5          MR. HEAVISIDE:  You know -- everybody in this room

6  has probably had tons of cases throughout the years where

7  something happens.  I don't know what it is, somebody is

8  killed, somebody is whatever.

9          THE COURT:  Sure.

10          MR. HEAVISIDE:  So the point is, there is no smoke

11  and mirrors here (inaudible).  I don't know what to say on

12  that.

13          THE COURT:  Yes.  Okay.  What else do you need from

14  me here?

15          MS. PIERSON:  Your Honor (inaudible) if we try Hill

16  in October (inaudible) do you know what your October looks

17  like?  With the holidays (inaudible) some flexibility --

18          THE COURT:  Yes.  You know -- 16 weeks, 18 weeks,

19  whatever, something along those lines that we can get it.  I

20  just want to avoid having too much of an interval

21  between -- because quite frankly, although you people are

22  living with this case, I am not, and one of the problems we

23  have if we get too much time in between is I start forgetting

24  about things.  And I have to go back and refresh myself and

25  review and that type of thing as well, so let's --

62

1          MS. PIERSON:  (Inaudible) work together on schedule,

2  we can work it in such a way that Your Honor has

3  motions (inaudible) during this fact period (inaudible) trial

4  goes off --

5          THE COURT:  Right.

6          MS. PIERSON:  -- we can work together.

7          THE COURT:  Okay.

8          MS. PIERSON:  (inaudible) we should.

9          THE COURT:  Okay.  That would be great.

10          MR. MARTIN:  Your Honor, this may be a question more

11  for me to ask our liaison, Mr. Williams.  But does the Court

12  know as we sit here, I guess, or stand here, what date that

13  would be available in October so if we --

14          THE COURT:  Well, let me see.

15          THE CLERK:  (Inaudible).

16          THE COURT:  Okay.  The first Monday in October is

17  October 2.

18          MR. MARTIN:  We will take it.

19          THE COURT:  And if this is just going to be a

20  two-week trial, which I find hard to believe, maybe three?

21          MS. PIERSON:  I would think maybe four, Your Honor.

22          THE COURT:  Normally when I have a lengthy trial

23  like that that is in excess of two weeks, I only have trial

24  days on Monday through Thursday.  We take Friday off.  It is

25  easier for me to get a jury that way if I can tell juries you

63

1    are going to have one day during the workweek to be able to

2    catch up and also, it is a little easier on trial counsel as

3    well.

4         And it allows the Court to take care of other matters on

5    the docket as well, so that is, that is usually my practice on

6    lengthy trials is to work Monday through Thursday and then

7    take Friday off.  So --

8              MS. PIERSON:  Your Honor, are there any conferences

9    or things since you usually (inaudible) in the month of

10   October, our case (inaudible) we ought to be aware of?

11             THE COURT:  No.  My judicial conference stuff is in

12   June and December, and the MDL conference is -- well, it is in

13   October this year.  Well, we can work around those things.

14   That is -- so October 2nd.  Let's shoot for that, okay?

15             A VOICE:  Thank you, Your Honor.

16             THE COURT:  Anything else you need my help on?  I

17   will get something out here on the coordination.  I want to

18   think about that a little more, and we will get something out

19   on that.  Anything else you need?

20             A VOICE:  Your Honor, nothing from the Plaintiff.

21             MS. PIERSON:  Nothing.

22             THE COURT:  Thank you very much.  This has been very

23   helpful to me and also, I think, having these monthly meetings

24   when necessary to keep us all up to speed on this and, again,

25   I commend you on your level of cooperation in trying to work

1  this case down.

2          A VOICE:  Thank you, Your Honor.

3          THE COURT:  Thank you so much.

4          A VOICE:  Thank you, Your Honor.

5          THE CLERK:  Court is adjourned.

6      (Concluded at 11:43 o'clock a.m.)

7

8          **CERTIFICATE OF COURT TRANSCRIBER**

9

10     I, court-approved transcriber, certify that the foregoing

11  is a correct transcript from the official electronic sound

12  recording of the proceedings in the above-entitled matter.

13

14

15  s/s Jean A. Knepley_____          September 16, 2016
    Signature of Approved Transcriber          Date

16

17

18

19

20

21

22

23

24

25