UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC., IVC   )
FILTERS MARKETING, SALES         )
PRACTICES AND PRODUCT LIABILITY  )
LITIGATION,                      )
_____)

                                 ) 1:14-ml-02570-RLY/TAB
This Document Relates to All     ) MDL No. 2570
Actions                          ) Indianapolis, Indiana
                                 ) **February 7th, 2017**
                                 )




**Before the Honorable**
**TIM A. BAKER, MAGISTRATE JUDGE**




OFFICIAL REPORTER'S TRANSCRIPT OF
PRETRIAL CONFERENCE




**Court Reporter:**              Laura Howie-Walters, FCRR/RPR/CSR
                                 Official Court Reporter
                                 United States District Court
                                 Room 217
                                 46 East Ohio Street
                                 Indianapolis, Indiana  46204



PROCEEDINGS RECORDED AND A TRANSCRIPT
LATER PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

2

1                    **A P P E A R A N C E S**

2

**For Plaintiffs:**              Matthew D. Schultz, Esq.
3                                LEVIN PAPANTONIO THOMAS MITCHELL
                                     RAFFERTY & PROCTOR, PA
4                                316 S. Baylen St.
                                 Suite 600
5                                Pensacola, FL  32502

6                                Robert J. Simmons
                                 LAW OFFICE OF ROBERT SIMMONS
7                                1312 N. Snowmass Lane
                                 Muncie, IN  47304

8
                                 Joseph N. Williams
9                                RILEY WILLIAMS & PLATT
                                 301 Massachusetts Avenue
10                               Indianapolis, IN  46204

11

12  **For Defendants:**             James McGinnis Boyers, Esq.
                                 Douglas B. King
13                               WOODEN & MCLAUGHLIN
                                 One Indiana Square
14                               Suite 1800
                                 Indianapolis, IN  46204
15
                                 John H. Martin, Esq.
16                               THOMPSON & KNIGHT
                                 1722 Routh Street
17                               Suite 1500
                                 Dallas, TX  75201
18
                                 John Joseph Tanner
19                               BAKER & DANIELS
                                 300 North Meridian Street
20                               Indianapolis, IN  46204

21

22

23

24

25

3

1               (Open court.)

2          THE COURT:  All right.  It's February 7th, 2017, and

3     we are here on the case of In Re: Cook Medical, Cause

4     No. 14—ML-2570.  I can't believe I have to look to see what

5     that cause number is.

6               We're here for a proceeding in connection with some

7     discovery disputes.  I thought it would be helpful to put this

8     on the record.  As I've just informed counsel, it's not my

9     intention to have too much formality with this, but it's

10    probably good to have a record.

11              And for the record, we have Doug King here for the

12    defendant.  We have Joe Tanner, although he's switched sides

13    of the table there.  We have Robert Simmons and we have Jim

14    Boyers for the defendants.

15              And we have Ben Martin here on behalf of the

16    plaintiff; Joe Williams is here.  I believe by phone we have

17    Matt Schultz.  Mr. Schutlz, are you there?

18          MR. SCHULTZ:  I am, Your Honor, and thank you for

19    allowing me to appear telephonically today.

20          THE COURT:  All right.  And you're coming through

21    loud and clear, so we can hear you just fine.

22              One thing I just noticed, I want to say, I see

23    Mr. Tanner here.  I want to tell you, I sat next to

24    Mr. Tanner's parents at the Colts games for years.  And is it

25    your sister that still sits in those seats?

4

1          MR. TANNER:  Yes, Your Honor.

2          THE COURT:  You don't need to stand up.  His sister

3     still sits next to me at those games with her husband, and

4     they have actually purchased some of my tickets to Colts

5     games.  So since I see you sitting here, I thought I better

6     mention that.

7          If anybody has an issue with respect to that, I want

8     you to know that, and you can tell me now or you can consult

9     with your clients and tell me later, but I look out and I see

10    Mr. Tanner sitting there and I think, you know, I need to

11    disclose that to everybody.  So if you want a minute to talk

12    with each other or talk with your clients about whether you

13    want me to continue in this case, I'm happy to let you do

14    that, but I just thought that was important to mention.

15    Whether there's a requirement or not, I just thought I'd go

16    ahead and mention it.

17         MR. WILLIAMS:  No objection from the plaintiff, Your

18    Honor.

19         THE COURT:  All right, Mr. Williams.

20         How about from the defendant?

21         MR. KING:  No objection.

22         THE COURT:  All right.  Thank you, Mr. King.

23         All right.  So I've got some e-mails that were very

24    helpful which, of course, I've reviewed.  I thought I would go

25    over them with you in case anybody has any additional comments

                                                                5

1    to make, and some of these things you may have reached

2    agreement on.

3               MR. WILLIAMS:  Your Honor?

4               THE COURT:  Yes?

5               MR. WILLIAMS:  Joe Williams for the plaintiff.

6    Given that we've got an hour and 15 minutes and that some of

7    these things were resolved, my plans were to go -- kind of

8    jump around and hit the issues that were most important first

9    in case we end up with --

10              THE COURT:  That's an excellent plan.  That's not

11   the plan we're going to follow.

12              MR. WILLIAMS:  All right.

13              THE COURT:  I've got a plan.

14              MR. WILLIAMS:  Okay.

15              THE COURT:  I'm going to go through these in order,

16   and if they're resolved, you're just going to tell me they've

17   been resolved.  I think I know which ones hopefully have been

18   resolved.  If they haven't, we'll deal with them.

19              MR. WILLIAMS:  Okay, great.

20              THE COURT:  All right.  The first one, slides.  Now

21   with respect to -- this will go to the -- I'm going to start

22   out with the plaintiff.  The VC -- for the record I'll say

23   what they are.

24              No. 1, slides, including plastic embedded slides for

25   VCA1, VCA2, and VCA3.  So, Mr. Williams, with respect to that,

6

1  is VCA1 resolved?

2          MR. WILLIAMS:  It is not, Your Honor.  And may I

3  approach the bench?

4          THE COURT:  Sure.  And you don't have to ask.  If

5  you have something you want to hand me, just come on up and

6  give it to me.

7          MR. WILLIAMS:  On -- with regard to the slides, and

8  the OUS materials, as Mr. Schultz goes through the

9  presentation, he's going to be referencing things -- this is

10  for the Court to keep.

11          THE COURT:  Okay.

12          MR. WILLIAMS:  The first half of it will deal with

13  (inaudible).

14          THE COURT:  Okay.  So when the defendant had

15  indicated in what they submitted to me that they were going to

16  make a slide scanner essentially, and produce virtual

17  microscopy slides of VCA1, you're saying that's not acceptable

18  to the plaintiff?

19          MR. WILLIAMS:  No -- that.

20          MR. SCHULTZ:  That --

21          MR. WILLIAMS:  Matt?

22          THE COURT:  Mr. Schultz, go ahead.

23          MR. SCHULTZ:  Yeah, I'm sorry, thank you, Your

24  Honor.  That does resolve the -- in a word, we looked at the

25  federal reg that the defendant cited.  We believe that it

7

1  permits them to keep copies and give us the originals, but we

2  talked to our expert, and he said that high res copies, as

3  they have proposed, would be sufficient in doing that.  So we

4  have resolved the issue.

5          THE COURT:  Amy, can you turn him down a little bit

6  (indicating)?

7          We're going to either try to turn you down just a

8  little bit or have you speak a little more softly, Mr.

9  Schultz.  You don't realize it, but your voice really is

10  booming.

11          So VCA1 is resolved?

12          MR. SCHULTZ:  It is, Your Honor.

13          THE COURT:  And how about 2 and 3?  Not yet?

14  Because you don't have the -- they haven't found the slides?

15          MR. KING:  Your Honor, may I address the Court?

16          THE COURT:  Yes, Mr. King.

17          THE WITNESS:  I got an e-mail from my client at 8:00

18  last night that they found VCA2 and 3, and they have already

19  begun scanning them, and we should be able to have the scans

20  of VCA1 in the plaintiffs' hands by Friday of this week.

21          We'll be able to have the scans of VCA2 and 3 in

22  plaintiffs' hands by a week from Friday.

23          THE COURT:  That would be the 17th.  Is that

24  acceptable to the plaintiff?

25          MR. WILLIAMS:  Your Honor, it would be acceptable if

8

1    we can –– and I don't know if ––

2            THE COURT:  Relying on expert supplementation.

3    We'll get to that maybe at the end, and that's a valid issue.

4            All right.  So I'm going assume production of them

5    have been resolved.  The issue of when they'll be produced,

6    and what impact that might have on plaintiffs' need to

7    supplement their experts is a remaining issue.  All right.

8            Number 2, materials from the OUS study.

9    Mr. Williams, has that been revolved?

10           MR. WILLIAMS:  I do not believe it has, Your Honor.

11   And if you reach into the back jacket of your binder, there

12   are two documents, one image and an e-mail, that I think

13   Mr. Schultz is going to reference as he discusses the issue

14   with Your Honor.

15           THE COURT:  All right.  Mr. Schultz, go ahead.

16           MR. SCHULTZ:  Thank you, Your Honor.  And let me

17   know if I'm too loud.

18           THE COURT:  It's better.

19           MR. SCHULTZ:  Just to give you a little background,

20   Cook initially, back in 2004, sought clearance for the Celect

21   filter through FDA.  FDA denied clearance in part because it

22   had questions about the sufficiency of the animal data Cook

23   has submitted.  FDA indicated Cook would have to undertake a

24   clinical trial, and that is what this study is, what's been

25   called the OUS, outside the United States or Mexico study.  It

9

1    was actually formerly, I think, called the long-term Celect

2    filter retrievability study or something along those lines.

3         In essence, this study is what got clearance for the

4    Celect filter, and got clearance in part based on Cook's

5    representation to FDA that there were no perforations in this

6    study.

7         The published study in 2009 also indicated that

8    there were no perforations in the study.  So obviously if

9    there are perforations -- the study involved 95 patients.  If

10   there are perforations in any of these patients, then that's

11   of paramount importance to us because that was the linchpin

12   for clearance of the Celect device in the first place.

13        We have gotten bits and pieces of documents from

14   Cook until -- I believe February 2nd is when we got the images

15   actually uploaded.  I think they had turned them over to us a

16   few days before.  So they have imaging where they do imaging

17   on implants.  They do follow-up imaging, and they do imaging

18   on retrieval.  And so there are multiple images for each of

19   the patients in this study.

20        One of the images that I believe Mr. Williams has

21   with him today is an example of why this is of such importance

22   to us.  We traced down in some of the bits and pieces that we

23   got of the study a particular patient where a perforation had

24   been reported to Cook.  Cook went back to the site

25   investigator, the doctor, and said, "Is it really a

1  perforation?"  We don't have that response because we don't

2  have the full CRFs, the patient files, but we know that there

3  was at least a reported perforation.

4          Then we got the imaging files.  We went and looked

5  at that particular patient because that was one we already had

6  a red flag on.  And I'm not a clinician, but you can see the

7  image of the filter and see that it would certainly raise

8  questions we would want to address with our experts.

9          It took me probably an hour to locate that single

10  image of -- fully aware of the patient's number and that I was

11  specifically looking for any imaging on that patient.  And the

12  significance of that, Judge, is simply that we don't yet have

13  the patient files, the CRF.  I'm not sure whether we're

14  getting them.  Mr. King can address that.  I don't know where

15  we stand on that, but we are looking at literally probably

16  hundreds of hours of work to associate these imaging files to

17  the patient files, to actually review the files themselves,

18  and determine whether there were any perforations.

19          The reason we have suspicions about this, not only

20  based on that image, for example, which is the only one I've

21  had time to track down, but Cook used an idiosyncratic

22  definition of perforation in the study.  They used imaging

23  studies that are not ideal for capturing perforation, and we

24  have an e-mail from their vice president of regulatory science

25  corroborating that, that they didn't use CT imaging, which is

1  what's ideal and recommended for capturing perforation.

2          So in essence, our experts want to analyze whether

3  the study was sufficient to capture perforation to begin with,

4  whether it was set up in a way that it wouldn't be likely to,

5  and whether it, in fact, did.  And to do that, we have to go

6  through all of these hundreds, if not thousands -- I don't

7  know how many there are -- of imaging files on the patients.

8  There have to be several hundred at minimum.  And associate

9  them with the case report files that we still don't have, and

10 I don't know whether we are getting.

11          So that, Your Honor, just by way of explanation, is,

12 I think, more about the amount of work that we're going to

13 have to do, and work that we're having to do two weeks before

14 the deadline for documents that we requested quite some time

15 ago.

16          THE COURT:  All right.  So let me ask Mr. King if

17 he's going to respond.

18          What you submitted to me, Mr. King, was that all raw

19 data that presently exists is in the possession of Cook, has

20 been located and been produced, hopefully by today.  What's

21 the status on that?

22          MR. KING:  Mr. Boyers can better address that than

23 me, Your Honor.

24          THE COURT:  Good afternoon.

25          MR. BOYERS:  Thank you, Your Honor.  We hope to have

1  the raw data shipped out to the plaintiffs today.  There's

2  been a weather issue with (inaudible) drive with that

3  information to us.  We expect to have it tomorrow, to ship to

4  them tomorrow.

5          It has 24 exports of raw data related to the OUS

6  study and the GTUS study.  There were ECRFs, we've determined,

7  and that raw data has the information from the ECRFs.  We will

8  need to work with the plaintiffs on -- and our client on

9  linking that raw data in a way that makes it usable, and we're

10  in discussions with our clients on that, but the raw data

11  itself will be produced tomorrow.

12          THE COURT:  Okay.  And with that understanding,

13  Mr. Schultz, it's hard to say until you see the data, but

14  where does that leave you in terms of wanting something

15  additional?

16          MR. SCHULTZ:  Well, I guess, Your Honor, the only

17  question I would have, based on what I just heard, is whether

18  Cook has any indication that all of the data they have and are

19  producing are, in fact, all of the data there ever were.  And

20  if there's any that's been lost or destroyed, to its

21  knowledge, I guess we would want to know what that was so we

22  can try to make sense of what we're getting.

23          THE COURT:  Do you know, Mr. Boyers, in terms of

24  production?

25          MR. BOYERS:  My understanding from the client is

1  that the -- they did not have regular CRFs for either study,

2  that they did it as ECRFs and that this raw data is the

3  entirety of the raw data.

4         THE COURT:  All right.  Well, let's produce that.

5  You said they'll get that tomorrow?

6         MR. BOYERS:  Yes, Your Honor.

7         THE COURT:  And then we'll see if there's still a

8  dispute at that point.

9         I'm going to move along through these as reasonably

10 quickly as I can.

11        The next one is animal studies reports, and it's

12 broken down into subcategories A through E.  A relates to

13 P030118D-03A, a migration test in vivo of sheep.  And

14 plaintiff is saying they didn't receive certain information,

15 although the defendants have indicated that plaintiffs are

16 simply confused about what has been produced and not produced

17 due to a mislabeling on a cover page.

18        Mr. Schultz?

19        MR. WILLIAMS:  Mr. Schultz is going to address the

20 issue, but I believe it's in this broader category 3 is where

21 you'll see the second half, the tabs A through I in the binder

22 that Mr. Schultz can reference.

23        THE COURT:  All right, go ahead, Mr. Schultz.

24        MR. SCHULTZ:  Thank you, Judge.  Maybe the easiest

25 way to address this initially is to say there is confusion.

1  We —— in putting this stuff together from Zaragoza and some of

2  the other outside contractors is kind of like reassembling the

3  Dead Sea Scrolls.  We get bit and pieces.  We try and

4  correlate it.  I don't claim to have perfect knowledge of what

5  they did or what the documents represent, but we do have a

6  story to tell.

7          I think, first of all, Cook is correct that —— if

8  you'll look at, I believe it's going to be tab D in the folder

9  Mr. Williams gave you, there's a draft study protocol.  This

10  is a protocol that was in possession with Mr. Arne

11  Molgaard—Nielsen.  He's the director of research for William

12  Cook Europe.  It's from April of 2005, and it describes a

13  study where they would shoot synthetic clots into filters in

14  sheep, and they would test for acute migration.  They would ——

15  if they had acute migration, they would come back and do a

16  30—day implant and then retest with the clot.

17          So this is a peculiar test in that they are putting

18  polyurethane clots into sheep, and I personally have not seen

19  another one like that.  So it stands out.

20          On the cover of it, Your Honor, it has that

21  designation, Study No. 03A.  Mr. King is correct that if you

22  look on the subsequent pages on the headings, they have a

23  study number that ends with O2A.  I think where the disconnect

24  is is that Mr. King says "Well, we produced, Cook has produced

25  O3A and O2A," and they have produced final reports for studies

1  bearing those numbers, but neither of those is this study.

2         The rest of the -- and we know that, for example,

3  because the protocol that I first directed you to from May of

4  2005 calls for six filters to be implanted into 12 sheep that

5  identifies Dr. DeGregoria at the University of Zaragoza in

6  Spain as the investigator who would carry out the study.

7         The next to the last page indicates, by the way,

8  that the data will be maintained for 15 years, and will be

9  accessible to the sponsor of the study, which is William Cook

10 Europe.  And we know, Judge, that this study happened because

11 if you look, for example, through this notebook, and I won't

12 belabor it, but Tab A of the notebook that you have of 045

13 4139, that's a November 2004 -- this, by the way, is -- under

14 Celect 510(k) is pending with FDA, a November of 2004 document

15 showing that this study was designed to test filtration

16 capacity, the acute and long-term migration risk is how it's

17 described, including the synthetic clots.

18        The next document, Tab B, 045 4140 is from December

19 of 2004, and Dr. DeGregoria is sending a letter here who says

20 he's collaborated for several years in a habitual way with

21 Cook.  He's confirmed this project.  He's asked for payment of

22 a scholarship in connection with the project, and he mentions

23 that Federico Bel and Alberto Llorente of Cook designed the

24 study.

25        The same day at Tab C, you'll see document 083 1782

1    that Dr. -- or excuse me, Mr. Molgaard-Nielsen of Cook sending

2    an e-mail confirming that he conceived the study, that there's

3    a 10,000 Euro budget for it, and he says "If Dr. -- if "he,"

4    meaning Dr. DeGregorio "can save us with respect to the

5    migration question, that is naturally worth a lot."  So we see

6    that Cook has designed, conceived and paid for the study.

7         I think if you look over at Tab E, we see in

8    March 2005 a document 0831 1050.  That is an e-mail from

9    Alberto Llorente a Mr. Molgaard.  He says there are "several

10   issues about Zaragoza.  There's the project in sheep

11   filtration tests.  Some of the particles of three millimeter

12   cross the filter.  No one in 5."  And what I infer from that

13   at least, Your Honor, is that they are already undertaking

14   some testing with these synthetic clots because they indicate

15   in the protocol that I first directed you to that they would

16   be three-millimeter, five-millimeter clots.  So this testing

17   clearly is being carried out.

18         If you look at Tab F, in fact, at 077 5816, you have

19   an e-mail from Mr. Molgaard to April Lavender who's in

20   regulatory at Cook.  And he says -- he speaks of this

21   experiment with clot injections, and indicates that he

22   personally participated in the work, along with two others who

23   from Cook Denmark and two from Spain.  He mentioned implants

24   for 30 days.  And if that's the case, again, if they failed

25   the acute migration, they were going to do 30-day implants and

1  move to the second phase.  So again, there's at least the

2  suggestion here that that's what this test is.

3         THE COURT:  So the bottom line is you think there is

4  no confusion, you think there is a test study that has not

5  been produced?

6         MR. SCHULTZ:  Well, not only the report of the

7  study, Your Honor, but all of the data, the e-mails

8  photographs, histology, anything else that's done.  And in the

9  03A and 02A, Your Honor, that Mr. King refers you to are

10  different studies.  03A was a study that we do have.  That was

11  two sheep where they placed multiple filters in them.  That

12  was in November of 2004 before this was even conceived.

13         The other study was 3A that Mr. Cook -- or excuse

14  me, Mr. King has mentioned that they produced is -- excuse me,

15  03A is the diameter study involved in two sheep.  O2A was an

16  acute animal migration test done in Oregon, not in Spain, and

17  it was done in May of 2004, a year before this 6 sheep/12

18  filter test that we see the protocol for here, and that test

19  in Oregon was two sheep and two filters.

20         So I agree with Mr. King.  I think they were

21  probably using the protocol from one of those earlier studies

22  as a template when they drafted the protocol that I first

23  showed to you, and that's why those numbers are on there.  I

24  don't know what the study ultimately was called, but we have

25  clear evidence, or at least bits and pieces that it was

1  carried out, and we have no documentation of it.

2          And the only other thing I would point out in this

3  regard, Your Honor, I put some other stuff in the binder,

4  including, for example, an e-mail from Dr. DeGregorio to

5  Mr. Molgaard where he talks about an ongoing study.  He

6  attaches an actual entire draft article for a study that was,

7  I believe, 12 sheep/24 filters where they had five Celect

8  perforations on 24 Celect filters.  This was at the very time

9  their 510(k) was pending with the FDA, and they represented to

10  the FDA under the VCA1 study they had no perforation out of 40

11  filters and sheep.

12          So this is material.  It's happening at the same

13  time.  That article was never published, and we don't have any

14  of the results of it except that maybe half of it represents a

15  study that we are aware of.  We just can't be sure.

16          THE COURT:  So do you have an identifying number or

17  something?  You call it in your e-mail the P030118D-038, but

18  I'm not sure that's the right number.

19          MR. SCHULTZ:  Right.  It would be the study that is

20  identified in 048-4250, that protocol that bears that study

21  name but again, probably because they used a template from

22  that earlier 03A study.  We don't know the name of the study

23  but we know that it was carried out.

24          THE COURT:  What was that number if the study?  Say

25  it again?

1          MR. SCHULTZ:  The Bates number on it, Your Honor, is

2    048-4250 and it was called a migration test in vivo sheep.  It

3    had the 03A and 02A number on the template protocol.  We've

4    not seen the final protocol or any reports from it.

5          THE COURT:  All right.  But for simple reference,

6    you're saying it's the migration test identified in Bates

7    stamp No. 048-4250?

8          MR. SCHULTZ:  Yes, sir.

9          THE COURT:  All right.  Well, why don't we hear from

10   the defendant on that situation, and maybe the defendant heard

11   something new now or maybe not.  Who's going to address that?

12         MR. KING:  We're going to have -- Mr. Simmons can

13   better address this, Your Honor.

14         THE COURT:  All right.  Mr. Simmons, go ahead.

15         MR. SIMMONS:  And I think there's a little bit of

16   confusion based on these incorrect numbers.

17         THE COURT:  If you'd like to have a seat, you may.

18         MR. SIMMONS:  Thank you, Your Honor.  But the fact

19   is, I mean there were no -- there weren't two '03 alpha

20   studies.  There was one '03 alpha study and one '02 alpha

21   study.  And a lot of this confusion starts because Zaragoza

22   did a number of tests for Cook.  And some of them are related

23   to immigration, but not in the sense of just throwing clots at

24   it, but also the radial force that the filters put out.  And

25   those were the studies they did in the summer of 2005 and in

20

1   the fall of 2005.  So we don't have any indication in Cook's

2   possession that there is another '03 alpha study that Zaragoza

3   did.

4           THE COURT:  You can't produce what you don't have.

5   But if it had to be produced, they would identify it as the

6   study that's been identified in your Bates stamp number --

7   what was it 048-4250?  Is there something that correlates to

8   that?

9           MR. SIMMONS:  Not that we've been able to find in

10  any of our records, Your Honor.

11          THE COURT:  Okay.

12          MR. KING:  Your Honor, if I may add?

13          THE COURT:  Hang on a second.  Mr. King, as I've

14  told you before, whenever you've got something to say, it's

15  generally helpful, but I need to really have one lawyer

16  address each of these issues if at all possible.

17          MR. KING:  Sorry, Your Honor.

18          THE COURT:  That's all right.  So I think that takes

19  care of 3A.

20          Now 3B, I'm going -- again, for the record, 3B is

21  P03118D-04, animal comparison test.  I think it relates -- at

22  least one of the issues in 3B also relates to 3E,

23  retrievability of the Celect and Gunther Tulip Vena Cava.  And

24  the overriding issue seems to be whether, in fact, those items

25  are in defendant's custody or control.  And you all seem to

1  have a disagreement about that, which I think is probably the

2  primary disagreement from the plaintiffs' perspective.  Is

3  that the issue?

4          MR. SIMMONS:  Mr. Schultz can address that issue,

5  Your Honor.

6          THE COURT:  All right.  Mr. Schultz, can you address

7  3B and 3E?

8          MR. SCHULTZ:  I can, Your Honor.  3B, in a word, the

9  defendant has suggested that there is a publication.  They

10  cite the publication in the e-mail, and that that is the final

11  report, so to speak, of this study, which ends with 04A.

12          That is -- cannot be the case, Your Honor, because

13  the protocol that I've identified as the study for which we

14  would like the data, final reports, et cetera, is a 12

15  filter/12 sheep study.  The final published -- and by the way,

16  one of the primary end points in that protocol, and one of the

17  reasons it's of interest to us is because perforation or

18  penetration of the vena cava.

19          THE COURT:  Right, but could you address the issue

20  of custody and control because at least on 3B, 3B Zaragoza, I

21  think there's a serious question as to whether that is in

22  Cook's custody and control.  They're not a Cook entity.  So, I

23  mean, the defendant worked with the group helping to develop

24  that protocol, but it looks like the study was performed and

25  published independently from Cook.

1        MR. SCHULTZ:  Well, I will address that, Your Honor.

2   Thank you.

3        First of all, it's not complete to say that Cook

4   designed the study and Zaragoza carried it out.  We don't know

5   exactly what participation they had in each of these studies.

6   We've already seen on the previous one that the director of

7   research personally was involved in carrying out the study.

8   We have other e-mail traffic where they talk about them

9   traveling down for it.  We know they paid for the study.

10       The publication that's referred to on 3B does not

11   pertain to the same study as the protocol that I've described.

12   So I think there's a gap there.  What's important to

13   understand, Judge, is that Zaragoza and Cook go back many

14   years as Dr. DeGregorio's letter that I've already showed you

15   indicates.

16       We have e-mail from 2013, in fact, where

17   Dr. DeGregorio refers to Mr. Molgaard as "My Dear Arne," and

18   says "Of course what is confidential between friends is always

19   confidential."  This is not simply an external testing lab

20   that they used on a one-off basis, Your Honor.  They have a

21   long-standing relationship, including publications together,

22   presentations together.  Cook has paid a lot of money to

23   Zaragoza.

24       The law that I've been able to locate, Your Honor,

25   and I can cite you a couple of cases.  I don't have the

1   Seventh Circuit case, for which I apologize, but the Second

2   Circuit --

3           THE COURT:  You can probably hold that.  I think the

4   defendants are excited to brief this.  So if that's going to

5   happen, you don't need to cite me to a bunch of case law right

6   now, because we may have to brief it.  But I've got an idea

7   about that I want to share with counsel in a few minutes.

8           All right.  Anything else you want to say about

9   custody and control?  I think the issue on 4E is an easier

10  issue perhaps for the plaintiff, but 4B I've got some question

11  about that.

12          Maybe just let me ask the defendant to respond to

13  what you just heard with respect to 4B.  Who's going to

14  address that?

15          MR. KING:  Certainly.  The draft protocol --

16          THE COURT:  I said 4.  I meant 3, excuse me.

17          MR. KING:  Understood.

18          The draft protocol did call for 12 sheep, but it was

19  a draft protocol that was pulled from a template.  The

20  subsequent protocols were two sheep/four filter studies, and

21  Cook has produced everything that it has in its possession on

22  those studies.

23          And a little bit of history might be useful,

24  especially as we get into the four alpha and five alpha tests.

25          THE COURT:  You produced everything, you mean

1   everything in your custody and control.  There could be more,

2   but you don't -- I mean that's was the issue, right?  Whether

3   there's something else that needs to be produced that's not in

4   your custody and control.  Do you want to say something else?

5           MR. KING:  Just by way of history, and I think this

6   might clarify some issues here.  We produced everything we

7   have with respect to 04 alpha, the test carried out in June

8   and July of 2005.  And that was essentially like an alpha test

9   where we're learning about the types of machines they would

10  need to diagnose the radial force, and how firmly the hooks

11  attach to the cava.  And then they went back in later that

12  year, October, November of 2005, and did the 05 alpha tests.

13  And that is the test, I believe Mr. Schultz has the raw data

14  that we produced related to that test, as well as the

15  protocols that we've done with that test.

16          So to the extent that there was -- that Mr. Schultz

17  is looking for a final report for the 04 alpha test, there

18  would be none, and we have e-mails to suggest that no final

19  report was done because it was a learning experience type test

20  to figure out the sorts of machinery and methods they would

21  need to do a feasibility study, if you will.

22          And then in 05 alpha, where they were able to

23  develop better raw data, Mr. Schultz has that information.  So

24  I wonder if that history might be useful in discerning which

25  of these Zaragoza tests we're talking about, because there

 1  have been multiple.  And unfortunately, when

 2  Dr. DeGregorio and the folks at Zaragoza corresponded with

 3  Arne, they would often mix issues.  So when we have these

 4  e-mails that mention this test and that test, they're not

 5  discreet in the sense that they are keeping e-mails tight to

 6  one test or another.

 7          THE COURT:  All right.

 8          MR. SCHULTZ:  And if I may, Your Honor?

 9          THE COURT:  Sure.

10          MR. SCHULTZ:  On 04A, I think that's a perfect

11  example of why we're interested in these materials.  I think

12  what we've gotten, by the way, is everything in Cook's

13  possession.  The issue is whether these are in their control

14  given their long-standing relationship.  The e-mail on 04A

15  said they didn't do a final report because they didn't see

16  what they expected.  And that obviously piqued our interest.

17  What did they see?  And why was it such that it prompted them

18  not to create a formal report.

19          Certainly the study generated data.  They typically

20  generate histology, photographs, you know, forms that are

21  filled out as the study is carried out.  All of that under the

22  protocol should be in William Cook Europe's possession.  If

23  it's not, it's our argument that it's within their control,

24  and it should at least be requested of Zaragoza even if it

25  can't be compelled.

1          THE COURT:  So defendant may want to brief this.  I

2    don't know if you still want to do that.  Here's my thought on

3    this.  We're under a tight time frame.  We've already got the

4    issue of supplementation of expert witnesses.  If you brief

5    it, it's going to take more time, which hurts the plaintiff

6    frankly.

7          As I look at this, based upon what you've submitted

8    and what I've heard, here's kind of the way I'm leaning,

9    although I reserve the right to change my mind on that

10   particular issue.  On 3B, which involves Zaragoza, I've got a

11   question, a serious question, I think, whether Cook has

12   custody and control of that situation.

13         As I mentioned, defendant did work with the group to

14   develop the protocol, but it seems like the study was

15   performed and published independently.  So I would think -- I

16   think it would be a stretch to find custody and control for

17   the 3B item.

18         The 3E item strikes me as something that's

19   different.  3E, it looks like there truly is a long-standing

20   relationship between Cook and the Dotter Institute.  There

21   does appear to be financial support going on there.  There

22   appears to be a fact that there was specifically a contract

23   with the defendant to perform studies.  And I think that the

24   Dotter Institute had provided Cook with copies of the results

25   of the study.  All of that seems to suggest custody and

1   control to me.  So you don't really need to respond to this

2   right now.  I'll come back to it, but what I'm kind of

3   thinking about here is with respect to 3B, there's no custody

4   and control.  There's no obligation to -- for any further

5   production, but with respect to -- I keep saying 3 -- 4,

6   excuse me -- no, 3, 3E, there's no -- 3B, there's no custody

7   and control for the reasons I've stated, but 3E, there does

8   seem to be custody and control.

9          So that's likely how I would rule on this if later

10  in this conference we get to the point where I give you my

11  rulings.  What I'm thinking is you all kind of, as a

12  compromise, you get one, you don't get the other, and we don't

13  brief it.  So keep that in your thought process for now.

14  We're going to come back to that.

15         That takes us to 3C.  Has that issue -- it looks

16  like defendant was going to produce on that and it might be

17  resolved.  Is 3C resolved?

18         MR. KING:  I'm taking a look, Judge.

19         THE COURT:  3E -- 3C, excuse me, was FS080102, a 12

20  sheep/12 filters.

21         MR. KING:  Right, and so very quickly, Your Honor,

22  the story here is again we're talking about names of studies,

23  and we may be talking about protocols that were based on

24  templates, that they are the wrong identifying numbers.

25         What we know is that in April of 2005, Cook created

1  a draft protocol that it called VCA2.  That was 12 sheep/12

2  filters.

3          THE COURT:  Hang on just a second.  I just wanted a

4  quick answer to the question.  Was this produced?  Has it been

5  resolved?  Are you saying it hasn't been produced and it has

6  not been resolved?

7          MR. KING:  We're saying we don't know, Your Honor.

8  They have produced something called VCA2 that was done three

9  years later on a different number of sheep, and we're trying

10 to clarify whether the 12 sheep/12 filter was ever done.

11         THE COURT:  All right.  Well, let's have the

12 defendant explain what they think they've produced.

13         MR. SIMMONS:  Well, we did produce the --

14         THE COURT:  That's Mr. Simmons for the record.  Go

15 ahead.

16         MR. SIMMONS:  Yes, Your Honor, my apologizes.

17         We did produce all the related materials with the

18 Victor Charlie Alpha 2 study, VCA2.

19         The original draft that Mr. Schultz had cited to us

20 in his original complaint was a draft from 2005.  It was very

21 early, and it did have a mention of VCA2.  But we've also

22 produced subsequent protocols where it had been revised to

23 actually be tailored to what was actually done in VCA2, which

24 was a two sheep/four filter study.  And we've produced the

25 service proposals.  We've produced the final protocol with the

1   signatures on it, and I sent that to Mr. Schultz and

2   plaintiffs' leadership counsel earlier today.  And those have

3   been produced since mid-2015.  So the plaintiffs have those in

4   their possession.  Then we have the draft reports that

5   eventually got circulated before the study was terminated and

6   those have been produced as well.

7          In addition to that, all the imaging, the pictures,

8   the histology slides, or pictures of the histology slides at

9   least have been produced to plaintiffs.  So everything that we

10  have on VCA2, at least in digital format, has been produced.

11  And then the histology slides after they're scanned will be

12  produced.

13         THE COURT:  Will be produced when?

14         MR. WILLIAMS:  A week from --

15         THE COURT:  Oh, that's what you were talking about

16  before, by the 17th?

17         MR. SIMMONS:  Yes, Your Honor.

18         THE COURT:  All right.  Does that help in any way,

19  Mr. Schultz?

20         MR. SIMMONS:  It may, Your Honor.  I think the issue

21  distills into this:  Mr. King said there is no 12 sheep/30-day

22  FS080102 study.  I understand that.  I understand VCA2 and

23  that FS number, and the two-sheep study, they produced all of

24  that.  We're getting the slides copied now I've learned this

25  morning.

1            The question remains, Your Honor, we know that they

2    planned the 12-sheep study.  They planned to do it and present

3    it to FDA on April 29th of 2005.  We have a protocol of it

4    from April.  We have a table entry suggesting that it was

5    begun in 2005, and the $50,000 were either budgeted or spent

6    for it.  So the question is this, whether it went under the

7    name VCA2 FS080102 or any other number or name, was there any

8    12 sheep/30-day study done back in 2005 in anticipation of

9    meeting with the FDA?  That's the real nub of the question.

10           THE COURT:  All right.  Anything else you can add on

11   that, Mr. Simmons?

12           MR. SIMMONS:  Yes, Your Honor.  The draft protocol

13   that Mr. Schultz had cited to us on this issue, while it did

14   have the VCA2 on one of the template forms, it also had a

15   footer that said TS040008, which was the original study on

16   sheep that fits this description.  It ended up being more than

17   12 sheep.  I believe it was 20, if memory serves, but all the

18   documentation on that study's also been produced.

19           MR. SCHULTZ:  Your Honor, the VCA1 study he's

20   referring to had already passed the 180-day mark by the time

21   this protocol was created.  So this is not a holdover protocol

22   from VCA1, which was conceived and designed more than a year

23   before this.

24           My question again is regardless of what name it

25   might have gone under, we know Cook planned a 12 sheep/12

1 filter study for presentation to FDA in April of '05.  We have

2 a protocol for that study from March and April of '05.  They

3 didn't present it to FDA.

4          The question is, did they do the study?  This is

5 not -- we know what we have from VCA1.  We know what we have

6 from the 2008 version of VCA2.  Respectfully, that response

7 didn't answer the question that we have remaining.

8          THE COURT:  All right.  Mr. Simmons, do you have

9 anything else to add on that?

10          MR. SIMMONS:  I don't, Your Honor.  I'm afraid I'm

11 not exactly sure what Mr. Schultz is looking for at this

12 point.

13          THE COURT:  I think you are all speaking a different

14 language -- what?

15          UNIDENTIFIED SPEAKER:  I think, Your Honor, we just

16 did not do that study.

17          THE COURT:  Well, I think maybe there's a

18 disagreement over that, or a misunderstanding about it, but I

19 don't think you all talking about that issue anymore is going

20 to get us any further down the line to resolve the issue as it

21 relates to 3C.

22          So that brings up 3D, which was the VCOB TS090024,

23 which I think essentially relates to involvement of the Cook

24 platinum filter, which I think the defendant is declining to

25 produce those for various reasons, essentially saying that's

32

1  beyond the pale of what's at issue, at least with respect to

2  the Bellwethers.  Is it Mr. Schultz again?  Who's going to

3  address that?  Mr. Schultz, do you want to address 3D?

4          MR. SCHULTZ:  Yes, Your Honor, thank you.  The VCOB

5  study, the word "platinum" doesn't appear anywhere in this

6  protocol, and I am sure it doesn't appear anywhere in the

7  final report, although we don't have it because the summary

8  PowerPoint of the report in August of 2009 refers to the

9  protocol as a Celect prototype.

10          The platinum 510(k) was more than three years after

11  this study was done.  What they were doing was testing the

12  Celect filter with different modifications to try and fix the

13  problem of perforation that it had.  And the actual title of

14  the protocol, Judge, is "GLP Study for Safety and Performance

15  of Prototype Celect Vena Cava Filters."  It's referred to as a

16  Celect with elongated leg.  That did, three years later,

17  become the platinum, but it's our position, Your Honor, the

18  order the defendants referred to in your order said they would

19  not have to put Celect platinum into search terms, and that's

20  another issue that I'm not here to address, but the point is

21  this was not a Celect platinum document.  It wasn't not

22  produced because it contains the word platinum because it

23  doesn't.  The prototype -- or excuse me, the protocol doesn't

24  at least.

25          So any prototype testing on the Celect in order to

1  fix a problem that many of our clients had with the Celect,

2  that being perforation, certainly is relevant and we believe

3  we should be entitled to all data, the histology, and

4  everything else related to that study.

5          THE COURT:  All right.  Defendant?

6          Mr. Simmons?

7          MR. SIMMONS:  Mr. Schultz' characterization of this

8  as a test of a prototype that eventually became platinum is

9  correct.  I disagree and object to the characterization that

10 it was entirely to prevent perforations.

11         That said, that is why it has not been produced up

12 to this point, and we are speaking with our clients on

13 strategy on the production of that going forward.

14         THE COURT:  In the event that anything might be

15 produced, do you have a time frame?

16         MR. SIMMONS:  I would defer to my colleague,

17 Mr. King, on that.

18         THE COURT:  Mr. King?

19         MR. KING:  I can't give you a time frame.

20         THE COURT:  All right.  Just hang on a moment.

21         Okay, that takes us to item No. 4, which there is an

22 indication -- and No. 4 is "Weekly & Monthly Complaint

23 Summaries from William Cook Europe."  There was some

24 indication that that might be resolved.  Is that resolved?

25         MR. SIMMONS:  I believe so, Your Honor.

1          THE COURT:  Okay.  And the next item, actually the

2     next item, No. 5, I found to be one of the most fascinating

3     items of them all.  It was "Leigh Conners' Personnel File."

4     Has that been resolved?

5          MR. SIMMONS:  I believe so.

6          THE COURT:  Let me tell you why I find that

7     fascinating because I have smart lawyers on both sides, and

8     the submission from plaintiffs' counsel -- let me make sure.

9     Yes.  The submission from plaintiffs' counsel identifies that

10    as Leigh Conners personnel file with no apostrophe, but the

11    submission from the defendant is Leigh Conners' personnel

12    file, triggering a raging debate as to whether the apostrophe

13    is appropriate or not.

14         MR. WILLIAMS:  It's appropriate.

15         THE COURT:  You find that it is appropriate?

16         MR. WILLIAMS:  I concede that that is appropriate.

17         THE COURT:  Well, there were some who perhaps were

18    not willing to concede it quite as quickly as you, but I

19    thought the apostrophe was appropriate, Mr. Williams, so I

20    appreciate your concession.  That issue has been resolved.

21    All right.  The things we talk about around here.  All right.

22         That brings up No. 6, the image files that Cook

23    overlooked.  Has that been resolved?

24         MR. WILLIAMS:  Your Honor, very possibly, within the

25    last four weeks we've been produced more than 180,000

1   documents, and so we are still trying to comb through those.

2          THE COURT:  Possibly resolved, if not you can always

3   bring it back to the Court's attention.

4          MR. WILLIAMS:  Thank you, Your Honor.

5          THE COURT:  All right.  You're welcome.

6          No. 7 is -- I'm sorry, was there something else?

7          MR. WILLIAMS:  No, I was ready to move on.

8          THE COURT:  Okay.  No. 7 is Cook's continued e-mail

9   what's called destruction.  Although in the defendant's

10  version, the destruction's in quotes.  So once again, a

11  difference maybe in the quotations, in punctuation.

12         This is an issue -- it's interesting whether I

13  should be addressing this or not.  You all have appropriately

14  indicated that perhaps this is something Judge Young might be

15  raising with you on February 9th at a status conference.

16  Certainly it would be appropriate to defer to him if that's

17  what he wants to do.  If not, we can certainly address it and

18  I can give you a ruling on it.  How do plaintiffs' want to

19  proceed?

20         MR. SIMMONS:  Your Honor, as we -- I mean, and this

21  issue has really come to the forefront for us within the last

22  couple of days as we've gone through some depositions that

23  we've taken recently.  And so we put it on both agendas, not

24  knowing at the time the agendas were put out which judge would

25  be more appropriate to handle the issue.

1          At this point, we think --

2          THE COURT:  I guess it depends on what the ruling

3  is, right?

4          MR. SIMMONS:  I suppose in hindsight, sure.  But at

5  this point, considering the relief that I'm going to ask the

6  Court for on this issue, we think it's properly put before

7  you.

8          THE COURT:  Okay.  What do the defendants want to

9  do?

10          MR. KING:  Your Honor, we have -- this is Doug King

11  for the record.  We have put everyone who's involved in the

12  sales and marketing and clinical support of filters and the

13  strategic business unit on hold.

14          THE COURT:  I understand your position.  I just --

15  did you want me to rule on this or do you want me to defer to

16  Judge Young?

17          MR. KING:  We can -- we'll let you rule on it.  I

18  mean not let you, but we're glad to have you rule on it.

19          THE COURT:  Yeah, because you all had indicated --

20          MR. KING:  We're happy to have you do it.

21          THE COURT:  All right.  So go back to the plaintiff

22  then.  I mean, it sounds like you have something you want to

23  say about that, Mr. Williams, so go ahead.

24          MR. WILLIAMS:  I do, Your Honor.  The binder that I

25  gave you, the first five tabs, the numbered tabs are going to

1  kind of walk us through this issue.  The first tab behind tab

2  1 is Cook's electronic information policy that was produced to

3  us.

4         On the second page, you'll note in the highlighting,

5  Cook's typical document destruction policy is that deleted

6  items in e-mails are deleted off the system within 30 days,

7  and e-mails in the in box of folks are deleted within 60 days.

8         If you go to Tab 2, we've got case management order

9  11, which this court entered back in 2015.  And in this case

10  management order, I've highlighted a number of times in which

11  the Cook entities stated that litigation hold notices were put

12  on -- were issued.  If you look under -- on page two under

13  Section B2, a suspended, any procedure or process that would

14  result in the elimination or transfer to a less accessible

15  medium of any unpreserved data.  If you go through, there are

16  a number of statements throughout this CMO that say the

17  parties understand and will meet the preservation obligations

18  they have under the Federal Rules of Civil Procedure.

19         This was signed by Mr. Lee for the defendants and

20  Mr. Martin for the plaintiffs.  That was back in 2015.  We had

21  assumed that a litigation hold and that document preservation

22  procedures had been put into place.

23         THE COURT:  Well, there was a litigation hold,

24  right, affecting allegedly 191 people?

25         MR. WILLIAMS:  Well, Your Honor, if you look at

1    Mr. King's e-mail, and I will address this with the deposition

2    that we took last week, or two weeks ago, he says "However, as

3    of this writing," which was yesterday, "currently these people

4    are under hold."  That says to me that if you're saying as of

5    this writing, that a litigation hold very possibly could have

6    been put in place as late as yesterday.

7              And if you look on Tab 3, this is the deposition or

8    excerpts of the deposition of Courtney Whitelock.  She was a

9    sales representative who detailed or visited the treating

10   physician for Bellwether plaintiff, Ms. Elizabeth Hill.  In

11   fact, we have a document that suggests that she visited that

12   physician close to 150 times in five years.  That's close to

13   two times a month for five years straight.

14             When asked in her deposition if she recalled any

15   statements at all that she made to that physician, she said

16   no, which highlights the problem.  If you look on the third

17   page of Tab 3, the first thing we get on these two pages is

18   Mr. Heaviside asks her "Has Cook done anything to look at your

19   computer or preserve your material?"  She says "Yes, within

20   the last six months." So we're talking fall of 2016.

21             The following page on -- it's page 17 of the

22   deposition, Mr. Heaviside asks "Were you ever advised by the

23   legal department or anybody else of the need to preserve

24   documents, including e-mails, as part of a litigation hold?"

25             She says "Not to my knowledge."

1          He says "So no one ever told you that you needed to

2    preserve documents for a litigation?"

3          She said, "Right."

4          He then goes through and has her describe the fact

5    that she had plenty of e-mails that were not produced, and we

6    got her custodial file.  She states that -- Your Honor will

7    remember we talked ad nauseam on several occasions about call

8    notes.  She says in her deposition that after she visited a

9    physician, she would e-mail the details of that meeting to her

10   supervisor and that material should be kept in her e-mail.

11         When Mr. Heaviside said "The mystery is why don't we

12   have any of your e-mails before 2012 and after 2013, you can't

13   answer that question, right?"

14         She says "It's not part of my job to keep track of

15   e-mail."  This is on page 32 of the deposition.

16         When Mr. Heaviside asked her if she would even

17   agree, sitting there today at her deposition, if she would

18   agree to not delete anything off of her iPad, you'll see the

19   colloquy with Ms. Pierson who refuses to let her answer the

20   question.

21         As we go through this, she notes that they had all

22   sorts of things, like call notes, preplanning call work

23   sheets, all this information that would have memorialized what

24   these sales reps said to these physicians.  And this is a

25   Bellwether case.  Those communications are crucial.

40

1          THE COURT:  Remind me again what title did Courtney

2   Whitelock have?

3          MR. WILLIAMS:  She -- I believe it was -- was it a

4   district manager?

5          MR. MARTIN:  Ms. Whitelock?  Ms. Whitelock is a

6   sales rep.  And I believe the actual title is district

7   manager.  And Mr. Williams can talk in a minute about

8   (inaudible), Your Honor.  She's actually -- Whitelock's a

9   regional manager over about eight people like her.

10          THE COURT:  All right.  For the record, that was Ben

11   Martin.

12          All right, go ahead, Mr. Williams.

13          MR. WILLIAMS:  Throughout her deposition then, this

14   is on page 109, which is also behind Tab 3 and highlighted,

15   Ms. Whitelock explains that she had call notes.  She doesn't

16   know where they are.  She never deleted them off her computer,

17   and she gave her computer to Cook within the last six months.

18   This raises an issue to us of paramount importance.

19          The Hill case, even if we're not talking about when

20   they should have put a litigation hold on earlier, the Hill

21   case was filed in 2014.  This is the sales rep that detailed

22   the treating physician over 140 times.  And she testified

23   under oath that no one told her to preserve her documents, no

24   one told her about a litigation hold, and nobody knows where

25   her e-mails are, the very e-mails that set out what she told

1    this physician when she made sales rep calls.

2           THE COURT:  What are you asking for?

3           MR. WILLIAMS:  What we are asking for, and there's

4    plenty more to back this up, but to cut to the chase, we did a

5    lot of looking over the weekend and even last night on what

6    MBL ports do.  Maybe surprisingly or not, this is not an

7    uncommon issue in what they do when these type of things come

8    up.  And I think the best approach to this is to do it

9    methodically.

10          What we need at this point, we've got a lack of

11   evidence on two Bellwether trials.  What we need at this point

12   is a 30(b)(6) deposition about the litigation hold, about the

13   preservation of e-mail, the dates that these things were

14   implemented, who was covered, what they were told, because if

15   there's a spoliation issue here, and we're going to try these

16   cases, if we're entitled -- if we can prove a spoliation

17   issue, we'll -- we can get an adverse inference to present to

18   the jury when the evidence is closed.

19          But before asking for that, what we have identified

20   in Miss Whitelock's deposition, and what we have seen from the

21   CMO11, and the representations that were made about litigation

22   hold and the preservation of documents, at a minimum, we need

23   to do discovery on this limited issue so we can determine what

24   happened to the evidence that we need to prove our case.

25          THE COURT:  All right.  Defendant want to respond to

1  that?

2       MR. KING:  Your Honor, first of all, I would

3  respectfully like to have an opportunity to consult with

4  Ms. Pierson on this who was at these depositions.  I don't

5  know what these people said in their depositions.  I don't

6  know what they were -- I don't know the context.  He's taken

7  some things out of -- and I'm not suggesting he's --

8       THE COURT:  I know, there's certain pages in the

9  deposition, it's not the entire deposition.  I know what you

10 mean.

11      MR. KING:  And I would like to talk to her.  So I'd

12 like to have that opportunity.  But I would like to mention,

13 Your Honor, Mr. Schultz, who's on the phone, and I have talked

14 about Ms. Whitlock -- Whitelock, excuse me, and Ms. Conners

15 before.  And number one, Ms. Conners is no longer an employee

16 of our company and left the company in 2013, which would have

17 been two years after -- almost three years after the date of

18 implant.

19      So her laptop would have been taken back by the

20 company, and it no longer exists.  So whatever e-mails

21 Ms. Conners had with the physician prior to the implant would

22 have been scrubbed off her computer and the computer no longer

23 exists because she left the company in 2013, in the fall.

24      Ms. Whitelock, who still works for us as Mr. Schultz

25 and I have had this conversation before, as Mr. Schultz will

1   recall, in Ms. Whitelock's case, she traded in her computer

2   and got a new one, a new laptop in 2013.  Again, three years

3   after the implant.  So I realize in her old computer, which

4   would have kept whatever e-mails that she would have had with

5   Dr. Zuzga, the implanting physician prior to the implant in

6   2010, no longer exists.

7           So while what Mr. Williams says sounds pretty good,

8   in the context of this particular case, it's meaningless

9   because these two individuals didn't have computers.  Their

10  computers were gone in 2013, one because she left the company

11  and the other because she traded in her computer.

12          So whatever existed on their computers that is

13  material to the Hill case and material to what was told to the

14  physician prior to the date of implant was gone long before

15  the lawsuit was even filed in 2014.

16          THE COURT:  All right.  So let me ask you this

17  question, Mr. King, and this is an important answer.  When did

18  the litigation hold referenced in number -- paragraph seven of

19  your e-mail --

20          MR. KING:  Yes, Your Honor.

21          THE COURT:  -- go into effect?

22          MR. KING:  I'll have to check with the client.  I

23  cannot answer that.

24          THE COURT:  Well, you check that out.

25          MR. KING:  I will.

1            THE COURT:  So here's my take on this, and I'll come

2   back to all of these things when we're done, since it seems to

3   be kind of great import right now.  I'm sensitive to the

4   notion that if there's information not being kept in violation

5   of a litigation hold, or in violation of an understanding of

6   what the case management order is or otherwise, that there may

7   be a need for a 30(b)(6) deposition.  I don't think we're

8   there yet, but I think you've set forth a basis that causes me

9   to wonder what's going on here.

10           That being said, part of the answer to that question

11  is when this litigation hold went into effect.  It's not maybe

12  the end of the question, but it's an important question.

13           MR. KING:  Your Honor --

14           THE COURT:  Just a second.

15           MR. KING:  I'm sorry.

16           THE COURT:  And because the defendant, you know,

17  they're not going to be able to save everything.  They're just

18  not.  There's just too much here.  They have to make

19  reasonable good faith efforts to save documents that are

20  subject to the hold or request in litigation.  And what

21  they've set forth here is, at least the representation is,

22  that they have placed holds on e-mail accounts of all district

23  managers, regional managers, clinical specialists in the

24  peripheral interventions, strategic business unit, that's

25  i.e., all people involved in marketing of supported filters

1  which involves approximately 190 people; if that hold was put

2  in place at the correct time, that strikes me as inherently

3  reasonable.  But Mr. Williams has come forward with evidence,

4  or at least information today that suggests there may be

5  issues with respect to that.

6         So I'm going to have Mr. King confer with whoever he

7  needs to confer with and have the lawyers report back to me in

8  seven days on the status of that, and at that point, I'll make

9  a determination whether there needs to be a 30(b)(6)

10 deposition to inquire further.

11        MR. KING:  Your Honor, may I add one other thing?

12        THE COURT:  Go ahead.

13        MR. KING:  [When this litigation began in 2014, and

14 we began –– and we had our first pretrial conference before

15 you in this room in the fall of 2014, we began to identify

16 people who we knew were involved and put litigation holds on

17 them.  So what this policy we're talking about in my e-mail

18 that was sent to the Court, this is an attempt to blanket the

19 company.

20        We had previously put litigation holds on different

21 people as we learned they are involved in this case or

22 relevant to it.  So there's not going to be one set time that

23 a litigation hold went into effect.

24        THE COURT:  Well, find out what you can find out.  I

25 mean, there's been no suggestion to date, at least to the

1   Court, that there's been an issue with respect to litigation

2   holds.  I'm not suggesting by any of my comments that there is

3   a problem, all right?  And frankly, that's not really what

4   Mr. Williams is saying.  Mr. Williams is saying he's got a

5   question about it.  If those things turn out to be what he's

6   concerned about, it could be a huge issue, but we're just at

7   this point trying to determine what happened.  And that's why

8   you need to confer with your client and then talk to

9   Mr. Williams and his people, and then let me know in a week

10  where things stand.  And we'll do whatever we need to do at

11  that point.

12            MR. KING:  Yes, sir.

13            THE COURT:  All right.  And then that brings us to

14  item No. 8.

15            MR. MARTIN:  Yes, Your Honor.

16            MR. SIMMONS:  Mr. Martin is going to address that

17  for the plaintiff.

18            THE COURT:  You're going to let Mr. Martin speak

19  finally.  Excellent.  All right, Mr. Martin, you did speak

20  once before.

21            Cook's boilerplate objections.  I'm not really sure

22  what you want me to do with this because what we have is a

23  huge litany of objections, which are boilerplate to a certain

24  extent.  I'll grant you that.  But we also have a whole bunch

25  of discovery, which probably is overbroad in certain respects.

1  So how now do I piecemeal through that and get you a result

2  you want?

3          MR. MARTIN:  Your Honor, I agree with the Court on

4  this to some extent, yes.  I think what we really -- here's

5  the problem.  We've got all of these requests for production,

6  interrogatories.  Each one of them has had numerous

7  objections, and Cook has produced documents, but the problem

8  is that when they produce documents subject to the objection,

9  once we get to trial, the Court, of course, would see the

10  problem.  If we don't go forward and get a ruling on the

11  objections on matters that we may want to make -- we must make

12  a determination as to whether or not anything has been

13  produced subject to an objection or not.

14          THE COURT:  Right, and I think -- I'm sorry to

15  interrupt you, but I think your concern is valid.  That's

16  probably why they amended the rules on December 1st to say if

17  you withhold anything that was subject to objection, you need

18  to let us know what you're withholding.  But most of this

19  stuff, as I understand it, was probably produced or the

20  objections were raised before the rule was amended.  So in

21  that respect, how do we proceed?

22          MR. MARTIN:  Even so -- and again, I think today may

23  be premature to -- it is premature for the Court to

24  (inaudible) us to present all of the -- all of the briefing

25  and issues that would be necessary to go through each one of

1  these objections.

2          What I would suggest, Your Honor, but -- and even

3  under the old rule, and when these were served, you know, an

4  objection may be appropriate, it may not be appropriate, and

5  so we just need to get those ruled upon.  But what we have

6  been told, after trying to work this out, is that Cook is not

7  going to pull down any of their objection on any of these

8  things.

9          What I think we need to do is make one more stab

10  amongst ourselves.  We need to make a determination as to

11  which of these request for production interrogatories are

12  something that we need and we need the objections ruled upon.

13  And then Doug and his team can tell us whether, you know, to

14  count sand or not, and then we can come back to the court --

15          MR. KING:  I didn't say that.

16          MR. MARTIN:  -- come back to the Court and have the

17  Court rule.  So I think we need to make one more stab at

18  each -- we have not gone through each and every one of these

19  yet, and I think it's going to be necessary for us to do that

20  so that then we can bring this to the Court at a -- pretty

21  soon, but certainly with a little bit more ammunition on ours

22  and their side.

23          THE COURT:  As usual, you've kind of put your finger

24  on it because just candidly, I'm going to require that you do

25  that.  I need you to do that individually on each objection

1 before you dump it all on the Court and say -- I wouldn't be

2 able to possibly resolve that.

3          So if you can resolve it, great.  If you can't, come

4 back with specific discovery requests and specific objections

5 on what those problems are, and then I'll be happy to address

6 them with you.

7          MR. MARTIN:  One of the things, Your Honor, we just

8 wanted to make certain that we weren't -- that --

9          THE COURT:  Waiving anything?

10         MR. MARTIN:  A suggestion was made that we were kind

11 of not pushing the objections, and we've somehow waived it by

12 some waiting or delay.  I certainly wanted to keep it on the

13 table.

14         THE COURT:  All right.  So it's on the table.  So

15 the final one was "Complaint Files," No. 9, and there's a

16 question whether this has been resolved or whether it's even

17 ripe.  From plaintiffs' perspective?

18         MR. WILLIAMS:  Your Honor, this was -- this is

19 another -- and I think Doug and I -- Mr. King and I, I'm

20 sorry, spoke about this prior to you coming out.  This is

21 just -- with the volume of documents that we've received

22 within the last two or three weeks, I am not in a position yet

23 to know if this is off the table or not.

24         THE COURT:  So it's not ripe.

25         Sorry, Miss Holtz, would you be kind enough to let

1  those people know, who I think are probably -- are they here?

2  Is it 2:30?  What time is my next conference?  Oh, 2:30, we

3  still have ten minutes.

4         With that, Mr. Williams, why don't you go ahead and

5  unleash your argument with respect to the experts on

6  supplementation?

7         MR. WILLIAMS:  Sure, and Your Honor, I'm not sure

8  because this has the potential to affect trial dates.

9         THE COURT:  Yes, it does.

10        MR. WILLIAMS:  So I don't know if it's -- you know,

11 if I should address it here with you or we should do that on

12 Thursday?

13        THE COURT:  Well, that's an excellent point.  If it

14 affects a trial date, it affects Judge Young a lot more than

15 it affects me.

16        MR. WILLIAMS:  Well, I'll tell you what we're

17 thinking.  We've got -- we received, and I put it in that

18 first folder in the inside cover of your binder, there's a

19 summary of the documents that we received in January 2017,

20 which was somewhere between around 30 days, right after the

21 report's being done.  We received, at least when we put this

22 together, close to 186,000 documents.

23        THE COURT:  Didn't you ask for these documents?

24        MR. WILLIAMS:  What's that?

25        THE COURT:  Didn't you ask for these documents?

1          MR. WILLIAMS:  We did.

2          THE COURT:  And they gave them to you, so no

3   complaining that you got a bunch of documents.  That's what

4   you asked for.

5          MR. WILLIAMS:  Well, to be fair, we asked for them a

6   couple years ago and we just got them now.

7          THE COURT:  All right.

8          MR. WILLIAMS:  At the end of the day, though, I

9   don't know if supplementation is the right way to go, because

10  if we supplement, what will happen is we'll have the report

11  out there, and then if they come across a new document that we

12  just received, and they say "Well, you know, I need to tweak

13  my opinion," well, now we have an impeachable situation when

14  there really shouldn't be one.

15         I think if we could get another 30 days to get our

16  expert reports -- I mean, they are substantially completed --

17         THE COURT:  Remind me when the due date is?

18         MR. WILLIAMS:  16 or 15.  February 15.

19         THE COURT:  17 is the deadline for plaintiffs'

20  reports.  Didn't I already say I'm not enlarging those

21  deadlines?

22         MR. WILLIAMS:  You did, Your Honor, but that was

23  before we got dumped with 186,000 documents.

24         THE COURT:  That's right.  I just -- you're wanting

25  until March 17th or something?  Isn't that St. Patrick's Day.

1    That would be improper.

2                 MR. WILLIAMS:  It would be improper.

3                 THE COURT:  But yet inherently ironic.

4                 All right, and Ms. Pierson, if I saw somewhere she

5    said -- was it Ms. Pierson wouldn't agree with that?

6                 MR. WILLIAMS:  She had told me and others on various

7    calls that they would object to our supplementation.  We

8    haven't discussed this because really we kind of made the

9    decision, at least strategically, that we think we should just

10   rather do the reports all at once rather than supplement in

11   the last day or two.  So --

12                THE COURT:  Do you think it's possible to grant the

13   request that you've asked for and still realistically keep

14   your trial date?

15                MR. WILLIAMS:  From the plaintiffs' perspective, I

16   think that it's a possibility.  I obviously am not going to

17   speak to Mr. King or his --

18                THE COURT:  Mr. King can speak.

19                MR. KING:  I would have to speak with co-counsel on

20   this, Your Honor.

21                THE COURT:  Here's what I suggest we do.  Let me get

22   an entry out on this.  Let me tell you what my ruling's going

23   to be, and I'll cobble something together that might be

24   helpful to Judge Young to have that in hand when he talks with

25   you.  You're seeing him on Thursday?

1          MR. WILLIAMS:  Thursday.  Yes, Your Honor.

2          THE COURT:  What time is your conference with him?

3          MR. WILLIAMS:  Ten in the morning, Your Honor.

4          THE COURT:  Thursday, 10 a.m.?  And then raise it

5     with him.  I think he's going to be very reluctant to extend

6     deadlines that impact a trial date.  You know, he's got a

7     schedule and I'm doing everything to keep him on track, and

8     we've conferred here and there with the idea that we need to

9     keep this on track as best we can.

10          So I don't want to make a ruling on that right now,

11    but I'd like him to know kind of what's going on.  I do think,

12    without the benefit of a whole lot of discussion or briefing

13    on this, that there's been -- there's some additional

14    information that the plaintiffs have received that might cause

15    the need to revisit that deadline to some degree as much as I

16    would hate to do that, but I'll leave that for Judge Young.

17    Don't tell him I said I was going to extend the deadline

18    because that's not what I said.

19          All right, is there anything else for today before I

20    give you a quick run down on where we are?

21          MR. WILLIAMS:  Not from the plaintiff, Your Honor.

22          THE COURT:  Mr. King?

23          MR. KING:  No, Your Honor.

24          THE COURT:  All right.  So I'm going to try do this

25    as efficiently as I can.  We'll have a record of it, and then

1  I'll try to do a real short entry for the rulings.  And then

2  if you want the rationale, you can always get a copy of the

3  transcript, request a copy be transcribed.  Let me just get my

4  thoughts together for one moment before I do that.

5          Okay.  The first issue relates to the slides,

6  including the plastic embedded slides for VCA1, VCA2 and VCA3.

7  VCA1 has been resolved.  With respect to VCA2 and VCA3, I'm

8  going to order that produced to plaintiffs by February 17th.

9          The second issue presented to the Court relates to

10 materials for the OUS study.  Defendant has indicated to the

11 Court that they'll be producing raw data to the plaintiffs by

12 February 8th.  In light of that, no dispute is ripe with

13 respect to that production.

14          The next issue is 3, item 3, animal studies.  The

15 first one I will address is 3A, which is P030118D-038.

16 There's what defendant identifies as perhaps confusion on the

17 plaintiffs' part as to whether a different study existed.

18 It's frankly not entirely clear from what's been presented to

19 the Court whether it's confusion or whether there might, in

20 fact, be some other study or part of another study that hasn't

21 been produced.

22          To the extent there is something else out there, and

23 it's not just the plaintiffs' confusion, that does need to be

24 produced, and I'll identify this as follows:  This study is

25 the migration test identified as Bates No. 0484250, and this

1  study and any related documents would need to be produced by

2  February 17th if this has not already been produced.  So if it

3  exists, then it needs to be produced.

4          UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor, the

5  number you gave was 048-4250?

6          THE COURT:  48-4250.

7          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          UNIDENTIFIED SPEAKER:  I just wanted to clarify

10  that.

11          THE COURT:  With respect to 3B, which is

12  No. P03118B-04A, and 3E, Retrievability of the Celect and

13  Gunther Tulip Vena Cava, I view those issues as both being

14  ones of custody and control; that is, whether Cook has

15  sufficient custody and control over the items such that they

16  need to be produced.

17          With respect to 3B, I find that -- let me make a

18  note here.  With respect to 3B, there is no custody and

19  control.  Zaragoza is not a Cook company.  It's not a Cook

20  entity.  The defendant did work with that group to develop a

21  protocol for the testing, but the study was performed and

22  published independently, such that I do not believe there's

23  sufficient facts to establish custody and control for purposes

24  of discovery production.

25          I think 3E is different.  I think there is custody

1  and control with respect to 3E, involving the Dotter

2  Institute, because there, there does appear to be a

3  long-standing relationship with the defendant.  There does

4  appear to be financial support.

5           There appears to be some type of a contract with

6  defendant to perform studies.  And as a result of that -- and

7  I would also say that I think that Dotter provided Cook with

8  a copy of the results of the study.  As a result of that, I

9  think there is sufficient facts to establish custody and

10 control for 3E.  So 3E would need to be produced, but 3B, no.

11 That would be by February 17th.

12          Next item is 3D, which relates to VCOB (TS0900024),

13 and this relates to, and defendant's concern with this coming

14 into this, was that platinum was not an agreed-upon term.

15 It's true that platinum was not an agreed-upon term for search

16 purposes, but it has been presented to the Court, and I think

17 it's been established that this testing involved a prototype

18 of a filter that is involved in this litigation.  As a result,

19 the defendant must produce the information sought under 3D by

20 February 17th.

21          Items 4, the "Weekly & Monthly Complaint Summaries

22 from William Cook Europe"; Items 5, the "Lee Conners Personnel

23 File"; and Items 6, the "Image Files that Cook Overlooked"

24 appear to be resolved.  There may be some issue with respect

25 to Item 6, but as I've said before, if it turns out that

1  something comes up that's not, in fact, resolved, you can

2  always bring it to the Court's attention, but for today's

3  purposes, I'm going to treat 4, 5 and 6 as resolved with a

4  question mark on 6.

5       No. 7 is "Cook's Continued E-mail 'Destruction.'"

6  With respect to this, there is a pretrial with Judge Young

7  this Thursday at 10 a.m., and I will defer to Judge Young on

8  that issue because this involves a potential issue with

9  respect to trial date because this involves an issue of

10  spoliation.  As I indicated to counsel, if there's a serious

11  issue with respect to that, a 30(b)(6) deposition may be

12  appropriate, but the parties need to meet and confer, and let

13  me or Judge Young know what the status of that is.

14       Item No. 8 is "Cook's 'boilerplate' Objections,"

15  that's the term used, and that issue's not ripe.

16       Issue No. 9 are the "Complaint Files" and that issue

17  also is not ripe.

18       Finally, there's the issue of supplementation of

19  expert reports.  The deadline for plaintiffs expert reports is

20  February 15th, and the plaintiffs' have asked for March 17th

21  to supplement their reports, and that issue is something that

22  I asked them to raise with Judge Young at the Thursday

23  conference.

24       Now just one moment.

25       All right, I'm going to correct one thing I said

1  because I misspoke with respect to Item No. 7, "Cook's

2  Continued E-mail 'Destruction'" as that term is used by

3  plaintiff.  I'm not saying there's been e-mail destruction

4  here, but that's the reference.

5       Just to clarify, what I actually asked the parties

6  to do was meet and confer and report back to me within one

7  week with respect to -- I believe Mr. King indicated he needed

8  to talk with somebody, his colleagues or his client or both,

9  and see where they were on that issue.  So I'm going to have

10 the lawyers report back to me within seven days on the issue

11 of Cook's e-mail preservation and see where we are.

12      The issue with respect to Judge Young relates to

13 supplementation of experts.  So you raise that with Judge

14 Young.  I presume he'll deal with it.  If he doesn't want to

15 deal with it or can't deal with it for some reason, I'll be

16 happy to address that issue with you.

17      All right.  From plaintiffs' perspective, anything

18 else to raise?

19      MR. SIMMONS:  No, Your Honor.

20      THE COURT:  All right.  Thank you.

21      MR. SCHULTZ:  Judge, I apologize if I missed it, but

22 I did not hear a ruling on 3C, which is where plaintiffs

23 (inaudible) for any documents that might have pertained to a

24 study, if one occurred, between March and May of 2005 for a 12

25 sheep/12 filter study.

1          THE COURT:  Right, here's what I've got for 3C if I

2   didn't say it.  I apologize and I may not have.  I may have

3   skipped over it.  Let me go back to 3C just a moment.

4          I think I did skip over it.  3C is identified in the

5   e-mail as FS080102, 12 sheep/12 filters per 029-5478.  It

6   appears to me with respect to 3C that the defendant has

7   produced documents responsive to this discovery request.

8   Therefore, the issue is moot.  In the event that it could be

9   seen that that wasn't moot, in my opinion, defendant's

10  production with respect to item 3C is sufficient to satisfy

11  the discovery obligation.

12         Thank you for bringing that to my attention,

13  Mr. Schultz.

14         MR. SCHULTZ:  Thank you, Your Honor.

15         THE COURT:  All right.  Anything else on behalf of

16  the defendant?

17         MR. KING:  No, Your Honor.

18         THE COURT:  And we're only six minutes overtime.

19  Not bad.  Thank you all very much.

20                 (Court adjourned.)

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


       I, Laura Howie-Walters, hereby certify that the foregoing is a true and correct transcript transcribed to the best of my ability from recorded proceedings in the above-entitled matter.


<u>/S/LAURA HOWIE-WALTERS</u>   February 17th, 2017

LAURA HOWIE-WALTERS, FCRR, RPR, CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division