IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE:  COOK MEDICAL, INC., IVC
FILTERS MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates to All Actions

## MEMORANDUM IN SUPPORT OF THE COOK DEFENDANTS' PROPOSED SECOND AMENDED BELLWETHER TRIAL PLAN AND REQUEST FOR DEADLINE TO WITHDRAW PLAINTIFFS' CUMULATIVE AND DUPLICATIVE EXPERT TESTIMONY

This multi-district litigation was created on October 14, 2014, now over two years ago. Since that time, Plaintiffs have taken a "scorched earth" approach to discovery, serving more than 170 Requests for Production and Interrogatories on the Cook Defendants and their former employees, conducting 18 depositions of Cook employees, and serving roughly 270 Requests for Production to third parties.  As a result, the defendants, Cook Inc., Cook Medical LLC (f/k/a Cook Medical Inc.), and William Cook Europe ApS (collectively, "Cook" or "Defendants"), have produced 250 gigabytes of data and more than a million pages of documents regarding the design, manufacture, testing, sale, regulatory approval, post-market surveillance, of the Günther Tulip and Celect vena cava filters, as well as myriad other topics.  Yet, Plaintiffs continue to seek still more discovery, requesting between *eleven* and *fourteen* additional Cook depositions and (among other things) serving Cook with more than 100 additional requests for production.

On July 19, 2016, the Court chose three bellwether cases—*Gage, Hill*, and *Brand*—and on October 17, 2016, issued a schedule for the discovery, motion practice, and trial of those cases.  (Order on Bellwether Trial Selections [Dkt. No. 2107]; Case Management Order # 19 (Bellwether Trial Plan) [Dkt. No. 3015].)  Both the Bellwether Trial Plan and the Court's

1

comments during the November 10, 2016, Status Conference made clear that the time had come to focus on case-specific fact and expert discovery in the *Gage* and *Hill* cases.

Since the Court issued its Bellwether Trial Plan, however, Cook has continued to face a barrage of company discovery, and Plaintiffs' scorched earth approach has been extended even more, including the disclosure of 13 expert witnesses with 17 separate reports, that are cumulative, duplicative, and threaten the Court's schedule for the trials of *Gage* and *Hill*. Given Plaintiffs' most recent deposition requests and expert disclosures, trials of these bellwether matters are now likely to take ***six to eight*** weeks, and needlessly will involve the presentation of cumulative expert testimony on multiple topics, countless side issues, and mini-trials (*i.e.*, trials within the trial) on, for example, the FDA's 510k clearance process, the vitality of the FDA's regulations for post-market surveillance practices, the risk of filter fracture (even though neither Mr. Gage nor Ms. Hill experienced a filter fracture), among other issues.

The Court's Bellwether Trial Plan contemplated that the parties would spend late 2016 and January-February of 2017 focused on case specific discovery and depositions, with March-June focused on expert reports and expert depositions, and the months that followed dedicated to pre-trial motions and trial preparations. Given the significant scientific and legal issues before the Court, as well as the sweeping accusations made by Plaintiffs regarding nearly every aspect of the design, testing, manufacture, sale and use of the products, the Court's Bellwether Trial Plan has been a critical guide for preparing the cases for trial. However, at the stage when the parties should be focused on completing *Hill*- and *Gage*-specific discovery, deposing Plaintiffs' experts, and completing Cook's experts' reports, instead, Cook's time and resources must be dedicated to addressing Plaintiffs' ongoing company discovery, Plaintiffs' cumulative and

redundant expert reports, and preparing (and responding to) for Plaintiffs' experts' opinions without the core materials on which Plaintiffs' experts relied.

In addition to the 18 company depositions previously taken, Plaintiffs seek ***eleven*** to ***fourteen*** additional depositions of Cook employees, former employees, former consultants, and third parties in the next 60 days.  Plaintiffs also have served Cook with over 100 new requests for production in connection with the company employee and third party depositions since the selection of the bellwether cases.[1]  At the same time, Cook has been stonewalled by Plaintiffs with respect to treating physician depositions in *Hill*—depositions central to Cook's expert disclosures currently due on May 16—and Plaintiffs have failed to produce key materials upon which their experts rely for their opinions in *Hill*, in particular, making it impossible for Cook's experts to fully rebut their opinions by Cook's expert disclosure deadline.

Perhaps the greatest threat to the Court's Bellwether Trial Plan, though, is Plaintiffs' service on March 17, 2017, of ***seventeen*** duplicative and redundant expert reports.  Plaintiffs served reports from medical causation experts with word-for-word ***identical*** reports in large parts (Drs. Rajebi and Marmureanu); engineering experts with the same areas of expertise opining on the same topics (John LaDisa, Robert McMeeking, Alan Litsky, and Robert Ritchie); and other experts offering redundant and cumulative opinions on topics far beyond their substantive expertise.  Rule 26 and Seventh Circuit authority prohibit such cumulative testimony due to the burden placed on both the opposing party and the Court.  Indeed, Plaintiffs' present slate of experts will require the Court to address the redundancy in what will likely be ***ten or more*** different *Daubert* motions, in addition to ruling on two significant motions for summary

---

[1] Plaintiffs also have served well over 100 Requests for Production on eight different non-party consulting and/or public relations firms since the selection of the bellwether cases.

US.111108364.01

judgment and potentially dozens of motions in limine, in two different cases, all in the last 70 days before trial.

Given the compressed schedule for *Gage* and *Hill*, Cook respectfully requests that the Court (1) enter the proposed Second Amended Bellwether Trial Plan attached as Exhibit A,[2] and (2) order Plaintiffs to withdraw or reduce their duplicative, cumulative and redundant expert opinions contained in the 17 expert reports in the interests of proportionality and judicial economy. Specifically, Plaintiffs should be limited to two engineering experts per case, one medical causation expert per case, and redundant and cumulative opinions outside the scope of the expert's qualification.

## I.   BACKGROUND

### A.   History of the Bellwether Trial Plan

The Court picked three bellwether cases—*Gage*, *Hill* and *Brand* —on July 19, 2016, (Order on Bellwether Trial Selections [Dkt. No. 2107]), and entered Case Management Order # 19 (Bellwether Trial Plan) on October 17, 2016. The Court's Bellwether Trial Plan was amended at Plaintiffs' request on January 4, 2017. (*See* Amended Case Management Order # 19 (Amended Bellwether Trial Plan) [Dkt. No. 3326].)

During the Court's February Status Conference, the Court enlarged the parties' deadlines for expert disclosures by 30-days, and the parties agreed to confer on other deadlines that may be impacted by those enlargements and to submit a new trial plan to the Court. Since that time, the parties have agreed that the deadlines for *Daubert* motions and motions for summary judgment (currently July 10, 2017) and the deadline for completing expert depositions (currently June 22, 2017) must be enlarged at least 30 days. However, despite having conferred multiple times, the parties have reached an impasse on multiple issues, specifically: (1) Plaintiffs' request that the

---

[2] A summary of the deadlines in the proposed Second Amended Bellwether Trial Plan is attached as Exhibit B.

Court's May 22, 2017 non-expert fact discovery deadline be enlarged by 30-days, given the Court's directive that company discovery has ended; (2) Plaintiffs' request that the Court's Paragraph 8, which provides a deadline for filing a motion for bifurcation of any issue or claim (including punitive damages), should be stricken in its entirety; (3) whether Plaintiffs are entitled—in addition to the ***17 expert reports already*** served—to submit yet more reports in the form of rebuttal reports; and (4) other necessary deadlines (*i.e.*, exhibit lists, deposition designations and counter-designations, etc.) given the impending bellwether trial dates.  Cook also proposes moving the trial in *Gage* ahead of *Hill* given its advanced discovery, and that the Court set a deadline 60 days or more prior to trial on which the case not tried is moved to the next trial setting under the Bellwether Trial Plan.

Because the parties have been unable to reach a compromise, Defendants submit their proposed Second Amended Bellwether Trial Plan as Exhibit A, and address these substantive disputes more fully below.

### B.    Plaintiffs' Duplicative Expert Reports

On March 17, 2017, Plaintiffs disclosed 17 expert reports from 13 different experts.  In particular, Plaintiffs disclosed four engineers (John LaDisa, Ph.D., Al Litsky, Ph.D., Robert McMeeking, Ph.D., and Robert Ritchie, Ph.D.); a pathologist (Michael Fishbein, M.D.); a hematologist (David Garcia, M.D.); two forensic economists (Robert W. Johnson and James A. Mills); a biostatistician (Rebecca Betensky, Ph.D.); two physicians opining on medical causation offering overlapping, often verbatim, opinions (Mohammad Reza Rajebi, M.D., and Alexander R. Marmureanu, M.D.); a life care planner (Leigh Anne Levy, RN); and a regulatory expert (David A. Kessler, J.D., M.D.) who offers opinions on nearly every engineering, scientific, and medical topic addressed by the other experts.  These experts authored generic reports, as well as

case-specific reports in *Gage* and *Hill*.  (*See* Disclosure Letter from David Matthews, attorney for Plaintiffs, to Andrea Pierson, attorney for Defendants (March 17, 2017) (attached as Exhibit C).[3]  ***In total, Plaintiffs' experts required more than 550 pages to communicate their opinions in 17 separate reports.***

Given the compressed timeframe of the Court's Bellwether Plan, Defendants contacted Plaintiffs, and requested that the parties mutually agree to produce within seven days of their experts' Rule 26(a)(2)(B) reports the core materials[4] upon which their experts rely[5] in their reports—*something Plaintiffs concede[6] Defendants are entitled to receive so that Defendants' experts can prepare their reports and prepare for the Plaintiffs' experts' depositions.* Defendants also requested on March 23, 2017, that Plaintiffs withdraw the duplicative and cumulative expert disclosures, which Plaintiffs declined to do.  (*See* Exhibit E, at 2.)

Receiving no response to Defendants' request for mutual disclosure of core expert reliance materials, on March 24, 2017, Defendants provided Plaintiffs with notice of their intent to subpoena the materials.  On March 27, 2017, counsel for Plaintiffs finally agreed to produce them.  (*See* Email from Ben Martin and Matt Schultz, attorneys for Plaintiffs, to Andrea Pierson, attorney for Defendants (March 27, 2017) (attached as Exhibit F).)  ***Despite having promised to do so by March 31, 2017, Defendants still have not received key information, data, and materials relied upon by Plaintiffs' experts in formulating their opinions—information that Cook's experts clearly require in order to address the opinions of Plaintiffs' experts—a fact***

---

[3] For example, Drs. Marmureanu and Rajebi each drafted a generic, common-issue report as well as case-specific reports for *Hill* and *Gage*.  Leigh Anne Levy, the life care planner, on the other hand, did not draft a generic, common-issue report, but she did draft case-specific reports for *Hill* and *Gage*.

[4] Defendants are only requesting materials not already produced in this litigation, and excluded publically-available literature.

[5] *See* Email from Andrea Pierson, attorney for Defendants, to Michael Heaviside, attorney for Plaintiffs, at 1-2 (March 20, 2017) (attached hereto as Exhibit D).

[6] *See* Correspondence from Matt Schultz, attorney for Plaintiffs, and Andrea Pierson, attorney for Defendants (March 23-24, 2017) (conceding Defendants "are entitled to receive reliance materials") (attached as Exhibit E).

US.111108364.01

*particularly true in Hill*.  Here are a few examples of core, missing information now more than three weeks after Plaintiffs' experts served their reports (and just over one month before Cook's expert reports are due):

- Dr. Rajebi—one of Plaintiffs' two medical causation experts—based his opinions on imaging and personal examinations performed of Ms. Hill on March 16, 2017, and opines that Ms. Hill has caval and duodenal stenosis as a result of her Cook IVC filter.  He specifically comments that bilateral swelling of her legs was observed on exam. However, despite numerous requests, Plaintiffs have yet to produce a single medical record, note, patient form, or other document regarding his examinations.[7]

- The Defendants are missing key materials relied upon by one of Plaintiffs' engineering experts, Dr. LaDisa. Dr. LaDisa used CAD models created by MARVL from design drawings, and then conducted a finite element analysis model using complex algorithms known only to him (and not disclosed in his report) to conduct an FEA model upon which his opinions—and the opinions of Plaintiffs' other engineering experts—are based. Despite multiple requests, Plaintiffs have not produced (1) the CAD models created by MARVL; and (2) the algorithms known only to Dr. LaDisa and relied upon for his FEA analysis.

- Plaintiffs also are withholding exemplar filters and instructions for use upon which their experts rely, and without which Cook cannot prepare for their depositions and Cook's experts cannot complete their work.  For example, Plaintiffs have yet to produce Dr. LaDisa's: "ev3. Protégé everflex™ self-expanding peripheral stent system. 2010," and the "Amplatzer occluder and delivery system - instructions for use. 2012" upon which his opinions are based.  Plaintiffs also have failed to produce the exemplars and other information referenced in the report of engineering expert, Dr. McMeeking: (1) the Greenfield exemplar; (2) the Vena-Tech exemplar; and (3) whatever documents or information upon which the experts rely described as McMeeking source material for footnotes 36, 37, 38, 41, and 42 (each listed over-generically as, e.g., "bostonscientific.com" or "azom.com").

- Plaintiffs also are withholding materials cited by their third and fourth engineers, Mr. Ritchie and Mr. Litsky, which include: (1) the Sherman explanted filter; (2) native versions of photographs contained in their reports on which their rely; and (3) other explanted filters examined by Mr. Ritchie and/or Mr. Litsky.

---

[7] On April 6, 2017, the undersigned counsel received a disc of images from counsel for Mrs. Hill, which presumably contains the Duplex IVC ultrasound on which two of Plaintiffs' expert rely, which Cook repeatedly and specifically requested during the last three weeks.  Plaintiffs still have yet to produce any notes, medical records, or other documents regarding medical examinations specifically noted by Dr. Rajebi, one of their medical experts.  Mr. Gage also testified by deposition that Dr. Rajebi conducted a medical examination of Mr. Gage sometime between November 2016 and January 2017.  (*See* Deposition of Arthur Gage, at 127-135 (Jan. 9, 2017) (**excerpts** attached hereto as Exhibit G).)  Plaintiffs also have failed to produce those medical records.

- Plaintiffs' "lifecare planner," Ms. Levy, narrates a 30+ page report detailing the lengthy medical history of Ms. Hill.  Yet Plaintiffs have failed to produce all of the materials upon which she relied, including: (1) "Social Media Records - 04/16/15" (which Plaintiffs refuse to produce); (2) notes or records from four interviews with Ms. Hill; and (3) notes or records from consultation with Dr. Marmureanu.  Ms. Levy also has failed to produce notes and records from multiple interviews of Mr. Gage and his ex-wife, upon which she apparently relies for her opinions.

Defendants cannot reasonably be expected to gather, assess, and rebut such information by their May 16, 2017 expert disclosure given Plaintiffs' continued delay in providing the core materials forming the bases of their experts' opinions—a fact particularly true in *Hill*.

Expert discovery is also being hindered by the duplicative, cumulative, and overly broad nature of Plaintiffs' experts' reports – duplicative and cumulative opinions which this Court ultimately will be required to address on *Daubert* if not addressed now.  The following table (Table 1) summarizes key areas of extensive overlap amongst many of Plaintiffs' experts:

**TABLE 1:**

**Overlap in Plaintiff Expert Reports**

| | Rebecca Bretensky | Michael Fishbein | David Garcia | David Kessler | Leigh Anne Levy | Reza Rajebi | Alexander Marmureanu | John LaDisa | Robert McMeeking | Alan Litsky / Robert Ritchie |
|---|---|---|---|---|---|---|---|---|---|---|
| Adequacy of IFUs / Warnings / Labeling | | | ▓ | | | | | | | |
| Adequacy of Testing | | ▓ | ▓ | | | ▓ | | ▓ | ▓ | ▓ |
| Cook's Complaint Reports & Post-Market Surveillance | ▓ | | | | | | | | | ▓ |
| Injuries / Damages / Medical Causation | | | | | ▓ | ▓ | | | | |
| Design of Cook Filters | | | ▓ | | | ▓ | ▓ | ▓ | ▓ | ▓ |
| Efficacy of Filters | | | ▓ | | | ▓ | ▓ | ▓ | ▓ | |
| Risks Associated with Filters | ▓ | ▓ | ▓ | ▓ | | ▓ | ▓ | ▓ | ▓ | ▓ |

The duplicative and cumulative topics addressed by Plaintiffs' experts is even more egregious given that Drs. Rajebi, Marmureanu, Fishbein, and Garcia are *medical*  doctors, with no training, education or experience in engineering, medical product design, medical product testing, medical product regulation, post-market surveillance, or other non-medical topics—yet they all offer opinions well outside their expertise. ***Portions of the reports of Drs. Rajebi and Marmureanu,***

US.111108364.01

*in fact, are nearly word-for-word identical on the topics of causation in Hill* (and although the plagiarism is less apparent for Mr. Gage's case, their opinions on causation are also the same). (*Compare* Expert Report of Mohammad Reza Rajebi, M.D., Regarding Elizabeth Jane Hill and Arthur Gage, at Addendum A, p. 7-13 (**excerpts** attached as Exhibit H), *with* Expert Report of Alexander Marmureanu, M.D., at 12-17 (Hill) (**excerpts** attached as Exhibit I)).  Ms. Levy (who is not a medical doctor) spends 32 of 47 pages of the substantive portion of her reports opining on the same medical history for Ms. Hill and Mr. Gage that is recited by Drs. Rajebi and Marmureanu, and opining on issues related to medical causation.  Likewise, Plaintiffs *four* engineering experts opine on similar engineering topics, and simultaneously offer opinions on regulatory issues.  Plaintiffs' regulatory expert—a medical doctor and lawyer—likewise offers opinions far afield from the alleged regulatory issues in *Hill* and *Gage* regarding the adequacy of Cook's testing, efficacy of IVC filters, and risks associated with IVC filters, *when each of these topics is equally covered by three (efficacy), seven (testing) and eight (risks) other experts*.

This duplication is no small matter.  For the Court, it means addressing the redundancy in likely ten or more different *Daubert* motions.  For Cook, it means identifying, retaining, and disclosing experts to rebut the cumulative opinions, including needlessly investigating and deposing Plaintiffs' duplicative and cumulative experts on their grossly overlapping opinions.  Cook anticipates that the depositions of the experts alone will require at least 17 full days of deposition and hundreds of hours of preparation.  The Court's time needlessly sorting through the duplicative and cumulative opinions (a fact likely to get worse during depositions should the Court not address it now) on *Daubert* and summary judgment motions is also a critical reason to force Plaintiffs today to drop their "back-up" engineering and medical causation experts.  Moreover, even were Plaintiffs' experts to survive *Daubert* motions, ultimately Plaintiffs'

disproportionate disclosures will cause the trials to include 23 to 25 experts per trial.  This is in addition to the likely 20 or more fact witnesses called by both sides as witnesses.  The trials of these cases now will take *six to eight weeks*—an outcome easily avoided if Plaintiffs are forced now to drop their "back-up" experts and choose the experts that will testify in this matter judiciously.

**C.     Other Pre-Trial Issues Raised by Plaintiffs Threatening to Derail the Court's Bellwether Trial Plan**

Plaintiffs continue to pursue common-issue, company discovery from Defendants, which this Court noted had ended *nearly six months ago* during its November 10, 2016 Status Conference.  Specifically, on November 10, 2016, this Court required Plaintiffs to provide a list of any remaining issues with previously-served company discovery (which Plaintiffs did, and those issues have been resolved), and noted that by agreement of the parties during the conference no additional discovery beyond the company depositions and custodial productions permitted in Judge Baker's November 15, 2016, Discovery Order would be permitted.  (*See* November 10, 2017, Transcript, at 36-40 ("[W]e have the understanding that once the additional discovery has been taken here, that we'll have—by agreement we'll have a cut-off point for further Cook fact discovery.") (**excerpts** attached as Exhibit J; Discovery Order, ¶ 1 (Nov. 15, 2016) [Dkt. No. 3069] (permitting Plaintiffs six additional depositions, beyond the original 20 authorized, for a total of 26 depositions, as well as permitting six additional custodian files).) Plaintiffs seek under the Discovery Order eleven depositions of fact witnesses associated with the company case, which would bring the total number of common-issue, company discovery depositions to 29.[8]  Plaintiffs also believe that they are entitled to three more witnesses associated with the company case beyond these eleven.  This number of depositions is contrary

---

[8] According to Cook's calculations, Plaintiffs have already spent over 125 hours taking depositions of common-issue witnesses.

to the intent of Magistrate Judge Baker's November 2016 Discovery Order limiting Plaintiffs to only six more common-issue depositions, or a total number of 26 such depositions, (*see* Discovery Order, ¶ 1 [Dkt. No. 3069]), and Defendants have raised that issue with Judge Baker.[9] (*See* Letter to Magistrate Judge Baker from Andrea Pierson, at 2-3 (April 7, 2017) (attached as Exhibit L).)

In addition to seeking these depositions, Plaintiffs also are attempting to re-open company document discovery by serving entirely new requests for production to Cook under the guise of attachments to notices of deposition. Specifically, Plaintiffs have served 49 Requests for Production, requiring production of documents in advance of the depositions of four current and one former Cook employees.[10] Defendants have asked Judge Baker to intervene in the interests of proportionality and fairness, but also because Defendants cannot possibly comply with these requests and simultaneously meet the deadlines in the Court's Bellwether Trial Plan. (*See* Exhibit L, at 4-5.) If this history is any indication, Plaintiffs likely will serve still more discovery with further, additional requests for deposition as well.

Plaintiffs also have served Non-Party Requests for Production to Drs. Robert Smouse and Dr. Paul Timperman, former independent-contractor, consultants to Cook; Dr. Frank Lynch, a

---

[9] Although Cook believes Plaintiffs have already exceeded their allotted number of depositions by requesting 29 common-issue depositions instead of 26, Plaintiffs argue that the limit of 26 depositions only applies to current Cook employees. Plaintiffs claim Case Management Order 2 (Deposition Protocol) ("CMO 2") is silent about non-Cook employee depositions, and they are therefore entitled to as many as they want. (*See* Correspondence from Matt Schultz, attorney for Plaintiffs, and Andrea Pierson, attorney for Defendants (March 23-24, 2017) (attached hereto as Exhibit K).) Cook disagrees with this interpretation and believes that Plaintiffs have either exceeded their limit or, at a minimum, should be required to seek "leave of Court" and show "good cause" for any non-party depositions Plaintiffs seek. (*See* CMO 2, at 1-2 [Dkt. No. 281].)

[10] *See* Notice to Take the Videotaped Oral Deposition of Henrik Gyllun with CMO 2 Request for Documents (attached hereto as Exhibit M); Notice to Take the Videotaped Oral Deposition of Jennifer Brown with CMO 2 Request for Documents (attached hereto as Exhibit N); Notice to Take the Videotaped Oral Deposition of James Smith with CMO 2 Request for Documents (attached hereto as Exhibit O); Notice to Take the Videotaped Oral Deposition of Lars Milling with CMO 2 Request for Documents (attached hereto as Exhibit P); Notice to Take the Videotaped Oral Deposition of Melvin Kem Hawkins with CMO 2 Request for Documents (attached hereto as Exhibit Q); Notice to Take the Videotaped Oral Deposition of Anthony Ragheb with CMO 2 Request for Documents (attached hereto as Exhibit R).

US.111108364.01

treating physician in *Hill* and a principal investigator in the ongoing CIVIC study; and Dr. John Kauffman, the director of the Dotter Institute.  Plaintiffs have demanded that Cook comply equally with those requests in advance of noticing their depositions, which seek thousands of pages of discovery identified in response to 94 additional Requests for Production.[11]

In addition, although counsel for Ms. Hill promised multiple times in November and December 2016, January 2017, and February 2017 to obtain dates for the depositions for the treating physicians in *Hill* (and asked Cook not to do so), Plaintiffs did not.[12]  Instead, Plaintiffs scheduled only one treating physician deposition—Dr. Mark Zuzga.  Consequently, in *Hill*, the depositions of the following treaters still remain to be completed:  Dr. Mark Zuzga—the placing physician (started but not finished; scheduled on April 19); Dr. Frank Lynch—the retrieving physician (not scheduled); Dr. Anthony Moreno—the prescribing physician (started but not finished; scheduled on April 26, 2017); and Ann M. Santoro—Ms. Hill's counselor (not scheduled).  Defendants have been working diligently to schedule these depositions since learning that Plaintiffs apparently did not plan to do so, despite promises to the contrary,[13] yet key depositions remain unscheduled despite Cook's best efforts.

In the *Hill* case, in particular, this is problematic—Defendants' experts cannot plausibly opine on Ms. Hill's medical care and treatment without the depositions of the physicians who placed, prescribed, and retrieved her IVC filter.  It is impossible to assess accurately the

---

[11] This includes standalone Requests for Production as well as Requests for Production attached to the Notices of Deposition that have been served for these four consultants.  (*See* Notice of Intent Serve Subpoena on Frank Lynch, M.D. (attached hereto as Exhibit S); Notice of Intent to Serve Subpoena on Robert Smouse, M.D. (attached hereto as Exhibit T); Notice to Take the Videotaped Oral Deposition of H. Robert Smouse, M.D., with CMO 2 Request for Documents (attached hereto as Exhibit U); Notice to Take the Videotaped Oral Deposition of John A. Kaufman, M.D., with CMO 2 Request for Documents (attached hereto as Exhibit V); Notice of Intent to Serve Subpoena on Paul Timperman, M.D. (attached hereto as Exhibit W); and Notice to Take the Videotaped Oral Deposition of Paul Timperman, M.D., with CMO 2 Request for Documents (attached hereto as Exhibit X).)

[12] *See, e.g.*, Correspondence between Andrea Pierson, et al., counsel for Defendants, and Joe Johnson, et al., counsel for Plaintiffs (Dec. 13, 2016 to Jan. 3, 2017) (attached hereto as Exhibit Y).

[13] Defendants acknowledge that Plaintiffs never promised to notice the deposition of Ann M. Santoro, but Plaintiffs did promise to notice the depositions of the other three doctors.

techniques used to place and retrieve her IVC filter absent the deposition of Dr. Lynch (retrieving physician), and it is impossible to assess the knowledge of and warnings provided to Ms. Hill by her prescribing physician—Dr. Moreno—until his deposition is completed. Defendants' experts further cannot adequately address Ms. Hill's claim for emotional distress and allegations of depression and anxiety without the deposition of her therapist—Ms. Santoro.[14] Fortunately, the problem is far less pronounced in *Gage*, and all remaining treating physician depositions have been scheduled and will be completed in the next three weeks.[15]

Defendants also have requested two independent medical examinations of Ms. Hill related to her claims of gastrointestinal injuries and caval stenosis, which Ms. Hill's experts alleged in their March 17, 2017, reports. Defendants provided Plaintiffs with a protocol for conducting the IMEs on March 30, 2017. (*See* Email from Anna Rutigliano, attorney for Defendants, to Ben Martin, et al., attorneys for Plaintiffs (March 30, 2017) (attached as Exhibit Z).) The parties conferred on the protocol on April 6, 2017, but Plaintiffs' refuse to permit any of the medical examinations requested by Cook. Judge Baker will address the IME issue on April 13, but as a consequence, Mrs. Hill's IMEs remain unscheduled.

## III.   <u>ARGUMENT</u>

This Court should adopt Defendants' Proposed Second Amended Bellwether Trial Plan attached as Exhibit A; enforce the closure of common-issue, company discovery; and—in the

---

[14] Despite multiple calls and service of a subpoena on Ms. Santoro, she has refused to sit for deposition. On April 5, 2017, Ms. Santoro advised Defendants of her intent to seek legal counsel to respond to the subpoena, and she has refused to provide available dates for her deposition until her yet-to-be-retained counsel approves. Likewise, the deposition of Dr. Lynch has not been scheduled, because Plaintiffs are pursuing the production of documents from Dr. Lynch regarding multiple issues unrelated to the treatment of Ms. Hill. Dr. Lynch's counsel filed a Motion to Quash the subpoena directed to him on February 17, 2017, and Plaintiffs' moved to transfer the Motion to the Southern District of Indiana on March 3, 2017. That motion has not yet been ruled upon and, as a result, Dr. Lynch's deposition has not yet been scheduled.

[15] Only the following treating physicians still need to be deposed in *Gage*, all of whom have confirmed dates: Dr. Antonio Pangan (April 25, 2017); Dr. Timothy Larkin (April 19, 2017); and Dr. Mark Goodwin (started but not finished; April 19, 2017).

interests of judicial economy and efficiency—force Plaintiffs to withdraw the duplicative and cumulative opinions of their "back up" experts.  Given Plaintiffs' ongoing company and case-specific discovery, the factual development of the bellwether cases continues to be an ever-changing landscape, particularly with regard to the *Hill* case.  And though the Court made clear during the February 2017 Status Conference that supplemental reports would only be permitted under extraordinary circumstance, (*see* Transcript of February Status Conference, at 30 (February 9, 2017) (**excerpts** attached  as Exhibit AA) ("There's no—there would be no supplementation unless somebody gives me a pretty darn good reason that it needs to be done."), ***virtually all of Plaintiffs' expert reports include a claim of entitlement to supplement their reports due to ongoing fact discovery***.  Likewise, ***virtually every Plaintiffs' expert report reserves the right to submit an expert rebuttal report following the disclosure of Cook's experts' reports***.  Such a result would not be proportional to the needs of *Gage* and *Hill*, and would be inefficient, burdensome, and unduly prejudicial under the tight trial deadlines this Court has imposed.

### A.  The Court Should Enter Additional Deadlines Essential to Trial Preparation

The Bellwether Trial Plan does not provide deadlines that the parties agree are important to the preparation of the cases for trial, and given the proximity to trial, it would be helpful to know those deadlines now.  Defendants respectfully request that the Court enter deadlines for those tasks central to the bellwether trials, as outlined in Defendants' Proposed Amended Bellwether Trial at Exhibit A, and summarized at Exhibit B, such as jury instructions, deposition designations and objections, motions in limine, and the like.[16]

### B.  The Court Should Require Plaintiffs to Withdraw Duplicative Expert Testimony, and Deny Plaintiffs More Expert Reports

---

[16] As Exhibit B notes, the parties have conferred and agreed on a number of those deadlines.

First, Defendants respectfully request that the Court order Plaintiffs to withdraw all duplicative and cumulative expert testimony within ten days, and prohibit Plaintiffs from holding an arsenal of experts to serve as "back-ups" in the event than an expert is excluded under *Daubert*.   Courts routinely strike duplicative, cumulative, and excessive expert testimony.   *See Neace v. Laimans*, 951 F.2d 139, 143 (7th Cir. 1991) (upholding a district court's exclusion of an expert, in part, because it "would have been cumulative"); *McCauley v. Nucor Corp.*, 2007 WL 2316463, at *7 (S.D. Ind. 2009) (excluding expert testimony that is "cumulative and offers nothing new that would assist the trier of fact because the remainder of his opinions are already well covered" by other experts); *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence.").   Permitting multiple expert witnesses to express the same opinions on the same subject is a waste of the Court's time and Cook's time during pre-trial expert discovery, *Daubert* briefing, and trial.

Furthermore, the total number of reports—and the extensive overlap amongst them—is excessive and disproportionate to the needs of this case, and unfairly requires Defendants to prepare for and depose multiple experts on the same substantive topics.   Such a result is neither proportional to the issues in this litigation nor in the interest of judicial economy.   Cook estimates that it will take 17 to 25 full days to depose all of Plaintiffs' experts on the contents of each report in *Hill* and *Gage*, and this needs to be done within roughly two months.   (*See* Chart of Plaintiffs' Expert Deposition Dates attached as Exhibit BB.)    Moreover, the substantive portions of Plaintiffs' expert reports comprise a dismaying 550 pages of text, "far more than any jury or judge can reasonably be expected to digest."   *In re Zimmer NexGen Implant Prods. Liab. Litig.*, 2015 WL 5145546, at *3 (N.D. Ill. Aug. 31, 2015) (admonishing the parties for disclosing

unwieldy expert reports, hundreds of pages in length).  At a minimum, the Court should curtail the excessive nature of Plaintiffs' expert disclosures by ordering Plaintiffs to identify one expert per topic, and strike duplicative and cumulative portions of Plaintiffs' experts' reports.  For example, there is simply no justification for four engineering experts with redundant opinions, or two medical causation experts with word-for-word identical opinions in *Hill*.   The Court further should order Plaintiffs to remove within ten days the designations that are both duplicative and outside the scope of the expert's qualifications—for example, medical doctors opining on regulatory and engineering issues that are also addressed in depth by Plaintiffs' regulatory and engineering experts.   This would streamline the pre-trial discovery process, save time and money, and be in the interest of judicial economy.

Plaintiffs' "expert reserve" tactic is inefficient, unfair, and not proportional to the needs of *Gage* and *Hill*.  Plaintiffs presumably have designated multiple experts on the same topics so that there will always be an expert-in-reserve who can offer an opinion if the first expert is excluded.  That tactic defeats the spirit and intent of Rule 26(a)(2)(B), and is contrary to case law prohibiting such duplication.  *See Neace*, 951 F.2d at 143; *McCauley*, 2007 WL 2316463, at *7; *see also* Fed. R. Evid. 403.  Unless the Court curtails this process, Defendants will be required to prepare for and depose the experts on their redundant opinions and disclose corresponding experts—essentially guaranteeing that there will be nearly 30 testifying experts in each of the first two bellwether trials, leading to trials of ***six to eight*** weeks in length.   This is disproportionate to the needs of the cases.

Second, recent discussions between the parties' counsel about the Amended Bellwether Trial Plan makes clear that they view "rebuttal reports" differently.   Defendants believe Plaintiffs' experts have amassed more than enough experts and opinions in their 17 expert

US.111108364.01

reports.  However, virtually every expert disclosed by Plaintiffs asserts in his or her report a "right" to disclose supplement and rebuttal opinions in the future, and counsel for Plaintiffs asserts such a right when conferring on the Amended Bellwether Trial Plan.

However, Rule 26(a)'s disclosure requirements are mandatory, and the sanction of exclusion of new opinions "is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *David v. Caterpillar, Inc*., 324 F.3d 851, 857 (7th Cir. 2003) (quoting *Salgado v. Gen. Motors Corp*., 150 F.3d 735, 742 (7th Cir. 1998).  Under Rule 26, an expert may only offer rebuttal opinions on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), and expert testimony that is used to present new opinions, address previously-disclosed topics, or simply to bolster a previous expert opinion is not proper.  Fed. R. Civ. Pro. 26(a)(2)(D)(ii); *Stanfield v. Dart,* 2013 U.S. Dist. LEXIS 20175, at *8-10 (N.D. Ill. Feb. 14, 2013).

This Court was unambiguous during the last status conference in stating that supplemental reports would only be permitted under extraordinary conditions, yet recent conversations with Plaintiffs' counsel about the Second Amended Bellwether Trial Plan have made clear Plaintiffs' belief that the Court's failure to address rebuttal reports in the Plan permits them to serve unlimited rebuttal reports up to and including 30 days from Defendants' expert disclosure deadline—that is, until at least mid-June—and each of Plaintiffs' expert reports also states plainly their alleged right to do so at any time.  Given the compressed trial schedule under which the parties are operating—including 21 to 25 expert and company depositions, as well as the preparation of Cook's own substantial expert disclosures and depositions, in the next 60-90 days, Cook respectfully requests that the Court make clear that rebuttal expert reports will not be permitted.  If the Court is inclined to permit them at all, it should make clear in advance the

timing and parameters.  That is, other reports are not permitted absent a showing of substantial justification that (1) the evidence is necessary to contradict or rebut evidence on the same subject matter, and (2) the subject matter was not previously known or available prior to the Defendants' expert disclosure.  Cook also requests that, given the compressed timeframe for expert depositions and *Daubert* motions, any such reports must be served within seven days of Defendants' expert disclosure deadline.

### C.       The Court Should Not Extend the Deadline for the Close of Fact Discovery

In order to maintain an orderly, efficient, and fair pre-trial schedule, the Court should not wholesale enlarge its May 22, 2017, deadline to close fact discovery as Plaintiffs' request.  As noted above, aside from the limited depositions and custodial productions defined in Judge Baker's Discovery Order, this Court confirmed during its November 10, 2016 Status Conference that common-issue, company discovery was closed.  (*See* Exhibit J, at 36-40 ("[W]e have the understanding that once the additional discovery has been taken here, that we'll have—by agreement we'll have a cut-off point for further Cook fact discovery.").)  Magistrate Judge Baker likewise limited company discovery on November 15, 2017.  (*See* Discovery Order, ¶¶ 1-2 (Nov. 15, 2016) [Dkt. No. 3069]).  Although the Court limited Plaintiffs to 26 common-issue, company discovery depositions, Plaintiffs have already requested 29 such depositions (and have indicated that they believe they are still entitled to three more, for a total of 32 depositions).  On top of company depositions, Plaintiffs are also seeking to re-open document discovery by serving Requests for Production in advance of, or in conjunction with, each notice of deposition.  As noted above, Plaintiffs have made over 100 requests for production since the close of common-issue, company discovery.

These requests and tactics are not proportional and are oppressive and unduly burdensome. For that reason, Defendants have requested Judge Baker's assistance. (*See* Exhibit L, at 2-5.) Given the tight timeframe to be ready for trial, the ongoing company discovery at this point in the litigation is unduly prejudicial to Cook, and the Court should decline to extend the close of Fact Discovery to permit unfettered discovery.[17]

### C. Deadline for Motions to Bifurcate

Although the parties jointly submitted a proposed bellwether trial plan on December 28, 2016, that included a deadline for the bifurcation of issues and claims,[18] and even though two separate orders of this Court have included a deadline for motions to bifurcate (*see* Case Management Order # 19 (Bellwether Trial Plan), at ¶ 8 [Dkt. No. 3015]; Amended Case Management Order # 19 (Amended Bellwether Trial Plan), at ¶ 8 [Dkt. No. 3326]), Plaintiffs now suggest that Paragraph 8 of the Plan should be stricken. As Cook understands it, Plaintiffs now assert Defendants should not have the opportunity to move to bifurcate any issue for trial, including punitive damages. The Court should reject Plaintiffs' objection and should continue to include the proposed deadline for bifurcation motions in the Second Amended Bellwether Trial Plan for multiple reasons.[19]

First, the issue of bifurcation of punitive damages was not considered on its merits, and thus has not been resolved. Plaintiffs correctly note that Cook brought a motion back in the fall

---

[17] As Cook's counsel has informed Plaintiffs, Cook has no objection to the timeliness of the following previously-requested and limited depositions beyond the close of Fact Discovery on May 22, 2017: Dr. Lynch (as Ms. Hill's treating physician) and these Cook witnesses, if permitted by Judge Baker: Tony Ragheb, Kem Hawkins (the subject of a forthcoming Apex motion), Dr. Smouse, or Jim Carlson.

[18] Joint Motion to Enter Amended Case Management Order # 19 (Amended Bellwether Trial Plan) [Dkt. No. 3314].

[19] Plaintiffs' counsel, Ben Martin, informed the undersigned counsel on March 15, 2017, that Plaintiffs believe Magistrate Judge Baker previously decided the issue of bifurcation of punitive damages for trial in October 2015. Plaintiffs do not explain why they previously agreed to bifurcation motion deadlines in the first two versions of CMO #19, both of which post-dated by months the Court's order denying Cook's original motion to bifurcate on which they now rest their objection. Plaintiffs' position is not well-taken for several reasons.

US.111108364.01

of 2015 broadly seeking bifurcation of the trial and a corresponding stay of discovery of defendants' financial conditions.  (*See* Cook Defendants' Memorandum in Support of their Motion to Bifurcate Punitive Damages at Trial and During Discovery [Dkt. No 621].)  Magistrate Judge Baker denied the motion, concluding that the "Defendants have not convinced the Court that bifurcation is appropriate" at that time, which was well before company and case-specific discovery had been completed, and long before this Court selected the bellwether trial picks.  (Order on Defendants' Motion to Bifurcate, at 4 [Dkt. No. 871].)  Judge Baker did ***not***— and could not—foreclose any future consideration of the question of bifurcation for trial in *Hill*, *Gage* and *Brand* given that company discovery was ongoing and the bellwether trials had not yet been selected.  On the contrary, Judge Baker specifically noted that this Court could "of course" revisit the issue of bifurcation based on the facts and posture of a particular case at the time:

> **The trial judge, of course, may revisit these issues, for example, at the final pretrial conference with the benefit of completed discovery, rulings on dispositive motions, and viable trial dates.**

*Id*. at 5 (emphasis added).

As contemplated by the Court's Order, Cook expects to bring such renewed motions in one or more of the bellwether cases based on the facts developed in discovery, the substantive motions Cook expects to file over the coming months, and the rulings the Court may make on such motions.  In fact, the testimony and documents developed and produced in the course of discovery have not borne out either Plaintiffs' hyperbolic allegations of egregious conduct, (*see, e.g.*, Master Compl. ¶¶ 185-94 [Dkt. No. 213] (accusing Cook of conduct that was willful, wanton, reckless, and "undertaken with a conscious indifference to the consequences")), or their claims that the compensatory and punitive damages issues are "inextricably intertwined." (S*ee* Pl. Resp. to Motion to Bifurcate [Dkt. No. 644].)  In addition, the individual facts of specific

cases, particularly the relative timing of a specific plaintiff's implantation and injury and Cook's claimed knowledge, also bear on whether bifurcation is appropriate in a particular case.  Based on this discovery and these case-specific facts, Cook believes it can now make the showing of unfair prejudice from a joint trial of compensatory and punitive damages.  Cook therefore expects to bring renewed motions to bifurcate based on the grounds contemplated in the Court's October 30, 2015 Order.

Second, the Court's consideration of the appropriateness of bifurcation in any individual case will need to take into account the policies toward punitive damages bifurcation reflected in the governing state's law.  A number of states—including Florida and Georgia, whose substantive laws will presumably apply to the bellwether *Hill* and *Brand* cases respectively— ***require*** bifurcation of the trial of some or all of a plaintiff's punitive damages claims, citing concerns for fairness and unfair prejudice.  *See W.R. Grace & Co. v. Waters*, 638 So. 2d 502, 506 (Fla. 1994) (stating Florida law:  "We hold that henceforth trial courts, when presented with a timely motion, ***should bifurcate the determination of the amount of punitive damages from the remaining issues at trial***."); O.C.G.A. § 51-12-5.1(d)  (requiring separate phase of trial to determine amount of punitive damages under Georgia law); *see also* Minn. Stat. § 549.20 ("After a determination [of compensatory damages] has been made, the trier of fact shall, in a separate proceeding, determine whether and in what amount punitive damages will be awarded.").  Even assuming these state policies would not control the issue of bifurcation in a federal court trial, they certainly present case-specific factors that a federal court should consider in addressing a motion to bifurcate the trial of a punitive damages claim under the law of such a state.  This issue was not—and could not have been—raised or addressed in Cook's original, non-case-specific motion, but will be addressed in Cook's renewed motions.

US.111108364.01

At present, of course, Cook is not asking the Court to consider or resolve the suitability of bifurcation in any particular case, and in fact has not made final decisions about renewed motions in any or all of the bellwether cases.  All that Cook asks here is that the Court continue to maintain the deadline for such motions in the Bellwether Trial Plan in the event that Cook elects to bring them.

> ### D.  The Court Should Enter Defendants' Proposed Bellwether Trial Plan and Conduct the *Gage* Trial in October 2017

Cook respectfully requests that the Court order Plaintiffs to withdraw their redundant and cumulative experts' opinions, decline to permit even more expert reports, and enforce the close of fact discovery as detailed in Defendants' Proposed Bellwether Trial Plan.  However, given (1) Plaintiffs' delayed production, and failure to produce, key expert reliance materials in *Hill,* (2) the numerous remaining treating physician depositions yet to be taken in *Hill*, and (3) Plaintiffs refusal to permit the IMEs requested of Ms. Hill (a topic to be addressed by Judge Baker on April 13, 2017), at a minimum, Cook requests that *Gage* advance before *Hill* and that the deadlines in the Defendants' Proposed Second Amended Bellwether Trial Plan be entered.

As noted above, in *Hill*, four treater depositions remain (only two of which have a confirmed date).  Significantly, the deposition of the physician who actually removed Ms. Hill's filter (Dr. Frank Lynch) has not yet been scheduled, despite Cook's diligent pursuit of deposition dates since learning of Plaintiffs failure to secure them.  Defendants' medical experts cannot render their reports until that deposition has been completed; it is a critical piece of the puzzle on all of Ms. Hill's claims for damages.  Had Plaintiffs requested deposition dates from Dr. Lynch (as they assured Cook's counsel they were doing multiple times between November 2016 and February 2017), or informed Defendants of their progress, this problem could have been avoided.  Likewise, their insistence on receiving certain documents from Dr. Lynch prior to deposition

caused his counsel to file a Motion to Quash with the United States District Court for the Middle District of Pennsylvania on February 17 , 2017, and that motion continues to be pending without decision.  Plaintiffs apparently refuse to conduct his deposition without the production of those documents.   In addition, the deposition of the physician who prescribed the product (Dr. Moreno) will not be completed until April 26, 2017, and the deposition of the social worker who treated Ms. Hill (who, for the first time in Ms. Levy's report disclosed on March 17, 2017, now claims to suffer from post-traumatic stress disorder) is unlikely to be scheduled until late May. Defendants also have requested that Plaintiffs confirm whether they do intend to call three fact witnesses—Marcia Mullis, Tara Augustine, and Barbara Frank—as witnesses at trial, and have indicated their intent to depose them if they do so.  Plaintiffs have not yet responded, but if they respond affirmatively, those depositions must be taken in *Hill* as well.

In *Gage*, on the other hand, only three treater depositions remain, the last of which will be completed on April 25, 2017.[20]   As such, case-specific discovery in *Gage* will be completed with sufficient time to allow Defendants' experts to review and rely on this testimony in advance of the current expert report deadlines for *Gage*.   Unfortunately, given the current status of the schedule of treater depositions in *Hill*, the same thing cannot be said for *Hill*.

Furthermore as outlined above, Plaintiffs' failure to promptly provide Defendants with the materials upon which their experts relied in formulating their opinions has disproportionately prejudiced Defendants' experts in the *Hill* case—prejudice that prevents Defendants' experts in the *Hill* from authoring their case-specific reports by the Court's May 16, 2017, deadline. Specifically, Plaintiffs' medical experts, Drs. Rajebi and Marmureanu, opined in their reports that Ms. Hill suffered a permanent injury to her vena cava as a result of her filter, and that this

---

[20] Cook may take two other fact witness depositions as well, but they are damages witnesses and will not impact their expert disclosures.

US.111108364.01

injury has resulted in lower leg swelling and a lifelong need for Ms. Hill to take anticoagulants. (*See* Exhibit H, at Addendum A, p. 7, 11-12; Exhibit I, at 12, 14-15 (Hill).) Life-care planner, Leigh Anne Levy, thereafter based a substantial portion of her opinions on Ms. Hill's future health care needs on this asserted permanent injury to Ms. Hill's vena cava. These physicians expressed that bases for these opinions were: (1) a March 16, 2017 ultrasound of her IVC, and (2) a physical examination positive for bilateral lower extremity swelling. (*See, e.g.*, Exhibit H, at Addendum A, p. 7, 11.) Defendants, however, were not provided with this March 16, 2017 ultrasound image until April 6, 2017, almost three weeks after the submission of Drs. Rajebi's and Marmureanu's reports in this case. Furthermore, Defendants have yet to be provided with *any records* from any physical exam conducted by a physician that records or otherwise notes the lower extremity swelling highlighted in Plaintiffs' experts' reports. Presumably Ms. Hill completed a medical history, was physically examined, and routine medical records from the visit were created. Defendants' experts in the *Hill* case cannot possibly evaluate or respond to Plaintiffs' claims that Ms. Hill has a permanent injury to her vena cava and resultant lower extremity swelling unless and until all the information relied on by Drs. Rajebi and Marmureanu is provided to Defendants for review.

Further jeopardizing the timing of Defendants' expert reports in *Hill* is Defendants' need to conduct Independent Medical Examinations ("IMEs") on Ms. Hill to evaluate her newly-claimed permanent injuries. Although Defendants timely requested IMEs of Mrs. Hill in March, the parties have yet to reach agreement as to the type of examinations to be performed or the location for the IMEs, let alone set dates that would allow Defendants' experts sufficient time to review in advance of their upcoming deadline to submit expert reports. Defendants have requested examinations to asses Ms. Hill's claims of (1) permanent injury to her inferior vena

24

cava and (2) permanent injury to her gastrointestinal tract.  These IMEs will necessarily involve imaging, testing, and other procedures, and Plaintiffs have objected to all of Defendants' IME requests.  Judge Baker will address these issues on April 13, 2017, but as a result of Plaintiffs' refusal, no IME has been scheduled for Mrs. Hill.

Contrary to Plaintiffs' experts in *Hill*, Plaintiffs' experts in *Gage* did not render opinions based on information that had previously not been provided or otherwise made accessible to Defendants.  Furthermore, Defendants only need one IME (a psychological exam) in *Gage*. Unlike in *Hill*, this IME will not involve any imaging, testing, or other bodily procedures. Consequently, Defendants expect it will be easy to schedule and expect to conduct this IME in relatively short order.  This, combined with the fact that the essential treaters for Mr. Gage are all scheduled to be deposed within the next three weeks, make *Gage* the case most likely to be ready for trial on October 23, 2017.  As such, Defendants request that *Gage* be tried first.

## IV. CONCLUSION

For the foregoing reasons, Cook requests that the Court (1) enter the Second Amended Bellwether Trial Plan attached as Exhibit A, and (2) order Plaintiffs to withdraw the duplicative, cumulative and redundant opinions contained in the 17 expert reports in the interests of proportionality and judicial economy within ten days.  In the alternative, if the Court is unwilling to limit the scope of Plaintiffs' experts and enforce the closure of company discovery, then Cook requests that the Court change the order in which the bellwether cases get tried:  *Gage* should go first and *Hill* should go second.

US.111108364.01

Respectfully submitted,

Dated April 11, 2017          /s/      *Andrea Roberts Pierson*
                              Andrea Roberts Pierson (# 18435-49)
                              John T. Schlafer (# 28771-49)
                              FAEGRE BAKER DANIELS, LLP
                              300 N. Meridian Street, Suite 2700
                              Tel:     (317) 237-0300
                              Fax:     (317) 237-1000
                              Andrea.Pierson@FaegreBD.com
                              John.Schlafer@FaegreBD.com

                              *Attorneys for the defendants, Cook Inc.,*
                              *Cook Medical LLC (f/k/a Cook Medical*
                              *Inc.), and William Cook Europe ApS*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2017, a copy of the foregoing MEMORANDUM IN

SUPPORT OF THE COOK DEFENDANTS' PROPOSED SECOND AMENDED

BELLWETHER TRIAL PLAN AND REQUEST FOR DEADLINE TO WITHDRAW

PLAINTIFFS' CUMULATIVE AND DUPLICATIVE EXPERT TESTIMONY was filed

electronically, and notice of the filing of this document will be sent to all parties by operation of

the Court's electronic filing system to CM/ECF participants registered to receive service in this

matter.  Parties may access this filing through the Court's system.  Lead Co-Counsel for

Defendants will serve any non-CM/ECF registered parties.


*/s/      Andrea Roberts Pierson*

US.111108364.01