# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE:  COOK MEDICAL, INC.,   ) CAUSE NO. 1:14-ml-2570-RLY-TAB
IVC FILTERS MARKETING, SALES ) MDL No. 2570
PRACTICES AND PRODUCTS        ) Indianapolis, Indiana
LIABILITY LITIGATION          ) Tuesday, February 21, 2017
                              ) 11:34 o'clock a.m.


Before the
HONORABLE MAGISTRATE JUDGE TIM A. BAKER


TRANSCRIPT OF PRETRIAL CONFERENCE

APPEARANCES:
FOR THE MDL PLAINTIFFS:   Riley Williams & Piatt, LLC
                          By:  Joseph N. Williams
                          301 Massachusetts Avenue
                          Indianapolis, Indiana 46204

                          Heaviside Reed Zaic
                          By:  Michael W. Heaviside
                          910 17th Street, NW, Suite 800
                          Washington, D.C. 20006

                          The Law Offices of Ben C. Martin
                          By:  Ben C. Martin
                          3710 Rawlins Street, Suite 1230
                          Dallas, Texas 75219

FOR THE MDL DEFENDANTS:   Wooden & McLaughlin LLP
                          By:  Douglas B. King and
                          James McGinnis Boyers
                          One Indiana Square
                          Suite 1800
                          Indianapolis, Indiana 46204-2019

                          Faegre Baker Daniels LLP
                          By:  Andrea Roberts Pierson
                          300 North Meridian Street
                          Suite 2700
                          Indianapolis, Indiana 46204

COURT TRANSCRIBER:      Jean A. Knepley, RDR, CRR, CRC, FCRR
                        46 East Ohio Street, Room 309
                        Indianapolis, Indiana 46204


        PROCEEDINGS TAKEN BY ELECTRONIC RECORDING

1                     (In open court.)

2          THE COURT:  All right, we are here on the record in

3   In re:  Cook, and that is Cause No. 14-2570.

4   It is -- what day is today -- February 21, 2017, and we are

5   here for a pretrial conference.

6      For the record we have Mr. Joe Williams here on behalf of

7   the Plaintiff, along with Ben Martin and Mike Heaviside.

8   Mr. Heaviside, you weren't here last time either, were you?

9          MR. HEAVISIDE:  We were with Miss Pierson in

10  Florida.

11         THE COURT:  Okay.  All right.  Very good.  On behalf

12  of the Defendant we have Mr. James Boyers, Mr. Doug King, and

13  Mrs. Andrea Pierson.  And we are here for a pretrial

14  conference to address some matters.  I received from counsel

15  some letters that outlined some various discovery disputes,

16  which looks like maybe there are four that have been

17  highlighted there.  I think we will just deal with those and

18  resolve them, if we can.

19     When you were here to see me the last time I asked that

20  we be a little informal, to be as efficient as possible and

21  not have to stand up and make speeches.  Also, the microphones

22  pick you up better.  It is just better to just sit where you

23  are.

24     Mr. Williams, are you going to be handling this?

25         MR. WILLIAMS:  I am going to be handling the

4

1    document instruction issue first on the list.

2            THE COURT:  Number 1 is the litigation hold issue

3    for Hill and Gage.  Go ahead, Mr. Williams.

4            MR. WILLIAMS:  Thank you, Your Honor.  May I

5    approach?

6            THE COURT:  Yes.  You don't have to ask me, just

7    come on up and give me something.  Thank you.

8            MR. WILLIAMS:  When we were last here, Your Honor,

9    we had identified some potential issues with document

10   destruction, and Your Honor asked the Defendants to provide

11   within seven days the Plaintiffs -- a run-down of some

12   information regarding litigation holds so that the Plaintiffs

13   could evaluate where they were at.

14      We have received that correspondence from Mr. Boyers last

15   week, and in going through that and in going through the file,

16   we have determined that there is more than a significant

17   chance that we are dealing with some document destruction

18   issues, and I would like to walk through that and demonstrate

19   to the Court where we are coming from with that.

20           THE COURT:  Go ahead.

21           MR. WILLIAMS:  All right.  The first document I

22   gave, Your Honor, are some excerpts from a 30(b)(6) deposition

23   that the Plaintiffs took in January of 2015.  So this is

24   shortly after the MDL had formed, and this was an ESI

25   deposition.  Cook designated a Mr. Scott Blanchard to talk

5

1    about the various document management systems and policies

2    that Cook had.

3            THE COURT:  Just one second.

4            MR. WILLIAMS:  Sure.

5            THE COURT:  Go ahead.

6            MR. WILLIAMS:  Thank you, Your Honor.  So if you

7    turn, and I have just taken two pages out of this deposition

8    to highlight to Your Honor that the sales representatives that

9    Cook employed used their e-mail to document to their

10   supervisors what transpired during sales calls with

11   physicians.  The first page, the question was asked prior to

12   IRIS, which is the sort of ComVault software that Cook has

13   been using just for the last couple of years.

14       The question was, "Compared to IRIS, how would the sales

15   force people activities be tracked either in terms of customer

16   meetings, sales made, that type of information?"

17   Mr. Blanchard responded with he believes e-mail.

18       On the next page, which is page 97 of his transcript, the

19   question was asked, at least in the highlighted portion:

20   "Under corporate policy, if I had a work-related e-mail or

21   work related -- let's stick with work-related e-mail, it would

22   not be appropriate for me just to keep it on my C drive, my

23   individual computer, I should post it to the network."

24       Mr. Blanchard responded with, "The policy indicates, so

25   yes."

6

1      We took in the Hill matter -- more specifically,

2   Mr. Heaviside took the deposition of a sales representative

3   who detailed or visited the treating physician in the Hill

4   Bellwether case a couple of weeks ago.  In her deposition, the

5   portion to that deposition, Your Honor, in that binder I gave

6   you last time we were here --

7           THE COURT:  Which I have right here in front of me.

8           MR. WILLIAMS:  Fantastic.

9      If you would turn then, Your Honor, to the fourth page

10  from the back.

11          THE COURT:  Is that under Tab I?

12          MR. WILLIAMS:  That is under Tab 3 -- I am sorry,

13  Tab 3, fourth page from the back.

14     Prior to this point in the deposition -- I will wait

15  until you get there.

16          THE COURT:  Sorry.

17      (Off-the-record discussion.)

18          THE COURT:  Sorry, Mr. Williams.  Go ahead.

19          MR. WILLIAMS:  Thank you, Your Honor.

20     Prior this point in the deposition, Miss Courtney

21  Whitelock, and that is the name you need to remember for this

22  hearing, as one of the detailers for the treating physician,

23  testified that she sent e-mails detailing her visits with

24  physicians, both prior to 2012 and after 2013.

25          THE COURT:  What was her position?

7

1          MR. WILLIAMS:  She was, I believe, a district

2   manager, which is Cook's words for what I would call a sales

3   representative.

4          Ms. Whitelock, when confronted with the fact that none of

5   her e-mails were produced in this case, testified that she

6   didn't know what happened to those e-mails.  She testified

7   that what she would call "call notes"; in other words,

8   information about a sales visit she would reduce to e-mail and

9   send it to her supervisor.

10          So then we get to page 109, which is of the deposition,

11   which is what I have asked Your Honor to turn to.  And for the

12   record, I will read Mr. Heaviside's questioning and the

13   answer.

14          He says:  "Now, those would be the call notes that we

15   talked about previously, right?"

16          She responds:  "Yes."

17          "QUESTION:  So you kept call notes, only we don't know

18   where they are right now, right?

19          "ANSWER:  I do not know where my notes are, no.

20          "QUESTION:  Was that part of what you turned over?

21          "ANSWER:  I did not physically turn anything over.

22          "QUESTION:  Were they on your computer?

23          "ANSWER:  The call notes are on my computer, yes.

24          "QUESTION:  And you turned -- you turned over your

25   computer, right?

8

1      "ANSWER:  Right.

2      "QUESTION.  So your call notes should be on your

3  computer?

4      "ANSWER:  Yes."

5      She testified in her deposition that her computer was

6  provided to Cook's counsel just within the past six months.

7  So she is testifying that she has got -- she keeps call notes.

8  She keeps e-mails, and they were on her computer when she gave

9  it to Cook's counsel.

10      We did not have any of those e-mails produced from her

11  custodial file.  May I approach again, Your Honor?  I am

12  sorry, I keep asking.  It is a habit.

13          THE COURT:  Thank you.

14          MR. WILLIAMS:  Now, here the Court, what is

15  a -- listed as a single complaint report that begins at Bates

16  label Cook MDL 257084036.  The date of this complaint file is

17  August 13 -- or August 19 of 2013.

18      It notes that the customer was the Morton Plant Hospital,

19  and the doctor was Dr. Zuzga.  And for the record, Dr. Zuzga

20  was the implanting physician for the Hill case.

21      You will note that it says the area representative was

22  Courtney Whitelock, and you will notice at the bottom of his

23  page it notes that this report was then generated, which in

24  speaking with Mr. Boyers, I understand accessed from a

25  database, July 15, 2014, by Wooden McLaughlin, one of the

9

1   firms who appeared for Cook in this case.  That is in 2014.

2   If you go, Your Honor, to the third page of this document

3   which is Bates labeled Cook MDL 257084038, there is a

4   description of the event on what I will call the bottom third

5   of the page which notes that an unsuccessful retrieval attempt

6   was made.  The patient came back on August 19, 2013, with

7   nausea and vomiting, and it was noted that one of the legs had

8   perforated the cava and was in the duodenum.

9        We brought this to Your Honor's attention in our e-mail

10  yesterday saying that Cook should have known at least by July

11  of 2014 that this case should have been put on a litigation

12  hold.  The response that we received from Cook, which was sent

13  to Your Honor yesterday afternoon says, quote, the report does

14  not mention Elizabeth Hill or provide any information to

15  suggest that the patient involved in the report was

16  contemplating litigation against Cook.  Thus, this report is

17  not persuasive evidence that Cook should have issued a

18  litigation hold earlier than it did.

19       (Off-the-record discussion.)

20            A VOICE:  Thank you.  We will get to that one.

21            MR. WILLIAMS:  I am handing Your Honor what has been

22  marked Cook MDL 2570745352.

23       The first page of this shows that this is an e-mail sent

24  to brucefleck@cook from Courtney Whitelock, the Hills sales

25  representative, sent on August 20, 2013.

1      The subject is Celect perforation.  In the body of the

2   message she said the leg, the Celect leg is in the duodenum.

3   You go to the second page of this document, Your Honor, this

4   is what was attached to the e-mail.  It is a fairly graphic

5   representation of the filter leg perforating the duodenum.

6   Now, this is just a copy, but if you see what I circled in

7   yellow highlight, it says Elizabeth Hill.

8      On August 20, 2013, they had a film of the Celect filter

9   leg perforating the vena cava into the duodenum, marked as

10   Elizabeth Hill.  The e-mail was sent from Courtney Whitelock,

11   who was the sales representative at the time, and it generated

12   the report that I showed Your Honor previously, which also

13   noted that Dr. Zuzga was the physician, and that it occurred

14   at Morton Plant Hospital.

15      So as of August 20, 2013, Cook knew there was a

16   perforating leg through the duodenum.  They knew it was

17   Elizabeth Hill.  They knew it was Courtney Whitelock, the

18   sales rep.  We know one year later a report was generated by

19   Wooden & McLaughlin.  We are talking July 2014.

20      And respectfully, I think it is strange credulity to say

21   that you are not anticipating litigation when you have outside

22   counsel generating complaint reports.  So in July of 2014

23   Wooden McLaughlin generates this report.  It pulls it off of

24   the database.  Three months later, Elizabeth Hill files her

25   lawsuit on October 30th; is that right, Mike?  It is

11

1   October 2014.  Okay.  October 14, 2014.

2        In the e-mail that we received from Cook's counsel on

3   February 14, which was attached to the submission they made

4   last night, they said that there was no way that they could

5   determine who was the sales representative for Mrs. Hill's

6   case until they received the lot number for the product.  They

7   say that the complaint was filed on October of 2014 and there

8   was no lot number.  They say when she served her Plaintiff

9   profile form in 2013, April, there was no lot number.

10        They said we didn't even get the medical records until

11   May of 2016, so -- and then we determined who it was.  We put

12   a litigation hold in place on May 6, 2016.  Candidly, Your

13   Honor, the documents that I have just showed you demonstrate

14   they knew exactly who it was.  They knew exactly who the sales

15   rep was, they knew who the patient was, they knew who the

16   physician was, and it allowed documents to continue to be

17   destroyed for more than two years after the complaint or

18   nearly two years after the complaint was filed.

19             THE COURT:  You think the date they would have known

20   all this would have been August of -- well, August 19 of 2013?

21             MR. WILLIAMS:  I think -- yeah, I think, though even

22   giving Cook the biggest benefit of the doubt, which --

23             THE COURT:  July of 2014?

24             MR. WILLIAMS:  Yes or even October of 2014, when the

25   complaint was filed.

12

1          THE COURT:  Okay.

2          MR. WILLIAMS:  So Your Honor asked them last time we

3    were here to kind of tell us what you have done for litigation

4    hold purposes.  They talked about what they did for Courtney

5    Whitelock.  They said -- and this is Cook's February 14 e-mail

6    that was attached to their submission last night.  They said,

7    you know, they put a litigation hold on Miss Whitelock on

8    May 6, 2016.  They suspended their routine document retention

9    policies, including application of the electronic information

10   policy, and they interviewed Ms. Whitelock.

11        Ms. Whitelock confirmed that she did not use her iPhone's

12   text feature for substantive communications.  If you receive a

13   document I mistakenly handed to you out of order was August

14   20, 2013.  You will see I have highlighted.  It is an e-mail

15   from Courtney Whitelock to Bruce Fleck in which she is

16   explaining to him it is Dr. Mark Zuzga at Morton Plant

17   Hospital, and you can see it is sent from her iPhone.

18        If you go back to the e-mail that had the pictures of the

19   perforated duodenum.  There is some meta data on the cover

20   page of that e-mail.  It says photo.pngatt0001.txt.  That

21   indicates that she sent this picture of the perforated

22   duodenum for Mrs. Hill via her iPhone.  And respectfully, I

23   don't know that there is anything more substantive than a

24   picture of the duodenum being perforated by the filter, and we

25   were told that she said she didn't use her iPhone text feature

13

1    for substantive communications.

2         Now all the documents I am showing, Your Honor, are

3    documents that were produced to us, which means that they knew

4    all these things, yet we still have them represented to us in

5    her e-mail, now, in the company's e-mail, which brings me to

6    my next point.

7         When Mr. King sent his e-mail to the Court before the

8    last February 7 -- before the February 7th conference, he said

9    that as of that date, or as of the writing of that e-mail, all

10   sales people are put on litigation hold.  And I explained to

11   Your Honor, well, if you read that carefully, it very well

12   could mean as of February 5, 2016, all sales reps are on hold.

13        In the response that we received talking about litigation

14   holds that Cook had put into place, they refused to tell us

15   anything about anyone except the Hill salespeople.  And they

16   said everything else is attorney-client privilege.

17        The case law which is developed, which is pretty clear,

18   is the minute you notice that there is information that has

19   been spoliated, the attorney-client privilege that applies to

20   things like litigation holds doesn't apply.  And what we have

21   seen in the Hill case is a microcosm.  This is one out of 1500

22   cases.  Now it happens to be a bellwether case, but for us to

23   know what we are dealing with here, we have got to know what

24   kind of litigation hold and preservation communications Cook

25   made to its sales reps.

14

 1          THE COURT:  Do you have any evidence to suggest that

 2   this has happened on other cases?

 3          MR. WILLIAMS:  We know -- I think the Brand case is

 4   the only other case that we have looked at, but we don't -- to

 5   be quite honest, Your Honor, and to be candid, we, we have

 6   drilled down in the Hill case, and we haven't drilled down the

 7   Gage case because it is third up -- or I am sorry, the Brand

 8   case because it's third up.

 9          MR. MARTIN:  Your Honor, I actually can speak a

10   little bit to Brand because I did look at it in the last day

11   or two.

12          THE COURT:  For the record, that is Mr. Martin.  Go

13   ahead, Mr. Martin.

14          MR. MARTIN:  I can't remember if I am supposed to

15   stand up or not, Your Honor.

16          THE COURT:  You don't have to stand up.

17          MR. MARTIN:  What happened in Brand, Brand was a --

18   in 2011, one of these complaint, single complaint reports

19   similar to this was, was created.  This is 2011 in Miss

20   Brand's case, and Miss Brand is the Plaintiffs' Bellwether,

21   the third trial in the case, and her injury was, was much more

22   severe, I guess, than the significant injury of the duodenum.

23   And the reason I say that is that when this complaint form was

24   created in 2011, it had the lot number in it.  It had all of

25   the same information or similar information that Joe had

15

1   indicated for his person, such that it would have been very

2   easy back in 2011 when Ms. Brand's complaint on a very

3   significant injury case had been written up, been very easy

4   then for them to have that at their disposal.  They did have

5   it at their disposal.

6        One thing I do not know is when -- if there was a

7   generation of this Wooden McLaughlin or any law firm with

8   respect to when they generated this, this document into, into

9   or out of their database.  But nonetheless, in 2013, Miss

10  Brand's lawyers filed a lawsuit.  We now represent her.

11       Ms. Brand's lawyers filed a lawsuit in the Federal

12  District Court in Georgia, and at that point in time, then

13  again, she alleged that she had had a fractured filter, that

14  everything that she alleged in 2013 in her lawsuit was,

15  indeed, contained within or largely -- certainly contained

16  within that same type of single complaint report that Joe has

17  talked about with respect to this case.

18       We have since been sent the defense fact sheet or profile

19  form, whatever the document is called, with respect to

20  Ms. Brand.  Now, Ms. Brand is coming up for expert deadline

21  herself in about four, five months.  But the point being that

22  in the responsive defense fact sheet, again, very similar to

23  this case is -- there are no documents that -- we have no call

24  notes.  We have no documents.  So there is a similar situation

25  that we know exists in the Brand case.

16

1          Your Honor, if I can put a little more context on this,

2    which I was going to do before Mr. Martin talked to us about

3    the Brand case.  We have been told repeatedly that Cook has a

4    document retention or an e-mail retention policy, and that is

5    behind Tab 1 of the binder that I gave Your Honor the last

6    time.  The highlighted portion of that -- Your Honor, it is

7    there.

8          (Off-the-record discussion.)

9          THE COURT:  Please continue.

10          MR. MARTIN:  Thank you, Your Honor.  It says that

11    Cook observes the following retention periods for the below

12    listed folders, and it says the sent box is deleted after 60

13    days and in-box is deleted after 60 days.  And Cook reminds us

14    of that in several cases that correspond saying listen, none

15    of this stuff would have been there because we purge

16    everything within 60 days anyway.

17          In speaking to our ESI expert, which we recently

18    retained, Cook uses a Microsoft exchange server, and the

19    exchange server, at least according to our experts so far,

20    will have some imprint of the e-mails on the server, not

21    necessarily stored on the individual machines.  The individual

22    machines can't have them, but it is because they synchronize

23    the server.

24          Those servers are backed up, and their 30(b)(6) witness

25    on ESI said they used ComVault is the software they use to

17

1  back things up.  He also states that these people can –– that

2  Cook employees can create their own folders like we all do.  I

3  have got an e–mail folder that says Cook, and I have one from

4  another case and another case.  They can do that, too, and

5  those folders are not deleted.  So this 60–day retention

6  policy that Cook keeps referring to is only dealing with the

7  computer, the individual work station.

8           THE COURT:  All right.  So what are you asking for

9  on this issue?

10           MR. MARTIN:  So, Your Honor, what we are asking for

11  at this point, I think, is twofold.  One –– and I know

12  Mr. King said as much in his e–mail before, but we would feel

13  more comfortable with an order from the Court instructing

14  suspension of all document destruction that is going on.  And

15  maybe Cook has done that already, maybe the order would be

16  superfluous, but we feel compelled to request that now.

17           THE COURT:  It couldn't be phrased that way.

18           MR. MARTIN:  Well, no –– obviously.

19           THE COURT:  Well, that is what I am asking.  What do

20  you want?

21           MR. MARTIN:  I think we want an order suspending all

22  document destruction policies for anybody at Cook that

23  participated in selling our marketing, the filters.

24           THE COURT:  You are asking for twofold, first, an

25  order from the Court instructing that there be a suspension of

18

1  all document destruction policies for anyone who participated

2  in selling or marketing the filters that are involved in this

3  litigation?

4            MR. MARTIN:  Yes.

5            THE COURT:  What is the second thing?

6            MR. MARTIN:  The second part is the 30(b)(6)

7  deposition of somebody at Cook that we can talk to about when

8  litigation holds were put in place and what they did to

9  preserve evidence.  It was at this point we are starting -- I

10 mean, I think we arguably could make a showing with regard to

11 the Hill case that we are entitled to spoliation instruction.

12 But before we do that, we would like to take the 30(b)(6)

13 deposition so that we can confirm what we believe we have

14 uncovered through the documents that we have presented Your

15 Honor.

16           THE COURT:  So the second piece of what you want is

17 a 30(b)(6) deposition of a Cook witness about when litigation

18 holds were put in place and what steps were taken to comply

19 with those holds; is that right?

20           MR. MARTIN:  Yes, broadly.  I mean, and how they

21 were communicated, what Cook did to ensure that they

22 were -- that the employees were following it.  I think that is

23 all --

24           THE COURT:  What steps were taken to comply with the

25 holds?

19

1              MR. MARTIN:  Perfect.

2              THE COURT:  Okay.  Anything else on that issue?

3              MR. MARTIN:  I do not believe so, Your Honor.

4              THE COURT:  All right.  Why don't we hear from the

5    Defendants.  Mr. Boyers?

6              MR. BOYERS:  Thank you, Your Honor.  Excuse me.

7         Well, I think that it might be best to start with

8    Mr. Blanchard's testimony.  He, he wasn't designated to be a

9    marketing 30(b)(6) witness (inaudible) about the communication

10   of information about meetings with physicians.  Now, one thing

11   that has to be clarified, and we have told the Plaintiffs this

12   before, that the DMs and RMs, their computers don't back up to

13   the network server at Cook with respect to files like Word

14   documents, Excel spreadsheets, that sort of thing.  But the

15   e-mail is synced to the e-mail server at Cook.

16        So the e-mail is maintained on the server, and the

17   electronic data policy operates on a server level.  So I

18   wanted to make that clarification.  Also, Your Honor, we have

19   produced documents for Courtney Whitelock in this litigation.

20   And I, I wanted to make that point as well.  We did pull her

21   computer, we did pull her e-mail, we did review it and

22   identify what was responsive and produced it.  So I didn't

23   want there to be any misapprehension there.

24        With respect to the single complaint report, Your Honor,

25   No. 1, there is no mention of Elizabeth Hill anywhere in the

20

single complaint report, and it seems to be that the
Plaintiffs are arguing that if you receive an adverse event
report which -- and single complaint report, which often just
have preliminary information that doesn't provide a lot of
detail, you, you can't just make a, a decision that there has
to be a hold issue.

        Here the single complaint report was created by Cook in
August of 2013.  The lawsuit wasn't filed until 13 or 14
months later.  So there is nothing here to suggest that a
litigation hold was necessary, and so I, I think that with
respect to Courtney Whitelock's testimony, I wasn't there at
her deposition, but I think that the testimony that we cited
to in our e-mail to the Plaintiffs lays out that it is not
apparent that there were relevant documents created in 2010
when the implant took place.

        And so, again, with the policy that was in place,
anything that was created during that time period and the
testimony suggests that nothing was relevant to this case
would have been deleted by the operation of the policy long
before there was a single complaint report, long before there
was a lawsuit.  And so this is really an attempt to make a
mountain out of a molehill.

        Now, Courtney Whitelock also got a new computer in 2013
so, you know, that affected what she chose to move to her new
computer.  But we think that, that the information that we

21

1  have provided demonstrates that if you look at the timeline

2  and you look at the single complaint report, the Plaintiffs

3  have suggested we should have looked at this and known in

4  July 15 of 2014 when this happened to be collected from the

5  TrackWise database that this is somehow tied to Elizabeth

6  Hill, this should have been put on hold immediately.  This was

7  collected through our vendor and was later reviewed, but

8  again, there is nothing here that suggests that litigation is

9  eminent.  And the lawsuit was filed --

10            THE COURT:  The Bates stamp number -- well, I guess

11  it is called the single complaint report Bates stamp number

12  0084036.

13            MR. BOYERS:  Yes.

14            THE COURT:  The first page it does indicate that the

15  report was generated or accessed by Wooden McLaughlin on or

16  about July 15, 2014.

17            MR. BOYERS:  That's right.

18            THE COURT:  And everything matches up, Courtney

19  Whitelock and the date of August 19th of the event date

20  certainly matches up, and I think Dr. Zuzga matches up, so.  I

21  mean --

22            A VOICE:  The hospital is actually different, Your

23  Honor.

24            THE COURT:  I didn't say "the hospital."

25            A VOICE:  No.  I know you didn't, but I just wanted

22

1  to make a point that the hospital identified there is

2  different than the hospital that was ultimately identified.

3            THE COURT:  I just want to make sure the Plaintiffs

4  are getting all the relevant documents, and if they are not

5  and there is some reason why they aren't, we can argue about

6  what the ramifications, if any, are of that.  They have at

7  least presented information to the Court that suggests there

8  may be some documents out there that they weren't getting.

9            A VOICE:  Your Honor, with respect to the single

10  complaint report and the documents that they attached, these

11  are e-mails that were uploaded into the TrackWise system

12  consistent with Cook's following procedures when an issue

13  arises that it becomes a product complaint.  So when you see

14  on the first page it lists attached files, you will see that

15  there are e-mails in there that were prepared and preserved

16  consistent with Cook's (inaudible) system requirements.

17            THE COURT:  How about Miss Whitelock, did she use

18  her iPhone to upload a picture of a perforation?

19            A VOICE:  Well, the e-mail was sent from her iPhone.

20  That is the e-mail.

21            THE COURT:  You need to be over there by the

22  microphone.  That is why I need you to sort of stay over

23  there.

24            A VOICE:  Sorry, Your Honor.  I tend to pace.

25            THE COURT:  Well, don't pace, stay by the

23

1  microphone.

2         A VOICE:  The e-mail was sent from Courtney

3  Whitelock's iPhone, but that e-mail was captured because the

4  e-mail is synced with the exchange server, that e-mail was

5  captured.  So she wasn't sending a text message, she was

6  attaching a photograph or image that she obtained attached to

7  her phone as far as we can tell from that e-mail.

8         THE COURT:  Okay.

9         MS. PIERSON:  Your Honor (inaudible) on that point

10 Miss Whitelock's deposition, I have attended her

11 deposition --

12        THE COURT:  Just for the record, that is Miss

13 Pierson speaking.  Go ahead.

14        MS. PIERSON:  Thank you, Your Honor.  I have

15 attended Miss Whitelock's deposition, the deposition of Leigh

16 Conners, who was a supervisor during the period of time

17 when (inaudible) and also Dr. Zuzga's deposition, the

18 physician who placed her filter in the first place.  All three

19 of these witnesses have said that Dr. Zuzga wouldn't even talk

20 to Miss Whitelock until sometime in 2012, so the notion that

21 there is some evidence, whether it is (inaudible), if they are

22 not communicating there are no documents (inaudible) generated

23 about communication.

24    And Dr. Zuzga's testimony was (inaudible) he didn't want

25 to be around them.  Miss Whitelock has testified that he

24

1  wouldn't give her the time of day until sometime in 2012, and

2  her supervisor has confirmed that fact.  So, I mean, I, as you

3  said, the question of spoliation instruction is a question for

4  a different day.  I do think it is relevant to note the

5  Seventh Circuit pattern's instruction requires three things;

6  that there be evidence that the evidence be intentionally

7  destroyed, and that it is intentionally destroyed (inaudible).

8  All three of those things must be proven, but first there has

9  to be something, some relevant document, as you say, in the

10 first place that wasn't provided, and these witnesses have

11 confirmed that that simply does not fit.

12       Miss Whitelock also was asked by Plaintiffs' counsel

13 about the communications related to Mrs. Hill's specific

14 perforation, and she has confirmed that the documents that

15 Cook had in its possession and produced, but that, that is all

16 the information that was created that she ever saw about

17 Mrs. Hill.  So again, the fundamental question is, is there

18 some evidence in the first place, and all of the witnesses who

19 would know about that have confirmed that there is no missing

20 evidence.

21            THE COURT:  All right.

22            A VOICE:  Your Honor?

23            THE COURT:  Is that all from the Defendant?  Was

24 there anything else on that issue?

25            A VOICE:  Yes.  With respect to the single complaint

25

1   report, when the lawsuit was filed, because of the different

2   hospital and different information that was provided in the

3   complaint, Cook created a new single complaint report because

4   it didn't recognize -- and the data in the single complaint

5   reports did not match up.  So Cook was operating under the

6   understanding that what was raised by the lawsuit was not

7   related to any existing single complaint report.

8              MR. KING:  Your Honor, this is Doug King.  I have

9   one thing --

10             THE COURT:  You -- okay.  You can.

11             MR. KING:  Just very brief.

12             THE COURT:  You can, but then I am going to have to

13  really insist that we have one lawyer for each issue.  That is

14  the only way we are going to get through this.  Go ahead, Mr.

15  King, and then we will impose that rule.

16             MR. KING:  Our law firm generates these reports off

17  the Cook database as a part of our collection of documents for

18  this litigation.  That is the only reason it shows up that

19  way.

20             THE COURT:  Okay.  Is there anything else from the

21  Defendants?  Mr. Boyers?  Yeah?  Okay.  So Mr. Williams.

22             MR. WILLIAMS:  Yes, Your Honor.

23             THE COURT:  Just help me through this.  You had

24  provided information to the Court that indicated that -- as

25  Mr. Hill [sic] has just indicated, that there was a report

26

1  that was generated or accessed on or about July 15, 2014, by

2  Wooden McLaughlin.  The Hill lawsuit was filed in October of

3  2014, correct?

4             MR. WILLIAMS:  Yes, Your Honor.

5             THE COURT:  So if these documents and such were back

6  in July or before, and the lawsuit wasn't filed until October,

7  why is it something that shouldn't have been picked up on a

8  hold?

9             MR. WILLIAMS:  Well, first thing is, we were told by

10 Cook just recently that they didn't put a hold on until May of

11 2016.  So even if you used the complaint as the trigger date,

12 there is still 18 months that they are destroying documents,

13 that the hold wasn't put in place, and I think the answer,

14 though, to your question why we should use the July date,

15 Mr. Cook gave it to you in the answer, in his answer.  He said

16 to you, we collected these documents as a collection procedure

17 for this litigation.  Their outside counsel investigated

18 reports of complaints for purposes of litigation.

19      And the idea that the complaint report does not

20 necessarily state Mrs. Hill's name, we showed you in that

21 e-mail the films that they are talking about that are attached

22 to this report specifically state Elizabeth Hill.

23      With regard to the statement that Ms. Pierson said, that

24 everybody here confirms that Dr. Zuzga never communicated with

25 these people at the time Mrs. Hill's filter issue was going

27

1  on, if you look, Your Honor, at the document that I gave you

2  that has the pictures of the perforated duodenum, the last two

3  pages of that exhibit, go to the last page of the exhibit.

4          THE COURT:  If I can find the exhibit.  Okay.

5          MR. WILLIAMS:  The last page of that exhibit

6  is -- is an e-mail dated August 27, 2013, that was sent to

7  Dr. Zuzga with copy to Courtney Whitelock.  That was with

8  regard to the adverse event that happened here.  Cook can tell

9  us, you know, it looks like there were no documents and

10 everything is fine.  The problem is, our hands are tied.  We

11 don't know if there were any documents because they were

12 destroyed.

13         THE COURT:  Okay.  Okay.  I think we have covered

14 that issue, so let's move on.  I think you all have them

15 slightly misnumbered in your -- you didn't follow the same

16 numbering system.  But the second issue -- let me pull up the

17 right e-mail here, was one that Mr. Williams had identified as

18 Cook's request to claw back patient numbers in the OUS study.

19 And it appeared as though from the response that we received

20 from Cook that perhaps that was being cured by the

21 supplemental protective order.

22         A VOICE:  I think we are going to work that out.

23         THE COURT:  So No. 2 would be moot, which brings me

24 to No. 3, which is -- these are Plaintiffs' characterizations,

25 not mine at this point -- Cook's refusal to produce their

28

1  financial information on punitive damages expert needs, which

2  the Defendant had provided a pretty lengthy letter to me.  I

3  don't know that you were copied on the letter that had been

4  provided to me, but I got a letter dated February 20, 2017,

5  which sets forth in quite a bit of detail from Mr. Boyers what

6  they believe they have produced on financial stuff.  You

7  haven't produced that to Plaintiffs' counsel, have you,

8  Mr. Boyers?

9          MR. BOYERS:  Your Honor, in the e-mail transmission

10  I copied all of lead counsel.

11          A VOICE:  I think we received that, Your Honor.

12          THE COURT:  You received that.  That begs the

13  question, then, in light of what the Defendants believe they

14  have provided to you, what, what do you think you still need?

15          A VOICE:  We will let Mr. Martin address that.

16          THE COURT:  All right, Mr. Martin.

17          MR. MARTIN:  Your Honor, thank you.  Your Honor,

18  when I have asked our colleague, Bill Curtis, who is handling

19  the expert witness who he is trying to compile data such that

20  he will be able to talk about those, those things, however you

21  want to put it, financial solvency worth, the value --

22          THE COURT:  Why do you need to know how much money

23  the CEO makes?

24          MR. MARTIN:  I am sorry, Your Honor?

25          THE COURT:  Why do you need to know how much money

29

1   the CEO makes?

2          MR. MARTIN:  Well, I will give you an example, Your

3   Honor.  I believe in a recent deposition in another case that

4   I won't mention, the CEO in that particular company was

5   bringing in an exorbitant number -- they were bringing in

6   exorbitant amounts of money that would be able to satisfy

7   punitive damages of verdict.  We are talking about something

8   in the tens of millions of dollars.

9          THE COURT:  You mean to avoid having resources

10  available to pay a judgment?

11         MR. MARTIN:  It all goes into what the company's

12  value is; and again, I think maybe incorrectly has been termed

13  in the past, net worth, but it -- that is one thing that would

14  go into the net worth is the value of the company is what the

15  CEO does or does not --

16         THE COURT:  Was this referring to a publicly-traded

17  company or private company?

18         MR. MARTIN:  That is part of the problem.  This is a

19  privately-held corporation which makes it more difficult to

20  make a determination of value and why it is so important that,

21  that we have this discovery so that we don't have, we don't

22  have a year-end financial statement to, to go to that, that

23  goes to all the processes of, of what would be required for

24  publicly-held corporation.

25         THE COURT:  Well, according to Mr. Boyers'

1  February 20, 2017, letter, you have received either audited or

2  primarily unaudited information.  You have received an audited

3  annual report from William Cook Europe from 2006 to 2015,

4  balance sheets for Cook Medical from 2006 to 2015, unaudited

5  income statements for Cook Medical from 2006 to 2015,

6  unaudited balance sheets for Cook, Inc. from 2006 through

7  2015, and unaudited income statements for Cook, Inc. from 2006

8  to 2015.  I mean, what more do you need to establish value for

9  punitive damages purposes?

10           MR. MARTIN:  Well, one of the problems, Your Honor,

11  is we have absolutely nothing from Cook Group, Inc., and our

12  concern is, and it is a very valid concern, that Cook Group,

13  Inc., which is -- it is the, you know, highest level of the

14  tipi.  That, that company is over all of these companies, and

15  we believe that it is very probable, very likely, certainly

16  very possible that the money would be funneled to Cook Group,

17  Inc.  When Cook Group, Inc. was let out of this lawsuit it was

18  CMO3 that was entered by this Court and by agreement

19  concomitant with that dismissal, and in that, in CMO3, it is

20  very specific, and it indicates that Cook Group, Inc. and any

21  other associated entity, that those companies are not subject

22  to prohibition with the discovery.

23       And I would say, Your Honor, for that very reason, we let

24  that umbrella company out of this case, but we have a specific

25  CMO that I think it shows the Court that everyone recognizes

1  that Cook, the Cook Group entity, Cook Group, Inc. corporation

2  may very well have relevance as to the money in this case and

3  the actual -- and the actual holding of funds that could be,

4  you know, multiple billions of dollars coming from these

5  companies that we have sued.

6       So -- and everyone recognized it when we let them out.

7  That is why we had a CMO3 that said that they were not -- I

8  got a CMO here, Your Honor.  Get that CMO3, Mike.  Just one

9  second.  Your Honor, I won't belabor, you know, go through the

10  16-page document or whatever it is -- or six-page document,

11  but, Your Honor, I would like to hand a copy to the Court, if

12  I may.

13       THE COURT:  The CMO3?  Any time you have something

14  you want me to see, just bring it up to me, otherwise I won't

15  be able to see it.  Just bring it up.  CMO3, all right.

16       MR. MARTIN:  Thank you.  Anyone else?  So back in,

17  back in April 17, 2015, the dismissal of certain corporations

18  were, were negotiated, and I, I would suggest to the Court

19  that this was part of the agreement.  And I would suggest to

20  the Court that Mr. King and at that time, Mr. Levin signed off

21  on behalf of both parties, recognized the fact that there

22  would be dismissal of additional Cook entities but that they

23  would be taken out of the master complaint.

24       THE COURT:  Well, the line that you are talking

25  about is Paragraph G, right?

32

1          MR. MARTIN:  Yes.

2          THE COURT:  And just for the record it provides,

3    "Notwithstanding the provisions above, discovery regarding the

4    financial worth of any additional Cook entity is reserved

5    until the scope of such discovery, if any, is determined by a

6    trial court at the appropriate time."

7          So I am not sure that answers the question.  I think it

8    recognizes that the parties dealt with it and kind of deferred

9    on the issue.  This means that there is the potential for

10   discovery, but it has to be determined at the appropriate

11   time, whether now or some other time.  But the scope that you

12   are seeking, the scope of the discovery is appropriate, and

13   that is -- I think that would be largely a Defendants'

14   objection is that they provided you some financial

15   information, but they find that your discovery requests are

16   overbroad, not proportional, burdensome, you name it.  I think

17   they used every word I could find -- every word they could

18   find.

19         So that is the question, right?  Is what you are seeking

20   now on the financial side, is it -- is it proportional and

21   appropriate?

22         MR. MARTIN:  We have a situation here where, Your

23   Honor, we are dealing with a private company manufacturing

24   this product.  Private companies can move money around however

25   you want to -- however I would put it, hyperbolically, I

33

1   guess, if that is a word.  They can and they do, and, but,

2   Your Honor, we have no way to make a determination as to what

3   these companies have or where -- excuse me, where, where this

4   money is unless we peer into these Cook entities that are, I

5   would call it, the umbrella, and there is no reason to suspect

6   that they don't funnel money into that corporation.  And I

7   would suggest, Your Honor, that is why -- that is why we have

8   this CMO so that we can, we can peer into this at this point

9   in time.

10          We have a, we have an expert, we suggest that this is

11  needed.  We have a CMO that suggests everyone knew at some

12  point that this would be an issue.  We have, you know, we are

13  coming up on a deadline for our expert to be able to answer

14  the question as to whether or not any monies are -- any money

15  that would otherwise be available that has been generated by

16  these other companies went to the big Cook company.

17          Your Honor, I would not believe that what has been

18  requested is overly burdensome.  It is just a different

19  company that Cook really does not want to give us the

20  information for.  They have given us information for some of

21  the -- for the Cook companies to -- I will have to, I will

22  have to look at 2015 and '16 for WCE.  I didn't think we had

23  those, but nonetheless, it is just a company that don't want

24  to give us the information for.

25          I, I don't -- I have not seen anything that would

34

1  indicate it has been such a burden for them to give us the

2  financial statements for William Cook Europe or Cook -- the

3  counterpart here in Indiana if they just don't want to give it

4  to us.

5          THE COURT:  So is your position now that the problem

6  is they are just not giving you anything involving Cook Group,

7  Inc.?  It is just a failure to produce anything with Cook

8  Group, Inc. that all the other entities, production has been

9  sufficient as it relates to financial information, but the

10  shortfall production as it relates to Cook Group, Inc.?

11          MR. MARTIN:  I am trying to answer the Court's

12  question, and I will answer it as best I can this way.  We

13  have part of the puzzle, but our expert -- the part of the

14  puzzle that is missing is the part of the puzzle that is that,

15  that is the big Cook, and yes.  We have, we have pieces of the

16  puzzle.  William Cook Europe, we have some financial

17  statements from William Cook Europe.  We have some financial

18  statements, balance sheets, and income statements from, from

19  the Cook entity here in the United States that is involved in

20  this manufacture, distribution of this product.  But we don't

21  have any idea as to whether or not the big Cook is involved in

22  being and having money funneled to it.

23      So if we have the financial documents that would show

24  those things, we can tell whether or not these other companies

25  are, are sending their money to a corporation that is sort of

35

1  upstairs.  And I, I suspect it -- I suspect that we will

2  probably find that it is, and so when we go to the jury some

3  day and try to put an expert on the stand as to what -- I will

4  use the term "net worth" of these companies are, and what,

5  what, indeed, is the ability, whether it is in the form of

6  punitive damages that, that they really have access to or that

7  they have even more access to, it is very important to look at

8  that, that particular company.

9       So that is one aspect of what we have asked for.  Is what

10  a CEO makes the most important thing in this particular

11  request of just a handful more of things that we need?  It, it

12  may be very important if, if this CEO's making $50 million a

13  year off of this, one of these companies.

14      So, but it, it is not the most important thing, and I

15  think we have whittled down exactly to just a handful of

16  things, Your Honor, that, that we think it would be

17  extraordinarily simple for them to get us.

18          THE COURT:  Now, the "handful of things," is that

19  what appears on page 3 of Mr. Boyers' letter, the six numbered

20  paragraphs and things?

21          MR. MARTIN:  I would say we would put it in Page No.

22  2 of what Mr. Williams had sent to the Court yesterday at

23  12:13 p.m.

24          THE COURT:  There are nine items in Page No. 2.

25          MR. MARTIN:  And it is a list of -- yes, it listed

36

1    nine items.  They are probably the same list, but I would just

2    go through them very quickly --

3              THE COURT:  These are not -- look, these are not

4    simple little six, you know, where you whittle it down to a

5    few little -- I think you said a few items.  I mean, one of

6    them, all explanatory notes that the -- it is No. 7 -- all

7    explanatory notes that accompany the above records.  I mean,

8    just that request, not even sure how you would even respond to

9    that.

10             MR. MARTIN:  I actually think that that is a term of

11   art, and I believe that actually is a term of art in the

12   financial and the accounting industry.  I don't, you know,

13   Your Honor, I am not an accountant.  I can't testify to that,

14   but I, I believe from my conversations with, with Phil Kerr

15   and his conversations with the expert, our expert can

16   do -- can really do very little, if anything, with respect to

17   placing a value on what -- on these companies.  What, what is

18   available to them and what they -- and what they have done, if

19   anything, to move money into a different corporation.

20        But if the Court were to look at a measure of what we

21   have asked for, balance sheets, income statements, cash flow

22   statements, lines of credit or credit facilities extended,

23   explanatory notes, that, that --

24             THE COURT:  They say -- they say they have provided

25   that to you, though.  They say -- at least what I read before,

37

1   they provided unaudited balance sheets for Cook, Inc.,

2   unaudited income statements for Cook Medical, so you have all

3   that, you just don't have it for Cook Group, Inc.; is that the

4   problem?

5           MR. MARTIN:  Exactly, and I -- you know, I, I will

6   have to say that -- I am sorry?  I will say this, Your Honor,

7   if, if I may.  I am getting my information from -- I asked

8   Phil Kerr, who is dealing with this -- Phil --

9           THE COURT:  Is that your expert?

10          MR. MARTIN:  Phil is one of the -- he is a PSC

11  member, and he is -- and he is handling that particular

12  expert.  And he is the one that I talk to.  I said, "Phil,

13  what does he need?"  And I sent what he needed.  We have -- we

14  have previously requested this stuff.  I sent what Phil told

15  me that he needed in order to make his determinations, and

16  this information is what we were given and that I have given

17  to the Court these nine things.  You know, Your Honor, I, I

18  would suggest that if there are some things on this list that

19  the Court has a question about as to why, why the expert needs

20  these things or how difficult it may be to get them or how

21  easy it may be in the industry to get these things, I, I

22  would, I would suggest that we could, you know, present the

23  expert in a short hearing, maybe a phone hearing if the Court

24  wanted to do it next week.

25          And so that, so that you are not hearing from me, but you

38

1  are hearing actually from, from the expert who I, I will

2  certify exactly what I have asked Phil for.  He -- I believe

3  that he has asked the expert the exact same thing.  What do

4  you need, and I have also been told, Your Honor, that it is

5  not a burdensome thing to get these things.

6          THE COURT:  All right.  Thank you very much.  Who is

7  going to speak on behalf of the Defendant?

8          MR. BOYERS:  Your Honor, Jim Boyers on behalf of the

9  Cook Defendants.

10         THE COURT:  Go ahead, Mr. Boyers.

11         MR. BOYERS:  Your Honor, I think that the

12 information we provided the Court lays out our concerns.

13 Number one, we provided the information necessary to calculate

14 that worth.

15         THE COURT:  Have you provided anything with respect

16 to Cook Group, Inc.?

17         MR. BOYERS:  We have not provided anything with

18 respect to Cook Group, Inc., Your Honor.

19         THE COURT:  Why not?

20         MR. BOYERS:  Well, Your Honor, it is not a

21 Defendant.  I think it would confuse issues in the sense

22 that -- I think it would raise questions about if it is put in

23 front of the jury, Cook Group information, it may be

24 misleading to the jury as to what party -- or how a nonparty's

25 financial arrangements have anything to do with the

39

1  calculation of punitive damages.

2          THE COURT:  Is it possible for the various Cook

3  entities to transfer money, including to Cook Group, Inc.,

4  such that it might artificially suggest a lower net worth when

5  it comes time, if it comes time to determine punitive damages?

6          MR. BOYERS:  Is it possible?  Well, I think that,

7  Your Honor, the financial statements referred to intercompany

8  transactions, but I don't know that we have produced.  But I,

9  I can't speak for certain with respect to your question.

10          THE COURT:  I am wondering if information that you

11  did provide already might show if, if Cook Medical, Inc. --

12  let me backtrack for a minute.  Yeah, if Cook Medical, Inc.

13  was somehow giving millions and millions of dollars to Cook

14  Group, Inc., is that something that would show up on a balance

15  sheet?  That information might have already have been provided

16  somehow?  You may not know the answer to that question.

17          MR. BOYERS:  Yes, I, I don't know that that level of

18  detail -- I don't know, Your Honor.

19          THE COURT:  Anything else you are willing to

20  provide?  Let me just assume for the purposes of this

21  discussion that I think their request for financial

22  information seemed rather broad.  I mean, is there anything

23  you are willing to provide that might give them some input,

24  some guidance, some information without opening up the flood

25  gates here?

40

1          MR. BOYERS:  Well, Your Honor, I would have to

2     consult with my client on that in terms of what it would be

3     willing to provide.  If the question is specific to Cook

4     Group, Inc., we, you know, I think if the Plaintiffs provided

5     a more narrow list.  I just, as the Court noted, a lot of what

6     is here is not clearly related to the determination of net

7     worth, and it goes far beyond Cook Group, and it seeks

8     information that is not necessarily available.  And certainly,

9     we, we don't have a clear understanding of what they are

10    getting at in terms of specific things that they need to

11    calculate net worth.

12         And through the process, we have been clear with the

13    Plaintiffs about what we were producing.  And back in

14    September, we, we identified everything we produced, and Bill

15    Curtis, we heard nothing until November.  And then we thought

16    everything was resolved in January, and this popped up again

17    February 9th.  So, Your Honor, they talk about what their

18    expert needs, but raising it within a month of the deadline

19    seems to be a burden in and of itself that is unnecessary.

20         MR. MARTIN:  Your Honor, may I respond to this?

21         THE COURT:  Well, let's just make sure he is done.

22    Is there anything else, Mr. Boyers?

23         MR. BOYERS:  The other thing is that with, with

24    respect to both Hill and Gage, those states have caps on

25    punitives, so the evidence here with respect to the two

41

1   Bellwethers that are coming up is -- it is not really

2   significant.

3            THE COURT:  Okay.  All right.  Was there something

4   else then you were going to add, Mr. Martin?

5            MR. MARTIN:  Your Honor, on, on the point that I

6   believe Mr. Boyers just said, we, we sent two sets of

7   discovery on net worth if you want to call that global

8   language net worth.  Back in 2015, back in 2016, I believe in

9   the spring or maybe the summer of 2016, Mr. Boyers just

10  indicated that they gave us the answer in September, but we

11  didn't push for it until November.

12       So I mean, you know, when we, when we have been parsing

13  this, this, all of this delay that has been suggested, and now

14  it, it is less than a month before our expert needs it.

15  They -- we have been parsing through this since, admittedly,

16  September, and we still haven't gotten the documents.  So I

17  don't think the fact that -- well, first of all, there has

18  been no delay.

19           THE COURT:  Well, I mean, the reality is you

20  addressed the fires as they arise, and right now the fire is

21  you need to get information to your expert on financial

22  information.  That is why this is coming up now, and you maybe

23  knew there was an issue before, but there was no reason to

24  push it.  I, I don't think -- I don't think this dispute is

25  going to get resolved on that particular issue, so I

42

1   appreciate your position on that.

2       Let's talk about this fourth issue which the Plaintiffs

3   have identified as additional information uncovered related to

4   the Dotter Institute.  Now, it looks like from the Defendants'

5   response to that, that at least I read it to be that they are

6   trying to discover if there are -- if there are any other

7   documents that might be within the custody and control of

8   Dotter related to this study.  So far they haven't found any

9   documents, so I don't know really what is still in dispute.

10  Miss Pierson is up for that one.  Ms. Pierson?

11          MS. PIERSON:  If I may address it.  We have a little

12  more information even this morning, and we were able to

13  confirm that no one at Cook or Dotter Institute has discovered

14  any documents related to the study.

15          THE COURT:  Okay.  Now, you can't produce what you

16  don't have.

17          MS. PIERSON:  Right.

18          THE COURT:  In light of that representation to the

19  Court, Plaintiffs, what do you want to do?

20          MR. WILLIAMS:  Well, Your Honor, the problematic

21  thing about it is, we know that by the documents that we have

22  received that such a study exists or it occurred, and just

23  the -- just the statement that, well, we don't have it, I

24  think what, what -- kind of what we were talking about at the

25  beginning of this hearing, you will have to forgive me, it is

43

1   just a statement that it, it doesn't exist, doesn't satisfy

2   me.  It -- where did it go?  I mean, there was a Japanese

3   doctor that did a study, at least that is what we saw in the

4   Dotter documents.  If they say we don't have it because X, Y,

5   Z, this is where it went, this is where you might be able to

6   find it yourself, that is one thing.  But just to say, gosh,

7   gee, whiz, I don't know what happened to it.

8           THE COURT:  Well, let's find out.  Ms. Pierson, any

9   idea what would have happened?  It does appear as though there

10  was some study done, so what happened to the documents?

11          MS. PIERSON:  We had produced what

12  documents (inaudible) those are the ones that Mr. Williams

13  refers to.  There is some limited paperwork that refers to the

14  fact that the study took place.  Our understanding is that the

15  Japanese physicians wanted to conduct the study were unable to

16  secure (inaudible) in Japan to conduct the study in Japan, so

17  they came to do the study here.  And the data or images that

18  relate to the study presumably were taken back to Japan by

19  those physicians.  We don't know that, though.  We don't

20  employ the physicians.  They are not in our control.

21          What we are able to do is to check Cook's records and to

22  confer with the Dotter Institute so that they can check their

23  records, and we confirmed that neither of them has any

24  additional documents regarding the study.  If we need

25  to (inaudible) declarations so that you have something more

44

1   than Cook's counsel giving you that, we are happy to do that,

2   but the fact of the matter is, we have spent the time since we

3   were with you last searching for any additional information

4   regarding the study, and it does not exist.

5          THE COURT:  Okay.  Thank you.  Just hold on one

6   moment.

7          A VOICE:  Sure.

8          A VOICE:  Your Honor, I think --

9          THE COURT:  Go ahead.

10         A VOICE:  The salient point then is, we know that a

11  study occurred.  We knew that it occurred here.  We knew that

12  the Dotter Institute was involved.  We know that Cook was

13  involved.  The salient question is, when did you have these

14  documents, and when did they leave your possession?

15     I mean, if there was a study that was performed, it,

16  again, it is strange credulity to think that Cook never saw

17  these things.  And so, I am circling, coming full circle.  I

18  think we need to know when they had them and when they ceased

19  to have them.

20         MS. PIERSON:  To be clear, Judge Baker, we never had

21  the docs.  We didn't have them.  We -- we didn't have them.

22         THE COURT:  I understand.

23         MS. PIERSON:  We didn't have them.  I don't know

24  what else to say other than that.

25         THE COURT:  I don't know what else you can say.  All

45

1   right.  So here is what I am going to do.  Was there anything

2   else for today?

3              A VOICE:  No, Your Honor.

4              THE COURT:  I, I just need to take a short break

5   because I have got some people who I have to say something to,

6   and I want —— I made a couple of notes.  I will come back and

7   give you my rulings on these issues, and then the other thing

8   I wanted to talk with you about was, I want to get some dates

9   on the calendar for settlement conferences.

10      We talked about doing something in June, taking the

11  Plaintiffs separately without the Defendants talking for half

12  day or a day, whatever it takes.  And then about a week or two

13  after that, maybe about a week after that, getting the

14  Defendants to come in, talking, and see if there is any basis

15  for the discussion.  So you might start looking at your

16  calendars while I am in there for June or July.  What is your

17  date on Hill?  What is the trial date?

18             A VOICE:  October 4?

19             A VOICE:  No, no, no, 23rd.

20             A VOICE:  Twenty-third.

21             THE COURT:  Let's look in June and July.  Yes, Ms.

22  Pierson.

23             MS. PIERSON:  When you spoke with Mr. —— the last

24  time we were together, I think it was his feeling that this

25  would best occur after the expert reports had been exchanged,

46

1    and Judge Young extended those deadlines by 30 days when we

2    had our last status conference.

3            THE COURT:  What is the deadline?

4            MS. PIERSON:  The Plaintiffs' expert reports are due

5    mid-March, and ours are due in mid-May.

6            THE COURT:  Wouldn't June be good?

7            MS. PIERSON:  I -- one thing we haven't talked about

8    is the summary judgment deadline, and I think our view is that

9    it would be best to do it after the Daubert summary judgment

10   motions are filed.  So while you are gone, we will check our

11   calendars and look at that, that date, but I think our view is

12   it is better after motion practice occurs.

13           THE COURT:  After you get rulings on those motions?

14           MS. PIERSON:  No, just filing the motions, Your

15   Honor.  We -- I don't think we can predict how long it will

16   take Judge Young to rule on them.  Our preference would be to

17   exchange Daubert motions and motions for summary judgment.

18           THE COURT:  All right.  Why don't you look at your

19   calendars for June, July.  I will be back as soon as I can.

20   It will probably be 15 minutes or so, and then we will take

21   care of the rulings and maybe get some dates on the calendar,

22   all right?

23           MS. PIERSON:  Thank you.

24           A VOICE:  Thank you, Your Honor.  Thank you.

25        (Brief recess.)

47

AFTER RECESS

1          THE COURT:  Okay.  We are back on the record

2  following the short break.  I appreciate your patience.  I

3  will now give you rulings with respect to the matters before

4  the Court.

5          The first issue relates to Defendants' litigation hold

6  practices.  In my view, there is evidence before the Court and

7  supported by arguments by the Plaintiffs that raises some

8  concerns regarding the preservation of information by

9  Defendants such that some type of follow up is appropriate.

10  Specifically, there has been evidence submitted and argued

11  regarding the Scott Blanchard deposition, and Mr. Blanchard

12  testified that Cook Salesforce used e-mails to track sales to

13  track meetings and related information.

14          There is the -- in the Hill matter, the Bellwether, there

15  is the deposition of Courtney Whitelock, a district manager

16  who testified her call notes and e-mails should have been on

17  her computer that she gave to Defendants' counsel, but those

18  apparently were not on there.

19          There has been a complaint report presented to the Court

20  for a female patient with an event date of August 19, 2013,

21  showing problems with perforation of the cava.  The evidence

22  also shows in August 11, 2013, photo of a perforation, and

23  that individual is identified as Elizabeth Hill, and it

24  identifies Courtney Whitelock -- or Courtney Whitelock was

48

1    identified as the sales representative.  In addition, evidence

2    was presented to the Court showing complaint reports generated

3    by outside counsel dated July 15, 2004, which was shortly

4    before the Hill lawsuit was filed on October 2014.

5        The documents reveal and indicate that the Defendants

6    knew at least who the sales representative, who the doctor,

7    and who the Plaintiff were when she filed her lawsuit, yet

8    documents may not have been preserved with respect to that

9    claim.  Evidence also suggests that Whitelock may have used

10   her iPhone to send pictures of the Hill perforation back to

11   Cook even though the Defendants said she didn't use her -- or

12   she said, I think it was, I think the Defendant said she

13   didn't use her phone for substantive information.

14       These are issues that don't establish spoliation or

15   anything like that at this point.  It is just a question of

16   does it require some action from the Court?  I think the

17   Plaintiffs have done a, a good job of presenting information

18   to the Court that at least makes me have some concerns about

19   production.  I am not saying anything is intentional or even

20   that anything wasn't produced.

21       At this point, I just have some questions about that.  I

22   think the Plaintiffs have questions.  They have got -- they

23   have got more than questions, I think.  They have got a lot of

24   concerns, but at this point I have questions; and therefore,

25   my ruling on that particular issue for the reasons I have just

49

1   outlined is twofold.

2       Number 1, Defendants shall suspend all document

3   destruction policies for anyone who participated in selling or

4   marketing the filters used in this litigation; and No. 2,

5   within 21 days, Defendants shall produce a Rule 30(b)(6)

6   deponent about when litigation holds were put in place and

7   what steps were taken to comply with those holds.

8       The second issue before the Court involved Cook's request

9   to claw back patient numbers in the OUS study, and counsel has

10  indicated to the Court that that issue has been resolved or is

11  moot for today's purposes.

12      The third issue before the Court involves Plaintiffs'

13  request for financial information from the Defendant which

14  they believe is necessary to show punitive damages, at least

15  relevant to the punitive damages inquiry.

16      Plaintiffs represent to the Court that there is just

17  really a few items that they need as indicated by the expert

18  witness they have or at least the liaison who is working with

19  their expert witness.  In my view, what Plaintiff is really

20  requesting is substantially broader than that.  In fact, in

21  the e-mail I received outlining this, it identifies

22  information to consist of nine subparts as follows:

23      Number 1, income statements for the last five years.

24      Number 2, balance sheets for the last five fiscal years

25  and the most recent completed fiscal quarter.

50

1          Number 3, cash flow statements for the last five fiscal

2    years and the most recent completed fiscal quarter.

3          Number 4, details of any transactions, loans, and

4    payments, including dividends between each Defendant and that

5    Defendants' parent company for the last five fiscal years and

6    the most recent completed fiscal quarter.

7          Number 5, all advertising expenditures, research and

8    development expenditures and capital expenditures for the last

9    five fiscal years.

10         Number 6, any lines of credit or credit facilities

11    extended or established specifically for each Defendant and

12    each Defendants' parent company for the last five fiscal years

13    and the most recent concluded fiscal quarter.

14         Number 7, all explanatory notes that accompany the above

15    records.

16         Number 8, explanations of any cash management policies

17    between each Defendant and that Defendants' parent company.

18         And nine, total compensation for the president and/or

19    chief executive officer of each Defendant company for the most

20    recently ended fiscal year.

21         That strikes me as substantially overbroad and not

22    proportional to the issues in the case.  What the Defendant

23    has produced includes all the annual reports for William Cook

24    Europe from 2006 to 2015, unaudited balance sheets for Cook

25    Medical, Inc. from 2006 through 2015, unaudited income

51

1   statements for Cook Medical, Inc. from 2006 through 2015,

2   unaudited balance sheets for Cook, Inc. from 2006 through

3   2015, and unaudited income statements for Cook from 2006

4   through 2015.

5        In my view, these documents that have been produced

6   satisfy Defendants' obligation to produce requested

7   information regarding the Cook Defendants' net worth.  As

8   indicated, Cook has produced roughly ten years of financial

9   data, and the request that the Plaintiffs are promulgating

10  appear to me to be cumulative, duplicative, overly broad, and

11  not proportional to the needs of the case, including, as I

12  kind of mentioned during oral argument, Plaintiffs' request to

13  know the total compensation for the president and/or CEO of

14  each Cook entity.  This is a privately-held entity, and this

15  strikes me as a fishing expedition.

16       I guess all discovery, to a certain extent, involves some

17  fishing, but the Court gets to determine which pond gets the

18  fish in and how long the Plaintiffs get to fish.  And to me,

19  it just seems too long and too broad.  I am not saying there

20  is not some additional information Plaintiffs might be

21  entitled to as it relates to Defendants' net worth and

22  everything, but it just, I have got to deal with the dispute

23  in front of me, and the request is just way too broad.  So

24  that is -- the request for financial information is denied.

25       That brings up the Dotter information, which is

52

1    additional information covered related to the Dotter

2    Institute.  Defendants have represented to the Court that they

3    have produced all documents that they have or that Dotter has

4    regarding any study that would be responsive to the request.

5    Defendants aren't required to produce information that they

6    don't have.  I will take the representation from counsel that

7    they have searched, and that is all they had.  If they find

8    anything else that is responsive, they have a duty to

9    supplement, but that request will be denied.

10             All right, that takes care of the discovery.  Questions?

11                  MR. WILLIAMS:  One point of clarification.

12                  THE COURT:  Yes, Mr. Williams.

13                  MR. WILLIAMS:  With regard to the financial

14   information, are you suggesting that Plaintiffs are precluded

15   from narrowing our request and resubmitting --

16                  THE COURT:  No, I am not.

17                  MR. WILLIAMS:  Thank you.

18                  THE COURT:  I think -- if you think you want

19   something else, that is exactly what you should do.

20                  MR. WILLIAMS:  Okay.  Thanks, Your Honor.

21                  THE COURT:  Ms. Pierson, was there something else?

22                  MS. PIERSON:  Just one point of clarification, Your

23   Honor.  Your second ruling with respect to litigation hold and

24   the 30(b)(6) deposition, is that a 30(b)(6) deposition

25   directed to the litigation hold in the Hill case?

53

1          THE COURT:  I hadn't thought about it from that

2   standpoint.

3          MS. PIERSON:  The facts that you recited --

4          THE COURT:  Are you anticipating there would be

5   different 30(b)(6) deponents for the different Bellwethers, or

6   is it one person who would be able to testify generally as to

7   your practices?

8          MS. PIERSON:  Yes, yes, so I think there is one body

9   of information that general litigation hold practices in the

10  filter litigation, then there are specific holds that are

11  entered as new --

12         THE COURT:  You would be in the best position -- I

13  am sorry to cut you off.  You would be in the best position to

14  know who those deponents would be.  In my view, at least what

15  I would anticipate, that this is like the normal case is there

16  would be probably multiple people involved with the

17  deposition -- excuse me -- with the litigation holds, that

18  there may be somebody who has particular expertise with

19  respect to Hill and that is what we are dealing with now

20  because that is the first Bellwether coming up.  But there are

21  probably issues that go across all cases that would need to be

22  inquired into.

23      So I don't mean to limit this to Hill.  You may have a

24  certain deponent who is particularly knowledgeable about Hill,

25  and then maybe that satisfies the upcoming Bellwether, but

54

1    based on the arguments Plaintiffs are making, in fact, they

2    specifically said they thought Hill was a microcosm of

3    potentially, other 1500 cases.  That has not been established

4    but we, we just need somebody who can testify, I would say

5    more broadly than just Hill.

6            MS. PIERSON:  I just want to be clear.

7            THE COURT:  I, I don't mean to --

8            MS. PIERSON:  Sounds like you are expecting us to

9    prepare this person on Gage or some other case in the MDL.

10   They need to be prepared to talk about litigation holds

11   generally in the filter litigation and Mrs. Hill's litigation

12   holds in particular?

13           THE COURT:  I think that is accurate.

14           MS. PIERSON:  Thank you, Your Honor.

15           THE COURT:  Thank you.  All right.  So let's look at

16   our calendars.  We can go off the record now.

17       (Off-the-record discussion.)

18       (Concluded at 1:19 p.m.)

19                              - - -

20

21

22

23

24

25

55

1               CERTIFICATE OF COURT TRANSCRIBER

2

3       I, court-approved transcriber, certify that the foregoing

4  is a correct transcript from the official electronic sound

5  recording of the proceedings in the above-entitled matter.

6

7

8  s/s Jean A. Knepley_____        ____February 28, 2017
   Signature of Approved Transcriber          Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25