IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE:  COOK MEDICAL, INC., IVC
FILTERS MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates to All Actions

### RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION REQUESTING AN ADDITIONAL RULE 30(b)(6) DEPOSITION RELATED TO SPOLIATION

Plaintiffs have deposed *two* Rule 30(b)(6) witnesses for *over nine* hours regarding Cook's document preservation and litigation hold practices, in addition to a lengthy deposition on Cook's electronic information systems more than a year ago. Plaintiffs have deposed the district manager, regional manager, and implanting physician who serve as the basis of their spoliation claims in the *Hill* case. Plaintiffs have access to relevant employee emails that were material enough to be saved or filed by the employee. Plaintiffs have access to all relevant IVC filter design records, risk management files, manufacturing records, instructions for use, product labels, distribution lists, engineering research and feasibility documents, testing documents, regulatory letters and clearance letters, FDA submissions, quality assurance documents, and complaint files of adverse events. With all of this information at their disposal, Plaintiffs concede (as they must) that they have no evidence of any bad faith destruction of evidence by Cook or any Cook employee. Plaintiffs' Brief in Support of their Motion Requesting an Additional Rule 30(b)(6) Deposition Related to Spoliation, Dkt. 4425 ("Pls.' Br.") at 8.

This should end any further inquiry into the issue of alleged spoliation. Nevertheless, throwing aside the standard of proportionality, Plaintiffs ask the Court for leave to continue to fish for (nonexistent) evidence of bad faith document destruction to support their quest for an

adverse inference instruction. Pls.' Br. at 11-13. Enough is enough. Plaintiffs' fishing expedition cannot go on indefinitely, particularly when the parties are a mere six months from trial. This is especially true when their request is based on pure speculation that (a) hypothetical emails from a regional manager existed in 2010 (though she says they did not), (b) the emails contained relevant information (though she says they would not), and (c) the emails were destroyed in bad faith, (of which plaintiffs concede there is no evidence).  The facts and evidence do not justify additional discovery on this topic and the Court should deny Plaintiffs request for yet another deposition seeking to uncover acts of bad faith that did not occur.[1]

### A.  Plaintiffs' factual claims about the evidence are misleading.

Before turning to the substantive arguments, Cook would like to specifically address a few of the assertions Plaintiffs set forth in their brief that are misleading. These statements appear to be calculated to generate concern by the Court rather than present what the evidence *actually* demonstrates.

***First***, Plaintiffs claim that "Cook's testimony so far demonstrates it failed to preserve relevant information" (Pls.' Br. at 3), but Cook is still left wondering what relevant information Plaintiffs have in mind.  Regardless of the timing of Cook's litigation hold, or the content of its litigation hold notice, the evidence (as outlined below) shows that Cook has preserved all relevant information.  Plaintiffs' references to Cook's email retention policy do not equate to evidence that *relevant* information was ever destroyed (much less that it existed) or that Cook destroyed it intentionally and in bad faith. (Pls.' Br. at 3.)

---

[1] Plaintiffs initially presented their request for an additional deposition to the Court by letter dated March 30, 2017. Cook responded on April 7, 2017. (That response is attached hereto as Exhibit A.)

**_Second_**, Plaintiffs allege, by citation to an Order written by the Court, that "Cook represented to this Court that it was on notice of filter litigation in 2010." (Pls.' Br. at 5.)  The Order relates to the question of whether Cook should produce a privilege log listing communications relating to litigation that post-date February 23, 2010. (May 1, 2015, Order on April 30, 2015 Status Conference, Dkt. 396).   This date was not the result of any presentation of evidence on the anticipation of the *Hill, Gage*, or *Brand* lawsuits (or the lawsuits consolidated in this MDL), and was not arrived at for purposes of the question of spoliation.

Nonetheless, Plaintiffs jump to the conclusion that "[t]his means that Ms. Whitelock was put on hold more than six years after Cook was first on notice of the filter litigation."  (Pls.' Br. at 5.)  This red herring is a perfect example of ignoring facts in favor of hyperbole: as of February 23, 2010, Mrs. Hill **_hadn't even undergone her filter placement_**.  Using this date to suggest to the Court that Cook destroyed evidence in bad faith for six years is grossly misleading and irrelevant to the question of whether Ms. Whitelock possessed relevant information, whether it was reasonable for Cook to identify her and place her on a litigation hold when they did, and whether any relevant information was destroyed in bad faith.

**_Third_**, By generalizing the inquiry of when Cook reasonably anticipated litigation without reference to any specific case or claim, Plaintiffs equate that question with the separate issue of what information was reasonably placed on hold once litigation was anticipated. *See,* Pls.' Br. at 4. For example, Plaintiffs' cite no authority mandating that a medical device manufacturer must place its entire sales force on hold without regard to whether the individual might possess relevant information.  Given the hundreds of sales employees within Cook, such a sweeping hold would be neither reasonable nor proportional.  Yet again, Plaintiffs omit context when they report that Ms. Whitelock called upon Dr. Zuzga's office 149 times and testified that

US.111228664.04

she would "usually send an email" following such meeting, thus Cook must have destroyed 149

relevant emails.  (Pls.' Br. at 7.)  But that is not the case. Plaintiffs continue to omit the more

relevant line of testimony, ***when they actually specifically asked Ms. Whitelock if she prepared***

***call notes following those 149 interactions***:

> Q. Well, would it have been your practice to prepare a call note
> following ***these meetings***[2] with your customers?
>
> A. No.
>
> Q. You never did it or you sometimes did it or you always did it?
>
> A. I don't recall doing it.
>
> Q. Ever?
>
> A. Not that I remember.

(Whitelock 115:2-10, attached hereto as Exhibit B) (emphasis added).  Plaintiffs allege that Cook

intentionally destroyed Ms. Whitelock's emails detailing interactions with Dr. Zuzga, despite

already questioning her on this point and receiving a clear answer that she doesn't recall ever

preparing an email following a single interaction.  No matter how many depositions they take,

Plaintiffs cannot will into existence "missing" documents that were never created in the first

instance.

### B.  There is no evidence that Cook data was intentionally destroyed in bad faith.

Moving on from Cook's concerns about Plaintiffs' approach to this briefing, the relief

they seek – yet another Rule 30(b)(6) deposition – is inappropriate under the circumstances.

Plaintiffs claim they need this deposition to establish bad faith by Cook so that they may then

seek an adverse inference instruction.  (Pls.' Br. at 8.)  But the authority Plaintiffs' cite makes

---

[2] Again, when Mr. Heaviside questions her about "these meetings" he is referring to the exhibit that purportedly lists
her 149 interactions with Dr. Zuzga's office. (Whitelock 113-115) (introducing the spreadsheet of the 149 entries
and subsequently questioning her on the contents of the spreadsheet, including whether or not she prepared call
notes following these interactions).

clear that "the *reason*" for any data loss is "crucial" to the appropriateness of an adverse inference instruction. (Pls.' Br. at 8 (quoting *Bracey v. Grondin*, 712 F. 3d 1012, 1019 (7th Cir. 2013)) (emphasis added)). And though no request for such an instruction is presently before the Court, a look ahead at that ultimate inquiry makes clear that no further depositions are necessary on this topic. This is because here, "the reason" for the data "destruction" Plaintiffs dislike is not in question: Plaintiffs themselves have described Cook's regular process for retention or deletion of electronic information not subject to a litigation hold. (Pls.' Br. at 3. )

To summarize, in 2008, Cook implemented an Electronic Information Policy ("EIP") addressing, among other things, data management of Cook's email.  Under the EIP, all emails saved or filed in folders by employees are preserved permanently. (Blanchard (1/29/15) 95:8-13; 113:13-114:11 attached hereto as Exhibit C; Blanchard (3/14/17) 27:7-12, attached hereto as Exhibit D.) Only emails left in four user folders, inbox, sent, deleted, and spam email, are subject to automatic deletion after a specified number of days: 60 for inbox and sent items, 30 for deleted items, and 14 for spam. (Blanchard (1/29/15) 94:20-95:7; Blanchard (3/14/17) 26:24-27:12.) Under the EIP, any Cook employee can avoid automatic deletion of a material email by placing it in a user-created email folder. *Id.*  Emails placed in folders by users are retained permanently unless or until deleted. *Id.* Thus, Plaintiffs' ominous "conveyor belt toward permanent destruction" (Pls.' Br. at 3) contains only those emails that Cook employees do not deem substantive enough to save, and even as to those emails, applies only to employees not on litigation hold.

Plaintiffs' spoliation allegations are focused on emails of district and regional managers contained in one of the four folders. (Pls.' Br. at 3-8.) As explained below, it is unlikely that these folders contained any relevant information. But more importantly, Cook's testimony about

5

its electronic information process disposes of any doubt about "the reason" for the data loss about which Plaintiffs' now complain. It's not intentional; it's not bad faith; it is routine data management.  Thus, the "alternative explanation" factor in Plaintiffs' bad faith analysis has already been satisfied. (Pls.' Br. at 9.)

Plaintiffs have not suggested that Cook's routine data management practice itself is wrongful.  Instead, Plaintiffs dwell on the question of whether those routine practices – all of which have now been suspended for all custodians of interest to Plaintiffs – were suspended timely, or timely enough for Plaintiffs' satisfaction. As explained below, Cook contends that they were. But even if there is some room for disagreement about Cook's timing, without evidence of bad faith, that disagreement does not merit further dedication of resources by the parties or the Court because Plaintiffs are already aware of the timing of Cook's issuance of litigation holds – another of the three factors Plaintiffs contend may demonstrate bad faith. (Pls.' Br. at 9.) They also already know all they can about the nature of the information destroyed (emails that Cook's sales force opted not to retain during a time they had no obligation to do so, to the extent such emails existed at all). No deposition is necessary because no unanswered questions remain of Plaintiffs' bad faith inquiry. *Id.*

Cook fully complied with the Court's February 22, 2017, Order requiring testimony regarding "regarding Defendants' litigation hold and document retention practices for this litigation, including when any such hold was put in place and what steps have been taken to comply with this hold." (Dkt. 3777). Even before that Order, Cook had already produced its document retention policies and schedules, including its document hold procedure. Cook has now provided Plaintiffs with a list of every custodian on hold related to filters and the date that person was first placed on hold, and Cook's witnesses have testified about what steps have been

6

taken to effectuate the holds. The list of questions that Plaintiffs now say Cook's witnesses goes beyond the Court's Order to invade Cook's work product. (Pls.' Br. at 10 n. 7)

## C. Cook timely issued litigation holds

Plaintiffs dismiss out of hand the Five (5) Terabytes of data that Cook has preserved related to filters (Hunt 267:15-16, attached hereto as Exhibit E) and are fixated instead on a narrow category of Cook sales employees (district and regional managers) and a single category of documents (email) that Plaintiffs wish a) had existed and b) Cook had retained for a longer period of time. Pls.' Br. at 6. But the evidence does not support Plaintiffs' assertions about whether these emails were likely to contain relevant information or how quickly Cook could identify those custodians.

Several foundational flaws in Plaintiffs' argument undermine it entirely.

*First*, Plaintiffs misunderstand the role of Cook's district managers and regional managers in the distribution of Cook's products. It is simply not the case that each and every filter implanted in a patient was "sold" directly by a district manager to an implanting physician. Instead, "district managers are often not present at the cases and hospitals stock [filters] whether on consignment or by buying them and keeping them on the shelf themselves. So, a district manager may have very little to do with the sale of a particular product." (Hunt 280:15-21; Whitelock 110:4-13, 258:23-259:13.)

*Second*, Cook does not reasonably anticipate litigation from each filter implantation. Plaintiffs essentially argue that as soon as *a* plaintiff filed *a* lawsuit related to its filter (in 2010, for example), Cook should have anticipated litigation from that point forward with respect to all filter implantations.  Plaintiffs offer no authority supporting this overbroad burden on device manufacturers, and it finds no support in the facts applicable here either. Cook's witness testified

US.111228664.04

that "adverse event reports" made to Cook may or may not involve a patient, and often do not result in litigation. (Hunt 281:7-282:24.) Indeed, as discussed in detail below, Mrs. Hill was not the initial reporter of her own adverse event.

*__Third__*, even where Cook is able to reasonably anticipate litigation by a specific individual plaintiff, it does not automatically know which district and regional manager to consider placing on hold. Cook's witness testified that only through the implanted filter's lot number can Cook reliably identify the district and regional manager associated with the implanting facility. (Hunt 278:13-281:16; 328:22-329:16.) And even then, it is not always the case that the district or regional manager had anything to do with that facility's procurement of the device at issue, or would possess any relevant information.

These business realities – all of which Plaintiffs are aware – undermine the credibility of their feigned shock at the timing of Cook's hold issuance. District Manager Courtney Whitelock's litigation hold regarding Mrs. Hill's filter provides a helpful illustration.

Ms. Hill's filter was placed on November 17, 2010.  (Zuzga (Feb. 8, 2017) 76:19-77:8, attached hereto as Exhibit F.)  In August 2013, Cook learned that *a* patient (later understood to be Mrs. Hill) was hospitalized in Florida for a filter perforation.  At that time, Ms. Hill was admitted to a hospital within Ms. Whitelock's assigned territory.  (Whitelock 188:6-9.) When Ms. Whitelock became aware of Ms. Hill's hospitalization, she notified Cook's complaint department.  (Whitelock 183:8-12.) Ms. Hill never contacted Cook about her filter at that time, and Cook was not aware that Mrs. Hill was the patient connected with that August 2013

8

complaint. (Hunt 196:12-197:9).[3]  Having had no contact with the patient regarding that August 2013 hospitalization, Cook did not reasonably anticipate litigation at that time. Hunt 85:1-86:1.

Moreover, although Mrs. Hill filed her lawsuit on October 14, 2014, Plaintiffs omit the material fact that Cook was not served with that lawsuit until January 5, 2015. Pls.' Br. at 4;[4] Notices of Service of Process, attached hereto as Exhibit L.

Plaintiffs express concern that Ms. Whitelock was not placed on litigation hold until May 6, 2016. Pls.' Br. at 4. But they are well aware that no aspect of that delay was caused by bad faith. Cook needed the lot number of Mrs. Hill's device to match her lawsuit up with the district manager assigned the territory containing her implanting facility.[5] Cook has no access to lot numbers unless or until provided by Plaintiffs. Lot numbers of implanted devices are in the possession of the implanting facility or provider. (Hunt 327:11-15; 328:4-12.) In Mrs. Hill's case, she omitted the lot number from her Plaintiffs Fact Sheet (attached hereto as Exhibit M, *see* p. 5), and did not otherwise provide it to Cook. (Hunt 350:23-351:13).  Lending support to Cook's position that the lot number is the only way to reliably identify an implanting facility (and therefore its assigned district and regional manager), Mrs. Hill also misidentified her physician as "Frank" rather than "Mark" Zuzga and incorrectly reported in her PFS that her removal took place in Pennsylvania on August 8, a week prior to her hospitalization in Florida

---

[3] Plaintiffs have suggested to Cook's witnesses that Cook ought to have identified Mrs. Hill's name through some imaging Cook received in August 2013. Hunt 197:11-200:15. Until Plaintiffs enlarged that image to 200x magnification, converted it from color to black and white, and turned it upside down, Cook did not perceive Mrs. Hill's name on the image. Hunt 308:18-310:14. Moreover, even had Cook been aware of Mrs. Hill's identity at the time of the August 2013 report, Cook would not have retained it because Mrs. Hill's providers could not release it consistent with HIPAA without Mrs. Hill's authorization. Hunt 310:18-312:22; 349:17-21.

[4] Because Plaintiffs are misleading the Court by claiming that "the *reality* of litigation was known by Cook when Mrs. Hill's complaint was filed", their claim that they were deprived of data for "19 months" is likewise untrue. *Id.*

[5] Cook could not simply match its August 2013 internal complaint report with Mrs. Hill's lawsuit because the internal complaint did not contain her name, and the internal complaint and her lawsuit reflected different dates and different hospitals. *Compare* Excerpt from Complaint Report No. 84105 (identifying Morton Plant Hospital), attached hereto as Exhibit G *with* Dkt. 1 (8:14-cv-2738) (identifying Penn State Hershey Medical Center Hospital) attached hereto as Exhibit H. Mrs. Hill's short form complaint identified her implant physician as "Michael Zunga," and identified Mease Countryside Hospital. Dkt 108 (1:14-cv-6016) , attached hereto as Exhibit I.

US.111228664.04

for the perforation. *Id.* at 8. Cook received authorizations to retrieve Mrs. Hill's medical records from her various physicians in early 2015. (Hunt 330:3-331:6.) Cook's counsel initially received a shipment of records from her implanting facility but they were incomplete and did not contain the lot number. *Id.*; 352:3-12. Cook's counsel ultimately received complete records in April 2016 and identified and provided the lot number to Cook on May 2, 2016. (Hunt 285: 4-23; 327:16-20; 330:3-331:6.) Cook identified Ms. Whitelock as the applicable district manager on May 4, 2016, and placed her on litigation hold just two days later. (Hunt 285: 4-23.) Thus, the evidence is that Cook placed Ms. Whitelock on hold within ***4 days*** of learning her relationship with Mrs. Hill's complaint – not six years or 19 months or 30 months as Plaintiffs contend. Pls.' Br. at 5.

It is worth noting that while Plaintiffs are critical of Cook for not placing Ms. Whitelock on litigation hold on August 2013 (Pls.' Br. at 4), Plaintiffs themselves apparently did not anticipate litigation at that time either.  Neither Ms. Hill nor her counsel requested retention of critical evidence -- Ms. Hill's filter -- until **September 13, 2016**, over *three years* after her retrieval, nearly *two years* after Ms. Hill's lawsuit was served on Cook, and *four months* after Cook placed Ms. Whitelock on litigation hold  (Sept. 14 Letter, attached hereto as Exhibit N). By September 2016, Ms. Hill's filter had long since been discarded under the hospital's two-week retention policy.  If Cook is guilty of spoliation for adhering to its standard email management practices in 2013, Plaintiffs are likewise at fault for failing to anticipate litigation and preserve Ms. Hill's filter – evidence that (unlike hypothetical emails) actually existed and is relevant to the case.[6] *See St. Cyr v. Flying J Inc.*, 2007 WL 1716365, *3 (M.D. Fla. 2007) (relying on both state and federal law) (ordering an adverse inference jury instruction where the plaintiff had a duty to preserve her van from her car accident prior to commencing her lawsuit); *Marous v.*

---

[6] It also appears that Mrs. Hill deleted activity from her Facebook account during the relevant time period. This discovery is ongoing.

*Biomet, Inc.*, 2017 WL 784412, *7 (N.D. Ind. 2017) (finding no evidence of bad faith but acknowledging the possibility of spoliation where there is bad faith and the plaintiff retained an attorney prior to revision surgery but did not retain the device at issue).

Even setting aside the timing of when the parties anticipated litigation about Ms. Hill's filter, the emails Plaintiffs now seek – if they ever existed, and there is no evidence to suggest that they did – would have been sent by Ms. Whitelock prior to Ms. Hill's implant in November 2010. Ms. Whitelock has testified that she did not delete her emails and left them in her inbox (or presumably her sent items folder) and she does not recall ever trying to locate an email that is older than 60 days old (Whitelock 20:9-14; 22:2-18). Thus even were hypothetically relevant emails created, they were unavailable long before Ms. Hill's hospitalization three years later, and even longer before Ms. Hill served Cook with a lawsuit in January 2015. (Hunt 284:18-20.) Upon identifying Ms. Whitelock as the district manager for the hospital at which Ms. Hill's filter was placed. Cook imaged her laptop, and preserved her data related to physician interactions in Cook's applications IRIS and Concur. (Hunt 286:4-287:22.)

### D. Cook's regional and district managers' email folders were unlikely to contain information relevant to Mrs. Hill's claims

Further undermining Plaintiffs' argument about the dire effects of Cook's routine data management practices is the fact that there is very little evidence suggesting that the district and regional managers would have had any emails relevant to Plaintiffs' claims. Plaintiffs are simply wrong that "it is reasonable to infer that considerable relevant evidence was destroyed . . . ." (Pls.' Br. at 6-7.)

Plaintiffs rely on a *single* line of deposition testimony from *one* district manager (Ms. Whitelock) to suggest that sales representatives memorialize all visits with physicians in e-mails

to their supervisors. (Pls.' Br. at 7.) That is simply not the case. Plaintiffs incorrectly state that Ms. Whitelock visited the implanting physician at least 149 times, and that she testified that she would "usually send an e-mail" after interactions with physicians.  (*Id.*) As noted, this is misleading for two reasons.

<u>***First***</u>, there is no evidence that Ms. Whitelock had any substantive contact with Dr. Zuzga, much less the frequent substantive contact Plaintiffs' claim:

- Plaintiffs' source for the "149 visits" was expense report data related to interactions with professionals in the hospital's "cath lab" or with Dr. Zuzga's office staff generally.  (Whitelock 121:5-127:24; 130:3-14; 273:2-23; 257:1-5; Zuzga (Feb. 8, 2017) 40:5-14).

- Ms. Whitelock testified those visits largely would have been with the nurses and other professionals who stock the "cath lab" with many Cook products, only one of which was the Celect filter.  (Whitelock 130:3-14; 132:21-133:5; 273:2-274:4).

- Ms. Whitelock testified that Cook supplied over 5,000 products at the hospital, including stents, wires, catheters, and IVC filters, and the 149 visits could relate to any of those products, and more than likely were not expenses related to any meeting with Dr. Zuzga.  (Whitelock 133:1-5; 134:9-13; 136:16-19; 247:9-15, 256:13-25, 258:16-22, 272:18-273:5, 276:4-13, 279:16-19).

- She explained that the educational programs to which the expenses relate were "more for the staff when I do the educational presentations."  (Whitelock 130:3-14).  Dr. Zuzga confirmed this fact.  (Zuzga (rough) (April 19, 2017) 158:12-19, attached hereto as Exhibit J).

12

- If Dr. Zuzga attended an educational program at all, Ms. Whitelock testified he would have been passing through, possibly grabbing a lunch or food.  (Whitelock 272:18-273:5; Zuzga (rough) (April 19, 2017) 158:24-159:2). Dr. Zuzga similarly testified that if he was present at any of those visits it "may be her coming in for a case," or that Ms. Whitelock may be at his office for a day but he "may be there 20 minutes scrubbing the entire time" . . . and that he is "bouncing around [patient] rooms all day." (Zuzga (Feb. 8, 2017) 39:16-41:17; Zuzga (rough) (April 19, 2017) 158:20-159:12.)

Put simply, the two people whom Plaintiffs alleged participated in whatever contact the 149 entries represent have both confirmed that even when Dr. Zuzga was present, the contact was nonsubstantive and minimal, and *no witness* has suggested that any contact between Ms. Whitelock and Dr. Zuzga pertained to the Celect filter or Ms. Hill. (Indeed, there was no contact at all between the two prior to the placement of Ms. Hill's filter in 2010.) No Cook 30(b)(6) witness could or would establish facts to the contrary.

This lack of evidence of any substantive contact is not a surprise, given that Ms. Whitelock's job was to ensure the hospital had adequate numbers of products in stock. (Whitelock  256:13-25).  Dr. Zuzga confirmed "I don't rely on reps a lot so I don't have a lot of reps in my lab. So to say she is there to support, I guess she supports the case meaning if I need a stent that we didn't have on site she might have one in her car." (Zuzga (Feb. 8, 2017) 18:9-13).[7] Ms. Whitelock did not "sell" the Celect to Dr. Zuzga, he used it long before her

---

[7] Given that the entire claim of spoliation raised by Plaintiffs centers on hypothetical emails about Ms. Whitelock's alleged contacts with Dr. Zuzga, it is important that the Court review the testimony of the only three witnesses on this subject (Whitelock, Zuzga, and Conners) in its entirety.  This testimony makes clear that there was <u>no</u> substantive contact of any kind on any topic prior to Ms. Hill's 2010 procedure, and no substantive contact about the Celect, much less

employment with Cook began and did not rely on her to tell him what product to use or how to use it.  Her role did not include the substantive sales conduct regarding Celect that Plaintiffs allege, and there is no evidence to the contrary.

**_Second_**, there is no evidence to suggest that Ms. Whitelock had any contact with Dr. Zuzga – much less substantive contact reduced to an email or "call note" – prior to Ms. Hill's 2010 procedure:

- Dr. Zuzga, Ms. Whitelock, and Ms. Whitelock's supervisor all testified that Dr. Zuzga and Ms. Whitelock had no substantive contact (if any contact at all) prior to 2012 – long after Ms. Hill's 2010 procedure. (Whitelock 275:19-276:3; Conners 86:25-87:8, attached hereto as Exhibit K; Zuzga (rough) (April 19, 2017) 156:13-25; 159:10-12.

- Only three of the 149 expense entries to which Plaintiffs repeatedly point occurred before the date of Ms. Hill's implant, and those contacts did not pertain to the Celect because they were long after Dr. Zuzga began using the Celect filter, which was before Ms. Whitelock began working at Cook. (Whitelock 63:21-64:1; 66:11-22; 71:19-20; 276:24-277:21).

- Dr. Zuzga did not need direction or instruction from Ms. Whitelock on the Celect or IVC filters, and he was not the subject of "sales calls" regarding the Celect, because he had years before made the decision to use the Celect to treat his patients.  (Whitelock 276:24-280:10); Zuzga (rough) (April 19, 2017) 159:10-21.

relevant email messages, because Dr. Zuzga began using the Celect before Ms. Whitelock was hired and did not rely on her for information about it.

14

- Dr. Zuzga remembers none of those three interactions, but Ms. Whitelock has confirmed that they were contacts with staff of the "cath lab" because Dr. Zuzga simply wouldn't give her the time of day until approximately 2012.  (Whitelock 275:19-276:3; Zuzga (Feb. 8, 2017) 41:8-17.).  Her supervisor at the time, Ms. Conners, confirms this fact.  (Conners 86:25-87:8).

Thus, there's no evidence to suggest, much less prove, that Ms. Whitelock and Dr. Zuzga had *any* substantive interactions prior to Ms. Hill's implant, much less any interactions about the Celect filter.

Indeed, Ms. Whitelock testified that she had "very minimal" interaction with Dr. Zuzga prior to the implant procedure on November 17, 2010.  (Whitelock 276:17-22):

- Prior to November 17, 2010, Ms. Whitelock never spoke to Dr. Zuzga about the Celect or Tulip IVC filters, never provided him with written materials, data, materials, marketing materials, studies, or articles about the Celect, and was not involved in the decision to place a filter in Ms. Hill and does not know why Dr. Zuzga chose the Celect filter. (Whitelock 277:5-280:10).

- Dr. Zuzga confirmed that his interactions with sales representatives were minimal, saying he doesn't "rely on the reps a lot, so I don't have a lot of reps in my lab." (Zuzga (Feb. 8, 2017) 18:9-10; Zuzga (Feb. 8, 2017) 40:5-14) ("when she's there, she spends a considerable bit more time with the staff than she does with the physician, only because I'm bouncing around rooms all day"); Zuzga (rough) (April 19, 2017) 158:12-159:12.

15

- He also testified that Ms. Whitelock never advised him of retrieval techniques and never advised him to call specific Cook employees if he had issues.  (Zuzga (Feb. 8, 2017)18:16-23).

If that weren't enough to establish how unlikely it is that any emails ever were created reflecting relevant interactions between Ms. Whitelock and Dr. Zuzga, Plaintiffs' suggestion that every interaction with Dr. Zuzga would be reflected in an email is at odds with Ms. Whitelock's answer in the negative when Plaintiffs *specifically* asked her if she would have sent e-mails relating to these 149 visits. *See, supra*, at 4 (citing Whitelock 115:2-10). Rather than providing Ms. Whitelock's actual testimony explaining that she did not prepare call notes relating to these visits, Plaintiffs point the Court to Ms. Whitelock's testimony that she would "usually send an e-mail" after interactions with physicians.  (Pls.' Br. at 7.) However, this answer was simply a response to the very broad question of "What are [call notes]?", which she testified she sent "on and off". (Whitelock 40:2-12.) Plaintiffs' suggestion that there were emails created by Ms. Whitelock regarding Dr. Zuzga or the Celect filter is untrue.

The testimony of Ms. Whitelock's supervisor at the time of Ms. Hill's implant (Leigh Conners) is consistent with Ms. Whitelock's report of her email habits.  (Conners 59:16-25) ("Courtney and I would speak on the phone a fair amount.  If you're asking me if she, on a regular basis, sent me call notes, not that I recall.").

> Q: How about – how about with you? Did you receive e-mails from Courtney after she would make a call upon a doctor?
>
> A: Did I receive e-mails from Courtney after her sales calls?  Not on – *that was not part of our routine practice*.

(Conners 60:23-61:7, 86:13-87:8) (emphasis added).

The testimony of Dr. Zuzga, Ms. Whitelock, and Ms. Whitelock's supervisor lines up on this critical point: it was not Ms. Whitelock's practice to memorialize her physician visits with emails.  And during the period in question (before Ms. Hill's implant), Ms. Whitelock had no substantive interactions with Dr. Zuzga that could have been documented.  Plaintiffs are basing a spoliation argument on evidence that is "missing" because it never existed.

**E.  Cook's preservation efforts began long before formation of the MDL; 92 employees were on hold for filters by the time the MDL was created**

Cook's robust document retention efforts further undermine Plaintiffs' claim that Cook intentionally targeted any category of documents for intentional bad faith destruction. ***First,*** Documents related to the design, manufacture, testing, regulatory approval and other core issues relevant to the filter MDL cases are preserved permanently.  (Pls.' Br. at 6.) Examples of documents permanently retained under Cook's records management policy include:

- design history files,
- risk management files,
- device master records,
- instructions for use,
- product labels,
- manufacturing components,
- distribution lists,
- engineering research and feasibility documents,
- testing documents,
- change control and deviation,
- regulatory letters and clearance letters,
- device listings,
- device tracking databases,
- FDA submissions,
- quality assurance documents,
- complaint files of adverse events, and
- quality system procedures

(Hunt 261:15-266:20.)  All of those documents (and others) relevant to filters have been preserved in accordance with Cook's regular retention policies.  (*Id.*)

**Second,** all emails served or placed in folders by Cook employees are preserved.

**Third,** in connection with Cook's early lawsuits related to filters, Cook and its outside counsel preserved and collected additional documents as required to comply with discovery obligations in those cases. (Hunt 267:7-269:13.)  As the number of cases increased, Cook ultimately issued legal holds to 37 employees in 2013 to preserve data for use in specific lawsuits. (Hunt 105:16-20; 270:5-9.)  In February 21, 2014, Cook issued a general hold instructing 55 additional employees to hold data related to filters, without reference to any specific lawsuit. (Hunt 105:7-111:6.) Cook issued its general hold to an additional 40 employees during 2015, to an additional 71 employees during 2016, and to an additional 117 employees thus far in 2017.[8] (Hunt 271:14-272:2.)  *Currently over 1200 Cook employees are on document hold, 320 of those for filter litigation.* (Hunt 266:24-267:6.) These employees include those working in engineering, design, product development, testing, operations, quality, regulatory, post-market surveillance, sales and marketing from multiple distinct Cook entities. (Hunt 272:3-274:8.) No Cook employee has been removed from a filter hold, and departing employees' data is retained even after their separation from Cook. (Hunt 275:15-23; 296:1-5.)

The evidence reflects that **92 employees were on case specific and/or general hold for filters *before* the MDL was created and before Mrs. Hill (or Ms. Brand or Mr. Gage) served their lawsuits on Cook**. While Cook cannot disclose the filter litigation holds to Plaintiffs because their content is subject to the attorney-client privilege, Cook urges the Court to

---

[8] The email files for 117 District Managers and Regional Managers were placed on hold on February 1, 2017.  Those custodians received Cook's hold notice on February 8, 2017. *See* Pls.' Br. at 6.

undertake an *in camera* review of its legal hold forms, which will confirm that both Cook's case specific and its general holds contained appropriate instructions on data preservation.

Cook also identified "key" custodians by name in the *Adams* ESI Order (July 2, 2014) (Dkt. 36) and again in this matter in CMO11 (July 10, 2015) (Dkt. 521 at 5). In neither instance did Plaintiffs raise a complaint about the scope of key custodians.

**F. Because the Court made no preliminary finding of spoliation before the 30(b)(6) depositions, Cook properly instructed its witnesses not to divulge privileged information about its legal holds**

Plaintiffs' simultaneously ask this Court to take the extraordinary step of making a preliminary finding of spoliation (resulting in waiver of Cook's privilege as to the content of its litigation holds) *and* criticize Cook for not having waived its privilege at the deposition in the absence of such a finding. Pls.' Br. at 10-13.

As support for their request for this Court to find waiver of the privilege protecting Cook's litigation holds, Plaintiffs rely primarily on *Major Tours, Inc. v. Colorel,* No. CIV 05–3091(JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009), which is distinguishable. (Pls.' Br. at 11-13.) In *Major Tours*, the court relied on the testimony of two of defendants' 30(b)(6)witnesses, one who stated that even after a litigation hold was placed, he wouldn't have saved any relevant emails relating to the claims of racial discrimination, and one who said that they didn't even know what a litigation hold was. *Major Tours, Inc.*, 2009 WL 2413631, at *3. To the contrary, both Ms. Whitelock and Ms. Conners have confirmed that no relevant emails ever existed. Dr. Zuzga's testimony also proves that there was no substantive contact that could prompt the creation of the emails Plaintiffs' suggest. Mr. Hunt likewise testified that he was aware of no documents subject to litigation hold that were destroyed. (Hunt 295:3-10; 317:11-14.) He also testified (and Cook provided supporting documentation) that 320 Cook employees

19

are on hold related to filters, and another 800 or more are otherwise subject to a document hold. (Hunt 267:4-6.)  The evidence in this case is insufficient to warrant the result in *Major Tours*.

Plaintiffs also cite to two footnotes in *Zubulake*, 229 F.R.D. 422, 425 nn. 15-16, that do not actually discuss what minimum threshold showing of spoliation is necessary to result in waiver of privilege over litigation holds.  The court in *Zubulake* was concerned with defendant employee's intentional destruction of information and counsel's inadequate instructions regarding litigation holds.  *See id.* at 436. The *Zubulake* court ordered an adverse inference sanction in reliance on "concrete evidence" that relevant e-mail was lost and the "extensive proof…that [defendant] personnel were deleting relevant e-mails." *Id.* at 427.  Again, Plaintiffs in this case can point to no evidence, let alone "concrete evidence" or "extensive proof," that any relevant documents were not preserved by Cook employees, much less that they were intentionally deleted by any Cook employee.

It is worth noting that *Zubulake* was analyzed by this Court in *Ball v. Versar, Inc.*, 2005 WL 4881102 (S.D. Ind. Sept. 23, 2005).  In ruling on motions to compel and for sanctions this Court found that *Zubulake* was inapplicable, concluding that "an adverse inference instruction [was] too severe" where the producing parties did not "conduct themselves in bad faith nor [had the moving party] demonstrated any realized prejudice to its overall ability to defend itself at trial." *Id.* at *4.  Although *Ball* presented a different context (request for sanctions rather than request for a preliminary spoliation finding sufficient to waive privilege), Plaintiffs' request for additional discovery or other relief here should be rejected for reasons similar to those the Court cited in *Ball*: "insufficient information exists to determine whether discoverable and potentially relevant information has been irretrievably destroyed.  [The producing parties] did preserve and produce a wealth of e-mails." *Id.*

US.111228664.04

Plaintiffs' characterization of *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 634 (D. Colo. 2007), is factually inaccurate and misleading. In *Cache La Poudre Feeds*, ruling on a *prior* motion to compel by the plaintiff, the court found that "it did not have a sufficient factual record" to determine whether defendant had not complied with discovery obligations, or if the discovery plaintiff sought simply did not exist. The court allowed plaintiff to take a 30(b)(6) deposition to "to explore the procedures that [defendant] employed to identify, preserve and produce responsive documents relative to specific items raised" in the motion to compel. *Id.* at 619. Based on testimony from that deposition, the plaintiff then brought a motion for relief from discovery violations, and the court ultimately ordered a small monetary sanction in part for destruction of evidence. However, this finding was based on a very specific and clear admission from defendant's 30(b)(6) witness—the witness "acknowledged that [defendant] continued its practice of expunging the hard drives of former employees even after this litigation commenced [and litigation holds were implemented]." *Id.* at 629. The court also took issue with defendant's counsel "turn[ing] a blind eye" to the procedure of wiping hard drives of former employees, which would negatively impact the search for discoverable information. *Id.*

Here, Plaintiffs already had their bites at the apple with not just one but *two* depositions to gather information about Cook's document preservation practices. In neither of those two depositions did a Cook representative make the type of admission which occurred in *Cache La Poudre Feeds*, or even imply that a similar practice was taking place.

*Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 489 (D. Del. 2012), *aff'd sub nom. Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, No. CV 07-127-LPS-MPT, 2014 WL 545440 (D. Del. Feb. 7, 2014) is similarly distinguishable.  In *Magnetar Technologies*, the court addressed spoliation in ruling on defendant's motion to compel, noting

the concrete evidence of relevant document destruction which supported the court's finding of spoliation: within the first year after the complaint was filed, nearly seven hundred boxes of documents believed to be relevant to the question of patent validity were inadvertently destroyed at a facility maintained by one of the plaintiffs. *Id.* at 473. The court concluded: "Due to the extensive number of documents destroyed, the potential prejudice their destruction may have caused [defendant], and the occurrence of the destruction after the start of litigation, the spoliation here is a serious matter worthy of sanction." *Id.* at 489. Here, there is no evidence any document existed, let alone that they were relevant. And if any documents were destroyed, it was years before Mrs. Hill even had her filter retrieved, let alone filed suit.

In summary, Plaintiffs have not met their burden of establishing any reliable evidence that would support a reasonable inference that relevant information has been destroyed. *Cf. Tate & Lyle Americas, LLC v. Glatt Air Techniques, Inc.*, 2014 WL 10209161, at *2 (C.D. Ill. Aug. 4, 2014). As such, Plaintiffs have failed to make a preliminary showing of spoliation as required for Cook's litigation holds to be discoverable and therefore the Court should deny Plaintiffs' request for further depositions and access to Cook's litigation holds. *See Carlock ex rel. Andreatta-Carlock v. Williamson*, 2011 WL 308608, at *4 (C.D. Ill. Jan. 27, 2011) ("However, placing the threshold [for a minimum showing of spoliation] too low may authorize fishing expeditions into privileged communications based on naked claims of bad faith.").

Moreover, Plaintiffs' quest to invade the privilege as to the content of the litigation hold isn't reasonably calculated to obtain the evidence they seek about alleged bad faith. Plaintiff has not suggested that the holds issued were inadequate, rather that they were issued at the wrong time (or to the wrong people at the right time). The *content* of the hold that custodians did

receive has no bearing on either of these facts, making the extraordinary sanction of privilege waiver all the more ill-fitting to these facts.

Counsel's instruction to Mr. Hunt not to divulge privileged information is consistent with applicable authority and the Court's orders related to the Rule 30(b)(6) deposition. (Pls.' Br. at 10 n. 7.)  The Court's comments on February 21, 2017, did not include the preliminary finding required to destroy the privilege, and the Court specifically noted only information requiring "further inquiry and action."   (Feb. 21, Order at 1.)  In ordering the Rule 30(b)(6) depositions, the Court specifically stated: "These are issues that don't establish spoliation or anything like that at this point. . . . I'm not saying anything is intentional or even that anything wasn't produced."  (Feb. 21, 2017 Hrg. Tr. at 48.)  Cook's counsel's instructions not to answer were entirely consistent with the Court's comments and the authority protecting the privileged content of litigation holds except where there has been an initial finding on spoliation – a finding that Plaintiffs acknowledge wasn't previously made by seeking it now.  Nevertheless, as stated above, Cook is willing to produce to the Court for *in camera* inspection the filter litigation holds, should the Court have any questions regarding the instructions provided to hold recipients.

Finally, none of the questions that that Plaintiffs contend are unanswered would or could lead to evidence of bad faith. (Pls.' Br. at 10 n. 7)  The question of bad faith is more than even evidence of intentional destruction of documents, it requires a showing of "destruction for the purpose of hiding adverse information."  *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998) (affirming the magistrate judge's entry of judgment for the defendant even where there was evidence that the defendant destroyed adverse information shortly before his deposition).  Plaintiffs already know when Cook's filter holds were implemented and as to which custodians.  Knowing exactly how Cook selected those custodians doesn't change those ultimate

US.111228664.04

facts, and that information is protected by work product.  *See, Hofmann v. Aspen Dental Mgmt., Inc.*, 2011 WL 1258053, at *2 (S.D. Ind. Apr. 4, 2011), *objections sustained in part and overruled in part sub nom., Hoffmann v. Aspen Dental Mgmt., Inc.,* 2011 WL 1988816 (S.D. Ind. May 23, 2011); *O'Toole v. Perez*, 2016 WL 4975203, at *3-5 (N.D. Ill. Sept. 16, 2016).

### G.   Cook has been transparent about its litigation hold practices in this litigation, and Plaintiffs are not entitled to yet another deposition on that topic.  Instead, the parties should be focused on the substantive, case-specific and expert discovery now required under the Court's Bellwether Trial Plan

Plaintiffs should not be given additional discovery regarding Cook's litigation hold and electronic information practices as Plaintiffs request, because their spoliation claims not only meritless they are aimed at claims that are preempted.  Plaintiffs have yet to articulate what relevant information they believe is contained in the hypothetical emails that were allegedly destroyed or what legal claims they would prove, and because these emails never existed in the first place, Cook can only speculate.  The hypothetical emails cannot legally support their failure to warn claim because they presumably would not show an absence of information that was provided to physicians.  At best, the emails could only show information affirmatively provided to physicians in violation of the FDCA. Those claims are preempted, and Plaintiffs have no parallel state law claims.  *See Buckman Co.v. Plaintiff's Legal Committee*, 531 U.S. 341, 353 (2001) (holding that claims that exist solely by virtue of the FDCA disclosure requirements are preempted); *Marmol v. St. Jude Med. Ctr.*, 132 F.Supp.3d 1359 (M.D.Fla. 2015) (holding that Florida does not recognize private causes of action – such as plaintiff's product liability claim – for violations of FDA regulations).   Plaintiffs cannot succeed on a spoliation claim that would support only a preempted cause of action.  *See Wolicki-Gables v. Doctors Same Day Surgery Center, Ltd.,* -- So.3d --, 2017 WL 603316, *6 (Fla. 2d DCA 2017) ("As a result, the spoliation

claim must fail.  Even if they had the [lost evidence], the [plaintiffs] would not have been able to proceed further against [defendant].")

## Conclusion

In conclusion, Cook reiterates the sentiment it has expressed in other filings and letters to the Court. The *Hill* case is heading toward an October trial date. Plaintiffs' efforts to distract from the merits of this dispute have gone on long enough. The time has come for the parties and the Courts to focus their energy on preparation for trial on the substantive, scientific issues before this Court:  whether the Tulip and Celect were defectively designed and whether they proximately caused the injuries of the bellwether plaintiffs.

Cook respectfully requests that the Court deny Plaintiffs' Motion for additional Rule 30(b)(6) depositions.

US.111228664.04

Respectfully submitted,

Dated April 27, 2017                    /s/ *J. Joseph Tanner*

J. Joseph Tanner (# 11856-49)
Andrea Roberts Pierson (# 18435-49)
Anne K. Ricchiuto (#25760-49)
Anna C. Rutigliano (# 32743-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  joe.tanner@faegrebd.com
E-Mail:  andrea.pierson@faegrebd.com
E-Mail: anne.ricchiuto@faegrebd.com
E-Mail:  anna.rutigliano@faegrebd.com

*Attorneys for the defendants, Cook Inc.,
Cook Medical LLC (f/k/a Cook Medical
Inc.), and William Cook Europe ApS*

US.111228664.04

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2017, a copy of the foregoing  Response In Opposition To

Plaintiffs' Motion Requesting An Additional Rule 30(B)(6) Deposition Related To Spoliation as

filed electronically, and notice of the filing of this document will be sent to all parties by

operation of the Court's electronic filing system to CM/ECF participants registered to receive

service in this matter.  Parties may access this filing through the Court's system.  Lead Co-

Counsel for Defendants will serve any non-CM/ECF registered parties.


*/s/ J. Joseph Tanner*

US.111228664.04