# EXHIBIT A

FaegreBD.com

**FAEGRE BAKER DANIELS**

USA ▾ UK ▾ CHINA

**Andrea Roberts Pierson**
Partner
andrea.pierson@FaegreBD.com
Direct +1 317.237.1424

Faegre Baker Daniels LLP
300 North Meridian Street ▾ Suite 2700
Indianapolis ▾ Indiana 46204-1750
Main +1 317 237 0300
Fax +1 317 237 1000

April 7, 2017

Hon. Magistrate Tim A. Baker
Unites States District Court
Southern District of Indiana
Birch Bayh Federal Building & U.S. Courthouse
46 East Ohio Street
Indianapolis, IN  46204

Re:    Cook Medical, Inc., IVC Filters Products Liability Litigation MDL 2570

Dear Judge Baker:

This letter constitutes Cook's response to Mr. Williams' March 30, 2017, letter to you requesting additional Rule 30(b)(6) depositions related to Cook's legal holds. Implicit in Plaintiffs' request to continue their pursuit of evidence supporting a spoliation sanction is a concession that they found no evidence during the *nine* hours of Cook's Rule 30(b)(6) testimony that any relevant data was destroyed, much less that it was destroyed in bad faith. This is not, as Plaintiffs suggest, because of any inappropriate conduct by Cook's witness or its counsel during the depositions. Rather, it is because such evidence and evidence of bad faith simply do not exist.

As set forth below, Cook's witnesses testified at length about Cook's diligent and comprehensive data preservation efforts. In total, Cook has preserved over Five (5) Terabytes of data related to filters (Hunt 267:15-16), and there is no evidence of bad faith destruction of any data relevant to Plaintiffs' legal claims.

### *Cook's preservation efforts began long before formation of the MDL*

Notwithstanding the existence of any threatened or pending litigation, Cook keeps the vast majority of the documents related to the design, manufacture, testing, regulatory approval and other core issues relevant to the MDL cases permanently. Examples of core documents with a permanent retention period in Cook's records management policy include: design history files, risk management files, device master records, instructions for use, product labels, manufacturing components, distribution lists, engineering research and feasibility documents, testing documents, change control and deviation, regulatory letters and clearance letters, device listings, device tracking databases, FDA submissions, quality assurance documents, complaint files of

1

adverse events, and quality system procedures ("Core Documents"). (Hunt 261:15-266:20.) All of those documents (and others) relevant to filters have been preserved in accordance with Cook's regular retention policies. (*Id.*)

Though outside the scope of this MDL,[1] in connection with Cook's early lawsuits related to filters, Cook and its outside counsel preserved and collected additional documents as required to comply with discovery obligations in those cases. (Hunt 267:7-269:13.) As the number of cases increased, Cook ultimately issued legal holds to 37 employees in 2013 to preserve data for use in specific lawsuits. (Hunt 105:16-20; 270:5-9.) In February 21, 2014, Cook issued a general hold instructing 55 additional employees to hold data related to filters, without reference to any specific lawsuit. (Hunt 105:7-111:6.) Cook issued its general hold to an additional 40 employees during 2015, to an additional 71 employees during 2016, and to an additional 117 employees thus far in 2017.[2] (Hunt 271:14-272:2.) These employees include those working in engineering, design, product development, testing, operations, quality, regulatory, post-market surveillance, sales and marketing from multiple distinct Cook entities. (Hunt 272:3-274:8.) No Cook employee has been removed from a filter hold, and departing employees' data is retained even after their separation from Cook. (Hunt 275:15-23; 296:1-5.)

In addition to Cook's routine practice of keeping permanently all Core Documents related to the design, manufacture, and sale of the Tulip and Celect IVC Filters, ***currently over 1200 Cook employees are on document hold, 320 of those for filter litigation***. (Hunt 266:24-267:6.)

While Cook cannot disclose the filter litigation holds to Plaintiffs because their content is subject to the attorney-client privilege, Cook urges the Court to undertake an *in camera* review of its legal hold forms, which will confirm that both Cook's case specific and its general holds contained appropriate instructions on data preservation.

---

[1] This Court's Order on February 21, 2017, Pretrial Conference allowed Plaintiffs to conduct a Rule 30(b)(6) deposition regarding "Defendants' litigation hold and document retention practices for this litigation, including when any such hold was put in place and what steps have been taken to comply with this hold." Implicit in the Court's order is a limitation – at a minimum – to the cases in MDL 2570, if not a limitation to (1) the *Hill* case to which Plaintiffs' point for their claim of spoliation of alleged "call notes" authored by Ms. Whitelock and to holds generally related to the MDL. (*See* Transcript of February 21, 2017, Hearing at pp. 53-54.) Nevertheless, Cook permitted Plaintiffs extensively to question its Rule 30(b)(6) witnesses about all litigation hold practices generally related to cases pending in the MDL, and the witnesses were specifically prepared to offer facts and information regarding holds and hold practices applicable to the three bellwether cases.

[2] The email files for the 117 District Managers and Regional Managers referenced in Mr. King's February 7, 2017, email to Plaintiffs were placed on hold on February 1, 2017. Those custodians received Cook's hold notice on February 8, 2017.

2

### *Cook's emails were managed through its long-standing Electronic Information Policy*

In 2008, Cook implemented an Electronic Information Policy ("EIP") addressing, among other things, data management of Cook's email.[3] Under the EIP, emails within just four user folders, inbox, sent, deleted, and spam email, are subject to automatic deletion after a specified number of days: 60 for inbox and sent items, 30 for deleted items, and 14 for spam. (Blanchard (1/29/15) 94:20-95:7; Blanchard (3/14/17) 26:24-27:12.) However, Cook's automatic settings apply only to emails that Cook employees have not moved to another user-created email file. (Blanchard (1/29/15) 95:8-13; 113:13-114:11; Blanchard (3/14/17) 27:7-12.) Under the EIP, any Cook employee can avoid automatic deletion of any email by placing it in a user-created email folder. *Id.* Emails placed in folders by users are retained permanently unless or until deleted. *Id.*

Plaintiffs' claims during the February 21, 2017, hearing and in Mr. Williams letter focus on hypothetical emails allegedly automatically deleted under Cook's routine application of the EIP from the inbox, sent, and deleted user folders ("the Three Folders"). There is no claim that a "spam" folder hypothetically could have contained relevant information.

If a Cook employee is not one of the 1200 employees on document hold, and if they do not move the email to a user-created file, emails in one of the Three Folders are still subject to Cook's routine Records Management Schedule, and employees are still obligated and instructed to save substantive emails regarding topics listed in the schedule pursuant to the applicable retention period. Employees can save the information in an email file or through other means, such as a Word document, Excel spreadsheet, or other data source.

### *Cook's regional and district managers' emails were unlikely to contain information relevant to the Bellwether Plaintiffs' claims*

Notwithstanding Cook's substantial data preservation, Plaintiffs have identified a narrow category of Cook employees (district and regional managers) and a single category of documents (email) that Plaintiffs wish Cook had retained for a longer period of time. (Williams Mar. 30 Letter at 2-4.) To support their argument, Plaintiffs insist that Cook's sales representatives' emails would contain relevant information about their "marketing to physicians." (*Id.* at 3.) As Plaintiffs are aware, the evidence is strongly to the contrary.

Plaintiffs rely on a *single* line of deposition testimony from *one* district manager (Ms. Whitelock) to suggest that sales representatives memorialize all visits with physicians in e-mails to their supervisors. (*Id.* at 2.) That is simply not the case. Plaintiffs incorrectly state that Ms. Whitelock visited the implanting physician at least 149 times, and that she testified that she would "usually send an e-mail" after interactions with physicians. (*Id.*) This is misleading for two reasons.

---

[3] Although Plaintiffs imply that they first learned of Cook's email management practices during the recent Rule 30(b)(6) depositions (Mar. 30 Letter at 2), Cook produced its Electronic Information Policy ("EIP") on January 23, 2015, and this policy was the subject of testimony by Cook's IT 30(b)(6) witness on January 29, 2015.

3

First, there is no evidence that Ms. Whitelock had any substantive contact with Dr. Zuzga, much less the frequent substantive contact Plaintiffs' claim. Plaintiffs' source for the "149 visits" was expense report data related to interactions with professionals in the hospital's "cath lab" or with Dr. Zuzga's office staff generally. (Whitelock 121:5-127:24; 130:3-14; 273:2-23; 257:1-5; Zuzga 40:5-14). Ms. Whitelock testified those visits largely would have been with the nurses and other professionals who stock the "cath lab" with many Cook products, only one of which was the Celect filter. (Whitelock 130:3-14; 132:21-133:5; 273:2-274:4). Ms. Whitelock testified that Cook supplied many different products at the hospital, including stents, wires, catheters, and IVC filters, and the 149 visits could relate to any of those products, and more than likely were not expenses related to any meeting with Dr. Zuzga. (Whitelock 133:1-5; 134:9-13; 136:16-19; 272:18-273:5). She explained that the educational programs to which the expenses relate were "more for the staff when I do the educational presentations." (Whitelock 130:3-14) If Dr. Zuzga attended the program at all, Ms. Whitelock testified he would have been passing through, possibly grabbing a lunch or food. (Whitelock 272:18-273:5). Dr. Zuzga similarly testified that if he was present at any of those visits it "may be her coming in for a case," or that Ms. Whitelock may be at his office for a day but he "may be there 20 minutes scrubbing the entire time" . . . and that he is "bouncing around [patient] rooms all day." (Zuzga 39:16-41:17.) Put simply, the two people whom Plaintiffs alleged participated in whatever contact the 149 entries represent have both confirmed that even when Dr. Zuzga was present, the contact was nonsubstantive and minimal, and no witness has suggested that any contact between Ms. Whitelock and Dr. Zuzga pertained to the Celect filter or Ms. Hill.

This lack of evidence of any substantive contact is not a surprise, given that Ms. Whitelock's job was to ensure the hospital had adequate numbers of products in stock. (Whitelock 256:13-25). Dr. Zuzga confirmed "I don't rely on reps a lot so I don't have a lot of reps in my lab. So to say she is there to support, I guess she supports the case meaning if I need a stent that we didn't have on site she might have one in her car." (Zuzga 18:9-13).[4] Ms. Whitelock did not "sell" the Celect to Dr. Zuzga, he used it long before her employment with Cook began and did not rely on her to tell him what product to use or how to use it. Her role did not include the substantive sales conduct regarding Celect that Plaintiffs allege, and there is no evidence to the contrary.

Second, there is no evidence to suggest that Ms. Whitelock had any contact with Dr. Zuzga – much less substantive contact reduced to an email or "call note" – prior to Ms. Hill's 2010 procedure. Only three of the 149 expense entries to which Plaintiffs repeatedly point occurred before the date of Ms. Hill's implant (and thus during the time Plaintiffs believe Ms. Whitelock "market[ed]" Ms. Hill's filter), and those contacts did not pertain to the Celect because they were long after Dr. Zuzga began using the Celect filter, which was before Ms. Whitelock began working at Cook. (Whitelock 63:21-64:1; 66:11-22; 71:19-20; 276:24-277:21). He did not need

---

[4] Given that the entire claim of spoliation raised by Plaintiffs centers on hypothetical emails about Ms. Whitelock's alleged contacts with Dr. Zuzga, it is important that the Court review the testimony of the only three witnesses on this subject (Whitelock, Zuzga, and Conners) in its entirety. This testimony makes clear that there was <u>no</u> substantive contact of any kind on any topic prior to Ms. Hill's 2010 procedure, and no substantive contact about the Celect, much less relevant email messages, because Dr. Zuzga began using the Celect before Ms. Whitelock was hired and did not rely on her for information about it.

direction or instruction from Ms. Whitelock, and was not the subject of "sales calls" regarding the Celect, because he had years before made the decision to use the Celect to treat his patients. (Whitelock 276:24-280:10). Dr. Zuzga remembers none of those three interactions, but Ms. Whitelock has confirmed that were contacts with staff of the "cath lab" because Dr. Zuzga simply wouldn't give her the time of day until approximately 2012. (Whitelock 275:19-276:3; Zuzga 41:8-17.) Her supervisor at the time, Ms. Conners, confirms this fact. (Conners 86:25-87:8). Thus, there's no evidence to suggest, much less prove, that Ms. Whitelock and Dr. Zuzga had *any* substantive interactions prior to Ms. Hill's implant, much less any interactions about the Celect filter.

Indeed, Ms. Whitelock testified that she had "very minimal" interaction with Dr. Zuzga prior to the implant procedure on November 17, 2010. (Whitelock 276:17-22). Prior to November 17, 2010, Ms. Whitelock never spoke to Dr. Zuzga about the Celect or Tulip IVC filters, never provided him with written materials, data, materials, marketing materials, studies, or articles about the Celect, and was not involved in the decision to place a filter in Ms. Hill and does not know why Dr. Zuzga chose the Celect filter. (Whitelock 277:5-280:10). Dr. Zuzga confirmed that his interactions with sales representatives were minimal, saying he doesn't "rely on the reps a lot, so I don't have a lot of reps in my lab." (Zuzga 18:9-10; Zuzga 40:5-14) ("when she's there, she spends a considerable bit more time with the staff than she does with the physician, only because I'm bouncing around rooms all day"). He also testified that Ms. Whitelock never advised him of retrieval techniques and never advised him to call specific Cook employees if he had issues. (Zuzga 18:16-23).

If that weren't enough to establish how unlikely it is that any emails ever were created reflecting relevant interactions between Ms. Whitelock and Dr. Zuzga, Plaintiffs' suggestion that every interaction with Dr. Zuzga would be reflected in an email is at odds with Ms. Whitelock's testimony when Plaintiffs *specifically* asked her if she would have sent e-mails relating to these 149 visits:

> Q. Well, would it have been your practice to prepare a call note following these meetings with your customers?
> A. No.
> Q. You never did it or you sometimes did it or you always did it?
> A. I don't recall doing it.
> Q. Ever?
> A. Not that I remember.

(Whitelock 115:2-10.) It is likewise completely inconsistent with the testimony of her supervisor, Ms. Conners. (Conners 86:13-87:8).

Rather than providing Ms. Whitelock's actual testimony explaining that she did not prepare call notes relating to these visits, Plaintiffs point the Court to Ms. Whitelock's testimony that she would "usually send an e-mail" after interactions with physicians. (Mar. 30 Letter at 3.) However, this answer was simply a response to the very broad question of "What are [call notes]?", which she testified she sent "on and off". Whitelock 40:2-12. Plaintiffs' mistakenly

5

suggest that there were emails created by Ms. Whitelock regarding Dr. Zuzga or the Celect filter, which is untrue and grossly misleading.

The testimony of Ms. Whitelock's supervisor at the time of Ms. Hill's implant (Leigh Conners) is consistent with Ms. Whitelock's report of her email habits. (Conners 59:16-25) ("Courtney and I would speak on the phone a fair amount. If you're asking me if she, on a regular basis, sent me call notes, not that I recall.").

> Q: How about – how about with you? Did you receive e-mails from Courtney after she would make a call upon a doctor?
>
> A: Did I receive e-mails from Courtney after her sales calls? Not on – *that was not part of our routine practice*.

(Conners 60:23-61:7) (emphasis added).

The testimony of Dr. Zuzga, Ms. Whitelock, and Ms. Whitelock's supervisor lines up on this critical point: it was not Ms. Whitelock's practice to memorialize her physician visits with emails. And during the period in question (before Ms. Hill's implant), Ms. Whitelock had no substantive interactions with Dr. Zuzga that could have been documented. Plaintiffs are basing a spoliation argument on evidence that is "missing" because it never existed.

### *Cook had no obligation to hold its sales representatives' emails in the absence of notice that they had documents relevant to a legal claim*

Particularly in light of the evidence that relevant information was unlikely to be contained in unsaved regional and district managers' emails, Plaintiffs' asserted preservation standard is extraordinary. To satisfy Plaintiffs' current demands, Cook would have had to have retained *all* email communications of *all* district and regional managers beginning on or about February 23, 2010, even in the absence of any notice that those specific employees were likely to have information relevant to an existing product liability claim. That burden is inconsistent with the proportionality obligations embodied in the Federal Rules. Ms. Hill's case, which Plaintiffs highlight, provides a helpful illustration.

Ms. Hill's filter was placed on November 17, 2010. (Zuzga 76:19-77:8.) In August 2013, Ms. Hill was admitted to a hospital within Cook district manager Courtney Whitelock's assigned territory. (Whitelock 188:6-9.) When Ms. Whitelock became aware of Ms. Hill's hospitalization, she notified Cook's complaint department. (Whitelock 183:8-12.) Ms. Hill never contacted Cook about her filter at that time, and it is not Cook's policy to implement litigation holds upon receipt of an adverse event report because Cook does not reasonably anticipate litigation at that time. (Hunt 281:14-282:2, 17-24.) History demonstrates that there are far fewer lawsuits filed against Cook than adverse events reported. (Hunt 282:8-11.)

While Plaintiffs are critical of Cook for not placing Ms. Whitelock on litigation hold on August 2013 (Mar. 30 Letter at 3), Plaintiffs themselves apparently did not anticipate litigation at that time either. Neither Ms. Hill nor her counsel requested retention of critical evidence -- Ms. Hill's filter -- until September 13, 2016, over three years after her retrieval, nearly two years

6

after Ms. Hill's lawsuit was served on Cook, and four months after Ms. Whitelock was placed on litigation hold. (Sept. 14 Letter ) (attached). By September 2016, Ms. Hill's filter had long since been discarded under the hospital's two-week retention policy. If Cook is guilty of spoliation for adhering to its standard email management practices in 2013, Plaintiffs are likewise at fault for failing to anticipate litigation and preserve Ms. Hill's filter and other relevant information from destruction at that time. *See St. Cyr v. Flying J Inc.*, 2007 WL 1716365, *3 (M.D. Fla. 2007) (relying on both state and federal law) (ordering an adverse inference jury instruction where the plaintiff had a duty to preserve her van from her car accident prior to commencing her lawsuit); *Marous v. Biomet, Inc.*, 2017 WL 784412, *7 (N.D. Ind. 2017) (finding no evidence of bad faith but acknowledging the possibility of spoliation where there is bad faith and the plaintiff retained an attorney prior to revision surgery but did not retain the device at issue).

Even setting aside the timing of when the parties anticipated litigation about Ms. Hill's filter, the emails Plaintiffs now seek – if they ever existed, and there is no evidence to suggest that they did – would have been sent by Ms. Whitelock prior to Ms. Hill's implant in November 2010. Ms. Whitelock has testified that she did not delete her emails and left them in her inbox and she does not recall ever trying to locate an email that is older than 60 days old (Whitelock 20:9-14; 22:2-18), and thus even were hypothetically relevant emails created, they were unavailable long before Ms. Hill's hospitalization three years later, and even longer before Ms. Hill served Cook with a lawsuit in ***January 2015***.[5] (Hunt 284:18-20.) Cook promptly identified Ms. Whitelock as the district manager for the hospital at which Ms. Hill's filter was placed in 2010, on May 2, 2016, and held her emails by May 6, 2016. Cook further imaged her laptop, and preserved her data related to physician interactions in Cook's applications IRIS and Concur. (Hunt 286:4-287:22.)

A similar fact pattern exists for the other two bellwether cases. Tonya Brand's filter was implanted on March 19, 2009. On July 14, 2011, Mrs. Brand underwent an unsuccessful retrieval attempt in a hospital within Cook district manager Tamara Clemmer's assigned territory. Ms. Clemmer reported this to Cook, which conducted an investigation. (Hunt 289:10-16.) Indeed, Plaintiffs have already received, and relied on, several of Ms. Clemmer's emails relating to that incident. Cook issued a case-specific hold relating to her claim on April 15, 2013, a month before Mrs. Brand filed her lawsuit. (Hunt 289:21-291:9.) Mrs. Brand then dismissed her lawsuit on May 21, 2014, and did not refile it for six months, on November 13, 2014. (Hunt 292:9-293:8.) Ms. Clemmer was placed on hold on June 24, 2014. (Hunt 293:9-15.) To the extent Plaintiffs seek Ms. Clemmer's emails from on or before Ms. Brand's implantation in 2009, unless Ms. Clemmer affirmatively retained them, they would have been

---

[5] Plaintiffs' focus on the May 6, 2016, issuance of Ms. Whitelock's hold disregards what they know about Cook's procedures for identifying district and regional managers who might have information relevant to a specific plaintiff. This process begins with Cook's knowledge of the lot number of the product at issue in a given case. (Hunt 278:18-280:7; 328:22-329:16.) Cook learned the lot number of Ms. Hill's device on May 2, 2016, identified Ms. Whitelock within two days and placed her on hold just two days later. (Hunt 285:4-23.) In fact, Cook's counsel had multiple discussions with Plaintiffs' counsel regarding discovery and informed them that they could not accurately identify the district managers without the lot information.

unavailable long before Ms. Brand's 2011 incident, even if Ms. Clemmer had been placed on hold at that time.

Arthur Gage's filter was implanted on April 25, 2011. His filter was never retrieved and no one complained to Cook about his filter until his lawsuit was filed on November 11, 2014, by which point nearly 100 Cook employees were already on a filter-related hold. (Hunt 295:14-20; 317:4-8; Hunt Ex. 3.) Mr. Gage served Cook with a lawsuit on November 27, 2014, and produced his lot number on March 18, 2015. (Hunt 295:14-296:6.) Cook then placed the relevant regional manager and district manager on a litigation hold on March 27, 2015, just nine days after they received the lot number and could identify those employees. (Hunt 296:7-297:16.) There is no claim by Plaintiffs that any emails relevant to the *Gage* case were not properly retained. To the extent Plaintiffs seek emails from on or before Mr. Gage's implantation in 2011, unless they were affirmatively retained, they would have been unavailable long before Mr. Gage's 2014 lawsuit.

There is simply no evidence that any relevant email in any bellwether case ever existed, much less that it was destroyed or destroyed in bad faith. In addition, the undisputed testimony proves that any hypothetically-created emails, allegedly relevant to the bellwether cases and not otherwise preserved, would have discarded pursuant to Cook's routine practices under the EIP. As such, there is no support for Plaintiffs' allegation of spoliation.

***Cook has been transparent about its litigation hold practices in this litigation, and Plaintiffs are not entitled to yet another deposition on that topic. Instead, the parties should be focused on the substantive, case-specific and expert discovery now required under the Court's Bellwether Trial Plan***

Plaintiffs should not be given additional discovery regarding Cook's litigation hold and electronic information practices as Plaintiffs request, because their spoliation claims are preempted. Plaintiffs have yet to articulate what relevant information they believe is contained in the hypothetical emails that were allegedly destroyed or what legal claims they would prove, and because these emails never existed in the first place, Cook can only speculate. The hypothetical emails cannot legally support their failure to warn claim because they presumably would not show an absence of information that was provided to physicians. The emails could only show information that was affirmatively provided to physicians in violation of FDA regulations. As such, this information is only relevant in supporting claims based on violations of the FDCA, which are preempted. *See Buckman Co. v. Plaintiff's Legal Committee*, 531 U.S. 341, 353 (2001) (holding that claims that exist solely by virtue of the FDCA disclosure requirements are preempted). The only way that Plaintiffs could glean relevant information from any sales representatives' emails are if they support a parallel state law claim, which Plaintiffs have not shown here. *See Marmol v. St. Jude Med. Ctr.*, 132 F.Supp.3d 1359 (M.D.Fla. 2015) (holding that Florida does not recognize private causes of action – such as plaintiff's product liability claim – for violations of FDA regulations). Thus, where a party claims that spoliated evidence would support a preempted cause of action, the spoliation claim must fail. *See Wolicki-Gables v. Doctors Same Day Surgery Center, Ltd.*, -- So.3d --, 2017 WL 603316, *6 (Fla. 2d DCA 2017) ("As a result, the spoliation claim must fail. Even if they had the [lost evidence], the [plaintiffs] would not have been able to proceed further against [defendant].")

In addition, Plaintiffs have received more than sufficient discovery on the question of Cook's litigation holds. Plaintiffs long ago took the Rule 30(b)(6) deposition of Scott Blanchard that lasted over five hours regarding all of Cook's electronic information systems. Plaintiffs have deposed all of the witnesses knowledgeable about the contacts allegedly at issue – Ms. Whitelock, Dr. Zuzga, and Ms. Conners. Cook has produced its EIP, relevant record retention schedule, Litigation Hold Policy, and all of the Core Documents regarding the Celect's design, development, manufacture and sale. Plaintiffs also took for some *nine hours* the depositions of Mr. Blanchard and Mr. Hunt regarding the litigation hold topics outlined in the Court's February 21, 2017 Order. Although Cook at times objected to questions as beyond the scope of the Court's Order, Cook never instructed either Rule 30(b)(6) witness not to answer a question pertaining to its litigation holds, except for one question where Cook instructed Mr. Hunt to answer only to the extent the question was not seeking disclosure of work product. (Hunt 125:5-13).

The time has come to focus the parties' efforts in the remaining time before trial on the substantive, scientific issues before this Court: ***whether the Tulip and Celect were defectively designed and whether they proximately caused the injuries of the bellwether plaintiffs.*** Further discovery would be a pointless distraction for which there is no evidentiary support.

***Cook properly instructed its witnesses not to divulge privileged information about its legal holds***

Notwithstanding the evidence demonstrating Cook's substantial data preservation both before and since creation of the MDL, and notwithstanding the lack of evidence that the hypothetical emails Plaintiffs seek ever existed (let alone existed at the time Cook became aware of Plaintiffs' claims), Plaintiffs ask this Court to take the extraordinary step of making a preliminary finding of spoliation resulting in waiver of Cook's privilege as to the content of its litigation holds. *Tate & Lyle Americas, LLC v. Glatt Air Techniques, Inc.*, 2014 WL 10209161, at *2 (C.D. Ill. Aug. 4, 2014) ("some courts have compelled disclosure of a litigation hold letter once the moving party makes a preliminary showing of spoliation") (citing *Major Tours, Inc. v. Colorel,* No. CIV 05-3091(JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009)). No such finding is warranted under the circumstances here.

As support for their request for this Court to find waiver of the privilege protecting Cook's litigation holds, Plaintiffs rely on two cases, *Major Tours* and *Zubulake*. (Mar. 30 Letter at 1, 6.) Both cases are clearly distinguishable from the facts here. In *Major Tours*, the court relied on the testimony of two of defendants' *designated 30(b)(6)witnesses*, one who stated that even after a litigation hold was placed, he wouldn't have saved any relevant emails relating to the claims of racial discrimination, and one who said that they didn't even know what a litigation hold was. *Major Tours, Inc. v. Colorel*, 2009 WL 2413631, at *4 (D.N.J. Aug. 4, 2009). To the contrary, both Ms. Whitelock and Ms. Conners have confirmed that no relevant emails ever existed. Dr. Zuzga's testimony also proves that there was no substantive contact that could prompt the creation of the emails Plaintiffs' suggest. Mr. Hunt likewise testified that he was aware of no documents subject to litigation hold that were destroyed. (Hunt 295:3-10; 317:11-14.) He also testified (and Cook provided supporting documentation) that 320 Cook employees are on hold related to filters, and another 800 or more are otherwise subject to a document hold. (Hunt 267:4-6.) The evidence in this case is insufficient to warrant the result in *Major Tours*.

9

Plaintiffs also cite to two footnotes in *Zubulake*, 229 F.R.D. 422, 425 nn. 15-16, that do not actually discuss what minimum threshold showing of spoliation is necessary to result in waiver of privilege over litigation holds. Instead, the footnotes merely recite a quote from the defendant's outside counsel discussing oral instructions to employees regarding document preservation and a list of employees whom outside counsel met with regarding document preservation. Even assuming that this citation in some way supports an inference that a preliminary showing of spoliation was made, the court in *Zubulake* was concerned with defendant employee's ***intentional*** destruction of information and counsel's ***inadequate*** instructions regarding litigation holds. *See id.* at 436. The *Zubulake* court ordered an adverse inference sanction in reliance on "concrete evidence" that relevant e-mail was lost and the "extensive proof...that [defendant] personnel were deleting relevant e-mails." *Id.* at 427. Again, Plaintiffs in this case can point to no evidence, let alone "concrete evidence" or "extensive proof," that any relevant documents were not preserved by Cook employees, much less that they were intentionally deleted by any Cook employee.

It is worth noting that *Zubulake* was analyzed by this Court in *Ball v. Versar, Inc.*, 2005 WL 4881102 (S.D. Ind. Sept. 23, 2005). In ruling on motions to compel and for sanctions in *Ball*, this Court found that *Zubulake* was inapplicable, concluding that "an adverse inference instruction [was] too severe" where the producing parties did not "conduct themselves in bad faith nor [had the moving party] demonstrated any realized prejudice to its overall ability to defend itself at trial." *Id.* at *4. Although *Ball* presented a different context (request for sanctions rather than request for a preliminary spoliation finding sufficient to waive privilege), Plaintiffs' request for additional discovery or other relief here should be rejected for reasons similar to those the Court cited in *Ball*: "insufficient information exists to determine whether discoverable and potentially relevant information has been irretrievably destroyed. [The producing parties] did preserve and produce a wealth of e-mails." *Id.*

As their misplaced reliance on these cases demonstrates, Plaintiffs have not met their burden of establishing any reliable evidence that would support a reasonable inference that relevant information has been destroyed. *Cf. Tate & Lyle Americas, LLC v. Glatt Air Techniques, Inc.*, 2014 WL 10209161, at *2 (C.D. Ill. Aug. 4, 2014). As such, Plaintiffs have failed to make a preliminary showing of spoliation as required for Cook's litigation holds to be discoverable and therefore the Court should deny Plaintiffs' request for further depositions and access to Cook's litigation holds. *See Carlock ex rel. Andreatta-Carlock v. Williamson*, 2011 WL 308608, at *4 (C.D. Ill. Jan. 27, 2011) ("However, placing the threshold [for a minimum showing of spoliation] too low may authorize fishing expeditions into privileged communications based on naked claims of bad faith.").

Counsel's instruction to Mr. Hunt not to divulge privileged information is consistent with the authority above and the Court's orders related to the Rule 30(b)(6) deposition. (Mar. 30 Letter at 6-7.) The Court's comments on February 21, 2017, did not include the preliminary finding required to destroy the privilege, and the Court specifically noted only information requiring "further inquiry and action." (Feb. 21, Order at 1.) In ordering the Rule 30(b)(6) depositions, the Court specifically stated: "These are issues that don't establish spoliation or anything like that at this point. . . . I'm not saying anything is intentional or even that anything wasn't

produced." (Feb. 21, 2017 Hrg. Tr. at 48.) Cook's counsel's instructions not to answer were entirely consistent with the Court's comments and the authority protecting the privileged content of litigation holds except where there has been an initial finding on spoliation – a finding that Plaintiffs acknowledge wasn't previously made by seeking it now. Nevertheless, as stated above, Cook is willing to produce to the Court for *in camera* inspection the filter litigation holds, should the Court have any questions regarding the instructions provided to hold recipients.

Finally, the substance of the privileged information that Plaintiffs' seek (Mar. 30 Letter at 7) is unnecessary. Plaintiffs already know when Cook's filter holds were implemented and as to which custodians. Knowing how and when Cook selected those custodians doesn't change those ultimate facts, and that information is protected by work product. *See, Hofmann v. Aspen Dental Mgmt., Inc.*, 2011 WL 1258053, at *2 (S.D. Ind. Apr. 4, 2011), *objections sustained in part and overruled in part sub nom., Hoffmann v. Aspen Dental Mgmt., Inc.*, 2011 WL 1988816 (S.D. Ind. May 23, 2011); *O'Toole v. Perez*, 2016 WL 4975203, at *3-5 (N.D. Ill. Sept. 16, 2016).

### *Mr. Hunt was adequately prepared for questions within the scope of the Court's February 22, 2017 Order*

Plaintiffs claim Mr. Hunt was inadequately prepared because he was not familiar with one email and could not recall ten facts during more than five hours of testimony.[6] (Mar. 30 Letter at 5-6.) As set forth below, the information was either beyond the scope of the Court's February 21, 2017, Order, or Plaintiffs already have it. None of Plaintiffs' criticisms justify an additional deposition.

First, Plaintiffs point to a January 25, 2012 email from an employee at William Cook Europe to Rita Hardin, Cook's Direct of Customer Relations and Regulatory Reporting in Indiana. January 2012 is nearly three years before creation of the MDL in October 2014. There is no reason to believe an MDL was anticipated at this time and, therefore, no reason for Mr. Hunt to know why this now five-year-old email exchange took place or have prepared to testify about it. That email refers to "product liability claims," but Mr. Hunt testified that he did not know what the author of that document intended by those words (Hunt 300:4-301:14) – and indeed, Plaintiffs concede that only two of the nine cases about which they sought to question Mr. Hunt are currently pending in the MDL. (Mar. 30 Letter at 4.) Of those two MDL cases (*Snow* and *Brand*), only *Brand* is a bellwether selection, and Mr. Hunt answered all questions asked about the *Brand* case throughout the day, including when a case-specific hold was first implemented and when the district and regional manager were placed on hold.

Plaintiffs' next three "unanswered" questions seek factual (though arguably privileged) information that, if the Court believes is relevant, Cook could disclose through interrogatory responses: the names of the cases subject to case specific holds on April 15, 2013, which custodians were placed on hold for the *Brand* case, and whether Cook maintains a document

---

[6] Plaintiffs also intimate that that perhaps Pamm Garwood would have been a more appropriate Rule 30(b)(6) witness. Mar. 30 Letter at 6. Ms. Garwood is an hourly administrative employee who discharges hold-related tasks at the direction of others. She is certainly not better positioned than one of Cook's lawyers to discuss Cook's hold procedures.

11

"setting forth the identity of the cases for which individual custodians were placed on hold." (Mar. 30 Letter at 5.) Cook is willing to disclose to the Court *in camera* the answers to these questions. Specific to the *Brand* custodians on hold, Plaintiffs already know the hold dates for the district and regional managers assigned to the territory containing Ms. Brands' implant facility, and have identified those personnel as those of highest interest. Re-convening a deposition to provide the remainder of that list (which the witness would be unlikely to memorize in any event) is an inefficient way to deliver that information even if the Court determines that it should be disclosed. In addition, further discovery on those points is not warranted. Plaintiffs do not suggest, much less proffer any evidence to suggest, that documents relevant to *Brand* existed or failed to be preserved. Unless and until Plaintiffs make such a threshold showing, no additional discovery should be permitted. Plaintiffs already have received more than sufficient information proportional to the questions raised by their claim of allegedly deleted emails.

Plaintiffs' next three items (the number of holds issued in 2009-2011) were actually answered by Mr. Hunt's testimony (and Cook's produced document) that the first hold related to filters was issued on April 15, 2013. (Hunt 90:5-9.) Those questions are also inappropriate because they predate the scope of testimony about holds related to the MDL (created in 2014) and are irrelevant to the issue at hand.[7] Plaintiffs have the identity of all filter hold recipients relevant to the MDL. Plaintiff's final four items (how many filter lawsuits were filed in 2010-2013) also predate creation of the MDL, are irrelevant to their claim of spoliation, and at any rate are matters of public record that do not require Rule 30(b)(6) testimony.

Plaintiffs have no evidence even suggesting that relevant evidence existed, much less was destroyed or destroyed in bad faith. Additional discovery is not warranted as a result, and Plaintiffs' have not established that Cook's witnesses' preparation on topics within the scope of the Court's February 21 Order was insufficient in any respect, much less that it justifies an additional deposition.

For the reasons set forth above, Cook respectfully requests that the Court decline to make a preliminary finding of spoliation resulting in waiver of Cook's privilege as to the content of its litigation holds. Cook reiterates its offer to produce the holds themselves or other privileged information related to the holds to the Court for *in camera* review. Cook also respectfully requests that the Court deny Plaintiffs' request for an additional Rule 30(b)(6) deposition on the basis that there has been no showing sufficient to warrant additional inquiry into Plaintiffs' meritless spoliation allegations.

Respectfully submitted,

*Andrea Pierson*

Andrea Roberts Pierson

Enclosures

---

[7] The earliest-filed case currently in the MDL was filed on November 19, 2012.