# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
- - -

IN RE:  COOK MEDICAL, INC.,  :
IVC FILTERS MARKETING, SALES  : Case No. 1:14-ml-2570-
PRACTICES AND PRODUCTS      : RLY-TAB
LIABILITY LITIGATION      :
----------------------------- MDL No. 2570
This Document Relates to:   :
All Actions      :
-----------------------------


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
- - -
Thursday, January 26, 2017
- - -
Videotaped Deposition of COURTNEY WHITELOCK
held at Holiday Inn Express, 2580 Gulf to Bay Boulevard,
Clearwater, Florida, on the above date, beginning at
9:16 a.m., before Kimberly A. Overwise, a Florida
Professional Reporter, Certified Realtime Reporter, and
Notary Public.
- - -


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 2

1   APPEARANCES:
2
3   HEAVISIDE REED ZAIC
4   BY:  MICHAEL HEAVISIDE, ESQ.
5   910 17th Street, NW, Suite 800
6   Washington, DC  20006
7   202-223-1993
8   mheaviside@hrzlaw.com
9   Counsel for Plaintiffs
10
11  WAGSTAFF & CARTMELL LLP
12  BY:  DAVID C. DEGREEFF, ESQ.
13  4740 Grand Avenue, Suite 300
14  Kansas City, MO  64112
15  816-701-1100
16  ddegreeff@wcllp.com
17  Counsel for Plaintiffs
18
19  FAEGRE BAKER DANIELS LLP
20  BY:  ANDREA ROBERTS PIERSON, ESQ.
21  BY:  ANNA RUTIGLIANO, ESQ.
22  300 N. Meridian Street, Suite 2700
23  Indianapolis, IN  46204
24  andrea.pierson@faegrebd.com
25  anna.rutigliano@faegrebd.com
26  Counsel for Defendants
27
28  ALSO PRESENT:  Kevin Pollard, videographer
29
30
31
32
33
34
35
36

Page 3

1                I N D E X
2   WITNESS:                          Page
3   COURTNEY WHITELOCK
4     By Mr. Heaviside              7, 312, 319
5     By Ms. Pierson                256, 317
6
7
8   Certificate of Oath              320
9   Deposition Certificate           321
10  Errata Sheet                     322
11  Acknowledgment                   323
12
13             E X H I B I T S
14              (Attached.)
15
16  No.      Description            Page
17
18  462  Document entitled "Cook Electronic     10
19       Information Policy," Bates Nos.
20       CookMDL2570_0002406-08
21
22  463  Amended Defendant Fact Sheet            28
23
24  464  Document Bates No. Hill_DFS_0067        44
25
26  465  Document headed "Ethics and Compliance"  50
27
28  466  Document headed "Mission and Values"    52
29
30  467  Two-page spreadsheet              113
31
32  468  E-mail, 6/22/15, to PI Reps North       136
33       America from Fleck, Bates No.
34       CookMDL2570_0693891
35
36  469  Document entitled "Value Added Selling   140
37       for IVC Filters- Handling Filter
38       Complications," Bates Nos.
39       CookMDL2570_0187535-37
40

Page 4

1   470  Document entitled "Value Added Selling   144
2        for IVC Filters - Overcoming the Concern
3        of Filter Tilt, Bates Nos.
4        CookMDL2570_0187538-9
5
6   471  Document entitled "Venous Drive-Thru #3  148
7        'Alleviating Concerns over Tulip
8        Tilting,'" Bates No. 0322429
9
10  472  Document entitled "Venous Drive-Thru #1  151
11       'A Difficult Question,'" Bates No. 0322430
12  473  E-mail string, 12/14/12, Bates Nos.     152
13       CookMDL2570_0322470-73
14
15  474  E-mail string, 6/15/09-6/16/09, Bates   160
16       Nos. CookMDL2570_0379327-30
17  475  E-mail string, 8/23/13, Bates Nos.      169
18       CookMDL2570_0382334-36
19
20  476  E-mail string, 1/23/08-1/28/08, Bates   178
21       Nos. CookMDL2570_0380878-82
22  477  E-mail, 8/20/13, to Fleck from Whitelock, 185
23       Bates No. CookMDL2570_0745352
24
25  478  Images from procedure              188
26
27  479  Letter, 8/20/13, to Zuzga from Deckard   196
28
29  480  E-mail, 8/27/13, to Zuzga from Deckard,  197
30       Bates No. CookMDL2570_0089352
31  481  E-mail string, 10/9/13, Bates No. 0089360 200
32  482  Single Complaint Report, PR#84105, Bates 207
33       Nos. CookMDL2570_0084036-46
34
35  483  Single Complaint Report, PR#112697, Bates 213
36       No. Hill_DFS_0099-112
37  484  Celect Reportable Complaints 01 Oct 2008- 232
38       13 Sep 2013, Bates Nos.
39       CookMDL2570_0015049-61
40  485  Document headed "Cook IVC Filters: The  236
41       broadest, most proven line in the world"
42

Page 17

1    Q    And that was your personal computer?
2    A    No.  It was my work computer.
3    Q    Okay.  And do you know what -- and who's the
4  "they" anyway?  Who's the "they" --
5    A    I don't -- I don't know the company.
6    Q    Okay.  And do you know what they did with that
7  information?
8    A    I do not.
9    Q    Could you turn to the second page of what
10 we've marked as Exhibit 462 and the second bullet point
11 from the bottom of the page 2?  And just for the record,
12 the Bates number for the page I'm referring to is Cook
13 MDL2570 0002047.  So, Courtney, you see where I am,
14 right, Litigation and --
15   A    Uh-huh.
16   Q    -- Government Investigations?
17   A    Yes.
18   Q    Right?
19        It says:  "Employees will be notified by the
20 Legal Department of the need to preserve documents,
21 including e-mail, as part of a 'litigation hold.'"
22        Were you ever advised by the legal department
23 or anybody else of the need to preserve documents,
24 including e-mails, as part of a litigation hold?
25   A    No, not to my knowledge.

Page 18

1    Q    All right.  So no one ever told you that you
2  needed to preserve documents for a litigation hold;
3  right?
4    A    Right.
5    Q    So it goes on to say:  Until notified by the
6  Legal Department that the litigation hold is lifted,
7  employees must:  Preserve all documents; disable any
8  automatic delete functions (e-mail, voicemail, text
9  messaging); and suspend following the company record
10 retention policy.
11        So having never been advised of a litigation
12 hold, can I assume that you did not take those measures?
13   MS. PIERSON:  Object to form.
14   THE WITNESS:  I was told when they were
15 getting ready to take the information off my
16 computer to leave everything as is, don't touch
17 anything.
18 BY MR. HEAVISIDE:
19   Q    And that was in the last six months?
20   A    Uh-huh.
21   Q    Uh-huh is yes?
22   A    Oh, yes.  Sorry.
23   Q    So did you suspend following the company
24 record retention policy?
25   A    Did I suspend?

Page 19

1    MS. PIERSON:  Object to form.
2  BY MR. HEAVISIDE:
3    Q    Okay.  Let me just tell you this:  Andrea can
4  object whenever she wants.  Okay?  She's doing her job
5  and preserving an objection, but it doesn't mean you
6  don't have to answer the question.  All right?
7    A    I don't understand the question.
8    Q    All right.  Let me try it again.  This
9  document that you're looking at, right, page 2, under
10 Litigation and Government Investigations --
11   A    Oh, where it says suspend.
12   Q    -- it says that once they tell you about a
13 litigation hold, which apparently they didn't tell you
14 about, it says you are to suspend following company
15 record retention policies.
16        So I'm asking you, did you suspend following
17 the company record retention policy?
18   MS. PIERSON:  Object to form.
19   THE WITNESS:  Whatever was on my computer I
20 kept on my computer.
21 BY MR. HEAVISIDE:
22   Q    That's not what I asked you.  All right?  Let
23 me try again.
24   A    I still don't understand what the suspend
25 means.

Page 20

1    Q    Well --
2    A    I don't understand what that means, suspend
3  following company record retention policy.  I don't know
4  what that means.
5    Q    Okay.  Well, I don't know what you're
6  answering so let's try to unpack this, as they say.  All
7  right?
8    A    Okay.
9    Q    Do you know what the company record retention
10 policies are?
11   A    The company -- no.  All I know is when they
12 were getting the stuff off my computer, I left it as is.
13 I didn't delete anything.  I left everything the way it
14 was.
15   Q    Okay.  Of course, what I asked you was:  Do
16 you know what the company record retention policies are?
17   A    No.
18   Q    Okay.  Well, let's go up one bullet point on
19 that same page.  All right?
20   A    Uh-huh.
21   Q    See where I am where it says --
22   A    Yes, Retention of E-mail.
23   Q    Okay.  So it says Retention of E-mail.  Right?
24 It says:  "Cook observes the following retention periods
25 for the below-listed folders and will automatically

1  delete e-mail in those folders after the listed time."
2      A   Okay.
3      Q   So it seems to be their retention policy that
4  after 30 days all deleted items are removed.  Were you
5  aware of that?
6      MS. PIERSON:  Object to form.
7      THE WITNESS:  I mean, it's not part of my job
8  to keep track of our e-mail so I don't know what
9  they do with the e-mails.
10     BY MR. HEAVISIDE:
11     Q   Okay.  Here's the question again, if I may.
12  Were you previously aware that the company retention
13  policy was to automatically delete all deleted items
14  after 30 days?
15     A   I am not aware of that.
16     Q   All right.  Did you know that the company's
17  retention policy was to delete -- automatically delete
18  everything in spam folders after 14 days?
19     A   No.
20     Q   Did you know that regarding the sent folder,
21  everything would automatically be deleted after 60 days?
22     A   No.
23     Q   And did you know regarding your inbox, that
24  everything in your inbox would be automatically deleted
25  after 60 days?

1      A   No.
2      Q   So did you ever in the course of your work at
3  Cook go back to check an e-mail that you either sent or
4  received 60 days in the past and find it not there?
5      A   Not that I recall.
6      Q   All right.  So were you able while you were
7  working for Cook, if you wanted to check a received or
8  sent e-mail, were you able to go back on your computer
9  and find those that were more than 60 days old?
10     A   Not that I recall.
11     Q   Okay.  So you never at work went to check an
12  e-mail that either you sent or received more than 60
13  days prior?
14     A   I don't want to comment because I don't have a
15  specific date that I can remember where I did it.
16     Q   Okay.  So you don't know whether you did or
17  you didn't is what you're saying?
18     A   I don't recall doing it.
19     Q   All right.  So never in the course of your
20  employment with Cook did you sit at your desk and think,
21  you know, I know I either sent or received a message
22  about this topic, whatever the topic may be, that was
23  more than 60 days old?  You never had that experience?
24     A   I don't have specific examples so I don't feel
25  comfortable commenting if I don't have specific examples

1  where I remember that I went back, looked for the
2  certain e-mail to try and find it.
3      Q   So you may have or you may not have, you just
4  don't remember?
5      A   I don't -- I don't recall.
6      Q   Well, it is fair to say, though, that before
7  today you were not aware of the company's retention of
8  e-mail policy; right?
9      A   Correct.  It's not something that I in my
10  day-to-day work --
11     Q   Okay.
12     A   -- keep up with.
13     Q   And you never remember getting from the legal
14  department as per this document, the litigation hold,
15  the directive to preserve everything?
16     MS. PIERSON:  Object to form.
17     THE WITNESS:  I don't remember.
18     BY MR. HEAVISIDE:
19     Q   If we were to go to your office right now and
20  look on your computer, could we get an e-mail that you
21  either sent or received 60 days before today?
22     A   I don't know.
23     Q   What kind of electronic devices did you use in
24  the course of your employment with Cook?
25     A   We have a computer, we have iPads, and then we

1  have our phones.
2      Q   Did anyone tell you to or ask you to preserve
3  texts or voice messages on your phone?
4      A   What do you mean, did anyone?
5      Q   Anyone from Cook or their lawyers or the legal
6  department.
7      A   No.
8      Q   And what kind of work-related information was
9  on your iPad?
10     A   I mean, our e-mail syncs up to it and then we
11  have certain apps that we can use for work.
12     Q   And what would those apps be?
13     A   We have an app so we can order stuff.  We have
14  an app that we can use to show -- it has data sheets.
15  We have scanning for our consignment.  Those are the
16  main ones that I use.
17     Q   So data sheets, what kind of data sheets are
18  you talking about?
19     A   For various products.  It shows the different
20  specs so the physicians or the hospitals have the order
21  information.
22     Q   Is there any -- and I'm going to limit this to
23  IVC filters.  Okay?
24     A   (Witness nods head).
25     Q   Any educational materials?

Page 37

1    MR. HEAVISIDE: I'm not badgering her. Maybe
2  you could talk to her to actually answer the
3  questions, not something else.
4    THE WITNESS: Well, this is not something I've
5  done before.
6    MR. HEAVISIDE: I understand that. I
7  understand it.
8    MS. PIERSON: It's okay. Wait until he poses
9  a -- a question.
10   So --
11   MR. HEAVISIDE: I get it.
12   MS. PIERSON: -- ask her questions, she'll
13 tell you what she knows. But there are things
14 you're asking her that she clearly doesn't know.
15 And when she doesn't know, just because you ask her
16 multiple times, it's not going to change the
17 answer.
18   MR. HEAVISIDE: Obviously. And that's the --
19 on the rare occasion when she actually attempts to
20 answer the question. My problem now is that if I
21 ask a question --
22   THE WITNESS: I need a break. It's too much.
23   MR. HEAVISIDE: Wow. Okay. Sorry.
24   THE WITNESS: No. I work for a good company
25 and it's just too much.

Page 38

1    THE VIDEOGRAPHER: We are now off the record.
2  The time is 9:55.
3    (Discussion off the record.)
4    THE VIDEOGRAPHER: We are now back on the
5  record. The time is 10:06.
6  BY MR. HEAVISIDE:
7    Q   Courtney, we're going back on the record now.
8  Okay?
9    A   Okay. Yes.
10   Q   Are you feeling a little better now?
11   A   Yes.
12   Q   So here's the thing: No one's trying to trick
13 you. It's just you and I will spend a little time here
14 together. And you get frustrated, I get frustrated. So
15 I would just ask you to the extent you can, listen to
16 what I'm actually asking you and answer what I'm asking
17 you, not something else. Okay?
18   A   Uh-huh, yes.
19   Q   Okay. So I think we were talking about an
20 IFU; right?
21   A   Yes.
22   Q   You know what an IFU is?
23   A   Yes.
24   Q   What is it?
25   A   Instructions for use.

Page 39

1    Q   And you have nothing to do with drafting an
2  IFU; right?
3    A   Correct.
4    Q   And you know that an IFU has approved
5  indications for the product; right?
6    A   Yes.
7    Q   And by the product, I'm talking about the
8  Celect -- the Cook Celect filter. Okay?
9    A   Yes.
10   Q   So you know that the IFU has approved
11 indications; right?
12   A   (Witness nods head).
13   Q   Yes?
14   A   Yes.
15   Q   And you know that the IFU has approved
16 retrieval techniques; right?
17   A   Yes.
18   Q   All right. And you know that a Cook
19 salesperson should not promote off-label indications or
20 off-label retrieval techniques?
21   A   Yes.
22   Q   Okay. It would be wrong to do that?
23   MS. PIERSON: Object to the form.
24   THE WITNESS: It would be wrong.
25

Page 40

1    BY MR. HEAVISIDE:
2    Q   Let me ask you about call notes. You know
3  what call notes are?
4    A   Yes.
5    Q   What are they?
6    A   If I had an interaction with a physician, I
7  would usually send an e-mail just letting my boss know I
8  met with such and such and, you know, detail what
9  happened during the meeting.
10   Q   Okay. And did you do that routinely through
11 the course of your employment with Cook?
12   A   On and off, yes.
13   Q   So, for example -- and we'll get into this
14 later, but in that document there, the defense fact
15 sheet, there's a list of meetings that you had with
16 Dr. Zuzga, for example. All right?
17   A   (Witness nods head).
18   Q   And I'm going to represent to you that the
19 number of meetings exceeds 140. Okay? Does that sound
20 roughly accurate?
21   MS. PIERSON: Object to form.
22   THE WITNESS: Can you say that again? Sorry.
23   BY MR. HEAVISIDE:
24   Q   Sure. Rather than having to ask you how many
25 times have you ever met with Dr. Zuzga -- which I think

Page 61

1    A  I mean, I didn't tie it together like that
2  because --
3    Q  How about as we sit here --
4    A  -- that's not how I thought of it.
5    Q  -- right now?  Does it make sense?
6    A  I mean, if they were going to use it after the
7  educational program, then they were going to use it.
8    Q  Okay.  And when did you start with Cook?
9    A  In May of 2009.
10   Q  Did you learn anything at Pfizer about adverse
11 event reporting?
12   A  I don't remember.
13   Q  Did you have any --
14      (Telephone interruption.)
15      MR. HEAVISIDE:  Oops.
16   BY MR. HEAVISIDE:
17   Q  Did you have any responsibility -- sorry about
18 that.  Sorry.
19      Did you have any responsibility at Pfizer
20 regarding adverse event reporting?
21   A  I do not remember.
22   Q  Okay.  You started at Cook, when did you say,
23 May of?
24   A  2009.
25   Q  All right.  And were you always involved in --

Page 62

1  during your employment with Cook with sales of IVC
2  filters?
3    A  Yes.
4    Q  How did you -- you didn't go into that job
5  with any knowledge of IVC filters, did you?
6    A  No.
7    Q  Okay.  And how did you attain whatever
8  knowledge you did attain about IVC filters?
9    A  We had training.
10   Q  Okay.  And what did that training consist of?
11   A  I don't remember the ins and outs.  I just
12 know that we learned about the filters, we learned about
13 the competitor filters, we learned where the filter's
14 placed, we learned about our device and how it works.
15   Q  And in what -- what form did that instruction
16 take?
17   A  What do you mean?
18   Q  Well, was it a pamphlet?  Was it a recording?
19 Was it an in-person meeting?  Was it a --
20   A  We would go up to Bloomington to do our
21 training, so we were up at the headquarters.  We had
22 product managers come in and talk to us and then we had
23 trainers.
24   Q  And did they give you any handouts?
25   A  We did have a notebook, a big binder.

Page 63

1    Q  And what happened to that binder, if you know?
2  Still have it?
3    A  I do not have it.
4    Q  Do you know what happened to it?
5    A  No.  I've moved several times since then.
6    Q  Have you ever gotten more than one training
7  binder other than the initial training binder that you
8  were provided with?
9    A  Yes.  When we would go to meeting -- regional
10 meetings, we would sometimes have binders.
11   Q  And what happened to those binders?
12   A  I don't recall.
13   Q  And how often were those regional meetings?
14   A  It depended.  There wasn't a timeline that we
15 had to have them.
16   Q  Were you taught how to differentiate a Cook
17 filter from a competitor filter?
18   A  In the training?
19   Q  Yeah.
20   A  I don't remember.
21   Q  In the course of your contacts with customers,
22 specifically Dr. Zuzga, did you ever discuss or provide
23 him with information regarding the advantages of a Cook
24 filter as compared to a competitor filter?
25   A  He was already using it when I met him, so we

Page 64

1  didn't have much interaction about it.
2    Q  Okay.  So would the answer be that you never
3  discussed with him the advantages of a Cook filter as
4  compared to a competitor filter?
5    A  Correct.
6    Q  What is SBU sales training?
7    A  Sales -- strategic business unit.
8    Q  Okay.  So what is that specifically with
9  regard to your employment?
10   A  Well, there's SBUs and then we fall under.  So
11 I'm under peripheral intervention.
12   Q  That's your --
13   A  But there's different units.  Yeah.
14   Q  So your SBU is peripheral intervention?
15   A  Peripheral intervention, uh-huh.
16   Q  And you got peripheral intervention sales
17 training; right?
18   A  Uh-huh.
19   Q  What did that consist of?
20   A  I don't remember because we've had a couple
21 trainings.
22   Q  All right.  And you got SBU peripheral
23 intervention tracking tools; right?
24   A  I don't remember.
25   Q  Well, as part of your job as a sales rep for

Page 65

1    Cook, did you summarize published medical articles?
2      A   Not to my knowledge. I may have summarized,
3   but that would be the extent of it.
4      Q   Well, if you did summarize scientific articles
5   regarding filters, what did you do with your summary?
6      A   It would just be in speaking, like if I was
7   talking to a physician.
8      Q   You'd tell him what you read in a particular
9   article?
10     A   Yes.
11     Q   Did you memorize the summary or did you record
12  it in some fashion?
13     A   No, I didn't memorize anything. I'd have to
14  look at it and then if I was talking to them, then we
15  would talk about it.
16     Q   Okay.
17     A   So it's not something I'd talk about all the
18  time.
19     Q   So when you said you would look at it, you
20  would look at your summary or you would look at the
21  actual article?
22     A   A summary, if there was one to look at.
23     Q   One that you prepared?
24     A   No, I wouldn't have prepared it. I would have
25  looked at the summary, let's say, from the article. And

Page 66

1   then if it came up in conversation, I might reference
2   it. And that would be the extent of it.
3      Q   You mean like a bullet point in the front of
4   an article?
5      A   Where it talks about the summary, the finding.
6      Q   So what -- did you have any of those
7   discussions with Dr. Zuzga about any --
8      A   No.
9      Q   -- articles?
10     A   No.
11     Q   Did you have any discussions with any of your
12  other customers about any of those articles?
13     A   None that I can specifically recall.
14     Q   But you do recall that you had it with some
15  people, but you specifically didn't have it
16  with Dr. Zuzga?
17     A   Yes. I know I did not have it with Dr. Zuzga
18  because he was already using our filters. So...
19     Q   So you didn't have to update him about
20  anything about the Cook filter because he was already
21  using it; is that right?
22     A   Uh-huh, yes.
23     Q   Apparently in October of 2009 your territory
24  was split; is that right?
25     A   Uh-huh.

Page 67

1      Q   Yes?
2      A   Yes.
3          MS. PIERSON: It's hard, hard to remember for
4   all of us, but if you can --
5          THE WITNESS: Just say --
6          MS. PIERSON: -- just answer audibly whatever
7   your answer is, yes, no, or anything else, just
8   answer audibly for Mike and then he'll -- then he
9   won't follow up.
10         THE WITNESS: I will try.
11         MS. PIERSON: It's hard.
12  BY MR. HEAVISIDE:
13     Q   So what does that mean, your territory was
14  split? They added another sales rep?
15     A   They did. They were going -- well, we added
16  one -- we actually added two.
17     Q   And who were they?
18     A   Maggie Driscoll and Brandon Jacoby.
19     Q   So after the split -- Brandon who?
20     A   Jacoby.
21     Q   After the split did Dr. Zuzga stay on your
22  client list, so to speak?
23     A   Yes.
24     Q   Yes?
25     A   Yes.

Page 68

1      Q   So both before and after the split Dr. Zuzga
2   was on your customer list regarding IVC filters?
3      A   Yes.
4      Q   Have you ever seen any of your Cook district
5   manager performance reviews?
6      A   Yes.
7      Q   When did you see them?
8      A   We usually sign them every year.
9      Q   Have you seen them recently?
10     A   I just signed my most recent one.
11     Q   Okay. Other than your most recent one, have
12  you seen any others recently?
13     A   No.
14     Q   And I'm looking at the one that says period
15  covered May 9 to November 2009. Remember I asked you
16  about SBU tracking tools?
17     A   Yes.
18     Q   It says here: Uses SBA-specific sales
19  training and tracking tools.
20         But you don't remember what those were?
21     A   No.
22         MS. PIERSON: Object to form.
23  BY MR. HEAVISIDE:
24     Q   And I'm -- and just to make everybody's life
25  easier, I'm referring to Hill DFS 0069 because this is

17 (Pages 65 to 68)

Page 69

1  one of the documents that's in that big defense fact
2  sheet.
3     A  Oh, okay.
4        MR. DEGREEFF:  463.
5     BY MR. HEAVISIDE:
6     Q  This says you had a thorough -- so, Courtney,
7  if you turn to page 2 of that document, on the bottom
8  it's 0070.
9     A  Okay.
10    Q  On the top there it says Skill Evaluation
11 Detail?
12    A  Yep, I see it.
13    Q  It says you have a thorough knowledge of Cook
14 products and their indications; correct?
15    A  Yes.
16    Q  And you told me previously that it would be
17 improper to promote an off-label indication for a
18 product; right?
19    A  Yes.
20    Q  Okay.  It says you have a thorough
21 understanding of relevant disease states; right?
22    A  Yes.
23    Q  How did you attain that thorough
24 understanding?
25    A  When we learned it in training and then being

Page 70

1  out in the field as well talking with physicians.  They
2  like to educate.
3     Q  I'm sorry?  What was the -- I didn't hear --
4     A  They like to educate.
5     Q  Did you attain a thorough understanding about
6  hemodynamics associated with tilt in a filter?
7     A  No.
8     Q  Okay.  Did you attain a thorough understanding
9  of a thrombosis associated with an unretrieved filter?
10       MS. PIERSON:  Object to form.
11       THE WITNESS:  Can you say that again?  Sorry.
12    BY MR. HEAVISIDE:
13    Q  Yeah.  Did you ob -- did you attain a thorough
14 understanding regarding the issue of a thrombosis
15 occasioned by an unremoved filter?
16       MS. PIERSON:  Object to form.
17       THE WITNESS:  I know it can happen.  I mean,
18 it's one of the risks associated with filters.
19    BY MR. HEAVISIDE:
20    Q  Did you -- is it your understanding that the
21 greatest cause of an in-vein thrombosis is a retained
22 filter?
23       MS. PIERSON:  Object to the form.
24       THE WITNESS:  Can you say that again?  Sorry.
25

Page 71

1     BY MR. HEAVISIDE:
2     Q  Did you attain an understanding that the
3  greatest cause of a post-implant in-vein thrombosis is a
4  retained filter?
5     A  No.
6     Q  This says on that same page halfway down, it
7  says territory Management.
8     A  Yes.
9     Q  It says:  "Establishes champions in targeted
10 accounts."
11       What -- what does that mean?
12    A  When we call -- when we say "champion," it's a
13 physician who supports Cook products and they're willing
14 to help try them, see how they work, talk to the lab
15 about getting them in.  That's what we mean when we say
16 "champion."
17    Q  Was Dr. Zuzga a champion?
18    A  No, at that time he was not a champion.
19    Q  When did he become a champion?
20    A  Never for me.  He was already using the
21 product.  So in terms of IVC filters, he was not a
22 champion.
23    Q  Did he become a champion for some other Cook
24 product?
25    A  No.

Page 72

1     Q  Okay.  So you just said "never for me," which
2  would imply for somebody else.  I'm just trying to
3  clarify.
4     A  Oh, I mean I don't know for anybody else, but
5  specifically for me he was not a champion.
6     Q  Okay.  On the bottom of that page where it
7  says Comments --
8     A  Yes.
9     Q  -- it says:  She never hesitates to share
10 information that she has learned and she has taken the
11 lead to summarize and share with the team JVIR articles
12 that pertain to our products.
13    A  Okay.
14    Q  Okay.  So what is JVIR?
15    A  That's the Journal of Vascular Interventional
16 Radiology.
17    Q  All right.  So it seems that you must have
18 summarized those and then disseminated that summary to
19 team members?
20    A  Yes.
21    Q  Okay.  So then you wrote summaries; right?
22    A  Yes.
23    Q  And to whom did you give those summaries?
24    A  It would have been to my team.
25    Q  And who was on your team?

Page 109

1    Q    And maybe you have notebooks?
2    A    I don't know.
3    Q    And maybe you have preplanning; right?
4    A    I don't know.
5    Q    Well, anyway, back to this page on your
6  performance review, 0084, it says:  Detailed information
7  on account history and follow up notes from meetings.
8         Now, those would be the call notes that we
9  talked about previously; right?
10   A    Yes.
11   Q    So you kept call notes only we don't know
12 where they are right now; right?
13   A    I do not know where my notes are, no.
14   Q    Was that part of what you turned over?
15   A    I did not physically turn anything over.
16   Q    Were they on your computer?
17   A    The call notes are on my computer, yes.
18   Q    And you turned over your computer; right?
19   A    Right.
20   Q    So your call notes should be on your computer?
21   A    Yes.
22   Q    Okay.  And I think you told me the Concur app
23 was just to record expenses?
24   A    Yes.
25   Q    What other apps were there?

Page 110

1    A    At this time or if we're still talking about
2  2011, nothing.
3    Q    Okay.  Well, at any time then.
4    A    I mean, we have the apps that are approved by
5  Cook.
6    Q    Yeah.  What are they?
7    A    Like we talked about earlier, we have an app
8  called Portfolio, which has our products; we have the
9  Relocation app, which is used so if a product is used,
10 we can track it; and we have a Consignment app, which is
11 used for any product that's on consignment, so if we
12 scan it, then we can track it to keep a record of what's
13 in the hospital.
14   Q    Okay.  Did you ever have any other apps,
15 Cook-approved apps, that you don't currently have?
16   A    No.
17   Q    Did you ever have any apps like, for example,
18 if a doctor or a customer asked you a question about
19 complications or something like that where you could
20 refer to that app to get information to respond to the
21 question?
22   A    Not an app.
23   Q    Okay.  Not an app.  In what other form could
24 you get that information?
25   A    What do you mean?

Page 111

1    Q    You said you didn't get -- you didn't have --
2  you said "not an app," which would suggest there was
3  some other way you could seek out that information.
4    A    For what?
5    Q    For what I asked you.  Questions about
6  complications --
7    A    Oh, for complications.  Well, if there were
8  complications, they would refer to me, let me know about
9  it, if that's what you're asking.
10   Q    If a customer had a question about comp --
11 about complications?
12   A    Regarding?
13   Q    Regarding a filter, a Cook filter, you would
14 be the person that they would ask about those
15 complications?
16        MS. PIERSON:  Object to form.
17        THE WITNESS:  Yes.  And then I would refer to
18 someone in product management to talk to them about
19 it.
20 BY MR. HEAVISIDE:
21   Q    So you would tell the customer call this
22 person in product management or you would tell this
23 person in product management to call this customer?
24   A    Well, I would usually find out what -- you
25 know, what their concerns are and then I would get in

Page 112

1  contact with someone who is in product management and
2  then it would go from there.
3    Q    And would you follow up to see whether or not
4  those questions had or had not been answered?
5    A    Usually if a doctor and a product manager have
6  an interaction, I'm not usually involved.
7    Q    And you don't know what transpired or didn't
8  transpire?
9    A    Right.
10   Q    Let me ask you this --
11        MR. HEAVISIDE:  How are we doing timewise?
12        THE VIDEOGRAPHER:  We're at two hours and 17
13 minutes on the record.
14        MR. HEAVISIDE:  Are those -- what are those,
15 three-hour tapes?
16        THE VIDEOGRAPHER:  Oh, no.  It's digital so --
17        MR. HEAVISIDE:  Go all day long?
18        THE VIDEOGRAPHER:  Yeah.
19        MS. PIERSON:  Let's not do that.
20        MR. HEAVISIDE:  Do you want to take a little
21 coffee break now?
22        MS. PIERSON:  Yes.  Is this a good spot maybe
23 just to get a quick bite?
24        MR. HEAVISIDE:  Yes.
25        MS. PIERSON:  I don't know if there's

Page 113

1    something downstairs, but --
2         THE COURT REPORTER:  Do you want to go off the
3    record?
4         MR. HEAVISIDE:  Yes.
5         THE VIDEOGRAPHER:  We are now off the record.
6    The time is 11:45.
7         (Luncheon recess taken from 11:45 a.m. to
8    12:43 p.m.)
9         THE VIDEOGRAPHER:  We are now back on the
10   record.  The time is 12:43.
11        (Exhibit No. 467 was marked for
12   identification.)
13   BY MR. HEAVISIDE:
14        Q   Courtney, are you ready to be back on the
15   record?
16        A   Yes.
17        Q   I'm going to put in front -- in front of you a
18   two-page document, two large pages, and it's been marked
19   Exhibit 467.  And, again, these pages are an enlarged
20   version of what's in Exhibit 463, which is the amended
21   defendant fact sheet.
22        A   Okay.
23        Q   So what I'm really trying to say is this came
24   out of here.  Okay?
25        A   Okay.

Page 114

1        Q   Do you recognize that at all?
2        A   I do not recognize this spreadsheet.
3        Q   Well, it seems -- just take a minute and look
4    at it, but it seems to record meetings with customers.
5        A   Yes.
6        Q   Is that fair to say?
7        A   Yes.
8        Q   Okay.  If you were to look in the far right
9    quadrant of that document, you'll see on the top of the
10   column Report ID.
11        A   Okay.
12        Q   All right?  You see that?
13        A   Yes.
14        Q   And then there are entries in that column
15   which is styled Report ID, which is a series of numbers;
16   right?
17        A   Yes.
18        Q   Do you know what those reports are?
19        A   No.
20        Q   Did you make reports following these meetings
21   with your customers?
22        A   I did not make a report like this.
23        Q   What kind of report did you make?
24        A   I mean, going back to the call notes that we
25   talked about in length, that would be it.  I mean, I see

Page 115

1    food here.
2        Q   Well, would it have been your practice to
3    prepare a call note following these meetings with your
4    customers?
5        A   No.
6        Q   You never did it or you sometimes did it or
7    you always did it?
8        A   I don't recall doing it.
9        Q   Ever?
10        A   Not that I remember.
11        Q   Well, in the middle of the page see where it
12   says Currency and Approved Amount?
13        A   Oh, yes.
14        Q   It's in white?
15        A   Attendee Currency.
16        Q   Yeah, and then Approved Amount.
17        A   Oh, yes.
18        Q   Well, if you go down that column, there's an
19   entry for 1,071 US dollars.
20        A   Oh, okay, I see it.
21        Q   You see that?
22        A   Yes.
23        Q   Now, wouldn't somebody at Cook want to know
24   what you spent 171(sic) US dollars for?
25        A   Yeah.

Page 116

1        Q   And how would you advise them of what you
2    spent it for?
3        A   Well, that would go back to the Concur app, so
4    it would be in the Concur for my expenses.
5        Q   So it would just be --
6        A   All my dollar -- I mean, anything I spent on
7    my card I have to report in Concur.
8        Q   But didn't anybody ask you, Courtney, why did
9    you spend a thousand dollars today, what was it for?
10        A   I don't remember the specific one.
11        Q   Well, would that be your normal practice as a
12   sales rep for Cook where you'd go out and spend a
13   thousand dollars and no one at Cook would want to know
14   what you want to spend the money for?
15        MS. PIERSON:  Object to form.
16        THE WITNESS:  Of course, when I have something
17   that's going to be a larger spend, I always okay it
18   with my boss.
19   BY MR. HEAVISIDE:
20        Q   Is there paperwork associated with advising
21   your boss what this is going to be about and who's going
22   to be there and seeking approval?
23        A   It's a conversation.
24        Q   Okay.  So you just say I want to have a little
25   gathering and it's going to cost a thousand dollars and

Page 121

1      Okay.  I'll ask another question.  I'll
2  withdraw that question and ask you another
3  question.
4      BY MR. HEAVISIDE:
5      Q   Does the information on these documents
6  reflect approximately 140 educational presentations and
7  list Dr. Zuzga as the attendee?
8      MS. PIERSON:  Object to form.
9      You can answer if you know.
10      THE WITNESS:  I don't know how many times.  I
11  see him listed but I don't know the number.
12      BY MR. HEAVISIDE:
13      Q   Do you have any reason to believe that this
14  listing, which was prepared by Cook and provided to us
15  by Cook, any reason to believe it's incorrect?
16      A   I don't know who provided it.
17      Q   I just told you who provided it.
18      A   I thought you said if it was provided by Cook.
19      Q   No.  It was provided by Cook.
20      A   Okay.  I don't know who provided it.
21      Q   I just told you who provided it.
22      A   Okay.  I don't know how it was made
23  spreadsheetwise or what goes into it.  I know what I do
24  to record when I have an interaction with a physician
25  that involves any kind of money, money and with food

Page 122

1  involved, we put it into our Concur.  What happens after
2  that I don't know.
3      Q   So how many educational presentations did you
4  put on at which Dr. Zuzga was an attendee?
5      A   I don't know.  I don't count.  I mean, I've
6  been here seven years.  I see them all the time.
7      Q   Go ahead and count them.  I mean, it's
8  ridiculous we can't get by this.  But if you want to be
9  that way, go ahead and count them.
10      A   Well, if there -- I mean, if it said 140,
11  there was 140.  I mean, I see his name, I see I'm
12  listed, I see there was educational presentations.  I
13  don't see why I need to count them.
14      MR. DEGREEFF:  Just count them.
15      BY MR. HEAVISIDE:
16      Q   So that you can answer the question.
17      MS. PIERSON:  I think she has answered the
18  question, Mike.
19      MR. DEGREEFF:  No, she's not answering the
20  question.
21      MS. PIERSON:  I don't think you like the
22  answer.
23      MR. HEAVISIDE:  It's not that I don't like the
24  answer.  It's not an answer.
25      MS. PIERSON:  It's -- it's --

Page 123

1      MR. HEAVISIDE:  She doesn't know how many
2  educational programs she did.  This lists at least
3  140.  She's refusing to count them.  And then she
4  won't even say, yeah, I assume this is correct
5  since it was prepared by Cook.  So --
6      MS. PIERSON:  Well, I mean, either she knows
7  how many there were or she doesn't know.
8      MR. HEAVISIDE:  Well, either she can count
9  them or she can't.  Let's hope she can.
10      BY MR. HEAVISIDE:
11      Q   Ma'am, do you have any reason to think that
12  this information provided to the plaintiffs in this case
13  as reflected on those sheets is not accurate?
14      A   I don't know because I didn't make it.  I
15  mean, I see my name, I see -- I see everything on the
16  spreadsheet, but I didn't make the spreadsheet and I
17  don't know where it came from.
18      Q   Okay.  Well, is it in your experience at Cook
19  that they provide fictional or -- or fictitious
20  information when requested to provide information?
21      MS. PIERSON:  Object to form.
22      THE WITNESS:  Cook would never provide
23  information that is not accurate.
24      BY MR. HEAVISIDE:
25      Q   Okay.  Well, then Cook provided this

Page 124

1  information, so we can conclude that in your opinion
2  it's accurate; right?
3      A   I mean, again, I didn't make the spreadsheet.
4  I wasn't there for this.  I'm not going to say
5  something -- I mean, I wasn't there for it.  I see
6  what's on here --
7      Q   Okay.  So any information regarding filters
8  that you didn't actually prepare, you don't know if it's
9  accurate or not?
10      MS. PIERSON:  Object to form.
11      THE WITNESS:  I mean, that's not my job.
12      BY MR. HEAVISIDE:
13      Q   I asked you do you know whether it's accurate
14  or not?  Anything that's been provided to us by Cook
15  that you didn't prepare, you don't know whether it's
16  accurate?
17      MR. DEGREEFF:  That's probably a question for
18  Andrea since the DFS was provided and signed for.
19      MS. PIERSON:  I think she's answered your
20  question.  She doesn't know.  I'd just move on.  I
21  don't think you're getting anywhere.
22      BY MR. HEAVISIDE:
23      Q   Well, I have another question, which is it is
24  your position that any information provided to us -- and
25  by "us" I mean the plaintiffs -- by Cook regarding IVC

Page 125

1   filters, unless you personally prepared it, you don't
2   know when it's accurate or not?
3         MS. PIERSON: Object to form.
4         THE WITNESS: I mean, the documents that were
5   provided to you are from Cook. How you got them,
6   when you got them, I mean, I don't know.
7   BY MR. HEAVISIDE:
8      Q   I didn't ask you how -- when you got them, did
9   I? I know you're getting a little tense.
10     A   I would think Cook -- I'm not getting tense.
11  I would think Cook as the good company they are would
12  give you the proper information.
13     Q   Okay. Well, they gave us this information.
14     A   Okay.
15     Q   So you think it's accurate?
16        MS. PIERSON: Object. It's been asked and
17  answered.
18        MR. HEAVISIDE: It hasn't been answered.
19        MS. PIERSON: It has. You just don't like the
20  answer that she gave.
21        MR. HEAVISIDE: It's an obtuse answer. I
22  mean, can anybody actually maintain that level of
23  inability to answer a question? Seriously.
24  BY MR. HEAVISIDE:
25     Q   Let's assume that -- I'm going to assume that

Page 126

1   your answer is you think this is accurate or you have no
2   reason to not think it's accurate; is that all right
3   with you? Does that seem fair?
4      A   Can you ask again?
5         MS. PIERSON: Please move on. For the love of
6   God, please move on. You've asked this question
7   five times. She's given you the answer many times.
8   The document says what it says.
9   BY MR. HEAVISIDE:
10     Q   Do you want me to count it for you? Do you
11  want to count them together?
12     A   No.
13     Q   Do you want to do it by yourself?
14     A   I don't think there's a need to count them.
15     Q   Well, you don't think so, but there is.
16        MS. PIERSON: Do -- do you want her to
17  count --
18        MR. HEAVISIDE: I do.
19        MS. PIERSON: -- the entries on the
20  spreadsheet?
21        MR. HEAVISIDE: I do.
22        MS. PIERSON: Okay.
23        MR. DEGREEFF: The educational --
24        MS. PIERSON: Stay on the record.
25        Courtney, take your time. You can -- I'll

Page 127

1   give you my pen. You can mark on the spreadsheet.
2   Mr. Heaviside would like you to count it.
3         THE WITNESS: Okay.
4         MR. DEGREEFF: Do you know what you're
5   counting? The ones --
6         MS. PIERSON: You're not questioning the
7   witness. Stop.
8         MR. DEGREEFF: Andrea, if you talk to me again
9   like that, we're going to have a real problem.
10        MS. PIERSON: You do whatever you think you
11  need to do.
12        MR. DEGREEFF: For the record, let the record
13  reflect the inappropriate nature in which counsel
14  is approaching me.
15        THE WITNESS: Can I have a different pen?
16        MS. PIERSON: Sure, no problem.
17        There's one questioner at a time and right now
18  Mike's the questioner.
19        MR. HEAVISIDE: What time are we starting this
20  counting endeavor?
21        THE VIDEOGRAPHER: We're at 2:34.
22        MR. HEAVISIDE: Okay. Just curious to see how
23  long it might take.
24        THE WITNESS: 149.
25

Page 128

1   BY MR. HEAVISIDE:
2      Q   How many?
3      A   149.
4      Q   149. Okay.
5         MS. PIERSON: Thank you.
6   BY MR. HEAVISIDE:
7      Q   Now, what period of time do these entries
8   cover?
9      A   I mean, I'd have to look at the dates here.
10     Q   Yeah, exactly.
11        MR. HEAVISIDE: By the way, when did that
12  calculation end?
13        THE VIDEOGRAPHER: We're now at 2 hours, 38
14  minutes.
15  BY MR. HEAVISIDE:
16     Q   Okay. I'm sorry. If you would, what's the
17  period of time covered by these entries?
18     A   It looks like it starts in 2010 to 2016.
19     Q   To when?
20     A   2016.
21     Q   Okay. So it's March of 2010 through February
22  of 2016; right?
23     A   Yes.
24     Q   Yes?
25     A   Yes.

Page 129

1    MR. HEAVISIDE:  Yes, that's marked as an
2  exhibit; right?
3    THE WITNESS:  Yes.
4    THE COURT REPORTER:  Yes.
5    THE WITNESS:  Oh, yes.  467.
6    MR. HEAVISIDE:  Okay.
7  BY MR. HEAVISIDE:
8    Q   And I hope this is not controversial.  Can you
9  and I agree that the period from 3/18/20 -- 2010 to
10 2/2/2016 is approximately six years?
11   A   Yes.
12   Q   Yes?
13   A   Yes.
14   Q   So 149 entries over six years is approximately
15 23 entries per year; correct?
16   A   Yes.  I would have to do the math to be a
17 hundred percent, but looks like you just did it.
18   Q   Okay.  So these were 23 opportunities over the
19 last six years in educational presentations of one form
20 or another to inform your customers about your products;
21 right?
22   A   Yes.
23   Q   To discuss issues regarding complications,
24 retrieval techniques, dwell time, efficacy, those kind
25 of things?

Page 130

1    MS. PIERSON:  Object to form.
2  BY MR. HEAVISIDE:
3    Q   Those would have been opportunities, should
4  you have taken them, to discuss those issues; right?
5    A   These are educational presentations.  So if
6  there was any form of a complication like we spoke about
7  earlier, it wouldn't have come up in something like
8  this.
9    Q   In an educational presentation?
10   A   No.  This was more for the staff when I do the
11 educational presentations.
12   Q   Did you --
13   A   We have a lot of different products in the
14 labs.
15   Q   Okay.  Did you present during any of these 149
16 educational presentations issues regarding the tilt or
17 perforation or retrieval techniques or dwell time or
18 efficacy, like that?
19   MS. PIERSON:  Object to form.
20   THE WITNESS:  Not to my knowledge.  That's not
21 something I would talk about in this forum.
22 BY MR. HEAVISIDE:
23   Q   Okay.  Remember I asked you about this entry
24 about $1,071?
25   A   Yes.

Page 131

1    Q   Okay.  And that was apparently in November of
2  2012; right?
3    A   Uh-huh, yes.
4    Q   Wait a minute.  I don't want to steer you
5  wrong.  No, that's right, $1,071, November 6, 2012.
6    A   2012, yes.
7    Q   In Palm Harbor.  Where is Palm Harbor?
8    A   Palm Harbor is that way.
9    Q   Well, that's my fault for asking the question
10 that way.  How far is Palm Harbor from Clearwater?
11   A   Ten minutes.
12   Q   And you spent $171 at Gino's New York Pizza on
13 that occasion?
14   A   Yes.
15   Q   You think I'm going to ask you how many slices
16 that is, but I'm not.  At any rate, apparently there
17 were 83 attendees at Gino's pizzeria on that particular
18 occasion; is that right?
19   A   That's what -- the number of attendees, yes,
20 83.
21   Q   And that was some form of educational
22 presentation; right?
23   A   Yes.
24   Q   So who would the 83 people have been and what
25 do you think was presented?

Page 132

1    MS. PIERSON:  Object to form.
2    THE WITNESS:  So around this time in November
3  is what is called tech week.  So this is for the
4  techs that work in the lab.  They honor them that
5  week.  And so vendors are able to provide an
6  in-service for not just the ones that work in the
7  lab who we normally work with, we call -- I mean,
8  it spans the whole radiology department.  So that's
9  what this specific one was.  That's why there were
10 so many attendees.
11 BY MR. HEAVISIDE:
12   Q   And this is an educational presentation.  What
13 kind of educational information did you present to
14 the --
15   A   So on a day like this --
16   Q   -- 83 attendees?
17   A   Well, they would be coming in and out.  So
18 we'd be able to set up in the conference room and then
19 they're coming in and out, you know, during their lunch
20 shifts and I'm able to talk to them then.
21   Q   And did you provide them with written
22 materials?
23   A   No.  It would just be products.  They like to
24 get their hands on products, especially ones that don't
25 get to see it all the time.

Page 133

1    Q   And you would just show them your product?
2    A   We would have demo devices.  We'd have our
3  stents there, wires, catheters, IVC filters.  They're
4  able to deploy them.  It just gives them education so
5  they can learn about the different devices.
6    Q   And were there competitors there to make
7  similar presentations?
8    A   It was spread out so different vendors on
9  different days is how they do it.
10    Q   Well, on this day, on the day you spent a
11  thousand dollars.
12    A   On the day I was there, I do not remember if
13  anyone else was there.
14    Q   Who's Jacqueline Robinson?
15    A   I don't -- where are you looking?
16    Q   I'm looking in the employee column.  You see
17  that column?
18    A   No.  Report name?  No.  Where?
19    Q   This is an entry on 11/8/2011 in Clearwater --
20    A   11/8 --
21    Q   -- apparently an educational presentation
22  involving Jason's Deli of all places.  That's what I'm
23  talking about.
24    A   I don't know why that name is in there.  I
25  don't even know who that is.

Page 134

1    Q   So whatever educational presentation was made
2  or not made, you don't know anything about it; right?
3    A   I don't know who that is, but I see -- so the
4  Jason's Deli, when you're seeing that --
5    Q   Yeah.
6    A   -- that's getting delivered.  We're not going
7  to these places.  Does that clarify for you?
8    Q   It helps.  Where was it delivered to?
9    A   It would be delivered to the hospital.  So no
10  one's going out.  I mean, they're working in the
11  hospital.  We provide food in the hospital.  No one's
12  going out to get it.  They're not going out to these
13  places.
14    Q   How about this entry for -- who's Sean Howard?
15    A   He's one of our corporate accounts executives
16  and he comes out -- he's the one who I would defer to.
17  He knows ins and outs of studies.  He's the one that
18  would talk to physicians if they have more questions
19  regarding studies.  Specifically, our drug-eluting stent
20  is what he focuses on.
21    Q   And who would be that person regarding IVC
22  filters?
23    A   Darrell Talbert or Bruce Fleck.
24    Q   So if you had any questions about the filters,
25  you would -- you would direct them to Darrell Talbert or

Page 135

1  Bruce Fleck --
2    A   Yes.
3    Q   -- right?
4       And then whatever -- in whatever form they
5  answered your questions, you would accept that as the
6  answer; right?
7    A   Yes.
8    Q   In other words, you didn't question what
9  Darrell Talbert or Bruce Fleck provided to you in the
10  form of an answer to your question --
11    A   No --
12    Q   -- right?
13    A   -- I did not.
14    Q   So -- so whatever information Bruce Fleck or
15  Darrell Talbert provided to you would be information
16  that you relied on?
17    A   Yes.
18    Q   At this time do you know whether Dr. Zuzga was
19  also working out of BayCare?
20    A   Yes, he was.
21    Q   Okay.  So when they list company Mease
22  Countryside Hospital, it would also, at least in terms
23  of Dr. Zuzga, properly include BayCare?
24    A   Uh-huh.
25    Q   Right?

Page 136

1    A   Yes.
2    Q   You see this entry on August 20th of 2013?
3  It's for $237.
4    A   Yes.
5    Q   And that lists, you know, similarly Dr. Zuzga,
6  Mease Countryside Hospital as his affiliation,
7  educational presentation, and then it says $237 Java
8  Soul.  Is that $237 worth of coffee that was delivered
9  at your request in BayCare or --
10    A   No.  I see Chick-Fil-A as being 237.  Java
11  Soul is $5.
12    Q   Well, that's a deal.  Let's talk about
13  Chick-Fil-A.  Did you have -- did you have delivered
14  $237 worth of Chick-Fil-A to Mease Countryside?
15    A   Yes, that would be the dollar, yes.
16    Q   And that was to have a courtesy as -- as you
17  conducted whatever kind of educational presentation you
18  so desired; right?
19    A   Yes.
20    Q   Okay.  You can put that away and I'm not going
21  to ask you to count anything else I don't think.
22       (Exhibit No. 468 was marked for
23  identification.)
24       MR. HEAVISIDE:  Okay.  I'm going to -- I'm
25  sorry I don't have another one of these.

Page 137

1    MS. PIERSON:  May I just see it before you
2  show it to her?
3    This one's --
4    MR. HEAVISIDE:  For her, yeah.
5    MS. PIERSON:  You've got one?
6    MR. HEAVISIDE:  I do.
7  BY MR. HEAVISIDE:
8    Q  So, Courtney, you should have in front of you
9  an exhibit that has been marked 468.
10   A  468, uh-huh, yes.
11   Q  Okay.  And that's -- the ending Bates numbers
12  on the bottom are 0693891.  That's in the bottom
13  right-hand corner; right?
14   A  Yes, it is.
15   Q  Now, this is something to PI reps North
16  America.  Are you a PI rep North America?
17   A  Yes.
18   Q  All right.  And it's from Bruce Fleck; right?
19   A  Yes.
20   Q  And it's dated June -- June of 2015; right?
21   A  Yes.
22   Q  Do you recall receiving this?
23   A  I do not.
24   Q  Do you recall over the course of your
25  employment receiving instructions on how to deal with

Page 138

1  certain issues from Bruce Fleck or others at Cook?
2    A  To my best knowledge, I do not recall specific
3  e-mails that were given to me or sent to me.
4    Q  Did you ever get any instructions, e-mail or
5  otherwise, in written form from anybody at Cook as to
6  how to reply to questions that may be posed to you
7  regarding filters from customers?
8    A  If there's ever questions from customers that
9  I can't answer, I always -- like I said, I would call in
10  Bruce or I would call Darrell to have them help me
11  answer those questions.
12   Q  Okay.  So whenever -- if somebody posed a
13  question to you regarding filters, for example, and you
14  couldn't answer it, you would get Bruce or Darrell
15  Talbert --
16   A  Involved.
17   Q  -- to answer it and you would rely on whatever
18  answer they provided; right?
19   A  Yes.
20   Q  This document you have in front of you,
21  towards the middle of the page, it says No. 3.  Do you
22  see that?
23   A  Yes.
24   Q  Regarding journal articles.  It says:  In
25  journal articles, reassure them that while struts may

Page 139

1  appear to be outside the cava on imaging, very few
2  struts are clinically -- very few are clinically
3  relevant.  In most cases, physicians don't want to
4  review the details of articles, they just want to hear
5  your confident response.
6    So if anyone -- any of your customers were to
7  ask you about any information from an article, would you
8  give them merely a confident response?
9    A  I mean, it depends if I had seen the article
10  or if I haven't seen it.  It's not a conversation that I
11  remember.
12   Q  Ever?
13   A  I can't say ever.  I just don't remember.  I
14  mean, generally speaking, we don't talk about articles.
15  If there is a lot of talk on articles and the doctor
16  wants to get more in depth, then, like I said, I'll
17  always refer to Darrell or Bruce.
18   Q  Fleck.  So you remember you told me that you
19  had summarized certain JVIR articles.  Did you ever
20  discuss your summary of those articles with customers?
21   A  It was more just for our team to be aware that
22  they're out there.
23   Q  Okay.  So if -- if any concerns were raised in
24  those articles, you discussed those with your team
25  rather than with your customers?

Page 140

1    A  Yes.
2    Q  So you had no conversations with customers in
3  an attempt to overcome the concern regarding filter
4  strut penetration; is that true?
5    A  Yes, that's true.
6    (Exhibit No. 469 was marked for
7  identification.)
8  BY MR. HEAVISIDE:
9    Q  Courtney, here's another document that's been
10  marked 469.  I'm showing it to your lawyer first.  Okay.
11  Do you have that document in front of you?
12   A  Yes.
13   Q  And in the bottom right, the ending Bates
14  numbers are 0187535; right?
15   A  Yes.
16   Q  And you see where it lists Types of
17  Complications?
18   A  Yes.
19   Q  It talks about deployment issues, retrieval
20  issues, recurrent PE, migration, fracture, thrombosis,
21  penetration/perforation; right?
22   A  Yes.
23   Q  Now, first of all, have you ever seen this
24  document before?
25   A  I don't remember seeing it.

Page 245

1      MS. PIERSON:  Ben Martin is calling you.
2      MR. HEAVISIDE:  He is?
3      MS. PIERSON:  No.  He's calling.  I don't know
4  why he's calling.  He knows where we are.  I'm
5  going to tell him you declined him.
6      MR. HEAVISIDE:  Just hang up on him.
7  BY MR. HEAVISIDE:
8      Q    Okay.  You have the 488 in front of you;
9  right?
10     A    Yes.
11     Q    You see in the far right-hand column there's a
12  handwritten notation that says "500 copies laminated"?
13     A    I see that, yes.
14     Q    So do you know whether or not you received
15  this kind of laminated card or --
16     A    I don't remember this.
17     Q    Okay.  And you don't remember what was
18  attached to that e-mail we just discussed regarding
19  laminated cards; right?
20     A    Right.  I do not remember.
21     Q    What information have you received from Cook
22  regarding how to distinguish a Cook product in terms of
23  promoting sales from a non-Cook product?
24     A    I mean, Cook has always -- always instructed
25  us never to bash other companies, just talk about

Page 246

1  specifically what our products do and how they help
2  patients.
3      Q    Do you ever point out to customers in any way
4  that your products might be better or might help
5  patients more?
6      A    Usually the physician is -- I mean, in the
7  interactions that I have now the physician's already
8  using our filter.  I just don't talk about filters a
9  lot.
10     Q    Well, you apparently had a big drop in your
11  business at some point in time -- we discussed that
12  earlier in the day -- regarding filters.  You remember
13  that?
14     A    Uh-huh.
15     Q    How did you overcome that impediment?
16     MS. PIERSON:  Object to form.
17     THE WITNESS:  I mean, I'd have to see which
18  specifically you were talking about, which --
19  BY MR. HEAVISIDE:
20     Q    How many big drops in your IVC sales have you
21  had?
22     A    I mean, business fluctuates all the time.
23  That's sales.  You win, you lose, you win, you lose.
24  That's just how it happens.
25     Q    Okay.  Well, when you lose, how do you

Page 247

1  thereafter win?  What steps do you take?
2      A    It just depends.  I mean, I don't know to
3  which one you're referring to, to which specific event
4  you're referring to.
5      Q    I'm referring to when you have a sales loss --
6      A    A loss?
7      Q    -- or a big dip --
8      A    In general?
9      Q    Yeah.  -- and you want to encourage more sales
10  for the IVC filter, how do you do it?
11     A    Well, don't forget we have other products so I
12  may talk about other products.
13     Q    Well, I'm not asking about other products.
14     A    Well, that's the reality of my job, though.
15     Q    Well, I'm not all that interested in that.
16  I'm asking about IVC filters.
17     A    No, I understand.  But if I lose the IVC
18  filter business or they're not using it anymore,
19  sometimes you just take a step back.  I mean, physicians
20  are going to do what they want to do.  So they're
21  trained medical professionals.  If they want to use
22  another company, then they have the right to do so.
23     Q    Of course, they do.  But you as a sales rep
24  don't do anything to promote sales of your product?
25     A    If they want to try a competitor product, then

Page 248

1  they're going to try the competitor product.  If they
2  like it better, then they like it better.
3      Q    I didn't ask you that.  I said, do you as a
4  sales rep do nothing to promote your customers using
5  your product?
6      A    It's not that I do nothing.  If there's
7  something specifically, they come to me and they say,
8  Courtney, I'm not using your filter anymore because of
9  X, well, I would explore that more, figure out why, why
10  don't they want to use it anymore.  I mean, it's a lot
11  of fact-finding.  But if I --
12     Q    But would you encourage them to use your
13  product more?
14     A    It's not that I encourage them.  It is what it
15  is.  If they say, Courtney, I'm not using your filter
16  anymore, I'm using X, okay, I ask them why, what are the
17  reasons, we explore it.  At the end of the day if they
18  want to use the competitor, then they're going to use
19  the competitor.  I'm not going to push them to use a
20  product they don't want to use.
21     Q    Okay.  So you do nothing as a sales rep to
22  promote --
23     A    It's not that I do nothing.
24     MS. PIERSON:  Object to form.
25

62 (Pages 245 to 248)

Page 253

1    she -- it doesn't sound like you have a hard stop
2    at 5:30, but --
3        THE WITNESS:  No.
4        MS. PIERSON:  All right.  We're good.
5        Do you need a break, Courtney?
6        THE WITNESS:  Well, can I get some water?
7        MS. PIERSON:  Yeah, yeah.  Let's just pause
8    for a second and get some water.
9        MR. HEAVISIDE:  Are we off now?
10       MS. PIERSON:  Sure.
11       THE VIDEOGRAPHER:  We are now off the record.
12   The time is 4:02.
13       (Short recess.)
14       THE VIDEOGRAPHER:  We are now back on the
15   record.  The time is 4:14.
16       (Exhibit No. 489 was marked for
17   identification.)
18   BY MR. HEAVISIDE:
19       Q   Okay.  Courtney, here's an exhibit that's been
20   marked as 488.
21       A   Okay.
22       MR. DEGREEFF:  It should be 489.
23       THE COURT REPORTER:  That's my fault.  Sorry.
24       MS. PIERSON:  You can't get out of this job
25   that easily.

Page 254

1    BY MR. HEAVISIDE:
2        Q   Okay.  Here's a document that's been marked as
3    Exhibit 489.  Now, have you seen this document before?
4        A   Hold on.
5        Q   Pardon me?
6        A   I said hold on.  I'm reading it.
7        Q   Just for the record, it's Bates Stamp 0321731.
8        A   Yes, I see that.
9        Q   And this is an e-mail to you from Bruce Fleck?
10       A   Yes.
11       Q   Right?
12       A   Yes.
13       Q   And Bruce Fleck says to you:  "Courtney, just
14   had a very good discussion with Dr. Montague from
15   St. Joe's in Tampa."
16       Is Dr. Montague at St. Joe's in Tampa one of
17   your customers?
18       A   Yes.
19       Q   Okay.  And Bruce Fleck asks you:  Please work
20   with him to collect any information possible to report
21   the six or seven cases of caval thrombosis his group has
22   seen with Celect over the last two years.
23       So my question to you is what did you do
24   following this invitation from Bruce Fleck to collect
25   information about six or seven cases of caval thrombosis

Page 255

1    with Celect filters over the last two years?
2        A   I do not remember.
3        Q   Do you think you did something or do you think
4    you might have just ignored this?
5        A   No, I don't think I ignored it, but I don't
6    remember the ins and outs of this.
7        Q   Pardon me?
8        A   I don't remember the ins and outs of this.
9        Q   Did you obtain patient records on these six or
10   seven cases?
11       A   I don't remember.
12       Q   Did you try to?
13       A   I don't remember.
14       Q   Did you obtain imaging on these six or seven
15   cases?
16       A   I don't remember.
17       Q   And I assume you don't remember whether you
18   tried to obtain imaging on these cases; is that right?
19       A   I don't remember.
20       MR. HEAVISIDE:  Okay.  Well, as much fun as
21   it's been, I am going to conclude my questioning.
22   But your lawyer may have some things she wants to
23   discuss with you.
24       THE WITNESS:  Okay.
25

Page 256

1        EXAMINATION
2    BY MS. PIERSON:
3        Q   Courtney, hi.  I know it's been a long day.
4    We started about 9 o'clock this morning.  Do you need
5    a -- a break or anything before we continue?
6        A   I'm good.
7        Q   Okay.  First, you previously introduced
8    yourself to the jury.  Your name's Courtney Whitelock;
9    correct?
10       A   Yes.
11       Q   And what is your position with Cook Medical?
12       A   I am a district sales manager.
13       Q   What is a district sales manager?
14       A   My role is to provide products to the
15   physicians.  I support cases.  And then I also am there
16   if they have any questions, either the lab or the
17   physician.
18       Q   Okay.  So I want to split those up a little
19   bit so I can be sure I understand what you mean.  First,
20   you say your job is to provide the product.  What do you
21   do exactly?
22       A   I make sure that they have what they need in
23   the lab.  There's so many different products that we
24   have so my job is to make sure that they have what they
25   need for the particular cases.

Page 257

1    Q   And when you say "the lab," what are you
2  talking about?
3    A   I'm talking about the suite where the cases
4  are performed, so the cath lab or the interventional
5  radiology suite.  It's where the cases are performed.
6    Q   So it's the place within the hospital where a
7  patient is taken for whatever procedure they're going to
8  have?
9    A   Yes.
10   Q   And you mentioned the word "cases."  Can you
11 give us some idea of the different products or -- or
12 types of patient conditions that the products that you
13 provide treat?
14   A   So they could --
15       MR. HEAVISIDE:  I'll object to the form.
16       THE WITNESS:  You mean like if they have
17 diabetes or like that, like their disease state?
18 BY MS. PIERSON:
19   Q   Yeah, I'm sorry, it was a poorly phrased
20 question.  Let me -- let me try again.
21       First, for the products that you provide,
22 what -- do they fall within a particular type of
23 product?
24   A   Oh, it would be peripheral, peripheral
25 products.

Page 258

1    Q   So when you say you provide peripheral
2  products, are they products that are used to treat
3  different patient illnesses or conditions that might be
4  related to their peripheral vascular system?
5    A   Yes.
6    Q   And we've been talking here today about one
7  product, a vena cava filter.  Is that used to treat a
8  peripheral vascular condition?
9    A   It's a venous condition.
10   Q   Thank you.  That's what I -- that's a good and
11 important clarification.  Give us -- give the jury some
12 idea of what other kinds of products you provide.
13   A   I provide stents for the legs to open up
14 blockages.  I also provide balloons for that, wires,
15 catheters.
16   Q   How -- how many different products do you
17 supply to hospitals who need them?
18   A   I mean, the focus ones, there's, you know,
19 four or five that we focus on, but we always say that we
20 have, you know, 5,000 product lines because there's
21 different lengths and sizes and so that's why we have so
22 many different ones.
23   Q   Okay.  So going back to your description of
24 your job where you said that the first thing a district
25 manager does is to provide product, the products that

Page 259

1  you've just been describing, the approximately 5,000
2  different products, who do you provide those to exactly
3  at the hospital?
4    A   Well, usually a contract is made so there's a
5  contract that the hospital has with Cook.  And then we
6  work with the lab to make sure -- the lab manager.
7  There's usually a manager that's in the lab and we would
8  work with them to ensure that they have what they need.
9    Q   Who communicates with you from the hospital to
10 tell you how much they need or what type of product
11 they -- they want to stock?
12   A   That is what -- you work with the lab manager
13 for that.
14   Q   Okay.  And since you've been working for Cook,
15 has the lab manager at the -- at BayCare changed?
16   A   No.  Since I've been working there, it's the
17 same manager.
18   Q   And who is that?
19   A   They're all -- I mean, each hospital has their
20 own individual ones.  And then there's a contracting
21 side that has, you know, their individual office.  So as
22 long as we're on contract, then, you know, they can use
23 our product.
24   Q   I want to better understand and ask you some
25 questions in just a minute about the hospitals that are

Page 260

1  within the territory that you cover, but before we talk
2  about that, I just want to go back to the three things
3  you said your job includes.  Delivering product was one
4  of those.  I thought I heard you say also that you
5  answer questions for physicians.  How does that happen
6  in your job?
7    A   I mean, they see so many different things and
8  different -- you know, all patients present differently.
9  So each patient is individualized different.  So, you
10 know, if you were -- you're different than I'm going to
11 be, especially for, you know, a procedure.  So usually
12 ask questions to find out what the procedure's going to
13 be, what do they use, if they don't use something, why
14 don't they use it.  So...
15   Q   If a physician has a question for you
16 that's -- that's beyond what you know from your
17 training, what do you do?
18   A   We usually call on -- I mean, we have
19 corporate development team members that we can bring in
20 or the product manager, sometimes we bring in the
21 engineers.
22   Q   To the extent that a doctor has a question
23 about something related to the design of a product,
24 is -- is that something within your area of expertise?
25   A   No.  I would call on an engineer for that.

Page 269

1      MR. HEAVISIDE:  He didn't see that on your
2  little outfit?
3      THE WITNESS:  I don't always wear this one.
4      MR. HEAVISIDE:  Oh, okay.
5  BY MS. PIERSON:
6      Q   Ms. Whitelock, the first time that you
7  interacted with Dr. Zuzga, was that about a year after
8  you started working for Cook?
9      MR. HEAVISIDE:  Objection.
10     THE WITNESS:  Around that.
11 BY MS. PIERSON:
12     Q   And when you spoke with him for the first
13 time, do you remember what you talked about?
14     A   No.
15     Q   Why -- why is it that you were employed by
16 Cook for almost a year before Dr. Zuzga even spoke to
17 you?
18     A   He just didn't associate with a lot of reps.
19     Q   All right.  In your experience having worked
20 at the hospital where Dr. Zuzga performs procedures, how
21 frequently do you interact with him?
22     A   Now?
23     Q   Well, let's start first in the 2009-2010 time
24 period.  How frequently did you have any contact with
25 him then?

Page 270

1      A   I mean, I would see him because he would come
2  in for cases or I'd say hi, but, I mean, it was very
3  minimal.
4      Q   How long after you were employed by Cook --
5  how much time passed before you had a substantive
6  conversation with Dr. Zuzga?
7      MR. HEAVISIDE:  Objection.
8      THE WITNESS:  I don't remember the exact year
9  but, I mean, it took time.  I mean, it probably
10 took a couple years.
11 BY MS. PIERSON:
12     Q   Mr. Heaviside asked you some questions about a
13 spreadsheet that was marked as Exhibit 467.  Do you
14 remember those questions?
15     A   Uh-huh.
16     Q   First, prior to today had you ever seen this
17 document?
18     A   No.
19     Q   When you have contact with a physician,
20 Dr. Zuzga or some other physician, what do you -- what
21 do you do after that?
22     A   Usually nothing.
23     Q   Is there any way that you record your contact
24 with -- with a physician?
25     A   I mean, I would usually pick up the phone and

Page 271

1  call my boss if I had something to talk about right
2  after it or I could send an e-mail.
3      Q   With respect to the times that you purchased
4  something, food or drink or something like that, for
5  hospital employees or for someone else, were there
6  record -- records that you had to complete or something
7  that you had to do?
8      A   It would just be the Concur.  So it would all
9  be on Concur.
10     Q   And what is Concur?
11     A   That is the expense system that we use.
12     Q   Is that something that you input into the
13 computer or someone else does?
14     A   I do.  I input my specific stuff.
15     Q   And tell us, if you would, with Concur, are
16 there fields that you -- is it a drop-down menu --
17     A   Uh-huh.
18     Q   -- or is it something you type in?
19     A   It's both.
20     Q   With respect to when you're inputting an
21 expense, is there a question that you have to complete
22 that tells Cook or whoever receives the information who
23 you were presenting to --
24     A   Yes.  You have to put names.
25     Q   -- or purchasing for?

Page 272

1      A   We have to put names.
2      Q   In the Concur system, are all the people that
3  work in the lab listed?
4      A   Yes.
5      Q   And when you input information about an
6  educational program expense, for example, some of the
7  things Mr. Heaviside asked you about, do you list the
8  names of all of the people who attended that?
9      MR. HEAVISIDE:  Objection.
10     THE WITNESS:  Yes.
11 BY MS. PIERSON:
12     Q   With respect to the entries that are on
13 Exhibit 467, Mr. Heaviside asked you about this column
14 that's titled "Attendee."
15     A   Uh-huh.
16     Q   Do you remember that?
17     A   Yes.
18     Q   Have you interacted with Dr. Zuzga 149 times
19 and purchased the food that's listed on Spreadsheet 467?
20     MR. HEAVISIDE:  Objection.
21     THE WITNESS:  I did.  I mean, all of these are
22 my names so I know it was my expenses, but
23 Dr. Zuzga may not have been sitting there the whole
24 time.  You know, he may come in, gotten his food,
25 quickly said hi and was gone.

Page 273

1    BY MS. PIERSON:
2       Q    Are you able to tell looking at Exhibit 467 or
3    from your memory whether Dr. Zuzga was present at all of
4    the interactions that are listed on this spreadsheet?
5       A    No.
6       Q    The spreadsheet lists as one of the categories
7    educational presentation.  What is that?
8       A    That would just be going over products.
9       Q    And what do you mean when you say "going over
10   products"?
11      A    Well, usually I mean there's a demo if there's
12   a new wire or if we're going over the filter.  So it's
13   usually there's a demo available and then we're talking
14   about the product.  Or it's for the staff, too.  We may
15   have added an extra balloon or it might be a new balloon
16   or, you know, just to get them familiar with the box and
17   how it looks.  So there's all kinds of educating that
18   you do for the staff that you don't necessarily do for
19   the doctor.
20      Q    Where -- where would these educational
21   presentations take place?
22      A    Usually in the lab in their break room or in a
23   bigger conference room.
24      Q    And where there are number of attendees
25   listed, maybe the number is 13 or 5 or 4 or 6, who would

Page 274

1    the people -- who are those attendees?
2       MR. HEAVISIDE:  Objection.
3       THE WITNESS:  Those are the techs and the
4    nurses that are in the lab.
5    BY MS. PIERSON:
6       Q    There are a variety of dollar amounts listed
7    on this spreadsheet.  Mr. Heaviside asked you about one
8    that was for about a thousand dollars.
9       A    Uh-huh.
10      Q    Do you remember his question?
11      A    Yes.
12      Q    Other than that one entry for a thousand
13   dollars, are there any other entries of that size?
14      A    No.  No.
15      Q    Looking at Exhibit 467 on the dollar amount
16   that's spent, are there a number of entries for $3, $5,
17   and other amounts?
18      A    Yes.
19      Q    And there's a column there that lists where
20   you obtained the food that you were purchasing and
21   providing; correct?
22      A    Yes.
23      Q    Tell us what some of those places are.
24      A    I mean, there's a lot of Panera Bread because
25   they deliver.  It's just restaurants, restaurants that

Page 275

1    will deliver.  So it's a lot of food that comes to the
2    hospital.  No one's going there.
3       Q    So when you're providing food to the
4    hospitals, it's normally sandwiches, pizza, that sort of
5    thing?
6       A    Oh, yeah.  Sorry.
7       Q    You're not providing lobster and steaks?
8       A    No.
9       Q    Mr. Heaviside asked you some questions about
10   your contacts with Dr. Zuzga.  And I want to be sure I
11   understand.  First, in a -- in a given year, how
12   frequently do you have a one-on-one meeting with
13   Dr. Zuzga, if ever?
14      MR. HEAVISIDE:  Objection.
15      THE WITNESS:  It would be -- I would see him
16   in the lab.  That's where our interactions would
17   be.
18   BY MS. PIERSON:
19      Q    And tell us when you see him in the lab
20   what -- how you interact.
21      A    I mean, now we have a relationship where I
22   will support his cases, able to watch them or be in
23   them.  During that time I was not -- I mean, I would
24   just say hi.
25      Q    When did it change?  If you were hired in

Page 276

1    2009, when did it change that you got more than a couple
2    of words in with Dr. Zuzga?
3       A    Probably 2012 I would say.
4       Q    Okay.  And of the -- the Cook products that
5    Dr. Zuzga uses, you mentioned grafts, stents, and other
6    things.  Let me start with does he use more than vena
7    cava filters?
8       A    Yes, he does.
9       Q    Of the Cook products that Dr. Zuzga uses, what
10   percent of those are filters versus grafts, stents, and
11   other things?
12      A    It's hard to put a percent to it, but he
13   mostly uses the balloons and stents and wires.
14      Q    Okay.  Do you know when Mrs. Hill had her vena
15   cava filter placed by Dr. Zuzga?
16      A    No.
17      Q    I'll represent to you, Ms. Whitelock, that
18   Mrs. Hill's procedure occurred on November 17th of 2010.
19   Prior to November 17, 2010, had you met with Dr. Zuzga
20   or had any kind of conversation with him?
21      MR. HEAVISIDE:  Objection.
22      THE WITNESS:  It would be very minimal.
23   BY MS. PIERSON:
24      Q    When you started working for Cook in May of
25   2009, had Dr. Zuzga been using Cook vena cava filters?

Page  277

1     A    Yes, he was.
2     Q    Do you know how long he had been using Cook
3  vena cava filters?
4     A    No, I don't.
5     Q    And the specific product that -- that was
6  implanted in Mrs. Hill was a Celect vena cava filter.
7  Do you know when Dr. Zuzga began using the Celect vena
8  cava filter?
9     A    No.
10    Q    At any point in time prior to November 17,
11 2010, had you spoken with Dr. Zuzga about the Celect
12 vena cava filter?
13    MR. HEAVISIDE:  Objection.
14    THE WITNESS:  No.
15 BY MS. PIERSON:
16    Q    Had you given him any written materials about
17 the Celect filter?
18    A    No.
19    Q    Had you provided him with any -- any data
20 about the Celect versus competitors?
21    A    No, because he was already using it.  So...
22    Q    And when you began working for Cook, at least
23 up until the end of 2010, in that period of time, did
24 Dr. Zuzga ever ask you for any information about the
25 Celect?

Page  278

1     MR. HEAVISIDE:  Objection.
2     THE WITNESS:  No, not that I remember.
3  BY MS. PIERSON:
4     Q    Did you leave with him any materials regarding
5  the Celect?
6     A    No.
7     Q    Did you either orally or in writing provide
8  him with any data about the Celect versus any of the
9  competing products in the marketplace?
10    A    No.
11    Q    As you sit here today, do you remember ever
12 speaking with Dr. Zuzga about the Celect filter?
13    MR. HEAVISIDE:  Objection.
14    THE WITNESS:  No.
15 BY MS. PIERSON:
16    Q    Have you ever left with Dr. Zuzga any kind of
17 a marketing material or other data regarding a Celect
18 filter?
19    MR. HEAVISIDE:  Objection.
20    THE WITNESS:  No.
21 BY MS. PIERSON:
22    Q    Has Dr. Zuzga ever called you or stopped you
23 in the lab and said I've got a question about a Celect
24 filter?
25    MR. HEAVISIDE:  Objection.

Page  279

1     THE WITNESS:  No.
2  BY MS. PIERSON:
3     Q    Does -- does Dr. Zuzga ever ask you for
4  medical literature or articles?
5     A    No, he doesn't.
6     Q    Have you ever provided him with any kind of
7  medical literature or article?
8     A    No.
9     Q    Does Dr. Zuzga -- has he ever come to you and
10 said, hey, can you give me a summary of a -- a
11 particular study?
12    A    No.
13    Q    And have you ever provided him with any sort
14 of summary of any type of study?
15    A    No.
16    Q    When you have interacted with Dr. Zuzga and
17 talked to him about products, were those products other
18 than the Celect filter?
19    A    Yes.
20    Q    Have you ever communicated with Dr. Zuzga
21 about the Tulip filter?
22    A    No.
23    Q    Do you know if he's ever used it?
24    A    I don't.
25    Q    The decision to -- to place in Mrs. Hill a

Page  280

1  Celect vena cava filter, were you part of that decision?
2     A    No.
3     Q    Did anyone ask you whether her filter should
4  be a Celect versus someone else?
5     A    No.
6     Q    Do you know why Dr. Zuzga believed that a
7  Celect filter was the appropriate filter to treat
8  Mrs. Hill?
9     MR. HEAVISIDE:  Objection.
10    THE WITNESS:  I do not.
11 BY MS. PIERSON:
12    Q    We talked a second ago about studies and
13 medical literature.  Has Dr. Zuzga ever come to you and
14 said would you interpret this study for me?
15    MR. HEAVISIDE:  Objection.
16    THE WITNESS:  No.
17 BY MS. PIERSON:
18    Q    Mr. Heaviside asked you some questions about a
19 reference in an e-mail to summaries of I think JVIR
20 articles.  Do you remember those questions?
21    A    Uh-huh, yes.
22    Q    When you reviewed an article -- let me start
23 first, do you have any training in reviewing medical
24 literature?
25    A    Not that I remember, no.

Page 181

1  that information being as you embark on your career in
2  sales, is that one day the payers -- Medicare, Medicaid,
3  commercial plans -- are going to realize they are
4  spending an increasing amount of money on the placement
5  and retrieval of IVC filters and yet there's not a lot
6  of clinical evidence that demonstrate these filters
7  actually improve patient outcomes?
8        Were you ever previously aware of that
9  information?
10       MS. PIERSON:  Object to form.
11       THE WITNESS:  No.
12  BY MR. HEAVISIDE:
13     Q   So no one from Cook shared that information
14  with you?
15     A   No.
16     Q   And so any of this information that I've been
17  asking you about that was not shared with you, obviously
18  you were never in a position to share it with any of
19  your customers since it wasn't shared with you; right?
20       MS. PIERSON:  Object to form.
21       THE WITNESS:  It just -- I mean, it's nothing
22  that I've ever talked about with my customers.
23  BY MR. HEAVISIDE:
24     Q   Well, how about this, this is just -- if
25  someone does not provide you with information, right,

Page 182

1  you cannot therefore provide somebody else with
2  information that you never received; right?
3     A   Correct.
4       MR. HEAVISIDE:  I never know what I'm going to
5  find in this.
6       MS. PIERSON:  I'm just glad to know it's a
7  surprise to you.
8  BY MR. HEAVISIDE:
9     Q   You mentioned briefly Elizabeth Hill.  Do you
10  remember Elizabeth Hill?
11     A   Yes.
12     Q   And apparently there was an adverse event
13  reported to you regarding Ms. Hill's IVC filter;
14  correct?
15     A   Yes.
16     Q   And how did that -- how did that information
17  come to your attention?
18     A   I was told when I was in the lab that day.
19  They let me know.
20     Q   And who's the "they" you're referring to?
21     A   The lab manager.
22     Q   Who is that?
23     A   Colleen.
24     Q   What's her last name?
25     A   Dillon.

Page 183

1     Q   Do you remember when that was?
2     A   No.
3     Q   Would it have been in August of 2013 do you
4  think?
5     A   I don't remember the date.
6     Q   No idea?
7     A   I do not remember the date, no.
8     Q   And what did you do upon receiving that
9  information?
10     A   I called it in to the complaints department.
11     Q   As soon as Colleen Dillon told you about it?
12     A   Uh-huh, yes.
13     Q   And who did you talk to at the complaints
14  department?
15     A   I don't remember.
16     Q   And what happened next with regard to that
17  complaint?
18     A   I don't know.  I -- whenever I call, I give
19  them the information I have.  If they have any other
20  questions, they'll let me know.  And then that's it for
21  me, from my side.
22     Q   Okay.  So after you called this in as soon as
23  Colleen Dillon told you about it, you had no further
24  participation with this event; is that right?
25     A   Right.

Page 184

1     Q   You didn't talk to anybody else about this
2  event?
3     A   Oh, I did talk to Bruce or Darrell.
4     Q   Oh.  Bruce Fleck?
5     A   Bruce or Darrell, I don't remember which one.
6     Q   And did you call them or did they call you?
7     A   No.  They wouldn't have called me.  I don't
8  remember if they called.  I know e-mails went back and
9  forth about it, but I don't remember everything about
10  it.
11     Q   Well, do you remember anything about it?
12     A   I remember I -- I mean, I've seen, you know,
13  the documents.
14     Q   When did you see the documents?
15     A   When I've looked at them.
16     Q   When did you look at them?
17     A   Yesterday.
18     Q   Oh, yesterday.  Okay.  So your lawyers gave
19  you these documents to look at?
20     A   Yes, we looked at them.
21     Q   Okay.  Well, having done that only yesterday,
22  do you have any recollection of the information in those
23  documents?
24     A   I mean, it just -- I'm either talking to Bruce
25  or Darrell, we were talking about what happened.  I

Page 185

1 remember he asked if I called it in.  I called it in.
2    Q   Did anybody from Cook ask you to obtain
3 further information regarding that event?
4    A   I don't remember.
5    Q   Did you obtain any further information about
6 that event?
7    A   Whatever was given I reported.
8    Q   And whatever was given was the verbal
9 information you got from Colleen Dillon?
10    A   (Witness nods head).
11    Q   Nothing else?
12    A   Not that I remember.
13       (Exhibit No. 477 was marked for
14    identification.)
15    BY MR. HEAVISIDE:
16    Q   So I'm going to show you another document
17 that's -- oh, yeah, I do that all the time.  Here you
18 go.  Courtney, this is a document that's been marked
19 Exhibit 477.  And on the bottom it has the Bates No.
20 0745352.  Is that what you have in front of you?
21    A   Yes.
22    Q   Right.  Now, just so you know, every time I
23 talk about this Bates number, and I have in every
24 exhibit, I'm talking about this number on the bottom
25 right.

Page 186

1    A   Yes.
2    Q   On the bottom left, it says "Company
3 Confidential" and that means because all these documents
4 have been provided to the plaintiffs by Cook.  Okay?
5    A   Okay.
6    Q   So let's look at this document you have in
7 front of you.  This is an e-mail dated August 20th of
8 2013; right?
9    A   Yes.
10    Q   And this is an e-mail from you?
11    A   Yes.
12    Q   Was this sent on your computer or your phone
13 or your iPad or do you know?
14    A   It would have been computer or phone.
15    Q   It would have been what?
16    A   The computer or the phone.  I'm not sure.
17    Q   And you didn't just send it to Bruce Fleck;
18 right?
19    A   I sent it to my boss.
20    Q   Who's that?
21    A   Lisa.  And then Sam.
22    Q   And who's Sam?
23    A   He's a venous specialist.
24    Q   And since you sent this message to Sam, you
25 must know who Sam works for; right?

Page 187

1    A   Yes.  He works for Cook.
2    Q   Okay.  So you sent this message to Bruce
3 Fleck, Sam Bradshaw, and Lisa Davis on August 20, 2013;
4 right?
5    A   Yes.
6    Q   And the subject is Celect perforation; right?
7    A   Yes.
8    Q   And this regards the Elizabeth Hill matter
9 that -- that we've been talking about here today; right?
10    A   Yes.
11    Q   So it says:  "The Celect leg is in the
12 duodenum"; right?
13    A   Yes.
14    Q   And what is the duodenum?
15    A   It's a part of the bowel is what I understand.
16    Q   And is that how a Celect filter is designed to
17 perform, to be in the duodenum?
18    A   No.
19    Q   So this is not something you would expect;
20 right?
21    A   No.
22    Q   No, you wouldn't expect it; correct?
23    A   Correct.
24    Q   And it says:  "I have already placed
25 incident."

Page 188

1    What does that mean?
2    A   I called it in.
3    Q   And then you -- you relay some history there.
4 Where did you obtain that history?
5    A   That would have been from the lab.
6    Q   And you were told that on August 20th --
7 excuse me -- August 19th patient presented with nausea
8 and vomiting; right?
9    A   Yes.
10       (Exhibit No. 478 was marked for
11    identification.)
12    BY MR. HEAVISIDE:
13    Q   So now you have in front of you an exhibit
14 which has been marked --
15       MS. PIERSON:  She actually doesn't.  Do you
16    have one for her or do you want her to have this
17    one?
18       MR. HEAVISIDE:  Oh.  Oh, excuse me.  Lord,
19    have mercy.
20    BY MR. HEAVISIDE:
21    Q   Now you have it, Exhibit 478, in front of you.
22    A   I do.
23    Q   Right?
24    A   Yes.
25    Q   This is an image that you transmitted to Bruce