# EXHIBIT E

## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

--------------------------- )
IN RE: COOK MEDICAL, INC.   )
IVC FILTERS MARKETING, SALES ) Case No.
PRACTICES AND PRODUCTS      ) 1:14-ml-2570-
LIABILITY LITIGATION        ) RLY-TAB
--------------------------- )
This Document Relates to:   ) MDL No. 2570
All Actions                 )
--------------------------- )

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED 30(b)(6) DEPOSITION OF

JAMES BERNARD HUNT

March 21, 2017

Indianapolis, Indiana

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## Page 2

1
2          The videotaped 30(b)(6) deposition of
3  JAMES BERNARD HUNT, called by the Plaintiffs for
4  examination, taken pursuant to the Federal Rules of
5  Civil Procedure of the United States District
6  Courts pertaining to the taking of depositions,
7  taken before CORINNE T. MARUT, C.S.R. No. 84-1968,
8  Registered Professional Reporter and a Certified
9  Shorthand Reporter of the State of Illinois, at the
10 offices of Faegre Baker Daniels, LLP 300 North
11 Meridian Street, Suite 2700, Indianapolis, Indiana,
12 on March 21, 2017, commencing at 9:39 a.m.
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1  APPEARANCES:
2
3      ON BEHALF OF THE PLAINTIFFS:
4      RILEY WILLIAMS & PIATT LLC
5      301 Massachusetts Avenue
6      Indianapolis, Indiana  46204
7      317-633-5270
8      BY:  JOSEPH N. WILLIAMS, ESQ.
9         jwilliams@rwp-law.com
10
11     LAW OFFICES OF BEN C. MARTIN, LLP
12     3710 Rawlins Street, Suite 1200
13     Dallas, TX 75219
14     (214) 761-6614
15     BY:  BEN C. MARTIN, ESQUIRE
16        Bmartin@bencmartin.com
17
18
19     ON BEHALF OF THE DEFENDANTS:
20     FAEGRE BAKER DANIELS LLP
21     300 North Meridian Street, Suite 2700
22     Indianapolis, Indiana  46204
23     317-237-0300
24     BY:  ANDREA ROBERTS PIERSON, ESQ.
25        andrea.pierson@FaegreBD.com
26        JOHN JOSEPH TANNER, ESQ.
27        joe.tanner@FaegreBD.com
28        ANNE K. RICCHIUTO, ESQ.
29        anne.ricchiuto@FaegreBD.com
30
31 ALSO PRESENT:
32     JASON VOELKE, Paralegal,
33        Rueb & Motta;
34
35
36 VIDEOTAPED BY:  ANTHONY MICHELETTO
37
38
39 REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968

## Page 4

1              I N D E X
2  JAMES BERNARD HUNT              EXAMINATION
3     BY MR. WILLIAMS................ 8
4     BY MR. MARTIN................. 203
5     BY MR. WILLIAMS................ 251
6     BY MS. PIERSON................ 261
7     BY MR. WILLIAMS................ 317
8     BY MS. PIERSON................ 350
9     BY MR. WILLIAMS................ 359
10
11        E X H I B I T S
12 HUNT DEPOSITION EXHIBIT        MARKED FOR ID
13 No. 1   List of custodians and hold      39
14        dates
15
16 No. 2   Cook Legal Department:          54
17        Procedure for Document Hold";
18        CookMDL2570_0006306 - 0006308
19
20 No. 3   Bullet Point list of dates of  104
21        holds
22 No. 4   Document, "Timeline of Events:  120
23        Hill"
24
25 No. 5   1/25/12 e-mail and attached     133
26        spreadsheet;
27        CookMDL2570_0200522
28
29 No. 6   Stockton v. Cook Medical        166
30        Incorporated Complaint for
31        Money Damages and Demand for
32        Jury Trial
33 No. 7   Adams v. Cook Medical           168
34        Incorporated Complaint At Law
35        and Demand for Jury Trial
36
37

Page 85

1    Q.   When you say -- okay.  So, you said a
2  product complaint is not the same thing as a
3  litigation Complaint?
4    A.   Correct.
5    Q.   When you use the phrase "product
6  complaint," what are you referring to?
7    A.   I'm referring to an adverse event
8  report.
9    Q.   So, what additional things need to
10  happen after a product complaint, as you use that
11  term, before it triggers Cook's responsibility to
12  initiate a document hold?
13    MS. PIERSON:  Object to form.  You can answer.
14  BY THE WITNESS:
15    A.   I don't know in terms of responsibility.
16  In terms of what our procedure calls for, it would
17  be anticipation of litigation as well as
18  identifying somebody who would have relevant
19  information that wouldn't otherwise be preserved.
20  BY MR. WILLIAMS:
21    Q.   And what facts need to exist generally
22  for Cook to anticipate litigation?
23    A.   Well, an example would be receiving a
24  Summons and Complaint or a letter that specifically

Page 86

1  threatens litigation.
2    Q.   Anything else?
3    A.   Not that comes to mind off the top of my
4  head.
5    Q.   So, for Cook to anticipate litigation,
6  there needs to be an express threat received?
7    MS. PIERSON:  Object to the form of the
8  question.
9  BY THE WITNESS:
10    A.   That's an example.
11  BY MR. WILLIAMS:
12    Q.   Is there something less than an express
13  threat that would cause Cook to anticipate
14  litigation for purposes of a document hold?
15    MS. PIERSON:  Same objection.
16  BY THE WITNESS:
17    A.   Probably, but it's not coming to mind.
18  BY MR. WILLIAMS:
19    Q.   Would, say, 25 adverse events within a
20  year, would that be something sufficient to -- for
21  Cook to anticipate litigation over a product?
22    MS. PIERSON:  Object to the form of the
23  question.
24  BY THE WITNESS:

Page 87

1    A.   I don't think the number of complaints
2  would necessarily matter.  It would depend on the
3  nature of the complaints and other information
4  involved.
5  BY MR. WILLIAMS:
6    Q.   So, if -- let me just ask you this.  If
7  a Cook product has 20 adverse events in one
8  calendar year and those adverse events are related
9  to a product failure that is consistent amongst
10  those 20, is that sufficient for Cook to anticipate
11  litigation?
12    MS. PIERSON:  Object to the form of the
13  question.  It calls for a legal conclusion.  You
14  can answer.
15  BY THE WITNESS:
16    A.   I don't think the number of complaints
17  is necessarily directly related to whether or not
18  litigation is imminent.
19  BY MR. WILLIAMS:
20    Q.   Is imminent.  Is that what you said?
21    A.   That's what I said.
22    Q.   Is that different than reasonably
23  anticipated?
24    A.   It's probably different, but the

Page 88

1  intention is the same.
2    Q.   In Cook's mind, is the number of
3  consistent adverse events related to a product ever
4  relevant to its anticipation of litigation?
5    MS. PIERSON:  Object to the form of the
6  question.  But you can answer.
7  BY THE WITNESS:
8    A.   I didn't say it wasn't relevant.  I just
9  said it wouldn't necessarily automatically trigger
10  something.
11  BY MR. WILLIAMS:
12    Q.   I understand.  So, you are saying it
13  wouldn't control, but it could be a factor to
14  consider?
15    MS. PIERSON:  Object to the form of the
16  question.
17  BY THE WITNESS:
18    A.   In theory it could be, yes.
19  BY MR. WILLIAMS:
20    Q.   After a lawsuit is filed, who is in a
21  better position to determine which custodians need
22  to be placed on document hold, the Plaintiff filing
23  the lawsuit or Cook?
24    MS. PIERSON:  Object to the form of the

Page 105

1   up on the camera?
2       A.   Yes.
3       Q.   Okay.  This is a document you reviewed
4   in preparation for your deposition today?
5       A.   Yes.
6       Q.   Do you know who created this document?
7       A.   I believe it was created by one of the
8   folks here or someone working for Faegre.
9       Q.   Okay.  It was not created by someone at
10  Cook in-house?
11      A.   Not that I know of.
12      Q.   Okay.  Are the statements that are
13  contained on Hunt Exhibit 3 true and accurate?
14      A.   The ones that can be evaluated for truth
15  are accurate as far as I can tell.
16      Q.   Okay.  So, let's go to the fourth
17  bullet:  "Filter holds issued in individual cases
18  on April 15, 2013 and September 5, 2013 to 37
19  employees."
20      A.   Yes.
21      Q.   What were the individual cases that were
22  placed on hold for April 15, 2013?
23      MS. PIERSON:  Object to the question as beyond
24  the scope of the Court's February 22nd order, but

Page 106

1   you can answer.
2   BY THE WITNESS:
3       A.   I don't know specifically which cases
4   individual holds related to.
5   BY MR. WILLIAMS:
6       Q.   Do you recall the name of any case that
7   was placed on hold on April 15, 2013?
8       MS. PIERSON:  Object to form.
9   BY THE WITNESS:
10      A.   I don't know that cases were put on
11  hold.  If I recall correctly, one of the cases that
12  individuals, custodians, were placed on hold
13  related to was Tonya Brand.
14  BY MR. WILLIAMS:
15      Q.   Who were the individual custodians that
16  were placed on hold for the Brand case on April 15,
17  2013?
18      A.   I don't recall.
19      Q.   If you reviewed Hunt Exhibit 1, would
20  that refresh your recollection?
21      A.   Yes, probably.  Well, as to when they
22  were issued.  The people to whom they were issued,
23  but not the specific case with respect to which
24  they were issued.

Page 107

1       Q.   Okay.  Does Cook maintain a document
2   that sets forth the identity of the cases for which
3   individual custodians are placed on hold?
4       A.   I don't know.
5       Q.   Have you ever seen a document that
6   contained that information, that type of
7   information?
8       A.   I don't believe so other than an
9   individual hold itself.
10      Q.   Just tell me if I'm right or wrong.  For
11  you to be able to determine what case an individual
12  custodian was placed on hold for, you would have to
13  look at the actual communication to that custodian
14  setting forth the terms of the hold?
15      MS. PIERSON:  Object to form.
16  BY THE WITNESS:
17      A.   That is the only way I know how to do
18  that at the present time.
19  BY MR. WILLIAMS:
20      Q.   Other than Tonya Brand, do you recall
21  any other individual cases for which holds were
22  issued on April 15, 2013?
23      MS. PIERSON:  Object.
24  BY THE WITNESS:

Page 108

1       A.   I don't recall.
2       MS. PIERSON:  Outside the scope.
3   BY MR. WILLIAMS:
4       Q.   Do you recall any -- the identity of any
5   of the cases for which holds were issued on
6   September 5, 2013?
7       MS. PIERSON:  Same objection.
8   BY THE WITNESS:
9       A.   I believe there may have been a
10  supplemental hold issued relative to the Brand case
11  on that date.  But I don't know the number of the
12  37 that would have --
13      Q.   Okay.
14      A.   -- been related to that.
15      Q.   What was supplemented?
16      A.   The list of names to whom the hold
17  applied.
18      Q.   For purposes of the Brand case?
19      MS. PIERSON:  Object to form.
20  BY THE WITNESS:
21      A.   I believe so.
22  BY MR. WILLIAMS:
23      Q.   There may be other cases that were
24  supplemented or added on September 5, but you

Page 109

```
 1   believe at least the Brand case was supplemented on
 2   September 5, 2013?
 3        A.   I believe so.
 4        Q.   Just tell me generally why would -- how
 5   does the concept of supplementing a document hold
 6   for purposes of a case come about?
 7        MS. PIERSON:  So, I'll give you this
 8   instruction, Mr. Hunt.  If answering his question
 9   requires you to disclose information within the
10   work product protection, so specifically
11   communications that you've had with your counsel or
12   communications between in-house counsel relative to
13   how you arrived at a particular decision, I'm
14   instructing you not to provide that information.
15   But if you can answer his question without
16   disclosing that, go ahead.
17             Do you want me to read you the question
18   back?
19        THE WITNESS:  No, I think I -- I think I
20   remember the question.
21   BY THE WITNESS:
22        A.   And I guess, you know, without any
23   specific person or evaluation, I would just say
24   again that if an individual is identified and we
```

Page 110

```
 1   believe they have relevant information that is not
 2   otherwise preserved, we'll issue a hold.  I don't
 3   know for sure that that determination was made with
 4   respect to any specific person to whom a hold was
 5   issued on September 5.
 6   BY MR. WILLIAMS:
 7        Q.   Okay.  The next bullet says, "General
 8   hold issued on February 21, 2014."
 9             What does a general hold mean?
10        A.   My understanding of a general hold
11   relative to this litigation would be one that is
12   not specific to a particular Plaintiff's case but
13   is broader in that it relates to filters more
14   broadly.
15        Q.   Did that general hold apply to the Cook
16   Celect filter?
17        MS. PIERSON:  Object to the question in that
18   it requires you to disclose the content of the
19   hold.  If you can answer his question without
20   disclosing the contents of the hold, you can
21   answer.
22   BY THE WITNESS:
23        A.   I'm not sure how I answer the question
24   without specifically disclosing.
```

Page 111

```
 1        MS. PIERSON:  Can you ask it one more time,
 2   Joe.
 3        MR. WILLIAMS:  Sure.
 4   BY MR. WILLIAMS:
 5        Q.   The general hold that was issued on
 6   February 21, 2014, did that cover the Cook Celect
 7   IVC filter?
 8        A.   Without saying specifically what was in
 9   the hold, my understanding is it was intended to
10   cover custodians who had -- may have relevant
11   information with respect to cases involving that
12   filter, among others.
13        Q.   Among others.  Which others?
14        MS. PIERSON:  I will object to the question
15   and instruct you not to disclose the content of the
16   hold.  He's entitled to ask you if holds were
17   issued relevant to the Celect or the Tulip, the
18   products that are at issue here.  But beyond that,
19   I'm instructing you not to answer.
20   BY MR. WILLIAMS:
21        Q.   Did it cover the Tulip?
22        A.   It did.
23        Q.   And did it cover the Celect?
24        A.   Yes.
```

Page 112

```
 1        Q.   Okay.  Prior to that general hold --
 2   well, strike that.
 3             February 21, 2014, was that the first
 4   date a, quote, "general hold," end quote, was
 5   issued with regard to those two filters?
 6        A.   Yes.
 7        Q.   What was the precipitating event for the
 8   initiation of the general hold on February 21,
 9   2014?
10        MS. PIERSON:  Object to the question in that
11   it calls for work product information and
12   attorney-client privilege.  I'm instructing you not
13   to answer.
14   BY MR. WILLIAMS:
15        Q.   Are you going to take your lawyer's
16   advice?
17        A.   I am.
18        Q.   Who initiated and don't -- I just want
19   the identity.  Who initiated the general hold on
20   February 21, 2014?
21        MS. PIERSON:  Object to form.
22   BY THE WITNESS:
23        A.   It would have been the Legal Department
24   in consultation with outside counsel.
```

Page 193

1    Q.   Do you see where it says patient
2 reported on August 19, 2013 with nausea and
3 vomiting?
4    A.   "The patient came in on August 19, 2013
5 with nausea and vomiting."
6    Q.   Do you see that it says, it noted that
7 one of the legs had perforated the cava and was in
8 the duodenum?
9    A.   Yes.
10    Q.   And that the patient was being sent to
11 the University of Pennsylvania for removal?
12    A.   Yes.
13    Q.   Are you aware that this complaint report
14 related to Mrs. Hill's adverse event?
15    A.   I believe that's the conclusion that was
16 ultimately reached, yes.
17    Q.   When was that conclusion ultimately
18 reached?
19    A.   I don't know the exact date.
20    Q.   In 2013?
21    A.   I don't know the exact date.
22    Q.   Do you know a year that that conclusion
23 was reached?
24    A.   I do not.

Page 194

1    Q.   Was that conclusion reached prior to
2 May 6, 2016?
3    MS. PIERSON:  Object that it's beyond the
4 scope, and this has been asked and answered of
5 other company representatives.  But you can answer.
6 BY THE WITNESS:
7    A.   I don't know when that conclusion was
8 ultimately drawn.
9 BY MR. WILLIAMS:
10    Q.   What did Cook do to identify persons or
11 custodians with relevant information upon the
12 filing of Mrs. Hill's lawsuit?
13    MS. PIERSON:  Object to form.  You can answer.
14 BY THE WITNESS:
15    A.   Okay.  So, upon the filing of the
16 lawsuit with -- I'm sorry.  What was the question
17 again?  What did we do to identify relevant people?
18 BY MR. WILLIAMS:
19    Q.   Custodians with potentially relevant
20 information.
21    MS. PIERSON:  Pause one second, if you would,
22 before you answer that.
23    MR. VOELKE:  Joe, I think there is a date on
24 there.

Page 195

1    MS. PIERSON:  To the extent that the question
2 calls for the witness to identify the way in which
3 it identified people who should preserve
4 information in response to Mrs. Hill's lawsuit, if
5 any, we object that it calls for work product
6 information or attorney-client communications.
7    So, if you can answer his question
8 without -- maybe ask the question one more time,
9 Joe, if you don't mind.  I'm not sure there is a
10 way to answer it without disclosing work product.
11 BY MR. WILLIAMS:
12    Q.   What did Cook do to identify the
13 custodians with potentially relevant information
14 related to Mrs. Hill's lawsuit?
15    MS. PIERSON:  Object that it calls for work
16 product information.  I instruct the witness not to
17 answer.
18    BY MR. WILLIAMS:
19    Q.   Are you going to take your lawyer's
20 advice?
21    A.   Yes.
22    Q.   On what date did Cook first attempt to
23 make that determination?
24    MS. PIERSON:  Object that it calls for work

Page 196

1 product information.  I'm instructing the witness
2 not to answer.
3    MR. WILLIAMS:  Just the date?  That you
4 first -- that Cook first tried to look for
5 responsive information related to Mrs. Hill's
6 lawsuit?
7    MS. PIERSON:  Yes.
8 BY MR. WILLIAMS:
9    Q.   Are you going to take your lawyer's
10 advice?
11    A.   Yes.
12    Q.   Fair enough.  Do you have any
13 explanation as to why Mrs. -- or Ms. Whitelock was
14 not placed on litigation hold until May 6, 2016?
15    A.   Yes.
16    Q.   What is that explanation?
17    A.   We did not have information sufficient
18 to reliably identify her as someone having relevant
19 information with respect to the lawsuit prior to
20 that date.
21    Q.   You had the Single Complaint Report
22 related to Mrs. Hill.  Fair?
23    MS. PIERSON:  Object to form.
24 BY MR. WILLIAMS:

Page 197

```
1       Q.   It says it was created on August 20,
2    2013.  Cook had that document on that date,
3    correct?
4       MS. PIERSON:  Object to form that it's beyond
5    the scope.
6    BY THE WITNESS:
7       A.   So, your question indicates that it was
8    related to Mrs. Hill.  At that time frame we did
9    not know it was related to Mrs. Hill.
10   BY MR. WILLIAMS:
11      Q.   You know that Ms. Whitelock sent an
12   e-mail to Bruce Fleck on August 20, 2013.  We just
13   looked at that, right?
14      A.   Yes.
15      Q.   And attached to that was imaging of some
16   human anatomy?
17      MS. PIERSON:  Object to form.
18   BY THE WITNESS:
19      A.   Appears so, yes.
20   BY MR. WILLIAMS:
21      Q.   Do you see the identifying information
22   on that imaging study?
23      A.   I see there is some stuff.
24      MR. WILLIAMS:  Is there any way to make this
```

Page 198

```
1    clearer?
2       THE VIDEOGRAPHER:  Focus button there.
3       MR. WILLIAMS:  Which one?
4       THE VIDEOGRAPHER:  Center AF.
5       MR. WILLIAMS:  It is sideways.  It's like
6    being a dentist having to work in a mirror.
7    BY MR. WILLIAMS:
8       Q.   Do you see that it says "Elizabeth
9    Hill"?
10      MS. PIERSON:  Object to form.
11   BY MR. WILLIAMS:
12      Q.   This is just a copy, to be sure,
13   Mr. Hunt.  But -- let's see if this is going to
14   work.
15      "Elizabeth Hill."  Do you see that?
16      MS. PIERSON:  Object to form that it's beyond
17   the scope upon which this witness has been
18   designated to testify.
19      MR. WILLIAMS:  Well, he's saying that Cook
20   couldn't identify anything to do with Mrs. Hill
21   until 2016 even though her lawsuit was filed
22   several years before.
23      He was designated to talk about when
24   litigation holds were put into place with regard to
```

Page 199

```
1    Mrs. Hill.  I'm asking him why these documents
2    don't give Cook the ability to identify Mrs. Hill
3    all the way back in 2013.
4       MS. PIERSON:  You've mischaracterized the
5    witness' testimony.  You can ask your next
6    question.
7       MR. WILLIAMS:  I want him to answer the one I
8    asked.
9    BY THE WITNESS:
10      A.   Do I see that it says "Elizabeth Hill"?
11   BY MR. WILLIAMS:
12      Q.   Yeah.
13      A.   Well, given the information now that it
14   may say "Elizabeth Hill," I can see some characters
15   that could be part of that name.
16      Q.   Okay.  What was the first time that Cook
17   looked at that document that we were just looking
18   at?
19      MR. WILLIAMS:  Put it back up, Ben, on the
20   thing.
21   BY MR. WILLIAMS:
22      Q.   When was the first time that Cook looked
23   at these images in trying to determine what
24   evidence should be preserved related to Mrs. Hill's
```

Page 200

```
1    lawsuit?
2       MS. PIERSON:  Hold on just one second, Jack.
3       I object to the question in that it
4    calls for work product information if it's asking
5    what Cook or its counsel did to determine what
6    should or should not be included in a litigation
7    hold.
8       If you can answer his question without
9    disclosing conversations with your counsel or
10   conversations related to the determination of who
11   should be held or what should be held, then you can
12   answer his question.  Otherwise I'm instructing you
13   not to answer.
14   BY THE WITNESS:
15      A.   I don't know.
16      MS. PIERSON:  Well, then that takes care of
17   it, doesn't it?
18      THE WITNESS:  Yeah.
19   BY MR. WILLIAMS:
20      Q.   Are you aware that on August 20, 2013
21   Donna Deckard sent a letter to a Dr. Zuzga related
22   to Mrs. Hill's perforated duodenum?
23      A.   I am generally aware that Donna Deckard
24   sent a letter to a Dr. Zuzga on or around that time
```

Page 261

1   4:57 p.m.
2        (WHEREUPON, a recess was had
3        from 4:57 to 5:02 p.m.)
4        THE VIDEOGRAPHER:  We are back on the record
5   at 5:02 p.m.
6             EXAMINATION
7   BY MS. PIERSON:
8        Q.   Good evening, Mr. Hunt.
9        A.   Good evening.
10       Q.   Thanks for your patience today.  We
11  appreciate it.
12            I want to talk with you first about
13  Cook's process for preserving information.
14       A.   Yes.
15       Q.   First, does Cook have a records
16  retention or records management program?
17       A.   We do.
18       Q.   And as part of that program, is there a
19  schedule that's forth how long certain types of
20  documents are to be preserved?
21       A.   There is.
22       Q.   Is it fair to say that for many of the
23  company's core documents the retention period is
24  permanent or very long?

Page 262

1        A.   Yes.
2        Q.   In some cases is the retention period
3   set, in addition to the record retention schedule,
4   by quality control documents?
5        A.   Yes.
6        Q.   Or even by law, by regulation?
7        A.   Yes.
8        Q.   Correct?
9             I want to talk about some examples of
10  the types of documents that are preserved pursuant
11  to Cook's record retention schedule.
12            First, design history files, things like
13  verifications of a design and validation documents.
14  How long are those kept?
15       A.   Those are kept permanently.
16       Q.   How about risk management files
17  including things such as DFMECAs.  How long are
18  those kept?
19       A.   Those are kept permanently.
20       Q.   The device master record, which includes
21  things like materials of bill and routing
22  documents.  How long is that kept?
23       A.   Those are kept permanently.
24       Q.   Also within the device master record,

Page 263

1   the Instructions for Use.  How long are those kept?
2        A.   Those are kept permanently as well.
3        Q.   Product labels are part of the device
4   master record, correct?
5        A.   Yes.
6        Q.   And how long are those kept?
7        A.   They're kept permanently.
8        Q.   Manufacturing documents are part of the
9   device master record, correct?
10       A.   Correct.
11       Q.   How long are those kept?
12       A.   Those are kept permanently.
13       Q.   Distribution lists for the product.  How
14  long are those kept?
15       A.   Those are kept permanently.
16       Q.   Under Cook's regular record retention
17  program, documents regarding engineering research
18  and feasibility, how long are they kept?
19       A.   Those are kept permanently.
20       Q.   Testing documents, are those also kept
21  permanently?
22       A.   Those are kept permanently as well.
23       Q.   Change control and deviation documents
24  related to the design, are those also kept

Page 264

1   permanently?
2        A.   They are.
3        Q.   And how about regulatory documents.  I
4   want to ask you about some categories of those.
5             Regulatory approval letters or clearance
6   letters from the Food and Drug Administration.  How
7   long are those kept under Cook's record retention
8   program?
9        A.   Those are kept permanently.
10       Q.   Device listings and device tracking
11  databases related to the regulatory documents.  How
12  long are those kept?
13       A.   They're retained permanently.
14       Q.   Submissions to the FDA, whether it's a
15  510(k) or a PMA.  Under Cook's regular record
16  retention program, how long are those kept?
17       A.   Those are kept permanently.
18       Q.   Medical device reports to the FDA.  How
19  long are those kept?
20       A.   Those are kept permanently.
21       Q.   FDA or regulatory inspection documents.
22  How long are those kept?
23       A.   Those are kept permanently.
24       Q.   How about quality assurance documents

Page 265

1    related to your products, how long are those kept?
2        A.   Those are permanent as well.
3        Q.   How about complaint files of adverse
4    events.  How long are those kept?
5        A.   Those are kept permanently.
6        Q.   How about Quality System procedures
7    documentation related to the Quality Systems used
8    both to manufacture your products and in relation
9    to the operation of the company.  How long are
10   those kept?
11       A.   Yes.
12       Q.   Risk management files, how long are
13   those kept?
14       A.   With respect to engineering risk
15   assessments and --
16       Q.   Yes.
17       A.   Those are kept permanently.
18       Q.   Mr. Hunt, are these just some examples
19   of the types of documents that in the ordinary
20   course of Cook's business are kept permanently?
21       A.   Yes.
22       Q.   And that is -- that's true based on
23   Cook's record retention schedule?
24       A.   Correct.

Page 266

1        Q.   Was it also Cook's practice to keep
2    those things permanently pursuant to Quality
3    Systems or regulation prior to the adoption of a
4    record retention schedule?
5        A.   Yes.
6        Q.   And the retention of those things on a
7    permanent basis or a very long basis, is that true
8    regardless of whether the documents deal with
9    filters or some other product that Cook
10   manufactures?
11       A.   That's correct, yes.
12       Q.   Is there anything unique about Cook's
13   retention of those things on a permanent basis or a
14   very long basis that's related to litigation in any
15   way?
16       A.   No.
17       Q.   Do you keep all of those things
18   permanently regardless of whether a document hold
19   has been issued?
20       A.   Absolutely.
21       Q.   I want to shift gears for a second,
22   Mr. Hunt, and talk about how Cook preserves
23   documents for litigation.
24          First, not unique to filters, stepping

Page 267

1    back, how many Cook employees are presently on some
2    form of a document hold?
3        A.   Over 1,200.
4        Q.   And how many Cook employees are on hold
5    in connection with the filter MDL litigation?
6        A.   320.
7        Q.   In the course of defending the lawsuits
8    that have been filed in the filter MDL litigation,
9    has Cook or its outside counsel or their agents
10   collected documents?
11       A.   Yes.
12       Q.   Give us some idea, if you could, how
13   much data Cook has collected as part of this
14   process?
15       A.   I believe it's on the order of
16   5 terabytes of data.
17       Q.   Is that 5 terabytes of data collected
18   and preserved in addition to the documents that are
19   otherwise being preserved under Cook's regular
20   record retention program?
21       A.   Yes.  There may be some overlap, but
22   yes.
23       Q.   And the 5 terabytes of data, is that in
24   addition to the documents that are being held by

Page 268

1    the more than 1,200 people who are on some form of
2    a document hold?
3        A.   Yes.
4        Q.   I want to focus specifically on the
5    filter MDL litigation in the Southern District of
6    Indiana.
7          Is it fair to say, Mr. Hunt, that Cook
8    employees were on hold for individual filter cases
9    or lawsuits prior to the creation of the MDL in
10   October of 2014?
11       A.   Yes.
12       Q.   Prior to the creation of the MDL, were
13   documents relevant to those individual cases
14   preserved under the record retention schedule?
15       A.   Yes.
16       Q.   Prior to the creation of the MDL, were
17   documents relevant to the filter cases or to the
18   filter litigation collected and preserved by Cook
19   or its outside counsel in the individual cases?
20       A.   Yes.
21       Q.   And just by way of example, would some
22   of the things that Cook's counsel in defending
23   individual cases, some of the things that would be
24   collected be the core documents that we've talked

Page 269

1   about earlier?
2       A.   Yes.
3       Q.   Things like a 510(k), for example?
4       A.   Yes.
5       Q.   And other documents related to the
6   design, the manufacture or the sale of the
7   products?
8       A.   Yes.
9       Q.   Prior to the creation of the MDL, were
10  additional documents being held by individual hold
11  recipients pursuant to both individual and general
12  holds?
13      A.   Yes.
14      Q.   And we have talked a lot today about the
15  term "individual case hold" or a "general hold."
16  Tell us what that means.  How are those different?
17      A.   It's -- so, the same rules would apply
18  relative to preserving information and other
19  instructions within the hold notices.
20          The description of the case that is
21  provided in the hold notice would be specific to an
22  individual case when we are talking about a
23  specific hold notice whereas the general hold
24  notice would describe much more generally the

Page 270

1   products and the issues involved.
2       Q.   Okay.  I want to talk about the
3   individual case holds first.
4       A.   Um-hmm.
5       Q.   Prior to the MDL creation in October of
6   2014, is it accurate to say that there were 37 core
7   employees who received individual case litigation
8   holds relevant to the Tulip or Celect?
9       A.   Yes.
10      Q.   And then at some point did Cook develop
11  a document hold related to the preservation of
12  documents regarding the filter litigation that went
13  to a broader audience?
14      A.   Yes.
15      Q.   Okay.  And is that what we've referred
16  to today or you've referred to as the general hold?
17      A.   Well, I think you said "broader
18  audience."  The general refers to the fact that
19  it's not case-specific.  So...
20      Q.   The --
21      A.   But, yeah, there were more people placed
22  on hold as well.
23      Q.   Is that the hold that you referred to
24  today as the one that was issued on February 21 of

Page 271

1   2014?
2       A.   That was the first of the general hold
3   notices, yes.
4       Q.   Okay.  After the February 21, 2014
5   general hold was issued but before the MDL was
6   created in October of 2014, were 55 additional Cook
7   employees placed on hold for the first time?
8       A.   Yes.
9       Q.   Those 55 Cook employees were in addition
10  to the 37 Cook employees who had already been
11  placed on hold relative to filter litigation,
12  correct?
13      A.   That's correct.
14      Q.   After the MDL was created in October of
15  2014 did Cook place additional employees on hold
16  related to filter litigation?
17      A.   Yes.
18      Q.   How many additional Cook employees were
19  placed on hold in 2015?
20      A.   40.
21      Q.   How many additional Cook employees were
22  placed on hold in 2016?
23      A.   71.
24      Q.   How many additional Cook employees were

Page 272

1   placed on hold in 2017?
2       A.   117.
3       Q.   Of the people or Cook employees who have
4   been placed on hold relative to the filter MDL
5   litigation, does that include employees who work in
6   the field of engineering?
7       A.   Yes.
8       Q.   Does it include employees who work in
9   the design or product development areas?
10      A.   Yes.
11      Q.   Does it include employees who work in
12  the field of testing?
13      A.   Yes.
14      Q.   In the field of operations?
15      A.   Yes.
16      Q.   In the area of quality?
17      A.   Yes.
18      Q.   In the area of regulatory?
19      A.   Yes.
20      Q.   In the area of postmarket surveillance?
21      A.   Yes.
22      Q.   And the -- and employees in the fields
23  of sales and marketing?
24      A.   Yes.

Page 273

1    Q.    Does it include employees who are
2  employed by or associated with different Cook
3  entities?
4    A.    Yes.
5    Q.    Does that include employees of
6  Cook Inc.?
7    A.    Yes.
8    Q.    Of MED Institute?
9    A.    It includes certainly people that were
10  employees of MED Institute at the time the hold was
11  issued. There's been some change relative to what
12  MED Institute is and where employees went, so I'm
13  not sure of their current status, but yes.
14    Q.    So, today they may be employees of CRI?
15    A.    Correct.
16    Q.    Or some other Cook entity?
17    A.    Correct.
18    Q.    But their documents are still being
19  held?
20    A.    Yes.
21    Q.    Does it -- do the Cook filter MDL holds
22  include employees of Cook Medical?
23    A.    Yes.
24    Q.    And William Cook Europe?

Page 274

1    A.    Yes.
2    Q.    And Muffin?
3    A.    Muffin, again, changed its name, but
4  yes.
5    Q.    CGI?
6    A.    Yes.
7    Q.    And Cook (Canada)?
8    A.    Yes.
9    Q.    And there were some issues this morning
10  with respect to the list that is Exhibit 2 and
11  whether certain employees in the -- in the district
12  manager or regional manager category, whether they
13  were employees of Cook -- of CMI or some other
14  entity.
15    A.    Yes.
16    Q.    Do you remember those questions?
17    A.    I think Exhibit 1 for the record instead
18  of 2, but yes.
19    Q.    Thank you. With respect to Exhibit 1,
20  to the extent that DMs or RMs are listed as
21  employees of the IP holding entity, I think it was
22  CTI?
23    A.    CMT, yes.
24    Q.    CMT. Thank you. With respect to

Page 275

1  Exhibit 1, to the extent that district managers or
2  regional managers are listed as employees of CMT,
3  is that incorrect?
4    MR. WILLIAMS:   Objection; leading.
5  BY THE WITNESS:
6    A.    Yes.
7  BY MS. PIERSON:
8    Q.    Who employs them?
9    A.    It would be CMI, which converted to an
10  LLC and is now Cook Medical LLC.
11    Q.    Regardless of what's listed on Exhibit 1
12  as the entity, are the documents of those hold
13  recipients in fact being preserved?
14    A.    Absolutely.
15    Q.    Mr. Hunt, the holds that we have been
16  talking about here today that have been issued in
17  connection with the Cook MDL filter litigation and
18  the litigation prior to the filter MDL, have any of
19  those holds been lifted?
20    A.    No.
21    Q.    Are all of those holds still in place
22  today?
23    A.    Yes.
24    Q.    Mr. Hunt, in addition to the holds, I

Page 276

1  want to talk to you about the way that Cook
2  collected documents in connection with the filter
3  MDL litigation.
4    First, Mr. Blanchard told us when he
5  testified last week about the electronic side of
6  document collection following the issuance of a
7  hold.
8    Explain to us, if you would, how did
9  Cook collect other documents in the filter
10  litigation.
11    A.    So, other documents that are not in
12  electronic format and captured by imaging of hard
13  drives and other steps that are taken by our IT
14  folks would be either collected directly by outside
15  counsel or another person interviewing a custodian
16  who had identified those documents or they would be
17  sent directly to our third-party vendor Canon.
18    Q.    When Cook collected documents in
19  connection with the filter MDL litigation,
20  specifically hard copy documents, did it do that
21  through its internal and external counsel?
22    A.    Yes.
23    Q.    Is that the 5 terabytes of data that we
24  talked about earlier or some portion of that?

Page 277

1    A.   Presumably it's some portion of that,
2  yes.
3    Q.   Prior to the creation of the MDL in
4  October of 2014, were both hard copy and electronic
5  documents related to filter collected and preserved
6  in connection with individual filter cases?
7    A.   Yes.
8    Q.   By whom were they collected and
9  preserved?
10   A.   They would have been collected by
11  outside counsel in conjunction with our Legal
12  Department.
13   Q.   Prior to the creation of the MDL, were
14  those documents collected and preserved for
15  employees both in the United States and in Denmark?
16   A.   Yes.
17   Q.   The MDL was created in October of 2014.
18  Tell us, what did Cook do after that to continue to
19  preserve documents?
20   A.   Well, obviously we continued to observe
21  our document retention policy.  So, a host of core
22  documents would have been preserved permanently as
23  a result of that.
24        Also, with respect to individual --

Page 278

1  well, custodians who had received hold notices,
2  they would have been notified to preserve all their
3  documents as well as the steps IT takes relative to
4  their electronic documents.
5    Q.   Mr. Hunt, I want to shift gears for a
6  second and ask you some questions about the Hill
7  case.
8    A.   Okay.
9    Q.   Mr. Williams asked you some questions
10  about the preservation of Ms. Whitelock's
11  documents.  Do you remember those questions?
12   A.   I do.
13   Q.   Why wasn't Mrs. Whitelock sent a formal
14  litigation hold memo in August of 2013?
15   A.   We were unable to reliably identify
16  Mrs. Whitelock as being associated with the product
17  that was implanted in Mrs. Hill until that time.
18   Q.   What do you mean when you say that, you
19  couldn't reliably identify her?
20   A.   We have a process for identifying
21  district managers and regional managers associated
22  with products that requires the use of a lot number
23  associated with the product.  The process involves
24  multiple people at Cook who use various Cook

Page 279

1  systems to extrapolate that information.
2        And that's the unambiguous and reliable
3  way we've determined to find out who specifically,
4  district managers and regional managers, are
5  associated with products.
6    Q.   Explain to us, if you would, why isn't
7  it as simple as just knowing where the person got
8  their filter?
9    A.   Well, with respect to information that's
10  contained in reports or complaints that we receive
11  from third parties, we've found that they very
12  often contain inaccurate or conflicting information
13  and dates are often wrong, doctors are wrong.
14  Rarely are district managers or regional managers
15  actually named.
16        In addition, sales territories change
17  and reps move around and territories are divided
18  and we have different channels of distribution for
19  products in terms of whether they were sold
20  directly or put on consignment, et cetera.
21        So, the process that we use for
22  determining information about DMs and RMs through a
23  lot number can yield other useful information as
24  well about the product in terms of how it was

Page 280

1  distributed.
2    Q.   Until Cook has the lot number for the
3  specific product implanted in a specific patient,
4  is Cook able to reliably or accurately identify who
5  the sales rep was that may have been involved in
6  the delivery of the product?
7    A.   No.
8    Q.   Even when you know the product lot
9  number and who the sales rep is for a particular
10  territory, does that necessarily mean that that
11  district manager was involved in the delivery of
12  the product?
13        MR. WILLIAMS:  Objection; leading.
14  BY THE WITNESS:
15   A.   No.  Specifically with respect to
16  filters, district managers are often not present at
17  the cases and hospitals stock these products
18  whether on consignment or by buying them and
19  keeping them on the shelf themselves.  So, a
20  district manager may have very little to do with
21  the sale of a particular product.
22  BY MS. PIERSON:
23   Q.   Even if Cook is able to identify the
24  product lot number and the sales rep responsible

Page 281

1  for the territory within which the product was
2  distributed, does that automatically mean that
3  the -- that district manager or their supervisor
4  have relevant information that is not otherwise
5  being preserved?
6      A.   No.
7      Q.   Why doesn't Cook place district managers
8  on hold immediately upon receiving a complaint of
9  an adverse event?
10      A.   Well, for a couple of reasons.  One, we
11  would have to make a determination that they would
12  have -- or be likely to have relevant information
13  that wasn't otherwise being preserved.
14           But, also, when you talk about product
15  complaints, they're not equal to lawsuits and we
16  don't treat them as such.
17      Q.   Do all -- first, when you use the term
18  "complaint," are you talking about someone calling
19  in with an adverse event report?
20      A.   Yes.
21      Q.   Or it could be that it's a complaint
22  related to a product that doesn't have anything to
23  do with the patient, right?
24      MR. WILLIAMS:  Objection; leading.

Page 282

1  BY THE WITNESS:
2      A.   Presumably, yes.
3  BY MS. PIERSON:
4      Q.   When someone calls the Cook complaint
5  line, do all of those calls result in a complaint
6  report?
7      A.   I'm not positive about that.
8      Q.   Okay.  To the extent that a complaint in
9  the form of an alleged adverse event is reported to
10  Cook, do all of those reports become lawsuits?
11      A.   No.
12      Q.   Does Cook issue a litigation hold each
13  time a complaint is called in to the complaint
14  hotline of an alleged adverse event?
15      A.   Sorry.  Can you repeat that.  Do we do
16  what?
17      Q.   Sure.  Each time someone reports to Cook
18  an alleged adverse event, does Cook automatically
19  issue a document hold?
20      A.   No.
21      Q.   Why not?
22      A.   Because document holds are used when we
23  have a reasonable anticipation of litigation and
24  complaints are not that.

Page 283

1      Q.   Okay.  Back to Mrs. Hill for a second.
2  Mr. Williams asked you some questions about the
3  first report in August of 2013 and had those
4  pictures attached to it.  Do you remember that
5  complaint report?
6      A.   Yes.
7      Q.   In August of 2013 did anyone at Cook
8  know the identity of Mrs. Hill?
9      A.   Not that I know of.
10      Q.   Had Mrs. Hill or anyone on her behalf
11  told Cook that she intended to file a lawsuit in
12  August of 2013?
13      A.   No.
14      Q.   Did Cook know in August of 2013 that
15  Mrs. Hill would ultimately file a lawsuit?
16      A.   No.
17      Q.   Were there other reports of alleged
18  adverse events that did not result in lawsuits?
19      A.   Absolutely.
20      Q.   You've mentioned a couple times today,
21  Mr. Hunt, that Cook places Cook employees on hold
22  when Cook reasonably anticipates litigation and
23  believes the employee may have relevant information
24  that isn't otherwise being preserved.  Do you

Page 284

1  remember that?
2      A.   Yes.
3      Q.   And when you say "information that isn't
4  otherwise being preserved," what are you referring
5  to there?
6      A.   Well, I'm referring, you know, most of
7  the time I guess to the document retention policies
8  and the things related to that.  There could be
9  other categories of documents also that are being
10  preserved elsewhere, either because they've already
11  been collected or they exist in another repository
12  or could be a number of reasons that they're
13  already being preserved.
14      Q.   In the Hill case, Mrs. Hill filed her
15  lawsuit in October of 2014.  Are you familiar with
16  that?
17      A.   Yes.
18      Q.   When was Cook first served with the Hill
19  lawsuit?
20      A.   I believe it was January of 2015.
21      Q.   Why wasn't Mrs. Whitelock placed on hold
22  in January of 2015?
23      MR. WILLIAMS:  Objection; asked and answered.
24  BY THE WITNESS:

Page 285

1      A.   We did not know her identity or
2  association with the case.
3  BY MS. PIERSON:
4      Q.   Mr. Hunt, did there come a point in time
5  later when Cook received the lot number for the
6  product implanted in Mrs. Hill?
7      A.   It was.
8      Q.   Was that on May the 2nd of 2016?
9      A.   It was.
10     Q.   After Cook received the lot information
11 related to Mrs. Hill's product, how much time did
12 it take between receipt of the lot information and
13 identification of Ms. Whitelock as the district
14 manager for the territory where Ms. Hill's product
15 was implanted?
16     A.   Within two days.
17     Q.   And within -- how much time did it
18 take -- let me start again.
19          How much time did it take from the
20 moment that Cook identified Courtney Whitelock as
21 that district manager to actually issue a hold as
22 to Ms. Whitelock's documents?
23     A.   That was also within two days.
24     Q.   Mr. Hunt, there have been some questions

Page 286

1  in other depositions, not in your deposition, or
2  argument that Ms. Whitelock did not receive a
3  litigation hold.
4          Do you know if Ms. Whitelock received a
5  litigation hold?
6      A.   I do.
7      Q.   Did she receive one?
8      A.   She did receive one.
9      Q.   How do you know that?
10     A.   I have seen the litigation hold issued
11 to her as well as an acknowledgment form signed by
12 her.
13     Q.   Did anyone speak with Ms. Whitelock
14 about Mrs. Hill's lawsuit?
15     A.   Yes.
16     Q.   Who spoke with her?
17     A.   It was an attorney from Wooden
18 McLaughlin, and I don't recall her name offhand.
19     Q.   After counsel spoke with Ms. Whitelock,
20 were any of her documents collected?
21     A.   Yes.
22     Q.   Was her e-mail collected?
23     A.   Yes.
24     Q.   Was her laptop imaged?

Page 287

1      A.   Yes.
2      Q.   There were a number of applications that
3  Ms. Whitelock used, Iris, Portfolio, Concur and
4  e-mail.  Are you familiar with the fact that
5  information was preserved as well?
6      A.   Yes.
7      Q.   Why didn't Cook collect Ms. Whitelock's
8  iPad or her iPhone?
9      A.   She was interviewed and indicated that
10 she did not utilize those devices for
11 communications or storage of information that
12 wasn't already being preserved elsewhere.
13     Q.   The information that was collected from
14 Ms. Whitelock, has that been preserved by Cook or
15 its outside counsel?
16     A.   Yes.
17     Q.   Does Ms. Whitelock continue to be on
18 hold today?
19     A.   She does.
20     Q.   Does her information continue to be
21 preserved today?
22     A.   Yes.
23     Q.   Mr. Martin asked you some questions
24 about Leigh Conners.

Page 288

1      A.   Um-hmm.
2      Q.   Are you familiar with the fact that
3  Ms. Conners was at one time the supervisor for
4  Ms. Whitelock?
5      A.   I am, yes.
6      Q.   Are you familiar with the fact that
7  Ms. Conners' last day at Cook was November the 13th
8  of 2013?
9      A.   Yes.
10     Q.   Was that before Mrs. Hill's lawsuit was
11 filed?
12     A.   Yes.
13     Q.   Was that before the MDL was created?
14     A.   Yes.
15     Q.   Mr. Hunt, Mr. Williams asked you some
16 questions today about the images that were attached
17 to a complaint report that he says are related to
18 Mrs. Hill.
19          Do you remember those questions?
20     A.   Yes.
21     Q.   At any point in time, to your knowledge,
22 did any person at Cook have the ability to read
23 those images and discern Mrs. Hill's name?
24     A.   Not to my knowledge.

Page 293

1    A.   Um-hmm.
2    Q.   At the time that Mrs. Brand filed her
3  second lawsuit, were both general and
4  Brand-specific holds in place?
5    A.   Yes.
6    Q.   Had they been in place now for months or
7  even years?
8    A.   Yes.
9    Q.   Who is the district manager for the
10  territory where Mrs. Brand's filter was placed?
11    A.   I believe that's Tamara Clemmer.
12    Q.   Was Ms. Clemmer one of the district
13  managers who received a filter hold on June the
14  24th of 2014?
15    A.   Yes.
16    Q.   Were additional custodians placed on
17  hold following service of the Brand lawsuit in
18  November 2014?
19    A.   Yes.
20    Q.   And again in 2015?
21    A.   Yes.
22    Q.   And again in 2016?
23    A.   Yes.
24    Q.   And again in 2017?

Page 294

1    A.   Yes.
2    Q.   Since the Brand lawsuit was filed in
3  November of 2014, have more than 228 Cook employees
4  received a filter hold?
5    A.   Yes.
6    Q.   And that's in addition to the other 92
7  Cook employees on filter holds issued before Brand
8  filed her November 2014 lawsuit?
9    A.   Yes.
10    Q.   That's in addition to the 900 or so Cook
11  employees on other types of document holds,
12  correct?
13    A.   Correct.
14    MR. WILLIAMS:  Objection; leading.
15  BY MS. PIERSON:
16    Q.   Since Cook first learned of Mrs. Brand's
17  lawsuit in May of 2013, have documents been held
18  continuously regarding filter pursuant to Cook's
19  normal record retention practices?
20    A.   Yes.
21    Q.   And documents that were collected prior
22  to the filing of Mrs. Brand's lawsuit that
23  pertained to filter, have those documents been
24  continuously preserved by Cook or its outside

Page 295

1  counsel?
2    A.   Yes.
3    Q.   Are you aware of any documents that were
4  destroyed that pertained to Mrs. Brand or her
5  filter?
6    A.   No.
7    Q.   Are you aware of any documents that were
8  destroyed that pertained to Mrs. Hill or her
9  filter?
10    A.   No.
11    Q.   I want to talk for a second about
12  Mr. Arthur Gage.
13    A.   Okay.
14    Q.   Are you familiar with the fact that
15  Mr. Gage's lawsuit was filed on November the 11th
16  of 2014?
17    A.   Yes.
18    Q.   Was a filter hold in place in
19  November of 2014?
20    A.   Yes.
21    Q.   Was the rep or district manager who was
22  responsible for the territory in which Mr. Gage's
23  filter was sold, was that district manager
24  identified in March of 2015?

Page 296

1    A.   Yes.
2    Q.   And was that about a week after the
3  Plaintiff Fact Sheet was served?
4    A.   Yes.
5    Q.   Which included the lot number?
6    A.   Yes.
7    Q.   Did Bill Guthrie -- first, was Bill
8  Guthrie the district manager?
9    A.   That's my understanding, yes.
10    Q.   Did Mr. Guthrie receive a litigation
11  hold?
12    A.   He did.
13    Q.   Did he receive his litigation hold on
14  March the 27th, 2015, less than ten days after Cook
15  got the lot information from Plaintiffs?
16    A.   Yes.
17    Q.   Now, Mr. Guthrie left Cook at some
18  point, right?
19    A.   He did.
20    Q.   Was that on July the 9th of 2015?
21    A.   I believe so, yes.
22    Q.   And Mr. Guthrie has passed away since
23  that time, correct?
24    A.   That's my understanding.

Page 305

1    Stockton/Huffman lawsuit?
2       A.   Yes.
3       Q.   And is it accurate to say, Mr. Hunt,
4    that Cook was served with the Complaints in those
5    lawsuits at some later date after filing?
6       A.   Yes.
7       MR. WILLIAMS:  Objection; leading.
8    BY MS. PIERSON:
9       Q.   With respect to Exhibits 8 to 18, at the
10   time of filing or service of all of those lawsuits,
11   was Cook already preserving core documents related
12   to the Tulip and Celect filters pursuant to its
13   normal record retention practices?
14      A.   Yes.
15      Q.   That included the design, the
16   engineering, the testing, the regulatory and the
17   other categories of documents that we talked about
18   earlier, correct?
19      A.   Yes.
20      Q.   Prior to receipt of any of the lawsuits
21   that are in Exhibits 8 to 18, was Cook already
22   preserving documents pursuant to individual holds
23   related to individual filter litigation?
24      A.   Yes.

Page 306

1       Q.   Prior to receipt of those lawsuits, had
2    Cook's outside counsel already collected documents
3    related to Cook's Tulip and Celect filters in
4    connection with the individual cases?
5       A.   Yes.
6       Q.   Prior to receipt of the lawsuits that
7    are Exhibits 8 to 18, was Cook already maintaining
8    or holding documents pursuant to the individual
9    case holds?
10      A.   Yes.
11      Q.   Mr. Williams asked you some questions
12   about Exhibit 20, a letter from Mr. Dalimonte to
13   Mr. King.  Do you remember those questions?
14      A.   Yes.
15      Q.   The letter is dated December the 10th of
16   2012, correct?
17      A.   Correct.
18      Q.   And as of December the 10th of 2012 was
19   Cook already preserving documents pursuant to its
20   normal record retention schedule related to filter?
21      A.   Yes.
22      Q.   Specifically to the Tulip and Celect?
23      A.   Yes.
24      Q.   As of December 10, 2012, had Cook

Page 307

1    already gathered documents between 2010 and 2012
2    related to individual filter cases?
3       A.   Yes.
4       Q.   Did Cook continue to preserve those
5    documents following receipt of Mr. Dalimonte's
6    letter?
7       A.   Yes.
8       Q.   Did Cook continue to follow its record
9    retention schedule with respect to the core
10   documents related to the Tulip and filter after
11   receipt of Mr. Dalimonte's letter?
12      A.   Yes.
13      Q.   Did Cook, after the receipt of
14   Mr. Dalimonte's letter, issue both general and
15   individual case holds?
16      A.   Yes.
17      MS. PIERSON:  Let's take a quick break and
18   then we'll come back and wind up.
19      THE VIDEOGRAPHER:  We are off the record at
20   5:49 p.m.
21         (WHEREUPON, a recess was had
22            from 5:49 to 5:58 p.m.)
23      THE VIDEOGRAPHER:  We are back on the record
24   at 5:58 p.m.

Page 308

1    BY MS. PIERSON:
2       Q.   Mr. Hunt, this morning Mr. Williams
3    asked you some questions about recipients who got a
4    case-specific hold?
5       A.   Yes.
6       Q.   I think I heard you testify this morning
7    that there were 37 recipients of a case-specific
8    hold related to filter.  Is that correct?
9       A.   That is correct.
10      Q.   Of those 37, how many recipients are you
11   aware of that went on to receive a general hold as
12   well?
13      A.   I believe there were 34 of those.
14      Q.   And with respect to the Cook employees
15   who received the Brand-specific hold, how many
16   people received a Brand-specific litigation hold?
17      A.   I believe the number is 35.
18      Q.   Mr. Williams showed you some pictures
19   that were taken of a patient's duodenum as part of
20   the one of the earlier exhibits.  Do you remember
21   that --
22      A.   I do.
23      Q.   -- series of pictures?
24         I'm marking as Exhibit 27 this copy and

Page 309

```
 1   I will put it on the screen so that the jury can
 2   see it or the judge.
 3              (WHEREUPON, a certain document was
 4              marked Hunt Deposition Exhibit
 5              No. 27, IMG 1926.jpeg.)
 6   BY MS. PIERSON:
 7       Q.   First, Mr. Hunt, is Exhibit 27 an
 8   accurate copy of the images as they are included in
 9   the complaint report in Cook's possession?
10       A.   That's my understanding.
11       MR. WILLIAMS:  I will object to that question.
12   I think he contradicted that earlier.
13   BY MS. PIERSON:
14       Q.   In the complaint report or in Cook's
15   documents, are the images that Mr. Williams showed
16   you actually in color, not in black-and-white?
17              (Clarification requested by the
18              reporter.)
19   BY MS. PIERSON:
20       Q.   Mr. Hunt, in the complaint report where
21   these images are included, are the images actually
22   in color and not in black-and-white?
23       A.   That's my understanding, yes.
24       Q.   And the size of the images, are they as
```

Page 310

```
 1   depicted in this hard copy that I've marked as
 2   Exhibit 27?
 3       A.   Those are the images that I saw
 4   previously, yes.
 5       Q.   When you look at the images as kept --
 6   received and kept in Cook's records, are you able
 7   to discern what any of this writing says?
 8       A.   No.
 9       Q.   And to your knowledge, did anyone at
10   Cook do as Mr. Williams did today, which is to blow
11   the photos up by more than 200 times, convert them
12   to black-and-white and try to read the words that
13   are imprinted on the documents?
14       A.   Not that I am aware of, no.
15       MR. WILLIAMS:  Object to the form of the
16   question.
17   BY MS. PIERSON:
18       Q.   Is the identity -- when a Cook filter is
19   placed in a patient, does Cook know who the patient
20   is?
21       A.   No.
22       Q.   Why not?
23       A.   Often the reps are not present at the
24   case, first of all.  But, second of all, presumably
```

Page 311

```
 1   the identity of the patient is something that would
 2   be protected by HIPAA and I think reps are
 3   instructed not to retain that information even if
 4   they're exposed to it.
 5       Q.   So, in August of 2013 when Courtney
 6   Whitelock sent an e-mail to Bruce Fleck regarding
 7   an incident of a patient of Dr. Zuzga, did Cook
 8   have the identity of the patient?
 9       A.   No.
10       Q.   And from what we've marked as
11   Exhibit 27, was Cook able to discern the identity
12   of the patient?
13       A.   No.
14       Q.   If Cook had received that information on
15   the identity of the patient, would it be in
16   violation of HIPAA?
17       A.   Likely.
18       Q.   And if Cook were to try to find out the
19   identity of a specific patient who received one of
20   its products, would that require the disclosure of
21   information subject to HIPAA?
22       A.   Yes.
23       Q.   When Cook receives images like what
24   we've marked as Exhibit 27, is the patient
```

Page 312

```
 1   information typically redacted?
 2       MR. WILLIAMS:  Object to the form.
 3   BY THE WITNESS:
 4       A.   Generally, yes.
 5   BY MS. PIERSON:
 6       Q.   And would it be contrary to HIPAA or is
 7   it your understanding based on HIPAA that it would
 8   be contrary to the requirements of HIPAA for Cook
 9   to try to identify the identity of the person from
10   whom the images were taken?
11       MR. WILLIAMS:  Object to the form.
12   BY THE WITNESS:
13       A.   I don't know whether it would be
14   contrary to HIPAA itself, which applies to, you
15   know, the healthcare providers primarily.  But Cook
16   has a policy not to retain that information.
17   BY MS. PIERSON:
18       Q.   At the end of the day, Mr. Hunt,
19   regardless of the illegibility of the information
20   on Exhibit 27, did Cook know the identity of
21   Ms. Hill?
22       A.   No.
23       Q.   Mr. Hunt, we've spent more than eight
24   hours here today talking about Cook's litigation
```

Page 317

1    BY THE WITNESS:
2        A.   Yes.
3    BY MS. PIERSON:
4        Q.   And as of November 11, 2014 when the
5    Gage lawsuit was filed, were 92 or more Cook
6    employees already on hold related to filter
7    litigation?
8        A.   Yes.
9        MR. WILLIAMS:  Objection; leading.
10   BY MS. PIERSON:
11       Q.   Mr. Hunt, as you sit here today, are you
12   aware of any document subject to a filter MDL
13   litigation hold that has not been preserved?
14       A.   Absolutely not.
15       MS. PIERSON:  Thank you, Mr. Hunt.  I have no
16   further questions.
17           FURTHER EXAMINATION
18   BY MR. WILLIAMS:
19       Q.   Mr. Hunt, you talked a lot now, just now
20   about core documents?
21       A.   Yes.
22       Q.   What are the core documents related to
23   sales and marketing?
24       A.   Core documents related to sales and

Page 318

1    marketing.
2        Q.   Yes.
3        A.   I don't know that I could answer that
4    question.
5        Q.   What are the core documents for product
6    design?
7        A.   They would be design history file.  I
8    don't know that I could create an exhaustive list
9    for you.
10       Q.   That's okay.  I won't belabor that
11   point.
12           You testified a few different times in
13   response to your questioning from Ms. Pierson that
14   Cook consistently and continually preserved the
15   core documents?
16       A.   Absolutely, yes.
17       Q.   Can you think of any of the core
18   documents that -- for the sales or marketing
19   department?
20       A.   I could think of several documents that
21   would be related to sales.
22       Q.   But would they be the core documents
23   that are preserved consistently and continually as
24   you had testified previously?

Page 319

1        MS. PIERSON:  Objection to form,
2    mischaracterizes his testimony.  But you can answer
3    if you know.
4    BY THE WITNESS:
5        A.   I don't know how I would define core
6    documents relative to sales, but things like
7    product approvals and clearances, things like that
8    would be preserved permanently.
9    BY MR. WILLIAMS:
10       Q.   Would communications between district
11   managers and regional managers about interaction
12   with physicians be considered a core sales and
13   marketing document?
14       MS. PIERSON:  Object to form.
15   BY THE WITNESS:
16       A.   I don't know but I doubt it.
17   BY MR. WILLIAMS:
18       Q.   Is there any situation in which an
19   e-mail is considered a core document?
20       MS. PIERSON:  Same objection.
21   BY THE WITNESS:
22       A.   I don't know.
23   BY MR. WILLIAMS:
24       Q.   Because my question is if core documents

Page 320

1    are preserved consistently and continuously, we
2    know from Mr. Blanchard's deposition, and I think
3    you probably know, too, that e-mails that are kept
4    in an employee's e-mail box, so their in box or
5    sent mailbox, are automatically deleted every 60
6    days if that custodian is not placed on hold at the
7    server level.  You understand that?
8        A.   Yes.
9        Q.   Okay.  So, I would take it that those
10   core documents could not be e-mails due to the
11   automatic deletion policy that Cook maintains?
12       MS. PIERSON:  Object to form and that it
13   mischaracterizes the witness' testimony.
14   BY THE WITNESS:
15       A.   I believe there's a mechanism for
16   retaining e-mails and electronic documents beyond
17   the 60-day automatic deletion policy.
18   BY MR. WILLIAMS:
19       Q.   But would you agree with me that if a
20   core document is left in the box, it will be
21   gone within 60 days if a litigation hold has not
22   been placed?
23       MS. PIERSON:  Object to the form of the
24   question and that it's beyond the scope upon which

Page 325

1   BY MR. WILLIAMS:
2       Q.   Was there more than five?
3       MS. PIERSON:  Same objection.
4   BY THE WITNESS:
5       A.   I don't recall.
6   BY MR. WILLIAMS:
7       Q.   Okay.  So, documents were collected and
8   preserved for some number of IVC filter lawsuits --
9       A.   Yes.
10      Q.   -- between 2010 and 2012?
11      A.   Yes.
12      Q.   But am I still correct that no
13  individual custodian was placed on document hold
14  until April 15, 2013?
15      A.   In terms of receiving a specific hold
16  notice or general hold notice, I believe that's
17  correct.
18      Q.   For the individual cases that documents
19  were collected and preserved for between the years
20  of 2010 and 2012, were the custodians of those
21  documents informed that the documents were being
22  collected and preserved for purposes of IVC filter
23  litigation?
24      MS. PIERSON:  Object to the question in that

Page 326

1   it calls for attorney-client communications, and I
2   instruct the witness not to answer.
3   BY MR. WILLIAMS:
4       Q.   Are you going to take your lawyer's
5   advice?
6       A.   I am.
7       Q.   You have testified that Ms. Whitelock
8   did not receive a litigation hold until May 6,
9   2016, correct?
10      A.   Yes.
11      Q.   And I believe the reason you gave was
12  because Cook was unable to determine the lot number
13  for the product that was implanted in
14  Mrs. Elizabeth Hill, is that correct?
15      A.   That's correct.
16      Q.   What did Cook do to attempt to identify
17  the lot number for the product implanted in
18  Mrs. Hill from the date the lawsuit was filed until
19  the date Ms. Whitelock was put on litigation hold?
20      MS. PIERSON:  I object to the form of the
21  question in that it may call for work product
22  information or communications from your counsel.
23      So, Mr. Hunt, if you can answer that
24  question without disclosing the analysis, thought

Page 327

1   process or communications of your counsel, you can
2   answer.
3   BY THE WITNESS:
4       A.   Let me think about this.
5       MS. PIERSON:  May I make a suggestion that
6   might help us to get over this hurdle?
7       MR. WILLIAMS:  Sure.
8       MS. PIERSON:  Do you want him to wait and
9   answer first?  I don't mean to interrupt.
10      MR. WILLIAMS:  Sure, and then go ahead.
11      MS. PIERSON:  Mr. Hunt, how did Cook identify
12  the lot number for Ms. -- for Ms. Hill's product?
13      THE WITNESS:  So, the lot number was
14  determined from Mrs. Hill's or Ms. Hill's medical
15  records.
16  BY MR. WILLIAMS:
17      Q.   And when were those medical records
18  received?
19      A.   I believe it was -- they were received
20  by outside counsel in April, mid-April of 2016.
21      Q.   So, from the date that Cook first had
22  notice of Mrs. Hill's lawsuit up until the date her
23  medical records were received, Cook was aware, at
24  least according to your 30(b)(6) testimony, that it

Page 328

1   did not have the lot number for Mrs. Hill's
2   product, correct?
3       A.   Yes.
4       Q.   And Cook was also aware, then, according
5   to your testimony today, that without the lot
6   number, it would be unable to identify reliably
7   custodians to place on litigation hold?
8       MS. PIERSON:  Object to form.
9   BY THE WITNESS:
10      A.   It would be unable to reliably identify
11  the district manager and regional manager
12  associated with the particular product.
13  BY MR. WILLIAMS:
14      Q.   And when a district manager is not
15  placed on litigation hold, there is a threat that
16  e-mails in their in box can be -- will be
17  automatically deleted every 60 days?
18      MS. PIERSON:  Object to form.
19  BY THE WITNESS:
20      A.   Yes.
21  BY MR. WILLIAMS:
22      Q.   At any time between the date that Cook
23  first had notice of Mrs. Hill's lawsuit up and to
24  the date that they received Mrs. Hill's medical

Page 329

1    records, did Cook communicate to Mrs. Hill or her
2    lawyer that we are unable to place a document hold
3    or preservation procedure on anybody related to her
4    case because we don't have the lot number?
5        MS. PIERSON:  Object to the form of the
6    question.
7    BY THE WITNESS:
8        A.   I don't know specifically.  My
9    understanding is that the necessity of the lot
10   number was communicated to her attorneys.
11   BY MR. WILLIAMS:
12       Q.   Who --
13       A.   My understanding is that the information
14   is part of what is requested on Plaintiff's Fact
15   Sheets.  Requests were made to her attorneys for
16   authorization for medical records.
17       Q.   When did those -- when did Cook receive
18   those authorizations, do you recall?
19       A.   I don't recall the exact date, no.
20       Q.   Would it surprise you if they received
21   them sometime in late spring, early summer of 2015?
22       MS. PIERSON:  Object to the form of the
23   question.
24   BY THE WITNESS:

Page 330

1        A.   I don't know what would surprise me.
2    BY MR. WILLIAMS:
3        Q.   Do you know if they did -- if they
4    received -- if Cook's lawyers received medical
5    authorizations from Mrs. Hill in late spring, early
6    summer of 2015?
7        A.   I don't recall the date.
8        Q.   Do you recall the month?
9        A.   No.
10       Q.   Do you recall that it took almost a year
11   to get medical records after the authorizations
12   were provided?
13       MS. PIERSON:  Object to the form of the
14   question.
15   BY THE WITNESS:
16       A.   To get complete medical records, it may
17   have been.
18   BY MR. WILLIAMS:
19       Q.   Do you have any understanding as to why
20   it took a year?
21       MS. PIERSON:  Same objection.
22   BY THE WITNESS:
23       A.   I have some understanding that it took a
24   while to get an authorization relative to medical

Page 331

1    records.  I have some understanding that when
2    medical records were first received they were
3    incomplete.  And I have some understanding that by
4    the time that a full set of medical records
5    including the lot number was received, it was
6    April of 2016.
7    BY MR. WILLIAMS:
8        Q.   Was the lot number contained in
9    Dr. Zuzga's medical records?
10       A.   I assume so.
11       MS. PIERSON:  We don't want you to guess or
12   speculate.  If you don't know, tell him if you
13   don't.
14   BY THE WITNESS:
15       A.   I don't know whose medical records they
16   are, but I understand him to be the implanting
17   physician.
18   BY MR. WILLIAMS:
19       Q.   Other than ask for medical
20   authorizations from Mrs. Hill's counsel, did Cook
21   do anything else to determine the lot number for
22   the product that was implanted in Mrs. Hill?
23       MS. PIERSON:  Object to the form of the
24   question.

Page 332

1    BY THE WITNESS:
2        A.   Other than asking for it on the
3    Plaintiff Fact Sheet form?
4    BY MR. WILLIAMS:
5        Q.   Yeah, that's my question.  Did you do --
6    did Cook do anything else?
7        MS. PIERSON:  Same objection.
8    BY THE WITNESS:
9        A.   And asking for the medical
10   authorization?
11   BY MR. WILLIAMS:
12       Q.   Um-hmm.
13       A.   I don't know.
14       Q.   I'm on page 265 of your deposition today
15   in response to questions of Ms. Pierson.
16       MS. PIERSON:  One second, please.  What line?
17       MR. WILLIAMS:  18.
18   BY MR. WILLIAMS:
19       Q.   Question was, "Were additional
20   custodians placed on hold following service of the
21   Brand lawsuit in November 2014?"  You said, "Yes"?
22       A.   Yes.
23       Q.   "And again in 2015?"  And you said,
24   "Yes"?

Page 349

1      A.   I don't know specifically.  Cook has
2   entered into a number of agreements with covered
3   entities called Business Associate Agreements that
4   may or may not bring certain conduct within the
5   purview of HIPAA, and it's not really my area.
6      MS. PIERSON:  Ours either, for the record.
7   BY MR. WILLIAMS:
8      Q.   The question was asked that you answered
9   on page 283, line 3, is, "If Cook had received that
10  information on the identity of the patient, would
11  it be in violation of HIPAA?"  And you said,
12  "Likely."
13         So, do you believe that Cook would
14  likely -- sure.  I'm looking right here.
15     A.   I don't know definitively the answer to
16  that question.
17     Q.   But do you think that Cook would likely
18  be in violation of HIPAA if it received information
19  on the identity of a patient?
20     A.   I think that the provider giving the
21  information would likely be in violation of HIPAA.
22     Q.   But not Cook?
23     A.   I don't know.
24     Q.   Okay.  But when you gave the answer

Page 350

1   "Likely," were you thinking of the provider and not
2   Cook?
3      MS. PIERSON:  Object to form.
4   BY THE WITNESS:
5      A.   Probably.
6   BY MR. WILLIAMS:
7      Q.   Okay.
8      MR. WILLIAMS:  That's all I have.
9      MS. PIERSON:  I have just a couple of
10  cleanups, Mr. Hunt, and then we'll be done.
11         FURTHER EXAMINATION
12  BY MS. PIERSON:
13     Q.   Mr. Williams asked you some questions
14  about Ms. Whitelock's hold on May the 6th of 2016
15  and whether Cook was able to identify the lot
16  information rather than that date.
17         Do you remember those questions?
18     A.   I do.
19     Q.   Did Cook ask Ms. Hill and her lawyers
20  for the lot information in the form of the
21  Plaintiff Fact Sheet?
22     A.   Yes.
23     Q.   Did the Plaintiff provide it in the
24  Plaintiff Fact Sheet?

Page 351

1      A.   No.
2      Q.   Did the Plaintiff provide the lot number
3   to Cook in some other form?
4      A.   No.
5      Q.   Did -- and when I say "Plaintiff," I'm
6   talking about Mrs. Hill and her attorneys.  You
7   understand that?
8      A.   Yes.
9      Q.   Did Mrs. Hill or her attorneys send
10  medical records with the Plaintiff Profile Form or
11  Plaintiff Fact Sheet that included the lot
12  information?
13     A.   No.
14     Q.   Did Cook or its attorneys ask for
15  medical authorizations from Ms. Hill and her
16  attorneys?
17     A.   Yes.
18     Q.   At some point in time did Mrs. Hill or
19  her attorneys provide Cook with medical
20  authorizations?
21     A.   Yes.
22     Q.   Following receipt of the medical
23  authorizations from Mrs. Hill or its counsel, did
24  Cook ask Mrs. Hill's providers to provide medical

Page 352

1   records pursuant to authorization?
2      A.   Yes.
3      Q.   When medical records were initially
4   provided, did they include the lot information?
5      A.   No.
6      Q.   In fact, the provider who ultimately
7   provided the lot information, records were
8   requested from that provider twice before the lot
9   information was actually received, correct?
10     MR. WILLIAMS:  Objection; leading.
11  BY THE WITNESS:
12     A.   That's my understanding, yes.
13  BY MS. PIERSON:
14     Q.   Mr. Williams asked you some questions
15  about the holds that were issued following receipt
16  of the Brand lawsuit in 2013 and specifically the
17  series of questions that I asked you about were
18  holds issued in 2014, 2015, 2016, 2017.  Do you
19  remember those questions?
20     A.   Yes.
21     Q.   He asked you which of those applied to
22  the Brand lawsuit.
23         You understand, Mr. Hunt, that
24  Mrs. Brand's lawsuit involves a Celect filter?