**EXHIBIT F**

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
--------------------------------'
In Re: COOK MEDICAL, INC., IVC          '
FILTERS MARKETING, SALES                'Case No.
PRACTICES AND PRODUCTS LIABILITY '1:14-cv-06016
LITIGATIONS                '-RLY-TAB
--------------------------------'

IN THE CIRCUIT COURT OF THE
SIXTH JUDICIAL CIRCUIT IN AND FOR
PINELLAS COUNTY, FLORIDA

--------------------------------'
ELIZABETH JANE HILL,          '
   Plaintiff,           '
vs.                     'Case No.
COOK MEDICAL INCORPORATION a/k/a '1:14-cv-06016
COOK MEDICAL, INC.; COOK        '
INCORPORATED and COOK GROUP,    '
INC.,                   '
   Defendants.          '
--------------------------------'
               ---
         February 8, 2017
               ---
   Confidential - Subject to the Protective Order
     Videotaped deposition of MARK ZUZGA, DO, held
   at Holiday Inn, 2580 Gulf to Bay Boulevard,
   Clearwater, Florida 33765, commencing at
   3:03 p.m., on the above date, before Tami Cline,
   Registered Merit Reporter, Certified Realtime
   Reporter, and Florida Professional Reporter.
               ---
         GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com

## Page 2

```
 1    APPEARANCES:
 2
 3    HEAVISIDE REED ZAIC
 4    BY:  MICHAEL W. HEAVISIDE, ESQ.
 5    910 17th Street NW, Suite 800
 6    Washington, DC 20006
 7    202-223-1993
 8    Mheaviside@hrzlaw.com
 9    Representing Plaintiff
10
11    -and-
12
13    LAW OFFICES OF BEN C. MARTIN, LLP
14    BY:  THOMAS WM. ARBON, ESQ.
15    3710 Rawlins Street, Suite 1230
16    Dallas, Texas 75219
17    214-761-6614
18    Tarbon@bencmartin.com
19    Representing Plaintiff
20
21    FAEGRE BAKER DANIELS, LLP
22    BY:  ANDREA PIERSON, ESQ.
23    BY:  ANNA RUTIGLIANO, ESQ.
24    300 North Meridian Street, Suite 2700
25    Indianapolis, Indiana 46204
26    317-237-0300
27    Andrea.pierson@faegrebd.com
28    anna.rutigliano@FaegreBD.com
29    Representing Defendants
30
31    BUSH GRAZIANO RICE & PLATTER, P.A.
32    BY:  HOLLY B. PLATTER, ESQ.
33    101 East Kennedy Boulevard, Suite 1700
34    Tampa, Florida 33602
35    813-228-7000
36    Hplatter@bgrplaw.com
37    Representing Witness
38
39    ALSO PRESENT:
40    Devon Mulholland, Videographer
41    Mr. Jason Voelke, Assistant to Mr. Heaviside
42    Ms. Patty Spate, Assistant to Mr. Heaviside
```

## Page 3

```
 1             ---
 2          I N D E X
 3             ---
 4   Testimony of:  MARK ZUZGA, DO
 5   DIRECT EXAMINATION BY MR. HEAVISIDE...............  8
 6
 7
 8          E X H I B I T S
 9
10          (Exhibit 12 Not Marked)
11   ZUZGA EXHIBIT
12   Exhibit 1   Curriculum Vitae                 10
13   Exhibit 2   Cross Notice of Videotaped Deposition  16
14       of Dr. Mark Zuzga
15   Exhibit 3   Notice of Taking Deposition Duces  16
16       Tecum Via Videotape
17   Exhibit 4   Acknowledgement of Agreed Protective  17
18       Order
19   Exhibit 5   Courtney Whitelock District Manager  21
20       Performance Review, Bates No.
21       Hill_DFS_0085 - 0088 - Confidential,
22   Exhibit 6   8/27/13 E-mail, Bates No.         25
23       CookMDL_2570_0089352 - Company
24       Confidential
```

## Page 4

```
 1          E X H I B I T S
 2         (Attached to Transcript)
 3    ZUZGA EXHIBIT
 4   Exhibit 7   8/20/13 Letter from Donna Deckard to  28
 5       Dr. Zuzga
 6   Exhibit 8   8/20/13 E-mail Chain and Photograph,  31
 7       Bates No. CookMDL_2570_0720871 -
 8       0720872 - Company Confidential
 9   Exhibit 9   Single Complaint Report, Bates No.  33
10       CookMDL2570_0084036 - 0084046 -
11       Company Confidential
12   Exhibit 10   Educational Presentations by    40
13       Courtney Whitelock
14   Exhibit 11   Bruce Fleck Trip Report, Bates No.  45
15       0733926
16   Exhibit 12   ***OMITTED***
17   Exhibit 13   Cook Celect Filter Set for Jugular  48
18       Vein Approach Instructions for Use,
19       Bates No. Cook IVCF 005801 - 005812
20   Exhibit 14   Celect Reportable Complaints 01 Oct  53
21       2008 - 13 Sept 2013, Bates Cook IVCF
22       008488 - 008500 and Bates No.
23       CookMDL2570_0015049 - 0015061 -
24       Company Confidential
```

Page 17

1  A. Correct.
2  Q. Okay. So responsive to Schedule A on the
3  notice, you brought your office notes and your CV?
4  A. Uh-huh.
5  Q. Right? No more, no less?
6  A. Correct.
7  Q. Okay. Also a housekeeping matter, I believe
8  that this document is your acknowledgment of the
9  protective order entered in this case?
10  A. I'd have to see it.
11  Q. I'm going to mark --
12  A. That's my signature.
13     MR. HEAVISIDE: Okay. I'll mark that as 4.
14        - - -
15     (Exhibit 4, Acknowledgement of Agreed
16  Protective Order, was marked for identification.)
17        - - -
18  BY MR. HEAVISIDE:
19  Q. Doctor, do you -- do you recall a sales rep
20  or regional salesman manager named Courtney
21  Whitelock?
22  A. Yes.
23  Q. Do you still work with Courtney Whitelock?
24  A. She comes in when I do cases occasionally,

Page 18

1  yes.
2  Q. And what does she do when you do cases?
3  A. She watches.
4  Q. Okay. So she -- it would be a stretch to say
5  she assists you is what you're saying?
6  A. That would be accurate. She doesn't assist
7  me at all. She's there to provide support if
8  questions are needed on products, I guess I would
9  say. I don't rely on the reps a lot, so I don't have
10  a lot of reps in my lab. So to say she's there to
11  support, I guess she supports the case, meaning if I
12  needed a stent that we didn't have on site, she might
13  have one in her car.
14  Q. Okay.
15  A. That's about the extent of it.
16  Q. But she's not advising you about retrieval
17  techniques and things like that; right?
18  A. No.
19  Q. Did she ever advise you that if you had any
20  issues, questions about a Cook Celect device that you
21  should call a gentleman by the name of Bruce Fleck or
22  somebody named Darrell Talbert?
23  A. Not that I can remember, no.
24  Q. Have you ever spoken to either of those two

Page 19

1  gentlemen?
2  A. Not that I can remember, no.
3  Q. We deposed Courtney Whitelock some time ago.
4  I just wanted to ask you about a couple issues that
5  came up there. For example, this document, just for
6  the purposes of the record, is Bates stamped
7  Hill_DFS_0077, and it's a performance review by
8  Courtney Whitelock's supervisor, if you will --
9  A. Uh-huh.
10  Q. -- about her performance obviously. Right?
11  So one of the comments is --
12     MS. PIERSON: I'm sorry, Mike. I just need
13  to interpose an objection. If you're going to
14  read to him a document, we need to mark it as an
15  exhibit. Do you have it to mark?
16     MR. HEAVISIDE: I have it. I don't agree
17  that we have to do that but --
18     MS. PIERSON: Yeah. Object.
19     MR. HEAVISIDE: Because I'm not asking him
20  about the veracity of the document. I'm asking
21  about the information contained therein.
22     MS. PIERSON: We'll object to the form of the
23  question.
24     MR. HEAVISIDE: All right.

Page 20

1     THE WITNESS: Excuse me. Can I send this
2  text out? I'm sorry.
3  BY MR. HEAVISIDE:
4  Q. Still with me?
5  A. Yes.
6  Q. Okay. So this is an analysis of Courtney
7  Whitelock's endeavors in 2010. And it says, "Overall
8  Courtney had a good year. Courtney took a large hit
9  to her filter business this year with
10  issues/conversions at her number one account, BayCare
11  in Tampa."
12     Can you add any clarity to the circumstances
13  surrounding that big hit to her filter business at
14  BayCare?
15     MS. PIERSON: Object to form.
16     THE WITNESS: No, I can't.
17  BY MR. HEAVISIDE:
18  Q. Were you -- was one -- BayCare one of the --
19  A. BayCare is probably one of the largest
20  hospital systems in the Tampa region.
21  Q. And it's a system that you work within, so to
22  speak?
23  A. Yes.
24  Q. Okay. And you were working within them in

Page 37

BY MR. HEAVISIDE:
Q. Why?
A. I have a full schedule. It's a busy day. It starts at 5:00 a.m. and ends when the sun is down. I don't have time to research every single product that's already been approved by the FDA as to whether or not I can pick and choose which ones have already been approved. Now, also, I don't have a full range of products available to me. The only products that are available to me are the ones that the hospital chooses to be available to me.
Q. And what devices -- by the way, let me back up a second. I assume, correct me if I'm wrong, that Courtney Whitelock or somebody else from Cook represented to you that the Cook IVC filters were, in fact, approved by the FDA?
  MS. PIERSON: Object to form.
  THE WITNESS: If they were in our lab, I would imagine that they have to be approved by the FDA.
BY MR. HEAVISIDE:
Q. Okay. So would it be surprising to you to learn that these filters actually were never approved by the FDA?

Page 38

  MS. PIERSON: Object to form.
  THE WITNESS: Yes.
BY MR. HEAVISIDE:
Q. Because in your mind, if a product is approved by the FDA, it's gone through sufficient efficacy and safety testing; right?
A. Yes.
Q. And if a product is cleared by the FDA but not approved by the FDA, were you aware that that product did not have to go through that same rigid testing?
  MS. PIERSON: Object to form.
  THE WITNESS: I didn't know there was a distinct between cleared and approved.
BY MR. HEAVISIDE:
Q. Okay.
A. Now, there are certain things that are off label, which is different, but it has nothing to do with filters.
Q. Or it doesn't?
A. I don't know.
Q. Okay. I told you, I think, when we started that we had the opportunity to depose Courtney Whitelock. It seems like an eternity, but it might

Page 39

have only been two weeks. But, nonetheless, do you recall how -- strike that.
  Who was the sales rep that preceded Courtney Whitelock?
A. I couldn't tell you.
Q. Was there one?
A. I imagine there was one, but I -- I don't remember if there was or even if I met them. If you gave me a name, I may recognize it, but I couldn't tell you offhand.
Q. Let's stick with Courtney Whitelock then. All right?
A. Okay.
Q. Now, Courtney Whitelock indicated -- well, strike that.
  How many educational presentations has Courtney Whitelock made to you and your staff within the last five years?
A. I couldn't tell you. I mean, what is -- what would you qualify as an education? Can you be a little bit more specific on the question?
Q. Now, see, the problem is, I don't know what she characterizes as an educational presentation. I just know that she listed it on a document as an

Page 40

educational presentation. And I'll -- rather than drag this out, I'll tell you that she indicated that between March of 2010 until sometime in 2015 --
A. Uh-huh.
Q. -- there were 149 educational presentations which list you, Dr. Zuzga, as the attendee.
A. Educational presentation may be her coming for a case. Now, keep in mind she may be there all day and I may be there 20 minutes scrubbing the entire time. So she's probably -- well, not probably, but when she's there, she spends a considerable bit more time with the staff than she does with the physician, only because I'm bouncing around rooms all day.
Q. All right. I'm going to just mark this. I'm not going to ask you to read it because -- although I do have a magnifying glass if you want to use that but...
        - - -
  (Exhibit 10, Educational Presentations by Courtney Whitelock, was marked for identification.)
        - - -
  MR. HEAVISIDE: I'm going to mark this as Exhibit 10. Counsel, unless you have got X-ray

Page 41

 1    vision, it's not going to help you all that much,
 2    but do you want it?
 3        MS. PLATTER:  Sure.  Thanks.
 4        MR. HEAVISIDE:  Andrea, you're familiar with
 5    this document.
 6        MS. PIERSON:  I am.
 7  BY MR. HEAVISIDE:
 8    Q.  At any rate, this was provided to us by
 9  Courtney Whitelock at her deposition, and it
10  indicates before 11/17/10, which was the date of
11  implant --
12    A.  Uh-huh.
13    Q.  -- at least three educational presentations
14  listing Dr. Zuzga as the attendee.
15    A.  Yeah.
16    Q.  Do you remember any of those?
17    A.  No.
18    Q.  If you had -- if you had a question or if
19  Cook, through their sales rep, wanted to impart some
20  important information to you, that would have been --
21  I'm not saying it was --
22    A.  Right.
23    Q.  -- but it would have been an opportunity to
24  do so; right?

Page 42

 1    A.  Correct.
 2        MS. PIERSON:  Object to form.
 3  BY MR. HEAVISIDE:
 4    Q.  All right.  Now, similarly, excuse me, the
 5  date of the failed retrieval attempt was 3/23/11.
 6    A.  Uh-huh.
 7    Q.  So the last exhibit, 10, indicates that
 8  between the date of implant and the date of failed
 9  retrieval, there were at least nine educational
10  presentations by Courtney Whitelock with you as an
11  attendee.
12    A.  Uh-huh.
13    Q.  Let me ask you that same question.  Had Cook
14  desired to impart to you important information
15  regarding the safety, risk, complications associated
16  with the Celect, those would have presented
17  opportunities to do so; correct?
18        MS. PIERSON:  Object to form.
19        THE WITNESS:  Yes.
20  BY MR. HEAVISIDE:
21    Q.  And post-failed retrieval attempt on 3/23/11
22  through when the device was actually retrieved, which
23  was 8/21/13, there were 100 educational presentations
24  where Courtney Whitelock listed Zuzga as attendee.

Page 43

 1    A.  Uh-huh.
 2    Q.  Same question.  Should Cook have desired to
 3  impart to you important information regarding the
 4  Cook Celect, those would have been opportunities to
 5  do so; correct?
 6        MS. PIERSON:  Object to form.
 7        THE WITNESS:  Yes.
 8  BY MR. HEAVISIDE:
 9    Q.  There's some suggestion that --
10        MR. ARBON:  You talked at the same time.
11  BY MR. HEAVISIDE:
12    Q.  There was some talking over.  When I asked
13  you those three questions about whether or not those
14  educational presentations provided opportunities to
15  impart knowledge or important information about Cook
16  Celect filters, you said, yes, those would have been
17  opportunities; right?
18    A.  Yes.  Yes.
19        MS. PIERSON:  Objection.
20        MR. HEAVISIDE:  And I know Andrea has an
21    objection to the form of that question.
22  BY MR. HEAVISIDE:
23    Q.  All right.  Okay.  In addition to this
24  document here which lists the educational

Page 44

 1  presentations, it appeared that you attended some
 2  kind of Cook conference in Indiana in 2015.  Do you
 3  recall that?
 4    A.  You said 2015?
 5    Q.  Yeah.
 6    A.  No.  That's not right.
 7    Q.  Okay.
 8    A.  That's not an accurate date.
 9    Q.  Do you recall --
10    A.  I recall a conference, but my -- it's not in
11  2015.  It's probably '11.
12    Q.  2011?
13    A.  I'm guessing.  It's a big guess.
14    Q.  What happened at that conference?
15    A.  It was more of an on-site visit just to see
16  the company and show us products.  I can't give you
17  details.  Maybe, you know, their research and what
18  they were up and coming and, you know, a basic plant
19  tour is what I'm telling you.
20    Q.  And who extended an invitation to you to come
21  to Indiana to Cook?
22    A.  Actually, Dr. Andrew Davis, who is since
23  deceased.  He is a -- or was one of the
24  interventional radiologists at Countryside Hospital

Page 73

1  says --
2      MS. PIERSON: Who's on it?
3      MR. HEAVISIDE: Who's on it? Bruce Fleck.
4      MS. PIERSON: Who's it to? Who's it from?
5      MR. HEAVISIDE: It's to Bruce Fleck. It's
6  from Kerry Stafford.
7      MS. PIERSON: Okay.
8  BY MR. HEAVISIDE:
9      Q. And the subject is "Celect delivery concern."
10 This is talking about, again, showing physicians an
11 off-label implantation technique.
12     "Show them the technique for deploying the
13 filter with the hook "and collet" still in the
14 sheath."
15     What's a collet?
16     A. I think that's like the little pusher that's
17 in there.
18     Q. Then it says, "This stabilizes the filter so
19 it doesn't move during deployment. While this
20 technique is currently off-IFU, it is being validated
21 by our engineering team and will be added to the IFU
22 as an official [sic] step."
23     So certainly at the time you were putting
24 this filter in, this technique was off-label and

Page 74

1  nobody told you about this off-label technique;
2  correct?
3      A. Correct.
4      MS. PIERSON: Object to form.
5  BY MR. HEAVISIDE:
6      Q. Okay. I know it's been awhile, but let's
7  just try to go through the medical reports regarding
8  your treatment of Elizabeth Hill. Okay.
9      A. Okay.
10         - - -
11     (Exhibit 23, 10/4/10 Mark Zuzga, DO Medical
12 Record, Bates No. W.Florida 2 - 3, was marked for
13 identification.)
14         - - -
15 BY MR. HEAVISIDE:
16     Q. That's been marked Exhibit 23; right?
17     A. Yes.
18     Q. And this appears to be a letter from you to
19 Dr. Moreno; correct?
20     A. Correct.
21     Q. "I saw Elizabeth Hill in consultation today.
22 She presents for evaluation" --
23     THE COURT REPORTER: I'm sorry?
24     ///

Page 75

1  BY MR. HEAVISIDE:
2      Q. "She presents for evaluation of a temporary
3  IVC filter insertion."
4      Correct?
5      A. Yes.
6      Q. "Risks and benefits were discussed with
7  Elizabeth, including bleeding, thrombosis and need
8  for secondary procedure."
9      Correct?
10     A. Yes.
11     Q. So the risks that you discussed with
12 Mrs. Hill at that point in time were risks attendant
13 to the procedure, like bleeding or bruising or that
14 type of thing?
15     MS. PIERSON: Object to form.
16     THE WITNESS: That line actually means risks
17     and benefits meaning bleeding during with -- the
18     procedure, thrombosis of the cava, which filters
19     can cause, and need for secondary procedures.
20     That line covers pretty much putting the filter
21     in and long-term complications of filters in and
22     of themselves.
23 BY MR. HEAVISIDE:
24     Q. Well, it covers the complications as known to

Page 76

1  you as conveyed to you by Cook; correct?
2      MS. PIERSON: Object to form.
3      THE WITNESS: No. That's me and my 12 years
4      of practice knowing what the risk of filters are.
5      That's exactly why I put that line in every
6      patient that I see that I put a filter in.
7  BY MR. HEAVISIDE:
8      Q. Did you discuss with Mrs. Hill the
9  possibility that the Cook filter would perforate the
10 IVC wall and penetrate into the duodenum?
11     A. That specifically, no, probably -- not that I
12 recall.
13     Q. Okay. And she had no history of DVT, no
14 history of PE; right?
15     A. Correct.
16     Q. So then I think probably the next time you
17 saw her would have been to do the implant; right?
18     A. Correct.
19     Q. And that would have been November 17th of
20 2010. I'll give you this Exhibit 24.
21         - - -
22     (Exhibit 24, 11/17/10 Interventional
23 Operative Report, Bates No. W.Florida 14 - 15 and
24 W.Florida 5, was marked for identification.)

Page 77

1             ---
2    BY MR. HEAVISIDE:
3        Q.  All right.  Pardon me.  That's the next time
4    you saw her, 11/17/2010; right?
5        A.  Yes.
6        Q.  And you implanted the Cook Celect Filter as
7    for -- as per the cleared indication in the IFU?
8        A.  Correct.
9        Q.  And --
10           MS. PIERSON:  Just object to form.
11   BY MR. HEAVISIDE:
12       Q.  And you confirmed -- it says, "Completion
13   venogram showed proper placement without evidence of
14   migration."
15       A.  Yes.
16       Q.  Right?
17           So the conclusion was successful placement of
18   the temporary IVC filter without complication?
19       A.  Correct.
20       Q.  Is there a third page of that document you
21   have there?
22       A.  Yes.
23       Q.  Let me ask you about that.
24       A.  Yes.

Page 78

1        Q.  This is -- on the top it says Morton Plant
2    Mease Health Care --
3        A.  Correct.
4        Q.  -- right?
5            And this, I read, is kind of a -- what you
6    have to submit to get --
7        A.  To book a case.
8        Q.  Yeah.
9        A.  Yes.
10       Q.  Right?
11       A.  Yes.
12       Q.  And where it says, "Diagnosis/chief
13   complaint" --
14       A.  Yes.
15       Q.  -- it says "DVT"?
16       A.  Yes.
17       Q.  But she never, in fact, had a DVT; right?
18       A.  No.
19       Q.  This is just in case, associated with her
20   upcoming back surgery, she could possibly have a
21   DVT --
22       A.  Correct.
23       Q.  -- right?
24           But not that she had ever had one --

Page 79

1        A.  Correct.
2        Q.  -- previously?
3            ---
4           (Exhibit 25, 11/17/10 Interventional
5    Operative Report, was marked for identification.)
6            ---
7    BY MR. HEAVISIDE:
8        Q.  This would be Exhibit 25.  This is --
9        A.  This is the same one.
10       Q.  Okay.
11       A.  It's the same one as 24.
12       Q.  It just appears in a different form?
13       A.  A different font, yes.
14       Q.  Is that right?
15       A.  Yes.
16       Q.  Now, when you put this filter in in
17   November of 2010, was your expectation you could
18   successfully remove it in a relatively short period
19   of time thereafter; right?
20       A.  Yes.
21       Q.  Excuse me.  Do you want me to get you some
22   water or are you all right?
23       A.  No.  I'm good.
24       Q.  All right.  So when she went -- so she had

Page 80

1    her back surgery in February; right?
2        A.  Yes.
3        Q.  Then she went back to you in March to take
4    the filter out; right?
5        A.  Yes.
6           MR. VOELKE:  It's actually November.  You
7    said February.
8           MS. SPATE:  No.  The surgery was
9    December 6th.
10          MR. VOELKE:  It was December.
11          THE WITNESS:  Okay.  Sorry.
12   BY MR. HEAVISIDE:
13       Q.  Yeah.  Okay.  I have been corrected.  The
14   surgery was in December; right?
15       A.  Yes.
16       Q.  Okay.  The implant was in November?
17       A.  Correct.
18       Q.  All right.  So she comes back to you for
19   retrieval; right?
20       A.  Yes.
21       Q.  And at that point in time it was your
22   expectation that this temporary filter would be
23   easily retrieved; correct?
24       A.  Yes.