# EXHIBIT K

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: COOK MEDICAL, INC.,    ) Case No.
IVC FILTERS MARKETING,        ) 1:14-ml-2570-RLY-TAB
SALES PRACTICES AND           )
PRODUCTS LIABILITY            ) MDL No. 2570
LITIGATION                    )
_____

This Document Applies to All Actions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF LEIGH CONNERS
Friday, February 3, 2017
Greenville, South Carolina
9:28 a.m.

Reported by: Karen Kidwell, RMR, CRR, CLR
GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## Page 2

1    VIDEOTAPED DEPOSITION of LEIGH CONNERS, a
2  witness in the above-entitled action, taken pursuant
3  to notice, pursuant to the Federal Rules of Civil
4  Procedures before KAREN K. KIDWELL, RMR, CRR, a
5  Certified Shorthand Reporter, at the Hampton Inn &
6  Suites Hilton Greenville Downtown RiverPlace, 171
7  Riverplace, Greenville, South Carolina, 3rd day of
8  February, 2017, at 9:28 a.m.
9
10
11  APPEARANCES:
12    LAW OFFICES OF BEN C. MARTIN
13    BY: BEN C. MARTIN, ESQ.
14    3710 Rawlins Street
15    Suite 1230
16    Dallas, TX 75219
17    214.761.6614
18    bmartin@bencmartin.com
19    Counsel for Plaintiffs
20
21
22    HEAVISIDE REED ZAIC
23    BY: MICHAEL W. HEAVISIDE, ESQ.
24    910 17th Street, NW
25    Suite 800
26    Washington, DC 20006
27    202.223.1993
28    mheaviside@hrzlaw.com
29    Counsel for Plaintiffs

## Page 3

1  APPEARANCES CONTINUED:
2    FAEGRE BAKER DANIELS LLP
3    BY: ANDREA ROBERTS PIERSON, ESQ.
4    300 North Meridian Street
5    Suite 2700
6    Indianapolis, IN 46204
7    317.237.0300
8    apierson@bakerdaniels.com
9    Counsel for Defendant
10
11
12
13  ALSO PRESENT:
14  Jason Voelke
15  Devyn Mulholland, Videographer

## Page 4

1              I N D E X
2  WITNESS/EXAMINATION              Page
3  LEIGH CONNERS
4    By Mr. Martin                    8
5    By Mr. Heaviside               221
6    Further by Mr. Martin          303
7    By Ms. Pierson                 305
8    Further by Mr. Martin          379
9    Further by Ms. Pierson         397
10   Further by Mr. Martin          398
11
12           E X H I B I T S
13  Number    Description         Page
14  Conners 1  Cook Medical Human Resources ......58
15       District Manager Performance
16       Review of Courtney Whitelock
17       dated 1/1/2011, Confidential,
18       Bates Hill_DFS_0081-084
19  Conners 2  Spreadsheet page with NPI .........89
20       Number, Attendee First,
21       Attendee Last first few
22       columns
23
24  Conners 3  Spreadsheet page, continuation ....89
25       of Exhibit 2
26  Conners 4  Cook Celect Filter Set, ..........104
27       Instructions for Use, Company
28       Confidential, Bates
29       CookMDL2570_0445420-5434

Page 57

1    THE WITNESS: Again, I don't -- I really
2    don't recall much about the experience.
3    BY MR. MARTIN:
4        Q. Right. Well, anything you do recall --
5    let's do it that way. Is there anything you recall
6    about the experience?
7        A. I remember sitting in a -- I remember
8    having a really great dinner out with peers, but I
9    can't recall who was there. I recall having a --
10   there was a classroom portion. Again, could not tell
11   you what was discussed. And I recall that we then
12   went into the lab, and I can't recall the details of,
13   you know, what was done in the lab. I really can't.
14       (Off record discussion.)
15       MR. MARTIN: Let's look at the -- I don't
16   know what we're on as far as exhibit number. I
17   know we're going, I guess --
18       MR. HEAVISIDE: Well, she's got these
19   numbered 1 through 12. I --
20       MR. MARTIN: That's fine.
21       MR. HEAVISIDE: We can figure it out
22   later, I guess.
23       MR. MARTIN: We're going to mark Exhibit
24   Number 1 to the Conners deposition, and I'm
25   going to hand you this -- a document stamped 81,

Page 58

1    -2, -3, -4, so 0081 through 0084.
2        (Conners 1 was marked for identification.)
3    BY MR. MARTIN:
4        Q. Could you -- if you could please identify
5    what that document appears to be?
6        MS. PIERSON: You -- you don't have a
7    copy?
8        MR. HEAVISIDE: Just that one.
9        MS. PIERSON: Just this one that you're
10   going to ask the witness about. Okay. Is that
11   true for everything today?
12       MR. HEAVISIDE: No.
13       MS. PIERSON: Okay. Just this one?
14       MR. MARTIN: True for a lot of them. Do
15   we have a screen we can blow them up on?
16       MR. HEAVISIDE: Right here.
17       MS. PIERSON: Just give me one second to
18   review it, and we'll find a way to work off of
19   it.
20       MR. MARTIN: Oh, perfect. There's a
21   screen right there.
22   BY MR. MARTIN:
23       Q. All right. So all I want you to do is
24   identify what that four-page document is.
25       A. This was a performance review given by

Page 59

1    Courtney's current manager, Lisa Froehlich.
2        Q. Okay. This is off the record.
3        (Off record discussion.)
4    BY MR. MARTIN:
5        Q. So while you're getting that, I do want to
6    ask you about this. You know, we took Ms. Conners --
7    excuse me, we took Ms. Whitelock's deposition the
8    other day.
9        A. Okay.
10       Q. Are you aware of that?
11       A. I am aware of that.
12       Q. All right. And Ms. Whitelock --
13   Ms. Whitelock says that she had sent her boss certain
14   call notes, what she described as sending e-mails
15   after she would talk to a doctor, for instance.
16       Is that kind of the way it went with you
17   and Courtney when you were her boss, that when she
18   would go out and call on a doctor, she would send you
19   call notes?
20       MS. PIERSON: Object to form.
21       THE WITNESS: No, generally not. Courtney
22   and I would speak on the phone a fair amount.
23   If you're asking me if she, on a regular basis,
24   sent me call notes, not that I recall.
25

Page 60

1    BY MR. MARTIN:
2        Q. How about an irregular basis?
3        MS. PIERSON: Object to form.
4        THE WITNESS: I -- generally Courtney and
5    I would speak over the phone. We did a lot of
6    verbal precall planning, post-call.
7    BY MR. MARTIN:
8        Q. If Courtney Whitelock did testify that she
9    would provide routine or usually the information
10   about what had occurred at a sales call and send an
11   e-mail to that -- to that person, her boss, her boss
12   at one time would have been you, correct?
13       MS. PIERSON: Object to form.
14       THE WITNESS: I can't speak to why she --
15   Lisa had Courtney on call reports. It's not --
16   I can't speak to that. So if you're asking me
17   why she was sending Lisa call follow-up notes.
18   I can't speak to that. I wasn't her manager.
19   And that -- that might have been a function of
20   something between them. Lisa manages
21   differently.
22   BY MR. MARTIN:
23       Q. How about -- how about with you? Did you
24   receive e-mails from Courtney after she would make a
25   call upon a doctor?

Page 85

1  BY MR. MARTIN:
2      Q. Right.
3      A. And after that, I don't have any -- I
4  wasn't involved.
5      Q. That's what I wanted to tie up. Just --
6  that's it. Just for the record, from Courtney, if
7  she sent them -- okay. If she sent them, as she
8  indicates in her deposition, and you were the person
9  and her other boss that she -- or bosses that she
10 sent them to, these call notes that she described and
11 the details she described in them, I simply want to
12 tie it up --
13     A. Right.
14     Q. -- that you gave your computer up, and
15 that would have been the computer that they would
16 have been in if they existed, true?
17     MS. PIERSON: Object to form.
18     THE WITNESS: I guess what makes -- what's
19  making me uncomfortable with this line of
20  questioning is we're assuming what the content
21  of her e-mails was. But if you're -- yes, the
22  e-mails that she would have sent to me -- and
23  they could have been "had a great day today" or
24  could have been, you know, "I ran out of gas on
25  the highway" -- those would all be on my laptop

Page 86

1   that are no longer with me. And I sent them
2   back to Cook.
3  BY MR. MARTIN:
4      Q. Did Cook ever tell you what they intended
5  to do with the e-mails that existed on your computer
6  when you gave your computer to them upon your leaving
7  that employment?
8      A. I had zero discussion around that, what
9  they intended to do. I went on to a new
10 organization. And my employment was, you know, no
11 longer with Cook. So I had no discussions with their
12 IT department or anyone else.
13     Q. And to the extent other people may have
14 sent you, if they did, e-mails after making sales
15 calls upon doctors including Dr. Zuzga, okay, if he
16 were one of them, then, in fact, you don't have those
17 e-mails now because you gave Cook your computer for
18 the same reason that you don't have the Courtney
19 Whitelock e-mails, correct?
20     A. Right.
21     MS. PIERSON: Object to form.
22  BY MR. MARTIN:
23     Q. Just very -- it's just tieing up where
24  they were.
25     A. You did reference Dr. Zuzga, and in the

Page 87

1   time that I was Courtney's manager, she had not been
2   in front of him. He was a physician we had hoped
3   for, she'd tried to meet, but she had not had any
4   contact. He was kind of that elusive physician.
5       So in the time that I was her manager, she
6   hadn't even been in front of him. So there would not
7   have been any e-mails. And I can speak to no e-mails
8   regarding any interactions with him specifically.
9       Q. Well -- but e-mails may or may not have
10  existed about -- about the fact that he wasn't able
11  to be talked to. I mean, even those e-mails might
12  exist.
13      MS. PIERSON: Object to form.
14      THE WITNESS: Ben, I can't -- I'm sure
15   there may have been an e-mail that said, "I
16   tried to meet Dr. Zuzga and was unable," but I
17   can't speak to what -- I can't speak to what her
18   e-mails or anybody else's e-mails. What I can
19   and what I think you're going at here is say, I
20   have no idea, when I turned in my laptop, what
21   happened to any of that content. I went on to a
22   new organization. So I -- I have zero knowledge
23   of what occurred with that information.
24  BY MR. MARTIN:
25      Q. I understand.

Page 88

1       A. I turned in my laptop, and I was done.
2   Cut up my American Express, and I was done with Cook.
3       Q. Did anybody from Cook ever tell you that
4   there was a litigation hold on any cases -- let me
5   start over.
6       Did Cook ever tell you that there was a
7   litigation hold on anything relating to IVC filter?
8       A. I'm not --
9       Q. Did Cook ever tell you there was a
10  litigation hold on anything in the last five years?
11      MS. PIERSON: Object to form.
12      Ben's not entitled to ask you about any
13   litigation that you may or may not have known of
14   that's unrelated to IVC filters and specifically
15   not allowed to ask you about communications
16   between you and attorneys for Cook.
17      THE WITNESS: Okay.
18      MS. PIERSON: So I think I'm reading his
19   question right -- correctly. I think what he
20   wants to know is, do you have a recollection of
21   ever receiving something called a litigation
22   hold regarding an IVC filter?
23      THE WITNESS: I do not have any
24   recollection. My -- my communications are with
25   friends. I do not recall any.

Page 61

1   A. Did I receive e-mails from Courtney after
2   her sales calls? Not on -- that was not part of our
3   routine practice.
4   Q. How many times did it happen?
5   A. I can't recall. Generally, we would --
6   she would call me and we would discuss.
7   Q. Did it happen more than zero?
8   A. It happened more than zero. I'm sure she
9   sent me an e-mail more than zero times.
10  Q. She's sent you hundreds of e-mails, hasn't
11  she?
12      MS. PIERSON: Object to form.
13      THE WITNESS: Again, I can't recall how
14  many e-mails Courtney has sent to me. We did a
15  lot of our communication -- we had a very open
16  dialogue. Every manager has a different
17  function and manages their team differently. I
18  can't speak to what she testified to with Lisa.
19      MR. MARTIN: Objection. Nonresponsive.
20  BY MR. MARTIN:
21  Q. My question to you is, if she was there
22  under you for a year and a half, that would have been
23  over 500 days -- I believe my addition is correct.
24  You had approximately eight people under you I think
25  was -- you know, you had indicated an approximate

Page 62

1   number.
2       And I want to know if it is your testimony
3   that you received less than 100 e-mails from Courtney
4   Whitelock during the time -- that year and a half
5   time that you were her boss?
6       MS. PIERSON: Object to form.
7       THE WITNESS: I'm not going to answer
8   that. I'm not going to tell you how many
9   e-mails. If you're asking me if Courtney
10  e-mailed in -- me during the year and a half, so
11  500 days, yes, Courtney sent me e-mails while I
12  was her manager. I cannot recall what the
13  content of those e-mails were.
14  BY MR. MARTIN:
15  Q. Where are they?
16  A. Well, I would imagine -- I don't know. I
17  left Cook three -- over three years ago. And when I
18  left, I turned in my laptop.
19  Q. All right. And so three years ago, you
20  had not deleted any of those e-mails that -- that
21  were on your laptop that you had received from
22  Courtney, correct?
23      MS. PIERSON: Object to form.
24      THE WITNESS: I can't recall if I -- I
25  mean, I don't keep every e-mail I receive. That

Page 63

1   would leave a lot of e-mails in one's inbox.
2   BY MR. MARTIN:
3   Q. Well, you look at them. And you know that
4   when you -- you know that, when you delete an e-mail,
5   it's still on your hard drive. You understand that,
6   don't you?
7   A. I can't recall. I don't know what Cook's
8   policy -- IT policy is for -- it's, again, three and
9   a half years ago. When I left, I shipped my laptop
10  back to Cook, and I took a new position with a new
11  company. That is all.
12  Q. What would the best way to be -- to
13  determine what Courtney Whitelock told doctors about
14  IVC filters during the time that she worked for you?
15  What would be the best way to discover -- and I'm
16  talking about not the legal term discover but to
17  discover, to find out what she told those doctors?
18      MS. PIERSON: Object to form.
19      THE WITNESS: I don't really completely
20  understand what you're asking me.
21  BY MR. MARTIN:
22  Q. Want me to ask again?
23  A. You don't have to -- I guess I'm trying to
24  process. If you're asking me how Courtney and I
25  would discuss her sales calls --

Page 64

1   Q. No, that's not what I'm asking you.
2   A. No.
3   Q. I am asking you what would, now years
4   later, at least three years -- you've been gone for
5   three years now, right?
6   A. Right.
7   Q. What would be the best way -- knowing how
8   Cook worked while you were there, at least with
9   respect to the doctors you and your sales team called
10  on, what would be the best way to make a
11  determination as to what that conversations --
12  conversation or conversations were that Courtney
13  Whitelock was having with those doctors she was
14  detailing about what she was telling them about IVC
15  filters? What would be the best -- the best source
16  of information to find that out?
17      MS. PIERSON: Objection. Form.
18      THE WITNESS: So you're asking me what
19  would be the best source of information three
20  years later to find out how -- what she was
21  talking to her physicians about?
22  BY MR. MARTIN:
23  Q. That's correct.
24  A. I -- I don't know what that would be. I'm
25  not -- in my role as a sales manager, I'm not an