```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
 2                     INDIANAPOLIS DIVISION

 3
     IN RE:  COOK MEDICAL, INC., )CAUSE NO. 1:14-ml-2570-RLY-TAB
 4   IVC FILTERS MARKETING, SALES)MDL NO. 2570
     PRACTICES AND PRODUCTS       )Indianapolis, Indiana
 5   LIABILITY LITIGATION         )February 7, 2017
                                  )1:30 p.m.
 6

 7

 8

 9                            BEFORE THE
                HONORABLE MAGISTRATE TIM A. BAKER
10

11

12

13            OFFICIAL REPORTER'S TRANSCRIPT OF

14                    PRETRIAL CONFERENCE

15

16

17

18
19   Court Reporter:      Cathy Easley Jones, RDR, FCRR
                          Official Court Reporter
20                        46 East Ohio Street, Room 291
                          Indianapolis, IN  46204
21

22

23

24

25          PROCEEDINGS TAKEN BY ELECTRONIC RECORDING
               COMPUTER-AIDED TRANSCRIPTION
```

2

# **A P P E A R A N C E S**

FOR THE MDL PLAINTIFFS:    Mr. Joseph N. Williams
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN  46204

Mr. Ben C. Martin
LAW OFFICES OF BEN C. MARTIN
3710 Rawlins Street
Suite 1230
Dallas, TX  75219

Mr. Matthew D. Schultz(By phone)
LEVIN PAPANTONIO THOMAS MITCHELL
  RAFFERTY & PROCTOR
316 S. Baylen Street
Suite 600
Pensacola, FL  32502

FOR THE MDL DEFENDANTS:    Mr. Douglas B. King
Mr. James M. Boyers
Mr. Robert J. Simmons
WOODEN & McLAUGHLIN
One Indiana Square, Suite 1800
Indianapolis, IN  46204-2019

Mr. John J. Tanner
FAEGRE BAKER DANIELS
300 North Meridian Street
Suite 2700
Indianapolis, IN  46204

1     *(In open court)*

2          THE COURT:  It's February 7th, 2017; and we are here

3     in the case of In Re: Cook Medical, Cause No. 14-ml-2570.  I

4     can't believe I would have to look to see what that cause

5     number is.

6          We're here for a proceeding in connection with some

7     discovery disputes.  I thought it would be helpful to put this

8     on the record.  As I have just informed counsel, it's not my

9     intention to have too much formality with this; but it's

10    probably good to have a record.

11         And for the record, we have Doug King here for the

12    defendant.  We have Joe Tanner, although he switched sides of

13    the table.  We have Robert Simmons, and we have Jim Boyers for

14    the defendants.

15         And we have Ben Martin here on behalf of the

16    plaintiff.  Joe Williams is here.  I believe by phone we have

17    Matt Schultz.

18         Mr. Schultz, are you there?

19         MR. SCHULTZ:  I am, Your Honor; and thank you for

20    allowing me to attend telephonically today.

21         THE COURT:  And you are coming through loud and

22    clear.  So we can hear you just fine.

23         One thing I just noticed -- and I want to say this.

24    I see Mr. Tanner here.  I want to tell you, I sat next to

25    Mr. Tanner's parents at the Colts game for years.  Is it your

4

1  sister that still sits in those seats?

2          MR. TANNER:  Yes, Your Honor.

3          THE COURT:  You don't need to stand up.

4          His sister still sits next to me at those games with

5  her husband, and they have actually purchased some of my

6  tickets to Colts games.  So since I see you sitting here, I

7  thought I better mention that.  So if anybody has an issue

8  with respect to that, I want you to know that; and you can

9  tell me now.  You can consult with your clients and tell me

10 later.

11         But I look out and I see Mr. Tanner sitting there, I

12 think, you know, I need to disclose that to everybody.  So if

13 you want a minute to talk with each other or talk with your

14 clients about whether you want me to continue in this case,

15 I'm happy to let you do that.  But I just thought that was

16 important to mention.  Whether there's a requirement or not, I

17 thought I would just go ahead and mention that.

18         MR. WILLIAMS:  No objection from the plaintiff, Your

19 Honor.

20         THE COURT:  All right, Mr. Williams.

21         How about from the defendant?

22         MR. KING:  None.

23         THE COURT:  All right.  Thank you, Mr. King.

24         All right.  So I've got some e-mails that were very

25 helpful.  Of course, I reviewed them; but I thought I would go

1  over them with you in case anybody has any additional comments

2  to make.  Some of these things you may have reached agreement

3  on.

4        MR. WILLIAMS:  Given that we've got an hour and 15

5  minutes and that some of these things were resolved, my plans

6  were to kind of jump around and hit the issues that were most

7  important, first, in case we end up with --

8        THE COURT:  That's an excellent plan, but that's not

9  the plan we're going to follow.  I've got a plan.  We're going

10  to go right through these in order; and if they're resolved,

11  you're just going to tell me they've been resolved.  And I

12  think I know which ones hopefully have been resolved; and if

13  they haven't, we'll deal with them.

14        MR. WILLIAMS:  Okay.

15        THE COURT:  The first one, slides, now with respect

16  to -- maybe I'll start with the plaintiff.  For the record,

17  I'll say what they are.  No. 1, slides, including, plastic

18  embedded slides for VCA1, VCA2 and VCA3.

19        So, Mr. Williams, with respect to that, is VCA1

20  resolved?

21        MR. WILLIAMS:  It is not, Your Honor.  May I

22  approach the bench?

23        THE COURT:  Sure.  And you don't have to ask.  If

24  you have something you want to hand me, just come on up and

25  give it to me.

1          MR. WILLIAMS:  With regard to the slides and the OUS

2    materials, as Mr. Schultz goes through the presentation, he's

3    going to be referencing things -- this is for the Court to

4    keep.  The first half of it will deal with (inaudible).

5          THE COURT:  So when the defendant had indicated in

6    what they submitted to me that they were going to make a slide

7    scanner essentially and produce virtual microscopy slides of

8    VCA1 which they had located, that's not acceptable to the

9    plaintiff?

10          MR. WILLIAMS:  No.  Matt, please go ahead.

11          THE COURT:  Mr. Schultz, go ahead.

12          MR. SCHULTZ:  Yeah, I'm sorry.  Thank you, Your

13    Honor.  That does resolve -- in a word, we looked at the

14    federal regs that the defendant cited.  We believe that it

15    permits them to keep copies and give us the originals; but we

16    talked to our expert, and he said that high res copies as they

17    have proposed would be sufficient, so we have resolved that

18    issue.

19          THE COURT:  Amy, can you turn him down a little bit?

20          We're going to either try to turn you down a little

21    bit or have you speak a little more softly there, Mr. Schultz.

22    I know you don't realize it, but your voice really is booming.

23          So VCA1 is resolved?

24          MR. SCHULTZ:  It is, Your Honor.

25          THE COURT:  How about 2 and 3, not yet, because they

1  haven't found the slides?

2          MR. KING:  Your Honor, may I address the Court?

3          THE COURT:  Yes, Mr. King.

4          MR. KING:  I got an e-mail from my client at eight

5  o'clock last night that they found VCA2 and 3, and they have

6  already begun scanning them; and we will be able to have the

7  scans of VCA1 in the plaintiffs' hands by Friday of this week,

8  and we'll be able to have the scans of VCA2 and 3 in

9  plaintiffs' hands by a week from Friday.

10          THE COURT:  That would be the 17th.  Is that

11  acceptable to the plaintiff?

12          MR. WILLIAMS:   your Honor, it would be acceptable

13  if we can -- and I don't know if we need --

14          THE COURT:  Underlying expert supplementation.

15  We'll get to that maybe at the end, and that's a valid issue.

16          All right.  So I'm going to assume production of

17  them has been resolved.  The issue of when they'll be produced

18  or what impact that might have on plaintiffs' need to

19  supplement their experts is a remaining issue.

20          All right.  No. 2, materials from the OUS study.

21  Mr. Williams, has that been resolved?

22          MR. WILLIAMS:  I do not believe it has, Your Honor.

23  And if you reach into the back jacket of your binder, there

24  are two documents, one image and an e-mail that I think

25  Mr. Schultz is going to reference as he discusses the issue

1  with Your Honor.

2          THE COURT:  All right.  Mr. Schultz, go ahead.

3          MR. SCHULTZ:  Thank you, Your Honor.  Let me know if

4  I'm too loud.

5          Just to give you a little background, Cook initially

6  back in 2004 sought clearance for the Celect filter through

7  FDA.  FDA denied clearance in part because it had questions

8  about the sufficiency of the animal data Cook had submitted.

9          FDA indicated Cook would have to undertake a

10  clinical trial.  That is what this study is, what's been

11  called the OUS, Outside the United States or the Mexico study.

12  It was actually formerly I think called the long-term Celect

13  filter retrievability study or something along those lines.

14          In essence, this study is what got clearance for the

15  Celect filter.  It got clearance in part based on Cook's

16  representations to FDA that there were no perforations in this

17  study.

18          The published study in 2009 also indicated that

19  there were no perforations in the study.  So, obviously, if

20  there are perforations -- the study involved 95 patients.  If

21  there are perforations in any of these patients, then that's

22  of paramount importance to us because that was the linchpin

23  for clearance of the Celect device in the first place.

24          We have gotten bits and pieces of documents from

25  Cook until -- I believe February 2nd is when we got the images

1  actually uploaded.  They may have turned them over to us the

2  day before.  So they have imaging where they do imaging on

3  implants.  They do follow-up imaging, and they do imaging on

4  retrieval; and so there are multiple images for each of the

5  patients in this study.

6          One of the images that I believe Mr. Williams has

7  with him today is an example of why this is of such importance

8  to us.  We traced down in some of the bits and pieces that we

9  got of the study a particular patient where a perforation had

10 been reported to Cook.  Cook went back to the site

11 investigator, the doctor; and said, "Is it really a

12 perforation?"  We don't have that response because we don't

13 have the full CRFs, the patient files.

14         But we know that there was at least a reported

15 perforation.  Then we got the imaging files.  We went and

16 looked at that particular patient because that was one we

17 already had a regular flag on.  And I'm not a clinician, but

18 you can see the image of the filter and see that it would

19 certainly raise questions we would want to address with our

20 experts.

21         It took me probably an hour to locate that single

22 image, fully aware of the patient's number and that I was

23 specifically looking for any imaging on that patient.  The

24 significance of that, Judge, is we don't yet have the patient

25 files, the CRFs.  I'm not sure whether we're getting them.

1  Mr. King can address that.  I don't know where we stand on

2  that, but we are looking at literally probably hundreds of

3  hours of work to associate these imaging files to the patient

4  files to actually review the files themselves and determine

5  whether there were any perforations.

6         And the reason we have suspicions about this not

7  only based on that image, for example, which is the only one

8  I've had time to track down, but Cook used an idiosyncratic

9  definition of perforation in the study.  They used imaging

10 studies that are not ideal for capturing perforation; and we

11 have an e-mail from their vice president of regulatory science

12 corroborating that, that they didn't use CT imaging, which is

13 what's ideal and recommended for capturing perforation.

14        So in essence, our experts want to analyze whether

15 the study was sufficient to capture perforation to begin with,

16 whether it was set up in a way that it wouldn't be likely to,

17 and whether it, in fact, did; and to do that, we have to go

18 through all of these hundreds, if not thousands -- I don't

19 know how many there are -- of imaging files on the patients --

20 there have to be several hundred at minimum -- and associate

21 them with the case report files that we still don't have and I

22 don't know whether we are getting.

23        So that, Your Honor, just by way of explanation, is

24 I think more about the amount of work that we're going to have

25 to do and work that we're having to do two weeks before the

1    deadline for documents that we requested quite some time ago.

2          THE COURT:  All right.  So let me ask Mr. King if

3    he's going to respond.  What you submitted to me, Mr. King,

4    was that all raw data that presently exists and is in the

5    possession of Cook has been located and will be produced

6    hopefully by today.  What's the status on that?

7          MR. KING:  Mr. Boyers can better address that than

8    me, Your Honor.

9          THE COURT:  Good afternoon.

10         MR. BOYERS:  Thank you, Your Honor.  We hope to have

11   the raw data shipped out to the Plaintiffs today.  There has

12   been a weather issue with the (inaudible) that information to

13   us.  We expect to have it tomorrow to ship to them tomorrow.

14         It has 24 exports of raw data related to the OUS

15   study and the GTUS study.

16         There were ECRFs we've determined, and that raw data

17   has the information from the ECRFs.  We will need to work with

18   the Plaintiffs and our client on linking that raw data in a

19   way that makes it usable; and we're in discussions with our

20   clients on that, but the raw data itself will be produced

21   tomorrow.

22         THE COURT:  Okay.  And with that understanding,

23   Mr. Schultz -- it's hard to say until you see the data, but

24   where does that leave you in terms of wanting something

25   additional?

12

1          MR. SCHULTZ:  Well, I guess, Your Honor, the only

2    question I would have based on what I just heard is whether

3    Cook has any indication that all of the data they have and are

4    producing are, in fact, all of the data there ever were.  And

5    if there's any that's been lost or destroyed to its knowledge,

6    I guess we would want to know what that was so we can try and

7    make sense of what we're getting.

8          Do you know, Mr. Boyers, in terms of the production?

9          MR. BOYERS:  My understanding from the client is

10   that they did not have regular CRFs for either study, that

11   they did it as ECRFs and that this raw data is the entirety of

12   the raw data.

13         THE COURT:  All right.  Well, let's produce that.

14   And you said they would get that tomorrow?

15         MR. BOYERS:  Yes, Your Honor.

16         THE COURT:  And then we'll see if there's still a

17   dispute at that point.

18         I've got to move along through these as reasonably

19   quickly as I can.

20         The next one is animal studies reports; and it's

21   broken down into subcategories, A through E.  A relates to

22   P030118D-03A, a migration test in vivo of sheep.  And

23   plaintiff is saying it didn't receive certain information,

24   although the defendants have indicated that plaintiffs are

25   simply confused about what has been produced and not produced

13

1    due to a mislabeling on a cover page.

2            Mr. Schultz --

3            MR. WILLIAMS:  Mr. Schultz can address the issue.  I

4    believe it's in this broader category 3 is where you'll see

5    the second half, tabs A through I in the binder, that

6    Mr. Schultz is going to reference.

7            THE COURT:  All right.  Go ahead, Mr. Schultz.

8            MR. SCHULTZ:  Thank you, Judge.  Maybe the easiest

9    way to address this initially is to say there is confusion.

10   We are putting this together from Zaragoza, some of the other

11   outside contractors, kind of like reassembling the Dead Sea

12   scrolls.  We get bits and pieces.  We try and correlate it.

13           I don't claim to have perfect knowledge of what they

14   did or what the documents represented, but we do have a story

15   to tell.  I think, first of all, Cook is correct that -- if

16   you'll look at I believe it's going to be tab D in the folder

17   Mr. Williams gave you, there's a draft study protocol.

18           This is a protocol that was in the possession of

19   Mr. Arne Molgaard-Nielsen.  He's the director of research for

20   William Cook Europe.  It's from April of 2005, and it

21   describes a study where they would shoot synthetic clots into

22   filters in sheep; and they would test for acute migration.

23   They would -- if they had acute migration, it would come back

24   and do a 30-day implant and then retest with the clots.

25           So there is a peculiar test in that they're putting

1  polyurethane clots into sheep, and I personally have not seen

2  another one like that.  So it stands out.

3          On the cover of it, Your Honor, it has that

4  designation, the study No. 03A.  Mr. King is correct that if

5  you look on the subsequent pages on the headings that have a

6  study number, that ends with O2A.

7          I think where the disconnect is that Mr. King says,

8  well, we've produced -- Cook has produced O3A and O2A, and

9  they have produced final reports for studies bearing those

10  numbers; but neither of those is this study.

11          The rest of the -- and we know that, for example,

12  because the protocol that I first directed you to from May of

13  2005 calls for 6 filters to be implanted into 12 sheep.  It

14  identifies Dr. De Gregorio at the University of Zaragoza in

15  Spain as the investigator who will carry out the study.  The

16  next to the last page indicates, by the way, that the data

17  will be maintained for 15 years and will be accessible to the

18  sponsor of the study, which is William Cook Europe.

19          And we know, Judge, that this study happened because

20  if you look, for example, through this notebook -- and I won't

21  belabor it but tab A of the notebook that you have of Bates

22  045-4139, that's a November 2004 -- this by the way

23  (inaudible) is pending with FDA -- November 2004 document

24  showing that this study was designed to test filtration

25  capacity, the acute and long-term migration risks as I

 1  described, including the synthetic clots.

 2          The next document, tab B, 0454140, is from December

 3  of 2004; and Dr. De Gregorio is sending a letter here.  It

 4  says he's collaborated for several years in a habitual way

 5  with Cook.  He has confirmed this project.  He's asked for

 6  payment of a scholarship in connection with the project, and

 7  he mentions that Frederico Bell and Alberto Llorente of Cook

 8  designed the study.

 9          The same day at tab C, you'll see document 0831782.

10  That's Dr -- or excuse me -- Mr. Molgaard-Nielsen of Cook

11  sending an e-mail confirming that he conceived the study, that

12  there's a 10,000 euro budget for it and he says, quote, "If

13  Dr." -- "if he," meaning Dr. De Gregorio -- "can save us with

14  respect to the migration question, that is naturally worth a

15  lot." So we see that Cook has designed, conceived and paid for

16  the study.

17          If you look over at tab E, we see in March 2005 a

18  document 0831050.  That is an e-mail from Alberto Llorente to

19  Mr. Molgaard.  He says there are several issues about

20  Zaragoza.  There's the project in sheep filtration tests.

21  Some of the particles of 3-millimeters across the filter.  No

22  (inaudible) in 5.

23          What I infer from that, at least, Your Honor, is

24  that they are already undertaking some testing with these

25  synthetic clots because they indicate in that protocol that I

1   first directed you to that they would be 3-millimeter,

2   5-millimeter clots.  So this testing clearly is being carried

3   out.

4           If you look at tab F, in fact, at 0775816, we have

5   an e-mail from Mr. Molgaard to April Lavender, who is the

6   regulatory at Cook; and he says -- he speaks of this

7   experiment with clot injections and indicates that he

8   personally participated in the work along with two others

9   Cook Denmark and two from Cook Spain.  He mentioned implants

10  for 30 days; and if that's the case, again, if they failed the

11  acute migration, they were going to do 30-day implants and

12  move to the second phase.

13          So again, there's at least the suggestion here that

14  that's what this test is.

15          So --

16          THE COURT:  So the bottom line is -- there's no

17  confusion.  You think there is a test study that has not been

18  produced?

19          MR. SCHULTZ:  Not only the report of the study, Your

20  Honor, but all of the data, the e-mails, photographs,

21  histology, anything else that's done.

22          The O3A and O2A, Your Honor, that Mr. King refers to

23  you are different studies.  O3A was a study that we do have

24  that was two sheep where they placed multiple filters in them.

25  That was in November of 2004 before this was even conceived.

17

1          The other, O3A, that Mr. Cook -- or excuse me --

2    Mr. King has mentioned that they produced -- excuse me, O3A is

3    the diameter study involving two sheep.  O2A was an acute

4    animal migration test done in Oregon, not in Spain; and it was

5    done in May of 2004, a year before this six sheep (inaudible)

6    that we see the protocol for here; and that test in Oregon was

7    two sheep and two filters.

8          So I agree with Mr. King.  I think they were

9    probably using the protocol from one of those earlier studies

10   as a template when they drafted the protocol that I first

11   showed to you, and that's why those numbers are on there.  I

12   don't know what the study ultimately was called, but we have

13   clear evidence or bits and pieces that it was carried out; and

14   we have no documentation of it.

15         The only other thing I would point out in this

16   regard, Your Honor, I put some other stuff in the binder,

17   including, for example, an e-mail from Dr. De Gregorio to

18   Mr. Molgaard where he talks about an ongoing study with Cook's

19   perforating.  He attaches a -- an actual entire draft article

20   for a study that was, I believe, 12 sheep, 24 filters, where

21   they had 5 Celect perforations out of 24 Celect filters.  This

22   was at the very time (inaudible) while 10K is pending with FDA

23   and they've represented to FDA under the VCA1 study they had

24   no perforations out of 40 filters in sheep.  So this is

25   material.  It's happening at the same time.  That article is

18

1  never published, and we don't have any of the results of it,

2  except that maybe half of it represents a study that we are

3  aware of.  We just can't be sure.

4          THE COURT:  Do you have -- so do you have an

5  identifying number or something?  You call it in your e-mail

6  the P030118D-03A, but I'm not sure that's the right number.

7          MR. SCHULTZ:  Right.  It would be the study that is

8  identified in 0484250, that protocol that bears that study

9  name; but again, probably because they used a template from

10 that earlier 038 study, we don't know the name of the study,

11 but we know that it was carried out.

12         THE COURT:  What was that number of the study?  Say

13 that again?

14         MR. SCHULTZ:  The Bates number on it, Your Honor, is

15 0484250; and it was called a migration test in vivo sheep.  It

16 had the 03A and O2A number on the template protocol.  We've

17 not seen the final protocol or any reports from it.

18         THE COURT:  But for simple reference, you're saying

19 it's the migration test identified in Bates stamp No. 0488250?

20         MR. SCHULTZ:  Yes, sir.

21         THE COURT:  All right.  Well, why don't we hear from

22 the defendant on that situation.  It may be that the defendant

23 heard something new now or maybe not.  Who's going to address

24 that?

25         MR. KING:  Mr. Simmons can better address that.

1          THE COURT:  All right, Mr. Simmons, go ahead.

2          MR. SIMMONS:  And I think there is a little bit of

3   confusion based on these incorrect numbers.

4          THE COURT:  If you would like to have a seat, you

5   may.

6          MR. SIMMONS:  Thank you, Your Honor.  The fact is

7   there were no -- there were two 03 alpha studies.  There was

8   one 03 alpha study and one 02 alpha study.  And a lot of this

9   confusion starts that Zaragoza did a number of tests for Cook,

10  and some of them are related to migration but not in the sense

11  of just throwing clots at it but also the radial force that

12  the filters put out.  Those were the studies they did in the

13  summer of 2005 and the fall of 2005.

14         So we don't have any indication in Cook's possession

15  that there is another 03 alpha study that Zaragoza did.

16         THE COURT:  Well, you can't produce what you don't

17  have; but if it had to be produced, they've identified it as

18  the study that's been identified in your Bates stamp numbered,

19  what is it, 0484250.  Is there something that correlates to

20  that?

21         MR. SIMMONS:  Not that we've been able to find in

22  any of our records, Your Honor.

23         THE COURT:  Okay.

24         MR. KING:  Your Honor, if I may add --

25         THE COURT:  Hang on a second.  Mr. King, as I've

20

1   told you before, whenever you have something to say it's

2   generally helpful; but I need to really have one lawyer

3   address each of these issues if at all possible.  Otherwise --

4           MR. KING:  Sorry, Your Honor.

5           THE COURT:  That's all right.

6           So I think that takes care of 3A.  Now, 3B, I -- for

7   the record, 3B is P03118D-04 animal comparison test.  I think

8   it relates -- at least one of the issues in 3B also relates to

9   3E, retrievability of the Celect and Günther Tulip vena cava

10  And the overriding issue seems to be whether, in fact, those

11  items are in defendant's custody and control; and you also

12  seem to have a disagreement about that, which I think is

13  probably the primary disagreement from the plaintiffs'

14  perspective?  Is that the issue?

15          MR. WILLIAMS:  Mr. Schultz can address that issue,

16  Your Honor.

17          THE COURT:  Mr. Schultz, can you address 3B and 3E?

18          MR. SCHULTZ:  I can, Your Honor.

19          3B, in a word, the defendants have suggested that

20  there is a publication.  They cite the publication in the

21  e-mail and that that is the final report, so to speak, of this

22  study, which ends with 04A.  That cannot be the case, Your

23  Honor, because the protocol that I have identified as the

24  study for which we would like the data, final reports, et

25  cetera, is a 12-filter, 12-sheep study.

21

1           The final published -- and by the way, one of the

2    primary end points in that protocol and one of the reasons

3    it's of interest to us was perforation or penetration of the

4    vena cava.

5           THE COURT:  Right, but could you address the issue

6    of custody and control because at least on 3B, Zaragoza, I

7    think there's a serious question as to whether that is in

8    Cook's custody and control.  They're not a Cook entity.  The

9    defendant worked with the group I think to develop that

10   protocol but looks like the study was performed and published

11   independent from Cook.

12          MR. SCHULTZ:  I will address that, Your Honor.

13   Thank you.

14          First of all, it's not complete to say that Cook

15   designed the study and Zaragoza carried it out.  We don't know

16   exactly what participation they had in each of these studies.

17   We've already seen on the previous one that the director of

18   research personally was involved in carrying out the study.

19   We have other e-mail traffic where they talk about them

20   traveling down for it.  We know they paid for the study.  The

21   publication that's referred to on 3B is -- does not pertain to

22   the same study as the protocol that I've described.  So I

23   think there is a gap there.

24          What's important to understand, Judge, is that

25   Zaragoza and Cook go back many years, as Dr. De Gregorio's

22

1   letter that I've already showed you indicates.  We have an

2   e-mail from 2013, in fact, where Dr. De Gregorio refers to

3   Mr. Molgaard as "My Dear Arne" and says, "Of course, what is

4   confidential between friends is always confidential."

5           This is not simply an external testing lab that they

6   used on a one-off basis, Your Honor.  They have a longstanding

7   relationship, including publications together, presentations

8   together.  Cook has paid a lot of money to Zaragoza.  The law

9   that I've been able to locate, Your Honor -- and I can cite

10  you a couple of cases.  I don't have a Seventh Circuit case,

11  for which I apologize; but the Second Circuit --

12          THE COURT:  Hold that.  I think the defendants are

13  excited to brief this; so if that's going to happen, you don't

14  need to cite me to a bunch of case law right now because we

15  may have to brief it.  I've got an idea about that I want to

16  share with counsel in a few minutes.

17          Anything else you want to say about custody and

18  control?  I think the issue on 4E is an easier issue perhaps

19  for the plaintiff; but 4B, I've got some question about that.

20          Let me just ask the defendant to respond to what you

21  just heard with respect to 4B.  Who's going to address that?

22  Four.  I meant 3.  Excuse me.

23          MR. SIMMONS:  The draft protocol did call for 12

24  sheep, but it was a draft protocol that was pulled from a

25  template.  The subsequent protocols were two sheep, four

23

1  filter studies.  Then Cook has produced everything that it has

2  in its possession on those studies.

3         And a little bit of history might be useful,

4  especially as we get into the 4 alpha and 5 alpha and 5 alpha

5  tests.

6         THE COURT:  Produced everything.  You mean

7  everything in your custody and control.  There could be more

8  but you don't -- I mean, that's the issue, right, whether

9  there's something else that needs to be produced that's not in

10 your custody and control.  Were you going to say something

11 else?

12        MR. SIMMONS:  Just by way of history -- and I think

13 this might clarify some issues here.

14        We produced everything that we have with respect to

15 04 alpha, the test carried out in June, July of 2005.  And

16 that was essentially like an alpha test where we're learning

17 about the types of machines they would need to diagnose the

18 radial force and how firmly the hooks attached to the cava.

19        And then they went back in later that year, October,

20 November of 2005, and did the 05 alpha test.  And that is the

21 test I believe Mr. Schultz has the raw data that we've

22 produced related to that test as well as the protocols that

23 we've done with that test.

24        So to the extent that there was -- that Mr. Schultz

25 is looking for a final report for the 04 alpha test, there

24

1  would be none; and we have e-mails to suggest that no final

2  report was done because it was a learning experience type test

3  to figure out the sorts of machinery and methods they would

4  need to do a feasibility study, if you will.

5         And then in 05 alpha where they were able to develop

6  better raw data, Mr. Schultz has that information.  So I

7  wonder if that history might be useful in discerning which of

8  these Zaragoza tests we've been talking about because there

9  have been multiples; and unfortunately, when Dr. De Gregorio

10 and the folks at Zaragoza corresponded with Arne, they would

11 often mix issues.  So when we have these e-mails that mention

12 this test and that test, they're not discrete in the sense

13 that they're keeping e-mail tied to one test or another.

14        MR. SCHULTZ:  And if I may, Your Honor.

15        THE COURT:  Sure.

16        MR. SCHULTZ:  On 04A, I think that's a perfect

17 example of why we're interested in these materials.  I think

18 what we've gotten, by the way, is everything in Cook's

19 possession.  The issue is whether these are in their control,

20 given their longstanding relationship.

21        The e-mail on 04A said they didn't do a final report

22 because they didn't see what they expected, and that obviously

23 piques our interest.  What did they see and why was it such

24 that it prompted them not to create a formal report?

25        Certainly the study generated data.  They typically

1   generate histology, photographs, forms that are filled out as

2   the study is carried out.  All of that under the protocol

3   should be in William Cook Europe's possession.  If it's not,

4   it's our argument that it's within their control; and it

5   should at least be requested of Zaragoza, even if it can't be

6   compelled.

7           THE COURT:  So defendant may want to brief this.  I

8   don't know if you still want to do that.  Here's my thought on

9   this.  We're under a tight time frame.  We've already got the

10  issue of supplementation of expert witnesses.  If you brief

11  it, it's going to take more time, which hurts the plaintiff,

12  frankly.

13          As I look at this based on what you've submitted and

14  what I've heard, here's kind of the way I'm leaning, although

15  I reserve the right to change my mind on that particular

16  issue.

17          On 3B, which involves Zaragoza, I've got a

18  question -- a serious question I think whether Cook has

19  custody and control in that situation.

20          As I mentioned, defendant did work with the group to

21  develop the protocol; but it seems like the study was

22  performed and published independently.  I would think -- I

23  think it would be a stretch to find custody and control for

24  the 3B item.

25          The 3E item strikes me as something that's

1  different.  3E, it looks like there truly is a longstanding

2  relationship between Cook and the Dotter Institute.  There

3  does appear to be financial support going on there.  There

4  appears to be the fact that it was specifically contracted

5  with the defendant to perform studies, and I think the Dotter

6  Institute had provided Cook with copies of the results of the

7  study.  All of that seems to suggest custody and control to

8  me.

9         So you don't really need to respond to this right

10 now.  I'll come back to it.  But what I'm kind of thinking

11 about here is with respect to 3B, there's no custody and

12 control.  There's no obligation for any further production;

13 but with respect to -- I keep saying 3 -- 4, excuse me -- no,

14 3.  3B, there's no custody and control for the reasons I've

15 stated; but 3E, there does seem to be custody and control.

16        Now, so that's likely how I would rule on this.  If

17 later in this conference I get to the point where I give you

18 my rulings, what I'm thinking is you all kind of as a

19 compromise, you get one.  You don't get the other, and we

20 don't brief it.  So keep that in your thought process for now.

21 We'll kind of come back to that.

22        That takes us to 3C.  Has that issue -- looks like

23 defendant was going to produce on that and it might be

24 resolved?  Is 3C resolved?

25        MR. SCHULTZ:  I'm taking a look, Judge.

1          THE COURT:  3E -- 3C, excuse me -- was FS080102, 12

2  sheep, 12 filters.

3          MR. SCHULTZ:  Right.  So very quickly, Your Honor,

4  the story here is -- again, we're talking about names of

5  studies; and we may be talking about protocols were based on

6  templates that bear the wrong identifying numbers.

7          What we know is this.  In April of 2005, Cook

8  created a draft protocol that it called VCA2.  That was 12

9  sheep, 12 filters.

10          THE COURT:  Hang on just a second.  I just want a

11  quick answer to the question.  Was it produced?  Has it been

12  resolved?  Are you saying it hasn't been produced and it has

13  not been resolved?

14          MR. SCHULTZ:  We're saying we don't know, Your

15  Honor.  They have produced something called VCA2 that was done

16  three years later on a different number of sheep.  So we're

17  trying to clarify whether the 12 sheep, 12 filter was ever

18  done.

19          THE COURT:  All right.  Well, let's have the

20  defendant explain what they think they've produced.

21          MR. SIMMONS:  Well, we did produce --

22          THE COURT:  That's Mr. Simmons, for the record.  Go

23  ahead.

24          MR. SIMMONS:  Yes, Your Honor.  My apologies.

25          We did produce all (inaudible) with the Victor

28

1   Charlie Alpha 2 study, VCA2.  The original draft that

2   Mr. Schultz had cited to us in his original complaint was a

3   draft of 2005.  It was very early, and it did have a mention

4   of VCA2; but we've also produced subsequent protocols where it

5   had been revised to actually be tailored to what was actually

6   done in VCA2, which was a 2-sheep, 4-filter study; and we've

7   produced the service proposals.  We've produced the final

8   protocol with the signatures on it; and I sent that to

9   Mr. Schultz and plaintiffs' leadership counsel earlier today,

10  and those have been produced since mid-2015.  So plaintiff

11  have those in their possession.

12          Then we have the draft reports that eventually got

13  circulated before the study was terminated, and those have

14  been produced as well.

15          In addition to that, all the imaging, the pictures,

16  histology, slides or pictures of the histology slides at least

17  have been produced to plaintiff.  So everything that we have

18  on VCA2 at least in digital format has been produced, and then

19  the histology slides after they're scanned will be produced.

20          THE COURT:  Will be produced when?

21          MR. KING:  A week from --

22          THE COURT:  Oh, that's what you were talking about

23  before, by the 17th?

24          MR. KING:  Yes, Your Honor.

25          THE COURT:  Does that help in any way, Mr. Schultz?

1           MR. SCHULTZ:  It may, Your Honor.  I think the issue

2    distills into this.  Mr. King said there is no 12-sheep,

3    30-day FS080102 study.  I understand that.  I understand VCA2

4    and that FS number were the 2-sheep study.  They've produced

5    all of that.  We're getting the slides copied now I've learned

6    this morning.

7           The question remains, Your Honor, we know that they

8    planned the 12-sheep study.  They planned to do it and present

9    it to FDA on April 29th of 2005.  We have a protocol of it

10   from April.  We have a table entry suggesting that it was

11   begun in 2005 and $50,000 were either budgeted or spent for

12   it.

13          So the question is this:  Whether it went under the

14   name VCA2 FS0080102 or any other number or name, was there any

15   12-sheep, 30-day study done back in 2005 in anticipation of

16   meeting with the FDA?  That's the real nub of the question.

17          THE COURT:  Anything else you can add on that,

18   Mr. Simmons?

19          MR. SIMMONS:  Yes, Your Honor.  The draft protocol

20   that Mr. Schultz had cited to us on this issue, while it did

21   have the VCA2 on one of the template forms, it also had a

22   footer that said TS040008, which was the original study on

23   sheep that fits this description.  It ended up being more than

24   12 sheep.  I believe it was 20, if memory serves, but all the

25   documentation on that study has also been produced.

1          MR. SCHULTZ:  Your Honor, the VCA1 study he's

2    referring to had already passed the 180-day mark by the time

3    this protocol was created.  So this is not a holdover protocol

4    from VCA1 which was conceived and designed more than a year

5    before.

6          My question again is regardless of what name it

7    might have gone under, we know Cook planned a 12-sheep,

8    12-filter study for presentation to FDA in April of '05.  We

9    have a protocol for that study from March and April of '05.

10   They didn't present it to FDA.  The question is did they do

11   the study?  This is not -- we know what we have from VCA1.  We

12   know what we have from the 2008 version of VCA2.

13   Respectfully, that response didn't answer the question that we

14   have remaining.

15         THE COURT:  Mr. Simmons, do you have anything else

16   to add on that?

17         MR. SIMMONS:  I don't, Your Honor.  I'm afraid I'm

18   not exactly sure what Mr. Schultz is looking for at this

19   point.

20         THE COURT:  I think you all are kind of --

21         MR. SIMMONS:  I think, Your Honor, we just did not

22   do that study.

23         THE COURT:  I think -- maybe there's a agreement

24   over that or a misunderstanding about it, but I don't think

25   you talking about that issue anymore is going to get us any

1  further down the line to resolve the issue as it relates to

2  3C.

3          So that brings up 3D, which was the BCOB (TS090024),

4  which I think essentially relates to involvement of the Cook

5  platinum filter, which I think the defendant is declining to

6  produce those for various reasons, essentially saying that's

7  beyond the pale of what's at issue at least with respect to

8  the Bellwethers.

9          Is it Mr. Schultz again that's going to address

10  that?

11          Mr. Schultz, do you want to address 3D?

12          MR. SCHULTZ:  Yes, Your Honor.  Thank you.

13          The BCOB study, the word "platinum" doesn't appear

14  anywhere in this protocol.  I am sure it doesn't appear

15  anywhere in the final report, although we don't have it,

16  because a summary PowerPoint of the report in August of 2009

17  refers to it as the protocol does as a Celect prototype.

18          The platinum 510K was more than three years after

19  this study was done.  What they were doing was testing the

20  Celect filter with different modifications to try and fix the

21  problem of perforation that it had; and the actual title of

22  the protocol, Judge, is GLP study for safety and performance

23  of prototype Celect vena cava filters.  This is -- it is

24  referred to as a Celect with elongated legs that did three

25  years later become the platinum; but it's our position, Your

32

1   Honor, the order the defendants referred to, your order said

2   that they would not have to put Celect platinum into search

3   terms, and that's another issue that I'm not here to address;

4   but the point is this was not a Celect platinum document.  It

5   wasn't not produced because it contains the word "platinum"

6   because it doesn't.  The prototype -- or excuse me -- the

7   protocol doesn't at least.

8          So any prototype testing on the Celect in order to

9   fix a problem that many of our clients had with the Celect,

10  that being perforation, certainly is relevant; and we believe

11  we should be entitled to all the data, the histology, and

12  everything else related to that study.

13         THE COURT:  All right.  Defendant.  Mr. Simmons?

14         MR. SIMMONS:  Mr. Schultz's characterization of this

15  as a test, a prototype that eventually became platinum, is

16  correct.  I disagree and object to the characterization that

17  it was entirely to prevent perforations.

18         That said, that is why it has not been produced up

19  until this point; and we are speaking with our clients on

20  strategy on production of that going forward.

21         THE COURT:  In the event that anything might be

22  produced, do you have a time frame?

23         MR. SIMMONS:  I would defer to my colleague,

24  Mr. King, on that.

25         THE COURT:  Mr. King?

33

1          MR. KING:  No, I can't give you a time frame.

2          THE COURT:  Hang on a moment.

3          Okay.  That takes us to item No. 4, which there's an

4    indication -- and number 4 is weekly and monthly complaint

5    summaries from William Cook Europe.  There is some indication

6    that that might be resolved.  Is that resolved?

7          MR. SIMMONS:  I believe so, Your Honor.

8          THE COURT:  And the next item -- actually, the next

9    item, No. 5, I found to be one of the most fascinating items

10   of them all.  It was Leigh Conner's personnel file.  Has that

11   been resolved?

12         MR. SIMMONS:  I believe so.

13         THE COURT:  Let me tell you why I find that

14   fascinating, because I have smart lawyers on both sides; and

15   the submission from plaintiffs' counsel -- let me make sure.

16   Yes, the submission from plaintiffs' counsel identify that as

17   Leigh Conners' personnel file with no apostrophe.  The

18   submission from the defendant is Leigh Conner's, S apostrophe,

19   personnel file, triggering a raging debate as to whether the

20   apostrophe is appropriate or not.

21         MR. WILLIAMS:  It's appropriate.  I concede that

22   that is appropriate.

23         THE COURT:  Well, there were some who perhaps were

24   not willing to concede it quite as quickly as you; but I

25   thought the apostrophe was appropriate, Mr. Williams, so I

34

 1    appreciate your concession.  That issue has been resolved.

 2              Five.  The things we talk about around here.

 3              That brings up No. 6, the image files that Cook

 4    overlooked, has that been resolved?

 5              MR. WILLIAMS:  Your Honor, very possibly.  Within

 6    the last four weeks, we've been produced more than 180,000

 7    documents.  So we are still trying to comb through those.

 8              THE COURT:  Possibly resolved.  If not, you can

 9    always bring it back to the Court's attention.

10              MR. WILLIAMS:  Thank you, Your Honor.

11              THE COURT:  All right.  You're welcome.  No. 7 --

12    I'm sorry, was there something else?

13              MR. WILLIAMS:  No, I was ready to move on.

14              THE COURT:  Number 7 is Cook's continued e-mail --

15    what's called destruction, although in the defendant's

16    version, the destruction is in quotes.  So once again, a

17    difference in maybe quotations, punctuation.

18              This is an issue -- it's interesting whether I

19    should be addressing this or not.  You all have appropriately

20    indicated that perhaps this is something Judge Young might be

21    raising with you on February 9th at his status conference.

22    Certainly it would be appropriate to defer to him if that's

23    what he wants to do.  If not, we can certainly address it; and

24    I can give you a ruling on it.

25              How do plaintiffs want to proceed?

1          MR. WILLIAMS:  Your Honor, as we -- I mean, and this

2     issue has really come to the forefront for us within the last

3     couple of days as we've gone through some depositions that

4     were taken recently.  And so we put it on both agendas not

5     knowing at the time the agendas were put out which judge would

6     be more appropriate to handle the issue.

7          At this point, we think --

8          THE COURT:  I guess it kind of depends on what the

9     ruling is, right?

10         MR. WILLIAMS:  I suppose in hindsight, sure.  But at

11    this point, considering the relief that I'm going to ask the

12    Court for on this issue, we think it's properly put before

13    you.

14         THE COURT:  Okay.  What do the defendants want to

15    do?

16         MR. KING:  Your Honor, this is Doug King, for the

17    record.  We have put everyone who is involved in the sales and

18    marketing and clinical support of filters in the strategic

19    business unit on hold --

20         THE COURT:  I understand your position.  Did you

21    want me to rule on this or do you want me to defer to Judge

22    Young?

23         MR. KING:  Oh, we can -- we'll let you -- not let

24    you but have you rule on it.

25         THE COURT:  Because you all have indicated --

36

1        MR. KING:  We're happy to have you rule on it.

2        THE COURT:  All right.  So go back to the plaintiff

3  then.  It sounds like you have something you want to say about

4  that, Mr. Williams, so go ahead.

5        MR. WILLIAMS:  I do, Your Honor.  The binder I gave

6  you, the first five tabs, the number tabs, are going to kind

7  of walk us through this issue.

8        The first tab behind tab 1 is Cook's electronic

9  information policy.  It was produced to us.  On the second

10 page you'll note in the highlighting Cook's typical document

11 destruction policy is that deleted items and e-mails are

12 deleted off the system within 30 days, and e-mails in the

13 inbox of folks are deleted within 60 days.

14       If you go to tab 2, we've got case management order

15 11, which this Court entered back in 2015.  And in this case

16 management order, I've highlighted a number of times in which

17 the Cook entities stated that litigation hold notices were

18 issued.  If you look on page 2 under section B2, they

19 suspended any procedure or process that would result in the

20 elimination or transfer to a less accessible medium of any

21 unpreserved data.

22       If you go through, there are a number of statements

23 throughout this CMO that say the parties understand and will

24 meet the preservation obligations they have under the federal

25 rules of civil procedure.  This was signed by Mr. Lee for the

1  defendants and Mr. Martin for the plaintiff.  That was back in

2  2015.

3       We had assumed that a litigation hold and a document

4  preservation procedure had been put into place.

5       THE COURT:  Well, there was a litigation hold,

6  right, affecting allegedly 191 people?

7       MR. WILLIAMS:  Well, Your Honor, if you look at

8  Mr. King's e-mail -- and I will address this with the

9  deposition that we took last week or two weeks ago -- he says

10  quote, "However, as of this writing, which was yesterday,

11  currently, these people are under hold."  That says to me, if

12  you're saying as of this writing, that a litigation hold very

13  possibly could have been put in place as late as yesterday.

14       And if you look on tab 3, this is the deposition --

15  or excerpts of the deposition of Courtney Whitelock.  She was

16  a sales representative who detailed or visited the treating

17  physician for Bellwether plaintiff, Ms. Elizabeth Hill.  In

18  fact, we have a document that suggests that she visited that

19  physician close to 150 times in five years.  That's close to

20  two times a month for five years straight.

21       When asked in her deposition if she recalled any

22  statements at all that she made to that physician, she said

23  no, which highlights the problem.  If you look on the page --

24  the third page of tab 3, the first thing we get on these two

25  pages is Mr. Heaviside asks her, "Has Cook done anything to

1  look at your computer or preserve your material?"

2          She says, "Yes, within the last six months."  So

3  that we're talking fall of 2016.

4          The following page on -- it's page 17 of the

5  deposition.  Mr. Heaviside asks, "Were you ever advised by the

6  legal department or anybody else of the need to preserve

7  documents, including e-mails as part of a litigation hold?"

8          She says, "Not to my knowledge."

9          He says, "So no one ever told you that you needed to

10  preserve documents for litigation?"

11          She said, "Right."

12          He then goes through and has her describe the fact

13  that she had plenty of e-mails that were not produced when we

14  got her custodial file.  She states that -- Your Honor will

15  remember we talked ad nauseam on several occasions about call

16  notes.  She says in her deposition that after she visited a

17  physician, she would e-mail the details of that meeting to her

18  supervisor, and that material should be kept in her e-mail.

19          When Mr. Heaviside said, quote, "The mystery is why

20  don't we have any of your e-mails before 2012 and after 2013.

21  You can't answer that question, right?"

22          She says, "It's not part of my job to keep track of

23  e-mail."  This is on page 32 of the deposition.

24          When Mr. Heaviside asked her if she would even agree

25  sitting there today at her deposition -- if she would agree to

39

1  not delete anything off of her iPad, you will see the colloquy

2  with Ms. Pierson, who refuses to let her answer the question.

3          As we go through this, she notes that they had all

4  sorts of things, call notes, preplanning call worksheets, all

5  this information that would have memorialized what these sales

6  reps said to these physicians; and this is a Bellwether case.

7  Those communications are crucial.

8          THE COURT:  What title did Courtney Whitelock have?

9          MR. WILLIAMS:  Was it a district manager?

10         MR. MARTIN:  Ms. Whitelock is a sales rep, and I

11 believe the actual title is district manager.  Mr. Williams

12 will talk in a minute about Leigh Conners, Your Honor.  She is

13 actually Ms. Whitelock's regional manager, over about eight

14 people like her.

15         THE COURT:  For the record, that was Ben Martin.

16         Go ahead, Mr. Williams.

17         MR. WILLIAMS:  Throughout her deposition then --

18 this is on page 109, which is also behind tab 3 and

19 highlighted -- Ms. Whitelock explains that she had call notes.

20 She doesn't know where they are.  She never deleted them off

21 her computer, and she gave her computer to Cook within the

22 last six months.

23         This raises an issue to us of paramount importance.

24 The Hill case, even if we're not talking about when they

25 should have put a litigation hold on earlier -- the Hill case

40

1   was filed in 2014.  This is a sales rep that detailed to

2   treating physicians over 140 times.  She testified under oath

3   that no one told her to preserve her documents.  No one told

4   her about a litigation hold, and nobody knows where her

5   e-mails are, the very e-mails that set out what she told this

6   physician when she made sales rep calls.

7           THE COURT:  What are you asking for?

8           MR. WILLIAMS:  What we are asking for -- and there's

9   plenty more to back this up; but to cut to the chase, we did a

10  lot of looking over the weekend and even last night on what

11  MDL courts do -- it may be surprising or not.  This is not an

12  uncommon issue -- and what they do when these types of things

13  come up; and I think the best approach to this is to do it

14  methodically.

15          What we need at this point, we've got a lack of

16  evidence on two Bellwether trials.  What we need at this point

17  is a 30(b)(6) deposition about the litigation hold, about the

18  preservation of e-mail, the dates that these things were

19  implemented, who was covered, what they were told, because if

20  there is a spoliation issue here and we're going to try these

21  cases -- if we can prove a spoliation issue, we can get an

22  adverse inference to present to the jury when the evidence is

23  closed.

24          But before asking for that, what we have identified

25  in Ms. Whitelock's deposition and what we have seen in the --

41

1  from CMO11 and the representations that were made about

2  litigation hold and the preservation of documents, at a

3  minimum, we need to do discovery on this limited issue so we

4  can determine what happened to the evidence that we need to

5  prove our case.

6          THE COURT:  All right.  Defendant want to respond to

7  that?

8          MR. KING:  Your Honor, first of all, I would

9  respectfully like to have an opportunity to consult with

10 Ms. Pierson on this, who was at these depositions.  I don't

11 know what these people said in their depositions.  I don't

12 know what -- I don't know the context.  He's taking some

13 things -- and I'm not suggesting --

14         THE COURT:  I know.  There's certain pages in the

15 deposition, not the entire deposition.  I know what you mean.

16         MR. KING:  And I would like to talk to her.  So I

17 would like to have that opportunity.

18         But I would like to mention, Your Honor,

19 Mr. Schultz, who is on the phone, and I have talked about

20 Ms. Whitelock and Ms. Conners before; and No. 1, Ms. Conners

21 is no longer an employee of our company and left the company

22 in 2013, which would have been two years after -- almost three

23 years after the date of implant.  So her laptop would have

24 been taken back by the company, and it no longer exists.  So

25 whatever e-mails Ms. Conners had with the physician prior to

42

1   the implant would have been scrubbed off of her computer, and

2   her computer no longer exists because she left the company in

3   2013 in the fall.

4          Ms. Whitelock, who still works for us, as

5   Mr. Schultz -- we've had this conversation before -- as

6   Mr. Schultz will recall, in Ms. Whitelock's case, she traded

7   in her computer and got a new one, got a new laptop in 2013,

8   again, three years after the implant.

9          And her old computer, which would have kept whatever

10  e-mails that she would have had with Suska, the implanting

11  physician, prior to the implant in 2010 no longer exists.

12         So while what Mr. Williams says sounds pretty good,

13  in the context of this particular case, it's meaningless

14  because these two individuals didn't have computers -- their

15  computers were gone in 2013, one because she left the company

16  and the other because she traded in her computer.  So whatever

17  existed on their computers that is material to the (inaudible)

18  case and material to what was told to the physician prior to

19  the date of implant was gone long before the lawsuit was even

20  filed in 2014.

21         THE COURT:  All right.  So let me ask you this

22  question, Mr. King; and this is an important answer.  When did

23  the litigation hold referenced in paragraph 7 of your e-mail

24  go into effect?

25         MR. KING:  I would have to check with the client.  I

43

1  cannot answer that.

2          THE COURT:  Well, you check that out.  Here's my

3  take on this, and I'll come back to all of these things when

4  we're done; but since it seems to be kind of of great import

5  right now, I'm sensitive to the notion that if there's

6  information not being kept in violation of a litigation hold

7  or in violation of understanding with the case management

8  order or otherwise, that there may be a need for a 30(b)(6)

9  deposition.  I don't think we're there yet, but I think you've

10  set forth a basis that causes me to wonder what's going on

11  here.

12          That being said, part of the answer to that question

13  is when this litigation hold went into effect.  It's not maybe

14  the end of the question; but it's an important question,

15  because the defendant -- they're not going to be able to save

16  everything.  They're just not.  There's too much here.  They

17  have to make reasonable good faith efforts to save documents

18  that are subject to the hold or requested in litigation.

19          What they've set forth here is -- at least the

20  representation is that they have placed holds on e-mail

21  accounts of all district managers, regional managers, clinical

22  specialists in the peripheral intervention strategic business

23  unit.  That's i.e., all people involved in marketing supported

24  filters which involves approximately 191 people.

25          If that hold was put in place at the correct time,

44

1   that strikes me as inherently reasonable; but Mr. Williams has

2   come forward with evidence -- at least information today that

3   suggests there may be issues with respect to that.  So I'm

4   going to have Mr. King confer with whoever he needs to confer

5   with and have the lawyers report back to me in seven days on

6   the status of that; and at that point, I will make a

7   determination whether there's going to be a 30(b)(6)

8   deposition to inquire --

9           MR. KING:  Your Honor, may I add one other thing?

10          THE COURT:  Go ahead.

11          MR. KING:  When this litigation began in 2014 and we

12   had our first pretrial conference before you in this room in

13   the fall of 2014, we began to identify people who we knew were

14   involved and put litigation holds on them.  So what this

15   policy we're talking about in my e-mail that was sent to the

16   Court, this is an attempt to blanket the company.  We had

17   previously put litigation holds on different people as we

18   learned they are involved in this case or relevant to it.  So

19   there's not going to be one set time that a litigation hold

20   went into effect.

21          THE COURT:  Well, find out what you can find out.

22   There's been no suggestion to date at least to the Court that

23   there's been any issue with respect to litigation holds.  I'm

24   not suggesting by any of my comments that there is a problem,

25   all right.  And frankly, that's not really what Mr. Williams

45

1   is saying.  Mr. Williams is saying he's got a question about

2   it.  If those things turn out to be what he's concerned about,

3   it could be a huge issue.

4          But we're just at this point trying to determine

5   what happened, and that's why you need to confer with your

6   client and then talk to Mr. Williams and his people; and then

7   let me know in a week where things stand, and we'll do

8   whatever we need to do at that point.

9          MR. KING:  Yes, sir.

10          THE COURT:  That brings us to item No. 8.

11          MR. WILLIAMS:  Mr. Martin is going to address that.

12          THE COURT:  We'll let Mr. Martin speak finally.

13   Excellent.

14          Hello, Mr. Martin.  No, you did speak once before,

15   Cook's boilerplate objections.  I'm not really sure what you

16   want me to do with this because what we have is, you know, a

17   huge litany of objections which are boilerplate to a certain

18   extent.  I'll grant you that; but we also have a whole bunch

19   of discovery, which probably is overbroad in certain respects.

20   So how now do I piecemeal through that and get you a result

21   you want?

22          MR. MARTIN:  Your Honor, I agree with the Court on

23   this, to some extent, yes.  I think -- here's the problem.

24   We've got all of these requests for production,

25   interrogatories.  Each one of them has had numerous

1  objections.  Cook has produced documents; but the problem is

2  that when they produce documents subject to the objection,

3  once we get to trial, the Court, of course, would see the

4  problem if we don't go forward and get a ruling on the

5  objections on matters that we may want to -- we must make a

6  determination as to whether or not anything has been produced

7  subject to an objection or not.

8        THE COURT:  I think -- sorry to interrupt you, but

9  your concern is valid.  That's probably why they amended the

10 rules on December 1st to say if you withhold anything that was

11 subject to an objection, you need to let us know what you're

12 withholding.  But most of this stuff, as I understand it, was

13 probably produced or the objections were raised before the

14 rule was amended.  So in that respect, how do we proceed?

15       MR. MARTIN:  Even so -- and again, I think today may

16 be premature to -- it is premature for the Court to

17 (inaudible) us to present all of the briefing and issues that

18 would be necessary to go through each one of these objections.

19       What I would suggest, Your Honor -- and even under

20 the old rule when these were served, you know, an objection

21 may be appropriate.  It may not be appropriate.  So we just

22 need to get those ruled upon.  What we have been told after

23 trying to work this out is Cook is not going to pull down any

24 of their objections on any of these things.

25       What I think we need to do is make one more stab

47

 1   amongst ourselves.  We need to make a determination as to

 2   which of these requests for production, interrogatories are

 3   something that we need and we need the objections ruled upon;

 4   and then -- and Doug and his team can tell us whether to

 5   (inaudible).  Then we can come back to the Court and have the

 6   Court rule.

 7           So I think we need to make one more stab at each --

 8   we have not gone through each and every one of these yet; and

 9   I think it's going to be necessary for us to do that so that

10   then we can bring this to a court pretty soon but certainly

11   with a little bit more ammunition on ours and their side.

12           THE COURT:  As usual, you've kind of put your finger

13   on it because just candidly, I'm going to require that you do

14   that.  I need you to do that individually on each objection

15   before you dump it all on the Court.  I wouldn't be able to

16   possibly resolve that.

17           So if you can resolve it, great.  If you can't, come

18   back with specific discovery requests and specific objections

19   on what those problems are; and I'll be happy to address them

20   with you.

21           MR. MARTIN:  One of the things, Your Honor, we just

22   wanted to make sure -- the suggestion was made that we were

23   kind of not pushing the objections and we've somehow waived it

24   by some waiting or delaying.  I certainly wanted to keep it on

25   the table.

48

1          THE COURT:  All right.  So it's on the table.  So

2    the final one was complaint files, No. 9, and there is -- the

3    question is whether this has been resolved or whether it's

4    even ripe.  Plaintiffs' perspective?

5          MR. MARTIN:  Your Honor, this is another -- and I

6    think Doug and I -- Mr. King and I -- I'm sorry -- spoke about

7    this prior to you coming out.  This is just -- with the volume

8    of documents that we've received within the last two, three

9    weeks, I am not in a position yet to know if this is off the

10   table or not.

11         THE COURT:  So it's not ripe.

12         Ms. Holtz, would you be kind enough to let those

13   people know who I think are probably -- are they here?  Is it

14   2:30?  What time is my next conference?  2:30?  Oh, we still

15   have 10 minutes.

16         With that, Mr. Williams, why don't you go ahead and

17   unleash your argument with respect to the experts and

18   supplementation.

19         MR. WILLIAMS:  Sure.  And Your Honor, I'm not sure

20   because this has the potential to affect trial dates.

21         THE COURT:  Yes, it does.

22         MR. WILLIAMS:  So I don't know if it's -- you know,

23   if I should address it here with you or if we should do that

24   on Thursday.

25         THE COURT:  That's an excellent point.  If it

49

1    affects a trial date, it affects Judge Young a lot more than

2    it affects me.

3           MR. WILLIAMS:  I'll tell you what we're thinking.

4    We've got -- we received -- and I put in that first folder,

5    inside cover of your binder, there's a summary of the

6    documents that we received in January 2017, which was

7    somewhere between around 30 days prior to the expert reports

8    being done.  We received at least when we put this together

9    close to 186,000 --

10          THE COURT:  Didn't you ask for these documents?

11          MR. WILLIAMS:  What's that?

12          THE COURT:  Didn't you ask for these documents?

13          MR. WILLIAMS:  We did.

14          THE COURT:  They gave them to you.  So don't

15   complain that you got a bunch of documents.  That's what you

16   asked for.

17          MR. WILLIAMS:  We clearly asked for them a couple

18   years ago, and we've got them now.

19          At the end of the day, though, I don't know if

20   supplementation is the right way to go because if we

21   supplement, what will happen is we'll have a report out there;

22   and then if they come across a new document that we just

23   received and they say well, you know, I need to tweak my

24   opinion, well, now we have it -- you know, an impeachable

25   situation when there really shouldn't be one.

50

1          I think if we could get another 30 days to get our

2    expert reports -- I mean, they are substantially completed --

3          THE COURT:  Remind me when the due date is.

4          MR. WILLIAMS:  16 or 15?  February 15th.

5          THE COURT:  15.  17 is the deadline for plaintiffs'

6    reports.  Now, didn't I already say I'm not enlarging those

7    deadlines?

8          MR. WILLIAMS:  You did, Your Honor; but that was

9    before we got dumped with 186,000 documents.

10          THE COURT:  That's right.  You're wanting until

11    March 17th or something?  Isn't that --

12          MR. WILLIAMS:  That's Saint Patrick's Day.

13          THE COURT:  That would be improper.

14          MR. WILLIAMS:  That would be improper.

15          THE COURT:  But yet inherently ironic.

16          And Ms. Pierson, if I saw somewhere -- was it

17    Ms. Pierson that wouldn't agree to that?

18          MR. WILLIAMS:  She had told me and others on various

19    calls that they would object to our supplementation.  We

20    haven't discussed because really we kind of made the decision

21    at least strategically that we think we should just rather do

22    the reports all at once rather than supplement within the last

23    day or two.  So --

24          THE COURT:  Do you think it's possible to grant the

25    request that you've asked for and still realistically keep

1  your trial date?

2       MR. WILLIAMS:  From the plaintiffs' perspective I

3  think it's a possibility.  I honestly am not going to speak

4  for Mr. King and his side.

5       MR. KING:  I would have to consult with co-counsel

6  on this, Your Honor.

7       THE COURT:  Here's what I suggest you do.  Let me

8  get an entry out on this.  Let me tell you what my ruling is

9  going to be; and I'll cobble something together, as it might

10  be helpful to Judge Young to have that in hand when he talks

11  with you.  Are you seeing him on Thursday?

12       MR. WILLIAMS:  Thursday, yes, Your Honor.

13       THE COURT:  What time is your conference with him?

14       MR. WILLIAMS:  Ten.

15       MR. KING:  Ten in the morning, Your Honor.

16       THE COURT:  Thursday, 10 a.m.  Then raise it with

17  him.  I think he's going to be very reluctant to extend

18  deadlines that impact the trial date.  He's got his schedule,

19  and I'm doing everything to keep you on track.  We've

20  conferred here and there with the idea that we need to keep

21  this on track as best we can.  So I don't want to make a

22  ruling on that right now, but I would like him to know kind of

23  what's going on.

24       I do think, without the benefit of a whole lot of

25  discussion or briefing on this, that there's been -- there's

52

1  some additional information that the plaintiffs have received

2  that might cause the need to revisit that deadline to some

3  degree as much as I would hate to do that; but I'll leave that

4  for Judge Young.  Don't tell him I said I was going to extend

5  the deadline because that's not what I said.

6         Is there anything else for today before I give you a

7  quick rundown on where we are?

8         MR. WILLIAMS:  Not from the plaintiffs, Your Honor.

9         THE COURT:  Mr. King?

10        MR. KING:  No, Your Honor.

11        THE COURT:  So I'm going to try to do this as

12  efficiently as I can.  We'll have a record of it, and then

13  I'll try to do a real short entry for the rulings and then if

14  you want the rationale, you can always get a copy of the

15  transcript -- request a copy be transcribed.

16        Let me just get my thoughts together for one moment

17  before I do that.

18        Okay, the first issue relates to the slides,

19  including the plastic embedded slides for VCA1, VCA2 and VCA3.

20        VCA1 has been resolved.

21        With respect to VCA2 and VCA3, I'm going to order

22  that produced to the plaintiffs by February 17th.

23        The second issue presented to the Court relates to

24  materials for the OUS study.  Defendant has indicated to the

25  Court that they will be producing raw data to the plaintiffs

53

1   by February 8th.  In light of that, no dispute is ripe with

2   respect to that production.

3              The next issue is item 3, animal studies.  The first

4   one I will address is 3A, which is P030118D-03A.  This is what

5   defendant identifies as perhaps confusion on the plaintiffs'

6   part as to whether a different study existed.  It's, frankly,

7   not entirely clear from what's been presented to the Court

8   whether it's confusion or whether there might, in fact, be

9   some other study or part of another study that hasn't been

10  produced.

11             To the extent there is something else out there and

12  it's not just the plaintiffs' confusion, it does need to be

13  produced.  I'll identify this as follows:  This study is the

14  migration test identified as Bates number 0484250, and this

15  study and any related documents would need to be produced by

16  February 17th if this has not already been produced.  So if it

17  exists, it needs to be produced.

18             MR. KING:  I'm sorry, Your Honor.  The number you

19  gave was 0484250?

20             THE COURT:  484250.

21             MR. KING:  Thank you, Your Honor.  I just wanted to

22  clarify that.

23             THE COURT:  With respect to 3B, which is

24  No. P03118D-04A, and 3E, retrievability of the Celect and

25  Günther Tulip vena cava, I view those issues as both being

1   ones of custody and control, that is, whether Cook has

2   sufficient custody and control over the items such that they

3   need to be produced.

4        With respect to 3B, I find -- let me make a note

5   here --

6        With respect to 3B, I find that there is no custody

7   and control.  Zaragoza is not a Cook company.  It's not a Cook

8   entity.  The defendant did work with that group to develop a

9   protocol for the testing, but the study was performed and

10  published independently such that I do not believe there's

11  sufficient facts to establish custody and control for purposes

12  of discovery production.

13       I think 3E is different.  I think there is custody

14  and control with respect to 3E involving the Dotter Institute

15  because there does appear to be a longstanding relationship

16  with the defendant.  There does appear to be financial

17  support.  There appears to be some type of a contract with

18  defendant to perform studies; and as a result of that -- I

19  would also think -- I think Dotter provided Cook with a copy

20  of the results of the study.

21       As a result of that, I think there is sufficient

22  facts to establish custody and control for -- 3E would need to

23  be produced but 3B, no.  That would be by February 17th.

24       The next item is 3D which relates to VCOB

25  (TS090024).  This relates to and defendants concern with this

1  coming into this was that platinum was not an agreed upon

2  term.

3          It's true that platinum was not an agreed upon term

4  for search purposes, but it has been presented to the Court

5  and I think it's been established that this testing involved a

6  prototype of a filter that is involved in this litigation.  As

7  a result, the defendant must produce the information sought

8  under 3D by February 17th.

9          Items 4, the weekly and monthly complaint summaries

10 from William Cook Europe, items 5, the Leigh Conners personnel

11 file, and item 6, the image files that Cook overlooked appear

12 to be resolved.  There may be some issue with respect to item

13 6; but as I've said before, if it turns out that something

14 comes up that's, in fact, not resolved, you can always bring

15 it to the Court's attention; but for today's purposes, I'm

16 going to treat 4, 5 and 6 as resolved, with a question mark on

17 6.

18         No. 7 is Cook's continued e-mail destruction.  With

19 respect to this, there is a pretrial with Judge Young this

20 Thursday at 10 a.m.; and I will defer to Judge Young on that

21 issue because this involves a potential issue with respect to

22 trial date because this involves an issue of spoliation.

23         As I indicated to counsel, if there's a serious

24 issue with respect to that, a 30(b)(6) deposition may be

25 appropriate; but the parties need to meet and confer and let

1   me or Judge Young know what the status of that is.

2          Item No. 8 is Cook's boilerplate objections --

3   that's the term used -- and that issue is not ripe.

4          Issue No. 9 are the complaint files, and that issue

5   also is not ripe.

6          Finally, there is the issue of supplementation of

7   expert reports.  The deadline for plaintiffs' expert reports

8   is February 15th, and plaintiffs have asked to March 17th to

9   supplement their reports; and that issue is something that I

10  asked them to raise with Judge Young at the Thursday

11  conference.

12         Now, just one moment.

13         All right.  I'm going to correct one thing I said

14  because I misspoke with respect to item No. 7, Cook's

15  continued e-mail destruction, as that term is used by

16  plaintiff.  I'm not saying there's been e-mail destruction

17  here, but that's the reference.

18         Just to clarify, what I actually asked the parties

19  to do was to meet and confer and report back to me within one

20  week with respect to -- I believe Mr. King indicated he needed

21  to talk with his -- somebody, his colleagues or his client or

22  both, and see where they were on that issue.  So I'm going to

23  ask the lawyers report back to me in seven days on the issue

24  of Cook's e-mail preservation and see where we are.

25         The issue with respect to Judge Young relates to

57

1   supplementation of experts.  So you can raise that with Judge

2   Young.  I presume he'll deal with it.  If he doesn't want to

3   deal with it or can't deal with it for some reason, I will be

4   happy to address that issue with you.

5           All right.  From plaintiffs' perspective, anything

6   else to raise?

7           MR. WILLIAMS:  No, Your Honor.

8           THE COURT:  All right.

9           MR. SCHULTZ:  Judge, Matt Schultz.  I apologize if I

10  missed it, but I did not hear a ruling on 3C, which is where

11  plaintiffs are asking for any documents that might have

12  pertained to a study, if one occurred, between March and May

13  of 2005 for a 12-sheep, 12-filter study.

14          THE COURT:  Here's what I've got for 3C.  If I

15  didn't say it, I apologize; and I may not have.  I may have

16  skipped over it.  Let me go back to 3C.  Just a moment.  I

17  think I did skip over it.

18          3C is identified in the e-mail as FS080102, 12

19  sheep, 12 filters per 0295478.  It appears to me with respect

20  to 3C that the defendant has produced documents responsive to

21  this discovery request.  Therefore, the issue is moot.  In the

22  event that it can be seen that that wasn't moot, in my

23  opinion, defendant's production with respect to item 3C is

24  sufficient to satisfy the discovery obligation.

25          Thank you for bringing that to my attention,

58

1    Mr. Schultz.

2              MR. SCHULTZ:  Thank you, Your Honor.

3              THE COURT:  Anything else on behalf of the

4    defendant?

5              MR. KING:  No, Your Honor.

6              THE COURT:  And we're only six minutes over time.

7    Not bad.  Thank you all very much.

8              *(The proceedings were adjourned at 2:36 p.m.)*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF COURT REPORTER</u>

2

3         I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from electronically recorded

5    proceedings in the above-entitled matter.

6

7

8      /s/ Cathy Jones                        May 1, 2017
     _____
9      CATHY JONES, RDR, FCRR
       Official Court Reporter
10     Southern District of Indiana
       Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25