Russell Budd
rbudd@baronbudd.com
Roland Tellis
Rtellis@baronbudd.com
Evan Zucker
ezucker@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:     (818) 839-2333

Ben Martin
bmartin@bencmartin.com
THE LAW OFFICES OF BEN C. MARTIN
3710 Rawlins Street, Suite 1230
Dallas, Texas 75219
Telephone:     (214) 761-6614

*Attorneys for Plaintiffs and the Proposed
Classes*

Wendy Fleishman
wfleishman@lchb.com
Daniel E. Seltz
dseltz@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone:     (212) 355-9500

## IN THE UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF INDIANA

### INDIANAPOLIS DIVISION

| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB MDL No. 2570 |
|---|---|
| | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Document related to Plaintiffs: | |
| BARBARA GETTMAN, ALFRED HAKIM, DALE HOLDGREVE, HENRY JOHNSON, DETRICE LIVINGSTON, WENDY NOVEL, individually and on behalf of other members of the general public similarly situated, | Case No.  1:17-cv-06064-RLY-TAB |
| Plaintiffs, | |
| v. | |
| COOK GROUP, INC.; COOK INCORPORATED; COOK MEDICAL, LLC; AND WILLIAM COOK EUROPE APS, | |
| Defendants. | |

1

For their Amended Complaint against Cook Group, Inc.; Cook Incorporated; Cook Medical, LLC; and William Cook Europe ApS (collectively "Defendants" or "Cook") Plaintiffs Barbara Gettman, Alfred Hakim, Dale Holdgreve, Henry Johnson, Detrice Livingston and Wendy Novel alleges as follows[1]:

**Introduction**

1.      This is a class action to allow Plaintiffs and Class Members (defined below) to seek and receive appropriate diagnostic services and other declaratory relief that they require as a direct and proximate result of the negligent and wrongful misconduct of Defendants in connection with the development, design, promotion, marketing, and sale of certain inferior vena cava filters.

2.      Defendants have designed, marketed, and sold medical devices known as Gunther Tulip Mreye, Gunther Tulip Vena Cava Filter, Cook Celect Vena Cava Filter, and Cook Celect Platinum ("Cook IVC Filters") that were negligently and defectively designed and for which Defendants have failed to provide adequate information and warnings regarding their safety, effectiveness, and failure rates.

3.      These Cook IVC Filters are prone to break into parts (fracture) such that struts break away from the device and ultimately can become lodged in a vein, artery, or even an organ, such as the heart or lungs.  The filters also tend to break loose from the point of implantation and migrate to other locations in the bloodstream or become lodged in the heart or lungs.  The filters also have a significant chance of tilting within the IVC, perforating the vena cava and/or causing the formation of blood clots.

4.      Any and all of these adverse events have the potential to cause serious and life threatening medical conditions for patients implanted with the Cook IVC Filters.  In so doing, they significantly increase the risks of injury and death for those patients.

5.      However, many of these conditions can be asymptomatic in the patient prior to the manifestation of significant and sometimes fatal injuries.

---

[1] Plaintiffs initially filed a complaint in the Central District of California.  Their case was transferred by order of the Judicial Panel on Multidistrict Litigation to this Court for pretrial coordination.  Plaintiffs file this amended complaint directly in this multi-district litigation consistent with 14 U.S.C. § 1407 and *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), without effect on their right to remand for trial.

FIRST AMENDED CLASS ACTION COMPLAINT

6.       Plaintiffs and each and every Class Member will be better off knowing the state of their Cook IVC Filter, including its present condition and position.  The notice plan and diagnostic program described below will arm Plaintiffs, Class Members and their doctors with the knowledge they need to take steps to protect themselves from future harm.

7.       The devices at issue have injured Plaintiffs and the Class.  These devices are ticking time bombs implanted in unsuspecting patients.  The harm suffered by these patients exists as a result of the design defects inherent in the devices such that patients and doctors are unsure of safety of the current state of the device, and face a significantly increased risk of physical injury due to the implantation of the devices.  Each patient is in need of a diagnostic test to determine what is the safest course of medical action to deal with the flawed device.

8.       The relief that Plaintiffs seek on their own behalf and on behalf of the Class Members is consistent with the Food and Drug Administration's ("FDA") conclusion, described below, that physicians should consider removal as soon as a patient's transient risk for pulmonary embolism has passed, and will allow Plaintiffs and the healthcare community to effectuate the FDA's guidance.  This case presents a simple question: who should pay for the diagnosis and testing that the FDA has stated is needed for the Class?

**Parties**

9.       Plaintiff Barbara Gettman is a resident of the state of Colorado.  She was implanted with a Cook Gunther Tulip filter.  The filter has not been explanted.

10.       Plaintiff Alfred Hakim is a resident of the state of California.  He was implanted with a Cook Gunther Tulip filter.  The filter has not been explanted.

11.       Plaintiff Dale Holdgreve is a resident of the state of Ohio.  He was implanted with a Cook Gunther Tulip filter.  The filter has not been explanted.

12.       Plaintiff Henry Johnson is a resident of the state of Arizona.  He was implanted with a Cook Gunther Tulip filter.  The filter has not been explanted.

13.       Plaintiff Detrice Livingston is a resident of the state of Maryland.  She was implanted with a Cook Celect filter.  The filter has not been explanted.

FIRST AMENDED CLASS ACTION COMPLAINT

14.     Plaintiff Wendy Novel is a resident of the state of Pennsylvania.  She was implanted with a Cook Gunther Tulip filter.  The filter has not been explanted.

15.     Defendant Cook Group, Inc. is a citizen of the state of Indiana with a principle place of business at 750 Daniels Way, Bloomington, Indiana 47404 and is authorized to do business in the state of California and Cook Group, Inc. was doing business in California.  Cook Group, Inc. at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Cook IVC Filters.

16.     Defendant Cook Incorporated is a citizen of the state of Indiana with a principle place of business at 750 Daniels Way, Bloomington, Indiana 47404 and is authorized to do business in the state of California and Cook Incorporated was doing business in Los Angeles County.  Cook Incorporated at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Cook IVC Filters.

17.     Defendant Cook Medical LLC is a citizen of the state of Indiana with a principle place of business at 750 Daniels Way, Bloomington, Indiana 47404 and is authorized to do business in the state of California and Cook Medical LLC was doing business in Los Angeles County.  Cook Medical LLC at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Cook IVC Filters.

18.     Defendant William Cook Europe ApS is based in Bjaeverskov, Denmark with its principal place of business located at Sandet 6, 4632 Bjaeverskov, Denmark and is authorized to do business in the state of California and William Cook Europe ApS was doing business in Los Angeles County.  William Cook Europe ApS at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Cook IVC Filters.

**Jurisdiction**

19.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds, if not thousands, of proposed Class Members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and the citizenships of Defendants are diverse from those of Plaintiffs and the Class Members.  This Court also has subject matter jurisdiction over Plaintiffs' and the proposed Classes' claims pursuant to 28 U.S.C. § 1367(a).

20.      Venue is proper in this Court pursuant to 28 U. S. C. § 1391, because a Plaintiff resides in this district, and resided in this district at the time of implantation of the IVC filter, and because Defendants regularly conduct business here.  Venue is also proper in this District for pretrial matters by order of the Judicial Panel on Multidistrict Litigation.

**Background**

**A.      IVC Filters**

21.      IVC filters were first made commercially available to the medical community in the 1960s.  Over the years, medical device manufacturers have introduced several different designs of IVC filters.

22.      An IVC filter is a device that is designed purportedly to filter or "catch" blood clots that travel from the lower portions of the body to the heart and lungs.  IVC filters were originally designed to be permanently implanted in the inferior vena cava.

23.      The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body.  In certain people, for various reasons, blood clots travel from the vessels in the legs and pelvis, through the inferior vena cava, and into the lungs or heart.  Oftentimes, these blood clots develop in the deep leg veins, a condition called "deep vein thrombosis" or "DVT." Once blood clots reach the lungs, they are considered "pulmonary emboli" or "PE."  Pulmonary emboli present serious risks to human health.

24.      People at risk for DVT/PE can undergo medical treatment to manage the risk.  For example, a doctor may prescribe anticoagulant therapies such as medications like Heparin and

First Amended Class Action Complaint

1    Warfarin to regulate the clotting factor of the blood.  In some people who are at high risk for

2    DVT/PE and who cannot manage their conditions with medications, physicians may recommend

3    surgically implanting an IVC filter to prevent thromboembolitic events.

4         25.    Even though IVC filters have been on the market for decades and were

5    traditionally permanent implants, the use of these filters was limited primarily to patients who

6    were contraindicated for anticoagulation therapy.

7         26.    In order to increase sales of these devices, Cook began to sell "retrievable"

8    versions of the IVC filter in an effort to expand the market for prophylactic uses among

9    nontraditional patient populations that were temporarily at risk of developing blood clots.

10        27.    Other manufacturers also saw this opportunity, triggering a race to market a device

11   that provided physicians the option to retrieve the filter after the clot risk subsided.

12        28.    The Cook IVC Filters were marketed as retrievable filters.  The Cook Celect Vena

13   Cava Filters have four anchoring struts for fixation and eight independent secondary struts to help

14   with self-centering and clot trapping.

15        29.    The Gunther Tulip Vena Cava Filters have a top hook and four anchoring struts for

16   fixation and on each strut it has a "flower" formation that is shorter than the strut where a wire

17   piece branches out on each side.

18        30.    Cook engaged in aggressive marketing campaigns for the Cook IVC Filters,

19   despite negative clinical data.

20        31.    Cook bypassed the FDA's more onerous approval process for new devices and

21   obtained "clearance" under Section 510(k) of the Medical Device Amendments to the Food,

22   Drug, and Cosmetic Act by claiming the filters were substantially similar in respect to safety,

23   efficacy, design, and materials to previous devices.

24        32.    Section 510(k) permits the marketing of medical devices if the device is

25   substantially equivalent to other legally marketed predicate devices without formal review for the

26   safety or efficacy of the new device.  The FDA explained the difference between the 510(k)

27   process and the more rigorous "premarket approval" (PMA) process in its amicus brief filed with

28   the Third Circuit in *Horn v. Thoratec Corp.*, which the court quoted from:

> A manufacturer can obtain an FDA finding of 'substantial equivalence' by submitting a premarket notification to the agency in accordance with section 510(k) of the [Food Drug and Cosmetic Act]. 21 U.S.C. § 360(k). A device found to be 'substantially equivalent' to a predicate device is said to be 'cleared' by FDA (as opposed to 'approved' by the agency under a PMA. *A pre-market notification submitted under 510(k) is thus entirely different from a PMA which must include data sufficient to demonstrate that the IVC Filters is safe and effective.*

376 F.3d 163, 167 (3d Cir. 2004) (emphasis in original).

33.     In *Medtronic, Inc. v. Lohr*, the U.S. Supreme Court similarly described the 510(k) process, observing:

> If the FDA concludes on the basis of the [manufacturer's] § 510(k) notification that the device is "substantially equivalent" to a pre-existing device, it can be marketed without further regulatory analysis. . . . The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in average of 20 hours. . . . As one commentator noted: "The attraction of substantial equivalence to manufacturers is clear. Section 510(k) notification requires little information, rarely elicits a negative response from the FDA, and gets processed quickly."

518 U.S. 470, 478-79 (1996) (quoting Adler, The 1976 Medical Device Amendments: A Step in the Right Direction Needs Another Step in the Right Direction, 43 Food Drug Cosm. L.J. 511, 516 (1988)).

34.     A determination by the FDA that a device is substantially equivalent under §510(k) is not a finding that the device is safe and effective for its intended conditions of use. The FDA in the context of a §510(k) conclusion is ordinarily not a determination of whether the device is safe and effective because the FDA lacked the general authority to do so prior to more stringent approval process adoption. "[A]ccordingly, FDA regulation specify that a substantial equivalence determination 'does not in any way denote official approval of the device,' and that any representation conveying 'an impression of official approval… is misleading…" Brief for the United States as Amicus Curiae Supporting Respondents/Cross-Petitioners, pp. 19-20, *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (No. 95-754).

35.     Pursuant to *Wyeth v. Levine*, 555 U.S. 555 (2009), once a product is cleared "the manufacturer remains under an obligation to investigate and report any adverse events associated with the [product]. . . and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling . . . ."  This obligation extends to post-market monitoring of adverse events/complaints.

36.     Cook was aware but concealed the fact that their IVC Filters had additional safety and efficacy concerns not present in the predicate device upon which it sought §510(k) approval.

37.     Cook was aware that Cook IVC Filters were also used extensively off-label, including for purely prophylactic reasons for trauma patients or patients with upcoming surgeries such as bariatric (weight loss) and orthopedic procedures and that the filters were used for permanent and not temporary placement.

38.     Various Cook personnel were specifically recommending to clinicians insertion and removal techniques that were off-label.

39.     The Cook IVC Filters are constructed of conichrome.  Conichrome construction is specifically advertised as a frame which reduces the risk of fracture.

40.     The extreme failure rates of the Cook IVC Filters is attributable, in part, to the fact that they suffer from a design defect causing them to be unable to withstand the normal anatomical and physiological loading cycles exerted *in vivo* indicating that they pose an ever present and continuing unreasonable risk of harm.

**B.      Post-Market Performance Revealed The Cook IVC Filters Failed to Perform as Expected.**

41.     Both prior to and once placed on the market, Cook became aware of numerous confirmed events where its filters fractured, migrated, or perforated the inferior vena cava, caused thrombus and clotting, and caused serious injury, including death.

42.     Premarket and post-market clinical trials revealed that these filters failed and caused serious risks of harm.  In addition, peer-reviewed literature reflected that such filters actually increased the risk of patients developing thromboembolitic events.

43.    One key study, referred to as the PREPIC study, confirmed that placement of these IVC filters increases the risk of the exact thing that they are intended to protect against – thrombosis.  The increased rate in the PREPIC study was 35.7% for patients with an IVC Filter versus 27.5% for patients without.  This is especially troubling because it likely underestimates the thrombotic impact of these filters because almost half of the patients in the PREPIC study (in both groups) received anticoagulation treatment, which is also used to prevent thrombosis. Finally, the PREPIC study identified no statistically significant difference in the rate of fatal pulmonary embolism or all-cause death between patients with or without a filter.  That these IVC Filters are pro-thrombotic, or associated with an increase in deep vein thrombosis is also supported by a 2016 study authored by Brunson, Ho, White and Wun.

44.    Jim Gardner, Medical Science Officer, Chair of Clinical Trials at Cook and Director of Reimbursement at Cook repeatedly questioned whether there was a scientific basis for the use of Cook IVC filters.  While it is true of most medical devices that one must consider the risk versus the rewards of the treatment, Dr. Gardner question whether there was sufficient evidence of efficacy of these IVC filters at all.

45.    As it relates to prophylactic use, the Davies study from 2016 concludes that there is no high-quality evidence to support prophylactic IVC filter placement in any patient ground and that "widespread use of prophylactic IVC [filters] is not supported by evidence and should be discouraged."

46.    In a study of Gunther Tulip and Celect IVC filters implanted between July 2007 and May of 2009 reported by Cardiovascular Interventional Radiology on March 30, 2011 and later published in print journal in April of 2012, one hundred percent of the Gunther Tulip and Cook Celect filters imaged after 71 days of showed filter perforation of the vena cava wall. Durack JC, et al, *Cardiovasc Interent Radiol.*, "Perforation of the IVC: rule rather than the exception after longer indwelling times for the Gunther Tulip and Celect Retrievable Filters" 2012 Apr.; 35(2):299-308. Epub 2011 Mar 30.  The authors concluded: "Longer indwelling times usually result in vena caval perforation by retrievable Guther Tulip and Celect IVC filters. Although infrequently reported in the clinical literature, clinical sequelea from IVC filter

9

components breaching the vena cava can be significant.  We advocate filter retrieval as early as clinically indicated…"

47.     The same study found that 40% of all studied filters experienced tilt and all tilter filters demonstrated vena caval perforation.

48.     Similarly, another study by Dowell and Associates identified that 36% of patients with a Cook filter showed primary strut perforation, 66% showed progressive perforation over time and 79% showed primary structural perforation.  Additionally, the Zhou, et al. study confirmed a high penetration rate for these IVC Filters.  *See* Zhou, D, Moon E, et al., "Penetration of Celect Inferior Vena Cava Filters: Retrospective Review of CT Scans in 265 Patients." AJR 2014; 202:243-247.

49.     These perforation rates are well above published data in human and animal studies for similar filter types.  Perforation can result in serious sub-complications such as pooling of blood outside of the IVC (or hemorrhaging) near the surrounding organs and body cavities.  Additionally, when components of the IVC Filter perforate the vena cava wall, they can damage adjacent organs.

50.     The Cook IVC Filters are prone to an unreasonably high risk of failure and patient injury following placement in the human body.

51.     When IVC filter fractures occur, shards of the filter or even the entire filter can travel to the heart, where they can cause cardiac tamponade, perforation of the atrial wall, myocardial infarction, and/or death.

52.     The high risk of tilting and perforating the vena cava walls by Cook IVC Filters is well documented.  When such tilting occurs, the filters can also perforate the adjacent aorta, duodenum, small bowel, spine, or ureter, which may lead to retroperitoneal hematomas, small-bowel obstructions, extended periods of severe pain, and/or death.

53.     With respect to the initial testing and specifications of the filters at issue, Cook's analysis to evaluate the stresses placed on the devices after implant was inadequate to properly determine their real world performance.  In particular, Cook did not adequately consider the stress

loading impact of the struts incorporation into the walls of the vena cava sufficient to properly design a filter that would not fail after implantation.

54.     The geometric design of these filters and struts encouraged unnecessary stress on the contact point between the wires and sheath of the filters as well as wire to wire contact such that unreasonable failure rates would likely result and this defect would subject the devices to unreasonably high levels of tilt after implantation as well as perforation of the vena cava wall. These implantation malfunctions significantly and unreasonably raise the injury risk for these devices.

55.     Cook is and was aware that Cook IVC Filters had substantially higher reported failure rates than other IVC filters for fracture, perforation, migration, and death.

56.     Despite knowing that the Cook IVC Filters were substantially more likely than not to fracture, migrate, tilt, and/or cause death, Cook marketed its IVC Filters as being safe and effective.  In some instances Cook representatives instructed sales representatives to obscure the differences between Cook properties and those of competitors, such as retrievability and safe indwell times.

57.     Tenting is a well-known and well reported defect associated with these IVC filters. Cook fails to inform doctors or patients that tenting leads to perforation, an even more serious complication.  The process of tenting, penetration and perforation of the IVC filter struts are all interrelated and often progressive, meaning one defect leads to another and gets worse or more likely over time.  Cook's internal documentation identifies that it knew perforation can result in these other serious complications such as migration, tilting and device fracture.

58.     When reporting complication rates, Cook obscured defects like perforation by redefining the meaning of perforation to strut penetrating through the caval wall **and causing hemorrhage or hematoma --** the added bold qualifier distorted test and study results because it was inconsistent with industry norms and previous study definitions.  Because of this limitation and redefinition of "perforation" Cook did not disclose to the FDA, in its published article or in its Filter's Instruction s For Use ("IFU"), true perforation rates.  Any comparison to published

perforation rates for competitor products was also distorted due to the idiosyncratic definition of IVC perforation.

59.     At all times material hereto from the design phase, testing, and manufacture of the Cook IVC Filters, Cook lacked a thorough understanding dynamics of caval anatomy that impacted testing methods.

60.     At this time, each of the Cook IVC Filters contain the same or substantially similar defects resulting in the same or substantially similar mechanism of risk to Plaintiffs and the Class Members.

61.     The Cook IVC Filters are misbranded and adulterated by virtue of them failing to be the substantial equivalent of their predecessor device, making them subject to corrective action, including recall, in the interest of patient safety.

62.     Safer and more efficacious designs existed for this product, as well as reasonable treatment alternatives.

63.     Even with Cook's knowledge of design flaws Cook did not initiate design iterations to mitigate risks even in accordance with its own recommendations and studies it produced or reviewed.

64.     During the design phase of these IVC Filters, Cook cut corners and re-evaluated their testing and reporting effective diameter from 30 mm to 25 mm because testing at 30 mm resulted in increased fractures.

65.     Cook marketed and sold these IVC Filters as being retrievable but also represented them as being safe for the life of the patient without retrieval, and particularly that they were safe to remain in vivos as permanent devices despite their extreme failure rate at even low indwell times.

**C.     The Growing Medical Consensus in Support of Monitoring of IVC Filters.**

66.     In light of serious safety concerns associated with IVC filters, including Cook's, regulatory agencies and medical experts have recommended monitoring of patients with IVC filters.

67.     On August 9, 2010, the FDA issued an advisory to physicians and clinicians responsible for the care of patients with IVC filters.  Noting that it had, as of that date, received 921 device adverse event reports involving IVC filters, the FDA stated that it was "concerned that these retrievable IVC filters, intended for short-term placement, are not always removed once a patient's risk for [pulmonary embolism] subsides.  It recommended that physicians and clinicians consider removing the filter as soon as protection from PE is no longer needed."

68.     On May 6, 2014, the FDA issued an updated safety communication concerning IVC filters.  This communication reported that the FDA had developed a quantitative decision analysis designed to assess when "the risk of having an IVC filter in place is expected to outweigh the benefits."  The FDA published that decision analysis in the Journal of Vascular Surgery: Venous and Lymphatic Disorders, in October 2013.  The FDA's "mathematical model suggested that if the patient's transient risk for pulmonary embolism has passed, the risk/benefit profile begins to favor removal of the IVC filter between 29 and 54 days after implantation."

69.     In 2016, the Government of Canada issued its own alert concerning complications associated with IVC filters.  It urged, "Patients who receive a retrievable IVC filter should be scheduled for a retrieval assessment at the time of placement of an IVC filter. If the individual risk/benefit assessment indicates that a retrievable IVC filter should be removed, the patient should be referred for IVC filter removal when feasible."

70.     Also in 2016, the American College of Radiology, the Society of Interventional Radiology, and the Society for Pediatric Radiology issued a practice parameter concerning IVC filters. This collaborative practice parameter stated, "When a retrievable filter is placed, the patient should be clinically reassessed periodically to weigh the benefits of continued filtration (need for PE prophylaxis) against the associated risks (eg, recurrent deep venous thrombosis [DVT], IVC thrombosis, symptomatic penetration, or mechanical failure) and uncertainties (given limited data on long-term mechanical stability and integrity of some devices)."

71.     Recent additions to the medical literature also recommend monitoring of IVC filters.  A 2016 article, which noted particularly high rates of perforation among Cook filters, stated, "Filter-related complications may … go unrecognized or underappreciated as potential

13

causes of morbidity in patients."  Another, from 2014, emphasized that "systematic follow-up of patients in whom retrievable filters are placed is critical."  Follow-up is particularly important as the risks of complications associated with Cook's IVC filters increase with time.

72.     Despite this growing consensus, retrieval rates of IVC filters are low.  One study, using Medicare claims data and published in the Journal of the American College of Radiology, reported retrieval rates of 1.2-5.1 percent.  Thus, the vast majority of IVC filter recipients are not receiving the follow-up that medical professionals and regulatory bodies have recommended is crucial to ensure their safety, mitigate their risk of injury, and improve patient outcomes.

## PROPOSED NOTICE AND DIAGNOSTIC PROGRAM

73.     In its May 2014 safety communication concerning IVC filters, the FDA expressed concerns over the continuing presence of implanted IVC filters in patients.  To that end, the FDA recommended that:

> physicians and clinicians responsible for the ongoing care of patients with retrievable IVC filters consider removing the filter as soon as protection from pulmonary embolism is no longer needed.  The FDA encourages all physicians involved in the treatment and follow-up of patients receiving IVC filters to consider the risks and benefits of filter removal for each patient.  A patient should be referred for IVC filter removal when the risk/benefit profile favors removal and the procedure is feasible given the patient's health status.[2]

74.     Pursuant to the Durack study, as well as other studies concerning the Cook IVC Filters, all patients in whom a vena cava filter is placed are at risk of at least perforation and more often than not, some injury as a result of their implanted filter.

75.     Against this backdrop, and the massive scale of medical literature indicating that the Cook IVC Filters pose long term risks of migration, fracture, perforation, tilting, and ultimately catastrophic injury or death, Plaintiffs seek a monitoring program designed to evaluate whether the risk/benefit profile of every Class Member favors removal of the Cook IVC Filter and, if so, to gather information on the appearance, condition, and location of the IVC filter, including whether it has fractured, migrated, perforated, or tilted, in order to provide a physician

---

[2] http://www.fda.gov/medicaldevices/safety/alertsandnotices/ucm396377.htm (last visited 2/3/17.)

with the information necessary to remove the Cook IVC Filter safely and to prevent and mitigate severe and life-threatening complications.

76.     Specifically, Plaintiffs seek a medical monitoring protocol which consists of a notice campaign to all Class Members informing them of the availability and necessity of the medical motoring protocol; imaging of the filter and surrounding structures performed with a non-contrast CT scan of the abdomen in order to provide a detailed and accurate assessment of the current status of the device and critical information as to the safety and difficulty of possible filter removal; and review of the patient data collected by the protocol by an experienced interventional radiologist for every Class Member who still has a Cook IVC Filter installed.  The purpose of this monitoring procedure is to then allow the Class Member (or Class Member's care givers) to meet with the Class Member's physician to determine if retrieval is clinically necessary and, if so, to provide the physician with necessary information regarding how best to approach removal of the Cook IVC Filter (the "Medical Monitoring Protocol").  In addition to facilitating the assessment of the condition and removal prospects of the Cook IVC Filter, this monitoring protocol allows specific attention to be paid to the particular defects at issue before removal of the filter is attempted.

77.     Dr. Myerburg, writing in the New England Journal of Medicine, noted that with implantation of medical devices that have a demonstrated failure rate leading to death, (1) "tolerance and surveillance strategies should aim to achieve a risk of malfunction that is as close to zero as possible"; (2) that "physicians must know about the performance features of [the] device"; and (3) "patients have a right to obtain product information so that they can make informed decisions."[3]  Plaintiffs' proposed Medical Monitoring Protocol aims to reduce complications by aiding in the detection and remediation of any malfunction and also generally provides awareness of the issue so it can be investigated.  Without this protocol, many if not most patients implanted with these IVC Filters will not even be aware of the serious risk they are in.

---

[3] Myerburg R., et al., Life-Threatening Malfunction of Implantable Cardiac Devices. The New England Journal of Medicine 2006; 354:22.

FIRST AMENDED CLASS ACTION COMPLAINT

78.     Additionally, medical literature notes that "there appears to be no long-term survival benefit from long-term filter implantation…" and "lack of adequate follow-up evaluation for device retrieval may also contribute to inadvertent chronic filter implantation."[4]  Dr. Kuo and his co-authors also note that "When IVC filtration is no longer required, we believe prompt filter retrieval is desired if it can be performed with reasonable safety to avoid the risk of complications from long-term implantation."  Plaintiffs' proposed Medical Monitoring Protocol is designed to evaluate the risk of long-term implantation in association with the need and possibility of removal by offering Class Members an individual evaluation of their circumstances while educating them on the risks of the IVC Filter currently implanted in their vena cava.

**Fraudulent Concealment**

79.     Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by Cook when they had a duty to disclose those facts.  Defendants have kept Plaintiffs and their physicians ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on Plaintiffs' part, for the purpose of obtaining delay on Plaintiffs' part in filing on their causes of action.  Cook's fraudulent concealment did result in such delay.

80.     Cook is estopped from relying on the statute of limitations defense because Cook failed to timely disclose, among other things, facts evidencing the defective and unreasonably dangerous nature of the Cook IVC Filters.

81.     Cook was under a continuing duty to disclose the true character, quality and nature of the device that was implanted in Plaintiffs, but instead they concealed them.  Cook's conduct, as described in this Complaint, amounts to conduct purposely committed, which Cook must have realized was dangerous, needlessly reckless, without regard to the consequences or the rights and safety of Plaintiffs and Class Members.

---

[4] Kuo W., et al., High-risk Retrieval of Adherent and Chronically Implanted IVC Filters; Techniques for Removal and Management of Thrombotic Complications.  Journal of Vascular and Interventional Radiology 2009, 20:1548-1556.

**Class Action Allegations**

82.　　Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P. 23(a), (b)(2), and (c)(4) as representatives of the classes defined as follows:

83.　　Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the class representative Plaintiffs, for themselves and on behalf all others similarly situated, seek certification of the classes defined as follows (collectively, the "Classes"):

**Arizona Class** (represented by Henry Johnson)

All Arizona residents who, between October 31, 2003 and the date of the filing of this complaint, were implanted with a Cook IVC Filter – whose filter has not been explanted, and who has not filed a claim or lawsuit for personal injury relating to the Cook IVC Filter.

**California Class** (represented by Alfred Hakim)

All California residents who, between October 31, 2003 and the date of the filing of this complaint, were implanted with a Cook IVC Filter – whose filter has not been explanted, and who has not filed a claim or lawsuit for personal injury relating to the Cook IVC Filter.

**Colorado Class** (represented by Barbara Gettman)

All Colorado residents who, between October 31, 2003 and the date of the filing of this complaint, were implanted with a Cook IVC Filter – whose filter has not been explanted, and who has not filed a claim or lawsuit for personal injury relating to the Cook IVC Filter.

**Maryland Class** (represented by Detrice Livingston)

All Maryland residents who, between October 31, 2003 and the date of the filing of this complaint, were implanted with a Cook IVC Filter – whose filter has not been explanted, and who has not filed a claim or lawsuit for personal injury relating to the Cook IVC Filter.

**Ohio Class** (represented by Dale Holdgreve)

All Ohio residents who, between October 31, 2003 and the date of their filing of this complaint, were implanted with a Cook IVC Filter – whose filter has not been explanted, and who has not filed a claim or lawsuit for personal injury relating to the Cook IVC Filter.

**Pennsylvania Class** (represented by Wendy Novel)

All Pennsylvania residents who, between October 31, 2003 and the date of the filing of this complaint, were implanted with a Cook IVC Filter – whose filter has not been explanted, and who has not filed a claim or lawsuit for personal injury relating to the Cook IVC Filter.

Excluded from these classes are Defendants and their subsidiaries and affiliates, as well as the judicial officers and their staff to whom this is assigned or referred, and their immediate family members.

84.     The Class Members are so numerous that joinder is impracticable.  Thousands of Class Members have been implanted with the Cook IVC Filters and have not filed a claim or lawsuit alleging personal injury relating to the Cook IVC Filters.

85.     This case presents numerous questions of law or fact that are common to all Class Members.  These questions' answers are central to the validity of Plaintiffs' and Class Members' claims, and their determination is apt to drive the resolution of the claims.  These common questions predominate over any individualized issues and include:

a.     Whether the Cook IVC Filters have design defects;

b.     Whether Cook acted negligently in the design, manufacturing, marketing, and sale of the Cook IVC Filters at issue;

c.     Whether Plaintiffs have been exposed to increased or significantly increased risk of injury as a result of the implantation of the Cook IVC Filter at issue;

d.     Whether a Court-supervised notice and diagnostic program should be established to mitigate or reduce the risk of injury as a result of the implantation of the Cook IVC Filters at issue; and

e.     What a medical monitoring program that is consistent with the standard of care and with contemporary scientific principles would entail.

86.     Plaintiffs' claims are typical of the claims of those of Class Members, as they all arise from the same common course of conduct on the part of Defendants.

87.     Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs' interests are aligned with and not in conflict with those of Class Members.  Plaintiffs and the Classes are represented by counsel with long and deep experience in the prosecution of class actions, including those relating to product defects, including medical devices, medical negligence, personal injury, and medical monitoring.  Plaintiffs' counsel is knowledgeable about the applicable law and possesses the resources to fully commit to representing the Classes.

88.     Defendants have acted and have refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief, in the form of medical monitoring, is appropriate respecting the Classes as a whole.

89.     Questions of law or fact common to Class Members predominate over any questions affecting only individual Class Members.

90.     A class action is superior to other available methods for fairly and efficiently adjudicating these claims.

**CAUSE OF ACTION**
**MEDICAL MONITORING**
**(ON BEHALF OF COLORADO AND PENNSYLVANIA CLASSES)**

91.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

92.     Colorado and Pennsylvania recognize medical monitoring as an independent claim for relief.

93.     Plaintiffs were exposed to a significantly higher risk of injury and death from Cook's IVC Filters than they would have faced if the filters been designed without defect, had Cook given appropriate and adequate warnings regarding the risks of the IVC Filters, or had Plaintiffs received alternative forms of treatment.  As a result, Plaintiffs are and will be exposed to a significant risk of injury and death on an ongoing basis as a result of Cook's negligent conduct.

94.     Cook was fully aware of yet failed to adequately warn, protect, and educate Plaintiffs concerning these increased risks.

95.     Cook had a duty to provide necessary and adequate warnings of the increased risks of these IVC Filters.  By such negligent conduct, Cook breached their duties of care to the Plaintiffs and Class Members, and caused significantly increased risk of injury and damages to Plaintiff, giving rise to the need for diagnosis, assessment, and/or monitoring of these IVC Filters.

96.     As a proximate result of Cook's negligent conduct, Plaintiffs have experienced and been exposed to significantly increased risks of injury from the IVC Filters (including the devices' migration, tilting, fracturing, and perforation of the vena cava), including hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels, and organs; and death.

97.     Diagnostic and/or monitoring procedures exist that comport with contemporary scientific principles and the standard of care and make possible early detection of potential injury to Plaintiffs and Class Members, which would not be possible without such diagnostic and/or monitoring procedures.  The proposed Court-supervised diagnostic and/or monitoring program includes, but is not limited to, baseline exams and diagnostic exams.  This program is necessary and includes more monitoring than will be typically provided to Class Members in order to detect, prevent, and mitigate injury that may occur if treatment was delayed, and enable prompt treatment of the adverse consequences of the IVC Filters.

98.     The program and procedures set forth above are non-routine, and are fundamentally different from and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for those with Cook IVC Filters, including non-defective devices.

99.     The diagnostic and/or monitoring procedures proposed by this action are reasonably necessary for all Plaintiffs and Class Members because Plaintiffs and Class Members have been implanted with the IVC Filters, which present significantly increased risks of the same injuries and harm, including possibly death, to Plaintiffs and Class Members by the same mechanisms and modes of failure.

100.     As set forth above, the Court-supervised monitoring procedures are reasonably necessary according to contemporary scientific principles to enable Plaintiffs to obtain early

detection and diagnosis of the potential injury and increased risk of injury as a result of the implantation of the IVC Filters described above.

101.    By monitoring and testing Plaintiffs and Class Members who are at increased risk of injury from the IVC Filters, the risk of Plaintiffs and Class Members suffering injury, disease, and losses as described above may be significantly reduced, as Plaintiffs and Class Members and their physicians will have gained information necessary to choose appropriate interventions and treatments.

102.    Plaintiffs therefore seeks an injunction creating a Court-supervised comprehensive medical monitoring fund for Plaintiffs and the Class Members, which would facilitate the early diagnosis and treatment to mitigate future injury to Plaintiffs and Class Members.

103.    Accordingly, Cook should be required to establish a Court-supervised and Court-administered trust fund, in an amount to be determined, to pay for the medical monitoring protocol for all Class Members, which includes, among other things: (1) a notice campaign to all Class Members informing them of the availability and necessity of the medical motoring protocol and (2) an imaging procedure to be performed on every Class Member who still has a Cook IVC Filter installed by an interventional radiologist who will then consult with the Class Member's physician within 60 days to determine if retrieval is clinically necessary and, if so, to provide the physician with necessary information regarding how much force to exert in removing the Cook IVC Filter.

104.    Cook's negligent conduct has caused significant increased risk, as described above, that the law of these states recognizes as an injury to legally protected rights, giving rise to claims for injunctive/equitable relief.  The distribution of damages to individual Class Members without programmatic relief as described above is inadequate, inefficient, and/or inferior to a judicial injunctive, declaratory, or equitable degree, establishing and supervising class-wide medical monitoring services as described and as sought herein.  Plaintiffs have no adequate remedy at law, in that monetary damages cannot compensate for the increased risks of long-term physical and economic losses associated with future injury from the Cook IVC Filter, or the uncertainty associated with living with a defective and dangerous medical device.  Without a

21

Court-supervised comprehensive medical monitoring fund as described herein, Plaintiffs will continue to face increased risks of injury without proper diagnosis and opportunity for rehabilitation.

**CAUSE OF ACTION**
**NEGLIGENCE/MEDICAL MONITORING**
**(ON BEHALF OF MEMBERS OF ARIZONA, CALIFORNIA, MARYLAND, AND OHIO CLASSES)**

105.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

106.     The following jurisdictions recognize medical monitoring as a remedy and/or recoverable item of damages for negligent or tortious conduct:  Arizona, California, Maryland and Ohio.

107.     Plaintiffs were exposed to a significantly higher risk of injury and death from an IVC Filter, and will be exposed to injury and death on an ongoing basis as a result of Defendants' negligent conduct.

108.     Cook was fully aware of yet failed to adequately warn, protect, and educate Plaintiffs concerning these increased risks.

109.     Cook had a duty to provide necessary and adequate warnings of the increased risks of these IVC Filters.  By such negligent conduct, Cook breached their duties of care to the Plaintiffs and Class Members, and caused significantly increased risk of injury and damages to Plaintiffs, giving rise to the need for diagnosis, assessment, and/or monitoring of the IVC filter.

110.     As a proximate result of Cook's negligent conduct, Plaintiffs have experienced and been exposed to significantly increased risks of injury from the IVC Filter (including the device's migration, tilting, fracturing, and perforation of the vena cava), including hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels, and organs; and death.

111.     Diagnostic and/or monitoring procedures exist that comport with contemporary scientific principles and the standard of care and make possible early detection of potential injury to Plaintiffs and Class Members, which would not be possible without such diagnostic and/or

22

monitoring procedures.  The proposed Court-supervised diagnostic and/or monitoring program includes, but is not limited to, baseline exams and diagnostic exams.  This program is necessary and includes more monitoring than will be typically provided to Class Members in order to detect, prevent, and mitigate injury that may occur if treatment was delayed, and enable prompt treatment of the adverse consequences of these IVC Filters.

112.    The program and procedures set forth above are non-routine, and are fundamentally different from and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for those with IVC Filters, including non-defective devices.

113.    As set forth above, the Court-supervised monitoring procedures are reasonably necessary according to contemporary scientific principles, to enable Plaintiffs and Class Members to obtain early detection and diagnosis of the potential injury and increased risk of injury as a result of the implantation of the IVC Filters described above.

114.    By monitoring and testing Plaintiffs and Class Members who are at increased risk of injury from the Cook IVC Filters, the risk of Class Members suffering injury, disease, and losses as described above may be significantly reduced, as Class Members and their physicians will have gained information necessary to choose appropriate interventions and treatments.

115.    Plaintiffs therefore seeks an injunction creating a Court-supervised comprehensive medical monitoring fund for Plaintiffs and the Class Members, which would facilitate the early diagnosis and treatment to mitigate future injury to Plaintiff and Class Members.

116.    Accordingly, Cook should be required to establish a Court-supervised and Court-administered trust fund, in an amount to be determined, to pay for the medical monitoring protocol for all Class Members, which includes, among other things: (1) a notice campaign to all Class Members informing them of the availability and necessity of the medical motoring protocol and (2) an imaging procedure to be performed on every Class Member who still has a Cook IVC Filter installed by an interventional radiologist who will then consult with the Class Member's physician within 60 days to determine if retrieval is clinically necessary and, if so, to provide the physician with necessary information regarding how much force to exert in removing the Cook IVC Filter.

117.    Cook's negligent conduct has caused significant increased risk, as described above, that the law of these states recognizes as an injury to legally protected rights, giving rise to claims for injunctive/equitable relief.  The distribution of damages to individual Class Members without programmatic relief as described above is inadequate, inefficient, and/or inferior to a judicial injunctive, declaratory, or equitable degree, establishing and supervising class-wide medical monitoring services as described and as sought herein.  Plaintiffs have no adequate remedy at law, in that monetary damages cannot compensate them for the increased risks of long-term physical and economic losses associated with future injury from the IVC Filters, or the uncertainty associated with living with a defective and dangerous medical device.  Without a Court-supervised comprehensive medical monitoring fund as described herein, Plaintiff will continue to face increased risks of injury without proper diagnosis and opportunity for rehabilitation.

## Prayer for Relief

**WHEREFORE**, Plaintiffs pray for relief as follows:

1.    This action to be certified as a class action on behalf of the proposed classes; that the named plaintiffs be appointed as Class representatives, and that counsel below be designated Class Counsel;

2.    Creation of a comprehensive, Court-supervised notice and diagnostic/medical monitoring program for the proposed classes;

3.    Judgment to be entered against all Defendants on all causes of action and damages suffered;

4.    Plaintiffs be awarded the full, fair, and complete recovery for all causes of action;

5.    Plaintiffs be awarded all appropriate costs, fees, expenses, and pre-judgment and post-judgment interest, as authorized by law; and

6.    Such other relief that the Court deems just and proper.

1

**Jury Trial Demand**

2          Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

3

Dated:  May 5, 2017                          Respectfully submitted,

4

5
                                             By: ___/s/Roland Tellis_____
6                                                 Roland Tellis

7                                            Russell Budd
                                             rbudd@baronbudd.com
8                                            Roland Tellis
                                             rtellis@baronbudd.com
9                                            Evan Zucker
                                             ezucker@baronbudd.com
10                                           BARON & BUDD, P.C.
                                             15910 Ventura Boulevard, Suite 1600
11                                           Encino, California  91436
                                             Telephone:      (818) 839-2333
12                                           Facsimile:      (818) 986-9698

13

14                                           Ben Martin
                                             bmartin@bencmartin.com
15                                           THE LAW OFFICES OF BEN C. MARTIN
                                             3710 Rawlins Street, Suite 1230
16                                           Dallas, Texas 75219
                                             Telephone:      (214) 761-6614
17

18                                           Wendy Fleishman
                                             wfleishman@lchb.com
19                                           Daniel E. Seltz
                                             dseltz@lchb.com
20                                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                             250 Hudson Street, 8th Floor
21                                           New York, NY 10013
                                             Telephone:      (212) 355-9500
22

23                                           *On behalf of Plaintiffs and the proposed Classes*

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT