UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

_____

In Re: COOK MEDICAL, INC., IVC FILTERS　　　Case No. 1:14-ml-2570-RLY-TAB
MARKETING, SALES PRACTICES AND　　　　　　　　　　　　　MDL No. 2570
PRODUCTS LIABILITY LITIGATION
_____

This document relates to all cases.
_____

### PLAINTIFFS' MOTION TO PERMIT SUPPLEMENTAL EXPERT OPINIONS ON DOCUMENTS THAT WERE NOT TIMELY DISCLOSED

　　Plaintiffs recently came into possession of documents that should have been disclosed by Cook before Plaintiffs' expert reports were served. Because Cook withheld these important documents, Plaintiffs' experts were deprived the opportunity to address them. Accordingly, Plaintiffs seek leave to have certain of their experts provide a brief addendum to their reports addressing the documents.

　　**The Documents at Issue—Dotter Documents & the Cook IVC Filter Data Summary**

　　1.　<u>Documents from the Dotter Institute.</u>　The first issue concerns documents from a filter retrievability study carried out at the Dotter Institute. On February 7, 2017, the Court ordered Cook to obtain whatever documents Dotter possessed pertaining to the study. Cook's counsel advised the Court on February 17 that, after consulting internally and with Dotter, they were "able to confirm that no one at Cook or Dotter Institute has discovered any documents related to the study" and that responsive information "does not exist." Plaintiffs subsequently served a third-party subpoena on the Dotter Institute. In response it produced several hundred documents and images from the study, including images suggesting filter perforations.

2.  Cook's IVC Filter Data Summary.  The second issue involves Cook's August 2016 "IVC Filter Data Summary," which is a 150-page document that describes itself as "a comprehensive summary of 1) available data from Cook's in-house complaint database associated with Cook IVC filters; 2) an up-to-date summary of all manufacturers' IVC filter complaint data as reported to the FDA (accessed from the FDA's Manufacturer and User Facility Device Experience (MAUDE) database); and 3) a systematic search of the literature pertinent to the effectiveness of IVC filters in preventing PE and the potential risks posed by the Cook IVC filters."  The summary includes extensive analysis by Cook of these issues.  Although it was created in August 2016, Cook did not produce it until April 2017, after Plaintiffs' expert report deadline.

### Facts Concerning the Dotter Institute Documents

3.  All three bellwether trials involve perforated filters.  Plaintiffs' experts opine extensively on perforation.  Dr. David Kessler (supported by statistician Dr. Rebecca Betensky), addressed Cook's animal studies and internal business documents analyzing perforation in such studies.  Plaintiffs' expert interventional radiologist Dr. Reza Rajebi reviewed radiological imaging from Cook's Celect clinical trial.  The Dotter production, which Cook told this Court did not exist, includes documentation of a sheep study and hundreds of *in situ* filter images.

4.  Plaintiffs requested the Dotter documents.  Plaintiffs' original request for production numbers 18 and 19 sought all documents in connection with Cook's IVC filter-related animal studies. Document searches revealed the protocol for a Cook 2006 sheep study to be carried out by Japanese physicians at the Dotter Institute.  The study was called "Retrievability of the Celect and Gunther Tulip Vena Cava MReye Filters After 30_ and 90_Day Implantation in the Sheep Vena Cava."  Further evidence of this study was found in a year-end "brag sheet" by Cook sales

representative Mr. Mitch Asami, who noted he had convinced the Japanese physicians to perform the Dotter study. Plaintiffs sought documents relating to the study because it was not provided to FDA and similar Cook animal studies during this period showed a pattern of increased perforations when Celect was compared to Tulip.

5. <u>The Court ordered Cook to obtain documents from Dotter.</u> Following a meet-and-confer, the issue came before the Court on February 7, 2017. An email from Doug King the previous day confirmed Plaintiffs' request and suggested that Cook reach out to Dotter "to find out what data they still have." (**Ex. A**, D. King E-mail, 2/6/17 at 4, ¶ 3e.) The Court found "there is custody and control with respect to 3e involving the Dotter Institute" and found "sufficient facts to establish custody and control for --- 3e would need to be produced. That would be by February 17th." (**Ex. B**, Hrg. Tr. 2/7/17 at 54:13-23.)

6. <u>Cook counsel stated they consulted with Dotter regarding the documents.</u> Cook counsel James Boyers wrote on February 17: "With respect to paragraph 3(e) of the Order, the Cook Defendants are continuing their efforts to determine whether or not the Dotter Institute has any of the materials for that study." (**Ex. C**, J. Boyers Ltr., 2/17/17 at 2.)

7. <u>Cook counsel stated repeatedly that Dotter had no responsive documents.</u> At the hearing of February 21, the following colloquy occurred:

> THE COURT: Now, it looks like from the Defendants' response to that, that at least I read it to be that they are trying to discover if there are -- if there are any other documents that might be within the custody and control of Dotter related to this study. So far they haven't found any documents, so I don't know really what is still in dispute. Miss Pierson is up for that one. Ms. Pierson?
>
> MS. PIERSON: If I may address it. We have a little more information even this morning, and <u>we were able to confirm that no one at Cook or Dotter Institute has discovered any documents related to the study</u>.
>
> THE COURT: Okay. Now, you can't produce what you don't have.

3

> MS. PIERSON: Right.

(**Ex. D**, Hrg. Tr. 2/21/17 at 42:4-17) (emphasis added).

Plaintiffs' liaison Mr. Williams challenged the bare assertion that nothing existed. The Court asked Ms. Pierson to explain:

> THE COURT: Ms. Pierson, any idea what would have happened? It does appear as though there was some study done, so what happened to the documents?
>
> MS. PIERSON: There is some limited paperwork that refers to the fact that the study took place. Our understanding is that the Japanese physicians wanted to conduct the study were unable to secure (inaudible) in Japan to conduct the study in Japan, so they came to do the study here. And <u>the data or images that relate to the study presumably were taken back to Japan</u> by those physicians. We don't know that, though. We don't employ the physicians. They are not in our control. <u>What we are able to do is to check Cook's records and to confer with the Dotter Institute so that they can check their records, and we confirmed that neither of them has any additional documents regarding the study.</u> If we need to (inaudible) declarations so that you have something more than Cook's counsel giving you that, we are happy to do that, but the fact of the matter is, <u>we have spent the time since we were with you last searching for any additional information regarding the study, and it does not exist.</u>

(**Ex. D** at 43:8-44:4) (emphasis added).

Accordingly, the Court ruled: "Defendants have represented to the Court that they have produced all documents that they have or that Dotter has regarding any study that would be responsive to the request. Defendants aren't required to produce information that they don't have. I will take the representation from counsel that they have searched, and that is all they had. If they find anything else that is responsive, they have a duty to supplement, but that request will be denied."

    8.   <u>A nonparty subpoena to Dotter generated responsive documents.</u>  Plaintiffs served a nonparty subpoena on the Dotter Institute seeking these documents among others. On April 17, well after Plaintiffs' expert reports had been served, Dotter produced electronic documents in response to the subpoena.  The production included a folder titled "Research Lab Files." As

shown in the below screenshot of the "Research Lab Files" folder, (Image 1), there is a subfolder titled "Japan_Cook_filter_study," (Image 2), which includes 34 further subfolders containing some 332 files. (Image 3). These folders include among other things: more than 20 pre-retrieval and retrieval images, some suggesting perforation of the vena cava (Image 4); hundreds of still images from numerous retrievals in sheep, some suggesting perforation (Image 5); and gross photographs, some suggesting perforation (Image 6).



5

**Image 4**



**Image 5**



**Image 6**



9. Plaintiffs also received emails related to the study, cost estimates, a contract to carry out the study, and a study questionnaire confirming the identity of the study.



6

10. This is precisely the type of evidence relied upon and examined by Plaintiffs' experts, particularly Drs. Kessler, Betensky, and Rajebi, and it would have been available for their review had Cook produced it on February 17 as the Court ordered. Cook's failure to procure the evidence should not prevent Plaintiffs' experts from now relying and opining on it, should they deem it important to do so.

**Facts Concerning the IVC Filter Data Summary**

11. Cook withheld its August 2016 "Cook Medical IVC Filter Data Summary" until April 2017, after Plaintiffs' expert reports had been served. The key questions addressed by the document include how physicians judge risk vs. benefit in placing a filter; what Cook can do to "maximize the benefits and minimize the risks" of filters; how Cook might modify its labeling; whether it should offer additional physician training; whether "patients receive sufficient product information;" and other similar issues central to this litigation. (**Ex. E**, Filter Data Summary Table of Contents.)

12. The Summary was prepared for an August 2016 internal Cook panel discussion that included seven invited physicians and Ph.Ds. One of the physicians was Dr. John Kaufman of the Dotter Institute; hence the Dotter response to Plaintiffs' nonparty subpoena included an agenda for the meeting identifying the attendees, which included from Cook, Inc.: its President, its Chairman of the Board, its VP of Quality Assurance, its Medical Science Officer, a VP and Global Business Unit Leader for Peripheral Intervention, its Global Product Manager, and the Director of Regulatory Affairs/Regulatory Science. Also in attendance were six attendees from Denmark including WCE's Director of Research and its Product Development Manager. This was an important an unique occasion that generated an important and unique document.

13. The Summary includes comprehensive sales data, complaint data, FDA-reported adverse event data (2008-2016) and a "systematic literature search" pertaining to IVC filter adverse events. Importantly, it includes not only these data compiled in a single document, but sets out Cook's own interpretation of the data, including extraordinarily detailed adverse event rates (standing alone and in comparison to other filters) for post-implant pulmonary embolism (40-43), filter fracture (44-45), filter migration (45-46), thrombosis/occlusion (46-50), perforation/penetration (51-58), filter tilt (58-61), and post-implant DVT (61-63), as well as filter retrieval data (63-65). It includes a comprehensive analysis of complaints and adverse event occurrence rates from 2008-2016 (23-29) and FDA-reported adverse events (30-33). This latter section includes an image of a spreadsheet of all adverse events from 2004-2015 that is a continuation of previous similar spreadsheets (through 2012) relied upon heavily by Plaintiffs' experts, particularly Drs. David Kessler (regulatory expert) and Rebecca Betensky (expert statistician). Although Cook produced the massive predecessor spreadsheets, it still has not produced the up-to-date version that we now know exists by virtue of the Summary. No single document produced to date in this litigation condenses and analyzes this much relevant data from sales to efficacy to adverse event rates.

14. There is no question this document should have been produced in supplemental response to Plaintiffs' original requests for production. Indeed, the fact that Cook voluntarily produced it proves that point. But the timing and manner of production were inappropriate. Plaintiffs propounded CMO 2 requests for documents with respect to Cook defendant and corporate representative depositions. Cook took the position that it was required only to identify previously produced responsive documents, but curiously it also volunteered to produce any documents reviewed or relied upon by the deponents in preparing for depositions. Plaintiffs'

8

counsel addressed this in a letter to Cook: "Cook's position seems to be that it will not produce documents responsive to Plaintiffs' CMO 2 requests, but if its attorneys find particular documents useful to prepare the witness to testify, then those it will produce. Plaintiffs certainly don't object to receiving such documents, but would object if the procedure is tantamount to Cook having withheld documents until they proved useful for a witness's testimony. We will simply wait and see." (**Ex. F**, M. Schultz Ltr. to A. Pierson, 4/7/17 at 8.)  It turns out this is precisely what Cook had in mind.  Rather than producing this August 2016 document in a timely manner so that Plaintiffs' experts might have used it; Cook withheld it until April 7, 2017, after the expert report deadline, and produced it in a CMO 2 response for the deposition of Cook's own witness, Ms. Jennifer Brown.  Ms. Pierson used the document extensively in her friendly examination of Ms. Brown.

15. The prejudice is not theoretical.  Plaintiffs' expert Dr. David Kessler painstakingly assembled from dozens of documents precisely this sort of data for the period 2000-2009 to show that Cook had internally recognized the Celect filter had a perforation rate fifteen times higher than the Tulip filter.  At Dr. Kessler's request, Plaintiffs' counsel engaged the services of Harvard statistician Dr. Rebecca Betensky to analyze the statistical significance of the data.

16. Cook's literature survey on fracture within the Summary shows Celect had more than twice as many fractures as Tulip during the same period with comparable sales. The statistical significance of this data unquestionably would have been addressed by Drs. Kessler and Betensky had the Summary been timely produced.

17. The Summary supplies sales data by filter from October 2008 through June 2016 and provides Cook's own calculated complaint rates during the same period, which show Celect had a fracture rate 6 times higher than Tulip and 10.8 times higher than Celect Platinum while

also revealing a perforation rate 2.7 times higher than Tulip and 2.8 times higher than Celect Platinum. It also shows a Celect migration rate twice as high as Tulip and Platinum. All of this complaint data (and Cook's analyses of the data) would have been presented to Dr. Betensky and utilized by Dr. Kessler had it been available.

18. Similarly, the FDA-reported event data reflected in the Summary shows 165 penetration events for Celect vs. 40 for Tulip and 105 Celect fractures vs. 28 for Tulip. Drs. Kessler and Betensky could have combined known sales and FDA-reported adverse event data through 2009 with this data for 2009-2016 contained in the Filter Data Summary to provide an analysis covering the entire lifespan of both Celect and Tulip (assuming statistical significance, which Cook does not address). But this did not occur because Cook withheld the document until three weeks after their reports were served.

19. These are merely examples. Given the density of data and analysis contained in the Summary, it could have been put to any number of uses by these experts and perhaps others. Cook's failure to seasonably supplement its discovery (until just weeks after the expert deadline) should not be permitted to hamstring Plaintiffs' experts.

**The Applicable Standard**

20. Pursuant to Fed. R. Civ. P. 16(b), a schedule may be modified "only for good cause and with the judge's consent." *See also United States v. Cinergy Corp.*, 1:99-CV-1693LJMJMS, 2008 WL 695926 at *2 (S.D. Ind. Mar. 12, 2008) ("[A] party seeking to alter or modify a deadline must seek leave of the court and demonstrate good cause to do so.")

21. Plaintiffs aver that good cause exists for the relief requested in this motion and they have acted diligently in pursuing this request for relief.

**Request for Relief**

22. A copy of this motion was provided to counsel for Cook. A discussion was held May 17 and Cook did not agree to the relief sought herein.

WHEREFORE, Plaintiffs request **(1)** they be given 14 days from the date of ruling to consult with their experts regarding the Dotter documents and the IVC Filter Data Summary to determine whether any expert should provide an addendum; and, if so, **(2)** Plaintiffs request an additional 14 days for disclosure of additional opinions based on and limited to these documents; and **(3)** Plaintiffs request that Cook be required to bear the expenses borne by all parties, counsel, and witnesses with respect to any follow-up discovery of Plaintiffs' experts should the Court order such discovery.

Respectfully submitted this 17th day of May, 2017.

/s/ Joseph N. Williams
Joseph N. Williams, Atty. No. 25874-49
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com
*Liaison Counsel to Plaintiffs Steering Committee and on behalf of Plaintiffs Steering Committee*

Michael W. Heaviside, Esq.
HEAVISIDE REED ZAIC, A LAW CORPORATION
910 17th Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 223-1993
mheaviside@hrzlaw.com

>Ben C. Martin, Esq.
>THE LAW OFFICES OF BEN C. MARTIN
>3710 Rawlins Street, Suite 1230
>Dallas, TX  75219
>Telephone: (214) 761-6614
>Facsimile: (214) 744-7590
>bmartin@bencmartin.com
>
>David P. Matthews, Esq.
>MATTHEWS AND ASSOCIATES
>2509 Sackett St.
>Houston, TX  77098
>Telephone: (713) 522-5250
>Facsimile: (713) 535-7184
>dmatthews@thematthewslawfirm.com
>
>*Plaintiffs' Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 17, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

      Notice will be served on the parties listed below by first class U.S. Mail, postage prepaid:

Anthony J. Urban
Brian J. Urban
LAW OFFICES OF ANTHONY URBAN, P.C.
474 N. Centre Street, 3rd Floor
Pottsville, PA 17901

Carrie R. Capouellez
LOPEZ McHUGH LLP
214 Flynn Avenue
Moorestown, NJ 08057

Caleb H. Didriksen, III
Carl A Woods, III
DIDRIKSEN LAW FIRM, PLC
3114 Canal Street
New Orleans, LA 70119

Cliff W. Marcek
CLIFF W. MARCEK, P.C.
700 S. Third St.
Las Vegas, NV 89101

Craig D. Henderson
THE SNAPKA LAW FIRM
P.O. Box 23017
Corpus Christi, TX 78403

Curtis Hoke
THE MILLER FIRM LLC
The Sherman Building
108 Railroad Avenue
Orange, VA 22960

David C. Anderson
Anderson Law
711 Van Ness Avenue, Suite 220
San Francisco, CA 94102

Jack E. Urquhart
THE SNAPKA LAW FIRM
606 N. Carancahua, Suite 1511
Corpus Christi, TX 78401

Jay Harris
HARRIS, RENY & TORZEWSKI
Two Maritime Plaza, 3rd Floor
Toledo, OH 43604

Joseph A. Napiltonia
LAW OFFICE OF JOE NAPILTONIA
213 3rd Avenue North
Franklin, TN 37064

Joseph G. Sauder
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, PA 19041

Kimberly L. Adams
LEVIN PAPANTONIO THOMAS ETC PA - PENSACOLA FL
316 S BAYLEN ST STE 400
PENSACOLA, FL 32502

Marian S. Rosen
ROSEN & SPEARS
5075 Westheimer, Suite 760
Houston, TX 77056

Michael G. Glass
RAPPAPORT GLASS GREENE & LEVINE LLP
1355 Motor Parkway
Hauppauge, NY 11749

Neal L. Moskow
URY & MOSKOW
883 Black Rock Turnpike
Fairfield, CT 06825

Peter C. Wetherall
WETHERALL GROUP, LTD.
9345 W. Sunset Road
Suite 100
Las Vegas, NV 89148

Philip Sholtz
THE DRISCOLL FIRM, P.C.
211 N. Broadway
40th Floor
St. Louis, MO 63102

W. Bryan Smith
MORGAN & MORGAN, LLC
2600 One Commerce Square
Memphis, TN 38103

Wilnar J. Julmiste
ANDERSON GLENN LLP - BOCA RATON FL
2650 North Military Trial, Suite 430
Boca Raton, FL  33431

Heather H. Harrison
FAEGRE BAKER DANIELS LLP
311 S. Wacker Drive
Suite 4400
Chicago, IL 60606

Jennifer P Henry
THOMPSON & KNIGHT LLP
801 Cherry Street, Unit #1
Fort Worth, TX 76107

*/s/ Joseph N. Williams*
Joseph N. Williams