UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE:  COOK MEDICAL, INC.,  ) CAUSE NO. 1:14-ml-2570-RLY-TAB
IVC FILTERS MARKETING, SALES ) MDL No. 2570
PRACTICES AND PRODUCTS       ) Indianapolis, Indiana
LIABILITY LITIGATION         ) Friday, May 12, 2017
                             ) 3:11 o'clock p.m.


Before the
HONORABLE MAGISTRATE JUDGE TIM A. BAKER


TRANSCRIPT OF PRETRIAL CONFERENCE

APPEARANCES:
FOR THE MDL PLAINTIFFS      Riley Williams & Piatt, LLC
appearing by telephone:     By:  Joseph N. Williams
                            301 Massachusetts Avenue
                            Indianapolis, Indiana 46204

                            Heaviside Reed Zaic
                            By:  Michael W. Heaviside
                            910 17th Street, NW, Suite 800
                            Washington, D.C. 20006

                            The Law Offices of Ben C. Martin
                            By:  Ben C. Martin
                            3710 Rawlins Street, Suite 1230
                            Dallas, Texas 75219

FOR THE MDL DEFENDANTS      Faegre Baker Daniels LLP
appearing by telephone:     By:  Andrea Roberts Pierson
                            Andrew Lorin Campbell and
                            John Joseph Tanner
                            300 North Meridian Street
                            Suite 2700
                            Indianapolis, Indiana 46204

COURT REPORTER:             Jean A. Knepley, RDR, CRR, CRC, FCRR
                            46 East Ohio Street, Room 309
                            Indianapolis, Indiana 46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

2

 1            THE COURT:  This is Judge Baker.  Good afternoon,

 2  counsel.

 3            A VOICE:  Good afternoon.

 4            A VOICE:  Good afternoon, Your Honor.

 5            A VOICE:  Yes, sir.

 6            THE COURT:  Sorry to keep you waiting.  I appreciate

 7  your patience.  We were trying to figure out exactly which room

 8  we were going to be doing this in, and I made the court

 9  reporter move, I think, two different times, so it is all on

10  me.

11            I wanted to cover a couple of things before we got

12  started.  I did issue two orders today, hopefully you had a

13  chance to see them.  Obviously there wasn't a lot of time in

14  between when those were issued and this conference, but just so

15  we are all on the same page, I issued one order on one of the

16  cases regarding Dr. Lynch's testimony and some related issues.

17            And then also, I issued an order with respect to

18  local Rule 37-1, and I tried to not be critical in any way of

19  the lawyers.  But I also thought it was important to set forth

20  what I have concluded is a procedure that is not working very

21  well.  As set forth in much more detail in that order, these

22  conferences have kind of become difficult to manage from a

23  variety of standpoints that are set forth in that order.  So I,

24  I don't want to not have those conferences with you, but I

25  can't continue to have them in the way that they have been done

1  with so many issues being raised, no record being established,

2  and so I set forth in that order some parameters that need to

3  be followed as we push forward.

4         There are some issues for discussion today.  I think

5  at least one of those issues was addressed in the order I

6  issued today.  There are other issues that may not be suitable

7  for resolution at a 37-1 conference that you have raised, but

8  I will still quickly go over them with you.  There is a couple

9  of them I think I am prepared to issue a ruling on, subject to

10 whatever you have to say today.

11        So one thing I will add is that I do have a court

12 reporter present, and so when you do speak, it is important to

13 identify yourself each time before you speak.  Obviously if you

14 are the same person talking, you don't need to say your name

15 every time you talk, but if for some reason the other side

16 talks and you come back on the line, then you need to identify

17 yourself again.

18        So with that having been said, the first issue I see,

19 there is a May 5, 2017, letter from Faegre, and the first issue

20 is the confidentiality designations.  And in the order I issued

21 today, in fact, that was one of the main -- one of the primary

22 issues addressed in the order.  I do not feel comfortable

23 addressing issues regarding confidentiality designations

24 without a better record, and so, I have directed counsel to

25 brief that issue if that is something they want to bring to the

4

1  Court's attention.

2        The second issue that I see raised in that letter

3  looks like it is CMO No. 19, which I think was attached as

4  Exhibit G.  So let me ask -- let's see, is it Mr. Campbell, are

5  you going to address these issues?

6        MR. CAMPBELL:  I can, Your Honor.

7        THE COURT:  Help me here.  Was Exhibit G to the

8  May 5 -- it was your letter.

9        MR. CAMPBELL:  Yes.

10       THE COURT:  Was Exhibit G to the May 5 letter, was

11  that CMO No. 19?

12       MR. CAMPBELL:  CMO 19 set forth the procedure whereby

13  the parties were to negotiate an IME protocol.  The parties had

14  negotiated that protocol, and that is what we have submitted to

15  Your Honor in Exhibit G.  That is the protocol for independent

16  medical examinations, and we simply ask that Your Honor enter

17  that agreed protocol.

18       THE COURT:  Right.  And so my question though, is,

19  has that been filed on the docket somewhere?

20       MR. CAMPBELL:  It has not, other than with our

21  letter.  We -- well, I guess the letter wasn't filed.  We can

22  submit that on the docket with a joint motion or however Your

23  Honor would like us to do that.

24       THE COURT:  That is how I would like to do it, a

25  joint motion.  That is acceptable to me.  I am fine with that

1   protocol.  I think, then -- so I will look for that by way of a

2   joint motion and presumably approve that.  I think, then, the

3   issue becomes with respect to the IME of Ms. Hill, it appears

4   to me that the Defendants would like to engage in what the

5   Plaintiffs consider to be invasive procedures with respect to

6   that IME, and so that is what I wanted to talk with you a

7   little bit about today.

8          It looks like the IME that the Defendants propose

9   would involve an upper endoscopy and a venogram with a contrast

10  for Ms. Hill; is that correct, Mr. Campbell?

11          MR. CAMPBELL:  That's correct, Your Honor.

12          THE COURT:  All right.  Will you explain to me why

13  you think that is appropriate?

14          MR. CAMPBELL:  Sure.  Let me start with the venogram.

15  Ms. Hill's medical expert has offered the opinion that she has

16  suffered a permanent injury to her vena cava.  He opines that

17  her IVC has narrowed because of the placement of her filter,

18  and as a result, has suffered from and will continue to suffer

19  from injuries associated with that.

20          Her life care plan expert has then offered the

21  opinion that she will require a venogram every five years for

22  the remainder of her life to assess the anatomy of her IVC and

23  to monitor that injury.  Mrs. Hill has not had a venogram since

24  the filter was retrieved in August of 2013, so her next

25  venogram is coming due in the near future, and we think it is

1  only appropriate that based on the opinions of her medical

2  expert, who has alleged that she had this injury to her

3  venogram [sic] and her life care planner who opines that she

4  must undergo a venogram every five years, that she do so as

5  part of the independent medical examination that we have

6  suggested here.

7           The Plaintiffs have suggested she does not want to

8  undergo that venogram because it will require the injection of

9  contrast, and the point I would make there is that Plaintiffs

10 and Mrs. Hill has consented to a CT scan with contrast.  So she

11 has consented to injection of contrast associated with her CT

12 scan, but she has objected to the injection of contrast

13 associated with her venogram.  And what we have shown in our

14 letter is, in fact, that CT scan will require the injection of

15 more contrast than what would be required for a venogram.

16          So we are a little bit confused about why they would

17 object with respect to the venogram if they consent to more

18 contrast associated with the CT scan.  So that is the issue

19 with the venogram, and we think under the law that we have

20 cited and Rule 35, Cook is entitled to make that part of her

21 independent medical examination.

22          As to the upper endoscopy, similar issues.

23 Plaintiff's experts have offered the opinion that as part of

24 Mrs. Hill's damages, that she has an injury which an endoscopy

25 is needed to diagnose and to monitor and that, in fact, she

1  will require an endoscopy every three years for the remainder

2  of her life.

3           The last endoscopy was in July of 2014.  So again,

4  she is due for one in the very near future and, in fact, her

5  life care plan expert has said that she, in fact, plans to have

6  one this fall.  So apparently she is intending to do that in

7  the near future, and we think that that should happen as part

8  of the independent medical examination that we have proposed

9  here.

10          Plaintiff has objected because it is an invasive

11 procedure.  I would note that she has had seven prior upper

12 endoscopies according to her records; and again, she intends to

13 have one in the near future and her experts have suggested that

14 she will need them going forward.

15          Cook is paying for these procedures.  It will cover

16 the cost of any travel associated with these procedures.  So,

17 you know, we are going to make that available to her as part of

18 this.  So those are the points that I would make on the Hill

19 IME.

20          THE COURT:  Thank you, Mr. Campbell.

21          Who will we hear from on behalf of the Plaintiff?

22          MR. HEAVISIDE:  This is Mike Heaviside, Your Honor.

23          THE COURT:  All right, Mr. Heaviside.  Go ahead.

24          MR. HEAVISIDE:  I have to back up a little because

25 when we were negotiating the IME issue generally there were two

1  issues, of course, which would be the generic CMO for covering

2  all IMEs and in this case specific Hill matter.  So yes, we did

3  successfully resolve our issues on the generic side of things.

4          Now, in terms of specifically Miss Hill, there were

5  two -- an IME scheduled for New York, although we don't know

6  with whom, and also in North Carolina.  And again, we don't

7  know with whom.  So we negotiated the location.

8          We have narrowed some of the issues, and if the

9  question is raised why would you agree to one test and not the

10 other, it is because in the spirit of compromise we felt that

11 was a reasonable thing to do.  And the whole issue with

12 contrast is, it is a cumulative effect.

13         Now, the thing that somebody has had seven

14 endoscopies in the course of their life is like saying you have

15 survived two tours in Afghanistan, why not go back?  It is a

16 rather cavalier attitude towards Mrs. Hill and her ongoing

17 health; and frankly, the real point of this is that when

18 Dr. Lynch successfully retrieved the filter, he noted narrowing

19 of the IVC by venogram, so we have that.  And both of the

20 Plaintiff's experts, Doctors Marmureanu and Rejebi, they both

21 confirm that finding based on a very recent diagnostic testing,

22 either March 16th or March 17th of 2017 within the last six or

23 seven weeks.

24         So if that is the issue, the Defendants have all this

25 diagnostic testing, and we don't see any demonstration that

1   this kind of intrusive maneuver is necessary.

2            THE COURT:  Let me say this.  I agree it is invasive,

3   and I am reluctant to order it.  However, Mr. Campbell sets

4   forth a good argument that she is going to have it anyway.  Her

5   doctors have said --

6            MR. HEAVISIDE:  Well --

7            THE COURT:  -- she is due particularly in the case of

8   the upper endoscopy, she is due this fall.

9            MR. HEAVISIDE:  Well --

10           THE COURT:  If that is the case, why not just go

11  ahead and do it?

12           MR. HEAVISIDE:  Well, because I don't think that is

13  entirely accurate.  The life care planner is in no position to

14  dictate with what frequency Mrs. Hill receives medical care.

15           THE COURT:  Well, wait a minute, now.  You are going

16  to rely on that life care plan, throw it in front of the jury

17  and say, look, she is going to have all these medical costs, so

18  you are relying on that.

19           MR. HEAVISIDE:  No, not really.  What we are relying

20  on is her assessment of the costs associated with these

21  treatments.  I don't think we would be all that successful in

22  having the life care planner offered as an expert as to the

23  nature and extent of appropriate medical care.

24           THE COURT:  No, but what I am saying is, you are

25  offering the life care -- not to say that she has to have it

10

1   but to say that she –– this is what the cost of it would be.

2   So it doesn't necessarily suggest that she would be having it,

3   right?

4              MR. HEAVISIDE:  I don't follow that, to be absolutely

5   frank with you.  If her attending physicians feel that she has

6   to have an endoscopy, then the life care planner is certainly

7   able to assess costs associated with that procedure.  But the

8   life care planner is in no position to say she has to have it

9   and when she has to have it.  This is beyond her ––

10             THE COURT:  So what does her doctor say about ––

11             MR. HEAVISIDE:  –– abilities.

12             The doctor says that depending on her condition.  I

13   mean, if she were to develop DVT, for example, she may need a

14   lot of additional care.  If she doesn't develop DVT, then she

15   won't.  So that is the only way we can say it at this point in

16   time.  No one can say at this point in time with certainty

17   precisely when she will need this treatment or that treatment.

18             THE COURT:  Okay.  So you're representing to the

19   Court that there is no plan that you are aware of that Ms. Hill

20   would be having either a venogram or an upper endoscopy this

21   year?

22             MR. HEAVISIDE:  I am certainly not aware of any

23   venograms.  She has had three, and I know that the testing she

24   had on March 16th and March 17th is the diagnostic testing to

25   which both experts refer.  And I can tell you I am aware of no

11

1  plan of her having an endoscopy.  I, you know, she has had

2  seven in her lifetime, and believe me, she is not desirous of

3  rushing into something like that.  That is the best I can tell

4  you.

5          THE COURT:  All right.  That is all I can ask.  All

6  right, all right.  And then, did you have anything else on it,

7  Mr. Campbell?

8          MR. CAMPBELL:  Yes, Judge.  I just want to make sure

9  I am clear, because I am a bit confused.  Her life care plan

10 expert testified at her deposition in the last week that she is

11 scheduled to have an upper endoscopy this fall.  So there,

12 there is that.

13          Number 2, her medical expert, Dr. Marmureanu, is

14 offering opinions that she has suffered these injuries that can

15 only be assessed, as I understand it, by these types of

16 procedures.  So if she is refusing to undergo these procedures,

17 it is going to raise all kinds of issues -- all kinds of

18 evidentiary issues and as to what is admissible with respect to

19 what her injuries are, her refusal to undergo procedures that

20 would prove up those injuries, what prior procedures have been

21 done, what future procedures may need to be done.  And, so

22 those are some of the concerns that we have here, so.

23          Dr. Marmureanu, her medical expert, just for example,

24 offers this opinion, and I am quoting from his report.  Sorry,

25 I, I don't have it here immediately.  Just a moment.

1           MS. PIERSON:  Judge, this is Andrea Pierson.  I am

2    looking at page 12 of Dr. Marmureanu's report where he talks

3    about an upper endoscopy every three years.  He is the one who,

4    who suggests that she needs it every three years, not Dr. Levy,

5    the life care planner -- just Levy, not doctor.

6           MR. CAMPBELL:  So those are the concerns we have,

7    Your Honor.  The expert suggests this is necessary, that that

8    necessity underlies their opinion as to her damages in the

9    case.  And if she refuses to undergo those procedures, that it

10   will require all kinds of evidentiary considerations that, you

11   know, maybe we need to address in further briefing so that can

12   be considered.

13          THE COURT:  All right, I understand.  Let me just

14   help the court reporter out here for a second.

15   Dr. Marmureanu --

16          MR. CAMPBELL:  Excuse me -- it is Dr. Marmureanu.

17   Dr. Marmureanu is an orthopaedic surgeon.

18          THE COURT:  Just hang on, just hang on.

19          MR. CAMPBELL:  Okay.

20          THE COURT:  Because the name was referenced.  The

21   spelling of that is M-A-R-M-U-R-E-A-N-U.

22          All right.  Now, next is you all want to reopen the

23   deposition of Tonya Brand, which has drawn -- someone is

24   breathing really heavily into the phone.  It sounds like Darth

25   Vader, so try to not do that.  It is hard to hear.

1          So if the Defendants could extrapolate a little bit

2    on why they believe we need to reopen the deposition of Tonya

3    Brand, and the Plaintiff has objected, saying this is a

4    layperson and they have been fully deposed.

5          MR. TANNER:  Your Honor, this is Joe Tanner.  We set

6    it out in our letter.  Perhaps I can add a little flavor and

7    color to it, but as we stated, she was only deposed for four

8    hours, so it is not like she sat for a whole day and we are

9    asking for more time, etc., and it was a year and a half ago

10   before she was picked as a Bellwether.

11         THE COURT:  Why did her deposition only last four

12   hours?

13         MR. TANNER:  I, I don't know, Your Honor, other than

14   I know that they produced 3,000 pages of records at the

15   deposition, and she had testified that she had more, as I

16   understand, records that she hadn't even given to her lawyer.

17         Since that time there have been supplemental

18   responses, new information, including things like having been

19   told, having a discussion with her nurse about problems with

20   the filter in 2011, and she later presented the spreadsheet of

21   damages which she, at the deposition, indicated she didn't have

22   and that was later.

23         We have agreed that, you know, we are not going to

24   ask her the same questions again.  We don't have any interest

25   in doing that, and the Plaintiffs have said we don't mind her

14

1  sitting for another deposition, but they want to put a

2  restriction on it so it is not a convenience argument, it is a

3  restriction that we can't cover any topics that could have been

4  covered before for the risk that she would be giving

5  contradictory testimony.  And we just think that is really too

6  restrictive.

7          We are agreeing that we won't ask her the same

8  questions, that is not our intent.  But she -- the facts and

9  the situations are different.  She is now one of the three

10  Bellwether cases.  It is, I think, unwieldy to say the standard

11  are things that couldn't be covered before.  I think that

12  becomes a bit impossible to gauge by.

13         For instance, could we have asked her about a 2001

14  conversation with a nurse?  Now that we have more information

15  about it, is that something?  Could we have asked her about her

16  medical condition?  I mean, where does that line draw?  I think

17  the line drawn on we won't ask her the same questions is a much

18  more clear line and a line that can be respected in the

19  deposition without calling Your Honor frequently through the

20  deposition.

21         And as I said, there has been many more documents

22  produced.  It is interesting that Plaintiffs make a comment

23  about well, the Defendants had authorization before deposition,

24  but the authorizations came back to us.  She had filled out

25  only documents related to filter fractures as opposed to all

15

1  documents relating to her healthcare and that type of thing.

2  So we think it is a very reasonable thing to do, to ask her

3  additional questions.

4       I know we reopened the deposition of Mr. Gage, and

5  that went smoothly.  We don't intend to -- we can finish it in

6  the remaining three hours.  We are not asking for additional

7  time other than the standard presumptive seven hours.

8       There has been lots of depositions taken, including

9  ones recently when Plaintiffs have asked numerous questions

10 about the same topics and the same questions over and over and

11 over.  And that is just part of it, but we do commit to the

12 Court we are not going to ask the same questions.  She is the

13 Bellwether Plaintiff, and we think it is a reasonable

14 proportional request.

15       THE COURT:  Okay.  Plaintiff's response?

16       MR. MARTIN:  Yes, Your Honor.  Ben Martin, yes, sir.

17       THE COURT:  Thank you.

18       MR. MARTIN:  I would first address, Your Honor, the

19 scope that counsel suggests is okay, and that is, well, we

20 won't ask the same questions.  Well, if they are wanting to go

21 over the same subject matter and ask different questions about

22 the same subject matter, that is no restriction at all.  And I

23 would say this, too, that the deposition actually, to be, you

24 know, exact, it was four hours and 27 minutes.

25       Now, I would suggest to the Court that the reason it

1  took four hours and 27 minutes is that is what opposing

2  Counsel, Doug King at the time, thought he needed to take a

3  good deposition.  And I would suggest that he did take a good

4  deposition, and I would suggest that some people, you know,

5  take five-hour depositions instead of seven and they get much

6  more than a person taking seven hours in depositions.  I think

7  we have all experienced that.

8         THE COURT:  I think that is true.

9         MR. MARTIN:  But this deposition --

10        THE COURT:  Let me ask you this.  Are you, then,

11 agreeable to producing or not objecting, anyway, to the Brand

12 deposition as long as topics previously covered are not covered

13 the second time?

14        MR. MARTIN:  Yes, that is essentially it.  What I had

15 suggested was, that they be able to ask questions about what

16 has happened since, med -- what has happened since December of

17 the 2015 when they took the deposition?  So I think essentially

18 that, that is what we are suggesting.  Maybe it is a little bit

19 broader than what we are suggesting, but yeah, that is

20 agreeable.

21        THE COURT:  Okay.  Anything else with respect to the

22 Brand deposition, Mr. Martin?

23        MR. MARTIN:  Your Honor, I do want to say this, that

24 we did give an authorization.  I am looking at it right now,

25 and I don't see any, anywhere in here that restricts this to a

1  fracture.  I am -- this is the authorization that we were sent

2  by Wooden McLaughlin.  I mean, I am looking at it.  It was

3  signed.  I don't see any restriction; and quite frankly, if

4  there is some restriction buried in here about it, why did they

5  send us this authorization?

6          This authorization was sent to them in May of 2015.

7  So that, that is the actual truth of the matter.  Additionally,

8  we have a list and gave them a list of all the doctors and the

9  healthcare providers, and I don't know what else to say on

10 that.  And secondly --

11         THE COURT:  You lost me.  Mr., Mr. Martin, you kind

12 of lost me there for a second.  Does that relate to the Brand

13 deposition?

14         MR. MARTIN:  Sure.  Yes, the Brand deposition.  They,

15 they are saying -- are you talking about, the Court talking

16 about the authorization, the --

17         THE COURT:  Well, you started talking about it.  You

18 kind of lost me exactly where you were going with that issue.

19         MR. MARTIN:  I think that Mr. Tanner had suggested

20 that we had given them a false, a bad medical authorization

21 because it had some restriction in it.  And that is what I was

22 addressing, and that is the only reason I addressed the medical

23 authorization aspect, because we filled out the medical

24 authorization they gave us to fill out.  That is all.

25         THE COURT:  Okay.

18

1          MR. MARTIN:  The only other thing is the fact that it

2   is in the deposition that, in fact, we, we did not have any

3   medical -- she did not have any medical records that we didn't

4   have.  It is just a little point that -- a little inaccuracy

5   that needed to be cleared up.

6          I think as long as, as long as they take the

7   deposition about new things and not rehash the same subject

8   matter, go over the same subject matter, I think that is

9   unfair.

10          THE COURT:  Okay.

11          MR. MARTIN:  That is our argument, Your Honor.

12          THE COURT:  I understand.  Now, let's move on to the

13   Gage deposition.

14          MR. HEAVISIDE:  Excuse me, Judge Baker.  This is Mike

15   Heaviside, if I may.  Before we leave --

16          THE COURT:  No, no, no, no, no, no, no, no.

17          MR. HEAVISIDE:  I, I don't recall my opportunity to

18   respond to Ms. Pierson --

19          THE COURT:  Well, you, you didn't -- to Ms. Pierson?

20          MR. HEAVISIDE:  Yes.

21          THE COURT:  Well, she was a while ago.  I don't know

22   about that.  She, she shouldn't have said anything anyway

23   because it is not her issue.  So I don't need anymore response

24   on that, so we will just move on.

25          Let's talk about the Gage IME.  So there is a dispute

1  about doing a psychological component of an IME on the Gage

2  Plaintiff.  The Defendant want to be heard on that?

3           MR. CAMPBELL:  Yes, Your Honor.  This is Andrew

4  Campbell again.  The issue is similar to Hill.  Mr. Gage's

5  medical expert, Dr. Marmureanu, has offered the opinion that

6  anxiety and depression are known outcomes of chronic disease

7  and pain.  He intends to offer that opinion, and in terms of

8  future medical needs, he holds the following opinions to a

9  reasonable degree of medical certainty:

10          Psychological distress, and he opines that clinical

11  psychologists and counselor evaluation with treatment based on

12  that evaluation is necessary.  As a result, since they are

13  claiming psychological distress or psychological damages as

14  part of Mr. Gage's case, we believe that a psychological

15  examination as part of his independent medical examination only

16  makes sense.

17          So this is not something that we have concocted, it

18  is something that his own expert is offering an opinion on.

19  Again, we will pay for the travel associated with that portion

20  of the IME per the protocol and don't see any invasive,

21  anything invasive about this.  It would simply be an, a

22  physical examination, I believe, and then an interview.

23          THE COURT:  So I get claims of emotional distress in

24  so many of the cases that are filed here, and I don't ever

25  recall, really, ever being asked to approve or not approve a

20

1   psychological IME.  I think what I typically see are someone

2   who alleges emotional distress, maybe they have sought

3   treatment, maybe they haven't.

4           If they have sought treatment, those records are fair

5   game in discovery.  Plaintiff can be asked about those records

6   in the course of their deposition.  It could be one side could

7   even go hire an expert, I guess, to talk about whether those

8   types of damages would naturally flow from the underlying

9   incident.  But I have never seen a party ask for a

10  psychological IME.  I am not saying it has never happened, but

11  I just don't recall it.  It seems unusual.  Does it strike you

12  as unusual?

13          MR. CAMPBELL:  It doesn't, Your Honor, for this

14  reason:

15          Plaintiff's own expert is offering the opinion that

16  Mr. Gage should be evaluated by a psychologist or counselor,

17  should receive treatment based on that evaluation and that that

18  should be considered a component of his damages.  If Mr. Gage

19  was simply offering as a component of damages pain and

20  suffering, you know, that, that is one thing.  I understand

21  your point on that, but here he has gone a step further and is

22  offering a medical expert opinion who has said he should

23  undergo psychological evaluation and be treated according to

24  that evaluation, and that is a component of his damages.

25          THE COURT:  All right.  That --

21

 1          MR. CAMPBELL:  So again, I think it raises this

 2     evidentiary issue of if they are going to offer that opinion at

 3     trial, and Mr. Gage has refused to have that psychological

 4     evaluation that, you know, that should be considered or not

 5     considered in front of the jury as appropriate.

 6          THE COURT:  Well, isn't that --

 7          MR. HEAVISIDE:  Judge, this is Mike Heaviside again.

 8          THE COURT:  Hang on, hang on, hang on a second.  Just

 9     hang on, hang on.

10          MR. CAMPBELL:  Mike, I can handle it.

11          THE COURT:  Hang on, just hang on.  So Mr. Campbell,

12     wouldn't that really be a situation where you would actually be

13     in a good position where you, you have a situation where

14     Plaintiff is being told by their doctor they should undergo

15     psychological evaluation, they present that to the jury, you

16     then, on cross-examination, ask whether, in fact, the Plaintiff

17     has sought any psychological evaluation, Plaintiff answers no.

18     You would like the jury to know that you tried to get a

19     psychological evaluation, and they resisted it.  Wouldn't that

20     just help you?

21          MR. CAMPBELL:  Your Honor, I think that under these

22     circumstances, where an expert is going to offer the opinion

23     that, as a component of damages the jury should consider his

24     psychological state and psychological distress, that it is only

25     appropriate that he be evaluated by a psychologist to evaluate

22

1    what that psychological distress is.

2           THE COURT:  Okay.  And I think I heard Mr. Williams

3    chiming in to respond?

4           MR. WILLIAMS:  Yes, Your Honor.  And this will just

5    be brief, because I think Your Honor has made many of the

6    points that I was going to make.

7           To respond to Mr. Campbell's point about what the

8    expert has opined about, I think all he has done is identify

9    what may be for him, fertile ground for cross-examination.  If

10   he offers that opinion, they can cross him on it.  I, I don't

11   know why that opinion somehow compels or raises this

12   complicated evidentiary issue.

13          It happens in trials all the time.  An expert says

14   something, and you cross them on whether or not that component

15   of their opinion happens in fact or happens not in fact.  And

16   then you can explore with them how their opinion may or may not

17   change based upon the reality that exists in the world.

18          Frankly, these IMEs that have been proposed, I have

19   done a lot of injury work, and I know a lot of people on the

20   phone have.  These, these are the most, just kind of excessive

21   IMEs I have ever heard of.  Normally we send our client to an

22   IME doctor who takes a history and does a physical exam.

23          Here, we are asking -- they are asking, especially of

24   Mr. Gage, for a neuropsychological exam in which they haven't

25   told us what battery of tests they even want to do, who the

1  person is.  They are asking to send him out to California,

2  when, even if we were to concede that he should sit for a

3  neuropsych exam, I have got to believe there is 500

4  neuropsychologists that could do any number of a battery of

5  tests somewhere in the Chicagoland area.

6         But at this point I don't know anything about what

7  Dr. Marmureanu, when he says that there is this type of disease

8  process can trigger depression somehow compels the

9  psychological evaluation.  At best, or worse, depending on what

10 side you are on, I think it just opens up, you know, some area

11 of cross-examination on the expert.

12        THE COURT:  All right, thank you, Mr. Williams.  So

13 let me --

14        MR. WILLIAMS:  Sure.

15        THE COURT:  Mr. Campbell, let me ask you one other

16 question, just kind of going back.  If I heard you correctly, I

17 thought you said when we were addressing the IME of Plaintiff

18 Hill, that you had set forth the case law in your letter

19 justifying that, and, you know, while people were talking I

20 looked back through the letter.  I was looking at your May 5,

21 2017, letter.  I see case law in there about the

22 confidentiality designation.

23        I didn't see the case law in there with respect to

24 your right to do an invasive IME.  Maybe I missed it.  Can you

25 point me to that?

24

1        MR. CAMPBELL:  Yes, Your Honor, it is on page 6,

2   Paragraph, Section B3 there at the bottom, legal argument.

3   Begins, "Courts commonly allow invasive procedures as part of

4   IMEs" and goes on to cite a number of cases in which invasive

5   procedures have been performed, including in the pelvic mesh

6   litigation going on in West Virginia.  The IMEs included pelvic

7   exams, ultrasounds, lab work, x-rays, and the Court allowed

8   further invasive testing with the consent of the Plaintiffs,

9   according to the injuries alleged.

10        So I understand that in a routine injury case that

11   IMEs may be more limited, but these are not routine injury

12   cases that the Plaintiffs have.  And the injuries that the

13   Plaintiffs are alleging here, we think, require an increased

14   level of examination.

15        Mr. Gage has alleged that he is in constant pain

16   associated with his filter, and his medical expert is going to

17   offer the opinion that that causes psychological issues.  And

18   we think it is only appropriate that if the expert is going to

19   offer an opinion that his constant pain is causing

20   psychological issues that he see a psychologist or counselor

21   who can evaluate that.  And if Your Honor orders that to happen

22   somewhere else in Chicago where Mr. Gage is, we can discuss

23   that.  If there is going to be a battery of tests associated

24   with that, we can discuss that with Plaintiffs.  We can talk

25   about what the scope of that exam may be, but here it is just a

25

1 threshold question of whether, under these circumstances, this

2 kind of procedure, this kind of examination is appropriate.

3 And we think based on the law that we have cited in our letter

4 and the circumstances with Mrs. Hill and Mr. Gage, it is

5 appropriate here.

6          THE COURT:  All right.  Thank you.  Now, is that all

7 the issues for today?

8          MR. WILLIAMS:  Your Honor, this is Joe Williams.  May

9 I be heard for just 12 seconds on an issue that I -- it was not

10 in Mr. Campbell's letter but was also not in your order from

11 today.  And I want to make sure that it didn't get lost in the

12 shuffle or whether or not it is an issue that you wanted us to

13 brief.

14          THE COURT:  You have 11 seconds left.

15          MR. WILLIAMS:  Very good.  We had talked about Your

16 Honor had previously ordered the production of custodial files,

17 and Cook had made an objection, a written objection saying that

18 they did not want to comply with that order for a whole host of

19 reasons.  That was one of the issues that you took under

20 advisement after the mid-April hearing, and while I saw the

21 issue of additional depositions and the extended length of

22 expert depositions addressed specifically in the order today, I

23 did not see anything about the custodial files or the --

24          THE COURT:  Right.  There are a host of things I

25 didn't mention specifically.  I mean, we got into, you know,

26

1  how much social media, Facebook stuff you get into.

2           MR. WILLIAMS:  Sure.

3           THE COURT:  I didn't list them all.  Anything that is

4  not specifically mentioned in there, if you really want to

5  pursue it or either side really wants to pursue it, then the

6  suggestion that the implication or result is, that it needs to

7  be briefed.

8           MR. WILLIAMS:  Okay.  So just in final follow-up, if

9  Your Honor's order had not been obviously overturned by the

10 Court, that previous order is still in effect?

11          THE COURT:  Yes.

12          MR. WILLIAMS:  Okay.  Thank you, Your Honor.

13          THE COURT:  Okay.  So here -- just hang on.  Let me

14 just collect my thoughts for a second.  I will come back to

15 you.

16          (Brief recess.)

17          THE COURT:  Okay.  With respect to rulings for today,

18 with respect to the confidentiality designation, I have already

19 indicated that issue, if it needs to be pursued, will be done

20 by briefing.

21          With respect to CMO No. 19, I have indicated that I

22 am inclined to grant that.  It sounds like it is an agreed-upon

23 case management order.  That will be filed for approval by way

24 of a joint motion.

25          With respect to reopening the deposition of Tonya

27

1 Brand, I am going to allow that with the following provisos:

2           Number 1, Defendants shall not ask the same questions

3 asked at the prior deposition.

4           Number 2, Defendants should avoid questions that may

5 tend to duplicate testimony from the first deposition.

6           And No. 3, the deposition shall be limited to three

7 hours.

8           The next issue is the psychological evaluation or IME

9 of the Gage Plaintiff. I am going to deny that request. I

10 agree with Mr. Williams, and as I set forth, I believe that the

11 lack of Mr. Gage –– well, let me back up. I believe that this

12 is, as Mr. Williams said, this is fertile ground for

13 cross-examination. You can get his psychological records or

14 lack thereof and cross-examine about that, but it would be very

15 unusual and, in fact, as I indicated, I have never done it. I

16 am not even sure I have ever been asked to do it, to subject a

17 Plaintiff to a psychological IME.

18           And frankly, under the conditions that I am not sure

19 have been fully detailed and if the suggestion was by the

20 Defendants that the Plaintiff should have to go to California

21 to do that, I mean, that would be completely unacceptable. So

22 that request for an IME of the Gage Plaintiff is denied.

23           That leaves the IME of the Hill Plaintiff. I will

24 say, I am reluctant to allow that. That is a, particularly the

25 upper endoscopy, is an invasive procedure. Just because

28

1  somebody had seven prior endoscopies doesn't mean they want to

2  have eight.  In fact, it probably means they don't want to have

3  anymore, but I will take that issue under advisement and issue

4  a brief ruling on that soon.  I reserve the right to change my

5  mind, but I am inclined at this point to deny that.

6          So I will issue a brief order on those things

7  shortly, and please keep in mind my directive for these future

8  conferences.  If there is an issue or two or a relatively

9  straightforward thing that we can address by way of these

10 conferences, I am happy to have them with you, and I would like

11 to keep things moving.  But for the reasons I have previously

12 indicated, the complex and substantial issues need to have a

13 properly developed record and need to have the benefit of

14 briefing.  Thank you.

15          (Concluded at 3:54 o'clock p.m.)

16                  CERTIFICATE OF COURT REPORTER

17

18          I, Jean A. Knepley, hereby certify that the

19  foregoing is a true and correct transcript from

20  reported proceedings in the above-entitled matter.

21

22

23 /S/ Jean A. Knepley                 May 18, 2017
   JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR    Date
24 Official Court Reporter
   Southern District of Indiana
25 Indianapolis Division