**EXHIBIT L**

FaegreBD.com

**FAEGRE BAKER DANIELS**

USA ▾ UK ▾ CHINA

**Andrew L. Campbell**
Partner
andrew.campbell@FaegreBD.com
Direct +1 317 237 1011

Faegre Baker Daniels LLP
300 North Meridian Street ▾ Suite 2700
Indianapolis ▾ Indiana 46204-1750
Main +1 317 237 0300
Fax +1 317 237 1000

May 5, 2017

*Via Email: amy_holtz@insd.uscourts.gov*

Magistrate Judge Tim A. Baker
c/o Amy Holtz, Courtroom Deputy
U.S.D.C. for the Southern District of Indiana
Indanapolis Division
46 East Ohio Street
Indianapolis, IN  46204

Re:  Cook Medical, Inc., IVC Filters Products Liability Litigation, MDL 2570

Dear Magistrate Judge Baker:

The Cook Defendants ("Cook") respectfully submit this letter (1) in reply to Mr. Williams's May 3, 2017, email regarding Cook's confidentiality designations,[1] (2) to request that Elizabeth Hill submit to an inferior vena cava ("IVC") venogram and extended upper endoscopy as part of her independent medical examination ("IME"), and (3) to request that Tonya Brand's deposition be re-opened. We look forward to discussing these issues with Your Honor on May 12, 2017, at 3:00 p.m.

### I.  Reply In Support Of Cook's Confidentiality Designations

First, Plaintiffs ignore the applicable legal standard for designating documents as "confidential" in discovery, including Your Honor's observation that there is a "difference between requesting court protection for documents for purposes of discovery only, and requesting that documents submitted to and considered by the court be sealed.  The latter requires more scrutiny by the court and more justification by the proponent." *Meharg v. I-Flow Corp.*, 2009 WL 1404603, at *3 (S.D. Ind. May 15, 2009) (Baker, J.); *see Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002) ("Secrecy is fine at the discovery stage, before the material enters the judicial record."); *Morris v. Mid-Century Ins.*, 2013 WL 415631, at *1 (S.D. Ind. Jan. 31, 2013) ("[V]ery different standards govern limitations on the use and dissemination of materials and information exchanged in discovery than govern materials that are filed as part of the judicial record and underpin the court's decisions on substantive matters."). Here,

---

[1] For the Court's convenience, attached as Exhibits A, B, and C, are Mr. Williams's April 21, 2017, letter challenging Cook's confidentiality designations, Cook's May 1, 2017, letter defending its confidentiality designations, and Mr. Williams's May 2, 2017, email response.

US.111403286.01

Magistrate Judge Tim A. Baker -2- May 5, 2017

Cook has met its burden to sustain the confidentiality of its documents in discovery, and Plaintiffs have presented nothing to overcome that showing.

Second, Plaintiffs' reliance on Dr. Goodwin is misplaced, and does not overcome Cook's interest in maintaining the confidentiality of its documents. Dr. Goodwin was deposed on January 11, 2017. During that deposition, Cook objected to Plaintiffs showing Dr. Goodwin Cook's confidential documents. The Parties therefore called the Court, and Your Honor concluded that Dr. Goodwin was *not* a "Qualified Person" to whom Plaintiffs could disclose Cook's confidential documents because Dr. Goodwin currently consults with competitors of Cook, including Abbot Laboratories, Boston Scientific, and Medtronic Vascular, Inc. (*See* Mark J. Goodwin, M.D., Curriculum Vitae at p. 5, attached as Exhibit D; 2015 Open Payments data,[2] attached as Exhibit E; Case Management Order #8, Docket No. 481, at ¶¶ 4-6). Dr. Goodwin's deposition was therefore continued, apparently until the confidentiality issue could be resolved. Plaintiffs did not raise the issue with Cook until March 7 – nearly two months later – and Cook stated its position on March 21. However, Plaintiffs did not raise confidentiality with the Court at that time. Instead, Dr. Goodwin's deposition was rescheduled for April 19, 2017. As a result, Cook reasonably concluded that Plaintiffs had given up their effort to use Cook's confidential documents in Dr. Goodwin's deposition. However, Dr. Goodwin unilaterally canceled the deposition at the last minute (with the lawyers waiting in his conference room) due to a patient emergency. That same day, Plaintiffs' counsel was adamant that the deposition be rescheduled for May 8, the next available date for Dr. Goodwin (and certainly not enough time to resolve confidentiality with the Court). Thus, contrary to Mr. Williams's assertion that Dr. Goodwin is the impetus for seeking to lift confidentiality, Plaintiffs waited for months after Dr. Goodwin's deposition to raise confidentiality, were prepared to complete Dr. Goodwin's deposition on April 19 without resolving confidentiality, and rescheduled his deposition for a date that did not provide time to resolve confidentiality. Moreover, as Mr. Williams points out in the attachment to his email, there is at least one other physician who has refused to sign the Protective Order, but who has not been disclosed to Cook or the Court. Without identifying who refuses to sign the Protective Order, Cook cannot evaluate the applicability of the Protective Order based on the physician's competitor status.[3] In sum, Plaintiffs' reliance on Dr. Goodwin is not persuasive and, in any event, Plaintiffs have not disclosed any other physician who has refused to sign the Protective Order or what efforts have been made to secure their consent.

Third, during the March 15 meet and confer call, I asked Mr. Martin why Plaintiffs wanted to lift confidentiality precisely because, as noted above, the standard for confidentiality is different in discovery than for a substantive judicial purpose. Mr. Martin said he had no obligation to give me a

---

[2] Dr. Goodwin's Open Payments data is accessible at https://openpaymentsdata.cms.gov/physician/73447/payment-information. 2015 is the latest year for which data is available.

[3] Indeed, if a witness is deemed to "have a connection from a business perspective with a competitor of Cook," like Dr. Goodwin, then that witness is *not* a Qualified Person to whom confidential documents can be disclosed without Cook's written consent, *even if* the witness signs the Protective Order. (*See* CMO #8 at ¶ 4.h.). Thus, Plaintiffs are incorrect in their assumption that if Dr. Goodwin signs the Protective Order then that resolves the issue. If the Court is inclined to lift confidentiality, however, it should do so narrowly, *e.g.*, to permit disclosure only to Dr. Goodwin and only if he signs the Protective Order.

Magistrate Judge Tim A. Baker -3- May 5, 2017

reason why Plaintiffs wanted to lift confidentiality, and he never mentioned the physician deposition issue during the call. Instead, he was unambiguous in his statement that Cook could "presume that every document will be in the New York Times."[4] While Mr. Martin did raise the physician issue in a subsequent email, Plaintiffs have never disclosed which physicians have refused to sign the Protective Order (other than Dr. Goodwin) or what efforts they have made to secure their consent. These are the facts, and they weigh against lifting confidentiality.

## II.    IVC Venogram And Extended Upper Endoscopy As Part Of Elizabeth Hill IME

### A.    Background

As an initial matter, pursuant to Paragraph 4 of Amended Case Management Order #19 ("CMO #19"; Docket No. 3326), the parties have successfully negotiated (and request that the Court enter) the IME Protocol attached as Exhibit G.

Cook requested that Mrs. Hill undergo two IMEs – one to assess her cardiovascular health and one to assess her gastrointestinal health.

Cook's initial request for a cardiovascular IME included a request that Mrs. Hill undergo:
- Physical examination;
- Intravascular ultrasound;
- IVC venogram; and
- Lower extremity venous Doppler ultrasound.

Cook's initial request for a gastrointestinal IME included a request that Mrs. Hill undergo:
- Physical examination;
- Blood draw for laboratory testing;
- Extended upper endoscopy;
- Abdominal CT (with oral and IV contrast);
- Upper GI series; and
- Nuclear medicine gastric emptying study.

After negotiation, Cook agreed to remove intravascular ultrasound from the cardiovascular IME, and both the upper GI series and nuclear medicine gastric emptying study from the gastrointestinal IME. Cook also agreed to move the location of the cardiovascular IME from New York to Florida to alleviate Mrs. Hill's travel burden. Cook also agreed to pay for all costs associated with the above-listed procedures, and to pay for Mrs. Hills' travel expenses, and the expense of a non-lawyer companion to travel with her to undergo the gastrointestinal IME in North Carolina. Plaintiffs agreed to these terms,

---

[4]    I was not alone on the call, and my partner Joe Winebrenner attests to these facts. (Declaration of Mark Joseph Winebrenner, attached as Exhibit F).

Magistrate Judge Tim A. Baker                    -4-                              May 5, 2017

with the exception of the IVC venogram[5] and the extended upper endoscopy[6]. Plaintiffs object to the venogram because of the risks attendant to contrast. (*See* Exhibit H, April 11, 2017, Email from Michael Heaviside). Plaintiffs object to the endoscopy due to the "invasive" nature of the procedure and the "risk of perforation and anesthesia reaction." (*Id.*)

      **B.**    **Cook's Need for the Requested IME**

Mrs. Hill has put her cardiovascular and gastrointestinal health at issue and Cook needs the requested procedures to adequately analyze her claimed injuries and damages.

      **1.**    **IVC Venogram**

Mrs. Hill's medical expert, Alexander Marmureanu, M.D., opines that Mrs. Hill suffered a permanent injury to her IVC as a result of her Cook filter, despite any mention of Mrs. Hill suffering from caval thrombosis[7] and/or post-thrombotic syndrome[8] in her medical records. Specifically, Dr. Marmureanu opines that Mrs. Hill's IVC has narrowed because of the placement of her filter (*i.e.*, that she has developed IVC stenosis[9]), and as a result, she "suffers from problematic lower extremity edema[10] from

---

[5] Venograms allow doctors to view their patients' veins through radiographic means with the use of a contrast dye. *Venography*, Stedman's Medical Dictionary for the Health Professions and Nursing (5th ed. 2005). Veins cannot typically be seen via x-ray, so contrast dye is injected into the patient's bloodstream to provide the contrast necessary for doctors to view the veins. *Venograms: Take a Good Look*, Healthline, http://www.healthline.com/health/venogram#overview1 (last visited May 4, 2017). Venograms are used to assess the size and condition of veins. *Id.*

[6] Upper endoscopy is the examination of the upper gastrointestinal tract through the use of a long, flexible scope. *Understanding Upper Endoscopy*, American Society for Gastrointestinal Endoscopy, https://www.asge.org/home/for-patients/patient-information/understanding-upper-endoscopy (last visited May 4, 2017). The procedure allows doctors to observe all parts of the upper gastrointestinal tract (which includes the esophagus, stomach, and duodenum) with little to no discomfort to the patient. *Id.* Cook would like to perform an extended upper endoscopy, which is an upper endoscopy, as previously described, in which the doctor would use a pediatric colonoscope to get to the ligament of Treitz (the suspensory muscle of the duodenum).

[7] Caval thrombosis occurs when a blood clot is present in the vena cava. *Inferior Vena Caval Thrombosis*, MEDSCAPE, http://emedicine.medscape.com/article/1933035-overview (last visited May 5, 2017). The extent and presentation of this condition is dependent upon the size and location of the clot. *Id.*

[8] Post-thrombotic syndrome occurs when a blood clot in a leg vein blocks blood flow, damaging valves in the legs that control the direction of blood flow. Sara R. Vazquez & Susan R. Kahn, *Postthrombotic Syndrome*, CIRCULATION, 2010; 121:e217-e219, https://doi.org/10.1161/CIRCULATIONAHA.109.925651 (last visited May 5, 2017). When these valves are damaged, they leak and allow fluid to pool around the ankle. *Id.* This manifests as chronic leg pain, swelling, and redness. *Id.*

[9] IVC stenosis involves the narrowing of the IVC. *See Stenosis*, STEDMAN'S MEDICAL DICTIONARY FOR THE HEALTH PROFESSIONS AND NURSING (5th ed. 2005).

[10] Edema is a swelling, usually of the legs and feet, due to the accumulation of excessive fluid in these tissues. *See Edema*, STEDMAN'S MEDICAL DICTIONARY FOR THE HEALTH PROFESSIONS AND NURSING (5th ed. 2005).

Magistrate Judge Tim A. Baker                -5-                                May 5, 2017

venous insufficiency which more likely than not will result in thrombotic complications as she ages." (*See* Dr. Marmureanu Expert Report Regarding Elizabeth Hill ("Marmureanu Hill Report"), at 2, 14, attached as Exhibit I). Dr. Marmureanu bases these conclusions on his review of Mrs. Hill's medical records and imaging. (*Id.* at 1, 13).

Similarly, Mrs. Hill's life care plan expert, Leigh Anne Levy, opines that her narrowed IVC puts her at risk for caval thrombosis, post-thrombotic syndrome, deep venous thrombosis,[11] and venous reflux,[12] and as a result, she will require lifelong anticoagulant therapy and medical monitoring. (*See* Leigh Anne Levy's Expert Report Regarding Elizabeth Hill ("Levy's Hill Report"), at 19-20, attached as Exhibit J). She also states that the complications resulting from post-thrombotic syndrome will require more than $22,000 in assisted living alone. (*Id.* at 19). Dr. Marmureanu reached similar conclusions. (Marmureanu Report at 16).

A venogram was performed prior to the placement of Mrs. Hills' filter, and provides detailed imaging of the anatomy (and width) of Mrs. Hill's IVC. A venogram was also performed prior to the attempted removal of her filter on March 23, 2011, and prior to the removal of her filter on August 21, 2013. However, no venography exists to document the current anatomy (width) of Mrs. Hill's IVC. Cook's expert witnesses need to examine a current venogram to assess Plaintiff's claims that Mrs. Hill's IVC was narrowed as a result of her filter placement.

Plaintiffs have claimed that they are concerned about the risks presented to Mrs. Hill from the injection of "contrast" in the venogram. The amount of contrast injected during venography, however, is minimal compared to the amount of contrast that is involved with CT scans[13]; and, *Plaintiffs do not object* to Mrs. Hill undergoing an abdominal CT with oral and IV contrast. Moreover, Mrs. Hill has had several procedures over the years that have involved the injection of contrast, and never had a reaction or complication from one of these procedures.[14] Finally, Ms. Levy has opined that Mrs. Hill requires a venogram every five years for the remainder of her life to assess the anatomy of her IVC. (Levy's Hill Report at 22). Mrs. Hill has not had a venogram since her retrieval on August 21, 2013. Thus, she is

---

[11] Deep vein thrombosis involves the formation of one or more blood clots in the deep veins, usually in the legs. *See Deep Venous Thrombosis (DVT)*, STEDMAN'S MEDICAL DICTIONARY FOR THE HEALTH PROFESSIONS AND NURSING (5th ed. 2005). This carries a high risk of pulmonary embolism, where the clot is released into circulation. *See Embolization*, STEDMAN'S MEDICAL DICTIONARY FOR THE HEALTH PROFESSIONS AND NURSING (5th ed. 2005).

[12] Venous reflux occurs when venous valves do not function properly, leading to reversal of blood flow through the valves during standing or sitting. *Venous Disorders Widespread and Undertreated*, UCSF MEDICAL CENTER, https://www.ucsfhealth.org/newsletters/heart_and_vascular_center_news/winter_2007/venous/ (last visited May 4, 2017).

[13] Mrs. Hill's medical records confirm that the amount of contrast administered during a venogram is much less than the amount of contrast administered during CT. For example, Mrs. Hill's was injected with roughly 50 mL of "Optiray" contrast during her November 17, 2010 venogram (*See* Hill Medical Records at Mease Countryside 47, attached as Exhibit K), while over 100 mL of "Optiray" contrast during her June 10, 2010, CT of her abdomen (*id.* at Dr. Bidani 61).

[14] On June 10, 2010, and October 18, 2011, Mrs. Hill had CT scans of the abdomen with contrast. On December 11, 2013, Mrs. Hill had a CT of the abdomen with and without contrast. On December 10, 2015, Mrs. Hill had a CT of the abdomen and the pelvis with contrast.

Magistrate Judge Tim A. Baker                     -6-                              May 5, 2017

almost due for a venogram per Ms. Levy's report, and Cook is essentially offering to pay for this procedure.

### 2. Extended Upper Endoscopy

Dr. Marmureanu opines that Mrs. Hill has suffered a narrowing in her bowel (*i.e.*, duodenal stenosis[15]) as a result of her filter placement. (Marmureanu Report at 2). Based on this finding, Ms. Levy opines that Mrs. Hill's damages include the need for an "upper endoscopy for history of duodenal injury every 3 years," and care from a gastroenterologist. (Levy's Hill Report at 20). Ms. Levy also states that because of her duodenal injury, Mrs. Hill has had to modify her diet, experiences fecal incontinence, and will be forced to sell her home because she is unable to travel – all due to her bowel issues. (Levy's Hill Report at 13). Additionally, she states that Mrs. Hill is unable to perform activities of daily living and her social functions have been limited. (*Id.*).

Plaintiffs have objected to the upper endoscopy due to the "invasive" nature of the procedure and the "risk of perforation and anesthesia reaction." (*See, supra,* April 11, 2017, Email from Michael Heaviside). Mrs. Hill's medical records reflect, however, that she has consented to undergo this procedure on at least *seven* prior occasions, and never suffered a complication like a perforation, or had any reaction to anesthesia.

Furthermore, Ms. Levy has opined that Mrs. Hill needs an upper endoscopy every three years to assess her duodenal injury. (Levy's Hill Report at 19). Mrs. Hill's last upper endoscopy was July 2, 2014. According to Ms. Levy's findings, Mrs. Hill is due for an upper endoscopy in the next two months and, indeed, Ms. Levy indicated in her deposition on May 4, 2017, that Mrs. Hill is planning to have an upper endoscopy "this fall."

Since Mrs. Hill is planning to undergo this procedure in the near future, Plaintiffs' objections to the invasive nature of the procedure and the risk of perforation and anesthesia reaction are not persuasive. Mrs. Hill's experts say she needs this procedure in the next two months, and Cook is offering to pay for this procedure in this instance. Waiting until "this fall" would not allow Cook adequate time to supplement its expert reports and prepare for trial.

### 3. Legal Argument

Courts commonly allowed invasive procedures as part of IMEs. Indeed, in *Zumstein v. Boston Scientific Corporation*, No. 2:13-cv-02344, 2014 WL 7236406 (S.D. W. Va., Dec. 17, 2014), the court ordered an IME that included pelvic and vaginal examinations when the plaintiff placed her urogynecologic condition at issue. In *Humphrey v. Cartagena*, 865 N.Y.S.2d 200 (App. Div. 2008), the court granted a motion to compel an IME for urodynamic testing because the plaintiff voluntarily underwent the same testing with her own physician without any adverse effect and failed to make a showing of why a repeat test would pose a threat to her health. In *In re: Ethicon, Inc.*, MDL No. 2327, Pretrial Order #214 (S.D.

---

[15] Duodenal stenosis involves narrowing of the duodenum. *See Stenosis,* STEDMAN'S MEDICAL DICTIONARY FOR THE HEALTH PROFESSIONS AND NURSING (5th ed. 2005).

Magistrate Judge Tim A. Baker     -7-     May 5, 2017

W. Va. 2016), the court allowed IMEs that included pelvic exams, external ultrasounds, lab work, and x-rays. The court further allowed more invasive testing, but only if the plaintiffs consented. *Id.* If the plaintiffs refused, then their refusal likely would be admissible at trial. *Id.*

Courts typically apply a burden-shifting standard to determine the permissible scope of an IME that one party claims is dangerous. *See Pena v. Troup*, 163 F.R.D. 352, 353 (D. Colo. 1995) (*citing Lefkowitz v. Nassau Cty. Med. Ctr.*, 94 A.D.2d 18, 462 N.Y.S.2d 903 (App. Div. 1983)). Under this standard, the party opposing the IME must make a *prima facie* showing that it is potentially dangerous to undergo the requested examination. *See id.* at 355. Once such a showing is made, the burden shifts to the requesting party to demonstrate the need for the examination and its safety. *Id.* Here, Plaintiffs have made no *prima facie* showing that the requested examinations are dangerous to Mrs. Hill. Indeed, the evidence shows quite the opposite. Mrs. Hill has undergone multiple venograms and even more endoscopies in the past with no adverse outcomes. Mrs. Hill has not shown how repeating these tests would pose any risk to her health. Moreover, according to her own expert, Mrs. Hill is due for both tests soon, and there is no reason why these tests are suddenly too dangerous for her to undergo.

Finally, Cook and its experts have carefully considered its options, and have narrowed the IMEs to only those procedures absolutely essential to evaluate Mrs. Hill's claimed injuries. Specifically, Cook agreed to remove two tests from its initial requests to minimize the risk and inconvenience for Mrs. Hill as much as possible.

### III. Re-Opening The Deposition Of Tonya Brand

Cook requests that Mrs. Brand's deposition be re-opened. Cook deposed Mrs. Brand on December 10, 2015, for approximately 4 hours as part of the discovery pool (the deadline to complete this discovery was April 2016). (*See* Tonya Brand Deposition at 4 and 151 (time on the record at 9:23 a.m., and off the record at 1:50 p.m., attached as Exhibit L). At the deposition, Mrs. Brand produced numerous previously unproduced records and testified that there were many outstanding records that she had not yet provided to her counsel. (*See Id.* at 25:13-29:25). On October 16, 2016 – nearly a year later – Mrs. Brand served supplemental written discovery responses in which she disclosed – for the first time – that a nurse told her in 2011 that "there was a problem with her filter," and produced a spreadsheet that detailed her damages in the case. (*See* Supplemental Answers to Interrogatory No. 2 (at p. 4), No. 17 (at pp. 12-13), and Exhibit A (at pp. 18-19), attached as Exhibit M). Cook asked Plaintiffs to reopen Mrs. Brand's deposition with the understanding that Cook would not repeat the questions asked in her first deposition. Plaintiffs refused, arguing that a re-opened deposition should be limited to "[q]uestions that relate to her medical condition since [her first deposition]." (*See* May 2, 2017, email exchange, attached as Exhibit N). In light of the additional records and information disclosed since Mrs. Brand's first deposition, Cook requests that the deposition be re-opened with the only limitation that Cook will not repeat questions asked in her first deposition.

Magistrate Judge Tim A. Baker -8- May 5, 2017

We look forward to discussing these issues with you on May 12, 2017, at 3:00 p.m.

Very truly yours,

*Andrew L. Campbell*

Andrew L. Campbell