# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: COOK MEDICAL, INC.      :
IVC FILTERS MARKETING, SALES   :
PRACTICES AND PRODUCTS         : Case No. 1:14-ml-
LIABILITY LITIGATION           : 2570-RLY-TAB
                               :
-----------------------------: MDL No. 2570
                               :
This Document Relates to       :
All Actions                    :
                               :
-----------------------------:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
        The video-recorded 30(b)(6) deposition
of COOK MEDICAL, INC., as given by SCOTT ANDREW
BLANCHARD, taken pursuant to the Federal Rules of
Civil Procedure of the United States District
Courts pertaining to the taking of depositions,
taken before Pauline M. Vargo, an Illinois
Certified Shorthand Reporter, C.S.R. No. 84-1573,
at the law offices of Faegre Baker Daniels, LLP,
Suite 2700, 300 North Meridian Street,
Indianapolis, Indiana, on March 14, 2017, at
9:44 a.m.

        GOLKOW TECHNOLOGIES, INC.
    877.370.3377 ph | 917.591.5672 fax
            Deps@golkow.com

Page 2

```
 1              APPEARANCES
 2
 3   PRESENT ON BEHALF OF THE PLAINTIFFS:
 4       RILEY WILLIAMS & PIATT, LLC
 5       301 Massachusetts Avenue
 6       Indianapolis, Indiana 46204
 7       317.633.5270
 8       BY: JOSEPH N. WILLIAMS, ESQ.
 9           jwilliams@rwp-law.com
10           ANNE MEDLIN LOWE, ESQ.
11           alowe@rwp-law.com
12
13       LAW OFFICES OF BEN C. MARTIN
14       3710 Rawlins Street, Suite 1230
15       Dallas, Texas 75219
16       214.761.6614
17       BY: BEN C. MARTIN, ESQ.
18           bmartin@bencmartin.com
19
20   PRESENT ON BEHALF OF THE DEFENDANTS:
21       FAEGRE BAKER DANIELS, LLP
22       300 North Meridian Street, Suite 2700
23       Indianapolis, Indiana 46204
24       317.237.1424
25       BY: ANDREA ROBERTS PIERSON, ESQ.
26           andrea.pierson@faegrebd.com
27           ANNE K. RICCHIUTO, ESQ.
28           anne.ricchiuto@faegrebd.com
29
30   ALSO PRESENT:
31
32       DANIEL REGARD
33       CRAIG D. BALL
34
35   VIDEOGRAPHER:
36
37       STEPHAN HOOG
38       Golkow Technologies
39   REPORTED BY:
40       PAULINE M. VARGO, RPR, CRR
```

Page 3

```
 1                  I N D E X
 2              Tuesday, March 14, 2017
 3   WITNESS                     EXAMINATION
 4   SCOTT ANDREW BLANCHARD
 5       By Mr. Williams..................Page 6
 6       By Ms. Pierson...................Page 160
 7       By Mr. Williams..................Page 218
 8       By Ms. Pierson...................Page 234
 9       By Mr. Williams..................Page 242
10       By Ms. Pierson...................Page 244
11       By Mr. Martin....................Page 247
```

Page 4

```
 1                  EXHIBITS
 2   BLANCHARD EXHIBIT              MARKED FOR ID
 3   Exhibit 8   Document, "Timeline of Events    15
 4               Regarding Courtney Whitelock
 5               Data Preservation"
 6               1 page
 7
 8   Exhibit 9   Document, "Cook Electronic       27
 9               Information Policy"
10               CookMDL2570_2406 through
11               CookMDL2570_2408
12   Exhibit 10  Exchange 2010 Architecture and   38
13               Design Guide
14               147 Pages
15   Exhibit 11  Case Management Order No. 11,    94
16               Electronically Stored
17               Information and Document
18               Production Protocol
19               20 Pages
20   Exhibit 12  2/6/17 e-mail from Douglas King  141
21               to Amy Holtz re Cook Defendants'
22               response to J. Williams' 1/31/17
23               e-mail re 2/7/17 discovery
24               Conference
25
26
27              EXHIBITS
28          PREVIOUSLY MARKED
29   EXHIBIT                    FIRST REFERRED TO
30
31   Exhibit 477  8/20/13 E-mail from Fleck to    187
32                Whitelock
33                CookMDL2570_0745352
34
35   Exhibit 478  Screenshot of iPhone            187
36                1 page
37
```

### Page 53

1  is?
2  A.  A legal hold is a feature in Exchange
3  that allows an administrator to place a custodian's
4  mailbox on legal hold.
5  Q.  And mechanically what does the
6  administrator have to do to place a custodian's
7  Exchange account on hold?
8  MS. PIERSON:  For what period of time?
9  MR. WILLIAMS:  We were talking
10  about -- we were talking about Exchange 2007.
11  A.  I do not know the steps an Exchange
12  administrator goes through to adjust the setting
13  for -- to place a mailbox on hold.
14  Q.  Help me understand.  Is it something
15  that the Exchange administrator would -- is it like
16  a box that you click?
17  A.  I don't know how the feature is enabled
18  in Exchange.  I know it does exist.
19  Q.  When the administrator effectuates that
20  hold, and we are talking about Exchange 2007, does
21  that prevent the custodian from deleting anything?
22  A.  That places the mailbox on hold.  It
23  does not necessarily suspend the retention policy.
24  Q.  Flesh that out for me.  I'm not sure I

### Page 54

1  understand you.
2  A.  So, the content is retained on the
3  Exchange server regardless of what a user may or
4  may not do.
5  Q.  So, if I'm a Cook employee and I'm
6  placed on litigation hold, I could go through my
7  mailbox and on my local machine delete all my
8  e-mails, but those e-mails would still or that data
9  would still exist on the server?
10  A.  Can you ask that question again?  I want
11  to be sure I answer it accurately.
12  Q.  Sure, sure.  And I'm not trying to trick
13  you.  I'm just trying to understand how this works.
14  If I'm a Cook employee and the decision
15  is made to put my Exchange account on litigation
16  hold and that account is placed on litigation hold,
17  if I go back to my workstation, my local
18  workstation, and I delete everything in my mailbox,
19  in my primary mailbox, my question is, does that
20  data still exist on the server?
21  A.  So, the custodians on legal hold are
22  instructed not to delete content.
23  Q.  My question was a little bit different,
24  but I appreciate that answer.

### Page 55

1  My question is what happens when a
2  custodian -- let's say they disobey the order not
3  to delete anything and they delete everything
4  locally.  If they are on litigation hold, is that
5  data -- does it still exist on the server?
6  MS. PIERSON:  Object to form.
7  A.  I don't understand the locally concept.
8  Q.  What do you call --
9  MS. PIERSON:  Just let him finish.
10  BY MR. WILLIAMS:
11  Q.  Okay.  In Outlook.  I'm sorry.  What I'm
12  talking about is if I'm sitting at a computer, my
13  work computer, let's say it's a laptop, when I say
14  "locally," I'm talking about actually working in
15  Outlook on my laptop.  What would you call --
16  instead of using the word "locally," what would you
17  use?
18  A.  I just would make sure.  I didn't
19  understand what you're referring to, what you just
20  called "locally."  So, if you are saying someone
21  who is sitting at their workstation and performing
22  an action.
23  Q.  Yes, and is "workstation" the word?  I
24  mean, is that --

### Page 56

1  A.  Laptop.
2  Q.  Perfect.  So, let's go back to my -- to
3  my hypothetical so I can understand what's going on
4  here.
5  MR. WILLIAMS:  What's funny?
6  MS. PIERSON:  The idea that these
7  series of questions of "who is on first" is
8  very difficult to do just what you've said.
9  So, it wasn't meant to be a demeaning "ha."
10  It's just that it's a different vernacular,
11  it's difficult.
12  MR. WILLIAMS:  Okay.  Thank you.
13  MS. PIERSON:  I think you've got your
14  vernacular straight between you and the
15  witness now, so well done.
16  MR. WILLIAMS:  Thank you very much.
17  BY MR. WILLIAMS:
18  Q.  So, Mr. Blanchard, if I am a Cook
19  employee and the decision is made to place my
20  Outlook account on litigation hold -- follow me?
21  A.  I do.
22  Q.  And a decision to place me on litigation
23  hold is made.  Still follow me?
24  A.  I believe so.

Page 57

1   Q.   And that litigation hold is then
2   implemented at the server level; is that correct?
3   A.   The feature is enabled at the server
4   level, correct.
5   Q.   Okay. So let's say the feature is
6   enabled and I am told "You are on litigation hold,
7   don't delete anything," which would be the standard
8   procedure; fair?
9   A.   The users would be instructed not to
10  delete any relevant content, correct.
11  Q.   I go back to my laptop and I disregard
12  that instruction and I delete everything in my
13  primary mailbox. My question is, is that data
14  still maintained on the server?
15       MS. PIERSON: Object to form.
16  A.   So, hypothetically if a user disobeyed a
17  legal order, hold order, and went to their laptop,
18  deleted content, would the legal hold feature
19  retain that e-mail?
20  Q.   Yes.
21  A.   Yes, it would.
22  Q.   Okay. And it would exist just then on
23  the server?
24       MS. PIERSON: Object to form.

Page 58

1   A.   I want to be precise. Can you ask -- to
2   just make sure I'm just -- roll back to that again.
3   Q.   Sure. If that hypothetical situation
4   occurred where somebody on their laptop deleted
5   everything in the primary mailbox but the legal
6   hold feature had been enabled, is the only place
7   that that data would be -- is the only place that
8   data would exist then be on the Exchange server?
9   A.   The Outlook client and the Exchange
10  server synchronize. So, if you were to
11  hypothetically delete content here, it would be
12  deleted from the server. The hold feature keeps a
13  copy so that way the content itself is not deleted.
14  From the user's perspective, the content would
15  appear to have been deleted.
16  Q.   Thank you. Does Cook back up its
17  Exchange server?
18  A.   Cook does back up its Exchange server.
19  Q.   How often does it do so?
20  A.   It would be done daily.
21  Q.   And how are those backups stored?
22       MS. PIERSON: I'm sorry. Just
23  interpose our objection that this is beyond
24  the scope of the Court's order and also

Page 59

1   redundant of the 30(b)(6) that this witness
2   has already given, but you can answer.
3   A.   It's done to disk.
4   Q.   How long has it been done to disk?
5   A.   I don't know.
6   Q.   Okay. For a number of years at least?
7   A.   Correct.
8        MS. PIERSON: Object to form.
9   Q.   Where are those disks stored?
10  A.   The disks are in the data center.
11  Q.   Where is the data center located?
12  A.   Park 48.
13  Q.   Park 48?
14  A.   That's the office location name we call
15  it in Bloomington.
16  Q.   Thank you. Are those backup tapes ever
17  -- I'm sorry -- backup disks ever recycled?
18       MS. PIERSON: Same objections.
19  A.   Meaning as in when they are no longer
20  used taken out and -- I don't understand the
21  question.
22  Q.   Are those backup disks ever overwritten?
23       MS. PIERSON: Same objection. Excuse
24  me. Same objection. Sorry.

Page 60

1   A.   We run a cycle. It's approximately 21
2   days of retention through backups for acute
3   failure.
4   Q.   And so approximately every 21 days those
5   backup disks are overwritten?
6   A.   Well, it would begin to overwrite. The
7   whole thing would not be overwritten on 21 days.
8   Q.   So to help my understanding, if I
9   said -- and let's assume there were no litigation
10  holds in place. If I said, Mr. Blanchard, can I
11  get the backup of the Exchange server in 2013,
12  would the answer be that no longer exists?
13  A.   Can you ask the question one more time?
14  Q.   Sure. Let's assume that there are no
15  litigation holds in place. If I asked you,
16  Mr. Blanchard, can I have the backup disk of the
17  Exchange server on a date in 2013, would you tell
18  me that no longer exists?
19  A.   What date are we talking about this
20  occurring on? Today?
21  Q.   Yes, if I asked you today.
22  A.   Okay. So, backups from 2013, correct,
23  would not exist.
24  Q.   Are there any backup iterations that are

Page 97

1  Q. Sure. You will agree, if you look at
2  Paragraph B2, that it says certain things have been
3  suspended by the parties?
4  A. Okay.
5  Q. Fair?
6  A. Um-hmm.
7  Q. Is that a yes?
8  A. There is text preceding that.
9  Q. Right.
10 A. Yes.
11 Q. I'm trying to break it down to make it
12 more digestible.
13 A. Okay.
14 Q. Certain activities have been suspended
15 by the parties; understood?
16 A. I see that, yes.
17 Q. The activities that have been suspended
18 by the parties are any reasonably identifiable
19 processes and procedures which would result in the
20 elimination or transfer to a less successful medium
21 of any unpreserved data and associated metadata.
22 A. Okay.
23 Q. What I'm asking you, and maybe you don't
24 know the answer to this question, is that statement

Page 98

1  or was that statement true on July 10, 2015, as it
2  pertained to Cook?
3        MS. PIERSON: Object to form.
4  A. Yes.
5  Q. List for me, please, all reasonably
6  identifiable processes and procedures which would
7  result in the elimination or transfer to a less
8  successful medium of any unpreserved data and
9  associated metadata.
10       MS. PIERSON: Object to form.
11 A. I'm not aware of any transfer to less
12 successful medium or unpreserved data.
13 Q. So, let's get rid of that.
14       List for me at Cook all reasonably
15 identifiable processes and procedures which would
16 result in the elimination of data and associated
17 metadata.
18       MS. PIERSON: Object to form, calls
19    for a legal conclusion.
20 A. Yeah, I'm sorry, I'm not following you
21 on that. We are starting to take away.
22 Q. Well, you said you weren't aware of
23 any -- of any transfer to a less successful medium,
24 right?

Page 99

1  A. Okay, yes.
2  Q. I'm asking you because these were
3  representations that were made to the Court about
4  things that the parties were doing to preserve
5  evidence. These representations were signed by
6  parties or by the lawyers for both sides. On July
7  10, 2015, they were submitted to the Court.
8        What I am trying to do is understand
9  what this means for Cook, and I want to know what
10 processes and procedures exist at Cook which would
11 result in the elimination of data and associated
12 metadata.
13       MS. PIERSON: Object to form. That's
14    beyond the scope of the Court's February 22nd
15    order, and your question calls for a legal
16    conclusion.
17 A. I'm not aware of the processes or
18 procedures that would result in elimination.
19 Q. Well, we know that e-mails that are left
20 in the inbox for 60 days are automatically deleted,
21 right?
22 A. For a custodian who has not been
23 notified by IT on a legal hold.
24 Q. Right. Would you agree that that is a

Page 100

1  process or procedure that results in the
2  elimination of data?
3        MS. PIERSON: Object to form.
4  A. So, if IT has been notified by legal
5  counsel to place a custodian on a legal hold, we
6  would do so in Exchange, which would prevent that
7  from occurring.
8  Q. I appreciate that. My question was
9  different, though, so let me ask it again.
10       Do you agree with me that the deletion
11 of e-mail in the inbox folder after 60 days results
12 in the elimination of data?
13       MS. PIERSON: Object to form.
14 A. I do not agree.
15 Q. Tell me why you don't agree.
16 A. Because the e-mail hold feature, in this
17 case we are talking Exchange, preserves it.
18 Q. If the hold was placed?
19 A. That's how we act off of.
20 Q. No, I understand. But if there was an
21 employee at Cook who was not on litigation hold,
22 would you agree that e-mail being deleted
23 automatically every 60 days, that e-mail that rests
24 in the inbox, is a procedure that results in the