# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
------------------------- )
IN RE: COOK MEDICAL, INC. )
IVC FILTERS MARKETING, SALES ) Case No.
PRACTICES AND PRODUCT     ) 1:14-ml-2570-
LIABILITY LITIGATION      ) RLY-TAB
------------------------- )
This Document Relates to: ) MDL No. 2570
All Actions               )
------------------------- )

STATE OF INDIANA ) IN THE MARION SUPERIOR COURT
                 )SS:
COUNTY OF MARION ) CAUSE NO. 49D07-1310-CT-036987
JULIE KAY MESSER, et al., )
                          )
      Plaintiffs,         )
   -vs-                   )
                          )
COOK INC., et al.,        )
      Defendants.         )

JAMES E. BROWN,          ) Consolidated
                         ) for Discovery
      Plaintiff,         ) and Pre-Trial
                         ) Original &
   -vs-                  ) Trial Court:
                         ) Monroe Circuit 1
COOK INC., et al.,       )
                         ) Cause No.
      Defendants.        ) 53C01-1608-CT-
                         ) 001670

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VIDEOTAPED DEPOSITION OF JAMES H. SMITH
May 9, 2017

Page 2

3   The videotaped deposition of JAMES H. SMITH,
4   called by the Plaintiffs for examination, taken
5   pursuant to the Federal Rules of Civil Procedure of
6   the United States District Courts pertaining to the
7   taking of depositions, taken before CORINNE T.
8   MARUT, C.S.R. No. 84-1968, Registered Professional
9   Reporter and a Certified Shorthand Reporter of the
10  State of Illinois, at the offices of Faegre Baker
11  Daniels LLP, 300 North Meridian Street, Suite 2700,
12  Indianapolis, Indiana, on May 16, 2017, commencing
13  at 9:41 a.m.

Page 3

1   APPEARANCES:
2    ON BEHALF OF THE PLAINTIFFS:
3     HEAVISIDE REED ZAIC
      910 17th Street, NW, Suite 800
4     Washington, D.C. 20006
      202-223-1993
5     BY: MICHAEL W. HEAVISIDE, ESQ.
         mheaviside@hrzlaw.com
6
7     LAW OFFICES OF BEN C. MARTIN, LLP
      3710 Rawlins Street, Suite 1230
8     Dallas, TX 75219
      (214) 761-6614
9     BY: BEN C. MARTIN, ESQ.
         Bmartin@bencmartin.com
10
11    JASON VOELKE, R.N.,
         Legal Nurse Consultant
12
13
14   ON BEHALF OF PLAINTIFF JAMES BROWN IN
     CAUSE NO. 53C01-1608-CT-001670:
15
     PFEIFER, MORGAN & STESIAK
16   53600 North Ironwood Drive
     South Bend, Indiana 46635
17   572-272-2870
     BY: JAMES P. BARTH, ESQ.
18      jbarth@pilawyers.com
19
20
21
22
23
24

Page 4

1   ON BEHALF OF THE DEFENDANTS:
2    FAEGRE BAKER DANIELS LLP
     300 North Meridian Street, Suite 2700
3    Indianapolis, Indiana 46204
     317-237-0300
4    BY: ANDREW L. CAMPBELL, ESQ.
        andrew.campbell@FaegreBD.com
5
6    FAEGRE BAKER DANIELS LLP
     202 s. Michigan Street, Suite 1400
7    South Bend, Indiana 46601
     574-239-1956
8    BY: ERIC D. NICHOLS, ESQ.
        eric.nichols@FaegreBD.com
9
10
11
12
13  VIDEOTAPED BY: BEN STANSON
14
15
16  REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968
17
18
19
20
21
22
23
24

Page 13

1  documents?
2  A. I can't remember exactly when. This
3  was -- this was a while ago. I don't know the
4  exact date.
5  MR. CAMPBELL: I want to clarify for the
6  record. Was that in response to this particular
7  request or was that an earlier discovery request?
8  THE WITNESS: An earlier discovery request.
9  BY THE WITNESS:
10  A. I get the two mixed up. I don't know if
11  this was the same one or the earlier request, but I
12  got notice that I needed to provide anything on my
13  computer, if that's what you're asking.
14  BY MR. HEAVISIDE:
15  Q. That's not what I'm asking, but I will
16  ask that question.
17  A. Okay.
18  Q. So, you don't know when you met with
19  Cook attorneys specifically with regard to this
20  CMO 2 request for documents and what you did in
21  response to this CMO 2 request for documents. Is
22  that your testimony?
23  MR. CAMPBELL: I just want to state for the
24  record.

Page 14

1  MR. HEAVISIDE: Okay. Let me just say. You
2  can't interrupt after every question. Judge Baker
3  was pretty clear on that.
4  MR. CAMPBELL: I understand, but I want to
5  make sure the record is clear. As you know, Mike,
6  there is an objection as to the CMO 2 request for
7  documents. That objection was brought to
8  Judge Baker. Judge Baker has not ruled on that
9  objection.
10  And, so, from Cook's perspective there
11  is no obligation on the part of Cook or its
12  witnesses to respond to this CMO 2 request for
13  documents.
14  Now, you can ask him the question and he
15  can answer what he did in response to this request.
16  MR. HEAVISIDE: Okay. Let me just say this.
17  MR. CAMPBELL: But you know the context of
18  this.
19  MR. HEAVISIDE: What you just said has nothing
20  whatsoever to do with what I'm asking this witness.
21  I am asking him if he did anything in response to
22  this CMO 2 request for documents.
23  Whether you have an objection pending or
24  not, he can still answer that question.

Page 15

1  MR. CAMPBELL: I understand. And you can
2  answer that question.
3  BY THE WITNESS:
4  A. I guess I'll have to read the document
5  again because I have to refresh my memory.
6  BY MR. HEAVISIDE:
7  Q. Go ahead.
8  A. I submitted everything that I had
9  surrounding this document that's mentioned in here.
10  I surrendered my computer. I surrendered my hard
11  drive and they took the information. That's what I
12  did.
13  Q. And when did you do that?
14  A. When they -- when it was asked and I
15  can't remember. It was well over a year ago.
16  Q. Well, Exhibit 1 is dated March 24 of
17  2017. So, given your last answer, is it fair to
18  say that you've done nothing in response to this
19  CMO 2 request attached to Exhibit 1?
20  A. I -- I gave everything that was asked of
21  me to Cook and to the attorneys that called me at
22  the time and requested this document or sent this
23  document or a previous one. I have given
24  everything that I have.

Page 16

1  Q. All right. Well, you just said that was
2  a year ago. Right?
3  A. I said that was -- I couldn't remember
4  and I thought it feels like at least a year ago.
5  Q. Okay. This is within the last six
6  weeks.
7  A. Okay. Then I guess I don't remember
8  doing anything since then with my documents.
9  Q. Okay. That's all I was asking you.
10  A. Okay.
11  Q. I'm not sure why that was so difficult.
12  Exhibit 1 is within the last six weeks.
13  A. Okay.
14  Q. So, you really did nothing in response
15  specifically to Exhibit 1 and the request for
16  documents attached thereto, correct?
17  A. Exhibit 1 -- Exhibit 1?
18  Q. It's what you're reading right now.
19  A. Okay. So, this is the Exhibit 1.
20  Q. Do you see the stamp there where it says
21  Exhibit 1?
22  A. Yeah.
23  Q. Okay. Well, that's Exhibit 1.
24  A. Well, that's good. I see a lot of

Page 17

1  paperwork that come across my desk and I just want
2  to make it clear that I'm usually not used to
3  looking at legal documents. So, I apologize for
4  not paying attention to Exhibit 1.
5       Now, what was your question again?
6   Q.  My question was Exhibit 1 was served
7  within the last six weeks, and I believe you have
8  already said, I just want to make sure, that you
9  did nothing specifically in response to the request
10 for documents attached to Exhibit 1?
11  A.  Correct. It was all sent in earlier.
12 Everything that I sent in, I sent in earlier.
13  Q.  Okay. And that was, as far as you can
14 recall, about a year ago?
15  A.  Yes.
16  Q.  Okay. And who made that request to you
17 about a year ago?
18  A.  When this whole thing started, from what
19 I remember, I got an e-mail from Cook and then I
20 got an e-mail from an attorney group and the
21 process just started. They said this is what we're
22 doing. We're going to collect your hard drive. Do
23 not destroy any documents and do not delete
24 anything off of your computer and so on and so

Page 18

1  forth. And I'm like okay.
2   Q.  And who sent you that e-mail --
3   A.  I don't --
4   Q.  -- from Cook?
5   A.  I don't remember. Legal counsel. Legal
6  counsel.
7   Q.  I think you just said you got an e-mail
8  from somebody at Cook and then an e-mail from some
9  attorneys?
10  A.  Yes.
11  Q.  All right. And you don't recall who
12 from Cook sent you that e-mail?
13  A.  I don't.
14  Q.  And do you recall the identity of the
15 law firm who also sent you an e-mail on that same
16 subject?
17  A.  It was a law firm here in Indianapolis.
18 That's all I knew.
19  Q.  Sir, what did you do in preparation for
20 this deposition today?
21  A.  In preparation. I met with these guys.
22  Q.  Who are "these guys"?
23  A.  Andy and Eric.
24  Q.  These are the attorneys that are present

Page 19

1  with you today?
2   A.  Um-hmm.
3   Q.  And how many times did you meet with
4  them?
5   A.  How many times did I meet with them
6  prior to today.
7   Q.  Correct.
8   A.  Let me see. I met once in Bloomington
9  and then here once.
10  Q.  And what was the duration of those
11 meetings?
12  A.  The duration, probably five hours each
13 time.
14  Q.  So, a total of --
15  A.  Five, six hours, something like that.
16  Q.  Total ten hours?
17  A.  Yeah.
18  Q.  And during those ten hours did the
19 attorneys present you with documents for your
20 review?
21  A.  Yes.
22  Q.  Any idea of how many documents?
23  A.  Oh, I'd say at least 15, 20 documents
24 that I can remember.

Page 20

1   Q.  Have you ever been deposed before?
2   A.  No, sir.
3   Q.  And you understand that you're under
4  oath today, correct?
5   A.  I do.
6   Q.  Just like you would be if you were
7  standing in court with Judge Young and a jury,
8  right?
9   A.  Absolutely.
10  Q.  If I may, I'm going to ask you a couple
11 questions about your resume.
12  A.  Okay.
13  Q.  And so that you'll have some point of
14 reference, I'm going to give you what's been marked
15 Exhibit 2.
16     (WHEREUPON, a certain document was
17      marked James Smith Deposition
18      Exhibit No. 2, Resume of James H.
19      Smith.)
20 BY MR. HEAVISIDE:
21  Q.  And Exhibit 2 is your resume, right?
22  A.  Correct.
23  Q.  And did you prepare this?
24  A.  Yes.

Page 21

1  Q. Do you recall when?
2  A. Long time ago. About I would say
3  probably five years ago. To me that's a long time.
4  Q. Do you see on Exhibit 2 bullet point 4?
5  A. Yes.
6  Q. It says, "Preferred corporate sales
7  trainer and lecturer, both in the United States and
8  nationally."
9      Can you help me understand the
10 distinction between in the United States and
11 nationally?
12 A. It was a typo.
13 Q. Okay. What should it read?
14 A. Internationally.
15 Q. And when did you begin your work as an
16 international preferred corporate sales trainer and
17 lecturer?
18 A. I started with Cook in 19 -- let me see.
19 '82 to '92. Probably in '96 is when I started with
20 Cook. And about, oh, in my career, in the middle
21 of this career, I was asked by Cook to go and
22 lecture some of the -- at national sales meetings
23 globally for Cook. That is the meaning of that
24 sentence right there.

Page 22

1  Q. Do you recall when you began that
2  enterprise?
3  A. I wouldn't call it an enterprise. I
4  would call it part of my career, and Cook is the
5  one who asked me to give these lectures.
6  Q. All right. All I'm asking --
7  A. Did I answer your question?
8  Q. No, I don't think so.
9  A. Okay.
10 Q. I have no doubt that Cook asked you to
11 do that.
12 A. Correct.
13 Q. I'm just asking you when did they ask
14 you to do that. When did you start doing that?
15 A. The timeline I'm -- I'm a little drawn
16 out. It would have been somewhere between 2000 --
17 let me see. Probably around, in around 2005, 2006,
18 when I was having -- when I was with the PI/DI
19 division.
20 Q. And what's PI/DI?
21 A. There is Peripheral Intervention and
22 Diagnostic Intervention and we covered -- that just
23 means we covered a lot of products, two divisions
24 instead of one.

Page 23

1  Q. Was one of the products IVC filters?
2  A. IVC filters came on -- yeah, it would
3  be, yes.
4  Q. Okay. Do you recall -- did you prepare
5  anything in writing regarding these international
6  sales training specifically with regard to IVC
7  filters?
8  A. My purpose at those lectures was to
9  teach sales reps how to be critical thinkers and
10 teach them to be a procedural partner with
11 physicians, teach them how to ask the right
12 questions with physicians.
13     The products, that was not really the
14 intent of the lectures that I was giving. I have a
15 background as a radiology technologist, and they
16 wanted me to take that knowledge and see how to
17 have conversations with physicians and make sure
18 that we're getting the right answers and asking the
19 right questions.
20 Q. Thank you.
21 A. It was less product-oriented than
22 anything. And to answer your question, I don't
23 remember if IVC filters or micropuncture or
24 catheters or Zilver stents or balloons or the other

Page 24

1  1500 products or more that we have was involved in
2  that presentation. It was more on how to become a
3  procedural partner.
4  Q. Thank you. But my question was: Were
5  there written materials associated with those
6  presentations?
7  A. At that time I'm sure there was.
8  Q. And if we wanted to get copies of those
9  written presentations, where would we get them?
10 From whom would we get them?
11 A. Whatever was on my hard drive. I don't
12 even know if I still have any of that information.
13 That was a long time ago.
14 Q. Who else at Cook could we get those
15 from?
16 A. Whoever took the information. Legal or
17 whoever has that information that they -- they took
18 off my hard drive.
19 Q. Who else at Cook would have that
20 information? To whom at Cook did you previously
21 give that information?
22 A. I don't think I gave it to anyone.
23 Q. You didn't -- did you have to get it
24 approved by anyone?

Page 29

1  Q. Okay. And were there written materials
2  provided in conjunction with that training?
3  A. I don't remember.
4  Q. If there were, where would they be?
5  A. On my computer or in my office. I don't
6  think I would keep things for that long from 2001.
7  I don't know.
8  Q. So, you've worked for Cook continuously
9  since 1996, is that right?
10 A. Correct.
11 Q. So, that's about what, 21 years?
12 A. Yes, sir.
13 Q. And from 2012 through the present, your
14 job has been setting up physician training programs
15 throughout the United States and Canada, is that
16 right?
17 A. Correct.
18 Q. So, what's involved with that?
19 A. There's a lot involved. Is there
20 anything specific you want to know?
21 Q. Yeah, I want to know what's involved
22 with that. Maybe it's a lot, but not having that
23 done myself, I wouldn't know.
24 A. Okay. So, the idea -- so, there is a

Page 30

1  physician training course. We have physicians that
2  come to our local sales reps and ask them -- there
3  is two sides to it. There is physicians that want
4  to be trained and then there's physicians that want
5  to provide the training.
6       I handle logistics. I handle
7  contracting. I go out and visit the hospital to
8  make sure that the lab is doing what -- if the lab
9  is appropriate. If it's an animal lab, I go in and
10 verify the animal lab and make sure that we can do
11 contracting with them.
12      My job is setting up logistics and
13 working with the sales team locally to see if a
14 course is adequate for Cook as far as logistics go,
15 hotel, airport, animal lab, cath lab, surgery, make
16 sure the hospital is aware that we're going to be
17 there, see if there is any contracting that needs
18 to be done with the hospital.
19      That's the logistics side of setting up
20 a course. I meet with the physician and discuss
21 payment. I discuss -- I discuss contracts.
22      On the other side is I, from there, I
23 monitor these programs once they get started and I
24 monitor the attendees and send them communication

Page 31

1  on logistics like, "This is" -- "I see you signed
2  up for a course on our website. This is the --
3  these are the hotel requirements."
4       And a lot of that's already on there,
5  but I follow up and make sure that -- I kind of dot
6  the Is and cross the Ts from that end of it.
7  Q. Thank you. Now, when you say you
8  monitor these physicians regarding logistics, how
9  do you communicate with them? In what form does
10 that communication take place?
11 A. So, when you say the physician, are you
12 talking about the physician that's providing the
13 training or the attendees that want to come to the
14 course?
15 Q. Both. But let's take them one at a
16 time.
17 A. Okay. Which one would you like?
18 Q. Let's start with the attendees that want
19 to attend the course.
20 A. Okay. So, an e-mail will go out to them
21 from, first of all, it comes from corporate, our
22 corporate travel department, because that's where
23 the website is housed. We noticed that they signed
24 up for a course.

Page 32

1       A logistical e-mail will go to them,
2  reminding them to contact Cook Travel to set up
3  their airline reservations and pretty much they're
4  signed up.
5       As we get about five weeks, four weeks
6  closer to the course, I send out an e-mail
7  introducing myself and letting them know that I
8  will be there and I go over more of the course
9  logistics and ask them if they have any questions.
10      We want to make sure that if there is
11 any compliance issues that I can answer those
12 questions for them. If they have any hotel
13 concerns, if they have any special -- special
14 questions. Just more logistics. And then I attend
15 the course.
16 Q. All right. So, those communications
17 with physicians who want to attend these sessions?
18 A. Yes.
19 Q. Is primarily by way of e-mail, is that
20 right?
21 A. Yes.
22 Q. Okay. And how about the physicians who
23 want to instruct, so to speak?
24 A. Yeah.

Page 33

1  Q. How do you identify those physicians?
2  A. Sometimes there are physicians that
3  we've already worked with over the years through
4  other training -- training opportunities, whether
5  it's been for sales rep training because we -- so,
6  there's -- they've already been with Cook and
7  provided training for us in the past.
8      But more recently and what started this
9  was we had a lot of physicians that came to us and
10 said, "We would -- we need to" -- or we need. "I'd
11 like to work with you. We have -- we use a lot of
12 your products. I came from a university setting,"
13 so on and so forth.
14     So, we can meet those guys at meetings.
15 They will meet us at a meeting, at a conference.
16 Q. Let me stop you for a second.
17 A. Yes.
18 Q. When you say "us," do you mean just you
19 or others?
20 A. No. Others.
21 Q. What -- who would those others be?
22 A. They'll meet with corporate people at
23 Cook. They could possibly meet with corporate
24 people at Cook.

Page 34

1  Q. Who would those be? Just so I have
2  some --
3  A. Mark Breedlove.
4  Q. Okay. What's his position at Cook?
5  A. His title just changed again. He's the
6  director of our new SBU, and it's called P -- Cook
7  vascular.
8  Q. SBU is strategic business unit?
9  A. Yes, sir.
10 Q. I'm sorry. I might have interrupted
11 you. Who else besides Mark Breedlove would be
12 included in that?
13 A. They could meet with product managers.
14 They could meet with -- do you want names?
15 Q. Yeah, please.
16 A. Okay. They could meet with Chris
17 Mobley. They could meet with 20 different
18 engineers and all their names I can't think of off
19 the top of my head. But there are a lot of
20 engineers. There are a lot of corporate people at
21 some of these larger meetings they could talk to.
22     And then the word either could trickle
23 down to me that "We met with this gentleman. Would
24 you go out and check with him." We sit down and

Page 35

1  determine if it fits in our -- in our schedule with
2  courses. Do we need him on the East Coast, the
3  West Coast. Again, it's a lot of logistics with
4  the courses.
5      And, so, if it's determined that I want
6  to meet -- that Cook wants to move forward, if we
7  want to move forward with a course, I go out and
8  visit the site.
9  Q. Now, when you said that the word can
10 trickle down to you --
11 A. The word can trickle down, yeah.
12 Q. Right.
13 A. Right.
14 Q. How does that word, in what form does
15 that word trickle down to you?
16 A. Usually it's verbal, cellphone or could
17 be an e-mail.
18 Q. Okay.
19 A. Typical communication lines.
20 Q. So, you obviously e-mail regularly in
21 the normal course of your business, right?
22 A. Absolutely.
23 Q. And who is involved in the determination
24 of what -- you were just telling me about doctors

Page 36

1  may contact you, and "you" meaning you personally
2  or these other engineers?
3  A. Cook.
4  Q. Whoever, right?
5  A. Cook.
6  Q. And indicate some desire to be a
7  lecturer, for lack of a better word?
8  A. Correct.
9  Q. In some of these training, right?
10 A. Yep. Sales reps also contact us and
11 say, "Hey, I have a physician that has used our
12 product and he's shown some desire to -- to train.
13 Do we have" -- you know, they contact me as well,
14 yes.
15 Q. Now, that universe of physicians who
16 contact you, and I mean you individually and you
17 Cook.
18 A. Yeah.
19 Q. Okay? Who makes the decision as to
20 which of those physicians is granted that
21 opportunity?
22 A. Well, Dennis Windsor is my boss and
23 there is a -- we have a team and that's -- there is
24 Margie Sullivan, myself, Mike Longo. We're the

9 (Pages 33 to 36)

Page 37

1  Vista training team as of today, and that may
2  change. But there is a -- that's the team.
3      We have a Vista training team and we get
4  together and discuss needs and wants and things
5  like that.
6    Q.  Do you sort of vet, for lack of a better
7  word, which of these physicians who have
8  demonstrated an interest in being a lecturer should
9  in fact be a lecturer?
10   A.  I vet the program. I vet the hospital.
11 I vet the animal lab, if that's what needs to be.
12 I do not vet the physician personally.
13     That comes from -- I will say that there
14 have been -- there have been times that we have
15 gone to a program and I've had a conversation with
16 the physician and it was decided by him and myself
17 that this isn't going to work for us for lack --
18 for many reasons why a program wouldn't work.
19     So, I am -- I am involved in the vetting
20 process of the logistically. If you live in
21 Sheboygan and it's a seven-hour flight or a
22 seven-hour drive to an airport, probably am not
23 going to be able to work something out on a Vista
24 scale.

Page 38

1    Q.  And who else -- I think you said that
2  it's not really your responsibility to vet the
3  physician?
4    A.  Correct.
5    Q.  Who in the group of the Vista team bears
6  that responsibility?
7    A.  Well, the way -- the way we -- I
8  mentioned that there are -- it either may not work
9  and there may be contracting reasons that it can't
10 work. So, we never -- we never schedule a year
11 worth of courses.
12     So, let's say we have gone through the
13 contracting process. Everything looks good. We
14 are all set to go. We always do just one course to
15 make sure -- it's called a pilot. And then once we
16 have -- we have done one course, then we come back
17 and we determine -- I'll meet with the physician.
18     If the hospital -- we look at our
19 reviews from other physicians that attended. Then
20 we make a determination if we need to carry on with
21 more courses or not.
22     And that's with the physician's input
23 that was doing the training and that as well.
24   Q.  You just said the reviews of the

Page 39

1  physicians who put on the training. Who --
2    A.  Who attend, yes.
3    Q.  Yeah. Who provides those reviews, the
4  attendees?
5    A.  No. They are sent -- they are sent a
6  questionnaire.
7    Q.  Who is the "they"?
8    A.  The attendee -- the attending
9  physicians. At the end of the course we send them
10 a questionnaire asking them questions about the
11 course, what did they like, what did they didn't
12 like, did the hotel work for you, was
13 transportation provided, did you feel that you
14 would attend another course and that sort of thing.
15   Q.  And is that by way of e-mail?
16   A.  Yes, it is.
17   Q.  And I suppose that the response is also
18 by way of e-mail, correct?
19   A.  Correct. Originally we were doing it by
20 hand. We would hand it to them. But we weren't
21 getting -- basically we were told, "If you could
22 just e-mail this to me, I'll get it to you
23 quicker." So, we did it that way.
24   Q.  And those e-mails, both to the attending

Page 40

1  physician and the responses from the attending
2  physician, would come from you by e-mail and be
3  returned to you by e-mail, is that right?
4    A.  Originally, yes. More recently there is
5  a website that they go to and that information --
6  the surveys we're talking about, correct? Yeah,
7  those are -- those are now sent to Cook.
8      There's a -- we have someone that is
9  kind of a project manager, Mike Longo. And Mike
10 Longo collects those surveys, and then he e-mails
11 us the results or we have it on a conference call
12 and we talk about, you know, those results.
13   Q.  And what is that site, the site to which
14 you just referred?
15   A.  It's actually a -- it's an e-mail that
16 goes out that directs them to a website, and I
17 don't have it in front of me, but that's available.
18   Q.  From whom?
19   A.  From Cook.
20   Q.  Have physicians demonstrated an interest
21 in being a lecturer at one of these meetings and
22 Cook has declined to offer them that opportunity?
23   A.  Yes.
24   Q.  What would be the basis for declining

10 (Pages 37 to 40)

Page 37

1  Vista training team as of today, and that may
2  change. But there is a -- that's the team.
3      We have a Vista training team and we get
4  together and discuss needs and wants and things
5  like that.
6      Q.  Do you sort of vet, for lack of a better
7  word, which of these physicians who have
8  demonstrated an interest in being a lecturer should
9  in fact be a lecturer?
10     A.  I vet the program. I vet the hospital.
11 I vet the animal lab, if that's what needs to be.
12 I do not vet the physician personally.
13     That comes from -- I will say that there
14 have been -- there have been times that we have
15 gone to a program and I've had a conversation with
16 the physician and it was decided by him and myself
17 that this isn't going to work for us for lack --
18 for many reasons why a program wouldn't work.
19     So, I am -- I am involved in the vetting
20 process of the logistically. If you live in
21 Sheboygan and it's a seven-hour flight or a
22 seven-hour drive to an airport, probably am not
23 going to be able to work something out on a Vista
24 scale.

Page 38

1      Q.  And who else -- I think you said that
2  it's not really your responsibility to vet the
3  physician?
4      A.  Correct.
5      Q.  Who in the group of the Vista team bears
6  that responsibility?
7      A.  Well, the way -- the way we -- I
8  mentioned that there are -- it either may not work
9  and there may be contracting reasons that it can't
10 work. So, we never -- we never schedule a year
11 worth of courses.
12     So, let's say we have gone through the
13 contracting process. Everything looks good. We
14 are all set to go. We always do just one course to
15 make sure -- it's called a pilot. And then once we
16 have -- we have done one course, then we come back
17 and we determine -- I'll meet with the physician.
18     If the hospital -- we look at our
19 reviews from other physicians that attended. Then
20 we make a determination if we need to carry on with
21 more courses or not.
22     And that's with the physician's input
23 that was doing the training and that as well.
24     Q.  You just said the reviews of the

Page 39

1  physicians who put on the training. Who --
2      A.  Who attend, yes.
3      Q.  Yeah. Who provides those reviews, the
4  attendees?
5      A.  No. They are sent -- they are sent a
6  questionnaire.
7      Q.  Who is the "they"?
8      A.  The attendee -- the attending
9  physicians. At the end of the course we send them
10 a questionnaire asking them questions about the
11 course, what did they like, what did they didn't
12 like, did the hotel work for you, was
13 transportation provided, did you feel that you
14 would attend another course and that sort of thing.
15     Q.  And is that by way of e-mail?
16     A.  Yes, it is.
17     Q.  And I suppose that the response is also
18 by way of e-mail, correct?
19     A.  Correct. Originally we were doing it by
20 hand. We would hand it to them. But we weren't
21 getting -- basically we were told, "If you could
22 just e-mail this to me, I'll get it to you
23 quicker." So, we did it that way.
24     Q.  And those e-mails, both to the attending

Page 40

1  physician and the responses from the attending
2  physician, would come from you by e-mail and be
3  returned to you by e-mail, is that right?
4      A.  Originally, yes. More recently there is
5  a website that they go to and that information --
6  the surveys we're talking about, correct? Yeah,
7  those are -- those are now sent to Cook.
8      There's a -- we have someone that is
9  kind of a project manager, Mike Longo. And Mike
10 Longo collects those surveys, and then he e-mails
11 us the results or we have it on a conference call
12 and we talk about, you know, those results.
13     Q.  And what is that site, the site to which
14 you just referred?
15     A.  It's actually a -- it's an e-mail that
16 goes out that directs them to a website, and I
17 don't have it in front of me, but that's available.
18     Q.  From whom?
19     A.  From Cook.
20     Q.  Have physicians demonstrated an interest
21 in being a lecturer at one of these meetings and
22 Cook has declined to offer them that opportunity?
23     A.  Yes.
24     Q.  What would be the basis for declining

Page 41

1  that opportunity to a physician who requested it?
2     A.   There could be many. One could be what
3  we pay per hour. They -- I've had numerous
4  physicians think that that was not enough.
5     Q.   And it's generally $400 an hour?
6     A.   Yes, it is.
7     Q.   Okay.
8     A.   So, that's one thing. I've also had
9  courses that I -- that I went and visited and the
10 hospital wouldn't allow the program. The
11 contracting wouldn't work for the hospital or the
12 physician.
13        As you know, some physicians are
14 private. Some physicians are -- work for the
15 hospital. Logistically it didn't work out.
16        Those are the ones that I can think of
17 off the top of my head, yes.
18    Q.   And what is your participation -- we've
19 talked a little bit about logistics regarding these
20 meetings?
21    A.   Correct.
22    Q.   What's your participation in the
23 substance of what is presented at these meetings?
24    A.   The substance at this meeting is all

Page 42

1  gone through, usually checked through the product
2  management team and then run through our Legal and
3  Compliance Department at Cook.
4     Q.   Okay. And who -- regarding Vista, who
5  would be on the -- I think you said it was product
6  management team? Who are the individuals on that
7  team?
8     A.   So, if we're speaking filters, is
9  that -- I mean, I have product management teams --
10    Q.   We're speaking --
11    A.   -- for 12 different --
12    Q.   -- filters.
13    A.   Filters. Okay.
14    Q.   Yeah.
15    A.   So, the product management team would be
16 Darrell Talbert and Amanda McEdwards I think is on
17 that team as well and then there is the whole
18 Regulatory and Compliance Department.
19    Q.   So, regarding the substance of these
20 presentations.
21    A.   Correct.
22    Q.   The product management team and the
23 entire regulatory and compliance teams would have
24 input on that?

Page 43

1     A.   Correct.
2     Q.   And would you be in the loop, so to
3  speak about --
4     A.   No.
5     Q.   No? So, you had no participation
6  whatsoever in terms of the content of these
7  presentations, is that right?
8     A.   No, sir. That's correct.
9     Q.   So, regarding the content of these
10 presentations, was the content prepared by these
11 various people you talked to me about at Cook and
12 then given to the doctor to present or did the
13 doctor come up with his own unique presentation?
14    A.   Most of the physicians, almost all of
15 them have their own unique presentation. But I'm
16 sure that there is some input from Cook when they
17 need, say, a -- we call them data sheets. It's a
18 slide that shows different sizes that are
19 available, different links of a product, different
20 diameters.
21    Q.   We're talking about filters, right?
22    A.   Filters, yes.
23    Q.   Okay.
24    A.   Yeah. Other than that, you'd have to

Page 44

1  ask the -- ask those guys. I don't get involved
2  with the vetting of that material.
3     Q.   But the doctor -- is it fair to say that
4  the doctor would come up with a presentation or a
5  script or whatever and then submit it to these
6  people at Cook for their input and approval?
7     A.   That is correct.
8     Q.   And, so, then the -- those folks at
9  Cook, being the product management team and the
10 regulatory and the compliance teams, would receive
11 the presentation, make whatever changes would be
12 appropriate, approve it, and then send it back to
13 the physician for presentation, is that right?
14    A.   Correct. That's --
15    Q.   All right. So, what was ultimately
16 presented at these Vista meetings would have been
17 approved by these various folks at Cook, correct?
18    A.   Would have been reviewed and approved,
19 yes.
20    Q.   Okay. Now, were these Vista
21 presentations both in the United States and
22 elsewhere?
23    A.   We have a Vista -- Cook has a global
24 footprint and there are Vista courses globally,

11 (Pages 41 to 44)

Page 45

1  correct.
2  Q. And would physicians from the
3  United States participate in these global
4  presentations or would they be local physicians?
5  A. From my understanding that it could be
6  both, but usually we use physicians in these other
7  countries.
8      Now, whether a physician from the U.S.
9  has gone over and given lectures, I don't know
10 that. That's not in -- that's not our Vista
11 program. I just manage the western United States
12 and that's it.
13 Q. Okay. So, regarding Vista
14 presentations, your territory is the western
15 United States?
16 A. Correct. Say Texas west.
17 Q. Okay. And who would be Texas east?
18 A. Texas east would be Margie Sullivan.
19 Q. And who would be internationally?
20 A. Well, you'd have to speak with Dennis
21 Windsor. He's the Vista -- he's the new director
22 of Vista. So, he's the one that knows more about
23 international than I do.
24 Q. And when did the Vista program begin?

Page 46

1  A. Yeah, you know, I'm not that good with
2  timelines. But I'm going to say it started
3  somewhere -- so, I was -- let me see. What did I
4  write down here?
5      About 2010 I took -- I took -- I started
6  the program, but it wasn't called Vista at that
7  time.
8      We had -- I was asked to do two things,
9  work on the in-house training side of -- for sales
10 reps and then also work on the physician side,
11 because we hadn't really done much at all with
12 physician training up until that point and we saw a
13 need to provide that because physicians kept
14 contacting our sales reps and saying, "Hey, look,
15 you've got all this new technology, all this" -- a
16 lot of changes were going on at the time. "We
17 need -- we'd love to get -- to have you provide us
18 some additional peer-to-peer, one-on-one, more
19 doctor-to-doctor training courses. Can you do
20 that?"
21     So, that's when it kind of started.
22     I did not name the program Vista. I
23 just one day was told that's what we're calling it
24 globally. They wanted to put it -- put a global

Page 47

1  brand to it.
2  Q. So, this training program existed in
3  2010, but it wasn't called Vista at the time, it
4  got that name sometime thereafter, right?
5  A. Correct.
6  Q. Sometime around 2012 or so, is that
7  right?
8  A. I don't think it was that long because I
9  was -- I was in it a year and somewhere around
10 2010, mid-'10 to 2011. And I can't be certain on
11 that. My timelines aren't the greatest. But it's
12 somewhere around there.
13 Q. And did that program, although not
14 called Vista, did it exist before 2010?
15 A. The physician side, no. No. It did
16 not.
17 Q. But the sales rep side, yes?
18 A. Correct.
19 Q. And during the duration of this
20 training, both before and after it was called
21 Vista, it was attended by both physicians and sales
22 reps?
23 A. Absolutely.
24 Q. Okay. And was it usual to have the

Page 48

1  number of sales reps exceed the number of
2  physicians at these programs?
3  A. No, not from -- not from what I
4  remember. There -- we -- sorry. I'm a little
5  thirsty.
6      We require our sales reps to attend
7  these meetings.
8  Q. I was going to -- I'm glad you said. I
9  was going to ask you that. All right.
10     So, all sales reps have to attend these?
11 A. Absolutely.
12 Q. Okay. How many sales reps are there
13 actually?
14 A. Gosh, that's a good question. I don't
15 know the numbers. It grows every year. I mean
16 when I started in whenever, it was very few. We
17 have quite a few. I don't know the exact numbers.
18     I'm going to say in the U.S. or are you
19 worried -- or are you thinking global?
20 Q. Well, to make it easy, let's say the
21 U.S.
22 A. I'm going to shoot for maybe 150, 200.
23 Q. Okay.
24 A. And, again, I must specify that's my

Page 57

1  five-minute break. All right.
2  THE WITNESS: Good.
3  MR. HEAVISIDE: By the way, I forgot to tell
4  you. If you need to take a break at any time, just
5  make that known. All right?
6  THE VIDEOGRAPHER: We are off the record at
7  10:40 a.m.
8  (WHEREUPON, a recess was had
9  from 10:40 to 10:51 a.m.)
10  THE VIDEOGRAPHER: We are back on the record
11  at 10:51 a.m.
12  BY MR. HEAVISIDE:
13  Q. All right, Mr. Smith. I asked you
14  briefly before about when you were advised and how
15  you were advised regarding a litigation hold. Do
16  you remember me asking about that?
17  A. I do.
18  Q. And what's your understanding of what a
19  litigation hold is?
20  A. I don't have a whole lot of information.
21  Or my understanding, that I keep -- litigation
22  hold. I can't remember.
23  Q. Okay. Well, I think you said somewhere
24  along the line somebody at Cook and somebody from

Page 58

1  the legal department and perhaps somebody from
2  outside counsel advised you of a litigation hold.
3  Do you remember that?
4  A. Okay. Yep.
5  Q. Okay. So, what were you requested to do
6  regarding the litigation hold?
7  A. When I -- when I received the litigation
8  hold, I did what was in the Notice. I don't
9  remember the specifics at that time of what was in
10  the hold, but I followed the instructions and
11  that's what I remember.
12  Q. And the instructions came from Cook,
13  from somebody at Cook?
14  A. Yes.
15  Q. Did the instructions include preserve
16  all documents, disable any automatic delete
17  functions of e-mail, voicemail, text messaging and
18  suspend company record retention policies?
19  A. That sounds familiar.
20  Q. All right. And was that the first time
21  in your 21-year career there at Cook that you
22  obtained any information about what is involved in
23  a litigation hold?
24  A. I don't remember if I have had more or

Page 59

1  not.
2  Q. Have you previously been advised to
3  preserve documents as part of litigation hold?
4  A. Not that I can remember. I...
5  Q. And as far as you recall, this notice of
6  a litigation hold was communicated to you about a
7  year ago. Is that what you said?
8  MR. CAMPBELL: Object to form. You can
9  answer.
10  BY THE WITNESS:
11  A. Again, I think I stated my timeline's a
12  little -- my timeline is somewhat blurry on that
13  after 20 some years. But when I received the hold,
14  I followed the instructions.
15  BY MR. HEAVISIDE:
16  Q. But you don't know whether that receipt
17  of the hold was in the last six months or the last
18  year, is that right?
19  A. I definitely know it was not within the
20  last six months. It was a while back, and I don't
21  have timeline for that.
22  Q. And whenever it was that you received
23  this notice of a litigation hold, I think you said
24  you gave your computer and the hard drive to

Page 60

1  someone. Is that right?
2  A. Correct.
3  Q. And to whom did you give your computer
4  and the hard drive?
5  A. I don't remember. I think we've gone
6  over this. I don't remember the law firm that I
7  spoke with or who sent me the device to download.
8  I don't remember.
9  Q. That's a good clarification. I was just
10  trying to find out really whether or not you gave
11  your computer and the hard drive to attorneys or to
12  someone at Cook.
13  A. I don't -- I don't remember.
14  Q. Well, if you got the litigation hold
15  within the last year, let's say. Okay?
16  A. Okay.
17  Q. Have you continued to send and receive
18  e-mails in the ordinary course of your employment
19  at Cook since that time?
20  A. I send e-mails every day.
21  Q. So, the answer would be yes?
22  A. Yes.
23  Q. And roughly how many, if you know,
24  e-mails do you send on an average day?


### Page 117

1  these physicians or did you -- had they evidenced
2  some desire to be participatory in this program?
3     A.  Like I stated earlier, there were a list
4  of physicians that we had already used for other
5  training in the past. So, we had gone to them.
6        There were -- there were -- the way I
7  got the contact information was usually from the
8  regional managers or from -- or someone inside at
9  Cook said, "Hey, we'd like you to go visit, say, a
10 product manager. This gentleman uses our products.
11 We met him at a meeting. Could you go talk to him
12 and see if it fits within the Vista program."
13    Q.  Would that product manager be a
14 physician or not?
15    A.  I don't know the credentials of all of
16 our product managers. So, I can't answer that.
17    Q.  Do you have any product managers that
18 are -- regarding IVC filters that are physicians?
19    A.  Not that I'm aware of.
20    Q.  Okay. So, they -- who were they, the
21 product managers?
22    A.  For filters during the time I'm selling.
23 The people --
24    Q.  No, during the time you're starting up

### Page 118

1  the Vista program.
2     A.  Oh, it was Darrell Talbert and I think I
3  mentioned Amanda Edwards I know was part of the
4  program and I can't remember if Bruce Fleck was --
5  yes, and Bruce Fleck.
6     Q.  They were product managers for filters?
7     A.  Product managers, specialists in the
8  filter arena, yes.
9     Q.  And you know that none of those three
10 individuals are physicians, right?
11    A.  I do not know.
12    Q.  You don't know? Which one of those do
13 you think is a physician?
14    A.  I'm sorry. I didn't hear your question.
15 My ice was in the glass.
16    Q.  Darrell Talbert, Amanda Edwards, Bruce
17 Fleck, you don't know whether any of those are or
18 are not a physician?
19    A.  I thought you were asking me if I knew
20 of any other product managers that were physicians.
21       The answer to my question is no, they
22 are not physicians.
23    Q.  Okay. You mentioned that some of these
24 doctors you had used previously for educational

### Page 119

1  purposes, is that right, pre-Vista?
2     A.  I hadn't because I wasn't involved in
3  training, but Cook.
4     Q.  Okay.
5     A.  Cook had had some physicians that were
6  pre-that time.
7     Q.  Are you familiar with the term "Key
8  Opinion Leader"?
9     A.  I am.
10    Q.  Who were the Key Opinion Leaders
11 regarding Cook filters?
12    A.  Whether I'd classify them as Key Opinion
13 Leaders, that's not my call. But the first
14 physicians that I remember working with in Cook was
15 Dr. Hal Coons.
16    Q.  K-u-h-n-s?
17    A.  C-o-o-n-s. And I'd have to look at the
18 Vista schedule because, I mean, it started a while
19 back. Physicians have come and gone. So, I'd have
20 to look at them all.
21       But Dr. Coons was one. I know
22 Dr. Jacobs was one.
23    Q.  I was asking you about Key Opinion
24 Leaders. Are they --

### Page 120

1     A.  And we're talking about filters.
2     Q.  That's right.
3     A.  Because I have different types of
4  courses.
5     Q.  Filters, correct.
6     A.  Hal Coons for sure. Dr. Tony Venbrux.
7     Q.  Venbrook, one word, or is it Ven Brook?
8     A.  V-e-n-b-r-u-x.
9     Q.  Okay.
10    A.  Those are two names that come to mind.
11    Q.  As Key Opinion Leaders?
12    A.  Those -- those are physicians that I had
13 worked with. And whether they were considered Key
14 Opinion Leaders to the -- to their colleagues,
15 that's not my call.
16    Q.  How about physicians who were
17 consultants to Cook. Do you know anybody who would
18 satisfy that?
19    A.  Regarding IVC filters.
20    Q.  Exactly.
21    A.  I don't.
22    Q.  How about Dr. Smouse, S-m-o-u-s-s-e?
23    A.  It's Dr. Smouse. I do know his name and
24 whether he was -- what was -- okay. Let me back

Page 121

1  up.
2      So, what was your question again about
3  Dr. Smouse?
4      Q.  Well, what is your understanding of his
5  relationship with Cook regarding filters?
6      A.  I have no idea what his relationship
7  with Cook is.  I know that there are articles that
8  have his name on them and I know that he was a Cook
9  customer.  I never did a Vista course myself with
10 Dr. Smouse and I don't remember if he was ever
11 contacted to do a Vista course.  Not from my -- you
12 know, from my recollection, he was not.
13     Q.  How about a Dr. Timperman?
14     A.  Doesn't sound familiar.
15     Q.  Okay.  Do the participants in terms of
16 the physician instructor in the Vista program --
17     A.  Correct.
18     Q.  -- did they remain constant from year to
19 year or were there additions and deletions?
20     A.  From the filter side, I would say one --
21 one has been with us for a while, a long while.
22 Venbrux is still with us.
23         I would say that most of the filter guys
24 are pretty constant.  There may have been a few in

Page 122

1  and out, but most of them are constant.
2      Q.  And when you said "one's been with us a
3  long while," who is that one?
4      A.  His name is Dr. Jacobs.
5      Q.  And where is Dr. Jacobs located?
6      A.  Utah.
7          Dr. Venbrux has been a -- with us as
8  well.
9      Q.  And where is he located?
10     A.  Washington, D.C.
11     Q.  I'm going to show you a document and
12 maybe that will help us with our discussion of who
13 were Vista presenters.  Okay?
14     A.  Okay.
15     Q.  This is Exhibit 10.
16         (Clarification by the reporter.)
17     MR. CAMPBELL:  Do you want it back?
18     MR. HEAVISIDE:  Yeah.  Okay.  Sorry about
19 that.  This will be No. 8.  All right.
20             (WHEREUPON, a certain document was
21             marked James Smith Deposition
22             Exhibit No. 8, document, calendar
23             of courses; Bates Nos.
24             CookMDL2570_1027474.)

Page 123

1  BY MR. HEAVISIDE:
2      Q.  No. 8 is Bates stamped
3  CookMDL2570_1027474.  That's what you have before
4  you, right?
5      A.  Correct.
6      Q.  Now, this shows 48 events during an
7  11-month period of time.  Do you know what year
8  this is?
9      A.  I don't.
10     Q.  It shows you as the coordinator for 21
11 of those events?
12     A.  Yeah.
13     Q.  Right?
14     A.  Yes, it does.
15     Q.  And did you schedule all these events?
16     A.  They're all on a website and we pre-plan
17 those, yes.  Those are all scheduled.
18     Q.  But did you schedule them or did
19 somebody else schedule them?
20     A.  The physicians that I worked with in
21 coordination with their schedule is how we planned
22 this calendar for the previous -- from the previous
23 year to the next year.
24     Q.  So, you would just kind of have to work

Page 124

1  with their availability and fit it into a slot.  Is
2  that fair to say?
3      A.  No.  So, first I want to ask you
4  where -- you said I covered 21 courses?
5      Q.  Yeah, that's what I said.
6      A.  I'm responsible -- I'd have to count
7  those numbers again --
8      Q.  Go ahead.
9      A.  -- to see if I was involved with 21 of
10 these courses.
11     Q.  Go ahead.
12     A.  If I'm missing something, I count 11
13 total courses that I was involved with.
14     Q.  All right.  You're involved --
15     A.  If we're talking IVC filters, I see 1,
16 2, 3, 4 on this list that you gave me.
17     Q.  Well, what products were covered in the
18 Vista program?
19     A.  All kinds of products, peripheral and
20 IVC.
21     Q.  Peripheral other than IVC?
22     A.  I'm sorry?
23     Q.  Peripheral excludes IVC?
24     A.  Correct.

Page 125

1    Q.  All right. Well, in terms of the number
2  of events, you were -- April 7 through 9?
3    A.  One a month, maybe less than one a
4  month.
5    Q.  April 13 through 15, April -- that's
6  two. April 4 and 5, through 5th. That's three,
7  right?
8    A.  Yeah, my copy is highlighted. I'm not
9  sure if yours is highlighted.
10   Q.  That should make it easier for you,
11 then.
12   A.  I'm telling you if we're talking IVC
13 filters, I just counted them out. 1, 2, 3, 4, 5.
14   Q.  Well, first I asked you about events and
15 you said there weren't 21. You can go down that
16 list and see if there aren't 21. Don't change the
17 question, if you'd be so kind.
18   A.  I want to make sure that I -- so, I'm
19 going to ask you to repeat your first question.
20   Q.  Okay. My first question is: On this
21 single piece of paper --
22   A.  Correct. This one right here.
23   Q.  48 events over an 11-month period of
24 time. Were you the coordinator for 21 events?

Page 126

1    A.  Without me counting every one, if I'm on
2  here 21 times, I was the coordinator for 21 events.
3    Q.  Okay.
4    A.  Not 21 IVC course events.
5    Q.  All right. And how did the work that
6  you perform change, whether it was a peripheral
7  event or an IVC event?
8    A.  Same thing pretty much with logistics.
9  Most of the IVC courses are an animal lab. So, I
10 was involved with the animal lab. Most of our
11 peripheral courses are not animal labs. They are
12 in-room observation. So, my roles and duties
13 change versus IVC courses and peripheral courses.
14   Q.  How about DVT courses?
15   A.  DVT course for us was an in-house -- I'm
16 sorry. It was an IVC course that we no longer do
17 in Arizona. But it was very similar to a
18 peripheral course. No animal lab.
19   Q.  How about a course where you list as
20 DVT/IVC?
21   A.  Right.
22   Q.  Is that an IVC course or not an IVC
23 course?
24   A.  It is an IVC course.

Page 127

1    Q.  Okay.
2    A.  Without an animal lab.
3    Q.  And every one of these listed as IVC
4  filter with you as the coordinator you say involved
5  an animal lab, right?
6    A.  Well, here's -- yes. I don't know why
7  it's listed as -- so, yes. They're animal labs.
8  IVC filters are animal labs.
9    Q.  So, every course is listed on here as an
10 IVC filter course --
11   A.  Every course that's listed on here is
12 not an IVC course.
13   Q.  You didn't let me finish my question.
14 All right.
15       Every course that's listed on here as an
16 IVC filter course with you as the coordinator
17 involved an animal lab, is that right?
18   A.  Yes.
19   Q.  Okay. And what did you do in the animal
20 lab?
21   A.  I did logistics like I always did. And
22 in the animal lab a lot of times I would just get
23 sheath access. I would make sure that I coordinate
24 the time that the animals are put to sleep based on

Page 128

1  the didactic lecture that's going on.
2       So, I facilitated, coordinated, things
3  like that.
4    Q.  And did you facilitate the didactic
5  dinner that preceded these events?
6    A.  Yes.
7    Q.  What did your facilitation involve,
8  making a reservation?
9    A.  No, I had a travel agent do that.
10   Q.  Okay.
11   A.  Cook. Our website does all that. I'm
12 sorry. Cook Travel does all that.
13   Q.  What's the name of the Cook travel
14 agency?
15   A.  Cook Travel.
16   Q.  So, they would make the dinner
17 reservations. So, what was your logistic
18 responsibility for the didactic dinner?
19   A.  I would, if -- I would attend, make sure
20 that reservations were taken care of, make sure the
21 reps were all involved. It was mostly just
22 logistics. There was no presentation or anything
23 that I gave.
24   Q.  And in the animal lab did you have

Page 201

1  on December 18, 2013, about this course at Houston
2  Methodist, right, a Vista course?
3      A.  That's what it says.
4      Q.  Why were you excluded from this call?
5      A.  I have no idea.
6      Q.  Would you have expected to be on that
7  call?
8      A.  I'm not on every conference call that
9  goes on at Cook, no.
10     Q.  Well, I didn't really ask you that.
11         This is a conference call about a Vista
12 presentation, right?
13     A.  Yeah. I might have been on -- there is
14 many reasons why I wasn't invited. I -- I don't
15 know.
16     Q.  And attached is a course description,
17 right?
18     A.  Yep.
19     Q.  So, on the second page, after the coffee
20 break, the second bullet point says, "Describe
21 alternate tools and techniques for complex removal
22 of IVC filters," which would be off-label
23 techniques, right?
24     A.  "Demonstration and performance of

Page 202

1  complex of IVC filter removal." That is where --
2  again, I didn't write the memo, but I can assume
3  that that is correct, that there is going to be
4  some difficult IVC filter removal, yes. Removed,
5  correct.
6      Q.  Those being the off-label techniques
7  that we have been discussing, right?
8      A.  Again, I wasn't there. I didn't put the
9  material together. What one physician, Dr. --
10 Dr. Bismuth is usually the guy that runs this
11 course. There are all kinds of techniques that are
12 discussed at this course, and I know that they do
13 discuss difficult retrieval techniques, yes.
14     Q.  And what did you say the doctor's name
15 who was the instructor at this particular
16 presentation?
17     A.  Bismuth.
18     Q.  Bismuth, B-i-s?
19     A.  M-u-t-h.
20     Q.  From Houston?
21     A.  Yes.
22     Q.  Has Dr. Bismuth presented on behalf of
23 Cook on more than one occasion?
24     A.  Yes.

Page 203

1      Q.  Please tell me how many occasions, to
2  the best of your recollection.
3      A.  A minimum of three.
4      Q.  Is he still on your list of presenters?
5      A.  Yes.
6      Q.  When did he last present on behalf of
7  Cook, to your knowledge?
8      A.  I'm going to say a month ago.
9      Q.  So, April of 2017, right?
10     A.  From the best I can remember, it was
11 about a month ago.
12     Q.  And that would I assume have been in
13 Houston?
14     A.  Correct.
15     Q.  And that was a Vista presentation?
16     A.  Correct.
17     Q.  Do you know whether you attended this
18 particular presentation?
19     A.  This particular Exhibit 16?
20     Q.  Yeah.
21     A.  I don't because I wasn't copied on the
22 e-mail. So, I can't be sure I did or did not.
23     Q.  And I'm hoping that's actually
24 Exhibit 17 that you have in your hands, right?

Page 204

1      MR. CAMPBELL:  I think we are at 16.
2  BY THE WITNESS:
3      A.  16.
4  BY MR. HEAVISIDE:
5      Q.  All right.
6      A.  Do you want to stay with that one?
7      Q.  No, 16 is correct. I erroneously wrote
8  down on mine 17.
9      A.  Okay.
10     Q.  Just so we are clear, though, 16 is the
11 e-mail we have been discussing about this Houston
12 Methodist presentation and the course description,
13 right?
14     A.  Correct.
15     Q.  And, so, I might have already asked
16 this. But you don't recall whether you attended or
17 not, and so I would assume you don't really know
18 how many attendees there were?
19     A.  I don't.
20     Q.  Who keeps track of that kind of
21 information, how many attendees and who they were?
22     A.  There's a website. I think we talked
23 about it this morning. There is a website and
24 there is a gentleman in-house that handles that.

Page 205

1   His name is Mike Longo.
2     Q.  So, he does the input for all of the
3   Vista presentations, who was in attendance, who
4   wasn't, is that right?
5     A.  He is the new project manager for Vista,
6   yes.
7     Q.  And has he performed that task since the
8   first Vista presentation?
9     A.  No.
10    Q.  All right. Was there somebody in the
11  same job before him?
12    A.  Cathy Taylor.
13    Q.  And she is no longer at Cook, right?
14    A.  Correct.
15    Q.  And I think I asked you, but I don't
16  know if you recalled. What is that website?
17    A.  I'd have to get it -- I don't have it
18  off the top of my head. So, there's the -- and,
19  again, what website are you referring to?
20    Q.  The one you just referred to.
21    A.  The one where we send in our surveys.
22  It's more of a link. I shouldn't say a website.
23  Technology is -- it's a link where you click on a
24  link and you go to a site and you answer questions

Page 206

1   about the particular course you went to.
2     Q.  Okay. So, how do you get the physicians
3   to answer those questions?
4     A.  How do I get them to?
5     Q.  Yes.
6     A.  If you had the -- if you have the
7   answer, you let me know.
8     Q.  I guess you just ask them and then if
9   they do it, great. If they don't, they don't?
10    A.  That's right.
11    Q.  Right?
12    A.  We do the best we can to follow up to
13  get feedback on our courses, yes, we do.
14    Q.  And in addition to these questionnaires,
15  is there any summary prepared regarding what
16  transpired at a particular training course?
17    A.  Not that I'm aware of.
18    Q.  Is there some form of accounting
19  regarding expenses associated with the Vista
20  training course?
21    A.  I'm sure there is. I just don't know
22  who does that or anything. That's not in my --
23  you'd have to check with the accounting department
24  at Cook.

Page 207

1     Q.  Well, to whom do you or other attendees,
2   for example, submit travel expenses regarding --
3     A.  Dennis Windsor.
4     Q.  Dennis Windsor.
5         Have you ever heard of the Isis
6   database?
7     A.  Isis?
8     Q.  Yeah, or Iris.
9     A.  Iris. I've heard of Iris, yes.
10    Q.  Okay. What is it?
11    A.  That is a sales or that is something --
12  it's a -- it's sort of a database where whenever an
13  event occurs within Cook, we all are supposed to go
14  onto Iris and enter an event and make a comment
15  about that -- about that visit. That's global.
16    Q.  Like a visit to a doctor?
17    A.  Or a Vista course or gave an inservice.
18        That's what -- I don't use Iris all the
19  time because my sales team uses Iris. But there is
20  an occasion that I use Iris.
21    Q.  Okay. So, when your salespeople, for
22  example, make a trip to a doctor, they make an
23  entry in Iris as to what transpired during that
24  meeting?

Page 208

1     A.  I think that's fair enough to say, yes.
2     Q.  Okay. Some people call that a call
3   note. Are you familiar with that, that phrase?
4     A.  I'm familiar with it, yeah.
5     Q.  Is that similar to these entries in Iris
6   that you just told me about?
7     A.  Again, since I don't use it all that
8   time, I don't know if we may call it a call point
9   or just a follow-up. I don't know what you -- what
10  you want to call it.
11    Q.  Whatever those entries are, they are
12  some indication of what transpired either at the
13  meeting or at the event in question, right?
14    A.  From the best of my knowledge, yes.
15    Q.  Okay. Do you have any idea as to the
16  total number of instructors who have been on
17  contract with Cook to make Vista program
18  presentations?
19    A.  For the PI SBU unit only, I could say
20  there is probably -- I don't know the exact number
21  but -- I'm just going to say I don't know the exact
22  number. No, I can't tell you that.
23    Q.  Can you give me your best estimate?
24    A.  I can't answer that because I don't have