# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE:  COOK MEDICAL, INC.,    ) Case No.
IVC FILTERS MARKETING,         ) 1:14-ml-2570-RLY-TAB
SALES PRACTICES AND            )
PRODUCTS LIABILITY             ) MDL No. 2570
LITIGATION                     )

This Document Applies to All Actions


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF LEIGH CONNERS
Friday, February 3, 2017
Greenville, South Carolina
9:28 a.m.


Reported by: Karen Kidwell, RMR, CRR, CLR
GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

---

Page 2

1        VIDEOTAPED DEPOSITION of LEIGH CONNERS, a
2   witness in the above-entitled action, taken pursuant
3   to notice, pursuant to the Federal Rules of Civil
4   Procedures before KAREN K. KIDWELL, RMR, CRR, a
5   Certified Shorthand Reporter, at the Hampton Inn &
6   Suites Hilton Greenville Downtown RiverPlace, 171
7   Riverplace, Greenville, South Carolina, 3rd day of
8   February, 2017, at 9:28 a.m.
9
10
11  APPEARANCES:
12      LAW OFFICES OF BEN C. MARTIN
13      BY:  BEN C. MARTIN, ESQ.
14      3710 Rawlins Street
15      Suite 1230
16      Dallas, TX  75219
17      214.761.6614
18      bmartin@bencmartin.com
19      Counsel for Plaintiffs
20
21
22      HEAVISIDE REED ZAIC
23      BY:  MICHAEL W. HEAVISIDE, ESQ.
24      910 17th Street, NW
25      Suite 800
26      Washington, DC  20006
27      202.223.1993
28      mheaviside@hrzlaw.com
29      Counsel for Plaintiffs
30
31
32
33

---

Page 3

1   APPEARANCES CONTINUED:
2       FAEGRE BAKER DANIELS LLP
3       BY:  ANDREA ROBERTS PIERSON, ESQ.
4       300 North Meridian Street
5       Suite 2700
6       Indianapolis, IN  46204
7       317.237.0300
8       apierson@bakerdaniels.com
9       Counsel for Defendant
10
11
12
13  ALSO PRESENT:
14  Jason Voelke
15  Devyn Mulholland, Videographer
16
17
18
19
20
21
22
23
24
25
26
27
28
29

---

Page 4

1              I N D E X
2   WITNESS/EXAMINATION          Page
3   LEIGH CONNERS
4       By Mr. Martin               8
5       By Mr. Heaviside          221
6       Further by Mr. Martin     303
7       By Ms. Pierson            305
8       Further by Mr. Martin     379
9       Further by Ms. Pierson    397
10      Further by Mr. Martin     398
11
12           E X H I B I T S
13  Number     Description         Page
14  Conners 1  Cook Medical Human Resources ......58
15      District Manager Performance
16      Review of Courtney Whitelock
17      dated 1/1/2011, Confidential,
18      Bates Hill_DFS_0081-084
19  Conners 2  Spreadsheet page with NPI .........89
20      Number, Attendee First,
21      Attendee Last first few
22      columns
23
24  Conners 3  Spreadsheet page, continuation ....89
25      of Exhibit 2
26  Conners 4  Cook Celect Filter Set, ..........104
27      Instructions for Use, Company
28      Confidential, Bates
29      CookMDL2570_0445420-5434
30
31
32

---

Page 57

1      THE WITNESS: Again, I don't -- I really
2  don't recall much about the experience.
3  BY MR. MARTIN:
4      Q.  Right.  Well, anything you do recall --
5  let's do it that way.  Is there anything you recall
6  about the experience?
7      A.  I remember sitting in a -- I remember
8  having a really great dinner out with peers, but I
9  can't recall who was there.  I recall having a --
10 there was a classroom portion.  Again, could not tell
11 you what was discussed.  And I recall that we then
12 went into the lab, and I can't recall the details of,
13 you know, what was done in the lab.  I really can't.
14     (Off record discussion.)
15     MR. MARTIN:  Let's look at the -- I don't
16 know what we're on as far as exhibit number.  I
17 know we're going, I guess --
18     MR. HEAVISIDE:  Well, she's got these
19 numbered 1 through 12.  I --
20     MR. MARTIN:  That's fine.
21     MR. HEAVISIDE:  We can figure it out
22 later, I guess.
23     MR. MARTIN:  We're going to mark Exhibit
24 Number 1 to the Conners deposition, and I'm
25 going to hand you this -- a document stamped 81,

Page 58

1  -2, -3, -4, so 0081 through 0084.
2      (Conners 1 was marked for identification.)
3  BY MR. MARTIN:
4      Q.  Could you -- if you could please identify
5  what that document appears to be?
6      MS. PIERSON:  You -- you don't have a
7  copy?
8      MR. HEAVISIDE:  Just that one.
9      MS. PIERSON:  Just this one that you're
10 going to ask the witness about.  Okay.  Is that
11 true for everything today?
12     MR. HEAVISIDE:  No.
13     MS. PIERSON:  Okay.  Just this one?
14     MR. MARTIN:  True for a lot of them.  Do
15 we have a screen we can blow them up on?
16     MR. HEAVISIDE:  Right here.
17     MS. PIERSON:  Just give me one second to
18 review it, and we'll find a way to work off of
19 it.
20     MR. MARTIN:  Oh, perfect.  There's a
21 screen right there.
22 BY MR. MARTIN:
23     Q.  All right.  So all I want you to do is
24 identify what that four-page document is.
25     A.  This was a performance review given by

Page 59

1  Courtney's current manager, Lisa Froehlich.
2      Q.  Okay.  This is off the record.
3      (Off record discussion.)
4  BY MR. MARTIN:
5      Q.  So while you're getting that, I do want to
6  ask you about this.  You know, we took Ms. Conners --
7  excuse me, we took Ms. Whitelock's deposition the
8  other day.
9      A.  Okay.
10     Q.  Are you aware of that?
11     A.  I am aware of that.
12     Q.  All right.  And Ms. Whitelock --
13 Ms. Whitelock says that she had sent her boss certain
14 call notes, what she described as sending e-mails
15 after she would talk to a doctor, for instance.
16     Is that kind of the way it went with you
17 and Courtney when you were her boss, that when she
18 would go out and call on a doctor, she would send you
19 call notes?
20     MS. PIERSON:  Object to form.
21     THE WITNESS:  No, generally not.  Courtney
22 and I would speak on the phone a fair amount.
23 If you're asking me if she, on a regular basis,
24 sent me call notes, not that I recall.
25

Page 60

1  BY MR. MARTIN:
2      Q.  How about an irregular basis?
3      MS. PIERSON:  Object to form.
4      THE WITNESS:  I -- generally Courtney and
5  I would speak over the phone.  We did a lot of
6  verbal precall planning, post-call.
7  BY MR. MARTIN:
8      Q.  If Courtney Whitelock did testify that she
9  would provide routine or usually the information
10 about what had occurred at a sales call and send an
11 e-mail to that -- to that person, her boss, her boss
12 at one time would have been you, correct?
13     MS. PIERSON:  Object to form.
14     THE WITNESS:  I can't speak to why she --
15 Lisa had Courtney on call reports.  It's not --
16 I can't speak to that.  So if you're asking me
17 why she was sending Lisa call follow-up notes.
18 I can't speak to that.  I wasn't her manager.
19 And that -- that might have been a function of
20 something between them.  Lisa manages
21 differently.
22 BY MR. MARTIN:
23     Q.  How about -- how about with you?  Did you
24 receive e-mails from Courtney after she would make a
25 call upon a doctor?

Page 61

```
 1      A.  Did I receive e-mails from Courtney after
 2  her sales calls?  Not on -- that was not part of our
 3  routine practice.
 4      Q.  How many times did it happen?
 5      A.  I can't recall.  Generally, we would --
 6  she would call me and we would discuss.
 7      Q.  Did it happen more than zero?
 8      A.  It happened more than zero.  I'm sure she
 9  sent me an e-mail more than zero times.
10      Q.  She's sent you hundreds of e-mails, hasn't
11  she?
12      MS. PIERSON:  Object to form.
13      THE WITNESS:  Again, I can't recall how
14  many e-mails Courtney has sent to me.  We did a
15  lot of our communication -- we had a very open
16  dialogue.  Every manager has a different
17  function and manages their team differently.  I
18  can't speak to what she testified to with Lisa.
19      MR. MARTIN:  Objection.  Nonresponsive.
20  BY MR. MARTIN:
21      Q.  My question to you is, if she was there
22  under you for a year and a half, that would have been
23  over 500 days -- I believe my addition is correct.
24  You had approximately eight people under you I think
25  was -- you know, you had indicated an approximate
```

Page 62

```
 1  number.
 2      And I want to know if it is your testimony
 3  that you received less than 100 e-mails from Courtney
 4  Whitelock during the time -- that year and a half
 5  time that you were her boss?
 6      MS. PIERSON:  Object to form.
 7      THE WITNESS:  I'm not going to answer
 8  that.  I'm not going to tell you how many
 9  e-mails.  If you're asking me if Courtney
10  e-mailed in -- me during the year and a half, so
11  500 days, yes, Courtney sent me e-mails while I
12  was her manager.  I cannot recall what the
13  content of those e-mails were.
14  BY MR. MARTIN:
15      Q.  Where are they?
16      A.  Well, I would imagine -- I don't know.  I
17  left Cook three -- over three years ago.  And when I
18  left, I turned in my laptop.
19      Q.  All right.  And so three years ago, you
20  had not deleted any of those e-mails that -- that
21  were on your laptop that you had received from
22  Courtney, correct?
23      MS. PIERSON:  Object to form.
24      THE WITNESS:  I can't recall if I -- I
25  mean, I don't keep every e-mail I receive.  That
```

Page 63

```
 1  would leave a lot of e-mails in one's inbox.
 2  BY MR. MARTIN:
 3      Q.  Well, you look at them.  And you know that
 4  when you -- you know that, when you delete an e-mail,
 5  it's still on your hard drive.  You understand that,
 6  don't you?
 7      A.  I can't recall.  I don't know what Cook's
 8  policy -- IT policy is for -- it's, again, three and
 9  a half years ago.  When I left, I shipped my laptop
10  back to Cook, and I took a new position with a new
11  company.  That is all.
12      Q.  What would the best way to be -- to
13  determine what Courtney Whitelock told doctors about
14  IVC filters during the time that she worked for you?
15  What would be the best way to discover -- and I'm
16  talking about not the legal term discover but to
17  discover, to find out what she told those doctors?
18      MS. PIERSON:  Object to form.
19      THE WITNESS:  I don't really completely
20  understand what you're asking me.
21  BY MR. MARTIN:
22      Q.  Want me to ask again?
23      A.  You don't have to -- I guess I'm trying to
24  process.  If you're asking me how Courtney and I
25  would discuss her sales calls --
```

Page 64

```
 1      Q.  No, that's not what I'm asking you.
 2      A.  No.
 3      Q.  I am asking you what would, now years
 4  later, at least three years -- you've been gone for
 5  three years now, right?
 6      A.  Right.
 7      Q.  What would be the best way -- knowing how
 8  Cook worked while you were there, at least with
 9  respect to the doctors you and your sales team called
10  on, what would be the best way to make a
11  determination as to what that conversations --
12  conversation or conversations were that Courtney
13  Whitelock was having with those doctors she was
14  detailing about what she was telling them about IVC
15  filters?  What would be the best -- the best source
16  of information to find that out?
17      MS. PIERSON:  Objection.  Form.
18      THE WITNESS:  So you're asking me what
19  would be the best source of information three
20  years later to find out how -- what she was
21  talking to her physicians about?
22  BY MR. MARTIN:
23      Q.  That's correct.
24      A.  I -- I don't know what that would be.  I'm
25  not -- in my role as a sales manager, I'm not an
```

Page 85

```
 1    BY MR. MARTIN:
 2       Q.  Right.
 3       A.  And after that, I don't have any -- I
 4    wasn't involved.
 5       Q.  That's what I wanted to tie up.  Just --
 6    that's it.  Just for the record, from Courtney, if
 7    she sent them -- okay.  If she sent them, as she
 8    indicates in her deposition, and you were the person
 9    and her other boss that she -- or bosses that she
10    sent them to, these call notes that she described and
11    the details she described in them, I simply want to
12    tie it up --
13       A.  Right.
14       Q.  -- that you gave your computer up, and
15    that would have been the computer that they would
16    have been in if they existed, true?
17          MS. PIERSON:  Object to form.
18          THE WITNESS:  I guess what makes -- what's
19    making me uncomfortable with this line of
20    questioning is we're assuming what the content
21    of her e-mails was.  But if you're -- yes, the
22    e-mails that she would have sent to me -- and
23    they could have been "had a great day today" or
24    could have been, you know, "I ran out of gas on
25    the highway" -- those would all be on my laptop
```

Page 86

```
 1    that are no longer with me.  And I sent them
 2    back to Cook.
 3    BY MR. MARTIN:
 4       Q.  Did Cook ever tell you what they intended
 5    to do with the e-mails that existed on your computer
 6    when you gave your computer to them upon your leaving
 7    that employment?
 8       A.  I had zero discussion around that, what
 9    they intended to do.  I went on to a new
10    organization.  And my employment was, you know, no
11    longer with Cook.  So I had no discussions with their
12    IT department or anyone else.
13       Q.  And to the extent other people may have
14    sent you, if they did, e-mails after making sales
15    calls upon doctors including Dr. Zuzga, okay, if he
16    were one of them, then, in fact, you don't have those
17    e-mails now because you gave Cook your computer for
18    the same reason that you don't have the Courtney
19    Whitelock e-mails, correct?
20       A.  Right.
21          MS. PIERSON:  Object to form.
22    BY MR. MARTIN:
23       Q.  Just very -- it's just tieing up where
24    they were.
25       A.  You did reference Dr. Zuzga, and in the
```

Page 87

```
 1    time that I was Courtney's manager, she had not been
 2    in front of him.  He was a physician we had hoped
 3    for, she'd tried to meet, but she had not had any
 4    contact.  He was kind of that elusive physician.
 5          So in the time that I was her manager, she
 6    hadn't even been in front of him.  So there would not
 7    have been any e-mails.  And I can speak to no e-mails
 8    regarding any interactions with him specifically.
 9       Q.  Well -- but e-mails may or may not have
10    existed about -- about the fact that he wasn't able
11    to be talked to.  I mean, even those e-mails might
12    exist.
13          MS. PIERSON:  Object to form.
14          THE WITNESS:  Ben, I can't -- I'm sure
15    there may have been an e-mail that said, "I
16    tried to meet Dr. Zuzga and was unable," but I
17    can't speak to what -- I can't speak to what her
18    e-mails or anybody else's e-mails.  What I can
19    and what I think you're going at here is say, I
20    have no idea, when I turned in my laptop, what
21    happened to any of that content.  I went on to a
22    new organization.  So I -- I have zero knowledge
23    of what occurred with that information.
24    BY MR. MARTIN:
25       Q.  I understand.
```

Page 88

```
 1       A.  I turned in my laptop, and I was done.
 2    Cut up my American Express, and I was done with Cook.
 3       Q.  Did anybody from Cook ever tell you that
 4    there was a litigation hold on any cases -- let me
 5    start over.
 6          Did Cook ever tell you that there was a
 7    litigation hold on anything relating to IVC filter?
 8       A.  I'm not --
 9       Q.  Did Cook ever tell you there was a
10    litigation hold on anything in the last five years?
11          MS. PIERSON:  Object to form.
12          Ben's not entitled to ask you about any
13    litigation that you may or may not have known of
14    that's unrelated to IVC filters and specifically
15    not allowed to ask you about communications
16    between you and attorneys for Cook.
17          THE WITNESS:  Okay.
18          MS. PIERSON:  So I think I'm reading his
19    question right -- correctly.  I think what he
20    wants to know is, do you have a recollection of
21    ever receiving something called a litigation
22    hold regarding an IVC filter?
23          THE WITNESS:  I do not have any
24    recollection.  My -- my communications are with
25    friends.  I do not recall any.
```