

JOSEPH N. WILLIAMS
Attorney at Law

The Hammond Block Building
301 Massachusetts Ave. | Indianapolis, IN 46204
T: 317 | 633 | 5270   F: 317 | 426 | 3348
jwilliams@rwp-law.com

April 12, 2017
Via email: amy_holtz@insd.uscourts.gov

Magistrate Judge Tim A. Baker
c/o Amy Holtz, Courtroom Deputy
U.S.D.C. for the Southern District of Indiana
Indianapolis Division
46 East Ohio Street
Indianapolis, IN 46204

Re:   *In Re: Cook Medical, Inc.* (MDL 2570)

Dear Magistrate Judge Baker,

After we requested the Court's assistance with three issues (deposition conduct, use of errata sheets, and Cook's document retention/destruction), Ms. Pierson sent her April 7, 2017, letter outlining six issues Cook would like to address.

Last night, Cook filed a 27-page brief that sets forth most of what is contained in Ms. Pierson's discovery letter. Without waiving our right to respond to Cook's motion and brief, I have addressed the issues Ms. Pierson has outlined in her letter.

**1. "Duration of Four Expert Witness Depositions."**

No matter the expert witnesses Cook designates, Plaintiffs will take no longer than the seven hours provided by Federal Rule to complete those depositions. Plaintiffs simply asks Cook to do the same.

To support its request for more time, Cook lists the number of pages contained in our experts' reports. Primarily, Cook claims that Dr. Kessler's opinions are so extensive that he cannot possibly be deposed in one day. Dr. Kessler has never, however, been deposed for more than a single day in a federal case. If every other MDL lawyer can depose Dr. Kessler in one day, then so can Cook. In fact, Dr. Kessler's deposition in the Bard IVC Filter MDL lasted a little more than six hours, including all breaks save for lunch. Dr. Kessler's report in Bard was 61 pages longer than his report here (nearly 200 pages longer if you count appendices). Yet, Bard needed less than a day. Furthermore, while Cook states that his report is 458 pages long, it fails to point out that those



Magistrate Judge Tim A. Baker
April 12, 2017
Page 2

458 pages include: 104-page report of Dr. Fishbein, 13-page report of Dr. Betensky, 52 pages of Cook organizational charts, and 24 pages of deposition citations.

Plaintiffs respectfully request the Court to enforce the Federal Rules' 7-hour limitation on all depositions.

### 2. "Proportionality and Remaining Depositions."

There are two problems with Cook's position: First, it relabels nonparty depositions as "Company Depositions" to argue Plaintiffs are trying to exceed the number of corporate depositions this Court ordered. Nonparty depositions are neither "Cook Defendant" depositions nor "30(b)(6) depositions of the Cook Defendants," and do not count against the total of 26 such depositions this Court permitted. Second, "proportionality" in this context is not an issue. This Court already considered proportionality when it ordered an additional six corporate depositions. [*See* Filing No. 3069, at ECF p. 7633.]

CMO 2 was clear — any existing rule limiting the number of depositions was inapplicable to this MDL. [Filing No. 281, at ECF p. 1298.] Regarding depositions of the "Cook Defendants," Plaintiffs could take "up to ten (10) depositions of the Cook Defendants in addition to ten (10) FRCP 30(b)(6) depositions of the Cook Defendants." [*Id.* at 1298-1299.] Last November, this Court granted six additional depositions "beyond the original 20 authorized, for a total of 26 depositions." [*See* Filing No. 3069, at ECF p. 7633.] The Discovery Order also states: "Cook shall produce six additional custodian files … . Defendants shall produce these files within 28 days after Plaintiffs notify them of their selections." [*Id.*]

<u>Depositions.</u>  Plaintiffs have taken 18 "Cook Defendant" depositions or "30(b)(6) depositions of Cook Defendants." All were taken before the November 2016 Discovery Order was entered:

| #  | Deponent         | Date     | Type of Depo   |
|----|------------------|----------|----------------|
| 1  | Torben Andersen  | 6/8/16   | Cook Defendant |
| 2  | Scott Blanchard  | 1/29/15  | 30(b)(6)       |
| 3  | Mark Breedlove   | 1/16/15  | 30(b)(6)       |
| 4  | Brian Choules    | 7/22/16  | Cook Defendant |
| 5  | Jacob Clausen    | 6/21/16  | Cook Defendant |
| 6  | Bruce Fleck      | 7/20/16  | Cook Defendant |
| 7  | Mark Frye        | 6/30/16  | Cook Defendant |
| 8  | Rita Harden      | 1/22/16  | 30(b)(6)       |
| 9  | Ted Heise        | 3/31/16  | 30(b)(6)       |
| 10 | Per Hendriksen   | 6/15/16  | Cook Defendant |


| 11 | Anna Bjerg Jessen | 6/10/16 | Cook Defendant |
| 12 | April Lavender | 4/23/15 (resumed 12/17/15) | 30(b)(6) |
| 13 | Arne Molgaard Nielsen | 7/14/16 (resumed 10/5/16) | Cook Defendant |
| 14 | Mette Nielsen | 6/3/16 | Cook Defendant |
| 15 | Tom Roberts | 5/20/16 | Cook Defendant |
| 16 | Darrell Talbert | 4/27/15 (resumed 12/15/15) | 30(b)(6) |
| 17 | Jesper Thyregod | 6/1/16 | 30(b)(6) |
| 18 | William Voorhees | 5/17/16 | 30(b)(6) |

Plaintiffs therefore have two remaining depositions of the "original 20 authorized" plus the six additional depositions granted in November (i.e., eight more for a total of 26 "Cook Defendant" depositions or "30(b)(6) depositions of the Cook Defendants").

The following "Cook Defendant" depositions are currently (scheduled for a total of 23 taken or scheduled). Three are yet to be named.[1]

| # | Deponent | Date |
|---|---|---|
| 19 | Jen Brown | 4/21/17 |
| 20 | Henrik Gyllun | 5/16/17 |
| 21 | Lars Milling | 5/2/17 |
| 22 | Anthony Ragheb | 5/25/17 |
| 23 | Jim Smith | 5/9/17 |

Cook states, "Although this Court limited Plaintiffs to 26 common-issue, company discovery depositions, Plaintiffs have requested 28 such depositions (and have indicated they believe they are still entitled to three more, for a total of 31 depositions)."[2] To arrive at 28, Cook includes two former Cook employees and three consulting doctors (none of whom have ever been Cook employees).

---

[1] Plaintiffs have advised Cook counsel since December 2016 that they are "holding back" depositions and custodian file requests until another round of depositions because they believe the depositions will help identify the best witnesses and files for their final requests. An email from Doug King on January 24, 2017, acknowledged that Plaintiffs had "previously requested" depositions of Ms. Brown and Mr. Gyllun, (Ex. A, D. King Email 1/24/17), but dates were not provided until after Plaintiffs' repeated requests into March 2017. (Ex. B, M. Schultz Email 3/11/17.)

[2] A. Pierson Letter to Judge Baker (4/7/17) at 2-3.



RILEY WILLIAMS & PIATT LLC

Magistrate Judge Tim A. Baker
April 12, 2017
Page 4

CMO 2 and the November Discovery Order clearly provide a total of 26 depositions of "the Cook Defendants [or] FRCP 30(b)(6) depositions of the Cook Defendants." Former employees and nonparty doctors are not counted against Plaintiffs' total.

Cook then complains that these nonparty depositions will occur during a busy period when experts and other Cook employees are being deposed. Plaintiffs first requested the depositions of Dr. Timperman and Mr. Hawkins on November 15, 2016.[3] Despite Plaintiffs' repeated requests, dates were not agreed upon until March 2017. The same is true for Cook company witnesses for whom dates were not provided until March when Plaintiffs' counsel e-mailed and threatened to seek Court intervention:

> We have three remaining depositions but we are saving at least one and maybe all for additional marketing people after we depose Mr. Smith, **which is why we have asked repeatedly for dates over the past four months**. There simply is no circumstance that could possibly explain taking four months to obtain deposition dates from any given employee, much less three management level employees. **Now this discovery will overlap with expert depositions instead of having been obtained in time for our experts to make use of it**. We need to confirm the first three (Smith, Brown, Gyllun) by Wednesday or we will advise the Court of the situation and alert Magistrate Judge Baker that a motion to compel dates will be forthcoming.[4]

Cook now seeks to capitalize on this delay by limiting Plaintiffs' discovery just as the discovery period is coming to a close. Plaintiffs have every right to these important depositions, which they have repeatedly sought for months. All but one finally are scheduled. Further delay is unwarranted.[5]

<u>Custodian Files.</u>  This Court ordered Cook to produce six additional custodian files within 28 days of Plaintiffs' identification of a given custodian. [*See* Filing No. 3069, at

---

[3] Ex. C, B. Martin Email 11/15/17.

[4] Ex. B, M. Schultz Email 3/11/17.

[5] The deponents and dates are: Dr. Timperman (May 3), Dr. Smouse (May 26), Mr. Hawkins (June 12), and Dr. Kaufman (June 19). The last deponent, Mr. Carlson, is a former Cook employee. Cook advised Plaintiffs on March 23 that it would inquire into whether it would represent Mr. Carlson and accept service on his behalf. Plaintiffs have not received a response.

Magistrate Judge Tim A. Baker
April 12, 2017
Page 5

ECF p. 7633.] Ms. Pierson's letter states in a footnote that Plaintiffs "continue to express a right to request at least three more custodial files under the Court's Discovery Plan." This is correct. Plaintiffs obtained the custodian files for Cook employees Brian Bates and Jim Smith in January. Plaintiffs recently requested the custodian file for Neal Fearnot. Plaintiffs still have three requests available to them.

Cook now seeks to prevent Plaintiffs from requesting the files until the end of 2017. As noted in Mr. Schultz's email of March 11, 2017, to Ms. Pierson:

> We still have custodian files available to request but also with these we are waiting (or at least may wait) until we get further discovery before we decide how to use the last of our requests. We also want to learn more about document destruction before seeking any further these files, and that will happen over the next 10 days.[6]

Plaintiffs could have requested the custodian files earlier had Cook not taken several months to provide dates for depositions of Cook employees, fully aware that Plaintiffs were holding back custodian file requests until those depositions were taken. Here, again, Cook seeks to capitalize on its own delay by requesting even more delay.

Ms. Pierson's letter also states that Cook is "evaluating the proportionality" of Plaintiffs' recent request for Mr. Fearnot's file. Proportionality has already been ruled upon. [*See* Filing No. 3069, at ECF p. 7633.] Cook does not have the prerogative to second-guess the Discovery Order, nor should the parties or the Court spend time re-arguing what already has been decided. This is especially so in this instance because Mr. King acknowledged at the time of the Court's initial ruling: "these general corporate discovery depositions and custodian files, that that's <u>probably not even going to happen this calendar year. That it might be into 2017. I'm not arguing with that</u>."[7]

Plaintiffs intend to identify their remaining three deponents and remaining three custodians shortly after May 16, by which time three key Cook employees will have been deposed (Jen Brown, Jim Smith, and Henrik Gyllun), all of whom Plaintiffs first requested months ago.

---

[6] Ex. B, M. Schultz Email 3/11/17.

[7] Ex. D, Status Conference Tr. (11/10/16) at 33:1-25.



### 3. "Plaintiff's New Requests for Production."

Cook opposes Plaintiffs' use of CMO 2, ¶ D, which allows any party to seek from the opposing party the production of documents or identification of previously produced documents pertinent to a given deponent. [Filing No. 281, at ECF p. 1300-1301.][8]

<u>Cook's Claim that Discovery is "Closed."</u> Cook's objection is premised on its claim that Plaintiffs' CMO 2 requests "contravene[e] Judge Young's November 10, 2016 direction that company discovery is closed."[9] Ms. Pierson frequently invokes this characterization of the status conference in discussing discovery with Plaintiffs' counsel. There was no such direction from Judge Young according to the hearing transcript, which is quoted below and attached as Exhibit D. Instead, the Judge Young noted that once remaining company discovery was complete (including the additional depositions Judge Baker had permitted), there would be no further requests for company discovery without some special showing. That is, the Court specifically contemplated the very discovery Plaintiffs are attempting to undertake at this time and for which CMO 2 notices have issued.

No one, including the Cook Counsel addressing this issue before Judge Young, believed company discovery was "closed" in November:

> *Mr. King at 21:4-22:5:* But what we would really be interested in, Your Honor, is some deadline that would be a close on fact discovery, particularly fact discovery on Cook…. It would assist, I think, both sides and the Court if **at some point** we have a firm deadline for when that company discovery is over. Now, obviously since Mr. Martin has said they're not really ready to identify these eight depositions they get … **obviously we can't set a firm deadline today**. But what I would request the Court, if that **once they're done with this round of discovery that say – you know, that be the end – that be the close of discovery on the company and that's what we would propose.**

After some back and forth, the Court concluded that the parties would agree upon at a cutoff after the corporate discovery that had already been undertaken (i.e., what Plaintiffs are attempting to complete now):

---

[8] Ms. Pierson objected to the CMO 2 requests by letter dated April 5, 2017. (Ex. E.) Plaintiffs' counsel provided a detailed response to Cook on April 7. (Ex. F.) This response borrows heavily from that letter.

[9] A. Pierson Letter to Judge Baker (4/7/17) at 4 (emphasis added).



> *The Court at 40:7-19:* And then also we have the understanding that once the additional discovery has been taken here, that we'll have – by agreement we'll have a cut-off point for further Cook fact discovery … . With the understanding, of course, that if something comes up that's compelling, we'll consider it.

There was no suggestion at the November 10 hearing that company discovery was complete in any respect, only that once the remaining depositions were taken and custodian files were produced, there would be a cut-off point. There was no suggestion by the Court or any party that CMO 2 was somehow nullified or would not apply to the depositions then under discussion (i.e., the depositions Plaintiffs are still waiting to take).

The Court's orders during the November hearing show that CMO 2 remains in effect and applies to the upcoming depositions. The Discovery Order of November 15 granting six additional depositions and custodian files does not state or imply that CMO 2 would not apply to the depositions. [*See* Filing No. 3069.] The Court's November 15 "Order on November 10, 2016, Pretrial Conference" notes that discovery was discussed and makes no reference to company discovery being "closed" or to CMO 2. [*See* Filing No. 3070.]

Your Honor entered CMO 20 that same day. It supersedes Section E of CMO 2 (not applicable here), but states in footnote 1: "**The remaining provisions of CMO #2 are not impacted by this order and remain in full force and effect**." [Filing No. 3071, at ECF p. 7636.] Section D of CMO 2 is one of those "remaining provisions" and carries today the meaning and effect it carried before the November hearings.

Finally, Doug King noted toward the end of the hearing that Cook continued to produce documents when Plaintiffs pointed out inadequate production (using the clot-trapping study as an example):

> [T]hey found that there was data – underlying data that they hadn't received and that they wanted to go back and look and see if it was there and we did so. We didn't need a court order. We didn't need any intervention from the Court. **So in that kind of situation, we're going to do it…. And we will continue to.**

Judge Young responded, "It's like I said earlier, eventually these documents are going to have to be produced anyway. So let's just get it done." Cook's position that its document-production obligations ended November 10 contradicts its commitment to the Court and ignores the Court's express recognition that further document production may occur.



Breadth/Burden. Cook next objects on breadth and burden grounds, (a) because the request seeks production of documents referenced within a responsive document; (b) because they seek documents relating to products other than Tulip and Celect; and (c) because the requests are not limited to any specific timeframe.

It is true the requests seek all documents referenced within a responsive document. This was included specifically because of issues raised many times with Cook in which Plaintiffs have seen documents referenced in email chains but the referenced documents were not produced. As Plaintiffs' counsel wrote Ms. Pierson, an irrelevant document mentioned in passing within a responsive document need not be produced. On the other hand, if a responsive document discusses a study report, another email communication, etc., then Plaintiffs would expect the referenced document to be produced so they could make sense of the responsive document itself. This situation will seldom arise because most such attachments or referenced documents would themselves be responsive. Plaintiffs must rely on Cook's judgment in determining which such documents should be produced.

Cook objects that the requests seek documents relating to products other than Tulip and Celect. Although the Court did not require "Platinum" to be used as an ESI search term (as there were no Platinum cases at the time), discovery in this litigation has never been limited by Court order to Tulip and Celect. In any event, the requests are tailored specifically to this concern. Namely, the requests encompass non-Tulip/non-Celect documents only "if discussion, examination, testing, or study of that [non-Tulip/non-Celect] filter was undertaken in whole or in part for the purpose of comparing that filter's design, performance, safety, or efficacy" to a Tulip/Tulip component or Celect/Celect component. If Cook, for example, undertook an animal study that showed Celect perforated at a rate forty times higher than a Celect Platinum or Bard Recovery, that test clearly would be relevant; but Cook apparently takes the disturbing position that such a document is one "relating to products other than the two at issue in this action," and therefore the document is not discoverable. Ultimately, documents relating to other filters are responsive only if they also relate to Tulip or Celect, which is reasonable.

Cook argues the requests are not limited to any specific time frame. Tulip was first developed in the early 1990s and Celect was first discussed almost 15 years ago. The requests themselves are self-limiting. If a document is responsive and otherwise discoverable then it makes no difference whether it is 2 months old or 20 years old.

Proportionality. Cook claims the requests are disproportionate to the needs of the case, "particularly to the needs of *Hill* and *Gage*." The depositions are not specific to *Hill* and *Gage*. The litmus for discovery is not whether Cook has produced "over a



million pages of documents" (a figure that includes a staggering number of duplicates). Defendants in the Xarelto MDL are producing five million pages per month for 10 months (pursuant to PTO 21). Bard has produced approximately 1.6 million documents comprising more than 4 million pages in the Bard IVC filter MDL. Bard's latest supplemental production alone exceeded Cook's entire production in this case. The question is not how many documents Cook has produced; it is whether any given CMO 2 request encompasses responsive documents not yet produced. If so, then just as Doug King assured the Court, the documents should be produced.

With respect to Cook 30(b)(6) or custodial fact witness depositions, Cook is obliged not only to "produc[e] discoverable documents," but to identify responsive documents previously produced. CMO 2 contemplated that document production already would have occurred before CMO 2 requests were propounded, so previous productions don't foreclose additional ones.

Additionally, the CMO 2 requests encompass witness-specific documents such as presentations by witnesses, remuneration to witnesses, personnel files, and internal policies that governed the witness's specific areas of responsibility. These documents are not likely to have been captured in previous productions. The same is likely true for even routine items like email for witnesses whose custodian files were not produced, such as Mr. Ragheb, or for Cook consultants like Drs. Smouse, Timperman, and Kaufman. Indeed, in the brief Ms. Pierson filed last night she states that the CMO 2 requests would require the production of thousands of pages of documents; so clearly the requests encompass documents not yet produced.

<u>Non-Cook Witnesses.</u>  Finally, Cook claims that CMO 2 "makes clear that the Cook Defendants have no obligation to respond to requests for production accompanying deposition notices served on third parties," but Cook cites only half of the governing language.[10]

Specifically, Cook cites CMO 2, ¶ D.2., which applies to any Cook 30(b)(6) and/or custodial fact witness depositions. Cook does not mention ¶ D.1., which applies to "<u>any notice of deposition</u> where there is an accompanying request for the production of documents" and which requires "the responding <u>Party</u>" to alert lead counsel for "the noticing <u>Party</u>" of "any reason the requested documents cannot be produced a minimum of fourteen (14) days prior to the date of the noticed deposition." CMO 2 thus

---

[10] A. Pierson Letter to Judge Baker (4/7/17) at 4-5. Not coincidentally, Cook seeks to count these "third party" depositions as "Company Depositions" when adding up the number it contends Plaintiffs are entitled to take.



includes two operative provisions. Paragraph D.2. is limited to Cook 30(b)(6) and custodian depositions and requires not only production of responsive documents, but identification of previously produced documents, which makes sense given that witness-specific documents will have been produced for all custodians. Paragraph D.1. applies to "any" other depositions. Cook's interpretation of CMO 2 renders ¶ D.1. superfluous. Cook also seeks to narrow ¶ D.2. in its April 5 letter to counsel, where it claimed it need only identify responsive documents for Cook witnesses (but need not produce any new documents whatsoever). It thus seeks to erase all of ¶ D.1. and half of ¶ D.2. Cook undoubtedly possesses relevant, responsive documents such as communications, confidentiality agreements, payment records, and other similar documents for consultants like Drs. Smouse and Kaufman who have worked closely with Cook on IVC filters for many years. CMO 2 requires production of those documents.[11]

### 4. "Production of Expert Reliance Materials."

Since the disclosure of our expert reports, we have been diligently attempting to provide Cook with all information it requests related to our experts. This information has now been provided.

### 5. "IME Protocol."

Cook has proposed an incredible IME protocol, to which we have objected. Contrary to Ms. Pierson's letter, Mr. Heaviside outlined our objections during a telephone conference last week (prior to Cook's April 7, 2017, letter). Our specific objections fall into two categories: (1) invasiveness; and (2) burden.

<u>Invasiveness</u>. Cook has requested that Mrs. Hill sit for a number of procedures that carry significant risks:

(1) *Extended upper endoscopy*: this involves inserting a scope with a light and camera through the mouth and down the esophagus; this invasive procedure carries the risks of perforation and anesthesia reaction (among others).

(2) *Intravascular ultrasound*: an ultrasound wand is inserted into a catheter, which is inserted into an artery in the groin and moved up to the heart; this surgery carries risks of blood clots, heart attack, allergic reaction, and damage to heart valve or blood vessel (among others).

---

[11] Cook did propose, however, to produce any previously unproduced documents that it uses in preparing its company witnesses for deposition. In other words, Cook seems to be saying that if it finds some advantage to a particular document, then it will produce that document regardless of whether it was requested.


(3) *IVC Venogram*: contrast material is injected into the patient for the purpose of imaging; this procedure carries the risks involved attendant to the contrast dye and the risks generally associated with radiation exposure.

(4) *Upper GI Barium swallow & nuclear medicine gastric emptying study*: both involve introduction of radioactive material into the body for imaging purposes, which carries the risks associated with radiation exposure.

Plaintiffs do not have a problem with an IME **if** the IME is what we all understand an IME to be: an examination. Typically, an IME involves a questionnaire, history, physical examination, and, in some cases, imaging. Candidly, in the combined years of injury practice, we have not seen anything like this before. An Independent Medical Examination is not an Independent Medical Exploratory Surgery. Outside of litigation, every physician requires the patient to sign an informed consent before performing any of these procedures. The reason: they all carry the risk of further injury.

Here, Cook asks to insert instruments into Mrs. Hill's body (and presumably the body of anyone else who goes to trial). Each of these clients had already had excess radiation because of implant venograms, multiple CTs to diagnose filter failure, and long retrieval attempts. The last thing they need is more cumulative cancer-causing radiation. The National Cancer Institute warns there "is no amount of radiation that is completely without risk." Cook's products have damaged our clients' organs, and now they want to do more damage. Plaintiffs object to these proposed IMEs.

<u>Burden</u>. Cook's proposed protocol would have Mrs. Hill travelling to New York and then North Carolina to meet with doctors (who have not even been identified, a requirement of Rule 35). Cook then suggests that Mrs. Hill foot the bill for travel and accommodations (airfare, hotel, meals, etc.). We have yet to find a court that has required a plaintiff to travel anywhere but the forum state for an IME. For obvious reasons, Plaintiffs object.

**6. "Outstanding Discovery Requests in *Hill*."**

Mrs. Hill has provided everything she has to Cook, and Cook's complaints appear to be an attempt to manufacture a discovery dispute. What Cook does not mention in its letter is that Mrs. Hill's counsel (Joe Johnson) sent Ms. Pierson's associate (Anna Rutigliano) a letter on October 20, 2016, which provided the following:

(1) Expected employment records release authorization;

(2) Two original executed HIPAA authorizations;


(3) Executed release for tax information;

(4) Executed Medicare authorization;

(5) Executed insurance records release;

(6) Executed release for any workers' compensation records;

(7) Executed authorization for the Social Security Administration.[12]

These releases provide Cook with access to everything it needs. In addition, Cook has been provided with Mrs. Hill's "social media" documents (90 pages) and a list of her out-of-pocket expenses.

**7. Conclusion.**

We look forward to meeting with you tomorrow. If you need anything prior to the hearing, then please don't hesitate to let me know.

Sincerely,

RILEY WILLIAMS & PIATT, LLC

Joseph N. Williams

JNW/mll
Attachments

---

[12] *See* October 20, 2016, letter from Joe Johnson (Ex. G).