# EXHIBIT L

Page 1

```
 1                UNITED STATES COURT
              SOUTHERN DISTRICT OF INDIANA
 2               INDIANAPOLIS DIVISION
 3
             CASE NO.:  1:14-ml-2570-RLY-TAB
 4          MDL No.  2570
 5   IN RE:  COOK MEDICAL, INC.,
     IVC FILTERS MARKETING, SALES
 6   PRACTICES AND PRODUCT
     LIABILITY LITIGATION
 7
     This Document Relates to
 8   Case No. 1:14-cv-06016-RLY-TAB
 9
           VIDEO DEPOSITION OF ELIZABETH JANE HILL
10
      Taken on Behalf of the Defendants, Cook Incorporated,
11   Cook Medical, LLC (f/k/a Cook Medical Incorporated) and
                  William Cook Europe ApS
12
13   DATE TAKEN:    THURSDAY, NOVEMBER 10TH, 2016
14   TIME:          8:54 A.M. - 4:28 P.M.
15   PLACE:         VERITEXT
                    37 NORTH ORANGE AVENUE
16                  SUITE 500
                    ORLANDO, FLORIDA  32801
17
18
19
20
               STENOGRAPHICALLY REPORTED BY:
21
                ANTHONY TRUJILLO, RMR, CRR
22                Registered Merit Reporter
                 Certified Realtime Reporter
23
24
25
```

Page 34

1   Q.   Did you ever see any print advertisements?
2   A.   No.
3        (Pause.)
4   Q.   Did you ever contact Cook about your filter?
5   A.   No.
6   Q.   Why not?
7   A.   Why would I?
8   Q.   When did you first contact an attorney?
9        MR. JOHNSON: Don't answer that question.
10  A.   I...
11       MS. COX: Are you instructing her not to
12  answer?
13       MR. JOHNSON: I am. That's an attorney-client
14  privilege that I'm not going to let her waive or
15  breach.
16       MS. COX: And can you explain to me what about
17  the fact of her contacting you is attorney-client
18  privilege?
19       MR. JOHNSON: I think the relationship when it
20  starts is protected; it's privileged. And we're not
21  going to go there.
22       MS. COX: I'm not asking for the content of
23  anything that you discussed.
24       MR. JOHNSON: No -- the date, that is not going
25  to be answered. So let's move on.

Page 35

BY MS. COX:

Q. Had you -- why did you file a lawsuit?

MR. JOHNSON: Form objection.

Q. You can answer.

A. Okay. Because the filter failed. I almost died. And that's why.

Q. How did you -- how did you come to find your attorney?

MR. JOHNSON: Don't answer that question.

MS. COX: You're instructing her not to answer --

MR. JOHNSON: Yes.

MS. COX: -- how she came to find you?

MR. JOHNSON: Yeah. If there was a referral lawyer, for example, that's privileged. So that's a hypothetical. So we're not answering that.

BY MS. COX:

Q. Can you tell me tell who the attorneys are that are representing you in this matter?

A. Joseph Johnson.

Q. Have you ever talked to any other attorney?

MR. JOHNSON: You can answer.

A. Joshua Sheridan in Tampa.

Q. And do you still talk to Joshua Sheridan in Tampa?

1    A.   About once a year.
2    Q.   How do you know Mr. Sheridan?
3    A.   He -- I -- he was a lawyer that I knew in
4  Tampa.
5    Q.   Were you -- did you ever live in Tampa?
6    A.   It's right by St. Pete.
7    Q.   Okay. And is that how you came to find
8  Mr. Johnson?
9         MR. JOHNSON: Don't answer that question.
10 BY MS. COX:
11   Q.   Have you -- do you recall filling out a
12 plaintiff fact sheet in this case?
13   A.   Would you show it to me?
14   Q.   Yes.
15        Do you recognize this? Do you recognize this?
16   A.   I believe this is a form I filled out.
17   Q.   If you look at the last page.
18   A.   The very last?
19   Q.   Yes.
20        MR. JOHNSON: Page 24. Not the very last
21   because you've got attachments.
22        MS. COX: Oh, sorry. Yes. Page 24.
23 BY MS. COX:
24   Q.   You'll see that there's a verification page,
25 and it looks like your husband signed this on 2/17/2015.

Page 40

1  correct?
2  A.  It would have been around that time, I assume.
3  Q.  But you just don't recall how -- how long
4  before February '15 or so?
5  A.  No, I do not.
6  Q.  Is this your signature on the last -- on this
7  page, 24?
8  A.  Yes.
9  Q.  And you understood that you were under the
10 obligation to tell the whole truth when you filled out
11 this document, correct?
12 A.  Yes, of course.
13 Q.  Tell me, how was this document prepared?
14 A.  I went through and filled it out.
15 Q.  Did you handwrite your answers?
16 A.  Yes.
17 Q.  Okay.  I'm looking at this document and it's
18 typed, so I'm wondering if you filled out something by
19 hand first or if you actually typed these answers.
20 A.  Filled it out by hand, sent it to (indicating)
21 Babbitt and Johnson.
22      MS. COX:  Okay.  So we're going to put a
23   request on the record for the handwritten version of
24   the plaintiff fact sheet.
25      MR. JOHNSON:  I don't know whether it exists;

Page 41

1    but if it does, we'll certainly --
2         MR. HEAVISIDE:  Consider your request.
3         MR. JOHNSON:  Consider your request.  I mean,
4    I -- I suspect that we destroyed those things, but I
5    don't know for sure at this point.
6         MS. COX:  Okay.  Well, we'll follow up after
7    the deposition that we would like you to check and
8    see if you still have --
9         MR. JOHNSON:  Sure.
10        MS. COX:  -- maintained a copy of the
11   handwritten answers to the plaintiff fact sheet.
12        MR. JOHNSON:  Okay.
13   BY MS. COX:
14        Q.   Do you know who typed the answers in here?
15        A.   No.
16        Q.   You assume it was someone at your attorney's
17   office?
18        A.   Of course.
19        Q.   Did you review the typewritten answers once
20   they were typed to make sure they were the same as your
21   handwritten answers?
22        A.   They were sent to me by e-mail to -- to review.
23        Q.   So you reviewed it by e-mail and then you sent
24   it back?
25        A.   Then I sent the e-mail back, that it looks

Page 42

1 correct to me.
2 Q. And then -- and then you signed when?
3 A. (After perusing document) What is it, Page 24?
4 Q. Yes.
5 A. Yeah.
6 Q. How did you sign the copy? Did you -- did you
7 sign it after you looked at their typewritten notes, or
8 did you fill it out by hand, sign it, and send that in?
9 A. I honestly don't remember.
10 Q. Okay. Did anyone help you fill out these
11 responses?
12 A. No.
13 Q. Did you review any records in order to fill in
14 the information?
15 A. No.
16 Q. You didn't review any of your medical records
17 to fill out all this stuff?
18 A. No.
19 Q. So you've got a really good memory.
20 A. Pretty good. I've had to write it down so many
21 times, I...
22 Q. So when you signed this, you don't know if this
23 signature was before or after you reviewed the typed
24 copy?
25        MR. JOHNSON: Form objection. It's been asked

Page 220

1  Do you have any of those documents?
2  A.  No. I do not.
3  Q.  Okay. M, the very last one on Page 23. This
4  asks for screen shots of all Web pages of each type of
5  social media used by you, like Facebook, Twitter,
6  Instagram, showing any and all posts and messages from
7  the date of implantation to the present.
8      It says that these documents are attached, but
9  there are no documents from any social media attached to
10 your plaintiff fact sheet.
11     Have you printed out those and given them --
12 given them to your attorney?
13 A.  I -- I forwarded them -- what's her -- what's
14 her name?
15     MR. JOHNSON: Don't worry about it.
16 A.  Okay.
17 Q.  So you have provided documents.
18     What did you provide?
19 A.  Access to my Facebook, which I understand
20 you-all needed and I said it's fine. I don't care.
21 Q.  So did you just send them your -- your password
22 and say log on and print it out?
23 A.  I asked them to print it out because I didn't
24 have access to print it out.
25 Q.  Is Facebook the only social media that you use?

```
                                                  Page 221
 1      A.   Yeah, because I don't know how to do the
 2 others.
 3      Q.   Well, I'm with you.  I have never been on
 4 anything else.
 5           But I just wanted to make sure you didn't
 6 Snapchat or --
 7      A.   Oh, no.
 8      Q.   -- LinkedIn or Instagram or Vine.
 9      A.   No.
10      Q.   I don't even know what Vine is.
11      A.   No.  I don't know either.
12      Q.   So Facebook is it?
13      A.   Facebook is it.
14      Q.   I'm going to put a note on the record for you
15 not to go in and erase any of the content of your
16 Facebook page from here on out.  We just want to make
17 sure it's preserved.
18      A.   I don't know how anyway.
19      Q.   That's fine.  And we'll work with your
20 attorneys to get the information.
21      A.   Okay.
22      Q.   Have you ever had any contact with any
23 representative of Cook?
24      A.   No.
25      Q.   Have you ever seen any brochure or product
```

1  Q.  Have you ever seen anyone else for any sort of
2  therapy or counseling that we haven't already talked
3  about today?
4  A.  No. Baby bonding class.
5  Q.  When you were -- when you just had your son?
6  A.  Uh-huh.
7  Q.  Earlier today you testified the first time that
8  you talked to a lawyer, you talked to a Mr. Sheridan.
9      I asked you when you first contacted
10 Mr. Sheridan, and I specifically stated I only wanted to
11 know the date that you contacted him.
12     And I was not inquiring about the substance of
13 your conversation with Mr. Sheridan. Your attorney
14 directed you not to answer.
15     But, for the record, I'm going to ask you one
16 more time for the date on which you first contacted
17 Mr. Sheridan to talk about a potential lawsuit against
18 Cook.
19     MR. JOHNSON: Don't answer that question.
20     MS. COX: And are you objecting on the basis of
21  attorney-client privilege?
22     MR. JOHNSON: I am.
23     MS. COX: And do you have any other basis for
24  your objection?
25     MR. JOHNSON: It's irrelevant. It's

Page 230

1   immaterial.  It doesn't tend to prove or disprove
2   any issue in this case.  It seeks misleading -- it
3   would be confusing and misleading to the jury.  It
4   has no place in this litigation.
5        MS. COX:  Is your instruction to her not
6   respond -- to not respond based solely on the
7   attorney-client privilege?
8        MR. JOHNSON:  It's based on the attorney-client
9   privilege.  And I don't know whether there are any
10  attorney work product issues that might related to
11  him and her, but --
12       MS. COX:  Right.  Well, I'm not asking about
13  substance.  I'm asking about a fact that she would
14  know regardless of speaking with an attorney.
15       So I'm trying to clarify for the record -- let
16  me finish -- if you are instructing her not to
17  answer based solely on attorney-client privilege.
18       MR. JOHNSON:  I am basing it on privilege, yes.
19       MS. COX:  Okay.  I would like to hand you a
20  case called Coffey-Garcia versus South Miami
21  Hospital.  You're a Florida attorney.  This is a
22  Florida case that was just decided in June.
23       It basically held that a -- a person is -- the
24  attorney-client privilege does not cover the fact of
25  when a person first discusses possible legal

1   remedies with an attorney.
2          If you look at the holding on the first page of
3   4, attorney-client privilege does not protect facts
4   known by a client independent of any communication
5   with the lawyer.  So I'll ask again.
6   BY MS. COX:
7   Q.   Do you know --
8          MR. JOHNSON:  Let -- let me put on the record,
9   she's not going to answer the question.  I just went
10  through this issue three weeks ago in a trial.
11         There is other case law, which I believe is the
12  opposite of this case, out of probably a different
13  district.
14         So we're not -- we're not going to get into an
15  argument here.  It's -- it's -- it's done.  She's
16  not answering.
17         MS. COX:  We're making a record and we will
18  follow up with the Court.
19         MR. JOHNSON:  Okay.
20         MS. COX:  Okay.  I don't have any further
21  questions.
22         Do you have any questions?
23         MR. JOHNSON:  I do have a few questions.
24         THE WITNESS:  I'm okay.
25                     CROSS-EXAMINATION