UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE COOK MEDICAL, INC. IVC FILTERS MARKETING, SALES PRACTICES, AND PRODUCT LIABILITY LITIGATION | Case No: 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to All Actions

> *Hill v. Cook Medical, Inc., et al.*
> Case No. 1:14-cv-6016-RLY-TAB
>
> *Gage v. Cook Medical, Inc., et al.*
> Case No. 1:14-cv-1875-RLY-TAB

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY
OR, IN THE ALTERNATIVE, TO COMPEL EXPERT DEPOSITIONS**

**I.    Introduction.**

Defendants have disclosed a total of 28 experts:

- 7 retained non-medical experts, for whom Cook has provided reports;[1]
- 7 retained medical experts for whom Cook has provided reports;[2]
- 8 Rule 26(a)(2)(C) case-specific treating physicians;[3] and
- 6 Cook-affiliated Rule 26(a)(2)(C) witnesses;[4]

This motion first addresses opinions exceeding the scope of treatment for all of the Rule 26(a)(2)(C) case-specific treating physicians. It then addresses the opinions by two of the Cook-

---

[1] Jon Fryzek (statistics), Elisa Harvey (regulatory), Gerald Lynch (life care), Harold Pellerite (regulatory), Kennethy Perry (engineering), Scott Robertson (engineering), and Renu Virmani (pathology).
[2] Drs. Todd Baron, Michael Ferrante, Antonio Gasparis, Bennett Leventhal, Timothy Morris and Anthony Venbrux, as well as Paul Bishop (MSEE).
[3] Drs. Bridget Bellingar, Paul Crisostomo, Mark Goodwin, Timothy Larkin, Frank Lynch, Anthony Moreno, Antonio Pangan, and Mark Zuzga.
[4] Jennifer Brown (Director of Regulatory Affairs, Cook Research, Inc.), Brian Choules (former Technical Director and Pre-Clinical Bench Testing Manager, Cook Research, Inc.); Dr. James Gardner (Medical Science Officer, Cook, Inc.), Dr. Rolf Gunther (Cook KOL and inventor of the GuntherTulip), Dr. John Kaufman (Dir. Of Dotter Institute and Cook KOL), and Dr. Robert Smouse (Cook Consultant and KOL).

affiliated Rule 26(a)(2)(C) witnesses (Jen Brown and Brian Choules). Plaintiffs seek either to exclude their opinions or to compel depositions to discover those opinions, the bases for them, and whether either should have provided a report.

II.     Argument.

    A.     **Expert Opinion Testimony of Defendants' Hybrid Physician Witnesses Should Be Excluded.**

        1.     **Whether Hybrid Physician Witnesses Must Submit a Rule 26(a)(2)(B) Expert Report Depends on the Scope of the Opinion Offered.**

Expert witnesses must either provide a written report or a disclosure in lieu of a report, depending on whether "the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B)–(C). A report is required if the witness is specially retained/employed, or if the witness is an employee who regularly gives expert testimony. Fed. R. Civ. P. 26(a)(2)(B). If the witnesses is not required to provide a report but may offer expert testimony, then the proponent of that testimony must disclose "the subject matter on which the witness is expected to present [expert] evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). In other words, "non-retained witnesses who happen to be experts must provide summary disclosures" but not reports. *Martin v. Stoops Buick, Inc.*, No. 1:14-cv-00298-RLY-DKL, 2016 WL 4088132, at *1 (S.D. Ind. July 28, 2016) (Young, C.J.).

In the past, treating physicians were considered fact witnesses: "a species of percipient witness . . . not specially hired to provide expert testimony; rather, they are hired to treat the patient and may testify to and opine on what they saw and did without the necessity of the proponent of the testimony furnishing a written expert report." *Goodman v. Staples The Office*

2

*Superstore*, 644 F.3d 817, 819 (9th Cir. 2011); *see also Fieden v. CSX Transp.*, 482 F.3d 866, 871 (6th Cir. 2007) ("[A] report is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment."). Treaters who offered opinions beyond observations made during treatment were considered "hybrid" witnesses who generally were required to provide a report. *Goodman*, 644 F.3d at 819, 825–26.

The 2010 amendments to Rule 26, which ushered in the Rule 26(a)(2)(C) disclosure requirement, have been interpreted in the same fashion. The advisory committee's note to the 2010 amendments states: "A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony." However, a distinction remains when a treating physician's opinions exceed the scope of treatment. As Judge Young recently explained:

> Whether an expert must provide a complete report under 26(a)(2)(B) or a less extensive summary under 26(a)(2)(C) depends on the expert's relationship to the issues involved in the litigation. *See Malibu Media, LLC v. Harrison*, No. 1:12–cv–01117, 2014 WL 6474065, at *2 (S.D. Ind. Nov. 19, 2014) (citing *Downey v. Bob's Disc. Furniture Holdings, Inc.,* 633 F.3d 1, 6 (1st Cir. 2011)). Treating physicians, for example, often have firsthand knowledge of the events giving rise to the litigation and typically are not "retained or specially employed to provide testimony." *Id.* In such cases, the treating physician need only provide a 26(a)(2)(C) summary disclosure. *Id. If the treating physician testifies beyond the scope of his observations, however, he is treated as a retained expert*.

*Martin*, 2016 WL 4088132, at *1 (emphasis added). *Accord In re: Zimmer Nexgen Knee Implant Products Liability Litigation*, MDL No. 2272, No. 12-C-6279, at *5, 2015 WL 3799534 (N.D. Ill. June 17, 2015) (excluding opinions of hybrid physician witness where "those opinions . . . exceed the scope of" the physician's "treatment and have not been presented in an

3

expert report identifying the facts and data supporting his conclusions"); *Slabaugh v. LG Elecs. USA, Inc.*, No. 1:12-CV-01020-RLY, 2015 WL 1396606, at *2 (S.D. Ind. Mar. 26, 2015) ("[T]he treating physician need only provide a 26(a)(2)(C) summary disclosure *so long as the testimony does not exceed the scope of observations made during treatment*." (emphasis added)); *Brunswick v. Menard, Inc.*, No. 2:11-CV-247, 2013 WL 5291965, at *3 (N.D. Ind. Sept. 19, 2013) ("[A] treating physician may be required to submit an expert report when his testimony exceeded the scope of his observations during treatment.") (citing *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010)).

### 2. The Treating Physicians' Opinions Disclosed by Cook Exceed the Scope of Observations Made During Treatment.

On June 12, 2017, Defendants identified eight medical witnesses through Rule 26(a)(2)(C) disclosures. *See* Cook Defendants' Rule 26(a)(2)(B) and 26(a)(2)(C) Expert Disclosures, at 2–20 (Ex. A). Plaintiffs take issue with the disclosures for seven of these witnesses (presented in the order in which they are disclosed in Exhibit A).

#### a. Dr. Frank Lynch.

Dr. Lynch performed the filter explant procedure for Mrs. Hill. Defendants contend that Dr. Lynch's expert testimony will concern "his medical education, training and experience upon which he relied in treating Mrs. Hill; his care and treatment of Mrs. Hill; his opinions concerning Mrs. Hill's condition at the time of treatment; and his opinions regarding her prognosis at the time of treatment." *Id.* at 3. However, it is clear from the disclosure that Cook seeks to elicit opinions exceeding the scope of his treatment of Mrs. Hill.

As recently as two months ago, "[t]he parties agree[d] that Dr. Lynch is an expert in IVC filters," but the parties and the Court understood that "here, Dr. Lynch is considered an ordinary nonparty witness because he will testify as Hill's treating physician." *In re Motion of Frank*

4

*Lynch to Quash Subpoena*, No. 1:17-mc-00022-RLY-TAB (S.D. Ind. May 12, 2017), Filing No. 15, at ECF 305.  In limiting the subpoena served on Dr. Lynch for deposition, "the Court [struck] a balance between Dr. Lynch's treatment of Hill and his expert opinions on IVC filters." *Id.* at 306.  The Court held that "Dr. Lynch will not provide his expert 'opinion' unless it is intertwined with information that can be characterized as 'data,' which pertains to Dr. Lynch's treatment of Hill and removal of Hill's Cook IVC filter." *Id.* at 307.  Despite these limitations, Defendants have disclosed Dr. Lynch on the following issues:

- "[H]is placement of at least 800–1,000 filters and retrieval of over 1,800 filters.'"

- "His knowledge of the benefits and risks of IVC filters," including comparing risks of Cook filters to other brands and comparing risks of permanent devices to retrievable devices.

- "There is no specific period of time within which a filter cannot be removed."

- "Perforation and penetration are not well-defined terms in the literature."

- "Only 15-20% of all retrievals require retrieval techniques other than the standard technique."

- "He has never seen a patient with long-term clinical sequelae from a penetration of the small intestine."

Ex. A, at 3–6.

None of these opinions was formed based on Dr. Lynch's specific treatment of Mrs. Hill and all exceed the scope of treatment. As with the remaining physicians discussed below, Defendants might properly have presented these opinions by way of a Rule 26(a)(2)(B) report (although that would have totaled 14 retained case-specific medical witnesses in addition to the other 13 retained and non-retained experts).  The report deadline has passed.  Accordingly, Plaintiffs seek to exclude these opinions and any others exceeding the scope of his observations during Dr. Lynch's treatment of Mrs. Hill.

5

### b. Dr. Anthony Moreno.

Dr. Moreno treated Mrs. Hill. Defendants contend that Dr. Moreno's expert testimony will concern "his medical treatment of Elizabeth Hill and his opinions concerning Elizabeth Hill and IVC filters." *Id.* at 6. Defendants thus admit that Dr. Moreno would offer opinion testimony both about his treatment and about "IVC filters." His disclosure includes the following:

- "Placing filters before complex spinal surgeries is the standard of care in the United States."

- "Dr. Moreno estimates the frequency of a hematoma in the spine caused by anticoagulation during complex spinal surgery to be 5-10%. The rate of complications from filters is lower."

- "Literature discussing patients with blood clots is not directly applicable to patients undergoing a massive surgery. The literature does not compare patients undergoing bypass with patients undergoing a massive surgery."

- "Dr. Moreno . . . believes that filters save lives and it is an accepted form of treatment."

- "The rate of complications in a complex spinal surgery is 70%. His job is to prevent death, paralysis and blindness first."

- "Dr. Moreno has had dozens of patients who developed a PE without a filter, and one or two of them later died."

- "He does not have any concerns with leaving an IVC filter in permanently."

- "Without the option of prescribing IVC filters, he will not do complex spinal surgeries."

*Id.* at 6–8. These opinions exceed the scope of treatment. Furthermore, some of Dr. Moreno's opinions should be stricken as based on nothing more than speculation. For example: "Mrs. Hill may not have survived the surgery if he had not prescribed a filter to her." *Id.* at 7.

### c. Dr. Mark Zuzga.

Dr. Zuzga treated Mrs. Hill. Defendants contend that Dr. Zuzga's expert testimony will concern his "medical treatment of Elizabeth Hill and his opinions concerning Elizabeth Hill and

6

IVC filters." *Id.* at 8.  As with Dr. Moreno, Defendants here admit that Dr. Zuzga's opinions will extend to IVC filters generally.  Defendants' disclosure of his opinions includes:

- "The decision to use a filter rather than anticoagulants is at the discretion of the spinal surgeon. High-risk patients getting high-risk spinal surgeries are in a different patient population than patients who are just at an increased risk of blood clots."

- "It is up to the physician to evaluate the patient's individual medical condition, and a device manufacturer does not have patient-specific medical information."

- "Trauma or other unusual movement in the abdomen can also affect filter placement."

- "Dr. Zuzga believes in the safety and efficacy of filters, including the safety and efficacy of Cook filters."

- "[C]ertain patients are at a greater risk of developing PE than others. Patients who have died from PE often did not experience any prior symptoms. Patients over the age of 40 are at risk of developing PE, and the risk doubles for every decade over 40. Other factors that increase risk of PE include obesity, major surgery, slower blood flow from limited mobility, hypertension, trauma, chronic illnesses, medications, and history of prior surgeries."

- "The only two available treatments for PE are anticoagulants and filters."

- "Anticoagulants carry risks, including bleeding, stroke, death and paralysis. In his experience, physicians generally do not prescribe anticoagulants to patients undergoing a major surgery like a 10-12 hour spinal surgery due to the risk of bleeding."

- "The Celect filter has shown safe and effective results as compared to other filters. He has never stopped using any Cook filters because they were unsafe or had too high of a complication rate."

- "After he learned of Mrs. Hill's perforation of her vena cava, he continued using the Celect filter in patients."

- "He estimates that he is able to retrieve 80-90% of filters he attempts to retrieve."

- "Prior to Mrs. Hill's implant procedure, Dr. Zuzga was aware of, *and it was known in the medical community*, the following risks: perforation of the vena cava, perforation of adjacent organs, inability to retrieve, migration, fracture, bleeding, embedment, tilt, infection, death and need for an open removal."

7

- "Many patients experiencing a filter perforation are asymptomatic."

- "Tilted filters are still safe and effective."

- "A patient's anatomy can cause tilt. Trauma can cause tilt."

- "Malpositioning of the filter can also cause tilt, and this was a known risk prior to Mrs. Hill's implant procedure. *This risk was also generally known in the medical community*."

- "There is strong clinical evidence to support the use of filters."

- "Dr. Zuzga continues to prescribe and use Cook products in his patients."

*Id.* at 8–10 (emphasis added).

### d.     Dr. Paul Crisostomo.

Dr. Crisostomo treated Mr. Gage.  As with preceding witnesses, Defendants admit they will seek opinions regarding "IVC filters" generally:

- "Dr. Crisostomo has experience placing, monitoring, and retrieving Cook filters. He primarily uses the Cook Gunther Tulip filter, *which he finds to be a safe and effective way to treat his patients*."

- "Nothing from Dr. Crisostomo's experience with Cook filters causes him to believe they are defective or dangerous in any respect, and will continue to use these filters in the treatment of patients."

- "When Dr. Crisostomo treats a patient who has a history of DVT or PE, or a patient who has an existing DVT or PE, and that patient could not be anticoagulated, he chooses an IVC filter as the appropriate method of treatment in order to protect the patient from a life-threatening PE."

- "Dr. Crisostomo believes that each time a patient has a PE, the subsequent PE will likely be even more severe than the prior PE. Dr. Crisostomo also believes that if a patient has a history of recurrent Pes, his or her mortality risk increases with each PE. PEs that cause death act to suffocate or disrupt oxygen to a patient's heart."

- "Dr. Crisostomo is familiar with the risks of filters in vivo . . . . Those risks have been well known in the medical community from 2010 to the present date."

- "Dr. Crisostomo will also testify that physicians learn all these aforementioned risks during their medical education and training. He will

8

> testify that these risks were well-known to him when treating Mr. Gage and well known in the relevant medical community at the time a filter was placed in Mr. Gage."

- "Dr. Crisostomo believes that Cook filters are 'among the best' and 'do the right job' and are safe and effective ways to treat his patients."

- "When Dr. Crisostomo weighs the benefits against the risks of perforation, migration, tilt, and all other things attendant to placing an IVC filter, he believes that the key benefit outweighing the risks is the prevention of life-threatening PE."

- "Dr. Crisostomo believes that a filter is placed between the renal veins or horizontally would be considered a 'malpositioned filter.'"

- "Things can happen during the placement of any IVC filter, such as malposition, tilt, and being deployed in the wrong location—for example, either too high or too low in relation to the renal veins. Those are all known risks of having filters placed regardless of the physician who places the filter or regardless of the type of filter being placed. These risks are not unique to Cook filters."

*Id.* at 11–13 (emphasis added).

### e. Dr. Mark Goodwin.

Dr. Goodwin treated Mr. Gage. Again Defendants disclose opinions regarding "IVC filters" generally:

- "The fact that PE is 'probably the number one cause of death in hospitals across the United States.' Physicians categorize pulmonary emboli into separate subcategories so that physicians can determine how to treat the patient. The subcategories of Pes are small, massive, and submassive. The normal death rate for a massive PE is approximately 15-32%, and the death rate for a submassive PE is approximately 5-10%

- Statistics show that between 50,000 and 200,000 people die each year from PE, and the true number of people who die each year from PE is actually larger than this figure. The risk of death has been 'unrecognized for a long period of time,' but recently there has been improvement to greater physician knowledge and improved care for those patients suffering from PE."

- "Dr. Goodwin is comfortable using Cook filters. He has used multiple filter types, and has had good results with the Cook Tulip filter. He uses the Tulip filter most frequently, and he believes that the Tulip is easy to deploy, easy to retrieve, and is safe for his patients. In his experience, the Tulip filter has a

9

nice balance, the hook is fairly easy to get to, and there is not much scar tissue or endotheliazation associated with the filter, making it easy to retrieve."

- "Throughout his 30 years of practicing medicine and using Tulip filters, he has never had a complication with a Tulip filter in any of his patients. He has confidence in the Tulip filters and he would prescribe a Tulip filter for a patient today. Indeed, he would be comfortable having one placed in him."

- "IVC filters work and protect patients from life-threatening PE."

- In 2011, he and other physicians in the relevant medical community (those physicians who place IVC filters) were aware of the risks of IVC filters."

- "Dr. Goodwin was aware of the following risks regarding IVS filters: . . . . For patients who cannot be on blood thinning medications and who have a history of PE, these risks are outweighed by the benefits of IVC filters."

- "A filter may be tilted slightly to the side due to the way it was placed by the physician. All physicians, including Dr. Goodwin, have some rate of tilt in the deployment. No physician is immune to it. Tilt is a risk associated with all filters and is not unique to the Tulip. Tilt does not affect the efficacy of the filter in of in any way and that tilt generally has no clinical relevance or clinical significance."

- "Perforations are very rare, and that when perforation does occur, it is generally without clinical significance. Patients don't have pain, and they generally experience no bleeding. He would not be concerned if he had a patient whose IVC filter had penetrated his or her caval wall, but no organs or other surrounding structures were touched."

- "As a general rule of thumb, prior to placing IVC filters he tells patients that filter placement is a relatively safe procedure with a low complication rate."

- "Even though most IVC filters can be removed, the inability to retrieve a filter is a known risk and was well-known risk in the medical community in 2011 when Mr. Gage received his filter."

- "The decision to remove an IVC filter is based on many clinical factors, and that decision needs to be made by a patient's treating physicians in conjunction with the patient. He knows of no doctor who expects the manufacturer to tell them when to retrieve a filter."

- "Syncope is one of the biggest predictors of cardiac mortality from a PE."

- "Dr. Goodwin . . . does not believe the Tulip filter causes abdominal or back pain in his patients."

- "A car accident involving a blow to the abdomen in the area of the filter may potentially place a patient at risk for complications."

*Id.* at 13–15.

### f.    Dr. Timothy Larkin.

Dr. Larkin treated Mr. Gage. Again Defendants disclose opinions regarding "IVC filters" generally:

- "Dr. Larkin has prescribed IVC filters to his patients, including Mr. Gage. He has had success with IVC filters, and to his recollection, none of his patients have had a significant embolic event after a filter's placement."

- "With respect to IVC filters, IVC filters are important treatment tools for patients who have pulmonary emboli who cannot take blood thinners. IVC filters help prevent pulmonary emboli and help save people's lives."

- "Aside from Mr. Gage, Dr. Larkin has never had any other patient for whom he has prescribed an IVC filter complain of pain."

*Id.* at 15–18.

### g.    Dr. Antonio Pangan.

Dr. Pangan treated Mr. Gage. Defendants disclose the following opinions that exceed the scope of his treatment:

- "All medical treatments and devices have risks, that there is no perfect or risk-free medical device, and that it is the prescribing physicians' job to determine whether or not the benefits of a procedure or medical device outweigh the potential risks."

- "Mr. Gage will most likely not live until he is 80, and he will probably not live until he is 75 if he decides not to do dialysis."

*Id.* at 18–19.

### 3.    The Expected Opinion Testimony of Defendants Hybrid Physician Witnesses Exceeding the Scope of Their Treatment Should Be Excluded.

"If a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a

11

motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  Thus, generally, "[t]he consequence of non-compliance with Rule 26(a)(2)(B) is 'exclusion of an expert's testimony . . . .'" *Meyers*, 619 F.3d at 734 (quoting *Gicla v. United States*, 572 F.3d 407, 410 (7th Cir. 2009)).

Defendants did not submit Rule 26(a)(2)(B) reports for the experts identified above despite clear preexisting law.  That failure is neither substantially justified nor harmless. Defendants' attempt to ignore the requirements of Rule 26(a)(2) and provide opinion testimony by treaters, without reports, where that opinion testimony is not related to the treaters' treatment of plaintiffs in this litigation, is without justification.  Further, Plaintiffs would plainly be harmed by the admission of that opinion evidence, because without expert reports, Plaintiffs are unable to adequately evaluate or counter Defendants' experts' opinions.  The reporting deadline has passed.  Defendants have identified 21 other experts to testify in *Hill* and/or *Gage*, including 12 other medical doctors.  Therefore, the Court should exclude any and all expert testimony offered by Drs. Lynch, Moreno, Zuzga, Crisostomo, Goodwin, Larkin, and Pangan that exceeds the scope of treatment.

      **B.**     **Expert Opinion Testimony of Defendants' Hybrid Employee Witnesses Should Be Excluded or, in the Alternative, Depositions Should Be Compelled.**

"A party may depose any person who has been identified as an expert whose opinions may be presented at trial."  Fed. R. Civ. P. 26(b)(4)(A).  Defendants have identified Jennifer Brown, Ph.D. as an expert, asserting that her Rule 26(a)(2)(C) disclosure is "intended to summarize the expert opinions to which Dr. Brown is expected to testify."  Ex. A, at 20. Defendants have similarly identified Brian Choules, Ph.D. as an expert, also asserting that his Rule 26(a)(2)(C) disclosure is "intended to summarize the expert opinions to which Dr. Choules is expected to testify."  *Id.* at 23.

Plaintiffs previously deposed Dr. Brown and Dr. Choules, but both depositions occurred before Cook's expert disclosures. Cook made no indication it might call either Dr. Brown or Dr. Choules to trial as experts. Naturally, Plaintiffs' examination of these witnesses focused on their work with Cook, but not upon expert topics that had yet to be disclosed. Their disclosures are quite broad.

Dr. Brown intends to testify extensively on the IVC Filter Data Summary (a document created in mid-2016 but not produced until her deposition in April 2017 after Plaintiffs' expert reports were served). She seeks to offer opinions such as the following: "(1) the risk-to-benefit ratio of Cook's IVC filters is favorable; (2) patients treated with Cook IVC filters largely experience favorable outcomes; and (3) the adverse events experienced by patients with Cook IVC filters are all known potential risks associated with the use of IVC filters." *Id.* at 20. She would opine on complaint rates for all manner of filter complications, rates for complications reported in the medical literature, definitions of perforation from 62 publications, retrieval rates, how Cook's IFUs "appropriately and accurately" warn of complications and "adequately informed physicians," and her opinion that "Cook appropriately communicated with the FDA" concerning its filters. *Id.* at 21–23. Plaintiffs not only are entitled to clarify her precise opinions and probe the basis for the opinions, but to establish the necessary predicates to challenge the evidentiary basis for many of these "opinions," while also making a record for any *Daubert* issues.

If anything, Dr. Choules' disclosure is even broader and covers virtually every aspect of filter development, but without identifying any specific opinions. His disclosure includes: "the design, development and testing" of Cook filters and the fact they were "robust, comprehensive, and state of the art;" that Cook "properly performed and documented" its design and development activities; that "all bench tests, animal tests, and FEA simulations" were "properly

13

conducted" and establish "the safety and efficacy" of Cook filters; and "analyzing fracture and filter behavior" for Cook filters, including his opinion that they are "safe and effective and not prone to fracture." *Id.* at 22. Dr. Choules intends to offer opinions on all of these matters based on a half-page disclosure comprised of six bullet points. Cook's position is that because he was deposed as a fact witness, Plaintiffs are not entitled to depose him in order to find out his specific opinions or the bases for them.

"The purpose of Rule 26(b)(4)(A) is to ensure that parties can properly prepare for cross-examination of expert witness[es] at trial." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 899, 904 (N.D. Ohio 2009) (citing Fed. R. Civ. P. 26(b)(4)(A) advisory committee's note to 1970 amendment). In order to facilitate that preparation, only four days after Defendants informed Plaintiffs of the new hybrid status of Drs. Brown and Choules, Plaintiffs promptly requested a mere half day of additional deposition time for each of these formerly fact-only witnesses. Email from Matt Schultz to Jessica Benson Cox, et al., June 16, 2017 (Ex. B). Defendants summarily refused: "You have already deposed Brown and Choules. We will not be providing additional dates." Email from Jessica Benson Cox to Matt Schultz & Andrea Roberts Pierson, June 23, 2017 (Ex. B).

It is well settled that a testifying expert is subject to deposition under Rule 26(b)(4)(A). *See generally Davis v. Carmel Clay Sch.*, No. 1:11-CV-00771-SEB, 2013 WL 2159476, at *4–5 (S.D. Ind. May 17, 2013) (citing *Olmstead*, 657 F. Supp. 2d at 903–04) (distinguishing between testifying experts, who are required to submit to depositions under Rule 26(b)(4)(A), and consulting experts, who are not). Given Defendants' refusal to produce these putative experts for deposition, Plaintiffs seek to exclude all expert opinions from Drs. Brown and Choules.

Without the opportunity to depose Drs. Brown and Choules *in their expert capacity*, Plaintiffs, their counsel, and their own experts would be unable to be adequately review and

rebut Dr. Brown's and Dr. Choules' opinions. Therefore, the Court should exclude any and all expert opinion testimony proffered by Drs. Brown and Choules in this litigations. Given that Cook has disclosed 26 other experts, Plaintiffs respectfully submit this is the most appropriate relief. If, however, the Court is inclined to permit Drs. Brown and Choules to offer expert opinions of any description at trial, then Plaintiffs request an order requiring Defendants to provide deposition dates with all due haste.[5]

**III.   Conclusion.**

Expert opinion testimony exceeding the scope of treatment by Drs. Lynch, Moreno, Zuzga, Crisostomo, Goodwin, Larkin, and Pangan should be excluded. All expert opinions by Drs. Brown and Choules should be excluded based upon Defendants' refusal to produce the witnesses for deposition. If their opinions are not to be excluded, Drs. Brown and Choules should be compelled to sit for deposition in time to permit any necessary *Daubert* briefing or other motions to exclude.

Dated: July 5, 2017.                          Respectfully Submitted,

*/s/ Joseph N. Williams*
Joseph N. Williams, Atty. No. 25874-49
Riley Williams & Piatt, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com

*Liaison Counsel to Plaintiffs' Steering Committee and on behalf of Plaintiffs' Steering Committee*

---

[5] *Daubert* motions are due August 9. Plaintiffs requested deposition dates of Drs. Gardner (Cook employee) and Gunther (Cook KOL), on June 16; but none have been provided. If the same occurs with Drs. Brown and Choules their depositions will not be taken before the *Daubert* deadline.

    */s/ Michael W. Heaviside*
Michael W. Heaviside, Esq.
Heaviside Reed Zaic, A Law Corporation
910 17th Street NW, Suite 800
Washington, DC 20006
Telephone: (202) 233-1993
Email: mheaviside@hrzlaw.com

*/s/ Ben C. Martin*
Ben C. Martin, Esq.
The Law Office of Ben C. Martin
3710 Rawlin Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 74407590
Email: bmartin@bencmartin.com

*/s/ David P. Matthews*
David P. Matthews, Esq.
Matthew and Associates
2509 Sackett St.
Houston, TX 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
Email: dmatthews@thematthewslawfirm.com

*Plaintiffs' Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2017, a copy of the foregoing was served electronically and notice of the service of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system. A copy of the foregoing was also served via U.S. Mail to the following non-CM/ECF participants:

Anthony James Urban
Law Offices of Anthony Urban, PC
474 N. Centre Street, 3rd Floor
Pottsville, PA 17901

Carrie R. Capouellez
Lopez McHugh, LLP
214 Flynn Avenue
Moorestown, NJ 08057

Carl A. Woods, III
Didriksen Law Firm
3114 Canal Street
New Orleans, LA 70119

Curtis Hoke
The Miller Firm LLC
The Sherman Building
108 Railroad Avenue
Orange, VA 22960

John Cornew
409 E. Maple ave
Lindenwold, NJ 08021

Jay Harris
Harris, Reny & Torzewski
3rd Floor
Two Maritime Plaza
Toledo, OH 43604

Joseph G. Sauder
Chimicles & Tikellis, LLP
361 West Lancaster Avenue
Haverford, PA 19041

Neal Lewis Moskow
Ury & Moskow
883 Black Rock Turnpike
Fairfield, CT 06825

Philip Sholtz
The Driscoll Firm, P.C.
211 N. Broadway, 40th Floor
St. Louis, MO 63102

Brian J. Urban
Law Offices of Anthony Urban, PC
474 N. Centre Street, 3r Floor
Pottsville, PA 17901

Caleb Hoff Didricksen, III
Didricksen Law Firm, PLC
3114 Canal Street
New Orleans, LA 70119

Cliff W. Marcek
Cliff W. Marcek, P.C.
700 S. Third Street
Las Vegas, NV 89101

David Carl Anderson
Anderson Law
711 Van Ness Avenue
Suite 220
San Francisco, CA 94102

James R. Olson
Olson, Cannon, Gormley, Angulo
& Stoberski
9950 West Cheyenne Avenue
Las Vegas, NV 89129

Joseph A. Napiltonia
Law Office of Joe Napiltonia
213 3rd Avenue North
Franklin, TN 37064

Max E. Corrick
Olson, Cannon, Gormley,
Desruisseaux
9950 West Cheyenne Avenue
Las Vegas, NV 89129

Peter C. Wetherall
Wetherall Group, LTD
9345 W. Sunset Road, Suite 100
Las Vegas, NV 89148

Richard A. Freese
Langston Sweet & Freese PA
The Morgan Keegan Center
2900 Highway 280, Suite 240
Birmingham, AL 35223

| | |
|---|---|
| W. Bryan Smith<br>Morgan & Morgan, LLC<br>2600 One Commerce Square<br>Memphis, TN 38103 | Wilnar Jeanne Julmiste<br>Anderson Glenn LLP – Boca Raton, FL<br>2201 NW Corporate Blvd, Suite 100<br>Boca Raton, FL 33431 |

                                                */s/ Ben C. Martin*  
                                                Ben C. Martin