EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                    Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                                        MDL No. 2570

_____

This Document Relates:

      *Hill v. Cook Medical, Inc., et al.*
      Case No. 1:14-cv-6016-RLY-TAB

      *Gage v. Cook Medical, Inc., et al.*
      Case No. 1:14-cv-1875-RLY-TAB

_____

## COOK DEFENDANTS' RULE 26(a)(2)(B) AND 26(a)(2)(C) EXPERT DISCLOSURES

### I.    COOK DEFENDANTS' RULE 26(a)(2)(B) DISCLOSURES: NON-MEDICAL

Cook discloses the following retained expert witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).[1]  Cook retained or specifically employed these persons to provide expert evidence in both the *Hill* and *Gage* matters.  Cook certifies that expert reports, in compliance with Rule 26(a)(2)(B), have been served for each of these persons upon Plaintiffs' counsel.

    **A.**    **Jon P. Fryzek, PhD MPH**
           EpidStat Institute
           Johns Hopkins Campus
           9601 Medical Center Drive
           Rockville, MD 20850

    **B.**    **Elisa Harvey, DVM, Ph.D.**
           CardioMed Device Consultants LLC
           3168 Braverton Street, 2nd Floor
           Launce Workplaces Suite 13
           Edgewater, MD 21037

---

[1] Consistent with Magistrate Baker's Order on June 7, 2017, Telephonic Status Conference, Cook discloses non-medical experts herein.  Cook will disclose medical experts in *Hill* and *Gage* on July 29, 2017, consistent with the Court's order.

> **C.**   **Gerald Lynch, Ph.D.**
> Purdue Krannert School of Management
> 403 W. State Street
> West Lafayette, IN 47907
>
> **D.**   **Harold Pellerite**
> Pellerite Medical Device Consulting, LLC
> 24005 Jockey Club Terrace, Apt. TC
> Damascus, MD 20872-2162
>
> **E.**   **Kenneth Perry, Ph.D.**
> Echobio LLC
> 11588 Arrow Point Drive
> Bainbridge Island, WA 98110
>
> **F.**   **Scott Robertson, Ph.D.**
> Fathom Engineering
> 600 Addison Street
> Berkeley, CA 94710
>
> **G.**   **Renu Virmani, MD**
> CVPath Institute
> 19 Firstfield Road
> Gaithersburg, MD 20878

## II.   <u>Cook's Rule (a)(2)(C) Disclosures</u>[2]

> **A.**   **Elizabeth Hill**
>
> > **1.**   **Dr. Bridget Bellingar**
> > 7101 Park Street North
> > Seminole, FL 33777

Dr. Bellingar may be called to testify live or by deposition in accordance with her medical records of Mrs. Hill, and her January 19, 2017, depositions (and exhibits thereto), regarding her medical treatment of Elizabeth Hill and her opinions concerning Elizabeth Hill and IVC filters.  Specifically, Dr. Bellingar may testify about the following facts and opinions:

- Mrs. Hill has experienced anxiety and depression for many years, and her condition required the medications referenced in Dr. Bellingar's medical records

---

[2] Cook's Rule 26(a)(2)(C) disclosures are offered to summarize the *opinion testimony* to which these witnesses are expected to testify in accordance with the Federal Rules.  While these disclosures include certain facts, they are not intended to identify each and every fact that these witnesses may offer at trial consistent with their deposition testimony or medical records.

US.112861500.01

and those referenced in Mrs. Hill's pharmacy records.  Mrs. Hill's anxiety and depression pre-date her 2010 filter placement and 2013 filter retrieval.

- Her care and treatment of Mrs. Hill, including her treatment of Mrs. Hill for two decades for back pain, spinal issues, depression, anxiety, diverticulosis, gastric and esophageal issues, GERD, duodenitis, hemorrhoids, and inflammation of the duodenum, among others.

- Mrs. Hill's back conditions that caused referred pain to her abdominal area.

- After Mrs. Hill underwent her gallbladder removal on December 7, 2011, she did not experience any gastrointestinal symptoms until August 2013.

- Mrs. Hill's depression has been consistent since the 1990's and has not changed, even after her filter was retrieved in August 21, 2013.

- Prior to her 2010 filter placement, and since the placement, Mrs. Hill has possessed multiple risk factors for PE.

    **2.   Dr. Frank Lynch**
         Penn State Hershey Heart and Vascular Institute
         500 University Drive
         Hershey, PA 17033

Dr. Lynch may be called to testify live or by deposition in accordance with his May 26, 2017, deposition (and exhibits thereto), regarding his medical education, training and experience upon which he relied in treating Mrs. Hill; his care and treatment of Mrs. Hill; his opinions concerning Mrs. Hill's condition at the time of treatment; and his opinions regarding her prognosis at the time of treatment.  Specifically, Dr. Lynch may testify about the following facts and opinions:

- His medical education, training and experience, including his placement of at least 800-1,000 filters and retrieval of over 1,800 filters.

- His reliance on his IVC experience and expertise in treating Mrs. Hill.

- His knowledge of the benefits and risks of IVC filters, when treating Mrs. Hill, including but not limited to:

    o  Filters provide the benefit of preventing life-threatening complications of venous thromboembolic disease, especially in patients that cannot receive or has failed standard anticoagulation therapy.

- Long-term complications of permanent devices are established in the literature, and many are related to the duration of implantation.

- Retrievable filters provide the benefit of preventing complications of permanent devices because they can be removed once the filter is no longer indicated or the patient can tolerate standard therapy.

- Implantation and retrieval of a device requires a risk benefit assessment.

- Risks inherent with filter use known to him when treating Mrs. Hill include thrombotic complications, such as recurrent lower extremity DVT, thrombosis or occlusion of the inferior vena cava, as well as mechanical complications, such as migration, embolization, penetration and fracture.

- Benefits of filter use known to him when treating Mrs. Hill include catching blood clots and protecting patients against life-threatening pulmonary embolism.

- The question of whether the benefits of using a filter outweigh its risks is dependent on the patient's situation. In general, if a patient cannot receive standard therapy, the benefits outweigh the risks.

- There are risks involved with using any IVC filter, not just Cook filters.

- Dr. Lynch performs a risk benefit assessment before treating each patient, including Mrs. Hill.

- Dr. Lynch will describe Mrs. Hill's particular filter complication and how he retrieved her filter, including but not limited to:

  - Penetration of a filter is a well-documented complication that also occurs with permanent devices.

  - Mrs. Hill's complication could have happened with any IVC filter, and is not unique to Cook filters.

  - In his experience, most perforations or penetrations are not clinically significant, and patients with a vena cava or organ perforation typically do not have any clinical consequences.

  - Perforation is not a barrier to retrieving a filter.

  - In his experience, any filter can be retrieved and there is no time limit for retrieval.

  - Based on imaging alone, it can be difficult to tell if a filter is really outside the caval wall. Just because a filter element is outside a column of contrast on a venogram, it does not necessarily indicate perforation.

4

- Dr. Lynch will testify about Mrs. Hill's retrieval procedure and hospitalization on August 21, 2013, including her initial contact with him, her informed consent, procedure, discharge, and communications after discharge.  He will also testify about his observations and clinical assessment of Mrs. Hill's condition before, during, and after the procedure.

- One alternative to Mrs. Hill's retrieval procedure was to leave the filter implanted.

- Dr. Lynch's custom is to obtain a lower extremity ultrasound to assess blood clots in the legs.  He did not find anything concerning in Mrs. Hill's case, and did not observe any swelling in her legs. There was also no indication from his assessment that Mrs. Hill was experiencing any thrombotic condition or clotting disorder.

- Many techniques are used to retrieve filters, including the specific retrieval technique Dr. Lynch used with Mrs. Hill.  Cook did not teach him any retrieval techniques, nor did Cook promote any retrieval technique, including the technique used with Mrs. Hill.

- Dr. Lynch retrieved Ms. Hill's filter with limited procedure and fluro time.  He used a loop snare technique that he has used with many other types of procedures.

- Dr. Lynch does not rely on Cook sales representatives for any clinical experience or advice as to how to proceed with the management of a case.

- There are many reasons a filter may be difficult to retrieve, which are not unique to Cook filters.

- Dr. Lynch's procedure note discusses narrowing of the cava.  He was unconcerned about that observation, which can be a result of caval spasm.

- Narrowing of the IVC after removal of a filter is an expected consequence of retrieval, which resolves over time.  It is not clinically significant and he does not do anything to treat narrowing when he observes it.

- Dr. Lynch did not believe that Mrs. Hill required any further treatment following the retrieval.

- Dr. Lynch will testify that based on his experience with patients that have complications similar to Mrs. Hill, no patient has subsequently developed stenosis from their vena cava or any other complications, and he had no reason to believe that Mrs. Hill would experience any medical complications at the time of his treatment.

- Mrs. Hill did not require lifetime anticoagulants related to her filter implant or retrieval.

US.112861500.01

- Mrs. Hill executed a consent prior to the retrieval procedure.  Physician's discretion must determine whether or not a patient might benefit from a prophylactic device.  The burden is on the physician performing the procedure to make sure the patient understood the contents of the consent and has no additional questions.

- Vena cava narrowings generally do not cause clinical sequelae or a negative clinical experience.  Based on his interaction with Mrs. Hill, and given his medical knowledge and experience with a large number of patients, her degree of IVC narrowing was not likely to lead to clinical consequences and was likely to resolve.

- There is no specific period of time within which a filter cannot be removed.

- Perforation and penetration are not well-defined terms in the literature.

- Only 15-20% of all retrievals require retrieval techniques other than the standard technique.

- The risks he discusses with his patients are not unique to the Celect filter and are not unique to any length of indwell time.

- He has never seen a patient with long-term clinical sequelae from a penetration of the small intestine.

- He did not observe any negative clinical sequelae from Mrs. Hill's penetration of her IVC or duodenum.

- He still uses Cook filters and has confidence in the safety and efficacy of Cook filters. Nothing about the retrieval of Mrs. Hill's filter or her condition changed his opinions regarding Cook filters.

   **3.    Dr. Anthony Moreno**
          Moreno Spine & Scoliosis
          1800 Mease Dr.
          Safety Harbor, FL 34695

Dr. Moreno may be called to testify live or by deposition in accordance with his medical records, and his March 14, 2017, and April 26, 2017, depositions (and exhibits thereto), regarding his medical treatment of Elizabeth Hill and his opinions concerning Elizabeth Hill and IVC filters.  Specifically, Dr. Moreno may testify about the following facts and opinions:

- Mrs. Hill had a strong need for a filter.  She had a complex spinal deformity surgery.  Complex spinal surgeries can involve 20-30 screws and last 10-20 hours. The rate of DVT and PE in these surgeries is very high, and can be up to 1-4%.

6

- Placing filters before complex spinal surgeries is the standard of care in the United States.

- If Mrs. Hill had received anticoagulation, she could have bled into her spine and became paralyzed.

- Complex spinal procedures produce DVTs and PEs on a regular basis.

- During a complex spinal procedure, each screw placed is tapped and reamed, which stirs up blood and fat from marrow. This makes patients more prone to venous events.

- Dr. Moreno prescribed IVC filters for all complex spinal surgeries he performed. Mrs. Hill is the only patient Dr. Moreno has ever had that experienced a complication from an IVC filter.

- Dr. Moreno estimates the frequency of a hematoma in the spine caused by anticoagulation during complex spinal surgery to be 5-10%. The rate of complications from filters is lower.

- Literature discussing patients with blood clots is not directly applicable to patients undergoing a massive surgery. The literature does not compare patients undergoing bypass with patients undergoing a massive surgery.

- Dr. Moreno ordered Mrs. Hill's filter placement because he believes that filters save lives and it is an accepted form of treatment.

- The rate of complications in a complex spinal surgery is 70%. His job is to prevent death, paralysis and blindness first.

- Mrs. Hill may not have survived the surgery if he had not prescribed a filter to her.

- It is possible that Mrs. Hill may have to undergo additional spinal procedures with Dr. Moreno, especially because adults with scoliosis have a revision rate of 20%.

- Mrs. Hill had an excellent outcome following her spine procedure.

- Mrs. Hill needed an IVC filter prior to her July 2013 surgery. Dr. Moreno would have ordered another filter for Mrs. Hill's revision spine surgery in July 2013 if she did not still have her filter in place.

- Mrs. Hill's December 2010 back surgery was a considered a "large deformity surgery" because it involved nine levels.

- Dr. Moreno has had dozens of patients who developed a PE without a filter, and one or two of them later died.

- If Mrs. Hill had not had an IVC filter placed, he would not have done the surgery.

- He does not have any concerns with leaving an IVC filter in permanently.

- Dr. Moreno continues to prescribe IVC filters.

- Without the option of prescribing IVC filters, he will not do complex spinal surgeries.

4.    **Dr. Mark Zuzga**
      Surgical Associates of West Florida
      West Florida Vein Center
      1840 Mease Drive, Suite 301
      Safety Harbor, FL 34695

Dr. Zuzga may be called to testify live or by deposition in accordance with his medical records, and his February 8, 2017, and March 19, 2017, depositions (and exhibits thereto), regarding his medical treatment of Elizabeth Hill and his opinions concerning Elizabeth Hill and IVC filters.  Specifically, Dr. Zuzga may testify about the following facts and opinions:

- Dr. Zuzga treated Mrs. Hill on October 4, 2010, November 17, 2010, March 23, 2011, and August 2013.

- He will testify about Mrs. Hill's implant and attempted retrieval procedure, the informed consent process, and his clinical judgment and observations of Mrs. Hill's condition.

- Dr. Zuzga's informed consent process includes educating the patient about the risks and benefits that he has learned in his 12 years of practice.

- He has never read the IFU for the Celect filter.

- Dr. Zuzga does not rely on sales representatives, and Cook sales representatives do not advise him about medical techniques.

- Dr. Zuzga knew when he placed Mrs. Hill's filter that there was a chance of difficult retrieval with all IVC filters, and there is a percentage of filters that he assumes will not come out.

- Mrs. Hill was at a high risk for DVT and PE based on the magnitude of her upcoming spinal surgery.  The filter was placed to protect her from a PE.

- The decision to use a filter rather than anticoagulants is at the discretion of the spinal surgeon. High-risk patients getting high-risk spinal surgeries are in a

different patient population than patients who are just at an increased risk of blood clots.

• There is no procedure with a 100% success rate, and all procedures have some rate of complications.

• It is up to the physician to evaluate the patient's individual medical condition, and a device manufacturer does not have patient-specific medical information.

• Patient anatomy deformity can cause an outcome of a procedure that is different than expected.

• Trauma or other unusual movement in the abdomen can also affect filter placement.

• Dr. Zuzga believes in the safety and efficacy of filters, including the safety and efficacy of Cook filters.

• Dr. Zuzga knew when he treated Mrs. Hill that pulmonary embolisms are life threatening and certain patients are at a greater risk of developing PE than others. Patients who have died from a PE often did not experience any prior symptoms. Patients over the age of 40 are at risk of developing PE, and the risk doubles for every decade over 40. Other factors that increase the risk of PE include obesity, major surgery, slower blood flow from limited mobility, hypertension, trauma, chronic illnesses, medications, and history of prior surgeries.

• The only two available treatments for PE are anticoagulants and filters.

• Anticoagulants carry risks, including bleeding, stroke, death and paralysis. In his experience, physicians generally do not prescribe anticoagulants to patients undergoing a major surgery like a 10-12 hour spinal surgery due to the risk of bleeding.

• The Celect filter has shown safe and effective results as compared to other filters. He has never stopped using any Cook filters because they were unsafe or had too high of a complication rate.

• After he learned of Mrs. Hill's perforation of her vena cava, he continued using the Celect filter in his patients.

• He would not consider using a permanent filter in a patient where he wanted to retrieve the filter.

• He estimates that he is able to retrieve 80-90% of filters he attempts to retrieve.

• Dr. Moreno is the physician most familiar with Mrs. Hill's risk of PE during or after her spinal surgery. He was in the best position to weigh the risks and benefits of the procedure.

9

- If Mrs. Hill had received anticoagulant therapy before her surgery, she was possibly at risk of bleeding into her spine and becoming paralyzed.

- Dr. Zuzga decided to place a Celect filter into Mrs. Hill; Cook did not and its sales representative did not.

- Prior to Mrs. Hill's implant procedure, Dr. Zuzga was aware of, and it was well known in the medical community, the following risks: perforation of the vena cava, perforation of adjacent organs, inability to retrieve, migration, fracture, bleeding, embedment, tilt, infection, death and need for an open removal.

- Many patients experiencing a filter perforation are asymptomatic.

- Tilted filters are still safe and effective.

- A patient's anatomy can cause tilt.  Trauma can cause tilt.

- Malpositioning of the filter can also cause tilt, and this was a known risk prior to Mrs. Hill's implant procedure.  This risk was also generally known in the medical community.

- Dr. Zuzga will testify that his knowledge of the risks and filters came from medical education, training and his review of the medical literature, and he had knowledge of those risks prior to November 2010.

- Dr. Zuzga will testified that he did not rely on the IFU, communications from Cook, or the MAUDE database in choosing the Celect filter for Mrs. Hill.

- Dr. Zuzga will testify that the vena cava tracks a patient's spine, thus the vena cava could make a small curve where the patient has severe scoliosis.

- When he places the filter, the catheter is placed at a small angle, which can be caused by the patient's anatomy.

- Because Mrs. Hill did not have to undergo a second implant procedure prior to her spine revision procedure, she did not face the risks of that procedure.

- It is possible that Mrs. Hill could have gone to a different physician in Tampa for her retrieval procedure.

- There is strong clinical evidence to support the use of filters.

- Dr. Zuzga continues to prescribe and use Cook products in his patients.

**B.      Arthur Gage Case**

   **1.      Paul Crisostomo, M.D.**
            Loyola University Medical Center
            2160 South 1st Avenue
            Maywood, IL  60153

Dr. Crisostomo may be called to testify live or by deposition in accordance with his medical records, January 13, 2017 deposition (and exhibits thereto) regarding his medical treatment of Arthur Gage and his opinions concerning Arthur Gage and IVC filters. Specifically, Dr. Crisostomo may testify about the following facts and opinions:

- Dr. Crisostomo has experience placing, monitoring, and retrieving Cook filters. He primarily uses the Cook Günther Tulip filter, which he finds to be a safe and effective way to treat his patients.

- Nothing from Dr. Crisostomo's experience with Cook filters causes him to believe they are defective or dangerous in any respect, and he will continue to use these filters in the treatment of his patients.

- Dr. Crisostomo considers and is familiar with the risks of and treatments for blood clots. Ensuring that a patient does not get a pulmonary embolism is an important goal of any physician treating a patient.

- In his experience as a physician treating patients, he agrees that PE creates a significant risk of death for patients. Dr. Crisostomo is familiar with the research that indicates between 50,000 and 200,000 people will die from PEs each year.

- When Dr. Crisostomo treats a patient who has a history of DVT or PE, or a patient who has an existing DVT or PE, and that patient could not be anticoagulated, he chooses an IVC filter as the appropriate method of treatment in order to protect the patient from a life-threatening PE.

- Mr. Gage has many of the factors that Dr. Crisostomo believes put patients at risk for PE, include coronary heart or artery disease, hypertension, recent surgery or injury, prior history of PE or DVT, sedentary or inactive lifestyle, and obesity.

- Dr. Crisostomo believes that each time a patient has a PE, the subsequent PE will likely be even more severe than the prior PE. Dr. Crisostomo also believes that if a patient has a history of recurrent PEs, his or her mortality risk increases with each PE. PE's that cause death act to suffocate or disrupt oxygen to a patient's heart.

- Dr. Crisostomo is familiar with the risks of filters in vivo, including penetration of the caval wall, perforation of an adjacent organ or structure, tilt of the filter either on deployment or after deployment, migration or movement of the filter, inability to retrieve the filter, fracture, bleeding at the incision site or after the filter is placed, embedment, endothelialization of the legs or top of the filter, hematoma at the vascular site, acute damage to the IVC wall, thrombosis or stenosis, and death. Those risks are not unique to either the Cook Celect or Tulip filters. Those risks have been well known in the medical community from 2010 to the present date.

- Dr. Crisostomo will also testify that physicians learn about all these aforementioned risks during their medical education and training. He will testify that these risks were well-known to him when treating Mr. Gage and well known in the relevant medical community at the time a filter was placed in Mr. Gage.

- Dr. Crisostomo believes that Cook filters are "among the best" and "do the right job" and are safe and effective ways to treat his patients.

- When Dr. Crisostomo weighs the benefits against the risks of perforation, migration, tilt, and all other things attendant to placing an IVC filter, he believes that the key benefit outweighing the risks is the prevention of life-threatening PE.

- Dr. Crisostomo's knowledge of Mr. Gage's filter position began with his first visit with Mr. Gage on November 19, 2013. At that time, Mr. Gage's filter was already malpositioned.

- Mr. Gage's filter is tilted in "kind of a horizontal way so that it's extending into the renal veins."

- Dr. Crisostomo's goal when placing a vena cava filter is to place it beneath the renal veins. He believes that the tip or the hook should be lower than the renal veins, and he wants the struts even lower than that.

- Dr. Crisostomo believes that a filter that is placed between the renal veins or horizontally would be considered a "malpositioned filter."

- Things can happen during the placement of any IVC filter, such as malposition, tilt, and being deployed in wrong location—for example, either too high or too low in relation to the renal veins. Those are all known risks of having filters placed regardless of the physician who places the filter or regardless of the type of filter being placed. These risks are not unique to Cook filters.

- Dr. Crisostomo agrees that the person in the best position to assess the source of Mr. Gage's pain, including right flank pain or abdominal pain, would be a physician or an expert who has access to all of Mr. Gage's medical records, and he would defer to that physician or expert.

12

- Dr. Crisostomo has been reviewing radiology reports and watching the position of Mr. Gage's vena cava filter for approximately three years.  Over this time, Dr. Crisostomo believes that the position of Mr. Gage's vena cava filter has remained stable, has not moved, has not penetrated adjacent organs, but is "near the aorta, near the duodenum, and near the pancreas."

> **2.     Mark Goodwin, M.D.**
> Midwest Heart Specialists
> 801 South Washington Street, 4th Floor
> Naperville, IL  60540

Dr. Goodwin[3] may be called to testify live or by deposition in accordance with his medical records, and January 11, 2017 deposition (and exhibits thereto) regarding his medical treatment of Arthur Gage and his opinions concerning Arthur Gage and IVC filters.  Specifically, Dr. Goodwin may testify about the following facts and opinions:

- Dr. Goodwin was very familiar with the reasons to place a filter when treating Mr. Gage.  He knows and describes the clinical significance of PE, and recurrent PE, and how PE causes injury and potentially death.  Various patient-specific factors can place a patient at increased risk for PE.

- The fact that PE is "probably the number one cause of death in hospitals across the United States."  Physicians categorize pulmonary emboli into separate subcategories so that physicians can determine how to treat the patient.  The subcategories of PEs are small, massive, and submassive.  The normal death rate for a massive PE is approximately 15-32%, and the death rate for a submassive PE is approximately 5-10%.

- There are different treatment alternatives for patients presenting with PE and the risks and benefits of each.  There are various pharmacologic, mechanical, and surgical techniques for the treatment of PE, and different circumstances under which the varying treatment alternatives may be deployed.

- Statistics show that between 50,000 and 200,000 people die each year from PE, and the true number of people who die each year from PE is actually probably larger than this figure.  The risk of death from a PE has been "unrecognized for a long period of time," but recently there has been improvement due to greater physician knowledge and improved care for those patients suffering from PE.

- Dr. Goodwin is comfortable using Cook filters.  He has used multiple filter types, and has had good results with the Cook Tulip filter.  He uses the Tulip filter most

---

[3] A copy of Dr. Goodwin's CV was not included as an exhibit to his deposition.  As such, his CV is attached hereto as **Exhibit 1**.

frequently, and he believes that the Tulip is easy to deploy, easy to retrieve, and is safe for his patients.  In his experience, the Tulip filter has a nice balance, the hook is fairly easy to get to, and there is not much scar tissue or endothelialization associated with the filter, making it easy to retrieve.

- Throughout his 30 years of practicing medicine and using Tulip filters, he has never had a complication with a Tulip filter in any of his patients.  He has confidence in the Tulip filters and he would prescribe a Tulip filter for a patient today.  Indeed, he would be comfortable having one placed in him.

- IVC filters work and protect patients from life-threatening PE.

- In 2011, he and other physicians in the relevant medical community (those physicians who place IVC filters) were aware of the risks of IVC filters.

- Dr. Goodwin was aware of the following risks regarding IVC filters: endothelialization or embedment of the filter, migration, tilt, tenting, fracture, penetration or perforation of the vena cava, hematoma at the access puncture site, hemorrhage, acute damage to the inferior vena cava, thrombosis, stenosis, infection, inability or difficulty retrieving the filter, and death.  Many of these risks are exceedingly rare or are clinically insignificant.  For patients who cannot be on blood thinning medications and who have a history of PE, these risks are outweighed by the benefits of IVC filters.

- A filter may be tilted slightly to the side due to the way it was placed by the physician.  All physicians, including Dr. Goodwin, have some rate of tilt in the deployment. No physician is immune to it.  Tilt is a risk associated with all filters and is not unique to the Tulip.  Tilt does not affect the efficacy of the filter in any way and that tilt generally has no clinical relevance or any clinical significance.

- Perforations are very rare, and that when perforation does occur, it is generally without clinical significance.  Patients don't have pain, and they generally experience no bleeding.  He would not be concerned if he had a patient whose IVC filter had penetrated his or her caval wall, but no organs or other surrounding structures were touched.

- As a general rule of thumb, prior to placing IVC filters he tells patients that filter placement is a relatively safe procedure with a low complication rate.

- Even though most IVC filters can be removed, the inability to retrieve a filter is a known risk and was well-known as a risk in the medical community in 2011 when Mr. Gage received his filter.

- The decision to remove an IVC filter is based on many clinical factors, and that decision needs to be made by a patient's treating physicians in conjunction with the patient.  He knows of no doctor who expects the manufacturer to tell them when to retrieve a filter.

14

- Mr. Gage has a prior history of PE, and another PE could be life-threatening to Mr. Gage.  As a result, the decision was made to place an IVC filter.  He believes that because Mr. Gage's blood thinners had been stopped, the filter protected Mr. Gage from suffering from another life-threatening PE.

- Syncope is one of the biggest predictors of cardiac mortality from a PE.  Mr. Gage presented with syncope, placing Mr. Gage in a higher risk category for mortality from PE, and therefore increasing the need for an IVC filter.

- Mr. Gage was at risk of dying if he did not get the filter.  Dr. Goodwin believed the benefits of placing the filter and potentially saving Mr. Gage's life outweighed the risks.

- Mr. Gage has expressed that he has pain in his abdomen and his back that he attributes to the Tulip filter.  Dr. Goodwin, however, does not believe the Tulip filter causes abdominal or back pain in his patients.

- A car accident involving a blow to the abdomen in the area of the filter may potentially place a patient at risk for complications.

    3.    **Timothy J. Larkin, M.D.**
          Midwest Heart Specialists
          801 South Washington Street, 4th Floor
          Naperville, IL  60540

Dr. Larkin may be called to testify live or by deposition in accordance with his medical records, and April 19, 2017 deposition (and exhibits thereto) regarding his medical treatment of Arthur Gage and his opinions concerning Arthur Gage and IVC filters.  Specifically, Dr. Larkin may testify about the following facts and opinions:

- Dr. Larkin has prescribed IVC filters to his patients, including Mr. Gage. He has had success with IVC filters, and to his recollection, none of his patients have had a significant embolic event after a filter's placement.

- Dr. Larkin knew when treating Mr. Gage that a pulmonary embolism can cause permanent damage to organs, can cause cardiac arrest, and can be life-threatening. Dr. Larkin has treated patients who have had a pulmonary embolism with the following alternative method of treatments: "clot-busting" medications, anticoagulants, and IVC filters.  With respect to IVC filters, IVC filters are important treatment tools for patients who have pulmonary emboli who cannot take blood thinners.  IVC filters help prevent pulmonary emboli and help save people's lives.

US.112861500.01

- Dr. Larkin never guarantees results to his patients in medicine generally, as well as when prescribing medical devices, as there can be complications. There are inherent risks in using any medical device in patients.

- The decision regarding the removal of a patient's IVC filter is based on a variety of factors that are patient-specific. The decision to retrieve a filter is best left to the clinician who is treating the patient. He would not expect a medical device manufacturer to make such a decision about one of his patients.

- A VQ scan performed on Mr. Gage on December 21, 2010, was read as an intermediate probability for a pulmonary embolism. On December 22, 2010, Dr. Larkin evaluated Mr. Gage due to his complaints of chest pain. On that date, which was several months prior to Mr. Gage receiving his IVC filter, Dr. Larkin believed that Mr. Gage needed to be on long-term Coumadin if additional tests confirmed the existence of a pulmonary embolism, especially since there was no precipitating event, such as surgery or recent trauma, that predisposed Mr. Gage to having a pulmonary embolism.

- In December, 2010, Mr. Gage had an indeterminate VQ scan and a negative CTA. Then, in February, 2011, Mr. Gage presented to Edward Hospital's emergency room with recurrent chest discomfort. An angiogram was performed and the VQ scan was indeterminate. Dr. Larkin and other medical providers believed Mr. Gage was experiencing a pulmonary embolism; therefore, he was started on Heparin and Coumadin.

- Mr. Gage is a very complicated case due to his medical history, including coronary bypass procedures, chronic renal insufficiency, and multiple hospital admissions for chest discomfort. Due to the indeterminate VQ scan, if Mr. Gage did not receive blood thinning medication, he would be at risk for recurrent pulmonary emboli, which could potentially lead to Mr. Gage's death.

- On April 26, 2011, Dr. Larkin recommended placing an IVC filter in Mr. Gage when he started bleeding again after resuming his blood thinning medication. According to Dr. Larkin, the inability to anticoagulate a patient with recurrent PE, like Mr. Gage, is one of the reasons to place an IVC filter. Mr. Gage was at risk for dying since Mr. Gage could not take anticoagulants in treatment of his pulmonary embolism. Consequently, Dr. Larkin prescribed the IVC filter to help save Mr. Gage's life.

- Based on Dr. Larkin's clinical experience, he prescribed an IVC filter for Mr. Gage because he believed the benefits of the filter outweighed any potential risk.

- On July 7, 2011, Dr. Larkin examined Mr. Gage, following the placement of the IVC filter on April 27, 2011. Because there was no clear-cut, precipitating factor for Mr. Gage's previous pulmonary embolism, such as surgery or trauma, Dr. Larkin believed Mr. Gage needed to be prescribed Coumadin life-long. Specifically, at this point in time, it would never be safe to stop Mr. Gage's

16

anticoagulation; therefore, he made the decision to keep Mr. Gage on blood thinners indefinitely "solely based on his risk for PE in the future."

- Dr. Larkin's decision to place Mr. Gage on lifetime anticoagulation had nothing to do with his IVC filter.

- Mr. Gage needed an IVC filter placed permanently based on multiple things, including Mr. Gage's chronic renal insufficiency, which makes future diagnosis of PEs very difficult, as well as Mr. Gage's bleeding issues while on anticoagulants.

- Additionally, because of Mr. Gage's complicated history and the possibility that he may need surgery in the future, Mr. Gage needs a filter for added protection if Mr. Gage's blood thinning medication would need to be stopped prior to any future surgeries.  Mr. Gage's noncompliance with medication is another reason justifying permanent filter placement.

- Because Mr. Gage's medical history shows that he is prone to traumatic falls and motor vehicle accidents, Mr. Gage's filter should be kept in as added protection in case Mr. Gage's anticoagulants were stopped due to bleeding.

- Even though filters and anticoagulants both have risks, Dr. Larkin determined that the benefits of keeping Mr. Gage's filter in and prescribing life-long blood thinning medication outweighed the risks to Mr. Gage.

- Since Mr. Gage has underlying significant coronary artery disease, chronic chest discomfort of "difficult-to-ascertain etiology," and chronic renal insufficiency, which makes visualization of his coronaries very difficult, Dr. Larkin believes that it is difficult to figure out where Mr. Gage's complaints of pain are actually coming from and what is causing Mr. Gage's alleged pain.

- On June 24, 2013, Dr. Larkin reviewed the abdominal CT report regarding Mr. Gage, discussed the CT images with Dr. Ramanathan, and determined that the IVC filter had not changed in the last few years, and that it was stable.  Dr. Larkin did not believe that Mr. Gage's filter "was causing any issues at that time."  His plan was already to leave the filter in place permanently prior to this visit.

- On January 16, 2014, Dr. Larkin met with Mr. Gage and discussed the "slightly slanted" position of the IVC filter.  After speaking with and examining Mr. Gage, Dr. Larkin came to the clinical opinion that the filter was not the cause of Mr. Gage's pain.

- Dr. Larkin has not seen any evidence that Mr. Gage's filter has perforated into an adjacent organ.

- Dr. Larkin believes that Mr. Gage's IVC filter is not causing him pain—based on his knowledge and examination of Mr. Gage.

US.112861500.01

- Mr. Gage has not had any clinical symptoms to suggest that he has IVC stenosis. Dr. Larkin also confirmed that he has not reviewed any imaging that would suggest Mr. Gage has IVC stenosis or occlusion.

- Dr. Larkin's clinical opinion was, and continues to be, that the tilted position of the filter is not causing Mr. Gage any problem.  He does not believe that the filter is causing Mr. Gage pain, and he does not believe that the filter's penetration of the wall of the IVC is causing any sort of medical problem.

- Aside from Mr. Gage, Dr. Larkin has never had any other patient for whom he has prescribed an IVC filter complain of pain.

- Dr. Larkin's opinion is that Mr. Gage's filter has been effective in preventing Mr. Gage from having a PE.

- If he had to do it all over again, Dr. Larkin would still recommend Mr. Gage have an IVC filter placed due to the fact that Mr. Gage was having bleeding that limited his ability to be anticoagulated in the face of a pulmonary embolism, and Dr. Larkin wanted to make sure Mr. Gage was protected from a life-threatening PE.

    **4.**    **Antonio Pangan, M.D.**
             Loyola University Medical Center
             2160 South 1st Avenue
             Maywood, IL 60153

Dr. Pangan may be called to testify live or by deposition in accordance with his medical records, and his April 25, 2017 and May 23, 2017 depositions (and exhibits thereto) regarding his medical treatment of Arthur Gage and his opinions concerning Arthur Gage.  Specifically, Dr. Pangan may testify about the following facts and opinions:

- It is sometimes difficult in his experience to identify the true etiology or cause of a patient's pain, especially when the patient has multiple health related issues.  In fact, more than once, Mr. Gage has presented with unexplainable complaints of pain.

- All medical treatments and devices have risks, that there is no perfect or risk-free medical device, and that it is the prescribing physicians' job to determine whether or not the benefits of a procedure or medical device outweigh the potential risks.

- Dr. Pangan has been seeing Mr. Gage as a patient since December 2006.  Mr. Gage has had a lot of medical issues, many of which pre-date his filter and are unrelated to the filter.

18

- Mr. Gage's problems with his kidneys predate his filter. There are multiple reasons for why Mr. Gage's kidneys could be declining, including Mr. Gage's heart problems, his high blood pressure, and his diabetes.

- He saw Mr. Gage on April 25, 2011, and at that time recommended that Mr. Gage go to the emergency room because Dr. Pangan believed that Mr. Gage was possibly experiencing a life-threatening PE due to the fact that Mr. Gage was having trouble breathing, was off his Coumadin, and had a history of PE.

- PE is life-threatening and that he has seen patients die from PE.

- Dr. Pangan saw Mr. Gage on October 8, 2013, after Mr. Gage was hit by a car. Dr. Pangan was not sure whether the pain Mr. Gage was experiencing after the accident was due to the filter versus the car accident. He was not able to rule out at that time whether the accident caused micro-trauma to the filter.

- A vascular surgeon would be in a better position to evaluate the clinical significance of Mr. Gage's filter and its positon than Dr. Pangan.

- Mr. Gage has complained of pain several times after undergoing medical procedures.

- Mr. Gage has a history of noncompliance with his medications.

- Dr. Pangan cannot say for sure whether the filter is the cause of Mr. Gage's alleged pain.

- Dr. Pangan will testify that he was unaware of multiple motor vehicle accidents and falls that Mr. Gage experienced after his filter placement, and did not factor these incidents into his assessment of Mr. Gage's complaints of pain.

- Records from July 19, 2016, suggest that the blood flow from Mr. Gage's kidneys appears to be normal.

- In November 2015, he referred Mr. Gage to a nephrologist, and the nephrologist determined that Mr. Gage is not a candidate for kidney transplant due to his multiple comorbidities and other health problems.

- Mr. Gage will most likely not live until he is 80, and he will probably not live until he is 75 if he decides not to do dialysis.

- Mr. Gage has been diagnosed with dumping syndrome and that this could cause abdominal pain. This diagnosis pre-dates Mr. Gage's filter placement.

- Mr. Gage has been diagnosed with gastric reflux and that this could cause abdominal pain. This diagnosis pre-dates Mr. Gage's filter placement.

19

- Mr. Gage has been diagnosed with gout and that this could cause back or spine pain.  This diagnosis pre-dates Mr. Gage's filter placement.

- Mr. Gage has been diagnosed with sciatica and that this causes shooting pain down the extremities.   This diagnosis pre-dates Mr. Gage's filter placement.

**C.     Non-Case-Specific, Non-Retained Experts**

    **1.     Jennifer Brown, Ph. D.**
        Cook Research, Incorporated
        1 Geddes Way
        West Lafayette, IN 47906

Dr. Brown is the Director of Regulatory Affairs at Cook Research Incorporated ("CRI"). She began working at MED Institute ("MED"), which is now known as CRI, in August 2007, and prior to commencing work in her current role, she held the roles of regulatory scientist and scientific communications scientist, as well as the Director of Regulatory Science, at MED and CRI.  Dr. Brown's opinions are based on her educational background, training, and relevant work experience at MED and CRI.  Pursuant to Rule 26(a)(2)(C), this disclosure is intended to summarize the expert opinions to which Dr. Brown is expected to testify, and does not limit her ability to testify as a fact witness on other matters.  Dr. Brown may be called to testify in accordance with her April 21, 2017 and May 8, 2017 depositions (and exhibits thereto), as well as the following:

- The process by which Cook identified, gathered and summarized the information described in the August 2016 Cook Medical IVC Filter Data Summary (CookMDL2570_1276605-6675) ("Data Summary"), which was a reliable process and summary of the information described, including the methodology used to consider the information within the Data Summary.

- Sections 3 through 6 of the Data Summary, which analyze Cook's IVC filters based on a review of design documentation, internal sales and complaint data, MAUDE data, and published literature, including but not limited to the fact that (1) the risk-to-benefit ratio of Cook's IVC filters is favorable; (2) patients treated with Cook IVC filters largely experience favorable outcomes; and (3) the adverse events experienced by patients with Cook IVC filters are all known potential risks associated with the use of IVC filters.

US.112861500.01

- As described in Section 4.2., the analysis of Cook's sales and complaint data reveals that from October 2008 to June 2016, a total of 477,533 Cook IVC filters were supplied world-wide; during the same time period 2,709 complaints were entered into Cook's complaint database for its IVC filters.   The resulting complaint rate for the Tulip is .54% and for Celect is .59%

- The occurrence rates for Tulip can be calculated based on sales data and complaint data from October 2008 to June 2016 and are as described in Table 4.3-2.   Data from that period reveals the following occurrence rates by percentage: PE .0042; fracture .011; migration .014; IVC occlusion .0061; perforation of vena cava .057; retrieval difficulties .043.

- The occurrence rates for Celect can be calculated based on sales data and complaint data from October 2008 to June 2016 and are as depicted in Table 4.3-3.   Data from that period reveals the following occurrence rates by percentage: PE .0062; fracture .066; migration .030; IVC occlusion .019; perforation of vena cava .153; retrieval difficulties .084.

- Cook's analysis of the clinical need for IVC filters, history of IVC filters, and comments on IVC filters from global regulators, as summarized in sections 2.1 through 2.3 of the Data Summary.

- Cook's efforts in optimizing benefits and minimizing risks of its IVC filters, as summarized in section 2.4 of the Data Summary.

- The purpose of the Data Summary and the key questions that were to be answered based on the Data Summary, as summarized in section 1 of the Data Summary.

- Cook's post-market efforts to evaluate device performance and improve device safety and performance, as summarized in paragraph 2.5 of the Data Summary.

- As described in Section 6, there are limitations to published literature, including those listed in Section 6.1.  Cook's methodology for gathering and analyzing the literature is as described in Section 6.1, and it included two literature searches in the MEDLINE database and specifically-defined criteria outlined in Section 6.1.

- The PE rates for patients with an existing filter in place in the published literature are as described in Section 6.2 and Tables 6.2.1-1 to 4.  The rates for Cook's Tulip and Celect are lower than the overall rates, equivalent or lower than the rates for anticoagulant drug studies, and lower than the SIR, CIRSE, ACR/SIR practice guidelines.

- Migration data reported in the literature is as described in Section 6.2.3 and Table 6.2.3-2.  The rates for the Tulip and Celect are low and are within the ACR, SIR, and CIRSE guidelines.

21

- Thrombosis and occlusion data reported in the literature is as stated in Section 6.2.4. There are many different definitions of those terms in the publications as reflected in Table 6.2.4-1.  The reported rates for overall data, the Tulip and Celect are as reported in Table 6.2.4-2 and 3.  The data for Tulip and Celect is better than the overall rates, both in follow up and retrieval.

- Cook's analysis of the literature on perforation/penetration data is as described in Section 6.2.5 and Tables 6.2.5-1 to 3.   There is no uniform definition of perforation/penetration in the literature. Published literature on IVC filters includes a number of different definitions of perforation and penetration, and there is no universal, agreed-upon definition for either term. See Table 6.2.5-1. The literature on perforations/penetrations is as described in Section 6.2.5, and analysis reveals a potential bias in patient selections.  Analysis of the literature reveals that nearly all reported perforations/penetrations have no clinical sequela. Among the 62 publications, symptomatic penetration was reported in 22 publications, while .7% of all Cook IVC filters and 3.2% of reported penetrations were symptomatic.  When the influence of the literature described at page 56-57 are removed, the overall, Tulip, and Celect penetration rates are as reports in Table 6.2.5-3. The choice of specific patient data collection and analysis methods have an effect on estimating penetration rates. The ACR, SIR, and CIRSE reported range of penetration rates is 0-41%.

- The published literature reports the information contained in Section 6.2.6 regarding filter tilt.  ACR, SIR and CIRSE define tilt as more than 15 degrees from the IVC axis for non-self centering filters.   There are many different definitions of tilt as included in Table 6.2.6-1.  Reported instances of filter tilt overall, Tulip and Celect in the literature identified is as stated in Table 6.2.6.2.

- The published literature on retrieval rates is as described in Section 6.2.8.  Filter retrieval is identified as a benefit and of clinical interest as described at page 63. Retrieval rates in the literature for the Tulip and Celect are as described in Table 6.2.8-1 and pages 63-64.   Advanced retrieval techniques are discussed in the literature as described at pages 64-65, and Table 6.2.8-3.

- Cook's instructions for use for the Tulip, Celect, and Cook retrieval kits appropriately and accurately describe the potential adverse events with those products and the clinical studies described therein.  Cook's use of the descriptions in the "Potential Adverse Events" section of the instructions for use properly warned physicians of the risks associated with use of the products.  Cook's description of the Clinical Studies in the instructions for use are appropriate and adequately informed physicians about the studies.

- FDA received and considered Cook's instructions for use for the Tulip, Celect, and Cook retrieval kits.  Cook has appropriately communicated with FDA regarding potential changes to its IFUs.

US.112861500.01

- The OUS/Lyon study and Cook's description of the study in its instructions for use was appropriate and adequately described the study.  Dr. Brown is familiar with the study and will testify to her opinions regarding the study, the Study Protocol, the Final Report, and the published Lyon study as described in detail during her depositions on April 21, 2017 and May 8, 2017.

    **2.**       **Brian D. Choules, Ph.D.**
                1805 W. Kelly Dr.
                Prescott, AZ  86305

Dr. Choules is the former Technical Director (2006-2016) and Pre-clinical Bench Testing Manager (1998-2004).  His education and experience are detailed in his deposition taken on July 22, 2016.  Dr. Choules's opinions are based on his educational background, training, and relevant work experience at MED and CRI.  The facts and opinions to which Dr. Choules is expected to testify are those set forth in his deposition (and exhibits thereto) taken by plaintiffs in this action.  Pursuant to Rule 26(a)(2)(C), this disclosure is intended to summarize the expert opinions to which Dr. Choules is expected to testify, and does not limit his ability to testify as a fact witness on other matters.

- The design, development, and testing timeline for Tulip, Celect, and Celect Platinum were robust, comprehensive and state of the art.

- The design control procedure, specification, and design inputs for Tulip, Celect, and Celect Platinum, including all design verification activities were properly performed and documented.

- All bench tests, animal tests, and FEA simulations for Tulip, Celect, and Celect Platinum were properly conducted and evidence the safety and efficacy of these filters.

- FEA and other Cook test methods, including set up test protocols, and interpretation of test results and end points.

- Facts concerning the design procedures and design files for the products in question and how they were properly maintained and accurate.

- Analyzing fracture and filter behavior for Tulip, Celect, and Celect Platinum, and his opinion that these designs are safe and effective and not prone to fracture.

    **3.**       **James Gardner, M.D., M.B.A.**

US.112861500.01

Cook Incorporated
750 Daniels Way
P.O. Box 489
Bloomington, IN  47402

Dr. James Gardner is the Medical Science Officer of Cook Incorporated, and he serves as Director of Third-Party Reimbursement.  He received his medical degree from the Indiana University School of Medicine (1987), and his MBA from the Indiana University Graduate School of Business in 1990.  Prior to joining Cook in 1998, Dr. Gardner spent eight years in physician practice administration with ECP Healthcare/Unity Physician Group, a large, multi-specialty physician group based in Bloomington, Indiana. Dr. Gardner will testify based on his educational background, training, and relevant work experience at Cook.  Pursuant to Rule 26(a)(2)(C), this disclosure is intended to summarize the expert opinions to which Dr. Brown is expected to testify, and does not limit his ability to testify as a fact witness on other matters.

- Dr. Gardner is familiar with the clinical significance of DVTs and PE, recurrent PE, and how PE causes injury and potentially death.  Various patient-specific factors can place a patient at increased risk for PE.  He is generally familiar with frequency and rates of DVTs and PE, and is aware of the treatment modalities available to physicians when a patient is at risk of PE and recurrent PE.

- There are different treatment alternatives for patients presenting with PE and the risks and benefits of each.  There are various pharmacologic, mechanical, and surgical techniques for the treatment of PE, and different circumstances under which the varying treatment alternatives may be deployed.

- The Tulip and Celect are safe and effective products.  The risk benefit analysis of the Tulip and Celect are favorable, and both have a long clinical history of successful use in patients.

**4.      Rolf Günther, M.D.**
Institute for Radiology, Charité University Hospital
Charitéplaz 1, D-10117 Berlin
Germany

Dr. Günther is one of the key developers of the Günther Tulip IVC filter.  He is a physician, inventor, and a historian of IVC filters.  Dr. Günther may be called to testify regarding

24

the following facts and opinions, which do not limit his ability to testify to the other factual information.

- His relationship with Cook. Dr. Gunther will testify that, while he has been contracted as a consultant and presenter by Cook on numerous occasions and receives royalties as compensation for his efforts designing the Tulip and Celect filters, he has never and would never let his contractual relationships with Cook affect his judgment, the results of any study, the accuracy of any presentation content, or the design safety of any product.

- Non-clinical testing of Tulip and Celect IVC filters.  In numerous animal and bench studies, Dr. Gunther examined the safety and functioning of the Tulip and Celect filters.  He will testify, based on his personal experiences in studies, that non-clinical testing showed the Tulip and Celect filters were safe devices, whether used in their permanent or retrievable indications, which were retrievable for an extended period after implantation and performed properly and effectively even if not oriented in the center of the vena cava (*i.e.*, tilted).  He will further testify that any study limitations did not adversely impact the results of any study and that the studies were, in his opinion, conducted properly in light of their purposes.

- The design of the Tulip and Celect filters.  Prof. Gunther will testify that patient safety was the primary concern during the design of the Tulip and Celect filters. He will further testify that design differences between Cook IVC filters and competitors, such as the use of Conichrome / Elgiloy alloy, increase patient safety and improve the performance, durability, and retrievability of the Tulip and Celect filters.

    **5.    John A. Kaufman, M.D.**
           Dotter Interventional Institute
           3181 SW Sam Jackson Park Rd.
           Portland, OR  97239

Dr. Kaufman is the current Director of the Dotter Interventional Institute (the "Dotter Institute"), a division of the Oregon Health and Science University School of Medicine ("OHSU").  Dr. Kaufman's opinions are based on his educational background, training, and relevant work experience at the Dotter Institute and OHSU.  The facts and opinions to which Dr. Kaufman is expected to testify are those that will be set forth in his upcoming deposition (and exhibits thereto) that will be taken by plaintiffs in this action.  Pursuant to Rule 26(a)(2)(C), this disclosure is intended to summarize the expert opinions to which Dr. Kaufman is expected to

testify, and does not limit his ability to testify as a fact witness on other matters.  For the sake of fair notice and in an abundance of caution, a summary of particular facts and opinions as to which Dr. Kaufman is expected to testify includes the following:

- His relationship with Cook.  Dr. Kaufman will testify that, while Cook has provided some support to the Dotter Institute, he has never and would never let any support from Cook affect his judgment, the results of any study, the accuracy of any educational content, or the mission and functioning of the Dotter Institute.

- The safety and retrievability of IVC filters.  Dr. Kaufman has been involved in numerous non-clinical and clinical studies of IVC filters through the Dotter Institute, as well as in the treatment of patients with a variety of brands and models of IVC filters.  He will testify, based on his personal experiences in both studies and actual patients, that IVC filters are safe devices that are retrievable for an extended period after implantation without adverse medical impact to patients.  He will further testify that any study limitations in any particular study he was involved with did not adversely impact the results of any study and that the studies were, in his opinion, conducted properly in light of their purposes.

- The use of ovine models for testing of human vascular medical devices, particularly IVC filters.  Dr. Kaufman will testify that the use of sheep to test vascular medical devices is well accepted in the field and that sheep provide accurate and predictable results for how medical devices will perform in the human IVC.

- The safety of Cook filters compared to competitors.  Dr. Kaufman will testify that, in his experience, Cook filters are at least as safe as, if not safer than, competitor filters.  Further, Cook filters are at least as safe as the Greenfield filter.

- The 2016 Cook Data Summary.  Dr. Kaufman will testify that he was involved with the 2016 Data Summary prepared by Cook, that he is in general agreement with the information presented, and that he agrees with the information prepared by the panel.

- Filter events without clinical sequelae.  Dr. Kaufman will testify that, in his experience, tilt, migration, and even penetration without clinical sequelae are not adverse events, are not of particular concern, and do not generally impact patient safety.

- The "off-label" use of filters.  Dr. Kaufman will testify that, while he did not personally experience any Cook promotion of the off-label use of Tulip or Celect filters, such off-label use of IVC filters was common in medicine, was at the sole discretion of each patient's physician, and was appropriate, as the physician had determined the benefits outweighed the risks.

26

US.112861500.01

      **6.**    **H. Robert Smouse**
          Central Illinois Radiological Associates
          114 W. Stratford Dr., Suite E
          Peoria, IL  61614

Dr. H. Robert Smouse ("Dr. Smouse") is a physician and clinical researcher who has served as a consultant for Cook studies and presentations and has provided medical care related to IVC filters to patients in his private medical practice.  Dr. Smouse will  be deposed on a date to be mutually-agreed upon by the parties.  While not waiving any objections to portions of said testimony, Cook states that Dr. Smouse may be called to testify with regard to his involvement with various clinical and non-clinical IVC filter studies, his observations during specific studies, and his experience with IVC filters in his medical practice, including the following:

- His relationship with Cook.  Dr. Smouse will testify that, while he has been contracted as a consultant and presenter by Cook on numerous occasions, he has never and would never let his contractual relationships with Cook affect his judgment, the results of any study, or the accuracy of any presentation content.

- The retrievability of the Gunther Tulip IVC filter.  In several studies, Dr. Smouse implanted filters in human patients or served as the principal investigator for the study.  Dr. Smouse will testify, based on his personal experiences in both studies and actual patients, that the Tulip filter is a safe device which is retrievable for an extended period after implantation without adverse medical impact to patients. He will further testify that any study limitations did not adversely impact the results of any study and that the studies were, in his opinion, conducted properly in light of their purposes.

- The use of ovine models for testing of human vascular medical devices, particularly IVC filters.  Dr. Smouse will testify that the use of sheep to test vascular medical devices is well accepted in the field and that sheep provide accurate and predictable results for how medical devices will perform in the human IVC.

- The expected compression of a human IVC.  Dr. Smouse will testify regarding how IVC compression can be measured, the basis of Dr. Smouse's original opinion to Cook that humans probably experience a maximum of 25 to 30% compression of the IVC, and that Cook's ovine study of IVC compression and the resulting compression rate used to fatigue test filters were appropriate based on his experiences.

- Cook-sponsored non-clinical studies.  Dr. Smouse was the interventionalist for several non-clinical studies sponsored by Cook and authored numerous articles based on results from those studies, including peer-reviewed articles. Dr. Smouse will testify as to the purposes of the various studies, that the use of sheep in these studies was appropriate and indicative of the expected performance in the human IVC, the methods behind his subjective observations as he retrieved and implanted filters in the studies (e.g., retrieval force, retrieval complication), and his opinion that the results of the various non-clinical studies indicated that the Celect was safe for both permanent and retrievable indications.

- The extended retrieval window of the Celect filter.  Dr. Smouse will testify that, based on his experience retrieving filters in various animal studies and in human patients, that the Tulip and Celect filters were safely retrievable for extended periods without an adverse medical impact to patients.

- Filter events without clinical sequelae.  Dr. Smouse will testify that, in his experience, tilt, migration, and even penetration without clinical sequelae are not adverse events, are not of particular concern, and do not generally impact patient safety.

- The "off-label" use of filters.  Dr. Smouse will testify that, while he did not personally experience any Cook promotion of the off-label use of Tulip or Celect filters, such off-label use was common in medicine, was at the sole discretion of each patient's physician, and was appropriate, as the physician had determined the benefits outweighed the risks.

US.112861500.01

Respectfully submitted,

Dated:  June 12, 2017

/s/ Andrea Pierson
Andrea Roberts Pierson (# 18435-49)
John Joseph Tanner (# 11856-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com
E-mail:  joe.tanner@faegrebd.com
E-Mail:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

*Counsel for the defendants, Cook Incorporated,*
*Cook Medical LLC (f/k/a Cook Medical*
*Incorporated), and William Cook Europe ApS*

29

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2017, a copy of the foregoing COOK DEFENDANTS'

RULE 26(a)(2)(B) AND 26(a)(2)(C) EXPERT DISCLOSURES has been served by electronic

mail on all of the following:

David P. Matthews
Matthews & Associates
2905 Sackett Street
Houston, Texas 77098
dmatthews@thematthewslawiirm.com

Michael Heaviside
HEAVISIDE REED ZAIC
910 17th Street, Ste. 800
Washington, D.C. 20006
mheaviside@hrzlaw.com

Joseph N. Williams
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
jwilliamsrtprwp-law.com

Ben C. Martin
LAW OFFICES OF BEN C. MARTIN
3710 Rawlins Street, Suite 1230
Dallas, TX 75219
benmartin@bencmartin.com

/s/ Andrea Pierson

US.112861500.01

# EXHIBIT 1

Revised 3-2017

Signature:

CURRICULUM VITAE

**MARK J. GOODWIN, M.D.**

**Office Address:**    Advocate Health and Hospitals Corporation    Advocate Medical Group-MHS
1901 S. Meyers Road, Suite 350    Edward Hospital
Oakbrook Terrace, Illinois 60181    P.O. Box 3226
801 S. Washington Street
Naperville, Illinois 60540

**Date of Birth:**    October 1, 1955; Evergreen Park, Illinois

**Citizenship:**    U.S.A.

**Education:**

1973-1977    B.A., University of Notre Dame, Notre Dame, Indiana

1977-1981    M.D., University of Illinois, Chicago, Illinois

1995-1996    Executive Certificate Program, Northwest Kellogg Graduate School of Management Evanston, Illinois

**Postgraduate Training and Fellowship Appointments:**

1981-1982    Internship, Foster G. McGaw Hospital of Loyola University Medical Center, Maywood, Illinois

1982-1984    Resident in Internal Medicine, Foster G. McGaw Hospital of Loyola University Medical Center, Maywood, Illinois

1983-1984    Associate Chief Resident in Internal Medicine, Foster G. McGaw Hospital of Loyola University Medical Center, Maywood, Illinois

1984-1986    Fellow in Cardiovascular Diseases, Foster G. McGaw Hospital of Loyola University Medical Center, Maywood, Illinois

1985-1986    Chief Fellow in Cardiovascular Diseases, Foster G. McGaw Hospital of Loyola University Medical Center, Maywood, Illinois

CURRICULUM VITAE, Page 2.
**MARK G. GOODWIN, M.D.**

**Licensure and Board Certification:**

Illinois Medical Licensure                036-066770

| | |
|---|---|
| 1982 | National Board of Medical Examiners |
| 1984 | American Board of Internal Medicine<br>    Certificate #100738 |
| 1989 | American Board of Internal Medicine, Subspecialty Board of Cardiovascular Diseases<br>    Certificate #100738 |
| 1991 | American Board of Internal Medicine, Subspecialty Board of Critical Care Medicine<br>    Certificate #100738 |
| 2008 | American Board of Vascular Medicine, Subspeciality Endovascular Medicine (expires 2017).  Certificate # 325 |

**Awards and Honors:**

| | |
|---|---|
| 1977 | Magna Cum Laude, University of Notre Dame, Notre Dame, Indiana |
| 1981-1982 | Intern of the Year Award, Foster G. McGaw Hospital of Loyola University Medical Center, Maywood, Illinois |
| Member | Alpha Omega Alpha |

**Society Membership:**

Member, American College of Physicians

Fellow, American College of Cardiology

Member, American Heart Association

Fellow, Society for Cardiac Angiography

Member, American Society of Internal Medicine

Member, Illinois State Medical Society

Fellow, American College of Chest Physicians

Fellow, The Society for Cardiac Angiography and Interventions

CURRICULUM VITAE, Page 3.
**MARK G. GOODWIN, M.D.**

**Society Membership (continued):**

Member, International Society for Endovascular Specialists

Member, Society for Vascular Medicine

**Hospital Appointments:**

1987-1991      Consulting Cardiologist:
                     Central DuPage Hospital, Winfield, Illinois

1989-1993      Consulting Cardiologist:
                     Oak Park Hospital, Oak Park, Illinois

1986-2002      Consulting Cardiologist
                     Foster G. McGaw Hospital, Loyola University Medical Center, Maywood, Illinois

1986-present   Consulting Cardiologist:
                     Good Samaritan Hospital, Downers Grove, Illinois
                     Elmhurst Memorial Hospital, Elmhurst, Illinois
                     Edward Memorial Hospital, Naperville, Illinois

1996-present   Consulting Cardiologist:
                     Central DuPage Hospital, Winfield, Illinois

1998-2004      Valley West Hospital, Sandwich, IL

1999-present   Consulting Cardiologist:
                     Linden Oaks Hospital, Naperville, IL

2001-2008      Kishwaukee Community Hospital, DeKalb, IL

2002-2004      Rush Copley Memorial Hospital, Aurora, IL

2003-2008      St Alexius Medical Center, Hoffman Estates, IL

2004-2006      Swedish American Hospital, Rockford, IL

2005-2007      Lincoln Park Hospital, Chicago, IL

**Faculty Appointments:**

1989-present   Clinical Assistant Professor of Medicine, Loyola University Stritch School of
                     Medicine, Maywood, Illinois

CURRICULUM VITAE, Page 4.
**MARK G. GOODWIN, M.D.**

**Administrative Appointments/Committees:**

| | |
|---|---|
| 1982-1983 | Vice President of House Staff, Foster G. McGaw Hospital of Loyola University Medical Center, Maywood, Illinois |
| 1982-1983 | Chairman, Chicago Associate Meeting of the American College of Physicians |
| 1983-1984 | President of House Staff, Foster G. McGaw Hospital of Loyola University Medical Center, Maywood, Illinois |
| 1986-present | Physician, Advocate Medical Group- Midwest Heart Specialists, Edward Hospital, Naperville, Illinois |
| 1983-present | ACLS Instructor |
| 1989-present | Director, Cardiac Catheterization Laboratory, Edward Hospital, Naperville, Illinois |
| 1989-2004 | Chairman, Cardiac Catheterization Quality Assurance Committee, Edward Hospital, Naperville, Illinois |
| 1992-present | Member, Board of Directors, Edward Cardiovascular Institute, Naperville, Illinois |
| 1993-present | Director, Cardiac Catheterization Laboratory, Edward Cardiovascular Institute, Naperville, Illinois |
| 1994-2002 | Member, Board of Directors, Edward Hospital, Naperville, Illinois |
| 1996-2002 | Senior Vice President, Midwest Heart Specialists, Naperville, Illinois |
| 2000-2005 | Member, Board of Directors, Cardioworks, Inc., Lombard, Illinois |
| 2002-present | Executive Vice President, Advocate Medical Group-Midwest Heart Specialists, Naperville, Illinois |
| 2001-present | Member, Board of Directors DuPage County Medical Society |
| 2001-2006 | Member, Board of Directors Gateway Medical Resource |
| 2008-present | Member, Blue Cross/Blue Shield Provider Transparency Advisory Committee |
| ?-present | Member, Philips Medical Advisory Board |
| 2009-2014 | Director, Peripheral Vascular, Edward Hospital, Naperville, Illinois |

CURRICULUM VITAE, Page 5.
**MARK G. GOODWIN, M.D.**

2012-Present   Director, Structural Heart, Edward Hospital, Naperville, Illinois

2014-Present   Chief of Cardiology, Edward Hospital, Naperville, Illinois

**Administrative Appointments/Committees (continued):**

Present          Consultant: Edward Lifesciences, Boston Scientific, Medtronic, Abbott

Present          Medical Advisory Board, Boston Scientific

Present          Proctor: Edward Lifesciences

Present          Proctor: Abbott, CTO, BV

Present:         Proctor: Boston Scientific, WATCHMAN, CTO

2016-Present:  System Medical Director, Edward-Elmhurst Health Cardiac Innovations and
                    Structural Heart Center


**Other Achievements:**

2000             Co-developer of the Northern Illinois University Business Mastery Certificate for
                    Physicians Program

**Presentations:**

  1.  Goodwin, M:    Ultrafact CT,  The Oprah Show. May, 2000

  2.  Goodwin, M:    Heart Hospitals, International Symposium on Bioethics, University of
       Notre Dame, Notre Dame, Indiana

  3.  Goodwin, M:    Bioethics, University of Notre Dame, Notre Dame, Indiana, semi-annual
       basis

  4.  Goodwin, M:    Cardiology Partnerships, Phillips Medical, Amsterdam, Holland, Feb. 2003

  5.  Goodwin, M:    New technology in cardiac imaging, Transcatheter Cardiovascular
       Therapeutics, Washington DC, Sept. 2003

  6.  Goodwin, M:    Drug eluding stents, Cardiology Update, Midwest Heart Specialists
       Symposium, Oak Brook, Illinois, Dec. 2003

  7.  Goodwin, M:    What is happening with services for medical and Surgical at the Heart
       Hospital, United Healthcare Center for Education, Naperville, Illinois, Jan. 2004

CURRICULUM VITAE, Page 6.
**MARK G. GOODWIN, M.D.**

8.  Goodwin, M:    Specialty care hospitals: what motivates physicians to do these deals, Healthcare Financial Management Association, Chicago, Illinois, Feb. 2004

9.  Goodwin, M:    Heart Hospital Interview, Forbes Magazine, March 2004

**Presentations (continued):**

10. Goodwin, M:    Heart Hospital Interview, Bloomberg Magazine, March 2004

11. Goodwin, M:    Cardiovascular Care Study:  Midwest Heart Specialists, The Outpatient Care Institute, Washington DC, April 2004

12. Goodwin, M:    The quest for quality healthcare: Physicians perspective on quality improvement, Midwest Business Group on Health, June 2004

13. Everett, Nicolet, BS, BSN; Goodwin, Mark, MD; Kerwin, Peter, MD; Kordish, Colleen, RN. Cardiac Alert – Improving Door to Balloon Time for STEMI through Performance Measurement. Presented at 7th Annual ACC-NCDR Registry Meeting and Quality Conference: Building Your Benchmark Strength

14. Goodwin, M.:    New Vascular Treatment for PVD, 4th Annual Advanced Cardiology for Primary Care Physicians, Chicago, Illinois, May 2009

15. Goodwin, M:    Panelist, Deep Venous Disease III, 6th Annual Chicago EndoVascular Conference (CVC), Chicago, Illinois, July 2016

16. Goodwin, M:    Patients with Varicose Veins: When Do We Investigate the Deep System?  6th Annual Chicago EndoVascular Conference (CVC), Chicago Illinois, July 2016

17. Goodwin, M:    DVT/PE, TCT 2016, Walter E. Washington Convention Center, Washington, DC, October 2016

18. Goodwin, M:    Trans Caval TAVR – Report on 100 Patient Registry, LINC, Leipzig, Germany, January 2017

**Clinical Research Participation:**

2001         Prospective, Randomized, Single-Blinded, Parallel-Group (2-Arm), Multi-center, Clinical Evaluation of the RX ACHIEVE™ Drug-Coated Coronary Stent System in the Treatment of Patients With De Novo Native Coronary Artery Lesions (DELIVER); Guidant Corporation
             Sub-Investigator

2001         A Prospective, Randomized, Open-Label, Multicenter Study in Patients Presenting with Acute Coronary Syndromes (ACS); Aventis

**MARK G. GOODWIN, M.D.**

Sub-Investigator

2002          A Randomized Evaluation in PCI Linking Angiomax™ to Reduced Clinical Events, Part 2:  REPLACE-2; The Medicines Company; The Medicines Company
Sub-Investigator

**Research (continued):**

2002          A Phase II, Multicenter, Double-Blind, Placebo-Controlled, Dose-Ranging Study to Evaluate the Safety and Efficacy of BO-653 in the Prevention of Post-Angioplasty Restenosis in Stented Lesions:  The PREVAIL Study; Chugai Pharma
Sub-Investigator

2003          A Randomized, Open-Label, Multicenter Pilot Study Evaluating the Safety and Efficacy of Pharmacomechanical Thrombolysis Combined with GPIIb/IIIa Inhibition in Acute Myocardial Infarction
Sub-Investigator

2004          TAXUS ARRIVE 2: Multi-Center Safety Surveillance Program
Principal-Investigator

2007          A Clinical Trial Comparing Treatment with Cangrelor (in Combination with Usual Care) to Usual Care, in Subjects Who Require Percutaneous Coronary Intervention
Sub-Investigator

2007          "The HERCULES Trial": A Prospective, Non-randomized, multi-center, single-arm clinical trial to assess the safety and efficacy of the RX HERCULINK ELITE RENAL stent system for the treatment of suboptimal post-procedural percutaneous transluminal angioplasty (PTA) in atherosclerotic *de novo* or restenotic renal artery stenosis in patients with uncontrolled hypertension.
Primary Investigator

2008          SAPPHIRE Worldwide: Stenting and Angioplasty with Protection in Patients at High-Risk for Endarterectomy, Principal Investigator

2009          XIENCE V® Everolimus Eluting Coronary Stent System (EECSS) USA Post-Approval Study, Principal Investigator

2011          Carotid Revascularization with ev3 Arterial Technology Evolution Post Approval Study- Post Market Surveillance Arm (CREATE PAS), Principal Investigator

2011          EXPERT CTO: Evaluation of the XIENCE Coronary Stent, Performance, and Technique in Chronic Total Occlusions, Principal Investigator

2011          A prospective, multicenter, single blind, randomized, controlled trial comparing the Moxy™ drug coated balloon vs. standard balloon angioplasty for treatment of

CURRICULUM VITAE, Page 8.
**MARK G. GOODWIN, M.D.**

femoropopliteal arteries (LEVANT 2), Principal Investigator

2011        Renal Denervation in Patients with Uncontrolled Hypertension SYMPLICITY (HTN-3), Principal Investigator

**Research (continued):**

2012        A Randomized Trial of the Medtronic-Invatec IN.PACT Admiral ™ Drug-Eluting Balloon vs Standard Percutaneous Transluminal Angioplasty (PTA) for the Treatment of Atherosclerotic Lesions in the Superficial Femoral and/or Proximal Popliteal (SFA/PPA) Arteries (IN.PACT SFA II), Principal Investigator

2013        ARTISAN: iCAST™ RX De Novo Stent Placement for the Treatment of Atherosclerotic Renal Artery Stenosis in Patients with Resistant Hypertension, Principal Investigator

2013        PARACHUTE IV: PercutAneous Ventricular RestorAtion in Chronic Heart FailUre due to Ischemic HearT DiseasE, Sub-Investigator

2014        ILLUMENATE Pivotal: ProspectIve, Randomized, SingLe-Blind, U.S. MuLti-Center Study to EvalUate TreatMent of Obstructive SupErficial Femoral Artery or Popliteal LesioNs With A Novel PacliTaxel-CoatEd Percutaneous Angioplasty Balloon, Principal Investigator

2015        TAVR Registry: Safety of the expandable eSheath during Caval-Aortic Access for Transcatheter Aortic Valve Replacement

2015        TAVR IDE: Transcaval Access for Transcatheter Aortic Valve Replacement in Patients with No Good Options for Aortic Access

2016        NOVACROSS: A Prospective, Multi-Center, Non-randomized, Single arm, Open label, Pivotal Study to Evaluate the Safety and Effectiveness of the NovaCross™ Micro-catheter in Facilitating Crossing Chronic Total Occlusion (CTO) Coronary Lesions

2016        RENALGUARD PLC:  A Study to Evaluate RenalGuard® System Safety & Efficacy When Compared with Standard Care in the Prevention of Contrast Induced Nephropathy in the Setting of a Catheterization Laboratory

2016        EVOLVE Short DAPT:  A prospective, multicenter, single-arm study designed to assess the safety of 3-month dual antiplatelet therapy (DAPT) in subjects at high risk for bleeding undergoing percutaneous coronary intervention (PCI) with a SYNERGYTM Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY Stent System)

CURRICULUM VITAE, Page 9.
**MARK G. GOODWIN, M.D.**


**Original Publications:**

1.   Hartmann J, McKeever L, Teran J, Bufalino V, Marek J, Brown A, <u>Goodwin M</u>, Amirparviz F, Motarjeme A:  Prolonged infusion of urokinase for recanalization of chronically occluded aorto-coronary bypass grafts.  Am J Cardiol 61(1):189-191, 1988.


**Original Publications (continued):**

2.   Hartmann JR, McKeever LS, Bufalino VJ, Marek JC, Brown AS, <u>Goodwin MJ</u>, Colandrea MA, Stamato NJ, Cahill JM, Amirparviz F:  A system approach to intravenous thrombolysis in acute myocardial infarction in community hospitals:  The influence of paramedics.  Clin Cardiol 11:812-816, 1988.

3.   McKeever LS, Hartmann JR, Bufalino VJ, Marek JC, Brown AS, <u>Goodwin MJ</u>, Stamato NJ, Cahill JM, Colandrea MA, Amirparviz F:  Prolonged selective urokinase infusion in totally occluded coronary arteries and bypass grafts:  Two case reports.  Catheterization and Cardiovascular Diagnosis 15(4):247-251, 1989.

4.   McKeever LS, Hartmann JR, Bufalino VJ, Marek JC, Brown AS, <u>Goodwin MJ</u>, Colandrea MA, Stamato NJ, Cahill JM, O'Donnell MJ, Amirparviz F, Enger EL:  Acute myocardial infarction complicating recanalization of aortocoronary bypass grafts with urokinase therapy. Am J Cardiol 64:683-685, 1989.

5.   <u>Goodwin MJ</u>, Hartmann JR, McKeever LS, Bufalino VJ, Marek JC, Brown AS, Colandrea MA, Stamato NJ, Cahill JM, O'Donnell MJ, Amirparviz F, Enger EL:  Safety of intraaortic balloon counterpulsation in patients with acute myocardial infarction receiving streptokinase intravenously.  Am J Cardiol 64:937-938, 1989.

6.   Hartmann JR, McKeever LS, Bufalino VJ, Marek JC, Brown AS, <u>Goodwin MJ</u>, Colandrea MA, Stamato NJ, Cahill JM, O'Donnell MJ, Amirparviz F, Enger EL:  A randomized trial of intravenous streptokinase versus tissue plasminogen activator for the treatment of acute myocardial infarction:  Results using an aggressive approach.  J Interven Cardiol 3(2):69-73, 1990.

7.   Hartmann JR, McKeever LS, Stamato NJ, Bufalino VJ, Marek JC, Brown AS, <u>Goodwin MJ</u>, Cahill JM, Enger EL:  Recanalization of chronically occluded aortocoronary saphenous vein bypass grafts by extended infusion of urokinase:  Initial results and one year follow-up.  J Am Coll Cardiol 18(6):1517-1523, 1991.


**Case Reports:**

1.   Stamato NJ, Cahill JM, <u>Goodwin MJ</u>, Winters G:  Cardiac amyloidosis causing ventricular tachycardia:  Diagnosis made by endomyocardial biopsy.  Chest 96(6):1431-1433, 1989.

2.   Stamato NJ, <u>Goodwin MJ</u>, Foy B:  Diagnosis of coronary sinus diverticulum in Wolff-

CURRICULUM VITAE, Page 10.
**MARK G. GOODWIN, M.D.**

Parkinson-White syndrome using coronary angiography.  PACE 12:1589-1591, 1989.

**Reviews and Chapters:**

1.  McKeever LS, Hartmann JR, Bufalino VJ, Marek JC, Brown AS, Goodwin MJ, Stamato NJ, Cahill JM, Colandrea MA, Amirparviz F:  Prolonged selective urokinase infusion in totally occluded coronary arteries and bypass grafts:  Two case reports.  Catheterization and Cardiovascular Diagnosis 15(4):247-251, 1989.