CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1                UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
2                  INDIANAPOLIS DIVISION
3
      IN RE: COOK MEDICAL, INC.,    ) Case No.
4     IVC FILTERS MARKETING,        ) 1:14-ml-2570-RLY-TAB
      SALES PRACTICES AND PRODUCT   )
5     LIABILITY LITIGATION          ) MDL No. 2570
6
          VIDEOTAPED DEPOSITION OF FRANK C. LYNCH, M.D.
7
               Taken in the offices of McQuaide
8     Blasko, 1249 Cocoa Avenue, Suite 210, Hershey,
      Pennsylvania, on Friday, May 26, 2017, commencing
9     at 12:06 p.m. before Tiffany L. Mast, Court
      Reporter, and Kevin Frank, Videographer.
10
11    APPEARANCES:
12                FAEGRE BAKER DANIELS
                  BY: ANDREA ROBERTS PIERSON, ESQUIRE
13                300 North Meridian Street
                  Suite 2700
14                Indianapolis, Indiana 46204
                  (317) 237-1424
15                andrea.pierson@FaegreBD.com
16                -- For Cook Medical, Inc.
17
                  FAEGRE BAKER DANIELS
18                BY: ANNA RUTIGLIANO, ESQUIRE
19                300 North Meridian Street
20                Suite 2700
21                Indianapolis, Indiana 46204
22                (317) 237-1191
23                anna.rutigliano@FaegreBD.com
24
25                -- For Cook Medical, Inc.

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 20

1    it appears to me that you treated Mrs. Hill on just

2    one day.  That was August the 21st of 2013.

3                    Is that consistent with your memory?

4    A.       Yes, it is.  Yeah.

5    Q.       When you treated Mrs. Hill on that day, were

6    you treating her in order to retrieve her vena cava

7    filter?

8    A.       Yes.

9    Q.       And in your care and treatment of Mrs. Hill,

10   did you rely on your education, training, and

11   experience?

12   A.       Yes.

13   Q.       And that includes your experience over the,

14   at that time, probably close to 18 years or 17 years

15   of treating patients with vena cava filters?

16   A.       If you include my training, yes.  Yeah.

17   Q.       Did you rely, in treating Mrs. Hill, on your

18   general knowledge of vena cava filters and the

19   retrieval techniques for retrieving them?

20   A.       Yes.

21   Q.       Did you rely on your general knowledge of the

22   medical literature in treating Mrs. Hill?

23   A.       Yes.

24   Q.       Would you agree, Dr. Lynch, that your care

25   and treatment of Mrs. Hill was influenced by your

EXHIBIT A

Page 23

1    had used, at that point, the Option ELITE filter, as

2    well.

3                    We also, historically, had placed

4    permanent filters as part of our practice, which

5    predates much of this.  And we still place permanent

6    filters today.  That would include Bird's Nest

7    filter, the Simon Nitinol filter, Boston Scientific

8    Greenfield filter, the Trapeze filter.  I believe

9    that's all of them.  Yeah.

10   Q.        Give us some sense, overall, of how many

11   times you've placed or retrieved a vena cava filter.

12   A.        Personally?

13   Q.        Yes.

14   A.        I've probably placed close to, if not in

15   excess of, 800 to a thousand filters.  I've retrieved

16   in excess of 1800 filters.  Our entire group places

17   devices.  I primarily remove the ones that are

18   referred to us.

19   Q.        Okay.  And if you could, give us some sense

20   of how many times you think you've placed or

21   retrieved a Cook filter.

22   A.        That probably represents about 20 percent of

23   my experience in both realms.

24   Q.        Okay.  Dr. Lynch, are you familiar with the

25   Cook Celect filter?

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 89

1    expertise, and experience that you had in retrieving

2    filters exceeded that that was available in Tampa?

3                    MS. PIERSON:  I object.  That calls

4    for speculation.

5                    THE WITNESS:  I'm not sure I

6    necessarily came to that conclusion.  I think, as I

7    stated earlier, I don't know what the state of

8    knowledge or practice was in the area at the time.

9    All I can know is that, for whatever reason, she was

10   motivated to seek me out.  I reviewed her case and

11   offered her a procedure.

12                    So I'm not sure if that was

13   referring to her perceived level of expertise, or

14   whether that is, you know, prefacing what I think

15   she later outlines as satisfaction with her patient

16   care, so --

17    BY MR. HEAVISIDE:

18   Q.        You have one of the largest filter extraction

19    practices in the United States; isn't that true?

20   A.        I think it's large.  I'm not sure how it

21    compares across the country.  There are several large

22    centers, so yeah.

23   Q.        Do you recall testifying previously in

24    another deposition that you --

25   A.        Yes.  Yeah.

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 90

1    Q.          -- that you believed you had the largest

2    filter extraction practice in the United States?

3                        MR. STEPANIAN:  I'm going to object.

4    If you're going to start quoting from another

5    deposition, I think you ought to show it to him and

6    give him the opportunity to see it.  So, I mean, if

7    you want to ask him the question, that's fine.

8                        But if you're going to refer to a

9    deposition, I think that he ought to have the right

10   and the ability to see it.

11                       MR. HEAVISIDE:  I'm happy to go

12   through it.  I just -- if he doesn't remember, he

13   doesn't remember.  That's fine.

14                       THE WITNESS:  I don't remember

15   expressing that I felt that my experience was --

16   took primacy over anybody else's.  I know I have a

17   large experience.  I collaborate with several other

18   physicians who are experts throughout the country.

19                       So I've published several large

20   series, so -- but, yeah, I don't recall having said

21   that I have the largest.

22   BY MR. HEAVISIDE:

23   Q.          I'm hoping you can clarify this for me.

24                       You testified at one point in time

25   that what appears before us as this one -- what

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 95

1   BY MR. HEAVISIDE:

2   Q.        Number 7, also from your website, it's styled

3      frequently asked questions, right?

4   A.        Uh-huh.

5   Q.        And the third question is, someone else tried

6      to remove my filter and failed, might it still be

7      possible to remove the filter?

8              And the answer contains this

9      sentence.  It says, the experience and technical

10     expertise of physicians who provide filter removal

11     services vary greatly.  If you are in this

12     situation, I would strongly encourage you to seek a

13     second option from someone with extensive experience

14     removing IVC filters, right?

15  A.        Yes, I say that.

16  Q.        And you -- I know you're a humble man, but

17     you have more experience in removal of filters than

18     the general interventional radiologist, would you

19     agree?

20  A.        I believe that to be true, yeah.

21  Q.        And more expertise than a general --

22  A.        Than a general --

23  Q.        Yeah.

24  A.        Yes, I believe that to be true.  Yes.

25  Q.        And more, in your practice, more resources

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 96

1      than the general interventional radiologist?

2  A.         Maybe, yeah.  I consider our practice to be

3      average in most regards, so yeah.

4  Q.         Well, for example, I think you discussed with

5      Ms. Pierson an off-label retrieval technique, using

6      some other equipment, I'm going to say, because I'm

7      not as familiar with it as you are.

8                    Isn't it likely that your general

9    interventional radiologist somewhere else might not

10   have that kind of equipment available to them?

11 A.         Yes, that's possible.  Yeah, depending on the

12     practice.  Yeah.

13 Q.         I think you mentioned that your facility was

14     particularly -- I'm going to say zealous; that might

15     be too strong of a word -- but interested, perhaps,

16     in following people who have gotten IVC filters,

17     than the general population of interventional

18     radiologists?

19 A.         I think of all practitioners placing devices,

20     yeah.

21 Q.         And you published on that, right?

22 A.         Yes.

23 Q.         And I'm just going to -- this question is

24     related and not related to the question I asked you

25     before.

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 97

1            In one of your publications, which is
2    called a Method for Following Patients with
3    Retrievable Inferior Vena Cava Filters -- you remember
4    that publication, yes?
5    A.        Yes.
6    Q.        Towards the end, it says, because the
7    institution is located in a relatively affluent and
8    rural part of the country, most patients had stable
9    contact information and had the financial and social
10   means to return for follow-up visits and to return
11   for actual filter removal, right?
12   A.        Yes.
13   Q.        So can I fairly conclude that there are
14   people, many people in the United States, who for
15   geographic limitations or financial limitations,
16   don't have the ability to get to you for a
17   complicated retrieval of their filter?
18   A.        To get to me, in particular?
19   Q.        Yes.
20   A.        That's probably a true statement.  Whether or
21   not getting to me is required for their care, I'm not
22   sure.
23            That statement was mostly directed
24   by the fact that most academic centers are not in
25   rural Pennsylvania.  They're usually in an urban

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 98

1     environment, where patients' social structures

2     maybe make it difficult for physicians to follow up

3     with them.  So I think, physicians who can provide

4     filter removal services are widespread throughout

5     the country, and it's not just geography that

6     presents barriers to it.  I think that was the

7     point of my statement, so --

8   Q.      That might have been the point of your

9     statement, but isn't it true, that in the real

10    world, that geography and money presents a barrier

11    to people who need somebody who is capable of a

12    complicated retrieval technique rather than just a

13    simple retrieval technique?

14  A.      I think any retrieval technique -- the

15    majority of those patients in that series got

16    standard retrieval.  So it was those -- there was not

17    extraordinary means required to take their filter

18    out.  Yeah.

19  Q.      I guess I'm not -- I am using the concept

20    from that article, but I'm not specifically asking

21    you about that article.  And I'm just trying to ask

22    you, you know, somebody like Mrs. Hill, you know

23    that her physician tried to take her filter out by

24    the standard on-label technique and was unable to do

25    so, right?

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 99

1   A.        That was my understanding, yeah.

2   Q.        Right.

3   A.        Yeah.

4   Q.        So somebody like her, had she not had the

5   money, for example, and the support to get to

6   somebody like you, she would have difficulty getting

7   that filter out, right?

8                    MR. STEPANIAN:  Object to the form.

9                    THE WITNESS:  I have no idea what

10  resources were available to her in Florida at the

11  time that the situation arose.  As I think I stated

12  before, all I know is that she asked me to review

13  her case.  I reviewed her case and offered her a

14  retrieval procedure.  Whether or not there was

15  somebody within an hour of where she lived, I don't

16  know that to be the case, so no.

17   BY MR. HEAVISIDE:

18  Q.        But her doctor couldn't get it out; we know

19  that.

20  A.        I know that to be a fact, yeah.

21  Q.        Okay.  Now, Cook counsel asked you about

22  presentations you've made regarding IVC filters.

23                    Do you remember that question?

24  A.        Yes.

25  Q.        And you said, yes, you've made presentations,

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 104

1    Q.        I'm going to show you another document, if I

2    may.  It's marked as Exhibit Number 9.

3                    Now, in conjunction with

4    presentations, Exhibit Number 9 seems to be a

5    PowerPoint presentation.  In the first box there, it

6    says, IVC filters, when to place one, when to remove

7    one.  Then it says, Frank C. Lynch.

8                    So is this a PowerPoint that you

9    prepared or used in a presentation?

10   A.        This appears to be an iteration of a lecture

11   that I commonly give.  I can't -- often in my title

12   slide, it will say at what --

13   Q.        Right.

14   A.        -- venue I'm giving it, but I don't see that

15   here.  So I don't recall exactly when or where I gave

16   this, so --

17   Q.        Sure.  On page 2 of that PowerPoint, in the

18   bottom box, for lack of a better word --

19   A.        Uh-huh.

20   Q.        -- where it says clinical studies.

21   A.        Yep.

22   Q.        It says two and eight-year follow up, no

23   difference in recurrent PE mortality or post

24   thrombotic syndrome, increased rate of recurrent DVT

25   in filter group; 20.8 percent versus 11.6 percent.

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 114

1    filters.

2                    And that 41 percent penetration

3    rate, although I don't see it on the slide as part

4    of my presentation -- I used that slide in many of

5    my presentations -- is that -- I believe it was

6    titanium Greenfield had a really high perforation

7    or penetration rate, I should say.

8                    But he, in his article, he

9    describes some sources, saying penetrations

10   occurred between 10 and 25 percent, so --

11   Q.        Are you familiar with a peer-reviewed

12   published article by Dr. Zhou, Z-h-o-u, and others,

13   March of 2014.  And this is, I believe, it's

14   entitled Penetration of Celect Inferior Vena Cava

15   Filters: Retrospective Review of CT scans in 265

16   Patients.

17                    Do you recall that study?

18   A.        Not specifically, no.

19   Q.        Maybe you will by the results.

20                    MR. STEPANIAN:  I'm just going to

21   object.  I'll let you go a little further with this,

22   but this postdates his treatment of Ms. Hill, so I

23   don't really see how it relates to her care, but go

24   ahead.

25

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 115

1   BY MR. HEAVISIDE:

2   Q.        This article indicates -- and this is

3       specifically with regard to Celect filters -- the

4       penetration of the primary leg was observed in 39

5       percent of patients within 30 days and 80 percent of

6       patients within 90 days after placement.

7                   Do you recall, now, this article or

8       is this --

9   A.        I don't recall the specific -- that specific

10      -- those specific numbers.  I mean, there's a large

11      body of IVC literature out there.

12  Q.        Right.

13  A.        I don't have full recall of all papers, so --

14  Q.        In your experience, specifically, with Celect

15      filters, do you have an estimate, for example, of

16      the penetration of primary legs within 30 days and

17      penetration within 90 days after placement?

18  A.        As part of my practice, I don't rigorously

19      evaluate filters at those intervals.

20  Q.        Right.

21  A.        My general impression is that penetration

22      through the cava is common, and I see it with all

23      devices, so --

24  Q.        That raises another question.

25                  Cook's counsel asked you about

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 116

1    whether or not these problems, as you've just

2    described, are common to all filters, or are they

3    Celect-specific, right?

4    A.        Yes.

5    Q.        And as you just indicated, I think you say

6    that all filters have problems, right?

7    A.        Yes.

8              MS. PIERSON:  Object to form and

9    foundation.  You're mischaracterizing the testimony.

10             MR. HEAVISIDE:  I'm sorry.  I don't

11   want to mischaracterize anything.

12   BY MR. HEAVISIDE:

13   Q.        Didn't you just tell me that all filters

14   have --

15   A.        I have observed caval penetration,

16   essentially, with all filters I've had experience

17   with.

18   Q.        Right.

19   A.        Yeah.

20   Q.        And you've not done any study, or have you,

21   in terms of the frequency of that finding in Celect

22   filters or Bard filters or anybody else's filters,

23   have you?

24   A.        There were some incidental statistics that

25   were included in some of my publications, but that

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 117

1    wasn't the main thrust of the article.  I don't

2    remember the exact numbers.  But I'm referring to my

3    clinical experience, not my research experience, when

4    I say I see it frequently, so --

5    Q.       Okay.

6    A.       Yeah.

7    Q.       That raises another question.

8             For you to assess, should you be

9    interested in assessing, for example, a difference

10   in these failures, so to speak, amongst different

11   brands of filters.  If you were to go beyond your

12   clinical experience, you would have to rely on what

13   information is available from the manufacturer,

14   right?

15            Let me ask you a different question.

16   A.       Okay.

17   Q.       Should you or someone else attempt to assess

18   the frequency of these failure rates by a different

19   device, one way to do it would be to evaluate

20   reported adverse events, correct?

21   A.       That might be one methodology, yes.

22   Q.       Okay.  And if you chose to employ that

23   methodology, you might, for example, go to the MAUDE

24   database, right?

25   A.       That could be a potential source, yeah.

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 124

1   A.        Like asking me for advice or providing me

2   with it?

3   Q.        Either way.

4   A.        Not to my -- not to my recollection, I guess.

5   The interaction we have with territory reps is often

6   very informal.  You know, it's sort of like, hey, we

7   did this interesting case, sort of thing.  I don't

8   recall any formal communications with representatives

9   from Cook.

10  Q.        I don't mean formal either.  I mean just

11  communication.

12            For example, did you discuss the

13  loop snare technique at any time with Kevin Tanner

14  or anybody else from Cook?

15  A.        I don't have any specific recollection of

16  doing that, so no.  I might have described how I did

17  it, but I don't recall a specific instance where I

18  may have done that, so --

19  Q.        Did you send any films or records or reports

20  regarding Elizabeth Hill to anybody at Cook?

21  A.        I don't recall doing that.

22  Q.        I'm just going to -- how long have I been

23  rambling on here, so to speak?

24            THE VIDEOGRAPHER:  Fifty-two

25  minutes.

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 132

1    it's not a form objection, then you can make that

2    objection at the time of trial.

3                    Please do not interrupt my

4    deposition again.

5                    MS. PIERSON:  I just made my

6    objection to foundation.

7    BY MR. MARTIN:

8    Q.        Yes, sir.  So my question again -- and let's

9    add one minute to my time -- the question again,

10   you've read the instructions for use for the Cook

11   Celect filter, specifically the time period looking

12   at before Ms. Hill's retrieval by you, correct?

13   A.        Yes.

14   Q.        And we've talked about what technique that

15   IFU instructs the doctors is the preferred method,

16   correct, the Günther Tulip retrieval set, right?

17   A.        The preferred method.

18   Q.        All right.  And it is -- you are not saying

19   that the IFU for the Cook Celect back in 2009 and

20   2010 suggested any other retrieval technique, are

21   you?

22   A.        It suggested the preferred method.

23   Q.        It doesn't suggest any of these complicated

24   retrieval methods that you've discussed, the

25   angioplasty balloon, the endobronchial forceps, or

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 139

1    BY MR. MARTIN:

2    Q.        Before she was operated upon you -- excuse

3    me.  Before she was operated upon by you,

4    Dr. Lynch, and you were performing the risk benefit

5    analysis, the ultimate decision that you made was

6    that the benefit of having this filter removed was

7    greater than the risk of having it removed.

8              Would that be a fair statement?

9    A.        The benefit of having it removed, outweighed

10   the risk of both my retrieval procedure as well as

11   the risk of leaving it in place.

12   Q.        Correct.  And one of the things that you had

13   at your disposal was indeed the film that showed

14   that spike of the IVC filter protruding through one

15   side of that duodenum to also the other side of that

16   duodenum; you recall that?

17   A.        I remember having the CT scan that

18   demonstrated penetration of a filter leg into the

19   duodenum.  I'm not sure if I had any other -- I know

20   there was a report of an endoscopic image.  I'm not

21   sure that I saw that.

22   Q.        Given that you have seen that and you

23   witnessed, through the viewing of that film, a prong

24   of an IVC filter extending through the duodenum to

25   the extent in nature that it did, are you surprised

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 140

1    that Ms. Hill would consider that she was in danger?

2                    MR. STEPANIAN:  I'm going to object

3    because I think you just totally mischaracterized

4    what his answer was.

5                    MR. MARTIN:  I didn't ask him about

6    his answer.  I asked him --

7                    MR. STEPANIAN:  Yeah.  No, you had

8    it -- you --

9                    MR. MARTIN:  Court reporter, would

10   you please tell Mr. Lawyer here what -- sorry, I

11   can't remember your name --

12                   MR. STEPANIAN:  Mr. Stepanian.

13                   MR. MARTIN:  Mr. Stepanian.  Would

14   you please tell Mr. Stepanian --

15                   MR. STEPANIAN:  I am a lawyer, too.

16                   MR. MARTIN:  I know you are, and

17   that's why I called you a lawyer.

18                   Would you please -- I just didn't

19   remember your name.  Okay, sir?

20                   MR. STEPANIAN:  It's okay.  I heard

21   the question.  I don't need the question read back.

22                   MR. MARTIN:  Then I'll re-ask it.

23   Let me re-ask it.

24                   MR. STEPANIAN:  You asked him --

25                   MR. MARTIN:  Why don't you just let

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 157

1    Q.        Mr. Heaviside asked you some questions from
2      your current website.
3    A.        Yep.
4    Q.        Do you tell patients on your current website
5      that not all filters must be retrieved, they can be
6      left permanently?
7    A.        That is an option, yeah.  There are instances
8      where the risk of leaving the filter in is less than
9      taking it out.
10   Q.        Do you also tell your patients today that
11     there is no specific period of time within which a
12     filter cannot be removed?
13   A.        That is my general belief.  Yeah.
14   Q.        And Mr. Heaviside asked you some questions
15     about a PowerPoint presentation that you had given.
16             Is it your experience, as reflected
17    in this PowerPoint, that with the Cook Celect, at the
18    Hershey Medical Center, the Celect could be retrieved
19    up to 1,265 days?
20   A.        At the time I wrote this, that was probably
21     -- that was the longest implantation period that we
22     had seen.  So that's anecdotal evidence.  So while
23     it --
24   Q.        What's the longest you've seen today?
25   A.        I would have to go look.  I don't know off

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 158

1   the top of my head.  But that's an anecdotal report,

2   so that's not necessarily every filter that's been in

3   for that many days could come out.  Certainly, it is

4   feasible that it could come out, or at least possible

5   that it could be removed.

6   Q.      Mr. Heaviside asked you some questions about

7   whether Mrs. Hill's filter had fractured.

8                    Was your notation during

9   Mrs. Hill's procedure that the filter was removed

10  intact and without incident?

11  A.      Yes.

12  Q.      If you had observed that the filter was

13  fractured, you would have noted that in your

14  report --

15  A.      Yes.

16  Q.      -- correct?

17  A.      Yeah.

18  Q.      Mr. Heaviside asked you some questions about

19  the rate of perforation or penetration.

20                   First, is there any uniformly held

21  definition of perforation or penetration among

22  interventional radiologists?

23  A.      I think there is some controversy as to those

24  definitions and the terms sometimes are loosely-used

25  interchangeably.  Perforation and penetration are not

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 159

1    well-defined terms in the medical literature.

2   Q.        What is your definition today of perforation?

3                    Is there one?

4   A.        I have my personal definition that I use, and

5      it's language that is applied outside of filters, as

6      well.  To me, a penetration means the -- an object

7      has entered into the substance of something else,

8      like a needle penetrating into an organ.

9                    A perforation implies to me that

10     there is some loss of integrity to that substance.

11     It's usually used in context of a hollow organ.  And

12     it may or may not be related to a penetration event.

13     So we talk about perforated appendicitis.  So that

14     happens spontaneously because of inflammation and

15     dilation, perforated diverticulitis, perforated

16     gallbladders, you know.  So there's a focal loss of

17     integrity in the outside part of the organ.

18                    And then ruptured would be a diffuse

19     loss of integrity, like a ruptured spleen in trauma.

20   Q.        Sure.  Of all the filters that are implanted,

21     and there are hundreds and thousands of filters that

22     have been implanted over the course of your career,

23     correct?

24   A.        Across the nation and the world?

25   Q.        Yes.

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 160

1   A.        Yeah.  Yeah.  Yeah.

2   Q.        Give the jury some sense of how frequently

3   retrieval techniques other than the standard

4   techniques are required.

5   A.        There are some numbers that are published in

6   the literature.  I'd have to go back and look at my

7   paper, but it's somewhere in the 15 to 20 percent

8   range.

9   Q.        Of all retrievals?

10  A.        Yeah.  And it depends somewhat on the device,

11  so -- and often if you look at centers that have high

12  technical success for retrieval, their use of

13  advanced techniques is higher because they're not

14  backing away from the devices that fail standard

15  retrieval techniques, so --

16  Q.        Mr. Heaviside asked you some questions about

17  reporting to the FDA through the MAUDE database.

18                Remember those questions?

19  A.        Yes.

20  Q.        Did you feel it was necessary to report

21  Mrs. Hill's complication to the FDA through the

22  MAUDE database?

23  A.        I guess in -- it's unclear to me what my

24  burden of responsibility is in that regard.  And I

25  think that's one of the reasons why I find the MAUDE

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 162

1    A.       No.

2    Q.       In other words, if Mrs. Hill's filter -- if

3    Mrs. Hill had come to you to have her filter

4    retrieved at two months or three months, these are

5    the same risks that you would have advised her of at

6    that time, correct?

7    A.       Yes.

8    Q.       Regardless of the type of filter that she had

9    implanted?

10   A.       Yes.

11   Q.       Mr. Martin asked you some questions about why

12   the retrieval took so long in Mrs. Hill's case.

13            Remind us again, how long was the

14   fluoro time?

15   A.       Seven minutes of fluoro time.  Yeah.

16   Q.       And that includes the period of time that

17   you're essentially creating the loop to snare her

18   filter, right?

19   A.       Yes.

20   Q.       That's not all time that you're focused on

21   retracting the filter, correct?

22   A.       That's correct.  Yep.

23   Q.       Finally, Mr. Martin asked you a couple of

24   questions about the narrowing of Mrs. Hill's filter.

25   And I heard you say that in your experience,

EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 163

1    narrowing at retrieval doesn't matter at all.

2                    Is that an opinion that you formed

3    over the course of caring for patients and retrieving

4    filters over the last 20 years?

5    A.       Yes.  That's my opinion.  It's come from my

6    clinical experience, as well as data that I've seen

7    in literature.

8                    Her -- seeing narrowing at the time

9    of explantation is very, very common.  And there

10   are some institutions -- this is not the case for

11   Ms. Hill -- but there are some institutions in the

12   setting of an unidentical standard retrieval, they

13   don't even advocate doing a cavogram afterwards

14   because there's -- you never seen anything that is

15   of any clinical consequence, so --

16   Q.       And in your experience, is there any

17   long-term clinical consequence of observing

18   narrowing at the time of retrieving a vena cava

19   filter?

20   A.       My experience is that those narrowings

21   resolve.  So there's, you know, my experience is that

22   that observation is not associated with a long-term

23   clinical sequela.

24   Q.       In your experience, is there any clinical

25   sequela or clinical -- negative clinical experience

EXHIBIT A