Exhibit D

**CONFIDENTIAL**



University of California,
San Francisco

**Bennett L. Leventhal, MD**
Professor
Department of Psychiatry
Langley Porter
Psychiatric Institute
Box 0984-CAS, Room LP-152
401 Parnassus Avenue
San Francisco, CA 94143-0984
Voice: (415) 502-1924
Fax: (415) 476-7722
Email: Bennett.Leventhal@ucsf.edu
http://psych.ucsf.edu

# EXPERT REPORT

Date:    29 June 2017

Case:    Gage vs. Cook Medical, Inc.
         1:14-ML-2570-RLY-TAB
         MDL No. 2570

Name of Subject: GAGE, Arthur
DOB of Subject: 30 May 1949

Date of Examination: Direct Clinical Examination Requested But Not Performed

Materials Reviewed: See Appendix 1: Materials Received

Introduction:
I was retained by the law firm of Faegre Baker Daniels LLP in March 2017. I was asked to review the case of Mr. Arthur Gage and to offer opinions with respect to the psychiatric aspects of this case.

With respect to my credentials, please see Appendix 2 for my complete *curriculum vitae*. In the past four years, I have offered trial testimony in the following cases: *Long v. Sec'y of HHS*, No. 08-792V, 2015 U.S. Claims LEXIS 218 (Fed. Cl. Feb. 9, 2015) and *United States v. Jason Gmoser*, 14-CR-20048. The fee for my professional services in this case is $750 per hour.

Mr. Arthur Gage is a 68-year-old male who had a Günther Tulip inferior vena cava filter placed on 25 April 2011 at the Edward Heart Hospital in Naperville, IL. The attending physician who implanted the filter was Dr. Mark Goodwin of Midwest Heart Specialists in Naperville, Illinois. The reason for placing the filter was that Mr. Gage had dyspnea (shortness of breath), had a probable bilateral PE (pulmonary embolus) and was at acute risk for further, potentially fatal emboli to the lungs, heart and brain. At the time the filter was placed, Mr. Gage could no longer take anticoagulants due the presence of gross hematuria. Mr. Gage now asserts that the placement of the Günther Tulip filter has led to nearly constant pain for the 6 years since the placement of the filter. As a result, with the assistance of his attorneys, he has taken legal action.

Nature of this Consultation:
I was provided an extensive collection of medical records to review, along with transcripts of a number of depositions (See Appendix). In addition, I received a video of Mr. Gage's deposition taken on 9 January 2017. After review of these materials, a number of clinical questions became apparent. Unfortunately, a direct clinical examination was not possible. With this limit in mind, I have used the available materials to develop opinions to a reasonable degree of medical certainty.

Case Review:
Mr. Arthur Gage is a 68-year-old man who lives in Woodridge, Illinois. He is currently disabled and has been for many years. According to Mr. Gage he was married in 1971 and divorced in 1995 after 24 years of marriage (According to his ex-wife, Ms. Carol James, they were married in 1971 and divorced in 2000, or 29 years of marriage). He has 4 adult children. Mr. Gage lives alone most of the time but has had various family members living with him from time-to-time. He has his own car and drives to medical appointments and for other purposes. He cooks and otherwise cares for himself. Mr. Gage has a girlfriend of 10 year, Ms. Orajean Daugherty. She is a Certified Nursing Assistant. According to Mr. Gage, Ms. Daugherty, his daughter and his god-daughter assist him from time-to-time, especially in dealing with his medical problems. According to Ms. James, she speaks with Mr. Gage several times per week about his medical problems, provides explanations/advice, and frequently accompanies him to medical appointments.

Mr. Gage grew up on the West Side of Chicago. He came from a large family with 2 brothers, 1 stepbrother, 4 sisters and 5 stepsisters. His parents died of cancer (father-prostate; Mother- colon). He graduated from Cregier High School in 1968. Three of his sisters have died (according to Mr. Gage: 1 unknown causes, 1 heart failure and 1 MRSA). Mr. Gage was employed in various jobs until 1985. At age 36, he was placed on disability because he had so many medical problems and doctor appointments that he could no longer work. His principal problems at the time of his disability determination were apparently related to heart disease; he has developed a number of other significant medical problems since that time. Mr. Gage indicated that he has not been employed since 1985; for quite a while, he has spent most his time each day involved with managing his healthcare: clinic visits, doctor visits, inpatient stays, rehabilitation, etc.

When he was a younger man, Mr. Gage apparently had an active life style that included working at various jobs and his favorite sport, boxing. However, Mr. Gage also has a long and complex history of medical problems that forced him to dramatically reduce these activities, initially due to the early onset of cardiovascular disease that left him determined to be disabled by the age of 36. This long cardiovascular history includes hypertension and hypercholesterolemia as well as multiple episodes of problems with blood clots. Mr. Gage's medical history also includes 2 heart attacks, 2 bypass surgeries, stent placements and the placement of a cardiac pacemaker as well as the IVC filter. Over these many years of medical problems, Mr. Gage has received regular care from his general practitioner, along with cardiologists and other physicians. For a period of time, he also had a home health nurse visiting him on a weekly basis to help maintain his medical care; more recently, Mr. Gage has been meeting with a cardiology clinic nurse practitioner on a weekly basis.

One of the complications associated with Mr. Gage's cardiovascular disease has been frequent blood clots. Reportedly, he has been treated with anticoagulants, on and off, since the 1980s. On 25 April 2011, he was admitted to Edward Hospital with shortness of breath. He was diagnosed with pulmonary emboli. On 27 April 2011, a Günther Tulip inferior vena cava filter was placed to prevent further blood

clots. Mr. Gage indicates that this is when his current problems began. He says that the filter was not placed properly and that it is "tilting." He feels that as a result the filter is causing him to experience pain. Mr. Gage says that the pain started the day of insertion. Mr. Gage's description of his pain varies, ranging from excruciating pain in the right side to a constant aching pain in the abdomen and lower back, buttocks and radiating down the right leg. Mr. Gage suggests that this pain is different from all the other pain that he has repeatedly experienced. Shortly after the placement of the filter, Mr. Gage said that he asked for a pain shot. Apparently this has been his habit, subsequently. When the pain gets worse, he goes to the ER and asks for pain shots. Beginning in 2013, he sought consultation from a pain medicine physician and, as a result, has been placed on a variety of medications. Mr. Gage reports that standing, sitting, and walking makes the pain worse and that nothing can make it feel better. He takes no medications for his pain at the present time.

In addition to his cardiovascular disease, Mr. Gage has a history of diabetes mellitus and cholecystitis. He also reportedly has degenerative disk disease and gout. Mr. Gage is said to have had 4 bouts of cancer: 1. Stomach cancer which was apparently successfully treated with a partial gastrectomy and chemotherapy; 2. Colon cancer which is treated with a partial colectomy and chemotherapy; 3. Testicular cancer that was treated with the removal of the testis and chemotherapy; and, 4. Rectal cancer which was treated with chemotherapy. As a result of his multiple GI procedures, Mr. Gage reports that he has "dumping syndrome." In addition, Mr. Gage has had renal disease since the 1970's which led to a nephrectomy; he is now reported to have chronic renal insufficiency and end-stage renal disease. The records suggest that it has been recommended that Mr. Gage begin dialysis but he has declined to do so.

Pain and pain management appear to be another central theme in Mr. Gage's medical history. Long prior to his alleged challenges following placement of the inferior vena cava filter, Mr. Gage has had repeated bouts of pain. This has included abdominal pain, leg pain and back pain. He has received many treatments for this recurrent pain, including the use of multiple medications, ranging from emergency room injections of narcotics to codeine, gabapentin and Lyrica. Mr. Gage indicates that none of these medications appear to have had long-term efficacy in terms of his pain, leading to the conclusion that pain has been his constant companion for decades.

Complicating Mr. Gage's history of chronic, recurrent pain has been an extensive record of an extraordinary number of accidents and injuries. According to the record, Mr. Gage has had 10 motor vehicle collisions, with injuries, in the past 15 or 20 years. In addition, Mr. Gage has had at least 10 significant falls which have necessitated visits to the emergency room. These accidents and injuries have repeatedly been associated with all manner of pain, including head, neck, back, chest, leg, knee, ankle, hand, and flank pain. In addition, these injuries are associated with reports of multiple prior episodes of loss of consciousness and dizziness, suggesting not just injury in the periphery but also to the brain.

Perhaps not surprisingly, in addition to these many accidents, injuries and major medical problems, Mr. Gage appears to have had extensive concerns about his health that have risen to the level of preoccupations and possibly anxiety or fears. For example, in the early 2000's he had repeated episodes related to concerns that he might have colon cancer like his mother. At another time, he sought care following an epidural injection for pain treatment because he thought he might have developed fungal meningitis, a rare disorder that might not be part of the experience and knowledge of the typical patient; however, it was vaguely reminiscent of his sister's MRSA. And another concern of this nature came in 2015 when he went to the emergency room following a cut from a pedicure because he was concerned

about getting a systemic infection. He has had similar reports of somatic concerns and persistent pain during visits with Dr. Pangan following medical procedures for which ongoing pain is rarely, if ever, a problem.

Mr. Gage does not report a personal or family history of psychiatric illness. He denies use of alcohol and substance abuse. He reportedly had hallucinations and delusions when treated with Lyrica in 2014 but no other specific psychiatric symptoms were found in the record.

Despite his disability status and his many medical problems, Mr. Gage lives alone in his apartment where he cooks and cares for himself. Even though there are reports that Mr. Gage may have vision problems and has had many automobile accidents, Mr. Gage still drives.

Mental Status Examination
In order to complete this report, I requested the opportunity to directly examine Mr. Gage. Regrettably, this request was denied by Mr. Gage. While I was unable to directly examine Mr. Gage, 1 could derive a secondary mental status examination based on observations of the video deposition. By its very nature, the conclusions that one can definitely draw from this examination are limited. But with the medical records and other materials, as well as the recorded deposition there are data that provide insight into this man and his functioning. Only a complete, in-person, direct clinical examinations will allow for the gathering of more definitive evidence about Mr. Gage's current condition and functioning, including the presence or absence of diagnoses.

Mr. Gage appeared to understand the purpose of the deposition and seemed to try to be cooperative with the attorney conducting the questioning. While he responded readily to some of the attorney's questions and instructions, frequently there were periods of hesitation even for seemingly straightforward questions. It was difficult to tell whether this was due to a lack of attention, confusion, difficulty with memory, problematic cognitive processing, or a combination of these and other factors.

Mr. Gage appeared to be his stated age. His physical maturation, hygiene, grooming and attire were appropriate for his age, gender and social background. Despite his extensive medical history, he appeared robust and physically comfortable. He was well-developed and without signs of physical deformity. Mr. Gage's movements were quite slow and his motor activity level appeared to be a bit sluggish. He appeared to have adequate coordination and posture but he was not observed walking or in other more active situations than sitting for the examination. There was no evidence of tics or stereotypies. However, his facial expression appeared "masked" with limited movement in response to emotional content. While he did not have a tremor, the face had a leonine quality.

The quality of Mr. Gage's voice was normal however, the rate of his speech was slow and the quantity of speech production was parsimonious. His speech was fluent but slow and without typical conversational rhythm and inflection. Mr. Gage generally appeared to articulate without difficulty but there was occasional slurring of words. He was able to maintain effective but limited verbal communication. No special accents or dialects were noted. Verbal comprehension appeared to be problematic. Even when considering that the deposition may be a somewhat foreign situation for Mr. Gage, at times, he seemed to have difficulty comprehending comments or questions. He also had virtually no non-verbal communication and it was difficult to discern whether he fully appreciated the non-verbal communication of others. Mr. Gage's emotional expression was very limited. His facial expressions were flat and there

was little emotional expression in his voice. The overall range of his emotional expression was quite limited.

Mr. Gage was apparently generally oriented to time, place, person and situation. He often seemed distracted by his own thoughts or to have difficult attending and concentrating. It was difficult to assess his intellectual ability but at times his comprehension and problem solving appeared to be quite poor. Similarly, his memory seemed impaired. He could not remember many of the critical events in his life and was quite confused about even recent events. For example, he did not remember his current medications, the names of his doctors, that he had not completed some forms himself, and that he had filed for bankruptcy one year ago. Similarly, Mr. Gage's ability for abstraction was poor. The continuity, clarity and tempo of Mr. Gage's thinking was slow and below expected levels. There was no evidence of hallucinations, illusions, or other perceptual anomalies. His sense of identity appeared to be intact. However, he does seem to have challenges with body image and a focus on pain. Despite what he described as persistent, chronic pain, even during the interview, he seemed comfortable as he sat still for an extended period of time. At no point did he appear to be in any distress or discomfort.

Mr. Gage presented no evidence of thoughts or plans that might lead to him harming himself or others. During the course of the interview, Mr. Gage maintained good eye contact and related appropriately to the attorneys.

Clinical Impressions and Conclusions:
Mr. Gage presents with a complex clinical picture. He has been disabled for 30 years and as is often the case in situations like this, he has multiple diagnoses that likely interact with one another thus making it difficult to sort out the complex interactions between his current medical and psychosocial situation so that one can attribute specific causal elements to each of his problems. It is clear that he has a myriad of medical problems, including cardiovascular disease, cancer, gout, diabetes, renal disease, dumping syndrome, and a chronic pain syndrome. It is also highly probable that he has an accompanying psychiatric disorder. Finally, it is likely that most, if not all of these problems existed antecedent to the placement of the Günther Tulip inferior vena cava filter and that they will persist into the indefinite future.

While it is not possible to arrive at definitive diagnoses without direct clinical examinations, it is possible to develop a list of diagnoses to be considered (a "differential diagnosis") from the available records. I have developed a differential diagnosis for Mr. Gage. To a reasonable degree of medical certainty, it is my opinion that it is probable Mr. Gage suffers from at least one, if not more, of the following diagnoses:

I. **Somatic Symptom and Related Disorders** (DSM5):
   1. Somatic Symptom Disorder (DSM5 300.82; ICD F45.1)
      Predominant pain; Persistent; Moderate Severity
      A. One or more somatic symptoms that are distressing or result in significant disruption of daily life.
      B. Excessive thoughts, feelings, or behaviors related to the somatic symptoms or associated health concerns as manifested by at least one of the following:
         1. Disproportionate and persistent thoughts about the seriousness of one's symptoms.
         2. Persistently high level of anxiety about health or symptoms.

      3. Excessive time and energy devoted to these symptoms or health concerns.
- C. Although any one somatic symptom may not be continuously present, the state of being symptomatic is persistent (typically more than 6 months).

2. Factitious Disorder Imposed on Self (DSM5 300.19; ICD F68.10)
   - A. Falsification of physical or psychological signs or symptoms, or induction of injury or disease, associated with identified deception.
   - B. The individual presents himself or herself to others as ill, impaired, or injured.
   - C. The deceptive behavior is evident even in the absence of obvious external rewards.
   - D. The behavior is not better explained by another by another mental disorder, such as delusional disorder or another psychotic disorder.

3. Factitious Disorder Imposed on Another (DSM5 300.19; ICD F68.10)
   (Previously Factitious Disorder by Proxy)
   - A. Falsification of physical or psychological signs or symptoms, or induction of injury or disease, in another, associated with identified deception.
   - B. The individual presents another individual (victim) to others as ill, impaired, or injured.
   - C. The deceptive behavior is evident even in the absence of obvious external rewards.
   - D. The behavior is not better explained by another mental disorder, such as delusional disorder or another psychotic disorder.

4. Illness Anxiety Disorder (DSM5 300.7; ICD F45.21)  Care Seeking Type
   - A. Preoccupation with having or acquiring a serious illness.
   - B. Somatic symptoms are not present or, if present, are only mild in intensity. If another medical condition is present or there is a high risk for developing a medical condition (e.g., strong family history is present), the preoccupation is clearly excessive or disproportionate.
   - C. There is a high level of anxiety about health, and the individual is easily alarmed about personal health status.
   - D. The individual performs excessive health related behaviors (e.g., repeatedly checks his or her body for signs of illness) or exhibits maladaptive avoidance (e.g., avoids doctor appointments and hospitals).
   - E. Illness preoccupation has been present for at least 6 months, but the specific illness that is feared may change over that period of time.
   - F. The illness-related preoccupation is not better explained by another mental disorder, such as somatic symptom disorder, panic disorder, generalized anxiety disorder, body dysmorphic disorder, obsessive-compulsive disorder, or delusional disorder, somatic type.

## II. Neurocognitive Disorders:
1. Mild Neurocognitive Disorder (DSM5 799.59; ICD R41.9) Unspecified
   - A. Evidence of modest cognitive decline from a previous level of performance in one or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition) based on:

   1. Concern of the individual, a knowledgeable informant, or the clinician that there has been a mild decline in cognitive function; and
   2. A modest impairment in cognitive performance, preferably documented by standardized neuropsychological testing or, in its absence, another quantified clinical assessment.
  B. The cognitive deficits do not interfere with capacity for independence in everyday activities (i.e., complex instrumental activities of daily living such as paying bills or managing medications are preserved, but greater effort, compensatory strategies, or accommodation may be required).
  C. The cognitive deficits do not occur exclusively in the context of a delirium.
  D. The cognitive deficits are not better explained by another mental disorder (e.g., major depressive disorder, schizophrenia).

## III. Depressive Disorders
 1. Major Depressive Disorder (DSM5 296.31; ICD F33.0) Mild, Recurrent
  A. Five (or more) of the following symptoms have been present during the same 2-week period and represent a change from previous functioning; at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure:
   Note: Do not include symptoms that are clearly attributable to another medical condition.
   1. Depressed mood most of the day, nearly every day, as indicated by either subjective report (e.g., feels sad, empty, hopeless) or observation made by others (e.g., appears tearful).
   2. Markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day (as indicated by either subjective account or observation).
   3. Significant weight loss when not dieting or weight gain (e.g., a change of more than 5% of body weight in a month), or decrease or increase in appetite nearly every day.
   4. Insomnia or hypersomnia nearly every day.
   5. Psychomotor agitation or retardation nearly every day (observable by others, not merely subjective feelings of restlessness or being slowed down).
   6. Fatigue or loss of energy nearly every day.
   7. Feelings of worthlessness or excessive or inappropriate guilt (which may be delusional) nearly every day (not merely self-reproach or guilt about being sick).
   8. Diminished ability to think or concentrate, or indecisiveness, nearly every day (either by subjective account or as observed by others).
   9. Recurrent thoughts of death (not just fear of dying), recurrent suicidal ideation without a specific plan, or a suicide attempt or a specific plan for committing suicide.
  B. The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning
  C. The episode is not attributable to the physiological effects of a substance or to another medical condition.
   Note: Criteria A–C represent a major depressive episode.
  D. The occurrence of the major depressive episode is not better explained by schizoaffective disorder, schizophrenia, schizophreniform disorder, delusional disorder, or other specified and unspecified schizophrenia spectrum and other psychotic disorders.
  E. There has never been a manic episode or a hypomanic episode.

Mr. Gage presents with a complex clinical picture that is difficult to fully interpret without direct, detailed medical and psychological examination. There are many key pieces of the clinical picture that must be added to the current story before arriving at a definitive diagnostic conclusions, an etiologic understanding of the clinical situation and treatment recommendations. However, to a reasonable degree of medical certainty, it is highly probable that Mr. Gage has one or all of these conditions and possibly even others.

The past 30 years of Mr. Gage's life have revolved around his medical symptoms and their care. He has been to hospitals and clinics many times and much of his current identity is associated with the illnesses. At the moment, Mr. Gage appears to meet criteria for Somatic Symptoms and Related Disorders. Indeed, the possibility of such a diagnosis is indicated in the records from Mr. Gage's admission to Hinsdale Hospital on 09/11/2007. In his note, Dr. Geoffrey Kuhlman notes in the "Review of Systems:" "Despite his history of somatization disorder, he has felt well lately." Other records clearly confirm that Mr. Gage also has serious medical conditions that are of great concern to him. Based on the available information, Mr. Gage may meet the A, B, and C criterial for Somatic Symptom Disorder. Further, the specifiers for pain, persistence and multiple disorders are met in this record.

Based on the available information, the diagnosis for Factitious Disorder must be considered. This is complex because for many years, Mr. Gage has presented at the offices of multiple healthcare providers with many symptoms for which there is not an evident physical or laboratory finding. With respect to "Factitious Disorder Imposed on Self," based on the information available, Mr. Gage may meet the B, C and D criteria along with the "recurrent episodes" specifier. The issue of deception is more difficult to discern from the record, however many of his stories regarding his symptoms are inconsistent, leading to the possibility that he may be "fabricating" some of his symptoms to maintain his current sense of himself and control of his environment – both social and medical. In addition, he is frequently reported as "non-compliant" with his treatments. In short, he may be "fabricating" symptoms for personal gain. But, what may be the gain? In the case of a lawsuit, it could be compensation. But, this is an ongoing situation which is long antecedent to the lawsuit. For many years, even before the much more complex medical situation that is present today, ongoing symptoms and injuries could offer continuing access to disability payments and status while also helping to maintain wanted social relationships. This is a serious matter that is not taken lightly and will require further investigation.

An additional consideration is "Factitious Disorder Imposed on Others." Such a situation is one that may be the result of manipulation by friends or family members to approximate disorder for some personal gain. In this instance, based on the available information, it is possible that the A, B, C and D criteria have been met. The major concern in this area comes from Mr. Gage's ongoing disability and the possibility that others may capitalize on this financially. Of great concern is Mr. Gage's initial assertion he did not recognize some of the questionnaires, answers and handwriting. Ms. Daugherty made similar claims when shown certain exhibits and only later, after being confronted with her own handwriting admitted to completing some of the documents. And, then there is the testimony of Ms. James about not recognizing some of the handwriting but that it was not Mr. Gage's – Ms. Daugherty made the same assertion. So, it is not clear how these documents were completed and whether they accurately reflect Mr. Gage's condition or whether there are some other forces involved that might be consistent with this diagnosis. This may be reflected in documents completed by others about which Mr. Gage professed no personal knowledge.

Additionally, there is also a real possibility of Illness Anxiety Disorder. Based on the available information and as reported in the narrative above, Mr. Gage may meet the A, B, C, D and E criteria for this condition. For example, his responses to the pedicure and epidural, as well as in repeated visits with Dr. Pangan after medical procedures such as his pain at the insertion site following an arteriogram may represent exceptionally high levels of anxiety about his health and well-being.

Major Depressive Disorder may also be relevant for Mr. Gage although it is difficult to fully determine without further history and direct examination. Nonetheless, based on the available information, he may meet the A (1, 2, 4, 6, 8), B, C, D and E criteria for a mood disorder. The presence of such a disorder could play a primary role or aggravate both other psychiatric but also medical conditions.

However, Mr. Gage's problems may not end with his medical and somatic disorders. His many accidents and injuries are of great concern for multiple reasons:
1. In and of themselves, the accidents and injuries could be a cause or consequence of his medical and/or somatic disorders.
2. Any or all of these many accidents and injuries could cause some if not all manner of the pain and discomfort that is currently reported by Mr. Gage. And since many of these events and their associated symptoms occurred before the IVC filter placement, it is possible, if not probable, that they are completely independent of the alleged injuries from the filter. Indeed, it is much more biologically feasible that these injuries are the cause of his current pain and other symptoms than is the "tilted filter."
3. These accidents and injuries could have actually caused permanent damage to both his central and peripheral nervous systems leading a plethora of symptoms like the ones reported.
4. These accidents and injuries could have been part of a conscious or unconscious process to keep him connected to his family and friends, as well as the healthcare system that are all central to his life and identity.
5. These accidents and injuries could be the result of a depression and possible suicidal equivalent behaviors.

Finally, there is evidence to suggest that Mr. Gage may be experiencing cognitive processing problems and, possibly, cognitive decline or even a dementia. The compelling evidence for this is his incredibly poor memory for even important events in his life, such his filing for bankruptcy or the date of his divorce as well as the names of his doctors and medications. He reportedly has trouble keeping his medications straight requiring a visiting nurse or nurse practitioner to set-up his meds in daily boxes. In addition, consistent with cognitive decline is evidence that his ability for abstract thinking seems quite poor when he has trouble thinking through and answering even simple questions in the deposition. He also has some of the facial and cognitive features that could be consistent with a neurodegenerative disorder such as Parkinson's Disease. Finally, there is extensive evidence to suggest that repeated head trauma, such as that which Mr. Gage has experienced in his accidents and injuries could contribute to Chronic Traumatic Encephalopathy (CTE) which increases risk for dementia. There are many etiologies for cognitive decline, some of which may be treatable, thus making it a very important matter for which there a compelling need for a physical, psychiatric and psychological examination if for no other reason than for Mr. Gage's health and safety.

**Summary and Conclusions:**
Mr. Gage is a 68-year-old man with a long history of medical problems that started in the 1970's and have persisted to the present time. He clearly has multiple, complex medical conditions including

cardiovascular disease, renal disease, cancer, coagulopathy, diabetes, gout, dumping syndrome, etc. However, as part of this clinical situation is the high probability of the presence of a significant psychiatry disorder, including one or several of the Somatic Symptom and Related Disorders, as well as a possible mood disorder and neurocognitive disorder.

Mr. Gage's medical and psychiatric conditions are likely having a significant and adverse effect on his health-seeking behaviors and the reliability of his reports regarding his pain and his myriad of other symptoms. Indeed, individuals experiencing the disorders outlined above can have significantly distorted perceptions of their health experiences, including pain. This is not to say that Mr. Gage does not "believe" that what he is saying is true. Indeed, it is possible that he very much needs his pain and other symptoms to maintain meaning, purpose, relationships, and function in his life. Along with the lack of biological plausibility and the fact that his many complaints have been persistent and long antecedent to the placement of the IVC filter, his conclusion that the filter is causing his current pain seems improbable. This improbability is reinforced by the excellent review of Mr. Gage's pain syndromes by F. Michael Ferrante, MD, pain medicine specialist at UCLA. Indeed, the history and any one of the several possible diagnoses outlined above and in Dr. Ferrante's report, leads to the conclusion that it is medically far more probable that the IVC filter not only saved his life but that his current symptoms and disability are not related to the IVC filter.

In short, based on the information available, it is more likely than not that Mr. Gage's various medical conditions, particularly his chronic medical problems, repeated injuries and psychiatric disorders are the likely cause of his many aches, pains, discomfort and disability. Further, if properly diagnosed and treated, it is possible that there can be a considerable reduction in Mr. Gage's symptoms and, possibly, even his disability. But, there must be more clinical work completed in order to arrive at a specific diagnosis (or diagnoses) and, more importantly, to develop an appropriate treatment plan for Mr. Gage to improve his health, function and safety.


Bennett L. Leventhal, MD

Case 1:14-ml-02570-RLY-TAB   Document 5618-4   Filed 08/03/17   Page 12 of 14 PageID #: 13706

in re: 1:14-ML-2570-RLY-TAB MDL #2570        Page 11 of 13                                29 June 2017

**References**:

DSM5
American Psychiatric Association (2013), *Diagnostic and Statistical Manual of Mental Disorders (5th Edition)*. Washington, DC.

ICD
World Health Organization (2010), *ICD-10 Classification of Diseases, Functioning, and Disability*. Geneva.

## Appendix 1: MATERIALS RECEIVED
### 3 April 2017

A. Plaintiff's Complaint
B. Plaintiff (Updated) Fact Sheet
C. Plaintiff's Answers to Defendant's Interrogatories
D. Deposition Transcript and Videotape of Arthur Gage
E. Deposition Transcript of Dr. Goodwin
F. Deposition Transcript of Dr. Crisostomo
G. Portion of the produced records list below:
   1. Adventist Bolingbrook Hospital – Pathology 09-19-16 [ABH Path 001-004]
   2. Adventist Bolingbrook Hospital [Adventist000001-1211]
   3. Dr. Sushama Gundlapalli [Gundlapalli 000001-34]
   4. Dr. Timothy Larkin [Larking000001-66]
   5. Dr. Timothy Larkin [Larking000067-211]
   6. Edward Hospital [Edward000001-1368]
      Edward Hospital [Edward1369-2749]
      Edward Hospital [Edward2750-3527]
   7. Edward Hospital Imaging Reports [Edward Rad 001-018]
   8. Gastroenterology Service Ltd. [Gastreoenterology000001-000067]
   9. Loyola University Medical Center [Loyola000001-000526]
   10. Loyola University Medical Center [Loyola000527-001970]
       Loyola University Medical Center [Loyola001971-003420]
       Loyola University Medical Center [Loyola003421-004732]
       Loyola University Medical Center [Loyola004733-006150]
       Loyola University Medical Center [Loyola006151-006962]
   11. Midwest Heart [Midwest Heart000001-123]
   12. Osco Pharmacy [OscoPLT 000001-103]
   13. DuPage Medical Group [DPM – 000001-000063]
   14. Good Samaritan Hospital [GS – 000001-000280]
       Good Samaritan Hospital [GS – 000281-000878]
   15. Hinsdale Hospital [Hinsdale Hosp. 000001-000870]
       Hinsdale Hospital [Hinsdale Hosp. 000871-002082]
   16. Bolingbrook Family Medicine [Bolingbrook Family 000001-000047]
   17. St. Mary of Nazareth Hospital [St. Mary 000001-000057]
   18. Rush-Copley Hospital [Rush-Copley 000001-000102]

### 8 June 2017
1. Deposition of Carol James
2. Deposition of Orajean Daugherty
3. Deposition of Antonio Pangan, MD

### 23 June 2017
1. Report of F. Michael Ferrante, MD, date 21 June 2017

## APPENDIX 2:  Bennett L. Leventhal, MD *curriculum vitae*