# EXHIBIT I

Confidential - Subject to the Protective Order

```
 1            IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
 2                 INDIANAPOLIS DIVISION
 3

    ------------------------------ )
 4  In Re:  COOK MEDICAL, INC.,    )  Case No.
    IVC FILTERS MARKETING,         )  1:14-ml-2570-
 5  SALES PRACTICES AND            )  RLY-TAB
    PRODUCTS LIABILITY LITIGATION  )
 6  ------------------------------ )  MDL No. 2570
    This Document Relates To:      )
 7                                 )
        1:14-cv-01875-RLY-TAB      )
 8      Arthur Gage                )
    ------------------------------ )
 9
10      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
11      VIDEOTAPED DEPOSITION OF PAUL CRISOSTOMO, M.D.
12
13                    January 13, 2017
14
15          Loyola University Medical Center
                    Maywood, Illinois
16
17
18
19
20
21              GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph | 917.591.5672 fax
22                  deps@golkow.com
23
24
```

Golkow Technologies, Inc.                                     Page 1

Confidential - Subject to the Protective Order

1  correct?

2  A.  Yes.

3  Q.  Would you agree, Doctor, that with all
4  filters there is a known risk of tenting or pushing
5  the caval wall out?

6  A.  Yes.

7  Q.  That's really not a risk, is it?  It has
8  no clinical sequela?

9  A.  If -- if the filter is not deployed
10  straight, it would have more clinical sequelae than
11  if a filter was kinked or had outpouching of the
12  IVC.

13       You know, the ideal scenario is that the
14  filter has just enough apposition to the vena cava
15  that it doesn't move but if it creates a lot more
16  tension on the vena cava, I would theorize that it
17  would cause more problems and a higher risk of
18  perforation.

19  Q.  Okay.  The risks of vena cava filters,
20  is that something that you've ever studied?

21  A.  No.

22  Q.  Or researched?

23  A.  No.

24  Q.  Okay.  With respect to your knowledge of

Confidential - Subject to the Protective Order

1   the risks of all vena cava filters, is it fair to
2   say, Doctor, that penetration of the caval wall is
3   a known risk?
4       A.   Yes.
5       Q.   That perforation of the caval wall is a
6   known risk?
7       A.   Yes.
8       Q.   That perforation of an adjacent organ or
9   structure is a known risk?
10      A.   Yes.
11      Q.   Tilting of the filter either on
12  deployment or after it's deployed, that's a known
13  risk?
14      A.   Yes.
15      Q.   Migration or movement of the filter,
16  that is a known risk?
17      A.   Yes.
18      Q.   An inability to retrieve the filter is a
19  known risk?
20      A.   Yes.
21      Q.   Fracture of the filter is a known risk?
22      A.   Yes.
23      Q.   Bleeding either at the incision site or
24  after the filter is placed, that's a known risk?

Confidential - Subject to the Protective Order

```
1       A.      Yes.
2       Q.      Embedment of the filter or
3   endothelialization of the -- a portion of the
4   filter, either the legs or the top, that's a known
5   risk?
6       A.      Yes.
7       Q.      These are all known risks with any vena
8   cava filter, correct?
9       A.      Correct.
10      Q.      Not unique to the Tulip?
11      A.      Correct.
12      Q.      Not unique to the Celect?
13      A.      Correct.
14      Q.      These are known risks of all filters
15  that were well known in the medical community in
16  2010, correct?
17      A.      Correct.
18      MR. GALLAGHER:  Object to form.
19  BY MS. PIERSON:
20      Q.      Doctor, do you have the ability to
21  choose filters other than Cook Celect and Cook
22  Tulip?
23      A.      Yes.
24      Q.      In your practice do you choose filters
```

Confidential - Subject to the Protective Order

```
1    other than the Cook Celect and Cook Tulip?
2         A.    No, I haven't.
3         Q.    Do you believe that the Cook Celect and
4    Cook Tulip filters are the best filters to treat
5    your patients who require a vena cava filter?
6         A.    I don't know if they're the best, but
7    they do the right job.
8         Q.    In other words, whether -- whether one
9    filter in a clinical study performs better than
10   another filter, that's not something you've looked
11   at?
12        A.    Correct.
13        Q.    You feel confident, though, that the
14   Cook Celect and the Cook Tulip filters are in fact
15   safe and effective ways and at least among the best
16   to treat your patients?
17        A.    Yes.
18        Q.    Okay.  Back on the known risks for a
19   second, there were a few I omitted.
20              Would you agree that a hematoma at the
21   vascular site is a known risk?
22        A.    Yes.
23        Q.    Acute damage to the IVC wall is a known
24   risk?
```

Confidential - Subject to the Protective Order

```
 1      A.    Yes.
 2      Q.    Thrombosis or stenosis is a known risk?
 3      A.    Yes.
 4      Q.    Even death is a known risk, correct?
 5      A.    Yes.
 6      Q.    Again, these risks are all risks that
 7   are common to all vena cava filters?
 8      A.    Yes.
 9      Q.    And they were well known in the medical
10   community in 2010, correct?
11      A.    Yes.
12      Q.    Doctor, when you place a vena cava
13   filter in your patients, do you guarantee any
14   result?
15      A.    No.
16      Q.    Why not?
17      A.    Because the unexpected always happens.
18      Q.    Medicine is not an exact science, is it?
19      A.    Correct.
20      Q.    There are things that can happen during
21   the placement of a vena cava filter that can cause
22   it to fall within the category of these known
23   risks, correct?
24      A.    Yes.
```

Confidential - Subject to the Protective Order

```
 1   he last treated with you I understand in October of
 2   2016.  Is that correct?
 3        A.   That sounds correct, yes.
 4        Q.   By my count you saw him about 12 times.
 5   Does that sound right?
 6        A.   That sounds probably right.
 7        Q.   In the course of treating Mr. Gage, you
 8   did not go back and review his medical records from
 9   other folks who treated him, correct?
10        A.   Correct.
11        Q.   Mr. Gallagher asked you about a 2012
12   x-ray that you looked at on his first visit.  But
13   other than that, were there any records from his
14   care and treatment before that you reviewed?
15        A.   Not that I recall, no.
16        Q.   And since you began treating Mr. Gage,
17   at any time have you been supplied with the medical
18   records of the other physicians who have treated
19   him?
20        A.   No.
21        Q.   So, to the extent that he's seen another
22   vascular surgeon named Dr. Larkin, to the extent
23   that he's been treated by Dr. Goodwin, an
24   interventional cardiologist, or other medical
```

Confidential - Subject to the Protective Order

```
1    providers, you haven't seen any of their records?
2         A.    No.
3         Q.    Correct?
4         A.    No.
5         Q.    Okay.
6         A.    Correct.
7         Q.    Doctor, you're not a spinal surgeon?
8         A.    No.
9         Q.    Or a gastroenterologist?
10        A.    No.
11        Q.    Is it fair to say that because you've
12   neither looked at Mr. Gage's records related to his
13   back condition or looked at the records related to
14   his abdominal conditions, that you have no opinions
15   about the causes of those conditions?
16        A.    Correct.  I -- yes, I don't know -- yes.
17        Q.    Is the only information that you had
18   about Mr. Gage's back conditions and his abdominal
19   conditions, did that come from what Mr. Gage told
20   you?
21        A.    Yes.  A lot of it did, yes.  As well as
22   whatever I could glean from the chart.
23        Q.    And when you say what you could glean
24   from the chart, you mean what you brought with you
```

Confidential - Subject to the Protective Order

```
1    here today?
2         A.    Yes.
3         Q.    What we marked as Exhibit 7?
4         A.    Yes, or 8 or -- yes.
5         Q.    Okay.  Doctor, I'll -- I will represent
6    to you and can show you, Mr. Gage has a very long
7    history of back problems, abdominal problems,
8    cancers and other conditions.  Are you familiar
9    with any of those conditions?
10        A.    Not the exact nature, no.
11        Q.    Have you done anything to investigate
12   whether any of his unrelated medical conditions
13   could be causing him back pain?
14        A.    I got the CAT scan of the abdomen and
15   pelvis which demonstrates -- it looks at the bony
16   alignment of the back.  It looks at the other
17   abdominal pelvic structures.  So, in brief, it
18   would look at other obvious causes.
19              But as for subtle causes of back pain or
20   abdominal pain that perhaps a specialist may
21   identify, I'm not a specialist in those other
22   things.  But I look for other gross, obvious
23   causes, and I didn't see any other obvious, gross
24   causes.
```

Confidential - Subject to the Protective Order

| | |
|---|---|
| 1 | Q.     Would you agree, Doctor, that whether |
| 2 | Mr. Gage's spinal conditions or his history of |
| 3 | cancer or other conditions are causing his back |
| 4 | pain, that's not an opinion you've reached in the |
| 5 | course of treating him? |
| 6 | A.     Yes, correct. |
| 7 | Q.     And whether his complaints of right |
| 8 | flank pain, whether those are actually caused by |
| 9 | his abdominal conditions, his history of cancer, |
| 10 | his many other unrelated medical conditions, |
| 11 | whether those things are causing his abdominal pain |
| 12 | or not, you have no opinion on that either, |
| 13 | correct? |
| 14 | A.     Correct. |
| 15 | Q.     Okay.  Would you agree with me that |
| 16 | without having the opportunity to review all of |
| 17 | Mr. Gage's medical records and the opportunity to |
| 18 | consult with a specialist in those fields who have |
| 19 | treated him, it's not possible to determine whether |
| 20 | his complaints of back pain are caused by his |
| 21 | filter or something else? |
| 22 | A.     I wouldn't say not possible.  But I |
| 23 | would say if I consulted with other specialists, I |
| 24 | would certainly have a better opinion or a better |

Confidential - Subject to the Protective Order

```
 1   assessment of the contribution of or the
 2   elicitation of his pain.
 3        Q.   Okay.  Would you agree that the person
 4   in the best position to assess the source of
 5   Mr. Gage's pain would be a physician or an expert
 6   who has access to all of his medical records?
 7        MR. GALLAGHER:  Object; form.
 8   BY THE WITNESS:
 9        A.   Yes.
10   BY MS. PIERSON:
11        Q.   And same thing for his complaint of
12   right flank pain or abdominal pain.  Would the
13   person who is in the best position to assess the
14   source of that pain be someone, a physician or an
15   expert, who has access to all of Mr. Gage's medical
16   records?
17        A.   Yes.
18        MR. GALLAGHER:  Object; form.
19   BY MS. PIERSON:
20        Q.   You'd defer to that kind of an expert,
21   wouldn't you?
22        A.   Yes.
23        MR. GALLAGHER:  Object.
24   BY MS. PIERSON:
```