**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to the Following Actions only:

    Elizabeth Jane Hill
    No. 1:14-cv-06016-RLY-TAB

    Arthur Gage
    No. 1:13-cv-01875-RLY-TAB

**COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
TO EXCLUDE EXPERT OPINIONS OF DR. MOHAMMAD RAJEBI**

The plaintiffs offer Dr. Mohammad Rajebi as an expert witness for the sole purpose of interpreting certain venogram images related to patients in the "Lyon study."[1] The images Dr. Rajebi seeks to interpret come from 58 patients in a clinical study who received a Celect vena cava filter, underwent a retrieval procedure, and for whom a removal venogram was available for his review. All received the Cook Celect vena cava filter, and according to the Lyon study, none experienced perforations to their inferior vena cava. Dr. Rajebi disagrees with this finding and asserts that 46 of the 58 patients experienced perforations.

Dr. Rajebi's opinions should be excluded for three reasons. *First*, he is not qualified to testify in this case. He repeatedly lied under oath about his employment status. He has little

---

[1] Lyon, et al., *Short- and Long-term Retrievability of the Celect Vena Cava Filter: Results from a Multi-institutional Registry*, JVIR 2009, 20:1441.

experience as a practicing physician. He lacks a certificate in interventional radiology. And he has no publications or presentations about IVC filters to his name.

*Second*, Dr. Rajebi's testimony is unreliable. His theory fails all five core *Daubert* factors. It has not been tested. It has not been subjected to peer review or publication. It has no known error rate. It does not follow any professional standards. And it is not generally accepted in the relevant scientific community; it is purely subjective personal opinion.

*Third*, Dr. Rajebi's testimony would not be helpful to the jury. It would not be helpful to the jury in the *Gage* case because Mr. Gage did not receive a Celect filter; he received a Tulip filter. None of the images Dr. Rajebi reviewed were images of patients who received a Tulip filter. Dr. Rajebi's testimony also would not be helpful to the jury in the *Hill* case because Ms. Hill's doctor testified that he was independently aware of the risks associated with Celect filters (including perforation) and chose to prescribe the filter anyway. This makes the Lyon study, and therefore Dr. Rajebi's testimony about the Lyon study, irrelevant.

Cook therefore respectfully asks the Court to exclude Dr. Rajebi's testimony in these cases.

## SUMMARY OF DR. RAJEBI'S OPINIONS

Dr. Mohammad Rajebi alleges that he is a full-time, practicing interventional radiologist. Ex. A, Rajebi Dep. 98:25-99:2; 148:23-149:3. Plaintiffs' counsel initially designated him to testify on all of the same issues addressed by Dr. Marmureanu—the plaintiffs' key medical causation expert. However, in the days leading up to Dr. Rajebi's deposition, the plaintiffs withdrew all of his opinions except one: his opinion that venograms from patients in the Lyon study show vena cava perforations.[2] *Id*. at 5:18-6:8; 9:18-10:13; 268:16-271:06; 278:23-279:03;

---

[2] The venogram images Dr. Rajebi seeks to interpret came from a clinical study conducted between 2005 and 2009 at clinical sites in Germany, Mexico, Australia, Spain, Ireland, and the

Ex. D, Email (exhibit 1 to Rajebi Dep.). Dr. Rajebi purports to interpret the venograms of 58 of the patients in the study who were implanted with the Cook Celect filter and underwent retrieval procedures. Though the Lyon study notes that no physician clinical investigators reported a "perforation," 21 "penetrations" were reported. Ex. E, Lyon Study (exhibit 17 to Rajebi Dep.) p. 1445.

Dr. Rajebi's sole proffered opinion is contained in a single paragraph of his report:

> I have had the opportunity to review the venograms for OUS study Registry 8 subjects that were provided to plaintiffs through discovery. For purposes of my review, I applied the definition of a "perforation" used in the published Lyon study: a "strut protruding out of the IVC wall." Using that definition, it is my opinion that out of the 58 patients who underwent removal and for whom a removal venograms was available for my review 46 confirmed the filter had perforated the vena cava. A chart summarizing my findings is attached as Exhibit C and incorporated by reference as if set forth in full.

Ex. F, Rajebi Report pp. 41-42 (footnotes omitted). *See also* Ex. A, Rajebi Dep. 301:06-304:05; 319:18-320:04 (noting the limited nature of the opinions captured by Exhibit C to Dr. Rajebi's report).

The Lyon study did not include individuals who had been implanted with the Tulip filter. It included only individuals who had received the Celect filter. *See generally* Ex. E, Lyon Study. Plaintiff Hill received a Celect filter. Plaintiff Gage did not; he received a Tulip filter. *Id*. at addend. B, p. 1 (second paragraph).

---

United Kingdom. The study protocol is titled *Prospective Study of the Cook Filter, Including Permanent and Retrievable Use*, Ex. B (exhibit 18 to Rajebi Dep.), and the final report is called *Final Report September 2009: Prospective Study of the Cook Celect Filter, Including Permanent and Retrievable Use*, Ex. C (exhibit 19 to Rajebi Dep.). However, Dr. Rajebi's current focus is not on the actual clinical study, the Study Protocol, or the results included in the Final Report. Instead, he alleges that when he applies a definition of "perforation," which he asserts can be found in Lyon, et al., *Short- and Long-term Retrievability of the Celect Vena Cava Filter: Results from a Multi-institutional Registry*, JVIR 2009, 20:1441, 1445, there were (in his view) 46 undocumented perforations. Ex. F, Rajebi Report pp. 41-42 & n.100. Cook disagrees with Dr. Rajebi's interpretation of the published Lyon study.

**ARGUMENT**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's decision *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the cases that follow it. Under this framework, there is essentially a three-step inquiry: (1) the expert must be qualified by knowledge, skill, experience, training, or education; (2) the expert's testimony must be based on sufficient facts or data, as well as reliable principles and methods, and the expert must have reliably applied those principles and methods to the facts of the case; and (3) the proposed expert testimony must assist the trier of fact to understand the evidence or determine a fact at issue in the case. *See* FED. R. EVID. 702; *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The proponent of the expert testimony has the burden of establishing admissibility by a preponderance of the evidence. *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Dr. Rajebi's testimony fails at all three steps.

**I.   Dr. Rajebi Is Unqualified to Offer His Proposed Testimony.**

"A district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks." *Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 901 (7th Cir. 1994). That is to say the expert has to be "qualified," whether "by knowledge, skill, experience, training, or education." FED. R. EVID. 702. Dr. Rajebi is not qualified to testify in this case.

Dr. Rajebi lied under oath about his employment status in an effort to qualify himself as an expert witness. At his deposition on May 18, 2017, Dr. Rajebi repeatedly claimed that he was currently employed by the University of Colorado, both as a professor and clinician in interventional radiology. Ex. A, Rajebi Dep. 99:12-100:13; 148:23-149:18. That was untrue. Dr. Rajebi has not been employed by the University since at least March 23, 2017. Ex. G, Certification of Public Record (received as part of a public records request).

Dr. Rajebi provided his curriculum vitae in advance of his May 18, 2017, deposition, listing:

**PRESENT POSITION:**

**Assistant Professor** – Interventional Radiology, Department of Radiology, University of Colorado, Denver, CO

Ex. F, Rajebi Report, ex. A, CV p. 1. When asked about the accuracy of that statement—specifically, his present employment at the time of deposition—he affirmed its accuracy. Ex. A, Rajebi Dep. 99:3-25. When counsel inquired further, he confirmed *three times* his continuous employment at the University at the time of the deposition. *Id*. at 100:4-13 (Q. "How long have you held the title of assistant professor?" A. "Two -- almost two years. I mean, I started in August [of 2015]." Q. "Thank you. And have you been continuously employed as an assistant professor since that time?" A. "Yes."); 148:10-15 (Q. "Okay. I think you told me this earlier, but you have continuously had the title of assistant professor at the University of Colorado." A. "Correct."); 149:9-16 (Q. "Okay. So let me ask this one more time, Doctor. Have you been employed continuously in the title of assistant professor at the University of Colorado . . . since August of 2015?" A. "Yes."). Indeed, Dr. Rajebi went into great detail describing his present employment at the University. *See*, *e.g.*, *id*. at 149:17-152:9; 157:6-12. Dr. Rajebi went so far as to confirm that were he not being deposed at that exact moment, he would be working at the University. *Id*. at 149:24-150:15.

Why Dr. Rajebi chose to lie under oath about his employment status is unclear. Perhaps it was to pad his thin qualifications. He finished his fellowship training in 2014 and has been in practice as a radiologist only since that time. Ex. F, Rajebi Report, ex. A, CV (Education) p. 3; Ex. A, Rajebi Dep. 89:05-14. As a result, he has yet to receive a certification in interventional radiology. *Id*. at 86:20-87:02. What's more, he has no publications to his name on IVC filters.

5

*Id.* at 132:04-10; 162:12-17; 173:02-05.  And he has given no presentations on IVC filters.  *Id.* at 163:02-165:09.  Nor has he ever served as a principal investigator in a clinical study like the Lyon study; indeed, he has never so much as participated in such a clinical study.  *Id.* at 293:18-20; 324:2-22.  In addition to lacking the certification held by most interventional radiologists, Dr. Rajebi is not fellowship-trained in diagnostic radiology—the discipline solely focused on reviewing and interpreting patient imaging.  *Id.* at 110:11-112:25.[3]

Dr. Rajebi's lack of candor about his employment status coupled with his thin qualifications disqualifies him from testifying as an expert witness.

## II.  Dr. Rajebi's Opinions Are Unreliable Under All of the Core *Daubert* Factors.

"If the proffered expert testimony is not based on independent research"—and here Dr. Rajebi's proffered testimony is not; it's based only on his own visual observations of images from someone else's study—"the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'"  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317–18 (9th Cir. 1995) (on remand from the Supreme Court).  *Daubert* sets forth a non-exclusive checklist for district courts to use in assessing the reliability of scientific expert testimony.  FED. R. EVID. 702, Advisory Committee's Note (2000 amends.).  That checklist includes: "(1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or

---

[3] He alleges only interventional radiologists can review and interpret venograms taken during a procedure.  Ex. A, Rajebi Dep. 110:16-111:4.

theory has been generally accepted in the scientific community." *Id*. Dr. Rajebi's testimony satisfies none of these core *Daubert* factors.

### A. Dr. Rajebi's technique and theory can be tested but it hasn't been.

"At the outset, it is important to note that the record supports the . . . conclusion that the witness did not conduct any studies or analysis to substantiate his opinion." *Deimer v. Cincinnati Sub-Zero Prod., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995) (excluding expert testimony based on personal observation). Dr. Rajebi acknowledged at his deposition that quality-control testing is done "all the time" in his job because it is "something that's needed":

> Q. So my question again: Has anybody ever hired you or -- or engaged you and asked you to conduct a study where you're testing the accuracy of your review of images?
> A. *We do it all the time in my job.* That's our -- that's how we evaluate each other. There's a concept of evaluating each radiologist. So if I look at the -- if I look at some images which had previous certain images, there's a box that comes up and says, If the previous report was accurate, in your opinion. And I have multiple degrees of accuracy. I say A, B, C, and that's how we evaluate each other. *Yeah, that's something that's needed.*

Ex. A, Rajebi Dep. 291:07-20 (emphasis added).

Needed to be sure—but not done, at least in this case:

> Q. In the work that you've done in this case, did you share the images that you reviewed about the OUS study with anyone else?
> A No.
> Q. Did you seek the input of any other people on how to interpret those images or what the images show?
> A. No.

*Id.* at 175:12-19. Dr. Rajebi does not think he personally needs others to review his work, even though in his former employment it was required as a matter of course:

> Q. Are there any thought leaders in the field of interventional radiology that you would defer to?
> A. In the same setting? Of filters?
> Q. Yes.
> A. No.

7

> Q. And in the setting of interpreting imaging as it relates to the vena cava. Are there any thought leaders in the field who you would defer to their opinions on the interpretation of imaging related to the vena cava?
> A. No. I would -- I would interpret my -- that -- I don't feel the need to do that. I will interpret my own images.

*Id*. at 70:01-13.

Despite Dr. Rajebi's confidence, as his own description of the quality control required by his profession requires, his technique for reviewing the Lyon images and the accuracy of his interpretations should have been verified in some respect. Indeed, every other medical witness in the *Hill* and *Gage* cases agree that diagnosing perforation by venogram—regardless of how perforation is defined—is difficult and subject to multiple interpretations because one cannot visualize the caval wall on a venogram. Yet, Dr. Rajebi had no standards for reviewing the images, no study protocol, no documentation of his review of any image, and no notes or measurements. There is no way to verify or test his methodology or opinions in any respect, because they are only that—unsubstantiated opinions. In not subjecting his review methodology or opinions to testing or quality control, Dr. Rajebi—as judged against his own testimony—failed to "be[] as careful as he would be [or at least, should be] in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc*., 104 F.3d 940, 942 (7th Cir. 1997). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (*Daubert* requires the district court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). This is just one indication among many that his testimony is not reliable.

### B. Dr. Rajebi failed to subject his analysis to the scrutiny of peer review and publication.

"[S]ubmission [of expert opinion] to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in

8

methodology will be detected." *Daubert*, 509 U.S. at 593. But, as suggested by the testimony just quoted, Dr. Rajebi did not subject his analysis in this case to the review of his peers:

> Q. Was any peer review process applied to your analysis of the images in the Lyon's study?
> A. No.

Ex. A, Rajebi Dep 291:24-292:01.

> Q. Other than the work that you've done in this litigation, have you published your opinion that the images in the Lyon's study show perforation anywhere?
> A. No. These are all confidential. Why would I --
> Q. Have you told anybody other than the lawyers that's your opinion --
> A. No.

*Id.* at 325:08-16. Likewise, he has not published on IVC filters—much less his methodology for reaching any related conclusions about imaging showing perforations by IVC filters. *See id*. at 132:04-10; 162:12-17; 173:02-05. Confidential or not, Dr. Rajebi could have made clear to the lawyers who hired him that radiologists making diagnoses from images employ peer review mechanisms all the time and, in his view, "need" their peers to review their work. *See id*. at 291:11-20. He apparently did not do that. This, too, draws into question the validity of his opinions.

### C. Dr. Rajebi's mode of analysis has an unknown error rate.

Dr. Rajebi presented no evidence about the reliability of his methodology. He apparently does not even know what the error rate is:

> Q. Do you know the error rate, if any, for your methodology of looking at the images and diagnosing perforation?
> A. No.
> Q. Have you done anything to try to determine if there's a rate of error for that?
> A. I -- I'm not -- no, I haven't done anything.

9

Ex. A, Rajebi Dep. 290:13-20. The lack of a known error rate is yet another indication that Dr. Rajebi's testimony is unreliable. *See*, *e.g.*, *J & V Dev., Inc. v. Athens-Clarke Cty.*, 387 F. Supp. 2d 1214, 1225 (M.D. Ga. 2005) (excluding expert testimony where the expert "offered no testimony about the error rate for his methodology"); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 465 (W.D. Pa. 2003) (excluding expert testimony where the plaintiff "ha[d] not shown an acceptable error rate (or any error rate) for th[e expert's] methodology").

> **D. Dr. Rajebi's opinions show no regard for existing professional standards and controls.**

There are standardized definitions for what it means for a filter to perforate the inferior vena cava. This includes a standard established by the Society for Interventional Radiologists ("SIR"), an organization that is an "authority" (Dr. Rajebi's word, Ex. A, Rajebi Dep. 356:14-18) on the subject:

> Q. The 3 millimeter standard. That comes from the Society for Interventional Radiologists, correct?
> A. Sure.

*Id*. at 235:08-11. Dr. Rajebi does not follow the SIR standard, however:

> Q. It sounds as though you do not follow that guideline in your clinical practice –
> A. No.

*Id*. at 235:12-14. He says "[n]obody uses it, so it's not important." *Id*. at 235:21-24. But he has cited no objective evidence to support his belief that the SIR's standard is incorrect.

There are other definitions of perforation promulgated by standard-setting organizations, but Dr. Rajebi was unaware of them at the time of his deposition:

> Q. Did [your methodology] include evaluating the definitions of perforation for all of the professional governing bodies, like, for example, standard-setting organizations?
>     [Plaintiffs' counsel]: Object to form.
> A. I -- I think you should provide me with those.
> Q. (By [Cook's counsel]) Sure.

10

>A. And if you want, we can continue. Because there might be some society out there using the same definition. How do I know?
>Q. Yeah. It wasn't part of your work to figure that out. That's my point.
>A. No, I just went to SIR guidelines because SIR is the authority who would decide -- at least gives you a guideline. I'm not aware of any other society that has that guidelines, unless you provide me with that.

*Id*. at 356:01-18. *See also id*. at 357:09-358:01 (testifying to a lack of familiarity with an ISO standard).

So there are standards and controls. Dr. Rajebi just thinks they do not apply to his work in this case.

### E. Dr. Rajebi's theory has not been generally accepted in the scientific community.

"Widespread acceptance [of a particular expert's theory] can be an important factor in ruling particular evidence admissible, and a known technique that has been able to attract only minimal support within the community, may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (internal quotations marks and citation omitted). Dr. Rajebi says: "I have my own definition of perforation." Ex. A, Rajebi Dep. 298:17. He considers "[a]ny gap" between the column of contrast on a venogram (which shows the blood flow through the inferior vena cava) and a filter strut "that's visible to my eyes" as proof there has been a perforation. *Id*. at 281:3-17; *see also id*. at 227:21-28:23. He claims that whether there has been a perforation is "[s]cientifically . . . very simple." *Id*. at 298:16-22. "It's an easy determination," Dr. Rajebi testified, "to see if the strut is out or not."[4] *Id*. at 315:11-21.

---

[4] Dr. Rajebi's report suggests that he applied a definition of perforation from the Lyon study, which he says is a "'strut protruding out of the IVC wall.'" Ex. F, Rajebi Report p. 41. However, the OUS Study Protocol defines perforation as "[p]rotrusion of filter struts through the wall of the IVC causing hemorrhage or hematoma," Ex. B p. 25, as does the Final Report, which incorporates the OUS Study Protocol, Ex. C, app'x C.

11

The Food and Drug Administration is less self-assured; according to the FDA, "[d]etermination of caval penetration is complicated." Ex. H, FDA Guidance p. 8 (exhibit 21 to Rajebi Dep.). This is why, as Dr. Rajebi testified, there is no "universally accepted" definition of perforation. Ex. A, Rajebi Dep. 297:9-14; *see also id.* at 322:5-13. Which to him "means that[] probably none of the[ definitions] are accurate . . . ." *Id.* at 234:5-8. So he did not bother to conduct a systematic review of the scientific literature on the subject. *Id.* at 296:11-15.

"[A]ny theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect. By the same token, if the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable. Accordingly, courts have excluded expert testimony where the expert selectively chose his support from the scientific landscape." *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 & n.164 (S.D.N.Y. 2005) (internal quotation marks and citation omitted) (citing cases).

The Court should do the same here. Dr. Rajebi's opinion is not scientific opinion. It is subjective personal opinion—*ipsi dixit*, in other words. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." FED. R. EVID. 702, Advisory Committee's Note (2000 amends.) (citing *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994) (expert testimony based on a completely subjective methodology held properly excluded). Dr. Rajebi "presented no proof that his theory is generally accepted in the scientific community." *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002). And he relied on a definition of perforation that other experts in his field would not rely on. "Unsubstantiated testimony, such as

12

this, does not ensure that 'the expert's opinion has a reliable basis in knowledge and experience of his discipline.'" *Id*. (quoting *Deimer,* 58 F.3d at 345). His testimony therefore ought to be excluded for this reason, as well. *See*, *e.g.*, *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 604-05 (S.D.W. Va. 2013) ("Dr. Zolnoun's first general causation opinion is therefore based on nothing more than her personal, unscientific observation and opinion that 'it's obvious' that mesh arms are sharp and can serrate or tear nerves. This is the type of 'subjective, conclusory approach that cannot reasonably be assessed for reliability' and that Rule 702 is designed to exclude." (quoting FED. R. EVID. 702, Advisory Committee's Note (2000 amends.))).

\* \* \* \* \*

The plaintiffs cannot establish, as is their burden, that Dr. Rajebi's methodology is reliable based on any of the five core *Daubert* factors. It has not been tested. It has not been subjected to the scrutiny of peer review and publication. There is no known error rate. It does not track professional standards. And it is not generally accepted in the relevant scientific community. This is not the kind of expert testimony that can be trusted.

### III. Dr. Rajebi's Opinions Would Not Help the Jury.

An expert has to be able to "help the trier of fact to understand the evidence or to determine a fact in issue . . . ." FED. R. EVID. 702(a). This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotations marks and citation omitted). The proffered testimony must be "sufficiently tied to the facts of the case" such that it will actually aid the jury *Id*. (same). This is *Daubert*'s requirement of "fit." *Id*.

Dr. Rajebi's testimony fails the fit requirement as to both the Gage and Hill cases, but for different reasons. As to the Gage case, Dr. Rajabi's testimony is about a study relating to a filter

13

Mr. Gage did not receive. And as to the Hill case, Dr. Rajebi's testimony cannot be used for a proper purpose, namely, to establish Cook gave an inadequate warning.

### A. Dr. Rajebi's testimony would not be helpful to the jury in *Gage* because his testimony relates to a study about a filter that Mr. Gage did not receive.

The Lyon study is a study of individuals who received the Celect filter. Ex. E, Lyon Study p. 1441. Mr. Gage did not receive the Celect filter. He received a different filter—the Tulip filter. Dr. Rajebi's testimony therefore is of necessity not "sufficiently tied to the facts of the [Gage] case." "Clearly, expert testimony does not 'help' if it is unrelated to facts at issue . . . ." 29 Victor James Gold, FEDERAL PRACTICE & PROCEDURE (Wright & Miller) § 6265.2 (2d ed. Westlaw ver.) (footnotes omitted). Dr. Rajebi's testimony therefore should be excluded from evidence in the Gage case for this reason alone.

### B. Dr. Rajebi's testimony would not be helpful to the jury in *Hill* because it cannot be used for a proper purpose.

There is only one arguably proper reason why plaintiffs' counsel might want to use Dr. Rajebi's testimony in *Hill*: to attempt to show Cook failed to properly warn about the potential risk of perforation associated with the Celect filter. Dr. Rajebi's opinions do not "fit" that legal question for multiple reasons, however.

*First*, the Lyon study to which Dr. Rajebi points is not included in the Celect's Instructions for Use. Ex. I, IFU. The IFU does not cite Lyon, et al., *Short- and Long-term Retrievability of the Celect Vena Cava Filter: Results from a Multi-institutional Registry*, JVIR 2009, 20:1441, which was published in 2009—*two years after the Celect's IFU was drafted, reviewed, and cleared by FDA*. The IFU does include a discussion of the data and images from the OUS Study and its 74-patient cohort, including 43 patients with attempted retrieval techniques, and the OUS Study Protocol's definition of perforation. *See*, *supra*, at n.4.

14

However, Dr. Rajebi's testimony regarding the Lyon study or his application of a definition of perforation alleged derived from the Lyon study does not "fit."

*Second*, even were the plaintiffs to suggest that the Celect IFU somehow misrepresents the images Dr. Rajebi seeks to interpret, that testimony also would not assist the jury and lacks "fit." Ms. Hill's physician neither read nor relied upon the Celect IFU. Dr. Mark Zuzga was Ms. Hill's implanting surgeon and the physician who prescribed the Celect for her. Dr. Zuzga testified that he did not rely on the IFU in making his selection:

> Q. You were asked in your first deposition about a document called an IFU, or Instructions for Use. Do you remember that?
> A. Yes.
> Q. And your testimony in your first deposition was that you didn't read the IFU for the Celect filter; correct?
> A. Correct.
>
> * * *
>
> Q. When counsel asked at the last deposition about the Celect instructions for use and you said that you did not review it, is it safe to say that because you hadn't reviewed it, you didn't rely on it at the time of Mrs. Hill's filter placement?
> A. Correct.
> Q. And that you didn't rely on Cook's communication in the IFU to form an opinion as to the risks associated with the Celect filter?
> A. Correct.
> Q. You did not rely on anything that Cook communicated to you in selecting the filter appropriate for Mrs. Hill?
> A. Correct.

Ex. J, Zuzga Dep. 141:7-14, 144:15-145:3.

Dr. Zuzga did not need to read the IFU to know that there were risks associated with implanting the Celect filter—including a risk of perforation:

> Q. [Plaintiffs' counsel] asked you some questions last time we were together about whether based on some language in the Celect IFU, whether a physician would be led to believe that there were never any adverse events with the Celect filter. Do you remember those questions?
>    [Plaintiffs' counsel]: Form.

15

> THE WITNESS: Vaguely, yes.
> BY [Defense counsel]:
> Q. Okay. Even after having been shown that by [Plaintiffs' counsel], would you ever believe that there were no adverse events associated with the Cook Celect filter?
> A. No.
> Q. Has anyone ever told you that?
> A. No.

*Id.* at 177:3-17.

> Q. [Plaintiffs' counsel] asked you several questions about risks that you -- did you tell Mrs. Hill this, did you tell Mrs. Hill that. The fact of the matter is, is there any risk that you've heard about today that you did not know in November of 2010?
> A. No.
> Q. Okay. In November of 2010, you knew about the risks that [Plaintiffs' counsel] described about organ perforation, a narrowed or stenosed vena cava, those were all well known to you?
> A. Correct.
> Q. And when Mr. Johnson asked you, you had no expectation that Mrs. Hill's perforation -- or excuse me, you had no expectation that Mrs. Hill's filter would perforate her duodenum following your retrieval attempt, it's accurate to say that you had no expectation, but you always knew it was a risk?
> A. Correct.

*Id.* at 224:21-225:13. *See also id.* at 113:8-114:8 (testifying that the risk of perforation was well known); *id.* at 142:15-143:5 (noting he understood the risk of perforation included the specific risk that the filter could perforate the small intestine); *id.* at 129:1-130:4, 133:13-18, 137:12-14 (noting Ms. Hill was specifically warned of the risk of perforation). And of course Dr. Zuzga prescribed the Celect anyway.

Even today he would prescribe the Celect:

> Q. Is there anything that you learned following her retrieval attempt in March of 2011, that caused you say, Hey, I need to bring Mrs. Hill back and do something different with her?
> A. No.
>     [Plaintiffs' counsel]: Form.
> BY [Defense counsel]:

16

> Q. Is there anything that you learned after March of 2011, even up to today, that would cause you to change the way that you treated Mrs. Hill following March of 2011?
>     [Plaintiffs' counsel]: Form.
>     THE WITNESS: No.
> BY [Defense counsel]:
> Q. Dr. Zuzga, do you continue today to use Cook products?
> A. Yes.
> Q. After you leave this deposition, will you continue to prescribe and use Cook products in your patients?
>     [Plaintiffs' counsel]: Form.
>     THE WITNESS: Yes.

*Id*. at 181:16-182:5.  *See also id*. at 76:3-77:2 (similar).  He would have prescribed the same course of treatment all over again:

> Q. One last question. Dr. Zuzga, we talked in great detail about all of the risks associated with the Celect filter and with other filters. We talked about all the risks known to you, perforation, organ perforation, stenosis and other things. In your opinion, are all of those risks outweighed by the risk of death from a pulmonary embolism?
> A. Yes.
> Q. In Mrs. Hill's specific case, even knowing the exact complications that she experienced and that her lawyers claim, is it your opinion, still, that the risk of death from PE before her 10- to 12-hour spinal surgery, that that risk outweighs the risk of all the complications that she experienced?
> A. Yes.

*Id*. at 226:1-15.

    Therefore, even assuming Dr. Rajebi's interpretation of the imaging is right and the plaintiffs' claim of misrepresentation in the Lyon study is correct, it would make no difference. Dr. Zuzga was already aware of the risk of perforation.  And he prescribed the Celect anyway. Dr. Rajebi's testimony therefore would serve no useful purpose, and it would not be helpful to the jury in either *Gage* or *Hill*.

## CONCLUSION

The Court should exclude the testimony of Dr. Mohammad Rajebi from evidence in these cases.

Respectfully submitted,

Dated: August 9, 2017
*/s/ John T. Schlafer*
Andrea Roberts Pierson (# 18435-49)
J. Joseph Tanner (#11856-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
Email:  andrea.pierson@faegrebd.com
Email:   joe.tanner@faegrebd.com
Email:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
Email:  stephen.bennett@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2017, a copy of the foregoing **COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF DR. MOHAMMAD RAJEBI** was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.  Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

*/s/ John T. Schlafer*

US.111236933.07