# EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1          UNITED STATES DISTRICT COURT

           SOUTHERN DISTRICT OF INDIANA

2              INDIANAPOLIS DIVISION

3  IN RE: COOK MEDICAL, INC.,

   IVC FILTERS MARKETING,

4  SALES PRACTICES AND PRODUCT

   LIABILITY LITIGATION      Case No. 1:14-ml-2570-RLY-TAB

5  _____  MDL No. 2570

6  This Document Relates to ALL ACTIONS

7  *********************************************************

8           VIDEOTAPED/ORAL DEPOSITION OF

9              LEIGH ANNE LEVY, RN

10                  VOLUME 1

11               MAY 4TH, 2017

12  *********************************************************

13     VIDEOTAPED/ORAL DEPOSITION of LEIGH ANNE LEVY, RN,

14  produced as a witness at the instance of the Defendant,

15  and duly sworn, was taken in the above-styled and

16  numbered cause on the 4th of May, 2017, from 10:34 a.m.

17  to 7:25 p.m., before Stephanie McClure Lopez, CSR, in

18  and for the State of Texas, reported by machine

19  shorthand, at the Courtyard by Marriott, 2700 Hoppe

20  Trail, Round Rock, Texas, pursuant to the Texas Rules

21  of Civil Procedure and the provisions stated on the

22  record or attached hereto.

23

24      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 36

1    A.   Yes, 'for the members there is.

2    Q.   Okay.  Anything else?

3    A.   I'm sorry.  Anything else what?

4    Q.   The question was:  What literature you read as

5    part of your profession.

6    A.   I read extensively --

7    Q.   Okay.

8    A.   -- all the time.  It's not one specific

9    journal.  It's continuing education around whichever I

10   may have a question about or something that I want to

11   learn about.  So, there's an entire body of literature

12   out there.  I read all the time.

13   Q.   Okay.  You've cited some literature in your

14   reports, Ms. Levy.  Would you agree that the literature

15   that you have cited are authoritative resources in the

16   field of life care planning?

17   A.   I wouldn't say that.  I think we use the term

18   authoritative in a different context.  The body of

19   literature that we cite is just to orient the reader to

20   the -- to the field of life care planning or to the

21   disability that we're talking about.

22   Q.   You wouldn't cite anything you think was

23   inaccurate, correct?

24   A.   I'm not sure that that question's a little bit

25   overly broad.  Inaccurate to what I guess would be my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 57

1  care planning at that time?

2      A.  Cost research, interviewing patients,

3  preparing chronologies, putting medical records into

4  timelines.

5      Q.  You've mentioned a couple of times today that

6  you -- you hold a certification as a life care planner,

7  correct?

8      A.  That's correct.

9      Q.  Can -- can you give us a definition of what

10  exactly a life care planner is?

11      A.  So, a life care planner is someone with

12  background, training and experience in the medical

13  field or in rehabilitation who conducts a comprehensive

14  needs assessment of a disability and then helps make

15  cost projections based around those needs.

16      Q.  I want -- I want to better understand that hat

17  as you call it.  But first I wondered if --

18      A.  Did I call it a hat?

19      Q.  -- if there were some things that we could

20  agree that you are -- are not.  First, you're not a

21  medical doctor, correct?

22      A.  That's correct.

23      Q.  You cannot prescribe any medication or

24  therapy?

25      A.  That's correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 58

1    Q.  You have no ability to diagnose medical

2  conditions or treat medical conditions with

3  prescription therapies?

4    A.  That's correct.

5    Q.  Of all the costs that are listed in the life

6  care plans that you prepare, you are not the one who

7  would actually prescribe any of those treatments,

8  correct?

9    A.  So, I think maybe where you're getting a

10  little bit confused is a life care plan is not a

11  prescription for care.  A life care plan is a

12  comprehensive needs assessment and so, it's an analysis

13  of a disability.  And I have input into that analysis

14  of that disability and how it's going to express itself

15  over time based on my background, education and

16  training.

17         So, we're not prescribing care but we're

18  looking at a disability and saying, "This is how it's

19  affecting you medically and here is the cost analysis

20  based on that needs assessment for that particular

21  item."

22    Q.  Okay.  What terminology do you use to describe

23  the things that are -- are the line items under the

24  cost assessment?

25    A.  I'm sorry.  I don't follow the question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 59

1    Q.  In my lay terms it looks to me like when you

2  prepare a life care plan that there is at -- at the end

3  a cost assessment that includes either surgeries or

4  other medical treatments or medical therapies.  Is that

5  the right terminology to describe generally what comes

6  under your cost assessment?

7    A.  So, it's -- medical goods and services is, I

8  guess, the terminology that some people use.

9    Q.  Okay.  The medical goods and services that are

10  contained in your cost projection in the Hill case, is

11  it accurate to say that you are not the person who

12  would prescribe those things or perform those services?

13    A.  No one is prescribing in the life care plan.

14    Q.  I understand that.  I understand that.  You've

15  been very -- very clear about it.

16          To the extent that there are medical

17  therapies or prescriptions or procedures that you've

18  cost out as part of your work in the Hill case, is it

19  accurate to say that the things that are listed are not

20  things that you, as a registered nurse or life care

21  planner would do?

22    A.  I'm not going to be prescribing.  Prescription

23  is not part of my purview, no.

24    Q.  Okay.  You wouldn't be the person who writes

25  the orders for those things, for example?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 60

1    A.   That's correct.

2    Q.   Okay.  And -- and same question for the Gage

3  case.  To the extent that there are medical therapies

4  or surgical procedures or medications or other medical

5  services for which you have provided a cost estimate,

6  is it accurate to say, Ms. Levy, that you could not

7  prescribe or order those things?

8    A.   That's correct.

9    Q.   Because you're not a doctor, right?

10   A.   That's correct.

11   Q.   You're not a vascular surgeon?

12   A.   No, I'm not.

13   Q.   You're not an interventional radiologist?

14   A.   No, I'm not.

15   Q.   You're not a cardiologist, a pulmonologist or

16  a hematologist?

17   A.   That's correct.

18   Q.   You have no expertise in gastroenterology,

19  nephrology or oncology, correct?

20   A.   That's correct.

21   Q.   You're not an epidemiologist?

22   A.   I will stipulate I'm not a physician.

23   Q.   Okay.

24   A.   That might save you from having to name all

25  the specialties.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 61

1    Q.   Sure, sure.

2         You do not hold a specialty in radiology,

3    correct?

4    A.   That's correct.

5    Q.   You ever not a physiatrist?

6    A.   That's correct.

7    Q.   You're not a psychologist or a psychiatrist?

8    A.   That's correct.

9    Q.   You are not a licensed social worker?

10   A.   No, I'm not.

11   Q.   You're not a rehabilitation specialist?

12   A.   I don't know that I would agree with that

13   statement.  I work in rehabilitation all the time.

14   So...

15   Q.   Let's come back to that one in just a minute.

16        You do not have a specialty in pain

17   management?

18   A.   No, I do not.

19   Q.   You're not an engineer or an economist?

20   A.   No, I'm not.

21   Q.   You would agree with me, wouldn't you,

22   Ms. Levy, that of all those things that I've just

23   listed from vascular surgery on down, you are not an

24   expert in those areas, correct?

25   A.   I'm -- I am a registered nurse with a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 172

1    A.  Right.  But I --

2    Q.  Okay.

3    A.  If your question is have I ever been excluded?

4  No, I have not.  I have been held up as an expert and

5  have stayed.

6    Q.  I was asking you a moment ago about your life

7  care plans and the implementation of the life care

8  plans.  Is there a way to determine how often your life

9  care plans accurately predict the lifetime expenses

10  that a patient will face?

11    A.  No, there's no way to do that because what

12  you're talking about -- when we're talking over the

13  lifetime continuum of 20, 30, 40 years, sometimes 60

14  years if it's a child.  So, we'd have to get to the end

15  of 60 years to see what that -- what that rate was.

16    Q.  Okay.  In the course of your work as a life

17  care planner, have you ever tried to research or study

18  the question of how frequently your life care plans are

19  actually implemented?

20    A.  No, I have not.

21    Q.  In the course of your work as a life care

22  planner, have you ever done anything to determine how

23  frequently your life care plan accurately identifies

24  the future medical costs of the -- of the client?

25    A.  No.  As I stated before, we -- we are looking

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 173

1   out over the lifetime continuum and the numbers that we

2   give are today's values.  So, an economist has to march

3   that out and then we'd have to get to the end of that

4   lifetime continuum to do a retrospective to look at.

5       Q.  And that's never been done, correct?

6       A.  No.  I'm 45.

7       Q.  Let's -- I want to breakdown what you said a

8   little bit.

9           In your life care plans on one side of the

10  page you identify that -- the treatments that the

11  plaintiff is likely to need, correct?

12      A.  What we identify -- what a life care plan is

13  is a comprehensive needs assessment.  It's not a

14  utilization pattern.  We are looking at what is the

15  need of this patient based on this disability and then

16  we are taking that need and projecting the costs for

17  that need.

18      Q.  Okay.  And tell me, when you say these are the

19  needs of the plaintiff that are on one side of the

20  page, how likely are those needs?

21      A.  I guess I'm not understanding what you're --

22  what you're saying.

23      Q.  Yeah.

24      A.  When we write a life care plan, there's a

25  medical foundation that's laid and the -- the physician

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 183

1    Q.   Does --

2    A.   In terms of developing an actual tic mark

3  tool, that's not what we're doing.

4    Q.   Okay.  So, does your --

5    A.   So, I guess I'm a little lost.

6    Q.   -- communication with the plaintiff stop once

7  the lawsuit stops?

8    A.   Oftentimes not.  Oftentimes -- and we've told

9  all of our patients, when your lawsuit concludes, we're

10  more than happy to sit down with you and go over your

11  life care plan with you and answer any questions that

12  you have.  And we have had patients come back to us

13  after that.

14    Q.   What data do you or MediSys have to show the

15  rate of accuracy of the projection of future medical

16  needs for your life care plans?

17    A.   I guess I'm getting a little lost in your

18  question.  You know, we do a comprehensive needs

19  assessment.  We're not doing long-term studies of 20,

20  30 years out.

21    Q.   Uh-huh.

22    A.   So, I'm not quite sure how to answer your

23  question.

24    Q.   Yeah.  If we wanted to determine the known or

25  potential rate of error for the -- the needs

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 184

1    identified -- future medical needs identified in any of

2    your plans, could we do that?  Is there a way to do it?

3        A.  If you wanted to look at our plans and try to

4    find a rate of error?  I'm -- I'm not --

5        Q.  That's right.

6        A.  You'd have to look at each individual plan to

7    really understand what each item that's been projected

8    is and you have to look at the patient's -- you'd have

9    to do those follow-ups that we do.  And so, that's why

10   I said it's a dynamic document.  So, when you're

11   talking about rate of error, it's not really a rate of

12   error because it's a dynamic document.  So, it's going

13   to change over time.  The needs might change over time.

14       Q.  Uh-huh.

15       A.  And -- and so, we do look at that and

16   complications might arise that we didn't project --

17       Q.  Okay.

18       A.  -- because there is no crystal ball for that.

19   So, we do our best-faith effort by getting all these

20   heads around the table and doing this comprehensive

21   assessment and doing all the research and all the

22   things that we do; but in terms of going back and doing

23   a long-term research study, that's not something we've

24   done.

25       Q.  Okay.  You've used the term dynamic a few

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 185

1    times --

2        A.   Yes.

3        Q.   -- when -- when we've been talking about this

4    issue.  If I -- again I want to be sure I understand

5    you.

6            If I'm understanding you correctly, it is

7    your belief that because the life care plan is -- is

8    dynamic, it can change at any point in time.  Fair?

9        A.   It can change with the patient's medical

10   condition, yes.

11       Q.   Okay.  And is it -- it's your belief that

12   because the life care plan could change as the

13   patient's needs change, that it's not possible to

14   identify a rate of accuracy in identifying the needs,

15   correct?

16       A.   That's a -- I think that's a

17   mischaracterization of what I'm saying.

18            What I have said is it's a dynamic

19   document and this snapshot in time it would be correct

20   for that patient.

21       Q.   Uh-huh.

22       A.   Ten years down the line, if something were to

23   change, they had a catastrophic event that we -- we

24   didn't consider but that is not typically what we see.

25   This is the best-faith effort with all the heads around

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 186

1    the table.

2        Q.  Okay.

3        A.  So, I'm not the appropriate person to design a

4    research study to examine the things that you're asking

5    about.  That's my statement.

6            If it could be done, I would defer to an

7    economist or an actuarialist or someone who -- who has

8    more experience in doing that.  I wouldn't be the

9    person to -- to do that.  I -- I do what we do, which

10   is the follow-up phone calls and adjusting as we need

11   to.

12       Q.  You've identified today, I think, two ways

13   that we could follow up on one of your life care plans

14   to determine how frequently the future medical needs

15   actually come to fruition and are -- are used by the

16   patient.

17           One of those was a patient survey at some

18   regular intervals.  The -- the other one was this kind

19   of a study that you've described.  Has MediSys at any

20   point in time or -- or have you either -- done either

21   of those two things with respect to any of the 90 life

22   care plans you prepared?

23           MS. RHOADES:  Object to form.

24       A.  Actually -- actually I think you put words in

25   my mouth.  I didn't say we could -- we could do it this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 187

1   way by doing a survey and doing a research study.  What

2   I said was is that we have not tried to undertake doing

3   a survey tool and we have not designed a research study

4   and I don't even know if that's possible.

5          What I pointed out was because it's a

6   dynamic document and it changes over time, I would see

7   that there -- that there would be complications but I

8   am not the one to design a research study and do the

9   things that you're talking about.  Those were -- those

10  were, unfortunately, your words not mine.

11       Q.  (BY MS. PIERSON)  Okay.  You've never

12  conducted this kind of a research study.  Fair?

13       A.  Which kind of research study?

14       Q.  The exact one you've been describing.

15       A.  I have not designed a life care planning

16  research study.  In my doctoral studies I was a part of

17  a lot of research studies and I did analyze the data

18  but for this particular thing I have not seen --

19       Q.  And neither has MediSys.

20       A.  We have not, no.

21       Q.  And a survey that would go out to plaintiffs

22  following the lawsuit to say, "Did you need the medical

23  things that are listed here," that's not something

24  you've ever designed?

25       A.  That's correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 199

1    that Mrs. Hill could identify things that she needs and

2    then it will be included in your plan; is that right?

3        A.   No.   That's a misstatement of what I'm saying.

4    She would not say, "I need X."  She would report

5    symptomatology, complaints, different items, things

6    that she struggles with.   That's that whole

7    comprehensive interview.

8        Q.   Uh-huh.

9        A.   A life care plan is not just looking at the

10   medical needs of the patient.  We're looking at the --

11   how is the disability affecting them vocationally, how

12   is it affecting them in their family, how is it

13   affecting them in their social roles and relationships.

14   And so, it is a comprehensive needs assessment of that.

15            For example, you may or may not see in a

16   medical record a description of the fact that she had a

17   vocation that she was trying to get back to.  You might

18   not see that but you might get it in an interview.  And

19   so, we would identify that that's a need.

20       Q.   When a plaintiff, like Mrs. Hill, identifies

21   some limitation or it's something that they'd like to

22   do that they're not able to do, how do you decide when

23   that or a related therapy ought to be included in your

24   life care plan?

25       A.   I'm sorry.  Say it again.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 203

1    doctor must have agreed that it's needed or that the

2    likelihood that it will be needed is significant,

3    right?

4        A.   Correct.

5        Q.   Is there a percent or a rate that you apply or

6    that -- that Dr. Moreno applied in Mrs. Hill's case to

7    determine how likely it is that the things listed in

8    your report would be needed?

9             MS. RHOADES:   Marmareanu versus Moreno.

10   You slipped back into it.

11            MS. PIERSON:   So close.

12       Q.   (BY MS. PIERSON)   Ms. Levy, under your

13   methodology when you prepare a life care plan, as

14   you've done here on page 1 of Mrs. Hill's report, is

15   there a risk factor or rate of likelihood that's --

16   that a medical condition will arise that's applied

17   before you include it in your report?

18       A.   I think you're -- where we are different is I

19   would not, for example, say to Dr. Marmareanu give me a

20   percentage of how likely this will happen.   That's not

21   the way that life care planners discuss things.   We

22   discuss things in terms of a disability in the way it's

23   going to express itself.

24            And so, in my conversation with

25   Dr. Marmareanu it's not a percentage point.   It's more

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 204

1    that it is medically probable she's going to have this

2    complication or she's going to need this.

3        Q.  Okay.  When you say "medically probable," what

4    do you mean?

5        A.  It's based on his background, education and

6    training and he would say, you know, what is medically

7    probable that she's going to need and he would give

8    that opinion.

9        Q.  Okay.  Have -- did you ask Dr. Marmareanu how

10   he defined medically probable?

11       A.  No.  That's not part of the conversation.  The

12   conversation is:  Here's this patient; these are the

13   needs we've identified; how is this disability going to

14   express itself?

15       Q.  Uh-huh.

16       A.  What are her future care needs that she's more

17   likely than not or more probable than not gonna need.

18   But we don't talk in legalese because it's how do I

19   manage this disability?

20       Q.  Okay.  That's helpful.

21            When you say more likely than not or more

22   probable than not, is that what you said?

23       A.  And that's what I'm talking about.  I don't

24   want to get hung up on semantics and legal terms.  When

25   I say to him, what is she going to need based on this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 255

1   carry across to someone else.

2       Q.   Okay.  I put in front of you what we marked as

3   Exhibit 10.  Exhibit 10 is a document that your

4   attorney provided to us this week.  Can you tell me

5   what Exhibit 10 is?

6           (Levy Exhibit 10 marked.)

7       A.   That's the raw data for the cost analysis that

8   we did.

9       Q.   (BY MS. PIERSON)   Okay.  When you prepare a

10  cost analysis, do you use any kind of software or a

11  program of any sort?

12      A.   So, we have spreadsheets that we enter our

13  data into that will spit it into this format so that

14  you can see it in the life care plan and it will do the

15  calculation on that.

16      Q.   Okay.  I'm getting ahead of myself a little

17  bit.  But when you prepare a life care plan and you

18  identify services or goods that should be included in

19  the plan, as you did with Mrs. Hill, do you provide

20  that list to someone else in your office who then

21  determines the cost information that should be

22  included?

23      A.   No.

24      Q.   Okay.

25      A.   No.  We have spreadsheets of the data and --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 256

1    that we -- that we have.

2        Q.  Okay.  The spreadsheets of the data that you

3    have, those are not unique to any particular case or

4    plaintiff it sounds like?

5        A.  No.  Like, what's unique and specific to them

6    is that cost analysis, those recommendations for the

7    start and stop times and those kinds of things.

8        Q.  Okay.  The data that you're talking about

9    that's in the spreadsheet, is that an Excel

10   spreadsheet?

11       A.  It's -- it comes out looking like an Excel

12   spreadsheet almost but then, like I said, it's a

13   program that spits it into those tables so that it's

14   lines up for you.

15       Q.  What's name of the program?

16       A.  I'd have to find out for you.

17       Q.  Are you the person who runs the program when

18   cost projections are prepared or does somebody do that

19   for you?

20       A.  No.  So, I do -- as I stated before some of

21   the data is Dr. Harrell's.  Some of it might be mine.

22   We update it from time to time and then I'm -- I'm the

23   one that inputs that cost analysis for the life care

24   plan that I'm working on or he'll do his or vice versa.

25       Q.  Okay.  I'm not very familiar with the software

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 257

1    that you use in your -- your area.  So apologies if

2    this is a really stupid question.

3            But when you use the software and input

4    the medical treatments that are -- first, do you input

5    medical treatments and services?

6        A.  So, when you talk about medical services it's

7    simply -- you've seen the life care plan and you see it

8    puts it into the columns for you.  So, that's the

9    extent of it.  It's putting it into those columns but

10   we have spreadsheets that we do all the cost -- the

11   hours and hours of cost data research that we do and

12   those are updated and put into it.

13       Q.  And the spreadsheets that you're talking about

14   where all the cost data is gathered and input into,

15   what are those called?

16       A.  I just call them spreadsheets.

17       Q.  Okay.

18       A.  Those are our costs data.

19       Q.  Okay.  And can anyone in MediSys input cost

20   data into those spreadsheets?

21       A.  No, only Dr. Harrell and myself.

22       Q.  And when you and Dr. Harrell gather the cost

23   information that later gets put into the spreadsheet,

24   do you create any documents in doing that?

25       A.  This is the document.  The life care plan

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 258

1    would be the document of the data we've -- we've input.

2        Q.   Okay.  And -- and, again, apologies if I'm

3    asking you a question that doesn't fit but I don't know

4    your office and how it works.  So, I need to better

5    understand.

6             If there is a data source that's not

7    publicly available and that you or Dr. Harrell gather

8    cost information from when -- when you gather that cost

9    information, are you doing it by phone or in writing?

10       A.   The -- all of the data is publicly available.

11   You would just have to call to get it.

12       Q.   Okay.

13       A.   So, you'd have to call the company if you're

14   looking for attendant care and you have to speak to

15   someone and gather that cost data.

16       Q.   We talked earlier today about things that were

17   listed under a data source on page 25 of your Hill

18   report.  The things that I put a mark by, is it fair to

19   say that the information is not published anywhere?

20       A.   Right.  Those are going to be businesses.  So,

21   you're going to have to contact them and ask -- and ask

22   for that cost.  They're not going to put it out on a

23   website.

24       Q.   Okay.  And -- and when you contact one of

25   those --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 259

1   A.  I take that back.  Some of them actually do --

2   will list -- if it's like a facility, sometimes they

3   will list the data out there.

4   Q.  Okay.  When you contact a data source that

5   does not publish their information to get cost

6   information, once you gather that cost information,

7   where do you put it?

8   A.  On the spreadsheet that I told you about.

9   Q.  Okay.  Is it put anyplace else?

10   A.  That's the spreadsheet and then we -- like I

11   said we have the program that puts it into the table

12   for you.

13   Q.  Okay.  Is your -- your conversation with that

14   entity recorded in any way?

15   A.  What do you mean?  The --

16   Q.  Well, one way to record a conversation where

17   you call a data source and say, "How much -- how much

18   does an Ace wrap cost?" or, "How much is the -- what's

19   the cost for this particular surgical procedure?" one

20   way to do it would be to write it down on a piece of

21   paper and then give it to somebody that puts it in a

22   spreadsheet.

23         I'm just trying to understand, other than

24   a spreadsheet, is there any other document that records

25   your conversation with the data source?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 264

1      A.   No.

2      Q.   Okay.  So, that sounds like the spreadsheet,

3   like your report, is a living document?

4      A.   Right.  We update it every couple of years

5   with the data that we have.

6      Q.   Okay.  Is there a regular schedule for

7   updating the spreadsheet from top to bottom?

8      A.   We know that we do it every couple of years.

9      Q.   There's not a particular date --

10     A.   No.

11     Q.   -- on which you do it every two years?

12     A.   No because that is hours and hours and hours

13   and hours and hours of research.

14     Q.   Uh-huh.

15     A.   And so, you couldn't do it all in a day.

16     Q.   Okay.  Between the two years is there ever a

17   time that the data is updated?

18     A.   It just depends.  If we're doing a new

19   procedure or something that isn't on the spreadsheet,

20   we might do the data at that time.

21     Q.   Okay.  Are there ever times where there's a

22   line item in the spreadsheet and when you're working on

23   a case or a plan for someone you might call the data

24   source and say, "Hey, is this information still

25   correct?  Is there a different cost?"

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 265

1    A.  No because we know that we're -- we're current
2  within two years.
3    Q.  Okay.  And what about with when you get a case
4  where there's a new geographic area that you haven't
5  worked in before?  For example, Tampa, if you had never
6  done work in Tampa before, would someone from your
7  office be calling locations in Tampa to get correct
8  geographic cost information?
9    A.  If we have a patient in an area that we
10  haven't accessed before, we will call in that -- that
11  area.  Yes, we will.
12    Q.  And if, for example, you had a plaintiff out
13  of Tampa ten years ago and you put cost information
14  into your spreadsheet and then a plaintiff like
15  Mrs. Hill comes along, there's already information in
16  your spreadsheet about costs in Tampa, how do you
17  determine if that information is current?
18    A.  As I stated we would know when that
19  information was inputted.  So, we update all the
20  information for that area.  If we hadn't done it in ten
21  years, we would know we hadn't done it in ten years and
22  we would update it.
23    Q.  When you say you'd know, that's based on your
24  memory?
25    A.  No.  It would be -- that particular section

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 273

1    Q.   Routine diagnostic studies, what does that

2  come from?

3    A.   That's the PFR as well.

4    Q.   Okay.  The costs for basic laboratory tests,

5  where does that come from?

6    A.   The PFR.

7    Q.   Okay.  Same thing with the ultrasound

8  abdominal?

9    A.   That's correct.

10   Q.   And with the ultrasound extremities?

11   A.   That's correct.

12   Q.   How about the venogram?  Where does the cost

13 of that come from?

14   A.   From the PFR.

15   Q.   Bathroom safety, where's the cost of that come

16 from?

17   A.   Multiple different sources.  If you see there

18 it says riteaid.com, home-med-equip.com, spinlife.com,

19 amed.com and I think that's it.

20   Q.   Okay.  The data sources that you've listed

21 here and the costs are those -- those data sources and

22 costs that are listed in the spreadsheet?

23   A.   Yes.  We take these and we put them on the

24 spreadsheet.

25   Q.   In other words, you didn't go to those

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 279

1    number for average unit costs and one number for annual

2    costs and one number for lifetime costs.  Does that one

3    number represent the average of the data or costs that

4    you gathered on -- from both national and local

5    sources?

6         A.   So, if you look on page 20 and we talk about

7    the average hourly of direct hire.  So, that's the

8    average of all the direct hires that we contacted.  And

9    then we have the agency contracting -- or sorry.  The

10   direct hire is the national data and then we have the

11   agency contracting and that's -- that's actually

12   national and state, sorry, on direct hire.

13        Q.   Uh-huh.

14        A.   And then on agency contracting we have the

15   local survey we call -- that we called with those

16   average.  And then we averaged all that together to

17   give us the 15.03 an hour.

18        Q.   I'm sorry.  I should have made a note when you

19   were talking earlier, Ms. Levy.  You said the local

20   sources that you relied on for local information in

21   Mrs. Hill's case were Hospitals Without Walls, Legacy

22   Private Care and Home Instead, correct?

23        A.   I believe it -- Apria Medical is one of those

24   as well.  So, I believe it's Apria Medical, APC Home

25   Care, I believe, or -- I'd have to look back at the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 280

1  thing to see the -- I'd have to look at the specific

2  spreadsheet to see the breakdown.  But I believe it's

3  Hospital Without Walls, Legacy Private Care, Home

4  Instead, I know for three of them, and I think it's

5  either APC Home Care or Apria Medical are the local.

6      Q.  Okay.

7      A.  But I'd have to look back at the spreadsheet.

8      Q.  Okay.  Well, when you average the -- the

9  national data and the state data to determine the

10  average hourly of direct hire, how many national

11  sources did you use versus state sources?

12      A.  So, we have several.  In the area I think

13  there's about six that we do.  We have national sites

14  that we look at that give averages for those particular

15  categories, home health or certified nurses assistant.

16      Q.  Okay.  So, you looked up six national sources

17  and then the four state sources that you just mentioned

18  to me, Apria, APC, Hospital Without Walls and Legacy

19  Private Care.

20      A.  I have to look back at it but I believe it's

21  four on the local and then I believe it's six on the

22  national.

23      Q.  Okay.  And then the other part of that

24  calculation was agency contracting and you said for

25  that one you used local data only, correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 287

1   locate?  Is that available anywhere?

2       A.  We have our -- like I say we deal with Capitol

3   Anesthesia.  We deal with their billing office from

4   time to time, if they're willing to talk to us; but in

5   terms of releasing all of the codes, they haven't.

6       Q.  Is there some document where you keep track

7   who you talk to, when you talked to them and what they

8   told you about the costs of anesthesia services?

9       A.  We don't have a document for that.  We have

10  the spreadsheets for these prices that we've done and

11  we know those are the usual ranges for those

12  procedures.

13      Q.  Okay.  Under the intracranial hemorrhage, it

14  looks like the first source is this Texas PricePoint,

15  correct?

16      A.  That's correct.

17      Q.  Okay.  And I am on admission M.D. does that

18  come from PFR?

19      A.  That's correct.

20      Q.  Of the two that follow it, subsequent day and

21  discharge day, that's PFR?

22      A.  That's correct.

23      Q.  And the surgeon fee is PFR?

24      A.  That's correct.

25      Q.  And anesthesia is it the same thing?  This is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 322

1   records or something else?

2       A.   It's a combination.   Comes from the medical

3   records and then my interviews with her.

4       Q.   The same thing is true for the top of page 14,

5   bloating, increased anxiety, insomnia, worsened

6   depression, where does that come from?

7       A.   From the interview and from the medical

8   records.

9       Q.   Okay.   And PTSD symptomatology what's that

10  come from?

11      A.   Medical records and also from the interviews

12  that I've conducted with her.

13      Q.   Is there any medical record that includes a

14  diagnosis of PTSD symptomatology?

15      A.   So, there wouldn't be a diagnosis of a

16  symptomatology.   It would be the diagnosis of PTSD.

17      Q.   Okay.

18      A.   But the symptomatology of PTSD is intrusive

19  thoughts, nightmares, those kinds of things.

20      Q.   Okay.   Is there any medical record that

21  includes the diagnosis of PTSD for Mrs. Hill?

22      A.   So, I would like need to look back at that

23  medical record for -- because if you go to the top

24  where it says current complaints, I cite where I've

25  obtained all this information.   So, I'd need to go back

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 324

1    A.  My rehabilitation experience and the

2  interviews that I've spoken with her and the medical

3  records.

4    Q.  And then beneath that it talks about on the

5  symptoms survey Mrs. Hill lists the following

6  complaints.  That's the symptoms survey that Mrs. Hill

7  completed for you?

8    A.  And in my interviews with her.

9    Q.  Okay.  We'll mark that as an exhibit in just a

10  moment.

11           Section D, E, and F appear to be summaries

12  of Mrs. Hill's past medical history, psychosocial

13  history and educational history.  And at the beginning

14  of each of those sections it looks to me like you've

15  listed the sources of the information in those

16  sections?

17    A.  That's correct.

18    Q.  Is that right?

19           And then the section that follows Section

20  3, projected medical services needs, again I want to be

21  sure I understand the sources of the information that

22  are listed there, Ms. Levy.  So, at the top of the page

23  it says Dr. Alex Marmareanu was consulted by phone.  Do

24  you see that?

25    A.  Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 325

1     Q.  Okay.  And the five things that have this

2  little diamond by them, those are the five things that

3  Dr. Marmareanu recommended, correct?

4     A.  Those are his specific recommendations but he

5  has -- him and I discussed the life care plan in its

6  entirety and he has agreed with that.

7     Q.  Okay.  When you said "he's agreed with that"

8  how do you -- how do you know he's agreed with it?

9     A.  Because I discussed it with him.  We went over

10  the entirety of the life care plan and I said, "This is

11  what I've listed.  This is where we're at.  Is this --

12  is --"

13     Q.  Did you send Dr. Marmareanu a draft of your

14  report?

15     A.  No.

16     Q.  Did -- did he have the ability to review it

17  before you signed it?

18     A.  The review was him and I talking.

19     Q.  Okay.  So, you talked through by phone the

20  report; is that right?

21     A.  Yes.

22     Q.  How many times have you talked to

23  Dr. Marmareanu?

24     A.  On two different occasions regarding Mrs. Hill

25  and on one occasion regarding -- regarding, excuse me,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 329

1   that I've done in the file.  If I have out of town

2   travel if I've got billing or something like that, I

3   will let them know; but on average I just let them know

4   how many hours.

5       Q.  Okay.  And how do you let them know that?  By

6   e-mail or talking to someone?

7       A.  So, our billing office person it could be a

8   combination.  We're a pretty small, intimate office.

9       Q.  Understood.  The five diamonds that we've just

10  been pointing to, these are the things that

11  Dr. Marmareanu recommended to you, correct?

12      A.  Yes.

13      Q.  And under the heading outpatient physician and

14  therapeutic care from specialties, the identification

15  of the physician and therapeutic care required for

16  Mrs. Hill, who made that determination?

17      A.  So, it's in combination.  It's that whole

18  entire assessment, medical records, who she's seeing

19  now, based on my conversations with Dr. Marmareanu who

20  he -- he thinks she's he's gonna need to see based on

21  complications, who would drive that particular thing,

22  for example, hematologist, oncologist.  If she goes on

23  anticoagulant therapy --

24      Q.  Uh-huh.

25      A.  -- that's the physician she would followup

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 345

1    sense of the amount that a provider is typically paid

2    for the services in terms of a percentage in comparison

3    to what they're billed?

4         A.   It's not in my purview.

5         Q.   Okay.

6         A.   I hold no expertise in that.

7         Q.   If the amount actually paid for the services

8    is 40 percent or 30 percent of the amount billed,

9    sounds like you don't have any knowledge of that at

10   all?

11        A.   I don't have any knowledge or an opinion on

12   that, no.

13        Q.   Okay.  I saw somewhere in your report, too,

14   that the numbers that are listed here are in present

15   dollars, correct?

16        A.   This is today.  If you bought this today, this

17   is what it would cost.  We don't do any present-day

18   value in terms of the terminology used for an

19   actuarialist or an economist.

20        Q.   Inherent in your answer I think of two things

21   I want to be clear on.  One, you've not included in

22   your cost projection any -- any cost of inflation, for

23   example?

24        A.   That's outside my purview.  I would defer that

25   to an economist or an actuarialist.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 346

1      Q.   Okay.  And, two, is it correct to say that to

2  the extent that the cost of something changes, for

3  example, a medication that is a brand that later

4  becomes generic, that's not something that you've tried

5  to include either, correct?

6      A.   I think that's a misstatement.  So -- or a --

7  not -- not exactly clear.  So, when we consider

8  medications, we look at averages.  We're trying to get

9  a central measure of tendency.  So, some of the costs

10  might be generic.  Some of them might be brand name but

11  we're taking an average of all the costs based on the

12  websites that we utilize for those costs.

13      Q.   Okay.  We talked about the fact that your cost

14  estimate does -- does not include inflation.  Is it

15  also correct to say that you did not attempt to

16  discount to present value?

17      A.   No.  That's outside my purview.  I would defer

18  to an economist or an actuarialist.

19      Q.   If an economist or an actuarialist were to

20  discount the total amount to present value, that would

21  be less than the amount of your cost projection,

22  correct?

23      A.   I don't have an opinion on that.  I would

24  defer to them.

25      Q.   Okay.  In other words, if it's -- if it's your

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 361

1   way that it was tested?

2       A.   No, I do not.

3       Q.   You have no criticisms about the care and

4   treatment of Dr. Zuzga, Dr. Lynch or Dr. Moreno?

5       A.   I do not.

6       Q.   You would defer to their medical judgments for

7   the conclusions that they've reached in their medical

8   records?

9       A.   I would defer to them about their conclusions,

10  yes.

11      Q.   To the extent that you are aware of any

12  medical conditions that Mrs. Hill had prior to

13  receiving her filter, your knowledge of those comes

14  from your conversations with her and the medical

15  records that are listed in your report, correct?

16      A.   My knowledge of her -- if I understand you

17  correctly, my knowledge of her past medical history is

18  from interviews with her, the questionnaires we went

19  over and what's contained in the medical records.

20      Q.   In the course of your work in the Hill case,

21  you never tried to contact Dr. Zuzga?

22      A.   That's correct.

23      Q.   Or Dr. Moreno?

24      A.   No.  That's correct.

25      Q.   Or Dr. Lynch?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 362

1    A.   That's correct.

2    Q.   Or Dr. Bellingar?

3    A.   That's correct.

4    Q.   Or Dr. Bidani?

5    A.   That's correct.

6    Q.   Ms. Santoro, her social worker?

7    A.   I'm not aware of a Ms. Santoro.

8    Q.   You never tried to contact Mr. Hill?

9    A.   No.  At the time -- at the time that I was

10   interviewing her, he has been present but his -- I

11   don't want to violate his own health -- he's in poor

12   health.

13   Q.   Okay.  How many -- when you saw Mrs. Hill in

14   person on that one occasion was he present?

15   A.   No.  He was not.

16   Q.   Okay.  I thought I understood you to say

17   earlier that you had met with her one time in person

18   and your other communications were by phone?

19   A.   And --

20   Q.   Is that right?

21   A.   That's correct.  And he's been in the

22   background at times.

23   Q.   Okay.  So, during the three or four phone

24   calls that you've had with Mrs. Hill, has Mr. Hill

25   participated in the phone call in any way?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 363

1      A.   I don't believe so, no.

2      Q.   Okay.

3      A.   As I stated --

4      Q.   Have you asked him --

5      A.   -- he's had other health issues himself.

6      Q.   Have you asked Mr. Hill any questions or has

7  he provided to you any information about Mrs. Hill's

8  medical condition?

9      A.   No.  He was actually hospitalized for part of

10 the conversations.

11     Q.   Okay.  In the course of your work in the Gage

12 case, have you spoken with Dr. Pangan?

13     A.   No, I have not.

14     Q.   Have you spoken with Dr. Larkin?

15     A.   No, I have not.

16     Q.   Have you spoken with Dr. Goodwin?

17     A.   No.

18     Q.   Have you spoken with Mr. Gage's long-time

19 girlfriend?

20     A.   No, I have not.

21     Q.   Have you spoken with any of Mr. Gage's

22 children?

23     A.   No, I have not.

24     Q.   Your report in the Hill case lists all of the

25 records that you received from the lawyers for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 364

1    Mrs. Hill.  Did you ever ask the lawyers to see any

2    other records that are not listed in your report?

3         A.  No, I did not.

4         Q.  In the Gage case your report lists all of the

5    medical records that you reviewed in connection with

6    his case.  Did you ask Mr. Gage's lawyers to see any

7    medical records that are not listed in your report?

8         A.  No, I did not.

9         Q.  Did you ever send a request to any medical

10   providers for Mrs. Hill to request other records?

11        A.  No, we would not.

12             (Levy Exhibit 12 marked.)

13        Q.  (BY MS. PIERSON)  I'm handing you what's been

14   marked as Exhibit 12.  Is Exhibit 12 an authorization

15   for the collection of medical records for Mrs. Hill?

16        A.  This is an authorization to actually speak

17   with providers.  Even though it includes medical

18   records, we use it when we contact providers so that

19   they have a Health Information Privacy Act release form

20   so that they can discuss health information with us.

21        Q.  Okay.  You could have collected medical

22   records using this authorization, correct?

23        A.  We would not.  All medical records come

24   through the attorney's office.

25        Q.  Okay.  You did not use this to collect any of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 368

1    Q.   You mentioned in -- in your report that you

2  first spoke with Dr. Marmareanu on March the 7th.   The

3  report is dated March the 11th.   Was your report

4  prepared between March the 7th and March the 11th?

5    A.   It was actually prepared before then.   So,

6  I -- when I receive medical records and when I do my

7  interview, I'm preparing the report at that time.   So,

8  there -- it's prepared in different stages.

9    Q.   Okay.

10    A.   So, the final product is after I've spoken

11  with Dr. Marmareanu and gotten his opinions and then if

12  I have any other questions, I can go back to him before

13  final production.

14    Q.   Okay.   Before you talked to Dr. Marmareanu on

15  March the 7th, had you prepared your cost estimate?

16    A.   I had a preliminary cost analysis to speak

17  with him about items that I thought were of -- of --

18  based on the needs assessment.   So, then I would go

19  through the items and adjust accordingly.

20    Q.   What changes did you make to the needs

21  assessment after you spoke with Dr. Marmareanu?

22    A.   I couldn't tell you off the top of my head.

23  This is our final product and we overwrite.   So, I

24  can't tell you with any specificity.

25    Q.   What changes to the cost projection did you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 369

1   make after you spoke with Dr. Marmareanu on March the

2   7th?

3        A.  As I stated this is a document that's

4   overwritten.  So, I can't tell you with any specificity

5   what -- what was changed.

6        Q.  Well, did you have to change very much?

7        A.  Once again, I had conversations with

8   Dr. Marmareanu.  I -- I have items that I have

9   identified in the medical records.  We went over those

10  and if something didn't pertain or he didn't feel was

11  necessary, it was removed.  I can't tell you with any

12  specificity what exactly was removed because the

13  document's overwritten but I don't have a big

14  recollection that I had to make huge changes because

15  like I said it literally is a schematic for me to be

16  able to ask questions and say, "Is this -- is this

17  accurate?"

18       Q.  Okay.  Did the significant costs that are

19  included in Mrs. Hill's life care plan, for example,

20  the attendant care costs for DVT complication,

21  inpatient or outpatient, those were all things that you

22  had in your report before March the 7th, correct?

23       A.  I am not sure.  As I stated before, I'm not

24  sure what was in the plan, what wasn't.  I have an

25  item -- I have a needs assessment that I do and then I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 370

1  verify with him and then the final product is our -- is

2  our opinions.

3       Q.   There's another significant cost in your cost

4  analysis for Mrs. Hill and that's the cost for an

5  intracranial hemorrhage or a brain bleed, correct?

6       A.   Correct.

7       Q.   Okay.  Was that in your report before you

8  talked to Dr. Marmareanu?

9       A.   I believe not because I think he made the

10  recommendation for anticoagulant therapy and that would

11  have come after a recommendation for anticoagulant

12  therapy.

13       Q.   And how about the cost for caval thrombosis?

14  Was that in your report before you talked to

15  Dr. Marmareanu?

16       A.   I'm not sure.  I don't have a specific

17  recollection of that.

18       Q.   Okay.

19       A.   As I stated, that is only a template for me to

20  have a conversation with him.  That's not anything

21  other than me pulling ideas out of the medical records

22  and confirming with him that that's reasonable.  So, I

23  don't have a specific recollection of that.

24       Q.   Okay.  Ms. Levy, we talked earlier about the

25  depositions that you had reviewed.  You're aware that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 371

1    other treating physicians and fact witnesses have been

2    deposed in Mrs. Hill's case, correct?

3        A.   I am not aware, no.

4        Q.   Okay.  Nobody's told you that?

5        A.   I am not aware, no.  Since I produced my

6    report, I don't know who's been deposed.

7        Q.   Okay.  Have you asked anyone for copies of

8    depositions that have been taken in this case,

9    Mrs. Hill's case?

10       A.   No.  I received her deposition.

11       Q.   Have you asked anyone if any of the treating

12   physicians have been deposed in Mrs. Hill's case and if

13   you could read the depositions?

14       A.   I believe I may have said has Dr. Choudhry

15   been deposed but I can't remember when I asked that.

16   And I don't think he had been.

17       Q.   Okay.  Other than that have you asked about

18   the depositions of any other treaters of Mrs. Hill?

19       A.   No, I was not aware anyone had been deposed.

20       Q.   You talked earlier about relying on interviews

21   with Mrs. Hill for some of the information contained in

22   your report.  If something Mrs. Hill told you is

23   contradicted by her sworn testimony in this case, which

24   one would you follow in developing your life care plan?

25       A.   I'd need to see specifically what you're

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 378

1    use?

2        A.   It can happen at any time.   Once you've

3    anticoagulated the body and a patient takes a fall or

4    gets involved in a car accident, they're at risk for

5    intracranial hemorrhage.   That's why any time a patient

6    on anticoagulant therapy hits their head they get a CAT

7    scan in the ER.

8        Q.   You would agree with me, wouldn't you, that if

9    the risk of those things happening is less than 1

10   percent, they shouldn't be included in a life care

11   plan, should they?

12       A.   It's not less than 1 percent.

13       Q.   Okay.   But if the risk is less than 1

14   percent -- if less than 1 percent of patients who take

15   anticoagulants have those risks, you wouldn't include

16   it then, would you?

17       A.   I would defer to Dr. Marmareanu as to what he

18   felt was reasonable risk for her.

19       Q.   And in -- in your mind if the risk of those

20   complications was, for example, less than 10 percent,

21   should -- should they be included in your report?

22       A.   Once again I'm going to defer to

23   Dr. Marmareanu.   He felt those items needed to be

24   included.   As to specific percentages, I would defer to

25   him to tell you that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 379

1    Q.   Okay.  From your perspective as the life care

2    planner who prepared this report, there's no rate of

3    incident that you're looking for before you agree to

4    include something in your report, correct?

5    A.   No.  I'm looking to the medical foundation

6    from the consultant that I am speaking with --

7    Q.   Okay.

8    A.   -- and what they feel are reasonable

9    complications.

10   Q.   I want to understand better one aspect of the

11   plan that you have prepared for Mrs. Hill and that's

12   the attendant care.  What attendant care is it exactly

13   that you think Mrs. Hill will need for four hours a

14   day?

15   A.   So, what we've talked about is due to her

16   caval stenosis she's at risk for post-thrombotic

17   syndrome and DVTs.  With that you can have chronic

18   pain, you can have leg ulcerations and you can have

19   diminished capacity.  So, we felt that it was

20   reasonable to set aside attendant care for her to help

21   her in her day-to-day functioning.

22        What we know from our experience is when

23   you go to hire someone a typical visit they're not

24   going to come out for two hours.  They have to contract

25   for four; and so, that's a reasonable cost that we set

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 381

1    complications.  What kind of complications would she

2    have to experience in order to require the attendant

3    care that you've included?

4        A.  So, as -- as I stated in there, is that she --

5    if she were to develop caval thrombosis and the known

6    complications associated with it, post-thrombotic

7    syndrome, including skin ulcers, chronic pain, chronic

8    extremity swelling, then she would require attendant

9    care.

10       Q.  Okay.  If she does not develop caval

11   thrombosis, then she's not going to require the care

12   that you included here, correct?  It hinges on

13   developing caval thrombosis.

14       A.  Or the complications associated with the

15   stenosis.

16       Q.  Okay.  And your belief that she will require

17   attendant care if she experiences either caval

18   thrombosis or complications from stenosis, what's that

19   based on?

20       A.  Dr. Marmareanu's opinion and the diagnostic

21   studies contained in the medical records that show she

22   has a narrowed vena cava.

23       Q.  Okay.  You've -- you've checked your report

24   for accuracy, correct?

25       A.  I've done it to the best of my ability, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 384

1    Q.  Okay.  When you were preparing the report in

2  Mrs. Hill's case, did you take portions of her report

3  from a report that you had prepared in connection with

4  a Bard case?

5    A.  I don't believe so, no.  What specifically are

6  you talking about?

7    Q.  Nothing specifically.  I'm just asking a

8  question.  If you'd prepared life care plans or expert

9  reports in connection with Bard filter cases, did you

10 cut and paste or copy portions of your Bard report into

11 this report?

12   A.  I would not copy and paste a specific filter

13 she has.  Maybe it was referenced in a medical record

14 as a Bard versus -- I'd have to look back to see what

15 kind she has.  It's not necessarily uncommon to have it

16 referenced as one versus another.

17   Q.  Okay.  You told me earlier today that the

18 accuracy of your cost projections that it's been

19 verified by actuarists (sic) and economists.  How often

20 have they reviewed your cost projections?

21   A.  So, it's an actuarialist --

22   Q.  Thank you.

23   A.  -- and an economist.

24       And so, every time a life care plan goes

25 before the court typically there's an economist or an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 385

1  actuarialist who looks at those numbers.

2      Q.  So, how often has it happened that there's an

3  actuarist (sic) or on economist on the other side that

4  looks at your numbers?

5      A.  I couldn't give you any certainty but I know

6  that they are hired on both sides of the docket and

7  will review the life care plan.  And I haven't received

8  any -- any feedback that something was inaccurate.

9      Q.  You -- you would know about the instances

10  where one of those types of experts was disclosed by

11  the defense, correct?

12      A.  Not necessarily.

13      Q.  Okay.

14      A.  Sometimes they're named after we produced our

15  report and it just doesn't come into our purview.

16      Q.  Well, that's what I'm trying to understand,

17  Ms. Levy.  Your assumption is that there's always an

18  act- -- actuarist or an economist on the other side

19  who's verifying your work.  I want to know what you

20  really know.

21              How many times has one on the other side

22  reviewed your work?

23      A.  So, you -- the word that you said that I

24  always say there's somebody on the other side, that's

25  not an accurate statement of what I said.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 386

1    Q.  Okay.

2    A.  I don't know if there's always a person on the

3    other side but I know in the past we have an economist

4    and actuarialist either on the other side or also

5    working for the plaintiff who have reviewed our work in

6    the 30 years that we have been in business and we have

7    not gotten the feedback --

8    Q.  Yeah.

9    A.  -- that there's a problem with that.

10   Q.  For the 90 reports that you've been written,

11   the 90 reports that you've been the lead author on, how

12   many times have they been reviewed by an economist and

13   actuarist?

14   A.  So, I don't know because not all of them have

15   gone to deposition or trial, whatever.

16   Q.  Okay.

17   A.  Sometimes we'll produce a life care plan or

18   cost analysis and the court -- and the case will

19   settle.

20   Q.  Just mark one more thing, Ms. Levy.

21       MS. RHOADES:  How much over are we now?

22   About ten minutes?

23       You need to wrap this up for this evening.

24   Q.  (BY MS. PIERSON)  Is Exhibit 14 the patient

25   questionnaire that you provided to Mrs. Hill and that