# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: COOK MEDICAL, INC.,
IVC FILTERS MARKETING, SALES
PRACTICES AND PRODUCT LIABILITY
LITIGATION

Case No.
1:14-ml-2570-RLY-TAB

This Document Relates to         MDL No. 2570
ALL ACTIONS

ORAL AND VIDEO DEPOSITION OF

LEIGH ANNE LEVY

May 5, 2017

(Volume 2)

ORAL AND VIDEO DEPOSITION OF LEIGH ANNE LEVY, produced as a witness at the instance of the Defendants, and previously duly sworn, was taken in the above-styled and numbered cause on May 5, 2017, from 9:10 a.m. to 11:26 a.m., before WILLIAM M. FREDERICKS, CSR in and for the State of Texas, reported by machine shorthand at the Courtyard Marriott Hotel, 2700 Hoppe Trail, Round Rock, Texas, pursuant to the Federal Rules of Civil Procedure.

1  things I was provided after.

2  Q.  Okay.  I noted the -- in Mr. Gage's case
3  there's this notation that it's in consultation with
4  Dr. Marmureanu on the front page, and that's not on
5  Mrs. Hill's report.

6       Is there any significance to that?

7  A.  It just probably was omitted on the -- the
8  front, but his opinions are cited in the needs
9  assessment.

10 Q.  Okay.  And you described for me yesterday
11 that all of the -- the prognoses for Mrs. Hill or
12 things that are included as -- as likely
13 complications, that those were all things that
14 Dr. Marmureanu either suggested to you or you
15 discussed with him and he agreed.

16      Is that true for Mr. Gage's report as
17 well?

18 A.  Yes.  Those are -- the complications are --
19 were discussed with Dr. Marmureanu but were also
20 gleaned from the medical records themselves.

21 Q.  Okay.  I want to ask you a couple of
22 questions about the report.

23      With respect to the -- the
24 recommendations -- I'm sorry.  Let me start again.

25      With respect to the medical services and

1  goods that are listed in your life care plan for
2  Mr. Gage, is it your understanding that Dr. Marmureanu
3  believes all of these things will be needed by
4  Mr. Gage to a reasonable degree of medical certainty?
5      A.   That's correct.
6      Q.   Is it your understanding that the con- --
7  complications contemplated in the projection for
8  Mr. Gage are reasonably probable?
9      A.   These are the complications that were
10 identified in the medical records by his treating
11 providers and also by Dr. Marmureanu.
12     Q.   Okay.  And is it your understanding that to
13 the extent we're talking about things that may happen
14 to Mr. Gage in the future in your life care plan
15 that -- that all of those things are reasonably
16 probable?
17     A.   That's correct.
18     Q.   Is it your belief that all of the
19 complications or potential complications that are
20 listed in Mr. Gage's report are directly related to
21 his vena cava filter?
22     A.   And the complications associated with it.
23     Q.   Okay.  And is it your belief, Ms. Levy, that
24 all of the potential complications and the goods and
25 services listed in Mr. Gage's report are -- are

Case 1:14-ml-02570-RLY-TAB   Document 5693-5   Filed 08/09/17   Page 5 of 15 PageID #: 16570

Page 366

1  reasonably probable to occur, meaning that the
2  likelihood that they'll occur is something above
3  50 percent; we don't know what?
4      A.   I'm going to defer that to Dr. Crisostomo and
5  Dr. Marmureanu.
6      Q.   Okay.  If Dr. Crisostomo has the opinion that
7  these things are not likely to happen in the future,
8  that would be inconsistent with your inclusion of them
9  in the plan, correct?
10     A.   As I stated before, we try to get a consensus
11 of opinion, and we take into account various
12 specialties and what they recommend, but I have had
13 the opportunity to speak with Dr. Marmureanu, and this
14 is what he felt.  I haven't had the opportunity with
15 Dr. Crisostomo, so...
16     Q.   We used the term yesterday "reasonably
17 probable" to describe the things that are included in
18 your life care plan.
19          Do you remember that?
20     A.   I used that terminology, yes.
21     Q.   Okay.  To the extent that there are potential
22 complications and costs associated with those
23 contained in Mr. Gage's life care plan, is it accurate
24 to say that you believe those things are reasonably
25 probable?

1    A.    Based on my conversations with Dr. Marmureanu
2 and the review of the medical records, yes.
3    Q.    And when we use the term "reasonably
4 probable" in connection with the complications in
5 Mr. Gage's report, is it fair to say that that -- that
6 means you believe those things have a 50 percent or
7 greater chance of actually occurring?
8    A.    Once again you're asking me to put a
9 percentage on that, and I would defer that opinion to
10 Dr. Marmureanu.  I don't have an opinion about
11 percentages.  I have my conversations with
12 Dr. Marmureanu and my consultations with him, and he
13 said that these are reasonably probable.  We didn't
14 have a conversation about percentage points, so I
15 can't --
16    Q.    Okay.
17    A.    -- speak to that.
18    Q.    For that reason, Ms. Levy, is it fair to say
19 that for all of the complications that are listed in
20 Mr. Gage's life care plan, the -- the likelihood,
21 whether that's five percent, 10 percent, 20 percent,
22 75 percent, you don't know that number for any of
23 those complications, correct?
24    A.    Here's what I would say:  We take each
25 patient as they come to the -- the life care plan as

1  they are. So in the general population, you might
2  have a percentage point of intercranial hemorrhages
3  not so much; but for someone like Mr. Gage, who has
4  frequent falls, frequent motor vehicle accidents, is
5  on a blood thinner, all those things, his percentage
6  might be higher than the average person. So I can't
7  with certitude put a percentage on that because I
8  would defer that, as I stated, to Dr. Marmureanu.
9     Q.  Okay. Do you know the percentage likelihood
10 for any of the complications for Mr. Gage that are
11 listed in your report?
12    A.  Once again, I stated it would be impossible
13 to determine each specific person. We have to look at
14 in a life care plan what is reason- -- to use your
15 words, what is reasonably probable. We know that he
16 is at a higher risk. I don't have a percentage point
17 on that for these complications because of his
18 comorbidity issues.
19    Q.  Let me try this one more time, Ms. Levy, in a
20 slightly different way.
21        Whether we're talking about -- for
22 example, brain bleed is one of the things included in
23 your life care plan. Whether we're talking about
24 Mr. Gage or the population as a whole, as you sit here
25 today, do you know what the -- the percentage is for

1   the risk of that occurring to Mr. Gage or any other
2   person in the world?
3        A.   No, I don't.
4        Q.   Okay.  And if we were to go through the other
5   complications in your life care plans and ask the same
6   question, for any of those complications, do you know
7   what the percentage risk is for the plaintiff or any
8   other patient in the world?
9        A.   I think you're asking a question that isn't
10  determinable.  We're looking at a needs assessment,
11  and based upon our opinions and the medical records
12  and the medical trajectory we come to what is rea- --
13  to use your words, what is reasonably probable for
14  this patient, but it's not so important to put a
15  percentage point on something.  We have to take that
16  patient as they are and what we see their need is.
17       Q.   Do you know the percentage chance or risk for
18  any patient for any of the complications listed in
19  your life care plans?  It's a yes or no question.
20       A.   As I've stated --
21            MS. RHOADES:  Object to form.
22       A.   As I've stated, I don't have an opinion about
23  percentage points, and I don't know that it's accurate
24  to produce any kind of percentage points for Mr. Gage,
25  but I would defer any kind of opinions about

1   percentage points to his -- to Dr. Marmureanu.

2        Q.   (BY MS. PIERSON)  We could go through this

3   list with respect to Mr. Gage and -- and ask specific

4   questions.  The percentage chance that he will require

5   a DVT open procedure, do you know what that is?

6        A.   Do I know what what is?  The percentage or

7   the --

8        Q.   The likelihood that --

9        A.   -- DVT open procedure?

10       Q.   The likelihood that Mr. Gage will need a DVT

11  open procedure.

12       A.   As I've stated before, these are the things

13  that, using your terminology, are reasonably probable.

14  They have not been put into a percentage point because

15  that is not how we do it as a life care planner.  So

16  if --

17       Q.   Have you --

18       A.   -- you're looking for percentage points, I

19  would defer that to Dr. Marmureanu, who may have an

20  opinion on that.

21       Q.   And -- and that statement, that -- that you

22  defer to Dr. Marmureanu and that you do not have an

23  opinion about the risk or percent of likelihood for

24  any complications in Mr. Gage's report --

25       A.   As I've stated --

1          MS. RHOADES: Object to form.

2      Q.  (BY MS. PIERSON)  Is that correct?

3      A.  No.

4      Q.  Okay.

5      A.  As I've stated before, these are reasonably probable occurrences based on a full analysis of this patient. If you're looking for percentage points, I'm not going to be able to give you percentage points because that's outside of my purview. I would defer that to Dr. Marmureanu.

11     Q.  Okay. And that's true for both the report in Hill and Gage, correct?

13     A.  If you're wanting percentage points, I defer to Dr. Marmureanu.

15     Q.  Okay. You -- you understand Ms. Levy that when I use the term "percentage points" I'm talking about the likelihood that Mr. Gage or Ms. Hill will actually experience the complication that you've listed in your plan?

20     A.  I understand what your intent is, yes.

21     Q.  Okay. Thank you. There's a notation in the document that we marked as Exhibit 16, the Patient Questionnaire form, that Mr. Gage has a cardiologist named Sara Sirna.

25              Did you ever receive any records from

1    Q.   There -- there is something called a cohort
2    life table.  Are you familiar with that term?
3    A.   I'm not familiar with the term "cohort."  If
4    you'll define what you're telling -- what you're
5    speaking about, I can tell you if I'm familiar with
6    it.
7    Q.   When I use the -- the term "cohort life
8    table," I use it to mean a -- a table that includes
9    the average life expectancy for a patient within a
10   particular cohort.  Say all people with brown hair,
11   what's their average life expectancy, and it would be
12   a table that included that amount, for example.
13        Is there any cohort life table as I have
14   defined that term for patients who have coronary
15   artery disease with vessel disease?
16   A.   I don't believe it's broken out that way, no.
17   Q.   Okay.  Is there any cohort life table for
18   patients who have Stage 4 kidney disease?
19   A.   There possibly could be, but I would defer to
20   a nephrologist on that.
21   Q.   Okay.  Did you consult with a nephrologist
22   here?
23   A.   No, I didn't.  It wasn't necessary.
24   Q.   Did you do any research to determine what is
25   the average life expectancy for a patient with Stage 4

1  kidney disease?

2  A. As I stated before, I don't have an opinion
3  on life expectancy. If one of his providers wants to
4  offer that, I'm more than happy to adjust. What we
5  have are based on our National Vital Statistics. If
6  there's a consensus of opinion to adjust his life
7  expectancy, I would consider that.

8  Q. My question is --

9  A. But it's not an opinion I'm going to seek out
10 because it's not something that I'm giving an opinion
11 to.

12 Q. And -- and for that reason, Ms. Levy, is it
13 fair to say that you did not undertake to research
14 what the average life expectancy is for a patient in
15 Stage 4 kidney disease?

16 A. That's correct.

17 Q. Okay. Do you know what the average life
18 expectancy is for a patient in Stage 4 kidney disease
19 who -- who has been refused a kidney transplant?

20 A. No. Once again I would defer all of that to
21 a nephrologist.

22 Q. Do you know what the life expectancy is for a
23 patient in Stage 4 kidney disease who has refused
24 dialysis?

25 A. Once again I would defer that to a

1  nephrologist. It's not an opinion I sought out.
2  Q. You -- you do know as a nurse, though,
3  Ms. Levy, that all of these things impact when a
4  person is likely to die, correct?
5  A. Once again, we base our life expectancy on
6  the National Vital Statistics that take into account
7  patients such as Mr. Gage who have multiple
8  comorbidities. I'm not going to render an opinion
9  about life expectancy, whether it's reduced or not
10 reduced, because that's outside my purview. So I
11 don't have an opinion about that.
12 Q. Not -- not my question. My question is you
13 told us yesterday you have 20-plus years of nursing
14 experience.
15 A. That's correct.
16 Q. As a nurse, when a patient has Stage 4 kidney
17 disease and they refuse dialysis, are they likely to
18 not survive much longer?
19 A. Once again you're asking me for a medical
20 opinion, and I don't have an opinion on that. I would
21 defer that to his nephrologist or one of his treating
22 providers to render any opinions about life expectancy
23 or reduced life expectancy. That's outside of my
24 purview.
25 Q. The difference between the target age and the

1   start age that you have in your chart is about

2   14 years, correct?

3       A.   That's correct.

4       Q.   Okay.  Do you know if patients who have the

5   kind of heart condition like Mr. Gage has, if they're

6   likely to live 14 years?

7       A.   As I stated before, we base our life

8   expectancy on what the federal government has deemed

9   appropriate.  If someone has a different opinion, I

10  would defer to them.  I don't have a personal opinion

11  about his life expectancy.

12      Q.   Is it fair to say you also do not have an

13  opinion about whether a patient with the kind of

14  kidney disease that Mr. Gage has is likely to live

15  another 14 years or not?

16      A.   That's correct.  I do not have an opinion on

17  that.

18      Q.   The medical procedures, diagnostic procedures

19  and medical history listed in Mr. Gage's report, is --

20  is this the total of the procedures, diagnoses and

21  medications that you're aware of based on the medical

22  records that you've been given by Mr. Gage's

23  attorneys?

24      A.   This is the report I had with the medical

25  records I had.  It is based on that.  But as I stated

1   additional two hours to help him with self-care and
2   monitoring.
3       Q.   Does Mr. Gage today have an attendant two
4   hours per day?
5       A.   No, he does not.
6       Q.   What's your understanding of why Mr. Gage is
7   taking anticoagulants today?
8       A.   In my conversations with Dr. Marmureanu and
9   in review of the medical records, it appears Mr. Gage
10  was put on anticoagulant therapy for concern for a
11  pulmonary embolism or chronic deep vein thrombosis,
12  but in going back through the diagnostic studies there
13  was no pulmonary embolism identified on the
14  diagnostics that we had.  There was no chronic deep
15  vein thrombosis identified on any of the ultrasounds
16  that we saw.  So Dr. Marmureanu expressed to me that
17  he should not have been on anticoagulant therapy long
18  term.
19              What we have projected is that he be on
20  long-term anticoagulant therapy for the IVC filter
21  that is retained because he is now at increased risk
22  for caval thrombosis and deep venous thrombosis.
23      Q.   Okay.  Prior to Mr. Gage receiving his IVC
24  filter, had he had a DVT?
25      A.   He had had two.