**EXPERT REPORT**
**DAVID A. KESSLER, M.D.**

**TABLE OF CONTENTS**

I.     BACKGROUND & QUALIFICATIONS ..................................................................................... 5

II.    OVERVIEW ............................................................................................................................... 8

III.   COOK MARKETED THE CELECT IVC FILTER UNDER THE 510(k) REGULATORY
       FRAMEWORK WHICH REQUIRED A SHOWING OF SUBSTANTIAL EQUIVALENCE TO
       PREDICATE DEVICES AND NOT PROOF OF SAFETY AND EFFICACY ........................... 9
       A.   General Framework for the Regulation of Medical Devices ............................................. 9
       B.   Substantial Equivalence ................................................................................................... 14
       C.   Substantial Equivalence is Not FDA Approval — It is Clearance ................................... 15
       D.   FDA Standards for Device Labeling ................................................................................. 18
       E.   Medical Device Reporting & Medical Device Reporting .................................................. 21
       F.   Physicians' Abilities to Assess the Safety and Efficacy of Medical Devices .................. 31

IV.    THE REGULATORY HISTORY OF COOK'S TULIP AND CELECT FILTERS ..................... 33
       A.   Clearance Chronology for Tulip and Celect in the US. .................................................... 33
       B.   Tulip is Cleared for Marketing in the US. ........................................................................ 33
       C.
       D.   Celect is Cleared for Marketing in the US. ....................................................................... 44

V.     A DEVICE MANUFACTURER MUST ENSURE THAT THE QUALITY OF ITS DEVICE
       DOES NOT "FALL BELOW THAT WHICH IT PURPORTS OR IS REPRESENTED TO
       POSSESS" ................................................................................................................................. 47

VI.    THE CELECT FILTER FELL BELOW THE QUALITY THAT IT PURPORTED OR WAS
       REPRESENTED TO POSSESS. ................................................................................................ 49

VII.  COOK HAD AN OBLIGATION TO ENSURE THAT THE CELECT FILTER WAS AT
      LEAST AS SAFE AND EFFECTIVE AS THE GÜNTHER TULIP AND TO ENSURE THE
      SAFETY OF CELECT THROUGHOUT THE LIFE OF ITS PRODUCT................................ 148

VIII.

IX.

X.    CONCLUSIONS. ......................................................................................................... 157

## APPENDICES & SCHEDULES

Appendix A:   Resume of David A Kessler, M.D.

Appendix B:   List of Cases and Compensation Information

Appendix C:   List of Published Articles Relating to FDA, Drugs & Devices

Appendix D:   List of Documents Considered or Relied Upon


Schedule 2:   Individuals Identified in the Report of David A. Kessler, M.D.



Schedule 5:   Report of Rebecca Betensky, Ph.D.

Schedule 6:   Report of Michael Fishbein, M.D.

Schedule 7:   Exhibit C to Report of Reza Rajebi, M.D.


Schedule 9:   Diagram of Predicate and Prior Predicate Devices

Schedule 10:  Deposition Citations

## I.      BACKGROUND & QUALIFICATIONS

1.      My name is David A. Kessler, M.D. I received my M.D. degree from Harvard Medical School in 1979 and my J.D. degree from the University of Chicago Law School in 1978.

2.      I did my pediatrics training at John Hopkins Hospital.

3.      I was appointed in 1990 by President George H.W. Bush as Commissioner of the United States Food and Drug Administration and was confirmed by the United States Senate.  I also served in that position under President William Jefferson Clinton until February 1997.

4.      I have taught food and drug law at Columbia University Law School, and I have testified many times before the United States Congress on food, drug, and consumer protection issues under federal and state law.  Over the last thirty years, I have published numerous articles in legal, medical, and scientific journals on the federal regulation of food, drugs, and medical devices.  I have had special training in pharmacoepidemiology at Johns Hopkins Hospital. My resume is attached as Appendix A.  A list of cases in which I have appeared as a witness in the last five years and documentation of my expert witness fee is attached as Appendix B.  A list of my published articles relating to FDA issues, including drugs and devices, is attached as Appendix C.

5.      As Commissioner, I had ultimate responsibility for implementing and enforcing the United States Food, Drug, and Cosmetic Act ("FD&C Act").  I was responsible for overseeing five Centers within FDA.  They included, among others, the Center for Drug Evaluation and Research, the Center for Devices and Radiological Health, and the Center for Biologics Evaluation and research.  In addition to those duties, I placed high priority on getting promising therapies for serious and life-threatening diseases to patients as quickly as possible. During my tenure as Commissioner, the FDA announced a number of new programs, including:

the regulation of the marketing and sale of tobacco products to children; nutrition labeling for food; user fees for drugs and biologics; preventive controls to improve food safety; measures to strengthen the nation's blood supply; and the MedWatch program for reporting adverse events and product problems involving both drugs and devices. I created an Office of Criminal Investigation within the Agency. I was directly involved with the regulation of medical devices. In addition, I established "The Committee for Clinical Review" that reviewed device evaluation and review. I worked closely with FDA's Division of Drug Marketing, Advertising and Communications and was involved in establishing the Center for Devices and Radiological Health's Promotion and Advertising Policy Staff.

6.     I am a senior advisor to TPG Capital, a leading global private equity firm, which owns pharmaceutical and biomedical companies. I served on the board of Aptalis Pharma and serve on the boards of Tokai Pharmaceuticals and the medical device and biologics company Immucor, Inc. In these advisory and fiduciary capacities, I have advised companies on the standards and duties of care within the pharmaceutical and medical device industry. I also chaired the compliance committee of Aptalis, and I chair the quality committee of Immucor, which involves ensuring compliance with FDA laws and requirements.

7.     The documents provided to me by counsel, or that I accessed independently from various sources, including, but not limited to, FDA's website, are listed in Appendix D to this report. At my request, Appendix D was prepared by counsel. Based on my review of those documents and my training and experience, I have a number of opinions that are detailed below.

8.     It is my understanding that the Bellwether Plaintiffs in this matter are: Elizabeth Jane Hill (Case No. 1:14-cv-06016); Arthur Gage (Case No. 1:14-cv-01875) and Tonya Brand (Case No. 1:14-cv-06018) I understand that more than 1,200 additional cases have been filed in the MDL as of this writing.

9.     It is my understanding that the Defendants in this matter are: Cook Group, Inc.;

Cook Medical Incorporated a/k/a Cook Medical, Inc.; Cook Medical, LLC; Cook Incorporated;

Medical Engineering and Development Institute, Inc.; Cook Medical Technologies; Cook

Denmark International ApS; Cook Denmark Holdings, ApS; Cook Group Europe ApS; Cook

Nederland BV; and William Cook Europe ApS.  In this report I refer to the Defendants

collectively as "Cook."  In certain instances I will use the following abbreviations:

- WCE:  William Cook Europe
- MEDI:  Medical Engineering & Development Institute

are attached to this

report as Schedule 1.

10.     Because the terms "penetration" and "perforation" appear frequently in this

report, I clarify here that unless I make an express exception, when I apply the term terms

"penetration" and "perforation" (as distinguished from reporting another's use of the terms), I

mean:

- Penetration:  Penetration of the vein wall by filter hooks with transmural incorporation.

- Perforation:  Strut or anchor devices extending more than 3 mm (">3mm") outside the wall of the IVC as demonstrated by CT, US, venography, or autopsy.[1]

These definitions are discussed in detail at appropriate points in the report.[2]

11.     It is my understanding that this matter involves the following causes of action:

strict products liability failure to warn; strict products liability design defect; negligence;

---

[1] This definition is derived from the definition used in the guidelines published by the Society for Interventional Radiology (SIR).  However, SIR calls both of these "IVC penetration" (the latter is the definition applied for quality improvement reporting purposes). I have taken the approach of the International Standards Organization (ISO), which has a substantively identical definition to the SIR definition but refers to protrusion >3mm as "perforation."

[2] My opinions concerning the relative rates of perforation between Tulip and Celect do not imply that Tulip is a safe or effective device.

negligence per se; breach of express warranty; breach of implied warranty; violations of applicable state laws prohibiting consumer fraud and unfair and deceptive trade practices; loss of consortium; wrongful death; survival; and punitive damages.

## II.   OVERVIEW

12.     All manufacturers of medical devices need to ensure the safety of their devices and respond reasonably to evidence of safety concerns.

13.     A device manufacturer must ensure that the quality of its device does not "fall below, that which it purports or is represented to possess."[3] If the quality of the device does fall below that which it purports or is represented to be, the product is deemed "adulterated" under the statute. The consequence of a product being adulterated is that it may not be marketed until and unless its adulterated quality is rectified.

14.     There are two routes to the market for a medical device.  One route, the pre-market approval application requires a full set of pre-clinical and clinical studies and is generally viewed as the most thorough device application process.  A second route allows devices that are substantially equivalent to a marketed device ("the predicate") to submit a 510(k) application that establishes "substantial equivalence."

15.     A manufacturer who submits a 510(k) application must ensure that any device submitted under this 510(k) route be as safe and effective as its predicate device and not raise new questions about safety or effectiveness.

16.     Cook IVC filter medical devices known as the Günther Tulip MR*Eye* Vena Cava Filter and Günther Tulip Vena Cava Filter ("Tulip") and Celect Vena Cava Filter ("Celect") were intended to be deployed in the inferior vena cava (IVC), to prevent pulmonary embolism in

---

[3] FD&C Act, Section 501 (21 U.S.C. Section 351(c))

patients at risk for such outcomes, and for whom traditional anti-coagulation was contra-indicated.  As discussed below, Cook was required to establish that the Celect was as safe and effective as the Tulip.  Cook also was required to ensure that the quality the Celect did not fall below that which it purported or was represented to possess.

### III. COOK MARKETED THE CELECT IVC FILTER UNDER THE 510(K) REGULATORY FRAMEWORK WHICH REQUIRED A SHOWING OF SUBSTANTIAL EQUIVALENCE TO PREDICATE DEVICES AND NOT PROOF OF SAFETY AND EFFICACY.

### A. General Framework for the Regulation of Medical Devices

17.     The Food and Drug Administration (FDA) is one of the nation's most important consumer protection agencies.  It is responsible for implementing the nation's food, drug, and medical device laws.  "Before 1976, medical devices could be marketed without review by the U.S. Food and Drug Administration (FDA).  Periodic attempts to regulate some devices as drugs, for which the agency did require premarketing clearance, proved to be cumbersome and inadequate.  Spurred by the increased technological complexity of devices and mounting disclosures of shortcomings involving pacemakers, intrauterine devices, and intraocular lenses, Congress enacted the comprehensive Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic Act.  The primary purpose of the amendments was to ensure that new devices were safe and effective before they were marketed."[4]

18.     The Federal Food, Drug, and Cosmetic Act (hereinafter, the "Act") (21 U.S.C. 301 *et seq.*), as amended by the Medical Device Amendments of 1976 (the "1976 amendments") (Public Law 94-295), the Safe Medical Devices Act of 1990 (the "SMDA") (Public Law 101¬629), the Food and Drug Administration Modernization Act of 1997 ("FDAMA") (Public

---

[4] Kessler DA *et al.*, The Federal Regulation of Medical Devices, *The New England Journal of Medicine*, August 8, 1987.

Law 105-115), the Medical Device User Fee and Modernization Act ("MDUFA") (Public Law

107−250) and the medical device provisions of the Food and Drug Administration Amendments

Act of 2007 ("FDAAA") (Public Law 110-85), along with the applicable regulations in the Code

of Federal Regulations, established a framework for the regulation of medical devices intended

for human use.

19.     Congress established three classes of devices, based on the regulatory

requirements needed to provide reasonable assurance of their safety and effectiveness. The three

classes of devices are class I, class II, and class III. Class I devices present no unreasonable risk

of illness or injury and are subject to regulation through "general controls." 21 U.S.C.

360c(a)(1)(A). Class II devices are potentially more harmful and are subject to general controls,

but FDA in addition has authority to require that such devices comply with other "special

controls." 21 U.S.C. 360c(a)(1)(B). Class III devices present "a potential unreasonable risk of

illness or injury." 21 U.S.C. 360c(a)(1)(C)(ii)(II).

20.     In drafting the 1976 amendments, Congress divided medical devices in two

different ways: (1) according to three classes noted above — class I, II, or III, and (2) according

to seven basic categories — pre-amendment, post-amendment, substantially equivalent, implant,

custom, investigational, and transitional. The current regulatory scheme involved weaving these

two methods of subdivision into a workable statutory framework. Unlike the regulation of new

drugs, in which standards of safety and effectiveness are applied uniformly, the regulation of

devices is based primarily on risk.

21.     More specifically, devices that were in commercial distribution before May 28,

1976 (the date of enactment of the 1976 amendments), generally referred to as pre-amendments

devices, are classified after FDA has: (1) received a recommendation from a device classification

panel (an FDA advisory committee); (2) published the panel's recommendation for comment, along with a proposed regulation classifying the device; and (3) published a final regulation classifying the device.[5]

22.     Devices that were not in commercial distribution prior to May 28, 1976, generally referred to as post-amendments devices, are classified automatically by statute (section 513(f) of the Act (21 U.S.C. 360c(f)) into class III without any FDA rulemaking process.  Those devices remain in class III and require a manufacturer to submit to FDA a premarket approval application, unless or until: (1) the device is reclassified into class I or II; (2) FDA issues an order classifying the device into class I or II in accordance with section 513(f)(2) of the Act (21 U.S.C. 360c(f)(2)); or (3) FDA issues an order finding the device to be substantially equivalent, under section 513(i) of the Act (21 U.S.C. 360c(i)), to a predicate device that does not require premarket approval.

23.     Before a Class III device may be introduced into the market, a manufacturer must obtain a "premarket approval" ("PMA" may refer to either premarket approval or premarket application) from FDA.  (21 U.S.C. 360c(a)(1)(C), 360e(a)).  To obtain a PMA, the manufacturer must submit information to FDA in a premarket approval application that provides reasonable assurance that the device is safe and effective for its intended use.  (21 U.S.C. 360c(a)(1)(C), 360e(a), (c), and (d) (1994 & Supp. IV 1998); 21 C.F.R. Pt. 814).

24.     PMA is the most detailed type of device marketing application and review required by FDA.  The applicant must receive FDA approval of its PMA application prior to marketing the device. Any sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).  PMA requires clinical testing to ensure safety and effectiveness.

---

[5] FD&C Act, Section 513 (21 U.S.C. 360c)

25.     A "grandfathering" provision permits Class III devices that were on the market before the Medical Device Amendment's enactment to remain on the market until FDA initiates and completes a rulemaking requiring the submission of a PMA.  (21 U.S.C. 360e(b)(1)(A)). Congress permitted manufacturers to distribute similar devices by showing through a premarket notification process that they are "substantially equivalent" to grandfathered devices.  (21 U.S.C. 360e(b)(1)(B)).  That premarket notification process is known as the "Section 510(k) process," referring to the applicable section of the Act (21 U.S.C. 360(k)).  A device is "substantially equivalent" to a grandfathered device only if, *inter alia*, the device has the same "intended use" as the predicate device. (21 U.S.C. 360c(i)(1)(A) (1994 & Supp. IV 1998)).

26.     In brief, the following summarizes how the statutory provisions operate in practice:

a.     Medical devices are classified into one of three classes, I, II, or III.

b.     Class III devices pose the greatest risk.  Class I devices pose the least regulatory risk.

c.     The class that a device is in determines the regulatory requirements.

d.     Most class II devices can get on the market by what is called a premarket notification or 510(k) process.

e.     A device that requires the submission of a premarket notification 510(k) cannot be commercially distributed until an authorizing letter of substantial equivalence ("clearance") from FDA is received by the manufacturer.

f.     A 510(k) application must demonstrate that the device is substantially equivalent to a device that (1) was legally in commercial distribution in the US before May 28, 1976; or (2) has been determined by FDA to be substantially equivalent. 510(k) premarket applications can "piggyback" by demonstrating substantial equivalence to a device that has been found substantially equivalent.  This practice has led to significant controversy and concern that many important devices are not being reviewed for safety and effectiveness.[6]

---

[6] Medical Devices and the Public's Health: The FDA 510(k) Clearance Process at 35 Years (2011)

g.  Class III devices need to get on the market through the more thorough Premarket Approval Application process or PMA.

h.  When it enacted the 1976 Medical Device Amendments, Congress required that all implanted devices (devices that were implanted in the human body) be categorized as Class III and thus subject to safety and efficacy review.

i.  The PMA process is more involved and included the submission of clinical data to support claims made for the device.

j.  Devices that are being studied or evaluated are considered investigational devices. In order to obtain the clinical data to support a submission of a device, the manufacturer needs to submit an Investigational Device Exemption (IDE). Higher-risk investigational devices are classified as "significant risk" devices and require greater scrutiny.

k.  An IDE allows the investigational device to be used in a clinical study to collect safety and effectiveness data required to support a PMA application or a premarket notification 510(k) submission to FDA.

l.  Clinical studies of devices with significant risk must be approved by FDA and an Institutional Review Board ("IRB") before a study can begin.

m.  Studies of devices of non-significant risk must be approved by the IRB before a study can begin.

n.  An IRB is a committee that has been formally designated to approve, monitor, and review research studies involving humans with the responsibility to protect the rights and welfare of the research subjects.

o.  When a physician uses an investigational device, the protocols involving those investigational devices must be approved by a local IRB. A local IRB can be established by a university, hospital, or other institution. Each IRB must have at least five members, with varying backgrounds to promote complete and adequate review of research activities commonly conducted by the institution. The IRB shall be sufficiently qualified through the experience and expertise of its members, and the diversity of the members, to safeguard the rights and welfare of human subjects. (45 C.F.R. § 690.101).

p.  The Center for Devices and Radiological Health within FDA is delegated, by the Commissioner, with the responsibility for regulating medical devices.

**B.     Substantial Equivalence**

27.     According to FDA:

"A 510(k) requires demonstration of substantial equivalence to another legally U.S. marketed device.  Substantial equivalence means that the new device is at least as safe and effective as the predicate.

A device is substantially equivalent if, in comparison to a predicate it:

- has the same intended use as the predicate; and
- has the same technological characteristics as the predicate; or
- has the same intended use as the predicate; and
- has different technological characteristics and the information submitted to FDA:
    - does not raise new questions of safety and effectiveness; and
    - demonstrates that the device is at least as safe and effective as the legally marketed device.

A claim of substantial equivalence does not mean the new and predicate devices should be identical.  Substantial equivalence is established with respect to intended use, design, energy used or delivered, materials, chemical composition, manufacturing process, performance, safety, effectiveness, labeling, biocompatibility, standards, and other characteristics, as applicable."[7]

28.     FDA also has stated: "A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device (21 CFR 807.92(a)(3)) that is not subject to PMA. Submitters must compare their device to one or more similar legally marketed devices and make and support their substantial equivalency claims."[8]

29.     Thus, to qualify for substantial equivalence, a device must not raise new questions about safety and effectiveness.

---

[7] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/Premarket Submissions/PremarketNotification510k/ucm2005718.htm (emphasis in original)
[8] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/Premarket Submissions/PremarketNotification510k/ucm2005718.htm.

### C.      Substantial Equivalence is Not FDA Approval — It is Clearance

30.      A determination by the FDA in the 510(k) process that a device is substantially equivalent to a predicate device is not a finding that the device is safe and effective for its intended conditions of use.

31.      The fact that a 510(k) clearance is not a finding of safety and efficacy was addressed by the United States Supreme Court in the *Medtronic v. Lohr* case.[9]

32.      The United States government, through the Solicitor General, filed a brief in that case setting out the position of FDA and the United States government, which stated: "[t]he clearance of a post-Amendments device under Section 510(k)—based on a determination that the device is substantially equivalent to a pre-Amendments Class III device—does not reflect a determination by the FDA that the device is safe and effective, much less a specific determination that the device's design is required to ensure its safety and effectiveness. [A] determination of substantial equivalence...is not equivalent to an approval by the FDA of the device's safety and effectiveness.' H.R. Rep. No. 808 [101st Cong., 2d Sess. (1990)], at 14 . . . As the court of appeals observed, the FDA ordinarily will not have determined whether the pre-Amendments device was safe and effective (since the FDA lacked the general authority to do so prior to enactment of the Amendments)….[A]ccordingly, FDA regulations specify that a substantial equivalence determination 'does not in any way denote official approval of the device,' and that any representation conveying 'an impression of official approval...is misleading and constitutes misbranding."[10]

---

[9] *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)
[10] Brief for the United States as Amicus Curiae Supporting Respondents/Cross-Petitioners, pp. 19-20, *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (No. 95-754)

33.     The Court's opinion distinguished the "rigorous PMA review" from the 510(k)

clearance process and found them "by no means comparable."[11]

34.     The Court said that "in contrast to the 1,200 hours necessary to complete a PMA

review, the § 510(k) review is completed in an average of only 20 hours."[12]

35.     The Court specifically stated: "Although 'substantially equivalent' Class III

devices may be marketed without the rigorous PMA review, such new devices, as well as all new

Class I and Class II devices, are subject to the requirements of § 360(k).  That section imposes a

limited form of review on every manufacturer intending to market a new device by requiring it to

submit a `premarket notification' to the FDA (the process is also known as a § 510(k) process,'

after the number of the section in the original Act).  If the FDA concludes on the basis of the

§ 510(k) notification that the device is 'substantially equivalent' to a pre-existing device, it can

be marketed without further regulatory analysis (at least until the FDA initiates the PMA process

for the underlying pre-1976 device to which the new device is 'substantially equivalent').  The

§ 510(k) notification process is by no means comparable to the PMA process; in contrast to the

1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an

average of only 20 hours.  *See* 1987 Hearings, at 384.  As one commentator noted: 'The

attraction of substantial equivalence to manufacturers is clear.  [Section] 510(k) notification

requires little information, rarely elicits a negative response from the FDA, and gets processed

very quickly.'  Adler, The 1976 Medical Device Amendments: A Step in the Right Direction

Needs Another Step in the Right Direction, 43 Food Drug Cosm. L. J. 511, 516 (1988); *see also*

Kahan, 39 Food Drug Cosm. L. J., at 514-519."[13]

---

[11] *Lohr*, 518 U.S. 470 at 478
[12] *Id.*
[13] *Id.* at 478-479

16

36.     The Court noted "[t]he 510(k) process is focused on *equivalence*, not safety."

Specifically, the Court stated "[t]he company's defense exaggerates the importance of the

§510(k) process and the FDA letter to the company regarding the pacemaker's substantial

*equivalence* to a grandfathered device.  As the court below noted, '[t]he 510(k) process is

focused on equivalence, not safety.' 56 F. 3d, at 1348.  As a result, 'substantial equivalence

determinations provide little protection to the public.  These determinations simply compare a

post-1976 device to a pre-1976 device to ascertain whether the later device is no more dangerous

and no less effective than the earlier device.  If the earlier device poses a severe risk or is

ineffective, then the later device may also be risky or ineffective.' Adler, 43 Food Drug Cosm. L.

J., at 516.  The design of the Model 4011, as with the design of pre-1976 and other `substantially

equivalent' devices, has never been formally reviewed under the MDA for safety or efficacy."[14]

37.     Justice O'Connor, with whom Chief Justice Scalia and Justice Thomas joined,

concurring in part and dissenting in part, stated "[t]he § 510(k) process merely evaluates whether

the Class III device at issue is substantially equivalent to a device that was on the market before

1976, the effective date of the MDA; if so, the later device may be also be marketed."[15]

38.     One may argue that to the extent that there are no differences between a

substantially equivalent device and its predicate, the device that is found to be substantially

equivalent should be safe and effective.  The problem with that argument is that the predicate

device has never itself been found to be safe and effective.

39.     There are instances where FDA can under the 510(k) clearance process request

"clinical data."  FDA can request clinical data from a manufacturer to determine whether a

device's indication for use falls within the device's intended use.  FDA can also request clinical

data if the agency has determined that the 510(k) submission has new technological

---

[14] *Id.* at 492-493 (emphasis in original)
[15] *Id.* at 513

characteristics relative to its predicate.  That determination of new technological characteristics is based in significant part on the manufacturer telling the FDA that the device has new technological characteristics.

40.    FDA acknowledges the 510(k) process has "evolved" over time.[16]  On July 28, 2014, FDA stated in a guidance document, "[t]he 510(k) review standard (substantial equivalence of a new device to a legally marketed (predicate) device) differs from the PMA review standard (reasonable assurance of safety and effectiveness).  The 510(k) review standard is comparative, whereas the PMA standard relies on an independent demonstration of safety and effectiveness.  Nonetheless, the principles of safety and effectiveness underlie the substantial equivalence determination in every 510(k) review.  The standard for a determination of substantial equivalence in a 510(k) review is set out in section 513(i) of the FD&C Act. . . ."[17]

41.    The Institute of Medicine in its report titled "Medical Devices and the Public's Health: The FDA 510(k) Clearance Process at 35 Years" ("IOM Report"), concluded: "The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions.  The 510(k) process cannot be transformed into a premarket evaluation of safety and effectiveness as long as the standard for clearance is substantial equivalence to any previously cleared device."[18]

42.    FDA has limited resources and must rely on the data submitted by the manufacturer.

### D.    FDA Standards for Device Labeling

43.    The general labeling requirements for medical devices are set out in 21 CFR § 801.

---

[16] The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] —Guidance for Industry and Food and Drug Administration Staff (July 28, 2014)

[17] *Id.* at 6.

[18] IOM Report at 5.

44.     On March 8, 1991, the Director of the Office of Device Evaluation made public a "Device Labeling Guidance." FDA, General Program Memorandum #G91-1.[19]

45.     The document stated "[w]hile this guidance is primarily intended to ensure the adequacy of, and the consistency in, the labeling information for devices subject to premarket approval, it may also contribute to premarket notification reviews."[20]

46.     The Device Labeling Guidance set out the following general sections for a device label: 1) Indications for Use, 2) Contraindications, 3) Warnings, 4) Precautions, and 5) Adverse Reactions.  The Device Labeling Guidance stated for the Warnings section in relevant part: "Describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. Include an appropriate warning if there is reasonable evidence of an association of a serious hazard with the use of the device.  A causal relationship need not have been proved."[21]

47.     In addition to these labeling requirements, Section 301(a) of the FD&C Act prohibits misbranded drugs and devices from being introduced into interstate commerce.[22] Section 502(a) of the FD&C Act states that a device is misbranded if its labeling is false or misleading in any particular. [23]  FDA guidance titled "Labeling: Regulatory Requirements for Medical Devices," dated August 1989, states:

> Section 502(a) declares that a drug or device is misbranded if its labeling proves false or misleading in any particular. The phrase 'false or misleading' is not confined in meaning to untrue, forged, fraudulent, or deceptive.  In fact, the word, statement, or illustration may be true in the strict sense of the word; however, the labeling can be deemed by the FDA to be in violation of the law if it proves deceptive to the customer.  It is not

---

[19] FDA, Device Labeling Guidance, Gen. Program Memo. #G91-1 (1991)

[20] *Id.*

[21] *Id.*

[22] 21 USC § 331(a). The Act also prohibits manufacturers from introducing devices into interstate commerce "for any intended use that is outside FDA's substantial equivalence determination (clearance) for such devices." (FDA Guidance on Responding to Unsolicited Requests for Off-Label Information (2011).

[23] 21 U.S.C § 352(a)

a necessary condition that the labeling should be flatly and baldly false;
the word 'misleading' in the Act means that labeling is deceptive if it is
such as to create or lead to a false impression in the mind of the reader. A
'false impression' may result not only from a false or deceptive statement,
but may also be instilled in the mind of the purchaser by ambiguity or
misdirection.  It may also be caused by failure to inform the consumer of
facts that are relevant to those statements actually made.  In other words,
the label that remains silent as to certain consequences may be as
deceptive as the label that contains extravagant claims.[24]

48.    FDA's labeling guidance also gives examples of false and misleading

misrepresentations. These examples include: "ambiguity, half-truths, and trade puffery" and

"failure to reveal material facts, consequences that may result from use, or the existence of

difference of opinion."  Thus, labeling may be misbranded if it makes a misleading statement or

fails to inform the consumer of facts that are relevant to those statements actually made.[25]

49.    A "Perspective" in The New England Journal of Medicine, June 1st, 2006, arose

from the work of a panel that conducted an investigation of some potentially fatal malfunctions

of implantable defibrillators. That commentary included certain principles relevant to the

framework for conduct of medical device manufacturers, as follows:

a.    "First, manufactured products can never be entirely free of design or
manufacturing flaws, but when the consequence of a malfunction is a potentially
fatal event, tolerance and surveillance strategies should aim to achieve a risk of
malfunction that is as close to zero as possible.

b.    Second, physicians must know about the performance features of any device they
recommend for a patient so that they can carry out their ethical obligation of
obtaining informed consent. This information must be in a form that is
understandable and clinically useful.

c.    And third, patients have a right to obtain product information so they can make
informed decisions about risks and benefits and can understand what expectations
are reasonable.

---

[24] See also FDA Guidance "Labeling: Regulatory Requirements for Medical Devices" (1989)
[25] Id. at 4-5.  There are counterpart "mini-FDA" state laws as well, many of which track the federal standards and
definitions and would be subject to the same or a similar analysis.

d.     All companies are required by the Food and Drug Administration to evaluate device malfunctions systematically in the postmarketing phase to identify those that are clinically significant to correct defects and to act to prevent failures in performance. These internal processes necessarily center on engineering skills and methods, but the consequences of device malfunctions are more than an issue for engineering. They have clinical implications for patients that may include a risk of fatal events. Thus, engineering performance standards are insufficient benchmarks without evaluation by experts of the possible effects on individual patients.

e.     [C]ompanies must reevaluate their approach to patient safety in the context of communication. A critical question is when and how information about product performance should be communicated to physicians and patients. Although the issues, both ethical and practical, are complex, one conclusion is clear: Transparency in matters that affect patient safety should be embraced as a primary corporate obligation.

f.     From the perspective of physician and patient expectations, corporate responsibility and public perception, we believe that proactive communication policies centering on the proper use of active and passive transparency should be the norm.

g.     Corporate culture fosters a loyalty to corporate goals that may create unintended bias and distorted perceptions about product performance and patient safety."[26]

**E.     FDA Standards for Medical Device Reporting**

50.     Following clearance of a device through the 510(k) process, a device manufacturer has adverse-event reporting obligations pursuant to 21 CFR, Part 803, which establishes requirements for medical device reporting for device manufacturers and others.[27] The regulations include several technical definitions that are discussed in detail below with reference to manufacturers' reporting obligations.

51.     Facilities such as hospitals, ambulatory surgical facilities, nursing homes, and outpatient diagnostic or treatment facilities (which are not a physician's office) are called

---

[26] Robert J. Myerburg, M.D., David W. Feigal, Jr., M.D., M.P.H., and Bruce D. Lindsay, M.D. "Life-Threatening Malfunction of Implantable Cardiac Devices," *The New England Journal of Medicine*, 2006 Jun 1;354(22):2309-11.
[27] Part 803 is divided into five subparts: Subpart A "General Provisions: (§§ 803.1-803.19); Subpart B "Generally Applicable Requirements for Individual Adverse Event Reports" (§§ 803.20-803.23); Subpart C "User Facility Reporting Requirements" (§§ 803.30-803.33); Subpart D "Importer Reporting Requirements" (§§ 803.40-803.42); and Subpart E "Manufacturer Reporting Requirements" (§§ 803.50-803.58).

"device user facilities" and have certain mandatory reporting obligations in connection with death or serious injury.[28]

52.     "Importers" also have reporting obligations. Importer is defined to include "any person who imports a device into the United States and who furthers the marketing of a device from the original place of manufacture to the person who makes final delivery or sale to the ultimate user, but who does not repackage or otherwise change the container, wrapper, or labeling of the device or device package. If you repackage or otherwise change the container, wrapper, or labeling, you are considered a manufacturer as defined in this section." An importer must report to FDA and the manufacturer when it learns that one of its devices may have caused or contributed to a death or serious injury.  An importer must report only to the manufacturer when its imported device has malfunctioned and would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.[29]

53.     Medical device manufacturers are subject to the most extensive mandatory reporting requirements.  "Manufacturer" is defined as follows:

> *Manufacturer* means any person who manufactures, prepares, propagates, compounds, assembles, or processes a device by chemical, physical, biological, or other procedure. The term includes any person who either:

---

[28] In brief, device user facilities must report suspected medical device-related deaths to FDA and to the manufacturer, if known; and must report suspected medical device-related serious injuries to the manufacturer or, if the manufacturer is unknown, to FDA. Device user facilities are not required to report device malfunctions even where the malfunction would likely cause or contribute to death or serious injury were the malfunction to recur. However, they may voluntarily report such events through MedWatch. Regulatory definitions and MedWatch are discussed below. See 21 CFR §§ 803.30-803.33.  Note that physician's offices are not device user facilities and have no reporting obligations. See 21 CFR § 803.3(a) (defining ambulatory surgical facility); (d) (defining device user facility); (i) (defining hospital); (q) (defining nursing home); (r) (defining outpatient diagnostic facility); (s) (defining outpatient treatment facility); and (u) (defining physician's office).

[29] See 21 CFR §§ 803.40-803.42 and 21 CFR § 803.3(j) (defining importer). Also relevant is the definition of "distributor" is defined in § 803.3(e) ("*Distributor* means any person (other than the manufacturer or importer) who furthers the marketing of a device from the original place of manufacture to the person who makes final delivery or sale to the ultimate user, but who does not repackage or otherwise change the container, wrapper, or labeling of the device or device package. If you repackage or otherwise change the container, wrapper, or labeling, you are considered a manufacturer as defined in this section.")

(1)     Repackages or otherwise changes the container, wrapper, or labeling of a device in furtherance of the distribution of the device from the original place of manufacture;

(2)     Initiates specifications for devices that are manufactured by a second party for subsequent distribution by the person initiating the specifications;

(3)     Manufactures components or accessories that are devices that are ready to be used and are intended to be commercially distributed and intended to be used as is, or are processed by a licensed practitioner or other qualified person to meet the needs of a particular patient; or

(4)     Is the U.S. agent of a foreign manufacturer.[30]

54.     FDA issued in March 1997 a guidance titled "Medical Device Reporting for Manufacturers."[31] The guidance summarized a manufacturer's reporting obligations in Table 1:

| REPORTER | WHAT TO REPORT | REPORT FORM # | TO WHOM | WHEN |
|---|---|---|---|---|
| Manufacturer | 30 day reports of deaths, serious injuries and malfunctions | Form FDA 3500A | FDA | Within 30 calendar days from becoming aware of an event |
| Manufacturer | 5-day reports on events that require remedial action to prevent an unreasonable risk of substantial harm to the public health and other types of events designated by FDA | Form FDA 3500A | FDA | Within 5 work days from becoming aware of an event |
| Manufacturer | Baseline reports to identify and provide basic data on each device that is subject of an MDR report. At this time, FDA has stayed the requirement for denominator data requested in Part II, Items 15 and 16 on Form 3417. | Form FDA 3417 | FDA | With 30 calendar, and 5 work day reports when device or device family is reported for the first time. Interim and annual updates are also required if any baseline information changes after initial submission. |
| Manufacturer | Annual Certification | Form FDA 3381 | FDA | Coincide with firm's annual registration dates. |

---

[30] 21 CFR §§ 803
[31] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 6, Table 1. The annual certification requirement was revoked by the FDA Modernization Act of 1997 and was removed from the regulation as published January 26, 2000 (65 FR 4112)

55.     On November 8, 2016, FDA issued a superseding final guidance titled "Medical Device Reporting for Manufacturers,"[32] a draft of which originally issued on July 9, 2013.[33] Strictly speaking, the FDA's 1997 guidance governed MDR reporting for Cook IVC filters through November 2016. From a regulatory perspective, the 2013 draft guidance would be expected to shape manufacturers' expectations and performance, but as stated in the document, it was distributed "for comment purposes only" and "[w]hen final" it would supersede the 1997 guidance.[34]

56.     As noted in the 1997 guidance, "FDA relies on the goodwill and cooperation of all affected groups," including manufacturers, "to accomplish the objectives of the regulation."[35] The guidance was clear that these obligations extended to foreign manufacturers, who were "fully subject to the medical devices reporting requirements."[36]

57.     Under the regulations, manufacturers are required to report device-related deaths, serious injuries, and malfunctions "whenever they become aware of information that reasonably suggests that a reportable event has occurred (one of their devices has or may have caused or contributed to the event.)"[37]

---

[32] FDA Guidance, Medical Device Reporting for Manufacturers (2016).

[33] The most significant change from the 2013 draft guidance to the 2016 final guidance was its re-adoption of the "two-year rule." (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 12-13). As discussed below, a manufacturer is required to file a report when it becomes aware of an event in which one of its devices malfunctioned and the malfunction would be likely to cause or contribute to a death or serious injury were the malfunction to recur. The 1997 guidance stated that once a malfunction actually caused or contributed to a death or injury, it would be presumed that the malfunction was likely to cause death or serious injury until two years had passed in which the malfunction did not cause or contribute to death or serious injury. The 2013 draft guidance eliminated this "two-year rule;" the 2016 final guidance reinstated it, but with a recommendation that the manufacturer notify FDA with a summary of its rationale to cease reporting at the end of two years. A manufacturer who seeks to cease reporting in a shorter period of time must request an exemption under 21 CFR § 803.19(d). The 2016 final guidance also stated that certain contract manufacturers need not file reports. (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 14-15). It also recommends that "user error" if there was no other device-related performance error. (*Id.* at 7). Finally, the final guidance clarifies that a delay in surgery due to a malfunction is MDR reportable even if the patient suffered no adverse consequences. (*Id.* at 27).

[34] FDA Guidance, Medical Device Reporting for Manufacturers (2013)

[35] *Id.* at viii

[36] *Id.* at 3-4

[37] *Id.* at 8

58. "Reportable events" for a manufacturer under the rules include death, serious injury, and device malfunction. Reportable events must be reported within 30 days[38] and supplemented within 30 days of receiving new or changed information.[39] A report may be required within 5 work days under certain circumstances.[40/41]

59. The critical definitions for determining a manufacturer's duty to report adverse events include the following (with italics representing defined terms):

a. An *MDR Reportable Event* (or *reportable event*) for manufacturers means:

An event that manufacturers or importers *become aware* of that reasonably suggests that one of their marketed devices:

(1) May have *caused or contributed* to a death or *serious injury*, or

(2) Has *malfunctioned* and that the device or a similar device marketed by the manufacturer or importer would be likely to *cause or contribute* to a death or *serious injury* if the malfunction were to recur.[42]

b. A manufacturer is deemed to have *become aware* when:

an employee … has acquired information that reasonably suggests a reportable adverse event has occurred…. If you are a manufacturer, you are considered to have become aware of an event when any of your employees becomes aware of a

---

[38] 21 CFR § 803.50

[39] 21 CFR § 803.56

[40] 21 CFR 803.53. 5-day reports may be requested by FDA and are required when "[a]n MDR reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health," including when indicated through "trend analysis." Manufacturers also were required to submit "baseline reports" when an event for a device model or device family was reported for the first time. 21 CFR § 803.55. This requirement was removed from the regulation effective October 27, 2008. (73 FR 33692 and 73 FR 53686) (See FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 2 n.2)

[41] Manufacturers typically become aware of events through "complaints," which they must review and evaluate. "Complaint" is defined as "any written, electronic, or oral communication that alleges deficiencies related to the identity, quality, durability, reliability, safety, effectiveness, or performance of a device after it is released for distribution." 21 CFR § 820.3(b). Under the 1997 guidance, a "complaint" included "any indication of the failure of a device to meet customer or user expectations for quality or to meet performance specifications." (FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 31). See 21 CFR § 820.198 for a manufacturer's procedural and record-keeping duties with respect to adverse event complaints.

[42] 21 CFR § 803.3(o)

reportable event that is required to be reported…. [or when] any … employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.[43]

The term "reasonably suggests" as used in this definition "includes any information, such as professional, scientific, or medical facts and observations or opinions, that would reasonably suggest that a device has caused or contributed to a reportable event."[44]

    c.    *Caused or contributed* (to a death or *serious injury*) means that:

a death or *serious injury* was or may have been attributed to a medical device, or that a medical device was or may have been a factor in a death or *serious injury*, including events occurring as a result of: (1) Failure, (2) *Malfunction*, (3) Improper or inadequate design, (4) Manufacture, (5) Labeling, or (6) User error.[45]

Thus, a device is deemed to have *caused or contributed* to an event if it "may have been" a factor in a death or *serious injury* including events resulting from failure or *malfunction* (defined below) and "user error."  The term "user error" included "any error made by the person using the device" whether the sole cause or merely a contributing cause to a reportable event.[46]

    d.    A *serious injury* includes: "an injury or illness that:"

    (1)    Is life-threatening,

    (2)    Results in permanent impairment of a body function or permanent damage to a body structure, or

---

[43] 21 CFR § 803.3(b)

[44] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 35. The 2016 guidance includes a similar interpretation of the phrase "reasonably suggests," defining it as "any information, including professional, scientific, or medical facts, observations, or opinions that would cause you to come to a reasonable conclusion that a device has caused or may have caused or contributed to an MDR reportable event." (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 6).

[45] 21 CFR § 803.3(c)

[46] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 36. The 2016 guidance defines "user error" as "a device-related error or mistake made by the person using the device" whether it is the sole or merely a contributing cause to a reportable event. (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 7). FDA reasoned in both guidances that *user error* may indicate deficiencies in labeling.

(3) Necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure. Permanent means irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage.[47]

"Life-threatening" events constitute a *serious injury* "even if temporary in nature."[48] FDA addressed this issue in responding to comments and adopting the final rule in 1995, stating: "FDA believes that life-threatening events that may have been caused by a device must be reported, regardless of whether the damage was 'temporary.'"[49]

Regardless of whether an injury or illness is life-threatening, it constitutes a *serious injury* if it results in "permanent impairment," or "permanent damage to a body structure." The term "Permanent impairment" means "irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage."[50]  According to FDA, "any intervention is per se 'significant' if it is necessary to preclude permanent impairment of a body function or permanent damage to a body structure,"[51] and this is true "regardless of the immediacy of the surgical or medical intervention."[52]

An injury or illness is a *serious injury* if it necessitates surgical or medical interventions to prevent permanent impairment or permanent damage to a body structure.  FDA clarified in 2016 that not every delay in surgery would be reportable, but "[a] delay of surgery due to a defective product, such as a broken suture, or other malfunction of the device where the patient

---

[47] 21 CFR § 803.3(w)

[48] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 9, 36. See also FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 10 ("a life-threatening injury meets the definition of serious injury, regardless of whether the threat was 'temporary.'"); 60 Fed. Reg. 63579 (Dec. 11, 1995) at 63587 (Final Rule 21 CFR 803 & 807) ("life-threatening events may include temporary damage")

[49] 60 Fed. Reg. 63579 (Dec. 11, 1995) at 63587

[50] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 35. See also FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 10 (2016 guidance)

[51] 60 Fed. Reg. 63579 (Dec. 11, 1995) at 63586

[52] *Id.* at 63586

remained stable with no adverse consequences may be MDR reportable as a malfunction."[53] The 2016 guidance also clarified that "a device does not have to *malfunction* for it to cause or contribute to a serious injury. Even though a device may function properly, it can still cause or contribute to a death or serious injury."[54]

    e.    *Malfunction* "means the failure of a device to meet its performance specifications or otherwise perform as intended. Performance specifications include all claims made in the labeling for the device. The intended performance of a device refers to the intended use for which the device is labeled or marketed, as defined in 801.4 of this chapter."[55]

The first potential *malfunction* is a failure of the device to meet performance specifications, which include all claims made in the device's "labeling." The term "labeling," includes "all labels and other written, printed or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."[56] FDA has "liberally" interpreted the word "accompanying" so that it "extends to posters, tags, pamphlets, circulars, booklets, brochures, instruction books, direction sheets, fillers, etc."[57] Accordingly, the failure of a device to live up to a manufacturer's representations regarding performance constitutes a *malfunction*.

The second potential *malfunction* is a failure of the device to "otherwise perform as intended," which, under 21 CFR § 801.4:

> Refer[s] to the objective intent of the persons legally responsible for the labeling of devices. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent

---

[53] FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 27
[54] FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 10-11
[55] 21 CFR § 803.3(k)
[56] FD&C Act, Section 201(m) (21 USC § 321(m)); FDA, Device Labeling Guidance, Gen. Program Memo. #G91-1 (1991), Attachment at 1
[57] FDA Guidance "Labeling: Regulatory Requirements for Medical Devices" at 2 (1989). See also *Kordel v. United States*, 335 U.S. 345, 346-47 (1948) (defining "labeling" expansively)

may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised…..

FDA's 1997 guidance clarified the meaning of *malfunction*:

A malfunction should be considered reportable if any one of the following is true:

- the chance of a death or serious injury resulting from a recurrence of the malfunction is <u>not</u> remote;

- the consequences of the malfunction affect the device in a catastrophic manner that may lead to a death or serious injury;

- the malfunction causes the device to fail to perform its essential function and compromises the device's therapeutic, monitoring or diagnostic effectiveness which could cause or contribute to a death or serious injury, or other significant adverse device experiences. The essential function of a device refers not only to the device's labeled use, but for any use widely prescribed within the practice of medicine;

- the malfunction involves a long-term device implant that would prevent the implant from performing its function;

- the device is considered life-supporting or life-sustaining, and thus essential to maintaining human life; or

- the manufacturer takes or would be required to take action under section 518 or 519(f) of the FD&C Act as a result of the malfunction of the device or other similar devices.[58]

The first bullet point incorporates the *MDR reportable event* requirement to report a device *malfunction* if "the device or a similar device marketed by the manufacturer or importer would be likely to *cause or contribute* to a death or *serious injury* if the malfunction were to recur.[59]   The 2013 draft guidance and 2016 final guidance both clarify that a "similar" device is one with the same "[b]asic design and performance

---

[58] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 33-34.
[59] 21 CFR § 803.3(o)

29

characteristics related to device safety and effectiveness; intended use and function; and device classification and product code." Devices that "differ only in minor features unrelated to safety or effectiveness can be considered similar devices," and devices may be deemed "similar" if they share the same brand name or common name.[60]

Importantly, FDA stated with respect to recurrence: "Reporters do not need to assess the likelihood that the malfunction will recur. The regulation assumes that if a malfunction has occurred once, the malfunction will recur. Furthermore, FDA believes that once malfunction has caused or contributed to a death or serious injury, a presumption that the malfunction is likely to cause or contribute to a death or serious injury has been established."[61] The presumption "continues until the malfunction has caused or contributed to no further deaths or serious injuries for two years, or the manufacturer can show, through valid data, that the likelihood of another death or serious injury as a result of the malfunction is remote."[62]

60. In summary, a manufacturer, whether foreign or domestic, must report an event as a serious injury or death when it becomes aware of information reasonably suggesting that its

---

[60] FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 11; FDA Guidance, Medical Device Reporting for Manufacturers (2013) at 12. For example, Cook reported to FDA adverse events for the Celect with the catalog number IGTCFS-65-1-FEM-CELECT (marketed in the U.S.) but did not report to FDA adverse events for the Celect with the catalog number IGTCFS-65-2-FEM-CELECT (marketed in Europe) although the filters were "the exact same device," according to an email from Mette Nielsen in WCE Regulatory Affairs to Cook Vice President of Quality Assurance Tom Roberts. (045 2880) ("we have decided only to include catalog numbers marketed in the US (IGTCFS-1-FEM/JUG/UNI-CELECT) in the response letter, though we know that is not the whole story.") Also see 019 9001 (related email); 045 2882 (FDA request); 045 2891(draft response to FDA); 045 2883 (alternate draft response to FDA).

[61] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 9, 34

[62] *Id.* at 10. The 2013 draft guidance included the same presumption, but eliminated the two-year rule. (FDA Guidance, Medical Device Reporting for Manufacturers (2013)) at 11. The 2016 final guidance includes the presumption, but reinstates the two-year rule. (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 11). The 2013 draft guidance also clarified that "the malfunction of a long-term implant [per the fourth bullet point] is reportable only when the malfunction would be likely to cause or contribute to a death or serious injury if it were to recur," i.e., long-term implants are subject to the same rules as other devices. (FDA Guidance, Medical Device Reporting for Manufacturers (2013) at 11).

device may have been a factor in causing or contributing to a death or serious injury, even if caused by user error. The manufacturer must report an event as a malfunction when it becomes aware of information reasonably suggesting (1) that its device failed to perform as the manufacturer intended or as the manufacturer represented it would perform in its labeling, and (2) the device, or a similar one marketed by the manufacturer might be a factor in causing or contributing to a death or serious injury should the malfunction recur. Once the malfunction has occurred, it is presumed that it will recur, and once a malfunction causes death or serious injury, it is presumed that the same malfunction would do so were it to recur.

61.     FDA hosts a publicly available database called Manufacturer and User Facility Device Experience (MAUDE).[63] The database provides public access to information from MDRs, subject to redaction of trade secrets and other sensitive information.[64]

62.     FDA has stated that adverse event reporting by manufacturers and others "help[s] us to protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use."[65] To facilitate this regulatory purpose, it is imperative that manufacturers comply scrupulously with reporting requirements.

F.     **Physicians' Abilities to Assess the Safety and Efficacy of Medical Devices**

63.     In my opinion, physicians are rarely in a position to determine whether a device is safe and effective. That is the responsibility of the manufacturer.

64.     Physicians in practice are rarely in a position to undertake scientific studies to assess the safety and efficacy of medical devices and physicians in practice are rarely in a position to undertake clinical studies to assess the safety and efficacy of medical devices.

---

[63] Generally speaking, MAUDE includes reports dating back to 1991 (with manufacturer reports since August 1996). A more limited MDR database includes data regarding incidents from 1984 through July 31, 1996. See https://www.fda.gov/downloads/Training/CDRHLearn/UCM234355.pdf
[64] 21 CFR § 803.9
[65] 21 CFR § 803.1

65.     There are physicians who are specially-trained and have dedicated their careers to investigating the safety and efficacy of medical devices.  In many instances they undertake studies of medical devices at the behest of the manufacturer who intends to sell the device.  In most cases, it is the manufacturer that funds physician investigators to undertake such clinical trials.  These physician investigators are usually distinct from physicians in practice, whose primary focus is on taking care of patients.

66.     Physicians in practice are in the position of reading the medical literature and keeping abreast of developments.  Time constraints limit the ability of these physicians to keep abreast of all medical literature on a subject.

67.     While physicians in practice read the medical literature, articles dealing with specialized scientific questions relating to a device are often published in the scientific, rather than medical, literature.  It is more likely that a physician in practice will read the medical literature rather than the scientific literature.  For example, engineering and other pre-clinical data could be published in the scientific engineering literature.  Data that has clinical relevance to practicing physicians would likely be published in the medical literature.

68.     The results of scientific and clinical testing done by a manufacturer are submitted as part of a 510(k) or PMA application.  Those results, unless published elsewhere, are usually not available to practicing physicians.  In certain instances, FDA may put online portions of a 510(k) application that were the subject of a Freedom of Information Act request.  More generally, 510(k) listings and/or clearance letters, in contrast to the application itself, are

32

available online. It would be the rare instance where a practicing physician would review the scientific and clinical testing that is part of a 510(k) or PMA application, unless such scientific and clinical testing was published elsewhere.

69.     Physicians in practice gather their information about the safety and efficacy of a medical device from various sources. These may include the IFU, the medical literature, peers, teachers, conferences, promotional materials, and actual medical practice.

70.     While a physician in practice can observe how a device performs in an individual or group of patients, such a physician cannot assess the safety and efficacy of a device in a controlled setting.

71.     Observations of adverse events from a physician in practice, while anecdotal, are important pieces of information that comprise the "safety profile" of a device.

72.     As FDA has long acknowledged, while isolated case reports, random experience, and reports lacking sufficient details to permit scientific evaluation are not regarded as valid scientific evidence to demonstrate safety or effectiveness, such information may be considered in identifying a device that has questionable safety and effectiveness.

### IV.    THE REGULATORY HISTORY OF COOK'S TULIP AND CELECT FILTERS.

### A.    Clearance Chronology for Tulip and Celect in the US.

73.     The following table (Table 1) provides a timeline of significant clearance events for the Tulip and Celect filters in the United States, which are discussed in more detail throughout this report.

**Table 1. Selected Events Regarding Tulip & Celect U.S. Clearance.**

| Date | Event | K Number |
|---|---|---|
| 1998.10.28 | 510(k) application for the Günther Tulip Vena Cava MR*eye* Filter Set Source: 006 1818[66] | K983823 |
| 1999.01.26 | NSE determination on the 10/28/98 submission Source: 018 2248 | K983823 |
| 2000.03.15 | Re-submission of the Günther Tulip 510(k) application (permanent use only) Source: IVCF 000002 | K000855 |
| 2000.10.18 | Clearance for Günther Tulip (permanent use) Source: IVCF 000492 | K000855 |
| 2003.08.05 | 510(k) application for Günther Tulip (retrievable use) IVCF 000496 | K032426 |
| 2003.10.31 | Clearance for Günther Tulip (retrievable use) Source: IVCF 001040 | K032426 |
| 2004.07.30 | 510(k) application for the Cook 2nd Generation Vena Cava Filter (Celect) Source: 006 0699 (Cover Letter); 006 1277 (Submission) | K042067 |
| 2005.02.01 | NSE determination on the 7/30/04 submission Source: 006 1161 | K042067 |
| 2006.06.26 | Re-submission of the its Celect 510(k) application Source: IVCF 002055 (Summary); IVCF 001964 (Submission) | K061815 |
| 2007.04.20 | Clearance of Celect (permanent use) Source: IVCF 004157 | K061815 |
| 2007.11.30 | 510(k) application for Celect (retrievable use) Source: IVCF 004160 at 4179 | K073374 |
| 2008.03.07 | Clearance of Celect (retrievable use) Source: IVCF 004347 | K073374 |
| 2012.06.01 | 510(k) application for Celect Platinum Source: IVCF 005099  (Cover Letter); IVCF 005102 (Submission) | K121629 |
| 2012.07.03 | Clearance of Celect Platinum (permanent and retrievable use) Source: IVCF 005732 | K121629 |

B.     **Tulip is Cleared for Marketing in the US.**

74.     On October 28, 1998, Cook submitted a 510(k) application for its Günther Tulip Vena Cava MR*eye* Filter Set ("Tulip") for the prevention of recurrent pulmonary embolism in specified circumstances (K983823).[67]  The filter had been marketed in Europe since August 13, 1995.[68]  Cook stated that the Günther Tulip was substantially equivalent to Stainless Steel *Greenfield Vena Cava Filter* and the *LGM-Vena Tech* 30 Series filters.[69]

---

[66] Throughout this report 7-digit references are to "CookMDL2570_" bates numbers. Specific page references are included only for lengthy documents.
[67] 006 1818
[68] 018 2248
[69] 006 1818 at 1840

75.     FDA denied clearance on January 26, 1999.[70]

76.     Cook resubmitted a 510(k) application on March 15, 2000 (K000855).  It sought clearance "for the permanent placement indication only" as the original 1998 submission had been denied "due to a retrievability function,"

The Tulip was cleared for permanent placement on October 18, 2000.[72]

77.     On August 5, 2003, Cook submitted a 510(k) application for clearance of the Tulip with an option to retrieve the device (K032426).[73]  The Tulip was cleared for permanent placement with a retrievability option on October 31, 2003.[74]

C.

---

[70] 018 2248

[72] IVCF 000492. The Tulip was cleared based upon the following indications for use: "prevention of recurrent pulmonary embolism (PE) via placement in the vena cava in the following situations: pulmonary thromboembolism when anticoagulant therapy is contraindicated; failure of anticoagulant therapy in thromboembolic diseases; emergency treatment following massive PE where anticipated benefits of conventional therapy are reduced; and chronic, recurrent PE where anticoagulant therapy has failed or is contraindicated." (IVCF 000492 at 494)
[73] IVCF 000496
[74] IVCF 001040. The indications for use were identical to those in the permanent clearance. Additionally, the clearance stated: "The Günther Tulip Vena Cava Filter may be retrieved according to the instructions supplied in the section labeled: Optional Filter Retrieval. A retrieval set for jugular retrieval also was cleared. (IVCF 1040 at 1042)

84.     In 2005 Dr. Rolf Günther, Dr. Jörg Neuerburg, and others (including WCE Director of Research Arne Mølgaard-Nielsen) published an article in a German medical journal titled "New Optional IVC Filter for Percutaneous Retrieval – In Vitro Evaluation of Embolus Capturing Efficiency."[84]  The article, which compared the clot-trapping efficiency of the Tulip and Celect filters, stated: "Although clinical experience has shown that the Tulip filter can be retrieved beyond the standard recommendation of 10 days after insertion, certain features of the filter construction, such as the loop-like secondary wires of the Tulip filter, may be an obstacle to even longer retrieval times.  Once the loop of the secondary wires has been overgrown with neointima, retrieval may be difficult, as the loop may be bound by fibrous tissue. We hypothesized that eliminating the loop and leaving the end of those wires only slightly curved would facilitate percutaneous retrieval and prolong the retrieval period without deteriorating the embolus capturing efficiency.  Preliminary data indicate that much longer dwell-times (90 days and more) until filter retrieval might be possible."[85]

_____

[84] Fortschr Roentgenstr 2005; 2005:632-636 (075 0585). The article is published in English.
[85] 075 0585 at 0589. The article also acknowledges that retrieval "avoid[s] the well-documented late sequelae of permanent IVC filters," citing Decousus et al, A clinical trial of vena caval filters in the prevention of pulmonary embolism in patients with proximal deep-vein thrombosis. New England J Med 1998; 338:409-415, which concluded that "[i]n high-risk patients with proximal deep-vein thrombosis, the initial beneficial effect of IVC filters for the prevention of pulmonary embolism was counter-balanced by an excess of recurrent deep-vein thrombosis, without any difference in mortality." (037 9211 at 9211)  Also see 075 0585 at 0786 ("In view of the long-term sequelae of IVC filter insertion, there is currently a trend toward optional IVC filters….")

96.     In October 2007 Dr. Arno Buecker of the University of Aachen published an article titled "Long-Term Retrieval of Modified Günther Tulip Filters,"[105] Co-authors included WCE Director of Research Arne Mølgaard Nielsen, Dr. Jörg Neuerburg, and Dr. Rolf Günther. The article stated regarding the Tulip: "Although … studies proposed longer possible filter dwell times, there are still some concerns about the ingrowth of the filter struts into the vena cava

---

[105] *Invest. Radiology* 2007; 42:692-696.

vessel wall, which may require excessive force to advance the sheath over the tissue fixed to the filter struts.  Consequently, the design of the Günther Tulip was changed to prevent the possibility of any loops to be fixated to neointimal covering.  Opening of the loops and reforming them as straight struts will facilitate will facilitate withdrawal of these filter struts without major trauma…. [T]he modified design of the Celect filter solves the problem of long-term retrievability seen with the original design of the Günther tulip filter."[106]

### D.    Celect is Cleared for Marketing in the US

99.    Cook submitted a 510(k) application to FDA for its Cook 2nd Generation Vena Cava Filter (Celect) on July 30, 2004.[108]  Cook stated that "[T]he Cook 2nd Generation Vena Cava Filter is substantially equivalent to the following  predicate devices in terms of materials, design features and intended use:  Cook Günther Tulip Vena Cava MR*eye* Filter and Retrieval Set (K032426) and the Cook Günther Tulip Vena Cava MR*eye* Filter (K000855)."[109]

---

[106] 016 0576 at 0579-80 (emphasis added)

[108] 006 0699 (Cover Letter); 006 1277 (Submission)
[109] 006 1277 at 1306

100.    On February 1, 2005, FDA denied clearance and issued a Not Substantially Equivalent (NSE) letter.[110]  FDA expressed concerns regarding, among other things, vessel wall perforations in Cook's animal study and lack of supporting clinical data.  FDA indicated that clinical data would be required for clearance.[111]

101.    On June 26, 2006, Cook resubmitted a 510(k) application.[112]  Cook's 2006 re-submission identified the predicate device as "Günther Tulip Vena Cava Filter #K000855."[113]

102.    On April 20, 2007, FDA cleared the device for the prevention of recurrent pulmonary embolism via placement in the vena cava via either the jugular or femoral vein for certain specific situations.[114]  FDA's clearance did not include any provision for the filter to be retrievable.[115]

103.    On November 30, 2007, Cook submitted Celect for clearance with a retrievable option using the Günther Tulip Retrieval Set.[116]  Cook stated that "[t]he proposed Cook Celect Vena Cava Filter and Günther Tulip Vena Cava Filter Retrieval Set are similar to the predicate Cook Celect Vena Cava Filter and Günther Tulip Vena Cava Filter Retrieval Set…. William Cook Europe ApS holds the 510(k) for the Celect Vena Cava Filter, determined to be substantially equivalent on April 20, 2007.  There is no change in the design, dimensions or

---

[110] 006 1161
[111] 006 1163
[112] IVCF 001964
[113] IVCF 001964 at 1975
[114] IVCF 004157. The Celect was cleared based upon the following indications for use: "Intended for the prevention of recurrent pulmonary embolism (PE) via placement in the vena cava in the following situations: Pulmonary thromboembolism when anticoagulant therapy is contraindicated; Failure of anticoagulant therapy in thromboembolic diseases; Emergency treatment following massive PE where anticipated benefits of conventional therapy are reduced; and Chronic, recurrent PE where anticoagulant therapy has failed or is contraindicated." These intended uses are identical to the intended uses for which the Günther Tulip originally was cleared. (IVCF 001964 at 1978, 1993)
[115] IVCF 004157
[116] IVCF 004160 at 4179

materials in either the cleared Celect Vena Cava Filter…. The indications for use are expanded to include retrieval of the Cook Celect Vena Cava Filter."[117]

104.    FDA cleared the device, including optional retrieval, on March 7, 2008.[118]

105.    Of note, Cook's original July 2004 510(k) application for the Celect stated: "Testing was conducted to demonstrate that the filter fixes itself within the vena cava at the deployment site with no tendency to perforate the caval wall. Radial force testing and observation from the animal study are reported…. Testing demonstrates that the Cook 2nd Generation Vena Cava Filter fixes itself within the vena cava at the deployment site with no tendency to perforate the caval wall."[119]

106.    Cook's applied for clearance of its Celect Platinum filter on June 1, 2012.[120]

107.    The Celect Platinum was a version of the Celect filter with modified anchor points.  Cook's 510(k) application for the Platinum noted the addition of "radiopaque markers" and stated: "The radiopaque marker on each primary leg is constructed from a platinum tungsten alloy; the radiopaque markers enhance filter visibility on procedural imaging."[121]

108.    FDA cleared the Platinum for permanent and retrievable use on July 3, 2012.[122]

109.    On June 3, 2014, Cook announced it was "introducing the next-generation of a proven technology at the 2014 Annual Vascular Meeting of the Society for Vascular Surgery (SVS) and the SVS Foundation."[123]

---

[117] IVCF 4160 at 4194

[118] IVCF 004347. The indications for use were the same as with the 2007 Celect clearance. The clearance letter added: "The filter may be retrieved according to the instructions supplied in the section labeled "Optional Filter Retrieval." (IVCF 004347 at 4349)

[119] 006 1277 at 1297-98 (emphasis added)

[120] IVCF 005099  (Cover Letter); IVCF 005102 (Submission)

[121] IVCF 005102 at 5113-14

[122] IVCF 005732 at 735

**V.      A DEVICE MANUFACTURER MUST ENSURE THAT THE QUALITY OF ITS DEVICE DOES NOT "FALL BELOW THAT WHICH IT PURPORTS OR IS REPRESENTED TO POSSESS."**

111.     In addition to, and independent from, the requirement that a device manufacturer must ensure that a device is as safe and effective as its predicate, the manufacturer also must ensure that the product is not adulterated, which ensures, in part, the quality of its device does not "fall below, that which it purports or is represented to possess."[125]  If the quality of the device does fall below that which it purports or is represented to be, the product is deemed "adulterated" under the statute.  The consequence of a product being adulterated is that it may not be marketed until and unless its adulterated quality is rectified.  This provision requires the manufacturer to ensure that the device is safe throughout its marketed life.

112.     For the Celect filter, Cook represented that these filters met performance standards.

---

[123] https://www.cookmedical.com/peripheral-intervention/celect-platinum-ivc-filter-introduced-at-svs/

[125] 21 USC § 351(c)

113. Accordingly, in my opinion, as represented by Cook:

114.    In my opinion, Celect fell below the quality which it purported or was represented

to possess, and thus was adulterated under the Federal Food, Drug & Cosmetic Act,

## VI.    THE CELECT FILTER FELL BELOW THE QUALITY THAT IT PURPORTED OR WAS REPRESENTED TO POSSESS.

115.    As noted above, in my opinion, Cook had an obligation to ensure:

**A.**

**B.**

125.     On July 30, 2004, Cook submitted to FDA a 510(k) application for its Cook 2nd Generation Vena Cava Filter (Celect).[138] The study protocol and a summary of the 30-day results for VCA1 were furnished to FDA with the original 510(k) submission.[139] On August 18, 2004, FDA requested "the animal study histographs, micrographs, or photos and histopathology data in color,"[140] which Cook provided.[141]

---

[138] 006 0699 (Cover Letter); 006 1277 (Submission)
[139] 006 1429
[140] 006 0858
[141] 006 0866

128.    On February 1, 2005, FDA denied clearance and issued a Not Substantially

Equivalent (NSE) letter.[148]

_____

[148] 006 1161

136.    Cook re-submitted the Celect 510(k) on June 26, 2006.[164]  It included in its

submission (Appendix C) the final reports for VCA1 30-day, 60/90-day, 180-day and 360-day

results.[165]

---

[164] IVCF 001964 at 1975

[165] Appendix C included: a report on the Dotter Institute Acute Animal Migration Test and VCA1 30-day results (IVCF 002058-2235); 60/90-day results (IVCF 002236-2592); 180-day results (IVCF 002593-2792) and 360-day results (IVCF 002793-3232).

Between
October 2005 and May 2008 Cook conducted a clinical study on the long-term clinical
retrievability of Celect. It was conducted at sites outside the United States and hence is often

referred to as the "OUS study."  It eventually was published and the lead author was Dr. Stuart

Lyon, although, as discussed below, the published article was written by MEDI Director for

Regulatory Science Jennifer Brown and she (along with MEDI Vice President Bill Voorhees)

appeared as an author.[276]  ("Lyon/Cook article")

---

[276] Lyon, et al. "Short- and Long-term Retrievability of the Celect Vena Cava Filter: Results from a
Multiinstitutional Registry," JVIR; 10:1441-1448  (Nov. 2009)

*C1.*     ***Background to the OUS Study***

204.    In June 2006 Cook resubmitted its 510(k) application for Celect but did not include any clinical data for Celect.[284]

### C2.    The OUS Study's Overall Design

---

[284] IVCF 001964 at 1985 ("No clinical trial data is included.") & 2053 (seeking to substitute Tulip clinical data)

210.   The Lyon/Cook article was published in the Journal of Vascular and
Interventional Radiology in 2009.[293]   The article addressed        95         patients.[294]

**C3.**

211.   The terms "penetration" and "perforation" often carry different technical
definitions in the IVC filter context.  Whether "penetration" or "perforation" or some other term
is used, however, there is and has been for many years a general standard to which those terms
refer when they are intended to convey protrusion of an IVC filter component outside the vena
cava (as opposed to fixation in the vena cava wall). That standard is greater than 3mm (>3mm).
The following tables (Tables 3a and 3b) summarize representative sources over time for the
>3mm standard, as explained further in text that follows.

_____

[293] Lyon, et al. "Short- and Long-term Retrievability of the Celect Vena Cava Filter: Results from a Multiinstitutional Registry," JVIR; 10:1441-1448 (Nov. 2009) ("Lyon/Cook article").
[294] Lyon/Cook article at 1442. The article stated: "the data cannot be used to assess the safety and performance associated with use of the device as a permanent filter," (*Id.* at 1448),

**Table 3a. Representative Sources For >3mm Standard (Medical Literature)**

| Year/Source | Term Used/Standard |
|---|---|
| 1993: Ferris, et al., Percutaneous Inferior Vena Caval Filters: Follow-Up of Seven Designs in 320 Patients, *Radiology* 188: 851-856 (*Note:* Cited in Celect 2006 Clinical Evidence Report. (016  1380 at 1432)) | "Definitions … **IVC penetration---**Filter components extending **more than 3 mm** outside the wall of the IVC …" |
| 1998: Linsenmaier, et al., Indications, Management and Complications of Temporary Inferior Vena Cava Filters, *J. Cardiovasc. Interv. Radiol.* 21:464-469 (*Note:* Submitted by Cook in 2000 Tulip 510(k) (IVCF 000246)) | "Complication… **IVC penetration > 3 mm**" |
| 2007: Sadaf, Significant Caval Penetration by the Celect Inferior Vena Cava Filter: Attributable to Filter Design?, *JVIR* 18:1447-1450 (038 2236 at 2238) | "**penetration** as extension of filter components by **more than 3 mm** outside the IVC as depicted on CT, cavography, abdominal duplex ultrasonography, or autopsy." (citing Ferris, *supra*, and calling this "true caval perforation") |
| 2009: de Gregorio, Laparoscopic Demonstration of Vena Cava Wall Penetration by IVC Filters on an Ovine Model, *34th Annual SIR Meeting Presentation* (037 3150) | Cook consultant commenting on Cook filter study "Filter **penetration**: extension of filter components by **more than 3 mm** outside de IVC s depicted on CT, cavography, ultrasonography or autopsy" (citing Ferris & Sadaf, *supra*) |
| 2016 Literature: Montgomery & Kaufman, A Critical Review of Available Inferior Vena Cava Filters and Future Directions, *Semin. Interv. Radiol.* 33:79-87 | "When describing complications, **most publications conform to the SIR Standards** of Practice Committee definitions…. **Filter penetration** describes a strut or anchoring device extending **more than 3 mm** outside of the vena cava." |

**Table 3b. Representative Sources For >3mm Standard (Medical Societies, Regulatory Authorities & Cook)**

| Year/Source | Term Used/Standard |
|---|---|
| 2001 SIR: Society for Interventional Radiology – Grassi, et al., Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism, *J. Vasc. Interv. Radiol.*12:137-141 (083 0744) | "IVC penetration: Penetration of the vein wall by filter hooks with transmural incorporation. For quality reporting improvement purposes, the definition of **IVC penetration** is filter strut or anchor devices extending **more than 3 mm** outside the wall of the IVC demonstrated by CT, US, venography, or autopsy." |
| 2005 ACR: American College of Radiology – ACR Practice Guideline for the Performance of Percutaneous Inferior Vena Cava (IVC) Filter Placement for the Prevention of Pulmonary Embolism | "IVC penetration: Penetration of the vein wall by filter hooks with transmural incorporation. For quality reporting improvement purposes, the definition of **IVC penetration** is filter strut or anchor devices extending **more than 3 mm** outside the wall of the IVC as demonstrated by CT, US, venography, or autopsy." |
| 2008 ISO/SIR: | |
| 2009 CIRSE: Cardiovascular and Interventional Radiological Society – CIRSE Quality Improvement Guidelines for Percutaneous Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism | "**IVC Penetration --** Penetration of the vein wall by filter hooks with transmural incorporation. For quality reporting improvement purposes, the definition of **IVC penetration** is filter strut or anchor devices extending **more than 3 mm** outside the wall of the IVC demonstrated by CT, US, venography, or autopsy." |

---

[295] *JVIR* encourages authors to apply SIR reporting standards in defining terms for manuscripts. See: https://www.elsevier. com/__data/promis_misc/jvir_ita.pdf (*JVIR* Instructions for Authors).

| 2009 MHRA: Medicines and Healthcare Products Regulatory Agency (UK) – Guidance on the Vigilance System for CE-Marked Devices | "2.2 Perforation/erosion … **IVC filter perforation more than 3 mm** outside the inferior vena cava wall should be reported." |
|---|---|
| 2011 ISO: ISO Standard 25539-3 (077 1220 at 1284) | **Caval perforation** defined as "Filter strut or anchor devices extending **more than 3 mm** outside the wall of the IVC, as demonstrated by CT or autopsy." |

212.    As seen above, IVC penetration may refer to fixation within the "vein wall" with "transmural incorporation" which would leave just the anchor hook, if anything, outside the vein wall (SIR/ACR/ISO standards).  But leading journals, regulatory authorities, and medical societies have recognized for years the significance of protrusion >3mm and some (like ISO and MHRA) distinguish "penetration" from "perforation" based on the >3mm standard. Whatever name is used, protrusion >3mm is "the standard that comes from the SIR definition,"

a.      The Society for Interventional Radiology's 2001 guidelines defined "IVC

penetration" for quality reporting purposes as "filter strut or anchor devices extending more than

3 mm outside the wall of the IVC demonstrated by CT, US, venography, or autopsy."[300]

b.     The ISO 25539-3 standard distinguishes between "penetration" and "perforation," defining "caval perforation" by the >3mm standard"[304]   The MHRA in the UK parallels the ISO standard, defining "perforation/erosion" by the >3mm standard and requiring adverse incident reports for all perforations.[305]

---

[300] 083 0744 at 0745

[304] 077 1220 at 1284. ISO defines "Caval penetration" as "Filter strut or anchor devices which become incorporated in the wall of the cava but do not extend more than 3 mm outside of the wall. Does not cause extravasation of dye." The draft ISO definition was the same in 2008 was known to Director of Research Arne Mølgaard and MEDI Director of Non-Clinical Testing Brian Choules in 2008. (079 9288 (email) & 079 9289 (definitions)).
[305] MHRA, Guidance on the vigilance system for CE-marked medical devices (2009) at 4-5 & MHRA, Guidance for manufacturers on reporting device-specific adverse incidents under the European vigilance system (2014).

      c.       FDA's November 1999 Guidance for Cardiovascular Intravascular Filter 510(k)

Applications,[307] uses the words "penetration" and "perforation" in addressing the requirements

for 510(k) applications.

                                                 The Lyon/Cook article defined perforation as "strut

protruding out of the IVC wall."  The article claimed that by this definition, there were no

perforations in the study.

---

[307] FDA, Guidance for Cardiovascular Intravascular Filter 510(k) Applications (1999) ("1999 Guidance").

*C4.*

223.    FDA's November 1999 Guidance for Cardiovascular Intravascular Filter 510(k)

Applications,[318]

_____

[318] FDA, 1999 Guidance

included a section titled "Clinical Investigations." It stated: "The intent of the clinical study should be to demonstrate that the rates of complications for the investigational filter are comparable to other marketed vena cava filters. Although the risks themselves are well described in the literature, the definitions and methods used to determine the rates are inconsistent and highly variable. Therefore, it is critical to prospectively define and identify the methods of analysis for each potential complication. The complications identified and analyzed during the course of the clinical investigation should include the following... :

> 5. Caval penetration: Determination of caval penetration is complicated. Examination via cavography may show filter hooks or legs outside the flow of contrast. This is not necessarily due to penetration. It may be due to endothelialization or tenting of the vena cava or locations in tributary veins. Computed tomography (CT) scans can be used to help rule out some false positives. After correction for magnification, filter base diameter from hook to hook should be recorded from both the implant and follow-up plain films. If an increase in filter base diameter of ≥ 5 mm is recorded, a CT scan should be performed to confirm or exclude the position of filter legs outside of the inferior vena cava. Any other changes, which may be suggestive of possible filter leg penetration of the vena cava, should trigger a CT scan, regardless of increase in the filter base diameter.[320]

The guidance also states that "any" change that "may be suggestive of possible filter leg penetration … should trigger a CT scan."

---

[320] IVCF 042414 at 2421 (emphasis added)

*C5.*

**Table 4.**

[327] In my role as Commissioner of the FDA, I regularly sought and relied upon the input and analyses of healthcare experts in reaching regulatory determinations, including reliance upon the opinions of biostatisticians, epidemiologists, and medical doctors from various disciplines. For this report, I consulted with Dr. Rajebi and reviewed the images available for the 21 patients reported as "penetrations."

[328] The exhibit to Dr. Rajebi's report discussing penetrations/perforations is attached as Schedule 7 to this report.

[329] Only 58 patients had attempted retrievals. Under the standard >3mm definition, 12.1% of that population had perforations. Under the Lyon/Cook article definition of perforation, Cook's study documents show a 17.2% perforation rate.

a.   In June 2006 Cook resubmitted the Celect 510(k).[331]

---

[331] IVCF 001964.

FDA cleared the Celect as a permanent device 10 days later on April 20, 2007.[341]

---

[341] IVCF 004157 (emphasis added)

c.    Cook applied for clearance of Celect as a retrievable filter in November 2007.

238.    The published Lyon/Cook version of the study in the Journal of Vascular and Interventional Radiology claimed there were 21 "penetrations" but no "perforations."[347]  JVIR is the same journal that publishes the SIR guidelines defining "IVC penetration" as discussed above ("filter strut or anchor devices extending more than 3 mm outside the wall of the IVC demonstrated by CT, US, venography, or autopsy").  The principal author was Dr. Stuart Lyon, who participated in the study.  The article included as authors MEDI Vice President and Chief Science Officer William Voorhees as well as MEDI Director of Regulatory Science Jennifer Brown.[348]

a.    Under the heading Study Endpoints and Analysis, the article stated that the "primary objective of the study was to verify the safety and performance of the Celect filter by assessing the incidence and severity of adverse events associated with retrieval of the device" and that the composite major complication rate included "hemorrhage, PE, vena cava perforation, procedure-related death, occlusion, significant migration [>20mm], and filter fracture…."[349]

b.    In the Filter Retrieval section of the article, the authors stated:

"Strut penetration (ie, transmural incorporation or filter incorporation into the IVC wall) was noted in 21 patients based on preretrieval imaging. Importantly, there was no evidence of IVC perforation (ie, strut protruding out of the IVC wall) or extravasation or hemorrhage in any patient, and there were no patient-reported complications typically associated with perforation (e.g., pain)."[350]

---

[347] Lyon/Cook article at 1445
[348] *Id.* at 1441
[349] *Id.* at 1444
[350] Lyon/Cook article at 1445 (emphasis added).

c.      Again, in the Discussion section, the article stated: "Complications that occurred before and after retrieval procedures were assessed. There were no reports of significant filter migration, filter fracture, IVC occlusion, or IVC perforation in the present study."[352]

d.      The article also compared Celect's complication rates with those reported in a study of its competitor filter, the Bard G2 filter, noting: "A separate report on the retrievability of the Recovery G2 filter also included a high retrieval success rate (100%; n = 51) at a mean indwell time of 53.4 days (range, 7–242 d). However, caval penetration was observed in nine patients (18%)…. Based on these data, the incidence of device-related complications (eg, penetration, migration, extreme tilt) for the Recovery G2 filter appears to be higher than that for the Celect filter."[353]  The article did not reveal that the Bard G2 study employed the standard definition for IVC penetration (endpoint: "presumed caval penetration (struts extending more than 3 mm outside the contrast medium-filled IVC lumen)."[354]  The G2 study used CT to assess suspected perforation.[355]

_____

[352] *Id.* at 1447 (emphasis added)
[353] *Id.* at 1448
[354] Oliva, et al, Recovery G2 Inferior Vena Cava Filter: Technical Success and Safety of Retrieval, JVIR 2008; 19:884 at 885.
[355] *Id.* at 887 & 888, Fig. 3.

While the Lyon/Cook article, published in the leading journal for interventional radiologists, claimed that it counted every "strut protruding out of the IVC wall" as a "perforation" it told readers, "[i]mportantly, there was no evidence of IVC perforation" in the study.[357]

    a.    MEDI Director of Regulatory Science Jennifer Brown

is listed as the contact for correspondence in the

---

[357] Lyon/Cook article at 1445

The article was submitted in November 2008 and accepted for publication in July 2009 after revision.

Imaging data at follow-up and at retrieval were examined for evidence of

---

[358] Lyon/Cook article at 1441

*C6.*

245.    Cook

repeatedly cited the study to purportedly demonstrate the Celect filter's safety as a medical device with respect to perforations.

246.    After the Celect received clearance, Cook cited the OUS study in its IFUs, which accompanied every device sold to medical providers.

a.    The 2008 Celect IFU included information on 74 patients and, although its "Potential Adverse Events" section included "Vena cava perforation," the "Clinical Studies" section cited the OUS and stated: "No device related major adverse events (defined as hemorrhage, perforation, death, occlusion, filter fracture or significant filter migration) have occurred."[366]  Cook's 2009 Celect IFUs contained the same language,[367] as did its 2012 Celect IFU.[368]

b.    The same language appears in the Celect Platinum IFU, which also states: "Previously published clinical studies for the Celect filter suggest probable clinical results for the successful retrieval of the Celect Platinum filter."[369]

c.    Cook's IFUs note that perforation is a "potential adverse event," but then state that no perforations occurred out of 74 patients in the OUS study

---

[366] 001 2374 at 2379. Other 2008 Celect IFUs contain the same language. (001 2338 at 2342; 001 2350 at 2354; 001 2362 at 2366; 044 5420 at 5425)

[367] 016 1696 at 1699; 016 1684 at 1687; 016 1707 at 1710; 016 5984 at 5987

[368] 018 7167 at 7172

[369] Platinum IFU US-1203-425-01 (2012) at 6; Platinum IFU US-1203-427-01 (2012) at 6; Platinum IFU US-1203-423-01 (2012) at 7. The Platinum IFUs include "Vena cava perforation/penetration" as potential adverse events.

d.     In my opinion, Celect and Celect Platinum were misbranded with respect to perforation.  IFUs constitute "labeling" and a medical device is misbranded if its labeling is "false or misleading" in any particular.  As FDA has stated: "It is not a necessary condition that the labeling should be flatly and baldly false; the word 'misleading' in the Act means that labeling is deceptive if it is such as to create or lead to a false impression in the mind of the reader…. A 'false impression' … may also be caused by failure to inform the consumer of facts that are relevant to those statements actually made.  In other words, the label that remains silent as to certain consequences may be as deceptive as the label that contains extravagant claims."[370]

247.    Cook used the OUS study in its promotion and marketing communications, which also constitute "labeling" under the FD&C Act.[371]

---

[370] See also FDA Guidance "Labeling: Regulatory Requirements for Medical Devices" (1989).

[371] In addition to direct promotion by Cook, the article has been cited 61 times in the medical literature according to a PubMed search conducted March 12, 2017.

**D.**

251.     As has been my past practice, although I am a Professor of Biostatistics, I have
repeatedly throughout my career asked other biostatisticians to carry out statistical analyses of
data.  I asked counsel to engage a biostatistician to review the data discussed in this section.  Dr.
Rebecca Betensky is a Professor of Biostatistics at the Harvard School of Public Health.

266. Dr. Betensky conducted a number of analyses based upon the detailed data in Schedule 4, which are presented in summary fashion above. All of her conclusions and the bases for those conclusions are set forth in her report (Schedule 5), and a summary of her conclusions is set forth in Schedule 4.

267. Dr. Betensky's conclusions included the following:

279.    By mid-2007, after the Celect had received clearance with a permanent indication in the United States,

290.    Celect was cleared as a retrievable device six weeks later on March 7, 2008.[448]

_____

[448] IVCF 004347

307.    The redesigned Celect (Celect Platinum) was submitted for 510(k) clearance on

June 1, 2012.[489]

---

[489] IVCF 005099 & 005102

308.     Cook applied for clearance of its Celect Platinum filter on June 1, 2012.[490]  FDA

cleared the Platinum for permanent and retrievable use on July 3, 2012.[491]

309.     Cook's 510(k) application for the Platinum noted the addition of "radiopaque

markers" and stated: "The radiopaque marker on each primary leg is constructed from a platinum

tungsten alloy; the radiopaque markers enhance filter visibility on procedural imaging."[492]

Elsewhere in the submission, Cook stated:

a.     "The filter implant has a radiopaque marker on each primary leg to enhance filter visibility on procedural imaging."[493]

b.     "This proposed device modification (i.e., addition of a platinum radiopaque marker to each primary filter leg to enhance filter visibility on procedural imaging) has been assessed through William Cook Europe's design control process."[494]

c.     "The filter implant is substantially equivalent to the predicate devices (Table 1). In comparison to the predicate devices, the ends of the primary filter legs for the proposed Cook Celect Platinum Vena Cava Filter implant are modified to enhance filter visibility on procedural imaging."[495]

d.     "Compared to the Cook Celect Vena Cava Filter, the Cook Celect Platinum Vena Cava Filter has a radiopaque marker (a platinum tungsten alloy) on each of its primary legs to enhance filter visibility on procedural imaging."[496]

e.     "Compared to the predicate devices, the Cook Celect Platinum Vena Cava Filter implant is substantially equivalent to the Cook Celect Vena Cava Filter implant (K073374, K090140, and K121057). In comparison to the predicate devices, the proposed Cook Celect Platinum Vena Cava Filter has a platinum marker on each of its primary legs. The platinum material enhances visibility of the primary legs on procedural imaging."[497]

---

[490] IVCF 005099  (Cover Letter); IVCF 005102 (Submission)
[491] IVCF 005732 at 735
[492] IVCF 005102 at 5113-14
[493] IVCF 005102 at 5114
[494] IVCF 005102 at 5120
[495] IVCF 005102 at 5123
[496] IVCF 005102 at 5124
[497] IVCF 005102 at 5127

f.    "Biocompatibility, performance bench testing, and animal testing data … support this enhancement in filter design [radiopaque markers]; testing results demonstrate that the change does not affect the safety and effectiveness of the proposed device…. The fundamental scientific technology of the device is not affected by the addition of the platinum markers. The addition of the platinum markers to the Cook Celect Platinum Vena Cava Filter implant to enhance filter visibility does not raise new types of safety and effectiveness questions."[498]

g.    "[E]ach primary leg of the Cook Celect Platinum Vena Cava Filter implant also has platinum radiopaque marker (composed of a platinum tungsten alloy) to enhance filter visibility on procedural imaging…."[499]

310.    The "Risk Analysis" attached as Appendix A to the application stated: "The Cook Celect Platinum filter is identical to the Cook Celect filter except for the addition of radiopaque markers on the Celect Platinum filter. The radiopaque markers are added to improve the radiopacity of the filter."[500]

The Celect Platinum was cleared for marketing in the U.S. on July 3, 2012.[502]

312.    On June 3, 2014, Cook announced it was "introducing the next-generation of a proven technology at the 2014 Annual Vascular Meeting of the Society for Vascular Surgery (SVS) and the SVS Foundation."  It stated: "Celect Platinum's proven IVC filter is designed to

---

[498] IVCF 005102 at 5127
[499] IVCF 005102 at 5142
[500] IVCF 005201 at 5202

[502] IVCF 005732

enhance visibility.  The specially designed anchors and platinum markers on the filter's feet allow secure caval fixation."[503]

313.    According to an October 1, 2014, letter signed by Cook Senior Global Product Manager Darrell Talbert, the Celect filter remained available for purchase until December 31, 2014.  The letter, addressed to Cook customers, stated, "After December 31, 2014, you will only be able to order the Celect Platinum…. You may use any of the Celect filters that you currently have on your shelf until they are gone."[504]

## VII.    COOK HAD AN OBLIGATION TO ENSURE THAT THE CELECT FILTER WAS AT LEAST AS SAFE AND EFFECTIVE AS THE GÜNTHER TULIP AND TO ENSURE THE SAFETY OF CELECT THROUGHOUT THE LIFE OF ITS PRODUCT.

315.    According to FDA: "a 510(k) requires demonstration of substantial equivalence to another legally U.S. marketed device. Substantial equivalence means that the new device is at least as safe and effective as the predicate."[505]

---

[503] https://www.cookmedical.com/peripheral-intervention/celect-platinum-ivc-filter-introduced-at-svs/
[504] 069 3299
[505] See http://www.fda.gov/MedicalDevices/Device RegulationandGuidance/HowtoMarketYourDevice/ PremarketSubmissions/PremarketNotification510k, last accessed August 9, 2016

317.     As noted by FDA reviewers, "IVC filters are class II devices regulated with special controls requiring FDA clearance of a 510(k) premarket notification, which demonstrates that the device under review is as safe and effective as a device already on the market."[508]

318.     In its original 2004 Celect 510(k) application, Cook stated that "[T]he Cook 2nd Generation Vena Cava Filter is substantially equivalent to the following  predicate devices in terms of materials, design features and intended use:  Cook Günther Tulip Vena Cava MR*eye* Filter and Retrieval Set (K032426) and the Cook Günther Tulip Vena Cava MR*eye* Filter (K000855)."[509]

_____

[508] Angela Smith & Dorothy Abel, "Regulation of Peripheral Vascular Devices," *Endovascular Today* (Nov. 2005).
[509] 006 1277 at 1306

319.    Cook's 2006 re-submission identified the predicate device as "Günther Tulip Vena Cava Filter #K000855."[510]

320.    Cook's 2007 submission for clearance of the Celect as a retrievable device cited the Celect Vena Cava Filter as the predicate device.[511]

321.    In my opinion, Cook had an obligation to ensure that the Celect was at least as safe and effective as the predicate Tulip device and did not raise any new safety questions.

---

[510] IVCF 001964 at 1975
[511] IVCF 4160 at 4194

IX.

A.    **Cook's Clot-Trapping Study and Celect's Clot-Trapping Performance**

335.    Cook carried out a clot-trapping study      in 2004 that was published in the medical literature,[523] relied on in Celect 510(k) applications,[524] and included in its marketing and promotional labeling.[525]

As set forth in                                the published version of the study,[529] Dr. Günther tested the filters in a "flow model simulating the physical parameters of flow in the human IVC."[530] The filters were implanted in simulated IVC tubes of 15mm, 22mm, and 30mm diameters and clots were passed through the tubes, both singly and serially in groups of 5. The filters were tested in both vertical and horizontal orientations (simulating standing and lying positions) and in both centered (concentric) and tilted (eccentric) positions

---

[523] 075 0585
[524] 006 1235 (K042067) & 006 5014 at 5047 (K061815)
[525] 063 9933

[529] 075 0585. The published study included Mr. Mølgaard and Cook consultant Dr. Jörg Neuerburg as co-authors.
[530] 009 1076 at 1078

338.    Below is an example of promotional material (a 2007 Celect marketing brochure) citing Cook's published clot-trapping study:[534]



[1]Günther RW, Neuenburg J, Mossdorf A. New optional IVC filter for percutaneous retrieval – in vitro evaluation of embolus capturing efficiency. Rofo. 2005 May;177(5):632-6.

339.    The graph reports "clot-trapping ability" for Tulip and Celect.  On the left is "clot-trapping success" in percentages and across the bottom are various clot sizes ranging from 3-x5mm to 10x24 mm.  No explanatory text accompanies the bar graph, which represents the following:[535]

---

[534] 063 9933. Also see IVCF 005769 at 5771 (2008 brochure with same table).

[535] Percentages between two lines on the bar graph are confirmed by reference to the published study (075 0585 at 0588, Table 1) and the final study report (009 1076 at 1091, Appx. A & Table 1 (averaging results for 22mm tube).

**Table 7. Clot-Trapping Ability of Celect as Represented**

| Clot Size | Celect % "Clot-Trapping Success" |
|---|---|
| 3x5mm | 70% |
| 3x10mm | 82.5% |
| 3x20mm | 90% |
| 5x10mm | 95% |
| 5x20mm | 95% |
| 7x10mm and larger | 100% |

340.    Cook presents these figures as Celect's "Clot-Trapping Ability" and its "Clot-Trapping Success (%)" by clot size.



**B.      Cook's Representations Regarding Celect's Clot-Trapping Performance**

344.    As seen in the bar graph from 2007 Celect marketing brochure depicted above, which also appears in a 2008 Celect brochure,[545]

_____

[545] IVCF 005769 at 5771

## X.     CONCLUSIONS[548]

In my opinion:

347.    Physicians are rarely in a position to determine whether a device is safe and effective.

---

[548] This is not an all-inclusive list of opinions.  For all opinions please see the entire report.

Signed this 17th day of March, 2017 in San Francisco, California.

_____

David A. Kessler, M.D.

# Appendix A:

# Resume of David A. Kessler, M.D.

# DAVID A. KESSLER

| | |
|---|---|
| 1969-1973 | AMHERST COLLEGE, Amherst, Massachusetts<br>Bachelor of Arts, *magna cum laude* (B.A. Independent Scholar, 1973) |
| 1973-1979 | HARVARD MEDICAL SCHOOL, Boston, Massachusetts<br>Doctor of Medicine (M.D. 1979) |
| 1975-1977 | UNIVERSITY OF CHICAGO LAW SCHOOL, Chicago, Illinois<br>Doctor of Law (J.D., 1978), Harvard Law School, 1977-1978 |
| 1984-1986 | NEW YORK UNIVERSITY GRADUATE SCHOOL OF BUSINESS ADMINISTRATION (Manhattanville), Purchase, New York<br>Advanced Professional Certificate in Management |

## EMPLOYMENT

| | |
|---|---|
| 2003-present | UNIVERSITY OF CALIFORNIA, SAN FRANCISCO<br>Professor of Pediatrics, Epidemiology and Biostatistics |
| 2003-2007 | Dean, School of Medicine<br>Vice Chancellor of Medical Affairs |
| 1997-2003 | YALE UNIVERSITY SCHOOL OF MEDICINE<br>Dean<br>Professor of Pediatrics, Internal Medicine, and Public Health |
| 1990-1997 | UNITED STATES FOOD AND DRUG ADMINISTRATION<br>Commissioner<br>(Appointed by President George H. W. Bush, Reappointed by President William J. Clinton) |
| 1984-1990 | THE HOSPITAL OF THE ALBERT EINSTEIN COLLEGE OF MEDICINE<br>Medical Director |
| 1986-1990 | COLUMBIA UNIVERSITY<br>Julius Silver Program in Law, Science and Technology<br>Lecturer on Law |
| 1982-1984 | MONTEFIORE MEDICAL CENTER<br>Special Assistant to the President |
| 1981-1984 | UNITED STATES SENATE COMMITTEE ON LABOR AND HUMAN RESOURCES, Consultant to the Chairman |

David A. Kessler                                                                 Page 2

## HONORARY DEGREES

| | |
|---|---|
| 1992 | AMHERST COLLEGE, Amherst, Massachusetts<br>Doctor of Science *honoris causa* |
| 1992 | GEORGE WASHINGTON UNIVERSITY, Washington, D.C.<br>Doctor of Science *honoris causa* |
| 1993 | PHILADELPHIA COLLEGE OF PHARMACY AND SCIENCE, Philadelphia,<br>Pennsylvania, Doctor of Science *honoris causa* |
| 1993 | DICKINSON COLLEGE OF LAW, Carlisle, Pennsylvania<br>Doctor of Laws *honoris causa* |
| 1995 | ALBANY MEDICAL COLLEGE, Albany, New York<br>Doctor of Science *honoris causa* |
| 1997 | NORTHEASTERN UNIVERSITY, Boston, Massachusetts<br>Doctor of Science *honoris causa* |
| 1998 | MOUNT SINAI SCHOOL OF MEDICINE, New York, New York<br>Doctor of Humane Letters *honoris causa* |
| 1998 | COLGATE UNIVERSITY, Hamilton, New York<br>Doctor of Science *honoris causa* |
| 1998 | YALE UNIVERSITY, New Haven, Connecticut<br>Master of Arts *privation* |
| 1999 | CONNECTICUT COLLEGE, New London, Connecticut<br>Doctor of Humane Letters *honoris causa* |
| 2001 | DICKINSON COLLEGE, Carlisle, Pennsylvania<br>Doctor of Science, *honoris causa* |
| 2001 | UNION COLLEGE, Schenectady, New York<br>Doctor of Laws, *honoris causa* |
| 2002 | UNIVERSITY OF LOUISVILLE, Louisville, Kentucky<br>Doctor of Public Service, *honoris causa* |
| 2005 | STATE UNIVERSITY OF NEW YORK, Syracuse, NY<br>Doctor of Science, *honoris causa* |

David A. Kessler                                              Page 3

2012        DREXEL UNIVERSITY, Philadelphia, PA
            Doctor of Science, *honoris causa*

2013        CLAREMONT GRADUATE UNIVERSITY, Claremont, CA
            Doctor of Science, *honoris causa*


## HONORS

NATIONAL ACADEMY OF SCIENCES, Public Welfare Medal,
Honorary Member

INSTITUTE OF MEDICINE, Member

AMERICAN SOCIETY OF CLINICAL ONCOLOGY
Distinguished Service Award for Scientific Achievement

AMERICAN ACADEMY OF ARTS AND SCIENCES, Fellow

PHI BETA KAPPA, Amherst College

UNIVERSITY OF CHICAGO LAW REVIEW, Associate Editor

2008 PUBLIC HEALTH HERO AWARD, UC Berkeley

SIGMA XI, The Scientific Research Society of North America

BARNARD COLLEGE Barnard
Medal of Distinction

CASPAR PLATT AWARD, The University of Chicago Law School

HARVARD BLODGETT AWARD IN BIOLOGY, Amherst College

WHITING FOUNDATION GRANT-IN-AID for research at
Sloan-Kettering Institute

NATIONAL SCIENCE FOUNDATION FELLOWSHIP (declined)

JOHN WOODRUFF SIMPSON FELLOWSHIP, awarded by Amherst
College for the study of medicine

ALVAN T.--VIOLA D. FULLER AMERICAN CANCER SOCIETY
JUNIOR RESEARCH FELLOW (declined)

NATIONAL INSTITUTES OF HEALTH TRAINING FELLOWSHIP
RECIPIENT for physiology research at the Marine Biological Laboratory,

David A. Kessler                                                    Page 4

Woods Hole, Massachusetts

PHI DELTA THETA SCHOLARSHIP
DISTINGUISHED PUBLIC SERVICE AWARD
The George Washington University School of Medicine and Health Sciences

UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION
Special Citation

AMERICAN SOCIETY OF PUBLIC ADMINISTRATION
National Capitol Area Chapter
President's Award for Outstanding Achievement

AMERICAN FEDERATION FOR AIDS RESEARCH (AmFAR)
Sheldon W. Andelson Public Policy Achievement Award

THE WOODROW WILSON AWARD FOR DISTINGUISHED
GOVERNMENT SERVICE Johns Hopkins University

HAL OGDEN AWARD
Association of State and Territorial Directors of Health Promotion and
Public Health Education and the U. S. Centers for Disease Control

NATIONAL ORGANIZATION FOR RARE DISEASES (NORD)
Outstanding Service to the Public Health Award

MARCH OF DIMES
Franklin Delano Roosevelt Leadership Award

CHILDREN'S HOSPITAL NATIONAL MEDICAL CENTER
Children's Research Institute Award of Academic Excellence

AMERICAN HEART ASSOCIATION
National Public Affairs Special Recognition Award for Food Labeling

ISRAEL CANCER RESEARCH FOUNDATION
President's Award

INSTITUTE FOR ADVANCED STUDIES IN IMMUNOLOGY AND AGING
Lifetime Public Service Award

AMERICAN LUNG ASSOCIATION
Special Recognition Award

UNIVERSITY OF CHICAGO ALUMNI ASSOCIATION
Professional Achievement Award (Washington, D.C. Chapter)

U. S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

Secretary's Award for Excellence in Public Service

NATIONAL KIDNEY CANCER ASSOCIATION
Progressive Leadership Award

JOHNS HOPKINS UNIVERSITY SCHOOL OF PUBLIC HEALTH
Dean's Medal

AMERICAN CANCER SOCIETY
Medal of Honor

AMERICAN HEART ASSOCIATION
Meritorious Achievement Award

WORLD HEALTH ORGANIZATION Pan
American World Health Organization World
No Tobacco Day Award

AMERICAN HEART ASSOCIATION
National Public Affairs Special Recognition Award for Tobacco

PROFESSIONAL ACHIEVEMENT CITATION, University of
Chicago Alumni Association

PENNSYLVANIA HOSPITAL Molly
and Sidney N. Zubrow Award

AMERICAN LUNG ASSOCIATION OF CONNECTICUT
Humanitarian Award

AMERICAN COLLEGE OF PREVENTIVE MEDICINE
Special Recognition Award

ASSOCIATION OF AMERICAN MEDICAL COLLEGES AND THE ROBERT
WOOD JOHNSON FOUNDATION
David E. Rogers Award for Improving Health and Healthcare of the American
People

JACOBS INSTITUTE OF WOMEN'S HEALTH
Excellence in Women's Health Award

NARAL PRO-CHOICE AMERICA
Lifetime Achievement Award

THE ASSOCIATION OF STATE AND TERRITORIAL CHRONIC DISEASE
PROGRAM DIRECTORS
Joseph W. Cullen Award for Outstanding Contributions to Chronic Disease
Prevention and Control

THE COLLEGE OF WILLIAM & MARY LAW SCHOOL
2005 Benjamin Rush Medal

CALIFORNIA CENTER FOR PUBLIC HEALTH ADVOCACY
David Kessler Award for Extraordinary Contribution to the Public
Health

BOOKS FOR A BETTER LIFE AWARD

## INTERNSHIP & RESIDENCY

1981-1982    SENIOR ASSISTANT RESIDENT, Department of Pediatrics,
             The Johns Hopkins Hospital

1980-1981    ASSISTANT RESIDENT, Department of Pediatrics,
             The Johns Hopkins Hospital

1979-1980    INTERN, Department of Pediatrics,
             The Johns Hopkins Hospital

## ACADEMIC APPOINTMENTS

2003-        UNIVERSITY OF CALIFORNIA, SAN FRANCISCO
present      Professor of Pediatrics
             Professor of Epidemiology and Biostatistics

1997-        YALE UNIVERSITY
2003         Professor of Pediatrics
             Professor of Internal Medicine
             Professor of Public Health

1990-        ALBERT EINSTEIN COLLEGE OF MEDICINE
1997         Department of Pediatrics
(On leave)   Department of Epidemiology and Social Medicine
             Associate Professor of Pediatrics
             Associate Professor of Epidemiology and Social Medicine

1988-        ALBERT EINSTEIN COLLEGE OF MEDICINE
1990         Department of Epidemiology and Social Medicine
             Assistant Professor

1986-        COLUMBIA UNIVERSITY SCHOOL OF LAW
1990         Julius Silver Program in Law, Science and Technology
             Lecturer on Law

David A. Kessler                                                                 Page 7

| 1982- | ALBERT EINSTEIN COLLEGE OF MEDICINE |
| 1990 | Department of Pediatrics |
| | Assistant Professor |

## SPECIAL STUDY

| June | JOHNS HOPKINS SCHOOL OF HYGIENE AND PUBLIC HEALTH |
| 1987 | Graduate Summer Program in Epidemiology - Pharmacoepidemiology |

| June | YALE SCHOOL OF ORGANIZATION AND MANAGEMENT |
| 1985 | Advanced Management Studies in Health Care Management |

1977-1978   HARVARD LAW SCHOOL, Special Student

## RESEARCH EXPERIENCE

| Summers | SLOAN-KETTERING INSTITUTE FOR CANCER RESEARCH |
| 1970-1972 | Division of Drug Resistance, New York, New York |
| | Research Asst |

| Summer | MARINE BIOLOGICAL LABORATORY, Woods Hole, Massachusetts |
| 1972 | Physiology course |

| 1974-1975 | CHILDREN'S HOSPITAL MEDICAL CENTER |
| | Department of Surgical Research, Boston, Massachusetts |
| | Research Associate |

| Summer | DEPARTMENT OF HEALTH, EDUCATION and WELFARE |
| 1976 | Office of the General Counsel, Chicago, Illinois |
| | Law Clerk |

## VISITING COMMITTEE

1992-1994   UNIVERSITY OF CHICAGO LAW SCHOOL

## UNIVERSITY ACCREDITATION

| 2008-2012 | WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES, |
| | Chair of LLU Accreditation Committee |

| 2013-Present | NORTHWEST COMMISSION ON COLLEGES AND UNIVERSITIES |
| | University of Washington |

## SPECIAL PROJECTS

1982-1988     THE ROBERT WOOD JOHNSON FOUNDATION
              Program for Hospital Initiatives in Long-Term Care,

1989-1990     THE PEW CHARITABLE TRUSTS
              THE ROBERT WOOD JOHNSON FOUNDATION
              Program to Strengthen Hospital Nursing Co-Director

## CORPORATE BOARD AND ADVISORY POSITIONS AND COMMITTEES

2011 - 2014     APTALIS HOLDINGS
                Member of Board, Chairman of Compliance Committee

2011 - Present  IMMUNCOR
                Member of Board, Chairman of Compliance Committee

2009 - Present  TOKAI
                Member of Board

2008 - Present  TPG
                Senior Advisor

2007            GOOGLE HEALTH ADVISORY COUNCIL

2007            REVOLUTION HEALTH GROUP
                Medical Advisory Board

2007            PERSEUS LLC
                Advisory Board

2003 – Present  FLEISHMAN HILLARD INTERNATIONAL COMMUNICATIONS
                International Advisory Board

2000 – 2003     PERSEUS-SOROS BIOTECHNOLOGY FUND Scientific Advisory Board

## ADVISORY COMMITTEES

2007            THE RHODES TRUST, THE RHODES SCHOLARSHIPS
                Chair, California Selection Committee

David A. Kessler                                                                                          Page 9

2006              CENTER FOR THE ADVANCED STUDIES ON AGING, UNIVERSITY OF
                  MIAMI External Advisory
                  Group

2005 – Present    BROAD MEDICAL RESEARCH PROGRAM
                  Advisory Board

2005              CLINTON SCHOOL OF PUBLIC HEALTH, UNIVERSITY OF ARKANSAS
                  FOR MEDICAL SCIENCES
                  National Advisory Board

2003, 2013        HEINZ AWARDS (HEINZ FAMILY FOUNDATION)
                  Awards Juror

2003              MARCH OF DIMES
                  Chair, Prematurity Campaign in Northern California

2002 – 2004       CENTER ON ALCOHOL MARKETING AND YOUTH AT GEORGETOWN
                  UNIVERSITY Advisory Board

2001 -            UNIVERSITY OF CHICAGO LAW REVIEW
                  Editorial Advisory Board

2000 – 2005       JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION
                  Oversight Committee

2000              GOVERNOR'S BLUE RIBBON COMMISSION ON MENTAL HEALTH,
                  STATE OF CONNECTICUT
                  Honorary Chair

2000              FILM AID INTERNATIONAL, INTERNATIONAL RESCUE COMMITTEE
                  Advisory Board

1999              WORLD HEALTH ORGANIZATION
                  Expert Panel on Tobacco

1997              ADVISORY COMMITTEE ON TOBACCO AND PUBLIC HEALTH
                  (Co-Chairman with C. Everett Koop)

1993              GOVERNMENT UNIVERSITY INDUSTRY ROUNDTABLE
                  National Academy of Sciences

1990              ADVISORY COMMITTEE ON THE FOOD AND DRUG ADMINISTRATION
                  Chairman, Drugs and Biologics Subcommittee

1988 – 1989       NATIONAL ADVISORY COUNCIL ON HEALTH CARE TECHNOLOGY
                  ASSESSMENT, Department of Health and Human Services, Washington, D.C.
                  Chairman, Patient Outcomes Subcommittee

David A. Kessler                                                          Page 10

## PRIOR FEDERAL COMMITTEE MEMBERSHIPS

WHITE HOUSE COMMISSION ON PRESIDENTIAL SCHOLARS

NATIONAL COUNCIL ON SCIENCE AND TECHNOLOGY
Committee on Health, Safety and Food R&D, Vice Chair

INSTITUTE OF MEDICINE
Forum On Drug Development and Regulation

INSTITUTE OF MEDICINE
AIDS Roundtable

NATIONAL TASK FORCE ON AIDS DRUG DEVELOPMENT

OFFICE OF SCIENCE AND TECHNOLOGY POLICY Federal Coordinating
Council for Science, Engineering and Technology Committee on Life Science
and Health Biotechnology Research Subcommittee, Member ex officio

## BOARDS OF DIRECTORS

Current:

CENTER FOR SCIENCE IN THE PUBLIC INTEREST

DRUG STRATEGIES

Past:

AMHERST COLLEGE BOARD OF TRUSTEES

ELIZABETH GLASER PEDIATRIC AIDS FOUNDATION
Chairman, Board of Directors

NATIONAL CENTER FOR ADDICTION AND SUBSTANCE ABUSE
COLUMBIA UNIVERSITY

INTERNATIONAL PARTNERSHIP FOR MICROBICIDES INDEPENDENT
CITIZENS OVERSIGHT COMMITTEE OF THE CALIFORNIA INSTITUTE
FOR REGENERATIVE MEDICINE

HENRY J. KAISER FAMILY FOUNDATION

DOCTORS OF THE WORLD

David A. Kessler                                                                    Page 11

YALE-NEW HAVEN HOSPITAL

CONSUMERS UNION

NATIONAL COMMITTEE FOR QUALITY ASSURANCE

NEW YORK COUNTY HEALTH SERVICE REVIEW ORGANIZATION

COMPREHENSIVE MEDICAL REVIEW ORGANIZATION

<u>FELLOWSHIP</u>

YALE COLLEGE Fellow,
Calhoun College

<u>LECTURESHIPS</u>

THE REGIS J. FALLON LECTURE SERIES ON HEALTH AND LAW
University of Chicago

GRAYSON DISTINGUISHED LECTURE
Southern Illinois University School of Law

WEINBERG SYMPOSIUM LECTURE
Harvard Medical School

THE THOMAS B. FERGUSON LECTURE
Society of Thoracic Surgeons

GEORGE E. ALTMAN, M.D. LECTURE
Beth Israel Hospital

BETH AND RICHARD SACKLER LECTURE
University of Pennsylvania

MARTIN W. WITTE LECTURE
Newport Beach Public Library and Newport Beach Public Library Foundation

HERBERT L. ABRAMS LECTURE
Harvard Medical School

GEORGE GOODMAN LECTURE
State University of New York at Stony Brook

EVNIN LECTURE
Princeton University, Woodrow Wilson School

BOYARSKY LECTURE
Law, Medicine, and Ethics, Kenan Ethics Program, Duke University

CHARTER LECTURE
The University of Georgia

GARDERE & WYNNE LECTURE
Health Law and Policy Institute, University of Houston

DISTINGUISHED LECTURE IN NATIONAL SERVICE
University of Miami

TENTH ANNUAL JOHN O. VIETA, MD LECTURE
Lenox Hill Hospital

HARPER FELLOWSHIP LECTURE
Yale Law School

DR. JAMES STEWART KAUFMAN MEMORIAL LECTURE
The Mt. Sinai Health Care Foundation

DULCY B. MILLER MEMORIAL LECTURE
Smith College

JEAN MAYER LECTURE IN NUTRITION AND FOOD POLICY
Tufts University

HENRY BARNETT DISTINGUISHED LECTURESHIP
Albert Einstein College of Medicine

MARTIN A. CHERKASKY DISTINGUISHED LECTURESHIP
Robert Wagner Graduate School of Public Service New York
University

ALPHA OMEGA ALPHA DISTINGUISHED LECTURESHIP
Cornell Medical School--New York Hospital

ST. GEORGE SOCIETY LECTURESHIP
Johns Hopkins Medical School

GOVERNOR WINTHROP ROCKEFELLER DISTINGUISHED
LECTURESHIP University of Arkansas Medical School

MOLLY AND SIDNEY N. ZUBROW LECTURE
Pennsylvania Hospital

LEROY HOECK M.D. DISTINGUISHED LECTURESHIP
Children's Hospital National Medical Center

JULES AND JANE HIRSH HEALTH POLICY ADDRESS
George Washington University

JOHN S. LATTA LECTURESHIP
University of Nebraska Medical
School

PAUL K. SMITH MEMORIAL LECTURE
George Washington University

WOLK HEART FOUNDATION LECTURE
Colgate University

HASTINGS LECTURE
Association for the Advancement of Medical Instrumentation
National Heart, Lung and Blood Institute

INSTITUTE OF MEDICINE 25TH DISTINGUISHED LECTURESHIP University
of Washington

RALPH CAZORT LECTURESHIP
Meharry Medical School

DAVID M. IFSHIN MEMORIAL LECTURE
Potomac, Maryland

CHARLES C. LEIGHTON MEMORIAL LECTURE
Leonard David Institute of Health Economics
University of Pennsylvania

D. W. HARRINGTON LECTURE State
University of New York At Buffalo School of
Medicine and Biomedical Sciences

SAMUEL RUBIN LECTURE FOR THE ADVANCEMENT OF LIBERTY
Columbia University

LEO S. WEIL MEMORIAL LECTURE
Tulane Medical Center, Touro Infirmary,
and Louisiana State University School of Medicine

THOMAS PARRIN LECTURE
University of Pittsburgh School of Public Health

DAVID PACKARD LECTURE
Uniformed Services University of the Health Sciences

NORMAN E. ZINBERG LECTURE
Harvard Medical School

JOHN H. ERSKINE LECTURE
St. Jude's Children's Research Hospital

MARTIN V. BONVENTRE MEMORIAL LECTURE
The Brooklyn Hospital Center

PURVES LECTURE
Woodbridge Library, Woodbridge, Connecticut

VISITING SCHOLAR LECTURE University of
Oklahoma - Board of Regents Oklahoma Scholar
Leadership Extension Program

J. ROSWELL GALLAGHER LECTURER
Society of Adolescent Medicine

KATHERINE BOUCOT STURGIS LECTURESHIP
American College of Preventive Medicine

HELMUT SCHUMANN LECTURE
Dartmouth-Hitchcock Medical Center

50TH ANNIVERSARY COMMUNICATION LECTURE
Centers for Disease Control and Prevention

5TH JAMES BORDLEY III MEMORIAL LECTURE
Mary Imogene Bassett Hospital

TURNER LECTURE
University of California

MARIE SHULSKY MEMORIAL LECTURE ON HEALTH AND
SOCIAL RESPONSIBILITY
Fifth Avenue Synagogue, New York, New York

GERTRUDE AND G.D. CRAIN, JR. LECTURE SERIES
Medill School of Journalism, Northwestern University

GEORGE ARMSTRONG LECTURE
Ambulatory Pediatric Society

ARCO FORUM OF PUBLIC AFFAIRS
Institute of Politics, John F. Kennedy School of Government
Harvard University

PAUL LEVINGER LECTURE AND PROFESSORSHIP PRO TEM IN THE
ECONOMICS OF HEALTH CARE Brown University

David A. Kessler                                                                              Page 15

ARNOLD J. SCHWARTZ MEMORIAL HEALTH LECTURE
Robert F. Wagner Graduate School of Public Service New York
University

RONALD ALTMAN MEMORIAL LECTURE
Festival of Arts, Books and Culture, Cherry Hills, New Jersey

SAMUEL MARTIN, M.D. III MEMORIAL LECTURE Division of
General Internal Medicine and Leonard Davis Institute University of
Pennsylvania

CARL J. MARTINSON, M.D. MEMORIAL LECTURESHIP ON HEALTH
PROMOTION AND DISEASE PREVENTION University of Minnesota

LEONARD SILK MEMORIAL LECTURE Mt.
Desert Island Biological Laboratories

CALDWELL LECTURE
American Roentgen Ray Society

RICHARD H. DENT LECTURE St.
George's School

ROBERT T. WONG DISTINGUISHED PROFESSORSHIP
University of Hawaii, Manoa

NIDA/American Psychiatric Association Obesity Symposium

HARVARD OBESITY COURSE

STANFORD BARIATRIC COURSE

AMERICAN BARIATRIC SOCIETY

RHODES ENDOWED LECTURE

STAFFORD LITTLE LECTURE PUBLIC LECTURES AT
PRINCETON

GERALD AND SALLY DENARDO LECTURESHIP, SANTA
CLARA UNIVERSITY

ALEX AND LENA CASPER MEMORIAL LECTURE, MIAMI
UNIVERSITY

UNIVERSITY OF VERMONT FOOD SYSTEMS
LEADERSHIP

GOOGLE LECTURE

GLOBAL STUDIES SYMPOSIUM, WHITMAN COLLEGE
Excellence in Public Service

DONALD DUNPHY LECTURE, MCCONE HOSPITAL,
UNIVERSITY OF NORTH CAROLINA

CENTER FOR GLOBAL HEALTH, STANFORD MEDICAL
SCHOOL

STANFORD UNIVERSITY: THE ETHICS OF FOOD & THE
ENVIRONMENT

STANFORD MEDICAL SCHOOL, DEPARTMENT OF
MEDICINE, GRAND ROUNDS

LEGACY WARNER SERIES LECTURE ON IMPACT OF
FAMILY AND SMOKING PREVENTION AND CONTROL
ACT

LEADING VOICES IN PUBLIC HEALTH, EAST
TENNESSEE STATE UNIVERSITY

92ND STREET YMCA PUBLIC LECTURE, NEW YORK

COMMONWEALTH CLUB OF CALIFORNIA

SAN FRANCISCO PUBLIC LIBRARY LECTURE

KANSAS CITY PUBLIC LIBRARY

YALE ROBERT WOOD JOHNSON CLINICAL SCHOLARS
PROGRAM


COMMUNITY/PUBLIC SERVICE AWARDS

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE
Montgomery County Chapter
Person of the Year

LEAGUE OF WOMEN VOTERS, NEW YORK
Carrie Chapman Catt Award

COMMON CAUSE
Public Service Achievement Award

David A. Kessler                                                                                    Page 17

AMERICAN ACADEMY OF PEDIATRICS
Excellence in Public Service

BUSINESS WEEK
Best in Public Service

GEORGE ORWELL AWARD FOR HONESTY AND CLARITY
IN PUBLIC LANGUAGE
National Conference of Teachers of English

ANTI-DEFAMATION LEAGUE OF B'NAI BRITH
Man of Achievement Five Towns, New York

GOLDEN SLIPPER CLUB OF PHILADELPHIA
Golden Slipper Award

NATIONAL FATHER'S DAY COMMITTEE
Father of the Year Award

UNITED SENIORS HEALTH COOPERATIVE
Seniors Advocate Award

NATIONAL ASSOCIATION OF GOVERNMENT COMMUNICATORS
Communicator of the Year Award

NATIONAL CONSUMERS LEAGUE
Trumpeter Award

THE INTERNATIONAL PLATFORM ASSOCIATION
George Crile Award

AMERICAN LUNG ASSOCIATION of New York
Life and Breath Award in Public Health

CONSUMER FEDERATION OF AMERICA
Philip Hart Public Service Award

CAMPAIGN FOR TOBACCO FREE KIDS
Distinguished Service Award

MEDICAL SOCIETY OF NEW YORK, 1st District Branch
Public Service Award

ONCOLOGY NURSING SOCIETY
Public Service Award

PUBLIC VOICE FOR FOOD & HEALTH POLICY
Special Recognition Award for Advancing the Consumer Interest in Food and
Agriculture Policy

David A. Kessler                                                        Page 18

## ATTENDING PEDIATRICIAN

2003 - 3/2013    UNIVERSITY OF CALIFORNIA, SAN FRANCISCO MEDICAL
                 CENTER

1997-2003        YALE-NEW HAVEN HOSPITAL

1982-1990        BRONX MUNICIPAL HOSPITAL CENTER

1982-1990        NORTH CENTRAL BRONX HOSPITAL

1982-1990        MONTEFIORE MEDICAL CENTER

1982-1990        HOSPITAL OF THE ALBERT EINSTEIN COLLEGE OF MEDICINE

## COMMUNITY ACTIVITIES

                 SCARSDALE SCHOOL DISTRICT, Scarsdale, New York

1986-1990        Legislative Affairs Advisory Committee 1988-
                 1990 Buildings and Facilities Advisory
                 Committee

1990             SCARSDALE STUDENT TRANSFER EDUCATION PLAN, Board of Trustees

## GENERAL INFORMATION

Address:                                         Office Phone:
    2715 Steiner Street                          (415) 929 1121
    San Francisco, CA 94123

Married:                                         Born:
    Paulette Kessler                             May 31, 1951
    Two children – Elise and Ben

## MEDICAL LICENSURE

    California
    Connecticut (non-active)
    Maryland (non-active)
    New York (non-active)

## PUBLICATIONS

### Books

Kessler, David A., CAPTURE: A THEORY OF THE MIND, Harper Collins (Publication date: March 15, 2016)

Kessler, David A. THE END OF OVEREATING: TAKING CONTROL OF THE INSATIABLE AMERICAN APPETITE, Rodale, 2009
> Translated and Adapted:
> 過食にさようなら-止まらない食欲をコントロール [単行本]
> КОНЕЦ ОБЖОСТВЖУ
> 이 페이지 번역하기
> Perché mangianmo troppo (e come fare per smetteria
> Laat je niet volvreten: Hoe de voedselindustgrie schade toebrengt ann onze gexondheid
> Das Ende des groben Fressens  Wie die Nahrungsmittelindustrie Sie zu ubcrmaBigem Essen berleitet und was Sie dagegen tun konnen
> Muszáj annyit enni? Hadüzenet a só, a zsír és a cukor ellen
> Also: Romania, Canada, UK, Australia, India
> Your Food is Fooling You: How Your Brain is Hijacked by Sugar Fat and Salt (US Young Adult Version)
> Hijacked: How Your Brain is Fooled by Food (Canadian Young Adult Version)

Kessler, David A., A QUESTION OF INTENT: A GREAT AMERICAN BATTLE WITH A DEADLY INDUSTRY, Public Affairs (Hardcover 2001) (Paperback 2002)

### Edited Books

Eisdorfer, Carl, Kessler, David A., Spector, Abby (eds.), CARING FOR THE ELDERLY: RESHAPING HEALTH POLICY, Johns Hopkins University Press, 1989. Includes chapter by Coombs, C., Eisdorfer, C., Feiden, K., and Kessler, D.A. "Lessons from the Program for Hospital Initiatives in Long-Term Care."

### Articles

Kessler, David A., Nesbit, J.A., Westmoreland, T.M., Albright, M.B., "A Tribute to C. Everett Koop," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA, 110(18):7108-9 (April 30, 2013)

Articles

McClellan M, Benner J, Schilsky R, Epstein D, Woosley R, Friend S, Sidransky D, Geoghegan C, Kessler D. An accelerated pathway for targeted cancer therapics. NATURE DRUG DISCOVERY. 2011 10(2):79-80

Kessler, David A., "Towards More Comprehensive Food Labeling," NEW ENGLAND JOURNAL OF MEDICINE, 371:193-195 (July 27, 2014)

Kessler DA, Mande JR, Scarbrough FE, Schapiro R, Feiden K. Developing the "nutrition facts" food label. HARVARD HEALTH POLICY REVIEW 2003;4:13-24

Kessler, David A., Nesbit, J.A., Westmoreland, T.M., Albright, M.B., "A Tribute to C. Everett Koop," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA, 110(18):7108-9 (April 30, 2013)

Naleid, A.M., Grimm, J.W., Kessler, David A., Sipols, A.J., Aliakbari, S., Bennett, J.L., Wells, J., Figlewicz, D.P., "Deconstructing the Vanilla Milkshake: the Dominant Effect of Sucrose on Self-administration Flavor Mixtures," APPETITE, 50(1):128-38 (January 2008)

Halme, Dina J. and Kessler, David A., "FDA Regulation of Stem Cell-Based Therapics", NEW ENGLAND JOURNAL OF MEDICINE, 355 (16): 1730-1735 (October 19, 2006)

Kessler, David A., "Alcohol Marketing and Youth: The Challenge for Public Health," JOURNAL OF PUBLIC HEALTH POLICY, 26(3):292-295 (Autumn 2005)

Kessler, David A., "The Tobacco Settlement," NEW ENGLAND JOURNAL OF MEDICINE, 337:1082-1083 (October 9, 1997)

Kessler, David A., Wilkenfeld, J.P., Thompson. L.J. "The Food and Drug Adminstration's Rule on Tobacco: Blending Science and Law," PEDIATRICS, 99(6):884-887 (June 1997)

Kessler, David A., Natanblut, Sharon L., Wilkenfeld, Judith P., Lorraine, Catherine C., Mayl, Sharon Lindan, Bernstein, Ilisa B.G. and Thompson, Larry, "Nicotine Addiction: A Pediatric Disease," JOURNAL OF PEDIATRICS, 130:518-524 (April 1997)

Kessler, David A., Barnett, Philip S., Witt, Ann, Zeller, Mitchell R., Mande, Jerold R. and Schultz, William B., "The Legal and Scientific Basis for FDA's Assertion of Jurisdiction Over Cigarettes and Smokeless Tobacco," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 277:405-409 (February 5, 1997)

Kessler, David A., Hass, Arthur E., Feiden, Karyn L. , Lumpkin, Murray and

Temple, Robert, "Approval of New Drugs in the United States: Comparison with the United Kingdom, Germany and Japan," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 276:1826-1831 (December 11, 1996)

Kessler, David A., Witt, Ann, Barnett, Philip S., Zeller, Mitchell R., Natanblut, Sharon, Wilkenfeld, Judith, Lorraine, Catherine C., Thompson, Larry J. and Schultz, William B., "The Food and Drug Administration's Regulation of Tobacco Products," NEW ENGLAND JOURNAL OF MEDICINE, 335:988-994 (September 26, 1996)

Silverman, Barbara G., Brown, S. Lorie, Bright, Roslie A., Kaczmarek, Ronald G., Arrowsmith-Lowe, Janet B., Kessler, David A., "Reported Complications of Silicone Gel Breast Implants: An Epidemiologic Review," ANNALS OF INTERNAL MEDICINE, 124:744-756 (April 15, 1996)

Kessler, David A., "Nicotine Addiction in Young People," NEW ENGLAND JOURNAL OF MEDICINE, 333:186-189 (July 20, 1995)

Kessler, David A., "Accelerating the Approval of Drugs for Life-Threatening and Serious Diseases," SCIENTIFIC AMERICAN, 272:48-52 (March 1995)

Kessler, David A., Rose, Janet L., Temple, Robert J., Schapiro, Renie and Griffin, Joseph, "Therapeutic Class Wars: Drug Promotion in a Competitive Marketplace," NEW ENGLAND JOURNAL OF MEDICINE, 331:1350 (November 17, 1994)

Kessler, David A., Merkatz, Ruth B., Schapiro, Renie, "A Call for Higher Standards for Breast Implants," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 270:2607-2608 (December 1, 1993)

Kessler, David A., Siegel, Jay P., Noguchi, Philip D., Zoon, Kathryn C., Feiden, Karyn L., and Woodcock, Janet, "Regulation of Somatic Cell Therapy and Gene Therapy by the Food and Drug Administration," NEW ENGLAND JOURNAL OF MEDICINE, 329:1169-1173 (October 14, 1993)

Merkatz, Ruth B., Temple, Robert, Sobel, Solomon, Feiden, Karyn, Kessler, David A., and members of the working group on Women in Clinical Trials, "Women in Clinical Trials of New Drugs: A Change in FDA Policy," NEW ENGLAND JOURNAL OF MEDICINE, 329:292-296 (July 22, 1993)

Kessler, David A. for the Working Group, "A New Approach to Reporting Medication and Device Adverse Effects and Product Problems," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 269:2765-2768 (June 2, 1993)

Kessler, David A., Taylor, Michael A., Maryanski, James H., Flamm, Eric L., and Kahl, Linda S., "The Safety of Foods Developed by Biotechnology," SCIENCE, 256:1747-1749 (June 26, 1992)

Kessler, David A., "The Basis for the FDA's Decision on Breast Implants,"

NEW ENGLAND JOURNAL OF MEDICINE, 326:1713-1715 (June 18, 1992)

Kessler, David A., "Communicating to Patients About Their Medication," NEW ENGLAND JOURNAL OF MEDICINE, 325:1650-1652 (December 5, 1991)

Kessler, David A., "Drug Promotion and Scientific Exchange," NEW ENGLAND JOURNAL OF MEDICINE, 325:201-203 (July 18, 1991)

Kessler, David A. and Pines, Wayne L., "The Federal Regulation of Prescription Drug Advertising and Promotion," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 264:2409-2415 (November 14, 1990)

Kessler, David A., "The Federal Regulation of Food Labeling: Promoting Foods to Prevent Disease," NEW ENGLAND JOURNAL OF MEDICINE, 321:717-725 (September 14, 1989)

Kessler, David A., "The Regulation of Investigational Drugs," NEW ENGLAND JOURNAL OF MEDICINE, 320:281-288 (February 2, 1989)

Kessler, David A., Pape, Stuart, and Sundwall, David, "The Federal Regulation of Medical Devices," NEW ENGLAND JOURNAL OF MEDICINE, 317:357-366 (August 6, 1987)

Kessler, David A., "Food Safety: Revising the Statute," SCIENCE, 223:1034-1040 (March 1984)

Kessler, David A., "Regulating the Prescribing of Human Drugs for Nonapproved Uses Under the Food, Drug and Cosmetic Act," HARVARD JOURNAL OF LEGISLATION, 693-760 (1978)

Kessler, David A., "Implementing the Anticancer Clauses of the Food, Drug and Cosmetic Act," THE UNIVERSITY OF CHICAGO LAW REVIEW, 44:817-850 (1977)

Kessler, David A., Langer, Robert S., Pless, Naomi A., and Folkman, Judah, "Mast Cells and Tumor Angiogenesis," INTERNATIONAL JOURNAL OF CANCER, 18:703-709 (November 15, 1976)

Kessler, David A., "Experimental Activation of the Herpes Virus Associated with the Lucke Renal Adenocarcinoma of the Leopard Frog, Rana Pipiens," unpublished thesis, Amherst College (1973)

Editorials

Kessler, David A., Myers, Matthew, "Beyond the Tobacco Settlement," NEW ENGLAND JOURNAL OF MEDICINE, 345:535-537 (August 16, 2001) (editorial)

David A. Kessler                                                              Page 23

    Kessler, David A., "Cancer and Herbs," NEW ENGLAND JOURNAL OF MEDICINE, 342 (23):1742-43 (June 8, 2000) (editorial)

    Koop, C. Everett, Kessler, David A., Lundberg, George D., "Reinventing American Tobacco Policy - Sounding the Medical Community's Voice," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 279:550-552 (February 18, 1998) (editorial)

    Kessler, David A., "Addressing the Problem of Misleading Advertising," ANNALS OF INTERNAL MEDICINE, 116:950-951 (June 1, 1992) (editorial)

Published Speeches

    Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 52:1-5, presented at the Food and Drug Law Institute's 39th Annual Educational Conference, Washington, D.C. (December 10-11, 1996)

    Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 51:207-216 (1996), presented at the Food and Drug Law Institute's 38th Annual Educational Conference, Washington, D.C. (December 12-13, 1995)

    Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 50:327-334 (1995), presented at the Food and Drug Law Institute's 37th Annual Educational Conference, Washington, D.C.(December 13-14, 1994)

    Kessler, David A., "Statement on Nicotine-Containing Cigarettes," TOBACCO CONTROL, 3:148-158 (1994)

    Kessler, David A., "Issues in Approving Drugs for AIDS Treatment," REGULATORY AFFAIRS, 6:189-200 (1994), presented at the Institute of Medicine's 25th anniversary lecture series, Seattle, Washington

    Kessler, David A., "FDA's Revitalization of Medical Device Review and Regulation," BIOMEDICAL INSTRUMENTATION AND TECHNOLOGY, May/June 1994:220-226, presented at the AAMI/NIH Cardiovascular Science and Technology Conference, Rockville, Maryland (December 10, 1993)

    Kessler, David A., "Harmonization," PHARMACEUTICAL ENGINEERING, 14:38-40 (January/February 1994), presented at the Second International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, Orlando, Florida (October 27, 1993)

    Kessler, David A. "The Academic/Industry Interface: The Risks of Scientists Becoming Entrepreneurs," HOPKINS MEDICAL NEWS, Fall 1993:58

Kessler, David A., "Controlled Release and Rational Drug Development," presented at the Controlled Release Society Meeting, July 27, 1993, FOOD AND DRUG REPORTS, 4:9 (1993)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD DRUG COSMETIC LAW JOURNAL, 48:1-10 (1993), presented at The Food and Drug Law Institute's 35th Annual Educational Conference, Washington, D.C. (December 8, 1992)

Kessler, David A., "Reinvigorating the Food and Drug Administration," FOOD TECHNOLOGY, 46:20 (August 1992), presented at the Annual Meeting of Institute of Food Technologists, New Orleans, LA (June 20-24, 1992)

Kessler, David A., "A Challenge for American Pharmacists," AMERICAN PHARMACY, 33-36 (January 1992)

Kessler, David A., "Remarks--1991 Annual DIA Meeting," DRUG INFORMATION JOURNAL (October 1991)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD DRUG COSMETIC LAW JOURNAL, 46:773-779 (November 1991), presented at the Association of Food and Drug Officials' Annual Conference, Grand Rapids, MI (June 17, 1991)

Kessler, David A., "Restoring the FDA's Preeminence in Regulation of Food," FOOD DRUG COSMETIC LAW JOURNAL (May 1991)

Kessler, David A., "Remarks Upon Taking the Oath of Office," JOURNAL OF THE ASSOCIATION OF FOOD AND DRUG OFFICIALS, 55:7-10 (April 1991)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD DRUG COSMETIC LAW JOURNAL, 46:21-26 (January, 1991), presented at the Food and Drug Law Institute's 33rd Annual Educational Conference, Washington, D.C. (December 11, 1990)

# Schedule 4:

# Celect Sales and Complaint/Reported Adverse Event Data

6