# Guidance for the Submission of 510(k) Premarket Notifications for Cardiovascular Intravascular Filters

**This document is intended to provide guidance in the preparation of a regulatory submission. It does not bind the FDA or the regulated industry in any manner.**

Interventional Cardiology Devices Group
Division of Cardiovascular, Respiratory and Neurological Devices
Office of Device Evaluation

Document Issued on:

While this guidance document represents a final document, comments and suggestions may be submitted at any time for Agency consideration by writing to Veronica Price, Interventional Cardiology Devices Group, Office of Device Evaluation, 9200 Corporate Boulevard (HFZ-450), Rockville, MD 20850. For questions regarding the use or interpretation of this guidance, contact Veronica Price at (301) 443-8243.

**U.S. Department of Health and Human Services**
Food and Drug Administration
Center for Devices and Radiological Health

COOKFOIA 000001

*Scope:*

This draft guidance has been developed in an attempt to identify important preclinical tests and clinical design considerations for cardiovascular intravascular filters (filters). This guidance addresses filters that are permanently implanted in the inferior vena cava for the purpose of preventing thromboemboli generated in the lower limbs from flowing into the right side of the heart and the pulmonary circulation. It is limited in scope to those filters that are designed in such a way as to be seated within the vena cava via a series of hooks which are at the end of several legs or struts which converge at an apex. Filters that have a design that is significantly differs from this may require premarket approval and submission of a premarket approval application (PMA). This guidance is further limited to filters indicated for use for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations: pulmonary thromboembolism when anticoagulants are contraindicated; failure of anticoagulant therapy in thromboembolic diseases; emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated. Manufacturers who wish to pursue other indications should contact FDA to determine the data necessary to support a new indication and the appropriate regulatory pathway.

## I.   <u>Introduction</u>

Pulmonary embolism (PE) is a serious clinical issue causing significant morbidity and mortality. It has been estimated that there are more than 600,000 cases of clinically significant PE occur each year in the United States[1,2], resulting in approximately 200,000 deaths annually in the United States[3]. The patient often survives the first embolism but is at high risk that a second fatal PE will occur. PE recurs in approximately 6 to 25% of treated patients[2]. Additionally, the incidence of PE in patients with deep venous thrombosis (DVT) is 19% to 28%[4]. Treatment of PE has been shown to be effective in reducing the mortality from 30% to 8%[1]. Normally, patients with deep venous thrombosis and/or PE are treated with anticoagulation therapy. However, in some patients anticoagulation is ineffective, contraindicated or results in complications which require that it be discontinued. For these patients, vena caval interruption

---

[1] Dalen, J.E. and J.S. Albert, "Natural history of pulmonary embolism,"*Progressive Cardiovascular Diseases,*17:259-270,1975.

[2]Smith B.A., "Vena Caval Filters,"*Emergency Medicine Clinics of North America,*Vol. 13, No.3:645-654,1994.

[3] Nunnelee, J.D., and A. Kurgan,"Interruption of the inferior vena cava for venous thromboembolic disease,"*Journal of Vascular Nursing,*11:80-2,1993.

[4]Mohan, C.R., J.J. Hoballah, W.J. Sharp, T.F. Kresowik, C.T. Lu and J.D. Corson, "Comparative efficacy and complications of vena caval filters,"*Journal of Vascular Surgery,*Vol.21 No. 2:235-246,1995.

1

COOKFOIA 000002

with a filter is recommended. The goal of filter placement is to try to obtain high filtering efficiency (large and small emboli) without impedance of blood flow and with reduced device related thrombosis while minimizing migration and without penetration of the vessel wall. The following are the criteria for an ideal filter: nonthrombogenic; high filter efficiency without impedance of blood flow; secure fixation within the vena cava; rapid and safe percutaneous insertion; low rate of associated morbidity; and magnetic resonance imaging (MRI) compatibility[5].

The necessary array of tests for a particular filter will depend, in part, on the specific design. Therefore, this document may not reflect the complete battery of pre-clinical testing necessary to qualify all filters/designs. However, there are certain aspects of filter design that are general in nature and should be assessed. The degree to which a proposed device is similar to a currently marketed filter will indicate the level of testing necessary, i.e., whether the design characteristics can be assessed via *in vitro* bench testing, *in vivo* animal testing, clinical testing or some combination of all three.

## II.   Pre-Clinical Testing

### A.   Biocompatibility

Biocompatibility testing should be conducted in accordance with blue book memorandum #G95-1 entitled "Use of International Standard ISO-10993, Biological Evaluation of Medical Devices Part 1: Evaluation and Testing", which includes an FDA matrix that designates the type of testing needed for various medical devices. Cardiovascular intravascular filters are defined as permanent implant, blood-contacting devices.

### B.   Filter Performance

Below is an outline of the general issues that need to be addressed when seeking premarket clearance for a filter. It is the submitter's responsibility to conduct testing which adequately addresses the concerns outlined below as well as any others which may arise due to the unique design of the given device. The goal of this outline is to identify the objective(s) of the pre-clinical test. Test protocols and acceptance criteria for these tests are the responsibility of the submitter. FDA recognizes that there are many different testing methods that may be used to satisfy the objective(s). Where appropriate, some of these tests may be combined. These tests may best be carried out in bench top models or in animal models or in a combination of both. FDA advises that prior to the initiation of animal studies, the submitter should contact FDA and discuss the proposed animal study to ensure

---

[5]Grassi, C J. "Inferior Vena Caval Filters: Analysis of Five Currently Available Devices," *American Journal of Roentgenology*,156:813-821, April 1991.

2

COOKFOIA 000003

general agreement on the adequacy of the animal study protocol.

All tests should be performed on filters fabricated by representative manufacturing processes. An adequate number of samples should be tested. The objectives, test methodology, results and conclusions must be clearly defined for each test performed. The performance specifications, test conditions and acceptance criteria for all tests should be completely explained and justified by comparison to expected clinical conditions. Where appropriate, testing should be conducted in an environment simulating clinical conditions. The results of all tests should be reported in a statistically meaningful format, i.e., specification of the number of samples, range of values, mean, standard deviation, and a 95 percent confidence interval where appropriate. A probability measure that is indicative of the statistical significance of any comparisons made should be provided.

1.    Simulated deployment

An assessment of the ability to completely deploy the filter reliably in the chosen location under simulated clinical conditions should be made. This test should take into consideration the various routes by which the filter can be introduced into the patient, e.g., femoral, jugular, etc. Although it is recognized that the left femoral route is the most tortuous, all labeled routes should be examined.

2.    Introducer/sheath suitability

The objective(s) of this test should be to demonstrate that the sheath will adequately resist kinking when used in the most tortuous pathway. In addition, all bonds of the introducer/sheath should be assessed for their pull strength.

3.    Clot trapping ability

This test should demonstrate that the device can capture clinically significant emboli yet still permit sufficient blood flow around trapped emboli without caval occlusion. It should also examine whether the filter achieves this efficiency immediately post-deployment. If it does not, the time period necessary to achieve full filtering efficiency should be characterized.

3

COOKFOIA 000004

4.    Filter fracture

The filter's response to worst-case respiratory and diaphragmatic movements in the vena cava under simulated respiratory cycles should demonstrate sufficient fatigue resistance of the filter design. In addition, there should be an examination of corrosion resistance and weld strength following cycling.

5.    Caval perforation/filter migration

This test should demonstrate that the filter fixes itself within the vena cava at the deployment site and undergoes sufficient endothelialization. The force necessary for device fixation should be characterized over the range of labeled inferior vena cava (IVC) diameters.  In addition, this force should not suggest a tendency to perforate the caval wall.

6.    Thrombogenicity

The thrombogenic potential of the filter should be examined.  This test should demonstrate that the affect of the device on the blood flow would be sufficient to cause stasis which could lead to thrombus formation in and around the device.

7.    MRI compatibility

The extent to which the filter is compatible with MR imaging should be assessed. (See Appendix A.)

4

COOKFOIA 000005

### III.   Clinical Requirements

It is anticipated that the development of a "new" vena cava filter will require a human clinical investigation to establish its equivalency to currently marketed filters. Such a study may also be necessary for a modified filter design. The need for such a study should be discussed with FDA prior to submission of an investigational devices exemption (IDE) application. In those cases in which a study is deemed necessary, the sponsor should carefully consider the following items:

- the appropriate study design;
- the study hypothesis;
- appropriate sample size;
- definitions of success and failure; and
- the clinically relevant endpoints necessary for the demonstration of substantial equivalence.

For the indications outlined previously, the risks and benefits to the patients are well documented. The intent of the clinical study should be to demonstrate that the rates of complications for the investigational filter are comparable to other marketed vena cava filters. Although the risks themselves are well described in the literature, the definitions and methods used to determine the rates are inconsistent and highly variable. Therefore, it is critical to prospectively define and identify the methods of analysis for each potential complication. The complications identified and analyzed during the course of the clinical investigation should include the following:

1.   Complications during filter insertion

In the course of trying to place the filter in the vena cava the following complications have been noted: sheath perforation; introducer tip detachment; guidewire kinking; and sheath kinking[6,7]. These complications can result in filter deformation; fracture; premature release or insufficient opening; improper placement; and thrombus formation which may result in insufficient opening[8]. There have also been reports of problems with the filter sticking to and/or getting caught in the introducer while the device is being deployed, practitioner difficulty

---

[6]Becker, D.M. et al.,"Inferior Vena Cava Filters Indications, Safety, Effectiveness,"*Archives of Internal Medicine*,152:1985-1994,1992.

[7]Greenfield, L.J., et al., "Extended evaluation of the titanium Greenfield vena caval filter,"*Journal of Vascular Surgery*,September 1994:458-465.

[8]Bergqvist,D.,"The Role of Vena Caval Interruption in Patients with Venous Thromboembolism,"*Progress in Cardiovascular Diseases*, 37(1):25-37,1994.

5

COOKFOIA 000006

with inserting and/or retrieving failed insertions of the device, and problems with the filter legs breaking during insertion and deployment within the introducer and/or breakage of the filter /filter legs upon placement of the device within the patient[9]. The protocol should identify these potential complications and ensure that they will be captured by the investigator on the appropriate data collection forms.

2.   Recurrent pulmonary embolism

Patients who present with symptoms suggestive of recurrent PE should undergo a lung scan and/or an arteriogram. If recurrent PE is confirmed, a contrast vena cavogram should be performed to check for any clot within the filter. Some of the mechanisms which may be responsible for PE after filter insertion are the following: ineffective filtration; continuous growth of trapped thrombi through the filter; development of thrombosis on the proximal end of the filter; filter migration to a position where it does not function optimally; filter retraction from the caval wall at thrombus retention (occurring if some of the hooks have grasped the thrombus, which creates a channel between the filter and the caval wall); and embolization through collaterals that may be lumbar or embolization that may occur via the ovarian/spermatic veins; embolization from thrombi proximal to the filter (arm veins, renal or hepatic veins, the right heart); and incorrect position of the filter[8]. For those patients who experience a recurrent PE, every attempt should be made to determine the probable mechanism.

3.   Death

Deaths attributable to filter complications have been reported to result from cardiac arrest immediately following filter placement, misplacement of the filter during insertion and cephalic migration of a filter to the heart after placement. All patients with suspected filter complications who died during the clinical investigation should undergo an autopsy. A complete report of the findings should be provided for review.

4.   Filter migration

Minor filter migration in the caudal or cephalic direction is commonly reported and does not appear to be associated with clinically significant events. The walls of the vena cava are known to move with respiration and changes in intra abdominal pressure induce flexion on the limbs of the filter. The filter may appear to have migrated due to x-ray equipment variation, patient position, measurement error, and respiration. Much of the reported filter movement may

---

[9] FDA MDR database

6

COOKFOIA 000007

actually be due to measurement error resulting from differences in patient positioning, breathing and parallax. True migration may be caused by an excessively large a vena cava, inadequate positioning and massive embolization into the filter with caval dilatation [8]. It is recommended that any movement of the filter with relation to the spine that is 5 mm or greater be recorded as filter migration. Assessment of distal migration should be determined from post implant and follow-up AP and lateral films after correction for magnification. When follow-up images are obtained, efforts should be made to closely reproduce patient positioning and patient respiration to reduce errors in the interpretation of filter migration.

5.   Caval penetration

Determination of caval penetration is complicated. Examination via cavography may show filter hooks or legs outside the flow of contrast. This is not necessarily due to penetration. It may be due to endothelialization or tenting of the vena cava or locations in tributary veins. Computed tomography (CT) scans can be used to help rule out some false positives. After correction for magnification, filter base diameter from hook to hook should be recorded from both the implant and follow-up plain films. If an increase in filter base diameter of $\geq 5$ mm is recorded, a CT scan should be performed to confirm or exclude the position of filter legs outside of the inferior vena cava. Any other changes which may be suggestive of possible filter leg penetration of the vena cava, should trigger a CT scan, regardless of increase in the filter base diameter.

6.   Filter tilting and angulation

The significance of tilting and angulation of caval filter after placement is controversial. There is a theoretical loss of filtering efficacy of any filter when tilted or angulated significantly; however there is no good clinical data to support a definite increased incidence in PE or failure to trap thrombi. All instances of tilting or angulation should be noted as well as any associated clinical sequelae.

7.   Caval occlusion

Caval occlusion is related to filter thrombogenicity, design and flow patterns[8]. Small or moderate sized emboli trapped in a filter are usually asymptomatic since the residual patency of the vena cava and the normal paravertebral collateral veins permit adequate venous return. A large trapped embolus or a cluster of small emboli may occlude a filter completely and thus block the vena cava. After a period of days or weeks, the occlusion occurs and causes a sudden swelling of both lower limbs. In almost all cases the symptoms of IVC occlusion are transient and resolve almost completely within a few weeks or a few months since the

7

                    COOKFOIA 000008

thrombi undergo spontaneous lysis. Since it is often clinically difficult or impossible to distinguish IVC filter occlusion from extension of the preexisting DVT because the symptoms may be similar, all instances should be recorded as occlusion unless the extension of DVT can be ruled out.

8. Filter embolization

The risk of filter embolization is primarily limited to the first two weeks after implantation. Embolization of the filter is a serious complication with variable clinical consequences, comparable to pulmonary thromboembolism. These range from being totally asymptomatic to sudden death. Therapy also ranges from no therapy to open chest surgery and removal of the device. All cases of filter embolization should be recorded and the reasons for occurrence immediately assessed. The subsequent treatment should also be described in detail.

9. Other risks

Complications that occur at the puncture site such as: hematoma formation and A-V fistula, DVT at the puncture site, pneumothorax and air embolism after jugular insertion, should all be recorded on data collection forms and analyzed.

## IV. Labeling

The Division of Cardiovascular, Respiratory and Neurological Devices (DCRND) of the Office of Device Evaluation (ODE) conducted a review of the labeling for marketed cardiovascular intravascular filters (vena cava filters). Based on that review, the Food and Drug Administration (FDA) believed that several changes should be made to existing labels to ensure consistency among device manufacturers and to facilitate appropriate use of the devices clinically. The following sections of the labeling were affected: Indications for use, contraindications and warnings. The Attachment contains a copy of the labeling format developed for this device.

8

COOKFOIA 000009

**Attachment**

INDICATIONS FOR USE

The labeling should include the following text:

> **The [NAME OF DEVICE] is indicated for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations:**
>
> - **pulmonary thromboembolism when anticoagulants are contraindicated;**
>
> - **failure of anticoagulant therapy in thromboembolic diseases;**
>
> - **emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and**
>
> - **chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.**

CONTRAINDICATIONS

The labeling should include the following contraindication:

> **Vena Cava filters should not be implanted in patients with risk of septic embolism.**

Your labeling may include other contraindications which are specific to your particular device design.

WARNINGS

The labeling should include information regarding the use of the device in patients undergoing magnetic resonance imaging (MRI). The following terminology should be used:

**MRI-Safe:**         **No additional risk to the patients, but may affect the quality of the diagnostic information.**

**MRI-Compatible:**   **MRI-Safe and neither interferes with nor is affected by the operations of a MRI device.**

**Non-Compatible:**   **Neither MRI-Safe nor MRI-Compatible and should not be used in conjunction with MRI systems.**

Data to support the the chosen warning should be included in your 510(k) notification.

9

# Guidance for the Submission of 510(k) Premarket Notifications for Cardiovascular Intravascular Filters

## Draft Document

## This document is being distributed for comment purposes only.

Prepared by:

Veronica Price
Interventional Cardiology Devices Group
Division of Cardiovascular, Respiratory and Neurological Devices
Office of Device Evaluation

Draft released for comment on: January 28, 1997

Comments and suggestions regarding this draft document should be submitted within 30 days of the above release date to Veronica Price, (HFZ-450), 9200 Corporate Boulevard, Rockville, MD, 20850. Comments and suggestions received after this date may not be acted upon by the Agency until the document is next revised and updated. For questions regarding this draft document, contact Veronica Price at (301) 443-8243.

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
### Food and Drug Administration
### Center for Devices and Radiological Health

COOKFOIA 000011

# TABLE OF CONTENTS

I.      Introduction...............................................................1

II.     Pre-Clinical Testing...................................................2

III.    Clinical Requirements..............................................4

IV.     Labeling....................................................................7

Attachment.......................................................................8

2

COOKFOIA 000012

***Scope:***

This draft guidance has been developed in an attempt to identify important preclinical tests and clinical design considerations for cardiovascular intravascular filters (filters). This guidance addresses filters that are permanently implanted in the inferior vena cava for the purpose of preventing thromboemboli generated in the lower limbs from flowing into the right side of the heart and the pulmonary circulation. It is limited in scope to those filters that are designed in such a way as to be seated within the vena cava via a series of hooks which are at the end of several legs or struts which converge at an apex. Filters that have a design that is significantly differs from this may require premarket approval and submission of a premarket approval application (PMA). This guidance is further limited to filters indicated for use for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations: pulmonary thromboembolism when anticoagulants are contraindicated; failure of anticoagulant therapy in thromboembolic diseases; emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated. Manufacturers who wish to pursue other indications should contact FDA to determine the data necessary to support a new indication and the appropriate regulatory pathway.

## I.     <u>Introduction</u>

Pulmonary embolism (PE) is a serious clinical issue causing significant morbidity and mortality. It has been estimated that there are more than 600,000 cases of clinically significant PE occur each year in the United States[1,2], resulting in approximately 200,000 deaths annually in the United States[3]. The patient often survives the first embolism but is at high risk that a second fatal PE will occur. PE recurs in approximately 6 to 25% of treated patients[2]. Additionally, the incidence of PE in patients with deep venous thrombosis (DVT) is 19% to 28%[4]. Treatment of PE has been shown to be effective in reducing the mortality from 30% to 8%[1]. Normally, patients with deep venous thrombosis and/or PE are treated with anticoagulation therapy.

---

[1] Dalen, J.E. and J.S. Albert, "Natural history of pulmonary embolism,"*Progressive Cardiovascular Diseases*,17:259-270,1975.

[2]Smith B.A., "Vena Caval Filters,"*Emergency Medicine Clinics of North America*,Vol. 13, No.3:645-654,1994.

[3] Nunnelee, J.D., and A. Kurgan,"Interruption of the inferior vena cava for venous thromboembolic disease,"*Journal of Vascular Nursing*,11:80-2,1993.

[4]Mohan, C.R., J.J. Hoballah, W.J. Sharp, T.F. Kresowik, C.T. Lu and J.D. Corson, "Comparative efficacy and complications of vena caval filters,"*Journal of Vascular Surgery*,Vol.21 No. 2:235-246,1995.

3

COOKFOIA 000013

However, in some patients anticoagulation is ineffective, contraindicated or results in complications which require that it be discontinued. For these patients, vena caval interruption with a filter is recommended. The goal of filter placement is to try to obtain high filtering efficiency (large and small emboli) without impedance of blood flow and with reduced device related thrombosis while minimizing migration and without penetration of the vessel wall. The following are the criteria for an ideal filter: nonthrombogenic; high filter efficiency without impedance of blood flow; secure fixation within the vena cava; rapid and safe percutaneous insertion; low rate of associated morbidity; and magnetic resonance imaging (MRI) compatibility[5].

The necessary array of tests for a particular filter will depend, in part, on the specific design. Therefore, this document may not reflect the complete battery of pre-clinical testing necessary to qualify all filters/designs. However, there are certain aspects of filter design that are general in nature and should be assessed. The degree to which a proposed device is similar to a currently marketed filter will indicate the level of testing necessary, i.e., whether the design characteristics can be assessed via *in vitro* bench testing, *in vivo* animal testing, clinical testing or some combination of all three.

## II.   Pre-Clinical Testing

### A.   Biocompatibility

Biocompatibility testing should be conducted in accordance with blue book memorandum #G95-1 entitled "Use of International Standard ISO-10993, Biological Evaluation of Medical Devices Part 1: Evaluation and Testing", which includes an FDA matrix that designates the type of testing needed for various medical devices. Cardiovascular intravascular filters are defined as permanent implant, blood-contacting devices.

### B.   Filter Performance

Below is an outline of the general issues that need to be addressed when seeking premarket clearance for a filter. It is the submitter's responsibility to conduct testing which adequately addresses the concerns outlined below as well as any others which may arise due to the unique design of the given device. The goal of this outline is to identify the objective(s) of the pre-clinical test. Test protocols and acceptance criteria for these tests are the responsibility of the submitter. FDA recognizes that there are many different testing methods that may be used to satisfy the objective(s). Where appropriate, some of these tests may be combined. These tests may best be carried out in bench top models or in animal models or in

---

[5]Grassi, C J. "Inferior Vena Caval Filters: Analysis of Five Currently Available Devices," *American Journal of Roentgenology*,156:813-821, April 1991.

4

COOKFOIA 000014

a combination of both. FDA advises that prior to the initiation of animal studies, the submitter should contact FDA and discuss the proposed animal study to ensure general agreement on the adequacy of the animal study protocol.

All tests should be performed on filters fabricated by representative manufacturing processes. An adequate number of samples should be tested. The objectives, test methodology, results and conclusions must be clearly defined for each test performed. The performance specifications, test conditions and acceptance criteria for all tests should be completely explained and justified by comparison to expected clinical conditions. Where appropriate, testing should be conducted in an environment simulating clinical conditions. The results of all tests should be reported in a statistically meaningful format, i.e., specification of the number of samples, range of values, mean, standard deviation, and a 95 percent confidence interval where appropriate. A probability measure that is indicative of the statistical significance of any comparisons made should be provided.

1.   Simulated deployment

An assessment of the ability to completely deploy the filter reliably in the chosen location under simulated clinical conditions should be made. This test should take into consideration the various routes by which the filter can be introduced into the patient, e.g., femoral, jugular, etc. Although it is recognized that the left femoral route is the most tortuous, all labeled routes should be examined.

2.   Introducer/sheath suitability

The objective(s) of this test should be to demonstrate that the sheath will adequately resist kinking when used in the most tortuous pathway. In addition, all bonds of the introducer/sheath should be assessed for their pull strength.

3.   Clot trapping ability

This test should demonstrate that the device can capture clinically significant emboli yet still permit sufficient blood flow around trapped emboli without caval occlusion. It should also examine whether the filter achieves this efficiency immediately post-deployment. If it does not, the time period necessary to achieve full filtering efficiency should be characterized.

5

COOKFOIA 000015

4.  <u>Filter fracture</u>

The filter's response to worst-case respiratory and diaphragmatic movements in the vena cava under simulated respiratory cycles should demonstrate sufficient fatigue resistance of the filter design. In addition, there should be an examination of corrosion resistance and weld strength following cycling.

5.  <u>Caval perforation/filter migration</u>

This test should demonstrate that the filter fixes itself within the vena cava at the deployment site and undergoes sufficient endothelialization. The force necessary for device fixation should be characterized over the range of labeled inferior vena cava (IVC) diameters. In addition, this force should not suggest a tendency to perforate the caval wall.

6.  <u>Thrombogenicity</u>

The thrombogenic potential of the filter should be examined. This test should demonstrate that the affect of the device on the blood flow would be sufficient to cause stasis which could lead to thrombus formation in and around the device.

7.  <u>MRI compatibility</u>

The extent to which the filter is compatible with MR imaging should be assessed. (See Appendix A.)

6

COOKFOIA 000016

## III.   Clinical Requirements

It is anticipated that the development of a "new" vena cava filter will require a human clinical investigation to establish its equivalency to currently marketed filters. Such a study may also be necessary for a modified filter design. The need for such a study should be discussed with FDA prior to submission of an investigational devices exemption (IDE) application. In those cases in which a study is deemed necessary, the sponsor should carefully consider the following items:

- the appropriate study design;
- the study hypothesis;
- appropriate sample size;
- definitions of success and failure; and
- the clinically relevant endpoints necessary for the demonstration of substantial equivalence.

For the indications outlined previously, the risks and benefits to the patients are well documented. The intent of the clinical study should be to demonstrate that the rates of complications for the investigational filter are comparable to other marketed vena cava filters. Although the risks themselves are well described in the literature, the definitions and methods used to determine the rates are inconsistent and highly variable. Therefore, it is critical to prospectively define and identify the methods of analysis for each potential complication. The complications identified and analyzed during the course of the clinical investigation should include the following:

1.   Complications during filter insertion

In the course of trying to place the filter in the vena cava the following complications have been noted:  sheath perforation; introducer tip detachment; guidewire kinking; and sheath kinking[6,7]. These complications can result in filter deformation; fracture; premature release or insufficient opening; improper placement; and thrombus formation which may result in insufficient opening[8]. There have also been reports of problems with the filter sticking to and/or getting caught in the introducer while the device is being deployed, practitioner difficulty

[6]Becker, D.M. et al.,"Inferior Vena Cava Filters Indications, Safety, Effectiveness,"*Archives of Internal Medicine*,152:1985-1994,1992.

[7]Greenfield, L.J., et al., "Extended evaluation of the titanium Greenfield vena caval filter,"*Journal of Vascular Surgery*,September 1994:458-465.

[8]Bergqvist,D.,"The Role of Vena Caval Interruption in Patients with Venous Thromboembolism,"*Progress in Cardiovascular Diseases*, 37(1):25-37,1994.

7

COOKFOIA 000017

with inserting and/or retrieving failed insertions of the device, and problems with the filter legs breaking during insertion and deployment within the introducer and/or breakage of the filter /filter legs upon placement of the device within the patient[9]. The protocol should identify these potential complications and ensure that they will be captured by the investigator on the appropriate data collection forms.

2.   Recurrent pulmonary embolism

Patients who present with symptoms suggestive of recurrent PE should undergo a lung scan and/or an arteriogram. If recurrent PE is confirmed, a contrast vena cavogram should be performed to check for any clot within the filter. Some of the mechanisms which may be responsible for PE after filter insertion are the following: ineffective filtration; continuous growth of trapped thrombi through the filter; development of thrombosis on the proximal end of the filter; filter migration to a position where it does not function optimally; filter retraction from the caval wall at thrombus retention (occurring if some of the hooks have grasped the thrombus, which creates a channel between the filter and the caval wall); and embolization through collaterals that may be lumbar or embolization that may occur via the ovarian/spermatic veins; embolization from thrombi proximal to the filter (arm veins, renal or hepatic veins, the right heart); and incorrect position of the filter [8]. For those patients who experience a recurrent PE, every attempt should be made to determine the probable mechanism.

3.   Death

Deaths attributable to filter complications have been reported to result from cardiac arrest immediately following filter placement, misplacement of the filter during insertion and cephalic migration of a filter to the heart after placement. All patients with suspected filter complications who died during the clinical investigation should undergo an autopsy. A complete report of the findings should be provided for review.

4.   Filter migration

Minor filter migration in the caudal or cephalic direction is commonly reported and does not appear to be associated with clinically significant events. The walls of the vena cava are known to move with respiration and changes in intra abdominal pressure induce flexion on the limbs of the filter. The filter may appear to have migrated due to x-ray equipment variation, patient position, measurement error, and respiration. Much of the reported filter movement may

---

[9] FDA MDR database

8

actually be due to measurement error resulting from differences in patient positioning, breathing and parallax. True migration may be caused by an excessively large a vena cava, inadequate positioning and massive embolization into the filter with caval dilatation[8]. It is recommended that any movement of the filter with relation to the spine that is 5 mm or greater be recorded as filter migration. Assessment of distal migration should be determined from post implant and follow-up AP and lateral films after correction for magnification. When follow-up images are obtained, efforts should be made to closely reproduce patient positioning and patient respiration to reduce errors in the interpretation of filter migration.

5.    <u>Caval penetration</u>

Determination of caval penetration is complicated. Examination via cavography may show filter hooks or legs outside the flow of contrast. This is not necessarily due to penetration. It may be due to endothelialization or tenting of the vena cava or locations in tributary veins. Computed tomography (CT) scans can be used to help rule out some false positives. After correction for magnification, filter base diameter from hook to hook should be recorded from both the implant and follow-up plain films. If an increase in filter base diameter of $\geq$ 5 mm is recorded, a CT scan should be performed to confirm or exclude the position of filter legs outside of the inferior vena cava. Any other changes which may be suggestive of possible filter leg penetration of the vena cava, should trigger a CT scan, regardless of increase in the filter base diameter.

6.    <u>Filter tilting and angulation</u>

The significance of tilting and angulation of caval filter after placement is controversial. There is a theoretical loss of filtering efficacy of any filter when tilted or angulated significantly; however there is no good clinical data to support a definite increased incidence in PE or failure to trap thrombi. All instances of tilting or angulation should be noted as well as any associated clinical sequelae.

7.    <u>Caval occlusion</u>

Caval occlusion is related to filter thrombogenicity, design and flow patterns[8]. Small or moderate sized emboli trapped in a filter are usually asymptomatic since the residual patency of the vena cava and the normal paravertebral collateral veins permit adequate venous return. A large trapped embolus or a cluster of small emboli may occlude a filter completely and thus block the vena cava. After a period of days or weeks, the occlusion occurs and causes a sudden swelling of both lower limbs. In almost all cases the symptoms of IVC occlusion are transient and resolve almost completely within a few weeks or a few months since the

9

COOKFOIA 000019

thrombi undergo spontaneous lysis. Since it is often clinically difficult or impossible to distinguish IVC filter occlusion from extension of the preexisting DVT because the symptoms may be similar, all instances should be recorded as occlusion unless the extension of DVT can be ruled out.

8.   Filter embolization

The risk of filter embolization is primarily limited to the first two weeks after implantation. Embolization of the filter is a serious complication with variable clinical consequences, comparable to pulmonary thromboembolism. These range from being totally asymptomatic to sudden death. Therapy also ranges from no therapy to open chest surgery and removal of the device. All cases of filter embolization should be recorded and the reasons for occurrence immediately assessed. The subsequent treatment should also be described in detail.

9.   Other risks

Complications that occur at the puncture site such as: hematoma formation and A-V fistula, DVT at the puncture site, pneumothorax and air embolism after jugular insertion, should all be recorded on data collection forms and analyzed.

IV.   **Labeling**

The Division of Cardiovascular, Respiratory and Neurological Devices (DCRND) of the Office of Device Evaluation (ODE) conducted a review of the labeling for marketed cardiovascular intravascular filters (vena cava filters). Based on that review, the Food and Drug Administration (FDA) believed that several changes should be made to existing labels to ensure consistency among device manufacturers and to facilitate appropriate use of the devices clinically. The following sections of the labeling were affected: Indications for use, contraindications and warnings. The Attachment contains a copy of the labeling format developed for this device.

10

COOKFOIA 000020

**Attachment**

<u>INDICATIONS FOR USE</u>

The labeling should include the following text:

> **The [NAME OF DEVICE] is indicated for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations:**

- **pulmonary thromboembolism when anticoagulants are contraindicated;**

- **failure of anticoagulant therapy in thromboembolic diseases;**

- **emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and**

- **chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.**

<u>CONTRAINDICATIONS</u>

The labeling should include the following contraindication:

> **Vena Cava filters should not be implanted in patients with risk of septic embolism.**

Your labeling may include other contraindications which are specific to your particular device design.

<u>WARNINGS</u>

The labeling should include information regarding the use of the device in patients undergoing magnetic resonance imaging (MRI). The following terminology should be used:

**<u>MRI-Safe:</u>**   **No additional risk to the patients, but may affect the quality of the diagnostic information.**

**<u>MRI-Compatible:</u>**   **MRI-Safe and neither interferes with nor is affected by the operations of a MRI device.**

**<u>Non-Compatible:</u>**   **Neither MRI-Safe nor MRI-Compatible and should not be used in conjunction with MRI systems.**

Data to support the the chosen warning should be included in your 510(k) notification.

11

COOKFOIA 000021

# The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]

# Guidance for Industry and Food and Drug Administration Staff

**Document issued on: July 28, 2014**

**The draft of this document issued on December 27, 2011.**

**This document supersedes FDA's Guidance on the CDRH Premarket Notification Review Program, 510(k) Memorandum K86-3, dated June 30, 1986.**

For questions for the Center for Devices and Radiological Health regarding this document, contact the Premarket Notification (510(k)) Section at 301-796-5640.

For questions for the Center for Biologics Evaluation and Research regarding this document, contact the Office of Communication, Outreach and Development at 1-800-335-4709 or 240-402-7800.



**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Devices and Radiological Health**
**Center for Biologics Evaluation and Research**

COOKFOIA 000022

*Contains Nonbinding Recommendations*

# Preface

## Public Comment

You may submit electronic comments and suggestions at any time for Agency consideration to http://www.regulations.gov.  Submit written comments to the Division of Dockets Management, Food and Drug Administration, 5630 Fishers Lane, Room. 1061, (HFA-305), Rockville, MD, 20852.  Identify all comments with the docket number FDA-2011-D-0652. Comments may not be acted upon by the Agency until the document is next revised or updated.

## Additional Copies

### CDRH

Additional copies are available from the Internet. You may also send an e-mail request to CDRH-Guidance@fda.hhs.gov to receive a copy of the guidance.  Please use the document number 1766 to identify the guidance you are requesting.

### CBER

Additional copies are available from the Center for Biologics Evaluation and Research (CBER) by written request to the address below, by email request to the email address below, by calling the phone number below, or from the Internet at the webpage below:


Center for Biologics Evaluation and Research (CBER),
Office of Communication, Outreach and Development,
10903 New Hampshire Ave, Bldg. 71, Room 3128
Silver Spring, MD 20993, or by calling 1-800-835-4709 or 240-402-7800, by email ocod@fda.hhs.gov, or from the Internet at
http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/default.htm.

COOKFOIA 000023

*Contains Nonbinding Recommendations*

# Table of Contents

*I.*   *Introduction* ........................................................................................ *1*

*II.*   *Background* ......................................................................................... *2*

   **A.**   **The Medical Device Amendments and Device Classification** .................... **2**

   **B.**   **The 510(k) Classification Process** .......................................................... **3**

   **C.**   **Evolution of the 510(k) Program** .......................................................... **4**

*III.*   *Scope* .................................................................................................. *5*

*IV.*   *The 510(k) Decision-Making Process* ................................................ *5*

   **A.**   **The 510(k) Review Standard** ................................................................ **6**

   **B.**   **The Flowchart** ..................................................................................... **10**

   **C.**   **Predicate Device(s)** ............................................................................. **10**

   **D.**   **Intended Use** ........................................................................................ **15**

   **E.**   **Technological Characteristics** .............................................................. **18**

   **F.**   **Requests for Performance Data** ........................................................... **22**

   **G.**   **The 510(k) Summary** ........................................................................... **26**

***Appendix A.  510(k) Decision-Making Flowchart*** ........................................ ***27***

***Appendix B.  The 510(k) Summary Document Requirements*** ......................... ***28***

***Appendix C. Sample of 510(k) Summary Complying with 21 CFR 807.92*** ........ ***33***

***Appendix D.  Glossary of Significant Terminology*** ...................................... ***39***

COOKFOIA 000024

*Contains Nonbinding Recommendations*

# The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]

# Guidance for Industry and Food and Drug Administration Staff

> *This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.*

## I.   Introduction

FDA developed this document to provide guidance to industry and FDA staff about current review practices for premarket notification (510(k)) submissions. The intent of this guidance is to identify, explain, and clarify each of the critical decision points in the decision-making process FDA uses to determine substantial equivalence. This guidance is not intended to implement significant policy changes to the current 510(k) review process. Rather, the intent of this guidance is to enhance the predictability, consistency, and transparency of the 510(k) program by describing in greater detail the regulatory framework, policies, and practices underlying FDA's 510(k) review.

The draft of this guidance document contained sections addressing FDA's Special and Abbreviated 510(k) programs. FDA intends to finalize those sections separately. Until FDA issues new final recommendations on the Special and Abbreviated 510(k) programs, the recommendations for Special and Abbreviated 510(k)s contained in "The New 510(k) Paradigm - Alternate Approaches to Demonstrating Substantial Equivalence in Premarket Notifications," dated March 20, 1998, (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080187.htm) remain in effect.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

COOKFOIA 000025

1

*Contains Nonbinding Recommendations*

# II.  Background

## A.  The Medical Device Amendments and Device Classification

The Medical Device Amendments (MDA) (Pub. L. 94-295) to the Federal Food, Drug, and Cosmetic (FD&C) Act were enacted on May 28, 1976.  The MDA directed FDA to issue regulations that classify all devices that were in commercial distribution at that time into one of three regulatory control categories:  Class I, II, or III, depending upon the degree of regulation necessary to provide reasonable assurance of their safety and effectiveness.  The class into which a device is placed determines the requirements that a medical device manufacturer must meet prior to distributing a device in interstate commerce.  According to section 513(a)(1) of the FD&C Act (21 U.S.C. § 360c(a)(1)), the three device classes are defined as follows:

- **Class I**:  Devices are subject to a comprehensive set of regulatory authorities called general controls that are applicable to all classes of devices.[1]

- **Class II**:  Devices for which general controls, by themselves, are insufficient to provide reasonable assurance of the safety and effectiveness of the device, and for which there is sufficient information to establish special controls to provide such assurance.[2]

- **Class III**:  Devices for which general controls, by themselves, are insufficient and for which there is insufficient information to establish special controls to provide reasonable assurance of the safety and effectiveness of the device.  Class III devices typically require premarket approval.[3]

Premarket notification is the process by which a new device,[4] i.e., a post-amendments device, is classified into one of these three device classes.[5]  A manufacturer who intends to market in the United

---

[1] General controls apply to all classes of medical devices and provide FDA with the means of regulating devices to assure their safety and effectiveness.  General controls include but are not limited to provisions that relate to establishment registration and device listing; premarket notification, although most class I devices are exempt by regulation from this requirement; prohibitions against adulteration and misbranding; records and reports; and good manufacturing practices.  Section 513(a)(1)(A) of the FD&C Act (21 U.S.C. § 360c(a)(1)(A)).

[2] The original definition of a class II device in the Medical Device Amendments of 1976 (Pub. L. 94-295) identified performance standards rather than special controls as the mechanism by which FDA could establish reasonable assurance of safety and effectiveness.  The Safe Medical Devices Act of 1990 (Pub. L. 101-629) added "special controls," which can include the promulgation of performance standards as well as postmarket surveillance, patient registries, development and dissemination of guidelines (including guidelines for the submission of clinical data in premarket notification submissions), and other appropriate actions as FDA deems necessary to provide such assurance.  Section 513(a)(1)(B) of the FD&C Act (21 U.S.C. § 360c(a)(1)(B)).

[3] Certain types of devices classified into class III that were in commercial distribution in the United States before May 28, 1976, and those determined to be substantially equivalent to such devices, may be cleared through the 510(k) process until FDA issues an administrative order requiring them to go through the premarket approval process.  Section 515(b)(1) of the FD&C Act (21 U.S.C. § 360e(b)(1)).  Prior to the enactment of the Food and Drug Administration Safety and Innovation Act (FDASIA) (Pub. L. 112-144) on July 9, 2012, FDA had to publish regulations to require such devices to go through the premarket approval process.  Section 608(b) of FDASIA (126 Stat. 1056) changed the process from rulemaking to administrative order.

[4] For the purpose of this guidance document, a "new device" means a device within the meaning of section 201(h) of the FD&C Act that is not legally marketed.  It can be either a completely new device or a modification of a legally marketed device that would require a new 510(k).

[5] By contrast, an unclassified devices, as defined in FDA's Guidance for Industry and Food and Drug Administration Staff, "Medical Device Classification Product Codes" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm285317.htm), is a pre-amendments

COOKFOIA 000026

2

*Contains Nonbinding Recommendations*

States a Class I, II, or III device intended for human use, for which a Premarket Approval application (PMA) is not required, must submit to FDA a premarket notification submission (often referred to as a 510(k)), unless the device is exempt from the 510(k) requirements of the FD&C Act and does not exceed the limitations of exemptions for each of the device classification regulations (Section .9 of 21 CFR Parts 862 through 892, e.g., 21 CFR 862.9, 21 CFR 864.9, etc.).  Under section 510(k) of the FD&C Act, a manufacturer must submit a 510(k) to FDA at least 90 days before introducing, or delivering for introduction, a device into interstate commerce for commercial distribution so the Agency can determine whether or not the device meets the criteria for market clearance (Sections 510(k) and (n) of the FD&C Act (21 U.S.C. §§ 360(k) & (n))).  The Agency bases its decision on whether the device is substantially equivalent (SE) to a legally marketed (predicate) device (Section 513(i) of the FD&C Act (21 U.S.C. § 360c(i))).  The device cannot be commercialized until FDA issues an order (510(k) clearance) stating that the device has been determined to be SE (Section 513(f)(1) of the FD&C Act (21 U.S.C. § 360c(f)(1))).

## B.    The 510(k) Classification Process

According to section 513(f) of the FD&C Act, a new (i.e., post-amendments) device is automatically in Class III and must undergo premarket approval or reclassification before it can be marketed, unless it is a type of device that was in commercial distribution prior to May 28, 1976, and is SE to another such device; or it is within a type of device introduced after May 28, 1976, that has been reclassified into Class I or II and is SE to another device within such classification.  For information about how FDA's classification product codes assist in accurate identification and tracking of current medical devices, please see FDA's Guidance for Industry and Food and Drug Administration Staff, "Medical Device Classification Product Codes" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm285317.htm).

When FDA determines under sections 510(k), 513(f)(1), and 513(i) of the FD&C Act that a new device is SE to a legally marketed (predicate) device, the new device is classified into the same class and subject to the same requirements as the predicate device.  (See **Section IV.C.**)  A determination that a new device is not substantially equivalent (NSE) to a predicate device results in the new device being classified into Class III.  Thus, 510(k) review is both the mechanism by which a manufacturer seeks marketing authorization for a new device and by which FDA classifies devices into their appropriate regulatory category.  Because devices are classified according to the level of regulatory control necessary to provide a reasonable assurance of safety and effectiveness,[6] classification of a

device for which a classification regulation has not been promulgated. Unclassified devices require submission of a 510(k) premarket notification to FDA. A not-classified device is a post-amendments device for which the Agency has not yet reviewed a marketing application or for which the Agency has not made a final decision on such a marketing application. A pre-amendments device is a device that was on the market prior to the enactment of the Medical Device Amendments to the FD&C Act on May 28, 1976.

[6] The three device classes are described in section 513(a) of the FD&C Act (21 U.S.C. § 360c(a)):
(1) There are established the following classes of devices intended for human use:
(A) CLASS I, GENERAL CONTROLS.—
(i) A device for which the controls . . . are sufficient to provide reasonable assurance of the safety and effectiveness of the device.
(ii) A device for which insufficient information exists to determine that the controls referred to in clause (i) are sufficient to provide reasonable assurance of the safety and effectiveness of the device or to establish special controls to provide such assurance, but because it—
(I) is not purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, and
(II) does not present a potential unreasonable risk of illness or injury,
is to be regulated by the controls referred to in clause (i).

COOKFOIA 000027

3

*Contains Nonbinding Recommendations*

new device through the 510(k) process requires FDA to determine the issues of safety and effectiveness presented by the new device, and the regulatory controls necessary to address those issues.[7]

# C.     Evolution of the 510(k) Program

Since its inception, the 510(k) program has undergone a number of statutory changes.  Notably, the Safe Medical Devices Act of 1990 (Pub. L. 101-629) added section 513(i), which codified FDA review practice in applying the "substantial equivalence" review standard.  In addition, FDA has modified its implementation of the program to adapt to changing circumstances and to accommodate the evolving medical device landscape.  For example, the alternative options of a Special 510(k) or an Abbreviated 510(k) still exist today.  Additional information regarding these alternative options can be found in FDA's guidance, "The New 510(k) Paradigm – Alternative Approaches to Demonstrating Substantial Equivalence in Premarket Notifications" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080189.pdf).  The current 510(k) program reflects the current statutory framework and FDA's implementation of that framework through regulation, guidance, and administrative practice.  A history of the 510(k) program has been summarized in other documents that FDA has published.[8]

This guidance document provides updated information to the existing guidance document entitled "Guidance on the CDRH Premarket Notification Review Program, 510(k) Memorandum K86-3" (K86-3 Guidance), issued on June 30, 1986.  The K86-3 Guidance was written and issued as final guidance prior to the February 27, 1997 implementation of FDA's Good Guidance Practices (GGPs), and has not been updated since its initial publication date.  This guidance replaces the K86-3 Guidance.

---

(B) CLASS II, SPECIAL CONTROLS.—A device which cannot be classified as a class I device because the general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device, and for which there is sufficient information to establish special controls to provide such assurance . . .

(C) CLASS III, PREMARKET APPROVAL.—A device which because—

(i) it (I) cannot be classified as a class I device because insufficient information exists to determine that the application of general controls are sufficient to provide reasonable assurance of the safety and effectiveness of the device, and (II) cannot be classified as a class II device because insufficient information exists to determine that the special controls described in subparagraph (B) would provide reasonable assurance of its safety and effectiveness, and

(ii)(I) is purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, or

(II) presents a potential unreasonable risk of illness or injury,

is to be subject, in accordance with section 515, to Premarket approval to provide reasonable assurance of its safety and effectiveness.

[7] If FDA has established special controls applicable to the device type, the 510(k) would need to adequately address the issues covered by the special controls for the device to be classified into Class II.  *See* Section 513(a)(1)(B) of the FD&C Act (21 U.S.C. § 360c(a)(1)(B)).

[8] *See* CDRH Preliminary Internal Evaluations – Volume I: 510(k) Working Group Preliminary Report and Recommendations (http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDRH/CDRHReports/UCM220784.pdf).  *See also* CDRH Preliminary Internal Evaluations – Volume II: Task Force on the Utilization of Science in Regulatory Decision Making Preliminary Report and Recommendations (http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDRH/CDRHReports/UCM220783.pdf).  *See also* 510(k) and Science Report Recommendations: Summary and Overview of Comments and Next Steps (http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDRH/CDRHReports/UCM239449.pdf).

*Contains Nonbinding Recommendations*

# III. Scope

This guidance provides recommendations to industry and FDA staff about the content of 510(k) submissions and the decision-making process for determining substantial equivalence of devices reviewed under the 510(k) program.  The guidance has been organized to coincide with the critical decision points outlined in the 510(k) Decision-Making Flowchart (See **Appendix A**), which has been updated to track section 513(i) of the FD&C Act and relevant regulations more closely.  This document provides guidance on the following issues:

- the appropriate use of multiple predicates (See Section IV.C);
- the processes associated with determining whether a new device with new indications for use has a new intended use (See Section IV.D);
- the process for determining whether different technological characteristics raise different questions of safety and effectiveness (See Section IV.E);
- when performance data, with special emphasis on clinical performance data, may be necessary to support an SE determination (See Section IV.F); and
- how to develop 510(k) Summaries to promote greater transparency in the 510(k) decision-making process (See Section IV.G).

The overarching principles in this guidance are applicable to devices that are subject to 510(k) review by CDRH, including the Office of Device Evaluation (ODE) and the Office of In Vitro Diagnostics and Radiological Health (OIR), as well as devices that are subject to 510(k) review by the Center for Biologics Evaluation and Research (CBER).  This guidance is not intended to supplant existing device-specific guidance, but may cover broader areas not addressed in device-specific guidance documents.  If you have questions about how this guidance and a device-specific guidance apply to a particular issue, please contact FDA to discuss.  In addition, this guidance does not address review issues unique to combination products.  For information on combination products, please refer to the Office of Combination Products webpage (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/OfficeofScienceandHealthCoordination/ucm2018184.htm).

# IV. The 510(k) Decision-Making Process

A 510(k) is a premarket submission made to FDA to demonstrate that the new device to be marketed is "substantially equivalent" to a legally marketed device[9] (21 U.S.C. §§ 360(k), 360(n), 360c(f)(1) & 360c(i); 21 CFR 807.92(a)(3)) which is not subject to PMA.  Manufacturers must compare their new device to a similar legally marketed device to support its substantial equivalence (21 U.S.C. § 360c(i); 21 CFR 807.92(a)(3)).

The most commonly used method of demonstrating substantial equivalence is through the submission and FDA review and clearance of a Traditional 510(k).  Under 21 CFR 807.87, FDA established basic content requirements for 510(k)s to be submitted by device manufacturers in support of substantial equivalence.  The Agency has provided a general framework on how to format an original submission for a Traditional 510(k) in FDA's Guidance for Industry and FDA Staff, "Format for

---

[9] Under 21 CFR 807.92(a)(3), a legally marketed device to which a new device may be compared for a determination regarding substantial equivalence is a device that was legally marketed prior to May 28, 1976, or a device which has been reclassified from class III to class II or I, or a device which has been found to be substantially equivalent through the 510(k) premarket notification process.

COOKFOIA 000029

5

*Contains Nonbinding Recommendations*

Traditional and Abbreviated 510(k)s"
(http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm084365.htm).  Although the basic content requirements apply to all 510(k)s, the type of data and information necessary to establish substantial equivalence varies by the type of device and the differences between the new device and the predicate device.  FDA has issued many device-specific guidance documents that clarify the data that should be included in 510(k)s for particular device types.  If a manufacturer is unsure of what information to include within a 510(k) submission, the manufacturer may contact FDA and submit a pre-submission to seek additional feedback to ensure submissions contain appropriate data elements.  For more information on the pre-submission process, see FDA's Guidance for Industry and FDA Staff, "Requests for Feedback on Medical Device Submissions: The Pre-Submission Program and Meetings with Food and Drug Administration Staff"
(http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM311176.pdf).

Please note that the use of the Standards Data Report for 510(k)s (Form 3654)
(http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM081667.pdf), recognized consensus standards, and device-specific guidance documents is not limited to Abbreviated 510(k) submissions.  Appropriate reliance on these documents can facilitate the review of all 510(k) submissions and can help to make the review process more consistent.  Medical device manufacturers should consider relying on and citing to standards and device-specific guidance documents wherever appropriate, regardless of the type of 510(k) submission.

A new device does not need to be identical to the predicate device for it to be found substantially equivalent to the predicate device.  In FDA's experience, it is rare for a new device to be identical to a predicate device.  Given the diversity of technologies evaluated under this review standard, this guidance adopts a flexible approach to determining "substantial equivalence" to accommodate evolving technology while maintaining predictability and consistency to promote confidence among device developers, practitioners, and patients.

## A.    The 510(k) Review Standard

### 1.    The Statutory Standard

The 510(k) review standard (substantial equivalence of a new device to a legally marketed (predicate) device) differs from the PMA review standard (reasonable assurance of safety and effectiveness).  The 510(k) review standard is comparative, whereas the PMA standard relies on an independent demonstration of safety and effectiveness.  Nonetheless, the principles of safety and effectiveness underlie the substantial equivalence determination in every 510(k) review.  The standard for a determination of substantial equivalence in a 510(k) review is set out in section 513(i) of the FD&C Act, which states:

Substantial Equivalence

(i)(1)(A) For purposes of determinations of substantial equivalence under subsection (f) and section 520(l), the term "substantially equivalent" or "substantial equivalence" means, with respect to a device being compared to a predicate device, that the device has the same intended use as the predicate device and that the Secretary by order has found that the device

*Contains Nonbinding Recommendations*

(i) has the same technological characteristics as the predicate device, or

(ii)(I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device contains information, including appropriate clinical or scientific data if deemed necessary by the Secretary or a person accredited under section 523, that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and effectiveness than the predicate device.

(B) For purposes of subparagraph (A), the term "different technological characteristics" means, with respect to a device being compared to a predicate device, that there is a significant change in the materials, design, energy source, or other features of the device from those of the predicate device.

Safety and effectiveness factor into both parts of the FDA's review. First, FDA must find that the intended use of the device and its predicate are "the same." As discussed in the Intended Use Section of this guidance, differences in the indications for use, such as the population for which a device is intended or the disease a device is intended to treat do not necessarily result in a new intended use. Such differences result in a new intended use when they affect (or may affect) the safety and/or effectiveness of the new device as compared to the predicate device and the differences cannot be adequately evaluated under the comparative standard of substantial equivalence. (See **Section IV.D.**)

Second, when comparing a new device to a predicate device, FDA must find that the two devices have "the same technological characteristics," or that a "significant change in the materials, design, energy source or other features of the device" does not raise different questions of safety and effectiveness and that the device is as safe and effective as a legally marketed device.

Although the 510(k) process involves a comparison of a new device to a predicate device rather than an independent demonstration of the new device's safety and effectiveness, as is required for approval of a PMA, in both cases FDA's review decision reflects a determination of the level of control necessary to provide a "reasonable assurance of safety and effectiveness."[10] The evidentiary standard, however, is different. In the 510(k) context, FDA generally relies, in part, on FDA's prior determination that a reasonable assurance of safety and effectiveness exists for the predicate device. Demonstrating basic similarities between a new device and a predicate device typically requires manufacturers to provide descriptive information such as a comparison of specifications, materials, and technology. In contrast, FDA generally evaluates differences between the new device and the predicate device to determine their effect on safety and effectiveness. It follows that the evidence necessary to show substantial equivalence will increase as differences between the new device and the predicate device increase if those differences significantly affect, or may significantly affect, safety or effectiveness (21 CFR 807.81).

---

[10] Under section 513(a)(2) of the FD&C Act, the safety and effectiveness of a device are to be determined:
   (A)  with respect to the persons for whose use the device is represented or intended,
   (B)  with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device, and
   (C)  weighing any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

COOKFOIA 000031

7

*Contains Nonbinding Recommendations*

###   2.      *The Least Burdensome Principle*

The FDA Modernization Act of 1997 (FDAMA) added two provisions, commonly known as "the least burdensome provisions," to the FD&C Act; these were amended by the FDA Safety and Innovation Act of 2012 (FDASIA) (Pub. L. 112-144; 126 Stat. 1051). The provision relating to substantial equivalence, section 513(i)(1)(D), states:

> (i)      Whenever the Secretary requests information to demonstrate that devices with differing technological characteristics are substantially equivalent, the Secretary shall only request information that is necessary to making substantial equivalence determinations. In making such request, the Secretary shall consider the least burdensome means of demonstrating substantial equivalence and request information accordingly.
>
> (ii)      For purposes of clause (i), the term "necessary" means the minimum required information that would support a determination of substantial equivalence between a new device and a predicate device.
>
> (iii)      Nothing in this subparagraph shall alter the standard for determining substantial equivalence between a new device and a predicate device.

Although the statutory provision refers only to information requests related to determining the substantial equivalence of technological characteristics of a device and its predicate, the underlying principle that information requests should relate to the review standard is a basic principle of good regulatory practice with broad applicability to the 510(k) decision-making process.

FDA's guidances, "The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm085994.htm) and "Suggested Format for Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions of FDAMA" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073679.htm) ("the Least Burdensome Guidances"), explain how FDA intends to apply the least burdensome provisions. "The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles" interprets least burdensome as "a successful means of addressing a premarket issue that involves the most appropriate investment of time, effort, and resources on the part of industry and FDA," and specifies that the least burdensome provisions do not affect the statutory premarket review standards for devices. The recommendations discussed in this guidance for evaluating substantial equivalence are consistent with the principles discussed in the Least Burdensome Guidances, but applies them by discussing the considerations that may affect the type of information necessary to demonstrate substantial equivalence at different decision points in the review of a 510(k).

###   3.      *Categories of NSE Determinations*

The K86-3 Guidance stated: "If it is clear from an initial review that a new device has a[n] intended use or technological feature that makes it NSE, the Center will not review or require performance information in the 510(k). Instead the applicant will be notified that the device is NSE, and any performance data will be reviewed in a PMA or reclassification petition." The same is not true for NSE decisions based on a lack of performance data, which do not preclude submission of a new 510(k) containing different or additional data to support a finding of substantial equivalence. Thus, it

8

*Contains Nonbinding Recommendations*

has been FDA's longstanding policy to treat NSE determinations as falling into two categories: (1) those that reflect FDA's affirmative determination that the device is a Class III device and cannot be reviewed in a 510(k) submission, and (2) those that reflect inadequacies in the evidence that preclude a finding of substantial equivalence.

The first category of NSE determinations includes a variety of different decisions, such as a finding of a lack of a predicate device, a new intended use, or different technological characteristics that raise different questions of safety or effectiveness when the new device is compared to the cited predicate device, that as a matter of law results in an NSE determination.  In most cases, FDA will provide the opportunity for the manufacturer to respond to initial concerns regarding the equivalency of the new device's intended use or technology to a predicate device via response to a request for additional information.  When FDA issues an NSE letter for a reason in this first category, the letter will typically not identify performance-based deficiencies.  Consequently, the device is automatically classified into Class III and will require PMA approval,[11] or if eligible, granting of a *De Novo* before marketing.  If FDA believes that the device found NSE may be eligible for the *De Novo* program, the NSE letter will typically indicate FDA's recommendation.  More information regarding the *De Novo* program can be found in FDA's Guidance for Industry and CDRH Staff, "New Section 513(f)(2) - Evaluation of Automatic Class III Designation" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080197.pdf).

The second category of NSE determinations is for those devices for which FDA has not affirmed that the new device has a different intended use or that the different technological characteristics raise different questions of safety or effectiveness when compared to the cited predicate device, but rather that the information provided in the submission is insufficient to demonstrate substantial equivalence to the predicate device.  In this situation, FDA generally first identifies the specific additional information – typically related to performance testing – that needs to be provided so that FDA may complete its evaluation of substantial equivalence.  Upon receipt of FDA's request for additional information (either through a formal letter, email, phone call or fax), the manufacturer has the opportunity to respond to FDA's request.  If the manufacturer in its response does not provide the requested information or a substantive justification for not providing the requested information, FDA will consider the response incomplete and place the submission immediately back on hold as an incomplete response.  Once a complete response is received, FDA will work with the manufacturer to try to resolve identified deficiencies in an interactive capacity following the timeframes and interactions instituted with the passage of the Medical Device User Fee Amendments of 2012 (MDUFA III).[12]  For more information on communications during the review of a 510(k) submission, see FDA's Guidance for Industry and FDA Staff, "Types of Communication During the Review of Medical Device Submissions"

---

[11] Alternatives to PMAs include submission of a Product Development Protocol (PDP) (Section 515(f) of the FD&C Act) or a Humanitarian Device Exemption (HDE) (Section 520(m)(2) of the FD&C Act and 21 CFR 814.104).  An HDE may be an appropriate option if the device has been determined by the Office of Orphan Products Development to be eligible for an HDE through a Humanitarian Use Device (HUD) designation (21 CFR 814.100 and 814.102).  Unlike other regulatory submissions, given the limited patient population, an HDE only has to demonstrate a reasonable assurance of safety and probable benefit (Section 520(m)(2) of the FD&C Act and 21 CFR 814.104).  For more information on HUD designations, please see FDA's guidance "Humanitarian Use Device (HUD) Designations" (http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM336515.pdf).

[12] The passage of FDASIA (Pub. L. 112-144) on July 9, 2012, included the Medical Device User Fee Amendments of 2012 (MDUFA III), Title II of FDASIA (126 Stat. 1002), which reauthorized the device user fee program for another five years.  The MDUFA III Commitment Letter (http://www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM295454.pdf) outlines changes to the review timeframes and/or expected interactions for many premarket submissions.

9

COOKFOIA 000033

*Contains Nonbinding Recommendations*

(http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm341918.htm).  If the manufacturer does not respond at all to FDA's requests for additional information, the submission will be subsequently withdrawn by FDA within the timeframe specified by FDA's Guidance for Industry and FDA Staff, "FDA and Industry Actions on Premarket Notification (510(k)) Submissions: Effect on FDA Review Clock and Goals" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM089738.pdf).  If a 510(k) is withdrawn due to a lack of response, the manufacturer may submit a new 510(k) with additional information that addresses the outstanding deficiencies communicated by FDA based on the review of the prior 510(k).  If the manufacturer provides the requested information after the withdrawal date, it will be considered and processed as a new 510(k) (21 CFR 807.87(l)); therefore, all information previously submitted would have to be resubmitted so that the new 510(k) is complete.  If a new 510(k) is submitted to address deficiencies raised in this type of NSE letter, as explained in FDA's Guidance for Industry and FDA Staff, "Refuse to Accept Policy for 510(k)s" (http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-meddev-gen/documents/document/ucm315014.pdf), the new 510(k) should clearly identify how the outstanding issues have been addressed and cross-reference where the new information is provided within the newly submitted 510(k).  Failure to cite the prior 510(k) number may result in a Refuse to Accept decision.

## B.    The Flowchart

The 510(k) Substantial Equivalence Decision-Making Process Flowchart (K86-3 Flowchart) was originally presented in the K86-3 Guidance and has served as the overarching "framework" for 510(k) decision-making for decades.  The K86-3 Flowchart has provided a concise summary of the 510(k) decision-making process and serves as a common frame of reference for scientific and regulatory discussions related to the 510(k) process.  However, the K86-3 Flowchart has not been updated since 1986 and, consequently, does not incorporate certain terminology set out in subsequent amendments to the FD&C Act.  Furthermore, the K86-3 Flowchart's visual structure may be more complex than necessary.  To specifically address these issues, a modified Flowchart is provided that both more closely tracks the language of section 513(i) of the FD&C Act and relevant regulations, and visually simplifies our presentation of the decision-making algorithm.

It should be noted that the 510(k) Decision-Making Flowchart (the Flowchart) (see **Appendix A**) is meant to be used in conjunction with this guidance document and not as a "stand-alone" document without appropriate references to the context of each critical decision point.

## C.    Predicate Device(s)

As discussed in Section IV.A, the 510(k) review standard is substantial equivalence of a new device to a legally marketed device.  Under 21 CFR 807.92(a)(3), a legally marketed device is a device that (i) was legally marketed prior to May 28, 1976 (preamendments device[13]) and for which a PMA is not required; *or* (ii) has been reclassified from Class III to Class II or I; *or* (iii) has been found SE through the 510(k) process.  For purposes of determining substantial equivalence, the legally marketed device is commonly referred to as the "predicate device" or "predicate."  While manufacturers may identify more than one predicate device, only one is required.  FDA encourages

---

[13] *See* Preamendment Status (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/ComplianceActivities/ucm072746.htm).

*Contains Nonbinding Recommendations*

manufacturers to identify a single predicate device to simplify and facilitate the decision-making process. When a manufacturer does identify **multiple predicates**, the **primary predicate** refers to the one with indications for use and technological characteristics most similar to the device under review. Although using a single predicate is optimal, when multiple predicates are appropriate (as described in the examples below), FDA recommends identifying a primary predicate in the submission to facilitate a timely, well-supported decision.

Section 513(i) of the FD&C Act and 21 CFR 807.100(b) state that, for a new device to be considered substantially equivalent to a predicate device, the new device must have the same intended use as the predicate device **and** the same technological characteristics or different technological characteristics that do not raise different questions of safety and effectiveness than the predicate device. Therefore, the use of a "split predicate" is inconsistent with the 510(k) regulatory standard. "Split predicate" refers to a situation in which a manufacturer is attempting to "split" the 510(k) decision making process by demonstrating that a new device has the same intended use as one marketed device while comparing the new device's technological characteristics with a second marketed device that has a different intended use. As a general matter, to find a device substantially equivalent, FDA must be able to address Decision Points 1 through 4 in the Flowchart using one predicate device identified by the manufacturer. FDA may use one or more additional devices proposed by the manufacturer in certain instances to help support substantial equivalence, as described below.

### 1.    *Multiple Predicates*

A manufacturer may use multiple predicate devices[14] to help demonstrate substantial equivalence in certain circumstances. Manufacturers sometimes choose to do this when combining features from two or more predicate devices with the same intended use into a single new device, when seeking to market a device with more than one intended use, or when seeking more than one indication for use under the same intended use, as described in the examples below.

**Multiple Predicates Example 1**:
A manufacturer submits a 510(k) for a new hemodialysis catheter. This new catheter has an extension (the portion of the device outside the body) design that is similar to predicate A and a tip (the portion of the device inside the body) design similar to predicate B. Both predicates A and B have the same intended use as the new device. In this example, the manufacturer is relying on both predicate A and predicate B, which have the same intended use as the new device, to support substantial equivalence with respect to technological characteristics. The manufacturer may choose either predicate as the primary predicate in this example.

**Multiple Predicates Example 2**:
A manufacturer submits a 510(k) for a plate indicated for fixation of both diaphyseal (the shaft of a long bone) and epiphyseal (the ends of a long bone) fractures, i.e., the plate can be used to set a long bone, such as the femur or thigh bone, that is broken in the middle or at the ends. The manufacturer cites a predicate device that is a plate indicated for middle bone fractures only and another predicate device that is indicated specifically for bone tip fractures. While the indications for use of each predicate device are different, both devices have the *same* intended use, namely,

---

[14] *See* 510(k) and Science Report Recommendations: Summary and Overview of Comments and Next Steps. (http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDRH/CDRHReports/UCM239449.pdf).

COOKFOIA 000035

11

*Contains Nonbinding Recommendations*

fracture fixation of the long bone.[15]  Thus, although the manufacturer could have used a single predicate device, in cases where a manufacturer intends to market a device for more than one indication and a different predicate exists to support each specific indication, the manufacturer may cite more than one relevant predicate device to support an SE determination.  In this case, using two appropriate predicates clearly identified by the manufacturer helped to facilitate clearance of the new device, which was indicated to treat both types of fractures treated by the predicates.

**Multiple Predicates Example 3**:
A manufacturer submits a 510(k) for a laser platform that consists of two hand pieces:  an Er:YAG laser hand piece and a Q-Switch Nd:YAG laser hand piece.  The manufacturer cites two predicates to support substantial equivalence for both of their requested proposed indications for use.  In this case, each predicate cited does not share the same indications for use as the other predicate because each predicate consists of only one hand piece in which the indications correspond to the indications for one of the hand pieces included in the new device.  However, the indications for both hand pieces fall within the scope of the general intended use of lasers, "incision, excision, ablation, vaporization of soft tissue."  The Er:YAG laser hand piece is indicated for the incision, excision, ablation, vaporization of soft tissue; and the Q-Switch Nd:YAG laser hand piece is indicated for tattoo removal.  The new device is found substantially equivalent to the predicate devices because it has the same intended use and the new device's technological characteristics are similar to the cited predicates.

In each example above, a single predicate could have been used to establish substantial equivalence of the new device, but the manufacturer used multiple predicates to show that FDA had found similar technology or indications to be substantially equivalent.

**Multiple Predicates Example 4**:
A manufacturer submits a 510(k) for a multi-parameter monitor.  The monitor includes different technologies that can stand alone independently, but can also be used together for the general intended use of measuring patient vital information.  If there is a predicate device for each of the parameters, then the combination of these parameters, assuming that monitoring of each individual parameter does not interfere with the others, can be found substantially equivalent.

It should be noted that in Examples 2, 3, and 4 above, the specific indications of the new device may necessitate new performance testing, but they do not change the overall intended use of the device relative to the predicates.  These types of situations will need to be assessed on a case-by-case basis; in some situations, a specific indication may actually alter the overall intended use of the device in which case the multiple predicates concept may not be applicable.  More information regarding when a specific indication is reasonably included within a general indication can be found in FDA's Guidance for Industry, "General/Specific Intended Use" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073944.htm).

Features can also be added to a new device to increase convenience of use and/or functionality, without altering the intended use or risk profile (relative to a predicate) of the new device.  Under

---

[15] It is important to note that if multiple predicates are used to support the same intended use, any different technological characteristics between the new device and the cited predicate devices must not raise different questions of safety and effectiveness.  Section 513(i) of the FD&C Act (21 U.S.C. § 360c(i)).

12

*Contains Nonbinding Recommendations*

such circumstances, the device with the added feature can be reviewed in a 510(k), even if the added feature consists of a component that may fall under a different classification regulation.  A catheter-thermometer construct is useful in illustrating this concept.

**Multiple Predicates Example 5**:
A manufacturer submits a 510(k) for a urinary catheter with a thermometer.  The thermometer/temperature-measuring feature is not affecting the intended use or risks of using the catheter (assuming it is integrated appropriately), nor is the catheter affecting the performance or risk profile of the thermometer.  The temperature-measuring feature is a convenience component that is added to the catheter, with the intended use of the device still being that of the catheter to pass fluids to or from the urinary tract, so it is appropriate to have a legally marketed catheter serving as the primary predicate.

There are obvious limitations to feature/component additions in the 510(k) program.  If a feature is added which alters the intended use of the new device and/or alters the safety profile (i.e., introduces new or additional risk factors) such that comparison to a predicate cannot be made, the new device is ineligible for the 510(k) program.  A new device with a new design feature or added component must meet the SE standard with at least a single predicate from the same classification regulation.

## 2.    *Reference Devices*

When demonstrating substantial equivalence in a 510(k) submission, manufacturers sometimes direct attention to similar situations FDA has encountered in the past.  If a manufacturer successfully navigates through Decision Point 4 on the Flowchart using a single predicate device, other legally marketed devices, which FDA calls "**reference devices**," may be used to support scientific methodology or standard reference values at Decision Point 5a.

It is important to note that a reference device is not considered a predicate device and it cannot be used to address Decision Points 1 – 4 on the Flowchart.  Additionally, the applicability of a reference device will need to be reviewed by FDA for its appropriateness.  If a selected reference device is used in an anatomical location or for a physiological purpose that is considerably different than that of the new device, its utility as a reference device may be limited.

If a manufacturer intends to use a reference device, the manufacturer should provide a scientific rationale that justifies its use.  This concept is illustrated in the Reference Device Examples below.  We recommend that you read these examples side-by-side with the Flowchart in Appendix A so that you can follow the decision-making process.

**Reference Device Example 1**:  A manufacturer submits a 510(k) for a total knee implant with coating X (the new device).  Other coated knee implants with the same intended use with coatings A, B, and C are legally marketed.  In addition, a total hip implant with coating X is legally marketed.  The manufacturer cites the legally marketed knee implant with coating A as the predicate device.  FDA determines that the new device has an appropriate predicate device (thus, answering "yes" at Decision Point 1) and the new device has the same intended use as the predicate device (thus, answering "yes" at Decision Point 2 in the Flowchart).[16]  However, FDA

---

[16] The answer at Decision Point 2 may possibly be "no" if the predicate device is uncoated.  Introducing a coated arthroplasty device into an anatomical location which previously only had non-coated devices would likely create a new intended use due to the different fixation methods.

COOKFOIA 000037

*Contains Nonbinding Recommendations*

determines that the new device does not have the same technological characteristics as the predicate device (thus, answering "no" at Decision Point 3 in the Flowchart), because the new device (knee implant with coating X) has a chemical profile different from the chemical profile of the cited predicate device (knee implant with coating A).  There are no other technological differences between the new device and the cited predicate device (knee implant with coating A).  FDA determines that the new device does not raise different questions of safety and effectiveness.  In this case, FDA determines that the safety and effectiveness questions regarding the coating material are whether it is biocompatible and whether it affects the fixation of the implant and these questions apply to both the new device and predicate device (thus, answering "no" at Decision Point 4 in the Flowchart).

After Decision Point 4 in the Flowchart, if appropriate, the manufacturer may refer to the reference device (the hip implant with coating X in this situation) to support the appropriate scientific methods for the characterization of coating X on the new knee implant device.  In this particular example, the manufacturer provided an adequate scientific rationale to support that the methods used to characterize the biocompatibility and characteristics of the coating (e.g., strength, abrasion, etc.) on the hip implant are applicable to the knee implant.[17]  The reference device (hip implant with coating X) is used in this case solely to assist with the characterization of the coating on the new device (knee implant with coating X).

**Reference Device Example 2:**  A manufacturer submits a 510(k) for an over-the-counter blood glucose test system (glucose meter).  Other glucose meters with the same intended use are legally marketed.  The manufacturer cites a legally marketed glucose meter as the predicate device.  FDA determines that the new device has an appropriate predicate device (thus, answering "yes" at Decision Point 1) and the new device has the same intended use as the predicate device (thus, answering "yes" at Decision Point 2 in the Flowchart).  The manufacturer has not demonstrated that the new device has the same technological characteristics as the predicate device (thus, answering "no" at Decision Point 3 in the Flowchart), but the new device does not raise different questions of safety and effectiveness (thus, answering "no" at Decision Point 4 in the Flowchart).

Because glucose meters of this type typically have relatively high inherent total error due to limitations in their technology and other factors, in order to sufficiently characterize the analytical performance of the new device (and answer "yes" at Decision Point 5a in the Flowchart), the new device uses the same approach to characterize analytical performance as the predicate device.  Specifically, the accuracy of the new device is evaluated by comparing its blood glucose results to reference values generated on a laboratory-based glucose measurement device that has been well-validated for precision and accuracy, and that is traceable to a higher order, e.g., internationally recognized standard.  If the performance of the new device (including accuracy compared to the reference values from a reference device) is equivalent to the performance of the predicate device (including accuracy of the predicate compared to the reference values from a reference device), the FDA would determine that the data demonstrate equivalence (thus answering "yes" at Decision Point 5b in the Flowchart).

---

[17] The applicability of the scientific methodology used to characterize certain aspects of a legally marketed device will depend upon the specific scenario.  In this example, it is determined that the duration of contact, which affects the biocompatibility testing, and the mechanical testing conducted to fully characterize the coating on the hip implant are directly relevant and informative for the same coating applied to the knee implant.  However, if the manufacturer wanted to rely on the scientific methodology for a coating used in a different type of implant (e.g., cardiovascular), it may not be appropriate to exercise this approach.

14

COOKFOIA 000038

*Contains Nonbinding Recommendations*

### 3. Lack of Predicate Device

If a predicate device with the same intended use cannot be identified, or if the new device's different technological characteristics raise different questions of safety or effectiveness, a manufacturer may submit a *De Novo* request, either after receipt of an NSE letter or directly requesting classification through the *De Novo* process.[18]  For high risk devices, a PMA (or alternative submission type) may be required.

### 4. Identification and Documentation of the Predicate(s)

Although manufacturers may cite more than one predicate device in a 510(k), FDA recommends that the manufacturer clearly identify the primary predicate device to which substantial equivalence is being claimed.[19]  Further, as part of the decision-making process, FDA should clearly cite the predicate device relied upon in determining substantial equivalence for the new device in its review documentation.  If multiple predicates or reference devices are used in accordance with this guidance, the manufacturer should identify each device and explain why more than one predicate or a reference device is necessary and appropriate to support substantial equivalence.  Manufacturers should choose the most appropriate single or primary predicate for their new device, and should limit the multiple predicates to those most helpful in facilitating review of the new device and to the minimum number necessary to support substantial equivalence.  Predicate device(s) relied upon for SE must be accurately cited in the 510(k) Summary (see **Appendix B**) according to 21 CFR 807.92 (a)(3). Reference devices also may be cited in the 510(k) Summary.

## D.   Intended Use

Under section 513(i) of the FD&C Act, FDA may only determine that a device is substantially equivalent to a predicate device if it has the same intended use.[20]  (Refer to the 510(k) Decision-Making Flowchart in **Appendix A**).  A finding of NSE due to a new intended use is relatively rare. Approximately 10% of all NSE decisions are due to a new intended use.[21]  This type of NSE determination generally reflects a finding that a change in the *indications for use* of a device creates a

---

[18] Section 607 of FDASIA (Pub. L. 112-144; 126 Stat. 1054), which was enacted on July 9, 2012, amended section 513(f)(2) of the FD&C Act by providing the option of directly submitting a request for *De Novo* classification without the need for an NSE determination.  A manufacturer who intends to submit a direct *De Novo* request is encouraged to engage in dialogue with FDA through the pre-submission process to obtain additional feedback related to whether a valid predicate exists for the new device and appropriate performance data that will be necessary to support a reasonable assurance of safety and effectiveness.  For more information on the pre-submission process, see FDA's Guidance for Industry and FDA Staff, "Requests for Feedback on Medical Device Submissions: The Pre-Submission Program and Meetings with Food and Drug Administration Staff" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM311176.pdf).

[19] Although devices recently cleared under the 510(k) program are often selected as the predicate device to which substantial equivalence is claimed, any legally marketed Class II or Class I device may be used as a predicate device.  However, section 513(i)(2) of the FD&C Act provides that a predicate device may not have been removed from the market at the initiative of the Commissioner of Food and Drugs or been determined to be misbranded or adulterated by a judicial order.  *See also* 21 CFR 807.100.

[20] This guidance is not intended to supplant either of the following guidance documents:  "Determination of Intended Use for 510(k) Devices; Guidance for CDRH Staff" (Update to K98-1)" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm082162.htm) or "General/Specific Intended Use" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073944.htm).

[21] Refer to "Initial Results of 510(k) Audit: Analysis of Not Substantially Equivalent (NSE) Determinations" (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDRH/CDRHReports/ucm259173.htm).

15

COOKFOIA 000039

*Contains Nonbinding Recommendations*

new *intended use*. This section of the guidance provides further clarification about the terms "intended use" and "indications for use," describes how FDA determines what the intended use of a device is, and provides examples of changes in indications for use that may constitute a new intended use making the device ineligible for review under the 510(k) program.

### 1.        Explanation of Intended Use and Indications for Use

For purposes of substantial equivalence, the term **intended use** means the general purpose of the device or its function, and encompasses the indications for use. The term **indications for use**, as defined in 21 CFR 814.20(b)(3)(i), describes the disease or condition the device will diagnose, treat, prevent, cure or mitigate, including a description of the patient population for which the device is intended.[22] The intended use of a device is one criterion that determines whether a device can be cleared for marketing through the 510(k) process or must be evaluated in a PMA (or alternative submission type), or if appropriate, a *De Novo* request. The proposed labeling in a 510(k) is used to determine a device's intended use (Section 513(i)(1)(E) of the FD&C Act). The indications for use statement in a 510(k) is also a factor in determining a device's intended use. Consistency between the indications for use statement and the proposed labeling will facilitate the review of the 510(k).

A finding of substantial equivalence means that the indications for use of the new device fall within the intended use of the predicate device and, therefore, the two devices have the same intended use. For devices with general indications for use that do not specify a disease, condition, or population (or an anatomical site from which a disease state or population may be inferred), the indications for use and intended use are the same. Such indications for use are referred to as "tool type" indications for use. Examples of devices with "tool type" indications for use include devices such as scalpels, which are often indicated for cutting tissue, or imaging devices, which are often indicated for taking images of the body. A scalpel indicated for removing a particular type of cancerous cell, however, has indications for use specific to the identified disease, condition, or population, and therefore, does not have "tool type" indications for use.

### 2.        Determining Intended Use

Section 513(i)(1)(E)(i) of the FD&C Act provides that the FDA's determination of intended use of a device "shall be based upon the proposed labeling" submitted in a 510(k). When a review of the indications for use and all other information in the proposed labeling submitted with a 510(k) supports an intended use that is the same as that of the predicate device, FDA will determine that the new device and predicate device have the same intended use. This guidance does not address FDA's authority to consider information outside the labeling in reviewing a 510(k) and issue an "SE with limitations" under section 513(i)(1)(E) of the FD&C Act because "there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling" and such use "could cause harm." For information on "SE with limitations," please see the guidance document, "Determination of Intended Use for 510(k) Devices; Guidance for CDRH Staff (Update to K98-1 )" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm082162.htm). When a review of the labeling submitted with a 510(k) shows that the indications for use of a new device and predicate device differ, FDA must evaluate whether the new[23] indications for use

---

[22] We have a long-standing policy of applying the definition of indications for use in the PMA regulation at 21 CFR 814.20(b)(3)(i) in the same way in the 510(k) context.

[23] For purposes of Section IV.D, the term "new" in describing indications for use refers to an indication that is new or differs from that of the predicate device.

16

COOKFOIA 000040

*Contains Nonbinding Recommendations*

fall within the same intended use as that of the predicate device.  As described in Section IV.A, because the substantial equivalence determination is grounded in safety and effectiveness, this determination depends upon the safety and effectiveness of the new device for the new indications relative to the safety and effectiveness of the predicate device.

Once FDA has determined the indications for use of the new device upon review of the proposed labeling, FDA may rely upon relevant clinical and/or scientific information, that does not appear in the proposed labeling submitted with the 510(k), regarding the safety and effectiveness of the new indications for use.  For example, FDA may rely upon publicly-available scientific information or Agency knowledge about how a disease progresses to determine whether indications for use to treat a certain disease or anatomical site constitute a new intended use.

### 3. Determining When Indications for Use Result in a New Intended Use

Not every change in indications for use that may affect safety or effectiveness will result in a finding of a new intended use.  Only a change in the indications for use that raises different questions of safety and effectiveness and therefore, precludes a meaningful comparison with the predicate device constitutes a new intended use.  FDA may find changes in indications for use of a device to constitute a new intended use when the changes raise a safety or effectiveness issue that was not raised by the predicate device, or the changes have the potential to significantly increase a safety or effectiveness concern raised by the predicate device.[24]  In the first case, reliance on a predicate device is inadequate because the safety or effectiveness issue was not considered in reviewing the 510(k) for the predicate device.  In the second case, although the safety or effectiveness issue may have been considered in the 510(k) for the predicate device, the finding of substantial equivalence for the predicate device cannot be generalized to the new indications for use because of a probable, significant change in the incidence or severity of the issue.  In both cases, the predicate device is not an adequate "proxy" for an independent determination of safety and effectiveness.

> **Illustrative Example 1**:  A new device's instructions for use describe using a general surgery device in a body cavity, but the predicate device is used only to treat external injuries.  A comparison to the predicate device may not be adequate to address the risk of infection posed by internal use of the device.  Because of the need for an independent assessment of an issue that was not evaluated or was of significantly less concern during FDA's review of the 510(k) for the predicate device, FDA may determine that the indication for use of the new device constitutes a new intended use and a PMA (or alternative submission type), or if appropriate, a *De Novo* request, is required.

> **Illustrative Example 2**:  A 510(k) for an existing surgical ablation device cleared for ablation of cardiac tissue has now been submitted for the treatment of atrial fibrillation. While the devices are similar in technology, additional clinical testing has been conducted to demonstrate that not only can the device ablate cardiac tissue, but also that doing so can treat atrial fibrillation safely and effectively.  While the question of whether or not cardiac tissue can be safely and effectively ablated was raised by the predicate device, FDA has determined that the specific indication for the treatment of atrial fibrillation constitutes a new intended use because it raises questions of both safety and effectiveness not raised by the predicate device.  Specifically, treatment of atrial

---

[24] *See* 21 CFR 807.92(a)(5); *see also* FDA guidance "General/Specific Intended Use" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073944.htm) which implements section 513(i)(1)(F) of the FD&C Act.

COOKFOIA 000041

17

*Contains Nonbinding Recommendations*

fibrillation requires extensive ablation to create linear lines of conduction block in a maze-like pattern that eliminates fibrillatory conduction in the atria.  The effectiveness assessment for the treatment of atrial fibrillation warrants a clinical outcome study.  Furthermore, the risks of iatrogenic heart block and collateral cardiac or extra-cardiac damage are either raised or increased when such a complex and extensive lesion set is created.  As a result, a PMA (or alternative submission type) is required.

### 4. Changes in Indications for Use that May Result in a New Intended Use

All new indications for use should be evaluated to determine whether they reflect a new intended use.  Certain types of changes, however, warrant particular attention in evaluating whether the new indications for use result in a new intended use because they are more likely to significantly affect safety or effectiveness:

- a change from a functional/performance indication to a treatment or aesthetic indication;

- a change from a diagnostic indication to a screening indication, or vice versa;

- a change in the anatomical structure of use;

- a change in the patient population (e.g., adult versus pediatric; different disease populations);

- a change in the clinical context or setting (e.g., periodic monitoring versus continuous monitoring; hospital versus home use).

## E.  Technological Characteristics

After FDA has determined that a valid predicate device exists for a new device and that both devices have the same intended use, FDA will move to Decision Points 3 and 4 of the Flowchart (see **Appendix A**).  In these steps of the 510(k) review process, FDA compares the technological characteristics of the new device and the predicate device to determine whether the new device has the same technological characteristics as the predicate, and if not, whether the different technological characteristics raise different questions of safety and effectiveness.[25]  Devices reviewed under the 510(k) program commonly have different technological characteristics from their predicate device(s); however, FDA rarely makes a finding of NSE at Decision Point 4.[26]

### 1. Step 1 – Identification of Technological Characteristics of the New and Predicate Device

For FDA to evaluate whether differences exist between the technological characteristics of the new device and the predicate device(s), the manufacturer should clearly identify the technological characteristics of each device individually.  Technological characteristics include materials, design,

---

[25] Section 513(i)(1)(A) of the FD&C Act and 21 CFR 807.100(b)(2).  "Different technological characteristics" are defined as "significant change in the materials, design, energy source, or other features of the device from those of the predicate device."  Section 513(i)(1)(B) of the FD&C Act and 21 CFR 807.100(b)(2)(ii)(A).

[26] Refer to "Initial Results of 510(k) Audit: Analysis of Not Substantially Equivalent (NSE) Determinations" (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDRH/CDRHReports/ucm259173.htm).

18

COOKFOIA 000042

*Contains Nonbinding Recommendations*

energy source, and other device features, as defined in section 513(i)(1)(B) of the FD&C Act and 21 CFR 807.100(b)(2)(ii)(A).

To facilitate FDA's review of a device's technological characteristics, the device description in a 510(k)[27] should include the information necessary to explain the new device's technological characteristics, including similarities in materials, design, energy source, and other device features. This information will be evaluated by FDA to determine whether the technological characteristics of the new device are different and, if so, whether they raise different questions of safety and effectiveness as compared to the predicate(s). Examples of key characteristics that should be provided as part of a 510(k) submission include, but are not limited to, the following features:

- An overall description of the device design. A complete description of the device may be facilitated by the submission of engineering drawings or other figures. If the device consists of multiple components, a diagram identifying how the different components of the device system work together may be beneficial. The device description should also include a discussion of the physical specifications, dimensions and design tolerances that are critical to the new device.[28] Significant features of the new device should have a clear purpose within the context of the overall design and intended use. In cases where this is not apparent, it is important for the 510(k) submission to provide a discussion of how a particular device design or component contributes to the overall use and function of the new device.

- Materials. For many devices, a complete identification of the detailed chemical formulation used in the materials of construction, especially for those materials that come into contact with the patient, should be provided. Note that the FDA does not clear/approve materials.[29] Any additives, including color additives, coatings, or other surface modifications should also be identified. For some devices, the processing of the material (e.g., forged vs. cast) or the state of the material (e.g., amorphous vs. crystalline) may also significantly contribute to or affect the overall safety or function of the device, and so should be included as part of the device description, as applicable.

- Energy sources. This not only includes energy delivery to the device, including the use of batteries, but also energy delivery that is part of the functional aspect of the device (e.g., laser, radiofrequency, ultrasound, etc.) and that affects the patient and/or the health care

---

[27] FDA's regulations require manufacturers to include in their 510(k)s "[a] description of the device that is the subject of the premarket notification submission, such as might be found in the labeling or promotional material for the device, including an explanation of how the device functions, the scientific concepts that form the basis for the device, and the significant physical and performance characteristics of the device, such as device design, material used, and physical properties." 21 CFR 807.92(a)(4); *see also* 21 CFR 807.87(f).

[28] The original Flowchart from the K86-3 Guidance included a decision point related to whether or not "descriptive characteristics" were precise enough to ensure equivalence. However, the term "descriptive characteristics" does not appear in the statute or regulations. The 510(k) Decision-Making Flowchart described in **Appendix A** specifically addresses this to reflect the statute more closely and minimize confusion.

[29] For additional considerations, refer to the FDA guidance, "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing' (Replaces #G87-1 #8294) (blue book memo)" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080735.htm). *See also* Draft Guidance for Industry and FDA Staff, "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing'" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM348890.pdf). FDA's draft guidance represents the Agency's proposed approach on this topic.

19

COOKFOIA 000043

*Contains Nonbinding Recommendations*

professional using the device.  Where applicable, a discussion of this characteristic should be provided.

- Other key technological features.  These include, but are not limited to, software/hardware features, density, porosity, degradation characteristics, nature of reagents (recombinant, plasma derived, etc.), principle of the assay method, etc., that are not explicitly included as part of the materials, design or energy source characteristics.  These technological features should be included as part of the device description in the 510(k) submission, as appropriate for the specific device technology.[30]

A 510(k) submission must also contain information about the technological characteristics of the predicate device (21 CFR 807.87(f), 807.92(a)(3) and (a)(6)).  The manufacturer of the new device should provide information necessary and sufficient to fully and clearly identify and describe the technological characteristics of the predicate device so that FDA can conduct a comparative assessment of the technological characteristics, as further described in Step 2.

**2.    *Step 2 – Identification of Differences in Technological Characteristics Between the New and Predicate Device***

Once the technological characteristics of the new and predicate device(s) have been clearly identified, the next step involves a comparison of these characteristics to identify any differences.  This may involve a comparison of detailed specifications as well as a comparison of the system-level technological characteristics of the devices.  FDA relies upon information provided about the predicate device, in addition to the information in our files as appropriate, and the new device to determine whether the new device has different technological characteristics (Decision Point 3) in comparison to the predicate(s).

At this point, FDA will assess whether the similarities/differences in technological characteristics between the new and predicate device(s) have been appropriately identified.  FDA highly recommends that the manufacturer summarize this information in tabular format to facilitate this step of review.

**3.    *Step 3 – Determination of Whether the Differences in Technological Characteristics Raise Different Questions of Safety and Effectiveness***

If FDA determines that there are differences in the technological characteristics of the new device and the predicate device, FDA will review and evaluate all relevant information bearing on any such differences in technological characteristics to determine whether they raise different questions of safety and effectiveness for the new device as compared to the predicate device (Decision Point 4 on the Flowchart).  A "different question of safety or effectiveness" is a question raised by the technological characteristics of the new device that was not applicable to the predicate device, and poses a significant safety or effectiveness concern for the new device.

Some examples are provided below to illustrate cases where the response to this general question was "yes," i.e., the new device was determined to raise different safety and effectiveness questions in comparison to the predicate device, and the new device was found NSE.

---

[30] We encourage manufacturers to determine whether there is an applicable device-specific guidance or special controls for the device type as provided in a special controls document or classification regulation.

*Contains Nonbinding Recommendations*

<u>**Illustrative Example 1**</u>
**Predicate:**  A biological indicator utilizing natural bacterial spores with recognized resistance characteristics as organisms for the biological indicator, where the presence of a color change or fluorescent signal is indicative of bacterial viability.
**New Device:** A biological indicator based on recombinant technology/genetic engineering, where the fluorescent signal is not indicative of bacterial viability; it is indicative of plasmid enzyme expression.
**Intended Use:**  Same
**Different questions of safety and effectiveness?**  Yes
**Why:**  Due to the engineering of a plasmid into the biological indicator, it is possible to have viable bacteria that do not contain the plasmid in sufficient amounts to generate a signal.  In this case, the biological indicator could falsely indicate that the monitored load was sterilized properly due to the absence of fluorescent signal, while there are viable non-expressing bacteria in the indicator (development of false negatives).  This technological difference raises different types of safety and effectiveness concerns for using a recombinant-DNA plasmid that codes for antibiotic resistance and a signaling enzyme in the spores of a biological indicator.  Appropriate test methodologies and risk assessments need to be determined to address the properties of the introduced plasmid and host bacterial spore that could affect indicator performance.  Because these types of questions were not necessary to take into account for the predicate device, the new device would be found NSE.

<u>**Illustrative Example 2**</u>
**Predicate:**  A mechanical device used for embryo dissection
**New Device:**  An electrical device used for embryo dissection
**Intended Use:**  Same
**Different questions of safety and effectiveness?**  Yes
**Why:**  In this example, changing the process from a mechanical process to an electrical energy source (e.g., laser) changes the way the device operates and raises different safety concerns regarding how the heating aspect of the electrical mechanism affects the embryo.  Because these types of questions were not necessary to take into account for the predicate device, the new device would be found NSE.

<u>**Illustrative Example 3**</u>
**Predicate:**  A device inserted into the patient's pharynx through the mouth to provide a patent airway by mechanically moving the soft tissue.
**New Device:**  A device placed externally on the mandible and neck to apply a vacuum to move the soft tissue forward and thus "open" the airway.
**Intended Use:**  Same
**Different questions of safety and effectiveness?**  Yes
**Why:**  The predicate device is invasive and placed midline in the oropharynx and does not exert pressure on the vascular, respiratory, or nerve structures in the neck, whereas the new device exerts continuous external negative pressure on these areas, raising different types of safety questions, such as the risks and potential adverse events associated with the stimulation of the nerve structures in the neck.  Because these types of questions were not necessary to take into account for the predicate device, the new device would be found NSE.

In the event the answer to Decision Point 4 is "No" and the differences between the new device and the predicate device do not raise different questions of safety and effectiveness, then the scientific

21

*Contains Nonbinding Recommendations*

review of the performance data will proceed.  However, if the answer to Decision Point 4 is "Yes" and the differences between the new device and predicate device raise different questions of safety and effectiveness, then the new device will be found NSE.  Upon receipt of this type of NSE letter, the manufacturer may submit a PMA (or alternative submission type), or if appropriate, a *De Novo* request.

## F.    Requests for Performance Data

Although FDA may rely upon descriptive information alone to address the critical questions in the Flowchart (Decision Points 1 through 4), performance data are typically needed in a Traditional 510(k) to demonstrate the substantial equivalence of a new device to a predicate device.  In addition, information on device performance described in labeling or other sections of the 510(k) should be supported with appropriate performance data.  The type and quantity of performance data necessary to support a determination of substantial equivalence depend upon the device and/or device type.[31]  Performance data may be needed to address a variety of safety and effectiveness issues and may be generated from different types of tests and studies.

FDA's data requests typically follow a stepwise analytical process to ensure the information requested reflects the least burdensome approach to establishing substantial equivalence.[32]  First, FDA considers whether descriptive information about the technological characteristics, such as the materials, design, and specifications, of the new device is sufficient.  Very few 510(k) submissions rely solely on descriptive information about materials, design, specifications, and other technological characteristics (see 21 CFR 807.87(f) and (g)).  When this information is not sufficient to support a substantial equivalence determination, FDA then considers whether non-clinical bench performance testing or analytical studies using clinical samples would be sufficient.  For *in vitro* diagnostic devices (IVDs), analytical studies include, but are not limited to, evaluations of accuracy, precision, specificity, and sensitivity.  Non-clinical bench performance testing includes a wide variety of test modalities that will be dependent upon the specifics of the actual device, including, but not limited to:

- mechanical, electrical, and biological engineering performance, such as fatigue, wear, tensile strength, compression, flowrate, burst pressure;
- electromagnetic compatibility (EMC);
- sterility;
- stability/shelf life;
- software validation;
- other forms of non-clinical, including device-specific.

Non-clinical animal and/or biocompatibility studies are typically requested when other forms of non-clinical bench performance testing are not sufficient to demonstrate substantial equivalence.  Non-clinical laboratory studies that support the safety of medical devices must be conducted in compliance with 21 CFR Part 58, Good Laboratory Practice (GLP) for Nonclinical Laboratory

---

[31] Manufacturers should also determine whether there is an applicable device-specific guidance or special controls for the device type as provided in a special controls document or classification regulation.

[32] FDA follows the "least burdensome" provisions.  *See* Final Guidance for FDA and Industry, "The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm085994.htm).

22

COOKFOIA 000046

*Contains Nonbinding Recommendations*

Studies, as applicable, to ensure the quality, reliability, and integrity of study data.[33] For more information on this topic, see FDA's Draft Guidance for Industry and Food and Drug Administration Staff, "The Applicability of Good Laboratory Practice in Premarket Device Submissions: Questions & Answers" (http://www.fda.gov/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm366338.htm). FDA's draft guidance represents FDA's proposed approach on this topic.

When analytical or non-clinical bench performance testing data, or non-clinical animal and/or biocompatibility studies are insufficient, or available scientific methods are not acceptable, e.g., the scientific methods are deemed unacceptable because they are not clinically validated or are not supported by a valid scientific rationale, FDA may request clinical performance data to support a substantial equivalence determination.  For 510(k)s reviewed in the Office of Device Evaluation, FDA currently requests clinical data for less than 10 percent of the 510(k) submissions.  In some instances, clinical data may be a less burdensome means of demonstrating substantial equivalence than other means of performance testing, and 510(k)s reviewed in CBER for products intended to ensure the safety and effectiveness of blood and blood products typically include clinical data. Clinical data provided in support of any marketing application, including a 510(k) when those data are relevant to a substantial equivalence determination, should constitute valid scientific evidence as defined in 21 CFR 860.7(c)(2)[34] and must comply with the Investigational Device Exemptions (IDE) regulations as applicable.[35]

Although not an exhaustive list of instances in which FDA may request clinical data to demonstrate substantial equivalence,[36] the following scenarios illustrate the most common situations in which clinical data may be requested.  As explained in the Scope Section (see **Section III**), the information in this guidance and the examples below do not take the place of any device-specific guidance.

---

[33] The applicability of GLPs to non-clinical studies in a 510(k) submission is also mentioned in FDA's Guidance "Refuse to Accept Policy for 510(k)s" in the Performance Data – General section of the checklist (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm315014.pdf).

[34] 21 CFR 860.7(c)(2): Valid scientific evidence is evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device under its conditions of use. The evidence required may vary according to the characteristics of the device, its conditions of use, the existence and adequacy of warnings and other restrictions, and the extent of experience with its use. Isolated case reports, random experience, reports lacking sufficient details to permit scientific evaluation, and unsubstantiated opinions are not regarded as valid scientific evidence to show safety or effectiveness. Such information may be considered, however, in identifying a device the safety and effectiveness of which is questionable.

[35] In the U.S., clinical studies/investigations (*see* 21 CFR 812.3(h)) involving one or more human subjects to determine the safety or effectiveness of a device must be conducted in accordance with the Investigational Device Exemptions (IDE) regulations, 21 CFR Part 812, as applicable.  In addition, such studies/investigations must comply with the regulations governing institutional review boards (21 CFR Part 56), informed consent (21 CFR Part 50), and financial disclosure (21 CFR Part 54).  *See also* Guidance for Clinical Investigators, Industry, and FDA Staff, "Financial Disclosure by Clinical Investigators" (http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM341008.pdf). Studies conducted outside the U.S. generally do not have to comply with the IDE regulations, but FDA recommends that such studies be conducted in accordance with good clinical practice.  For information on good clinical practice, see 78 FR 12664 (Feb. 25, 2013).

[36] The acceptability or level of data necessary to support an SE determination is product specific and therefore, not discussed in this guidance.  Manufacturers should determine whether there is an applicable device-specific guidance or special controls for the device type as provided in a special controls document or classification regulation as these sources may provide further information about performance data that may be necessary in a 510(k) submission.

23

COOKFOIA 000047

*Contains Nonbinding Recommendations*

Note:  The examples provided below distinguish between examples that are only applicable to diagnostic devices, including IVDs, and therapeutic devices.  This is because there are significant differences in the clinical data requirements for these two categories of devices.

### 1.    *New or Modified Indications for Use – Same Intended Use*

In rare instances, FDA may rely upon clinical data to determine that new or modified indications for use fall within the same intended use as a predicate device.

**Illustrative Examples:**

- The new device is an IVD that is indicated for over-the-counter use, whereas the predicate device is indicated for prescription use in the home or prescription use in a clinical setting.  The newly indicated test population might fall within the intended use of the predicate device.  Clinical data (demonstrating that the user can collect the sample, generate an accurate result, and adequately interpret the result) might establish that the indication for use for the new device falls within the intended use of the predicate device.

- The new IVD is indicated for use with patients who have symptoms and signs of illness from any member of a specified set of closely related diseases.  The indications for use for the predicate IVD do not include one of the diseases addressed by the new IVD.  Clinical data (concerning all diseases in the newly specified set) might establish that the indications for use for the new device fall within the intended use of the predicate device.

- The manufacturer modifies the indications for use, explicitly or implicitly, by proposing a different surgical implantation method which also affects the indications for use, e.g., a minimally invasive procedure in place of an open procedure, and the safety and effectiveness of the new device cannot be adequately replicated or otherwise characterized in a non-clinical performance (including animal) test environment to adequately support substantial equivalence to the predicate.  Although on its face a minimally invasive procedure would appear to involve less serious risks than an open procedure, the minimally invasive procedure may be less effective or may present different but still serious risks.

### 2.    *Technological Differences*

FDA may request clinical data for a 510(k) when the technological differences between the new device and predicate device are significant but do not support an immediate NSE determination due to different questions of safety and effectiveness.  In these limited situations, clinical data may be needed to evaluate the safety and effectiveness of the new device as compared to the predicate device.

**Illustrative Examples:**

- A new IVD uses the same analyte-specific chemistry as the predicate, but with a different read-out technology (e.g., chemiluminescence instead of colorimetry).  Clinical data may be necessary to demonstrate that the new device performs equivalent to the predicate.

- Performance characteristics of the new device in comparison to the predicate are significantly different in non-clinical performance testing, e.g., the predicate is rigid whereas the new

24

*Contains Nonbinding Recommendations*

device is designed to be more flexible.  Clinical data may be necessary to demonstrate that the new device performs equivalent to the predicate.

- Some devices that display data about the patient's anatomy or physiology, e.g., glucose meters, pulse oximeters, blood pressure cuffs, are supported by software.  If there is a change in the software that relates to how the software analyzes the patient's anatomy or physiology, the device may need to be tested on actual patients to assure that the software performs in a manner that is equivalent to the previous version.  In this case, non-clinical data may not suffice.

- The technological characteristics of the new device raise a question concerning whether its clinical performance can be expected to be equivalent to the clinical performance of the predicate.  Clinical data may be necessary to demonstrate that the new device performs equivalent to the predicate.  For IVDs, an example is a new prothrombin time (clotting) test using thromboplastin that is a recombinant product instead of a naturally occurring material.

### 3.   *Non-clinical Testing Methods are Limited or Inappropriate Because of the Indications for Use or Device Technology*

FDA requests clinical data for a 510(k) submission to address issues that cannot be adequately addressed using non-clinical test methods because of the indications for use or device technology.  For instance, for certain indications or technologies, FDA may request clinical data when non-clinical testing methods are not validated, are limited or are inappropriate, because of either their scope or their applicability, to demonstrate substantial equivalence.

**Illustrative Examples:**

- For some devices, the way they are used and the environment in which they are used affect the way they perform.  For example, the non-clinical performance testing on the new device may be insufficient to support a substantial equivalence determination if the testing cannot replicate the way the device will be used or the way similar devices have been demonstrated to fail in a clinical setting. Although the non-clinical testing for these devices might be informative for many other aspects of the device, it may be necessary to supplement the non-clinical data with clinical simulation performance data or clinical performance data.

- If the non-clinical testing of a device raises safety concerns that cannot be mitigated or answered through non-clinical testing, such a device may require clinical testing to assure that the safety questions are not greater than those raised by the predicate device.

New scientific information may affect FDA's expectations concerning the type and level of performance data included in a 510(k) submission.  For device types with long histories of safe use and well understood mechanisms of action, more limited performance testing data may be sufficient.  On the other hand, a pattern of adverse events or published literature documenting poor clinical outcomes with a particular technology may lead FDA to reconsider its regulatory approach to premarket submissions for such technology. [37]  Should FDA change its scientific decision making

---

[37] *See* SOP: Decision Authority for Additional or Changed Data Needs for Premarket Submissions (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDRH/CDRHReports/ucm279288.htm).

COOKFOIA 000049

25

*Contains Nonbinding Recommendations*

with regard to a particular device, FDA will consider its options (e.g., guidance, advisory panel meeting, etc.), for explaining such change and the basis for the decision to ensure transparency in the change in policy.  FDA also intends to consider any pending 510(k) submissions that may be affected by the change or allow for an appropriate transition period, in certain situations that may affect the industry at large.

# G.    The 510(k) Summary

The 510(k) Summary[38] is a document that provides a high-level discussion of the content of a 510(k) and must include all the elements identified in 21 CFR 807.92.  A 510(k) Summary must be in sufficient detail to provide an understanding of the basis for a determination of substantial equivalence (21 CFR 807.92(a)).

In an effort to improve the transparency and predictability of the 510(k) program and to ensure that the 510(k) Summary reflects the information provided in a 510(k) submission to support a substantial equivalence determination, FDA intends to verify the accuracy and completeness of the information included in a 510(k) Summary.

Although the 510(k) Summary is a document created by the manufacturer and is included in the 510(k), revisions to the 510(k) Summary may be necessary to accurately reflect the FDA's decision-making process.  For example, manufacturers may have identified several devices as potential predicate devices, whereas, in the course of FDA's substantial equivalence evaluation, FDA may have determined that only one of these devices is an appropriate predicate device.  In addition, it is possible during the course of FDA's review of the 510(k), that additional information or testing may be requested and submitted.  Consequently, the manufacturer may be requested to update the 510(k) Summary to accurately include and convey the information identified in 21 CFR 807.92 and which was used to support the final decision-making process.

In **Appendix B**, FDA describes the requirements of the content to be included in a 510(k) Summary, in accordance with 21 CFR 807.92, and provides guidance on the information to be included in a 510(k) Summary to ensure compliance with 21 CFR 807.92 and consistency in the level of information conveyed and captured in the 510(k) Summaries which are available to the public on FDA's website.  In **Appendix C**, FDA has provided a hypothetical 510(k) Summary in order to demonstrate the recommended level of detail for each section.

---

[38] As specified in 21 CFR 807.87(h), a 510(k) Statement as described in 21 CFR 807.93 may be provided in lieu of a 510(k) Summary. However, in order to facilitate transparency, FDA encourages all submitters to utilize the 510(k) Summary option.

COOKFOIA 000050

*Contains Nonbinding Recommendations*

# Appendix A.  510(k) Decision-Making Flowchart



SE = "Substantially Equivalent"
NSE = "Not Substantially Equivalent"
IFU = "Indications For Use"

*This Flowchart is not intended to be used as a 'stand-alone' document and should only be considered in conjunction with the accompanying text in this guidance.*

27

*Contains Nonbinding Recommendations*

# Appendix B.  The 510(k) Summary Document Requirements

In Appendix B, FDA provides further clarification and guidance to facilitate compliance with the requirements set forth in 21 CFR 807.92 and consistency in the information conveyed in the 510(k) Summaries which are available to the public on FDA's website.  As noted earlier in this guidance document, if during the course of review, additional testing or information are requested, the manufacturer should submit a revised 510(k) Summary to reflect the additional information.  The following identifies the information that must be included in the 510(k) Summary under 21 CFR 807.92, information that we recommend be included in the 510(k) Summary, and other considerations.

- 807.92(a)(1): "The submitter's name, address, telephone number, a contact person, and the date the summary was prepared."
    - The "submitter" or manufacturer should be the holder of the 510(k), not a consultant or law firm.

- 807.92(a)(2): "The name of the device, including the trade or proprietary name if applicable, the common or usual name, and the classification name, if known."
    - FDA recommends that the manufacturer list all applicable names and model numbers, if known.
    - If the submission is bundled[39], the 510(k) Summary should list all applicable classification regulations and product codes.

- 807.92(a)(3): "An identification of the legally marketed device to which the submitter claims equivalence.  A legally marketed device to which a new device may be compared for a determination regarding substantial equivalence is a device that was legally marketed prior to May 28, 1976, or a device which has been reclassified from class III to class II or I (the predicate), or a device which has been found to be substantially equivalent through the 510(k) premarket notification process."
    - FDA recommends that the manufacturer provide the 510(k) number of the device used as the predicate device in support of the current 510(k) submission.
    - If using an exempt device as a predicate, the manufacturer should list the classification regulation and the product code.
    - If using a device that has been reclassified from Class III to II as a predicate, where a 510(k) has not been submitted, please list the PMA number.
    - If the manufacturer lists an inappropriate predicate device, FDA will request that such information be removed and the 510(k) Summary updated accordingly by the manufacturer.

- 807.92(a)(4): "A description of the device that is the subject of the premarket notification submission, such as might be found in the labeling or promotional material for the device, including an explanation of how the device functions, the scientific concepts that form the basis for the device, and the significant physical and performance characteristics of the device, such as device design, material used, and physical properties."

---

[39] *See* Guidance for Industry and FDA Staff, "Bundling Multiple Devices or Multiple Indications in a Single Submission" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm089732.pdf).

COOKFOIA 000052

*Contains Nonbinding Recommendations*

The description of the device attributes should include the following details:

- o Device Identification:
    - List all key device components included in the submission (e.g., catheter, cable wire, leads)
    - List all model numbers (if known) and briefly explain the differences among models

- o Device Characteristics (address all that apply):
    - software
    - biologics
    - drugs
    - any patient-contacting materials
    - coatings
    - additives
    - single-use
    - sterile
    - sterilization method [specify]

- o Environment of Use (address all that apply):
    - healthcare facility/hospital
    - home
    - other [specify]

- o Brief Written Description of the Device:
    - Explanation of how the device works/principle of operation
    - Mechanism of action
    - Any necessary feature to determine SE or device performance
    - Energy source (if applicable)

- o Materials of Use
    - General type of material used (e.g., polysulfone, stainless steel)
    - If material conforms to an FDA recognized consensus standard for medical use, include the applicable number (e.g., ASTM FXXXX-last 2 numbers of the year)
    - Duration and type of contact

- o Key Performance Specifications/Characteristics of the Device

- 807.92(a)(5): "A statement of the intended use of the device that is the subject of the premarket notification submission, including a general description of the diseases or conditions that the device will diagnose, treat, prevent, cure, or mitigate, including a description, where appropriate, of the patient population for which the device is intended. If the indication statements are different from those of the legally marketed device identified in paragraph (a)(3) of this section, the 510(k) summary shall contain an explanation as to why the differences are not critical to the intended therapeutic, diagnostic, prosthetic, or surgical use of the device, and why the differences do not affect the safety and effectiveness of the device when used as labeled."

29

COOKFOIA 000053

*Contains Nonbinding Recommendations*

- o The 510(k) Summary should include the Indications for Use, which should be identical to that proposed on the Indications for Use Sheet and the labeling.
- o If the Indications for Use are different from those of the predicate device, a brief explanation is required to address why the differences in the Indications do not affect the safety and effectiveness of the device and do not alter the intended therapeutic, diagnostic, prosthetic, or surgical use of the device.

- 807.92(a)(6): "If the device has the same technological characteristics (i.e., design, material, chemical composition, energy source) as the predicate device identified in paragraph (a)(3) of this section, a summary of the technological characteristics of the new device in comparison to those of the predicate device.  If the device has different technological characteristics from the predicate device, a summary of how the technological characteristics of the device compare to a legally marketed device identified in paragraph (a)(3) of this section."

- 807.92(b): "510(k) summaries for those premarket submissions in which a determination of substantial equivalence is also based on an assessment of performance data shall contain the following information:"
  "(1) A brief discussion of the nonclinical tests submitted, referenced, or relied on in the premarket notification submission for a determination of substantial equivalence,"
  - o A high level summary of the tests that were used to demonstrate substantial equivalence should be included (e.g., fatigue testing, biocompatibility, etc.).
  - o If a guidance document was referenced/used for the testing, the guidance document should be referenced in this section.
  - o If an FDA recognized consensus standard (e.g., test method or guide) was used/relied upon for testing, please list the standard connotation (e.g., ASTM FXXXX-last 2 numbers of the year).

"(2) A brief discussion of the clinical tests submitted, referenced, or relied on in the premarket notification submission for a determination of substantial equivalence. This discussion shall include, where applicable, a description of the subjects upon whom the device was tested, a discussion of the safety or effectiveness data obtained from the testing, with specific reference to adverse effects and complications, and any other information from the clinical testing relevant to a determination of substantial equivalence,"
  - o FDA is interested in collecting an appropriate degree of detail within this section to be informative regarding the level of evidence that was necessary to support an SE determination.
  - o As applicable, FDA recommends the following details be included regarding the clinical evidence provided to support an SE determination:

    - Level of Evidence (identify one)
      - Randomized, multi-arm, "blinded" study with concurrent sham (placebo) control
      - Randomized, multi-arm, "blinded" study with concurrent ("active") control
      - Randomized, multi-arm, un"blinded" study with a control (control that is either active or consists of no treatment)
      - Non-randomized study with concurrent ("active") control
      - Single-arm study with patient serving as own control (include designed single-arm crossover)
      - Single-arm study with Historical Control (using patient-level data)

30

COOKFOIA 000054

*Contains Nonbinding Recommendations*

- Single-arm study with Literature Control (historical control)
- Single-arm study with Objective Performance Criteria
- Single-arm study with Performance Goals
- Registry
- Observational study
- Systematic review (meta-analysis with patient-level data)
- Meta-analysis based on summary information only
- Literature Summary
- Uncertain

- Location of Study (specify one of the following)
    - United States only
    - outside of United States only
    - both in United States and outside of United States
    - Identify applicable IDE number [Gxxxxxx]

- Primary Safety Endpoint Identified?
    - If Yes, describe

- Primary Effectiveness Endpoint Identified?
    - If Yes, describe

- Primary Composite Safety/Effectiveness Endpoint Identified, if applicable?
    - If Yes, describe

- Patient Accountability (Enter number of patients reported at each stage):

| Stage | Investigational Device Arm Total | Control Arm Total | Total |
|---|---|---|---|
| Enrollment | | | |
| Treatment | | | |
| Primary Safety Endpoint Analysis | | | |
| Primary Effectiveness Endpoint Analysis | | | |
| Primary Composite Safety/Effectiveness (if app) | | | |

The content of the table may need to be modified depending upon the specifics of the clinical data provided and the endpoints studied.

- Identify whether the study met the primary endpoint
    - Whether Yes or No, describe

- Describe the study results in appropriate parameters

- Identify the adverse events and complications observed in the study, including those associated with the device.

COOKFOIA 000055

31

*Contains Nonbinding Recommendations*

"(3) The conclusions drawn from the nonclinical and clinical tests that demonstrate that the device is as safe, as effective, and performs as well as or better than the legally marketed device identified in paragraph (a)(3) of this section."

- o A brief summary of why the device is substantially equivalent to the predicate.


- 807.92(c): "The summary should be in a separate section of the submission, beginning on a new page and ending on a page not shared with any other section of the premarket notification submission, and should be clearly identified as a '510(k) summary'."


- 807.92(d): "Any other information reasonably deemed necessary by the agency."
   - o If the FDA determines that other information needs to be included within the 510(k) Summary, such information must be included within this document.

32

COOKFOIA 000056

*Contains Nonbinding Recommendations*

# Appendix C. Sample of 510(k) Summary Complying with 21 CFR 807.92

## 510(k) Summary

### I.  SUBMITTER

Device Submitter, Inc.
123 Main Street
Anywhere, MD 01234

Phone: 555-555-1234
Fax: 555-555-0123

Contact Person: John Contact
Date Prepared: May 16, 2013

### II.  DEVICE

Name of Device: Brand X Endoscopic Stapling System, Model x123, Model y456
Common or Usual Name: Endoscopic Stapling System
Classification Name: Endoscope and Accessories (21 CFR 876.1500)
Regulatory Class: II
Product Code: ODE

### III. PREDICATE DEVICE

Brand Z Endoscopic Plication System, KXXXXXX
This predicate has not been subject to a design-related recall.[40]

No reference devices were used in this submission.

### IV. DEVICE DESCRIPTION

The Brand X Endoscopic Stapling System consists of a flexible endoscope, an endoscopy suite, and a number of associated accessories. The endoscope and staples are provided sterile (EtO).

Brand X uses an implant (surgical staple) that is delivered by a flexible endoscope by a surgeon or gastroenterologist for approximating adjoining portions of the esophageal and gastric tissues at the gastroesophageal junction, thereby creating a permanent surgical fundoplication. The system includes an ultrasonic transducer that operates as a range finder for measuring the relative alignment and the distance between the transducer at the tip of the endoscope (the anvil) and the ultrasonic mirror in the

---

[40] On July 9, 2012, section 605 of FDASIA (Pub. L. 112-144) added section 518A to the FD&C Act, which directs FDA to establish a program to routinely and systematically assess information regarding device recalls, and to use that information to proactively identify strategies for mitigating health risks presented by defective or unsafe devices.  FDA believes that one way to carry out this directive is to provide greater transparency on recalled devices.  Identifying whether a predicate was recalled is optional, but doing so would help the Agency achieve this FDASIA directive.

33

COOKFOIA 000057

*Contains Nonbinding Recommendations*

cartridge (that includes the staples). The device deploys sets of implantable staples for performing the fundoplication procedure.

The system combines a video camera, an ultrasonic range finder and a surgical stapler in a single unit. The flexible endoscope includes light guides, irrigation, air insufflation and suction channels that terminate at the endoscope tip.  The stapler portion includes a cartridge that contains sterile 4.8 mm standard "B" shaped titanium surgical staples. Model x123 includes five (5) staples per cartridge, while Model y456 contains only four (4). The tip of the endoscope contains an anvil for the staples, as well as two small stainless steel screws that are extracted from the tip of the endoscope and engage into nuts positioned in the cartridge. The ultrasonic range finder measures the distance between an ultrasonic mirror in the cartridge and the tip of the endoscope. It also verifies alignment between the cartridge and the anvil, before insertion of the screws.

The endoscopy suite includes the ISL (Insufflation, Suction and Light) console, the CCU (Camera Control Unit) console and a monitor. The ISL console provides suction, insufflation and a white light (Xenon) source for illumination. The CCU console contains a controller for the camera, ultrasonic range finder and sensors that indicate status of the bending angle, screws and fire. The monitor displays patient information, the video image, and the processed data from the controllers such as ultrasonic data, fire status, degree of bending and screw position.  A keyboard for entering data during the procedure is also included.  The System includes three software applications: the video controller software, the ultrasound controller software, and the ISL controller software.  The software systems work in conjunction with the hardware consoles listed above in order to visualize the procedure and deliver the staples.  The endoscope is designed for single-patient use, and it is connected to the CCU and ISL consoles via a multi-connector.  The endoscope handle contains the controls used by the operator to manipulate the endoscope.

The associated accessories include:
- Irrigation bottle with liquids for irrigation of the camera lens
- Suction canister for extracting liquids during the procedure
- Silicon tubes for connecting the ISL and other accessories to the endoscope
- Disposable air filter of the suction ISL input channel
- Overtube for protecting patient's pharynx

## V.  INDICATIONS FOR USE

The Brand X Stapling System is indicated for the endoscopic placement of surgical staples in the soft tissue of the esophagus and stomach in order to create anterior partial fundoplication for treatment of symptomatic chronic Gastro Esophageal Reflux Disease (GERD) in patients who require and respond to pharmacological therapy.

The Indications for Use statement for the Brand X device is not identical to the predicate device; however, the differences do not alter the intended therapeutic use of the device nor do they affect the safety and effectiveness of the device relative to the predicate.  Both the subject and predicate devices have the same intended use for the treatment of GERD, by approximating tissue in the esophagus and stomach.

34

COOKFOIA 000058

*Contains Nonbinding Recommendations*

VI. COMPARISON OF TECHNOLOGICAL CHARACTERISTICS WITH THE PREDICATE DEVICE

Transoral endoscopic fundoplication is the technological principle for both the subject and predicate devices. It is based on the use of endoscopic instrumentation for approximating and permanently adjoining gastric and esophageal tissues, creating plications at the level of the gastroesophageal valve and thereby restoring valvular functionality and reducing gastric reflux into the esophagus.

At a high level, the subject and predicate devices are based on the following same technological elements:

- Endoscope – used to reach the target tissue
- Device inserted through an overtube – to protect the esophagus
- Creation of a gastric (or gastroesophageal) plication in close proximity to the gastroesophageal junction by the retroflexed device
- Use of a permanent implant to secure tissue
- Use of a mechanical component for positioning and launching the implant
- User-controlled mechanical trigger (or knob) to launch the fastener (implant)
- Mechanically securing the plication by a permanent implant fastener

The following technological differences exist between the subject and predicate devices:

- Use of an ultrasound range finder
- Use of a staple as a fastener
- Use of different tissue capture and fixation mechanisms
- The predicate device must be used in conjunction with a flexible endoscope whereas the subject device has a flexible endoscope incorporated into the system.

VII.   PERFORMANCE DATA

The following performance data were provided in support of the substantial equivalence determination.

**Biocompatibility testing**

The biocompatibility evaluation for the Brand X device was conducted in accordance with the FDA Blue Book Memorandum #G95-1 "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing,'" May 1, 1995, and International Standard ISO 10993-1 "Biological Evaluation of Medical Devices − Part 1: Evaluation and Testing Within a Risk Management Process," as recognized by FDA.  The battery of testing included the following tests:

- Cytotoxicity
- Sensitization
- Irritation
- Systemic toxicity
- Pyrogen Testing

The endoscopic delivery system is considered tissue contacting for a duration of less than 24 hours, while the staples are considered permanent implants.  The titanium staple material conforms to ASTM F-67-06 for chemical composition.

35

COOKFOIA 000059

*Contains Nonbinding Recommendations*

**Electrical safety and electromagnetic compatibility (EMC)**
Electrical safety and EMC testing were conducted on the Brand X device, consisting of the ISL console, CCU console and endoscope.  The system complies with the IEC 60601-1, IEC 60601-2-18 and IEC 60601-2-37 standards for safety and the IEC 60601-1-2 standard for EMC.

**Software Verification and Validation Testing**
Software verification and validation testing were conducted and documentation was provided as recommended by FDA's Guidance for Industry and FDA Staff, "Guidance for the Content of Premarket Submissions for Software Contained in Medical Devices."  The software for this device was considered as a "major" level of concern, since a failure or latent flaw in the software could directly result in serious injury or death to the patient or operator.

**Mechanical and acoustic testing**
- Acoustic Testing
- Elongation of the bending cable
- Torque on the handle wheel and force on cable
- Crimp assembly, cable tensile strength, cable flexibility, minimum bending radius of the cables
- Staple verification
- Simulated use testing

**Animal Study**
In the animal study conducted, 16 pigs underwent endoscopy with the Brand X System. Twelve pigs underwent fundoplication, and 4 pigs served as a sham (control) group. There were no procedure related complications or premature deaths in this study, at the 2, 4 and 6 week follow-up (4 pigs in each group).

The safety and feasibility of the Brand X device were evaluated by macroscopic and histological evaluation of the tissue in the treatment stapled areas. These studies demonstrated that the Brand X device can safely create an anterior partial fundoplication, similar to that which is constructed using other endoscopic suturing devices.

**Clinical Studies**
Clinical testing of the Brand X device included an initial feasibility study of 6 patients, a pilot study consisting of 13 patients and a pivotal study of 72 patients. Substantial equivalence was based in part on the pivotal study.

Pivotal Study
The pivotal study was a prospective, multi-center, open label, non-randomized, single arm study of 72 patients, of which 66 were available for primary endpoint analysis; 3 subjects did not complete the procedure, and 3 were excluded from the effectiveness analysis.  The device was used to staple the fundus of the stomach to the esophagus, using standard B shaped surgical staples. Stapling was performed in two or three locations at least 1.5 cm above the GE junction, separated by at least 90 degrees. The procedure was intended to create a partial anterior fundoplication as a reflux barrier. Patients were followed for a period of six months at 6 sites both in the United States and outside of the United States under IDE G070136.

36

COOKFOIA 000060

*Contains Nonbinding Recommendations*

Primary effectiveness endpoint:
GERD health related quality of life score (GERD-HRQL) off proton pump inhibitor (PPI) was improved from baseline by > 50%, at six months post procedure in at least 53% of the patients (53% is the lower boundary of the 95% confidence interval).

Primary safety endpoint:
The primary safety endpoint consisted of all treatment-related adverse events, during and after the procedure. "Treatment-related" events were conventionally defined as those which occurred in the first 30 days post-procedure.

Effectiveness
The primary endpoint for the Brand X study focused on the GERD-HRQL score. The study results demonstrated that 75% of the patients had a >50% improvement in their GERD-HRQL score off PPI at six months compared to baseline. Hence the study met its primary endpoint with the required 95% confidence level.

The reduction in the median score for the Brand X device of 23.0 units (from 29.0 to 6.0) represents a 79.3% improvement. This value is almost identical to the published result for the pivotal trial of the predicate device (79.2%). Therefore, the effectiveness of the Brand X system in successfully treating chronic symptoms of GERD is similar to the effectiveness reported for the predicate device.

The median value of the percent of time pH < 4.0 decreased from an initial value of 8.3% at baseline to 6.75%. Therefore, the study met its secondary endpoint related to the acid exposure test. A comparison to results reported in the literature revealed that the change in the median values of the Brand X device showed a decrease of 19%, while the predicate showed a decrease of 18%. Hence, the Brand X results in reducing the exposure to gastric acids are similar to those reported for the predicate system.

Safety
The study reported nine patients with a total of nine serious adverse events (SAEs). Four events were considered mild in intensity, involving pain and fever. Three events were classified as moderate in intensity, involving pneumothorax, pneumomediastinum, and pneumoperitoneum (all resolved spontaneously). Two events were considered severe in intensity: one involved esophageal perforation (required drainage) and another had suicidal thoughts (non-device/procedure related).

Six of the SAEs were considered related to the device: one definitely (esophageal perforation) and the others possibly. Three events were considered not related to the device. The median time from procedure to SAE was 1.5 days for events related to the device. None of the patients with SAEs required any operation or re-operation. Adverse events reported that occurred in greater than the 5% level were postoperative pain or discomfort in 33% of patients, postoperative nausea in approximately 10%, and sore throat in 21%. The adverse events were mild or insignificant in most cases.

The SAEs and overall safety profile were similar to the predicate device for which two perforations and one bleeding event were reported. The number of AEs was similar to those reported for the predicate device. Three cases of fever were reported in the current study (for 72 patients), similar to the 3 cases of fever reported for the predicate. There were 23 cases of chest pain (23/72 = 32%) vs. 17% reported for the predicate; abdominal pain was recorded for 5% of the patients in the current

COOKFOIA 000061

37

*Contains Nonbinding Recommendations*

study vs. 44% of the patients for the predicate. Sore throat was reported for 15 patients (15/72 = 21%) vs. 15% for the predicate.

<u>Summary</u>
Based on the clinical performance as documented in the pivotal clinical study, the Brand X system was found to have a safety and effectiveness profile that is similar to the predicate device.

VIII.   CONCLUSIONS

Since the predicate device was cleared based in part on the results of clinical studies, and since the comparison of bench testing to clinical outcomes is still not well understood for this type of device, clinical testing was required to support substantial equivalence.  The non-clinical data support the safety of the device and the hardware and software verification and validation demonstrate that the Brand X device should perform as intended in the specified use conditions.  The clinical data demonstrate that the Brand X device performs comparably to the predicate device that is currently marketed for the same intended use.

COOKFOIA 000062

*Contains Nonbinding Recommendations*

# Appendix D.  Glossary of Significant Terminology

The following terms are defined for purposes of this guidance:

**Classification regulation –** The classification regulations are Agency-defined categories of medical devices based on intended use and technology. Each device classification regulation defines the class (i.e., Class I, II, or III) for the device category which in turn determines the regulatory requirements. Device classification regulations are codified by rule or order in 21 CFR Parts 862-892.

**Indications for use –** The disease or condition the device will diagnose, treat, prevent, cure or mitigate, including a description of the patient population for which the device is intended.

**Intended use –** The general purpose of the device or its function.  The intended use of a device encompasses the indications for use.

**Multiple Predicate Devices –** Two or more predicate devices that have been provided to support an SE determination.  If using multiple predicate devices to demonstrate substantial equivalence, each predicate device must have the same intended use as the new device, and any different technological characteristics between the new device and the predicate devices must not raise different questions of safety and effectiveness.

**Performance Data –** Performance data can be any data, including non-clinical (e.g., data from engineering testing, such as fatigue, wear, corrosion, etc., biocompatibility, functional animal studies, cadaver, etc.) and/or clinical, that are provided to support the substantial equivalence of a device that is intended to be marketed.

**Predicate Device –** A legally marketed device (as defined in 21 CFR 807.92(a)(3)) to which a new device may be compared for a determination regarding substantial equivalence because the devices have the same intended use and the same technological characteristics or different technological characteristics that do not raise different questions of safety and effectiveness.

**Primary Predicate Device –** A predicate device with indications for use and technological characteristics that are most similar to the new device.  The primary predicate should be identified within a 510(k) submission.

**Reference Device –** A legally marketed device that is intended to provide scientific and/or technical information (e.g., test methodology) to help address the safety and effectiveness of a new technological characteristic.  Reference devices are not predicate devices and may only be used after Decision Point 4 on the 510(k) Decision-Making Flowchart.

**Split Predicate –** Using one legally marketed device for intended use and a different legally marketed device for technological characteristics to demonstrate substantial equivalence.  The use of a "split predicate" is inconsistent with the 510(k) regulatory standard.

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**    Public Health Service
Food And Drug Administration

## Memorandum

**Date:**     **August 14, 1996**

**From:**     Nurse Consultant (HFZ-520)
Office of Surveillance and Biometrics

**Subject:**     Adverse Event Review Request
Cardiovascular Intravascular Filter

**To:**     Veronica Price, Lead Reviewer, ODE/DCRND
Through: Suzanne Rich, Team Leader
OSB/DPS/PEB1, HFZ-520 _SSR 8-14-96_

This memo is to inform you that as of August 8, 1996, there are a total of 1172 mandatory adverse event reports (MDRs) on file for cardiovascular intravascular filters under the product code of DTK. Of the 1172 MDR reports, there are 51 deaths, 202 injuries, and 917 malfunctions. There are ten voluntary reports, 39 distributor reports, and 41 user facility reports on file for this device.

The top 5 most frequently reported problems associated with cardiovascular intravascular filters within the mandatory adverse event report database are as follows: (1) sticking; problems with the filter sticking to and/or getting caught in the introducer while the device is being deployed, (2) insertion/removal; practitioner difficulty with inserting and/or retrieving failed insertions of the device, (3) break; problems with the filter legs breaking during insertion and deployment within the introducer and/or breakage of the filter/filter legs upon placement of the device within the patient, (4) migration; the device moving within the patient's vasculature upon or after insertion, and (5) separates; the filter itself and/or the filter legs separating from the carrier capsule and/or the filter legs separating upon deployment and/or insertion into the patient.

If you have any questions, please feel free to contact me at (301) 594-3271.

Diane Dwyer, R.N., B.S.N.
Nurse Consultant

COOKFOIA 000064

# MEMORANDUM

| | |
|---|---|
| **DATE:** | December 2, 1996 |
| **FROM:** | Veronica Price |
| | Biomedical Engineer |
| | ODE/DCRND/ICDG |
| **TO:** | The Record |
| **RE:** | Reclassification of Cardiovascular Intravascular Filters |

## *Introduction:*

This memo has been prepared in accordance with the ODE Guidance on Reclassification of Devices for Reviewers. The goal of this memo is to review the regulatory history of the cardiovascular intravascular filter, provide detail on the known risks associated with this device and justify the down classification from class III to class II. (Note: This reclassification is not intended to cover the Bird's Nest Filter marketed by Cook under P850049. The device description has been written such that it precludes this particular filter design.)

## *Regulatory History of Device:*

(I)     Proposed for class III (Three) by Cardiovascular Device Classification Panel March 9, 1979 (44 FR 13284).

The Reclassification Panel cited the following reasons for recommending Class III classification for this device:

- The device is an implant used for life sustaining purpose;
- The materials used in the device and its design should minimize the thromboembolic complications;
- The materials used in the device and its design should minimize the tendency to perforate the vena cava; and
- The device should allow as much venous blood to return to the heart as possible.

(ii)    Final Rule promulgated February 5, 1980 (45 FR 17736), classifying Cardiovascular Intravascular Filters (21 CFR 870.3375) as Class III devices.

An amendment to the final rule was published May 11, 1987 (52 FR 17736) stating that a date for PMA or PDP requirement would be published.

(iii)   a.    Federal Register Notice of August 14, 1995, (60FR41986), requiring manufacturers of 31 group 2, Class III devices to submit to FDA summaries of, and citations to, safety and effectiveness information known for these devices.

COOKFOIA 000065

b.   Reclassification submissions received from Nitinol Medical Technologies on July 22, 1996, and B. Braun Vena Tech on September 30, 1996.

C.   515(I) submission received from  Boston Scientific Corporation on August 14, 1996.

This reclassification has been initiated by the two manufacturers cited above (b.).

### Device Description:

A cardiovascular intravascular filter is an permanent implant that is placed in the inferior vena cava for the purpose of preventing pulmonary thromboemboli (blood clots generated in the lower limbs and broken loose into the blood stream) from flowing into the right side of the heart and the pulmonary circulation.  The filter is seated within the vena cava via a series of hooks which are at the end of several legs or struts which converge at an apex.  The goal of filter placement is to  try to obtain high filtering efficiency (large and small emboli) without impedance of blood flow, reduced device related thrombosis,  migration and without penetration of the vessel wall.  It is indicated for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations: pulmonary thromboembolism when anticoagulants are contraindicated; failure of anticoagulant therapy in thromboembolic diseases; emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

### Proposed Reclassification:

A.   Identification

Cardiovascular Intravascular Filter

B.   Recommended Classification

Class II
Special Controls:          Standard Labeling (Intended Use)
                           Device Guideline

C.   Risks to Health

When the cardiovascular intravascular filter was proposed for classification into class III, (44 FR 13284), the panel provided reasons for their recommendation.  The reasons included the risk of: thromboembolism, vena cava perforation, and decreased blood flow to the right heart (caval occlusion).  Following FDA's review of the reclassification petitions, 515(I) submission, MDR's and the literature, additional risks have been identified.  They include: complications during filter insertion; death; thrombogenicity;

COOKFOIA 000066

filter migration; filter tilting and angulation; filter embolization; and fracture of filter. Although these risks are potentially life threatening, as is the disease they are intended to treat, they are well known to the users and are well characterized in the medical literature. FDA now believes that these risks can be controlled by special controls.

On the basis of its review, FDA now believes that the use of the cardiovascular intravascular filter for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations: pulmonary thromboembolism when anticoagulants are contraindicated; failure of anticoagulant therapy in thromboembolic diseases; emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated, does not present a potential unreasonable risk of illness and injury, and that special controls would provide reasonable assurance of the safety and effectiveness of the device. The published guideline and standard labeling are special controls for this device.

D.   Summary of reasons for reclassification

FDA has determined that the following reasons support its recommendation to reclassify the cardiovascular intravascular filter from class III to class II:

1.   General controls by themselves are insufficient to provide reasonable assurances of the safety and effectiveness of the device.

2.   There is sufficient publicly available information to establish special controls to provide reasonable assurance of the safety and effectiveness of the device for its intended use.

3.   There is sufficient publicly available information to demonstrate that the risks to health have been characterized for the cardiovascular intravascular filter and that the relationships between the performance characteristics and these risks have been established.

Cardiovascular Intravascular Filters can be reclassified from Class III to Class II because it meets the criteria of 513(e) (2) of the act. Special controls in the form of standardized labeling and a device guidelines on vena cava filters have been developed. These special controls, in addition to general controls, provide reasonable assurance of the safety and effectiveness of the device, and there is sufficient information to establish special controls to provide such assurance. A regulatory level of Class III is unnecessary.

E.   Summary of data upon which the reclassification is based

COOKFOIA 000067

A recommendation to down classify cardiovascular intravascular filters (870.3375) from Class III to Class II is being proposed. This recommendation is based on an extensive review of published reports concerning this category of devices, information submitted in reclassification petitions and by manufacturers in response to the published 515(I), a review of MDR's, and previously cleared 510(k)'s.

Cardiovascular intravascular filters have a long history of use. Over the course of this time, the potential benefits and risks have been well characterized. It is possible and appropriate to minimize the risks through the use of special controls. These controls include standardized labeling  as well as published guidelines.

The labeling that has been developed for marketed filters includes a list of approved indications for use. A required contraindication is identified and a warning statement regarding MRI compatibility are all mandated. Additional contraindications and warnings may be added to address particular device issues.

Although there are no existing published guidelines or guidance documents for this category of devices, the review of previously submitted 510(k)'s and IDE's  has demonstrated a set of consistent requirements in terms of required data. A formal guideline is being developed concurrently with the review of the information on reclassification. The guidance document will help to convey to manufacturers of these products the necessary in vitro, animal and human clinical data that will be necessary to support marketing clearance.

**Known Risks:**

A.      Complications during filter insertion

The filter is delivered using several different components of a system which include a sheath, guidewire, and introducer.  The overall insertion success rate is usually about 95% but there may be difficulties in correctly placing the filter in up to 15% (Ref. 7). In the course of trying to place the filter in the vena cava the following complications have been noted:  sheath perforation; introducer tip detachment; guidewire kinking; and sheath kinking (Refs. 6 and 16). These complications can result in  filter deformation; fracture; premature release or insufficient opening; improper placement; and thrombus formation on filter which may result in insufficient opening (Ref. 7). There have also been reports of problems with the filter sticking to and/or getting caught in the introducer while the device is being deployed, practitioner difficulty with inserting and/or retrieving failed insertions of the device, and problems with the filter legs breaking during insertion and deployment within the introducer and/or breakage of the filter /filter legs upon placement of the device within the patient (Ref. 4). These complications are a function of the design of the delivery system, the adherence to the instructions for use and human error. The risks can be controlled by special controls.

COOKFOIA 000068

B.    Recurrent Pulmonary Embolism

The incidence of PE reported in the literature is 1.9% to 5% (Refs. 11, 17, and 22) despite the presence of a filtering device.  Mortality from PE with a filter in place is 0.9%. (Ref. 17)  Medical opinion is that the risk of PE from untreated proximal DVT is as high as 50% and that PE mortality without treatment is 8% (Refs. 5 and 13).  Such recurrences almost always occur within the first three months, usually within one month (Ref. 11). Some of the mechanisms which may be responsible for PE after filter insertion are the following: ineffective filtration; continuous growth of trapped thrombi through the filter; development of thrombosis on the proximal end of the filter; filter migration to a position where it does not function optimally; filter retraction from the caval wall at thrombus retention, occurring if some of the hooks have grasped the thrombus, which creates a channel between the filter and the caval wall; and embolization through collaterals that may be lumbar or embolization that may be via the ovarian/spermatic veins; embolization from thrombi proximal to the filter (arm veins, renal or hepatic veins, the right heart); and incorrect position of the filter (Ref. 7).  The risk of recurrent PE is a function of material selection, device design and adherence to the instructions for use and can be controlled by special controls.

c.    Death

The death rate associated with filter use that can be attributed to filter complications is low and has been reported to be from 0.12% to 4% (Refs. 14 and 17).  Death attributable to filter complications have been reported to result from cardiac arrest immediately following filter placement, misplacement of the filter during insertion and cephalic migration of a filter to the heart after placement.  This risk can be attributed to user error or design flaws.  This risk of death can be controlled by special controls.

D.    Thrombogenicity

The materials of the device should be biocompatible and not lead to thrombogenicity. The affect on the blood flow should not be great enough to cause stasis which would lead to thrombus formation in and around the device.  Reported rates of IVC thrombus vary from 7 to 22% (Refs. 7 and 12).  The proper choice of materials and the design of the device to minimize or eliminate the risk of stasis can be controlled by special controls.

E.    Filter Migration

The design of the filter must be such that it is stable within the vena cava.  The filter release mechanism that is part of the delivery system must be simple and controlled such that the filter is deployed in the desired location and is completely opened.  If it is not, it

COOKFOIA 000069

can ultimately propagate into the right heart or it may tilt such that its filtering efficiency is compromised. The occurrence of filter migration in the literature varies from 6% to 53% (Refs. 8, 9, 18, and 23). Minor filter migration in the caudal or cephalic direction is commonly reported and does not appear to be associated with clinically significant events. Much of the reported filter movement may actually be due to measurement error resulting from differences in patient positioning, breathing and parallax. True migration may be caused by too large a vena cava, inadequate positioning and massive embolization into the filter with caval dilatation (Ref. 7). The risk of migration can be controlled by special controls.

F.     Caval Penetration

The filter must be designed such that it is secure within the vena cava without penetrating the wall of this vessel and potentially penetrating nearby organs. Slight penetration of the caval wall by filter struts is usually asymptomatic and clinically insignificant perhaps because penetration occurs gradually, allowing time for the vessel wall to fibrose. A caval penetration rate of 9% has been reported (Ref. 12). There have been rare cases, however, when strut migration or breakage have led to retroperitoneal complications such as bowel perforation, neurovascular injury or small bowel obstruction. This risk may be controlled by special controls.

G.     Filter Tilting and Angulation

The significance of tilting and angulation of caval filter after placement is controversial. There is a theoretical loss of filtering efficacy of any filter when tilted or angulated significantly; however there is no good clinical data to support a definite increased incidence in PE or failure to trap thrombi. A properly designed device should minimize the possibility for tilting upon deployment or angulating after implantation. This risk can be controlled by special controls.

H.     Caval Occlusion

Caval occlusion is related to filter thrombogenicity, design and flow patterns (Ref. 7). Small or moderate sized emboli trapped in a filter are usually asymptomatic since the residual patency of the vena cava and the normal paravertebral collateral veins permit adequate venous return. A large trapped embolus or a cluster of small emboli may occlude a filter completely and thus block the vena cava. After a period of days or weeks, the occlusion occurs and causes a sudden swelling of both lower limbs. In almost all cases the symptoms of IVC occlusion are transient and resolve almost completely within a few weeks or a few months since the thrombi undergo spontaneous lysis. It is often clinically difficult or impossible to distinguish IVC filter occlusion from extension of the preexisting DVT, since the symptoms may be similar. Optimally, the filter should capture all clinically threatening PE above a critical size. Rates of occlusion for the various filters has been reported to be anywhere from 4% to 18% (Refs. 15 and 24). This complication is a function of device design and is clinically manageable under most

COOKFOIA 000070

circumstances.  The risk of caval occlusion can be controlled by special controls.

I.     Filter Embolization

The risk of filter embolization is primarily limited to the first two weeks after implantation.  After two weeks, the points of contact between the device and the vein wall become tightly bound by collagen, muscle fibers and neoendothelium and embolization of the filter becomes virtually impossible.  Embolization of the filter is a serious complication with variable clinical consequences, comparable to pulmonary thromboembolism.  These range from being totally asymptomatic to sudden death.  Therapy also ranges from no therapy to open chest surgery and removal of the device.  Proper design and close adherence to the instructions for use can minimize the risk of filter embolization.  This risk can be controlled by special controls.

J.     Fracture of filter

Filters may fracture as a result of direct trauma to the abdomen, or from a metal fatigue phenomenon when perforation exists and the tip of the leg becomes locked into a vertebral body or adjacent immobile tissues whereby respiratory motion may then cause repeated unanticipated flexion of the filter leg, or it may fracture due to metal corrosion and weld.  The fracture fragments may migrate locally or distally.  This complication usually is asymptomatic and requires no treatment.  The incidence of occurrence has been reported at 2% (Ref. 12).  Filter fracture is a function of design and delivery into the IVC.  The risk can be controlled by special controls.

K.     Other Risks

The complications that occur at the puncture site are not uniquely related to delivery of intravascular cardiovascular filters but represent the complications observed with various catheter techniques.  Events occurring at the delivery site include: hematoma formation and A-V fistula, DVT at puncture site, pneumothorax and air embolism after jugular insertion.  Many of these events can be minimized or eliminated by appropriate operator training and comprehensive device labeling.  Most are well known risks associated with many different interventional procedures which can be controlled by special controls.

L.     **Benefits**

Pulmonary embolism is a serious clinical issue causing significant morbidity and mortality.  It has been estimated that there are more than 600,000 cases of clinically significant PE occur each year in the United States (Refs. 10 and 25), resulting in approximately 200,000 deaths annually in the United States (Ref. 21).  The patient often survives the first embolism but is at high risk that a second fatal PE will occur.  PE recurs in approximately 6 to 25% of treated patients (Ref. 25).  Additionally, the incidence of PE

COOKFOIA 000071

in patients with DVT is 19% to 28% (Ref. 20). Treatment of PE has been shown to be effective in reducing the mortality from 30% to 8% (Ref. 10). Normally, patients with deep venous thrombosis and/or PE are treated with anticoagulation therapy. However, in some patients anticoagulation is ineffective, contraindicated or results in complications which require that it be discontinued. For these patients, vena caval interruption is recommended. Historically, vena cava interruption was achieved first by ligation which involved the direct suturing of the IVC and then by plication with clips around the exterior of the vein. The original concept of surgically ligating the vena cava to prevent PE proved effective but required major surgery and was complicated by significant mortality and venous stasis complications. Also, large collateral venous channels developed, which are capable of allowing the passage of emboli. Suture plication to subdivide the lumen of the vena cava was effective in arresting emboli and had fewer stasis problems, but it still required abdominal surgery. Vena cava filters were then developed. Although placement of filters are not without risks, the likelihood of risks occurring is relatively small and special controls will further minimize these occurrences.

## *Conclusion:*

In summary, FDA believes that based on publicly available, valid scientific evidence, the intravascular cardiovascular filter can be regulated as a Class II device (general and special controls) to reasonably assure that the device is safe and effective for its intended use.

## *References:*

1. B. Braun Vena Tech, reclassification petition. Docket No. 94N-0418.

2. Nitinol Medical Technologies, reclassification petition. Docket No. 94N-0418

3. Boston Scientific Corporation, 515(I) submission. Docket No. 94N-0418.

4. FDA MDR database

5. Alpert, J.S., R. Smith, C.H. Carlson, I.S. Ockene, L. Dexter, J.F. Dalen,"Mortality in patients treated for pulmonary embolism," *Journal of the American Medical Association,* 236:1477-1480,1976.

6. Becker, D.M. et al.,"Inferior Vena Cava Filters Indications, Safety, Effectiveness,"*Archives of Internal Medicine*,152:1985-1994,1992.

7. Bergqvist,D.,"The Role of Vena Caval Interruption in Patients with Venous Thromboembolism,"*Progress in Cardiovascular Diseases,*" 37(1):25-37,1994.

8. Berland, L.L., F.E. Maddison, and V.M. Bernhard,"Radiologic follow-up of vena cava

COOKFOIA 000072

filter devices,"*American Journal of Roentgenology,*1980;134:1047-1052.

9. Crochet, D.P. et al.,"Vena Tech-LGM Filter: Long-term Results of a Prospective Study,"███████,188:857-860,1993.

10. Dalen, J.E. and J.S. Albert," Natural history of pulmonary embolism,"*Progressive Cardiovascular Diseases,*17:259-270,1975.

11. Epstein, H.E., M.D. Darcy, D.W. Hunter, C. Coleman, S.M. Tadavarthy, P.H. Murray, W.E. Casteneda-Zuniga and K. Amplatz, "Experience with the Amplatz retrievable vena cava filter,"████████172:105-110,1989.

12. Ferris, E.J. et al.,"Percutaneous Inferior Vena Caval Filters: Follow-up of Seven Designs in 320 Patients," ███████88:851-856,1993.

13. Goldhaber S.Z. and C.H. Hennekens,"Time trends in hospital mortality and diagnosis of pulmonary embolism," *American Heart Journal,*104:305-306,1982.

14. Greenfield, L.J. and B.A. Michna,"Twelve-Year Clinical Experience with the Greenfield Vena Caval Filter," *Surgery,*104:706-712,1988.

15. Greenfield, L.J. and M.C. Proctor,"Twenty-year clinical experience with the Greenfield filter,"*Cardiovascular Surgery,* Vol 3, No. 2:199-205.

16. Greenfield, L.J., et al.,"Extended evaluation of the titanium Greenfield vena caval filter,"*Journal of Vascular Surgery,*September 1994:458-465.

17. Greenfield, L.J.,"Current indications for and results of Greenfield filter placement,"*Journal of Vascular Surgery,*1:502-504,1984.

18. Messmer, J.M. and L.J. Greenfield,"Greenfield caval filters; long-term radiographic follow-up study,"███████156:613-618,1985.

19. Millward, S.F., J.I. Marsch, R.A. Peterson, et al.,"LGM (Vena Tech) Vena Cava Filter: Clinical Experience in 64 patients,"*Journal of Vascular and Interventional Radiology,* 2:429-433,1991.

20. Mohan, C.R., J.J. Hoballah, W.J. Sharp, T.F. Kresowik, C.T. Lu and J.D. Corson,"Comparative efficacy and complications of vena caval filters,"*Journal of Vascular Surgery,*Vol.21 No. 2:235-246,1995.

21. Nunnelee, J.D., and A. Kurgan,"Interruption of the inferior vena cava for venous thromboembolic disease,"*Journal of Vascular Nursing,*11:80-2,1993.

22. Ricco, J.B., D. Crochet, P. Sebilotte, A. Serradimigni, J.M. Lefebvre, E. Boissou, P.

COOKFOIA 000073

Geslin, P. Virot, C. Vaislic, M. Gallet, Y. Biron, D. Lefant, J.M. Desmarq and D. De La Faye," Percutaneous transvenous caval interruption with the LGM Filter; early results of a multicenter trial,"*Annals of Vascular Surgery,* 3:242-247,1988.

23. Rose B.S., D.C. Simon, M.L. Hess and M.E. Van Aman," Percutaneous transfemoral placement of the Kimray-Greenfield vena cava filter,"████████165:373-376,1987.

24. Simon, M., C.A. Athanasoulis, D. Kim, et. al.,"Simon Nitinol inferior vena cava filter; Initial clinical experience,"████████172:99-103,1989.

25. Smith B.A.,"Vena Caval Filters,"*Emergency Medicine Clinics of North America,*Vol. 13, No.3:645-654,1994.

_____

Veronica A. Price

COOKFOIA 000074

**1**

COOKFOIA 000075

# BIBLIOGRAPHY

## I.   PULMONARY EMBOLISM

Albert JS, Smith R, Carlso H, Ockene IS, Dexter L, and Dalen JE. "Mortality in patients treated for pulmonary embolism," JAMA 1977; 236.

Aschieri F, Enrico M, Prophylaxis and treatment of pulmonary thromboembolism. Minerva Cardioangiol. May 1986; 34:383-398.

Bell WR, Bartholomew JR, Pulmonary thromboembolic disease. Curr Probl Cardiol. Sep 1985; 10:1-70.

Blinder RH, Coleman RE. Evaluation of pulmonary embolism. Radiol Clin North Am. Sep 1985; 23:391-405.

Carter BL, Jones ME, Waickman LR. Pathophysiology and treatment of deep vein thrombosis and pulmonary embolism. Clin Pharm. May-June 1985; 4:279-298.

Dalen JE, Albert JS. Natural history of pulmonary embolism. Progr Cardiovasc Dis. 1975; 17:259-270.

Delcampo C. Pulmonary embolectomy: a review. Can J Surg. Mar 1985; 28:111-113.

Dismuke SE, Wagner EH, Pulmonary embolism as a cause of death: the changing mortality in hospitalized patients. JAMA 1986; 255:2039-2042.

Hirsch J, Hull RD, Raskob GE. Diagnosis of pulmonary embolism. J AM Coll. Cardiol; Dec 1986; 8:128B-136B.

Homans J. Thrombosis of the deep veins of the lower leg causing pulmonary embolism. N Engl J Med. 1934; 211:993-997.

Kakkar VV, Adams PC. Preventive and therapeutic approach to venous thromboembolic disease and pulmonary embolism - can death from pulmonary embolism be prevented? J Am Coll Cardiol. 1986; 8:146B-158B.

Moser KM, Pulmonary embolism. Am Rev Respir Dis. 1977; 115:829.

Oschner A, DeBakey M. Intravenous clotting and its sequelae. Surgery. 1943; 14:679-690.

Parfel Z, Shechter M, Vered Z, Ratk S, Goor B, Gafni J. Review of echocardiographically diagnosed right heart entrapment of pulmonary emboli in transit with emphasis on management. Am Heart J, Jan. 1987; 113:1717-178.

COOKFOIA 000076

Predin H.  Pulmonary embolism after hip arthroplasty.  Lakartidningen.  Dec 1985; 82:4513-4515.

Sefden AM, Pensak ML.  Postoperative deep venous thrombosis and pulmonary embolism: diagnosis, management, and prevention.  Am J. Otol. Sept 1986; 7:377-388.

Simon M, Sacks BA.  Pulmonary Embolism.  Surgical Radiology, Chapter 20, Teplick and Haskin eds., W.B. Saunders Co., Philadelphia, 1981.

Wolfe WG, Sabiston DC.  Pulmonary Embolism, Textbook of Surgery, Chapter 52, Sabiston Ed., W.B. Saunders Co., Philadelphia., 1980.

## II.   VENA CAVA INTERRUPTION

### A.   Surgical

Adams JT, DeWeese JA.  Partial interruption of the inferior vena cava with a new plastic clip.  Surg. Gynecol Obstet.  1966; 123:1087-1088.

Adams JT, DeWeese JA.  Experimental and clinical evaluation of partial vein interruption in the prevention of pulmonary emboli.  Surgery.  1965; 57:82-102.

Dale WA, Paulwan F, Bauer FM.  Ligation of the inferior vena cava with absorbable gut.  Surg. Gynecol Obstet. 1956; 102:517-530.

DeWeese MAS, Hunter DC.  A vena cava filter for the prevention of pulmonary embolism:  a five year clinical experience.  Arch Surg. 1963; 86:852-868.

Duke WA.  Ligation of the inferior vena cava for thromboembolism.  Surgery. 1958; 43:24-44.

Leather RP, Clark WR Jr, Powers SR, Parker FB, Bernard HR, Eckert C.  Five year experience with the Moretz vena cava clip in 62 patients.  Arch Surg. 1968; 97:357-364.

Miles RM, Prevention of pulmonary embolism by the use of a plastic vena caval clip.  Ann Surg.  1966; 63:192-198.

Miles RM, Richardson RR, Wayne L, Elsea PW, Stewart SB, Duncan D.  Long term results with the serrated Teflon vena caval clip in the prevention of pulmonary embolism. Ann Surg. 1969; 169:881-891.

Nabseth DC, Moran JM.  Reassessment of the role of inferior vena cava ligation in venous thromboembolism.  N Engl J Med. 1965; 273:1250.

O'Neil EE.  Ligation of the inferior vena cava in the prevention and treatment of pulmonary embolism.  N Engl J Med.  1945; 232:641-646.

Oschner A, Oschner JI, Sanders HS.  Prevention of pulmonary embolism by caval ligation.  Ann Surg. 1970; 171:223-238.

Piccone VA Jr, Vidal E, Yarnoz M, Glas P, LeVeen HH.  The late results of caval ligation.  Surgery.  1970; 68:980-998.

Ravitch MM, Snodgrass E, McEnany T.  Compartmentalization of the vena cava with the mechanical stapler.  Surg Gynecol Obstet.  1966; 122:561-566.

Spencer FC, Quattlevaum JK, Quattlebaum JK, Jr, Sharp EH, Jude JR.  Plication of the inferior vena cava for pulmonary embolism:  a report of 20 cases.  Ann Surg.  1962; 155:827-837.

Streuter MA, Paine JR.  Temporary occlusion of the inferior vena cava suggested as a means of treatment in thromboembolism requiring cava ligation.  Surgery.  1953; 34:20-27.

**B.    Transvenous Devices**

1.    Greenfield

Akins CW, Thurer RL, Waltman AC, Margolies MN, Schneider RC.  A misplaced caval filer.  Arch Surg. 1980; 115:1133.

Allen HA, Cisternino ST, Ottesen OE, Queral L, Dagher F.  The Kimray-Greenfield vena cava filter:  a case of unusual misplacement.  CardioVasc Intervent Radiol.  1982; 5:82-84.

Brian S. Moore, MD, Karim Valji, MD, Anne C. Roberts, MD, Joseph J. Bookstein, MD.  Transcatheter Manipulation of Asymmetrically Opened Titanium Greenfield Filters. JVIR 1993; 4:687-690.

Carabasi RA, Moritz MJ, Jarrell BE.  Complications encountered with the use of the Greenfield filter.  Am. J. Surg.  1987, 154:163-168.

Castaneda F, Herrera M, Cragg A, et al.  Migration of a Kimray-Greenfield filter to the right ventricle.  Radiology.  1983; 149:690.

Cimochowski GE, Evans RH, Zarins CK, et al.  Greenfield filter versus Mobin-Uddin umbrella:  the continuing quest for the ideal method of vena cava interruption.  J Thorac Cardiovasc Surg 1980 March; 79(3):358-65.

Cragg A, Lund G, Rysavy J, et al.  Non surgical placement of arterial endoprosthesis:  A new technique using nitinol wire. Radiology.  1983; 147:261.

Golueke PJ, Garrett WV, Thompson JE, Smith BL, Talkington CM.  Interruption of the vena cava by means of the Greenfield filter: expanding the indications.  Surg. 1988; Jan: 111-117.

COOKFOIA 000078

Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. Clinical experience with the Kim-Ray Greenfield Vena Caval Filter. Ann Surg. 1977; 185:692-698.

Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. A new intracaval filter permitting continued flow and resolution of emboli. Surgery. 1973; 73:599-606.

Greenfield LJ. Current indication for and results of Greenfield filter placement. J Vasc Surg. 1984; 1:502-504.

Greenfield LJ. Technical considerations for insertion for vena cava filters. Surg Gynecol Obstet. 1979; 148:422-426.

Greenfield LJ, Cho KJ, Proctor, Mary, et al. Results of multicenter study of the modified hook-titanium Greenfield filter. J Vasc Surg 1991; 14:253-7.

Greenfield LJ, Peyton R, Crute S, et al. Greenfield vena cava filter experience. Arch Surg. 1981; 116:451.

Greenfield LJ, Proctor MC. Twenty-year clinical experience with the Greenfield Filter. 3 Cardiovascular Surgery 199-205 (1995).

Greenfield LJ, Stewart JR, Crute S. Improved technique for insertion of Greenfield vena cava filter. Surg Gynecol Obstet. 1983; 156:217-219.

Greenfield LJ, Zocco J, Wilk J, Schroeder TM, Elkins RC. Clinical experience with the Kimray-Greenfield Vena Cava Filter. 185 Ann. Surg. 692 (1977).

Kanter B, Moser KM. The Greenfield vena cava filter. Chest 1988; 1:170-175.

Kantor A, Glanz S, Gordon DH, Sclafani SJA. Percutaneous Insertion of the Kimray-Greenfield Filter: Incidence of Femoral Thrombosis. 149 AJR 1065 (1987).

Leiter B, Sequeira J, Weitzman F, Menzoian J. A complication following Kimray-Greenfield filter insertion. Cardiovasc Intervent Radiol. 1981; 4:215-217.

McAuley CE, Webster MW, Jarrett F, Hirsch SA, Steed DL. The Greenfield Intracaval filter as a source of recurrent pulmonary thrombo-embolism. Surgery 1984; 96:574-576.

Menzoian JO, LoGerfo FW, Doyle JE, Weitzman AF, Sequiera JC. Technical modifications in the placement of inferior vena cava filter devices. Am J Surg 1981; 142:216-218.

Miller CL, Wechsler RJ. CT evaluation of Kimray-Greenfield filter complications. AJR 1986; 141:45-50.

Orsinis RA, Jarrell BE. Suprarenal placement of vena cava filters; indications, techniques and results. J Vasc Surg. 1984; 1:124-135.

Phillips MR, Widrich WC, Johnson WC. Perforation of the interior vena cava by the Kimray-Greenfield filter. Surgery. 1979; 87:233-235.

Rose BS, Simon DC, Hess ML, Van Aman ME. Percutaneous transfemoral placement of the Kimray-Greenfield vena cava filter. 165 Radiology 373-376 (1987).

Schneider PA, Bednarkiewicz M. Percutaneous retrieval of Kimray-Greenfield vena cava filter. Radiology. 1985; 156:547.

Schroeder TM, Elkins RC, Greenfield LJ. Entrapment of sized emboli by the KMA-Greenfield intracaval filter. Surgery. 1978; 83:435-439.

Sequeria JC, Sacks BA, Tata J, Simon M. A safe technique for introduction of the Kimray-Greenfield filter. Radiology. 1979; 133:799-800.

Sidawy AN, Menzoian JO. Distal migration and deformation of the Greenfield vena cava filter. Surgery 1986; 99:369-372.

Stewart JR, Peyton JWR, Crute SL, Greenfield LJ. Clinical results of suprarenal placement of the Greenfield vena cava filter. Surgery. 1982; 92:1-4.

Sweeney TJ, Van Aman, ME. Deployment Problems with the Titanium Greenfield Filter. JVIR 1993; 4:691-694.

Tadavarthy SM, Castaneda-Zuniga WR, Cardella JF, Casteneda F, Darcy M, Smith T, Amplatz K. Percutaneous introduction of Kimray - Greenfield Filters. Sem in Interv Radiol. Sept 1986.

2.  Nitinol

Cragg A, Castaneda-Zuniga WR. Nitinol spiral Vena Caval Filter. Sem in Interv Radiol. Sep 1986; 3(3):227-230.

Cragg A, Lund G, Rysavy J, et al. "Non surgical placement of arterial endoprosthesis: A new technique using nitinol wire., Radiology 1983; 147:261.

Dotter CT, Buschman RW, McKinney MK, Rosch J. Transluminal expandable nitinol coil stent grafting: Preliminary report. Radiology. 1983; 147:259.

LaPlante JS, Contractor FM, Kiproff PM, Khoury MB. Migration of the Simon Nitinol Vena Cana Filter to the Chest, Case Report. AJR 1993; 160:385-386.

Palestrant AM, Prince MR, Simon M. Comparative in vitro evaluation of the nitinol inferior vena cava filter. Radiology. 1982; 145:351-355.

COOKFOIA 000080

Simon M, Athanosoulis CA, Kim D, Steinberg FL, Porter DH, Byse BH, Kleshinski S, Geller S, Orron DE, Waltman AC.  Simon Nitinol Vena Cava Filter; Initial Clinical Experience. Radiology 1989; 172:99-103.

Simon M, Athanosoulis CA, Kim D, et al.  Simon Nitinol Inferior Vena Cava Filter:  Initial Clinical Experience, Work in Progress. Radiology 1989; 172:99-103.

Simon M, Kaplow R, Salzman E, Freiman D.  A vena cava filter using thermal shape memory alloy.  Radiology 1977; 125:89.

Susita E, Golding L, Shifmomitsu T, Oko T Murabayashi S, Kambic HE. Nonsurgical implantation of a vascular ring prosthesis using thermal shape memory Ti/Ni alloy (nitinol wire). ASAID, Jul-Sep 1986; 32:30-34.

3.   Other

Castenada-Zuniga WR, Tadarathy SM, Galliani CA, Laerum F, Schwarten DE, Amplatz K.  "Experimental venous occlusion with stainless steel spiders." Radiology.  1981; 141:238.

Coleman CC, Casteneda-Zuniga WR, Amplatz K.  Mobin-Uddin vena cava filters.  Sem in Interv Radiol.  Sept 1986; 3(3):193-195.

Coleman CC.  Overview of interruption of the inferior vena cava.  Sem in Inter. Radiol. Sep 1986; 3(3):175-187.

Cragg A, Lund G, Salomonowitz, et al.  New percutaneous vena cava filter. AJR.  1983; 141:601.

Cragg HH, Lund G, Rysavy JA, Salomonowitz E, Castenada-Zuniga WE, Amplatz K.  Percutaneous arterial grafting.  Radiology.  Jan 1984; 150:45-49.

Darcy MD, Hunter DW, Lund GB, Cardella JF.  Amplatz retrievable vena caval filter.  Sem in Interv Radiol. Sep 1986; 3(3):214-219.

Eichelter P, Shenk WG:  Prophylaxis of pulmonary embolism:  a new experimental approach with initial results.  Arch Surg. 1968; 97:348-356.

Epstein HE, Darcy MD, Hunter DW, Coleman C, Tadavarthy SM, Murray PH, Casteneda-Zuniga WE, Amplatz K.  Experience with the Amplatz retrievable vena cava filter.  Radiology 1989; 172:105-110.

Ferris EJ, McCowan TC, Carver DK, McFarland DR.  Percutaneous Inferior Vena Caval Filters:  Follow-up of Seven Designs in 320 Patients.  Radiology 1993; 188:851-856.

Gianturco C, Anderson JH, Wallace S.  A new vena cava filter:  experimental animal evaluation.  Radiology.  1980; 137:835-837.

Gunther RW, Schild H, Fries A, Storkel S.  Vena cava filter to prevent pulmonary embolism, experimental study.  Radiology 1985; 156:315-320.

Gunther RW, Schnid H.  Basket filter for prevention of pulmonary embolism. Sem in Interv Radiol. Sept 1986; 3(3):220-226.

Hunter JA, DeLoria GA.  Hunter vena cava balloon:  rationale and results.  J Vasc Surg. 1984; 1:491-497.

Knight L, Amplatz K, Nicoloff D.  Alternate method of introduction of inferior vena cava filter.  Surg Gynecol Obstet. 1974; 138:762-764.

Knight L, Rizk G, Amplatz K. Percutaneous introduction of inferior vena cava filter:  human experience.  Radiology.  1974; 111:61-63.

Lund G, Rysavy J, Hunter DW, Casteneda-Zuniga WR, Amplatz K. Retrievable vena cava percutaneously introduced.  Radiology. 1985; 155:831.

Lund G, Rysavy J, Salomonowitz E, et al.  A new vena cava filter for percutaneous placement and retrieval:  experimental study.  Radiology. 1984; 152:369-372.

Maass D, Demierre D, Wallsten H, Senning A.  The helix filter:  a new vena cava filter for the prevention of pulmonary embolism.  J Cardiovasc Surg. 1985; 26:116-123.

McIntyre AB, McCredy RA, Hyde GL, Mattingly W.  A ten year follow-up study of the Mobin-Uddin filter for vena cava interruption.  Surg Gynecol Obstet. 1984; 158:513-516.

Menzoian JD, LoGerfo FW, Weitzman F, Espelata M, Sequiera JC.  Clinical experience with the Mobin-Uddin vena cava umbrella filter.  Arch Surg. 1980; 115:1179-1181.

Miles RM, Chappell F, Renner O.  A partially occluding vena cava clip for prevention of pulmonary embolism.  Am Surgeon. 1964; 30:40-47.

Millward SF, Marsch JI, Peterson RA, et al.  LGM (Vena Tech) Vena Cava Filter:  Clinical Experience in 64 Patients.  JVIR 1991; 2:429-433.

Mobin-Uddin K, McLean R, Bolooki H, Jude J.  Caval interruption for prevention of pulmonary embolism.  Arch Surg. 1969; 99:711-715.

Mobin-Uddin K, Smith PE, Martinez LO, Lombardo CR, Jude JR.  A vena caval filter for the prevention of pulmonary embolism.  Surg. Forum. 1967; 18:209-211.

Mobin-Uddin K, Utley JR, Bryant LR.  The inferior vena cava umbrella filter. Prog Cardiovasc Disc. 1975; 17:391-399.

Moretz WH, Rhode CM, Shepherd MH. Prevention of pulmonary emboli by partial occlusion of the inferior vena cava. Am Surgeon. 1959; 235:617-626.

Pate JW, Melvin D, Cheek RC. A new form of vena caval interruption. Ann Surg. 1969; 169:873-880.

Rao G. Long term experience with the Mobin-Uddin umbrella. Int Surg. 1980; 65:223-230.

Ricco JB, Crochet D, Sebilotte P, Serradimigni A, Lefebvre JM, Boissou E, Geslin P, Virot P, Vaislic C, Gallet M, Biron Y, Lefant D, Desmarq JM, De La Faye D. Percutaneous transvenous caval interruption with the LGM filter; early results of a multicenter trial. Ann Vasc Surg 1988; 3:242-247.

Rizk G, Amplatz K. A percutaneous method of introducing the caval umbrella. Am J Roentgenol. 1973; 117:903-909.

Roehm JO. The bird's nest filter: a new percutaneous transcatheter inferior vena cava filter. J Vasc Surg. 1984; 1:498-501.

Roehm JO, Gianturco C, Barth M. The bird's nest inferior vena caval filter. Sem in Interv Radiol. Sep 1986; 3(3)205-213.

Roehm JO, Gianturco C, Barth MH, Wright KC. Percutaneous transcatheter filter for the inferior vena cava. Radiology. 1984; 150:255-257.

Schlosser V. Umbrella filter implantation as prophylaxis against pulmonary embolism. Ann Radiol. 1979; 23:329-331.

Taylor FC, Awh MH, Kahn CH, Jr, Lu C. Vena Tech Vena Cava Filter: Experience and Early Follow-up. JVIR 1991; 2:435-440.

Williams RW, Shenk WG Jr. A removable intracaval filter for prevention of pulmonary embolism: early experience with the use of Eichelter catheter in patients. Surgery. 1970; 68:999-1008.

C.    **General**

Bomalaski JS, Martin GJ, Hughes RL, et al. "Inferior vena cava interruption in the management of pulmonary embolism,, Chest. 1982; 82(6):767-774.

Huisman MV, Biller HR, ten Cate JW, van Royen EA, Vreeken J, Kersten MJ, Bakx R. Unexpected high prevalence of silent pulmonary embolism in patients with deep venous thrombosis. Chest 1989; 95, 3:496-502.

Katsamouris AA; Waltman AC; Delihatsios MA; Athanosoulis, CA. Inferior vena cava filters; In vitro comparison of clot capture and flow dynamics. Radiology 1988; 166:361-366.

Mansour M, Change AE, Sindelar WF. Interruption of the inferior vena cava for the prevention of recurrent pulmonary embolism. Am Surg. Jul 1985; 51:375-380.

Mohan CR, Hoballah JJ, Sharp WJ, Kresowik TF, Lu CT, Corson JD. Comparative Efficacy And Complications of Vena Caval Filters. J. Vascular Surgery 1995; Feb: 235-245.

Molino JE. Interruption of the inferior vena cava for prevention of pulmonary embolism. Sem in Interv Radiol. Sept 1986; 3(3):188-192.

Prince MR, Novelline RA, Athanosoulis CA, Simon M. "Diameter of inferior vena cava and its implication for the use of vena caval filters." Radiology. 1983; 49:687.

Prince MR, Salzaman EW, Schoen FJ, Palestrant, AM, Simon, M. Local intravascular effects of the nitinol wire blood clot filter. Investigative Radiology. 1988; 23(4):294-300.

Roehm JOF, Johnsrude IS, Barth MH, Gianturco C. The Bird's nest inferior vena cava filter : progress report. Radiology. 1988; 745-749.

Ricco JB, et al Percutaneous transvenous caval interruption with the LGM filter: early results of a multicenter trial. 3 Ann Vasc. Surg 242-247 (1988).

Simon M, Palestrant AM. "Transvenous devices for the management of pulmonary embolism." Cardiovascular and Interventional Radiology. 1980; 3:308-328.

## III.   NITINOL MATERIAL

### A.   Physical Properties

Hazel RJ; Rohan GJ; West VC. Force relaxation in orthodontic arch wires. Am J Orthod. 1984; 86(5):396-402.

Rose RM, Radin EL, Paul JL. Repairing the human skeleton: materials for orthopedics. Tech Rev. 1974; 76:32.

Rozner AG, Wasilewski RS. Tensile properties of NiAl and NiTi, J. Inst Met. 1966; 99:169.

Tomashov ND, Chernova GP. Passivity and protection of metals against corrosion. Plenum Press, New York. 1967, 67.

### B.   Biocompatability

Amstutz HC. Recent developments in implants for orthopedic surgery. Surg Ann. 1971; 3(0):385-408.

COOKFOIA 000084

Buehler WJ, Wang FEA.  A summary of recent research in the nitinol alloys and their potential applications in ocean engineering.  Ocean Eng. 1968; 1:105.

Castleman LS, Motzkin SM, Slicandri FP, Bonawit VL, Johnson AA.  Biocompatability of Nitinol as an implant material.  J Biomed Mater Res. 1976; 10:695.

Cutright De, Bhasker SN, Perez B, Johnson RM, Cowan GSM Jr.  Tissue reaction to nitinol wire alloy.  Oral Surg Oral Med Oral Pathol. 1978; 35:578.

Dai KR, Wu RS, Yuan JX, Sun TH, Yang HB, Hong WQ, Shen SC, Liu LY.  Orthopaedic Applications of a NiTi Shape Memory Alloy.  Proc. Intl. Symp. On Shape Memory Alloy, China Academic Publishers. Sept 6-9, 1986; 430-432.

Dinglin Z, Weiming Z, Yinkan X, Kaiyuan T.  Study and Clinical Application of the Cervical Intervertebral Artificial Joint. Proc. Intl. Symp. on Shape Memory Alloy, China Academic Publishers.  Sept 6-9, 1986; 433-437.

Huacheng T, Fengzhi Y. Burstone CJ, Qin B.  Chinese NiTi Wire-A New Orthodontic Alloy.  Proc. Intl. Symp. On Shape Memory Alloy, China Academic Publishers. Sept 6-9, 1986; 421-426.

Jacobsen N, Hensten-Pettersen A, Hofsoy H.  Some biological aspects of nickel in *systemic aspects of biocompatability*.  Vol 1, Williams D.F. Ed., CRC Press, Boca Raton, Fla, 1981.

Jinfang J, Ping L, Shibi L, Jifang W, Li S.  Scoliosis Correcton rods of TiNi Alloy and Clinical Application.  Proc. Intl. Symp. On Shape Memory Alloy, China Academic Publishers. Sept 6-9, 1986; 379-388.

Kenfeng P, Yousheng T, Jiachen P, Clinical Application of NiTi Memory Alloy Pin in Oral-Maxillo-Facial Surgery.  Proc. Intl. Symp. On Shape Memory Alloy, China Academic Publishers. Sept 6-9, 1986; 427-429.

Kuo PP, Yang P, Zhang F, Yang H, Yu Y, Dai K, Hong, W, Ke M, Cai TD, Tao, J.  The use of nickel-titanium alloy in orthopedic surgery in China. Orthopedics. 1989; 12(1):42-47.

Miao X, Weitao J.  Applications of a NiTi Shape Memory Alloy to Medicine and Dentistry.  Proc. Intl. Symp. On Shape Memory Alloy, China Academic Publishers. Sept 6-9, 1986; 411-415.

Pei X, Yunyue F, Danhua Y.  Ti-Ni Shape Memory Alloy Clip for Tubal Sterilization.  Proc. Intl. Symp. On Shape Memory Alloy, China Academic Publishers. Sept 6-9, 1986; 444-446.

Schmerling MA, Wilkov MA, Sanders AE, Woosley JE.  Using the shape recovery of nitinol in the Harrington rod treatment of scoliosis.  J Biomed Mater Res.  Nov. 1976 10(6): 879-892.

COOKFOIA 000085

Smith DC.  Materials used for construction and fixation of implants.  Oral Sci Rev. 1974; 5:23.

Sundermann FW Jr.  Carcinogenic effects of metals.  Fed. Proc. 1978; 37:40.

Sundermann FW Jr.  A review of the metabolism and toxicology of nickel.  Ann Clin Lab Sci. 1977; 7:137.

Wallace JL.  Evaluation of the intermetallic compound TiNi as an implant material.  Thesis Polytechnic Institute of Brooklyn, NY, 1970.

Williams DF.  Biomaterials and biocompatability.  Med Prog Technol. 1976; 4:31.

Xufeng Z, Guolin L, Jinrui Y, Qi Z, Lin Y, Ziping H, Shouli Z, Jie H.  A Study of Shape Memory Alloy for Medicine.  Proc. Intl. Symp. On Shape Memory Alloy, China Academic Publishers. Sept 6-9, 1986; 416-420.

Yang PJ, Chang YF, Ge MZ, Cai TD, Tao JC, Yang HB.  Internal Fixation With NiTi Shape Memory Alloy Compressive Staples in Orthopaedic Surgery (A Review of 51 Cases).  Proc. Intl. Symp. On Shape Memory Alloy, China Academic Publishers. Sept 6-9, 1986; 438-443.

**2**

COOKFOIA 000087

## BIBLIOGRAPHY FOR HISTORICAL CONTROL STUDIES

1. Ferris EJ, McCowan TC, Carver DK, McFarland DR. Percutaneous Inferior Vena Caval Filters: Follow-up of Seven Designs in 320 Patients. 188 Radiology 851-856 (1993).

2. Simon M, CA, Kim D, Steinberg FL, Porter DH, Byse BH, Kleshinski S, Geller S, Orran DE, Waltman AC. Simon Nitinol Inferior Vena Cava Filter: Initial Clinical Experience Work in Progress. 172 Radiology 99-103 (1989).

3. Taylor FC, Awh MH, Kahn CE, Lu C. Vena Tech Vena Cava Filter: Experience and Early Follow-up. 2: JVIR 435-440 (1991).

4. Greenfield LJ, Cho KJ, Proctor M, Bonn J, Bookstein JJ, Castaneda-Zuniga WR, Cutler B, Ferris EJ, Keller F, McCowen T, Pais SO, Sobel M, Tisnado J, Waltman AC. Results of a Multicenter Study of the Modified Hook-Titanium Greenfield Filter. 14 J. Vascular Surgery 253-257 (1991).

5. Greenfield LJ, Proctor MC. Twenty-year clinical experience with the Greenfield Filter. 3 Cardiovascular Surgery 199-205 (1995).

6. Rose BS, Simon DC, Hess ML, Van Aman ME. Percutaneous transfemoral placement of the Kimray-Greenfield vena cava filter. 165 Radiology 373-376 (1987).

7. Golueke PJ, Garrett WV, Thompson JE, Smith BL, Talkington CM. Interruption of the vena cava by means of the Greenfield filter: expanding the indications. Surg. 1988; Jan: 111-117.

8. Carabasi RA, Moritz MJ, Jarrell BE. Complications encountered with the use of the Greenfield filter. Am. J. Surg. 1987; 154:163-168.

9. Kanter B, Moser KM. The Greenfield vena cava filter. Chest 1988; Jan: 170-175.

10. Kantor A, Glanz S, Gordon DH, Sclafani SJA. Percutaneous Insertion of the Kimray-Greenfield Filter: Incidence of Femoral Thrombosis. 149 AJR 1065 (1987).

11. Mohan CR, Hoballah JJ, Sharp WJ, Kresowik TF, Lu CT, Corson JD. Comparative Efficacy And Complications of Vena Caval Filters. J. Vascular Surgery 1995; Feb: 235-245.

12. Roehm JOF, Johnsrude IS; Barth MH, Gianturco C. The Bird's nest inferior vena cava filter : progress report. Radiology. 1988; 168:745-749.

13. Ricco JB, et al Percutaneous transvenous caval interruption with the LGM filter: early results of a multicenter trial. 3 Ann Vasc. Surg 242-247 (1988).

COOKFOIA 000088

14. Greenfield LJ, Zocco J, Wilk J, Schroeder TM, Elkins RC.  Clinical experience with the Kimray-Greenfield Vena Cava Filter.  185 Ann. Surg. 692 (1977).

15. Stewart JR, Peyton JWR, Crate SL, Greenfield LJ.  Clinical results of suprarenal placement of the Greenfield vena cava filter.  92 Sur. 1 (1982).

**3**

COOKFOIA 000090

**Attachment 3**
**Copies of Articles Listed**
**in the**
**Bibliography**

COOKFOIA 000091

Ernest J. Ferris, MD • Timothy C. McCowan, MD² • Danna K. Carver, RN
David R. McFarland, MD

# Percutaneous Inferior Vena Caval Filters: Follow-up of Seven Designs in 320 Patients[1]

Three hundred twenty-four percutaneous inferior vena caval (IVC) filters of different designs were placed in 320 patients from April 1983 through June 1992. No acute mortality or substantial morbidity was attributed to filter placement. Radiologic or pathologic follow-up data were obtained in 227 (71%) patients (230 filters); clinical follow-up data only were obtained in 50 (16%) patients (50 filters). One hundred twenty (43%) patients died; post-filter-placement pulmonary emboli (PE) were related to the cause of death in eight. At IVC filter imaging studies, 26 of 137 (19%) filters demonstrated caval thrombus; 12 of 132 (9%) filters had delayed penetration through the IVC wall of greater than 3 mm; 13 of 230 (6%) filters migrated more than 1 cm; and five of 230 (2%) filters had fracture of a strut or leg. Deep venous thrombosis (DVT) at the insertion puncture site or in the lower extremity was noted in 26 of 117 (22%) cases of filter placement. Among patients without imaging studies, clinical suspicion of complications included PE in four patients, IVC thrombus in 14 patients, and lower-extremity DVT in 10 patients. Long-term clinical and radiologic follow-up of all IVC filters is indicated due to the relatively high prevalence of some complications.

Index terms:   Interventional procedures, complications, 93.751, 944.77, 982.458, 982.751 • Venae cavae, filters, 982.456 • Venae cavae, interventional procedure, 982.456, 982.458

Radiology 1993; 188:851–856

¹ From the Department of Radiology, University of Arkansas for Medical Sciences, Mail Slot 556, 4301 W Markham St, Little Rock, AR 72205. From the 1992 RSNA annual scientific assembly. Received October 8, 1992; revision requested November 6; revision received February 16, 1993; accepted February 24. Address reprint requests to E.J.F.
² Current address: Department of Radiology, University of Nebraska Medical Center, Omaha.
ᶜ RSNA, 1993

TRANSVENOUS interruption of the inferior vena cava (IVC) for the prevention of pulmonary embolism became clinically feasible with the introduction of the Mobin-Uddin filter in 1967 (1). Although the Mobin-Uddin filter solved many of the problems of caval interruption, especially the morbidity and mortality associated with surgical clipping, plication, or ligation of the IVC, complications still occurred, most notably a 60%–70% rate of caval occlusion with venous stasis sequelae after filter insertion (2,3). The Kimray-Greenfield (KG) filter became available soon after the Mobin-Uddin filter (4). The higher rate of caval patency (approximately 95%) for the KG filter soon made it the favored device for transvenous caval interruption (5,6).

Since the filter introducers or carriers of the Mobin-Uddin and KG filters were relatively large (22 to 24 F), initially both filters were routinely inserted via the femoral or internal jugular vein by means of surgically created phlebotomies. Percutaneous insertion of the standard stainless-steel KG filter became popular in the 1980s (7–10). The large size of the percutaneous tract needed for placement of the introducer sheath (29.5 F) led to concern about a high rate of insertion site complications, particularly femoral vein thrombosis (11,12). Although there is disagreement regarding the actual rate of these access site complications, their significance, and the ability to reduce them with different insertion techniques or new devices, medical companies have designed different IVC filters specifically for percutaneous insertion with smaller introducer sheaths (13–20).

This report summarizes our clinical experience with seven different designs of percutaneous IVC filters: Bird's Nest type I (BN-I) (Cook, Bloomington, Ind), Bird's Nest type II (BN-II) (Cook), Amplatz (A) (Cook), nitinol (N) (Nitinol Medical Technologies, Woburn, Mass), Titanium Greenfield original design (TG) (Medi-tech/Boston Scientific, Watertown, Mass), Titanium Greenfield modified hook design (TGMH) (Medi-tech/Boston Scientific), and Vena-Tech (VT) (B. Braun Vena-Tech, Evanston, Ill). Although the stainless steel KG filter has been used (by means of both surgical cutdown and percutaneous insertion) at our institution, this filter, unlike the others analyzed in this article, was not specifically designed for percutaneous insertion and is not included in our study. This report emphasizes the postplacement, long-term complications of IVC filters, including recurrent pulmonary embolism (PE), IVC thrombus, penetration of the IVC by filter components, filter migration, filter fracture, and new or increased lower extremity deep venous thrombosis (DVT) after filter insertion.

## MATERIALS AND METHODS

### Demographics

From April 1985 through June 1992, 324 IVC filters were inserted in 320 patients at the University Hospital of the University of Arkansas for Medical Sciences and the John L. McClellan Memorial Veterans Administration Hospital. Informed consent was obtained for all filter placements and all follow-up studies, and any investigational filters were inserted with approval of each institution's Investigation Review Board. The number and types of filters are detailed in Table 1. Four patients each received two IVC filters. The average patient age at the time of filter insertion was 63 years (range, 15–95 years).

One hundred forty patients had a known malignancy at the time of filter

Abbreviations:   A = Amplatz, BN-I = Bird's Nest type I, BN-II = Bird's Nest type II, DVT = deep venous thrombosis, IVC = inferior vena cava, KG = Kimray-Greenfield, N = nitinol, PE = pulmonary embolism, TG = Titanium Greenfield, TCMH = Titanium Greenfield modified hook design, VT = Vena-Tech.

851

COOKFOIA 000092

placement. Of the 334 filters inserted, 256 (77%) were inserted because of a contraindication to anticoagulation therapy in patients with known PE or DVT involving the above-knee popliteal, superficial femoral, common femoral, or iliac veins, or IVC. Forty-four (14%) filters were inserted due to a failure or complication of anticoagulant therapy. Thirty (9%) filters were inserted prophylactically, primarily for venous thrombi in large veins in conjunction with poor cardiopulmonary reserve or expected long-term immobility.

Postplacement follow-up data were available for 277 (87%) of the 320 patients (280 filters). Forty-three patients (44 filters) were lost to follow-up after filter insertion. Of the 280 filters with follow-up studies, 230 had radiologic or pathologic examinations in addition to clinical evaluation. Fifty patients (50 filters) had only clinical follow-up (no radiologic or pathologic evaluation). The average time to the last postplacement follow-up was 404 days (range, 1–2,392 days).

## Definitions

Patients with follow-up were evaluated for the seven filter complications listed below. Only cases of appropriate and definitive radiologic or pathologic studies were used to compute complication rates. Most patients underwent more than one study on more than one occasion. All cases with radiologic follow-up had at least an abdominal radiograph. Complications were documented as clinically symptomatic or asymptomatic. Data about patients with clinically suspected complications but without definitive findings of radiologic or pathologic studies were summarized separately. In the four patients with more than one filter, the complication was attributed to a single, particular filter, if possible (eg, a complication prior to placement of the second filter); if potentially related to either filter, the complication was attributed to both filters.

*Death.*—Cause of death was obtained from death certificates or autopsy reports. Only autopsy results were considered definitive for the diagnosis of death from or related to PE.

*Recurrent PE.*—Pulmonary arteriography demonstrating acute PE; a change in a ventilation-perfusion lung scan to high probability from normal, low, or intermediate probability; and autopsy were considered definitive studies for recurrent PE. Patients were not routinely or systematically screened for recurrent PE.

*IVC thrombus.*—One hundred thirty-seven filters had definitive imaging or pathologic studies to diagnose IVC thrombus. These studies were obtained with abdominal ultrasound (US), contrast material-enhanced computed tomography (CT), intravascular US, or contrast-enhanced venacavography. The presence of any thrombus in the IVC or filter, no matter the size, was considered positive for IVC thrombus

*IVC penetration.*—Filter components extending more than 3 mm outside the wall

of the IVC as determined by using CT (contrast-enhanced or unenhanced images), venacavography, abdominal duplex US, a combination of intravascular US and fluoroscopy, or autopsy were considered positive for penetration. Acute penetrations during insertion are considered in the placement problems category. One hundred thirty-two filters had appropriate diagnostic radiologic studies. Involvement of adjacent organs or structures was evaluated with CT.

*Migration.*—Change in filter position, either cranial or caudal, of more than 1 cm as seen at abdominal radiography, CT, or venacavography was considered positive for filter migration. Two hundred thirty filters were evaluated for filter migration.

*Filter fracture.*—Abdominal radiographs of 230 filters were evaluated for disruption of filter components.

*New or increased DVT.*—Duplex sonography with compression or venography were considered definitive studies for DVT. In some cases, only the filter insertion puncture site was studied. Patients were not routinely or systematically screened for DVT, and patients with full lower-extremity imaging studies were usually referred due to clinical suspicion of DVT. One hundred seventeen filters had definitive studies after insertion. Only patients with new DVT or increased DVT after placement of the filter were listed as having positive findings.

*Insertion problems.*—On the basis of information from the radiologist and radiologic report and radiographs, difficulty with insertion of each of the filters was divided into three categories: filter-related (eg, malfunction of the filter without known patient or technical problems, incomplete filter opening, or filter tilt of greater than 15° from the axis of the IVC), patient-related (anatomic abnormalities increasing the difficulty of filter placement), and technique-related (eg, operator error during insertion causing caval penetration).

*Clinical complications.*—Fifty patients (50 filters) had clinical follow-up without imaging studies to confirm possible compli-

cations. Clinical suspicion was usually based on physical findings or symptoms, such as onset of lower-extremity swelling (unilateral or DVT), bilateral for caval thrombus) without known congestive heart failure, cellulitis, or trauma, or onset of pleuritic chest pain, hemoptysis, and dyspnea for recurrent PE. Patients with death certificates indicating possible filter complications without autopsy confirmation were included in the clinical totals but were not included in the statistics of the filter complications.

## RESULTS

The results for each filter complication category are given below for all filters. Complications divided by filter type are given for some categories in Table 2.

*Death.*—Of 277 patients followed up, 120 (43%) died. Most of these deaths were attributable to cancer and its inherent long- and short-term complications. PE was listed as the cause of death, or a major contributing factor, in autopsy results in eight patients. Various other causes such as myocardial infarction, congestive heart failure, hemorrhage, and fluid imbalance were listed as contributory or main causes of death in these patients.

*Recurrent PE.*—In addition to the eight patients with PE proved at autopsy, three other patients had recurrent PE demonstrated by using high-probability ventilation-perfusion lung scanning. One of these three patients had a second filter placed and later died of massive recurrent PE. This patient is also included in the group of eight patients who died of PE. The time from filter placement to documented recurrent PE ranged from 2 to 1,111 days, with an average of 226 days. Specifically, recurrent PE was

### Table 1
Percutaneous Filter Placement and Follow-up, by Filter Type

| Filter Type | Total No. Inserted | Radiologic or Pathologic | Clinical Only | Not Available | Average Length of Follow-up/Range (d)* |
|---|---|---|---|---|---|
| BN-I | 32 | 25 | 4 | 3 | 1,007/1–2,392 |
| BN-II | 46 | 33 | 9 | 4 | 440/1–1,297 |
| A | 30 | 27 | 3 | 0 | 673/1–1,910 |
| N | 21 | 17 | 2 | 2 | 470/1–1,200 |
| VT | 113 | 72 | 24 | 17 | 190/1–906 |
| TG | 10 | 6 | 3 | 1 | 380/5–1,075 |
| TGMH | 72 | 50 | 5 | 17 | 101/1–673 |
| Overall | 334† | 230 | 50 | 44 | 404/1–2,392 |

\* Number of days was calculated only for patients with follow-up at least 1 day after placement of IVC filter.
† Total patients = 320. Four patients received two filters each.

COOKFOIA 000093

## Table 2
### Percutaneous Filter Complications, by Filter Type

| Complications | BN-I (n = 32) | BN-II (n = 46) | A (n = 30) | N (n = 21) | VT (n = 113) | TG (n = 10) | TGMH (n = 72) | Total[c] (n = 324) |
|---|---|---|---|---|---|---|---|---|
| PE deaths | 1 | 1 | 2 | 1 | 1 | 0 | 2 | 8 |
| Recurrent PE[†] | 2 | 1 | 3 | 1 | 1 | | 2 | 11 |
| IVC thrombus[‡] | 4/23 (17) | 5/24 (21) | 5/22 (23) | 3/12 (25) | 7/28 (25) | 0/6 (0) | 2/22 (9) | 26/137 (19) |
| IVC penetration[‡] | 1/22 (5) | 1/16 (6) | 3/26 (12) | 4/12 (33) | 0/28 (0) | 3/6 (50) | 0/22 (0) | 12/132 (9) |
| Migration[‡] | 3/26 (12) | 0/32 (0) | 0/27 (0) | 2/17 (12) | 2/72 (3) | 3/6 (50) | 3/50 (6) | 13/230 (6) |
| Fracture[‡] | 1/26 (4) | 1/32 (3) | 0/27 (0) | 2/17 (12) | 1/72 (1) | 0/6 (0) | 0/50 (0) | 5/230 (2) |
| New DVT[‡] | 4/27 (15) | 3/15 (20) | 4/21 (19) | 1/9 (11) | 8/25 (32) | 1/6 (17) | 5/14 (36) | 26/117 (22) |
| Site | | | | | | | | |
| Ipsilateral | 2 | 2 | 1 | 0 | 4 | 0 | 3 | 12 |
| Contralateral | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Bilateral | 0 | 0 | 2 | 1 | 4 | 1 | 1 | 9 |
| Not available | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |

* Number of filters studied for complications in 320 patients. Four patients each received two filters.
† Includes deaths related to PE.
‡ First number is number of complications; second number is number of studies performed to evaluate for complications. Number in parentheses is percentage of studies that showed complications.

documented as follows: two BN-I filters, at 45 and 1,111 days, respectively; one BN-II filter, 280 days; three A filters, 2, 19, and 809 days, respectively; one N filter, 7 days; one VT filter, 294 days; one TG filter, 35 days; and two TGMH filters, 19 and 150 days, respectively.

*IVC thrombus.*—Of 137 filters with definitive imaging studies of the IVC, 26 (19%) had thrombus detected in the IVC or filter. Twelve of these filters (all with more extensive IVC thrombus or complete occlusion of the IVC) were symptomatic with bilateral lower-extremity swelling. The 13 patients with small IVC thrombi (the smallest was approximately 3 mm at intravascular US) had no symptoms.

*IVC penetration.*—Twelve of 132 (9%) filters were documented to have penetration of filter components of 3 mm or more through the wall of the IVC at postinsertion follow-up. Four filters (all nitinol) penetrated adjacent structures: two, the abdominal aorta; one, the iliac artery (the filter migrated caudad to the confluence of the iliac veins); and one, the third portion of the duodenum. No patients had symptoms related to caval penetration, including those with penetration into adjacent structures. Seven cases of acute caval penetration during insertion are not included in these statistics but are listed under insertion problems.

*Migration.*—Thirteen of 230 (6%) filters had documented migration at follow-up. Seven migrations were cephalic, and six were caudal. Of

three BN-I filters that migrated to the right atrium or ventricle, two migrations were discovered within 24 hours: One filter was removed percutaneously and a second filter was placed; the second migrated filter was repositioned in the intrahepatic IVC with a tip-deflecting wire. The third BN-I filter migration to the right ventricle was seen at 1-month follow-up. Attempts to remove or reposition the filter were unsuccessful. The patient has been followed up for 6 years, and no problems related to the filter have been found.

One N filter was found in the left pulmonary artery at 1-month follow-up. No attempt was made to remove the filter. The patient is doing well at almost 4 years after insertion and has normal pulmonary blood flow at ventilation-perfusion lung scanning. One N filter migrated caudad to the confluence of the iliac veins. This filter also showed caval perforation with penetration of the adjacent iliac artery. No attempts were made to remove the filter. No patient had clinical symptoms related to filter migration.

*Filter fracture.*—Five of 230 (2%) filters had a fracture of a strut or leg documented at follow-up. No historical incidents such as trauma could be found to account for the filter fractures. No patient had symptoms of filter fractures.

*New or increased DVT.*—Twenty-six of 117 (22%) filter insertions with follow-up lower-extremity US or venography had evidence of new DVT or extension of previous DVT in the lower extremity or at the puncture

site. Fifteen patients had symptoms of DVT, two had no symptoms, and clinical status information was not available for nine patients. Most cases were ipsilateral or bilateral (Table 2).

*Insertion problems.*—No acute deaths and no substantial morbidity were associated with filter insertion. No patient needed operative intervention to correct an insertion problem. Thirty-one filter-related problems of insertion occurred: difficulty adequately attaching filter anchoring struts to caval wall (BN-I, n = 2; BN-II, n = 5); difficulty releasing filter from delivery system (BN-I, n = 1; N, n = 1); incomplete filter opening or clustering of filter legs (VT, n = 13; TGMH, n = 5); and filter tilting (TGMH, n = 4). Patient-related insertion problems occurred in eight patients and were usually due to abnormal or distorted patient anatomy (eg, compression from adjacent tumor) or an unusually small- or large-diameter cava, making filter placement subjectively more difficult. All patients with difficult anatomy successfully received IVC filters. The filters involved were BN-I (n = 1), BN-II (n = 1), VT (n = 2), TGMH (n = 1), A (n = 1), and N (n = 2). Technique-related insertion problems occurred in 24 cases: prolapse of filter wires or components (BN-I, n = 3; BN-II, n = 6); acute penetration of the IVC (BN-II, n = 1; N, n = 1; TGMH, n = 5); incomplete filter opening or leg clustering due to suboptimal placement location (VT, n = 1; TGMH, n = 5); filter inserted inversely (VT, n = 1); and filter jammed in delivery device (N, n = 1).

*Clinical findings.*—Of the 50 patients (50 filters) with only clinical follow-up, four patients were thought to have recurrent PE (two underwent empiric treatment despite indeterminant ventilation-perfusion lung scans and no pulmonary arteriograms), 14 were thought to have caval thrombus, and 10 were believed to have new lower-extremity DVT. No imaging studies were available to confirm these clinical suspicions, and these patients were not included in the statistics of filter complications.

## DISCUSSION

From a theoretical viewpoint, one would prefer a transvenous filter that has a small introducer, is technically easy to insert, is mechanically and biologically stable, has a low rate of short- and long-term complications, and effectively protects against major embolic disease. While the ideal filter has yet to be produced, the new vena caval filters specifically designed for percutaneous transvenous insertion have facilitated placement and reduced the immediate morbidity and mortality of surgical insertion (13,14, 21–23). Ease of placement, however, is only one of the important reasons for choosing a particular type of filter.

The incidence of PE after filter placement remains problematic. Routine follow-up pulmonary angiography and ventilation-perfusion lung scanning are invasive or expensive, or both. Most filter patients are subjected to these studies only if there is a clinical suspicion of PE. Silent PE will be missed if these studies are not performed at the time of the embolic event. Reported recurrent PE rates for the KG filter have been approximately 5% (5–10,13,14,24). This rate is not significantly different from reported PE rates of 2%–7% for percutaneous filters (13,14,16–20,25–27).

All of these studies, including this one, have limitations in the accuracy of the reported incidence of PE as discussed above. Eleven of the 277 (4%) patients (280 filters) in this report with available follow-up had documented PE after filter insertion. Even considering the additional four patients with only a clinical suspicion of PE (for a total of 15 of 277 patients, or 5%), the rate of PE in this series is comparable with reported rates of PE for the various filter studies cited above. No notable difference in the rates of PE was apparent among the different filter types we reviewed.

Both the diagnosis and even the definition of caval thrombosis after filter placement is controversial. It is difficult in many cases to determine the clinical significance or cause (thrombus versus embolus) of thrombus identified in the filter or IVC. The diagnosis of caval thrombus usually requires invasive (vena cavogram or intravascular US) or expensive (contrast-enhanced CT) studies (28,29). Abdominal US can be a useful imaging tool to detect caval thrombus, but some examinations are technically inadequate, and the reliability of detecting small thrombi is not known (30). Without routine screening, clinically silent caval thrombi would be missed.

We have elected to classify all cases of thrombus detected in the IVC or filter as positive for caval thrombus. This classification includes even small thrombi, but there are no data to document the clinical significance of this finding. Caval thrombus may be significant as a source for small recurrent PE or as a nidus for more extensive caval thrombosis. The prevalence of caval thrombus in this series was 19%. Twelve of these 26 cases were symptomatic. More extensive caval thrombus or complete occlusion of the IVC was associated with a higher incidence of symptoms. The TG and TGMH filters had the lowest incidence of caval thrombus: 0% and 9%, respectively. These numbers should be viewed with caution, however, since the thrombus rate for these two filters may be artificially low compared with those of the other percutaneous filters because of the substantially shorter follow-up period (and, therefore, fewer overall appropriate imaging studies) for the TG and TGMH filters. Our series demonstrates an incidence of caval thrombus that compares with the 7%–22% reported in other series, but our overall rate is somewhat higher than the 3%–5% rate for the KG filter reported by most authors (5–10,13,14,16–20,25–27,31,32). This may reflect our more liberal definition of caval thrombus, more intensive follow-up, or a true difference in thrombus rates among the filter types.

Penetration of the wall of the IVC by components of caval filters is a known complication (13,14,32–34). Twelve perforations occurred in our series. Four cases, all N filters, involved adjacent structures: the abdominal aorta in two, iliac artery in one, and duodenum in one. The TG filter had a 50% rate of caval penetration in the six patients in our series. Other reports of caval penetration led to the redesign of this filter (35,36). No patient in our series

had clinical symptoms related to caval perforation.

Filter migration occurred in 13 of 230 (5%) filters studied. Most migrations were clinically insignificant, as they were just greater than the 1-cm cephalic or caudal change in location that was our criterion for filter migration. All BN migrations in our experience were among the BN-I filters (16,37). The anchoring struts have been redesigned (BN-II), and no migrations of the new filter design were seen in this series. Although fewer migrations have been reported with the BN-II filter, massive thromboembolism has been reported to cause cephalic migration of this filter (16,38).

The high rate of TG migration in our series corresponds with a known problem of this filter, which may also be related to the high incidence of TG filter caval penetration (35,36). All three TG filter migrations in this series also penetrated the IVC. Despite some very dramatic filter migrations (to the pulmonary artery and right side of the heart), no patients with filter migrations had symptoms, and the migrations were discovered only at radiologic follow-up studies. The two filter types with the most important migration problems (BN-I and TG) have been redesigned. When compared with other reports of filter insertions, including the KG filter, migration does not seem to be a major problem with the percutaneously inserted filters used in this series (5,6, 13,14,16–19,25–27,31,32,35–37).

Fractures of filter components are relatively rare (5,6,13,14,16–19,25,39, 40–42). Five of the 230 (2%) filters we studied had an identified fracture of a filter strut or leg at follow-up. These fractures occurred in one BN-I and one BN-II filter, two N filters, and one VT filter. The N fractures occurred in filters that showed leg splaying. No traumatic pathogeneses were apparent to account for the filter fractures. All fractures were asymptomatic. Since the filter anchoring components are usually fixed with endothelium at 2 weeks, there is probably little chance of embolization. Whether the fracture of a filter strut or leg decreases the protection from PE is unknown.

New or increased lower-extremity DVT was documented in 26 of 117 (22%) patients studied with venography or duplex US. Insertion site complications, notably DVT, were initially a major concern with the percutaneous placement of the KG filter (11,12). The need for concern remains controversial, and access site thrombosis

COOKFOIA 000095

rates for the KG filter have ranged from 10% to 41%, depending on the methods of placement and evaluation (7-15,43,44). It has been suggested that the new smaller-diameter percutaneous filters offer a significant reduction in postplacement lower-extremity DVT (15,45,46). The lowest prevalence of DVT in our filter population was with the N filter, which has the smallest-diameter introducer.

The relatively high prevalence of symptomatic DVT in this study (24 patients) may be related to the method of follow-up; that is, not every patient was routinely studied, and patients with symptoms were more likely to be referred for imaging tests. Patients with asymptomatic DVT who were not studied would have been missed. Additionally, we did not evaluate the prevalence of DVT in relation to the patient's anticoagulant status (approximately 30% of postinsertion filter patients were given longterm anticoagulation therapy). The rate of long-term anticoagulation therapy may affect the rate of postplacement DVT.

Placement difficulties have been encountered with all caval filters and depend on operator technique, patient anatomy, and filter design (47,48). Despite 63 problems related to insertion, no substantial morbidity and no mortality were related to placement of the filters. All patients referred for filter placement received an IVC filter. We noted a previously documented problem of incomplete opening of the VT filter in 13 cases (49,50). Most incomplete openings were unimportant, and no specific interventions were performed in these patients to improve filter opening.

The TGMH filter had noticeable clustering of filter legs in 10 cases. In half of these cases, however, the operator who placed the filter was not completely satisfied with the location of the introducer sheath (usually, against the lateral caval wall via the left iliac artery) and considered the clustering a technical error in most every case. CT of the IVC with the filter in position showed acceptable leg spacing when compared to the shape of the IVC. The number of acute penetrations by the TGMH filter (n = 5) should also be viewed with caution, since in four of the cases the hooks barely exceeded the 3 mm criterion for penetration. Prolapse of filter wires of the BN I and BN II filters above the upper anchoring struts was a technical problem that occurred in nine patients. No patients

are known to have been adversely affected by the prolapsed filter components.

Despite the difficulties in identifying the complications of IVC filters, the newer percutaneous IVC filters appear to adequately prevent PE and seem to have complications rates comparable with the older KG filter. Only the incidence of caval thrombosis (except with the TG or TGMH percutaneous filters) appears higher. Whether this represents a significant difference among filter types or reflects the more intensive follow-up given some of the percutaneous filter designs remains to be proved. Some complications occur many days or years after filter placement, and many complications, such as filter fracture, migration, and caval perforation, can be asymptomatic. In view of these facts, in patients with short life expectancy such as those with terminal malignancies, long-term filter complication rates may be less important than ease and safety of insertion. In patients with longer expected life spans, the lack of delayed complications becomes more important. We believe continuous, long-term follow-up, both clinical and radiologic, of these permanently implanted devices is essential. A national filter registry or multicenter study of IVC filters might help resolve some of the unanswered questions regarding filter efficacy and safety. ∎

## References

1. Mobin-Uddin K, Smith PE, Martinez LO, Lombardo CR, Jude JR.  A vena caval filter for the prevention of pulmonary embolus. Surg Forum 1967; 18:209-211.
2. Mobin-Uddin K, Trinkle JR, Bryant LR.  Present status of the inferior vena cava umbrella filter. Surgery 1971; 70:914-919.
3. Miligan AB, McKtonald AA, Hyde GL, Mattingly W.  A 1-year follow-up study of an X-fixation inferior vena cava interception. Surg Gynecol Obstet 1981; 153:51-54.
4. filter Mic... JR, Brown PF, Elmore...  ....  ....  ....  ....  ....
5. ....  ....  ....  ....  ....  ....  ....  ....  ....  .... Barnes R ....  ....  ....  ....  ....  ....  .... Arch Surg 1984; 116:[illegible].
6. .... dead.  Sit..a. BA.  Twelve year clinical experience with the Greenfield vena caval filter.  Surgery 1988; 104:706-712.
7. Tadavarthy SM, Castaneda-Zuniga W, Salomonowitz E, et al.  Kimray-Greenfield vena cava filter: percutaneous introduction. Radiology 1984; 151:525-526.
8. Rose Br, Simon DC, Hess ME, Van Aman MJ.  Percutaneous transfemoral placement of the Kimray-Greenfield vena cava filter. Radiology 1987; 165:373-376.
9. Denny DF, Dorfman GS, Cronan JJ, Greenwood LH, Morse SS, Yoselevitz M.  Greenfield filter: percutaneous placement in 50 patients. AJR 1988; 150:427-429.
10. Pais SO, Tobin KD, Austin CB, Queral L.  Percutaneous insertion of the Greenfield inferior vena cava filter: experience with 96 patients. J Vasc Surg 1988; 8:460-464.
11. Kantor A, Glanz S, Gordon DH, Sclafani SJ.  Percutaneous insertion of the Kimray-Greenfield filter: incidence of femoral vein thrombosis. AJR 1987; 149:1065-1066.
12. Tobin KD, Pais SO, Austin CB.  Femoral vein thrombosis following percutaneous placement of the Greenfield filter. Invest Radiol 1989; 24:442-445.
13. Dorfman GS.  Percutaneous inferior vena caval filters. Radiology 1990; 174:987-992.
14. Grassi CJ.  Inferior vena caval filters: analysis of five currently available devices. AJR 1991; 156:813-821.
15. Dorfman GS.  Evaluating the roles and function of vena caval filters: will data be available before or after these devices are removed for the market? Radiology 1992; 185:15-17.
16. Roehm JOF, Johnsrude IS, Barth KH, Gianturco C.  The bird's nest inferior vena cava filter: progress report. Radiology 1988; 168:745-749.
17. Epstein DH, Darcy MD, Hunter DW, et al.  Experience with the Amplatz retrievable vena filter. Radiology 1989; 172:105-110.
18. Simon M, Athanasoulis CA, Kim D, et al.  Simon nitinol inferior vena cava filter: initial clinical experience. Radiology 1989; 172:99-103.
19. Ricco JB, Crochet D, Sebilotte P, et al.  Percutaneous transvenous caval interruption with the LGM filter: early results of a multicenter trial. Ann Vasc Surg 1988; 3:242-247.
20. Greenfield LJ, Cho KJ, Pais O, Van Aman M.  Preliminary clinical experience with the titanium Greenfield vena caval filter. Arch Surg 1989; 124:657-659.
21. Mansour M, Chang AE, Sindelar WF.  Interruption of the inferior vena cava for the prevention of recurrent pulmonary embolism. Am Surg 1985; 51:375-380.
22. Spencer FC, Quattlebaum JK, Quattlebaum JK Jr, Sharp EH, Jude JR.  Plication of the inferior vena cava for pulmonary embolism: a report of 20 cases. Ann Surg 1962; 155:827-837.
23. Miller RM, Richardson RR, Wayne L, Elsea RW, Stewart SB, Duncan D.  Long-term results with the serrated Teflon vena caval clip in the prevention of pulmonary embolism. Ann Surg 1969; 169:881-891.
24. Geisinger MA, Zelch MG, Risius B.  Recurrent pulmonary emboli after Greenfield filter placement. Radiology 1987; 165:383-384.
25. Greenfield LJ, Cho KJ, Proctor M, et al.  Results of a multicenter study of the modified hook-titanium Greenfield filter. J Vasc Surg 1991; 14:253-257.
26. Murphy TP, Dorfman GS, Yedlicka JW, et al.  LGM vena cava filter: objective evaluation of early results. JVIR 1991; 2:107-115.
27. McCowan TC, Ferris EJ, Carver DK, Baker ML.  Amplatz vena caval filters: clinical experience in 30 patients. AJR 1990; 155:177-181.
28. Miller CL, Wechsler RJ.  CT evaluation of Kimray-Greenfield filter complications. AJR 1986; 147:45-50.
29. McCowan TC, Ferris EJ, Carver DK.  Inferior vena caval filter thrombi: evaluation with intravascular US. Radiology 1990; 177:783-788.
30. Liu GC, Angiuaco TL, Ferris EJ, Shah HR, Reifsteck JE, Harshfield DL.  Inferior vena caval filters: noninvasive evaluation. Radiology 1986; 160:521-524.
31. Millward SF, Marsh JI, Peterson RA, et al.  LGM (Vena Tech) vena caval filter: clinical experience in 64 patients. JVIR 1991; 2:429-433.

COOKFOIA 000096

pus WM.   Complications of the nitinol vena caval filter. JVIR 1992; 3:401–408.

33. Carabasi RA, Moritz MJ, Jarrell BE.   Complications encountered with the use of the Greenfield filter. Am J Surg 1987; 154:163–167.

34. Kupferschmid JP, Dickson CS, Townsend RN, Diamond DL.   Small bowel obstruction from an extruded Greenfield filter strut: an unusual late complication. J Vasc Surg 1992; 16:113–115.

35. Greenfield LJ, Cho KJ, Pais SO, Van Aman M.   Preliminary clinical experience with the titanium Greenfield filter. Arch Surg 1989; 124:657–659.

36. Teitelbaum GP, Jones DL, van Breda A, et al.   Vena caval filter splaying: potential complication of use of the titanium Greenfield filter. Radiology 1989; 173:809–814.

37. McCowan TC, Ferris EJ, Reifsteck JE, Liu GC, Baker ML.   Retrieval of dislodged bird's nest inferior vena caval filters. J Intervent Radiol 1988; 3:179–183.

38. Rogoff PA, Hilgenberg AD, Miller SL, Stepham SM.   Cephalic migration of the

of two cases. Radiology 1992; 184:819–823.

39. Messmer JM, Greenfield LJ.   Greenfield filters: long-term radiographic follow-up study. Radiology 1985; 156:613–618.

40. Taheri SA, Kulaylat MN, Johnson E, Hoover E.   A complication of the Greenfield filter: fracture and distal migration of two struts—a case report. J Vasc Surg 1992; 16:96–99.

41. Lang W, Schweiger H, Fietkau R, Hofmann-Preiss K.   Spontaneous disruption of two Greenfield vena caval filters. Radiology 1990; 174:445–446

42. Awh MH, Taylor FC, Lu CT.   Spontaneous fracture of a Vena-Tech inferior vena caval filter. AJR 1991; 157:177–178.

43. Mewissen MW, Erickson SJ, Foley WD, et al.   Thrombosis at venous insertion sites after inferior vena caval filter placement. Radiology 1989; 173:155–157.

44. Dorfman GS, Cronan JJ, Paolella LP, et al.   Iatrogenic changes at the venotomy site after percutaneous placement of the Greenfield filter. Radiology 1989; 173:159–162

45. Hicks ME, Middleton WD, Picus D, Darcy MD, Kleinhoffer MA.   Prevalence of local

placement of a Bird's Nest vena caval filter. JVIR 1990; 1:63–68.

46. Molgaard CP, Yucel EK, Geller SC, Knox TA, Waltman AC.   Access-site thrombosis after placement of inferior vena cava filters with 12–14-F delivery sheaths. Radiology 1992; 185:257–261.

47. Vesely T, Darcy M, Picus D, Hicks M   Technical problems associated with placement of the Bird's Nest inferior vena cava filter. AJR 1992; 158:875–880.

48. Kastan DJ, Forcier NJ, Kahn ML.   Simon nitinol vena cava filter: preliminary observations and suggested procedural modifications. JVIR 1991; 2:123–124.

49. Reed RA, Teitelbaum GP, Taylor FC, et al.   Incomplete opening of LGM (Vena Tech) filters inserted via the transjugular approach. JVIR 1991; 2:441–445.

50. Millward SF, Marsh JL, Peterson RA, et al.   LGM (Vena Tech) vena cava filter: clinical experience in 64 patients. JVIR 1991; 2:429–433.

September 1993

COOKFOIA 000097

Morris Simon, MD • Christos A. Athanasoulis, MD • Ducksoo Kim, MD • Fred L. Steinberg, MD • David H. Porter, MD • Barbara H. Byse, MD • Stephen Kleshinski, BS • Stuart Geller, MD • Dan E. Orron, MD • Arthur C. Waltman, MD

# Simon Nitinol Inferior Vena Cava Filter: Initial Clinical Experience

## Work in Progress[1]

The Simon nitinol filter for percutaneous institution of the vena cava to prevent pulmonary embolism is currently undergoing a multicenter clinical trial. Preliminary clinical results are reported as work in progress. The results in 44 patients at two centers are analyzed in detail, and major events are reported from 103 patients in 17 centers in the United States during a 10-month period. The filter was successfully inserted via the femoral or jugular route in all patients through a 9-F catheter. The placement procedure was easy and without significant complications. Follow-up studies included plain radiography, ultrasonography, magnetic resonance (MR) imaging, and clinical evaluation. No filter migration or perforation occurred among the 103 patients. Symptomatic occlusions occurred in 7%–9%, comparable to other series, and some asymptomatic occlusions were detected with MR imaging only. The implications of occlusion of the filter are discussed.

Index terms: Embolism, pulmonary, 60.72 • Vena cava, filters • Vena cava, interventional procedure, 982.1299 • Vena cava, stenosis or obstruction, 982.455

Radiology 1989; 172:99–103

THE Simon nitinol filter (SNF or filter) for the prevention of pulmonary embolism is currently undergoing clinical trial in a multi-institutional study in the United States, with 17 participating centers. At this time, a total of 103 filters have been placed in patients. This filter is presently classified as an investigational device by the U.S. Food and Drug Administration (FDA). The trial did not include randomization with any other vena cava filter in current clinical use, since extensive published data already exist regarding the safety and efficacy of these devices.

The SNF exploits the unique thermal shape-memory properties of nitinol, a nickel-titanium alloy that can exist as a soft, straight set of wires when cooled but is instantly transformed into a previously imprinted, complex rigid filter shape when warmed (1,2). Biocompatibility of this material has proved comparable to stainless steel in animal and human studies (3,4). A cold saline infusion allows it to pass easily through a standard 9-F catheter for delivery into the inferior vena cava (IVC). Here, it is warmed to body temperature, assumes its filter shape, and locks into place. It is designed to trap emboli from the lower limbs or pelvis and prevent the emboli from reaching the lungs. The filter is 3.8 cm long, has a 28-mm dome with seven overlapping loops, and has six diverging legs with terminal hooks to engage the vena cava wall (Fig 1). The legs serve as a coarse first filter, while the dome forms a fine second filter. The filter can adapt to a broad range of vena cava widths up to a maximum of 28 mm.

This preliminary progress report focuses on detailed early clinical results of placement of the SNF in 44 patients. We also report follow-up data of the major complications of filter placement that would be reportable to the study monitor in a total of 103 patients from all 17 centers participating in the clinical trial.

## PATIENTS AND METHODS

### Patients

The study population consisted of 26 men and 18 women, ranging in age from 19 to 96 years (median, 62 years). Eighteen patients underwent placement of the SNF at Beth Israel Hospital (BIH), and 26 underwent the procedure at Massachusetts General Hospital (MGH) between February and November 1988. Appropriate informed consent was obtained from all patients.

The clinical indications for filter placement were those generally accepted for IVC filter placement (5). The major indications were pulmonary embolism or extensive deep venous thrombosis when anticoagulant or thrombolytic therapy was contraindicated, resulted in complications, or failed to prevent recurrent embolism. The high proportion of filter placements in neurosurgical patients at MGH is noteworthy.

### Methods

Insertion procedure.—Before the procedure is started, a 500 mL bag of normal saline is cooled in a bucket of ice chips for at least half an hour. The 9-F delivery catheter is inserted percutaneously into a

[1] From the Department of Radiology, Beth Israel Hospital, Harvard Medical School, 330 Brookline Ave, Boston, MA 02115 (M.S., D.K., D.H.P., S.K., D.E.O.), and the Department of Radiology, Massachusetts General Hospital, Boston (C.A.A., F.L.S., B.H.B., S.G., A.C.W.). From the 1988 RSNA annual meeting. Received December 5, 1988; revision requested January 17, 1989; revision received February 14; accepted February 17. Address reprint requests to M.S.

Nitinol Medical Technologies (NMT), Woburn, Mass. is the manufacturer of the Simon nitinol filter and is responsible for the conduct of the clinical trial under Food and Drug Administration Investigational Device Exemption no. C870093. M.S. is the Scientific Director of NMT and C.A.A. is a member of the Board of Advisors. All authors are in full compliance with established guidelines at their respective institutions for disclosure of financial interest related to research projects.

© RSNA, 1989

See also the editorial by Yune (15–16) and article by Epstein et al (105–110) in this issue.

Abbreviations: BIH = Beth Israel Hospital, FDA = Food and Drug Administration, IVC = inferior vena cava, MGH = Massachusetts General Hospital, SNF = Simon nitinol filter.

COOKFOIA 000098

common iliac vein via a standard femoral or jugular venipuncture, on either side, with the Seldinger technique. The catheter is first used to obtain a preliminary vena cavogram to determine the position of the renal veins and to ensure that the vena cava does not exceed 28 mm in width, after correction for magnification. The presence of thrombi or significant anatomic anomalies is also shown. The catheter can then repositioned just below the lower renal vein, the optimal location for the filter dome.

The filter comes ready to be delivered. It is received preloaded in the storage-tube section of the delivery system and is preassembled with a telescoping feeder-pump section and pusher wire. The cold saline is briefly infused through the storage tube via a sideport at the rate of about 10 drops per second to cool and soften the filter. The storage tube is then connected directly to the 9-F catheter so that the cold saline infuses into the IVC for a few seconds. Typically, less than 150 mL of saline is required for filter delivery, an insufficient amount to affect patient temperature. The filter is then advanced rapidly through the catheter until it is almost within the hood of the catheter. This requires about six forward strokes of the feeder-pump handle. Finally, a single backward stroke of the storage tube and catheter unsheaths the filter and releases it into the IVC. It is instantaneously transformed into its expanded delivered form and locks into place. The catheter is then pulled back gently, and a follow-up venogram is obtained to check the final position of the filter and whether there is any leg penetration. Finally, the catheter is removed and the puncture site is compressed in the usual manner. The procedure requires only routine angiographic skills and typically takes 30-45 minutes to complete, including both vena cavograms, if cine or digital-subtraction imaging is used.

The femoral and jugular delivery systems are identical, except that the jugular catheter system is longer and its filter is preloaded for a feet-first delivery from above. After a jugular delivery, follow-up venography can be performed through the same catheter by means of a retrograde injection of contrast medium just above the filter.

*Follow-up.* — The initial and follow-up examinations were directed toward the detection of complications at the venipuncture site, such as venous thrombosis and hemorrhage, and at the filter site, including filter migration, penetration or perforation of the vena cava wall, misplacement, filter tilting, or crossing of the filter legs. Possible recurrent pulmonary embolism and systemic effects of the nitinol material were also evaluated with clinical and laboratory methods. In addition, partial or complete occlusion of the filter due to trapped emboli, an anticipated sequela of filter placement, was also diagnosed clinically or by means of noninvasive imaging, including magnetic resonance (MR) imaging.



Figure 1.   The SNF is shown in its extended form for passage through a 9-F catheter (top) and in its fully expanded form viewed from the end (left) and from the side (right).

Protocol requirements included clinical history and physical examination, documentation of the placement procedure, and plain radiography of the filter shortly after placement and again at 3 and 6 months. Optional studies included ultrasound (US) imaging of the puncture site and filter region, computed tomography (CT), MR imaging, or digital-subtraction angiography. Chest radiography and ventilation/perfusion lung scanning were also optional studies. Vena cavography enhanced with contrast material was performed only when clinically indicated. The clinical examination at 3 and 6 months included history, physical examination of the puncture site and lower limbs, plain radiography of the filter region, and laboratory tests of blood and urine for liver and kidney function and blood clotting. Autopsy examination of the vena cava and filter of patients who died during the course of the 6-month study or later, due to any cause, was encouraged but was not a protocol requirement.

The study protocol requires that major complications at all centers be reported immediately to the study monitors. These included filter migrations, recurrent pulmonary embolism, IVC occlusions, and filter-related deaths.

No follow-up medications or other therapies were prescribed. The use or withholding of anticoagulant or thrombolytic therapy at the time of filter placement or subsequently was based purely on clinical considerations and was not influenced by the protocol.

## RESULTS

The trial is now in progress and data are incomplete; thus, only limited trends can be reported. Of the 103 patients at all 17 centers, there were no filter migrations and no deaths related to the filter (Table 1). There was one unconfirmed case of symptomatic recurrent pulmonary embolism, and two patients had confirmed asymptomatic pulmonary embolism. There were seven cases of confirmed symptomatic IVC occlusion and two possible IVC occlusions detected on the basis of clinical findings only.

Of the 44 patients studied in Boston, 10 have undergone a 3-month

### Table 1
Summary of Preliminary Results of SNF Placement in 103 Patients at 17 Centers

| Results | No. of Patients |
|---|---|
| Migrations | |
| Cranial | 0 |
| Caudal | 0 |
| Recurrent pulmonary embolism | |
| Symptomatic | 0 (1) |
| Asymptomatic | 2 |
| IVC occlusion | |
| Symptomatic | 7 (2) |
| Asymptomatic | 0 |
| Deaths related to filter | 0 |

Note.—Numbers in parentheses represent additional patients with clinically suspected findings only.

### Table 2
Summary of Preliminary Results of SNF Placement in 44 Patients

| Results | No. of Patients |
|---|---|
| Periprocedure complications | |
| Entry site thrombus | 3 |
| Hemorrhage | 0 |
| Failure to introduce | 0 |
| Filter misplacement | 0 |
| Leg penetration | 0 |
| Perforation | 0 |
| Tilting of dome | 24 |
| Spindle formation† | 1 |
| Leg crossing‡ | 4 (2) |
| IVC patency | |
| Patent with thrombus | 3 |
| Occlusion (symptomatic) | 3 (2) (7-11) |
| Occlusion (asymptomatic) | 3 (7) |
| Recurrent pulmonary embolism | |
| Symptomatic | 0 (1) |
| Asymptomatic | 2 |
| Death | |
| Related to filter | 0 |
| Unrelated to filter | 7 |

Note.—Numbers in parentheses represent patients with clinically suspected findings only; numbers in brackets are penetrations.
* Dome tilting of up to 30° denotes normal adaptation to a small IVC lumen. It does not affect filtering efficiency, since the dome hole sizes are unaffected.
† Spindle formation is an intermediate stage of dome recovery that may occur in very small vena cavas.
‡ Leg crossing occurred in the first four patients due to a pusher wire problem that has been corrected.

follow-up and four have completed a 6-month follow-up (Table 2). Initial abdominal radiographs of the filter were obtained in all 44 patients; seven underwent abdominal radiography at 3 months, and four at 6 months. Ultrasound studies of the puncture sites were performed in 18 patients soon after placement, five at 3 months and two at 6 months. US studies of the IVC and filter region proved technically difficult due to wide variations in build and bowel contents in individual patients but

were attempted in nine patients in the early period after placement, in five patients at 3 months, and in two at 6 months. CT was performed in three patients. Twenty-five MR imaging examinations with nongated T1-weighted sequences or a new fast gradient-echo sequence were performed in 21 patients. MR imaging appears to be a promising noninvasive method for determining the patency of the vena cava and for documenting thrombi captured in the filter or complete occlusion of the vena cava (6). In seven patients, follow-up was only by telephone interview of the referring physician or patient. One patient refused all follow-up examinations.

Seven patients died of causes unrelated to the filter placement during the trial period. None of these patients died of pulmonary embolism. One autopsy study was obtained during the study period and showed no thrombus in the filter. A second autopsy was performed on a patient after the 6-month study period and showed an organized thrombus attached to the legs—a result that confirmed findings of an earlier follow-up MR imaging study—as well as a more recent thrombus captured in the filter dome.

Forty-one filters were delivered by the femoral route, 29 on the right and 12 on the left, and three were delivered by the jugular route, two on the right, and one via the left external jugular vein. The filter-placement procedure was well tolerated by all 44 patients. There were no failures of introduction. Some early problems with material caused difficulty in starting the filter movement out of the storage tube, and some leg crossing resulted in the first four patients, without clinical effect. These early problems were resolved by minor design changes of the feeder system. There was no clinical evidence of hematoma formation at the venous puncture site. Five of the 18 patients studied with US in the days following the procedure showed some local thrombosis. Three patients were symptomatic. This finding could represent local thrombus formation due to intimal injury, thrombus peeled off of the catheter surface during catheter withdrawal, or new development of venous thrombosis in patients not receiving anticoagulant therapy. Femoral thrombus was noted subsequently in one patient who developed disseminated vascular coagulation. No arteriovenous fistula formation or air embolism occurred.

The filter tip was properly positioned within 3 cm of the lowest renal vein in all patients, except three in whom it was delivered slightly lower than planned due to early operator inexperience. In two cases, the dome appeared to engage the inferior edge of the lowest renal vein without affecting renal venous return. It should be noted that in large venae cavae, the tip of the filter normally descends about 2 cm during dome formation as the catheter is being withdrawn. It is possible to readvance the filter upward to its optimal position before the legs are released, but this is not recommended because of the risk of damage to the venous endothelium. In smaller venae cavae, the filter dome commonly assumed a slightly tilted position.

Penetration of the vena cava wall by the filter legs did not occur. There was no clinical evidence of retroperitoneal hemorrhage, nor was any seen in patients followed up with MR imaging or CT. There were no instances of either cranial or caudal filter migration. The device appears to secure itself well.

## DISCUSSION

It is now widely accepted that vena cava filters have become the method of choice for the prevention of pulmonary embolism for patients who cannot be given anticoagulant or thrombolytic drugs or in whom such drugs have failed (7). In the United States, the only device currently available for clinical use is the Greenfield filter (8). At the time of its introduction in 1973, placement of the Greenfield filter required surgical venotomy of the jugular or femoral vein in order to insert the large metal delivery capsule that houses the folded filter. In recent years, percutaneous insertion of the Greenfield filter has been performed with increasing frequency. However, this requires dilation of the venipuncture track to accommodate a 29-F (measured outside diameter) introduction sheath, about 9.6 mm in outside diameter (9). Questions have been raised about the mechanical efficacy of the Greenfield filter, which has been shown to allow the passage of large emboli once its apex has been filled with clot, a condition resulting in recurrent pulmonary embolism (10). Other problems included tilting, misplacement, caudal or cranial migration, perforation, and fracture of the Greenfield filter, and thrombosis at the entry site (11,12). IVC occlusion is reported to occur in about 5% of patients (13).

For these reasons, a number of investigators have attempted to develop im-

proved filter devices that are easier to insert, have lower complication rates, and produce a more effective mechanical filtering action. The SNF is one of these. Others include the bird's-nest filter, the Amplatz filter, and the Gunther filter (14–16). The SNF is distinguished by its ease of insertion and mechanical effectiveness. The device is preloaded to eliminate handling of the filter device, and the delivery system is preassembled. The delivery is accomplished through a 9-F (3-mm outside diameter) angiographic catheter; thus, local complications at the puncture site are minimized. The clinical trial is limited to a femoral or jugular vein approach on either side, but access to the central venous system may eventually be gained via a number of alternative peripheral veins. The external jugular vein has been used in one patient. The only special requirement is the infusion of a cold saline solution during the brief passage of the filter through the catheter.

During the clinical trial, a number of new observations and insights have emerged about the filter placement and the capture of emboli en route to the lungs. These relate to tenting of the vena cava wall, tilting of the dome, and occlusion of the filter by thrombus.

Local tenting of the vena cava wall due to pressure by the rim of the filter dome was observed frequently, particularly in smaller venae cavae, but appeared to have no significant hemodynamic impact or ill effect. The tented portion fills in within a few months due to development of a slightly thicker neointima at the points of contact just within the outer rim so that the rim may appear to lie just outside the main column of contrast medium on follow-up venograms. Similarly, though rarely, the distal end of a filter leg may appear to lie alongside the lumen. Earlier animal experiments have documented that this effect is due to a longitudinal crease formed by the legs in the vena cava wall and covered with endothelium. The leg ends had not penetrated the vena cava wall.

The dome of the filter frequently was observed to be tilted about 20°–25° toward the wall of the vein, particularly in small venae cavae (Fig 2). This result is due to the dome geometry, which is more easily accommodated in a confined space if the dome is slightly inclined rather than perfectly transverse. However, such sloping does not impair the filtering efficiency of the filter because the size of the openings in the dome remain unchanged. Fewer openings of a given size are required to subdivide a smaller IVC cross section. This contrasts with the Greenfield filter, in which tilting enlarges the size of the openings between some of the legs and

COOKFOIA 000100

thus reduces the mechanical efficiency of the device, an effect well documented in in vitro studies (17). Portions of the dome loops or legs that are in contact with the wall of the vena cava become covered by a neointimal layer within 2 weeks (3).

Traditionally, occlusion of a vena cava filter has been regarded as a serious complication. However, the SNF is designed to trap emboli in the IVC in order to prevent them from reaching the lungs. We would therefore argue that filter occlusion should be considered an unfortunate but expected event in a small but significant percentage of the patients in our study. Occlusion is certainly preferable to pulmonary embolism, the potentially fatal alternative. Partial or complete occlusion may be associated with obstructive symptoms of variable severity, depending on the size of the emboli, the completeness of obstruction, and the state of the collateral venous return. The symptoms are usually transient, with recovery in weeks or months as lysis and recanalization of the IVC or enlargement of collateral vessels occur. We believe that the frequency of occlusion thus primarily reflects the recurrence rate of pulmonary embolism and the size of the emboli in a given patient population rather than any defect of filter design or performance.

The frequency of recurrent pulmonary embolism in patients such as ours who cannot receive anticoagulant treatment, and thus the potential clot capture rate of the filter, is difficult to determine and can be estimated only indirectly. Before the use of anticoagulants, mortality due to pulmonary embolism was reported to be about 30% (18), while the current mortality in patients treated with anticoagulant therapy is only 8% (19). This difference of 22% thus represents the probable fatal recurrence rate of pulmonary embolism when anticoagulants are not used. Since less than one-third of significant pulmonary emboli are lethal, there must be at least three times this number of clinically significant recurrent emboli, or more than 66%. It seems clear that once a patient has had a single episode of embolism and remains untreated with anticoagulants, the probability of a recurrence is very high. This is supported by autopsy studies of pulmonary embolism (20, 21) and a clinical study of the Gunther filter with contrast material–enhanced CT, which showed thrombi in 39% of the filters studied at an arbitrary point of time in the follow-up period (22).

Clinical reports of patients with filters in place indicate that 5%–10% experience symptoms and signs of IVC occlusion (22). In view of the estimated high embolism recurrence rate, it



**Figure 2.** Radiographs of filter dome in a central position (a) and in a tilted position commonly assumed in smaller venae cavae (b).

seems that some large single emboli or several smaller emboli can be massive enough to cause a symptomatic occlusion when captured in the filter. Furthermore, since improved imaging methods indicate that complete occlusion may occur without symptoms if good venous collaterals exist, the total number of complete occlusions is probably higher than previously reported. In the BIH/MGH series, five of the 44 patients (11%) had lower-limb swelling. MR imaging showed filling defects in the filters in three patients, which could represent captured emboli. Three of 44 patients (7%) showed complete occlusion (Table 2). In addition, two patients had clinical findings that may have been due to IVC occlusion, but this result was not confirmed with imaging studies. The symptomatic occlusion rate in the BIH/MGH series is thus 7%–11% (three plus a possible two of 44 patients), and the overall symptomatic occlusion rate is 7%–9% (seven plus a possible two of 103 patients) in all 17 participating centers, findings comparable to those previously reported by other investigators. Another three completely asymptomatic patients also showed complete occlusion, which would not have been detected without a routine MR imaging follow-up study. To our knowledge, this is the first clinical study in which it has been possible to use noninvasive MR imaging to assess the presence of thrombus in a vena cava filter, since the SNF is nonferromagnetic (23). This suggests that the true total occlusion rate for other IVC filters may be greater than previously reported without MR imaging.

Partial or complete filter occlusion may cause various transient but nonlethal clinical problems. Small emboli, generally asymptomatic or associated with mild leg swelling, can be recog-

nized as filling defects when imaged with contrast material–enhanced CT, digital-subtraction angiography, or vena cavography or with MR imaging or duplex US. Recovery occurs within days or weeks. In contrast, a large embolus or cluster of small emboli that cause complete occlusion of the vena cava with total absence of flow on MR or US images. A complete occlusion may also be asymptomatic if adequate collateral veins exist. Generally, collateral veins are multiple and small and will not allow passage of emboli. Occasionally, one or two collateral veins may be large. This large size could explain recurrent pulmonary embolism (24). However, if the collateral veins are compromised, there may be severe lower-limb swelling that can persist for weeks or months (25,26). MR images showed that three of our patients with no symptoms had complete occlusion. Five patients had clinical signs of occlusion that were confirmed in three with MR imaging. It is of interest that five of the eight patients with complete occlusion were neurosurgical patients. Such patients tend to be more prone to develop extensive venous thrombosis with obstruction of the collateral venous pathways (27).

Thus, it is likely that the rate of filter occlusion reflects the prevalence of recurrent embolism in the various populations of patients who receive the filters. Symptomatic occlusions at a rate of 5%–10% have been reported in various other studies of filters (22). We believe these occlusions do not indicate filter failure and thus cannot be used to compare filter efficiency. In fact, too low an occlusion rate should raise questions of patient selection or, perhaps, of significant clots being allowed to pass through the filter. These emboli may be missed clinically, and routine fol-

low-up ventilation/perfusion radionuclide studies are rarely used (28). Even deaths due to pulmonary embolism may be ascribed to the known underlying cardiac disease or malignancy, as autopsies are performed in only a small percentage of fatalities in hospitals.

The possibility of local thrombosis occurring on the filter itself as a reaction to a metallic device in the bloodstream is difficult to rule out with certainty. This would be difficult or impossible to distinguish from captured emboli from the veins of the lower limb or even from the catheter surface during withdrawal. The nitinol material of the SNF has been shown to have low thrombogenicity in animal experiments (2). Furthermore, since the majority of SNFs in humans remain clotfree, inherent thrombogenicity of the nitinol wire seems unlikely. In this population of patients with SNFs and without anticoagulation treatment, the high probability of recurrent embolism remains the most likely cause of filter occlusion.

All attempts to insert the filter were successful. There was no filter migration or significant malplacement. Only one filter dome failed to form completely in an extremely small vena cava, and its intermediate spindle shape was considered satisfactory. Crossing of the filter legs was extremely rare after an initial problem with the pusher wire was corrected. Some thrombus developing at the venipuncture site within a week of the procedure could represent venipuncture trauma, coincidental venous thrombosis, or stripping of the thrombus layer from the surface of the small-bore delivery catheter during withdrawal (29). The rate of recurrent pulmonary embolism was very low. Pulmonary embolism was suspected in one of 103 patients on the basis of clinical findings and a change in the pattern of abnormal findings on ventilation/perfusion scans. Another patient was asymptomatic, but new perfusion defects were observed on a routine follow-up perfusion scan at 2 weeks. A vena cavogram demonstrated a thin thrombus extending above the filter from clot contained within it. No deaths were attributable to recurrent pulmonary embolism or any complication of filter placement.

In conclusion, our initial experience with the SNF is encouraging. The procedure for percutaneous filter insertion is simple, quick, and relatively free of significant complications at the venipuncture site due to the small size of

the introducer catheter. The operator never handles the filter, and the delivery system requires no assembly. The only special requirement is the infusion of cold saline while the filter is being advanced through the catheter.

Partial or complete vena cava occlusion, which may be symptomatic or asymptomatic, is regarded by the authors as an expected effect of successful trapping of thromboemboli in the filter. In the larger series of 103 patients, symptomatic occlusion occurred in 7%–9%, a finding comparable to those in published series of other filters. All patients showed marked clinical improvement over a period of weeks or months. The use of MR imaging permits noninvasive demonstration of thromboemboli in the filter. In our detailed BIH/MGH series, we demonstrated filling defects or occlusions in 25%–29% (11 plus a possible two of 44) of patients, comparable to 39% in a contrast material-enhanced CT study of another filter.

A more detailed and complete report of the results of the clinical trial of the SNF is planned when the study is completed in 1969.

## ADDENDUM

Since this article was submitted, one migration of a SNF has occurred and will be included in a future report.

The bird's nest filter (Cook, Bloomington, Ind) has been recommended for clinical approval by an FDA panel since this article was submitted.

Acknowledgments: We are indebted to the many unnamed investigators currently participating in the clinical trial of the SNF at numerous centers in the United States. Their interest and dedication in the exploration of new interventional development and in the pursuit of the demanding protocol necessary to obtain meaningful data have been remarkable. We thank Ann Maloney, RT, Beth Israel Hospital, and Joseph Dehovedos, RT, Massachusetts General Hospital, and their staff for technical assistance, and Claire Martinez, BA, for manuscript preparation.

## References

1. Simon M, Kaplow R, Salzman E, Freiman D. A vena cava filter using thermal-shape memory alloy: experimental aspects. Radiology 1977; 125:87–94.
2. Palestrant AM, Prince MR, Simon M. Comparative in vitro evaluation of the nitinol inferior vena cava filter. Radiology 1982; 145:351–355.
3. Prince MR, Salzman EW, Schoen FJ, Palestrant AM, Simon M. Local intravascular effects of the nitinol wire blood clot filter. Invest Radiol 1988; 23:294–300.
4. Rabkin IK, Zalmovskii VA, Khmelevskaia II, Maksimovich IV, Rabkin DI, Khusenov BP. Experimental basis and first clinical trial of x-ray intravascular blood vessel prosthesis. Vestn Rentgenol Radiol 1984; 4:59–64.
5. Greenfield LJ. Current indications for and results of Greenfield filter placement. J Vasc Surg 1984; 1:377–382.
6. Laub GA, Kaiser WA. MR angiography with gradient motion refocusing. J Comput Assist Tomogr 1988; 12:377–382.
7. Denny DF Jr, Dorfman GS, Gronan JJ, Greenwood LH, Morse SS, Yoselevitz M. Greenfield filter: percutaneous placement in 50 patients. AJR 1988; 150:427–429.
8. Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. A new intracaval filter permitting continued flow and resolution of emboli. Surgery 1973; 73:599–606.
9. Roehm JOF, Gianturco C, Barth MH, Wright KC. Percutaneous transcatheter filter for the inferior vena cava: new device for treatment of thromboembolic disease. Radiology 1984; 150:255–257.
10. Bountis K, Velebit V, Barilla J, Schmidt P, et al. Recurrent fatal pulmonary embolism despite inferior vena cava interruption with the Greenfield filter. [journal]
11. Greenfield LJ, Michna BA, Tauscher JR. Complications and failures of venous interruption. Arch Surg 1987; 122:183–188.
12. Kaiser A, Clure S, Gordon DH, Sclafani SJ. Percutaneous placement of the titanium Greenfield filter. AJR 1988; 150:325.
13. Greenfield LJ, Peyton R, Crute S, Barnes R. Greenfield vena cava filter experience. Arch Surg 1981; 116:1451–1456.
14. Roehm JOF, Johnsrude IS, Barth MH, Gianturco C. The bird's nest inferior vena cava filter: progress report. Radiology 1988; 168:745–749.
15. Dorfman GS, Hunter DW, Lund GB, Cardella JF. Amplatz retrievable vena cava filter. Semin Interventional Radiol 1986; 3:214–219.
16. Gunther RW, Schild H, Fries A, Storkel S. Vena caval filter to prevent pulmonary embolism: experimental study. Radiology 1985; 156:315–320.
17. Kanematsu AA, Wallman AC, Delichatsios MA, Athanasoulis CA. Inferior vena cava filters in the comparative interruption and flow dynamics. Radiology 1988; 166:361–366.
18. Barton DW, Jordan RL. Anticoagulant drugs in treatment of pulmonary embolism: prophylactic value. Lancet 1960; 1:1309–1312.
19. Urokinase pulmonary embolism trial: a national cooperative study. Circulation 1973; 47(suppl 2):1–108.
20. Freiman DG, Suyemoto J, Wessler S. Frequency of pulmonary thromboembolism in man. N Engl J Med 1965; 272:1278–1280.
21. Smith GT, Dammin GJ, Dexter L. Postmortem arteriographic studies of the human lung in pulmonary embolization. JAMA 1964; 188:143–151.
22. Pobee F, Johnson B, Korth R, et al. Gunther vena caval filter: results of long-term follow-up. AJR 1988; 151:1031–1034.
23. Tadavarthy SM, Oerez HV, Vlahaki S, et al. Low-artifact intravascular device: MR imaging evaluation. Radiology 1988; 168:713–719.
24. Ferris EJ, Vlahaki SP, Byrne JJ, Nabseth DC, Shapiro JH. The inferior vena cava after ligation and plication. Radiology 1967; 89:1–10.
25. Kakkar VV. The problems of thrombosis in the deep veins of the leg. Ann R Coll Surg Engl 1969; 45:257–276.
26. Mahorner H, Castleberry JW, Coleman WO. Attempts to restore function in major veins which are the site of massive thrombosis. Ann Surg 1957; 146:510–522.
27. Swann KW, Black PM. Deep vein thrombosis and pulmonary emboli in neurosurgical patients: a review. J Neurosurg 1984; 61:1–10.
28. Sharma GVRK, Tow DE, Parisi AF, Sasahara. AA. Diagnosis of pulmonary embolism. Ann Rev Med 1977; 28:159–169.
29. Sieglman SS, Caplan LH, Annes GP. Complications of catheter angiography: study with oscillometry and "pullout" angiograms. Radiology 1968; 91:251–253.

# Vena Tech Vena Cava Filter: Experience and Early Follow-up[1]

Frank C. Taylor, MD
Mark H. Awh, MD
Charles E. Kahn, Jr., MD
Chien-Tai Lu, MD

Index terms:   Embolism, pulmonary, 60.72 • Venae cavae, filters, 982.1299 • Venae cavae, thrombosis, 982.442

JVIR 1991; 2:435–440

Abbreviations:  IVC = inferior vena cava, LGM = LG-Medical, SGF = stainless steel Greenfield filter

Vena caval filters, such as the Vena Tech filter, that employ low-profile introducer systems have provided physicians with a variety of options for percutaneous placement. From April 1989 to April 1990, 81 patients underwent percutaneous placement of the Vena Tech filter at the authors' institution. Follow-up has been obtained to evaluate the filter with regard to the prevention of pulmonary embolism, the maintenance of caval patency, and mechanical stability. Two cases of pulmonary embolism have been seen following filter placement. Three cases of caval thrombosis have occurred, with recanalization of the cava seen in two of these cases. There have been one broken filter and one case of incomplete filter opening. Limited filter tilting and migration have occurred, though in no case has filter tilt or migration been clinically significant. This experience with the Vena Tech filter suggests that it is safe and effective for the prevention of pulmonary embolism.

Percutaneous placement of inferior vena caval (IVC) filters has gained popularity as an acceptable alternative to anticoagulation for the prevention of pulmonary embolism. The stainless steel Greenfield filter (SGF) (Medi-tech/Boston Scientific, Watertown, Mass), which has been in use for a number of years, has proved both safe and effective in preventing pulmonary embolism while maintaining caval patency in a high percentage of patients (1–3). Some authors have concluded that in some patients with deep venous thrombosis and/or pulmonary embolism, filter insertion may be a better primary treatment than anticoagulation (4). Reported complications with the SGF have included tilting and migration of the filter and, very rarely, mechanical disruption (5–7). Complications associated with percutaneous SGF filter placement include bleeding, hematoma, and venous thrombosis at the insertion site (7–11). These complications may be partly attributable to the large introducer sheath needed to accompany the SGF filter delivery system. Newer filtering devices have

narrower profile introducer systems that are intended to reduce complications and simplify the percutaneous approach while providing adequate filtration (12). We report our initial experience with one of these lower-profile filter systems, the Vena Tech filter (B Braun/Vena Tech, Evanston, Ill), known in Europe as the LGM filter (Celsa LG-Medical, Chasseneuil, France).

## PATIENTS AND METHODS

The Vena Tech filter is a cone-shaped filtering device (Fig 1). The six-legged filter cone is stamped from a nonmagnetic, biocompatible metal known as Phynox (Imphy SA, Imphy, France) (cobalt 42%, chromium 21.5%, iron 8.85%, nickel 18%, molybdenum 7.5%, magnesium 2%, and a maximum of carbon 0.15%, beryllium 0.001%). Welded to each limb of the filter cone is a straight, stabilizing side rail. On each side rail there is a small upward-pointing barb; these barbed side rails are intended to properly align and fix the filter within

[1] From the Department of Radiology, University of Chicago, Chicago. From the 1990 RSNA scientific assembly. Received May 3, 1991; revision requested June 6; revision received June 27; accepted July 3. Address reprint requests to F.C.T., Department of Radiology, Loma Linda University Medical Center, 11234 Anderson St, PO Box 2000, Loma Linda, CA 92354.

<sup>c</sup> SCVIR, 1991

See also the article by Millward et al (429–433) and the editorial by Greenfield (425–426) in this issue.

435

436 • Journal of Vascular and Interventional Radiology

November 1991

the cava. There are slight differences between the femoral and jugular Vena Tech filters. The side rails on the femoral filter are shorter to facilitate passage of the unopened filter through the 12-F (outer diameter) introducer sheath (Fig 1). The technique of filter placement has been well described previously (13).

Whenever possible, we place the Vena Tech filter via the right common femoral vein. Heparin administration is discontinued prior to the procedure. After the vein is punctured, contrast material is injected to check for femoral vein thrombosis. Routinely, a single-plane anteroposterior inferior vena cavogram was obtained to (a) determine the presence and location of thrombus in the IVC, (b) identify any venous anomalies, (c) identify the level of the renal veins, and (d) determine the diameter of the IVC. The recommended limit of IVC diameter for the Vena Tech filter is 28 mm. When the left femoral vein approach was undertaken, an extra-stiff guide wire (Amplatz Super Stiff; Medi-tech/Boston Scientific) was used to facilitate the advancement of the delivery catheter into the IVC.

The filter's positional stability was evaluated on a radiograph obtained immediately after placement. This image was compared with the inferior vena cavogram and fluoroscopic observations recorded on videotape. Mechanical stability and long-term positional stability were evaluated by comparing follow-up radiographs with the original postplacement radiograph. The vena cavogram and follow-up radiographs were all obtained in the anteroposterior projection on similar equipment with a 40-inch film-focal distance. Measurements were corrected for an estimated 20% magnification. Patency of the IVC was evaluated with duplex sonography, computed tomography (CT), or venography. Direct patient interviews were conducted and medical records were reviewed to detect any evidence of pulmonary embolism or IVC thrombosis.

Vena Tech filters were placed in 81 consecutive patients between April 21, 1989, and April 26, 1990. The patients' ages ranged from 17 to 88 years, with a mean age of 57 years; 28 were male and 53 were female. Patients with pulmonary embolism diagnosed by means of angiography (19 patients), high-probability ventilation-perfusion imaging (17 patients), or both (six patients), were the largest group in whom filters were placed. Three of these patients were found to have an SGF straddling the right renal vein and the IVC at presentation. The presence of deep venous thrombosis or caval thrombus led to filter placement in another 20 patients. The filter was placed prophylactically in 17 patients in whom there was a high clinical suspicion of pulmonary embolism, but this was not confirmed with high-probability ventilation-perfusion scanning, and pulmonary angiography was not performed. The filter was placed prophylactically in two additional patients with fractures who were considered at risk for developing deep venous thrombosis and subsequent pulmonary embolism and in whom anticoagulation was contraindicated.

## RESULTS

### • Placement

Sixty-four filters were placed via the right common femoral vein. Fourteen filters were placed via the left common femoral vein, and three were placed via the right internal jugular vein. Three were placed suprarenally because of thrombus located within the infrarenal cava. In one patient the filter was prematurely released into the right iliac vein by an inexperienced operator. There were no clinically apparent complications related to percutaneous access in any of the patients.

One of the three filters delivered via the jugular vein did not open completely. In this case the cephalic points of the stabilizing side rails appeared to have engaged the caval wall, with the base of the filter cone failing to open. The filter base was



**Figure 1.** The jugular Vena Tech filter is pictured on the left. It differs from the femoral filter (right) in the length of the stabilizing side rails. The dimensions of the filter cones are identical.

not placed within clot, and there were no apparent errors in filter deployment technique (Fig 2). Serial radiographs confirmed that the filter remained unopened for 4 days until the patient was discharged. Further follow-up regarding the position of the filter was not available.

### • Positional Stability

Alignment of the filter immediately after placement was satisfactory in 77 of 81 patients (95%). At the time of placement, the filter was tilted in four patients; tilt ranged from 9° to 14°, with a mean of 11.3°. In one of these patients, the filter also migrated cephalad approximately 17 mm immediately after deployment. This cephalic migration may have been aggravated by the patient coughing during the filter deployment. The transverse diameter of this patient's IVC was 28 mm, the upper limit recommended for the filter. The position remained unchanged, as seen on abdominal radiographs obtained daily for 4 days, at which time the patient was discharged. In the remaining patients, no other cephalic or caudal migration occurred at the time of placement.

We were able to assess filter position at follow-up in 46 patients. The follow-up interval ranged from 5 to 568 days, with a mean of 241 days. A

COOKFOIA 000104

Taylor et al • 437

Volume 2   Number 4



**Figure 2.** Radiograph demonstrates completely opened Vena Tech filter delivered via the jugular method.

total of five filters were tilted from 7° to 15°, with a mean tilt of 10.6° seen at follow-up. No filter tilt greater than 15° was seen. The filter migrated caudad in 16 patients (36%) over a range of 3.3–22.5 mm, with a mean of 9.5 mm. Of these, six migrated caudad 10 mm or more. The patient in whom there was caudal migration of 22.5 mm was the same patient described previously in whom cephalic migration occurred immediately after deployment (4.8 days follow-up). Cephalic migration of the filter occurred in two patients (8 and _ mm). At follow-up, tilting and migration were seen together in three patients. One of the filters, which was tilted approximately 15°, was also broken at its apex.

• **Mechanical Stability**

In a single patient, a follow-up radiograph obtained 10 months after filter placement demonstrated a fracture and separation of the filter at its apex. This occurred in a patient in whom the filter was placed in a suprarenal position (14).

• **Pulmonary Embolism**

Follow-up regarding pulmonary embolism was obtained by means of chart review, letters to referring physicians, and direct patient interviews. This information was available in 53

patients over a range of 5–568 days. The mean follow-up time was 241 days. Two patients (3.8%) had pulmonary emboli diagnosed during the follow-up interval. In one of these patients, a small pulmonary embolus was found at autopsy 37 days after filter placement. The cause of death in this patient was reported as right heart failure secondary to pulmonary hypertension and pulmonary fibrosis. In a second patient, recurrent pulmonary embolism was diagnosed by means of high-probability ventilation-perfusion imaging 19 days after filter placement. There were new defects on the ventilation-perfusion scan when compared with the initial study. During the follow-up period, low-probability ventilation-perfusion scans were returned for six patients. An intermediate-probability scan was reported in a patient with sickle cell anemia in whom pulmonary infarct was considered equally likely. The overall clinical impression for this patient was that she did not have a pulmonary embolus. No repeat pulmonary angiograms were obtained. Clinical follow-up and patient interviews did not suggest symptomatic pulmonary embolism in another 44 patients.

• **IVC Patency**

Information regarding IVC patency was available for 39 patients, with a follow-up period ranging from 35 to 568 days (mean, 283 days). A patent IVC was diagnosed in 25 patients with duplex ultrasound (US), in three patients with CT, and in two patients with inferior vena cavography. The IVC was patent in six other patients as determined by means of clinical history alone.

Thrombosis of the IVC occurred in three patients (8%). In one, a CT examination showed thrombosis of the infrarenal IVC, both iliac veins, femoral veins, and the portal and superior mesenteric veins. In two of the patients, IVC thrombosis was suspected from a clinical history of bilateral lower extremity edema. In all three patients, follow-up radiographs demonstrated a decreased filter span, giv-

ing the filter a "collapsed" appearance. At follow-up (156, 179, and 266 days), these patients were asymptomatic. Duplex sonography demonstrated an occluded IVC in one patient and a small IVC with flow in the other two. In one of these two patients with flow seen at duplex sonography, a repeat cavogram demonstrated a recanalizing IVC and the partially collapsed Vena Tech filter (Fig 3).

## DISCUSSION

The most important feature of any IVC filter is its ability to prevent pulmonary embolism. Maintenance of caval patency, mechanical and positional stability of the filter, minimal complications associated with its percutaneous insertion, and ease of insertion are also important features when selecting this type of device.

In a previous European multicenter study, a 13% migration rate was reported with the Vena Tech/LGM filter (13). Filter migration in that study was described as movement of more than 20 mm from the site of initial placement. In our follow-up group of patients, only one filter migrated more than 20 mm (2.2%). A total of six filters (13%) migrated more than 10 mm. Radiographic beam parallax and changes due to respirations may account for some small changes in filter position seen at follow-up (1,15). Studies with other filters have shown that the points of contact of the filter to the caval wall become firmly attached due to reendothelialization of the lumen over a matter of weeks (16,17). This attachment of the filter to the IVC wall should limit the possibility of migration to the short term following filter placement.

It has been reported that the filtration ability of conical devices such as the SGF filter and the Vena Tech filter is affected by tilting. In vitro studies suggest that a filter tilting greater than 15° is less effective at trapping clots (18,19). An in vivo study (3) and a long-term clinical follow-up study

438 • Journal of Vascular and Interventional Radiology

November 1991



Figure 3. Immediate postplacement anteroposterior radiograph (a) demonstrates satisfactory filter position in a patient who subsequently presented with a history and clinical findings consistent with IVC thrombosis approximately 6 weeks after filter placement. The follow-up radiograph (b) and vena cavogram (c) obtained 3 months following filter placement shows markedly decreased filter span and a recanalized IVC.

(20) suggest that tilting may not significantly decrease SGF clot-trapping ability. Nevertheless, one study of the SGF showed tilting greater than 15° in 12% of cases (1). In the aforementioned study of the Vena Tech/LGM filter, tilting greater than 15° was seen in 8% (13). In our experience, no filter was tilted more than 15° although four filters, or approximately 9%, were tilted at angles between 10° and 15°.

One of the tilted filters, as mentioned before, was also fractured at its apex. This filter was placed in a suprarenal location, and we have postulated that the repetitive, minute changes in caval diameter due to respirations and right heart contractions caused breakage due to metal fatigue at the filter apex (14,21). A decrease in filter span has been reported as a sign of caval thrombosis with the Greenfield filter (5,6,22). This decrease in filter span, which is most likely related to clot retraction, has also been observed in our experience with the Vena Tech filter.

Duplex US has proved useful as a means to noninvasively follow-up caval patency (23,24). In the three patients with symptoms and radiographs demonstrating decreased filter span, duplex sonography demonstrated flow within a recanalized IVC in two patients. We were able to see flow through the IVC, above and below the filter, and in both iliac veins in a majority of the follow-up cases. In only a few cases, however, were we able to actually image inside the filter (Fig 4). Transabdominal sonography is probably inadequate to consistently evaluate for the presence of a thrombus trapped within the filter (23,24). US imaging of the IVC may be limited by obesity and overlying bowel gas. A caval patency rate of 92% has been reported in the LGM European trial (13). Our caval patency rate is also approximately 92%.

Pulmonary embolism after filter placement has been reported as 2% in the previous multicenter Vena Tech/LGM trial (13). Documented pulmonary embolism following filter placement in our series is similar at 4%. The frequency of recurrent pulmonary embolism as well as caval thrombosis after filter placement in our report may be lower than real, since definitive imaging studies such as follow-up ventilation-perfusion scans, pulmonary angiograms, or inferior vena cavograms were obtained only in clinically symptomatic cases.

Our experience with the Vena Tech filter placed via the jugular approach has been limited, and although we have found only one incompletely opened filter from this approach, other reports (25–27) suggest that the problem of incomplete or nonopening with the present jugular filter design is not uncommon and

COOKFOIA 000106



Figure 4.   US scan of the IVC demonstrates the filter within a patent IVC.

requires further investigation (14,25–28). Should the filter remain unopened, placement of a second filter should be considered. At the present time, and with the current filter design, we would recommend that the jugular approach be used only when the filter cannot be placed from the femoral vein.

In conclusion, we have found the Vena Tech IVC filter delivery system to be relatively simple to use. The placement of the filter from the femoral approach can be performed easily and safely. Our results suggest that the Vena Tech filter is effective in preventing clinically significant pulmonary embolism while maintaining caval patency.

References

1.  Greenfield LJ, Peyton R, Crute S, Barnes R.   Greenfield vena caval filter experience. Arch Surg 1981; 116:1451–1456.
2.  Greenfield LJ.   Current indications for and results of Greenfield filter placement. J Vasc Surg 1984; 1:502–504.
3.  Greenfield LJ, Michna BA.   Twelve-year clinical experience with the Greenfield vena caval filter. Surgery 1988; 104:706–712.
4.  Cohen JR, Tenenbaum N, Citroh M.   Greenfield filter as primary therapy for deep venous thrombosis and/or pulmonary embolism in patients with cancer. Surgery 1991; 109:12–15.
5.  Messmer JM, Greenfield LJ.

Greenfield caval filters: long-term radiologic follow-up study. Radiology 1985; 156:613.
6.  Berland LL, Maddison FE, Bernhard VM.   Radiologic follow-up of vena cava filter devices. AJR 1980; 134:1047–1052.
7.  Ross BS, Simon DC, Hass ML, Van Aman M.   Percutaneous transfemoral placement of the Kimray-Greenfield vena cava filter. Radiology 1987; 165:373–376.
8.  Kantor A, Glanz S, Gordon DH, Selafani SJA.   Percutaneous insertion of the Kimray-Greenfield filter: incidence of femoral vein thrombosis. AJR 1987; 149:1065–1066.
9.  Denny DF Jr, Dorfman GS, Cronan JJ, Greenwood LH, Morse SS, Yoselevitz M.   Greenfield filter: percutaneous placement in 50 patients. AJR 1988; 150:427–429.
10.  Mewissen MW, Erickson SJ, Foley WD, et al.   Thrombosis at venous insertion sites after inferior vena caval filter placement. Radiology 1989; 173:155–157.
11.  Dorfman GS, Cronan JJ, Paolella LP, et al.   Iatrogenic changes at the venotomy site after percutaneous placement of the Greenfield filter. Radiology 1989; 173:159–162.
12.  Hicks ME, Middleton WD, Picus D, Darcy MD, Kleinhoffer MA.   Prevalence of local venous thrombosis after transfemoral placement of a Bird's Nest vena caval filter. JVIR 1990; 1:63–66.
13.  Ricco JB, Crochet D, Sebilotte P, et al.   Percutaneous transvenous caval interruption with the "LGM"

filter: early results of a multicenter trial. Ann Vasc Surg 1988; 3:242–247.
14.  Avni MH, Taylor FC.   CT strut cantilever fracture of a Vena Tech inferior vena caval filter. AJR 1991; 157:177–178.
15.  Greenfield LJ, Cho KJ, Tauscher JR.   Evolution of hook design for fixation of the titanium Greenfield filter. J Vasc Surg 1990; 12:345–353.
16.  Gianturco C, Anderson JH, Wallace S.   A new vena cava filter: experimental animal evaluation. Radiology 1980; 137:835–837.
17.  Teitelbaum GP, McGurrin M, Davies BL, et al.   Insertion and recovery of a new retrievable vena caval filter: work in progress. Radiology 1988; 23:527–533.
18.  Palestrant AM, Prince M, Simon M.   Comparative in vitro evaluation of the nitinol inferior vena cava filter. Invest Radiol 1982; 145:351–355.
19.  Katsamouris AA, Waltman AC, Delichatsios MA, Athanasoulis CA.   Inferior vena cava filters: in vitro comparison of clot trapping and flow dynamics. Radiology 1988; 166:361–366.
20.  Thompson BH, Cragg AH, Smith TP, Barentewski H, Bernhard WH, De Jong SC.   Thrombus-trapping efficiency of the Greenfield filter in vivo. Radiology 1989; 172:979–981.
21.  Kim D, Porter DH, Siegel JB, Simon M.   Perforation of the inferior vena cava with aortic and vertebral perforation by a suprarenal Greenfield filter. Radiology 1989; 172:721–723.
22.  Teitelbaum GP, Jones DL, van Breda A, et al.   Vena caval filter splaying: potential complication of use of the titanium Greenfield filter. Radiology 1989; 173:809–814.
23.  Pasto ME, Kurtz AB, Jarrell BE, et al.   The Kimray-Greenfield filter: evaluation by duplex real-time/pulsed Doppler ultrasound. Radiology 1983; 148:223–226.
24.  Guglielmo FF, Kurtz AB, Wechsler RJ.   Prospective comparison of computed tomography and duplex sonography in the evaluation of recently inserted Kimray-Greenfield filters into the inferior vena cava. Clin Imaging 1990; 14:216–220.
25.  Dorfman GS.   Percutaneous inferior vena caval filters. Radiology 1990; 174:987–992.
26.  Murphy TP, Dorfman GS, Yedlicka JW, et al.   LGM vena cava filter: objective evaluation of early results.

COOKFOIA 000107

# ORIGINAL ARTICLES

From the Southern Association for Vascular Surgery

# Results of a multicenter study of the modified hook–titanium Greenfield filter

Lazar J. Greenfield, MD, Kyung J. Cho, MD, Mary Proctor, BSN, Joseph Bonn, MD, Joseph J. Bookstein, MD, Wilfrido R. Castaneda-Zuniga, MD, Bruce Cutler, MD, Ernest J. Ferris, MD, Frederick Keller, MD, Timothy McCowan, MD, S. Osher Pais, MD, Michael Sobel, MD, Jaime Tisnado, MD, and Arthur C. Waltman, MD, *Ann Arbor, Mich., Philadelphia, Pa., San Diego, Calif., Minneapolis, Minn., Worcester, Mass., Little Rock, Ark., Birmingham, Ala., Baltimore, Md., Richmond, Va., and Boston, Mass.*

Initial efforts to modify the stainless steel Greenfield filter for percutaneous insertion led to development of a titanium Greenfield filter, which could be inserted by use of a 12F carrier. This device functioned well as a filter but had an unacceptable 30% rate of migration, tilting, and penetration. Therefore a titanium Greenfield filter with modified hooks was developed and has been tested in 186 patients at 10 institutions. Successful placement occurred in 181 (97%); placement of the remainder was precluded by unfavorable anatomy. A contraindication to anticoagulation was the most frequent indication for insertion (76%). All but two were inserted percutaneously, predominantly via the right femoral vein (70%). Initial incomplete opening was seen in four patients (2%), which was corrected by guide wire manipulation and asymmetry of the legs in 10 (5.4%). Insertion site hematoma occurred in one patient, and apical penetration of the cava during insertion occurred in a second patient. Both events were without sequelae. Follow-up examinations were performed at 30 days at which time 38 deaths had occurred. Recurrent embolism was suspected in six patients (3%) and two of three deaths were confirmed by autopsy. Filter movement > 9 mm was seen in 13 patients, (11%) and increase in base diameter ≥ 5 mm was seen in 17 patients (14%). CT scanning showed evidence of caval penetration in only one patient (0.8%). Insertion site venous thrombosis was seen in 4/46 (8.7%) patients screened. The modified hook titanium Greenfield filter is inserted percutaneously or operatively through a sheath, eliminating concern for misplacement from premature discharge. The modified hook design has reduced the incidence of migration and caval penetration, but proper orientation of the carrier in the vena cava is necessary to avoid leg asymmetry. No evidence was found of filter occlusion, but longer follow-up is needed to confirm late patency equivalent to the standard Greenfield filter. (J Vasc Surg 1991;14:253-7.)

From the University of Michigan, Ann Arbor (Drs. Greenfield and Cho and Ms. Proctor), Thomas Jefferson Medical College, Philadelphia (Dr. Bonn), University of California, San Diego (Dr. Bookstein), University of Minnesota, Minneapolis (Dr. Castaneda-Zuniga), University of Massachusetts Medical Center, Worcester (Dr. Cutler), University of Arkansas for Medical Sciences, Little Rock (Drs. Ferris and McCowan), University of Alabama Hospital, Birmingham (Dr. Keller), University of Maryland Hospital, Baltimore (Dr. Pais), Medical College of Virginia, Richmond (Drs. Sobel and Tisnado), and Massachusetts General Hospital, Boston (Dr. Waltman)

Presented at the Fifteenth Annual Meeting of the Southern Association for Vascular Surgery, Palm Springs, Calif., Jan. 23-26, 1991.

Reprint requests: Lazar J. Greenfield, MD, Department of Surgery, the University of Michigan Hospitals, 2101 Taubman Center, Box 0346, Ann Arbor, MI 48109.

24/6/31813

Percutaneous insertion of the Greenfield filter in the vena cava for protection against thromboembolism by use of a dilator-sheath technique via the jugular vein was reported in 1984,[1] and subsequently percutaneous insertion from the femoral vein was reported in 1985.[2] However, the necessity for use of a large sheath (26F) to accommodate the carrier for the standard stainless steel filter and for prolonged compression of the vein was associated with a 30% to 41% incidence of insertion site venous thrombosis.[3] To minimize this problem yet retain the advantages of the percutaneous technique, a titanium model of the Greenfield filter was developed, which allowed the carrier system to be reduced to size 12F.[4] A

253

COOKFOIA 000108



Fig. 2. The standard stainless steel Greenfield filter *(left)* is shown for comparison with the modified-hook titanium Greenfield filter *(right)*

Scientific Corporation and reviewed at the University of Michigan (L.J.G.) where the radiographic studies were also subject to additional review (K.C.). Fisher's exact test (two-tail) was used for comparison of complication rates between this series and the previous titanium filter study.

## RESULTS

Filters were placed successfully in 181 of 186 patients (97%) in whom the procedure was attempted. The filter could not be inserted in five patients because of tortuosity of the iliac vein precluding catheter advancement (three cases), scar tissue at the insertion site precluding advancement of the dilator-sheath system (one case), and respiratory arrest in a patient whose jugular access was difficult.

The patients who received filters ranged in age from 17 to 92 years (mean, 58 years). There were 66 female (36%) and 115 male (64%) patients. The most frequent indication for insertion was a contraindication to anticoagulation (75%). Other indications included the presence of a free-floating thrombus (11%), need to discontinue anticoagulation because of a complication (11%), failure of anticoagulation to prevent recurrent embolism (9%), chronic recurrent embolism with pulmonary hypertension (4%), massive embolism requiring vasopressors (2%), and failure of another device to prevent recurrent embolism (2%). Many patients had more than one indication for insertion.

The primary route of insertion was the right femoral vein (129 cases, 70%). Other insertion sites included the right jugular vein in 35 cases (19%), the left femoral vein in 19 cases (10%), and the left jugular vein in 1 case (0.5%). Overall there were 148 femoral insertions (80%) and 36 jugular insertions (20%). Insertion site hematoma occurred in one patient. At the time of discharge of the filter, initial incomplete opening was seen in four cases (2%), but manipulation with a wire or catheter produced complete deployment of the filter limbs in each case. Leg asymmetry thought to be due to positioning of the carrier catheter against one side of the vena cava at the time of discharge was seen in 10 cases (5.4%). In several cases the leg spacing was corrected by catheter manipulation. Misplacement of a filter into a lumbar vein occurred in one case, and penetration of the vena cava occurred during placement in one case when the tip of the filter was pushed outside of the vena cava. No extravasation of contrast medium was noted, and there were no long-term sequelae. Because of the misplacements, additional filters were inserted for a total of 184 filters in 181 patients, with one patient receiving three filters and one patient receiving two filters. One filter was inserted in the superior vena cava (1%) and the remainder in the inferior vena cava: 175 infrarenal (95%) and 8 (4%) suprarenal.

At the time of 30-day follow-up 35 patients had died, for a 19% early mortality rate. Three of the deaths were suspected to be due to recurrent pulmonary embolism, and this was confirmed in two: one patient with thrombus within the filter and probably propagating above it, and one patient whose filter was

COOKFOIA 000109

clear and who had other sources of thromboemboli (clamshell closure of atrial septal defect and thrombosed jugular vein). The third patient died suddenly with known cardiac disease and a rhythm disturbance, and no autopsy was obtained. In addition, three nonfatal recurrent emboli were suspected, one was confirmed by angiogram. Based on the six suspected or confirmed recurrent events, the recurrent embolism rate is 3%.

A total of 123 of 146 (84%) patients who were alive 30 days after placement returned for evaluation. Filter movement over 9 mm was noted in 13 (11%). An increase in base diameter in excess of 5 mm was seen in 17 (14%), with CT scans performed in 13 (11%). On the basis of the CT studies, caval penetration by the filter was suspected in two (1.6%) and confirmed in one (0.8%). No symptoms or physiologic changes could be attributed to these findings. New lower extremity edema was reported in 12 patients (9.7%). In four patients it was in the same leg as the insertion site, but in the remaining patients it was either in the contralateral leg or in patients who had a jugular insertion site. Screening of the insertion sites for venous thrombosis by duplex examination was performed routinely at two sites in 46 patients, and the incidence was 4/46 (8.7%).

## DISCUSSION

Obvious procedural and cost advantages to patients and hospitals exist when percutaneous techniques are used for placement of filter devices to prevent pulmonary thromboembolism. The evolution of both percutaneous interventional techniques and alternative filter devices has resulted in a variety of approaches available to interventional radiologists, cardiologists, and vascular surgeons. Although ease of insertion is an important consideration, the more important factors are the long-term safety and effectiveness of a given device that is implanted permanently.

The concept of a retrievable device has some superficial appeal, but further analysis shows that the logic behind it is faulty. To retrieve a device assumes that one can predict with confidence that the patient will have no further risk of venous thrombosis or embolism. The implication also exists that the device that was inserted has an intrinsic future liability to the patient. Since a device is available that does not carry such liability, it is hard to justify subjecting the patient to an added risk. The Greenfield filter was developed after extensive animal experimentation and inserted initially in 1972.[7] Since then, the patients receiving stainless steel Greenfield filters have

been followed carefully with no evidence of any long-term consequences that could not be attributed to an underlying thrombotic disorder.[8] The long-term patency rate of the Greenfield filter in all reported series has ranged from 95% to 98%, indicating that it remains effective as a filter without increasing distal venous pressures or contributing to the postthrombotic syndrome.[9,10] However, the carrier system was designed to be inserted operatively, and when it became possible to use larger dilators for percutaneous approaches, it required a 26F sheath to allow passage of the carrier catheter. This size defect in the femoral vein and the prolonged compression required to control bleeding after withdrawal of the sheath resulted in an unacceptable incidence of insertion site venous thrombosis. Although it is possible to reduce the size of the carrier system to 19.5F without deforming the stainless steel filter, the optimal reduction in size occurs when a titanium alloy is used instead of stainless steel. The added flexibility of titanium, however, was presumably responsible for the less secure fixation and distal slippage when the standard hook model was tested in patients. This had not been seen in the sheep studies most likely because of the smaller size of the cava and the fact that the animal functions on four legs instead of two. Several configurations of limb angulation and hook design were tested before the current recurved hook design with 80 degree angle was selected. The recurved portion of the limb should serve as a barrier to penetration beyond the axis of the limb, and the 80 degree hook should limit both upward and downward vectors of force, which might induce migration.

In the present clinical series percutaneous filter insertion by use of the sheath dilator was successful in 97% of cases. Angulation of the iliac vein was the most common reason for failure of insertion, but it might be amenable to use of a stiffer sheath or an alternative insertion site. The left femoral vein route will always incur a relative disadvantage because of the compression by the left common iliac artery. The sheath provides additional security against misplacement caused by premature discharge, since the filter would remain within the sheath. The apical end of the filter can perforate the wall of the vena cava, however, as demonstrated in one case, and there should be particular caution when entering the vena cava from the left femoral approach to avoid this possibility.

Operative insertion of the titanium Greenfield filter with the modified hook was used in two patients and has previously been used at the time of laparotomy for direct placement into the vena cava by palpation. When the carrier system is not centered in

COOKFOIA 000110

Volume 14
Number 3
September 1991

*Study of the modified hook Greenfield filter*  **257**

the vena cava but against the wall, the filter will be discharged into a narrower folded area of the cava. Because the recurved filter hooks are at a greater angle than the standard hook, there is immediate fixation with less ability to equalize the position of the legs, and some asymmetry of the limbs may result. This raises the possibility of impairment of filtration in the area of wider limb spread. No statistically significant association occurred in this series between suspected or documented recurrent embolism and asymmetrical leg spacing. Incomplete opening also was seen in four instances and presumably reflects a transient binding of the limbs, since it was corrected in each case by further manipulation by guide wire or catheter. Aside from one hematoma, the morbidity at the insertion site seemed minimal, although routine follow-up duplex examination for thrombosis was performed in only one institution and showed an incidence of insertion-site venous thrombosis of 8%.

A potentially important technical difference in the insertion technique is the absence of the guide wire that facilitates axial centering of the filter. Although some potential exists for tilting of the filter in its absence, concern that this has an adverse effect on filter effectiveness has not been substantiated. The only obvious deleterious effect of tilting is when the apex of the filter is displaced all the way to the wall of the cava where a nidus of thrombus can form.

In the 30-day follow-up experience, the incidence of recurrent pulmonary embolism was within the range observed previously. The fatal pulmonary embolism rate (1.9%) is always a concern, but it is never possible to cover all potential sources of embolism or to be sure of the cause of death without an autopsy. Change in filter position occurred in 11% of placements, which was lower than the 27% incidence observed with the earlier titanium model (p < 0.035). No adverse effects of this movement were noted, and there was no significant proximal migration. Suspected caval penetration was observed in only two cases and confirmed by CT scanning in one (0.8%). This is a distinct improvement over the previous model titanium filter where 9/30 (30%) penetrations were suspected, and four were confirmed (13%). Including all suspected or confirmed penetrations, the difference between filter series is statistically significant (p < 0.005). No adverse effects from the suspected or confirmed penetrations were found and none would be expected unless the limbs entered the peritoneal cavity or an adjacent structure. No evidence was seen of new bilateral

edema in any of the patients at early follow-up, but long-term assessment of caval patency must await future studies. As evidence accumulates that the indications for the Greenfield filter should be broadened, it is appropriate that efforts continue to minimize cost and patient risk. A recent report has documented that the total cost of percutaneous insertion of the Greenfield filter is 58% of the cost of a surgical approach. Fortunately, anyone with experience using the stainless steel filter will find the percutaneous approach much easier as well as cost-effective.

### REFERENCES

1. Tadavarthy SM, Castaneda-Zuniga W, Salam-onowitz E, et al. Kimray-Greenfield filter: percutaneous intracaval insertion. Radiology 1984,151:525-6.
2. Denny DF, Cronan JJ, Dorfman GS, Esplin C. Percutaneous Kimray-Greenfield filter placement by femoral vein puncture. AJR 1988;145:827-9.
3. Glanz S, Gordon DH, Kantor A. Percutaneous femoral insertion of the Greenfield vena cava filter: incidence of femoral vein thrombosis. AJR 1987;149:1065.
4. Greenfield LJ, Savin MA. Comparison of titanium and stainless steel Greenfield vena caval filters. Surgery 1989,106:820-8.
5. Greenfield LJ, Cho KJ, Pais SO, VanAmar M. Preliminary clinical experience with the titanium Greenfield vena caval filter. Arch Surg 1989,134:68?-9.
6. Greenfield LJ, Cho KJ, Tauscher JR. Evolution of hook design for fixation of the titanium Greenfield filter. J Vasc Surg 1990;9:344-53.
7. Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. A new intravaval filter permitting continued flow and resolution of emboli. Surgery 1973,73:599-606.
8. Greenfield LJ, Muhna BA. Twelve-year clinical experience with the Greenfield vena caval filter. Surgery 1988,104:706-12.
9. Chimochowski GE, Evans RH, Zarins CK, Lu CT, DeMeester TR. Greenfield filter versus Mobin-Uddin umbrella: the continuing quest for the ideal method of vena caval interruption. J Thorac Cardiovasc Surg 1980;79:358-65.
10. Gomez GA, Cutler BS, Wheeler HB. Transvenous interruption of the inferior vena cava. Surgery 1983;93:612-9.
11. Greenfield LJ, Cho KJ, Tauscher JR. Limitations of percutaneous insertion of Greenfield filters. J Cardiovasc Surg 1990;31:626-9.
12. Cohen JR, Tenenbaum N, Citron M. Greenfield filter as primary therapy for deep venous thrombosis and/or pulmonary embolism in patients with cancer. Surgery 1991;109:12-5.
13. Hye RJ, Mitchell AT, Dory CE, Freischlag J, Roberts AC. Analysis of the transition to percutaneous placement of Greenfield filters. Arch Surg 1990,125:1550-3.

Submitted Feb 2, 1991, accepted Apr 3, 1991

COOKFOIA 000111



*Cardiovascular Surgery*, Vol. 3, No. 2, pp. 199–205, 1995
Copyright © 1995 Elsevier Science Ltd
Printed in Great Britain. All rights reserved
0967–2109/95 $10.00 + 0.00

# Twenty-year clinical experience with the Greenfield filter

L. J. Greenfield and M. C. Proctor

*Department of Surgery, University of Michigan Medical Center, Michigan, USA*

The purpose of this study was to characterize the long-term safety and efficacy of the stainless-steel Greenfield filter. All patients who underwent Greenfield filter placement at three institutions during tenure of the senior author (L.J.G.) were entered prospectively into a filter registry and followed on an annual basis. Follow-up consisted of clinical examination to evaluate the status of venous disease or recurrence of pulmonary embolism, abdominal radiographs to determine the stability of the filter and an evaluation of the patency of the inferior vena cava and lower extremities. This report summarizes the 20-year experience. The rate of recurrent pulmonary embolism was 4% and the caval patency rate was 98%. Some filter movement or no clinical significance was seen in 8% of cases. There was no procedural mortality and morbidity was minimal. Greenfield filter insertion provides long-term protection from pulmonary embolism while preserving caval patency.

Keywords: thromboembolism, vena caval filter, long-term outcome

Vena caval filters have become the standard means of mechanical protection against pulmonary thromboembolism. The stainless-steel Greenfield filter (Medi-Tech, Watertown, Massachusetts, USA) was introduced in 1972 to combine effective filtration with the expectation of long-term patency based on the geometry of its conical design. To evaluate the performance of the filter, patients were entered prospectively into a registry and annual follow-up studies were obtained. The results of these studies have been published periodically, the most recent documenting the 12-year experience[1–4]. As technological advances were made, it became possible to insert devices percutaneously rather than operatively and a titanium model of the Greenfield filter was developed to facilitate this approach (*Figure 1*). As these devices are intended to be permanent implants, it is important to continue to provide long-term assessments, and therefore this review was undertaken to update previous reports and provide data for the 642 patients with stainless-steel Greenfield filters followed over a 20-year period at three major medical centers.



**Figure 1** Currently available Greenfield vena caval filters. a 12-Fr titanium and b stainless steel.

## Patients and methods

The study population includes all patients who had Greenfield filters placed during the tenure of the senior author (L.J.G.) at the University of Oklahoma, the Medical College of Virgina (MVC), the University of Michigan Medical Center (UMMC), and the Veteran's Administration and community hospitals affiliated with these medical centers. Patient demographics, coexisting

Correspondence to: Dr L. J. Greenfield, 2101 Taubman Center, Ann Arbor, MI 48 109, USA

COOKFOIA 000112

diagnoses, indications for filter placement, procedural events, use of anticoagulants, results of diagnostic tests and post-procedural outcomes were collected at the time of filter placement. Patients underwent yearly physical examinations, abdominal radiographs and diagnostic testing to determine the status of thromboembolic disease, filter stability and patency of extremity veins and vena cava. Initially this involved venography, venacavography or nuclear scanning, but these invasive procedures were replaced by duplex and ultrasonography scans of the lower extremities and the inferior vena cava. At the time of death, information from autopsy or the death notes was reviewed and cause of death recorded.

Many patients had been lost to follow-up. In preparation for this report, a mailing was sent to the last known address of 287 patients known to be alive. A questionnaire was included requesting information regarding recurrence of pulmonary embolism, history of known mechanical problems with the filter and problems related to venous insufficiency such as the use of stockings or stasis ulceration. Available medical records from patients at the MCV and the UMMC were reviewed. Information regarding vital status, recurrent embolism, signs or symptoms of venous insufficiency or mechanical problems with the filter was collected. The Veteran's Administration data system was queried for 112 patients previously lost to follow-up to determine their vital status, the last date of serivce and/or the date of death.

Information was entered into a 4th Dimensions data-base (ACI Inc., USA) and downloaded into Excel 4.0 (Microsoft Inc., USA) for recoding. Analyses of continuous and dichotomous variables were carried out in Systat 5.0 (Systat Inc., USA) for the Macintosh (Apple Inc., USA) and life test comparisons were performed in SAS version 6.04 (SAS Institute) for the personal computer.

## Results

Data for 642 patients who underwent placement of 667 24-Fr stainless-steel Greenfield filters between 1972 and 1992 were reported. The mean (range) age was 55 (13–92) years and 270 (42%) were females. Within the group 64% were white, 27% black and 9% Hispanic and other. The major indication for placement was a contraindication to anticoagulation (45%), while recurrent pulmonary embolism (20%) and complication of anticoagulation (16%) were less common (*Table 1*). The primary coexisting diagnoses were recent surgery (24%), malignancy (21%) and venous disease (13%) (*Table 2*). Deep vein thrombosis was reported in one-half of cases; 45% had abnormal V/Q scans while 25% had pulmonary embolism documented by angiogram. Placement was by operative venotomy in 86% of cases and via the jugular vein in 72%. In the last ten cases a 19.5-Fr delivery system was used to deploy the

filter instead of the standard 24-Fr carrier. General anesthesia was required in 2% of placements either in conjunction with another procedure or because of an uncooperative patient. Filters were positioned below the level of the renal veins in 84% of cases while 8.5% were located above the renal vein and the remainder were placed in the superior vena cava or iliac veins. Problems related to placement are summarized in *Table 3* and

Table 1  Indications for Greenfield filter placement

| Indication | |
|---|---|
| Contraindication to anticoagulant | 45 |
| Recurrent pulmonary embolism | 20 |
| Prophylaxis | 13 |
| Complication of anticoagulation | 16 |
| Embolectomy | 5 |
| Previous device failure | 1 |

Values are percentages

Table 2  Primary coexisting diagnoses in patients with stainless-steel Greenfield filters*

| | |
|---|---|
| Malignancy | 21 |
| History of pulmonary embolism | 16 |
| Venous disease | 13 |
| Recent surgery | 24 |
| Cardiac disease | 6 |
| Disease of the central nervous system | 2 |
| Hypercoagulable state | 2 |
| Gastrointestinal disease | 2 |
| Trauma | 7 |
| Pulmonary hypertension | 2 |
| Psychiatric alcoholism | 1 |
| Pregnancy | 1 |
| Arterial disease | 1 |
| Renal disease | 1 |
| Other medical | 1 |

Values are percentages. *This listing reflects the one primary diagnosis reported for each patient

Table 3  Placement problems and morbidity associated with filter placement

| | |
|---|---|
| Dilator | 25 |
| Guidewire | 41 |
| Abandoned | 3 |
| Fogarty catheter | 2 |
| Air embolism | 2 |
| Misplacement | 3 |
| Hematoma | 1 |
| Infection | 1 |
| Penetration | 0.2 |
| Other | 2 |

Values are percentages

COOKFOIA 000113

include small vessel size, misplacement, air embolism and the need for vein dilatation. In 2% of cases the initial approach was abandoned and a second attempt proved successful. In three cases of misplacement retrieval was attempted and two filters were successfully repositioned. Morbidity related to placement included insertion site hematoma in 1% and infection in 1%. There were no cases of procedural death. Ninety-eight patients (15%) died within the immediate post-procedural period and an additional 88 (14%) died within the first year. Mortality related to the various diagnoses is given in *Table 4*.

Response to the mailing allowed update of information for 87 patients while 57 letters were returned 'addressee unknown' and these patients remained lost to follow-up. Review of the Veteran's Administration data allowed verification of the vital status of 80 patients and 71 medical records at the MCV were reviewed to complete that experience. Status for all patients of the UMMC was verified through the hospital information system. At the present time, 280 patients are known to be dead, 222 alive and 140 lost to follow-up. Autopsy data were available for 45 (16%) of those who died.

Follow-up examinations were completed for 246 (54%) of the 456 patients alive following filter placement. The mean (range) number of follow-up examinations was 3 (1–13) visits. The mean length of follow-up was 56.5 months, the median was 40 months. Some 713 examinations were reported.

At the time of their last evaluation, 53 patients (22%) were using anticoagulants and five had complications requiring its discontinuation. Some 112 patients (45%) reported either unilateral or bilateral edema and 14 (6%) had stasis ulceration. The insertion site vein was evaluated in 101 patients and found patent in 94 (93%). Rehospitalization was required in 74 cases and 40 (16%) had a subsequent surgical procedure. Filter stability was evaluated in 192 cases and documented in 178. There was significant tilting or migration in ten cases (5%) requiring additional filter placement in two as a result of concern for effective protection. Four patients (2%) are known to have a fractured filter strut. There were no clinical sequelae in these patients related to filter tilt, migration or limb fracture. Anticoagulant therapy was discontinued in 16% and initiated in 23%.

**Table 5** Findings at follow-up

| | |
|---|---|
| Anticoagulant therapy | 22 |
| Complications of anticoagulation | 10 |
| Support stockings | 34 |
| Edema | 45 |
| Ulceration | 6 |
| Occlusion of the inferior vena cava | 3.6 |
| Recurrent pulmonary embolism | 4 |
| Filter instability | 7 |

Values are percentages

Support stockings were discontinued in 19% while use was initiated in 11%. Five patients developed new areas of skin breakdown while 92% never experienced problems with ulceration. Edema developed or worsened in 33 patients and improved in 53 (*Table 5*).

New deep vein thrombosis was diagnosed in 7% of patients during the follow-up period and there were 22 suspected or confirmed new episodes of pulmonary embolism among those who survived the post-procedural period. Three were confirmed at post-mortem examination, three by pulmonary angiogram, six had new defects on V/Q scan and ten patients reported new clinical symptoms of pulmonary embolism for a recurrence rate of 4%. Nine patients were found to have caval occlusion at their last follow-up for a caval patency rate of 96%.

The mean(s.d.) survival time was 76.6(66) months, with median survival of 72 months. Product limit survival estimates show a mean(s.e.m.) survival of 114.4(3.5) months (*Figure 2*). The death rate was initially high, at ten deaths per 1000 placements, but after 12 months the rate stabilized generally between two and four deaths per 1000 placements.

**Table 4** Mortality associated with coexisting diagnoses

| Disorder | Died (%) |
|---|---|
| Malignancy | 70 |
| Pulmonary hypertension | 31 |
| Cardiac disease | 60 |
| Recent surgery | 32 |
| Pulmonary disease | 25 |
| Recent trauma | 20 |



**Figure 2** Life table survival analysis for 642 patients. Mean(s.e.m.) survival is 114(3.5) months

COOKFOIA 000114

## Discussion

The relative ease with which vena caval filters can be inserted may obscure the fact that these are permanent implants with many reasons to monitor their long-term behavior. These include expansion of the indications for filter placement, the use of devices in patients with a longer life expectancy, a cost-conscious health care system that requires outcome-based studies to justify procedural treatment and a growing insistence by the Food and Drug Administration to demonstrate the efficacy and safety of medical devices. This 20-year report objectively documents the patterns of use and outcomes for the largest series of patients with the stainless-steel Greenfield filter.

Comparison of the 1988 review with the current findings suggest basic similarities in the patient population but some changes in practice patterns. (*Table 6*).

The mean age, sex and racial distribution have been stable over time. Indications for filter placement and the pattern of coexisting diagnoses have remained relatively unchanged in the authors' experience despite a perceived increase in the use of prophylaxis as an indication (*Tables 7* and *8*). The similarity between the two reviews with respect to the rate of recurrent pulmonary embolism (4%) and inferior vena cava patency (96%) indicates no deterioration in performance of this device with time (*Table 6*).

The decreased number of jugular insertions reflects the increased involvement of interventional radiologists and their preference for percutaneous femoral vein placement, accounting for 14% of cases in this review. Unlike earlier reports[3–7], insertion site thrombosis was found to be less than 7% in those undergoing duplex imaging. There has been a slight increase in the percentage of suprarenal placements as information regarding the safety and long-term patency of filters in this position has accumulated[8–12].

In preparation for this report the proportion of patients with outcome data was increased from 41 to 54% and the mean follow-up time was extended from 43 to 56 months. In addition, the proportion of cases lost to follow-up was reduced from 41 to 21%, thus strengthening the validity of the conclusions.

In an effort to better understand mortality in this cohort of patients, several hypotheses with respect to survival in subgroups of interest were formulated (*Figures 3–9*). Log-rank and Wilcoxon $\chi^2$ values were derived from tests of equality of survival over strata and appropriate $P$ values were determined. As previously demonstrated for patients with suprarenal filters[12], patients with malignancy as a primary diagnosis had

**Table 7** Comparison of indications for Greenfield filter placement 1988–1993

| Indication | 1988 | 1993 |
| --- | --- | --- |
| Contraindication to anticoagulant therapy | 38 | 45 |
| Recurrent pulmonary embolism | 27 | 20 |
| Prophylaxis | 17 | 13 |
| Complication of anticoagulation | 17 | 16 |
| Embolectomy | 8 | 5 |
| Previous device failure | 2 | 1 |

Values are percentages

**Table 6** Changes in placement and outcome findings for patients with stainless-steel Greenfield filters 1988–1993

| | 1988 | 1993 |
| --- | --- | --- |
| No. of patients | 459 | 642 |
| Mean age (years) | 55 | 55 |
| Sex (female) (%) | 40 | 42 |
| Race (white) (%) | 67 | 64 |
| Route (%) | | |
| Intrajugular | 83 | 72 |
| Location (%) | | |
| L3 | 79 | 75 |
| Suprarenal | 6.9 | 8.5 |
| Recurrent pulmonary embolism (%) | 4 | 4 |
| Occlusion of the inferior vena cava (%) | 4 | 3.6 |
| Follow-up rate (%) | 41 | 54 |
| Mean follow-up (months) | 43 | 56 |
| Rehospitalization (%) | 42 | 30 |
| Misplacement (%) | 3 | 3 |
| Multiple placements (%) | 2.3 | 5 |
| Percutaneous placement (%) | 0 | 14 |
| Patient status | | |
| No. of patients alive (%) | 140 (30) | 222 (35) |
| No. of patients who died (%) | 133 (29) | 280 (44) |
| No. of patients lost to follow-up (%) | 186 (41) | 140 (22) |

**Table 8** Comparison of coexisting diagnoses in patients with Greenfield filters 1988–1993[a]

| | 1988 (n = 459) | 1993 (n = 642) |
| --- | --- | --- |
| Venous disease | 58 | 60 |
| Recent surgery | 33 | 33 |
| Cardiac disease | 24 | 23 |
| Neurologic disease | 19 | 25 |
| Obesity | 17 | 14 |
| Malignancy | 17 | 21 |
| Gastrointestinal disease | 16 | 16 |
| Pulmonary hypertension | 13 | 9 |
| Recent trauma | 9 | 10 |
| Arterial disease | 9 | 9 |
| Pulmonary disease | 9 | 10 |
| Renal disease | 6 | 7 |
| Psychiatric/alcoholism | 5 | 5 |
| Diabetes | 4 | 5 |
| Hypercoagulable state | 4 | 5 |
| Sepsis | 4 | 1 |
| Post-partum | 0.8 | 0.8 |
| Other | 19 | 1 |

Values are percentages. [a]This listing includes all coexisting diagnoses reported for each patient

*Experience with the Greenfield filter: L. J. Greenfield and M. C. Proctor*

shorter survival times than the remainder of the cohort (*P* = 0.0001). Those with an acute event (recent trauma or surgery) also had longer survival times than all others (*P* = 0.0001). The authors failed to reject the null hypothesis of no difference for patients with a history of pulmonary hypertension or prior pulmonary embolism (*P* = 0.12, log rank test), and those with cardiac or pulmonary disease (*P* = 0.11, log rank test). It is suspected that those who had prophylaxis as the indication for filter placement would have prolonged survival and that those with recurrent pulmonary embolism as the indication would have shorter survival but the authors were unable to reject the null hypothesis in either case with *P* values of 0.75 and 0.11 (log rank test) respectively.

In the authors' experience, limb fracture is rare and failure to find sequelae is supported by other reports[13–16]. In 1985 Messmer and Greenfield[17] reported radiographic follow-up for patients followed for 1–9 years. Filter movement of more than 3 mm, which was used as minimal standard, was found in 34% of cases[17]. The authors now recognize that respiratory variation and the elasticity of the vena cava account for apparent movement for distances of 10 mm or greater. The current rate of 8% reflects the most extreme of this group in which movement exceeds radiographic artefact or respiratory variation.

This review of the stainless-steel Greenfield vena caval filter continues to demonstrate the long-term ability of this device to protect patients from pulmonary embol-



**Figure 3** Survival comparison of those with history of pulmonary embolism *versus* all others. *P* = 0.1209 (log rank test) and 0.0980 (Wilcoxon signed rank test)



**Figure 5** Comparison of survival between those with malignancy and all others. *P* = 0.0001 (log rank test) and 0.0001 (Wilcoxon signed rank test)



**Figure 4** Comparison of survival between those with cardiac or chronic pulmonary disease and all others. *P* = 0.1046 (log rank test) and 0.2236 (Wilcoxon signed rank test)



**Figure 6** Comparison of survival between those with acute events and all others. *P* = 0.0001 (log rank test) and 0.0001 (Wilcoxon signed rank test)

COOKFOIA 000116



*Experience with the Greenfield filter: L. J. Greenfield and M. C. Proctor*



Figure 7 Comparison of survival between those with trauma and all others. $P = 0.0025$ (log rank test) and 0.0059 (Wilcoxon signed rank test)



Figure 9 Comparison of survival between those with recurrent pulmonary embolism as the primary indication and all others. $P = 0.1114$ (log rank test) and 0.1186 (Wilcoxon signed rank test)



Figure 8 Comparison of survival between those with prophylaxis as the primary indication and all others. $P = 0.7483$ (log rank test) and 0.7743 (Wilcoxon signed rank test)

ism while maintaining the patency of the vena cava. This consistency and safety over a period of 20 years should relieve concerns regarding Greenfield filter placement in younger patients and make it more difficult to justify the use of temporary devices to protect against pulmonary thromboembolism.

The conclusion that patients are protected from pulmonary embolism by the presence of the filter could always be challenged by the absence of a prospective randomized trial. Such a trial, however, would be difficult to justify as the original study by Barritt and Jordan[18] is not likely to be repeated in patients with deep venous thrombosis. In that series, which studied the effectiveness of treating pulmonary embolism with heparin, ten of the 19 control patients who received no

treatment sustained recurrent embolism and five of them died. With an incidence of pulmonary embolism of 53% and a mortality rate of 26% for the group, the consequences of untreated venous thrombosis are grave. When prophylaxis is the indication for filter insertion then it is usually the case that there is a free-floating tail of thrombus in the proximal venous system in which heparin is less effective in preventing embolism; alternatively the patient who is at extremely high risk of venous thrombosis has a contraindication to anticoagulant prophylaxis (e.g. patients with long bone or pelvic fractures). In this latter category, the authors have preliminary experience in a group of 80 patients with fractures who had no treatment and sustained six fatalities from pulmonary embolism while a similar group of 40 patients treated during the same year with prophylactic filter placement had no fatalities from this condition. This is obviously an area in which more effective methods of thromboprophylaxis should be studied and such a multicenter trial is planned.

## Acknowledgements

This work was supported in part with funding from Boston Scientific Corporation.

## References

1. Greenfield L, Michna B. Twelve-year clinical experience with the Greenfield vena caval filter. *Surgery* 1988; 104: 706–12.
2. Greenfield L, Peyton R, Crute S, Barnes R. Greenfield vena caval filter experience: late results in 156 patients. *Arch Surg* 1981; 116: 1451–5.
3. Greenfield L, Zocco J, Wilk JK, Schroeder T, Elkins R. Clinical experience with the Kim–Ray Greenfield vena caval filter. *Ann Surg* 1977; 185: 692–8.

204

COOKFOIA 000117

John O. F. Roehm, Jr., MD • Irwin S. Johnsrude, MD • Merle H. Barth, MD • Cesare Gianturco, MD

# The Bird's Nest Inferior Vena Cava Filter: Progress Report[1]

The bird's nest inferior vena cava filter in clinical trial since 1982, has been placed in 568 patients at risk for pulmonary embolism. Of the 481 patients in whom the filter had been in place for 6 months or more, 440 were followed up clinically. The prevalence of clinically suspected recurrent pulmonary thromboembolism was 2.7% (12 patients) and that of inferior vena cava filter occlusion was 2.9% (13 patients). With the initial filter design, filter migration occurred in five patients. No migrations have occurred in the 147 patients treated with the filter after its modification to improve the anchoring system for greater stability. The bird's nest filter has proven safe and effective in the prevention of pulmonary embolism.

Index terms: Embolism, pulmonary, 60.72 • Interventional procedures • Venae cavae, filters, 982.1299 • Venae cavae, thrombosis, 982.751

Radiology 1988; 168:745–749

THE bird's nest filter (BNF), a percutaneous transcatheter inferior vena cava (IVC) filter (Cook, Bloomington, Ind) has been in clinical trial since February 1982 (1). Disenchantment with the commercially available transvenous IVC filters of Mobin-Uddin (MU) and Kimray-Greenfield (KG) was the stimulus for the development of the BNF. Still classified as an investigational device by the Food and Drug Administration (FDA), the BNF has been placed in 568 patients in a 5-year multi-institutional study.

Introduced before the FDA instituted control over medical devices, the MU (2) and the KG (3) filters have been in fairly widespread use, and it is with their reported clinical results that a new filter must be compared. In 1980, Cimochowski et al (4) reported on the clinical follow-up of 97 patients, 32 of whom had been treated with the KG filter and 65 of whom had been treated with the MU umbrella. The clinical incidence of recurrent pulmonary thromboembolism (PTE) was 3% for the MU device and 3.3% for the KG device. Occlu-

sion of the IVC occurred in 73% of the patients with the MU umbrella and 5% with the KG filter. Because of the high rate of IVC occlusion, the MU umbrella has fallen into disfavor. In 1984, Greenfield (5) reported the cases of 260 patients treated at four hospitals, with clinical follow-up in 99 cases. The incidence of recurrent PTE was 5% and that of IVC thrombosis, 2%.

We believe that this review of the findings in 568 patients treated with the BNF is the largest in the literature. Initial clinical information is available in 549 patients. Six-month clinical follow-up information is available in 440 patients. At follow-up, the incidence of clinically suspected recurrent PTE was 2.7% and that of IVC occlusion was 2.9%; these findings compare favorably with those reported for the KG filter.

## MATERIALS AND METHODS

Clinical trials were begun at seven institutions after approval by their institutional review boards, and the BNF was placed after appropriate informed consent was obtained from 568 patients. Table 1 shows

[1] From the Section of Cardiovascular Radiology, Methodist Hospital, Mail Station #305, 6565 Fannin, Houston, TX 77030; and Baylor College of Medicine (J.O.F.R., M.H.B.); the Department of Radiology, School of Medicine, East Carolina University, Greenville, NC (I.S.J.); and the Section of Experimental Diagnostic Radiology, University of Texas System, M. D. Anderson Hospital and Tumor Institute (C.G.), Houston. From the 1987 RSNA annual meeting. Received November 19, 1987; revision requested February 4, 1988; revision received April 6; accepted April 13. Supported in part by the George Alfred Cook Memorial Fund and the John S. Dunn Research Foundation. Address reprint requests to J.O.F.R.
© RSNA, 1988

## Table 1
### Data on BNF Placement

| Investigating Institution | No. of Patients | Type of BNF | | No. of BNFs in Place for 6 mo | No. of Cases with 6-mo Follow-up |
|---|---|---|---|---|---|
| | | Original Model | Modified Strut | | |
| Methodist Hospital, Houston | 240 | 159 | 82 | 195 | 192 |
| Pitt County Memorial Hospital, Greenville, NC | 92 | 57 | 35 | 57 | 58 |
| Massachusetts General Hospital, Boston | 69 | 69 | 0 | 69 | 69 |
| Indiana University Medical Center, Indianapolis | 42 | 33 | 9 | 33 | 30 |
| Albert Einstein Medical Center, Philadelphia | 30 | 30 | 0 | 30 | 23 |
| University of Arkansas for Medical Sciences, Little Rock | 33 | 32 | 1 | 32 | 21 |
| Hospital of University of Pennsylvania, Philadelphia | 62 | 42 | 20 | 55 | 47 |
| Total | 568 | 422 | 147 | 481 | 440 |

WARNING: This material may be covered by copyright law

COOKFOIA 000118

the distribution of patients undergoing BNF placement by institution.

At the Massachusetts General Hospital, the BNF and the KG filter were used alternately. There were no other attempts at randomization.

The BNF is constructed of four stainless steel wires, each of which is 15 cm long and 0.18 mm in diameter. The wires are preshaped with many nonmatching bends of short radius. At each end, the fine wires are attached to V-shaped struts (the junction point) for fixation to the wall of the IVC. Each strut ends in a hook with a small loop stop to minimize the risk of IVC perforation. One strut is Z-shaped so that a pusher wire made from a 1.1-mm 0.042-inch guide wire can be screwed onto it. The original model of the BNF came preloaded in 3-F Teflon catheter that was either 40 cm long for the femoral vein approach or 70 cm long for the jugular and subclavian vein approaches. In 1986, the struts were modified with the use of a stiff wire measuring 0.46 mm in diameter to improve fixation (Fig 1). The broader struts necessitated preloading of the BNF in a 12-F catheter, an increase in diameter of 1.05 mm. The catheter fits inside a thin Teflon sheath, which is inserted percutaneously with a tapered introducer over a standard 1-mm (0.038-inch) guide wire after venipuncture of a femoral, jugular, or subclavian vein. The tapered introducer is removed, and the filter-carrying catheter, with the pusher wire attached, is inserted into the sheath.

As originally designed (6), the filter is secured by flexible 0.25-mm struts, which were affixed to the IVC wall by a series of short forceful jabs. With the introduction of the model with the stiffer 0.46-mm struts, the method of engaging the IVC wall was altered to a single gentle push for every 1–3 mm of distance to securely engage the hooks and struts in the IVC wall. After fixation of the hooks and additional withdrawal of the catheter by 1–3 cm over the securely held pusher wire, the catheter is then freely mobile at the skin, and the wires of the BNF are advanced into the IVC with the pusher wire. The junction point of the second pair of struts still within the catheter is advanced to overlap the first junction point by 1–2 cm, thereby packing the many loops of wires in the IVC. The second pair of hooks is then pushed into the IVC by simultaneously advancing the pusher wire and withdrawing the catheter. A gentle 1–3-mm to-and-fro action on the pusher wire secures these hooks. The handle on the pusher wire is rotated counterclockwise ten to 15 turns to free the wire from the BNF, and it is withdrawn with continued counterclockwise rotation. The BNF then produces a crisscrossing maze of 100 cm of 0.18-mm wires over an average length of 7 cm of the IVC. This provides multiple surfaces as barriers to the passage of emboli. Occasionally, several wires "prolapse" beyond the first pair of hooks in the IVC (Fig 1a). Prolapse of the wires has produced no problems and does not interfere



Figure 1.   Comparison of original and modified BNFs. (a) Radiograph depicts exposed struts of modified "stiff-strut" BNF (on right) and original flexible-strut BNF (on left). (b) Lateral and axial views of modified BNF, which had been placed from catheter into 1.5-cm-diameter plastic tube.

with the effectiveness of the BNF (Fig 1b). Katsamouris et al (7) demonstrated that the BNF is effective in trapping emboli, whether compressed, elongated, or prolapsed in configuration.

Clinical follow-up was achieved in 440 of 561 patients (91.3%) with the BNF in place for 6 months or longer. Longest follow-up in each institution was conducted by means of a telephone contact with the patient, family, or physician or a letter questionnaire when telephone contact failed. Two questions concerned the patient's clinical course, symptoms of PTE and IVC occlusion, and, when appropriate, cause of death and autopsy information. According to clinical criteria, a patient was considered free of embolism if there was no history of new leg swelling, no hemoptysis, and no episode of unexplained chest pain. Follow-up by means of cavography of the IVC, computed tomography, or ultrasound (US) was scattered and random and employed with the greatest frequency at the University of Arkansas (8). The vast majority of follow-up data were clinical. The records indicate that 27 follow-up cavograms were obtained. The IVC was patent in 21 cases and occluded in six; in three, the IVC was opened with thrombolytic therapy. US examinations of the IVC were recorded in ten cases and demonstrated occlusion in one. Pulmonary angiograms were obtained by passing a catheter over a guide wire through the BNF in three cases. One angiogram showed no PTE, one showed decreased volume of PTE, and one showed a new embolus.

## RESULTS

In the 568 patients treated with the BNF, clinical data were available for

549. The age range was 15–93 years (median = 63 years), and 45% (n = 247) of the patients were female.

The transfemoral approach was used in 513 cases (90.4%), transjugular in 28 (5.1%), transsubclavian in five (1.2%), and intraoperative in one (0.2%). The placement route was not specified in one case. The design of the BNF proved totally unsuitable for intraoperative placement via venotomy of the IVC. The only patient so treated, at the insistence of the surgeon, had a routine postoperative course and results with our intraoperative placement of the BNF was difficult, necessitating direct manual placement of some of the wires within the IVC by the surgeon.

Indications for BNF placement included anticoagulant contraindications or complications in 407 patients (74%) and recurrent embolization despite anticoagulation therapy in 68 patients (12.5%). Placement was prophylactic in 74 patients (13.5%), most commonly because of lower extremity deep venous thrombosis or because of planned surgery in a patient with a history of PTE. As increased confidence in the BNF developed in the medical community, patients were referred for BNF placement either to supplement or to eliminate anticoagulation therapy.

In the 440 patients who were clinically followed up, the longest follow-up was 5 years (Table 2). The frequency of possible recurrent PTE was 2.7% (12 patients) and that of IVC



**Figure 2.** Cavograms of IVC depicting BNFs in place. (a, b) Flexible-strut BNF. Note marked curvature of proximal and distal struts (arrows). (c, d) Modified BNF with inflexible struts.



It had been anticipated that the construction of the hooks and struts was adequate to prevent BNF migration. However, three filters migrated to the right atrium; two of them were removed percutaneously, and the other was repositioned in the infrarenal IVC, with a second BNF placed alongside to secure it (Fig. 2). A fourth patient has been asymptomatic with the BNF in his right atrium and right ventricle, and the fifth died of a massive PTE, which was found at autopsy along with the BNF in the pulmonary artery 20 days after placement.

Because of these five cases of migration, the struts were modified. The very flexible 0.25-mm struts were replaced with 0.46-mm inflexible struts that cannot be inverted in the IVC. There have been no migrations in the 147 patients treated with the modified-strut BNF.

**Figure 3.** (a) Radiograph shows prolapsed wires (arrows) of BNF, an insignificant finding. (b) Radiograph shows compact wire configuration of BNF after institution of new shaping method.

thrombosis was 2.9% (13 patients). Recurrent PTE was confirmed in only two patients, on the basis of pulmonary angiographic findings in one and autopsy findings in the other. Thrombosis was confirmed with US in one patient and cavography in six.

Movement of the first pair of hooks occurred during one BNF placement, and the hooks were repositioned with a tip deflector wire. Suspected movement of the simple straight wire hooks in two of the first six cases led to use of barbed hooks. On seventh occasions during insertion, the first pair of hooks became inverted, and a tip deflector wire was used to pull the junction point back to the V position.

## DISCUSSION

Interruption of IVC blood flow by the use of the transvenous MU and KG filters has been an increasingly popular method of treatment in patients with PTE. Although both are designed for introduction via venous cutdown, the MU filter was modified and placed percutaneously by Rizk and Amplatz (9) in 1973 and by Knight et al (10) in 1974 through the femoral vein after dilation to 27 F. In 1984, Tadavarthy et al (11) reported on percutaneous placement of the



Figure 4. (a) Chest radiograph shows BNF (arrows) in right atrium. (b) Oblique radiograph obtained after repositioning of BNF in the infrarenal IVC and fixation with a second BNF. Patient was symptom free 13 months later. R = right.

**Table 2**
**Follow-up Data in 140 Cases at 6 Months or Longer**

| Finding | No. of Cases (%) |
|---|---|
| Recurrent pulmonary thromboembolism | 12 (2.7) |
| IVC thrombosis | 13 (2.9) |
| Filter movement | 1 (0.2) |
| Filter migration | 3 (0.1) |
| Caval perforation | 0 (0) |

* Number of cases = 147.

This permits repositioning of the hooks if so desired. The BNF is a free-form cluster of wires pressing against the IVC wall at many sites; alignment within the IVC is not necessary. A constant geometric shape of wires more readily seen on radiographs may make it easier to identify such a filter but would not improve clinical results.

The best IVC filter will be the one that produces the greatest reduction in the frequency of recurrent PTE and the fewest problems. The frequency of possible recurrent PTE (2.7%) and IVC thrombosis (2.9%) in patients treated with the BNF compares favorably with those associated with the use of other devices. ∎

Acknowledgment: The authors express their appreciation to Marilyn Bowie, RT, and Marget Bunch for their dedicated assistance and to Carolyn Greenhorn for her secretarial skills.

**References**

1. Roehm JOF Jr, Gianturco C, Barth MH, Wright KC. Percutaneous transcatheter filter for the inferior vena cava: a new device for treatment of patients with pulmonary embolism. Radiology 1984; 150:255–257.
2. Mobin-Uddin K, McLean R, Jude JR. A new catheter technique of interruption of inferior vena cava for prevention of pulmonary embolism. Am Surg 1969; 35:889–894.
3. Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. A new intracaval filter permitting continued flow and resolution of emboli. Surgery 1973; 73:599–606.
4. Cimochowski GE, Evans RH, Zarins CK, Lu CT, DeMeester TR. Greenfield filter versus Mobin-Uddin umbrella: the continuing quest for the ideal method of vena caval interruption. J Thorac Cardiovasc Surg 1980; 79:358–365.
5. Greenfield LJ. Current indications for and results of Greenfield filter placement. J Vasc Surg 1984; 1:502–504.
6. Roehm JOF Jr, Gianturco C, Barth MH. The bird's nest inferior vena caval filter. Semin Intervent Radiol 1986; 3:205–213.
7. Katsamouris AA, Waltman AC, Delichatsios MA, Athanasoulis CA. Inferior vena cava filters: in vitro comparison of clot capture and flow dynamics. Radiology 1988; 166:361–366.
8. Liu C-C, Angelucci TL, Ferris EJ, Shah HR, Reifsteck JE, Harshfield DL. Inferior

KG filter after embolization to 24-F. Unanticipated life-threatened dilation to 45-F has led to reported prevalence of femoral vein thrombosis of 10% (10) to 41% (11). Rose et al (12) reported five cases of recurrent PTE in 109 patients with KG filters, three of which produced fatal results. Geisinger et al (14) reported three cases of recurrent PTE due to three different KG filter problems. Cardiac (15,16) and pulmonary artery (17) migration of the KG filter have been reported. Perforation by the KG filter struts of the wall of the IVC has been well documented (18) as well as perforation of the small bowel (19) and liver, duodenal wall, portal vein, and psoas muscles (20). Nevertheless, the KG filter is the only commercially available IVC filter and is being placed percutaneously with increasing frequency.

In 1982, dissatisfaction with the KG filter led to the development of the BNF, which is designed for percutaneous introduction. Additionally, it provides multiple surfaces of fine wire crisscrossing the IVC over a length of 6–7 cm to trap emboli. In its initial design, the BNF was placed within a 8-F catheter and had flexible struts which permitted live migration. A new model with stiff struts has been used in 147 patients with no migration, but it requires a 12-F catheter for placement.

The development of femoral vein thrombosis after BNF placement has been infrequent enough in these patients with preexisting venous disease to go unrecognized. Follow-up venograms were not obtained in any patients.

We have found no reported cases of thrombus formation on the BNF, and several cases of IVC occlusion have been demonstrated to be related to a massive volume of embolic material trapped by the BNF (21).

Unlike the KG filter, which is popped from its carrier into the IVC lumen and which must be centered and aligned straight within the IVC to provide filtration of a PTE (7,18), the BNF is under the control of the operator and can be partially replaced in the catheter by advancing the catheter while pulling outward on the pusher wire. The filter wires and the struts will reenter the catheter, but the barbed hooks will not.

vena caval filters: noninvasive evaluation. Radiology 1986; 160:521-534.

9. Rizk GK, Amplatz K. A percutaneous method of introducing the caval umbrella. AJR 1973; 117:903-909.

10. Knight L, Rizk GH, Amplatz K. Percutaneous introduction of inferior vena cava filter: human experience. Radiology 1974; 111:91-93.

11. Tadavarthy SM, Castaneda-Zuniga WR, Salomonowitz E, et al. Kimray-Greenfield vena cava filter: percutaneous introduction. Radiology 1984; 151:525-526.

12. Cope C, Simon M, Amplatz ML, Van Aman ML. Percutaneous transfemoral placement of the Kimray-Greenfield vena cava filter. Radiology 1987; 165:375-376.

13. Kantor A, Glanz S, Gordon DH, Sclafani SJA. Percutaneous insertion of the Kimray-Greenfield filter: incidence of femoral vein thrombosis. AJR 1987; 149:1065-1066.

14. Geisinger MA, Zelch MG, Risius B. Recurrent pulmonary embolism after Greenfield filter placement. Radiology 1987; 165:383-384.

15. Castaneda F, Herrera M, Cragg AH, et al. Migration of a Kimray-Greenfield filter to the right ventricle. Radiology 1984; 149:690a.

16. Moore R, Dagher FJ, Tavares S, Attar S. Migration of a Kimray-Greenfield umbrella to the heart. South Med J 1985; 78:946-947.

17. Friedell ML, Goldenkranz RT, Parsonnett V, et al. Migration of a Greenfield filter to the pulmonary artery: a case report. J Vasc Surg 1986; 3:929-931.

18. Phillips MR, Widrich WC, Johnson WC. Perforation of the inferior vena cava by the Kimray-Greenfield filter. Surgery 1980; 87:233-235.

19. Sidawy AN, Menzoian JO. Distal migration and deformation of the Greenfield vena cava filter. Surgery 1986; 99:369-372.

20. Miller CL, Wechsler RJ. CT evaluation of Kimray-Greenfield filter complications. AJR 1986; 147:45-50.

21. Roehm JOF Jr, Gianturco C, Barth MH. Percutaneous interruption of the inferior vena cava: the bird's nest filter. In: Bergan JJ, Yao JST, eds. Surgery of the veins. New York: Grune & Stratton, 1985; 487-495.

9504-31     R4/95     BRD 5/95     50

Ann Vasc Surg 1988; 3: 242–247

# Percutaneous Transvenous Caval Interruption with the "LGM" Filter: Early Results of a Multicenter Trial

Jean Baptiste Ricco, MD, Dominique Crochet, MD, Philippe Sebilotte, MD,
André Serradimigni, MD, Jean Marie Lefebvre, MD,
Emmanuel Boissou, MD, Phillipe Geslin, MD, Patrice Virot, MD,
Claude Vaislic, MD, Michel Gallet, MD, Yves Biron, MD,
Didier Lefant, MD, Jean Michel Desmarq, MD,
Dominique De La Faye, MD, *Poitiers, Nantes, Nancy, Marseille, Lille,
Castres, Angers, Limoges, Caen, Lyon, Rennes, La Rochelle, Dunkerque,
and Brest, France*

From September 1985 to December 1986, 100 patients undergoing percutaneous placement of a transvenous "LGM" caval filter were included in a multicenter prospective trial. Peripheral venogram completed by pulmonary arteriography or scintigraphy were obtained for all patients. Eighty-five patients had experienced pulmonary embolism, 59 had iliocaval thrombosis, while 40 had venous thrombosis confined to the lower limbs. In two instances, insertion or passage of the catheter was impossible. Ninety-eight "LGM" filters were placed percutaneously through the internal jugular vein, 82 of which were correctly positioned in the infrarenal inferior vena-cava. Eight filters were positioned with a tilt of more than 15 degrees with respect to the vertical axis, five failed to open correctly, and three were incompletely open and tilted. No postoperative deaths were observed; there were two recurrent embolisms, and seven caval thromboses occurred during the year that followed insertion of the filter. The "user-friendliness" and efficacy of this percutaneous filter makes it a treatment of choice in the partial interruption of the inferior vena cava.

KEY WORDS: Partial interruption of inferior vena cava; percutaneous intracaval filter; "LGM" intracaval filter.

## ORGANIZATION OF THE TRIAL

The "LGM"* filter is a new device for partial interruption of the inferior vena cava which was perfected

*From the Unité de Chirurgie Vasculaire, Poitiers, France.*

*Presented at the Annual Meeting of the Peripheral Vascular Surgery Society, Toronto, Ontarior, Canada. June 1987.*

*Reprint requests: J.B. Ricco, MD, Unité de Chirurgie Vasculaire, 24, rue René Descartes, 86035, Poitiers, France.*

*\*Trademark for filter manufactured by LG Medical, Chasseneuil, France.*

after a series of in vitro and in vivo experimental studies [1]. This system was used in human beings as part of a multicenter prospective trial grouping 14 centers (7 surgical; 4 cardiologic, and 3 radiologic). All patients included in this study had lower limb venograms completed by vena cavogram, pulmonary arteriography or scintiscan. The choice of whether to enter the patient or not into the trial was left entirely to the participating centers according to their usual indications of vena caval filter insertion. The patients had clinical and vena caval contrast examination on day eight, as well as three, six and 12 months after the placement of the filter.

242

COOKFOIA 000123

VOLUME 2
No 3 - 1988

*PERCUTANEOUS TRANSVENOUS CAVAL INTERRUPTION WITH "LGM" FILTER*     243

### TABLE I.—Correlation between venograms and pulmonary arteriograms

| Pulmonary embolism | Number of patients | Venous thrombosis | | |
|---|---|---|---|---|
| | | Iliocaval | Femoropopliteal | Floating thrombus |
| < 40% | 57* | 34 | 22 | 19 |
| > 40% | 28 | 11 | 17 | 14 |
| 0 | 15 | 14 | 1 | 9 |
| Total | 100 | 59 | 40 | 42 |

*One patient did not have venous thrombosis demonstrated on venograms after pulmonary embolism.

## PATIENTS AND METHODS

From September 1985 to December 1986, 100 patients were included in this trial. There were 45 women and 55 men whose mean age was 67 years. Twenty-five patients had marked edema of the lower limbs; 10 of these had a history of lower limb venous thrombosis. Of these 100 patients, 85 had experienced a pulmonary embolism while under heparin therapy at therapeutic doses; 15 patients did not have pulmonary embolism. Fifty-nine patients had femoropopliteal thrombosis extending to the iliocaval junction, 40 had a femoropopliteal and sural thrombosis with a patent vena cava, and one patient had no thrombosis visible on venograms performed after the occurrence of pulmonary embolism.

The diagnosis of pulmonary embolism was made in 54 cases by pulmonary scintiscan, and in 31 cases by pulmonary arteriography. Pulmonary embolism was judged to be severe when 40% or more of the pulmonary arterial bed was amputated. Fifty-seven patients had pulmonary embolism of less than 40%; 28 had pulmonary embolism of more than 40%. Forty-eight patients (56%) had experienced more than one pulmonary embolism before the filter was placed. A floating thrombus was found in 42 patients, 28 of whom had iliocaval thrombosis. The site and the type of venous thrombosis were correlated with the degree of embolic amputation (Table I). Indications for filter caval interruption are listed in Table II. We were unable to classify one patient who had pulmonary embolism and had to undergo emergency orthopedic surgery. No venous thrombosis was visualized on vena cavograms and cardiac sonography was normal.

## THE "LGM" CAVAL FILTER

The "LGM" filter is a stamped, six-pronged, cone-shaped, metal device. On each leg, there is a hooked stabilizer and six sharp ends which ensure the centering and the fixation of the device (Fig. 1). The filter is made of stainless steel with high cobalt content, well-known for its biocompatibility, resistance to corrosion and elasticity. In the opened position, the diameter of the filter is 30 mm, its height, 47 mm. The filter is

### TABLE II.—Indications for "LGM" caval filters in 100 patients

| Indication | Number |
|---|---|
| Severe pulmonary embolism with lower limb venous thrombosis | 17 |
| Pulmonary embolism and contraindication to anticoagulation | 9 |
| Pulmonary embolism and iliocaval thrombosis | 26 |
| Recurrent pulmonary embolism in spite of heparin | 31 |
| Iliocaval thrombosis without embolism | 13 |
| Cor pulmonale with lower limb venous thrombosis | 3 |
| Others | 1 |

packed in a syringe ready for use. The external diameter of the accompanying single-use carrier catheter or applicator is four mm.

## TECHNIQUE OF PLACEMENT OF THE "LGM" FILTER

The patient is positioned in the dorsal supine position with a cushion placed under his shoulders. His head is turned to the left away from the right internal jugular vein which is punctured under local anesthesia passing between the sternal and clavicular heads of the sternocleidomastoid muscle. If percutaneous catheterization is not achieved on the right, alternatives include venous cutdown, left jugular, subclavian or femoral approaches. This was not done in our series.

A J guidewire is inserted and run down through the inferior vena cava under fluoroscopy, then the applicator is inserted over the guidewire until its extremity is flush with the lowest border of the renal veins previously landmarked on preoperative vena cavogram with respect to the lumbar spine. The J guidewire is withdrawn, heparin is injected into the applicator, and the site of discharge is confirmed by a repeat cavogram. The reoccupied metal landmark on the discharging piston of the applicator should be placed approximately four cm below the left renal vein (Fig. 2). The discharging piston is removed, the

COOKFOIA 000124







**Fig. 1.** "LGM" filter with six legs and stabilizers which ensure correct alignment (arrow). Components of filter introduction, seating, and discharge system also shown.

**Fig. 2.** Placement of "LGM" filter: Metal reoccupied landmark on applicator should be located about 4 cm below renal vein.

marker ring is placed at the level of the neck puncture point, heparin is injected into the applicator, and the filter syringe is screwed on to the applicator. The filter is placed in the capsule (Fig. 3a) and pushed down until the black mark is flush with the entrance of the capsule. In this position, the filter is ready for discharge at the end of the capsule (Fig. 3b). The filter is ejected by pushing on the capsule while the other hand holds the piston firmly (Fig. 3c). The insertion apparatus is removed and the puncture site is compressed during ten minutes.

Patients receive intravenous heparin immediately after the operation, then heparinate of calcium, and antivitamin K anticoagulation for three months. Anticoagulation is then generally discontinued.

## RESULTS

### Immediate

There were no deaths or complications due to the placement of the "LGM" caval filter. No intraoperative or immediately postoperative embolism occurred in this series. Of 100 attempts at insertion, there were only two failures by the internal jugular route. Of the 98 filters discharged, 82 were positioned correctly. Eight filters had a 15 degree tilt or more, although they opened adequately. Five filters opened incompletely, but were correctly aligned, while three were incompletely opened and tilted. Most misplacements

occurred at the beginning of our experience and were due to errors in the discharging protocol. The position of the filters with respect to the vertebrae is listed in Table III.

### At one year

Eight patients died of their initial disease within the year after insertion of their filter. Embolism recurred in two patients, one at one month, the other at six months. In the first case, the filter had failed to open completely and was tilted; it then migrated from L1 to T12. In the second case, the filter was correctly aligned but incompletely opened in a patient who had an underlying floating caval thrombus. In both cases, the severity of pulmonary embolism was moderate and recurrent embolic migration was not observed. Twenty-nine patients had lower-limb edema one year after insertion in spite of constant use of elastic support hose. Of these patients, seven had vena caval thrombosis whereas in the remaining 22, the vena cava was patent below the filter although they had iliofemoral or extended femoropopliteal thrombosis.

Control cavograms were obtained for 90 patients at one year: the inferior vena cava was patent in 83 and occluded in seven. The principal clinical features of these patients and the date of thrombosis are indicated in Table IV. Three technical problems related to the placement of the caval filter were responsible for immediate thrombosis. In four other cases, a floating

COOKFOIA 000125

VOLUME 2
No 3 - 1988

PERCUTANEOUS TRANSVENOUS CAVAL INTERRUPTION WITH "LGM" FILTER

245



**Fig. 3.** Placement of "LGM" filter: (a) Filter introduction syringe is attached to end of applicator; filter is then pushed into applicator capsule. (b) Filter is seated with piston until black mark is flush with end of capsule. (c) Filter is discharged by firmly holding piston in one hand and pulling back capsule along with other.

COOKFOIA 000126



TABLE III.—Site of "LGM" filter at discharge

| Spinal column level | Number of patients |
|---|---|
| T12 | 0 |
| L1 | 16 |
| L2 | 48 |
| L3 | 30 |
| L4 | 4* |

*Four filters incompletely opened in the iliac bifurcation.

iliocaval thrombosis most likely embolized to the filter and caused secondary caval thrombosis.

Thirteen filters migrated, nine to the iliac veins, and four to the renal veins. In all cases, displacement was less than the height of one vertebra, and there were no associated clinical consequences except in one case in which the migration of the filter from L1 to T12 was associated with recurrent embolism as mentioned above.

## DISCUSSION

In order to evaluate a new technique of partial interruption of the inferior vena cava, we had to compare it with the best available technique, which is presently considered to be the Greenfield vena caval filter. Evaluation should include "user-friendliness" of insertion, problems of opening and migration, prevention of recurrent pulmonary embolism, and persistence of inferior vena caval patency. As the follow-up in this series was only one year, only early results could be analyzed.

Failure to insert or to pass the catheter by the internal jugular route occurred in 2% of our patients. This is similar to or better than the failure rates reported by others; 8.5% for Andreassian and colleagues in 105

cases of Greenfield filters inserted by the jugular route [2], 9% for Combe [3], and 2.7% for Greenfield [4] when both the jugular and femoral approaches were employed. The "LGM" filter can also be inserted by the femoral route with a specially designed applicator. This, however, is impossible in the case of caval, bilateral iliac, or femoral thrombosis, which precludes its use in a large number of patients. The external caliber of the "LGM" filter applicator is 4 mm compared with 8 mm for the Greenfield model; this explains why the "LGM" filter may easily be inserted by the percutaneous route.

Incomplete opening of the filter occurred in eight patients; all "misfires" were due to technical errors, because, in the beginning of our experience we pushed the filter directly out rather than releasing it by uncovering it as the capsule was removed, thus allowing the filter to spring open in the vena caval lumen. During this maneuver, the stabilizers are the first to egress from the capsule, centering the filter in the middle of the lumen. The legs of the filter come out next and secure the filter in the correct position. Entanglement of the legs of the filter, which occurs occasionally with the Greenfield device, is impossible with the "LGM" filter because the filter is delivered already placed in the carrier syringe; no further maneuvers are required.

Tilting of the filter has been observed with all previously used intracaval devices. This occurred in 8% of our cases, and in 12% of 154 cases for Greenfield and associates [5]. When tilting occurs, the filter loses some of its effectiveness as clots greater than 3 mm can pass through the legs when it is improperly seated. Recurrent pulmonary embolism was observed in one of the eight patients in whom the filter was discharged in a tilted position. Migration of the "LGM" filter, which occurred in 13 patients in this study, was always less than the height of one vertebra. One of the migra-

TABLE IV.—Circumstances of onset of caval thrombosis after placement of "LGM" filter

| Patient | Age | Venous thrombosis before placement of filter | | Technical problems | Date of onset of caval thrombosis |
|---|---|---|---|---|---|
| | | Site | Floating | | |
| 1 | 60 | caval | yes | none | 1 year |
| 2 | 55 | caval | yes | Incomplete opening of filter | 8 days |
| 3 | 72 | femoral | no | none | 1 year |
| 4 | 45 | iliac | no | none | 3 months |
| 5 | 80 | femoral | no | migration of filter from L2 to L3 | 8 days |
| 6 | 65 | caval | no | tilted filter in iliac vein | 8 days |
| 7 | 68 | iliac | yes | none | 6 months |

COOKFOIA 000127



tions was responsible for recurrent embolism: this occurred when the improperly opened and tilted filter migrated from L1 to T12. Migrations are common with the Greenfield filter as Greenfield himself evaluated their incidence at 35%, 6% being proximal, while 29% were distal. Compared with these data, the "LGM" filter appears to be more stable than the Greenfield model.

Two recurrent embolisms were observed after one year in our series. The incidence of recurrent embolisms has been evaluated at 5% for the Greenfield filter [7] and 1.8% for the Mobin-Uddin device [8]. Seven caval thromboses were demonstrated in the 90 patients surviving at one year, all of whom had control cavograms. The only comparative prospective study on patency is that of Clement [9] who found that the vena cava remained patent in 88% of 216 cases with control venograms at three and six months. Greenfield reported a 98% patency rate, but this was based on only 99 of 257 filters, and of these, only 38 traditional peripheral venograms had been obtained.

The 93% patency rate found in our series for the "LGM" caval filter is therefore quite satisfactory. Comparison with the Greenfield filter, however, is difficult because of the disparity between the studies and the questionability of historical comparisons. Moreover, because of the long follow-up period now available for the Greenfield filters, the long-term rate of occlusion is higher than our series for which follow-up is still short.

It is difficult to distinguish the venous sequelae due to the placement of the "LGM" filter from those due to thromboembolic disease; moreover, follow-up in our series is short. Lower-limb edema was noted in 29 patients. Twenty-two patients had extended venous thrombosis before insertion of their filter, possibly explaining the observed disorders even though the filter remained patent. Seven patients developed thrombosis after the filter was placed, and in these

cases, venous sequelae can be considered to be secondary to the filter.

## CONCLUSION

There are several specific advantages to the "LGM" filter: its small size allows insertion of the filter percutaneously through the internal jugular vein under local anesthesia. On the other hand, mishaps similar to those observed with the Greenfield filter have been noted. Tilting and migration seem to be less common than in the best series of Greenfield; prevention of embolism is excellent.

## REFERENCES

1. RICCO JB, LEHMANN G, CROCHET J, LEFEBVRE JM, BOUISSOU E. Improved filter and catheter design (LGM) for percutaneous transvenous interruption of the inferior vena cava. In MAUER PC (Ed). Proceedings 14th World Congress International Union of Angiology, Munich: Verlag Munchen, 1986, pp 443–444.
2. ANDREASSIAN B, COHEN G, DUCHATELLE JP, KITZIS M, CHALAUX G, PAROT A, RICHER DE FORGES M. Methodes, resultats et indications de l'interruption de la veine cave inferieure. *Chirurgie* 1984; *110:442–449.*
3. COMBE J, MILLON G, COMBE M, FERGANE B, MILLERET P. 102 filtres de Greenfield: problemes techniques et resultats precoces. *Chirurgie* 1983; *109:693–699.*
4. GREENFIELD LJ, PEYTON R, CRUTE S, BARNES R. Greenfield vena caval filter experience: late results in 156 patients. *Arch Surg* 1981; *116:1451–1456.*
5. GREENFIELD LJ, STEWART JR, CRUTE S. Improved technique for insertion of Greenfield vena cava filter. *Surg Gynecol Obstet* 1983; *156:217–219.*
6. PHILLIPS MR, WIDRICH WC, JOHNSON WC. Perforation of the inferior vena cava by the Kimray Greenfield filter. *Surgery* 1980; *87:233–235.*
7. GREENFIELD LJ. Current indications for and results of Greenfield filter placement. *J Vasc Surg* 1984; *1:502–504.*
8. MOBIN-UDDIN K. The use of the umbrella in the treatment of thromboembolism. In VARCO RL, DELANEY JP (Eds). Controversy in Surgery. Philadelphia: Saunders, 1976, pp 321–336.
9. CLEMENT C, NICAISE H. La retention des branches du filtre intra-cave de Greenfield: signe indirect de thrombose de la veine cave inferieure. *Presse Med* 1985; *14:17–56.*

■ ■ ■

COOKFOIA 000128

Reprinted from ANNALS of SURGERY, Vol. 185, No. 6, June 1977. Copyright © 1977, by J.B. Lippincott Company.
Printed in U.S.A.

# Clinical Experience with the Kim-Ray Greenfield* Vena Caval Filter

L. J. GREENFIELD, M.D., J. ZOCCO, M.D., J. WILK, M.D., T. M. SCHROEDER, M.D., R. C. ELKINS, M.D.

From the Departments of Surgery of the University of Oklahoma Health Science Center, Oklahoma City, Oklahoma and the Medical College of Virginia, Virginia Commonwealth University, Richmond, Virginia

Over a four year period in two institutions, 85 Kim-Ray Greenfield vena caval filters were inserted in 76 patients who have been followed for a minimum of 6 to 53 months. The most frequent indication for placement was pulmonary embolism during anticoagulant therapy. Both femoral and jugular routes were used for transvenous insertion, and fewer complications were associated with the jugular approach. Surgical mortality within two weeks of operation occurred in three patients (4%), none from recurrent embolism. Late complications included recurrent thrombophlebitis in 7% and persistent extremity edema in 12% of patients. Two patients developed recurrent embolism (2.6%) which also was seen in 2 patients after clips were placed on the vena cava above the filter after misplacement. Venacavagrams in 31 patients an average of 11 months postoperative showed patency in 30 (97%) and lysis of trapped thrombi in four patients. No episodes of migration have occurred and the filter offers the advantages of sustained patency and effective filtration without vena caval occlusion.

P REVENTION OF PULMONARY embolism by transvenous insertion of a prosthesis into the inferior vena cava offers the advantages of minimal morbidity and mortality rates, hospital stay, and patient cost. This procedure as opposed to direct approaches to the vena cava was reserved originally for patients who could not tolerate general anesthesia but now should be considered for all patients who have a valid indication for mechanical protection against pulmonary emboli. Surgical ingenuity has produced a variety of devices to serve this purpose, the most popular of which has been the Mobin-Uddin umbrella.[10] In an effort to avoid some of the problems associated with this prosthesis, we designed a filter to provide effective trapping of emboli without producing vena caval occlusion or threat of migration.[2] This report reviews our clinical experience over the four year period from 1972 to 1976.

Presented at the Annual Meeting of the Southern Surgical Association, December 5–8, 1976, Palm Beach, Florida.
* U. S. Pat. No. 3952747
Submitted for publication December 10, 1976.

## Patients and Methods

Eighty-five filters were inserted in 76 patients: 29 at the University of Oklahoma Health Science Center, Oklahoma City, Oklahoma; 9 at the Great Plains Surgical Clinic, Lawton, Oklahoma; and 38 at the Medical College of Virginia, Virginia Commonwealth University, Richmond, Virginia. The patients ranged in age from 15–85 years with an average of 54 years, and included 28 females and 48 males. They have been followed for a minimum of 6 months to a maximum of 53 months from the time of insertion. Follow-up information was obtained by personal examination in the majority of cases and by telephone communication with patient or referring physician where necessary. Patients who died were subjected to autopsy examination of the pulmonary vascular bed as well as the filter which was exposed and photographed in situ after removal of the entire vena cava and iliac veins. Where autopsy was not permitted, review of the events prior to death was made to determine the possibility of recurrent embolization and post-mortem radiographic examination of the abdomen performed to confirm the position of the filter.

Any complication or death occurring within two weeks of surgery was presumed to be of a surgical nature. Patients who were anticoagulated prior to operation were administered heparin 12 hours after operation and maintained on oral anticoagulants for a period of four months. Follow-up venacavagrams were obtained by injection of contrast medium via a catheter positioned in the lower vena cava. These were obtained in cooperating patients at one month, 6 months, and

COOKFOIA 000129

Vol. 185 • No 6                                    VENA CAVA FILTERS                                              693

TABLE 1  Indications for Kim-Ray Greenfield Filter Placement in 76 Patients from 1972 to 1976

|  | | Percent |
|---|---|---|
| Contraindication to anticoagulation | 19 | 23 |
| Complication of anticoagulation | 13 | 16 |
| Prophylaxis | 9 | 11 |
| Recurrent embolism on anticoagulants | 31 | 38 |
| Following pulmonary embolectomy | 7 | 8 |
| More than one indication | 3 | 4 |
|  | 82 | 100 |

TABLE 2  Coexisting Disorders in 76 Patients Receiving Kim-Ray Greenfield Filters from 1972 to 1976

|  | Patients* | Percent* |
|---|---|---|
| Clinical deep venous thrombosis | 24 | 32 |
| Postoperative or postpartum | 11 | 14 |
| Trauma | 10 | 13 |
| Malignancy | 11 | 14 |
| Cardiac disease | 9 | 12 |
| Obesity | 8 | 11 |
| Arterial vascular disease | 7 | 9 |
| Gastrointestinal disease | 7 | 9 |
| Psychiatric disorder or alcoholism | 4 | 5 |
| Central nervous system disease | 4 | 5 |
| Pulmonary hypertension | 3 | 4 |
| Hypercoagulation state | 2 | 3 |

* More than one disorder diagnosed in some patients.

then yearly following operation. Peripheral venograms and additional venacavagrams were obtained where indicated clinically.

Extremities were evaluated by measurement of circumferences and edema was considered to be significant it it produced discomfort, required wearing of elastic stockings, or the administration of diuretic agents. The diagnosis of pulmonary embolism was made by pulmonary angiography and measurement of pulmonary arterial pressure to permit classification of the disease as described previously.[5] Lung photo-scanning also was obtained and used to follow resolution of the emboli. Lung scans also were used for screening of patients with pulmonary complaints during follow-up examination, recognizing their limitation in terms of specificity but also their value in terms of sensitivity. The appearance of a new perfusion defect of segmental size or larger in comparison with previous scans was considered to be strongly suggestive of recurrent embolism.

The technique of insertion has been described[1] and employs a catheter-carrier inserted usually via the jugular vein. Contrast medium can be injected through the catheter for verification of proximity to the renal veins. Insertion via the femoral vein was employed in conjunction with catheter pulmonary embolectomy and occasionally for other technical reasons. In each instance the vein was repaired by vascular suture to minimize stenosis at the point of repair.

## Results

The most frequent indication for filter placement was recurrent embolism during anticoagulant therapy which occurred in 31 patients (38% of indications, Table 1). Second in frequency was a contraindication to anticoagulation which existed in 19 patients (23%) followed by a complication of anticoagulation in 13 patients (15%). Fewer filters were inserted prophylactically, following pulmonary embolectomy, or for more than one indication. Prophylactic insertion in the absence of pulmonary embolism was felt to be justified only for a free floating thrombus above the level of

the groin in a patient who could not be anticoagulated due to associated disease or who was scheduled for a major operative procedure.

Coexisting deep venous thrombosis was evident clinically in 24 patients (32%, Table 2). Predisposing factors included malignancy, postoperative state, cardiac disease, obesity, and others as shown in Table 2.

The femoral route for insertion of the filter was used in 30 patients (39%), primarily because it was the only technique available until late 1974 and afterwards only in conjunction with catheter embolectomy or after failure or contraindication to jugular insertion (three patients). Early technical difficulty maneuvering the catheter-inserter out of the pelvis required placement of two filters, one in each iliac vein in 6 patients and one in the iliac vein and IVC in one patient as previously reported.[7] Table 3. In two patients, the catheter inserter could not be passed into the superior vena cava necessitating a femoral approach and in one additional patient, the left jugular vein was used successfully. Venous perforation by the femoral

TABLE 3  Operative Mortality and Morbidity Following Filter Insertion in 76 Patients

|  | Jugular | Femoral | Percent |
|---|---|---|---|
| Mortality within 2 weeks | 1 | 2 | 4 |
| Failure to pass catheter into IVC | 2 | 6 | 11 |
| Misplacement: | | | |
| cardiac | 1 | | 1 |
| suprahepatic | 1 | | 1 |
| renal | 3 | | 4 |
| iliac | 2 | 7 | 12 |
| Hemorrhage: | | | |
| retroperitoneal | 1 | 0 | 1 |
| wound | 1 | 3 | 5 |
| Venous perforation by catheter | 0 | 2 | 3 |

COOKFOIA 000130

694                                    GREENFIELD AND OTHERS                          Ann. Surg. • June 1977

TABLE 4. *Late Mortality and Morbidity Following Filter Insertion in 76 Patients*

|                              | Patients | Percent |
|------------------------------|----------|---------|
| Retroperitoneal hemorrhage   | 1        | 1.3     |
| Recurrent thrombophlebitis   | 4        | 5.2     |
| Extremity edema              | 9        | 11.8    |
| Suspected recurrent embolism | 2        | 2.6     |
| Migration of the filter      | 0        | 0       |
| Mortality                    | 13       | 17.1    |

catheter-inserter, occurred in two patients, one below and one above the inguinal ligament. In neither patient was additional surgery required nor were adverse sequelae observed.

Misplacement occurred also via the jugular approach. It was due to premature ejection of the filter in two cases, one lodging in the right atrium and one in the suprahepatic vena cava. Operative removal was required only for the intracardiac filter. There were 5 misplacements due to errors of position under fluoroscopy, three in the right renal vein and two at the bifurcation of the IVC with one or more of the struts of the filter placed into the right iliac vein. There were no direct adverse sequelae to these placements, but in one patient concern for adequate filtration led to operative placement of a clip on the vena cava above the filter and there was postoperative recurrent pulmonary embolism. In another patient whose filter was placed in the right common iliac vein in the face of left iliofemoral thrombi, recurrent embolism was documented and required placement of additional filters in the IVC and a large ovarian vein.

Retroperitoneal hemorrhage was suspected in one patient postoperatively because of fall in hematocrit after heparin administration. Wound hematomas were noted in one neck and three groin wounds. Only the groin wounds required open evacuation and each hematoma followed anticoagulation of the patient. Late retroperitoneal hemorrhage occurred in one patient three weeks postoperative following excessive prolongation of prothrombin time (Table 4). Recurrent thrombophlebitis occurred in 5 patients (7%) most of whom were not on anticoagulants at the time or had

TABLE 5. *Results of Venacavagrams Obtained after Filter Insertion*

|                               |        | Percent |
|-------------------------------|--------|---------|
| Patients Studied              | 31     | 40.7    |
| Total Studies                 | 44     |         |
| Months Postoperative (average)| 1–27 (11) |      |
| Trapped thrombi               | 4      | 12.9    |
| Clearing of trapped thrombi   | 3      | 75.     |
| Occlusion of IVC              | 1      | 3.2     |
| Patency documented            | 30     | 96.8    |

a contraindication to anticoagulation. Late edema of significance as defined earlier was seen in 9 patients (12%) usually in those patients who had the most extensive preoperative thrombophlebitis.

Recurrent thromboembolism was suspected in two patients on the basis of symptoms for an incidence of 2.6%, but only one of them had a significant alteration in perfusion lung scan. As mentioned previously two patients underwent reoperation for placement of a vena caval clip after misplacement of the filter and each of them sustained a postoperative pulmonary embolism as demonstrated by a new perfusion defect on lung scan. Migration of the filters was not observed.

Operative mortality within two weeks of operation occurred in three patients for a mortality rate of 4%. There were 13 deaths overall which occurred at intervals of two days to 16 months postoperative for a mortality rate of 17.1%. Autopsies were obtained in 8 of them and showed no evidence of recent or recurrent embolism. The patient who died two days after operation was found in fact not to have had pulmonary embolism. The other deaths were due to underlying cardiac, neoplastic, hepatic, renal, or neurological diseases. Eight patients were lost to follow-up.

Postoperative venacavagrams have been obtained at intervals of 1–27 months (Table 5). A total of 44 studies in 31 patients were obtained at an average interval of 11 months after filter insertion. Four patients demonstrated trapped thrombi and patent vena cavas at the time of initial venacavagram (Fig. 1). Three of them have been restudied and each of them showed resolution of the trapped thrombus (Fig. 2). Only one patient has shown occlusion of the vena cava and this was suspected by evidence on plain abdominal radiograph of contraction of the limbs of the filter as reported previously.[5] Documentation of patency then was found in 30 of 31 patients for a late patency rate of 97%. It is not uncommon to see tenting of the wall of the elastic vena cava by one or more struts of the filter outside the apparent contrast limits of the vena cava. On the basis of experimental and autopsy examination, this does not indicate perforation of the wall but instead an enfolding of the strut by the stretched vena cava wall.

## Discussion

Improvements in the management of patients with deep venous thrombosis and pulmonary embolism using anticoagulant therapy have reduced the need for mechanical interruption of the inferior vena cava. However, anticoagulation alone carries a mortality rate of 5–12%[15] and significant numbers of patients continue to sustain recurrent thromboembolism on adequate anticoagulant therapy or develop a serious

COOKFOIA 000131

complication of anticoagulation. In addition, many patients cannot be anticoagulated because of associated medical, surgical, or psychological disorders. In these patients there is a clear need for mechanical protection against thromboembolism provided that the procedure does not add significant morbidity or the risk of death.

Dissatisfaction with the results of vena caval ligation led to techniques of partitioning the cava to preserve flow. However, all of the devices designed for external compression of the cava required a general anesthetic and operative placement. A major conceptual advance was made by Eichelter and Schenk in 1968 who advocated a transvenous approach by catheter device under local anesthesia. This catheter and the Moser balloon were designed for temporary protection and later removal, but concern for the fate of trapped thrombi at the time of removal led to the next improvement. This was the transvenous implantation of a device for permanent caval narrowing (Pate clip), for total occlusion of blood flow (Hunter balloon) or for more gradual occlusion of blood flow by an umbrella device (Mobin-Uddin). The latter device has had widespread application with generally favorable results so that the indications for placement were extended beyond only the more critically ill patients.

The most serious complication of the Mobin-Uddin umbrella has been migration which was documented in 20 patients receiving the original 23 mm diameter device. Because of this, the diameter was increased

to 28 mm, but of the 234 patients receiving the larger device there have been two additional episodes of migration. It seems likely that the explanation for the migration after what appears to be adequate fixation is due to distention of the vein by distal embolus which distracts the caval wall freeing the device from its attachment (Fig. 3). The consequences of migration have been very serious with death in 14 of the 22 patients. An additional 20 patients were reported to show partial dislodgement and in 6 of them a larger umbrella was inserted above the previous one. Other patients had surgical interruption of the vena cava above the device. Additional complications reported include misplacement, retroperitoneal hemorrhage, perforation of the duodenum and ureter, and propagation of thrombus proximal to the umbrella with recurrent emboli. The latter complication is thought to result from turbulent flow, stasis, and the irregular surfaces on the proximal side of the umbrella requiring prolonged anticoagulation. As a consequence of the tendency of the umbrella to thrombose, caval patency has usually been lost and approximately 67% of patients show occlusion on re-examination. An effort has been made to reduce this by heparin bonding of the surface of the umbrella, but even when patent, pressure gradients as high as 20 mmHg have been measured below it.

In an effort to avoid these problems, and to design a filter which could be inserted at the time of catheter pulmonary embolectomy via the femoral vein,

Fig. 1. Contrast venacavagram in a 34-year old female showing an embolus trapped within the filter (arrow). Free flow of blood around the embolus is well demonstrated and no collateral veins are seen.



Fig. 2. Follow-up venacavagram obtained 6 months after initial demonstration of an embolus trapped in the filter (Fig. 1). Complete resolution of the embolus has occurred and free flow of contrast medium is seen within the vena cava.

COOKFOIA 000132



Fig. 3. Schematic illustration of the effects of a large embolus in the inferior vena cava tending to distend its walls after contact with a prosthesis. On the left, the Mobin-Uddin umbrella can be freed from its attachment permitting angulation and passage of the embolus or actual migration of both prosthesis and embolus. On the right the Kim-Ray Greenfield filter is embedded more securely by capture of a large embolus avoiding the possibility of migration by the "fish-hook" principle.

a cone-shaped stainless steel device was selected to permit entrapment of emboli without eliminating flow.[6] The geometry of the cone allows filling of 80% of its depth before the cross-sectional area is reduced by 64% which would be required to produce a pressure gradient. The filter is made of corrosion-resistant stainless steel struts fixed at an angle of 35° to an apical hub and is 40 mm in length and 30 mm at maximal open diameter at the base. Spacing between the struts ranges from two mm at the apex to approximately 6 mm at the base after insertion, but the principle of axial flow tends to direct a small moving embolus into the apex of the cone insuring that emboli larger than 3 mm will be trapped effectively. Fixation occurs by the recurved hooks which grasp the wall of the vena cava usually without full thickness penetration.[6] This "fish-hook" principle prevents proximal migration and becomes even more secure with capture of a large embolus distending the vena cava (Fig. 3).

Now that the transvenous methods of mechanical protection against pulmonary embolism have been established as safer and equally effective as more major surgical procedures, the standards should be

* Kim-Ray Medical Associates, 53, N.W. 42nd Street, Oklahoma City, Oklahoma.

elevated to include reduction in associated morbidity. It seems clear that preservation of vena caval blood flow allows the optimal physiological recovery of function of the venous system after thrombophlebitis. However, the filter does not treat the underlying disorder and the need for continued anticoagulation must be established for each individual patient. The additional benefit of preserved flow around a trapped embolus has been well demonstrated in this series by lysis of the thrombus on repeat venography and was predicted from experimental studies.[2] The problems of misplacement and premature discharge should improve with additional experience although any indirect placement under fluoroscopy will be subject to some errors of positioning. The ability to inject contrast medium through the catheter inserter as described should help to minimize this difficulty. The incidence of recurrent embolism after filter placement is comparable to other series and will probably remain in the 2–3% range subject to the variables of anticoagulation. The operative mortality rate of 4% compares favorably with the rate of 16% reported by Mobin-Uddin et al.[9] and the mortality rate of 12% associated with anticoagulation alone.[13] However, the most important advantage of the Kim-Ray Greenfield filter appears to be its ability to remain patent even after trapping emboli so that placement at higher levels in the vena cava may well be possible to provide filtration of the gonadal veins as well.

### Acknowledgments

The authors are grateful to Drs. Richard J. Allgood, Donald H. Garrett, Thomas M. Daniel and Thomas N. P. Johns for permission to include their patients in this review.

### References

1. Bloomfield, D. A., Jemain, S. L. and Cerruti, M. M.: Intracaval Umbrella Filter Therapy of Pulmonary Embolism. N.Y. State J. Med. 74:2185, 1975.
2. Brown, P. O., Elkins, R. D., and Greenfield, L. J.: Comparison of a New Intracaval Filter with the Mobin-Uddin Device and Clinical Experience. Circulation 48 (Suppl 4):5, 1973.
3. Eichelter, P., and Schenk, W. G., Jr.: Prophylaxis of Pulmonary Embolism: A New Experimental Approach with Initial Results. Arch. Surg. 97:348, 1968.
4. Friedman, S. A., Cerruti, M. M., Berger, N., et al.: Thromboembolism with the Intracaval Umbrella. Am. Heart J. 84:537, 1972.
5. Greenfield, L. J.: Pulmonary Embolism: Diagnosis and Management. Curr. Prob. Surg. Vol XIII: Apr. 1976.
6. Greenfield, L. J., McCurdy, J. R., Brown, P. P., and Elkins, R. C.: A New Intracaval Filter Permitting Continued Flow and Resolution of Emboli. Surgery 73:599, 1973.
7. Greenfield, L. J., Peyton, M. D., Brown, P. P., and Elkins, R. D.: Transvenous Management of Pulmonary Embolic Disease. Ann. Surg. 180:461, 1974.
8. Hunter, J. A., Sessions, R., and Buenger, R.: Experimental Balloon Obstruction of the Inferior Vena Cava. Ann. Surg. 171:315, 1970.

9. Mobin-Uddin, K., Callard, G. M., Bolooki, H., et al.: Transvenous Caval Interruption with Umbrella Filter. N. Engl. J. Med. 286:55, 1972.

10. Mobin-Uddin, K., McLean, R., Bolooki, H., and Jude, J. R.: Caval interruption for prevention of Pulmonary Embolism: Long Term Results of a New Method. Arch. Surg. 99-711, 1969.

11. Mobin-Uddin, K., Utley, J. R. and Bryant, L. R.: The Inferior Vena Cava Umbrella Filter. Prog. Cardiovasc. Dis. 17:391, 1975.

12. Moser, K. M., Hursany, P. G., Harvey-Smith, W., Durante, P.,

and Gursan, M.: Reversible Interruption of Inferior Vena Cava by Means of a Balloon Catheter. Preliminary Report. J. Thorac. Cardiovasc. Surg. 62:205, 1971.

13. Parg, J. W., Melvin, D., and Cheek, R. C.: A New Form of Vena Caval Interruption. Ann. Surg. 169:873, 1969.

14. Piccone, V. A., Vidal, E., Yarnuz, M., Glass, B. S., and LeVeen, H. H.: The Late Results of Caval Ligation. Surgery 68:980, 1970.

15. Silver, D., and Sabiston, D. C., Jr. The Role of Vena Caval Interruption in the Management of Pulmonary Embolism. Surgery. 77:1, 1975.

---

## DISCUSSION

DR. WALTER WOLFE (Durham, North Carolina): This paper should remind us, or at least bring back to memory, that there are probably over 200,000 documented cases of pulmonary emboli a year, and should highlight for us the significance of this problem.

Dr. Greenfield has presented here an improvement that is significant. I think, in that this occlusive device has apparently reduced the incidence of migration and catastrophic dislodgement which has plagued similar devices. This important point, I believe, needs to be stressed, and the many complications of the previous devices are well known and he has pointed this out very well.

We also agree that interruption of the vena cava should be done only with stricter indications; that is, in patients with proven recurrent emboli on adequate anticoagulation and patients where anticoagulation is not possible.

At Duke we have reviewed a thousand cases consecutively of proven pulmonary embolism. 729 of these were diagnosed and treated. They were all treated with heparin. We had a 2% mortality in this group. We had 7% major complication from heparin, and in two patients we believe the death was contributed by the heparin therapy.

Over the past 10 years we have used caval interruption in approximately two patients per year.

I have a question for Dr. Greenfield. I'd like him to elaborate on the total patient population this group came from. I wonder if he might comment some more on the significance of the extremity edema. Deep venous thrombosis is a major cause of emboli. However, many times it is clinically not noticeable. However, once caval interruption is undertaken, extremity edema becomes a problem.

I'm wondering why anticoagulation was continued in this group, and if you might elaborate on that.

I'm still concerned about recurrent emboli through filters, and I'm also concerned about migration, in spite of his results.

In summary, we feel pulmonary embolism should be managed by surgeons, but, basically, nonoperatively. And I stress the need for early, objective diagnosis and adequate heparin therapy.

DR. CHARLES H. WRAY (Augusta, Georgia): (Slide) One of the questions that Dr. Greenfield's paper raises in our minds is: Are we selecting patients properly for caval interruption? Even Dr. Wolfe's comments, these may be slightly redundant. Drs. Silver and Sabiston found that 5% of their patients died, and 5% required caval ligation. Probably more than 90% of patients can be treated with heparin alone.

The patients that die frequently succumb before therapy can be instituted on an adequate basis.

The patients that Dr. Greenfield reports and our patients include a large number of patients with contraindications to anticoagulant therapy. However, the more carefully we have studied patients with suspected recurrent embolism, the more we have rejected patients for caval interruption.

In 1972, when we reviewed these venograms in patients who had had therapeutic application of the Moretz clip, we found that approximately 20% showed either total or partial occlusion at the clip

site. These, in fact, are the patients that needed a clip because of an embolus after clip application.

Dr. Greenfield has demonstrated approximately 13% defects at his filter site. While this denotes a lack of thrombogenic effect of the device, the information also suggests that he has, we is not very good in selecting patients who will, in fact, have a subsequent embolus, since 80 to 90% of patients do not have evidence of clot entrapment, and in this sense did not need caval interruption.

My question, then, is: How can we improve our selection of patients for caval interruption?

In an opposite direction, however, while we are convinced of the infrequency of need of caval interruption in the therapeutic sense, we are convinced that there is a need for prevention of pulmonary embolism in certain high-risk patients. All students of this disease process are aware that sudden death from pulmonary embolism before treatment can be instituted is one of our largest challenges.

One of the reasons why caval interruption has not been used more frequently in a prophylactic sense relates to thrombosis at the site of interruption, with subsequent leg edema and ulceration. I believe that Dr. Greenfield had presented adequate evidence that his device does not cause thrombosis, and also that his device would meet some of these ideal criteria: Prevent passage of harmful emboli tertings; simple, safe application; cause no thrombosis at site of interruption; maintain normal venous hemodynamics; maintain effectiveness throughout life of patient.

We have hesitated in certain high-risk patients to make separate incisions to place a clip; for instance, in a patient with a hip fracture. Dr. Greenfield has demonstrated an excellent patency rate for his device; and if the technical details that cause misplacement are solved, then this technique would be applicable to a wide variety of high-risk patients.

(Slide) We are continuing to study caval interruption at this time in other abdominal surgery in high-risk patients. These are the 50 patients that were presented last year at this meeting. We now have approximately 150 high-risk patients with two late, nonfatal pulmonary emboli. The clip can be simply applied in the proper place. While we know that this is not harmful to patients, we do not know yet that it is particularly helpful.

I would like to ask Dr. Greenfield what he sees in the future for prophylactic insertion of his filter.

DR. ROBERT M. MILES (Memphis, Tennessee): Many devices for preventing pulmonary embolism have come down the pike in the past 20 years. Each has his own favorite, and I think each developer of such devices becomes proficient in the utilization of his particular device, and probably gets better results than others who might try to use it.

We prefer clipping, as you know, for several reasons. It's a direct procedure, which enables its precise application. In addition to that, our experience has been satisfactory over a period of 14 years. The recurrent embolus rate in our hands is about 5%, the disabling stasis sequelae rate is about 8%, and the mortality rate is about 10%. We feel that filters have a place, and that their chief advantage is that they can be applied under local anesthesia in the very critically ill patient.

The 12% misplacement rate is a little disturbing. If it is to be used in this very critically ill patient, it should be practically foolproof, because the surgery necessary for the removal of one of these devices from the heart or the hepatic vein, or some place like that, negates its real advantage.

We have used a few Mobin-Uddin filters, but the results haven't been too good, probably because we have used them only in the very critically ill patient that, in our opinion, might not survive vena caval clipping. This brings me to the main point, and that is, that most of these patients are not critically ill to begin with; but diagnostic delay, and persistence in treatment with anticoagulants have permitted recurrent embolism and progression of the disease to a critical degree. If these patients were promptly clipped or ligated, there would seem to be little need for a modality such as this.

DR. LAZAR J. GREENFIELD (Closing discussion): I think that at the present time we are in an era where we are challenged to provide adequate protection for the patient, and at the same time provide the patient with minimal morbidity as a consequence of the procedure.

DR. Wolfe's experience has been very favorable, but in the published series from Duke last year by Silver and Sabiston there was, in fact, a 12% mortality rate over all from patients managed on heparin, and in that reported experience 5% of them were thought to have died from recurrent embolism. I think it points out the fact that there is a persistent problem in relying upon anticoagulation alone. It clearly is challenging to us to find the appropriate indications and balance between use of anticoagulation and a mechanical device to protect the patients.

Certainly in our own hospital the complication rate with heparin anticoagulation has been high, somewhere in the range of 30 to 40%. However, we still rely upon heparin as our first line of defense, and utilize it in the management of our patients.

In terms of the total population that we see, these patients represent a very small fraction of the population with pulmonary embolism. The patients are on medical as well as surgical services within the hospital, and most of them are treated effectively by anticoagulants alone.

In terms of extremity edema, we defined this on the basis of any persistent problem for the patient which required either the wearing of elastic stockings or diuretic therapy, and we utilized these criteria to define the complication rate reported.

In terms of the need for continued anticoagulation in these patients, I think this brings up a very important point; and that is that we are not treating the underlying thrombotic problem in these patients by inserting a filter. They need to be maintained on anticoagulants for the underlying disorder. Every patient who has an indication for anticoagulant treatment and can tolerate anticoagulants is in fact maintained on them, generally for a minimum of three to four months, to try to minimize some of the late complications with deep venous thrombosis.

DR. Wray's comments in terms of selection of patients and whether or not it is appropriate on the basis of vena cavagrams is, I think, asking too much of the vena cavagrams. They are obtained at six-month intervals in our patients. I think there's really no way to know how many emboli have been trapped during that interval and whether or not the filters are, on that basis, doing the job that they are supposed to do. We simply don't have the ability to measure the migration of small emboli, and not much more information regarding the migration of large emboli.

In terms of the future for prophylactic insertion, it's interesting that because of our favorable experience there is considerable pressure on us from all services in the hospital to put filters in patients for indications that we do not accept at the present time; that is, the demonstration of major free-floating thrombi. Whether or not this will represent a valid indication in the future remains to be proved. I feel, personally, that we should continue to be strict in our indications for placement, and not relax them until we have more experience.

DR. Miles' experience has been favorable. In terms of the concern that he expressed about misplacement in the critically ill patient, these misplacements have not been ignored. In most instances a second filter has been placed, if the first one was misplaced, so that the patient would be guaranteed of protection.

These critically ill patients are, of course, our major concern, and I think the logic is hard to defend of continuing to subject patients to a major operative procedure and prolonged hospitalization, in order to protect them from recurrent embolization. Clearly, we have a technique available now which can provide the patient with effective prevention, and, hopefully, with long-term results that will show that this is, indeed, the optimal method of management of patients with pulmonary embolism.

COOKFOIA 000135

# Operative Removal of Misplaced Greenfield Vena Caval Filters

James R. Stewart, MD, Richmond, Virginia
Victor Loughlin, MB, FRCS, Richmond, Virginia
Stephen L. Crute, BS, Richmond, Virginia
Lazar J. Greenfield, MD, Richmond, Virginia

Using prescribed techniques [1,2], misplacement of the Greenfield® vena caval filter (Medi-Tech, Inc., Watertown, MA) should rarely occur. In our earlier series we have had nine misplacements in 156 patients (5.7 percent) [3]. All misplaced filters were amenable to early removal using a previously described intraluminal device [4]. Conditions that necessitate removal include misplacement in the heart or superior vena cava, or possible misplacement in the femoral or iliac veins. Dislodgement and migration might also necessitate operative removal in some situations, although we have never observed such a situation. We have anecdotal reports of the necessity of using wire cutters to dismantle the device because of the tendency of the hooks to become entangled in the tissues.

As a result of ongoing research in our laboratory and inquiry by physicians in the community, a safe and effective method for open removal of the filter has been developed.

## Technique

The Greenfield vena caval filter has been described elsewhere [5]. Through a midline laparotomy incision, the vena cava is identified and control obtained above and below the filter. Lumbar veins entering the area of the filter are individually ligated. Atraumatic vascular clamps are applied above and below the filter and the vessel is opened through a longitudinal venotomy. As each leg of the filter is mobilized from the wall of the inferior vena cava, PE 240 (internal diameter 0.066 inch) polyethylene tubing is passed over the hook and then is divided (Figure 1). Inadvertent attachment of the hooks to surrounding vital structures during operative manipulation is thus prevented. The procedure is repeated until all legs are freed and sheathed and the filter is safely removed (Figure 2).



*Figure 1. Inferior vena cava is clamped above and below the filter and a polyethylene sheath is placed over the mobilized hook through a longitudinal venotomy.*

From the Department of Surgery, Medical College of Virginia, Virginia Commonwealth University, Richmond, Virginia.

Requests for reprints should be addressed to Lazar J. Greenfield, MD, Department of Surgery, Medical College of Virginia, Box 645, MCV Station, Richmond, Virginia 23298.

408

Removal of Greenfield Filters

The vessel is repaired in standard fashion with monofilament suture material.

## Summary

Operative retrieval has not been necessary in our experience, though interest has been expressed by other surgeons. Specifically, during removal the hooks of the filter may become attached to adjacent structures, making manipulation and eventual extraction difficult. Because the occasion for late removal of a misplaced filter may arise, we have developed this method using readily available materials. We anticipate that this technique will be most useful for removal of filters that have been in place for more than 7 days. A method to retrieve filters in place less than 1 week has already been reported [4]. We have found the technique quite satisfactory in experimental animals.



## References

1. Stewart JR, Greenfield LJ. Transvenous vena caval filtration and pulmonary embolectomy. Surg Clin North Am 1982;62: 411–30.
2. Greenfield LJ. Technical considerations for insertion of vena caval filters. Surg Gynecol Obstet 1979;149:422–6.
3. Greenfield LJ, Peyton R, Crute S, Barnes R. Greenfield vena caval filter experience. Arch Surg 1981;116:1451–6.
4. Greenfield LJ, Crute SL. Retrieval of the Kimray Greenfield vena caval filter. Surgery 1980;88:719–22.
5. Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. A new intracaval filter permitting continued flow and resolution of emboli. Surgery 1973;73:599–606.

*Figure 2. Filter removed from experimental animal with hooks sheathed.*

COOKFOIA 000137

Greenfield L, Stewart J, Crute S. Results of surgical management of pulmonary thromboembolism. *J Clin Surg* 1982; 1: 194–9.

5.  Kantor A, Glanz S, Gordon DH, Sclafani SJ. Percutaneous insertion of the Kimray–Greenfield filter: incidence of femoral vein thrombosis. *AJR Am J Roentgenol* 1987; 149: 1065–6.

6.  Feinman L, Meltzer A. Phlegmasia cerulea dolens as a complication of percutaneous insertion of a vena caval filter. *J Am Osteopath Assoc* 1989; 89: 63–8.

7.  Rose B, Simon D, Hess M, Van Aman M. Percutaneous transfemoral placement of the Kimray–Greenfield vena cava filter. *Radiology* 1987; 165: 373–6.

8.  Stewart J, Peyton W, Crute S, Greenfield L. Clinical results of suprarenal placement of the Greenfield vena cava filter. *Surgery* 1982; 92: 1–4.

9.  Orsini R, Jarrell B. Suprarenal placement of vena caval filters: indications, techniques and results. *J Vasc Surg* 1984; 1: 125–35.

10. Jarrell B, Szentpetery S, Mendez-Picon G, Lee H, Greenfield L. Greenfield filter in renal transplant patients. *Arch Surg* 1981; 116: 930–2.

11. Brenner D, Brenner C, Scott J, Wehberg K, Granger JP, Schellhammer P. Suprarenal Greenfield filter placement to prevent pulmonary embolus in patients with vena caval tumor thrombi. *J Urol* 1992; 147: 19–23.

12. Greenfield L, Cho KJ, Proctor M, Sobel M, Shah S, Wingo J. Late results of suprarenal Greenfield vena cava filter placement. *Arch Surg* 1992; 127: 969–73.

13. Plaus W, Hermann G. Structural failure of a Greenfield filter. *Surgery* 1988; 103: 662–4.

14. Dufretay X, Pagny J, Relland J, Gaux J, Coulaud J, Lissac J. Intracaval breakage of a Kimray–Greenfield filter. *AJR Am J Roentgenol* 1990; 154: 1349–50.

15. Alexander J, Gewertz B, Zarins C. Intraoperative disruption of a Greenfield vena cava filter. *J Cardiovasc Surg (Torino)* 1989; 30: 130–3.

16. Bury T, Barman A. Strut fracture after Greenfield filter placement. *J Cardiovasc Surg (Torino)* 1991; 32: 384–6.

17. Messmer J, Greenfield L. Greenfield caval filters: long-term radiographic follow-up study. *Radiology* 1985; 156: 613–18.

18. Barritt DW, Jordan SC. Anticoagulant drugs in the treatment of pulmonary embolism: a controlled clinical trial. *Lancet* 1960; 1: 1309–12.

Paper accepted 6 June 1994

COOKFOIA 000138

Interventional Radiology

Barry S. Rose, MD • Donald C. Simon, MD • Mary Lee Hess, MD • Michael E. Van Aman, MD

REF. 3 is ①

# Percutaneous Transfemoral Placement of the Kimray-Greenfield Vena Cava Filter[1]

In those patients in whom inferior vena caval interruption was indicated to prevent pulmonary embolism, a Kimray-Greenfield (K-G) filter was placed...



...94 from the right common femoral vein and 15 from the left common femoral vein. All attempts at transfemoral filter insertion were successful except in...

...effective method for inserting K-G filters. The most frequent complication...

Index terms: Catheters and catheterization • ... • Embolism, pulmonary, 6.72 • ... interventional procedure, 569.1299 • Venacavae, filters

Radiology 1987; 165:373–376

INTERRUPTION of the inferior vena cava (IVC) with a Kimray-Greenfield (K-G) filter is an accepted method of preventing pulmonary embolism in patients with deep venous thrombosis in whom treatment with anticoagulants is contraindicated or ineffective (1–4). Between January 1982 and October 1985, 121 K-G filters were placed at our hospital. During this period, the insertion procedure required the combined efforts of a vascular surgeon performing a right internal jugular cutdown and a radiologist placing the K-G filter in the IVC. This approach to filter insertion was inconvenient, laborious, and time consuming. Recently there appeared reports in the literature describing percutaneous insertion of the K-G filter (5–7). We report our experience with percutaneous transfemoral insertion of the K-G filter in 121 patients.

## MATERIALS AND METHODS

From late October 1985 through May 1986, 121 patients were referred to our laboratory for K-G filter placement. In 109 patients the filters were placed percutaneously from the right (94 patients) or left (15 patients) common femoral vein. In the remaining 12 patients, the filters were placed via a right internal jugular approach, 11 following cutdown and one percutaneously. In two of these 12 patients, the jugular cutdown followed an unsuccessful attempt to insert the filter from a left common femoral approach. In the ten patients in whom the femoral route was not attempted, complicating factors included pelvic trauma, iliofemoral thrombosis, and extrinsic compression of the IVC. The patients in whom percutaneous transfemoral filters were placed ranged in age from 16 to 90 years, with an average age of 57 years, and included 63 males and 46 females. The indications for caval interruption in the 109 patients who underwent percutaneous transfemoral filter insertion are summarized in Table 1.

Radiographic examinations: clinical...

...were reviewed for all patients. Cavograms were obtained before filter insertion except in one patient; abdominal radiographs were obtained immediately after filter placement in all patients. Follow-up abdominal radiographs were available for 55 patients, and computed tomography (CT) scans of the abdomen were available in 28. Note was made of the location of the feet of the filter relative to the spine and the renal veins, the greatest lateral span of the feet of the filter, the angle of the filter relative to the longitudinal axis of the IVC, and the size of the IVC at the level of interruption. Changes in the location and angulation of the filter, and any span were noted on follow-up examinations. No corrections were made for the magnification or geometric factors or the small effect on measurements. The angle of respiration was assumed to be the same when sequential studies were compared.

We place the K-G filters from a right common femoral approach whenever possible. The administration of heparin is stopped before the procedure. If the right femoral vein has not been seen on a previous venogram, contrast material is injected through the vessel dilator before catheter insertion to check for femoral vein thrombosis. An inferior vena cavogram is obtained to rule out caval thrombosis, identify anomalies of the IVC, and document the level of the renal veins (6). The infrarenal vena cava is measured to check for megacava, previously shown to be present in about 3% of the population (8).

The K-G filter delivery system is prepared in accordance with the manufactur-...

[1] From the Department of Radiology, Ohio State University Hospitals, 450 W. 10th Ave., Columbus, OH 43210. Received April 16, 1987; revision requested May 30; revision received June 4. Address reprint requests to B.S.R.
© RSNA, 1987
See also the articles by Geisinger et al (pp ...) ...

### Table 1

IVC Interruption

| Indication | Patients |
|---|---|



Figure 1, 2.   (1a) Preplacement cavogram and (1b) postplacement radiograph. The K-G filter was placed several centimeters below the renal veins where the IVC measured 30 mm. The K-G filter placed in right infrarenal renal vein, preventing more proximal pulmonary emboli... A composite photograph of the preplacement and postplacement films of a patient's radiograph... placement... the filter shows single renal performing the IVC cavogram demonstrates again is representative... before the IVC thrombosis occluded...

em thrombus (Greenfield vena cava filter system, Medi-tech, Watertown, Mass.). On two occasions, inspection reveals that the pusher rod component of the delivery system was too short to release the filter from the carrier properly. A modified Amplatz fascial dilator kit (Amplatz renal dilator set; Cook Urological, Spencer, Ind.), which includes a 90-cm-long 8-F coaxial Teflon catheter and dilators ranging from 12 F to 24 F at 2-F increments, is used to enlarge the venipuncture. The 24-F dilator is equipped with a sheath. Recently, we have been using a modified 24-F sheath with a compressible sleeve (Cook/Amplatz sheath assembly).

Following coaxial dilation, the 24-F sheath is advanced into the venipuncture site over the 24-F dilator. After removal of the dilator, bleeding is controlled by squeezing the sleeve of the compressible sheath. Before inserting the K-G filter introducer, the main flush port of the catheter is connected to a pressurized, heparinized saline drip. Continual flushing of the carrier prevents clot formation around the filter while it is in the carrier capsule (3). The carrier capsule is inserted into the sheath and is advanced along the standard J-tipped 0.035-inch (0.089-cm) guide wire into the IVC. Once the carrier capsule exits the sheath and enters the iliac vein, the operator removes the sheath, and the assistant provides hemostatic...

... with the pusher wire extending beyond the nose of the filter in... with the IVC. While the Doc herself is firmly into the... pushing while the cap remains in position, the filter is expelled and displacement of the filter due to motion of the wire. The entire catheter insertion assembly is then withdrawn while the assistant continues to provide pressure at the venipuncture site. The entire procedure, from inferior vena cavography to the clamping of the venipuncture site, requires 20–30 minutes.

Hemostasis is usually achieved within five minutes. In the case of coagulopathy or the use of anticoagulant, a longer time may be required. Common femoral artery insertion may require the operator to obtain hemostasis. A radiograph is obtained after filter placement to document the position of the filter and the skin incision is closed. The postprocedure orders include bed rest and periodic groin checks for several hours.

## RESULTS

We were successful in placing K-G filters from a percutaneous right common femoral approach in all 94 patients in whom it was attempted. The common iliac vein could not be negotiated in two of 17 attempts at filter insertion from the left common... tated the level of filter insertion (Fig. 1). A filter was placed in suprarenal position in five patients. In two of these patients, thrombus was noted tending above the level of the renal veins on the preplacement inferior vena cavogram. An additional patient had renal vein thrombosis with extension into the IVC. One patient had a transplanted kidney, and a filter was placed above the renal renal veins to protect against recurrent embolic disease from...

... the filter was dislodged from the capsule with a curved guide wire, resulting in a suprarenal location. This filter subsequently migrated distally until the feet engaged the right renal vein orifice. None of these five patients have had any evidence of IVC occlusion or compromised renal function during follow-up of 2–17 months.

The filter span as measured from postprocedure radiographs averaged 23.0 mm (range, 17–33 mm). There was no change in span in 30 of 53 (57%) patients for whom follow-up radiographs were available. The span increased by 3–7 mm in 18 (34%) patients. The span decreased by 2 mm in three patients (6%) and by 6...

COOKFOIA 000140



**Complications Following Percutaneous Transfemoral Filter Placement in 109**

| Complication | Patients | Side of Insertion |
|---|---|---|
| | | |

Note. — Numbers in parentheses are percentages.



Figure 4. An inferior vena cavogram shows filling of a large left paravertebral vein (arrow). Placement of a K-G filter from the left common femoral vein was aborted because the filter carrier capsule was consistently trapped by this large vein despite the presence of a guide wire extending into the IVC.

... IVC thrombosis, which developed following insertion of the filter, had been previously documented by means of bilateral lower extremity venography. No complication related to penetration of the IVC was identified.

The filter angle, as measured on initial postplacement abdominal radiographs ... within 15° of the central long axis of the IVC in 105 patients (97%). In three patients, the filters had greater than 16° angulation. A change in angle to 16° or greater was noted on follow-up radiographs in three patients, including the patient in whom a filter strut appeared to penetrate the IVC. A change in the tilt of the axis was identified in two patients.

No filter migration was observed in 25 of the 53 patients (47%) for whom follow-up radiographs were available. ...

... complications encountered in our ... are listed in Table 2. Clinically ... acute 48 hours or ... the side ...

... on the side of filter insertion 6–18 days after the procedure. Results of clinical follow-up were available for all ten of these patients. Two patients had chronic lower extremity edema, although in both this was not a debilitating condition. Five months after the insertion ... related to filter placement. The remaining patients were asymptomatic ... follow-up of 6–18 months. In these patients either sufficient collaterals of sufficient clot lysis developed to render them clinically normal.

... were documented. Five patients had ...

... listed to percutaneous transfemoral filter placement occurred in ...

... during the same hospital stay. He had a swollen lower extremity on the side of insertion, but this was not believed to contribute to his death. In the other patient, hematoma was discovered incidentally during a pelvic CT examination, which also revealed thrombus within the ipsilateral femoral vein. There were no associated lower extremity signs or symptoms.

A femoral arteriovenous fistula developed in one patient following percutaneous transfemoral filter placement. The fistula was surgically closed without sequelae.

## DISCUSSION

The percutaneous transfemoral approach to K-G filter placement is easy to learn, well tolerated by patients, and less time consuming to perform than the jugular cutdown approach. In addition, the cost of the percutaneous placement in our hospital is less than the cost of the cutdown technique.

Tadavarthy et al. (5, 6) described the technique and indicated a preference for the right internal jugular approach. They listed the following as potential drawbacks to the femoral route: inability to pass the catheter due to resistance of a tortuous right iliac artery, encroachment of the filter and postcatheterization thrombus of the iliac and femoral venous systems. We assessed these potential problems in our series.

We used the right femoral vein as the primary route for filter insertion, and placement via this approach has been uniformly successful. There is often resistance at the level of the right common iliac vein (Fig. 3), but this has not prevented placement. The left femoral vein approach may be more difficult, secondary to problems passing the carrier capsule through a tortuous common iliac vein or across an acutely angled common iliac–IVC junction. The resistance at this level can usually be overcome by substituting a 0.038-inch (0.097-cm) heavy-duty Amplatz wire for the usual 0.035-inch J-wire. In our series, the left iliac vein could not be negotiated in two of 17 at-

COOKFOIA_000141

cedure was complicated by a large left paravertebral vein that consistently trapped the tip of the carrier capsule despite the presence of a guide wire extending into the IVC (Fig. 4).

Caudal migration of the K-G filter occurred in 49% of patients for whom follow-up abdominal radiographs were available. This rate compares favorably with those reported in other series (2, 4, 9) of 29%, 50%, and 60%. In these comparison series, a jugular cutdown was the primary route of insertion. Cephalic migration occurred in 4% of our patients, similar to the rate reported in these other series. The detected migration is acceptable and does not affect filter function.

The alignment of the K-G filter was within 15° of the longitudinal axis of the IVC (97°). This is attributed to the technique . . . releasing the filter with the guide wire extending through the filter into the proximal IVC.

Only femoral vein thrombosis, listed previously as a potential drawback (5, 6), has been encountered in actual practice . . .

. . . placement in a previously unaffected lower extremity . . .

. . . on the later date anytime 1-3 weeks after the procedure. It is possible that the phlebothrombosis may not be causally related to filter placement in some of these cases. Although the percutaneous transfemoral approach may be thrombogenic, only two patients suffered permanent sequelae as a result of this complication. In an attempt to lower the frequency of femoral vein thrombosis, we have recently altered our insertion technique as described by Shetry et al. (10). It is hoped that balloon dilation of the femoral venotomy will be less traumatic than the use of sequential dilators and therefore less thrombogenic.

venous fistula may have been avoided by use of the one-wall puncture technique. It is probably advisable to use this technique for the initial venipuncture whenever subsequent filter insertion is planned or a possibility.

In the large series of Greenfield et al. (3), recurrent pulmonary emboli were documented in 2% of patients and suspected in an additional 2%. In the commentary following the report of Greenfield et al., Zarins (3) noted a suspected nonfatal pulmonary recurrent embolism rate of 7% and a proved embolism rate of 3%. In two other series (1, 4), no clinically evident pulmonary emboli were reported. Our series includes documented recurrent pulmonary emboli in 4% of patients and suspected in an additional 1%.

IVC thrombosis was documented in three cases (3%) following insertion of the K-G filter. This IVC patency rate compares favorably with those in other series (1, 2, 4, 9, 11) of 95%-98% following placement via the cutdown technique.

Most angiographers and all patients find a femoral approach more comfortable than the jugular route. As noted by Denny et al. (7), a femoral approach is convenient in cases in which pulmonary angiography is performed to determine the need for K-G filter insertion and . . . the filter placement at the same time . . .

. . . no deaths directly related to the femoral approach. Before we started using the percutaneous femoral route, we encountered four patients whose right internal jugular veins were too small to accept the carrier capsule. They all required a second cutdown on the femoral vein for filter placement. We have not observed this problem with the femoral route.

We believe that the percutaneous transfemoral approach is a clear improvement over previous surgical

cause it is less time consuming and less costly. This approach also has additional advantages of convenience and patient comfort, compared with percutaneous jugular insertion. The occurrence of long-term morbidity related to this method of insertion is low in our series and appears to be acceptable in light of its other advantages. ∎

Acknowledgments: The author thank Diane Harmon for her assistance in preparation of the manuscript and John Croyle for his help with the illustrations.

References

1. Wingard M, Bernhard VM, Maddison F, Towne JB. Comparison of caval filters in the management of venous thromboembolism. Arch Surg 1978; 113:1264-1271.
2. Berland LL, Maddison FE, Bernhard VM. Radiologic follow-up of vena cava filter . . .
3. Greenfield LJ, Peyton R, Crute S, Barnes . . . Greenfield vena caval filter experience. Arch Surg 1981; 116:1451-1456.
4. Gomes GA, Cutler BS, Wheeler HB. Transvenous interruption of the inferior vena cava. Surgery 1983; 93:612-618.
5. Tadavarthy SM, Castaneda-Zuniga WR, Salomonowitz E, et al. Kimray-Greenfield vena cava filter: percutaneous introduction. Radiology 1984; 151:525-526.
6. Tadavarthy SM, Castaneda-Zuniga WR, Castella J, et al. Percutaneous introduction of the Kimray-Greenfield filter. Semin Intervent Radiol 1986; 3:169-204.
7. Denny DF, Cronan JJ, Dorfman GS, Esplin C. Percutaneous Kimray-Greenfield filter placement by femoral vein puncture. AJR 1985; 145:827-829.
8. Pais SO, Tobin KD, Austin CB, Queral L. Percutaneous insertion of the Kimray-Greenfield filter: technical considerations and implications for the use of vena caval filters. Radiology 1985; 149:687-689.
9. Messmer JM, Greenfield LJ. Greenfield caval filters: long-term radiographic follow-up study. Radiology 1985; 156:613-618.
10. Shetty PC, Bok LR, Burke MW, Sharma RP. Balloon dilation of femoral vein expediting percutaneous Greenfield vena caval filter placement. Radiology 1986; 161:275.
11. Cimochowski GE, Evans RH, Zarins CK, Lu CT, DeMeester TR. Greenfield filter versus Mobin-Uddin umbrella. J Thorac Cardiovasc Surg 1980; 79:358-365.

Reprinted from SURGERY, St. Louis
Vol. 103, No. 1, pp. 111-117, Jan., 1988, (Printed in the U.S.A.)
(Copyright © 1988, by The C.V. Mosby Company)

# Interruption of the vena cava by means of the Greenfield filter: Expanding the indications

Peter J. Golueke, M.D., Wilson V. Garrett, M.D., Jesse E. Thompson, M.D.,
Bertram L. Smith, M.D., and C. M. Talkington, M.D., Dallas, Texas

*Between 1978 and 1985, 88 patients underwent insertion of the Greenfield vena cava filter. In 21 of the 88 patients (23.9%) the filter was inserted prophylactically. Sixteen of the 21 prophylactic insertions were performed before total joint replacement in patients with a history of venous thromboembolism. Operative morbidity (4.6%) was minor and occurred only early in the series. The operative mortality rate was 4.6%. None of the deaths were related to filter insertion or pulmonary embolism. Follow-up in 65 patients (73.9%) ranged from 1 to 60 months (mean, 16.4 months). Leg edema developed in 9.2% (6/65), stasis ulceration in 3.1% (2/65), caval occlusion in 7.5% (3/40), and recurrent nonfatal embolism in 3.1% (2/65) of the patients. In the patients who received prophylactic filters before total joint replacement, there were no filter-related complications or episodes of pulmonary embolism. This series confirms the safety and effectiveness of the Greenfield filter and suggests that the indications for its use might be liberalized to include prophylactic insertion of the device in certain high-risk patients.*

*From the Department of Surgery, Baylor University Medical Center, Dallas, Texas*

DEATH FROM PULMONARY embolism (PE) continues to occur despite a widespread awareness of the frequency of the problem and familiarity with conventional anticoagulant therapy. Approximately 125,000 to 150,000 pulmonary embolism deaths occur each year in the United States, as documented by autopsy studies,[1-3] and it is estimated that more accurate classification of death certificates could raise this estimate to more than 200,000 deaths from PE annually.[4]

Greenfield[5] has demonstrated the safety and effectiveness of filtration of the inferior vena cava as a method of preventing death from PE. Nevertheless, some reluctance about the liberal use of vena caval filtration persists. Perhaps this reluctance reflects previous experience with anesthetic complications or caval occlusion associated with caval ligation, clipping, or insertion of the Mobin-Uddin umbrella. On the con-

trary, the Greenfield filter can be inserted with the patient under local anesthesia; this entails minimal morbidity and has been demonstrated to allow continued caval patency in almost all cases.[5,6] We have reviewed our recent experience with this technique to evaluate its effectiveness and safety so that, if confirmed, a somewhat more aggressive approach to caval interruption could be justified in an attempt to reduce the large number of preventable PE deaths. The prophylactic use of the device might then be considered in certain high-risk patients in whom anticoagulant prophylaxis is relatively contraindicated.

## METHODS AND PATIENTS

The records of all patients in whom we inserted the Greenfield vena cava filter at the Baylor University Medical Center from 1978 to 1985 were reviewed. The indications for filter placement included (1) recurrent PE despite adequate anticoagulation, (2) PE or deep vein thrombosis (DVT) with contraindication to anticoagulation, (3) PE or DVT with hemorrhagic complication of anticoagulation, and (4) prophylactic insertion in high-risk patients. The prophylactically treated group included patients with minimal cardiopulmonary reserve who could not tolerate recurrent PE,

Presented at the 1986 Annual Meeting of The Southern Association for Vascular Surgery, Dorado, Puerto Rico, Jan. 30-Feb. 1, 1986.

Accepted for publication May 21, 1987.

Reprint requests: Peter J. Golueke, M.D., Department of Surgery, Francis Scott Key Medical Center, 4940 Eastern Ave., Baltimore, MD 21224.

COOKFOIA 000143

*Surgery*
*January 1988*

112  Colwexe et al



Fig. 1. Abdominal radiograph revealing proper placement of Greenfield filter at L2-3 level.

**Table I. Complications of Greenfield filter insertion**

| Complication | No. of occurrences |
|---|---|
| Intraoperative stroke | 1 |
| Pneumothorax | 1 |
| Symptomatic thrombosis of internal jugular vein | 1 |
| Cervical wound infection | 1 |
| Total | 4 |
| Morbidity | 4.6% |

patients with nonattached thrombi in the vena cava or iliac veins, patients with a significant history of thromboembolic disease who were to undergo total hip or knee replacement, and patients who received the Greenfield filter prophylactically during venous thrombectomy.

The filter (Medi-Tech, Inc., Watertown, Mass.) was inserted via the internal jugular or common femoral vein, according to the technique described by Greenfield et al.[?] Local anesthesia was adequate in most cases, and the procedure was performed in the operating room or radiology department under fluoroscopic control. In patients with significant respiratory distress, the use of general endotracheal anesthesia with high oxygen concentrations was found to be advantageous. The techniques of routine placement of guide wires and intermittent bolus heparin infusion through the carrier system aided in correct placement and expansion of the filter at the level of the third lumbar vertebra (Fig. 1). Suprarenal filter placement was used when necessary. The veins through which the filters were inserted were repaired with monofilament vascular sutures. We followed the hematocrit value postoperatively to evaluate for retroperitoneal bleeding. Heparin infusion was continued during and after the procedure in those patients without contraindication. Warfarin was given postoperatively for 3 to 6 months to prevent recurrent deep vein thrombosis except in patients in whom its use was contraindicated or in patients without active thromboembolic disease (i.e., those undergoing prophylactic vena caval filtration). In patients in whom contraindication to anticoagulation was temporary (i.e., in the immediate postoperative period) anticoagulation was resumed at an appropriate subsequent time, usually before discharge.

All patients who were considered candidates for prophylactic caval filtration before total joint replacement had had a previously documented remote episode of PE or DVT. Patients with very recent or active venous thromboembolism in whom filters had been inserted at the time of joint replacement were not included in the prophylactic group. The Greenfield filter was usually placed the day before the scheduled orthopedic procedure merely because of the surgeon's preference, but in several cases it was placed without difficulty during the same operative procedure. These high-risk patients were managed perioperatively with antiplatelet therapy and intermittent pneumatic calf compression.

Follow-up consisted of physical examination with venous Doppler studies of the lower extremities when possible and telephone questionnaire responses in the remainder of the patients. Patients were evaluated for operative and long-term mortality and morbidity, including the rate of recurrent embolism and lower extremity venous sequelae of caval filtration. In this retrospective study only those patients clinically suspected of having recurrent pulmonary emboli on the basis of symptoms or signs (six patients) underwent evaluation for recurrent PE. This evaluation included

COOKFOIA 000144

a pulmonary angiogram in each. In addition, a vena-cavogram was obtained to evaluate the status of the filter in each of the two patients who had a positive documentation of recurrent pulmonary emboli. Although autopsies were not routinely performed, death certificates were reviewed or the primary physician at the time of the patient's death was contacted.

## RESULTS

Eighty-eight patients (50 males, 38 females) ranging in age from 21 to 82 years (mean, 55.7 years) underwent insertion of the Greenfield vena cava filter. Filter placement was indicated because of recurrent embolism despite adequate anticoagulation in 32.9% (29/88), thromboembolism with a contraindication to anticoagulation in 25.0% (22/88), a hemorrhagic complication of anticoagulation in 18.2% (16/88), and the need for prophylaxis in a high-risk situation in 23.9% (21/88). Of the prophylactic group, 76.2% (16/21) underwent filter insertion before total hip or knee replacement because of a significant history of venous thromboembolism, in 14.2% (3/21) the filter was inserted as protection from additional cardiopulmonary compromise, one patient (4.8%) received the filter because of a large free-floating thrombus extending into the vena cava, and one patient (4.8%) received the filter as prophylaxis during iliofemoral venous thrombectomy.

Filters were inserted through the right internal jugular vein in 87.5% (77/88) and from a femoral approach in 12.5% (11/88). Filter insertion by either approach was not possible in two patients early in the series, because of inadequate vein size in one and because of an inability to navigate the superior vena cava in the other. The overall insertion success rate was therefore 97.8% (88/90). Four of the eleven femoral insertions (36.4%) followed unsuccessful attempts at jugular insertion. The remaining six filters (54.6%) were inserted through the femoral vein because of previous neck surgery or because of the surgeon's preference. Local anesthesia was used in 68.5%, whereas general anesthesia was employed in 31.5% of the patients. The filter was placed in an infrarenal location in 85 patients (96.6%) but was purposefully positioned in a suprarenal location in three patients (3.4%).

Operative morbidity was 4.6% (Table I). The last 70 consecutive filters were placed without complication. The operative mortality rate was 4.6%, although none of the four deaths were related to filter insertion or recurrent PE. One patient died of progressive hepatic failure, two patients succumbed to severe cardiopulmo-



Fig. 2. Venacavogram of patient with recurrent pulmonary embolism following placement of Greenfield filter. The study shows a large thrombus extending from the tip of the filter. Also noted is that this filter was inadvertently placed too low in the vena cava near the confluence of the iliac veins. *(arrow).*

nary compromise, and the fourth patient died of progressive respiratory insufficiency without demonstrable recurrent PE. Filter migration did not occur, as documented by plain abdominal x-ray films of 34 patients, and there were no bleeding complications.

Follow-up was available for 65 patients (73.9%) and ranged from 1 to 60 months (mean, 16.4 months). The long-term mortality rate was 20.0% (13/65). No deaths were related to the Greenfield filter or recurrent embolism. Two patients (3.1%) had recurrent nonfatal PE after insertion of the Greenfield filter. The initial indication for filter placement in both patients had been recurrence of PE despite anticoagulation. One of these patients had recurrent chest pain and dyspnea. A venacavogram revealed a large thrombus in the filter, extending distal to the tip of the filter (Fig. 2). It is possible that the inappropriate low positioning of this patient's filter led to the clot's extending above the tip

COOKFOIA 000145

Table II. Long-term sequelae after insertion of Greenfield filter

| | |
|---|---|
| Recurrent pulmonary emboli | 3.1% (2/65) |
| Symptomatic leg edema | 9.2% (6/65) |
| Venous stasis ulceration | 3.1% (2/65) |
| Filter migration | 0.0% (0/34) |
| Caval occlusion | 7.5% (3/40) |

of the filter, which required additional therapy. The patient underwent caval thrombectomy and application of a Miles clip above the Greenfield filter. That was early in our experience; today this same patient would likely be treated by placement of a second filter in the vena cava proximal to the first, as described by Greenfield. The patient required large doses of warfarin (Coumadin) for maintenance of adequate anticoagulation, and a subsequent hematologic evaluation confirmed a marked hypercoagulable state, but the patient continues to do well 7 years after his first PE. The other patient with recurrent PE after filter insertion was also found on venacavogram to have a thrombus within the filter device. Since no extension of the thrombus above the tip of the filter was seen, this patient was treated with heparin anticoagulation and done well subsequently.

Of the 65 patients available for follow-up, 40 were examined in the office and venous Doppler studies were performed to evaluate the common femoral veins for spontaneity, phasicity, and response to venous augmentation by distal leg compression. Duplex venous echographic evaluation was not used. Venous Doppler examination revealed the inferior vena cava to be patent in 92.5% of the cases (37/40). It was deemed unnecessary to perform more invasive caval evaluation, as three previous studies have done so and documented similar caval patencies.[5,6,8] The remaining 25 patients in the follow-up group were reached by telephone and an extensive history regarding further symptoms or signs of deep vein thrombosis or pulmonary embolism was elicited. Of the entire follow-up group, moderate to severe leg edema developed in 9.2% (6/65) and venous stasis ulceration was noted in 3.1% (2/65). Both patients with leg ulcers had significant leg edema at initial presentation before filter insertion and had at least two recurrent episodes of extensive deep vein thrombosis (Table II).

There were no complications or deaths in the sixteen patients who underwent prophylactic filter placement before total joint replacement. In this high-risk group there were no episodes of pulmonary embolism, even

though the patients had only antiplatelet therapy and pneumatic compression. No bleeding complications occurred. After discharge one patient did develop acute DVT for which anticoagulation was required.

## DISCUSSION

Techniques for interruption of the inferior vena cava have evolved from laparotomy and caval ligation to the use of a filtration device placed through a minor jugular incision. In a recent review of 260 patients Greenfield[3] has documented the safety and effectiveness of caval filtration. There were no deaths related to filter placement, and only one of 35 postoperative deaths was possibly related to recurrent PE. A nonfatal air embolism is the only significant complication of filter insertion that occurred in his series. In follow-up extending to 100 months, Greenfield used contrast venacavograms or radioisotope studies and documented caval patency after filter insertion in 98% of 99 patients. The rate of recurrent PE was 5%. Although 41% of the patients wore elastic stockings for control of edema and 6% of patients had venous stasis ulcers, all of these patients had had significant edema from deep vein thrombosis before filter insertion. It is obvious that caval occlusion after filter insertion (2% in Greenfield's series) is not responsible for the more frequent postphlebitic sequelae of edema and stasis ulceration. The rare patient who has thrombosis of the inferior vena cava when the filter traps a large embolus has an increased likelihood of postphlebitic sequelae. Otherwise, it seems that the presence of the filter within the cava has no bearing on chronic postphlebitic problems. During Greenfield's 8-year follow-up, there was no evidence of filter migration or damage to retroperitoneal structures. Other groups[4,8] have confirmed Greenfield's experience with caval filtration.

We have noted similar gratifying results in a large series of patients in whom the Greenfield vena cava filter was placed. There were no procedure-related deaths in the present series. Morbidity was minimal and approached zero later in the experience, as familiarity with insertion techniques increased. Both major complications occurred during the first ten filter insertions. One patient had an unexplained pneumothorax in the early postoperative period. The other patient had previously had multiple strokes. In the recovery room, after filter insertion with the aid of local anesthesia, a worsening of his previously stable neurologic deficits was noted and it was therefore thought that he had suffered a mild perioperative stroke.

The rate of recurrent PE was 3.1%, and none of these were fatal. Patency of the vena cava, documented

COOKFOIA 000146

by venous Doppler studies, was 92.5%. This is a somewhat lower patency than noted by previous authors,[5,6,8] but it is probably related to the fact that equivocal noninvasive examinations were considered to indicate caval occlusion in this study. Many of the patients had mild edema of the lower extremities, but only 9.2% required elastic compression stockings and only 3.1% developed stasis ulceration. As in Greenfield's experience, all of the patients in this series who developed postphlebitic sequelae either manifested significant leg edema before filter insertion or subsequently developed DVT when anticoagulation was withheld because of a contraindication or hemorrhagic complication. This review did not reveal any episodes of filter migration or retroperitoneal injury from the intracaval filter. This experience adds support to the work of Greenfield and others[5,6,8] confirming the effectiveness and low morbidity of caval filtration. The advantages of the technique include its effectiveness, the minimal morbidity of a minor procedure that is usually performed with the patient under local anesthesia, a documented high caval patency rate, and low long-term morbidity.

In contrast, previous methods of caval interruption have not had similar success. The Mobin-Uddin umbrella, although noted to be as effective as the Greenfield filter in preventing recurrent PE, is associated with a 73% incidence of caval thrombosis and a 2.9% incidence of device migration.[4,8] Although use of the larger-diameter Mobin-Uddin device appears to have lessened the likelihood of umbrella migration, caval occlusion still occurs in a majority of cases. Ligation of the inferior vena cava requires general anesthesia and can occasionally cause up to a 47% decrease in cardiac output with subsequent hypotension secondary to decreased venous return,[9] especially in hemodynamically unstable patients. Other authors[10,11] have documented significant recurrent emboli after caval ligation, suggesting the formation of large collateral venous channels capable of transmitting emboli. The incidence of postphlebitic sequelae may be as high as 30% after ligation of the inferior vena cava.[10] Application of the caval clip device requires general anesthesia as well and is associated with a 35% incidence of caval occlusion.[12]

Since the Greenfield filter is effective and is without significant morbidity, we believe that the indications for its insertion could be liberalized. The well-accepted indications for caval interruption include (1) recurrent embolism despite anticoagulation and (2) PE or DVT with a contraindication to or a complication of anticoagulant therapy. Although anticoagulation is the appropriate first line of therapy for PE, its use is associated with a finite number of complications. Certain patient groups, such as the elderly, are more at risk of significant morbidity from anticoagulants.[13-17] We believe, as do Gomez et al.,[8] that earlier insertion of the filter in this group at higher risk of anticoagulation complication is probably safer than long-term anticoagulation therapy.

The rationale for prophylactic use of the Greenfield filter in most of our patients is founded on the knowledge that the most common complication of total hip or knee replacement is venous thromboembolism.[18] Before the institution of anticoagulant prophylaxis, the incidence of DVT following total hip replacement in patients without a previous history of thromboembolism was estimated to range from 35% to 56%.[19,20] Without prophylaxis, the incidence of pulmonary embolism in this group of patients is 10%, with fatal pulmonary embolism occurring in 2%, or 1 in 50 patients undergoing this elective orthopedic operation.[18,20,21] To circumvent this problem, anticoagulant prophylaxis was evaluated for this population. Harris et al.[22] found warfarin, dextran, and aspirin each to be superior to subcutaneous heparin in reducing the incidence of the thromboembolic phenomenon following total hip replacement (THR) at the cost of a greater than 10% incidence of significant bleeding complications. Salvati et al.[23] compared the combination of dextran-aspirin to dextran-warfarin for prophylaxis in patients with no history of thromboembolism who were about to undergo THR. Dextran-aspirin reduced the incidence of significant thromboembolism to 7% but caused a wound complication rate of 15%, whereas dextran-warfarin reduced the rate of significant thromboembolism to 5% but increased the wound complication rate to 24%.

Patients with a history of venous thromboembolic disease are at a much greater risk of recurrent thromboembolism after total hip or knee replacement and are not as well protected with low-dose anticoagulant prophylaxis.[22,24] It is for this group of patients who have a history of thromboembolic disease and who are about to undergo total joint replacement or other major orthopedic procedures, that we would recommend prophylactic caval interruption with the Greenfield filter. These patients are typically elderly, and this is another indication for filter insertion to avoid possible hemorrhagic complications of anticoagulation. The low morbidity associated with use of the Greenfield filter makes it an attractive alternative. In this series, 21 patients (23.9%) underwent prophylactic caval filtration. Sixteen of these 21 prophylactic filters were

COOKFOIA 000147

116   *Golucke et al.*

*Surgery*
*January 1988*

serted before total joint replacement in patients without active phlebitis or PE but with a documented history of significant venous thromboembolism. No hemorrhagic or thrombotic complications occurred during their hospitalizations. This group is relatively small, but the advanced age and history of thromboembolism, coupled with a need for major orthopedic surgery and subsequent immobilization, put the patients at high risk of pulmonary embolism, a complication that can be prevented by the safe and simple insertion of a Greenfield filter. Minimal anticoagulation (antiplatelet therapy) and intermittent pneumatic compression as used in our series probably help to lower the risk of DVT without significantly increasing bleeding complications,[34] but the available data suggest that these modalities alone do not adequately protect patients undergoing total joint replacement, especially if there is a previous history of PE or severe DVT.[22, 24]

There are no good prospective studies evaluating the effectiveness of anticoagulant prophylaxis in the high-risk patients undergoing total joint surgery who have a history of previous PE or DVT. More recent data have shown that warfarin and adjusted-dose subcutaneous heparin are probably effective in reducing the risk of DVT and PE in patients undergoing total joint surgery, but these studies have not taken into consideration those patients at much higher risk because of previous venous thromboembolism.[22, 23] In fact, many of the studies evaluating anticoagulant prophylaxis in the management of patients undergoing total joint surgery exclude patients with a history of DVT from the study group.[19, 22, 26]

Recently, other authors confronted with patients at high risk of both pulmonary embolism and bleeding complications during anticoagulant therapy have suggested increasing the use of caval interruption. Moore et al.[27] reviewed the records of 32 cancer patients receiving heparin and warfarin for thromboembolic disease and found a 50% incidence of significant bleeding complications. Eight patients (25%) had major hemorrhages that led to death or the cessation of therapy. Nearly 20% of the patients developed pulmonary emboli despite anticoagulation; four of these emboli were fatal. It was concluded that conventional anticoagulation therapy was neither safe nor effective in treating venous thromboembolism in cancer patients.

Jarrell et al.[28] reported a 62% incidence of DVT (documented by venogram) in paraplegic patients after spinal cord injury. Along with the usual complications

of anticoagulation, there appears to be resistance to heparin therapy in this group of patients, making monitoring more difficult. Also, the need for major surgery to stabilize thoracic and lumbar vertebral fractures in many of these patients makes caval filtration an attractive alternative. Twenty-one patients in their series received the Greenfield filter with good results.

Prophylactic interruption of the vena cava by means of the Mobin-Uddin umbrella in patients with hip fractures was introduced in 1973 by Fullen et al.[29] in an attempt to reduce the high incidence of fatal pulmonary emboli in this group of patients. Their randomized study showed a significant decrease in pulmonary emboli in the group that underwent prophylactic umbrella insertion as compared to the control group. There is little discussion in this review of the incidence of complications from caval occlusion caused by the Mobin-Uddin umbrella, the most likely reason that this effective prophylactic measure never became popular.

Rosenthal et al.[30] and Rao et al.[31] have suggested concomitant clipping of the vena cava during major abdominal procedures in patients at high risk of pulmonary embolism. The drawbacks of this type of prophylaxis include a 30% incidence of caval occlusion associated with the clip and the need for an open abdominal procedure. Therefore, this prophylactic technique would be impractical for the patients at highest risk of PE, those undergoing major orthopedic procedures, and those with spinal cord injury or cancer not requiring an intraabdominal procedure.

Percutaneous placement of the Greenfield filter has recently become possible and may make the decision to perform caval filtration even more attractive. Our preliminary experience with the percutaneous placement of more than 15 Greenfield filters is encouraging but must await follow-up evaluation. Some concern should remain regarding percutaneous placement since the radiologists seem to favor a femoral approach, which requires a large femoral venous puncture to allow the insertion of a 24F introducer in a patient prone to venous thrombosis. This approach also requires that the iliac veins be free a clot. Experience in placing the filter through a venous cutdown will likely still be required in a significant number of cases and the jugular route would seem preferable until follow-up data, preferably by venography, shows that there are no complications associated with the percutaneous femoral technique.

In summary, the Greenfield filter is a safe and

COOKFOIA 000148

effective means of interrupting the vena cava to prevent pulmonary embolism. Expanding the indications for insertion of the filter and its more frequent use in a prophylactic manner may help to reduce the significant number of preventable deaths that occur each year as a result of pulmonary embolism.

## REFERENCES

1. Morrell MT, Dunnill MS. The post-mortem incidence of pulmonary embolism in a hospital population. Br J Surg 1968;55:347-52.

2. Uhland H, Goldberg LM. Pulmonary embolism: a commonly missed clinical entity. Dis Chest 1964;45:533-6.

3. Hume M, Sevitt S, Thomas DP. Venous thrombosis and pulmonary embolism. Cambridge, Mass: Harvard University Press, 1970.

4. Dalen JE, Alpert JS. Natural history of pulmonary embolism. Prog Cardiovasc Dis 1975;17:257-70.

5. Greenfield LH. Current indications for and results of Greenfield filter placement. J Vasc Surg 1984;1:502-4.

6. Cimochowski GE, Evans RH, Zarins CK, Lu GT, DeMeester TK. Greenfield filter versus Mobin-Uddin umbrella. J Thorac Cardiovasc Surg 1980;79:358-65.

7. Greenfield LJ, Steward JR, Crute S. Improved technique for insertion of Greenfield vena cava filter. Surg Gynecol Obstet 1983;156:217-9.

8. Gomez GA, Cutler BS, Wheeler HB. Transvenous interruption of the inferior vena cava. Surgery 1983;93:612-9.

9. Moraun BM, Taber RE. The effects of inferior vena caval ligation on cardiac output: an experimental study. Surgery 1968;63:966-9.

10. Piccone VA, Vidal E, Yarnoz M, Glass BS, LeVeen HH. The late results of caval ligation. Surgery 1970;68:980-98.

11. Gurewich V, Thomas DP, Rabinov KR. Pulmonary emboli after ligation of the inferior vena cava. N Engl J Med 1966;274:1350.

12. Bernstein EF. The place of venous interruption in the treatment of pulmonary thromboembolism. In: Moser KM, Stein M, eds. Pulmonary thromboembolism. Chicago: Yearbook Medical Publishers, Inc. 1973;312-23.

13. Conn WW, Willis PW. Hemorrhagic complications of anticoagulant therapy. Arch Intern Med 1974;133:386-92.

14. Jick H, Slone D, Borda IT, Shapiro S. Efficacy and toxicity of heparin in relation to age and sex. N Engl J Med 1968;279:284-6.

15. Sreerama V, Ivan LP, Dennery JM, Richard MT. Neurosurgical complications of anticoagulant therapy. Can Med Assoc J 1973;108:305-7.

16. Vieweg WVR, Piscatelli RL, Houser JJ, Proulx RA. Compli-

cations of intravenous administration of heparin in elderly women. JAMA 1970;213:1303-6.

17. Walker AM, Jick H. Predictors of bleeding during heparin therapy. JAMA 1980;244:1209-12.

18. Harris WH, Salzman EW, DeSanctis RW. The prevention of thromboembolic disease by prophylactic anticoagulation. J Bone Joint Surg [Am] 1967;49A:81-9.

19. McKenna R, Bachmann F, Kaushal SP, Galante JO. Thromboembolic disease in patients undergoing total knee replacement. J Bone Joint Surg 1976;58A:928-32.

20. Evans GM, Feil EJ. Prevention of thromboembolic disease after elective surgery of the hip. J Bone Joint Surg 1971;53A:1271-80.

21. Tubiana R, DuParc J. Prevention of thromboembolic complications in orthopedic and accident surgery. J Bone Joint Surg [Br] 1961;43:7-15.

22. Harris WH, Salzman EW, Athanasoulis C, Waltman AC, Baum S, DeSanctis RW. Comparison of warfarin, low molecular weight dextran, aspirin, and subcutaneous heparin in prevention of venous thromboembolism following total hip replacement. J Bone Joint Surg 1974;56A:1552-62.

23. Salvati EA, Lachiewicz P. Thromboembolism following total hip-replacement arthroplasty. J Bone Joint Surg 1976;58A:921-5.

24. Hull RD, Raskib GE, Hirsh J. Prophylaxis of venous thromboembolism—an overview. Chest 1986;89:374S-83S.

25. Leyvraz PF, Richard J, Bachmann F, et al. Adjusted versus fixed-dose subcutaneous heparin in the prevention of deep-vein thrombosis after total hip replacement. N Engl J Med 1983;309:954-8.

26. Harris WH, Athanasoulis CA, Waltman AC, Salzman EW. High- and low-dose aspirin prophylaxis against venous thromboembolic disease in total hip replacement. J Bone Joint Surg 1982;64A:63-6.

27. Moore FD, Osteen RT, Karp DD, Steele G, Wilson RE. Anticoagulants, venous thromboembolism, and the cancer patient. Arch Surg 1981;116:405-7.

28. Jarrell BE, Posuniak E, Roberts J, Osterholm J, Cotler J, Ditunno J. A new method of management using the Kim-Ray Greenfield filter for deep venous thrombosis and pulmonary embolism in spinal cord injury. Surg Gynecol Obstet 1983;157:316-20.

29. Fullen WD, Miller EH, Steele WF, McDonough JJ. Prophylactic vena caval interruption in hip fractures. J Trauma 1973;13:403-10.

30. Rosenthal D, Cossman D, Matsumoto G, Callow A. Prophylactic interruption of the inferior vena cava—a retrospective evaluation. Am J Surg 1979;137:389-93.

31. Rau G, Zikria EA, Miller WH, Samadani SR, Ford WB. Concomitant prophylactic inferior vena caval clipping. Int Surg 1976;61:147-50.

COOKFOIA 000149

## SCIENTIFIC PAPERS

# Complications Encountered With the Use of the Greenfield Filter

R. Anthony Carabasi, III, MD, FACS, Michael J. Moritz, MD, and Bruce E. Jarrell, MD, FACS, Philadelphia, Pennsylvania

Several methods for interrupting the inferior vena cava have been utilized since O'Neil [1] introduced inferior vena caval ligation 40 years ago. Ligation was replaced by external plication utilizing various suture techniques or clips. More recently, intracaval devices have become popular. The current state of the art appliance is the Greenfield filter due to its superior efficacy, high patency rates and low incidence of complications [2–5].

Thomas Jefferson University Hospital serves as a regional spinal cord injury center for the Greater Delaware Valley [6]. In addition, the hospital has a large inpatient oncology service. As a result of the patient population, we have had the opportunity to accumulate a large experience with the use of the Greenfield filter. Herein, we review the complications we have encountered and suggest methods for both avoiding and treating them.

### Material and Methods

The series consisted of 193 patients in whom we placed 198 Greenfield filters between January 1980 and August 1986. Two additional patients who we treated after the filters were placed elsewhere were also included. Of these 200 filters, 188 (94 percent) were placed in the infrarenal position and 12 (6 percent) were inserted above the renal veins [7]. Transjugular placement was utilized in 159 (79.5 percent) filters, and the transfemoral route was used in the remaining 41 (20.5 percent).

We have standardized our insertion technique and several points warrant emphasis [7]. We insist that all patients have a preoperative contrast study of the inferior vena cava to assess the venous anatomy and the extent of

From the Department of Surgery, Jefferson Medical College, Philadelphia, Pennsylvania.

Requests for reprints should be addressed to R. Anthony Carabasi, III, Jefferson Medical College, 1025 Walnut Street, Philadelphia, Pennsylvania 19107.

Presented at the 15th Annual Meeting of the Society for Clinical Vascular Surgery, Scottsdale, Arizona, March 25–29, 1987.

thrombosis. At operation, anticoagulation is continued if possible. After exposure of the appropriate vein, a 0.035 inch flexible J wire is placed into the inferior vena cava and advanced to the point where the filter is to be placed [8]. The metal carrier containing the filter is then introduced over the wire. We usually pass the wire beyond the renal veins and into an iliac vein to be certain we are in the inferior vena cava. Frequent flushing of the carrier with heparin solution is carried out to prevent accumulation of clot on the filter. We then insert the carrier below the renal veins and pull up as we extrude the Greenfield filter [9,10]. The position of the filter is checked on the first postoperative day by an abdominal flat plate and by Doppler ultrasonography [7].

Long-term follow-up of these patients was carried out through the hospital vascular center. Venography was performed promptly for symptoms of recurrent pulmonary embolism or deep venous thrombosis.

### Results

Complications encountered in the series can be divided into three groups: complications that occurred due to venous anomalies, technical complications which occurred during filter insertion, and postoperative complications.

Venous anomalies: Abnormalities of the right internal jugular vein or inferior vena cava were encountered in five patients (2.5 percent). Absence of the right internal jugular veins was observed in two patients. This was managed by femoral insertion in one patient. The second patient had bilateral iliofemoral thrombosis which precluded Greenfield filter placement. Three patients (1.5 percent) had anomalies of the inferior vena cava. These anomalies were accurately diagnosed by preoperative venography and their management modified accordingly. The first patient had a double inferior vena cava (Figure 1) and this was managed by placing a Greenfield filter into each inferior vena caval seg-

COOKFOIA 000150

Carabasi et al





Figure 1. Contrast study obtained through a right femoral vein approach showing a double vena cava.

Figure 2. Severe adenopathy which deformed the inferior vena cava. The filter was placed above the renal veins.

ment. The second patient had a large inferior vena cava (4 cm). This was treated by expanding the struts of the Greenfield filter. The third patient had severe pericaval adenopathy (Figure 2), which was managed by placing the Greenfield filter in a suprarenal position.

Intraoperative complications: Eighteen patients (9.2 percent) had complications during Greenfield filter insertion. The most common complication encountered was inability to pass the introducer through the right internal jugular vein, which occurred in 14 patients (7 percent). Reasons for failure included small right internal jugular veins or a sharp angle at the junction of the right internal jugular vein and subclavian vein. Ten of these patients (5 percent) had successful placement of the filter through the femoral route. In four patients (2 percent), the Greenfield filter could not be placed through either the jugular nor femoral route.

Three patients (1.5 percent) had filters placed in an incorrect position. In two of these patients, the filter was discharged into the right renal vein. In one patient, this was recognized in the operating room

and a second filter was placed in the suprarenal position. In the second patient, the misplacement was noted in the early postoperative period, but the patient refused further corrective surgery. The third patient in this group was a 29 year old gravid woman who had a Greenfield filter placed at another institution for progression of deep venous thrombosis despite heparinization. The postoperative chest roentgenogram revealed the unexpanded filter overlying the right side of the heart, and she was transferred to our institution with an intracardiac filter. A lateral chest radiograph obtained at our institution showed the filter behind the heart, possibly in the azygous vein. Vena caval and pulmonary angiography revealed thrombosis in the distal inferior vena cava and a right pulmonary embolism. A second Greenfield filter was placed through the previous jugular approach into the infrarenal inferior vena cava without difficulty. The final complication in this group also occurred in a patient who underwent filter placement at another institution. The surgeon had encountered difficulty passing the carrier device into the inferior vena cava. Upon extrusion, the filter failed to open and was floating freely

COOKFOIA 000151



Figure 3. A thrombosed Greenfield filter which failed to trap.



in the inferior vena cava (Figure 3). Proximal migration was prevented by the introducer which fortunately was left in position above the filter. Intravenous streptokinase was given directly into the filter through a femoral catheter. The filter struts expanded after 40 minutes, and the filter subsequently functioned well.

Postoperative complications. Thirteen patients (6.5 percent) had a complication in the postoperative period. Five of these complications (2.5 percent) were considered minor and consisted of the following: one small retroperitoneal hematoma, two filters which migrated caudally, and two filters with one or more prongs extending outside the wall of the inferior vena cava. The filters functioned well in all of these patients, and no further treatment was required. Proximal migration of the Greenfield filter was not seen in this series.

Eight patients (4 percent) had major postoperative complications secondary to the filter. The most common of these complications was thrombosis of the inferior vena cava, which occurred in five patients (2.5 percent). Transient lower extremity swelling developed in four of these patients and resolved with anticoagulant treatment. The remaining patient was a 47 year old man in whom deep venous thrombosis developed in August 1983. Despite heparinization, he had two documented pulmonary emboli. For this reason, a Greenfield filter was inserted without difficulty. Seven months later, rest pain developed in his left foot secondary to



Figure 4. Large embolus with the superior portion of the clot above the top of the filter.

arterial stenosis. The patient underwent femorometatarsal and left femoropopliteal arterial bypasses. On the fourth postoperative day, the patient fell in the room, disrupting the leg wound. Twenty-four hours after this event, massive bilateral lower extremity swelling developed. Venography revealed bilateral deep venous thrombosis extending into the inferior vena cava up to the level of the Greenfield filter. The wound subsequently became infected, and venous gangrene of the left lower extremity occurred requiring above knee amputation. Two patients (1 percent) had recurrent pulmonary embolism after filter placement; one of which was fatal. In one of the two patients, a recurrent pulmonary embolism developed 6 weeks after initial filter placement. A venogram was obtained, which revealed a large embolus trapped in the filter with a tail extending above the top limits of the device (Figure 4). She was treated with a second Greenfield filter placed in the suprarenal position and has subsequently done well. The fatal recurrent pulmonary embolism occurred in a 27 year old psychotic man who sustained a traumatic subdural hematoma and T6 paraplegia after leaping from a window. During heparinization,

Carabasi et al

deep venous thrombosis developed which was treated with intravenous heparin. The patient was not a candidate for continued anticoagulation because of his subdural hematoma and self-destructive behavior, and accordingly, a Greenfield filter was placed at the level of the body of the third lumbar vertebra. Two months later, the patient died suddenly. A postmortem examination revealed multiple pulmonary emboli. The Greenfield filter had migrated caudally into the right common iliac vein just distal to the inferior vena caval bifurcation, allowing thrombi from the left femoral vein to embolize to the pulmonary circulation. The final major complication occurred in a 20 year old woman who sustained a T12 fracture dislocation in an automobile accident. One week after hospitalization, deep venous thrombosis of the left lower extremity developed. A Greenfield filter was placed, and spinal stabilization was subsequently achieved utilizing an anterior approach. Postoperatively, right leg causalgia developed, and a roentgenogram revealed that the filter angulation had changed since the spinal operation. Nine months after filter insertion, exploration of the right sympathetic chain was carried out, and a filter prong was found to be imbedded in the L1 ganglion. This was removed, and the patient had complete relief of her symptoms.

When these three groups were combined, there was a total of 34 complications (17.4 percent). Twenty-six of these complications (13.3 percent) were judged to be minor since they caused no morbidity and because all of the filters functioned properly. In eight patients (4.1 percent), major complications occurred, including one death (0.51 percent) from a recurrent pulmonary embolism.

## Comments

The Greenfield filter is a useful device for preventing primary or recurrent pulmonary embolism when heparinization is contraindicated or when conventional therapy has failed. Our mortality rate of 0.5 percent and major complication rate of 4.1 percent clearly justifies its continued use in properly selected patients. Surgeons using this device should be aware of the complications that can occur. They should also be aware that many complications can be avoided by following certain procedures during preoperative evaluation, intraoperative insertion, and postoperative follow-up.

Preoperative venography is vital to demonstrate the size, contour, and anomalies of the inferior vena cava. It also identifies the location of the renal veins and the extent of any inferior vena caval thrombosis [12]. Visualizing the thrombus is essential to avoid iatrogenic pulmonary embolism caused by manipulation of the carrier during Greenfield filter placement. During venography, we recommend placing a radiopaque marker on the patient's back as this provides a useful reference point for the renal veins and helps avoid fluoroscopic errors at operation.

Preoperative diagnosis of inferior vena caval anomalies permits careful planning to safely place the Greenfield filter. Double infrarenal inferior vena cava has been reported to occur in 0.2 to 3 percent of patients [13]. Preoperative identification is essential, as adequate protection against pulmonary embolism requires placing either one Greenfield filter in the suprarenal cava or two filters, one in each infrarenal cava.

The size of the inferior vena cava is also important. The Greenfield filter has a diameter of 3 cm between its prongs, and the manufacturer does not recommend it for use in vessels larger than 2.8 cm in diameter due to the risk of improper seating [14]. Expanding the struts outward to increase the filter's diameter is not recommended as it increases the size of the compartments into which the inferior vena cava is divided and decreases the filter's efficacy. Also, it increases the angle between the struts and the caval wall and may increase the risk of strut extrusion, as occurred in our patient. We do not recommend the use of a Greenfield filter for vena cavas greater than 3 cm in diameter. Insertion of bilateral iliac vein filters or, in a patient able to tolerate general anesthesia, application of an external caval clip, are alternative methods of treatment [15,16].

Markedly irregular areas of the inferior vena cava should be avoided for filter placement in order to avoid angulation and the risk of strut extrusion. This may require placement above the renal veins, which was necessary in one instance in our series.

Absent internal jugular veins are a minor problem which can almost always be handled simply by placing the filter by way of a femoral or axillary approach.

The use of a guide wire greatly facilitates the procedure. Sliding the carrier over the wire minimizes any difficulty that may be encountered when maneuvering the bulky assembly beyond obstacles, particularly the eustachian valve of the right atrium and prominent hepatic or renal veins. Thus, the time that the filter introducer assembly is in the vascular space is greatly decreased, which decreases the risk of filter thrombosis. The carrier must be intermittently flushed with heparin solution to discourage thrombus formation on the filter. Clotting of the Greenfield filter can cause tethering of the filter struts after ejection. This can result in improper seating of the incompletely opened filter and proximal filter migration [17,18]. When noted intraoperatively, the filter should not be allowed to migrate proximally while the tethered prongs are being freed with intracaval streptokinase.

Accurate filter placement is facilitated by good fluoroscopic equipment to assess the guide wire's position. Other investigators have noted unintentional suprarenal placement of the Greenfield filter in up to 7 percent of patients [19]. Misplacement in the right renal vein has been seen in up to 4 percent of patients and in the common iliac veins or inferior

vena caval bifurcation in up to 2.6 percent of patients [20]. More recently, investigators have noted a decrease in placement errors since adopting routine use of a guide wire [21].

Other incorrect positions reported include the left hepatic vein and right side of the heart [19,20,22-24]. Of the four intracardiac devices reported, three detached from the introducer during passage through the right heart and the other apparently migrated proximally. Of these four filters, the ventricular one was left in situ, and the atrial filters were removed (two surgically and one by using the transvenous retrieval device designed by Greenfield).

All patients must be followed carefully after filter placement. Changes in the filter's position can occur both in the early and late postoperative periods, and in our series, this occurrence was responsible for the one death. Once the filter was expanded in our series, proximal migration was not seen.

Distal migration is more common. Berland et al [25] documented a 48 percent rate of distal migration of caval Greenfield filters (10 of 21 filters over distances of 1 to 7 cm. In most other series, distal migration has ranged from 0 to 6.1 percent, which is consistent with our own rate of 1.5 percent [4,21]. Many of the investigators did not follow all filters with serial roentgenograms, as did Berland. If a filter does migrate distally past the inferior vena caval bifurcation, the patient is no longer fully protected against pulmonary embolism, and appropriate measures to prevent embolization should be taken, such as anticoagulation or placement of a second Greenfield filter.

During postoperative follow-up, it may become evident that one or more struts of the Greenfield filter have extruded beyond the walls of the vena cava. In our series, this was a benign condition which was seldom associated with injury to adjacent structures or retroperitoneal hematoma. In one of our patients, extrusion was due to retraction during subsequent operation. The filter prong became embedded in a lumbar sympathetic ganglion, initiating lower extremity causalgia. There are no other reports of injury to structures adjacent to the cava in the literature; however, other studies have documented higher rates of filter extrusion, which have ranged from 15 to 36 percent [4,21]. These rates may have been due to incorrect release of the filter, as stressed by Sequeira et al [10], or intraoperative manipulation of the filter, as described by Phillips et al [26]. Those groups reporting a high incidence of extrusion did not report any injury to adjacent structures. Other studies have also verified the low incidence of retroperitoneal bleeding, which has been estimated to be between 0 and 2.6 percent [19,20].

Inferior vena caval thrombosis occurred in five of our patients (2.5 percent). Four of these patients had no associated lower extremity morbidity on short-term follow-up. Venous gangrene developed in one patient, requiring above-knee amputation. As three of these five patients had filters placed through the femoral vein, we believe that this route may be associated with a higher incidence of this complication. Also, patients with inferior vena caval thrombosis appear refractory to thrombolytic therapy, which failed on the three occasions it was tried.

The overall inferior vena caval patency rate in our series was 97.5 percent, which was comparable to the 95 to 98 percent rate of other large series [2,3,9,21]. The proponents of inferior vena cava plication demonstrated more than 10 years ago that a patent inferior vena cava is desirable for two major reasons: a lower incidence of recurrent pulmonary embolism due to avoidance of both widely dilated collateral vessels and an inferior vena cava cul-de-sac and a lower incidence of lower extremity complications, including edema, recurrent deep venous thrombosis and their sequelae. The transvenous devices offer a lower perioperative morbidity rate and a higher caval patency rate than open inferior vena caval clipping, and the Greenfield filter has the highest patency rate of the devices thus far developed.

## Summary

The Greenfield filter can be used with a low complication rate provided one adheres to certain principles. First, preoperative venography to define the inferior vena caval anatomy will help avoid difficulties associated with anatomic variations. At the time the study is carried out, it would be extremely useful if the radiologist places a radiopaque marker at the level of the renal veins. This will ensure that filters will be placed in the infrarenal position when appropriate, thus preventing occasional inadvertent discharge, particularly into the right renal vein. Second, use of a guide wire greatly facilitates passage of the introducer and accurate intracaval positioning. Third, intraoperative technical errors must be recognized and promptly corrected. Finally, meticulous postoperative follow-up is essential, and recurrent embolism or any change in filter position requires repeat roentgenography of the vena cava to guide appropriate corrective treatment.

## References

1. O'Neil EE. Ligation of the inferior vena cava in the prevention and treatment of pulmonary embolism. N Engl J Med 1945; 232: 641-6.
2. Gomez GA, Cutler BS, Wheeler HB. Transvenous interruption of the inferior vena cava. Surgery 1983; 93: 612-9.
3. Cimochowski GE, Evans RH, Zarins CK, Lu CT, DeMeester TR. Greenfield filter vs Mobin-Uddin umbrella: the continuing quest for the ideal method of vena caval interruption. J Thorac Cardiovasc Surg 1980; 79: 358-65.
4. Wingerd M, Bernhard VH, Maddison F, Towne JB. Comparison of caval filters in the management of venous thromboembolism. Arch Surg 1978; 113: 1264-71.
5. Adelson J, Steer ML, Glotzer DJ, Skillman JJ, Simon M, Salzman EW. Thromboembolism after insertion of the Mo-

Page 154

COOKFOIA 000154

Carabasi et al

bin-Uddin caval filter. Surgery 1980; 87: 184–9.

6. Jarrell BE, Posuniak E, Roberts J, Osterholm J, Cotler J, Ditunno J. A new method of management using the Kimray-Greenfield filter for deep venous thrombosis and pulmonary embolism in spinal cord injury. Surg Gynecol Obstet 1983; 157: 316–20.

7. Orsini RA, Jarrell BE. Suprarenal placement of vena cava filters: indications, techniques, and results. J Vasc Surg 1984; 1: 124–35.

8. Greenfield LJ, Stewart JR, Crute S. Improved technique for insertion of Greenfield vena cava filter. Surg Gynecol Obstet 1983; 156: 217–9.

9. Menzoian JO, LoGerfo FW, Doyle JE, Weitzman AF, Sequeira JC. Technical modifications in the placement of inferior vena caval filter devices. Am J Surg 1983; 142: 216–9.

10. Sequeira JC, Sacks BA, Tate J, Simon MA. Safe technique for introduction of the Kimray-Greenfield filter. Radiology 1979; 133: 799–800.

11. Pasto ME, Hurtz AB, Jarrell BE, et al. The Kimray-Greenfield filter: evaluation by duplex real-time pulsed Doppler ultrasound. Radiology 1983; 148: 223–6.

12. Riggs CE. Vena cavography relative to umbrella filter placement. Radiology 1972; 105: 450–1.

13. Phillipps E. Embryology, normal anatomy, and anomalies. In: Ferris EJ, Hipona FA, Kahn PC, Phillipps E, Shapiro JH, eds. Venography of the inferior vena cava and its branches. Baltimore: Williams & Wilkins, 1969.

14. Product information (revised Oct. 1986). Watertown, MA: Medi-Tech.

15. Miles RM, Richardson RR, Wayne L, Elses PW, Stewart SB, Duncan D. Long-term results with the serrated teflon vena caval clip in the prevention of pulmonary emboli. Ann Surg 1969; 169: 881–91.

16. DeWeese MS, Draft RO, Nichols WK, Six HH, Thompson NW. Fifteen year clinical experience with the vena cava filter. Ann Surg 1973; 178: 247–57.

17. Leiter B, Sequeira J, Weitzman AF, Menzoian J. A complication following Kimray-Greenfield filter insertion: locking of struts with incomplete opening. Cardiovasc Intervent Radiol 1981; 4: 215–7.

18. Castaneda F, Herrera M, Cragg AH, et al. The migration of a Kimray-Greenfield filter from the inferior vena cava to the right ventricle in a 61-year old man is described. Radiology 1983; 149: 690.

19. Greenfield LJ, Peyton R, Crute S, Barnes R. Greenfield vena cava filter experience: late results in 156 patients. Arch Surg 1981; 116: 1451–6.

20. Greenfield LJ, Zocco J, Wilk J, Schroeder TM, Elkins RC. Clinical experience with the Kimray-Greenfield vena cava filter. Ann Surg 1977; 185: 692–8.

21. Greenfield LJ. Current indications for and results of Greenfield filter placement. J Vasc Surg 1984; 1: 502–5.

22. Allen HA, Cisternino SJ, Ottiesen OE, Ouerali L, Dagher F. The Kimray-Greenfield vena cava filter: a case of unusual misplacement. Cardiovasc Intervent Radiol 1982; 5: 82–4.

23. Akins CW, Thurer RL, Waltman AC, Margolies MN, Schneider RC. A misplaced caval filter: its removal from the heart without cardiopulmonary bypass. Arch Surg 1980; 115: 1133.

24. Greenfield LJ, Crute SL. Retrieval of the Greenfield vena cava filter. Surgery 1980; 88: 719–22.

25. Berland LL, Maddison FE, Bernhard VM. Radiologic follow-up of vena cava filter devices. Am J Radiol 1980; 134: 1047.

26. Phillips MR, Widrich WC, Johnson WC. Perforation of the inferior vena cava by the Kimray-Greenfield filter. Surgery 1980; 67: 233–5.

Page 155

COOKFOIA 000155



# today's practice of cardiopulmonary medicine

## The Greenfield Vena Cava Filter*

Benjamin Kanter, M.D.,† and Kenneth M. Moser, M.D., F.C.C.P.‡

Interruption of the inferior vena cava (IVC) has been used for several decades as a means of protecting patients with lower extremity deep venous thrombosis (DVT) from pulmonary embolism (PE). The long history of this approach has been marked, as expected, by an evolution of the techniques employed.[1] It took some years before it became apparent that unilateral interruptive procedures (femoral vein ligation) were inadequate and needed to be replaced by IVC interruption. It took additional time to appreciate that IVC ligation had a number of deficiencies and was best replaced by partially-occlusive, and preferably less invasive, procedures.[2] During the past 20 years, transvenous approaches have developed that obviate the need for general anesthesia with its attendant risks, costs, and delays.[3] A number of transvenous devices have been described; however, only two have gone into widespread use: the Mobin-Uddin umbrella filter,[4] and more recently, the Greenfield filter.[5] Other devices, such as the Hunter balloon,[6] bird's nest filter,[7] and the nitinol wire filter,[8] have been reported, but are not in general use.

The value of any form of therapy in venous thromboembolism is dictated chiefly by the attendant risk/benefit ratio. This ratio is not accurately predicted by theoretical considerations or by preliminary reports; such evaluation must await general application. This is because a given risk/benefit defined in carefully structured investigations may not reflect the results when the approach is applied to a diverse universe of patients. Due to the context of general use, risk/benefit is conditioned by the experience and skill of those using the approach and the particular patients involved. "Murphy's Law" then operates: modifications of the approach are made, results accrue, and the true (or "real") risk/benefit ratio slowly emerges. These basic considerations apply to the use of the Greenfield filter. This approach now has been available for a sufficient period to allow a reasonable assessment of both its risks and benefits as found in current practice. We have undertaken this appraisal based on review of the available literature and our own experience.

In preparing this review, we have had to contend with the diversity of clinical practice. Specifically, investigators have used different insertion techniques, varying criteria for defining complications, monitored different parameters, had diverse follow-up periods and protocols, etc. However, this compilation reasonably represents the actual variety of "state of the art" to which any given patient may be exposed.

### MOBIN-UDDIN FILTER

In order to appreciate the development of the Greenfield filter, it is necessary to understand what has previously been available. The Mobin-Uddin filter was the first widely used transvenous device, having been introduced in the 1960s. It resembles an umbrella and consists of six stainless steel spokes radiating from a central hub. A thin fenestrated Silastic sheet covers the metal on each side but allows protrusion of the spokes by 2 mm.[4] In its original design, the filter expanded to 23 mm in cross-sectional diameter, having been developed in such fashion based on autopsy studies of human vena cava morphology.[9] However, due to filter migration in man, the filter was increased in size to its current 28 mm.[4] This has helped reduce the number of proximally migrating filters but has not eliminated the problem. In one report 20 of 1,981 (1 percent) of 23 mm filters proximally migrated vs two of 234 (0.85 percent) 28 mm filters, and in another report, 9.4 percent of the 28 mm filters migrated.[17] This filter is efficacious in preventing pulmonary embolism;[1,17,18] however, complications have been recognized, including caval thrombosis in 33 to 85 percent of patients,[17,18,19] proximal migration of the filter resulting in death,[4,20,21] venous stasis sequelae related to filter placement,[4,20,21,22] and a higher than expected rate of recurrent pulmonary embolism perhaps related to the high incidence of caval thrombosis.[21,24]

*From the Division of Pulmonary and Critical Care Medicine, Department of Medicine, UCSD Medical Center, University of California, San Diego, School of Medicine.
This study was supported in part by an ALA/ATS Research Training Fellowship (B.K.).
†Fellow, Department of Pulmonary and Critical Care Medicine.
‡Professor of Medicine; Director, Pulmonary and Critical Care Medicine.
Reprint requests: Dr. Moser, UCSD Medical Center (H-772), 225 Dickinson Street, San Diego 92103

170

The Greenfield Vena Cava Filter (Kanter, Moser)

COOKFOIA 000156



Figure 1. The Greenfield filter (metric measure).

## GREENFIELD FILTER

In an effort to resolve the problems of filter migration and caval thrombosis, Greenfield developed a conical stainless steel wire filter. It has been designed so that 80 percent of the depth of the filter can be occluded before reducing the cross-sectional area by 64 percent. This allows central trapping and capture of emboli with continued flow through the cava.[1,4,5] The filter is 4.6 cm in length and 3.0 cm in diameter at its base when fully expanded (Fig 1). The ability of the filter to trap emboli 2.0 mm and larger has been demonstrated experimentally.[4] The thrombus entrapment efficiency of the filter has been shown to be a function of the size of the embolus, and depth of filling.[4] A significant gradient across the filter does not occur during repeated embolization until the filter is filled to approximately 70 percent of its depth.[4] Because of the continued blood flow around trapped clot and the conical geometry of the device (funneling clot toward its apex in the middle of the vascular channel), clot lysis can take place, thus cleaning the filter. This has been shown to occur in dog studies and in clinical practice as well.[1,4,5] Although not explicitly studied, it has been suggested that the filter will be less efficient if lodged obliquely within the cava.[5,12,15]

## OPERATIVE TECHNIQUE

Anatomic definition of a patient's IVC is mandatory prior to filter placement, as the device has a finite maximal diameter. In addition to congenital abnormalities in the venous system, cavae with diameters greater than 28 mm (so-called "megacava") may be present in up to 3 percent of patients, and require placement of the filter in the suprarenal segment of the IVC.[4] Venous cavography will also alert the physician to the presence of clot in the IVC or the renal veins. Such clot may prevent the struts of the filter from completely opening and engaging the caval wall. This situation, once recognized, can be dealt with by suprarenal filter placement.

The filter can be introduced by either jugular or femoral venous cut-down. The procedures are dissimilar, however, in their use of guide wires and insertion catheters.[4] A percutaneous approach has also been described.[5] Techniques for insertion have been published.

Filter design and instructions on passage with the equipment, as well as new therapies, both the design and application of this device have evolved. These progressive changes are important because they have conditioned previously reported results. The most significant technical change occurred in 1983 when both the insertion catheter and the techniques of femoral and jugular placement were modified. The modifications included the following: (1) placement using Seldinger guide wire technique; (2) providing a disposable introducer; and (3) provision for continuous heparin irrigation of the system through an additional access port.

Most filters are placed via a right internal jugular approach. A cut-down is made to the internal jugular in line with the fibers of the sternocleidomastoid muscle. A segment of the vein is then mobilized. The introducer (which includes the filter and its carrier) can be inserted through a transverse incision in the jugular or the guidewire may be passed first, and then back-loaded through the carrier. The filter is then guided to a location below the lowest renal vein and above the bifurcation of the iliac veins. Knowledge of the venous anatomy is critical to avoid placement in a renal, hepatic, iliac, or other vessel.[4,5,15] Once the device is in place, the carrier is removed while the filter's position is maintained by use of a stylet within the introducer system. As the carrier is withdrawn from around the filter, the legs open and engage the caval wall. The guide wire running longitudinally through the filter helps to prevent angled insertion.[4] The introducer assembly is removed, and the venotomy repaired.

### Operative Complication

Most series documenting operative complications were compiled prior to the changes made in 1983, changes designed to improve certain reported complications of insertion; oblique placement, clot formation during insertion, and difficult accurate placement into the infrarenal IVC.[4] Anecdotal reports, substituting these improvements.[4] Therefore, these early reports likely represent "worst-case" statistics. We have pooled reports of 286 attempted insertions from those series reporting this complication. Misplacement occurred in nine patients, and the filters were displaced into various locations, including the improper IVC, the renal vein, iliac veins,[9] and the right ventricle.[4] Elimination of misplacements has been reported following adoption of newer guide wire usage.[4] Thirty-three of 286 filters were lodged obliquely in the cava, the denominator having been drawn from those series reporting this complication.[4,9,15] Wound hematomas were noted in nine patients.[4,9,15] Air emboli occurred in three patients without serious residua.[4,9] Two episodes of vagal compression were noted by one series.[4] A case report documented formation of clot within the carrier assembly (prior to constant heparin flush administration) with subsequent incomplete initial opening of the filter.[9] Finally, one group reported perforation of the cava by three limbs of the filter after an attempt was made to push the filter more distally following release;[9] however no clinical problem ensued.

Early caval occlusion (at two weeks) has been reported in two patients.[9] This was postulated to be due to massive embolic obstruction of the filter. There have been no other complications directly attributable to filter placement in the late postoperative period.

Thirty day mortality varies from 0 to 19 percent.[4,9,15] For deaths were uniformly related to the original embolic event or underlying disease. A single fatality, due to early recurrence of pulmonary embolism has been reported following filter misplacement.[9]

## RECURRENT PULMONARY EMBOLISM

The purpose of caval filtration is to prevent pulmonary embolism. One of the arguments against the use

COOKFOIA 000157

of the Mobin-Uddin umbrella, and indeed, all other devices which can lead to caval occlusion, is that future embolization may take pace through extensive venous collateral circulation.[20] In addition, the presence of a foreign surface in the blood stream may activate clotting, and the "protector" may then become the seed from which future embolic episodes grow.[1,3,25,30,31]

Recurrent pulmonary embolism is an uncommon event following Greenfield filter insertion. Published data on 259 patients[1,2,5,11,17,18,24,28] disclosed seven pulmonary emboli after insertion (2.6 percent).[17] An additional patient died from pulmonary embolism after a filter was misplaced into the right iliac vein, leaving a left proximal iliac DVT uncovered.[17] The low incidence of embolic recurrence (whether or not anticoagulant was used) had been attributed to the geometry of the device and its excellent record of long-term patency. At odds with these data are three patients reported from the University of Pittsburgh, all of whom had pulmonary emboli arising from proximally propagating clot on top of the filter.[20] Others had reported the risk of clot formation in an obliquely lodged filter but those patients had a benign course.[6,25] The Pittsburgh series is unique in that two of the three filters were in apparently good position. All three cavae were patent, although two filters contained thrombus. Unfortunately, the total number of patients was not reported; thus, their overall incidence of recurrence is unknown.

### PATENCY

Venous stasis complications are a significant concern in any patient with deep vein thrombosis. While the primary obstructing thrombi usually lie in the distal veins of the legs, caval occlusion may markedly exaggerate stasis complications.[1,9,18,28,31] Long-term caval patency has proven to be a unique advantage of this device.[18] In nine series comprising 257 patients with varying degrees of follow-up, only eight cases (3.1 percent) of caval thrombosis were documented.[1,4,5,11,17,18] When commented upon, the occlusions occurred within one month of insertion.[18] New venous stasis complications have not been seen postoperatively unless caval occlusion or recurrent deep venous thrombosis developed.[1,9,11,18,28] Indeed, many patients with preexisting chronic venous stasis thrombosis have resolved their stasis phenomena after filter placement.[18] The role of anticoagulation in conditioning the long-term patency of the device remains uncertain. Whether subclinical clot formation takes place intermittently on the filter is not known. It has been postulated that some venograms revealing clot "trapped" within a filter may in reality represent in-situ thrombosis, and thus a source for future emboli.[3,21]

### ANTICOAGULATION

Anticoagulation remains the primary therapy for deep venous thrombosis. Caval filtration serves to protect the patient from one complication of this disease (pulmonary embolism) but has no effect on venous thrombosis. Therefore, anticoagulation should be administered as usual if no contraindication exists. While he prefers to discontinue heparinization briefly prior to insertion, Greenfield contends that anticoagulation is not an absolute contraindication to filter placement.[9] This assertion is supported by the experience of Gomez et al[8] who routinely administered 7,500 units of heparin immediately prior to venotomy, in those patients without contraindication and noted no increase in complications. In the two reported cases of retroperitoneal hematoma in association with a filter,[13,18] both patients received excessive anticoagulation therapy. In one of the cases, the patient underwent laparotomy 18 months later (for another condition), at which time, one arm of the filter was noted to have perforated the IVC.[18] The actual timing could not be proven, and the earlier bleed would suggest that the perforation took place during or shortly after insertion. There is no other evidence that patients receiving anticoagulation therapy are at increased risk of caval hemorrhage.[1,9,11,18]

### FILTER MIGRATION

The construction of the Greenfield filter is such that the curved prongs of the struts effectively anchor the filter to the caval wall. When the introducer is loaded with the filter, the struts are under tension. During the insertion, the filter springs open to engage the caval wall; the prongs may actually perforate the cava at this point. Among nine series (259 insertions), possible filter movement occurred in 27.[1,4,5,11,17,18] All cases were confined to two series[11,18] and comprise a significant percentage of their patients. Apparent migration, as little as 2 mm, was reported, with no significant proximal migrations. An argument has been put forth that some of those "migrations" actually represent parallel-related discrepancies between fluoroscopy at insertion and later roentgenograms.[18] Only one significant proximal migration has been reported, this due to unrecognized placement in a dilated segment of vein that was too large to engage the filter.[5]

### CAVAL PERFORATION

As stated previously, when the filter springs open during insertion, its struts engage the wall of the vena cava with some force. Penetration of the caval wall by the sharp anchoring prongs is necessary to prevent filter migration. Whether the prongs actually perforate the cava is not documented, but there have been no reported complications attributed to this. However, strut perforation can take place in a minority of cases.

172

COOKFOIA 000158

particularly if there is angled insertion.[33-34] or if an effort is made to alter the position of a filter after it has been extruded.[35] Methods used to assess filter position have included computerized tomography, ultrasound, and venacavography.[35,36] Strut perforation has been the local cause of two retroperitoneal hematomata,[11,36] one mimicking intestinal obstruction,[34] and one reversible hematuria.[37] Long-term experience in patients both treated and untreated with anti-coagulants has not revealed other complications.

### INFECTION

There have been no reported cases of an infected Greenfield filter. This concern was raised by such a report involving a Mobin-Uddin umbrella[38] and led S[39] et al[39] to examine the effect of Greenfield filter insertion in a canine model of septic embolism. These studies suggest that sepsis is not an absolute contraindication to filter placement,[39] and that the device can be sterilized if contamination takes place. In addition, we recommended that prophylactic antibiotics be administered to filtered patients in whom bacteremia may arise due to dental or surgical manipulation.[6]

### THROMBOLYTIC THERAPY

Little is known about the morbidity/mortality of thrombolytic therapy administered following insertion of the Greenfield filter. Four patients are reported in the literature in whom filters were in place prior to such treatment.[32,37] Few details are given; however, no complication attributable to the presence of the filter was noted. Given the absence of significant complications during insertion into anticoagulated patients, it may be safe to administer thrombolytic agents shortly after filter placement. However, further observations in this regard are needed.

### SUPRARENAL PLACEMENT

Having established the excellent long-term patency record of this filter, some have begun placing the device in a suprarenal position when IVC thrombus location prevents lower placement, or in other special contexts, as follows:[11,35,36,40] recurrent thromboemboli with IVC thrombus extending to or above the renal veins despite adequate anticoagulation; recurrent thromboemboli secondary to renal vein thrombosis despite adequate anticoagulation; recurrent thromboemboli from a previous IVC interruption despite adequate anticoagulation; recurrent thromboemboli with a large patent left ovarian vein (with or without thrombus) as a possible source of embolus despite adequate anticoagulation; presence of a perirenal IVC thrombus when anticoagulation is contraindicated; after renal transplant surgery—if contraindications to anticoagulation exist; and in the presence of renal cell carcinoma with extension of tumor thrombus into the

vena cava. Initial concerns over adverse renal consequences of potential suprarenal occlusion have not materialized.[35,40-42] Thus far, 35 patients have been reported with a filter placed above the renal veins.[11,35,36,40-42] There were no complications or caval occlusions and renal function remained unchanged in all patients.

### INDICATIONS AND DISCUSSION

No technique can be evaluated without establishing an "ideal" standard. In our view, such an ideal caval interruptive approach would incorporate the following features: (1) The procedure should be applicable with safety and efficacy by physicians of reasonable skill after modest periods of training. (2) The procedure should be performed without general anesthesia and with minimal patient invasion. (3) The approach should not interfere, acutely, with caval blood flow to a significant degree. (4) All potential emboli above a defined size (eg, 2 mm diameter) should be prevented. (5) Acute and chronic complications of the procedure (eg, bleeding, caval thrombosis) should be minimal. (6) The approach should be applicable despite concurrent anticoagulant or thrombolytic therapy. (7) The interruption should be reversible.

Except for its use with thrombolytic therapy (for which there are few data) and the current permanency of its insertion, the Greenfield filter appears to approximate these ideal goals.

As experience with the device has widened and the initially favorable reports concerning safety, caval patency, etc, have been confirmed, indications for insertion have understandably been liberalized. Early use was confined to patients with known DVT/PE and either complications from, or contraindications to anticoagulation; and to patients who experienced recurrent pulmonary embolism despite anticoagulant therapy. An excellent analysis of these indications has been published.[43] Many authors have since argued for a wider use of the device.[9,11,32,35,36,40-46] Of the cases presently reviewed, the indications for insertion were as follow: anticoagulation (AC) contraindicated, 184 (34 percent); failure of AC, 130 (29 percent); complication of AC, 66 (15 percent); prophylactic placement, 72 (16 percent); other, 30 (6 percent).[9,11,32,35,36,40-46]

We routinely insert the filter in patients undergoing pulmonary thromboendarterectomy for pulmonary hypertension due to chronic proximal pulmonary artery clot.[46,47] These patients now number over 30. Despite the high intracaval pressures often present in these patients and the common use of heparin, no significant complications have occurred. We have been gratified to see resolution of venous stasis problems postoperatively in some patients as their venous pressures return to normal, despite the presence of the filter. Because of the nature of the underlying disease

we make an effort to maintain all such patients on long-term anticoagulation. There have been no caval thromboses, and no embolic recurrences.

ACKNOWLEDGMENT. We thank Joyce Sly for her assistance in the preparation of the manuscript.

## REFERENCES

1. Greenfield LJ. Vena caval interruption and pulmonary embolectomy. Clin Chest Med 1984; 5:495-505

2. Silver D, Sabiston DC. The role of vena caval interruption in the management of pulmonary embolism. Surgery 1975; 77:1-10

3. Stewart JR, Greenfield LJ. Transvenous vena caval filtration and pulmonary embolectomy. Surg Clin North Am 1982; 62:411-30

4. Brewster DC. Introduction to symposium on transvenous vena cava interruption. J Vasc Surg 1984; 1:487-90

5. Mansour M, Chang AE, Sinclair WF. Interruption of the inferior vena cava for the prevention of recurrent pulmonary embolism. Am Surg 1985; 51:375-80

6. Simon M, Palestrant AM. Transvenous devices for the management of pulmonary embolism. Cardiovasc Intervent Radiol 1980; 3:308-16

7. Mobin-Uddin K, McLean R, Jude JR. A new catheter technique of interruption of inferior vena cava for prevention of pulmonary embolism. Vasc Surg 1969; 35:559-94

8. Mobin-Uddin K, Utley JR, Bryant LR. The inferior vena cava umbrella filter. Progr Cardiovasc Dis 1975; 18:391-99

9. Mobin-Uddin K, McLean R, Bolooki H, Jude JR. Caval interruption for prevention of pulmonary embolism. Arch Surg 1969; 99:711-15

10. Greenfield LJ, Stewart JR, Crute S. Improved techniques for insertion of Greenfield vena caval filter. Surg Gynecol Obstet 1983; 156:217-19

11. Greenfield LJ, Zocco J, Wilk J, Schroeder TM, Elkins RC. Clinical experience with the Kim-Ray Greenfield vena caval filter. Ann Surg 1977; 185:692-98

12. Greenfield LJ, Peyton R, Crute S, Barnes R, Greenfield vena caval filter experience. Arch Surg 1981; 116:1451-55

13. Greenfield LJ. Current indications for and results of Greenfield filter placement. J Vasc Surg 1984; 1:502-04

14. Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. A new intracaval filter permitting continued flow and resolution of emboli. Surgery 1973; 73:599-606

15. Hunter JA, DeLaria GA. Hunter vena cava balloon: rationale and results. J Vasc Surg 1984; 1:491-97

16. Roehm JOF. The bird's nest filter: a new percutaneous transcatheter inferior vena cava filter. J Vasc Surg 1984; 1:498-501

17. Vena Cava Interruption. Samuel HC, director, Yale vascular service. Contemp Surg 1982; 20:43-55

18. Mendelian JC, LoGerfo FW, Weitzman AF, Ezpaleta M, Sequeira JC. Clinical experience with the Mobin-Uddin vena cava umbrella filter. Arch Surg 1980; 115:1172-81

19. Ablaza J, Stein ME, Gloster JD, Skillman JJ, Simon M, Salzman EW. Thromboembolism after insertion of the Mobin-Uddin

... follow-up study of the Mobin-Uddin filter for vena cava interruption. Surg Gynecol Obstet 1984; 158:813-16

21. Gomez GA, Cutler BS, Wheeler HB. Transvenous interruption of the inferior vena cava. Surgery 1983; 93:612-19

22. Berland LL, Maddison FE, Bernhard VM. Radiologic follow-up of vena cava filter devices. Am J Radiol 1980; 134:1047-52

23. Cimochowski GE, Evans RH, Zarins CK, Lu C, DeMeester TR. Greenfield filter versus Mobin-Uddin umbrella. J Thorac Cardiovasc Surg 1980; 79:358-64

24. Wingerd M, Bernhard VM, Maddison F, Towne JB. Comparison of caval filters in the management of venous thromboembolism. Arch Surg 1978; 113.1264-69

25. Schroeder TM, Elkins RC, Greenfield LJ. Entrapment of sized emboli by the KMA-Greenfield intracaval filter. Surg 1978; 83:435-39

26. Phillips MR, Widnch WC, Johnson WC. Perforation of the inferior vena cava by the Kim-Ray Greenfield filter. Surgery 1980; 87:233-35

27. Prince MR, Novelline RA, Athanasoulis CA, Simon M. The diameter of the inferior vena cava and its implications for the use of vena caval filters. Radiology 1983; 149:687-89

28. Novelline RA. Practical points on transvenous insertion of inferior vena cava filters. Cardiovasc Intervent Radiol 1980; 3:319-24

29. Castro F, Herrera M, Cragg AH, Salomonowitz E, Lund G, Castro-Zuniga WR, et al. Migration of a Kimray-Greenfield filter to the right ventricle. Radiology 1983; 149:690

30. Cimino RA, Jarrell BE. Supraclaval placement of vena caval filters: indications, techniques, and results. J Vasc Surg 1984; 1:154-55

31. Tadavarthy SM, Castaneda-Zuniga W, Salomonowitz E, Lund G, Cragg A, Hunter D, et al. Kimray-Greenfield vena cava filter: percutaneous introduction. Radiology 1984; 151:525-26

32. Rosenthal D, Jones D, Stanton PE, Lamis PA. A simplified technique for placement of the Kimray-Greenfield filter. Surg Gynecol Obstet 1985; 161:481-82

33. Allen RA, Cisternino SJ, Ottesen OE, Queral L, Dagher F. The Kimray-Greenfield vena caval filter: a case of unusual misplacement. Cardiovasc Intervent Radiol 1982; 5:82-84

34. Stinn JH, Jarrett PE, Wasteil C. The treatment of recurrent pulmonary embolism: experience with the Kimray-Greenfield vena cava filter. Ann R Coll Surg Engl 1983; 65:225-27

35. Burke P, Mehigan JT, Stewart JR, Nyland JMR, Carr J, Domekus-Hayes DF. The Greenfield filter as an adjunct to pulmonary embolism management. Indian J Med Sci 1984; 152:121-23

36. Silber R, Queral LA, Dagher F. Clinical experience with Kim-Ray Greenfield filters. Md State Med J 1982; 31:45-47

37. Jarrell BE, Posuniak E, Roberts J, Osterholm J, Cotler J, Dituno J. A new method of management using the Kim-Ray Greenfield filter for deep venous thrombosis and pulmonary embolism in spinal cord injury. Surg Gynecol Obstet 1983; 157:316-20

38. Leiter B, Sequeira J, Weitzman AF. A complication following Kimray-Greenfield filter insertion. Cardiovasc Intervent Radiol 1981; 4:215-17

39. Crane C. Venous interruption for pulmonary embolism: present status. Progr Cardiovasc Dis 1975; 18:329-33

40. McAuley CE, Webster MW, Jarrett F, Hirsch SA, Steed DL. The Greenfield intracaval filter as a source of recurrent pulmonary thromboembolism. Surgery 1984; 96:574-76

41. Friedman SA, Cerruti MM, Berger N, Washor H, Kosmorsi J. Thromboembolism with the intracaval umbrella. Am Heart J 1972; 84:237-39

42. Nomer SR, Nabseth DC. Intracaval devices for the prevention of pulmonary embolism. Am J Surg 1971; 121:642-47

43. Ochsner A, Ochsner JL, Sanders HS. Prevention of pulmonary embolism by caval ligation. Ann Surg 1970; 171:923-38

44. ... results of caval ligation. Surgery 1970; ...

45. Adams JT, Feingold BE, DeWeese JA. Comparative evaluation of ligation and partial interruption of the inferior vena cava. Arch Surg 1971; 103:272-76

46. Dunne MG, Goldstein WZ. Computed tomographic and ultrasound appearance of Kim-Ray Greenfield vena caval filters and potential for noninvasive localization. J Comput Tomogr 1983; 7:375-80

47. Greenfield LJ, Scher LA, Elkins RC. KMA-Greenfield filter placement for chronic pulmonary hypertension. Ann Surg 1979; 189:560-65

48. Scott JH, Anderson CL, Shankar PS. Septicemia from infected

174

The Greenfield Vena Cava Filter (Kanter, Moser)

caval umbrella. JAMA 1980; 243:1133-34

Peyton JWR, Hyleman MB, Greenfield LJ, Crute SL, Sugerman HJ, Quershi GD. Comparison of Greenfield filter and vena caval ligation for experimental septic thromboembolism. Surg 1983; 93:533-37

Stewart JR, Peyton JW, Crute SL, Greenfield LJ. Clinical results of suprarenal placement of the Greenfield vena cava filter. Surgery 1982; 92:1-4

Nivell BE, Szentistvany S, Mendez-Picon G, Lee HM, Greenfield LJ. Greenfield filter in renal transplant patients. Arch Surg 1983; 118:648-52

Peyton JWR, Stewart JR, Greenfield LJ, Crute SL. Hemodynamics and renal function following experimental suprarenal vena caval occlusion. Surg Gynecol Obstet 1982; 155:37-42

Rosenthal D, Gershon CR, Rudderman R. Renal cell carcinoma invading the inferior vena cava: the use of the Greenfield filter to prevent tumor emboli during nephrectomy. J Urology 1983

54  Bomaiaski JS, Martin GJ, Hughes RL, Yao JST. Inferior vena cav. interruption in the management of pulmonary embolism. Ches 1982; 82:767-74

55  Canteimo NL, Menzoian JO, LoGerfo FW, Faxuio G, Mozde PJ. Clinical experience with vena caval filters in high-risk cance patients. Cancer 1982; 50:341-44

56  Moser KM, Spragg RG, Utley J, Daily PO. Chronic thrombon obstruction of major pulmonary arteries: Results of thromboen darterectomy in 15 patients. Ann Intern Med 1983; 99:299-30

57  Moser KM, Daily PO, Peterson K, Dembitsky W, Vapnek JM Shure D, et al. Thromboendarterectomy for chronic, majo vessel thromboembolic pulmonary hypertension: immediat and long-term results in forty-two patients. Ann Intern Med (i press)

COOKFOIA 000161

1065

# Percutaneous Insertion of the Kimray-Greenfield Filter:

## Incidence of Femoral Vein Thrombosis



Alan Kantor[1]
Sidney Glanz
David H. Gordon
Salvatore J. A. Sclafani

Venograms were obtained in 17 patients 5–8 days after percutaneous dilatation of the common femoral vein for insertion of the Kimray-Greenfield inferior vena cava filter. The venograms showed thrombosis of the common femoral vein in seven (41%) of the 17 patients, four of whom were symptomatic. Common femoral vein thrombosis can have serious clinical sequelae. The possibility of this complication should be considered before inserting the filter percutaneously via the femoral vein.

The Kimray-Greenfield inferior vena cava filter is an effective device for prevention of pulmonary emboli in patients with deep venous thrombosis of the lower extremities [1, 2]. The indications for filter placement are (1) continued pulmonary emboli in an adequately anticoagulated patient with significant deep venous thrombosis (popliteal, superficial femoral, common femoral, and iliac veins) or (2) pulmonary emboli in a patient with a contraindication to anticoagulation.

Percutaneous placement of the filter is possible by either the internal jugular or common femoral vein approach [3, 4]. We obtained follow-up lower extremity venograms in 17 patients after percutaneous femoral vein dilatation for placement of the Kimray-Greenfield filter to assess the patency of the femoral vein.

### Materials and Methods

Percutaneous placement of 26 Kimray-Greenfield filters via the femoral vein was performed as previously described [3, 4]. Twenty-two filters were successfully placed via the right femoral vein. Four placements were attempted via the left femoral vein, only two of which were successful. Follow-up venograms were obtained in 17 of these patients. Indications for filter placement in the patients studied were a contraindication to anticoagulation (12 patients) and recurrent pulmonary emboli while adequately anticoagulated (five patients).

Before inserting the filter, an angiogram of the inferior vena cava was obtained to assess the inferior vena cava and to ensure that a left inferior vena cava was not present. Left renal venograms were also obtained both to assess the position of the left renal vein and to rule out a circumaortic renal vein collar. None of the patients had this variant.

A skin incision, previously made for placement of the angiographic catheters, was extended to approximately 1 cm. The hole in the femoral vein was dilated to 24 French with Amplatz renal dilators [3, 5]. The filter introduction system was passed through the 24-French sheath and advanced over a guidewire into position in the inferior vena cava. The filter was then placed by withdrawing the introduction system, and the introduction system was removed from the vein. Compression of 5–10 min usually was adequate to obtain hemostasis. Heparin was discontinued 4 hr before the procedure in those patients who were anticoagulated. Anticoagulation was restarted in those patients without a contraindication to anticoagulation by the next day.

Five to 8 days after filter placement, lower extremity venograms were obtained with 50 ml of 60% contrast material. Filming was done over the thigh and pelvis to assess the superficial and common femoral veins and the iliac veins.

Received March 15, 1987; accepted after revision July 21, 1987.

Presented at the annual meeting of the American Roentgen Ray Society, Miami Beach, FL., April 1987.

[1] All authors: Department of Radiology, State University of New York, Health Science Center at Brooklyn, 450 Clarkson Ave., Brooklyn, NY 11203. Address reprint requests to A. Kantor.

AJR 149:1065–1066, November 1987
0361-803X/87/1495-1065

© American Roentgen Ray Society

COOKFOIA 000162

## Results

Of the 17 follow-up venograms, 10 were normal. In seven patients, the studies showed isolated thrombosis of the common femoral vein or external iliac vein (Fig. 1). Of these, three were asymptomatic and two had mild swelling of the thigh. Two others had marked swelling of the lower extremity. The swelling resolved slowly in one patient; the other patient died two weeks after filter insertion from complications of malignancy.

Of the seven patients who developed deep venous thrombosis, only two were continued on heparin after filter placement. The other five had a contraindication to anticoagulation. Only two of the 10 patients with normal follow-up venograms were continued on heparin. The other eight patients also had a contraindication to anticoagulation.

## Discussion

At the present time the Kimray-Greenfield filter is the most widely used device for prevention of pulmonary emboli in patients who have failed to respond to anticoagulation or in whom anticoagulation is contraindicated [1, 2].

The possibility of venous thrombosis after vein dilation has been postulated [3]. Denny and others reported no clinical evidence of thrombosis either in 11 patients with percutaneously placed filters [4] or in 20 patients followed by sonography and CT of the femoral puncture site [6].

We performed clinical and venographic follow-up studies in 17 patients after percutaneous femoral vein placement of Kimray-Greenfield filters. Clinical evidence of deep venous thrombosis was present in four patients (24%). Of these, swelling of the lower extremity was severe in two patients and mild in two. However, venography showed thrombosis at the puncture site in seven patients (41%). The thrombosis was isolated to the puncture site without evidence of extension into the superficial femoral or popliteal vein. Lower extremity venograms were not obtained before filter insertion. However, since deep venous thrombosis is an ascending process, the patients probably would not have had thrombosis of the common femoral vein unless they also showed evidence of thrombi inferiorly in the extremity.

These results suggest that femoral vein thrombosis can occur after percutaneous insertion of the Kimray-Greenfield filter. Although only two patients had significant symptoms, common femoral vein thrombosis can lead to chronic venous insufficiency and rarely can have catastrophic clinical sequelae, including limb loss.

Right femoral vein insertion of the Kimray-Greenfield filter is a fast and easy approach, often taking only 20–30 min. Insertion of the filter via the left femoral vein is more difficult because of the angle that the left iliac vein makes with the inferior vena cava and because of compression by the overlying left iliac artery. Two of our four attempts from the left side were unsuccessful, and we believe that the left femoral vein approach should be attempted only when other access routes are unavailable.

Four of the 17 patients studied were given anticoagulation after filter placement. Two of these developed femoral vein thrombosis. The number of cases is too small to assume that anticoagulation did not help prevent femoral vein thrombosis, and it is prudent to heparinize patients who have no contraindication to anticoagulation after filter placement.

Although femoral vein insertion of the Kimray-Greenfield filter is quick and easy, we believe that, because of the



**Fig. 1.—**Lower extremity venogram shows thrombosis of common femoral vein with flow of contrast material into collateral vessels.

potential complication of femoral vein thrombosis, this technique should not be used in all patients, especially since safe and accepted alternatives are available, such as jugular vein insertion or surgical insertion via the saphenous vein. While it is true that jugular vein thrombosis may occur after percutaneous filter placement, unilateral jugular vein thrombosis does not cause serious problems [3].

In a patient on a respirator in whom the jugular approach may be difficult and in patients who are unstable, are seriously ill, or have a short life expectancy, the right femoral approach is acceptable and even preferable. In younger, more stable patients with a long life expectancy we believe that, because of the puncture-site complications of percutaneous femoral insertion, this procedure should not be used in all patients.

## REFERENCES

1. Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. A new intracaval filter permitting continued flow and resolution of emboli. Surgery 1973;73:599–606

2. Greenfield LJ, Peyton R, Crute S, Barnes R. Greenfield vena cava filter experience: late results in 156 patients. Arch Surg 1981;116:1451–1456

3. Tadavarthy SM, Castaneda-Zuniga W, Salomonowitz E, et al. Kimray-Greenfield vena cava filter: percutaneous introduction. Radiology 1984; 151:525–526

4. Denny DF, Cronan JJ, Dorfman GS, Esplin C. Percutaneous Kimray-Greenfield filter placement by femoral vein puncture. AJR 1985;145:827–829

5. Rusnak B, Castaneda-Zuniga W, Kotula F, Herrera M, Amplatz K. An improved dilator system for percutaneous nephrostomies. Radiology 1982;144:174

6. Dorfman GS, Denny DF, Cronan JJ, Greenwood LH, Morse SS. Percutaneous Greenfield inferior vena cava filter placement: experience in 30 cases. Presented at the annual meeting of the Radiological Society of North America, Chicago, November 1986

COOKFOIA 000163

# Comparative efficacy and complications of vena caval filters

Chittur R. Mohan, MD, Jamal J. Hoballah, MD, William J. Sharp, MD, Timothy F. Kresowik, MD, Chien-Tai Lu, MD, and John D. Corson, MB, ChB, FRCS, Iowa City, Iowa

*Purpose:* A variety of vena caval filters (VCFs) are available for usage. The choice of filter type depends on physician preference and certain patient variables. An evaluation of the different VCFs used in our institution was done to compare their efficacy and complication rates.

*Methods:* The medical records of all patients who underwent insertion of a VCF from January 1987 to June 1993 at the University of Iowa Hospitals & Clinics and the affiliated Veterans Administration Medical Center were reviewed. One hundred ninety-nine VCFs were placed in 196 patients (123 males, 73 females), with a mean age of 61 years (range 13 to 87 years). Thirty-five (18%) VCFs (30 stainless steel Greenfield filters [SGFs] and five titanium Greenfield filters with modified hook [TGF-MHs]) were inserted in the operating room via an open technique. The remaining 164 VCFs (82%) were inserted in the radiology suite by a percutaneous technique (38 SGF, 23 TGF-MH, 51 Vena Tech filters [VTFs], 48 Bird's nest filters [BNFs] and 4 Simon Nitinol filters). Thromboembolic risk factors in these 196 patients included malignancy (99), trauma (21), recent surgery (27), cerebrovascular accident with paralysis (6), and miscellaneous conditions (43). Indications for VCF placement included a contraindication to anticoagulation (92), complication of anticoagulation (44), failure of anticoagulation (36), prophylaxis (31), adjunct to pulmonary embolectomy (1), noncompliance (1), hemodynamically unstable patient (1), and prior VCF complication (3). Mean follow-up of the patients was 12 months (range 0 to 87 months). Because there were only four Simon Nitinol filters inserted during the study period, they were excluded from further analysis.

*Results:* A comparative analysis revealed that there was a significantly higher incidence of symptomatic IVC thrombosis with the use of the BNF ($n = 7$) (14.6%) versus the SGF ($n = 0$) (0%), TGF-MH ($n = 1$) (3.6%), or VTF ($n = 2$) (4%) ($p < 0.05$ by chi-squared testing). The VCF-related mortality rate was also higher with the BNF ($n = 5$) (10.9%) versus the SGF ($n = 1$) (1.5%), TGF-MH ($n = 1$) (3.6%), or VTF ($n = 0$) (0%) ($p < 0.05$ by chi-squared testing). However there was no significant difference in the occurrence of clinically apparent recurrent pulmonary embolism during follow-up between the four different filter types (2 [4.3%] BNF, 3 [4.4%] SGF, 1 [3.6%] TGF-MH, and 1 [2%] VTF).

*Conclusion:* These data indicate that the use of the BNF was associated with increased morbidity and mortality rates compared with the use of the SGF, TGF-MH, and VTF filters. (J VASC SURG 1995;21:235-46.)

From the Section of Vascular Surgery and Section of Interventional Radiology (Dr. Lu), University of Iowa Hospitals & Clinics, Iowa City.

Presented at the Forty-second Scientific Meeting of the International Society for Cardiovascular Surgery, North American Chapter, Seattle, Wash., June 6, 1994.

Reprint requests: John D. Corson, MB, ChB, FRCS, Section of Vascular Surgery, University of Iowa Hospitals & Clinics, 200 Hawkins Drive, Iowa City, IA 52242.

Copyright © 1995 by The Society for Vascular Surgery and International Society for Cardiovascular Surgery, North American Chapter.

0741-5214/95/$3.00 + 0   24/6/60244

Venous thromboembolism remains a significant clinical problem, especially in patients in whom there is an incidence of deep venous thrombosis (DVT) of at least 19% to 28%.[1] Additionally pulmonary embolism (PE) occurs in 600,000 patients/year in the United States and results in a 5% mortality rate in patients undergoing surgery.[2] Anticoagulation alone is usually adequate therapy in the management of most cases of DVT and PE; however, under certain circumstances anticoagulation may be con

235

236  *Mohan et al.*

JOURNAL OF VASCULAR SURGERY
February 1995

traindicated or fail to prevent thromboembolic complications.[3] In such circumstances vena caval interruption is indicated. In addition, vena caval interruption may be indicated prophylactically in some patients who are deemed at a high risk for development of a PE.[4] Currently, a vena caval filter (VCF) is the preferred mechanical device for caval interruption because of the ease of percutaneous insertion and proven efficacy.[5] A variety of VCFs are available for usage. The choice usually depends on physician preference in addition to specific patient variables, such as access site and caval diameter. In this study four types of VCFs were retrospectively compared with regard to their efficacy and complication rates.

## PATIENTS AND METHODS

The medical records of all the patients who underwent insertion of a VCF from January 1987 to June 1993 at the University of Iowa Hospitals & Clinics and the affiliated Veterans Administration Medical Center were reviewed. Details noted from the medical records included patient age, sex, medical history, thromboembolic risk, and thromboembolic episode preceding the VCF placement. All the relevant diagnostic studies related to the thromboembolic episodes, such as venous duplex scans, venograms, computed tomography scans, ventilation/perfusion scans, and pulmonary angiograms, were also evaluated. Procedure records of each VCF placement were reviewed for the indication, type of VCF, operative technique, site of insertion, venacavogram data, site of deployment in the vena cava, and complications. Follow-up data were gathered from the medical records, clinic notes, outside medical records, and telephone interviews with the patients, family members, or the local physician. Major symptomatic complications related to the VCF such as caval thrombosis and recurrent PE were analyzed. These major complications were documented on the basis of diagnostic study results such as results of contrast studies of the vena cava, venous duplex scanning, ventilation/perfusion scanning, or autopsy findings. In those patients who died during the follow-up period, the cause of death was noted either from the medical records or autopsy findings, if available.

Patient demographics and the duration of follow-up of the different types of VCFs were analyzed for any statistical difference by analysis of variance and Student-Newman-Kuels test. The underlying risk factors, thromboembolic episodes, indications for the VCF placement, and the postprocedure anticoagulation status between the various types of VCFs were compared by chi-squared testing.

Statistical analysis of the major symptomatic complications and VCF-related mortality between the various different types of VCFs was also performed by chi-square testing. A p value less than 0.05 was considered statistically significant.

## RESULTS

One hundred ninety-nine Food and Drug Administration-approved VCFs were inserted in 196 patients. There were 123 males and 73 females with a mean age of 61 years (range 13 to 87 years). Eighty-eight percent of these patients were older than 40 years of age. The underlying risk factors for thromboembolism in these patients included malignancy ($n = 99$), trauma ($n = 21$), recent surgical procedure ($n = 27$), cerebrovascular accident with paralysis ($n = 6$), and other miscellaneous conditions ($n = 43$). Prior thromboembolic episodes included PE in 105 patients (including 11 recurrent), and DVT in 91 (including 12 recurrent). Of the 105 patients with PE, 48 patients had a documented concomitant DVT. PE was diagnosed by "high probability" ventilation/perfusion scanning in 75 and by pulmonary angiography in the remaining 30 patients. The diagnosis of DVT was made by use of venous duplex scanning in 128 and venography in 11 patients. The indications for the VCF placement were a contraindication (46%), complication (23%), or failure (13%) of anticoagulation, prophylaxis (16%), and miscellaneous (3%). The miscellaneous indications included prior VCF complication in three, adjunct to pulmonary embolectomy in one, noncompliance with anticoagulation therapy in one, and hemodynamic instability with PE in one patient.

One hundred ninety-two VCFs were placed electively in the infrarenal position and seven filters were electively deployed in the suprarenal cava (four Vena Tech filters [VTF], two stainless steel Greenfield filters [SGF], one Bird's nest filter [BNF]). The indications for deployment in the suprarenal position were inadequate space because of inferior vena cava (IVC) thrombus in six, and infrarenal IVC thrombosis (IVCT) as a result of a previous VCF device in one patient. When the outcome of these seven patients with the suprarenal filters was analyzed, it was found that five patients had died because of their underlying medical condition (metastatic disease in three, existing PE in one and multisystem organ failure in one) and one died because of complications from IVC thrombosis related to a previous VCF. The six patients who died had been monitored for 1 to 56 days (median 5 days). Only one patient with a VCF in the suprarenal position was alive and doing

COOKFOIA 000165

JOURNAL OF VASCULAR SURGERY
Volume 31, Number 2

well without any complications at 38 months of follow-up.

Table I depicts the different types of VCFs that were inserted in this patient population. These included the stainless steel Greenfield filter (SGF) (Medi-tech/Boston Scientific Corporation, Watertown, Mass.), the titanium Greenfield filter with modified hook (TGF-MH) (Medi-tech/Boston Scientific Corporation), the Vena Tech filter (VTF) (B. Braun Vena Tech, Evanston, Ill.), the Bird's nest filter (BNF) (Cook Inc., Bloomington, Ind.), and the Simon Nitinol filter (SNF) (Nitinol Medical Technologies, Inc., Woburn, Mass.). These filters were inserted under the supervision of 12 staff physicians (five vascular surgeons and seven interventional radiologists). Three patients had two VCFs inserted. Two SGFs were inserted in one patient under the same anesthesia because the initial filter was misplaced into the right common iliac vein. A second filter was then appropriately placed in the infrarenal IVC. Another patient had development of IVC thrombosis 12 days after the successful deployment of a VTF, and a BNF was then placed in the suprarenal position. The third patient had a misplaced BNF that had to be removed after its migration and perforation of the common femoral vein. Another BNF was inserted in this patient 4 months later. Thus 199 VCFs were placed in 196 patients on 198 separate occasions. In addition, in one other patient an experimental prototype temporary filter was inserted into each iliac vein. These two devices were later removed when thrombosis developed around them at 5 days, and the patient received a VTF positioned in the suprarenal cava. Because these were prototype devices, they are excluded from further analysis.

There were only four SNFs inserted in this patient population. The indications for placement of these four SNFs were a contraindication to anticoagulation in three and a complication of anticoagulation in one. The thromboembolic episode before their placement was PE in three patients and DVT in one patient. The SNFs were placed via the right femoral vein in two, left femoral vein in one, and right internal jugular vein in one. All of them were placed in the infrarenal location and the size of the IVCs measured 15 ± 2 mm. No patient with a SNF received anticoagulation after insertion. These four patients were monitored for a mean duration of 5 months (range 0.5 to 8 months). No complications related to the filter were identified. One patient died 45 days after filter insertion because of metastatic disease from esophageal carcinoma. The four patients with a SNF were

Table I. Types of vena caval filters placed

|  | *No. (%)* |
| --- | --- |
| SGF | 68 (34) |
| TGF-MH | 28 (14) |
| VTF | 51 (26) |
| BNF | 48 (24) |
| SNF | 4 (2) |

excluded from further analysis because the numbers were too few to give meaningful data in terms of efficacy and complications.

Thirty-five (18%) VCFs were inserted via the right internal jugular vein by an open technique. These comprised 30 SGFs and five TGF-MH filters. The remaining 160 (82%) VCFs were inserted by a percutaneous technique (38 SGF, 23 TGF-MH, 51 VTF, and 48 BNF). Thirty-five of these were percutaneous insertions via the right internal jugular vein, 109 via the right femoral vein, and the remaining 16 via the left femoral vein (Table II). All the VCFs inserted by the vascular surgeons were either SGFs (30) or the TGF-MH filters.

Anticoagulation was continued or restarted in 52 (26%) of cases, either several hours after filter placement or within 2 weeks when there was no longer an absolute contraindication to anticoagulation. The anticoagulation was usually continued if possible for up to 3 to 6 months.

A contrast study of the IVC done before the insertion of each VCF was available for review in 165 (85%) cases. In the remaining 30 cases (27 SGF and 3 TGF-MH), the venacavogram was either not obtained or not available because of film purging or lack of hard copy films during fluoroscopic placement. The diameter of the IVC at the site of filter insertion in these 162 patients were as follows for each filter: SGF 20 ± 5 mm, TGF-MH 18 ± 4 mm, VTF 18 ± 5 mm, and BNF 20 ± 5 mm. There was no statistical difference in the diameter of the IVC between the various types of filters (by ANOVA and Student Newman Kuels test).

## Mortality and morbidity

The patients were monitored for a mean duration of 12 months (range 0 to 87 months). Ninety-three patients (48%) died during the follow-up period, and autopsy findings were available in 15 (five with BNFs, six with SGFs, one with a TGF-MH, and three with VTFs). Ninety-two percent of the deaths were due to the underlying medical condition or concurrent illness, and the remaining 8% were due to VCF-related complications. Seventeen patients died

COOKFOIA 000166

238   *Mohan et al.*

JOURNAL OF VASCULAR SURGERY
February 1996

**Table II.** Insertion sites of the various VCFs

|  | *Right internal jugular* | | *Percutaneous* | |
|---|---|---|---|---|
|  | *Open* | *Percutaneous* | *Right femoral* | *Left femoral* |
| SGF | 30 | 16 | 21 | 1 |
| TGF-MH | 5 | 10 | 12 | 1 |
| BNF | 0 | 3 | 34 | 11 |
| VTF | 0 | 6 | 42 | 3 |
| Total | 35 | 35 | 109 | 16 |

within 30 days of the filter placement (five because of VCF-related causes, 12 because of underlying primary disease). The remaining 76 deaths occurred beyond 30 days after filter placement (two because of VCF-related causes, 74 because of underlying primary disease). The placement of a BNF was associated with a significantly higher complication rate (25%) than that of the SGF, TGF-MH, and VTF. Death directly related to a complication associated with the VCF occurred in 7 of 192 patients (3.6%). Four of the patients died because of complications as a result of IVC thrombosis and the other 3 patients died because of a PE despite the presence of a filter. The BNF had a significantly higher VCF-related mortality rate compared with the SGF, TGF-MH, or VTF.

Patient demographics, indications for filter placement, length of follow-up, and outcomes of the patients with each type of VCF are depicted in Table III. These data were comparable between the different filters except for the duration of follow-up, which was shorter for the patients with BNFs.

Major symptomatic complications after VCF placement occurred in 21 of 195 (10.8%) cases (192 patients) and are depicted in Table IV. All of these VCFs were positioned in the infrarenal location. Symptomatic IVC thrombosis (IVCT) after a VCF placement occurred in 10 cases (5.1%) from 2 days to 7.5 months (median 28 days) after the VCF placement. In seven patients, it was detected within 30 days after the VCF placement, and in the other three patients it was diagnosed at 3, 6, and 7.5 months, respectively. The presenting feature of symptomatic IVC thrombosis in these 10 patients was acute renal failure as a result of extension of thrombosis into the renal veins in five, phlegmasia cerulea dolens in four, and superior vena caval (SVC) syndrome in one. In the latter patient thrombosis was present in both the superior and inferior vena cava. When the data were analyzed for the different types of filters, the incidence of complications was found to be significantly higher for BNFs (14.6%) compared

with SGFs (0%), TGF-MHs (3.6%), or VTFs (4%) ($p < 0.05$, by chi-squared testing) (Table V).

In the BNF group with symptomatic IVC thrombosis, the clinical presentation was acute renal failure as a result of extension of thrombosis into the renal veins ($n = 4$), phlegmasia cerulea dolens ($n = 2$), and an associated SVC syndrome ($n = 1$). All four patients who had development of acute renal failure were treated without operation and died as a result of renal failure. Hence, the mortality rate was 57% in patients with a BNF who had development of symptomatic IVC thrombosis. One patient with phlegmasia cerulea dolens underwent an iliofemoral venous thrombectomy and four-compartment fasciotomy. He was then maintained on anticoagulation for 6 months. The second patient with phlegmasia cerulea dolens in the BNF group was treated with anticoagulation alone but died as a result of sepsis from bilateral pneumonia. The patient with the associated SVC syndrome was treated with anticoagulation and steroids (for cerebral edema) but succumbed because of widespread metastatic disease. The patient with a TGF-MH who had development of symptomatic IVC thrombosis was diagnosed with phlegmasia cerulea dolens but died because of his underlying renal cell carcinoma. One of the two patients with a VTF and symptomatic IVC thrombosis was diagnosed with phlegmasia cerulea dolens. The other patient who had development of acute renal failure had a BNF placed in the suprarenal position after the onset of the renal failure. This patient died 1 day later because of sepsis/adult respiratory distress syndrome, which had developed unrelated to the IVC thrombosis and renal failure. There was no death because of IVC thrombosis in the one patient with a TGF-MH and the two patients with a VTF who had symptomatic IVC thrombosis.

Five patients (2.6%) with clinically apparent recurrent PEs were diagnosed before death during the follow-up. Recurrent PE was confirmed at autopsy in two of these five patients. In another two patients PE was diagnosed only at the time of

COOKFOIA 000167

JOURNAL OF VASCULAR SURGERY
Volume 21, Number 2

**Table III.** Patient demographics, indications and outcomes of the different VCFs

| | SGF | TGF | VTF | BNF |
|---|---|---|---|---|
| Age (yr.) | 63 ± 15 | 58 ± 16 | 60 ± 15 | 63 ± 16 |
| Male:Female ratio | 44:23 | 18:10 | 30:21 | 29:17 |
| Risk factors: | | | | |
| Malignancy | 35 (52%) | 13 (46%) | 24 (47%) | 25 (54%) |
| Recent surgery | 5 (8%) | 5 (18%) | 8 (16%) | 8 (17%) |
| CVA with stroke | 2 (3%) | 1 (4%) | 2 (4%) | 0 (0%) |
| Trauma | 10 (15%) | 3 (11%) | 5 (10%) | 3 (7%) |
| Miscellaneous | 15 (23%) | 6 (21%) | 12 (23%) | 10 (22%) |
| T-E Episodes: | | | | |
| DVT | 38 (57%) | 10 (36%) | 33 (43%) | 20 (43%) |
| PE | 29 (43%) | 18 (64%) | 29 (57%) | 26 (57%) |
| Iliac vein thrombosis | 3 (4%) | 2 (7%) | 3 (6%) | 2 (4%) |
| Indications: | | | | |
| Contraindication to AC | 28 (41%) | 13 (46%) | 25 (49%) | 23 (48%) |
| Complication of AC | 14 (21%) | 6 (21.5%) | 13 (25%) | 10 (21%) |
| Failure of AC | 8 (12%) | 6 (21.5%) | 7 (14%) | 5 (10%) |
| Prophylaxis | 16 (23%) | 3 (11%) | 6 (12%) | 6 (13%) |
| Miscellaneous | 2 (3%) | 0 (0%) | 0 (0%) | 4 (8%) |
| Post-procedure AC | 24% | 36% | 29% | 31% |
| Follow-up (mos.) | | | | |
| Median | 4.25 | 6 | 6 | 2.25 |
| Range | 0.03 to 87 | 0.06 to 53 | 0 to 53 | 0.03 to 42 |
| Deaths (Follow-up period) | 30 (45%) | 11 (39%) | 22 (43%) | 30 (65%) |

*CVA,* Cerebrovascular accident; *T-E,* thromboembolic; *AC,* anticoagulation

autopsy. All seven recurrent episodes of PE developed between 4 days and 17 months (median 12 days) after the insertion of the VCF. PE was the cause of death in three of the seven patients (43%) with recurrent PE. Two patients with a BNF had development of recurrent PE. One died of PE and the other patient died as a result of *Pseudomonas* pneumonia. Of the three patients with recurrent PE in the SGF group, one died of a fatal PE. The other two patients died because of respiratory failure (caused by aspiration pneumonia) and metastatic disease. The one patient with a TGF-MH who had development of a recurrent PE died after that episode. Only one patient with a VTF had development of a recurrent PE. However, he died because of severe left ventricular failure and pulmonary edema. By chi-squared testing there was no significant difference in the incidence of recurrent PE after the insertion of the various types of VCFs (BNF 4.2%, SGF 4.4%, TGF-MH 3.6%, and VTF 2%).

Patients in whom the VCF was placed because of a complication of anticoagulation had a significantly higher incidence of symptomatic IVC thrombosis than when it was inserted for other indications (14% vs 2.5%, $p < 0.05$ by chi-squared testing). Similarly, despite receiving anticoagulation after the VCF placement, a significantly higher number of patients had development of symptomatic IVC thrombosis compared with those who were not given anticoagu-

lant after the procedure (13% vs 2%, $p < 0.05$ by chi-squared testing). Patients with BNFs who were maintained on anticoagulation therapy had a higher incidence of symptomatic IVC thrombosis compared with those patients who did not receive any anticoagulation therapy (33% vs 6%, $p < 0.05$ by chi-squared testing). Similarly, clinically apparent recurrent PE developed more often in patients with SGFs who underwent postprocedure anticoagulation therapy compared with those patients who did not receive anticoagulants after the procedure (19% vs 0%, $p < 0.05$ by chi-squared testing). There was no significant difference in the incidence of symptomatic IVC thrombosis or recurrent PE with or without anticoagulation among the other three types of VCFs studied, and there was no difference in the occurrence of clinically apparent recurrent PE with regard to the indications for VCF placement or postprocedure anticoagulation status.

Because of the high incidence of symptomatic IVC thrombosis associated with the BNF found in this study, we critically evaluated all the postfilter placement venacavograms in this group. In the 47 BNFs that were placed in the infrarenal position, the superior aspect of the cephalad struts of the BNFs were indeed below the level of the renal veins in all cases. However, the upper end of the wires of the filter were not always found to lie at or below the upper ends of the cephalic struts (Fig. 1). Hence, we

COOKFOIA 000168

JOURNAL OF VASCULAR SURGERY
February 1995

240  Mohan et al.

**Table IV. Complications of VCF placed**

| Patient no. | VCF type | Indication for VCF | Post VCF anticoagulation | Time of occurrence | VCF-related complication | Diagnosis of complication | Outcome |
|---|---|---|---|---|---|---|---|
| 1 | BNF | Complication of anticoagulation | No | 9 days | Rec. PE | VQ scanning | Death (unrelated) |
| 2 | BNF | Complication of anticoagulation | No | 7 days | Rec. PE | VQ scan/autopsy | PE (death) |
| 3 | BNF | Contraindication of anticoagulation | No | 20 days | IVCT | Duplex/autopsy | Kidney failure (death) |
| 4 | BNF | Complication of anticoagulation | Yes | 26 days | IVCT | Duplex | Death (unrelated) |
| 5 | BNF | Contraindication of anticoagulation | Yes | 7.5 months | IVCT | Duplex | Kidney failure (death) |
| 6 | BNF | Contraindication of anticoagulation | No | 26 days | IVCT | Duplex | Kidney failure (death) |
| 7 | BNF | Contraindication of anticoagulation | Yes | 2 days | IVCT | Venography | Alive |
| 8 | BNF | Failure of anticoagulation | Yes | 20 days | IVCT | Duplex | Kidney failure (death) |
| 9 | BNF | Contraindication of anticoagulation | Yes | 3 months | IVCT/SVCT | Venography | Death (unrelated) |
| 10 | BNF | Contraindication of anticoagulation | No | At deployment | Misplacement | Venography | No further sequelae |
| 11 | BNF | Contraindication of anticoagulation | Yes | At deployment | Misplacement | Venography | No further sequelae |
| 12 | BNF | Complication of anticoagulation | No | At deployment | Misplacement | Venography/CT scanning | Migration/penetration-femoral vein |
| 13 | SGF | Contraindication of anticoagulation | No | 4 days | Rec. PE | Autopsy | PE (death) |
| 14 | SGF | Contraindication of anticoagulation | No | 12 days | Rec. PE | VQ scanning | Death (unrelated) |
| 15 | SGF | Complication of anticoagulation | No | 40 days | Rec. PE | VQ scanning/autopsy | Death (unrelated) |
| 16 | SGF | Contraindication of anticoagulation | No | At deployment | Misplacement | Radiolngy/venography | Another SGF placed |
| 17 | TGF-MH | Contraindication of anticoagulation | Yes | 3 months | Rec. PE | VQ scanning | PE (death) |
| 18 | TGF-MH | Contraindication of anticoagulation | No | 6 months | IVCT | Duplex | Death (unrelated) |
| 19 | VTF | Failure of anticoagulation | No | 17 months | Rec. PE | Autopsy | Death (unrelated) |
| 20 | VTF | Complication of anticoagulation | Yes | 30 days | IVCT | Duplex | Alive |
| 21 | VTF | Prophylactic | Yes | 12 days | IVCT | Duplex/autopsy | Death (unrelated) |

*Rec.*, Recurrent ; *VQ*, ventilation/perfusion; *SVCT*, superior vena cava thrombosis.

classified the BNFs in this series as "prolapsed-BNF", as defined by extension of the wires above the level of the cephalad struts, and "compact-BNF", where the wires remained below the level of the cephalad struts. Prolapsed BNFs were seen in 17 cases (36%). The length of prolapse of the wires beyond the cephalad struts in these prolapsed BNFs was 23 ± 14 mm. However, in seven of these 17 cases (41%), the upper end of the prolapsed wires was still below the level of both renal veins (infrarenal prolapse). In the remaining 10 instances, the prolapsed wires had extended beyond the level of the renal veins into the suprarenal IVC (suprarenal prolapse) (Fig. 2). Six of the 10 suprarenal prolapsed BNFs developed symptomatic IVC thrombosis. This was significantly higher than

that which occurred when the filter did not have a suprarenal prolapse of the wires ($p < 0.05$, by chi-squared testing).

## DISCUSSION

Appropriate early diagnosis and effective initial management of DVT and PE aims to limit further morbidity and lessen the mortality associated with thromboembolism. The primary therapy for DVT or PE is anticoagulation, initially with intravenous heparin followed by a maintenance dose of oral warfarin for at least 6 weeks and usually for 3 to 6 months.[3] There are, however, always subsets of patients in whom anticoagulation is contraindicated, has failed, or caused complications. In these patients

COOKFOIA 000169

JOURNAL OF VASCULAR SURGERY
Volume 31, Number 1

*Mohan et al.*   241



**Fig. 1.** Plain radiograph of abdomen shows BNF with upper ends of wires lying above level of cephalic struts. *Arrow* points to wires.

Interruption of the passage of major emboli to the pulmonary circulation is indicated to prevent death from PE. Historically these patients were traditionally treated surgically by ligation of the IVC below the renal veins.[5-8] A variety of techniques involving plication, sieving the vena cava or the use of extracaval clips later evolved.[9-14] A major disadvantage of the use of these operative methods was that many of these patients were elderly or frail or had severe comorbid illnesses that not only precipitated the thromboembolic episode but also placed them at a high operative risk for the surgical procedure.

Direct surgical techniques have been almost exclusively superseded by the use of a variety of transvenous filter devices that have been developed over the past two decades.[15-19] The VCFs that are currently available for clinical use come in various sizes and configurations, with proponents claiming superiority of one filter over others with regard to clot-trapping ability and long-term caval patency.

The development of the Mobin-Uddin umbrella in 1967 started the modern era of transvenous caval interruption.[18] The Mobin-Uddin umbrella was usually inserted via the right internal jugular vein and came initially in a 23 mm diameter size.[19] Potentially lethal migration of this device prompted the devel-

opment of the larger 28 mm diameter umbrella.[20,21] The Mobin-Uddin umbrella has a high late caval occlusion rate possibly up to 73% and, hence, is not favored by most clinicians because of the availability of alternative filters with higher caval patency rates.[22]

The SGF was introduced in 1972.[16] The conical shape of this filter is said to be beneficial in maintaining circumferential flow through the vena cava despite progressive central filter occlusion. Prior studies have shown that this device effectively traps emboli 3 mm or greater in diameter.[23] Tilting of the device reduces the clot trapping efficiency and may be seen in up to 1.7% of cases.[24] The SGF has a reported 4% rate of recurrent embolism, while maintaining a long term caval patency over 95%.[22,25-27] The SGF comes with a 24F carrier system and hence was traditionally placed operatively with a jugular or femoral cut down. Use of a large (28F) sheath did allow for percutaneous introduction. When the device was inserted through the femoral vein, there was a reported 41% incidence of insertion-site femoral vein thrombosis.[28] Hence, most of these devices were usually inserted via the jugular vein. When the vena cava is large (> 30 mm in diameter), separate SGFs are recommended for insertion into each iliac vein.[29,30] A titanium model of the Green-

COOKFOIA 000170

242   *Mohan et al.*

JOURNAL OF VASCULAR SURGERY
February 1995



Fig. 2. Postfilter placement vena cavogram reveals suprarenal prolapse of BNF; *RV*, renal vein; *BNF*, Bird's nest filter in IVC; *Arrow* points to prolapsed wires.

field filter (TGF) was developed in 1987 to decrease the carrier system to a 12F size to facilitate percutaneous placement through a 14F sheath.[31] A recurved hook design with a twist to 80 degrees was required in the current model of the TGF (TGF-MI4) to facilitate better fixation to the caval wall and prevent distal slippage.[32] In a multicenter trial involving 186 patients, recurrent PE (3%), insertion site venous thrombosis (9%), incomplete opening (2%), and asymmetry of the legs (5%) were noted with this modified version, while maintaining a 100% filter patency rate.[33]

In 1977, a filter device made from nitinol (nickel/titanium alloy) was described. The SNF has the smallest carrier system (7F) of all filter devices and, hence, can be introduced through an antecubital vein. A SNF may be useful for patients who have a relative contraindication to a jugular approach, such as severe orthopnea, a very short neck, or other anatomic abnormalities and in whom the femoral approach is not feasible because of ilio/femoral vein thrombosis. After a decade of clinical experience with the SNF, the reported caval occlusion rate is 18%, and misplacement of the filter is 3%.[34]

The Amplatz filter (William Cook Europe, Bjaerverskov, Denmark) is a device made from

stainless steel alloy with an attached hook at one end to allow retrieval or repositioning. Even though it had excellent clot trapping efficacy because of its dense arrangement of wires, the rate of vena caval occlusion was 21%.[35] This device is still considered to be in a developmental stage.

The VTF was introduced to the market in 1986. Originally developed in France as the LGM filter (La Medical, Chassneuil, France), the VTF, as it is known in the United States, is made of Phynox, a material similar to that used in temporary cardiac pacing wires. The VTF is introduced through a 12F sheath. This device has an IVC thrombosis rate of 4% to 30%.[36-40] Incomplete opening of the VTF has been reported in 8% to 41% of transjugular insertions, and, hence, it is recommended that this route should be avoided if possible.[36,41,42]

Roehm et al.[43] reported the first use of the BNF in 1984. This filter was approved for clinical use by the United States Food and Drug Administration in 1989. It consists of four stainless steel wires pre-shaped into a crisscrossing array of nonmatching bends. In its initial design, each of these wires was 25 cm long, 0.18 mm in diameter and ended in a 0.25 mm flexible strut connected to a hook. When inserted, two struts are arranged in a V-shaped

COOKFOIA 000171

JOURNAL OF VASCULAR SURGERY
Volume 21, Number 2

*Mohan et al.* 243

Table V. Comparison of the complications of VCFs

|  | SGF | TGF-MH | VTF | BNF |
|---|---|---|---|---|
| Symptomatic IVC thrombosis | 0% | 1 (3.6%) | 1 (4%) | 7 (14.6%)* |
| Recurrent PE | 3 (4.4%) | 1 (3.6%) | 1 (2%) | 2 (4.2%) |
| Misplacement | 1 (1.5%) | 0% | 0% | 3 (6.3%) |
| VCF-related death | 1 (1.5%) | 1 (3.6%) | 0% | 5 (10.9%)* |

*Significantly higher than SGF, TGF-MH, or VTF by chi-squared testing, *p* < 0.05.

manner cephalad, with the other two in an inverted V-shaped manner caudad. The original model came preloaded in an 8F polytetrafluoroethylene sheath. In 1986, the device was modified with a stiffer 0.46 mm strut to improve the fixation to the vena cava walls and limit migration. The modification necessitated preloading the RNF in a 12F sheath. The BNF produces a crisscross nest of 100 cm of 0.18 mm wires over an average length of 7 cm of the IVC. This unique design of the BNF allows it to be placed in an IVC that measures up to 40 mm in diameter.[44] In one series reported in 1988, in which 440 patients had been monitored for more than 6 months, the reported incidence of clinically suspected recurrent PE was 2.7% and the IVC occlusion rate was 2.9%.[44] However, only 37 of these 440 patients were studied by venacavography or ultrasonography. Seven of these 37 patients (19%) had a caval occlusion. Another study reported a 21% rate of vena caval thrombosis after placement of a BNF.[40] The modification with a stiffer strut appeared to prevent migration of the filter, which had occurred in some patients who had the original device. One of the problems with the design of the BNF is that extrusion of the filter is operator dependent. Depending on the mode of deployment, several wires may "prolapse" beyond the cephalic V-strut fixed in the IVC. A prolapsed BNF (defined as the length of the filter wires beyond the longer limb of the cephalic V-strut or approximately 6 cm from the center of the V-strut) remains effective for clot trapping.[44,49] The incidence of BNF prolapse reported varies from 8% to 45%.[31,47,48] The results of our study suggest that a prolapsed BNF is still effective for clot trapping, because there was no incidence of clinically apparent recurrent PE in any of our 17 prolapsed BNFs. On the contrary, the two cases of recurrent PE associated with the BNF occurred in a "compact BNF." These two cases of recurrent PE were documented by new findings on the ventilation/perfusion scans, and confirmed further by autopsy in one of them. The significant finding in this report is that symptomatic IVC thrombosis occurred in 60% of cases with a suprarenal prolapse of the BNF. Only one case of

symptomatic IVC thrombosis occurred in the "compact BNF" group, which is a comparable finding with the other types of VCF devices. The prolapse of the wires of the BNF may be an operator-dependent phenomenon. In our opinion the BNF is technically more difficult to deploy correctly than the other types of VCFs. Our view is supported by the reported experience of Vesely et al.,[49] who reviewed the technical problems with the placement of 165 BNFs. It is possible that the operator's learning curve could have contributed to the incidence of prolapse of the BNF and, hence, the increased morbidity and mortality rates. Comparatively the other three VCFs analyzed in this study (i.e., SGF, TGF-MH, and VTF) were not as susceptible to technical problems at the time of deployment.

The BNF had a higher caval thrombotic complication rate at our institution compared with the VTF, SGF, and the TGF-MH devices. The VTF performed satisfactorily in our hands, but the complication rates in published series are substantial. Based on our own more limited experience and the reports of low morbidity in a large multi-center series, the TGF-MH is our current filter of choice. In patients who need vena caval interruption for prophylaxis, we specifically prefer the TGF-MH because of its safety, ease of placement, and low incidence of complications.

REFERENCES

1. Kakkar V. The diagnosis of deep vein thrombosis using [125]I fibrinogen test. Arch Surg 1972;104:152-9.
2. Sabiston Jr. DC. The diagnosis and treatment of pulmonary thromboembolism. In: Najarian JS, Delaney JP, eds. Advances in vascular surgery. Chicago: Year Book Medical Publishers, 1983:219-30.
3. Salzman EW, Deykin D, Shapiro RM, Rosenberg R. Management of heparin therapy: controlled prospective trial. N Engl J Med 1975;292:1046-50.
4. Alexander JJ, Yuyhas JP, Piotrowski JJ. Is the increasing use of prophylactic percutaneous IVC filters justified? Am J Surg 1994;168:102-6.
5. Becker DM, Philbrick JT, Selby JB. Inferior vena cava filters: indications, safety and effectiveness. Arch Intern Med 1992;152:1985-94.
6. Ochsner A, Ochsner JL, Sanders HS. Prevention of pulmonary embolism by caval ligation. Ann Surg 1970;171:923-38.

COOKFOIA 000172

7. Dale WA. Ligation of the inferior vena cava for thromboembolism. Surgery 1958;43:24-44.

8. Madden JL. Ligation of the inferior vena cava. Ann Surg 1954;140:200-5.

9. Spencer FC, Quattlebaum JK, Quattlebaum JK Jr, Sharp EH, Jude JR. Plication of the inferior vena cava for pulmonary embolism. A report of 20 cases. Ann Surg 1962;155:827-37.

10. De Weese MS, Hunter DC Jr. A vena cava filter for the prevention of pulmonary embolism: a five-year clinical experience. Arch Surg 1963;86:852-68.

11. Adams JT, De Weese JA. Partial interruption of the inferior vena cava with a new plastic clip. Surg Gynecol Obstet 1966;123:1087-8.

12. Miles RM, Chappel F, Renner O. A partially occluding vena caval clip for prevention of pulmonary embolism. Am Surg 1964;30:40-7.

13. Moretz WH, Rhode CM, Shepherd MH. Prevention of pulmonary emboli by partial occlusion of the inferior vena cava. Am Surg 1989;25:617-26.

14. Ravitch MM, Snodgrass E, McEnany T, Rivarola A. Compartmentation of the vena cava with the mechanical stapler. Surg Gynecol Obstet 1966;122:561-6.

15. Greenfield LJ, McCurdy JR, Brown PP, Elkins RC. A new intra-caval filter permitting continued flow and resolution of emboli. Surgery 1973;73:599-606.

16. Greenfield LJ, Zocco J, Wilk J, Schroeder TM, Elkins RC. Clinical experience with the Kim-Ray Greenfield vena cava filter. Ann Surg 1977;185:692-8.

17. Hunter JA, Session R, Buenger R. Experimental balloon obstruction of the inferior vena cava. Ann Surg 1970;171:315-20.

18. Mobin-Uddin K, Smith PE, Martinez LD, Lombardo CR, Jude JR. A vena caval filter for the prevention of pulmonary embolism. Surg Forum 1967;18:209-11.

19. Mobin-Uddin K, McLean R, Bolooki H, Jude JR. Caval interruption for prevention of pulmonary embolism. Long term results of a new method. Arch Surg 1969;99:711-5.

20. Mobin-Uddin K, McClean R, Jude JR. A New catheter technique of interruption of inferior vena cava for prevention of pulmonary embolism. Am Surg 1969;35:889-94.

21. Mobin-Uddin K, Trinkle JK, Bryant LR. Present status of the inferior vena cava umbrella filter. Surgery 1971;70:914-9.

22. Cimochowski GE, Evans RH, Zarins CK, Chien-Tai Lu, DeMeester TR. Greenfield filter versus Mobin-Uddin umbrella: the continuing quest for the ideal method of vena caval interruption. J Thorac Cardiovasc Surg 1980;79:358-65.

23. Schroeder TM, Elkins RC, Greenfield LJ. Entrapment of sized emboli by the KMA-Greenfield intracaval filter. Surgery 1978;83:435-9.

24. Greenfield LJ. Percutaneous devices for vena cava filtration. In: Ernst CB, Stanley JC, eds. Current therapy in vascular surgery. Philadelphia: BC Decker, 1991:990-5.

25. Greenfield LJ, Michna BA. Twelve-year clinical experience with the Greenfield vena caval filter. Surgery 1988;104:706-12.

26. Gomez GA, Curler BS, Wheeler HB. Transvenous interruption of the inferior vena cava. Surgery 1983;93:612-9.

27. Wingerd M, Bernhard VM, Maddison F, Towne JB. Comparison of caval filters in the management of venous thromboembolism. Arch Surg 1978;113:1264-71.

28. Kantor A, Glanz S, Gordon DH, Sclafani SJA. Percutaneous femoral insertion of the Kimray-Greenfield vena cava filter: incidence of femoral vein thrombosis. Am J Roentgenol 1987;149:1065-6.

29. Pais SO, Mirvis SE, De Orchis DF. Percutaneous insertion of the Kimray-Greenfield filter: technical considerations and problems. Radiology 1987;165:377-81.

30. Greenfield LJ, Whitehill TA. New developments in caval interruption: current indications and new techniques for filter placement. In: Veith FJ, ed. Current critical problems in vascular surgery. St. Louis: Quality Medical Publishing, 1992:113-21.

31. Burke PE, Michna BA, Harvey CF, Crute SL, Sobel M, Greenfield LJ. Experimental comparison of percutaneous vena caval devices: titanium Greenfield filter versus bird's nest filter. J Vasc Surg 1987;6:66-70.

32. Greenfield LJ, Cho KJ, Tauscher JR. Evolution of hook design for fixation of the titanium Greenfield filter. J Vasc Surg 1990;12:345-53.

33. Greenfield LJ, Cho KJ, Proctor M, et al. Results of a multicenter study of the modified hook-titanium Greenfield filter. J Vasc Surg 1991;14:253-7.

34. Simon M, Achtzehner CA, Kim D, et al. Simon Nitinol inferior vena cava filter: initial clinical experience. Radiology 1989;172:99-103.

35. Epstein DH, Darcy MD, Hunter DW, et al. Experience with the Amplatz retrievable vena cava filter. Radiology 1989;172:105-10.

36. Ricco JB, Crochet D, Sebilotte P, et al. Percutaneous transvenous caval interruption with the "LGM" filter: early results of a multicenter trial. Ann Vasc Surg 1988;2:242-7.

37. Millward SF, Marsh JI, Paterson RA, et al. LGM (Vena Tech) vena Cava Filter: Clinical Experience in 64 Patients. J Vasc Interv Radiol 1991;2:429-33.

38. Taylor RC, Awh MH, Kahn Jr, CE, Lu CT. Vena Tech vena cava filter: Experience and early follow-up. J Vasc Interv Radiol 1991;2:435-40.

39. Crochet DP, Stora O, Ferry D, et al. Vena Tech-LGM filter: long-term results of a prospective study. Radiology 1993;188:857-60.

40. Ferris EJ, McCowan TC, Carver DK, McFarland DR. Percutaneous inferior vena caval filters: follow-up of seven designs in 320 patients. Radiology 1993;188:851-6.

41. Reed RA, Teitelbaum GP, Taylor FC, et al. Incomplete opening of LGM (Vena Tech) filters inserted via the transjugular approach. J Vasc Interv Radiol 1991;2:441-5.

42. Korbin CD, Reed RA, Taylor RC, Kokoris ST, Teitelbaum GP. In vitro flow phantom analysis and clot-capturing ability of incompletely opened Vena Tech-LGM vena caval filters. Cardiovasc Interv Radiol 1993;14:3-6.

43. Roehm JOF, Gianturco C, Barth MH, Wright KC. Percutaneous transcatheter filter for the inferior vena cava: a new device for treatment of patients with pulmonary embolism. Radiology 1984;150:255-7.

44. Reed RA, Teitelbaum GP, Taylor FC, Pentecost MJ, Roehm JOF. Use of the Bird's nest filter in oversized inferior vena cavae. J Vasc Interv Radiol 1991;2:447-50.

45. Roehm JOF, Johnsrude IS, Barth MH, Giannuzco C. The bird's nest inferior vena cava filter: progress report. Radiology 1988;168:745-9.

46. Goldberg RS, Wing CM, LeVeen RF, Cope C. Effectiveness of a prolapsed Bird's nest filter. J Vasc Interv Radiol 1993;4:505-11.

47. Carlson JE, Yedlicka JW, Castaneda-Zuniga WR, Hunter DW, Amplatz K. Acute clot trapping efficiency in dogs with

COOKFOIA 000173

JOURNAL OF VASCULAR SURGERY
Volume 21, Number 2

Mohan et al.   245

compacted versus elongated wires in Bird's nest filters. J Vasc Interv Radiol 1993;4:513-6.

48. Katsamouris AA, Waltman AC, Delichatsios MA, Athanasoulis CA. Inferior vena cava filters: in vitro comparison of clot trapping and flow dynamics. Radiology 1988;166:361-6.

49. Vesely T, Darcy M, Picus D, Hicks M. Technical problems

associated with placement of the Bird's nest inferior vena caval filter. Am J Roentgenol 1992;158:875-80.

Submitted June 10, 1994; accepted Aug. 29, 1994.

## DISCUSSION

Dr. George Johnson, Jr. (Chapel Hill, N.C.). Dr. Mohan presented the data in a well-organized and succinct fashion. However, the data presented did nothing to support my bias to favor Greenfield filters over other filters. It is difficult to randomize this type of study, and therefore any conclusions drawn from these data are merely speculative. There are many variables, including the use of five different types of devices in these patients. I assume there was no protocol for which device was used. There is considerable variation in number of each type of filter that was evaluated. The number of physicians involved, and certainly the device, although not stated, must be large.

Fifteen percent of the preoperative phlebograms were not available. Thus we really don't know how many of the patients had an IVCT before the procedure.

The insertion of an IVC device from the groin has been reported to be associated with more ilithfemoral thrombosis than other sites. I should not determine the number of BNFs inserted from the groin that had complications versus the number of Greenfield filters inserted from the groin that had complications.

With the relatively small number of BNFs and VTFs inserted, is it possible that the technique for insertion of these filters was still in the learning process for a number of instances?

How many of the Greenfield filters were inserted prophylactically? One expects and hopes that the complications would be less in the prophylactic insertions.

It is interesting to see the large number of patients who had development of renal failure after insertion of the BNF. They did try to address this in their presentation, but is this unique to this device? Or is this because of inappropriate technique in inserting the device?

It is interesting to note in Table IV that 18 of the filters were inserted for complications of or contraindications to anticoagulant therapy. Yet seven of the patients were subsequently given anticoagulant. Could it be that the filters were not indicated in the first place?

Thus these data have all the defects that accompany a retrospective study. I believe John Porter would let me apply a Sachett level four to this study. As many of you know, I believe the incidence of death from PE, although certainly present, is overemphasized. However, I strongly believe in prophylaxis. I do question the filter as a prophylactic measure.

This study represents a lot of work. It will be quoted extensively. The information is sorely needed, and it's probably one of the best documents we have evaluating the various IVC filters. Unfortunately, these data, like other data on PE, don't convince me that my prejudice in favor of the Greenfield filter is correct.

Dr. John D. Corson. There was no specific protocol for filter selection. The filters were placed by a variety of different physicians. As you correctly point out, there may be a learning curve in the use of the various devices. A device that is safe and has a simple standardized insertion technique is highly desirable.

As noted in the text, the majority but not all the venacavograms were available for late review. However, none of the patients who had an infrarenal filter placed had evidence of caval thrombosis at the time of filter placement. With regard to the question of postfilter placement IVC thrombosis, all the patients with a BNF who had development of IVC thrombosis had the filter placed via a femoral approach. Only one patient with a TGF subsequently had development of an IVCT. In this patient the filter had been placed via a jugular approach. The site of insertion of the different types of filters are depicted in Table III. We did not specifically look at the incidence of insertion site thrombosis in this retrospective study.

In response to Dr. Johnston's question concerning prophylaxis, only 16% of the filters were placed for this indication. To justify the use of a filter for prophylaxis, it must have minimal morbidity. Our data, as well as those in other reports, demonstrate that there is a significant caval thrombosis rate after insertion of certain filters. If you elect to place a filter for prophylaxis, you should choose the filter that has the least morbidity and the lowest caval thrombosis rate. The Greenfield filter appears to have a lower incidence of caval thrombosis compared with the others.

Dr. Johnston pointed out that 92 (46%) of the patients had a contraindication to anticoagulation as the indication for filter placement. The threshold for filter placement is quite variable even between colleagues at our own institution in this regard. Of interest, 53 (26%) of the patients were given anticoagulant again after filter placement. We believe that there is some benefit in limiting lower extremity thrombus propagation by maintaining the patient on anticoagulation therapy after filter placement, provided that it can be given safely.

COOKFOIA 000174

246   *Mohan et al.*

JOURNAL OF VASCULAR SURGERY
February 1995

Vascular surgeons may have little control over the treatment of patients with thromboembolism, many of whom are referred directly to an interventional radiologist. I would make a plea that surgeons remain closely involved in all aspects of the treatment of patients with venous thromboembolism. We are the primary care doctors for vascular disease and know more about DVT and its complication than most other physicians.

Dr. Lazar J. Greenfield (Ann Arbor, Mich.). All of us would like to see a randomized prospective study that would produce some data for comparison purposes. Unfortunately, when we look to the reports of alternative filters, it's very difficult to find comparable follow-up information. Many of them appear to have incidences of vena caval thrombosis in the range of about 20%, which is what seems to be occurring in this particular series with the BNF.

What do you do to treat the patient who has development of vena caval thrombosis at the level of the filter? The concern is not just for the stasis sequelae, but the fact that this then becomes a nidus for new thrombus that can propagate and become a new source of embolism. Consequently these patients acquire a new risk of recurrent embolism based on that level of thrombosis.

Dr. Corson. Thrombolysis may have a limited role by lysing impacted thrombus at the filter level and restoring caval patency. Presumably, unless patients were being screened routinely, only patients with symptoms would be seen with this problem. The treatment would be determined by their symptoms and the ability to reiterate a further course of anticoagulation. An additional question might be what to do when you realize that a BNF has been put in with the wires prolapsing above the renal veins. Clearly those patients had a high mortality rate in our series. Obviously if you can maintain them with a reasonable level of anticoagulation, that would seem appropriate for the initial management of this problem, provided anticoagulation was not contraindicated. One hopes that with appropriate anticoagulation you could limit the problem of renal vein thrombosis. The thought of trying to remove a BNF that has prolapsed up above the level of the renal veins is a bit adventurous. We are not

certain why renal vein thrombosis occurred in our series. It is possible that renal vein thrombosis occurred because of local hemodynamics in that area. The other possibility is that a propagated DVT on its way to the lungs impacted at the filter site and caused caval thrombosis with propagation to the renal veins.

Dr. Arie L. Markel (Haifa, Israel). I have a question that has to deal with insertion of IVC filters in patients who already have thrombosis in the IVC. Recently we treated a 66-year-old man, who was admitted to our Internal Medicine Department with a clinical and lung ventilation/perfusion scanning diagnosis of PE. Further investigation showed a left renal tumor that extended into the IVC. Computed tomography scanning and duplex ultrasonography showed a large thrombus (tumor?) in the IVC that extended proximally near the diaphragm. Heparin was started, but the patient had development of a massive left iliac thrombosis that was treated by streptokinase and then warfarin. After thrombolytic therapy was stopped, the patient had development of a huge retroperitoneal hematoma. Heparin was stopped and an IVC filter was suggested before surgery.

Could a filter be inserted when a large thrombus is present in the IVC? What are the limitations to filter insertion in this area?

Dr. Corson. Clearly, you can put in a suprarenal filter safely if there is adequate space for insertion. This is why you need to individualize filter choice for each patient, depending on the size of the cava and the amount of space available for filter deployment. There is enough experience with Greenfield filters placed above the renal veins to show that it is relatively safe in these rather difficult circumstances.

Dr. Markel. But in this case the thrombosis was near the hepatic veins.

Dr. Corson. If there is no space available you cannot place a filter. In certain cases, lysis might allow filter placement, but in your case this was not an option. A direct surgical approach with thrombectomy would have to be considered.

COOKFOIA 000175

**4**

COOKFOIA 000176

TABLE 1

OBSERVED COMPLICATION RATES FOR THE SIMON NITINOL FILTER

| | All | 1 month only | All 6 months | Both 3 and 6 months | | At least 3 months |
| | | | | 0-3 months | 3-6 months | |
|---|---|---|---|---|---|---|
| Number of Patients | 197 | 12 | 46* | 31* | 31* | 58 |
| Deaths | 43/197 (21.8%) | 1/12 (8.3%) | - | - | - | - |
| Major Misplacement | 1/181 (1.6%) | 0/12 (0.0%) | 0/46 (0.0%) | 0/31 (0.0%) | 0/31 (0.0%) | 0/58 (0.0%) |
| Migration | 1/197 (0.5%) | 0/12 (0.0%) | 0/46 (0.0%) | 0/31 (0.0%) | 0/31 (0.0%) | 0/58 (0.0%) |
| Occlusion | 16/197 (8.1%) | 0/12 (0.0%) | 4/46 (8.7%) | 2/31 (6.5%) | 0/31 (0.0%) | 4/58 (6.9%) |
| Recurrent Pulmonary Embolism | 3/197 (1.5%) | 0/12 (0.0%) | 0/46 (0.0%) | 0/31 (0.0%) | 0/31 (0.0%) | 0/58 (0.0%) |

One additional patient, who refused both follow-up visits, had both occlusion and recurrent pulmonary embolism, both occurring before the scheduled three month follow-up.

COOKFOIA 000177

TABLE 2

REPORTED COMPLICATION RATES FOR THE SIMON NITINOL, GREENFIELD AND VENA TECH FILTERS

| Filter | 1* | 2 | 3 | 4* | 5 | 7 | 9 |
|---|---|---|---|---|---|---|---|
| | | | Greenfield | | | | Vena Tech |
| Reference | | | | | | | |
| Deaths | 49/156 (31.4%) | 6/109 (5.5%) | 13/65 (20.0%) | NS | NS | 133/469 (28.4%) | 10/100 (10%) |
| Major Misplacement | 9/156 (5.8%) | 1/109 (0.9%) | NS | 3/193 (1.6%) | 23/463 (5.0%) | 18/469 (2.1%) | 4/100 (4%) |
| Migration | 0/156 (3.8%) | 2/53 (0.0%) | 0/34 (0.0%) | 2/193 (1.0%) | 27/258 (10.5%) | NS | 13/90 (14.4%) |
| Occlusion | 3/59 (5.1%) | 3/109 (2.6%) | 3/40 (7.5%) | 5/193 (2.6%) | 8/257 (3.1%) | 10/127 (8%) | 7/90 (7.7%) |
| Recurrent Pulmonary Embolism | 6/107 (5.6%) | 5/109 (4.6%) | 2/65 (3.1%) | 2/193 (1%) | 7/289 (2.4%) | 25/469 (5.5%) | 2/90 (2.2%) |

* Numbers refer to references listed in Attachment 5.
+ Not specified.

COOKFOIA 000178

TABLE 3

COMPARISON OF COMPLICATION RATES FOR THE SNF BETWEEN PATIENTS
WITH 3 MONTHS AND 6 MONTHS OF FOLLOW-UP

|  | 3 months follow-up | 6 months follow-up | p-value |
|---|---|---|---|
| Number of Patients | 12 | 46 | |
| Major Misplacement | 0 | 0 | 1.00 |
| Migration | 0 | 0 | 1.00 |
| Occlusion | 0 | 4 | 0.57 |
| Recurrent Pulmonary Embolism | 0 | 0 | 1.00 |

COOKFOIA 000179



TABLE 4

CONFIDENCE INTERVALS FOR RATES (%) OF MAJOR EVENTS

| Reference | Wittnel Study | 1 | 2 | 3 | 4 | 5 | 7 | 9 |
|---|---|---|---|---|---|---|---|---|
| Deaths | 17.1 - 26.8 | 20.3 - 29.2 | 2.1 - 11.6 | 10.3 - 29.7 | 0.3 - 4.3 | 3.2 - 7.4 | 24.3 - 32.8 | 4.9 - 17.6 |
| Major Displacement | 0.0 - 6.6 | 2.0 - 10.6 | 0.0 - 3.2 |  | 0.0 - 1.8 | 2.1 - 14.8 | 1.0 - 3.6 | 1.1 - 9.9 |
| Migration | 0.0 - 6.6 | 0.0 - 2.3 | 0.0 - 8.5 | 0.0 - 11.6 | 0.4 - 4.8 | 1.0 - 5.2 |  | 8.0 - 23.4 |
| Occlusion | 1.9 - 12.3 | 0.0 - 10.7 | 0.0 - 8.5 | 0.0 - 15.7 |  |  | 3.9 - 13.9 | 2.3 - 13.3 |
| Recurrent Pulmonary Embolism | 0.0 - 6.6 | 1.3 - 9.9 | 0.7 - 8.5 | 8.6 - 18.6 | 0.1 - 3.6 | 1.1 - 4.8 | 3.2 - 7.5 | 0.3 - 7.0 |

# MEMORANDUM

| | |
|---|---|
| **DATE:** | August 11, 2004 |
| **FROM:** | Veronica Price |
| | Biomedical Engineer |
| | ODE/DCRND/ICDG |
| **TO:** | The Record |
| **RE:** | Reclassification of Cardiovascular Intravascular Filters |

## *Introduction:*

This memo has been prepared in accordance with the ODE Guidance on Reclassification of Devices for Reviewers. The goal of this memo is to review the regulatory history of the cardiovascular intravascular filter, provide detail on the known risks associated with this device and justify the down classification from class III to class II. (Note: This reclassification is not intended to cover the Bird's Nest Filter marketed by Cook under P850049. The device description has been written such that it precludes this particular filter design.)

## *Regulatory History of Device:*

(i) Proposed for class III (Three) by Cardiovascular Device Classification Panel March 9, 1979 (44 FR 13284).

The Reclassification Panel cited the following reasons for recommending Class III classification for this device:

- The device is an implant used for life sustaining purpose;
- The materials used in the device and its design should minimize the thromboembolic complications;
- The materials used in the device and its design should minimize the tendency to perforate the vena cava; and
- The device should allow as much venous blood to return to the heart as possible.

(ii) Final Rule promulgated February 5, 1980 (45 FR 17736), classifying Cardiovascular Intravascular Filters (21 CFR 870.3375) as Class III devices.

An amendment to the final rule was published May 11, 1987 (52 FR 17736) stating that a date for PMA or PDP requirement would be published.

COOKFOIA 000181

(iii)   a.   Federal Register Notice of August 14, 1995, (60FR41986),  requiring manufacturers of 31 group 2, Class III devices to submit to FDA summaries of, and citations to, safety and effectiveness information known for these devices.

        b.   Reclassification submissions received from Nitinol Medical Technologies on July 22, 1996, and  B. Braun Vena Tech on September 30, 1996.

        c.   515(i) submission received from  Boston Scientific Corporation on August 14, 1996.

This reclassification has been initiated by the two manufacturers cited above (b.).

*Device Description:*

A cardiovascular intravascular filter is a permanent implant placed in the inferior vena cava for the purpose of preventing thromboemboli (blood clots) originating from pelvic and lower limb venous thrombosis from flowing into the right side of the heart and the pulmonary circulation. The filter is seated within the vena cava via a series of hooks which are at the end of several legs or struts which converge at an apex.  The goal of filter placement is to obtain high filtering efficiency (ability to trap large and small emboli) without impedance of blood flow, device related thrombosis, device migration or penetration of the vessel wall.  It is indicated for the prevention of recurrent pulmonary embolism by placement in the vena cava in the following situations: risk or occurrence of pulmonary thromboembolism when anticoagulants are contraindicated; failure of anticoagulant therapy in thromboembolic diseases; emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

*Proposed Reclassification:*

A.   Identification

     Cardiovascular Intravascular Filter

B.   Recommended Classification

     Class II
     Special Controls:        Standard Labeling (Intended Use)
                              Draft Guidance

COOKFOIA 000182

C.    Risks to Health

When the cardiovascular intravascular filter was proposed for classification into class III, (44 FR 13284), the panel provided reasons for their recommendation. The reasons included the risk of: thromboembolism, vena cava perforation, and decreased blood flow to the right heart (caval occlusion). Following FDA's review of the reclassification petitions, 515(I) submission, MDR's and the literature, additional risks have been identified. They include: complications during filter insertion; death; thrombogenicity; filter migration; filter tilting and angulation; filter embolization; and fracture of filter. Although these risks are potentially life threatening, as is the disease they are intended to treat, they are well known to the users and are well characterized in the medical literature. FDA now believes that these risks can be controlled by special controls.

On the basis of its review, FDA now believes that the use of the cardiovascular intravascular filter for the prevention of recurrent pulmonary embolism by placement in the vena cava in the following situations: risk or occurrence of pulmonary thromboembolism when anticoagulants are contraindicated; failure of anticoagulant therapy in thromboembolic diseases; emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated; does not present an unreasonable risk of illness and injury, and that special controls would provide reasonable assurance of the safety and effectiveness of the device. The draft guidance and standard labeling are special controls for this device.

D.    Summary of reasons for reclassification

FDA has determined that the following reasons support its recommendation to reclassify the cardiovascular intravascular filter from class III to class II:

1.    General controls by themselves are insufficient to provide reasonable assurances of the safety and effectiveness of the device.

2.    There is sufficient publicly available information to establish special controls to provide reasonable assurance of the safety and effectiveness of the device for its intended use.

3.    There is sufficient publicly available information to demonstrate that the risks to health have been characterized for the cardiovascular intravascular filter and that the relationships between the performance characteristics and these risks have been established.

COOKFOIA 000183

Cardiovascular Intravascular Filters can be reclassified from Class III to Class II because it meets the criteria of 513(e) (2) of the act. Special controls in the form of standardized labeling and a device draft guidance on vena cava filters have been developed. These special controls, in addition to general controls, provide reasonable assurance of the safety and effectiveness of the device, and there is sufficient information to establish special controls to provide such assurance. A regulatory level of Class III is unnecessary.

E.      Summary of data upon which the reclassification is based

A recommendation to down classify cardiovascular intravascular filters (870.3375) from Class III to Class II is being proposed. This recommendation is based on an extensive review of published reports concerning this category of devices, information submitted in reclassification petitions and by manufacturers in response to the published 515(I), a review of MDR's, and previously cleared 510(k)'s.

Cardiovascular intravascular filters have a long history of use. Over the course of this time, the potential benefits and risks have been well characterized. It is possible and appropriate to minimize the risks through the use of special controls. These controls include standardized labeling as well as a guidance document.

The labeling that has been developed for marketed filters includes a list of approved indications for use. A required contraindication is identified and a warning statement regarding MRI compatibility are all mandated. Additional contraindications and warnings may be added to address particular device issues.

Although there are no existing published guidelines or guidance documents for this category of devices, the review of previously submitted 510(k)'s and IDE's has demonstrated a set of consistent requirements in terms of required data. A formal guidance is being developed concurrently with the review of the information on reclassification. The guidance document will help to convey to manufacturers of these products the necessary in vitro, animal and human clinical data that will be necessary to support marketing clearance.

COOKFOIA 000184

**Known Risks:**

A.  Complications during filter introduction

The filter is delivered using several components of a system which include a sheath, guidewire, and introducer.   The overall insertion success rate is usually about 95% but there may be difficulties in correctly placing the filter in up to 15% (Ref. 8).  In the course of trying to place the filter in the vena cava the following complications have been noted:  sheath perforation; introducer tip detachment; guidewire kinking; and sheath kinking (Refs. 7 and 16).  These complications can result in  filter deformation; fracture; premature release or insufficient opening; improper placement; and thrombus formation on filter which may result in insufficient opening (Ref. 8).  There have also been reports of problems with the filter sticking to and/or getting caught in the introducer while the device is being deployed, practitioner difficulty with inserting and/or retrieving failed insertions of the device, and problems with the filter legs breaking during insertion and deployment within the introducer and/or breakage of the filter /filter legs upon placement of the device within the patient (Ref. 5).  These complications are a function of the design of the delivery system, the adherence to the instructions for use and human error.  The risks can be controlled by special controls.

b.    Recurrent Pulmonary Embolism

The incidence of PE reported in the literature is 1.9% to 5% (Refs. 11, 17, and 21) despite the presence of a filtering device.  Mortality from PE with a filter in place is 0.9%. (Ref. 17)  Medical opinion is that the risk of PE from untreated proximal DVT is as high as 50% and that PE mortality without treatment is 8% (Refs. 6 and 13).  Such recurrences almost always occur within the first three months, usually within one month (Ref. 11).  Some of the mechanisms which may be responsible for PE after filter insertion are the following: ineffective filtration; continuous growth of trapped thrombi through the filter; development of thrombosis on the proximal end of the filter; filter migration to a position where it does not function optimally; filter displacement from the caval wall of the hooks by vessel wall thrombus which creates a channel between the filter and the caval wall; and emboli bypassing the filter through collateral lumbar veins or  the genital veins; embolization from thrombi proximal to the filter (arm veins, renal or hepatic veins, the right heart); and incorrect positioning of the filter (Ref. 8).  The risk of recurrent PE is a function of material selection, device design and adherence to the instructions for use and can be controlled by special controls.

c.    Death

The death rate associated with filter use that can be attributed to filter complications is low and has been reported to be from 0.12% to 4% (Refs. 14 and 17).  Death attributable to filter complications have been reported to result from cardiac arrest immediately following filter placement, misplacement of the filter during insertion and cephalic

COOKFOIA 000185

migration of a filter to the heart after placement. This risk can be attributed to user error or design flaws. This risk of death can be controlled by special controls.

d.   Thrombogenicity

The materials of the device should be biocompatible and not lead to thrombogenicity. The affect on the blood flow should not be great enough to cause stasis which would lead to thrombus formation in and around the device. Reported rates of IVC thrombus vary from 7 to 22% (Refs. 8 and 12). The proper choice of materials and the design of the device to minimize or eliminate the risk of stasis can be controlled by special controls.

e.   Filter Migration

The design of the filter must be such that it is stable within the vena cava. The filter release mechanism that is part of the delivery system must be simple and controlled such that the filter can be deployed in the desired location and is completely opened. If not, it can ultimately migrate into the right heart or tilt and compromise filtering efficiency. The occurrence of filter migration in the literature varies from 6% to 53% (Refs. 9, 10, 18, and 22). Limited filter movement in the caudal or cephalic direction is commonly reported and does not appear to be clinically significant. Much of the reported filter movement may actually be due to measurement error resulting from differences in patient positioning, breathing and parallax. True migration may be caused by too large a vena cava, inadequate positioning and massive embolization into the filter with caval dilatation (Ref. 8). The risk of migration can be controlled by special controls.

f.   Caval Penetration

The filter must be designed such that it is secure within the vena cava without perforating the wall of this vessel to cause hemorrhage or potentially injuring nearby organs. Slight penetration of the caval wall by filter struts is usually asymptomatic and clinically insignificant perhaps because penetration occurs gradually, allowing time for the vessel wall to fibrose. A caval perforation rate of 9% has been reported (Ref. 12). There have been rare cases, however, when strut migration or breakage have led to retroperitoneal complications such as bowel perforation, neurovascular injury or small bowel obstruction. This risk may be controlled by special controls.

g.   Filter Tilting and Angulation

The significance of tilting and angulation of caval filter after placement is controversial. There is a theoretical loss of filtering efficacy of any filter when tilted or angulated significantly; however there is no good clinical data to support a definite increased incidence in PE or failure to trap thrombi. A properly designed device should minimize the possibility for tilting upon deployment or angulating after implantation. This risk can be controlled by special controls.

COOKFOIA 000186

h.   Caval Occlusion

Caval occlusion is related to filter thrombogenicity, design and flow patterns (Ref. 8).Small or moderate sized emboli trapped in a filter are usually asymptomatic since the residual patency of the vena cava and the normal paravertebral collateral veins permit adequate venous return.  A large trapped embolus or a cluster of small emboli may occlude a filter completely and thus block the vena cava.  In almost all cases the symptoms of IVC occlusion, swelling of both lower limbs,  are transient and resolve almost completely within weeks or a few months as the thrombi undergo spontaneous lysis or collateralization occurs.  It is often difficult or impossible to clinically distinguish IVC filter occlusion from extension of the preexisting DVT, since the symptoms may be similar.  Optimally, the filter should capture all emboli of a size that may cause clinically critical PE.  Rates of occlusion for the various filters have been reported to be between 4% to 18% (Refs. 15 and 23).  This complication is a function of device design and is clinically manageable under most circumstances.  The risk of caval occlusion can be controlled by special controls.

i.   Filter Embolization

The risk of filter embolization is primarily limited to the first two weeks after implantation.  After two weeks, the points of contact between the device and the vein wall become firmly incorporated by tissue reaction and embolization of the filter becomes virtually impossible.  Embolization of the filter is a serious complication with clinical consequences comparable to pulmonary thromboembolism.  These range from totally asymptomatic to sudden death.  Need for therapy also ranges from none to chest surgery for removal of the device.  Proper design and close adherence to the instructions for use can minimize the risk of filter embolization.  This risk can be controlled by special controls.

j.   Fracture of filter

Filters rarely fracture as a result of direct trauma to the abdomen, but may from metal fatigue due to respiratory motion when perforation permits the tip of a leg to become locked to immobile tissues and subject to repeated unanticipated flexion, or fracture may be due to metal or weld corrosion.  The fracture fragments may migrate locally or distally.  This complication is usually  asymptomatic and requires no treatment.  The incidence has been reported at 2% (Ref. 12).  Filter fracture is a function of design and delivery into the IVC.  The risk can be controlled by special controls.

k.   Other Risks

The complications that occur at the vessel puncture site are not uniquely related to delivery of intravascular cardiovascular filters but are representative of  complications observed with various catheter techniques.  Events occurring at the delivery site include: hematoma formation and A-V fistula, DVT at puncture site, pneumothorax and air

COOKFOIA 000187

embolism after jugular insertion.   Many of these events can be minimized or eliminated by appropriate operator training and comprehensive device labeling.  Most are well known risks associated with many different interventional procedures which can be controlled by special controls.

1.    Benefits

Pulmonary embolism is a serious clinical issue with significant morbidity and mortality. It has been estimated that there are more than 600,000 cases of clinically significant PE occur each year in the United States (Refs. 23 and 24), resulting in approximately 200,000 deaths annually in the United States (Ref. 20).  The patient may survive the first embolism but remain at risk for a fatal recurrent PE.  PE recurs in approximately 6 to 25% of treated patients (Ref. 24).  Additionally, the incidence of PE in patients with DVT is 19% to 28% (Ref. 19).  Normally, patients with deep venous thrombosis and/or PE are treated with anticoagulation therapy.  However, in some patients anticoagulation is ineffective, contraindicated or results in complications which require that it be discontinued.  For these patients a vena cava filter is recommended.  Historically, vena cava interruption was achieved  by suture ligation  and then later by plication with fenestrated clips on the vein.  These original concepts to prevent PE proved effective but required major surgery with a significant incidence of mortality and venous stasis complications.  Also, large collateral venous channels developed, with ligation,  capable of allowing the passage of emboli.  Plication to subdivide the lumen of the vena cava was effective in arresting emboli and had fewer stasis problems, but it still required abdominal surgery.  Vena cava filters were then developed.

*Conclusion:*

In summary, FDA believes that based on publicly available, valid scientific evidence, the intravascular cardiovascular filter can be regulated as a Class II device (general and special controls) to reasonably assure that the device is safe and effective for its intended use.

*References:*

1. B. Braun Vena Tech, reclassification petition. Docket No. 94N-0418.

2. Nitinol Medical Technologies, reclassification petition. Docket No. 94N-0418

3. Boston Scientific Corporation, 515(I) submission.  Docket No. 94N-0418.

4. FDA MDR database

5. Draft Guidance for the Submission of  Premarket  Notifications for Cardiovascular Intravascular Filters.

COOKFOIA 000188

6. Alpert, J.S., R. Smith, C.H. Carlson, I.S. Ockene, L. Dexter, J.F. Dalen,"Mortality in patients treated for pulmonary embolism," *Journal of the American Medical Association*, 236:1477-1480,1976.

7. Becker, D.M. et al.,"Inferior Vena Cava Filters Indications, Safety, Effectiveness,"*Archives of Internal Medicine*,152:1985-1994,1992.

8. Bergqvist,D.,"The Role of Vena Caval Interruption in Patients with Venous Thromboembolism,"*Progress in Cardiovascular Diseases*," 37(1):25-37,1994.

9. Berland, L.L., F.E. Maddison, and V.M. Bernhard,"Radiologic follow-up of vena cava filter devices,"*American Journal of Roentgenology*,134:1047-1052,1980.

10. Crochet, D.P. et al.,"Vena Tech-LGM Filter: Long-term Results of a Prospective Study,"*Radiology*,188:857-860,1993.

11. Epstein, H.E., M.D. Darcy, D.W. Hunter, C. Coleman, S.M. Tadavarthy, P.H. Murray, W.E. Casteneda-Zuniga and K. Amplatz, "Experience with the Amplatz retrievable vena cava filter," *Radiology*,172:105-110,1989.

12. Ferris, E.J. et al.,"Percutaneous Inferior Vena Caval Filters: Follow-up of Seven Designs in 320 Patients," *Radiology*,188:851-856,1993.

13. Goldhaber S.Z. and C.H. Hennekens,"Time trends in hospital mortality and diagnosis of pulmonary embolism," *American Heart Journal*,104:305-306,1982.

14. Greenfield, L.J. and B.A. Michna,"Twelve-Year Clinical Experience with the Greenfield Vena Caval Filter," *Surgery*,104:706-712,1988.

15. Greenfield, L.J. and M.C. Proctor,"Twenty-year clinical experience with the Greenfield filter,"*Cardiovascular Surgery*, Vol 3, No. 2:199-205.

16. Greenfield, L.J., et al.,"Extended evaluation of the titanium Greenfield vena caval filter,"*Journal of Vascular Surgery*,September 1994:458-465.

17. Greenfield, L.J.,"Current indications for and results of Greenfield filter placement,"*Journal of Vascular Surgery*,1:502-504,1984.

18. Messmer, J.M. and L.J. Greenfield,"Greenfield caval filters; long-term radiographic follow-up study," *Radiology*,156:613-618,1985.

19. Mohan, C.R., J.J. Hoballah, W.J. Sharp, T.F. Kresowik, C.T. Lu and J.D. Corson,"Comparative efficacy and complications of vena caval filters,"*Journal of Vascular Surgery*,Vol.21 No. 2:235-246,1995.

COOKFOIA 000189

20. Nunnelee, J.D., and A. Kurgan,"Interruption of the inferior vena cava for venous thromboembolic disease,"*Journal of Vascular Nursing*,11:80-2,1993.

21. Ricco, J.B., D. Crochet, P. Sebilotte, A. Serradimigni, J.M. Lefebvre, E. Boissou, P. Geslin, P. Virot, C. Vaislic, M. Gallet, Y. Biron, D. Lefant, J.M. Desmarq and D. De La Faye," Percutaneous transvenous caval interruption with the LGM Filter; early results of a multicenter trial,"*Annals of Vascular Surgery,* 3:242-247,1988.

22. Rose B.S., D.C. Simon, M.L. Hess and M.E. Van Aman," Percutaneous transfemoral placement of the Kimray-Greenfield vena cava filter,"*Radiology*,165:373-376,1987.

23. Simon, M., C.A. Athanasoulis, D. Kim, et. al.,"Simon Nitinol inferior vena cava filter; Initial clinicale experience," *Radiology*,172:99-103,1989.

24. Smith B.A.,"Vena Caval Filters,"*Emergency Medicine Clinics of North America*,Vol. 13, No.3:645-654,1994.

Veronica A. Price

COOKFOIA 000190



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

---

Food and Drug Administration
Rockville MD 20857

December  12, 1996

Jonathan S. Kahan
Hogan & Hartson
Columbia Square
555 Thirteenth Street, NW
Washington, DC  20004-1109

Dear Mr. Kahan:

Your petition submitted on behalf of Nitinol Medical Technologies, Inc.
requesting the Food and Drug Administration to reclassify cardiovascular
intravascular filters was received by this office on 12/03/96.  It was
assigned docket number 96P-0482/CCP 1 and it was filed on 12/03/96.  Please
refer to this docket number in future correspondence on this subject with
the Agency.

Please note that the acceptance of the petition for filing is a procedural
matter in that it in no way reflects an agency decision on the substantive
merits of the petition.

Sincerely,

Jennie Butler
Dockets Management Branch

COOKFOIA 000191

<u>515(i) SUBMISSION</u>        RECLASSIFICATION PETITION

CFR NUMBER:  870.3375          DOCKET NUMBER:

DEVICE NAME:  Cardiovascular intravascular filters

PRODUCT CODE:  DTK

PANEL: CV      DIVISION:  DCRND        BRANCH: ICDG

---

APPLICANT:  Nitinol Medical Technologies, Inc.
CONTACT:    Jonathan S. Kahan, Hogan & Hartson L.L.P.
ADDRESS:    Columbia Square
            555 Thirteenth Street, N.W.
            Washington, D.C. 20004-1109
PHONE NO.:  (202)-637-5600        FAX NO.:  (202)-637-5910

---

DATE ON SUBMISSION:  July 22, 1996      #COPIES:  3
DATE RECEIVED:       July 22, 1996
DUE:                 December 14, 1996
DATE AI LETTER:
DATE RESPONSE:
DECISION:

0018  '96  DEC -3  P3 :22

        COOKFOIA 000192

# HOGAN & HARTSON
### L.L.P.

JONATHAN S. KAHAN
PARTNER
DIRECT DIAL (202) 637-5794

COLUMBIA SQUARE
555 THIRTEENTH STREET, NW
WASHINGTON, DC 20004-1109
TEL (202) 637-5600
FAX (202) 637-5910

July 22, 1996

BY MESSENGER

Document Mail Center (HFZ-401)
Center for Devices and Radiological Health
Food and Drug Administration
9200 Corporate Boulevard
Rockville, MD 20850

> **Re:    Class III Device Safety and Effectiveness Summary and Citation for Nitinol Medical Technologies, Inc.'s Simon Nitinol Filter™ System and Simon Nitinol Filter-Straight Line™ System**

Dear Sir or Madam:

In accordance with the Food and Drug Administration's ("FDA") order requiring the submission of safety and effectiveness information for certain class III devices, Nitinol Medical Technologies, Inc. ("NMT"), by its counsel, is submitting the enclosed safety and effectiveness summary and citation for its Simon Nitinol Filter™ System ("SNF System") and Simon Nitinol Filter-Straight Line™ System ("SNF/SL System"). See 60 Fed. Reg. 41984, 41985 (Aug. 14, 1995). FDA's August 14, 1995 order requires the submission of safety and effectiveness summaries and citations for intravascular cardiovascular filters by August 14, 1996. The information contained in this submission was provided by NMT to Hogan & Hartson for submission to FDA.

The SNF System and the SNF/SL System are intravascular cardiovascular filters as defined by 21 C.F.R. § 870.3375(a). These devices are permanently implanted venous interruption devices intended for use in the prevention of recurrent pulmonary embolisms. They are currently classified as class III devices. In the attached submission, NMT is requesting the reclassification of such filters to class II. NMT is also requesting that FDA implement only the following special controls in conjunction with their reclassification: patient registries and guidelines regarding the submission of clinical data in premarket notifications.

96P-0482

\\\DC - 57841/1 - 0313468.01

BRUSSELS   LONDON   MOSCOW   PARIS*   PRAGUE   WARSAW
BALTIMORE, MD   BETHESDA, MD   COLORADO SPRINGS, CO   DENVER, CO   McLEAN, VA

*Affiliated Office

Page 193

COOKFOIA 000193

.TSON L.L.P.

Docu      Mail Center (HFZ-401)
July     1996

         We trust that the information contained in the enclosed summary and
.tation will be sufficient to enable FDA to reclassify intravascular cardiovascular
filters from class III to class II.  Please direct any questions or requests for
information concerning this submission to me at the number given above.

                                    Sincerely,

                                    Jonathan S. Kahan

Enclosure

cc:    Sherrie Coval-Goldsmith, Nitinol Medical Technologies, Inc.
       Laurie A. Clarke, Esq.

\\\DC - 57841/1 - 0313468.01

COOKFOIA 000194

# CLASS III PREAMENDMENTS DEVICE
## SAFETY AND EFFECTIVENESS
## SUMMARY AND CITATION
## FOR
## NITINOL MEDICAL TECHNOLOGIES, INC.'S
## SIMON NITINOL FILTER SYSTEM
## AND
## SIMON NITINOL FILTER-STRAIGHT LINE SYSTEM

Nitinol Medical Technologies, Inc.
263 Summer Street, 7th Floor
Boston, MA 02210

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000195

## I.      IDENTIFICATION

### A.     Intended Use

The Simon Nitinol Filter™ (SNF) and Simon Nitinol Filter - SL™ (Straight Line) (SNF/SL) Systems are permanently implanted venous interruption devices designed for the prevention of recurrent pulmonary embolisms ("RPE"). PE are created when a thrombus in the venous system of the lower limbs or pelvis floats free in a caudal direction from the upper extremity or cephalad direction through the vena cava and the right heart and into the pulmonary artery where it may block blood flow to a variable amount of lung tissue. This condition may be fatal if the embolism is large.

The Simon Nitinol Filter ("the SNF" or "the filter") is designed to mechanically obstruct the passage of blood clots through the vena cava to prevent serious injury from pulmonary emboli. It is inserted percutaneously, using the standard Seldinger technique, through either a femoral, jugular, antecubital, or subclavian approach using a 7 French (I.D.) introducer. 1/ The filter is held in place by the outward pressure of the filter's wire legs and mushroom-shaped dome cap. Hooks on the ends of the legs anchor the filter to the vena cava wall. The outer edges of the mushroom-shaped dome cap expand against the vena cava wall and help stabilize the filter. The double filtering mechanism is accomplished by the cone shaped legs and the overlapping circular mesh of the dome that spans the vena cava to trap clots.

The indications for use includes patients at risk for pulmonary embolisms or with a history of recurrent embolisms in the following situations:

---

1/      The SNF system has received 510(k) premarket clearance for jugular, femoral, and antecubital delivery (K894703, K92144, and K940489). The SNF/SL system has received 510(k) premarket clearance for jugular and femoral delivery (K944353). Nitinol Medical Technologies, Inc. ("NMT") has or very shortly will file 510(k) notifications to modify: (1) the SNF System to allow subclavian delivery of the filter; (2) the SNF/SL System to allow antecubital and subclavian delivery of the filter; (3) the SNF System to add one or two gold, radiopaque marker bands to different models of the device; and (4) the SNF/SL System to remove one or both gold, radiopaque marker bands from different models of the device. The SNF System currently has no radiopaque bands; the SNF/SL System currently has two gold, radiopaque bands. Upon clearance of these modifications, models of both the SNF System and the SNF/SL System will be available with zero, one, or two gold, radiopaque marker bands.

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000196

- Where anticoagulants are contraindicated

- Where anticoagulant therapy resulted in complications

- Where anticoagulant therapy failed in thromboembolic disease

- Where the patient requires emergency treatment following a massive pulmonary embolism and anticipated benefits of conventional therapy are reduced

- Where the patient is at high risk of pulmonary embolism, *e.g.*, major hip surgery, chronic heart failure with deep vein thrombosis ("DVT").

## B.   Listing of the Component Parts and Materials

The SNF and SNF/SL Systems consist of two major components:  the implanted filter and the single use delivery system.  The filter used in both systems is identical.  They have different delivery systems.  In addition, different models of each system are available for femoral, jugular/subclavian, and antecubital delivery of the filter.  The different models have different length delivery sheaths and pusher wires.

### 1.   <u>Filter</u>

The SNF and SNF/SL System's filter is a sterile, non-pyrogenic vena cava blood clot filter made of a nitinol alloy which is approximately equiatomic nickel and titanium.  Nitinol compares favorably with stainless steel and titanium in that it is hyperelastic, more corrosion resistant, fatigue resistant, and nonferromagnetic so it can be imaged successfully by magnetic resonance imaging ("MRI").  As discussed below in Section V, it has also been shown to be biocompatible in cell culture, animal, and human studies.

In addition, nitinol possesses thermal shape memory characteristics, permitting ambient temperature passage of the device as a set of seven straight pliable wires through a standard caliber angiographic catheter.  Subsequent transformation of the device occurs upon extrusion of the wire into the warm caval blood stream at the designated site.  The predetermined filter configuration consists of a six conically arranged legs and a mushroom - shaped dome cap with seven overlapping petal-shaped wire loops.  The cap is 29 mm in diameter.  The cap is attached to a nitinol sleeve, from which radiate six wire legs, each approximately 25

2



mm long. Each leg has a pointed 90° hook, approximately 1.5 mm long, at the end. The span between the ends of opposite legs is at least 32 mm. The filter shape has been optimized for stability in the blood stream and for trapping clots as small as 3 mm. The device may be used in vena cavas up to 28 mm in diameter.

The filter is loaded into an approximately 2 mm (I.D.) polycarbonate storage capsule with an integral "Y" port and a male fitting at one end and a female fitting at the other end. The filter is sterilized, stored, and shipped in its capsule. The filter is designed to be introduced by standard percutaneous jugular, femoral, antecubital, or subclavian delivery using a standard 7 French I.D. angiographic introducer sheath. The sheath is designed to accept a dilator and a guide wire for its introduction. When the sheath is in the correct position, the dilator and guide wire are removed and the filter storage tube and associated delivery system are attached to the sheath. The filter is advanced through the sheath by means of the pusher wire until it reaches the tip of the sheath. At this point, the pusher wire is held in position while the sheath is withdrawn, which releases the filter into the vena cava. The filter is instantly transformed into its imprinted expanded shape, locking it into place. The entire delivery system may then be removed. The two delivery systems are described below.

### 2. The SNF Delivery System

The SNF delivery system is designed for the femoral, jugular, subclavian, or antecubital delivery of the filter. It is intended for single use.

#### a. Pusher Wire

The pusher wire is a coiled stainless steel guidewire of 0.044 inch diameter, housed in a circular plastic storage and deployment system that is attached to a polycarbonate feeder handle. The handle is in turn attached to the filter storage tube by telescoping stainless steel tubes that slide relative to one another. To advance the filter, the physician moves the telescoping tubes in and out while "ratcheting" the pusher wire by applying intermittent thumb pressure at a flexible polyethelene "thumb window" in the handle.



The length of the pusher wire depends on the delivery route. It is 84 cm for femoral delivery, 119 cm for jugular and subclavian delivery, and 139 cm for antecubital delivery. As noted above, there are different models of the SNF System for femoral, jugular/subclavian, and antecubital delivery (the "SNF Femoral System," the "SNF Jugular/Subclavian System," and the "SNF Antecubital System," respectively).

#### b. Pusher Cup/Pad



A pusher cup or pad is attached to the distal end of the pusher wire to provide positive contact with the filter while it is advanced through the catheter. A small stainless steel cup is used to surround and cradle the feet of the filter in the

3

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000198



SNF Femoral System as the filter is delivered dome first. A small stainless steel pad is used at the end of the pusher wire in the SNF Jugular/Subclavian and Antecubital Systems as the filter is advanced through the catheter in the feet first direction. The pad pushes against a rigid tip sleeve on the top end of the filter. The pusher cup or pad is braised onto the end of the pusher wire. The pusher cup or pad has a maximum O.D. of 0.083 inches. The I.D. of the cup is 0.076 inches, wall of 0.0035 inches, length of 0.2 inches, and depth of 0.075 inches.

### c   Pusher handle

The pusher handle consists of a circular housing tube with integral handle and telescoping tubes.

### d.   Catheter/dilator set



The catheter set consists of a 7 FR FEP sheath, coaxial PTFE dilator, and a .038in. teflon coated J guidewire for femoral, jugular/subclavian, and antecubital delivery, respectively. 2/ The length of sheath is 48 cm for the SNF Femoral System, 83 cm for the SNF Jugular/Subclavian System, and 103 cm for the SNF Antecubital System.

### 3.   SNF/SL Delivery System

The SNF/SL delivery system is designed for the femoral, jugular, subclavian, or antecubital delivery of the filter. It is intended for single use.

The SNF-SL system differs from the SNF system in that it dispenses with the ratcheting handle, the looped pusher-wire storage tube, and telescoping stainless steel tubes. This is made possible by using a hyperelastic nitinol pusher wire.

### a.   Nitinol pusher wire

The diameter of the nitinol pusher wire is 0.040 inches except that it is $0.025 \pm 0.005$ inches for the last 11.5 cm from its distal end. The wire is made of nitinol because of this alloy's anti-kinking properties and flexural resiliency. The wire is centerless ground to a gentle taper with a small nub left at the end. The overall length of the wire (from the distal tip of the pusher cup/pad to the diametral transition of the pusher handle) depends on the delivery approach. The length of the pusher wire is 84 cm for femoral delivery, 119 cm for jugular/subclavian delivery, and 139 cm for antecubital delivery. As noted above, there are different models of the SNF/SL System for femoral, jugular/subclavian, and antecubital delivery (the "SNF/SL Femoral System," the "SNF/SL Jugular/Subclavian System," and the "SNF/SL Antecubital System," respectively).

---



2/   The guidewire is used for femoral and jugular/subclavian delivery, but not for antecubital delivery.

4

**b.    Pusher cup/pad**
A pusher cup or pad is attached to the distal end of the pusher wire to provide positive contact with the filter while it is advanced through the catheter. A small stainless steel cup is used to surround and cradle the feet of the filter in the SNF/SL Femoral System as the filter is delivered dome first. A small stainless steel pad is used in the SNF Jugular/Subclavian and Antecubital Systems as the filter is advanced through the catheter in a feet first direction. The pad pushes against a rigid tip sleeve on the top end of the filter. The cup or pad is placed on the end of the pusher wire and a crimp is made over the nub. A small bead of TraBond FDA-2LV adhesive is used to smooth the transition from the pusher pad to the wire.

**3.    Pusher handle**
A small diameter stainless steel handle grip is crimped onto the proximal end of the pusher wire. The outer diameter of the handle is twice that of the pusher wire and it is less bendable than the wire.

**4.    Catheter set**
The catheter set consists of a 7 FR FEP sheath, coaxial FEP dilator, and a .038in. teflon coated J guide. 3/ The length of sheath is 48 cm for the SNF/SL Femoral System, 83 cm for the SNF/SL Jugular/Subclavian System, and 103 cm for the SNF/SL Antecubital System.

**II.    RISKS TO HEALTH**

Pulmonary emboli are common, clinically dramatic and potentially lethal complications of DVT, usually originating in the lower limbs and pelvis. It is estimated that there are 620,000 cases of clinically significant pulmonary embolism in the U.S. each year. (Dalen, 1975). Treatment of pulmonary embolism has been shown to be effective in reducing the mortality from 30% to 8%. (Dalen, 1975). Treatment often begins with prophylactic measures such as early ambulation, low-dose anticoagulants, or pneumatic stockings. Once pulmonary embolism occurs, anticoagulant drugs are instituted to inhibit further clot formation. Additionally, thrombolytic drugs have been shown to be effective in accelerating the process of clot lysis.

Venous interruption procedures are recommended primarily when there is a contraindication to the use of anticoagulant or thrombolytic drugs.

---

3/    The guidewire is used for femoral and jugular/subclavian delivery, but not for antecubital delivery.

\\\DC - 57841/1 - 0309549.01

5

COOKFOIA 000200

## A.      Background

The original concept of surgically ligating the vena cava to prevent pulmonary emboli proved effective but required major surgery and was complicated by significant mortality and venous stasis complications. Also, large collateral venous channels developed, which are capable of allowing the passage of emboli.

These problems led to surgical efforts to interrupt the passage of emboli through the vena cava while maintaining its patency for normal blood flow. Suture plication to subdivide the lumen of the vena cava was effective in arresting emboli and had fewer stasis problems. However, it still required abdominal surgery with its inherent morbidity and mortality.

The next phase of development was the indirect placement of devices in the inferior vena cava ("IVC") after gaining access to the venous system via a peripheral vein such as the jugular or femoral vein. In general, the devices were collapsible for transportation through the venous channels and reexpandable upon reaching the vena cava where they could be secured. Early attempts included a detachable balloon which was introduced via cut down on the jugular vein. This totally occluded the vena cava. A removable sieve-like expanded catheter was tested in dogs. A spring-like v-shaped wire was inserted, via the femoral vein, flattening the vena cava into a narrow slit that prevented passage of emboli. These devices had significant limitations. In 1970, Mobin-Uddin introduced an umbrella filter. This was originally introduced via the jugular vein cutdown but subsequently has been inserted via either the femoral or jugular routes. The filter worked well but there were problems of migration and a high rate of filter occlusion. In 1973, the Greenfield filter was introduced and had a high patency rate and improved security. It was also initially inserted via cutdown but is now placed percutaneously. However, the delivery capsule is large, making the insertion procedure difficult. Also the filtering action was imperfect and a variety of complications were reported.

A filter system with a simple delivery system to reduce morbidity and an improved filtering efficiency was still needed. The Simon Nitinol Filter was developed to address these needs. The filter takes advantage of the thermal shape-memory property of nitinol alloy wire, as opposed to the spring-memory of other filters. It uses a very small-bore delivery catheter, which makes the percutaneous insertion procedure very simple. The filter is inserted as a set of soft thin wires straightened for passage through a standard 7 I.D. French catheter. The filter expands at body temperature, *i.e.*, upon extrusion into the vena cava.

As discussed below in Section V.B.3., Nitinol has been used extensively in a variety of medical applications including: orthodontics wiring; orthopedic compression staples; femoral head prostheses; scoliosis correction rods; cervical intervertebral disc prostheses; cranial plate rivets; and fallopian tube clips. These

6

COOKFOIA 000201

devices take advantage of the alloy's thermal shape-memory, biocompatibility, corrosion resistance, fatigue resistance, and non-magnetic properties, offering significant advantages compared with stainless steel and titanium.

**B.    List of General Hazards Associated with the Device**

Potential adverse events associated with the use of the SNF are generally the same as those associated with other vena cava filters. The following generic operative and postoperative complications are potential device risks. Where there is a risk that is specific to the SNF, that risk is highlighted and discussed.

**1.    Events occurring at the venapuncture site**

Complications include those encountered with standard venous catheterization procedures. Their frequency and severity are directly related to the size and rigidity of the introducer sheath as well as the experience and skill of the operator. These complications are:

- Inability to insert or advance the introducer sheath into the IVC (may be due to size or rigidity of introducer sheath, venous occlusion, or anastomotic variations)

- Local hemorrhage or hematoma formation (more common with large sheaths)

- Local thrombosis (more common with large sheaths)

- Traumatic A-V fistula (due to poor needle puncture technique)

- Air embolism (particularly with large sheaths and jugular access)

- False aneurysm

- Infection

The Simon Nitinol Filter introducer sheath is substantially smaller and more flexible than the sheaths utilized with other filter systems, and so fewer complications are to be expected. The filter introducer sheath is inserted by a standard Seldinger technique.

7

COOKFOIA 000202

2.      **Events occurring at the delivery site**

The complications at the delivery site can include:

- Misplacement - wrong vein

- Perforation of the femoral or iliac veins or IVC by a filter (usually a function of filter design)

- Pericaval hemorrhage (may occur with perforation)

- Failure to expand fully (usually due to thrombus forming around filter during delivery)

- Embolization of filter (usually due to failure to expand fully, total occlusion of filter with increased distal vena cava pressure, or distention of the IVC due to postural effects or breathing maneuvers)

- Tilting of filter

- Tenting of filter

- Asymmetrical opening of filter legs

- Hooking of filter legs.

Delivery site complications are more likely to occur if different catheters and introducers are used for the venography and filter delivery. The same introducer is used to perform both operations when placing the Simon Nitinol Filter.

However, it is possible, because of the SNF's material composition (Nitinol alloy), that it may be delivered slightly higher or lower than intended due to the shape transformation as it emerges from the delivery catheter. It is also possible that the feet of the filter may not separate completely from the pusher cup at the time of delivery. Recent modifications of the cup design appear to have eliminated the feet release problem. Although these problems may occur, experience attendant with the use of the device typically renders them insignificant to the clinician.

8

3.    **Postoperative adverse events**

Postoperative adverse events are those that occur greater than 24 hours following percutaneous insertion of a vena cava filter and include:

· RPE

It is clinically recognized that the greatest risk of recurrent pulmonary embolism exists during the first few days or weeks after the development of a deep venous thrombosis or following the initial pulmonary embolic event. The fresh thrombus may still be undergoing active propagation, is relatively fragile, and is poorly attached to the vein wall. It is during this period that pieces break off most easily and migrate to the lungs. For this reason, anticoagulant therapy is instituted immediately or, if this therapy is contraindicated, a vena cava filter device is placed on an emergency basis. Within the first few weeks, the thrombi become more organized, less fragile, and more adherent so that the recurrence rate falls dramatically (Huisman, 1989; Sabiston, 1977). Thus, anticoagulant therapy may be discontinued after six weeks, though more commonly it is given for three to six months when the risk of RPE is minimal. Only if there is an underlying disease which continues to predispose to new episodes of DVT or PE is prophylactic anticoagulant therapy continued for more than six months, possibly for life. Once a filter has been placed it remains in place and offers protection permanently. The declining rate of recurrent embolization also is reflected in the incidence of postoperative events. The reported incidence of recurrent PE following placement of a filter is very low, i.e. 1-5% (Epstein, 1989; Ricco, 1988; Greenfield, 1984). Where indicated in the literature, and as shown in the clinical trials for the Simon Nitinol Filter and similar filters, such recurrences almost always occur within the first three months, usually within one month (Epstein, 1989). The incidence of recurrent PE and new or worsened DVT with the Simon Nitinol Filter is equal to or lower than that found with other vena cava filters (Ferris, 1993).

· Filter Occlusion

Any vena cava filter is designed to trap emboli in the IVC and thus prevent them from reaching the lung where they could prove fatal. Small or moderate sized emboli trapped in a filter are usually asymptomatic since the residual patency of the vena

9

cava and the normal paravertebral collateral veins permit adequate venous return.  A large trapped embolus, or a cluster of small emboli may occlude a filter completely and thus block the vena cava.  Even this may by asymptomatic if there is a generous network of collateral paravertebral veins.  More typically, after a well period of days or weeks following filter placement, the occlusion occurs suddenly and causes swelling of both lower limbs.  The severity may range from mild swelling at the end of the day to severe swelling even at rest, depending upon the state of the collateral veins.  In rare, extreme cases, the collateral vessels also may be occluded, causing severe painful swelling of both lower limbs.  In almost all cases, the symptoms of IVC occlusion are transient and resolve almost completely within a few weeks or, possibly, a few months.  Treatment is primarily leg elevation, the use of elastic stockings, and, if not contraindicated, use of anticoagulant or thrombolytic drugs.  On rare occasions surgical thrombectomy may be required.

In these patients it is often clinically difficult or impossible to distinguish embolic IVC occlusion from propagation of the preexisting DVT, since the symptoms may be similar.  Preexisting DVT may be a continuing problem because the patients are often unable to receive anticoagulant therapy.  In the case of the Simon Nitinol Filter, which is nonferromagnetic, the occlusion can be distinguished by MRI.  In the literature reporting the incidence of occlusion with other filters, occlusions have virtually all occurred within three months of insertion of the filter, generally within two months (Epstein, 1989; Greenfield, 1984; Kanter, 1988).  This is in accord with the declining frequency of RPE during the months after the initial event.

It is likely that occlusions of the Simon Nitinol Filter are generally the result of captured emboli, rather than thrombosis *in situ*, for a number of reasons;

> The majority of Simon Nitinol Filters do not develop thrombi or occlusions

> There is poor correlation between the time of filter placement and the occurrence of occlusion

10

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000205

The location of the thrombi in the Simon Nitinol Filter corresponds to sites of trapping rather than regions of maximal wire concentration

Animal and in vitro experiments have shown low thrombogenicity of the Nitinol material

Thus, one can conclude that, for any vena cava filter, occlusion is an expected outcome in a small but significant fraction of patients who experience a major embolic event after filter placement (Simon, 1989). It is thus not a true complication but simply the filter fulfilling its intended purpose (Epstein, 1989). Therefore, the incidence of filter occlusion likely reflects the rate of recurrent embolism in a particular patient population as well as the mechanical efficiency of the filter. Thus, an inefficient filter might have too low an occlusion rate and too high a PE rate. At the opposite extreme, a filter could have too high an occlusion rate if it could be too easily obstructed by small embolic particles that could have been easily managed by the lungs, *e.g.*, the Mobin - Uddin umbrella filter. Optimally, the filter should capture all clinically threatening pulmonary emboli above a critical size. If it is successful, an appropriately small rate of IVC occlusion and lower limb venous obstruction would still be inevitable.

• Filter Embolization

The Simon Nitinol Filter is initially secured in the IVC by the outward pressure of its expanding dome and legs and by engagement of the terminal hooks with the vena cava wall. Within two weeks of implantation, the SNF becomes further secured by the formation of a thin neoendothelium which grows over the wires wherever they contact the vein wall. Theoretically, embolization of a filter to the heart or lungs may occur at the time of delivery if its normal expanded configuration is prevented by thrombus forming around it while still collapsed in its introducer sheath or if the caval diameter is excessively large. Delayed embolization may also occur within the first two weeks if a filter captures clot, the vena cava pressure rises, and the vena cava consequently becomes over distended (Greenfield, 1977). After two weeks, the points of contact between the device and the vein wall become tightly bound by neoendothelium, fibrous tissue, and muscle fibers and embolization of the filter becomes virtually impossible (Epstein, 1989). Two cases of embolization of the SNF, reported to have occurred within 10 days of placement (LaPlante, 1993), support this view.

11

Embolization of the filter is a serious complication with variable clinical consequences, comparable to pulmonary thromboembolism. These range from being totally asymptomatic to sudden death. Therapy also ranges from no therapy to open chest surgery and removal of the device.

• Local Filter Migration

It has been noted that vena cava filters may migrate a few centimeters toward the head or feet during the weeks or months following their placement (Sidawy, 1986; Miller, 1986). This complication is largely dependent upon the specific filter design and reflects the susceptibility of the particular filter to hemodynamic forces acting upon it. The direction of blood flow and elevation pressure in the vena cava below the filter after clot capture tend to push the filter craniad. Most filters are designed to resist this. A water hammer effect due to the weight of a column of blood, particularly during ambulation, tends to force the filter downward notably if a clot has been captured. Small migrations usually are clinically insignificant.

• Penetration of the IVC Wall

All commercially available vena cava filters have been reported to penetrate or puncture the IVC wall (Ferris, 1993; Millward, 1991; Greenfield, 1991). Most reports have been anecdotal. It is the legs or struts of the devices which are usually responsible. However, they may also penetrate adjacent structures such as the aorta, the ureter, or a vertebral body. This process appears to be slowly progressive over a period of months. A protective fibrous tissue sheath develops over the tips of the legs and hooks. Penetration of the IVC usually is not associated with symptoms and consequently requires no treatment.

• Fracture of the Filter

Fracture of vena cava filters has been encountered as the result of direct trauma to the abdomen, *e.g.*, "the quad cough," a respiratory therapy technique used to assist quadriplegic patients to cough up secretions. It also has occurred as a metal fatigue phenomenon when perforation exists and the tip of a filter leg becomes locked into a vertebral body or adjacent immobile tissue. Respiratory motion may then cause repeated unanticipated flexion of the filter leg. Other possible mechanisms include metal corrosion and weld failure. The fracture fragments may migrate locally or distally. This complication usually is asymptomatic and requires no treatment. It may occur as

12

COOKFOIA 000207

an early or late complication, within months or years of the filter placement.

## C.   Mechanisms and Procedures to Control the Risks

The mechanisms and recommended procedures for the SNF in controlling the risks described above are identified in this section.

| Risks | Recommended control |
|---|---|
| Inability to insert or advance the introducer sheath into the IVC | The device's smaller and more flexible sheath and instructions for use |
| Local hemorrhage or hematoma formation | The device's smaller sheath |
| Local Thrombosis | The device's smaller sheath |
| Traumatic A-V fistula | Instructions for Use |
| Air embolism | Instructions for Use |
| False aneurysm | None |
| Infection | Validation of Device Sterilization |
| Misplacement - wrong vein | Instructions For Use |
| Perforation of the femoral or iliac veins or IVC by a filter | Instructions For Use |
| Failure to expand fully | Instructions For Use |
| Embolization of filter | Instructions For Use |
| Tenting of filter | Instructions For Use |
| Asymmetrical opening of filter legs | Instructions For Use |
| Recurrent pulmonary embolism | Instructions For Use |
| Filter occlusion | Instructions For Use |
| Local filter migration | Instructions For Use |
| Perforation of the IVC wall/ Pericaval hemorrhage | Instructions For Use |
| Fracture of the filter | Compliance with GMPs |
| Misplacement - too high/low | Instructions For Use |
| Incomplete separation of feet from pusher cap | Compliance with GMPs |

The SNF and SNF/SL Systems have been designed to reduce certain risks of vena cava filters.  In addition, compliance with good manufacturing

13

practices ("GMPs") reduce some of those risks by ensuring that the device is not defective. Their instructions for use also contain directions for the proper use of the device to minimize other risks.

Moreover, the labeling of the SNF System and the SNF/SL System contain contraindications, warnings, and precautions which also are intended to reduce certain risks. The following contraindications, warnings, and precautions appear in the labeling of the SNF and SNF/SL Systems:

Use of the Simon Nitinol Filter is contraindicated in:

- Early pregnancy when fluoroscopy may endanger the fetus

- Patients with vena cava diameters > 28mm

- Patients with vena cava diameters > 24mm, if surgery requiring general anesthesia is scheduled within two weeks

- Patients at risk of septic embolism.

The following caution statements have been developed:

- If resistance is encountered during a femoral insertion procedure, withdraw the guidewire and check vein patency fluoroscopically with a small injection of contrast medium. If a large thrombus is demonstrated, remove the venipuncture needle and try the vein on the opposite side. A small thrombus may be bypassed by the guidewire and introducer. If both femoral approaches are obstructed, the operator may switch to the jugular or antecubital approach using the SNF Jugular/Subclavian or Antecubital System. 4/

---

4/    The caution will be revised to include the option of subclavian delivery upon clearance of the 510(k) notice for that modification to the SNF System. Likewise, the caution in the labeling of the SNF/SL System will be revised to include the option of subclavian and antecubital delivery upon clearance of the 510(k) notice for those modifications.

14

- Do not deliver the filter by pushing it beyond the end of the introducer. Instead, unsheath the stationary filter by holding the pusher wire and withdrawing the introducer as described in the Directions For Use.

- The introducer sheath has two radiopaque markers. The outside distance of the markers on the introducer catheter serves as the "target" location to position the filter just prior to unsheathing and deployment. 5/

- The introducer catheter hub has a special internal design. Care should be taken to make connections firmly, but without excessive force that may cause hub breakage.

- Saline solution must be infused during the delivery of the Simon Nitinol Filter through the 7 French introducer catheter. Cold saline assists in making the nitinol material soft and malleable. The use of cold saline solution is however optional, based on the operator's preference. However, room temperature saline is required to assist filter delivery and maintain catheter patency.

- With the filter positioned between the radiopaque markers of introducer catheter, the tapered segment of the pusher wire handle will be positioned close to the touhy-borst cap of the Y-adapter.

- The dome of the filter will normally descend 1-2 cm due to shortening when the shape recovery occurs so that its tip will be lower than its actual position in the introducer before unsheathing. If the vena cava is too small to accommodate the fully centered filter dome, the dome may tilt toward the vena cava wall. If

---

5/     Upon clearance of the 510(k) notice for modifications to these devices, this statement will be revised to reflect the presence of one radiopaque marker on certain models of both devices or deleted from models with no radiopaque markers.

15

very small, the filter may assume a spindle or cone configuration. These variations are functionally effective in undersized vena cavas.

- MRI compatibility: The filter is MRI-safe and neither interferes with nor is affected by the operations of an MRI device.

- Federal law (USA) restricts this device to sale by or on the order of a physician.

**D.   Bibliography**

A bibliography is provided in **Attachment 1.** For convenience, it is divided into the following sections:

I.   **PULMONARY EMBOLISM**

II.   **VENA CAVA INTERRUPTION**

    A.   **Surgical**

    B.   **Transvenous Devices**

       1.   Greenfield Filter

       2.   Nitinol Filter

       3.   Other Filters

    C.   **General**

III.   **NITINOL MATERIAL**

    A.   **Physical Properties**

    B.   **Biocompatibility**

The cites within each category are in alphabetical order.

**III.   RECLASSIFICATION RECOMMENDATION**

Intravascular cardiovascular filters are classified as class III devices under 21 C.F.R. § 870.3375. NMT recommends that FDA reclassify intravascular

16

cardiovascular filters, including the SNF System and the SNF/SL Systems for femoral, jugular, antecubital, and subclavian delivery from class III to class II (special controls) for the reasons identified in the next section.

## IV.   SUMMARY OF REASONS FOR RECOMMENDATION

### A.   Explanation of Why SNF and SNF/SL Systems Meet the Statutory Criteria for Reclassification

The SNF and SNF/SL Systems meet the criteria set forth in section 513(a)(1)(B),(e)(2), and (f)(2)(C)(i) of the Federal Food, Drug, and Cosmetic Act ("FDC Act") for the reclassification of an implantable device from class III to class II.  First, classification of implantable SNF intravascular cardiovascular filters as class III devices is not necessary to provide reasonable assurance of their safety and effectiveness.  The long history of safe use of implantable vena cava filters, including the SNF filter, as well as the clinical data summarized in this document provide reasonable assurance of the safety and effectiveness of these devices.  FDA's review and approval of a premarket approval ("PMA") application for such devices is not necessary for the agency to have reasonable assurance of their safety and effectiveness.

Second, special controls, such as patient registries and the development and dissemination of guidelines (including guidelines for the submission of certain clinical data in the premarket notification submissions), and other appropriate actions FDA deems necessary to provide a reasonable assurance of the safety and effectiveness of intravascular cardiovascular filters would provide such assurance.  The long history of safe and effective use of the intravascular cardiovascular filters and the clinical data summarized in this document provide reasonable assurance to FDA regarding the safety and effectiveness of such devices.  Special controls, such as patient registries, would provide FDA with additional information regarding the use of intravascular cardiovascular filters in clinical practice and would allow the agency to track the filters if problems with them occur.  Thus, special controls would provide the agency with additional assurance regarding the safety and effectiveness of these devices.

Third, there is sufficient information to establish special controls to provide reasonable assurance of the safety and effectiveness of the devices.  The long history of safe and effective use of implantable vena cava filters, including the SNF, and the clinical data regarding the use of such filters summarized in this document, reveal the benefits and risks associated with these devices.  Thus, they provide sufficient information for FDA to establish special controls for implantable vena cava filters.  For example, the Percutaneous Transluminal Coronary Angioplasty Catheter System Testing Guidance, which is, in part, applicable to the SNF and SNF/SL Systems, has been developed.

17

Fourth, general controls by themselves are probably insufficient to provide reasonable assurance of the safety and effectiveness of the device, thus precluding reclassification of the SNF and SNF/SL systems to class I. Intravascular cardiovascular filters are permanent implants that are intended to be used to prevent the migration of pulmonary embolisms into the pulmonary arteries, which can be life-threatening. Special controls that are designed to address the risks posed specifically by intravascular cardiovascular filters would supplement the general controls pertaining to adulteration, misbranding, registration, notification, repair, replacement, and refund, device records, and device reports that are applicable to all devices. This combination would provide FDA with additional methods of ensuring the safety and effectiveness of such devices. Therefore, NMT recommends that FDA reclassify implantable vena cava filters, including the SNF and SNF/SL System from class III to class II and establish the special controls identified below.

## B.     Special Controls

NTM recommends that FDA implement only the following special controls in conjunction with the reclassification of intravascular cardiovascular filters: patient registries and guidelines regarding the submission of 510(k) notices for such devices. Those special controls would be adequate to provide FDA with reasonable assurance of the safety and effectiveness of intravascular cardiovascular filters, including the SNF and SNF/SL Systems.

## V.     SUMMARY OF SCIENTIFIC EVIDENCE

NMT recommends that intravascular cardiovascular filters generally and the SNF System and SNF/SL System specifically, be reclassified as class II devices based on the following preclinical and clinical data.

## A.     Preclinical Studies

Animal studies have been performed to demonstrate the safety and effectiveness of nitinol for implanted devices.

Studies performed in dogs showed formation of a cellular fibrous capsule around nitinol plates after three months, with decreasing cellularity at 12 and 17 months. There were no adverse tissue reactions, and histological analysis of implant sites yielded no significant differences between animals receiving nitinol implants and control animal who received commercially marketed plates of CO-CR alloy. Neutron activation analysis showed no metallic contamination in the organs due to the implant. (Castleman, 1976).

18

Implants in the rat femur and subcutaneous tissues for up to 10 months showed no adverse local tissue reaction and no corrosion of the implants. New bone formation occurred at the implant site, and there was no bone resorption or rejection changes. Rabbits implanted with nitinol disks for three to 360 days showed no inflammatory reaction. (Miao, 1986). A pseudomembrane formed around the implants. A second rabbit implant study in paravertebral tissues also showed no local tissue reaction. (Xufeng, 1986).

In another study, 36 dogs were implanted with endovascular spiral wire prostheses constructed of nitinol. The prosthesis was implanted in the aorta and major arteries via an angiographic catheter. Fourteen month follow-up demonstrated a good and prolonged permeability of the nitinol prosthesis. Morphological investigation showed that the endovascular prosthesis was separated in a ring-like fashion by a fine layer of connective tissue and was lined with a layer of epithelial cells. (Rabkin, 1984).

Cragg et al. developed a technique for percutaneous arterial grafting using coils of nitinol passed via a catheter into the iliac artery or abdominal aorta of nine dogs. Patency was demonstrated in all but one graft at 15 weeks. (Cragg, 1984). The same team developed and tested a percutaneous vena cava filter in 11 dogs. Nitinol wire spirals were straightened and passed through an 8 French teflon catheter into the IVC, where the spirals resumed their original shape on exposure to body temperature. (Cragg, 1983). They also described the nonsurgical placement of an arterial pseudoprosthesis passed into the aorta of dogs via catheter. Follow-up aortograms demonstrated long term patency with minimal thrombus formation.

Dotter et al. placed expandable nitinol coil stents via percutaneous catheter in dogs for the restoration and maintenance of patency in the lumina of blood vessels and biliary ducts. (Dotter, 1983). Simon et al. used a nitinol vena cava filter to capture experimental emboli in dogs. A large bore catheter was used to introduce thromboemboli into the femoral vein. (Simon, 1977).

In addition, preclinical studies of the Simon Nitinol Filter have been performed at Beth Israel Hospital in Boston. In one study, twenty-seven devices were placed in the venae cavas of 16 dogs and one sheep. They were examined angiographically or by autopsy after periods of from one week to four years to determine the effects of filter shape, wire surface finish, and wire cleaning procedure. All eighteen cleaned wire filters remained patent by venography, although some showed small venographic filling defects caused by adherent organized thrombi. Filters in larger veins tended to have less thrombus. As stated previously, two filters implanted for four years showed no appreciable weight loss due to corrosion, and histological study showed a thin endothelialization of wires in contact with the vein wall without adverse tissue reaction. (Prince, 1988).

19

These findings were substantiated by subsequent unpublished studies of 18 sheep and one dog, with the same favorable outcome.  Prince et al., 1988 also conducted in vitro tests of human platelet adhesion and plasma coagulation effects of nitinol wire in human blood.  The nitinol wire was found to be comparable to the medical-grade stainless steel used in other vena cava filters.  (Prince, 1988).

The preclinical data show that the materials used in the Simon Nitinol Filter are biocompatible and safe for long term implantation in the vascular system.  They also show that the filter is effective at filtering clots from the bloodstream.

## B.    Clinical Studies

Nitinol has been used extensively in humans in the field of dentistry and orthodontics.  The alloy lends itself to shaping into various configurations, making it a natural for orthodontic appliances, such as braces, archwires, and edgewire brackets.  The physical properties of nitinol wire have been examined for such uses, and nitinol has been found comparable to stainless steel and eligiloy. (Ingram; Hazel, 1984).  A clinical study was conducted in which the safety and efficacy of the SNF was compared to the safety and efficacy of predicate devices, based on historical studies.  Foreign clinical data regarding the use of nitinol implants are also summarized below in section B.3.

### 1.    Historical Controls

The following 15 studies were selected as historical controls after consultation with FDA during the investigational device exemption (IDE) phase because the patient population has been adequately characterized, the indications for use are the same as or similar to those proposed for the SNF, and the follow-up reporting is relatively complete.  6/  Clinical data regarding the SNF was compared to the clinical data derived from these studies in order to evaluate the safety and efficacy of the SNF relative to the predicate devices.  The design of the study was reviewed and approved by FDA as part of the IDE considerations.

#### a.    Reference Study #1

Ferris et al., 1993 reported on the placement of seven differently designed filters in 320 patients at two medical centers from 1985 to 1992.  The indications for filter placement included contraindication to anticoagulation in patients with known PE or DVT (250), failure or complications with anticoagulation (44), and prophylaxis (30).

---

6/    Some of the historical control studies to which the SNF clinical data is compared were added subsequent to FDA's approval of the IDE application as they were published after that date.

20

Follow-up was available for 277 patients with 43 patients lost-to-follow-up. The follow-up period ranged from one to 2,392 days, with an average of 404 days. Follow-up was by radiologic or pathologic methods (227 patients with 230 filters), and clinical (50 patients with 50 filters).

At IVC filter imaging studies, 26 of 137 filters demonstrated thrombus; 12 of 132 filters had delayed penetration through the IVC wall, 13 of 230 filters migrated, and five of 230 filters had a fractured strut or leg. DVT at the insertion site or lower extremity was noted in 26 of 117 filter placements. Clinical suspicion of complications included PE in four patients, IVC thrombus in 14 patients, and lower extremity DVT in 10 patients. A breakdown of complications by filter type is as follows:

| Complication | Birds Nest - I (n=32) | Birds Nest -II (n=46) | Am-platz (n=30) | Nitinol (n=21) | Vena Tech (n=113) | Titanium Green-field (n=10) | Titanium Green-field Modified Hook Design (n=72) | Total* (n=324) |
|---|---|---|---|---|---|---|---|---|
| PE Deaths | 1 | 1 | 2 | 1 | 1 | 0 | 2 | 8 |
| Recurrent PE | 2 | 1 | 3 | 1 | 1 | 1 | 2 | 11 |
| IVC Thrombus | 4/23 | 5/24 | 5/22 | 3/12 | 7/28 | 0/6 | 2/22 | 26/137 |
| IVC Penetration | 1/22 | 1/16 | 3/26 | 4/12 | 0/28 | 3/6 | 0/22 | 12/132 |
| Migration | 3/26 | 0/32 | 0/27 | 2/17 | 2/72 | 3/6 | 3/50 | 12/230 |
| Fracture | 1/26 | 1/32 | 0/27 | 2/17 | 1/72 | 0/6 | 0/50 | 13/230 |
| New DVT | 4/27 | 3/15 | 4/21 | 1/9 | 8/25 | 1/6 | 5/14 | 26/117 |

* Number of filters studied for complications in 320 patients. Four patients received two filters.
Numerators represent number of complications. Denominator represents number of studies performed to evaluate complications.

Overall, 120 (43%) of the patients died during the follow-up period. Post placement PE were related to cause of death in eight patients.

**b.      Reference Study #2**
Simon et al. studied the placement of the Simon Nitinol filter in 44 patients at the Beth Israel and Massachusetts General Hospitals from February 1988 through November 1988. Additional major complication information on the Nitinol filter is presented in this article from 103 patients at 17 institutions. The clinical indications for filter placement were those generally accepted for IVC filter

21

placement.  The major indications for placement were PE or extensive DVT when anticoagulant or thrombolytic therapy was contraindicated, resulted in complications, or failed to prevent recurrent embolism.  The filter was successfully placed in all patients via the femoral or jugular approach.  The trial was still ongoing at the time of publication and thus, the data are incomplete.

Of the 103 patients treated, there were no filter migrations and no deaths related to the filter.  There was one unconfirmed case of symptomatic RPE, and two patients had confirmed asymptomatic PE.  There were seven cases of confirmed symptomatic IVC occlusion and two possible IVC occlusions.

Of the 44 patients studied at the Beth Israel and Massachusetts General Hospitals, five patients experienced a thrombus at the entry site, 24 had some tilting of the dome, one had a spindle formation, and six had leg crossing.  Additionally, there were five confirmed and 11 suspected cases of IVC thrombus in which the IVC was patent, three confirmed and two suspected cases of symptomatic IVC occlusion, and three confirmed cases of asymptomatic IVC occlusion.  One patient was suspected of having a symptomatic RPE and one patient was confirmed to have had an asymptomatic RPE.  Seven deaths occurred, none of which were related to the filter.

### c.    Reference Study #3

Taylor et al., 1991 reported on the placement of the Vena Tech filter in 81 patients at one institution from April 1989 to April 1990.  The indications for filter placement included:  patients with diagnosed PE (19), patients with high probability of PE (17), diagnosed and high probability of PE (6), presence of DVT (20), and prophylactic placement (19).  Femoral access was used in 78 cases and jugular access in three cases.

The follow-up period ranged from five to 568 days, with an average of 241 days follow-up.  Follow-up was obtained using radiographs, vena cavograms, duplex sonography, CT and/or venography, direct patient interviews, and review of medical records.  Long term follow-up included postoperative and late mortality and complication rates for all patients.

Ninety-five percent (77) of patients in whom filter placement was attempted had successful placements.  Four patients had tilted filters, one of which also migrated.  There were no clinically apparent complications related to the percutaneous access.  One of the three jugular delivered filters did not open completely.

Long term follow-up revealed:  five tilted filters, 16 migrated filters, and one filter with a fracture leg.  Information was available for review on 53 patients for PE via physician referral letters, chart review, and direct patient interviews.  Two patients were found to have a PE.  IVC patency information was available in 39 patients with follow-up ranging from 35 to 568 days (average of 283

22

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000217

days).  Thirty-six patients were found to have a patent IVC and three were found to have a thrombus.  In all, three patients with thrombus, a decreased filter span was observed in a follow-up radiograph.  On duplex sonography, one patient was found to have an occluded IVC and a small IVC flow in the other two.

Two patients were reported to have expired, one due to right heart failure secondary to pulmonary hypertension and pulmonary fibrosis and the other patient was found to have a PE at autopsy.

### d.    Reference Study #4

Greenfield et al., 1991 reported on the placement of the Modified Hook-Titanium Greenfield filter in 186 patients at 10 medical centers from 1989 to 1990.  Contraindication to anticoagulation was the most frequent indication (75%) for use.  Successful placement occurred in 181 (97%); placement of the remainder was precluded by unfavorable anatomy.  All but two were placed percutaneously, predominantly via the right femoral vein (70%).  Initial incomplete opening was seen in four patients which was corrected by guide wire manipulation.  Insertion site hematoma occurred in one patient, and apical penetration of the vena cava occurred in another patient.

Follow-up was performed at 30 days, at which time 35 deaths were noted.  RPE was suspected in six patients and two out of three deaths were confirmed at autopsy.  Filter movement was seen in 13 patients and increase in base diameter in 17.  CT scanning showed evidence of caval penetration in one patient.  Insertion site thrombosis was seen in four of 46 patients screened.

### e.    Reference Study #5

Greenfield and Proctor, 1995 reported on the long term safety and efficacy of Greenfield filters.  A total of 642 patients were prospectively entered into a filter registry and followed annually at the University of Oklahoma, Medical College of Virginia, University of Michigan Medical Center, and the Veterans Administration ("VA") and community hospitals affiliated with these medical centers from 1972 to 1992.  The indications for filter placement included contraindication to anticoagulation, recurrent embolism despite anticoagulation, prophylaxis, complications of anticoagulants, concurrent catheter embolectomy, or previous device failure.  Placement was by operative venotomy in 86% of cases and via the jugular vein in 72%.

The mean follow-up was 56.5 months.  Follow-up was by physical exam, including abdominal radiographs and diagnostic testing to determine the status of thromboembolic disease, filter stability, and the patency of extremity veins and the vena cava.

Ninety-eight percent of patients in whom filter placement was attempted had successful placements.  Misplacements occurred in 3% of patients.  Tilting and migration occurred in 10 patients (5%) and required additional filter

23

placement in two patients.  Puncture site complications were reported for thrombosis (<7%), hematoma (1%), and air embolism (2%).  In 2% of the cases, an initial approach was abandoned and a second attempt was successfully made.

Long term complications included IVC penetration (0.2%), caval occlusion (4%), leg edema (45%), and ulceration (5%).  RPE was suspected or confirmed in 22 (4%) of the cases.  Three cases of RPE were confirmed at post mortem examination, three by pulmonary angiogram, six had new defects on V/Q scan and 10 reported new clinical symptoms of pulmonary embolism.

Overall, 280 of the 642 patients died during the follow-up period (44%).  The author reported 238 deaths related to coexisting diagnoses but did not specify how many of the remaining 42 deaths were related to a pulmonary embolism.

### f.    Reference Study #6

Rose et al., 1987 studied the placement of the Kimray-Greenfield ("K-G") filter in 121 patients at the Ohio State University Hospitals from October 1985 through May 1987.  The K-G filter was placed in patients for whom anticoagulation was contraindicated or who had complications resulting from anticoagulation, patients with recurrent thromboembolism despite anticoagulation, and patients requiring the filter for prophylactic purposes.  In 109 patients, the catheter was placed in the femoral vein, and these are the patients for whom follow-up was reported.  In 12 patients on whom the jugular approach was used, follow-up was not reported although, in some instances, complications were mentioned in the published report.

Radiographs documenting filter migration were obtained and results reported for 53 patients in the study.  Adverse reactions were compiled for 109 study subjects, with the most frequent postinsertion complication being femoral vein thrombosis in 10 patients.

The filters were deemed to be placed successfully in all patients, although in at least one case, the filter was misplaced without adverse effect.  Puncture site complications were reported in 10 patients (9%), while there were 28 reported instances of migration (26 caudal, two cephalic).  Ten cases of thrombophlebitis and three cases of IVC thrombosis were documented.  Two patients experienced significant extraperitoneal hematomas.  Five patients had recurrent pulmonary emboli, which were fatal in three patients.  One patient died of dural sinus thrombosis developed during filter placement.  Mortality unrelated to filter placement was not reported.

### g.    Reference Study #7

Golueke et al., 1988 implanted the Greenfield vena cava filter in 88 patients at Baylor University Medical Center between 1978 and 1985.  The indications for placement were the same as the Rose study.  In 16 patients, the

24

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000219

filter was placed prophylactically before joint replacement. Sixty-five patients were followed up for one to 60 months.

Follow-up in this retrospective study consisted of physical exam, doppler studies of the lower extremities for 45 patients; for those patients suspected of having RPE, additional follow-up evaluation was performed. For the remaining patients, telephone follow-up was utilized. Deaths and complications were reported only for those 65 patients followed up.

The overall success rate for filter placement was 97.8%. The operative mortality rate was 4.6%, but none of the deaths were related to filter placement. In 34 patients for whom abdominal x-rays were obtained, there were no instances of filter migration.

Of the 65 patients for whom long-term follow-up information was available, the mortality rate was 20%. Two patients had nonfatal RPE, one with chest pain and dyspnea. There were three cases of filter occlusion in 40 patients for whom Doppler exams were performed (7.5%). Moderate to severe leg edema occurred in six of 65 patients, while two patients had venous stasis ulceration.

**h.    Reference Study #8**

Carabasi et al., 1987 placed 198 Greenfield filters in 193 patients at Thomas Jefferson University Hospital, between January 1980 and August 1986. Two additional patients whose filters were originally placed by other surgeons were also followed in this study. Transjugular placement was used for 159 filters, and the femoral approach was used for the other 41. Indications for placement were not specified, but likely were similar to those in other studies.

The length and details of follow-up for patients involved in this study were not specified. Venography was performed for symptoms of RPE or DVT. Complications and deaths were reported for all patients.

Eighteen patients experienced complications during insertion. In four patients, filter placement was unsuccessful. Filters were misplaced in three patients. Postoperatively, 13 patients had complications, five of them minor. These included retroperitoneal hematoma, caudal migration, and penetration of the vena cava by the prongs of the filter. None of the patients experienced adverse effects as a result of these complications.

The most common complication among the eight patients with major complications was thrombosis of the IVC, which was seen in five patients. Four patients experienced transient swelling in a lower limb, while one patient's leg ultimately was amputated above the knee. Two patients had RPE, one of which was fatal. In the latter case, the filter had migrated caudally, allowing thrombi to embolize to the pulmonary circulation. The final patient with a major complication experienced right leg causalgia, which upon x-ray examination was shown to be

25

caused by a filter prong embedded in a nerve ganglion. Symptoms disappeared with filter removal. The total complication rate in this study was 17.4%.

### i.   Reference Study #9

Kanter and Moser, 1988 presented a retrospective review of 463 patients from 10 different studies utilizing the Greenfield filter. Specifics of the patient populations and length of follow-up were not given in this report. The indications for insertion in 450 patients included: contraindication to anticoagulation (154 patients), failure of anticoagulation (130 patients), complications of anticoagulation (66 patients), prophylactic placement (72 patients), and other indications (30 patients). The review compiled certain postoperative complications for some or all of the patients involved in the studies. The long-term mortality rate, however, was not specified.

Of the reported 463 attempted filter placements, 12 were unsuccessful. Twenty-three filters were misplaced, while 33 were tilted. Wound hematoma were noted in nine patients and air emboli in three. Two episodes of vagal compression were noted in one study and there was a single case reported of clot formation within the carrier assembly. A single incidence of caval penetration by the filter limbs also was reported. Early caval occlusion occurred in two patients and one patient died of RPE following filter misplacement. Thirty-day mortality varied from zero to 14 percent.

Additional data on complications were reported for various subsets of patients. Seven patients of 289 experienced pulmonary emboli after filter placement; the number of these patients taking anticoagulants as well is not reported. Eight cases of caval thrombosis, all of which occurred within one month of filter placement, were reported out of 257 patients. Possible filter migration was reported in 27 of the 258 patients in which the filters were implanted.

### j.   Reference Study #10

Kantor et al., 1987 reported the percutaneous placement of 26 Kimray-Greenfield filters via the femoral approach. The indications for placement were contraindication to anticoagulation in 12 patients and RPE despite anticoagulation in five patients.

Follow-up via venogram was conducted for 17 patients over a five to eight day period. Short term mortality and complications were reported for the 17 patients followed-up.

Twenty-four of the 26 filter placements attempted were successful. Of the 17 patients followed-up, seven demonstrated isolated thrombosis of the common femoral vein or external iliac vein. Three patients were asymptomatic, two had mild swelling of the thigh, and the remaining two had marked swelling of the leg. In one of the latter two patients, swelling resolved spontaneously, while the other patient died two weeks after filter insertion from complications of malignancy.

26

COOKFOIA 000221

### k.      Reference Study #11

Mohan et al., 1995 reviewed the medical records of 196 patients implanted with 199 vena cava filters between January 1987 and June 1993 at the University of Iowa Hospitals and Clinics and the affiliated VA Medical Center. The indications for filter placement included: contraindication to anticoagulation (92), recurrent embolism despite anticoagulation (26), prophylaxis (31), complications of anticoagulants (44), adjunct to pulmonary embolectomy (1), noncompliance (1), hemodynamically unstable patient (1), and prior vena cava filter ("VCF") complication (3).

Filters included the Steel Greenfield filter (SGF), Titanium Greenfield filter-Modified Hook (TGF-MH), Vena Tech filter (VTF), Bird's Nest filter (BNF), and Simon Nitinol filter (SNF). Jugular delivery was used for 51 of the 160 filters placed percutaneously, femoral delivery was used for 109 filters.

The mean follow-up period was 12 months (range 0 to 87 months). All relevant diagnostic studies related to the thromboembolic episodes were evaluated as well as procedure records, clinic notes, outside medical records, and telephone interviews with the patients, family members, or the local physician.

A breakdown of complications by filter type is as follows:

| Complication | SGF (n=68) | TGF-MH (n=28) | VTF (n=51) | BNF (n=48) | SNF (n=4) | TOTAL (n=199) |
|---|---|---|---|---|---|---|
| PE Deaths | 1 | 1 | 0 | 1 | 0 | 3 |
| Recurrent PE | 3 | 1 | 1 | 2 | 0 | 7 |
| IVC Thrombus | 0 | 1 | 2 | 8 | 0 | 11 |
| Misplacement | 1 | 0 | 0 | 3 | 0 | 4 |
| Migration | 0 | 0 | 0 | 1 | 0 | 1 |

Ninety-three patients died during the follow-up period. Ninety-two percent of the deaths were due to the underlying medical condition. The remaining 8% of deaths were due to VCF related complications which may have included a pulmonary embolus or IVC thrombosis.

### l.      Reference Study #12

Roehm et al., 1988 reported on the placement of the Cook Bird's Nest Filter (BNF) in 568 patients at five institutions during investigational studies of the device from 1982 to 1987. Indications for placement included anticoagulant contraindications or complications in 407 patients, recurrent embolism despite anticoagulation in 68 patients, and prophylactic placement in 74 patients. The

27

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000222

transfemoral approach was used in 513 cases.  The transjugular approach was used in 28 cases.  The transsubclavian approach was used in six patients and intraoperatively in one patient.

Four hundred and forty patients of 481 in whom the device had been placed for six months or more were followed-up.  For the most part, follow-up was conducted by telephone, with random follow-up by cavography of the IVC, CT scanning, or ultrasonography.  The long-term mortality rate was not reported, but some information on follow-up complications was provided.

Recurrent pulmonary thromboembolism ("RPTE") was suspected in a number of patients, but was confirmed in only two.  One patient died of RPTE.  IVC thrombosis was confirmed in seven patients.  Five cases of migration, one fatal, were reported.  Four filters migrated to the right atrium.  One filter migrated to the pulmonary artery.  Modification of the struts apparently eliminated migration in the last 147 patients implanted with the modified filter.

**m.  Reference Study #13**

Ricco et al., 1988 reported on the placement of the LGM filters (apparently identical to the Vena Tech filter) in 100 patients from September 1985 to December 1986.  The indications for placement included severe PE with lower limb thrombosis, PE with contraindication to anticoagulation, PE with iliocaval thrombosis, RPE, iliocaval thrombosis, cor pulmonale with lower limb venous thrombosis, and "other" conditions.  Only the jugular approach was used.

Ninety patients were followed-up for one year or more.  Cavograms were obtained for these 90 patients.  Postoperative deaths and complications were reported for the one year period.

Ninety-eight of the 100 attempted filter placements were successful.  Eighty-two of the 98 filters were correctly positioned, eight filters were significantly tilted, five filters did not open completely.  Two patients experienced RPE; in both, the filter was either misplaced, partially unopened, or both.  Twenty-nine patients had lower leg edema, seven with caval thrombosis, and the remaining 22 with iliofemoral or femoropopliteal thrombosis.

Cavograms obtained for 90 patients showed that seven filters were occluded, three due to placement problems and four due to thrombi embolized to the filter.  Thirteen filters migrated, nine cephalic and four caudally.

**n.  Reference Study #14**

Greenfield et al., 1977 reported on the insertion of 85 Greenfield filters in 76 patients at two institutions over a four year period.  Indications were contraindication or complications from anticoagulation, recurrent embolism, prophylaxis, and as a follow-up to pulmonary embolectomy.  Information on coexisting disorders was provided.

28

\\\DC - 57841/1 - 0509549.01

COOKFOIA 000223

Follow-up ranged from six to 53 months, the majority were conducted by personal examination and the remainder were by telephone contact. Venograms were obtained in a number of the cases at one, six, and 12 months. Postoperative and long-term mortality were reported and complications were given for all patients.

Misplacement occurred via the femoral and jugular approaches in 18 patients. In some patients, an additional filter was placed to correct the original misplacement, although operative removal was required for an intracardiac filter. Recurrent embolism was documented in one case of misplacement.

Operative site complications included: one suspected retroperitoneal hemorrhage, four hematomas, and one late retroperitoneal hemorrhage. Recurrent thrombophlebitis occurred in five patients. Nine patients had significant leg edema. Two patients experienced RPTE. No migration was reported. The mortality rate was 17.1%, but no deaths were reported as being related to the filter.

o.   **Reference Study #15**

Stewart et al., 1982 reported on 12 patients who received Greenfield filters at two institutions. The indications for placement included inability to coagulate or complications from anticoagulation, recurrent embolism, and prophylaxis. The jugular approach was used in 10 patients, while two patients had intraoperative placements through the right atrium.

Follow-up ranged from five weeks to 58 months, with the majority of patients examined by the physician and receiving plain x-ray, noninvasive venous evaluation, and Doppler examination. Postoperative and long-term deaths and complications were reported for all patients except one.

All attempted filter placements were successful, although two patients were required to undergo intraoperative placement of the filter through the right atrium. There were no misplacements, no migrations, and no deaths attributed to the procedure. Five patients died during the course of the study, two of causes unrelated to filter placement, one of a ruptured hematoma 10 days after filter insertion, one of cardiac arrest with a massive embolus lodged in the filter, and one of septic complications after filter placement and renal transplant. Recurrent embolism was demonstrated in one patient and recurrent thrombophlebitis was encountered in two patients. One patient with cardiomyopathy had lower extremity edema.

For convenience, a bibliography of these studies, which are included in the complete bibliography provided in **Attachment 1**, is provided in **Attachment 2**. A copy of each article listed in **Attachment 2** is provided in **Attachment 3**.

29

2.    **Clinical Study Involving the SNF**

The following clinical data was presented in the 510(k) notice for the SNF System that was submitted to FDA on July 24, 1989 (K894703). The data include 206 patients who received the Simon Nitinol Filter from February 1988 to July 24, 1989. The filters were implanted at 23 institutions, and the number of patients reported from each institution ranges from one to 31, with 10 institutions contributing 10 or more patients each.

a.    **STUDY OBJECTIVES**

The objectives of the clinical trial were to:

- Assess clot filtering efficacy of the filter as measured by the lack of recurrent pulmonary embolism

- Assess the ease of filter insertion and placement

- Assess the security of filter anchorage as measured by the lack of filter migration

- Assess the clinical complications of the filter both during the insertion procedure and in the postinsertion period. Complications evaluated included minor complications related to the insertion procedure and occlusion of the filter and major complications such as filter migration and recurrent pulmonary embolism.

b.    **EXPERIMENTAL DESIGN**

This was a multi-center, non-randomized trial, involving approximately 200 patients treated with the Simon Nitinol Filter via either the femoral or jugular route. Patients requiring the placement of a vena cava filter and meeting all of the inclusion criteria and none of the exclusion criteria were asked to participate in the trial. Each patient treated was followed up intraoperatively and at three and six months. The data collected included: preexisting conditions, previous treatment(s), primary and secondary indications, procedural difficulties, laboratory parameters, and device complications. Clinical results were compared to historical control studies to evaluate the substantial equivalence of the Simon Nitinol Filter to predicate devices.

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000225

### c.    METHOD OF DATA COLLECTION AND ANALYSIS

Each investigator was instructed to record all efficacy data, laboratory results, and adverse device effects in the cases report forms provided by the sponsor. Data were collected either through clinical examination or telephone follow-up (if a patient did not return for follow-up).

Data generated during this study were reviewed by a study monitor for completeness and accuracy.

The analysis of patient data consisted of two parts.  First, the data were compared to results of the 15 historical control studies described above to evaluate the safety and efficacy of the SNF compared to the safety and efficacy of other marketed devices.  Second, the data obtained were analyzed to determine if they adequately represented the comparative safety and effectiveness of the device. The analysis of the three and six month data showed that all significant events of occlusion, recurrent pulmonary embolism, major misplacement, or migration had occurred prior to the three month follow-up examination.  Thus, it was evident that three month follow-up data would be sufficient to predict the comparative safety and effectiveness of the SNF.  This evaluation was in accord with observations noted in the literature.  Nevertheless, the data for both the three month and the six month follow-up examinations are included in the study results.

### d.    Inclusion/Exclusion Criteria

Patients were included if they presented with PE or were at risk for PE from DVT and anticoagulation was contraindicated, had proven ineffective in the past, or had produced complications.  In some patients, the SNF was inserted prophylactically prior to major surgery.  Specific inclusion criteria were:

- Male or female patients that were at least 18 years old; and

- Experienced a prior pulmonary embolism and had a clear contraindication to standard anticoagulation treatment;

- Recurrent pulmonary embolism despite anticoagulation treatment;

- Had massive pulmonary embolism requiring treatment with thrombolytic drugs or pulmonary embolectomy;

31

- Were undergoing major surgery with high risk of pulmonary embolism (e.g. hip surgery, major neurological surgery);

- Had deep vein thrombosis involving the pelvic veins or inferior vena cava and were considered at high risk of pulmonary embolism; or

- Had experienced pulmonary embolism and were likely to have recurrences because of chronic predisposing diseases such as congestive heart failure, pulmonary emphysema, paraplegia, chronic or recurrent deep vein thrombosis.

Individuals not meeting the above inclusion criteria were excluded from the study along with:

- Patients with a vena cava > 28mm in diameter as shown by venography;

- Patients with acute submassive pulmonary embolism secondary to a transient problem (i.e. sports injury); and

- Patients prone to leg edema and skin ulcerations.

e.    Patient/Procedure Demographics

There were 206 procedures performed in 97 males and 96 females, the gender of 13 patients was not reported. The mean age at the time of the procedure was 62.7 years. Preexisting conditions for the patients enrolled in the study included many forms of malignancies, vascular disease, major surgery, and other underlying conditions. The indications for filter insertion for the 117 of the 206 patients for whom the indication has been reported are:  contraindication to anticoagulation --98 patients (83.8%), failure of anticoagulation--12 patients (10.2%), severe pulmonary hypertension--three patients (2.6%), surgery--two patients (1.7%), and trauma and prolonged immobilization--one patient each (0.9%).

The delivery route of the filter was reported for 131 of the 206 patients. Femoral delivery was used on 121 patients; jugular deliver was used on 10 patients. As of the compilation of these data, 47 of 206 patients died (22.8%), all but one death was due to causes unrelated to filter placement.

32

COOKFOIA 000227

### f.    Study Results

The rate of successful insertion for the SNF was 100%.  There were six reports (5%) of difficulties with venipuncture, 11 procedures with reported difficulty advancing the device into the IVC (9.2%), and 15 reports of difficulty releasing the device into the IVC (12.5%).  None of these difficulties were significant enough to cause a failure of insertion.

With respect to perforation of the vena cava wall and adjacent structures, there were no reports of penetration.  There were three reports of penetration, defined as encroachment of the filter legs or dome into the vena cava wall far enough to be visualized via venacavogram.  One of these reports was described as "tenting" and another was indicated as being uncertain.

There was one report of major filter misplacement, *i.e.*, the filter is outside the IVC, with the SNF.  This problem did not result in patient safety concerns or in lessening of filter efficacy.

Tilting of the filter was experienced in 39 patients (32.5%).  There were no corresponding adverse effects reported.

Only two instances of migration were noted (0.5%).  In one case the filter was inserted less than two weeks prior to surgery in a patient with a large vena cava.  It is believed that as a result of surgery, the vena cava expanded slightly and the device migrated through the heart to the pulmonary artery.  The patient was asymptomatic and experienced no adverse effects as a result of this migration.  The other patient was also asymptomatic.

There were three reported cases (1.5%) of recurrent pulmonary embolism during the study.  One case was asymptomatic and two were symptomatic; all occurred within approximately one month of filter placement.  The first patient, who had a history of PE, had a filter placed on May 2, 1988 prior to neurosurgery.  On June 3, 1988, the first symptoms of RPE were noted, along with symptomatic occlusion.  One month later, the patient's symptoms were resolving.  The second patient, who had a primary central nervous system malignancy, had fatal symptomatic pulmonary embolism one week after filter placement.  Upon autopsy, it was found that the filter was completely occluded.  The third patient had a filter placed due to DVT.  Although the patient was asymptomatic, pulmonary emboli were discovered during a routine lung scan two weeks after filter placement.  When this patient was followed up two and four months later, no new emboli were found.

Of the 20 patients for whom filter occlusion was reported (two of whom also had recurrent pulmonary embolism), four were asymptomatic and 16 were symptomatic.  Two of the symptomatic patients also had RPE.  The first of these

33

patients had complete occlusion and swelling of both legs. One month later, the swelling in one leg had resolved, while the other leg was phlebitic. The patient refused follow-up and was dropped from the study. The second patient died of RPE. Four other patients with symptomatic occlusion had their symptoms resolved and completed six months of follow-up. Data are not available for six other patients with symptomatic occlusion. Four other patients with symptomatic occlusion died of their underlying disease before completing the study. Of the four patients with asymptomatic occlusion, two completed the six month follow-up, one died of his/her underlying disease, and data are not available for the remaining patient.

There were no malfunctions reported. Due to its design features, neither tilting of the filter within the vena cava nor failure of several filter legs to expand completely constitute malfunctions, since they do not affect filter efficacy.

Three patients of the 206 enrolled were lost-to-follow-up. None of the patients were dropped from the study due to complications or adverse events related to the filter. The remaining 203 patients either completed the study or were still being followed at the time of data analysis.

### g.      Results of Statistical Analysis

Although the study was officially limited to 197 patients, data for an additional patients evaluated under the study protocol have been provided when available.

The data for the SNF shows only one incident of filter migration and three reported cases of recurrent pulmonary embolism (two symptomatic and one asymptomatic). The rate of migration is 0.5% and the rate of recurrent pulmonary embolism is 1.5%. These rates compare favorably to the results reported for the other filters for which data was available, *i.e.*, the historical controls.

Of the 197 patients evaluated in this analysis, 46 had 6 month follow-up visits. Thirty-one of these also had a three month follow-up examination; the remaining 15 missed the three month follow-up, but reported for the six month evaluation. Eleven patients completed three month follow-up but were not yet due for the six month evaluation. Three patients were lost-to-follow-up or refused follow-up.

Tables summarizing the SNF study results and comparing them to the results of studies regarding the historical controls are provided in **Attachment 4**. Table 1 shows the observed complication rates for the SNF for major filter misplacements, migrations, occlusions, and recurrent pulmonary embolism. Table 1 breaks down the rates of major complications to show the overall rates, the rates for the 12 patients with three month, but no six month follow-up (including one patient who died between the three and six month visits), and the rates for all 46 patients

34

\\\DC - 57841/1 - 0309549.01

COOKFOIA 000229

with six month follow-up. For the 31 patients with both three and six month follow-up data, the rates are reported separately for the first three months and the second three months. Comparison of the results shows that all significant events occurred prior to the three month follow-up exam for all groups of patients. A statistical analysis of the complication rates comparing those patients with only three month follow-up to those with six month follow-up was not significant for any parameter. See Table 3.

Table 2 shows the same rates for the historical controls. The data in these tables were analyzed statistically to compare the rates of the reported complications between the SNF and the predicate devices. A comparison of 95% confidence intervals disclosed that the confidence intervals for complications observed in the study of the SNF overlapped those of the predicate devices. This demonstrates that the SNF is equivalent to predicate filters in the measured parameters of safety and effectiveness. See Table 4.

**h.     Conclusion: Reclassification to Class II is Appropriate**

The clinical data demonstrate that the Simon Nitinol Filter is as safe and effective as the predicate devices for its intended use: interrupting the migration of emboli through the vena cava. In addition, major complications will be apparent by the time of the three month follow-up visit. Moreover, the historical control data and the SNF data, coupled with the long safe history of use of the devices warrant down classification to class II. If FDA were to require a patient registry as well as adherence to a clinical data guidance as special controls, class II down classification can provide a reasonable assurance of safety and efficacy of these devices. Their safety and efficacy profile is well defined. It would be a waste of FDA and industry resources to require PMA applications for this class of devices.

**3.     Foreign Clinical Data**

Substantial human experience with nitinol implants in China was reported at the International Symposium on Shape Memory Alloys held in Guilin, China September 6-9, 1986. Dai reported using nitinol memory staples for repair of fractures in 58 patients. No tissue reactions, complications, or displacements were observed in three to 48 months follow-up, and there was an apparent reduction in healing time. (Dai, 1986). In another study, 51 patients had extensive bone and joint surgery with nitinol staples in the ankle, foot, wrist, and hand. Eight patients had staples removed after three to 26 months, providing an opportunity for histologic study. They displayed local fibrous hyperplasia without foreign body reaction. (Yang, 1986).

Sixteen patients were implanted with a cup-shaped femoral head prosthesis. Follow-up ranged from six to 48 months, with no evidence of loosening

35

COOKFOIA 000230

or femoral neck fracture by x-ray or clinical observation.  However, one device developed a crack and was replaced.  There was no adverse reaction to the nitinol. (Dai, 1986).

Thirty-two patients were implanted with nitinol scoliosis correction rods 7 to 8 mm in diameter and up to 28 cm long.  There were no adverse local or systemic effects and good clinical results were obtained.  The length of follow-up was not specified.  (Jinfang, 1986).

Thirty-two patients were implanted with 8 mm wide, 8 mm thick, and 15 mm long U-shaped nitinol prostheses that were inserted into a cervical intervertebral disc.  Good clinical results were obtained and no abnormal tissue reaction was observed in one to four years follow-up.  (Dinglin, 1986).

Twenty-four patients implanted with nitinol cranial plates and rivets experienced no local or systematic effects and no displacement.  (Miao, 1986).

Fallopian tube clips 1 mm thick, 2 mm wide, and 15 mm long were used to sterilize 325 patients between 1981 and 1985.  There were no reports of pain, infection, or other adverse effect.  (Pei, 1986).

Kuo, et al., discuss the use of nitinol as a biomedical material since 1981 in China.  The authors summarize 265 cases, including 71 involving orthopedic surgery.  They report good biocompatibility results.  (Kuo, 1989).

The foreign clinical data is consistent with U.S. clinical data regarding the safety and effectiveness of nitinol in long-term implants.

36

COOKFOIA 000231