UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

_____

IN RE: COOK MEDICAL, INC. IVC FILTERS
MARKETING, SALES PRACTICES AND          Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS   LIABILITY LITIGATION              MDL No. 2570

_____

This Document Relates to Plaintiff
       Arthur Gage
       Civil Case No. 1:14-cv-01875- TWP-MJD

_____

### COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

The Cook Defendants[1] respectfully ask this Court to grant their motion for summary

judgment as to all of Plaintiff Arthur Gage's claims against them.   Plaintiff asserts claims based

on strict-liability failure to warn, negligent design, manufacturing, and failure to warn, and

breach of express and implied warranty, and seeks compensatory and punitive damages.  *See*

Compl., Case 1:14-cv-01875-TWP-MJD Dkt. 1.[2]

### SUMMARY OF ARGUMENT

Cook is entitled to summary judgment as to Plaintiff's claims for multiple reasons.  At

the threshold, Plaintiff's claims fail because he failed to commence this action within Illinois's

two-year statute of limitation.  In April 2011, Plaintiff both knew that he had suffered an injury

and believed that his Cook Tulip IVC filter had wrongfully caused that injury, yet he did not

commence an action against Cook until three and a half years later.

_____

[1] The Cook Defendants are Cook Incorporated, Cook Medical LLC f/k/a Cook Medical
Incorporated, and William Cook Europe APS (collectively "Cook Defendants" or "Cook").
[2] Unlike most plaintiffs in the MDL, Plaintiff Gage never filed a short-form complaint
incorporating the allegations of the Master Complaint, *see* Case 1:14-ml-02570-RLY-TAB Dkt.
213.  Gage's original complaint, filed in this district on November 11, 2014, is thus the operative
pleading.  Notably, the Complaint does not assert a claim for strict-liability design defect.

1

On the merits, Plaintiff cannot establish either liability or causation.  As detailed in Cook's separate Daubert motions, Plaintiff's experts lack either the qualifications or the reliable methodologies required to opine on issues of design defect, failure to warn, and causation.  The Court should exclude their opinions, and, because Plaintiff's claims cannot survive without those opinions, Cook is entitled to summary judgment.

Even if the Court were to admit the testimony of Plaintiff's experts, summary judgment would still be required because the experts' opinions do not create genuine issues of material fact on either liability or causation elements of Plaintiff's design-based, manufacturing-based, and warning-based claims.  On design, neither of the experts Plaintiff has designated actually identifies *any* defect in the design of the Cook Tulip IVC filter.  Rather, the experts opine that all filters are bad, assert that filters offer no benefits to patients, and complain that filters have a "tendency" to perforate.  None of these state a design defect.  On the element of causation, Plaintiff's only designated expert cannot link Plaintiff's injuries to any design defect in the Tulip IVC filter.  He instead circularly blames Plaintiff's perforation on the filters' tendency to perforate and on the Plaintiff's treating physician's initial decision to use the filter.

On manufacturing, Plaintiff offers no expert testimony of any kind.

As to Plaintiff's failure-to-warn claims, Plaintiff has no expert who opines that Cook should have provided additional information in the Cook Tulip Instructions for Use (IFU) about any complication that Plaintiff actually experienced or that Cook violated any duty of care in omitting such information.  On the element of causation, Plaintiff's claim is hopeless.  The undisputed facts establish that his treating physician did not read or rely on the warnings in the Tulip IFU, already knew about all of the complications Plaintiff claims at the time he placed the filter, and would still have placed the filter even today under the same circumstances.

US.109782865.34

Plaintiff's express warranty claim fails because he has failed to adequately identify any express warranty, and his implied warranty claim fails based on his failure to present expert evidence on design defect, failure to warn, or causation, as discussed above.

Plaintiff's claim for punitive damages also fails as a matter of law, both because Plaintiff's compensatory claims fail and because Plaintiff cannot produce clear and convincing evidence of any conduct by Cook that meets the high threshold for a punitive damages award.

## <u>Statement of Material Facts Not in Dispute</u>

Pursuant to Local Rule 56-1(a), Cook submits that the following facts are potentially determinative of the motion. Each of the following facts is either undisputed or the Court may assume its truth for purposes of the present motion. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996) (holding that court addressing summary judgment motion should view disputed evidence in the light most favorable to the nonmoving party).

**Plaintiff Arthur Gage**

On April 27, 2011, Plaintiff had a Cook Tulip IVC filter surgically placed by physicians at Edwards Hospital. Ex. A, 4/27/11 Operative Report. Plaintiff began having excruciating pain immediately after placement of the IVC filter. Ex. B, Pl. 1/9/17 Dep. at 237:14-239:11; Ex. C, 5/22/17 Orajean Daughrity Dep. at 74:25-78:20. This pain was new and different from any pain that Plaintiff had experienced prior. Ex. D, 8/13/15 Pl. Dep. at 57:1-15; Orajean Daughrity Dep. at 101:3-102:19. Plaintiff immediately attributed his new-onset pain to the IVC filter. 1/9/17 Pl. Dep. at 243:7-9. Plaintiff told his medical providers in the days immediately following placement of the IVC filter that he believed his new-onset pain was caused by the IVC filter. Id. at 243:10-12; Ex. E, 4/25/17 Pangan Dep. at 35:15-36:12; Ex. F, 4/30/17 Consultation Note. Plaintiff had not been expecting pain before placement of the IVC filter, so the pain he suffered immediately after undergoing the procedure left him with the immediate impression that

3

something was wrong.  1/9/17 Pl. Dep. at 239:11-12.  An x-ray taken two days after the placement already showed that the IVC filter was tilted.  Ex. G. 6/21/17 Marmureanu Dep. at 649:12-18.

Plaintiff commenced this action on November 14, 2014, by filing his complaint with the Court.

**Plaintiff's Use of Anticoagulants**

Plaintiff is currently prescribed anticoagulants, and has been prescribed anticoagulants for many years.  Ex. H, Pl Pharmacy Records.  Even before Plaintiff received his filter, he frequently had been prescribed anticoagulants.  See Pl Pharmacy Records.  Plaintiff's cardiologist, Dr. Larkin, also testified that Plaintiff's current use of anticoagulants is unrelated to his filter inasmuch as Plaintiff would be required to take anticoagulants regardless of the presence of Plaintiff's filter.  Ex. I, Larkin Dep. at 83:23-85:9. (Q. "That decision to place him on lifelong blood thinners, that was solely based on his risk for PE in the future and not the fact that he had an IVC filter placed, correct?"  A.  "Correct.").

**Plaintiff's Doctors' Knowledge**

Neither Dr. Goodwin (the placing physician) nor Dr. Larkin (the prescribing physician) read the IFU accompanying Plaintiff's Cook Tulip filter.  Ex. J, Goodwin Dep. at 96:19-24; Larkin Dep. at 54:9-15.  Dr. Goodwin testified that he did not rely on anything from Cook when determining how to place Plaintiff's filter, but instead relied on his medical education, training and judgment.  Goodwin Dep. at 116:4-10.  At the time he placed Plaintiff's filter, Dr. Goodwin was fully aware of the risks associated with Tulip filters, including the risks of tilt, tenting, penetration, perforation, migration, acute damage to the inferior vena cava, hematoma at the

vascular access site, hemorrhage, thrombosis or stenosis, infection, and death.[3]  Goodwin Dep. at 92:20-99:1; 104:2-105:18.  Dr. Goodwin testified that even knowing everything he knows about the risks of IVC filters and Plaintiff's claims here, he would still put a Tulip filter in Plaintiff today if presented with the same scenario.  Goodwin Dep. at 123:1-18.  Dr. Goodwin has continuously used the Tulip in his patients since the product became available, *id.* at 85:14-86:5, he gets good results with it, *id.* at 86:6-9, and he finds it safe and easy to retrieve, *id.* at 86:10-87:5.  He has had no complications with it, *id.* at 87:6-9, and he has confidence in the filter and he would prescribe it for a patient today, including himself.  *Id.* at 87:10-14.

## ARGUMENT

### I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994), *cert. denied*, 513 U.S. 821 (1994) ("[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law.").

If a plaintiff fails to establish a genuine issue of material fact as to any one of the elements of the claim asserted, the defendant is entitled to summary judgment.  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).  As a corollary, if an element of a plaintiff's claim requires expert testimony and that expert testimony is inadmissible under the *Daubert* standard, summary judgment must be granted. *See, e.g.*, *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 905 (7th Cir. 2007) (affirming summary judgment where exclusion of expert testimony

---

[3] Dr. Larkin, the prescribing physician, was also aware of these risks at the time he prescribed placement of an IVC filter in Mr. Gage.  Larkin Dep. at 35:15-48:16.

US.109782865.34

left no evidence of defect or causation). [4]

## II.  __Choice of Law.__

Although Plaintiff Arthur Gage resides in Illinois, he filed his case directly in this MDL Court pursuant to the Court's filing Order.  The Court has already ruled that it will treat such a foreign direct-filed case as if it had been transferred from the judicial district in the state from which the case originated.  Entry on Motion for Judgment on the Pleadings Based on the Statute of Repose, *In re Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Product Liability Litigation*, No. 1:14-ml-02570-RLY-TAB, MDL No. 2570, May 31, 2017 ("[T]he court adopts this approach, as it is in keeping with the rule that the transferee court applies the law of the state in which the transferor court is located.").  Under this ruling, the Court will apply the choice-of-law rules of the state of Illinois.

Illinois follows the choice-of-law methodology of the Restatement.  *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007).  Although there typically is a presumption in personal injury cases that the law of the state where the injury occurred governs, that presumption may be overcome by showing that another state has a more significant relationship to the issue under consideration.  *Id.* at 902–03; Restatement (Second) of Conflict of Laws, § 175 (1971) ("Second Restatement").  In assessing that issue, "Illinois courts consider the principles set forth in sections 6 and 145 of the Second Restatement."  *Curtis v. TransCor Am.*, LLC, No. 10 C 4570, 2012 WL 1080116 (N.D. Ill. Mar. 29, 2012).

---

[4] Cook has moved to dismiss the *Gage* action for lack of subject matter jurisdiction because Gage's filing for bankruptcy protection after the commencement of this action means that he is not the real party in interest.  *See* Dkt. 5373, 5374.  That motion recognized the possibility that the bankruptcy trustee might intervene or substitute herself as the real party in interest in this action.  *See* Dkt. 5374 at 9.  Should that occur, the arguments set forth in this motion apply equally to any claims that the trustee might pursue based on Gage's claimed injuries.  The trustee steps into the shoes of bankruptcy petitioner Gage, and the substance of the claims remains the same.  *See, e.g., In re Ostrom-Martin, Inc.*, 188 B.R. 245, 251 (Bankr. C.D. Ill. 1995).

Here, Gage's complaint alleges that he is a citizen and resident of Woodridge, Illinois, and that the placement of his Cook IVC filter occurred in Naperville, Illinois.  Compl. Para. 2. Plaintiff makes no allegations that suggest that any other state has a more significant relationship to Plaintiff's claims for compensatory damage than Illinois.  Illinois law therefore governs Plaintiff's claims for compensatory damages.[5]

### III. Illinois's statute of limitations bars Plaintiff's claims.

Cook is entitled to summary judgment because Illinois's two-year statute of limitations bars all Plaintiff's claims..

#### A.  The Illinois statute of limitations and the discovery rule.

 Under Illinois law, a personal injury action must be commenced within two years of the action's accrual.  735 Ill. Comp. Stat. Ann. 5/13-202; 735 Ill. Comp. Stat. Ann. 5/13-213(d) (2017).  All of the product liability claims Plaintiff asserts here—strict liability, negligence, and breach of warranty—are subject to this two-year statute of limitations.  *See, e.g., Witherell v. Weimer*, 421 N.E.2d 869, 874 (Ill. 1981) (dismissing negligence, strict product liability, and breach of warranty claims against pharmaceutical defendant because plaintiff failed to bring suit within two-year statute of limitations).

The traditional rule is that "[a] cause of action for personal injuries [] accrues at the time the plaintiff is injured."  *Hutson v. Hartke*, 686 N.E.2d 734, 736 (Ill. App. Ct. 1997).  Illinois has adopted the "discovery rule."  *Id*. (citing *Rozny v. Marnul*, 250 N.E.2d 656, 665-66 (Ill. 1969)). Under this rule, commencement of the statute of limitations period only begins once the plaintiff "knows or reasonably should know that he has been injured and that his injury was wrongfully caused."  *Golla v. Gen. Motors Corp.*, 657 N.E.2d 894, 898 (Ill. 1995).  Stated another way,

---

[5] The choice-of-law issue regarding Plaintiff's claim for punitive damages is more complicated, and is addressed in section IX below.

7

"when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed." *Nolan v. Johns-Manville Asbestos*, 421 N.E.2d 864, 868 (1981).

In determining when a plaintiff reasonably should have discovered that an injury was caused by a defendant's wrongful conduct, courts look to the nature of the injury: "the more obvious the injury, the more easily a plaintiff should be able to determine its cause." *Hoffman*, 765 N.E.2d at 121. Where an injury is "caused by a sudden traumatic event, the plaintiff's cause of action accrues when the injury occurred." *Golla v. Gen. Motors Corp.*, 657 N.E.2d 894, 898 (1995). This is because "the nature and circumstances surrounding the traumatic event are such that the injured party is thereby put on notice that actionable conduct *might* be involved." *Golla*, 657 N.E.2d at 899 (emphasis added). *See also Reat v. Illinois Cent. R. Co.*, 197 N.E.2d 860, 863 (Ill. App. Ct. 1964) ("where the defendant's alleged breach of duty *causes the plaintiff to suffer pain* the invasion of his interest is manifest as soon as it occurs and he has a ripe cause of action then") (emphasis added).

"When a plaintiff asserts the discovery rule to delay commencement of the statute of limitations, he has the burden of proving the date of discovery." *Solis v. BASF Corp.*, 979 N.E.2d 419, 429 (Ill. Ct. App. 2012). Although this issue often involves disputed facts for the jury, *see, e.g., Witherell*, 421 N.E.2d at 874, where the undisputed facts permit only one conclusion, the question is one for the court. *Id. See also Golla*, 657 N.E.2d at 897 ("If only one conclusion can be drawn from the undisputed facts, then the timeliness of the plaintiff's complaint becomes a question of law for the trial court to determine.").

## B. Plaintiff failed to commence this action within the two-year Illinois statute of limitations.

8

Cook is entitled to summary judgment as to all of Plaintiff's claims based on the Illinois statute of limitations. Plaintiff did not commence this action within two years of its accrual, and the discovery rule does not save his claim. As this Court has held in this very litigation, where the material facts are undisputed, a court may grant summary judgment on a statute of limitations defense. *See, e.g.,* Entry on the Cook Defendants' Motion for Summary Judgment, Dkt. 5575 (Aug. 2, 2017) (concerning plaintiff Valerie Graham, No. 1:15-cv-764-RLY-TAB).

The undisputed facts establish that within a few days of the initial placement of Plaintiff Arthur Gage's Tulip IVC filter in April 2011:

- Gage experienced a sudden onset of excruciating pain, which continues to the present day;
- He knew that this pain was new, unexpected, and different from what he had expected from his surgery;
- The pain immediately made him think something was wrong; and
- He blamed the pain on the IVC filter.
- 

Despite knowing in April 2011 that he had suffered an injury and believing at that time that the Cook filter had wrongfully caused that injury, Plaintiff did not commence the present action until he filed his original Complaint on November 14, 2014, over three and a half years later. *See* Complaint, Case 1:14-cv-01875-TWP-MJD Dkt. 1; Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). Plaintiff thus failed to bring this action within Illinois's two-year statute of limitations, and Cook is entitled to summary judgment on all of Plaintiff's claims.

The evidence supporting Plaintiff's knowledge of his injury and his blame of his Cook filter for that injury is substantial, and most of it comes from Plaintiff's own testimony. Plaintiff testified that immediately following placement of his IVC filter on April 27, 2011, he experienced significant pain:

> Q.    Tell me everything you remember about waking up.
> A.    I was in discomfort.
> Q.    Describe this discomfort.
> A.    It was just an excruciating pain.
>       * * * * *
> Q.    And you had it right when you woke up?
> A.    As soon as I woke up.

1/9/17 Pl. Dep. 237:21-238:15.  *See also id.* at 242:1-4 (Q: "So you had a sudden onset of pain right after the procedure, and you have had that pain from that day one until now?" A: "Yes."); *id.* at 248:4-6 (Q: "Is it your testimony that you had pain ever since it was put in until today, correct?" A: "From day one, yes."); Compl. ¶ 25 ("Plaintiff Arthur Gage began experiencing extreme chest pain and shortness of breath immediately after the implant of the Filter.").

Plaintiff also testified that the pain that he experienced immediately following his surgery was new, different, and unexpected, and it made him think that something was wrong:

> Q.    And this was a new pain you never had before?
> A.    Yes.
> Q.    Did anyone tell you before the procedure that you should expect to have pain after?
> A.    No.
> Q.    So did you think something was wrong?
> A.    Yes.

1/9/17 Pl. Dep. 239:5-12.  *See also id.* at 244:16-17 ("Q: "Did you think something wasn't right?" A: "Yes.").  Plaintiff's companion, Orajean Daughrity, also testified that Plaintiff complained of new and different pain following placement of the IVC filter:

> A.    After the filter, he started experiencing aching.  He said it felt like aching in his groin area, lower back and down his right leg.
> Q.    His groin area, his lower back and his right leg?
> A.    Yes.
> Q.    So what was the general area that he complained about, and how was it different than his complaints prior to the placement of the filter?
> A.    He said he had never had pain there before in those areas.
> Q.    And had he expressed to you any kind of pain in those areas prior to the placement of the filter?
> A.    No, he had not.

US.109782865.34

> Q.      Did he have pain in his abdominal area after the placement of the filter?
> A.      Yes, he did.
> Q.      Was this different than any abdominal pain that he expressed to you before
>          the placement?
> A.      Yes.  It was a constant aching pain.
> Q.      So you felt it was - - it was a consistent pain?
> A.      Yes.
> Q.      And it was a different kind of pain?
> A.      Yes.

5/22/17 Daughrity Dep. 101:19-102:19.

Plaintiff testified that he blamed this new "something wrong"—this new, sudden and

unexpected pain—on his Cook IVC filter:

> Q.      Did you tell [your doctors] that this pain was different than the pain you
>          had before?
> A.      Yes.
> Q.      Did you think this pain was because of your filter?
> A.      I believe so, yes.
> Q.      Did you tell your doctor you thought the pain was because of your filter?
> A.      Yes.

1/9/17 Pl. Dep. 243:4-12.  *See also id.* at 247:9-12 (Q: "But before you left the hospital, you

were telling people that you thought your filter was causing you some sort of pain?" A: "Yes.");

Daughrity Dep. 76:8-10 (Q: "Is your understanding that [Gage] told the doctors that he was

having pain from his filter?" A: "Yes."); *id.* at 76:23-77:3 (Q: "He believed the filter was causing

the pain?" A: "Yes." Q: "And that was within three days of placement?" A: "Yes.").

Plaintiff's medical records and treating physicians also confirm that within days of the

placement of his IVC filter, Plaintiff reported that the filter was causing him pain:

> Q.      From your [May 2, 2011] notes, it would appear that during this visit Mr. Gage
>          was telling you he thought his filter was causing him pain.  Is that a fair
>          interpretation of that record?
> A.      Yes.
> Q.      So, he was reporting to you he thought the filter was the cause?
> A.      Yeah, I can only say what I wrote in my note.  But, yeah, if you had to make an
>          assumption, I would say yes.

US.109782865.34

4/23/17 Pangan Dep. 121:13-122:1.  *See also* 4/30/11 Consultation Note ("He developed abdominal pain shortly after the IVC filter placement, which he described as a right-sided periumbilical abdominal pain wrapping around to his right back.  The pain is described as constant and worse with deep breathing or certain movements.  ***He feels that the filter is causing his pain.***") (emphasis added); Plaintiff says his pain was unexpected, that is, it was out of the ordinary for him.  *See* 1/9/17 Pl. Dep. 239:5-12.  And Plaintiff's primary care provider, Dr. Pangan, who saw Plaintiff shortly after the placement of his filter, testified that he would not have told Plaintiff that such pain was normal or expected.  Ex. K, 4/23/17 Pangan Dep. 121:24-122:1.

Finally, Plaintiff's own expert, Alexander Marmureanu, M.D., testified at his deposition that he understood that Plaintiff was telling his physicians within days of receiving the IVC filter that the filter was causing him pain:

> Q.    In your opinion, having reviewed his medical records, did Mr. Gage know that his filter was causing him pain as early as April 20 - - April 30th, 2011?
> A.    I'm not sure if he knew or not, but that's what he claimed.
> Q.    Okay.  That's certainly what he told his physician and which you've repeated [on page 3 of your report], correct?
> A.    Exact.  Yes.

Marmureanu Dep. 649:3-11, June 21, 2017.  Dr. Marmureanu further testified that x-rays taken two days after the IVC filter's placement show that the filter had already malfunctioned and was tilting within the vessel.  *See generally* 6/21/17 Marmureanu Dep. at 649:12-656:23.

These undisputed facts, provided by Plaintiff himself, his companion, his treating doctors, and his own retained expert, establish that in April 2011 Plaintiff both knew of his injury and blamed his Cook filter for that injury.  The two-year Illinois statute of limitations therefore began running at that time, and expired not later than April 2013.  Plaintiff did not commence this action until November 2014, and failed to bring this action within the statute of limitations.

US.109782865.34

Illinois courts have consistently granted summary judgment on the statute of limitations based on similar facts. *See, e.g., Conley v. Springfield Clinic*, 474 N.E.2d 421, 422 (Ill. App. Ct. 1985) (plaintiff's deposition testimony established that within weeks of her shoulder surgery she experienced pain, attributed it to her surgery, and expressed these concerns to her provider, thus commencing the statute of limitations period). For example, in *Hutson v. Hartke*, a plaintiff working on a hog farm was exposed to ammonia fumes while working in a barn and immediately experienced physical symptoms of the exposure. 686 N.E.2d 734, 735 (Ill. Ct. App. 1997). Nine days after the exposure, the plaintiff sought out medical care and was diagnosed with pneumonia. *Id.* at 736. Two years and one day after the initial ammonia exposure, she filed suit. *Id.* The trial court dismissed the case based on the statute of limitations, and the Illinois Court of Appeals affirmed, holding that the plaintiff "underwent a sudden, traumatic event" on the day she was exposed to the ammonia and that the event "put her on notice of a reasonable probability that her injury was wrongfully caused." *Id.* at 737. The court found it significant that the plaintiff complained of symptoms—coughing, along with a burning nose and throat—immediately following her exposure to the ammonia fumes, *id.*, and that the plaintiff had recognized that the ammonia level in the barn that day was "extraordinarily high." *Id.* at 738. The court rejected the plaintiff's argument that the running of the statute of limitations was tied to when she first sought out medical care and/or obtained a medical diagnosis. *Id.* at 737-38.

The *Hutson* court held that a plaintiff is put "on notice that an injury is wrongfully caused when a reasonable person would know or should know that something out of the ordinary or unnatural caused an injury." Id. at 738 (emphasis added). Under such circumstances, "the awareness of a physical problem carries with it the awareness of a wrongful causation, and the running of the limitations period begins." *Id. See also Berry v. G. D. Searle & Co.*, 309 N.E.2d

13

550, 556 (1974) (holding plaintiff's product liability claim against a drug manufacturer was time barred because the suit was filed more than two years after the onset of plaintiff's stroke symptoms, which the court held was "a traumatic event"); *Reat*, 197 N.E.2d at 866 (dismissing on statute of limitations grounds, stating:  "He knew he had pain. He knew he was physically injured. He was not legally ignorant of the existence of his alleged cause of action.").

Like the plaintiffs in *Hutson*, *Berry*, and *Reat*, Plaintiff Gage's claimed injuries stem from a readily identifiable traumatic event:  the placement of his IVC filter on April 27, 2011, which, according to Plaintiff, produced "excruciating" pain immediately after surgery.  And, as in *Hutson*, *Berry*, and *Reat*, the undisputed facts show that at the time of that event Plaintiff knew or, at minimum, reasonably should have known that he had suffered an injury and that the injury was due to the Cook filter.  Indeed, Plaintiff himself immediately attributed his pain complaints to the filter.  The two-year statute of limitations therefore began to run at that time, and expired on or about April 27, 2013, more than 18-months before Plaintiff commenced this action.  Cook is therefore entitled to summary judgment on all of Plaintiff's claims.

**IV. Cook is Entitled to Summary Judgment on All of Plaintiff's Claims Based on the Exclusion of Plaintiffs' experts.**

As the Court is aware, contemporaneously with this summary judgment motion Cook has served *Daubert* motions seeking to exclude the proposed trial testimony of Plaintiffs' experts Dr. Marmureanu, Dr. Rajebi, Dr. McMeeking, Dr. Kessler, Dr. Garcia, Dr. Betensky, Dr. Fishbein, and Ms. Levy.  The Cook Defendants are entitled to summary judgment as to all claims against them based on the exclusion of those experts' testimony.  Because Plaintiff's claims about his Tulip IVC filter involve complex medical and scientific issues, he must present expert testimony to establish product defect (design or warnings) and causation (design or warnings).  *See, e.g., Thornton v. M7 Aerospace LP*. 796 F.3d 757, 772 (7th Cir. 2015) ("Expert testimony is required

14

to establish that a product is defective or unreasonably dangerous"); *see also Show v. Ford Motor Co.*, 697 F.Supp.2d 975, 983 (N.D. Ill. 2010) ("[P]roducts liability cases that involve complex products beyond a lay jury's understanding require expert testimony."), *aff'd,* 659 F.3d 584 (7th Cir. 2011); *Hernandez v. Schering Corp.*, 958 N.E.2d 447 (Ill. App. Ct. 2011) (holding that without expert testimony plaintiffs cannot prevail on their product liability claims).

Where an element of a claim requires expert testimony and the court excludes the expert who was to provide that testimony, the claim fails as a matter of law. *See, e.g., C.W. ex rel Wood v. Textron, Inc.,* 807 F.3d 827, 838 (7th Cir. 2015) (affirming summary judgment where exclusion of expert testimony left no evidence of causation); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 905 (7th Cir. 2007) (affirming summary judgment where exclusion of expert testimony left no evidence of causation). Here, Plaintiff has offered only Dr. Marmureanu and Dr. McMeeking to testify on his claim of negligent design and only Dr. Marmureanu to testify on causation based on negligent design. If the Court grants Cook's motions to exclude Plaintiff's experts on either defect or causation, Plaintiff's negligent design claim fails as a matter of law.

Likewise, Plaintiff has offered only Dr. Marmureanu and Dr. Garcia to testify on his claim that Cook's IFU failed to adequately warn and only Dr. Marmureanu to testify that some failure to warn caused his injuries.[6] Should the Court grant Cook's motions to exclude Plaintiff's experts on either defect or causation, Plaintiff's warning-based claims fail as a matter of law and Cook is entitled to summary judgment. *See, e.g., Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d

---

[6] Plaintiff's expert Dr. Mohammed Rajebi had included a case-specific report for Plaintiff in his original report, but he withdrew that report at his deposition, *see* Ex. L, Rajebi Dep. at 5:18-20, 8:24-9:7 and 9:24-10:2; and Plaintiff has confirmed that he does not intend to rely on Dr. Rajebi for a specific causation opinion *See* Ex. M, Email from Matt Schultz, dated May 16, 2017. Plaintiff's expert Dr. Fishbein also offered some case-specific opinions concerning Plaintiff, but confirmed at his deposition that he was not offering any opinion concerning the cause of Plaintiff's injuries. *See* Ex. N, Fishbein Dep. at 243:11-16.

US.109782865.34

924, 932 (S.D. Ind. 2014) (granting summary judgment where exclusion of expert rendered plaintiff unable to establish element of causation).

**V.   Cook is Entitled to Summary Judgment on Plaintiff's Negligent Design Claim.**

Even if the Court were to deny Cook's *Daubert* motions, Cook is nevertheless entitled to summary judgment on Plaintiff's negligent design claims.  (As noted above, Plaintiff does not assert a strict-liability design defect claim.)

Plaintiff's negligent design claim focuses on the conduct and fault of the defendant. *Baltus,* 557 N.E.2d at 585.  In Illinois, a product liability action based in negligence falls within the framework of common law negligence. *Calles,* 864 N.E.2d at 264.  Therefore, a plaintiff must establish the following elements: (1) the existence of a duty of care owed by the defendant; (2) a breach of that duty; (3) an injury; (4) proximate cause; and (5) damages.  *Id.*  "Because products liability actions involve specialized knowledge or expertise outside of a layman's knowledge, the plaintiff must provide expert testimony on the standard of care and a deviation from that standard." *Salerno v. Innovative Surveillance Tech., Inc.*, 932 N.E.2d 101, 112 (Ill. App. Ct. 1st Dist. 2010).

Plaintiff bears the burden of showing the Cook was negligent in its design of the Tulip IVC filter.  *Blue v. Envtl. Eng'g. Inc.*, 828 N.E.2d 1128, 1142 (Ill. 2005) ("in any negligence action, the burden is on the plaintiff to prove negligence, not the defendant").

**A.  Plaintiff cannot create a genuine issue of material fact concerning negligent design.**

Plaintiff proposes to support his claims of negligent design through the testimony of two experts, Dr. Robert McMeeking and Dr. Alexander Marmureanu.  Even assuming *arguendo* that the Court admits the proposed expert testimony of Dr. McMeeking and/or Dr. Marmureanu, that testimony fails as a matter of law to create a genuine issue of material fact on the issue of

16

negligent design.  Plaintiff's design-based claims therefore fail as a matter of law.  *Salerno*, 932 N.E.2d  at  112 (holding summary judgment appropriate on negligent design claim where "plaintiff failed to provide any expert testimony to establish the relevant standard of care or a deviation therefrom that proximately caused his injury").

### 1.   Dr. Marmureanu's testimony does not support a design defect.

Plaintiff cannot rely on the testimony of Dr. Marmureanu to establish that Cook negligently designed the Tulip IVC Filter.  Dr. Marmureanu's reports offer no opinion that the design of the Tulip IVC implant is defective or that Cook failed to follow the appropriate standard of care in designing it.  His general report never uses the terms negligent, "unreasonably dangerous,"  "standard of care," defect, or defective.[7]  These are of course the critical elements of Plaintiff's negligent design claim.  *See, e.g., Blue v. Environmental Eng'g, Inc.,* 828 N.E.2d 1128, 1142 (Ill.2005) (holding that "a negligence claim for a defective design of a product" rests on proof that "the defendant deviated from the standard of care that other manufacturers in the industry followed at the time the product was designed").  Dr. Marmureanu's general report vaguely refers to "problems…with the [Celect/Tulip] vena cava filter," but the claimed existence of a "problem" does not demonstrate negligence and is not a standard for imposing liability.  Ex. O, Marmureanu General Report at 24, 36.

Although Dr. Marmureanu's *plaintiff-specific* report on Plaintiff make several conclusory references to the "defective [Cook/Gunther/Celect/Tulip] filter," Gage Rpt. at 4, 10, 15, it never explains or supports any actual defect or violation of any standard of care.  Ex. P, Marmureanu Hill Report and Ex. Q, Marmureanu Gage Report.  The closest he gets is a suggestion that a filter

---

[7] The only times the Report even mentions the word "design" is to describe his view of Cooks' historical intent in designing the filters or conducting a particular study.  *See* Marmureanu Rpt. at 12, 16, 18, 19, 33, 34.  The report assert no flaws in the design.

US.109782865.34

is defective "due to the stiffness of the filter, resulting in excess radial force, and lack of perforation limiters on the filter struts." Hill Rpt. at 12, *see also* Gage Rpt. at 4.  In his Hill report (but not his Gage report), Dr. Marmureanu says in a footnote that "I discuss stiffness and radial force in the main body of my report." Hill Rpt. at 12 n.3.  ***But he does not.***  His General Report does not even mention the terms "stiffness" or "perforation limiters," and it refers to radial force only in a statement that he intends to use animation at trial to "demonstrate" the issue—an issue that his report does not address.  Moreover, Dr. Marmureanu does not address in *any* report how this alleged design problem demonstrates a departure from the standard of care or creates a risk to the patient that outweighs the utility of the IVC design as a whole.  He does not present the evidence needed to prove negligent design.  *See* Marmureanu Rpts. *passim*.

These omissions are critical, because they demonstrate that Dr. Marmureanu has no idea what the supposed design defect in the Cook filters is or how Cook supposedly violated the standard of care.  He simply condemns "the filter as a whole"—indeed, all IVC filters—and he does not know or (apparently) care about any specific defect in the design or departure from standard of care.  He testified:

> [Q]   What causes did you consider in evaluating what made it perforate?
> A.     Well -- well, I think made it perforate, again, it's based on what I learned, it's the design and the material, and not only just the poor workmanship that perhaps went into the R&D, and the filter tilted and then perforated.
> And as I recall correct, internal documents from Cook, might have been Nielsen, I think, or somebody identified the fact that once they tilt, then that perforating results in embedded hooks and so on.
> So I actually like to quote the Cook internal documents of that.

Ex. R, 6/20/17 Marmureanu Dep. at 349:18-350:6; *see also* 6/20/17 Marmureanu Dep. at 344:14-19 ("Could be the design. Could be the material the filter is made of."); Dep. at 325:3-16 ("So it's not only the design. It's the filter as a total.").  Dr. Marmureanu's opinions do not create a genuine issue of material fact on the issue of design defect.

**2.   Dr. McMeeking's testimony does not support a design defect.**

Plaintiff likewise cannot rely on the testimony of Dr. McMeeking to establish a design defect in the Tulip IVC Filter.  Although Dr. McMeeking's report asserts that "the designs of the Cook inferior vena cava filters are deficient as they lead to the faults described in this report," Ex. S (McMeeking Report) at 1, he offers no specific portion of the design that was defective, and no specific design change that Cook should have made to render the filter non-defective.

The closest that Dr. McMeeking gets to citing a *specific* defect in the Tulip filter is his opinion and testimony that Cook should have "contemplated" or considered making some design changes to reduce the risks of the filter.  *See, e.g., id.* at 49.  But after reciting the changes that he thinks Cook should have considered, he gave this crucial testimony:

> Q.   You don't know, as you sit here today, whether those changes would actually increase other risks imposed by the filter; correct?
> * * *
> A.   Without making a specific assessment, I am not in a position to – to comment on that or to make that assessment.
> Q.   You are not in a position today, as you sit here, to say whether those changes that you suggested *would preserve all of the benefits of the filter without any reduction of the benefits; correct?*
> * * *
> A.   The – since that addresses medical benefits, *I'm not in a position to make assessment of the benefits*.

Ex. T, McMeeking Depo. at 315:25-316:20 (emphasis added).  As discussed above, Plaintiff's negligent warning claim requires him to prove that Cook failed to exercise reasonable care in designing the Tulip filter, resulting in a defect.  But Dr. McMeeking's inability to assess the benefits of the filters means that he *cannot evaluate whether the product is defective or whether Cook exercised reasonable care*.  His admitted inability to assess the benefits of the changes that he proposes means that he cannot perform the analysis Illinois law requires.

Much of Dr. McMeeking's analysis was also devoted to showing that the Cook filter might fail in a "worst-case scenario." *See, e.g.,* McMeeking Depo. at 160:14 ("I was concerned to try to identify what could be considered to be worst-case conditions"), 204:10-11; *see also id.* at 111:17, 112:11, 149:5, 149:16, 154:11, 165:20, 195:2, 207:19-22.  He testified:

> Q.  There's been a lot of questions about the calculations that you have done that are contained in your report. Many of those calculations addressed worst-case scenarios; is that correct?
> A.  That's correct.

*Id.* at 304:3-8.  But he admitted that *few people* would ever experience a "worst-case scenario":

> Q.  Would you expect that a high percentage of individuals who receive Celect or Tulip filters would fall into that worst-case scenario?
>    * * *
> A.  No. I would expect a very small number of the population would fall into that category.

*Id.* at 305:1-8.  And he ultimately testified that he is *not* saying that Cook had to design its filters to survive the worst-case scenario.  *Id.* at 314:19-23.  Indeed, he specifically that it would be "unlikely" that a company could design a device to survive the worst-case scenario in every case. *Id.* at 315:2-9.  Thus, Dr. McMeeking did not and cannot testify that the possibility that Cook's filter may fail under a "worst-case scenario" means that it is *defectively designed*.  He testified merely that Cook should have "take[n] into consideration what the worst-case conditions are," *id.* at 314:23-315:1, but he never testified that Cook's engineers *failed* to do so, what they would have found if they had, or that they could have changed the device for the better *if* they had done so.  And he did not identify any *specific* design change that he contends: (1) Cook should have made to accommodate the worst-case scenario, and (2) made the filter *defective* in its absence.

Dr. McMeeking also acknowledged that his "worst-case scenario" analysis simply does not apply to Plaintiff.  Dr. McMeeking described his "worst case scenario" theory as follow:

> [Q]    So your calculation is that in a 15-millimeter vena cava, once a filter perforates, it doesn't have to be endothelialized, but once it perforates, one instance of Valsalva, a cough, a sneeze, a bowel movement, is going to either break or it is going to deform that filter; correct?
>
> A.    That's correct, yes.

McMeeking Dep. at 205:9-15.  But he concedes that Plaintiff Gage's *actual* experience with his Tulip filter is radically different from what Dr. McMeeking's calculations of filter longevity predict.  Plaintiff lived with his Tulip filter since 2011 and doubtless experienced hundreds of instances of Valsalva, and yet he has never suffered either breakage or deformity of his filter.  He lived with an intact perforated filter far longer than the single cough or bowel movement that Dr. McMeeking calculated it would take to break the filter.  McMeeking Dep. at 205:20-206:19; 306:14-307:7.  Thus, whether or not Dr. McMeeking "worst case scenario" identifies a design defect that might lead to injury in *some* patient, that defect has no connection to Plaintiff's claims, and cannot prevent summary judgment on negligent design.

Dr. McMeeking's identification of supposed "superior alternatives" to the Tulip filter likewise does not create an issue of fact concerning any defect in the Tulip's design.  Cook acknowledges that although a plaintiff need not demonstrate a "reasonable alternative design" to prevail on a design defect case, evidence of such a reasonable alternative design may be evidence of a design defect.  *See Baley v. Fed. Signal Corp.*, 982 N.E.2d 776, 802 (Ill. App. 2013).  But Dr. McMeeking's proposed "reasonable alternative designs" are neither reasonable nor truly alternatives, and thus provide no evidentiary support for a claim of design defect in the Tulip.

First, recall Dr. McMeeking's concession that he is "not in a position to make assessment of the benefits" of any changes to the design of an IVC filter.  McMeeking Depo. at 316:16-17.  Without an ability to assess the benefits of a design change, he certainly cannot opine on whether a "reasonable alternative design" exists—*i.e.*, one that reduces risks while maintaining benefits.

21

Second, the alternatives he suggests are not reasonable.  Dr. McMeeking's evaluation of alternatives looks only at the issue of perforation.  *See* McMeeking Report at 41-48.  Although he compares *perforation* rates among various IVC filters, *id.* at 43, 45, he does not compare or analyze the other factors that inherently affect whether one IVC filter would be "reasonable" as an alternative to another, including filter performance, migration, and tipping.  One cannot logically determine the reasonableness of an alternative by considering only one of many relevant factors.

Third, Dr. McMeeking's proposed reasonable alternative designs are unhelpful because they are not truly "alternatives" to the Tulip at all.  The Tulip is designed to be used as either a permanent or a retrievable filter, intended to be *removable*, Ex. U, IFU for Cook Tulip Filter Set, and that retrievability is one of its major benefits.  But the "reasonable alternative designs" Dr. McMeeking touts are the Greenfield filter and the VenaTech IVC filter, *permanent* filters that are never intended to be removed.  McMeeking Dep. at 76:13-77:2, 228:10-13 and 259:19-260:1.  These are not equivalent or comparable products; key features have opposite purposes.[8]

Dr. McMeeking does not create a genuine issue of material fact on design defect.

**B.  Plaintiff cannot create a genuine issue of material fact concerning causation based on design defect.**

Causation is an essential element of any tort.  *Lewis v. Lead Industries Ass'n., Inc.*, 793 N.E.2d 869, 873 (2003). Because of the complex nature of medical devices and medical injury, Plaintiff must support causation with expert testimony.  *Show v. Ford Motor Co.,* 659 F.3d 584, 588 (7th Cir. 2011) (holding that under Illinois law, expert testimony is required in a products liability suit).  He cannot do so.

---

[8] The only retrievable equivalent Dr. McMeeking identifies is the Celect Platinum. McMeeking Dep. at 281:9-282:11. But Dr. McMeeking can cite no evidence that the Celect Platinum has better results than the Tulip, either generally or with respect to perforation.

22

The only expert Plaintiff has identified to try to make a causal link between a supposed design defect and the perforation of Plaintiff's Tulip IVC filter is Dr. Marmureanu.[9]  As discussed above, Dr. Marmureanu never actually identifies what he believes the design defect in the Tulip filter is; he simply criticizes the "filter as a total."  Marmureanu Dep. at 325:3-16.[10]  This vagueness and lack of definition carries over into his causation opinions, which are vague, internally contradictory, and ultimately inadequate to support an inference of causation.

Dr. Marmureanu's report offers no opinion that any design defect in the Tulip filter caused Plaintiff's perforation; indeed, Dr. Marmureanu's 17-page report on Plaintiff Gage does not even mention the word design.  Indeed, although Dr. Marmureanu's Gage report opines that the perforation by Plaintiff's Tulip IVC caused other symptoms, *see, e.g.,* Marmureanu Gage Rpt. at 4 ("Perforation of the IVC by Cook IVC filters causes abdominal pain."), he never offers any opinion about what caused the perforation—design defect, surgeon error, trauma, or anything else.

Dr. Marmureanu does opine that "the defective Gunther Tulip filter has a 'tendency to perforate' and its 'tendency to progressively perforate,'" Marmureanu Gage Rpt. at 1 (source of internal quotes unclear), but, unlike his report on Plaintiff Hill, he never asserts that this

---

[9] Although Plaintiff's expert Dr. Michael Fishbein expresses some opinions concerning the individual Plaintiffs' perforations and the consequences of those perforations, he expresses no opinion linking the perforation to any defect in the design of the Tulip IVC filter.

[10] Although Dr. Marmureanu baldly asserts in his Gage report that a filter is defective "due to stiffness of the filter struts resulting in excessive radial force," Gage Rpt. at 4, he never offers anything to support his assertion and he never attributes these issues to the filter's design.  He says in a footnote to his Hill report that "I discuss stiffness and radial force in the main body of my report," Hill Rpt. at 12 n.3, but he does not in fact do so.  An expert cannot create a genuine issue of material fact on the element of design defect with a bald assertion unsupported by any authority or analysis that does not even mention design. *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012) (stating that Rule 702 requires that expert testimony be relevant, reliable, and have a factual basis—requirements that must be met before the jury is allowed to hear the expert testimony).

US.109782865.34

"tendency" caused Plaintiff Gage's injuries.[11]  And even if he offered such an opinion, that opinion would not cure the omission because a "tendency" is not a design defect.  The word "tendency" is simply too vague and too broad to useful in describing whether one thing actually caused another.  *See Adams v. Indiana Bell Tel. Co.*, 2 F. Supp. 2d 1077, 1088 (S.D. Ind. 1998), *rev'd on other grounds sub nom. Adams v. Ameritech Servs., Inc.*, 231 F.3d 414 (7th Cir. 2000) ("The term 'any tendency' is so broad that it has the effect of allowing admission of evidence that has only the slightest bit of probative worth.") (citing Charles A. Wright & Kenneth W. Graham, Federal Practice § 5165).

Dr. Marmureanu also does not opine that any of the defects that Dr. McMeeking attributes to the Tulip caused Plaintiff any injuries.  First, Dr. Marmureanu's makes no reference to any design defect opinion by Dr. McMeeking; indeed, Dr. Marmureanu has not even read Dr. McMeeking's report, see Marmureanu Dep at 423:25-424:14, and so could not have relied on any defects identified in that report in forming his causation opinions.  Second, Dr. Marmureanu's own opinion that "all filters are bad," Marmureanu Dep. at 154:4-6, contradicts Dr. McMeeking's opinions the filters can be made safer through additional investigation.  Dr. Marmureanu thus could not base any causation opinion on Dr. McMeeking's design defects.

Plaintiff has no expert evidence showing that any negligence in design of the Tulip IVC filter caused Plaintiff's injuries, and Cook is entitled to summary judgment on that claim.

## VI. Cook is Entitled to Summary Judgment on Plaintiff's Negligent Manufacturing Claims.

Cook is entitled to summary judgment on Plaintiff's manufacturing-based claim. Although Plaintiff's complaint asserts that Cook was negligent in manufacturing the Tulip IVC

---

[11] Dr. Marmureanu's Gage report also omits the opinion expressed in his Hill report that perforation was caused by the "medically unnecessary" implantation of the Cook filter. Marmureanu Hill Rpt. at 2.

filter, *e.g.*, Compl. ¶¶ 43(b), 52(c), 53(d), Plaintiff has identified no expert who opines that Cook failed to exercise reasonable care in manufacturing or that Plaintiff's Tulip filter departed from its intended design. *See Salerno*, 932 N.E.2d at 112 (product liability case needs expert testimony "on the standard of care and a deviation from that standard"). Absent such expert testimony, Cook is entitled to summary judgment on Plaintiff's manufacturing-based claims.

**VII.** **Cook is Entitled to Summary Judgment on Plaintiff's Failure-to-Warn Claims.**

Cook is also entitled to summary judgment on Plaintiff's strict liability and negligent failure-to-warn claims. Plaintiff cannot present sufficient expert testimony to establish either that the Tulip IFU should have provided doctors with additional information about possible risks of IVC filters or that the omission of such information breached any applicable standard of care. Plaintiff also cannot establish that any omission from the IFU had any causal link to Plaintiff's claimed injuries. Plaintiff can offer no expert testimony to support his claim that the Tulip IFU should have provided information that it did not, and he cannot establish causation.

**A. Plaintiff has no expert testimony that Cook should have provided doctors with additional information or warnings concerning perforation or other possible complications of IVC filters.**

Cook is entitled to summary judgment on Plaintiff's failure-to-warn claims, both negligence and strict liability, because he can offer no expert testimony that Cook should have provided doctors with any additional instructions or warnings concerning potential risks of using the Tulip IVC filter.

Illinois courts apply the "learned intermediary doctrine" to the duty to warn concerning risks of medical products. *Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35, 42 (Ill. 2002). Under this doctrine, the manufacturer only has a duty to warn prescribing physicians of the product's known dangerous propensities, who in turn have a duty to convey the warnings to their

25

patients.  *Id.*  Because the duty to warn is owed to the physician, the adequacy of the warning is judged by "whether it sufficiently apprises physicians of the risks associated" with use of the medical device. *Hernandez v. Schering Corp.*, 958 N.E.2d 447, 455 (Ill. App. Ct. 2011).  Expert testimony is necessary to determine whether the warning adequately informed the physician of the risks.  *See Northern Trust Co. v. Upjohn Co.*, 572 N.E.2d 1030, 1036 (Ill. App. Ct. 1991).

Plaintiff here lacks any expert testimony that the Tulip IFU failed to adequately inform doctors of the product's risks.  Only two of Plaintiff's experts, Dr. Alexander Marmureanu and Dr. David Garcia, address the contents of the Cook Tulip's instructions for use, and neither creates an issue of fact on failure to warn under the circumstances of this case.

Although Dr. Marmureanu's report opines that certain complications can arise from the use of IVC filters, [CITE REPORT], he ***never opines***, either in his General Report or in the Gage-specific report, that Cook should have warned about such complications, that Cook violated any standard of care in failing to do so, or that the Tulip is defective or unreasonably dangerous as a result of any such omission.

The mere omission of a warning about a possible risk is not a ground for liability; the omission must be negligent or must render the product defective and unreasonably dangerous. *See, e.g., Salerno v. Innovative Surveillance Tech., Inc.*, 932 N.E.2d 101, 109 (Ill. App. Ct. 2010).  The jury cannot simply *assume* that an alleged omission of a warning about a possible complication constitutes a defect or shows that Cook failed to exercise reasonable care.  Not all risks are sufficiently severe or sufficiently likely to occur to justify alarming product users.  On the contrary, courts have recognized that there are downsides to overwarning: "[w]hile it is important for a manufacturer to warn of potential side effects, it is equally important that it not overwarn because over warning can deter potentially beneficial uses of the drug by making it

seem riskier than warranted and can dilute the effectiveness of valid warnings." *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 392 (7th Cir. 2010).  Dr. Marmureanu offers no opinion that the Tulip IFU should have warned about any of the nine possible IVC filter complications he mentions in his report, *see* Marmureanu Rpt. at 24-36, or that Cook violated any standard of care in omitting such warnings.  His stated opinions therefore cannot defeat summary judgment on this claim.

> Dr. Garcia also offers a brief opinion concerning the Tulip IFU.  He states:

> > The manufacturer of a device with well-established risks must warn physicians about these risks in the device's IFU, including their frequency, severity and permanency. In the IFUs for the Gunther-Tulip (G-T) and Celect IVC filters, Cook fails to provide adequate information about the frequency, severity and permanency of possible IVC filter complications, including the possible need for long-term anticoagulation in many patients whose filter cannot be removed.

Ex. V, Garcia Rpt. at 11-12.  Dr. Garcia does not mention the Cook IFU anywhere else in his report, and he does not identify a single specific complication about which Cook failed to warn other than the possible need for long-term anticoagulation.

> The need for long-term anticoagulation has no bearing on Plaintiff's claims because Plaintiff's treating doctors had already prescribed anticoagulants for Gage *before* he received his Tulip IVC filter as treatment for unrelated medical conditions, specifically a serious heart condition and a history of deep vein thrombosis, Ex. R, Pl. Pharmacy Records; 6/21/17 Marmureanu Dep. at 692:1-21, and those same doctors continue to prescribe anticoagulants for him today. See Pl. Pharmacy Records.  Specifically, Plaintiff's treating physician Dr. Larkin testified that Plaintiff would be required to take anticoagulants regardless of the presence of his filter.  4/19/17 Larkin Dep. at 83:23-85:9.  And even Dr. Marmureanu concedes whether Plaintiff would need anticoagulants absent the filter would depend on his treating physicians' evaluation. 6/21/17 Marmureanu Dep. at 694:4-6 ("I would think if the filter will be out, they will need to re-

US.109782865.34

evaluate him and basically reassess if the Coumadin is necessary or not."); *id.* at 718:18-719:4. A plaintiff cannot avoid summary judgment on a failure-to-warn claim through evidence that a defendant failed to provide information about a particular risk that the plaintiff has not actually suffered.

Plaintiff has designated no other expert who proposes to offer any opinion about the Tulip's IFU or warnings. Absent expert testimony that Cook's IFU was inadequate, defective, or unreasonably dangerous, Plaintiff cannot establish the element of defect in his strict-liability claim or of breach of duty in his negligence claim. Cook is therefore entitled to summary judgment on all of Plaintiff's failure-to-warn claims.

### B. The undisputed facts establish that any alleged omission of information from the Tulip IFU did not cause Gage's alleged injuries.

Even assuming for the sake of argument that Plaintiff could offer expert testimony that Cook violated some standard of care in omitting some warning from the IFU, Cook is still entitled to summary judgment on Plaintiff's warning claims because Plaintiffs cannot as a matter of law establish that any alleged deficiency in the IFU caused Plaintiff's alleged injury. Specifically, Plaintiff's causal chain for his failure-to-warn claim is deficient in three ways: (1) the doctor who placed Plaintiff's Tulip IVC filter did not read or rely on the Tulip IFU in any way; (2) he knew of all the risks at issue here, including the risk of perforation, at the time he placed Plaintiff's IVC filter; and (3) he still believes that the benefits of the filter to Plaintiff outweigh the risks and would still place the filter in Plaintiff today.

### 1. Dr. Goodwin did not read or rely on the Tulip IVC filter IFU.

Any deficiency in the instructions or warnings for the Tulip IVC filter did not cause Plaintiff's injuries because Dr. Mark Goodwin, Plaintiff's implanting surgeon, and Dr. Timothy Larkin, the physician who prescribed the Tulip, did not read the IFU for the Tulip IVC filter

US.109782865.34

before placing Plaintiff's IVC Filter.  Goodwin Dep. at 96:19-24; Larkin Dep. at 54:9-15. Dr.

Goodwin testified:  "Q. Have you read Cook's Instructions for Use for the Tulip? A. No."

1/11/17 Goodwin Dep. at 96:19-24.  Because Dr. Goodwin did not read the IFU, he could not

have relied on its contents either in selecting or placing the Tulip IVC filter.  Indeed, he testified

that he did not rely on anything from Cook in placing the filter, but relied on his own education,

training, and judgment.  1/11/17 Goodwin Dep. at 116:8-10 ("Q. Were you relying on anything

from Cook with respect to how to place the filter?  A. Never.").  The content of the IFU thus had

no impact on Dr. Goodwin, and any omissions from the IFU could not have changed his decision

to place the filter and could not have caused Plaintiff's injuries.

## 2. Dr. Goodwin was already aware of the risk of the complications Plaintiff experienced.

At the time Dr. Goodwin placed Plaintiff's Tulip IVC filter, he was fully aware of the

risks associated with implanting the Tulip filter, including the risks of tilt, tenting, penetration,

perforation, migration, acute damage to the inferior vena cava, hematoma at the vascular access

site, hemorrhage, thrombosis or stenosis, infection, and death.[12]  Goodwin Dep. at 92:20-99:1;

104:2-105:18.  He knew of all these risks in 2011, and they were well known within the medical

community as well.  11/11/17 Goodwin Dep. at 99:18-100:1.

This knowledge is also demonstrated by a brochure about IVC filter placement that Dr.

Goodwin's office provided to patients before such a procedure.  The brochure's "Common

Questions" section addressed possible complications, including both perforation (puncture) of

the vena cava and penetration of the vein wall of the vena cava. The brochure stated:

**Q: What are the possible adverse effects associated with vena cave filter placement?**
A: Possible adverse effects include the following:

---

[12] Dr. Larkin, the prescribing physician, was also aware of these risks at the time he prescribed placement of an IVC filter in Mr. Gage.  Larkin Dep. at 35:15-48:16.

- The vena cava filter may move or migrate from its initial implantation site. (Extremely rare)
- **The wall of the vena cava could be perforated (punctured) during the procedure.** (Extremely rare)
- A hematoma (a swelling or mass of blood caused by a break in a blood vessel) Garcuamay occur at the access puncture site. (Rare)
- **The hooks of the filter can penetrate the vein wall of the inferior vena cava.** This is common, and produces a problem only in extremely rare cases.
- Migrating blood clots can obstruct the inferior vena cava and filter, resulting in swelling of the lower extremities.

Ex. W, Günther Tulip™ Vena Cava Filter Brochure; *see also* 1/11/17 Goodwin Dep. at 105:2-

106:9 (discussing brochure, emphasis added).  Dr. Goodwin testified that all of these risks—

including perforation and penetration—were universal to all IVC filters and that all were known

both to Dr. Goodwin and to the medical community at the time of Plaintiff's 2011 surgery:

> Q. Do you agree that those are all known risks of any filter placement procedure?
> A. Yes.
> Q. Again, not unique to Cook or to the Tulip?
> A. Correct.
> Q. And known by you and in the medical community in April of 2011?
> A. Yes.

1/11/17 Goodwin Dep. at 105:10-18.

With knowledge of all these risks, Dr. Goodwin prescribed and placed the Tulip IVC

filter in Plaintiff.  Given this fact, any alleged omission from the Tulip IFU of any risk of IVC

filters could not have influenced Dr. Goodwin's decision to place the Tulip filter and thus could

not, as a matter of law, have caused Plaintiff's claimed injuries.  *See Wooten v. Johnson &

Johnson Products, Inc.*, 635 F. Supp. 799, 804 (1986) (finding only relevant issue was whether

prescribing physician was aware of risks and granting summary judgment where physician

testified that he was and plaintiff produced no concrete evidence to contrary).

**3.  Dr. Goodwin would still have placed the Tulip filter in Plaintiff today.**

Dr. Goodwin testified that if Plaintiff came to him today in the same situation presented

US.109782865.34

in 2011, Dr. Goodwin would provide exactly the same treatment and would still place the filter.

He testified:

> Q.    With respect to the specific patient Arthur Gage, in the case of Mr. Gage, was it your judgment that the benefits of placing a Tulip filter outweighed the risks for Mr. Gage?
>
> A.    Yes. If a thousand times he came in with that same scenario, a thousand times I'd put a filter in.
>
> Q.    You'd do it again today?
>
> A.    I'd do it again today.

1/11/17 Goodwin Dep. at 123:1-9.

The rest of Dr. Goodwin's testimony further supports this conclusion.  He testified:

- He has used the Tulip filter in his patients continuously since the product because available, 1/11/17 Goodwin Dep. at 86:14-87:5;
- He gets good results with the Tulip, *id.* at 87:6-9;
- He finds the Tulip safe to put in and easy to retrieve, *id.* at 87:10-88:5;
- He has had no complications with Tulip filters in his patients in 30 years, *id.* at 93:14-17; and
- He has confidence in the Tulip filter and would prescribe it for a patient today, including himself, *id.* at 87:10-14.

Plaintiff had every opportunity to elicit testimony from Dr. Goodwin that he would have done something differently in his treatment of Plaintiff had he received additional information from Cook, but such testimony does not exist.

In sum, the undisputed facts establish that any claimed deficiency in the Tulip IFU's instructions or warnings did not cause Gage's IVC filter perforation or the consequences that flowed from it.  Plaintiff cannot establish the necessary element of causation, and Cook is entitled to summary judgment on Plaintiff's failure-to-warn claim.

**VIII.    <u>Cook is Entitled to Summary Judgment on Plaintiff's Breach of Express and Implied Warranty Claims.</u>**

Cook is entitled to summary judgment on Plaintiff's breach of express and implied warranty claims.

US.109782865.34

**A. Gage's express warranty claim cannot survive summary judgment where he fails to provide the terms of alleged express warranty or the substance of any affirmation of fact or promise.**

"In an express warranty action, plaintiff must show breach of an affirmation of fact or promise which was made part of the basis of the bargain." *Wheeler v. Sunbelt Tool Co.*, 537 N.E.2d 1332, 1341 (1989).  Because "express warranties are contractual in nature, the language of the warranty itself is what controls and dictates the obligations and rights of the various parties." *Hasek v. DaimlerChrysler Corp.*, 745 N.E.2d 627, 634 (2001).  "To state a claim, the terms of the express warranty must be stated or attached to the complaint [citations], and failure to do so renders the claim invalid." *Board of Education of City of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580, 595 (1989).  Here, the full of extent of Gage's allegations is a single generic assertion that Cook expressly warranted to him that its filter was safe, Compl. ¶ 51, and Plaintiff has identified no other evidence of any express warranty by Cook.  Plaintiff's generic allegation does not support a claim for express warranty.  *See Corwin v. Connecticut Valley Arms, Inc.*, 74 F. Supp. 3d 883, 892 (N.D. Ill. 2014) (holding plaintiff's assertion that defendant "expressly warranted" that its product was "reasonably fit for their intended uses without endangering human safety and free from design or manufacturing defects" was insufficient and constituted no more than a formulaic recitation of the elements for a breach of express warranty claim).  Cook is therefore entitled to summary judgment on Plaintiff's breach of express warranty claim.

**B. Cook is entitled to summary judgment as a matter of law because Gage's inability to prove defect is fatal to a breach of implied warranty claim.**

A product breaches the implied warranty of merchantability if it is not fit for the ordinary purposes for which such goods are used.  810 Ill. Comp. Stat. Ann. 5/2-314(2)(c) (West 2016); *Alvarez v. Am. Isuzu Motors*, 749 N.E.2d 16, 22 (Ill. App. Ct. 2001).  To succeed on a claim of breach of implied warranty, a plaintiff must allege and prove: (1) a sale of goods, (2) by a

32

merchant of those goods, and (3) that the goods were not merchantable. *Brandt v. Boston Scientific Corp.*, 792 N.E.2d 296, 299 (Ill. 2003).

The theory of breach of implied warranty of merchantability is nearly identical to strict liability, *State Farm Fire & Casualty Co. v. Miller Electric Co.*, 562 N.E.2d 589, 595 (1990), and, as in strict liability claims, a plaintiff must prove the product is defective to prevail. *Alvarez*, 749 N.E.2d at 23. Plaintiff cannot do so. As detailed above, none of Plaintiff's experts actually identifies any defect in the design of the Cook Tulip IVC filter or opines that Cook should have provided additional material information or warnings in its IFUs. Plaintiff therefore cannot satisfy the elements of a breach of implied warranty claim, and Cook is entitled to summary judgment on that claim. *See Show v. Ford Motor Co.*, 659 F.3d at 588 (the complex nature of medical device and injury suits require expert testimony to support claims of defect).

**IX.** **Cook is Entitled to Summary Judgment on Plaintiff's Punitive Damages Claim.**

Cook is entitled to summary judgment on Plaintiff's claim for punitive damages, both because his claims for compensatory damages fail and because he cannot as a matter of law meet the high threshold necessary for the imposition of punitive damages.

First, Plaintiff's punitive damages claim fails because his product liability claims fail. As discussed above, a claim for punitive damages is not an independent cause of action, but "merely a remedy that must be asserted in conjunction with a substantive claim." *Hallgren*, 124 So. 3d at 355. A finding of liability is therefore a prerequisite to a determination of punitive damages. *See Engle*, 945 So.2d at 1262–63. Because all of Plaintiff's substantive product liability claims fail as a matter of law, Plaintiff's claim for punitive damages likewise fails as a matter of law.

Even if the Court were to find that one or more of Plaintiff's product liability claims survives summary judgment, Cook is still entitled to summary judgment because Plaintiff cannot

33

as a matter of law meet the high standard for punitive damages.  Although Illinois law governs Plaintiff's claims for compensatory damages, the choice of the law governing his claim for punitive damages is not so simple.  As discussed in Cook's forthcoming motion for bifurcation of punitive damages, Cook contends that the law of Indiana, the state in which all the Cook conduct with which Plaintiff takes issue occurred, applies to Plaintiff's punitive damages claim. The Court need not decide the choice-of-law question to grant Cook summary judgment on Plaintiff's punitive damages claim, however, because Plaintiff's evidence could not sustain an award of punitive damages under either state's standard.

Illinois permits an award of punitive damages in product liability actions if the defendant acted willfully or with such gross negligence as to indicate a wanton disregard of others' rights. *J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.*, 516 N.E.2d 260, 263 (Ill. 1987). Courts have defined "willful or wanton conduct" as "a course of action which shows an utter indifference to or conscious disregard for the safety of others." *Proctor*, 682 N.E.2d at 1216. Under Indiana law, punitive damages may be awarded only when the jury could find by clear and convincing evidence that the defendant acted with malice, fraud, willful and wanton misconduct, oppressiveness "which was not the result of a mistake of fact or law, mere negligence, or other human failing." *Wohlwend v. Edwards*, 796 N.E.2d 781, 784 (Ind. 2003); Ind. Code § 34-51-3-1 (Burns Code Ed. Repl. 1998).

Here, even assuming that Plaintiff could produce sufficient evidence to create a genuine issue of material fact on one or more of his product liability claims, he cannot produce evidence that could clearly and convincingly permit a jury to conclude that Cook engage in the culpable conduct required by either of these standards: intentional misconduct or gross negligence.  There is no gross negligence, no fraud, no malice, and no wanton or willful misconduct.

This conclusion is particularly compelling in the specific circumstances of this case, where Plaintiff's own expert Dr. Marmureanu concedes that the treating doctor's use of the Tulip filter did not violate any standard of care.  The Court should grant Cook summary judgment on Plaintiff's claim for punitive damages.

## CONCLUSION

The Court should grant summary judgment to Cook on all of Plaintiff's claims.

Dated: August 11, 2017

/s/ John T. Schlafer
Andrea Roberts Pierson (# 18435-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
Email:  andrea.pierson@faegrebd.com
Email:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

35

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, a copy of the foregoing COOK DEFENDANTS'

MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS was

filed electronically, and notice of the filing of this document will be sent to all parties by

operation of the Court's electronic filing system to CM/ECF participants registered to receive

service in this matter.  Parties may access this filing through the Court's system.  Counsel for

Defendants will serve any non-CM/ECF registered parties.

*/s/ John T. Schlafer* _____

US.109782865.34