Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
INDIANAPOLIS DIVISION

------------------------------ )
In Re:  COOK MEDICAL, INC.,  ) Case No.
IVC FILTERS MARKETING,       ) 1:14-ml-2570-
SALES PRACTICES AND          ) RLY-TAB
PRODUCTS LIABILITY LITIGATION )
------------------------------ ) MDL No. 2570
This Document Relates To:    )
                             )
   1:14-cv-01875-RLY-TAB     )
   Arthur Gage               )
------------------------------ )


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF
TIMOTHY JAMES LARKIN, M.D.

April 19, 2017


Advocate Heart Institute
Naperville, Illinois




GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 2

        The videotaped deposition of
TIMOTHY JAMES LARKIN, M.D., called for examination,
taken pursuant to the Federal Rules of Civil
Procedure of the United States District Courts
pertaining to the taking of depositions, taken
before CORINNE T. MARUT, C.S.R. No. 84-1968,
Registered Professional Reporter and a Certified
Shorthand Reporter of the State of Illinois, at the
offices of Advocate Heart Institute, 801 South
Washington Street, Naperville, Illinois, on
April 19, 2017, commencing at 9:06 a.m.

Page 3

APPEARANCES:
 ON BEHALF OF THE PLAINTIFFS:
    MATTHEWS & ASSOCIATES
    2905 Sackett Street
    Houston, Texas  77098
    713-552-5250
    BY:  DAVID P. MATTHEWS, ESQ.
       dmatthews@dpmlawfirm.com

    FEARS NACHAWATI
    4925 Greenville Avenue, Suite 715
    Dallas, Texas  75206
    866-705-7584
    BY:  MATTHEW McCARLEY, ESQ.
       mccarley@fnlawfirm.com

 ON BEHALF OF THE COOK MEDICAL, INC. DEFENDANTS:
    FAEGRE BAKER DANIELS LLP
    300 North Meridian Street, Suite 2700
    Indianapolis, Indiana  46204
    317-237-0300
    BY:  JESSICA BENSON COX, ESQ.
       jessica.cox@FaegreBD.com
       J. JOSEPH TANNER, ESQ.
       joe.tanner@faegreBD.com

 ON BEHALF OF THE DEPONENT:
    KOMINIAREK BRESLER HARVICK & GUDMUNDSON, LLC
    33 North Dearborn Street, Suite 1310
    Chicago, Illinois  60602
    312-322-1111
    BY:  ERIN S. DAVIS, ESQ.
       edavis@kbhglaw.com

Page 4

ALSO PRESENT:
    CATHI M. SNAPP, Paralegal,
    Faegre Baker Daniels LLP


VIDEOTAPED BY:  ANTHONY MICHELETTO

REPORTED BY:  CORINNE T. MARUT, CSR No. 84-1968

Page 5

```
 1          I N D E X
 2  TIMOTHY JAMES LARKIN, M.D.        EXAMINATION
 3     BY MS. COX................   9
 4     BY MR. MATTHEWS...............  102
 5     BY MS. COX...................  176
 6     BY MR. MATTHEWS...............  180
 7
 8
 9         E X H I B I T S
10  LARKIN DEPOSITION EXHIBIT       MARKED FOR ID
11  No. 1   Second Amended Cross Notice of    11
12          Video Deposition of Dr.
13          Timothy Larkin
14  No. 2   Curriculum Vitae           12
15  No. 3   Medical records; Bates Nos.    50
16          Midwest Heart000001 - 000123
17
18  No. 4   Handwritten medical records;   55
19          Bates Nos. Edward001238 - 001273
20  No. 5   12/22/10 medical record; Bates  59
21          Nos. Edward000118 - 000120
22
23  No. 6   3/7/11 Discharge Summary;      61
24          Bates Nos. Edward000083 - 000084
25  No. 7   4/26/11 Consultation Report;   65
26          Bates Nos. Edward000090 - 000092
27
28  No. 8   Report of VQ Scan;             69
29          Bates Nos. Edward000861
30  No. 9   4/27/11 nursing note;          70
31          Bates Nos. Edward000540
```

Page 6

```
 1         E X H I B I T S
 2  LARKIN DEPOSITION EXHIBIT       MARKED FOR ID
 3  No. 10  booklet, Cook G|nther Tulip     79
 4          Vena Cava Filter Set; Bates
 5          Nos. Edward001170 - 001175
 6  No. 11  6/24/13 Progress Note; Bates    89
 7          Nos. Edward001875 - 001877
 8
 9  No. 12  4/26/11 Report of             118
10          Consultation; Bates Nos.
11          Edward000001, 000090 and 000091
12
13  No. 13  7/7/11 medical record; Bates   121
14          Nos. Midwest Heart 000001,
15          000007, 000008, 000009
16
17  No. 14  12/8/11 medical record; Bates  136
18          Nos. Midwest Heart000001,
19          000045 and 000046
20
21  No. 15  1/3/13 medical record;         146
22          GAGE, 478 and 479
23  No. 16  7/18/13 medical record; Bates  150
24          Nos. Midwest Heart000001,
25          000029 and 000030
26  No. 17  1/16/14 medical record; Bates  154
27          Nos. Midwest Heart00001,
28          000024 and 000025
29  No. 18  ***SKIPPED IN NUMBERING***
30  No. 19  11/16/13 medical record from   155
31          Loyola Hospital; no Bates
32          numbers indicated
33  No. 20  12/3/13 CT report from Loyola  157
34          Hospital; no Bates numbers
35          indicated
```

Page 7

```
 1         E X H I B I T S
 2  LARKIN DEPOSITION EXHIBIT       MARKED FOR ID
 3  No. 21  12/10/13 progress note from   160
 4          Loyola Hospital; no Bates
 5          numbers indicated
 6  No. 22  12/11/13 CT report;           161
 7          Bates Nos. Gage00069
 8
 9  No. 23  1/13/14 progress note of      164
10          Loyola Hospital; no Bates
11          numbers indicated
12
13  No. 24  1/21/14 progress note from    168
14          Loyola Hospital; no Bates
15          numbers indicated
16
17  Nos. 25 ***SKIPPED IN NUMBERING***
18  and 26
19  No. 27  5/12/15 radiology report of   169
20          Loyola Hospital; no Bates
21          numbers indicated
22  No. 28  5/23/15 radiology report of   171
23          Loyola Hospital; no Bates
24          numbers indicated
25  No. 29  article by Mismetti, et al.,  142
26          "Effect of a Retrievable
27          Inferior Vena Cava Filter Plus
28          Anticoagulation vs
29          Anticoagulation Alone on Risk
30          of Recurrent Pulmonary Embolism"
```

Page 8

 1    THE VIDEOGRAPHER:  We are now on the record.
 2  My name is Anthony Micheletto.  I am a videographer
 3  with Golkow Technologies.
 4      Today's date is April 19, 2017.  The
 5  time is 9:06 a.m., as indicated on the video
 6  screen.
 7      This video deposition is being held in
 8  Naperville, Illinois in the matter of In Re Cook
 9  Medical, Incorporated IVC Filters Marketing, Sales
10  Practices and Products Liability Litigation, in the
11  United States District Court, Southern District of
12  Indiana.
13      Today's deponent is Timothy Larkin, MD.
14      Will counsel please identify yourselves
15  for the video record.
16    MS. COX:  This is Jessica Cox for the
17  Defendants.
18    MR. MATTHEWS:  David Matthews for the
19  Plaintiff.
20    MS. DAVIS:  Erin Davis on behalf of the
21  witness.
22    THE VIDEOGRAPHER:  Our Court Reporter today is
23  Corinne Marut.  Please swear in the doctor.
24      (WHEREUPON, the witness was duly

Page 33

1  BY THE WITNESS:
2     A.  Could you rephrase that.
3  BY MS. COX:
4     Q.  Sure. If you had a patient who had PE
5  and who couldn't take a blood thinner and you
6  didn't have a filter as an option, what could be
7  the potential outcome there?
8     MR. MATTHEWS:  Object to the form.
9  BY THE WITNESS:
10    A.  Well, the possibility is they could have
11 another pulmonary embolism and have a complication
12 from that other pulmonary embolism.
13 BY MS. COX:
14    Q.  When you treat a person who has more
15 than one pulmonary embolism, tell me what the
16 concern is with a second and third pulmonary
17 embolism.
18    MR. MATTHEWS:  Object to the form.
19 BY THE WITNESS:
20    A.  Well, the concern is that with a
21 recurrent pulmonary embolism, you could have a
22 bigger clot or -- and just get into the more
23 serious complications of low blood pressure and
24 rapid heart rate.

Page 34

1  BY MS. COX:
2     Q.  Once you have a PE, are you more likely
3  to have another PE?
4     MR. MATTHEWS:  Object to the form.
5  BY THE WITNESS:
6     A.  It depends on what the cause of the
7  pulmonary embolism is.
8  BY MS. COX:
9     Q.  Are filters an important tool to have to
10 help save patients' lives?
11    MR. MATTHEWS:  Object to the form.
12 BY THE WITNESS:
13    A.  Yes.
14 BY MS. COX:
15    Q.  Would you agree that there's always a
16 risk inherent in using any medical device in a
17 patient?
18    MR. MATTHEWS:  Object to the form.
19 BY THE WITNESS:
20    A.  Yes.
21 BY MS. COX:
22    Q.  And that would be whether it's a filter,
23 a pacemaker or a stent?
24    A.  Yes.

Page 35

1     Q.  Do you ever guarantee results to your
2  patients where you've prescribed a medical device?
3     A.  No.
4     Q.  Why is that?
5     A.  Because even -- because complications
6  are associated with medical devices.
7     Q.  And do you ever guarantee anything in
8  medicine?
9     A.  No.
10    Q.  When you prescribe things like IVC
11 filters, pacemakers, stents, are you doing that
12 because in your calculus the benefit of these
13 devices outweigh the potential for their risk?
14    A.  Yes.
15    Q.  I want to talk a little bit about the
16 known risks associated with the use of IVC filters.
17       Have you heard of something called
18 perforation or penetration of the IVC?
19    A.  Yes.
20    Q.  Can you tell me just generally what that
21 means?
22    A.  Well, that would mean that one or more
23 of the struts went through the wall of the IVC.
24    Q.  And is that a known risk with using IVC

Page 36

1  filters?
2     A.  Yes.
3     Q.  Is that something you were aware of in
4  April of 2011, for example?
5     A.  Yes.
6     Q.  How were you made aware of that risk?
7     A.  Just common knowledge about the
8  procedure and the device.
9     Q.  So, through your training and experience
10 and perhaps speaking with colleagues, you -- it was
11 a risk you were aware of?
12    MR. MATTHEWS:  Object to the form.
13 BY THE WITNESS:
14    A.  Yes.
15 BY MS. COX:
16    Q.  And it was a commonly known risk?
17    MR. MATTHEWS:  Object to the form.
18 BY THE WITNESS:
19    A.  Yes.
20 BY MS. COX:
21    Q.  You might be aware that Dr. Goodwin had
22 his deposition taken in this case previously. Did
23 you know that?
24    A.  Yes.

9 (Pages 33 to 36)

Page 37

1    Q.   We talked with Dr. Goodwin about
2  perforations or penetrations of the IVC, and he
3  told us that usually they're not clinically
4  significant. Would you agree with Dr. Goodwin?
5    MR. MATTHEWS: Object to the form.
6  BY THE WITNESS:
7    A.   Yes.
8  BY MS. COX:
9    Q.   Tell me in your -- in your opinion are
10 perforations -- perforations/penetrations in and of
11 themselves harmful to a patient?
12   MR. MATTHEWS: Object to the form.
13 BY THE WITNESS:
14   A.   I can't answer that.
15 BY MS. COX:
16   Q.   Would you defer to Dr. Goodwin about
17 specific opinions about penetration or perforation?
18   A.   Yes.
19   Q.   Have you yourself ever had a patient
20 suffer a problem or complication from a penetration
21 or perforation?
22   A.   No, I have not.
23   Q.   Perforation and/or penetration into an
24 adjacent organ or structure is also a risk with IVC

Page 38

1  filter use, correct?
2    A.   Correct.
3    Q.   And that's a risk with all filters,
4  correct?
5    MR. MATTHEWS: Object to the form.
6  BY THE WITNESS:
7    A.   Could you ask that again.
8  BY MS. COX:
9    Q.   Sure.
10   A.   Are you speaking about IVC filters?
11   Q.   IVC filters, yes.
12   MR. MATTHEWS: Object to the form.
13 BY THE WITNESS:
14   A.   Yes.
15 BY MS. COX:
16   Q.   Is that a risk that you were aware of in
17 April of 2011?
18   A.   Yes.
19   Q.   And how were you aware of that risk?
20   A.   Again, through common knowledge, my
21 training.
22   Q.   Doctors that prescribed IVC filters were
23 aware of that risk in April of 2011?
24   MR. MATTHEWS: Object to the form.

Page 39

1  BY THE WITNESS:
2    A.   Yes.
3  BY MS. COX:
4    Q.   Is fracture of an IVC filter component a
5  known risk?
6    A.   Yes.
7    Q.   And embolization of that component a
8  known risk with filters?
9    A.   Yes.
10   Q.   Is that a risk you knew about in
11 April of 2011?
12   A.   Yes.
13   Q.   And is that a commonly known risk?
14   A.   It's a risk.
15   Q.   And by that I mean is it a risk that is
16 commonly known by practitioners?
17   MR. MATTHEWS: Object to the form.
18 BY THE WITNESS:
19   A.   I can't answer what other practitioners
20 know.
21 BY MS. COX:
22   Q.   Okay. How were you made aware of that
23 risk?
24   A.   Again, through my training, experience

Page 40

1  and discussions with colleagues.
2    Q.   Is the inability to retrieve a filter a
3  known risk, that is, the risk that a filter might
4  become permanent or need to be surgically removed
5  in an open type procedure?
6    MR. MATTHEWS: Object to the form.
7  BY THE WITNESS:
8    A.   I'm sorry. What was the question there?
9  BY MS. COX:
10   Q.   Is the inability to retrieve a filter a
11 known risk?
12   MR. MATTHEWS: Object to the form.
13 BY THE WITNESS:
14   A.   I can't really answer that.
15 BY MS. COX:
16   Q.   When you prescribe a filter, do you
17 prescribe filters that can be retrieved at later
18 dates or do you -- or do you have any knowledge
19 about retrievability of filters?
20   MR. MATTHEWS: Object to the form.
21 BY THE WITNESS:
22   A.   Again, there is two questions.
23 BY MS. COX:
24   Q.   Okay.

Page 41

1    A.   Could you rephrase that.
2    Q.   Sure.  What is your understanding about
3 if and when a filter can be retrieved after it's
4 placed?
5       MR. MATTHEWS:  Object to the form.
6 BY THE WITNESS:
7    A.   The filters that are put in now we can
8 retrieve them.
9 BY MS. COX:
10   Q.   And when you prescribe a filter that is
11 one where it can be retrieved, do you understand
12 that there's a risk that that filter might not be
13 able to be retrieved after a time?
14      MR. MATTHEWS:  Object to the form.
15 BY THE WITNESS:
16   A.   Yes.
17 BY MS. COX:
18   Q.   Is there a -- so, is there a known risk
19 that a filter might not be able to be retrieved?
20   A.   Yes.
21      MR. MATTHEWS:  Object to the form.
22 BY MS. COX:
23   Q.   Is there also a risk that a filter might
24 need to be retrieved in an open procedure, for

Page 42

1 example, rather than the normal retrieval process?
2    A.   Yes.
3    Q.   And are those risks, the risk of an
4 inability to retrieve or the need to do an open
5 procedure, are those risks that you knew about in
6 April of 2011?
7    A.   Yes.
8    Q.   And are those risks that you knew about
9 by virtue of your training and your experience?
10   A.   Yes.
11   Q.   Are bleeding, hemorrhage, a possible
12 risk with the use of IVC filters?
13   A.   Yes.
14   Q.   Is that a risk that you knew about in
15 April of 2011?
16   A.   Yes.
17   Q.   Is that another risk that you knew about
18 by virtue of your training and experience?
19   A.   Yes.
20   Q.   Is embedment also a known risk?
21        And I can -- what I mean by embedment
22 is --
23      MR. MATTHEWS:  Object to form.
24 BY THE WITNESS:

Page 43

1    A.   Can you rephrase that.
2 BY MS. COX:
3    Q.   I have heard the word
4 "endothelialization" and I'm not sure what that
5 means, but that does that make sense to you?
6       MR. MATTHEWS:  Object to the form.
7 BY THE WITNESS:
8    A.   Well -- yes.
9 BY MS. COX:
10   Q.   What does endothelialization mean?
11   A.   Endothelialization is when a layer of
12 cells would grow over the struts of a filter.
13   Q.   And is that a known risk with the use of
14 IVC filters?
15   A.   Yes.
16      MR. MATTHEWS:  Object to the form.
17 BY MS. COX:
18   Q.   Is that something you knew about in
19 April of 2011?
20   A.   Yes.
21   Q.   Is that something you also knew about by
22 virtue of your training and your experience?
23   A.   Yes.
24   Q.   I promise I'm almost done with this

Page 44

1 list.
2        Is migration a known risk with IVC
3 filters?
4    A.   Yes.
5    Q.   Tell me, when I say "migration," what
6 does that mean?
7    A.   That would mean where the filter moves
8 from its original position.
9    Q.   Is that a risk that you knew about in
10 April of 2011?
11   A.   Yes.
12   Q.   And is that another risk that you knew
13 about by virtue of your training and experience?
14   A.   Yes.
15   Q.   Is tilt also a known potential
16 occurrence with a filter?
17   A.   Yes.
18   Q.   And tell me, what does the term "tilt"
19 mean to you?
20   A.   It would be where the filter is off to
21 one side of the IVC.
22   Q.   When Dr. Goodwin was deposed previously,
23 he said in his experience tilt doesn't really have
24 any clinical significance.  Do you agree with

Page 45

1  Dr. Goodwin?
2      MR. MATTHEWS: Object to the form.
3  BY THE WITNESS:
4      A.  I can't really speak to what Dr. Goodwin
5  spoke about in his deposition.
6  BY MS. COX:
7      Q.  Does tilt have any clinical significance
8  to you?
9      A.  Again, I can't really answer that
10 question.
11     Q.  If one of your patients with an IVC
12 filter had an image that showed the filter was
13 tilted, would you do anything after seeing that
14 image?
15     A.  Again, it depends on the specific
16 patient.
17     Q.  Have you ever seen tilt cause any harm
18 to a patient?
19     MR. MATTHEWS: Object to the form.
20 BY THE WITNESS:
21     A.  Not in my practice.
22 BY MS. COX:
23     Q.  Have you heard about tilt ever causing
24 harm to a patient?

Page 46

1      A.  I can't answer that.
2      MR. MATTHEWS: Object to the form.
3  BY MS. COX:
4      Q.  In your experience has tilt ever
5  affected how a filter worked, for example?
6      A.  I can't answer that.
7      MR. MATTHEWS: Object to the form.
8          (Clarification requested by the
9           reporter.)
10 BY MS. COX:
11     Q.  Over the course of your career when you
12 prescribe IVC filters, have you had occasion to see
13 filters that were tilted on appearance and imaging?
14     A.  Yes.
15     Q.  Has it ever been anything that's caused
16 you any concern?
17     A.  No.
18     Q.  Dr. Goodwin said that tilt can happen
19 because of a patient's anatomy or how a filter is
20 deployed. Do you agree with those conclusions or
21 do you have any opinion?
22     A.  I don't have an opinion on that.
23     Q.  Do you defer to Dr. Goodwin on the -- on
24 areas of opinions about tilt and its clinical

Page 47

1  significance?
2      A.  Yes.
3      Q.  Is malpositioning of a filter a known
4  risk?
5      A.  Yes.
6      Q.  Is that a risk that you were aware of in
7  April of 2011?
8      A.  Yes.
9      Q.  And is that a risk you are aware of by
10 virtue of your training and experience?
11     A.  Yes.
12     Q.  What about thrombosis, stenosis or
13 occlusion of the IVC?
14     A.  Yes.
15     Q.  Is that something you were aware of in
16 2011?
17     A.  Yes.
18     Q.  And that was also a risk you were aware
19 of by virtue of your training and experience?
20     A.  Yes.
21     Q.  What about death, is that a potential
22 risk?
23     A.  Yes.
24     Q.  And that is a risk that you were aware

Page 48

1  of in April of 2011?
2      A.  Yes.
3      Q.  A risk that you were aware of by virtue
4  of your training and experience?
5      A.  Yes.
6      Q.  This list of risks that we just went
7  through that you were aware of in April of 2011,
8  you told me that you were aware of all of those
9  risks by virtue of your training and your
10 experience, correct?
11     A.  Yes.
12     Q.  You didn't need a manufacturer to tell
13 you about them, for example?
14     MR. MATTHEWS: Object to the form.
15 BY THE WITNESS:
16     A.  No.
17 BY MS. COX:
18     Q.  We spoke earlier about how you don't
19 guarantee results to your patients. Do you recall
20 that?
21     A.  Yes.
22     Q.  Would you agree there are many factors
23 that can affect the success of a procedure?
24     A.  Yes.

12 (Pages 45 to 48)

Page 53

1  Q.  When you refer a patient for an IVC
2  filter placement, what imaging do you usually see
3  in their chart, if any?
4      MR. MATTHEWS:  Object to the form.
5  BY THE WITNESS:
6  A.  I don't usually see any in relation to
7  that.
8  BY MS. COX:
9  Q.  So, you don't usually review, you know,
10 pre-procedure cavagrams, for example?
11 A.  No.
12 Q.  And you don't usually see images taken
13 after the filter was placed, for example?
14 A.  No.
15 Q.  Okay.  In preparation for your
16 deposition did you review any documents related to
17 Cook?
18 A.  No.
19 Q.  Did you review -- let me short-circuit
20 this.
21     You didn't review any documents outside
22 of Mr. Gage's medical records, correct?
23 A.  That is correct.
24 Q.  Did you do any research on IVC filters?

Page 54

1  A.  No.
2  Q.  Did you review any documents related to
3  the design of Cook filters?
4  A.  No.
5  Q.  Is it fair to say you're not going to be
6  offering opinions about the design of Cook filters?
7  A.  Yes.
8  Q.  Is it fair to say -- here's a question.
9      Have you reviewed the package insert or
10 the IFU that might have accompanied the Cook filter
11 placed in Mr. Gage?
12 A.  No.
13 Q.  Have you ever seen a package insert or
14 IFU that comes with a filter?
15 A.  No.
16 Q.  So, is it fair to say you won't be
17 offering any opinions about the warnings that
18 accompanied Mr. Gage's filter in that IFU?
19 A.  Yes.
20 Q.  Did you -- sorry.
21     Did you review anything Cook might have
22 submitted to the FDA?
23 A.  No.
24 Q.  So, are you -- is it fair to say you're

Page 55

1  not going to offer opinions regarding Cook's
2  compliance with FDA regulations, for example?
3  A.  Yes.
4  Q.  Okay.  Have you ever discussed this
5  lawsuit with Mr. Gage or his family?
6  A.  No.
7      (WHEREUPON, a certain document was
8       marked Larkin Deposition Exhibit
9       No. 4, Handwritten medical records;
10      Bates Nos. Edward001238 - 001273.)
11 BY MS. COX:
12 Q.  I'm going to hand you Exhibit 4, and
13 I'll represent to you that this is just a stack of
14 handwritten notes from Edward Hospital; and you
15 were kind enough to review these before your
16 deposition started.
17     And my question was just are any of
18 these handwritten notes yours, and I believe you
19 said that Edward 1239, Edward 1241 and Edward 1250
20 are all notes that you actually handwrote.
21     Is that correct?
22 A.  Yes.
23 Q.  Looking at Exhibit 3, which is your
24 chart that reflects your care and treatment of

Page 56

1  Mr. Gage, in this chart it looks like you first saw
2  him on April 10, 2009 and the last note in there is
3  from May 2, 2016.
4      My first question is:  Do you remember
5  how you came to treat Mr. Gage in April of 2009?
6  A.  No, I don't.
7  Q.  Do you recall if it was for a particular
8  medical issue that you first started treating
9  Mr. Gage?
10 A.  I would assume it was for his heart.
11 Q.  Do you have any idea about Mr. Gage's
12 health prior to April of 2009?
13 A.  Could you rephrase that.
14 Q.  Did you have access to any of his
15 medical records before you started treating him in
16 April of 2009?
17 A.  No.
18 Q.  So, do you know anything about his
19 history of PE or DVT prior to seeing you in 2009?
20 A.  No.
21 Q.  Do you know anything about his use of
22 anticoagulants prior to coming and seeing you?
23 A.  No.
24 Q.  Mr. Gage, it looks like, suffered from

Page 81

and his legs. This happened about a week ago. He did not tell anyone. He was just mentioning it today."
    Did I read that correctly?
  A. Yes.
  Q. This is part of your chart, is that correct?
  A. Yes.
  Q. And this note was written on 5/17. So, roughly a week ago is when he's telling her he had a motor vehicle accident, is that correct?
  A. Yes.
  Q. So, that would have been around May 10ish, I would say less than two weeks after his filter was placed, is that correct?
  A. Yes.
  Q. Were you made aware of this car accident?
  A. I'm sorry. What was your question?
  Q. Were you aware that he was in this accident with a car?
  A. Yes.
  Q. Was that concerning at all to you?
  A. Yes.

Page 82

  Q. Tell me, why was that concerning?
  A. Well, the concern about that is if somebody is on Coumadin and they are hit by a car and they hit their head, that they could have a -- they could bleed in their head.
  Q. We took Mr. Gage's deposition in this case and he told us that between 2000 and 2015 he has been involved in nine car accidents and had nine traumatic falls that have brought him to the emergency room. Would that testimony surprise you?
    MR. MATTHEWS: Object to the form.
BY THE WITNESS:
  A. I don't really have an opinion on that.
BY MS. COX:
  Q. I'm going to turn to the Bates No. 7 in your chart. It's a visit --
  A. I'm sorry. What --
  Q. Page 7 of Exhibit 3. A visit with you on July 7, 2011.
  A. Okay.
  Q. This was a visit in your office, and I believe this was the first time you personally saw Mr. Gage after he had his filter placed. Does that sound correct?

Page 83

  A. I don't know. I have to read the note.
    Okay. I read it.
  Q. So, this was the first time you saw Mr. Gage after his filter was placed?
  A. I don't remember that specifically if that was the first time.
  Q. In this note you talk about his history of recurrent PE and that he has an IVC filter. In the highlighted portion on the screen it says, "He's actually doing quite well. He's recently been to Rib Fest. He's been on boats."
    So, do you recall he was doing well during this visit?
  A. I don't recall that specifically other than what I'm reading right now.
  Q. So, if he would have had, for example, a PE since his filter was placed, that would be something that you would have noted here, correct?
  A. Yes.
  Q. So, no -- nothing in this visit shows any concerns for his PE at this point, correct?
  A. Correct.
  Q. Now, on the second page of this note, under "Decision Making," it says, "Pulmonary

Page 84

embolism. He is going to be on Coumadin lifelong."
    Can you tell me what that means?
  A. Well, the issue at that point was that there was no -- oh, I lost my mike. I'm sorry.
    MR. MATTHEWS: What page are you on? I'm sorry.
    MS. COX: 08.
BY THE WITNESS:
  A. I'll start again.
    There was no clear-cut, precipitating factor for his pulmonary embolism, i.e., surgery or trauma at the time when he initially presented, so therefore you don't really know if it's ever safe to stop anticoagulation.
BY MS. COX:
  Q. So, in this visit you are making the determination that he was going to be on blood thinners the rest of his life?
  A. I was going to keep him on blood thinners indefinitely at that time.
  Q. And that was due to his risk of having another PE?
  A. That would be the risk of having another thromboembolic event, yes.

Page 85

Q. As part of that decision were you factoring in his heart function and COPD and maybe ability to tolerate a future PE?
A. Not specifically.
Q. That decision to place him on lifelong blood thinners, that was solely based on his risk for PE in the future and not the fact that he had an IVC filter placed, correct?
A. Correct.
Q. It also says under "Decision Making" that "IVC filter, this will be the same." Does that mean you're prescribing his filter to remain in lifelong?
A. At that point I had made the decision to leave it in, yes.
Q. And what was that decision based on?
A. That was a clinical decision based on multiple things, including his chronic renal insufficiency, which makes future diagnosis of pulmonary embolism very difficult, the troubles he had had with anticoagulation with bleeding issues. And when you put those two together, I thought the filter should stay in place.
Q. So, that decision to have his filter

Page 86

remain was not based on your review of any imaging of his filter at that time, correct?
A. That's correct.
Q. The decision to have his filter stay lifelong, would that possibly be based on his risk of needing a future surgery where blood thinners would have to be stopped as well?
MR. MATTHEWS: Object to the form.
BY THE WITNESS:
A. I'm sorry. Rephrase that, please.
BY MS. COX:
Q. Given his complicated history, was Mr. Gage at -- did he -- was there a good probability that he might need another surgery in the future where you'd also have to stop blood thinners, for example?
A. Yes.
Q. So, the filter would add protection if he wasn't able to take blood thinners because of an upcoming surgery, for example?
A. That's correct.
Q. Was it also based on your knowledge of his risks of falls or being in motor vehicle accidents that might lead to bleeding and a need to

Page 87

stop anticoagulants?
MR. MATTHEWS: Object to the form.
BY THE WITNESS:
A. Yes.
BY MS. COX:
Q. Knowing that filters and anticoagulants both have risks, you made the decision back in July of 2011 that the benefits of keeping the filter in and taking blood thinners lifelong outweighed the risks to Mr. Gage, correct?
A. Correct.
Q. Do you ever recall an instance where Mr. Gage may have been non-compliant with a medication?
A. There were instances where I was concerned that he wasn't taking his medicines correctly.
Q. Is that another reason that perhaps an IVC filter being in place was a good idea in case he didn't take his blood thinners?
MR. MATTHEWS: Object to the form.
BY THE WITNESS:
A. Yes.
BY MS. COX:

Page 88

Q. I'm going to skip through some, try to get you out of here on time.
Can you turn to page marked 35. It's a note from 5/31/13.
And all I want you to do is look at the highlighted paragraph on the screen. If you can see, I will put it on the top. It's a little easier to see on the top.
It just says, "Continues to complain of daily angina," which you told me meant pain, "which has been very difficult for me to quantify. I'm not really convinced he is having angina. He ambulates without a problem, walks into the office and then tells me he is having crushing chest pain. It's a very difficult situation because he certainly has underlying atherosclerotic coronary disease. He does not take his medications properly."
Did I read all of that correctly?
A. Yes.
Q. Tell me what you mean by the difficulty in treating his pain and complaints of pain.
A. Well, the issue is that Mr. Gage has underlying significant coronary artery disease and