Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

----------------------------- )
In Re: COOK MEDICAL, INC.,   ) Case No.
IVC FILTERS MARKETING,        ) 1:14-ml-2570-
SALES PRACTICES AND           ) RLY-TAB
PRODUCTS LIABILITY LITIGATION )
----------------------------- ) MDL No. 2570
This Document Relates To:    )
                             )
  1:14-cv-01875-RLY-TAB      )
  Arthur Gage                )
----------------------------- )

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
VIDEOTAPED DEPOSITION OF MARK J. GOODWIN, M.D.

January 11, 2017

Advocate Heart Institute
Naperville, Illinois

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 2

5   The videotaped deposition of MARK J. GOODWIN, M.D.,
6   called for examination, taken pursuant to the
7   Federal Rules of Civil Procedure of the United
8   States District Courts pertaining to the taking of
9   depositions, taken before CORINNE T. MARUT, C.S.R.
10  No. 84-1968, Registered Professional Reporter and a
11  Certified Shorthand Reporter of the State of
12  Illinois, at the offices of Advocate Heart
13  Institute, 801 South Washington Street, Naperville,
14  Illinois, on January 11, 2017, commencing at 9:22
15  a.m.

Page 3

1  APPEARANCES:
2   ON BEHALF OF THE PLAINTIFF ARTHUR GAGE:
3     THE GALLAGHER LAW FIRM, LLP
4     2905 Sackett Street
5     Houston, Texas  77098
6     713-222-8080
7     BY: MICHAEL T. GALLAGHER, ESQ.
8        PAMELA McLEMORE, ESQ.
9        pamm@gld-law.com
10
11    FEARS NACHAWATI
12    4925 Greenville Avenue, Suite 715
13    Dallas, Texas  75206
14    866-705-7584
15    BY: MATTHEW McCARLEY, ESQ.
16       mccarley@fnlawfirm.com
17
18  ON BEHALF OF THE COOK MEDICAL, INC. DEFENDANTS:
19    FAEGRE BAKER DANIELS LLP
20    300 North Meridian Street, Suite 2700
21    Indianapolis, Indiana  46204
22    317-237-0300
23    BY: ANDREA ROBERTS PIERSON, ESQ.
24       andrea.pierson@faegrebd.com
25       NICHOLAS B. ALFORD, ESQ.
26       nicholas.alford@faegrebd.com
27
28  ALSO PRESENT:
29    SHAWNA FUGATE, Paralegal,
30       The Gallagher Law Firm, LLP
31
32
33  VIDEOTAPED BY: ANTHONY MICHELETTO
34
35  REPORTED BY: CORINNE T. MARUT, CSR No. 84-1968

Page 4

1          I N D E X
2  MARK J. GOODWIN, M.D.         EXAMINATION
3     BY MR. GALLAGHER..............  6
4     BY MS. PIERSON................ 62
5     BY MR. GALLAGHER.............. 157
6     BY MS. PIERSON................ 158
7     BY MR. GALLAGHER.............. 159
8
9
10       E X H I B I T S
11  GOODWIN DEPOSITION EXHIBIT       MARKED FOR ID
12  No. 1    4/25/11 Operative Report; no    22
13      Bates numbers
14
15  No. 2    4/29/11 report of CT exam;      42
16      Bates Nos.
17      F052F394DB064C1A915A, GAGE, 13
18      and 14
19  No. 3    article by Sag, et al.,         49
20      "Analysis of Tilt of the
21      G|nther Tulip Filter"; Bates
22      Nos. Cook IVCF 008370
23
24  No. 4    Cross Notice of Videotaped      63
25      Deposition of Mark J. Goodwin, MD
26  No. 5    Consent for                    102
27      Procedure/Sedation; Bates Nos.
28      Edward001157
29  No. 6    G|nther Tulip brochure; Bates  103
30      Nos. Edward001170 - 001175
31
32  No. 7    Peripheral Procedure report;   142
33      Bates Nos. Edward001158 - 001164
34
35

Page 5

1    THE VIDEOGRAPHER:  We are now on the record.
2        My name is Anthony Micheletto.  I am a
3    videographer for Golkow Technologies.
4        Today's date is January 11, 2017.  The
5    time is 9:22 a.m., as indicated on the video
6    screen.
7        This video deposition is being held in
8    Naperville, Illinois in the matter of Cook Medical,
9    Incorporated IVC Filters Marketing, Sales Practices
10   and Products Liability Litigation in the matter of
11   Arthur Gage for the United States District Court,
12   Southern District of Indiana, Indianapolis Division.
13       Today's deponent is Mark J. Goodwin, MD.
14       Will counsel please identify yourselves
15   for the video record.
16       MR. GALLAGHER:  Mike Gallagher on behalf of
17   Arthur L. Gage, Sr.
18       MS. McLEMORE:  Pam McLemore on behalf of
19   Mr. Gage.
20       MR. McCARLEY:  Matthew McCarley on behalf of
21   Mr. Gage.
22       MS. PIERSON:  I'm Andrea Pierson on behalf of
23   Cook Medical.
24       MR. ALFORD:  Nick Alford, Cook Medical.

Page 6

1    THE VIDEOGRAPHER:  Our Court Reporter today is
2    Corinne Marut.  Please swear in the doctor.
3        (WHEREUPON, the witness was duly
4        sworn.)
5        MARK J. GOODWIN, M.D.,
6    called as a witness herein, having been first duly
7    sworn, was examined and testified as follows:
8            EXAMINATION
9    BY MR. GALLAGHER:
10   Q.   Good morning.  Dr. Goodwin, my name is
11   Mike Gallagher.  I'm a lawyer from Houston, Texas.
12   I represent Mr. Gage in a lawsuit that he's filed
13   against Cook regarding injuries related to the IVC
14   filter, Günther Tulip, that was implanted I think
15   by you on April 25 of 2011 here at Edwards
16   Hospital.
17       It's with regard to that surgery, your
18   experience and background that we're going to make
19   inquiry today.
20       I'm sure you had your deposition taken
21   many times in the past, but for the record if at
22   any time you don't understand a question, you tell
23   me.  I'll restate whatever it is to try to clarify
24   it for you.

Page 7

1        Also, if you need to have a recess at
2    any time, just say so and we'll recess at your
3    convenience.  If you don't understand the question,
4    tell me and I'll try to straighten it up.
5        Tell me a little bit about your
6    educational background beginning with where you
7    graduated from college and then medical school,
8    intern, residency.
9    A.   Went to University of Notre Dame,
10   graduated in 1977, went from there to University of
11   Illinois for medical school, graduated from there
12   in 1981.  I went to Loyola for my medical
13   residency, was intern of the year, then chief
14   resident, then did my cardiac fellowship and was
15   chief fellow, which I left that program in 1986.
16   Q.   You did your fellowship in cardiology
17   and did you say "and" something?
18   A.   At Loyola.
19   Q.   At Loyola?
20   A.   Um-hmm.
21   Q.   Are you board-certified?
22   A.   Yes.
23   Q.   All right, sir.  In what year were you
24   certified?

Page 8

1    A.   Wow.
2    Q.   Okay.
3    A.   No idea.  Somewhere in my past.
4    Q.   All right.  Did you after you finished
5    your residency at Loyola then go into private
6    practice?
7    A.   Yes.
8    Q.   Tell me a little bit about that, just in
9    summary form.
10   A.   At the time I was recruited to go to NIH
11   and Mass General.  I decided to join the group out
12   here.  It was a four-man practice at the time.
13   That practice has now grown to about 50 physicians.
14       I've been out, originally was mainly at
15   Good Samaritan, but have been most of my career at
16   Edward Hospital, which is probably the last 25
17   years have been predominantly here at Edward
18   Hospital.
19   Q.   And what is the name of the group within
20   which --
21   A.   It was formerly Midwest Heart
22   Specialists for most of my career.  Approximately
23   four years ago we joined a group called Advocate
24   Medical Group, and now we're technically Advocate

Page 85

1    Q.  And then I think the last mode that you
2  mentioned of treating patients who are at risk of
3  PE was a vena cava filter.
4        I want to talk with you a little bit
5  about vena cava filters and your use of them.
6        First, in your 32 years practicing as an
7  interventional cardiologist, how many times do you
8  think you've implanted a vena cava filter?
9    A.  Well over 100, but I don't know the
10 exact number.
11   Q.  Okay.  Have you used filters made by a
12 variety of manufacturers?
13   A.  Yes.
14   Q.  Are you familiar with the vena cava
15 filters that are made by Cook Medical which are
16 known as the Tulip vena cava filter and the Celect
17 filter?
18   A.  Yes.
19   Q.  Have you prescribed both of those
20 filters for your patients?
21   A.  Yes.
22   Q.  How frequently have you prescribed the
23 Tulip product?
24   A.  I don't know.  I'd have to look.

Page 86

1    Q.  And how about the Celect?
2    A.  Same thing.
3    Q.  Have you used those products in your
4  patients continuously since they've been available?
5    A.  Yes.
6    Q.  In the time that you have prescribed a
7  Tulip for your patients, have you had good results
8  with it?
9    A.  Yes.
10   Q.  Tell me, what are the benefits that you
11 believe a Tulip filter or filters in general bring
12 to your patients.
13   A.  I think, once again, you're talking
14 about a life-threatening situation.  So, when you
15 have a person who cannot be on a blood thinner and
16 still is at risk for a life-threatening situation,
17 the first and foremost thing is to keep that person
18 alive and that's to prevent another clot from going
19 into the lung and straining the right heart.  So, I
20 think filters from that standpoint work.
21       The trade-off, as with any device, is
22 there is risks and benefits.
23       I think for me the biggest issue, the
24 advantage I like about the Tulip is I find it easy

Page 87

1  to retrieve.  So, in those patients where we can
2  retrieve it, we try to retrieve it.  Can't be
3  retrieved in everybody.
4        So, I think it's safe to put in.  I
5  think it works and I think it's easy to retrieve.
6    Q.  In your 30 years of practicing medicine
7  and using the Tulip, have you ever had any
8  complications with a Tulip with your patients?
9    A.  No.
10   Q.  Do you have confidence in the Tulip?
11   A.  Yes.
12   Q.  Would you prescribe it for a patient if
13 you needed to do a procedure today?
14   A.  I'd put it in me.
15   Q.  Okay.  And how about the Celect, with
16 respect to the Celect product, have you had any
17 complications with patients with the Celect?
18   A.  No.
19   Q.  And, again, if you had to do a procedure
20 today, would you choose a Celect for your patients?
21   A.  Sure.
22   Q.  If you needed a vena cava filter, would
23 you choose a Celect?
24   A.  Yeah, I could use either one on me.

Page 88

1    Q.  Okay.  Now, earlier today Mr. Gallagher
2  asked you some questions about some of the risks or
3  complications that can happen with filters
4  generally.  I'd like to ask you some questions
5  along those lines.
6        First, Mr. Gallagher mentioned the word
7  "tilt" to you.  What does tilt mean in your world
8  with respect to a filter?
9    A.  Once again, I don't think tilt is that
10 big a deal.
11       So, a vena cava is a tube and we put it
12 in.  There is legs that open up and it sits like
13 this.  So, any little tilt, any -- if the thing is
14 not 180 degrees perfectly centered, it's considered
15 a tilt.
16       So, you can imagine the vena cava itself
17 is not a straight column.  It has bends to it.  It
18 is beating and pulsating and the patient itself is
19 moving, he or she.  So, it's almost impossible that
20 it's going to be centered perfectly 100 percent of
21 the time.  As a matter of fact, I would say it is
22 impossible.
23       So, to me the issue of tilt is does tilt
24 really have any clinical significance, and in my

Page 89

1 experience it doesn't.
2    Q.  When a filter is tilted slightly to the
3 side, can that be caused by the way that the filter
4 is placed by the surgeon who is placing it?
5    A.  Yes.
6    Q.  Or physician I should say?
7    A.  So, you put it too high and the feet get
8 into the renal vein.  Then it's going to -- imagine
9 if one of the foot goes here and the other foot is
10 against the wall.  It's going to tilt it this
11 direction.
12        Sometimes the anatomy of the patient.
13 Like I said, these are curved structures.  So, to
14 have something sit perfectly is -- you know, it's
15 ideal but I think impossible.
16        So, I think most of the issues are
17 either patient anatomy or how they're deployed.
18    Q.  Okay.  Do all physicians have some rate
19 of tilt in the deployment?
20    A.  Yes.
21    Q.  No physician is immune to it --
22    A.  Correct.
23    Q.  -- including you.
24        In terms of other causes of tilt or

Page 90

1 potential causes, if a patient has a trauma to
2 their vena cava, if they are in a car accident, for
3 example, or they get punched hard in the vena cava,
4 can that change the position of their filter?
5    A.  I've not seen that.  I assume it seems
6 possible it could, but I have not seen that.
7    Q.  Okay.  And what about if a patient has
8 compromised caval tissues.  For example, if they
9 are extremely dehydrated and their caval tissues
10 collapse, can that affect the position of their
11 filter as well?
12    A.  Yeah, in certain circumstances it could.
13 Those would be pretty rare and pretty extreme, but
14 they could.
15    Q.  Along those lines, things that
16 compromise the caval tissues, is it accurate to say
17 that a patient who is in poor health may have less
18 robust caval tissues?
19    A.  Yeah, I think generally the worse your
20 health -- it's sort of catch-22.  The worse your
21 health, generally your tissues, your ability to
22 heal are worse.
23        On the other hand, typically that subset
24 of patients has a high risk of bleeding from blood

Page 91

1 thinners.  So, there is a trade-off.
2    Q.  They're a compromised patient in terms
3 of strength of their tissues whether they are on
4 anticoagulants or they have a filter --
5    A.  Correct.
6    Q.  -- correct?
7        And specifically with respect to
8 patients who have had cancer or multiple cancer
9 diagnoses, are those patients who have compromised
10 or can have compromised caval tissues?
11    A.  If they've had radiation or severely
12 aggressive tumor, perhaps they could.  That would
13 probably be the only subset that I would be
14 concerned about.
15    Q.  Okay.  If we were talking about a
16 patient who had prostate cancer, stomach cancer and
17 a variety of other cancers, would you expect that
18 they may have some effects from radiation on their
19 caval tissues?
20    A.  They could have effect from radiation on
21 their caval tissues.
22        There is also for certain tumors,
23 certain cancers make a protein that make you more
24 likely to form clots, which makes you more likely

Page 92

1 to get DVTs, which makes it more likely to get PEs,
2 which sometimes may make it more likely to develop
3 clots.
4        So, malignancies or cancer creates a
5 different variable.  One is the tissues.  One is
6 are they more prone, how much more prone are they
7 to develop clots.
8    Q.  Does a patient who has recurrent PEs or
9 PEs that travel at least through the inferior vena
10 cava, are they likely to have compromised caval
11 tissues in their inferior vena cava?
12    A.  Not necessarily.
13    Q.  Okay.  Nothing about traveling up
14 either --
15    A.  No.
16    Q.  -- through the cava or to the lungs
17 affects the quality of their tissues?
18    A.  Correct.
19    Q.  Thank you.  Helpful to know.
20        So, I want to talk with you about other
21 known risks of placement of a filter.
22        First of all, the risk that we were just
23 talking about, tilt, is that unique to Cook
24 products or the Tulip product?

Page 93

1  A. No.
2  Q. And do you believe that tilt of a filter
3  affects the efficacy of the filter in any way?
4  A. No. I think the first thing I stated
5  was that the most important thing is to prevent
6  clot from traveling that could cause a death, and
7  then I think filters do a great job of that.
8      I don't really think, like I said, in
9  the last -- I don't know how many years -- there's
10 only been one filter I have not been able to remove
11 and that had been in somebody almost four years.
12     So, I don't really see tilt as that big
13 of a deal.
14 Q. In your experience practicing for some
15 30 years, is a tilted filter just as effective at
16 preventing PE?
17 A. Yes.
18 Q. In your experience do patients who have
19 tilt of their filter have any symptoms from that?
20 A. No.
21 Q. With respect to other risks for any
22 filter placement, would you agree, Doctor, that an
23 inability to retrieve the filter is -- is a known
24 complication with any filter?

Page 94

1  A. I wouldn't call it complication. It's a
2  known risk of doing the procedure. Most can be
3  removed. Sometimes they can't and you have to be
4  alive to have gotten there. If you had died, we
5  wouldn't have to worry about removing the filter.
6      But if the filter is in, we can't with
7  100 percent certainty save your life. We could say
8  it will help to save your life. And, so, I think
9  that's just -- that's just a sequela of the
10 procedure itself.
11 Q. That's a helpful clarification. Thank
12 you.
13     Would you agree that tenting of the
14 caval wall is a known possibility with any filter?
15 A. Yes.
16 Q. Is there any clinical significance of
17 that for patients?
18 A. No.
19 Q. Would you agree that penetration of the
20 caval wall, that that is a known possibility with
21 any filter?
22 A. Yes.
23 Q. And is there any clinical significance
24 to that in your mind?

Page 95

1  A. No.
2  Q. How about penetration of the caval wall,
3  is penetration of the caval wall from a filter a
4  known risk of any filter?
5  A. Yes.
6  Q. In your view does penetration of the
7  caval wall have any clinical significance for
8  patients?
9  A. Not in my experience. I have read
10 probably one or two articles where it was a theory
11 of whether the leg had affected something. But for
12 the amount of filters going in, exceedingly,
13 exceedingly, exceedingly, exceedingly rare.
14 Q. So, in your experience, the times that
15 there have been perforation are very rare?
16 A. Yes.
17 Q. And was there any clinical
18 significance --
19 A. None.
20 Q. -- to those?
21     Were the patients in pain?
22 A. No.
23 Q. Were they experiencing any bleeding?
24 A. No.

Page 96

1  Q. If a patient had penetration of their
2  caval wall but no organs or other surrounding
3  structures were touched, would that cause you any
4  concern as a physician?
5  A. No.
6  MR. GALLAGHER: Objection.
7  BY MS. PIERSON:
8  Q. And the things that I have just been
9  asking you about -- strike that. Let me start
10 again.
11     How about a little bit of migration or
12 movement of the filter. Is that a known risk with
13 any filter?
14 A. Yes.
15 Q. Does that cause any concerns or any
16 impact on the patient?
17 A. Slight migration, no. If it becomes
18 dislodged and embolizes to the heart, yes.
19 Q. Have you read Cook's Instructions for
20 Use for the Tulip?
21     (Clarification requested by the
22     reporter.)
23 BY THE WITNESS:
24 A. No.

Page 97

1    I'm sorry. I forgot you were over here.
2    BY MS. PIERSON:
3    Q. Have you read Cook's Instructions for
4    Use for the Celect?
5    A. No.
6    Q. There are some potential adverse events
7    that are listed in those documents that I want to
8    ask you about.
9    First, acute damage to the inferior vena
10   cava. Do you agree that it's a known risk that the
11   vena cava could be affected by the filter?
12   A. Yeah.
13   Q. And that's true of all filters, not just
14   Cook's, correct?
15   A. Yes.
16   Q. Hematoma at the vascular access site.
17   Is that a known risk of filter placement?
18   A. Exceedingly rare.
19   Q. Okay. Not unique to Cook or Tulip?
20   A. No.
21   Q. How about hemorrhage, is that a known
22   risk?
23   A. Wow. Yes.
24   Q. How about thrombosis or stenosis?

Page 98

1    A. Yes.
2    Q. How about infection?
3    A. I've never seen one. I suppose it could
4    happen.
5    Q. Okay. Do you agree that infection is a
6    known risk of any surgical procedure?
7    A. Yes.
8    Q. Including filter placement?
9    A. Yes.
10   Q. Again, not unique to Cook or the Tulip?
11   A. Correct.
12   Q. And death is a known risk of any filter
13   placement?
14   A. Correct.
15   Q. Again, not unique to Cook or to the
16   Tulip?
17   A. Correct.
18   Q. Dr. Goodwin, were all of these risks
19   that we've been talking about, were all of those
20   known risks to you in 2011?
21   A. Yes.
22   Q. And were they known risks within the
23   medical -- the relevant medical community who
24   places filters in April of 2011?

Page 99

1    A. Yes.
2    Q. I want to talk with you about Mr. Gage
3    and your care and treatment of Mr. Gage.
4    First, I think you told me earlier you
5    saw him only one day. That was on April the 27th
6    of 2011, correct?
7    A. To the best of my recollection.
8    Q. I heard you tell Mr. Gallagher earlier
9    that it is your practice to talk to a patient
10   before you place the filter about the filter
11   placement and the risks?
12   A. Correct.
13   Q. Okay. So, in April of 2011 what did you
14   tell a patient before you placed a filter in their
15   vena cava?
16   A. As a general rule of thumb what I tell a
17   patient is that they've had a clot that went to
18   their lung. We're concerned about another clot
19   going and that they can't take blood thinners,
20   because most of these are put in because a person
21   can't take blood thinners.
22   We are going to put a small device in
23   that's sort of like a screen that allows blood to
24   flow through it but would trap any clots so the

Page 100

1    clots don't go to their lungs. That it is a
2    relatively safe procedure, probably less than 1 out
3    of 5,000 chance of any complication, the biggest
4    complication being bleeding from their groin.
5    Q. Dr. Goodwin, when a patient can't take
6    blood thinners, is a filter the best option in your
7    view to prevent recurrent PE?
8    A. If they've had a significant PE, yes.
9    Q. When you tell the patient about the
10   risks of a filter or the placement of the filter,
11   where are they and where are you?
12   A. I don't understand your question.
13   Q. Well, does the patient come to your
14   office in advance of the procedure?
15   A. No, these are -- most of -- the vast
16   majority of these patients are hospitalized
17   patients. Normally I'm down in the cath lab. So,
18   normally they have just been put on the table.
19   It's before they receive sedation. And I just go
20   in there and explain to them what it is we're going
21   to do and why they're there.
22   Q. Does the patient have the opportunity to
23   ask you questions?
24   A. Yes.

Page 101

1    Q.    In the case of Mr. Gage's procedure,
2  would you have explained all of these risks to him?
3    A.    What I said is what I typically say to
4  everybody. I wouldn't have gone through every risk
5  that you said because some of those are exceedingly
6  rare. So, I generally go through the major risks.
7  What I consider the biggest risk to be bleeding.
8    Q.    Mr. Gage has testified that he was not
9  aware that a filter was being placed in his body.
10  Is there any doubt in your mind that you
11  communicated clearly to Mr. Gage that you would be
12  placing a filter in his body?
13    A.    I have 100% certainty that I had talked
14  to him and because I do as part of my practice
15  every day. I have not looked at his medical
16  records, but I assume he signed an informed consent
17  as well, but I have never looked at his records.
18    Q.    Okay. After you finish the procedure
19  with Mrs. Gage -- Mr. Gage, did you talk to him
20  again?
21    A.    Just at the end of the procedure to say
22  that it went well, went successfully.
23         And I can't remember in him
24  specifically. Most patients I traditionally say,

Page 102

1  "Make sure you talk to your doctors in the next six
2  months about it coming out," but I can't say with
3  100% certainty say whether I said it to him or not.
4    Q.    Did Mr. Gage again at the conclusion of
5  the procedure have the opportunity to ask you any
6  questions or express any concerns?
7    A.    Yes.
8    Q.    You mentioned a consent and I want to
9  hand you what's been marked as Exhibit 5.
10         (WHEREUPON, a certain document was
11         marked as Goodwin Deposition
12         Exhibit No. 5: Consent for
13         Procedure/Sedation; Bates Nos.
14         Edward001157.)
15  BY MS. PIERSON:
16    Q.    Is Exhibit 5 the consent to the filter
17  placement?
18    A.    Yes.
19    Q.    And is this the consent that would have
20  been given to Mr. Gage on the day of the procedure
21  that you performed?
22    A.    Yes.
23    Q.    There's a witness signature at the
24  bottom. Who is that?

Page 103

1    A.    Looks like I'm guessing one of the
2  nurses up on the floor.
3    Q.    Okay.
4    A.    Because I don't recognize her name as
5  one of the ones that works in the cath lab.
6    Q.    Certainly you're familiar with this
7  consent?
8    A.    Yes.
9    Q.    And all of your patients including
10  Mr. Gage signed this consent prior to filter
11  placement?
12    A.    Yes.
13    Q.    I'm handing you what's been marked as
14  Exhibit 6.
15         (WHEREUPON, a certain document was
16         marked as Goodwin Deposition
17         Exhibit No. 6: G|nther Tulip
18         brochure; Bates Nos. Edward001170 -
19         001175.)
20  BY MS. PIERSON:
21    Q.    What is Exhibit 6?
22    A.    I don't know. Never seen it before.
23         It appears to be a patient brochure that
24  discuss what a filter is and what the concerns of

Page 104

1  it would be.
2    Q.    Okay. Dr. Goodwin, in Mr. Gage's
3  medical records there's a reference to having
4  received a patient brochure with this same title.
5  Would you have given this to Mr. Gage?
6    A.    No. For most implantable devices,
7  whether it's a stent, whatever, you get a stent
8  card or you get information about it. That would
9  be the staff that would have given it to him, not
10  me.
11    Q.    Is it the practice of your staff to
12  provide to patients this kind of a patient guide
13  before a filter placement?
14    A.    It's part of our policy.
15    Q.    Dr. Goodwin, would you turn to the
16  page that at the bottom is marked 1173.
17         Under "Common Questions," it asks, "What
18  are the possible adverse effects associated with
19  vena cava filter placement?"
20         Do you see that?
21    A.    Yes.
22    Q.    And the answer says, "Possible adverse
23  effects include the following: The filter may move
24  or migrate, the wall of the vena cava could be

Page 105

1  perforated or punctured, a hematoma may occur at
2  the access puncture site, the hooks of the filter
3  can penetrate the vein wall of the inferior vena
4  cava," and then the last one is, "Migrating blood
5  clots can obstruct the inferior vena cava and
6  filter resulting in swelling of the lower
7  extremities."
8       Do you see those?
9    A.  Yes.
10   Q.  Do you agree that those are all known
11 risks of any filter placement procedure?
12   A.  Yes.
13   Q.  Again, not unique to Cook or to the
14 Tulip?
15   A.  Correct.
16   Q.  And known by you and in the medical
17 community in April of 2011?
18   A.  Yes.
19   Q.  You can set that document aside.
20      I want to ask you some questions about
21 what was previously marked as Exhibit 2, which
22 is -- excuse me.  Not Exhibit 2.  Exhibit 1, which
23 is your operative notes.
24   A.  Okay.  Here it is.

Page 106

1    Q.  First, tell the jury, how is it that you
2  came to treat Mr. Gage?
3    A.  I don't remember the specific details.
4  Normally a case like this, the treating physician,
5  a group of physicians decide that the person would
6  need a filter.  They call us.  We take a look at
7  the chart and the patient and figure out whether
8  they qualify and then we go ahead with the
9  procedure.
10   Q.  In this case was it Dr. Larkin who
11 referred this patient to you?
12   A.  I don't recall.  I would assume yes, but
13 I don't know.
14   Q.  Is Dr. Larkin one of your partners?
15   A.  Yes.
16   Q.  He's a cardiologist in your group?
17   A.  Yes.
18   Q.  Did you do a physical exam of Mr. Gage
19 before you placed his filter?
20   A.  Just a brief one.  His abdomen and his
21 groin.  I did not do a full exam.
22   Q.  Okay.  With respect to the filter that
23 was placed in Mr. Gage, the Tulip filter, are you
24 the person who selected the filter for his

Page 107

1  procedure?
2    A.  Yes.
3    Q.  Was there any input by anyone from Cook
4  about what filter should be chosen for Mr. Gage?
5    A.  No.
6    Q.  Was there anyone present during the
7  procedure from Cook?
8    A.  No.
9    Q.  Did anyone from Cook influence what you
10 chose for Mr. Gage or whether you chose to place a
11 filter in Mr. Gage's body?
12   A.  No.
13   Q.  Do you know why Mr. Gage required a
14 filter?
15   A.  He required a filter because he had had
16 a high probability pulmonary embolus with fainting,
17 which puts him at higher risk for future events,
18 and he was bleeding because of his surgical
19 procedure that had been done at Loyola.  So, we had
20 to stop the blood thinners.  In order to protect
21 him so that he wouldn't die, we put in a filter.
22   Q.  You've hit upon a good point.  The
23 condition that Mr. Gage had at the time that he
24 came to you for treatment, he already had a

Page 108

1  pulmonary embolism, correct?
2    A.  Correct.
3    Q.  And he was at risk of having another
4  pulmonary embolism, correct?
5    A.  Correct.
6    Q.  So, your decision to place a filter in
7  Mr. Gage's body, was that a decision that was made
8  in fact to save his life?
9    A.  It's in part to save his life.  More to
10 prevent a life-threatening event.  You can't with
11 100 percent certainty say that everybody is going
12 to die.  But we know that subset of patients have a
13 much, much, much, much higher risk of dying, and so
14 this helps prevent that.
15   Q.  I should have asked you this earlier
16 when we were talking about pulmonary embolism, but
17 are there some medical conditions or what we call
18 comorbidities that make patients more likely to
19 have a pulmonary embolism or a second pulmonary
20 embolism?
21   A.  Obviously not being on a blood thinner
22 would be the largest one, being sedentary.  There
23 is probably 30 or 40 other factors that can
24 predispose you to clots.  But the biggest one is

Page 113

1  Q. The reference that follows, "The patient
2  developed gross hematuria." I think you said this
3  earlier. But that's blood in his urine?
4  A. Correct.
5  Q. And is that an indication that his
6  anticoagulant therapy is not doing what we hoped it
7  would do, he's overcoagulated?
8  A. Doesn't mean he is overcoagulated. It
9  means that there is some nidus that's causing him
10 to bleed, and we can't continue to give a blood
11 thinner when you're bleeding.
12 Q. In the case of Mr. Gage, was he in fact
13 no longer a candidate for anticoagulants?
14 A. Yes.
15 Q. So, with a patient who has an existing
16 PE, a DVT, they can't take anticoagulants, for that
17 patient is there any available therapy other than
18 the placement of a filter?
19 A. No.
20 Q. Will that patient likely die without the
21 placement of a filter?
22 A. His situation would be somewhere between
23 a probably 7 to 35% chance of dying if he doesn't
24 get the filter.

Page 114

1     MR. GALLAGHER: Object; leading.
2  BY MS. PIERSON:
3  Q. Now, the sections of your operative
4  report that follow, the third paragraph here that I
5  am pointing to, is that a description of how you
6  performed the procedure?
7  A. Yes.
8  Q. Can you explain to the jury how you
9  placed Mr. Gage's filter?
10 A. Basically we go into your right groin.
11 We put a small needle and put a wire in and then we
12 put a catheter into that vein. That catheter
13 allows us to access under x-ray. We take a small
14 angiogram. An angiogram is a picture with dye that
15 allows us to see where the veins from the kidney
16 come in. And then under x-ray we deploy it.
17    So, a filter is here. We basically pull
18 back a sheath that allows it to open up, and that's
19 how we deploy a filter.
20 Q. When you mentioned where you deploy the
21 filter, I just want to be make sure I understand
22 what you're saying.
23    The renal veins, they come off of your
24 vena cava like branches of a tree, correct?

Page 115

1  A. Right. So, they feed into -- the renal
2  veins feed from the kidneys into the vena cava.
3  So, we want the tip of the filter to be about at
4  the renal veins and what we call the legs, which
5  are the support, to be below the renal arteries.
6  Q. And I think you've said this now a
7  couple of times, but your goal is to place it
8  exactly where those veins meet, correct?
9  A. Yes.
10 Q. I want to put on the screen page 1174
11 from the previous exhibit that we referred to.
12    Just looking at the diagram over here on
13 the right-hand side of the page, are these the
14 renal veins up here?
15 A. Yes.
16 Q. So, is it your goal to get the tip of
17 the filter about here and you want the legs or the
18 struts to extend down to just beneath the renal
19 veins, right?
20 A. Definitely beneath the renals with the
21 legs and where I like the tip to be, personal
22 preference, I like the tip to be at the level of
23 the renal veins.
24 Q. Okay. And how did you learn that this

Page 116

1  was the right place to put a filter?
2  A. Talking to lots of people and going to
3  lots of courses.
4  Q. Okay. Your knowledge of how to place
5  the Tulip or where to place it, is that based on
6  your medical education, training and judgment?
7  A. Yes.
8  Q. Were you relying on anything from Cook
9  with respect to how to place the filter?
10 A. Never.
11    MS. PIERSON: Mike, can I ask you one favor.
12 I'm worried that when you guys are talking that
13 it's picking up on the video. Do you mind just
14 taking your microphone off if you're going to talk?
15    THE VIDEOGRAPHER: His microphone is right
16 there.
17    MS. PIERSON: Okay. Perfect. Sorry. I
18 thought it was on your body somewhere.
19    MR. GALLAGHER: No, no.
20    MS. PIERSON: Thank you. In that case, carry
21 on.
22    MR. GALLAGHER: Thank you. I apologize.
23    MS. PIERSON: No, no, it's okay.
24 BY MS. PIERSON:

Page 121

1  doesn't -- ideally, like I said, I believe in
2  taking them out when they can come out. But, once
3  again, you have to be alive to have the filter to
4  be able to come out. And I've never seen a filter
5  kill somebody.
6      Q.   There is a reference in the patient
7  handout --
8      MR. GALLAGHER: Object. Non-responsive.
9  BY MS. PIERSON:
10     Q.   -- that we talked about earlier --
11     A.   I'm sorry? Oh, that was jury stuff.
12 I'm sorry.
13     Q.   There is a reference --
14     A.   I thought he was asking me a question.
15     Q.   There is a reference in the patient
16 handout that we talked about earlier that advises
17 patients that 20 to 50,000 people per year die from
18 pulmonary embolism. Are you familiar with that
19 statistic?
20     A.   I actually thought it was higher.
21     Q.   In your studies and research about
22 pulmonary embolism, would you agree that the
23 risks --
24     A.   It's 50 to 200,000. You had said 20 or

Page 122

1  50.
2      Q.   Thank you. Let me ask my question
3  again.
4           Dr. Goodwin, within the patient brochure
5  that we've marked as I believe Exhibit 4, it
6  mentions a statistic that between 50,000 and
7  200,000 people die each year from PE?
8      A.   Yes.
9      Q.   Are you familiar with that statistic?
10     A.   Yes.
11     Q.   In your research about pulmonary
12 embolism, is that an accurate estimate of the
13 number of people who die each year from pulmonary
14 embolism?
15     A.   I think it may underestimate, but it's
16 probably reasonable.
17     Q.   Okay. I asked you earlier if the
18 benefits of filter placement generally outweigh the
19 risks in your experience. Do you remember that
20 question?
21     A.   Yes.
22     Q.   Okay. And you said yes, correct?
23     A.   In specific patients. Not in every
24 patient.

Page 123

1      Q.   With respect to the specific patient
2  Arthur Gage, in the case of Mr. Gage, was it your
3  judgment that the benefits of placing a Tulip
4  filter outweighed the risks for Mr. Gage?
5      A.   Yes. If a thousand times he came in
6  with that same scenario, a thousand times I'd put a
7  filter in.
8      Q.   You'd do it again today?
9      A.   I'd do it again today.
10     Q.   When Mr. Gallagher was questioning --
11     A.   Despite being here.
12     Q.   Well, that is a good point.
13          Even though you know he's filed a
14 lawsuit that he claims to have some complications
15 that he attributes to the Tulip filter, even
16 knowing all that, would you still put a Tulip
17 filter in Mr. Gage if he required one tomorrow?
18     A.   Yes.
19     Q.   Mr. Gallagher asked you a question
20 earlier today about when you did the procedure on
21 Mr. Gage, that there was a vena cavogram.
22          First, tell the jury, what's a vena
23 cavogram?
24     A.   The IVC or vena cava that Mr. Gallagher

Page 124

1  addressed earlier is the tube that -- the vein that
2  drains your legs. A vena cavogram is picture. So,
3  it's a picture of the vena cavogram.
4      Q.   Okay. I thought I heard you tell him
5  earlier that you did a vena cava to ensure that
6  there was no clot in the vena cava?
7      A.   Correct.
8      Q.   Is that something that you do before you
9  place the filter?
10     A.   Yes.
11     Q.   Okay. And why is that important?
12     A.   Because if there is clot in the
13 filter -- I mean if there is clot already in the
14 vena cava, then you have to wonder how high does
15 the clot go. If you're putting a filter in the
16 middle of a clot, there might be clot above it.
17          Then there is different technical issues
18 about putting a cava filter inside of clot. It's
19 more of a safety factor for the patient.
20     Q.   I want to ask you one more thing on your
21 operative note. There is a note here that you
22 placed the filter, "Will hold Heparin for now and
23 resume pending when urology feels it's safe to
24 proceed."