UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

_____

IN RE: COOK MEDICAL, INC. IVC FILTERS
MARKETING, SALES PRACTICES AND          Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS   LIABILITY LITIGATION              MDL No. 2570

_____

This Document Relates to Plaintiff
       Elizabeth Jane Hill
       Civil Case No. 1:14-cv-06016-RLY-TAB

_____

## COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Elizabeth Hill needed reconstructive spinal surgery.  She had a significant spinal

deformity and ended up on the operating table for nearly nine hours. That type of surgery—

lengthy spinal reconstruction surgery—presents a much higher risk than other surgeries that the

patient will develop a blood clot that could migrate to the lungs, causing a deadly pulmonary

embolism (PE), or to the brain, causing a deadly stroke.  Mrs. Hill's spinal surgeon insists that

any patient who is going to endure such a surgery first have a filter placed in his or her inferior

vena cava (IVC) to trap any blood clots that might develop before they can migrate elsewhere in

the body.  Indeed, he feels so strongly about it that he testified that if vena cava filters were not

available, he likely would stop doing complex spinal surgeries altogether.

Mrs. Hill received a filter—a Celect® IVC filter—and never developed a PE. She had

another major back surgery approximately three years later. The filter was still inside her, and

she never developed a PE after that surgery.

Shortly after her second back surgery, Mrs. Hill went to the emergency room

complaining of nausea, vomiting, diarrhea and abdominal pain.  She was initially diagnosed with

US.111463199.39

Crohn's disease, but further examination revealed that one of the "struts" of her vena cava filter had protruded out of her vena cava and into a portion of her small intestine. The filter was removed in an outpatient procedure, and she was discharged the same day. She nevertheless claims to have suffered "significant and severe injuries to her body."

Only two substantive claims remain in this case: failure-to-warn and design-defect.[1] Mrs. Hill also seeks punitive damages. Given the undisputed facts that have emerged in discovery, Mrs. Hill cannot prevail on any of these claims, and Cook[2] is entitled to summary judgment.

Mrs. Hill cannot prevail on her **failure-to-warn** claim for several reasons, but one stands out above all others: the physician who implanted the device testified that: (1) he never read or relied on the warnings supplied with the product (or *any* information from Cook, for that matter), (2) he was already aware of the risks of the product—including the very complication that Mrs. Hill experienced, and (3) knowing everything that he knows today, he would not change his treatment of Mrs. Hill. Under Florida law, that testimony forecloses Mrs. Hill's failure-to-warn claim. On top of that, Mrs. Hill lacks the expert testimony required under Florida law that Cook should have provided different or additional warnings to physicians, or that a different or additional warning would have changed her physician's treatment. That is also a stopper for Mrs. Hill's failure-to-warn claim.

Mrs. Hill also cannot prevail on her **design-defect** claim as a matter of law, again, for several reasons—most notably her failure to produce the required expert testimony identifying any *specific defect* in the design of the filter; her expert simply points out that the filters can

---

[1] The Court has already dismissed Plaintiff's claims based on consumer fraud, breach of express and implied warranty, and negligence *per se*. *See* Entry On The Cook Defendants' Motion For Partial Judgment On The Pleadings**,** Dkt. 4687 (May 17, 2017).

[2] "Cook" refers to Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, and William Cook Europe ApS.

2

perforate the vena cava.  Indeed they can, but that is a well-known risk of vena cava filters, not the mark of a design defect.  Mrs. Hill also has no expert testimony establishing that any design defect *caused* her alleged injuries to a reasonable degree of medical certainty.  All medical devices and procedures include complications; the fact that a complication occurred does not mean that it was caused by a *defect* in the product.

Mrs. Hill's claim for **punitive damages** fails, both because her substantive claims fail and because a reasonable jury could not conclude that Cook intentionally, maliciously, or willfully designed a defective product.

All of this presumes that the Court denies Cook's motions to exclude the testimony of several of Mrs. Hill's expert witnesses in this case. If the Court grants those motions, Mrs. Hill's claims cannot survive because she needs expert testimony to support them.

Finally, Defendant Cook Incorporated is entitled to summary judgment as to all claims against it because it undisputedly was not involved in the manufacture, distribution, or sale of Hill's Celect IVC filter.

<u>**Statement of Material Facts Not in Dispute**</u>

Pursuant to Local Rule 56-1(a), Cook submits that the following facts are potentially determinative of this motion. Each of the following facts is either undisputed or the Court may assume its truth for purposes of the present motion. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996) (disputed facts must be taken in light most favorable to nonmoving party).

US.111463199.39

**Plaintiff Elizabeth Hill**

Elizabeth Hill was implanted with a Celect Inferior Vena Cava filter on November 17, 2010, by Dr. Mark Zuzga in Florida.[3] The consent form provided to Hill before her surgery warned of risks including pain, infection, bleeding, "Injury to vessel or nerve (Including perforation)," "Pulmonary embolus (clot in lung)," "Filter Migration," and ""JVC thrombosis resulting in leg swelling."[4] Mrs. Hill suffered no complications at the time the IVC filter was placed.[5]  An unsuccessful attempt to remove the Celect filter was made on March 23, 2011.[6]

Mrs. Hill subsequently complained of gastrointestinal symptoms and was diagnosed with bowel inflammation suggestive of Crohn's Disease.[7] A subsequent endoscopy determined that the Celect filter had perforated her inferior vena cava into her duodenum.[8]  Her filter was removed by Dr. Frank Lynch on August 21, 2013,[9] under approximately 7 minutes of fluoro time, and she was discharged the same day with no recommendation for any additional treatment.[10]

Mrs. Hill commenced the present action on October 30, 2014.  She claims that as a result of a defect in the design of her Celect filter and its warnings, she has suffered "significant and severe injuries to her body."[11]

---

[3] Ex. A, 11/17/10 Operative Report (Dr. Zuzga 4-5).
[4] Ex. B, Consent Form (Mease Countryside 55) Ex. 36 to Zuzga Dep. (4/19/17).
[5] See 11/17/10 Operative Report.  (Dr. Zuzga 4-5)
[6] Ex. C, 3/23/11 Operative Report.  (Dr. Zuzga 2-3)
[7] Ex. D, 8/12/13 Radiology Report.  (Morton Plant 648)
[8] Ex. E, 8/15/13 Operative Report.  (Morton Plant 125-126)
[9] Ex. F, 8/21/13 Operative Report.  (Penn State 10-11)
[10] Ex. G, Lynch Depo at 45:25-46:6, 68:9-16.
[11] Complaint, Dkt 1.

**The Cook Defendants' Connections to Hill's Celect IVC Filter**

William Cook Europe ("WCE") manufactures Celect IVC filters.[12]  Cook Medical is the North American distributor of Celect IVC filters and is responsible for sales of Celect IVC filters in the United States.[13]

The Celect IVC filter placed in Mrs. Hill was from lot number E2586270.[14]  WCE manufactured the filters in that lot in May 2010, sold and shipped the filter (along with the rest of the lot) to Cook Medical, and invoiced Cook Medical for the price of the lot.[15]  Cook Medical sold Mrs. Hill's Celect IVC filter directly to BayCare, the health care system that operates the facility where Mrs. Hill was implanted with the filter.[16]

Defendant Cook Incorporated is a separate entity from Cook Medical LLC and WCE.[17] Cook Incorporated does not manufacture, distribute, or sell Celect filters.[18]  Cook Incorporated had no role in the manufacture, distribution, or sale of the Celect IVC filter placed in Mrs. Hill in November 2010.[19]

**Dr. Anthony Moreno**

Dr. Anthony Moreno, a board-certified spinal surgeon, was Mrs. Hill's spinal surgeon. He performed nearly nine hours of surgery to reconstruct Mrs. Hill's spine on December 6, 2010.[20]  He testifies that the surgery involves a markedly elevated risk of the patient developing a life-threatening blood clot, but due to the nature of the surgery, he could not give her blood-

---

[12] *See* Breedlove Decl. ¶ 3.
[13] *Id.*
[14] *Id.* ¶ 7, 10. The Breedlove Declaration contains a thorough explanation of the manufacturing and distribution system for Celect filters and tracks the distribution path of Hill's implant in detail.
[15] *Id.* ¶¶ 8, 9.
[16] *Id.* ¶ 10.
[17] *Id.* ¶ 11.
[18] *Id.* ¶ 3.
[19] *Id.* ¶ 11.
[20] Ex. H, Moreno Dep. Vol. 2 at 13:13-16; 20:14-21:22

thinning medication to prevent blood clots.[21]  As treating doctor, Zuzga noted, if Mrs. Hill had

been on anti-coagulants at the time of her surgery, she could "bleed[] out," suffer a stroke, or

die.[22]  Thus, before doing the surgery, he referred Mrs. Hill to Dr. Zuzga – a board certified

vascular surgeon -- to place an IVC filter in Mrs. Hill's vena cava to guard against a blood clot

traveling to her lungs or other parts of her body, where it could cause serious injury or kill her.[23]

Dr. Moreno testified that he likely would stop doing this type of spinal surgery in the future if

IVC filters were not available.[24]

**Dr. Mark Zuzga**

Dr. Mark Zuzga chose the Celect IVC that was implanted in Mrs. Hill.[25]  He testified that

he neither read nor relied on the instructions for use (IFU) for the Celect IVC filter.[26]  He

testified that he already knew about all the possible complications that Mrs. Hill's medical expert

(Dr. Alexander Marmureanu) says the IFU should have described, and in particular the

complications Mrs. Hill claims she experienced.[27]  The consent form that he presented to Hill

before the surgery expressly warned of risks including pain, infection, bleeding, and "Injury to

vessel or nerve (*Including perforation*)."[28] And he testified that even knowing of the

complications that Hill experienced with her filter, he would not have changed his treatment of

Ms. Hill.[29]  He continued to use Cook products even after he learned of Mrs. Hill's lawsuit and

---

[21] Moreno Dep. Vol. 2 at 28:17–30:25.
[22] Ex. I, Zuzga Dep. Vol 2 at 71:2-19
[23] Ex. J, Moreno Dep. Vol. 1 at 10:21– 11:7; 13:22–18:8; 43:6-15.
[24] Moreno Dep. Vol. 2 at 59:13-19.
[25] Zuzga Dep. Vol. 2 at 108:20-25.
[26] Zuzga Dep. Vol. 2 at 141:7-14; 144:15-145:3.
[27] *Id*. at 224:21-225:13, *see also id.* at 113:8–114:8; 129:11–130:23; 133:4-23; 137:8–138:1;
142:6 – 143:10. Ex. K, Marmureanu Rpt at 24-36;
[28] Consent Form (Mease Countryside 55) Ex. 36 to Zuzga Dep. (4/19/17)
[29] Zuzga Dep. Vol. 2 at 181:9-21.

US.111463199.39

heard the accusations made by Mrs. Hill's counsel during deposition, and said he would continue to do so in the future.[30]

## Argument

Cook is entitled to summary judgment on Mrs. Hill's two remaining claims (failure to warn and design defect), and on her request for punitive damages, because they present no genuine issue of material fact under Florida law.[31]

Cook begins by noting that, as the Court is aware, Cook has served *Daubert* motions seeking to exclude the proposed trial testimony of several of Hill's experts, including Drs. Marmureanu, McMeeking, and Garcia. If the Court excludes those experts' testimony, Cook will automatically be entitled to summary judgment on the claims to which the experts' testimony relate: for design, McMeeking and Marmureanu, for warnings, Garcia and Marmureanu. Mrs. Hill's claims involve complex medical and scientific issues, and Florida law requires expert testimony to establish both defect (in either the product design or warnings) and causation of her injury. *See, e.g., Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1337 (M.D. Fla. 2015) (strict liability failure-to-warn claim in case involving IVC filters requires expert testimony that warnings did not adequately convey information or misrepresented actual risks); *Jacob v. Korean Air Lines Co., Ltd.*, No. 12-CV-62384, 2014 U.S. Dist. LEXIS 58007, 2014 WL 1584444, at *6 (S.D. Fla. Mar. 20, 2014) ("Although causation is an issue generally left to a jury,

---

[30] Zuzga Dep. Vol. 2 at 76:7-20; 181:23–182:5

[31] This Court has already applied Florida law to address several of Mrs. Hill's claims for compensatory damages in this case. *See* Dkt. 4687 (May 17, 2017) (applying Florida law and dismissing Hill's claim based on negligence per se). Mrs. Hill did not object to the application of Florida law to those claims, effectively conceding its applicability. *See* Dkt. 4433 (April 21, 2017) (arguing negligence *per se* issue under Florida law without disputing choice of law). The Court should apply Florida law to the remaining claims for compensatory damages. The choice-of-law issue regarding Mrs. Hill's claim for punitive damages and is addressed in section III below.

medical causation falls beyond the scope of a layperson's knowledge and requires competent medical testimony.") (collecting cases). Where an element of a claim requires expert testimony and the court excludes the expert who was to provide that testimony, the claim fails as a matter of law. *See, e.g., Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 905 (7th Cir. 2007) (affirming summary judgment where exclusion of expert testimony left no evidence of causation); *Tillman*, 96 F. Supp. 3d at 1349  ("without any medical or expert testimony to demonstrate a causative link between the failed removal and the subsequent blood clot, [plaintiff] cannot recover those damages").

Mrs. Hill has offered only Dr. Marmureanu and Dr. McMeeking to testify on her claim of design defect, and only Dr. Marmureanu to testify on causation based on a design defect.  Thus, if the Court grants Cook's motions to exclude either expert, Mrs. Hill's design-based claims fail as a matter of law and Cook is entitled to summary judgment.  Likewise, Hill has offered only Dr. Marmureanu and Dr. Garcia to testify on her claim that Cook's IFU failed to adequately warn and only Dr. Marmureanu to testify that some failure to warn caused her injuries.[32]  Should the Court grant Cook's motions to exclude Mrs. Hill's expert on either defect or causation, the warning-based claims fail as a matter of law and Cook is entitled to summary judgment.  *See, e.g., Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 932 (S.D. Ind. 2014) (granting summary judgment where exclusion of expert rendered plaintiff unable to establish element of causation).

---

[32] Dr. Mohammed Rajebi previously was disclosed as a case-specific expert in *Hill*, but he withdrew that report at his deposition, *see* Ex. L, Rajebi Dep. at  5:18-20, 8:24-9:7 and 9:24-10:2; and Plaintiff's counsel has confirmed that they will not offer Dr. Rajebi for any case-specific opinions or opinions beyond one narrow topic unrelated to Mrs. Hill. *See* Ex. M, Email from Matt Schultz, dated May 16, 2017.  Plaintiff's expert Dr. Fishbein also offered some case-specific opinions, but confirmed at his deposition that he was just not offering any opinion concerning the cause of Mrs. Hill's alleged injuries.  *See* Ex. N, Fishbein Dep. at 243:11-16.

**I.  Cook is Entitled to Summary Judgment on Mrs. Hill's Failure-to-Warn Claims.**

Cook is entitled to summary judgment on Mrs. Hill's failure-to-warn claims (both the strict-liability and the negligence varieties) for the simple reason that her physician who placed the filter testified that **he never read Cook's IFU (i.e., warnings) and relied entirely on his own knowledge of the risks of the filter**, so Mrs. Hill cannot prove that any defect in the IFU **caused her injury**. Indeed, her doctor testified that even knowing what he knows today, he would not have treated Mrs. Hill any differently. That alone is enough to defeat her failure-to-warn claim. But in addition, Mrs. Hill cannot present sufficient expert testimony to establish either that the Celect IFU should have provided doctors with additional information about possible risks of IVC filters, or that the omission of such information breached any applicable standard of care.  For either or both reasons, Cook is entitled to summary judgment on Mrs. Hill's failure-to-warn claim.

**A.  The undisputed facts establish that any omission of information from the Celect IFU did not cause Mrs. Hill's alleged injuries.**

Under Florida law, a manufacturer of a medical device discharges its duty to warn by providing a warning to the treating medical professional—the "learned intermediary"—rather than the patient.  *Felix v. Hoffmann–LaRoche, Inc.,* 540 So.2d 102, 104 (Fla. 1989); *Buckner,* 400 So.2d at 822; *see also Christopher v. Cutter Labs.,* 53 F.3d 1184, 1192 (11th Cir. 1995) (applying Florida law).  It is the physician who, in consultation with the patient "weighs the potential benefits against the dangers in deciding whether to recommend" the product to the patient.  *Felix,* 540 So.2d at 104.

A doctor's failure to read the warning label therefore means that proximate cause is lacking, and therefore defeats a failure-to-warn claim. *See, e.g., Lopez v. Southern Coatings, Inc.*, 580 So. 2d 864, 865 (Fla. Dist. Ct. App. 1991) ("Where the person to whom the manufacturer

US.111463199.39

owed a duty to warn ... has not read the label, an inadequate warning cannot be the proximate cause of the plaintiff's injuries."); *Ashby Div. Of Consol. Aluminum v. Dobkin*, 458 So.2d 335, 337 (Fla. 3d DCA 1984) (where plaintiff did not read the warnings, "any failure to warn could not, as a matter of law, be the proximate cause of plaintiff's injuries."); *Pinchinat v. Graco Children's Prod., Inc.*, 390 F. Supp. 2d 1141, 1148 (M.D. Fla. 2005) (same).

In addition, "the failure of the manufacturer to provide the physician with an adequate warning of the risks associated with a [medical device] is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warning should have communicated." *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1192 (11th Cir. 1995) (citing *Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102, 105 (Fla.1989)); *see also Zanzuri v. G.D. Searle & Co.*, 748 F. Supp. 1511, 1517 (S.D. Fla.1990). Thus, if a treating physician "had substantially the same knowledge" of the risks posed by the medical device "as an adequate warning from the manufacturer should have communicated" to the physician, the omission of the risk from the product's instruction for use is irrelevant and causation is lacking. *See Christopher,* 53 F.3d at 1192–93; *Walls v. Armour Pharm. Co.,* 832 F. Supp. 1467, 1481–82 (M.D. Fla. 1993); *Felix,* 540 So.2d at 105.

Mrs. Hill's failure-to-warn claim fails under these legal rules because Dr. Zuzga, the doctor who placed her Celect IVC filter, testified that: (1) he did not read or rely on the Celect IFU in any way; (2) he was already aware of the risks of the complications that Mrs. Hill actually experienced; and (3) he would still have placed the IVC filter in Mrs. Hill, even if Cook had told him everything that Mrs. Hill claims was improperly omitted from the IFU, even knowing what he knows today about the complications Mrs. Hill actually experienced.

US.111463199.39

### 1.    Dr. Zuzga testified that he did not read or rely on the IFU.

Even assuming some deficiency in the instructions or warnings for the Celect IVC filter, the undisputed facts conclusively establish that the deficiency did not cause Mrs. Hill's injury because Dr. Zuzga testified that he neither read nor relied on the IFU:

> Q.    You were asked in your first deposition about a document called an IFU, or Instructions for Use.  Do you remember that?
> A.    Yes.
> Q.    And your testimony in your first deposition was that *you didn't read the IFU for the Celect filter; correct?*
> A.    *Correct.*
> * * *
> Q.    When counsel asked at the last deposition about the Celect instructions for use and you said that you did not review it, *is it safe to say that because you hadn't reviewed it, you didn't rely on it at the time of Mrs. Hill's filter placement?*
> A.    *Correct.*
> Q.    And that you didn't rely on Cook's communication in the IFU to form an opinion as to the risks associated with the Celect filter?
> A.    Correct.
> Q.    You did not rely on anything that Cook communicated to you in selecting the filter appropriate for Mrs. Hill?
> A.    Correct.[33]

Because Dr. Zuzga did not read or rely on the IFU, the content of the IFU had no impact on his decision to place the Celect filter in Mrs. Hill, and therefore had nothing to do with her alleged injury.  Stated another way, even if the IFU had said exactly what Mrs. Hill contends it should have said, nothing would have changed because Dr. Zuzga would still have placed the filter. Mrs. Hill's failure-to-warn claim therefore fails as a matter of law and undisputed fact.  *Lopez*, 580 So. 2d at 865; *Dugas v. 3M Co.*, No. 3:14-CV-1096-J-39JBT, 2016 WL 1271040, at *11 (M.D. Fla. Mar. 29, 2016) ("a [doctor's] failure to read a warning defeats a failure to warn claim as a matter of law"); *Pinchinat*, 390 F. Supp. 2d at 1148 ("Under Florida law, plaintiff's failure to read the warning label extinguishes proximate cause in a failure to warn claim."); *Ashby*, 458

---

[33] Zuzga Dep. Vol. 2 at 141:7-14, 144:15-145:3 (emphasis added).

US.111463199.39

So. 2d at 337 (where plaintiff did not read the warnings, "any failure to warn could not, as a matter of law, be the proximate cause of plaintiff's injuries.").

**Dr. Zuzga already knew of the risk of the complications Mrs. Hill experienced.**

Even if Dr. Zuzga had read the IFU, any deficiency in the IFU could not have caused Mrs. Hill's injuries because Dr. Zuzga testified that he already knew about all the possible complications that Mrs. Hill now says the IFU should have described—and in particular the complications Mrs. Hill claims she experienced.[34]  That undisputed fact also entitled Cook to summary judgment on Mrs. Hill's failure-to-warn.

Mrs. Hill alleged in her Complaint that her physicians did not know "nor could they have learned through the exercise of reasonable care, the risks of serious injury and/or death associated with and/or caused by Cooks' [*sic*] IVC Filters."[35] Dr. Zuzga's testimony establishes that this allegation is false, and that he *did* in fact know of all the risks of IVC filters relevant to Mrs. Hill that she complains Cook did not include in the IFU. He testified that even without reading the IFU, he was fully aware of the risks associated with the filter—including the risk of perforation:

> Q.    [Plaintiff's counsel] asked you several questions about risks that you -- did you tell Mrs. Hill this, did you tell Mrs. Hill that.  The fact of the matter is, is there any risk that you've heard about today that you did not know in November of 2010?
> A.    No.
> Q.    Okay.  In November of 2010, you knew about the risks that [Plaintiff's counsel] described about organ perforation, a narrowed or stenosed vena cava, those were all well known to you?
> A.    Correct.
> Q.    And when Mr. Johnson asked you, you had no expectation that Mrs. Hill's perforation -- or excuse me, you had no expectation that Mrs. Hill's filter would

---

[34] Only the complication Mrs. Hill claims to have suffered bear on her warnings claim.  Mrs. Hill cannot claim to have been harmed by a failure to warn of a complication she did not experience.
[35] Master Compl. ¶ 57.

US.111463199.39

> perforate her duodenum following your retrieval attempt, it's accurate to say that you had no expectation, but you always knew it was a risk?
>
> A.    Correct.[36]

Dr. Zuzga's pre-existing knowledge is also borne out by the IVC Filter consent form that he presented to Mrs. Hill before the surgery, which expressly warned of risks including pain, infection, bleeding, and "Injury to vessel or nerve (Including perforation)."[37] Dr. Zuzga thus knew of these risks, just as the learned-intermediary doctrine contemplates.[38]

Notwithstanding Dr. Zuzga's knowledge of all these risks, Dr. Zuzga placed the Celect IVC filter. Given this undisputed fact, any omission from the IFU of any risks—including perforation and duodenal perforation—could not have influenced Dr. Zuzga's decision to place the Celect filter, and thus could not, as a matter of law, have caused Mrs. Hill's claimed injuries. *Felix,* 540 So. 2d at 104 (affirming summary judgment where treating doctor knew of the product's dangers, holding that "any inadequacy in the [product] warning could not have been the proximate cause of the birth defects").

### 2.    Dr. Zuzga testified that he would not have treated Mrs. Hill any differently even knowing the complications she actually suffered.

Even assuming (contrary to the undisputed facts) that Dr. Zuzga had read the IFU, and that he was unaware at the time he placed Mrs. Hill's filter of some risk of IVC filters that eventually affected Mrs. Hill, any failure by Cook to warn of that risk *still* could not have caused

---

[36] Zuzga Dep. Vol. 2 at 224:21-225:13.  *See also id.* at 113:8-114:8 (testifying that the risk of perforation was well known); *id.* at 142:10-143:5 (noting he understood the risk of perforation included the specific risk that the filter could perforate the small intestine); *id.* at 129:1-130:4; 133:13-18; 137:12-18 (noting Ms. Hill was specifically warned of the risk of perforation).
[37] Consent Form (Mease Countryside 55) Ex. 36 to Zuzga Dep. (4/19/17)
[38] Although Hill testified that she had received medication before she signed this specific consent form (see Ex. O, Elizabeth Hill Dep. at 107:25-108:15), that testimony does not create an issue of fact concerning what *Dr. Zuzga* knew, and it is his knowledge that matters. *See Christopher,* 53 F.3d at 1192–93.

Mrs. Hill's injuries because additional warnings undisputedly would not have altered Dr. Zuzga's treatment of Mrs. Hill. This is yet a *third* reason why her failure-to-warn claim fails.

At the first session of Dr. Zuzga's deposition, Mrs. Hill's attorney spent substantial time questioning Dr. Zuzga about the possible complications of IVC filter placement that Mrs. Hill is stressing in this litigation: perforation, embedment, retrievability, progressive perforation, and off-label retrieval techniques,[39] and Dr. Zuzga testified at his deposition about the complications that Mrs. Hill had actually encountered.[40] Nevertheless, even knowing the complications that Mrs. Hill *actually* suffered, Dr. Zuzga testified that he *still* would have concluded that her risk of a pulmonary embolism during her lengthy spine surgery outweighed the risks of any complication from the IVC filter:

> Q.    … Dr. Zuzga, we talked in great detail about all of the risks associated with the Celect filter and with other filters. We talked about all the risks known to you, perforation, organ perforation, stenosis and other things. In your opinion, are all of those risks outweighed by the risk of death from a pulmonary embolism?
> A.    Yes.
> Q.    In Mrs. Hill's specific case, *even knowing the exact complications that she experienced and that her lawyers claim*, is it your opinion, still, that the risk of death from PE before her 10- to 12-hour spinal surgery, that that risk outweighs the risk of all the complications that she experienced?
> A.    Yes.[41]

And he testified that even with all the discussion of possible complications, he would not change how he treated Mrs. Hill, even today:

> Q.    Is there anything that you learned following her retrieval attempt in March of 2011, that caused you say, Hey, I need to bring Mrs. Hill back and do something different with her?
> A     No.
>         ****

---

[39] Ex. P, Zuzga Dep. Vol. 1 at 62:1-63:3, 72:4-9, 83:21-24.
[40] *Id.* at 75:11-22.
[41] Zuzga Dep. Vol. 2 at 226:1-15 (emphasis added).

US.111463199.39

> Q.    Is there anything that you learned after March of 2011, even up to today, that would cause you to change the way that you treated Mrs. Hill following March of 2011?
> A:    No.[42]

Indeed, in the two months between the two sessions of his deposition, Dr. Zuzga continued to use Cook products, and he testified that he intends to continue using them in the future:

> Q.    Dr. Zuzga, do you continue today to use Cook products?
> A.    Yes.
> Q.    After you leave this deposition, will you continue to prescribe and use Cook products in your patients?
>       ****
> A     Yes.[43]

In sum, the undisputed facts establish that any claimed deficiency in the Celect IFU or warnings could not as a matter of law have caused Mrs. Hill's IVC filter perforation or the consequences that flowed from it.  Dr. Zuzga testified that he not only knew about all the possible complications about which Mrs. Hill claims Cook failed to warn, he would still have placed the IVC filter even had he known the complications that Mrs. Hill would actually experience.  Mrs. Hill therefore cannot establish the necessary element of causation, and Cook is entitled to summary judgment on her failure-to-warn claim.  *Felix,* 540 So. 2d at 104.

**B.    Mrs. Hill has no expert testimony that Cook should have provided doctors with additional information or warnings concerning perforation or other possible complications of IVC filters.**

Even if Mrs. Hill could establish causation, her failure-to-warn claim would still fail as a matter of law and undisputed fact because she can offer no expert testimony that Cook should have provided doctors with any additional instructions or warnings concerning potential risks of using the Celect IVC filter.

---

[42] Zuzga Dep. Vol. 2 at 181:9-13.  *See also id.* at 76:7-11.
[43] *Id.* at  181:23-182:5.  *See also id.* at 76:12-20 ("Q…Since that [February] deposition, have you continued to choose Cook products for your patients?  A Yes.").

US.111463199.39

The mere omission of a warning about a possible risk is not a ground for liability; the omission must be negligent or must render the product defective and unreasonably dangerous. *See, e.g., Colville v. Pharmacia & Upjohn Co. LLC*, 565 F. Supp. 2d 1314, 1320 (N.D. Fla. 2008) (holding that both strict liability and negligent failure-to-warn claims require the plaintiff to prove "that the warnings accompanying the item were inadequate"); *In re Standard Jury Instructions in Civil Cases--Report No. 13-01 (Prod. Liab.)*, 160 So. 3d 869, 875-76 (Fla. 2015) (setting forth jury instructions for failure to warn claims under theories of strict liability (403.8) and/or negligence (403.10)).  Because Mrs. Hill's failure-to-warn claim involves the complex issue of what information a medical-device manufacturer should provide to a medical doctor about the risks of a particular device, she must support her claim with expert testimony.  *See Tillman*, 96 F. Supp. 3d at 1337 (granting summary judgment on failure-to-warn claim based on plaintiff's failure to provide expert testimony that IFU did not adequately convey information or misrepresented the actual risks).

Mrs. Hill lacks any such expert testimony here. Only two of her experts, Dr. Alexander Marmureanu and Dr. David Garcia, address the contents of the Cook Celect's instructions for use, and neither expert's opinion is sufficient to create an issue of fact on the adequacy of Cook's warnings.  Dr. Marmureanu's report opines that certain complications can arise from the use of IVC filters and asserts (sometimes incorrectly) that the Celect IFU does not warn of those complications.[44] But he ***never opines,*** either in his General Report or in his Hill-specific report, that Cook should have warned about such complications, that Cook violated any standard of care in failing to do so, or that the Celect is defective or unreasonably dangerous as a result of any such omission.  The jury cannot simply *assume* that the omission of a warning about a possible

---

[44] Ex. K, Dr. Marmureanu Rpt. 24-36

16

complication constitutes a defect or shows that Cook failed to exercise reasonable care.  Not all risks are sufficiently severe or sufficiently likely to occur to justify alarming product users.  On the contrary, the Seventh Circuit has emphasized that there are downsides to overwarning: "While it is important for a manufacturer to warn of potential side effects, it is equally important that it not overwarn because over warning can deter potentially beneficial uses of the drug by making it seem riskier than warranted and can dilute the effectiveness of valid warnings." *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 392 (7th Cir. 2010).  Dr. Marmureanu offers no opinion that the Celect IFU should have warned about any of the nine possible complications he mentions in his report,[45] or that Cook violated any standard of care in omitting such warnings.  His stated opinions therefore cannot support Mrs. Hill's claim, and cannot defeat summary judgment.

Dr. Garcia offers but a brief and cursory opinion concerning the information provided by the Celect IFU.  His report states:

> The manufacturer of a device with well-established risks must warn physicians about these risks in the device's IFU, including their frequency, severity and permanency. In the IFUs for the Gunther-Tulip (G-T) and Celect IVC filters, Cook fails to provide adequate information about the frequency, severity and permanency of possible IVC filter complications, including the possible need for long-term anticoagulation in many patients whose filter cannot be removed.[46]

But he does not mention the Cook IFU anywhere else in his report, and he does not assert that Cook failed to provide adequate information about any specific complication other than the possible need for long-term anticoagulation, and he provides no identifiable bases for his opinion that Cook "failed to provide adequate information."

---

[45] *See* Marmureanu Report. at 24-36.
[46] Ex. Q, David Garcia, M.D Expert Report at 11-12.

Dr. Garcia's report has no bearing on Mrs. Hill's claims because she does not allege—and none of her experts opines—that she *needs* long-term anticoagulation as a result of her filter. Indeed, Dr. Garcia's opinion itself demonstrates its lack of application to this case:  the language quoted above refers to "the *possible* need for long-term anticoagulation in many patients *whose filter cannot be removed*."[47]  But it is undisputed that Mrs. Hill's filter **has** been removed. Although Dr. Marmureanu's initial written report asserted that Hill needed "lifetime anticoagulation,"[48] he expressly disavowed that opinion at his deposition based on Hill's current condition—most prominently the fact that she has not used or needed anticoagulants since her filter was removed in 2013.[49]  A plaintiff cannot avoid summary judgment on a failure-to-warn claim through evidence that a defendant failed to provide information about a particular risk that the plaintiff does not claim to have suffered.  *See, e.g.*, *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1367 (M.D. Fla. 2015) (under Florida law, failure to warn claim requires plaintiff to establish "that the inadequate warning was a proximate cause of her injury").

Mrs. Hill has designated no other expert who proposes to offer any opinion about the Celect's IFU or warnings.  Absent expert testimony that Cook's IFU was inadequate, defective, or unreasonably dangerous, Mrs. Hill cannot establish the element of defect in her strict-liability failure-to-warn claim, or of breach of duty in her negligent-failure-to-warn claim.  Cook is therefore entitled to summary judgment on all of Mrs. Hill's failure-to-warn claims.

## II.   Cook is Entitled to Summary Judgment on Plaintiff's Design-Based Claims.

Cook is entitled to summary judgment on Mrs. Hill's defective-design claims primarily because she has failed to produce expert testimony (which she needs under Florida law)

---

[47] Garcia Report. at 11-12 (emphasis added).
[48] Ex. R, Marmureanu Hill Report. at 15-16.
[49] Ex. S, Marmureanu Dep. at 480:14-481:6.

US.111463199.39

identifying any *specific defect* in the design of the filter that she received.  Her experts simply point out that the Celect filter can perforate the vena cava, but that that is a well-known risk of vena cava filters, not the mark of a design defect.  And Mrs. Hill has no expert testimony establishing that any design defect *caused* her injury.  All medical devices pose the risk of injury; the fact that an injury occurs does not mean that it was caused by a *defect* in the product. Hill had to produce expert testimony to link the injury to a defect, and she has failed to do so.  Her design-defect claims thus fail as a matter of law and undisputed fact.

Although Florida law generally recognizes both the consumer-expectation test and the risk-utility test for design-defect claims, *Tillman*, 96 F. Supp. 3d at 1338, it applies only the risk-utility test in cases (like this one) that involve a "complex medical device."  *See id.* at 1339; *Rydzewski v. DePuy Orthopaedics, Inc*., No. 11–80007–Civ, 2012 WL 7997961, at *2 (S.D. Fla. Aug. 14, 2012) (rejecting the consumer-expectation test in a design defect claim pertaining to a medical device) (collecting cases); *Agrofollajes, S.A. v. E.I. Du Pont De Nemours & Co.*, Nos. 3D07-2322, 3D07-2318, 3D07-1036, 2009 Fla. App. LEXIS 19621, 2009 WL 4828975, at *21 (Fla. Dist. Ct. App. Dec. 16, 2009) (holding the consumer expectation test "inappropriate" for determining defectiveness" in a medical device case); *In re Fosamax Prods. Liab. Litig*., 2010 U.S. Dist. LEXIS 33260 at *18  n. 4 (S.D.N.Y. 2010) (applying Florida law and rejecting consumer-expectation test in a design defect claim pertaining to a prescription drug).  The risk-utility test requires plaintiffs to prove that the risk of harm presented by a specific design element of a product outweighs its utility to a patient.  *See* FSJI 403.7b.  This recognizes the fundamental truth that *all* medical devices pose risks to the patient.  It is only when those risks *outweigh the benefit to the patient* that a device may be considered defective.

US.111463199.39

Thus, for a negligent-design claim, Hill must prove all of the elements of a negligence claim (duty, breach, cause, and damages), *see Stazenski v. Tennant Company*, 617 So.2d 344, 345-46 (Fla. 1st DCA 1993), and must also prove that the product was defective or unreasonably dangerous. *See Marzullo v. Crosman Corp.*, 289 F. Supp. 2d 1337, 1342 (M.D. Fla. 2003) (citing *Siemens Energy & Automation v. Medina*, 719 So.2d 312, 315 (Fla. 3d DCA 1998)). Hill bears the burden of proof on all elements. *Husky Indus., Inc. v. Black*, 434 So.2d 988, 991 (Fla. 4th DCA 1983) (citing *Ford Motor Co. v. Hill*, 404 So.2d 1049 (Fla.1981)).

## A.  Hill cannot create a genuine issue of material fact concerning design defect.

Mrs. Hill proposes to support her claims of design defect and negligent design through the testimony of two experts: Dr. Robert McMeeking and Dr. Alexander Marmureanu. Even assuming that the Court allows Drs. McMeeking and/or Marmureanu to testify as experts, their testimony fails as a matter of law to create a genuine issue of material fact on the issue of design defect. Hill's design-based claims therefore fail as a matter of law. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 773 (7th Cir. 2015) ("failure to come forward with expert testimony regarding any alleged design defect or dangerousness is fatal to their claim"); *Malvaes v. Constellation Brands, Inc.*, No. 14-21302-CIV, 2015 WL 3874815, at *2 (S.D. Fla. June 23, 2015) (design-defect claim fails without expert testimony of defect); *Fagundez v. Louisville Ladder, Inc.*, Case No. 10–23131, 2011 WL 6754089, at *2 (S.D. Fla. Dec.22, 2011) (collecting cases).

### 1.  Dr. Marmureanu's testimony does not support a design defect.

Mrs. Hill cannot rely on the testimony of Dr. Marmureanu to establish a design defect in the Celect IVC Filter. Dr. Marmureanu's reports offer no opinion that the design of the Celect IVC implant is defective or that Cook failed to follow the appropriate standard of care in

US.111463199.39

designing it.  His general report never uses the terms "defect," "defective," "unreasonably dangerous," or "standard of care."[50]  These are of course the critical elements of Mrs. Hill's strict-liability and negligent-design claims.  *See, e.g., West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 87 (Fla. 1976) ("In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish … the defect and unreasonably dangerous condition of the product").  Dr. Marmureanu's general report vaguely refers to "problems…with the [Celect/Tulip] vena cava filter,"[51] but a "problem" is of course not a standard for imposing liability.

Although Dr. Marmureanu's Hill-specific report makes several conclusory references to the "defective [Celect] filter,"[52] that report never explains or supports any actual defect. His report says that a filter is defective "due to the stiffness of the filter, resulting in excess radial force, and lack of perforation limiters on the filter struts."[53]  He then drops a footnote stating: "I discuss stiffness and radial force in the main body of my report."[54] ***But he does not.***  His General Report does not even *mention* the terms "stiffness" or "perforation limiters," and its only reference to radial force is in a statement that he intends to use animation at trial to "demonstrate" the issue—an issue that his report *does not address*.  Moreover, Dr. Marmureanu does not address in any way how this alleged design problem creates a risk to the patient that outweighs the utility of the IVC design as a whole.  He does not present the evidence necessary under the standard of defective design in Florida.

---

[50] The only times Dr. Marmureanu's report even mentions the word "design" is to describe his view of Cook's historical intent in designing the filters or conducting a particular study.  *See* Marmureanu General Report. at 12, 16, 18, 19, 33, 34.  The report asserts no flaws in the design.
[51] Marmureanu General Report at 24, 36.
[52] Marmureanu Hill Report at 12.
[53] *Id.*
[54] Marmureanu Hill Report at 12 n.3.

US.111463199.39

These omissions are critical, because they demonstrate that Dr. Marmureanu has no idea what the supposed design defect in the Cook filters is.  He simply condemns "the filter as a whole"—indeed, *all* IVC filters, regardless who makes them—and he does not know or (apparently) care about any specific defect in the design.  He testified:

> Q.    In your report regarding Mrs. Hill's conclusion, have you reached the conclusion that Mrs. Hill's alleged injuries were caused by the design of the Celect filter?
>
> A.    Well, I would say more than the design. They were design -- they were caused by the filter. It's not only the design. It's the metal in the filter that created the perforation. It's a poor design, but it's not only -- it's the way it was being -- the metal was being used with the design, the way it was welded with the design, the fracture they came up with the design. So it's not only the design. It's the filter as a total.[55]

This is simply a blizzard of conclusions without any facts or reasoning to support them.  As the Court is well aware, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989).  Dr. Marmureanu's opinions therefore do not create a genuine issue of material fact on the issue of design defect.

### 2.    Dr. McMeeking's testimony does not support a design defect.

Mrs. Hill likewise cannot rely on the anticipated testimony of Dr. McMeeking to establish a design defect in the Celect IVC Filter. Although Dr. McMeeking's report asserts that "the designs of the Cook inferior vena cava filters are deficient as they lead to the faults described in this report,"[56] his report offers no specific portion of the design that was defective, and no specific design change that Cook should have made to render the filter non-defective.

---

[55] Marmureanu Dep. at 325:3-16; *see also id.* at 344:14-19 ("Could be the design. Could be the material the filter is made of."); *id.* at 349:18-24 ("it's the design and the material, and not only just the poor workmanship that perhaps went into the R&D, and the filter tilted then perforated").

[56] Ex. T, Robert M. McMeeking, Ph.D., Report at 1.

US.111463199.39

The closest that Dr. McMeeking gets to citing a *specific* defect in the Celect filter is his opinion and testimony that Cook should have "contemplated" or considered making some design changes to reduce the risks of the filter.[57] But after reciting the changes that he thinks Cook should have considered, he gave this crucial testimony:

> Q.   You don't know, as you sit here today, whether those changes would actually increase other risks imposed by the filter; correct?
>       * * *
> A.   Without making a specific assessment, I am not in a position to – to comment on that or to make that assessment.
> Q.   You are not in a position today, as you sit here, to say whether those changes that you suggested *would preserve all of the benefits of the filter without any reduction of the benefits; correct?*
>       * * *
> A.   The – since that addresses medical benefits, *I'm not in a position to make assessment of the benefits.* [58]

As discussed above, Florida law requires Mrs. Hill to prove that the risk of harm presented by a specific design element of the Celect outweighs its utility to patients. Dr. McMeeking's inability to assess the benefits of the filters means that he *cannot support Hill's design-defect claim.*  His admitted inability to assess the benefits of the changes that he proposes means that he is missing half of the analysis that Florida law requires.

Much of Dr. McMeeking's analysis was also devoted to showing that the Celect filter might fail in a "worst-case scenario."[59]  He testified:

> Q.   There's been a lot of questions about the calculations that you have done that are contained in your report. Many of those calculations addressed worst-case scenarios; is that correct?
> A.   That's correct.[60]

---

[57] *See, e.g.,* McMeeking Report at 49.

[58] Ex. U, Robert M. McMeeking, Ph.D. Dep. at 315:25-316:17 (emphasis added).

[59] *See, e.g.,* McMeeking Dep. at 160:13-14 ("I was concerned to try to identify what could be considered to be worst-case conditions")& 204:10-11 ("I've been looking at worst-case conditions"); *see also id.* at 111:17, 112:11, 149:5, 149:16, 154:11, 165:20, 195:2, 207:19-22.

[60] McMeeking Dep. at 304:3-8.

US.111463199.39

But he acknowledged that *very few people* would ever experience a "worst-case scenario."

> Q.    Would you expect that a high percentage of individuals who receive Celect or Tulip filters would fall into that worst-case scenario?
>       * * *
> A.    No. I would expect a very small number of the population would fall into that category.[61]

And he ended up testifying that he is *not* saying that Cook had to design its filters to survive the worst-case scenario.[62]  Indeed, he specifically acknowledged that it would be "unlikely" that a company could design a device to survive the worst-case scenario in every case.[63]  Thus, Dr. McMeeking did not testify and was unable to testify that the possibility that Cook's filter may fail under a "worst-case scenario" means that it is *defectively designed*.  At the end of the day, he testified merely that Cook should have "take[n] into consideration what the worst-case conditions are,"[64] but he never testified that Cook's engineers *failed* to do so, what they would have found had they done so, or that they could have changed the device for the better *if* they had done so.  And he did not identify any *specific* design change that he contends: (1) Cook should have made to accommodate the worst-case scenario, and (2) made the filter *defective* in its absence.

What's more, Dr. McMeeking acknowledged that his "worst-case scenario" analysis simply does not apply to Mrs. Hill.  Dr. McMeeking described his "worst case scenario" theory as follow:

> [Q]    So your calculation is that in a 15-millimeter vena cava, once a filter perforates, it doesn't have to be endothelialized, but once it perforates, one instance of Valsalva, a cough, a sneeze, a bowel movement, is going to either break or it is going to deform that filter; correct?

---

[61] McMeeking Dep. at 305:1-8.
[62] *Id.* at 314:19-23.
[63] *Id.* at 315:2-9.
[64] *Id.* at 314:23-315:1.

A.      That's correct, yes.[65]

But he conceded that Mrs. Hill's *actual* experience with her Celect filter was radically different from his prediction that the filter may fail after a single cough, a single sneeze, or a single bowel movement.  Mrs. Hill had a Celect filter that perforated her vena cava and was in a perforated state for at least a week before it was retrieved,[66] and she would have experienced coughs, sneezes, and bowel movements at some point during that week, yet she never suffered either breakage or deformity of her filter.  In other words, she lived with an intact perforated filter far longer than the single cough, sneeze, or bowel movement that Dr. McMeeking calculated it would take to destroy the filter.[67]  Thus, regardless of whether Dr. McMeeking's "worst-case scenario" accurately identifies a design defect that might lead to breakage, deformity, or injury in some other patient, that defect has no connection to Hill's claims.  His opinion therefore cannot stave off summary judgment on Mrs. Hill's design-defect claim.

Dr. McMeeking's identification of supposed "superior alternatives" to the Celect filter likewise does not create an issue of fact concerning any defect in the Celect's design.  Cook acknowledges that although a plaintiff need not demonstrate a "reasonable alternative design" to prevail on a design defect case, evidence of such a reasonable alternative design may be evidence of a design defect.  *See Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 511 (Fla. 2015).  But Dr. McMeeking's proposed "reasonable alternative designs" are neither reasonable nor truly alternatives, and thus provide no evidentiary support for a claim of design defect in the Celect.

---

[65] McMeeking Dep. at 205:9-15.

[66] Mrs. Hill alleges that she experienced nausea, vomiting, diarrhea and abdominal pain attributable to the filter on August 13, 2013, and that the filter was removed eight days later, on August 21, 2013. (Ex. V, Morton Plant 117-119; Ex. F, Penn State 10-11)

[67] McMeeking Dep. at 205:20-206:19; 306:14-307:7.

First, recall Dr. McMeeking's concession that he is "not in a position to make assessment of the benefits" of any changes to the design of an IVC filter.[68]  Without an ability to assess the benefits of a design change, he certainly cannot opine on whether a "reasonable alternative design" exists—*i.e.*, one that reduces risks while not compromising any of the benefits.

Second, the alternatives he suggests are not reasonable.  Dr. McMeeking's evaluation of alternatives looks only at the issue of perforation.[69]  Although he compares *perforation* rates among various IVC filters[70], he does not compare or analyze the other factors that inherently affect whether one IVC filter would be "reasonable" as an alternative to another, including filter performance, migration, and tipping.  One cannot logically determine the reasonableness of an alternative by considering only one of many relevant factors.  Dr. McMeeking's approach is analogous to saying that a Volkswagen Beetle is a "reasonable alternative design" to a Ford pickup truck's "defectively" low gas mileage because the Volkswagen gets better gas mileage, without comparing or accounting for other factors like cargo capacity, towing power, and off-road ability.

Third, Dr. McMeeking's proposed reasonable alternative designs are also unhelpful because they are not truly "alternatives" to the Celect at all.  The Celect is designed to be used as either a permanent or a retrievable filter, intended to be *removable*,[71] and that retrievability is one of its major benefits.  But the "reasonable alternative designs" Dr. McMeeking touts are the Greenfield filter and the VenaTech IVC filter, both of which are *permanent* filters, which are

---

[68] McMeeking Dep. at 316:16-17.
[69] *See* McMeeking Report at 41-48.
[70] *See* McMeeking Report. at 43, 47.
[71] Ex. W, IFU for Cook® Celect® Filter Set.

US.111463199.39

never intended to be removed.[72]  These are not equivalent or comparable products; key features have opposite purposes.[73]

Dr. McMeeking's opinions therefore do not create a genuine issue of material fact on the issue of design defect.

**B.     Plaintiff cannot create a genuine issue of material fact concerning causation based on design defect.**

Mrs. Hill's inability to prove that the Celect was defectively designed dooms her design-defect claim all by itself. But there is another reason why her claim fails: she cannot prove that any design defect *caused her injury*.

Causation is an essential element of any tort.  *In re Trasylol Prod. Liab. Litig.*-MDL-1928, No. 08-MD-1928, 2013 WL 3353833, at *3 (S.D. Fla. July 3, 2013) (*citing Lewis v. Lead Industries Ass'n., Inc.*, 793 N.E.2d 869, 873 (2003) ("[a]n essential element of a plaintiff's cause of action for any tort is that there be a proximate causal relationship between the act or omission of the defendant and the damages which the plaintiff has suffered.")).  Because of the complex nature of medical devices and medical injury, Mrs. Hill must support the causation element of her design-defect claim with expert testimony.  *See Schenone v. Zimmer Holdings, Inc.*, No. 3:12-CV-1046-J-39MCR, 2014 WL 12576790, at *3 (M.D. Fla. Aug. 8, 2014) (citing *Hughes v. Stryker Corp.*, 423 Fed. Appx. 878, 881 & n.4 (11th Cir. 2011) (citation omitted).  She cannot.

The only expert Mrs. Hill has identified to try to make a causal link between a supposed design defect and the perforation of her filter is Dr. Marmureanu.[74]  But as discussed above, Dr.

---

[72] McMeeking Dep. at 76:13-77:2, 228:10-13, 259:19-260:1.

[73] The only retrievable equivalent Dr. McMeeking identifies is the Celect Platinum. McMeeking Dep. at 281:9-282:11. But Dr. McMeeking can cite no evidence that the Celect Platinum has better results than the Celect, either generally or with respect to perforation.  He views the Celect Platinum as better based solely on eyeballing its increased surface area.  *Id.* at 94:1-21

US.111463199.39

Marmureanu never actually identifies what he believes the design defect in the Celect filter is; he simply criticizes the "filter as a total."[75]  This vagueness and lack of definition carries over into his causation opinions, which are vague, internally contradictory, and ultimately inadequate to support an inference of causation.

Dr. Marmureanu's report offers no opinion that any design defect in the Celect filter caused Mrs. Hill's perforation; indeed, his 17-page report on Mrs. Hill does not even mention the word "design."  Instead, he opines that "Ms. Hill's Celect filter failure was caused by the Celect filter's tendency to perforate the IVC and progressively perforate."[76]  But a "tendency" is not a *design defect*.  And the word "tendency" is simply too vague and too broad to be useful in describing whether one thing actually caused another. *See Adams v. Indiana Bell Tel. Co.*, 2 F. Supp. 2d 1077, 1088 (S.D. Ind. 1998), *rev'd on other grounds sub nom. Adams v. Ameritech Servs., Inc.*, 231 F.3d 414 (7th Cir. 2000) ("The term 'any tendency' is so broad that it has the effect of allowing admission of evidence that has only the slightest bit of probative worth.") (citing Charles A. Wright & Kenneth W. Graham, Federal Practice § 5165).

Dr. Marmureanu also opines that the perforation was caused, ***not by any specific defect*** in the Celect filter or even by the product's "tendency," but by *Dr. Zuzga's decision to use the filter at all*.  He states: "Mrs. Hill's injuries are caused by the medically unnecessary implantation of

---

[74] Although Plaintiff's expert Dr. Michael Fishbein expresses some opinions concerning the individual Plaintiffs' perforations and the consequences of those perforations, he expresses no opinion linking the perforation to any defect in the design of the Celect IVC filter.

[75] Ex. S, Marmureanu Dep. at 325:3-16. Although Dr. Marmureanu baldly asserts in his Hill report that a filter is defective "due to the stiffness of the filter, resulting in excess radial force, and lack of perforation limiters on the filter struts," Ex. R, Marmureanu Hill Report. at 12, he never offers anything to support his assertion and he never attributes these issues to the filter's design.  He says in a footnote that "I discuss stiffness and radial force in the main body of my report," Hill Report. at 12 n.3, but he does not in fact do so.  An expert cannot create a genuine issue of material fact on the element of design defect with a bald assertion unsupported by any authority or analysis that does not even mention design.

[76] Marmureanu Hill Report. at 1; *see also id.* at 2.

US.111463199.39

the Celect filter."[77]  But Cook of course did not make the decision to implant the Celect filter in Plaintiff; Dr. Zuzga testified that he and he alone made that decision.[78]  Strangely enough, Dr. Marmureanu then excuses Dr. Zuzga for this decision, opining that "Ms. Hill's injuries were not caused by a violation of the standard of care by any treating physician, particularly in light of the IFU."[79]  If Mrs. Hill contends that the IFU should have told Dr. Zuzga something that it did not, that is a failure-to-warn claim, which Cook addressed above.  Any such deficiency in the IFU, however, has nothing to do with any claimed design defect in the Celect filter, and a surgeon's decision to place the filter—regardless how Dr. Marmureanu feels about the advisability of that placement—does not lay the causation of Mrs. Hill's perforation at Cook's door.

Finally, Dr. Marmureanu does not opine that any of the defects that Dr. McMeeking attributes to the Celect caused Mrs. Hill any injuries.  First, Dr. Marmureanu's report makes no reference to any design-defect opinion by Dr. McMeeking; indeed, Dr. Marmureanu conceded that he never even read Dr. McMeeking's report,[80] so he could not have relied on any defects identified in that report in forming his causation opinions.  Second, Dr. Marmureanu's own opinions contradict Dr. McMeeking's opinions on product defect, so Dr. Marmureanu could not have relied on Dr. McMeeking's theories.  Both Dr. McMeeking's view that Cook did not do enough investigation into his "worst-case scenario" and his description of what he views as reasonable alternative designs necessarily *assume* that IVC filters can be made safer.  But Dr. Marmureanu's view is *just the opposite*: he believes that "all filters are bad,"[81] and that they

---

[77] Ex. R, Marmureanu Hill Report. at 2.
[78] Zuzga Dep. Vol. 2 at 108.
[79] Marmureanu Hill Report. at 16; *see also id.* at 2 ("[t]here was no violation in the standard of care for medical service rendered by Mrs. Hill's medical providers.").
[80] Marmureanu Dep at 423:25-424:14.
[81] Marmureanu Dep. at 154:4-6.

US.111463199.39

should not be sold or even given away.[82]  Dr. Marmureanu thus could not base any causation

opinion on Dr. McMeeking's claimed design defects.

Because Mrs. Hill has no expert evidence establishing that a *specific* defect in the design

of the Celect IVC filter caused her injuries, Cook is entitled to summary judgment on her design-

defect claim.

### III. Cook is Entitled to Summary Judgment on Hill's Punitive-Damages Claim.

Cook is entitled to summary judgment on Mrs. Hill's claim for punitive damages, both

because her claims for compensatory damages fail (as discussed above) and because she cannot

as a matter of law meet the high threshold necessary for the imposition of punitive damages.

First, Mrs. Hill's punitive damages claim fails because her substantive liability claims

fail.  A claim for punitive damages is not an independent cause of action, but "merely a remedy

that must be asserted in conjunction with a substantive claim."  *Hallgren*, 124 So. 3d at 355.  A

finding of liability is therefore a prerequisite to a determination of punitive damages. *See Engle*,

945 So.2d at1262–63.  Because all of Mrs. Hill's substantive liability claims fail as a matter of

law, her claim for punitive damages likewise fails as a matter of law.

Even if the Court were to find that one or more of Mrs. Hill's liability claims survives

summary judgment, however, Cook is still entitled to summary judgment on her punitive-

damages claim because she cannot as a matter of law meet the high standard for such damages.

Although Florida law governs Mrs. Hill's claims for compensatory damages, the choice of the

law governing her claim for punitive damages is not as simple. As discussed in Cook's

forthcoming motion for bifurcation of punitive damages, the law of Indiana, the state in which all

the Cook conduct with which Mrs. Hill takes issue occurred, should apply to Mrs. Hill's

---

[82] Marmureanu Dep. at 255:22-27.

punite-damages claim. But the Court need not decide the choice-of-law question to grant Cook summary judgment on Mrs. Hill's punitive-damages claim, because Mrs. Hill's evidence could not sustain an award of punitive damages under either Florida or Indiana law.

Florida permits an award of punitive damages in product liability actions where the plaintiff can show by "clear and convincing evidence" that the defendant is guilty of intentional misconduct or gross negligence.  Fla. Stat. § 768.72.  Under Indiana law, punitive damages may be awarded only when the jury could find by clear and convincing evidence that the defendant acted with malice, fraud, willful and wanton misconduct, oppressiveness "which was not the result of a mistake of fact or law, mere negligence, or other human failing." *Wohlwend v. Edwards*, 796 N.E.2d 781, 784 (Ind. 2003); Ind. Code § 34-51-3-1 (Burns Code Ed. Repl. 1998). Here, even assuming that Mrs. Hill's product liability claims survived summary judgment, she cannot produce evidence that could clearly and convincingly permit a jury to conclude that Cook engaged in the culpable conduct required by either of these different standards: intentional misconduct or gross negligence.

By no stretch of the imagination could Mrs. Hill's evidence be viewed as anything more damning than a failure to exercise reasonable care. There is no gross negligence, no fraud, no malice, no wanton or willful misconduct, and certainly no intentional misconduct in the record. Mrs. Hill could tenably argue, at the most, for some mistake, negligence, or human failing, but this is not enough for a punitive damage award under either state's standard.

This conclusion is particularly compelling in the specific circumstances of this case: Mrs. Hill's treating doctor testified that he *actually knew* of all the risks of the Celect IVC filter, and that he decided to place the Celect filter notwithstanding those risks (and would do the same thing today), and Mrs. Hill's own expert Dr. Marmureanu concedes that the treating doctor's use

31

of the Celect filter did not violate any standard of care. The Court therefore should grant Cook summary judgment on Mrs. Hill's claim for punitive damages.

**IV.    Defendant Cook Incorporated is Entitled to Summary Judgment on All Claims Against It Because It Did Not Manufacture or Sell Mrs. Hill's Celect Filter.**

Finally, Defendant Cook Incorporated (as distinguished from Defendants Cook Medical LLC and William Cook Europe APS) is entitled to summary judgment on all claims against it because it had no role in the manufacture or sale of Mrs. Hill's IVC filter.

To recover under any Florida product liability theory, a plaintiff must demonstrate that the defendant is in the chain of manufacture, sale, and distribution of the product claimed to have caused the injury. *West v. Caterpillar Tractor Co.,* 336 So. 2d 80, 87 (Fla.1976) (adopting the requirement from the Restatement (2d) of Torts § 402A, which permits imposition of liability on "[o]ne who sells any product in a defective condition unreasonably dangerous" and requires that the seller be engaged in the business of selling the product); *Jennings v. BIC Corp.,* 181 F.3d 1250, 1255 (11th Cir. 1999) ("the manufacturer of a defective product can be held liable if the manufacturer made the product in question"); *North Miami General Hospital, Inc. v. Goldberg,* 520 So. 2d 650, 652 (Fla. Dist. Ct. App. 1988) (finding the doctrine of strict liability inherently requires a defendant be a business within the product's distributive chain).

Here, Cook Incorporated had no role in the manufacture or distribution of Hill's Celect IVC filter. As the company's documents show, her filter was manufactured by William Cook Europe,[83] which sold the filter to the filter's United States distributor Cook Medical.[84]  Cook

---

[83] Breedlove Decl. ¶ 3, 8.
[84] *Id.* ¶ 8.

US.111463199.39

Medical in turn sold Hill's filter to BayCare, the system that operates the facility where Hill received her implant in November of 2010.[85]

Cook Incorporated is a separate entity from both Cook Medical and William Cook Europe.[86]  Cook Incorporated does not make, distribute or sell Celect IVC filters,[87] and it had no involvement in the manufacture, distribution, or sale of the Celect IVC filter placed in Hill.[88] Because Cook Incorporated had no role in the manufacture, sale, or distribution of Hill's IVC filter, it cannot as a matter of law be held liable under any product liability theory, and Cook Incorporated is entitled to summary judgment as to all such claims. *See Samuel Friedland Family Enters. v. Amoroso*, 630 So. 2d 1067, 1068 (Fla. 1994) ("The underlying basis for the doctrine of strict liability is that those entities within a product's distributive chain 'who profit from the sale or distribution of [the product] to the public …should bear the financial burden of even an undetectable product defect.") (quoting *North Miami General Hosp., Inc. v. Goldberg*, 520 So. 2d 650, 651 (Fla. Dist. Ct. App. 1988).

Cook Incorporated is likewise entitled to summary judgment on Mrs. Hill's claim for punitive damages.  A finding of liability is a prerequisite to a determination of punitive damages. *See Engle v. Liggett Group, Inc.*, 945 So.2d 1246, 1262–63 (Fla. 2006). As discussed above, Cook Incorporated can have no liability because it did not manufacture, distribute, or sell Mrs. Hill's filter.  Absent a viable claim for liability against Cook Incorporated, Hill's claim for punitive damages against that company likewise fails as a matter of law.  Cook Incorporated is therefore entitled to summary judgment as to all of Mrs. Hill's claims against it in this case.

---

[85] Breedlove Decl. ¶ 10.
[86] *Id.* ¶ 11.
[87] *Id.* ¶ 3.
[88] *Id.* ¶ 11.

US.111463199.39

## **Conclusion**

The Court should grant the defendants summary judgment as to all of plaintiff's claims in this case.

Dated: August 11, 2017                         Respectfully submitted,

                                               /s/ *John T. Schlafer*
                                               Andrea Roberts Pierson (# 18435-49)
                                               John T. Schlafer (# 28771-49)
                                               FAEGRE BAKER DANIELS LLP
                                               300 North Meridian Street, Suite 2700
                                               Indianapolis, Indiana  46204
                                               Telephone:  (317) 237-0300
                                               Facsimile:  (317) 237-1000
                                               Email:  andrea.pierson@faegrebd.com
                                               Email:  john.schlafer@faegrebd.com

                                               James Stephen Bennett (# 22869-02)
                                               FAEGRE BAKER DANIELS LLP
                                               110 W. Berry Street, Suite 2400
                                               Fort Wayne, Indiana  46802
                                               Telephone: (260) 424-8000
                                               Facsimile: (260) 460-1700
                                               stephen.bennett@faegrebd.com

                                               *Attorneys for Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, William Cook Europe ApS*

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2017, a copy of the foregoing COOK

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was filed electronically, and notice

of the filing of this document will be sent to all parties by operation of the Court's electronic

filing system to CM/ECF participants registered to receive service in this matter.  Parties may

access this filing through the Court's system.  Lead Co-Counsel for Defendants will serve any

non-CM/ECF registered parties.

/s/ *John T. Schlafer*　　　　　　　

US.111463199.39