# EXHIBIT G

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION
3
      IN RE: COOK MEDICAL, INC.,    ) Case No.
4     IVC FILTERS MARKETING,        ) 1:14-ml-2570-RLY-TAB
      SALES PRACTICES AND PRODUCT   )
5     LIABILITY LITIGATION          ) MDL No. 2570
6
          VIDEOTAPED DEPOSITION OF FRANK C. LYNCH, M.D.
7
            Taken in the offices of McQuaide
8     Blasko, 1249 Cocoa Avenue, Suite 210, Hershey,
      Pennsylvania, on Friday, May 26, 2017, commencing
9     at 12:06 p.m. before Tiffany L. Mast, Court
      Reporter, and Kevin Frank, Videographer.
10
11    APPEARANCES:
12                   FAEGRE BAKER DANIELS
                     BY: ANDREA ROBERTS PIERSON, ESQUIRE
13                   300 North Meridian Street
                     Suite 2700
14                   Indianapolis, Indiana 46204
                     (317) 237-1424
15                   andrea.pierson@FaegreBD.com
16                   -- For Cook Medical, Inc.
17
                     FAEGRE BAKER DANIELS
18                   BY: ANNA RUTIGLIANO, ESQUIRE
19                   300 North Meridian Street
20                   Suite 2700
21                   Indianapolis, Indiana 46204
22                   (317) 237-1191
23                   anna.rutigliano@FaegreBD.com
24
25                   -- For Cook Medical, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 42

1 Is that customary?
2 A. Sometimes when patients are attempting to
3 contact me, they call my academic office. So my
4 administrative assistant may yield -- or may field
5 the initial call. Sometimes the call is directed
6 into our procedural area, where either a nurse or a
7 nursing technologist may answer the phone. So it's
8 likely I was otherwise engaged and some other, you
9 know, person took that initial phone call.
10 Q. Within Exhibit 3, there are some informed
11 consents that Mrs. Hill signed on pages 5 and 6.
12 Is it customary for your patients to
13 sign an informed consent before their filter is
14 retrieved by you?
15 A. Yes.
16 Q. Are you looking at pages 5 and 6 right now,
17 Doctor?
18 A. Five --
19 Q. It should say five and -- five six in the
20 lower right-hand corner --
21 A. Yes.
22 Q. -- the Penn State number.
23 A. Uh-huh.
24 Q. What was the indication for Mrs. Hill's
25 filter retrieval?

Page 43

1 A. As stated on the consent form?
2 Q. Yes.
3 A. I'd have to look at it.
4 So pages 5 and 6 are the consents
5 for moderate sedation. So we obtained separate
6 informed consent for that part of the procedure,
7 since it carries its own risk.
8 Q. Let me put it a slightly different way --
9 A. Yeah.
10 Q. -- Doctor.
11 A. Yeah. So the procedural consent is page 3
12 and 4.
13 Q. Okay.
14 A. Yeah. And as, I believe, in my recollection,
15 the assessment of -- to summarize Mrs. Hill's case
16 was that her filter had penetrated the cava, and she
17 no longer needed it, so --
18 Q. Okay. Thank you.
19 Were there alternatives to retrieving
20 the filter?
21 A. Alternatives outside of attempting to remove
22 the filter?
23 Q. Yes. Yes.
24 In other words, could you have left
25 Mrs. Hill's filter in place?

Page 44

1 A. Well, that's always an alternative, but by
2 doing so, you accept the potential long term
3 complications of the device, many of which are
4 related to the duration of implantation. So that's
5 always an alternative.
6 Q. Dr. Lynch, I'd like to take a look at your
7 operative report, which is dated August the 21st,
8 2013. And if you look at the number at the lower
9 right-hand corner that says Penn State, and it
10 should say Penn State 10 --
11 A. Yep.
12 Q. -- and Penn State 11.
13 Do you have that?
14 A. Yes.
15 Q. Tell us, if you could, first, when you set
16 about to retrieve Mrs. Hill's filter, what technique
17 did you use, and how did you do it?
18 A. If I recall, in what is normally part of my
19 practice, even in the setting of a previously-failed
20 retrieval technique, I usually try the standard
21 technique first, so -- and I believe that's what I
22 outlined here.
23 So I -- getting down to the nuts
24 and bolts of the procedure, accessed the jugular
25 vein and introduced a working sheath, injected

Page 45

1 contrast to make sure there was no clot in the
2 filter. And then I used an endovascular snare, a
3 generic device for capturing foreign bodies, to try
4 to capture the filter hook. That was unsuccessful.
5 And then I put a larger working
6 catheter in and then did a technique that can be
7 used to capture the apex of the filter without
8 grabbing onto the hook. And that's, generically in
9 interventional radiology, that's referred to as an
10 in situ snare. I don't think I used that language
11 in the report, but what I describe is doing that,
12 so --
13 So rather than grabbing onto the
14 hook, I formed a wire loop underneath the filter
15 apex and then was able to free the filter from the
16 wall and remove it.
17 Q. Let me backtrack just a second.
18 A. Yeah.
19 Q. Before you performed this actual procedure,
20 did Mrs. Hill come to the hospital on the day of the
21 procedure?
22 A. She may have arrived the night before. I'm
23 not sure. That's -- I'm not sure if it was the night
24 before or the day of.
25 Q. Okay. According to your medical records, or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 46

1  the hospital's medical records, it has the admit
2  date and the discharge date as August 21st, 2013.
3         Would that mean this was a
4  single-day procedure?
5  A.    Yeah. It's considered to be an outpatient
6  procedure that we perform in the hospital.
7  Q.    And before you performed the retrieval
8  procedure, did you have an opportunity to speak with
9  Mrs. Hill, and did Mrs. Hill have an opportunity to
10 speak with you?
11 A.    Yes.
12 Q.    And could she ask you any questions that she
13 wanted to ask you?
14 A.    She should have had that opportunity, yeah.
15 Q.    Do you recall anything that she expressed to
16 you?
17 A.    Not in specifics, no.
18 Q.    If Mrs. Hill had expressed concerns, either
19 extreme anxiety or pain or other symptoms, would you
20 have recorded that within your records?
21 A.    I may not have rigorously recorded that, no.
22 Q.    Do you have any memory of Mrs. Hill
23 expressing to you any special concerns about her
24 filter or her medical condition?
25 A.    Not specifically.

Page 47

1  Q.    And at the time of the procedure itself, who
2  prepares Mrs. Hill for the procedure?
3  A.    Who prepares her?
4  Q.    Yes, like --
5  A.    There's a variety of caregivers that are
6  involved, so -- at our institution, on arrival, we
7  have an outpatient pre-procedure and recovery area.
8  So there's a number of nurses that would have cared
9  for her at that point in time, which would include
10 starting an IV, establishing baseline vital signs,
11 and doing a pre-procedure assessment.
12        Before a filter removal, my custom
13 is to get a lower extremity ultrasound, make sure
14 there's no acute blood clot in the legs. So in the
15 course of doing that, the patient will encounter the
16 technologists who are performing that examination.
17 And then when the patient comes to the actual
18 department, the patient will encounter another set of
19 nurses that would do immediate pre-procedure
20 assessment.
21        During that period of time, the
22 patients will interact with physicians, physician
23 extenders, or physician trainees to do the initial
24 consent for the procedure. And then immediately
25 before the procedure, a physician does a

Page 48

1  pre-procedure assessment for their candidacy for
2  sedation. And usually, it's that point in time where
3  we ask if there's any lingering questions or concerns
4  and clarifications before we start, so --
5  Q.    Can I stop you just one second?
6  A.    Yeah.
7  Q.    You mentioned, I think, having done or
8  typically having -- doing some kind of an ultrasound
9  --
10 A.    Uh-huh.
11 Q.    -- on a patient before the procedure takes
12 place.
13 A.    Yes.
14 Q.    Did that happen in Mrs. Hill's case?
15 A.    I believe it did, yes.
16 Q.    And did you observe anything of concern?
17 A.    No. Huh-uh.
18 Q.    When the ultrasound was done, would that
19 reveal to you if there was a presence of any
20 thrombus or any kind of thrombotic syndrome?
21 A.    We only examine the legs, so that would --
22 the purpose is to detect those things in the lower
23 extremities below the groin.
24 Q.    When you examined Mrs. Hill and looked at her
25 ultrasound, did you find that she had any swelling

Page 49

1  of her legs?
2  A.    Not to my recollection, no.
3  Q.    Was there any indication to you, prior to
4  retrieving Mrs. Hill's filter, that she had any sort
5  of thrombotic condition or any sort of clotting
6  disorder?
7  A.    I don't recall that as part of my history,
8  no.
9  Q.    As she presented to you on that day, did you
10 believe that she was having any clinical symptoms in
11 her lower extremities that would lead you to believe
12 that either the condition of her vena cava or the
13 condition of her filter, that they were slowing the
14 flow of blood?
15 A.    I don't recall any specific findings that
16 would suggest that.
17 Q.    Okay. And you explained to us just a moment
18 ago, the way that you performed the procedure -- and
19 I thought I heard you say that you retrieved her
20 filter using an in situ snare.
21 A.    In situ snare, yeah.
22 Q.    Okay. Can you tell us again what that is
23 exactly?
24 A.    So a standard snare, basically, is a closed
25 wire loop. In order to capture something, there has

13 (Pages 46 - 49)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 66

1  A.  At the explant site, where the narrowings
2  are, generally, the narrowing will resolve over time.
3  The opportunity to make that assessment in humans is
4  anecdotal. I have had a number of patients who have
5  had filters have them removed and come back and had
6  new filters placed. So I've had the opportunity to
7  observe IVCs that have had filters in before,
8  removed, and then, you know, are coming back.
9      We know in animal models, that there
10  is a local fibrotic reaction that occurs where the
11  device is placed, and that over time, that resolves,
12  so --
13  Q.  Is that true regardless of when you retrieve
14  the filter?
15  A.  I'm not sure I understand when you say when.
16  Q.  If a -- in your experience, if a patient has
17  had a filter retrieved at three months, six months,
18  one year, is there always some reaction of the cava
19  to having the filter retrieved?
20  A.  Observable reaction?
21      In addition to the local scaring
22  fibrosis that I mentioned, there can be also
23  narrowing related to the muscular nature of the blood
24  vessels. So there can be sort of a spasm. So that
25  is also transient and results much more quickly.

Page 67

1      There are patients where I take
2  filters out and the cava looks normal afterwards.
3  There may be a slight contour abnormality where the
4  filter was, but really without any narrowing. So the
5  amount of observable narrowing is, you know, maybe
6  zero in some patients, but --
7  Q.  Tell me what you mean when you say that
8  there's a spasm of the cava upon retrieval.
9  A.  So the inferior vena cava, like all blood
10  vessels, has a large, you know, has a muscular
11  component to it. When it is manipulated, it causes
12  irritation of the muscle, which can cause the muscle
13  fibers to contract, which can cause a temporary
14  narrowing of the blood vessel, so --
15  Q.  Okay. Is that what you were observing in the
16  case of Mrs. Hill on her venogram?
17  A.  I don't know how much of which component was
18  there. It could have been a combination of fibrosis
19  or a spasm, so -- both; I'm not sure. From a
20  fluoroscopic imaging, there's no way to tell the
21  difference, so --
22  Q.  Okay. Did you notice or note in your
23  operative report any significant fibrosis in
24  Mrs. Hill's case, where her filter had been
25  retrieved?

Page 68

1  A.  Well, fibrosis is a histologic assessment, so
2  short of doing a biopsy, I wouldn't have known. But
3  my only presumption was there was a fibrotic reaction
4  that was related to the interaction with the filter
5  apex that I had to dissect free from the wall.
6      So beyond that, I could not make any
7  assessment of fibrosis to the blood vessel wall, so
8  --
9  Q.  In Mrs. Hill's case, once you had retrieved
10  her filter and had a chance to look at her
11  post-filter cavogram, were you concerned at all
12  about the condition of her cava?
13  A.  No.
14  Q.  Did you believe that she required any further
15  treatment?
16  A.  No.
17  Q.  Was there anything about the post-retrieval
18  cavogram that caused you any concern about
19  Mrs. Hill's health?
20  A.  No.
21  Q.  There's a note in your operative report about
22  the effort and time required to remove the filter
23  was far greater than normally required.
24  A.  Uh-huh.
25  Q.  And then it states, successful, technically

Page 69

1  difficult removal of a tilted apex-imbedded Celect
2  filter.
3  A.  Uh-huh.
4  Q.  Explain to us what you mean when you say
5  those things.
6  A.  That's terminology that I include in my
7  report when I start using techniques that are beyond
8  the standard techniques, so --
9  Q.  Is there anything about the seven minutes of
10  fluoroscopy time or anything about the in situ
11  technique that you used that you believe was a very
12  complicated retrieval or a dangerous retrieval for
13  Mrs. Hill?
14  A.  Well, I don't think the use of an in situ
15  snare was dangerous, per se, but that was much more
16  technically difficult than a standard snare removal.
17  So that's why that statement was included in the
18  report, so --
19  Q.  Give us some sense of, if a standard
20  retrieval is a one, and a very, very complex
21  retrieval of a patient is a 10, where did
22  Mrs. Hill's retrieval fall?
23  A.  Probably around five or six. Yeah.
24  Q.  Okay. And the techniques that you described
25  to me earlier, using the balloon or other techniques

18 (Pages 66 - 69)