**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

—————————————————————

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                    Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                                      MDL No. 2570

—————————————————————

This Document Relates to the Following Actions only:

    Elizabeth Jane Hill
    No. 1:14-cv-06016-RLY-TAB

    Arthur Gage
    No. 1:13-cv-01875-RLY-TAB

—————————————————————

**COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION**
**TO EXCLUDE EXPERT OPINIONS OF DR. DAVID KESSLER**

Dated:  August 9, 2017

/s/ Andrea Roberts Pierson
Andrea Roberts Pierson (# 18435-49)
Christin Jaye Eaton (MN Bar # 228795)
Victoria R. Calhoon (# 28492-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
Email:  andrea.pierson@faegrebd.com
Email:  christin.eaton@faegrebd.com
Email:   victoria.calhoono@faegrebd.com
Email:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
Email:   stephen.bennett@faegrebd.com

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES ................................................................................... vi

I.      OVERVIEW ................................................................................................. 2

II.     THE DAUBERT STANDARD .................................................................... 3

III.    THE FDA'S REGULATION OF VENA CAVA FILTERS ........................ 4

IV.     THE COURT SHOULD EXCLUDE DR. KESSLER'S TESTIMONY BECAUSE
        HE IS NOT QUALIFIED TO RENDER OPINIONS ON IVC FILTERS OR
        PERFORATION ........................................................................................... 5

V.      DR. KESSLER'S OPINIONS LACK THE REQUIRED FIT TO *GAGE* BECAUSE
        HE DOES NOT OPINE ON THE TULIP ................................................... 8

VI.     DR. KESSLER CANNOT OPINE THAT COOK MISLED THE FDA IN ITS
        REGULATORY SUBMISSIONS AND SOLD "ADULTERATED" OR
        "MISBRANDED" DEVICES BECAUSE THE PLAINTIFFS CANNOT PURSUE
        SUCH THEORIES AS A MATTER OF LAW, SO THE TESTIMONY WOULD
        BE IRRELEVANT, UNHELPFUL TO THE JURY, AND FAR MORE
        PREJUDICIAL THAN PROBATIVE ......................................................... 9

VII.    THE COURT SHOULD EXCLUDE DR. KESSLER'S "NARRATIVE MARCH"
        BECAUSE IT IS NOT A PROPER SUBJECT OF EXPERT TESTIMONY, IT
        WILL NOT HELP THE JURY DETERMINE ANY FACT AT ISSUE, AND HIS
        CHERRY-PICKING METHODOLOGY IS PLAINTIFF-SLANTED AND NOT
        SCIENTIFIC. ............................................................................................. 12

        A.  An expert witness may not simply offer factual narrative based upon record
            evidence. ........................................................................................... 13

        B.  An expert may not opine on a defendant's state of mind or motives .......................... 18

VIII.   SECTION III.A. AT ¶ 26 AND SECTION III.C. ARE INADMISSIBLE LEGAL
        OPINIONS THAT INACCURATELY DOWNPLAY FDA CLEARANCE AND
        WILL NOT ASSIST THE JURY ................................................................ 19

IX.     DR. KESSLER LACKS QUALIFICATIONS OR A RELIABLE METHOD TO
        APPLY THE SUBSTANTIAL EQUIVALENCE DEFINITION CONTAINED IN
        SECTION III.B AND DRAW THE IMPERMISSIBLE LEGAL CONCLUSIONS
        EXPRESSED IN SECTIONS VII. AND VIII .............................................. 20

X.      THE ADULTERATION AND MISBRANDING OPINIONS EXPRESSED IN
        SECTIONS V., VI. AND X. ARE IMPERMISSIBLE LEGAL OPINIONS,
        BASED ON A NARRATIVE READING THAT USURPS THE JURY'S ROLE,
        WHICH DR. KESSLER IS NOT QUALIFIED TO OFFER ............................ 22

        A.  The adulteration and misbranding opinions are impermissible legal opinions ............ 22

        B.  The adulteration and misbranding opinions are based on alleged violation of
            federal regulation, which are inadmissible under Florida law. ............................ 24

US.113596269.03

C.   Dr. Kessler's misbranding opinions are based on his mistaken assertion that the Celect IFU is misleading ................................................................................ 25

D.   The Court should exclude Dr. Kessler's adulteration and misbranding opinions, which are based on a statement that the Celect filter fell below the quality it purported to possess, because he is not qualified to offer these opinions and did not follow a reliable method in reaching them ............................................................. 28

XI.   DR. KESSLER'S OPINIONS ON REPORTING REGULATIONS ADDRESSED IN SECTION III.E. WOULD NOT ASSIST THE JURY ..................................................... 33

XII.   THE COURT SHOULD EXCLUDE DR. KESSLER'S OPINIONS IN SECTIONS VI.D-G, SUGGESTING THE CELECT PERFORATES MORE OFTEN THAN THE TULIP, BECAUSE HE BRINGS NO SPECIAL EXPERTISE TO THIS ANALYSIS AND LACKS A RELIABLE METHOD TO ISSUE THESE OPINIONS ............................................................................................................................. 34

XIII.   DR. KESSLER LACKS QUALIFICATIONS OR A RELIABLE METHOD TO OFFER THE OPINIONS RELATED TO PROMOTIONAL LABELING REGARDING CELECT'S CLOT-TRAPPING ABILITY ................................................. 38

XIV.   CONCLUSION ........................................................................................................ 39

US.113596269.03

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Baldonado v. Wyeth*,
  2012 WL 1802066 (N.D. Ill. May 17, 2012) ................................................................. *passim*

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)......................................................................................................... *passim*

*Cunningham v. Masterwear, Inc.*,
  2007 WL 1164832 (S.D. Ind. 2007) ...................................................................................6

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993)......................................................................................................... *passim*

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) .............................................................................................37

*Ervin v. Johnson & Johnson, Inc.*,
  492 F.3d 901 (7th Cir. 2007) ...............................................................................................4

*Good Shepherd Manor Found., Inc. v. City of Momence*,
  323 F.3d 557 (7th Cir. 2003) .................................................................................20, 23, 27

*Hall v. Flannery*,
  840 F.3d 922 (7th Cir. 2016) ...............................................................................................6

*Higgins v. Koch Develop. Corp.*,
  997 F. Supp. 2d 924 (S.D. Ind. 2014), *aff'd,* 794 F.3d 697 (7th Cir. 2015) .......................6, 37

*Hogan v. Novartis Pharmaceuticals Corp.*,
  2011 WL 1533467 (E.D.N.Y. Apr. 24, 2011) .....................................................................9

*In re C.R. Bard, Inc.*,
  948 F. Supp. 2d 589 (S.D.W.V. 2013)..........................................................................13, 18

*In re Fosamax Products Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009)................................................................14, 15, 17, 22

*In re Trasylol Prod. Liab. Litig.*,
  709 F. Supp. 2d 1323 (S.D. Fla. 2010) .............................................................................18

*In re Viagra Products Liability Litigation*,
  658 F. Supp. 2d 950 (D. Minn. 2009)...............................................................................14

*In re Zimmer NexGen Knee Implant Products Liab. Litig.*,
  2015 WL 5145546 (N.D. Ill. Aug. 31, 2015) ..................................................14, 22, 23, 27

iii

*Jones v. Lincoln Elec. Co.*,
    188 F.3d 709 (7th Cir. 1999) ...............................................................................38

*Krist v. Eli Lilly and Co.*,
    897 F.2d 293 (7th Cir. 1990) ...............................................................................37

*Lang v. Kohl's Food Stores, Inc.*,
    217 F. 3d 919 (7th Cir. 2000) ..............................................................................31

*Myers v. Illinois Central R. Co.*,
    629 F.3d 639 (7th Cir. 2010) .............................................................................1, 8

*Ocasio v. C.R. Bard, Inc.*,
    2015 WL 2062611 (M.D. Fla. May 4, 2015)......................................................14

*Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.*,
    2006 WL 1663357 (N.D. Ga. June 14, 2006).......................................................9

*Peoples State Bank v. Stifel, Nicolaus & Co.*,
    2013 WL 1024917 (S.D. Ind. Mar. 14, 2013).....................................22, 23, 31, 34

*Rosen v. Ciba-Geigy Corp.*,
    78 F.3d 316 (7th Cir. 1996) .............................................................................31, 38

*Sann v. Mastrian*,
    2012 WL 253088 (S.D. Ind. Jan. 26, 2012)........................................................34

*Tillman v. C.R. Bard, Inc.*,
    96 F. Supp. 3d 1307 (M.D. Fla. 2015)...........................................................14, 18

*Tucker v. SmithKline Beecham Corp.*,
    596 F. Supp. 2d 1225 (S.D. Ind. 2008)................................................................23

*U.S. v. Hall*,
    93 F.3d 1337 (7th Cir. 1996) .................................................................15, 17, 25

*United States v. Allen*,
    207 F.Supp.2d 856 (N.D. Ind. 2002) ................................................................4, 5

*Wells v. Allergen, Inc.*,
    2013 WL 7208221 (W.D. Okla. Feb. 4, 2013) ...................................................13

*Wyeth v. Levine*,
    555 U.S. 555 (2009).............................................................................................24

## STATE CASES

*Murthy v. N. Sinha Corp.*,
    644 So. 2d 983 (Fla. 1994)...................................................................................24

**FEDERAL STATUTES**

21 U.S.C. § 321(k) ..................................................................................................27

21 U.S.C. §§ 321(k), 321(m) ..................................................................................27

21 U.S.C. § 321(m) .................................................................................................27

21 U.S.C. § 337(a) ..................................................................................................10

21 U.S.C. § 360c(i)(1)(A)(i) ...................................................................................20

Food, Drug, and Cosmetic Act (FDCA) ........................................................... *passim*

Pub. L. No. 94-295 ..................................................................................................19

Safe Medical Devices Act of 1990, Pub. L. No. 101-629 .......................................19

**RULES**

Rule 403 .............................................................................................................. *passim*

Rule 702 ................................................................................................. vii, 1, 3, 17

Rule 702(a)..............................................................................................................12

Rules 401 and 402....................................................................................................3, 12

**OTHER AUTHORITIES**

Lyon, *et al*. "Short- and Long-term Retreivability of the Celect Vena Cava Filter:
    Results from a Multi-institutional Registry,"............................................26

FDA Guidance, "Labeling: Regulatory Requirements for Medical Devices"
    (1989) ........................................................................................................27

FDA Guidance, Premarket Notification 510(k), *available at*
    https://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomark
    etyourdevice/premarketsubmissions/premarketnotification510k/default.htm........20

*J. Vasc. Intervent'l Radiol.* 20(11) (2009) ..............................................................26

*https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/search.CFM* ...........35

Morris Simon, MD, *Vena Cava Filters: Prevalent Misconceptions*, 10(8) JVIR
    1021-1024 (1999)......................................................................................21

## <u>STATEMENT OF ISSUES</u>

1. Whether Dr. Kessler is qualified under *Daubert* to offer the opinions beyond his premarket regulatory expertise?

2. Whether Dr. Kessler's narrative testimony regarding Cook documents, Cook's state-of-mind, and impermissible legal conclusions should be excluded under the Federal Rules of Evidence and *Daubert*?

3. Whether Dr. Kessler's opinions "fit" the facts and issues in the *Gage* case, and would assist the jury under Rule 702 and *Daubert*, given that he has no opinions about the Tulip?

4. Whether Dr. Kessler's opinions "fit" the facts and issues in the *Hill* case and whether his proposed testimony would assist the jury under Rule 702 and *Daubert*, given that the only remaining claims are design defect and failure-to-warn.

5. Whether Dr. Kessler's opinions are barred by *Buckman*?

6. Whether Dr. Kessler's opinions on adulteration or misbranding are impermissible legal opinions and should be excluded under the Federal Rules of Evidence and *Daubert*?

7. Whether Dr. Kessler's opinions regarding substantial equivalence lack a reliable methodology?

8. Whether opinions offered by Dr. Kessler that are redundant and duplicative of testimony offered by Plaintiffs' other experts should be excluded?

## INTRODUCTION

The Court would never allow a plaintiff to call Chief Justice John Roberts as an expert witness in a personal-injury case to narrate the plaintiff's case to the jury, read portions of documents and testimony that the plaintiff found favorable, and then convey his impression of the documents and law to the jury. Yet that is essentially what plaintiffs here propose to do with Dr. David Kessler.  Dr. Kessler was the Commissioner of the Food and Drug Administration from 1990 to 1997, and the plaintiffs have invested heavily in him obviously in the hopes that the jury will believe that whatever the former Commissioner of the FDA says in a medical-device case—on *any subject*—must be right.

The problem is that it is not enough in the Seventh Circuit for an expert to have a big name, or to be generally regarded as an expert. "'The question we must ask is not whether an expert witness is qualified *in general*, but whether his qualifications provide a foundation for [him] to answer a *specific question*'" at issue in a lawsuit. *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (emphasis added, citation omitted).

Dr. Kessler's non-regulatory opinions do not pass that test here, and his regulatory opinions lack "fit" to the remaining claims in *Hill* of design defect and failure to warn. He may be generally qualified, and have expertise in regulatory matters, but he is not qualified to give the testimony that the plaintiffs want him to give in these cases, and the testimony they ask him to offer is not relevant to the remaining legal claims. Thus, the Cook Defendants move under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), to exclude Dr. Kessler's proposed trial testimony entirely, or alternatively to bar his testimony in specific areas discussed below.

I.      **OVERVIEW**

In general, the plaintiffs are proffering Dr. Kessler to do four things: 1) narrate their main theories based on his review of Cook documents and deposition testimony in this case; 2) opine that FDA failed to verify the safety and effectiveness of the Celect; 3) opine that Cook misled the FDA in its submissions to the agency; and 4) opine that the Celect perforates more often than the Tulip.  But Dr. Kessler cannot do any of those four things under the rules of evidence or *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), for key reasons.

1.      Courts routinely refuse to allow experts to simply narrate one side's theories of the case through use of exhibits and deposition testimony for the obvious reason that allowing an expert to do so simply puts the expert's "seal of approval" on one side of the case, which does not help the jury find the facts. Exhibits and testimony will come in at the trial, and the attorneys will give their clients' narratives during closing arguments—arguments that the Court will undoubtedly tell the jury are not themselves evidence. Allowing an expert to give a narrative based on exhibits and testimony simply constitutes a closing argument in the middle of trial— and one that the jury might take as *evidence*, rather than argument.

2.       Dr. Kessler unfairly diminishes the means by which Cook's filters were cleared to market, citing old data about FDA processes in general, assuming the role of legal expert to instruct the jury, and dismissing the extensive review the FDA actually undertook.  In condemning Cook's statements about its filter studies, he steps far outside his area of expertise. Dr. Kessler is not qualified to decide if perforation occurred, yet seeks to mislead the jury based on his "common sense" interpretations.  The jury may bring common sense, but an expert must bring specialized expertise.  Having none, Dr. Kessler should not be presented as an authority on Cook's animal and clinical studies or other non-regulatory topics.

US.113596269.03

3.      The one area in which Dr. Kessler *does* have expertise (FDA regulations and operations) is an area on which *he cannot testify as a matter of law*. One of Dr. Kessler's chief opinions is that Cook mislead the FDA about the Celect filters.  But that fraud-on-the-FDA theory is preempted by the Food Drug and Cosmetic Act, and the plaintiffs cannot pursue it at trial. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). Thus, they cannot offer expert testimony in support of the theory, as it would be irrelevant under Rules 401 and 402, unduly prejudicial under Rule 403, and unhelpful to the jury under Rule 702.

4.      Whether Cook has received more perforation complaints for the Celect than the Tulip is a question on which Dr. Kessler's testimony is inadmissible for two reasons: not only is a jury perfectly adept at reading Cook documents and judging whether one number is larger than another, but the plaintiffs are already proffering another expert (Dr. Rebecca Betensky, a biostatistician) to speak to that question, and Dr. Kessler simply *adopts* her analysis, making his redundant. What the plaintiffs are really trying to do, though, is have the jury believe that any higher rate of perforation is *caused by a faulty design*. That is a different and more complicated issue, and Dr. Kessler offers no reliable method to address it.  If he were allowed to suggest this conclusion to the jury, he would be directly contradicting Dr. Betensky, who conceded in her deposition that she *could not conclude that a higher rate of perforation was caused by Celect's design*, and that if someone else said it did, they would be misusing her analysis.

Thus, defendants move to exclude Dr. David Kessler as an expert witness at trial.

## II.      <u>THE DAUBERT STANDARD</u>

The Seventh Circuit has set forth a three-step *Daubert* analysis: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand evidence or to determine a fact in issue.

US.113596269.03

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  The party proffering the expert must show these factors by a "preponderance of proof."  *United States v. Allen*, 207 F.Supp.2d 856, 869 (N.D. Ind. 2002).

## III.    THE FDA'S REGULATION OF VENA CAVA FILTERS

In 1996, years before the Tulip or Celect filters were even submitted for clearance, an FDA memorandum acknowledged that perforation was among the "well known" risks associated with filter use.[1]  This memorandum was prepared in connection with the process by which IVC filters were down-classified from Class III to Class II, based on FDA's determinations that this would provide reasonable assurance of safety and effectiveness and that there was sufficient publicly available information to demonstrate that the risks to health have been characterized.[2]  With its October 28, 1998, initial 510(k) submission for the Tulip filter, Cook too recognized perforation as a known complication.[3]

FDA has continued to evaluate the use of IVC filters and to weigh the risks and benefits. For example, on August 9, 2010 and May 6, 2014, FDA issued Safety Communications titled "Removing Retrievable Inferior Vena Cava Filters," which were directed to physicians who use them.[4]  In the 2010 Safety Communication, FDA noted that filter usage was increasing, but doctors were not always removing filters once the patient's risk for PE subsided.[5]  FDA listed the "Known long term risks associated with IVC filters," including perforation – the focus of Dr. Kessler's opinions.[6]  In the 2014 Safety Communication, FDA added a quantitative decision analysis for physicians, to inform the retrieval timing decision, and said it was requiring

---

[1] Ex. 1, Memo from V. Price re: Reclassification of Cardiovascular Intravascular Filters, CookMDL2570_1281413 at 1281415.
[2] *See* Ex. 2, E. Harvey Rpt.(June 12, 2017) at pp. 15-17.
[3] Ex. 3, Portions of K983823, Tulip 510(k), Oct. 28, 1998, CookMDL2570_0061818 at 1860.
[4] Ex. 4 and 5, Dr. Kessler Dep., Ex. 22 (2010 Communication) and Ex. 21.(2014 Communication), 407:6-17.
[5] 2010 Communication at 1-2.
[6] *Id.*

US.113596269.03

collection of additional clinical data for currently marketed filters.[7]  FDA again listed perforation among the adverse event reports that have been received.  *Id.*  (Remarkably, Dr. Kessler did not even discuss the 2010 and 2014 Safety Communications in his report. *See* Ex. 6, Expert Rpt. of David Kessler (Mar. 17, 2017) (hereinafter "Rpt."), *passim.*[8])

FDA has acknowledged it is hard to diagnose perforation, but it has been well-aware of the known risk of perforation – no matter how defined – for decades.  In a 1999 Guidance document to inform manufacturers about the testing FDA would like to see for IVC filters, FDA said: "Determination of caval penetration is complicated.  Examination via cavography may show filter hooks or legs outside the flow of contrast.  This is not necessarily due to penetration."[9]  More recently, the definition being used in the PRESERVE study, created to collect post-market information about the use of many different brands of IVC filters, is >5mm[10] and the definition of "Clinically significant perforation" is "protrusion of filter legs through the wall of the IVC causing hemorrhage or hematoma or touching, impressing, or perforating another organ or that triggers the decision to remove the filter; resulting in an attempt to remove the IVC filter or requiring other intervention."[11]

## IV.  THE COURT SHOULD EXCLUDE DR. KESSLER'S TESTIMONY BECAUSE HE IS NOT QUALIFIED TO RENDER OPINIONS ON IVC FILTERS OR PERFORATION

Dr. Kessler has expertise in certain FDA regulatory matters, but he does not have any education or experience dealing with IVC filters, interventional radiology, interventional cardiology, or vascular surgery. Yet he purports to offer a wide variety of opinions that have nothing to do with regulatory matters, and everything to do with the nuts and bolts of IVC filters.

---

[7] 2014 Communication at 2.
[8] At deposition, he said the Communications showed only that there was "basic safety data" not available. (Ex. 7, Dep., Vol. 2, 408:15-25 (hereinafter "Dep.")).  Dep., Vol. 2, 413:24-414:9.
[9] Ex. 8, 1999 FDA Guidance for Cardiovascular Intravascular Filter 510(k) Submissions  at 10, cited in Rpt. at 96..
[10] Ex. 9, J. Brown Dep., Vol. 2, 482:7-483:1.
[11]  *Clinicaltrials.gov*, Ex. 10 at 2.

This is a classic example of a party trying to convert an expert in one area into an "uber expert" who can testify to anything he or she wishes. That is inconsistent with Seventh Circuit law. *See Hall v. Flannery*, 840 F.3d 922, 930 (7th Cir. 2016) (holding that an expert physician who possessed considerable knowledge about surgery, pediatrics, and neurology was unqualified to opine about plaintiff's heart-related issues because he had no specialized knowledge of cardiology); *see also Cunningham v. Masterwear, Inc.*, 2007 WL 1164832, *10 (S.D. Ind. 2007). Indeed, this court has excluded expert testimony where the expert's background does not give him *superior* knowledge on an issue before the jury. *See, e.g., Higgins v. Koch Develop. Corp.*, 997 F. Supp. 2d 924, 930 (S.D. Ind. 2014), *aff'd,* 794 F.3d 697 (7th Cir. 2015).

In a number of instances, Dr. Kessler proffers opinions that consist mainly of his re-interpretation of Cook data to find filter perforations that, in his view, Cook failed to disclose to the FDA. But outside the courtroom, Dr. Kessler would not be called upon to do this work—*i.e.*, he would not be asked to review medical images and records and determine whether an IVC filter perforated or penetrated the vena cava. That is because he is simply not qualified to do so.

Dr. Kessler concedes that outside of litigation, he has not defined penetration or perforation. Dep. 269:6-14. While he is a physician, he has never placed a vena cava filter and would not order placement without the advice of a vascular surgeon or hematologist. Dep. 126:19-127:16. He does not specifically recall treating a patient with a vena cava filter and has not recommended one be retrieved. Dep. 129:12-25. He does not recall treating a patient who had perforation of their filter. Dep. 131:17-19. He does not recall being involved in a hospital decision about whether or which IVC filters to make available. Dep. 130:24-131:12. He is not a member of the Society of Interventional Radiologists or other professional societies for vascular surgery or interventional cardiology, and outside this litigation he would not typically keep

6

current with the journals in those fields.  Dep. 130:9-23, 136:17-137:2.  He is not certified in radiology, vascular surgery, cardiology, or interventional radiology, and is not a specialist in pathology or hematology.  Dep. 101:4-25, 109:17-13.

He does not recall if he ever viewed an x-ray, a CT scan, or a venogram for a patient with an IVC filter.  Dep. 145:20-146:22.  He would not in his medical practice independently review a venogram or other image to evaluate whether a filter had been correctly placed or to evaluate a complication.  Dep. 147:21-148:14.  He does not recall ever taking or collecting pathology or making histology slides related to a vena cava, or interpreting such slides in the course of his medical practice.  Dep. 151:22-152:18.

Consistent with his usual practice not to review imaging on his own, Dr. Kessler spoke with an interventional radiologist (Plaintiffs' expert Dr. Mohammed Rajebi) █████████ ██████████████████████████████████████████████████ Dep. 46:18-49:14, 50:4-51:14.  But he testified that he did not rely on Dr. Rajebi's interpretation of the images.  Dep. 48:19-49:5.  ████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████

Dr. Kessler offered no opinions on pulmonary embolism (PE) or how often it hurts people.  Dep. at 191:25-192:9.  He offered no opinions about alternative treatments for PE or their risks and benefits.  Dep. at 192:10-21.  He deferred comment on the benefits of IVC filters, in general or in the population of patients indicated for their use, to physicians with special expertise he does not have.  Dep. at 201:20-202:22, 573:7-575:5.[12]

---

[12] ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

US.113596269.03

As discussed above, the question is not whether an expert witness is qualified *in general*, but whether his qualifications provide a foundation for him to answer a *specific* question that is relevant in a lawsuit. *Myers*, 629 F.3d at 644. Dr. Kessler simply does not have the qualifications to address *specific* issues relating to perforation and penetration of IVC filters, or the uses risks and benefits of IVC filters. Thus, he should not be allowed to testify on such matters.

Yet Dr. Kessler's opinions depend on his doing just that.  Dr. Kessler's report focuses almost exclusively on perforation – taken in isolation and without any consideration of other risks and benefits – and on his claims that Celect is more likely to perforate than Tulip and Cook. In issuing these opinions, he relies upon his preferred definition of perforation: "Strut or anchor devices extending more than 3 mm ("&gt;3mm") outside the wall of the IVC as demonstrated by CT, US, venography, or autopsy."  Rpt. at 7.  He imposes this definition by fiat on many contexts where it was not actually used, because he says it was a clear consensus for all times.  Rpt. at 88-90, Tables 3a., 3b.  He is wrong about this.[13]  He presumes that whenever an image appears to show a strut &gt;3mm outside a column of contrast or the IVC wall, something shocking and dangerous has happened.  ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████

The Court should exclude all of Dr. Kessler's opinions regarding perforation, IVC filter use, retrieval, and perforation studies because he is simply not qualified to offer them.

## V.   DR. KESSLER'S OPINIONS LACK THE REQUIRED FIT TO *GAGE* BECAUSE HE DOES NOT OPINE ON THE TULIP

---

[13] Ex. 13, J. Brown Dep., Vol. 1, 407:24-408:5; Ex. 14,  *Plaintiff Expert* R. Rajebi Dep. 232:24-233:2, 234:13-21; Ex. 12, Venbrux Rpt. at 6.

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

8

Dr. Kessler's report focuses on the Celect, and how its perforation rate compares to the Tulip, but he lacks any substantive opinions about the regulatory history or testing of the Tulip itself. Dr. Kessler's report contains one footnote that tries to leave the door open to opinions later: "My opinions concerning the relative rates of perforation between Tulip and Celect do not imply that Tulip is a safe or effective device." Rpt. 7, n. 2. Mr. Gage claims damages as a result of being implanted with the Tulip filter. Gage Compl. ¶ 3. Without offering any opinions in his report about the Tulip, Dr. Kessler's opinions lack even the most basic fit to the facts of Mr. Gage's case, and therefore he should not be permitted to testify in *Gage*. *See, e.g., Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.*, 2006 WL 1663357, at *4-5 (N.D. Ga. June 14, 2006) (excluding expert testimony that was based on facts and claims that were dismissed or excluded—noting that there was too great an analytical gap between the relevant facts and the expert's opinions—and concluding that expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful); *Hogan v. Novartis Pharmaceuticals Corp.*, 2011 WL 1533467, at *1-3 (E.D.N.Y. Apr. 24, 2011) (excluding a FDA regulatory expert in part because most of her testimony is irrelevant to the present action).

**VI.    DR. KESSLER CANNOT OPINE THAT COOK MISLED THE FDA IN ITS REGULATORY SUBMISSIONS AND SOLD "ADULTERATED" OR "MISBRANDED" DEVICES BECAUSE THE PLAINTIFFS CANNOT PURSUE SUCH THEORIES AS A MATTER OF LAW, SO THE TESTIMONY WOULD BE IRRELEVANT, UNHELPFUL TO THE JURY, AND FAR MORE PREJUDICIAL THAN PROBATIVE**

The plaintiffs propose to have Dr. Kessler testify at length that Cook hid information from FDA when Cook made its regulatory submissions that resulted in the FDA clearing its filters for sale. He opines that the Celect did not meet a particular standard that Cook told FDA that it had met. He also opines that Cook concealed information from the FDA related to a clinical and animal study, and that makes the Celect "adulterated" or "misbranded" under the

Food, Drug, and Cosmetic Act (FDCA). Dr. Kessler is incorrect about Cook misleading the FDA, but there are two more fundamental points that require exclusion of his testimony on this score: 1) plaintiffs cannot pursue a "fraud-on-the-FDA" theory as a matter of law, so Dr. Kessler's opinion that Cook misled the FDA is irrelevant and far more prejudicial than probative, and will not assist the jury in determining any factual issue in this case; and 2) this Court has already ruled that plaintiffs cannot pursue a claim based on the theory that Cook violated the FDCA by marketing "adulterated" or "misbranded" devices; only the government may enforce the FDCA. Thus, Dr. Kessler's opinions on these topics should be excluded.

> **A.      Plaintiffs cannot pursue a "fraud-on-the-FDA" theory as a matter of law, so Dr. Kessler's opinion that Cook defrauded the FDA, or that the Celect was "adulterated" or "misbranded" are irrelevant, prejudicial, and will not assist the jury in determining any factual issue.**

In a prior order, this Court dismissed the Plaintiff Hill's negligence *per se* claim because violations of a statute are not permitted to be the basis of a private cause of action without clear statutory language creating such an action (Dkt. 4687).  Yet, Plaintiff Hill currently alleges that the Food, Drug, and Cosmetic Act (FDCA) was violated because her filter was "misbranded" and "adulterated."[15]  Dr. Kessler supports these allegations by misstating what the filters were "purported to be," and by substituting his judgment for that of the FDA.  The FDCA does not allow the enforcement of the Act by anyone other than the United States. 21 U.S.C. § 337(a). Dr. Kessler's former position as FDA Commissioner does not give him the ability to charge, try, and convict Cook for actions for alleged violations (in his view) of the FDCA.

Moreover, in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), the Supreme Court held that a "fraud-on-the-FDA" claim was preempted by the FDCA. While Plaintiffs Hill did not specifically enumerate a "fraud-on-the-FDA" claim in her Complaint, it is evident from

---

[15] Master Compl. ¶¶ 90-91.

Dr. Kessler's testimony that she is pursuing the theory as a means to have Cook held liable, which is exactly the use that the Supreme Court precluded in *Buckman*.

The plaintiffs in *Buckman* (like the plaintiffs here) argued that the defendant misled the FDA in the course of obtaining approval to market bone screws. 531 U.S. at 343. They claimed that the misrepresentations were at least a but-for cause of injuries that they allegedly suffered from the bone screws, because if the defendants had not made the misrepresentations, the FDA never would have approved the devices, and the plaintiffs never would have been injured. *Id.* The Supreme Court concluded that the plaintiffs' claims were preempted by the FDCA because "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the [FDA]," and that "this authority is used by the [FDA] to achieve a somewhat delicate balance of statutory objectives." *Id.* at 348. Allowing plaintiffs to pursue fraud-on-the-FDA claims would "ske[w]" that "delicate balance." *Id.* The Court also observed that allowing fraud-on-the-FDA claims would "cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the [FDA], will later be judged insufficient in state court." *Id.* at 351. "Applicants would then have an incentive to submit a deluge of information that the [FDA] neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application." *Id.* That, in turn, would "delay health care professionals' ability to prescribe appropriate off-label uses" for medical devices. *Id.*

Dr. Kessler's opinions do exactly what the Supreme Court wanted to avoid in *Buckman*. He offers a revisionist, after-the-fact view of Cook's submittals to FDA, wholly disregarding the FDA's determinations in light of the information Cook actually provided. For example, he uses a definition of "perforation" other than the one that Cook actually used, and then argues that Cook

US.113596269.03

misled the FDA by giving information that did not square with *his own* preferred definition of the term, rather than examining Cook's submission *as actually presented* to the FDA.[16]

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

Plaintiffs cannot avoid *Buckman* simply by refraining from expressly designating a count of their complaints as a "fraud-on-the-FDA" claim. The Supreme Court's holding applies whenever an allegation of fraud on the FDA "is a critical element in [plaintiffs'] case." 531 U.S. at 353. And such an allegation is obviously a "critical element" in Dr. Kessler's opinions, and thus in plaintiffs' contemplated presentation and arguments to the jury at trial. *Buckman* therefore prohibits them. Thus, Dr. Kessler's opinion that Cook misled the FDA are improper and irrelevant under Rules 401 and 402, far more prejudicial than probative under Rule 403, and will not assist the jury in determining any fact in issue in this case under Rule 702(a), so it should be excluded.

**VII.**   **THE COURT SHOULD EXCLUDE DR. KESSLER'S "NARRATIVE MARCH" BECAUSE IT IS NOT A PROPER SUBJECT OF EXPERT TESTIMONY, IT WILL NOT HELP THE JURY DETERMINE ANY FACT AT ISSUE, AND HIS CHERRY-PICKING METHODOLOGY IS PLAINTIFF-SLANTED AND NOT SCIENTIFIC.**

Despite his lack of special expertise related to any aspect of IVC filters, Dr. Kessler seeks to serve as plaintiffs' "narrator in chief." A full 178 out of 367 paragraphs in his report consist of

---

[16] Rpt. 97-102

██ ████████████████

nothing more than recitation of the contents of plaintiffs' favorite Cook documents and snippets of plaintiffs' favorite testimony.[19] It is evident that plaintiffs plan to put Dr. Kessler on the stand, tout his status as a former FDA Commissioner, and have him simply convey the plaintiffs' theories in this case, which center around a theme that the company lied to FDA and had an evil state of mind. Essentially, plaintiffs seek to have Dr. Kessler deliver a closing argument during the evidentiary portion of the trial. This tactic is improper.

### A.   An expert witness may not simply offer factual narrative based upon record evidence.

It turns out that this is not the first time that plaintiffs in litigation have tried to use this tactic with **Dr. Kessler in particular**. Federal courts have excluded Dr. Kessler's testimony in the past for this very exercise of narrating the company history through a summary of select evidentiary documents. For example, in *Wells v. Allergen, Inc.*, 2013 WL 7208221 (W.D. Okla. Feb. 4, 2013), the court concluded that "Dr. Kessler may not 'simply rehash[ ] otherwise admissible evidence about which he has no personal knowledge.' *An expert must do more than simply 'constructing a factual narrative based upon record evidence'* or 'address[ ] "lay matters which a jury is capable of understanding and deciding without the expert's help."'" 2013 WL 7208221, at *2 (emphasis added, citations omitted). And in *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589 (S.D.W.V. 2013), the court concluded that "documents and testimony should be presented directly to the jury, not through an expert," and that Dr. Kessler could not opine on the defendant's knowledge, intent, or motives, because such conclusions were "factual inferences for the jury to determine, not for an expert to opine." 948 F. Supp. 2d at 628-29.

---

[19] *See* Kessler Rpt. at ¶¶ 73-77, 79-97, 99-110, 116-121, 123-151, 153, 155-156, 160-167, 169-174, 178-180, 182-185, 187-190, 192-196, 200-210, 220-223, 234a., 234c.-235, 237, 238a., 238c., 240a.-240b., 242-244, 246a.-246b., 247b.-247d., 254-255, 257, 271-274, 275a.-275d., 276a.-d., 278-291, 293-294b., 294e.-294g., 296-306, 308-310, 313, 316, 318-320, 325-327, 333, 338, and 342.

Other courts have done the same with different experts; they routinely exclude the very sort of testimony that plaintiffs proffer from Dr. Kessler here—*i.e.*, experts who plan to "merely read, selectively quote from, or 'regurgitate' the evidence." *In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (excluding testimony of FDA expert who offered narrative history of product and FDA submissions); *see also Ocasio v. C.R. Bard, Inc.*, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015) (expert's testimony that summarized defendant's documents was improper; "regardless of the accuracy of [the expert's] characterization, however, such testimony must be excluded because 'an expert cannot be presented to the jury [ ] for the purpose of constructing a factual narrative based upon record evidence.'"); *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015) (excluding expert's opinions that offered "plaintiff-slanted summaries of [manufacturer] documents," stating that it would "not permit [the expert] to testify 'to simple inferences drawn from uncomplicated facts that serve only to buttress plaintiff's theory of the case.'"); *In re Viagra Products Liability Litigation*, 658 F. Supp. 2d 950, 967 (D. Minn. 2009) ("The question is . . . whether the jury could interpret the documents that [the expert] highlights in her report without the assistance of an expert.") ; *In re Zimmer NexGen Knee Implant Products Liab. Litig.*, 2015 WL 5145546, at *12 (N.D. Ill. Aug. 31, 2015) (excluding expert testimony which "simply summarize[d] internal [manufacturer] documents regarding post-market surveillance").   If Dr. Kessler is allowed walk the jury through plaintiffs' cherry-picked Cook documents, the jury naturally could presume his expertise offers special insights they don't have.  *See, e.g., Baldonado v. Wyeth*, 2012 WL 1802066, at *4 (N.D. Ill. May 17, 2012) (finding that "allowing an expert to provide summary testimony 'based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself.'"); *see*

*also U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403.").

And there can be no reasonable doubt that Dr. Kessler is "selectively quot[ing] from … the evidence." *Fosamax*, 645 F. Supp. 2d at 192. Examples include:

- He quotes the following "con" from a pro/con table in a document:  But he fails to list the accompanying "pro:"

- He cites statements about a potential risk of Celect, while omitting one physician's observations  Excellent overall performance would be central to an FDA compliance officer considering whether the product was adulterated.

- While Dr. Kessler avoided offering opinions on pulmonary embolism (PE), its treatments, or the risks and benefits of alternative therapies,[23] what he purported to do was offer regulatory opinions about the risk of perforation. By cherry-picking documents and even the regulatory context of many of the documents



[23] Dep. 191:25-192:21, He deferred comment on the benefits of IVC filters, in general or in the population of patients indicated for their use, saying "Let me let the interventional radiologist talk about that", or the vascular surgeon or the hematologists. *Id.* at 201:20-202:22, 573:7-575:5.

15

Dr. Kessler dissects, the very foundation of his opinions are no longer sufficiently rigorous to withstand scrutiny under *Daubert*.

-  Dr. Kessler issues no opinion that the reasons for Celect Platinum's development make that filter adulterated, misbranded, or not substantially equivalent. Rpt. at 127-148. He ends this section by re-stating his opinion that the _Celect_ fell below the quality it was represented to possess, Kessler Rpt. at 148, ¶ 314, but offers no expert "tie" between this re-assertion and the preceding paragraphs.

- Another document focused upon by Dr. Kessler cites the Simon article, discussed *supra*.

As mentioned earlier, plaintiffs essentially want Dr. Kessler to deliver a closing argument in the middle of trial. There are two profound problems with that (beyond the obvious issue with allowing one side two closing arguments). First, closing argument is routinely preceded by an admonition from the Court that it is *not evidence*. Allowing a closing argument under the guise of trial testimony would convert a non-evidentiary closing argument into substantive evidence. And second, allowing summation by an *expert* is particularly dangerous because the expert wears a cloak of credibility. If Dr. Kessler were allowed walk the jury through plaintiffs' cherry-picked Cook documents, the jury naturally could presume his expertise offers special insights they don't have. *See, e.g., Baldonado v. Wyeth*, 2012 WL 1802066, at *4 (N.D. Ill. May 17, 2012) ("allowing an expert to provide summary testimony 'based on nothing more than [the expert's]

US.113596269.03

review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself.'"); *see also U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403.").

During this trial, admissible documents for which foundation is established should be presented to the jury directly, and if Dr. Kessler is allowed to testify, his commentary should be "limited to explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge." *Fosamax*, 645 F. Supp. 2d at 192.  The jury does not need Dr. Kessler to read documents and other evidence to them, and allowing him to do so simply conveys the impression that it must be important because a former FDA commissioner was reading them. That is the very reason for their exclusion under both Rule 702 (which requires expert testimony to be helpful to the jury) and Rule 403 (which prohibits evidence whose probative value is greatly outweighed by its prejudicial effect)[26].

---

[26] Dr. Kessler says his expertise helped him understand exchanges with FDA and provided context for his opinions. Dep. 235, 236.  But his testimony is still improper if the vast majority of it amounts to nothing more than a summary and statement of his "advocacy-based interpretation of documents in the record." *Baldonado*, 2012 WL 1802066, at *4.

**B.**     **An expert may not opine on a defendant's state of mind or motives.**

Another reason why courts have excluded Dr. Kessler's testimony is because he (expressly or implied) tries to opine about a defendant's state of mind or motives.  *See, e.g., Bard,* 948 F. Supp. 2d  at 628-29. (Dr. Kessler could not opine on defendant's knowledge, intent, or motives, because such conclusions were "factual inferences for the jury to determine, not for an expert to opine."). Other courts have excluded similar experts from doing the same. *See, e.g., Tillman*, 96 F. Supp. 3d at 1326 (excluding an expert's opinions about a manufacturer's intent, state of mind, and motivations, which were based on internal manufacturer documents, as unhelpful because "a jury is fully capable of drawing its own inferences from this memorandum without assistance from an expert"); *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010) (excluding an expert's "conclusory opinions regarding [the manufacturer's] and the FDA's state of mind and knowledge based on her reading of internal [manufacturer] documents and FDA correspondence" because "[t]he jury can infer intent from this evidence directly").

Though disclaiming any intent to offer state-of-mind testimony,[27] Dr. Kessler's opinion in paragraph 98 of his report (for example) does just that. He bases his opinion about Cook's purpose in redesigning the Tulip filter ████████████████████████████████

████████████████████████████████████████████████████████████████

████     The Court should exclude Dr. Kessler's opinions because they are inadmissible legal opinions, his methodology is flawed, and he is not qualified to opine on the science underlying his regulatory opinions

---

[27] Dep. at 93.



**VIII.   SECTION III.A. AT ¶ 26 AND SECTION III.C. ARE INADMISSIBLE LEGAL OPINIONS THAT INACCURATELY DOWNPLAY FDA CLEARANCE AND WILL NOT ASSIST THE JURY**

In Section III. A.-C. of his report, Dr. Kessler discusses the regulatory framework for device approval or clearance.  Rpt. at 9-31.  In Section III.A. at paragraph 26 and in III.C., Dr. Kessler recites regulatory concepts and history.  Rpt. at 12-13, 15-18.  The statements downplay the importance of clearance through the 510(k) process, by which "[m]ore than 95% of all medical devices used in the United States are reviewed."[31]   In the last four decades, there have been "well over 100,000 medical devices cleared for marketing through the 510(k) process."[32]  FDA received the legal opinions referenced by Dr. Kessler in paragraph 41, Rpt. at 18, and has not eliminated this mainstream pathway by which the vast majority of medical devices reach the U.S. market.[33]

Dr. Kessler cites *Medtronic v. Lohr,* its statement that the clearance process is focused on "*equivalence*, not safety" and the Court's 1987 and 1988 references, all to diminish the process by which the Cook IVC filters were brought to market.  Rpt. at 15-18.  He cites an "average" 20-hour figure for 510(k) review, Rpt. at 16, which bears no relevance to the at-issue applications, that involved multiple submissions, numerous responses to FDA requests, and clinical data.[34]  He acknowledges the 510(k) process has "evolved," Rpt. at 18, but fails to note that the substantial equivalence definition he uses in this case, Rpt. at 14, was added by the Safe Medical Device Amendments of 1990, enacted after the history discussed in *Lohr* and after the product at issue in *Lohr* was cleared.[35]

---

[31] Harvey Rpt., at 9 ("Harvey Rpt.").
[32] *Id.*
[33] Harvey Rpt. at 10, citing July 2011 statement by Dr. Jeffrey Shuren, then-Director of the FDA Center for Devices and Radiological Health ("CDRH") affirming that "FDA believes that the 510(k) process should not be eliminated".
[34] *See* discussion in Section III above; *see also* Harvey Rpt. at 12.
[35] *See* Safe Medical Devices Act of 1990, Pub. L. No. 101-629, at 4515 (adding language to the "substantial equivalence" definition); *cf.* Medical Devices Amendments of 1976, Pub. L. No. 94-295, at 544-45.

Sections III.A. at ¶ 26 and III.C. should be excluded as seeking to taint the jury's view of clearance based on inapplicable and outdated information.  In addition, this discussion is an inadmissible legal opinion.  It is for the court, not the experts, to state the law for the jury.  "[C]ommon law courts do not allow opinion on a question of law." *McCormick on Evidence* § 12 (7th ed. 2013); *see also Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible.").

## IX.    DR. KESSLER LACKS QUALIFICATIONS OR A RELIABLE METHOD TO APPLY THE SUBSTANTIAL EQUIVALENCE DEFINITION CONTAINED IN SECTION III.B AND DRAW THE IMPERMISSIBLE LEGAL CONCLUSIONS EXPRESSED IN SECTIONS VII. AND VIII

In Section III.B. Dr. Kessler cites the definition of Substantial Equivalence (SE), and his application of that definition is fundamentally flawed.  Rpt. at 14.  In Sections VII. and VIII., he applies it, claiming Cook had an obligation to ensure the Celect "did not raise any new safety questions," Rpt. at 150, ¶ 322, and it did raise new questions about perforation as compared to the Tulip.  Rpt. at 150, ¶ 323 and at 152, ¶ 334.

In stating Cook's obligation, Dr. Kessler skips right over the predicate question: did the Celect have "different technological characteristics" than the Tulip?  If not, then the question whether the Celect raised "new questions of safety" does not even arise.[36]  Rpt. at 14.  Dr. Kessler acknowledges the "new technological characteristics" requirement in a discussion about the times when FDA can request clinical data, Rpt. at 17, ¶ 39, but does not apply the analysis before stating Cook must ensure there were no new safety questions raised by the Celect.  Dr.

---

[36] *See* 21 U.S.C. § 360c(i)(1)(A)(i) -(ii) (for the purpose of determining substantial equivalence means a finding that a device has "the same technological characteristics as the predicate device" or if there are different technological characteristics, information is submitted "that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and effectiveness than the predicate device"); Ex. 22, FDA Guidance, Premarket Notification 510(k), *available at* https://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomarketyourdevice/premarketsubmissions/premarketnotification510k/default.htm.

US.113596269.03

Kessler's opinions that the Celect did raise new safety questions, Rpt. at 150 and 152, ¶¶ 323, 334, and that these were not resolved, Rpt. at 151, ¶ 328, are tied to his personal perforation definition.  He lacks qualifications or a reliable method to make these claims.

When he is not re-interpreting Cook data, *see, e.g.,* Rpt. at 152, ¶ 332, Dr. Kessler sets about cherry-picking facts from Cook records. ███████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████ ██ ████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████ █

Dr. Kessler's cherry-picking continued as he inconsistently applied his own preferred definition of perforation. ████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████ ██ ██

_____

█ ████████████████████████████████████████████████████████████
██ ████████████████████████████████████████████████████
██ █████████████████████████████████████████ █████████████████
1999 Guidance; Morris Simon, MD, *Vena Cava Filters: Prevalent Misconceptions*, 10(8) JVIR 1021-1024 (1999) ("Simon Article").

██████████████████████████████████████████████████

████████████████████

Testimony that merely provides a "narrative of select regulatory events through the summary or selective quotation from internal [manufacturer] documents, regulatory filings, and the deposition testimony of [manufacturer] employees," is subject to exclusion as not helpful to assist the trier of fact.  *See In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *see also In re Zimmer Nexgen Knee Implant Products Liab. Litig.*, 2015 WL 5145546, at *12 (N.D. Ill. Aug. 31, 2015) (excluding expert testimony which "simply summarize[d] internal [manufacturer] documents regarding post-market surveillance").  Here, Dr. Kessler's testimony is actively **un**helpful, because he lacks qualifications to offer legitimate expert guidance to a jury about how these data should be interpreted, and seeks to retrospectively impose a definition that was not stated per study protocol.

## X.    THE ADULTERATION AND MISBRANDING OPINIONS EXPRESSED IN SECTIONS V., VI. AND X. ARE IMPERMISSIBLE LEGAL OPINIONS, BASED ON A NARRATIVE READING THAT USURPS THE JURY'S ROLE, WHICH DR. KESSLER IS NOT QUALIFIED TO OFFER.

### A.    The adulteration and misbranding opinions are impermissible legal opinions

Expert opinions that amount to legal conclusions do not assist the trier of fact because they "merely tell the jury what result to reach." *People's State Bank*, 2013 WL 1024917, at *8. In *People's State Bank*, an expert was excluded from saying the defendant's behavior conformed to the legal standard of care, *Id.* at *9, because:

> [t]hese opinions embrace legal conclusions and usurp the trier of fact's role. They state that Defendants' actions did not violate any laws or regulations but instead its disclosures were sufficient in all material respects. As a result, these opinions do not guide the fact-finder on the ultimate issue; rather, they tell the fact-finder what the verdict must be.

██████████████████████████████████████████████████

US.113596269.03

*Id.* at *9; *see also Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir.2003) (affirming the district court's exclusion of expert testimony where the testimony was based "on purely legal matters and made up solely of legal conclusions").

In his report, Dr. Kessler states definitively that the Cook Celect filter "was adulterated," Rpt. at 49, ¶ 114, and that the Celect and Celect Platinum filters "were misbranded with respect to perforation." Rpt. at 159, ¶ 361. He says the Celect filter "raised new safety questions concerning perforation compared to Tulip and therefore was not substantially equivalent" Rpt. at 159, ¶ 366, and "Cook's promotional labeling omitted relevant facts and was misleading concerning the clot-trapping efficiency of its Celect filter." Rpt. at 160, ¶ 367. These are impermissible legal conclusions that tell the jury what result to reach.

By the time he was deposed, Dr. Kessler wished to avoid telling the jury what to do. Dep. 242:8-14. Yet his remaining opinions avoid the jury's province in semantics only. He explains Cook's obligation, says Cook failed to meet it if certain things occurred, then says those things occurred. *See e.g.*, CONCLUSIONS, Rpt. at 157-160.

Even if Dr. Kessler was permitted to provide an "ultimate conclusion" on the issues of adulteration and misbranding, these are not questions that the FDA, let alone Dr. Kessler, is permitted to answer. Indeed, "[t]he FDA does not have the authority to declare unilaterally that a label is false or misleading and thus that a drug is misbranded; it must proceed to court for a judicial determination in an enforcement action." *Tucker v. SmithKline Beecham Corp.*, 596 F. Supp. 2d 1225, 1229 n.3 (S.D. Ind. 2008); *see also In re Zimmer NexGen Knee Implant Prod. Liab. Litig.,* 2015 WL 5145546, at *18 (N.D. Ill. Aug. 31, 2015) (excluding expert's opinions on misbranding and adulteration because they were improper legal conclusions and not even the FDA has the authority to declare unilaterally that a label is false or misleading; it must proceed

to a court for a judicial determination); *Wyeth v. Levine*, 555 U.S. 555, 570 (2009) ("Moreover, because the statute contemplates that federal juries will resolve most misbranding claims, the FDA's belief that a drug is misbranded is not conclusive").

FDA has not issued any Warning Letter to Cook concerning its IVC filters, nor taken any other action against the filters.  Dep. 366:21-367:6.  Dr. Kessler should not be allowed to walk into the courtroom, wearing his FDA Commissioner mantle, and level accusations FDA has not made, especially when he brings no special expertise.

**B.    The adulteration and misbranding opinions are based on alleged violation of federal regulation, which are inadmissible under Florida law.**

The only standard provided by Dr. Kessler to govern Cook's conduct is the FDA regulatory framework of substantial equivalence, adulteration, and misbranding.  One can search his report for any reference to an "industry standard" informed by some other guide, and come up empty.  *See* Rpt., *passim*.  Yet according to the law in the State of Florida, violations of statute cannot be the basis of a private cause of action without clear statutory language creating such an action.  *Murthy v. N. Sinha Corp.*, 644 So. 2d 983, 985 (Fla. 1994).  Accordingly, Hill's negligence *per se* claim could not survive under Florida law because it was based on allegations of misbranding and adulteration under the FDCA.  Entry on the Cook Defs.' Mot. for Partial J. on the Pleadings, May 17, 2017 (Hill Dkt. 230).  At deposition, Dr. Kessler repeatedly inserted a reference to industry standards, saying this was "implied" in his report.  Dep., Vol. 1, 238:2-15.  Yet when asked what his definition of the industry standard was, he simply referred back to the regulations.  Dep., Vol. 1, 238:16-240:3.  ████████████████████

████████████████████████████████████

████████████████

**C.** **Dr. Kessler's misbranding opinions are based on his mistaken assertion that the Celect IFU is misleading**

Dr. Kessler's misbranding opinions relate primarily to the statements contained in Celect labeling about the OUS Study. 

This is not proper expert testimony.  *See U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996); *Baldonado*, 2012 WL 1802066, at *4.  The reason Dr. Kessler purports to do something more than read a spreadsheet is that he claims to carry the right definition, the one Cook should have used.  Yet for this exercise, he brings no expertise to the table.  And in issuing his opinions, he ignores the actions taken by the real FDA; the operative FDA; the FDA that cleared the Celect to market.

Dr. Kessler claims that the Celect is misbranded because the IFU discusses the results of the OUS Study, but does not mention perforations. Kessler Rpt. at ¶¶ 199, 246-247, 249.



US.113596269.03



In his report, Dr. Kessler criticizes at length the "Lyon Study,"[49] ███████████████████

████████████  ▪  The article reports 21 penetrations and no perforations, which the authors

explained as "(ie, strut protruding outside the IVC wall) or extravasation or hemorrhage in any

patient…".[51] ███████████████████████████████

In addition, the Lyon Study cannot be a basis for a misbranding claim because the

publication was not referenced in the labeling for the Celect.  It is the OUS study that is

[49] Lyon SM, *et al*, "Short- and Long-term Retreivability of the Celect Vena Cava Filter: Results from a Multi-institutional Registry," *J. Vasc. Intervent'l Radiol.* 20(11), 1441-1448 (2009), referred to generally in this litigation as the "Lyon Study."

[51] Lyon at 1445; J. Brown Dep., Vol. 1, 68:16-69:1.

US.113596269.03

referenced in the Celect IFU, not the Lyon Study.[52]  Based on the definitions of "label" and

"labeling" in the FDCA, a published article is not a label or labeling because it is not referenced

or included on or within the packaging for the device, nor would it even meet the more liberal

interpretation of "accompanying" that includes pamphlets, brochures, instruction books, and the

like.  21 U.S.C. §§ 321(k), 321(m);[53] Ex. 28, FDA Guidance, "Labeling: Regulatory

Requirements for Medical Devices" (1989) at 2.  ███████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████  ███████

Moreover, misbranding is a legal opinion that not even FDA alone can make.  *See Good*

*Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming the

district court's exclusion of expert testimony where the testimony was based "on purely legal

matters and made up solely of legal conclusions"); *see also In re Zimmer Nexgen Knee Implant*

*Prod. Liab. Litig.,* 2015 WL 5145546, at *18 (N.D. Ill. Aug. 31, 2015).  The proper claim to be

decided by this jury is failure to warn.  The jury is able to discern for itself whether statements

about perforation meet the standards stated by this court.

The jury also should be protected from Dr. Kessler's speculation that if he had been FDA

Commissioner, FDA would not have cleared the Celect.  Kessler Rpt. at 111, ¶ 248.  He has no

grounds to guess what FDA reviewers would have thought in 2007-2008, 10 years after he left.

His remove is heightened by his lack of familiarity with the relevant medical practice.

---

[52] *See, e.g.,* Celect IFU, I-CELECT-PERM-UNI-0805-351-01EN (2008), CookMDL2570_0098039 at 0098043-45
[53] The FDCA defines "label" as "a display of written, printed, or graphic matter upon the **immediate container** of any article; and a requirement made by or under authority of this chapter that any word, statement, or other information appear on the label shall not be considered to be complied with unless such word, statement, or other information also appears on the outside container or wrapper, if any there be, of the retail package of such article, or is easily legible through the outside container or wrapper."  21 U.S.C. § 321(k) (emphasis added).  "Labeling" is also defined in the FDCA as: "all labels or other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."  21 U.S.C. § 321(m).

█████████████████████████████████

US.113596269.03

**D.      The Court should exclude Dr. Kessler's adulteration and misbranding opinions, which are based on a statement that the Celect filter fell below the quality it purported to possess, because he is not qualified to offer these opinions and did not follow a reliable method in reaching them**

Dr. Kessler says Cook set performance standards for itself ████████████████████ ████████████████████ and did not meet them, making the product adulterated and misbranded.  Rpt. at 47-49 ¶¶ 111-115, and Section VI., Rpt. at 49-147.  ████████████



Dr. Kessler says Cook represented it "met performance standards," (Rpt. at 47, ¶ 112), but says nothing about the legal definition of or criteria for "performance standards."  He cites the statute defining adulteration (the quality of a device "fall[s] below, that which it purports or is represented to be" Rpt. at 47, ¶ 111), but says nothing about where Cook purported or represented to any party outside of Cook the contents of the items he identified as the performance standards Cook set.

Dr. Kessler identifies three things that set the performance standard for Cook and formed the basis for his adulteration charge: ████████████████████████



He said design files must be maintained for FDA inspection, but he does not know if any inspector ever looked at these items.  Dep. 536:25-537:8.  He does not know if FDA ever saw the

_____

US.113596269.03



██████████ Perforation of the caval wall is a known complication of IVC filters, and it would not be feasible to expect this event never to occur.  *Id.*

Dr. Kessler agreed that because his adulteration opinions are based on the requirements Cook set for itself, Cook's own definition and measurement is what matters.  Dep. 543:12-544:1.

██████████ Yet nowhere in Dr. Kessler's report has Cook's counsel found a discussion of this article. ████████████████████████

Consistent with Cook's and FDA's focus on clinical significance, the authors in the referenced Simon article explain that "A second common conceptual misconception is "vena cava perforation" by the filter when filter parts are seen to extend more than a few millimeters

Another document focused upon by Dr. Kessler also cites the same Simon article.  And in that context too, Dr. Kessler ignores the article.

US.113596269.03

beyond the vena cava lumen."[59]  They say: "This is partly a semantic problem *and partly a pathophysiologic misunderstanding*."[60]  After noting the differences between penetration, the normal biologic process of transmural incorporation and tenting of the vein wall, the authors name the "extremely rare "perforation" of the vein wall associated with significant bleeding."[61]  With respect to tenting, they note that this process that can result in contact points "*eventually extend[ing] as much as 5-10 mm outside of the imaged vein lumen*."[62]  They explain that not all penetration is bad, because "By design, filters must exert a small outward force on the vein wall so as to resist dislodgement and migration of the device from its deployed site, particularly when the proximal venous pressure rises after a large embolus is trapped."[63]  They characterize observations except the extremely rare perforation as "this whole range of normal and very common benign extensions of filter parts outside the vein lumen."[64]

Importantly, the authors of the article specifically referenced by Cook in its design document take on precisely the issue plaguing Dr. Kessler's report.  When filter parts are seen to extend more than a few millimeters beyond the vena cava lumen, Dr. Kessler calls it perforation. The authors call that a misconception.  It is not surprising that Dr. Kessler may have a misconception about how to find perforation on images, because that is not something he does outside a courtroom.  His lack of expertise to read such images or interpret perforation data should keep him from offering such opinions inside a court.

When analyzing an expert's methodology, the Seventh Circuit considers whether the evidence is genuinely scientific, as opposed to being unscientific speculation offered by a

---

[59] Simon Article, at 1022.
[60] *Id.* at 1022-1023 (emphasis added).
[61] *Id*. at 1023.
[62] *Id*. (emphasis added).
[63] *Id.*
[64] *Id.*

US.113596269.03

genuine scientist. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). When reviewing an expert's methodology, the *Daubert* factors (e.g., testing, peer review, publication) should be used as a starting point, but district courts are free to fashion an approach more tailored to the particular evidentiary submission at issue. *People's State Bank*, 2013 WL 1024917, at *5. An expert's work will be admissible only to the extent that it is reasoned, uses methods of the discipline, and is founded on data. *Lang v. Kohl's Food Stores, Inc.*, 217 F. 3d 919, 924 (7th Cir. 2000); *People's State Bank*, 2013 WL 1024917, at *4. Dr. Kessler's opinion that Cook did not meet its own standard meets none of these criteria.

In concluding that Cook did not meet its design input, Dr. Kessler challenges Cook's conclusion that the ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ This is consistent with the Simon article inform the input, as it is focused on significance.

Dr. Kessler is not qualified to interpret Cook's design input or to challenge Cook's conclusion that it was met. As noted above, he is not expert in determining whether an IVC filter has perforated the vena cava. ███████████████████████████ ████████████████████ ████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████ He did not defer to Plaintiffs' cardiovascular pathologist, Dr. Michael C. Fishbein, Dep. 296:12-19. Instead, Dr. Kessler reviewed second-hand characterizations of the raw data. Dep. 289:8-17, 294:3-296:3. There is nothing expert about this task, and it is actively unhelpful. A jury should not be misled into

thinking that a person unqualified to review images could offer special insight into how to match up spreadsheet entries against a perforation definition.

Dr. Kessler's belief that the Celect data raise insurmountable obstacles to its safety also fails to account for the extent to which FDA itself evaluated this data.[65]  Cook provided the FDA with reports and raw data ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ █████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

The US FDA is the agency charged with deciding whether there is sufficient data to clear a medical device to market.  In this case, that agency cleared the Celect after extensive engagement with Cook.  Yet Dr. Kessler seeks to call the device adulterated because of a risk expressly considered by FDA.  And in so doing, he would claim the title of former Commissioner.  This is unfair, inexpert, and makes no sense.

One central theme in Dr. Kessler's report is that Celect perforates more often than Tulip, and this was kept from FDA. ████████████████████████████████

████████████████████████ ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████



## XI.   DR. KESSLER'S OPINIONS ON REPORTING REGULATIONS ADDRESSED IN SECTION III.E. WOULD NOT ASSIST THE JURY

In Section III.E. (Rpt. at 21-31), Dr. Kessler states regulations and guidance documents for medical device reporting.  He expresses no opinion about Cook's compliance or noncompliance with these regulations and guidelines.[75]  To the extent anyone should be instructing the jury about legal standards for its deliberations in this case, that person should be the judge.  Noncompliance with federal regulations does not provide the applicable standard for this case in any event.  *See* Entry on the Cook Defs.' Mot. for Partial J. on the Pleadings, May



US.113596269.03

17, 2017 (Hill Dkt. 230) (granting judgment on the pleadings for Plaintiff's negligence *per se* claim premised on alleged FDCA violations).

When analyzing the relevance of proposed expert testimony, the court must consider whether the testimony will assist the trier of fact with its analysis of the issues.  In this inquiry, the Court considers whether the expert's testimony is sufficiently tied to an issue before the jury.  *Sann v. Mastrian*, 2012 WL 253088, *3 (S.D. Ind. Jan. 26, 2012); *see also Peoples State Bank v. Stifel, Nicolaus & Co.*, 2013 WL 1024917, *6 (S.D. Ind. Mar. 14, 2013) (stating that the suggested testimony must "fit" the issue to which the expert is testifying).  By laying a groundwork of regulations without applying them to the facts of these cases or offering an opinion demonstrates a lack of fit between the issues in these cases.

## XII. THE COURT SHOULD EXCLUDE DR. KESSLER'S OPINIONS IN SECTIONS VI.D-G, SUGGESTING THE CELECT PERFORATES MORE OFTEN THAN THE TULIP, BECAUSE HE BRINGS NO SPECIAL EXPERTISE TO THIS ANALYSIS AND LACKS A RELIABLE METHOD TO ISSUE THESE OPINIONS

Dr. Kessler proposes to testify that the Celect filter perforated at a higher rate (*i.e.*, a higher percentage of the time) than the Tulip filter.  Rpt. at 112-145, e.g. ¶¶ 250, 269, 314 and Schedule 4.  The vast majority of the paragraphs in these sections merely quote excerpts from Cook documents.  Dr. Kessler should be excluded from reading these excerpts, which requires no special expertise but suggests to the jury that he is uniquely qualified to evaluate these topics.

US.113596269.03



One problem with comparing two devices based on complaint data is an inability to sort out the impact of potential confounding factors – things such as differences in the people who get the filters, or in the doctors who place them, that affect the differences in outcome we see.  Dr. Betensky, the Harvard Biostatistician who did statistical analysis for Dr. Kessler, acknowledged that she could not measure the potential confounding factors in the filter data.[77]  Yet Dr. Kessler simply refused to acknowledge these limits, and would not engage in any professional discussion about this topic at his deposition.[78]

Before any expert is allowed to suggest to the jury that one filter type causes a higher perforation risk than another, they should conduct a causal analysis consistent with the standards

[77] Betensky Dep. 194:15-198:17.
[78] When asked about limits to complaint data, he simply refused to acknowledge them.  He parried question after question about statistics and data with barbs and comments about what Cook should have done.  Dep.  474:4-483:4.  He does not know if different groups of people who use IVC filters may face different underlying risks of perforation, (e.g. people with cancer), and deflected question after question about the importance these differences could make to a statistical analysis of cause.  Dep. 486:4-490:13.  For a witness asking permission from this Court to tell the jury the Celect filter causes a higher perforation risk than the Tulip, Dr. Kessler displayed a remarkable unwillingness to talk about statistics.  Instead, he parried question after question with accusations about Cook that were entirely irrelevant to the legitimate data questions on the table.  Dep. 488:18-489:2, 491:9-12.

35

in a professional field.  There are such standards in the fields of epidemiology and statistics[79], but one will not find any use of them in Dr. Kessler's report.[80]

At deposition, Dr. Kessler expressed incredulity that he would even be asked questions about cause.  He repeatedly talked of the filter as being the obvious cause of a strut sticking out of a vessel wall.  Dep.  482:11-497:1.  He said "If a strut sticks out of a vessel wall, you don't need causal statistics to determine that that is sticking out.  Right?  This whole notion about causality, it makes no sense." Dep.  482:11-24.  *See also* Dep.  482:11-484:1, 484:20-486:1.

Yet causality is exactly what Dr. Kessler proposes to state.  His proposed testimony would affirmatively mislead the jury into thinking that the higher proportion of reported perforation complaints that have been received by Cook for the Celect filter as compared to the Tulip is *caused by something unique about the Celect and its design*.  Any testimony that (for example) Celect perforated 10 times more often than Tulip over a given time period will unavoidably suggest to a juror that something about the Celect's design *causes* it to perforate 10 times more often than a Tulip filter.  This inference is certainly a layperson's natural reaction to such a statistic, and there can be no doubt that plaintiffs want to use any disparity in perforation rate to support just such a conclusion by the jurors—after all, the question here is not whether Celect perforates more, but whether it does so *because of a design defect*.

But Dr. Betensky – the Harvard Biostatistician who calculated the risk ratios at Dr. Kessler's request[81] – ███████████████████████████████████████████

---

■ ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

When asked at deposition for any published source that would support the drawing of a causal relationship when there are spontaneous complaint reports with no accounting for potential confounding factors, Dr. Kessler referenced Bradford Hill and WHO – two standards that were *not* applied in his report. Dep. 494:6-497:1; Rpt. at 112-145 and Schedule 4.

██████████████████████████████ █ ██████████████

████████████████████████████████████████

████████████████ And she testified that anyone who tried to say otherwise would be misusing her conclusions.[84]

Allowing Dr. Kessler to relay Dr. Betensky's statistics would impermissibly vest him with authority he should not have.  *Dura Auto. Sys. of Ind., Inc. v. CTS Corp*., 285 F.3d 609, 613 (7th Cir. 2002). He has not followed the reliable methods used in the field of epidemiology or biostatistics, and has not displayed the *superior* knowledge necessary to qualify him to offer epidemiology and biostatistics testimony.  *See Higgins v. Koch Develop. Corp.*, 997 F. Supp. 2d 924, 930-31 (S.D. Ind. 2014), *aff'd,* 794 F.3d 697 (7th Cir. 2015).

What Dr. Kessler wants to do is precisely what Dr. Betensky said would be a misuse of her analysis. He wants to present Betensky's analysis, but not be limited by the discipline of her field. He should not be allowed to launder those opinions, losing the limits in the wash.[85]  And, given the limits to the complaint data that are explained by both Cook expert Dr. Jon Fryzek and Plaintiff expert Dr. Rebecca Betensky, Dr. Kessler should not be allowed to march through the Cook documents excerpted in Sections VI.D-G. of his report and Schedule 4, because the entire exercise is designed to leave the jury with exactly the impression Drs. Fryzek and Betensky say would be unsupported by any reliable statistical method – the impression that something unique

---

[81] Dr. Kessler requested Dr. Betensky, who has calculated statistical comparisons for him in another lawsuit, to calculate comparisons for him here. Dep. 444:14-447:2.  This is consistent with Dr. Kessler's practice throughout his career; he works with others who perform the statistical analysis.  Dep. 448:18-445:15; Rpt., ¶ 251.
[82] Betensky Dep. 185-186.
[83] *Id.* at 204-205.
[84] *Id.*
[85] Separately, Cook has moved to exclude Dr. Betensky's opinions.  Dr. Kessler's repetition of her opinions should be excluded for the same reasons as are stated there.  It also would be redundant and unhelpful to have Dr. Kessler just repeat the opinions expressed by another expert.  A district judge has "broad discretion" under Rule 403 to exclude expert testimony that is redundant. *Krist v. Eli Lilly and Co.*, 897 F.2d 293, 298 (7th Cir. 1990).

US.113596269.03

about the Celect filter or its design in fact causes a much higher rate of perforations than the Tulip.

### XIII. DR. KESSLER LACKS QUALIFICATIONS OR A RELIABLE METHOD TO OFFER THE OPINIONS RELATED TO PROMOTIONAL LABELING REGARDING CELECT'S CLOT-TRAPPING ABILITY

Dr. Kessler says Cook's promotional labeling omitted relevant facts and was misleading concerning the clot-trapping efficiency of the Celect filter (Rpt. ¶¶ 335-346), based merely on his ███████████████████████████████████████████████ ████████████████████████ This exercise does not require specialized knowledge or expertise, as any lay person could read the results of the study and determine which results were included in Cook's promotional brochure.  Dr. Kessler's methodology concerning ██████ █████████████ can be fairly characterized as "unscientific speculation offered by a genuine scientist," which is improper expert testimony.  *Rosen*, 78 F.3d at 318.  Allowing Dr. Kessler to testify regarding the results ███████████████ "could give the jury the impression that he did something more than simply review the materials, which the jury can do itself."  *Baldonado*, 2012 WL 1802066, at *4.

Dr. Kessler is not qualified to offer such opinion because his conclusions are rooted in expertise and knowledge that Dr. Kessler does not have.  *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723-24 (7th Cir. 1999).  Dr. Kessler has never seen, held, touched, placed, or retrieved an IVC filter.  Dep. 154:4-7.  Outside this litigation, he has never personally tested or studied an IVC filter.  Dep. 154:14-24.  Thus, Dr. Kessler does not have the *superior knowledge* of IVC filters or testing related to IVC filters to render him qualified to testify on the █████████████ ███████ *Jones*, 188 F. 3d at 723.

And his testimony on the ████████████████ runs a substantial risk of confusing the jury, because he fails to note the test's underlying purpose (which was met): ███████████████████████



████████████████████████████ Dr. Kessler presumes an expertise he does not have.

He is not an interventional radiologist, Dep. 109:21-23, and he is not a cardiologist.  Dep. 110:2-

4.  He therefore has no basis to guess their expectations for ████████████████

## XIV.   **CONCLUSION**

For the reasons stated above, the Cook Defendants urge the Court to grant their motion

and to bar from the trial in this action the testimony of Plaintiffs' expert Dr. David Kessler.

Respectfully submitted,

Dated: August 9, 2017

_/s/ Victoria R. Calhoon_
Andrea Roberts Pierson (# 18435-49)
Christin Jaye Eaton (MN Bar # 228795)
Victoria R. Calhoon (# 28492-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:   andrea.pierson@faegrebd.com
E-Mail:   christin.eaton@faegrebd.com
E-Mail:   victoria.calhoon@faegrebd.com
E-Mail:   john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

_Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS_

████████████████████████████

US.113596269.03

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2017, a copy of the foregoing **COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF DR. DAVID KESSLER** was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.  Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

/s/ John T. Schlafer _____

40