**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                              MDL No. 2570
_____

This Document Relates to the Following Actions only:

    Elizabeth Jane Hill
    No. 1:14-cv-06016-RLY-TAB

    Arthur Gage
    No. 1:13-cv-01875-RLY-TAB

_____

**COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION**
**TO EXCLUDE EXPERT OPINIONS OF DR. ALEXANDER MARMUREANU**

Dated:  August 9, 2017            /s/ Andrea Roberts Pierson
                                  Andrea Roberts Pierson (# 18435-49)
                                  J. Joseph Tanner (# 11856-49)
                                  John T. Schlafer (# 28771-49)
                                  FAEGRE BAKER DANIELS LLP
                                  300 North Meridian Street, Suite 2700
                                  Indianapolis, Indiana  46204
                                  Telephone:  (317) 237-0300
                                  Facsimile:  (317) 237-1000
                                  Email:  andrea.pierson@faegrebd.com
                                  Email:  joe.tanner@faegrebd.com
                                  Email:  john.schlafer@faegrebd.com

                                  James Stephen Bennett (# 22869-02)
                                  FAEGRE BAKER DANIELS LLP
                                  110 W. Berry Street, Suite 2400
                                  Fort Wayne, Indiana  46802
                                  Telephone: (260) 424-8000
                                  Facsimile: (260) 460-1700
                                  Email:  stephen.bennett@faegrebd.com

                                  *Counsel for the defendants, Cook Incorporated, Cook*
                                  *Medical LLC (f/k/a Cook Medical Incorporated), and*
                                    *William Cook Europe ApS*

## TABLE OF CONTENTS

Page

STATEMENT OF ISSUES ....................................................................................... vi

INTRODUCTION .................................................................................................... 1

I.    Legal Standard for Admission of Expert Testimony ..................................... 2

II.   Dr. Marmureanu's Opinions ......................................................................... 2

      A.    Dr. Marmureanu's general opinions about the Tulip filters. ................ 3

      B.    Dr. Marmureanu's general opinions about the Celect filters. .............. 5

      C.    Design ................................................................................................. 6

III.  Dr. Marmureanu is Not Qualified to Offer His Proposed Expert Testimony. ..................... 6

      A.    Dr. Marmureanu's exaggerated claims of expertise. ......................... 7

      B.    Dr. Marmureanu is not qualified to opine on design issues. ............... 9

      C.    Marmureanu is not qualified to opine warning issues. ..................... 10

IV.   Dr. Marmureanu's Proposed Expert Testimony in his General Report is Not Based on a Reliable Methodology ....................... 12

      A.    Dr. Marmureanu failed to employ a reliable methodology in evaluating the design of the Celect and Tulip IVC filters. ................. 13

      B.    Dr. Marmureanu failed to employ a reliable methodology in evaluating the instructions and warnings for the Celect and Tulip IVC filters. .............................. 27

V.    Dr. Marmureanu Failed to Employ a Reliable Methodology in Evaluating Whether the Celect IVC Filter Caused any Injury to Plaintiff Hill ................. 30

      A.    Dr. Marmureanu did not perform a reliable differential diagnosis to identify all possible causes of Mrs. Hill's malpositioned filter and perforation. ................. 33

      B.    Dr. Marmureanu did not perform a reliable differential diagnosis of Ms. Hill's symptoms or alleged injuries. ........................... 36

            a.    IVC stenosis. ............................................................................... 36

            b.    Duodenal stenosis and gastrointestinal symptoms. .................... 38

            c.    Venous insufficiency. .................................................................. 40

            d.    Depression and anxiety. ............................................................. 42

      C.    Dr. Marmureanu did not perform a reliable differential diagnosis to determine Ms. Hill's permanent and future medical complications. ........................... 42

VI.   Dr. Marmureanu Failed to Employ a Reliable Methodology in Evaluating Whether Perforation or Malpositioning of the Günther Tulip IVC Filter Caused any Injury to Plaintiff Gage .................... 43

      A.    Dr. Marmureanu's case-specific opinions concerning Plaintiff Gage .................... 43

      B.    Dr. Marmureanu did not use a reliable methodology. ....................... 45

a.   Dr. Marmureanu did not perform a reliable differential diagnosis of the malpositioning and perforation of Mr. Gage's IVC filter. ................................. 45

b.   Dr. Marmureanu did not perform a reliable differential diagnosis of Mr. Gage's current symptoms. .................................................................. 48

i.   Chronic pain. ................................................................................ 49

ii.   Need for lifelong anticoagulation. ............................................... 52

iii.   Psychological distress. ................................................................. 52

VII.   Dr. Marmureanu's Proposed Expert Testimony Would Not Assist the Jury ..................... 53

A.   Jurors Do Not Need Expert Testimony to Understand the Cook Documents. .......... 54

B.   Dr. Marmureanu's Testimony Does Not Reflect a Sufficient Degree of Medical Certainty. ....................................................................................... 56

VIII.   The Court Should Exclude Opinions that Dr. Marmureanu Did Not Disclose in His Expert Report ........................................................................................................... 58

CONCLUSION ................................................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Baldonado v. Wyeth*,
2012 WL 1802066 (N.D. Ill. May 17, 2012) ........................................................55

*Bowersock v. Davol, Inc.*,
2017 WL 711849 (S.D. Ind. Feb. 23, 2017) ........................................................26

*Brown v. Burlington Northern Santa Fe Ry.*,
765 F.3d 765 (7th Cir. 2014) ..............................................................18, 27, 32

*C.W. ex rel. Wood v. Textron, Inc.*,
807 F.3d 827 (7th Cir. 2015) ..............................................................43

*Chapman v. Maytag Corp.*,
297 F.3d 682 (7th Cir. 2002) ..............................................................13, 25

*Clark v. Takata Corp.*,
192 F.3d 750 (7th Cir. 1999) ..............................................................12, 26

*Crowley v. Chait*,
322 F. Supp. 2d 530 (D.N.J. 2004) ........................................................17

*Cunningham v. Masterwear, Inc.*,
2007 WL 1164832 (S.D. Ind. 2007) ......................................................12, 26, 38

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993) ..............................................................passim

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ..............................................................12, 21

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ..............................................................7, 22, 25

*Ervin v. Johnson & Johnson, Inc.*,
2006 WL 1529582 (S.D. Ind. May 30, 2006), *aff'd* 492 F.3d 901 (7th Cir. 2007) ..............................................................32

*Ervin v. Johnson & Johnson, Inc.*,
492 F.3d 901 (7th Cir. 2007) ..............................................................2, 32

*Finley v. Marathon Oil Co.*,
75 F.3d 1225 (7th Cir. 1996.) ..............................................................59

*Gayton v. McCoy*,
  593 F.3d 610 (7th Cir. 2010) ...........................................................................7

*Goldberg v. 401 N. Wabash Venture LLC*,
  755 F.3d 456 (7th Cir. 2014) .........................................................................19

*Hall v. Flannery*,
  840 F.3d 922 (7th Cir. 2016) .........................................................................11

*Henderson v. Sheahan*,
  196 F.3d 839 (7th Cir. 1999) .........................................................................58

*Higgins v. Koch Dev. Corp.*,
  997 F. Supp. 2d 924 (S.D. Ind. 2014) ......................................................11, 58

*Higgins v. Koch Development Corp.*,
  No. 3:11-cv-81-RLY-WGH, 2013 WL 6238650 (S.D. Ind. Dec. 3, 2013) ...................6, 32, 48

*In re Ready-Mixed Concrete Antitrust Litig.*,
  261 F.R.D. 154 (S.D. Ind. 2009)....................................................................52

*In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*,
  218 F. Supp. 3d 700 (N.D. Ill. 2016) ................................................18, 32, 48, 51

*In re Zimmer Nexgen Knee Implant Products Liab. Litig.*,
  2015 WL 5145546 (N.D. Ill. Aug. 31, 2015) ...............................................32, 55

*Jones v. Lincoln Elec. Co.*,
  188 F.3d 709 (7th Cir. 1999) ...........................................................................7

*Lang v. Kohl's Food Stores, Inc.*,
  217 F. 3d 919 (7th Cir. 2000) ...........................................................12, 20, 27, 53

*Lyman v. St. Jude Med. S.C., Inc.*,
  580 F. Supp. 2d 719 (E.D. Wis. 2008)............................................................17

*Mid-State Fertilizer Co. v. Exchange National Bank*,
  877 F.2d 1333 (7th Cir. 1989) .......................................................................32

*Myers v. Ill. Cent. R.R. Co.*,
  629 F.3d 639 (7th Cir. 2010) ..............................................................1, 18, 31

*Navarro v. Fuji Heavy Indus., Ltd.*,
  925 F. Supp. 1323 (N.D. Ill. 1996), *aff'd*, 117 F.3d 1027 (7th Cir. 1997) ...............12

*People's State Bank v. Stifel, Nicolaus, & Co.*,
  2013 WL 1024917 (S.D. Ind. May 14, 2013)................................................12, 54

*Rosen v. Ciba-Geigy Corp.*,
   78 F.3d 316 (7th Cir. 1996) ...................................................................................12

*Sann v. Mastrian*,
   2012 WL 253088 (S.D. Ind. Jan. 26, 2012).......................................................53

*Smith v. Ford Motor Co.*,
   215 F.3d 713 (7th Cir. 2000) .................................................................................53

*State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*,
   980 F. Supp. 2d 1031 (N.D. Ind. 2013) .........................................................17, 50

*U.S. v. Hall*,
   93 F.3d 1337 (7th Cir. 1996) .................................................................................55

*United States v. Allen*,
   207 F.Supp.2d 856 (N.D. Ind. 2002) ......................................................................2

*Wendler v. Ezra, P.C. v. Am. Intl. Grp., Inc.*,
   521 F.3d 790 (7th Cir. 2008) .................................................................................32

*Wintz By and Through Wintz v. Northrop Corp.*,
   110 F.3d 508 (7th Cir. 1997) .................................................................................56

**STATE CASES**

*Dabros by Dabros v. Wang*,
   611 N.E.2d 1113 (Ill. App. Ct. 1993) ...................................................................58

**RULES**

Fed. R. Civ. P. 26(a)(2)(B) .........................................................................................59

Fed. R. Civ. P. 37(c)(1)................................................................................................59

Fed. R. Evid. 702 ....................................................................................2, 21, 25, 58

Rule 403 .......................................................................................................................55

## STATEMENT OF ISSUES

1.  Did Dr. Marmureanu employ a reliable methodology under *Daubert* to evaluate whether the Celect filter caused any injury to Plaintiff Hill, and whether he is properly qualified to do so?

2.  Did Dr. Marmureanu employ a reliable methodology under *Daubert* to evaluate whether the Tulip filter caused any injury to Plaintiff Gage, and whether he is properly qualified to do so?

3.  Whether Dr. Marmureanu's proposed testimony would assist the jury under FRE 702 and *Daubert* during the *Hill* and *Gage* trials?

4.  Whether Dr. Marmureanu is qualified under *Daubert* to offer expert opinions on the design and warnings of the Celect and Tulip filters in his general report?

5.  Did Dr. Marmureanu employ a reliable methodology under *Daubert* in evaluating the design and warnings of the Celect and Tulip filters in his general report?

6.  Whether the Court should exclude opinions that Dr. Marmureanu did not disclose in his general and case specific expert reports?

## INTRODUCTION[1]

Plaintiffs' medical expert—Dr. Alexander Marmureanu—describes himself as "***the most qualified physician in the world right now to have an opinion about Celect and Tulip.***"  He claims expertise in literally ***all*** areas of medicine, as well as the field of engineering, before declaring that "***all filters are bad***" and "***filters have no benefits***" even for patients at high risk of pulmonary embolism who cannot take anticoagulants.  Dr. Marmureanu reaches his opinions without ever having researched, studied, or published regarding vena cava filters; without having considered the complication rates for any therapy or treatment used to prevent pulmonary embolism (including filters); and with little experience placing (and almost no experience retrieving) IVC filters.

Dr. Marmureanu jumped to his litigation-driven conclusions regarding filters generally and, Plaintiffs Hill and Gage specifically, without qualification or any reliable scientific methodology.  And, Dr. Marmureanu specifically failed to apply a differential diagnosis or etiology when reaching opinions in *Hill* and *Gage*, and when opining on Cook's complaint files.  None of Dr. Marmureanu's testimony is based on a systematic ruling in and ruling out of all possible causes as required by *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).  Instead, Dr. Marmureanu believes he can opine on literally ***any*** medical or engineering topic simply because he is a physician and—in his words—"***an expert in giving an opinion***."  Dr. Marmureanu's reports are lengthy, but at his deposition, he frequently disavowed (or disagreed with) opinions in his reports.  He has not submitted his opinions or methodology to review by his

---

[1] Dr. Marmureanu authored four reports in *Hill* and *Gage*: a general report, two case specific reports, and one "Analysis" report discussed below.  In total, his opinions cover 129 pages and his deposition testimony is 749 pages long.  As such, the discussion of his myriad opinions within this *Daubert* motion is lengthier than normal.

peers, and he concedes he would be reluctant to do so.  He failed to apply a consistent

methodology, and his analysis thus has no discernible rate of error.

Defendants Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated),

and William Cook Europe ApS ("Cook") therefore move this Court, pursuant to the Federal

Rules of Evidence, to exclude Dr. Marmureanu's testimony at trial.  *See* Fed. R. Evid. 702;

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

## I.      Legal Standard for Admission of Expert Testimony

The Seventh Circuit has established three requirements in its application of the *Daubert*

standard: (1) the witness must be qualified as an expert by knowledge, skill, experience, training,

or education; (2) the expert's reasoning or methodology underlying the testimony must be

scientifically reliable; and (3) the testimony must assist the trier of fact to understand evidence or

to determine a fact in issue.  *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir.

2007).  The party proffering the expert must establish these factors by a "preponderance of

proof."  *United States v. Allen*, 207 F.Supp.2d 856, 869 (N.D. Ind. 2002).  Here, Dr. Marmureanu

fails to satisfy any of these requirements, and the Court should exclude his testimony.

## II.     Dr. Marmureanu's Opinions

Dr. Marmureanu provided three reports in this litigation, one report as Plaintiffs' general

causation expert (hereafter "Marm. Rpt.") (*See* Ex. A), and separate case-specific reports for

Plaintiffs Elizabeth Hill and Arthur Gage ("Marm. Hill Rpt." (*See* Ex. B) and "Marm. Gage

Rpt."(*See* Ex. C).).  He also attaches to his report an "Analysis" restating excerpts from select

Cook complaint files and 18-pages of tables regarding those files.  Ex. D, Analysis; Ex. E,

Deposition of Dr. Alexander Marmureanu, June 20-21, 2017 ("Marm. Dep."), at 383:2-392:10;

449:13.

Dr. Marmureanu testified that he is a board-certified thoracic surgeon and that he bases his opinions on (1) his education, training, and experience; (2) his review of select internal Cook emails and memoranda provided to him by Plaintiffs' attorneys, and (3) his review of Cook's internal complaint files, also selected by Plaintiffs' attorneys.  Marm. Dep. at 54:13-21.  For his case-specific opinions, Dr. Marmureanu also reviewed the patient-specific medical records provided to him by Plaintiffs' counsel.  He did not perform physical examinations of either Mr. Gage or Mrs. Hill, and he has never spoken to Mr. Gage.  Marm. Dep. at 481:22-482:23; 503:12-19; 673:11-18.

### A.  Dr. Marmureanu's general opinions about the Tulip filters.

Dr. Marmureanu's general report is focused entirely on Cook's Instructions for Use.[2] With respect to the Tulip, Dr. Marmureanu notes 10 possible complications he associates with the Cook Tulip IVC filter, and he asserts that the Instructions for Use (IFU) do not warn of those complications: perforation, progressive perforation/penetration, organ and vessel strut perforation, fracture, tilt, migration, thrombosis, embedded filter, endothelialization, and alternative and complicated methods of retrieval.[3]  *Id*; Marm. Rpt. at 3-24.

He does not know (and did no research to determine) the frequency of any of the alleged complications he cites; neither does he know (and he did not attempt to determine) the overall complication rate with Tulip or frequency of those complications with any filter on the market. *See* Marm. Dep. at 183:3-184:6; 236:22-237:13.  Likewise, he does not know (and did not

---

[2] He asserts the general report applies to all possible Tulip and Celect IFUs, even if they have changed, and notes: "***It is to be understood that this report as regards to the instructions for use (IFU) is not intended to cover language present in a particular section of an IFU***."  Marm. Rpt. at 2.  Consistent with that comment, none of the opinions in his general report suggest changes to any particular words or section of the IFUs.

[3] Dr. Marmureanu's general report never suggests that the Tulip or Celect ***actually cause*** any of the events he notes, and Cook disputes that the events he describes are "complications" at all, much less risks of the type and magnitude required to be included in the filters' IFUs.  *See* Ex. F, Report of Dr. Anthony Venbrux ("Venbrux Rpt."), at 13-15.

attempt to determine) the (1) overall complication rates for the Tulip or any other filter, or (2) complication rates or types considered to be acceptable in the relevant medical community. *See* Marm. Dep. at 232:17-25; 233:17-234:24; 441:21-25.  Dr. Marmureanu fully concedes that all of the alleged complications he identifies were well known by physicians at the time of Mr. Gage's 2011 filter placement.[4]  Marm. Dep. at 264:19-266:11.

Although Dr. Marmureanu's report asserts that the Tulip IFU did not warn of these complications, it offers no opinion on how Cook should have done so.  The report does not suggest the content, location, size, color, or appearance of any proposed warning, and it does not discuss the Tulip IFU's existing warnings.  The report does not assert that Cook's alleged omission violated any duty of care to treating surgeons or to patients, and it does not claim that the alleged omission rendered the filter defective or unreasonably dangerous. *See id.*; *see also* Marm. Dep. at 470:22-471:12.  He does not state that any different warning would have changed the prescribing decisions of any physician. *See* Marm. Rpt., *passim*.

Dr. Marmureanu summarily concludes that the alleged "problems" he identifies with the Tulip IFU "substantially contributed to Mr. Gage's injuries."  Marm. Rpt. at 24.  However, his report excludes no explanation or basis for his conclusion.  It does not address (and he apparently did not consider) that Mr. Gage's physician neither read nor relied on the Tulip IFU.  Goodwin Dep. at 96:19-24, 107:3-12, 116:8-10; 156:8-20.  His report also apparently ignores that Mr. Gage's physician repeatedly affirmed his knowledge of each and every complication identified

---

[4] This is consistent with the testimony of Mr. Gage's treating physicians, all of whom have testified that these risks were well known at the time Mr. Gage's filter was placed. Ex. G, Deposition of Dr. Mark Goodwin, January 11, 2017 ("Goodwin Dep."), at 92:20-99:1; Ex. H, Deposition of Dr. Timothy Larkin, April 19, 2017 ("Larkin Dep."), at 35:15-48:11; Ex. I, Deposition of Dr. Paul Crisostomo, January 13, 2017 ("Crisostomo Dep."), at 77:24-81:11, as well as with Cook's medical expert, Dr. Antonios Gasparis.  Ex. J, Report of Dr. Antonios P. Gasparis, June 29, 2017 (hereinafter Gasparis Rpt."), at 16.

by Dr. Marmureanu at the time of selecting the Tulip for Mr. Gage, as well as his knowledge of the risk of the exact complications Mr. Gage experienced.  Goodwin Dep. at 92:20-99:1.

### B.    Dr. Marmureanu's general opinions about the Celect filters.

Dr. Marmureanu's report takes a similar approach to the Celect filter.  This time he notes nine possible complications associated with the Celect: perforation, progressive perforation, perforation of organs, vessels, and other structures, fracture, migration, embedded filter, endothelialization, tilt, and alternative and complicated methods of retrieval.[5] Marm. Rpt. at 24-36.  He again fully admits that he does not know (and did no research to determine) the frequency of any of the alleged complications with the Celect or any other filter, the overall complication rate for the Celect or any other filter, or the rates considered acceptable in the relevant medical community.  *See* Marm. Dep. at 183:3-184:6; 232:17-25; 233:17-234:24; 236:22-237:13; 441:21-25.  Dr. Marmureanu concedes that all of the complications he identifies were well known by physicians in the medical community at the time of Mrs. Hill's 2010 filter placement.  Marm. Dep. at 264:19-266:11.

Again, Dr. Marmureanu's report asserts that the Celect IFU did not warn of these complications, but it offers no opinion regarding how Cook should have done so.  It does not suggest the content, location, or appearance of any proposed warning.  He does not assert that Cook's alleged omission violated any duty of care to treating surgeons or to patients, and he does not claim that the alleged omission rendered the filter defective or unreasonably dangerous.  He summarily concludes that "[t]he foregoing problems described above with the Celect vena cava filter substantially contributed to Mrs. Hill's injuries," with no explanation for how he reached

---

[5] Dr. Marmureanu's report omits from his list for the Celect filter the complication of thrombosis. Further evidencing the fallacy in his methodology noted below, IFUs for both the Celect and Tulip include thrombosis as a potential adverse event, ("Thrombosis or stenosis at the implant site" (Ex. K, Tulip IFU) and "Vena cava occlusion or thrombosis" (Ex. L, Celect IFU)), yet only one of the IFUs is allegedly faulty in Dr. Marmureanu's view.

that conclusion and no discoverable methodology. Marm. Rpt. at 36.  He again apparently

ignores that Dr. Zuzga, Mrs. Hill's physician, was independently aware of all of the alleged

complications he identifies, including the exact complications Mrs. Hill experienced.  Ex. M,

Deposition of Dr. Mark Zuzga, April 19, 2017 ("Zuzga Dep."), at 113-14, 129-30, 133, 137, 142-

43, 177, 224-25.

### C.    Design

Dr. Marmureanu's general expert report offers no opinions concerning the design of

either the Tulip or Celect, and it does not suggest that either design was defective or

unreasonably dangerous.  He admits that he cannot identify any filter safer than the Celect or

Tulip, and he does not allege that any other filter would not have become malpositioned in Mrs.

Hill and Mr. Gage.  Marm. Dep. at 154:11-14; 380:1-4; Marm. Hill Rpt. *passim*, Marm. Gage

Rpt. *passim*.  Moreover, although his general expert report purports to observe certain

complications in filter patients, it does not opine that the Tulip or Celect design *causes* any of the

complications he identified, much less identify a methodology for doing so.

Dr. Marmureanu's general report focuses only on the risks of filters and the IFUs.  It

contains no analysis regarding the designs or their benefits.  And, it includes no opinion on the

most critical question:  ***Are there benefits to patients for whom the Tulip and Celect are***

***intended that outweigh the known risks?***

### III.    Dr. Marmureanu is Not Qualified to Offer His Proposed Expert Testimony.

Dr. Marmureanu presents a classic example of an expert with experience in a specific

field who tries to opine beyond his identified expertise.  As this Court has noted, "simply

possessing a medical degree does not qualify a [doctor] as an expert in all medical fields."

*Higgins v. Koch Development Corp.*, No. 3:11-cv-81-RLY-WGH, 2013 WL 6238650, at *3

(S.D. Ind. Dec. 3, 2013).  The key question is not whether the expert is qualified in general, but

whether the expert's qualifications provide sufficient foundation for an opinion on a particular topic. *Gayton v. McCoy,* 593 F.3d 610, 617-618 (7th Cir. 2010).

The Court must look at each of the expert's conclusions and determine whether the expert has adequate education, skill, and training to reach that conclusion. *Id.* at 617 (finding a general practice physician unqualified to testify about heart disease drugs because he lacked specialized knowledge of cardiology and pharmacology); *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (finding surgeon not competent to testify to diagnostic radiology opinions and that he would be, at best, just parroting the opinion of an expert in radiology). Courts exclude expert testimony where the expert's conclusions are rooted in medical knowledge and training the expert does not have. *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723-24 (7th Cir. 1999).

Here, although Dr. Marmureanu may be an experienced thoracic surgeon, he is not qualified to give the opinions he offers about IVC filters.

### A.    Dr. Marmureanu's exaggerated claims of expertise.

Dr. Marmureanu overstates to the point of absurdity his expertise to opine concerning IVC filters. Dr. Marmureanu is board certified in thoracic surgery (that is, surgery pertaining to the chest), practices in the area of chest and heart surgery, and is certainly qualified to testify in that area. But Dr. Marmureanu is ***not*** an expert on the peripheral vascular system, on IVC filters, or on most of the other topics on which he offers opinions. He is not board certified in vascular surgery (surgery relating to blood veins), interventional cardiology, or radiology (including the certification required for the subspecialty of interventional radiology)—the medical specialties that place and retrieve filters. Marm. Dep. at 77:5-14; Gasparis Rpt. at 2 fn.2. He is not board certified in gastroenterology, nephrology, pain medicine or management, psychology, or psychiatry)—the medical specialties that treat patients for conditions of the type claimed by Mrs.

Hill and Mr. Gage.  Marm. Dep. at 76:24-78:21.  He has never practiced in any of these medical fields, and he specifically has never practiced in any medical specialty that focuses on the peripheral vascular system.  *Id*. at 92:5-95:1.

Dr. Marmureanu has never researched, studied, or published about the medical conditions for which IVC filters are prescribed, much less about their use or retrieval.  Marm. Dep. at 125:13-25.  Specifically, he has never researched, published, or studied pulmonary embolism, venous thromboembolism (VTE), or deep vein thrombosis (DVT), or the design, testing, marketing, or post market surveillance of any medical device, including IVC filters.  *Id.* at 125:16-127:21; 129:9-11.

Dr. Marmureanu considers himself to be an expert in ***all*** of fields of medicine, asserting that he is "***an expert in giving an opinion****,*" and simply being a medical doctor is sufficient credential to make him an expert on all medical topics.  Marm. Dep. at 79:3-10; *see also id.* at 80:13-15 ("I'm extremely knowledgeable and qualified to talk about all those specialties as a medical doctor holding a license.").  Indeed, there is *literally* no aspect of the practice of medicine in which Dr. Marmureanu does not consider himself an expert:

> Q.      **Okay. Doctor, asking the question in a slightly different way. What fields of medicine are you not an expert in**?
> A.      **I can't think of any**.

Marm. Dep. at 101:9-12 (emphasis added); *see also id.* at 82:24 ("**I will not defer to anybody else**.") (emphasis added); *id.* at 109:14-17 ("**I specialize in pretty much everything you have**.") (emphasis added).

Dr. Marmureanu's unlimited expertise apparently also extends to the field of engineering. Dr. Marmureanu has no degrees in engineering, has never been employed as an engineer, and his only training in engineering came in high school in Romania.  Marm. Dep. at 95:2-99:2.

Nevertheless, Dr. Marmureanu considers himself an expert, and he is unwilling to defer to even a Ph.D. in engineering—not even Plaintiffs' own engineering expert, Richard McMeeking, Ph.D. *Id.* at 423:15-426:3.  He specifically (and inexplicably) claims he is qualified to opine on the engineering design of the Celect and Tulip filters.  *See id.* at 102:13-104:1.

### B.     Dr. Marmureanu is not qualified to opine on design issues.

First, Dr. Marmureanu offers no qualifications to opine on the design of IVC filters, generally, or the Celect or Tulip filters, specifically.  He is not an engineer; he has never been involved in the design of an IVC filter; and he has never studied the design of any IVC filter. *See* Marm. Dep. at 95:2-99:19-24, 426:12-427:16.  His report and Curriculum Vitae include no articles about the design, testing, or manufacture of any medical device.  *Id.* at 126:14-16.  He has never designed or conducted a clinical study.  *Id.* at 139:13-22.  He has never before been asked to offer an opinion about whether something related to a medical device caused a patient's injury.  *Id.* at 320:2-8.

His only basis for his stated "expertise" is his work in this case.  Marm. Dep. at 102:13-104:1.

> Q.     Okay. So the engineering aspect, engineering design aspect of IVC filters you believe you are an expert in that?
>
> A.     I believe I'm very knowledgeable based on the amount of time I spent studying the matter, yes.

*Id.* at 102:22-103:1.  Elsewhere, however, Dr. Marmureanu admits that "**I personally done [*sic*] no research**" regarding IVC filters.  Marm. Dep. at 155:10-11 (emphasis added). Even in this litigation, he did not review any of the design or testing documents related to the Tulip or Celect.  Ex. N, Marmureanu Reliance List ("Reliance List"), *passim.*

Second, nothing in Dr. Marmureanu's clinical experience qualifies him to discuss the design of IVC filters.[6] He has at best limited experience with IVC filters, and has *no* recent experience. He has not placed *any* IVC filters since approximately 2013. Marm. Dep. at 205:11-18. With respect to Celect and Tulip filters in particular, he does not remember how many he placed, but estimates a total of only 20-40 for both filters combined between 2003 and 2013, and he admits there would have been "months where I've placed no filters." He could not remember any patient in whom he placed a Tulip or Celect having had a complication. Marm. Dep. at 205:8-208:12; 209:17-22; 221:16-222:7.

The last time Dr. Marmureanu *removed* an IVC filter was "seven, eight years ago." Marm. Dep. at 210:23-211:2. He estimates that he has removed only 25 filters over his entire career. *Id*. at 211:3-212:4. He has used only standard removal techniques, and has not performed or studied any advanced, complex, or off-label retrieval techniques. *Id.* If he could not perform the retrieval using the IFU instructions, he would refer the patient to an interventional radiologist. *Id.* He thinks he recalls a few Celect filters and a few Tulip filters among his filter retrievals, but could not recall any of the details. Marm. Dep. at 212:5-10.

His lack of engineering qualification and limited history with of IVC filters does not qualify Dr. Marmureanu to offer his opinions on design.

**C.    Marmureanu is not qualified to opine warning issues.**

Dr. Marmureanu likewise has no education, experience, or expertise that qualify him to opine on the adequacy of Cook's instructions and warnings. He has no education, training, or knowledge on how to draft warnings or instructions for medical products, on the meanings of the headings that appear in them, or on the regulations that dictate the content and structure of those

---

[6] Indeed, none of Dr. Marmureanu's reports rely on his use of filters or treatment of patients with filters as the basis of any opinion. His experience with filters is sufficiently minimal that it did not even warrant mention in any of his four reports.

IFUs (which are reviewed by the FDA). *See* Ex. O, Food and Drug Administration, Guidance for Cardiovascular Intravascular Filter 510(k) Submissions, Nov. 26, 1999; Marm. Dep. at 103:8-23, 104:12-18. The only qualification he claims is his employment as a "practicing physician" and a "regular doctor," which he says qualifies him to read product instructions and warnings. *Id*. at 103:19-23. But he has no recent practical experience in reviewing or applying the instructions or warnings applicable to any IVC filter. *Id*. at 205:11-16 (stating that the last time he placed a filter was "many years back"). Moreover, he has no clear memory of reviewing any filter IFU, and he did not review or rely upon any other filter's instructions or warnings in reaching his opinions regarding the sufficiency of Cook's instructions and warnings. *See* Marm. Dep. at 191:9-17; Reliance List, *passim* (omitting instructions or warnings for products other than Tulip and Celect).

Despite this lack of qualification, Dr. Marmureanu asserts that he is not only an expert on filter warnings, ***he is more qualified than anyone else on the planet***:

> Knowingly what the filters do and they don't do, and based on my practice and based on the data, I think that I'm ***the most qualified physician in the world right now to have an opinion about Celect and Tulip*** based on me reviewing over 300 cases.

Marm. Dep. at 172:20-24 (emphasis added).

Dr. Marmureanu's hubris is misplaced. His mere licensure as a physician and his uneducated review of cherry-picked Cook company documents do not qualify him to opine on the instructions and warnings for filters. *See, e.g., Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 931 (S.D. Ind. 2014) (holding expert unqualified to opine that chlorine gas caused asthma where plaintiff offered no evidence "that would give [expert] superior knowledge on the effects of chlorine gas exposure on the human pulmonary system" or that showed she "ha[d] previous experience treating patients who have been exposed to chlorine gas"); *Hall v. Flannery*, 840 F.3d

922, 930 (7th Cir. 2016) (holding expert physician possessing knowledge about surgery, pediatrics, and neurology nevertheless lacked specialized knowledge of cardiology and was not qualified to opine about heart-related issues); *Cunningham v. Masterwear, Inc.*, 2007 WL 1164832, *9 (S.D. Ind. 2007) (holding doctor's experience in diagnosing and treating asthma did not qualify doctor to opine whether plaintiff's asthma was attributable to PCE exposure).

## IV.   Dr. Marmureanu's Proposed Expert Testimony in his General Report is Not Based on a Reliable Methodology

Even assuming for the sake of argument that Dr. Marmureanu were qualified, *Daubert* nevertheless requires exclusion of those opinions because Dr. Marmureanu did not employ a reliable methodology—or, often, any methodology at all.  "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and reliable and relevant under the test set forth by the Supreme Court in *Daubert*."  *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

In analyzing an expert's methodology, the Court considers whether the evidence is genuinely scientific, as opposed to being unscientific speculation offered by a genuine scientist. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).  An expert's work will be admitted only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data. *Lang v. Kohl's Food Stores, Inc.*, 217 F. 3d 919, 924 (7th Cir. 2000); *People's State Bank v. Stifel, Nicolaus, & Co.*, 2013 WL 1024917, at *4 (S.D. Ind. May 14, 2013).

When analyzing expert reports, courts should consider (1) whether theories or techniques can and have been tested, (2) whether the methodology as applied is generally accepted by the scientific community, (3) whether it has been the subject of publication and peer review, and (4) whether it has an acceptable known or potential error rate.  *Navarro v. Fuji Heavy Indus., Ltd.*, 925 F. Supp. 1323, 1328 (N.D. Ill. 1996), *aff'd*, 117 F.3d 1027 (7th Cir. 1997) (quoting *Daubert*

*v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1316 (9th Cir. 1995)).  The focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert,* 509 U.S. at 595.  Personal observation without any personal study or experiment is not a substitute for scientific methodology and does not satisfy the *Daubert* standard.  *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002).

    **A.**    **Dr. Marmureanu failed to employ a reliable methodology in evaluating the design of the Celect and Tulip IVC filters.**

Although Dr. Marmureanu's general report includes no opinions regarding design, his *Hill* and Gage reports vaguely note strut radial force and stiffness, without explanation or identification of any reliable basis.[7]  Marm. Hill Rpt. at 12; Marm. Gage Rpt. at 4.  However, Dr. Marmureanu's "methodology"—if any exists—featured none of the normal indicia of an expert opinion on design:

- He did no independent research into the designs for, or use of, the Celect and Tulip filters.  *See, e.g.,* Marm. Dep. at 154:25-155:15.

- He examined no Celect, Tulip, or any other filter.  Marm. Dep. at 428:1-6; Marm. Rpt., *passim* (no mention of examining filters).

- He reviewed no complaint reports for any other filter or treatment alternatives to the Celect and Tulip filters.  Marm. Dep. at 173:25-174:12.

- He conducted no testing on Celect, Tulip, or any other filters.  Marm. Rpt., *passim* (no mention of testing); Marm. Dep. at 486:24-487:4.

- He performed no metallurgical analysis of any filters.  Marm. Rpt. *passim*; Marm. Dep. at 98:20-21.

- He measured no dimensions or angles, analyzed no forces, and performed no calculations concerning IVC filters.  Marm. Rpt. *passim*.

---

[7] He testified:  "I think it's due to a poorly designed filter and probably material, or definitely the material that's being used in this filter, which according to my study, seems to be stronger and stiffer than anything else is creating more of a radial force than . . . Than the other filters on the market."  Marm. Dep. at 345:1-24.  But he admits that he does not know and has never quantified the radial force or stiffness he criticizes.  *Id.* at 547:16-549:12.

- He made no comparisons between the designs of the Cook filters and the designs of other manufacturers' filters.  Marm. Dep. at 182:22-183:2.

- He did not research (and does not know) the rates of any complications he allegedly associates with the Tulip or Celect designs or the rates of any complications with any IVC filter.  Marm. Dep. at 234:3-237:18.

In short, he did none of the things that one would reasonably expect an expert to do to form a scientifically defensible opinion.  Moreover, Dr. Marmureanu expressly disavowed knowledge of any filter with a lower or better complication rate than the Tulip and Celect—which Cook's epidemiology expert, Jonathan Fryzek, Ph.D. MPH, calculates as *less than one percent*.  Marm. Dep. at 234:3-237:18; Ex. P, Deposition of Jon P. Fryzek, July 12, 2017, at 11-12; Ex. Q, Report of Jon P. Fryzek, MPH, Ph.D. (Exhibit 1 to Fryzek Dep.) ("Fryzek Rpt."), at 24.

When pushed at deposition for a basis for his design opinions, Dr. Marmureanu stated that his "methodology" consisted of reviewing four things: ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████     Marm. Dep. at 345:15-23.  He further noted:

Q.     … What methodology did you use to determine whether the design of Cook's filters caused the complications that are listed in your report?

A.     I didn't use -- well, the methodology was -- was reading the data, ██████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ PR records, as well as other experts' reports, which they refer to this issue, as well as other literature which refers to this issue.

Marm. Dep. at 325:23-326:9.   Dr. Marmureanu later downplayed even this narrow litigation-focused methodology by saying he just agrees with positions that he (erroneously) believes Cook already reached:

> *So it's not about methodology.* It's about agreeing with Cook that Celect has a problem and agreeing with the literature data and agreeing with the implant positions which they say Cook has a tendency to perforate -- I'm sorry, the Celect which is made by Cook.

*Id*. at 327:9-14 (emphasis added).

Dr. Marmureanu's review of the four categories of documents he describes does not constitute a sound methodology for arriving at an opinion about filter design.  Each source is flawed individually, and even taken together they do not define a defensible scientific method.

1.      **Complaint files.**  Dr. Marmureanu spent 70-80 percent of his time reviewing ███



████████████████████  Marm. Dep. at 153:8, 156:6; 398:3-14; Ex. D, "Analysis," p.1.  He does not reference his Analysis as a basis for any opinion in his reports.  *See* Marm. Reports, *passim.*  But at deposition, Dr. Marmureanu asserted *for the first time* that the ████████  form the basis of myriad opinions.  *See, e.g.*, 325:23-326:9.  ████████████

████████████████████████████

████████████  Dr. Marmureanu's reliance on his review of these files presents several problems.

First, Dr. Marmureanu did not review *all* Cook complaint files relating to IVC filters, nor did he personally select or define the selection criteria for the files that he did review.[8]  In fact, Dr. Marmureanu reviewed only a small portion of the total of files Cook produced to Plaintiffs, and he reviewed only the files selected by Plaintiffs' attorneys.  In his general report, he relies on

---

[8] ████████████████████████

████████████████████████  He has no knowledge of whether the complaints were reported to FDA, but that assumption undoubtedly impacted his opinions.

even fewer files to support his opinions.[9] ██████████████████████████████

██████████████████████████████ *See* Marm. Dep. at 464:5-11,

444:17-20, 445:7-25.  He did not know the total number of files, and he did not ask for any more

information related to them.  Marm. Dep. at 464:12-24.  Perhaps predictably, Plaintiffs' attorneys

did ***not*** provide to Dr. Marmureanu files that address issues wholly unrelated to product design,

████████████████████████████████████████████████████

██████████████████████████████████████ Marm. Dep. at

397:18-23.  Even if one accepted Dr. Marmureanu's assertion for the first time by deposition that

all of the files he reviewed include design problems (and they do not), ████████████████

█████████████████████████████████████████████████████

█████████████████

        Second, Dr. Marmureanu reviewed the files in a vacuum with absolutely no context.  He

had no information regarding the total number of Celect and Tulip filters sold or implanted in

patients, and thus had no denominator for the files he considered.  He logically needed such

information to determine how frequently the events he believes to be "injuries" actually "resulted

from the use of the IVC filter."  Analysis, p. 1. █████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████ Ignoring this key denominator, Dr. Marmureanu's flawed

---

[9] His Report at 3-36 reveals that he relied on an even smaller group for his opinions: █████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████

methodology deprived him of available data that would give context to his review, ███████ ████████████████████████████████████████████████████████████████████ He likewise considered the files without knowing or researching the average or acceptable rates for any IVC filter complications, including the Tulip and Celect, opining conclusory that any complaint rate above zero—an impossibility—is unacceptable.  Marm. Dep. at 374:11-375:1.

A reliable scientific methodology requires consideration of more than just a subset of documents in isolation picked by counsel; it requires consideration of the totality of the scientific evidence.  Moreover, an expert methodology that relies on one party's attorneys to define the universe of data considered is not a reliable methodology.  *See State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1048-49 (N.D. Ind. 2013); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) (expert testimony excluded where expert failed to independently verify the reliability of the data provided by counsel); *Crowley v. Chait*, 322 F. Supp. 2d 530, 547 (D.N.J. 2004) ("to allow [expert] to offer testimony to a jury as to conclusions he has reached on the basis of this highly filtered version of events, is unacceptable.").

Third, although Dr. Marmureanu acknowledges that the complaint files he reviewed ███ █████████████████████████████████████ he nevertheless asserts that he performed a differential diagnosis for each complaint file and concluded that "the injuries described in the complaints resulted from the use of the IVC filter."  Analysis, p. 1; Marm. Dep. at 473:13-17.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████   ████████████████████

████████████████████████████████████████████

██████████████ a doctor can neither "rule in" nor "rule out" other possible causes of the complications that affect any particular patient, as required for a "differential diagnosis."  *See Myers*, 629 F.3d at 644. ████████████████████████████

████████████████████████████ Dr. Marmureanu's lack of medical records fundamentally undercuts the methodology he says he employed.  *See Brown v. Burlington Northern Santa Fe Ry.*, 765 F.3d 765, 773 (7th Cir. 2014) ("an expert must do more than just state that she is applying a respected methodology; she must follow through with it").  Even if he attempted to perform a differential diagnosis as to each of the files as he claims**,** he lacked critical information to do so, and his report is utterly devoid of any explanation or basis for that attempted methodology.  *In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 218 F. Supp. 3d 700, 714 (N.D. Ill. 2016) (excluding testimony where expert report "provides almost no explanation of how the sources he reviewed support his conclusions").

Fourth, although Dr. Marmureanu says his methodology consists of "agreeing with" comments contained in the files, Marm. Dep. at 327:9-14, he in fact knows nothing about whom or what he is agreeing with. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ Absent such knowledge, Dr. Marmureanu had no sound method for coming to his alleged "agreement" with the files.  An expert may not simply

repeat and agree with the comments of laypeople. *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014) ("An expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful."). 

Dr. Marmureanu's unreliable methodology offers no basis for his extrapolation from his analysis of cherry-picked complaint files to his blanket condemnation of the hundreds of thousands of IVC filters manufactured by Cook and other companies.

He simply assumes without any identified basis that if complaint files *existed*, then all IVC filters—

[12] *See, e.g.,* Ex. O, Food and Drug Administration, Guidance for Cardiovascular Intravascular Filter 510(k) Submissions, p. 7 Nov. 26, 1999 ("Minor filter migration . . . does not appear to be associated with clinically significant events"); p. 8 ("The significance of tilting and angulation of caval filter after placement is controversial . . . there is no good clinical data to support a definite increased incidence in PE or failure to trap thrombi."); Marm. Rpt. at 24 (noting perforation is often undiagnosed and discovered incidentally); Ex. M, Zuzga Dep. at 121:21-122:2 (stating that tilted filters are still safe and effective);

both Cook's and other manufacturers'—must be bad.  As such, his opinions based on the

complaint files and any discussion of the files should be excluded. [13]

2.    **Cook internal documents.**  Dr. Marmureanu's second identified step in his

methodology was to review a set of internal Cook documents picked by Plaintiffs' counsel.  *See*

Marm. Dep. at 321:15-23; Marm. Rpt. ████████████████████████████████

███████.  He had never before reviewed any company's internal documents, had no knowledge of

the sender/recipient or context, and did not identify receiving company documents as a

medically-recognized step in performing a differential diagnosis.  Again, this methodology has

several inherent flaws.

First, Dr. Marmureanu's review of internal company documents as part of his

methodology was dictated by Plaintiffs' attorneys, not by any scientific or medical protocol,

Marm. Dep. at 321:3-9, 15-23, a methodology far different than the methodology that Dr.

Marmureanu uses when he actually treats patients, Marm. Dep. at 726:6-10.  ([Q] "[W]hen

you're treating patients in your regular practice, is there ever a time that -- that you look at

internal emails, internal memorandum, as part of your treatment of a patient?  [A]  No.").  Such a

methodology, wholly divorced from the ordinary tools of the medical profession, is not a reliable

methodology under *Daubert*:  "[E]xperts' work is admissible only to the extent it…uses the

methods of the discipline."  *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

Second, as with the Cook complaint files, Dr. Marmureanu reviewed only the Cook

internal documents that Plaintiffs' attorneys selected for his review.  *See* Marm. Dep. at 321:15-

_____

[13] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

23.  This subset of the documents Cook produced notably omitted internal documents favorable to Cook that contradict or undercut the inferences that Dr. Marmureanu tries to draw. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

Even if materials presented to an expert are balanced, a methodology that relies primarily on what an expert learns about the subject in the course of litigation is suspect.  *Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995); Advisory Committee Note to the 2000 Amendments to Rule 702.

**3.   Other experts' reports.**  Dr. Marmureanu testified that he also relied on the reports of Plaintiffs' other experts in this litigation.  Marm. Dep. at 325:23-326:9; 365:6-8. Again, this assertion presents several problems.  First, his report identifies no other specific expert report or portion of a report on which he relies, and he could not identify during his deposition.  Marm. Dep. at 326:25-327:2; 327:20.

Second, Dr. Marmureanu's other testimony undercuts any possibility that he relied on the reports of other Plaintiffs' experts.  He testified that he had no substantive conversations with the other experts.  Marm. Dep. at 24:4-25:4; 739:5-9.  He did not review any of their draft reports, and did not provide his draft report to any of them.  *Id.* at 25:4-10; 423:25-424:14.

Third, and in apparent contradiction of the denials described in the previous paragraph, massive sections of Dr. Marmureanu's report on Plaintiff Hill are *word-for-word copies* of the Hill report prepared by Dr. Rajebi, another of Plaintiffs' experts.  *See* Ex. T, a comparison of Marmureanu Report on Hill (Mar. 17, 2017) with Rajebi Report on Hill, Addendum A (Mar. 17, 2017).  When asked about this identical language at his deposition, Dr. Marmureanu professed ignorance and could offer no explanation for the virtually verbatim reports:

> Q   **When you read Dr. Rajebi's report in the Hill case, did you notice that it's nearly word for word identical to your report?**
> A   **I didn't notice. It could be. I mean, I'm not sure why it would be. I don't know. There is no way to explain it.**
> Q   Did you provide your report to him or him to you in advance of signing it?
> A   I did not provide my report to him, nor -- I've never -- actually, I think when I looked at his report, my report was already written.
> *****
> Q   **Is there any basis that you know of why your description and opinions in Mrs. Hill's case, as written in your report, would be nearly identical to Dr. Rajebi's?**
> A   **I have no idea.**

Marm. Dep. at 483:8-484:18 (emphasis added).  *Daubert* does not permit one expert to serve as a mere mouthpiece for another.  *See, e.g.*, *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,  285 F.3d 609, 614 (7th Cir. 2002).

    **4.**    **Medical literature.**  During his deposition, Dr. Marmureanu made clear his view that medical literature was not helpful in reaching his opinions in the case and was not a central part of his methodology.  He repeatedly said the literature is "not that great" and that, in his opinion, "it would be very difficult to render an opinion only based on what's written [in] the literature."  Marm. Dep. at 14:6-9.  He bemoaned the poor quality of the available medical literature multiple times during his deposition.  *See, e.g.*, *id.* at 17:9-19:5.  Nevertheless, he allegedly relied on his review of a handful of that unreliable medical literature as part of his methodology.  *See id.* at 325:23-326:9, Marm. Rpt. at 3-36 (citing six studies for Celect

complications and thirteen for Tulip).  Dr. Marmureanu does not reconcile his lack of faith in the medical literature with his alleged reliance on it.

Again, Dr. Marmureanu's methodology—*i.e.*, noting that the literature he reviewed is not of good quality, but citing his review of it as a basis for his methodology—is not scientifically reliable.  Indeed, when asked whether he would apply the same "evidence-based" approach to his opinions here that he uses in his medical practice, he was skeptical that he could do so:

> So when you bring up only factual-evidence evidence based, I can tell you this will be quite difficult to do in this litigation just because the -- I review hundreds of medical literature articles, the evidence is not that great.
> So it would be very difficult to render an opinion only based on what's written the literature.

Marm. Dep. at 14:3-9.

Moreover, when asked at his deposition to identify what medical literature supported a particular opinion he offered, Dr. Marmureanu was nearly always unable to identify any such literature and simply assured the questioner that the article was among those identified in his report.  *See* Marm. Dep. at 168:6-169:8 (unable to recall any study that shows a reduction in mortality with filters); 240:2-241:2 (unable to recall what literature suggests Celect and Tulip filters more frequently require complex retrieval procedures); 324:16-325:2 (when asked to back up his claim of support in the literature, he stated "I wrote this report months ago.  I don't remember every piece of literature and every word."); 366:12-23 (responding to a question about whether he researched the frequency of his off-the-cuff assertion that "disease" and "strong hugs" can cause an IVC filter to perforate, he stated "I use common sense."); 527:23-25 ("Q: What literature or testing supports that opinion [that perforation of a duodenum can lead to sepsis]? A: It's – it's the medical judgment."); 536:24-537:4 ("Q: As you sit here today, are you able to identify any study, test or literature that supports that opinion [that perforation of the

duodenum can cause chronic inflammation]? A: No. It's based on the general research, literature research as well as Cook research that I've done.").

Further undercutting his methodology, Dr. Marmureanu testified that the medical literature offers no consensus on the meaning of critical terms, including perforation and penetration, and that different medical articles therefore use those terms to mean different things. *See* Marm. Dep. at 453:9-25; 304:20-305:2.  He admits that his reliance on the medical literature fails to account for those differences.  For example, Dr. Marmureanu cites Durack[14]  for the proposition that all filters "perforate," *id.* at 442:10-12, without ever considering what the author means by "perforate," and with no consideration to those authors' conclusions that perforation was asymptomatic in 100% of patients in the study.

Dr. Marmureanu arbitrarily classifies the few studies that he can read to support portions of his opinions—primarily PREPIC 1 and PREPIC 2—as "good articles" or "great studies." Marm. Dep. at 21:18-22, 19:6-11.  ***But neither of those studies included the Tulip or Celect***, and his report identifies no basis to reach any conclusion about the Tulip or Celect based on those studies.[15]  Just as arbitrarily, Dr. Marmureanu is "not happy" with the larger body of medical literature that supports the safety and efficacy of filters, and he dismisses them as "of limited value."  *Id.* at 17:9-19:5.  However, he has no methodology or criteria for crediting some articles and not others, and neither his report nor his deposition testimony cites any study on the

---

[14] Durack, et al., Perforation of the IVC Rule Rather than Exception After Longer Indwelling Time for the Gunther Tulip and Celect Retrievable Filters,35(2) Cardiovasc. Intervent. Radiol. 299-308 (2012).

[15] Decousus H, et al., A Clinical Trial of Vena Cava Filters in the Prevention of Pulmonary Embolism in Patients with Proximal Deep-Vein Thrombosis.  N. Engl J Med. 1998. 338, 409-416 (PREPIC 1); Mismetti P, et al., Effect of a Retrievable Inferior Vena Cava Filter Plus Anticoagulation vs. Anticoagulation Alone on Risk of Recurrent Pulmonary Embolism: A Randomized Clinical Trial. JAMA. 2015; 313(16):1627-1635 (PREPIC 2).

ability of the Celect or Tulip to catch blood clots or on rates of pulmonary embolism with those filters.

In many instances Dr. Marmureanu simply recites what he recalls or believes certain medical articles say; he does no independent analysis of his own. *See* Marm. Dep. at 181:22-25 ("So ***I don't have a clear opinion*** other than quoting you the PREPIC study which says that they reduce the early PEs by their own effective mortality, which is what interests me.") (emphasis added). As noted above, Dr. Marmureanu may not of course simply quote the opinions of others and present it as his own expert testimony. *See, e.g., Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002).

**5.   "Experience, training, and education."** Finally, when all else fails, Dr. Marmureanu repeatedly recites his experience, education, and training as the basis for his opinions. Indeed, he retreated to this position at least 18 times during his deposition, often as the only support for an opinion, using it as a catchall to cover any opinion he asserted. For example:

> So it would be very difficult to render an opinion only based on what's written the literature. So I will have to refer, which I actually did, to, again, to my education, practice, experience, and the data, and I hope this answers your question.

Marm. Dep at 14:8-12. *See also id.*. at 168:2-4; 170:13-24. In relying so heavily on his "experience, education, and training," Dr. Marmureanu avoided doing any investigation or research that might have challenged his existing views. Given his limited and remote experience with IVC placement and his total lack of any expertise in advanced retrieval techniques, his reliance on his "experience, training, and education" is misplaced.

Courts applying *Daubert* have routinely recognized that an expert's mere assertion that a fact is so based on the expert's training and experience, without any accepted or objective supporting data, is not sufficient under *Daubert* and Rule 702. *See, e.g., Chapman v. Maytag*

*Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) ("Personal observation is not a substitute for scientific

methodology and is insufficient to satisfy *Daubert's* most significant guidepost."); *Clark v.*

*Takata Corp.*, 192 F.3d 750, 758-759 (7th Cir. 1999) (expert opinion testimony excluded where

the opinion was based solely on that expert's "experience"); *Bowersock v. Davol, Inc.*, 2017 WL

711849, *8 (S.D. Ind. Feb. 23, 2017 (experts alluding to prior patient experiences to support

causation theory help unreliable under Rule 702).  Indeed, Dr. Marmureanu's report fails even to

mention his experience placing and retrieving filters as the basis for any opinion.  Marm. Rpts.,

*passim*.  "[N]o physician may testify to his or her opinion based solely on the expert's say so and

a medical degree."  *Cunningham v. Masterwear, Inc.*, 2007 WL 1164832, *10 (S.D. Ind. 2007).

This is exactly the case with Dr. Marmureanu.  He points to his "experience," but cannot

substantiate that experience with any details much less provide support for his claim that his

"experience" informs him in any reliable way.[16]

Combining the disparate elements of Dr. Marmureanu's "methodology" likewise does

not meet the threshold for the admission of expert testimony.  The methodology does not meet

any of the four basic *Daubert* factors:

1.     Dr. Marmureanu's methodology has not and cannot be tested, because it is not
        consistent and relies primarily on his personal interpretation of Cook complaint
        files and internal documents selected by Plaintiffs' attorneys and on his personal
        education, practice, and experience that—at best—is dated and limited.

2.     Dr. Marmureanu's methodology and opinions are not generally accepted by the
        scientific community.  Indeed he is not a member of the relevant scientific
        community.  He has not presented any of his methodology to that community for
        consideration and when asked if he would be willing to present his work and
        testimony to his peers, he responded:  "I'm not sure."  Marm. Dep. at 120:9-
        121:11.

---

[16] Marm. Dep. at 252:15-253:9 (asked if the filters he placed provided benefits to his patients:  "I
don't recall.  I don't put filters in for years . . ."); 255:3-18 (when asked about when he was last
credentialed to place a filter:  "I don't have because I didn't do it in years . . .").

3.      Dr. Marmureanu's methodology and opinions have not been the subject of publication or peer review.  On the contrary, Dr. Marmureanu admitted that he was not sure he would be comfortable submitting his reports or his testimony in this litigation to independent peer review.  Marm. Dep. at 120:12-19.

4.      Dr. Marmureanu's methodology has no acceptable known or potential error rate. His methodology is so riddled with inconsistencies and incomplete information that the error rate is most certainly high.  They are simply his subjective opinions; he applies no objective standards and produces no reproducible or verifiable results.  *See Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765 (7th Cir. 2014) (affirming exclusion of expert testimony, noting:  "Comparing two unknown, potentially wide-ranging variables is not a scientific exercise. There is no known error rate attached to such a calculation, nor is such guesswork widely accepted in the scientific community.") (citing *Daubert*).

Dr. Marmureanu's methodology thus fails all four of the basic *Daubert* factors.  *See Daubert*, 509 U.S. at 593-4.

This lack of a reliable methodology is not surprising to Dr. Marmureanu: "it's not about methodology."  Marm. Dep. at 327:9.  Dr. Marmureanu did not apply scientific principles to address medical question; in fact, he was not even asked a specific question.  *Id.* at 321:15.  As Dr. Marmureanu put it, ███████████████████████████

████████████████████████████████████████████████████████

"Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang*, 217 F.3d at 924.

**B.      Dr. Marmureanu failed to employ a reliable methodology in evaluating the instructions and warnings for the Celect and Tulip IVC filters.**

The failings of Dr. Marmureanu's methodology discussed above with respect to the issue of design likewise undercut his opinions concerning product warnings.  Notably, Dr. Marmureanu's discussion of warnings does not include a causal link between his observed complications and filter design, nor does it include the opinion that had any specific warning been used, it would have changed physician prescribing decisions.

As with his design methodology, Dr. Marmureanu did none of the things that one would reasonably expect an expert to do to form a scientifically defensible opinion about the adequacy of a medical device's warnings.  For example:

- He did not review instructions for use for any IVC filters other than Celect and Tulip, Marm. Dep. at 191:9-13.  Ex. N, Reliance List, *passim* (listing only Tulip and Celect IFU;

- He did not identify any specific language that he alleges Cook should have included, *id.* at 470:24-471:4;

- He did not identify any specific location in the IFU he would recommend for any additional warning, *id.* at 471:5-8;

- He did not identify any specific size, color, or font he would recommend for any additional warning, *id.* at 471:9-12;

- He did nothing to compare or balance the likelihood of the occurrence or significance of a particular complication that might occur *with* a filter against the actual risks of PE or other complications that might occur if a filter is *not* used. For example, he did nothing to account for how often the complications on which he focuses occur, how often they are symptomatic, or how often they require medical intervention, such that an additional warning should have been included;[17]

- He did nothing to investigate the degree to which physicians in the relevant medical community were already aware of these possible complications from IVC filters and of their relative frequency and severity, though he fully admits physicians were well aware of those risks at the time of the Hill and Gage procedures and today, *id.* at 264:19-266:11;

- He did not identify any other manufacturer who provided warnings about any of the complications that he says Cook should have warned about, *id.* at 471:25-472:4;

- He did nothing to determine how physicians in the relevant medical community would interpret Cook's existing warnings, or whether they might interpret existing warnings (*e.g.*, "acute damage to the inferior vena cava," "extravasation

---

[redacted]

of contrast material at time of vena cavogram," "hemorrhage," "thrombosis or stenosis at implant site," and "filter embolization")—as the implanting physicians in these cases and Cook's experts agree—as including the alleged complications to which he points.  Zuzga Dep. at 113:8-12; 114:1-8; 118:24-119:7; 119:17-120:6; 120:12-21; 121:7-14; 122:15-21; 123:13-21; Ex. F, Venbrux Rpt. at 13; Ex. J, Gasparis Rpt. at 16-17.

Dr. Marmureanu's methodology for warnings included no attempt to gather the information that would logically inform an opinion concerning whether a warning was adequate; what any different warning should be; and whether it would change the outcome of Mrs. Hill or Mr. Gage.

The undisputed facts also demonstrate that Dr. Marmureanu's attempt to perform the core task of his methodology for opining on the Cook IFUs—the actual reading of what the Cook IFUs said—was at best sloppy.  Dr. Marmureanu confirmed that reviewing the Cook IFUs was the threshold element of his methodology on the warnings issue:

> Q      So my question is: If your report says that Cook did not warn of a particular complication, you've reviewed the IFU --
> A      Yes.
> Q      -- and there is no such warning, fair?
> A      That's correct, yes.

Marm. Dep. at 470:16-21.  Presumably applying this methodology, Dr. Marmureanu opined:

> Though perforation of the vena cava by the Cook Celect ("Celect") IVC filter is a common occurrence that can lead to serious injury and death, **the Cook Celect Vena Cava Filter Set instructions for use (IFU) do not warn of the complication**.

Marm. Rpt. at 24 & n.87 (emphasis added) (citing "Cook:MDL2570 0098039 (2008 Celect IFU)").

In fact, Dr. Marmureanu's statement is plainly wrong.  *See* Ex. L, Celect IFU at 5.  The IFU for the Celect warns of the exact complication Mrs. Hill experienced, contrary to Dr. Marmureanu's claims.[18]

--------

[18] In another example, he alleges the Tulip IFU does not warn of the risk of thrombosis or occlusion when it states:  "Thrombosis or stenosis at implant site."  Ex. K, Tulip IFU at 5.  He

**POTENTIAL ADVERSE EVENTS**
- Damage to the vena cava
- Pulmonary embolism
- Filter embolization
- Vena cava perforation
- Vena cava occlusion or thrombosis
- Hemorrhage
- Hematoma at vascular access site
- Infection at vascular access site
- Death

Celect IFU at 5.  Likewise, both IFUs warn of "damage to the vena cava," which inherently

includes perforation, and which Dr. Marmureanu wholly ignores.  Zuzga Dep. at 142:6-9

(agreeing damage to IVC includes perforation); *see also* Venbrux Rpt. at 14; Gasparis Rpt. at 17.

Dr. Marmureanu's false statement is not a minor blunder.  It demonstrates that his

execution of his claimed methodology is fundamentally unreliable:  he cannot even correctly

read the instructions he is criticizing.  Perforation is the **central** issue in these cases because it is

the complication that Plaintiffs Hill and Gage claim happened to them and caused them damages.

Dr. Marmureanu's conclusion that the Celect label contains no warning about perforation

demonstrates an appalling lack of care in carrying out his claimed methodology and undercuts

the fundamental premise of his entire opinion concerning product warnings.

**V.      Dr. Marmureanu Failed to Employ a Reliable Methodology in Evaluating Whether
         the Celect IVC Filter Caused any Injury to Plaintiff Hill**

Moving from the general to the specific, the methodology Dr. Marmureanu used to reach

his case-specific opinions concerning Plaintiff Hill is also unreliable.

---

offers no opinions on why Cook's warnings of *acute damage to the inferior vena cava,
extravasation of contrast material at time of vena cavagram, hemorrhage, thrombosis or stenosis
at implant site, and death* in the Tulip IFU, and *damage to the vena cava, filter embolization,
vena cava perforation, vena cava occlusion or thrombosis, hemorrhage and death* in the Celect
IFU did not sufficiently warn doctors in the relevant medical community of the risks he
identified.  One explanation, of course, is that he simply does not know, because he has never
been a member of the relevant medical community who regularly reviews the IFUs for filters.

In his case-specific report for *Hill*, Dr. Marmureanu opines that Mrs. Hill's filter, a Celect, (1) progressively perforated into the IVC and duodenum, tilted, and became embedded; (2) the perforation and embedment caused stenosis, gastrointestinal pain and dysfunction, problematic lower extremity edema from venous insufficiency, and depression/anxiety; and (3) Mrs. Hill will require, as a result of complications with her IVC filter, the following treatment:

   a.   lifetime anticoagulation and a proton pump inhibitor (PPI);
   b.   monitoring and medical surveillance for life, including annual visits to a vascular specialist;
   c.   psychological counseling;
   d.   compression hosiery; and
   e.   lymphedema therapy.

Marm. Hill. Rpt. at 12-16.  He opines that her filter was "medically unnecessary," but does not fault her physician for his choice to place the "medically unnecessary" filter.  *Id.* at 14-17.

Though his report is silent as to any methodology, Dr. Marmureanu suggested during his deposition that he applied a differential diagnosis, sometimes called differential etiology, to reach his *Hill*-specific causation opinions, which he confirmed is defined as follows:

   Etiology is the study of causation and in a differential etiology, the doctor rules on all the potential causes of a patient's ailments, and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment.

Marm. Dep. at 342:15-24 (quoting *Myers*, 629 F.3d at 644).  *See also id.* at 334:30-335:11.  But his testimony reveals otherwise.  Specifically, he neither ruled in nor ruled out all potential causes for (1) Mrs. Hill's IVC filter malpositioning and perforation, (2) her alleged symptoms from those events, or (3) her alleged permanent or future injuries.  Instead, for each, he reflexively points to the design of the Celect alone, failing even to use a systematic analysis to evaluate whether the design should be ruled in or out.

The cornerstone of a differential diagnosis is the physician's systematic consideration of all possible causes of an ailment based on scientific evidence. An effective differential diagnosis "must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out,'" *Ervin*, 492 F.3d at 904, and must explain why each cause was ruled in and then ruled out. *See Higgins*, 794 F.3d at 705 (upholding exclusion of expert opinions where report failed to identify whether other potential causes were considered and, if so, how and why they were ruled out); *Brown*, 765 F.3d at 744 (failure to meaningfully consider and rule out potential alternative causes in conducting differential etiology is "fatal to [the expert's] testimony"); *Ervin v. Johnson & Johnson, Inc*., 2006 WL 1529582, at *6 (S.D. Ind. May 30, 2006) (flaw in ruling in a cause and ruling out another cause were critical in rendering differential diagnosis unreliable), *aff'd* 492 F.3d 901 (7th Cir. 2007). An expert may not simply assert that all potential causes were considered, but must articulate the systematic and consistent scientific basis for doing so. *In re Zimmer NexGen*, 218 F. Supp. 3d at 721 (N.D. Ill. 2016) (noting that experts' failure to articulate in his report the potential causes ruled in and scientific basis for exclusion was fatal because the expert "does not even explain to the Court what his reasoning is, how the sources he reviewed inform his conclusion, or why he applies the method that he does. These problems render the etiology unreliable…"). Conclusions alone, without the explanations or support for those conclusions, are inadmissible. *Wendler v. Ezra, P.C. v. Am. Intl. Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008)("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.") (*quoting Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)). "'An expert applying a differential etiology must do more than just state that she is applying a respected methodology; she must follow through with it." *In re*

*Zimmer NexGen Knee Implant Prod. Liab. Litig.*, 218 F. Supp. 3d at 713 (internal quotes and punctuation omitted).

### A.   Dr. Marmureanu did not perform a reliable differential diagnosis to identify all possible causes of Mrs. Hill's malpositioned[19] filter and perforation.

Dr. Marmureanu's report states that Ms. Hill's filter design had a tendency to perforate the IVC and progressively perforate leading to tilt.  Marm. Hill Rpt. at 1.  When asked what potential causes for her perforation he "ruled in to reach this opinion," Dr. Marmureanu summarily responded:  "**I don't need to do a differential diagnosis** because I see the perforated filter on the endoscopy pictures provided to me.  So I know that filter perforated."  Marm. Dep. at 336:8-337:11.  He later claimed to have looked for other metallic sources of perforation but never considered what other things—aside from filter design—could have caused Mrs. Hill's filter to become malpositioned and perforate:

> [Q]   Did you perform a differential diagnosis to determine the cause of Mrs. Hill's perforation, specifically what made her strut perforate her vena cava?
>
> A.    The presence of the filter. I couldn't find -- yes, I looked again for another -- other sources of materials. There were no gunshot wounds, no swords, no knives, no sharp objects, no bullet wounds, no -- any other shrapnel or any other needles around.  So my only conclusion was that that strut, based on the medical records I reviewed, based on what the doctors are saying, based on what the CT reading are saying, it's probably a strut from that IVC filter, or more likely than not, actually definitely.

Marm. Dep. at 337:14-338:4.  Dr. Marmureanu confirmed that, despite the requirements of a true differential diagnosis, he had not even considered other possible causes for the filter strut movement through the caval wall and duodenum:

> Q.    In Mrs. Hill's case, were there any other causes of perforation of the vena cava filter through the caval wall or the duodenum, are there any other causes of that perforation that you considered?

---

[19] For the purpose of this section, when Cook uses the term "malposition," or one of its cognates, Cook intends the term to include Plaintiffs' contention that the filter was tilted upon insertion or became tilted sometime thereafter.

A.      No.  I think it's due to a poorly designed filter and probably material, or definitely the material that's being used in this filter, which according to my study, seems to be stronger and stiffer than anything else in creating more of a radial force …[t]han the other filters on the market.

Marm. Dep. at 345:1-13.

Plainly, Dr. Marmureanu did not know (and made no effort to determine) whether Mrs. Hill's perforation and filter positioning had other possible causes, when—in fact—Cook's expert witnesses, the medical literature, and the treating physicians in *Hill* and *Gage* have confirmed that there are multiple possible causes of filter malpositioning and perforation that are not unique to the Celect—none of which Dr. Marmureanu considered.

- Malpositioning of the filter on placement as a result of technical error.[20]

- Anatomic abnormalities resulting in a filter touching the caval wall or placing unusual forces on the cava.[21]

- Trauma to the abdomen.[22]

- Compromised vena cava tissues, caused by malnutrition, circulating inflammatory markers, malignancy; changes in caval shape; decrease in caval area leading to increase in force on the IVC wall.[23]

- Cumulative effect of prone positioning, abdominal compression and positive pressure ventilation during a spinal procedure.[24]

- Physiologic changes in the diameter of the vena cava.[25]

_____

[20] Marm. Dep. at 293:1-4; 447:3-8.  Gasparis Rpt. at 5; Venbrux Rpt. at 27; Zuzga Dep. at 122:3-21; Goodwin Dep. at 89:2-11.

[21] Venbrux Rpt. at 28-29; Gasparis Rpt. at 10; Zuzga Dep. at 122:3-21; Goodwin Dep. at 89:2-17.

[22] Marm. Dep. at 3501-353:7; Venbrux Rpt. at 28.

[23] Marm. Hill Rpt. at 12 (citing Dowell et al, Celect Inferior Vena Cava Wall Strut Perforation Begets Additional Strut Perforation, 26 J Vasc Interv Radiol 1510-1518 (2015); see also Goodwin  at 90:7-22 (compromised caval tissues); Venbrux Rpt. at 28; Zuzga Dep. at 122:11-14 (contraction of the vena cava); Marm. Dep. at 352:10-15 (compromised caval tissues).

[24] Venbrux Rpt. at 283-29; Zuzga Dep. at 122:3-21.

[25] Marm. Rpt. at 40, 44 (citing Jia, et al., Caval Penetration by Inferior Vena Cava Filters: A Systematic Literature Review of Clinical Significance and Management, Amer. Heart Assoc. Online Circulation 944-952 (2015) (available at http://circ.ahajournals.org) and Sag, et al.,

Dr. Marmureanu's report does not include any discussion or discernable basis for ruling in or out any possible cause—even the one Cook's experts believe caused Mrs. Hill's perforation—her anatomy and subsequent spine surgery.[26]  *See* Venbrux Rpt. at 27-29.  At best, he reviewed Mrs. Hill's medical records, identified the perforation, and attributed the perforation to the design—a far cry from the comprehensive "ruling in" and "ruling out" required by a differential diagnosis.[27]  Marm. Dep. at 458:11-15, 607:23-608:5.

Perhaps most troubling, however, is that Dr. Marmureanu ruled *in* the design of the Celect as the cause of Mrs. Hill's malpositioning and perforation without any systematic basis for doing so.  Dr. Marmureanu performed no test, study, or independent research regarding the Celect design.  He also ruled in filter design without knowing the tilt or perforation rate for the

---

Analysis of Tilt of the Günther Tulip Filter, 19 J Vasc Interv Radiol 669-676 (2008) ("it is possible that forces external to the IVC may affect filter angulation)).

[25] Marm. Rpt., at 46 (citing Laborda et al., Laparoscopic Demonstration of Vena Cava Wall Penetration by Inferior Vena Cava Filters in an Ovine Model, 22 J Vasc Interv Radiol 951-956 (2009)).

[26] Dr. Marmureanu did not identify by report or deposition—and made no effort to determine— how frequently filters become misplaced and perforate as a result of physician error, anatomic abnormalities, subsequent surgeries, caval structural changes, or the filter's design.  This is particularly important given that, by his own admission, Mrs. Hill's complication is very rare. Marm. Dep. at 234:3-237:18; 434:11-15; 437:15.

[27] When repeatedly pushed to identify causes for filter malpositioning that can cause IVC perforation, Dr. Marmureanu finally vaguely identified "weak IVC," "trauma with car accidents," "somebody hugging her really hard," and "just increasing though abdominal pressure." Marm. Dep. at 350:21-353:7.  When pushed to identify possible causes for Mr. Gage's claimed filter malpositioning (apex in the renal vein and struts allegedly through the cava wall), Dr. Marmureanu identified "foreign bodies," "bullets and swords," "trauma," "gunshot wounds," and "aggressive hugs to anything else."  Marm. Dep. at 354:10-356:6.  However, his report does not note these causes or any consideration of them, and he identified them only when repeatedly pressed during deposition.  Cook's experts have explained that Mrs. Hill's filter became malpositioned as a consequence of the extreme curvature of her spine and/or subsequent spinal surgery, which caused the filter to touch the canal wall, embed, and perforate when her spine and cava were straightened.  Venbrux Rpt. at 27, 29.  However, the point is not that Dr. Marmureanu's conclusion is wrong; it is that he considered no other possible cause than a defectively designed filter.

Celect or any other filter on the market.  Marm. Dep. at 234:3-237:18.  Because Dr. Marmureanu failed to systematically rule in or out all possible causes but one—Mrs. Hill's filter design—his opinions must be excluded.

> ### B.   Dr. Marmureanu did not perform a reliable differential diagnosis of Ms. Hill's symptoms or alleged injuries.

Dr. Marmureanu also failed to systematically rule in and rule out potential causes of Mrs. Hill's alleged injuries, including caval stenosis, gastrointestinal pain and dysfunction, lower extremity edema from venous insufficiency, and depression/anxiety.

> #### a.   IVC stenosis.

The primary injury Dr. Marmureanu alleges Mrs. Hill sustained as a result of her IVC perforation is stenosis of her vena cava.  Marm. Hill Rpt. at 3, 12.  He defines stenosis as "unnatural narrowing." [28]  Marm. Hill Rpt. at 13.  However, this bedrock opinion from which many of his other opinions flow lacks any reliable basis. [29]  In fact, Dr. Marmureanu never "rules in" any of the possible causes of the appearance of caval stenosis in his report, and thus never "rules out" other possible causes, assuming blanketly that any stenosis he believes he observed was caused by her caval perforation. [30]  Marm. Dep. at 519:2-520:7.

First, Dr. Marmureanu bases his diagnosis of IVC stenosis solely on his observation of narrowing of the IVC in a March 2017 Duplex ultrasound.  Marm. Dep. at 520:20-24.  However, he fully acknowledges there are other possible causes of the appearance of narrowing on imaging that he did not consider, *id*. at 519:2-5, specifically, breathing, coughing, surrounding tissues and

---

[28] Dr. Marmureanu testified that narrowing and stenosis are "kind of the same thing."  Marm. Dep. at 714:3-9.

[29] *See, e.g.*, Marm. Hill Rpt. at 2 (attributing lower extremity edema and venous insufficiency to IVC stenosis).

[30] Marm. Dep. at 555:16-20 (admitting stenosis can lessen or resolve after filter retrieval); Marm Dep. at 521:23-522:2 (admitting the vast majority of patients with even moderate stenosis have no symptoms or injury at all).

organs, foreign bodies, any sort of retroperitoneal process, cancer, and hematoma.  In a nutshell, as he put it, "Anything that's in the vicinity could push into it."  *Id*. at 519:9-23; *see also* Lynch Dep. at 66:16-67:21 (identifying a spasm and contraction of muscle fibers of the IVC as a temporary cause of narrowing).  He also admits that IVC stenosis can occur in the absence of filter perforation, *even when a patient has never had a filter*.  Marm. Dep. at 552:25-556:6.

Dr. Marmureanu's report reveals no systematic identification or elimination of the possible causes of narrowing on imaging or stenosis.  He has no knowledge of the appearance of Mrs. Hill's IVC prior to her filter placement, and his report neither considers nor rules out the existence of stenosis simply from the presence of a filter in the absence of perforation – stenosis that may have been present even prior to Mrs. Hill's IVC perforation.  Marm. Hill Rpt., *passim.* In fact, the lone March 2017 IVC Duplex ultrasound on which Dr. Marmureanu relies was taken at his request for the purpose of this litigation, Marm. Dep. at 504:519, 520:20-24, but his assessment of "moderate stenosis" from this image differs from *every* other physician's reading of the images and medical records in this case.  Dr. Marmureanu ignores that (1) the technician who performed the imaging noted in the Ultrasound Worksheet that the "IVC was in normal limits," Marm. Dep. at 511:15-512:4; Ex. U, Marm. Dep. Exhibit 14; (2) the physician who reviewed the images and prepared the final report on the ultrasound concluded that the "Patency [openness] of IVC was good flow, *suggesting [absence] of any significant degree of stenosis,*" Marm. Dep. at 512:10-18; Ex. U, Marm. Dep. Exhibit 14; [31] (3) the physician who retrieved Mrs. Hill's filter and assessed her vena cava personally in 2013—Dr. Frank Lynch, an interventional radiologist who has retrieved over 1,800 filters—found only moderate, temporary

---

[31] In other words, an ultrasound technician and a diagnostic radiologist in the ultrasound department—both selected by Dr. Marmureanu and presumably highly experienced in reading ultrasounds—concluded that Mrs. Hill's IVC was normal and found no evidence of stenosis, yet thoracic surgeon Dr. Marmureanu disagrees with their conclusion.  Marm. Dep. at 506:3-6.

narrowing (not stenosis), which he explains is common in retrieval patients, Ex. R, Lynch Dep. at 80:2-15; and (4) a June 22, 2017 CT imaging and ultrasound unequivocally showed absolutely no narrowing of Mrs. Hill's vena cava.  Ex. F, Venbrux Rpt. at 31; Marm. Dep. at 591:6-25 (admitting a CT is required to see caval circumference); 481:4-15 (admitting ultrasounds show blood flow is "quite good").  Dr. Marmureanu reached his stenosis opinion even before considering the sole evidence on which he relies; he wrote his diagnosis of "IVC stenosis" in the "Diagnosis/Symptoms" section of the 2017 Duplex ultrasound imaging order *before the imaging occurred*.  Marm. Dep. at 509:15-510:13, and Ex. V, Marm. Dep. Exhibit 12.

Wholly ignoring contrary evidence, and reaching a conclusion before imaging is ever conducted, is not a methodology.  *See Cunningham v. Masterwear, Inc.*, 2007 WL 1164832, *10 (S.D. Ind. 2007) ("[N]o physician may testify to his or her opinion based solely on the expert's say so and a medical degree.").[32]

Dr. Marmureanu's unreliable analysis and failed methodology became even more clear by deposition:  he admits he cannot say Mrs. Hill has any present injury from alleged caval narrowing, but notes "in the future" it is "theoretically possible" that she could be one of "a very small number" of patients who develop severe stenosis or occlusion.  Marm. Dep. at 523:20-524:17.  This is not a differential diagnosis.  *Id*.

### b.   Duodenal stenosis and gastrointestinal symptoms.

Dr. Marmureanu opines that the perforation of Mrs. Hill's filter into her duodenum (small intestine) resulted in duodenal stenosis and caused Mrs. Hill's acute gastrointestinal symptoms,

---

[32] This lack of certainty is magnified by the apparent worsening of Mrs. Hill's stenosis during the course of Dr. Marmureanu's deposition.  Early in the deposition, he states Mrs. Hill has only "mild to moderate stenosis," Marm. Dep. at 480:24-25, but her condition grows more severe as he testifies, and he later changes his opinion to "moderate" stenosis.  Marm. Dep. at 505:19-506:1 ("So for the record, I'm calling it moderate, not mild to moderate.").  *See also id.* at 480:16-481:16.

including pain, nausea, and vomiting.  However, Dr. Marmureanu failed reliably to diagnose

duodenal stenosis, and further failed to perform a differential diagnosis related to Mrs. Hill's

complaints.  His report evidences no such analysis, and he can cite no testing, studies, or

experience to support his opinion that perforation of a duodenum by an IVC filter can cause

gastrointestinal symptoms like those Mrs. Hill reports.  He relies entirely on "common sense"

and his "clinical judgment."   Marm. Dep. at 525:16-527:2.  However, he is not a

gastroenterologist and can identify no relevant experience upon which to make a such a

judgment.  His report makes clear he simply reviewed Mrs. Hill's 2013 medical records and

went no further:

> Q      Were there any potential causes of her nausea, vomiting and other things she
> reported at the hospital that you considered and ruled out that were not contained
> in her medical records?
> A      I only value medical records, so I just don't know how to answer that.

Marm. Dep. at 608:16-21.

Dr. Marmureanu also fully admits that his opinions that Mrs. Hill suffers from "scarring

of the duodenal wall and chronic inflammation," or that alleged erosion or scarring had any

clinical effects, is unsupported by any medical evidence.  Marm. Dep at 531:11-16 ("It might

have, it might not have.  It might lead to obstruction.  It might not."); 532:4-533:8.  He also

admits that he lacks sufficient information to determine whether Mrs. Hill suffers from duodenal

stenosis at all.  Marm. Hill Rpt. at 3; Marm. Dep. at 596:24-597:10 (acknowledging he lacks

sufficient information to conclude Mrs. Hill suffers from duodenal stenosis).  He admits that she

has no present injury or intestinal problems, Marm. Dep. at 569:5-25, and that he ruled in—but

did not and could not rule out—her *pre-existing duodenitis*[33] as the source of pain and

---

[33] Duodenitis is "inflammation of the duodenum," otherwise known as the small intestine.
Marm. Dep. at 568:1-9.

inflammation of her duodenum, abdominal pain, and intestinal issues.  *Id.* at 573:1-579:6 ("I didn't rule it out").  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████

Despite (1) acknowledging that roughly 99% of organ perforation and stenosis is asymptomatic, (2) admitting that he does not know the rate of organ perforation or related complications with any filter, and (3) confirming that Mrs. Hill has a long history of gastrointestinal issues and duodenitis which can cause the same symptoms and that he cannot systematically exclude, he summarily concludes that there are no other causes for her symptoms other than her filter.  Marm. Dep. at 434:11-15; 568:2-13.  That is not a reliable differential diagnosis.

### c.    Venous insufficiency.

Dr. Marmureanu opines in his report that Mrs. Hill has "problematic lower extremity edema from venous insufficiency that will result in thrombotic complications as she ages." Marm. Hill Rpt. at 2. *See also id.* at 14 ("Moderate stenosis gives her a more likely that not risk of thrombotic issues, including DVT and caval thrombosis.").  However, Dr. Marmureanu acknowledged by deposition that such thrombotic issues are a "rare risk," and he admits that he

_____

34 ████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████ He
can't opine on that topic because he lacks any evidence that her perforation or duodenal perforation caused any symptoms at all.  Marm. Dep. 577:13-20.  In fact, by his own admission, the vast majority of  organ perforation by a filter strut causes no medical consequences at all. Marm. Dep. at 434:11-15.

cannot claim with any medical certainty that Mrs. Hill will *actually* develop any complication

from her alleged stenosis.  Marm. Dep. at 585:15-586:16 ("…you're not saying that, to a

reasonable degree of medical certainty, that Mrs. Hill will develop those things, correct? A:

Absolutely not.")

Other examples of such shoddy or nonexistent methodologies abound.  Dr. Marmureanu

"diagnosed" Mrs. Hill with plus 2 edema "from venous insufficiency" based on a 15-second

touch:

| Q | And when you say Mrs. Hill has plus 2 edema, what is the basis for that opinion? |
|---|---|
| A | The physical exam. |
| Q | When did you perform a physical exam? |
| A | At the time when she had the duplex, IVC duplex. |
| Q | Where did you do that? |
| A | In the radiology suite while she was getting -- right before she got the duplex. |
| Q | How did you do that? |
| A | I just looked at her feet. I touched her feet with my right hand. |
| Q | Was there anything else that you did? |
| A | No. I -- basically, I wasn't planning to do much. But when she got on the table, she had a little trouble getting on the table. I helped her. I said, "Your legs are a little swollen." She said, "Well, they're always like this." So that was plus 2. |

                                               ***

| A. | How long did I touch her feet? |
|---|---|
| Q. | Yeah. |
| A. | 15 seconds. |
| Q. | Was there anything else involved in your physical examination of Mrs. Hill? |
| A. | No. |

Marm. Dep. at 481:22-482:15, 503:17-22.   That was his entire diagnostic procedure.  He

considered no other causes for the alleged swelling; he did nothing to compare her condition that

day to her condition any prior or subsequent day; and he does not know whether the condition of

her legs has changed since he saw her.  *Id*. at 482:16-23.  Moreover, Dr. Marmureanu simply

*assumed* the edema he diagnosed was attributable to the IVC filter and the perforation.  He did

nothing to "rule in" or "rule out" other possible causes.  In sum, Dr. Marmureanu diagnosed

Mrs. Hill with plus 2 edema based on a brief, chance encounter, diagnosed venous insufficiency, and attributed both to her Celect filter based on nothing at all.

### d.   Depression and anxiety.

As yet another example of Dr. Marmureanu's complete lack of methodology, he opines that Mrs. Hill should undergo psychological counseling because "she has been traumatized by this filter."  Marm. Dep. at 620:12-19.  He agreed that he had not made a judgment of whether counseling would help her, Marm. Dep. at 620:22-621:25 ("I will have to defer this to me having a discussion with her."), and his recommendation is based entirely on his view that a lot of patients benefit from such counseling.[35]  *See* Marm. Dep. at 621:25.  He admits that (1) he does not know whether she has received such counseling since the retrieval of her filter, and (2) he cannot say whether she would actually benefit from such counseling until he talks to her—which he has not done.  *Id.*  These conclusions lack any reliable methodology and should be excluded.

### C.   Dr. Marmureanu did not perform a reliable differential diagnosis to determine Ms. Hill's permanent and future medical complications.

Dr. Marmureanu did not even pretend to apply a reliable differential diagnosis to support his opinions of permanent and future medical complications.  To note the most prominent example of this failing—and bearing in mind his claim that all conclusions he reached are supported exclusively by Mrs. Hill's medical records—Dr. Marmureanu asked to "take back" his opinions that Mrs. Hill would require lifetime anticoagulants, PPI, and lymphedema therapy during his deposition, saying that he discovered on review of her medical records that she had not required any of the treatments since her 2013 filter retrieval.  Marm. Dep. at 479:10-481:21. Curiously, though, Mrs. Hill has not required medical monitoring and surveillance, counseling, or compression hosiery any time since her filter was retrieved in 2013, yet he has not withdrawn

_____

■ ████████████████████████████████████████████
████████████████████████████████████

those opinions.  Marm. Dep. at 617:25-618:6 (When asked if she required annual surveillance to date:  "I don't know.  I do not know");  620:2-621:25 (admitting she has not required counseling, and he doesn't know if she will);  Marm. Dep. at 622:2-20 █████████████████

██████████████████████████████████████████████████████████████████

██████████

In sum, as with his general opinions, Dr. Marmureanu's opinions concerning Mrs. Hill specifically are not based on a reliable differential diagnosis or any other reliable methodology. They are litigation-driven opinions that work backwards to try to find support in existing medical records for *ipse dixit* subjective diagnoses and as a last resort to invoke Dr. Marmureanu's "recommendations."  The Court should accordingly exclude his opinions.  *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) (excluding expert's "opinion [that] amounts to nothing more than the *ipse dixit*.")

## VI.    Dr. Marmureanu Failed to Employ a Reliable Methodology in Evaluating Whether Perforation or Malpositioning of the Günther Tulip IVC Filter Caused any Injury to Plaintiff Gage

The methodology Dr. Marmureanu used to reach his case-specific opinions concerning Plaintiff Arthur Gage is also unreliable.

### A.    Dr. Marmureanu's case-specific opinions concerning Plaintiff Gage

Dr. Marmureanu and Cook's experts agree that Mr. Gage's filter is malpositioned, with the apex of the filter located in his right renal vein.  Marm. Gage Rpt. at 3.  He asserts the struts are perforating the caval wall as well.[36]  *Id*.  Dr. Marmureanu's report contains no opinions about when Mr. Gage's filter became malpositioned, Mr. Gage's imaging, or the position of the filter at the time of placement by his interventional cardiologist, Dr. Mark Goodwin.

---

[36] Cook's experts, however, do not agree with Dr. Marmureanu that the struts are perforating any adjacent organs.

Nevertheless, Dr. Marmureanu's report states that the placement of a Tulip filter "substantially contributed to" Mr. Gage's suffering (1) severe progressive tilting of his filter, (2) progressive perforation of Mr. Gage's vena cava by the filter's apex and struts, (3) migration of the apex through the right renal vein into the perihepatic region (*i.e.*, the anatomy around or near the liver), and (4) migration of the struts through the mesentery into the pancreatic head and aortocaval region causing chronic inflammation and severe, persistent pain.  Marm. Gage Rpt. at 3.

Dr. Marmureanu says that Mr. Gage's pain started shortly after placement and became chronic due to the perforation of the IVC by the Tulip, which he says has a tendency to perforate, and states that perforation of the IVC can cause abdominal pain.  Marm. Gage Rpt. at 3-4.  He conclusorily states that he has ruled out Mr. Gage's various other medical conditions as causes of his pain. *Id.* at 4.

Dr. Marmureanu opines that Mr. Gage will continue to have chronic pain and will need lifetime anticoagulation as a result of complications with his IVC filter.  He also opines that this chronic pain and life-long anticoagulation gives rise to need for treatments that pose great risk and require routine testing, and that anxiety and depression might accompany his chronic disease and pain.  Marm. Gage Rpt. at 11.  He asserts that because Mr. Gage's IVC filter struts have perforated, any fall, cough, sneeze, or MVA, or even a "deep breath" could lead to intra-abdominal catastrophe and Mr. Gage's death.  *Id.* at 14.  He said it is also more likely than not that Mr. Gage will have a clinically significant upper or lower intestinal bleed caused by his need for life-long anticoagulation. *Id.*

**B.     Dr. Marmureanu did not use a reliable methodology.**

Dr. Marmureanu claims to have reached his opinions concerning Mr. Gage using a differential diagnosis.  Marm. Dep. at 348:3-7.

In Mr. Gage's case, Dr. Marmureanu neither "ruled in" nor "ruled out" all possible causes either of Mr. Gage's perforation and malpositioned filter or of the symptoms that Mr. Gage allegedly suffers.  Instead, Dr. Marmureanu jumped to the conclusion that "all filters are bad" and used that premise to blame every complication and symptom on Mr. Gage's Tulip filter.

**a.     Dr. Marmureanu did not perform a reliable differential diagnosis of the malpositioning and perforation of Mr. Gage's IVC filter.**

Dr. Marmureanu's testimony demonstrates that he did not employ a differential diagnosis in concluding that the design of the Cook filter caused the malpositioning of and perforation by that filter.  He simply jumped to the conclusion that the only possible cause of the malpositioning and perforation was the filter.

> Q.     When you were analyzing the question of what [caused] Mr. Gage's filter to be positioned where it is and to perforate, what causes did you consider?
>
> A.     …Are you asking me if I consider any other issues, with any other perhaps the perforation is due to bullets and stab wounds and swords or anything else or? I don't think that you would have to do any sort of other work to identify the fact other than review the medical records and the films to identify there is a perforated filter -- or there is an IVC filter that perforates. And again, based on review of my documents, I couldn't find anything else in that adjacent that would explain another foreign body being present in his organs.

Marm. Dep. at 347:6-348:2.  Dr. Marmureanu reiterated this approach when asked again about perforation causes he had considered:

> [Q]     What causes did you consider in evaluating what made it perforate?
>
> A.     Well -- well, I think made it perforate, again, it's based on what I learned, it's the design and the material, and not only just the poor workmanship that perhaps went into the R&D, and the filter tilted and then perforated.

> And as I recall correct, internal documents from Cook, might have been Nielsen, I think, or somebody identified the fact that once they tilt, then that perforating results in embedded hooks and so on.
>
> So I actually like to quote the Cook internal documents of that.

Marm. Dep. at 349:18-350:6.  When asked yet again—for a third time—about whether, in applying a differential diagnosis, Dr. Marmureanu considered other possible causes for the malpositioning of a filter, he vaguely conceded that "in theory, there are *a lot of things could cause malposition*."  *Id.* at 359:12-23.  However, he could identify only two possible causes:  (1) a rollover car accident, or (2) being hit with a baseball bat in the abdomen. *Id.* at 359:15-360:3.  He did not explain the "lot of things" that could cause filter malpositioning, but simply stated in a conclusory manner that "my opinion is nothing else other than the filter design and materials that caused the malposition." *Id.* at 360:1-3.

Dr. Marmureanu's report fails to articulate any discernable differential diagnosis, much less the causes he ruled in or out.  He failed even to consider (or articulate) a number of possible causes for malpositioning and perforation suggested by Mr. Gage's medical history, including: (1) surgical misplacement of the filter in the original procedure; (2) Dr. Goodwin's failure to place the filter below the renal veins as instructed by the IFU; and (3) the plethora of Mr. Gage's post-placement motor vehicle accidents and traumatic falls.[37]  Marm. Dep. at 34:18-35:12; 592:2-593:23; Tulip IFU at 7.  Additionally, the treating physicians in this case, Cook's expert witnesses, and the published medical literature make clear that there are multiple possible causes

---

[37] *See* Ex. W, Report of Dr. F. Michael Ferrante, M.D., ("Ferrante Rpt."), at 10-11 (identifying post-placement falls and accidents); *see also*  Ex. X, Deposition of Arthur Gage, January 9, 2017 ("Gage Dep."), at 202:14-219:22 (discussing post-placement traumatic falls and accidents).  Dr. Marmureanu never "rules in" Mr. Gage's motor vehicle accidents or falls in his report, and he only "rules out" one of the accidents at his deposition based on the fact that he does not "remember reading anything in regards to the possibility that trauma with car accidents made her [*sic*] perforate." Marm. Dep. at 352:15-18.  Dr. Marmureanu does not consider whether any of the other falls or accidents contributes to Mr. Gage's alleged perforation or malpositioning.

of malpositioning of an IVC filter and subsequent perforation, all of which Dr. Marmureanu neither ruled in nor ruled out.  *See, e.g.*, Venbrux Rpt. at 28-29.  He specifically failed to study (or even consider) whether Mr. Gage's filter was malpositioned on placement, even though "I've seen filters with the hook into the right renal vein" in his own practice.  Marm. Dep. at 360:5-15.  He also admits he does not know the rate of physician malplacement, and his report reveals that he never considered the effect of Dr. Goodwin's deviation from the IFU on placement and whether that deviation could have caused or contributed to the malpositioning.  Gage Rpt., *passim*.[38]

Thus, although Dr. Marmureanu testified that he "ruled out all other causes that would make that filter perforate," Marm. Dep. at 354:17-18, his testimony makes clear that he neither ruled in nor ruled out any of these possible causes.  This is consistent with Dr. Marmureanu's report, which includes no discussion of his methodology, and no mention of the consideration (or exclusion) of *any* other possible cause of Mr. Gage's malpositioned filter or alleged perforation.

Only when pressed in deposition did Dr. Marmureanu say he excluded physician malplacement.  He did so based solely on Dr. Goodwin's testimony that he believed he properly placed the filter.  Marm. Dep. at 653:8-654:9.  Notably, however, Dr. Marmureanu also says that filter position must be determined by venogram, CT, or other imaging, *id.* at 283:21-285:10.  Dr. Marmureanu does not have that imaging.  Here, he concludes the filter was correctly positioned at placement *in the absence of* any imaging and without mentioning that the only post-placement imaging (48 hours after placement) shows the filter malpositioned.  Marm Dep. at 665:18-

---

[38] Dr. Marmureanu also admits that Dr. Goodwin deviated from the IFU by attempting to place the apex of the filter slightly above the renal veins rather than just below the renal veins.  *Id.* at 592:2-593:6.  *Id.* at 665:1-17; 653:19-24 (identifying operator error as a potential cause of tilt on deployment); Goodwin Dep. at 89:2-23; see also White S, et al., Misplaced Inferior Vena Cava Filter in Right Renal Vein with Erosion into Renal Collecting System, J. Endourol, 2009, 23; 11:1899-1901.

666:25.  This is neither a systematic ruling in nor a systematic ruling out of any possible cause for the malpositioning, and, relying solely on the testimony of another physician is not a sufficient basis for ruling out a potential cause.[39]  *In re Zimmer NexGen Knee*, 218 F. Supp. 3d at 719.

Finally, when Dr. Marmureanu jumped to the conclusion that a defect in the design of the Tulip filter caused Mr. Gage's malpositioned filter, he lacked any reliable scientific basis for doing so.  Dr. Marmureanu agrees with Cook's experts that the apex of the filter is lodged inside Mr. Gage's right renal vein, Marm. Gage Rpt. at 3, and he acknowledges that the filter was tilted and malpositioned within two days after placement.  Marm. Dep. at 649:3-18; 665:18-666:25.  Dr. Marmureanu did not identify in his report—and could not identify in his deposition—any test, literature, study, or other scientific proof that supports his belief that something about the design of the Tulip, if properly placed by a physician, could cause it to migrate ***horizontally*** and ***against the upward flow of blood*** in the vena cava and ***against the flow of blood*** from the right renal vein into the vena cava.  Marm. Dep. at 360:12-362:3, 363:22-364:5; 666:2-18.

> **b.   Dr. Marmureanu did not perform a reliable differential diagnosis of Mr. Gage's current symptoms.**

Dr. Marmureanu's opinion that Mr. Gage has suffered, or will suffer, from a variety of symptoms related to his IVC filter requiring future treatment also lacks a reliable methodology.[40]

---

[39] This is especially true here where the physician being relied upon only treated Mr. Gage a single time and has never reviewed any post-placement medical records.  *See* Goodwin Dep. at 63:24-64:10, 101:15-17, 146:8-10, 149:19-22.

[40] Dr. Marmureanu also lacks the qualifications to rule in or rule out whether Mr. Gage's complicated preexisting gastro-intestinal and back and spine issues are potential causes of Mr. Gage's current pain.  He is not a pain management specialist, a spinal surgeon, a neurologist, or a gastroenterologist, and simply having a medical degree does not make him an expert in all fields of medicine.  *Higgins v. Koch Dev. Corp.*, 2013 WL 6238650, at *3 (S.D. Ind. Dec. 3, 2013) ("simply possessing a medical degree does not qualify a [doctor] as an expert in all medical fields").

Dr. Marmureanu's report lists three conditions that he opines are "substantially contributed to" by the perforation and malpositioning of his filter:  chronic pain, need for lifelong anticoagulation, and psychological distress.  Marm. Gage Rpt. at 3, 9, 11.  With respect to chronic pain, his differential diagnosis is incomplete and unreliable, and does not support a link between the perforation and the pain.  As to the need for lifelong anticoagulation and psychological distress, Dr. Marmureanu does not even try to employ a differential diagnosis; his opinions rest entirely on speculation and his own say-so.

### i.    Chronic pain.

Aside from being unqualified to opine about whether Mr. Gage's complicated preexisting gastrointestinal and back and spine issues are potential causes of Mr. Gage's current pain, Dr. Marmureanu also fails to reliably apply his stated methodology.  Marm. Dep. at 335:1-8; 343:13-16.  Instead, he makes conclusory statements and omits the explanatory footwork necessary to ensure the reliability of his methodology.  Rather than reasoned analysis, Dr. Marmureanu provides only *ipse dixit*.

As an initial matter, Dr. Marmureanu claims that his conclusions are "substantiated by numerous entries" in Mr. Gage's medical records, and then cites three records as examples.  Marm. Gage Rpt. at 4-5.  However, when the physicians who authored two of those records were deposed (the physician who authored the third record has never been deposed), they each back peddled.  One conceded that he is not a specialist in spinal surgery, gastroenterology, or pain management, and he conceded that he would defer to a physician with greater expertise in such fields and who had the opportunity to review all of Mr. Gage's medical records.  *See* Ex. I, Crisostomo Dep. at 86:16-90:22.  The other agreed that he could not opine whether Mr. Gage's filter was actually causing Mr. Gage any pain.  Ex. Y, Deposition of Dr. Antonio Pangan, May 23, 2017, at 141:18-143:8.  Dr. Marmureanu appears unaware of that testimony and, even were

that not the case, the records do not excuse Dr. Marmureanu from performing his own differential diagnosis. *See State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1048 (N.D. Ind. 2013) (an expert's proffered opinion that "merely parrots information" is generally excluded.).

Although Dr. Marmureanu identifies several possible sources of pain that he rules in and then out (*e.g.*, dehydration; caval abnormalities; gout; chest pain; spinal pain; dumping syndrome; episodic abdominal pain; pseudoaneurysm; gallbladder; and pancreatitis), he fails to explain why he does not rule other possible causes in. Most glaringly, Dr. Marmureanu fails to rule in any of the 18 traumatic falls or car accidents suffered by Mr. Gage as potential sources of Mr. Gage's chronic pain in either his abdomen, back, or leg. Ferrante Rpt. at 8-11; *see also* Ex. X, Gage Dep. at 192:6:-219:22 (discussing pre- and post-placement falls and accidents). Indeed, this section of Dr. Marmureanu's report is devoid of any mention of Mr. Gage's extensive history of traumatic injury due to falls and motor vehicle accidents. Marm. Gage Rpt. at 3-10.

Moreover, despite acknowledging that Mr. Gage is an "interesting gentleman" who could possibly benefit from psychological counseling, Marm. Dep. at 635:10-636:7, Dr. Marmureanu also fails to rule in whether Mr. Gage's pain is psychogenic. Although Dr. Marmureanu acknowledges abdominal pain can be psychogenic, Marm. Gage Rpt. at 7, he offers no explanation as to why it is not a plausible explanation in Mr. Gage's case. This is especially problematic here because Mr. Gage's records contain references to ████████████████████ ██████▐███████████████████████████████ ████████████████████████████████████████

---

▌██████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

Finally, Dr. Marmureanu's methodology is unreliable because he offers no explanation as to why he rules out various potential causes of pain.  For example, Dr. Marmureanu acknowledges that "[t]here is a reference to lumbar pain radiating down [Mr. Gage's] posterior right thigh to the bottom of his right foot" in the medical records, but Dr. Marmureanu rules this out as a potential cause simply because "this episodic complaint is not consistent with his previous or subsequent lumbar spine complaints."  Marm. Gage Rpt. at 6-7.  Wholly missing from this explanation is any description or explanation as to *how* this episodic complaint is *different from* or *inconsistent with* Mr. Gage's previous or subsequent complaints.  "Conclusions alone, without the explanations or support for those conclusions, are inadmissible."  *See In re Zimmer NexGen Knee*, 218 F. Supp. 3d at 712.  Without such an explanation, Dr. Marmureanu's opinion amounts to *ipse dixit*: the complaints of pain are inconsistent because Dr. Marmureanu says they are inconsistent—hardly evidence of a reliable methodology grounded in sound reasoning.[42]

---

[42] Dr. Marmureanu cuts corners like this multiple times.  For example, he claims that the abdominal pain that Mr. Gage has complained of "since receiving the IVC filter is distinct" from Mr. Gage's dumping syndrome, but nowhere does he explain how it is distinct.  Marm. Gage Rpt. at 7.  More troubling, however, is Dr. Marmureanu's characterization of Mr. Gage's pre-placement complaints of pain as episodic rather than chronic.  Mr. Gage's pre-placement records, however, are replete with references to chronic pain.  *See, e.g.*, Ferrante Rpt. at 5-8 (identifying various records describing Mr. Gage's pain as chronic).  Dr. Marmureanu ignores these records and fails to explain how he can rule these chronic and persistent causes of pain out as the source of Mr. Gage's current complaints of pain.

### ii.        Need for lifelong anticoagulation.

Dr. Marmureanu lacks any reliable methodology supporting his opinion that "[b]ut for the embedded Gunther Tulip filter Mr. Gage would not be on chronic anticoagulation."  Marm. Gage Rpt. at 10.  His statement is sheer speculation.  As Gage's medical records show, and as Dr. Marmureanu admitted at his deposition, Mr. Gage's treating doctors had prescribed anticoagulants *before* he received his Tulip IVC filter as treatment for unrelated medical conditions, specifically a serious heart condition and a history of deep vein thrombosis, Marm. Dep. at 692:1-21, and those same doctors continue to prescribe anticoagulants for him today.  Indeed, Dr. Larkin testified that Mr. Gage would be required to take anticoagulants regardless of the presence of his filter.  Ex. H, Larkin Dep. at 83:23-85:9.

Dr. Marmureanu uses no scientific or medical methodology to attribute Mr. Gage's current treatment with anticoagulants solely to the presence of the IVC filter, simply *assuming* with no identified basis that the filter is the *only* reason Mr. Gage's treating doctors continue to treat him with anticoagulants.  *See* Marm. Dep. at 694:1-3.  Dr. Marmureanu concedes only that if the filter were not there, Mr. Gage's treating physicians would need to reevaluate whether to continue his anticoagulants.  *Id.* at 694:4-6; 718:18-719:4.  Dr. Marmureanu's belief that continued use of anticoagulants would be unnecessary in the hypothetical situation where his filter is removed, Marm. Dep. at 694:7-13, is mere speculation and unsupported by any identifiable methodology.  *See In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 164 (S.D. Ind. 2009).

### iii.       Psychological distress.

Dr. Marmureanu also employed no "differential diagnosis" in reaching his opinion that Mr. Gage suffers from and will require treatment for psychological distress caused by his IVC filter.  He testified:

[Q]   With respect to Mr. Gage, whether his psychological distress is caused by his filter or some other factors in his life, would you also defer to a specialist in the area of psychology or psychiatry?

A     **Well, first of all, let's say routine issue I never defer to anybody. We talked about it.**

\*\*\*\*\*

In this case, in Mr. Gage, the filter is there, still perforated. **And based on the documents reviewed, he's quite unhappy about that.**

**And he seemed to be a very interesting gentleman. I never met Mr. Gage. But reading it, he's got renal insufficiency and he does not want to go on hemodialysis which, I mean, if he needs hemodialysis and if he doesn't go on it, it could be lethal.**

**So, obviously, he's a little bit of an interesting gentleman. So if he keeps on com- -- doctors are able to read in between the lines, you know.**

\*\*\*\*\*

But now, the reality, he's got a filter with multiple holes in the IVC and the blood is thin because he's on anticoagulation. The filter perforates all the adjacent organs. I mean, apparently -- well, definitely, it's a very issue [sic], **so I truly believe psychological counseling would help this guy.**

Marm. Dep. at 634:15-636:7 (emphasis added).  Dr. Marmureanu does not know whether Mr. Gage has in the past, or would in the future, be willing to undergo counseling.  *See id.* at 699:7-9.

Dr. Marmureanu's mere belief as a non-psychologist that psychological counseling will help Mr. Gage, a man he has never met, based on "reading between the lines" of medical records, is not an opinion supported by a reliable methodology.  As noted above, "[t]alking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang*, 217 F.3d at 924.

## VII.   Dr. Marmureanu's Proposed Expert Testimony Would Not Assist the Jury

The Court also should exclude Dr. Marmureanu's proposed expert testimony because his opinions simply will not assist the jury.  The key question on the relevance of proposed expert testimony is whether the testimony will assist the trier of fact with its analysis of the issues.

*Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  The Court must consider whether the expert's testimony is sufficiently tied to the facts of the case so that it will help the jury in resolving a factual dispute. *Sann v. Mastrian*, 2012 WL 253088, *3 (S.D. Ind. Jan. 26, 2012)

(*citing Daubert*, 509 U.S. at 591); *see also Peoples State Bank v. Stifel, Nicolaus & Co.*, 2013 WL 1024917, *6 (S.D. Ind. Mar. 14, 2013) (holding that suggested testimony must "fit" the issue to which the expert is testifying). Dr. Marmureanu's proposed testimony would not assist the jury for several reasons.

### A.   Jurors Do Not Need Expert Testimony to Understand the Cook Documents.

The opinions in Dr. Marmureanu's general report regarding select Cook documents would not be helpful because, as the doctor himself acknowledges, jurors can reach their own conclusions based on the same material Dr. Marmureanu reviewed.



Marm. Dep. at 472:20-23.  Dr. Marmureanu further acknowledges that the Cook documents from which he copied do not require expert knowledge to understand:

> Q    When you reviewed the Cook documents, you interpreted them based on your medication -- medical education, training and judgment, correct?
> A    Yes. Correct.
> Q    You would agree with me, though, that most of the Cook documents that you reviewed don't require any medical education or training to be able to read them, correct?
> A    Correct.

Marm. Dep. at 729:22-730:5; *see also id.* at 727:2-9, 727:25-728:1 (referring to comment "That doesn't take a knowledge to be a cardiac surgeon to understand that.")  Moreover, he has no foundation or context for the internal company documents and no knowledge, experience, or

training to allow him to interpret documents ██████████████████████████████████

████████████████████████████████████████████████

      Moreover, such narrative summaries of corporate documents and communications are not

proper expert testimony because such summaries do not involve the application of scientific,

technical, or specialized knowledge and thus do not aid the jury in its role as the trier of fact.

*See, e.g., Baldonado v. Wyeth*, 2012 WL 1802066, at *4 (N.D. Ill. May 17, 2012).[44]  Such is the

case with Dr. Marmureanu; he offers only his own advocacy-based interpretation of documents

selected by Plaintiffs' attorneys, which he has no qualification, training, or experience to

interpret.  Such testimony would not be helpful to the jury, and his references to Cook

documents, including the Analysis report and any reliance thereon should be excluded.[45]

---

██████████████████████████████████████████████████

[44] In *Baldonado*, the court held that "allowing an expert to provide summary testimony 'based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself.'"  *Id.*  Even if the expert relied on his expertise to wade through the relevant documents, the vast majority of his testimony amounted to a summary and statement of the expert's "advocacy-based interpretation of documents in the record," and such testimony was therefore improper.  *Id.*; *see also In re Zimmer Nexgen Knee Implant Products Liab. Litig.*, 2015 WL 5145546, at *12 (N.D. Ill. Aug. 31, 2015) (excluding expert testimony which "simply summarize[d] internal [manufacturer] documents regarding post-market surveillance"); *U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403.").

██████████████████████████████████████████████

### B.    Dr. Marmureanu's Testimony Does Not Reflect a Sufficient Degree of Medical Certainty.

Dr. Marmureanu's testimony would not be helpful to the jury because he cannot and does not express opinions to a reasonable degree of medical certainty or based on the consensus of the medical community.  *See, e.g.*, *Wintz By and Through Wintz v. Northrop Corp.*, 110 F.3d 508 , 515 (7th Cir. 1997) (applying Illinois's "reasonable degree" standard).  Dr. Marmureanu's own testimony makes clear that his opinions are simply that—his personal opinions.  Although Dr. Marmureanu pays lip service to the requirement that he express opinions "to a reasonable degree of medical certainty," Marm. Dep. at 624:3-6, the opinions themselves fail to bear that out.  At his deposition, he repeatedly admitted that he could not state to a reasonable degree of medical certainty a number of the opinions including:

- Alleged erosion or scarring of Mrs. Hill's duodenal wall had clinical effects. Marm. Dep at 531:11-16 ("It might have, it might not have. It might lead to obstruction. It might not.").
- Mrs. Hill's abdominal pain between 2010 and 2013 was caused by perforation of her duodenum.  Marm. Dep. at 577:13-20 ("A. You can't say that. That's impossible to say.").
- Mrs. Hill will develop thrombotic issues, occlusion, or severe stenosis.  Marm. Dep. at 586:4 ("…you're not saying that, to a reasonable degree of medical certainty, that Mrs. Hill will develop those things, correct? A Absolutely not."); 524:6-17.
- Mrs. Hill currently suffers from duodenal stenosis.  Marm. Hill Rpt. at 3; Marm. Dep. at 596:24-597:10 (acknowledging he lacks sufficient information to conclude Mrs. Hill suffers from duodenal stenosis)
- Mrs. Hill requires psychological counseling.  Marm. Hill Rpt. at 16; Marm. Dep. at 620:22-621:25 ("I will have to defer this to me having a discussion with her.").
- Mr. Gage requires psychological evaluation and possibly treatment.  Marm. Gage Rpt. at 12; Marm. Dep. at 633:15-635:7 (acknowledging opinion is based on "reading between the lines" of Mr. Gage's medical records).

More fundamentally, however, Dr. Marmureanu's own testimony confirms that he is simply "the wrong guy" to ask about the relative risks and benefits of the use of IVC filters generally or of Celect and Tulip IVC filters specifically.  He believes all filters are bad, offer no

benefits, and should not be sold.  He claims Mrs. Hill's doctor placed a "medically unnecessary" product.  Yet, he never weighed the risks and benefits of filters in his analysis, and he contradictorily supports a physician's choice to use filters and believes Mr. Gage's filter may benefit him in the future.  Marm. Dep. at 255:22-27; 495:13-496:11 (deferring to vascular surgeons, interventional radiologists, and interventional cardiologists on whether filters should be sold); 279:5-12 ("as long as you document and prove that what you've done it's the right thing to do and you believe and you can defend your position, you're in good shape."); Gage Rpt. at 17 ("Mr. Gage again may need his anticoagulation held for a surgical procedure or for a bleeding complication and may theoretically benefit from filtration").

Ultimately, Dr. Marmureanu acknowledges that he is the "wrong guy" to ask about the continued viability of IVC filters as a treatment option, deferring to physicians in the relevant medical community:

> Q.   Is it your opinion that vena cava filters generally should not be available in the marketplace?
> A.   Well, it's an interesting question. Like told you, I personally believe they do more harm than good based on the evidence I have in my practice.
> However, obviously you see there are other people that are still placing them. So my opinion is they don't do much good, actually any good.  ***But I'm not the only practicing physician.*** Actually, I'm the one that's not doing the procedure anymore. So I think that's what -- ***I would be the wrong guy to ask***.

Marm. Dep. at 256:2-13 (emphasis added).

Dr. Marmureanu cannot and does not say that the risks of the Celect and Tulip outweigh their benefits.  His report contains no consideration of the benefits of those products, and nowhere in his report has he opined (or provided the bases for opining) that the risks outweigh the benefits.  *See* Marm. Rpt., Marm. Hill Rpt., and Marm. Gage Rpt., *passim*.  He defers to physicians in the relevant medical community (of which he is not a member) and acknowledges their belief that the benefits ***do*** outweigh the risks.  Marm. Dep. at 255:28-256:13.  Given that,

his opinions have no "fit."  *See Henderson v. Sheahan*, 196 F.3d 839, 852 (7th Cir. 1999) ("[A]n expert witness may not guess or state an opinion which is based merely on speculation or conjecture," but must instead testify to "a reasonable degree of medical and scientific definiteness.") (citing *Dabros by Dabros v. Wang*, 611 N.E.2d 1113, 1117 (Ill. App. Ct. 1993)). And his testimony would not assist the jury.  *See* Fed. R. Evid. 702; *Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 930 (S.D. Ind. 2014), *aff'd,* 794 F.3d 697 (7th Cir. 2015) (a party must show by a "preponderance of proof" that their expert is qualified; that their expert's reasoning or methodology is scientifically reliable; and that their expert's testimony will assist the trier of fact).

Finally, statements and opinions in Dr. Marmureanu's general report related to complications Mrs. Hill and Mr. Gage did not experience (*i.e.*, fracture, migration, and the like) also should be excluded.  They do not "fit" the facts of the cases, and he offers in his *Hill* and *Gage* reports no connection to those plaintiffs.  Marm. Hill Rpt., *passim*; Marm. Gage Rpt., *passim*.  Absent some connection to the Plaintiffs at hand, his opinions will only serve to confuse the jury.

## VIII.   The Court Should Exclude Opinions that Dr. Marmureanu Did Not Disclose in His Expert Report

Finally, even if the Court were to permit Dr. Marmureanu to testify on some topics, the Court should nevertheless bar Dr. Marmureanu from testifying to any opinions not disclosed in his expert report.  At his deposition, Dr. Marmureanu was willing, even eager, to offer a broad array of opinions about the Celect and the Tulip that he did not disclose in his report.

For example, Dr. Marmureanu attempted at his deposition to tie Plaintiff Gage's renal insufficiency problems to Gage's Tulip implant, an opinion that he admitted he had not offered in his report.  Marm. Dep. at 642:15-19.  Likewise, his newly-identified safer alternative

design——compression socks—should be excluded.  *Cf.* Marm. Dep. at 380:1-4 to 160:210.

Such undisclosed opinions are not part of this litigation, and the Court should exclude them.  *See*

Fed. R. Civ. P. 26(a)(2)(B) (retained experts must furnish a report containing "a complete

statement of *all* opinions the witness will express and the basis and reasons for them.")

(emphasis added); Fed. R. Civ. P. 37(c)(1); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th

Cir. 1996.).[46]

## CONCLUSION

For the reasons stated above, the Cook Defendants urge the Court to grant their motion

and to bar from the trial in this action the testimony of Plaintiffs' expert Dr. Alexander

Marmureanu.

---

[46] In addition, given Dr. Marmureanu's penchant to offering newly formed and undisclosed opinions on a wide variety of topics, the Court should bar him from offering other opinions not disclosed in his report, which he volunteered by deposition or acknowledges are not contained in his report, *see* Marm. Dep. at 372:2-382:11, including: (1) complication or occurrence rates for any filter; (2) safer alternative design; (3) how the Tulip or Celect compare to any other filter; (4) that any other treatment or therapy other than the Celect or the Tulip in Plaintiffs Hill or Gage, respectively, would not have resulted in the same complications; (5) that a randomized controlled clinical trial of IVC filters is possible, or whether such a study would be ethical; (6) that Cook promoted off-label use of filters, or any discussion of off-label use of filters; (7) █████████ ███████████████████████████████████████████████████; and (9) any opinion concerning the manufacturing or the marketing of the Celect and Tulip filters.

Respectfully submitted,

Dated:  August 9, 2017

/s/ Andrea Roberts Pierson
Andrea Roberts Pierson (# 18435-49)
John T. Schlafer (# 28771-49)
J. Joseph Tanner (# 11856-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
Email:  andrea.pierson@faegrebd.com
Email:  joe.tanner@faegrebd.com
Email:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
Email:   stephen.bennett@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

### CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2017, a copy of the foregoing **COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF DR. ALEXANDER MARMUREANU** was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.  Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

/s/ Andrea Roberts Pierson