## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                    Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                               MDL No. 2570
_____

This Document Relates to the Following Actions only:

      Elizabeth Jane Hill
      No. 1:14-cv-06016-RLY-TAB

      Arthur Gage
      No. 1:13-cv-01875-RLY-TAB

_____

### COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
### TO EXCLUDE EXPERT OPINIONS OF LEIGH ANNE LEVY, R.N., CLCP

Defendants Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated),

and William Cook Europe ApS (collectively, the "Cook Defendants" or "Cook") move this

Court to exclude at trial the testimony of Plaintiffs' expert Leigh Anne Levy, R.N., CLCP.  Ms.

Levy's proposed expert testimony fails to meet the standards for such testimony imposed by

Rule 702 and by *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and its progeny.

I.    **Legal Standard for Admission of Expert Testimony**

The Seventh Circuit has established a three-step analysis for applying the *Daubert*

standard for the admission of expert evidence: (1) the witness must be qualified as an expert by

knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology

underlying the testimony must be scientifically reliable; and (3) the testimony must assist the

trier of fact to understand evidence or to determine a fact in issue.  *Ervin v. Johnson & Johnson,*

*Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  The party proffering the expert must show these factors by a "preponderance of proof."  *United States v. Allen*, 207 F.Supp.2d 856, 869 (N.D. Ind. 2002).  Here, Plaintiffs' expert Levy fails on all three of these elements.

## II.    Ms. Levy's Opinions

Leigh Anne Levy is a life care planner and nurse.  She is not a medical doctor who prescribes care, and she is not an economist.  Ex. A, May 4, 2017 Levy Dep. at 57:19-58:4; 59:16-60:10, 61:19-20, 346:13-18.[1]  Ms. Levy has drafted life care plans for both Elizabeth Hill and Arthur Gage ("Plaintiffs").  These life care plans contain summaries of Plaintiffs' medical history, forecasts of Plaintiffs' future medical needs, and assessments of the present-day costs of the medical goods and services that Plaintiffs may need in the future.

Ms. Levy prepared her reports by compiling a list of Plaintiffs' projected future medical needs from other sources and inputting those needed goods and service into a proprietary, undisclosed database that analyzed the present-day cost of those treatments.  May 4, 2017 Levy Dep. at 255:9-256:7, 273:20-25, 368:1-8.  She then relayed her reports by phone to Plaintiffs' medical expert, Dr. Alexander Marmureanu, and she states that he agreed with her assessments. *Id.* at 324:18-325:21.  Ms. Levy consulted no other doctors in preparing her reports.  *Id.* at 361:20-362:7, 363:11-17, 371:11-19.  She did not review any of the depositions of medical doctors taken in this litigation, *Id.* at 371:11-19, and she omitted thousands of pages of medical records from her review.  Ex. B, Chart Comparing Levy's Medical Records Reviewed With All Records Available ("Comparison Chart").

---

[1] Ms. Levy's deposition took place over the course of two days, May 4 and 5, 2017. Because the two transcripts contain overlapping page numbers, Cook labeled these transcripts as two separate exhibits, Exhibit A and Exhibit E.

### A.      Elizabeth Hill Life Care Plan

In preparing Mrs. Hill's life care plan, Ms. Levy reviewed some of Mrs. Hill's medical records, her deposition, and her social media records.  She also interviewed Mrs. Hill.  Ex. C, March 11, 2017 Life Care Plan and Cost Analysis of Elizabeth Jane Hill ("Hill Rpt.").

Ms. Levy outlined Mrs. Hill's current complaints, 

*Id.* at 14-15.  She concludes, based on a consultation with Dr. Marmureanu, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 19.

Ms. Levy outlined Mrs. Hill's anticipated needs for outpatient and therapeutic care, diagnostic services (including CT scans of her abdomen and upper endoscopies), medications, durable medical equipment (mostly for monitoring her clotting factors), and inpatient care/outpatient procedures for possible complications like venous reflux, caval thrombosis, and/or a GI bleed or intracranial hemorrhage.  Hill Rpt. at 19-20. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hill Rpt. at 22-24.

### B.      Arthur Gage Life Care Plan

In preparing Mr. Gage's life care plan, Ms. Levy reviewed some of Mr. Gage's medical records and his two depositions, and she interviewed him.  Ex. D, March 11, 2017 Life Care Plan and Cost Analysis of Arthur Gage ("Gage Rpt.").

Ms. Levy projects that 

Gage Rpt. at 17.  She also speculates that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  As a result, she opines, ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  She believes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



*Id.* at 18.

Ms. Levy assumes Mr. Gage will live at least 14 more years (to age 81), projecting his

life expectancy based on actuarial tables, ████████████████████████████████████

████████████. Ex. E, May 5, 2017 Levy Dep. at 380:17-382:1, 383:4-17. ████████████

████████████████████████████████████████████████████████████████████

Gage Rpt. at 21-23.

### III.    Ms. Levy Lacks the Qualifications to Offer Her Proposed Expert Testimony

Ms. Levy lacks the qualifications to offer the medical and economic opinions expressed

in her reports.  To address her qualifications, the Court must determine what "specific question"

Ms. Levy is answering in her testimony.  *Gayton v. McCoy,* 593 F.3d 610, 617-618 (7th Cir.

2010) ("The question we must ask is not whether an expert witness is qualified in general, but

whether his 'qualifications provide a foundation for [him] to answer a specific question.'")

(quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). Although Ms. Levy is a

nurse and certified life care planner, she is not qualified to diagnose a patient with a medical

condition or to provide economic analysis of a plaintiff's damages claims.  The Court should

therefore bar her from offering any expert opinions on those topics.

Ms. Levy readily acknowledges that she is not a medical doctor and cannot prescribe

medication or diagnose medical conditions.  May 4, 2017 Levy Dep. at 57:19-58:4; 59:16-60:10.

She admits that she is not qualified to determine the likelihood that a specific condition will

manifest in a given patient's future.  May 5, 2017 Levy Dep. at 367:3-17, 368:19-369:3, 370:21-

371:14.  Ms. Levy also admits that she is not an economist.  May 4, 2017 Levy Dep. at 61:19-20, 346:13-18.

A life planner without a medical degree lacks "the education, training or experience needed to predict the care and treatment [a plaintiff] needs today, or will need in the future." *Norwest Bank, N.A. v. K-Mart Corp.*, No. 3:94-CV-78RM, 1997 WL 33479072, at *2 (N.D. Ind. Jan. 29, 1997); *see also Hale v. Gannon*, No. 1:11-CV-277-WTL-DKL, 2012 WL 3866864, at *4 (S.D. Ind. Sept. 5, 2012) ("[T]he Court agrees that treatment included in [the expert's] life care plan that is not supported by a doctor's recommendation is not scientifically reliable.").  Life care planners are limited to "opinions of the costs of treatment, if the need for treatment is established by medical evidence."  *Id.*  Yet Ms. Levy's proposed testimony goes beyond this limited scope in several ways.  First, she relies on inadmissible diagnoses from Dr. Marmureanu. Second, she sets forth medical needs not supported by Dr. Marmureanu's testimony.  Third, she improperly provides economic analysis as to the total costs of Plaintiffs' medical needs.

### A.     Ms. Levy is unqualified to deliver her testimony insofar as it relies on inadmissible opinions of Dr. Marmureanu

Ms. Levy relies exclusively on Dr. Marmureanu for the diagnoses on which her life care plans rely.  Contemporaneous with this motion, Cook has filed a separate *Daubert* motion to exclude the opinions of Dr. Marmureanu. To the extent the Court grants Cook's *Daubert* motion and finds Dr. Marmureanu's testimony inadmissible, the Court should also exclude Ms. Levy's testimony.

Although experts may rely on inadmissible evidence in forming their opinions, Dr. Marmureanu's opinions on Plaintiffs' medical conditions form the entire foundation of Levy's opinions concerning the necessity and costs of various treatments.  She cannot serve as proxy for Dr. Marmureanu's inadmissible opinions under the guise of using them to support her own.  An

unqualified expert may not serve as the "mouthpiece" for a non-testifying expert with a different specialty. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer."); *Hamdan v. Indiana Univ. Health N. Hosp., Inc.*, No. 1:13-CV-195-WTL-MJD, 2015 WL 3674087, at *3 (S.D. Ind. June 11, 2015) ("[T]o allow [one expert] to 'parrot' the opinion of another expert in a different field. . . is improper."). If Dr. Marmureanu's testimony is inadmissible, Ms. Levy cannot simply parrot his opinions into the record. As the Seventh Circuit has noted, "[t]hat would not be responsible science." *Dura*, 285 F.3d at 614. Indeed, this Court has recognized that it must exclude a life care planner's opinions that are not supported by admissible medical expert testimony. *Hale v. Gannon*, No. 1:11-CV-277-WTL-DKL, 2012 WL 3866864, at *5 (S.D. Ind. Sept. 5, 2012) ("With respect to each item of treatment listed on Brown's plan, the Plaintiff must prove the necessity of treatment to the usual standard and by admissible evidence.").

In Ms. Levy's two reports, both sections titled "Projected Medical Service Needs" consist entirely of medical opinions purportedly offered by Dr. Marmureanu, specifically predicting Plaintiffs' future medical needs. *See* Hill Rpt. at 19-20; Gage Rpt. at 17-19. Furthermore, the sections entitled "Cost Analysis" set forth Dr. Marmureanu's purported opinions a second time by listing Plaintiff's medical needs in line-item form, as their cost is assessed. Hill Rpt. at 22-24; Gage Rpt. at 21-23. Accordingly, if Dr. Marmureanu is excluded, Ms. Levy cannot provide the testimony detailed in these sections of her reports. To do so would impermissibly parrot Dr. Marmureanu's opinions in front of the jury.

Thus, to the extent that the Court grants Cook's motion to exclude the opinions of Dr. Marmureanu on which Ms. Levy relies, the Court should exclude her opinions as well.

**B.      Ms. Levy is unqualified to deliver medical opinions that Dr. Marmureanu does not support**

Even assuming that the Court admits some or all of Dr. Marmureanu's proposed testimony, this Court should nevertheless exclude Ms. Levy's testimony because it goes beyond the boundaries of her own expertise and is not supported by the opinion of Dr. Marmureanu or any other qualified expert.

First, although Ms. Levy claims otherwise, the evidence shows that she alone drafted the lists of medical diagnoses in her reports. Dr. Marmureanu never saw Ms. Levy's expert reports or her proposed diagnoses before she completed them. May 4, 2017 Levy Dep. at 325:13-15. Instead, Ms. Levy drafted the reports and spoke with Dr. Marmureanu by phone, giving him a chance to "agree[] with" her conclusions. *Id.* at 324:18-325:21, 368:1-8. She cannot remember the extent to which Dr. Marmureanu made any changes to her reports, and she has no earlier drafts. *Id.* at 368:20-370:2. Critically, Dr. Marmureanu's report does not offer many of the diagnoses and prescriptions proposed in Ms. Levy's report. For example, Dr. Marmureanu's reports do not discuss the diagnostic studies that Ms. Levy says Plaintiffs must undergo to monitor their alleged filter-related injuries and conditions. *Compare* Ex. F, Marmureanu Hill Rpt. at 15-16; Ex. G, Marmureanu Gage Rpt. 11-16, *with* Hill Rpt. at 19-20; Gage Rpt. at 17-19. Ms. Levy consulted no doctors other than Dr. Marmureanu, May 4, 2017 Levy Dep. at 361:20-362:7, 363:11-17, 371:11-19, meaning that she must have arrived at these diagnoses herself. Because these diagnoses are beyond Ms. Levy's qualifications and form the whole basis for Ms. Levy's reports, her testimony should be fully excluded.

Second, even assuming that Ms. Levy had in fact obtained some of the diagnoses in her reports from Dr. Marmureanu, she includes many diagnoses in her reports that find no support in Dr. Marmureanu's reports or deposition testimony.  *See* Marmureanu Hill Rpt. at 15-16, Marmureanu Gage Rpt. at 11-16 (Future Medical Needs, under "Case Specific Opinions Regarding Arthur Gage" for absence of opinions present in Ms. Levy's reports).  Each opinion in Ms. Levy's reports not supported by Dr. Marmureanu's reports must be excluded.  Therefore, the Court must bar the following testimony:

- Opinions about future care found in Plaintiffs' "Project Medical Service Needs" sections under the following headings:

  - "Outpatient Physician and Therapeutic Care from the following specialties," *see* Hill Rpt. at 19; Gage Rpt. at 17;

  - "Diagnostic services needed to evaluate and oversee medical management," *see* Hill Rpt. at 19; Gage Rpt. at 18);

  - "Medications," *see* Hill Rpt. at 20; Gage Rpt. at 18;

  - "Durable Medical Equipment and Supplies," *see* Hill Rpt. at 20; Gage Rpt. at 18-19; and

  - "Inpatient Care. . ." *see* Hill Rpt. at 20; Gage Rpt. at 19;

- ██████████████████████████████ Gage Rpt. at 17;

- Any opinions as to Plaintiffs' psychological condition and treatment needs, *see, e.g.*, Hill Rpt. at 15 (███████████████████████████);

- Opinions about Ms. Levy's cost analysis of any of the treatments discussed above.  Hill Rpt. at 22-24; Gage Rpt. at 21-23.

In addition, at Dr. Marmureanu's deposition, he affirmatively **withdrew** several opinions on which Ms. Levy had relied.  Dr. Marmureanu disavowed the opinions in his report that ████

███████████████████████████████████████████████

███████████████████████████████████████ By

8

extension, Dr. Marmureanu also cannot support an opinion that Mrs. Hill ██████████

███████████████████████████████ Hill Rpt. at 19.  Ms. Levy is

undisputedly unqualified to offer any of these opinions herself to a reasonable degree of medical

certainty, and, given Dr. Marmureanu's retraction of his opinions on these topics, she cannot be

permitted to testify that Plaintiffs will or might incur the costs of those procedures and that

treatment.  *See Hale,* 2012 WL 3866864, at *5 (excluding any life care planning testimony not

supported by a doctor's testimony at trial).  Thus, if Ms. Levy's testimony is not barred outright,

she must at least be prohibited from offering the following testimony from her report:

- ████████████████████████████ Hill Rpt. at 19.

- ████████████████████████████████████████
  ██████████████████
  Hill Rpt. at 19.

- That Mrs. Hill requires medical monitoring or diagnostic studies █████████
  █████████████████████.  Hill Rpt. at 19.

- That Mrs. Hill requires medications and medical equipment related to
  anticoagulation.  Hill Rpt. at 20.

- That Mrs. Hill will require inpatient care or complications such as GI bleed or
  intracranial hemorrhage.  Hill Rpt. 20.

- The cost of any of the above described medical needs, as listed in her cost
  analysis.  Hill Rpt. at 22-23.

Ms. Levy is unqualified to offer the medical opinions in her reports, and the Court should

bar or limit her testimony as described above.

### C.    Ms. Levy is unqualified to provide economic analysis

For similar reasons, the Court should preclude Ms. Levy from offering any economic

testimony regarding Ms. Hill's or Mr. Gage's alleged damages.  Ms. Levy is not an economist,

May 4, 2017 Levy Dep. at 61:19-20, and in fact frequently declined to answer specific questions

that required an economist's expertise.  *See, e.g.*, *Id*. at 186:3-11, 345:13-25, 346:13-24 ("That's

outside my purview. I would defer that to an economist or actuarialist.")  She thus cannot accurately forecast the costs Plaintiffs will allegedly incur in light of inflation and other considerations; she can only report the present-day costs of medical goods and services.  *Id.* at 345:13-25.  This Court should therefore limit Ms. Levy's testimony so that she opines only on her stated area of expertise: the present-day cost of any medical treatments prescribed or approved by a qualified physician.

### IV.  Ms. Levy's Proposed Expert Testimony is Not Based on a Reliable Methodology

Expert testimony is admissible only if it is based on reliable methodology.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993); *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015).  Ms. Levy's expert testimony does not rest on a reliable methodology, and the Court should exclude it.

Ms. Levy's methodology fails to satisfy several of the factors that the *Daubert* Court considered to be indicia of a reliable scientific methodology, including (1) whether an expert's technique can be tested, (2) whether it has a known rate of error, and (3) whether the technique has been subjected to peer review.  *Daubert*, 509 U.S. at 593-94.  First, Ms. Levy's methodology cannot be tested because, according to Ms. Levy, life care plans are "dynamic" plans that must constantly be updated.  May 4, 2017 Levy Dep. at 184:10-13.  Specifically, Ms. Levy stated that her methodology requires follow-up conversations with patients because unanticipated needs might arise.  *Id.* at 184:6-13, 185:22-24.  Thus, according to her, no individual life care plan can be tested for accuracy because each plan is meant to shift an indeterminate number of times with the introduction of information that contradicts the original forecast.  This approach renders courts unable to determine the reliability of her methodology for purposes of admissibility.

The inherent uncertainty in each life care plan also implicates two other *Daubert* reliability factors: (1) that a methodology has a known rate of error; and (2) that the methodology has been subjected to peer review.  One federal court in Indiana found life care plans unreliable based on just these points, stating:

> It is impossible to say that any principle underlying Dr. Voogt's opinions concerning medical needs has been subjected to peer review, or its error rate established, because the opinions are based solely upon the judgmental skills Dr. Voogt has developed in his years of experience. A recently completed study conducted through Louisiana State University enabled Dr. Voogt to determine, using a scientific method, how well he had done through the years in predicting the types of care a neurologically impaired patient would require, and Dr. Voogt's testimony suggests that he has done very well. But that study tests no scientific principle; it simply appraises Dr. Voogt's forecasting ability. Setting aside that experience might make him a better forecaster today than he was a decade ago, the study might identify Dr. Voogt's error rate, but the study cannot identify the error rate of another life care planner using the same methodologies and techniques.

*Norwest Bank, N.A. v. K-Mart Corp.*, No. 3:94-CV-78RM, 1997 WL 33479072, at *6 (N.D. Ind. Jan. 29, 1997) (excluding proposed expert testimony of life care planner based under *Daubert*).

Here, Ms. Levy cannot even provide evidence of her own error rate, let alone that of her methodology as a whole.  She failed to identify any error rate for her calculations at deposition, and she testified that it is not possible to define whether her reports are "accurate."  May 4, 2017 Levy Dep. at 172:6-173:6.  As noted above, her life care plans are unavoidably "dynamic," constantly changing, and evolving based on what a patient needs.  *Id.* at 183:24-184:13.  She simply projects her best guess as to future expenses based on the information available at a particular point in time; information that can change at any point in time.  *Id.* at 185:6-186:1.  As a result, Ms. Levy can never opine with any reasonable degree of certainty that any patient will *actually* need the care she identifies or that the patient will *actually* incur the costs Levy projects. Ms. Levy recognizes that she *could* test the rate of error on her life care plan predictions, if not

her methodology, but she has not undertaken any surveys or studies that would provide her with information about her error rate. *Id.* at 186:12-187:4.

Ms. Levy also does not assert that the methodology she used for these particular cases have been subjected to peer review, nor could she. *See Norwest Bank, N.A. v.* 1997 WL 33479072, at *6 ("It is impossible to say that any principle underlying Dr. Voogt's opinions concerning medical needs has been subjected to peer review, or its error rate established, because the opinions are based solely upon the judgmental skills Dr. Voogt has developed in his years of experience."). Instead, Ms. Levy maintains that the accuracy of her cost projections has been verified during litigation by opposing actuarialists and economists. May 4, 2017 Levy Dep., at 384:17-385:1. In other words, Ms. Levy maintains that her methodology is accurate simply because she has not been challenged in litigation. Not only is Ms. Levy unable to prove that her work has actually been verified by economic experts—she could not quantify how many actuarialists or economists have been on the other side of her cases, and could not quantify how many times those experts actually verified her work, *Id.* at 385:2-386:19—but this testimony is beside the point. Occasional review by opposing experts does not rise to the level of peer review and does not establish any error rate. Ms. Levy's failure to establish an error rate and demonstrate that her methodology has survived peer review underscores its lack of reliability.

Plaintiffs will doubtless argue that life care planning is a recognized discipline and note that Ms. Levy has cited literature in her reports. Cook does not dispute that Ms. Levy's methodology may in fact assist patients anticipate and plan for possible health care needs and expenses—but that does not mean that the methodology is scientifically-based or that it produces predictions that are accurate to a reasonable degree of certainty, as required to prove a fact in a court of law. *See, e.g.*, *Wintz By and Through Wintz v. Northrop Corp.*, 110 F.3d 508 (7th Cir.

1997) (applying Illinois's "reasonable degree" standard) (citing *Scholle v. Continental Nat'l Am. Group*, 44 Ill.App.3d 716, 3 Ill. Dec. 350, 355, 358 N.E.2d 893, 898 (1976)).  The "use of a recognized methodology does not breathe reliability into an opinion formed without reference to scientific principle." *Norwest*, 1997 WL 33479072, at *5.  Although Ms. Levy cited to literature in order to "orient the reader to the. . . field of life care planning," she makes no connection between her proffered opinion and any literature or scientific principle.  May 4, 2017 Levy Dep. at 36:19-20.  Instead, she simply lists Plaintiffs' alleged medical needs and their costs based on her unverified judgment.  "An expert must be able to relate an opinion to some scientific principle known. . . in the literature of the expert's field." *Norwest*, 1997 WL 33479072, at *5.  Ms. Levy's proposed testimony lacks such a principle, and the Court should exclude it.

## V.     Even Assuming Ms. Levy's Methodology Were Reliable, She Has Not Properly Applied that Methodology

Even assuming for the sake of argument that Ms. Levy's life-planning methodology were reliable in theory, she has failed in several ways to properly follow or apply that methodology.  The Court should therefore exclude her testimony.  *See Mayes v. City of Hammond, Indiana*, No. 2:03-CV-379-PRC, 2006 WL 1707267, at *2 (N.D. Ind. June 21, 2006) (excluding testimony of expert on hypnotism with "impressive credentials" because he did not "appl[y] hypnotism principles and methods reliably to the facts of this case").

### A.     Ms. Levy did not consult doctors within the appropriate "clinical specialty" in arriving at her opinions

Ms. Levy's stated methodology required her to obtain diagnoses of medical conditions by doctors "according to their clinical specialty," and then to evaluate the cost of the needed care described by the medical expert.  Hill Rpt. at 1; Gage Rpt. at 1.  In fact, however, Ms. Levy relies on Dr. Marmureanu for several predictions that extend beyond his "clinical specialty" as a

thoracic and cardiovascular surgeon.  Marmureanu Dep. at 53:19-54:12, 77:5-78:11.  Contrary to her stated methodology, Ms. Levy's reports rely on Dr. Marmureanu's diagnoses and opinions in areas such as radiology, vascular surgery, nephrology, and pain management, areas in which Dr. Marmureanu admits he does not regularly practice.[2]  Marmureanu Dep. at 92:5-95:1.  Ms. Levy has thus failed to follow her own stated methodology, and the Court should therefore exclude her testimony.

      **B.**    **Ms. Levy failed to take several steps critical to the life care plan methodology**

The life care planning methodology also contemplates that Ms. Levy will take steps beyond speaking to a clinical specialist that are necessary to complete the "life care planning process," and her reports assert that she has done so.  Hill Rpt. at 1; Gage Rpt. at 1.  These steps consist of "gathering and reviewing all relevant information, including the complete medical records of the client, depositions and interrogatories of the client's doctors, and day-in-the-life videos," as well as identifying "remaining 'holes' in the data."  *Hale v. Gannon*, No. 1:11-CV-277-WTL-DKL, 2012 WL 3866864, at *3 (S.D. Ind. Sept. 5, 2012).  However, Ms. Levy skipped several critical steps in the life care planning process:

> 1.   She did not perform a comprehensive review of Plaintiffs' medical records, as she failed to review numerous records;
>
> 2.   She did not consult with any of Plaintiffs' treating doctors; and
>
> 3.   She took no steps to identify, let along rectify, holes in her data.

These omissions undermine her application of her stated methodology.

---

[2] The issue of whether Dr. Marmureanu himself is qualified to testify in these areas presents a different question, which is addressed in Cook's *Daubert* motion concerning Dr. Marmureanu. The issue here is whether Ms. Levy has followed her own methodology or instead has relied on Dr. Marmureanu in areas outside his clinical specialty of cardiothoracic surgery.

**Review of medical records.**  According to Ms. Levy's reports, life care planning methodology requires that "*[a]ll* past medical, social, psychological, vocational, educational, and rehabilitation data are taken into consideration to the extent that it is available and applicable." Hill Rpt. at 1; Gage Rpt. at 1 (emphasis added).  Although Ms. Levy had authorizations to collect all of Plaintiffs' medical records from the hospitals directly, May 4, 2017 Levy Dep. at 363:24-364:8; Exs. I-J, Levy Dep. Exhibits 12 and 13, she considered and lists in her reports *only* medical records selected and provided to her by Plaintiffs' attorneys.  *See* Hill Rpt. at 2; Gage Rpt. at 2.

In relying solely on what Plaintiffs' attorneys provided, Ms. Levy has not reviewed anywhere near all of the medical records available for either Mrs. Hill or Mr. Gage.  *See* Comparison Chart.  For the Gage report, Ms. Levy reviewed only records from Edward Hospital and Loyola Medicine, despite the production in this case of thousands of pages of additional, relevant medical records from at least nine other medical providers.  Comparison Chart at 1.  For the Hill report, Ms. Levy likewise failed to review thousands of pages of available records, *id.* at 3-5; for 16 of Mrs. Hill's medical providers, she reviewed no records at all.  *Id.* at 4-5.

Thus, contrary to the methodology she sets out in her reports, Ms. Levy did not review all available "medical, social, psychological, vocational, educational, and rehabilitation data" relating to either Mrs. Hill or Mr. Gage.  She again failed to follow her own stated methodology for life care planning, and the Court should exclude her testimony.  *Hale*, 2012 WL 3866864, at *3 ("[C]omposing a life care plan requires gathering and reviewing all relevant information, including. . . depositions and interrogatories of the client's doctors. . . .").

Furthermore, failure to consider "sufficient facts or data" makes expert testimony unreliable. *See Bielskis v. Louisville Ladders, Inc.*, 663 F.3d 887, 895 (7th Cir. 2011) (excluding

expert whose "sources of information" behind his opinion were insufficient).  Ms. Levy failed to consider a significant amount of the medical records in this case, and as a result, her opinion lacks the necessary facts and data to be considered reliable.

**Information from treating physicians.**  Ms. Levy gathered very little information about Plaintiffs' medical conditions from what would seem to be the best sources available:  Plaintiffs' treating physicians.  Ms. Levy acknowledges that she did not speak to *any* of Plaintiffs' treating physicians about Plaintiffs' conditions.  May 4, 2017 Levy Dep. at 361:20-362:7, 363:11-17, 371:11-19.  What's more, she inexplicably did not review any of the depositions of any of the doctors who actually treated Mrs. Hill or Mr. Gage.[3]  *Id.* at 371:11-19.  Finally, although she purports to rely on those treating physicians' medical records in forming her opinions, Ms. Levy's reports include no citations to any treating physician's medical records that predict Plaintiffs' future care needs as a result of any filter-related injuries.  Hill Rpt., *passim*; Gage Rpt., *passim*. Ms. Levy's apparent disregard for the opinions and diagnoses of Plaintiffs' treating doctors is inconsistent with the methodology she claims to follow, and renders her opinions unreliable and inadmissible.  *See Lologo v. Wal-Mart Stores, Inc.*, No. 2:13-cv-1493-GMN-PAL, 2016 WL 4084035, at *6 (D. Nev. July 29, 2016) ("[B]ecause Nurse Cook did not consult Ms. Lologo's treating physicians in forming her long-term care plan, the Court finds that her opinions are based on insufficient facts or data and must be excluded.").

**Identifying and filling "holes" in her information.**  After gathering the limited information that she used to compile her reports, Ms. Levy failed to identify the holes in the information provided to her.  Specifically, Ms. Levy took no measures to assess the likelihood that any of the conditions listed in her reports will actually manifest.  She has no method for

---

[3] For the Gage report, she failed to review the depositions of Drs. Paul Crisostomo, Mark Goodwin, Timothy Larkin, and Antonio Pangan.  For the Hill report, she did not review the depositions of Drs. Bridget Bellingar, Mark Zuzga, and Anthony Moreno.

determining the actual or relative likelihood of these conditions, and admits that she leaves such

determinations to Dr. Marmureanu.  May 4, 2017 Levy Dep. at 378:13-379:9.  Her reports

instead simply *assume* that Plaintiffs will suffer from the many conditions listed in the life care

plans, even when Dr. Marmureanu has acknowledged that they are unlikely.  For example, Ms.

Levy's report on asserts that Mrs. Hill is ███████████████████████████████████

██████████████████████████████████████  Hill Rpt. at 19.  Yet Dr.

Marmureanu, the purported source for virtually all of Ms. Levy's medical information, testified

that such complications are rare and that Mrs. Hill is unlikely to develop them:



Marmureanu Dep. at 585:15-586:8 (emphasis added).  Despite Dr. Marmureanu's admission that

this opinion is not to a reasonable degree of medical certainty, Ms. Levy relies on it to form her

opinion that Mrs. Hill will require ██████████████████████████  May 4, 2017

Levy Dep. at 381:16-22.

Ms. Levy asserts that Dr. Marmureanu told her by telephone that all of the treatments she

predicts will be required to a "medical probability."  May 4, 2017 Levy Dep. at 203:12-204:8;

May 5, 2017 Levy Dep. at 364:25-365:17, 366:21-367:17.  However, Dr. Marmureanu's

testimony belies Ms. Levy's assertion.  In addition to his statements about the low probability

Mrs. Hill will develop caval thrombosis, Dr. Marmureanu's fully retracted his opinions about Mrs. Hill's need for anticoagulants, proton pump inhibitors ("PPI"), and lymphatic treatment. As a result, Ms. Levy has no basis to say it is medically probably that Ms. Hill has any needs related to ███████████████████████████████  *See supra* § III(B), p. 9 (listing opinions in the Hill report affected by Dr. Marmureanu's retractions).  Dr. Marmureanu also fully admits that he cannot reliably say Mrs. Hill will require counseling, compression hosiery, or annual medical monitoring or surveillance.  Marmureanu Dep. at 617:25-618:6 (When asked if she required annual surveillance to date:  "I don't know.  I do not know"); *Id.* at 622:2-20 (admitting he did not evaluate whether Mrs. Hill's filter caused her need to have compression hosiery, and that she may need it for other unrelated health reasons); *Id.* at 620:2-621:25 (admitting he does not know if she needs or has required counseling, stating "I will have to defer this to me having a discussion with her").  This, too, exposes the uncertainty of Ms. Levy's prediction that ████████████████████████████████████████████ ██████████████████████  Hill Rpt. at 19-20.

Additional opinions upon which Ms. Levy relies to predict other treatments, but which Dr. Marmureanu admits he *cannot* reach to any reasonable degree of medical certainty include the following:

- Alleged ██████ of Mrs. Hill's vena cava has any clinical effect. Marmureanu Dep. at 585:15-586:8.

- Alleged ████████████████████████████ has any clinical effects. Marmureanu Dep at 531:11-16 ("It might have, it might not have. It might lead to obstruction. It might not.").

- Ms. Hill currently suffers from duodenal stenosis.  Marmureanu Dep. at 596:24-597:9 (acknowledging he lacks sufficient information to conclude Mrs. Hill suffers from duodenal stenosis).

- Mrs. Hill requires psychological counseling.  Marmureanu Dep. at 620:22-621:25 ("I will have to defer this to me having a discussion with her.").

Ms. Levy has no reliable foundation to think that Dr. Marmureanu believes to a medical probability that Mrs. Hill will require any specific medical treatment in the future, and it makes clear that her methodology is unsupported.

Each of the omitted steps discussed above is important to a life care planner's methodology, and provides sufficient grounds to exclude testimony as unreliable. The combination of these multiple omissions makes clear that Ms. Levy has been quite careless in adhering to her own stated methodology, and the Court should exclude her testimony on that ground.

### C. Plaintiffs' refusal to disclose Ms. Levy's calculation spreadsheet leaves Cook and the Court unable to determine the reliability of her testimony

The Court should also bar Ms. Levy's proposed testimony because it relies on a methodology that she will not reveal and that the Court therefore cannot evaluate for reliability. Ms. Levy testified that she calculates the present-day cost of a patient's predicted medical needs by inputting those needs into a database (Ms. Levy refers to this document as "the spreadsheet"). May 4, 2017 Levy Dep. at 255:9-256:7, 273:20-24. This database/spreadsheet contains cost data that Ms. Levy and one coworker have gathered from various primary sources and entered in the program, *Id.* at 257:3-259:8; 264:2-265:2, and Ms. Levy relies on this data and the calculations based on that data to produce her life care plans. *Id.* at 257:3-258:1. The reliability of the spreadsheet and the accuracy of the data it contains are therefore critical to the reliability of Ms. Levy's testimony.[4]

---

[4] At her deposition, Ms. Levy referred repeatedly to the spreadsheet in explaining her opinion. For example, when asked about sources for the local data that she collected and relied on in Mrs. Hill's life care plan, she stated "I'd have to look at the specific spreadsheet to see the breakdown." May 4, 2017 Levy Dep. at 279:18-280:7; *see also* 280:16-22 (stating that she would have to look at the spreadsheet for national sources as well); 287:6-12 ("We have the

Given the importance of the spreadsheet and Ms. Levy's repeated deference to that document at deposition, Cook requested that Ms. Levy produce the spreadsheet for Cook to examine. *See* Ex. K, June 9, 2017 Letter to D. Matthews. Ms. Levy, through Plaintiffs' attorneys, refused. *See* Ex. L, June 17, 2017 E-mail from J. Rhoades. As a result, neither Cook nor the Court can know where all the data that Ms. Levy relies upon comes from and cannot check that data to ensure it is up to date, geographically appropriate, and accurate in numbers of other ways.

When an expert discloses only "the sources of information [she] reviewed" and does not "disclose the facts or data [she] relied upon" in conducting their analysis, it is grounds for exclusion. *Eversole v. H & J Trucking, Inc.*, No. 3:09-CV-007-RLY-WGH, 2010 WL 9589559, at *1 (S.D. Ind. June 4, 2010). This Court cannot reasonably determine the reliability of Ms. Levy's methodology without understanding whether her spreadsheet itself is reliable. Because she refuses to disclose that spreadsheet, the Court must exclude her testimony.

### D. Ms. Levy fails to explain how the materials she reviewed informed her conclusion

Each of Ms. Levy's reports sets forth a list of materials reviewed and a set of medical predictions. However, she provides no indication how she used those materials to support the specific conclusions she postulates. This failure is grounds for exclusion. In *In re Zimmer Nexgen Knee Implant Products Liability Litigation*, 218 F. Supp. 3d 700 (N.D. Ill. Oct. 21, 2016), a plaintiffs' medical expert claimed that the product at issue contained a design defect with "almost no explanation of how the sources he reviewed support his conclusions." *Id.* at 714. To support his conclusion of design defect, Plaintiffs' expert stated his opinion was based

---

spreadsheets for these prices that we've done and we know those are the usual ranges for those procedures.").

on his examination of one Plaintiff's implant as well as the medical records of "dozens of other individuals." *Id.* However, the expert did not describe what he saw in the implant and the medical records that led to his conclusion. *Id.* On this basis, the court excluded Plaintiffs' expert. *Id.* at 715 ("Plaintiffs emphasize Dr. Fetto's years of experience and the extent of the sources he reviewed, but without an explanation for how those sources support his conclusions, the court has no way to verify that Dr. Fetto uses those sources in a reliable way.")

Likewise here, Ms. Levy's conclusions are not tied to citations or any other indication as to how she concluded that the medical treatments and costs listed in her reports were necessary. She provides no analysis as to how the medical records she presumably reviewed support her proposed care plans. Instead, the section of the reports addressing Plaintiffs' future medical needs simply state that they are based on consultation with Dr. Marmureanu and "the review of available records." Hill Rpt. at 19; Gage Rpt. at 17. This stands in stark contrast with places where Ms. Levy provided at least some sources. Ex. M, Cost Analysis: Arthur Gage; Hill Rpt. at 15-18 ("Past Medical History").

Even at her deposition, when pressed for sources, Ms. Levy was unable to provide anything other than vague references to information coming from "medical records" or uncertain memory of one doctor providing a diagnosis. *See, e.g.*, May 4, 2017 Levy Dep., at 322:4-12; 329:13-23; May 5, 2017 Levy Dep., at 364:18-20; 394:6-18. Thus, the Court here also has "no way to verify" whether Ms. Levy has used her sources in a reliable way. *In re Zimmer Nexgen*, 218 F. Supp. 3d at 715. The Court should exclude her opinions.

### E.     Ms. Levy's testimony contains significant factual errors

In addition to Ms. Levy's failure to follow the necessary steps for creating a life care plan, Ms. Levy also made factual errors that exaggerate Plaintiffs' medical costs, and

demonstrate that she did not properly execute her stated methodology and her report is inherently

unreliable.  Ignoring critical, material data renders an expert's methodology unreliable and is

grounds for exclusion.  *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001)

("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render

an expert opinion, the district court correctly barred his testimony because such a selective use of

facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of

fact.'") (quoting Fed. R. Civ. Proc. 702); *Allgood v. Gen. Motors Corp.*, No.

102CV1077DFHTAB, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) (excluding expert

for relying on a selection of data, but providing no explanation for why that selected set of

information was appropriate); *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL

1162979, at *4 (N.D. Ill. Apr. 28, 2005) ("[D]isregard of relevant data undermines the reliability

of St. John's entire opinion in this matter.")

Furthermore, cross-examination is not an adequate avenue for dealing with an expert

whose "assumptions were not supported by evidence, but were, in fact, controverted by the facts

available. . . ."  *MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-CV-1096-SEB-TAB, 2009

WL 1916728, at *5 (S.D. Ind. June 29, 2009) (rejecting Plaintiff's argument that the "soundness

of the factual underpinnings of the expert's analysis. . . are factual matters to be determined by

the trier of fact").  The following errors are controverted by available evidence and cannot be

exposed to the jury, even with the protection of vigorous cross-examination.

First, Ms. Levy chose without explanation to ignore certain undisputed facts undeniably

material to Plaintiffs' cost predictions.  ███████████████████████

██████████████████████████████████████████

███████  Ex. N, Pangan Dep. at 162:20-164:22, 166:19-167:12; Marmureanu Dep., at 635:13-15

████████████████████████████████████████████████████  Despite this, Ms. Levy chose to project Mr. Gage's future life expectancy based on actuarial tables, not based on his actual physical condition.  May 5, 2017 Levy Dep. at 380:17-382:1, 383:4-17.  Such an unexplained and unjustified disregard of Mr. Gage's short life expectancy obviously and significantly magnifies his expected future medical costs, undermining any confidence that Ms. Levy has faithfully applied her methodology.

This omission also underscores the significance of Ms. Levy's failure to comprehensively review medical records, speak to Plaintiffs' treating physicians, or even read Plaintiffs' physicians' depositions.  These sources contain relevant information about Mr. Gage's prognosis and could have emphasized to Ms. Levy the significance of his ████████████████████ ████████████████—had she reviewed them.

Ms. Levy makes other factual errors that inflate her predicted cost of Plaintiffs' medical treatments.  For example, if a patient develops a deep vein thrombosis, the patient can logically be treated *either* operatively *or* non-operatively, but *not* operatively *and* non-operatively.  But Levy not only predicts that Mr. Gage will need to be treated for deep vein thrombosis—an assumption unsupported by medical evidence, as discussed above—she includes in her plan cost estimates for *both* an operative *and* a non-operative treatment, and gives no explanation for including both.  Gage Rpt. at 22.

To note another example, Mr. Gage ████████████████████████████████ ████████████████████████████████████████  Ex. O, Larkin Dep. at 83:23-84:20.  Even so, Levy includes the cost of anticoagulants in the costs she attributes to the presence of the filter, assuming without foundation, ████████████████████ ██████████████████████████████████  Gage Rpt. at 21.  In

23

addition, despite the available existing data about what Mr. Gage's ███████████ ██████████

*actually* cost, Levy projects an entirely different cost for the future that inflates the costs by

███████ over time.  Gage Rpt. at 21.  *Compare* Ex. M, Gage Rpt., Cost Analysis: Arthur Gage, at

2████████████████████████████████████████ *with* Ex. P, Gage Osco

Pharmaceutical Records, at Albertsons 0107-08, 0112 ████████████████████████████

███████████████

Third, Ms. Levy's report for Mrs. Hill contains information about Mrs. Hill's

employment that is (according to Plaintiffs) false.  Ms. Levy states that Mrs. Hill ██████████████

█████████████████████████████████████████████████████████████

████████████  Hill Rpt. at 18.  But Plaintiffs' recent brief opposing Cook's motion to compel

disclosure of Mrs. Hill's employment records contradicts Ms. Levy's report on this point,

declaring:

> This statement is the result of miscommunication. At one point after she had
> retired, Ms. Hill was told of an opportunity for part time employment teaching
> psychiatric nurses communication skills. To apply for the job, Ms. Hill had to take
> an on-line "orientation" which lasted several hours. She sat through the first hour
> of the orientation and never completed it.

Plaintiff Elizabeth Jane Hill's Response in Opposition to Cook Defendants' Motion to Compel

Discovery, Dkt. 5458, at 4-5.  Ms. Levy's report thus contains yet another factual error

undermining her application of her stated methodology.  The issue of whether a person is

employed would seem to be a critical aspect of accurate life care planning, as Ms. Levy herself

testified:

> A life care plan is not just looking at the medical needs of the patient. We're
> looking at the -- how is the disability affecting them vocationally, how is it
> affecting them in their family, how is it affecting them in their social roles and
> relationships. And so, it is a comprehensive needs assessment of that.

May 4, 2017 Levy Dep. at 199:9-14.  Ms. Levy's report is unclear about how she incorporated her misunderstanding of Mrs. Hill's employment history and the cause of her unemployment, but Ms. Levy makes clear that her needs-assessment incorporates a patient's vocational status into the care plan.  This is only logical; an individual's ability and desire to work is connected to the treatment they will need, yet Ms. Levy forecasted Mrs. Hill's treatment needs with an incorrect picture of her employment status.  Ms. Levy's entire set of opinions and calculations is rendered unreliable by this "miscommunication."

Furthermore, this error calls into question the sources of Ms. Levy's information and their reliability.  Ms. Levy presumably received this information from Mrs. Hill herself, inasmuch as Ms. Levy discussed Mrs. Hill's employment history in their interview together and Ms. Levy listed no employment records as sources for her report.  Hill Rpt. at 2-3, 13.  Cook does not dispute that an expert "has the right to rely on the facts and data made known to him by others."  *Wildwood Indus., Inc. v. Genuine Mach. Design, Inc.*, No. 4:06-CV-00124-PRC, 2008 WL 7404647, at *4 (N.D. Ind. July 3, 2008).  At the same time, an expert's testimony must be excluded if "some of the important facts and data upon which he relied are inaccurate. . . ."  *Id.* This "miscommunication" between Ms. Levy and Mrs. Hill undermines the reliability of their interview and of Ms. Levy's report.

In sum, the litany of errors in Ms. Levy's reports is an independent basis for exclusion. *See MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-CV-1096-SEB-TAB, 2009 WL 1916728, at *4-6 (S.D. Ind. June 29, 2009) (excluding expert because "an expert must independently verify facts given to him" and, in this case, "his mistaken assumptions and his failure to verify key facts are errors of methodology that render his resultant opinions unreliable."); *Wildwood*, 2008 WL 7404647, at *4.  The Court should bar Ms. Levy's testimony as unreliable.

**VI.     Ms. Levy's Proposed Expert Testimony Would Not Assist the Jury**

The Court also should exclude Ms. Levy's proposed expert testimony for Plaintiffs Hill and Gage because that testimony would not be relevant to the issues the jury will have to decide and thus will not assist the jury.  To be relevant, Ms. Levy's testimony would need to be "sufficiently tied to the facts" of this case to help the jury resolve a factual dispute.  *Sann v. Mastrian*, 2012 WL 253088, *3 (S.D. Ind. Jan. 26, 2012) (quoting *Daubert*, 509 U.S. at 591). However, the hypothetical future treatments that Ms. Levy proposes are not analytically sound, but are inadmissible as speculation based on mere assumptions.  *See Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007); *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999).

According to Ms. Levy's reports, her life care plan is supposed to assess the "medical and medically related goods and services that are needed" by both Mrs. Hill and Mr. Gage as a result of their alleged IVC filter injuries.  Hill Rpt. at 1; Gage Rpt. at 1.  Yet neither Mrs. Hill nor Mr. Gage *actually* has *any* of the complications that Levy projects in her reports, despite the lengthy periods since their respective surgeries that each has lived with the alleged consequences of their IVC filters.  Based on her various omissions in her process and her reporting of the facts, Ms. Levy is merely speculating as to a wide range of possible—but not probable—outcomes.  A court considered a similar life plan in *Norwest Bank, N.A. v. K-Mart Corp.*, No. 3:94-CV-78RM, 1997 WL 33479072 (N.D. Ind. Jan. 29, 1997), concluding that the life care planner's testimony was irrelevant, and in fact confusing to the jury.  The court reasoned:

> [L]ife care plans are used as recommendations to physicians who review the plans in developing treatment plans. As the court understands it, however, it is the physician, and not the life care planner, who determines the treatment ultimately received by the patient. Dr. Voogt is qualified to make a "forecast" in this sense, but such a forecast simply is not relevant to the issues the jury will have to decide. The jury will be asked neither to decide how much money K–Mart should set aside in reserve nor to act as Mrs. Frick's health care provider. Under Indiana law, which provides the rule of decision in this diversity case and so provides the

26

> lodestar for determinations of relevancy, damages for future medical expenses and disability are limited to that which is reasonably certain to occur in the future. See *Kaminski v. Cooper*, 508 N.E.2d 29, 30–31 (Ind. Ct. App.1987); *Kirk v. Harris*, 364 N.E.2d 145 (Ind. Ct. App.1977). Relevancy of evidence is not the same as sufficiency of evidence, but Rule 403 recognizes the authority to exclude evidence that poses this great an invitation to the jury to decide the issue of damages on an improper basis. A "forecast" such that Dr. Voogt can offer is close enough to the case's legal issues as to create a risk of jury confusion so great as to substantially outweigh the probative value of the forecast.

*Id.* at *3.

What assistance Ms. Levy's testimony would provide to the jury is unclear.  Her testimony consists of reporting Marmureanu's diagnoses (sometimes inaccurately) and calculating the present cost of medical treatments based on a spreadsheet.  This testimony is not relevant to how much Plaintiffs will actually end up paying for actual future medical treatment.  Indeed, Ms. Levy admits as much.  May 4, 2017 Levy Dep. at 345:13-346:18.  The testimony therefore will not help the jury reach any conclusions about the amount of Plaintiffs' damages, and the Court should exclude it.

## VII.   Conclusion

For the reasons stated above, the Cook Defendants urge the Court to grant their motion and to bar from the trial in this action the testimony of Plaintiffs' expert Leigh Anne Levy, R.N., CLCP.

Respectfully submitted,

Dated:  August 9, 2017

/s/ *J. Joseph Tanner*
Andrea Roberts Pierson (# 18435-49)
J. Joseph Tanner (# 11856-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
Email:  andrea.pierson@faegrebd.com
Email:  joe.tanner@faegrebd.com
Email:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2017, a copy of the foregoing **COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF LEIGH ANNE LEVY, R.N., CLCP** was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.  Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

*/s/ J. Joseph Tanner*