**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                           MDL No. 2570
_____

This Document Relates to the Following Actions only:

     Elizabeth Jane Hill
     No. 1:14-cv-06016-RLY-TAB

     Arthur Gage
     No. 1:13-cv-01875-RLY-TAB

_____

**COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
TO EXCLUDE EXPERT OPINIONS OF DR. ROBERT McMEEKING**

     The question before the Court is whether it should allow a witness to offer expert

testimony that a product is defectively designed when the expert:

- admits that he had no experience with the product outside of litigation;

- admits that he had never designed such a product (or anything close to it);

- admits that his opinions rest on two factual assumptions that he concedes are not in fact true;

- admits that his predictions about how the product will behave are contradicted by the plaintiffs' actual experiences with the product; and

- admits that his opinion is based almost entirely on a self-described "theoretical analysis," and that he has not validated his opinion that an alternative design would have been safer and no less effective.

As the Court has undoubtedly surmised, this is not a hypothetical question.  It is the actual state of affairs with Dr. Robert McMeeking, a mechanical engineer who opines that Cook's inferior-vena-cava filters are defectively designed.

The Court should exclude Dr. McMeeking's opinions from evidence for three reasons. *First*, Dr. McMeeking's opinions would not be helpful to the jury because they rest on assumptions that he admits are untrue.  He concedes, for example, that his analysis assumes that the inferior vena cava (the largest vein in the human body) is rigid, like a glass tube.  In reality, the inferior vena cava is quite pliable, not rigid, and Dr. McMeeking admits this.  What's more, his calculations produce results that are flatly inconsistent with what actually happened to both plaintiffs.  Dr. McMeeking predicts that a filter that has perforated the inferior vena cava will break or otherwise fail if the patient coughs or has a bowel movement (examples of what are known as "Valsalva maneuvers") even *once*.  But that did not occur with Gage or Hill.  Gage's filter perforated his inferior vena cava years ago, and it has never broken, despite thousands of Valsalva maneuvers since that time.  And Hill's filter perforated her inferior vena cava for at least a week (probably much longer), and never broke or otherwise failed.

*Second*, Dr. McMeeking is unqualified to give his opinions because he admits that he has no experience with inferior-vena-cava filters outside of litigation.  He may be a general expert in mechanical engineering, but the Seventh Circuit requires expertise specific to the subject matter of the case, and Dr. McMeeking lacks it.

*Third*, and finally, his opinions are unreliable.  He never studied inferior-vena-cava filters until he was hired as plaintiffs' expert.  He has never published articles about inferior-vena-cava filters, and has given no lectures about them.  The theories he espouses have gone entirely untested by the scientific community.  Nor does he validate his methodology against any

objective benchmark.  And if all of that weren't enough, although he claims in his report that all medical-device designs should be tested, he points to no specific tests that support his design theories.  His is purely, in the words of his own report, a "theoretical analysis."  Ex. 1, McMeeking Report p. 3.

All of this renders Dr. McMeeking's opinions inadmissible at trial, and the Court therefore should exclude them.

### SUMMARY OF DR. McMEEKING'S OPINIONS

Dr. Robert McMeeking is a professor of mechanical engineering at the University of California, Santa Barbara. Ex. 1, McMeeking Report p. 1.  In general, he opines that the designs of the Cook inferior-vena-cava filters are "deficient."  *Id*.  In particular, he believes, based almost entirely on a self-described "theoretical analysis" consisting entirely of mathematical equations and calculations that he performed by hand (*i.e.*, without a computer, as such calculations are typically done these days) that Cook's Celect filter is "highly likely" to tilt when implanted, and that the Tulip filter is "likely" to tilt when implanted.  *Id*. at 3.  And in his opinion, a propensity to tilt makes it "very likely" that both kinds of filters "will be prone to perforating the wall of the vena cava and to extending beyond it, possibly interfering with and entering organs that neighbor the vena cava."  *Id*.  He cites no specific tests to back up any of these theories.

Dr. McMeeking also did mathematical calculations (again by hand) to analyze the stresses experienced by the primary legs of the Celect and Tulip filters.  *Id*. at 1.  When we breathe, cough, or have a bowel movement (a Valsalva maneuver), it temporarily puts pressure on (*i.e.*, temporarily constricts) our inferior vena cavas and reduces their diameters—and therefore temporarily constricts anything that is inside the inferior vena cava, including an IVC filter.  Repeated constriction and "relaxation" places "cyclic stress" on the inferior vena cava and

anything inside of it.  Dr. McMeeking's goal was to calculate how long the filters would last before one or more the legs of the filters would break off (*i.e.*, fracture) due to cyclic stress.  *Id.* at 4; Ex. 2, McMeeking Dep. 142-96.  He concluded that in "almost all circumstances" Cook's IVC filters will eventually fail due to fracture "in a relatively short time" after implantation.  Ex. 1, McMeeking Report p. 4.  Indeed, he concluded that a filter that perforates the inferior vena cava may fail after a *single* cough or bowel movement.  Ex. 2, McMeeking Dep. 190-94, 204-05.

Dr. McMeeking ends his analysis by claiming that the likelihood of tilting, perforation, and fracture means that the filters are defectively designed.  Ex. 1, McMeeking Report p. 48.  These alleged defects, he claims, were foreseeable.  *Id.* at 3-4.  Dr. McMeeking also claims that leaving the filters on the market, "even after Cook and its employees were in possession of substantial information indicating that they were experiencing failures," "is contrary to engineering, industry and government standards . . . ."  *Id.* at 48.  He claims that Cook should have redesigned the filters to limit tilt and penetration by adding appendages with broad flat surfaces.  *Id.* at 49.  And he adds that Cook should have "contemplated" redesigning the filters to reduce the risk of fracture by ███████████████████████████████████ ███████████████████████████████  *Id.*  Finally, he claims that Cook should have "contemplated a complete redesign of the Tulip and Celect filters" because two non-retrievable filters on the market (the Tulip and Celect, by contrast, are *retrievable* filters) "sho[w] that better designs of IVC filter exist . . . ."  *Id.* at 49; Ex. 2, McMeeking Dep. 228, 259-60, 273.  He concedes that he relied on no actual testing (at least he identified no specific tests) to determine if the redesign that he says Cook should have "contemplated" would have reduced the filters' risks without diminishing their effectiveness.  *E.g.*, Ex. 2, McMeeking Dep. 62-66, 74-76, 266-67.  And he admits that he has no data regarding the incidence of adverse events with the two non-

retrievable filters that he holds up as superior, and therefore no idea how they compare to Tulip and Celect.  *Id*. at 228-31, 266-68.

## ARGUMENT

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's decision *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), and the cases that follow it.  Under this framework, there is essentially a three-step inquiry: (1) the expert must be qualified by knowledge, skill, experience, training, or education; (2) the expert's testimony must be based on sufficient facts or data, as well as reliable principles and methods, and the expert must have reliably applied those principles and methods to the facts of the case; and (3) the proposed expert testimony must assist the trier of fact to understand the evidence or determine a fact at issue in the case.  *See* FED. R. EVID. 702; *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  The proponent of the expert testimony has the burden of establishing admissibility by a preponderance of the evidence.  *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).  Dr. McMeeking's testimony fails at all three steps.

## I.   Dr. McMeeking's Opinions Would Not Assist the Jury.

*Daubert* motions often begin by discussing the expert's qualifications (or lack thereof) to offer the opinion that he or she offers.  That is an issue in this case, as we shall see shortly.  But Cook begins with an issue that is even more obvious in this case: Dr. McMeeking's opinions will not help the jury (and therefore are inadmissible under Rule 702(a)) because he admits that they are based on factual assumptions that simply are not true.

An expert has to be able to "help the trier of fact to understand the evidence or to determine a fact in issue . . . ."  FED. R. EVID. 702(a).  This condition goes primarily to relevance.

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotations marks and citation omitted).   The proffered testimony must be "sufficiently tied to the facts of the case" such that it will actually aid the jury. *Id.* (same). This is *Daubert*'s requirement of "fit." *Id.*

Dr. McMeeking's testimony fails the fit requirement in two ways.   One is that Dr. McMeeking's calculations rest on what he admits are counterfactual assumptions.   And the other is that his theories are inconsistent with what actually happened to the plaintiffs in these cases. In both ways, his testimony is a mismatch for this litigation.

### A.  Dr. McMeeking's opinions would not be helpful to the jury because they rest on what he acknowledges are counterfactual assumptions.

"[E]xpert testimony must be rejected if it lacks an adequate basis in fact."   *Cella v. United States*, 998 F.2d 418, 423 (7th Cir. 1993).  It should go without saying that "'an opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse.'"  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (citation omitted).[1]   "Clearly, expert testimony does not 'help' if it is unrelated to facts at issue or is based on factual assumptions that are not supported by the evidence."  29 Victor James Gold, FEDERAL PRACTICE & PROCEDURE EVIDENCE (Wright & Miller) § 6265.2 (2d ed. Westlaw ver.) (internal footnotes omitted).

This is exactly the situation here.  Dr. McMeeking admitted in his deposition that his

---

[1] *See also Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (affirming exclusion of expert testimony based on incorrect assumptions); *LVL XIII Brands, Inc. v. Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 642-43 (S.D.N.Y. 2016) (finding an expert's testimony unhelpful to a jury because it relied on a counterfactual assumption); *Laumann v. Nat'l Hockey League,* 117 F. Supp. 3d 299, 314-16 (S.D.N.Y. 2015) (reaching a similar conclusion regarding an expert's excessive reliance on counterfactual hypotheticals); *Group Health Plan, Inc. v. Philip Morris, Inc.,* 188 F. Supp. 2d 1122, 1132-34 (D. Minn. 2002) (concluding an expert's counterfactual model was "precariously built on a foundation of assumptions and speculation"), *aff'd in relevant part & remanded*, 344 F.3d 753 (8th Cir. 2003).

opinions are based on factual assumptions that are not true.

*First*, Dr. McMeeking testified that his calculations assume that the inferior vena cava is rigid—essentially like a glass tube.  Ex. 2, McMeeking Dep. 96-98, 203-04.  But he admitted that this is *not true*; for the inferior vena cava is not rigid, but pliable:

> Q. Okay. Your calculations dealing with tilt, do they assume that
> the inferior vena cava has rigid walls?
>
> A. They do.
>
> Q. Okay. Do you know whether the inferior vena cava is in fact
> rigid or pliable?
>
> A. *The wall itself is pliable, compliant*.

*Id*. at 96 (emphasis added).  *See also id.* at 203 (testifying that he made the same assumption for purposes of his perforation and fracture analyses).[2]

Dr. McMeeking testified that it is his "assessment from an engineering point of view" that it "would not necessarily make a difference" to his calculations whether the inferior vena cava were rigid or not.  *Id*. at 97.  But when asked for the basis of that "assessment," he said this:

> A. I haven't studied it directly, but it's my *surmise* it would not
> make a big effect to the tendency to tilt.
>
> Q. When you say surmise, that is not anything you have tried to
> calculate or test; correct?
>
> A. No, it's not.  I have not directly done calculations or tests to
> make an assessment of that.

---

[2] Dr. McMeeking testified at one point that he did not assume that the vena cava wall is rigid, but he then explained that his precise assumption was that "the vena cava and the tissues around the vena cava are rigid and constrain the way that the wall of the vena cava can respond to the presence of the filter."  Ex. 2, McMeeking Dep. 97.  And when asked later whether he was "assuming that the inferior vena cava has rigid walls," he answered: "Correct."  *Id.* at 203.

Ex. 2, McMeeking Dep. 97-98 (emphasis added).  *See also id*. at 108, 115-16 (making the same admission).  Expert testimony based on "surmise" is categorically not admissible in the Seventh Circuit; indeed, it's not admissible in any federal court.  *See, e.g., Cella*, 998 F.2d at 423.

*Second*, Dr. McMeeking's testified that his calculations assume that the interior of the inferior vena cava is a frictionless surface.  Ex. 2, McMeeking Dep. 98-99, 286-87.  But he admitted in his deposition that this assumption, too, is contrary to the facts:

> Q. . . . Do you know whether, in fact, the wall of the vena cava is frictionless or whether there is some friction associated with it?
>
> A. I haven't seen any data on the frictional conditions of the wall of the vena cava.  However, I have reviewed information from papers, et cetera, that indicate that *there is friction between metal objects and tissue that is of a similar nature to the wall of the vena cava*.  And although that friction is relatively small, *it is not zero*.

*Id*. at 98-99 (emphasis added).  Despite this concession, all of Dr. McMeeking's calculations assume an *absence* of friction.  *Id*. at 99, 287.  As with his counterfactual assumption about the inferior vena cava being rigid, he just assumes the actual facts will have no effect on his conclusions.

Dr. McMeeking testified that these two counterfactual—that is, incorrect—assumptions cut across *all* of his opinions.  *See id*. at 203-04, 286-87.  And while it is at least reasonable to hypothesize these assumptions affected his results, he cannot say by how much, if at all, because he concedes that he never did any testing or otherwise tried to ascertain the extent to which the assumptions affected his results.  *See id*. at 96-99. This undermines the helpfulness of all of his opinions.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  A court is entitled to conclude "that there is

simply too great an analytical gap between the data and the opinion proffered." *Id.* And so there is here.

* * * * *

Testimony based on incorrect assumptions does not help the trier of fact to understand the evidence or to determine "a fact in issue." FED. R. EVID. 702(a). Counterfactual assumptions are by their very nature *contrary* to the evidence and the facts—that is, *wrong*. Because Dr. McMeeking's opinions rest on admittedly counterfactual assumptions, the Court should exclude them.

### B. Dr. McMeeking's opinions would not be helpful to the jury also because his theories are inconsistent with what actually happened in these cases.

Dr. McMeeking testified that he would expect his self-described "theoretical analysis" to match what actually happens in the real world. Ex. 2, McMeeking Dep. 28-29. Here it does not. This suggests that even according to his own testimony, his untested assumptions might just be wrong. *See id.* at 29-31. This kind of evidence cannot be helpful to a jury interested in determining the truth. In other words, an expert who cannot relate his theory "to the factual situation at hand" fails the "fit" requirement of Rule 702 and *Daubert*. *See*, *e.g.*, *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 616 (7th Cir. 1993).

Dr. McMeeking opines based on his calculations that an IVC filter that had perforated the IVC wall would be destroyed (either through breakage or deformation) on the first instance of Valsalva—*e.g.*, a single cough or bowel movement. Ex. 2, McMeeking Dep. 190-94, 204-05. But that opinion is flatly inconsistent with what happened in these two cases. In both *Hill* and *Gage* the perforations that the plaintiffs' allege existed for an appreciable period of time—in Gage's case for years, and in Hill's case for more than a week (according to Hill herself), and likely much longer (according to Cook). *Id.* at 205-07. During that time the plaintiffs almost

9

surely experienced many instances of Valsalva.  *Id*.  And yet, their filters were not destroyed.  Indeed, Gage's filter was still in place—unbroken and unfractured—to the day of Dr. McMeeking's deposition in June of this year, 2017.  *Id*. at 206.

## II.  Dr. McMeeking Is Unqualified to Offer His Proposed Testimony.

"A district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks."  *Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 901 (7th Cir. 1994).  The expert has to be "qualified," in other words, whether "by knowledge, skill, experience, training, or education."  FED. R. EVID. 702.  While Dr. McMeeking may be an experienced general mechanical engineer, he is not qualified to give the opinions he offers in this case because *specific* question of the design of IVC filters is simply beyond his area of expertise.

### A.  It is not enough for an expert to be qualified generally; he must be qualified to give the specific opinions he offers.

In determining an expert's qualifications, the Seventh Circuit has repeatedly reminded litigants that it is not enough for an expert to be generally qualified in a particular area: the expert must be qualified to answer the *particular question* that he or she is venturing to answer.  *See, e.g., Gayton v. McCoy,* 593 F.3d 610, 617 (7th Cir. 2010).  A district court therefore is to look individually at each specific conclusion drawn by the expert.  *Id*.  And while courts do not ordinarily require that an expert be a specialist in a given field, *id*., expert testimony has been excluded where the expert's conclusions are rooted in knowledge and training that the expert does not have.  *See Hall v. Flannery*, 840 F.3d 922, 930 (7th Cir. 2016) (citing cases).

All of this is as true for engineers as it is for other kinds of experts.  *See*, *e.g.*, *Ancho v. Pentek Corp.*, 157 F.3d 512, 517-19 (7th Cir. 1998).  This is particularly so in the medical-device context, where engineering intersects with another area of expertise—medicine.  *See*, *e.g.*, *Botnick v. Zimmer, Inc.,* 484 F. Supp. 2d 715, 719-20 (N.D. Ohio 2007) (finding that a

mechanical engineer lacked the qualifications necessary to testify as to alleged defects in a bone plate); *Krueger v. Johnson & Johnson Prof'l, Inc.*, 160 F. Supp. 2d 1026, 1031-32 (S.D. Iowa 2001) (finding that a metallurgist with an engineering degree was not qualified to testify about alleged defects in a cervical plate device because he had "no experience in the design of medical implants or any other medical devices" and had "never been involved in the testing of a medical device to be used inside the body"), *aff'd*, 66 Fed. App'x 661 (8th Cir. 2003) (per curiam); *cf. McCorvey v. Baxter Healthcare Corp.*, No. 99–1250–CIV, 2001 WL 36393134, at *4-7 (S.D. Fla. Sept. 30, 2001) (excluding as unreliable the testimony of a mechanical engineer who had never worked with Foley catheters or conducted extensive research on their construction), *aff'd in relevant part & rev'd in part on other grounds,* 298 F.3d 1253 (11th Cir. 2002).

This Court has applied these principles before in other cases.  In *Higgins v. Koch Development Corp.*, for example, this Court held that the plaintiffs' proffered expert on chlorine gas exposure (a medical doctor) was not qualified to testify because she did not have a background that would give her "superior knowledge" on the specific effects of chlorine gas exposure.  997 F. Supp. 2d 924, 931 (S.D. Ind. 2014).  The Court also noted that there was no indication that the expert had previous experience treating patients who had been exposed to chlorine gas.  *Id.*  The Court accordingly held that the expert was unqualified to opine that the exposure caused the plaintiff's injuries.  *Id.*  The Seventh Circuit affirmed.  794 F.3d 697 (7th Cir. 2015).

So, to sum up, it is not enough to be an expert in a general subject; the expert has to have the *right kind* of expertise—expertise that is *specific* to the subject matter.  Expertise at a high level of generality will not do.  On that standard, Dr. McMeeking lacks the qualifications necessary to testify in this case.

**B. Dr. McMeeking learned everything he knows about IVC filters as a paid plaintiffs' expert in litigation.**

Cook does not dispute that Dr. McMeeking is qualified to offer opinions generally about metal fatigue and fracture. But Cook does dispute that Dr. McMeeking is qualified to testify specifically that its IVC filters are defective.

Dr. McMeeking testified that his experience with medical devices is principally limited to heart valves, stents, and breast implants, none of which has any relation to the IVC filters at issue here. Ex. 2, McMeeking Dep. 10-11, 21-23, 25-28. He conceded that he has no experience with IVC filters outside of litigation. *Id*. at 22. He has published no articles on IVC filters. *Id*. at 10. He has given no academic lectures on IVC filters. *Id*. at 22-23. He has no experience designing or working with IVC filters; indeed, he has never designed a medical device of any kind. *Id*. at 21, 27. This comes as no surprise, for he is not a biomedical engineer, which is the type of engineer who designs and evaluates medical devices and other equipment. *Id*. at 24; United States Dep't of Labor, Bureau of Labor Statistics, OCCUPATIONAL OUTLOOK HANDBOOK, https://www.bls.gov/ooh/architecture-and-engineering/biomedical-engineers.htm#tab-2 (last visited Aug. 8, 2017). Nor does he have any medical training. Ex. 2, McMeeking Dep. 23-24.

Dr. McMeeking's only previous experience with IVC filters has been as a paid plaintiffs' expert in litigation brought against another company—Bard. *Id*. at 22; *see Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1321-27 (M.D. Fla. 2015) (discussing Dr. McMeeking's opinions, and admitting some but not others, in a case where his qualifications were challenged only to the extent he testified about Bard's manufacturing processes). All he knows about IVC filters, then, is what he learned for the purposes of litigation. While hands-on experience is not essential to expert testimony, "a court is entitled to be skeptical about testimony by a witness outside his normal field of practice." *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 719 (7th Cir. 1998)

(citing *Navarro v. Fuji Heavy Indus., Ltd.,* 117 F.3d 1027, 1031 (7th Cir. 1997); *Braun v. Lorillard Inc.,* 84 F.3d 230, 234–35 (7th Cir. 1996)). "Personal experience may lead to knowledge, or the lack of experience may lead an expert to use inappropriate tests . . . ." *Id.* (internal citation omitted). Dr. McMeeking's lack of personal knowledge about IVC filters makes him unqualified to testify in this case. It also makes his opinions unreliable, an issue to which we finally turn.

### III. Dr. McMeeking's Opinions Are Unreliable.

When analyzing an expert's methodology, a court is to consider whether the evidence is genuinely scientific, as opposed to being unscientific speculation offered by a genuine scientist. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). An expert's work will be admissible only to the extent that it is reasoned, uses methods of the discipline, and is founded on data. *Lang v. Kohl's Food Stores, Inc.*, 217 F. 3d 919, 924 (7th Cir. 2000). *Daubert* sets forth a non-exclusive checklist of factors for district courts to use in assessing the reliability of scientific expert testimony. FED. R. EVID. 702, Advisory Committee's Note (2000 amends.). Those factors include: "(1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." *Id*. The Supreme Court in *Kumho Tire Co. v. Carmichael* held that these factors might also be applicable in assessing the reliability of non-scientific expert testimony—including engineering testimony—depending upon "the particular

circumstances of the particular case at issue."  526 U.S. 137, 149-50 (1999).  This is because "[e]ngineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases."  *Id*. at 150.

By any measure, whether by the factors set out by the Supreme Court in *Daubert* or by others adopted by the lower courts since *Daubert*, Dr. McMeeking's testimony is not reliable.

**A. Dr. McMeeking's acknowledgement that he learned everything he knows about IVC filters through his work as a paid plaintiffs' expert in filter litigation indicates his opinions are unreliable.**

In the years since *Daubert* was decided, the lower courts have built upon its framework, and they have measured the reliability of expert testimony against several additional (again, non-exclusive) factors.  Those factors are collected in the Advisory Committee's Note accompanying the 2000 amendments to Rule 702.  The first one listed is whether the expert is proposing to testify about matters "growing naturally and directly" out of research he has conducted "independent of the litigation," or whether the expert has developed his opinions "expressly for purposes of testifying."  FED. R. EVID. 702, Advisory Committee's Note (2000 amends.) (internal quotation marks omitted).  As support for the notion that this is a relevant factor, the Advisory Committee cited the court of appeals' opinion on remand from the Supreme Court in *Daubert* itself: *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).  That case describes the source of the expert's opinions as a "very significant fact to be considered."  *Id*.  Although not dispositive, "in determining whether proposed expert testimony amounts to good science, [a court] may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."  *Id*.  Therefore, "[t]hat an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science":

> For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support. Finally, there is usually a limited number of scientists actively conducting research on the very subject that is germane to a particular case, which provides a natural constraint on parties' ability to shop for experts who will come to the desired conclusion. That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were "derived by the scientific method."

*Id*.

Dr. McMeeking's testimony is lacking this "most persuasive basis" for concluding that his opinions are reliable. While Dr. McMeeking is no doubt an expert in his general field (mechanical engineering), he did not study IVC filters at all before being hired to testify in other filter cases. The experts who were excluded in *Daubert* had a similar flaw: they were experts in their respective medical fields, but they had never studied the specific drug at issue in that case (Bendectin) or its effects "before being hired to testify in this or related cases." *Id*. This undermined the reliability of their testimony. The same is true of the testimony of Dr. McMeeking here. And therefore as in *Daubert*, the expert testimony should be excluded.

## B. Dr. McMeeking's opinions are also unreliable because they have never been published and subjected to peer review.

Lacking in expertise gained outside of litigation, the *Daubert* court on remand looked to see what else might indicate the proffered expert's testimony was reliable. For "[i]f the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid

principles.'"  *Daubert*, 43 F.3d at 1317-18.  The first thing the court considered was whether there was "proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication."  *Id*. at 1318.  It hadn't been, which was troubling to the court:

> Bendectin litigation has been pending in the courts for over a decade, yet the only review the plaintiffs' experts' work has received has been by judges and juries, and the only place their theories and studies have been published is in the pages of federal and state reporters.  None of the plaintiffs' experts has published his work on Bendectin in a scientific journal or solicited formal review by his colleagues. Despite the many years the controversy has been brewing, no one in the scientific community—except defendant's experts—has deemed these studies worthy of verification, refutation or even comment.  It's as if there were a tacit understanding within the scientific community that what's going on here is not science at all, but litigation.

*Id*. (internal footnotes omitted).

The same is true here.  Although filter litigation has been a mainstay of the plaintiffs' bar for almost a decade now (the Bard litigation goes back at least to 2009, *see Linsday v. C.R. Bard, Inc.*, Misc. Nos. 1:MC-10-441, 1:MC-10-442, 2011 WL 240104, at *1 (M.D. Pa. Jan. 24, 2011)), Dr. McMeeking still has published no peer-reviewed studies of his thoughts on IVC filters.  Not even he apparently thinks his theories are good for anything other than litigation.  As a result, we have no idea how often Dr. McMeeking's methodology will produce erroneous results, or whether it is generally accepted in the relevant engineering community.  *See Kumho Tire*, 526 U.S. at 150-51.  This isn't a hallmark of "good science."  *See Daubert*, 43 F.3d at 1318.  It is the hallmark of an opinion that should be excluded.

**C. Dr. McMeeking's opinions are also unreliable because he failed to validate his self-described "theoretical analysis" through testing or otherwise.**

"Establishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review are the two principal ways the proponent of expert testimony can show that the evidence satisfies the [reliability] prong of Rule 702." *Daubert*, 43 F.3d at 1318.  Dr. McMeeking's testimony fails on both counts.  So, the plaintiffs are left to attempt to satisfy their burden of showing their expert's testimony is reliable through the very person who has offered the testimony—Dr. McMeeking himself.  *See id.* at 1318-19.  This they cannot do.  His own report and testimony undermines the reliability of his analysis.

**1. Dr. McMeeking's opinions are unreliable because he has failed to validate his methodology against an objective standard.**

"[E]xperts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Daubert*, 43 F.3d at 1319.  In a recent case involving a  knee implant, for example, Judge Pallmeyer excluded the opinions of an orthopedic surgeon with biomechanical engineering experience because he did not explain why his opinion—"that the design causes a tensile force that strains the interface"—was reliable.  *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 218 F. Supp. 3d 700, 714 (N.D. Ill. 2016), *appeal pending*.  Judge Pallmeyer also excluded the expert's opinions because he provided "almost no explanation" for how the sources he reviewed supported his conclusions.  *Id*.  "Plaintiffs emphasize [the expert's] years of experience and the extent of the sources he reviewed," Judge Pallmeyer stated, "but

without an explanation for how those sources support his conclusions, the court has no way to verify that [the expert] uses those sources in a reliable way."  *Id*. at 715 (internal record cite omitted).

Like the experts in *Daubert* and *Zimmer*, Dr. McMeeking does not adequately explain why his methodology is reliable.  *See* Ex. 1, McMeeking Report p. 5, ¶ 3.  Indeed, there is affirmative evidence of *unreliability*.  He concedes that Gage's and Hill's experiences with their filters are different than what his calculations of filter longevity would predict (*i.e.*, they have lived with intact perforated filters far longer than the single cough or bowel movement that Dr. McMeeking calculated it would take to break the filter).  Ex. 2, McMeeking Dep. 205-07.

The closest he comes to validating his methodology against an objective benchmark is this one, vague sentence: "The design, analysis and reliability assessment conducted by me for this report is typical of those routinely conducted during the design validation and verification of engineering devices and components."  Ex. 1, McMeeking Report p. 1.  By whom?  What basis does he have for saying that his analysis is "typical" of those that others conduct?  What source supports this statement?  He never explains.  It is pure say-so.

And while Dr. McMeeking's report states that he relied on data from certain studies about the "*in vivo* conditions that the filters experience after implantation," he does not explain how those external sources validate his methodology.  *Id*.  (Indeed, they undermine it, as we shall see later.)  He does go on to explain the standards that govern the work of engineers generally, and those who work for medical implant companies specifically, but he never demonstrates that these standards guided his own work here.  Ex. 1, McMeeking Report pp. 5-10, ¶ 4.  (And in fact, as we shall also see, they did not guide his work in certain critical ways.)  "Under *Daubert,* that's not enough."  *Daubert*, 43 F.3d at 1319.

## 2. Dr. McMeeking's opinions are unreliable because he has failed to support his opinions with any specific testing.

"Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593. Seventh Circuit cases "have recognized the importance of testing in alternative design cases" in the products liability realm. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368-69 (7th Cir. 1996) (citing cases). *See also Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 870 (7th Cir. 2001) ("In alternative design cases, we have consistently recognized the importance of testing the alternative design."); *accord Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 895 (7th Cir. 2011). This is not to say that "that hands-on testing is an absolute prerequisite to the admission of expert testimony." *Cummins*, 93 F.3d at 369. Rule 702 is designed to ensure that, when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work. *Id*. This objective can be accomplished in a number of different ways, *id*., including, in some cases, by mathematical calculations. *See*, *e.g.*, *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 815-16 (7th Cir. 2012). As in *Cummins* and other alternative-design cases decided by the Seventh Circuit, however, the opinions offered by Dr. McMeeking in this case "clearly lend themselves" to hands-on testing. 93 F.3d at 369 (citing *Porter v. Whitehall Labs, Inc.*, 9 F.3d 607 (7th Cir. 1993)); *accord Dhillon*, 269 F.3d at 870.

Dr. McMeeking's own report confirms this. There he states that, according to certain "authoritative textbooks," "[a]ll products should be thoroughly tested before release for sale." Ex. 1, McMeeking Report p. 6. He adds that, under federally mandated design controls, "[d]esign validation . . . *shall include testing of production units under actual or simulated use conditions*." *Id*. at 10 (emphasis added). He also notes that "[d]esign validation shall include

software validation and risk analysis, where appropriate." *Id*. Similarly, he claims that medical device companies should "adher[e] to the use of technology, design and production methods that are at the state of the art . . . ." *Id*. at 7. And he faults Cook's own bench testing of its filters as "inadequate" and as not meeting "the requisite standards of engineering, quality and governmental standards for ensuring their safety as medical implants . . . ." *Id*. at 48.

Yet, despite all of this, Dr. McMeeking admitted throughout his deposition that he performed no actual testing of his own. Ex. 2, McMeeking Dep. 220-21 ("I've done no bench testing of Cook filters."); *see also id*. at 46, 60-61, 64-66, 68, 76, 81, 83-84, 95, 97-98, 141, 198, 267. He also didn't perform any simulated testing with computers or other state-of-the-art technology. *See id*. at 89-91, 116, 123, 209. Nor did he specify any tests conducted by others that verified his theoretical calculations.

And all of this even though he acknowledges, as was the case in *Cummins*, 93 F.3d at 369, that there are "a number of considerations" that inform whether an alternative product design should be adopted. These include the effectiveness of the alternate design, the safety risks associated with the alternative design, the relative cost of the alternative design, and so on. *See* Ex. 2, McMeeking Dep. 221-25; Ex. 1, McMeeking Report pp. 8-9. These considerations are product-specific, and, as Dr. McMeeking's own report suggests, cannot be determined reliably without reliance on "testing of production units under actual or simulated use conditions." Ex. 1, McMeeking Report p. 10.

Dr. McMeeking cannot have it both ways. He cannot claim that Cook should have performed different or better testing, or that Cook should have adopted a better, alternative design, and then not do the hard work of testing himself, or at least have someone else do the testing. This is not the work of an expert who is adhering to the same standards of intellectual

20

rigor that he himself claims are demanded of others in his profession.  Dr. McMeeking's decision to insulate his theories from the "dispassionate crucible" of testing, actual or computer-simulated, "deeply, if not fatally, compromises his testimony's reliability."  *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005), *vacated in non-relevant part on reh'g,* 448 F.3d 936 (7th Cir. 2006).

## CONCLUSION

Dr. McMeeking's opinions are not the product of an expert with sufficient qualifications.  They're not reliable.  And they wouldn't be helpful to the jury.  They should be excluded from evidence under Rule 702 and *Daubert*.

Respectfully submitted,

Dated: August 9, 2017

/s/ *J. Joseph Tanner*
J. Joseph Tanner (# 11856-49)
Andrea Roberts Pierson (# 18435-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  joe.tanner@faegrebd.com
E-Mail:  andrea.pierson@faegrebd.com
E-Mail:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2017, a copy of the foregoing **COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF DR. ROBERT McMEEKING** was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.   Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

*/s/ J. Joseph Tanner*