UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

———————————————————————

IN RE: COOK MEDICAL, INC. IVC FILTERS
MARKETING, SALES PRACTICES AND  Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS   LIABILITY LITIGATION   MDL No. 2570

———————————————————————

This Document Relates Only to the Following Cases:
All cases involving Plaintiffs who received the Celect
or Tulip filters, specifically including:
Elizabeth Jane Hill – 1:14-cv-06016-RLY-TAB
Arthur Gage – 1:14-cv-01875-RLY-TAB

———————————————————————

**COOK DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION**

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ........................................................................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ......................................... 2

   I.  Federal Statutory Scheme Regulating Medical Devices ........................................ 2

      a.  Regulatory Scheme for Medical Devices from 1976 through 1990 ............................ 3

      b.  Regulatory Scheme for Medical Devices from 1990 through Present ...................... 5

   II.  The Tulip 510(k) Process ....................................................................................... 5

   III.  The Celect 510(k) Process ..................................................................................... 7

ARGUMENT ................................................................................................................. 10

   I.  Summary Judgment Standard ................................................................................ 10

   II.  Plaintiffs' State-Law Claims are Preempted by the Food, Drug, and Cosmetic Act and Subsequent Amendments ......................................................................... 10

      a.  Plaintiffs' Claims are Expressly Preempted Pursuant to 360k(a) of the MDA .......... 11

          i.  Impact of Lohr and Other Case Law on the Preemptive Effect of the 510(k) Process .................................................................................... 12

          ii.  510(k) Regulatory Review Has Undergone Significant Change since 1990 ........ 14

          iii.  FDA's Guidance for 510(k) Evaluation of IVC Filters Requires Detailed Evaluation of a Device's Safety and Effectiveness ............................... 16

              1.  FDA's Down Classification of IVC Filters ............................................. 16

              2.  FDA's Device-Specific Guidance for IVC Filters ................................... 17

          iv.  FDA Conducted a Thorough Evaluation of the Safety and Effectiveness of the Tulip and Celect Through Application of the 510(k) Process ...................... 18

              1.  FDA Requested and Reviewed Clinical Studies ..................................... 19

              2.  FDA Managed the Scope and Detail of Device Labels ............................ 20

              3.  FDA Enforced Pre-Clinical Testing and Design Requirements ................... 21

          v.  Plaintiffs' State Law Claims Impose Requirements Different From or in Addition to FDA Requirements Placed on Cook .................................... 24

              1.  Plaintiff Hill's Claims Under Florida Law are Preempted ........................ 24

              2.  Plaintiff Gage's Claims Under Illinois Law are Preempted ...................... 26

      b.  Even if Not Expressly Preempted, Plaintiffs' Claims are Implicitly Preempted ........ 27

CONCLUSION .............................................................................................................. 29

i

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Buckman v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ................................................................................................22, 28

*Byrnes v. Small*,
    142 F.Supp.3d 1262 (M.D.Fla. 2015) ..................................................................25

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992) ..............................................................................................11

*De La Paz v. Bayer HealthCare LLC*,
    159 F. Supp. 3d 1085 (N.D.Cal. 2016) ................................................................27

*Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*,
    16 F.3d 832 (7th Cir. 1994), *cert. denied*, 513 U.S. 821 (1994) ........................10

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995) ..............................................................................................11

*Hoagland v. Town of Clear Lake, Ind.*,
    415 F.3d 693 (7th Cir. 2005) ................................................................................11

*In re Incretin-Based Therapies Prod. Liab. Litig.*,
    142 F. Supp. 3d 1108 (S.D.Cal. 2015) ................................................................28

*Kemp v. Medtronic, Inc.*,
    231 F.3d 216 (6th Cir. 2000) ................................................................................20

*Lewis v. CITGO Petroleum Corp.*,
    561 F.3d 698 (7th Cir. 2009) ................................................................................10

*Martin v. Telectronics Pacing Systems, Inc.*,
    105 F.3d 1090 (6th Cir. 1997) ..............................................................................20

*McMullen v. Medtronic, Inc.*,
    421 F.3d 482 (7th Cir. 2005) ....................................................................11, 12, 25

*Medtronic v. Lohr*,
    518 U.S. 470 (1996) ...................................................................................... passim

*Mullins v. Ethicon, Inc.*,
    147 F. Supp. 3d 478 (S.D.W.Va. 2015) ..............................................................28

*Mutual Pharmaceutical Co. v. Bartlett*,
    133 S. Ct. 2466 (2013) ..........................................................................................28

*Papike v. Tambrands*,
    107 F.3d 737 (9th Cir. 1997) ...................................................................24

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011) ................................................................................28, 29

*Puerto Rico v. Franklin California Tax-Free Trust*,
    ___ U.S. ___, 136 S. Ct. 1938 (2016) ....................................................14

*Riegel v. Medtronic, Inc.*,
    552 U.S. 312 (2008) ........................................................................ passim

*Thomas v. Bombardier Recreational Products, Inc.*,
    682 F. Supp. 2d 1297 (M.D.Fla. 2010) ...................................................25

*Tillman v. C.R. Bard, Inc.*,
    96 F. Supp.3d 1307 (M.D.Fla. 2015) .....................................................25

*Wagner v. Teva Pharms. USA, Inc.*,
    840 F.3d 355 (7th Cir. 2016) ..................................................................28

*Whitson v. Safeskin Corp.*,
    313 F. Supp. 2d 473 (M.D. Pa. 2004) .....................................................16

STATE CASES

*Baltus v. Weaver Division of Kidde & Co.*,
    557 N.E.2d 580 (Ill.App.Ct. 1990) ........................................................26

*Calles v. Scripto-Tokai Corp.*,
    864 N.E.2d 249 (Ill. 2007) .....................................................................26

*Cintron v. Osmose Wood Preserving, Inc.*,
    681 So.2d 859 (Fla.Dist.Ct.App. 1996) ..................................................25

*Overland Bond & Inv. Corp. v. Howard*,
    292 N.E.2d 168 (Ill.Ct.App. 1972) ........................................................27

*Salerno v. Innovative Surveillance Tech.*,
    932 N.E.2d 101 (Ill.App.Ct. 2010) ........................................................26

*Solis v. BASF Corp.*,
    979 N.E.2d 419 (Ill.App.Ct. 2012) ........................................................27

*Werckenthein v. Bucher Petrochemical Co.*,
    618 N.E.2d 902 (Ill.App.Ct. 1993) ........................................................27

**FEDERAL STATUTES**

21 U.S.C. § 360 .................................................................................................................4

21 U.S.C. § 360c(i) .......................................................................................................5, 15

21 U.S.C. § 360c(i)(1)(A) ...........................................................................................15, 19

21 U.S.C. § 360c(i)(1)(A)(ii) ......................................................................................15, 19

21 U.S.C. § 360c(i)(1)(E) ...........................................................................................20, 25

21 U.S.C. § 360c(i)(A) .................................................................................................1, 18

21 U.S.C. § 360c(a) ..........................................................................................................5

21 U.S.C. § 360c(a)(1)(A) ................................................................................................3

21 U.S.C. § 360c(a)(1)(A)(ii) ...........................................................................................3

21 U.S.C. § 360c(a)(1)(A)-(C) .........................................................................................3

21 U.S.C. § 360c(a)(1)(B) ..............................................................................................15

21 U.S.C. § 360c(a)(1)(B),(C) ..........................................................................................4

21 U.S.C. § 360c(a)(1)(C) ................................................................................................4

21 U.S.C. § 360c(f)(1)(A) .................................................................................................4

21 U.S.C. § 360d ...............................................................................................................3

21 U.S.C. § 360d(a)(2) ......................................................................................................3

21 U.S.C. § 360k(a) ................................................................................................. passim

21 U.S.C. § 393(b)(2)(C) ..................................................................................................1

21 U.S.C. § 510(k) .....................................................................................................1, 4, 5

Food, Drug, and Cosmetic Act of 1938 .................................................................1, 2, 3, 12

Medical Device Amendments of 1976 ........................................................................ passim

Pure Food and Drugs Act of 1906 ....................................................................................2

Safe Medical Devices Act of 1990 ............................................................................. passim

**STATE STATUTES**

Fla. Stat. § 768.72 ..................................................................................................26

Ill. Comp. Stat. Ann. 5/2-314(2)(c)..........................................................................27

**RULES**

Fed. R. Civ. P. 56(c) ...............................................................................................10

**REGULATIONS**

21 C.F.R. § 807.81(a)(3) ..........................................................................................28

21 C.F.R. § 807.87(e)..........................................................................................20, 25

21 C.F.R. § 807.87(l) ...............................................................................................22

21 C.F.R. § 807.100(b) ..............................................................................................1

21 C.F.R. § 812.1(a), § 812.3(g)-(h)..........................................................................7

21 C.F.R. § 860.3 ....................................................................................................15

21 C.F.R. § 860.3(c)(2)........................................................................................15, 19

21 C.F.R. § 860.7(c)(2) ............................................................................................19

21 C.F.R. § 870.87(l) ...............................................................................................22

21 C.F.R. § 870.3375..........................................................................................16, 18

45 Fed. Reg. 7,973 (February 5, 1980) .....................................................................16

60 Fed. Reg. 41,986 (August 14, 1995) .....................................................................16

65 Fed. Reg. 17,138 (March 31, 2000) ............................................................... passim

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Article VI, cl. 2 ....................................................................................10

The Cook Defendants[1] ("Cook") respectfully request summary judgment based on federal preemption of all claims asserted by all Plaintiffs who received the Celect or Tulip filters, specifically including Plaintiffs Elizabeth Jane Hill and Arthur Gage (collectively "Plaintiffs").

## INTRODUCTION

Plaintiffs' claims arise from their respective treatment with Cook Tulip (e.g., Plaintiff Gage) and Celect (e.g., Plaintiff Hill) IVC filters, which are prescription medical devices. The Federal Food, Drug, and Cosmetic Act ("FDCA") required Cook to obtain clearance by the Food and Drug Administration ("FDA") before it could market the Tulip and Celect. Indeed, under the FDCA, FDA is charged with "ensuring that… there is reasonable assurance of the safety and effectiveness of devices intended for human use." 21 U.S.C. § 393(b)(2)(C). FDA may satisfy this regulatory mandate if it determines that a device is "substantially equivalent" to a device (or a device's progeny) marketed before the 1976 Medical Device Amendments to the FDCA (the "MDA"), called a "predicate device."

In 1990, the Safe Medical Devices Act ("SMDA") significantly amended Section 510(k) to state that a device is "substantially equivalent" if FDA determines that it has the "same technological characteristics" of a predicate device, or if FDA receives data demonstrating that "the device is as safe and as effective as a legally marketed device" and any technological differences "do not raise different questions of safety and effectiveness." 21 U.S.C. § 360c(i)(A); 21 C.F.R. § 807.100(b). Thus, under the post-SMDA 510(k) process, FDA conducts a device-specific review and may impose device-specific requirements on a device manufacturer to assure the safety and effectiveness of a proffered device.

---

[1] The Cook Defendants in this matter are Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, and William Cook Europe APS. All references to the "Cook Defendants" refer to all three entities unless otherwise noted.

1

In light of the FDA's comprehensive oversight of the safety and effectiveness of medical devices, the FDCA expressly preempts state law requirements (including state law tort claims) that are "different from, or in addition to" FDA's device-specific requirements that "relate[ ] to the safety or effectiveness of the device."  21 U.S.C. § 360k(a); s*ee also*, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 322 (2008)*; Medtronic v. Lohr*, 518 U.S. 470, 503 (1996).

In this case, Cook provided FDA with extensive data regarding the safety and effectiveness of both the Tulip and Celect through the 510(k) process as amended by the SMDA, after which FDA cleared both devices.  In the process, FDA imposed device-specific requirements on Cook to ensure the safety and effectiveness of the Tulip and Celect.  As a result, Plaintiff's state law claims are expressly preempted under 21 U.S.C. § 360k(a) because they impose requirements that are different from, or in addition to, the device-specific federal requirements embodied in the 510(k) process as applied to the Tulip and Celect.  In addition, Plaintiffs' claims are impliedly preempted because Cook could not comply with both the state law requirements embodied in Plaintiffs' claims and the federal requirements for medical device regulation outlined below.  Cook is therefore entitled to summary judgment on all of Plaintiffs' claims involving the Tulip and Celect.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

**I.**   **Federal Statutory Scheme Regulating Medical Devices**

Although the FDCA of 1938 (together with its numerous amendments) governs all aspects of developing, manufacturing and marketing medical devices, the FDA has not always enjoyed explicit authority to regulate medical devices for safety and effectiveness.  Neither the Pure Food and Drugs Act of 1906 (precursor to the FDCA), nor the FDCA itself recognized medical devices as distinct candidates for regulation.  Thus, the history of federal medical device

2

regulation consists of regular increases in both federal oversight and assurances of safety and effectiveness, culminating in the current regulatory scheme.

### a.      Regulatory Scheme for Medical Devices from 1976 through 1990

The MDA of 1976 bridged the gap between FDA's original authority and the modern medical device industry.  The FDCA – as amended by the MDA – required and authorized the Secretary of Health, Education and Welfare (now Health and Human Services) (the "Secretary") to place each medical device marketed in the United States into one of three classifications: Class I, Class II, or Class III.  Class I devices were subject to  "general controls" such as the prohibitions against adulteration and misbranding, the banning and restriction of certain devices, and the requirements to register devices and produce them under good manufacturing practices. 21 U.S.C. § 360c(a)(1)(A).  Devices not used for maintaining life or playing substantially important roles in sustaining health – and not presenting "potential unreasonable risk of illness or injury" – would also be designated Class I.  21 U.S.C. § 360c(a)(1)(A)(ii).

Class II devices present "a potential unreasonable risk of illness or injury," and could be used to maintain human life or play substantially important roles in sustaining health.  21 U.S.C. § 360c(a)(1)(A)-(C).  The MDA established that Class II devices were amenable to regulation by "performance standards"[2] to be promulgated by the Secretary after public notice.  21 U.S.C. § 360d.

Class III devices are those that maintain life or that play substantially important roles in sustaining health, and that present "potential unreasonable risk of illness or injury."  In other words, devices that could not effectively be regulated through "general controls" or the imposition of performance standards would fall into Class III.  These devices would require pre-

---

[2] "Performance standards" could include requirements for construction, materials, characteristics, testing, measurement of performance characteristics, labeling and marketing restrictions, to name a few.  21 U.S.C. § 360d(a)(2).

market approval ("PMA") "to provide reasonable assurance of [ ] safety and effectiveness."  21 U.S.C. § 360c(a)(1)(C).

The MDA placed all post-1976 devices into Class III by default.  However, to allow for continued innovation in the medical device industry, some new devices could be categorized as Class II (or Class I) by the Secretary when "substantially equivalent" to another device of the same type.  21 U.S.C. § 360c(f)(1)(A).  Finally and perhaps most importantly, regulatory evaluation of a device in either Class II or III was measured against an identical standard: "reasonable assurance of its safety and effectiveness."  21 U.S.C. § 360c(a)(1)(B),(C).

The MDA established one other important requirement:  manufacturers were required to register their facilities and identify the devices produced at those locations.  Medical Device Amendments of 1976, § 4; 21 U.S.C. § 360.  Registration triggered the requirement to "report to the Secretary . . . (1) the class in which the device is classified under section 513 or . . . that the device is not classified . . . and (2) action taken by such person to comply with requirements under section 514 [performance standards] or 515 [pre-market approval] which are applicable to the device."  21 U.S.C. § 510(k).  This report came to be known by regulators, manufacturers, lawyers, and courts as "the 510(k)."  Under the MDA's scheme of 1976, a Section 510(k) filing reflected merely the fulfillment of the manufacturer's obligation to report that the device existed. The Secretary had no role in "approving" or "clearing" a 510(k) submission.  Public Health Effectiveness of FDA 510(k) Clearance Process, T. Wizemann ed., Institute of Medicine, National Academies Press, Washington, D.C. (2010) at 6.[3]

---

[3] Available at https://www.nap.edu/catalog/12960/public-health-effectiveness-of-the-fda-510k-clearance-process-balancing.

### b.   Regulatory Scheme for Medical Devices from 1990 through Present

The Safe Medical Devices Act of 1990 ("SMDA") dramatically shifted this paradigm. After the SMDA, instead of simply being notified of a new device's existence and its method of compliance, the Secretary was required to engage in individual device reviews for the purpose of establishing each device's reasonable assurance of safety and effectiveness through (a) comparison to a predicate device of the same Class, and (b) a consideration, as necessary, of performance standards and even, *inter alia*, clinical data.  21 U.S.C. § 360c(i).  This case-by-case determination of safety and efficacy by reviewing predicates, performance, and clinical data for Class II devices was triggered when a manufacturer submitted a notice under the existing Section 510(k).  The Secretary would then find (or not) "by order" that the notified device had "the same technological characteristics as the predicate device" or, if possessing differing technological characteristics, that information submitted by the manufacturer established that "the device is as *safe and effective* as a legally marketed device, and [ ] does not raise different questions of *safety and efficacy* than the predicate device" 21 U.S.C. § 360c(a) (emphasis added).

Consequently, under the SMDA, before any new Class II device could proceed to market it specifically would have been found by the Secretary to be "as safe and effective" as an existing, legally marketed device.  The new Class II device would therefore embody a reasonable assurance of safety and efficacy after individual agency review against particular requirements. Cook's Tulip and Celect IVC filters both underwent this more stringent post-SMDA 510(k) review process.

## II.   The Tulip 510(k) Process

█████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████

5

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████

████████████████████████████████████

on March 15, 2000, Cook submitted a 510(k) application for Tulip, which covered permanent

placement only.  Lavender Decl., at ¶ 2. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████ FDA cleared the

Tulip with a permanent indication on October 18, 2000.  Lavender Decl., at ¶ 5.

On August 5, 2003, Cook submitted a 510(k) for the Tulip, which covered indications for

both permanent placement and retrievability.  Lavender Decl., at ¶ 6. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████



FDA cleared the Tulip for retrievable indication on October 31, 2003.  Lavender Decl., at ¶ 11.

## III.   <u>The Celect 510(k) Process</u>

---

[4] "IDE" refers to "Investigational Device Exemption," where a device that has not yet been approved or cleared by FDA is nevertheless permitted be used in clinical settings to determine its safety and/or effectiveness.  21 C.F.R. § 812.1(a), § 812.3(g)-(h).



On June 26, 2006, after further review of the NSE determination, Cook submitted a

510(k) for the Celect with a permanent indication only.  Lavender Decl., at ¶ 24.

---

[5] *See* FDA request for Additional Information, September 23, 2004, attached hereto as Exh. A27, at CookMDL2570_0060706.



On November 30, 2007, Cook submitted a 510(k) to expand the indication to include retrieval.  Lavender Decl., at ¶ 39. ████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ On March 7, 2008, FDA cleared the Celect with a retrieval indication.  Lavender Decl., at ¶ 41.

## ARGUMENT

### I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994), *cert. denied*, 513 U.S. 821 (1994) ("[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law.").  If a plaintiff fails to establish a genuine issue of material fact as to any one of the elements of the claim asserted, the defendant is entitled to summary judgment.  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).

### II.  Plaintiffs' State-Law Claims are Preempted by the Food, Drug, and Cosmetic Act and Subsequent Amendments

The Supremacy Clause of the United States Constitution provides the basis for the preemption doctrine:  "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof… shall be the Supreme Law of the land[.]"  U.S. Const., art. VI, cl. 2. As the clause has been construed by the courts, there are three ways wherein "federal law can preempt state and local law: express preemption, conflict (or implied) preemption, and field (or

complete) preemption." *Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693, 696 (7th Cir.

2005). Specifically, express preemption occurs when "a federal statute explicitly states that it

overrides state or local law." *Id.* Conflict preemption occurs where "it would be impossible for

a party to comply with both local and federal requirements or where local law 'stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"

*Id.* (quoting *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287 (1995)). Field preemption occurs

where "federal law so thoroughly 'occupies a legislative field' as to make it reasonable to infer

that Congress left no room for the states to act." *Id.* at 696-97 (quoting *Cipollone v. Liggett

Group, Inc.,* 505 U.S. 504, 516 (1992)). All of Plaintiffs' state law claims, regardless of which

states' law applies and as exemplified by the laws of Florida (Plaintiff Hill) and Illinois (Plaintiff

Gage), are preempted due to both the *express* language of the MDA and because Plaintiffs' state-

law claims *conflict* with FDA's ability to fulfill the intent of Congress.

### a. Plaintiffs' Claims are Expressly Preempted Pursuant to 360k(a) of the MDA

Congress expressly provided that FDA's comprehensive regulation of medical devices

preempts conflicting state law, including state law tort claims:

> [N]o State or political subdivision of a State may establish or continue in effect
> with respect to a device intended for human use any requirement-
>
> (1) which is different from, or in addition to, any requirement applicable under
> this Act to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter
> included in a requirement applicable to the device under this Act.

21 U.S.C. § 360k(a); *see also*, *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 487 (7th Cir. 2005).

As the Seventh Circuit has explained, this express preemption clause sets three conditions for

preemption: "(1) there must be a 'requirement' that a state 'establish[es] or continue[s] in effect,

with respect to a device intended for human use'; (2) there must be a relevant federal

requirement under the FDCA applicable to the device at issue; and (3) the state 'requirement' must be 'different from, or in addition to,' the federal requirement." *McMullen*, 421 F.3d at 487 (quoting 21 U.S.C. § 360k(a)). Here, Plaintiffs' state law claims impose requirements on Cook regarding the safety and effectiveness of the Tulip and Celect that are "different from, or in addition to" the requirements placed on Cook by the 510(k) clearance process described above.

At issue here, is whether the 510(k) process that was (and continues to be) applied to the Tulip and Celect, meets the standard set forth in *McMullen* and therefore preempts Plaintiffs' state law claims. For the reasons outlined below, the undisputed facts make clear that Plaintiffs' state law claims are preempted and Cook is entitled to summary judgment.

### i.   Impact of *Lohr* and Other Case Law on the Preemptive Effect of the 510(k) Process

In the first U.S. Supreme Court case to examine express preemption under Section 360k(a) of the MDA, the Court held that pre-SMDA 510(k) notification focused solely on equivalence and did not establish device-specific requirements related to the safety and effectiveness of the device. *Lohr*, 518 U.S. at 503. Specifically, the Plaintiff in *Lohr* brought state law tort claims against the manufacturer of a pacemaker that had undergone pre-SMDA 510(k) notification in 1982. The Court ruled that the 510(k) notification at issue in *Lohr* did not preempt the Plaintiff's design defect claims because it "did not 'require' [the device] to take any particular form for any particular reason." *Id.* at 493-94. The Court also found that general labeling and manufacturing requirements applicable to all medical devices did not preempt the Plaintiff's failure to warn claims because the requirements "reflect important but entirely generic concerns about device regulation generally, not the sort of concerns regarding a specific device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements." *Id.* at 501. The Court further reasoned that

preemption "required a *careful comparison* between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement." *Id.* (emphasis added); *see Riegel,* 552 U.S. at 322 ("[N]o pre-emption occurred in [*Lohr*] based on a *careful comparison* between the state and federal duties at issue.") (emphasis added).  The Supreme Court later clarified *Lohr,* stating that "federal manufacturing and labeling requirements applicable across the board to almost all medical devices did not pre-empt the common-law claims of negligence and strict liability at issue in *Lohr*."  *Id.*

Importantly, the *Lohr* Court's analysis was based solely on 510(k) notification as it existed in 1982, before passage of the SMDA.  As explained above, the SMDA fundamentally altered the way FDA evaluates the safety and effectiveness of medical devices in the 510(k) process, including the 510(k) process applied to the Tulip and Celect.   Indeed, at the time Tulip and Celect were cleared by FDA (and continuing today), the 510(k) process was materially different than the mere notification at issue in *Lohr*.  As explained in detail below, this fundamentally alters the application of *Lohr* where, as here, FDA imposed device-specific requirements related to the safety and effectiveness of the Tulip and Celect throughout the regulatory process.

Another guidepost in this Court's analysis is *Riegel*, 552 U.S. 312, in which the Supreme Court revisited its decision in *Lohr*.  As opposed to the 510(k) notification analyzed in *Lohr*, the Court held in *Riegel* that the PMA process, used by FDA to approve Class III medical devices, did have preemptive effect under §360k(a) because the PMA process imposed device-specific federal requirements. *Id.* at 322-23.  That process was not, as the Court found in *Lohr*, an exception to FDA safety and effectiveness review – it "*is* federal safety review."  *Id.* at 323 (emphasis added).  Where FDA allows "almost no deviations from the specifications in its

13

approval" and "the approved form [of the device] provides a reasonable assurance of safety and effectiveness," FDA's decision that the device may be marketed is preemptive. *Id.* Here, although Tulip and Celect received FDA clearance and not approval, the regulatory pathway applicable to the filters is more akin to the PMA process applicable to Class III medical devices analyzed in *Riegel*, than the pre-SMDA 510(k) process analyzed in *Lohr*.

A final guidepost is the fundamental shift in the Supreme Court's "presumption against preemption" articulated in *Lohr*. *Lohr* at 485 ("In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'") (internal citations omitted). Since *Lohr*, the Supreme Court has said that where, as here, Congress expressly preempts state law, "we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin California Tax-Free Trust*, ___ U.S. ___, 136 S. Ct. 1938, 1946 (2016) (internal quotations omitted). Because § 360k(a) contains an express preemption clause, there is no presumption against preemption as originally contemplated in *Lohr*.

### ii. 510(k) Regulatory Review Has Undergone Significant Change since 1990

The Tulip and Celect underwent (and remain subject to) a 510(k) process that is materially different from the process analyzed in *Lohr*. Indeed, the process applicable to the Tulip and Celect specifically focused on the safety and effectiveness of those products and FDA used its discretion to impose device-specific requirements on Cook.

14

As indicated above, under the SMDA, if there are different technological characteristics between the proffered device and its predicate device(s), the applicant must submit data (which may include clinical data) to demonstrate that the device is as safe and as effective as the predicate.  21 U.S.C. § 360c(i).  If the new technological characteristics raise questions of safety and effectiveness different from its predicate, the new device will not be found substantially equivalent.  21 U.S.C. § 360c(i)(1)(A)(ii).  In addition to technical characteristics, if the new device presents differing intended uses from the predicate device, it is not eligible for clearance. 21 U.S.C. § 360c(i)(1)(A). Accordingly, safety and effectiveness are at the core of the 510(k) process as amended by the SMDA, and as applied to the Tulip and Celect.

Moreover, the SMDA authorized FDA to impose "special controls" on device manufacturers that provide reasonable assurance of the safety and effectiveness of some devices. 21 U.S.C. § 360c(a)(1)(B); 21 C.F.R. § 860.3.  The original 1976 definition of Class II devices in the MDA "identified performance standards rather than special controls as the mechanism by which FDA could establish reasonable assurance of safety and effectiveness."  The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] – Guidance for Industry and Food and Drug Administration Staff, July 28, 2014 ("2014 510(k) Guidance"), attached hereto at Exh. B, at  COOKFOIA 000026, fn 2.  The purpose of special controls is to "provide adequate assurance of safety and effectiveness[.]"  21 C.F.R. § 860.3(c)(2).  In 2014, FDA reiterated that "[s]pecial controls are usually device-specific[.]"  *See* FDA, *Regulatory Controls (Medical Devices)* (last updated June 26, 2014).[7]

Utilizing its authority to issue special controls, "FDA has issued many *device-specific* guidance documents that clarify the data that should be included in 510(k)s for particular device

---

[7] Available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/ GeneralandSpecialControls/ucm2005378.htm.

types." Exh. B, 2014 510(k) Guidance, at COOKFOIA 000030 (emphasis added). These guidance documents are device-specific and designed to address specific risks or issues related to specific devices or types of devices. Where FDA has required manufacturers to follow them, they have been interpreted as federal requirements entitled to preemptive effect. *See*, *e.g.*, *Whitson v. Safeskin Corp.*, 313 F. Supp. 2d 473, 477 (M.D. Pa. 2004) (device-specific regulatory manual preemptive).

### iii. FDA's Guidance for 510(k) Evaluation of IVC Filters Requires Detailed Evaluation of a Device's Safety and Effectiveness

#### 1. FDA's Down Classification of IVC Filters

In 1980, FDA classified IVC filters as Class III devices. 45 Fed. Reg. 7,973 (February 5, 1980). In 1995, FDA issued a notice in the Federal Register requiring manufacturers of IVC filters to submit to FDA summaries of safety and effectiveness information known for these devices. 60 Fed. Reg. 41,986 (August 14, 1995); Memorandum from Veronica Price to Record Re: Reclassification of Cardiovascular Intravascular Filters, December 2, 1996, attached hereto at Exh. B, at COOKFOIA 000065. In 1996, FDA issued a memorandum that, after identifying all of the risks related to IVC filters, "FDA now believes that these risks can be controlled by special controls." *Id*. at COOKFOIA 000067. The statement also concluded that "based on publicly available, valid scientific evidence, the intravascular cardiovascular filter can be regulated as a Class II device (general and special controls) to reasonably assure that the device is safe and effective for its intended use." *Id*. at COOKFOIA 000072.

In 2000, FDA published its final rule reclassifying "cardiovascular intravascular filters" from Class III to Class II devices in the Federal Register. 65 Fed. Reg. 17,144 (March 31, 2000); *see also*, 21 C.F.R. § 870.3375. As part of its final rule, FDA also identified "special controls that the agency believes will reasonably ensure the safety and effectiveness of the devices." 65

Fed. Reg. 17,138 (March 31, 2000). The rule established the following special controls for these

filters:

- ISO 10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing;

- FDA's 510(k) Sterility Review Guidance and Revision (Feb. 12, 1990) (K90-1); and

- Guidance for Cardiovascular Intravascular Filter 510(k) Submissions (the "510(k) Filter Guidance" or "Guidance").

FDA stated that these special controls "provide reasonable assurance of the safety and

effectiveness" of the filters. *Id.*

## 2. FDA's Device-Specific Guidance for IVC Filters

The 510(k) Filter Guidance established vital pre-clinical testing, clinical design, and

labeling standards for IVC filter devices. Guidance for Cardiovascular Intravascular Filter

510(k) Submissions, November 26, 1999, attached hereto as Exh. C, at

CookMDL2570_0202630. The Guidance is a comprehensive directive the FDA issued

specifically for IVC filters that must be followed by both applicants and FDA. The Guidance

states that IVC filters "should demonstrate that the proposed device complies with either the

specific recommendations of this guidance or some alternate control that provides equivalent

assurances of safety and effectiveness." *Id.* While the guidance presents the special controls to

be considered for all IVC filter devices, the Guidance makes clear that FDA's evaluation of any

particular device and the application of the special controls are based on the specific design

being evaluated by FDA in the 510(k) process. *Id.* (Introduction) ("The necessary array of tests

for a particular filter will depend, in part, on the specific design.").

Pre-clinical testing (testing other than in humans) encompasses, for example, the

compatibility of the device with the human body and the device's inherent physical

17

characteristics (robustness, mechanical performance, compatibility with in vivo imaging techniques, etc.).  Here, the Guidance states that biocompatibility testing should be conducted and notes that "[i]t is the submitter's responsibility to conduct testing which adequately addresses the concerns identified [in the Guidance] as well as any others which may arise due to the unique design of the given device."  *Id.*

Clinical investigation includes – with respect to studying the device in human patients – defining the positive outcomes and potential adverse events to be measured, determining how patients will be selected to participate in the study, and establishing the size and duration of the study such that it will produce useful, statistically significant results applicable to the total expected patient population.  In the Guidance, FDA acknowledged that the risks of IVC filters are well documented for the indications for which IVC filters are intended and noted that the "intent of the clinical study should be to demonstrate that the rates of complications for the investigational filter are comparable to other marketed vena cava filters."  *Id.*

Regarding labeling, the Guidance recommended manufacturers implement a number of changes from previous filter device labels, including specific wording for when the filter device ought or ought not to be used and specific wording for warnings about MRI for patients using the device.  *Id.*

### iv.    FDA Conducted a Thorough Evaluation of the Safety and Effectiveness of the Tulip and Celect Through Application of the 510(k) Process

A "careful comparison" of the regulatory history of Tulip and Celect demonstrates that FDA did impose the type of device-specific requirements related to "safety and effectiveness" outlined in 21 U.S.C. §360c(i)(A) and that have preemptive effect under 21 U.S.C. § 360k(a) as interpreted by *Lohr* and *Riegel*.  Specifically, FDA imposed device-specific federal requirements relating to animal and clinical testing, labeling, and product design.  *See* 21 C.F.R. § 870.3375;

18

Exh. C, at CookMDL2570_0202630.  These requirements are "device-specific," and FDA

deemed them necessary to ensure the safety and effectiveness of the Tulip and Celect.

### 1.        FDA Requested and Reviewed Clinical Studies

If FDA determines clinical data is necessary, it may require such data in a 510(k)

submission.  21 U.S.C. § 360c(i)(1)(A)(ii); 21 C.F.R. § 860.3(c)(2).  When clinical data is

provided in the 510(k) submission it "should constitute valid scientific evidence as defined in 21

C.F.R. § 860.7(c)(2) and must comply with the Investigational Device Exemptions (IDE)

regulations as applicable."  Exh. B, 2014 510(k) Guidance, at COOKFOIA 000047.



Based, in part,

on this data, FDA cleared the Tulip for permanent placement.  Lavender Decl., at ¶ 5.

FDA then cleared the Tulip as a

retrievable device.  Lavender Decl., at ¶ 11.

Based, in part, on this data, FDA cleared Celect for permanent

placement.  Lavender Decl., at ¶ 38.

██████████████████████████████████████████████████████

FDA then cleared Celect as a retrievable device.  Lavender Decl., at ¶ 41.

FDA's request for clinical data related to the Tulip and Celect was necessarily device-specific.  *See, e.g.*, *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 227 (6th Cir. 2000); *Martin v. Telectronics Pacing Systems, Inc.*, 105 F.3d 1090, 1097 (6th Cir. 1997) ("the regulations governing investigational devices are essentially device specific").  These device-specific clinical testing requirements reflect "the sort of concerns regarding a specific device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements."  *Lohr*, 518 U.S. at 501.  Accordingly, the device-specific clinical data required by FDA weighs in favor of preemption.

### 2.    FDA Managed the Scope and Detail of Device Labels

FDA may require specific statements be included in device labeling.  21 U.S.C. § 360c(i)(1)(E).  Accordingly, each Tulip and Celect 510(k) submission included proposed labels, labeling, and advertisements.  21 C.F.R. § 807.87(e).

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

  █    ███████████████████████████████████████

  █    ████████████████████████████████████████

  █    ███████████████████████████████



### 3. FDA Enforced Pre-Clinical Testing and Design Requirements

According to the 510(k) Filter Guidance, the "necessary array of tests for a particular filter will depend, in part, on the specific design," and that additional pre-clinical testing may be "necessary to qualify all filters/designs." Exh. C, at CookMDL2570_0202630. Pre-clinical testing includes biocompatibility and analysis of filter performance. *Id.* ███████████

███████████████████████████████████████████████████████████

███████████████████████████ FDA's requests for additional data were not merely

suggestions. If Cook failed to provide the information requested, FDA would consider the

---

█████████████████████████████████████████████████

[9] *See* Exh. A27, at CookMDL2570_0060706.

510(k) withdrawn, pursuant to 21 C.F.R. § 807.87(l) ("If the additional information is not submitted within 30 days following the date of the request, the Commissioner will consider the premarket notification to be withdrawn.").  Indeed, FDA is "empowered to *require* additional necessary information" to facilitate the agency's substantial equivalence determinations. *Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (citing 21 C.F.R. § 870.87(l)) (emphasis added).

    FDA also sought and reviewed detailed testing and design information regarding the Tulip and Celect. ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████ After FDA cleared Tulip for a permanent indication, Cook submitted a second 510(k) for the retrieval indication,

███████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



This FDA review related to testing and design reflect "the sort of concerns regarding a specific device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements." *Lohr,* 518 U.S. at 501.  Indeed, as explained above, the modern 510(k) process, as amended by the SMDA and strengthened by the down classification of IVC filters in 2000 and the 510(k) Filter Guidance, is a radical departure from the process analyzed in *Lohr*.  518 U.S. at 479 (noting that the 510(k) notification at issue required "little information, rarely elicits a negative response from the FDA, and gets processed very quickly.").  Here, however, it took almost two years to obtain clearance for the Tulip with a

permanent indication, and three additional years for a retrieval indication.[10]  Similarly, it took

more than two years and nine months to obtain clearance for the Celect with a permanent

indication, and an additional 11 months for a retrieval indication.[11]  In sum, FDA "'weighed the

competing interests' and unambiguously resolved those interests in favor of implementing a

specific mandate" on Cook for marketing the Tulip and Celect.  *Papike v. Tambrands*, 107 F.3d

737, 741 (9th Cir. 1997) (*citing Lohr,* 518 U.S. at 501).  Therefore, these device-specific federal

requirements are entitled to preemptive effect.

> **v.** **Plaintiffs' State Law Claims Impose Requirements Different From or in Addition to FDA Requirements Placed on Cook**

The regulatory history of the Tulip and Celect shows that FDA imposed device-specific

research, design, manufacture, testing, marketing, and labeling requirements on these devices.

By enacting §360k(a), Congress expressly preempted any state law claim "different from or in

addition to" any and all FDA requirements imposed on the design, manufacture, and labeling of

these products.  *Riegel,* 522 U.S. at 326-27.  Here, Plaintiffs' product liability claims would

impose requirements different from or in addition to the federal requirements to which Cook was

(and continues to be) subject and thus Plaintiffs' claims are preempted under §360k(a).  While

the FDA requirements preempt the state-law product liability claims of all Plaintiffs who

received the Celect or Tulip, the preempted claims of Plaintiffs Hill and Gage are evaluated in

more detail below.

> **1.** **Plaintiff Hill's Claims Under Florida Law are Preempted**

**Failure to Warn:**  To advance her Florida-based failure to warn claim, Plaintiff Hill

must prove that Cook did not adequately warn of a particular risk that was known or knowable in

light of the generally recognized and prevailing best scientific medical knowledge available at

---

[10] *See* Lavender Decl., ¶¶ 1, 5, 11.
[11] *See* Lavender Decl., ¶¶ 15, 38.

the time of manufacture and distribution.  *Thomas v. Bombardier Recreational Products, Inc.*, 682 F. Supp. 2d 1297, 1300 (M.D.Fla. 2010).  Since the Celect implanted into Plaintiff Hill was subject to device-specific labeling requirements as described above, Plaintiff Hill's failure to warm claim is preempted.  *See McMullen*, 421 F.3d at 490; *see also*, *Byrnes v. Small*, 142 F.Supp.3d 1262, 1269 (M.D.Fla. 2015) ("Plaintiffs have not identified any federal requirements to inform the public or to update warning labels regarding the dangers of off-label use of medical devices.").  Cook had to submit proposed labels, labeling, and advertisements for FDA's review for the Celect.  21 C.F.R. § 807.87(e).  Furthermore, FDA exercised its authority to require that specific language be included in the Celect label.  21 U.S.C. §360c(i)(1)(E); Lavender Decl., at ¶¶ 25, 30, 31, 33, 34, and 37.

**Design Defect:**  To succeed on her design defect claim, Plaintiff Hill must prove that the Celect was unreasonably dangerous because of its design.  *See Tillman v. C.R. Bard, Inc.*, 96 F. Supp.3d 1307, 1338 (M.D.Fla. 2015); FSJI 403.7b.  Because the 510(k) process as applied to the Celect was explicitly designed to "provide reasonable assurance of safety and effectiveness[,]" Plaintiff Hill's design defect claim is also preempted.  *See* 65 Fed. Reg. at 17,144 (March 31, 2000).

**Negligence:**  Plaintiff Hill's negligence claim requires proof that Cook failed to exercise reasonable care to protect her from harm.  *See Cintron v. Osmose Wood Preserving, Inc.*, 681 So.2d 859, 861-62 (Fla.Dist.Ct.App. 1996).   The 510(k) process as applied to Celect was intended to provide a reasonable assurance of safety and, thus, Plaintiff Hill's negligence claim is likewise preempted.

**Punitive Damages:**  Plaintiff Hill's claim for punitive damages is derivative of her other claims and, thus, she is only entitled to punitive damages if she can show by "clear and

convincing evidence" that Cook is guilty of intentional misconduct or gross negligence.  Fla. Stat. § 768.72.  Given that Cook complied with all 510(k) requirements and received the appropriate clearances, like her other claims, Plaintiff Hill's claim for punitive damages is preempted.

### 2.  Plaintiff Gage's Claims Under Illinois Law are Preempted

Illinois has adopted the product liability doctrine set forth in section 402A of the Second Restatement of Torts.  *See Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249, 254 (Ill. 2007).  Under this doctrine, liability is imposed on the seller of "any product in a defective condition *unreasonably dangerous* to the user or consumer."  Restatement (Second) of Torts § 402A. Here, the 510(k) process applied to the Tulip filter implanted in Plaintiff Gage provided a reasonable assurance of safety that preempts Plaintiff Gage's traditional product liability claims under Section 402A.

Similarly, Plaintiff Gage's negligence claims focus on conduct that necessarily was dictated by FDA's device-specific requirements.  *Baltus v. Weaver Division of Kidde & Co.,* 557 N.E.2d 580, 585 (Ill.App.Ct. 1990).  Thus, Plaintiff Gage's negligence-based claims are likewise preempted.  Specifically:

**Design Defect:**  Under Illinois law, a manufacturer has a nondelegable duty to design reasonably safe products. *Salerno v. Innovative Surveillance Tech.*, 932 N.E.2d 101, 112 (Ill.App.Ct. 2010).  Thus, the critical question is whether the manufacturer exercised reasonable care in the design of the product, and "whether in the exercise of ordinary care the manufacturer should have foreseen that the design would be hazardous to someone." *Calles,* 864 N.E.2d at 271.  Since the 510(k) process that was applied to the Tulip was designed to "provide reasonable assurance of safety and effectiveness[,]" Plaintiff Gage's design defect claim is preempted.  *See* 65 Fed Reg. at 17,144 (March 31, 2000).

26

**Failure to warn:**   A failure to warn claim based in negligence focuses on the particular defendant's knowledge and conduct.  *Werckenthein v. Bucher Petrochemical Co.,* 618 N.E.2d 902, 908 (Ill.App.Ct. 1993).  Therefore, in negligence-based failure to warn claims, the plaintiff must show that "the defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity."  *Solis v. BASF Corp.*, 979 N.E.2d 419, 443 (Ill.App.Ct. 2012).  Once again, the 510(k) process as-applied provided an assurance of safety, including in the Tulip's labeling and, thus, Plaintiff Gage's failure to warn claim is likewise preempted.

**Implied and express warranty:**   Breach of the implied warranty of merchantability occurs when goods are not "fit for the ordinary purpose for which such goods are used."  810 Ill. Comp. Stat. Ann. 5/2-314(2)(c); *see also*, *Overland Bond & Inv. Corp. v. Howard*, 292 N.E.2d 168, 171 (Ill.Ct.App. 1972).  A determination of whether a device is fit for ordinary use "bears directly on its safety and effectiveness."  *De La Paz v. Bayer HealthCare LLC*, 159 F. Supp. 3d 1085, 1097, (N.D.Cal. 2016).  Here, FDA's review and clearance of the Tulip provided a reasonable assurance of safety and effectiveness and preempts Plaintiff Gage's implied warranty claim.  Plaintiff Gage's claim for breach of express warranty appears to be based on the IFU and other Tulip labeling that underwent FDA review.  Accordingly, "[a]ny claim for breach of express warranty based on those statements would require a determination that [the Defendant] did not conform to the descriptions approved by the FDA."  *Id*. at 1098.  Since Plaintiff Gage has made no such allegation, his breach of express warranty claims are likewise preempted.

### b.   Even if Not Expressly Preempted, Plaintiffs' Claims are Implicitly Preempted

State common-law claims involving a device cleared by the 510(k) process are also impliedly preempted under the principles of conflict preemption.  *Lohr*, 518 U.S. at 503; *see*

*also Buckman*, 531 U.S. at 352 ("neither an express pre-emption provision nor a saving clause bars the ordinary working of conflict pre-emption principles.").  State law is preempted by federal law when it is "not lawful under federal law… to do what state law required."  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011); *see also*, *Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466, 2480 (2013) ("When federal law forbids an action that state law requires, the state law is without effect.") (internal citations omitted); *Wagner v. Teva Pharms. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016); *In re Incretin-Based Therapies Prod. Liab. Litig.*, 142 F. Supp. 3d 1108, 1126 (S.D.Cal. 2015).  The key inquiry here is "whether the private party could independently do under federal law what state law requires of it."  *Mensing*, 564 U.S. at 620.  In *Mensing*, the Supreme Court ruled that under FDA regulations a generic drug manufacturer could not take independent action to immediately change the label as the plaintiff asserted was required under state law.  *Id.* at 618.

Similar to the Defendants in *Mensing* and related cases*, Cook is similarly prohibited from modifying or changing its IVC filters or its intended uses without first submitting a new 510(k) to FDA if the change would "significantly" change or modify the "design, components, method of manufacture, or intended use" of the device.  *See* 21 C.F.R. § 807.81(a)(3); 21 C.F.R § 807.81(a)(3).  If a jury were to find that the design or labeling of the Tulip or Celect are defective under state law, it would necessarily require Cook to make design and/or labeling changes that would significantly affect the safety or effectiveness of these devices that, in turn, and would require Cook to violate federal law – which expressly requires prior FDA review of these types of changes.  *Mensing*, 564 U.S. at 618-19; *Bartlett*, 133 S. Ct. at 2476; *but see*, *Mullins v. Ethicon, Inc.*, 147 F. Supp. 3d 478, 485 (S.D.W.Va. 2015).   Thus, it would be impossible for Cook "to comply with both [its] state-law duty to change the label and [its] federal law duty to

keep the label the same" without prior FDA review.  *Mensing,* 564 U.S. at 618.  Therefore, the Plaintiffs' common law claims are also preempted under the Supreme Court's conflict preemption principles.

## **CONCLUSION**

For the reasons detailed above, the Court should grant judgment summary judgment on all claims against the Cook Defendants by all Plaintiffs who received the Tulip or Celect, and specifically including Plaintiffs Elizabeth Jane Hill and Arthur Gage.

Respectfully submitted,

Dated: August 11, 2017                    */s/ Andrew L. Campbell*
                                          Andrea Roberts Pierson (# 18435-49)
                                          Andrew L. Campbell (25516-49)
                                          John T. Schlafer (# 28771-49)
                                          FAEGRE BAKER DANIELS LLP
                                          300 North Meridian Street, Suite 2700
                                          Indianapolis, Indiana  46204
                                          Telephone:  (317) 237-0300
                                          Facsimile:  (317) 237-1000
                                          Email:  andrea.pierson@faegrebd.com
                                          Email:  andrew.campbell@faegrebd.com
                                          Email:  john.schlafer@faegrebd.com

                                          James Stephen Bennett (# 22869-02)
                                          FAEGRE BAKER DANIELS LLP
                                          110 W. Berry Street, Suite 2400
                                          Fort Wayne, Indiana  46802
                                          Telephone: (260) 424-8000
                                          Facsimile: (260) 460-1700
                                          stephen.bennett@faegrebd.com

                                          *Counsel for the defendants, Cook Incorporated,
                                          Cook Medical LLC (f/k/a Cook Medical
                                          Incorporated), and William Cook Europe ApS*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2017, a copy of the foregoing COOK

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY

JUDGMENT BASED ON FEDERAL PREEMPTION was filed electronically, and notice of the

filing of this document will be sent to all parties by operation of the Court's electronic filing

system to CM/ECF participants registered to receive service in this matter.  Parties may access

this filing through the Court's system.  Lead Co-Counsel for Defendants will serve any non-

CM/ECF registered parties.


*/s/ Andrew L. Campbell*

31