# EXHIBIT A-1

**EXPERT REPORT**
**DAVID A. KESSLER, M.D.**

1

**TABLE OF CONTENTS**

I. BACKGROUND & QUALIFICATIONS ...................................................................................... 5

II. OVERVIEW ............................................................................................................................. 8

III. COOK MARKETED THE CELECT IVC FILTER UNDER THE 510(k) REGULATORY
FRAMEWORK WHICH REQUIRED A SHOWING OF SUBSTANTIAL EQUIVALENCE TO
PREDICATE DEVICES AND NOT PROOF OF SAFETY AND EFFICACY ........................... 9
    A. General Framework for the Regulation of Medical Devices ............................................. 9
    B. Substantial Equivalence ................................................................................................... 14
    C. Substantial Equivalence is Not FDA Approval — It is Clearance .................................... 15
    D. FDA Standards for Device Labeling .................................................................................. 18
    E. Medical Device Reporting & Medical Device Reporting ................................................. 21
    F. Physicians' Abilities to Assess the Safety and Efficacy of Medical Devices .................. 31

IV. THE REGULATORY HISTORY OF COOK'S TULIP AND CELECT FILTERS .................... 33
    A. Clearance Chronology for Tulip and Celect in the US. ................................................... 33
    B. Tulip is Cleared for Marketing in the US. ....................................................................... 33
    C.
    D. Celect is Cleared for Marketing in the US. ...................................................................... 44

V. A DEVICE MANUFACTURER MUST ENSURE THAT THE QUALITY OF ITS DEVICE
DOES NOT "FALL BELOW THAT WHICH IT PURPORTS OR IS REPRESENTED TO
POSSESS" ................................................................................................................................ 47

VI. THE CELECT FILTER FELL BELOW THE QUALITY THAT IT PURPORTED OR WAS
REPRESENTED TO POSSESS. ............................................................................................... 49

VII.    COOK HAD AN OBLIGATION TO ENSURE THAT THE CELECT  FILTER WAS AT
        LEAST AS SAFE AND EFFECTIVE AS THE GÜNTHER TULIP AND TO ENSURE THE
        SAFETY OF CELECT  THROUGHOUT THE LIFE OF ITS PRODUCT................................ 148

VIII.




IX.




X.      CONCLUSIONS. ......................................................................................................... 157

## APPENDICES & SCHEDULES

Appendix A:   Resume of David A Kessler, M.D.

Appendix B:   List of Cases and Compensation Information

Appendix C:   List of Published Articles Relating to FDA, Drugs & Devices

Appendix D:   List of Documents Considered or Relied Upon


Schedule 2:   Individuals Identified in the Report of David A. Kessler, M.D.



Schedule 5:   Report of Rebecca Betensky, Ph.D.

Schedule 6:   Report of Michael Fishbein, M.D.

Schedule 7:   Exhibit C to Report of Reza Rajebi, M.D.


Schedule 9:   Diagram of Predicate and Prior Predicate Devices

Schedule 10:  Deposition Citations

## I.   BACKGROUND & QUALIFICATIONS

1.     My name is David A. Kessler, M.D. I received my M.D. degree from Harvard Medical School in 1979 and my J.D. degree from the University of Chicago Law School in 1978.

2.     I did my pediatrics training at John Hopkins Hospital.

3.     I was appointed in 1990 by President George H.W. Bush as Commissioner of the United States Food and Drug Administration and was confirmed by the United States Senate. I also served in that position under President William Jefferson Clinton until February 1997.

4.     I have taught food and drug law at Columbia University Law School, and I have testified many times before the United States Congress on food, drug, and consumer protection issues under federal and state law.  Over the last thirty years, I have published numerous articles in legal, medical, and scientific journals on the federal regulation of food, drugs, and medical devices.  I have had special training in pharmacoepidemiology at Johns Hopkins Hospital. My resume is attached as Appendix A.  A list of cases in which I have appeared as a witness in the last five years and documentation of my expert witness fee is attached as Appendix B.  A list of my published articles relating to FDA issues, including drugs and devices, is attached as Appendix C.

5.     As Commissioner, I had ultimate responsibility for implementing and enforcing the United States Food, Drug, and Cosmetic Act ("FD&C Act").  I was responsible for overseeing five Centers within FDA.  They included, among others, the Center for Drug Evaluation and Research, the Center for Devices and Radiological Health, and the Center for Biologics Evaluation and research.  In addition to those duties, I placed high priority on getting promising therapies for serious and life-threatening diseases to patients as quickly as possible. During my tenure as Commissioner, the FDA announced a number of new programs, including:

the regulation of the marketing and sale of tobacco products to children; nutrition labeling for food; user fees for drugs and biologics; preventive controls to improve food safety; measures to strengthen the nation's blood supply; and the MedWatch program for reporting adverse events and product problems involving both drugs and devices. I created an Office of Criminal Investigation within the Agency. I was directly involved with the regulation of medical devices. In addition, I established "The Committee for Clinical Review" that reviewed device evaluation and review. I worked closely with FDA's Division of Drug Marketing, Advertising and Communications and was involved in establishing the Center for Devices and Radiological Health's Promotion and Advertising Policy Staff.

6.      I am a senior advisor to TPG Capital, a leading global private equity firm, which owns pharmaceutical and biomedical companies. I served on the board of Aptalis Pharma and serve on the boards of Tokai Pharmaceuticals and the medical device and biologics company Immucor, Inc. In these advisory and fiduciary capacities, I have advised companies on the standards and duties of care within the pharmaceutical and medical device industry. I also chaired the compliance committee of Aptalis, and I chair the quality committee of Immucor, which involves ensuring compliance with FDA laws and requirements.

7.      The documents provided to me by counsel, or that I accessed independently from various sources, including, but not limited to, FDA's website, are listed in Appendix D to this report. At my request, Appendix D was prepared by counsel. Based on my review of those documents and my training and experience, I have a number of opinions that are detailed below.

8.      It is my understanding that the Bellwether Plaintiffs in this matter are: Elizabeth Jane Hill (Case No. 1:14-cv-06016); Arthur Gage (Case No. 1:14-cv-01875) and Tonya Brand (Case No. 1:14-cv-06018) I understand that more than 1,200 additional cases have been filed in the MDL as of this writing.

9.     It is my understanding that the Defendants in this matter are: Cook Group, Inc.;

Cook Medical Incorporated a/k/a Cook Medical, Inc.; Cook Medical, LLC; Cook Incorporated;

Medical Engineering and Development Institute, Inc.; Cook Medical Technologies; Cook

Denmark International ApS; Cook Denmark Holdings, ApS; Cook Group Europe ApS; Cook

Nederland BV; and William Cook Europe ApS.  In this report I refer to the Defendants

collectively as "Cook."  In certain instances I will use the following abbreviations:

- WCE:  William Cook Europe
- MEDI:  Medical Engineering & Development Institute

are attached to this

report as Schedule 1.

10.     Because the terms "penetration" and "perforation" appear frequently in this

report, I clarify here that unless I make an express exception, when I apply the term terms

"penetration" and "perforation" (as distinguished from reporting another's use of the terms), I

mean:

- Penetration:  Penetration of the vein wall by filter hooks with transmural
  incorporation.

- Perforation:  Strut or anchor devices extending more than 3 mm (">3mm")
  outside the wall of the IVC as demonstrated by CT, US, venography, or autopsy.[1]

These definitions are discussed in detail at appropriate points in the report.[2]

11.     It is my understanding that this matter involves the following causes of action:

strict products liability failure to warn; strict products liability design defect; negligence;

[1] This definition is derived from the definition used in the guidelines published by the Society for Interventional Radiology (SIR).  However, SIR calls both of these "IVC penetration" (the latter is the definition applied for quality improvement reporting purposes).  I have taken the approach of the International Standards Organization (ISO), which has a substantively identical definition to the SIR definition but refers to protrusion >3mm as "perforation."
[2] My opinions concerning the relative rates of perforation between Tulip and Celect do not imply that Tulip is a safe or effective device.

negligence per se; breach of express warranty; breach of implied warranty; violations of applicable state laws prohibiting consumer fraud and unfair and deceptive trade practices; loss of consortium; wrongful death; survival; and punitive damages.

## II.  OVERVIEW

12.  All manufacturers of medical devices need to ensure the safety of their devices and respond reasonably to evidence of safety concerns.

13.  A device manufacturer must ensure that the quality of its device does not "fall below, that which it purports or is represented to possess."[3] If the quality of the device does fall below that which it purports or is represented to be, the product is deemed "adulterated" under the statute. The consequence of a product being adulterated is that it may not be marketed until and unless its adulterated quality is rectified.

14.  There are two routes to the market for a medical device.  One route, the pre-market approval application requires a full set of pre-clinical and clinical studies and is generally viewed as the most thorough device application process.  A second route allows devices that are substantially equivalent to a marketed device ("the predicate") to submit a 510(k) application that establishes "substantial equivalence."

15.  A manufacturer who submits a 510(k) application must ensure that any device submitted under this 510(k) route be as safe and effective as its predicate device and not raise new questions about safety or effectiveness.

16.  Cook IVC filter medical devices known as the Günther Tulip MR*Eye* Vena Cava Filter and Günther Tulip Vena Cava Filter ("Tulip") and Celect Vena Cava Filter ("Celect") were intended to be deployed in the inferior vena cava (IVC), to prevent pulmonary embolism in

---

[3] FD&C Act, Section 501 (21 U.S.C. Section 351(c))

patients at risk for such outcomes, and for whom traditional anti-coagulation was contra-

indicated.  As discussed below, Cook was required to establish that the Celect was as safe and

effective as the Tulip.  Cook also was required to ensure that the quality the Celect did not fall

below that which it purported or was represented to possess.

### III.   COOK MARKETED THE CELECT IVC FILTER UNDER THE 510(K) REGULATORY FRAMEWORK WHICH REQUIRED A SHOWING OF SUBSTANTIAL EQUIVALENCE TO PREDICATE DEVICES AND NOT PROOF OF SAFETY AND EFFICACY.

### A.   General Framework for the Regulation of Medical Devices

17.   The Food and Drug Administration (FDA) is one of the nation's most important

consumer protection agencies.  It is responsible for implementing the nation's food, drug, and

medical device laws.  "Before 1976, medical devices could be marketed without review by the

U.S. Food and Drug Administration (FDA).  Periodic attempts to regulate some devices as drugs,

for which the agency did require premarketing clearance, proved to be cumbersome and

inadequate.  Spurred by the increased technological complexity of devices and mounting

disclosures of shortcomings involving pacemakers, intrauterine devices, and intraocular lenses,

Congress enacted the comprehensive Medical Device Amendments of 1976 to the Federal Food,

Drug, and Cosmetic Act.  The primary purpose of the amendments was to ensure that new

devices were safe and effective before they were marketed."[4]

18.   The Federal Food, Drug, and Cosmetic Act (hereinafter, the "Act") (21 U.S.C.

301 *et seq.*), as amended by the Medical Device Amendments of 1976 (the "1976 amendments")

(Public Law 94-295), the Safe Medical Devices Act of 1990 (the "SMDA") (Public Law

101¬629), the Food and Drug Administration Modernization Act of 1997 ("FDAMA") (Public

---

[4] Kessler DA *et al.*, The Federal Regulation of Medical Devices, *The New England Journal of Medicine*, August 8, 1987.

Law 105-115), the Medical Device User Fee and Modernization Act ("MDUFA") (Public Law 107−250) and the medical device provisions of the Food and Drug Administration Amendments Act of 2007 ("FDAAA") (Public Law 110-85), along with the applicable regulations in the Code of Federal Regulations, established a framework for the regulation of medical devices intended for human use.

19.     Congress established three classes of devices, based on the regulatory requirements needed to provide reasonable assurance of their safety and effectiveness. The three classes of devices are class I, class II, and class III. Class I devices present no unreasonable risk of illness or injury and are subject to regulation through "general controls." 21 U.S.C. 360c(a)(1)(A). Class II devices are potentially more harmful and are subject to general controls, but FDA in addition has authority to require that such devices comply with other "special controls." 21 U.S.C. 360c(a)(1)(B). Class III devices present "a potential unreasonable risk of illness or injury." 21 U.S.C. 360c(a)(1)(C)(ii)(II).

20.     In drafting the 1976 amendments, Congress divided medical devices in two different ways: (1) according to three classes noted above — class I, II, or III, and (2) according to seven basic categories — pre-amendment, post-amendment, substantially equivalent, implant, custom, investigational, and transitional. The current regulatory scheme involved weaving these two methods of subdivision into a workable statutory framework. Unlike the regulation of new drugs, in which standards of safety and effectiveness are applied uniformly, the regulation of devices is based primarily on risk.

21.     More specifically, devices that were in commercial distribution before May 28, 1976 (the date of enactment of the 1976 amendments), generally referred to as pre-amendments devices, are classified after FDA has: (1) received a recommendation from a device classification

10

panel (an FDA advisory committee); (2) published the panel's recommendation for comment, along with a proposed regulation classifying the device; and (3) published a final regulation classifying the device.[5]

22.     Devices that were not in commercial distribution prior to May 28, 1976, generally referred to as post-amendments devices, are classified automatically by statute (section 513(f) of the Act (21 U.S.C. 360c(f)) into class III without any FDA rulemaking process.  Those devices remain in class III and require a manufacturer to submit to FDA a premarket approval application, unless or until: (1) the device is reclassified into class I or II; (2) FDA issues an order classifying the device into class I or II in accordance with section 513(f)(2) of the Act (21 U.S.C. 360c(f)(2)); or (3) FDA issues an order finding the device to be substantially equivalent, under section 513(i) of the Act (21 U.S.C. 360c(i)), to a predicate device that does not require premarket approval.

23.     Before a Class III device may be introduced into the market, a manufacturer must obtain a "premarket approval" ("PMA" may refer to either premarket approval or premarket application) from FDA.  (21 U.S.C. 360c(a)(1)(C), 360e(a)).  To obtain a PMA, the manufacturer must submit information to FDA in a premarket approval application that provides reasonable assurance that the device is safe and effective for its intended use.  (21 U.S.C. 360c(a)(1)(C), 360e(a), (c), and (d) (1994 & Supp. IV 1998); 21 C.F.R. Pt. 814).

24.     PMA is the most detailed type of device marketing application and review required by FDA.  The applicant must receive FDA approval of its PMA application prior to marketing the device. Any sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).  PMA requires clinical testing to ensure safety and effectiveness.

---

[5] FD&C Act, Section 513 (21 U.S.C. 360c)

25.     A "grandfathering" provision permits Class III devices that were on the market before the Medical Device Amendment's enactment to remain on the market until FDA initiates and completes a rulemaking requiring the submission of a PMA.  (21 U.S.C. 360e(b)(1)(A)). Congress permitted manufacturers to distribute similar devices by showing through a premarket notification process that they are "substantially equivalent" to grandfathered devices.  (21 U.S.C. 360e(b)(1)(B)).  That premarket notification process is known as the "Section 510(k) process," referring to the applicable section of the Act (21 U.S.C. 360(k)).  A device is "substantially equivalent" to a grandfathered device only if, *inter alia*, the device has the same "intended use" as the predicate device. (21 U.S.C. 360c(i)(1)(A) (1994 & Supp. IV 1998)).

26.     In brief, the following summarizes how the statutory provisions operate in practice:

a.     Medical devices are classified into one of three classes, I, II, or III.

b.     Class III devices pose the greatest risk.  Class I devices pose the least regulatory risk.

c.     The class that a device is in determines the regulatory requirements.

d.     Most class II devices can get on the market by what is called a premarket notification or 510(k) process.

e.     A device that requires the submission of a premarket notification 510(k) cannot be commercially distributed until an authorizing letter of substantial equivalence ("clearance") from FDA is received by the manufacturer.

f.     A 510(k) application must demonstrate that the device is substantially equivalent to a device that (1) was legally in commercial distribution in the US before May 28, 1976; or (2) has been determined by FDA to be substantially equivalent. 510(k) premarket applications can "piggyback" by demonstrating substantial equivalence to a device that has been found substantially equivalent.  This practice has led to significant controversy and concern that many important devices are not being reviewed for safety and effectiveness.[6]

---

[6] Medical Devices and the Public's Health: The FDA 510(k) Clearance Process at 35 Years (2011)

g.    Class III devices need to get on the market through the more thorough Premarket Approval Application process or PMA.

h.    When it enacted the 1976 Medical Device Amendments, Congress required that all implanted devices (devices that were implanted in the human body) be categorized as Class III and thus subject to safety and efficacy review.

i.    The PMA process is more involved and included the submission of clinical data to support claims made for the device.

j.    Devices that are being studied or evaluated are considered investigational devices. In order to obtain the clinical data to support a submission of a device, the manufacturer needs to submit an Investigational Device Exemption (IDE). Higher-risk investigational devices are classified as "significant risk" devices and require greater scrutiny.

k.    An IDE allows the investigational device to be used in a clinical study to collect safety and effectiveness data required to support a PMA application or a premarket notification 510(k) submission to FDA.

l.    Clinical studies of devices with significant risk must be approved by FDA and an Institutional Review Board ("IRB") before a study can begin.

m.    Studies of devices of non-significant risk must be approved by the IRB before a study can begin.

n.    An IRB is a committee that has been formally designated to approve, monitor, and review research studies involving humans with the responsibility to protect the rights and welfare of the research subjects.

o.    When a physician uses an investigational device, the protocols involving those investigational devices must be approved by a local IRB. A local IRB can be established by a university, hospital, or other institution. Each IRB must have at least five members, with varying backgrounds to promote complete and adequate review of research activities commonly conducted by the institution. The IRB shall be sufficiently qualified through the experience and expertise of its members, and the diversity of the members, to safeguard the rights and welfare of human subjects. (45 C.F.R. § 690.101).

p.    The Center for Devices and Radiological Health within FDA is delegated, by the Commissioner, with the responsibility for regulating medical devices.

B.    **Substantial Equivalence**

27.    According to FDA:

> "A 510(k) requires demonstration of substantial equivalence to another legally U.S. marketed device. Substantial equivalence means that the new device is at least as safe and effective as the predicate.
>
> A device is substantially equivalent if, in comparison to a predicate it:
>
> - has the same intended use as the predicate; <u>and</u>
> - has the same technological characteristics as the predicate; <u>or</u>
> - has the same intended use as the predicate; <u>and</u>
> - has different technological characteristics and the information submitted to FDA:
>   - does not raise new questions of safety and effectiveness; <u>and</u>
>   - demonstrates that the device is at least as safe and effective as the legally marketed device.
>
> A claim of substantial equivalence does not mean the new and predicate devices should be identical. Substantial equivalence is established with respect to intended use, design, energy used or delivered, materials, chemical composition, manufacturing process, performance, safety, effectiveness, labeling, biocompatibility, standards, and other characteristics, as applicable."[7]

28.    FDA also has stated: "A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device (21 CFR 807.92(a)(3)) that is not subject to PMA. Submitters must compare their device to one or more similar legally marketed devices and make and support their substantial equivalency claims."[8]

29.    Thus, to qualify for substantial equivalence, a device must not raise new questions about safety and effectiveness.

---

[7] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/Premarket Submissions/PremarketNotification510k/ucm2005718.htm (emphasis in original)
[8] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/Premarket Submissions/PremarketNotification510k/ucm2005718.htm.

### C.     Substantial Equivalence is Not FDA Approval — It is Clearance

30.     A determination by the FDA in the 510(k) process that a device is substantially equivalent to a predicate device is not a finding that the device is safe and effective for its intended conditions of use.

31.     The fact that a 510(k) clearance is not a finding of safety and efficacy was addressed by the United States Supreme Court in the *Medtronic v. Lohr* case.[9]

32.     The United States government, through the Solicitor General, filed a brief in that case setting out the position of FDA and the United States government, which stated: "[t]he clearance of a post-Amendments device under Section 510(k)—based on a determination that the device is substantially equivalent to a pre-Amendments Class III device—does not reflect a determination by the FDA that the device is safe and effective, much less a specific determination that the device's design is required to ensure its safety and effectiveness. [A] determination of substantial equivalence...is not equivalent to an approval by the FDA of the device's safety and effectiveness.' H.R. Rep. No. 808 [101st Cong., 2d Sess. (1990)], at 14 . . . As the court of appeals observed, the FDA ordinarily will not have determined whether the pre-Amendments device was safe and effective (since the FDA lacked the general authority to do so prior to enactment of the Amendments)....[A]ccordingly, FDA regulations specify that a substantial equivalence determination 'does not in any way denote official approval of the device,' and that any representation conveying 'an impression of official approval...is misleading and constitutes misbranding."[10]

---

[9] *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)
[10] Brief for the United States as Amicus Curiae Supporting Respondents/Cross-Petitioners, pp. 19-20, *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (No. 95-754)

33.     The Court's opinion distinguished the "rigorous PMA review" from the 510(k) clearance process and found them "by no means comparable."[11]

34.     The Court said that "in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours."[12]

35.     The Court specifically stated: "Although 'substantially equivalent' Class III devices may be marketed without the rigorous PMA review, such new devices, as well as all new Class I and Class II devices, are subject to the requirements of § 360(k). That section imposes a limited form of review on every manufacturer intending to market a new device by requiring it to submit a `premarket notification' to the FDA (the process is also known as a § 510(k) process,' after the number of the section in the original Act). If the FDA concludes on the basis of the § 510(k) notification that the device is 'substantially equivalent' to a pre-existing device, it can be marketed without further regulatory analysis (at least until the FDA initiates the PMA process for the underlying pre-1976 device to which the new device is 'substantially equivalent'). The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours. *See* 1987 Hearings, at 384. As one commentator noted: 'The attraction of substantial equivalence to manufacturers is clear. [Section] 510(k) notification requires little information, rarely elicits a negative response from the FDA, and gets processed very quickly.' Adler, The 1976 Medical Device Amendments: A Step in the Right Direction Needs Another Step in the Right Direction, 43 Food Drug Cosm. L. J. 511, 516 (1988); *see also* Kahan, 39 Food Drug Cosm. L. J., at 514-519."[13]

---

[11] *Lohr*, 518 U.S. 470 at 478
[12] *Id.*
[13] *Id.* at 478-479

36.     The Court noted "[t]he 510(k) process is focused on *equivalence*, not safety."

Specifically, the Court stated "[t]he company's defense exaggerates the importance of the

§510(k) process and the FDA letter to the company regarding the pacemaker's substantial

*equivalence* to a grandfathered device. As the court below noted, '[t]he 510(k) process is

focused on equivalence, not safety.' 56 F. 3d, at 1348. As a result, 'substantial equivalence

determinations provide little protection to the public. These determinations simply compare a

post-1976 device to a pre-1976 device to ascertain whether the later device is no more dangerous

and no less effective than the earlier device. If the earlier device poses a severe risk or is

ineffective, then the later device may also be risky or ineffective.' Adler, 43 Food Drug Cosm. L.

J., at 516. The design of the Model 4011, as with the design of pre-1976 and other `substantially

equivalent' devices, has never been formally reviewed under the MDA for safety or efficacy."[14]

37.     Justice O'Connor, with whom Chief Justice Scalia and Justice Thomas joined,

concurring in part and dissenting in part, stated "[t]he § 510(k) process merely evaluates whether

the Class III device at issue is substantially equivalent to a device that was on the market before

1976, the effective date of the MDA; if so, the later device may be also be marketed."[15]

38.     One may argue that to the extent that there are no differences between a

substantially equivalent device and its predicate, the device that is found to be substantially

equivalent should be safe and effective. The problem with that argument is that the predicate

device has never itself been found to be safe and effective.

39.     There are instances where FDA can under the 510(k) clearance process request

"clinical data." FDA can request clinical data from a manufacturer to determine whether a

device's indication for use falls within the device's intended use. FDA can also request clinical

data if the agency has determined that the 510(k) submission has new technological

---

[14] *Id.* at 492-493 (emphasis in original)
[15] *Id.* at 513

17

characteristics relative to its predicate.  That determination of new technological characteristics is based in significant part on the manufacturer telling the FDA that the device has new technological characteristics.

40.     FDA acknowledges the 510(k) process has "evolved" over time.[16]  On July 28, 2014, FDA stated in a guidance document, "[t]he 510(k) review standard (substantial equivalence of a new device to a legally marketed (predicate) device) differs from the PMA review standard (reasonable assurance of safety and effectiveness).  The 510(k) review standard is comparative, whereas the PMA standard relies on an independent demonstration of safety and effectiveness.  Nonetheless, the principles of safety and effectiveness underlie the substantial equivalence determination in every 510(k) review.  The standard for a determination of substantial equivalence in a 510(k) review is set out in section 513(i) of the FD&C Act. . . ."[17]

41.     The Institute of Medicine in its report titled "Medical Devices and the Public's Health: The FDA 510(k) Clearance Process at 35 Years" ("IOM Report"), concluded: "The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions.  The 510(k) process cannot be transformed into a premarket evaluation of safety and effectiveness as long as the standard for clearance is substantial equivalence to any previously cleared device."[18]

42.     FDA has limited resources and must rely on the data submitted by the manufacturer.

### D.     FDA Standards for Device Labeling

43.     The general labeling requirements for medical devices are set out in 21 CFR § 801.

---

[16] The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] —Guidance for Industry and Food and Drug Administration Staff (July 28, 2014)
[17] *Id.* at 6.
[18] IOM Report at 5.

44.     On March 8, 1991, the Director of the Office of Device Evaluation made public a "Device Labeling Guidance." FDA, General Program Memorandum #G91-1.[19]

45.     The document stated "[w]hile this guidance is primarily intended to ensure the adequacy of, and the consistency in, the labeling information for devices subject to premarket approval, it may also contribute to premarket notification reviews."[20]

46.     The Device Labeling Guidance set out the following general sections for a device label: 1) Indications for Use, 2) Contraindications, 3) Warnings, 4) Precautions, and 5) Adverse Reactions.  The Device Labeling Guidance stated for the Warnings section in relevant part: "Describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. Include an appropriate warning if there is reasonable evidence of an association of a serious hazard with the use of the device.  A causal relationship need not have been proved."[21]

47.     In addition to these labeling requirements, Section 301(a) of the FD&C Act prohibits misbranded drugs and devices from being introduced into interstate commerce.[22] Section 502(a) of the FD&C Act states that a device is misbranded if its labeling is false or misleading in any particular.[23]  FDA guidance titled "Labeling: Regulatory Requirements for Medical Devices," dated August 1989, states:

> Section 502(a) declares that a drug or device is misbranded if its labeling proves false or misleading in any particular. The phrase 'false or misleading' is not confined in meaning to untrue, forged, fraudulent, or deceptive.  In fact, the word, statement, or illustration may be true in the strict sense of the word; however, the labeling can be deemed by the FDA to be in violation of the law if it proves deceptive to the customer.  It is not

---

[19] FDA, Device Labeling Guidance, Gen. Program Memo. #G91-1 (1991)
[20] *Id.*
[21] *Id.*
[22] 21 USC § 331(a). The Act also prohibits manufacturers from introducing devices into interstate commerce "for any intended use that is outside FDA's substantial equivalence determination (clearance) for such devices." (FDA Guidance on Responding to Unsolicited Requests for Off-Label Information (2011).
[23] 21 U.S.C § 352(a)

> a necessary condition that the labeling should be flatly and baldly false;
> the word 'misleading' in the Act means that labeling is deceptive if it is
> such as to create or lead to a false impression in the mind of the reader. A
> 'false impression' may result not only from a false or deceptive statement,
> but may also be instilled in the mind of the purchaser by ambiguity or
> misdirection. It may also be caused by failure to inform the consumer of
> facts that are relevant to those statements actually made. In other words,
> the label that remains silent as to certain consequences may be as
> deceptive as the label that contains extravagant claims.[24]

48.    FDA's labeling guidance also gives examples of false and misleading

misrepresentations. These examples include: "ambiguity, half-truths, and trade puffery" and

"failure to reveal material facts, consequences that may result from use, or the existence of

difference of opinion." Thus, labeling may be misbranded if it makes a misleading statement or

fails to inform the consumer of facts that are relevant to those statements actually made.[25]

49.    A "Perspective" in The New England Journal of Medicine, June 1st, 2006, arose

from the work of a panel that conducted an investigation of some potentially fatal malfunctions

of implantable defibrillators. That commentary included certain principles relevant to the

framework for conduct of medical device manufacturers, as follows:

a.    "First, manufactured products can never be entirely free of design or
manufacturing flaws, but when the consequence of a malfunction is a potentially
fatal event, tolerance and surveillance strategies should aim to achieve a risk of
malfunction that is as close to zero as possible.

b.    Second, physicians must know about the performance features of any device they
recommend for a patient so that they can carry out their ethical obligation of
obtaining informed consent. This information must be in a form that is
understandable and clinically useful.

c.    And third, patients have a right to obtain product information so they can make
informed decisions about risks and benefits and can understand what expectations
are reasonable.

---

[24] See also FDA Guidance "Labeling: Regulatory Requirements for Medical Devices" (1989)

[25] Id. at 4-5. There are counterpart "mini-FDA" state laws as well, many of which track the federal standards and definitions and would be subject to the same or a similar analysis.

d.      All companies are required by the Food and Drug Administration to evaluate device malfunctions systematically in the postmarketing phase to identify those that are clinically significant to correct defects and to act to prevent failures in performance. These internal processes necessarily center on engineering skills and methods, but the consequences of device malfunctions are more than an issue for engineering. They have clinical implications for patients that may include a risk of fatal events. Thus, engineering performance standards are insufficient benchmarks without evaluation by experts of the possible effects on individual patients.

e.      [C]ompanies must reevaluate their approach to patient safety in the context of communication. A critical question is when and how information about product performance should be communicated to physicians and patients. Although the issues, both ethical and practical, are complex, one conclusion is clear: Transparency in matters that affect patient safety should be embraced as a primary corporate obligation.

f.      From the perspective of physician and patient expectations, corporate responsibility and public perception, we believe that proactive communication policies centering on the proper use of active and passive transparency should be the norm.

g.      Corporate culture fosters a loyalty to corporate goals that may create unintended bias and distorted perceptions about product performance and patient safety."[26]

## E.      FDA Standards for Medical Device Reporting

50.     Following clearance of a device through the 510(k) process, a device manufacturer has adverse-event reporting obligations pursuant to 21 CFR, Part 803, which establishes requirements for medical device reporting for device manufacturers and others.[27] The regulations include several technical definitions that are discussed in detail below with reference to manufacturers' reporting obligations.

51.     Facilities such as hospitals, ambulatory surgical facilities, nursing homes, and outpatient diagnostic or treatment facilities (which are not a physician's office) are called

---

[26] Robert J. Myerburg, M.D., David W. Feigal, Jr., M.D., M.P.H., and Bruce D. Lindsay, M.D. "Life-Threatening Malfunction of Implantable Cardiac Devices," *The New England Journal of Medicine*, 2006 Jun 1;354(22):2309-11.
[27] Part 803 is divided into five subparts: Subpart A "General Provisions: (§§ 803.1-803.19); Subpart B "Generally Applicable Requirements for Individual Adverse Event Reports" (§§ 803.20-803.23); Subpart C "User Facility Reporting Requirements" (§§ 803.30-803.33); Subpart D "Importer Reporting Requirements" (§§ 803.40-803.42); and Subpart E "Manufacturer Reporting Requirements" (§§ 803.50-803.58).

"device user facilities" and have certain mandatory reporting obligations in connection with death or serious injury.[28]

52.     "Importers" also have reporting obligations. Importer is defined to include "any person who imports a device into the United States and who furthers the marketing of a device from the original place of manufacture to the person who makes final delivery or sale to the ultimate user, but who does not repackage or otherwise change the container, wrapper, or labeling of the device or device package. If you repackage or otherwise change the container, wrapper, or labeling, you are considered a manufacturer as defined in this section." An importer must report to FDA and the manufacturer when it learns that one of its devices may have caused or contributed to a death or serious injury.  An importer must report only to the manufacturer when its imported device has malfunctioned and would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.[29]

53.     Medical device manufacturers are subject to the most extensive mandatory reporting requirements.  "Manufacturer" is defined as follows:

> *Manufacturer* means any person who manufactures, prepares, propagates, compounds, assembles, or processes a device by chemical, physical, biological, or other procedure. The term includes any person who either:

---

[28] In brief, device user facilities must report suspected medical device-related deaths to FDA and to the manufacturer, if known; and must report suspected medical device-related serious injuries to the manufacturer or, if the manufacturer is unknown, to FDA. Device user facilities are not required to report device malfunctions even where the malfunction would likely cause or contribute to death or serious injury were the malfunction to recur. However, they may voluntarily report such events through MedWatch. Regulatory definitions and MedWatch are discussed below. See 21 CFR §§ 803.30-803.33.  Note that physician's offices are not device user facilities and have no reporting obligations. See 21 CFR § 803.3(a) (defining ambulatory surgical facility); (d) (defining device user facility); (i) (defining hospital); (q) (defining nursing home); (r) (defining outpatient diagnostic facility); (s) (defining outpatient treatment facility); and (u) (defining physician's office).

[29] See 21 CFR §§ 803.40-803.42 and 21 CFR § 803.3(j) (defining importer). Also relevant is the definition of "distributor" is defined in § 803.3(e) ("*Distributor* means any person (other than the manufacturer or importer) who furthers the marketing of a device from the original place of manufacture to the person who makes final delivery or sale to the ultimate user, but who does not repackage or otherwise change the container, wrapper, or labeling of the device or device package. If you repackage or otherwise change the container, wrapper, or labeling, you are considered a manufacturer as defined in this section.")

(1)     Repackages or otherwise changes the container, wrapper, or labeling of a device in furtherance of the distribution of the device from the original place of manufacture;

(2)     Initiates specifications for devices that are manufactured by a second party for subsequent distribution by the person initiating the specifications;

(3)     Manufactures components or accessories that are devices that are ready to be used and are intended to be commercially distributed and intended to be used as is, or are processed by a licensed practitioner or other qualified person to meet the needs of a particular patient; or

(4)     Is the U.S. agent of a foreign manufacturer.[30]

54.     FDA issued in March 1997 a guidance titled "Medical Device Reporting for Manufacturers."[31]  The guidance summarized a manufacturer's reporting obligations in Table 1:

| REPORTER | WHAT TO REPORT | REPORT FORM # | TO WHOM | WHEN |
|---|---|---|---|---|
| Manufacturer | 30 day reports of deaths, serious injuries and malfunctions | Form FDA 3500A | FDA | Within 30 calendar days from becoming aware of an event |
| Manufacturer | 5-day reports on events that require remedial action to prevent an unreasonable risk of substantial harm to the public health and other types of events designated by FDA | Form FDA 3500A | FDA | Within 5 work days from becoming aware of an event |
| Manufacturer | Baseline reports to identify and provide basic data on each device that is subject of an MDR report.  At this time, FDA has stayed the requirement for denominator data requested in Part II, Items 15 and 16 on Form 3417. | Form FDA 3417 | FDA | With 30 calendar, and 5 work day reports when device or device family is reported for the first time.  Interim and annual updates are also required if any baseline information changes after initial submission. |
| Manufacturer | Annual Certification | Form FDA 3381 | FDA | Coincide with firm's annual registration dates. |

---

[30] 21 CFR §§ 803
[31] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 6, Table 1. The annual certification requirement was revoked by the FDA Modernization Act of 1997 and was removed from the regulation as published January 26, 2000 (65 FR 4112)

55.     On November 8, 2016, FDA issued a superseding final guidance titled "Medical Device Reporting for Manufacturers,"[32] a draft of which originally issued on July 9, 2013.[33] Strictly speaking, the FDA's 1997 guidance governed MDR reporting for Cook IVC filters through November 2016.  From a regulatory perspective, the 2013 draft guidance would be expected to shape manufacturers' expectations and performance, but as stated in the document, it was distributed "for comment purposes only" and "[w]hen final" it would supersede the 1997 guidance.[34]

56.     As noted in the 1997 guidance, "FDA relies on the goodwill and cooperation of all affected groups," including manufacturers, "to accomplish the objectives of the regulation."[35] The guidance was clear that these obligations extended to foreign manufacturers, who were "fully subject to the medical devices reporting requirements."[36]

57.     Under the regulations, manufacturers are required to report device-related deaths, serious injuries, and malfunctions "whenever they become aware of information that reasonably suggests that a reportable event has occurred (one of their devices has or may have caused or contributed to the event.)"[37]

---

[32] FDA Guidance, Medical Device Reporting for Manufacturers (2016).

[33] The most significant change from the 2013 draft guidance to the 2016 final guidance was its re-adoption of the "two-year rule." (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 12-13). As discussed below, a manufacturer is required to file a report when it becomes aware of an event in which one of its devices malfunctioned and the malfunction would be likely to cause or contribute to a death or serious injury were the malfunction to recur. The 1997 guidance stated that once a malfunction actually caused or contributed to a death or injury, it would be presumed that the malfunction was likely to cause death or serious injury until two years had passed in which the malfunction did not cause or contribute to death or serious injury. The 2013 draft guidance eliminated this "two-year rule;" the 2016 final guidance reinstated it, but with a recommendation that the manufacturer notify FDA with a summary of its rationale to cease reporting at the end of two years. A manufacturer who seeks to cease reporting in a shorter period of time must request an exemption under 21 CFR § 803.19(d). The 2016 final guidance also stated that certain contract manufacturers need not file reports. (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 14-15).  It also recommends that "user error" if there was no other device-related performance error. (*Id.* at 7). Finally, the final guidance clarifies that a delay in surgery due to a malfunction is MDR reportable even if the patient suffered no adverse consequences. (*Id.* at 27).

[34] FDA Guidance, Medical Device Reporting for Manufacturers (2013)

[35] *Id.* at viii

[36] *Id.* at 3-4

[37] *Id.* at 8

58.     "Reportable events" for a manufacturer under the rules include death, serious

injury, and device malfunction. Reportable events must be reported within 30 days[38] and

supplemented within 30 days of receiving new or changed information.[39]  A report may be

required within 5 work days under certain circumstances.[40/41]

59.     The critical definitions for determining a manufacturer's duty to report adverse

events include the following (with italics representing defined terms):

a.      An *MDR Reportable Event* (or *reportable event*) for manufacturers means:

An event that manufacturers or importers *become aware* of that reasonably
suggests that one of their marketed devices:

(1)     May have *caused or contributed* to a death or *serious injury*, or

(2)     Has *malfunctioned* and that the device or a similar device marketed by
the manufacturer or importer would be likely to *cause or contribute* to a
death or *serious injury* if the malfunction were to recur.[42]

b.      A manufacturer is deemed to have *become aware* when:

an employee … has acquired information that reasonably suggests a reportable
adverse event has occurred…. If you are a manufacturer, you are considered to
have become aware of an event when any of your employees becomes aware of a

---

[38] 21 CFR § 803.50

[39] 21 CFR § 803.56

[40] 21 CFR 803.53.  5-day reports may be requested by FDA and are required when "[a]n MDR reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health," including when indicated through "trend analysis." Manufacturers also were required to submit "baseline reports" when an event for a device model or device family was reported for the first time. 21 CFR § 803.55.  This requirement was removed from the regulation effective October 27, 2008. (73 FR 33692 and 73 FR 53686) (See FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 2 n.2)

[41] Manufacturers typically become aware of events through "complaints," which they must review and evaluate. "Complaint" is defined as "any written, electronic, or oral communication that alleges deficiencies related to the identity, quality, durability, reliability, safety, effectiveness, or performance of a device after it is released for distribution." 21 CFR § 820.3(b).  Under the 1997 guidance, a "complaint" included "any indication of the failure of a device to meet customer or user expectations for quality or to meet performance specifications." (FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 31). See 21 CFR § 820.198 for a manufacturer's procedural and record-keeping duties with respect to adverse event complaints.

[42] 21 CFR § 803.3(o)

reportable event that is required to be reported…. [or when] any … employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.[43]

The term "reasonably suggests" as used in this definition "includes any information, such as professional, scientific, or medical facts and observations or opinions, that would reasonably suggest that a device has caused or contributed to a reportable event."[44]

c.   *Caused or contributed* (to a death or *serious injury*) means that:

a death or *serious injury* was or may have been attributed to a medical device, or that a medical device was or may have been a factor in a death or *serious injury*, including events occurring as a result of: (1) Failure, (2) *Malfunction*, (3) Improper or inadequate design, (4) Manufacture, (5) Labeling, or (6) User error.[45]

Thus, a device is deemed to have *caused or contributed* to an event if it "may have been" a factor in a death or *serious injury* including events resulting from failure or *malfunction* (defined below) and "user error." The term "user error" included "any error made by the person using the device" whether the sole cause or merely a contributing cause to a reportable event.[46]

d.   A *serious injury* includes: "an injury or illness that:"

(1)  Is life-threatening,

(2)  Results in permanent impairment of a body function or permanent damage to a body structure, or

---

[43] 21 CFR § 803.3(b)

[44] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 35. The 2016 guidance includes a similar interpretation of the phrase "reasonably suggests," defining it as "any information, including professional, scientific, or medical facts, observations, or opinions that would cause you to come to a reasonable conclusion that a device has caused or may have caused or contributed to an MDR reportable event." (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 6).

[45] 21 CFR § 803.3(c)

[46] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 36. The 2016 guidance defines "user error" as "a device-related error or mistake made by the person using the device" whether it is the sole or merely a contributing cause to a reportable event. (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 7). FDA reasoned in both guidances that *user error* may indicate deficiencies in labeling.

(3) Necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure. Permanent means irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage.[47]

"Life-threatening" events constitute a *serious injury* "even if temporary in nature."[48] FDA addressed this issue in responding to comments and adopting the final rule in 1995, stating: "FDA believes that life-threatening events that may have been caused by a device must be reported, regardless of whether the damage was 'temporary.'"[49]

Regardless of whether an injury or illness is life-threatening, it constitutes a *serious injury* if it results in "permanent impairment," or "permanent damage to a body structure." The term "Permanent impairment" means "irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage."[50] According to FDA, "any intervention is per se 'significant' if it is necessary to preclude permanent impairment of a body function or permanent damage to a body structure,"[51] and this is true "regardless of the immediacy of the surgical or medical intervention."[52]

An injury or illness is a *serious injury* if it necessitates surgical or medical interventions to prevent permanent impairment or permanent damage to a body structure. FDA clarified in 2016 that not every delay in surgery would be reportable, but "[a] delay of surgery due to a defective product, such as a broken suture, or other malfunction of the device where the patient

---

[47] 21 CFR § 803.3(w)

[48] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 9, 36. See also FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 10 ("a life-threatening injury meets the definition of serious injury, regardless of whether the threat was 'temporary.'"); 60 Fed. Reg. 63579 (Dec. 11, 1995) at 63587 (Final Rule 21 CFR 803 & 807) ("life-threatening events may include temporary damage")

[49] 60 Fed. Reg. 63579 (Dec. 11, 1995) at 63587

[50] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 35. See also FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 10 (2016 guidance)

[51] 60 Fed. Reg. 63579 (Dec. 11, 1995) at 63586

[52] *Id.* at 63586

remained stable with no adverse consequences may be MDR reportable as a malfunction."[53]   The 2016 guidance also clarified that "a device does not have to *malfunction* for it to cause or contribute to a serious injury. Even though a device may function properly, it can still cause or contribute to a death or serious injury."[54]

e.      *Malfunction* "means the failure of a device to meet its performance specifications or otherwise perform as intended. Performance specifications include all claims made in the labeling for the device. The intended performance of a device refers to the intended use for which the device is labeled or marketed, as defined in 801.4 of this chapter."[55]

The first potential *malfunction* is a failure of the device to meet performance specifications, which include all claims made in the device's "labeling."  The term "labeling," includes "all labels and other written, printed or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."[56]  FDA has "liberally" interpreted the word "accompanying" so that it "extends to posters, tags, pamphlets, circulars, booklets, brochures, instruction books, direction sheets, fillers, etc."[57]  Accordingly, the failure of a device to live up to a manufacturer's representations regarding performance constitutes a *malfunction*.

The second potential *malfunction* is a failure of the device to "otherwise perform as intended," which, under 21 CFR § 801.4:

> Refer[s] to the objective intent of the persons legally responsible for the labeling of devices. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent

---

[53] FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 27
[54] FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 10-11
[55] 21 CFR § 803.3(k)
[56] FD&C Act, Section 201(m) (21 USC § 321(m)); FDA, Device Labeling Guidance, Gen. Program Memo. #G91-1 (1991), Attachment at 1
[57] FDA Guidance "Labeling: Regulatory Requirements for Medical Devices" at 2 (1989).  See also *Kordel v. United States*, 335 U.S. 345, 346-47 (1948) (defining "labeling" expansively)

may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised…..

FDA's 1997 guidance clarified the meaning of *malfunction*:

A malfunction should be considered reportable if any one of the following is true:

- the chance of a death or serious injury resulting from a recurrence of the malfunction is <u>not</u> remote;

- the consequences of the malfunction affect the device in a catastrophic manner that may lead to a death or serious injury;

- the malfunction causes the device to fail to perform its essential function and compromises the device's therapeutic, monitoring or diagnostic effectiveness which could cause or contribute to a death or serious injury, or other significant adverse device experiences. The essential function of a device refers not only to the device's labeled use, but for any use widely prescribed within the practice of medicine;

- the malfunction involves a long-term device implant that would prevent the implant from performing its function;

- the device is considered life-supporting or life-sustaining, and thus essential to maintaining human life; or

- the manufacturer takes or would be required to take action under section 518 or 519(f) of the FD&C Act as a result of the malfunction of the device or other similar devices.[58]

The first bullet point incorporates the *MDR reportable event* requirement to report a device *malfunction* if "the device or a similar device marketed by the manufacturer or importer would be likely to *cause or contribute* to a death or *serious injury* if the malfunction were to recur.[59]  The 2013 draft guidance and 2016 final guidance both clarify that a "similar" device is one with the same "[b]asic design and performance

---

[58] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 33-34.
[59] 21 CFR § 803.3(o)

characteristics related to device safety and effectiveness; intended use and function; and device classification and product code." Devices that "differ only in minor features unrelated to safety or effectiveness can be considered similar devices," and devices may be deemed "similar" if they share the same brand name or common name.[60]

Importantly, FDA stated with respect to recurrence: "Reporters do not need to assess the likelihood that the malfunction will recur. The regulation assumes that if a malfunction has occurred once, the malfunction will recur. Furthermore, FDA believes that once malfunction has caused or contributed to a death or serious injury, a presumption that the malfunction is likely to cause or contribute to a death or serious injury has been established."[61] The presumption "continues until the malfunction has caused or contributed to no further deaths or serious injuries for two years, or the manufacturer can show, through valid data, that the likelihood of another death or serious injury as a result of the malfunction is remote."[62]

60.     In summary, a manufacturer, whether foreign or domestic, must report an event as a serious injury or death when it becomes aware of information reasonably suggesting that its

---

[60] FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 11; FDA Guidance, Medical Device Reporting for Manufacturers (2013) at 12. For example, Cook reported to FDA adverse events for the Celect with the catalog number IGTCFS-65-1-FEM-CELECT (marketed in the U.S.) but did not report to FDA adverse events for the Celect with the catalog number IGTCFS-65-2-FEM-CELECT (marketed in Europe) although the filters were "the exact same device," according to an email from Mette Nielsen in WCE Regulatory Affairs to Cook Vice President of Quality Assurance Tom Roberts. (045 2880) ("we have decided only to include catalog numbers marketed in the US (IGTCFS-1-FEM/JUG/UNI-CELECT) in the response letter, though we know that is not the whole story.") Also see 019 9001 (related email); 045 2882 (FDA request); 045 2891(draft response to FDA); 045 2883 (alternate draft response to FDA).

[61] FDA Guidance, Medical Device Reporting for Manufacturers (1997) at 9, 34

[62] *Id.* at 10. The 2013 draft guidance included the same presumption, but eliminated the two-year rule. (FDA Guidance, Medical Device Reporting for Manufacturers (2013)) at 11. The 2016 final guidance includes the presumption, but reinstates the two-year rule. (FDA Guidance, Medical Device Reporting for Manufacturers (2016) at 11). The 2013 draft guidance also clarified that "the malfunction of a long-term implant [per the fourth bullet point] is reportable only when the malfunction would be likely to cause or contribute to a death or serious injury if it were to recur," i.e., long-term implants are subject to the same rules as other devices. (FDA Guidance, Medical Device Reporting for Manufacturers (2013) at 11).

device may have been a factor in causing or contributing to a death or serious injury, even if caused by user error. The manufacturer must report an event as a malfunction when it becomes aware of information reasonably suggesting (1) that its device failed to perform as the manufacturer intended or as the manufacturer represented it would perform in its labeling, and (2) the device, or a similar one marketed by the manufacturer might be a factor in causing or contributing to a death or serious injury should the malfunction recur. Once the malfunction has occurred, it is presumed that it will recur, and once a malfunction causes death or serious injury, it is presumed that the same malfunction would do so were it to recur.

61.     FDA hosts a publicly available database called Manufacturer and User Facility Device Experience (MAUDE).[63] The database provides public access to information from MDRs, subject to redaction of trade secrets and other sensitive information.[64]

62.     FDA has stated that adverse event reporting by manufacturers and others "help[s] us to protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use."[65] To facilitate this regulatory purpose, it is imperative that manufacturers comply scrupulously with reporting requirements.

### F.     Physicians' Abilities to Assess the Safety and Efficacy of Medical Devices

63.     In my opinion, physicians are rarely in a position to determine whether a device is safe and effective. That is the responsibility of the manufacturer.

64.     Physicians in practice are rarely in a position to undertake scientific studies to assess the safety and efficacy of medical devices and physicians in practice are rarely in a position to undertake clinical studies to assess the safety and efficacy of medical devices.

---

[63] Generally speaking, MAUDE includes reports dating back to 1991 (with manufacturer reports since August 1996). A more limited MDR database includes data regarding incidents from 1984 through July 31, 1996. See https://www.fda.gov/downloads/Training/CDRHLearn/UCM234355.pdf
[64] 21 CFR § 803.9
[65] 21 CFR § 803.1

65. There are physicians who are specially-trained and have dedicated their careers to investigating the safety and efficacy of medical devices. In many instances they undertake studies of medical devices at the behest of the manufacturer who intends to sell the device. In most cases, it is the manufacturer that funds physician investigators to undertake such clinical trials. These physician investigators are usually distinct from physicians in practice, whose primary focus is on taking care of patients.

66. Physicians in practice are in the position of reading the medical literature and keeping abreast of developments. Time constraints limit the ability of these physicians to keep abreast of all medical literature on a subject.

67. While physicians in practice read the medical literature, articles dealing with specialized scientific questions relating to a device are often published in the scientific, rather than medical, literature. It is more likely that a physician in practice will read the medical literature rather than the scientific literature. For example, engineering and other pre-clinical data could be published in the scientific engineering literature. Data that has clinical relevance to practicing physicians would likely be published in the medical literature.

68. The results of scientific and clinical testing done by a manufacturer are submitted as part of a 510(k) or PMA application. Those results, unless published elsewhere, are usually not available to practicing physicians. In certain instances, FDA may put online portions of a 510(k) application that were the subject of a Freedom of Information Act request. More generally, 510(k) listings and/or clearance letters, in contrast to the application itself, are

available online.  It would be the rare instance where a practicing physician would review the scientific and clinical testing that is part of a 510(k) or PMA application, unless such scientific and clinical testing was published elsewhere.

69.     Physicians in practice gather their information about the safety and efficacy of a medical device from various sources.  These may include the IFU, the medical literature, peers, teachers, conferences, promotional materials, and actual medical practice.

70.     While a physician in practice can observe how a device performs in an individual or group of patients, such a physician cannot assess the safety and efficacy of a device in a controlled setting.

71.     Observations of adverse events from a physician in practice, while anecdotal, are important pieces of information that comprise the "safety profile" of a device.

72.     As FDA has long acknowledged, while isolated case reports, random experience, and reports lacking sufficient details to permit scientific evaluation are not regarded as valid scientific evidence to demonstrate safety or effectiveness, such information may be considered in identifying a device that has questionable safety and effectiveness.

IV.     **THE REGULATORY HISTORY OF COOK'S TULIP AND CELECT FILTERS.**

A.     **Clearance Chronology for Tulip and Celect in the US.**

73.     The following table (Table 1) provides a timeline of significant clearance events for the Tulip and Celect filters in the United States, which are discussed in more detail throughout this report.

**Table 1. Selected Events Regarding Tulip & Celect U.S. Clearance.**

| Date | Event | K Number |
|---|---|---|
| 1998.10.28 | 510(k) application for the Günther Tulip Vena Cava MR*eye* Filter Set<br>Source: 006 1818[66] | K983823 |
| 1999.01.26 | NSE determination on the 10/28/98 submission<br>Source: 018 2248 | K983823 |
| 2000.03.15 | Re-submission of the Günther Tulip 510(k) application (permanent use only)<br>Source: IVCF 000002 | K000855 |
| 2000.10.18 | Clearance for Günther Tulip (permanent use)<br>Source: IVCF 000492 | K000855 |
| 2003.08.05 | 510(k) application for Günther Tulip (retrievable use)<br>IVCF 000496 | K032426 |
| 2003.10.31 | Clearance for Günther Tulip (retrievable use)<br>Source: IVCF 001040 | K032426 |
| 2004.07.30 | 510(k) application for the Cook 2nd Generation Vena Cava Filter (Celect)<br>Source: 006 0699 (Cover Letter); 006 1277 (Submission) | K042067 |
| 2005.02.01 | NSE determination on the 7/30/04 submission<br>Source: 006 1161 | K042067 |
| 2006.06.26 | Re-submission of the its Celect 510(k) application<br>Source: IVCF 002055 (Summary); IVCF 001964 (Submission) | K061815 |
| 2007.04.20 | Clearance of Celect (permanent use)<br>Source: IVCF 004157 | K061815 |
| 2007.11.30 | 510(k) application for Celect (retrievable use)<br>Source: IVCF 004160 at 4179 | K073374 |
| 2008.03.07 | Clearance of Celect (retrievable use)<br>Source: IVCF 004347 | K073374 |
| 2012.06.01 | 510(k) application for Celect Platinum<br>Source: IVCF 005099  (Cover Letter); IVCF 005102 (Submission) | K121629 |
| 2012.07.03 | Clearance of Celect Platinum (permanent and retrievable use)<br>Source: IVCF 005732 | K121629 |

    **B.**    **Tulip is Cleared for Marketing in the US.**

    74.    On October 28, 1998, Cook submitted a 510(k) application for its Günther Tulip Vena Cava MR*eye* Filter Set ("Tulip") for the prevention of recurrent pulmonary embolism in specified circumstances (K983823).[67]  The filter had been marketed in Europe since August 13, 1995.[68]  Cook stated that the Günther Tulip was substantially equivalent to Stainless Steel *Greenfield Vena Cava Filter* and the *LGM-Vena Tech* 30 Series filters.[69]

---

[66] Throughout this report 7-digit references are to "CookMDL2570_" bates numbers. Specific page references are included only for lengthy documents.
[67] 006 1818
[68] 018 2248
[69] 006 1818 at 1840

75.     FDA denied clearance on January 26, 1999.[70]

76.     Cook resubmitted a 510(k) application on March 15, 2000 (K000855).  It sought clearance "for the permanent placement indication only" as the original 1998 submission had been denied "due to a retrievability function,"

The Tulip was cleared for permanent placement on October 18, 2000.[72]

77.     On August 5, 2003, Cook submitted a 510(k) application for clearance of the Tulip with an option to retrieve the device (K032426).[73]  The Tulip was cleared for permanent placement with a retrievability option on October 31, 2003.[74]

C.

---

[70] 018 2248

[72] IVCF 000492. The Tulip was cleared based upon the following indications for use: "prevention of recurrent pulmonary embolism (PE) via placement in the vena cava in the following situations: pulmonary thromboembolism when anticoagulant therapy is contraindicated; failure of anticoagulant therapy in thromboembolic diseases; emergency treatment following massive PE where anticipated benefits of conventional therapy are reduced; and chronic, recurrent PE where anticoagulant therapy has failed or is contraindicated." (IVCF 000492 at 494)
[73] IVCF 000496
[74] IVCF 001040. The indications for use were identical to those in the permanent clearance. Additionally, the clearance stated: "The Günther Tulip Vena Cava Filter may be retrieved according to the instructions supplied in the section labeled: Optional Filter Retrieval. A retrieval set for jugular retrieval also was cleared. (IVCF 1040 at 1042)

84.     In 2005 Dr. Rolf Günther, Dr. Jörg Neuerburg, and others (including WCE

Director of Research Arne Mølgaard-Nielsen) published an article in a German medical journal

titled "New Optional IVC Filter for Percutaneous Retrieval – In Vitro Evaluation of Embolus

Capturing Efficiency."[84]  The article, which compared the clot-trapping efficiency of the Tulip

and Celect filters, stated: "Although clinical experience has shown that the Tulip filter can be

retrieved beyond the standard recommendation of 10 days after insertion, certain features of the

filter construction, such as the loop-like secondary wires of the Tulip filter, may be an obstacle

to even longer retrieval times.  Once the loop of the secondary wires has been overgrown with

neointima, retrieval may be difficult, as the loop may be bound by fibrous tissue. We

hypothesized that eliminating the loop and leaving the end of those wires only slightly curved

would facilitate percutaneous retrieval and prolong the retrieval period without deteriorating the

embolus capturing efficiency.  Preliminary data indicate that much longer dwell-times (90 days

and more) until filter retrieval might be possible."[85]

---

[84] Fortschr Roentgenstr 2005; 2005:632-636 (075 0585). The article is published in English.
[85] 075 0585 at 0589. The article also acknowledges that retrieval "avoid[s] the well-documented late sequelae of
permanent IVC filters," citing Decousus et al, A clinical trial of vena caval filters in the prevention of pulmonary
embolism in patients with proximal deep-vein thrombosis. New England J Med 1998; 338:409-415, which
concluded that "[i]n high-risk patients with proximal deep-vein thrombosis, the initial beneficial effect of IVC filters
for the prevention of pulmonary embolism was counter-balanced by an excess of recurrent deep-vein thrombosis,
without any difference in mortality." (037 9211 at 9211)  Also see 075 0585 at 0786 ("In view of the long-term
sequelae of IVC filter insertion, there is currently a trend toward optional IVC filters….")

96.     In October 2007 Dr. Arno Buecker of the University of Aachen published an

article titled "Long-Term Retrieval of Modified Günther Tulip Filters,"[105] Co-authors included

WCE Director of Research Arne Mølgaard Nielsen, Dr. Jörg Neuerburg, and Dr. Rolf Günther.

The article stated regarding the Tulip: "Although … studies proposed longer possible filter dwell

times, there are still some concerns about the ingrowth of the filter struts into the vena cava

———————————————

[105] *Invest. Radiology* 2007; 42:692-696.

vessel wall, which may require excessive force to advance the sheath over the tissue fixed to the
filter struts.  Consequently, the design of the Günther Tulip was changed to prevent the
possibility of any loops to be fixated to neointimal covering.  Opening of the loops and
reforming them as straight struts will facilitate will facilitate withdrawal of these filter struts
without major trauma…. [T]he modified design of the Celect filter solves the problem of long-
term retrievability seen with the original design of the Günther tulip filter."[106]

### D.      Celect is Cleared for Marketing in the US

99.      Cook submitted a 510(k) application to FDA for its Cook 2nd Generation Vena
Cava Filter (Celect) on July 30, 2004.[108]  Cook stated that "[T]he Cook 2nd Generation Vena
Cava Filter is substantially equivalent to the following  predicate devices in terms of materials,
design features and intended use:  Cook Günther Tulip Vena Cava MR*eye* Filter and Retrieval
Set (K032426) and the Cook Günther Tulip Vena Cava MR*eye* Filter (K000855)."[109]

---

[106] 016 0576 at 0579-80 (emphasis added)

[108] 006 0699 (Cover Letter); 006 1277 (Submission)
[109] 006 1277 at 1306

100.    On February 1, 2005, FDA denied clearance and issued a Not Substantially Equivalent (NSE) letter.[110]  FDA expressed concerns regarding, among other things, vessel wall perforations in Cook's animal study and lack of supporting clinical data.  FDA indicated that clinical data would be required for clearance.[111]

101.    On June 26, 2006, Cook resubmitted a 510(k) application.[112]  Cook's 2006 re-submission identified the predicate device as "Günther Tulip Vena Cava Filter #K000855."[113]

102.    On April 20, 2007, FDA cleared the device for the prevention of recurrent pulmonary embolism via placement in the vena cava via either the jugular or femoral vein for certain specific situations.[114]  FDA's clearance did not include any provision for the filter to be retrievable.[115]

103.    On November 30, 2007, Cook submitted Celect for clearance with a retrievable option using the Günther Tulip Retrieval Set.[116]  Cook stated that "[t]he proposed Cook Celect Vena Cava Filter and Günther Tulip Vena Cava Filter Retrieval Set are similar to the predicate Cook Celect Vena Cava Filter and Günther Tulip Vena Cava Filter Retrieval Set…. William Cook Europe ApS holds the 510(k) for the Celect Vena Cava Filter, determined to be substantially equivalent on April 20, 2007.  There is no change in the design, dimensions or

---

[110] 006 1161

[111] 006 1163

[112] IVCF 001964

[113] IVCF 001964 at 1975

[114] IVCF 004157. The Celect was cleared based upon the following indications for use: "Intended for the prevention of recurrent pulmonary embolism (PE) via placement in the vena cava in the following situations: Pulmonary thromboembolism when anticoagulant therapy is contraindicated; Failure of anticoagulant therapy in thromboembolic diseases; Emergency treatment following massive PE where anticipated benefits of conventional therapy are reduced; and Chronic, recurrent PE where anticoagulant therapy has failed or is contraindicated." These intended uses are identical to the intended uses for which the Günther Tulip originally was cleared. (IVCF 001964 at 1978, 1993)

[115] IVCF 004157

[116] IVCF 004160 at 4179

materials in either the cleared Celect Vena Cava Filter…. The indications for use are expanded to include retrieval of the Cook Celect Vena Cava Filter."[117]

104.    FDA cleared the device, including optional retrieval, on March 7, 2008.[118]

105.    Of note, Cook's original July 2004 510(k) application for the Celect stated: "Testing was conducted to demonstrate that the filter fixes itself within the vena cava at the deployment site with no tendency to perforate the caval wall. Radial force testing and observation from the animal study are reported…. Testing demonstrates that the Cook 2nd Generation Vena Cava Filter fixes itself within the vena cava at the deployment site with no tendency to perforate the caval wall."[119]

106.    Cook's applied for clearance of its Celect Platinum filter on June 1, 2012.[120]

107.    The Celect Platinum was a version of the Celect filter with modified anchor points.  Cook's 510(k) application for the Platinum noted the addition of "radiopaque markers" and stated: "The radiopaque marker on each primary leg is constructed from a platinum tungsten alloy; the radiopaque markers enhance filter visibility on procedural imaging."[121]

108.    FDA cleared the Platinum for permanent and retrievable use on July 3, 2012.[122]

109.    On June 3, 2014, Cook announced it was "introducing the next-generation of a proven technology at the 2014 Annual Vascular Meeting of the Society for Vascular Surgery (SVS) and the SVS Foundation."[123]

---

[117] IVCF 4160 at 4194

[118] IVCF 004347. The indications for use were the same as with the 2007 Celect clearance. The clearance letter added: "The filter may be retrieved according to the instructions supplied in the section labeled "Optional Filter Retrieval." (IVCF 004347 at 4349)

[119] 006 1277 at 1297-98 (emphasis added)

[120] IVCF 005099 (Cover Letter); IVCF 005102 (Submission)

[121] IVCF 005102 at 5113-14

[122] IVCF 005732 at 735

## V. A DEVICE MANUFACTURER MUST ENSURE THAT THE QUALITY OF ITS DEVICE DOES NOT "FALL BELOW THAT WHICH IT PURPORTS OR IS REPRESENTED TO POSSESS."

111.    In addition to, and independent from, the requirement that a device manufacturer must ensure that a device is as safe and effective as its predicate, the manufacturer also must ensure that the product is not adulterated, which ensures, in part, the quality of its device does not "fall below, that which it purports or is represented to possess."[125]  If the quality of the device does fall below that which it purports or is represented to be, the product is deemed "adulterated" under the statute.  The consequence of a product being adulterated is that it may not be marketed until and unless its adulterated quality is rectified.  This provision requires the manufacturer to ensure that the device is safe throughout its marketed life.

112.    For the Celect filter, Cook represented that these filters met performance standards.

---

[123] https://www.cookmedical.com/peripheral-intervention/celect-platinum-ivc-filter-introduced-at-svs/

[125] 21 USC § 351(c)

113.    Accordingly, in my opinion, as represented by Cook:

114. In my opinion, Celect fell below the quality which it purported or was represented

to possess, and thus was adulterated under the Federal Food, Drug & Cosmetic Act,

## VI. THE CELECT FILTER FELL BELOW THE QUALITY THAT IT PURPORTED OR WAS REPRESENTED TO POSSESS.

115. As noted above, in my opinion, Cook had an obligation to ensure:

**A.**

**B.**

125.     On July 30, 2004, Cook submitted to FDA a 510(k) application for its Cook 2nd Generation Vena Cava Filter (Celect).[138]  The study protocol and a summary of the 30-day results for VCA1 were furnished to FDA with the original 510(k) submission.[139]  On August 18, 2004, FDA requested "the animal study histographs, micrographs, or photos and histopathology data in color,"[140] which Cook provided.[141]

---

[138] 006 0699 (Cover Letter); 006 1277 (Submission)
[139] 006 1429
[140] 006 0858
[141] 006 0866

128.    On February 1, 2005, FDA denied clearance and issued a Not Substantially

Equivalent (NSE) letter.[148]

_____

[148] 006 1161

136.    Cook re-submitted the Celect 510(k) on June 26, 2006.[164]  It included in its submission (Appendix C) the final reports for VCA1 30-day, 60/90-day, 180-day and 360-day results.[165]

---

[164] IVCF 001964 at 1975

[165] Appendix C included: a report on the Dotter Institute Acute Animal Migration Test and VCA1 30-day results (IVCF 002058-2235); 60/90-day results (IVCF 002236-2592); 180-day results (IVCF 002593-2792) and 360-day results (IVCF 002793-3232).