# EXHIBIT 7

CONFIDENTIAL

Page 1

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF INDIANA
2            INDIANAPOLIS DIVISION
3         Case No.:  1:14-cv-06016-RLY-TAB
4    _____
5    In Re:  COOK MEDICAL, INC., IVC FILTERS
     MARKETING, SALES PRACTICES AND
6    PRODUCTS LIABILITY LITIGATION
7    _____
8          V I D E O   D E P O S I T I O N
9                     o f
10              DR. MARK ZUZGA
11        taken on behalf of Defendants
12
         DATE:          April 19, 2017
13
         TIME:          3:13 p.m. to 7:17 p.m.
14
         PLACE:         2580 Gulf to Bay Boulevard
15                      Clearwater, Florida  33765
16       BEFORE:        Dawn A. Hillier, RMR, CRR, CLR
                        Notary Public - State of
17                      Florida, at Large
18
19
20        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
21
22
23
24
25

CONFIDENTIAL

Page 138

1    A    Yes.
2    Q    In this particular case, Mrs. Hill and her
3 lawyers allege that she's at an increased risk of
4 thrombosis or occlusion of her vena cava as a
5 consequence of complications with her Celect.
6        On March 11th -- March 23rd, 2011, and on
7 November of 2010, was Mrs. Hill, in fact, warned in the
8 informed consent three times of the possibility of
9 thrombosis in her legs?
10       MR. JOHNSON:  Form.
11       THE WITNESS:  Yes.
12 BY MS. PIERSON:
13   Q    This informed consent reports that the risks
14 of the sedation including paralysis, brain damage, drug
15 reaction, or possibly death could occur?
16   A    Correct.
17   Q    She was told that in March of 2011?
18   A    Yes.
19   Q    She was told in the third paragraph about
20 alternatives to the procedure and that it might not turn
21 out as she or you expected?
22   A    Correct.
23   Q    You or someone on behalf of the hospital
24 explained the benefits of the procedure and told her,
25 again, no results can be guaranteed or assured.

Page 139

1    A    Correct.
2    Q    And, again, did Mrs. Hill acknowledge that she
3 had read and understood the informed consent?
4    A    Yes.
5    Q    In your opinion, Dr. Zuzga, did Mrs. Hill have
6 plenty of time and opportunity and explanation as it
7 related to the risks of her filter?
8        MR. JOHNSON:  Form.
9        THE WITNESS:  That's our standard procedure,
10 yes.
11 BY MS. PIERSON:
12   Q    Dr. Zuzga, you know today what Mrs. Hill
13 claims happened as a consequence of the placement of a
14 Celect filter.  You know that she claims that she has
15 vena cava perforation, that she had perforation of her
16 small intestine.  And today, she claims that she has
17 stenosis of her vena cava.  Are all of those
18 complications complications that she was expressly
19 warned about in these three informed consents?
20       THE WITNESS:  Yes.
21       MR. JOHNSON:  Form.
22 BY MS. PIERSON:
23   Q    Are they all complications that she had an
24 opportunity to discuss with you?
25   A    Yes.

Page 140

1    Q    Mrs. Hill has testified that although she
2 signed these three informed consents, that when she did
3 it, she was "drugged up" -- that's on page 246 of her
4 deposition -- so that she couldn't comprehend them.  In
5 your experience, is it your practice or the hospital's
6 practice to give informed consents to patients after
7 they've been sedated?
8    A    No.
9        MR. JOHNSON:  Form and foundation.
10       THE WITNESS:  No.
11 BY MS. PIERSON:
12   Q    Mrs. Hill has testified on page 107 of her
13 deposition that she recalled signing her form while on a
14 gurney without her reading glasses and after she had
15 already been medicated.
16       Is that true?
17       MR. JOHNSON:  Form.
18       THE WITNESS:  It's certainly not standard
19 procedure, no.
20 BY MS. PIERSON:
21   Q    That would be inconsistent with what you've
22 observed in 20 years of practice?
23   A    Yes.
24       MR. JOHNSON:  Form.
25 BY MS. PIERSON:

Page 141

1    Q    And giving Mrs. Hill consents to sign after
2 she had been sedated, would that be inconsistent with
3 what you observed in 20 years of practice?
4        MR. JOHNSON:  Form.
5        THE WITNESS:  Yes.
6 BY MS. PIERSON:
7    Q    You were asked in your first deposition about
8 a document called an IFU, or Instructions for Use.  Do
9 you remember that?
10   A    Yes.
11   Q    And your testimony in your first deposition
12 was that you didn't read the IFU for the Celect filter;
13 correct?
14   A    Correct.
15   Q    Is that because you had been trained and
16 educated on filters during your medical school and
17 residency and fellowship?
18   A    Correct.
19   Q    At the time that you implanted Mrs. Hill's
20 filter in November of 2010, you had implanted hundreds
21 of filters and many Celects in your patients; correct?
22       MR. JOHNSON:  Form.
23       THE WITNESS:  Correct.
24 BY MS. PIERSON:
25   Q    Was it your regular practice to place those

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1 filters without reviewing the instructions for use that
2 accompanied the product?
3     A   Yes.
4     Q   I want to ask you about some medical terms
5 that counsel asked you about last time.
6         First, when you see or hear the term "damage
7 to the vena cava," do you understand that damage to the
8 vena cava can include perforation of the vena cava?
9     A   Yes.
10    Q   And when you see in a document listed as a
11 risk of a filter, "perforation," do you understand that
12 that means it could, in fact, go through the wall of the
13 vena cava?
14    A   Yes.
15    Q   As a vascular surgeon, you're well familiar
16 with the organs and structures that are close to a
17 patient's vena cava?
18    A   Yes.
19    Q   And when you see as a listed risk, perforation
20 of the vena cava, do you know and understand that that
21 includes adjacent organs?
22    A   Yes.
23    Q   And structures?
24    A   Correct.
25    Q   In other words, if somebody said to you,

Page 143

1 Dr. Zuzga, as I understand they did in your medical
2 training, with a filter, there can be vena cava
3 perforation, you knew and understood that that could
4 include the small intestine?
5     A   Yes.
6     Q   When you see the term "filter hook embedded in
7 tissue growth," if you were to read that, would you
8 understand that to mean that the hook could become
9 overgrown with tissue?
10    A   Correct.
11    Q   And when a hook on a filter is touching the
12 wall of a vena cava, what is it that causes tissue to
13 grow over that?
14    A   It just can be a reaction from the body from a
15 foreign object inside.
16    Q   Is that true with other products too, not just
17 filters?
18    A   Yes.
19    Q   In other words, where there's blood flowing
20 over the filter or another product -- another product
21 and it's touching the caval wall, it's the body's
22 natural reaction to try and cover up that foreign
23 object; right?
24    A   Yes.
25    Q   It's a natural healing response?

Page 144

1     A   Yes.
2     Q   There's nothing about that growth that is
3 abnormal or unusual to filters?
4     A   Correct.
5     Q   With respect to vena cava filters, the Celect
6 and other filters, if the hook or the end of the filter
7 is touching the caval wall and it's touching it for some
8 four months, it can, in fact, grow over the hook?
9     A   Yes.
10    Q   That is a normal and expected consequence?
11    A   Correct.
12    Q   And it's a normal risk with any filter,
13 including the Celect?
14    A   Yes.
15    Q   When counsel asked at the last deposition
16 about the Celect instructions for use and you said that
17 you did not review it, is it safe to say that because
18 you hadn't reviewed it, you didn't rely on it at the
19 time of Mrs. Hill's filter placement?
20    A   Correct.
21    Q   And that you didn't rely on Cook's
22 communication in the IFU to form an opinion as to the
23 risks associated with the Celect filter?
24    A   Correct.
25    Q   You did not rely on anything that Cook

Page 145

1 communicated to you in selecting the filter appropriate
2 for Mrs. Hill?
3     A   Correct.
4     Q   Mr. Heaviside, another lawyer for Mrs. Hill,
5 asked you about the MAUDE database.  Do you remember
6 that?
7     A   No.
8     Q   Your response was that you didn't know what it
9 was.  Is it fair to say, Dr. Zuzga, that you were not
10 relying on anything in a MAUDE database in choosing a
11 filter for Mrs. Hill?
12    A   Correct.
13    Q   At the time that you implanted Mrs. Hill's
14 Celect filter, you had independent knowledge of the
15 risks of a vena cava filter?
16    A   Yes.
17    Q   And that came from your experience and your
18 review of the literature, not from any information from
19 Cook?
20    A   Correct.
21    Q   Or any information in a MAUDE database?
22    A   Yes.
23    Q   Is it safe to say that you did not review the
24 instructions for use that accompanied the retrieval
25 kit --

37 (Pages 142 - 145)

CONFIDENTIAL

Page 178

1    are on the record.
2 BY MS. PIERSON:
3    Q   Dr. Zuzga, Mrs. Hill's lawyers have asked --
4 have shown you some documents, one labeled, I believe it
5 was Exhibit 14 with complaints, a complaints
6 spreadsheet.  Do you remember that?
7    A   Yes.
8    Q   Mr. Johnson represented today that he had
9 counted some 30-some complaints that I think he
10 represented to be similar to Mrs. Hill's.
11   A   Yes.
12   Q   Do you remember those questions?
13   A   Yes.
14   Q   Do you agree, Dr. Zuzga, that as a physician,
15 knowledge of complaints or complications alone doesn't
16 answer the question; correct?
17      MR. JOHNSON:  Form.
18      THE WITNESS:  What do you mean?
19 BY MS. PIERSON:
20   Q   Well, is it important to you to know,
21 Dr. Zuzga, in addition to the number of complaints or
22 complications to know the total number of products sold
23 and are implanted?
24   A   Yes.
25   Q   In other words, for you to make a judgment

Page 179

1 about any complaint, you also need to know the
2 denominator; right?
3    A   Correct.
4    Q   If Cook, during the period of time shown in
5 this spreadsheet marked as Exhibit 14, if Cook sold
6 1,400 -- 143,880 Celect filters during the same period
7 of time that there were 30-some complaints, by my math,
8 the complaint or complication rate would be .03 percent.
9 Does the complication rate of .03 percent concern you in
10 any way?
11      MR. JOHNSON:  Form.  Form.  Foundation.
12      THE WITNESS:  No.
13 BY MS. PIERSON:
14   Q   In your experience, do all filters have a
15 complication rate equal or greater to that number?
16      MR. JOHNSON:  Form, foundation.
17      THE WITNESS:  Yes.
18 BY MS. PIERSON:
19   Q   Dr. Zuzga, if you had received, as Mr. Johnson
20 posits today, this complaint information and also had
21 received information about the total number of Celect
22 filters implanted and were able to calculate the rate of
23 complaints or concerns, is there anything about that
24 that would change your decision in Mrs. Hill's case?
25   A   No.

Page 180

1    Q   Mr. Heaviside asked you some questions last
2 time about various pieces of medical literature all of
3 which postdate Mrs. Hill's November 10, 2000 [sic]
4 placement of her filter.  Is it fair to say that if the
5 literature had not been published prior to her
6 placement, there's no way you could have known about it?
7    A   Correct.
8    Q   And is it accurate to say, Dr. Zuzga, that it
9 would be important to you to dig into those studies and
10 to understand what they meant?
11   A   Yes.
12   Q   Okay.  And even having seen the various
13 studies that Mr. Heaviside referred to, again, is it --
14 has it been your experience, in your hands, using the
15 Celect filter that the complication rate for complaints
16 is very low?
17   A   Yes.
18   Q   When we lawyers talk about complication rates,
19 either pointing to complaint reports or pointing to
20 medical literature, as a physician, would you rely on
21 any of that to choose the product for your patient?
22   A   No.
23   Q   When you chose the product for Mrs. Hill, did
24 you do that based on anything the lawyers have said or
25 that Cook has said?

Page 181

1    A   No.
2    Q   And in March of 2011, when you were unable to
3 retrieve Mrs. Hill's filter, after she left your care,
4 you certainly read additional medical literature; right?
5    A   Yes.
6    Q   But you continued to keep up with the
7 literature as it relates to vena cava filters?
8    A   Yes.
9    Q   Is there anything that you learned following
10 her retrieval attempt in March of 2011, that caused you
11 to say, Hey, I need to bring Mrs. Hill back and do
12 something different with her?
13   A   No.
14      MR. JOHNSON:  Form.
15 BY MS. PIERSON:
16   Q   Is there anything that you learned after March
17 of 2011, even up to today, that would cause you to
18 change the way that you treated Mrs. Hill following
19 March of 2011?
20      MR. JOHNSON:  Form.
21      THE WITNESS:  No.
22 BY MS. PIERSON:
23   Q   Dr. Zuzga, do you continue today to use Cook
24 products?
25   A   Yes.

46 (Pages 178 - 181)