# EXHIBIT 8

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: COOK MEDICAL, INC.,    ) Case No.
IVC FILTERS MARKETING,        ) 1:14-ml-2570-RLY-TAB
SALES PRACTICES AND PRODUCT   )
LIABILITY LITIGATION          ) MDL No. 2570

VIDEOTAPED DEPOSITION OF FRANK C. LYNCH, M.D.

Taken in the offices of McQuaide Blasko, 1249 Cocoa Avenue, Suite 210, Hershey, Pennsylvania, on Friday, May 26, 2017, commencing at 12:06 p.m. before Tiffany L. Mast, Court Reporter, and Kevin Frank, Videographer.

APPEARANCES:
  FAEGRE BAKER DANIELS
  BY: ANDREA ROBERTS PIERSON, ESQUIRE
  300 North Meridian Street
  Suite 2700
  Indianapolis, Indiana 46204
  (317) 237-1424
  andrea.pierson@FaegreBD.com
  -- For Cook Medical, Inc.

  FAEGRE BAKER DANIELS
  BY: ANNA RUTIGLIANO, ESQUIRE
  300 North Meridian Street
  Suite 2700
  Indianapolis, Indiana 46204
  (317) 237-1191
  anna.rutigliano@FaegreBD.com
  -- For Cook Medical, Inc.

## Page 2

APPEARANCES: (Continued)

  HEAVISIDE REED ZAIC
  BY: MICHAEL HEAVISIDE, ESQUIRE
  910 17th Street
  Suite 800
  Washington, D.C. 20006
  (202) 223-1993
  info@hrzlaw.com

  -- For Elizabeth Hill

  LAW OFFICES OF BEN C. MARTIN
  BY: BEN C. MARTIN, ESQUIRE
  3710 Rawlins Street, Suite 1230
  Dallas, TX 75219
  (214) 761-6614
  bmartin@bencmartin.com

  -- For Elizabeth Hill

  MCQUAIDE BLASKO
  BY: JONATHAN B. STEPANIAN, ESQUIRE
  1249 Cocoa Avenue
  Suite 210
  Hershey, PA 17033
  (717) 533-4444
  jbstepanian@mqblaw.com
  -- For Frank Lynch, M.D.

## Page 3

INDEX TO WITNESSES

| WITNESS | PAGE |
|---|---|
| FRANK C. LYNCH, M.D. | |
| By Ms. Pierson: | 8,156 |
| By Ms. Rutigliano: | -- |
| By Mr. Heaviside: | 83 |
| By Mr. Martin: | 130 |
| By Mr. Stepanian: | -- |

INDEX TO EXHIBITS

| LYNCH EXHIBITS | DESCRIPTION | PAGE MARKED |
|---|---|---|
| EXHIBIT 1 | BIO OF FRANK C. LYNCH, M.D. | 9 |
| EXHIBIT 2 | NOTICE OF DEPOSITION | 16 |
| EXHIBIT 3 | CHART FOR ELIZABETH HILL | 17 |
| EXHIBIT 4 | COPY OF GREETING CARD FROM ELIZABETH HILL TO FRANK C. LYNCH, M.D. | 17 |
| EXHIBIT 6 | PRINTOUT OF WEB PAGE | 93 |
| EXHIBIT 7 | PRINTOUT OF WEB PAGE | 94 |
| EXHIBIT 8 | CLINICAL INVESTIGATION AGREEMENT | 101 |
| EXHIBIT 9 | POWERPOINT PRESENTATION | 104 |

(Exhibit 5 was not marked.)

## Page 4

    MR. MARTIN: On the record today, we have two things to put on the record. Number one, this deposition is being taken pursuant to or with the ruling of Magistrate Baker regarding the -- I don't have this on.

    THE VIDEOGRAPHER: That's okay. You don't need your microphone on. You don't need your microphone for this. That's only for the video portion.

    MR. MARTIN: Okay.

    THE VIDEOGRAPHER: I was just helping him with his jacket.

    MR. MARTIN: Got it.

    THE VIDEOGRAPHER: I apologize.

    MR. MARTIN: That's all right.

    This deposition is being taken pursuant to the recent court order by Judge Baker. I believe it's Judge Baker's order. It is limited to those things that are outlined in the order. It is limited to data as opposed to the opinions with respect to this particular witness's outline in that order, with the specification that there isn't such a bright line. But all of that is explained in the order. We interpreted it as the order is written.

## Page 109

```
 1   versus what I may have seen anecdotally in my
 2   practice, so --
 3   Q.    Okay. But this cites -- regarding Celect
 4   refers to the Lions study, right?
 5   A.    I think that one line there refers to that,
 6   yeah. Yeah.
 7   Q.    And believe me, I'm not trying to quiz you
 8   about that.
 9   A.    Well, I just want to make sure I'm answering
10   you accurately.
11   Q.    Yeah. I'm not trying to quiz you about the
12   Lions study, believe me.
13   A.    Yeah.
14   Q.    But let me ask you this.
15   A.    Yeah.
16   Q.    This indicates to me that when someone
17   publishes something, like the Lions study, that it's
18   taken in the community, in the medical community, as
19   conveying correct information or accurate
20   information, right?
21   A.    Yeah. Yeah. Yeah.
22   Q.    And to that extent, you're relying on that
23   communication of accurate information, right?
24   A.    Yes.
25   Q.    So. And again, I'm not quizzing you about
```

## Page 110

```
 1   the Lions study, but I will remind you, I guess,
 2   that the Lions study is also referred to in the IFU
 3   for this Cook Celect device, for the proposition
 4   that in the Lions study, there were no perforations.
 5         So that's a communication of
 6   specific information to people who need that
 7   information and rely on that information, right?
 8         MS. PIERSON: Object to foundation.
 9         MR. STEPANIAN: I object, as well.
10         THE WITNESS: Again, I'd have to
11   review myself of the study as to the factual
12   content of it.
13   BY MR. HEAVISIDE:
14   Q.    Yeah.
15   A.    But in general, peer-reviewed literature is
16   held in high regard as scientific evidence that
17   should guide your practice.
18   Q.    Thank you.
19   A.    Yeah.
20   Q.    And let me just put it this way. If, for
21   example, the information in the Lions study was
22   erroneous, it would, to some degree, greater or
23   lesser degree, impede your ability to gain valid
24   scientific evidence, right?
25         MS. PIERSON: Object to foundation.
```

## Page 111

```
 1         THE WITNESS: I'm not sure I
 2   understand your question.
 3   BY MR. HEAVISIDE:
 4   Q.    Well, if you were reading any peer-reviewed
 5   article or study, clinical study, right, you rely on
 6   the, I guess integrity, of the information in that
 7   study to educate yourself on the subject at hand,
 8   right?
 9   A.    There's an assumption of integrity, but
10   there's also an art to reading medical literature
11   that helps you internally grade what the level of
12   quality of the evidence is. Just because it's
13   published in a journal doesn't mean it's, you know --
14   Q.    True.
15   A.    -- it came off the mountain on a stone
16   tablet, so yeah.
17   Q.    Right. But I guess I'm just trying to ask
18   you, if for example in the Lions study, the Lions
19   study says no perforations, and in fact, there were
20   perforations, is there some art form where you could
21   look behind that representation?
22         MS. PIERSON: Object to foundation.
23         THE WITNESS: That's -- that is --
24   yes. Being in -- one of the reasons why, in our
25   medical school training and our residency and our
```

## Page 112

```
 1   fellow training, we require academic pursuits, is to
 2   have our trainees become familiar with the foibles
 3   of investigation and publication. And we also hold
 4   quarterly journal clubs, where we critique articles.
 5         And reading the methods and the
 6   materials is often very important to understand
 7   where people may have been led astray or what sort
 8   of definitions they may have used. So that -- you
 9   may not agree with what their definition is. They
10   may, you know, define a tomato as a fruit, when you
11   really think it's a vegetable.
12   BY MR. HEAVISIDE:
13   Q.    Right.
14   A.    And so if, from the beginning, you decide
15   that you don't agree with their definition, then
16   that's going to taint the strength of the evidence
17   that they produce, so --
18   Q.    Yeah. But as you sit here today, you're not
19   aware of any foibles regarding the Lions study, are
20   you?
21   A.    I'd have to review the --
22   Q.    All right.
23   A.    I really don't recall it. The purpose of
24   this table was -- and this is a replication of a
25   table that I included in the publication that's
```