# EXHIBIT R

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION
3    IN RE: COOK MEDICAL, INC.,
     IVC FILTERS MARKETING,
4    SALES PRACTICES AND PRODUCT
     LIABILITY LITIGATION     Case No. 1:14-ml-2570-RLY-TAB
5    _____  MDL No. 2570
6    This Document Relates to ALL ACTIONS
7    ************************************************
8              VIDEOTAPED/ORAL DEPOSITION OF
9                  LEIGH ANNE LEVY, RN
10                      VOLUME 1
11                   MAY 4TH, 2017
12   ************************************************
13       VIDEOTAPED/ORAL DEPOSITION of LEIGH ANNE LEVY, RN,
14   produced as a witness at the instance of the Defendant,
15   and duly sworn, was taken in the above-styled and
16   numbered cause on the 4th of May, 2017, from 10:34 a.m.
17   to 7:25 p.m., before Stephanie McClure Lopez, CSR, in
18   and for the State of Texas, reported by machine
19   shorthand, at the Courtyard by Marriott, 2700 Hoppe
20   Trail, Round Rock, Texas, pursuant to the Texas Rules
21   of Civil Procedure and the provisions stated on the
22   record or attached hereto.
23
24          CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 74

1 the University of Florida. What's that?
2   A. What's the program?
3   Q. Yes.
4   A. It's for life care planning. Now they offer
5 several other different things. But it's the
6 University of Florida.
7   Q. So, am I -- am I correct in understanding you
8 to say that you attended some classes directed --
9   A. Yes.
10   Q. -- to life care planners in Florida?
11   A. Yes.
12   Q. Okay. And how long were you there?
13   A. So, they have different courses that you had
14 to complete. There were six courses. Some of it was
15 online. Some of it was onsite. And so, I believe it
16 was six modules.
17   Q. So, were there actual classes at the
18 University of Florida?
19   A. Uh-huh. Well, not -- we didn't have it at the
20 University of Florida. We were at Orlando.
21   Q. Okay. How long were you there to complete the
22 six modules?
23   A. So, the sixth module was a week long; but it's
24 several directed. So, it's whenever you were able to
25 complete the didactics.

Page 75

1   Q. How long does it -- did it take you to
2 complete the six modules?
3   A. I think I finished mine in a year and a half.
4   Q. Is this the kind of thing that you can do
5 while you're employed?
6   A. Yes. It's in addition to your -- you know,
7 it's basically continue -- you're seeking out education
8 that you do on your time.
9   Q. Okay. Your certification, you received that
10 from the International Commission on Health Care
11 Certification?
12   A. That's correct.
13   Q. Okay. It's my understanding that the
14 certifications are good for five years; is that --
15   A. Yes.
16   Q. So, yours ends in November of 2019?
17   A. That's correct.
18   Q. What do you have to do to get recertified?
19   A. You have to maintain your continuing education
20 credits and then you submit all of that at the end of
21 the five-year period.
22   Q. I should have asked you this earlier but you
23 talked about preparing a life care plan that's peer
24 reviewed.
25   A. Correct.

Page 76

1   Q. Is it peer reviewed -- was your life care plan
2 peer reviewed by the International Commission on Health
3 Care Certification?
4   A. No. So --
5   Q. Who reviewed it?
6   A. Through the University of Florida. They have
7 their committee that is -- it's approved through the
8 International Commission of Health Care Certification
9 that is a program that is -- if you pass through their
10 program and pass their peer review --
11   Q. Uh-huh.
12   A. -- then you can apply for certification
13 through them.
14   Q. And when you say "through them," you mean
15 through the University of Florida?
16   A. No.
17   Q. Through who?
18   A. So, University of Florida is the educational
19 program and you -- and they are a part of -- I want to
20 say there's four or five different programs nationally
21 that the International Commission on Health Care
22 Certification recognizes as a life care program where
23 they say if you complete that program and are peer
24 reviewed through that program that you can then apply
25 for certification.

Page 77

1   Q. Okay. Is there a name for the program that
2 peer reviewed your life care plan?
3   A. No. It was part of my program through the
4 University of Florida, the certified life care planner.
5   Q. Okay. University of Florida's -- Florida's a
6 big place. If I -- if I wanted to talk to someone at
7 the University of Florida and -- and see the plan that
8 you had prepared or see what coursework you attended,
9 what part of the University of Florida would I be going
10 to to do that?
11   A. So, I don't know that you'd have access to my
12 work because of the federal law of FERPA. You're not
13 allowed to request somebody's actual work that they do.
14       But you -- literally if you look under
15 certified life care planning for the University of
16 Florida, it would give you the contact person.
17   Q. Okay. Thank you.
18       We've talked a lot this morning about your
19 education and training. Have you ever received any
20 specific training or continuing education regarding the
21 future health care costs and needs of patients who
22 receive IVC filters?
23   A. So, I think what might be a little bit
24 confusing is life care planning is about a disability.
25 So, the disability analyzes patients who have had IVC

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 122

1  Q. Okay. Did he tell you anything about his care
2  and treatment of Mrs. Hill?
3  A. He wouldn't discuss. He just stated that he
4  would have everything in the medical records and I
5  could request those records if I wanted them.
6  Q. Okay. Have you requested them?
7  A. The attorneys have.
8  Q. Okay. You've seen Dr. Choudhry's records?
9  A. I've some of his records, yes.
10  Q. Okay. Other than the information that you
11  gained from Dr. Choudhry through the medical records
12  that you received, is there anything else that you've
13  learned about Dr. Choudhry or his care and treatment or
14  prognosis for Mrs. Hill?
15  A. Only through Mrs. Hill.
16  Q. Okay. Did Mr. Johnson ask questions of
17  Dr. Choudhry, too?
18  A. I don't believe so, no.
19  Q. Okay. You were the only person doing the
20  questioning?
21  A. Like I stated, it was pretty much a denial of
22  everything. So, it would be asking questions and then
23  he would say, "I'm not going to answer that."
24  Q. Okay. Was there any information that
25  Dr. Choudhry provided during your meeting that you rely

Page 123

1  upon for any of the opinions you hold in this case?
2  A. Just his medical records and what he -- he
3  expressed in those.
4  Q. Okay. In connection with Mr. Gage's case, did
5  you collaborate with any other life care planner,
6  specialty physician or health care professional?
7  A. I got -- collaborated with Dr. Marmareanu.
8  Q. Okay. Anyone else?
9  A. No. I was not provided the opportunity.
10  Q. What do you mean when you say that?
11  A. Dr. Crisostomo let the attorneys know he would
12  not be willing to speak with me.
13  Q. Okay. Did you personally reach out to any
14  physician for Mrs. Hill?
15  A. Dr. Choudhry.
16  Q. Okay. Did -- any others?
17  A. No.
18  Q. Did you personally make any effort to contact
19  any physician for Mr. Gage?
20  A. No because I was going to reach out and then
21  was told he's -- he's already stated he's not willing
22  to talk to me.
23  Q. Okay. By the attorneys for Mr. Gage?
24  A. Yes.
25  Q. Okay. Other than attempting to communicate --

Page 124

1  A. Can we take a pause so I can get some more
2  water?
3  Q. Yeah. You need to -- sure.
4  A. I'm losing my voice.
5  Q. No problem. No problem.
6     THE VIDEO TECHNICIAN: Off the record,
7  12:55.
8     (Off the record)
9     THE VIDEO TECHNICIAN: This is the
10  beginning of Media 3. Back on the record at 1:05.
11  Q. (BY MS. PIERSON) Ms. Levy, when we left off
12  we were talking about a collaboration that you've done
13  with others in connection with the reports that you
14  prepared. You mentioned in the Hill case that you had
15  tried to meet with Dr. Choudhry and collaborate with
16  him but you were unsuccessful, correct?
17  A. That's correct.
18  Q. Other than Dr. Choudhry, did you identify any
19  other physicians that you wanted to collaborate with in
20  connection with evaluating her -- her case?
21  A. No, I did not.
22  Q. Were there any other physicians that you or
23  the lawyers for Mrs. Hill reached out to to try to
24  arrange a time for you to talk?
25  A. I don't know if they reached out to anyone

Page 125

1  else. No, I couldn't say. But I did not, no.
2  Q. Okay. And in Mr. Gage's case, were there any
3  health care professionals that you wanted to
4  collaborate with but -- but did not?
5  A. I had wanted to talk with Dr. Crisostomo but
6  because I had Dr. Marmareanu I was comfortable with
7  speaking with him. It's always good to have as many
8  heads as you can around the table just to get a
9  perspective but I feel like we did a comprehensive
10  assessment.
11  Q. Did you ask the attorneys for Mr. Gage if you
12  could speak to any physicians other than
13  Dr. Crisostomos?
14  A. I -- I might have asked if -- I'm trying to
15  think what his name was. There was another physician
16  but then I think I got records in. So, there wasn't a
17  need to.
18  Q. Uh-huh.
19  A. But Crisostomo was the one I needed to speak
20  with.
21  Q. And in the case of Mr. Gage, you understand
22  that he has a long-standing and very complicated heart
23  condition, correct?
24  A. Yes, he does.
25  Q. Okay. At any point in time did you attempt to