# EXHIBIT Y

CONFIDENTIAL

Page 1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF INDIANA
2   INDIANAPOLIS DIVISION
3   Case No.: 1:14-cv-06016-RLY-TAB
4   _____
5   In Re:  COOK MEDICAL, INC., IVC FILTERS
    MARKETING, SALES PRACTICES AND
6   PRODUCTS LIABILITY LITIGATION
7   _____
8           V I D E O  D E P O S I T I O N
9                       o f
10               DR. MARK ZUZGA
11         taken on behalf of Defendants
12
13   DATE:       April 19, 2017
14   TIME:       3:13 p.m. to 7:17 p.m.
15   PLACE:      2580 Gulf to Bay Boulevard
                Clearwater, Florida  33765
16   BEFORE:     Dawn A. Hillier, RMR, CRR, CLR
                Notary Public - State of
17              Florida, at Large
18
19
20        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
21
22
23
24
25

Veritext Legal Solutions
www.veritext.com                                   888-391-3376

CONFIDENTIAL

Page 74

1 ones I can remember. It seems there are so many
2 different ones and they seem to be used at different
3 times.
4  Q  Okay. In your 15 years of practice, how many
5 times have you chosen a Cook filter for your patients?
6  A  I couldn't give you a number.
7  Q  Hundreds?
8  A  Hundreds.
9  Q  How many times have you implanted the Celect
10 filter in your patients?
11  A  Probably hundreds.
12  Q  Do you remember when you first started using
13 the Celect filter?
14  A  No.
15  Q  The Celect was cleared by the Food and Drug
16 Administration as a permanent filter on April the 20th
17 of 2007. Did you start using the Celect filter in your
18 patients shortly after that?
19  A  I don't remember.
20  Q  It was cleared as a retrievable product on
21 March the 7th of 2008, by the Food and Drug
22 Administration.
23     Do you know if you started using the Celect
24 around that time?
25  A  I couldn't tell you.

Page 75

1  Q  Since you began using the Celect filter,
2 whenever that was, is it fair to say that it has safely
3 and effectively treated your patients?
4  A  For the most part, yes.
5     MR. JOHNSON: Form.
6 BY MS. PIERSON:
7  Q  And stepping back, with respect to all of the
8 filters that you've used made by different
9 manufacturers, have you had good results with the Cook
10 filters as compared to those made by other
11 manufacturers?
12  A  Yes.
13     MR. JOHNSON: Form, foundation.
14 BY MS. PIERSON:
15  Q  Have you had good results, safe and effective
16 results for your patients with the Celect as compare to
17 other filters?
18  A  Yes.
19  Q  Do all the filters available to you as a
20 physician have some rate of complication?
21     MR. JOHNSON: Foundation.
22     THE WITNESS: Yes.
23 BY MS. PIERSON:
24  Q  Has there ever been a time that you've stopped
25 using a Cook filter because you thought it was unsafe or

Page 76

1 the complication rate was too high?
2  A  No.
3  Q  Has there ever been a time that you stopped
4 using the Celect filter because you thought it was
5 unsafe or the complication rate was too high?
6  A  No.
7  Q  Is there anything about the outcomes of your
8 patients receiving the Celect filter versus other
9 filters that would cause you to say, I won't use the
10 Celect on a patient?
11  A  No.
12  Q  After you learned of Mrs. Hill's 2013
13 perforation of her vena cava, did you continue to use
14 the Celect in your patients?
15  A  Yes.
16  Q  Okay. And Mr. Johnson mentioned that we first
17 met and you were deposed about two months ago, in
18 February of 2017. Since that deposition, have you
19 continued to choose Cook products for your patients?
20  A  Yes.
21  Q  Have you continued to use the Celect Platinum
22 for your patients?
23  A  Yes.
24  Q  Do you believe that the Cook Celect and the
25 Celect Platinum are safe and effective means of treating

Page 77

1 patients at risk of pulmonary embolism?
2  A  Yes.
3  Q  Now, you mentioned some other types of filters
4 that you've used made by Bard and Cordis and others. I
5 want to ask you about a few specific filters. Have you
6 ever implanted a filter called the Braun Vena Tech?
7  A  I think I have in the past.
8  Q  Okay. Are you familiar with the fact that the
9 Braun Vena Tech is a permanent filter?
10  A  Yes.
11  Q  If you have a patient who you've decided that
12 they should have a temporary or a retrievable filter, is
13 a permanent filter like the Braun Vena Tech available
14 for you?
15  A  I don't think we have it in our lab right now,
16 no.
17  Q  Okay. Would you choose a product that was
18 indicated only for permanent placement in a patient
19 where you want to retrieve the filter?
20  A  No.
21  Q  And how about the Greenfield Titanium filter?
22 Are you familiar with that?
23  A  Yes.
24  Q  Have you ever implanted that product?
25  A  And no, no, I have not.

Page 110

1  A  Correct.
2  Q  Is it your view, that sales representatives,
3  that their role is to deliver product to the hospital?
4  A  Correct.
5  Q  And to support the hospital staff?
6  A  Correct.
7  Q  When you interact with district managers or
8  sales representatives for companies who make the
9  products that you use, what are the circumstances for
10 that?
11  A  There's not much interaction. They're there
12 to just hang out with the staff, maybe do some
13 instructions with them. They bring lunch and doughnuts.
14 And that's about it.
15  Q  Okay. Do you expect the sales representative
16 or district manager to give you instructions on how to
17 place the product?
18  A  On new products, possibly, yes.
19  Q  Is it your expectation that the sales
20 representatives, that they'll tell you how to do the
21 procedure or they'll give you advice about things to do
22 during the procedure or not to do during the procedure?
23  A  No.
24  Q  You understand that they are not medical
25 doctors?

Page 111

1  A  Correct.
2  Q  And that they have no medical training?
3  A  Correct.
4  Q  You don't rely on them for your medical
5  judgment or medical decisions?
6  A  No.
7  Q  In the case of Mrs. Hill, choosing the Celect
8  product for Mrs. Hill's particular procedure, did any
9  representative of Cook play any part in choosing that
10 particular filter for Mrs. Hill's particular condition?
11  A  No.
12  Q  I want to talk with you about the day that you
13 placed Mrs. Hill's Celect filter. We discussed just a
14 second ago what happens typically when a patient comes
15 to the surgery center or the suite to have the
16 procedure.
17     Before you placed Mrs. Hill's Celect filter,
18 at that point in time, you'd been placing filters for
19 something like seven years?
20  A  Yes.
21  Q  Were you very familiar with the procedure for
22 how you place one?
23  A  Yes.
24  Q  Okay. Was the procedure that you used to
25 implant Mrs. Hill's Celect filter the same procedure

Page 112

1  that you used for other filters?
2  A  Yes.
3  Q  Were you relying on anything, any information
4  from Cook or any specific individual to know how to
5  place Mrs. Hill's Celect filter?
6  A  No.
7  Q  And before Mrs. Hill's procedure, were you
8  very familiar with the risks and the benefits of
9  filters?
10  A  Yes.
11  Q  Do you agree that there are always risks
12 inherent in placing a medical device?
13  A  Yes.
14     MR. JOHNSON: Form.
15 BY MS. PIERSON:
16  Q  Do you ever guarantee the results of any
17 filter to any patient?
18  A  No.
19  Q  Did you guarantee any results to Mrs. Hill?
20  A  No.
21  Q  Did you guarantee to Mrs. Hill that she would
22 not experience a complication with a filter?
23  A  No.
24  Q  Why not?
25  A  Because there's no perfect procedure, and

Page 113

1  everything carries an inherent risk.
2  Q  Was there anything about Mrs. Hill that made
3  her immune from the known complications with all
4  filters?
5  A  No.
6     MR. JOHNSON: Form.
7  BY MS. PIERSON:
8  Q  Back in November of 2010, was it well known in
9  the medical community that perforation of the vena cava
10 was a known risk of all filters?
11     MR. JOHNSON: Form.
12     THE WITNESS: Yes.
13 BY MS. PIERSON:
14  Q  That was something that you knew?
15  A  Yes.
16  Q  Based on your medical training and your
17 education?
18  A  Yes.
19  Q  Back in November of 2010, were you and the
20 general medical community well aware that if something
21 perforates the vena cava, it could also perforate an
22 organ or something else close to the vena cava?
23  A  Yes.
24     MR. JOHNSON: Form.
25 BY MS. PIERSON:

CONFIDENTIAL

Page 114

1  Q  Perforation of the small intestine was a known
2  risk with all filters in November 2010.
3  A  Correct.
4  Q  And you knew that?
5  A  Yes.
6  Q  And it was generally known in the medical
7  community?
8  A  Yes.
9      MR. JOHNSON: Form.
10 BY MS. PIERSON:
11 Q  For the patients who experience a perforation
12 of their vena cava or a perforation of their other
13 organs, are a portion of those patients completely
14 asymptomatic?
15 A  Yes.
16     MR. JOHNSON: Form.
17 BY MS. PIERSON:
18 Q  Give the jury some sense of when there is a
19 perforation of a vena cava or something else. How
20 frequently does the patient even know it's happening?
21 A  I couldn't give you a number. I've seen
22 several CAT scans before where struts were seen outside
23 the cava. And it was an incidental finding, meaning the
24 patient wasn't having any symptoms.
25 Q  In your work as a vascular surgeon, are there

Page 115

1  times that there are tools that you use that perforate
2  the vena cava? For example, a needle, for example?
3      MR. JOHNSON: Form.
4      THE WITNESS: Would I -- I don't understand
5  what you're asking. I don't know if there's a need
6  to perforate it.
7  BY MS. PIERSON:
8  Q  Yeah. Certainly you don't go out of your way
9  to do it.
10 A  No.
11 Q  That's fair to say?
12 A  Correct.
13 Q  But are there other types of procedures that a
14 patient might undergo where there's a need to place
15 something through the vena cava, like a needle, for
16 example?
17     MR. JOHNSON: Predicate.
18     THE WITNESS: Not that I'm aware of.
19 BY MS. PIERSON:
20 Q  We talked earlier about patients who
21 experience a perforation and whether they have symptoms,
22 clinical symptoms. In your experience, if a patient is
23 asymptomatic or does not have any clinical symptoms, do
24 you need to do anything about it?
25 A  Usually not.

Page 116

1  Q  In your experience where a patient has a
2  perforation of the vena cava and the filter is removed,
3  does the patient experience any clinical symptoms after
4  the removal?
5      MR. JOHNSON: Vague, speculation.
6      THE WITNESS: I guess if they were
7  asymptomatic before, I guess I would say it's a
8  case by case basis.
9  BY MS. PIERSON:
10 Q  In your experience in planting filters over
11 the last 15 years, give us some idea of how frequently
12 you see some kind of a complication like perforation.
13 A  I would say incidental findings, probably
14 three or four a year, that I'm aware of.
15 Q  Now, when you say "incidental findings," what
16 do you mean?
17 A  The patient came in with acute appendicitis,
18 had a CAT scan and had a previous filter and they noted
19 a strut out of the vena cava.
20 Q  In those patients where it's an incidental
21 finding, is the filter hurting them in any way?
22 A  No.
23 Q  Is it causing any damage or injury to the
24 patient?
25 A  No.

Page 117

1  Q  In those patients, did you do anything?
2  A  No.
3  Q  In your experience in planting many different
4  kinds of filters, is the complication rate with the
5  Celect filter any, any different than other filters?
6  A  No.
7      MR. JOHNSON: Forming, predicate.
8  BY MS. PIERSON:
9  Q  And we talked a little bit about the
10 experience of thrombose with the Option filter. Are
11 there -- I assume in that instance, you'd agree that the
12 Cook Celect filter, in your hands, has outperformed the
13 Option filter?
14     MR. JOHNSON: Form, predicate.
15     THE WITNESS: As far as thrombosis, yes.
16     MR. JOHNSON: As far as what?
17     THE WITNESS: Thrombosis of the cava, yes.
18 BY MS. PIERSON:
19 Q  Generally speaking, with the types of filters
20 that you've implanted over the years, is the Cook Celect
21 filter every bit as safe and effective in treating your
22 patients as any other filter on the market?
23     MR. JOHNSON: Predicate.
24     THE WITNESS: Yes.
25 BY MS. PIERSON:

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1  Q  We were talking a second ago about the risks
2  that you were aware of with respect to the Cook Celect
3  and other filters in November of 2010. In November of
4  2010, were you aware that it was possible that you might
5  not be able to retrieve a filter?
6  A  Yes.
7  Q  Were you aware of the known risks or potential
8  complication that a filter that you intended to be
9  temporary may wind up being permanent?
10  A  Yes.
11  Q  That was true with all filters?
12  A  Correct.
13  Q  Including the Celect?
14  A  Correct.
15  Q  And it was well known to you in November of
16  2010?
17  A  Yes.
18  Q  In November of 2010, were you aware of the
19  risk of migration of the filter?
20  A  Yes.
21  Q  Were you aware of the risk of migration to a
22  patient's heart or lungs?
23  A  Yes.
24  Q  Were you aware of the risk of migration to the
25  renal veins?

Page 119

1  A  Yes.
2  Q  Is that a known risk of all filters, including
3  the Celect that you were aware of in November of 2010?
4  A  Yes.
5  Q  And it was generally known in the medical
6  community?
7  A  Correct.
8      MR. JOHNSON: Form.
9  BY MS. PIERSON:
10  Q  And I should have asked you that same question
11  about an inability to retrieve the filter. Was that
12  risk a known risk or potential complication that was
13  well known in the general medical community?
14      MR. JOHNSON: Form.
15      THE WITNESS: Yes.
16  BY MS. PIERSON:
17  Q  How about a fracture of a filter? In November
18  of 2010, were you aware that it was possible that a
19  filter could fracture?
20  A  Yes.
21  Q  And that included Celect?
22  A  Correct.
23  Q  You knew that based on your medical education
24  and training?
25  A  Yes.

Page 120

1  Q  You didn't rely on Cook to tell you that in
2  any way?
3  A  No.
4  Q  Was that a known risk in the general medical
5  community?
6  A  Yes.
7      MR. JOHNSON: Form.
8  BY MS. PIERSON:
9  Q  In November of 2010, were you aware that
10  bleeding was a known risk with filters?
11  A  Yes.
12  Q  Were you aware that embedment of the filter or
13  growth around the filter hook or --
14  A  Yes.
15  Q  -- one of the struts, was it a possibility?
16  A  Yes.
17  Q  Were you and the general medical community
18  aware that this could happen with the Cook Celect or any
19  other filter --
20      MR. JOHNSON: Form.
21      THE WITNESS: Yes.
22  BY MS. PIERSON:
23  Q  Were you aware that the possibility of a
24  patient needing an open removal was a known risk in
25  November of 2010?

Page 121

1  A  Yes.
2  Q  Was that generally known in the medical
3  community?
4  A  Yes.
5      MR. JOHNSON: Form.
6  BY MS. PIERSON:
7  Q  Were you aware that the possibility of the
8  filter tilting, that that could happen in November of
9  2010?
10  A  Yes.
11  Q  That was something that was known by you and
12  the general medical community in November of 2010?
13      MR. JOHNSON: Form.
14      THE WITNESS: Correct.
15  BY MS. PIERSON:
16  Q  And, again, this was known to you based on
17  your medical education and your training; correct?
18  A  Correct.
19  Q  The tilting or movement of a filter, I heard
20  Mr. Johnson ask you about this a second ago.
21      Is it fair to say that over the years,
22  Dr. Zuzga, you have seen patients with filters who have
23  tilted?
24  A  Yes.
25  Q  Are their filters still safe and effective, in

Veritext Legal Solutions
www.veritext.com                                           888-391-3376

CONFIDENTIAL

Page 122

1 your judgment?
2     A    Yes.
3     Q    A filter can tilt based on the way the
4 physician deploys it; correct?
5     A    Um-hum. Yes.
6     Q    A filter can tilt by virtue of a patient's
7 anatomy or a deformity in their anatomy?
8     A    Correct.
9     Q    A filter can tilt as a result of trauma?
10    A    Yes.
11    Q    A filter can become tilted after placement
12 because of the contraction of the vena cava or a
13 movement of the vena cava in a subsequent procedure?
14    A    Correct.
15    Q    Malpositioning of the filter is a known risk
16 of any filter placement.
17    A    Correct.
18    Q    That was known to you in November of 2010?
19    A    Yes.
20    Q    And generally known in the medical community?
21    A    Yes.
22         MR. JOHNSON: Form.
23 BY MS. PIERSON:
24    Q    Infection is a known risk?
25    A    Yes.

Page 123

1     Q    Again, generally known to you and the medical
2 community in November of 2010?
3     A    Correct.
4     Q    Even death as a consequence of something with
5 a filter, that was a known risk for all filters in
6 November of 2010?
7     A    Yes.
8     Q    You knew that?
9     A    Yes.
10    Q    And it was generally known in the medical
11 community?
12    A    Yes.
13    Q    All of these risks that we've been talking
14 about, Dr. Zuzga, are they all risks that you were
15 taught about in your medical training and in your
16 fellowship training?
17    A    Yes.
18    Q    Are they all risks that were discussed in the
19 medical community and things that you were well familiar
20 with before you ever placed Mrs. Hill's filter?
21    A    Yes.
22    Q    You knew about those risks without regard to
23 any information provided to you by a filter
24 manufacturer?
25    A    Correct.

Page 124

1     Q    Correct?
2         We talked about your knowledge of the risks
3 based on your training. Did you also hear about these
4 risks related to vena cava filters at professional
5 meetings?
6     A    Yes.
7     Q    Did you hear about them or learn about them
8 from reviewing the medical literature?
9     A    Yes.
10    Q    And reviewing medical literature, that's
11 something that you do in the course of your job as a
12 vascular surgeon?
13    A    Yes.
14    Q    It's something that you've done since you
15 completed your medical training in the early 2000s?
16    A    Correct.
17    Q    You don't rely on any manufacturer to tell you
18 to review the medical literature?
19    A    Correct.
20    Q    You don't rely on a manufacturer to tell you
21 you need to talk to other physicians or attend seminars
22 about --
23    A    Correct.
24    Q    -- the procedures?
25         To the extent that -- that you have knowledge

Page 125

1 today about the risks attendant to filters, you have had
2 that knowledge since sometime before November of 2010;
3 correct?
4     A    Correct. Yes.
5     Q    And all of that knowledge comes from medical
6 education, medical training, and your review of medical
7 literature?
8     A    Correct.
9     Q    Did Mrs. Hill tell you, when she visited with
10 you in October of 2010 or in November -- November 2010,
11 that she's a registered nurse?
12    A    I don't -- I don't remember.
13    Q    Did she tell you that she formerly had worked
14 at a hospital?
15    A    She may have. I don't recall.
16    Q    Okay. Did she appear to be knowledgeable
17 about her procedure and about her anatomy?
18    A    I don't remember that, to be honest with you.
19 I mean, it was a long time ago.
20    Q    I mean, certainly someone who has medical
21 training like nursing, they would be in a good position
22 to ask you questions about the procedure?
23         MR. JOHNSON: Form, speculation.
24         THE WITNESS: I think so.
25 BY MS. PIERSON:

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1  Q  Were you aware of the fact or did Mrs. Hill
2  tell you that when she worked in a hospital, that she
3  actually gave informed consents to patients to sign?
4      MR. JOHNSON: Form.
5      THE WITNESS: No.
6  BY MS. PIERSON:
7  Q  Did she tell you that it had been her job to
8  explain informed consents to patients?
9  A  No.
10     MR. JOHNSON: Form.
11 BY MS. PIERSON:
12 Q  When a patient comes to you to have a filter
13 placed, do they sign an informed consent?
14 A  Usually in my office or in the hospital.
15 Q  Okay. And back in November of 2010, when --
16 or in October of 2010, when a patient came to you for a
17 visit before they got their filter, would you or your
18 office staff give to them an informed consent to review?
19 A  We've changed different procedures. I think
20 most of the consents or any at that time were all signed
21 in the hospital.
22 Q  When a patient in November of 2010, came in to
23 have a filter placed, were they given time to review the
24 consent?
25 A  That's pretty standard, yes.

Page 127

1  Q  And were they given an opportunity to ask you
2  questions about the consent?
3  A  Yes.
4  Q  Would they have the opportunity to ask nurses
5  or other hospital staff about the consent?
6  A  Yes.
7  Q  Does the hospital have a practice or did it in
8  November 2010, of being sure the patient had time to
9  read their consent before they signed it?
10     MR. JOHNSON: Form.
11     THE WITNESS: Usually.
12 BY MS. PIERSON:
13 Q  Okay. In other words, you're not rushing
14 patients?
15 A  Correct.
16 Q  Is it important to you that they have plenty
17 of time to review and understand the consent?
18 A  Yes.
19 Q  And to ask questions about the consent?
20 A  Yes.
21 Q  In Mrs. Hill's case, I want to show you the
22 consents that she signed. But back in November of 2010,
23 before a patient received a vena cava filter, was it
24 your practice or the hospital's practice to have them
25 sign two consents?

Page 128

1  A  I think it was.
2  Q  Patients signed a consent, both for the
3  procedure and for the specific placement of the filter;
4  correct?
5  A  That sounds about right.
6  Q  In Mrs. Hill's case, she signed three
7  different consents related to her vena cava filter. And
8  I want to ask you about those. First --
9      MR. JOHNSON: Do you have an extra copy?
10     MS. PIERSON: I do.
11 BY MS. PIERSON:
12 Q  First, I'm handing you what's been marked as
13 Exhibit 36.
14     (Exhibit 36 was marked.)
15 BY MS. PIERSON:
16 Q  We'll put this on the screen so that the jury
17 can see it as well.
18     Dr. Zuzga, is Exhibit 36 the informed consent
19 that Mrs. Hill was given for her vena cava filter
20 placement by you?
21 A  Yes.
22 Q  At the top of the page that's Mrs. Hill's
23 name, and then her signature appears at the bottom;
24 correct?
25 A  Correct.

Page 129

1  Q  And on the screen, I've highlighted in yellow.
2  This particular consent is a consent specifically for
3  her IVC; right?
4  A  Correct.
5  Q  And it says [as read]: The risks have been
6  explained to me. I understand these risks may include
7  but are not limited to...
8      And then there are a number of bullet points
9  there.
10 A  Yes.
11 Q  Do you see those?
12 A  Yep.
13 Q  In the informed consent that you or the
14 hospital gave to Mrs. Hill before her procedure, was she
15 specifically warned of the risk of pain, infection, or
16 bleeding?
17 A  Yes.
18 Q  Was she specifically warned of the risk of
19 injury to the vessel or nerve?
20 A  Yes.
21 Q  And do you see that right there?
22 A  Yes.
23 Q  It says [as read]: Including perforation.
24 A  Correct.
25 Q  Was Mrs. Hill specifically warned of the risk

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1  of perforation --
2    A   Yes.
3    Q   -- from her vena cava filter?
4    A   Yes.
5    Q   She's also warned of other risks that are far
6  worse; right?
7    A   Yes.
8    Q   She was warned of the risk of hematoma?
9    A   Yes.
10   Q   Stroke?
11   A   Yes.
12   Q   Pulmonary embolism?
13   A   Yes.
14   Q   Filter migration?
15   A   Yes.
16   Q   Heart arrhythmia?
17   A   Yes.
18   Q   And thrombosis resulting in leg swelling.
19   A   Yes.
20   Q   She was warned in the informed consent of the
21 risk of respiratory problems including paralysis, brain
22 damage, drug reactions or possibly death.
23   A   Correct.
24   Q   And the consent states [as read]: The
25 alternatives to this procedure have been explained and

Page 131

1  includes surgery, medical management, and observation.
2  My doctor has discussed with me the possible problems
3  with recovery and outcomes I may or may not expect as a
4  result of the procedure.
5        Did you do that?
6    A   Yes.
7    Q   The consent states that the benefits of the
8  procedure have been fully explained.
9        [As read]: I understand that no results can
10 be guaranteed or assured.
11   A   Correct.
12   Q   Mrs. Hill was told that in her informed
13 consent; correct?
14   A   Yes.
15   Q   And you told her that as well?
16   A   Yes.
17   Q   Mrs. Hill was told the goal of the procedure
18 is to significantly reduce the risk of pulmonary
19 embolus.
20   A   Correct.
21   Q   And at the bottom, it says [as read]: I
22 acknowledge and I have read and fully understand this
23 consent form and that all of my questions have been
24 answered to my satisfaction.
25   A   Correct.

Page 132

1    Q   And then Mrs. Hill signed it?
2    A   Yes.
3    Q   To your knowledge, Dr. Zuzga, were all of
4  Mrs. Hill's questions answered?
5    A   Yes.
6    Q   She had a question to ask -- she had an
7  opportunity to ask you and other staff at the hospital
8  any questions she had about the things listed on this
9  page.
10   A   Yes.
11   Q   And in this informed consent, Mrs. Hill was
12 specifically warned of the risks that she experienced.
13   A   Correct.
14   Q   There was a second consent that Mrs. Hill
15 signed that day that I'll mark as Exhibit 37.
16       (Exhibit 37 was marked.)
17 BY MS. PIERSON:
18   Q   Dr. Zuzga, again, is this a consent signed by
19 Mrs. Hill on November 17th of 2010?
20   A   Yes.
21   Q   And this is a consent to the procedure of
22 placing the vena cava filter?
23   A   Correct.
24   Q   So just so our jury understands, the first
25 consent that we reviewed is for the product itself, the

Page 133

1  filter. And the second consent is for the procedure
2  that you were performing?
3    A   Correct.
4    Q   In this consent, did you and the hospital warn
5  Mrs. Hill of, in paragraph three [as read]: The risks,
6  benefits, and possible problems which may include
7  infection, bleeding, blood vessel, and/or nerve injury,
8  injury to other tissues and/or organs affected by the
9  process of my intended procedure, brain, spine, or other
10 nervous system damage, loss of use of body parts, and/or
11 life have been explained.
12   A   Yes.
13   Q   And specifically within that paragraph, when
14 the consent says that she's -- she has been told about
15 the risks, benefits, and possible problems including
16 blood vessel and/or nerve injury, does that include
17 perforation of the vena cava?
18   A   Yes.
19   Q   And when this consent warns of injury to other
20 tissues and/or organs affected by the process of my
21 intended procedure, does that include the possibility of
22 organ damage from placement of a vena cava filter?
23   A   Yes.
24   Q   In paragraph four, it says [as read]: My
25 doctor has discussed with me the possible problems with

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1 recovery and outcomes I may or may not expect as a
2 result of the procedure. My doctor has also explained
3 the risks, benefits, and possible problems related to
4 alternatives and the possible result of not having the
5 procedure.
6     A   Yes.
7     Q   Is that accurate?
8     A   Yep.
9     Q   You explained all of those things to
10 Mrs. Hill?
11    A   Yes.
12    Q   And she consented to having the placement of a
13 vena cava filter?
14    A   Yes.
15    Q   You discussed with her the possibility of
16 having no filter at all; right?
17    A   Yes.
18    Q   She knew what the risks were of having no
19 filter.
20    A   Correct.
21    Q   She knew that by undergoing the placement of a
22 filter, there were a number of risks including the
23 possibility of death; correct?
24    A   Correct.
25    Q   Did Mrs. Hill have an opportunity to consider

Page 135

1 whether those risks were worth undergoing?
2     A   I would imagine so, yes.
3     Q   And at the conclusion of having all that
4 explained to her, did she, in fact, consent to the
5 procedure of placing the vena cava filter?
6     A   Yes.
7     Q   At the bottom, it says [as read]: I certify
8 that I read this consent or have had it read to me in a
9 language I understand, that I've had the opportunity to
10 ask questions, that all of my questions have been
11 answered to my satisfaction and that I knowingly and
12 willingly give consent to have this procedure treatment.
13       Did I read that correctly?
14    A   Correct.
15    Q   Dr. Zuzga, you were with Mrs. Hill on November
16 the 17th of 2010, did she have the opportunity to ask
17 questions, were her questions answered, and did she
18 knowingly and willingly give consent to have the
19 placement of her vena cava filter?
20       MR. JOHNSON: Form.
21       THE WITNESS: Yes.
22 BY MS. PIERSON:
23    Q   Mr. Johnson asked you some questions about
24 your effort to remove her filter four months after
25 placement. Because we're talking about the consents

Page 136

1 that Mrs. Hill signed, I think it's easier to go over
2 that one at the same time. So I'll hand you what I'm
3 marking as Exhibit 38.
4        (Exhibit 38 was marked.)
5 BY MS. PIERSON:
6     Q   Dr. Zuzga, four months after you placed
7 Mrs. Hill's filter, did she come back to you and to the
8 hospital to have her filter retrieved?
9     A   Yes.
10    Q   It was your hope that on that day you would be
11 able to get it out and that it would be a temporary
12 filter?
13    A   Correct.
14    Q   On that day, was she, again, given an
15 opportunity to ask you questions and to ask questions of
16 the hospital staff and nurses?
17    A   Yes.
18    Q   Again, was Mrs. Hill given an informed
19 consent?
20    A   Yes.
21    Q   What I've marked as Exhibit 38, is this the
22 informed consent that Mrs. Hill signed on the day of her
23 retrieval attempt?
24    A   Yes.
25    Q   And this particular informed consent, again,

Page 137

1 at the top says IVC filter; correct?
2     A   Yes.
3     Q   And it says [as read]: The risks have been
4 fully explained to me. I understand that these risks
5 may include but may be limited to...
6        And then there are a bunch of bullet points.
7     A   Yes.
8     Q   Again, on the day of Mrs. Hill's retrieval
9 attempt, was she warned of the risk of pain, infection,
10 or bleeding from her vena cava filter?
11    A   Yes.
12    Q   Again, was she warned of the risk of injury to
13 a vessel or a nerve including perforation?
14    A   Yes.
15    Q   She was warned on that day a third time of the
16 possibility that her vena cava could be perforated by
17 her filter or your attempt to retrieve her filter?
18    A   Correct.
19    Q   Was she warned of the risks of other and more
20 significant: Stroke, pulmonary embolism, filter
21 migration, arrhythmia?
22    A   Yes.
23    Q   Was she warned of the risk that she could
24 develop thrombosis resulting in leg swelling following
25 her filter?

Page 138

1  A  Yes.
2  Q  In this particular case, Mrs. Hill and her
3  lawyers allege that she's at an increased risk of
4  thrombosis or occlusion of her vena cava as a
5  consequence of complications with her Celect.
6     On March 11th -- March 23rd, 2011, and on
7  November of 2010, was Mrs. Hill, in fact, warned in the
8  informed consent three times of the possibility of
9  thrombosis in her legs?
10     MR. JOHNSON: Form.
11     THE WITNESS: Yes.
12 BY MS. PIERSON:
13  Q  This informed consent reports that the risks
14 of the sedation including paralysis, brain damage, drug
15 reaction, or possibly death could occur?
16  A  Correct.
17  Q  She was told that in March of 2011?
18  A  Yes.
19  Q  She was told in the third paragraph about
20 alternatives to the procedure and that it might not turn
21 out as she or you expected?
22  A  Correct.
23  Q  You or someone on behalf of the hospital
24 explained the benefits of the procedure and told her,
25 again, no results can be guaranteed or assured.

Page 139

1  A  Correct.
2  Q  And, again, did Mrs. Hill acknowledge that she
3  had read and understood the informed consent?
4  A  Yes.
5  Q  In your opinion, Dr. Zuzga, did Mrs. Hill have
6  plenty of time and opportunity and explanation as it
7  related to the risks of her filter?
8     MR. JOHNSON: Form.
9     THE WITNESS: That's our standard procedure,
10 yes.
11 BY MS. PIERSON:
12  Q  Dr. Zuzga, you know today what Mrs. Hill
13 claims happened as a consequence of the placement of a
14 Celect filter. You know that she claims that she has
15 vena cava perforation, that she had perforation of her
16 small intestine. And today, she claims that she has
17 stenosis of her vena cava. Are all of those
18 complications complications that she was expressly
19 warned about in these three informed consents?
20     THE WITNESS: Yes.
21     MR. JOHNSON: Form.
22 BY MS. PIERSON:
23  Q  Are they all complications that she had an
24 opportunity to discuss with you?
25  A  Yes.

Page 140

1  Q  Mrs. Hill has testified that although she
2  signed these three informed consents, that when she did
3  it, she was "drugged up" -- that's on page 246 of her
4  deposition -- so that she couldn't comprehend them. In
5  your experience, is it your practice or the hospital's
6  practice to give informed consents to patients after
7  they've been sedated?
8  A  No.
9     MR. JOHNSON: Form and foundation.
10     THE WITNESS: No.
11 BY MS. PIERSON:
12  Q  Mrs. Hill has testified on page 107 of her
13 deposition that she recalled signing her form while on a
14 gurney without her reading glasses and after she had
15 already been medicated.
16     Is that true?
17     MR. JOHNSON: Form.
18     THE WITNESS: It's certainly not standard
19 procedure, no.
20 BY MS. PIERSON:
21  Q  That would be inconsistent with what you've
22 observed in 20 years of practice?
23  A  Yes.
24     MR. JOHNSON: Form.
25 BY MS. PIERSON:

Page 141

1  Q  And giving Mrs. Hill consents to sign after
2  she had been sedated, would that be inconsistent with
3  what you observed in 20 years of practice?
4     MR. JOHNSON: Form.
5     THE WITNESS: Yes.
6 BY MS. PIERSON:
7  Q  You were asked in your first deposition about
8  a document called an IFU, or Instructions for Use. Do
9  you remember that?
10  A  Yes.
11  Q  And your testimony in your first deposition
12 was that you didn't read the IFU for the Celect filter;
13 correct?
14  A  Correct.
15  Q  Is that because you had been trained and
16 educated on filters during your medical school and
17 residency and fellowship?
18  A  Correct.
19  Q  At the time that you implanted Mrs. Hill's
20 filter in November of 2010, you had implanted hundreds
21 of filters and many Celects in your patients; correct?
22     MR. JOHNSON: Form.
23     THE WITNESS: Correct.
24 BY MS. PIERSON:
25  Q  Was it your regular practice to place those

Page 142

1 filters without reviewing the instructions for use that
2 accompanied the product?
3   A   Yes.
4   Q   I want to ask you about some medical terms
5 that counsel asked you about last time.
6        First, when you see or hear the term "damage
7 to the vena cava," do you understand that damage to the
8 vena cava can include perforation of the vena cava?
9   A   Yes.
10  Q   And when you see in a document listed as a
11 risk of a filter, "perforation," do you understand that
12 that means it could, in fact, go through the wall of the
13 vena cava?
14  A   Yes.
15  Q   As a vascular surgeon, you're well familiar
16 with the organs and structures that are close to a
17 patient's vena cava?
18  A   Yes.
19  Q   And when you see as a listed risk, perforation
20 of the vena cava, do you know and understand that that
21 includes adjacent organs?
22  A   Yes.
23  Q   And structures?
24  A   Correct.
25  Q   In other words, if somebody said to you,

Page 143

1 Dr. Zuzga, as I understand they did in your medical
2 training, with a filter, there can be vena cava
3 perforation, you knew and understood that that could
4 include the small intestine?
5   A   Yes.
6   Q   When you see the term "filter hook embedded in
7 tissue growth," if you were to read that, would you
8 understand that to mean that the hook could become
9 overgrown with tissue?
10  A   Correct.
11  Q   And when a hook on a filter is touching the
12 wall of a vena cava, what is it that causes tissue to
13 grow over that?
14  A   It just can be a reaction from the body from a
15 foreign object inside.
16  Q   Is that true with other products too, not just
17 filters?
18  A   Yes.
19  Q   In other words, where there's blood flowing
20 over the filter or another product -- another product
21 and it's touching the caval wall, it's the body's
22 natural reaction to try and cover up that foreign
23 object; right?
24  A   Yes.
25  Q   It's a natural healing response?

Page 144

1   A   Yes.
2   Q   There's nothing about that growth that is
3 abnormal or unusual to filters?
4   A   Correct.
5   Q   With respect to vena cava filters, the Celect
6 and other filters, if the hook or the end of the filter
7 is touching the caval wall and it's touching it for some
8 four months, it can, in fact, grow over the hook?
9   A   Yes.
10  Q   That is a normal and expected consequence?
11  A   Correct.
12  Q   And it's a normal risk with any filter,
13 including the Celect?
14  A   Yes.
15  Q   When counsel asked at the last deposition
16 about the Celect instructions for use and you said that
17 you did not review it, is it safe to say that because
18 you hadn't reviewed it, you didn't rely on it at the
19 time of Mrs. Hill's filter placement?
20  A   Correct.
21  Q   And that you didn't rely on Cook's
22 communication in the IFU to form an opinion as to the
23 risks associated with the Celect filter?
24  A   Correct.
25  Q   You did not rely on anything that Cook

Page 145

1 communicated to you in selecting the filter appropriate
2 for Mrs. Hill?
3   A   Correct.
4   Q   Mr. Heaviside, another lawyer for Mrs. Hill,
5 asked you about the MAUDE database. Do you remember
6 that?
7   A   No.
8   Q   Your response was that you didn't know what it
9 was. Is it fair to say, Dr. Zuzga, that you were not
10 relying on anything in a MAUDE database in choosing a
11 filter for Mrs. Hill?
12  A   Correct.
13  Q   At the time that you implanted Mrs. Hill's
14 Celect filter, you had independent knowledge of the
15 risks of a vena cava filter?
16  A   Yes.
17  Q   And that came from your experience and your
18 review of the literature, not from any information from
19 Cook?
20  A   Correct.
21  Q   Or any information in a MAUDE database?
22  A   Yes.
23  Q   Is it safe to say that you did not review the
24 instructions for use that accompanied the retrieval
25 kit --

Page 178

1  are on the record.
2  BY MS. PIERSON:
3      Q   Dr. Zuzga, Mrs. Hill's lawyers have asked --
4  have shown you some documents, one labeled, I believe it
5  was Exhibit 14 with complaints, a complaints
6  spreadsheet. Do you remember that?
7      A   Yes.
8      Q   Mr. Johnson represented today that he had
9  counted some 30-some complaints that I think he
10 represented to be similar to Mrs. Hill's.
11     A   Yes.
12     Q   Do you remember those questions?
13     A   Yes.
14     Q   Do you agree, Dr. Zuzga, that as a physician,
15 knowledge of complaints or complications alone doesn't
16 answer the question; correct?
17         MR. JOHNSON: Form.
18         THE WITNESS: What do you mean?
19 BY MS. PIERSON:
20     Q   Well, is it important to you to know,
21 Dr. Zuzga, in addition to the number of complaints or
22 complications to know the total number of products sold
23 and are implanted?
24     A   Yes.
25     Q   In other words, for you to make a judgment

Page 179

1  about any complaint, you also need to know the
2  denominator; right?
3      A   Correct.
4      Q   If Cook, during the period of time shown in
5  this spreadsheet marked as Exhibit 14, if Cook sold
6  1,400 -- 143,880 Celect filters during the same period
7  of time that there were 30-some complaints, by my math,
8  the complaint or complication rate would be .03 percent.
9  Does the complication rate of .03 percent concern you in
10 any way?
11         MR. JOHNSON: Form. Form. Foundation.
12         THE WITNESS: No.
13 BY MS. PIERSON:
14     Q   In your experience, do all filters have a
15 complication rate equal or greater to that number?
16         MR. JOHNSON: Form, foundation.
17         THE WITNESS: Yes.
18 BY MS. PIERSON:
19     Q   Dr. Zuzga, if you had received, as Mr. Johnson
20 posits today, this complaint information and also had
21 received information about the total number of Celect
22 filters implanted and were able to calculate the rate of
23 complaints or concerns, is there anything about that
24 that would change your decision in Mrs. Hill's case?
25     A   No.

Page 180

1      Q   Mr. Heaviside asked you some questions last
2  time about various pieces of medical literature all of
3  which postdate Mrs. Hill's November 10, 2000 [sic],
4  placement of her filter. Is it fair to say that if the
5  literature had not been published prior to her
6  placement, there's no way you could have known about it?
7      A   Correct.
8      Q   And is it accurate to say, Dr. Zuzga, that it
9  would be important to you to dig into those studies and
10 to understand what they meant?
11     A   Yes.
12     Q   Okay. And even having seen the various
13 studies that Mr. Heaviside referred to, again, is it --
14 has it been your experience, in your hands, using the
15 Celect filter that the complication rate for complaints
16 is very low?
17     A   Yes.
18     Q   When we lawyers talk about complication rates,
19 either pointing to complaint reports or pointing to
20 medical literature, as a physician, would you rely on
21 any of that to choose the product for your patient?
22     A   No.
23     Q   When you chose the product for Mrs. Hill, did
24 you do that based on anything the lawyers have said or
25 that Cook has said?

Page 181

1      A   No.
2      Q   And in March of 2011, when you were unable to
3  retrieve Mrs. Hill's filter, after she left your care,
4  you certainly read additional medical literature; right?
5      A   Yes.
6      Q   But you continued to keep up with the
7  literature as it relates to vena cava filters?
8      A   Yes.
9      Q   Is there anything that you learned following
10 her retrieval attempt in March of 2011, that caused you
11 to say, Hey, I need to bring Mrs. Hill back and do
12 something different with her?
13     A   No.
14         MR. JOHNSON: Form.
15 BY MS. PIERSON:
16     Q   Is there anything that you learned after March
17 of 2011, even up to today, that would cause you to
18 change the way that you treated Mrs. Hill following
19 March of 2011?
20         MR. JOHNSON: Form.
21         THE WITNESS: No.
22 BY MS. PIERSON:
23     Q   Dr. Zuzga, do you continue today to use Cook
24 products?
25     A   Yes.

Page 222

1  A   Correct.
2  Q   You informed Courtney Whitlock about this
3  adverse event because it was your desire that either she
4  or somebody with Cook submit a medical device report
5  relating to Mrs. Hill's situation?
6  A   Yes.
7  Q   You considered that to be an adverse event;
8  did you not?
9  A   Yes.
10 Q   All right. That's all I have. Before I'm
11 done --
12     MS. PIERSON: I have just three things that I
13 need to follow up.
14     MR. JOHNSON: What exhibit number are we going
15 to put on your PowerPoint before we forget?
16     MS. PIERSON: We'll do it as whatever the next
17 one is, which is 37 [sic].
18     (Exhibit 39 was marked.)
19         RECROSS EXAMINATION
20 BY MS. PIERSON:
21 Q   Dr. Zuzga, I just have three things that I
22 need to follow up on from what Mr. Johnson asked you.
23 First, he asked you multiple times about this 86 percent
24 perforation rate. And he made a point of saying we know
25 now based on the study that that rate's 86 percent. Do

Page 223

1  you remember those questions?
2  A   Yes.
3      MR. JOHNSON: Form.
4  BY MS. PIERSON:
5  Q   Would it be important to you to know what
6  other studies show too --
7  A   Yes.
8  Q   -- and what the overall clinical experience
9  has been?
10     It would also be important to you to know as
11 the article reports that 0 percent of patients were
12 symptomatic and that the authors concluded there was no
13 clinical significance; correct?
14 A   Yes.
15 Q   You wouldn't look at 86 percent in a vacuum;
16 right? You would want more information?
17 A   Correct.
18 Q   If what Mr. Johnson asserts is true, that
19 86 percent of Celect filters penetrate, and all are
20 progressive to perforation, if what he's saying were
21 true, that would be inconsistent with your experience
22 with this filter having implanted it hundreds of times;
23 correct?
24     MR. JOHNSON: Form.
25     THE WITNESS: Yes.

Page 224

1  BY MS. PIERSON:
2  Q   And 86 percent would be inconsistent with the
3  experience of any other physician you know with any
4  filter; right?
5      MR. JOHNSON: Form.
6      THE WITNESS: Yes.
7  BY MS. PIERSON:
8  Q   If this is what Mr. Johnson says is true,
9  wouldn't you expect to see people who receive the vena
10 cava filters, Celect filters, I mean, literally falling
11 down in the street?
12     MR. JOHNSON: Form.
13 BY MS. PIERSON:
14 Q   If it's really 86 percent.
15 A   Well, I would expect it not to be available
16 for use.
17 Q   And that's not the case, is it?
18 A   Correct.
19     MR. JOHNSON: Form.
20 BY MS. PIERSON:
21 Q   Mr. Johnson asked you several questions about
22 risks that you -- did you tell Mrs. Hill this, did you
23 tell Mrs. Hill that. The fact of the matter is, is
24 there any risk that you've heard about today that you
25 did not know in November of 2010?

Page 225

1  A   No.
2  Q   Okay. In November of 2010, you knew about the
3  risks that Mr. Johnson described about organ
4  perforation, a narrowed or stenosed vena cava, those
5  were all well known to you?
6  A   Correct.
7  Q   And when Mr. Johnson asked you, you had no
8  expectation that Mrs. Hill's perforation -- or excuse
9  me, you had no expectation that Mrs. Hill's filter would
10 perforate her duodenum following your retrieval attempt,
11 it's accurate to say that you had no expectation, but
12 you always knew it was a risk?
13 A   Correct.
14 Q   Mr. Johnson asked if, based on the information
15 he and Mrs. Hill's other lawyers have shown you, if
16 following the unsuccessful retrieval attempt, if you
17 would have sent Mrs. Hill to someone else? Again,
18 context is important for the information he's shown you;
19 right?
20 A   Yes.
21 Q   And if in context, the complication rate with
22 a Celect filter is less than 1 percent, it is equally
23 likely with all the information in that context that you
24 would have done exactly what you did in March of 2011?
25 A   Yes.

CONFIDENTIAL

Page 226

1  Q  One last question. Dr. Zuzga, we talked in
2  great detail about all of the risks associated with the
3  Celect filter and with other filters. We talked about
4  all the risks known to you, perforation, organ
5  perforation, stenosis and other things. In your
6  opinion, are all of those risks outweighed by the risk
7  of death from a pulmonary embolism?
8  A  Yes.
9  Q  In Mrs. Hill's specific case, even knowing the
10 exact complications that she experienced and that her
11 lawyers claim, is it your opinion, still, that the risk
12 of death from PE before her 10- to 12-hour spinal
13 surgery, that that risk outweighs the risk of all the
14 complications that she experienced?
15 A  Yes.
16 Q  That's all the questions I have, Dr. Zuzga.
17 Thank you for your time.
18     MR. JOHNSON: I'll be real quick.
19         FURTHER REDIRECT EXAMINATION
20 BY MR. JOHNSON:
21 Q  With respect to your personal experience with
22 the Celect filter, do you acknowledge your experience
23 may be different than the experience of other implanters
24 who do not attempt to retrieve filters within three or
25 four months?

Page 227

1  A  It's possible, yeah.
2  Q  You do acknowledge that the longer the filter
3  remains in place in the vena cava, there is an
4  increasing chance that a complication can occur?
5  A  Yes.
6  Q  Hence for that reason, you get your patients
7  back within three or four months. Agreed?
8  A  Correct.
9  Q  All right. With regard to the documents I
10 showed you about the 86 percent perforation rate
11 associated with the Celect filter, you said you would
12 need more information if you were aware of those
13 articles; correct?
14 A  Yes.
15 Q  But you need the information in order to ask
16 for the information, the more information; correct?
17     MS. PIERSON: Object to form.
18     THE WITNESS: But, again, here's what I would
19 tell you, that's one study that reviews one filter.
20 I don't put a lot of merit into one study. I would
21 look at several different studies across the board.
22 And, again, I will defer to you that it is not my
23 decision to have a filter on the shelf. And it is
24 certainly not in my hands to monitor if these
25 devices are safe across the nation.

Page 228

1  Again, I would refer on the FDA to inform me
2  if something is not safe for me to use.
3  BY MR. JOHNSON:
4  Q  All right. You do understand that there is an
5  obligation on the part of the device company --
6  A  I understand.
7  Q  -- if they know there's a problem --
8  A  Yes. Yes.
9  Q  -- to take their device off the market?
10 A  Yes.
11     MS. PIERSON: Object to form and foundation.
12 BY MR. JOHNSON:
13 Q  All right. Now, we talked about the one
14 article that you said if it would, it would -- you would
15 need to ask -- you would need more information; correct?
16 A  Correct.
17 Q  You need to know about the article in order to
18 ask for the information; correct?
19 A  Correct.
20     MS. PIERSON: Object to the form.
21 BY MR. JOHNSON:
22 Q  You acknowledge that the University of
23 Pennsylvania is a very reputable academic center?
24 A  It is. But it is also one study. I would --
25 all I would say to you is, there's not one study,

Page 229

1  there's not two studies, there's not three studies,
2  there's not five studies that's going to make me do --
3  sit there and research to see if this filter is safe.
4  I'm not -- that's not my job as a physician. My job as
5  a physician is to choose the appropriate thing that I
6  think is safe. And if someone else is watching and
7  tracking this data, they need to inform me that it's not
8  safe for the patient.
9  Q  And the Cleveland Clinic is another reputable
10 academic institution?
11 A  Sure, it is.
12 Q  So we've got three reputable academic centers
13 that are consistently finding an 86 percent perforation
14 rate with this Celect filter.
15     MS. PIERSON: Object to foundation.
16     THE WITNESS: I'm not disagreeing with you.
17 BY MR. JOHNSON:
18 Q  Okay. But recognizing that there is no
19 perfect device as you have indicated.
20 A  Yes.
21 Q  It's for that reason you get your patients in
22 as quickly as possible to remove the filter?
23 A  Correct.
24 Q  All right. And with regard to this risk
25 benefit issue, the benefit of putting the filter in, as