# EXHIBIT 1

CONFIDENTIAL

Page 1

```
1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
2                INDIANAPOLIS DIVISION
3          Case No.:  1:14-cv-06016-RLY-TAB
4      _____
5   In Re:  COOK MEDICAL, INC., IVC FILTERS
    MARKETING, SALES PRACTICES AND
6   PRODUCTS LIABILITY LITIGATION
7      _____
8              V I D E O   D E P O S I T I O N
9                        o f
10                  DR. MARK ZUZGA
11            taken on behalf of Defendants
12
         DATE:          April 19, 2017
13
         TIME:          3:13 p.m. to 7:17 p.m.
14
         PLACE:         2580 Gulf to Bay Boulevard
15                      Clearwater, Florida  33765
16       BEFORE:        Dawn A. Hillier, RMR, CRR, CLR
                        Notary Public - State of
17                      Florida, at Large
18
19
20       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
21
22
23
24
25
```

CONFIDENTIAL

Page 110

1    A   Correct.
2    Q   Is it your view, that sales representatives,
3  that their role is to deliver product to the hospital?
4    A   Correct.
5    Q   And to support the hospital staff?
6    A   Correct.
7    Q   When you interact with district managers or
8  sales representatives for companies who make the
9  products that you use, what are the circumstances for
10  that?
11    A   There's not much interaction.  They're there
12  to just hang out with the staff, maybe do some
13  instructions with them.  They bring lunch and doughnuts.
14  And that's about it.
15    Q   Okay.  Do you expect the sales representative
16  or district manager to give you instructions on how to
17  place the product?
18    A   On new products, possibly, yes.
19    Q   Is it your expectation that the sales
20  representatives, that they'll tell you how to do the
21  procedure or they'll give you advice about things to do
22  during the procedure or not to do during the procedure?
23    A   No.
24    Q   You understand that they are not medical
25  doctors?

Page 111

1    A   Correct.
2    Q   And that they have no medical training?
3    A   Correct.
4    Q   You don't rely on them for your medical
5  judgment or medical decisions?
6    A   No.
7    Q   In the case of Mrs. Hill, choosing the Celect
8  product for Mrs. Hill's particular procedure, did any
9  representative of Cook play any part in choosing that
10  particular filter for Mrs. Hill's particular condition?
11    A   No.
12    Q   I want to talk with you about the day that you
13  placed Mrs. Hill's Celect filter.  We discussed just a
14  second ago what happens typically when a patient comes
15  to the surgery center or the suite to have the
16  procedure.
17      Before you placed Mrs. Hill's Celect filter,
18  at that point in time, you'd been placing filters for
19  something like seven years?
20    A   Yes.
21    Q   Were you very familiar with the procedure for
22  how you place one?
23    A   Yes.
24    Q   Okay.  Was the procedure that you used to
25  implant Mrs. Hill's Celect filter the same procedure

Page 112

1  that you used for other filters?
2    A   Yes.
3    Q   Were you relying on anything, any information
4  from Cook or any specific individual to know how to
5  place Mrs. Hill's Celect filter?
6    A   No.
7    Q   And before Mrs. Hill's procedure, were you
8  very familiar with the risks and the benefits of
9  filters?
10    A   Yes.
11    Q   Do you agree that there are always risks
12  inherent in placing a medical device?
13    A   Yes.
14      MR. JOHNSON:  Form.
15  BY MS. PIERSON:
16    Q   Do you ever guarantee the results of any
17  filter to any patient?
18    A   No.
19    Q   Did you guarantee any results to Mrs. Hill?
20    A   No.
21    Q   Did you guarantee to Mrs. Hill that she would
22  not experience a complication with a filter?
23    A   No.
24    Q   Why not?
25    A   Because there's no perfect procedure, and

Page 113

1  everything carries an inherent risk.
2    Q   Was there anything about Mrs. Hill that made
3  her immune from the known complications with all
4  filters?
5    A   No.
6      MR. JOHNSON:  Form.
7  BY MS. PIERSON:
8    Q   Back in November of 2010, was it well known in
9  the medical community that perforation of the vena cava
10  was a known risk of all filters?
11      MR. JOHNSON:  Form.
12      THE WITNESS:  Yes.
13  BY MS. PIERSON:
14    Q   That was something that you knew?
15    A   Yes.
16    Q   Based on your medical training and your
17  education?
18    A   Yes.
19    Q   Back in November of 2010, were you and the
20  general medical community well aware that if something
21  perforates the vena cava, it could also perforate an
22  organ or something else close to the vena cava?
23    A   Yes.
24      MR. JOHNSON:  Form.
25  BY MS. PIERSON:

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    Q   Perforation of the small intestine was a known
2   risk with all filters in November 2010.
3    A   Correct.
4    Q   And you knew that?
5    A   Yes.
6    Q   And it was generally known in the medical
7   community?
8    A   Yes.
9        MR. JOHNSON: Form.
10   BY MS. PIERSON:
11   Q   For the patients who experience a perforation
12   of their vena cava or a perforation of their other
13   organs, are a portion of those patients completely
14   asymptomatic?
15   A   Yes.
16       MR. JOHNSON: Form.
17   BY MS. PIERSON:
18   Q   Give the jury some sense of when there is a
19   perforation of a vena cava or something else. How
20   frequently does the patient even know it's happening?
21   A   I couldn't give you a number. I've seen
22   several CAT scans before where struts were seen outside
23   the cava. And it was an incidental finding, meaning the
24   patient wasn't having any symptoms.
25   Q   In your work as a vascular surgeon, are there

Page 115

1   times that there are tools that you use that perforate
2   the vena cava? For example, a needle, for example?
3        MR. JOHNSON: Form.
4        THE WITNESS: Would I -- I don't understand
5    what you're asking. I don't know if there's a need
6    to perforate it.
7   BY MS. PIERSON:
8    Q   Yeah. Certainly you don't go out of your way
9   to do it.
10   A   No.
11   Q   That's fair to say?
12   A   Correct.
13   Q   But are there other types of procedures that a
14   patient might undergo where there's a need to place
15   something through the vena cava, like a needle, for
16   example?
17       MR. JOHNSON: Predicate.
18       THE WITNESS: Not that I'm aware of.
19   BY MS. PIERSON:
20   Q   We talked earlier about patients who
21   experience a perforation and whether they have symptoms,
22   clinical symptoms. In your experience, if a patient is
23   asymptomatic or does not have any clinical symptoms, do
24   you need to do anything about it?
25   A   Usually not.

Page 116

1    Q   In your experience where a patient has a
2   perforation of the vena cava and the filter is removed,
3   does the patient experience any clinical symptoms after
4   the removal?
5        MR. JOHNSON: Vague, speculation.
6        THE WITNESS: I guess if they were
7    asymptomatic before, I guess I would say it's a
8    case by case basis.
9   BY MS. PIERSON:
10   Q   In your experience in planting filters over
11   the last 15 years, give us some idea of how frequently
12   you see some kind of a complication like perforation.
13   A   I would say incidental findings, probably
14   three or four a year, that I'm aware of.
15   Q   Now, when you say "incidental findings," what
16   do you mean?
17   A   The patient came in with acute appendicitis,
18   had a CAT scan and had a previous filter and they noted
19   a strut out of the vena cava.
20   Q   In those patients where it's an incidental
21   finding, is the filter hurting them in any way?
22   A   No.
23   Q   Is it causing any damage or injury to the
24   patient?
25   A   No.

Page 117

1    Q   In those patients, did you do anything?
2    A   No.
3    Q   In your experience in planting many different
4   kinds of filters, is the complication rate with the
5   Celect filter any, any different than other filters?
6    A   No.
7        MR. JOHNSON: Forming, predicate.
8   BY MS. PIERSON:
9    Q   And we talked a little bit about the
10   experience of thrombose with the Option filter. Are
11   there -- I assume in that instance, you'd agree that the
12   Cook Celect filter, in your hands, has outperformed the
13   Option filter?
14       MR. JOHNSON: Form, predicate.
15       THE WITNESS: As far as thrombosis, yes.
16       MR. JOHNSON: As far as what?
17       THE WITNESS: Thrombosis of the cava, yes.
18   BY MS. PIERSON:
19   Q   Generally speaking, with the types of filters
20   that you've implanted over the years, is the Cook Celect
21   filter every bit as safe and effective in treating your
22   patients as any other filter on the market?
23       MR. JOHNSON: Predicate.
24       THE WITNESS: Yes.
25   BY MS. PIERSON:

30 (Pages 114 - 117)

CONFIDENTIAL

Page 126

1    Q   Were you aware of the fact or did Mrs. Hill
2  tell you that when she worked in a hospital, that she
3  actually gave informed consents to patients to sign?
4        MR. JOHNSON:  Form.
5        THE WITNESS:  No.
6  BY MS. PIERSON:
7    Q   Did she tell you that it had been her job to
8  explain informed consents to patients?
9    A   No.
10       MR. JOHNSON:  Form.
11 BY MS. PIERSON:
12   Q   When a patient comes to you to have a filter
13 placed, do they sign an informed consent?
14   A   Usually in my office or in the hospital.
15   Q   Okay.  And back in November of 2010, when --
16 or in October of 2010, when a patient came to you for a
17 visit before they got their filter, would you or your
18 office staff give to them an informed consent to review?
19   A   We've changed different procedures.  I think
20 most of the consents or any at that time were all signed
21 in the hospital.
22   Q   When a patient in November of 2010, came in to
23 have a filter placed, were they given time to review the
24 consent?
25   A   That's pretty standard, yes.

Page 127

1    Q   And were they given an opportunity to ask you
2  questions about the consent?
3    A   Yes.
4    Q   Would they have the opportunity to ask nurses
5  or other hospital staff about the consent?
6    A   Yes.
7    Q   Does the hospital have a practice or did it in
8  November 2010, of being sure the patient had time to
9  read their consent before they signed it?
10       MR. JOHNSON:  Form.
11       THE WITNESS:  Usually.
12 BY MS. PIERSON:
13   Q   Okay.  In other words, you're not rushing
14 patients?
15   A   Correct.
16   Q   Is it important to you that they have plenty
17 of time to review and understand the consent?
18   A   Yes.
19   Q   And to ask questions about the consent?
20   A   Yes.
21   Q   In Mrs. Hill's case, I want to show you the
22 consents that she signed.  But back in November of 2010,
23 before a patient received a vena cava filter, was it
24 your practice or the hospital's practice to have them
25 sign two consents?

Page 128

1    A   I think it was.
2    Q   Patients signed a consent, both for the
3  procedure and for the specific placement of the filter;
4  correct?
5    A   That sounds about right.
6    Q   In Mrs. Hill's case, she signed three
7  different consents related to her vena cava filter.  And
8  I want to ask you about those.  First --
9        MR. JOHNSON:  Do you have an extra copy?
10       MS. PIERSON:  I do.
11 BY MS. PIERSON:
12   Q   First, I'm handing you what's been marked as
13 Exhibit 36.
14       (Exhibit 36 was marked.)
15 BY MS. PIERSON:
16   Q   We'll put this on the screen so that the jury
17 can see it as well.
18       Dr. Zuzga, is Exhibit 36 the informed consent
19 that Mrs. Hill was given for her vena cava filter
20 placement by you?
21   A   Yes.
22   Q   At the top of the page that's Mrs. Hill's
23 name, and then her signature appears at the bottom;
24 correct?
25   A   Correct.

Page 129

1    Q   And on the screen, I've highlighted in yellow.
2  This particular consent is a consent specifically for
3  her IVC; right?
4    A   Correct.
5    Q   And it says [as read]:  The risks have been
6  explained to me.  I understand these risks may include
7  but are not limited to...
8        And then there are a number of bullet points
9  there.
10   A   Yes.
11   Q   Do you see those?
12   A   Yep.
13   Q   In the informed consent that you or the
14 hospital gave to Mrs. Hill before her procedure, was she
15 specifically warned of the risk of pain, infection, or
16 bleeding?
17   A   Yes.
18   Q   Was she specifically warned of the risk of
19 injury to the vessel or nerve?
20   A   Yes.
21   Q   And do you see that right there?
22   A   Yes.
23   Q   It says [as read]:  Including perforation.
24   A   Correct.
25   Q   Was Mrs. Hill specifically warned of the risk

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1 of perforation --
2    A   Yes.
3    Q   -- from her vena cava filter?
4    A   Yes.
5    Q   She's also warned of other risks that are far
6 worse; right?
7    A   Yes.
8    Q   She was warned of the risk of hematoma?
9    A   Yes.
10   Q   Stroke?
11   A   Yes.
12   Q   Pulmonary embolism?
13   A   Yes.
14   Q   Filter migration?
15   A   Yes.
16   Q   Heart arrhythmia?
17   A   Yes.
18   Q   And thrombosis resulting in leg swelling.
19   A   Yes.
20   Q   She was warned in the informed consent of the
21 risk of respiratory problems including paralysis, brain
22 damage, drug reactions or possibly death.
23   A   Correct.
24   Q   And the consent states [as read]:  The
25 alternatives to this procedure have been explained and

Page 131

1 includes surgery, medical management, and observation.
2 My doctor has discussed with me the possible problems
3 with recovery and outcomes I may or may not expect as a
4 result of the procedure.
5       Did you do that?
6    A   Yes.
7    Q   The consent states that the benefits of the
8 procedure have been fully explained.
9       [As read]:  I understand that no results can
10 be guaranteed or assured.
11   A   Correct.
12   Q   Mrs. Hill was told that in her informed
13 consent; correct?
14   A   Yes.
15   Q   And you told her that as well?
16   A   Yes.
17   Q   Mrs. Hill was told the goal of the procedure
18 is to significantly reduce the risk of pulmonary
19 embolus.
20   A   Correct.
21   Q   And at the bottom, it says [as read]:  I
22 acknowledge and I have read and fully understand this
23 consent form and that all of my questions have been
24 answered to my satisfaction.
25   A   Correct.

Page 132

1    Q   And then Mrs. Hill signed it?
2    A   Yes.
3    Q   To your knowledge, Dr. Zuzga, were all of
4 Mrs. Hill's questions answered?
5    A   Yes.
6    Q   She had a question to ask -- she had an
7 opportunity to ask you and other staff at the hospital
8 any questions she had about the things listed on this
9 page.
10   A   Yes.
11   Q   And in this informed consent, Mrs. Hill was
12 specifically warned of the risks that she experienced.
13   A   Correct.
14   Q   There was a second consent that Mrs. Hill
15 signed that day that I'll mark as Exhibit 37.
16       (Exhibit 37 was marked.)
17 BY MS. PIERSON:
18   Q   Dr. Zuzga, again, is this a consent signed by
19 Mrs. Hill on November 17th of 2010?
20   A   Yes.
21   Q   And this is a consent to the procedure of
22 placing the vena cava filter?
23   A   Correct.
24   Q   So just so our jury understands, the first
25 consent that we reviewed is for the product itself, the

Page 133

1 filter.  And the second consent is for the procedure
2 that you were performing?
3    A   Correct.
4    Q   In this consent, did you and the hospital warn
5 Mrs. Hill of, in paragraph three [as read]:  The risks,
6 benefits, and possible problems which may include
7 infection, bleeding, blood vessel, and/or nerve injury,
8 injury to other tissues and/or organs affected by the
9 process of my intended procedure, brain, spine, or other
10 nervous system damage, loss of use of body parts, and/or
11 life have been explained.
12   A   Yes.
13   Q   And specifically within that paragraph, when
14 the consent says that she's -- she has been told about
15 the risks, benefits, and possible problems including
16 blood vessel and/or nerve injury, does that include
17 perforation of the vena cava?
18   A   Yes.
19   Q   And when this consent warns of injury to other
20 tissues and/or organs affected by the process of my
21 intended procedure, does that include the possibility of
22 organ damage from placement of a vena cava filter?
23   A   Yes.
24   Q   In paragraph four, it says [as read]:  My
25 doctor has discussed with me the possible problems with

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1  recovery and outcomes I may or may not expect as a
2  result of the procedure.  My doctor has also explained
3  the risks, benefits, and possible problems related to
4  alternatives and the possible result of not having the
5  procedure.
6      A   Yes.
7      Q   Is that accurate?
8      A   Yep.
9      Q   You explained all of those things to
10  Mrs. Hill?
11      A   Yes.
12      Q   And she consented to having the placement of a
13  vena cava filter?
14      A   Yes.
15      Q   You discussed with her the possibility of
16  having no filter at all; right?
17      A   Yes.
18      Q   She knew what the risks were of having no
19  filter.
20      A   Correct.
21      Q   She knew that by undergoing the placement of a
22  filter, there were a number of risks including the
23  possibility of death; correct?
24      A   Correct.
25      Q   Did Mrs. Hill have an opportunity to consider

Page 135

1  whether those risks were worth undergoing?
2      A   I would imagine so, yes.
3      Q   And at the conclusion of having all that
4  explained to her, did she, in fact, consent to the
5  procedure of placing the vena cava filter?
6      A   Yes.
7      Q   At the bottom, it says [as read]:  I certify
8  that I read this consent or have had it read to me in a
9  language I understand, that I've had the opportunity to
10  ask questions, that all of my questions have been
11  answered to my satisfaction and that I knowingly and
12  willingly give consent to have this procedure treatment.
13          Did I read that correctly?
14      A   Correct.
15      Q   Dr. Zuzga, you were with Mrs. Hill on November
16  the 17th of 2010, did she have the opportunity to ask
17  questions, were her questions answered, and did she
18  knowingly and willingly give consent to have the
19  placement of her vena cava filter?
20          MR. JOHNSON:  Form.
21          THE WITNESS:  Yes.
22  BY MS. PIERSON:
23      Q   Mr. Johnson asked you some questions about
24  your effort to remove her filter four months after
25  placement.  Because we're talking about the consents

Page 136

1  that Mrs. Hill signed, I think it's easier to go over
2  that one at the same time.  So I'll hand you what I'm
3  marking as Exhibit 38.
4          (Exhibit 38 was marked.)
5  BY MS. PIERSON:
6      Q   Dr. Zuzga, four months after you placed
7  Mrs. Hill's filter, did she come back to you and to the
8  hospital to have her filter retrieved?
9      A   Yes.
10      Q   It was your hope that on that day you would be
11  able to get it out and that it would be a temporary
12  filter?
13      A   Correct.
14      Q   On that day, was she, again, given an
15  opportunity to ask you questions and to ask questions of
16  the hospital staff and nurses?
17      A   Yes.
18      Q   Again, was Mrs. Hill given an informed
19  consent?
20      A   Yes.
21      Q   What I've marked as Exhibit 38, is this the
22  informed consent that Mrs. Hill signed on the day of her
23  retrieval attempt?
24      A   Yes.
25      Q   And this particular informed consent, again,

Page 137

1  at the top says IVC filter; correct?
2      A   Yes.
3      Q   And it says [as read]:  The risks have been
4  fully explained to me.  I understand that these risks
5  may include but may be limited to...
6          And then there are a bunch of bullet points.
7      A   Yes.
8      Q   Again, on the day of Mrs. Hill's retrieval
9  attempt, was she warned of the risk of pain, infection,
10  or bleeding from her vena cava filter?
11      A   Yes.
12      Q   Again, was she warned of the risk of injury to
13  a vessel or a nerve including perforation?
14      A   Yes.
15      Q   She was warned on that day a third time of the
16  possibility that her vena cava could be perforated by
17  her filter or your attempt to retrieve her filter?
18      A   Correct.
19      Q   Was she warned of the risks of other and more
20  significant:  Stroke, pulmonary embolism, filter
21  migration, arrhythmia?
22      A   Yes.
23      Q   Was she warned of the risk that she could
24  develop thrombosis resulting in leg swelling following
25  her filter?

35 (Pages 134 - 137)

CONFIDENTIAL

**Page 142**

1  filters without reviewing the instructions for use that
2  accompanied the product?
3      A   Yes.
4      Q   I want to ask you about some medical terms
5  that counsel asked you about last time.
6          First, when you see or hear the term "damage
7  to the vena cava," do you understand that damage to the
8  vena cava can include perforation of the vena cava?
9      A   Yes.
10     Q   And when you see in a document listed as a
11 risk of a filter, "perforation," do you understand that
12 that means it could, in fact, go through the wall of the
13 vena cava?
14     A   Yes.
15     Q   As a vascular surgeon, you're well familiar
16 with the organs and structures that are close to a
17 patient's vena cava?
18     A   Yes.
19     Q   And when you see as a listed risk, perforation
20 of the vena cava, do you know and understand that that
21 includes adjacent organs?
22     A   Yes.
23     Q   And structures?
24     A   Correct.
25     Q   In other words, if somebody said to you,

**Page 143**

1  Dr. Zuzga, as I understand they did in your medical
2  training, with a filter, there can be vena cava
3  perforation, you knew and understood that that could
4  include the small intestine?
5      A   Yes.
6      Q   When you see the term "filter hook embedded in
7  tissue growth," if you were to read that, would you
8  understand that to mean that the hook could become
9  overgrown with tissue?
10     A   Correct.
11     Q   And when a hook on a filter is touching the
12 wall of a vena cava, what is it that causes tissue to
13 grow over that?
14     A   It just can be a reaction from the body from a
15 foreign object inside.
16     Q   Is that true with other products too, not just
17 filters?
18     A   Yes.
19     Q   In other words, where there's blood flowing
20 over the filter or another product -- another product
21 and it's touching the caval wall, it's the body's
22 natural reaction to try and cover up that foreign
23 object; right?
24     A   Yes.
25     Q   It's a natural healing response?

**Page 144**

1      A   Yes.
2      Q   There's nothing about that growth that is
3  abnormal or unusual to filters?
4      A   Correct.
5      Q   With respect to vena cava filters, the Celect
6  and other filters, if the hook or the end of the filter
7  is touching the caval wall and it's touching it for some
8  four months, it can, in fact, grow over the hook?
9      A   Yes.
10     Q   That is a normal and expected consequence?
11     A   Correct.
12     Q   And it's a normal risk with any filter,
13 including the Celect?
14     A   Yes.
15     Q   When counsel asked at the last deposition
16 about the Celect instructions for use and you said that
17 you did not review it, is it safe to say that because
18 you hadn't reviewed it, you didn't rely on it at the
19 time of Mrs. Hill's filter placement?
20     A   Correct.
21     Q   And that you didn't rely on Cook's
22 communication in the IFU to form an opinion as to the
23 risks associated with the Celect filter?
24     A   Correct.
25     Q   You did not rely on anything that Cook

**Page 145**

1  communicated to you in selecting the filter appropriate
2  for Mrs. Hill?
3      A   Correct.
4      Q   Mr. Heaviside, another lawyer for Mrs. Hill,
5  asked you about the MAUDE database.  Do you remember
6  that?
7      A   No.
8      Q   Your response was that you didn't know what it
9  was. Is it fair to say, Dr. Zuzga, that you were not
10 relying on anything in a MAUDE database in choosing a
11 filter for Mrs. Hill?
12     A   Correct.
13     Q   At the time that you implanted Mrs. Hill's
14 Celect filter, you had independent knowledge of the
15 risks of a vena cava filter?
16     A   Yes.
17     Q   And that came from your experience and your
18 review of the literature, not from any information from
19 Cook?
20     A   Correct.
21     Q   Or any information in a MAUDE database?
22     A   Yes.
23     Q   Is it safe to say that you did not review the
24 instructions for use that accompanied the retrieval
25 kit --

**37 (Pages 142 - 145)**

CONFIDENTIAL

Page 178

1    are on the record.
2 BY MS. PIERSON:
3    Q   Dr. Zuzga, Mrs. Hill's lawyers have asked --
4 have shown you some documents, one labeled, I believe it
5 was Exhibit 14 with complaints, a complaints
6 spreadsheet.  Do you remember that?
7    A   Yes.
8    Q   Mr. Johnson represented today that he had
9 counted some 30-some complaints that I think he
10 represented to be similar to Mrs. Hill's.
11    A   Yes.
12    Q   Do you remember those questions?
13    A   Yes.
14    Q   Do you agree, Dr. Zuzga, that as a physician,
15 knowledge of complaints or complications alone doesn't
16 answer the question; correct?
17       MR. JOHNSON:  Form.
18       THE WITNESS:  What do you mean?
19 BY MS. PIERSON:
20    Q   Well, is it important to you to know,
21 Dr. Zuzga, in addition to the number of complaints or
22 complications to know the total number of products sold
23 and are implanted?
24    A   Yes.
25    Q   In other words, for you to make a judgment

Page 179

1 about any complaint, you also need to know the
2 denominator; right?
3    A   Correct.
4    Q   If Cook, during the period of time shown in
5 this spreadsheet marked as Exhibit 14, if Cook sold
6 1,400 -- 143,880 Celect filters during the same period
7 of time that there were 30-some complaints, by my math,
8 the complaint or complication rate would be .03 percent.
9 Does the complication rate of .03 percent concern you in
10 any way?
11       MR. JOHNSON:  Form.  Form.  Foundation.
12       THE WITNESS:  No.
13 BY MS. PIERSON:
14    Q   In your experience, do all filters have a
15 complication rate equal or greater to that number?
16       MR. JOHNSON:  Form, foundation.
17       THE WITNESS:  Yes.
18 BY MS. PIERSON:
19    Q   Dr. Zuzga, if you had received, as Mr. Johnson
20 posits today, this complaint information and also had
21 received information about the total number of Celect
22 filters implanted and were able to calculate the rate of
23 complaints or concerns, is there anything about that
24 that would change your decision in Mrs. Hill's case?
25    A   No.

Page 180

1    Q   Mr. Heaviside asked you some questions last
2 time about various pieces of medical literature all of
3 which postdate Mrs. Hill's November 10, 2000 [sic],
4 placement of her filter.  Is it fair to say that if the
5 literature had not been published prior to her
6 placement, there's no way you could have known about it?
7    A   Correct.
8    Q   And is it accurate to say, Dr. Zuzga, that it
9 would be important to you to dig into those studies and
10 to understand what they meant?
11    A   Yes.
12    Q   Okay.  And even having seen the various
13 studies that Mr. Heaviside referred to, again, is it --
14 has it been your experience, in your hands, using the
15 Celect filter that the complication rate for complaints
16 is very low?
17    A   Yes.
18    Q   When we lawyers talk about complication rates,
19 either pointing to complaint reports or pointing to
20 medical literature, as a physician, would you rely on
21 any of that to choose the product for your patient?
22    A   No.
23    Q   When you chose the product for Mrs. Hill, did
24 you do that based on anything the lawyers have said or
25 that Cook has said?

Page 181

1    A   No.
2    Q   And in March of 2011, when you were unable to
3 retrieve Mrs. Hill's filter, after she left your care,
4 you certainly read additional medical literature; right?
5    A   Yes.
6    Q   But you continued to keep up with the
7 literature as it relates to vena cava filters?
8    A   Yes.
9    Q   Is there anything that you learned following
10 her retrieval attempt in March of 2011, that caused you
11 to say, Hey, I need to bring Mrs. Hill back and do
12 something different with her?
13    A   No.
14       MR. JOHNSON:  Form.
15 BY MS. PIERSON:
16    Q   Is there anything that you learned after March
17 of 2011, even up to today, that would cause you to
18 change the way that you treated Mrs. Hill following
19 March of 2011?
20       MR. JOHNSON:  Form.
21       THE WITNESS:  No.
22 BY MS. PIERSON:
23    Q   Dr. Zuzga, do you continue today to use Cook
24 products?
25    A   Yes.

46 (Pages 178 - 181)

CONFIDENTIAL

Page 222

1   A   Correct.
2   Q   You informed Courtney Whitlock about this
3 adverse event because it was your desire that either she
4 or somebody with Cook submit a medical device report
5 relating to Mrs. Hill's situation?
6   A   Yes.
7   Q   You considered that to be an adverse event;
8 did you not?
9   A   Yes.
10   Q   All right. That's all I have. Before I'm
11 done --
12      MS. PIERSON: I have just three things that I
13 need to follow up.
14      MR. JOHNSON: What exhibit number are we going
15 to put on your PowerPoint before we forget?
16      MS. PIERSON: We'll do it as whatever the next
17 one is, which is 37 [sic].
18      (Exhibit 39 was marked.)
19          RECROSS EXAMINATION
20 BY MS. PIERSON:
21   Q   Dr. Zuzga, I just have three things that I
22 need to follow up on from what Mr. Johnson asked you.
23 First, he asked you multiple times about this 86 percent
24 perforation rate. And he made a point of saying we know
25 now based on the study that that rate's 86 percent. Do

Page 223

1 you remember those questions?
2   A   Yes.
3      MR. JOHNSON: Form.
4 BY MS. PIERSON:
5   Q   Would it be important to you to know what
6 other studies show too --
7   A   Yes.
8   Q   -- and what the overall clinical experience
9 has been?
10      It would also be important to you to know as
11 the article reports that 0 percent of patients were
12 symptomatic and that the authors concluded there was no
13 clinical significance; correct?
14   A   Yes.
15   Q   You wouldn't look at 86 percent in a vacuum;
16 right? You would want more information?
17   A   Correct.
18   Q   If what Mr. Johnson asserts is true, that
19 86 percent of Celect filters penetrate, and all are
20 progressive to perforation, if what he's saying were
21 true, that would be inconsistent with your experience
22 with this filter having implanted it hundreds of times;
23 correct?
24      MR. JOHNSON: Form.
25      THE WITNESS: Yes.

Page 224

1 BY MS. PIERSON:
2   Q   And 86 percent would be inconsistent with the
3 experience of any other physician you know with any
4 filter; right?
5      MR. JOHNSON: Form.
6      THE WITNESS: Yes.
7 BY MS. PIERSON:
8   Q   If this is what Mr. Johnson says is true,
9 wouldn't you expect to see people who receive the vena
10 cava filters, Celect filters, I mean, literally falling
11 down in the street?
12      MR. JOHNSON: Form.
13 BY MS. PIERSON:
14   Q   If it's really 86 percent.
15   A   Well, I would expect it not to be available
16 for use.
17   Q   And that's not the case, is it?
18   A   Correct.
19      MR. JOHNSON: Form.
20 BY MS. PIERSON:
21   Q   Mr. Johnson asked you several questions about
22 risks that you -- did you tell Mrs. Hill this, did you
23 tell Mrs. Hill that. The fact of the matter is, is
24 there any risk that you've heard about today that you
25 did not know in November of 2010?

Page 225

1   A   No.
2   Q   Okay. In November of 2010, you knew about the
3 risks that Mr. Johnson described about organ
4 perforation, a narrowed or stenosed vena cava, those
5 were all well known to you?
6   A   Correct.
7   Q   And when Mr. Johnson asked you, you had no
8 expectation that Mrs. Hill's perforation -- or excuse
9 me, you had no expectation that Mrs. Hill's filter would
10 perforate her duodenum following your retrieval attempt,
11 it's accurate to say that you had no expectation, but
12 you always knew it was a risk?
13   A   Correct.
14   Q   Mr. Johnson asked if, based on the information
15 he and Mrs. Hill's other lawyers have shown you, if
16 following the unsuccessful retrieval attempt, if you
17 would have sent Mrs. Hill to someone else? Again,
18 context is important for the information he's shown you;
19 right?
20   A   Yes.
21   Q   And if in context, the complication rate with
22 a Celect filter is less than 1 percent, it is equally
23 likely with all the information in that context that you
24 would have done exactly what you did in March of 2011?
25   A   Yes.

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1  Q  One last question. Dr. Zuzga, we talked in
2  great detail about all of the risks associated with the
3  Celect filter and with other filters. We talked about
4  all the risks known to you, perforation, organ
5  perforation, stenosis and other things. In your
6  opinion, are all of those risks outweighed by the risk
7  of death from a pulmonary embolism?
8  A  Yes.
9  Q  In Mrs. Hill's specific case, even knowing the
10 exact complications that she experienced and that her
11 lawyers claim, is it your opinion, still, that the risk
12 of death from PE before her 10- to 12-hour spinal
13 surgery, that that risk outweighs the risk of all the
14 complications that she experienced?
15 A  Yes.
16 Q  That's all the questions I have, Dr. Zuzga.
17 Thank you for your time.
18    MR. JOHNSON: I'll be real quick.
19    FURTHER REDIRECT EXAMINATION
20 BY MR. JOHNSON:
21 Q  With respect to your personal experience with
22 the Celect filter, do you acknowledge your experience
23 may be different than the experience of other implanters
24 who do not attempt to retrieve filters within three or
25 four months?

Page 227

1  A  It's possible, yeah.
2  Q  You do acknowledge that the longer the filter
3  remains in place in the vena cava, there is an
4  increasing chance that a complication can occur?
5  A  Yes.
6  Q  Hence for that reason, you get your patients
7  back within three or four months. Agreed?
8  A  Correct.
9  Q  All right. With regard to the documents I
10 showed you about the 86 percent perforation rate
11 associated with the Celect filter, you said you would
12 need more information if you were aware of those
13 articles; correct?
14 A  Yes.
15 Q  But you need the information in order to ask
16 for the information, the more information; correct?
17    MS. PIERSON: Object to form.
18    THE WITNESS: But, again, here's what I would
19 tell you, that's one study that reviews one filter.
20 I don't put a lot of merit into one study. I would
21 look at several different studies across the board.
22 And, again, I will defer to you that it is not my
23 decision to have a filter on the shelf. And it is
24 certainly not in my hands to monitor if these
25 devices are safe across the nation.

Page 228

1    Again, I would refer on the FDA to inform me
2  if something is not safe for me to use.
3  BY MR. JOHNSON:
4  Q  All right. You do understand that there is an
5  obligation on the part of the device company --
6  A  I understand.
7  Q  -- if they know there's a problem --
8  A  Yes. Yes.
9  Q  -- to take their device off the market?
10 A  Yes.
11    MS. PIERSON: Object to form and foundation.
12 BY MR. JOHNSON:
13 Q  All right. Now, we talked about the one
14 article that you said if it would, it would -- you would
15 need to ask -- you would need more information; correct?
16 A  Correct.
17 Q  You need to know about the article in order to
18 ask for the information; correct?
19 A  Correct.
20    MS. PIERSON: Object to the form.
21 BY MR. JOHNSON:
22 Q  You acknowledge that the University of
23 Pennsylvania is a very reputable academic center?
24 A  It is. But it is also one study. I would --
25 all I would say to you is, there's not one study,

Page 229

1  there's not two studies, there's not three studies,
2  there's not five studies that's going to make me do --
3  sit here and research to see if this filter is safe.
4  I'm not -- that's not my job as a physician. My job as
5  a physician is to choose the appropriate thing that I
6  think is safe. And if someone else is watching and
7  tracking this data, they need to inform me that it's not
8  safe for the patient.
9  Q  And the Cleveland Clinic is another reputable
10 academic institution?
11 A  Sure, it is.
12 Q  So we've got three reputable academic centers
13 that are consistently finding an 86 percent perforation
14 rate with this Celect filter.
15    MS. PIERSON: Object to foundation.
16    THE WITNESS: I'm not disagreeing with you.
17 BY MR. JOHNSON:
18 Q  Okay. But recognizing that there is no
19 perfect device as you have indicated.
20 A  Yes.
21 Q  It's for that reason you get your patients in
22 as quickly as possible to remove the filter?
23 A  Correct.
24 Q  All right. And with regard to this risk
25 benefit issue, the benefit of putting the filter in, as

58 (Pages 226 - 229)

CONFIDENTIAL

Page 234

1       Veritext Legal Solutions
          1 North Franklin Street - Suite 3000
2            Chicago, Illinois 60606
               Phone: 312-442-9087
3
4
April 26, 2017
5
To: Erin Reynolds, Esq.
6
Case Name: Hill, Elizabeth v. Cook Incorporated, et al.
7
Veritext Reference Number: 2580537
8
Witness:  Dr. Mark Zuzga       Deposition Date:  4/19/2017
9
10  Dear Sir/Madam:
11  Enclosed please find a deposition transcript.  Please have the witness
12  review the transcript and note any changes or corrections on the
13  included errata sheet, indicating the page, line number, change, and
14  the reason for the change.  Have the witness' signature at the bottom
15  of the sheet notarized and forward errata sheet back to us at the
16  address shown above, or email to production-midwest@veritext.com.
17
18  If the errata is not returned within thirty days of your receipt of
19  this letter, the reading and signing will be deemed waived.
20
21
22
23  Sincerely,
24
25  Production Department

Page 235

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
ASSIGNMENT NO: 2580537
3  CASE NAME: Hill, Elizabeth v. Cook Incorporated, et al.
   DATE OF DEPOSITION: 4/19/2017
4  WITNESS' NAME: Dr. Mark Zuzga
5  In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7  I have made no changes to the testimony
   as transcribed by the court reporter.
8
9   Date          Dr. Mark Zuzga
10  Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13  They signed the foregoing Sworn
   Statement; and
14  Their execution of this Statement is of
   their free act and deed.
15
   I have affixed my name and official seal
16
17  this _____ day of_____, 20____.
18      Notary Public
19
   Commission Expiration Date
20
21
22
23
24
25

Page 236

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
ASSIGNMENT NO: 2580537
3  CASE NAME: Hill, Elizabeth v. Cook Incorporated, et al.
   DATE OF DEPOSITION: 4/19/2017
4  WITNESS' NAME: Dr. Mark Zuzga
5  In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7  I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9  I request that these changes be entered
   as part of the record of my testimony.
10
   I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
   Date          Dr. Mark Zuzga
14
   Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
   They have read the transcript;
17  They have listed all of their corrections
   in the appended Errata Sheet;
18  They signed the foregoing Sworn
   Statement; and
19  Their execution of this Statement is of
   their free act and deed.
20
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
   Notary Public
24
25  Commission Expiration Date

Page 237

1       ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 2580537
3  PAGE/LINE(S) /      CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20  Date          Dr. Mark Zuzga
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
   Notary Public
24
25  Commission Expiration Date

60 (Pages 234 - 237)