**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

---

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                    Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                                     MDL No. 2570

---

This Document Relates to the Following Actions only:

    Elizabeth Jane Hill
    No. 1:14-cv-06016-RLY-TAB

---

**COOK DEFENDANTS' TRIAL BRIEF**

Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, and William Cook Europe APS (collectively the "Cook Defendants") submit the following trial brief to address in advance several issues that Cook believes may arise at trial and that have arisen as a result of the Court's recent rulings. Specifically, this trial brief addresses:

1. The scope of admissibility of the testimony of Plaintiff's expert Dr. Kessler in light of the Court's order excluding evidence of FDA's 510(k) process, Cook's conduct in that process, and the Celect filter's clearance for sale through that process.

2. The relevance and admissibility of Plaintiff's proposed expert testimony concerning alleged "misbranding" and "adulteration" in light of summary judgment on Plaintiff's negligent failure-to-warn claim; and

3. The federal constitutional requirement that evidence supporting any award of punitive damages against Cook must relate to the conduct that the jury finds actually injured Plaintiff.

**I.   The Court's Grant Of Plaintiff's Motion To Exclude Evidence Concerning The Section 510(K) Clearance Process Renders Much Of Dr. Kessler's Proposed Testimony Irrelevant.**

At its September 25 hearing on pretrial motions, the Court orally granted Plaintiff's motion to exclude evidence of the Cook Celect IVC filter's journey and clearance for sale through FDA's 510(k) process. Following up on that order, on October 3, 2017, Cook sent Plaintiff's attorneys a detailed three-page letter seeking agreement on the subject areas and documents that will and will not be offered at the upcoming *Hill* trial in light of the Court's ruling, addressing in particular the proposed testimony of Plaintiff's regulatory expert Dr. David Kessler. *See* October 3, 2017 Letter from Andrew Campbell to Matthew Schultz (attached as Exh. A). In response, Plaintiff's attorney rejected Cook's attempt to clarify which of the more than 360 paragraphs of opinions by Dr. Kessler would presented at trial. *See* Schultz October 4, 2017 email (attached as Exh. B). Plaintiff's counsel suggests that the "wherefore clause" of Plaintiff's motion should clarify this point, but that clause states in its entirety:

> WHEREFORE, for the above reasons and those set forth in the incorporated memo of law, Plaintiff seeks an order excluding any evidence of or reference to the 510(k) clearance process at trial. …

Dkt. 6159 at 4.[1] Given Plaintiff's unwillingness to discuss the effect of the Court granting her motion, Cook is compelled to raise the issue with the Court. Cook submits that the Court's order barring evidence related to the 510(k) process requires the exclusion of testimony concerning the following portions of Dr. Kessler's report:

- Section II: ¶¶ 14, 15;
- Section III: ¶¶19-42, 68;
- Section IV: ¶¶73, Table 1, 74-77, 99-108;

---

[1] The "wherefore" clause also includes a footnote that states: "Voir dire on jurors' assumptions and attitudes regarding FDA 'approval' would still be appropriate, just as questioning is permitted into jurors' attitudes on insurance in trials where the existence of insurance is excluded."

- Section VI: ¶¶ 125-128, 131, 136, 151-156, 198 (first two sentences), 200, 203-204, 216(c) (second sentence), 234-236, 248, 277 (last two sentences), 279, 287, 290, 307-311;
- Section VII: All
- Section VIII: All
- Section IX: ¶ 343
- Section X (Conclusions): ¶¶ 359, 360, 365, 366

These paragraphs address the 510(k) process generally (Section II: ¶¶ 14, 15; Section III: ¶¶19-42, 68) and that process as applied to Cook's filters (Section IV: ¶¶73, Table 1, 74-77, 99-108; Section VII: All; Section VIII: ¶¶ 322-323, 327-329; Section X: ¶¶ 359-360, 365-366). The Court's order also excludes testimony concerning Cook's submission of information to the FDA during various stages of the 510(k) review process (Section VI: ¶¶ 125-128, 131, 136, 151-156, 198 (first two sentences), 200, 203-204, 216(c) (second sentence), 234-236, 248, 277 (last two sentences), 279, 287, 290, 307-311; Section VIII: ¶¶ 324-326, 330-334; Section IX: ¶ 343).

Given the Court's ruling that Cook may not present evidence of the reasonable care it exercised in the 510(k) process or the FDA's clearance of the Celect for sale in this country, the Court should also exclude Dr. Kessler's proposed testimony about what Cook did or did not submit to the FDA. As the *Cisson* court noted in upholding the exclusion of 510(k) evidence, one of the benefits of excluding such is to avoid a "mini-trial" about "whether Bard had in fact made all of the disclosures it should have made during the [510(k)] process." *Cisson v. C.R. Bard, Inc. (In re C.R. Bard, Inc.)*, 810 F.3d 913, 922 (4th Cir. 2016) (emphasis added). The Court therefore should not permit Plaintiff to present such evidence to the jury.

In addition, at many places in his report, Dr. Kessler makes comments about a 510(k) application or FDA clearance as part of a chronological timeline (e.g., Section VI: ¶ 289 ("[W]hile the Celect 510(k) application for retrievability was pending . . . "). Cook has not identified all those instances here, but the Court should prohibit Dr. Kessler from making any such references to 510(k) applications or FDA clearance in his testimony.

3

To be clear, Cook recognizes that the Court's order addressing evidence of the 510(k) process did not exclude *all* FDA-related documents.  Some FDA documents clearly will still be relevant to the claims and defenses in the case, including the FDA Guidance documents cited by Cook in its design documents (i.e., the 1999 FDA IVC Filter 510(k) Guidance), the 2010 and 2014 FDA Safety Communications, and FDA's discussion of known risks with IVC filters in other documents that are not part of Cook's 510k clearance letters.  These documents are relevant to general aspects of device design. If Dr. Kessler is permitted to offer his proposed testimony concerning adulteration, *see* section II below, the documents are also relevant to rebutting that testimony.

Finally, also with respect to Dr. Kessler, Cook notes that Plaintiff has withdrawn as a trial witness Dr. Rebecca Betensky—the statistician on whose calculations Dr. Kessler relies. Although Cook does not object to suspending its *Daubert* motion concerning Dr. Betensky for this case, Cook notes that a number of the arguments in its Betensky motion remain relevant to the motion to exclude Dr. Kessler's testimony about Dr. Betensky's statistics, including his use of her correlations to imply a causal relationship between the choice of a Celect filter and the relative likelihood that perforation will occur—a causal relationship that Dr. Betensky has said her figures do not support and that she views as a misuse of her calculations. Notwithstanding Plaintiff's withdrawal of Dr. Betensky as a witness, Cook submits that the Court must still consider those issues in addressing Cook's *Daubert* motion concerning Dr. Kessler.  In addition, depending on Dr. Kessler's actual testimony on the subject at trial, Cook reserves the right to offer at trial Dr. Betensky's deposition testimony about the limits of her work and the lack of any scientific basis to draw causal conclusions from her calculations.

## II. Misbranding and Adulteration Should Be Excluded Along With Plaintiff's Failure To Warn Claim.

Plaintiff's attorney stated at the September 25, 2017 hearing that despite the Court's ruling barring evidence about the FDA's 510(k) process, Plaintiff nevertheless still intends to offer Dr. Kessler's testimony about the purported "misbranding" and the claimed "adulteration" of the Celect IVC filter. In light of the Court's recent rulings (1) excluding section 510(k) evidence and (2) granting summary judgment on Plaintiff's failure-to-warn claim, the Court should exclude any proposed testimony concerning purported misbranding and adulteration of the Celect filter.

As a threshold matter, the Court's dismissal of Plaintiff's negligent failure-to-warn claim eliminates any arguable relevance that Dr. Kessler's misbranding and adulteration testimony might have had. As set forth in his report and his deposition, Dr. Kessler's proposed testimony about both misbranding and adulteration are based entirely on Cook's supposed failure to provide complete and accurate information to FDA or to physicians. *See* Kessler Rpt. at Dkt. 6156-1 paragraphs 47 ("labeling may be misbranded if it makes a misleading statement or fails to inform the consumer of facts that are relevant to those statements actually made"), 111-113 (adulteration), 246-249 (misbranding). For example, all of Dr. Kessler's misbranding opinions are centered around Cook's promotion and marketing communications to physicians, which Dr. Zuzga has expressly denied ever receiving or relying upon, much like the IFU. *See* Kessler Rpt. ¶¶ 43-48, 199 (bullet 6), 225, 246, 247, 249, 335, 338-340, 342, 344-346, 358, 361.[2] As to adulteration, Dr. Kessler offers extensive opinions about Cook's supposed misstatements about

---

[2] Such testimony and opinions are also irrelevant because, as the Court noted in its Order granting summary judgment on Plaintiff's failure-to-warn claim, Plaintiff's treating physician Dr. Zuzga did not review any of these materials prior to or as part of his treatment of Mrs. Hill. *See* Dkt. 6660 at pp. 4, 6-8.

5

the OUS Study in the IFU (1) given to the FDA as part of Cook's 510k, and (2) given to physicians with the Celect.

All of these allegations and opinions concern what Cook did nor did not tell FDA or doctors about the benefits and dangers of the Celect IVC filter; in other words, whether Cook provided adequate information, warnings, and instructions about the Celect. But the Court has granted summary judgment on Plaintiff's claim of negligent failure to warn and excluded evidence of Cook's 510(k), leaving Plaintiff with only design-based theories of recovery. Dr. Kessler's opinions about misbranding and adulteration are therefore irrelevant and inadmissible. *See* Fed. R. Evid. 401, 402. They are opinions in search of a theory to support, but the theory—failure to warn—is gone.

The Court should exclude Dr. Kessler's opinions about misbranding and about adulteration on other grounds as well. Most prominently, these opinions do not relate to any of the substantive elements of Plaintiff's remaining design claims. The Court has already dismissed Plaintiff's claim of negligence *per se* based on violation of FDA regulations, *see* Dkt. 6660, so the supposed violations of FDA regulations that Dr. Kessler alleges cannot themselves form the legal basis for any claim. Nor do the purported violations bear on or support either of the common law design theories remaining in the case, strict liability design defect and negligent design. For example, Dr. Kessler opines that the Celect is "misbranded" because "Cook omitted [from the IFU] what it had found in the study regarding perforation." Kessler Rpt. at 247. But even assuming Dr. Kessler's assertion were true—which it is not—it provides no support for Plaintiff's common law design claims. The omission of information from a product's IFU does not make the product's *design* defective or suggest a lack of reasonable care in the product's *design*. Viewed most generously, the testimony *might* provide

6

evidence of a failure to warn, but as noted above, the Court has already dismissed Plaintiff's failure-to-warn claim.

Likewise, Dr. Kessler asserts that Celect filter was "adulterated" because it "fell below the quality which it purported or was represented to possess." Kessler Rpt. para. 111. But again, even assuming Dr. Kessler were correct that the Celect fell below the quality it was "represented to possess," that conclusion in no way suggests that the product was defective in its *design*, nor does it suggest that Cook failed to exercise reasonable care in *designing* the filter. Dr. Kessler's conclusion, if believed, would merely mean that Cook had made a representation about the product that was not accurate. Again, Plaintiff might urge such evidence in support of a claim of misrepresentation or breach of express warranty, but those claims either are no longer or were never part of this case. In sum, Dr. Kessler's opinions about misbranding and adulteration simply have no bearing on Plaintiff's case. They are irrelevant under Rule 402 and would be confusing and unfairly prejudicial to Cook under Rule 403.

Cook expects that Plaintiff will try to defend Dr. Kessler's misbranding and adulteration evidence by citing *Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010), and particularly a comment by the *Bausch* court that "The evidence showing a violation of federal law shows that the device is adulterated and goes a long way toward showing that the manufacturer breached a duty under state law toward the patient." *Id*. at 557. But the *Bausch* decision did not address or decide whether the defendant breached a duty in the *design* of the device, and no Florida or 11th Circuit Court has held that testimony on adulteration is relevant to whether a product is defective in design under Florida law. Indeed, the procedural posture, the underlying facts, and the nature of the FDA violation at issue in *Bausch* all make clear that the *Bausch* court's comment does not support the admission of Dr. Kessler's misbranding and adulteration opinions in a case limited to design claims. Specifically:

7

1. Most obviously, the *Bausch* decision does not address misbranding at all, and Cook is aware of no authority suggesting that expert opinions concerning misbranding have any relevance to common law claims under Florida law. While adulteration deals with whether a medical device possesses the qualities it is represented to have, *see* Kessler Rpt. ¶ 111, misbranding addresses the *labeling* of a medical device, *id.* ¶ 47-48, which is a far cry from the design claims Plaintiff asserts here.

2. With respect to adulteration, the *Bausch* decision does not address the admissibility of opinion evidence about adulteration; indeed, the decision does not even address the merits of the plaintiff's substantive claims. The only issues in *Bausch* were whether the Food, Drug, and Cosmetic Act preempted the plaintiff's claim and whether the district court abused its discretion in denying the plaintiff leave to amend her complaint. *Id*. at 549. The court's comments about adulteration as "evidence" did not address the admissibility of such evidence, and in any event is dicta unnecessary to the decision in the case.

3. The *Bausch* court rejected federal preemption under *Lohr* based on its conclusion that the plaintiff's claim simply paralleled the existing federal requirement. *See id.* at 551. ("Nothing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements."). Here, in contrast, Plaintiff's remaining strict liability and negligent design claims do not "parallel" the misbranding regulations and the adulteration regulations on which Dr. Kessler bases his opinions. Dr. Kessler relies wholly on regulations concerning Cook's representations and communications, regulations that by no stretch of the imagination parallel any of the elements of Plaintiff's design-based claims.

4. In *Bausch*, FDA had made an *actual* finding that the defendant's medical device was adulterated because "the companies' manufacturing processes failed to comply with federal standards," and FDA had *actually* informed defendants that the product was adulterated *before* plaintiff was implanted with the medical device. *Id*. at 549. Moreover, the *Bausch* defendants later recalled a component of the medical device with the same catalogue number as the one implanted in the plaintiff. In contrast here, FDA has made no finding that the Celect is misbranded or adulterated, the Celect has never been recalled, and the Celect remains cleared by FDA, on the market, and in daily use by doctors. The only person talking about adulteration or misbranding is a retained expert whom Plaintiff has paid over half a million dollars for his opinions against Cook.

5. In *Bausch*, the ground for the FDA's adulteration finding matched the common-law theory on which plaintiff sought recovery. The adulteration finding was based on FDA's conclusion that "the companies' *manufacturing* processes failed to comply with federal standards," *id*. at 549 (emphasis added), while the plaintiff's common-law claim was based on "defective *manufacture*," *id.* at 553 (emphasis added). The adulteration thus related directly to the plaintiff's legal theory: both directly involved flaws in the defendants' manufacturing process. In contrast here, the FDA "violations" Dr. Kessler imagines relate to communications and representations, which have nothing to do with Plaintiff's design-based theories of recovery. Put another way, the *Bausch* court found no preemption because the plaintiff claimed that she could "prove that she was hurt by the manufacturer's *violation* of federal law." *Id*. at 550 (emphasis by the court). Here, Plaintiff could not have been "hurt by" the Cook violations of FDA regulations Dr. Kessler advances—even assuming they had

9

actually occurred—because those regulations had nothing to do with the filter design that she claims injured her.

6. Finally, the *Bausch* decision does not address the numerous cases applying Florida's prohibition of negligence *per se* claims based on claimed violation of FDA regulations. *See, e.g., McClelland v. Medtronic, Inc.*, No. No. 6:11–CV–1444–Orl–36KRS, 2012 WL 5077401, at (M.D. Fla. Sept. 27, 2012) (applying Florida law in medical device case, dismissing negligence *per se* claim that rely on alleged violations of the FDCA); *Blinn v. Smith & Nephew Richards, Inc.*, 55 F. Supp. 2d 1353, 1361 (M.D. Fla. 1999) ("The FDCA expressly prohibits private claims for violations of that statute, 21 U.S.C. § 337(a), strongly evidencing a legislative intent not to create a private cause of action."); *Stevens v. Danek Med., Inc.*, No. 95-14293-CIV-PAINE, 1999 WL 33217282 (S.D. Fla. Apr. 16, 1999) (same). Regardless of whether such claims are preempted by federal law—the issue in *Bausch*—Florida law clearly bars any claim of negligence based on a violation of FDA regulations, including the misbranding and adulteration regulations on which Dr. Kessler relies here. Indeed, the Court relied on just this line of cases in granting summary judgment on Plaintiff's negligence *per se* claims.

Finally, permitting Plaintiff to offer Dr. Kessler's testimony concerning claimed violations of FDA regulations on misbranding and adulteration would create exactly the same sort of "mini-trial" on FDA regulations that the Court sought to avoid in granting Plaintiff's motion to bar evidence of Cook's compliance with FDA's 510(k) process. As the Court will recall, Plaintiff's motion quoted the following passage from the *Cisson* decision that raised the specter of such a 510(k) mini-trial:

> [T]he court stated that bringing in such [510(k)] evidence would result in a "mini-trial" about (1) the strengths and weaknesses of the process and (2) whether Bard had in fact made all of the disclosures it should have made during the process. Bard's evidence would have initiated a battle of experts: Bard was prepared to characterize the review process as "thorough" and "robust" and the FDA's clearance of the Avaulta Plus as "an affirmative safety ... decision" based on "specific safety and efficacy findings." Cisson was prepared to argue, as she has done before this Court, that these characterizations wildly inflate the significance of the process, and that in any event Bard failed to make necessary disclosures to the FDA.
>
> [S]ubjecting the jury to many hours, and possibly days, of complex testimony about regulatory compliance could lead jurors to erroneously conclude that regulatory compliance proved product safety. In other words, having a "minitrial" could easily inflate the perceived importance of compliance and distract the jury from the central question before it—whether Bard's design was unreasonable based on any dangers it posed versus the costs required to avoid them.

Plaintiff's Memo. at 2 [Dkt. 6159] (quoting *Cisson v. C.R. Bard, Inc. (In re C.R. Bard, Inc.)*, 810 F.3d 913, 922 (4th Cir. 2016).

Plaintiff's intended presentation of Dr. Kessler's testimony concerning misbranding and adulteration under FDA regulations promises exactly the same type of "mini-trial" as Plaintiff urged would result from presentation of the 510(k) evidence the Court has excluded. The experts have drawn their battle lines:

- Plaintiff will present her expert Dr. Kessler's version of what FDA regulations say about misbranding and adulteration, and Cook will present its regulatory expert Harvey Pellerite's differing view of what the regulations provide and require.

- Plaintiff will present Dr. Kessler's opinions about what he believes Cook did and did not do in communicating with FDA and doctors about the Celect, and Cook employees will present contrary evidence concerning what Cook *actually* did.

- Finally, Dr. Kessler will opine that the Celect filter is adulterated and misbranded under FDA regulations, and Mr. Pellerite and Cook employees will testify to the their just-as-certain view that the Celect is neither adulterated nor misbranded—a view supported by

11

the fact that FDA itself has never found the product either adulterated or misbranded and permits it to remain available for physician use.

This is the same "battle of experts" over what FDA regulations say and what conduct violates them that prompted the *Cisson* court to endorse exclusion of both sides' proposed expert and company testimony on the 510(k) process, and that prompted this Court to follow suit. As in *Cisson*, such an expert mini-trial could improperly suggests an exaggerated role for FDA regulations and might suggest that violation of an FDA regulation may itself be a sufficient ground for liability—contrary to Florida law and this Court's order dismissing Plaintiff's claim of negligence *per se*. The Court should exclude Dr. Kessler's opinion that the Celect filter is adulterated and misbranded under those regulations.

Plaintiff's offer of Dr. Kessler's opinions concerning misbranding and adulteration under FDA regulations is a transparent attempt to evade this Court's rulings rejecting her claims based on failure to warn and negligence *per se*. Plaintiff wants the jury to conclude that because (in Dr. Kessler's view) the Celect was misbranded and adulterated under FDA regulations, the jury can find Cook liable. But at its core this argument relies on a warnings claim, and Plaintiff no longer has a warnings claim. Moreover, this elevation of FDA regulations to a standard of care enforceable under the common law is the definition of negligence *per se*, the very thing that Florida law and this Court rejected as a ground for recover. The Court should bar Plaintiff's attempted end-around the Court's prior rulings and should exclude Dr. Kessler's testimony about misbranding and adulteration.

**III.   Evidence that is not related to Plaintiff's claim for compensatory damages cannot support Plaintiff's punitive damage claim.**

Cook anticipates that Plaintiff may attempt to introduce at trial evidence of alleged Cook conduct that she claims support her claim for punitive damages, but that has nothing to do with

the design defect claim on which she bases her claim for punitive damages. With the Court's recent grant of summary judgment on Plaintiff's failure-to-warn claim, this risk becomes more acute, and Cook expects that Plaintiff will seek to offer evidence that would have been relevant only to her failure-to-warn claim under the pretext that such evidence is relevant to punitive damages. The Court should not admit such evidence.

The Due Process clause of the 14th Amendment bars any award of punitive damages based on evidence of conduct unrelated to the acts on which Plaintiff bases her claim for compensatory damages. The question for the jury on punitive damages is not whether Plaintiff can introduce evidence that shows that Cook is a "bad" company or engages in conduct that the jury might disapprover of; the question is whether the conduct that actually harmed Plaintiff meets the state-law standard for punitive damages. "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).

In *Campbell*, an action based on claim of bad-faith claims handling, the defendant insurer twice moved in limine to exclude evidence of its alleged conduct in unrelated cases in other states, and the trial court denied both motions. *Id*. at 414. Instead, the court permitted the plaintiffs to introduce extensive expert testimony regarding fraudulent practices by the insurer in its nation-wide operations, holding that such evidence was "'admissible to determine whether [insurer's] conduct in [this case] was indeed intentional and sufficiently egregious to warrant punitive damages.'" *Id.* at 415 (quoting *Campbell v. State Farm Mut. Ins. Co.*, 65 P.3d 1134 (Utah 2001)). This included evidence concerning the insurer's investigation of the personal life of one of its own employees and the manner in which the insurer's policies "corrupted its employees."

The Supreme Court found that a punitive damage award based on such evidence of conduct unrelated to the plaintiff's actual injuries was impermissible under the Due Process clause of the 14th Amendment.  The Court stated:

> For a more fundamental reason, however, the Utah courts erred in relying upon this and other evidence: **The courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages.** A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, but we have no doubt the Utah Supreme Court did that here. …. Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains. *Gore*, supra, at 593, 116 S.Ct. 1589 (BREYER, J., concurring) ("Larger damages might also 'double count' by including in the punitive damages award some of the compensatory, or punitive, damages that subsequent plaintiffs would also recover").

*Id*. at 422-23 (emphasis added).

As applied here, the *Campbell* holding requires that any evidence Plaintiff may offer in support of her punitive damage claim must relate to the Cook conduct that she claims injured her:  Cook's design of the Celect IVC filter.  As a corollary, evidence that does *not* relate to the Celect design—including both evidence relating to the Celect's warnings and instructions and more general evidence that Cook was supposedly a "bad company"—are irrelevant, and the admission of such evidence to support a claim for punitive damages would not only be error, but constitutional error.

Plaintiff's evidence concerning Cook conduct unrelated to product design is irrelevant to both Plaintiff's claim for compensatory and her claim for punitive damages, and the Court should bar any non-design-related evidence, including warning-related evidence and evidence purporting to show that Cook is a "bad company."  *See Homestate Cty. Mut. Ins. Co. v. Logicorp Enterprises, LLC*, No. 1:12-CV-1068-CAP, 2014 WL 12647766, at *2 (N.D. Ga. July 22, 2014)

("the evidence relevant to an award of punitive damages must be related to the alleged proximate cause of the collision") (*citing Highsmith v. Tractor Trailer Serv.*, No. 04–164, 2005 WL 6032882, *9, 2005 U.S. Dist. LEXIS 46156, *35 (N.D. Ga. November 21, 2005)).

Respectfully submitted,

Dated: October 9, 2017

/s/ Andrea Roberts Pierson
Andrea Roberts Pierson (# 18435-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com
E-Mail:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile:  (260) 460-1700
E-Mail:  stephen.bennett@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2017, a copy of the foregoing **COOK DEFENDANTS' TRIAL BRIEF** was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system. Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

/s/ Andrea Roberts Pierson

US.114178093