# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
 2               INDIANAPOLIS DIVISION

 3

 4  IN RE: COOK MEDICAL, INC.,      )
    IVC FILTERS MARKETING, SALES    ) Cause No.
 5  PRACTICES AND LIABILITY,        ) 1:14-ML-2570- RLY-TAB
    LITIGATION                      ) Evansville, Indiana
 6                                  ) September 25, 2017
                                    ) 9:13 a.m.
 7                                  )

 8

 9

10              Before the Honorable
                RICHARD L. YOUNG

11
           OFFICIAL REPORTER'S TRANSCRIPT OF
12                 MOTIONS HEARING

13

14

15  For Plaintiffs:          David P. Matthews, Esq.
                             MATTHEWS & ASSOCIATES
16                           2905 Sackett Street
                             Houston, TX  77098
17

18                           David C. DeGreeff, Esq.
                             WAGSTAFF & CARTMELL LLP
19                           4740 Grand Avenue, Suite 3000
                             Kansas City, MO  64112
20

21                           Matthew D. Schultz, Esq.
                             LEVIN PAPANTONIO THOMAS MITCHELL
22                           RAFFERTY & PROCTOR PA
                             316 S. Baylen Street, Suite 600
23                           Pensacola, FL  32502

24

25
```

```
 1                                      Joseph N. Williams, Esq.
                                        RILEY WILLIAMS & PIATT, LLC
 2                                      301 Massachusetts Avenue
                                        Indianapolis, IN  46204
 3

 4                                      Michael W. Heaviside, Esq.
                                        Julia Reed Zaic, Esq.
 5                                      HEAVISIDE REED ZAIC
                                        910 17th Street NW, Suite 800
 6                                      Washington, D.C.  20006

 7

 8
      For Defendants:                   Andrea Roberts Pierson, Esq.
 9                                      Jessica Benson Cox, Esq.
                                        FAEGRE BAKER DANIELS LLP
10                                      300 N. Meridian St., Suite 2700
                                        Indianapolis, IN  46204
11

12                                      Charles F. Webber, Esq.
                                        Bruce G. Jones, Esq.
13                                      FAEGRE BAKER DANIELS LLP
                                        90 S. 7th Street
14                                      Minneapolis, MN  55402

15
                                        John Joseph Tanner, Esq.
16                                      BAKER & DANIELS
                                        300 N. Meridian Street
17                                      Indianapolis, IN  46204

18
                                        Abigail M. Butler, Esq.
19                                      BAKER & DANIELS LLP
                                        111 E. Wayne Street, Suite 800
20                                      Fort Wayne IN  46802

21

22

23

24

25
```

```
 1  Court Reporter:              Margaret A. Techert
                                 United States District Court
 2                               101 NW Martin Luther King Blvd.
                                 Evansville, Indiana  47708
 3

 4

 5                PROCEEDINGS TAKEN BY MACHINE SHORTHAND
          TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|    |    |    |
|----|----|----|
|           | 1  | (In open court.) |
| 09:12:34  | 2  | THE CLERK:  All rise.  The United States District |
| 09:13:45  | 3  | Court for the Southern District of Indiana is now in session |
| 09:13:47  | 4  | pursuant to adjournment.  The Honorable Richard L. Young |
| 09:13:50  | 5  | presiding.  Court is in session.  Please be seated. |
| 09:13:53  | 6  | THE COURT:  Good morning.  We're here today in re: |
| 09:14:02  | 7  | Cook Medical, Inc., IVC Filters Marketing Sales Practices and |
| 09:14:02  | 8  | Products Liabilities Litigation, cause number MDL-2570.  We're |
| 09:14:10  | 9  | here today in anticipation of our trial beginning here in a |
| 09:14:16  | 10 | few short week weeks, October 23.  A number of motions have |
| 09:14:22  | 11 | been filed, motions in limine, Daubert motions, motions in |
| 09:14:27  | 12 | limine motions to strike.  The Court and staff have beenn busy |
| 09:14:32  | 13 | reading, as you have been busy writing, and we're trying to |
| 09:14:36  | 14 | get through this while also maintaining some semblance of |
| 09:14:40  | 15 | progress on our cases as well.  But hopefully we can make some |
| 09:14:46  | 16 | progress here today on letting you know what the Court thinks |
| 09:14:51  | 17 | about the motions that have been filed and give you some idea |
| 09:14:56  | 18 | as to how to prepare for presentation of your case. |
| 09:15:01  | 19 | So we have an omnibus hearing today on many motions |
| 09:15:05  | 20 | and also anything else you wish to discussion.  Here for the |
| 09:15:10  | 21 | plaintiff Ms. Hill, Dave Matthews. |
| 09:15:15  | 22 | MR. MATTHEWS:  Yes, Your Honor. |
| 09:15:15  | 23 | THE COURT:  Mr. Matthews, would you, for the record, |
| 09:15:17  | 24 | identify your table, please. |
| 09:15:19  | 25 | MR. MATTHEWS:  Yes; Dave DeGreeff, Matt Schultz, |

09:15:23  1  Julia Reed, Mike Heaviside, Joe Williams.

09:15:29  2          THE COURT:  Thank you.  And representing Cook, of

09:15:31  3  course, Andrea Pierson.

09:15:34  4          MS. PIERSON:  Good morning, Your Honor.  With me is

09:15:35  5  Chuck Webber, Joe Tanner and Bruce Jones.

09:15:39  6          THE COURT:  All right.  Great.  Welcome, everyone.

09:15:44  7  Have the attorneys, Mr. Matthews, Ms. Pierson, have you

09:15:48  8  discussed how you might want to proceed here today?

09:15:50  9          MR. MATTHEWS:  Yes, Your Honor.  We have been

09:15:52 10  exchanging kind of notes on how we thought we would proceed.

09:15:57 11  The plaintiffs thought that we would probably handle -- or

09:15:59 12  should handle the dispositive motions first.

09:16:02 13          THE COURT:  Okay.

09:16:04 14          MR. MATTHEWS:  Preemption motion, followed by the

09:16:06 15  motion for summary judgment, and then followed by the

09:16:11 16  assistant 510(k) motion, followed by the Daubert motions.

09:16:16 17  Obviously if the Court ruled in a certain direction, I think

09:16:17 18  it would give us more knowledge on how to proceed.

09:16:21 19          THE COURT:  Yes.  Absolutely.

09:16:22 20          MS. PIERSON:  If I may, Your Honor.  May I approach?

09:16:24 21          THE COURT:  You may.

09:16:25 22          MS. PIERSON:  Your Honor, we provided an agenda to

09:16:28 23  the Court and plaintiff last Tuesday.  It's attached here.

09:16:33 24          THE COURT:  Thank you.

09:16:34 25          MS. PIERSON:  Our approach is slightly different

09:16:37  1  than Mr. Matthew's.  Although it's true that the preemption

09:16:38  2  motion would dispose of all of the issues in the case, we

09:16:41  3  believe that it should be addressed with the other summary

09:16:43  4  judgment motions; and those motions are dependent, in part,

09:16:46  5  upon the Court's ruling on the Daubert motions.  So our

09:16:50  6  position had been and continues to be that the Court should

09:16:53  7  hear the Daubert motions first and then hear the motions for

09:16:57  8  summary judgment, and there's one from the plaintiff and a

09:16:59  9  couple from Cook.

09:17:01  10         Then at the end of the day, plaintiffs and I agree

09:17:04  11  that there were two motions that could be heard along today,

09:17:06  12  assuming we had time.  Sounds like we will have time.  That's

09:17:11  13  plaintiff's motion in limine that they call Cisson and the

09:17:14  14  defendant's motion to bifurcate punitive damages.  Because the

09:17:18  15  hearing today was set for Daubert motions and summary judgment

09:17:21  16  motions, we believe those should take priority and that

09:17:24  17  deciding the Daubert motions set the stage for the summary

09:17:28  18  judgment motions that are to come.

09:17:31  19         THE COURT:  We'll go ahead and hear the Daubert

09:17:33  20  motions first.  They were filed first.  And we'll proceed on

09:17:36  21  to summary judgment and other dispositive motions after that.

09:17:39  22  If I see your agenda here, Cook's motions.

09:17:46  23         MS. PIERSON:  Yes, Your Honor.  We'll begin with the

09:17:47  24  Daubert motion on Alexander Marmureanu, with your permission.

09:17:52  25         THE COURT:  Okay.

09:18:16  1          MS. PIERSON:  May it please, the Court.  Your Honor,

09:18:18  2     before we begin with Dr. Marmureanu and the motion to exclude,

09:18:22  3     I think on behalf of all the attorneys here, we'd just to

09:18:25  4     acknowledge the passing of Judge McKinney; and we know that

09:18:28  5     you and your staff and the other judges have been hit hard in

09:18:32  6     the last few weeks between the death of Judge Larue and the

09:18:36  7     death of Judge McKinney; and we extend our sympathy on behalf

09:18:41  8     of all the lawyers.

09:18:41  9          THE COURT:  Thank you.

09:18:41 10          MS. PIERSON:  Your Honor, the first motion before

09:18:43 11     court is the motion to exclude the testimony of Alexander

09:18:46 12     Marmureanu; and he is the plaintiff's causation expert in the

09:18:50 13     Hill case and he offers general opinions related to the IFU's.

09:18:54 14     I won't belabor the Daubert standard because the Court is well

09:18:58 15     aware of that.  Suffice it to say, the elements are very

09:19:01 16     clear.  His methodology is the issue and the question is:  Can

09:19:04 17     it be and has it been tested?  Is it subject to peer review?

09:19:08 18     Does it have a known or potential rate of error?  And is it

09:19:12 19     generally accepted in the relevant community.

09:19:14 20          *Myers* -- the 7th Circuit Court case of *Myers* and

09:19:17 21     also *Higgins*, an affirmation of one of your opinions, Your

09:19:20 22     Honor, sets out the standard for using a differential etiology

09:19:25 23     or differential diagnosis by medical doctors.  It's the means

09:19:29 24     by which they determine causation in the regular medical

09:19:33 25     practice and the way in which they're required to do it when

09:19:36  1   presenting their opinions to Court.

09:19:37  2          The *Myers* definition is in front of you.  It

09:19:40  3   requires a doctor to rule in all potential causes and then to

09:19:45  4   systematically rule those out.  And the 7th Circuit Court made

09:19:47  5   very clear in *Higgins* that that means not just saying that the

09:19:50  6   expert did it but that he must actually write it and include

09:19:53  7   it in his report.  A ruling in of all potential causes and a

09:19:58  8   systematic basis or criteria for ruling those causes out.

09:20:02  9          So I want to start first with Dr. Marmureanu's

09:20:06 10   qualification very briefly.  By his own admission,

09:20:08 11   Dr. Marmureanu is a thoracic surgeon.  That's a surgeon of the

09:20:12 12   chest.  He's not a surgeon with a specialty in the peripheral

09:20:15 13   vascular system.  And as it relates to vena cava filters, he's

09:20:19 14   not placed a vena cava filter since 2013.  In total over his

09:20:23 15   career, he placed 20 to 40, which means that at its height, he

09:20:27 16   placed maybe between two and four filters each year.  He

09:20:32 17   hasn't retrieved a vena cava filter in seven or eight years;

09:20:35 18   and in that case, did it only 25 times.  And he says if a

09:20:39 19   patient with a vena cava filter came to him with a

09:20:42 20   complication like that that Mrs. Hill suffers from, he would

09:20:45 21   send that patient to an interventional radiologist.

09:20:48 22          Plainly stated, the physicians who have expertise in

09:20:51 23   vena cava filters, their placement, their retrieval and

09:20:55 24   determining the genesis of complications, those are

09:20:58 25   interventional radiologists, interventional cardiologists and

09:21:03  1  vascular surgeons.  They're not thoracic surgeons.  It's not

09:21:05  2  his specialty.

09:21:07  3       You have said before in *Higgins* that a medical

09:21:09  4  degree alone does not qualify an expert to talk about all

09:21:12  5  topics related to medicine.  Yet Dr. Marmureanu claims not

09:21:16  6  only that he is the smartest person on the planet as it

09:21:20  7  relates to the Celect vena cava filter but that he is an

09:21:22  8  expert in all things, an expert in having an opinion.  But

09:21:25  9  *Cunningham* tells us he has to stay within the scope of

09:21:28 10  expertise; and even if he treated patients with vena cava

09:21:32 11  filters, that doesn't qualify him to opine on the genesis of

09:21:35 12  the cause of Mrs. Hill's perforation.

09:21:39 13       So let's turn to his methodology because this is

09:21:42 14  where the real problem lies with his proffered testimony.  The

09:21:46 15  7th Circuit Court said that a differential etiology requires

09:21:50 16  systematically ruling in and systematically ruling out all

09:21:53 17  possible causes, and the expert has to actually articulate

09:21:56 18  that in the report.  It can't leave it to guesswork for the

09:21:59 19  defendant or for the Court.  He must include obvious

09:22:03 20  alternative explanations.  He must explain his scientifically

09:22:08 21  valid decisions for ruling causes in and out.  And the mere

09:22:11 22  existence of a temporal relationship, she had a perforation

09:22:14 23  and she was hospitalized, that's not enough.

09:22:16 24       The expert also can't just extrapolate data and say,

09:22:20 25  "Here's a study.  Therefore, she had a perforation caused by

09:22:24  1  her filter."  He has to bridge the analytical gap and he has

09:22:27  2  to show in his report how he did that and the scientifically

09:22:31  3  valid basis through which he did it.  So we know that

09:22:35  4  Dr. Marmureanu didn't perform a differential diagnosis for a

09:22:37  5  few reasons.  One, it's not in his report.  Not in words and

09:22:41  6  not in deeds.  He doesn't in his report rule in any cause and

09:22:46  7  he doesn't rule out any cause, other than the design of the

09:22:50  8  filter.

09:22:50  9       Second.  When he was asked in his deposition, he

09:22:53 10  confirmed that he didn't use a differential diagnosis.  I

09:22:56 11  asked him, "Were there any other causes of the perforation of

09:23:01 12  Mrs. Hill's filter through the wall, any other causes that you

09:23:04 13  considered?"  And here's his answer, "No.  I think it's due to

09:23:08 14  poorly designed filter and probably too material."  That was

09:23:11 15  the beginning and the ending of his analysis.  He considered

09:23:14 16  no other possible causes.

09:23:16 17       I ask him again about that.  "What other potential

09:23:20 18  causes did you consider for the things she said she suffered

09:23:23 19  as a consequence of the perforation?"  And he said, "I don't

09:23:26 20  need to do a differential diagnosis because I see the

09:23:30 21  perforated filter."

09:23:30 22       So finally, when I presented him with the *Myers*

09:23:33 23  definition of deferential diagnosis and confirmed, "Is this

09:23:36 24  your methodology?  Is this what you tried to do?"  He agreed

09:23:39 25  that that was the proper methodology and he claimed that he

09:23:42  1   did it for every opinion that's in his report.  But we know

09:23:46  2   that's not accurate.  We know it's not accurate because from

09:23:49  3   his differential diagnosis, he reaches these broad

09:23:52  4   conclusions.  All filters are bad.  Filters don't work.

09:23:56  5   Filters have complications and Mrs. Hill had a complication.

09:23:59  6   And he alleges that he can conclude that she has all of the

09:24:03  7   conditions listed on the screen based on his methodology, and

09:24:07  8   that she will need future medical care five different times,

09:24:10  9   including anticoagulants and other therapies as a consequence

09:24:14 10   of her perforated vena cava.

09:24:17 11           We know that Dr. Marmureanu did not do a

09:24:20 12   differential diagnosis because he has not articulated any

09:24:24 13   causes he ruled in or the systematic means by which he

09:24:26 14   identified those.  We know he hasn't ruled any causes out in

09:24:30 15   his report or otherwise much less any criteria or systematic

09:24:34 16   basis for ruling them out.  He's failed to explain the how and

09:24:37 17   the why or any criteria for doing that.  So we know

09:24:41 18   Dr. Marmureanu didn't rule causes in in the first instance,

09:24:44 19   other than the design of the filter.  When he was asked this

09:24:47 20   question, he repeatedly could not identify any.  His analysis

09:24:52 21   was, there is a perforation, therefore she's hurt.  Without

09:24:55 22   any first step of what caused her perforation.

09:24:58 23           We know there are many different causes of

09:25:01 24   malpositioning of a filter and perforation of a filter; and

09:25:05 25   many of those causes he himself acknowledged in his

09:25:08  1   deposition.  I've put on the screen just six of those:

09:25:10  2   malpositioning of the filter on placement; anatomic

09:25:14  3   abnormalities like scoliosis and a curved spine; trauma to the

09:25:19  4   abdomen;, compromised caval tissues or changes in the shape of

09:25:23  5   caval area; the effects of a spinal surgery; and the

09:25:27  6   compression and moving of organs, including the vena cava,

09:25:30  7   during the surgery; and physiologic changes in the caval

09:25:34  8   diameter that makes the vena cava smaller so it's more likely

09:25:37  9   to become malpositioned or to perforate.

09:25:40  10          We know as it relates to her other injuries that he

09:25:42  11  also didn't rule in any causes.  Her chief complaint is that

09:25:45  12  she has abdominal pain and gastrointestinal issues.  I've

09:25:50  13  listed on the screen, Your Honor, four different causes.  You

09:25:53  14  don't even need a medical degree for most of these.  She could

09:25:56  15  have had a virus when she presented to the hospital in 2013.

09:26:00  16  She could have functional bowel disorder, which is what our

09:26:03  17  expert believes she has.  Her medical records show she was

09:26:05  18  diagnosed with lymphocytic colitis; and our gastrointestinal

09:26:08  19  expert, Dr. Baron explains why all of the symptoms that she

09:26:12  20  complains of today are likely from that.  And she also had an

09:26:16  21  altered micro balance in her stomach as a result of some other

09:26:20  22  conditions.

09:26:20  23          Those are four causes nowhere mentioned in

09:26:24  24  Dr. Marmureanu's report, not discussed.  He's not qualified to

09:26:27  25  rule them in and he can't rule them out.  And he ignores the

09:26:30  1  most plausible cause for the perforation of her filter through

09:26:33  2  a vena cava and her small intestine in the first place.  Our

09:26:37  3  experts explain, and the literature acknowledges, that where a

09:26:40  4  patient has an anatomic abnormality like a curved spine, that

09:26:44  5  the filter is -- and the filter is placed at the apex of that

09:26:48  6  curve, that your vena cava will not attach to your spine,

09:26:52  7  loosely tracks your spine.  So if your spine is curved,

09:26:55  8  frequently your vena cava is curved as well.  And here you can

09:26:59  9  see from Mrs. Hill's own images, this is the difference her

09:27:03 10  spine before her nine-hour procedure and after her nine-hour

09:27:07 11  procedure.  And from her own images, you can see the change in

09:27:09 12  the shape, the length, and the angle of her vena cava itself.

09:27:17 13          Our experts have explained that given that curve in

09:27:20 14  the first instance, when her filter is placed prior to the

09:27:24 15  spinal surgery, that it's likely that her vena cava filter was

09:27:28 16  touching the wall and became embedded as a result of right

09:27:31 17  away.  They also explain that when she had her spinal

09:27:34 18  procedure and her spine was straightened, that her vena cava

09:27:37 19  was both straightened and lengthened and that either the

09:27:40 20  procedure itself, or the effect of moving the vena cava when

09:27:43 21  it was attached to the wall but the vena cava itself was moved

09:27:46 22  and changed shape and position caused her perforation.

09:27:50 23          Those are two topics that the literature

09:27:53 24  acknowledges and that Dr. Marmureanu ignores.  He doesn't rule

09:27:56 25  it in.  His report is silent on that methodology completely.

09:28:02  1   Now, he says today that perforation caused her to have IVC

09:28:08  2   stenosis, gastrointestinal issues and vena insufficiency.  But

09:28:13  3   it stands in stark contrast to the fact that he acknowledges

09:28:16  4   that 99 percent of patients don't have those things and never

09:28:20  5   develop those things.  And I point this out not to suggest

09:28:22  6   that his conclusion is wrong but that his methodology is

09:28:26  7   flawed.  An expert cannot say it perforated and caused these

09:28:31  8   injuries without considering the 99 percent of people who, by

09:28:34  9   his own admission, don't have those injuries.

09:28:39 10          He today claims in plaintiff's response brief to

09:28:42 11   have ruled in these causes; trauma from a car accident, weak

09:28:45 12   IVC and other things.  You won't find those statements

09:28:49 13   anywhere in Dr. Marmureanu's report.  In fact, the only place

09:28:52 14   you'll find them is in the plaintiff's attorneys' response

09:28:55 15   brief.  But the fact of the matter is, even if they were

09:28:57 16   included, he hasn't laid out any criteria for identifying

09:29:00 17   those or determining that he looked at all plausible causes

09:29:04 18   and we know he didn't.  I just gave you five that come from

09:29:07 19   him, from the other medical doctors in the causes and from the

09:29:10 20   literature that aren't even on his list.  So he has no

09:29:13 21   reliable methodology also for ruling in the consequences of

09:29:18 22   the perforation.

09:29:19 23          As relates it relates to stenosis in particular of

09:29:21 24   her vena cava, he admits that there's no medical record that

09:29:24 25   diagnosis stenosis.  None.  That he reaches his conclusion on

09:29:28  1  stenosis based on an observation of narrowing of her vena cava

09:29:32  2  both immediately after her retrieval procedure and his

09:29:36  3  diagnosis based on recent imaging.  That's narrowing.  Not

09:29:40  4  stenosis.

09:29:40  5          He admits in his deposition that there are many

09:29:43  6  causes of narrowing that can appear on imaging totally

09:29:46  7  unrelated to a vena cava filter; breathing, pressure on the

09:29:50  8  vena cava and numerous others.  But setting that aside, all of

09:29:53  9  the injuries that he claims Mrs. Hill has flow from this

09:29:57 10  allegation that she has IVC stenosis; but he says people can

09:30:01 11  get stenosis of the vena cava without an IVC filter, with the

09:30:05 12  filter present that does not perforate, and with a perforation

09:30:08 13  that occurs for a short period of time and then is removed.

09:30:12 14  He has no ability to accurately rule in IVC stenosis from the

09:30:18 15  filter without ruling out the fact she had preexisting

09:30:21 16  narrowing, preexisting stenosis, or that she would have

09:30:25 17  stenosis even if everything had gone perfectly with her

09:30:28 18  filter.  He doesn't consider those things.  He can't rule them

09:30:30 19  in and so he can't rule them out.

09:30:32 20          His methodology for ruling in the Celect as a cause

09:30:36 21  of her small intestine or duodenal stenosis is equally flawed.

09:30:41 22  I think the main thing that I need to tell you here is, he

09:30:45 23  acknowledges that he cannot say she has duodenal stenosis to

09:30:48 24  any reasonable degree of medical certainty.  All of the

09:30:50 25  injuries that he alleges in her report related to her

09:30:53  1  gastrointestinal condition, they all come from her duodenum

09:30:59  2  completely and his report says she has duodenal stenosis; but

09:31:03  3  when pressed on that point in his deposition, he admitted that

09:31:06  4  he couldn't -- he couldn't eliminate her pre-existing medical

09:31:10  5  causes pre-existing duodenal issues and other abdominal

09:31:14  6  issues, and he admitted he couldn't say she had it from her

09:31:17  7  filter to a reasonable degree of medical certainty.

09:31:21  8      When we talk about venous insufficiency, another

09:31:25  9  injury that he alleges, again, he has no reliable methodology

09:31:28 10  for ruling in design as a cause.  The only basis for ruling it

09:31:32 11  in is based on an incidental touching of her feet and legs

09:31:36 12  when he helped her onto a table.  I asked him, "Did you

09:31:40 13  perform an independent medical exam?"  And he said, no, he

09:31:42 14  didn't.  I asked him the extent of the physical exam that

09:31:46 15  allowed him to diagnose swelling, which is all he's diagnosed;

09:31:48 16  swelling.  Nothing more.  And he said, "I was helping her onto

09:31:51 17  the table for imaging.  I touched her legs and said, 'they're

09:31:54 18  a little bit swollen.'"  And she said, "They're always

09:31:57 19  swollen."  Well, that's not a reliable basis for ruling in the

09:32:01 20  filter as a cause of her leg swelling.  Anything can cause leg

09:32:04 21  swelling; water retention, high blood pressure, which she has.

09:32:08 22  Any number of causes which he doesn't consider.

09:32:11 23      So then when we flip, Your Honor, to the other side,

09:32:14 24  causes ruled out.  We know that he did not systematically rule

09:32:18 25  out any possible causes of all of Mrs. Hill's injuries,

09:32:21  1  including her perforation and malpositioning of her filter

09:32:25  2  because it's not in his report and he didn't describe any

09:32:30  3  systematic basis for doing it.  They must be in his report and

09:32:33  4  *Higgins* requires they must be articulated with systematic,

09:32:36  5  repeatable criteria for doing that.  And he has none.  Weak

09:32:41  6  IVC and other surgeries is probably the best example.  In the

09:32:45  7  plaintiff's response they claim that he ruled out weak IVC as

09:32:47  8  a cause of the perforation.  But how?  Based on what?  And

09:32:51  9  what does weak IVC even mean to Dr. Marmureanu?  We can't tell

09:32:56 10  any of those things from his report because his report doesn't

09:32:59 11  ever show he ruled that out.

09:33:00 12          Same thing with other surgeries.  The response brief

09:33:04 13  said he considered other surgeries.  Noticeably absent from

09:33:08 14  the response brief is any claim that he actually ruled out

09:33:10 15  other surgeries, or what surgeries he ruled out and considered

09:33:14 16  in the first place.  She's had many surgeries, in addition to

09:33:18 17  two spinal surgeries.  He claims to have ruled out, through

09:33:21 18  his attorneys in the response brief, these other conditions

09:33:24 19  related to perforation; IVC stenosis, GI issues, venous

09:33:28 20  insufficiency and depression and anxiety.  But the bottom line

09:33:32 21  is that he never explains how he did that.  If he says he does

09:33:36 22  it based on the medical records, then he needs to cite the

09:33:40 23  medical records that allow him to do it.  But the fact of the

09:33:42 24  matter is, he says he rules out other causes because there's

09:33:46 25  no evidence or no mention of them in the medical records.

09:33:49 1          Your Honor, if that is his methodology, if that's

09:33:52 2 the criteria for how he systematically rules causes out, then

09:33:56 3 the design of the filter should be ruled out because you can

09:33:59 4 review all of Mrs. Hill's medical records and nowhere in there

09:34:03 5 does any treating physician or other professional suggest that

09:34:06 6 a defect in her filter caused her injuries.  That's not a

09:34:10 7 reliable criteria.

09:34:13 8          How do we know, what's the proof at the end of the

09:34:16 9 day that his methodology is unreliable?  The proof is this.

09:34:20 10 In his deposition he withdrew on the spot three opinions; a

09:34:25 11 need for lifetime anticoagulation, a need for lifetime proton

09:34:28 12 inhibitors and lymphedema therapy.  I asked him, "Why are you

09:34:34 13 ruling those out?  What's the criteria?"  He said, "I

09:34:36 14 rereviewed her medical records and she didn't need those,

09:34:40 15 hasn't needed those based on the medical records."  Well, that

09:34:43 16 was always the case.  He allegedly reached those opinions in

09:34:45 17 the first place to a reasonable degree of scientific

09:34:48 18 certainty; but on rereviewing the records, he eliminated them

09:34:51 19 simply by reading the same thing he had before.  She hasn't

09:34:55 20 needed those therapies, or any of the others that he claims

09:34:57 21 that she requires, since her filter was retrieved in 2013.

09:35:01 22          He also admits that five different opinions that

09:35:04 23 we've listed for you here, Your Honor, are not reached to a

09:35:07 24 reasonable degree of medical certainty.  Again, it's all about

09:35:10 25 methodology.  If, in his report, he said that "these are my

09:35:14  1  opinions and these are the things that I believe Mrs. Hill has
09:35:17  2  or needs," and then later, when questioned about them, says
09:35:21  3  "Well, I can't say that to a reasonable degree of scientific
09:35:25  4  certainty," that's not a methodology.

09:35:28  5      Other evidence is that we know his opinions and
09:35:30  6  methodology have not been peer reviewed.  They have not been
09:35:34  7  tested.  There's no known or potential rate of error.  It's
09:35:37  8  not been generally accepted in the scientific community and
09:35:41  9  it's not based on valid scientific decisions.  His
09:35:43  10  methodology, at best, is the lawyers handed me 300 complaint
09:35:48  11  reports about Cook filters.  I reviewed those to determine if
09:35:51  12  there was a serious injury and then I set those aside, and
09:35:55  13  then I reviewed the literature that the plaintiffs' lawyers
09:35:57  14  gave me and that their expert gave me, and then I reviewed
09:36:01  15  Mrs. Hill's medical records.  And from that review I reached
09:36:03  16  the conclusions that all filters are bad.  They shouldn't be
09:36:07  17  sold or given away.  This filter is related to high rates of
09:36:14  18  perforation or other complications, and Mrs. Hill was injured
09:36:17  19  as a consequence of the filter.

09:36:19  20      So it's pretty clear to me that there is no
09:36:22  21  methodology for any of Dr. Marmureanu's causation opinions.
09:36:26  22  And when you look at your report, while lengthy on both his
09:36:30  23  general report and his Hill specific report, there's no
09:36:32  24  articulated methodology, much less a systematic basis for
09:36:37  25  ruling in or ruling out causes.

09:36:38  1           So very briefly I want to touch on one more thing

09:36:42  2   related to his warnings opinions, Judge.  His general report,

09:36:44  3   the entire first report, is nothing but warnings.  And we've

09:36:48  4   explained in our briefing why he has no qualification to opine

09:36:51  5   on instructions for use and warnings related to filters.

09:36:56  6   Unlike the cases that the plaintiffs cited, Dr. Marmureanu

09:36:59  7   does not regularly writes IFU's for vena cava filters.  He

09:37:04  8   does not regularly read IFU's for vena cava filters and he has

09:37:08  9   no related training.  But the best way that I can show that

09:37:11  10  his methodology is flawed on the warnings claim, he has to

09:37:14  11  support the fact in order for plaintiffs to get to a jury.  He

09:37:18  12  has to support the fact that there's a defect in the warnings.

09:37:20  13  His report plainly states what I put on the screen, that the

09:37:24  14  IFU does not warn of the complication.  I asked him in his

09:37:28  15  deposition, "When your report says it does not warn of a

09:37:31  16  complication, that's what you meant, right?  That's what I

09:37:34  17  meant."

09:37:35  18          Our instructions for use for the Celect could not be

09:37:38  19  clearer.  Vena cava perforation is a warning.  It's there.

09:37:43  20  And in the plaintiff's response, the best they can say is that

09:37:47  21  he omitted it.  He doesn't mention it.  He ignores that the

09:37:52  22  central issue in this case is clearly included in our

09:37:54  23  instructions for use.  He's not critical of the language.

09:37:57  24  He's not saying it should have been stated differently or

09:38:00  25  should have included other information to doctors or it's in

09:38:02  1  the wrong place.  In fact, he told me by deposition he didn't

09:38:05  2  have any opinions as to what language should be included.  He

09:38:08  3  plainly missed the fact that the warning is there.

09:38:10  4          In contrast, another warning relevant to Mrs. Hill

09:38:13  5  is occlusion or thrombosis.  It's also in our IFU.

09:38:19  6  Dr. Marmureanu is not critical of that warning, has no

09:38:22  7  opinions about that warning and the words are plainly there.

09:38:24  8  By the same token, the same methodology he's critical of

09:38:29  9  perforation.  It doesn't make any sense.  That's because it's

09:38:31 10  not reliable.

09:38:33 11          The plaintiffs allege this frequency and severity is

09:38:35 12  the real issue and that our warnings should have included

09:38:38 13  information by frequency and severity of perforation.  With

09:38:42 14  two points on that, Your Honor.  First, Dr. Marmureanu doesn't

09:38:47 15  offer that opinion anywhere in his report.  You can't find it

09:38:50 16  in his report.  You can't find it in his deposition.  Nowhere.

09:38:52 17  This is a theory made up by the plaintiff's lawyers, not by

09:38:56 18  the experts they proffer.

09:38:58 19          Second, when I asked him explicitly, "Do you have

09:39:00 20  any opinions about the specific language that should be

09:39:02 21  included?"  He says said no.  And the reason that he can't

09:39:06 22  offer that opinion is that he also told us during his

09:39:08 23  deposition that he does not know the rates of complications

09:39:11 24  for the Celect or for any other filter on the market.  So he'd

09:39:16 25  be the wrong person, as he says, to opine on what a warning

09:39:19  1   should say, even if it should say something different, because

09:39:22  2   he doesn't know how frequently the complication occurs, if it

09:39:25  3   occurs at a rate that's significant enough that it should be

09:39:28  4   added to the instructions for use, or what language should be

09:39:31  5   used that physicians would interpret in a way to reach a

09:39:35  6   different result.

09:39:36  7          And when we get to the motion for summary judgment,

09:39:38  8   we'll explain why, based on the testimony of Dr. Zuzga,

09:39:41  9   nothing different in the warning would have changed his

09:39:46 10   decision to prescribe the filter.  We've articulated in our

09:39:47 11   brief why Dr. Marmureanu is not qualified to talk about

09:39:52 12   engineering topics.  High school classes on engineering don't

09:39:55 13   cut it.  He's not an engineer.  We've also articulated that

09:39:56 14   there are no fit for his opinions.  They will not assist the

09:40:01 15   jury.  They don't fit the facts of Hill because he ignores key

09:40:05 16   facts about her anatomy and her spinal procedures.  They don't

09:40:09 17   fit the facts of Hill because he's performed no differential

09:40:13 18   diagnosis; and they don't fit the facts of Hill because he

09:40:15 19   hasn't reached the opinions to a reasonable degree of medical

09:40:17 20   certainty.

09:40:18 21          His warnings' opinions also don't fit the facts of

09:40:21 22   Hill.  They ignore the actual language in the Cook Celect IFU.

09:40:26 23   They had no extra expert analysis beyond whether the words

09:40:30 24   appear on the page or don't appear on the page.  And his

09:40:33 25   opinions on Cook's complaint files and Cook documents are not

09:40:37 1  expert.  He's looked at Cook documents and regurgitated the

09:40:41 2  contents.  That's not expert opinion.

09:40:44 3          Ultimately, his opinions are conjecture and they're

09:40:47 4  largely outside the scope of his expertise.  They won't assist

09:40:51 5  the jury and as we've explained on the screen, Your Honor,

09:40:53 6  there are six reasons that they won't.  They're reciting

09:40:57 7  internal company documents is not expert under 7th Circuit

09:41:00 8  law.  That complaint files were not analyzed using any

09:41:04 9  cognizable methodology.  He can't perform a differential

09:41:08 10  diagnosis on those because they lack medical information.

09:41:10 11  They're about ten pages long.  They recite that the complaint

09:41:13 12  was reported to Cook.  There's no other detail in them to

09:41:17 13  allow a physician reliably to rule in or out causes for those

09:41:21 14  complaints because they don't contain patient history.  They

09:41:24 15  don't contain patient follow-up or any other information.

09:41:26 16  It's simply the report to Cook that a plaintiff had a

09:41:29 17  complication.  And as I said earlier, he hasn't reached these

09:41:33 18  opinions to a reasonable degree of medical certainty.

09:41:36 19          Finally, Dr. Marmureanu performs no risk benefit

09:41:40 20  analysis and no analysis of efficacy of the filters, and this

09:41:43 21  will be important when we get to our motion for summary

09:41:45 22  judgment.  You can search his report front to back, his four

09:41:49 23  reports, and you will never find an analysis of the risk

09:41:53 24  benefits or of consumer expectation in Dr. Marmureanu's

09:41:57 25  reports.  And there's one key reason why, Judge.  He doesn't

09:42:01  1  believe filters have any benefits.  He didn't look for the

09:42:03  2  benefits.  He didn't research the benefits.  He didn't even

09:42:06  3  try to come up with a list.  He reviewed complaint files and

09:42:09  4  cherry-picked documents by the plaintiffs and concluded all

09:42:13  5  filters are bad based on Cook documents about the Celect and

09:42:17  6  the Tulip.  That's the extent of his analysis.

09:42:20  7          You can't do a reliable risk benefit analysis or

09:42:24  8  consumer expectation test unless you truly look at all of the

09:42:28  9  information.  We know he looked at no benefits and we know he

09:42:31 10  that said very clearly he does not know the extent of any risk

09:42:36 11  associated with any filter, including the Celect.  He just

09:42:40 12  didn't bother to look.

09:42:41 13          Ultimately, opinions not contained in his report

09:42:44 14  should be excluded as well.  He has a tendency to add in

09:42:49 15  things.  Add in opinions about nephrology in the Gage case,

09:42:53 16  for example.  Add in things about Mrs. Hill's -- for example,

09:42:56 17  having ruled out surgeries.  If that's what he's going to say

09:43:01 18  on the stand, what the plaintiffs claim in their response,

09:43:04 19  that's not in his report.  Risk benefit analysis is not in his

09:43:06 20  report; and he certainly should not be permitted to go beyond

09:43:09 21  the confines of his report.

09:43:11 22          So for these reasons, Your Honor, we respectfully

09:43:13 23  request that you exclude the testimony of Dr. Alexandra

09:43:18 24  Marmureanu.

09:43:18 25          THE COURT:  Thank you.  Mr. Matthews?

09:43:23  1              MR. MATTHEWS:  Yes.  Good morning, Your Honor.

09:43:24  2              THE COURT:  Good morning.

09:43:24  3              MR. MATTHEWS:  David Matthews for the plaintiffs.

09:43:25  4              THE COURT:  Ms. Pierson doesn't think much of

09:43:28  5  Dr. Marmureanu's report.

09:43:30  6              MR. MATTHEWS:  Yes.  And I was there for the two

09:43:32  7  days of deposition for Dr. Marmureanu that Ms. Pierson took in

09:43:37  8  California, and there were a lot of questions asked in various

09:43:40  9  fields of expertise; and Dr. Marmureanu, I think, testified to

09:43:44  10  the best of his ability that he does have knowledge in many

09:43:48  11  areas of the human body, both anatomy and physiology.  There's

09:43:52  12  no doubt he did.

09:43:52  13              THE COURT:  Well, his report and his deposition were

09:43:54  14  interesting reading.

09:43:56  15              MR. MATTHEWS:  It was; and sorry for the length but

09:43:59  16  we were just presenting him.

09:44:02  17              THE COURT:  No apology necessary.

09:44:04  18              MR. MATTHEWS:  Here's the difficulty with

09:44:06  19  Dr. Marmureanu.  As you might recall, the defendants

09:44:08  20  complained --

09:44:09  21              THE COURT:  Is he really the smartest guy in the

09:44:11  22  world in these areas?

09:44:13  23              MR. MATTHEWS:  I would say that what he is, he's

09:44:16  24  board certified general surgeon and he's a board certified

09:44:20  25  thoracic surgeon.  But we're only presenting him for two areas

09:44:25  1  and that is the IFU and the adequacy of the IFU, which is

09:44:29  2  intended for doctors just like him.  He's a general surgeon,

09:44:33  3  which those surgeons focus on the abdomen, the esophagus, the

09:44:36  4  stomach, the small bowel, the liver, the pancreas and the

09:44:41  5  duodenum, the exact area where Ms. Hill was injured.

09:44:45  6          We have limited our experts because the defendants

09:44:48  7  asked us to.  As you recall, the Court said, "You should work

09:44:51  8  together to limit the experts."  We have done that.  If

09:44:56  9  Dr. Rajebi, our interventional radiologist would want to

09:44:59 10  testify about causation of injuries, they would say, "What

09:45:02 11  does he know about the abdomen?  What does he know about the

09:45:05 12  duodenum?  He's an interventional radiologist and applies and

09:45:10 13  implants devices.

09:45:11 14          So he is also -- Dr. Marmureanu is also a board

09:45:16 15  certified cardiothoracic doctor; meaning that he works the

09:45:24 16  heart, lungs, esophagus and he does open procedures on the

09:45:28 17  vasculature.

09:45:30 18          THE COURT:  You indicated that he makes some

09:45:31 19  opinions during such a lengthy deposition and throws out his

09:45:41 20  thoughts about things.  If something's not in his report, you

09:45:45 21  can't testify to it, right?

09:45:47 22          MR. MATTHEWS:  I think that's true -- generally

09:45:48 23  true.  Now, there may be an area that he amplifies from his

09:45:53 24  report that's asked about that was not specifically in his

09:45:56 25  report.  But in his report Ms. Pierson said he did not do a

09:46:00  1   differential diagnosis.  He says it multiple times in the

09:46:05  2   deposition.  The report is lengthy talking about her prior

09:46:07  3   duodenitis, her prior gastritis, her prior problems and the

09:46:11  4   proximity to the injury that we have simply don't apply.  And

09:46:17  5   I don't really have to go much further than look at the

09:46:19  6   medical records that he quotes and says there is evidence

09:46:23  7   that -- from the medical records that the epigastric

09:46:28  8   discomfort -- and I'm reading from medical record -- is likely

09:46:30  9   related to the post procedure inflammation from removal of the

09:46:35 10   IVC filter from the duodenum.

09:46:36 11          He's not making a stretch here on causation.  He

09:46:40 12   is -- has ruled out -- he looked at 37 sets of medical

09:46:44 13   records, every one; and went through in detail in the medical

09:46:48 14   record and in his report ruled out other causes.  So to say he

09:46:53 15   didn't do a differential diagnosis is simply not true and that

09:46:56 16   is within his report and he testified to it in deposition.

09:47:01 17          Is he an expert in all fields?  No.  It's hard,

09:47:04 18   though, when you ask a doctor who does general surgery, "Do

09:47:08 19   you have expertise in radiology?"  Well, he looks at radiology

09:47:12 20   every day.  I'm not going to ask him to be an expert in every

09:47:18 21   area of medicine.

09:47:20 22          THE COURT:  He's certainly not unique in that.  No

09:47:22 23   question.  You don't have to go any further.

09:47:25 24          MR. MATTHEWS:  All right.  He has placed filters.

09:47:27 25   He has not placed them in some time since 20 -- I think '10 or

09:47:31  1  '11 since he really figured out that they, No. 1, did not help

09:47:37  2  and there was a great deal of adverse events with them.  He

09:47:41  3  stopped using them.  I think the defendants wants to say,

09:47:43  4  "Well, he doesn't even use them anywhere.  So he can't be an

09:47:46  5  expert in the case."  I think just the opposite.  He has seen

09:47:49  6  the effects of filters.  He has had to remove filters.  He has

09:47:52  7  had to do complicated removals.  He has had to do open

09:47:56  8  procedures and he's testified to that in his deposition.

09:47:59  9          He is not going to be testifying outside of the area

09:48:02 10  of what a doctor such as himself needs to see in an

09:48:06 11  instruction for use and this is what it looks like.  It's a

09:48:09 12  small packet of ten pages.  They talk about what a doctor

09:48:13 13  needs to know.  And Ms. Pierson said that they warn about

09:48:17 14  perforation.  In fact, it's not in the warning section.

09:48:21 15  There's typically three sections in an IFU; the warnings, the

09:48:24 16  precautions; and then the potential adverse events is the only

09:48:28 17  place that is in the IFU.  Meaning, there's nothing that a

09:48:31 18  doctor would know that this could actually not just perforate

09:48:34 19  the IVC but also entangle and injure adjacent organs, as it

09:48:40 20  did with Ms. Hill.

09:48:41 21          We know that the strut went all the way through and

09:48:45 22  through her small intestine, her duodenum.  So there's no way

09:48:48 23  and Dr. Zuzga's testified, "I had no idea that could happen

09:48:52 24  and I did not expect that to happen."  So that is clearly he

09:48:56 25  was not warned and specific to this case; but Dr. Marmureanu,

| | | |
|---|---|---|
| 09:49:02 | 1 | a doctor that uses these filters, will testify that that IFU |
| 09:49:06 | 2 | is inadequate. |
| 09:49:07 | 3 | Now, if he's not a doctor and he's an engineer that |
| 09:49:11 | 4 | puts in an IFU together, the defendants would say, "Well, he's |
| 09:49:13 | 5 | not a doctor.  What would he know about what a doctor needs to |
| 09:49:17 | 6 | know or what a doctor needs to be warned about concerning the |
| 09:49:21 | 7 | risks of a filter or any medical device, for that matter." |
| 09:49:25 | 8 | He will discuss the injury to her.  He will discuss |
| 09:49:31 | 9 | the medical records he has reviewed.  The jury -- he certainly |
| 09:49:35 | 10 | does know about this area of the body.  He has a great deal of |
| 09:49:41 | 11 | information about foreign body reaction and the inflammation |
| 09:49:46 | 12 | of the injury site, similar to the doctors that treated |
| 09:49:49 | 13 | Ms. Hill.  He does operate on the bowel, the intestines and |
| 09:49:55 | 14 | specifically the duodenum. |
| 09:49:55 | 15 | We're talking about qualifications, his methodology. |
| 09:49:59 | 16 | His qualifications are that he is a general -- board certified |
| 09:50:02 | 17 | general surgeon and board certified cardiothoracic surgeon who |
| 09:50:06 | 18 | operates on the vasculature. |
| 09:50:08 | 19 | In terms of methodology, he has said and read all of |
| 09:50:12 | 20 | the medical records, all of the internal documents, as well as |
| 09:50:15 | 21 | other 300 complaint files concerning injuries that were in the |
| 09:50:19 | 22 | complaint files of the defendant; and he has done a full |
| 09:50:25 | 23 | differential diagnosis with Ms. Hill and will testify on very |
| 09:50:29 | 24 | specific areas.  The fact that they asked him about what he |
| 09:50:31 | 25 | has for engineering, I'm not going to be -- we're not going to |

09:50:34 1   be asking questions about engineering concepts; but yet, as a

09:50:39 2   doctor, he has to look at that IFU to see if it's sufficient

09:50:42 3   and whether this doctor was sufficiently warned, Dr. Zuzga.

09:50:50 4        MS. PIERSON:  Briefly respond, Your Honor.  Just

09:50:56 5   briefly, Judge.  What I heard Mr. Matthews say just now is

09:50:59 6   that Dr. Marmureanu's effectively withdrawn as a causation

09:51:03 7   expert for Mrs. Hill.  His first words are, he would only be

09:51:07 8   offered on the IFU and the adequacy of the IFU.  And in our

09:51:12 9   view, we should be entitled to summary judgment right now as a

09:51:15 10  consequence of that.  Dr. Marmureanu is the only expert who

09:51:19 11  has reviewed Mrs. Hill's medical records and who offers any

09:51:23 12  opinion about Mrs. Hill in particular.  As we've said in our

09:51:26 13  motion for summary judgment, even then his testimony only

09:51:29 14  supports a correlation, not causation.  But Mr. Matthews

09:51:35 15  admission currently that he will only ask Dr. Marmureanu to

09:51:38 16  opine on the IFU and the adequacy of the IFU is the beginning

09:51:42 17  and ending of this case on our motion for summary judgment.

09:51:45 18  And we'll address that more when we get to the motion itself.

09:51:48 19       But there are really three points that I just want

09:51:51 20  to remind the Court of and hammer home.  First, 7th Circuit

09:51:55 21  law cannot be clearer.  If an opinion is not in an expert's

09:51:59 22  report, it is not admissible.  You can search for differential

09:52:03 23  diagnosis through all of his three reports and you will never

09:52:06 24  see those words.  And in addition, you can search for any of

09:52:09 25  the tenets of that, ruling causes in, ruling causes out.  Even

09:52:14  1   if he didn't use the buzz words, you can search for what it

09:52:17  2   means and you won't find that anywhere in his report; and

09:52:20  3   that's because he didn't do it.  When I asked him about it,

09:52:23  4   before I showed him the *Myers* definition, it was clear.  He

09:52:26  5   didn't perform a differential diagnosis, even being shown the

09:52:31  6   *Myers* definition.  He admitted he didn't do a differential

09:52:34  7   diagnosis.

09:52:34  8           THE COURT:  He reviewed all of her medical records,

09:52:36  9   right?

09:52:37  10          MS. PIERSON:  That's right.

09:52:38  11          THE COURT:  And went through, I guess, very

09:52:45  12  thoroughly all those medical records.  What else did he need

09:52:50  13  to do?

09:52:51  14          MS. PIERSON:  Let's assume that he reviewed all the

09:52:53  15  records and reviewed them thoroughly.  He needed to go out and

09:52:56  16  search the literature and whatever resources medical doctors

09:53:00  17  would ordinarily look at and determine, when you have a

09:53:03  18  patient who has a malpositioned filter or a perforated filter,

09:53:08  19  what are all the potential causes that are noted in the

09:53:11  20  literature?  Or if he were actually practicing in the

09:53:15  21  specialty, which he's not, he might know some of that based on

09:53:18  22  his own experience and training.

09:53:19  23          In the medical literature we know that filters get

09:53:23  24  malpositioned and they perforate based on the way that they're

09:53:26  25  placed in the first place by the physician.  We know that

09:53:29  1   there's a tendency for them to be malpositioned and to

09:53:32  2   perforate if the patient has an abnormality -- an anatomic

09:53:37  3   abnormality, which Mrs. Hill had.  We know that there can be

09:53:39  4   compromised caval tissues caused by deficiencies in nutrition

09:53:43  5   caused by the contraction of the cava from other medical

09:53:46  6   conditions.

09:53:47  7          That list that I gave you earlier, Your Honor -- and

09:53:49  8   I'll hand up my PowerPoint so you've got it, on page 16 you'll

09:53:54  9   see these are other plausible, likely causes of malpositioning

09:54:00 10   and perforation that he didn't consider.  They're not on the

09:54:03 11   list.  That's the problem with just looking at the medical

09:54:06 12   records.  A doctor can only see what's in the records based on

09:54:09 13   the records, right?  So he would not know to consider anatomic

09:54:13 14   abnormalities unless it said in the record, "She has an

09:54:17 15   anatomic abnormality that caused her filter to perforate."  He

09:54:20 16   has to have expertise and do research that allows him to

09:54:24 17   identify all the plausible causes of the condition she

09:54:28 18   suffered and then apply that analysis to her medical records.

09:54:31 19          He's gone about this backwards, completely

09:54:34 20   backwards, and that's why he misses it.  And the obvious

09:54:38 21   example of why his methodology is wrong is if you look at his

09:54:42 22   claim of the only cause he ruled in was the filter and

09:54:45 23   something about the design of the filter; but you can search

09:54:48 24   her medical records and nowhere in her medical records do they

09:54:52 25   suggest that there's a problem with the design of the filter.

09:54:54  1          So then what other basis did he have to rule in

09:54:56  2  filter design?  Well, he went out and looked at literature

09:55:00  3  given to him by the plaintiff's lawyers given to them by their

09:55:03  4  experts, and there is a correlation observed in a portion of

09:55:06  5  that literature.  He ignores all the good literature and he

09:55:10  6  ignores the fact that the literature that he does cite doesn't

09:55:13  7  support causation.  Classic example.  In his Hill report he

09:55:17  8  cites the *Zhou* study and says, "Look at *Zhou*.  Zhou has a 13

09:55:22  9  percent organ perforation rate with the Celect.  That means 87

09:55:24 10  percent of people did not have organ perforation and of the

09:55:29 11  13 percent who did, less than one percent of those patients

09:55:32 12  were symptomatic."  So now if he tries to apply that one study

09:55:36 13  to Mrs. Hill's case, there's no fit, right?  Eighty-seven

09:55:39 14  percent of the time, based on that study, there's no organ

09:55:42 15  perforation at all; and in 99 percent of the time, people

09:55:45 16  don't have any of the medical complications that she alleges.

09:55:49 17          The analytical gap is too great and that's because

09:55:53 18  he doesn't start with a reliable basis for identifying all

09:55:57 19  plausible causes and then systematically try to rule those

09:56:00 20  out.  That's *Higgins* as you articulated it.  *Higgins* as the

09:56:05 21  7th Circuit affirmed it.  That's the *Myers* case and there's

09:56:08 22  one other case that I had personal experience with and I feel

09:56:12 23  like it does a great job of laying out that issue and that's

09:56:14 24  the *Jones* case.  In the *Jones* case, Judge Pallmeyer went to

09:56:18 25  great detail to go through 7th Circuit law since *Myers* and

09:56:23 1   *Higgins* and explain the very fine line --

09:56:27 2            THE COURT:  I notice in some of your filings that

09:56:29 3   *Zimmer* appeared.

09:56:32 4            MS. PIERSON:  It is.  It is.  It holds a special

09:56:34 5   place in our heart but the analysis there is very solid and

09:56:39 6   it's worth reading.  I'd say one other thing, Your Honor.  The

09:56:44 7   warnings opinions that Mr. Matthews says that Dr. Marmureanu

09:56:49 8   will proffer, he still has to prove and offer testimony on the

09:56:52 9   fact that there is a defect in the warnings and that the

09:56:56 10  defect in the warnings caused Mrs. Hill's injuries.  We'll

09:56:59 11  explain, when we argue summary judgment, why they can't get

09:57:03 12  there on that point.  But the bottom line is it's not enough

09:57:05 13  for an expert to say, "I read your warnings and it does not

09:57:09 14  warn of X," fill in the blank.  That's not a proper

09:57:13 15  methodology.

09:57:13 16           And even if it were, we know it's not a methodology

09:57:17 17  that can be tested or subjected to peer review and we know it

09:57:20 18  has a high rate of error because you take the very example

09:57:23 19  that I gave you.  The warning says vena cava perforation.  It

09:57:26 20  says damage to the vena cava.  Dr. Marmureanu's report and

09:57:30 21  deposition were, you do not warn of perforation.  Period.

09:57:34 22  There's no analysis of anything else.  No suggestion that we

09:57:37 23  needed any other words.  This whole concept --

09:57:40 24           THE COURT:  So you're saying that the consumer here,

09:57:42 25  the doctor, needs to read the IFU as a whole, not just in

09:57:47  1  sections as Mr. Matthews had indicated.

09:57:50  2          MS. PIERSON:  He needs to read the IFU as a whole

09:57:52  3  but he didn't even read it in sections, Judge.  He offers no

09:57:56  4  criticisms about the IFU itself.  None.  If you look at his

09:58:00  5  report, his general report, he says, here's literature noting

09:58:06  6  perforation.  Cook's IFU does not warn of perforation.  If you

09:58:10  7  look at the complication of migration, here's literature

09:58:13  8  noting migration.  Cook does not warn of migration.  But in

09:58:16  9  fact, we do plainly warn of perforation.  There's no mention

09:58:19 10  of that, no discussion of it, no analysis, no suggestion that

09:58:22 11  there need to be different words, that it needs to be in a

09:58:25 12  different place, that it needs to be in a box or anything

09:58:28 13  else.  Nothing.

09:58:30 14          And when you come to the complication of thrombosis,

09:58:33 15  which is the main injury that they're expert Dr. Marmureanu

09:58:37 16  says Mrs. Hill suffers from, we plainly warn of the risk of

09:58:42 17  thrombosis or occlusion; and he apparently has no criticisms

09:58:45 18  of that.  Again, it's not about his conclusions.  It's about

09:58:48 19  his methodology.  His methodology for addressing the warning

09:58:52 20  should have included looking at other instructions for use for

09:58:56 21  filters.  It should have included using filter instructions

09:59:00 22  for use and applying those in his practice, if not having

09:59:03 23  drafted those.  And there's a *Zimmer* opinion that the

09:59:06 24  plaintiffs cite to where Judge Pallmeyer ruled that a

09:59:09 25  physician could talk about the instructions for use.  But the

| 09:59:11 | 1 | key difference there was that physician read instructions for |
| 09:59:15 | 2 | use about knee implants every day in his practice.  His |
| 09:59:18 | 3 | testimony that he read the exact kind of instructions for use |
| 09:59:22 | 4 | that the defendant used and that other companies used, too. |
| 09:59:25 | 5 | Dr. Marmureanu can't say that here.  He doesn't |
| 09:59:27 | 6 | compare our warnings to anybody else's warnings.  He doesn't |
| 09:59:31 | 7 | suggest any specific language that should have been different. |
| 09:59:33 | 8 | So we can't say that there's a defect in the warnings.  And we |
| 09:59:36 | 9 | know he can't say that there's causation, even if you assumed |
| 09:59:40 | 10 | that he had a reliable methodology for suggesting there's |
| 09:59:43 | 11 | something wrong with our warnings.  He can't say there's |
| 09:59:46 | 12 | causation because the doctor didn't read them, and we'll get |
| 09:59:49 | 13 | to them in our motion for summary judgment.  But Florida law |
| 09:59:52 | 14 | and the physician's testimony are absolutely clear.  Nothing |
| 09:59:55 | 15 | different in the warning would have changed Dr. Zuzga's |
| 10:00:00 | 16 | decision making.  Nothing.  He said today, even knowing |
| 10:00:02 | 17 | everything the plaintiff's lawyers say about the Celect, he |
| 10:00:06 | 18 | would still choose the Celect for Mrs. Hill and he wouldn't |
| 10:00:08 | 19 | change anything about her treatment. |
| 10:00:09 | 20 | For these reasons, Judge, we respectfully request |
| 10:00:12 | 21 | that you exclude Dr. Marmureanu. |
| 10:00:14 | 22 | THE COURT:  Thank you. |
| 10:00:16 | 23 | MR. MATTHEWS:  Be clear on two things that |
| 10:00:17 | 24 | Ms. Pierson just said that we've not withdrawn Dr. Marmureanu |
| 10:00:21 | 25 | on specific causation.  I don't think I said that and we will |

10:00:25  1  limit his discussion and his testimony to what is in his

10:00:29  2  report.  And he does discuss in his report frequency of

10:00:34  3  events, perforation, the inadequacy of the warnings, specific

10:00:38  4  to warnings.

10:00:39  5           Just because they say perforation is a potential

10:00:42  6  adverse event, does it mean that it can occur or it does

10:00:46  7  occur.  And they knew it occurred upwards of 80 to 90 percent

10:00:50  8  in the studies that were coming out on a repetitive basis.

10:00:53  9  All of that is contained within his report.  I disagree with

10:00:58 10  Ms. Pierson.

10:01:00 11           THE COURT:  My notes indicate you indicated you were

10:01:02 12  not going to ask him about engineering issues.

10:01:04 13           MR. MATTHEWS:  We're not going to be specific as to

10:01:06 14  engineering issues outside of what he's testified and in his

10:01:09 15  report.

10:01:09 16           THE COURT:  In his report, right.

10:01:11 17           MR. MATTHEWS:  Right; and that is very limited.

10:01:12 18  That there was a sharp strut that penetrated the duodenum and

10:01:17 19  that was causing the injury and it's due to the force that

10:01:22 20  pushed through the tissue, which he is a medical doctor.

10:01:27 21  There is a bridge here that I think has to be crossed either

10:01:31 22  by an engineer or medical doctor; and in this case we have an

10:01:34 23  engineer testifying specific to the issue of radial force and

10:01:38 24  the material that is stiffer or was stiffer than prior

10:01:43 25  materials used with filters.  So we will bridge that with both

| | | |
|---|---|---|
| 10:01:47 | 1 | those two experts together. Thank you. |
| 10:01:57 | 2 | THE COURT: All right. Thank you. Who's up next? |
| 10:02:03 | 3 | MS. PIERSON: I am, Your Honor. |
| 10:02:05 | 4 | THE COURT: All right. |
| 10:02:05 | 5 | MS. PIERSON: Sorry to say that my work is front-end |
| 10:02:10 | 6 | loaded and then I'll be quiet for awhile. We've got a great |
| 10:02:14 | 7 | team of lawyers here and I want you to hear from them. So the |
| 10:02:16 | 8 | next expert up, Your Honor, is an interventional radiologist |
| 10:02:21 | 9 | by the name of Reza Rajebi. Dr. Rajebi -- I think our papers |
| 10:02:28 | 10 | are pretty clear and I don't think there's much to add to |
| 10:02:30 | 11 | these. He is is an interventional radiologist who formerly |
| 10:02:35 | 12 | practiced at the University of Colorado. He authored a very |
| 10:02:38 | 13 | lengthy report but the plaintiffs ultimately withdrew all of |
| 10:02:41 | 14 | his opinions, except two's paragraphs that are contained on |
| 10:02:46 | 15 | the bottom of pages 41 and the top of page 42. It really is |
| 10:02:50 | 16 | just two paragraphs. |
| 10:02:51 | 17 | He's proffered to say, "I reviewed images from a |
| 10:02:56 | 18 | study and that based on my review of the images of 58 |
| 10:03:01 | 19 | patients, it's my opinion that those patients had |
| 10:03:04 | 20 | perforation." And our challenge to Dr. Rajebi is about his |
| 10:03:08 | 21 | methodology for doing that. So the question is, by what |
| 10:03:12 | 22 | methodology did he reach that conclusion and is he qualified |
| 10:03:16 | 23 | to offer the opinion. |
| 10:03:17 | 24 | First on the point of qualifications. Our papers |
| 10:03:21 | 25 | were very clear. He committed perjury. He committed perjury |

10:03:24 1    under oath in his deposition not once but multiple times.  He

10:03:28 2    was repeatedly asked about his employment status and said that

10:03:32 3    he was working presently at the University of Colorado as a

10:03:37 4    practicing interventional radiologist.  The fact of the matter

10:03:39 5    is, he hadn't been practicing that long.  He had only been out

10:03:42 6    of his fellowship training for two years to begin with.  At

10:03:45 7    the time that he authored his report, he affirmed that he was

10:03:49 8    employed by the University of Colorado.  At the time of his

10:03:51 9    deposition, he affirms that he was an employee of the

10:03:54 10   University of Colorado and he, in fact, was not and he

10:03:57 11   perjured himself.  I even went so far as to say --

10:03:59 12           THE COURT:  Wouldn't you love to cross-examine on

10:04:02 13   something like that?

10:04:02 14           MS. PIERSON:  I would.  I would.  No doubt.  But I

10:04:04 15   even went so far as to say to him, "If you weren't here today

10:04:08 16   right now, what would you be doing?"  And his testimony was

10:04:11 17   essentially, "I'd be in my office treating patients."  That

10:04:15 18   was a boldfaced lie.  And we recogize, Judge, that ordinarily

10:04:17 19   questions of credibility are a matter for the jury, not a

10:04:20 20   matter for exclusion.  But there's a point at which the

10:04:23 21   perjury is so blatant that Your Honor has to exclude a witness

10:04:27 22   for that reason and that's the case here.

10:04:29 23           We also know that he's unqualified because of his

10:04:33 24   lack of experience, his lack of fellowship training in any of

10:04:36 25   the disciplines directly related and specialized in the field

10:04:41  1  of diagnosing perforation of the vena cava based on imaging.

10:04:46  2  He's a radiologist but he's not a fellowship trained

10:04:49  3  diagnostic radiologist.  He has no certification in

10:04:54  4  interventional radiology because he's not been practicing long

10:04:56  5  enough.  He has no peer reviewed publications about IVC

10:05:00  6  filters to his name and no other credentials to suggest that

10:05:04  7  he can do what he purports to do.

10:05:06  8          His methodology, though, is the bigger point, Your

10:05:07  9  Honor; and I want to just show you an example of what he did.

10:05:11 10  He took images from 58 patients.  I'll put one on the screen.

10:05:16 11  What you're seeing here, Your Honor, is the column of contrast

10:05:21 12  within a vena cava at the time of a venogram.  So he took

10:05:25 13  images and he reviews them on a computer called a DICOM viewer

10:05:28 14  and on his DICOM viewer, he looked at it and he says, "I can

10:05:32 15  see that there's a strut outside the column of contrast."

10:05:36 16          By his own admission, you can't see the wall of the

10:05:39 17  vena cava.  All you can see on the image is where the dye

10:05:42 18  itself appears.  And these little circles that are on the

10:05:46 19  page, these aren't circles he made when he was viewing these

10:05:50 20  images and making his diagnosis of perforation based on a

10:05:54 21  strut outside the column of contrast.  These are circles that

10:05:57 22  he made in his deposition when I asked him, "Show me where it

10:06:00 23  is exactly that you see perforation."

10:06:01 24          So the sum total of his methodology is this.  "I

10:06:05 25  pulled the image up on my viewer, I looked at it and then I

10:06:08  1    wrote down perforation.  Forty-six out of 58 times I wrote

10:06:13  2    down perforation."  And he says, "The way that I diagnosed

10:06:16  3    that was observing a leg outside the column of contrast."  Of

10:06:22  4    course we know that's not a reliable methodology for

10:06:26  5    diagnosing perforation.  It's not reliable within his field

10:06:29  6    for multiple reasons.

10:06:29  7            THE COURT:  Well, can't he do that just based on his

10:06:32  8    experience in looking at these images?

10:06:35  9            MS. PIERSON:  No, he can't, for a couple of reasons.

10:06:36 10    Because you can't see the wall of the vena cava on a venogram,

10:06:39 11    you can't tell if the strut's gone through the wall or not.

10:06:43 12    The wall has three layers and just because the column of

10:06:47 13    contrast is being held in by one layer, because you can't see

10:06:50 14    the wall itself, you can't tell if the wall is extended around

10:06:55 15    the strut or if the strut is going through the wall.  And

10:06:59 16    don't just take my word for it, Your Honor.

10:07:01 17            All of the professional societies to which

10:07:05 18    Dr. Rajebi belongs, none of them follow his definition.  They

10:07:09 19    all follow the definition that it's based on a length or a

10:07:14 20    distance outside the cava wall, whether it's three millimeters

10:07:18 21    or five millimeters.  We know in the FDA's current preserve

10:07:22 22    study that they define it as five millimeters outside the

10:07:25 23    column of contrast.  We know that other authors look for

10:07:28 24    objective criteria, like evidence of bleeding or hematoma or

10:07:32 25    extravasation of contrast.  But Dr. Rajebi did not follow the

| | | |
|---|---|---|
| 10:07:37 | 1 | methodology that his own societies prescribe, three |
| 10:07:38 | 2 | millimeters outside the column of contrast.  He didn't follow |
| 10:07:44 | 3 | the methodology that Dr. David Kessler, plaintiff's other |
| 10:07:46 | 4 | expert prescribes, which is measuring it as three millimeters |
| 10:07:50 | 5 | outside the column of contrast.  And if you -- |
| 10:07:54 | 6 | The reason why this is so important, Your Honor, is |
| 10:07:57 | 7 | that all of the societies that Dr. Rajebi belongs to, and even |
| 10:08:02 | 8 | the FDA acknowledged this, that determining or diagnosing |
| 10:08:05 | 9 | caval penetration is complicated and that examination via |
| 10:08:11 | 10 | cavogram may show filter hooks or legs outside the flow of |
| 10:08:13 | 11 | contrast but that's not necessarily due to penetration.  It |
| 10:08:16 | 12 | may be due to endothelialization or tenting of the vena cava |
| 10:08:20 | 13 | or locations in the tributary veins.  CT scans can be helpful |
| 10:08:25 | 14 | to rule out false positives. |
| 10:08:27 | 15 | So I have two points here as relates to the |
| 10:08:30 | 16 | methodology.  First, the way he chooses to diagnosis |
| 10:08:34 | 17 | perforation.  "I see a leg that by my naked eye I believe |
| 10:08:39 | 18 | shows something outside the column of contrast."  That's not |
| 10:08:42 | 19 | perforation under anybody's definition.  The FDA acknowledges |
| 10:08:46 | 20 | why you can't use that definition.  The societies that he |
| 10:08:50 | 21 | belonged to acknowledge that.  Plaintiff's own other experts |
| 10:08:54 | 22 | acknowledge that that methodology would not be a reliable |
| 10:08:57 | 23 | methodology. |
| 10:08:57 | 24 | But on top of that, even if that were the |
| 10:09:02 | 25 | methodology, even if he used a methodology to look at these, |

10:09:07  1  the fact is that he didn't document it in any way.  And one of

10:09:09  2  the tenets of any reliable methodology is that it be

10:09:13  3  repeatable.  That we be able to determine the known or

10:09:16  4  potential rate of error.  Dr. Rajebi eyeballed things.  That's

10:09:21  5  it.  He made no notes.  He made no measurements.  He made no

10:09:26  6  recording of what he saw.  And he looked at these on a DICOM

10:09:30  7  viewer.  Radiologists have the ability now by computer.  They

10:09:33  8  don't need to do it by business card or eyeballing or anything

10:09:37  9  else.  By computer they can actually measure the distance of

10:09:40 10  the strut to show that it's outside the column of contrast and

10:09:44 11  to show how much it's outside the column of contrast.

10:09:47 12          Dr. Rajebi didn't use any of the tools that are

10:09:50 13  available to him or that he would have used in his usual

10:09:54 14  practice.  He made no notes.  He made no recordings.  He

10:09:56 15  looked at the images and then he says, "Trust me.  There are

10:09:59 16  46 out of 58 perforations."  You remember the discussion we

10:10:03 17  had last week about Dr. Timperman and his use of a business

10:10:07 18  card to determine whether there was perforation.  What

10:10:11 19  Dr. Rajebi has done is even less than that.  He believes that

10:10:14 20  he can eyeball this and somehow determine that there's

10:10:18 21  perforation.

10:10:18 22          He simply can't.  We know that's not reliable

10:10:21 23  because the FDA says it isn't so; because his own experts say

10:10:25 24  it isn't so; because the societies to which he belongs and to

10:10:29 25  which he subscribes that govern his profession, they all say

| | | |
|---|---|---|
| 10:10:33 | 1 | that it isn't right.  There was no validation of what he did |
| 10:10:37 | 2 | in any way. |
| 10:10:39 | 3 | Back to the point of known or potential rate of |
| 10:10:41 | 4 | error.  Dr. Rajebi explains how in his practice it's very |
| 10:10:45 | 5 | common to have another interventional radiologist periodically |
| 10:10:48 | 6 | check the images that you've reviewed to be sure you're |
| 10:10:51 | 7 | reviewing them correctly.  That didn't happen here.  And I |
| 10:10:54 | 8 | submit it's particularly important for that to happen with a |
| 10:10:57 | 9 | physician who's only been practicing medicine for two years |
| 10:11:01 | 10 | post his fellowship. |
| 10:11:03 | 11 | Also his testimony has no fit, as we explain in our |
| 10:11:07 | 12 | papers, Your Honor.  His claimed fit is to a publication that |
| 10:11:10 | 13 | you'll hear of in this case called the Lyon publication.  And |
| 10:11:13 | 14 | the whole point by which plaintiffs offer his testimony is to |
| 10:11:17 | 15 | say, "In this publication you, Cook, said there were no |
| 10:11:21 | 16 | perforations.  Dr. Rajebi has looked at the images and he says |
| 10:11:25 | 17 | that there are 46 out of 58 perforations."  But the fact of |
| 10:11:28 | 18 | the matter is and as we've explained in our motion in limine, |
| 10:11:32 | 19 | the only point of plaintiff's Lyon study is to suggest that |
| 10:11:36 | 20 | Cook was dishonest in some way.  That their definition in the |
| 10:11:38 | 21 | Lyon study was inaccurate.  That's improper character |
| 10:11:42 | 22 | evidence.  It's inadmissible pursuant to Rule 404. |
| 10:11:45 | 23 | But we also know that there's no fit to Dr. Rajebi's |
| 10:11:48 | 24 | opinions because they can't be relevant to the warnings claim. |
| 10:11:52 | 25 | Dr. Zuzga has already said, when he was given during his |

45

10:11:56  1  deposition literature and told about plaintiff's view of the

10:11:59  2  Lyon study, wouldn't this change your decision?  And

10:12:02  3  ultimately his testimony was no.  I choose the product because

10:12:06  4  it's on the shelf because the FDA cleared it.  Doesn't matter

10:12:09  5  what one, two, three, or four, or five studies say.  That was

10:12:12  6  his testimony.  So even were Dr. Rajebi's testimony

10:12:16  7  admissible, it doesn't have anything to do with the facts of

10:12:20  8  the Hill case for that reason.

10:12:23  9         To the extent that the plaintiffs point to his

10:12:25 10  testimony to say, "Well, there's a part of your instruction

10:12:28 11  for use that refer to these images" -- I want to be clear

10:12:31 12  about one thing.  The Lyon publication is not referenced in

10:12:36 13  Cook's IFU and Dr. Rajebi is not offered for any opinions

10:12:40 14  regarding the instructions for use.  There is a clinical study

10:12:44 15  section which refers to interim data from the underlying

10:12:48 16  studies, the OUS study.  Dr. Rajebi has no opinions about

10:12:53 17  that.  No opinions about the IFU.  No opinions about the OSU

10:12:54 18  study.  No opinions about the summary of the OSU study within

10:13:00 19  the instructions for use.

10:13:00 20         His only point is to say, "I reviewed 58 images.  I

10:13:05 21  observed perforation and you should trust me that there's

10:13:09 22  perforation based on my eyeballing of the images."  That's not

10:13:12 23  data and it's not consistent with the standards of his

10:13:16 24  profession.  Thank you, Your Honor.

10:13:19 25         THE COURT:  Thank you.  Mr. Matthews.

10:13:21  1          MR. MATTHEWS:  Dave Matthews for the plaintiffs.  On

10:13:25  2   the issue of what was said in deposition, I was not there but

10:13:28  3   I've read it several times now.  She just called my witness a

10:13:33  4   perjurer.  So I feel like I need to address that first.  He

10:13:37  5   asked had he continuously worked as a professor at University

10:13:40  6   of Colorado and he said yes.  He was there from August 2013 to

10:13:46  7   March of 2015, I think.  He certainly can speak for himself at

10:13:52  8   time of trial that he.

10:13:52  9          Thought was there a break in those two years, I

10:13:55 10   believe that's what he thought.  He thought he was

10:13:57 11   answering -- I don't think the question was as clear as

10:13:59 12   Ms. Pierson says or thinks it was.  However, he did work

10:14:04 13   continuously for a two-year period at the University of

10:14:07 14   Colorado.  But again, I don't think that speaks to his

10:14:11 15   qualifications.

10:14:12 16          THE COURT:  Right.

10:14:13 17          MR. MATTHEWS:  And I think it's irrelevant for

10:14:15 18   purposes of a Daubert challenge.

10:14:16 19          THE COURT:  I agree.

10:14:18 20          MR. MATTHEWS:  Dr. Rajebi is board certified in

10:14:18 21   diagnostic radiology.  He's licensed to practice in five

10:14:22 22   states.  He's completed a four-year residency and then a

10:14:25 23   two-year fellowship in interventional radiology.  He was

10:14:28 24   working under Barry Katzen, the former president of Society of

10:14:31 25   Interventional Radiologists.  He was, prior to that, a senior

10:14:34  1  consultant at the Department of Radiology at Mayo Clinic, one

10:14:39  2  of the most prestigious medical facilities in our country.  He

10:14:43  3  works with the venograms on a daily basis.

10:14:45  4          A venogram is an x-ray with contrast, as we know and

10:14:50  5  seen.  It's used with every filter when they place them and

10:14:54  6  they take them out.  A doctor will be looking on the cath lab

10:14:58  7  table.  There's a screen.  He's looking at the venogram.  He's

10:15:01  8  got a foot pedal.  He's hitting it and he's trying to see

10:15:04  9  where that filter is to make sure it's in the right place, and

10:15:07 10  he takes a snapshot of it.  That's what we're talking about

10:15:10 11  when we talk about a venogram.  The contrast is injected so he

10:15:12 12  can see the actual flow of the blood.

10:15:15 13          So that's what he does daily.  He works with

10:15:17 14  these -- this is his bread and butter, if you will, as a

10:15:21 15  diagnostic radiology.  He is eminently qualified to read

10:15:27 16  venograms because he's read thousands of them.

10:15:29 17          In this case -- just a little background.  Back in

10:15:34 18  2004, 2005, Cook was trying to get the Celect on the market

10:15:37 19  and the FDA was concerned about the perforations from the

10:15:40 20  animal studies.  And they said, "Cook, you need human studies

10:15:43 21  to show us that this thing can be on the market, to make sure

10:15:47 22  there were no perforations."  They had conducted this very

10:15:49 23  study that we're talking about and were limiting Dr. Rajebi's

10:15:52 24  testimony to his review of the venogram from that very study.

10:15:55 25          We still don't have all of them and we've asked

10:15:58  1  repeatedly from this defendant.  We still don't have all of

10:16:00  2  them but of the ones we have, he's looked at and he's analyzed

10:16:04  3  these.  And he will show a jury that nearly every one, the

10:16:09  4  lion's share, if you will, of these venograms showed a

10:16:13  5  perforation.  They want to say well, he didn't use a

10:16:17  6  methodology.  Well, he used the same methodology that was in

10:16:19  7  that very study and the same methodology that was in every one

10:16:23  8  of their animal studies.  That was, is this perforation

10:16:28  9  outside of the IVC?  Is it outside of that vein?  And he's

10:16:32 10  going to testify -- I think I just heard and I've read an

10:16:35 11  entire cross-examination --

10:16:36 12          THE COURT:  Using the same type of images.

10:16:39 13          MR. MATTHEWS:  Yes.  Same type of images that they

10:16:40 14  use in their study.  Same type of -- and if you read the

10:16:44 15  study, their definition of a perforation is a strut outside

10:16:48 16  the vena cava.  That's what he's going to testify to.  Exactly

10:16:51 17  the same analysis they did within that study and the same one

10:16:55 18  they do within all of their animal studies.  He will testify

10:16:58 19  about it and he will show the jury the images themselves on

10:17:03 20  the DICOM presenter.

10:17:06 21          In terms of -- in terms of his qualifications, I'm

10:17:09 22  not sure they're saying that he's only practiced for two

10:17:13 23  years.  The fact is, he's been through six years of residency

10:17:17 24  and fellowship program and now he's been a professor for two

10:17:21 25  years in radiology.

| | | |
|---|---|---|
| 10:17:22 | 1 | In terms of why he is limited to this, again, Judge, |
| 10:17:26 | 2 | if you will recall, they had complained to us that we had too |
| 10:17:32 | 3 | many experts.  We have completely limited him only to these |
| 10:17:35 | 4 | OSU reads of venograms.  The information is relevant to show |
| 10:17:39 | 5 | what Cook knew or should have known, and what and how they |
| 10:17:45 | 6 | warned doctors about this; because this very information from |
| 10:17:48 | 7 | this Lyon study, the preliminary reports are in the IFU for |
| 10:17:52 | 8 | the Celect.  Very relevant to this case.  Thank you. |
| 10:17:55 | 9 | THE COURT:  Thank you, Mr. Matthews. |
| 10:17:57 | 10 | MS. PIERSON:  Your Honor, just briefly.  I just want |
| 10:17:59 | 11 | to correct one thing.  Dr. Rajebi is not board certified in |
| 10:18:03 | 12 | diagnostic radiology.  He's board certified in radiology. |
| 10:18:06 | 13 | That's different than the discipline of diagnostic radiology, |
| 10:18:10 | 14 | where you look at an image and you diagnosis a condition based |
| 10:18:13 | 15 | on the radiology.  So he does not have that qualification. |
| 10:18:17 | 16 | Secondly, this isn't like looking at an x-ray and |
| 10:18:21 | 17 | saying, "Oh, there's a broken bone on the x-ray."  Here he's |
| 10:18:25 | 18 | trying to diagnosis whether a strut is outside the cava wall, |
| 10:18:28 | 19 | whether there's perforation based on an image that, by this |
| 10:18:31 | 20 | own admission, does not show the wall.  That's the whole |
| 10:18:33 | 21 | reason that SIR and Dr. Kessler and other entities define |
| 10:18:41 | 22 | perforation as something more than just outside the column of |
| 10:18:45 | 23 | contrast.  It's outside the column of contrast by some |
| 10:18:48 | 24 | distance or outside the column of contrast with some other |
| 10:18:51 | 25 | objective evidence.  So the methodology that he uses isn't |

10:18:56  1  recognized in his profession.  It's rejected by the --

10:18:59  2          THE COURT:  Well, the methodology he's using is his

10:19:04  3  experience and training to the extent of whatever extent that

10:19:07  4  is but that's all subject to weight.  So his methodology is

10:19:14  5  observations of the images.  Now, whether -- whether it's

10:19:22  6  penetrating the actual wall, wouldn't that be subject to

10:19:27  7  cross-exam?

10:19:29  8          MS. PIERSON:  It's more than that, Your Honor.  The

10:19:31  9  conclusion that he wants to offer -- they're not offering him

10:19:33 10  to say the strut is outside the column of contrast.  That's

10:19:36 11  not what they're offering him for.  They're offering him to

10:19:39 12  say, these are perforations.

10:19:42 13          THE COURT:  Of the wall.

10:19:43 14          MS. PIERSON:  These are perforations of the cava

10:19:45 15  wall.

10:19:45 16          THE COURT:  Right.

10:19:46 17          MS. PIERSON:  And you can't see the wall on the

10:19:48 18  image.  You have to have other criteria.  He identified in his

10:19:52 19  report no other criteria.  He applied no other criteria.  And

10:19:56 20  whatever work it is that he did to diagnosis perforation,

10:20:00 21  that's not documented anywhere.  What he saw is not documented

10:20:04 22  anywhere.  When Mr. Matthews talks about stopping, taking a

10:20:07 23  screen shot so you can see something, zeroing in on it, he had

10:20:11 24  all the tools to do that at his disposal and did not do it.

10:20:14 25  If you ask him, "Show me how you identify these perforations."

10:20:19  1   He'll pull up a vena cava and he'll eyeball it and say, "Well,

10:20:23  2   in my view I see it there."

10:20:25  3          But this isn't like someone who analyzes

10:20:28  4   fingerprints, for example, and says, "I can see that

10:20:32  5   fingerprint is a match and that fingerprint is a match."  Even

10:20:36  6   today that takes a more complicated comparison of fingerprint

10:20:39  7   markings in order to be accurate.  No -- no physician, nobody

10:20:44  8   that governs the physicians who diagnosis perforation, even

10:20:49  9   plaintiff's own experts, none of them say a reliable

10:20:53 10   methodology is just eyeballing it.  It's too unreliable when

10:20:57 11   you can't see the structure that you're saying the strut went

10:20:59 12   through.  So that's why it's more than just cross, Your Honor.

10:21:03 13          THE COURT:  Thank you.  Mr. Matthews, will you come

10:21:12 14   back up?  How can his testimony be reliable if you can't see

10:21:22 15   the wall and you're saying it penetrates the wall.  If you

10:21:26 16   can't see the wall on the image --

10:21:29 17          MR. MATTHEWS:  The wall is adjacent to the contrast,

10:21:31 18   Your Honor, and he has explained that in deposition.  The wall

10:21:34 19   is directly adjacent to the contrast that flows through the

10:21:39 20   inferior vena cava.  He has done the same thing that they were

10:21:43 21   allowed to publish based on venograms from that very Lyon

10:21:48 22   study, which was outside the United States.  The have taken

10:21:50 23   the same venograms and read them and looked at the same -- and

10:21:53 24   used the same standard and specifically referred to in the

10:21:58 25   article that says, based on those same venograms, that that

10:22:02  1   strut is outside the vena cava wall.  He used that very same

10:22:07  2   standard, which he does on a repeated basis.

10:22:11  3          THE COURT:  Dr. Kessler is saying that's not the

10:22:13  4   right way to do it.

10:22:13  5          MR. MATTHEWS:  Well, three millimeters outside the

10:22:17  6   vena cava is a perforation.  He will describe that and that

10:22:21  7   definition is the Society of Interventional Radiology

10:22:25  8   definition as well, three millimeters outside the vena cava

10:22:27  9   wall.  But he is specific that he is using the same standard

10:22:31 10   that the defendants used within their animal studies and also

10:22:34 11   for the very Lyon study that was published -- that was peer

10:22:37 12   reviewed and published based on those reads of the venogram.

10:22:42 13   He was consistent with that study, which I think is important

10:22:45 14   in this case and the jury has to understand that.

10:22:49 15          THE COURT:  Okay.  Thank you.  Next up?

10:23:00 16          MR. SKWRAOF:  Good morning, Your Honor.

10:23:01 17          THE COURT:  Good morning.

10:23:02 18          MR. SKWRAOF:  Charles Webber for Cook.  I'm here to

10:23:05 19   talk to the Court about Dr. Rebecca Betensky, our motion to

10:23:09 20   exclude Dr. Betensky's testimony.  We've got a couple of

10:23:14 21   slides.  If I could approach, I'll just hand up a hard copy

10:23:17 22   and give one to counsel.

10:23:18 23          THE COURT:  Sure.  You have a copy for staff?

10:23:24 24          MR. SKWRAOF:  Absolutely.  Your Honor, Dr. Betensky

10:23:34 25   is a professor of biostatistics.  And just to give a short

10:23:39  1  background of what she did here.  She looked at several slices

10:23:43  2  of time.  For example, 2006 to 2008, or the year 2009 alone,

10:23:48  3  for example; and on the slide we've taken 2009 as an example

10:23:54  4  just to she what she did.  She looked at data relating to

10:24:01  5  complaints of perforation, reported perforations with both the

10:24:04  6  Celect and the Tulip.

10:24:06  7          She then compared those to sales figures for that

10:24:10  8  same type period for Celect and Tulip.  What she then did is

10:24:15  9  asked what percentage of Celect filters had a reported

10:24:20 10  perforation, and in this case 2009, and what percentage of

10:24:25 11  Tulip filters had a reported perforation in 2009.  The answer

10:24:30 12  turned out to be, for 2009, 0.055 for Celect filters.  That's

10:24:36 13  less than six out of every 10,000 and 0.0058 for Tulip.

10:24:44 14  That's less than six out of every hundred thousand that had a

10:24:47 15  reported perforation.  The ratio of those two numbers, the

10:24:51 16  .055 and the .0058 is 9.48.  It's just a simple division.

10:25:00 17  That's because about six in 10,000 is about ten times higher

10:25:04 18  than six out of 100,000.

10:25:06 19          So she concluded that the rate of perforation for

10:25:10 20  Celect in 2009 was 9.48 percent times -- I'm sorry.  9.48

10:25:15 21  times higher for the Celect than for the Tulip.  In this case,

10:25:19 22  Your Honor, the plaintiffs want to use Dr. Betensky's

10:25:24 23  calculation to say that there is something about the Celect

10:25:28 24  filter that's causing that difference.  That is, they want to

10:25:33 25  say it's device related.  But Dr. Betensky said that she can't

10:25:38   1   say that and that nobody can say that, based on the data that

10:25:42   2   she had.  Nobody can say that the difference in the reported

10:25:47   3   perforation rate is caused by the filter.  It's at pages 204

10:25:51   4   to 205 of her deposition.

10:25:54   5          The reason is because she concedes that she didn't

10:25:57   6   control for what statisticians call confounding factors and

10:26:01   7   what normal people call other possible causes.  For example,

10:26:05   8   patient factors such as age, are they taking other drugs, what

10:26:09   9   other diseases are they dealing with or perhaps doctor

10:26:13  10   experience.  Did the doctors have more experience with the one

10:26:16  11   device than the other.  Relevant in this case because we know

10:26:19  12   that Tulip has been on the market a lot longer than Celect and

10:26:24  13   a lot of the time periods she was looking at were very early

10:26:27  14   in the days when Celect was starting to be used.

10:26:30  15          Now, the plaintiffs, in their response, have

10:26:32  16   acknowledged that they can't use Betensky's figures to say

10:26:36  17   that there's a design defect.  They concede that in their

10:26:40  18   papers.  That would seem to be the end of the matter, since

10:26:44  19   that's what this case is about, design defect.  But what they

10:26:47  20   say they want to do instead is they say no, her observations,

10:26:50  21   her calculations support Dr. Kessler's opinions on

10:26:55  22   adulteration.  Now, we pointed out, Your Honor, in our motion

10:26:59  23   papers for both Dr. Kessler and Dr. Betensky that proof of

10:27:05  24   adulteration doesn't get the plaintiffs anywhere in this case.

10:27:09  25   We pointed out that they can't use -- even if they could prove

10:27:12  1  adulteration, they can't use that to prove a violation of the

10:27:15  2  Food, Drug, and Cosmetic Act because there's no private right

10:27:18  3  of action.  They can't use that to prove negligence because

10:27:21  4  this Court has already ruled that under Florida law, they

10:27:25  5  can't prove negligence per se by violation of a federal

10:27:28  6  standard; and they've acknowledged that they can't use it to

10:27:30  7  prove design defect.

10:27:33  8         We pointed all that out but Your Honor, I want to

10:27:36  9  step back and focus on a more fundamental point and that's

10:27:38 10  this.  The difference in the perforation rate could be

10:27:42 11  evidence that the Celect is adulterated only if the difference

10:27:45 12  in the perforation rate is device related.  All right?  In

10:27:49 13  other words, for them to say that this is proof that it's

10:27:52 14  adulterated means that there's got to be something about the

10:27:57 15  Celect device that is leading us to see the difference in

10:28:01 16  perforation rate -- the reported perforation rates; and that's

10:28:04 17  exactly what Dr. Betensky said you can't do with her data.

10:28:08 18  That is, she said you cannot draw any conclusion that the

10:28:12 19  difference in perforation rate, whatever the time period, is

10:28:15 20  somehow related to the device as opposed to something that has

10:28:19 21  nothing to do with the device.

10:28:20 22         To put it another way, Dr. Betensky would say, look,

10:28:23 23  it's perfectly possible, based on the data that she has seen

10:28:27 24  that she would testify to, that some -- something about the

10:28:31 25  patient population is causing us to see a 9.48 times or

| | | |
|---|---|---|
| 10:28:36 | 1 | whatever the amount is difference in reported rate for Celect |
| 10:28:39 | 2 | versus Tulip.  Maybe it's patient age.  Maybe it's doctor |
| 10:28:43 | 3 | experience.  There are a whole bunch of things that under |
| 10:28:47 | 4 | Dr. Betensky's view she would say, "Yeah, that could be |
| 10:28:49 | 5 | causing the difference.  I can't say it's the device." |
| 10:28:52 | 6 | Well, if one of those other factors is causing the |
| 10:28:56 | 7 | difference, then the device isn't adulterated.  What the |
| 10:29:00 | 8 | plaintiffs essentially are doing is saying, "Well, we're not |
| 10:29:03 | 9 | going to call it design defect.  We're going to call it |
| 10:29:05 | 10 | adulteration instead.  Your Honor, I submit that's a change of |
| 10:29:10 | 11 | terminology but not a change in theory.  What they're talking |
| 10:29:12 | 12 | about and what they need Dr. Betensky's figures to do, and |
| 10:29:15 | 13 | Dr. Kessler relying on her, is to have the jury reach some |
| 10:29:19 | 14 | conclusion that these figures are showing something about the |
| 10:29:23 | 15 | device itself and that's what Dr. Betensky said.  We |
| 10:29:26 | 16 | absolutely cannot do with her figures and she went further. |
| 10:29:29 | 17 | I asked her at her deposition, if somebody were to |
| 10:29:31 | 18 | use your figures to suggest that there's a causation factor |
| 10:29:36 | 19 | here with the device, that it's the device that's causing |
| 10:29:39 | 20 | these numbers, would they be misusing your analysis; and she |
| 10:29:43 | 21 | said yes.  I mean, the quote was actually she said, "I think |
| 10:29:45 | 22 | that's what I just said."  But that is definitely her |
| 10:29:48 | 23 | conclusion. |
| 10:29:49 | 24 | Your Honor, for that reason we would submit that the |
| 10:29:52 | 25 | plaintiffs could use Dr. Betensky's testimony only to prove |

| | | |
|---|---|---|
| 10:29:57 | 1 | something that Dr. Betensky herself says you can't use her |
| 10:30:00 | 2 | numbers for.  In other words, their theory works only if the |
| 10:30:04 | 3 | jury is misled and doesn't understand what Dr. Betensky is |
| 10:30:07 | 4 | saying.  And that's a classic call for an exercise of Daubert |
| 10:30:11 | 5 | to exclude that evidence at the front end because it can't go |
| 10:30:15 | 6 | anywhere for the plaintiffs.  They're using an expert's |
| 10:30:17 | 7 | testimony to do something that the expert herself says you |
| 10:30:19 | 8 | can't do.  Thank you, Your Honor. |
| 10:30:22 | 9 | THE COURT:  Thank you. |
| 10:30:31 | 10 | MR. SCHULTZ:  Good morning, Your Honor. |
| 10:30:32 | 11 | THE COURT:  Good morning. |
| 10:30:33 | 12 | MR. SCHULTZ:  I'm Matt Schultz.  I'm from the ??? |
| 10:30:35 | 13 | lab firm in Pensacola, Florida; and I've worked very closely |
| 10:30:39 | 14 | with Dr. Betensky and Dr. Kessler.  You can make a lot more |
| 10:30:43 | 15 | sense of Dr. Betensky's opinions if you are familiar with |
| 10:30:47 | 16 | Dr. Kessler's first because really, the only thing she was |
| 10:30:50 | 17 | called upon to do was to determine whether there was |
| 10:30:52 | 18 | statistical significance to the rates that Mr. Webber just |
| 10:30:57 | 19 | showed you, which Dr. Kessler opines on.  The first thing that |
| 10:31:02 | 20 | jumps out at you, of course, is that for these complaints -- |
| 10:31:04 | 21 | and these are not occurrence rates in the real world.  These |
| 10:31:07 | 22 | are only the rates for events that get reported to Cook as |
| 10:31:11 | 23 | adverse events, as complaints.  And logic will tell you and |
| 10:31:16 | 24 | every witness I've asked has testified that obviously not 100 |
| 10:31:20 | 25 | percent of real world events get reported. |

10:31:23  1          So these numbers should not suggest that this is the

10:31:26  2   real world occurrence rate for perforation, first of all; but

10:31:30  3   what you do see in 2009, which is before Ms. Hill's filter was

10:31:35  4   implanted, Cook was aware that the Celect had a perforation

10:31:39  5   rate that was ten times or 9.6, I believe was the number

10:31:42  6   Mr. Webber gave us, ten times that of Tulip.  And that is a

10:31:45  7   signal to a company, or it should be, to a reasonable and

10:31:49  8   reasonably prudent company that they have a problem on their

10:31:52  9   hands.  And Cook, in fact, knew that they had a problem on

10:31:55  10  their hands with perforation.  This is all detailed in 160

10:32:00  11  pages and 500 and some odd footnotes of Dr. Kessler's report,

10:32:04  12  which Dr. Betensky is opining in support of.

10:32:07  13         I need to kind of back up just a moment, Your Honor,

10:32:09  14  if I may, and address the legal premise to this argument.  The

10:32:15  15  defendants say throughout their papers that you have ruled on

10:32:19  16  the negligence per se claim and because you've done that,

10:32:23  17  adulteration and misbranding are out of the case.  We have a

10:32:27  18  negligence count that is free standing that was pled,

10:32:29  19  paragraphs 81 to 88 of the complaint; and under Florida law --

10:32:34  20  and we have put the Florida jury instruction in our papers --

10:32:39  21  all we have to prove is that they acted unreasonably.  That

10:32:43  22  they failed to do something they should have done or did

10:32:46  23  something they shouldn't have and that there's a causal

10:32:49  24  connection between that behavior and the fact that doctors

10:32:52  25  like Dr. Zuzga are placing filters in people like Ms. Hill.

10:32:56  1   And Dr. Zuzga, by the way, testified and will talk about it on

10:32:58  2   summary judgment.  He would want to know if there were a

10:33:00  3   disparity in rates like this.  He would expect to be told.  He

10:33:04  4   would listen to that and it might affect the decisions he

10:33:07  5   would make in implanting filters.  So this has a direct nexus

10:33:10  6   to Elizabeth Hill's case and her implanting physician.

10:33:15  7           But we have a free-standing negligence case.  You

10:33:17  8   did not throw that out when you ruled on negligence per se;

10:33:19  9   and under Florida law, violation of a federal statute,

10:33:22 10   violation of a state, statute violation of a regulation is

10:33:26 11   nonconclusive evidence of negligence.  So adulteration is very

10:33:29 12   much at play in the case.

10:33:32 13           The standard for adulteration doesn't require

10:33:35 14   anything having to do with causation.  We did concede in our

10:33:38 15   papers, as Dr. Betensky did in her deposition, that you can't

10:33:42 16   look at the rates alone; and of course, we don't in the case.

10:33:46 17   There's lots of other evidence, their own business records.

10:33:49 18   But you can't just look at the rates and decide or determine

10:33:52 19   based on that alone that there's a design defect that is

10:33:56 20   causing that disparity.  We don't have to prove that to prove

10:33:58 21   adulteration.  The standard for adulteration is whether the

10:34:03 22   Celect filter lives up to the representations that have been

10:34:06 23   made regarding the Celect filter.  If it does not, then it is

10:34:09 24   adulterated under Florida -- excuse me, federal law.  It's

10:34:12 25   actually adulterated under Florida law as well, which tracks

10:34:15  1  the federal statute; and it doesn't matter why those

10:34:19  2  perforations are happening.

10:34:19  3         Cook told the world in many ways, many times, as

10:34:24  4  outlined in Dr. Kessler's report, that the Celect filter

10:34:28  5  minimizes caval perforation due its secondary strut design.

10:34:35  6  They have promotional literature that says the Celect filter

10:34:39  7  improved on Tulip in terms of perforation; and if it does not,

10:34:42  8  it's adulterated.  It doesn't matter why it perforates more

10:34:45  9  often.  If they say we're improving perforation and in fact,

10:34:48 10  it has ten times the rate of perforation, then it's

10:34:51 11  adulterated; and that's Dr. Kessler's opinion.

10:34:54 12         This is not an issue of us suggesting to the jury

10:34:58 13  that the reason for the perforations is a design defect.  We

10:35:02 14  have an engineer, Dr. McMeeking, who will talk about the

10:35:05 15  design and will tie the design of the filter to its propensity

10:35:10 16  to perforate but that's not Dr. Betensky's job.  Her only task

10:35:14 17  here was to review Dr. Kessler's work and look at the

10:35:18 18  documents, which she did in detail in a four-hour phone call

10:35:24 19  with Dr. Kessler, where they had the documents up before them

10:35:28 20  electronically, and to determine whether there was statistical

10:35:30 21  significance to the differences that we see in the rates.  She

10:35:33 22  determined that there was.

10:35:33 23         This is something Cook knew about years before

10:35:37 24  Elizabeth Hill got her filter.  They should have done

10:35:39 25  something about it, including telling doctors, but they

10:35:41  1  didn't.  And that's how this all ties in the case.  They don't

10:35:44  2  challenge her qualifications.  They don't say that she got the

10:35:47  3  numbers wrong.  They only say that we're suggesting causation

10:35:49  4  and we put in our papers, Judge, if that is really a concern

10:35:53  5  that the jury is going to infer causation, even though she's

10:35:56  6  not saying that and Dr. Kessler is not saying that, then we

10:35:59  7  can give them a limiting any instruction saying, look, don't

10:36:02  8  misconstrue this as evidence for the reason why Dr. Betensky

10:36:05  9  is not trying to tell you why it perforates more often.  She

10:36:09 10  doesn't have to because that's not part of the standard.

10:36:11 11          So respectfully we think the Daubert motion should

10:36:14 12  be denied.  It does raise a question, Your Honor, and I'm not

10:36:17 13  asking for an advisory ruling on it, but we may talk about it

10:36:21 14  in summary judgment and that's on the need to call

10:36:24 15  Dr. Betensky at all.  Dr. Kessler wrote in his report and

10:36:26 16  testified in his deposition that as head of the FDA, he

10:36:30 17  routinely relied on statisticians in order to determine the

10:36:36 18  significance of numbers that he was working with.  So our view

10:36:38 19  is that we don't even need Dr. Betensky to come in and testify

10:36:41 20  to that because Dr. Kessler can give his opinion that there is

10:36:46 21  statistical significance based on his reliance on her.  It's

10:36:50 22  not a bolstering situation where, you know, he's saying yeah,

10:36:52 23  I taught somebody else and they agree with me.  He's simply

10:36:56 24  carrying out his work as he did as the commissioner of the

10:36:59 25  FDA.

10:36:59  1    So whether she even testifies –– we have her or our

10:37:03  2  may call list for that reason.  But if she is going to

10:37:05  3  testify, she certainly shouldn't be thrown on a Daubert motion

10:37:10  4  because the jury might get confused and think she's saying

10:37:12  5  something she is not saying.  That would not be an appropriate

10:37:15  6  ground for a Daubert ruling.

10:37:17  7    THE COURT:  Thank you.  Mr. Webber.

10:37:24  8    MR. WEBBER:  I think that what Mr. Schultz just said

10:37:26  9  illustrates exactly the problem.  Mr. Schultz repeatedly says

10:37:29 10  that the difference in perforation rates that Dr. Betensky

10:37:33 11  observed shows that Cook knew that it had a problem with

10:37:37 12  perforation and that it should have done something about it.

10:37:40 13  Both of those things would be true only if the difference in

10:37:44 14  perforation rate showed that there was something about the

10:37:47 15  device that was causing the difference in perforation rate.

10:37:51 16  Mr. Schultz couldn't say those things if everybody agreed that

10:37:54 17  the difference in perforation rate was caused by patient

10:37:57 18  factors, more patients with cancer were getting one filter

10:38:01 19  than the another, or doctor experience and it had nothing to

10:38:05 20  do with the device itself.

10:38:06 21    Put it another way.  Say that during one period of

10:38:08 22  time the Tulip device started to be used in more cancer

10:38:13 23  patients and you saw a difference in perforation rate with the

10:38:16 24  Tulip.  Nobody would say that that is some sort of design

10:38:20 25  problem with the Tulip driving it because it's the same

63

| | | |
|---|---|---|
| 10:38:23 | 1 | device.  It's just being used in a different patient |
| 10:38:26 | 2 | population.  That's accounting for the difference in |
| 10:38:29 | 3 | perforation rate.  Dr. Betensky said that is entirely possible |
| 10:38:32 | 4 | based on the data that she has seen.  She can't say that the |
| 10:38:35 | 5 | difference in perforation rate is caused by the device. |
| 10:38:38 | 6 |     But what Mr. Schultz says all relies on the premise |
| 10:38:42 | 7 | that there's something about the device, the Celect device, |
| 10:38:45 | 8 | that's making it perforate more often and that's why we're |
| 10:38:48 | 9 | seeing the difference; and that's exactly what Dr. Betensky |
| 10:38:50 | 10 | said you can't do.  Now they say that it doesn't matter. |
| 10:38:54 | 11 |     THE COURT:  But if they do say that, can't you |
| 10:38:57 | 12 | cross-exam on that?  Isn't there other causes that could do |
| 10:39:02 | 13 | that, age, experience of doctor, that type of question? |
| 10:39:07 | 14 |     MR. WEBBER:  Absolutely; and she would admit that. |
| 10:39:08 | 15 | And if the plaintiffs truly admit that, then her testimony is |
| 10:39:11 | 16 | irrelevant because she's basically saying, "I've observed a |
| 10:39:14 | 17 | difference in perforation rate but I have no idea what's |
| 10:39:17 | 18 | causing it," which is basically what she said.  They want to |
| 10:39:20 | 19 | use that to present to the jury just the perforation rate and |
| 10:39:23 | 20 | say, "Well, we'll leave it to you to cross-examine. |
| 10:39:26 | 21 |     THE COURT:  She wouldn't be qualified to say what |
| 10:39:28 | 22 | causes it, right? |
| 10:39:30 | 23 |     MR. WEBBER:  She wouldn't and she's disavowed.  She |
| 10:39:30 | 24 | said she cannot say what causes it.  The problem is statistics |
| 10:39:33 | 25 | are hard enough for lawyers to understand.  They're really |

10:39:36  1   hard for jurors to grasp; and we know full well that the

10:39:40  2   minute -- I imagine the minute Your Honor saw that there's a

10:39:42  3   9.48 percent ratio, the immediate thing is, "I wonder why the

10:39:46  4   device is doing that."  Jurors are naturally going to assume

10:39:49  5   it's something with the device; and especially if they try to

10:39:52  6   call it adulteration as opposed to design defect.  But it's

10:39:56  7   the same thing.  It's all related to how the device itself is

10:39:58  8   performing and whether there's something about the device

10:40:00  9   that's making it do that; and Dr. Betensky has said you can't

10:40:03 10   use it.  It's a classic call for Daubert.

10:40:05 11           THE COURT:  What they're saying is, Cook says the

10:40:07 12   Celect improves on the Tulip.  And what Dr. Betensky says is:

10:40:14 13   Well, no; my studies say no, that's not true."  Then the

10:40:20 14   plaintiffs are saying that's adulteration because they've said

10:40:23 15   something that is not actually happening.

10:40:27 16           MR. WEBBER:  And what Your Honor said -- and what

10:40:29 17   Your Honor just said illustrates the problem as well because

10:40:32 18   Dr. Betensky did not say that's not true.  All that

10:40:35 19   Dr. Betensky said was, "I notice a difference in perforation

10:40:39 20   rate," but she can't say that the Celect didn't improve on the

10:40:42 21   Tulip because she specifically said, "I can't say that the

10:40:45 22   difference I'm seeing is device related."

10:40:47 23           THE COURT:  Right.  But isn't that

10:40:49 24   cross-examination?

10:40:49 25           MR. WEBBER:  No; because the problem is that the

| | | |
|---|---|---|
| 10:40:51 | 1 | jury is going to reach the same conclusion that Your Honor |
| 10:40:53 | 2 | just did after 20 minutes of argument about it that what |
| 10:40:56 | 3 | Dr. Betensky must be saying is that the Celect isn't doing the |
| 10:41:01 | 4 | same job that the Tulip is doing; and she can't say that. |
| 10:41:05 | 5 | It's so easy to fall into that trap that that's why Daubert is |
| 10:41:10 | 6 | necessary because jurors are just going to fall into the |
| 10:41:15 | 7 | conclusion that if there's a difference in perforation rate, |
| 10:41:17 | 8 | there's a difference in some performance metric, that it must |
| 10:41:19 | 9 | be because the Celect is a different filter, even though |
| 10:41:22 | 10 | Dr. Betensky said you can't use the words to say that. |
| 10:41:24 | 11 | And the plaintiff's trying to move to say no, no, it |
| 10:41:27 | 12 | goes to show adulteration.  And then further here saying well, |
| 10:41:29 | 13 | maybe we won't even call Dr. Betensky.  Maybe we'll just have |
| 10:41:34 | 14 | Dr. Kessler talk about what Dr. Betensky said is just going to |
| 10:41:37 | 15 | obscure the issue further from the jury and make them think |
| 10:41:40 | 16 | that this difference in perforation rate must have something |
| 10:41:42 | 17 | to do with the device, when Dr. Betensky is standing up there |
| 10:41:46 | 18 | saying you can't use my results to say that.  But that's what |
| 10:41:49 | 19 | it's leading everybody to say.  That's what it's leading |
| 10:41:52 | 20 | Mr. Schultz to say to the Court, when he says, Cook knew it |
| 10:41:55 | 21 | had a problem.  That's true only if it's a device related |
| 10:41:58 | 22 | difference and Betensky said you can't say that. |
| 10:42:01 | 23 | When Your Honor said the Celect isn't performing as |
| 10:42:04 | 24 | well as the Tulip, that's only if it's device related and |
| 10:42:07 | 25 | Dr. Betensky said you can't use my results to say that. |

| | | |
|---|---|---|
| 10:42:10 | 1 | That's why the misunderstanding, the inference that a jury |
| 10:42:14 | 2 | will draw the wrong inference is so strong, it can't be |
| 10:42:17 | 3 | overcome by cross-examination.  And if we are right, as the |
| 10:42:21 | 4 | plaintiffs seem to acknowledge, that Dr. Betensky's data |
| 10:42:24 | 5 | cannot be used to show a device-related problem, if we're |
| 10:42:29 | 6 | right about that, and they seem to think that we are or they |
| 10:42:33 | 7 | have to concede we are, based on Dr. Betensky's testimony that |
| 10:42:36 | 8 | you can't say it's a device-related issue, then her testimony |
| 10:42:39 | 9 | is irrelevant; because she would say the difference -- the |
| 10:42:42 | 10 | 9.48 times difference, we just don't know why that is.  We |
| 10:42:46 | 11 | don't know if it's caused by the device, the patients, the |
| 10:42:49 | 12 | doctors, the atmospheric conditions, there are just so many |
| 10:42:53 | 13 | variables, it's just a fact that's out there with no relevance |
| 10:42:58 | 14 | or no apparent relevance because she can't connect it up.  And |
| 10:43:03 | 15 | that's not a failing of hers.  That's her being a statistician |
| 10:43:06 | 16 | saying the data that I have do not enable me to say that this |
| 10:43:10 | 17 | difference I'm seeing, this difference I'm observing in the |
| 10:43:12 | 18 | world between the performance of Celect and performance of |
| 10:43:15 | 19 | Tulip for this period of time, has something to do with the |
| 10:43:18 | 20 | device as opposed to something completely different. |
| 10:43:21 | 21 | Again, to put it a completely different way, Celect |
| 10:43:25 | 22 | and Tulip could be the identical devices, identically |
| 10:43:26 | 23 | designed, identically manufactured and according to |
| 10:43:32 | 24 | Dr. Betensky, you could still see a nine, tenfold difference |
| 10:43:36 | 25 | in perforation rate because it could be caused by a whole |

| | | |
|---|---|---|
| 10:43:40 | 1 | bunch of other factors that have nothing to do with the device |
| 10:43:43 | 2 | and that's the point is that if we can't say, because |
| 10:43:46 | 3 | Dr. Betensky says that none of us can, that it has something |
| 10:43:49 | 4 | to do with the device, then it doesn't matter whether you call |
| 10:43:51 | 5 | it design defect or adulteration or anything else if it posits |
| 10:43:57 | 6 | that there's something about the Celect device that's making |
| 10:43:59 | 7 | this happen, Dr. Betensky says you can't say that.  And that's |
| 10:44:03 | 8 | all that they are trying to use it to do and that's all |
| 10:44:06 | 9 | they're trying to get the jury to conclude, and they can't do |
| 10:44:08 | 10 | that; and it's something that goes beyond cross-examination |
| 10:44:12 | 11 | because it is so difficult for jurors to comprehend that |
| 10:44:15 | 12 | difference between correlation and causation.  Like I said, |
| 10:44:17 | 13 | it's tough for lawyers.  The 7th Circuit keeps telling people |
| 10:44:20 | 14 | about the difference between correlation and causation and it |
| 10:44:23 | 15 | still keeps happening.  Thank you, Your Honor. |
| 10:44:27 | 16 | MR. SCHULTZ:  May I respond very briefly, Judge? |
| 10:44:32 | 17 | THE COURT:  You may. |
| 10:44:35 | 18 | MR. SCHULTZ:  Your Honor, you have it exactly right. |
| 10:44:37 | 19 | Dr. Betensky is saying that's not true.  More specifically, |
| 10:44:40 | 20 | she's saying Dr. Kessler is saying it's not true.  What you |
| 10:44:44 | 21 | said about the performance of the filter -- |
| 10:44:46 | 22 | THE COURT:  What I interpret her saying is that |
| 10:44:49 | 23 | well, no, you can't blame it on the design.  It could be |
| 10:44:53 | 24 | something else or it could be the design but it could be |
| 10:44:56 | 25 | something else, too.  I can't say. |

10:45:01  1    MR. SCHULTZ:  It's not her role to say that, Your

10:45:02  2  Honor.  She's a numbers cruncher.  If we had not gotten a

10:45:05  3  statistician to verify that these are significantly different

10:45:08  4  numbers, then I'm sure we would be faced with a Daubert motion

10:45:11  5  saying Kessler can't talk about these difference in rates

10:45:14  6  because they may not have any statistical significance,

10:45:15  7  although Cook themselves concluded that they did internally.

10:45:19  8    But the adulteration standard, which the 7th Circuit

10:45:22  9  has said in the *Bausch* case goes a long way to showing that

10:45:25 10  the manufacturer breached a duty under state law for the

10:45:30 11  patient, which is precisely how we're using it here,

10:45:31 12  nonconclusive evidence of negligence.  Adulteration doesn't

10:45:35 13  ask why.  They had a problem with perforation.  If it's the

10:45:39 14  design, if it's because they're using it in different patient

10:45:44 15  populations, whatever the reason was, they had a problem and

10:45:46 16  it's a problem they ignored and that's negligence, Judge, or

10:45:49 17  certainly a jury can find that it is.  So we have it as

10:45:52 18  evidence of negligence under adulteration and then we have the

10:45:55 19  whole rest of the story that goes with this.

10:45:57 20    I deposed Henrik Gyllun, who's the head of QA,

10:46:01 21  quality assurance and quality engineering, for Cook Europe a

10:46:04 22  couple of months ago.  They had a CAPA investigation a month

10:46:09 23  after this device was cleared for retrievable use in the U.S.

10:46:13 24  to find out what was going on with perforation.  They were

10:46:16 25  already redesigning to make the Celect before it even got

10:46:19  1  cleared as a retrievable device and they could not figure it

10:46:22  2  out.  They actually said in their investigation, we cannot

10:46:25  3  rule out the design as the cause of these perforates and we're

10:46:29  4  not taking any remedial action because we don't know how to

10:46:32  5  remediate the problem.  And I asked Mr. Gyllun, that was nine

10:46:36  6  years ago, can you here sitting today rule out design as the

10:46:40  7  cause of the perforations; and his answer was no, I cannot

10:46:42  8  rule out design as the cause of perforations with Celect.

10:46:45  9  Specifically, the difference in the rate between Celect and

10:46:48 10  Tulip.

10:46:48 11          A jury may very well find that's negligence, Your

10:46:51 12  Honor, when they have a rate -- we've seen it reported as high

10:46:54 13  as 18 times Tulip in 2010 reported to management, and they sit

10:46:59 14  on it.  They silently redesign the filter and then tell the

10:47:02 15  world they were designing it for another reason, a jury is

10:47:06 16  certainly within its rights to find that that is failing to do

10:47:11 17  something that a responsible company would do.  So the why

10:47:14 18  doesn't matter.  We have an engineer who will speak to the why

10:47:17 19  but it doesn't matter to adulteration for Dr. Kessler, who's

10:47:21 20  not a defect expert.  It doesn't matter to Dr. Betensky, who's

10:47:23 21  just crunching numbers.

10:47:25 22          THE COURT:  Mr. Webber, any final word?

10:47:28 23          MR. WEBBER:  I think you heard it, Judge.

10:47:30 24          THE COURT:  Why don't we take ten minutes or so,

10:47:32 25  come back out.

| | | |
|---|---|---|
| 10:47:34 | 1 | THE CLERK:  All rise.  Court is in recess. |
| 11:01:46 | 2 | *(A recess was taken.)* |
| 11:01:47 | 3 | THE CLERK:  All rise.  Court is in session.  Please |
| 11:01:52 | 4 | be seated. |
| 11:01:57 | 5 | THE COURT:  We're ready to continue. |
| 11:01:59 | 6 | MS. PIERSON:  Thank you, Your Honor.  The next |
| 11:02:01 | 7 | motion to be addressed is Cook's motion to exclude the |
| 11:02:04 | 8 | testimony of Dr. David Kessler.  Dr. David Kessler, 20 years |
| 11:02:09 | 9 | ago, was the commissioner of the Food and Drug Administration. |
| 11:02:12 | 10 | He is a medical doctor who specializes in the field of |
| 11:02:16 | 11 | pediatrics.  And I think it's important to begin by noting the |
| 11:02:20 | 12 | 7th Circuit standard related to Daubert that we think is |
| 11:02:24 | 13 | relevant to Dr. Kessler's opinions.  Particularly it's the |
| 11:02:28 | 14 | *Gayton* court, when the 7th Circuit noted the question we must |
| 11:02:31 | 15 | ask is not whether an expert witness is qualified in general, |
| 11:02:35 | 16 | but whether his qualifications provide a foundation for him to |
| 11:02:39 | 17 | answer a specific question.  Dr. Kessler is the plaintiff's |
| 11:02:43 | 18 | regulatory expert.  That's his field of expertise.  And while |
| 11:02:47 | 19 | he may be qualified generally on many topics, his expertise in |
| 11:02:52 | 20 | regulatory matters is what is at issue here.  Now, the |
| 11:02:55 | 21 | plaintiffs present Dr. Kessler to do four things.  One, to |
| 11:02:58 | 22 | narrate the main theories of their case and to essentially |
| 11:03:01 | 23 | narrate a series of Cook Company documents.  Two, they proffer |
| 11:03:06 | 24 | Dr. Kessler to offer opinions that the Celect filter is |
| 11:03:09 | 25 | unsafe.  Three, they proffer him to opine that Cook misled the |

11:03:14  1  FDA in its submissions to the agency; and four, they offer him

11:03:17  2  to opine that the Celect perforates more than Tulip.

11:03:21  3          These topics are either improper topics for expert

11:03:25  4  testimony under 7th Circuit law or they're subject beyond

11:03:30  5  Dr. Kessler's qualification as a regulatory expert.  The

11:03:32  6  Daubert standard is intended to filter out improper expert

11:03:35  7  testimony and promote fairness at trial.  Dr. Kessler cannot

11:03:39  8  evade the Daubert standards simply because 20 years ago he was

11:03:43  9  the commissioner of the FDA.

11:03:45  10         So first, Your Honor, we believe that you should

11:03:47  11  prevent Dr. Kessler from offering what we call a narrative

11:03:52  12  march through Cook documents.  He is the plaintiff's narrator

11:03:57  13  in chief.  As I put on the slide in front of you, of his very

11:04:02  14  long report, more than half, in fact, 178 out of 367

11:04:08  15  paragraphs are simply a regurgitation of company documents

11:04:12  16  without any analysis.  A regurgitation of Cook employee

11:04:15  17  testimony without any analysis.  And I've given you one

11:04:19  18  example on the screen here that frankly is a little hard to

11:04:23  19  read in that showing.  Let me hand up a copy, if I may

11:04:27  20  approach.

11:04:28  21             THE COURT:  Thanks.

11:04:30  22             MS. PIERSON:  Every paragraph of Dr. Kessler's

11:04:33  23  report that we've highlighted on the earlier screen starts

11:04:37  24  essentially with on such and such a date, Mr. Heise e-mailed

11:04:41  25  Ms. Larsen.  He said X.  She said Y.  Next paragraph,

11:04:45  1    Ms. Larsen responded.  She said X, he said Y.  This is

11:04:50  2    paragraph after paragraph after paragraph of Cook internal

11:04:54  3    emails, Cook internal documents for which he offers no expert

11:04:58  4    opinion at all.  They're not regulatory opinions.  They're no

11:05:03  5    opinions whatsoever.  And we submit at a minimum, those

11:05:06  6    paragraphs should be excluded and he should be prevented from

11:05:09  7    serving as the narrator in chief.  He is their regulatory

11:05:15  8    expert.  He has no expertise to a narration of Cook documents.

11:05:19  9          In fact, 7th Circuit courts have held as much.  In

11:05:21 10    the *Baldonado* case, one of the cases that we cited in our

11:05:26 11    briefs, the Court noted specifically that cutting and pacing,

11:05:28 12    which is all Dr. Kessler has done, does not involve

11:05:31 13    scientific, technical or specialized knowledge.  And many

11:05:35 14    cases have reached the same conclusion, including courts who

11:05:39 15    are analyzing the testimony of Dr. Kessler.

11:05:42 16          In the *Wells* case, Your Honor -- in the *Wells* case,

11:05:52 17    Your Honor, Dr. Kessler's testimony was previously excluded

11:05:56 18    and there, the Western District of Oklahoma, in considering a

11:06:00 19    similar situation where he was offered as a regulatory expert

11:06:04 20    but the thrust of his testimony was to narrate a series of

11:06:09 21    company documents and just regurgitate what they said in the

11:06:12 22    order and in the way that the plaintiffs preferred.  There the

11:06:15 23    Court held that Dr. Kessler may not simply rehash otherwise

11:06:19 24    admissible evidence about which he has no personal knowledge.

11:06:23 25    They admitted his testimony only in part, only to the extent

73

11:06:28  1  and facts relied upon him in forming opinions that are

11:06:31  2  relevant and not cumulative.

11:06:34  3        We put on slide six, Your Honor, the host of courts

11:06:38  4  who agree with this concept that a party can't proffer an

11:06:42  5  expert, regulatory or otherwise, FDA commissioner or not.

11:06:45  6  They cannot proffer an expert who simply reads and

11:06:49  7  regurgitates company emails, company documents, company

11:06:54  8  statements time after time after time.  It's the Southern

11:06:57  9  District of Ohio, the Middle District of Florida on two

11:07:01 10  occasions, and the Northern District of Illinois, and also in

11:07:05 11  the *Fosamax* litigation in the Southern District of New York

11:07:10 12  applying Florida law.  Repeatedly courts have held that a

11:07:13 13  narrative history of the product and FDA submissions, that's

11:07:17 14  not expert and that should be excluded.

11:07:19 15        Of course, the danger, Your Honor, is self-evident.

11:07:23 16  Anytime a party puts an expert on the stand and then has them

11:07:27 17  essentially read from or describe company document, after

11:07:31 18  company document, after company document that are not relevant

11:07:34 19  to their expertise, he's not narrating our 510(k)'s or

11:07:39 20  submissions to the FDA.  He's narrating company emails and

11:07:44 21  company internal documents.  Even company communications

11:07:47 22  outside the United States.  That's not proper expert testimony

11:07:51 23  and that should be excluded.

11:07:54 24        It's the *Trasylol* case that we've cited a few times

11:07:58 25  in our brief, Your Honor, that we think is very important.

11:08:01  1   There the Court excluded the regulatory expert's opinions and

11:08:05  2   held that the report is broad and unwieldy.  And I can assure

11:08:09  3   you in the 500 paragraphs of opinions contained in his report,

11:08:13  4   more than half of which are nothing more than this narrative

11:08:17  5   march, he fits the qualification of broad and unwieldy.  In

11:08:22  6   that situation, again faced with a similar expert, the Court

11:08:25  7   held the regulatory expert does not analyze the facts.  She

11:08:29  8   regurgitates them and reaches conclusory opinions that are

11:08:32  9   purportedly based on those facts.  These facts should be

11:08:36 10   presented to the jury directly and presented by people with

11:08:39 11   personal knowledge of the emails, of the Cook documents and

11:08:43 12   other materials that Dr. Kessler regurgitates.

11:08:47 13           Now, the plaintiffs will argue that Dr. Kessler

11:08:50 14   applies the regulatory standards laid out in the Cook's

11:08:53 15   documents but his reports span paragraph after paragraph after

11:08:57 16   paragraph with no analysis or explanation at all.  No tie to

11:09:00 17   any underlying regulatory opinion.  And we know that

11:09:06 18   particularly coming from someone who the plaintiffs will put

11:09:09 19   on the stand and say to the jury, this man 20 years ago was

11:09:12 20   the commissioner of the FDA, that it imbues the documents that

11:09:16 21   he's reciting with no personal knowledge and no context, that

11:09:20 22   it imbues those with a certain amount of credibility or

11:09:24 23   gravitas.  That's how the jury is inappropriately misled.

11:09:28 24           The jury needs to hear from these documents by the

11:09:32 25   people who wrote them, and we will be bringing those people to

11:09:35  1   trial.  The plaintiffs will have full and fair opportunity to

11:09:37  2   ask them about the documents that they authored and to

11:09:39  3   cross-examine them on those documents.

11:09:41  4        So I want to turn now to Dr. Kessler's opinions.

11:09:46  5   You'll hear me say time and time again today and all of our

11:09:50  6   lawyers say, the question is methodology, methodology,

11:09:53  7   methodology; and that's the question with the opinions that

11:09:57  8   Dr. Kessler proffered.  Had he kept himself squarely within a

11:10:01  9   regulatory lane, we might be in a different position here but

11:10:04 10   he doesn't.  He's not offered to this Court to explain to the

11:10:07 11   jury here's the framework for submission to the FDA; Cook

11:10:11 12   chose the 510(k) framework and he's what Cook submitted to the

11:10:17 13   FDA.  That's not what he does.

11:10:19 14        Ninety-nine of his opinions are all to support the

11:10:22 15   plaintiff's theory of bad company conduct and nothing more

11:10:25 16   than that.  They are a thinly veiled attempt to allow him to

11:10:31 17   narrate their case without calling witnesses with personal

11:10:34 18   knowledge.

11:10:35 19        So as relates to Dr. Kessler's methodology, he

11:10:37 20   presents only -- we know that his methodology is unreliable

11:10:41 21   for a couple of reasons.  First, to the extent that he says

11:10:44 22   the conclusions that I reach are based on these handful of

11:10:47 23   Cook documents, he cherry-picks the documents that he relies

11:10:52 24   upon and he cherry-picks the parts of the document that he

11:10:55 25   relies on; and you simply can't cross-examine Dr. Kessler

11:10:58  1   about that when he has nearly 200 paragraphs of cherry-picking

11:11:02  2   in his report.

11:11:04  3          I want to give you an obvious example that's in our

11:11:07  4   brief, Your Honor.  We provided many examples at pages 15 and

11:11:11  5   16 of our Daubert memorandum.  He cites Cook documents but

11:11:16  6   omits the parts of the Cook documents that include that the

11:11:20  7   perforation rate of the Celect is low and that it's still

11:11:23  8   lower than all of the competitors' products and the physicians

11:11:27  9   believe that the Celect is the best filter on the market.  You

11:11:31 10   can't pick -- you can't reliably form an opinion by picking

11:11:35 11   out one part of the document that you like while ignoring the

11:11:38 12   other part of the document that stands in direct

11:11:41 13   contradiction.  That's not a reliable methodology and we know

11:11:45 14   that based on the *Barber* case.

11:11:46 15          There are also documents -- I'd note secondly, the

11:11:51 16   opinions that he offers based on Cook documents, Cook internal

11:11:54 17   emails, this is outside the scope of his expertise as a

11:11:58 18   regulatory expert and he doesn't apply -- have a methodology

11:12:02 19   for reviewing them or for choosing them and it can't be based

11:12:06 20   on his experience at FDA.  His testimony in his deposition was

11:12:09 21   that he would never have reviewed these kinds of internal

11:12:12 22   company documents at FDA; and the fact of the matter is when

11:12:16 23   he was at FDA, he never reviewed a 510(k) or PMA for a vena

11:12:21 24   cava filter in the first place.  He has no memory of having

11:12:23 25   any personal involvement with IVC filters while he was at the

11:12:27  1   FDA some 20 years ago.

11:12:28  2        But this type of analysis that he purports to do

11:12:33  3   looking at internal company documents and then offering legal

11:12:36  4   conclusions on adulteration or misbranding, that's not a

11:12:41  5   proper methodology and it's not the way that he would have

11:12:46  6   evaluated products within a regulatory framework while he was

11:12:50  7   at the FDA.

11:12:50  8        I want to contrast that to -- I want to contrast

11:12:56  9   that to -- with the testimony that we've offered from Dr.

11:13:00 10   Elisa Harvey.  She's Cook's premarket regulatory expert.  And

11:13:05 11   we've offered and you'll hear about the premarket expert and

11:13:10 12   postmarket expert that Cook has proffered.  Both folks who

11:13:13 13   worked at the FDA for a long time doing exactly what we're

11:13:16 14   proffering them to do in this specific case.

11:13:20 15        Dr. Harvey was asked by Mr. Schultz about her

11:13:22 16   methodology and what did she do and what did she review; and

11:13:26 17   she said, I did review some emails, what looked to me to be

11:13:30 18   internal emails but my review really focused on the process

11:13:33 19   that they went through in interacting with the FDA and

11:13:37 20   providing information in the 510(k)'s and responding to the

11:13:41 21   deficiencies.  So those internal documents don't have much

11:13:44 22   meaning or relevance for me in terms of whether or not they

11:13:46 23   complied with all of the requirements and regulations.

11:13:49 24        And the point is this.  If the FDA were reviewing,

11:13:52 25   as it did, the 510(k) for the Celect, which it reviewed not

11:13:56  1   once but twice and cleared the product twice, if the FDA were

11:14:00  2   reviewing the 510(k), they'd look at the information presented

11:14:04  3   to the FDA under the framework of what's required for an FDA

11:14:09  4   510(k) and then the FDA would have to clear the product or not

11:14:13  5   clear the product.  That's proper regulatory expert testimony.

11:14:17  6   What's not proper regulatory testimony is to narrate a series

11:14:21  7   of company documents or to draw conclusions about whether we

11:14:25  8   met FDA regulations within our 510(k) based on internal

11:14:30  9   company emails or extraneous information.

11:14:34 10         So the second main point, in addition to methodology

11:14:37 11   for Kessler's opinion, is legal conclusions.  And the good

11:14:40 12   news is this is an area where the parties agree.  We filed a

11:14:44 13   motion related to all of Dr. Kessler's legal opinions and

11:14:48 14   argued that opinions on adulteration and misbranding, that

11:14:51 15   those are inadmissible legal opinions.  The plaintiffs

11:14:55 16   simultaneously filed motions as  to our expert witnesses, who

11:14:59 17   in response to Dr. Kessler's opinion, have said in fact, the

11:15:02 18   products are not adulterated or misbranded.  And the

11:15:03 19   plaintiffs base this for excluding our experts on this point

11:15:07 20   is a legal conclusion that your experts can't reach.

11:15:10 21         The good news is there's common ground.  None of

11:15:13 22   these experts, Kessler, Harvey or Pellerite, should be

11:15:17 23   offering legal conclusions.  That's an easy decision.

11:15:20 24         Related to that, though, Your Honor, is that

11:15:23 25   Dr. Kessler cannot stand before this jury and say things like

11:15:28  1  adulteration is defined as the product failed beneath the

11:15:33  2  quality it was purported to have; and I'm not telling you that

11:15:36  3  it's adulterated but I am telling you that it met all of the

11:15:40  4  terms of the definition of adulteration.  That's just a shell

11:15:43  5  game.  It's no different than the legal conclusion of saying

11:15:46  6  that the product, in fact, is adulterated.

11:15:57  7          Dr. Kessler may apply facts to the regulatory

11:16:00  8  standards that are applicable to these products but he cannot

11:16:03  9  say conclusively that the Celect was misbranded or fell below

11:16:06 10  the quality which it was reported or was represented to

11:16:10 11  present.  Those things are legal conclusions.  And I'm sorry

11:16:13 12  to say that one of the best cases on this point was a case

11:16:15 13  where I lost.  It was in the *Zimmer NexGen* knee litigation

11:16:19 14  when Judge Pallmeyer held in 2005 that she was excluding the

11:16:23 15  expert testimony of both sides' FDA experts and ultimately

11:16:27 16  reserved the issue of FDA compliance only for punitive damages

11:16:32 17  phase.

11:16:32 18          But the reasoning that Judge Pallmeyer did that I

11:16:36 19  think is very relevant.  There she found that the's

11:16:39 20  plaintiff's proffered expert, Dr. Samaras, that his opinions

11:16:41 21  on adulteration and misbranding, that those were FDA

11:16:46 22  regulations.  Those were determinations that are preempted

11:16:49 23  under *Buckman* that we know are inadmissible, given that

11:16:52 24  there's no negligence per se claim or otherwise.  But also she

11:16:55 25  concluded that legal opinions by experts are inadmissible.  So

11:16:59  1  he can't offer opinions of adulteration or misbranding, and he

11:17:03  2  can't offer opinions that essentially draw the picture for

11:17:07  3  adulteration or misbranding but stop short of offering the

11:17:11  4  word itself.

11:17:12  5          Dr. Kessler's legal conclusions about substantial

11:17:15  6  equivalence and whether the Celect was substantially

11:17:18  7  equivalent to the Tulip device also are inadmissible.  First,

11:17:23  8  they're inadmissible legal conclusion.  They imply a defect.

11:17:28  9  When he uses terms like substantial equivalence, it's a legal

11:17:31 10  conclusion that implies -- improperly applies a defect.  He

11:17:35 11  also opines that in my opinion, if I were the FDA commissioner

11:17:40 12  at the time, FDA would not have cleared the Celect.  Likewise,

11:17:42 13  that is a legal conclusion.  Would the FDA have cleared the

11:17:46 14  Celect or not cleared the Celect?  And it will mislead the

11:17:49 15  jury if he's permitted to say that.

11:17:53 16          His testimony on that point as well is pure

11:17:55 17  speculation.  Whether he would have cleared the Celect filter

11:17:58 18  or not during the time that he was FDA commissioner or not is

11:18:02 19  hindsight, and hindsight after he's been paid to be an expert

11:18:06 20  in this litigation against Cook and in the litigation -- the

11:18:10 21  filter litigation against Bard.  The fact of the matter is

11:18:13 22  that during the time that Dr. Kessler was the FDA

11:18:16 23  commissioner, a number of filters were cleared for use through

11:18:18 24  the 510(k) process.  So he has no reliable basis for coming to

11:18:22 25  the conclusion either that the products are not substantially

11:18:26  1    equivalent or that he would not have cleared them when he was

11:18:29  2    at the FDA.

11:18:30  3            His testimony about whether the FDA would have

11:18:33  4    cleared the product or not further is a legal conclusion.  A

11:18:36  5    jury will take Dr. Kessler's testimony to mean that the Celect

11:18:39  6    is somehow defective and should not be on the market, which

11:18:43  7    will dictate the results for the plaintiff.

11:18:46  8            Dr. Kessler also opines that the Celect is

11:18:48  9    misbranded with respect to perforation and that Cook's

11:18:52 10    promotional labeling omitted relevant facts and was

11:18:55 11    misleading.  Again, misbranding is a legal conclusion that he

11:18:58 12    should not be permitted to offer.

11:19:01 13            One thing that I learned in this whole process that

11:19:04 14    I think helps to illuminate the narrow scope of the regulatory

11:19:08 15    expert testimony is that the questions of adulteration or

11:19:08 16    misbranding, they're not determinations that the FDA alone

11:19:13 17    could make, and they're not determinations that a private

11:19:16 18    citizen could make about a product.  I couldn't file a lawsuit

11:19:20 19    and say this product is adulterated and misbranded.

11:19:23 20            The way that a determination of adulteration and

11:19:26 21    misbranding is made is that the FDA must file an action

11:19:29 22    against the product manufacturer and a court must adjudicate

11:19:34 23    that the product is adulterated and misbranded but only after

11:19:38 24    the FDA concludes that it's necessary to bring the action in

11:19:40 25    the first place.  There's no legal cause of action for

11:19:44  1   adulteration and misbranding that's held by a private citizen

11:19:47  2   like Mrs. Hill.

11:19:51  3          Your Honor, we further explain in our papers that

11:19:53  4   Dr. Kessler should be barred from offering medical testimony

11:19:56  5   about filters or about perforation because he lacks the

11:20:00  6   required medical expertise.  By his own admission, he should

11:20:03  7   not be offering medical opinions in this case.  His training

11:20:07  8   and experience is in the field of pediatrics.  And you,

11:20:10  9   yourself, have held and the 7th Circuit has held multiple

11:20:13 10   times, Your Honor, that simply being a medical doctor does not

11:20:17 11   qualify one to offer opinions on all medical topics.

11:20:22 12   Pediatrics doesn't qualify him to opine on vena cava filters

11:20:27 13   and on issues related to the peripheral vascular system.

11:20:27 14          He admits that he's never placed a filter.  That

11:20:33 15   he's never treated a patient with an IVC filter.  That he's

11:20:36 16   not certified in any of the fields relevant to Mrs. Hill's

11:20:39 17   case, whether that's radiology, vascular surgery, cardiology,

11:20:43 18   gastroenterology, or any of the other things that relate to

11:20:46 19   the type of conditions that she alleges.

11:20:50 20          He also admits that he had no involvement with IVC

11:20:53 21   filters at the FDA and he couldn't recall having ever reviewed

11:20:57 22   a 510(k) application for a vena cava.  Importantly, when I ask

11:21:02 23   him the question about, "Would you defer to an interventional

11:21:09 24   radiologist or vascular surgeon on the question of whether

11:21:12 25   there are benefits to filters for the class of patients for

11:21:15 1  whom they're intended?"  He said, "that literature and science

11:21:19 2  should be talked about by the interventional radiologists."

11:21:21 3  And I put the quote on the screen for you, if you'd like to

11:21:25 4  see it, Your Honor.

11:21:25 5          It's pretty clear on questions of efficacy,

11:21:29 6  questions of risk benefit, questions of what patients are the

11:21:33 7  appropriate patients for filters, questions of the impact of

11:21:36 8  filters on those patients, those are all subjects well outside

11:21:40 9  of Dr. Kessler's expertise.  Yet a significant portion of his

11:21:46 10  report is dedicated to his regurgitation of Cook documents and

11:21:51 11  his analysis of whether those documents, tests, and studies

11:21:56 12  showed perforation or not.  He's not qualified to diagnosis

11:22:00 13  perforation.  He said that in his deposition.

11:22:02 14          In fact, he said that the way that he prepared to

11:22:05 15  understand what perforation even meant on a page was to talk

11:22:09 16  to Dr. Rajebi, the second-year doctor, and ask him to tell him

11:22:13 17  in a brief phone conversation what is perforation and what are

11:22:17 18  you looking at.  He hasn't studied perforation and his

11:22:21 19  definition of perforation, the definition that we spoke of

11:22:24 20  earlier, three millimeters outside the cava wall, is one that

11:22:28 21  he adopted that stands in contrast, as I said earlier to the

11:22:32 22  definition of Dr. Rajebi.  Dr. Rajebi says nobody ever uses

11:22:36 23  that definition.  Dr. Kessler superimposes his definition of

11:22:42 24  perforation on all of the opinions that he offers in this

11:22:44 25  case.

11:22:44  1         So he offers opinions about many Cook studies, VCA1,

11:22:48  2   VCA2, VCA3, VCOB, studies that were conducted at the

11:22:54  3   University of Zaragoza and many others.  Now, as I said

11:22:59  4   earlier, this narration of Cook studies or even studies

11:23:02  5   outside of Cook, that shouldn't be permitted because it's not

11:23:06  6   proper regulatory opinion.  He shouldn't be allowed to do

11:23:09  7   that.  He hasn't conducted or participated in these studies.

11:23:12  8   Well outside his qualification.  He has no personal knowledge

11:23:16  9   of those.

11:23:17 10         But here's where the problem lies.  Because he

11:23:20 11   cannot opine on what is or is not a perforation, he also

11:23:25 12   cannot opine on whether these studies do or do not show

11:23:30 13   perforation, whether they do or do not support his opinion

11:23:33 14   that the product is adulterated in some respect.  You have to

11:23:37 15   have some knowledge of the underlying medical condition to

11:23:40 16   evaluate studies.  He is not qualified and has no personal

11:23:44 17   knowledge of the studies.

11:23:45 18         Again, it would be a different story if what

11:23:48 19   Dr. Kessler were saying to this Court was Cook submitted a

11:23:52 20   510(k) application for the Celect.  Within the Celect it

11:23:55 21   should have had these three studies based on the 1999 FDA

11:23:59 22   guidance.  Their 510(k) did not have those studies.  So it's

11:24:03 23   my opinion that they didn't qualify.  They didn't submit a

11:24:06 24   proper 510(k) based on the 1999 guidance.  That's not what

11:24:10 25   he's saying.  You can look at all 200 pages of his report and

11:24:14  1   nowhere in there will you find any statement that Cook's

11:24:18  2   510(k) was somehow improper in some respect.  Nowhere.

11:24:22  3         All of his opinions relate to this concept of his

11:24:26  4   belief that Cook is a bad company and that Cook hid

11:24:29  5   information or had information and didn't share information

11:24:33  6   with the general public.  He never even offers the opinion

11:24:36  7   that under the FDA regulations, information that he says Cook

11:24:41  8   had and misleadingly withheld in some way, he never even

11:24:45  9   offers the opinion that that information, when you apply FDA

11:24:49 10   regulations, was required to be included within a 510(k)

11:24:53 11   submission.

11:24:54 12         He's a regulatory expert.  He's not a medical

11:24:57 13   doctor.  He's not a clinician who specializes in this field.

11:25:02 14   And both while he was within the FDA and outside the FDA, he

11:25:06 15   doesn't have the kind of experience that someone like Elisa

11:25:09 16   Harvey has, where her sole job for a long period of time at

11:25:13 17   FDA was to review 510(k) applications and review the

11:25:16 18   submissions with the 510(k) applications to confirm does this

11:25:20 19   meet the regulations that are applicable to 510(k)

11:25:23 20   applications and should the product be cleared.  He simply

11:25:26 21   hasn't done it.

11:25:28 22         Your Honor, we also argue in our papers that

11:25:31 23   Dr. Kessler should be barred from testifying that the Celect

11:25:35 24   perforates more often than the Tulip.  And I don't want to be

11:25:38 25   redundant about what we talked about earlier with respect to

11:25:42 1    Dr. Rajebi but I do want to say a few words about it.

11:25:45 2    Dr. Kessler opines in his report that the Celect perforates at

11:25:49 3    a higher rate than the Tulip, even though the rates of

11:25:52 4    perforation for both products are less than one percent.

11:25:56 5            First, he repeats Dr. Betensky's conclusions and

11:26:00 6    relies on her work to draw his opinions.  He does not himself

11:26:04 7    have a degree in epidemiology or biostatistics.  He has an

11:26:09 8    appointment as a professor of biostatistics and epidemiology

11:26:11 9    but he doesn't teach the methods of epidemiology or

11:26:17 10   biostatistics.  He can come and lecture within that group of

11:26:21 11   the university, based on his public policy and health

11:26:25 12   experience; but he's not offering opinions on epidemiology or

11:26:29 13   biostatistics when he does that.

11:26:30 14           His testimony is also improper because it's

11:26:34 15   duplicative of Dr. Betensky's testimony.  It's cumulative.

11:26:37 16   Plaintiffs can't offer two experts to say the same thing.

11:26:40 17   They have to pick one or the other.

11:26:43 18           As I put on the screen in front of you, you can see

11:26:45 19   very clearly that the opinions are essentially word for word,

11:26:49 20   identical and the overlap is clear.  In the *McCauley* case in

11:26:55 21   this district, the Court excluded similarly overlapping

11:26:58 22   testimony that was cumulative and offered nothing new that

11:27:01 23   would readily assist the trier of fact.

11:27:03 24           But even if you set aside the question of the

11:27:06 25   cumulative nature of Dr. Kessler's testimony versus

11:27:09 1  Dr. Betensky's testimony, they both focus their comparative

11:27:14 2  analysis on complaint data for the Tulip and Celect.  And

11:27:18 3  Dr. Kessler's testimony on this point, that the Celect

11:27:21 4  perforates ten times more than the Tulip, that testimony would

11:27:26 5  mislead the jury into thinking that a higher rate for the

11:27:29 6  Celect means that there's something wrong with the design -- a

11:27:33 7  higher rate for the Celect means there's something wrong with

11:27:35 8  the design.

11:27:36 9          And you asked a number of questions earlier about

11:27:39 10 Dr. Betensky; isn't this just something for cross-examination.

11:27:42 11 It's not.  It's proper summary judgment material.  And so we

11:27:45 12 put in our summary judgment papers in the Hill case, and I

11:27:48 13 believe in the Kessler case, too, courts in this jurisdiction,

11:27:52 14 the *Brown* case and other cases hold that correlation alone is

11:27:56 15 not enough.  When you're analyzing the expert's testimony, all

11:28:00 16 the expert can say is correlation, that doesn't get you over

11:28:04 17 the Daubert threshold because it doesn't go to causation, for

11:28:07 18 the same reasons that Mr. Webber mentioned earlier.  You can't

11:28:11 19 meet the gatekeeping feature of Rule 702 based on correlation

11:28:15 20 alone.

11:28:16 21         And you can't meet that same standard when you turn

11:28:19 22 then to the motion for summary judgment.  Correlation and

11:28:23 23 causation are two entirely different things.  Dr. Kessler's

11:28:26 24 testimony would mislead the jury into believing that, in fact,

11:28:29 25 there is causation, when at best he observes a correlation.

11:28:33  1   And it's not a reliable correlation because he and Betensky

11:28:39  2   together, she acknowledges, he relies on his work, that you

11:28:43  3   can't even -- even really reliably say it's a correlation

11:28:46  4   because they've done nothing to remove for confounders at all.

11:28:50  5   There could be a higher correlation between people who have

11:28:53  6   brown hair who get perforation or people who are young or some

11:28:56  7   other factor, cancer patients.  They've done none of the work

11:29:00  8   to analyze any of those things.

11:29:01  9          And because that kind of evidence -- imagine it.  A

11:29:06 10   jury hears the former commissioner of the FDA say, this thing

11:29:08 11   is ten times more likely to perforate than the Tulip.  Or at

11:29:12 12   one point in his report he says, this data shows it's 99 --

11:29:15 13   perforates 99 percent of the time more than the Tulip does.

11:29:20 14   That's grossly misleading.  A jury will not be able to ferret

11:29:25 15   out the difference between what they're actually saying is a

11:29:28 16   ten percent or other ratio correlation as opposed to

11:29:33 17   causation.  And this Court should exercise its gatekeeping

11:29:37 18   function to prevent Dr. Kessler and Dr. Betensky from doing

11:29:40 19   it.  And if even one of them is allowed to do it, both of them

11:29:44 20   should not be allowed to do it.

11:29:47 21          There are other opinions that we explain in our

11:29:50 22   papers that I won't go into in much detail because we've

11:29:54 23   briefed these extensively, Your Honor.  And the bottom line is

11:29:58 24   with respect to other opinions by Dr. Kessler and his opinions

11:30:00 25   in total, there is no fit.  The fit element of 702 is

11:30:05  1   particularly important as it relates to Dr. Kessler.

11:30:07  2         First, we know that there is no fit with respect to

11:30:10  3   his opinions on labeling, for example.  And if it's helpful,

11:30:14  4   his report is so long, I pulled out just the pages on labeling

11:30:18  5   and can pass it up when I'm done here.  All Dr. Kessler says

11:30:23  6   with respect to the labeling is -- there are three pages where

11:30:25  7   he says here's what the FDA regulation says labeling is, what

11:30:30  8   these sections of the labeling means.  That's it.  He doesn't

11:30:34  9   go on to offer any opinions about what those sections mean.

11:30:37 10         So to the extent that he says a warning in a label

11:30:41 11   is X, period, he offers no corresponding opinions about what

11:30:46 12   that means for IVC filters, what it means for the Celect, or

11:30:51 13   what the meant for the complications at issue in Mrs. Hill's

11:30:54 14   case.  So there's no fit between his labeling opinions and the

11:30:57 15   issues before this Court.

11:30:59 16         Likewise, he has two pages of opinions about

11:31:02 17   physicians are rarely in a position to understand the risks.

11:31:06 18   That testimony has no relevance or fit to this case

11:31:10 19   whatsoever.  He's not read any of the Hill specific records or

11:31:14 20   any of the Hill specific depositions.  So he can't offer any

11:31:17 21   opinions about whether Dr. Zuzga was in a position to know the

11:31:21 22   risks or not; and in fact, we know from his testimony at

11:31:24 23   length in his deposition that he was well aware of the risk

11:31:27 24   from his medical education and training and review of the

11:31:29 25   literature.

11:31:30  1        We know that Dr. Kessler's opinions on the framework
11:31:34  2   for adverse event warning have no fit and should be excluded.
11:31:39  3   So here's what he does on that point, Your Honor.  I think
11:31:43  4   this is important.  Dr. Kessler lays out in his work a
11:31:46  5   framework for adverse event reporting and when a company is
11:31:50  6   required to submit an adverse event report to the FDA and then
11:31:53  7   he stops.  Period.

11:31:57  8        There is not a single expert on plaintiff's side who
11:32:00  9   opines that Cook's adverse event reporting was insufficient in
11:32:05 10   some way, or that it was contrary to industry standards, or
11:32:08 11   that there was something wrong with the way or how Cook
11:32:10 12   submitted adverse event reports.  He offers no postmarket
11:32:15 13   opinions that relate to Cook's adverse event reporting at all.
11:32:19 14   So testimony that he offers about that framework is testimony
11:32:23 15   in the air.  It's like throwing a ball up and then waiting for
11:32:27 16   the jury to decide where it should bounce.  That's misleading.
11:32:30 17   It's confusing.  It's unfairly prejudicial even to hear about
11:32:35 18   adverse event reporting when he offers no context for it as it
11:32:38 19   relates to Cook's adverse event reporting.

11:32:41 20        He also offers opinions on testing and studies that
11:32:44 21   were not part of the FDA's submissions and then he tests and
11:32:48 22   studies that don't even pertain to the Celect.  Those aren't
11:32:51 23   tests or studies that Dr. Kessler would have reviewed when he
11:32:53 24   was the commissioner of the FDA.  They're not tests or studies
11:32:56 25   of the type that he would have reviewed after his work at the

11:32:59  1   FDA, and they aren't tests or studies that the FDA had before

11:33:02  2   it, when it was considering the 510(k) for the Celect.

11:33:06  3        A proper regulatory expert is one like Dr. Elisa

11:33:11  4   Harvey, who will come to this Court and she will explain to

11:33:14  5   you, here is the regulatory framework for a medical product to

11:33:18  6   come to market in this country.  Here's how Cook complied with

11:33:22  7   that regulatory framework, and here's what Cook submitted, and

11:33:27  8   here's what the FDA did, and here's how the FDA reviewed that

11:33:31  9   information and then the FDA cleared it.

11:33:33 10        A proper regulatory expert is one like Wally

11:33:36 11   Pellerite, who will come to this Court and explain to you,

11:33:39 12   Court, after the product was cleared for marketing twice,

11:33:42 13   after that time, here are the things that FDA does in its

11:33:46 14   monitoring of products, and here are actions that FDA could

11:33:50 15   have taken if they thought there was a problem.  They could

11:33:53 16   have ordered a recall or ordered Cook to send a dear doctor

11:33:57 17   letter or ordered other remedial action.  FDA did none of

11:34:00 18   those things.  But it's proper regulatory testimony for an

11:34:03 19   expert to say this is what happens from a FDA perspective

11:34:07 20   postmarket and those things did not happen here.

11:34:11 21        At the end of the day, that is -- that's not what

11:34:13 22   Dr. Kessler's offered to do.  Not at all.  What he's offered

11:34:17 23   to do primarily is to spend most of his time telling the bad

11:34:21 24   company case story to try to inflame the passions of the jury,

11:34:25 25   to try to mislead the jury about the true legal standard in

11:34:27  1   this case.  His opinions don't go to regulatory issues.  In

11:34:32  2   fact, there's barely any mention of the regulatory framework

11:34:35  3   that a regulatory expert typically provides.  That's the

11:34:39  4   reason why twice, Your Honor, two different courts have

11:34:44  5   significantly limited Dr. Kessler's opinions, and it's the

11:34:46  6   reason other regulatory experts have significantly been

11:34:49  7   excluded because their expertise, what they can offer to the

11:34:53  8   Court, is very limited.  And efforts to go beyond that, like

11:34:58  9   Dr. Kessler's efforts, are simply not permissible under

11:35:02 10   Daubert.  Thank you, Your Honor.

11:35:03 11           THE COURT:  Thank you.  Mr. Schultz.

11:35:16 12           MR. SCHULTZ:  Thank you, Your Honor.  Matt Schultz

11:35:17 13   for the plaintiff.  I want to mention, Judge, at the outset,

11:35:21 14   we did get the memo of ten minutes per side in argument and

11:35:27 15   Ms. Pierson spent 30 minutes.  I will try and keep my response

11:35:31 16   within ten but she did bring up a few things that I had not

11:35:35 17   anticipated.

11:35:37 18           I want to start where she ended, if I might, Your

11:35:39 19   Honor.  She just mentioned that they found two cases where

11:35:42 20   Dr. Kessler was limited.  The first was the *Wells* case out of

11:35:45 21   Oklahoma, and they gave half of the quote to the Court in

11:35:48 22   their briefing that said he couldn't rehash facts.  But the

11:35:52 23   Court went on to say in the same sentence, "To the extent the

11:35:55 24   facts relied upon by Dr. Kessler in forming his opinions are

11:35:59 25   relevant and not cumulative, he may include them in his

11:36:02  1   testimony."  So that was the ruling out of the *Wells* case.

11:36:05  2          The *Bard* case that they cite, that they said he was

11:36:08  3   excluded in, actually held that Dr. Kessler could offer

11:36:13  4   "expert testimony related to the FDA 510(k) framework and

11:36:18  5   process.  Bard's actions taken with respect to this framework

11:36:22  6   and process and form an expert opinion that embraces an

11:36:25  7   ultimate issue."  It went on to say, "Bard did not disclose

11:36:29  8   certain information to the FDA that he, as a former

11:36:32  9   commissioner of the FDA, would have found pertinent," and he

11:36:35 10   could testimony to that; and the Court found Dr. Kessler's

11:36:38 11   opinions related to product safety, design and labeling and

11:36:40 12   warnings are sufficiently reliable to be admissible and noted

11:36:44 13   that he, "relied upon Bard documents, testimony and scientific

11:36:48 14   literature for those opinions."  So those are the two cases

11:36:52 15   they cite for excluding Dr. Kessler and those were the actual

11:36:55 16   rulings I just quoted from.

11:36:57 17          I do want to back up, Your Honor, because we've

11:36:59 18   heard again this notion that adulteration and misbranding are

11:37:03 19   out of this case because of this Court's ruling on negligence

11:37:06 20   per se.  We have a negligence claim in our count.  Not cited

11:37:10 21   by Cook in their papers are cases out of Florida that discuss

11:37:16 22   negligence in a products liability case, and I want to take a

11:37:18 23   moment to cite a couple of them.  The first is the *Jones* case,

11:37:21 24   at 871 So. 2d 899 from the 3d DCA.  And under Florida law, we

11:37:26 25   have intermediate appellate courts absent a conflicting ruling

| | | |
|---|---|---|
| 11:37:30 | 1 | from another court or a contrary ruling from the Florida |
| 11:37:34 | 2 | Superior Court.  These are the law of the land, so to speak, |
| 11:37:37 | 3 | for Erie purposes. |
| 11:37:38 | 4 | But the *Jones* case reinstated a verdict in a |
| 11:37:41 | 5 | products liability action that alleged "negligence in design |
| 11:37:45 | 6 | testing and/or failure to test and failure to warn and strict |
| 11:37:50 | 7 | liability for a design defect.  The *Barfield* case at 197 So. |
| 11:37:55 | 8 | 2d 545 involved negligent development in manufacturing and the |
| 11:38:01 | 9 | Court said that a manufacture's duty to use reasonable care |
| 11:38:05 | 10 | includes making reasonable tests to discover latent hazards. |
| 11:38:10 | 11 | And the last one, Your Honor, the *Favors* case at 309 |
| 11:38:13 | 12 | So. 2d 69.  Actually, Judge, it was own a motion to dismiss |
| 11:38:18 | 13 | and the Court found sufficient allegations in a products |
| 11:38:22 | 14 | liability case that the product was negligently designed, |
| 11:38:27 | 15 | negligently failed to test, and negligently failed to |
| 11:38:31 | 16 | investigate similar explosions of similar wheels and rims so |
| 11:38:34 | 17 | as to do proper research on the correct causes thereof. |
| 11:38:38 | 18 | Those are essentially the very things that we have |
| 11:38:42 | 19 | alleged in our complaint for negligence.  So yes, negligence |
| 11:38:45 | 20 | per se is out.  It's out because this Court found that there's |
| 11:38:48 | 21 | no private cause of action under the FDCA.  There's not.  But |
| 11:38:53 | 22 | that doesn't mean that FDCA is irrelevant.  I've already |
| 11:38:57 | 23 | quoted to the Court the *Bausch* case, where they found that |
| 11:39:00 | 24 | violation of the Food and Drug Act included adulteration |
| 11:39:05 | 25 | specifically is relevant to determining whether there's a |

11:39:08 1   violation of the underlying state tort law.  And that's

11:39:11 2   consistent with Florida law where we have a standard jury

11:39:14 3   instruction that's in our papers.  The violation of a statute

11:39:17 4   like that is nonconclusive evidence of negligence.

11:39:19 5          And that's goes to a second point, Your Honor, legal

11:39:22 6   conclusions.  In fairness, we did -- we did basically a

11:39:27 7   goose/gander.  We didn't want to put ourselves in a position

11:39:29 8   of their folks being able to give ultimate opinions and

11:39:32 9   Dr. Kessler not being permitted to.  I would propose to the

11:39:35 10  Court, Your Honor, the correct legal ruling in this

11:39:38 11  circumstance is that the expert should be able to give the

11:39:41 12  ultimate opinion.

11:39:42 13         The case cited by and relied upon by Cook is

11:39:46 14  distinguishable.  That's the *People's State Bank v. Stifel,*

11:39:48 15  *Nicolaus & Company* out of this Court in 2013.  And I don't

11:39:53 16  know if it Your Honor's case.  If it was, you'll know this

11:39:56 17  already; but the ruling was that you could not have an

11:39:59 18  expert -- regulatory expert give an opinion that "nearly tells

11:40:03 19  the jury what result to reach."  And in that case, because it

11:40:06 20  involved violation of the Securities Act, the expert sought to

11:40:10 21  give an opinion that the Securities Act wasn't violated.

11:40:13 22  Well, that would tell the jury what determination or what

11:40:16 23  verdict to reach in that case.

11:40:17 24         If the jury in this case is told that the Celect is

11:40:23 25  adulterated or that it's misbranded, that does not compel a

11:40:26  1  verdict for the plaintiffs.  It is again, under Florida law,

11:40:28  2  nonconclusive evidence of negligence.  The ultimate decision

11:40:31  3  they have to make is whether there was product defect or

11:40:34  4  whether Cook was negligent in its conduct.  By giving that

11:40:37  5  opinion, the jury is not being told what result to reach.

11:40:42  6  It's not like the *People's State Bank* case.

11:40:48  7          On narrative opinions, Your Honor.  I think the

11:40:52  8  first issue is Cook mistakes Dr. Kessler's report for the

11:40:57  9  testimony that he intends to give in the case.  He is not, of

11:41:00 10  course, going to stand up and read his report to this jury.

11:41:02 11  His report was very thorough.  I spent 22 days with him

11:41:06 12  researching and writing and refining this report.  He cites

11:41:11 13  hundreds of documents, as Ms. Pierson pointed out, and he does

11:41:14 14  that because he's meticulous and thorough and wants to support

11:41:18 15  his opinions and he has.  That's not to say that he's going to

11:41:21 16  stand up and regurgitate, to use Ms. Pierson's word, every

11:41:26 17  element or item out of his report.

11:41:28 18          There is another MDL, Judge, pointed out.

11:41:30 19  Dr. Kessler's report is not objectionable because of the

11:41:34 20  amount of information it contains.  And I think the same would

11:41:37 21  hold true here, Your Honor.

11:41:38 22          We cite in our papers and I will rely primarily on

11:41:43 23  our response to this, but we do cite cases, including 7th

11:41:46 24  Circuit case law, that do allow the expert to give underlying

11:41:50 25  factual support for his opinions.  Ms. Pierson says that the

| | | |
|---|---|---|
| 11:41:55 | 1 | internal documents of Cook don't have any connection to the |
| 11:41:58 | 2 | regulatory standard.  Well, that's just wrong.  That is what |
| 11:42:01 | 3 | the entire report is about.  And Dr. Kessler's methodology, he |
| 11:42:05 | 4 | testified is the same methodology he would use at FDA, and he |
| 11:42:08 | 5 | was involved in 510(k)'s at FDA.  He testified to that as |
| 11:42:11 | 6 | well, although not for IVC filters. |
| 11:42:14 | 7 | He identifies a standard because that's what |
| 11:42:18 | 8 | adulteration and misbranding are about; and the standards come |
| 11:42:21 | 9 | out of their quality system regulation documents, designed |
| 11:42:24 | 10 | input requirements, a verification and validation.  The QSR |
| 11:42:28 | 11 | regulations Dr. Kessler signed as the FDA commissioner.  He |
| 11:42:32 | 12 | looks to those standards set by Cook.  The standard for |
| 11:42:36 | 13 | perforation for the Celect filter was that it shall not |
| 11:42:40 | 14 | perforate after fixation in the cava wall.  That's a standard |
| 11:42:43 | 15 | they set.  They say it's unreasonable and it's aspirational. |
| 11:42:45 | 16 | That's not what their design input requirements say.  And then |
| 11:42:48 | 17 | they have a verification and validation document that says not |
| 11:42:51 | 18 | only is that the standard but they met that standard.  And |
| 11:42:54 | 19 | they say that they know they met that standard based on animal |
| 11:42:57 | 20 | studies and then later based on the clinical study. |
| 11:43:00 | 21 | So Dr. Kessler goes and looks at the animal studies |
| 11:43:04 | 22 | and the clinical study.  In the animal studies, it's all in |
| 11:43:08 | 23 | his report.  There's not a single one where Tulip perforates |
| 11:43:11 | 24 | more often than Celect, and I think it's fair to say in every |
| 11:43:14 | 25 | one of them, Celect perforates more often than Tulip.  And we |

11:43:17  1    have to keep in mind we're not talking about efficacy.  We're

11:43:22  2    not talking about the why because the standard is, did it live

11:43:24  3    up to the representations or what it was reported to be; and

11:43:28  4    it does not.  So the evidence in the internal company

11:43:31  5    documents goes to whether that standard was met or not met.

11:43:34  6            Dr. Kessler -- it would make no sense for him to

11:43:37  7    take the stand and say, here's the definition of adulteration

11:43:40  8    under federal law and here's the definition of misbranding.

11:43:43  9    Take it from me, I'm the former head of the FDA.  Thank you

11:43:47  10   very much, and then go home.  Obviously he's entitled to

11:43:49  11   supply factual support for his opinions, and we cite in our

11:43:54  12   brief a number of cases that have recognized that, including

11:43:57  13   the ones that I just quoted to Your Honor.

11:44:01  14           There is a 7th Circuit case that we cited.  It says

11:44:03  15   if a witness' expertise would be helpful to the jury and the

11:44:07  16   facts which he recounts fall within his area of expertise,

11:44:10  17   then there's nothing improper about a selective summary.  And

11:44:14  18   that is out of the *Pree* case, P-R-E-E.  And that's exactly

11:44:19  19   what they accuse Dr. Kessler of doing.  Of course he's gone

11:44:22  20   and cherry-picked, to use their phrase, out of the million

11:44:26  21   pages of documents that they've got and the ones that support

11:44:29  22   his opinions.  If they feel like he's unfairly selected

11:44:33  23   documents, then that's fair game for cross-examination.

11:44:35  24           He has been permitted to testify to this in previous

11:44:39  25   cases, including the underlying data; and we have several

11:44:43  1   cases cited that effect in our papers.

11:44:48  2        On the issue of giving medical opinions in the

11:44:52  3   definition of perforation.  First of all, Dr. Kessler, he's a

11:44:55  4   Harvard trained physician but he's not giving medical

11:44:58  5   opinions, Your Honor.  He's not looking at images and saying,

11:45:01  6   "I think this is a perforation," or "I think that's a

11:45:04  7   perforation."  He's looking at Cook's documents.  Cook said

11:45:06  8   the Celect would perforate less frequently than the Tulip.

11:45:10  9   Again, many ways, many times they said this; and he's looking

11:45:13  10  at the documents that show that that's not true.  And that is

11:45:17  11  what constitutes adulteration under the law.

11:45:20  12        So naturally he's going to look to what they used.

11:45:24  13  His definition, by the way, is not greater than three

11:45:27  14  millimeters.  If you read probably the first five paragraphs

11:45:31  15  of the report, he says, "I will use the greater than three

11:45:34  16  millimeter standard throughout this report unless I'm

11:45:38  17  discussing a document that uses a different standard," because

11:45:40  18  there are more than one definition.  Greater than three

11:45:43  19  millimeters is important because Cook never used that in their

11:45:46  20  complaint investigations and it's relevant in that respect.

11:45:49  21  It is the most widely accepted standard and Dr. Kessler did

11:45:53  22  say, "If I'm talking about perforation, I think that is the

11:45:56  23  preferred definition to use.  But if I'm talking about a study

11:45:58  24  like the VAC1 sheep study, wherein the protocol for the study

11:46:03  25  itself it doesn't include greater than three millimeters.  It

11:46:06   1    just includes outside the wall as the definition of

11:46:09   2    perforation -- I think it was penetration in that study.  Then

11:46:11   3    he applies that definition.  So again, he's only using Cook's

11:46:14   4    definitions.

11:46:15   5            When the OUS had side investigators come back to

11:46:20   6    Cook and say, "We have legs eight to ten millimeters outside

11:46:25   7    the vena cava," by any standard that is a perforation.  These

11:46:28   8    were reported to Cook in their study.  They were concealed

11:46:30   9    from the FDA, despite the fact the FDA -- Ms. Pierson alluded

11:46:34  10    to the fact that Dr. Kessler never cited a regulatory standard

11:46:39  11    that would require them to submit that.  FDA specifically

11:46:42  12    asked Cook, "We want to know if you have perforations in the

11:46:45  13    study before we clear this device."  They wrote back and said,

11:46:47  14    "No, we don't," even though they had ten by the definition

11:46:51  15    they used in their study, which is strut out of the wall.  I

11:46:54  16    think they had seven by the greater than three millimeter

11:46:56  17    standard as reported by their own site investigators in their

11:47:00  18    study out of their business documents.  So Dr. Kessler is not

11:47:02  19    making judgment calls as a physician in the case.

11:47:08  20            The framework for reporting is relevant.  First of

11:47:10  21    all, it sets the standard for Dr. Marmureanu.  You've heard

11:47:14  22    Dr. Marmureanu reviewed over 300 complaints.  Well, he

11:47:18  23    reviewed them from a medical perspective precisely because

11:47:22  24    Dr. Kessler did not feel comfortable doing that.

11:47:26  25    Dr. Marmureanu reviewed them based on the regulatory MDR

11:47:29 1  Reporting standard.  Our reporting expert is going to opine on

11:47:31 2  what that standard is.  Dr. Marmureanu can't do that.  So

11:47:33 3  there's a marriage between their testimony and it's relevant

11:47:38 4  for that reason.

11:47:40 5          If you look at footnote 30 -- excuse me, footnote 60

11:47:43 6  at page 30 of his report -- I pulled it up -- he discusses the

11:47:47 7  126 adverse events that occurred outside the U.S. that Cook

11:47:53 8  intentionally withheld from the FDA and that we brought to

11:47:56 9  their attention, in fact, through deposition for the first

11:47:57 10 time and they were reported after we brought this up in

11:48:01 11 litigation.  That's important, Your Honor, because that

11:48:03 12 affects the MAUDE data, the public reports of adverse events

11:48:08 13 that Ms. Pierson just cited to you saying the Celect has a

11:48:11 14 lower perforation rate than every other competitor, which is

11:48:14 15 not true, first of all.

11:48:15 16         In fact, it's higher than any other competitor

11:48:17 17 except, I believe, the Bard G2.  But it's kind of beside the

11:48:21 18 point because for an adulteration opinion, we're not looking

11:48:25 19 at competitors' filters.  The standard is not how do you do

11:48:29 20 compared to Bard.  The standard is not are you saving lives,

11:48:32 21 is there a risk benefit analysis.  None of that is involved in

11:48:36 22 the adulteration standard.  The question is, are you as good

11:48:38 23 as you said you were going to be.

11:48:40 24         So the reporting is relevant.  To the extent they

11:48:44 25 under-reported, then went to doctors -- and we well hear

11:48:47  1   evidence of this throughout the witnesses -- went to doctors

11:48:49  2   and used the MAUDE data to do what Ms. Pierson just did, to

11:48:54  3   tell them look how great our Celect is.  Well, they had 126

11:48:57  4   events that involved three or four adverse event complications

11:49:01  5   in each one where you have a perforation, a tilt, a fracture.

11:49:04  6   So hundreds of events that were never reported to the FDA

11:49:07  7   during the time frame it should have been and were only

11:49:10  8   reported when we brought it up.  So regulatory reporting is

11:49:14  9   going to be part of this case, Your Honor, by our lights at

11:49:17 10   least.

11:49:17 11          And the last point Ms. Pierson made was testing and

11:49:21 12   studies not submitted to FDA.  Well, clearly what they didn't

11:49:25 13   tell FDA is just as important as what they did tell FDA,

11:49:29 14   particularly when FDA says we want to know about perforations

11:49:33 15   specifically; and they say there are none when they have ten,

11:49:36 16   which is one-sixth.  So about 17 percent perforations in their

11:49:41 17   clinical study; and they put that in the IFU, the interim data

11:49:45 18   from the OSU study and tell doctors, yes, there's potential

11:49:47 19   adverse event of perforation but if you look over at our

11:49:51 20   study, we had none.  When, in fact, they had 17 percent.

11:49:55 21          All of this ties together, Your Honor.  We can't

11:49:57 22   just put a bell jar over each individual opinion or individual

11:50:01 23   witness.  This all has context and tells the story that this

11:50:05 24   trial is going to be about and that the jury needs to hear.

11:50:08 25          So what was not submitted to FDA matters.  When Cook

11:50:13  1   performs animal test, after animal test, after animal test

11:50:17  2   showing that Celect perforates two and three and five times as

11:50:21  3   much as the Tulip, that's relevant knowledge to the

11:50:24  4   adulteration.

11:50:24  5         It's relevant knowledge to misbranding because they

11:50:26  6   go out and make representations, just like the representation

11:50:29  7   in the IFU that there were no perforations.  Whether they

11:50:33  8   submitted those tests to FDA or not, they knew there were

11:50:35  9   problems with perforations in animal studies.  They knew there

11:50:39 10   were problems in humans.  So I'm sorry if I went over time.  I

11:50:42 11   think I hit everything; and if you have any questions, I'm

11:50:45 12   happy to answer them.

11:50:46 13         THE COURT:  Thank you very much.

11:50:47 14         MS. PIERSON:  Your Honor, just a brief response.  We

11:50:52 15   appreciate your patience, especially for these experts that

11:50:56 16   have long, substantive opinions.  It just takes awhile

11:50:59 17   sometimes --

11:51:00 18         THE COURT:  It does.

11:51:00 19         MS. PIERSON:  -- to get through the material.

11:51:02 20   Judge, just a few responses to what Mr. Schultz said.  First

11:51:05 21   as it relates to the *Wells* case and the *Bard* cases that

11:51:10 22   limited Dr. Kessler's opinion, I encourage you to review those

11:51:13 23   yourself.  We've each given Your Honor interpretations of what

11:51:15 24   they hold but you'll make your own judgment.  And there are

11:51:18 25   other cases with other regulatory experts that we've cited in

| | | |
|---|---|---|
| 11:51:22 | 1 | our paper and that I've cited to you today that I think are |
| 11:51:24 | 2 | very relevant.  Regulatory expertise is a narrow area of |
| 11:51:27 | 3 | expertise.  It shouldn't become a mini trial or the central |
| 11:51:32 | 4 | trial in this issue where there are two key elements, no |
| 11:51:35 | 5 | matter what the legal theories, and that's design defect and |
| 11:51:39 | 6 | causation.  I encourage you to make your own judgment |
| 11:51:41 | 7 | reviewing those opinions. |
| 11:51:43 | 8 | As to what Mr. Schultz said with respect to |
| 11:51:45 | 9 | adulteration and misbranding, he says those are relevant.  The |
| 11:51:48 | 10 | point is they are legal conclusions.  Impermissible legal |
| 11:51:52 | 11 | conclusions that neither expert can offer; and if he doesn't |
| 11:51:54 | 12 | like the cases that we cite, I encourage you to read the cases |
| 11:51:58 | 13 | they cite because they took this position with Dr. Harvey and |
| 11:52:01 | 14 | Dr. Pellerite and it is the right position.  That none of the |
| 11:52:04 | 15 | experts should be using the words adulteration or misbranding. |
| 11:52:07 | 16 | Even if that weren't the case, though, Dr. Kessler |
| 11:52:10 | 17 | in his own deposition, even though his report said that these |
| 11:52:14 | 18 | products were adulterated and misbranded, in his deposition he |
| 11:52:18 | 19 | stopped short of that and said those are legal conclusions.  I |
| 11:52:21 | 20 | leave it to the other courts to decide, and he did that on |
| 11:52:24 | 21 | purpose because in one of the cases that I cited to you |
| 11:52:27 | 22 | earlier, either the *Wells* case or the *Bard* case, the Court |
| 11:52:30 | 23 | concluded that, in fact, he couldn't use those terms because |
| 11:52:33 | 24 | those were legal conclusions.  So regardless of what his |
| 11:52:36 | 25 | report says, he himself believes adulteration and misbranding |

11:52:39 1  are legal conclusions and neither side should be giving legal

11:52:44 2  conclusions to the jury.

11:52:46 3          Mr. Schultz argues that these things, the -- all of

11:52:50 4  the elements of them and the conclusion of adulteration and

11:52:53 5  misbranding are somehow evidence -- nonconclusive evidence of

11:52:58 6  negligence.  And we're going to address the plaintiff's

11:53:01 7  negligence claim when we get to summary judgment; but before

11:53:04 8  we go any further, I want to make perfectly clear one thing.

11:53:08 9  Florida law recognizes three types of negligence; negligent

11:53:13 10 failure to warn, negligent design, and negligent manufacture.

11:53:16 11 That is it.  There is no other cause of action.  Florida

11:53:19 12 courts have expressly rejected negligent testing, negligent

11:53:24 13 inspection, negligent failure to report adverse events.  All

11:53:29 14 these other kinds of bad conduct, those are not causes of

11:53:33 15 action under Florida law, and we'll go through the cases that

11:53:35 16 show that in just a second.

11:53:37 17         The point as it relates to Dr. Kessler is this.  His

11:53:40 18 opinions are legal conclusions.  They're not evidence of some

11:53:45 19 general garden variety negligence claim that does not exist

11:53:49 20 because there is no such beast.  And when Mr. Schultz is

11:53:52 21 talking about things like failure to report adverse events,

11:53:55 22 Florida courts have expressly said there is no claim for

11:53:59 23 negligent failure to report adverse events.  And again,

11:54:03 24 there's a reason for that.  These are all things that are

11:54:06 25 preempted under *Buckman*, when we're talking about

11:54:09  1   adulteration, we're talking about misbranding, we're talking

11:54:11  2   about adverse event reporting, these are all things that are

11:54:14  3   within the purview of the FDA.  And the FDA should be deciding

11:54:17  4   those issues and bringing causes of action for those issues.

11:54:20  5   They shouldn't be decided by a jury or by this Court.  That's

11:54:24  6   within the FDA's purview.

11:54:26  7           I noticed when Mr. Schultz was talking about the

11:54:29  8   narration part of Dr. Kessler's report, which as I said is a

11:54:34  9   full 50 percent or more, he said, "I spent 22 days with him

11:54:37 10   writing those opinions."  And I took note of that.  The fact

11:54:41 11   is Dr. Kessler could not sit down independently and write 200

11:54:47 12   pages of this email says this, this email says that, this

11:54:52 13   email says this.  The fact that those portions were written

11:54:55 14   either by or with the assistance of Mr. Schultz makes my

11:54:58 15   point.  Those aren't expert regulatory opinions.  They're

11:55:01 16   regurgitation of Cook emails, regurgitation of Cook documents.

11:55:06 17   He can't do that because he has no personal knowledge of those

11:55:09 18   documents and he can't do it because it's not permissible

11:55:13 19   expert regulatory opinion.

11:55:17 20           Mr. Schultz makes the point that Dr. Kessler will

11:55:20 21   testify about the regulatory framework and whether Cook met

11:55:24 22   that regulatory framework; but the example that he gives to

11:55:26 23   this Court belies that explanation.  He says that Dr. Kessler

11:55:30 24   will tell you that design inputs, engineering design documents

11:55:35 25   that Cook drafted with the original design goals for the

11:55:39  1   Celect, that the Celect didn't live up to those goals.  What

11:55:42  2   he didn't tell you was that document is not part of the

11:55:45  3   510(k).  That document was never given to the FDA.  So for

11:55:49  4   Dr. Kessler to say our 510(k) is or isn't appropriate, that we

11:55:53  5   submitted what we should or didn't submit, the design inputs

11:55:56  6   were never any part of what was submitted to FDA in the first

11:56:00  7   place.  It's not proper regulatory opinion for Dr. Kessler to

11:56:03  8   be offered to this Court to say Cook didn't meet its design

11:56:07  9   goals.  That's not appropriate.  That's not regulatory.

11:56:11 10        There's nothing about that that falls within his

11:56:14 11   experience at FDA.  He wasn't analyzing design inputs at FDA.

11:56:18 12   He wasn't saying we deviated from our design inputs at FDA.

11:56:22 13   He wasn't even reviewing 510(k)'s when he was at the FDA.  We

11:56:27 14   think he's not qualified to offer many of these opinions; but

11:56:29 15   at minimum, he ought to be limited strictly to the scope of

11:56:32 16   the regulatory framework and Cook's compliance with the

11:56:36 17   regulatory framework.  That's all.

11:56:38 18        And I mentioned this earlier to Your Honor.  You can

11:56:41 19   look at his opinion.  He's not critical of our 510(k) itself.

11:56:44 20   What he's critical of is postmarket.  It's after the product

11:56:49 21   was released he believes then the product was adulterated or

11:56:53 22   misbranded.  So as you you limit his opinions to what's

11:56:56 23   appropriate for a regulatory expert, his are limited even

11:56:59 24   farther.  At best he should be permitted to say, "I offer

11:57:03 25   postmarket opinions.  He's the postmarket structure by which

11:57:07  1   FDA monitors products and here's how the Celect was monitored.

11:57:12  2   FDA either did or didn't recall the product.  FDA either did

11:57:15  3   or didn't take action against Celect."

11:57:17  4         The fact of the matter is it didn't.  It didn't

11:57:20  5   order a recall and it didn't order a market withdrawal or any

11:57:24  6   other remedial action because even by virture of Kessler's own

11:57:28  7   testimony, the complication rate is less than one percent.

11:57:31  8   But a regulatory expert is not the person that should connect

11:57:34  9   those dots.  He should talk about the postmarket framework and

11:57:38 10   that's it.

11:57:39 11         I'd say just two last things, Your Honor.

11:57:41 12   Mr. Schultz says that Dr. Kessler can talk about medical

11:57:44 13   opinions related to perforation because he uses Cook's

11:57:47 14   definition.  That still doesn't qualify him.  Just reading

11:57:50 15   documents that a company has written, even if what Mr. Schultz

11:57:54 16   was saying were true, and it's not, that wouldn't qualify him

11:57:58 17   to talk about perforation.  He can't reliably define it and

11:58:02 18   it's not true that he applied Cook's definition.  And even if

11:58:05 19   that's what he tried to do, he's still not qualified.

11:58:07 20         The fact is he shouldn't be offering any opinions on

11:58:10 21   this topic because he's not a doctor who treats patients

11:58:13 22   with -- who need vena cava filters or with these conditions.

11:58:16 23   He's not a pathologist.  And outside of his work in this case,

11:58:20 24   he's never done any medical work related to the topic of vena

11:58:24 25   cava filters or perforations.

11:58:27  1          Lastly, Mr. Schultz talks about adverse event

11:58:30  2   reporting as relevant and I mentioned this before but, Florida

11:58:33  3   law does not recognize a cause of action for negligent failure

11:58:37  4   to report.  The cases on that are clear.  Second, the cases

11:58:39  5   are clear that claims related to adverse event reporting are

11:58:43  6   preempted under *Buckman*.  But third, Your Honor, don't be

11:58:46  7   mistaken or misled.  Dr. Kessler offers no opinions about

11:58:51  8   Cook's regulatory reporting.  And even if that were

11:58:54  9   permissible, it's expert.  The jury can't know, without the

11:58:58 10   assistance of an expert, whether a company's postmarket

11:59:02 11   reporting was proper or not.  That's regulatory expert opinion

11:59:05 12   and that's what Dr. Pellerite will talk about, if that

11:59:09 13   evidence is in at the trial.

11:59:11 14          But Dr. Kessler offers no opinions on that and they

11:59:15 15   must have an expert on that, if that's to be part of this

11:59:18 16   trial.  A jury can't decide alone whether Cook's reporting was

11:59:22 17   proper or improper, whether reporting a year later was okay or

11:59:25 18   was not okay, whether FDA's failure to take action when it

11:59:30 19   knew about adverse events, whether that means something or

11:59:33 20   doesn't mean something and Dr. Kessler does not opine on that

11:59:36 21   topic whatsoever.

11:59:37 22          And Mr. Schultz said lastly that the FDA -- that

11:59:41 23   Dr. Kessler's testimony on perforation is relevant because the

11:59:44 24   FDA asked about perforation.  You know the reasons why we

11:59:47 25   think he shouldn't be entitled to talk about perforation at

| | | |
|---|---|---|
| 11:59:50 | 1 | all; but even if Mr. Schultz is right on that point, then his |
| 11:59:54 | 2 | testimony should be limited to that.  Limited to what did FDA |
| 11:59:58 | 3 | ask, what did FDA receive in response.  Of all the tests and |
| 12:00:03 | 4 | studies and documents that Dr. Kessler opines on, there is |
| 12:00:08 | 5 | only one where there's a discussion back and forth -- actually |
| 12:00:12 | 6 | two where there's a discussion back and forth between FDA and |
| 12:00:16 | 7 | Cook about their testing.  That's VCA1, the first animal study |
| 12:00:21 | 8 | related to the Celect and the interim data that was provided |
| 12:00:23 | 9 | from the OUS study. |
| 12:00:25 | 10 | All these other studies, he's not qualified to |
| 12:00:29 | 11 | conduct or analyze those studies and they weren't part of the |
| 12:00:32 | 12 | FDA submissions, and they weren't part of any colloquy with |
| 12:00:36 | 13 | FDA.  So that's clearly well outside the scope of his confined |
| 12:00:39 | 14 | regulatory testimony.  Thank you, Your Honor. |
| 12:00:42 | 15 | THE COURT:  Mr. Schultz. |
| 12:00:48 | 16 | MR. SCHULTZ:  Thank you, Your Honor.  The standards |
| 12:00:52 | 17 | Dr. Kessler testifies to, as I mentioned, are Cook's |
| 12:00:54 | 18 | standards.  Mr. Gyllun, again head of QA who's in charge of |
| 12:00:59 | 19 | quality system regulation for the manufacturer William Cook |
| 12:01:03 | 20 | Europe, testified that these are specifications for device |
| 12:01:05 | 21 | performance.  That is the standard by which the device is |
| 12:01:08 | 22 | adjudged for adulteration purposes.  That's the analysis that |
| 12:01:13 | 23 | Dr. Kessler's undertaking.  So of course it's relevant. |
| 12:01:16 | 24 | We have the Cisson motion, which I hope we have time |
| 12:01:20 | 25 | to get to today because it changes everything about this trial |

```
12:01:23   1   and how we prepare for this trial, if 510(k) is in or out.  We
12:01:26   2   take the position it's irrelevant, misleading and should be
12:01:29   3   excluded; and if it is, then Dr. Kessler's opinions, of
12:01:33   4   course, won't make any difference because he won't be opining
12:01:36   5   on it.  But if it's in, then, of course, he's qualified to
12:01:39   6   speak of 510(k).
12:01:42   7          The suggestion again, Your Honor, and I just have to
12:01:44   8   address it, even though I mention this the first time around,
12:01:47   9   that Florida only recognizes these three elements of
12:01:52  10   negligence is just wrong; and we will deal with it on summary
12:01:55  11   judgment.  I just quoted to the Court three different cases
12:01:58  12   that talk about negligent testing, failure to investigate
12:02:02  13   device failures and figure out the source of them and so on.
12:02:06  14          The cases Ms. Pierson alludes to are cases that say,
12:02:09  15   for example, someone brought an independent claim for
12:02:13  16   negligent testing.  That was the count in their complaint and
12:02:16  17   the Court said no, that's subsumed within your other counts.
12:02:20  18   In that particular case, the testing case, it was in strict
12:02:23  19   liability design, defect and failure to warn.  But there's no
12:02:27  20   Florida case that says you can only get to negligence these
12:02:30  21   three ways.
12:02:30  22          The standard Florida jury instruction which I
12:02:33  23   presume the Court would give on negligence under the Erie
12:02:36  24   doctrine is very clear and it simply asks, were they
12:02:39  25   reasonable?  Did they fail to do something they should have
```

```
12:02:42  1  done?  Did they do something they shouldn't have?  That is the
12:02:44  2  reasonable man standard, the reasonable person standard.
12:02:46  3  That's what Florida follows and when you look in the products
12:02:48  4  liability series of the Florida standard jury instructions,
12:02:51  5  that's the question the jury has to answer.  And of course,
12:02:54  6  you can be negligent for failure to test.  You can be
12:02:57  7  negligent for failure to investigate.  You can be negligent in
12:03:01  8  many ways; and it's our position that Cook was.
12:03:04  9         Finally on the notion of never mentioning
12:03:07 10  adulteration.  I would yet again come back to the *Bausch*
12:03:10 11  decision because it's such a strong statement from the 7th
12:03:13 12  Circuit in the context of a products liability case saying
12:03:17 13  that adulteration -- they're specifically addressing
12:03:21 14  adulteration and saying that it goes a long way of proving the
12:03:23 15  violation of the underlying state substantive tort law.
12:03:25 16         The jury instruction -- and I don't know how this
12:03:28 17  cuts on Erie because it is somewhat evidentiary, I guess.  But
12:03:32 18  the standard jury instruction on violation is evidence of
12:03:36 19  negligence actually cites the statute.  It says cite the
12:03:40 20  statute and summarize it.  We can't get to the end of the case
12:03:43 21  and for the first time the jury hears the word adulteration or
12:03:46 22  the word misbranding and tries to figure out if that was
12:03:49 23  violated and thus is evidence of negligence.
12:03:52 24         And finally, Your Honor --
12:03:55 25         THE COURT:  I think in this circuit it's clear it's
```

| | | |
|---|---|---|
| 12:03:57 | 1 | evidence. |
| 12:03:58 | 2 | MR. SCHULTZ:  Okay.  Well, that makes it easy.  And |
| 12:04:00 | 3 | the last bit, Your Honor, is the suggestion that I wrote |
| 12:04:04 | 4 | Dr. Kessler's report, which was also made to me at deposition. |
| 12:04:07 | 5 | If I said something that suggested that, that certainly wasn't |
| 12:04:10 | 6 | my intention.  Dr. Kessler talked and I typed.  And of course |
| 12:04:13 | 7 | we talked about what went into the report and so on.  That has |
| 12:04:16 | 8 | been done for every expert report in this case and every other |
| 12:04:19 | 9 | case, as far as I know.  But I didn't want to let go |
| 12:04:22 | 10 | unchallenged her assertion that I wrote Dr. Kessler's report, |
| 12:04:25 | 11 | and I think that's what they thought, when they took his |
| 12:04:28 | 12 | deposition and started grilling him on lots of little details; |
| 12:04:31 | 13 | and I think they figured out he was the author.  Thank you, |
| 12:04:34 | 14 | Your Honor. |
| 12:04:35 | 15 | THE COURT:  Thank you.  Next, Dr. Garcia. |
| 12:04:58 | 16 | MR. WILLIAMS:  Good morning, Your Honor.  My name is |
| 12:04:59 | 17 | Jessica Cox and I'm here for the defendants. |
| 12:05:01 | 18 | THE COURT:  Good afternoon. |
| 12:05:03 | 19 | MR. WILLIAMS:  Good afternoon, Your Honor.  It is |
| 12:05:04 | 20 | already afternoon.  I might be able to keep my comments very |
| 12:05:07 | 21 | brief.  It appears from the witness list that the amended |
| 12:05:11 | 22 | witness list that plaintiffs filed last week, they have |
| 12:05:14 | 23 | withdrawn Dr. Garcia as an expert in this case.  He is not |
| 12:05:17 | 24 | listed as an expert on their will call list or their may call |
| 12:05:21 | 25 | list.  So I don't want to belabor the briefing that we have on |

12:05:26  1  file.

12:05:26  2          They didn't take him off their list altogether.  So

12:05:30  3  I can assume that they might have an argument that he could be

12:05:32  4  a rebuttal witness.  It's clear in this case that his opinions

12:05:36  5  would not be proper rebuttal testimony.  They say in their

12:05:41  6  response to our Daubert motion that his opinions are necessary

12:05:44  7  prove their claims.  That specifically his opinions relate to

12:05:49  8  their claims to establish negligence and failure to warn.

12:05:53  9          You have said in the *Bowman* case that it's improper

12:05:56 10  to have testimony that's only offered as an additional support

12:06:00 11  to an argument made in a party's case in chief as rebuttal

12:06:03 12  testimony.  If a plaintiff knows the defendant means to

12:06:05 13  contest an issue that's part of the case, it must be presented

12:06:10 14  in the case in chief.  So because his opinions would be

12:06:12 15  improper rebuttal testimony and because it's clear that

12:06:16 16  they've withdrawn him as an expert in their case in chief, I

12:06:18 17  don't want to spend a lot of time talking about it, if it

12:06:21 18  would be unnecessary to your decisions today.

12:06:23 19          THE COURT:  Very good.  Who's handling this?

12:06:28 20          MR. WILLIAMS:  Your Honor, Mr. Heaviside is going to

12:06:29 21  handle some issues with regard to Dr. Garcia.  If I could

12:06:31 22  address just the witness list issue, please.

12:06:34 23          THE COURT:  You may.

12:06:37 24          MR. WILLIAMS:  Thank you.  This was the subject of

12:06:39 25  Cook's motion to strike our witness list and continue the

| | | |
|---|---|---|
| 12:06:42 | 1 | trial, which I was told was going to be communicated to the |
| 12:06:45 | 2 | Court. |
| 12:06:45 | 3 | THE COURT:  It was. |
| 12:06:47 | 4 | MR. WILLIAMS:  That it had been withdrawn.  They |
| 12:06:49 | 5 | have pulled that motion down.  What I had said -- |
| 12:06:53 | 6 | THE COURT:  Last I heard was that you and the |
| 12:06:58 | 7 | defense were going to get together and try to resolve this |
| 12:07:04 | 8 | among yourselves without the Court's intervention. |
| 12:07:07 | 9 | MR. WILLIAMS:  Correct.  And that's what -- that's |
| 12:07:08 | 10 | what we did.  The motion, at least it's been represented to |
| 12:07:13 | 11 | me, will be withdrawn.  What we made clear, though -- or what |
| 12:07:15 | 12 | I made clear throughout probably five, six different emails |
| 12:07:19 | 13 | and a couple of phone calls with defense counsel, is that |
| 12:07:22 | 14 | because we have a rebuttal case and because we don't know what |
| 12:07:25 | 15 | they're going to put on or say in their opening statement, we |
| 12:07:29 | 16 | weren't going -- we can't just arbitrarily eliminate folks |
| 12:07:33 | 17 | from our witness list; because even if we think there's a very |
| 12:07:37 | 18 | high unlikeliness that these folks are going to be called, we |
| 12:07:42 | 19 | need to have them on our list because we don't know how the |
| 12:07:45 | 20 | evidence is going to develop.  We don't know what their case |
| 12:07:49 | 21 | in chief is going to look like.  And we if need to bring these |
| 12:07:51 | 22 | people on rebuttal, we want to make sure that they are still |
| 12:07:53 | 23 | included on the list so that we don't get attacked for not |
| 12:07:57 | 24 | including these people on our final list. |
| 12:07:59 | 25 | The Court's order only required that we provide a |

```
12:08:02  1   list of people who we believe will be present at trial.  We

12:08:06  2   broke that down into a will call and a may call list.  Those

12:08:10  3   are the people that we think -- are fairly confident that fit

12:08:15  4   into those categories.  But what I was clear about was we're

12:08:18  5   not going to just start striking people and say there is zero

12:08:23  6   percent chance that these folks are going to be called because

12:08:26  7   we don't know what's going to happen in their case in chief;

12:08:29  8   and for that matter, what they're going to say in their

12:08:32  9   opening statement.

12:08:34 10        With respect to Dr. Garcia, it is our belief at this

12:08:37 11   time that we most likely will not be calling him.  That being

12:08:40 12   said, if something gets raised at trial and we feel like we do

12:08:44 13   need to call him, he's been a disclosed expert.  He's got a

12:08:47 14   report.  There's a Daubert motion pending.  We believe that

12:08:50 15   that issue should be heard so that if the evidence requires us

12:08:53 16   to bring him to trial, that we be permitted to do so.

12:08:58 17        THE COURT:  All right.

12:09:01 18        MR. WILLIAMS:  Thank you, Your Honor.

12:09:03 19        MR. TANNER:  Your Honor, could I maybe address out

12:09:05 20   of order Mr. Williams' comments on the order of witness and

12:09:09 21   our concerns on that?  Would that be a good time, since he

12:09:12 22   just brought it up?

12:09:13 23        THE COURT:  Sure.  If the thought is that Garcia is

12:09:18 24   more than likely not going to be called in any -- there's

12:09:24 25   indication that he is going to be called, then we'll have a
```

| | | |
|---|---|---|
| 12:09:29 | 1 | hearing at that time.  There's no sense talking about |
| 12:09:35 | 2 | Dr. Garcia at this time and he's not going to be called.  If |
| 12:09:37 | 3 | he's going to be called, we'll take ten minutes to talk about |
| 12:09:43 | 4 | Dr. Garcia. |
| 12:09:47 | 5 | MR. TANNER:  Fair enough.  And it sounds like a good |
| 12:09:49 | 6 | solution.  And I will tell you that Joe and I have been |
| 12:09:50 | 7 | working together the last week I think very cooperatively and |
| 12:09:53 | 8 | have worked through these issues. |
| 12:09:54 | 9 | THE COURT:  I'm sure you have. |
| 12:09:54 | 10 | MR. TANNER:  But we just think it's important that |
| 12:09:57 | 11 | all three of us, the Court, us and the plaintiffs are on the |
| 12:09:59 | 12 | same page because they have identified 51 witnesses on their |
| 12:10:03 | 13 | final witness list for a case that they're going to put in in |
| 12:10:07 | 14 | one week, which obviously raised concerns.  Eighteen of those |
| 12:10:10 | 15 | they've put on their will call list.  Nineteen they said are |
| 12:10:14 | 16 | may call, which means they may call in their case in chief or |
| 12:10:18 | 17 | they may call them on rebuttal; and then another 14, like |
| 12:10:21 | 18 | Dr. Garcia, that they've said we're not taking off our list; |
| 12:10:23 | 19 | they may be in our rebuttal situation. |
| 12:10:26 | 20 | And this raises some concerns.  No. 1, in |
| 12:10:29 | 21 | preparation for trial, when are we going to find out when the |
| 12:10:32 | 22 | will calls move to the may calls in their case in chief. |
| 12:10:36 | 23 | Because they have to go first, they should be identifying what |
| 12:10:39 | 24 | testimony they're going to have to put on first and what that |
| 12:10:41 | 25 | order of witnesses.  So we have a little concern because |

12:10:44   1   they've said, well, we're not quite sure what you're going to

12:10:48   2   say in opening, and that's fair.  That might be fair for a

12:10:50   3   witness or two.  I submit it's not fair for 19 witnesses --

12:10:54   4          THE COURT:  Yes.

12:10:54   5          MR. TANNER -- not to know ahead of time because it

12:10:57   6   really hampers our preparation.

12:10:58   7          THE COURT:  I would agree with that.

12:10:59   8          MR. TANNER:  So saving them for after opening

12:11:02   9   creates some angst for us as to who is to come.

12:11:04   10          THE COURT:  I think I've said before, before every

12:11:07   11   trial date and when we adjourn for the day, I always ask

12:11:10   12   whoever is presenting the next day, "Who are your next three

12:11:13   13   or four witnesses going to be?

12:11:14   14          MR. TANNER:  And the only thing that raises a little

12:11:18   15   bit of complication, Your Honor, is we have -- nine of these

12:11:20   16   are witnesses from overseas and most of those are listed on

12:11:27   17   the may not call list or will call list; and trying to bring

12:11:32   18   them over on a 24-hour notice creates angst and issues.  And

12:11:36   19   we may have to go back to depositions for some of those that

12:11:39   20   we don't know well enough in advance if they're on the will

12:11:42   21   call list.

12:11:43   22          The other thing that causes us a bit of concern --

12:11:44   23          THE COURT:  I would expect that you would all work

12:11:46   24   out some path.

12:11:49   25          MR. TANNER:  Well in advance of the trial, Your

12:11:51  1    Honor.

12:11:52  2              THE COURT:  Yes.

12:11:52  3              MR. TANNER:  Thank you for that; and I think Joe and

12:11:55  4    I can do that.  The other concern we have is one that Ms. Cox

12:11:58  5    raised and that is, right now they have 31 potential rebuttal

12:12:02  6    witnesses.  And we're a little concerned that there's going to

12:12:04  7    be an attempt to save a lot of their case for rebuttal; and we

12:12:09  8    just want that to be out in the open right now that that's

12:12:12  9    not -- that's going to be something that obviously we're going

12:12:15 10    to strongly oppose, as Your Honor has written in opinions and

12:12:20 11    is trying to shift the order of proof through rebuttal

12:12:23 12    testimony, causes us concern with the number of rebuttal

12:12:27 13    witnesses, including Dr. Garcia and others.

12:12:30 14              So we're trying to raise that issue up-front so we

12:12:34 15    don't get into a messy situation during trial where there's a

12:12:37 16    whole huge rebuttal case after they put on their week long

12:12:41 17    case in chief.  Thank you, Your Honor.

12:12:45 18              MR. MATTHEWS:  I can address that.  There's no

12:12:47 19    sandbagging going on here.  David Matthews for the plaintiffs.

12:12:55 20    There's no sandbagging going on here.  We've given them a list

12:12:58 21    of the people we think we're going to call and that's who we

12:13:01 22    think we're going to call, with one exception.  I just noticed

12:13:05 23    it myself.  That's my mistake.  We do have a life care planner

12:13:09 24    by the name of Leigh Anne Levy, who just I noticed was not on

12:13:12 25    that list and that's my mistake.  We may call her.  She had a

12:13:16  1  life care plan of some $1.2 million but some opinions of

12:13:20  2  Dr. Marmureanu have changed and are limited to like $75,000 in

12:13:24  3  future medical care for Ms. Hill.  So that is one witness that

12:13:27  4  was not on the may call list but Dr. Garcia is still on the --

12:13:32  5          THE COURT:  That will be on the will call -- she'll

12:13:34  6  be on the will call.  Is that right?

12:13:36  7          MR. MATTHEWS:  I would put her on will call.

12:13:40  8          MR. WILLIAMS:  To be clear, Ms. Levy was on our

12:13:42  9  final witness list; but when I compiled our will call/may call

12:13:46  10 list, I inadvertently left her out of the spreadsheet; but she

12:13:49  11 was disclosed timely on our final list.

12:13:51  12         THE COURT:  She's been listed here.

12:13:55  13         MR. WILLIAMS:  Yes.

12:13:55  14         MR. TANNER:  Real quick, Your Honor.  If we can just

12:13:57  15 get a date by when they're going to identify who their will

12:14:00  16 call witnesses are because right now, the number of may calls

12:14:04  17 is so large; and now we're adding another one that wasn't on

12:14:08  18 any of the lists and that's what our concern is in

12:14:11  19 preparation.  So we really need to pin down that date, whether

12:14:14  20 it's two weeks before trial or whenever, when they're going to

12:14:17  21 have a definitive list; understanding if they have one in

12:14:21  22 there that may have to be a will call that they have to decide

12:14:24  23 after opening, we understand that.  But 19 is too many.

12:14:28  24         There's a second issue, Your Honor, that they

12:14:30  25 identified and I raised with Mr. Williams, a Robert Johns as

12:14:34  1  an expert, who we understood they withdrew based on the

12:14:38  2  hearing we had several months ago with Your Honor when we

12:14:40  3  talked about duplication of experts and the number of experts.

12:14:43  4  And they sent us an email listing him as having now no

12:14:48  5  opinions and would not be testifying.  And now he shows up on

12:14:51  6  their may call list.  I don't know if you've had a chance to

12:14:55  7  converse but based on representation, we didn't depose him.

12:15:00  8  We didn't counter him.  We didn't do anything with him and now

12:15:03  9  he shows up other up on their will call list -- or may call

12:15:06 10  list.

12:15:07 11         MR. WILLIAMS:  And Your Honor, I believe Mr. Tanner

12:15:08 12  raised that with me this morning and said that the

12:15:12 13  correspondence related to Mr. Johnson and his testimonial

12:15:15 14  opinions was sent from my colleague Mr. Martin.  As you know,

12:15:18 15  he is in the middle of a three-week medical malpractice trial

12:15:22 16  down in Fort Worth; and so I have not had an opportunity since

12:15:26 17  it was raised with me a couple hours ago to speak with Mr.

12:15:30 18  Martin.  I'll do that and we'll sort out the issue.

12:15:32 19         THE COURT:  All right.  Well, as I just mentioned, I

12:15:38 20  rely on you.  I expect you to work together to have this trial

12:15:43 21  run as smooth as possibly can.  Years ago there was trial by

12:15:47 22  ambush and no exchange of witness lists, those types of

12:15:50 23  things.  That's what the rules are for now, obviously, is to

12:15:53 24  give people a heads up so the trial can run smoothly.  And I

12:15:57 25  expect you to abide by that exchange information as soon as

12:16:03  1  you know it.  Mr. Matthews said there's no sandbagging here

12:16:07  2  and I take him at his word on that.  We don't do that.

12:16:16  3          MR. WILLIAMS:  Very quickly, too, Your Honor.  I

12:16:19  4  completely agree with that.  The one issue that is starting to

12:16:22  5  come up, though, and what I've heard a little bit today and in

12:16:25  6  some emails over the past couple of days, when we had a

12:16:28  7  hearing with Your Honor last week, Cook moved to prohibit our

12:16:32  8  use of corporate depositions at trial.  And Your Honor ruled

12:16:36  9  that that objection would be sustained on the basis of the

12:16:40 10  representations that were made during that hearing.

12:16:42 11          The Cook witnesses are going to be available when

12:16:45 12  the plaintiffs need them.  And we discussed the night before

12:16:49 13  saying, "Who are your next three or four witnesses?"  And I

12:16:53 14  think Your Honor identified that Cook has ample ways to

12:16:57 15  travel.  Bloomington's not far.  What I'm worried about,

12:17:00 16  though, is that we're going to ask for these Cook witnesses to

12:17:04 17  come live and there's going to be waffling.  We believe --

12:17:08 18          THE COURT:  I think I just covered that.

12:17:11 19          MR. WILLIAMS:  Okay.

12:17:11 20          THE COURT:  I think I just said no, there's going to

12:17:12 21  be no waffling.  If you need them, they'll be there.

12:17:15 22          MR. WILLIAMS:  All right.  Perfect.

12:17:17 23          MS. PIERSON:  The only other thing to add, Your

12:17:19 24  Honor, is maybe we can work together a little bit after this

12:17:21 25  hearing to get some clarity on these points.  I hear what Joe

12:17:25  1   is saying about a fear of people not being here.  That's not

12:17:28  2   our intent.  Our intent is to bring them here and have them

12:17:30  3   here live.  We told you we'll do that and we will do that.

12:17:33  4           What makes it a little difficult, though, is when

12:17:36  5   the may call list is 20 people long and the rebuttal list is

12:17:40  6   another 14 people.  So one additional thing I'd like to

12:17:43  7   suggest that we talk about and come to some agreement on and

12:17:47  8   present to you maybe a date by which both sides could say,

12:17:51  9   "Here's a defined number of may call witnesses."  Whether it's

12:17:57  10  five or ten, whatever the number is.  It certainly seems to me

12:18:01  11  any number more than ten is not reasonable, given the number

12:18:04  12  of witnesses in the case.  If both sides refined that list so

12:18:07  13  that we knew these people that are in their possible periphery

12:18:12  14  are narrowed, it just helps our preparation so much.

12:18:15  15          We don't need to be preparing 25 witnesses who are

12:18:18  16  never going to get called, and they don't need to be preparing

12:18:22  17  for cross-examination of ten people that we might not call.

12:18:25  18  Let us work together.  But I do think coming up with some

12:18:27  19  ground rules related to this issue will help all of us prepare

12:18:31  20  efficiently.  We just don't have time to unnecessarily prepare

12:18:34  21  for witnesses who won't actually be called in the trial.

12:18:40  22          THE COURT:  It's obvious to me that that is what you

12:18:42  23  need to do.  So it should be obvious to all of us.  I think

12:18:45  24  my -- and the rules provide for this and certainly every judge

12:18:51  25  I know provides for this.  We don't need duplication.  We

| | | |
|---|---|---|
| 12:18:54 | 1 | don't need cumulative evidence.  Jurors hate that.  If there's |
| 12:18:57 | 2 | one thing jurors say to me when I talk to them after a jury |
| 12:19:00 | 3 | trial is, "Why did the attorneys keep presenting witnesses |
| 12:19:03 | 4 | that said the same darn thing over and over again?"  I don't |
| 12:19:07 | 5 | need to tell you this.  You all are experienced trial lawyers. |
| 12:19:11 | 6 | You know that.  So work together; and I expect you to do that |
| 12:19:15 | 7 | and I think you'll be able to come to some sort of agreement. |
| 12:19:21 | 8 | And there's always times during the trial, as we all know, |
| 12:19:24 | 9 | that things change and a may call may be all of a sudden a |
| 12:19:31 | 10 | will call and vice versa.  You can work on that. |
| 12:19:36 | 11 | MR. WILLIAMS:  Thank you, Your Honor. |
| 12:19:39 | 12 | THE COURT:  Michael Fishbein. |
| 12:19:45 | 13 | MR. WEBBER:  Your Honor, Dr. Fishbein is a |
| 12:19:49 | 14 | pathologist.  I asked him, too, to make sure I was getting it |
| 12:19:51 | 15 | right. |
| 12:19:52 | 16 | THE COURT:  I would never figure that our. |
| 12:19:55 | 17 | MR. WEBBER:  We've done it both ways on our team. I |
| 12:19:55 | 18 | believe it is Fishbein.  He's a pathologist.  Your Honor, |
| 12:19:58 | 19 | pathologists, as the Court probably knows, study tissue and |
| 12:20:03 | 20 | they make diagnoses based on what they're seeing with tissue. |
| 12:20:07 | 21 | Most of Dr. Fishbein's opinions in this case relate to animal |
| 12:20:11 | 22 | studies that Cook did in the course of developing the Celect. |
| 12:20:14 | 23 | He voices his opinions about Cook's interpretation of the |
| 12:20:20 | 24 | tissue studies and we're not objecting to those. |
| 12:20:23 | 25 | So our motion to exclude Dr. Fishbein is limited to |

125

| | | |
|---|---|---|
| 12:20:27 | 1 | what we're calling his case specific opinions; and |
| 12:20:31 | 2 | specifically for purposes of the Hill case, where Dr. Fishbein |
| 12:20:34 | 3 | departs from his general opinions about pathology and |
| 12:20:39 | 4 | histology, the study of tissues, and in his report, at least, |
| 12:20:44 | 5 | purports to offer the opinion that Ms. Hill's filter |
| 12:20:48 | 6 | perforated her IVC and was tilted. |
| 12:20:52 | 7 | Your Honor, Cook does not dispute that the filter |
| 12:20:55 | 8 | perforated the IVC.  That has never been in dispute in this |
| 12:20:58 | 9 | case.  So there's really no need for expert testimony on the |
| 12:21:02 | 10 | point.  It's just not a fact in issue under Rule 702(a) in |
| 12:21:06 | 11 | Miss Hill's case. |
| 12:21:07 | 12 | As for tilt, that's not something that Dr. Fishbein |
| 12:21:10 | 13 | is qualified to assess.  The only way that anybody can assess |
| 12:21:15 | 14 | whether a filter is tilted or not is to review radiographic |
| 12:21:20 | 15 | images or to review the tissue itself with the filter still in |
| 12:21:24 | 16 | it, which Dr. Fishbein absolutely concedes he has not done |
| 12:21:27 | 17 | with Ms. Hill because her filter was removed and she's still |
| 12:21:32 | 18 | with us.  The only way that  he could assess tilt is by |
| 12:21:32 | 19 | looking at CT's or venograms, which is what people use to |
| 12:21:37 | 20 | discern whether the filter is tilted.  But he concedes he's |
| 12:21:41 | 21 | not qualified to do that.  He doesn't consider himself |
| 12:21:43 | 22 | qualified to read and interpret CT's and radiographic images. |
| 12:21:47 | 23 | And in fact, both sides have hired a whole bunch of |
| 12:21:51 | 24 | experts who will opine on their reading and interpretation of |
| 12:21:55 | 25 | CT's and other radiographic evidence; people are -- certainly |

12:21:59  1   would be more qualified than Dr. Fishbein, who fully admits

12:22:02  2   that he is not qualified to render those opinions.

12:22:05  3        The plaintiff's only other response on this is they

12:22:07  4   say, well, he can certainly read other doctors' reports that

12:22:10  5   say things about tilt of the filter and confirm those.  Well,

12:22:16  6   no, he can't.  All he can do is say, "Yeah, I've read doctor

12:22:19  7   X, Y, Z's report.  She said that she thought the filter was

12:22:23  8   tilted.  Sounds good to me."  That's just beyond his

12:22:29  9   expertise.  The 7th Circuit repeatedly says one expert can't

12:22:33 10   just parrot what another expert says in another field says and

12:22:37 11   say, "I agree with that.  Seems right to me."  That's really

12:22:39 12   all that Dr. Fishbein would be doing on the issue of tilt.

12:22:42 13        So Your Honor, because neither of his opinions in

12:22:46 14   Ms. Hill's specific case, the case specific opinion are

12:22:49 15   admissible one, because it's just not -- it's not necessary.

12:22:52 16   It's obvious.  It's not a fact that at issue.  That's with

12:22:59 17   respect to the perforation of her IVC.  And second with

12:23:01 18   respect to tilt, something that is just admittedly, in his own

12:23:03 19   words, beyond his ken.  Your Honor, we would ask the Court to

12:23:08 20   exclude that case specific evidence and limit Dr. Fishbein to

12:23:11 21   his general opinions that deal with his area of expertise.

12:23:16 22        THE COURT:  Thank you.

12:23:18 23        MR. MATTHEWS:  David Matthews for the plaintiffs.

12:23:20 24   Judge, we are not presenting Dr. Fishbein as an expert for

12:23:26 25   specific causation of injuries of Ms. Hill.  We would and will

12:23:30  1  ask him general questions about anatomy and physiology of the

12:23:35  2  IVC structure, function of the vena cava and that's -- none of

12:23:38  3  this has been challenged by the defendant.  I just want to let

12:23:41  4  the Court know the plan with Dr. Fishbein because of his

12:23:44  5  knowledge of the physiology of not only of the IVC but he has

12:23:48  6  had several autopsies of the decedents with IVC filters within

12:23:53  7  adjacent organs, including the duodenum; and he will testify

12:23:56  8  about how this filter did perforate through and through the

12:24:00  9  IVC -- I'm sorry, the duodenum, the small bowel; and he will

12:24:05 10  talk about that and the injury at the cellular level that

12:24:09 11  occurred.

12:24:09 12          THE COURT:  He's just going to testify as to what

12:24:11 13  he's observed in his practice?

12:24:13 14          MR. MATTHEWS:  Observed in his practice; also his

12:24:15 15  knowledge as to the pathology evidence from the Cook animal

12:24:18 16  studies.  So it will be animal studies, his practice, the

12:24:21 17  cellular level damage because one the issues in this case,

12:24:25 18  just so the Court understands, the defendant is saying if

12:24:27 19  there's a -- if there's a perforation of an adjacent organ,

12:24:31 20  that doesn't necessarily mean there's an injury and that

12:24:34 21  doesn't necessarily mean there's sequelae of future problems.

12:24:37 22  And that is what he's going to talk about, the cell level

12:24:41 23  entry.  That is the endothelium, the side wall of the IVC, the

12:24:47 24  layers of that, how that is injured, the proximity of the

12:24:52 25  small bowel to the IVC.  And he'll show -- and we'll plan on

12:24:57  1  showing with him an animation of how these organs are

12:25:02  2  configured next to the IVC; and we plan on doing that because

12:25:05  3  of his knowledge of not only pathology but anatomy and

12:25:09  4  physiology of the IVC.  But we will not be talking about

12:25:13  5  specific questions concerning did this filter injure Ms. Hill.

12:25:19  6          THE COURT:  Yes.

12:25:20  7          MR. MATTHEWS:  All right.

12:25:23  8          MR. SKWRAOF:  I was thinking I needed to respond but

12:25:25  9  then I was thinking I didn't.  I'm a little unclear about what

12:25:28 10  they're going to offer him for.  If they're going to put him

12:25:31 11  up to say Ms. Hill was injured because of this thing, that's

12:25:33 12  not something that's within his area of expertise.  He hasn't

12:25:37 13  examined Ms. Hill.  He hasn't examined any tissue of hers,

12:25:40 14  etcetera.  I think that's what he said at the end; and if

12:25:42 15  that's so, then that's fine.  He can't give Hill specific

12:25:45 16  opinions because he's not --

12:25:46 17          THE COURT:  I think that's what he said.  That's

12:25:48 18  what I heard.

12:25:50 19          MR. WEBBER:  Okay.  Terrific.  I'll go sit down now.

12:25:56 20          THE COURT:  And Leigh Anne Levy?

12:26:03 21          MR. WEBBER:  And that's mine, too, Your Honor; and

12:26:04 22  initially I planned to raise the issue that she's not on the

12:26:07 23  witness list.  So I was wondering if it was necessary to do

12:26:09 24  this; but apparently it sounds like she's on the will call

12:26:12 25  list.  So we'll go ahead and address this motion on that

12:26:15  1   basis.

12:26:15  2         Ms. Levy is not a doctor.  She can't opine on the

12:26:24  3   need for medical treatment -- on Ms. Hill's need for medical

12:26:28  4   treatment.  The only basis for her to say that any of the

12:26:31  5   treatments in her life care plan are likely to be medically

12:26:37  6   necessary is the testimony of Dr. Marmureanu, and you heard a

12:26:42  7   lot about that earlier.

12:26:44  8         THE COURT:  I didn't see anywhere where she was

12:26:47  9   testifying as to her opinion as to whether it's needed.  She's

12:26:51  10  basing her opinion on what someone else tells her is needed --

12:26:55  11  someone who's qualified to tell her.

12:26:56  12        MR. SKWRAOF:  That's what she needs to do.

12:26:57  13  Obviously we've moved to exclude to Dr. Marmureanu.  To the

12:27:01  14  extent that he is excluded, we believe -- and we believe the

12:27:03  15  plaintiffs conceded this -- that Ms. Levy's testimony must

12:27:08  16  fall with him, since she needs to rely on him for whether

12:27:12  17  things are -- whether any treatment is medically necessary.

12:27:14  18  But Your Honor, if Dr. Marmureanu's testimony stays in, there

12:27:18  19  are independent reasons to exclude her -- her testimony in

12:27:23  20  this case.

12:27:25  21        The two mains ones I'm going to cover -- obviously

12:27:27  22  our briefing covers it but I'm going to hit on two.  First is

12:27:30  23  the lack of support for her remaining opinions, lack of

12:27:34  24  support in Dr. Marmureanu's opinions; and then the second is

12:27:38  25  her use of an unreliable and actually more importantly

```
12:27:41  1    unverifiable methodology in this case.  I'll touch on those in
12:27:44  2    a moment.
12:27:45  3           One thing that kind of hangs over her conclusions
12:27:47  4    that you've already heard a little bit about, her original
12:27:50  5    conclusion in this case was that Ms. Hill would require $1.4
12:27:53  6    million or so in services and equipment over her remaining
12:27:59  7    life as calculated by Ms. levy.
12:28:02  8           After we filed our motion to exclude Ms. Levy's
12:28:06  9    conclusions, she issued a new calculation that now totals
12:28:10 10    $76,000.  That dramatic change, I think, shows a couple
12:28:14 11    things.  First, obviously that she's entirely dependent on
12:28:16 12    what Dr. Marmureanu says; but it also, I think, goes to
12:28:20 13    generally the unreliability of her conclusions.  That her
12:28:24 14    opinion would change so dramatically as a response to our
12:28:28 15    motion to exclude.
12:28:30 16           But let me touch first on the lack of support.
12:28:33 17    Again, Ms. Levy needs Dr. Marmureanu to support the necessity
12:28:37 18    of treatment; but what she is left with on her remaining
12:28:41 19    report is not tied to any opinion from Dr. Marmureanu that the
12:28:48 20    treatment will be reasonably -- be certain to be necessary.
12:28:52 21    And Your Honor, if I can hand up just a chart of the revised
12:28:55 22    cost estimate.
12:28:59 23           THE COURT:  Thank you.
12:29:11 24           MR. WEBBER:  Your Honor, what I've handed up is just
12:29:12 25    Ms. Levy's revised cost estimate.  It breaks out the items and
```

12:29:16  1  the cost exactly how she has it in her chart.  And then has

12:29:22  2  just a summary of what I'm going to summarize even further

12:29:26  3  here, the problems with the items that she's still got.  The

12:29:31  4  problem that she's got is that a lot of these things are not

12:29:34  5  tied to an opinion from Dr. Marmureanu that the treatment is

12:29:40  6  reasonably likely to be medically necessary, and we'd

12:29:45  7  indicated the three many reasons why here.

12:29:47  8          First with respect to the health and behavior

12:29:50  9  psych -- and as I said, we just copied this as it came to us.

12:29:54 10  Dr. Marmureanu can't opine as to psychological issues because

12:29:58 11  that's not his area of testimony; and it's also, I don't

12:30:00 12  think, subject to any dispute that Ms. Hill never sought any

12:30:03 13  psychological treatment relating to the filter.  We put in a

12:30:07 14  cite in the record where that appears according to the docket

12:30:10 15  number.

12:30:11 16          Therefore, there's really no basis for Ms. Levy to

12:30:14 17  conclude that Ms. Hill is going to need any further

12:30:16 18  psychological treatment due to -- due to the filter or its

12:30:23 19  retrieval, since Ms. Hill has never sought that, medical

12:30:26 20  records show that, and Dr. Marmureanu, as I said, can't opine

12:30:30 21  onto that because it's not within his expertise.

12:30:33 22          The next item and several items that we've listed

12:30:36 23  as -- and this covers the majority of the items in her chart,

12:30:39 24  MD consultation and others.  The problem is that all of those

12:30:44 25  rely on a supposition that Ms. Hill is going to need

```
12:30:48  1   continuing monitoring, continuing treatment for caval
12:30:53  2   stenosis.  That is a narrowing of the inferior vena cava and
12:30:57  3   duodenal or duodenal stenosis.  The problem is that in
12:31:01  4   Dr. Marmureanu's deposition, he testified that the need for
12:31:04  5   that treatment is, and I quote, "a theoretical possibility
12:31:07  6   that would kick in only" -- and again, if -- and these are his
12:31:11  7   words -- "if something will happen in the future."  And he
12:31:14  8   conceded that only a very small number of patients would ever
12:31:18  9   require that.
12:31:18 10           Based on that testimony, there's no basis to say
12:31:22 11   that there's a reasonable certainty that she's going to need
12:31:25 12   these services going forward.  So that knocks out a number of
12:31:28 13   the items in her remaining list based on Dr. Marmureanu's
12:31:31 14   testimony there.
12:31:33 15           Finally, Your Honor, the last kind of category that
12:31:36 16   we've got is things -- for example, podiatry and miscellaneous
12:31:40 17   adaptive equipment where Ms. Levy just hasn't specified what
12:31:44 18   that is.  We don't know what that miscellaneous adaptive
12:31:46 19   equipment is.  We don't know why she needs it for
12:31:49 20   adaptivity -- adaptation; and there's nothing that ties to
12:31:53 21   Dr. Marmureanu's report that says that she's going to need any
12:31:56 22   of these things.  We're just at a loss to figure out what
12:31:58 23   those things even are.  So there's just no foundation for
12:32:01 24   those.  That's the foundational problem with her opinion.
12:32:04 25           Beyond that, Your Honor, the second reason that I
```

12:32:07  1  covered was her unreliable and more importantly unverifiable

12:32:10  2  methodology.  She acknowledges that nobody has ever tested any

12:32:16  3  of her life care plans to see whether they actually came true.

12:32:20  4  Did the patient actually end up needing and using the services

12:32:25  5  and the products that Ms. Levy projected that the patient

12:32:30  6  would use?  And indeed, when she asked if there's a way to

12:32:34  7  determine how her life care plans -- how often they accurately

12:32:39  8  predict what a patient ends up using, her response was, and I

12:32:42  9  quote:  no, there's no way to do that."

12:32:45  10         Daubert -- that leads people to challenge opinions

12:32:50  11  where they rely on sort of there's an opinion that doesn't

12:32:53  12  rely on a solid enough foundation or isn't verifiable enough.

12:32:59  13  Your Honor, with this, we've got a witness who says there's no

12:33:02  14  way to verify that I'm ever right about these.  She could be

12:33:04  15  predicting $1.4 million worth of services and goods that

12:33:08  16  somebody needs to buy over the course of time and we'd have no

12:33:12  17  way of knowing if the actual number was zero or 1.4 or some

12:33:16  18  other number.  There is absolutely no why, as she says there

12:33:20  19  is, to verify that what she predicts will happen will ever

12:33:23  20  come true, that is by definition an unverifiable methodology

12:33:26  21  so nobody else can replicate that and nobody can check to see

12:33:31  22  if she's right.  And if you can never check to see if an

12:33:33  23  expert's opinions actually hold true in the real world, that's

12:33:36  24  an excludable opinion.

12:33:37  25         So for those reasons, Your Honor, we ask the Court

12:33:39 1   to exclude Ms. Levy's revised cost estimate in this case.

12:33:44 2   Thank you.

12:33:45 3          THE COURT:  Thank you.

12:33:46 4          MR. MATTHEWS:  Dave Matthews for the plaintiffs.

12:33:49 5   Ms. Levy is a registered nurse, certified life care planner.

12:33:53 6   She's has a Bachelor's and Master's in nursing from UT --

12:33:55 7   Austin.  She has specialized knowledge in life care costs.

12:33:59 8   She has a life care certificate through the University of

12:34:02 9   Florida.  She has interviewed Ms. Hill in person and on the

12:34:05 10  phone five times.  She's reviewed over 38 sets of medical

12:34:09 11  records, including records that state that CT should be done

12:34:16 12  of Ms. Hill on a regular basis from the medical records.  And

12:34:20 13  then Dr. Marmureanu has, through his deposition and through

12:34:25 14  interview with Dr. Marmureanu, takes that information and

12:34:28 15  tries to incorporate what the codes are and costs are.

12:34:31 16         Instead of doing a line item, I think it would be

12:34:35 17  more appropriate to determine whether she's qualified and

12:34:38 18  whether her methodology is correct.  She has done and she has

12:34:41 19  looked at medical records, interviewed the plaintiff and

12:34:44 20  interviewed the expert as to what this patient, our client,

12:34:48 21  will need in the future and she's done that.  I think she's

12:34:51 22  qualified and I think her methodology is proper and reliable.

12:34:55 23         The reason it went from 1.4 to 75, which I thought

12:34:59 24  the defendants would be thrilled at, was Dr. Marmureanu

12:35:03 25  thought that she should have a duplex ultrasound to see if she

| | | |
|---|---|---|
| 12:35:07 | 1 | still had stenosis or narrowing of her IVC.  And he determined |
| 12:35:11 | 2 | it was not as bad as it once was, and then reversed his |
| 12:35:15 | 3 | earlier finding that she needed lifelong anticoagulation. |
| 12:35:19 | 4 | Again, that was Dr. Marmureanu that actually reduced this life |
| 12:35:22 | 5 | care plan for the future, and I think they're trying to say |
| 12:35:27 | 6 | that that is challengeable because now her methodology is |
| 12:35:31 | 7 | improper or inadequate and that's simply not true.  She |
| 12:35:35 | 8 | responded to a medical decision by a medical doctor and |
| 12:35:39 | 9 | findings from the ultrasound that showed that the narrowing of |
| 12:35:42 | 10 | the IVC wasn't as bad as it once was. |
| 12:35:45 | 11 | Her methodology is sound.  She is a certified life |
| 12:35:47 | 12 | care planner.  And if there is a certain item they want to |
| 12:35:51 | 13 | challenge, they can certainly do that at the time of trial. |
| 12:35:55 | 14 | THE COURT:  Thank you. |
| 12:36:00 | 15 | MR. WEBBER:  Well, that's not what Dr. Marmureanu |
| 12:36:01 | 16 | said.  He didn't say, "Gee, it's not as bad as I once |
| 12:36:05 | 17 | thought."  He based his reversal on rereading of documents |
| 12:36:08 | 18 | that he had previously read.  Were we thrilled that the number |
| 12:36:12 | 19 | fell?  We were wondering why it didn't go to zero, based on |
| 12:36:15 | 20 | the fact that her remaining items are not based on anything |
| 12:36:19 | 21 | Dr. Marmureanu says at all.  Dr. Marmureanu withdrew his |
| 12:36:23 | 22 | conclusions.  So she wisely withdrew her estimates based on |
| 12:36:26 | 23 | that.  The problem is she should have withdrawn the rest |
| 12:36:29 | 24 | because they were never based on anything Dr. Marmureanu said |
| 12:36:33 | 25 | in the first place; and in fact, based on suppositions that |

```
12:36:33  1  Dr. Marmureanu had said are very unlikely to occur, only in a
12:36:37  2  small number of patients and only subject to the contingency
12:36:40  3  that other things happen.  That is not a basis on which to
12:36:43  4  conclude that somebody's going to need lifetime treatment or
12:36:46  5  services for anything.  So her number should be zero because
12:36:48  6  there's nothing that's verifiable.
12:36:51  7           THE COURT:  All right.
12:36:52  8           MR. WEBBER:  Thank you, Judge.
12:36:55  9           MR. MATTHEWS:  I would refer just to our response,
12:36:58 10  as well as the medical records and the testimony of
12:37:01 11  Dr. Marmureanu.  One issue, Judge.  Ms. Zaig has kind of a
12:37:04 12  family issue.  I thought that -- not an emergency.  I'm sorry,
12:37:08 13  if it sounds like that.
12:37:10 14           THE COURT:  Okay.
12:37:11 15           MR. MATTHEWS:  But she needed to be gone fairly
12:37:13 16  quickly.  I was wondering if we might be able to take one of
12:37:16 17  our motions out of order.  You can speak for yourself.
12:37:16 18           MS. ZAIC:  I apologize.  Never asked for the Court's
12:37:19 19  permission.  We had a preplanned family trip set monthns ago
12:37:24 20  that I changed the front end to be here today but I've got the
12:37:26 21  last flight out.  So I've got to get back.
12:37:31 22           THE COURT:  That's fine.
12:37:32 23           MS. ZAIC:  It's a preemption motion.
12:37:38 24           MR. MATTHEWS:  If the Court can indulge us and hear
12:37:40 25  that motion next.
```

12:37:41  1          THE COURT:  Absolutely.  Right now.

12:37:42  2          MR. JONES:  My apologies, Your Honor.  I wasn't

12:38:31  3  quite assembled.

12:38:32  4          THE COURT:  I'm sorry.  You may.

12:38:54  5          MR. JONES:  Thank you, Your Honor.  Your Honor, my

12:38:57  6  name is Bruce Jones for Cook.  I have been reading your orders

12:39:02  7  and writing for you for the last several months.  It's a

12:39:05  8  pleasure finally to have a chance to appear for you.  I

12:39:09  9  appreciate that opportunity.

12:39:09  10          The motion I'm going to be talking about this

12:39:12  11  afternoon is Cook's motion for summary judgment as to all of

12:39:16  12  plaintiff's claims based on federal preemption.  Specifically,

12:39:20  13  the FDCA, the Food, Drug and Cosmetics Act and the 1990

12:39:30  14  amendments to that act, and the FDA regulations that follow

12:39:34  15  under it.  The focus of this motion will obviously be the *Lohr*

12:39:40  16  case.  *Lohr* versus -- I'm sorry, I'm blanking -- Medtronic, I

12:39:44  17  believe.

12:39:45  18          The *Lohr* decision addressed the FDCA as it was in

12:39:53  19  1992, when the products that were before the *Lohr* case were

12:39:57  20  put through the 510(k) process.  The 510(k) process at that

12:40:01  21  time involved just a determination of substantial equivalence;

12:40:04  22  and the *Lohr* court held that that substantial equivalence was

12:40:10  23  not sufficiently focused on safety to show a congressional

12:40:16  24  intent to bar state tort actions.  The *Lohr* decision didn't

12:40:20  25  address the 1990 amendments at all, even though it was decided

12:40:23  1   in 1996, because those amendments were not at issue in the

12:40:26  2   1982 approval of the product that was before it.

12:40:31  3            Now, the plaintiffs want the Court to treat the *Lohr*

12:40:34  4   decision essentially as kind of a fly in amber, a historical

12:40:39  5   artifact, a moment of time that is frozen and cannot be

12:40:44  6   changed, regardless of what happens subsequently with the

12:40:48  7   statute that the *Lohr* case interpreted and the FDA regulations

12:40:52  8   under it.  In fact -- or at least by the actual practices of

12:40:59  9   the FDA under those later regulations.

12:41:02  10           In fact, the statutes and the regulations have

12:41:05  11  changed since 1982.  As I said, the 1990 amendments to the

12:41:11  12  FDCA substantially changed the standard under which the 510(k)

12:41:18  13  process operates.  Substantial equivalence now requires a

12:41:22  14  manufacturer to show that new products, "are at least as safe"

12:41:26  15  as the predicate products that they are based on.

12:41:31  16           The 510(k) -- the FDA 510(k) filtered guidance in

12:41:36  17  1990 -- issued in 1999 is a prime example of this.  It sets

12:41:41  18  specific preclinical testing standards, clinical design

12:41:44  19  standards and labeling standards for the -- for the IVC filter

12:41:51  20  that's definitely at issue in this case.  It imposes mandatory

12:41:55  21  compliance either with the specific recommendations of the

12:42:00  22  guidance itself or some alternative ground that provides --

12:42:03  23  and again I quote, "equivalent assurances of safety."

12:42:08  24           Everything in the 1990 statute and the regulations

12:42:11  25  promulgated and the guidances issued under it demonstrate that

12:42:15  1   the focus of the 510(k) process is now not just substantial

12:42:20  2   equivalence but is, in fact, safety and efficacy.  That

12:42:24  3   undermines the entire premise of the *Lohr* holding which relied

12:42:28  4   on the earlier pre-1990 version of the 510(k).

12:42:36  5          Compare *Lohr*, compare the *Riegel* case that's also

12:42:39  6   cited in the papers, they specifically rely on the fact that

12:42:42  7   the former 510(k) was not intended to ensure safety but it now

12:42:47  8   requires equivalent assurances of safety.  It's still

12:42:50  9   comparative.  Certainly it's still a comparative process

12:42:53 10   rather than an independent process.  But the fact remains that

12:42:56 11   the focus has shifted and safety is now a primary concern of

12:43:00 12   the 510(k) process.

12:43:03 13          In addition, with respect to the IVC filter in

12:43:05 14   particular, following the 1999 down classification from class

12:43:11 15   2 -- excuse me, from class 3 to class 2, the FDA said, "We can

12:43:16 16   handle any device specific issues with special controls," and

12:43:21 17   that's what they have done since then.

12:43:25 18          Even the Supreme Court in *Buckman* specifically said,

12:43:28 19   and I quote again, "The FDA simultaneously maintains both PMA

12:43:35 20   and the more limited 510(k) processes in order to ensure that

12:43:39 21   medical devices are reasonably safe."  So since *Lohr*, even the

12:43:42 22   Supreme Court has recognized that the modern 510(k) process is

12:43:47 23   intended as a reasonable assurance of safety and that is what

12:43:50 24   distinguishes the current situation from *Lohr*.

12:43:55 25          These changes are specifically born out by the

12:43:57 1   treatment of the FDA for the Celect and the Tulip IVC filters

12:44:02 2   that are at issue in this case.  The Tulip submitted its first

12:44:08 3   510(k) application in 1998.  It was finally approved, the last

12:44:12 4   one, in 2003.  The Celect started in 2004 and ended in 2008.

12:44:17 5   The submissions that Cook made to support those included

12:44:22 6   biocompatibility data, engineering testing under the FDA

12:44:26 7   mandated standard, clinical testing, feasibility studies,

12:44:30 8   animal testing, all things related directly to the safety of

12:44:33 9   the product.

12:44:34 10          Despite those submissions, the FDA actually rejected

12:44:39 11   initially both of the 510(k) applications.  The FDA required

12:44:44 12   additional data on safety, on biocompatibility, on retrieval.

12:44:49 13   Mr. Matthews referred this morning, in his discussion of the

12:44:53 14   Rajebi motion to the FDA's request and requirement that Cook

12:44:58 15   submit more data on perforation.  That's exactly what the

12:45:01 16   process was here.  We were trying to satisfy the FDA of the

12:45:06 17   safety of this product.  The FDA said, "Yeah; well, we need

12:45:09 18   more.  So give us more, prove this to us."  And we did that.

12:45:14 19          What plaintiff refers to as deficiencies in the Cook

12:45:20 20   submissions are actually the FDA doing its job and making sure

12:45:24 21   that it was satisfied that we had proven the safety; and

12:45:26 22   that's what we eventually did.

12:45:28 23          It also required labels in the IFU.  We said we'd

12:45:32 24   like to talk about retrieval in the information for users; and

12:45:37 25   the FDA said, "Well, yes; but here's exactly what you have to

12:45:40  1   say."  They mandated that -- the language that we put into our
12:45:44  2   IFU's.
12:45:47  3           In other words, it's a far cry from the old FDA.
12:45:49  4   *Lohr* described the old -- excuse me.  *Lohr* described the old
12:45:54  5   510(k) process as something that "requires little information,
12:45:56  6   rarely elicits a negative response from the FDA and gets
12:46:01  7   processed very quickly."
12:46:03  8           Nothing could be further from what happened here.
12:46:05  9   They required a great deal of information.  They rejected it
12:46:09 10   twice, and it took between four and five years each time.  Not
12:46:15 11   a quick process.
12:46:19 12           What we went through -- what Cook went through with
12:46:21 13   the Celect and the Tulip was not the *Lohr* FDA -- *not the Lohr*
12:46:26 14   510(k).  It was a new and different process and it has a new
12:46:32 15   and different affect than the 510(k) that was considered in
12:46:35 16   *Lohr.*
12:46:36 17           Under the new 510(k), the Court should find
12:46:40 18   preemption of state tort laws under both explicit and implicit
12:46:44 19   preemption.  Under explicit preemption, the FDCA and the
12:46:51 20   modifications to it, bar states from acquiring either through
12:46:54 21   regulations or through tort actions like this requirements
12:46:58 22   that are in addition to or different from those imposed by the
12:47:03 23   federal government.
12:47:05 24           Here, there are -- plaintiff's claim seeks to impose
12:47:11 25   new requirements on the IFU and its failure to warn claim, new

12:47:17  1    requirements for testing, new requirements for design.  All of

12:47:24  2    those violate the preemption clause in the FDCA; and all of

12:47:31  3    them require a finding of explicit preemption because the --

12:47:36  4    they are now trying to do what is exactly forbidden by the

12:47:40  5    FDCA.

12:47:41  6             With implicit preemption, the standard is whether or

12:47:42  7    not you can obey both federal law and the state law; and here

12:47:48  8    you can't.  The plaintiff's claims would require Cook to

12:47:53  9    change the design of the Celect or the Tulip filter in each

12:47:58 10    case but we can't do that.  Cook can't do that without going

12:48:01 11    back to the FDA and going through another 510(k) process for a

12:48:07 12    new design.

12:48:07 13             Likewise, the plaintiff's claim for failure to warn

12:48:11 14    claims that we need to change the language in our IFU and be

12:48:14 15    more specific in terms of frequency and that sort of thing.

12:48:18 16    But the FDA was very clear.  They approved our -- they cleared

12:48:24 17    our IFU and said this is what you have to say.  If we want to

12:48:27 18    change the language in the IFU as plaintiff's torts would

12:48:30 19    require us to do, we have to go back and go through another

12:48:34 20    510(k).  We can't comply right now with both the FDA's

12:48:37 21    requirements as to what our design has to be and what our

12:48:40 22    warning label has to say and the tort claims -- the duties

12:48:45 23    that the plaintiffs would impose on us through their tort

12:48:50 24    claims.

         25             I understand the plaintiffs argue *Lohr*.  It is what

12:48:54  1   I would argue if I was in their position because it's what

12:48:58  2   they have.  And as the cases the plaintiffs cite demonstrate,

12:49:01  3   a lot of cases, a lot of courts have reflexively applied *Lohr*

12:49:06  4   to post 1995 510(k) issues because the name 510(k) is in both

12:49:13  5   of them.  But those cases haven't done what we're asking you

12:49:17  6   to do here today.  They haven't analyzed whether or not the

12:49:20  7   *Lohr* case really analyzed what is going on under the new

12:49:26  8   510(k).  In fact, it does not.

12:49:30  9         The 510(k) interpretation in *Lohr* is not the same

12:49:34 10   510(k) that exists today.  It's not the same 510(k) under

12:49:39 11   which the Tulip and the Celect IVC filters were reviewed,

12:49:44 12   rejected, and then finally cleared for sale.  The 510(k) is

12:49:49 13   not unlike plaintiff's desire.  It is not a fly in amber.  It

12:49:53 14   is vital.  It is ongoing and it imposes safety requirements

12:49:58 15   that actually -- both on paper and in reality in this case.

12:50:02 16         The 510(k) clearly addresses safety and we submit

12:50:06 17   that it -- excuse me, it preempts plaintiff's claim here and

12:50:10 18   we ask you to grant summary judgment on that ground.  Thank

12:50:13 19   you.

12:50:14 20         THE COURT:  Thank you.  Ms. Reed.

12:50:25 21         MS. REED ZAIC:  Julia Reed Zaic, Heaviside Reed Zaic

12:50:27 22   Heaviside on behalf of the plaintiffs.  Thank you for taking

12:50:29 23   us out of order.  Counsel, I know I caused you to come up

12:50:33 24   before you were absolutely ready.  Again, I thank you very

12:50:37 25   much.

12:50:37  1          Your Honor, to start from probably the middle and
12:50:41  2     work forward and backwards, I did a search, when we filed our
12:50:46  3     papers and prior to this argument.  There are -- Lohr
12:50:49  4     *Medtronic* is cited 1,995 times in court case opinions that are
12:50:55  5     issued.  I did not review all of them.  I reviewed scores and
12:50:59  6     scores of them and scrolled down as far as I could and I felt
12:51:02  7     necessary to actually come and represent this, but I found two
12:51:07  8     opinions where this argument was put forward that *Lohr* is no
12:51:09  9     longer good law as to this issue; and both times that argument
12:51:12 10     was brought by Cook.

12:51:13 11          Once it was brought in the Southern District of
12:51:16 12     Florida in Horeo (phonetic) case that we have cited and the
12:51:19 13     judge -- I'm paraphrasing -- generally said that's a very
12:51:22 14     interesting concept but there's no legal authority to support
12:51:24 15     it.  You've got a law journal article and that's it.

12:51:28 16          The next time it was brought forward was in an
12:51:31 17     opinion issued in 2015 in the Southern District of West
12:51:34 18     Virginia, Judge Goodwin presiding; and I quote.  He says,
12:51:38 19     "Cook argues that the 510(k) process has changed since the
12:51:41 20     *Lohr* decision, and now the FDA makes a safety and
12:51:44 21     effectiveness determination when reviewing a product under
12:51:47 22     510(k).  And that *Lohr* has materially changed medical
12:51:51 23     device" -- I'm sorry.  "That the pacemaker at issue in *Lohr*
12:51:55 24     had been cleared and materially changed medical device
12:51:56 25     regulation and specifically increased the robustness of the

12:52:01  1   510(k) process."  He was referring to the amendments in 1990

12:52:04  2   where the Safe Medical Devices Act came in and modified the

12:52:09  3   medical device amendments of 1976.

12:52:12  4           He concludes that "the arguments raised by Cook do

12:52:15  5   not persuade me to abandon the Supreme Court's clear position

12:52:19  6   on this matter.  We urge you to do the same."

12:52:22  7           In 1976, the Medical Device Amendments amended the

12:52:25  8   food -- the Federal Food, Drug and Cosmetic Act.  It was meant

12:52:30  9   to further the public's health.  Nobody is going to come in

12:52:34 10   and argue that the FDA and that these acts have nothing to do

12:52:37 11   with safety and have nothing to do with public health.  But

12:52:39 12   the Supreme Court, in interpreting those amendments -- and

12:52:42 13   although in the face of FMDA in 1996, the *Lohr* opinion says:

12:52:47 14   "Congress has given the FDA a unique role in determining the

12:52:51 15   scope of 360(k), which is the expressed preemption position

12:52:56 16   that defendants have moved under for expressed preemption of

12:53:00 17   these medical devices.

12:53:01 18           Nowhere do they mention this test.  They don't cite

12:53:04 19   to the regulation that has determined the scope of the

12:53:08 20   expressed preemption clause in the medical device amendments;

12:53:11 21   and in doing so, in exercising that scope, the FDA promulgated

12:53:16 22   21 CFR 808.1(d).  It lays out a two-part test.  There is

12:53:22 23   federal preemption can happen -- expressed preemption under

12:53:25 24   this act can happen only when the FDA has established a

12:53:28 25   counterpart regulation specific to that device in dealing with

```
12:53:33  1   safety or there is some other federal requirement that has
12:53:37  2   been promulgated.  The Supreme Court in Lohr and Riegel has
12:53:40  3   stated that a federal requirement is -- it happens when a
12:53:44  4   device goes through the premarket approval process, which is
12:53:47  5   not what has happened here.  These devices were cleared by the
12:53:50  6   FDA under the premarket notification process, which is less
12:53:55  7   rigorous.
12:53:56  8         The 7th Circuit has also commented on this.  That a
12:53:59  9   federal requirement in the McMullen case, the 7th Circuit has
12:54:03 10   commented that a federal requirement is only created by
12:54:07 11   premarket approval of a device.  I understand this is the
12:54:11 12   argument the Cook defendants would like to put forward; but
12:54:13 13   the test is clear, only under those two circumstances can you
12:54:17 14   have federal preemption.  Either a counterpart regulation,
12:54:20 15   which there are none for IVC filters and they've not pointed
12:54:23 16   to a single federal requirement that's been created.
12:54:27 17         In the Riegel case -- understanding that in 1976,
12:54:29 18   the medical device amendments were enacted and the act was
12:54:35 19   amended in 1999.  Their argument is that the focus of Lohr was
12:54:40 20   pre-1990.  However, the Lohr decision, six years after these
12:54:44 21   amendments, they took into consideration and mentioned in the
12:54:47 22   opinion and Lohr was actually -- the holdings in Lohr were
12:54:51 23   reiterated in Riegel.  And it comes down to the FDA's focus on
12:54:55 24   equivalence, not safety.  This is 18 years after the
12:54:58 25   amendments in 1990 and that premarket approval is the focus --
```

12:55:01  1   is focused on safety.

12:55:03  2           It reiterated in *Lohr* that even though substantial

12:55:06  3   equivalence review is device specific, the *Lohr* court rejected

12:55:10  4   the manufacturer's contention that the 510(k) imposed device

12:55:14  5   specific comments were requirements.  The devices, when

12:55:19  6   reviewed and cleared under the 510(k) review process, are not

12:55:24  7   cleared for safety.  They received a substantial equivalence

12:55:29  8   determination.

12:55:33  9           My colleague mentioned the back-and-forth between

12:55:37 10   Cook and the FDA and what the FDA -- their reporting required

12:55:39 11   from the Cook defendants while they were -- while the FDA was

12:55:43 12   reviewing and clearing their 510(k) applications.  The

12:55:45 13   back-and-forth that occurred, the application didn't take five

12:55:49 14   years at a time.  Some were submitted and cleared the exact

12:55:52 15   same year.  But the point being is that under the regulations,

12:55:54 16   the FDA can ask for whatever information they want while

12:55:59 17   they're reviewing that application.  And if they ask for

12:56:01 18   additional information in order to make a substantial

12:56:03 19   equivalence determination, equivalent to the comparator,

12:56:07 20   equivalent to the predicate, in order to gather that

12:56:11 21   information, they make the request; and then the manufacturer

12:56:14 22   has three options under the 510(k) process.

12:56:17 23           They can provide the information.  They can submit a

12:56:20 24   new 510(k) submission with the information, or they can submit

12:56:25 25   a premarket approval application to the FDA in order to answer

12:56:30   1    those questions.  At every step of the way, the Cook

12:56:35   2    defendants had the opportunity to respond to these requests

12:56:38   3    with a premarket approval application, which would be a

12:56:43   4    completely different treatment under the current standing law,

12:56:45   5    if we were actually here on a PMA case.  That regulation is,

12:56:49   6    for the record, 21 CFR 807.87(l).

12:56:54   7            At the end of the day, when these devices were

12:56:58   8    cleared, they received a substantially equivalence letter and

12:57:01   9    the bottom line is under 21 CFR 807.97, the letters

12:57:08 10    specifically say that under the premarket notification

12:57:11 11    procedures, if a device is deemed substantially equivalent to

12:57:17 12    a product that was a premade 1976 device, meaning under the

12:57:22 13    medical device amendments, before the amendments in 1990 or

12:57:26 14    post -- or if the substantial equivalent is a post 199 -- I'm

12:57:32 15    sorry 1976 device that has been reclassified to a class 1 or

12:57:38 16    class 2, they are prohibited from representing that these

12:57:41 17    devices were approved.  It is misbranding if they do so.

12:57:50 18            The last one I'd like to make is that counsel

12:57:52 19    mentioned special controls.  The amendments in 1990 actually

12:57:58 20    relaxed some of the requirements.  Prior to 1990, under the

12:58:01 21    medical device amendment, the FDA was required, actually, by

12:58:06 22    Congress to go through and develop device specific

12:58:10 23    requirements, performance standards, for every medical device

12:58:13 24    that was on the market.  That became a very onerous process.

12:58:17 25            Part of the change that the Act went through in 1990

12:58:20  1  is that the performance standards requirement was relaxed and

12:58:24  2  special controls were put in their place.  It was a way to

12:58:27  3  administratively let up on the burden of the FDA to have to

12:58:33  4  establish performance standards for every medical device on

12:58:36  5  the market.

12:58:38  6         Counsel mentioned the 1999 guidance documents.

12:58:40  7  Guidance is not binding.  It says in the guidance itself that

12:58:43  8  this is not binding.  It does not confer any rights or

12:58:47  9  responsibilities upon any party involved.  The 1999 guidance

12:58:51  10  is exactly that.  It's guidance to submit a 510(k) submission.

12:58:56  11  This is what the FDA would like to see when they receive your

12:58:59  12  application.  If they don't like what they see, you have those

12:59:02  13  three options; provide information, submit a new one, or

12:59:05  14  submit a premarket application.

12:59:07  15         The 1999 guidance contains no specific information

12:59:11  16  about how a product should perform.  It does not require --

12:59:14  17  it's not a cookbook.  It's not, here's your documentation,

12:59:18  18  build me an IVC filter.  It's not that at all.  In fact, it

12:59:21  19  harkens back to the *Lohr* language that says nothing about this

12:59:25  20  process, the 510(k) process, says this medical device should

12:59:28  21  take this particular form.

12:59:30  22         The 1999 guidance holds no standards for anything

12:59:34  23  such as migration resistance, any particulars that you would

12:59:37  24  expect to see with regard to performance standards or

12:59:40  25  something that might be considered a federal requirement,

| | | |
|---|---|---|
| 12:59:42 | 1 | which again in the 7th Circuit is aligned with the *Lohr* |
| 12:59:46 | 2 | opinion that a federal requirement is only created by the |
| 12:59:51 | 3 | premarket approval process. |
| 12:59:52 | 4 | Again, the Cook defendants have ignored the actual |
| 12:59:55 | 5 | test to apply when it comes to expressed preemption.  They |
| 12:59:59 | 6 | cannot show there's a counterpart regulation or that there is |
| 13:00:01 | 7 | a federal requirement that they were in compliance with, and |
| 13:00:05 | 8 | we respectfully request that you deny their motion.  Thank |
| 13:00:08 | 9 | you. |
| 13:00:08 | 10 | THE COURT:  Thank you.  Reply? |
| 13:00:18 | 11 | MR. JONES:  Your Honor, when a statutory -- when a |
| 13:00:21 | 12 | case that interprets a statute is -- let me begin again.  When |
| 13:00:26 | 13 | a statute changes, cases that interpret the statute have to |
| 13:00:31 | 14 | take that into account.  Have to look at the statute again and |
| 13:00:34 | 15 | that's what we're asking the Court to do here.  *Lohr* didn't do |
| 13:00:37 | 16 | that, *Riegel* didn't do that.  None of the cases that plaintiff |
| 13:00:41 | 17 | has cited do that.  What we're asking is the Court to do that. |
| 13:00:45 | 18 | I understand why plaintiffs don't want you to do it and want |
| 13:00:47 | 19 | you to just apply the *Lohr* result without considering the |
| 13:00:51 | 20 | analysis, but I don't think that's the proper approach here. |
| 13:00:54 | 21 | In fact, there are federal requirements.  We lay |
| 13:00:57 | 22 | them all out in our motion papers.  I won't go through them |
| 13:01:01 | 23 | all but just to cite one, the most obvious.  In the process -- |
| 13:01:03 | 24 | in the 510(k) process, the FDA told us, here's what you have |
| 13:01:07 | 25 | to say on your label about retrieval.  If you don't say this, |

13:01:11  1   you can't sell your product.  I don't know how it could be

13:01:14  2   more clear that a requirement exists than to say, look, you do

13:01:18  3   it our way or you don't do it at all.

13:01:22  4           Finally, Ms. Reed Zaic was mistaken in saying that

13:01:27  5   one of the choices that Cook had was simply to submit a PMA

13:01:31  6   for the full safety evaluation for the IVC filters.  We could

13:01:37  7   not, in fact, have done that because when the downgrading

13:01:40  8   occurred during the 1990's, the IVC filters as a whole, as a

13:01:47  9   category were downgraded from class 3 to class 2.  PMAs can

13:01:52 10   only be submitted for class 3 devices.  FDA tells us what

13:01:56 11   process we have to use.  We had no option here to use a PMA

13:02:00 12   process.  We had to use the 510(k) because that's what FDA

13:02:05 13   told us we had to use.

13:02:06 14           We went through that.  They asked us about safety

13:02:10 15   concerns.  We provided the information they wanted.  They told

13:02:12 16   us what we needed to do.  They confirmed it -- excuse me.

13:02:15 17   They cleared the design.  They cleared the label and the IFU

13:02:23 18   after we had changed it the way we wanted it.  There's no way

13:02:26 19   we can both comply with what the FDA required us to do to sell

13:02:30 20   the product and what the plaintiff's theories of recovery want

13:02:35 21   us to do in order to warn and design the product.  It simply

13:02:39 22   isn't possible.  Both under expressed preemption and implied

13:02:43 23   preemption, we're entitled to summary judgment.  Thank you.

13:02:45 24           THE COURT:  Thank you.

13:02:51 25           MS. REED ZAIC:  Just a quick follow-up, Your Honor.

13:02:55  1    The last time that Cook made this argument in the Southern

13:02:58  2    District of West Virginia, Judge Goodwin also held that "I am

13:03:01  3    doubtful the Supreme Court would change its clear position on

13:03:04  4    this matter based on the FMDA which are the 1990 amendment.

13:03:06  5    In fact, any changes imposed by the FMDA, which had already

13:03:09  6    been in place --

13:03:18  7              COURT REPORTER:  I'm sorry.  Slow down, please.

13:03:18  8              MS. REED ZAIC:  I'm so sorry.  Maybe it will be

13:03:18  9    helpful if I look at any distress I'm causig.  I'll begin

13:03:19  10   again.  Judge Goodwin stated in his opinion in 2015, when Cook

13:03:23  11   brought this argument before him, "I am" doubtful the Supreme

13:03:28  12   Court would change its clear position on this matter based on

13:03:31  13   the FMDA, which are the amendments in 1900.  In fact, any

13:03:35  14   changes imposed by the FMDA which had already been in place

13:03:38  15   for six years at the time of the *Lohr* decision were available

13:03:41  16   to the Court," meaning the Supreme Court, "in interpreting

13:03:44  17   Congress' intent for 510(k)."

13:03:47  18              With regard to the labeling issue.  Cook's own

13:03:51  19   expert, Dr. Pellerite -- Mr. Pellerite, I apologize, actually

13:03:55  20   states in his report, "FDA's position is that changes to

13:03:59  21   labeling for a 510(k) approved cleared device may be made by a

13:04:03  22   manufacturer without first receiving FDA approval."  That

13:04:08  23   actually goes along with the current and current at the time

13:04:12  24   of the amendments in 1990 21 CFR 807.87(l).  A premarket

13:04:23  25   approval application is absolutely available to Cook to this

13:04:27  1  day.  It says it in the statute.  They have the three options;

13:04:29  2  if they would like to -- if they're requested for more

13:04:33  3  information, they can make a new application, provide the

13:04:36  4  information, or it says the black letter of the regulation,

13:04:39  5  they can provide a premarket approval application.  That's it,

13:04:47  6  Your Honor.  Thank you.

13:04:51  7         THE COURT:  Thank you for that argument.  Just to

13:04:54  8  give you a preview here of what my thoughts are on preemption.

13:04:58  9  I believe the law is clear on this subject.  *Lohr* is Supreme

13:05:06 10  Court law at this time and 7th Circuit reiterated its holding

13:05:11 11  in 2010 in *Bausch v. Stryker*.  That's my initial thoughts on

13:05:16 12  the preemption is that motion for summary judgment will be

13:05:20 13  denied.  All right.

13:05:21 14         It's 1:00 o'clock.  Let's take some time for lunch

13:05:25 15  and we'll come back and we'll finish up on the summary

13:05:28 16  judgment motions, also on plaintiff's Daubert motions.  All

13:05:36 17  right.  How about 2:00 o'clock.  Does that sound good?  Thank

13:05:42 18  you.

13:05:43 19         THE CLERK:  All rise.  Court is recess.

13:05:57 20         (A recess was taken.)

14:10:45 21         THE CLERK:  All rise.  Court is in session.  please

14:10:47 22  be seated.

14:10:51 23         THE COURT:  Back on the record regarding Cook

14:10:53 24  Medical versus -- or MDL.  I'm sorry.  We're ready now for

14:10:59 25  plaintiff's motions.  Get my list here.  I think Dr. Harvey

14:11:06  1   here is the first one.

14:11:23  2          MR. DEGREEFF:  Dave DeGreeff for plaintiff.  I think

14:11:25  3   we can probably -- because a lot of this has already been

14:11:29  4   argued with regard to our affirmative Daubert motions, we can

14:11:33  5   probably combine some of these.  I can probably do Harvey and

14:11:38  6   Pellerite at the same time, if you think that makes sense,

14:11:40  7   Your Honor, since they're both FDA.

14:11:43  8          THE COURT:  That's fine.

14:11:44  9          MR. DEGREEFF:  With regard to Ms. Harvey and

14:11:47 10   Mr. Pellerite, it's kind of four categories of things we're

14:11:51 11   seeking to limit or exclude.  First one is what I refer to is

14:11:55 12   just they need to stay in their lane, Your Honor, which is

14:11:57 13   that Ms. Harvey is a premarket regulatory expert,

14:12:02 14   Mr. Pellerite is a postmarket regulatory expert.  I think in

14:12:08 15   fairness, I think the defendant's response has already stated

14:12:11 16   that Mr. Pellerite would not address premarket except to the

14:12:17 17   extent that it was needed to lead into his postmarket

14:12:21 18   conclusions.  So we would ask that he be excluded from giving

14:12:25 19   any substantive premarket opinions.

14:12:26 20          The with regard to Ms. Harvey on the post -- on the

14:12:30 21   postmarket, I believe Ms. Pierson, when she was standing up

14:12:35 22   here, you can't offer two experts to say the same thing.  And

14:12:39 23   if Ms. Harvey is allowed to speak to postmarket, then she's

14:12:43 24   saying the exact same thing as Mr. Pellerite.  On top of that,

14:12:47 25   she's nowhere close to qualified for providing postmarket

14:12:52  1  opinions.  She even testified she wasn't.  I don't think I

14:12:55  2  need to go too much past that.  She testified she wasn't an

14:13:00  3  expert on postmarket issues.  That's the two of them.

14:13:03  4          Next one was opinions outside of their respective

14:13:08  5  areas of expertise, which is to the extent that they're

14:13:11  6  testifying about the safety and efficacy of IVC filters.

14:13:16  7  Again, I think Ms. Pierson talked about the fact that -- I

14:13:19  8  think she actually said that Dr. Kessler, who's actually a

14:13:22  9  physician, wasn't qualified to give those kind of opinions.

14:13:25 10  And certainly if a physician isn't qualified to give opinions

14:13:30 11  on the safety and efficacy of an IVC filter, I'm not sure how

14:13:33 12  a veterinarian and Mr. Pellerite would be.

14:13:37 13          On top of that, Ms. Harvey testified that she's not

14:13:40 14  a physician, statistician, or epidemiologist.  She admits she

14:13:45 15  hasn't fully reviewed the medical literature on IVC filters to

14:13:47 16  make a risk versus benefit assessment; and she admits she

14:13:50 17  hasn't undertaken any review of the MAUDE data base for IVC

14:13:53 18  filters.  We heard earlier somebody say methodology,

14:13:57 19  methodology, methodology; and there's nothing there for her to

14:14:01 20  provide any kind of opinion about IVC filters safety and

14:14:04 21  efficacy.

14:14:05 22          With regard to Mr. Pellerite, I believe that the

14:14:10 23  response from the defense said that he is not going to give

14:14:12 24  any opinions on clinical benefits or risk benefit but they

14:14:16 25  believe that he should still be able to testify as to efficacy

14:14:21  1   of IVC filters.  Again, Your Honor, we would ask that that

14:14:25  2   opinion be excluded for lack of any basis.  He's not a

14:14:28  3   physician.  He has no medical training in any relevant field.

14:14:31  4   He's not a biostatistician.  He's not an expert

14:14:34  5   epidemiologist -- or epidemiology or engineering.  He's got no

14:14:39  6   engineering or clinical study design.  He has never conducted

14:14:43  7   any kind of a filter failure analysis, and he admits that he's

14:14:48  8   not qualified to determine whether a filter was efficacious in

14:14:54  9   stopping a clot in a particular patient.  So again, that goes

14:14:58  10  back to the same argument as -- with regard to lack of

14:15:02  11  qualifications and methodology.

14:15:07  12          Legal conclusions, we would ask that -- I think

14:15:10  13  Mr.-- with regard to Mr. Pellerite and Mrs. Harvey, I think

14:15:15  14  Mr. Schultz and Ms. Pierson have already gone back and forth

14:15:18  15  on the legal conclusions issue but the point that I probably

14:15:21  16  don't need to address it too much for Your Honor.  You know

14:15:23  17  what our position would be; that they should able to testify

14:15:26  18  as to an ultimate conclusion.  They just can't tell the jury

14:15:29  19  what to say in the end.  Meaning because -- because they

14:15:34  20  failed to comply with this, they are negligent.  We can't

14:15:37  21  take -- they can't take it quite that far.

14:15:40  22          And then, Your Honor, we would seek to preclude

14:15:45  23  these experts from giving any kind of opinion that the 510(k)

14:15:50  24  process establishes safety and efficacy of a device.  It's for

14:15:54  25  the same reason you just heard with regard to the preemption

14:15:57  1  argument.  It's that the 510(k) processes is not a

14:15:59  2  determination of safety and efficacy; and for them to testify

14:16:02  3  that it is would be contrary to the Supreme Court law and

14:16:07  4  frankly, contrary to everything that's out there on it.

14:16:13  5       And then last, Your Honor, we would ask that they

14:16:15  6  not be able to testify on the speculative opinions or the

14:16:19  7  subjective thoughts of the FDA.  Things such as testimony by

14:16:25  8  Ms. Harvey that the FDA considers the 510(k) clearance process

14:16:30  9  and evaluation of safety and efficacy.  She can't testify as

14:16:32 10  to what the FDA believes.  There's no qualification or basis

14:16:36 11  for that.

14:16:36 12       And would you like me to now allow them to address

14:16:40 13  those two and come back and finish the rest of our motions,

14:16:43 14  Your Honor, or do you want me to go ahead and discuss the

14:16:46 15  treaters and Mr. -- Dr. Venbrux?

14:16:49 16       THE COURT:  Why don't we have them come up at this

14:16:51 17  time.

14:16:57 18       MS. BUTLER:  Good afternoon, Your Honor.  I'm

14:16:58 19  Abigail Butler.  I think my argument will also be relatively

14:17:04 20  short, too; and I'll do my best to address the points that he

14:17:07 21  just raised.  I had something prepared and I may get into that

14:17:12 22  a little bit but I think we can streamline this pretty

14:17:15 23  quickly.

14:17:16 24       We have no intention of offering duplicative

14:17:20 25  evidence.  We clearly have a premarket expert and a postmarket

14:17:25  1    expert.  Now, it is true in the reports that they have delved

14:17:30  2    into the area a little bit where it's necessary to kind of lay

14:17:32  3    a foundation for what they're talking about; but we don't have

14:17:35  4    any intention of having both of them come up and talk about

14:17:37  5    the 510(k) -- the 510(k) submission process.  That's -- we're

14:17:42  6    not wanting to do that.

14:17:43  7              THE COURT:  Okay.

14:17:44  8              MS. BUTLER:  As far as qualifications go, I didn't

14:17:48  9    think that I needed to really address that too much but I did

14:17:50  10   just hear him refer to Dr. Harvey as a veterinarian.  Yes,

14:17:54  11   she's a veterinarian.  She's been a veterinarian since 1996.

14:17:57  12   But what he also left out is that she was an employee for ten

14:18:01  13   years at FDA, and I know you know that from our briefing.  She

14:18:04  14   was a member of a scientific review team.  She reviewed

14:18:08  15   hundreds of 510(k)'s during her tenure in that position.

14:18:11  16              Then she moved on to the chief of peripheral

14:18:14  17   vascular devices, where she oversaw hundreds of 510(k)

14:18:17  18   submissions a year.  Now, from 2006 to the present, she's been

14:18:21  19   hired by over 200 medical device companies to help them

14:18:26  20   navigate the complexity of FDA regulation and getting products

14:18:31  21   cleared to market.  So I don't want to leave this Court with

14:18:34  22   the impression that Dr. Harvey is merely a veterinarian.  She

14:18:38  23   is much more than that.  I do think that her experience as a

14:18:41  24   veterinarian makes her uniquely situated to look at the animal

14:18:46  25   studies and the literature and what was submitted as part of

14:18:50  1  the 510(k) process.  So I don't think it's irrelevant but that

14:18:54  2  part was left out and I take issue with that.

14:18:56  3            As far as the legal conclusions, I'm not going to

14:18:59  4  belabor that either; but what I am concerned about and what I

14:19:02  5  think the plaintiffs are also concerned about is having a

14:19:06  6  situation where Dr. Kessler is able to use these words,

14:19:09  7  adulteration, misbranded, speak of them, say that's what our

14:19:13  8  products are and we can't respond to that.  So what I would

14:19:16  9  ask is that whatever decision the Court makes on that, it

14:19:20 10  applies evenly to all of the regulatory experts in this case.

14:19:25 11            I heard him mention the rule that safety and

14:19:31 12  efficacy plays in a 510(k) submission and I want to address

14:19:34 13  that very briefly.  No one in this case is suggesting that the

14:19:38 14  FDA conducts an independent review of safety and efficacy in a

14:19:43 15  510(k) submission.  No one is saying that.  There were some

14:19:47 16  suggestions in the briefing that Dr. Harvey or Mr. Pellerite

14:19:49 17  were doing that but they're not.  Guidance documents have made

14:19:54 18  it clear that it's a comparative analysis between safety and

14:19:59 19  effectiveness but it's looked at; and I think it would be

14:20:02 20  unfair and misleading to leave that part out when the 510(k)

14:20:08 21  submissions are discussed in front of jury.  They clearly have

14:20:11 22  to compare safety and efficacy to some extent because they're

14:20:16 23  comparing it to the predicate, and we would like to be able to

14:20:18 24  tell that story.

14:20:20 25            In addition, something that's unique in this case

14:20:22  1  and quite frankly, it's something I've never had come up in

14:20:25  2  any one of my cases is this down classification issue.  My

14:20:29  3  colleague Mr. Jones talked about that earlier today.  But in

14:20:33  4  2000 or in late 1990's, these filters were down classified

14:20:38  5  from class 3 to class 2.  Now, was that an independent

14:20:42  6  evaluation of Cook's filters being safe and effective?  No.

14:20:46  7  It was all filters in general and I think that part of the

14:20:49  8  story is relevant and should be heard by the jury as well, and

14:20:52  9  Dr. Harvey is qualified to discuss that.

14:21:04  10            Both Dr. Harvey and Mr. Pellerite offer testimony

14:21:07  11  and opinions concerning customs in a complex regulated

14:21:12  12  industry.  They discuss back and forth between Cook and FDA,

14:21:15  13  both in the premarket submission and the postmarket

14:21:18  14  submission; and that is what they are qualified to say and

14:21:22  15  what they ought to be able to say.  We heard a couple times

14:21:26  16  how narrow this regulatory testimony should be and how

14:21:29  17  everyone needs to stay in their lane.  But the case law is

14:21:33  18  clear that they are allowed to say those things.  They're not

14:21:36  19  going to be talking about what FDA thought but they should be

14:21:39  20  able to say what FDA was given by Cook, what form it took,

14:21:44  21  what FDA communicated back, and explain that process within

14:21:47  22  the context of the regulations.

14:21:50  23            Just real briefly.  Mr. Pellerite -- I didn't hear

14:21:52  24  much about Mr. Pellerite's qualifications but he was at FDA

14:21:56  25  for 29 years.  He was recognized by FDA as an expert in

14:21:59  1  regulatory requirements for devices and as an expert in

14:22:03  2  labeling requirements.  He's offering opinions regarding

14:22:06  3  matters he has experienced doing at FDA, for example

14:22:09  4  postmarket reporting and CAPA procedures.  He's explaining FDA

14:22:13  5  postmarket regulations; what they say, what they require, and

14:22:16  6  what they mean.

14:22:36  7          THE COURT:  Mr. DeGreeff.

14:22:40  8          MR. DEGREEFF:  Real briefly.  We're not saying that

14:22:42  9  Mr. Pellerite and Ms. Harvey aren't qualified to give opinions

14:22:46 10  on premarket and postmarket respectfully.  Just that they

14:22:50 11  shouldn't step outside their lanes.

14:22:52 12          With regard to efficacy, efficacy means do filters

14:22:56 13  stop clots.  And the 510(k) does not require a particular

14:23:01 14  company to prove efficacy.  So therefore, during Dr. Harvey's

14:23:06 15  time at the FDA, that doesn't qualify her to know what the

14:23:09 16  efficacy of IVC filters are or give any kind of opinion on the

14:23:14 17  IVC filters based on what she did.  That wouldn't have been

14:23:18 18  something that was even being submitted.

14:23:25 19          It would be the same for Mr. Pellerite with regard

14:23:28 20  to postmarket.  Sorry, Your Honor.  I'm trying to not go back

14:23:32 21  over everything.  With regard to the down classification of

14:23:36 22  the filters, the Celect filter didn't even exist at the time

14:23:41 23  of the down classification and we're here on a Celect filter

14:23:44 24  case.

14:23:44 25          And I'm not going do reargue preemption.  I think

14:23:48  1    that was pretty well covered and I think that's all I've got

14:23:53  2    on Pellerite.

14:23:55  3             THE COURT:  All right.  Anything else?  Okay.  Very

14:23:57  4    good.  Dr. Venbrux.

14:24:04  5             MS. BUTLER:  Go ahead.

14:24:07  6             MR. DEGREEFF:  I didn't know if you had anything.

14:24:12  7    Your Honor, we wanted to move to exclude Mr. Venbrux' opinion

14:24:25  8    about how the design of the filter may or may not have played

14:24:30  9    into Ms. Hill's ultimate injury.  He agreed during his

14:24:38 10    deposition that he wasn't giving any kind of opinion on the

14:24:41 11    design of Cook filters and that it wasn't his thing.

14:24:44 12             And then we heard -- actually, I forgot it when I

14:24:49 13    came up here.  But we've got a slide from Ms. Pierson laying

14:24:53 14    out all the things that had to be proved by our expert,

14:24:57 15    Dr. Marmureanu, to give his opinions related to design and --

14:25:01 16    the design and how it played into the plaintiff's injury; and

14:25:06 17    none of those are met with regard to Dr. Venbrux.  So we would

14:25:12 18    ask that same standard be applied to Dr. Venbrux as would be

14:25:15 19    to Dr. Marmureanu and those opinions be excluded, if that's

14:25:19 20    what you ultimately decide to rule, Your Honor.

14:25:21 21             He doesn't have any -- he doesn't have any training

14:25:24 22    in design and I believe that the -- the ultimate argument by

14:25:29 23    the defense is that somehow he incorporated the fact that he

14:25:33 24    was a doctor and that he had done differential diagnosis in

14:25:36 25    the past qualifies him to look at the design of a filter as a

| | | |
|---|---|---|
| 14:25:40 | 1 | possible cause of the tilt experienced by our client.  Your |
| 14:25:43 | 2 | Honor, nothing could be further from the truth.  Doctors on a |
| 14:25:47 | 3 | day-to-day basis look at the clinical causes when they're |
| 14:25:50 | 4 | doing a differential diagnosis.  They'll look through and |
| 14:25:53 | 5 | they'll say clinically, what's going on with this patient and |
| 14:25:55 | 6 | what causes it. |
| 14:25:56 | 7 | I doubt Dr. Venbrux is sitting around looking at the |
| 14:26:00 | 8 | design of specific devices and trying to figure out if that's |
| 14:26:04 | 9 | one of the causes.  So simply the idea that he was a |
| 14:26:08 | 10 | practicing physician doesn't qualify him to give a design |
| 14:26:11 | 11 | opinion. |
| 14:26:12 | 12 | THE COURT:  I thought he said he wasn't going to |
| 14:26:14 | 13 | give an opinion on the subject. |
| 14:26:15 | 14 | MR. DEGREEFF:  He did.  He did, Your Honor.  And |
| 14:26:15 | 15 | that's why I also find it confusing because he ultimately |
| 14:26:19 | 16 | gives opinions about -- the fact that he ruled out the design |
| 14:26:23 | 17 | of the Celect filter as the cause of the tilt in Ms. Hill to a |
| 14:26:27 | 18 | reasonable degree of medical certainty.  I don't see how he |
| 14:26:31 | 19 | can make that leap, having told us that he's not a design |
| 14:26:34 | 20 | expert. |
| 14:26:38 | 21 | Your Honor, he also should not be allowed to give |
| 14:26:40 | 22 | any opinions on the efficacy of IVC filters.  He has no |
| 14:26:46 | 23 | methodology for establishing that.  He hasn't met any of the |
| 14:26:49 | 24 | criteria that have been shown by Ms. Pierson to the Court |
| 14:26:53 | 25 | earlier today.  He testified that he doesn't even intend to |

14:26:57  1  give this opinion.  So he's just relying on his own personal

14:27:00  2  anecdotal experience, which isn't good enough under the law.

14:27:05  3  And I believe that's it on him.

14:27:10  4           THE COURT:  Thank you.

14:27:31  5           MS. COX:  Good afternoon.  I'm Jessica Cox for

14:27:33  6  defendants and I'm hear to talk a little about about

14:27:37  7  Dr. Venbrux.  And first, before I respond to that, I want to

14:27:40  8  tell you exactly who Dr. Venbrux is.  He's a board certified

14:27:46  9  interventional radiologist with over 30 years of experience

14:27:47 10  placing IVC filters.  He's put in and taken out pretty much

14:27:53 11  every filter on the market.  He's published many papers in

14:27:55 12  peer reviewed journals on IVC filters.  He's performed animal

14:27:59 13  testing of IVC filters.  He's performed clinical studies of

14:28:03 14  IVC filters.  He's taught courses and given lectures on IVC

14:28:07 15  filters all across the country; and I don't think there's any

14:28:11 16  disputing that he's definitely qualified to talk about IVC

14:28:14 17  filters, including the Celect filter that's at issue in this

14:28:17 18  case.

14:28:20 19           The plaintiff's main arguments are that Dr. Venbrux

14:28:22 20  isn't qualified to give any opinions related to the design.

14:28:27 21  That his opinions on tilt, perforation and efficacy weren't

14:28:31 22  formulated using a reliable methodology and that his opinions

14:28:36 23  are contradictory; and that's just not the case.

14:28:39 24           In terms of the qualifications for all of his

14:28:42 25  opinions, including his opinions on ruling out the design as a

14:28:46  1  cause of injury -- and actually, I should go back.  There was

14:28:50  2  some discussion by plaintiff's counsel that he said he wasn't

14:28:53  3  going to give any opinions on efficacy in his deposition, and

14:28:56  4  he clarified in his deposition he wasn't going to give any

14:29:00  5  engineering opinions.  He is going to stay in his lane if it

14:29:03  6  comes to talking about clot trapping studies or bench testing

14:29:06  7  or something that an engineer is more appropriately going to

14:29:09  8  talk about.  He's not going to venture there.  He's only going

14:29:12  9  to talk about his clinical experience, his review of the

14:29:14 10  literature, and his review of Mrs. Hill's medical records.  He

14:29:18 11  is staying -- in terms of efficacy, he's staying in his lane

14:29:21 12  and only talking about clinical efficacy.

14:29:24 13          All of the opinions that Dr. Venbrux offers in his

14:29:27 14  reports he's completely qualified to give.  He can talk about

14:29:31 15  clinical opinions about the Celect filter and its design.  He

14:29:33 16  can talk and he should consider the design of the filter in

14:29:37 17  evaluating what might have caused Ms. Hill's alleged injuries;

14:29:41 18  but he should not and he does not offer any engineering type

14:29:46 19  opinions.

14:29:47 20          Now, the plaintiffs cited some authority to say he

14:29:50 21  should not -- not even mention the word design when he's

14:29:53 22  giving opinions; and their cases that they cite in their brief

14:29:57 23  actually highlight why Dr. Venbrux should be allowed to give

14:30:00 24  the testimony that he's already proffered in his expert

14:30:03 25  report.  They cited case *Alexander v. Smith & Nephew* that says

14:30:06   1   a family practice doctor who's never performed spinal surgery

14:30:11   2   or used a spinal device shouldn't be able to talk about

14:30:13   3   whether a device was defective or caused an injury.

14:30:16   4           And they cite a case about a chemist, who's never

14:30:18   5   had any medical training, who shouldn't be able to say whether

14:30:20   6   or not a breast implant caused a problem in a person because

14:30:23   7   they don't have any expertise in medicine.

14:30:26   8           But in this case we're talking about an

14:30:28   9   interventional radiologist with 30 years of experience, with

14:30:31   10  experience implanting the product at issue, removing the

14:30:34   11  product at issue.  With peer reviewed publications on the

14:30:38   12  product at issue, he definitely is qualified to opine whether

14:30:42   13  or not a filter caused an injury.

14:30:44   14          One case they cite, the *Mora* case (phonetic), is

14:30:47   15  actually directly on point.  In that case there was a treating

14:30:50   16  physician who -- who was an orthopedic surgeon who had a lot

14:30:54   17  of experience implanting artificial knees, including the knee

14:30:57   18  that was at issue in that case.  He didn't have any training

14:31:01   19  in engineering or material science or anything like that,

14:31:03   20  metallurgy.  He was just an orthopedic surgeon who had used

14:31:07   21  this device a whole bunch.  And he gave an opinion that in his

14:31:11   22  opinion, the person had suffered an injury because of the

14:31:13   23  device, because of wear from the device.  And the Court said,

14:31:16   24  you know what, he can properly say whether or not the device

14:31:19   25  in his clinical opinion caused an injury.

14:31:22  1          What he couldn't say is why the device caused the

14:31:25  2  injury.  He couldn't say because of the -- of the

14:31:29  3  characteristics of the metal or because of how this might have

14:31:32  4  worn or how that design was tested because that's engineering.

14:31:35  5  But he could definitely, as a clinician with experience in

14:31:39  6  that product, rule in or rule out the product as a cause of

14:31:43  7  the jury.  That's exactly what Dr. Venbrux has done here and

14:31:46  8  should able to do here.

14:31:49  9          You know, cases show that an expert shouldn't be

14:31:52 10  required to satisfy an overly narrow test of their

14:31:55 11  qualification.  They don't have to have knowledge of

14:31:58 12  everything about a particular subject matter.  So he doesn't

14:32:01 13  have to be the engineer.  He doesn't have to be the expert in

14:32:04 14  the materials and the metallurgy and the radial forces and

14:32:08 15  this and that, just like he explained in his deposition.  But

14:32:11 16  he should be able to offer general opinions about whether or

14:32:13 17  not the design from a clinical perspective could have caused

14:32:18 18  Ms. Hill's injury.

14:32:21 19          Dr. Venbrux' opinions are the opinions he proffers

14:32:22 20  in his report are also based on a sound and reliable and

14:32:26 21  clearly articulated methodology.  Plaintiff argues in their

14:32:30 22  brief that he is just talking off the cuff and that's not

14:32:33 23  acceptable.  And they cite a case where an expert authored a

14:32:35 24  three-page report that had no citations and who in his

14:32:39 25  deposition couldn't answer any questions.  But that's not what

14:32:42  1   we have here.  Dr. Venbrux authored a 31-page report that he

14:32:48  2   specifically cited to 52 published articles in outlining how

14:32:53  3   he found a basis for all of his opinions.  He also

14:32:55  4   specifically discussed the results of an IME he conducted and

14:32:59  5   gave approximately eight hours of deposition testimony,

14:33:02  6   completely in opposite of the *Lane* case that they cite.

14:33:05  7        Plaintiffs also suggest that because he didn't

14:33:07  8   review adverse event reports, his methodology is somehow

14:33:10  9   unreliable because their expert took 300 adverse event reports

14:33:13 10   they selected and reviewed those.  But as our briefing shows,

14:33:17 11   in this case Dr. Venbrux actually reviewed the entire universe

14:33:22 12   of complaints that have ever been submitted to Cook.  Not just

14:33:26 13   cherry-picked complaints by plaintiff's counsel.  He looked at

14:33:28 14   the entire universe that were reported and synthesized in

14:33:32 15   Cook's data summary.  He reviewed an epidemiological

14:33:33 16   assessment of all the complaints that have ever been given to

14:33:39 17   Cook; and he used that data, correlated it with his 30 years

14:33:42 18   of experience, correlated with his review of the medical

14:33:44 19   literature to formulate the basis of his opinions.  And that

14:33:47 20   is a very sound and reliable methodology.

14:33:50 21        He also -- plaintiffs also say that he had no reason

14:33:53 22   to analysis.  He didn't use data or any accepted methodology

14:33:57 23   in the report.  But again, as the report clearly articulates

14:34:00 24   and outlines, he performed an IME.  He looked at imaging he

14:34:04 25   specifically requested to look at Mrs. Hill's IVC.  He also

14:34:07  1  used and described in detail the differential etiology that he

14:34:13  2  went through, how he ruled on things and what things he ruled

14:34:16  3  out.  Something that was absent in Dr. Marmureanu's report.

14:34:19  4  But basically, we have a very clearly articulated differential

14:34:23  5  etiology, which the plaintiffs themselves have pointed out in

14:34:26  6  their briefing on Dr. Garcia, that's the methodology that you

14:34:30  7  need to be using if you're a clinician talking about what

14:34:33  8  might have caused an injury.  So we have a clearly defined

14:34:36  9  methodology.  He's basing it on medical records, which he

14:34:39  10  cited to over 110 medical records that support his opinion,

14:34:42  11  Cook's data summary, epidemiological data, and it's all very

14:34:46  12  clearly articulated in his report.

14:34:49  13          Plaintiff's briefing also suggest that he has

14:34:51  14  some -- somehow made contradictory opinions, which is not

14:34:54  15  true.  They seem to be a little bit confused about the

14:34:57  16  opinions he's offered.  So I also want to clear up that the

14:35:00  17  testimony he gave in his deposition was completely consistent

14:35:03  18  with the testimony that he outlined in his report and it will

14:35:06  19  be the same as the testimony he's going to offer in trial.

14:35:09  20          First he gives an opinion that Mrs. Hill's filter

14:35:12  21  was tilted.  It looked tilted the first time you ever saw a

14:35:16  22  picture of it, right when it was placed; and that tilt was due

14:35:19  23  to Mrs. Hill's anatomy.  Not because of something going on

14:35:22  24  with the filter.  That was what he wrote in his report.  Then

14:35:27  25  in his deposition he said the exact same thing, "When I looked

14:35:30  1   at it initially, it looked tilted," but that tilt was because

14:35:32  2   of her anatomy.  Not because of the filter.

14:35:34  3        And if you look, this is a picture of Mrs. Hill's

14:35:37  4   spine; and you can see it's not a straight line.  And so

14:35:40  5   Dr. Venbrux, in his report and in his deposition, was saying

14:35:44  6   any filter that you put into that is going to tilt.  Not

14:35:47  7   because of any design with the filter.  It's because I'm

14:35:49  8   looking at a patient who has very severe scoliosis.  So

14:35:53  9   anything put in a circular body is not going to be sitting

14:35:57 10   straight up and down.

14:35:59 11        They also seem to suggest that his reports about

14:36:02 12   perforation somehow changed.  It's clear in his report that he

14:36:05 13   looked at CT images and said, "At this point in time I see a

14:36:10 14   perforation and that perforation looks identical to this CT in

14:36:14 15   this point of time."  In his deposition he was asked the same

14:36:17 16   questions and he reiterated the same exact testimony.  His

14:36:21 17   opinions have been unwavering.  They've been the same in his

14:36:24 18   expert report, his deposition, they'll be the same at trial.

14:36:26 19   They're based on a very sound methodology that's clearly

14:36:30 20   articulated in his report and definitely based on his 30 years

14:36:33 21   of experience that's completely applicable to all the issues

14:36:36 22   in this case.

14:36:47 23        MR. DEGREEFF:  Couple things, Judge.

14:36:48 24        THE COURT:  Sure.

14:36:49 25        MR. DEGREEFF:  First of all, I didn't even argue the

14:36:51 1    contradictory statements.  They are contradictory but based on

14:36:54 2    what you stated earlier, I feel like that's something we can

14:36:57 3    take up on cross-examination.

14:36:59 4              THE COURT:  I'd love for you to do that.

14:37:02 5              MR. DEGREEFF:  It sounds really fun, actually.

14:37:04 6    Other issues are -- you just heard a very long recitation

14:37:10 7    of -- basically you got a resume read to you about the guy

14:37:13 8    being a doctor and that's great.  I'm sure he can make

14:37:16 9    clinical determinations.  You know what he can't do?  Is make

14:37:20 10   design determinations.  He's even told us that in his

14:37:23 11   deposition when he testified to this.

14:37:24 12             "Dr. Venbrux are you planning to offer any opinions

14:37:28 13   in the trial of this case about the design of the Tulip or

14:37:30 14   Celect filter?"  His response was, "Other than to note that

14:37:33 15   it's a conical based filter but not in the terms of

14:37:36 16   engineering or things.  That's not my area."

14:37:38 17             He also testified -- the question was, "You're not

14:37:41 18   going to offer any opinion as to whether or not the structure

14:37:44 19   of the secondary legs of the Cook Celect filter inhibits tilt

14:37:48 20   or exacerbates tilt?"  His response, "no, sir."  It's exactly

14:37:52 21   what he's doing.  He's trying to talk about the fact that the

14:37:55 22   design of the filter was not the cause of tilt.

14:38:00 23             There's seven pages here of engineering things he

14:38:02 24   said he's not going to testify as to.  So the reality is

14:38:05 25   the -- I think I heard the phrase design from a clinical

14:38:10  1  perspective.  That's not a thing.  That's not a real thing.

14:38:13  2  There is no clinical aspect of design.  You design it and then

14:38:16  3  you look and see what happens clinically.  It's kind of

14:38:21  4  crossing two issues there.  So there's nothing to support any

14:38:25  5  design expertise and that's pretty much it.

14:38:31  6          Oh.  Also I would -- I guess I would point the Court

14:38:33  7  to page 21 of Ms. Pierson's lengthy PowerPoint from the Cook's

14:38:40  8  first Daubert motion on Dr. Marmureanu and all of the

14:38:45  9  requirements they believe he had to meet in ruling in --

14:38:49 10          THE COURT:  What page?

14:38:51 11          MR. DEGREEFF:  21; where she's talking about no

14:38:52 12  reliable methodology for ruling in Celect design.  And I

14:38:58 13  believe most of those the answer is no with regard

14:39:02 14  Dr. Venbrux.

14:39:05 15          I believe what we've got left is the treaters,

14:39:20 16  unless you have any questions, Your Honor.  So in the Hill

14:39:27 17  case -- and Your Honor, I'm not addressing the Gage treaters,

14:39:30 18  even though they were referenced in the brief.

14:39:33 19          THE COURT:  Right.

14:39:35 20          MR. DEGREEFF:  I believe you just wanted us to look

14:39:36 21  at Hill.

14:39:37 22          THE COURT:  Yes.

14:39:38 23          MR. DEGREEFF:  So the situation we've got going on

14:39:40 24  here, and I think we were -- I think we were classified in the

14:39:45 25  response as being petrified of this testimony.  Nothing could

14:39:48  1    be further from the truth.  What we're saying, Your Honor, is

14:39:51  2    that while they can testify as to -- treaters can testify as

14:39:56  3    to their treatment of Ms. Hill, they can testimony as to their

14:40:00  4    diagnosis of Ms. Hill, their observations of Ms. Hill, things

14:40:03  5    like that.  What they can't do is then somehow go on, based on

14:40:06  6    their experience, to make the categorical determination that

14:40:11  7    IVC filters are safe or IVC -- Cook IVC filters are effective.

14:40:18  8         Because, Your Honor, frankly, if they were going to

14:40:20  9    do this, they should have and were required to issue reports

14:40:26 10    on these kinds of opinions.  We haven't received any report,

14:40:29 11    Your Honor, and this is -- for example, the 2nd Circuit stated

14:40:33 12    this in *Krischall v. Hennessy*.  That's 533 F.Supp 2E790.

14:40:40 13    That's Northern District of Illinois 2008.  They stated

14:40:45 14    specifically if a treater's testimony goes beyond the scope of

14:40:48 15    treatment, observation and diagnosis, then an expert report is

14:40:52 16    required.

14:40:53 17         So for these treaters to try to make the leap beyond

14:40:57 18    what they've seen with regard to Ms. Hill and their treatment

14:41:00 19    of Ms. Hill to general statements about the effectiveness or

14:41:04 20    safety of IVC filters would be required to be in a report and

14:41:07 21    it's not in a report.

14:41:08 22         THE COURT:  Isn't it implied if they think highly

14:41:11 23    enough of a device to use it in their practice, that they

14:41:15 24    would believe that it's safe and efficient?  I mean, isn't

14:41:19 25    that implied?  You couldn't say it the other way round.  Well,

14:41:23  1   doc, you wouldn't put this device in there -- in Mrs. Hill if

14:41:28  2   you thought it was unsafe and not effective, right?

14:41:32  3          MR. DEGREEFF:  Well, Your Honor, with regard to

14:41:33  4   these particular physicians, they're not doing -- so what

14:41:38  5   happens is these filters get put in by people like the

14:41:44  6   implanters, for example, and the people go off into the world

14:41:47  7   and they don't see most of them again because most of them are

14:41:50  8   lost to follow-up.  So there's no way they can -- they can

14:41:53  9   say, hey, you know with regard to the patients I've implanted

14:41:58 10   and that I've seen again, they can give some sort of objective

14:42:01 11   I've seen it testimony about that perhaps.

14:42:04 12          What they can't say is based on my anecdotal

14:42:08 13   experience, these filters, generally speaking, are safe and

14:42:11 14   effective.  They have no methodology or basis.  It's pure

14:42:14 15   speculation based on their own anecdotal world.  Most of them

14:42:18 16   don't have any tracking for the people that are lost to

14:42:20 17   follow-up.  They have no idea what's happened to those people.

14:42:22 18   So for them, as treaters, to come in and say categorically

14:42:28 19   these filters are safe and effective is misleading and just

14:42:32 20   not true -- or not accurate and has no methodology behind it.

14:42:35 21          Now, if they were to have testified that they had

14:42:38 22   some sort of ongoing tracking basis and they reviewed all the

14:42:42 23   literature and they've done all these things you would have to

14:42:44 24   do to give an opinion, that would be one thing; but they

14:42:46 25   didn't and that's the reality of them.  They're practicing

14:42:50   1   physicians.  They're not guys that are sitting around reading

14:42:53   2   every scrap of literature and doing analysis of the MAUDE data

14:42:58   3   base, and doing all the these things they would have to do in

14:43:01   4   order to effectively and honestly give the opinion that these

14:43:04   5   things are safe and effective.  And that's the second issue on

14:43:08   6   those.

14:43:09   7               Also, Your Honor, with regard to --

14:43:12   8               THE COURT:  But by implanting them, aren't they

14:43:14   9   giving the opinion that they're safe and effective?

14:43:17   10               MR. DEGREEFF:  Based on their anecdotal experience,

14:43:21   11   they -- hopefully they're implanting them because they think

14:43:23   12   they're safe and effective.  I agree with you there, Your

14:43:26   13   Honor.  But I don't know how they can take it the next step

14:43:29   14   and say categorically these things across the board are safe

14:43:34   15   and effective.  I hear what you're saying, Your Honor.

14:43:38   16               With regards to the particular physicians at issue.

14:43:41   17   Dr. Marmureanu was an orthopedic surgery who freely admitted

14:43:47   18   he's not an expert in IVC filters.  He doesn't know anything

14:43:50   19   about IVC filters.  He doesn't have any practice knowledge of

14:43:54   20   IVC filters.  He doesn't have any involvement in the type of

14:43:57   21   filter he uses.  But yet he turns around and testifies that

14:44:01   22   the rate of complications for filters is low, numerous studies

14:44:05   23   validate the safety and efficacy of filters, and the filters

14:44:10   24   save lives.  He's got no basis for that whether in experience

14:44:14   25   or in methodology.  His opinion should be excluded on that

14:44:18  1  issue.

14:44:18  2          You've got Dr. Lynch, who was the explanter, who we,

14:44:23  3  the plaintiffs, subpoenaed for his deposition and asked for

14:44:30  4  documents on his global experience.  He moved for a protective

14:44:36  5  order and this Court ultimately granted his protective order

14:44:40  6  and said that he can't give general opinions in his testimony

14:44:43  7  and that it would be limited to his particular facts related

14:44:47  8  to Ms. Hill.  So that one's actually already been addressed,

14:44:50  9  Your Honor.

14:44:52  10          THE COURT:  All right.

14:44:53  11          MR. DEGREEFF:  And then the other one is the

14:44:54  12  implanting physician Dr. Zuzga and he was the implanter and

14:44:59  13  had a failed removal, and he was obviously more qualified than

14:45:04  14  Dr. Marmureanu with regard to IVC filters; but he still lacked

14:45:07  15  any kind of methodology, any sort of basis for any of his

14:45:13  16  opinions with regard to categorical safety.

14:45:16  17          He admits that he lacked any knowledge or basis for

14:45:19  18  comparing the safety profile of Cook filters to other filters.

14:45:23  19  He admitted he doesn't know the complication rate and

14:45:25  20  comparative rate of filter complications between the Celect

14:45:29  21  filter and other filters.  And he's testified he believed it

14:45:32  22  was not his job to monitor the safety of the product.

14:45:36  23          But yet he opines as to the safety and efficacy of

14:45:39  24  Cook IVC filters generally; that those filters save lives and

14:45:43  25  that there's a strong clinical evidence to support the use of

14:45:47  1   IVC filters, despite essentially admitting that he has no

14:45:50  2   basis for that.

14:45:51  3           So I guess, Your Honor, what I'm saying is several

14:45:53  4   things.  First of all, any general opinions like that should

14:45:56  5   have been in a report -- or required to be in any report and

14:45:59  6   should be excluded for not being in a report.  With regard to

14:46:03  7   Dr. Lynch, he's already been limited to the facts of his care

14:46:06  8   and treatment of Ms. Hill.  And Dr. Marmureanu is clearly not

14:46:10  9   qualified and Dr. Zuzga has no basis for these opinions as

14:46:15 10   well.

14:46:16 11           THE COURT:  Okay.  Thank you.  Ms. Pierson.

14:46:23 12           MS. PIERSON:  Good afternoon, Your Honor.  Thank

14:46:24 13   you.  I just want to point out initially before I dive into

14:46:28 14   this motion the irony of what Mr. DeGreeff just said when he

14:46:31 15   criticizes these physicians, Dr. Zuzga in particular, saying

14:46:35 16   his testimony is not admissible because he didn't know the

14:46:38 17   complication rates of the Celect or any other filters.  You

14:46:41 18   remember I used those exact words this morning when we talked

14:46:44 19   about Dr. Marmureanu, and this is an important concession as

14:46:48 20   it relates to that expert.  I won't rehash that ground but if

14:46:51 21   it's plaintiff's position that a physician is not properly

14:46:56 22   qualified to opine on safety and efficacy in the absence of

14:46:59 23   that information, then Dr. Marmureanu shouldn't be testifying

14:47:02 24   in this case.

14:47:03 25           But with respect to the motion that is the hand.

14:47:06  1   Your Honor, we're talking about the testimony of three

14:47:09  2   treating physicians.  And as an initial matter, all of those

14:47:11  3   physicians will be testifying by deposition.  Both sides have

14:47:14  4   already designated, counter designated and objected; and on

14:47:18  5   October the 9th, you will have the exact testimony in hand and

14:47:21  6   will be able to address these issues with the true testimony

14:47:24  7   in front of you.  Our view is that their motion is premature

14:47:28  8   and it's a far better exercise to have you actually see the

14:47:31  9   testimony and make your own determination.

14:47:33  10          But the fact of the matter is that the plaintiff's

14:47:38  11  interpretation of what is permitted from a treating physician

14:47:42  12  is far too narrow and simply incorrect under the law.  First,

14:47:45  13  to start with the question that you ask.  Every physician in

14:47:48  14  choosing a filter, just like a physician who chooses to

14:47:52  15  prescribe a medication, their inherently making a safety and

14:47:53  16  effectiveness determination every time they choose to

14:47:57  17  prescribe it.  They're also weighing the risks and the

14:47:59  18  benefits for that particular patient.  Even Dr. Marmureanu.

14:48:03  19  But all of the physicians in this case have explained that

14:48:06  20  part of the job of a doctor is to weigh the risks and benefits

14:48:09  21  each time they choose to use the product.

14:48:13  22          Treating physicians are permitted to testify without

14:48:15  23  a Rule 26(a)(2)(B) report as long as there is a Rule

14:48:19  24  26(a)(2)(C) disclosure, which we have.  They're permitted to

14:48:24  25  testify about their experience, education, and training, and

14:48:28  1  decision making, their care and treatment of the plaintiff.

14:48:31  2  What they're not permitted to testify to in the absence of an

14:48:34  3  (a)(2)(B) disclosure is events that happened in the future,

14:48:38  4  after their care and treatment of the patient ended.  So it is

14:48:42  5  correct to say that we could not, without a Rule 26(a)(2)(B)

14:48:46  6  report, have a physician come and testify and say, "I believe

14:48:51  7  that all filters are safe and effective.  If he hasn't made

14:48:56  8  that analysis, we haven't disclosed it in a 26(a)(2)(B)

14:49:00  9  report, he couldn't do that.

14:49:01  10        But what they can do with respect to Mrs. Hill, in

14:49:04  11  the case of Dr. Marmureanu -- excuse me, Dr. Moreno.  Their

14:49:10  12  names are very close and I confuse them routinely.  Dr. Moreno

14:49:13  13  is the spinal surgeon who prescribed Mrs. Hill's filter; and

14:49:18  14  what he can properly say is, "Here is all of my experience

14:49:23  15  leading up to my care and treatment of Mrs. Hill.  Here's why

14:49:26  16  I chose the vena cava filter for Mrs. Hill and why I choose it

14:49:29  17  for patients like Mrs. Hill.  This has been my experience.

14:49:33  18  This is how I used it in her case and these are the

14:49:37  19  complications that she did or didn't experience."

14:49:40  20        In the course of treating her, he reached

14:49:42  21  conclusions about her medical condition, about whether she

14:49:46  22  needed a filter, about whether she was at risk of pulmonary

14:49:50  23  embolism.  And his testimony in this case is strong.  His

14:49:53  24  testimony is that he would not do this procedure without a

14:49:58  25  vena cava filter.  He feels so strongly that it's important

```
14:50:01  1  for patients to have that because they can't take
14:50:05  2  anticoagulants.  And he explained that he chooses vena cava
14:50:08  3  filters for his patients because if they were given
14:50:11  4  anticoagulants, blood thinners, they would either blood to
14:50:15  5  death on the table during the procedure or they would bleed
14:50:19  6  into their spine.
14:50:19  7          It is his opinion that Mrs. Hill's filter probably
14:50:23  8  saved her life.  And if he had to do it all over again, he
14:50:26  9  would do the exact same thing and prescribe a filter.  All of
14:50:29 10  that is within proper Rule 26(a)(2)(C) disclosure testimony,
14:50:33 11  and we disclose that information in our disclosure.  The
14:50:39 12  plaintiffs aren't challenging the accuracy or the definiteness
14:50:43 13  of our disclosure.  It was properly disclosed.
14:50:46 14          With respect to to Dr. Zuzga --
14:50:48 15          THE COURT:  He can certainly testify his treating
14:50:51 16  and the why and wherefore's of his treatment decisions but in
14:50:55 17  terms of saying that he believes it saved her life, I don't
14:51:02 18  believe that's proper.  How does he base that on?  Just
14:51:07 19  because she survived?
14:51:09 20          MS. PIERSON:  He explains in his testimony that he
14:51:11 21  believes patients who undergo this particular procedure are at
14:51:14 22  a heightened risk of pulmonary embolism.  He's doing a lot of
14:51:19 23  screwing into their spine; and every time you do that, that
14:51:22 24  generates the kind of result that can create a blood clot.  So
14:51:26 25  he does not say that she developed a pulmonary embolism.  He
```

14:51:30  1    does not say that her filter caught a pulmonary embolism.  He

14:51:33  2    can't say that and he won't say that.

14:51:36  3            THE COURT:  But in terms of life-saving -- the word

14:51:38  4    saved her life I believe is a little dramatic here.  There may

14:51:42  5    be other ways to indicate that the filter performed as

14:51:47  6    expected.  So he may have to work with that.

14:51:51  7            MS. PIERSON:  Well, all the more reason to evaluate

14:51:53  8    this in the context of the actual question.  It's nuanced.  My

14:51:58  9    view of the plaintiff's motion is that they intend to limit

14:52:00 10    the testimony of Dr. Marmureanu, Dr. Zuzga and Dr. Lynch

14:52:05 11    solely to, "I saw Mrs. Hill on this day and this is what

14:52:08 12    happened on this day."  And the case law is very clear that

14:52:12 13    treating physician testimony is not that limited.  That it

14:52:15 14    includes all of the information and experience and basis that

14:52:19 15    they have leading up to the care and treatment of the patient.

14:52:23 16            We cited several --

14:52:25 17            THE COURT:  Sure, that's clear.  But they can

14:52:27 18    testify as to why's and wherefore's of why they did what they

14:52:32 19    did and why they recommended what they did.  It doesn't have

14:52:34 20    to be "I saw Mrs. Hill on September 25th and this is what I

14:52:42 21    did on that day," and then stop.  That doesn't help the jurors

14:52:47 22    any.  They have to know why and wherefore's.

14:52:51 23            MS. PIERSON:  One thing we do agree with plaintiffs

14:52:53 24    on is that the physicians can't testify about things that --

14:52:56 25    that they've never seen before, that they didn't consider in

182

| | | |
|---|---|---|
| 14:53:01 | 1 | the course of their treatment.  So for example, a tactic that |
| 14:53:02 | 2 | we've seen frequently in all of these depositions, |
| 14:53:07 | 3 | particularly in the physicians, is that the plaintiff's lawyer |
| 14:53:10 | 4 | will give the physician a Cook document, an internal document, |
| 14:53:14 | 5 | and say, "Have you ever seen this document before?  Does this |
| 14:53:17 | 6 | document surprise you?"  That's the kind of thing that we |
| 14:53:20 | 7 | believe that Rule 26(a)(2)(B) and (C) were designed to |
| 14:53:25 | 8 | prohibit.  Neither party should be permitted to give to the |
| 14:53:28 | 9 | physician a document that they've never seen, that they have |
| 14:53:30 | 10 | no personal knowledge of and ask them to opine on that.  They |
| 14:53:34 | 11 | are here to talk about their care and treatment of Mrs. Hill |
| 14:53:37 | 12 | and what caused them to treat Mrs. Hill the way that they did. |
| 14:53:41 | 13 | There's just one last point I'll make and I'll sit |
| 14:53:44 | 14 | down on this motion, Your Honor.  Two points, actually. |
| 14:53:47 | 15 | First, the motion that's actually before you is a motion |
| 14:53:51 | 16 | that's related to striking our disclosures for these |
| 14:53:55 | 17 | witnesses.  It's not a Daubert motion on the witnesses.  So |
| 14:53:59 | 18 | the question is what's the -- was our disclosure under Rule |
| 14:54:02 | 19 | 26(a)(2)C) proper.  We believe it was.  We said that in our |
| 14:54:07 | 20 | papers; but also there is the provision that dictates if a |
| 14:54:11 | 21 | disclosure is insufficient and the insufficiency is harmless, |
| 14:54:14 | 22 | that there's no need to do anything else. |
| 14:54:17 | 23 | Here, to the extent that there's some doubt about |
| 14:54:19 | 24 | whether all of these thoughts and opinions from the physicians |
| 14:54:22 | 25 | were properly disclosed, we know they were because the |

14:54:25 1   physicians were deposed; and we know they were because they're

14:54:28 2   contained within our nonretained expert disclosure.  But in

14:54:34 3   addition to that, these three physicians who are at issue have

14:54:37 4   also been disclosed as nonretained experts by the plaintiffs

14:54:39 5   for many of the same things that they're suggesting here are

14:54:43 6   not proper expert testimony.  So for those reasons, Your

14:54:46 7   Honor, we ask that you deny the motion.

14:54:49 8            THE COURT:  Thank you.

14:54:55 9            MR. DEGREEFF:  I'll be brief, Your Honor.  I think

14:54:58 10  you got a pretty good idea on this one.  Your Honor, you're

14:55:02 11  correct.  His basis for saying they save lives was because she

14:55:05 12  didn't die.  That was -- that was the opinion.  It's purely

14:55:08 13  speculative and you're absolutely correct on that one.

14:55:11 14            If they say -- if these treaters are allowed to

14:55:16 15  testify that these filters save lives and that these filters

14:55:19 16  are effective, then that certainly opens the door to the

14:55:24 17  plaintiffs to be able to show them documents they were never

14:55:28 18  provided and have never seen before that showed that these

14:55:31 19  filters aren't, and what Cook knew about these filters, and

14:55:34 20  what they weren't telling physicians about these filters

14:55:36 21  because a lot of what these physicians know and believe, Your

14:55:39 22  Honor, comes from the company.  The company is in a

14:55:41 23  position -- unique position to know what their bench testing

14:55:44 24  shows, show what their internal analysis shows.  Show all the

14:55:46 25  things that these physicians don't have access to.

14:55:49  1          In fact, this company went out and as part of their

14:55:52  2  marketing campaign, touted the MAUDE data, despite not

14:55:55  3  reporting all of these malfunctions and injuries and failures

14:56:01  4  properly.  So for them to take the position that they -- that

14:56:05  5  they would get to bring this information -- this testimony in

14:56:08  6  and we wouldn't be able to enlighten the doctors with some of

14:56:12  7  the internal things that were known, that feels like they

14:56:16  8  opened the door, Your Honor.

14:56:17  9          And lastly, these physicians may very well believe

14:56:24 10  that Cook filters are safer or that IVC filters are safe but

14:56:28 11  that's -- that doesn't mean that they can give that opinion,

14:56:31 12  Your Honor.  An opinion requires them to meet the Daubert

14:56:37 13  qualifications, and simply being a physician and implanting

14:56:39 14  filters doesn't get you there.  They have to have a proper

14:56:42 15  methodology for why they can make a categorical statement that

14:56:46 16  these things are safe or these things are effective.  So I

14:56:49 17  would just point that out, Your Honor.  Thank you very much.

14:56:52 18          THE COURT:  Thank you.  Anything else on this?

14:56:54 19          MS. PIERSON:  (Nods negatively.)

14:56:58 20          THE COURT:  Okay.

14:57:06 21          MS. PIERSON:  I think we're ready for the Hill

14:57:11 22  summary judgment motion, if you give us a second here.  Your

14:57:50 23  Honor, before I begin with the argument, I just want to

14:57:52 24  introduce my co-counsel Lee Teichner from Holland Unite in

14:57:59 25  Florida.

14:57:59  1          THE COURT:  Okay.  Welcome.

14:58:01  2          MR. TEICHNER:  Thank you.

14:58:04  3          MS. PIERSON:  It hopefully comes as a pleasant

14:58:06  4  surprise that a lawyer from Indiana would think it's a good

14:58:08  5  idea to consult with a lawyer from Florida when we're talking

14:58:11  6  about Florida law; and I've considered Lee's advice to be very

14:58:17  7  critical as we've prepared this case and though about what is

14:58:17  8  the applicable law for Mrs. Hill's claims.  So there may be an

14:58:22  9  occasion during the argument where Lee steps in and says

14:58:24 10  something about Florida law but we'll proceed; and if that's

14:58:28 11  necessary, he'll come to the podium, obviously.

14:58:32 12          THE COURT:  All right.

14:58:50 13          MS. PIERSON:  Your Honor, may it please the Court.

14:58:51 14  Cook has filed a motion for summary judgment in the case of

14:58:55 15  Ms. Elizabeth Hill, and I thought it might be helpful to begin

14:58:59 16  by reviewing initially what are the legal claims that remain

14:59:02 17  in this case.  Mrs. Hill filed an original complaint after the

14:59:06 18  MDL was created.  Shortly thereafter, there was a master

14:59:09 19  complaint that she adopted through a short-form complaint as

14:59:12 20  well.

14:59:13 21          Since that time, Your Honor granted a motion to

14:59:15 22  dismiss as to many of the legal theories in the case.  And so

14:59:18 23  the question is, what's left?  We also know in response to the

14:59:22 24  motion for summary judgment that the plaintiffs withdrew their

14:59:25 25  claim of strict liability failure to warn; and we'd ask that

14:59:29  1  the Court grant summary judgment on that as an initial matter,

14:59:31  2  given the withdrawal.

14:59:34  3          THE COURT:  Any position on that, plaintiff?

14:59:37  4          MR. SCHULTZ:  I think we said in our papers, Your

14:59:38  5  Honor, if you were inclined to do that, rather than denying it

14:59:44  6  moot, we ask that there be a notation in the order that it was

14:59:46  7  withdrawn and that was the basis for the summary judgment, so

14:59:49  8  it's not used elsewhere or later to suggest it was decided on

14:59:54  9  the merits by the Court as argued.

14:59:58 10          THE COURT:  Show the plaintiffs withdraw the claim

15:00:01 11  and motion granted.

15:00:03 12          MS. PIERSON:  Thank you, Your Honor.  So what I put

15:00:05 13  on the screen in front of you, Your Honor, are what plaintiffs

15:00:08 14  say the remaining legal theories are.  They say they are

15:00:12 15  negligent failure to warn, strict liability design defect, a

15:00:17 16  general negligence claim, and then punitive damages.  We agree

15:00:20 17  with them with one exception.  That third bullet point,

15:00:23 18  general negligence, we don't agree that that's a viable claim

15:00:26 19  or that it's a claim that's been pled in this case.

15:00:29 20          I want to begin, though, Your Honor, by saying you

15:00:32 21  don't have to consider the merits of any of those legal claims

15:00:36 22  because the fact of the matter is the plaintiffs have no

15:00:39 23  evidence of causation in this case; and you can dispose of all

15:00:42 24  of their claims without going any further, based on the sole

15:00:45 25  element of causation.  We made this argument in our moving

15:00:49  1   papers on the motion for summary judgment; and the argument

15:00:52  2   was that that first Florida law, there's many, many cases that

15:00:57  3   say regardless of the legal theory pled, defect on causation

15:01:02  4   must always be proven and causation is clear.

15:01:07  5            We argued in our moving papers that the plaintiffs

15:01:10  6   could not prevail under any legal theory because the element

15:01:14  7   of causation could not be met and the sole expert that tries

15:01:18  8   to -- that plaintiffs proffer to try and meet the element of

15:01:22  9   causation is Dr. Marmureanu.  You can search Dr. Marmureanu's

15:01:26 10   general report high and low and never find the word causation.

15:01:30 11   You will never find the words defect causing something.  You

15:01:34 12   can search his Hill report and you will find the same thing.

15:01:38 13   At no point in his report does he ever suggest that a defect

15:01:42 14   in the product or something about the product actually caused

15:01:45 15   Mrs. Hill's injuries.

15:01:47 16            You can search all of Dr. mcMeeking's report, their

15:01:51 17   engineering expert, and he does not opine on causation because

15:01:55 18   he's never seen Mrs. Hill's medical records.  He knows nothing

15:01:58 19   about her individual case.

15:02:01 20            Dr. Marmureanu observes a correlation in the

15:02:03 21   literature, not causation; and he doesn't even connect the

15:02:06 22   dots between the correlation in the literature and Mrs. Hill's

15:02:09 23   particular outcome.  Any defense as to lack of causation in

15:02:14 24   the Hill case is waived; and there are three excellent cases

15:02:17 25   7th Circuit and Southern District of Indiana cases right

15:02:21 1   there.  Because plaintiffs didn't respond to this in response

15:02:24 2   to the motion for summary judgment, this case really should be

15:02:28 3   closed.

15:02:29 4          But I want to turn to the legal theories that the

15:02:31 5   plaintiffs allege and explain to you why, even if that were

15:02:35 6   not a barrier, they still cannot meet their burden of proof as

15:02:39 7   a matter of law.  First with respect to their negligent

15:02:42 8   warnings claim.  They're required to prove both a defect in

15:02:46 9   the warnings and that the defect in the warnings caused

15:02:49 10  Mrs. Hill's injuries.  So I'm going to start with the element

15:02:52 11  of causation again.  First I've just put the elements in front

15:02:55 12  of you but Florida law is really very similar to Indiana's on

15:02:58 13  this point.

15:02:59 14         There must be expert evidence of a defect in the

15:03:01 15  warnings.  A breach of duty recognized by law.  And causation,

15:03:06 16  a causal connection between the conduct and the resulting

15:03:10 17  injury, as well as damages.

15:03:13 18         We know in Mrs. Hill's case that because this is a

15:03:17 19  prescription medical product, the Florida law lays out quite

15:03:22 20  clearly that the physician is a learned intermediary.  There's

15:03:26 21  no disputing the fact that Florida recognizes the learned

15:03:29 22  intermediary doctrine; and Florida law, even up to the 11th

15:03:34 23  Circuit is quite clear that the chain of causation is broken

15:03:38 24  if any one of three things happen.  First, if any claimed

15:03:43 25  deficiency -- any claimed deficiency as a matter of law cannot

15:03:45  1    be proven if a treating physician does not read the

15:03:49  2    manufacturer's warnings; second, if he already knows the risk

15:03:52  3    without the warning; and third, if it would not change the

15:03:55  4    treatment provided to the plaintiff, even with additional

15:03:57  5    knowledge.

15:03:58  6         All three of those things are lacking in Mrs. Hill's

15:04:01  7    case and that's why Cook is entitled to summary judgment on

15:04:05  8    our failure to warn claim.  Dr. Zuzga didn't read the

15:04:09  9    warnings.  His testimony on that point is unambiguous.  Dr.

15:04:12 10    Zuzga clearly testified that he was well aware of all of the

15:04:16 11    risks.  He said he had independent knowledge, not from Cook,

15:04:19 12    of the risk of perforation, the risk of organ perforation, the

15:04:24 13    risk of perforation of the duodenum.  When I asked him the

15:04:27 14    question of, "You know everything that Mrs. Hill experienced

15:04:29 15    as a consequence of her filter according to her.  Were any of

15:04:33 16    those things risks that you were not aware of prior to placing

15:04:37 17    her filter?"  And he said no.  He said he doesn't count on the

15:04:40 18    manufacturer to tell him anything about the risks; and all of

15:04:43 19    those were well-known to him and well-known in the relevant

15:04:47 20    medical community in November of 2010.

15:04:50 21         He's also testified that a different warning would

15:04:52 22    not change the plaintiff's outcome because he says it

15:04:57 23    doesn't -- he didn't pay attention to the IFU.  He didn't read

15:05:01 24    it and he still would choose the Celect, even if there were

15:05:04 25    different words in the IFU.  So during Dr. Zuzga's deposition,

15:05:09  1   he was given by plaintiff's counsel a copy of the instructions

15:05:12  2   for use and he was asked some questions about it.  He said the

15:05:16  3   words in the IFU "vena cava perforation" to him include

15:05:20  4   progressive perforation, organ perforation, duodenal

15:05:24  5   perforation.  He said he would read the words in the IFU, had

15:05:27  6   he read it, to include everything that she experienced and all

15:05:30  7   of those things were well-known to him no matter what the

15:05:33  8   words on the page said.

15:05:36  9           Florida law is clear that a physician's failure to

15:05:39 10   read the instructions for use is absolutely dispositive of a

15:05:43 11   warnings claim.  That's the *Lopez* case, *Ashby*, *Children's*

15:05:47 12   *Products* and *Pinchinat*.  But there are many more.

15:05:50 13           Now, in response to our motion on this point, the

15:05:53 14   plaintiffs suggest that Dr. Zuzga's testimony somehow creates

15:05:58 15   some ambiguity about whether he read the IFU or not.  And I

15:06:01 16   want to be sure that point is absolutely clear.  Here's his

15:06:07 17   testimony on whether he read the warnings.

15:06:12 18           (Audio recording was played at this time.)

15:07:07 19           MS. PIERSON:  Dr. Zuzga's testimony is very clear on

15:07:09 20   that point.  Now, Mr. Heaviside questioned him just before I

15:07:12 21   did and he asked these questions that plaintiff say create

15:07:17 22   some issue of genuine material fact.  It's the bottom Q&A that

15:07:21 23   they really referred to.  He was handed the IFU.  He wasn't

15:07:26 24   asked, "Have you ever read it?" or asked his familiarity withh

15:07:28 25   it.  He was handed the IFU, pointed to a particular section of

```
15:07:32  1   it dealing with retrieval techniques; and the he asked, "You
15:07:35  2   followed the retrieval technique outlined in the IFU;
15:07:40  3   correct?"  He said, "I never really thoroughly read the IFU.
15:07:43  4   So I based my retrieval techniques on my training."
15:07:45  5            About 20 pages later, Mr. Heaviside asked again
15:07:49  6   imbedding in the question the assumption that he's read the
15:07:51  7   IFU but never actually asking the question.  "Now, that, as
15:07:55  8   far as the IFU is concerned, is an off-label technique;
15:07:59  9   right?"  And the witness volunteers "Yes.  Again, I didn't
15:08:03  10  read the IFU, but I have not seen that in paging through it."
15:08:09  11           His testimony isn't confusing on this point.  He
15:08:12  12  didn't read it and we know that breaks the causal chain for
15:08:16  13  their failure to warn claim and it cannot be sustained.  We
15:08:19  14  also know that his independent knowledge of the risks,
15:08:21  15  including the risks that Mrs. Hill faced, breaks the causal
15:08:26  16  chain.  Florida and 11th Circuit law is absolutely clear on
15:08:29  17  that point.  We've cited four cases before you but there are
15:08:32  18  many just like it.
15:08:34  19           Dr. Zuzga, I went through each of the risks with
15:08:37  20  him, whether it's perforation, organ perforation, fracture,
15:08:41  21  migration, stenosis, thrombosis, occlusion, he said he was
15:08:44  22  familiar with all of those things based on his medical
15:08:47  23  education and training and he didn't rely on Cook to know
15:08:51  24  that.  I asked him toward the end of his deposition, "Is there
15:08:53  25  any risk that you've heard about today that you did not know
```

15:08:56 1  of in November of 2010," which is when the product was placed.

15:08:59 2  "No." "Okay.  In November 2010 you knew about the risks that

15:09:05 3  plaintiff's counsel described about organ perforation,

15:09:08 4  stenosed vena cava, those were all well-known to you?  Yes."

15:09:12 5          Plaintiffs make much in their response brief about

15:09:17 6  Dr. Zuzga suggesting that he didn't expect certain things; he

15:09:20 7  didn't expect perforation.  There's a key difference between

15:09:24 8  expecting an injury and knowing a risk; and I clarified this

15:09:27 9  with him.  I said, "When Mr. Johnson asked you about whether

15:09:32 10 you had an expectation that Mrs. Hill's filter would perforate

15:09:36 11 her duodenum following her retrieval attempt, is it accurate

15:09:39 12 to say that you had no expectation but you always knew it was

15:09:43 13 a risk?"  "Correct."

15:09:45 14         He went on to say in response to questions where

15:09:48 15 plaintiff's counsel asked him about, "Well, were you surprised

15:09:51 16 when her filter perforated her duodenum?"  He explained, "Yes.

15:09:54 17 As a physician, I'm always surprised.  I never expect a

15:09:58 18 complication or I wouldn't use the medical product.  But I

15:10:01 19 always know that it's a risk."  And it's that independent

15:10:04 20 knowledge of the risk that breaks the causal chain under

15:10:07 21 Florida law.

15:10:08 22         We also know that the third break in the causal

15:10:11 23 chain is present in this case.  A different warning would not

15:10:14 24 change the outcome of this case.  I asked Dr. Zuzga if there

15:10:18 25 was anything that he learned following Mrs. Hill's retrieval

15:10:22  1  attempt that would cause him to say, I need to bring her back

15:10:24  2  and do something different?  No, he wouldn't do anything

15:10:27  3  different.  I asked that same questions in other ways, too.

15:10:30  4  Is there anything you learned after March 2011, even up to

15:10:34  5  today, even through the deposition process, that would cause

15:10:38  6  you to change the way that you treated Mrs. Hill following

15:10:40  7  March of 2010?  No.

15:10:43  8          And we've cited in our papers many, many other

15:10:45  9  examples from his deposition where he repeatedly said he would

15:10:49 10  treat Mrs. Hill the exact same way today that he treated her

15:10:53 11  in 2010, regardless of what the IFU said.  He knew the risks.

15:10:59 12  He didn't need our instructions for use.  And as you recall,

15:11:02 13  his own words, he implants hundreds of medical products

15:11:07 14  without reading the instructions for use; and this is one that

15:11:10 15  he had implanted hundreds of times before he placed

15:11:13 16  Mrs. Hill's filter.  He didn't read the instructions for use.

15:11:16 17  So there can't be a causal connection to any failure to warn

15:11:20 18  claim regardless of what the plaintiff's fair warning should

15:11:24 19  have said.

15:11:25 20          Then I want to turn to the element of defect within

15:11:28 21  plaintiff's failure to warn claim.  Even a negligent failure

15:11:29 22  to warn claim has to prove defect.  It is an element under

15:11:33 23  Florida law.  So we know that the plaintiffs can't meet their

15:11:37 24  burden on a negligent failure to warn claim, first through

15:11:40 25  Dr. Marmureanu.  He can't get them there because he ignores

15:11:44  1  the very warning that Cook gives; that states clearly vena

15:11:48  2  cava perforation is a risk.  It also lists vena cava damage as

15:11:52  3  a risk.  And we know his methodology is unreliable for not

15:11:55  4  even considering those warnings.

15:11:58  5          We know that he doesn't opine on what Cook should

15:12:01  6  have done differently.  He doesn't say that the warnings are

15:12:04  7  defective in some respect.  He doesn't say anything other than

15:12:08  8  here's a risk and it's not in the IFU; and we know even on

15:12:11  9  that opinion, he gets it dead wrong.

15:12:15  10         With respect to Dr. Garcia, as I understand the

15:12:17  11  testimony -- or the arguments of counsel today, he's

15:12:20  12  essentially withdrawn for purposes of meeting the prima facia

15:12:24  13  elements of plaintiff's case.  But even if he weren't, his

15:12:26  14  report offers no analysis of the Celect IFU and identifies no

15:12:31  15  bases for any opinions about it.  He gives no reliable

15:12:35  16  methodology.  In fact, lists no methodology as all.  As we

15:12:39  17  quoted in our papers, there are about two lines of

15:12:41  18  Dr. Garcia's opinions that refer to the Cook Celect IFU, but

15:12:45  19  they don't provide any analysis or basis or comparison of our

15:12:49  20  IFU's to any other IFU's.  They don't suggest that a different

15:12:53  21  warning would have created a different action in Dr. Zuzga;

15:12:56  22  and of course, we know that it would not have.

15:12:59  23         As I understood plaintiff's response, that's not

15:13:02  24  really what they're relying on it relates to the elements of

15:13:07  25  defect.  Dr. Marmureanu is the witness for that purpose.  And

15:13:09  1    Dr. Kessler doesn't get them there.  The plaintiffs seem to

15:13:12  2    suggest that Dr. Marmureanu and Dr. Kessler are arm-in-arm on

15:13:16  3    the issue of warnings but that doesn't work.  Dr. Kessler

15:13:20  4    offers two pages of the framework for what is a medical device

15:13:25  5    warning; but he goes into no detail and he didn't analyze

15:13:29  6    Cook's instruction for use.  He has no opinion on the content

15:13:32  7    of the warnings; and although he notes that Cook warns of the

15:13:36  8    danger of perforation within its Celect IFU, he has no

15:13:39  9    criticisms of that.

15:13:41  10          So there's no witness on behalf of plaintiffs who

15:13:43  11   can suggest that something about the warning is defective.

15:13:46  12   It's not enough for them to say in the air vaguely the warning

15:13:52  13   should have been different.  It's not enough for the

15:13:54  14   plaintiffs to say, well, your warning should have contained

15:13:57  15   information about frequency and severity, when there is no

15:14:00  16   expert who will stand in front of this Court and say, based on

15:14:04  17   my experience reviewing IFU's for vena cava filters, it should

15:14:07  18   have had that or it would have changed the result of

15:14:11  19   physicians who read it.  Proof of defect requires far more.

15:14:15  20          And then lastly, just a quick reminder on the

15:14:19  21   screen, Your Honor.  This is a list of potential adverse

15:14:21  22   events from the Celect vena cava filters.  The language could

15:14:24  23   not be clearer when we warn of those points.

15:14:30  24          Now, with respect to the question of defect, there's

15:14:33  25   just one other point that I want to make.  Plaintiffs argue

15:14:40 1  that Dr. Zuzga's testimony on these points is essentially

15:14:43 2  irrelevant.  They say we don't need an expert on the issue of

15:14:46 3  warnings and they say that the treating physician didn't have

15:14:49 4  to read the warnings.  That's directly contrary to Florida

15:14:53 5  law.

15:14:54 6       Florida law requires expert evidence of defect and

15:14:57 7  causation on a failure to warn claim, even a negligent failure

15:15:00 8  to warn claim.  They have to have expert evidence that there

15:15:03 9  was something wrong with our warnings that breached the duty

15:15:07 10 of care; and that as a consequence of that, the physician

15:15:11 11 would have taken different action based on a different

15:15:14 12 warning.  It can't come from the lawyers and what they say.

15:15:17 13 It has to come from the actual experts, and there's no expert

15:15:20 14 that can get them there.

15:15:25 15      Your Honor, then moving to plaintiff's strict

15:15:28 16 liability design claim.  For the same reasons there -- similar

15:15:31 17 reasons, there's no evidence of defect or causation that can

15:15:34 18 support those two elements of their claim.  First on strict

15:15:39 19 liability, I want to start with the element of defect.  Under

15:15:42 20 Florida law, the plaintiffs must prove to you that the

15:15:45 21 defendant manufactured or sold the product, that it was

15:15:47 22 defective and unreasonably dangerous in condition, and that

15:15:50 23 the damages were proximately caused by the defective and

15:15:55 24 unreasonably dangerous conditions.  Those are the things they

15:15:58 25 have the burden of proof on.

15:15:59 1        We know that they can't meet that burden of proof on

15:16:02 2   defect and causation for a couple of reasons.  First, on the

15:16:06 3   element of defect, neither Dr. Marmureanu nor Dr. McMeeking

15:16:11 4   testifies about any specific defect in the Celect.  They only

15:16:14 5   talk about the fact that there's perforation with the Celect,

15:16:18 6   just as there is with every other filter on the market and

15:16:22 7   they attempt to observe a correlation.

15:16:25 8        And you asked some questions earlier of the other

15:16:28 9   counsel that relates to what's the interplay between the

15:16:30 10  doctor and the engineer.  A doctor can appropriately say based

15:16:34 11  on his review of the literature and his experience with the

15:16:38 12  product and on testing and data, that the design of a device

15:16:42 13  can be ruled in or ruled out as a potential cause.  What he's

15:16:46 14  not permitted to do, because he's not an engineer, is say the

15:16:50 15  radial force was wrong, the materials were not strong enough,

15:16:53 16  or what about the engineering design of the product caused it

15:16:57 17  to be defective.

15:16:58 18       But a properly qualified medical doctor, like

15:17:02 19  Dr. Venbrux, would say, "I've reviewed or I'm familiar with

15:17:06 20  many different kinds of filters that are designed to treat

15:17:09 21  this condition; and based on my knowledge of the rates of

15:17:13 22  perforation of other similar products, this design can be

15:17:16 23  ruled in or this design can be ruled out."  He might not be

15:17:20 24  able to get down to the level of detail of the engineering

15:17:23 25  design, but he can rule it in or rule it out.  And the *Jois*

15:17:28  1  case (phonetic) that I gave to you earlier, Your Honor,

15:17:29  2  explains that interplay under 7th Circuit law.  They're

15:17:33  3  related.

15:17:34  4          Dr. McMeeking, the engineer, he's the one that had

15:17:37  5  to carry the burden of proof for the plaintiffs and say, here

15:17:39  6  is the specific defect in the design of the Celect that causes

15:17:43  7  it to perforate in an amount that makes it unreasonably

15:17:47  8  dangerous and unsafe, and he can't do that either.

15:17:50  9          Now, Florida courts, in considering strict liability

15:17:53 10  claims in medical device cases, use a risk utility test; and

15:17:58 11  there are three cases that I've cited in front of you but

15:18:01 12  there are many that are cited in our papers.  The three cases

15:18:04 13  that I've cited explain that the consumer expectations test is

15:18:09 14  rejected and that instead risk utility is the proper test.

15:18:14 15  And the reasoning that Florida courts apply a risk benefit

15:18:18 16  analysis, instead of a consumer expectation test, is that it

15:18:22 17  just makes sense, given the inherently dangerous condition of

15:18:25 18  a medical device.

15:18:27 19          Medical devices will always have complications.

15:18:30 20  There is no device that will never have a complication in a

15:18:35 21  patient; and physicians in treating patients, the way that

15:18:38 22  they analyze whether to use the product, the treatment

15:18:41 23  decisions that they make, irrespective of products, are all

15:18:46 24  based on a risk benefit analysis.  Every physician in this

15:18:49 25  case has testified in the exact same way.

```
15:18:52   1          Florida courts recognize that medical products from
15:18:56   2   pharmaceutical products cases are different.  They treat them
15:18:59   3   differently by adopting things like the learned intermediary
15:19:03   4   defense.  The risk utility test, Your Honor, under Florida law
15:19:06   5   requires expert evidence that the risk of harm presented by
15:19:09   6   the design element outweighs the utility to the plaintiff.
15:19:12   7   And that is the plaintiff's burden of proof.
15:19:15   8          The plaintiffs can't meet that burden under the risk
15:19:19   9   utility test because Dr. Marmureanu didn't do a risk benefit
15:19:22  10   analysis.  Again, you can search his report from beginning to
15:19:25  11   end and you will never find a place in his report where he
15:19:30  12   weighs the risk of the product against its benefit; and that's
15:19:33  13   because he started with the assumption that there were no
15:19:36  14   benefits.  So you can't properly weigh the risks against the
15:19:39  15   benefits when you've never bothered to look for benefits.
15:19:42  16          And the flip side of the coin is true, too.  His
15:19:45  17   testimony was that he didn't know the rate of any of the risks
15:19:48  18   that he identified for the Celect or any other product on the
15:19:51  19   market.  We cited that testimony in our opening papers and
15:19:55  20   it's absolutely clear because he does not know the amount of
15:19:58  21   the risk -- of any risk for the Celect or any other product.
15:20:02  22   There's no way he can perform a reliable risk benefit analysis
15:20:06  23   and he doesn't even try.  He never explains how a design
15:20:11  24   defect or something about the design creates a risk that
15:20:13  25   outweighs the utility of the product.
```

15:20:15  1       When you turn to Dr. McMeeking, he actually declined

15:20:18  2  to perform this kind of analysis during his deposition.  He

15:20:22  3  identifies no specific part of the filter that is defective.

15:20:25  4  He suggests no specific design change.  The only thing that he

15:20:29  5  did was to calculate a worse case scenario, and he did some

15:20:33  6  mathematical calculations and ultimately his conclusion is

15:20:36  7  well, the person breathed or coughed or sneezed, the filter

15:20:41  8  would perforate or the filter would fracture.  That doesn't

15:20:44  9  have anything to do with Mrs. Hill's case.  She wasn't a worse

15:20:47 10  case scenario.  And the fact of the matter is we know she had

15:20:50 11  her filter for three years after it was placed.

15:20:54 12       Dr. McMeeking said this in his deposition, when

15:20:56 13  asked if he'd done this kind of analysis.  He said, "I'm not

15:21:00 14  in a position to comment on that or to make an assessment.

15:21:03 15  I'm not in a position to make an assessment of the benefits."

15:21:06 16  So he can't get the plaintiffs over the hurdle of the risk

15:21:10 17  utility test either.

15:21:11 18       Now, the plaintiffs will tell you, and they told us

15:21:13 19  in their papers, that the cases that I explained to you

15:21:17 20  earlier of a risk utility test, that those are all before a

15:21:22 21  2015 decision called *Aubin* by the Florida Supreme Court. The

15:21:23 22  *Aubin* decision was a case involving consumer construction

15:21:29 23  products.  And in that case the Florida Supreme Court held

15:21:31 24  that under Florida law, either risk utility or a consumer

15:21:35 25  expectation test could be applied to determine if the product

15:21:38  1  was, in fact, defective and unreasonably dangerous.

15:21:42  2          So there the Court applied those tests, including

15:21:45  3  the risk utility test, and said that the risk utility test --

15:21:49  4  whether a court chooses one test or the other test or gives

15:21:54  5  both tests to the jury to consider, that that's defined of the

15:21:57  6  facts of the case at issue.

15:21:59  7          But *Aubin* is not a medical device case.  It did not

15:22:03  8  expressly or impliedly overrule any of the decisions of the

15:22:07  9  Florida courts who apply the risk utility analysis to medical

15:22:11 10  device cases.  No Florida court since *Aubin* has analyzed *Aubin*

15:22:16 11  holdings in a complex medical device case; and none of the

15:22:19 12  cases applying a consumer expectation test -- excuse me.  None

15:22:23 13  of the cases applying a risk utility test to medical device

15:22:27 14  cases have been overruled since *Aubin*, based on the holding of

15:22:33 15  *Aubin*.  No court has predicted that *Aubin* would change Florida

15:22:34 16  law on medical devices.

15:22:36 17          And of course, *Aubin* doesn't make sense for a

15:22:39 18  medical products case anyway.  We know that ordinary consumer

15:22:43 19  expectations don't fit with medical devices.  The physician is

15:22:45 20  the person who receives the products.  The physician is the

15:22:48 21  person who is trained to understand what to expect or not

15:22:52 22  expect with respect to the product.  We also know that

15:22:56 23  construction products are unlike medical products.  They're

15:22:59 24  not unavoidably unsafe the way medical products are.  We know

15:23:04 25  *Aubin* doesn't fit because Florida observes the learned

15:23:07  1   intermediary doctrine, and we know *Aubin* doesn't fit based on

15:23:11  2   the actual testimony of the witnesses in this case.

15:23:14  3           Even if a consumer expectation test were applied,

15:23:17  4   Your Honor, the Celect is still not defective and the

15:23:21  5   plaintiffs still can't meet their burden of proof and here's

15:23:24  6   why.  The plaintiffs concede that were this test to be

15:23:26  7   applied, that Dr. Zuzga is the consumer.  And so the question

15:23:29  8   is, the expectations of Dr. Zuzga.  Dr. Zuzga testified that

15:23:35  9   the design performed as he expected and that he would use it

15:23:38 10   in the plaintiff again.  Dr. Marmureanu doesn't say and can't

15:23:42 11   say it didn't meet the expectations of Dr. Zuzga or any other

15:23:46 12   physician.

15:23:46 13           So the only person who's testified using the word

15:23:50 14   expectations at all is Dr. Zuzga, and that's the testimony

15:23:53 15   that I showed you earlier that I think is really important,

15:23:55 16   Your Honor.  Although plaintiff's lawyers repeatedly ask him,

15:23:59 17   "Did you expect Mrs. Hill's outcome?"  And his testimony was

15:24:02 18   "No."  He explained in his deposition, "I never expect a

15:24:06 19   patient to have a complication but I always know that there's

15:24:09 20   a risk."  And we know that the Celect design met Dr. Zuzga's

15:24:13 21   expectations first because he told us but also because he

15:24:18 22   continued to use the Celect long after Mrs. Hill's filter

15:24:24 23   perforation.  Long after learning it had perforated her

15:24:26 24   duodenum.  If it didn't meet his expectations, he wouldn't

15:24:30 25   keep using the product.

15:24:31  1    Let me talk lastly, Your Honor, about the third

15:24:33  2  claim of general negligence that the plaintiffs today allege.

15:24:37  3  There is no general negligence claim for a product liability

15:24:41  4  case understand Florida law.  That's the *Small case*.  But

15:24:44  5  there are many others.  The *Adams case* as well.  They've

15:24:48  6  expressly rejected the concept that there is a legal theory

15:24:51  7  based on a generalized duty of reasonable care or conduct that

15:24:56  8  appears to be bad conduct.

15:24:58  9    Instead, the only three claims for negligence under

15:25:02 10  a product liability theory in the State of Florida are failure

15:25:05 11  to warn, negligent design, and negligent manufacture.  If

15:25:10 12  plaintiff's claim is that they articulate it in their brief

15:25:13 13  and they articulate it today, a garden variety negligence

15:25:18 14  claim that's based on generalized conduct but not tied to a

15:25:22 15  duty of negligence, a duty of care and breach related to the

15:25:25 16  design, then we should -- we should receive summary judgment

15:25:28 17  on that count as a matter of law.

15:25:31 18    It's not a matter of fact.  It's a matter of law

15:25:33 19  that Florida courts do not recognize a general negligence

15:25:37 20  claim.  Florida courts have rejected independent claims for

15:25:41 21  other forms of alleged negligence; and this is our reply brief

15:25:44 22  at page 3.  Negligent testing, negligent inspection, negligent

15:25:49 23  failure to train, and negligent adverse event reporting, those

15:25:53 24  are not causes of action under Florida law.  And the cases

15:25:57 25  that Mr. Schultz cited a little bit ago, the *Jones* case, the

15:26:00  1   *Favor* case, *Bayfield*, *Tran* and *Adams* all of those cases

15:26:04  2   conclude that these are rejected as independent causes of

15:26:08  3   action; and that if anything, they're elements of proof of a

15:26:12  4   negligent design, negligent warning, or negligent failure to

15:26:16  5   warn claim.  These are not independent causes of action; and

15:26:19  6   allegations that Cook did or didn't do these things can't

15:26:23  7   support a theory of negligence in the absence of proof of

15:26:27  8   defect and causation.  They have to prove defect.  They can't

15:26:31  9   get around that element.  They have to prove causation.  They

15:26:34 10   can't get around that element.

15:26:35 11          The other reason that we know that there is no

15:26:38 12   general negligence case is from the very documents that

15:26:41 13   Mrs. Hill herself has filed.  In the Hill original complaint

15:26:45 14   under the heading of negligence, there are allegations of

15:26:50 15   negligent warning, negligent manufacture, and negligent

15:26:53 16   failure to warn.  Nothing else.  In the Hill short form

15:26:56 17   complaint, it incorporates the master complaint.  And if you

15:26:59 18   look at the master complaint specifically at paragraph 85 on

15:27:04 19   page 19, the elements of the negligence claim are articulated

15:27:08 20   and they're described as failure to warn and negligent design

15:27:13 21   and negligent manufacture.  There's no generalized negligence

15:27:18 22   conduct unrelated to design claim in this case and the master

15:27:22 23   complaint or under Florida law.

15:27:24 24          And of course that makes sense, Your Honor.  If you

15:27:26 25   had a product that was negligently tested or negligently

15:27:30  1   inspected but the product was fine and did not contain a

15:27:34  2   defect, you couldn't sustain as a matter of law a claim for

15:27:39  3   negligence in that case.  You couldn't; because there would be

15:27:41  4   no breach of duty if the product was appropriately designed.

15:27:46  5   There would be no damage or injury if the product was

15:27:49  6   appropriately designed.

15:27:52  7          Plaintiff must prove all of the elements of

15:27:54  8   negligence and that's in our opening papers at page, 20 and it

15:27:58  9   requires expert evidence of a defect.  For the reasons that I

15:28:02  10  explained to you earlier, they cannot meet their burden of

15:28:05  11  proof on defect or causation for this negligence claim anyway.

15:28:09  12  If this is, in fact, a negligent design claim, not some

15:28:13  13  generalized claim of negligence, no expert says that Cook

15:28:17  14  caused Mrs. Hill's damages.  McMeeking does not support the

15:28:22  15  element of causation, and Marmureanu can't support the element

15:28:25  16  of causation for all the reasons I've already articulated to

15:28:29  17  you earlier.

15:28:30  18          A tendency to perforate is not causation.  It's

15:28:33  19  correlation.  Dr. Marmureanu does not bridge the analytical

15:28:37  20  gap between Dr. McMeeking's opinions in design and Mrs. Hill's

15:28:41  21  perforation and damages.

15:28:42  22          So that then, Your Honor, takes me to the claim of

15:28:45  23  punitive damages and Mr. Tanner will address part of this

15:28:48  24  issue when he talks about bifurcation of punitive damages.

15:28:52  25  There is a significant choice of law question before this

15:28:54  1   Court, and it's Cook's position that Indiana law applies to

15:28:59  2   the conduct at issue under the claim of punitive damages.  But

15:29:02  3   as it relates to our motion for summary judgment, you do not

15:29:05  4   need to decide the question of choice of law in order to enter

15:29:10  5   summary judgment on plaintiff's claim of punitive damages.

15:29:13  6          Under either Indiana or Florida law, there is no

15:29:17  7   genuine issue of material fact.  Indiana's standard is a

15:29:20  8   little higher than Florida's, at least based on the words that

15:29:23  9   our courts use but the standards are similar.  But the fact of

15:29:26 10   the matter is, no matter which one you apply, plaintiffs have

15:29:30 11   no evidence of gross negligence.  They have no evidence of

15:29:34 12   fraud.  They have no evidence of malice.  They have no

15:29:37 13   evidence of willful or wanton misconduct.  They have no

15:29:42 14   evidence of intentional misconduct or mistake or -- mistake,

15:29:44 15   negligence and human failing are not enough.

15:29:47 16          We made these arguments in our opening papers on the

15:29:50 17   motion for summary judgment.  And in response, the plaintiffs

15:29:53 18   spend 11 pages talking about the choice of law question; but

15:29:56 19   they then fail to identify any specific conduct by Cook that

15:30:00 20   they say warrants punitive damages.  And I always love this

15:30:05 21   quote from *Firishchak* that judges are not ferrets; because

15:30:09 22   what the plaintiffs have asked you to do, Your Honor, they

15:30:12 23   cite paragraphs 1 to 96 of their statement of facts and they

15:30:15 24   ask you to connect the dots.  That's not what 7th Circuit law

15:30:19 25   permits.  They had the burden to show you the specific conduct

15:30:24  1  that supports an award of punitive damages and they didn't

15:30:27  2  meet that burden.

15:30:28  3          And the law on punitive damages requires not just

15:30:31  4  that they point to bad conduct by the company here or there

15:30:34  5  but they have to point to conduct that has a connection to

15:30:38  6  the -- to the conduct upon which Mrs. Hill bases her claims.

15:30:43  7  So it's not enough for them to say, "Judge, we're entitled to

15:30:47  8  punitive damages because Cook didn't report these adverse

15:30:52  9  events over here."  That doesn't support an award of punitive

15:30:55 10  damages.  It's not tied to the conduct at issue in their claim

15:30:57 11  of negligence or failure to warn with Mrs. Hill.

15:31:00 12          They had a burden to show you in the responsive

15:31:04 13  papers, Your Honor, what the specific conduct was that rises

15:31:07 14  to the level of meeting prima facie elements for punitive

15:31:11 15  damages and to connect the dots to Mrs. Hill and they haven't

15:31:13 16  done that.  We believe we're entitled to summary judgment on

15:31:17 17  their punitive damages claim as a result.

15:31:19 18          The papers, I think, speak for themselves on the

15:31:22 19  last points about whether Cook Incorporated is a proper

15:31:24 20  defendant in this case.  It is a separate entity from Cook

15:31:28 21  Medical and William Cook Europe.  It was not in the chain of

15:31:32 22  manufacture, sale and distribution of Mrs. Hill's filter and

15:31:34 23  it is entitled to summary judgment on all claims, including

15:31:39 24  punitive damages as a result.

15:31:40 25          We don't dispute the fact that Cook Medical and

15:31:43  1   William Cook Europe are proper parties to this action.  We do

15:31:46  2   believe that they're entitled to summary judgment for the

15:31:49  3   reasons I articulated.  But Cook Incorporated is not a proper

15:31:53  4   party and this is the time, Your Honor to clean that issue up.

15:31:58  5           So for all those reasons, Your Honor, we

15:32:00  6   respectfully request that you enter summary judgment on all of

15:32:03  7   the claims of Elizabeth Hill.

15:32:07  8           THE COURT:  Thank you, Ms. Pierson.  Mr. Schultz.

15:32:13  9           MR. SCHULTZ:  Thank you, Your Honor.  That was a

15:32:21 10   lot, Judge.  I'm going to jump around a little bit, I'm

15:32:26 11   afraid.  If you'll bear with me.  I think the place to start

15:32:30 12   is on causation.  That's where Ms. Pierson -- I'm sorry, Your

15:32:34 13   Honor.  Can I get a copy of the PowerPoint?

15:32:38 14           MS. PIERSON:  Absolutely.

15:32:44 15           MR. SCHULTZ:  The first issue on causation, Your

15:32:46 16   Honor, and the need for expert testimony, we do have expert

15:32:50 17   testimony, Dr. Marmureanu.  At A1 of his report attributed the

15:32:56 18   failure of the filters tendency to perforate.  He specifically

15:33:00 19   identified that as a defect.  Dr. McMeeking explains at great

15:33:04 20   length in technical engineering detail that the change from

15:33:08 21   the Tulip -- and that's really what this case is about.  They

15:33:10 22   took the leaves off of the Tulip and that allowed the Celect

15:33:14 23   to perforate endlessly, to use a Cook term in one of the

15:33:19 24   internal business documents, because the leaves on the Tulip

15:33:22 25   device actually acted as penetration limiters.  It could only

15:33:26 1   go so far.  They took those off and the primary leg has

15:33:28 2   nothing to stop it.  So that's why we see these extravagant

15:33:32 3   perforations like we did with Ms. Hill on Celect.  This is

15:33:34 4   well documented in Cook's filing.

15:33:36 5           Arne Molgaard-Nielsen, the director of research,

15:33:36 6   drew a diagram of it before Ms. Hill's filter was implanted.

15:33:43 7   It is a perfect depiction of what happened to her, but Cook

15:33:47 8   never told anyone and I will get to that when we talk about

15:33:51 9   punitive damages evidence.  But Dr. McMeeking opined that

15:33:53 10  those changes made the filter less stable, and stability is

15:33:57 11  what leads to perforation and tilt, lack of stability does so.

15:34:02 12  So we have expert testimony.

15:34:04 13          But I want to be clear on what Florida law really

15:34:07 14  is.  Cook cites a case -- one case that's from Judge Ungaro in

15:34:11 15  the Southern District of Miami where she says that there is

15:34:16 16  not -- there is a requirement for expert testimony on failure

15:34:23 17  to warn.  They cite Judge Ungaro's case to say that there's a

15:34:27 18  requirement for expert testimony on design defect.  She wasn't

15:34:30 19  addressing design defect.  She was addressing failure to warn.

15:34:32 20  She didn't cite any Florida case and she got it wrong.

15:34:35 21          The third DCA in Florida -- and I'm quoting from the

15:34:38 22  *Salozzo* case and this responds directly to Ms. Pierson, who

15:34:42 23  said it is not Florida law that you can get a failure to warn

15:34:45 24  claim without expert testimony.  Well, you can.  The *Salozzo*

15:34:48 25  case 578 So.2d 393 from the Third DCA.  "Expert evidence is

15:34:54  1  not required to permit any conclusion that the warnings

15:34:58  2  provided were inadequate, improperly located or both."  You

15:35:02  3  can bring a failure to warn claim without expert testimony but

15:35:07  4  we do have expert testimony in this case.

15:35:09  5          The same is true of the design defect, and the

15:35:12  6  *Upjohn* case that we cited, and Ms. Pierson mentioned in her

15:35:15  7  earlier arguments this morning, supports that proposition as

15:35:18  8  well with respect to design defect.  So we have the expert

15:35:22  9  testimony.  We don't have to have it but we do.

15:35:26 10          This sort of led into a discussion of failure to

15:35:30 11  warn generally and learned intermediary; and this gets a

15:35:34 12  little tricky, Judge, because I think Ms. Pierson is

15:35:37 13  conflating some concepts between the standards.  The concept

15:35:41 14  for design defect under *Aubin* -- and we should be -- I should

15:35:46 15  go ahead and address that at the outset.  Every case that

15:35:48 16  they've cited is, in fact, pre-Aubin.  The *Agrofolliajes* case

15:35:52 17  is one of the ones on this PowerPoint that she just showed you

15:35:55 18  today, Ms. Pierson did, and said that there's never been any

15:35:59 19  suggestion in any of those *pre-Aubin* cases have been overruled

15:36:04 20  expressly or impliedly.

15:36:05 21          Well, the *Aubin* decision itself named the

15:36:07 22  *Agrofolliajes* case and disapproved of it by name, along with

15:36:10 23  two other cases that applied the risk benefit test for

15:36:13 24  products liability.  So it has been expressly disapproved by

15:36:18 25  the Florida Supreme Court and two other risk benefit tests

15:36:22  1   were disapproved cases that use the risk benefit test.

15:36:26  2       The Florida Supreme Court said in *Aubin*, it was an

15:36:29  3   asbestos case, a products liability wrongful death case.  It

15:36:33  4   said in the case, "In approaching design defect claims, we

15:36:36  5   adhere to the consumer expectations test as set forth in the

15:36:40  6   secondary statement."  That is the declaration from Florida's

15:36:43  7   highest court.  They didn't equivocate.  They didn't say it's

15:36:47  8   only for asbestos cases.  They said, "In approaching design

15:36:49  9   defect claims, we adhere to the consumer expectations test as

15:36:53  10  set forth in the secondary statement.

15:36:56  11      Ms. Pierson tried to distinguish *Aubin* principally

15:37:01  12  on the argument that it doesn't involve the learned

15:37:03  13  intermediary doctrine and medical devices are different

15:37:06  14  because they do involve learned intermediaries who make

15:37:10  15  benefit decisions.  She's mistaken.  The *Aubin* decision did

15:37:13  16  include the learned intermediary doctrine.  One of the claims

15:37:16  17  made by Union Carbide was that the Court erred by not giving

15:37:21  18  their learned intermediary instruction.  The *Aubin* court has a

15:37:26  19  very detailed discussion of the learned intermediary doctrine

15:37:29  20  and how it applies in design defect claims, and they also held

15:37:34  21  that because Union Carbide's proffered instruction violated or

15:37:37  22  was inaccurate as to Florida law, it was not inappropriate to

15:37:41  23  refuse to give it.

15:37:42  24      So *Aubin* involves learned intermediary and in fact,

15:37:47  25  it tells us the standard that applies.  The standard -- we

15:37:50  1    keep hearing about risk.  Ms. Pierson talks about knowledge of

15:37:54  2    the risk, both with respect to the design defect standard

15:37:57  3    consumer expectation and with respect to learned intermediary.

15:38:02  4    They're different, though.

15:38:03  5            Learned intermediary, the *Aubin* case, tells us --

15:38:05  6    and I'll find a quote, if I may, Your Honor.  Speaks to

15:38:11  7    "knowledge of the danger and specifically in order to get past

15:38:16  8    summary judgment, there has to be no question of fact that the

15:38:20  9    intermediary knew the full extent of the danger."  That is a

15:38:25 10    quote from the *Aubin* court.  And there is a factual dispute

15:38:30 11    here about knowledge of the extent of the danger.  It is not

15:38:33 12    enough for a doctor to know that there may be some risk that

15:38:37 13    the IFU, for example, says perforation, while also then

15:38:41 14    saying, see our clinical study section where our clinical

15:38:45 15    study had no perforations; when, in fact, it had a 17 percent

15:38:49 16    perforation rate.

15:38:51 17            Dr. Zuzga was very clear that he was not aware of

15:38:55 18    the full extent of the danger involved here and he was

15:38:59 19    surprised by the result.  And I'm sorry, I'm kind of bleeding

15:39:05 20    design defect and learned intermediary but I think the

15:39:08 21    evidence speaks to both.  Dr. Zuzga testified that he relies

15:39:12 22    on sales representatives to provide him information if the

15:39:15 23    manufacturer has concern about the device.  He would consider

15:39:18 24    it important in his choice of selecting a Celect filter if

15:39:23 25    they knew it had a higher perforation rate than other filters,

15:39:28 1 which they knew and it did. They did not inform him of that,

15:39:31 2 despite the fact that he attended 149 presentations between

15:39:36 3 2010 and 2016 from Cook sales rep Courtney Whitelock. She did

15:39:42 4 not, she testified, discuss tilt perforation or problems with

15:39:46 5 retrieval in any of those occasions.

15:39:48 6          And he testified that no Cook representative ever

15:39:52 7 talked to him about the extent of the risk for perforation.

15:39:56 8 He doesn't know today, Your Honor, that there are Cook

15:39:59 9 documents that say Celect perforates 18 times as frequently as

15:40:03 10 Tulip; and of course there's a reason that Cook

15:40:07 11 representatives, if they even knew that, weren't going out and

15:40:09 12 telling doctors such a thing because naturally it would impact

15:40:13 13 their decision whether to use a filter.

15:40:16 14          So this question of the knowledge of the extent of

15:40:19 15 the danger is important and makes the learned intermediary

15:40:24 16 defense certainly one the jury has to determine, based on all

15:40:27 17 the testimony from Dr. Zuzga. They have not established, as a

15:40:31 18 matter of law, and with inferences strong in our favor, if you

15:40:34 19 read his testimony as cited in our papers, I think it's very

15:40:38 20 clear he didn't know the extent of the danger. He said he did

15:40:41 21 not expect it to happen; and knowledge of the risk is not

15:40:44 22 enough.

15:40:49 23          The learned intermediary doctrine also has another

15:40:52 24 aspect of it that's important for this case, Judge, and that

15:40:55 25 is that it's only available to the defense if the

15:40:59 1  manufacturer –– and I'm reading from *Aubin*, "did not

15:41:04 2  adequately convey the danger to the intermediary or take steps

15:41:07 3  to ensure that the intermediary would adequately warn the end

15:41:12 4  user."  Then they don't get the learned intermediary defense.

15:41:14 5          It certainly is a fact question.  We've seen no

15:41:17 6  evidence that Cook insured that he would adequately convey the

15:41:20 7  warning.  They just showed you testimony saying that he never

15:41:23 8  read the IFU.  They're not allowed to rely on doctors who

15:41:26 9  don't read IFU's as learned intermediaries.  That's the law.

15:41:28 10 It's the law in Florida at least and it's articulated clearly

15:41:32 11 in *Aubin*.

15:41:33 12         So from a learned intermediary perspective, the fact

15:41:36 13 that he doesn't read IFU's is very bad for their case.  It

15:41:40 14 doesn't make as big a difference in our case, Your Honor,

15:41:42 15 because the IFU is not the only warning that is absent here.

15:41:46 16 This is not a consumer product case where there's a warning on

15:41:50 17 a can of Drano and the consumer either read it or they didn't.

15:41:54 18         Cook interacts with Dr. Zuzga on a regular basis.  I

15:41:58 19 just mentioned the 149 presentations in a six-year period.

15:42:01 20 Every one of those presentations, every other interaction they

15:42:04 21 have had is an opportunity for Cook to convey information

15:42:08 22 about the extent of the perforation problem that Cook had.  It

15:42:12 23 never took an opportunity to do that.  Mr. Tom Roberts, who's

15:42:19 24 vice president of quality assurance for Cook Inc., who was

15:42:23 25 involved in Celect postmarketing adverse events matters,

15:42:27  1    testified patients and doctors have a right to know about the

15:42:30  2    rates of perforation.

15:42:33  3          Dr. Zuzga was never told about the rates of

15:42:37  4    perforation, despite the fact that Cook had study after study

15:42:41  5    and document after document showing the problem.  In fact,

15:42:43  6    their own expert epidemiologist Dr. Freizich has analyzed all

15:42:50  7    their complaints; and even by his math, Celect has

15:42:54  8    significantly higher rate of performation, fracture, problem

15:42:58  9    with imbedding and tilt than does Tulip and he freely admits

15:43:03 10    that.  None of that was ever conveyed to the physician.

15:43:05 11          Our failure to warn claim, Your Honor, is not just

15:43:08 12    that the IFU, which intentionally omitted information about

15:43:14 13    perforations in their clinical study.  It's not just that the

15:43:16 14    IFU was inadequate, and we do have expert testimony to that

15:43:20 15    effect, it is the fact that Cook interacted with this doctor

15:43:23 16    for years with full knowledge of the problem with perforations

15:43:26 17    and never conveyed it to him.  Mr. Roberts said they can send

15:43:29 18    out a "dear doctor" letter anytime they want to.

15:43:32 19          Their regulatory expert Mr. Pellerite -- Julia Reed

15:43:35 20    Reed Zaic read from his report.  He said, "We don't have to

15:43:38 21    have -- they don't have to have FDA approval in order to

15:43:41 22    change their IFU, if they want to add something into the

15:43:44 23    warning."  He said it's a typical business practice to consult

15:43:47 24    with FDA, and that makes sense; but they're not -- there's no

15:43:50 25    legal constraint against them modifying that warning.  So

15:43:53  1   there are lots of fact questions around whether failure to

15:43:58  2   warn was adequate.

15:44:01  3            On the design defect itself, again, Ms. Pierson

15:44:06  4   spoke in terms of risk.  The standard for design defect under

15:44:10  5   *Aubin* is consumer expectation.  And the question that is asked

15:44:13  6   is whether the device performed as an ordinary consumer would

15:44:16  7   expect.  It's not perception of risk.  It's not what might

15:44:20  8   happen.  The question is did this product perform as the

15:44:24  9   ordinary consumer might expect it to perform.

15:44:28  10           *Aubin* makes clear the ordinary consumer is the end

15:44:30  11  user.  The end user in this case is Ms. Hill.  Ms. Hill

15:44:35  12  testified, of course, that she would not have expected a

15:44:38  13  perforation through her duodenum; expect that they cannot

15:44:41  14  retrieve the filter four months after it was implanted and

15:44:44  15  that she would have to fly six states way to a specialty

15:44:49  16  doctor who specializes in taking out imbedded filters.

15:44:53  17           Dr. Zuzga, you've heard the testimony already, Your

15:44:54  18  Honor.  He also testified he did not expect this result and

15:44:57  19  was surprised by it.  It's not enough that he perceives the

15:45:01  20  risk.  The test is not did you know there was some risk this

15:45:05  21  might happen.  Of course there's a risk it might happen.  The

15:45:08  22  question is did the ordinary consumer expect it to perform in

15:45:11  23  the manner that it did.  Dr. Zuzga unequivocally said he did

15:45:14  24  not expect this filter to perform as it did.

15:45:18  25           And that takes me to the question of whether it's

15:45:20  1  consumer expectation versus risk benefit.  I've addressed that

15:45:25  2  somewhat, Your Honor, through *Aubin*.  It does not make any

15:45:31  3  distinction in the types of cases.  It expressly disapproved

15:45:35  4  three cases that applied the risk benefit analysis.  There is

15:45:39  5  an earlier case Ms. Pierson did not cite -- or at least in her

15:45:42  6  argument.

15:45:43  7          The first, the Ford Motor case, which is a case in

15:45:46  8  Florida law that made the observation that complex products

15:45:50  9  may sometimes be more amenable to a risk benefit analysis.

15:45:55 10  It's a sensible proposition.  No one has addressed that post

15:45:59 11  *Aubin* in Florida.  And contrary to what Ms. Pierson said, the

15:46:03 12  *Aubin* case did not say you can choose risk benefit or consumer

15:46:07 13  expectation depending on the context of the case.  The *Aubin*

15:46:11 14  court said consumer expectation is the rule and this does not

15:46:15 15  preclude plaintiffs or defendants from putting on evidence of

15:46:18 16  risk utility.  It would still have relevance in a case like

15:46:21 17  this, but they did not say you can choose whichever standard

15:46:24 18  you want.  They were unequivocal in their adoption of consumer

15:46:28 19  expectation.

15:46:30 20          On negligence, Your Honor, I've mentioned it a

15:46:33 21  couple of times.  I won't belabor it, but the jury instruction

15:46:37 22  is 403.9 in the products liability.  Negligence is the failure

15:46:40 23  to use reasonable care which is the care that a reasonably

15:46:53 24  careful designer, manufacturer, seller, importer, distributor,

15:46:58 25  or supplier would use under like circumstances.  And then, of

15:47:02  1   course, the counterpart to that and common law negligence.

15:47:07  2   That's the Supreme Court approved, and our Supreme Court does

15:47:10  3   review and approve and adopt all jury instructions in the

15:47:13  4   State of Florida and that's the one that is in our standard

15:47:16  5   instructions and presumably the one the jury in this case will

15:47:22  6   receive.

15:47:23  7            The *Small* case, there's a bit of a soft pedal on

15:47:28  8   this idea of proving defect.  The *Small v. Amgen* case that Ms.

15:47:34  9   Pierson cited to the Court says very clearly to prevail on

15:47:36 10   products liability claims sounding in negligence, you must

15:47:40 11   establish a duty or obligation recognized by the law,

15:47:43 12   requiring the defendant to protect others from unreasonable

15:47:47 13   risks.  And under Florida law, it's a foreseeable zone of risk

15:47:50 14   state.  If your conduct brings people within a foreseeable

15:47:54 15   zone of risk through your negligence, then you have -- that

15:47:57 16   legal duty arises.  And obviously for a medical device

15:48:00 17   manufacturer, anyone receiving that device is in the

15:48:02 18   foreseeable zone of risk if they're negligent in the way they

15:48:06 19   develop, test, manufacture, sell that device.

15:48:09 20            Second element is a breach of that duty.  Third

15:48:11 21   element, a reasonably close causal connection between the

15:48:15 22   conduct and the resulting injury and actual loss.  So

15:48:19 23   standard --

15:48:19 24            THE COURT:  Is there a general negligence claim in

15:48:21 25   the complaint?

15:48:24  1          MR. STPHAOFP:  There is, Your Honor.  And in fact,

15:48:25  2     there is no negligent failure to warn claim in the complaint.

15:48:29  3     There is a negligence count and it specifically mentions

15:48:32  4     failure to warn as one of the aspects of negligence.  The

15:48:36  5     negligence count included that they were under a duty to act

15:48:42  6     reasonably to design, develop, manufacture, market, and sell a

15:48:47  7     product that did not present unreasonable risk of harm.

15:48:51  8          Then the breach section is, as a complaint would,

15:48:53  9     they've breached these duties including A, B, C, D.  Failure

15:48:57 10     to warn is identified as a particular duty there.  So it is a

15:49:03 11     common law negligence claim.  It includes a failure to warn

15:49:06 12     aspect.  The cases that I cited to you earlier, again, you're

15:49:13 13     told there's no independent cause of action for failure to

15:49:15 14     test.  Well, there's not a free stand.  I can't file a

15:49:19 15     complaint that says failure to test.  But it's part -- it's

15:49:22 16     subsumed in a general negligence claim and that's what the

15:49:25 17     *Barfield*, *Jones* and *Favor* cases that I cited and quoted to the

15:49:28 18     Court earlier all say, where we have negligent design,

15:49:32 19     negligently failed to test, negligently failed to investigate

15:49:36 20     similar events in the past so as to do proper research on the

15:49:41 21     correct causes thereof.  So these shall all just -- it's

15:49:44 22     common law negligence, judge.  There's nothing magical about

15:49:47 23     it.

15:49:49 24          The *Adams* case finally, Your Honor, just to --

15:49:51 25     Ms. Pierson said it expressly rejected a general theory of

15:49:57  1    negligence.  In fact, it said there's not a separate cause of

15:50:00  2    action for negligent testing.  The duty to test, as the Court

15:50:04  3    concluded, is a sub part of a manufacturer's duty to design a

15:50:08  4    product with reasonable care.  And that's what our complaint

15:50:09  5    has alleged and that's the case we're going to take to the

15:50:13  6    jury -- or hopes to take to the jury.

15:50:18  7           Your next issue that Ms. Pierson addressed was

15:50:23  8    punitive misconduct.  She says we don't identify any willful,

15:50:27  9    wanton, essentially gross negligence being the standard in

15:50:32  10   Florida; and in fact, Your Honor, we put a timeline in the

15:50:39  11   papers in response to their summary judgment motion.  I

15:50:41  12   believe it's pages 5 to 9 and I'm not going to walk through it

15:50:45  13   and read to the Court what it can read or has read on its own.

15:50:49  14   The short version of it is, Your Honor, the first time the

15:50:54  15   Celect filter was conceived, Dr. Bjorg Norburg, who worked

15:51:00  16   with Dr. Gunter in Ogden, sent an email to Arne Molgaard

15:51:03  17   saying, "I've got an idea for a filter that will increase

15:51:06  18   retrievability.  We should take the legs off of the -- or the

15:51:09  19   tulip leaves off of the Tulip."  And Mr. Molgaard's response

15:51:13  20   was, "I have my doubts, as one of the major issue of the

15:51:15  21   leaves was to avoid perforation penetration at each breathing

15:51:20  22   or collapse of the cava."

15:51:22  23          So from the first -- literally the first time the

15:51:23  24   Celect was conceived, Mr. Molgaard expressed concern about

15:51:27  25   perforation and what he later called endless perforation.  We

15:51:32  1    go through 2002, 2005, '06, '07 all the way up to 2010

15:51:39  2    essentially looking at all the exits off the highway, if you

15:51:43  3    will.  Points where the knowledge is undeniable.  Knowledge

15:51:47  4    that they did not share with the treating physicians.  They

15:51:49  5    did not share with the plaintiff.  They, in fact, actively

15:51:53  6    concealed from physicians and from the FDA.

15:51:56  7            To suggest that that course of conduct would not

15:51:59  8    warrant punitive damages is just untenable, Judge.  And as I

15:52:03  9    mentioned before, that timeline ends with an actual depiction

15:52:06 10    of Mr. Molgaard's 2010 progressive perforation sequence, which

15:52:12 11    is exactly what happened to Ms. Hill in this case.  And

15:52:15 12    without being cheeky, it would have been nice if Mr. Molgaard,

15:52:19 13    instead of just sharing that with other executives at Cook,

15:52:22 14    would have shared it with Dr. Zuzga and if he had seen that

15:52:26 15    and seen the 2010 memo saying 18 times this many perforations

15:52:29 16    and all of the other documents that we discuss in here,

15:52:31 17    Dr. Zuzga's has already said that's information that would be

15:52:34 18    important to him and it may impact his choice or selection of

15:52:38 19    filter.

15:52:38 20            He doesn't know any of that even today, Your Honor.

15:52:41 21    So this notion of well, he would go back and do it again would

15:52:43 22    be terrifying, frankly, if he knew everything that's in these

15:52:48 23    documents that will be shown at trial; but he doesn't know

15:52:50 24    that even now.

15:52:52 25            So we feel we've made the case on punitive damages.

15:52:56  1   You know, when you give an IFU to doctors that actively

15:53:01  2   conceals information that's relevant clinically, that's

15:53:04  3   certainly not an accident and that's not simple negligence.

15:53:08  4          The last point, Your Honor, on Cook Inc.  Cook never

15:53:13  5   does say in its paper that Cook Inc. doesn't profit from the

15:53:16  6   sale of Celect filters; and if it does, then that is per se

15:53:21  7   liability in Florida for damages in a case like this,

15:53:28  8   including punitive damages.  The involvement of Cook Inc.

15:53:33  9   personnel is undeniable.  We've got just a few that I could

15:53:40 10   point out Molly Busenbark is a regulatory affair specialist

15:53:45 11   who worked on the Celect 510(k).  Falia or Valia Brine or

15:53:46 12   Breen, B-R-I-N-E, is a regulatory affair specialist who worked

15:53:53 13   on the 510(k).  Tom Roberts is vice president of quality

15:53:57 14   assurance who was involved in adverse event reporting,

15:54:01 15   including that whole affair of their failure to report or

15:54:05 16   choice not to report 126 events outside the United States.

15:54:09 17   April Lavender is a regulatory scientific affairs person at

15:54:14 18   Cook Inc. who was involved in the Celect 510(k) submissions.

15:54:17 19   Rita Harden is a customer relations specialist who was

15:54:21 20   involved in postmarket surveillance of Celect filters.

15:54:25 21          Kim Hawkins, the president of Cook Inc.  You just

15:54:28 22   issued an order.  You've seen some of these documents about

15:54:30 23   his involvement hands-on with the Celect.  He is a Cook Inc.

15:54:35 24   person.  Ted Heise, the vice president of regulatory

15:54:37 25   scientific affairs at Cook Inc. had deep involvement in the

| | | |
|---|---|---|
| 15:54:41 | 1 | 510(k).  He met with FDA on multiple occasions.  He's actually |
| 15:54:45 | 2 | the person who revealed for the first time to FDA that they |
| 15:54:48 | 3 | were doing this clinical study outside the U.S. and they |
| 15:54:51 | 4 | wanted to try and rely on it for their 510(k) submission.  He |
| 15:54:54 | 5 | was involved in writing the clinical evidence report when Lina |
| 15:54:58 | 6 | Hennegard Larsen, a clinical affair specialist at Cook Europe |
| 15:55:03 | 7 | said, we've got six perforations in our sheep study; and |
| 15:55:07 | 8 | Mr. Heise and they turned into maybe one perforation in the |
| 15:55:10 | 9 | sheep study by the time he was done rewriting the evidence |
| 15:55:13 | 10 | report that was submitted to regulatory authorities and then |
| 15:55:16 | 11 | relied on later in responses for request for additional |
| 15:55:20 | 12 | information in September of '06, I think it was, a February |
| 15:55:23 | 13 | response to FDA.  He reviewed, he testified, all of the |
| 15:55:27 | 14 | submissions and the results of the animal tests.  Ms. Brine |
| 15:55:31 | 15 | was actually the project leader for the 2006 Celect 510(k) |
| 15:55:36 | 16 | submission. |
| 15:55:37 | 17 | So there's -- Mr. Heise also testified there's not a |
| 15:55:42 | 18 | regulatory science function outside of Cook Inc. and he is |
| 15:55:46 | 19 | vice president of regulatory science.  So Cook Inc. is |
| 15:55:49 | 20 | carrying on all of those responsibilities with respect to the |
| 15:55:52 | 21 | filter.  So Cook Inc. is neck deep in the Celect filter and |
| 15:55:57 | 22 | everything that went on in this case.  It's true that William |
| 15:55:59 | 23 | Cook Europe is the manufacturer.  I think if you look in our |
| 15:56:02 | 24 | will call list, you'll see that we're calling more people from |
| 15:56:05 | 25 | Cook Europe than we are from Cook over here because they were |

15:56:09  1  the primary, first of all, manufacturer and investigator of

15:56:14  2  complaints and whatnot; but Cook Inc. had the involvement and

15:56:17  3  they're liable as well, Your Honor.  So unless you have any

15:56:20  4  questions, that's all.

15:56:21  5          THE COURT:  Thank you, Mr. Schultz.

15:56:41  6          MS. PIERSON:  Thank you, Your Honor.  Just a couple

15:56:42  7  of points in response to what Mr. Schultz has said.  First, I

15:56:46  8  want to start where I started in my opening with respect to

15:56:50  9  this motion.  There are two things that the plaintiffs must

15:56:53 10  prove no matter what claim they have, no matter what legal

15:56:57 11  theory they assert; that is causation and defect.  In our

15:57:00 12  moving papers we made perfectly clear that they lacked

15:57:04 13  evidence to support the element of causation, no matter what

15:57:07 14  legal theory they claim.  There was no response to that in

15:57:10 15  plaintiff's responsive papers and there was no response when

15:57:13 16  Mr. Schultz was before you.

15:57:15 17          At best, Dr. Marmureanu suggests that there's some

15:57:18 18  kind of a correlation.  He calls it a tendency to perforate.

15:57:22 19  But that's not the same thing as having expert evidence of

15:57:26 20  causation that a defect in the design caused Mrs. Hill's

15:57:30 21  injuries.  They cannot prove this -- cannot prove that in this

15:57:34 22  case.  Their expert doesn't say that and they must have expert

15:57:38 23  evidence of that.  That issue is dispositive of the entire

15:57:43 24  case.

15:57:43 25          Mr. Schultz suggests, though --

225

```
15:57:45  1        THE COURT:  Mr. Schultz says here that Dr. McMeeking
15:57:49  2   indicates changes from the Tulip to the Celect, taking the
15:57:54  3   leaves off, caused that instability and that was causation.
15:57:58  4        MS. PIERSON:  Assuming the facts most favorably to
15:58:00  5   plaintiffs, which I think we fairly have to do, if -- if
15:58:04  6   Dr. McMeeking said that, that still doesn't get them over the
15:58:07  7   causation hurdle.  He can't say that's what caused Mrs. Hill's
15:58:11  8   specific perforation.  The only person who can do that is
15:58:15  9   somebody who's seen Mrs. Hill's medical records and who's
15:58:17 10   performed a differential diagnosis to really analyze where all
15:58:22 11   of the potential causes.  The only expert that plaintiffs
15:58:25 12   offer who has done that is Dr. Marmureanu.  He is the only one
15:58:29 13   that is case specific to Mrs. Hill.  Dr. McMeeking is not.
15:58:32 14   There's nothing that Dr. McMeeking can do or say to save them
15:58:35 15   from the fact that they have no evidence of causation in
15:58:39 16   Mrs. Hill's case.
15:58:41 17        I explained -- and I won't reiterate why
15:58:44 18   Dr. Marmureanu's methodology is unreliable.  That he did not
15:58:47 19   perform a proper differential diagnosis.  That he did not rule
15:58:51 20   causes in in a reliable and systematic way.  That he did not
15:58:55 21   rule causes out in a reliable and systematic way.  And in the
15:58:59 22   absence of that, they don't have a medical expert who can
15:59:03 23   establish causation for Mrs. Hill.
15:59:05 24        They also don't have a medical expert who
15:59:08 25   establishes causation more generally because in his general
```

15:59:11 1   report, Dr. Marmureanu opines only on the warnings related to

15:59:15 2   Cook and within that he never establishes causation.  I have

15:59:20 3   searched his report six ways to Sunday for the word causation

15:59:24 4   in his general report and it's not there.  Even correlation is

15:59:28 5   not there.  Dr. Marmureanu cannot prove either general or

15:59:32 6   specific causation for them and that's a hurdle that they

15:59:37 7   simply cannot overcome.  I think that's why, when we raise

15:59:39 8   this point, there is no response, Your Honor.  There's not an

15:59:43 9   answer to the fact that they don't have evidence of causation.

15:59:47 10          Now, Mr. Schultz mentions the *Solazzo* case with

15:59:51 11  respect to the failure to warn claim, and I just want to make

15:59:55 12  clear the facts of that case.  That case is cited in our

15:59:59 13  papers but it's 578 So.2d 393.  The case that plaintiffs cite

16:00:06 14  for lack of need of expert testimony on warnings dealt with a

16:00:10 15  paint spray gun.  A paint gun.  It's not a medical product.

16:00:14 16  It doesn't consider the learned intermediary doctrine.  It

16:00:18 17  doesn't consider how Florida law handles medical devices.

16:00:21 18  It's not a complex medical device case and that's what the

16:00:24 19  cases we cite are about.

16:00:27 20          How, Judge, can a lay person know what information a

16:00:30 21  doctor would need about IVC filter risks or what warning would

16:00:33 22  be sufficient?  They can't.  It's impossible.  And that's why

16:00:37 23  Florida courts uniformly require expert evidence to support a

16:00:42 24  claim of failure to warn.

16:00:44 25          As it relates to Mr. Schultz' comments on the

| | | |
|---|---|---|
| 16:00:47 | 1 | elements of strict liability in *Aubin*, just a couple of |
| 16:00:50 | 2 | responses there.  He says that *Aubin* dictates that the test is |
| 16:00:53 | 3 | a consumer expectation test.  And just a reminder, that's a |
| 16:00:58 | 4 | product liability case but it's not a medical device case. |
| 16:01:00 | 5 | And *Aubin* acknowledges that under Florida law for products |
| 16:01:05 | 6 | cases, there are two possible tests; consumer expectation and |
| 16:01:09 | 7 | risk utility. |
| 16:01:11 | 8 | But the fact of the matter is we win either way on |
| 16:01:14 | 9 | the element of defect for strict liability.  Either way they |
| 16:01:18 | 10 | cannot prove the existence of a defect.  Under the consumer |
| 16:01:22 | 11 | expectation test, the question is, did the design of the |
| 16:01:25 | 12 | product perform as the ordinary consumer would expect.  It's |
| 16:01:29 | 13 | not whether Mrs. Hill's specific filter performed as she would |
| 16:01:33 | 14 | expect.  It is did the product, that means the product design, |
| 16:01:37 | 15 | did it perform as the ordinary consumer would expect.  And we |
| 16:01:41 | 16 | know, of course, that the ordinary consumer is not Mrs. Hill. |
| 16:01:44 | 17 | We know that two ways. |
| 16:01:46 | 18 | First, plaintiff's response concedes it.  The very |
| 16:01:49 | 19 | first line in discussing the consumer expectation test and the |
| 16:01:54 | 20 | response to the motion for summary judgment acknowledges that |
| 16:01:56 | 21 | the consumer is Dr. Zuzga.  And obviously that makes sense |
| 16:02:01 | 22 | under Florida law and the law of all other states who use that |
| 16:02:04 | 23 | test.  Mrs. Hill is not an ordinary consumer.  She can't |
| 16:02:08 | 24 | possibly understand the risks and benefits of a prescription |
| 16:02:11 | 25 | medical device. |

16:02:13  1        We know that we win even if consumer expectation is

16:02:17  2   the test because the product met Dr. Zuzga's expectations.

16:02:20  3   Again, his testimony was that he knew of the revision.  That

16:02:25  4   the product performed as he expected.  That he would prescribe

16:02:29  5   it again for Mrs. Hill, and that there was nothing that he

16:02:32  6   learned in the course of treating Mrs. Hill or in the course

16:02:35  7   of his two-day deposition where the plaintiff's lawyer's

16:02:38  8   showing him every bad company document and every piece of

16:02:41  9   literature they like that would change his decision about what

16:02:44 10   he did with Mrs. Hill.

16:02:46 11        I want to give you just one example of that, Your

16:02:48 12   Honor.  There's a study that you'll hear a lot in these cases

16:02:51 13   that the plaintiffs like.  You've already heard about.  The

16:02:54 14   lead author is called Durac, and the plaintiffs point to that

16:02:57 15   piece of literature.  They like it very much because it's a

16:03:00 16   study of Celect filters and it observes in one period of time

16:03:03 17   that 86 percent of Celects had perforated and another period

16:03:07 18   of time 100 percent of Celects had perforated.

16:03:10 19        Now, the authors -- we like the study very much

16:03:13 20   because the author is saying all those perforations are

16:03:15 21   asymptomatic, meaning they require no medical treatment and

16:03:19 22   the patients didn't sustain any injury.  There are a lot of

16:03:22 23   other studies but you'll hear the plaintiffs point repeatedly

16:03:25 24   to 86 percent, 86 percent.  Well they gave that exact study to

16:03:31 25   Dr. Zuzga and they asked Dr. Zuzga in his deposition, if Cook

16:03:33  1  had told you there was a study that included a 86 percent

16:03:38  2  perforation rate, would that have -- would that have changed

16:03:40  3  what you did?  And the answer was no.  Dr. Zuzga said even

16:03:45  4  knowing everything the plaintiff's lawyers had showed him

16:03:47  5  during his deposition, he would still prescribe the filter for

16:03:52  6  Mrs. Hill.  He continued to use the Celect and has confidence

16:03:55  7  in the product, even knowing the complication that Mrs. Hill

16:03:59  8  experienced.

16:04:00  9       The bottom line is that when the lawyers today

16:04:05 10  suggest to you that the question here is what would an

16:04:08 11  ordinary consumer expect and did the ordinary consumer receive

16:04:12 12  what they expected, the answer to that question is yes.  This

16:04:16 13  is an excellent medical product with a complication rate of

16:04:19 14  less than one percent.  Dr. Zuzga's testimony was that he had

16:04:23 15  never had a perforation or an experience like Mrs. Hill's,

16:04:27 16  other than Mrs. Hill.  He had high confidence in the product.

16:04:32 17  It met his expectations.

16:04:34 18       As it relates to the warnings comments that

16:04:37 19  Mr. Schultz made.  He makes this comment again that the

16:04:39 20  warnings did not not fully describe the extent of the danger

16:04:42 21  to the doctor and that he doesn't need an expert for that.

16:04:46 22  Mr. Schultz and I can debate this all day long.  I encourage

16:04:50 23  you to look at the cases.  Under Florida law, expert evidence

16:04:52 24  is required in a complex medical device case.  There's no

16:04:56 25  ambiguity about that.

16:04:58  1        Florida cases do not require manufacturers to

16:05:01  2  describe the extent of the danger.  But what they do require,

16:05:04  3  plaintiffs, who bear the burden of proof to do, is to give you

16:05:09  4  an expert who says a physician reviewing and interpreting

16:05:15  5  these instructions for use would expect to hear something

16:05:18  6  different.  That didn't happen here.  The expert that they

16:05:20  7  brought to you, Your Honor, said there is no warning of

16:05:23  8  perforation, period; and he got it wrong.  That's all there is

16:05:27  9  to it.

16:05:28 10        The lawyers say that thing warning should have been

16:05:31 11  different.  That they should have included some other

16:05:33 12  information about the extent of the risk.  But you have to pay

16:05:36 13  attention to what the witnesses say because that's the

16:05:39 14  evidence.  The evidence from the expert that they bring to

16:05:42 15  you, Dr. Marmureanu, is that the warning is absent, wholly

16:05:47 16  absent.  And when I asked him, he said he had no specific

16:05:51 17  language to suggest, no opinion about where it should go or

16:05:55 18  what it should say or what words it should use.  He didn't

16:05:58 19  offer the opinions that they suggest today.  Those have come

16:06:01 20  not from the witnesses but from the lawyers; and under Florida

16:06:04 21  law, that's not enough.  They bear the burden of proof to

16:06:08 22  prove defect in the warning and causation by expert evidence.

16:06:13 23        With respect to Mr. Schultz' comments on

16:06:16 24  negligence -- I'm sorry.  Just one more thing on *Aubin* and

16:06:20 25  strict liability before I move off of that.  *Aubin* says that

16:06:24   1   the jury instructions approved by the Florida Supreme Court

16:06:27   2   use both the consumer expectation test and the risk utility

16:06:30   3   test as alternative definitions of design defect in a general

16:06:35   4   products case, essentially.  They're applying it in a general

16:06:37   5   products case.  I didn't want the Court to be misled when

16:06:41   6   Mr. Schultz said *Aubin* dictates a consumer expectation test.

16:06:45   7   It doesn't dictate one, even in a products liability case that

16:06:48   8   doesn't involve medical devices.

16:06:54   9            With respect to the comments Mr. Schultz made on his

16:06:56   10   general negligence claim, I want to address the question that

16:06:59   11   you raised, Your Honor, about the master complaint.  I

16:07:02   12   encourage you to look at paragraph 85 of the master complaint.

16:07:05   13   It alleges that Cook breached its duty of care by doing three

16:07:09   14   or four things.  All of those things relate to negligent

16:07:14   15   design, negligent warning, negligent manufacture.  There is no

16:07:19   16   element alleged of generalized negligence.  It's not there.

16:07:23   17   And even if it were, that's not the determining factor.

16:07:26   18            The determining factor is, in fact, Florida law.

16:07:28   19   And Florida law dictates that no matter how they label their

16:07:32   20   negligence claim, they can allege that Cook didn't test

16:07:36   21   properly or didn't inspect properly.  That goes to a claim of

16:07:40   22   negligent manufacture.  They can allege that Cook didn't do

16:07:43   23   its drawings right or that Cook didn't in some way properly

16:07:48   24   test different designs.  That goes to a claim of negligent

16:07:51   25   design.  They can allege that we were negligent in our

16:07:53  1  warnings in some respect.

16:07:54  2       The only thing that they have even come close to

16:07:58  3  alleging here is negligent design but they're missing the key

16:08:02  4  element of defect.  That's why they keep retreating to this

16:08:05  5  position of it's a generalized question of negligence and that

16:08:09  6  doesn't bear fruit under Florida law.

16:08:13  7       There are a number of Florida cases that we've cited

16:08:16  8  to you in our papers, Your Honor, but the bottom line is this.

16:08:19  9  Under *Cooper*, *Wolicki*, *Small*, *Jennings* and many others, the

16:08:24 10  law of Florida goes this way.  Plaintiff's claims of

16:08:28 11  negligence and strict liability both require that one, a

16:08:32 12  defect existed in the product and two, the defect caused the

16:08:38 13  injury.  That comes straight from the *Cooper* case but you'll

16:08:42 14  also find it in the *Wolicki-Gables* case and many of the other

16:08:46 15  cases we cited.

16:08:47 16       Proof of negligent design requires evidence of the

16:08:50 17  existence of a defect in the product and the defendant's

16:08:53 18  alleged negligence was the proximate cause of the plaintiff's

16:08:57 19  injuries.  A product may be defective by virtue of a design

16:09:01 20  defect, a manufacturing defect, or an inadequate warnings; and

16:09:04 21  that's the *Jennings* case, Your Honor, an 11th Circuit case in

16:09:09 22  1999.  Florida law is not ambiguous on those points.  That

16:09:13 23  there are two missing elements for every legal theory that

16:09:17 24  they assert; defect and causation.

16:09:19 25       Now, Mr. Schultz argues two other points that I'd

16:09:23  1    like to address.  One is the question of punitive damages.

16:09:25  2    And again, I encourage you to think about this in terms of the

16:09:34  3    applicable law.  There's a choice of law question, whether

16:09:37  4    it's Indiana or Florida law.  The question is, is the conduct

16:09:43  5    conduct that meets the elements that I showed to you earlier;

16:09:45  6    willful and wanton misconduct, gross negligence, intent,

16:09:51  7    malice, fraud.  The plaintiffs have cited no specific evidence

16:09:56  8    of that to you and none that relates specifically to the

16:09:59  9    conduct that plaintiff alleges to her Celect and the design of

16:10:04 10    the Celect.

16:10:05 11           Evidence that Cook internally considered risks of

16:10:09 12    its medical product, that's a good thing.  That's not a bad

16:10:13 13    thing.  It's a good thing when our engineers are questioning

16:10:17 14    will a design work or not.  What are the risks?  How do the

16:10:21 15    risks balance against the benefits of the product?  And no

16:10:25 16    matter what internal company documents or deposition testimony

16:10:29 17    Mr. Schultz wants to cite to you today, that wasn't included

16:10:33 18    in their response.  What was included in their response was a

16:10:36 19    generic citation to 96 pages of a general statement of fact

16:10:40 20    with no connection to any of the actual legal claims or

16:10:44 21    product that Mrs. Hill received.

16:10:46 22           And quite to the contrary, evidence that our

16:10:50 23    engineers or our employees considered risks, discussed risks,

16:10:55 24    talked about ways to improve risks, that evidence is not

16:10:59 25    evidence of punitive damages.  It's not evidence of gross

16:11:03 1  misconduct, malice, intent, or willful or wanton conduct.

16:11:07 2  It's evidence of a company that cares and a company that

16:11:10 3  considered the risks and benefits of its products and future

16:11:14 4  products that it was developing.  That's not the stuff that

16:11:17 5  punitive damages are made of.  And in the absence of

16:11:20 6  plaintiff's citing you to a specific piece of conduct, a

16:11:25 7  specific piece of evidence that shows the element of punitive

16:11:29 8  damages, one of those elements of punitive damages Cook is

16:11:32 9  entitled to summary judgment on that claim.

16:11:35 10          I'd say lastly as relates to his argument on Cook

16:11:38 11 Inc.  There's a case that we cite in our papers, the *West* case

16:11:42 12 that I think is really important.  Mr. Schultz is not denying

16:11:45 13 that with respect to Mrs. Hill's filter, Cook Inc. had no

16:11:48 14 involvement.  None at all.  And the *West* case explains that

16:11:53 15 the question is the defendant's relationship to the product.

16:11:56 16 It doesn't matter if Cook Inc. had some decision unrelated to

16:12:02 17 other Celect -- some involvement related to Celect products

16:12:05 18 that Mrs. Hill did not receive.  The question is, did Cook

16:12:09 19 Inc. design or manufacture Mrs. Hill's specific product or

16:12:14 20 sell Mrs. Hill's specific product.  And Cook Inc. didn't do

16:12:18 21 any of those things.  They're simply not a proper party in

16:12:22 22 this particular case.  For those reasons, Your Honor, unless

16:12:23 23 you have other questions, we would again --

16:12:26 24          THE COURT:  A lot of Cook employees worked on the

16:12:29 25 510(k) and the regulatory scheme here?

16:12:33   1            MS. PIERSON:  There are Cook employees who are

16:12:34   2    involved in the 510(k) process for the Celect.  That is

16:12:37   3    correct.  But the question of a proper defendant under Florida

16:12:42   4    law is the relationship to the product that the plaintff

16:12:44   5    actually received.  So under Florida law, even if they were

16:12:49   6    involved with the 510(k) process, if April Lavender reviewed

16:12:52   7    it or some other person was involved in communications back

16:12:55   8    and forth with the FDA.  In the absence of designing,

16:12:59   9    manufacturing or selling Mrs. Hill's product, they can't be a

16:13:02  10    defendant.

16:13:04  11            Peripheral involvement in other things, regulatory

16:13:07  12    approval or marketing or something else, that's not enough to

16:13:10  13    keep Cook Inc. in the case.  They have to design, manufacture

16:13:13  14    or sell her Celect.  There are two other defendants here that

16:13:16  15    are proper defendants in Mrs. Hill's case but it's not Cook

16:13:19  16    Inc.

16:13:22  17            THE COURT:  Thank you.

16:13:22  18            MS. PIERSON:  Thank you, Your Honor.

16:13:36  19            MR. SCHULTZ:  On the last point, Your Honor.  510(k)

16:13:38  20    clearance is a permission slip from the FDA to sell a product.

16:13:42  21    I don't know how running the 510(k) for a product, which is

16:13:46  22    the product our client received, is not involved in the sale

16:13:50  23    of the product.

16:13:51  24            On the question -- so punitive damages very briefly.

16:13:56  25    We've got a lot of tobacco litigation in Florida under the

16:14:00  1   Engle Progeny cases.  Federal courts had a bit.  It's mostly

16:14:03  2   been in state court.  I've tried seven of them in the last

16:14:06  3   seven years, five of which went to verdict on punitive

16:14:08  4   damages, all of which included claims for punitive damages

16:14:11  5   under Florida law.  And these -- this case looks a lot like a

16:14:15  6   tobacco case.

16:14:16  7          We've got -- the misconduct doesn't go on as long

16:14:19  8   but that's, I think, a coincidence.  We've got manufacturer

16:14:24  9   that knew it had a problem.  It did everything it could to try

16:14:27 10   and explain away the problem internally.  When it couldn't do

16:14:30 11   that, it actively misled about the nature of it and the extent

16:14:34 12   of it, including misleading doctors, including the doctor in

16:14:36 13   this case; and that is the stuff of punitive damages, Your

16:14:39 14   Honor.  It's in the papers.  Dr. Kessler's written a 160-page

16:14:44 15   report that outlines a lot of that conduct.  And if there's

16:14:47 16   ever a punitive damages case outside of tobacco that was a

16:14:51 17   sure bet, I would say this is one.

16:14:54 18          The learned intermediary -- one other thing.  I'm

16:14:58 19   thinking we should have filed a motion in limine on this.

16:15:00 20   Ms. Pierson has many times today stood up and said these

16:15:03 21   filters have a complication rate of less than one percent.

16:15:06 22   The filters have a complaint rate of less than one percent.

16:15:10 23   Nobody knows -- and I've asked every one of their witnesses

16:15:13 24   that I've deposed, which is most of their experts.  No one

16:15:16 25   knows what that means in terms of real world complications.

16:15:20  1    There may be a one percent reporting rate of complaints.

16:15:22  2    There may be a tenth of a percent.  There may be a 50 percent.

16:15:26  3    Nobody knows.  So this drum beat of complication rate of less

16:15:30  4    than one percent simply isn't true, and we know that not all

16:15:34  5    complaints are -- all real world events are reported just as a

16:15:38  6    matter of logic.  So that, you know, should stop.

16:15:43  7              The learned intermediary, Your Honor, I just --

16:15:45  8    there was again some conflation between the design defect and

16:15:50  9    learned intermediary.  Under learned intermediary, it is true

16:15:52 10    that under design defect, the consumer under Florida law in

16:15:56 11    the *Felix* case is the doctor.  We don't quarrel with that.

16:16:00 12    Under learned intermediary, the duty to warn goes to Ms. Hill.

16:16:05 13    That duty can be discharged by warning the learned

16:16:08 14    intermediary but only if you warn to the full extent of the

16:16:11 15    danger and if you make reasonable assurance that that

16:16:14 16    intermediary will communicate the warning to Ms. Hill.

16:16:17 17              In this case, we know the learned intermediary did

16:16:20 18    not.  He had her sign a consent form for the procedure that

16:16:23 19    they've tried to turn into a warning about long-term

16:16:26 20    complications; but he testified himself he didn't read the

16:16:29 21    IFU.  I don't know how he could convey warnings to our client

16:16:33 22    that he didn't read.  So the failure to warn claim, I would

16:16:36 23    say, is rock solid.  The learned intermediary defense is very

16:16:41 24    tenuous, given the doctor's testimony.

16:16:43 25              Finally, Judge, causation.  It was the first thing I

| | | |
|---|---|---|
| 16:16:46 | 1 | addressed.  Dr. Marmureanu speaks to it.  Dr. McMeeking speaks |
| 16:16:49 | 2 | to it.  The *Tillman* case, which Ms. Pierson pointed out in her |
| 16:16:53 | 3 | PowerPoint, one of the cases they rely on in their causation |
| 16:16:56 | 4 | argument, was a Bard IVC filter case.  I think it was out the |
| 16:16:59 | 5 | Middle District in Florida.  And *Tillman* -- this is a quote |
| 16:17:03 | 6 | from the case.  "Tillman presents evidence that the filter as |
| 16:17:06 | 7 | designed has a propensity to tilt, migrate, or perforate the |
| 16:17:11 | 8 | IVC, complications which can also lead to fracture and |
| 16:17:15 | 9 | therefore, summary judgment was inappropriate." |
| 16:17:16 | 10 | And the judge in that case -- and I forget her |
| 16:17:20 | 11 | name -- but she declined to enter summary judgment on the same |
| 16:17:24 | 12 | arguments that are made here precisely because a jury can |
| 16:17:28 | 13 | infer the design changes that lead to a propensity for |
| 16:17:31 | 14 | perforation, one that's stark in this case compared to the |
| 16:17:33 | 15 | predicate device is enough for the jury to draw that |
| 16:17:37 | 16 | inference.  It certainly is an inference we're entitled to on |
| 16:17:40 | 17 | summary judgment as a matter of law. |
| 16:17:42 | 18 | The defect in the device includes that design |
| 16:17:45 | 19 | change, stiff materials, too match radial force on the IVC, |
| 16:17:49 | 20 | and the absence of penetration limiters, which is just what |
| 16:17:53 | 21 | they did, in fact, with Platinum.  They went ahead and put a |
| 16:17:57 | 22 | stop member -- they called it a radial pink marker on the end |
| 16:18:00 | 23 | so that what formally was the hook or the foot now acted as a |
| 16:18:04 | 24 | penetration limiter; and we've got penetration tests out |
| 16:18:07 | 25 | 50,000 cycles where the Celect that Ms. Hill has was failing |

16:18:11  1  at as low as five or 600 cycles.  The Platinum would go out

16:18:17  2  50,000 cycles every filter every time.  That clearly is a

16:18:21  3  design change that had some impact.

16:18:23  4          And on causation, Your Honor, we also have a medical

16:18:26  5  record, abdominal pain epigastric likely secondary to surgical

16:18:27  6  wire penetrating the duodenum, a surgical wire coming from the

16:18:35  7  inferior vena cava.  There's plenty of evidence in this case

16:18:37  8  that the jury can infer the defect in the filter and Cook's

16:18:42  9  misconduct were proximate causes -- or legal causes, to use

16:18:44 10  Florida's term, of miss Hill's damages.  Thank you.

16:18:51 11          MS. PIERSON:  Can I say just one thing?

16:18:52 12  Mr. Jones --

16:18:54 13          THE COURT:  Briefly.

16:18:55 14          MS. PIERSON:  Mr. Jones is going to be arguing the

16:18:58 15  plaintiffs motion.  Mr. Jones is going to be arguing the

16:19:01 16  plaintiff's motion for summary judgment, which addresses the

16:19:03 17  issue of assumption of the risk and some of the issues related

16:19:07 18  to Mrs. Hill's consent.  So I didn't address now but Mr. Jones

16:19:11 19  will be addressing the fact that we know, of course, that

16:19:14 20  Dr. Zuzga could pass the risks on to Mrs. Hill because he knew

16:19:18 21  them personally.  But we know, in addition to that, that he

16:19:21 22  did because he gave her a couple of informed consents.  And

16:19:24 23  Mr. Jones will describe those to you in more detail.

16:19:27 24          I just say finally this argument that Mr. Schultz

16:19:29 25  made about a jury being able to infer causation or infer

16:19:32  1    defect, that stands in stark contrast to all of the law that's

16:19:37  2    cited in our papers.  Both of those things expert evidence

16:19:43  3    under Florida law and we just urge you to review the cases

16:19:45  4    that are cited in our papers on that poing.  Thank you.

16:19:49  5            MR. SCHULTZ:  Are we taking up the plaintiff's

16:19:51  6    summary judgment?

16:19:51  7            THE COURT:  Yes.

16:20:07  8            MR. SCHULTZ:  So, Your Honor, we have agreement on

16:20:09  9    affirmative defenses 1, 3, 9, 10, 12 and 13 and we detail

16:20:15 10    those in the papers.  The remaining arguments are on No. 2,

16:20:18 11    assumption of the risk; No. 8, government rules defense; and

16:20:22 12    No. 11, superseding intervening cause.  Affirmative defense

16:20:27 13    No. 2, assumption of the risk is based on -- and Cook is

16:20:31 14    correct in terms of the distinction from *Blackburn v. Dorta*,

16:20:34 15    D-O-R-T-A, on express assumption of the risk.  It has been

16:20:39 16    limited in Florida to circumstances where there is a contract,

16:20:43 17    a waiver essentially, in full contact sport.

16:20:47 18            And Cook is arguing that the informed consent for

16:20:53 19    the surgery was a consent to perforation -- or I guess

16:20:57 20    specifically to the risk of perforation.  We address this in

16:21:01 21    more detail in our motion in limine to exclude the consent

16:21:04 22    forms, to which I would defer on the details.  I will point

16:21:09 23    out, Your Honor, the consent forms at issue say that the

16:21:14 24    doctor has discussed problems, "as a result of this

16:21:18 25    procedure."  All the risks that are listed are risks of the

16:21:23  1   procedure.  Some of the risks of the procedure also are

16:21:28  2   long-term risks, such as perforation which is listed.  You can

16:21:33  3   perforate someone's IVC when you are implanting a filter.  You

16:21:37  4   can perforate a filter when you're removing a filter.  So that

16:21:41  5   was a procedural risk that was wanders of.

16:21:44  6          Others certainly would not be long-term risk like

16:21:48  7   reaction to contrast dye or heart arrhythmia.  Those are

16:21:53  8   surgical risks that are not long-term risks of the filter and

16:21:57  9   they suggest, of course, what's already obvious on the face of

16:22:01  10  the document; and that is, that it was an informed consent for

16:22:05  11  the procedure itself.  And maybe most telling, Your Honor,

16:22:07  12  when Ms. Hill came back for her failed retrieval four months

16:22:11  13  later, Dr. Zuzga had her sign an identical form.  So if Cook's

16:22:16  14  position is right, then she was consenting to all the

16:22:18  15  long-term risks of filter placement when she had her filter

16:22:22  16  removed -- or when he thought he was going to remove it.

16:22:25  17         The forms are obviously informed consents for the

16:22:27  18  procedure and would not serve as a basis for assumption of the

16:22:32  19  risk.  Under Florida law we did cite one case that says, "It

16:22:36  20  must be clear that the plaintiff was assuming the risk of the

16:22:40  21  particular conduct by the defendant which caused his injuries.

16:22:43  22  No agreement to assume risks not known to the plaintiff will

16:22:48  23  be inferred unless clearly intended."  And we certainly

16:22:52  24  believe that that could not be said as a matter of law in this

16:22:55  25  case.

| | | |
|---|---|---|
| 16:22:57 | 1 | The 11th affirmative defense, Your Honor, I think is |
| 16:23:00 | 2 | very easy.  This is a superseding intervening cause argument. |
| 16:23:04 | 3 | Cook says that Ms. Hill's torturous anatomy -- you've seen an |
| 16:23:09 | 4 | x-ray of her scoliosis here today -- or an image of it, says |
| 16:23:12 | 5 | that her anatomy was the cause of her injury.  Causation is |
| 16:23:16 | 6 | substantive for Erie purposes as an elements of a tort; and |
| 16:23:20 | 7 | Florida law is very clear that a plaintiff's hyper-sensitivity |
| 16:23:24 | 8 | does not affect the causal relationship between the |
| 16:23:28 | 9 | defendant's conduct and the plaintiff's damages.  That's the |
| 16:23:29 | 10 | *Poole* case, P-O-O-L-E, at 571 So.2d 51, the *Ravel* case at 527 |
| 16:23:36 | 11 | So.2d 943 says the tortfeasor takes her victim as she finds |
| 16:23:43 | 12 | him.  It's an eggshell skull state, Your Honor, and |
| 16:23:46 | 13 | predisposition to disease.  The fact that someone may have a |
| 16:23:50 | 14 | different reaction than you expected is not a superseding or |
| 16:23:55 | 15 | intervening cause understand Florida law.  Not to mention it |
| 16:23:58 | 16 | would have been foreseeable to begin with. |
| 16:24:01 | 17 | We also pointed out, Judge, they have given up on |
| 16:24:04 | 18 | their third-party, what we call in Florida Fabre defense, |
| 16:24:08 | 19 | blaming the doctor.  Another aspect of this is the prejudicial |
| 16:24:12 | 20 | affect of allowing such an argument.  It's foreclosed legally. |
| 16:24:16 | 21 | But if it were not, we would argue that it suggests to the |
| 16:24:18 | 22 | jury that the doctor shouldn't have put the filter in, if |
| 16:24:21 | 23 | that's -- if her anatomy was so torturous that it was going to |
| 16:24:25 | 24 | cause perforation and injury. |
| 16:24:28 | 25 | Finally, the government rules defense, judge.  We |

16:24:31  1  talked about this a bit on preemption.  We'll talk about it if

16:24:34  2  we get to Cisson, which hopefully we will here shortly.  There

16:24:37  3  are three elements to the government rules defense.  They have

16:24:40  4  to comply with the law that is relevant to the event causing

16:24:45  5  death or injury.  That's one.  No. 2, the law has to be

16:24:48  6  designed to prevent the type of harm that allegedly occurred.

16:24:51  7  And third, the compliance with the law must be a condition for

16:24:55  8  selling the product.

16:24:56  9          I think this would be a pretty good argument in a

16:24:59 10  PMA case, Your Honor, where there has to be an independent

16:25:03 11  determination or demonstration of safety and effectiveness

16:25:07 12  through valid scientific evidence.  That's the FDA regulatory

16:25:11 13  standard.  That is not the standard for 510(k).  We have

16:25:15 14  quoted, Your Honor, as we did in the Cisson motion, court

16:25:20 15  after court after court that says FDA doesn't independently

16:25:24 16  assess the safety and effectiveness of a medical device.

16:25:27 17          I think the Goodlin case out of the 11th Circuit is

16:25:30 18  particularly appropriate, substantial equivalence review.

16:25:34 19  They say the agency considers only whether the device is

16:25:37 20  indeed the equivalent of a pre-existing device regardless of

16:25:41 21  how unsafe or ineffective the grandfathered device happens to

16:25:45 22  be.  And there're probably a dozen cases along the same lines,

16:25:49 23  starting with *Lohr* and *Riegel* from the U.S. Supreme Court

16:25:53 24  recognizing that 510(k) is not a safety determination.

16:25:55 25  Because it is not a safety determination, Judge, the 510(k)

16:25:59  1   law is not a law designed to prevent the type of harm that

16:26:05  2   allegedly occurred here.

16:26:06  3          Judge Goodwin ruled in the *Edenfield* case that the

16:26:08  4   Florida statute, the Florida's GRD was not satisfied by

16:26:12  5   compliance with the 510(k) process for precisely this reason

16:26:15  6   he had made a previous ruling on the Texas statute, which is

16:26:18  7   substantively identical to the Florida statute, and we would

16:26:23  8   suggest that the same ruling would obtain here.

16:26:28  9          And just so the record's clear, Your Honor, on

16:26:31 10   perforation for the 510(k) submission of Celect, Cook

16:26:36 11   submitted a study on 20 sheep that involved 40 Celect filters.

16:26:40 12   FDA found six perforations in that study and refused to clear

16:26:44 13   the device initially on the 2004 and said come back with human

16:26:47 14   clinical data and we'll talk.  And Cook did a clinical study

16:26:53 15   and as we know, concealed ten perforations in it because if

16:26:57 16   FDA wasn't going to clear the device with six sheep

16:27:00 17   perforations, it wasn't going to clear a device with ten human

16:27:05 18   perforations.  And that's the perforation evidence that FDA

16:27:08 19   got, the clinical study and the VCA1 sheep study.

16:27:12 20          So to suggest that somehow compliance with that and

16:27:17 21   proffering that evidence to FDA means that they get a rebuttal

16:27:22 22   presumption is a nonstarter we would suggest, Your Honor.

16:27:26 23   Thank you.

16:27:27 24          THE COURT:  Thank you.  Mr. Jones.

16:27:34 25          MR. JONES:  Thank you, Your Honor.  I'll address

16:27:40  1    these in the order that Mr. Schultz presented them.  First of

16:27:44  2    all with respect to the express assumption of risk.  The Court

16:27:48  3    should deny plaintiff's summary judgment on the express

16:27:52  4    assumption of risk.  As Mr. Schultz acknowledged, plaintiff

16:27:56  5    here signed consent forms that said, among other things, "I,

16:27:59  6    Elizabeth Hill, voluntarily consent to allow Dr. Zuzga and his

16:28:04  7    associates to perform the following procedure referred to as

16:28:07  8    IVC filter.  The risks have been fully explained to me.  I

16:28:11  9    understand that these risks may include but are not limited

16:28:14 10    to" -- and then third on the list is "injury to vessel or

16:28:20 11    nerve, including perforation."

16:28:22 12            She also talks later in the consent form about the

16:28:24 13    alternatives being explained, the benefits of the procedure

16:28:27 14    being explained, and she acknowledges that she has read and

16:28:31 15    fully understands this consent form and all the questions have

16:28:33 16    been answered to her satisfaction.

16:28:36 17            If there were a more clear and direct statement of

16:28:42 18    assuming a risk, I'm not sure what it would be.  That's -- she

16:28:47 19    says "I consent to this risk of perforation."  Plaintiff now

16:28:52 20    comes in and says that well, the consent form didn't apply to

16:28:56 21    the long-term risks of the IVC filter.  It only applied to the

16:28:59 22    risks of the procedure itself, despite the fact that it

16:29:02 23    includes things that couldn't have arisen during the procedure

16:29:06 24    and could only have arisen later, including migration --

16:29:10 25    migration -- filter migration and infection.  Those are

16:29:16  1  obviously not immediate.

16:29:19  2          Also Dr. Zuzga testified about the consent forms and

16:29:22  3  said that he contradicted plaintiff's interpretation.  He said

16:29:27  4  that "a consent form discussion of the risks," and I quote

16:29:30  5  here from Dr. Zuzga, "covers pretty much putting the filter in

16:29:34  6  and long-term complications of filters in and of themselves."

16:29:37  7  That's at pages -- page 75, line 6 to 22 of Dr. Zuzga's

16:29:44  8  deposition.

16:29:45  9          As Mr. Schultz mentioned, both parties have

16:29:49 10  addressed the consent forms in more detail in their -- in the

16:29:55 11  motion -- plaintiff brought a motion in limine and we are

16:29:58 12  responding tomorrow to that motion in limine.  I urge the

16:30:00 13  Court if you have any questions concerning the consent forms

16:30:02 14  or this particular ground for summary judgment, that you read

16:30:05 15  those as well because those are set -- things are set out in

16:30:09 16  more detail there.  We didn't address the specifics of

16:30:14 17  plaintiff's objections in our response because they hadn't

16:30:17 18  raised them.  They just raised a one-paragraph argument that

16:30:21 19  express -- excuse me, that assumption of risk had been

16:30:23 20  abolished entirely in Florida law.  We came back and pointed

16:30:28 21  out well, no, it has an express assumption of risk is still

16:30:31 22  there as a defense, which plaintiff concedes.  And so we

16:30:34 23  presented the consent form.

16:30:35 24          So their arguments and their reply are something

16:30:38 25  we've not had a chance to respond to yet.  We do that in the

16:30:41  1   motion in limine.  So I urge you to read it there.

16:30:44  2          I would also point out that although plaintiff now

16:30:47  3   argues that the consent forms were limited just to the

16:30:50  4   procedure itself, she didn't say that when she was asked about

16:30:52  5   the consent forms at her deposition.  She didn't suggest that

16:30:56  6   there was any kind of narrowing beyond the IVC filter itself.

16:31:00  7   Instead, she talked about how the consent filter -- she hinted

16:31:05  8   that it wasn't -- she wasn't fully cognizant of it because she

16:31:09  9   was on a gurney.  She had already been given medication and

16:31:13 10   she didn't have her reading glasses.

16:31:14 11          We have evidence to dispute that.  But again, that's

16:31:18 12   an issue of fact for the jury.  If she wants to come in now

16:31:21 13   and say that the consent form only meant that to her, she's

16:31:24 14   free to do that; but we're entitled to present the consent

16:31:27 15   form as evidence of her express assumption of the risk.  The

16:31:31 16   one thing I haven't mentioned, of course, is that she is

16:31:33 17   herself a health care professional; and she testified that she

16:31:36 18   has helped patients with these consent forms many times over

16:31:39 19   the years.  That's certainly something the jury is entitled to

16:31:43 20   consider when they consider what she believes she was

16:31:45 21   consenting to here.

16:31:47 22          The evidence --

16:31:48 23          THE COURT:  It seems there's an issue of fact there.

16:31:52 24          MR. JONES:  Thank you.  The next issue is

16:31:54 25   intervening cause.  Again, genuine issues of material fact

16:31:57  1  present judgment on intervening cause.  Mr. Schultz talked

16:32:00  2  about the eggshell defense.  We talked in our response about

16:32:04  3  the anatomy of Mrs. Hill being particularly unique and causing

16:32:10  4  the filter to tilt, at least in the perception of the x-rays.

16:32:19  5  Plaintiff argues this is an eggshell skull situation.  That we

16:32:22  6  were compelled to take Mrs. Hill as we found her.

16:32:25  7          He's missing a step here.  We didn't decide,

16:32:27  8  notwithstanding plaintiff's own anatomy, to put the filter in

16:32:33  9  anyway.  Dr. Zuzga did that.  He made that decision to take

16:32:36 10  the risk and that is the intervening cause.  So the eggshell

16:32:42 11  skull defense here doesn't apply at all.

16:32:44 12          I'd also point out that we cited in our response

16:32:48 13  four additional potential intervening causes.  First of all,

16:32:53 14  plaintiff's intervening spinal surgery.  Second, plaintiff's

16:32:56 15  lymphocytic colitis may have caused her problems according to

16:33:01 16  Dr. Baron.  Dr. Marmureanu himself testified that placement of

16:33:06 17  the filter alone, even without perforation, could be the cause

16:33:09 18  of stenosis.  And finally, Dr. Marmureanu testified that

16:33:13 19  plaintiff's duodenitis could have caused her abdominal pain.

16:33:17 20          Plaintiff's response either in their papers or at

16:33:20 21  oral argument today doesn't address any of those potential

16:33:23 22  issues at all.  We submit that those also create genuine

16:33:25 23  issues of material fact precluding summary judgment on the

16:33:30 24  intervening cause defense.

16:33:32 25          Finally with respect to the government regulations

16:33:35  1  defense.  This is Florida statute 768.1256(1).  There are

16:33:42  2  three elements, as Mr. Schultz noted.  No. 1, compliance with

16:33:48  3  state or federal regulations.  That's clearly a disputed issue

16:33:52  4  of fact.  The third element, that the fact that compliance

16:33:56  5  with the codes or regulations is a prerequisite to selling or

16:34:00  6  distributing the product is conceded by plaintiffs.  As

16:34:03  7  Mr. Schultz himself says a few minutes ago, the 510(k) is the

16:34:07  8  permission slip to sell the product.  So clearly the third

16:34:11  9  element is met.

16:34:11  10          The issue then comes to the second element, whether

16:34:15  11  or not the codes, statutes, rules, regulations, or standards

16:34:18  12  are designed to prevent the type of harm that allegedly

16:34:21  13  occurred.  Plaintiff here once again turns to *Lohr* as his only

16:34:28  14  source of answer, but *Lohr* is not relevant here.  The *Lohr*

16:34:33  15  decision addressed the question of federal preemption under

16:34:40  16  the supremacy clause of the United States Constitution, which

16:34:43  17  the *Lohr* case itself said is a very exacting standard.  It

16:34:47  18  requires proof that Congress intended to completely foreclose

16:34:53  19  state law on an issue.  And the *Lohr* court concluded that it

16:34:58  20  had not done so with respect to 510(k)'s.

16:35:01  21          Your Honor ruled this morning that that preemption

16:35:05  22  ruling remains intact in this case.  But that has nothing to

16:35:08  23  do with the standard that applies here.  This standard is not

16:35:12  24  a federal constitutional standard.  This is a state statutory

16:35:16  25  standard.  It simply says, was the regulation intended to --

16:35:21 1   designed to prevent the type of harm that allegedly occurred.

16:35:25 2   I'm not going to go through all the specifics that I went

16:35:28 3   through this morning concerning preemption; but here there's a

16:35:31 4   lot, the requirements, the regulations, the guidance

16:35:34 5   documents, none of that is subject to these strict strictures

16:35:38 6   of the preemption analysis that we talked about this morning

16:35:42 7   with respect to *Lohr*.

16:35:43 8          This is -- the 510(k) is clearly under -- by the

16:35:47 9   FDA's own definition designed to prevent the type of harm that

16:35:52 10  allegedly occurred here.  Cook's response cites several FDA

16:35:54 11  requirements that are designed to prevent the complications.

16:35:57 12  Particularly -- and this I quoted this morning -- pardon me.

16:36:01 13  I should have brought a little glass of water up.

16:36:04 14  Particularly the requirement that the new IVC filter be "at

16:36:07 15  least as safe and effective" as the predicate device.  Under a

16:36:13 16  fair reading of the statute, that is designed to prevent the

16:36:18 17  type of harm that allegedly occurred here.

16:36:22 18          Plaintiff's motion never addresses the Florida

16:36:24 19  standard.  It relies entirely on *Lohr* and the line of cases

16:36:28 20  that depend on *Lohr*.  And he cites cases that says the 510(k)

16:36:34 21  under *Lohr* is not intended to ensure safety.  But ensuring

16:36:38 22  safety is not the standard under the Florida statute.  It's

16:36:41 23  whether it was designed to prevent this kind of harm.

16:36:44 24          Finally, plaintiff cites two cases from Judge

16:36:47 25  Goodwin in West Virginia, the *Lewis* case and the *Edenfield*

16:36:49  1   case.  This is a single, Judge.  I will concede that those two

16:36:55  2   cases rule against the argument that we are urging here.  We

16:36:58  3   submit that they did not address the state standards that were

16:37:03  4   contained in the statutes at issue.  They only addressed *Lohr*

16:37:06  5   and assumed that the same standard in *Lohr* applied here.

16:37:09  6         We submit that they're incorrectly decided and we

16:37:13  7   therefore ask that you overrule the -- that you deny the

16:37:17  8   summary judgment based on the government regulations defense.

16:37:19  9   Thank you.

16:37:20  10         THE COURT:  Thank you, Mr. Jones.  Mr. Schultz.

16:37:27  11         MR. SCHULTZ:  Thank you, Your Honor.  Very briefly.

16:37:28  12   The fact that the Supreme Court's analysis of the 510(k)

16:37:33  13   process came up in a different legal posture, it remains the

16:37:38  14   Supreme Court's analysis and interpretation.  They said it in

16:37:41  15   '96.  They said it again in 2008.  We cite cases as recent as

16:37:47  16   2015.  In the *Zimmer NexGen* case, in short, the FDA's finding

16:37:51  17   of substantial equivalence as a matter of law is not a safety

16:37:55  18   determination.  Guidances are nonbinding.  Their experts have

16:37:59  19   testified that even the '99 guidance, that is a special

16:38:02  20   control for filters under the CFR is nonbinding.

16:38:06  21         This is not a safety process.  It's not a safety

16:38:08  22   statute.  It's not designed to ensure that these filters won't

16:38:12  23   hurt people.  That's not the purpose of the -- of the process.

16:38:15  24   There is a PMA process.  Ms. Reed Zaic cited to you the

16:38:20  25   federal regulation today.  I believe it was 807.60(l) or

16:38:25  1  67(l).  I probably got that wrong.  But Cook could have gone

16:38:29  2  through the PMA process, if they chose to.  They would have to

16:38:32  3  actually show safety and effectiveness in order to do that

16:38:35  4  through valid scientific evidence.  That's something they

16:38:38  5  didn't have to do in this process.  It's a choice they made.

16:38:40  6  If they had gone through PMA, they would probably have a very

16:38:44  7  strong government rules defense in this case.

16:38:46  8        And they take issue with the *Edenfield* case.  It's a

16:38:49  9  case, along with the Texas case, that rules in our favor and

16:38:54 10  they've not cited one that goes the other way.

16:38:57 11        One other point, Your Honor.  On the intervening

16:39:00 12  cause, the colitis duodenitis, those may be alternate causes.

16:39:09 13  I don't know if there's an issue of whether they could say,

16:39:10 14  look, the reason she -- Ms. Hill had pain or had inflammation

16:39:15 15  or what have you is not because of the filter.  It's because

16:39:18 16  of her pre-existing condition.  That's fine.  That's just an

16:39:20 17  argument that the filter didn't cause the problem.  That's not

16:39:23 18  a superseding intervening cause that would obliterate our

16:39:27 19  cause of action altogether.  It's a factual dispute.

16:39:31 20        Very different is hearing now for the first time

16:39:34 21  that it was Dr. Zuzga's decision to place the filter that is

16:39:37 22  the intervening cause.  Their papers say that it's her

16:39:40 23  anatomy.  That's clearly forbidden under the eggshell skull

16:39:43 24  rulings in Florida.  That Dr. Zuzga made the decision to place

16:39:47 25  the filter.  I just mentioned one of the dangers in this was

16:39:50  1  suggesting that.  They've abandoned that defense, Your Honor,

16:39:53  2  third-party liability.  They're not allowed to get up and tell

16:39:56  3  this jury or hint to the jury or suggest somehow that

16:40:00  4  Dr. Zuzga malpracticed and he never should have put this

16:40:04  5  filter in her.  They have the right to plead that and prove

16:40:07  6  that defense.  They didn't plead it properly.  We moved for

16:40:10  7  summary judgment and they conceded the propriety of summary

16:40:13  8  judgment on that.  So that argument should not be made in this

16:40:15  9  Court.

16:40:16  10         Last, Your Honor, migration is certainly a risk of

16:40:19  11  filter placement.  We've got clients throughout this

16:40:22  12  litigation who have migrations that occur in placement and

16:40:24  13  infection is a risk of every procedure.  Thank you, Your

16:40:24  14  Honor.

16:40:24  15         THE COURT:  All right.  Thank you.

16:40:36  16         MS. PIERSON:  Your Honor, we've got two more motions

16:40:38  17  on our list.  We're prepared to proceed with arguing those, if

16:40:42  18  you want us to, or maybe could we ask for a five-minute

16:40:45  19  stretch break, if you want to go forward.

16:40:48  20         THE COURT:  Why don't we take five minutes or so.

16:40:52  21         MS. PIERSON:  Thank you, Your Honor.

16:40:53  22         THE CLERK:  All rise.  Court is in recess.

16:41:16  23         (A break was taken at this time.)

16:49:44  24         THE CLERK:  All rise.  Court is in session.  Please

16:49:45  25  be seated.

16:49:46  1          THE COURT:  All right.  Plaintiff's Cisson motion

16:49:56  2  and then what else do I have here?  All right.

16:50:09  3          MR. SCHULTZ:  Thank you, Your Honor.

16:50:10  4          THE COURT:  Yes.

16:50:13  5          MR. SCHULTZ:  It's pretty straightforward.  It

16:50:14  6  piggybacks on some stuff we talked about more than once today.

16:50:19  7  Evidence of 510(k) clearance, the 4th Circuit, we quoted two

16:50:24  8  4th Circuit opinions early in the papers on this confirming

16:50:28  9  that it is of marginal relevance.  That it is potentially

16:50:32 10  misleading because it will suggest to the jury that safety and

16:50:37 11  effectiveness are, in fact, determined, when they are not

16:50:41 12  independently in the 510(k) process; and essentially just this

16:50:45 13  whole idea of a FDA seal of approval, and we cited some

16:50:48 14  testimony as an example from Dr. Harvey showing that's

16:50:54 15  precisely how Cook intends to use this evidence in the case.

16:50:58 16          I won't belabor what's in the motion.  It's not a

16:51:01 17  long motion.  The 4th Circuit has twice approved exclusion of

16:51:06 18  the evidence.  If you look  at the citations, I do think it's

16:51:12 19  useful, Your Honor, to take a moment and juxtapose.  At page 6

16:51:16 20  of the motion we have several cases like the ones I cited

16:51:19 21  earlier.  In fact, some of them are the same cases.  That

16:51:22 22  substantial equivalence is not a safety determination.  It's

16:51:24 23  not a safety statute, does not amount to a safety regulation.

16:51:29 24          On this particular issue of excluding 510(k), we've

16:51:33 25  got cases from the 4th Circuit, Southern District of Florida,

16:51:39  1   Southern District of West Virginia, Northern District of

16:51:43  2   Illinois, Middle District of Georgia holding that -- and these

16:51:46  3   quotes, I think, are appropriate, "510(k) compliance, even if

16:51:51  4   it satisfied the relevant standard, the substantial risk of

16:51:55  5   misleading the jury and wasting judicial resources by diving

16:51:59  6   into a morass of FDA regulations, none of which relate to the

16:52:03  7   state law claims at issue weighed heavily in favor of

16:52:07  8   exclusion."  That is from the *Cisson* case that was affirmed by

16:52:11  9   the 4th Circuit.

16:52:12  10         Again with the negligence claim, if you want to call

16:52:15  11  it negligent design, negligent failure to warn, whatever it

16:52:19  12  is, we're talking about the reasonableness of their conduct

16:52:21  13  with a consumer expectation claim.  We're talking about

16:52:24  14  whether the product performed as an ordinary consumer would

16:52:27  15  expect.  510(k) does not speak to either of those.  It doesn't

16:52:30  16  speak to the reasonableness of their conduct.  It doesn't

16:52:33  17  speak to what an expectation might be on the part of an

16:52:37  18  ordinary consumer; but a jury could easily believe that it

16:52:40  19  demonstrates safety and effectiveness.

16:52:43  20         We've cited other cases, language including the risk

16:52:45  21  of confusing and misleading the jury, the risk of misleading

16:52:49  22  the jury.  That's Southern District of Florida.  There's a

16:52:53  23  significant risk that jurors may be led to believe that the

16:52:56  24  510(k) clearance is equivalent to a finding of nonnegligent

16:53:01  25  design, which is an incorrect statement of the law.  That is

16:53:03  1    from the Northern District of Illinois in 2015.

16:53:07  2            Whether FDA cleared a device may be tangentially

16:53:12  3    relevant but that relevance is substantially outweighed by the

16:53:15  4    potential to confuse and mislead the jury.  That's out of the

16:53:18  5    Middle District of Georgia.  And when you compare those

16:53:21  6    statements that are included in our motion to the questioning

16:53:25  7    of Dr. Elisa Harvey, the premarket expert for Cook that

16:53:31  8    Ms. Pierson conducted during her deposition, you can see

16:53:34  9    precisely why these courts have the concerns that they have.

16:53:37 10            Ms. Pierson asked Dr. Harvey, for example, "Does the

16:53:40 11    510(k) process include a determination by FDA of safety and

16:53:44 12    effectiveness?  Answer, "So I think I've discussed that a lot

16:53:47 13    today.  I would say the answer to that is definitely yes."

16:53:50 14    And then she proceeds to explain the safety and effectiveness

16:53:55 15    determination.  Ms. Pierson asked her, "Does the 510(k)

16:53:58 16    process pose specific requirements on manufacturers that

16:54:01 17    safeguard consumer safety?"  We've just read a host of

16:54:06 18    decisions saying we know the process doesn't do that.  It's

16:54:08 19    not designed to do that and there's a danger the jury will

16:54:11 20    think it's going.

16:54:12 21            There's certainly a danger when these are the

16:54:14 22    questions that counsel intends to ask their 510(k) expert, and

16:54:18 23    Ms. Harvey does say yes, it provides safeguards to the

16:54:22 24    consumer.  Ms. Pierson asked her, "Has FDA made a

16:54:26 25    determination that the design of the product is safe and

16:54:29 1  effective for the public?"  The Supreme Court has answered

16:54:32 2  that question, Your Honor, and the answer is no.  Dr. Harvey

16:54:35 3  says the answer is yes.  "Based on your review of the record,"

16:54:39 4  Ms. Pierson asked, "how many times has FDA evaluated the

16:54:42 5  question of whether the risks of IVC filters are outweighed by

16:54:45 6  the benefits of IVC filters?"  After a long answer, the

16:54:50 7  summary response was, in many ways they're always evaluating

16:54:53 8  it.

16:54:53 9          They never evaluate that, Your Honor.  Risk benefit

16:54:56 10 analysis is not part of the 510(k) standard.  It's not part of

16:54:59 11 the 510(k) process.  It did not happen for the Celect filter.

16:55:02 12 And this is the testimony that this jury is going to hear if

16:55:07 13 510(k) is permitted into this trial.  Ms. Harvey says the FDA

16:55:11 14 has basically reinforced vena cava filters are a tool that

16:55:14 15 should be available to physicians and patients for situations

16:55:18 16 for the indication that has been cleared.  So this is a tool

16:55:21 17 for capturing clots and could be very useful for saving lives.

16:55:26 18         That is not a determination that the FDA makes when

16:55:28 19 they clear a filter.  This is exactly what the courts are

16:55:31 20 concerned about when they say that this is going to mislead

16:55:33 21 the jury into believing that there's already been an official

16:55:36 22 governmental decision that this device is safe and effective

16:55:40 23 when that's never happened.  The only decision that was made

16:55:43 24 is that it's as safe and effective as a Tulip, which was as

16:55:46 25 safe and effective as a vena tech and a Greenfield, which were

16:55:48  1   safe and effective all the way back before 1976.  There's no

16:55:52  2   PMA device in the Celect family tree.  There's no device on

16:55:56  3   which -- so essentially it is -- Dr. Kessler called it the

16:56:00  4   Xerox effect, this carbon copy effect.  It's as good a device

16:56:04  5   that went before it that was as good as one before that,

16:56:06  6   before that and calling it a Xerox because, of course, the

16:56:09  7   quality degrades over time when you keep copying the same

16:56:12  8   device.

16:56:13  9           The 4th Circuit also noted in *Husky* -- and this is

16:56:16 10   not 1996 *Lohr*.  This is about eight months ago in January of

16:56:20 11   this year.  They said that *Bard* in that case came back and

16:56:25 12   said yeah, but you know our process really was thorough and it

16:56:30 13   really was a safety ineffectiveness process, much like we

16:56:33 14   heard in the preemption argument here.  The 4th Circuit's

16:56:36 15   response to that was, this would only amplify the risk, as the

16:56:39 16   trial would then likely face a substantial diversion into just

16:56:43 17   on how rigorous those safety considerations were, how

16:56:45 18   forthcoming defendant was to the FDA, which is certainly an

16:56:47 19   issue here, and how robust the 510(k) process is.

16:56:52 20           So doctor -- excuse me, Judge Goodwin mentioned in a

16:56:58 21   post trial order in the -- one of the cases before him,

16:57:03 22   something that I think is important because this is -- he

16:57:07 23   ruled pretrial that it wasn't going to come in and then he

16:57:10 24   ruled post trial that he did not error in excluding it, and

16:57:13 25   the 4th Circuit affirmed him ultimately.  But in that post

16:57:17 1   trial order he says "Allowing 510(k) evidence would have

16:57:20 2   provoked the parties to engage in a time-consuming mini trial

16:57:24 3   on whether Bard, in fact, complied with its provisions.

16:57:26 4   Excluding 510(k) evidence avoided these risks and was

16:57:31 5   therefore proper under Rule 403.  Although Bard asserts that

16:57:34 6   such a mini trial would not have developed, the back and forth

16:57:37 7   on this issue both prior to and after trial has justified my

16:57:42 8   fears."

16:57:42 9           And this is a judge whose been through this process

16:57:45 10  several times now, Your Honor.  It's of marginal relevance.

16:57:50 11  It's -- we don't have to guess at how it's going to be

16:57:55 12  presented to the jury because Ms. Pierson favored us with

16:57:58 13  their presentation of it in Dr. Harvey's deposition for

16:58:02 14  reasons I don't understand but there it is; and that's exactly

16:58:05 15  what we seek to exclude in the case because it will mislead

16:58:08 16  the jury and it's going to lead to this mini trial issue that

16:58:10 17  every one of these courts talks about, off on a trial within a

16:58:15 18  trial on how important the process is.

16:58:19 19          And it's tough, Your Honor, these FDA experts who

16:58:22 20  say well, it's not part of the process but you have to know

16:58:25 21  how we really work.  Dr. Harvey almost testified, but she

16:58:29 22  wouldn't get quite there, that they really do a PMA review in

16:58:32 23  their 510(k) review.  She didn't work on the Celect clearance,

16:58:36 24  by the way, but she's speaking from general experience; and

16:58:39 25  she wouldn't go that far but she wouldn't say that their

16:58:42  1   review was only limited to what's actually set out in the

16:58:45  2   regulation.  Although that's what the evidence shows.  And I

16:58:48  3   asked her.  I said, "Can you show me any document

16:58:51  4   whatsoever" -- I believe that's a quote.  "Any document

16:58:54  5   whatsoever that shows that FDA determines safety or

16:58:57  6   effectiveness for the Celect filter."  And she said no, there

16:59:01  7   wouldn't be any such documents like that out of the 510(k)

16:59:05  8   process.  But then she gave the testimony that I just read in

16:59:07  9   her deposition.

16:59:08  10         We don't needs to lengthen the trial in order to

16:59:13  11  walk off into this distraction.  And it's one, Your Honor, and

16:59:17  12  we mentioned this in the papers, where we're hamstrung because

16:59:20  13  Cook can come in and say, so and so met with the FDA and

16:59:24  14  here's what that was all about.  And Mr. Heise can come in and

16:59:27  15  talk about all the conversations he had with FDA.  Well, we're

16:59:30  16  forbidden from taking discovery from the FDA.  So there's only

16:59:34  17  going to be one version of Cook and FDA interaction and that

16:59:37  18  will be Cook's version.  We have no way to challenge that

16:59:40  19  through traditional cross-examination or fact checking through

16:59:43  20  the agency because we're not allowed to take testimony of

16:59:45  21  them.

16:59:46  22         So there are a lot of reasons it's prejudicial to

16:59:48  23  us, Your Honor.  The trial is going to be long enough without

16:59:50  24  this evidence in; and it clearly will, I think, by calculation

16:59:56  25  end up misleading the jury as to the significance of the

16:59:59  1  process and what it really means for these filters.  Thank

17:00:02  2  you.

17:00:03  3         THE COURT:  Thank you, Mr. Schultz.  Mr. Jones.

17:00:11  4         MR. JONES:  Thank you, Your Honor.  To address one

17:00:17  5  point first.  If plaintiff is concerned about specific

17:00:19  6  questions to specific experts, I would submit that that is

17:00:23  7  appropriate for a motion in limine or appropriate for

17:00:26  8  objections at the time but it is not a reason for a blanket

17:00:30  9  prohibition of any discussion of the 510(k) clearance and

17:00:35 10  process that led to it.  It's simply a different level of --

17:00:38 11  there's an exclusion of an entire broad category of evidence

17:00:44 12  based on what apparently are a few questions to an expert.

17:00:49 13         The problem here, as like the problem with the

17:00:53 14  discussion of Florida statute Section 768.1256 that I just

17:00:59 15  made, is that plaintiffs are applying the wrong standards.

17:01:04 16  They're once again trying to apply the *Lohr* standard, the

17:01:07 17  absolute federal preemption test under the supremacy clause

17:01:10 18  and translate that into an evidentiary ruling.  The federal

17:01:16 19  standard in *Lohr* was whether Congress expressed a clear intent

17:01:20 20  to foreclose any state law cause of action.  It was an

17:01:23 21  all-or-nothing situation.  It's either preempted or it's not.

17:01:27 22         Here you're looking at Rule 401, which is arguably

17:01:30 23  the lowest threshold of any evidentiary rule.  Whether the

17:01:34 24  evidence has any tendency to make a fact of consequence to the

17:01:38 25  action more or less likely than it would be without the

17:01:40 1  evidence.  That's a standard that plaintiff never mentions at

17:01:44 2  all in their moving papers.

17:01:47 3          Nothing in *Lohr* or *Riegel* or any of the other cases

17:01:50 4  that plaintiffs cite suggest that the Supreme Court intended

17:01:55 5  strict analysis under federal preemption law to extend the

17:01:59 6  questions of relevance under the intentionally broad standard

17:02:03 7  of Rule 401.  Cisson and *Husky*, the cases -- 4th Circuit cases

17:02:09 8  on which plaintiff relies here, they just reflexively invoke

17:02:12 9  the result of the *Lohr* decision.  They don't address whether

17:02:14 10 the *Lohr* analysis was applicable to the much more generous

17:02:20 11 standards of relevance under the rules of evidence.  Cisson

17:02:22 12 and *Husky* did not apply.  The amendments to the FDCA, the new

17:02:27 13 FDA regulations and guidance, it didn't consider any of all

17:02:30 14 the things I talked about this morning.

17:02:31 15         Again, I recognize and respect your decision on the

17:02:34 16 preemption question.  This is a different question under a

17:02:36 17 different standard.

17:02:40 18         Cisson, *Husky* and the other cases plaintiffs cite

17:02:43 19 talk about whether the 510(k) process focuses on safety or

17:02:46 20 ensures safety.  But regardless of what the answer to that

17:02:51 21 question is, they don't state the standard for relevance under

17:02:55 22 Rule 401 and 402.  Evidence doesn't have to prove or defeat an

17:03:00 23 element of a claim all by itself in order to be relevant.  As

17:03:04 24 my law school professor used to say, a brick is not a wall.

17:03:07 25 All it has to do is help in one direction or another.

| | | |
|---|---|---|
| 17:03:10 | 1 | Evidence of the 510(k) process can be relevant to |
| 17:03:12 | 2 | the question of safety without establishing that the 510(k) |
| 17:03:16 | 3 | process ensures safety all by itself.  It merely needs to have |
| 17:03:21 | 4 | a tendency to prove that.  Plaintiff, as I said, never |
| 17:03:24 | 5 | addresses the standard of relevance.  Even assuming, for the |
| 17:03:28 | 6 | sake of argument, that Rule -- the 510(k) process did not |
| 17:03:33 | 7 | require proof of safety, and I realize Your Honor has ruled on |
| 17:03:37 | 8 | that, it is still -- what Cook did to meet that -- to meet |
| 17:03:43 | 9 | what it perceived as a requirement that the FDA was requiring |
| 17:03:45 | 10 | on it, the care it took, the conduct it engaged in, is |
| 17:03:49 | 11 | relevant to show that it demonstrated reasonable care. |
| 17:03:53 | 12 | The studies it did, the materials it submitted, the |
| 17:03:57 | 13 | questions that answered, the additional research that it did, |
| 17:04:00 | 14 | the changes it made to the labels and the IFU's based on what |
| 17:04:04 | 15 | the FDA told it to do, all that is evidence of the good |
| 17:04:08 | 16 | conduct of Cook, regardless of whether the FDA required it or |
| 17:04:13 | 17 | not.  It is relevant in that sense and it's not just a |
| 17:04:18 | 18 | marginal relevance.  It's a significant relevance because |
| 17:04:20 | 19 | plaintiffs are claiming here not only that we failed to |
| 17:04:23 | 20 | exercise reasonable care but that we engaged in gross |
| 17:04:26 | 21 | negligence, wanton conduct, all the punitive damage buzz |
| 17:04:30 | 22 | words. |
| 17:04:30 | 23 | What we actually did in response to the FDA's |
| 17:04:34 | 24 | request, regardless of whether or not the FDA was requiring |
| 17:04:38 | 25 | those or not, regardless of whether or not that determines |

17:04:41  1    safety nevertheless is relevant to the question of whether or

17:04:44  2    not we exercised reasonable care.

17:04:49  3         Turning to Rule 403.  The only prejudice that

17:04:52  4    plaintiffs cite from the admission of the 510(k) process in

17:04:55  5    their moving papers is the prejudice from the so-called mini

17:05:00  6    trials.  That admission of the evidence would produce because

17:05:08  7    and I quote, "plaintiff is forbidden to take evidence of FDA

17:05:12  8    to present a balance version of facts," which is the comment

17:05:16  9    which was just made there at the end.

17:05:19  10        Two things.  No. 1, the claim of prejudice rings

17:05:22  11   hollow because any prejudice or inability to call current FDA

17:05:27  12   employees would be to Cook, not to plaintiff.  Any current FDA

17:05:32  13   employee would confirm the FDA's extensive safety review

17:05:35  14   either generally or in the context of the Tulip and Celect

17:05:39  15   specifically.  So the prejudice, if any, from not being able

17:05:42  16   to call the FDA is to Cook and not to plaintiffs.

17:05:45  17        Second.  As was mentioned this morning, plaintiff

17:05:49  18   has retained the former commissioner of the FDA as their

17:05:55  19   retained expert.  I submit that -- and we haven't.  I submit

17:06:00  20   that a large portion of any lack of evidence of FDA practices,

17:06:05  21   procedures, whatever, can be cured by the testimony of

17:06:09  22   Dr. Kessler on those subjects.

17:06:12  23        Second.  The danger of a mini trial on the 510(k)

17:06:16  24   issue in this case is, I would submit, overblown.  The Court

17:06:20  25   can control the trial before it.  It can limit excessive or

17:06:24  1   cumulative testimony, testimony that spins too far away from

17:06:26  2   the central issues of the case.  I'm confident that it will do

17:06:30  3   so.

17:06:31  4           Also the safety issues that arise in the 510(k)

17:06:34  5   process are going to arise in other contexts as well in the

17:06:38  6   course of the trial on both sides.  A description of how they

17:06:42  7   were treated as part of the 510(k) process will add little to

17:06:46  8   the length or the complexity of the trial as result of that.

17:06:50  9           As the extensive declarations and evidence submitted

17:06:52 10   with our preemption motion would show, we expended a

17:06:58 11   tremendous amount of effort over four or five years to develop

17:07:00 12   documents and submit the proof that FDA requested for the

17:07:05 13   Tulip and for the Celect.  That is evidence of our standard of

17:07:08 14   care.

17:07:08 15           Finally, the exclusion would prejudice Cook.  As

17:07:14 16   noted in our responsive papers, jurors today know how heavily

17:07:19 17   regulated everything is; and if they don't hear about the

17:07:22 18   510(k) process, they can only wonder why didn't FDA step in,

17:07:27 19   why wasn't there some kind of clearance process here, what is

17:07:30 20   the FDA doing.  You cannot fairly remove the design and

17:07:35 21   development of the Tulip and the Celect, which is what

17:07:39 22   plaintiffs have said their case is about, from the 510(k)

17:07:42 23   process that was -- that it was intended to fulfill.

17:07:47 24           Finally, plaintiffs want the evidence of the 510(k)

17:07:51 25   process out but they still want to preserve their own right to

17:07:55  1   present evidence of Cook's postmarket FDA related conduct

17:07:58  2   concerning surveillance, adulteration, misbranding, that sort

17:08:02  3   of thing; and to criticize what Cook told the FDA in the

17:08:05  4   process of the 510(k).  At the very least, we submit that the

17:08:09  5   Court can't go half and half on this.  The Court should not

17:08:15  6   permit the plaintiffs to spend time criticizing what

17:08:19  7   documentation and what evidence and what information Cook

17:08:23  8   submitted to FDA as part of the 510(k) process and yet deny us

17:08:28  9   the chance to tell the other side of the story.  It's got to

17:08:33 10   be sauce for the goose and sauce for the gander however the

17:08:36 11   Court decides this issue.

17:08:40 12             That's all I have, Your Honor, unless you have

17:08:42 13   questions.  Thank you.

17:08:43 14             THE COURT:  Thank you, Mr. Jones.  Mr. Schultz.

17:08:51 15             MR. SCHULTZ:  Yes, Your Honor.  On the *Lohr* point, I

17:08:53 16   should have pointed out in my argument the device at issue in

17:08:57 17   *Husky* eight months ago was a post SMDA, a 2003 cleared device.

17:09:02 18   This is not a stretching of a 20-year-old case under a

17:09:06 19   different legal standard.  The 4th Circuit was dealing with

17:09:08 20   the issue that's before this Court and it was not the issue of

17:09:12 21   whether postmarket ought to come in or not come in.  It wasn't

17:09:15 22   the issue of preemption.  It was the issue of whether 510(k)

17:09:18 23   should come in.  That's what we've asked to have excluded.

17:09:21 24             We are not suggesting, Your Honor, that we get to

17:09:22 25   put in whatever we want about 510(k) with Dr. Kessler and then

17:09:25  1  they don't get to talk about it.  If the 510(k) process is

17:09:29  2  out, then it's out.  Dr. Kessler is not going to testify about

17:09:31  3  it.  His opinions about adulteration and misbranding are

17:09:35  4  certainly still relevant to the case for all the reasons that

17:09:38  5  have been discussed here today.  But we're not suggesting, of

17:09:41  6  course, that we get to put in 510(k) and they they don't get

17:09:44  7  to respond to it.

17:09:47  8          The argument that the prejudice of not being able to

17:09:51  9  cross-examine Cook -- excuse me, FDA officials only prejudices

17:09:57 10  them couldn't be more wrong, Your Honor.  Matt Krueger is the

17:10:00 11  person at FDA who wrote Cook, just before clearance,

17:10:04 12  specifically asking were there perforations in the study.

17:10:07 13  Cook came back and said well, because this was not really a

17:10:12 14  retrieval study, we're not going to talk about the

17:10:14 15  preretrieval images.  Well, the preretrieval images are where

17:10:17 16  all the perforations were discovered; and so they concealed

17:10:20 17  the perforations, told the FDA outright there were no

17:10:23 18  perforations.  I would love to have Matt Krueger and ask him

17:10:26 19  how that might affect his recommendation of whether to clear

17:10:28 20  the device.  We already know FDA refused to clear it because

17:10:29 21  what it saw is six perforations out of 40 sheep, ten

17:10:34 22  perforations out of 58 human beings I suspect would have

17:10:37 23  brought about the same result and that is no clearance.

17:10:40 24          We would love to do that, judge, but we can't; and

17:10:42 25  it's not fair for Cook to get to put on their version of what

17:10:45  1  happened with FDA and tout how the FDA put its seal of

17:10:51  2  approval on this filter and deemed it safe and effective and

17:10:53  3  it saves lives, when none of those determinations are actually

17:10:57  4  made in the process.  And Cook concealed information in order

17:11:00  5  to get the thing cleared.  It's exactly the situation that's

17:11:03  6  described in the Cisson case, and exactly the same battle of

17:11:07  7  experts that they talk about in those quotes that are in our

17:11:10  8  brief motion.

17:11:11  9          So the prejudice is to us and that is not the only

17:11:14 10  prejudice we argued.  The greatest prejudice -- I mean, we can

17:11:17 11  camp out in Evansville for an extra week, if that's what it

17:11:22 12  takes to deal with all of this evidence; and we are talking

17:11:24 13  about thousands of pages of evidence for the 510(k)'s.

17:11:27 14          THE COURT:  It's spring break.  I can understand you

17:11:29 15  want to stay here for another week but we won't make it.

17:11:35 16          MR. SCHULTZ:  Well, judge, time -- we're lawyers.

17:11:38 17  We're going to do what we need to get the case tried.  And if

17:11:40 18  you rule that it's in, we'll deal with it.  But that is not

17:11:43 19  the primary prejudice.  It is certainly a big concern for the

17:11:47 20  jury and to the Court.  The biggest prejudice to us is the

17:11:49 21  misimpression that it creates precisely through the examples

17:11:53 22  that I cited.  There are far more.  It's very clear Cook is

17:11:57 23  going to use those to create in the mind of the jury this

17:11:59 24  notion that FDA has determined safety and effectiveness in a

17:12:03 25  PMA style.  Well, they could have gotten that if they applied

17:12:06  1   for a PMA and they didn't.  And 510(k) should be excluded for

17:12:10  2   that reason, Your Honor.

17:12:12  3              THE COURT:  Thank you.

17:12:12  4              MR. JONES:  One point.

17:12:15  5              MR. SCHULTZ:  I'm sorry, judge.  Sorry.  I don't

17:12:18  6   want to be inappropriate.  We talked about witnesses today in

17:12:22  7   our witness list.  Some of the decisions obviously on the

17:12:26  8   summary judgment, this decision in particular, it's very hard

17:12:28  9   for us to know witnesses we will call.  If Dr. Kessler is not

17:12:32 10   allowed to talk about Cook documents, well then our witness

17:12:35 11   lists get a lot longer.  If 510(k) is out, it gets shorter and

17:12:40 12   so on.  I point that out because I know it's an issue of

17:12:43 13   concern for the Court that we get the witnesses sorted out.

17:12:47 14   Thank you.

17:12:47 15              MR. JONES:  One piece of context I wanted to give

17:12:51 16   the Court.  It appears that Mr. Schultz essentially kind of

17:12:55 17   gave with one hand and took away with the other.  He

17:12:59 18   acknowledged that if we're forbidden from talking about 510(k)

17:13:02 19   process, so is Dr. Kessler.  But then he went on to say well,

17:13:06 20   Dr. Kessler can still talk about adulteration and misbranding.

17:13:11 21              The Court should be aware that Dr. Kessler was

17:13:14 22   deposed shortly after the Court granted the motion to dismiss

17:13:17 23   the negligence per se claim which was based specifically on

17:13:20 24   the FDA regulations.  At his deposition, he suddenly shifted

17:13:27 25   all of his FDA opinions to redefine them as industry

17:13:33  1   standards, which he hadn't mentioned at all in his report.  He

17:13:36  2   says that well, yes, the industry standards are essentially

17:13:39  3   defined by the FDA regulations.  So they're still -- violation

17:13:43  4   of industry standards is what I'm concerned about here.

17:13:46  5   Again, he didn't put that in his report.

17:13:48  6           What I'm concerned about is that if you foreclose us

17:13:53  7   and the plaintiffs from talking about FDA regulations and the

17:13:56  8   510(k) process specifically, plaintiffs will simply try to

17:14:00  9   shift all that to industry standards; and then we will have to

17:14:04 10   come back and say well, if the industry standard was to follow

17:14:07 11   the FDA regulations and the FDA processes, then we've got to

17:14:10 12   be able to bring in all the information about the 510(k)

17:14:14 13   process because that demonstrates that we were complying with

17:14:17 14   industry standards.  I just want to raise that now.  We've got

17:14:21 15   a separate motion in limine addressing that issue of

17:14:24 16   Dr. Kessler extending his testimony from his report, but I

17:14:28 17   wanted to alert the Court to it because it does relate to the

17:14:31 18   ruling in this issue.  Thank you.

17:14:33 19           THE COURT:  Thank you.  Regarding the motion filed

17:14:46 20   by the plaintiffs regarding the 510(k), the Court will grant

17:14:52 21   that motion.  I find they raise some relevance to it, some

17:14:59 22   contextual to it but I believe any relevance is substantially

17:15:03 23   outweighed by the risk of prejudice here.  Mr. Jones, you were

17:15:11 24   very earnest in your argument here but it's hard for a

17:15:15 25   District Court to tell the Supreme Court that I'm not going to

17:15:19  1   follow what their precedent is.  And it seems that *Lohr* is

17:15:23  2   pretty strong precedent in this area and the 4th Circuit has

17:15:28  3   followed that, and I believe the 7th Circuit would follow that

17:15:32  4   as well.  So 510(k) evidence won't come in.

17:15:39  5           And just as a personal aside here.  All these cases,

17:15:45  6   judges are always educated in some fashion about industries or

17:15:51  7   products, patents, process, that type of thing.  When I

17:15:57  8   started digging into this case and trying to learn a little

17:16:00  9   bit about it, I didn't know the difference between a PMA and a

17:16:06 10   510(k).  Just assumed that if it's going in front of the FDA,

17:16:11 11   it's all safety related; but it appears not.  That's not the

17:16:16 12   case.

17:16:17 13           A PMA, of course, signs off on safety but then

17:16:24 14   subsequent to that, if a new product comes out, it just seems

17:16:28 15   to me is there product equivalent to what we signed off before

17:16:31 16   and that's all they're doing.  So I think the confusion there,

17:16:36 17   I initially assumed that that was all safety related but it's

17:16:42 18   not.  And so I think the risk of misleading the jury and

17:16:47 19   causing jury confusion bringing in 510(k) evidence would cause

17:16:53 20   that -- cause that problem for the jury.  So we'll grant that

17:16:58 21   motion.

17:16:59 22           MS. PIERSON:  Your Honor, just one clarifying point.

17:17:01 23   We obviously heard exactly what you previously -- exactly what

17:17:05 24   you just said.  But as that ruling applies to Dr. Kessler's

17:17:10 25   testimony --

17:17:11  1          THE COURT:  Dr. Kessler will be to testify what is

17:17:13  2    in his report.

17:17:18  3          MS. PIERSON:  Thank you.  His report overlaps these

17:17:20  4    areas.  It's lengthy enough that in order to be sure that he

17:17:24  5    complies with your ruling, I think we're really going to need

17:17:27  6    to work carefully, and Matt and I will work closely to do

17:17:30  7    that.  But we may be back to you with an issue as to what

17:17:34  8    parts of his report are prohibited by the ruling that you just

17:17:37  9    made as well, because there are parts of it that will be

17:17:40 10    affected by it.  So he's an important enough witness that --

17:17:46 11          THE COURT:  I think that's right.  Try to work it

17:17:47 12    out.  If you can't, then I'll try to assist in that.  But he

17:17:53 13    submitted a report.  If it goes into the 510(k) process, then

17:17:57 14    more than likely it's not going to come in.  I'm not going to

17:18:02 15    let a little bit of testimony dribble in here and little bit

17:18:06 16    dribble in there.  That would cause more confusion because

17:18:09 17    they're going to start saying -- the jurors are going to start

17:18:10 18    well, what is this?  What are we talking about here?  Can we

17:18:13 19    have more information on this?

17:18:14 20          MS. PIERSON:  Agreed.  Thank you, Your Honor.

17:18:19 21          THE COURT:  What else do we have?  Is that it?

17:18:24 22          MR. TANNER:  I think the last is the bifurcation.

17:18:29 23          THE COURT:  Sure.  Briefly.  I appreciate you all

17:18:31 24    sticking to the ten-minute rule today.

17:18:35 25          MR. TANNER:  Is that directed directly at me, Your

17:18:37  1   Honor?

17:18:37  2           THE COURT:  No; everybody.

17:18:41  3           MR. TANNER:  Thank you, Your Honor.  If Your Honor

17:18:42  4   does not grant summary judgment, we've then -- on the punitive

17:18:46  5   damages, we asked that issue be bifurcated.  As the Court

17:18:50  6   knows, bifurcation is an important tool to ensure not only

17:18:53  7   fairness to both parties and a reduction of prejudice but also

17:18:57  8   judicial economy.  And courts have used that, obviously,

17:19:00  9   throughout the United States where they bifurcated punitive

17:19:03 10   damages from the compensatory case; and that's especially true

17:19:08 11   en masse towards where an MDL situation like we have here.

17:19:12 12           I mean, even the manual of complex litigation says

17:19:16 13   in most cases, the issue of punitive damages is bifurcated and

17:19:20 14   there's lots of reasons for that.  Of particular importance is

17:19:24 15   it reduces the number of issues on appeal in a Bellwether

17:19:28 16   situation, which we are in here.  It also reduces the risk of

17:19:32 17   clouding the results and thereby diluting the usefulness of a

17:19:37 18   decision in a Bellwether trial.

17:19:39 19           We want to know liability and damages without it

17:19:44 20   being clouded by evidence coming in on that part of the case

17:19:47 21   dealing with punitive damages so that we can then address and

17:19:51 22   understand the real value of the Bellwether trial.  As you

17:19:56 23   know, 42(b) allows this bifurcation under the rules.  Courts

17:20:00 24   have routinely invoked it.  Plaintiffs commented that we

17:20:04 25   didn't cite cases dealing with punitive damages.  That's not

| | | |
|---|---|---|
| 17:20:08 | 1 | the case.  We cited several cases.  There's like 14 of them |
| 17:20:09 | 2 | listed here.  We have lots of cases on that.  We cited the |
| 17:20:13 | 3 | *Scheffler* case which says, bifurcating punitive damages is |
| 17:20:17 | 4 | conducive to judicial economy, simplifies complex cases like |
| 17:20:21 | 5 | we have here, and reduces the prejudice by deferring evidence |
| 17:20:27 | 6 | whose probative value is only tied to punitive damages. |
| 17:20:32 | 7 | Plaintiff cites some cases where they say well, look |
| 17:20:34 | 8 | they didn't bifurcate in these cases; but if you read those |
| 17:20:39 | 9 | cases you understand, well of course they didn't.  Those are |
| 17:20:39 | 10 | cases such as an insurance bad faith case, where compensatory |
| 17:20:43 | 11 | damages elements were bad faith and the same types of things |
| 17:20:47 | 12 | you would have in punitive damages.  Of course, those were |
| 17:20:51 | 13 | tried together but that's not the case here. |
| 17:20:53 | 14 | The case here talks about a mass tort, a Bellwether |
| 17:20:57 | 15 | case where you have punitives and in our estimation, |
| 17:21:00 | 16 | questionable punitive damages.  It will potentially shorten |
| 17:21:05 | 17 | the trial, not lengthen the trial.  Obviously, if no liability |
| 17:21:09 | 18 | is found in the compensatory section, you won't have openings |
| 17:21:13 | 19 | and closings and arguments on punitive damages.  You won't |
| 17:21:16 | 20 | have witnesses and exhibits on punitive damages.  We won't |
| 17:21:18 | 21 | have fights over evidence of punitive damages, related |
| 17:21:22 | 22 | evidence in the case. |
| 17:21:24 | 23 | Even if compensatory liability is found, there's no |
| 17:21:27 | 24 | reason we have to delay.  The same jury will be hearing the |
| 17:21:31 | 25 | case, just in a Phase 2.  We can start Phase 2 right away and |

17:21:35  1   there won't be a need to repeat the evidence.

17:21:38  2          If we bifurcate, you don't need to decide the

17:21:41  3   complex choice of law question that is before you, and we can

17:21:45  4   talk about it, if you'd like to talk about that now or if you

17:21:47  5   want to defer that to a later discussion; but you won't need

17:21:50  6   to even address that.  And importantly, bifurcation avoids a

17:21:54  7   retrial of this entire case.  As you know, this is an

17:21:57  8   important case to both parties.  It's important that we get it

17:22:00  9   right with the choice of law issue and the evidence issues on

17:22:06  10  punitive damages.  And we cited the *Smith v. I-Flow* case which

17:22:09  11  addresses this very issue and says look, if you don't

17:22:13  12  bifurcate the case, the -- and somebody would win on appeal on

17:22:18  13  issues like choice of law and the evidence on punitive

17:22:21  14  damages, you're then coming back and retrying the whole case.

17:22:26  15  Bifurcation solves that, in which case if there is an appeal,

17:22:28  16  we would be successful on appeal, then we can try just a

17:22:32  17  portion of the case that's effective.

17:22:34  18         Now, the plaintiff's position, as I understand it is

17:22:37  19  look, a limiting instruction, it's a cure-all.  It will take

17:22:40  20  care of this and we simply disagree.  A limiting instruction

17:22:43  21  cannot cure the choice of law issue.  A limiting instruction

17:22:47  22  cannot cure the admission of evidence.  The plaintiff's goal

17:22:50  23  here, as we've seen and is clear and it's the traditional way

17:22:54  24  that plaintiffs try these mass tort cases, is you put the bad

17:22:58  25  company case on trial.  You put -- you say there's a risky

17:23:01  1   product, the company doesn't care, it's a bad company.  Jury,

17:23:05  2   man, you've got to fix this.  You're the ones that have to

17:23:08  3   address that.

17:23:09  4          And they want punitive damages to be tried at the

17:23:12  5   same time as their compensatory case because that's the only

17:23:15  6   way they can get that evidence of the bad company evidence in

17:23:20  7   trial.  It's because the conduct that they want to put before

17:23:24  8   the jury and the character evidence of Cook isn't tied to any

17:23:27  9   of their other causes of action.  And we've talked ad nauseam

17:23:32 10   about the fact there is no general negligence cause of action

17:23:34 11   here.  There's no negligent duty to train, negligence dealing

17:23:38 12   with testing, reporting, sharing of information with the

17:23:45 13   Australian registry, subsequent remedial measures.  We've

17:23:49 14   talked about all those cases.  There's even a 2017 case we

17:23:52 15   cite, the *Minx* case which makes it clear that there's no duty

17:23:55 16   to train.  Makes it clear there's no duty to report.  Also the

17:23:59 17   *Smith* case.

17:24:02 18          Those cases say have to be tied to a defect; a

17:24:05 19   defect in the design or a defect in the warnings.  And you

17:24:09 20   can't say that negligence is subsumed by those and then get

17:24:15 21   the same cause of action by simply calling it a general

17:24:19 22   negligent cause of action.  It simply doesn't exist.  There is

17:24:22 23   no general cause of action for that.

17:24:24 24          So evidence that they want to talk about, documents

17:24:29 25   postdating Mrs. Hill, unrelated products, dealings with

17:24:33  1    foreign authorities, subsequent remedial measures, they're not

17:24:38  2    tied to their strict liability defect claim, which is their

17:24:42  3    only defect claim left, and their negligent failure to warn

17:24:45  4    claim; because in those you have to prove a defect, design or

17:24:49  5    warning, causation and damages.

17:24:51  6          The only way they get that evidence in is -- again

17:24:56  7    this general negligence claim, which doesn't exist under

17:24:59  8    Florida law or punitive damages.  And with no disrespect, I

17:25:02  9    would say you can't really game the system that way to infect

17:25:09 10    the jury, so to speak, with this punitive evidence that should

17:25:12 11    never come in in front of that jury until there's been a

17:25:15 12    finding of liability first.

17:25:20 13          We cited the *Vandersteen* case, which made it very

17:25:23 14    clear that the effectiveness of this limiting instruction --

17:25:27 15    and quite frankly, I'm not sure how this would work, how we

17:25:31 16    would tell the jury look, you're going to hear a bunch of

17:25:33 17    evidence about this topic A.  You're going to hear evidence B.

17:25:37 18    A is going to relate to only issue Y.  B is going to relate to

17:25:43 19    only issue Z.  We're not going to say this is A evidence and

17:25:48 20    this is B evidence.  You're not really going to be able to

17:25:50 21    tell what goes to which.  We'll give you a limiting

17:25:54 22    instruction.

17:25:54 23          But the Court in *Vandersteen* made it very clear.  It

17:25:56 24    said, "To be sure, the Court could instruct the jury to

17:26:00 25    consider evidence only as to punitive damages claim and we

17:26:04  1   presume the jury would endeavor to follow that instruction.

17:26:07  2   But we see no reason to take that -- excuse me, take the risk

17:26:12  3   that a jury would fail to do so at the cost of judicial

17:26:15  4   efficiency if bifurcation is minimal."  And that's the case

17:26:19  5   here.  There's simply no reason to take that risk.

17:26:24  6            Now, the plaintiffs say we can be prejudiced and the

17:26:27  7   prejudice they point to is time and expense.  Well, we haven't

17:26:31  8   seen evidence of that and we just don't think that's true.

17:26:34  9   But, Your Honor, there's ways we can handle the time and

17:26:37 10   expense.  We can move quickly.  We can move right into Phase

17:26:41 11   2.  We can handle that.  We can't handle an undue prejudice

17:26:46 12   that would come from throwing all of this bad case, so to

17:26:49 13   speak, information in their case in chief.  Plus all the

17:26:53 14   issues of necessary confusion with two state laws, two

17:26:56 15   standards, two purposes, things you've all heard before in

17:26:59 16   these type of normal cases that come up with bifurcation,

17:27:02 17   setting aside the fact that we're a Bellwether case.

17:27:06 18            Another issue that's particularly important here,

17:27:08 19   Your Honor, is the financial information.  And Your Honor has

17:27:11 20   ruled and Judge Baker has ruled that they weren't entitled to

17:27:14 21   detailed additional financial information of these companies.

17:27:19 22   It's because, as Judge Baker found, this is highly

17:27:23 23   confidential for this private, closely held corporation.

17:27:27 24   There's simply no need to disclose that information until

17:27:30 25   there has been a liability on compensatory damages claim that

17:27:35  1  has been found in a punitive damages stage.

17:27:39  2          Getting that information can't be unrung if it comes

17:27:42  3  in at the liability stage.  It should be done later.  And it's

17:27:46  4  complicated here because we have three defendants.  And so

17:27:49  5  what if there's liability found against one defendant that

17:27:53  6  goes to punitive damages stage but the jury has already heard

17:27:56  7  all this financial information about three defendants that all

17:28:00  8  have the name Cook in them.  How are you going to undo and

17:28:04  9  unring that bell and sort out that confusion?  Again, the

17:28:08 10  solution is bifurcation.

17:28:11 11          Again, I mention the choice of law issue.  But

17:28:14 12  again, we don't have to get into that choice of law issue.

17:28:17 13  There's no reason to get to that.  There's no reason to risk

17:28:20 14  appeal.  There's no reason to cloud the findings of the

17:28:22 15  Bellwether when you can bifurcate.  Again, we think that

17:28:26 16  they're going to put on the bad company case and hope the jury

17:28:29 17  awards them compensatory damages, but this evidence is not

17:28:34 18  tied to Mrs. Hill.  It's not tied to the burden of proof.

17:28:36 19  It's not tied to the actual elements.

17:28:38 20          Instead, bifurcation is a tool that the Court can

17:28:42 21  use as its gatekeeper function and we would respectfully

17:28:46 22  submit in this Bellwether trial it's particularly important

17:28:49 23  that you invoke that tool here, Your Honor.  So we'd move that

17:28:53 24  this case be bifurcated; punitive damages be held second with

17:28:58 25  the same jury.  Thank you.

17:29:03   1          THE COURT:  Mr. Schultz.

17:29:05   2          MR. SCHULTZ:  Thank you, Your Honor.  The defendants

17:29:08   3  mentioned in their reply that plaintiff said plaintiffs

17:29:13   4  suggest that bifurcation of punitive damages is a novel

17:29:16   5  concept invented by the Cook defendants; and that's not our

17:29:19   6  position at all, Judge.  What we've suggested is the type of

17:29:22   7  bifurcation they're suggesting is quite novel; and of the 14

17:29:26   8  or so cases that Mr. Tanner alluded to, I, in our response on

17:29:32   9  this issue, footnote 3, went through every one of their cases.

17:29:37  10  And in all of those cases but for a couple, there was

17:29:41  11  bifurcation.

17:29:42  12          The same we do in Florida for the tobacco cases.  We

17:29:45  13  put in entitlement evidence, along with the compensatory

17:29:48  14  evidence and we then do have a separate amount phase, because

17:29:52  15  the jury shouldn't be hearing Phillip Morris is worth $25

17:29:57  16  billion because, of course, that could cloud their judgment on

17:29:59  17  compensatory liability.

17:30:01  18          So what we're suggesting is this idea of bifurcating

17:30:06  19  both entitlement and amount from compensatory is what's novel.

17:30:11  20  It's unique.  In fact, of all the 14 cases they cited, only

17:30:15  21  one actually bifurcated that way.  That was a pollution case.

17:30:18  22  The *Scheffler* case that Mr. Tanner referred to, the trial

17:30:22  23  court bifurcated all punitive issues as well but said there

17:30:26  24  was no overlap of issues in the case.  And that's the real

17:30:29  25  distinction that matters.  The -- I'm not quite following the

17:30:34  1  argument that there's this whole body of punitive damage only

17:30:38  2  evidence.  When we talked about limiting instruction, we were

17:30:41  3  talking particularly about amount, financials.  And the jury

17:30:48  4  is going to hear the evidence.

17:30:50  5          TGA was mentioned.  TGA is a process where

17:30:55  6  Therapeutic Goods Administration, which is the Australian FDA,

17:30:57  7  came to Cook and said, we want to know your perforation rates.

17:31:00  8  And Cook went and did an investigation Celect versus Tulip and

17:31:05  9  discovered -- or formally acknowledged internally that Celect

17:31:09 10  had a vastly higher perforation rate.  They thought well,

17:31:13 11  maybe we can tell them it's not statistically significant.  So

17:31:17 12  let's run it by the statisticians.  Well, they did and it

17:31:19 13  turned out it was statistically significant.  So then they

17:31:22 14  came up with some other reasons why they would say, here it

17:31:25 15  is.  We'll give you the numbers but here's why they don't

17:31:27 16  matter.

17:31:28 17          That is evidence of negligence, Your Honor.  That is

17:31:30 18  evidence of a -- not a reasonably careful company.  It is

17:31:35 19  evidence that is relevant because it's knowledge on their part

17:31:38 20  of the problem they had that they failed to disclose to a

17:31:43 21  doctor who said he would like to know things and might change

17:31:46 22  his choice of filter if he were told things like that.  All of

17:31:48 23  this evidence ties directly to Ms. Hill.  There is the nexus

17:31:51 24  that is required under the law.

17:31:53 25          So just as in our tobacco cases, Judge, the jury

17:31:56  1  hears the evidence.  They're going to decide whether that

17:31:59  2  constitutes negligence.  They're going to decide whether that

17:32:00  3  satifies the strict liability standard.  And then they're

17:32:03  4  going to be asked whether by clear and convincing evidence it

17:32:06  5  is so reprehensible that it amounts to or warrants imposition

17:32:12  6  of punitive damages.  If they check yes on that box, which

17:32:15  7  will be the last question on the verdict form, then we come

17:32:18  8  back for a Phase 2.

17:32:20  9          I can't imagine it would be a whole lot different

17:32:22  10  here in our cases.  The tobacco companies will bring down a

17:32:25  11  vice president to talk about how they're new and different and

17:32:27  12  changed, and the FDA has got a stringhold on them and they're

17:32:31  13  not the same company.  And we cross-examine them.  We put in

17:32:34  14  the financial evidence at that point and then the jury gets

17:32:36  15  one question verdict.

17:32:38  16          So this idea that somehow there's this body of

17:32:41  17  evidence, I just haven't heard what it is that somehow is

17:32:44  18  relevant only to punitives.  It has nothing to do with the

17:32:47  19  negligence or strict liability claim.  All of this goes to

17:32:50  20  knowledge.  Subsequent remedial measures.  Ms. Hill's injury

17:32:54  21  was in August of 2013.  There are no subsequent remedial

17:32:58  22  measures until after the event that gives rise to the injury.

17:33:01  23  The federal rules were amended in 2003 or something like that.

17:33:05  24  So the only subsequent remedial measure evidence that might

17:33:07  25  come in this case is after 2013.  And sitting here, I can't

17:33:11  1   think of any off the top of my head.  There's not just a body

17:33:14  2   of evidence that's relevant to showing their knowledge and

17:33:19  3   their unreasonableness in the face of that knowledge and their

17:33:23  4   failure to convey that knowledge and in fact, their active

17:33:26  5   concealment of that knowledge, all of which goes to liability

17:33:27  6   under the underlying compensatory tort claims.

17:33:31  7        And the jury then is going to decide was it so bad?

17:33:33  8   Is it negligence that is gross?  Is it negligence that is also

17:33:36  9   wanton?  Does the meet that punitive damage standard?  So I

17:33:39  10  think I can speak for the plaintiff that we're fine

17:33:42  11  bifurcating but the bifurcation, Your Honor, should be -- and

17:33:45  12  this is -- I'll point out and I'll be done in 30 seconds.

17:33:50  13       The *Phillip Morris v. Williams* case, which has an

17:33:55  14  impact on jury instructions because the jury can determine

17:33:59  15  entitlement by princibility based on the prospect of harm to

17:34:02  16  nonparties, but they can only punish for harm that was visited

17:34:05  17  on the plaintiff themselves.  But the *Phillip Morris* case,

17:34:07  18  U.S. Supreme Court, said evidence of actual harm to

17:34:16  19  nonparties --

17:34:17  20       THE COURT:  Slow down.

17:34:17  21       MR. SCHULTZ:  Sorry.  I was reading.  Evidence of

17:34:17  22  actual harm to nonparties can help show that the conduct that

17:34:19  23  harmed the plaintiff also posed a substantial risk of harm to

17:34:24  24  the general public and so was particularly reprehensible.

17:34:27  25  That's 549 U.S. 346 at 355.  They held a page earlier -- or

17:34:36 1    noted a page earlier, potential harm is relevant to

17:34:39 2    establishing punitive damages as long as it "was harm

17:34:42 3    potentially caused by the plaintiff."

17:34:44 4           So there is complete overlap, as this Court

17:34:47 5    recognized when it denied bifurcation the first time around.

17:34:50 6    There's not this separate body of evidence that we have to say

17:34:53 7    this only relates to this or that.  The jury is going to see

17:34:57 8    the conduct -- the misconduct that led to the harm in this

17:34:59 9    case, and they are going to decide whether that conduct rises

17:35:03 10   to the level of punitive damages by a clear and convincing

17:35:08 11   standard and then we can have a second phase.

17:35:10 12          We even instruct the jury in Florida it's expected

17:35:13 13   to take no more than day so they don't think they're coming

17:35:17 14   back for another three-week trial, when they're making

17:35:20 15   decision on compensatory liability.  And we would suggest

17:35:20 16   that's what should happen here, and that is the type of

17:35:26 17   bifurcation that happened in 12 of the 14 cases that are cited

17:35:29 18   in their papers.

17:35:30 19          THE COURT:  Thank you.

17:35:31 20          MR. SCHULTZ:  Thank you.

17:35:31 21          MR. TANNER:  Just briefly, Your Honor.  First of

17:35:35 22   all, we disagree on the cases.  You can read the cases.  We'll

17:35:38 23   figure that out.  But he made our case for us.  He said he's

17:35:42 24   going to put in all this bad company evidence.  He's going to

17:35:45 25   talk about issues dealing with what we knew when we designed

17:35:49  1   the case -- or the product, etcetera.  They don't have a

17:35:53  2   negligent design element in this case.  They have a strict

17:35:56  3   liability design, yet they want to put in bad company evidence

17:35:59  4   about that.  That's exactly why it needs to be excluded.

17:36:02  5   That's exactly why it's not sufficient just to keep out the

17:36:06  6   financial information.

17:36:07  7           Focus in a product liability case is on the product

17:36:12  8   and what happened with this product and what happened with

17:36:15  9   this product in this plaintiff.  Not on how bad the company

17:36:21 10   was in developing that product when it's a strict liability

17:36:25 11   claim.  They have -- in their own summary judgment response,

17:36:30 12   Your Honor, they say they have negligence claim including

17:36:35 13   negligent failure to warn, strict liability design defect and

17:36:39 14   punitive damages.  They do not have a negligent design claim.

17:36:44 15           Yet they want to bring all this evidence in so that

17:36:47 16   they can prove their case and inflame, infest, whatever word

17:36:53 17   you want to use, the jury so the jury gets a bad feeling about

17:36:57 18   Cook and awards them compensatory damage from which they can

17:37:02 19   then elevate the punitive damages.  That's what's

17:37:05 20   fundamentally unfair.  That's what needs to be invoked -- or

17:37:10 21   cured with the bifurcation in this case, Your Honor.

17:37:14 22           THE COURT:  Thank you.

17:37:17 23           MR. SCHULTZ:  Just very briefly, Judge.  It has been

17:37:25 24   said before, Your Honor.  I should say it one more time.  We

17:37:28 25   alleged design, develop, manufacture, market and sell in our

17:37:33  1  negligence claim.  The cases I cite --

17:37:35  2          THE COURT:  This general negligence you've been

17:37:37  3  talking about, what elements would you have to prove for that

17:37:43  4  to succeed?

17:37:44  5          MR. SCHULTZ:  The elements are laid out in the *Small*

17:37:46  6  *v. Amgen* case that the cited and they are duty, breach,

17:37:49  7  causation and harm.  The suggestion I thought I heard

17:37:53  8  Ms. Pierson say several times today, the only negligence we

17:37:56  9  can prove is design, manufacture, and failure to warn; and

17:38:00 10  that we're somehow limited to that.  I cited you the *Favors*

17:38:02 11  case, the *Barfield* case, the others that say things like

17:38:06 12  failure to test are subsumed in a negligent design claim, if

17:38:10 13  you want to call it that.

17:38:11 14          But of course, our claim is that the filter is

17:38:15 15  negligently designed and that it was not properly tested.

17:38:17 16  Those are things a reasonable company would do, and we intend

17:38:22 17  to put on evidence that they didn't do that.  That's what

17:38:25 18  reasonable manufacturers do.  They fail to do what reasonable

17:38:27 19  manufacturers do, and I read you the jury instruction that

17:38:29 20  would apply under the products liability instructions in

17:38:31 21  Florida and that's the question the jury has to answer.

17:38:33 22          THE COURT:  So when I'm instructing the jury in the

17:38:36 23  preliminary instructions, what am I going to say the claims

17:38:39 24  are?

17:38:40 25          MR. SCHULTZ:  The claims are negligence, strict

17:38:42  1    liability and punitive damages.  And if they want to call it

17:38:46  2    negligent design -- we don't call it negligent design but

17:38:49  3    failure to design as a reasonably prudent company would is

17:38:52  4    certainly part of the claim.  Failure to warn as a reasonably

17:38:57  5    prudent company would is part of the claim.  Failure to

17:38:58  6    properly test or investigate your device, all of which was in

17:39:02  7    the *Favors* case, is part of the negligence claim.  Negligence

17:39:05  8    is about conduct and product liability -- strict liability is

17:39:09  9    about the device and we've brought both claims, Your Honor.

17:39:14 10          THE COURT:  So under the general title of general

17:39:17 11    negligence, you've got these prongs coming out, right?

17:39:19 12    Failure to warn, design?

17:39:25 13          MR. SCHULTZ:  Failure to properly test, like the

17:39:26 14    *Favors* case.  Not doing proper research on the causes of the

17:39:32 15    product failure.  All of which was on a challenge to the

17:39:35 16    sufficiency of a complaint upheld by the Third DCA -- excuse

17:39:39 17    me, the Fourth DCA in Florida.

17:39:41 18          THE COURT:  But design and test, those are

17:39:42 19    different.  I mean, you have to prove defect on design, right?

17:39:46 20          MR. SCHULTZ:  Strict liability design we have to

17:39:48 21    prove a defect.  The law in Florida -- they've said several

17:39:52 22    times today there are on three negligence theories in Florida;

17:39:55 23    design, testing and failure to warn.  That's not what the

17:39:59 24    cases say.  The cases say --

17:40:00 25          THE COURT:  Isn't that what that instruction says?

288

17:40:03  1              MR. SCHULTZ:  Which instruction is that?

17:40:05  2              THE COURT:  The Florida -- the one you cited.

17:40:09  3              THE CLERK:  You have it.

17:40:11  4              MR. SCHULTZ:  403.9, failure to use reasonable care.

17:40:17  5              THE COURT:  I think I left it on my desk.  In any

17:40:19  6    event, the instruction I saw negligence and it had some things

17:40:25  7    in bracket, failure to --

17:40:28  8              MR. SCHULTZ:  I've got it here, Your Honor.

17:40:29  9              THE COURT:  You have it?  Let me see it.

17:40:31 10              MR. SCHULTZ:  Yes, Your Honor.

17:40:34 11              THE COURT:  Sorry.  I left mine at my desk.

17:40:36 12              MR. SCHULTZ:  It's 403.9 and 403.1 is the

17:40:38 13    negligence.

17:40:39 14              THE COURT:  Negligence is failure to use reasonable

17:40:40 15    care which is reasonably careful designer, manufacturer,

17:40:44 16    seller, importer, distributor, supplier would use under the

17:40:48 17    circumstances.  And you would ask me to insert design, right?

17:41:04 18    Manufacture?

17:41:07 19              MR. SCHULTZ:  Well, I think we would just say a

17:41:09 20    reasonable company; but if we had to choose from the

17:41:12 21    bracketed, then we would probably put in whichever fit.  I

17:41:15 22    don't think importer would necessarily fit.

17:41:18 23              THE COURT:  No.

17:41:19 24              MR. SCHULTZ:  But sure; designer, supplier,

17:41:21 25    manufacturer.

17:41:23  1          THE COURT:  Okay.

17:41:27  2          MR. SCHULTZ:  And so Your Honor, the issue about

17:41:29  3   this idea of there only be three negligence theories are

17:41:33  4   actually federal district court cases that say you have to

17:41:36  5   prove a defect in a negligence products liabilities case; and

17:41:40  6   defect can be proven by design, warning, or manufacture.  So

17:41:47  7   it's -- no court has said that's the only -- those are the

17:41:51  8   only "negligence" claims, as if we should have put a count in

17:41:56  9   our complaint for negligent design, negligent manufacture,

17:41:59 10   negligent failure to warn.

17:42:00 11          Those cases arise from case law in Florida on

17:42:03 12   inconsistent verdicts, like the *C.C.* case and the *Ashby* case

17:42:07 13   that have said if a jury finds that there's no defect but

17:42:10 14   finds negligence, we find that's an inconsistent verdict.  So

17:42:13 15   obviously the implication of that is in the absence of a

17:42:16 16   defect, you can't find negligent conduct.

17:42:20 17          THE COURT:  Right.

17:42:20 18          MR. SCHULTZ:  But that is very different from saying

17:42:23 19   you can only bring a negligence case for design, manufacture,

17:42:26 20   or testing.  That's not what the law says.  The law in

17:42:29 21   Florida -- in fact, we cited the *Auburn Machine* case.  Florida

17:42:31 22   Supreme Court said in products liability cases, the normal

17:42:36 23   rules of negligence apply.  It's a common law negligence

17:42:40 24   claim; and I think under their design, as in the *Favors* case,

17:42:42 25   they said negligent design included development testing,

17:42:47  1  failure to figure out the cause of the problem.  That's why I

17:42:49  2  said several times if they want to call that our negligent

17:42:52  3  design claim, I don't care what it's called.  We're going to

17:42:54  4  prove the same thing either way, Your Honor.  We pled it as

17:42:58  5  negligence and it's a negligence count and these are the

17:43:00  6  manners in which they were negligent.

17:43:05  7            THE COURT:  Just a little confusion there.

17:43:08  8            MR. SCHULTZ:  It's all in our papers, Judge.

17:43:10  9            THE COURT:  I'm sure it is.

17:43:12 10            MR. SCHULTZ:  In a big stack of them.

17:43:13 11            MS. PIERSON:  Your Honor, if I may approach.  I gave

17:43:15 12  Mr. Schultz a copy of this summary judgment PowerPoint and I

17:43:19 13  didn't give one to you; and it's page 34 where I talk about

17:43:22 14  the *Small* case, and the holding of the *Small* case is very

17:43:25 15  clear and it's what we indicated on that page.  There is no

17:43:28 16  garden variety negligence claim.  Under Florida law, there are

17:43:32 17  three types of negligence claims; negligent design, negligent

17:43:36 18  warning, negligent manufacture.

17:43:38 19            I heard what Mr. Schultz said today but I encourage

17:43:40 20  you to look at the plaintiff's response on the motion for

17:43:42 21  summary judgment.  In the response they expressly disavow a

17:43:46 22  negligent design claim and say, we don't have to prove

17:43:48 23  anything about the design.  We have a garden variety

17:43:51 24  negligence claim, and they simply don't.  That kind of a claim

17:43:54 25  does not exist under Florida law.

17:43:57  1        But even if their claim somehow morphs into a

17:44:00  2   negligent design claim, which it shouldn't, they still cannot

17:44:03  3   meet their burden of proving defect or causation, both are

17:44:08  4   acquired.  Just by asserting that this is a negligent standard

17:44:11  5   where you look at the reasonableness of the conduct of the

17:44:13  6   defendant, that doesn't get them out of the element of defect.

17:44:16  7   And as is in the PowerPoint in front of you, Your Honor, the

17:44:19  8   *Small* case and other cases have held defect is an element of

17:44:23  9   all of their claims no matter how they're dressed up or what

17:44:26 10   they're called; and they can't approve that.

17:44:29 11        Causation is an element of all of their claims.  No

17:44:31 12   matter how they're dressed or what they're labeled or what

17:44:34 13   they're called today, they still have to prove specific

17:44:37 14   causation in Mrs. Hill and they can't do that.

17:44:41 15        THE COURT:  Thank you.  Okay.  I think that does it.

17:44:45 16   Anybody else have anything they want to talk about?

17:44:49 17        MR. MATTHEWS:  That's all for the plaintiffs.

17:44:51 18        THE COURT:  I'll give you ten minutes apiece.  This

17:44:55 19   has been very helpful to me in trying to wade through all of

17:45:01 20   this to get you ready for trial.  Obviously things I haven't

17:45:05 21   ruled on today, I've taken under advisement.  I'll get your

17:45:08 22   rulings out.  I may not get full written rulings supported by

17:45:13 23   full written opinions in the next few days but I'll get you a

17:45:18 24   ruling, followed up by writing later on, since we are --

17:45:23 25   there's a lot to do and we're on a time crunch a little bit

17:45:26  1  and got some other matters I have to tend to, obviously.

17:45:32  2          And then there probably will be some matters I'll

17:45:35  3  take under advisement at trial and I'll try to get something

17:45:41  4  to you as soon as we possibly can to give you good guidance in

17:45:46  5  going forward, but this is very helpful to me today.  I gave

17:45:49  6  you a little bit of chiding about the ten-minute rule but I

17:45:53  7  knew that wasn't going to work anyway, but I just wanted to

17:45:58  8  put in the back of your mind well, maybe he wants us to

17:46:01  9  shorten this up a little bit.  Anyway, it's all good.  Thank

17:46:05 10  you very much.

17:46:08 11          THE CLERK:  All rise.  Court is adjourned.

17:46:15 12          (Proceedings concluded at 5:45 p.m.).

         13  **********************************************************

         14              CERTIFICATE OF COURT REPORTER

17:46:15 15

         16      I, Margaret A. Techert, hereby certify that the

         17  foregoing is a true and correct transcript from

         18  reported proceedings in the above-entitled matter.

         19

         20

         21

         22  /S/ Margaret A. Techert                    **October 9, 2017**
             MARGARET A. TECHERT
         23  Official Court Reporter
             Southern District of Indiana
         24  Evansville Division

         25