UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,           )
IVC FILTERS MARKETING, SALES         ) Cause No.
PRACTICES AND LIABILITY,             ) 1:14-ML-2570- RLY-TAB
LITIGATION                           ) Indianapolis, Indiana
                                     ) **September 14,** 2017
                                     ) 10:08 a.m.
                                     )



**Before the Honorable
RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
STATUS CONFERENCE



**For Plaintiffs:**                  David P. Matthews, Esq.
                                     MATTHEWS & ASSOCIATES
                                     2905 Sackett Street
                                     Houston, TX  77098


                                     Ben C. Martin, Esq.
                                     LAW OFFICES OF BEN C. MARTIN
                                     3710 Rawlins Street, Suite 1230
                                     Dallas, TX  75219


                                     Joseph N. Williams, Esq.
                                     RILEY WILLIAMS & PIATT, LLC
                                     301 Massachusetts Avenue
                                     Indianapolis, IN  46204


                                     Michael W. Heaviside, Esq.
                                     HEAVISIDE REED ZAIC
                                     910 17th Street NW, Suite 800
                                     Washington, D.C.  20006

For **Defendants:**                Andrea Roberts Pierson, Esq.
                        John T. Schlafer, Esq.
                        FAEGRE BAKER DANIELS LLP
                        300 N. Meridian St., Suite 2700
                        Indianapolis, IN  46204

                        John Joseph Tanner, Esq.
                        BAKER & DANIELS
                        300 N. Meridian Street
                        Indianapolis, IN  46204


Court Reporter:         Margaret A. Techert
                        United States District Court
                        101 NW Martin Luther King Blvd.
                        Evansville, Indiana  47708


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

```
 1                    (In open court.)

 2            THE CLERK:  All rise.  District Court for the

 3  Southern District of Indiana is now in session pursuant to

 4  adjournment.  The Honorable Richard L. Young presiding.  Court

 5  is in session.  Please be seated.

 6            THE COURT:  Good morning.

 7            MR. MATTHEWS:  Good morning.

 8            MR. WILLIAMS:  Good morning, Your Honor.

 9            THE COURT:  We're here today in Re: Cook Medical,

10  Inc., IVC Filters Marketing, Sales Practices and Products

11  Liability litigation.  This is MDL 2570 and we're here for our

12  monthly status conference.  Plaintiffs are here by Ben Martin

13  by telephone.  Ben, can you hear is us?

14            MR. MARTIN:  Yes, Your Honor.  I can hear you, yes,

15  sir.

16            THE COURT:  David Matthews, Joe Williams and Mike

17  Heaviside.  Defendant Cook is here by John Schlafer, Andrea

18  Pierson and Joe Tanner.  And the parties have submitted a

19  joint proposed agenda for this status conference.  And

20  Ms. Pierson, you wish to begin with item No. 1?

21            MR. SKWRAO:  Thank you, Your Honor.  Mr. Tanner will

22  handle that matter.

23            THE COURT:  All right.  Very good.

24            MR. TANNER:  Thank you, Your Honor.  Joe Tanner on

25  behalf of the defendants.
```

1          THE COURT:  Sure.

2          MR. TANNER:  Kind of a unique argument here, Your

3    Honor, but not unprecedented, especially in this jurisdiction,

4    as you probably well know.  Mr. Gage had a duty.  Mr. Gage had

5    a duty to list all his assets accurately in the bankruptcy

6    filing, which is what the bankruptcy court is based on, is

7    people accurately reflecting their assets.  And when you

8    breach that duty, there are consequences; and the consequences

9    laid out by this southern district are either dismissal of the

10   case or that the damages are limited to the amount of the

11   creditors, interest, plus trustee expenses.

12          It's undisputed he didn't report his claim as an

13   asset.  He was fully aware of this case.  He had filed it nine

14   months before he filed his bankruptcy.

15          THE COURT:  The trustee's moved to reopen?

16          MR. TANNER:  The trustee has moved to reopen, Your

17   Honor.

18          THE COURT:  Yes.

19          MR. TANNER:  After we raised this issue with the

20   Court.

21          THE COURT:  Right.

22          MR. TANNER:  He didn't do anything to correct that

23   error for over two years.  In fact, two years to the day of

24   his filing of bankruptcy.  It's interesting that he did file

25   bankruptcy just three days before his deposition.  So there's

1   no question he knew about this lawsuit and the deposition had

2   been noticed before that.  So he filed between that period and

3   then also he didn't do anything to change his bankruptcy

4   filing after it was raised to him in January of this year.  He

5   waited, didn't do anything to help his creditors or to come

6   clean or to tell this Court or the bankruptcy court, "Oh, you

7   know what?  I do have a claim," until it was raised in this

8   Court and it was realized, in fact, he didn't.

9           THE COURT:  Let's assume it's reopened.  Then what

10  happens?

11          MR. TANNER:  Well, the judge, Judge Barker, made it

12  very clear that reopening a bankruptcy estate is not a cure

13  and that's one of their arguments.  And in the *Wiggins* case,

14  which I'm sure you're familiar with, she said that, indeed, is

15  not an excuse or a cure of the defect to preclude judicial

16  estoppel.  In fact, here it's even worse, since there was no

17  reason given for him to reopen the bankruptcy except for the

18  fact that he got caught, that he cheated his creditors.  There

19  was no innocent error.  There's been no evidence presented to

20  this Court of innocent error in any respect; and he didn't

21  simply act swiftly when he found out about it either.  He

22  waited seven months.  Presumably it was going away if we

23  hadn't raised it.  So reopening the bankruptcy estate does not

24  do anything to save his claim.

25          As in *Wiggins*, the plaintiffs here have said, "Well,

1  it was inadvertent."  Judge Barker said, "That's not enough."

2  Said first of all, for it to be inadvertent, three things have

3  to happen.  First, it's the plaintiff's burden of proof, not

4  the defendant's.  It's the plaintiff's burden of proof that

5  says he was not aware of the claim or he had no motive to

6  conceal.  Before Your Honor there's absolutely no evidence of

7  inadvertence presented by the plaintiff.  We don't have an

8  affidavit from Mr. Gage.  We don't have an affidavit from his

9  lawyers.  We don't have an affidavit from his bankruptcy

10 lawyer that says, "Oops, I made a mistake."  There's simply

11 no evidence from which you, Your Honor, can make a finding of

12 inadvertence.

13         Second.  Judge Barker made it clear, awareness of

14 the claim is all that is needed.  It's not relevant whether he

15 knew he had an obligation to report the asset as part of the

16 bankruptcy.  Indeed, Judge Barker said, "It is not the duty to

17 disclose of which the plaintiff must be aware but simply the

18 facts giving rise to the claim."  And Your Honor, that's

19 exactly what happened here.  In *Wiggins*, he had an EEOC claim

20 that he filed three months before he filed his bankruptcy

21 petition.  Here, he had a full-fledged lawsuit in place nine

22 months; and as we've said before, he was three days away from

23 his deposition in this case when he filed the bankruptcy.

24 Clearly he's aware of the claim and they can't establish proof

25 otherwise.

 1              The other is motive to conceal.  Judge Barker also

 2    found a motive to conceal claims exists when the result would

 3    be a discharge of debts.  Here, his debts were, in fact,

 4    discharged.  So that element cannot be established by them

 5    either.

 6              They do raise some other arguments that I'd like to

 7    address here briefly, Your Honor, since there's no evidence of

 8    inadvertence that's been presented to meet their burden of

 9    burden.  Number 1, they say something about the medical bills.

10    Well, the medical bills were submitted to the trustee.  So the

11    trustee must have had notice of this claim, being the medical

12    bills from this claim.  Well, there's no evidence of that.

13    First of all, there's no evidence from the trustee.  There's

14    no evidence supporting such speculation.  But the important

15    point with that is he actually checked no, he didn't have a

16    claim.  So how would a trustee know that he had a claim when

17    he checks no.

18              And third on that point is the submission of the

19    medical bills actually hurts their case.  Doesn't help their

20    case.  The submission of medical bills only shows his motive

21    because the submission of those medical bills ended up being

22    discharged in bankruptcy.  So it furthered his benefit from

23    not listing the assets.

24              He also said, well, he really wasn't asked about the

25    bankruptcy in this case until January.  And as we pointed out

1   in our paper, Your Honor, the issue is not when he's asked

2   about bankruptcy in this case.   The issue is when he's asked

3   about this case in bankruptcy and that was over two years ago

4   and he failed.

5          Next they argue bad faith should be required.

6   Again, not so.   That's not what the law says.   They've

7   provided no citation for bad faith being required.   In fact,

8   the law says otherwise.   We've cited the *Cannon-Stokes* case,

9   which is pretty clear.   A debtor is bound by the

10  representations no matter why they were made.   The *Becker*

11  case, the *Evinger* case.   Subjective intent is not relevant.

12         The other issue that they raise is well, this would

13  be a windfall to the defendant if we either dismissed the case

14  or limited the damages to the amount of the creditors, the

15  trustee expenses and the interest on the creditors' claims.

16  Again, courts have rejected that type of argument.   The

17  judicial estoppel principle is based on the integrity of the

18  Court and the courts have said whether it's a windfall or not

19  is simply not a relevant analysis.   And we cited the *Airadigm*

20  case for that principle as well, Your Honor.   But again, if

21  you step back and think about that argument, the focus should

22  be on what the plaintiff did or in this case did not do and

23  the consequences of that.

24         Under the plaintiff's logic, statute of limitations

25  wouldn't exist.   Statute of limitations, when you have a case

1  that's dismissed because of an action that the plaintiff did

2  not do, that's statute of limitations.  That's the same here

3  where you have a case where the damages are limited because of

4  something the plaintiff did not do.  It's not a focus on the

5  windfall on the defendant.  It's a focus on the action of the

6  plaintiff and the consequences of that action.

7          Finally, Your Honor, I'll address the *Metrou* case

8  which the plaintiffs have relied on heavily.  That case

9  doesn't help them.  We've stated that in our papers because it

10  is extremely -- there's a lot of factual distinguishing

11  factors in that case.  In that case the plaintiff was not

12  litigating his worker's compensation lawsuit before the

13  bankruptcy was filed.  It was after.  The plaintiff didn't

14  even know he had a tort claim in that case until after the

15  bankruptcy was filed.

16          There was evidence presented in that case of

17  innocent error.  There's been no evidence presented here.  In

18  fact, in that case the Court made a finding of innocent error

19  and there's been no finding here nor could there be.

20          The trustee was active in that case.  The trustee

21  has not been active in this case.  The appellate court was

22  concerned that well, if I limit the damages, maybe the

23  plaintiff's lawyers won't pursue that claim and might end up

24  hurting the creditors.  Here that's not the case.  There's

25  been no argument or evidence that they're going to abandon

1   this claim; and in fact, given that this claim is a MDL

2   Bellwether, the evidence would be contrary that they're just

3   going to abandon that claim if the damages are limited, as

4   they should be, we would submit, under judicial estoppel.

5           And finally that case, the Court supported the

6   *Cannon-Stokes* case.  The Court said maybe where there's a

7   finding of innocent error, where there's a finding of innocent

8   error, you may not invoke the judicial estoppel or send it

9   back to the bankruptcy court.  But it also said absent that,

10  when a debtor tries to cut out its creditors, "the claim is

11  gone forever."  And we would submit that's exactly the

12  situation here, Your Honor.  Either this Court should dismiss

13  this case for lack of standing for the actions of the

14  plaintiff or the damages should be limited to the amount of

15  the trustee expenses, the creditors' claim and the interest.

16  Thank you, Your Honor.

17          THE COURT:  Thank you, Mr. Tanner.  Mr. Matthews?

18          MR. MATTHEWS:  David Matthews for Mr. Gage.

19          THE COURT:  Yes.

20          MR. MATTHEWS:  The bankruptcy has been reinstated

21  and at this time the trustee will be substituted as the real

22  party and interest.  This omission was inadvertent.  Mr. Gage

23  is an elderly, uneducated man, did not know that a lawsuit was

24  an asset that needed to be listed.  The plaintiff stated in

25  his deposition, when asked, that he did file bankruptcy in

1   this year of 2017.  The *Metrou* case that we cited in our brief

2   and we included it in our papers, stated clearly that it is

3   the bankruptcy court's decision how funds will be distributed

4   after recovery, if any is realized.  So the bankruptcy court

5   is the Court as stated by the 7th Circuit.  That is the Court

6   that determines whether this bankrupt plaintiff should receive

7   funds or not, whether the creditors receive funds or not.

8   It's not up to the trial court and it should be in the hands

9   of the bankruptcy court.

10          Judicial estoppel, which the defendants are arguing,

11  is inappropriate when the omission is due to an accidental

12  mistake.  Even the defendants have stated in expert reports

13  that Mr. Gage experiences cognitive processing problems and

14  possibly early dementia.  That is also in our briefing papers

15  with the Court.  And again, whether this bankruptcy is dealt

16  with here or the bankruptcy court, I think the law is clear

17  that the bankruptcy court is where the decisions are made.  We

18  would say that this Court should proceed with a case that

19  we've discovered now -- the defendants chose this case to try

20  and we've discovered it now for over a year and a half.

21          By the way, the bankruptcy was over $18,000 that he

22  had filed his bankruptcy, about a third of which were bills

23  from the medical care from his IVC filter failure.  So we

24  think that the bankruptcy court is where the decision is made

25  and equitable estoppel in this case would be inappropriate.

```
 1              THE COURT:  I think I agree that the bankruptcy --
 2   if this, as you say, has been reinstated, that the bankruptcy
 3   case will be handled by the bankruptcy court.  I mean, I'm
 4   not -- I'm not about to handle anything involving bankruptcy
 5   issues.
 6              MR. MATTHEWS:  I'm afraid of bankruptcy myself,
 7   judge, and I'm just telling you the law the way it reads and
 8   that is, the bankruptcy court handles it.
 9              THE COURT:  Okay.  All right.  Mr. Tanner, any
10   reply?
11              MR. TANNER:  Just quickly, Your Honor.  Again on the
12   innocent or inadvertent error.  There's just no evidence of
13   that, unlike the other cases that we cite and they cite.  The
14   uneducated man thing doesn't fly because the lawyers are
15   responsible, just like in the statute of limitations, Your
16   Honor.  You can't claim that we didn't know if the bankruptcy
17   lawyers didn't list, you know, you're tied to that.
18              Third, on the being bankruptcy court issue, that's
19   not what the law says.  It's clearly not what Judge Barker
20   found.  The Metrou case did find --
21              THE COURT:  What I'm saying is determining which
22   creditors get paid --
23              MR. TANNER:  Correct, which ones.
24              THE COURT:  Yes.  That's what I'm saying.  I'm not
25   about to get into that.
```

1           MR. TANNER:  Correct.

2           THE COURT:  I have no basis to do that.

3           MR. TANNER:  We would agree with that, Your Honor.

4   And finally, on that reopening of bankruptcy estate, it can't

5   be overlooked that if you look at what was filed with the

6   bankruptcy court, even it was in error because they moved to

7   reopen the bankruptcy saying that this lawsuit had a

8   settlement and that there were settlement funds available to

9   the creditor -- or to the creditors and to the debtor, which

10  is just not true.

11          THE COURT:  Right.

12          MR. TANNER:  As this Court well knows.

13          THE COURT:  Right.

14          MR. TANNER:  Thank you.

15          THE COURT:  Mr. Matthews, any knowledge, any

16  information on that statement that the matter has been settled

17  and there's moneys available for creditors?

18          MR. MATTHEWS:  That had nothing to do with this

19  lawsuit, Your Honor.  Mr. Gage had no idea that this lawsuit

20  was an asset.  It was not listed.  Again, whether in fact this

21  was inadvertent, whether in fact creditors will be paid is --

22  and the trustee will make an appearance in this case.

23          THE COURT:  No.  I'm talking about Mr. Tanner

24  referred to a statement made, I guess in the petition to

25  reopen, that the matter had been settled and there's funds

1  available for payment to creditors.

2          MR. MATTHEWS:  That's not -- that's not my -- to my

3  knowledge, that never happened, that he said that there was

4  moneys to be paid and the money is settled.  There was a case

5  that he had received $900 from another case.  $993 from

6  another case but not this case.

7          THE COURT:  Okay.  Thank you.  Anything else on

8  this?

9          MR. TANNER:  No.  The petition says what it says,

10  Your Honor.

11          THE COURT:  All right.  I'll take this under

12  advisement.  Number 2, Hill's motion for leave to designate

13  Paul Timperman, MD after expert disclosure deadline.  Who's

14  going to handle that?

15          MR. HEAVISIDE:  We think Mr. Martin, unless --

16          MR. MARTIN:  Your Honor, can the Court hear me okay?

17          THE COURT:  Yes.

18          MR. MARTIN:  All right.  Your Honor -- and if

19  anything occurs where -- that connection becomes bad or

20  something, I'm about to be in a pretrial myself here and I

21  apologize for not being able to be there today, Your Honor,

22  and I appreciate the opportunity to being able to make this

23  argument on the phone but will pass it to Mr. Heaviside, if

24  the connection is just too bad.

25          Upon this motion, Your Honor, I'll try not to sort

1  of regurgitate everything that was in our motion and in our

2  reply, but let me -- let me start out this way by reminding

3  the Court that Dr. Timperman has worked for a Cook entity for

4  years, has consulted with Cook.  And I believe the evidence in

5  the deposition was that he's been paid about $1.9 million by

6  Cook as of the time that we took his deposition.

7          He is an interventional radiologist and his

8  importance is this.  Well, a little bit of background of what

9  he has done with Cook.  He has, among other things, evaluated

10 complaints and the complaints that come in on things such as

11 perforations and other complications of the IVC filters.  The

12 other thing that he has done is he has participated in

13 clinical trials of Cook -- clinical trials that Cook sponsored

14 or put on and he has -- he has analyzed images from those

15 clinical trials.

16          It is not known whether or not from his testimony --

17 it's ambiguous from my perspective -- as to whether or not he

18 actually had any participation in the 2009 blind Cook study,

19 which is really the impetus for our wanting to have his

20 testimony -- his important testimony to be able to be heard by

21 the jury.  That's his background.  He's a Cook person and I'll

22 go ahead and maybe take this a little bit backwards in that,

23 Your Honor, the suggestion that we would be able to even think

24 about getting a Rule 26 expert report from an individual who

25 works for Cook and has -- is under their control and in

1  addition, Your Honor, has an agreement with Cook that he

2  cannot disclose anything to anyone, much less us, and somehow

3  our being able to get an expert report from Dr. Timperman I

4  believe is outside the bounds of really much -- much logic.

5  We just can't do that.

6          So we go back to our definition of him and I hope

7  that we have indicated in the court record a reasonable reason

8  why we designated him when we did.  His deposition wasn't

9  taken until May; and indeed, we have been trying to get this

10 deposition and I hope that the brief -- my reply brief, Your

11 Honor, with the evidence of how long it's been even in 2016

12 trying to get his deposition.  But in any event, we took his

13 deposition.  We evaluated it.  We filed our motion and I

14 believe sometime within 60 days -- I don't have that exact

15 information in front of me but approximately 60 days after his

16 deposition became final, our motion to designate him as an

17 expert was filed.

18         So into the meat of it, Your Honor, his testimony is

19 important in this respect and the reason we should be able to

20 designate him, we believe, is this.  Ms. Hill's filter was put

21 in in 2012.  In 2009 there is a seminole study, a very

22 important study that Cook conducted.  When the study was

23 published, Cook has three authors on the study; and we can

24 show that Cook had a lot to do with writing that -- the

25 publication, writing the article that ended up being published

1  in the Journal of Vascular and Interventional Radiology in

2  2009.  That study -- that is the only study on the Celect

3  filter -- was the only study on the Celect filter at the time,

4  studied the complications of the Celect filter.  And I think I

5  can put it in these succinct three -- three sort of ways.

6           Number 1.  This study was -- this study was

7  performed three years -- or published three years before her

8  filter was placed.  This study had been going on for two or

9  three years before that and the study was important insofar as

10 it was used by Cook to get the Celect filter on the market for

11 its retrievability function.  So in that study, Your Honor,

12 Cook has said that there were no perforations found.  If the

13 Court were to read that article today, just like any other

14 physician who gets his hands on it, would read that article,

15 Cook has -- Cook has told the physicians that No. 1, we said

16 that, when we use the word perforation, doctors, we say

17 perforation means if there was a single strike outside of the

18 wall of the vena cava that -- we found that during that --

19 this study, we would report it.  We found no perforations in

20 the study.  That's what is in the medical literature right

21 now.  It's never been changed.

22          Your Honor, we do have evidence now and we do have

23 some of the underlying data now, and some of the underlying

24 data is what we showed their consultant Dr. Timperman at his

25 deposition in May.  And importantly, we showed him the actual

1  films, images from that blind Cook study, the study where they

2  said there were no perforations found.  Dr. Timperman looked

3  at several -- many, I guess.  I would call it a dozen or so of

4  these films and without -- without really equivocation on

5  many, many of them, he actually got to the millimeter, the

6  actual number of millimeters outside the wall of the vena cava

7  that he saw in these films; and Your Honor, if you -- you

8  know, his testimony is important in that he has said indeed,

9  there were perforations in these films and then we, of course,

10 have the film from the study.  That's the importance of it.

11           Now, lastly I will address the question about

12 whether or not this is hocus-pocus by Dr. Timperman having

13 used a business card to perform his measurements.  I have been

14 through every -- every one of about 20 pages where the word

15 card and business card is used in his deposition.  And what --

16 what it is, he's not using the business card to explain it,

17 Your Honor.  He's not using the business card as some sort of

18 a measuring device or ruler.  What he is doing is simply using

19 it and he explains it on page 310 of his deposition.  He

20 explains the methodology and he stands by the methodology.

21 And he was asked, "Do you stand by your use of the card?"  And

22 he said, "Yes."  It's a different way of doing the same thing

23 as if we would normally do it.

24           And what he is doing, Your Honor, is simply taking

25 a -- he's looking at the image.  He knows exactly that the

1  head or the hub of the filter is four millimeters.  This is

2  his explanation, not mine.  He measures -- he knows the hub of

3  the Celect filter is four millimeters.  Then what he does, he

4  takes -- it could be -- it could be a toothpaste box, it could

5  be a -- it could be, you know, anything.  But he takes a

6  straight edge and he then -- he then takes that four

7  millimeters that he knows is four millimeters and he puts --

8  he puts a marker on it, a fingernail essentially in this case;

9  and then he simply takes that and uses it to then see if --

10  how far this -- these vena cava filters stress go outside the

11  walls of the vena cava.

12          It's not magic.  It's not hocus-pocus.  And in fact,

13  the only -- the only equivocation that he gave was in the fact

14  that instead of being able to go into the tenths of a

15  millimeter, he wouldn't want to do that.  He's certainly

16  comfortable by saying -- by giving the number of millimeters

17  outside the vena cava wall through this method of essentially

18  using this card simply as a straight edge, comparing it to

19  what a known and fixed figure is or length is of that Celect

20  filter head or hub and that's it.  And if the Court wants an

21  explanation on page 309, I can read it; but it's there and

22  it's not hocus-pocus, Your Honor.  And so that's our argument

23  and the fact that it is truly testimony that's useful

24          THE COURT:  Thank you, Mr. Martin.  Mr. Tanner?

25          MR. TANNER:  Thank you, Your Honor.

1          THE COURT:  Certainly a unique way to measure.

2          MR. TANNER:  I would agree and not his normal way

3    either, Your Honor.  It's undisputed they've untimely tried to

4    designate him as an expert.  They seek kind of a late game

5    do-over and the 7th Circuit has said no under the *Salgado* case

6    that we cited where the Court said exclusion of nondesignated

7    expert testimony is "automatic and mandatory."  And that

8    should happen here unless the plaintiff is able to prove that

9    it was somehow justified and harmless.  And again, we don't

10   have any evidence before us, Your Honor, and they can't make

11   that finding.

12         It's important to understand the context.

13   Mr. Martin was kind of -- giving kind of an overview, which we

14   disagree with, which I'll talk about in a minute, about his

15   testimony but what -- what Dr. Timperman was doing and who he

16   is.  He was an independent contractor -- interventional

17   radiologist independent contractor for not a party to this

18   case, for a different Cook entity, Cook Researach Institute;

19   and he interviewed complaints that would come in and provide

20   input back to Cook.  That's what he did.

21         That's not what they're asking him to do in this

22   case, however.  In his deposition they asked him to review

23   images that he had never seen before and they asked him to

24   talk about these images from a report and a study that he

25   didn't participate in.  Instead, he used his business card and

1  they asked him to take a business card and hold it up and

2  make -- make images or make guesses as to the measurements.

3            Now, that's far from using, as he said, without

4  equivocation I heard Mr. Martin say.  That's not the case.  He

5  said this is a "quick and dirty."  This is inaccurate.  This

6  is uncertain.  They even asked him, "How are you able to

7  provide such certainty in your normal work?"  And he said,

8  "Well, I have calipers and I have a computer program that I do

9  all these measurements from."  That's not here.  Mr. Martin

10  talks about deposition page 329, where they ask him if he's

11  comfortable about his opinions.  And he said, "Yeah, based on

12  a note card.  This could change.  I equivocated quite a bit

13  when I told you because of the uncertainty of the note card."

14  Mr. Martin left out those qualifications of the witness, Your

15  Honor.

16            We objected during the deposition to the scope of

17  this.  We objected that he was providing expert testimony.

18  They were trying to get expert opinions from him and he had

19  not been designated an expert, and they did not object to

20  that.  When we get to that point, if we ever get to that

21  point -- we would submit we don't need to -- his testimony

22  will never pass the Daubert standards of reliability in this

23  case.

24            But let's get back to the timeliness issue, if we

25  might, Your Honor.  This situation, again, of the plaintiffs

1   own making.  They didn't designate him.  To get around that

2   fatal flaw, they need to prove no prejudice or surprise, that

3   they can cure the prejudice, and that it won't affect this

4   case.  Again, there's no evidence presented and they can't

5   prove any.

6           Let's talk about prejudice and surprise, if we

7   might, Your Honor.  The plaintiffs chose not to designate him

8   as an expert at every opportunity.  May 2016, a year and what,

9   three or four months ago, they knew of Dr. Timperman.  Didn't

10  designate him.  This Court set the deadline for designating

11  experts at March 17th of this year.  They didn't designate

12  him.  They took his deposition, obviously asking him opinion

13  testimony, on May 3rd.  Didn't designate him.  On May 5th,

14  they got the transcript.  Didn't designate him.  July 22nd,

15  expert discovery ended.  Didn't designate him.  August 1st, we

16  send preliminary witness lists and exhibits lists, and the

17  plaintiff sent preliminary witness lists and exhibit lists.

18  Don't designate him.

19          What makes matters worse is in his deposition, we

20  said, "He's not designated as an expert."  And they didn't

21  reject that notion or argue opposed to that.  Moreover, on the

22  August 1st witness list, they don't list him as an expert.  In

23  fact, they do list him as another expert, as a nonexpert.

24          This is clearly a situation where you're not

25  entitled, due to prejudice or surprise, to have an additional

1  deposition -- excuse me, expert designation.  The *Wilkins* case

2  makes it very clear that we cited.  "The disclosure was made

3  after the agreed upon expert disclosure date, after discovery

4  was closed, after appellee filed a motion for summary

5  judgment, just like here, and on the very date set by the

6  Court for filing motions to exclude experts.  It's hard to

7  accept that these events would serve as a surprise to the

8  appellee or that the appellee could cure such a surprise.  It

9  won't -- it's impossible in this Court.  It's hard to accept

10  that these events would not serve as surprise."  Same facts

11  here.

12           They can't cure the prejudice either.  They didn't

13  disclose until too late.  We didn't prepare to depose him as

14  an expert.  We didn't depose him as an expert.  We haven't

15  filed any Daubert motions and the deadline for doing so has

16  passed.  It would disrupt the schedule, we would submit.  The

17  Court made it very clear that the 3/17/2017 deadline for

18  disclosing experts would be final; and I think your words

19  were, "You better have a pretty good darn reason to supplement

20  that."  And we don't submit that that "darn reason standard"

21  has been met here either, Your Honor.

22           We would have to depose him as an expert.  We're

23  going to have to prepare other witnesses and experts to

24  counter his deposition and his testimony as an expert, and

25  we'd have to move to exclude, with trial being only a few

1   months away.

2          Another point is this report issue that Mr. Martin

3   raised.  Even their attempt to designate him was flawed and

4   fatally flawed, even if it had been on time, because he didn't

5   have a report.  They say, "We don't need a report or we can't

6   get a report."  That's not what the law says, Your Honor.

7   This is not an unretained expert who is providing testimony of

8   the work he does in the ordinary course of his business.  It's

9   not like a treating physician who, under the care -- provides

10  care and treatment to a patient and has opinions arising from

11  that care and treatment.

12         This is something very different.  This is a witness

13  that has looked at images purely for this litigation and asked

14  to make opinions purely for this litigation, just like any

15  other expert that you would require a report.  The fact that

16  the plaintiffs did not disclose him on time does not change

17  the character of the expert, Your Honor.

18         And you may say, "Well, why in the world were they

19  doing this now?"

20         THE COURT:  Okay, Mr. Tanner.  I've heard enough.

21  Mr. Martin, any reply?

22         MR. MARTIN:  Your Honor, reply to any specific part

23  the Court would like or reply to the entirety?

24         THE COURT:  Reply to Mr. Tanner's comments.

25         MR. MARTIN:  Yes.  My reply to his argument, Your

 1  Honor, I can go through the timing but on the timing, Your

 2  Honor -- and it was within 60 days of the time -- almost

 3  certain 53 days, within 60 days of the time that we took his

 4  deposition.  And understand, Your Honor, in almost every

 5  instance, Cook has made major -- or many instances has made

 6  major changes in the testimony through the errata sheet.  Some

 7  substantive changes have been made in many depositions.  It

 8  was a little bit of a tightrope.  That would have been a

 9  little bit of a tightrope to just immediately name him as an

10  expert and there had to be some analysis of it.

11          So if 30 -- then I guess the 60 days is too much

12  time, then that -- we would argue it's not but Your Honor, as

13  to the prejudice, I'm not quite understanding the prejudice.

14  No. 1, if -- if counsel wanted to file a Daubert motion as to

15  this witness -- they filed many Daubert motions, as many

16  experts -- we would not object to their filing a Daubert

17  motion at this point in time.  But we couldn't take

18  Dr. Timperman's deposition until we took it, and we really

19  couldn't name him or move to designate him much sooner than we

20  did.

21          And finally, Your Honor, as to -- as to the

22  prejudice, we still don't see the harm.  He is in their camp

23  and they can talk to him ad nauseam.  And all we want, Your

24  Honor, is a limited -- have him in a limited role of giving

25  this testimony that we know and he knows is the aggregate

1   testimony as to whether or not the perforations in these films

2   that he saw and that's it.  It's not -- it's nothing more than

3   that.  It's a limited role that we asked him to play in this

4   case.  It's an important role.  And I -- I think that -- that

5   if there's any prejudice, I'm not seeing it; and certainly the

6   importance of it would outweigh, I guess, whatever prejudice

7   that I'm still not seeing at the time.  I just don't see it.

8           THE COURT:  All right.  Thank you, Mr. Martin.  The

9   Court will deny the motion for leave to designate

10  Dr. Timperman after expert disclosures.  The designation came

11  significantly after our deadline -- our agreed upon deadline.

12  If there was problem in scheduling his deposition within the

13  deadline, parties could have come -- plaintiff could have come

14  to the Court and asked for relief on that.  Maybe we could

15  have worked out an agreement to take his deposition after the

16  deadline.

17          And also, even if I did -- did allow this

18  designation after the deadline, defendants certainly would

19  file a Daubert motion and there's no way that it would even

20  come close to satisfying Daubert standards.  I'm not going to

21  have my name on any opinion where an expert uses a business

22  card to conduct measurements in a complex medical products

23  liability case.  So Daubert -- it wouldn't satisfy Daubert

24  standards.  So I'll deny that motion.

25          Next item, Cook's motion precluding substantive use

1   of transcripts of depositions of witnesses who are available

2   to testify by trial.  Ms. Pierson.

3            MS. PIERSON:  Thank you, Your Honor.  Good morning.

4            THE COURT:  Good morning.

5            MS. PIERSON:  Your Honor, as we said in our papers,

6   the plaintiff has designated deposition testimony for

7   essentially 70 percent of the witnesses that she intends to

8   call at trial based on the preliminary witness and exhibit

9   lists.  We received those designations a few weeks ago.

10  They're substantive designations.  In total, not considering

11  any counters that Cook may have, by our count, you're looking

12  at over 30 hours of deposition testimony during the

13  plaintiff's case in chief.

14           The plaintiff has not designated deposition

15  testimony for herself or for any of her experts.  So what

16  she's chosen to do is that of the Cook employees who have been

17  deposed or other witnesses, nearly all of those are by

18  deposition.  We filed a motion with the Court, Your Honor, and

19  ask that you order, pursuant to Rule 32 and pursuant to your

20  authority under Rule 611, to control the presentation of

21  evidence.  That the Court require the plaintiff to bring the

22  Indiana witnesses to trial live and we've offered to bring

23  those witnesses for the plaintiffs.  The plaintiffs have

24  refused.

25           If I may approach, Your Honor.

```
 1                THE COURT:  You may.

 2                MS. PIERSON:  Just a couple of highlights from the

 3    papers.

 4                THE COURT:  Do you have a copy for plaintiffs?

 5                MS. PIERSON:  I do.  First, as -- Your Honor, as we

 6    noted in our papers in the 7th Circuit and in the southern

 7    district, there's a strong preference for the presentation of

 8    witnesses live and a strong preference against trials by

 9    deposition.  Certainly where 31 witnesses are designated by

10    deposition, the vast majority of the plaintiff's case would,

11    in fact, be a trial by deposition.  The Griman case, the Hosie

12    case, the 7th Circuit twice expressed that preference and

13    described deposition testimony as a substitute, a second best,

14    not to be used when the original is at hand.

15                In the Berry Plastics case, you, Your Honor, made

16    this point as well.  That deposition testimony would undermine

17    the Court's preference for live testimony and the significance

18    of cross-examination.  And of course, Judge Hamilton made the

19    same notation in the Orban case.  He said, "The Court aims to

20    limit the risk of trial by deposition."

21                So the 7th Circuit has consistently noted that

22    preference; and we noted in our papers that the 1st Circuit in

23    the Lonis case notes that the Federal Rules of Civil Procedure

24    that allow the use of deposition testimony in place of live

25    testimony have not changed the long-established principle that
```

1  testimony by deposition should ordinarily occur only if the

2  witness is not available to testify in person.

3          The result is that deposition testimony may not be

4  read when a witness is personally present in court at the time

5  the request is made to read the witness's testimony.  And

6  that's all Cook is asking for here, Your Honor.

7          So the plaintiffs make this point that they believe

8  that under Rule 32, that they have the right to present these

9  31 witnesses by deposition instead of calling them live; and

10 it's our position that that is wrong and it's an incorrect

11 interpretation of Rule 32.

12         Specifically, if you look at the second page of what

13 I gave to Your Honor, you'll see the relevant portion of Rule

14 32, which is 32(a)(4)(B).  It says, "A party may use for any

15 purpose the deposition of a witness, whether or not a party,

16 if the Court finds" -- and then under Section (B), "that the

17 witness is more than 100 miles from the place of hearing or

18 trial."  Interestingly, Your Honor the -- all of the folks

19 that we're talking about bringing live to trial, testifying

20 live at trial, had the Court ordered the trial be conducted in

21 Indianapolis, they would be within 100 miles of this

22 courthouse.  They are not within 100 miles of the Evansville

23 courthouse.  And I make that point only to say this isn't a

24 question of form over substance.  It shouldn't be decided

25 based on whether the case is tried here or is tried there.  It

1    should be decided according to the terms of Rule 32.

2             The third page of what I've given Your Honor

3    explains how courts interpret Rule 32 and the operative word

4    there is "is".  Multiple times multiple federal courts and

5    circuits have held that the question of proximity of the

6    witness to the place of trial is to be determined at the time

7    at which the deposition is offered.  These witnesses will be

8    available in court when the plaintiff wants to call them in

9    the order of their choosing.  We want to make them available

10   and we think that the jury will far prefer to hear from them

11   live, as this Court noted in the *Berry Plastics* case.

12            Under Rule 32(a)(4)(B), a witness is not unavailable

13   if the witness is present; and all of these witnesses, in

14   fact, will be present.  As we've noted here, the *Hartman* case

15   reached that conclusion, the *Niver* case reached that

16   conclusion, and I just point out the Young & Associates in

17   *Mazloum* cases, which are on the third and fourth pages of what

18   I gave you, Your Honor.  If the witnesses are made available

19   and it has been agreed for examination at trial, the Court

20   will not allow deposition testimony in lieu of live testimony.

21   And as the *Mazloum* case court noted, simply put, it is the

22   fact that a witness will actually be present at the trial that

23   renders him available.

24            So the plaintiff's point, when they suggest that

25   Rule 32 gives them permission to play portions of the

1   deposition or read portions of the deposition as opposed to

2   calling these people live and having an ordinary direct and

3   cross-examination of the witnesses is simply unfounded.  That

4   is not how courts interpret that section of Rule 32.

5            Another argument, Your Honor, that we've heard the

6   plaintiffs make and that we address in our briefs is the

7   question of these witnesses are parties; and if they are

8   parties, directors or officers, they believe that under Rule

9   32, they can use their deposition as opposed to calling them

10  live.  This is incorrect.  Rule 32(a)(3) doesn't give

11  plaintiff the discretion to decide she can present party

12  testimony by deposition whenever she wishes.  And the Court

13  reached this exact conclusion in the *Berry Plastics* case when

14  it analyzed Rule 32(a)(3) and how while the rule allows a rule

15  30b(6) and other party depositions to be used for any purpose,

16  it does not say they may be used at any time or in any manner

17  a party chooses.

18           This Court's reading of Rule 32(a)(3) is in line

19  with the 7th Circuit's decision in *Fey*, again a 7th Circuit in

20  1974, where the Court held that even under this rule, there

21  are limitations which afford a trial court reasonable latitude

22  for the expedition of the trial.  Expedition of the trial is

23  what Cook asks for here and also that the jury be presented

24  with the most accurate rendition of the truth as determined by

25  direct and cross-examination.

1            Rather than allowing the use of deposition

2  testimony, even where the witnesses are available in the

3  courtroom and could testify live, this Court should instead

4  insist that live testimony be taken in the first instance.  If

5  the plaintiff can show that any deposition designations won't

6  be repetitious in light of the live testimony, this Court

7  could permit playing the deposition.  If the plaintiffs choose

8  to use a deposition for impeachment purposes, we're not

9  suggesting that that is foreclosed; but what we're asking for

10  is that the witnesses who are present, at the time the

11  plaintiff seeks to offer their testimony, be called live and

12  in fact they are.

13            Now, the plaintiff's responsive brief to our motion

14  suggests a couple of things.  They suggest that Cook is trying

15  to get another bite at the apple, to clean up damaging

16  testimony.  And that's simply not accurate.  To the extent

17  that plaintiff believes they received some helpful testimony

18  during the deposition, they can elicit that same testimony

19  when the witness is on the stand.  To the extent that they

20  believe we somehow cleaned that up, they have the absolute

21  ability to impeach the witness.

22            They suggest that Cook wants to control the order of

23  the presentation of witnesses and that also is incorrect.  As

24  I've said and as we've repeatedly told plaintiff's lead

25  counsel, we'll provide these witnesses live in any order that

1    they choose.  All they need to do is tell us the date on which

2    they want the witness to appear and in fact, we'll make them

3    available.

4            This notion that Cook somehow wants to choose to

5    control the presentation of evidence, who's there and who's

6    not there, is incorrect.  We've offered to bring all of the

7    Indiana witnesses live at trial and in fact, the opposite is

8    true.  As we mentioned in our papers, Your Honor, the

9    plaintiffs are -- not only have they cherry-picked portions of

10   the depositions that they want to show the jury but in

11   addition to that, they're cherry-picking which witnesses they

12   believe will be best for them live versus by deposition.

13           So for example, Dr. Jim Gardner, who is the vice

14   president of reimbursement at Cook, is located in Bloomington.

15   His deposition was taken a few weeks ago.  At the conclusion

16   of the deposition, plaintiff's counsel served him with a

17   subpoena to appear live at trial.  Just a few days ago, as we

18   attached to our reply brief filed yesterday on this motion,

19   plaintiff's counsel asked if we would accept service for two

20   other witnesses, Scott Blanchard and Jack Hunt, who are also

21   located in Bloomington and who plaintiffs apparently intend to

22   subpoena and believe that they can call live at trial.

23           So they can't have it both ways.  It can't be that

24   under Rule 32 sometimes the Bloomington and Indiana based

25   witnesses are available and sometimes they're not available.

1    It can't work that way for Cook and it can't work that way for

2    plaintiffs.  And in fact, Rule 32 makes clear that those

3    witnesses are available for trial and thus should be called

4    live.

5           Just one last thing, Your Honor.  I put the text of

6    Rule 611 on the last slide here but I'm sure Your Honor knows

7    it quite well.  Rule 611 makes clear that this Court has the

8    discretion and in fact, a responsibility to exercise

9    reasonable control over the mode and order of examining

10   witnesses.  And point A1 I think is particularly important.

11   Make those procedures effective for determining the truth.  It

12   has always been the preference of courts in this jurisdiction

13   and across the country to determine the truth through live

14   testimony, through vigorous direct and through vigorous

15   cross-examination.

16          The fact of the matter is that of the witnesses that

17   the plaintiffs have designated from, nearly all of them were

18   deposed by plaintiffs for seven hours.  Cook had no

19   opportunity to ask questions during that seven hours.  We

20   could have asked that the witnesses stay for eight or nine or

21   ten hours and asked additional questions but that's not the

22   purpose of a deposition.  We're well aware that there's not a

23   distinction between discovery depositions and trial

24   depositions under the federal rules; but the fact is

25   practically speaking, I think Your Honor has to ask what is

1   the best and most efficient way for the jury to determine the

2   truth of the evidence before them.  Is it taking sound bites

3   from 30 witnesses or 31 witnesses who are deposed over seven

4   hours, questioned almost exclusively by the plaintiffs; or is

5   it bringing the witnesses with knowledge to the Court, asking

6   the plaintiffs to ask their questions and then Cook has an

7   opportunity to ask questions.

8         The other practical issue here, Your Honor, is that

9   as plaintiffs suggest this process would occur, during their

10  case in chief they would play a whole series of snippets from

11  video depositions.  Cook should have and is counter

12  designating testimony from the plaintiff's questioning of our

13  witnessess during the depositions.  But in Cook's case in

14  chief, it will call many of these same people live.  We

15  believe it's important for the jury to hear their story, to

16  hear what happened with these products and to hear about the

17  Cook Company live.

18        So the jury will hear from them first and two

19  versions of a video deposition snippets presented by

20  plaintiffs, and then by Cook.  Then the witness will be put on

21  live in Cook's case in chief and presumably plaintiff will

22  want to cross-examine those witnesses when they're on the

23  stand during Cook's case in chief.  So there's a significant

24  risk of duplication of the same evidence; and Your Honor has

25  the ability to choose that, in fact, the very best evidence,

1   live evidence be presented to the jury.  So that's the basis

2   for our motion, Your Honor.  Thank you.

3          THE COURT:  Thank you.  Mr. Williams?

4          MR. WILLIAMS:  Yes, Your Honor.  Thank you.  Joe

5   Williams for the plaintiffs.  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. WILLIAMS:  First, let me say we're not planning

8   on playing 31 depositions.  As we said in our papers, the

9   deposition cuts that we have made, we have reduced down to

10  less than eight hours and they would be played interspersedly

11  throughout our case in chief.  Before I get to the law, which

12  I believe is dispositive though, we need to point out that

13  Cook designated many of the same deposition witnesses that we

14  designated.  In fact, some of the ones that they designated

15  are Cook related people who reside in Indiana.  And I think

16  it's the old legal maxim that what's good for the goose is

17  good for the gander should apply.  If they're going to do the

18  exact same thing, it seems a little bit unsettling that

19  they've come and tried to preclude us from doing precisely

20  what they did.

21          In this handout that Ms. Pierson gave you, I flipped

22  through and I did not see listed the *Fey v. Walston* case.

23  It's a 7th Circuit decision from 1974.  Ms. Pierson did

24  mention it and we got the reply brief yesterday evening and I

25  had some time to read it.  They provided the Court with some

1  quotations from that decision.  They did not provide the Court

2  with the holding, which I believe is binding.

3          The Court said, "Rule 26(b) circumscribes the use at

4  trial of depositions of nonparty witnesses but with reference

5  to parties or their officers, directors, or managing agents,

6  depositions may be used by an adverse party for any purpose.

7  The pretrial deposition of a party is in a position different

8  from that of an ordinary witness and may be introduced as part

9  of the adversary substantive proof irrespective of the fact

10  that the party is available to testify or has testified at the

11  trial."  That is a direct quote from the 7th Circuit, which I

12  believe is binding here.

13          Not just that.  We provided the Court with Wright &

14  Miller's federal treatise which says the exact same thing.

15  That federal treatise said the same free use of these party

16  and officer depositions may be made -- they say the same

17  thing.  It says whether or not somebody is available to

18  testify at trial, if they are a party, that deposition can be

19  used.

20          As early as CMO 2 in this case, this Court

21  entered -- and I believe it was agreed by the parties -- that

22  depositions may, under the conditions prescribed in Federal

23  Rule of Civil Procedure 32(a)(1) through (4) be used against

24  any party who was represented at these depositions.

25          32(a)(3) is the rule that says that we can use

1  the -- we can use the deposition of a party for any purpose

2  that we want.  It doesn't rely on availability.  It's a

3  completely separate subsection.  Cook has known since CMO 2

4  that we have been permitted to use these depositions in our

5  case in chief.  We have hinged our trial strategy on using

6  certain portions of these depositions.  No one is telling Cook

7  that when it's their turn, when it's their case in chief, they

8  can't call anybody they want to try to come up and try to

9  clean up the damage that was done during these depositions.

10 But what they can't do is take away the right that we have

11 under the rules and under binding 7th Circuit precedent to

12 provide that deposition testimony.

13         There have been many depositions -- 30(b)6

14 depositions, officer depositions where -- I note there's been

15 several that I've been at that I've had to stay past 5:00

16 because opposing counsel provided a very extensive direct

17 examination of their own clients at the deposition.  So this

18 idea that Cook had no ability to do that is simply not true.

19 I've sat through several depositions where there have been

20 extensive examinations.  In fact, full direct examinations.

21         We took the sales rep deposition in the Brand case

22 down in Georgia; and when we got -- when Mr. Martin and I got

23 done examining that witness, Mr. Weber, for the defense, did

24 an entire direct examination.  In fact, I think his first

25 question was, "Good morning, Ms. Clemmer.  Could you please

1   introduce yourself for the jury."

2         So this idea that Cook has been prohibited or

3   somehow couldn't ask rehabilitating questions during these

4   depositions doesn't hold water because they've done it.  We've

5   got the right under the rule and under 7th Circuit precedent.

6         We've got the burden of proof in this case.  Cook

7   does not have the burden of proof.  We have to demonstrate to

8   the jury that Mrs. Hill is entitled to be compensated for the

9   wrongs done to her by Cook.  Implicit in that and inherent in

10  that is that we, as her lawyers, choose the best strategy and

11  the best way to put forward her case for the jury.  Your Honor

12  may disagree with our strategy, Cook may disagree with our

13  strategy; but it's our strategy on behalf of Mrs. Hill and

14  it's a strategy that's expressly allowed for by the rules.

15        If Cook prevails in this motion, apart from having

16  to ignore 7th Circuit precedent and Wright & Miller on civil

17  procedure, they will, in effect, succeed in telling us how to

18  try Mrs. Hill's case.  If they don't like the deposition

19  designations that we play, these are testimony from their

20  people, they can either counter designate under the rule of

21  completeness or call those witnesses in their case in chief.

22  But what they can't do is tell us how to try our case.

23        When we had a status conference with Your Honor back

24  on June -- might have been 9 or 19th of this year, Cook

25  brought up this same issue; and Your Honor told us that you

1  weren't going to tell us how to try our case, whether or not

2  you agree or disagree with our strategy.  When Ms. Pierson

3  then pressed and said, "Well, we should be able to bring live

4  witnesses during plaintiff's case in chief, if they're going

5  to play deposition clips."  Later on in the transcript said,

6  "I don't see anywhere in the rules that would allow for that."

7  Frankly, we think this issue has already been ruled upon; but

8  to the extent Your Honor believes it's not, 32(a)(3) and

9  binding 7th Circuit precedent allows us to proceed in the way

10  that we choose.

11          But just to be clear and so Your Honor -- I mean,

12  there's been this boogie man statement that there's going to

13  be 31 depositions, 50 hours of deposition testimony.  We've

14  cut it down and we have our clips down to less than eight

15  hours.  If our case in chief takes five days, we imagine

16  playing an hour and a half out of the balance on any given

17  day.  The jury is not -- the jury is going to have plenty of

18  live testimony; and if Cook is that worried about it, they can

19  bring those witnesses in their case.

20          THE COURT:  Thank you, Mr. Williams.

21          MR. WILLIAMS:  Thank you, Your Honor.

22          THE COURT:  Ms. Pierson.

23          MS. PIERSON:  Thank you.  Your Honor, just a few

24  responses.  I mean, today we're hearing from Mr. Williams that

25  they don't plan to play 31 witnesses by deposition.  That

1   there will only be eight hours of testimony.  I can tell you

2   that there are many, many lawyers at my office currently

3   trying to counter designate and to evaluate objections to 40

4   hours of deposition testimony that they've designated from 31

5   different witnesses.  If nothing else, it's a waste of our

6   time to be reviewing and devoting resources to evaluating

7   counter designations and objections for witnesses that they

8   apparently don't plan to play.

9          There was no reason to designate from 31 witnesses,

10  if they didn't intend, in fact, to use those witnesses at

11  trial; and we submit they do.  That they want to have it both

12  ways.  They want to tell Your Honor that there will only be

13  eight hours.  This won't really be a trial by deposition.  But

14  at the same time, their designations state otherwise.

15         Mr. Williams, in his discussion of the *Fey* case,

16  frankly is just wrong.  Your Honor, that case is a 7th Circuit

17  case.  It was decided in 1974 and the 7th Circuit noted that

18  in the reading of Rule 32(a)(3), that under that rule, there

19  are limitations which afford a trial court reasonable latitude

20  for expedition of the trial.  Your Honor applied that rule

21  when you decided the *Berry Plastics* case in 2015.  And in

22  fact, in that -- in that decision, evaluating whether a party

23  was able to avoid calling a witness live by reading their

24  deposition, this Court held that the "for any purpose" portion

25  of that rule, does not say that it may be used at any time or

1  in any manner a party chooses.

2            There are a number of additional 7th Circuit cases

3  and Southern District of Indiana cases that we've included in

4  our papers and that are included in the handout that I gave

5  you this morning that have been decided since *Fey* that reach

6  the conclusion that, in fact, this Court has the ability to

7  require a party to bring the parties -- to require the parties

8  to examine the witnesses live; and that in addition to that,

9  Rule 32 does not, in fact, permit them to read or play a

10 deposition when the witness is available.

11           The bottom line is that these witnesses are

12 available and that there's a strong preference in this circuit

13 and across the country to prevent trial by deposition.  At the

14 end of the day, Your Honor, I think you have to ask yourself

15 and we have to ask ourselves, how will these cases be tried

16 and how will these cases be discovered.  And under

17 Mr. Williams' view of the world, this will all happen in the

18 deposition and no place else.

19           Going forward, that will mean for every other case

20 that's worked up, plaintiffs will -- we have seven hours with

21 these witnesses, the time will have to be equally divided.

22 Plaintiffs will have their chance to do their "direct" of the

23 witnesses and we will be doing our full-blown trial cross.

24 That's not what depositions were intended to be.  Trials

25 weren't intended to be snippets from hundreds of hours of

1   depositions played at rapid fire for the jury.  They were

2   intended to be a search for the truth; and our system

3   establishes that the way that search for the truth should be

4   conducted is by having a witness on that stand under oath,

5   which each side having an equal ability to question them and

6   having had the opportunity to discover the facts and knowledge

7   that they have through deposition.

8           This Court has to ask itself how do you want

9   discovery to be conducted going forward, and how does this

10  Court want these cases to be tried.  We submit that where the

11  witnesses are available, Rule 32 requires the plaintiffs to

12  question them live.  They will be here.  The jury will hear

13  plenty of video deposition from witnesses who are outside the

14  state who can't appear at trial, who are not parties.  But for

15  the witnesses who are available, we believe that under Rule

16  32, they're required to bring them live and under Rule 611,

17  that the search for the truth and the Court's ability to

18  control the mode and presentation of evidence demands that

19  these people had the ability to be questioned face-to-face in

20  front of the jury in this case.  Thank you, Your Honor.

21          THE COURT:  Thank you.  The purpose of depositions,

22  of course, as we all know, is one, pretrial discovery; and

23  second, is due to unavailability of a witness for many -- what

24  could be many different reasons.  They're not able to appear

25  at trial and of course, depositions then come in at trial and

1  there's instructions to jurors regarding depositions.  And I

2  always tell jurors that, usually involving physicians, that --

3  or other professionals, that due to their schedules, it's hard

4  to get them into court in person and they're to treat this

5  deposition testimony just as if they were sitting in the

6  witness box.

7          The defendant Cook has made a representation to the

8  Court and to the plaintiffs that it will make all witnesses

9  available to the plaintiffs for -- at their scheduling for

10  trial; and this Court's preference is for live testimony from

11  witnesses as opposed to depositions.  My experience over the

12  years is jurors prefer live testimony.  And so the request of

13  Cook to preclude substantive use of transcripts, depositions

14  who are available is granted.  Cook will make available all

15  witnesses requested by plaintiffs at the time plaintiffs

16  request them to be made available.  Of course, obviously you

17  can use depositions for impeachment purposes.  Obviously you

18  can do that.

19          MR. WILLIAMS:  Your Honor, can I ask a clarifying

20  question?

21          THE COURT:  Sure.

22          MR. WILLIAMS:  So in every trial that I've ever

23  done, we tell the opposing side what witnesses we're going to

24  call the following day.  As you know, trial's fluid.  We have

25  no idea what they're going to say in their opening statement.

45

1            THE COURT:  At the end of the day, I always ask,

2    who's ever presenting at the time, give me your next three or

3    four witnesses.  So I do that for both sides so we all know.

4            MR. WILLIAMS:  If we say, "We need Cook witness A,

5    B, C and D tomorrow at 9:30," they're going to be there.

6            THE COURT:  That's what Cook is representing.  But

7    I'm assuming you may know more than eight hours or ten hours

8    before what your schedule is.  So let's -- let's use some

9    common sense here and courtesy as well.

10           MR. WILLIAMS:  I had three clarifying points.  The

11   second is, so Cook, who designated Indiana witnesses, I take

12   it they can't play those depositions either.

13           THE COURT:  If they're available to testify, no.

14   Only for impeachment.

15           MR. WILLIAMS:  For impeachment, sure.

16           THE COURT:  Right.

17           MR. WILLIAMS:  And now I just lost my third.  Oh.

18   Does this go for all Cook employees or just Cook employees --

19   I mean, there are Cook employees whose depositions we want to

20   play who live in Denmark.  I don't take it the Court is -- or

21   is Cook representing that those people are going to be sitting

22   in the courtroom when we need them.

23           THE COURT:  Cook has represented to me today and to

24   you --

25           MR. WILLIAMS:  Okay.

 1                THE COURT:  -- that any witness you want, they'll

 2    make available.

 3                MR. WILLIAMS:  Thank you.

 4                MS. PIERSON:  Our papers were the witnesses that are

 5    available that are in -- meaning the witnesses that are in

 6    Indiana are the ones that fall under Rule 32 is available.

 7                THE COURT:  Right.

 8                MS. PIERSON:  As a practical matter, Your Honor, we

 9    want the jury to hear from all these witnesses live.  So we'll

10    work with plaintiffs on any witness to bring them live.

11                THE COURT:  That's my understanding of your

12    representation.

13                MR. WILLIAMS:  And I guess, Your Honor, my issue is

14    if we're going to coordinate people coming over from Denmark,

15    what it's going to end up doing is dictating our order of

16    proof.  If we're going to have to tell somebody, probably

17    weeks in advance, we want Arna Mogard Nielsen on Tuesday.

18    Well, if their opening statement is different than we

19    anticipate and we want to change our order of proof, now we've

20    got a fellow in here from Denmark that we've got to call on

21    that day because he's now made available; and it's going to

22    disrupt the ability for us to try our case that we want to try

23    and order of proof that we want to.

24                THE COURT:  Then Cook can get their witnesses here,

25    whether they're local or international, in a very short period

1  of time.  They have several private aircraft that they can

2  dispatch --

3           MR. WILLIAMS:  Okay.

4           THE COURT:  -- to pick these witnesses up.

5           MR. WILLIAMS:  Thank you, Your Honor.

6           MS. PIERSON:  I don't know if that is, in fact,

7  true, Your Honor, but let us work with the plaintiffs.  Let's

8  see what we can work out in terms of scheduling.  I think both

9  sides want to be reasonable with one another.

10           MR. WILLIAMS:  Right.

11           MS. PIERSON:  I know Mr. Matthews expressed a desire

12  that this be a trial that we conducted in an orderly way.

13  We're committed to the same thing and we'll work together.  In

14  a trial of this length and my experience, typically each side

15  gives one another 48 hours notice of what witnesses will be

16  called and what exhibits will be used.  We believe -- and

17  actually, the next matter on the agenda, Your Honor, may be

18  matter 5, was Hill trial procedures.  So this might be a nice

19  way to segue to that.  But it's been my experience that that

20  works best given the length of the trial and particularly

21  where you have live witnesses and nobody wants somebody

22  sitting around for a long time.

23           So we think it's fair for each side to give the

24  other one 48 hours notice of witnesses and exhibits and that

25  will alleviate a lot of this problem.  To the extent that

1  witnesses are coming from another country, we obviously need

2  to coordinate more but I think we can work that out with the

3  plaintiffs.

4          THE COURT:  Mr. Williams.

5          MR. WILLIAMS:  Forty-eight hours has never been

6  feasible for me because I can tell you I know for a fact,

7  based on the motions that we've seen and volume of motions

8  we've seen, if we give Cook our list of witnesses 48 hours in

9  advance and there is some issue that we need to reorder, we

10  need to reshuffle, make strategical decisions, they'll come

11  back and complain.  I know they will.  It's happened with

12  every issue in this case.  I have never tried a case where

13  anybody has had to give anything more than day before.  That's

14  standard and I think day before --

15          THE COURT:  I just mentioned that's my standard

16  procedure.  But if you want -- if you're requesting a witness

17  from overseas from Denmark or whatever, you're going to have

18  to give them some kind of idea when you're going to call them.

19  That just makes sense.

20          MR. MATTHEWS:  Understand.

21          MR. WILLIAMS:  Fair enough.

22          THE COURT:  I'm sure you can work all that out.  I'm

23  not -- I'm not going to have much patience with game playing

24  on witnesses and we can't get them here by this time or late

25  notice or something like that.  My experience is you can't do

1  that in a complex, lengthy trial.  It has to have some kind of

2  coordination among me, you and everyone else in the trial.

3  We'll work that out.

4           MS. PIERSON:  Your Honor, we have really three more

5  matters on the agenda.  One is the date for the hearing on

6  motions in limine and the other was Hill trial procedures.  I

7  have a list of things that Mr. Matthews and I talked about and

8  we need some clarity on related to trial procedure.  Would you

9  like to --

10          THE COURT:  I've got a date for hearing on motions

11  in limine written down here September 25.  Tina?

12          THE CLERK:  That's for all pending motions.

13          THE COURT:  We can have an omnibus hearing on the

14  25th of September regarding what's pending.

15          MS. PIERSON:  The motions in limine, the responses

16  aren't due until the 26th.  So we won't be able to hear those

17  on the 25th.  And the 25th, as I understood, is the day we had

18  set aside for summary judgment and Daubert.  We've got a

19  pretty full day that day of motions.

20          THE COURT:  Whatever is ripe on the 25th we'll

21  discuss.

22          MS. PIERSON:  Can we -- should we work with Tina to

23  get -- what I think we're all really wondering, is there

24  another date that we can set aside for hearings on motions --

25          THE COURT:  Sure.

1          MS. PIERSON:  -- that wouldn't be ripe until the

2   26th?

3          THE COURT:  Sure.  We'll find a date for you.

4   Absolutely.  Just work with Tina Doyle on that and she'll find

5   a date for you.

6          MS. PIERSON:  Thank you, Your Honor.  In terms of

7   procedures -- I'm happy to come up or I can stay here.  But

8   just a few questions about the trial that I think both sides

9   had.

10          First, juror questionnaires.  Can you tell us what

11   is your practice about when those are sent out or when they're

12   completed and when the parties might have a chance to --

13          THE COURT:  When will they be available?

14          THE CLERK:  Generally we send those out the Friday

15   morning prior to the Monday trial start date, and those

16   usually are generated by email to lead counsel.

17          THE COURT:  If you need a few extra days on that, I

18   would have no problem.  Can we do it a week before trial,

19   Tina?

20          THE CLERK:  A week would probably be a little bit

21   scary because we have excuses coming in up until time; but

22   probably by Monday of the week prior I could have Linda

23   Carmichael make sure they draw in.

24          THE COURT:  We'll try to get them to you.

25          MS. PIERSON:  Thank you.  I think we mentioned at

1  the last status conference that both sides may want to suggest

2  some things that could be included in the Court's standard

3  questionnaire.  Would it be possible to get a copy of the

4  standard questionnaire that the Court uses and then maybe

5  Mr. Matthews and I can work together and submit something to

6  you jointly to consider?

7           THE COURT:  Sure.

8           MS. PIERSON:  And then in terms of voir dire, I know

9  it's your practice, Judge, to ask some preliminary questions

10 of the jury.  There's a deadline under our schedule that we

11 submit to you by October the 16th suggested additions to what

12 you might ask.  If we wanted to see what you already have on

13 your list, what you typically ask --

14          THE COURT:  I usually go through -- I talk to them

15 for probably half a hour, 45 minutes; discuss with them -- I

16 make them -- I try to make them feel comfortable, first of

17 all, welcoming them.  And then try to impress upon them the

18 seriousness of their job and their responsibilities as

19 citizens to come in and serve, the importance of that service.

20 Then I start talking to them a little bit about any prior jury

21 service, family, friends acquaintances ever been involved in

22 litigation.  I discuss burdens of proof, the difference

23 between a criminal burden of proof and a civil burden of

24 proof; direct, circumstantial evidence.  I discuss, as I

25 mentioned earlier, what deposition testimony is and what live

1   testimony is.

2            Other things I talk about are just in general about

3   the litigation.  I really don't get into specifics about it.

4   So that all takes about 45 minutes or so for me to do that.

5   Then each side will have an opportunity to question the

6   jurors -- jury pool as well.  And I usually limit it to 20

7   minutes in most trials for each side, but considering that

8   this might be a little more complex then the run-of-the-mill

9   employment case, I'll probably give you each 45 minutes to

10  question the jurors.  And if you need a little extra time, I

11  might be able to consider that as well, but I think you'll

12  know who you want after that.

13           MS. PIERSON:  Thank you, Your Honor.  And then how

14  about the length of opening statements.  Do you have any

15  thoughts on that?

16           THE COURT:  Well, I usually don't set time limits on

17  opening or closing.  You should know yourselves when you'll --

18  after how long you're going to lose them.  I know when I used

19  to try cases, I never liked the judge to impose a time limit

20  but you know.  So your opening statements, I wouldn't think

21  you would want to go much over 45 minutes or an hour.

22           MS. PIERSON:  Okay.  Thank you.  Your Honor, what

23  are your thoughts on what can be shown to the jury during

24  opening statements?

25           THE COURT:  Well, if it's been stipulated as

1  admissible, you can.

2          MS. PIERSON:  And then our -- our hope -- well,

3  before I move from that topic.

4          THE COURT:  And if you need a pretrial ruling on

5  admissibility that you want to show something to the jurors,

6  just let me know and I'll try to give you an idea about that.

7          MS. PIERSON:  Okay.  So one related question to

8  that.  It's my understanding that neither side should be

9  showing the jury, for example, deposition testimony, portions

10 of transcripts, or things like that during their opening

11 statement that have not yet been admitted.

12         THE COURT:  Right.

13         MS. PIERSON:  I want to be sure that's your

14 practice, too.

15         THE COURT:  Yes.

16         MS. PIERSON:  And then I've spoken with Mr. Matthews

17 about this just briefly but because I think both sides plan to

18 use some demonstratives in their opening, I think it's

19 important that we exchange them in advance so that to the

20 extent that there's some objection to showing it to the jury,

21 we have an opportunity to address that with you before the

22 jury's actually in the box.  So I was hoping we could maybe

23 get an agreement to do that 24 hours in advance or some

24 reasonable period of time.

25         THE COURT:  Reasonable heads up on that is good.

1              MS. PIERSON:  We'll work together on that.  And then

2    the deposition designations, to the extent that there's a

3    witness that's unavailable.  For example, each side has

4    designated from the doctors who are in Florida who can't be

5    compelled to come.

6              THE COURT:  Right.

7              MS. PIERSON:  Or other nonparties to the case.

8    What -- I'd like know what Your Honor's preference is on how

9    those are played.  So I can tell you we've already talked to

10   the plaintiffs about this and our preference is that although

11   each side designated portions of their testimony, some for the

12   plaintiff's case, they've designated what they like in our

13   counter designations and we've done the same for our case.

14   Our preference is that what's designated is played straight

15   through from beginning to end so that we don't need to counter

16   designate things that have already been designated for

17   context.  In my experience, it becomes very disjointed when

18   you try to play a deposition in terms of here's what the

19   plaintiff would ask, if the person was on the stand.  Here's

20   what the defendant would ask, if the witness is on the stand.

21   Do you have a preference as to how those are played?

22   (Mr. Martin left the conference at this time.)

23             THE COURT:  I've done it both ways over the years.

24   It really depends on how the parties want to do it.  By

25   playing it completely through, of course I explain to the

1  jurors that we're doing this for ease of their understanding

2  and smooth operation of -- smooth conducting of the trial.

3  That the plaintiff and defendant testimony is in here and I

4  would let them know when defendants are questioning and when

5  plaintiffs are questioning.  I've done it both ways.  But

6  certainly my observation is that playing it all at once is

7  easier for the jurors to grasp.  Whatever you guys want to do.

8         MS. PIERSON:  We'll work together and see if we can

9  resolve that.

10        THE COURT:  Mr. Williams, is that --

11        MR. WILLIAMS:  I just wanted to reserve an objection

12 once we see which will be played all through because

13 oftentimes I think if it's played all through, there could be

14 a misperception about sponsorship of certain evidence, and I

15 don't -- I don't want that to happen in our case in chief, if

16 it's -- you know, if we don't think that it would be

17 appropriate.  I'm not saying yea or nay right now.  I just

18 want to make sure that I'm not agreeing to anything.

19        THE COURT:  As I said, I would always explain that

20 to the jurors to your satisfaction or however you want me to

21 explain that, I would do that.

22        MS. PIERSON:  That's important to us as well.

23        THE COURT:  Sure.

24        MS. PIERSON:  We'll see if we can work that issue

25 out and if we can't, we'll let you know.  So our final witness

1  lists are due on Monday -- this coming Monday.

2          THE COURT:  I don't know.

3          MS. PIERSON:  They are.  It's coming right up.

4          THE COURT:  Okay.  Good.

5          MS. PIERSON:  Without a doubt.  And we've made the

6  request to the plaintiffs, but have not yet received a

7  response, about to the extent that they plan -- that they want

8  someone from the company to appear, that they plan to subpoena

9  them, we'd just like some advance warning of that.  Does the

10 Court contemplate that in the lists that are filed on Monday,

11 that that's our notice, essentially?  Or is there -- we just

12 want there to be some process so that we're sure we know if

13 someone is expected to be there, we're going to have them

14 there.

15         MR. WILLIAMS:  Your Honor, I thought we were just

16 told that when we identify our witnesses the night before,

17 they are Cook employees, they will be at trial.  If they're

18 asking us to tell them how we're going to put on our case four

19 weeks in advance, I absolutely object to that.  Frankly, we

20 haven't even gotten to that point.

21         THE COURT:  Right.

22         MR. WILLIAMS:  If the representation is the

23 witnesses are going to be made available, then that needs to

24 be the representation and that needs to happen.

25         THE COURT:  And I agree with you, Mr. Williams, on

57

1    that.  There's no -- it probably would be impossible for you

2    to schedule that at this point.  But we'll advise both sides

3    to try to give as much advance notice as you can just so we

4    can have this trial run smoothly.  And if it's the night

5    before, that's fine; but if you do the night before and it's

6    going to make it really difficult for Cook to get those

7    witnesses available, I'm going to know why couldn't we have

8    asked maybe 48 hours before, if you knew.  Okay?  So I'm just

9    trying to make this trial run as smoothly as we possibly can.

10           MS. PIERSON:  We'll work together on that point.

11   Really, my question was about -- I've heard the plaintiff say

12   a few times that they intend to narrow the list and if it's a

13   case that can be put on in a week and we've started to

14   schedule our witnesses according to that.  So all I'm really

15   asking --

16           THE COURT:  Is that what you think, Mr. Matthews,

17   Mr. Williams, a week to present your case?

18           MR. MATTHEWS:  Yes.  I think probably one week.

19           THE COURT:  By one week, we're going to work Monday

20   through Thursday.

21           MR. MATTHEWS:  Maybe five trial days.

22           THE COURT:  Five trial days?  Okay.  All right.

23           MS. PIERSON:  Thanks, Your Honor; and that helps.

24   There are something like 48 people on the list.  I just want

25   to know if there's some people that we can tell them, "You

1    don't need to be here," that we're available to tell them.

2    And if there are other people that need to be on high alert,

3    we'll have those people on high alert.

4             THE COURT:  Mr. Williams.

5             MR. WILLIAMS:  Not -- at the risk of potentially

6    speaking out of school, I'm hearing a little bit of hemming

7    and hawing about this making witnesses available.  And

8    by playing -- I mean, if the concern is truly the efficiency

9    at trial and trying to get this to run as smoothly as possible

10   with the least hiccups as possible, plaintiff's case in chief

11   can be run incredibly smoothly by using our 32(a)(3)

12   depositions.  We were told that they were going to be made

13   available and I think that's why Your Honor rejected my

14   position.

15            THE COURT:  It is.

16            MR. WILLIAMS:  I get that.  I'm now hearing, "Well,

17   can we hear by Monday?  Can we hear by X number of days?"  As

18   you know, you've tried enough cases, both as a lawyer and as a

19   judge, things change in a matter of seconds; and I can foresee

20   right now, "Well, we need X, Y and Z tomorrow."  And the first

21   thing that's going to be said is, "Why couldn't you have told

22   us yesterday?"

23            THE COURT:  These people are in Indiana.

24   Bloomington is an hour and a half from Evansville by car.  By

25   plane, it's 20 minutes.  So it will be difficult for Cook to

59

1  tell me that it's going to be hard for us to get them here.

2          MR. WILLIAMS:  Okay.  Thank you.

3          MS. PIERSON:  Thank you, Your Honor.  That's all I

4  have on the trial procedures for Hill.

5          THE COURT:  Also to both sides, you're going to file

6  your final witness lists and as we all know, many times those

7  lists -- there's people on those lists that are never called.

8  Let's do our best in good faith to let the other side know,

9  "Well, we're not going to call this person, we're not going to

10 call that person."

11         MR. MATTHEWS:  Understood.

12         MS. PIERSON:  That's all.

13         THE CLERK:  Your Honor, I do have one question.

14 When we were talking about the juror questionnaires and giving

15 them a blank copy, those juror questionnaires have already

16 been filled out.  So they won't be sent back out to the

17 jurors.

18         THE COURT:  Okay.  That's right.

19         THE CLERK:  If there's writing that's missing from

20 there, we can deal with it.  I'm happy to give a copy of what

21 will be answered.

22         MR. MATTHEWS:  I did send a questionnaire that I put

23 together to opposing counsel.  So we'll try to get that to the

24 Court within the next few days because it sounds like you're

25 going to try to incorporate that into the next mailing.

1              THE CLERK:  This mailing has already gone out.  So

2  this jury pool that we will have for our October 23rd trial

3  date, all those questions on our standard form have already

4  been submitted.

5              MR. MATTHEWS:  I understand.  But we would be

6  sending -- if we did another questionnaire, we would be

7  sending it or we could present it the morning of voir dire.

8  Would that be okay with the Court?

9              THE COURT:  We might be able to do that, yes.  What

10  Tina Doyle is telling you is that these questionnaires are

11  sent out way in advance.

12              MR. MATTHEWS:  Right.

13              THE COURT:  And they've already sent them back in

14  with their answers on them.  So if you've got additional

15  questions, we might be able to present it to them the morning

16  of trial or certainly you may be able to ask them.

17              MR. MATTHEWS:  We'll be prepared then.

18              MR. WILLIAMS:  Ms. Doyle, do you know how large the

19  veneer is on this?

20              THE CLERK:  We are bringing in 55.

21              MR. WILLIAMS:  Okay.

22              THE COURT:  And I thought we'd have at least two or

23  three alternates.

24              MR. WILLIAMS:  Your Honor, I have one additional

25  issue, just to kind of let Your Honor know.  There were a

1    number of cases that were filed in St. Louis city court --

2              THE COURT:  Yes.

3              MR. WILLIAMS:  -- that were moved to this Court.  We

4    have reached an agreement with the defendants on how those

5    cases -- where they'll go; and some of those cases involved

6    Indiana residents.  And so we've agreed that those folks who

7    are Indiana residents obviously can't be here in federal

8    court.  So without prejudice, they will be refiled in front of

9    the consolidated action before Judge Keele in Marion County

10   and the balance of those cases will remain here in the MDL.

11   And so I just -- we haven't -- with trial coming up, I just

12   don't -- we haven't memorialized it.  We haven't signed

13   anything or presented the Court with a stipulation; but I

14   wanted to let the Court know that we do have an agreement

15   because I know that those are open motions on the docket that

16   I do not believe need to be ruled upon, given our agreement.

17             MS. PIERSON:  That is correct.  We do have a deal as

18   it relates to the Indiana plaintiffs.  I think we have a deal

19   as relates to nonIndiana plaintiffs but we've got a little bit

20   of language that we have yet to work out.

21             MR. WILLIAMS:  Yes.

22             MS. PIERSON:  So we're close on that.

23             THE COURT:  That makes sense.

24             MR. WILLIAMS:  Just wanted to let you know.

25             THE COURT:  Thank you.

```
 1                 MS. PIERSON:  Can I go back to the jury

 2   questionnaires for one moment?  Thank you.  I want to be sure

 3   I'm clear.  The questionnaires have already gone out and

 4   they'll be back to this Court --

 5                 THE CLERK:  They're already back with the Court.

 6                 MS. PIERSON:  Do you think we could have them sooner

 7   then?  Is that possible?

 8                 THE CLERK:  We have to give them time to request --

 9                 MS. PIERSON:  Their excuses.

10                 THE CLERK:  -- excuses.

11                 MS. PIERSON:  I understand.  Maybe if we could at

12   least see like a blank copy of the questionnnaire.

13                 THE CLERK:  Yes.

14                 MS. PIERSON:  That way we can evaluate do we really

15   think we need to have some second or can this just be

16   addressed in voir dire.

17                 THE COURT:  Sure.

18                 MS. PIERSON:  That's all I had, Your Honor.  Thank

19   you.

20                 THE COURT:  Anything else from the plaintiffs?

21                 MR. MATTHEWS:  Nothing else, Your Honor.

22                 THE COURT:  All right.  Then the last item I have on

23   the agenda is the admissibility of medical and business

24   records.

25                 MR. MATTHEWS:  Yes.  We have been talking with
```

 1   opposing counsel about an agreement or agreements to

 2   stipulation as to the status of their files or their documents

 3   they've produced in litigation as business records, as well as

 4   authenticated, and also medical records and pharmacy records.

 5   We're working on a stipulation so at the time of trial there's

 6   not that issue.

 7             THE COURT:  Great.

 8             MR. MATTHEWS:  There's really just an issue of

 9   relevance.

10             THE COURT:  I'm assuming you're going to file a list

11   of exhibits stipulated or not.

12             MR. MATTHEWS:  That's what we hope to do.  That's

13   what I'm planning on doing.

14             MS. PIERSON:  We have -- maybe to put on the record.

15   We have already agreed that the medical and pharmacy records

16   of Mrs. Hill, that we've stipulated that those are authentic.

17   So we need not take depositions of records custodians as to

18   that.  We have already agreed that the documents that are --

19   that are written by Cook employees that Cook has produced,

20   that those are authentic.  Mr. Matthews and I will call

21   tomorrow to talk about what is a business record and what

22   isn't within those lists.  We've reached some agreements

23   already so that they don't need to take record custodian

24   depositions.

25             THE COURT:  Agree.  Very good.

1            MR. MATTHEWS:  We'll get that worked out.

2            THE COURT:  Good.  Anything else we need to discuss?

3   You received the Rule 72 entry I submitted yesterday --

4            MS. PIERSON:  We did.

5            THE COURT:  -- on your objection to Magistrate

6   Baker?

7            MR. WILLIAMS:  Oh yes.

8            THE COURT:  You received that?  Okay.  I currently

9   have 16 Daubert motions pending, eight filed by each side;

10  four summary judgment motions, and one motion in limine which

11  is not ripe yet.  But can you give me any idea if there's more

12  coming down the pipeline here?

13           MS. PIERSON:  No more Daubert or summary judgment

14  motions.  There are motions in limine that are due today and

15  there will be a number of those.  Probably not a surprise,

16  given the number of witnesses we've been talking about here

17  and breadth of testimony, that there are a number of motions

18  in limine.  The parties also are going to exchange preliminary

19  exhibit lists.  I can tell you we've got about 3700 on our

20  list.  The plaintiffs have about 7,000 on their list.  So

21  we've prepared motions in limine.  I think it's best we can,

22  knowing that the amount of information that's out there

23  related to this case, has yet to be really distilled, I think

24  the way both sides believe it properly should be.  So we're

25  prepared to file those motions with you today.  There will be

```
 1  a number of them, Your Honor.

 2            THE COURT:  Recall a story -- you all remember Judge

 3  Dillon from our court here.  Legendary judge.  He was walking

 4  by a witness room and he noticed ten or 15 banker's boxes.

 5  And he said, "What is in those boxes?"  And they said, "Well,

 6  judge, that's all our trial exhibits."  And he said, "Well,

 7  each side pick their best 100 exhibits and we'll go with

 8  that."  I'm not going to do that but Judge Dillon had his own

 9  ways of handling things.

10            MS. PIERSON:  We may file a joint motion requesting

11  that as we approach this deadline for exhibits.  It's a lot of

12  information.

13            THE COURT:  Judge Dillon said that there was no

14  objection.  I find that hard to understand that, I guess.

15            MS. PIERSON:  Sometimes you need to save us from

16  ourselves.

17            THE COURT:  That's true.

18            MS. PIERSON:  Thank you, Your Honor.

19            THE COURT:  Okay.  And again, as I mentioned before,

20  this is a complex litigation and I appreciate all the hard

21  work that you're all putting into it.  I appreciate the

22  cooperation I've seen so far on it and hopefully that will

23  continue.  And as I've said, hopefully we'll have a relatively

24  smooth trial proceeding and we'll get resolution of this case.

25            MS. PIERSON:  Thank you.
```

1          THE COURT:  If you've got any questions about

2 anything, trial procedures, deadlines, anything regarding this

3 litigation, just give Tina Doyle a call and she'll get it to

4 me and I'll try to give you our best answer as soon as I can.

5 Thank you.

6          MR. MATTHEWS:  Thank you, judge.

7          THE CLERK:  All rise.  Court is in.

8          (Proceedings concluded at 11:44 a.m.)

9 ********************************************************

10                 CERTIFICATE OF COURT REPORTER

11

12     I, Margaret A. Techert, hereby certify that the

13 foregoing is a true and correct transcript from

14 reported proceedings in the above-entitled matter.

15

16

17

18 /S/ Margaret A. Techert_____     **September 21, 2017**
   MARGARET A. TECHERT
19 Official Court Reporter
   Southern District of Indiana
20 Evansville Division

21

22

23

24

25