UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: COOK MEDICAL, INC., | ) |
| IVC FILTERS MARKETING, SALES | ) Cause No. |
| PRACTICES AND LIABILITY, | ) 1:14-ML-2570-RLY-TAB |
| LITIGATION | ) Evansville, Indiana |
| | ) **June 19**, 2017 |
| | ) 9:35 a.m. |
| | ) |

**Before the Honorable**
**RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
TELEPHONIC STATUS CONFERENCE

**For Plaintiffs:**                     Ben C. Martin, Esq.
                                        LAW OFFICES OF BEN C. MARTIN
                                        3710 Rawlins Street, Suite 1230
                                        Dallas, TX  75219


                                        Joseph N. Williams, Esq.
                                        RILEY WILLIAMS & PIATT, LLC
                                        301 Massachusetts Avenue
                                        Indianapolis, IN  46204


For **Defendants:**                     Andrea Roberts Pierson, Esq.
                                        John T. Schlafer, Esq.
                                        FAEGRE BAKER DANIELS LLP
                                        300 N. Meridian St., Suite 2700
                                        Indianapolis, IN  46204

                                        John Joseph Tanner, Esq.
                                        BAKER & DANIELS
                                        300 N. Meridian Street
                                        Indianapolis, IN  46204

Court Reporter:                    Margaret A. Techert
                                   United States District Court
                                   101 NW Martin Luther King Blvd.
                                   Evansville, Indiana  47708


              PROCEEDINGS TAKEN BY MACHINE SHORTHAND
         TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION M

```
 1                      (In open court.)
 2           THE COURT:  Good morning, everyone.
 3           MS. PIERSON:  Good morning.
 4           MR. WILLIAMS:  Morning.
 5           MR. MARTIN:  Morning.
 6           THE COURT:  Hope you had a good weekend.  We're here
 7  today on our monthly status conference leading up to our first
 8  Bellwether trial in October.  And who wants to lead off today
 9  to give me a status?  I see a filing from Friday -- Friday
10  evening here from Cook.  I'll be quite frank with you.  I
11  wasn't in the office this weekend and I did not see that, this
12  filing, until this morning.  So we'll try to go over as much
13  as we can but I just want to give you that heads up.  But Ben
14  or Joe, you want to give me an idea where we're at and if
15  we're on track?
16           MR. WILLIAMS:  Sure.  Ben, why don't you go ahead.
17           MR. MARTIN:  Certainly, Your Honor.  Your Honor --
18  and good morning.  And I think that the main focus today, if
19  I'm understanding kind of the agenda and kind of where we are,
20  is to kind of update the Court as to where we are.  We've got
21  an October trial setting, October 23rd, and that setting --
22  this is kind of important for the discussion we will have with
23  respect to Brand dates.  I think the Brand scheduling order
24  and the proposed orders are going to be of significance this
25  morning.
```

 1          And so just as a background, Your Honor, the Hill

 2  case, which is a Celect case, is set for trial, as the Court

 3  is well aware, October 23rd of this year; and we're proceeding

 4  to take -- we're taking depositions and doing all the other

 5  things you would imagine are taking place three or four months

 6  before trial.  And as the Court may be reminded, Your Honor,

 7  the Gage case is set for trial April the 30th.  Now they are

 8  on the same discovery path.

 9          So when you see Gage and Hill deadlines, they're

10  literally Hill and Gage deadlines that the Court had indicated

11  they would be on that same discovery path and they are.  And

12  so even though -- even though Gage has a trial setting of

13  April the 30th of next year, and their deadlines will have

14  been met, Gage's deadlines will have been met at the same time

15  as will Hill.  I guess in theory, then, once Gage -- once Hill

16  is tried, Gage will be trial ready; and I think that's what

17  the Court had wanted and that's what the Court is going to be

18  able to have, which is a good thing.

19          Your Honor, just to point out and remind the Court

20  one more aspect of the orders -- of the current order

21  regarding scheduling, and these are with respect to the trial

22  settings; three things I'd like to point out.  No. 1, to

23  run -- No. 1, if something were to happen and the Hill case

24  were not to be tried, case were settled, case were dismissed

25  for whatever reason, then the Gage case would go in its place

1   on October the 23rd.  Then the Brand case, which is the

2   plaintiff's Bellwether, okay, the Brand case, Tanya Brand, her

3   case would be -- which is scheduled for trial not until

4   September 10th of 2018, well over a year away.

5            THE COURT:  Correct.

6            MR. MARTIN:  The Brand case would then be pulled

7   back or up and would take the place of Hill and it would be

8   tried April the 30th, 2018.  So I believe, Your Honor, in

9   discussing two areas, the Hill and Gage deadlines and then the

10  Brand deadlines, I think that we can tell the Court that the

11  Hill and Gage deadlines, which we are going to then present

12  hopefully into a new CMO 19, are largely agreed upon.  In

13  fact, many, many of the deadlines have already passed and

14  aren't even on this list because they have passed.  Indeed,

15  defendant's expert reports is still on here but it's got, you

16  know, some changes that probably aren't important for our

17  discussion today; but everybody knows that defense experts'

18  reports have been given, etcetera.

19            So I think then other than just a couple of things

20  that we need to discuss in Gage and Hill, that there may be

21  some disagreement on, then the main thing I think we need to

22  discuss at this point in time would be my suggestion that I go

23  ahead, if I could, Your Honor, and talk about Brand.  We can

24  go back and kind of fill in the gaps with Hill and Gage but

25  there's your trial setting; October, April and then for Brand

1    all the way into September of next year.

2         May I go forth with our discussion on Brand -- or

3    suggestions on Brand, Your Honor?

4         THE COURT:  So Ben, what you're telling me is that

5    Gage and Hill are moving along as desired and planned, and we

6    don't need to spend much time discussing any further deadlines

7    in those two cases today.  Is that kind of what you're telling

8    me?

9         MR. MARTIN:  That's correct, Your Honor.  I will --

10   I will say that there are some things that I think that the

11   Court, both His Honor, as well as Judge Baker, may need to

12   look at with respect to some of the matters that there are

13   some disagreements on; but as far as -- and maybe in the next

14   week, two, three weeks, of course, the things that come

15   along -- well, you know, discovery but yes, that's accurate.

16        THE COURT:  Okay.  Andrea, would you agree with

17   that?

18        MS. PIERSON:  Good morning, Your Honor.  Thank you.

19   Mostly I would agree that that was the case until about 24

20   hours ago; but I did receive a message from Mr. Martin

21   yesterday that I think impacts the Hill and Gage schedule.  So

22   if I could, Your Honor, I'd just like to comment on that for a

23   moment and maybe we can put Hill and Gage to bed before we

24   move on to Brand.

25        THE COURT:  I would like to do that.

1          MS. PIERSON:  Thank you.  So the motion that we

2     filed on Friday, Your Honor, the motion that we sent to

3     plaintiffs a few weeks ago, we had some back and forth about

4     the motion itself, the proposed case management that's

5     attached and the charts of deadlines as well.  We understood

6     that Your Honor required a motion and we think it's helpful so

7     that you have a plan that you can work from, and I'll be happy

8     to send that over in Word so Your Honor can do whatever you

9     want to do with the plan following the call today.

10          It probably is most helpful, though, for this

11     discussion to take a look at exhibit A to our motion, which is

12     the chart of Gage and Hill deadlines.

13          THE COURT:  Hold on just a second.

14          MS. PIERSON:  Sure.

15          THE COURT:  Okay.  Got it.

16          MS. PIERSON:  So Your Honor may recall when we met

17     the last -- at the last status conference, that the deadline

18     for defendant's expert disclosures was June the 8th.  We had a

19     discussion about rebuttal expert reports and Your Honor

20     ordered that any rebuttals, that those could be submitted only

21     based on a showing of good cause and they needed to be

22     submitted seven days following receipt of the defendant's

23     expert reports.

24          Approximately two weeks ago we had a hearing with

25     Judge Baker and it was prompted by a motion to supplement

1   expert reports that was filed by the plaintiffs.  Specifically

2   the plaintiffs were asking for the opportunity to supplement

3   their expert -- a couple of their expert reports.  We, in

4   turn, filed a motion and requested that the Court extend our

5   deadlines, if the plaintiffs were permitted to supplement; and

6   there have been some things that had happened in discovery

7   that delayed our ability to submit our medical expert reports.

8          Specifically, the judge -- Judge Baker ordered we

9   would get an IME of Mrs. Hill.  That has not happened and she

10  was unavailable for a few weeks.  We had scheduled the

11  deposition of the plaintiff's key medical expert

12  Dr. Marmureanu.  He, unfortunately, had a medical condition

13  that arose that required his deposition to be postponed.

14         So to make a long story short, following that

15  hearing, Judge Baker issued an order that it required Cook to

16  submit its nonmedical expert reports on June the 12th and then

17  Cook's medical expert reports on June the 29th.  Those are the

18  first two dates on exhibit A.  So we staggered them and the

19  staggering allowed us to begin the depositions that were

20  engineering and epidemiology and other nonmedical experts

21  after the 12th.  So all that seemed to be settled and we

22  adjusted the deadlines in the first four lines of exhibit A.

23  The parties agreed on those deadlines and that's why we

24  submitted them to the Court on Friday as, in fact, agreed.

25         Late yesterday I received an email message from

1    Mr. Martin indicating that the plaintiffs request our

2    agreement that they be permitted to submit rebuttal expert

3    reports from two experts and that they will rebut two of our

4    expert reports.  So I think this will be a total of four

5    expert reports, and Mr. Martin has requested that they submit

6    those on July the 26th.  Now, July the 26th is five weeks

7    after the deadline for plaintiffs' rebuttal reports.  And

8    setting aside for the moment whether rebuttal reports are

9    permissible at all at this point, we don't know what they

10   intend to rebut.

11           Certainly there are very limited circumstances under

12   which rebuttal reports are permitted at all; but the fact of

13   the matter is that the plaintiffs now request the ability to

14   submit additional reports long after the deadline to do so

15   and after the time when our engineering experts will be

16   disclosed.

17           One other important point from our perspective.

18   We've been told by Mr. Martin that the two experts who will be

19   disclosing these four reports are Dr. McMeeking, their key

20   engineering expert who has already been deposed and who we

21   believe has serious flaws under Daubert that we'll want a

22   Daubert motion.  Dr. McMeeking is one of the experts who

23   Mr. Martin requests be permitted to submit new reports.

24           In addition to that, we're being told now that

25   Dr. LaDisa, an engineer whose report the plaintiffs submitted

1   originally back in March and then they withdrew as an expert

2   and told us he would not testify at trial, now we're being

3   told that Dr. LaDisa will be submitting two reports as well,

4   which interjects a whole new expert to what we believe is

5   truly the 11th hour.

6           As you can see from exhibit A, Your Honor, we are

7   jammed tight on these deadlines and we're at a point where we

8   have a couple more expert depositions to take of the

9   plaintiffs, and then they'll be taking many of our experts'

10  depositions, all of which culminates with filing of Daubert

11  motions on August the 9th.  Unfortunately, this incredibly

12  tight schedule we knew only about 20 days to decide Daubert

13  motions, motions in limine and motions for summary judgment

14  and the motions will be substantial here.

15          Our view is that that really is not enough time for

16  all of these things to happen.  But certainly even if we all

17  do our very best, which we have been doing and we're planning

18  to try this case in October, the injection of new reports from

19  new experts on July the 26th will frankly cause this schedule

20  to implode.

21          So I'm sorry to add this issue this morning but up

22  until about 24 hours ago, I believed that the deadlines in

23  Hill and Gage were set and that we were all able to meet those

24  deadlines.  But I do think this jeopardizes the schedule and

25  we need the Court's intervention, frankly.

1          Our view is that the plaintiffs, if they intend to

2  submit rebuttal reports and if they're able to meet the high

3  standards for rebuttal reports, that that should happen today,

4  seven days from the submission of our nonmedical reports and

5  consistent with the Court's orders on the deadline for

6  rebuttal reports.  This is their deadline to do rebuttal

7  reports, if they plan to do them at all.

8          THE COURT:  All right.  Thank you.  Ben.

9          MR. MARTIN:  Yes, sir.  Your Honor, I promise the

10 sky is not falling.

11         THE COURT:  It's getting pretty cloudy here.

12         MR. MARTIN:  Well, I'm on the West Coast.  So I have

13 to say that it's a little sunny here and it's sunny with

14 respect to this.  All this is, Your Honor, is that we last

15 week got the defense experts' reports; and with respect to two

16 of their science experts -- and it's only two experts out of

17 all their experts, that's the two that they gave us last week

18 anyway, two of their engineering experts, we have -- they have

19 given us opinions that our experts, just Dr. McMeeking, the

20 main one, and Dr. LaDisa as well -- we'll get into that in a

21 minute -- need to -- there are a couple of areas that they

22 need to rebut.

23         Now, we can make it very easy and I gave this to --

24 I gave this suggestion to opposing counsel.  The way -- you

25 know, the rebuttal, of course we have to be able to rebut

1   their statements that are -- for instance, our experts aren't

2   following the guideline -- aren't doing their calculations

3   correctly.  Let's just use that.  So they say, "Your experts'

4   calculations aren't being done correctly."  And we talk to our

5   experts and they say, "Well, sure they are.  And here's why,

6   Ben.  This, this, this and this."

7           So unfortunately, Dr. McMeeking is out of the

8   country right now and we need a little bit extra time for

9   that.  All we want to do is write a very specific report in

10  very specific areas that need to be rebutted.

11          Now -- and the only reason -- if we look at where

12  this is all going, Your Honor, the only reason is, here's what

13  we don't want to have happen at trial.  What we don't want to

14  have happen at trial is for our experts to get up and testify

15  as to certain matters, and then the defense -- and we have the

16  inability to talk at trial about what the defense experts have

17  said is a problem with our methodology or something --

18  something that we truly would have to rebut.

19          Now, if the Court -- I think it would be -- would

20  cure the entirety of the problem if the Court didn't require

21  any rebuttal experts.  We just want to be safe in that we

22  outline all of our opinions.  If we go to trial and we're able

23  to have our experts testify as to what they put in their

24  report, and then what the defense put in their report that

25  kind of is a theory we don't agree with, then we don't need

1  any rebuttal reports at all.  But what we don't want to have

2  happen is for Cook to stand up and say at trial, "Hey, hey.

3  You didn't disclose that, Ben, Joe.  We object to it."  And

4  that would be unfair.

5          Your Honor, we are completely happy with leaving

6  expert reports alone.  Our experts' depositions have been

7  taken; and if we don't need to do rebuttal reports, and we all

8  understand that we have things to say about what Cook's

9  experts had to say, but we want to be able to talk about them

10  at trial.  We're fine with having these two expert reports on

11  whatever those issues are, we'll just leave them alone.  No

12  problem.

13          But if we are going to be tied -- our hands are

14  going to be tied at trial with respect to their opinions, we

15  need to address it.  Unfortunately, the deadlines -- we want

16  to discuss how we might want to change that in Brand.

17  Unfortunately, the deadlines are such that seven days after we

18  get the expert reports to have to provide the rebuttal reports

19  became a little bit untenable, I guess you'd say.  I think

20  it's easily handled.  Just a ruling that we would ask the

21  Court, it sounds like maybe Cook might not even have a problem

22  with that.  I've not heard.  But just that, "Hey, let our

23  experts talk about what's in the defense report."  We don't

24  need rebuttal report.  That's solves the problem.

25          MS. PIERSON:  Your Honor, our view is that Rule 26

1   is very clear.  Our experts and plaintiffs' experts must

2   disclose all of their opinions and the bases for their

3   opinions.  The plaintiffs have a deadline for rebuttal reports

4   for nonmedical experts of today.  Your Honor said back in

5   April that that seven days from the disclosure of the

6   defendant's reports, the plaintiffs would submit any rebuttal.

7   So they're due today.  That fact has never been ambiguous.

8           Just to be clear, too.  One of the two people who

9   Mr. Martin proposes will submit a rebuttal report is

10  Dr. LaDisa, who they withdrew.  They withdrew him back in very

11  early April.  So we've all been proceeding under the

12  assumption that the plaintiffs' experts and all of their

13  opinions have been disclosed.  Now at the 11th hour they seek

14  to interject a whole new expert.  Our engineering expert,

15  Dr. Robertson, is scheduled to be deposed on June the 30th.

16  That's why -- his deposition was scheduled because the -- on

17  that date because the rebuttal report date is today, the 19th.

18  So to the extent that the plaintiffs have any rebuttal

19  opinions under Rule 26(b), they are due today.

20          MR. MARTIN:  Your Honor, if I may.

21          THE COURT:  Yes.

22          MR. MARTIN:  The Court will certainly recall the

23  argument that was made by Cook, and which in many respects was

24  accepted by the Court, that we had too many experts.  That the

25  experts -- this would have been the last status conference, I

 1   believe, Your Honor -- too many experts.  That we needed to

 2   cut down our experts because we had overlapping areas of

 3   testimony.  Your Honor, we went back and at the Court's

 4   suggestion -- and in some respects, it wasn't even an order,

 5   but the Court's suggestion, get this figured out.  We took our

 6   experts.  We took some of our experts down completely,

 7   including Dr. LaDisa, including some of our other engineering

 8   experts, and we put Dr. McMeeking up as our engineering

 9   expert.

10           So what it sounds like is occurring is that we're

11   being now punished, kind of.  The suggestion should be that we

12   should be punished, excuse me, because we did exactly what

13   Cook wanted us to do, exactly what the Court asked us to go

14   back and look at; and we literally -- I would say that we

15   literally sliced half of what our experts' areas of testimony

16   was and multiple experts, cut them all out.  Dr. LaDisa is

17   talking about -- he was already named.  He's not a new expert.

18   He's simply an expert that we took down to try to accommodate

19   Cook's argument and accommodate what the Court had requested

20   us to do.  So Dr. LaDisa is not a new expert.  This is a

21   tempest in a teapot.

22           And again, Your Honor, we are completely happy with

23   not having to go -- do any rebuttal expert reports.  But if we

24   do -- and just go have our experts be able to talk about what

25   they -- what they put in the reports; and if they -- and they

1    have an issue with what Cook's telling them about their -- of

2    their own opinions, we ought to be able to talk about that.

3            THE COURT:  Okay.  I've got it.  We can go on and on

4    and on about experts and rebuttal and challenges and those

5    types of things.  Daubert motions will be filed and I'll take

6    a look at those, but I see no reason here for any rebuttal

7    reports.  This will never end.  What happened to the great art

8    of cross-examination here?  So we're not going to have any

9    rebuttal reports.  Okay?

10           MR. WILLIAMS:  Yes, Your Honor.

11           MR. MARTIN:  Your Honor, one area of clarification.

12   I presume -- I don't want to presume anything, actually.  But

13   when we get to trial, is the reality of the situation -- does

14   the Court see the reality of the situation that our experts

15   are going to be able to talk about the areas that are in the

16   expert reports; and if the -- if Cook has pointed kind of the

17   finger at our methodology, for instance, I presume that we

18   will be able to explain whatever it is that Cook is having a

19   problem with.  I just wanted to have some idea that --

20           THE COURT:  Ben, I'm sure that Cook will

21   cross-examine your expert on the area where they think there's

22   a problem.  And of course then on redirect, you would be able

23   to go back and try to mend that.

24           MR. MARTIN:  Got it.

25           THE COURT:  That's just the rules of examination.

1           MR. MARTIN:  Thank you, Your Honor.

2           THE COURT:  Anything that's in the reports that's

3    disclosed, and we all know this, is fair game for examination.

4    If there's something that's not in the reports and has not

5    been disclosed, then it's not fair game.

6           MR. MARTIN:  Right.

7           THE COURT:  Okay?

8           MR. MARTIN:  Yes, sir.

9           THE COURT:  That's the purpose of expert reports,

10   disclosure, so you can be prepared.

11          MR. MARTIN:  Thank you, Your Honor.  Your Honor, if

12   the Court wants me to, I can then get back into the Brand

13   scheduling, and there's just a couple of things that -- a

14   couple things I think of import that we need to look at.

15          I can say what we have done, if Your Honor might

16   look at Joe Williams' filing on Friday.  It was simply this --

17   it was simply the grid that shows the Hill and Gage case, as

18   well as the Brand dates; and I will go down to the Brand

19   schedule and I'll just be pointing out a couple of things on

20   the Brand schedule that's of import.  Again, we're calling

21   this a little bit -- it could be seen as a little bit of an

22   artificial deadline because our trial setting is not until

23   October.

24          And if you go down to the very end of it, the Court

25   will see that we've got all these deadlines of December and

```
 1   January and February and March and all of a sudden it goes to
 2   September and there's four, five month lapse.  Well, that's
 3   because -- that's because we've got to be trial ready.  We're
 4   trying to get trial ready for April 30th, just in case Hill or
 5   Gage crapes.  So that's kind of why it looks that way.  So I
 6   wanted to point that out to the Court.  If the Court had the
 7   question, "Why are we looking at this September and there's
 8   nothing going on between April and September," that's the
 9   reason, Your Honor.
10            THE COURT:  Okay.
11            MR. MARTIN:  I would suspect that maybe if Hill and
12   Gage do go to trial as set, that we may come back and visit
13   some of these -- revisit some of these dates.  But for right
14   now, I think we're going forward with needing to get these
15   dates in place so that Brand can be trial ready on April the
16   30th under those circumstances.
17            What I took, Your Honor, and what I did -- and I
18   think Cook probably -- I think Cook does agree with most --
19   most of the dates, exhibits and filings for exhibit lists,
20   witness lists, deposition designations.  If there's any issue
21   with respect to that, I'm certain we can work those out but I
22   think we're all in agreement on those types of dates.
23            I think the date and dates that are really at issue
24   here -- and I'm not certain exactly why.  But if we go back to
25   the second date on the -- the first date on the list, case
```

specific track discovery deadline.  There was a typographical

error in Joe's email to the Court on Friday, Your Honor.  This

is the date that we suggest that the Brand case specific

depositions and discovery be completed.  Actually, that should

really say case specific -- case specific depositions deadline

so that -- so that we will have a date specific.

Then if we have the case specific depositions taken,

treating physicians, implanting physician, the fact

witnesses -- there have been only two case specific

depositions taken.  Ms. Brand's deposition was taken last

Friday and the first sales rep's deposition was taken last

Thursday.  So literally, only two Brand case specific

depositions have been taken.  So what we want to do is make

certain that we have enough time to complete the case specific

discovery in Brand.  There will be several more depositions

taken.  None have yet been scheduled, Your Honor.  And so

anyway, we've got -- we've got to have some time to do that.

Then if that -- if that deadline is entered and then

we have two solid weeks so that we can then impart all of that

case specific discovery to our plaintiffs' experts, and then

that will give them two weeks to include case specific

information that would be necessary for their -- for our

expert reports.  So that's the reason we wanted to actually

have another -- this is a new box, a case specific fact

discovery deadline.

1        What had happened in Hill and Gage was that we had

2   these deadlines for experts and they're pretty early in the

3   game, and we ended up continuing fact discovery just a couple

4   weeks ago.  We're still taking fact discovery in Hill and

5   Gage, and our experts really didn't have those -- those facts

6   to include in their reports.

7        So given the fact, Your Honor, that we have such a

8   lengthy period of time between now and our trial setting, we

9   certainly don't think that three months away -- three months

10  and about, I don't know, ten days away is too far to get our

11  experts together.

12       The positive is that most of our experts, and we

13  believe that most of defense experts, certainly with respect

14  to general liability experts, will be the same.  Most of them

15  will already have been taken -- their depositions will have

16  been taken.  Indeed, I'm going to suggest to the Court that we

17  have a provision in the scheduling order that -- in CMO 19,

18  that any general expert depositions that have been taken for

19  experts -- for expert depositions that have been taken on

20  noncase specific issues, that there be a limitation of

21  redeposing those people.  That we don't have to redepose the

22  regulatory experts and the pathologists to the extent there's

23  no case specific information that a pathologist can bring.

24       The great news is there's not going to be that much

25  general case expert stuff that's going to be different in Gage

1    and Hill, as certainly in Hill and Brand, because they're the

2    same Celect filter.  Gage may be a little bit different.

3    That's the reason why we want to go there.

4            Now, something very important it seems to the

5    defense and we don't understand why, Your Honor, is this.

6    Defense wants 60 days between the day that plaintiff

7    designates her experts.  We designate our experts

8    September 29th is our suggestion.  The defense wants 60 days

9    of a time lapse to pass before it names its expert witnesses.

10   Now, we did that this time and we got -- and we got in a big

11   problem.  We got all jammed up.

12           And what we didn't realize, because it's not in the

13   order, but we didn't realize that the defense was going to

14   require that all of our expert reports, all of our experts'

15   depositions, anything in writing or in depositions, all

16   depositions of our experts had to be taken before Cook ever

17   even gave us an expert report.  And we've got correspondence

18   as such and that's what they required.  We couldn't even get a

19   deposition set up until -- of the defense experts to get a

20   designation of an expert, couldn't get a report until -- until

21   we complied with their demand that we put up our experts for

22   depositions.

23           And the way that I guess that was allowed to happen,

24   and I don't know the reason that it happened, was -- and

25   that's the reason why they wanted this 60-day lapse.  Well,

1    there's no reason to have a 60-day lag between the date we

2    name our expert witnesses, give them our experts.  They need

3    to -- they need to give us -- Cook needs to give us their

4    expert reports within 30, 33 days, whatever that difference

5    is -- yeah, there it is.  Plaintiffs' expert reports 9/29,

6    that's our suggestion.  On October the 30th, we need their

7    expert reports.  And at that point, let's go start taking

8    depositions and we don't get into this jammed up process.

9         And quite frankly, part of the reason has been that

10   we've had our hands tied because we've been told we can't take

11   depositions of defense experts or get their reports until our

12   plaintiffs' experts have been taken.  The good news, there

13   aren't going to be that many more experts.  But we do have --

14   Your Honor, we do have a couple of experts, been talking to

15   three sets of experts because Brand is a different case.  It

16   involves a different situation.  It involves a vascular

17   surgeon as opposed to an intervention radiologist who has

18   placed -- who has placed the device.

19        We just have -- for various reasons there will be an

20   expert or two that we will name that are not experts in the

21   Hill or Gage case.  But the truth of the matter is, it's

22   not -- there's not going to be many and it's going to be --

23   we're going to be able to easily accomplish the expert

24   discovery in this case -- these expert depositions much easier

25   and much quicker than was accomplished in the past.

1          So that's my -- that's my suggestion, Your Honor.
2    Thank you very much.
3          THE COURT:  Okay.  Thank you.  Andrea, regarding
4    Ben's suggestion that general experts' reports already taken,
5    noncase specific unless good cause is shown that those folks
6    will not be redeposed.
7          MS. PIERSON:  On that specific issue, Your Honor, I
8    think we can craft some language that's acceptable to both
9    sides.  But generally speaking, we agree that experts should
10   not be redeposed on the same subject matter.
11         THE COURT:  Unless there's some good cause shown, I
12   think that probably is the best way to proceed on that.
13         MS. PIERSON:  Agreed.
14         THE COURT:  Good.  Then the plaintiffs' proposal
15   regarding moving up the defendant's disclosure 30 days to
16   October 30th, what's your thought on that?
17         MS. PIERSON:  If I may, Your Honor.  If you wouldn't
18   mind taking a look at exhibit B to our motion, which is the
19   chart of Brand deadlines.  Just let me know when you have
20   that.
21         THE COURT:  Okay.  I have it.
22         MS. PIERSON:  So Your Honor, in this chart I set out
23   in the first column your deadlines under CMO 19 and your oral
24   orders.  Next to that I put our proposed dates, which you'll
25   see are identical to the Court's, other than the same set are

1   not provided for in CMO 19, like responses to Daubert motions

2   or counter-deposition designations.  The additional entries

3   where there are blanks, under the Court's column, those are

4   things that in negotiations with Matt Schultz, on behalf of

5   the plaintiffs, both sides agree we need to have those

6   deadlines.  So we've agreed to some in Hill and Gage and we've

7   made proposals here for Brand.

8            So our deadlines parallel your deadlines exactly but

9   for the fact that there are a couple of new things that we

10  think need to be added.  Your Honor may recall that you chose

11  the Brand case as a Bellwether case in August of 2016 and Your

12  Honor issued the schedule for Brand in October of 2016.  So

13  obviously we are now in June of 2017, nine months after you

14  chose the Brand case as a Bellwether; and the fact of the

15  matter is that a month from now, the plaintiffs' expert

16  reports are due.  They're due on July the 17th.

17           To the extent that there are depositions the

18  plaintiffs wanted to take or work that they wanted to do, they

19  had nine months to do that and they haven't done it.  If you

20  look at the schedule, even after we get beyond expert reports,

21  no matter how you slice it, again, the Court has very little

22  time to decide Daubert motions, motions for summary judgment

23  and motions in limine and there will be many in the Brand case

24  as well.

25           Under defendant's proposed dates, working this case

up for an April trial setting, Your Honor has two months to

decide Daubert motions, motions in limine and motions for

summary judgment.  We think that deadline should not be any

tighter than that.  That it's simply not possible to address

all the issues with less than 60 days.  So when Mr. Martin

proposed a couple of weeks ago the deadlines in the Brand case

be extended from the Court's deadlines, our response to that

was, we've got a couple of weeks of wiggle room on the

plaintiff's expert report deadline but no more than that

because we have important deadlines on motion practice that

are coming up and that we do not want to move because we think

it makes it very difficult for the Court to address the

substantive legal issues that the Brand case will present.

       So the plaintiffs' proposal, in short, asks for a

couple of things.  First, the plaintiffs ask to rearrange fact

discovery; and the proposal that Mr. Martin had given us some

weeks ago, and that we've been talking about, would have fact

discovery close two months later than Your Honor had planned

in December of 2018.  On Friday we received Mr. Williams'

email message which now suggests to move fact discovery up to

September, essentially.  So it's a reshuffling of the deck now

that we're nine months into this thing or more and it's a

substantial change in the Court's framework for how these

deadlines will be conducted.

       Secondly, the plaintiffs ask that the time for

 1    defendant's expert reports be shortened.  And just as a

 2    reminder, the 60-day window between depositions, so that Cook

 3    would have the ability to fully discover all of the

 4    plaintiffs' experts opinions and the bases for those opinions,

 5    that was negotiated by the parties in the summer of 2016.  It

 6    was in the original case management order number 19 that Your

 7    Honor entered back in October.  It was in -- it was in the

 8    case management -- amended case management order that Your

 9    Honor entered in January of this year.

10           Mr. Tanner pointed out I misspoke when I said

11    depositions.  It's a 60-day window between the plaintiffs'

12    reports and our reports, both so that we can have time to prep

13    and rebut in the form of Cook's expert reports but also if we

14    choose to depose the experts, we could do that.  That spacing

15    is important in a case of this magnitude because of the number

16    of experts that the plaintiffs have and that Cook will have.

17    It's also critical so that if Cook chooses to depose the

18    experts, discover the bases for their opinion before Cook's

19    experts submit their reports, we have the ability to do that.

20           In the Hill and Gage case, it hasn't always been

21    necessary to do that.  We were very careful to prioritize

22    where we needed discovery and where we didn't need discovery,

23    and we worked cooperatively with Mr. Schultz to get those

24    depositions scheduled.  But this 60 days between the reports

25    is something that the parties negotiated more than a year ago

1    but it's part of the framework that this Court has entered

2    multiple times in these cases.

3              And I say the same thing about fact discovery.  The

4    staggering of fact discovery, the way the Court has done in

5    all of the case management orders and in the Hill and Gage

6    case, is consistent with this Court's orders and the parties

7    negotiations, and our view is that should not be changed.

8              Now, I'm a little bit confused when Mr. Martin makes

9    the argument that this 60-day window should be shortened

10   because of something that plaintiffs may or may not do with

11   their expert reports.  I read Mr. Williams' email message to

12   the Court on Friday, which says that they want a new schedule

13   as Ms. Brand is consulting with new experts that were not

14   named in Hill and Gage.  I heard Mr. Martin say both things

15   today; that there would be new experts and there won't be new

16   experts.  At the end of the day, expert reports, none of us

17   really know who their expert will be or whether it will

18   require less time to depose this expert.

19             The fundamental problem here is that the plaintiffs'

20   expert disclosure deadline is July the 17th and for the last

21   nine months they've not been preparing for that expert

22   disclosure deadline.  We don't believe that the deck should be

23   reshuffled, that the Court's framework should be modified, or

24   that the defendant's time for expert reports should be cut

25   short because the plaintiffs aren't prepared to timely

1   disclose their experts the way Your Honor ordered.  We believe

2   your original deadlines are appropriate and should be

3   maintained.  Thank you, Your Honor.

4           THE COURT:  Thank you.

5           MR. WILLIAMS:  Your Honor, this is Joe Williams.  If

6   I could have a couple of seconds to just address a couple of

7   points that were just made.

8           THE COURT:  Sure.

9           MR. WILLIAMS:  Thank you, Your Honor.  We've been

10  working Hill and Gage so that either of them could be tried.

11  As a result of that, the parties have focused on those two

12  cases and somewhat to the detriment of the preparation of the

13  Brand case; but to the extent that there has been argument

14  just made that we've had all this time to get this discovery

15  done and we've sat on our hands, we could present to the Court

16  right now emails going back to mid April where we are asking

17  for fact discovery depositions in the Brand case and we have

18  been stonewalled on it.

19          Now, if that reason was because the parties -- or

20  that Cook wanted to focus on Hill and Gage because they were

21  the first to be tried, that's fine.  But I just needed to

22  correct the record.  We haven't sat on our hands.  What we've

23  done is consistently asked for depositions and have been put

24  off.  So I just want to ensure that we corrected the record on

25  this claim that we've been delaying preparation of the Brand

1    case.

2            At the end of the day, the Brand case is tried, at

3    the earliest, at the end of April of 2018 and at the latest in

4    September of 2018.  The parties are rightfully focusing on

5    making sure that Gage and Hill are ready to go in September

6    because that's when we have set.  Because we are

7    simultaneously attempting to get those two cases ready to go,

8    Mrs. Brand, in her case preparation, shouldn't be made to

9    suffer so that we can just ensure that this schedule is met.

10           THE COURT:  Okay.  Well, as you know, when we talked

11   about these trial settings months ago, I was concerned about

12   setting aside time to try a case in October and then on the

13   eve of trial, for one reason or another, the case disappears

14   and we're sitting there with a large block of time that is not

15   being used for trial.  My thought is that if Hill -- Hill goes

16   and for some reason Gage does not go, I more than likely would

17   keep Brand in September of next year.  I just want to make

18   sure that -- because we always thought that we would try Brand

19   last, obviously, of the three.

20           So that's more than likely what I would probably do.

21   If Hill or Gage disappears for some reason, whatever reason --

22   and I'm not saying that it shouldn't disappear.  If you settle

23   a case, you settle a case.  Great.  If you settle both of

24   them, that's great, too.  If you settle all three, that's

25   really great.

```
 1            But that would probably be my -- because I
 2   understand that you are under pretty tight deadlines here and
 3   I know and I certainly appreciate all the hard work and
 4   coordination thus far.  I know this is not easy to do.  And of
 5   course, when you took on these cases and it became an MDL, you
 6   knew it wasn't going to be easy as well.  But that's what we
 7   do.  So that would be my thought here.  That if Hill and Gage
 8   both disappear, I'm thinking I'm looking at Brand in September
 9   of next year probably anyway.  Does that help?
10            MR. MARTIN:  Yes, Your Honor.  That cures any -- I
11   think of anybody's problems here.  And I'm going to guess,
12   Your Honor, that given the Court's discussion and ruling, kind
13   of, that we should go back to the table and go ahead and
14   figure out some dates that would take the burden off of us in
15   having to do a lot of discovery here while Hill and Gage are
16   being tried and that are being prepared.  But that I would
17   suggest, Your Honor, we can still do some things --
18            THE COURT:  Sure.  Absolutely.
19            MR. MARTIN:  -- in the time period.
20            THE COURT:  Go ahead.
21            MR. MARTIN:  I'm sorry, Your Honor.  We won't be a
22   burden.
23            THE COURT:  Right.  I'm assuming, looking at these
24   schedules and considering the work that you folks have
25   completed so far and then the work that's immediately ahead,
```

```
 1   if we get through a trial in October and we're looking at the
 2   first of the year here, you folks are going to be exhausted.
 3   So if Gage then doesn't go, I'm not going to move Brand up to
 4   that.  We would take time here and try it in September.
 5              MR. MARTIN:  Okay.  Great.
 6              THE COURT:  Is that helpful to all of you to reduce
 7   a little anxiety here?
 8              MR. WILLIAMS:  Yes, sir.
 9              THE COURT:  Andrea?
10              MS. PIERSON:  It does, Your Honor.  Don't we seem
11   perfectly calm?
12              THE COURT:  I am realizing here, and as I said
13   earlier, I appreciate your efforts in getting Hill and Gage
14   ready to go.  This is a monumental task that you are
15   performing here and I understand that and I'm realizing that
16   more so.  I'm willing to ease up a little bit on some of these
17   things to give you a little breathing room and time to put
18   this together without those type deadlines.
19              MS. PIERSON:  Your Honor, along those lines, may I
20   ask one related question?
21              THE COURT:  Sure.
22              MS. PIERSON:  Our instructions from our client are
23   that the Hill and Gage cases are not going to be settled and
24   particularly I think we have a conference with Judge Baker the
25   first week of August.  Plaintiffs have one at the end of July.
```

```
 1   We have one the first week of August.

 2           THE COURT:  Yes.

 3           MS. PIERSON:  And then our Daubert motions are due

 4   on August the 9th.  It occurs to me that by the time we reach

 5   maybe August the 4th, the day we meet with Judge Baker, I

 6   think all parties will be very, very clear on whether Hill and

 7   Gage are going to go or not going to go; and those last two

 8   months before trial, they're incredibly time intensive, as you

 9   know, and very, very expensive.  There are a whole bunch

10   arrangements that we're making of things that we're doing in

11   two different teams of lawyers working on Hill and Gage.  Lots

12   of issues that go into this.

13           I'd like to request, if possible, that there be some

14   date by which we could all agree that the Gage case will not

15   move forward in October.  And I can assure you, from my

16   client's perspective, that Gage will not be resolved through

17   settlement.  I don't want to say in advance of the meeting

18   with Judge Baker that it's impossible.  I think it's highly

19   unlikely.  But obviously we're going to hear what Judge Baker

20   has to say when we meet with Judge Baker on August the 4th.

21           But if we get do that date and the Gage case is not

22   resolved, I'd like to ask that the Court officially order that

23   it be moved to April so that we can really focus our

24   preparation on the Hill trial.  It will make things go more

25   smoothly on our side but make less work for the plaintiffs in
```

1    responding to Daubert motions, less work for the Court in

2    trying to decide two complete sets of Daubert motions, summary

3    judgment motions and motions in limine; and it would allow us

4    to have some witnesses that are unique to Gage would not need

5    to be holding dates in October for trial, if that's the case.

6              And just to remind you, they're two completely

7    separate products.  Everything is different.  The exhibits are

8    different.  The witnesses are different.  There's a little bit

9    of overlap on experts but not completely.

10             THE COURT:  Right.  Right.  Ben, what's your

11   thoughts?

12             MR. MARTIN:  Your Honor, if I may.

13             THE COURT:  Sure.

14             MR. MARTIN:  I think -- I think this might be best

15   answered -- here's our fear.  Our fear is that if Cook tries

16   to resolve the Hill case -- we're being told that Cook won't

17   but then in making a little second breath there, it sounded

18   like it was more of they're sure that they won't settle Hill

19   or Gage or offer money in Gage to get the case settled.  But

20   if we -- if what we're being told is that under no

21   circumstances are they going to offer any money, in other

22   words, they are trying Hill, offer zero, it's always going to

23   be zero, then -- and that is in stone, then that's one thing.

24             But our fear is if that's not what they're saying,

25   they're not agreeable -- Cook's not agreeable to that kind of

1    in stone sort of suggestion on never settling Hill, then our

2    fear if we do settle Hill, then we've lost -- we've lost our

3    ability to try the case in October.

4          I'm not suggesting that they have that motivation to

5    settle Hill.  But Joe, I really would like if you would -- if

6    you'd chime in because that's just my thought; and Joe and I

7    haven't had a chance to talk about that.  But that's my fear

8    is that Hill goes away and Gage is there not being tried until

9    April the 30th, when we've done the discovery on it.

10          MR. WILLIAMS:  And this is Joe, just to jump on what

11   Ben is saying.  I think the whole reason the Court wanted to

12   set these on simultaneous tracks is because the unexpected

13   oftentimes does happen, especially in these large cases.  And

14   if -- who knows what will happen but what we don't want to do

15   is even set ourselves up for the possibility that nothing

16   happens in October after the Court's blocked off the time.

17          We can say that we're going to try Hill and Cook can

18   say that they're not going to settle Hill.  It's going to be

19   cold assurance if something happens and we're left with a

20   bunch of open days in October.

21          MS. PIERSON:  Your Honor, if I may make one

22   suggestion.  We don't have to decide this issue today but I

23   think it would be helpful for our planning purposes if we

24   could reach agreement that after the conference with Judge

25   Baker on August the 4th, maybe the two of you chat and -- or

maybe we have another status conference and we each make clear what our positions are with respect to those cases.

I can assure you, with respect to the Gage case, that there is a greater chance that the plaintiffs will dismiss the Gage case than there is that Cook will settle the Gage case.  And with respect to the Hill case, I would say the same thing; that we have no intention of settling the Hill case or the Gage case.

Now, Judge Baker has ordered us to come and meet with him and we're going to do that, and he will speak directly to my client at the same time he speaks to Mr. Bennett and I.  But by August the 4th, it, I think, will be very clear to all sides that either the Hill case is going to be tried or the Gage case is going to be tried; and at that time it makes no sense for both sides to incur the hundreds of thousands of dollars of expenses that we will incur preparing Gage for trial, if Hill is still on Your Honor's docket after that conference and we believe it will be.

So my request is both in the interest of just practicality and how expensive and difficult it is to prepare two cases simultaneously, when we reach a point when we know for sure which case will be tried in October.  But at the same time, it is more efficient from Your Honor's perspective as well so that you're not faced with two complete sets of what will be different Daubert motions, motions for summary

1   judgment and motions in limine, trying to sort through the

2   legal issues and factual issues related to two completely

3   different products.

4          The experts we're dealing with on these trials, I'm

5   sure it doesn't surprise Your Honor to know, they're expensive

6   and they're very difficult to schedule.  So getting experts to

7   hold these dates is very difficult as well.

8          My only suggestion is that after this conference

9   with Judge Baker, that we make the call on which case is going

10  to be tried in October so that we don't need to incur what is

11  an incredible expense to simultaneously prepare two cases

12  unnecessarily in the last days before trial.

13         THE COURT:  Well, Andrea, that's an attractive

14  suggestion and I think both sides, after you meet with Judge

15  Baker, and as you know he's very thorough, he will do the best

16  he can to try to get these cases resolved.  And if he can't

17  get them resolved shortly after August 4th, I think we

18  probably will at that time designate whether Hill is going or

19  not in October.  That seems to make some sense to me.  So

20  let's see how that goes.

21         I normally don't talk to the Magistrate Judges about

22  settlement negotiations and I don't have really any intention

23  of doing that here, unless you want me to.  But normally those

24  are matters for the Magistrate Judge and I really don't have

25  much idea regarding settlement discussions prior to trial.

1   But you will, each side here, you guys will know, based on

2   your guts and your experience and the practicalities as to

3   whether Hill will go in October or not.  So I think that's a

4   good suggestion, Andrea, and we'll go with that.

5               MS. PIERSON:  Thank you, Your Honor.

6               THE COURT:  What else do we need to discuss here

7   today?

8               MS. PIERSON:  I was going to say there are two short

9   issues.  So go ahead, Joe.  Why don't you take the first one.

10              MR. TANNER:  Yeah.  Just real quick, Your Honor.

11  This is Joe Tanner.  Just a matter of the Court's preference

12  and convenience.  We anticipate several Daubert motions being

13  filed.  All of them will have standard 7th Circuit law on

14  Daubert that stands, etcetera.  And we were, as we're putting

15  them together, wondering about what would be most convenient

16  for the Court, since, as we've talked about, there's a very

17  limited amount of time for you to resolve and we may be filing

18  some early and that type of thing.

19              So the question is simply, does the Court prefer

20  separate motions for each Daubert motion that we have?  And if

21  that's the case, can we cross reference some of the law that

22  applies across the board; or is it easier for the Court, if we

23  have one general brief, that includes then sections for each

24  of the particular pieces of expert testimony that we are going

25  to seek to be excluded?  It's purely a matter of the Court's

```
 1   convenience.

 2              THE COURT:  Joe or Ben, any thoughts on that?

 3              MR. MARTIN:  Your Honor, I would say this.  That I'm

 4   certain that the lawyers who are briefing, and appellate

 5   lawyers, will probably have an idea as to how that might be

 6   best.  I haven't spoken to them.  I would suggest this, Your

 7   Honor.  It doesn't sound like there's a big difference as

 8   between them and if, for instance, the Daubert motion is filed

 9   by -- I don't think we have a problem with defense counsel

10   handling the way they want to handle Daubert motions, whether

11   in one document or other documents cross reference others.

12   What's easiest for them, that's fine with us.  I don't see

13   that as problem and we can just respond accordingly; and I

14   just don't see it as a problem, Joe, and I don't think we'll

15   have a problem either way.

16              I don't know if the Court needs to make a ruling on

17   how the Court wants it, unless the Court has a desire as to

18   how they should be done.  I know this.  Each side has

19   excellent briefing counsel and professionals and I think they

20   maybe even want to talk amongst themselves as to how to do it;

21   but I don't know this Court really -- I think we can get

22   through it without having a steadfast ruling by the Court,

23   unless Your Honor has been through this before, has a

24   preference.  We don't have a preference one way or the other,

25   I don't think.
```

```
 1              THE COURT:  How many of these -- how many of these

 2    Daubert motions do -- and just an estimate, how many do you

 3    think you're going to file?

 4              MR. TANNER:  Could be eight, ten, depending on the

 5    experts, Your Honor.

 6              THE COURT:  Well, I don't need eight or ten motions

 7    with the same standards in them and all of that.  So maybe

 8    combining them might be a good idea.

 9              MR. TANNER:  And we're happy to do that, Your Honor.

10              THE COURT:  And then --

11              MR. TANNER:  Your Honor, we may, by the way -- I

12    know typically the Court's procedure is all motions filed

13    together.  In this particular case, there may be one or two

14    Daubert motions that, for a particular reason, because a

15    ruling on them will impact whether there has to be rulings on

16    others, I'm just informing the Court we may actually be filing

17    a couple of Daubert motions early.

18              THE COURT:  That would be great.  Also considering

19    the time frame here after I review these, we may -- we may set

20    an omnibus hearing date to take care a lot of this stuff, and

21    I just may make some of these rulings on the record.  I may

22    not have time to write on all this.

23              MR. TANNER:  Obviously fine, Your Honor.

24              THE COURT:  We can do that.  Okay.  Anything else?

25              MR. WILLIAMS:  Your Honor, this is Joe Williams, and
```

1    I just had one kind of trial procedural question for you.

2             THE COURT:  Sure.

3             MR. WILLIAMS:  We were going -- the plaintiffs would

4    request -- or would like to request that we be permitted to

5    conduct -- well, both sides be permitted to conduct voir dire

6    like we would do in state courts, as opposed to how the

7    federal rules set it up right now.  We just think the cases

8    are -- considering the importance of these cases, you know,

9    being Bellwethers, examining the veneer is of the utmost

10   importance; and rather than just submitting the written

11   questions to Your Honor to ask that oftentimes close-ended --

12            THE COURT:  Let me cut you off here, Joe.  My

13   preference has been, since my first day in state court, was to

14   let the attorneys examine.

15            MR. WILLIAMS:  Okay.

16            THE COURT:  I conduct a voir dire that probably

17   lasts half hour, 45 minutes just trying to make them

18   comfortable, telling them what the case is about, explaining

19   the differences between the burden of proof in a criminal case

20   and civil case, direct and circumstantial evidence, what

21   depositions are, all those kind of things; whether they've

22   served on a jury before, whether they've had relatives or

23   acquaintances involved in litigation.  All that kind of

24   general stuff, I talk to them probably for half hour, 45

25   minutes; and then I always turn it over to the attorneys to

1    ask questions.

2            MR. WILLIAMS:  Great.

3            THE COURT:  But you're going to need to submit --

4    other than general questions, you're going to need to submit

5    what you're planning on going through and asking them in voir

6    dire so the other side has a chance to chime in on that.

7            MR. WILLIAMS:  Okay.  Well then, with that in mind,

8    Your Honor, I think we can take it from here.

9            MS. PIERSON:  Your Honor, this is Andrea Pierson.

10   So the procedure that you're describing sounds pretty similar

11   to what we saw in the NexGen trial with Judge Pallmeyer and

12   what I know Judge Cannali has done in the Lowtee (phonetic)

13   trials.  The questioning that you do initially on general

14   matters is obviously terrific help for both sides.  We also

15   gave Judge Pallmeyer a list of general questions that both

16   sides would want to know the answers to.  It might make things

17   more efficient if the Court asks on behalf of both parties.

18   So when the time gets closer, we may propose that there are

19   some case specific things that Your Honor inquires of.

20           THE COURT:  That's fine.

21           MS. PIERSON:  Taking the lead from there.  I think

22   these are small details that we can work out as we get closer.

23           THE COURT:  That's fine.  I've done that many times.

24           MS. PIERSON:  One other trial procedure question

25   that we had.  We'd like to know what Your Honor's preference

1   is with respect to live witnesses at trial, and I think we

2   have a unique opportunity here because the majority of the

3   witnesses are actually in Bloomington.  We have some that will

4   come from Denmark but we have a unique ability to have most of

5   the witnesses live, and our -- our preference is to -- to the

6   extent that there is a Cook witness that the plaintiffs intend

7   to call in their case, our preference is that we bring them

8   live and that we question them once.  That the plaintiffs do

9   whatever they want to do with the witnesses and then we do our

10  full exam of the witnesses.

11          Or that if plaintiffs prefer not to do that in their

12  case in chief or if the Court prefers not to do it, that we

13  bring the witness live in their case and then we'll bring them

14  a second time, if we need to, in Cook's case.  But I'm

15  interested to know if Your Honor has a preference or a

16  procedure.

17          THE COURT:  Well, in most instances I ask the

18  parties to just call the witness once and do your direct and

19  cross; and I explain that to the jurors as to what's going on

20  with this witness, why they won't see the witness in the other

21  case or in the defendant's case or in the plaintiff's case

22  because for convenience of the witness and efficiency in

23  running the trial, we'll just call the witness once.

24          But if for some strategic reason you want to call

25  them twice, then I really have no objection to that.  But it

1   just makes sense to me -- and many, many times over the years

2   we've done that and it seems to run pretty smooth, as long as

3   we explain to the jurors that this witness would normally be

4   called in both case in chief of the defense and then but for

5   the convenience of the witness, we're going to cross-examine

6   and direct examine, cross-exam one time.

7          MS. PIERSON:  Okay.  Thank you, Your Honor.  There

8   are some Cook witnesses who we understand the plaintiff may

9   prefer to play their depositions during their case in chief.

10  Our preference is to bring the witnesses live so that the jury

11  can hear from them live and that we can obtain some of the

12  efficiencies that you've just described.  So at some point

13  we'll need to work through the logistics of knowing who --

14  what Cook witnesses the plaintiffs want so that we can arrange

15  their schedules so they're available when the plaintiffs want

16  them.

17         MR. WILLIAMS:  Your Honor, this is Joe Williams.  I

18  think what I'm hearing -- and if I'm mistaken, I apologize --

19  but that Cook is attempting to do something that would

20  prohibit us from playing depositions in our case in chief

21  specifically when those depositions could be played under Rule

22  32, given that they're deposition testimony.  Oftentimes

23  30b(6) witnesses are corporate officers.

24         Your Honor knows we have the burden of proof.  We

25  don't want to be prohibited or have Cook dictate to us how to

1   try our case, and I think that's what I'm hearing happen by

2   the suggestion that we should be prohibited from playing

3   depositions if Cook could bring the witness live.

4           Rule 32 expressly allows us to use depositions if a

5   party, agent, or designee for any purpose; and we just want to

6   make sure that that right of ours is preserved.

7           THE COURT:  Okay.  I'm not going to tell you how to

8   try your case.  I told you what my thoughts are regarding

9   bringing witnesses in one time and efficiencies of trial; but

10  as I said, for strategic reasons if you want to bring somebody

11  live or play their taped testimony, that's fine with me as

12  well.

13          MR. WILLIAMS:  Thank you, Your Honor.

14          MS. PIERSON:  Judge, just one related scheduling

15  question then.  If, during the plaintiff's case, they choose

16  to play a deposition instead of bringing the witness live, our

17  plan is to bring the witnesses live, to do our cross of the

18  live witness in some instances.  I mean, I just think jurors

19  are far more likely to stay awake if they have a real person

20  testifying as opposed to playing a video.

21          So we need some notice from the plaintiffs of the

22  days on which they'll play which witness's deposition

23  testimony, if they choose to play it by video, so we can

24  arrange to have our witnesses there so when we do our cross,

25  we're crossing a live person for the jury to see.

1          MR. WILLIAMS:  Your Honor, I'm not sure I've ever

2    had, when I played a deposition in a trial, the defense be

3    permitted and call a witness live when it's not their case in

4    chief.  And if that's what I'm hearing, we would obviously

5    object to them bringing live witnesses in the middle of our

6    case.

7          THE COURT:  I don't know where the rules would allow

8    that.

9          MR. WILLIAMS:  Right.  Okay.

10         THE COURT:  Okay.  Anything else?

11         MR. WILLIAMS:  Not from the plaintiffs, Your Honor.

12         MS. PIERSON:  That's all from us, Your Honor.  Thank

13   you.

14         THE COURT:  Again, I appreciate all the effort and

15   the hard work you're putting into this case on behalf of your

16   clients and getting it in good shape for us to try.

17         MR. MARTIN:  Thank you, sir.

18         THE COURT:  Hold on just a second.  Hold on just a

19   second.

20         MS. PIERSON:  We're still here.

21         THE COURT:  We need to set a July status conference

22   as well.  We're set for, looks like, July 13th in

23   Indianapolis.  Is that what you have?

24         MS. PIERSON:  Yes, Your Honor.

25         THE COURT:  I mentioned to you one time either -- or

1  one of our last two conferences that we may want to consider

2  trying this case in Evansville.  And I know there's certain

3  thoughts both sides may have on that but I would like your

4  thoughts on that.  The courtroom here is huge, a lot of room.

5  It certainly is state-of-the-art technology down here.  And of

6  course we've got beaches down here.  We've got casinos.  We've

7  got whatever you guys want for the off hours.  But certainly

8  that is something that I want you to talk about and maybe one

9  of these status conferences we can come down here and you can

10 check out the facilities.

11         MR. MARTIN:  Your Honor I'll say this.  Generally I

12 make it a rule of mine not to ever try a case in a city with a

13 casino.  But we'll certainly maybe discuss that amongst our

14 plaintiffs' lawyers.

15         THE COURT:  That's fine.  And Andrea, if you could

16 do the same as well.

17         MS. PIERSON:  Yes.  We actually suggested to Tina

18 that we do the July conference in Evansville so we could all

19 come down and look.  Is that a possibility?

20         THE COURT:  Not on the 13th because I have to be in

21 Indianapolis anyway.  But if we could pick a different day.

22 What about the 12th or what's that here?  Maybe the 11th.

23         MR. WILLIAMS:  The 12th would be preferable from our

24 perspective, Your Honor.

25         MR. MARTIN:  Your Honor and Andrea, I believe that

```
 1   there is a deposition in Washington, D.C., if I'm not
 2   mistaken, of one of your experts that I will probably be
 3   attending.  Dr. Frezic (phonetic) I believe it is, if my
 4   memory serves.
 5              MS. PIERSON:  Yes.
 6              MR. MARTIN:  The 11th would be better for me.  But
 7   Joe, if the 11th is kind of out --
 8              MR. WILLIAMS:  No, no.  The 11th would work, too.
 9              MR. MARTIN:  I think that's right, isn't it, Andrea?
10              MS. PIERSON:  Yes, that works for us.
11              THE COURT:  How about then July 11 at 1:00 o'clock
12   Evansville time, which is Central Standard Time.
13              MS. PIERSON:  Got it.
14              THE COURT:  Okay.  You can come down here and if you
15   need any recommendations on hotels, we've got a brand-new
16   hotel about two blocks from the courthouse here right downtown
17   and I'm sure they'd love to have you as well.  And Ben, the
18   casino is probably four blocks away.  It's very nice.
19              MR. MARTIN:  I don't have a rule against pretrials
20   there.
21              THE COURT:  There you go.  I understand.  But in any
22   event, we'll try to give you good hospitality while you're
23   down here.
24              MR. WILLIAMS:  That's great.  Thank you, Your Honor.
25              THE COURT:  Thank you all.
```

1          MS. PIERSON:  Thank you, Your Honor.

2          (Proceedings concluded at 10:53 a.m.)

3    ********************************************************

4              CERTIFICATE OF COURT REPORTER

5

6      I, Margaret A. Techert, hereby certify that the

7    foregoing is a true and correct transcript from

8    reported proceedings in the above-entitled matter.

9

10

11

12   /S/ Margaret A. Techert                **July 13, 2017**
     MARGARET A. TECHERT
13   Official Court Reporter
     Southern District of Indiana
14   Evansville Division

15

16

17

18

19

20

21

22

23

24

25