1

2                     UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
3                        INDIANAPOLIS DIVISION

4

5   IN RE: COOK MEDICAL, INC.,          )
    IVC FILTERS MARKETING, SALES        ) Cause No.
6   PRACTICES AND LIABILITY,            ) 1:14-ML-2570- RLY-TAB
    LITIGATION                          ) Indianapolis, Indiana
7                                       ) **April 13,** 2017
                                        ) 10:06 a.m.
8                                       )

9

10

11                     **Before the Honorable**
                       **RICHARD L. YOUNG**
12
                   OFFICIAL REPORTER'S TRANSCRIPT OF
13                        STATUS CONFERENCE

14

15

16  **For Plaintiffs:**              David P. Matthews, Esq.
                                     MATTHEWS & ASSOCIATES
17                                   2905 Sackett Street
                                     Houston, TX  77098
18

19                                   Ben C. Martin, Esq.
                                     LAW OFFICES OF BEN C. MARTIN
20                                   3710 Rawlins Street, Suite 1230
                                     Dallas, TX  75219
21

22                                   Joseph N. Williams, Esq.
                                     RILEY WILLIAMS & PIATT, LLC
23                                   301 Massachusetts Avenue
                                     Indianapolis, IN  46204
24

25

```
 1                              Michael W. Heaviside, Esq.
                                HEAVISIDE REED ZAIC
 2                              910 17th Street NW, Suite 800
                                Washington, D.C.  20006
 3

 4
       For Defendants:          Andrea Roberts Pierson, Esq.
 5                              John T. Schlafer, Esq.
                                James Stephen Bennett, Esq.
 6                              FAEGRE BAKER DANIELS LLP
                                300 N. Meridian St., Suite 2700
 7                              Indianapolis, IN  46204

 8
                                John Joseph Tanner, Esq.
 9                              BAKER & DANIELS
                                300 N. Meridian Street
10                              Indianapolis, IN  46204

11

12

13

14

15     Court Reporter:          Margaret A. Techert
                                United States District Court
16                              101 NW Martin Luther King Blvd.
                                Evansville, Indiana  47708
17

18

19            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
          TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION
20

21

22

23

24

25
```

```
 1                        (In open court.)
 2            THE CLERK:  All rise.  The United States District
 3   Court for the Southern District of Indiana is now in session
 4   pursuant to adjournment.  The Honorable Richard L. Young
 5   presiding.  Court is in session.  Please be seated.
 6            THE COURT:  Good morning.  Welcome back.  We're here
 7   today in our monthly status conference regarding Cook Medical,
 8   Inc., IVC Filters Marketing, Sales Practices and Products
 9   Liabilities Litigation, MDL-2570.  Plaintiffs are here by Ben
10   Martin, David Matthews, Joe Williams and Mike Heaviside.
11   Defendants are here by Andrea Pierson, John Schlafer, Joe
12   Tanner and Steve Bennett.  And Mr. Tanner, you have my
13   condolences.
14            MR. TANNER:  Thank you, Your Honor.
15            THE COURT:  And we've got an agenda here.  Status of
16   the MDL is the first item.  Who wants to present?
17   Mr. Matthews?
18            MR. MATTHEWS:  Yes.  David Matthews for the
19   plaintiffs, Your Honor.
20            THE COURT:  Yes.
21            MR. MATTHEWS:  In terms of the status, there are
22   approximately 1600 cases filed currently in the MDL.  There
23   continues to be some cases filed.  I think just based on
24   science, the longer the filters are implanted, the greater the
25   risk of failure.  So I think we're going to continue to see
```

1   some amount --

2           THE COURT:  Advertising.  I see that.

3           MR. MATTHEWS:  Is that right?  I haven't seen any

4   advertising.

5           THE COURT:  Advertising on TV.

6           MR. MATTHEWS:  I would hope that stops.  But

7   nonetheless, I do think, though, we will see a downturn

8   because of, again, more doctors are taking these out once the

9   risk of PE subsides.  So I think that's going to occur in the

10  Celect.  The original Celect filter is no longer on the

11  market.  It was taken off the market some years ago.  So I

12  think the problems with the perforation of the filter failures

13  have been reduced greatly.  So I think that is occurring as we

14  speak.  That is a downturn in the number of cases.

15          There are filings in other state courts.  Recently

16  there's been approximately 100 cases that have been

17  transferred to this Court from St. Louis and we will be asking

18  for a briefing schedule from Your Honor to entertain a motion

19  to remand those cases back to state court.  And I don't know

20  if the Court would like to do that today, at the appropriate

21  time, to work on a scheduling of briefing.

22          THE COURT:  Sure.

23          MR. MATTHEWS:  Certainly we're willing to talk about

24  whatever is convenient for the Court.  We'll work around your

25  schedule with that.

1          THE COURT:  Great.

2          MR. MATTHEWS:  Other than that, that is the general

3    status of the MDL, which takes us to our Bellwether trial

4    selection.  So I'll let the defendants discuss the MDL

5    schedule as they see it or the status of the MDL.

6          THE COURT:  Okay.  Very good.  Ms. Pierson.

7          MS. PIERSON:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MS. PIERSON:  We have a couple of slides.  I think

10   our counts of the cases are similar to but slightly different

11   from those of Mr. Matthews.  We thought it might be helpful to

12   show these to Your Honor.  Maybe while they work on that, I

13   could address just a couple of points that Mr. Matthews made.

14         THE COURT:  I see them up here.

15         MS. PIERSON:  Maybe just to start where Mr. Matthews

16   left off with the Collins and Halinski matters.  Those are two

17   matters that were filed in St. Louis County in Missouri state

18   court.  They included a total of about 140 plaintiffs

19   implanted with the Tulip and Celect.  Those matters were

20   removed to the Eastern District of Missouri and then they were

21   transferred by the panel into your court last week.

22         Before they were transferred by the panel to your

23   court, while they were in the Eastern District of Missouri,

24   the parties fully briefed the issues in those cases and the

25   briefs are pending in those matters.  Specifically, the

1  defendants have moved to dismiss or sever most of the

2  plaintiffs in those cases because they had no connection to

3  the State of Missouri and there's question of personal

4  jurisdiction under Bauman as it relates to Cook.  You may

5  recall, Your Honor, you entered just this week an order asking

6  Cook to provide an affidavit with certain information about

7  contacts to the State of Missouri in the Fernandez case.

8         So our view is you'll be addressing some of this in

9  Fernandez already.  There's really no rush to address the

10 issue in Collins and Halinski.  But when Your Honor is

11 prepared to address it, whenever that might be, these issues

12 of personal jurisdiction have -- and motion to remand have

13 both been fully briefed by both sides with many, many

14 supplements.  As we explained to the Eastern District of

15 Missouri, and we make the same arguments to you here, Your

16 Honor should consider personal jurisdiction before it

17 considers a question of subject matter jurisdiction under a

18 motion to remand.  And there's 7th Circuit precedent that

19 supports the reasons to do that and the Court's authority to

20 do that.

21        So if and when the time comes that Your Honor is

22 inclined to address those cases, certainly let us know; but

23 they just arrived on your doorstep a few days ago.  So no one

24 here, obviously, expects any immediate turnaround on those

25 motions.

1          THE COURT:  Right.

2          MS. PIERSON:  So let's talk about the MDL as a

3    whole; and we prepared a few slides to help understand where

4    the cases are pending and what they include.  First in federal

5    courts inside the MDL and on their way to the MDL, there are a

6    total of 1,956 plaintiffs.  There are only 28 plaintiffs in

7    state courts.  And in total, that means that the number of

8    plaintiffs is close to 2,000.

9          If you look at the statistics based -- first let me

10   drill down on the state court cases for one moment.

11   Twenty-three state court cases, a total of 28 plaintiffs.

12   I've given you this list before, Your Honor, of the states in

13   which these cases are located.  There are two new states on

14   the list.  That's Texas and South Dakota.

15         And then one development you should be aware of with

16   respect to the Indiana cases.  Recently the parties agreed

17   that those cases should be consolidated before Judge Keele in

18   Marion County.  As of about the last seven days, that, in

19   fact, has happened and so they're now consolidated with him.

20   There may be reasons or times for the two of you to

21   communicate about the cases but again, since these cases have

22   only just been transferred to Judge Keele, I assume there will

23   be a status conference with him relatively soon to discuss

24   those and how they progress.

25         So then if you go to the next slide.  We've talked

```
 1   frequently about how the cases before Your Honor divide in

 2   terms of product.  And the division between Tulip and Celect

 3   continues to be very, very similar and close to 50/50.  The

 4   Celect Platinum cases continue to make up a very tiny piece of

 5   the MDL.  And then we have a couple of birds nest cases which

 6   will likely be moving for judgment before Your Honor because

 7   that product was subject to a PMA.

 8           So by and large, this MDL continues to be about two

 9   specific products, the Gunther Tulip and the Celect.  I want

10   to just correct one thing that I thought I heard Mr. Matthew

11   say.  Maybe I was mistaken.  The Celect product was replaced

12   with a Celect Platinum product.  There was never a recall of

13   the Celect product.  Cook never took it off the market because

14   there was any problem with the product or otherwise some

15   suggestion from the FDA.  So I want to be clear when we say --

16   an accurate statement is the Celect product is no longer being

17   sold because it was replaced with the Celect Platinum.

18           If you turn to the next slide, one thing has changed

19   since we were --

20           THE COURT:  Plaintiff and defendant need to come to

21   some type of agreement on that.  I don't want comments being

22   out there that "The Celect is no longer sold.  No, it was just

23   replaced."  I don't want that type of comment.  So there needs

24   to be some kind of an agreement as to what the --

25           MS. PIERSON:  Verbiage will be.
```

1     THE COURT: Verbiage will be, yes.

2     MS. PIERSON: We agree, Your Honor. Later on there

3 will be some issues that we'll be discussing as it relates to

4 plaintiffs' expert reports. But not to digress too much. One

5 substantial issue Your Honor will have to address in these

6 cases is whether there's any evidence related to FDA at all.

7 And you're probably familiar with -- there have been a number

8 of rulings bring Judge Pallmeyer and other judges that find

9 the issue of FDA to be a real side show and a distraction from

10 the trial on the merits about the questions of product

11 liability. That's an issue for another day. But consistent

12 with what you're raising, Your Honor, there are a number of

13 issues like that that we'll want to decide between the parties

14 or with your assistance long before we get to trial.

15     So back to the statistics for one moment, Your

16 Honor. When I'm before you, I typically tell you how the

17 injuries are divided based on the plaintiff profile forms that

18 have been submitted. The statistics that are in front of you

19 again are based on that same data, what the plaintiffs claim

20 their injuries are when they submit their plaintiff profile

21 forms. One change in the cases, though, Your Honor, since we

22 were before you in February, is that the category of unable to

23 be retrieved has really taken hold of this MDL and is the

24 second largest category of injuries claimed. It's second just

25 barely to this -- first, it's what's shown in green at

23 percent.  Second to "unable to be retrieved" is this "other" category.  And on the plaintiff profile forms, "other" can be, really, any injury that the plaintiff claims that's not subsumed by the core categories we've talked about in this MDL.  Someone could allege that they have pain from their vena cava filter or they could allege some other injury that's not common to the other MDL plaintiffs.

But a significant change from what I've been telling you in the past, Your Honor, about a caval perforation being the leading claim of injury, that is no longer the case.  An inability to retrieve the filter is the largest claimed injury.  And that is true regardless of the product that we're talking about, whether it's the Tulip product or the Celect product.

In the Tulip category, 30 percent of the injuries claimed are an inability to be retrieved.  And in the Celect category, it's closer to 20 percent of the plaintiffs who claim an inability to be retrieved.  That's curious to us.  So we tried to drill down on that.  And of the -- there's a total of about 19 -- about 2,000 cases nationwide, 1,900 in this MDL.  There's a lag in receiving plaintiff profile forms.  In fact, we'll be sending out deficiency letters in about 230 cases next week where the plaintiff profile forms are overdue.

But in addition to that, there's a subset of a few hundred PFS's that we just haven't been able to get through

```
 1   because they've been coming in recently.  So the numbers that
 2   I'm giving you today, Your Honor, are based on a review of
 3   1,200 of the cases before you.
 4           And if you drill down on that "unable to be
 5   retrieved", about 120 of those cases, or roughly ten percent
 6   of the cases where we have PFS's and we've been able to review
 7   those, ten percent of those cases are a case where a patient
 8   has no complaint other than, "I want my filter out and nobody
 9   will take it out."  Or maybe the plaintiff says it can't be
10   taken out.  So there will come a time when we talk about
11   what's representative in the MDL.  And certainly the most
12   representative category today appears to be this category of
13   someone complaining that they want their filter out but their
14   physician has placed it permanently.
15           I think that's all on the slides, right, John?  So
16   that's the status of the MDL.  We are very familiar with the
17   fact, Your Honor, that your court is receiving significant new
18   filings every day; and we are well aware of the fact that you
19   have limited resources to address that.  It's obviously a
20   significant concern to us that the number of filings continues
21   and that the advertising related to this continues.  It's not
22   an issue for this Court to decide today, but there's millions
23   of dollars being spent on advertising for these cases; and as
24   long as millions of dollars continue to be spent on that, the
25   cases will continue to come.
```

```
 1              One thing that we will be looking at in the coming
 2  weeks is whether there are groups of cases that can be
 3  addressed through motion practice and whether there are groups
 4  of cases that should proceed on a different track before Your
 5  Honor in some respect.  So we're anxious to get to the stage
 6  where Your Honor can start to reduce the number of cases
 7  before him as opposed to watching those numbers continue to
 8  increase.  We think there's a direct correlation to the
 9  advertising; and frankly, there's not much that we can do
10  about that.  But we'll continue to report to you about the
11  statistics and how the claims divide out.
12              THE COURT:  Okay.
13              MS. PIERSON:  That's all I have on the update, Your
14  Honor.  Thank you.
15              THE COURT:  Very good.
16              MS. PIERSON:  May I make one suggestion on the
17  agenda, Your Honor?
18              THE COURT:  Sure.
19              MS. PIERSON:  The Bellwether issue plan I think will
20  take some time to discuss; but the third and fourth items on
21  the agenda I think ought to be quick items to discuss.  I
22  might suggest that we reverse those.
23              THE COURT:  Mr. Martin, Mr. Matthews?
24              MS. PIERSON:  There's no objection.
25              THE COURT:  All right.  No. 3, motion for partial
```

1    judgments on pleading in Hill.

2              MS. PIERSON:  If there's a need for substantive

3    discussion on this at all, Mr. Schlafer will address that.

4    I'd only mention we're not confident that there is any need

5    for substantive discussion because the motion was filed --

6    timely filed.  There was no response to the motion.  Our view

7    is that it's ripe for ruling now.

8              THE COURT:  No response filed?

9              MS. PIERSON:  No.

10             MR. MARTIN:  I must say, you've got four lawyers

11   over here that are extremely surprised.  If there had been

12   anything filed with respect to motions to dismiss those cases

13   on statutes or repose, then we aren't aware of it.  And so I

14   mean, I'm simply -- we were very surprised, when we looked at

15   the -- when we looked at the agenda.  And so quite frankly,

16   what we thought was, that this must simply be telegraphing to

17   the Court something that will be coming up.  But as far as --

18   as far as it goes, we're simply -- I can tell the Court we're

19   unaware of those filings and it's just -- I don't know.

20             I don't want to ask counsel.  I'll let the Court

21   pose any questions, but we simply don't know about them having

22   been filed.  We certainly would have responded if -- anyway,

23   maybe counsel can explain it for you.

24             THE COURT:  Okay.

25             MS. PIERSON:  So this particular agenda item is

```
1    Hill.  I think you're addressing the statute of repose
2    motions, which is the next agenda item.  I'm happy to address
3    them all at once because the issue is the same.
4              THE COURT:  Okay.
5              MS. PIERSON:  The motion has been filed.  Deadline
6    to respond has passed.  There was no response.
7              THE COURT:  Deadline was April 10?
8              MS. PIERSON:  So under -- do you remember -- Go
9    ahead, John.
10             MR. SCHLAFER:  On the master document, as well as
11   the individual case.  Under CMO 18, that order states that
12   nonexigent motions are intended to be heard at regular status
13   conferences and sets deadlines for those.  Under the CMO 18,
14   the response was due seven days before this conference.  Under
15   the Court's local Rule 7.1, the response was due on Monday,
16   the 10th, that's correct, for both of those motions, Your
17   Honor.
18             MR. MARTIN:  If I may.  Which motions are you
19   talking about?
20             MR. SCHLAFER:  Motion for partial judgment on the
21   pleadings in Hill and a motion for complete judgment on the
22   pleadings in, I believe, six cases -- individual Bellwether
23   cases.
24             THE COURT:  Items 3 and 4 on the agenda, Mr. Martin.
25             MR. MARTIN:  May I ask when these motions were
```

```
 1   filed?

 2             MS. PIERSON:  On the 27th.

 3             THE COURT:  I show, at least in item No. 4, motions

 4   were filed on March 27.

 5             MR. WILLIAMS:  That's what it says.

 6             MR. SCHLAFER:  That's the same for item 3, Your

 7   Honor.

 8             MR. WILLIAMS:  Your Honor, Joe Williams for the

 9   plaintiffs.

10             THE COURT:  Yes, Mr. Williams.

11             MR. WILLIAMS:  I'm being candid when I say this.  We

12   were unaware of these things.  Might I suggest two things.

13   One, it doesn't need to be more than a couple days but we

14   would love to respond to these.  We were unaware of them.

15             Two, given the number of docket entries that get

16   filed in this case, I mean, this -- this is 4,186.  Most of

17   the docket entries that come through are just transferred into

18   remarks or something like that, and they get picked up by our

19   clutter folder in our office 365 email, all that kind of

20   stuff.

21             Might I suggest that if a party intends to file

22   something dispositive, whether it's 12(b)(6) motion, 12(c)

23   motion, some judgment motion, that they be e-mailed to counsel

24   to say, "Hey, listen.  We filed this.  Don't let it get caught

25   in the 5,000 documents that are filed."  That way we can
```

 1   ensure that we timely file a response.  I have no explanation,

 2   Your Honor, why we haven't seen these before.

 3          So all I can do at this point is ask that we have a

 4   couple days to respond to these motions, given that they -- at

 5   least I haven't read them yet but purport to be somewhat

 6   dispositive.

 7          THE COURT:  Any response to the request?

 8          MS. PIERSON:  Your Honor, we leave it to your

 9   discretion to decide what to do.  We would only say this.

10   It's multiple motions.  They were properly filed.  The

11   deadline has passed.  We put them on the agenda for the

12   conference today.  So there's certainly been no effort to hide

13   the ball.  We, of course, have no objection whatsoever going

14   forward with sending dispositive motions by email to counsel.

15   We'd gladly pay them that courtesy.  But we defer to your

16   judgment.  We believe the time to respond has passed.

17          THE COURT:  This document that I have is a joint

18   proposed agenda for the status conference and it lists these

19   motions.  And you're saying you just found out about it today?

20          MR. WILLIAMS:  Your Honor, I can tell you that last

21   night, when the four of us were meeting, and this morning when

22   we were meeting, we were deciding who was going to discuss

23   each of these things; and we had decided that when these items

24   come up, we're going to say, "Well, we'll just wait to see

25   when the motions are filed and then we'll provide a response."

1  Because we -- we were somewhat perplexed why they were on

2  there.  We thought it was just telling the Court we're

3  planning to file these motions.  And that's -- that's how we

4  read the agenda and that's where we are.

5          THE COURT:  All right.  How much time are you

6  requesting?

7          MR. MARTIN:  Given the circumstances, Your Honor, I

8  would lean on the Court to give us -- what is this?  Today is

9  Thursday?  We'll get something done fast and we can get a

10 response filed -- certainly have it done by a week.

11         MR. HEAVISIDE:  A week, Your Honor.

12         THE COURT:  On or about the close of business on

13 Friday, the 21st of April.

14         MR. WILLIAMS:  That's fine, Your Honor.  Thank you.

15         MR. MARTIN:  Thank you.

16         THE COURT:  Mr. Williams may have a good idea here,

17 considering the flow of filings that are coming through.  I

18 don't see all of them but I see a lot of them.  It might be --

19 it might be a good idea to -- well, it is a good idea that

20 dispositive motions or significant motions, once they're

21 filed, give the other side a heads up, no matter who files

22 them.  Okay?  Does that make sense?

23         MS. PIERSON:  Happy to do it, Your Honor.

24         MR. MARTIN:  Thank you.

25         MS. PIERSON:  Not an issue.

```
 1              THE COURT:  That way I'll avoid this again and
 2    having to give extra time and all that.  Okay.  Very good.
 3              MR. WILLIAMS:  Thank you, Your Honor.
 4              THE COURT:  Next issue, update on what plaintiffs
 5    have learned regarding the document destruction issue.
 6    Mr. Williams.
 7              MR. WILLIAMS:  Yes, Your Honor.  Given that -- given
 8    Cook's somewhat reluctance to discuss this, I just want to
 9    inform the Court that we have taken two Rule 30(b)(6)
10    depositions.  We learned in the last 30(b)(6) deposition there
11    are over 100 Cook sales employees that were not put on
12    litigation hold until February 8, 2017.  That means there's
13    been a significant amount of time where there has been at
14    least some amount of the relevant Cook folks not placed on
15    litigation hold.
16              We are meeting with Judge Baker again later this
17    afternoon to discuss next steps.  Plaintiffs at some point
18    will be filing some sort of motion for relief based on what we
19    believe to be document destruction in bad faith.  I know Cook
20    disagrees with that, and I don't want to belabor that point
21    here today because we'll talk about that with Judge Baker this
22    afternoon.  But I want it to remain on the Court's radar
23    because this will be a significant issue in each of the
24    Bellwether trials.  The evidence that we've got so far, it
25    deals primarily with the Hill case, which is our first
```

1  Bellwether trial.

2        So just wanted the Court to know we're working

3  through that issue.  We're working well with Judge Baker and

4  at some point there will be a motion forthcoming, but we're

5  not to that stage just yet.

6        THE COURT:  Okay.  Thank you.

7        MR. WILLIAMS:  Thank you, Your Honor.

8        THE COURT:  Mr. Tanner.

9        MR. TANNER:  Yes, Your Honor.  Thank you.  Joe

10  Tanner.  Briefly, as the Court knows, there's really no motion

11  before it at this time and we are going to be talking to Judge

12  Baker this afternoon; but I did want to give you just an

13  update on where we are.  There have been a couple of 30(b)(6),

14  as well as other depositions of other witnesses, including one

15  of these sales reps and a regional manager that have

16  testified, and one of the doctors that have testified about

17  these documents that supposedly exist but nobody's ever

18  testified that they do exist.

19        And if we could put a slide up.  We've looked

20  carefully at the accusation because it's a serious one.  It's

21  a serious one that Cook somehow didn't do --

22        MR. WILLIAMS:  Your Honor, may I briefly object for

23  one moment?  I did not prepare any of this because we got very

24  deliberate and sincere emails from Cook that said they did not

25  want to argue this issue with Your Honor today.  So what I did

 1   was essentially reserve everything I was going to say for

 2   Judge Baker.  I'm taken a little bit by surprise by coming in

 3   with a PowerPoint presentation.  There's already been facts

 4   discussed by Mr. Tanner that are hotly in dispute.  We simply

 5   just wanted to abide by Cook's desire, which was not get into

 6   the details or into the weeds on this issue because we're

 7   talking about it with Judge Baker.

 8           And frankly, I feel somewhat at a disadvantage

 9   before Your Honor because I took -- I took that recommendation

10   and I took that request by Cook to heart, and now I feel like

11   I've -- well, now I feel I'm at a disadvantage because I

12   didn't bring all the tools I've got on this issue.

13           MR. TANNER:  And Your Honor, I'm not going to make

14   argument.  I'm telling you the status.  My understanding is he

15   wanted a status update.  I can give you the full argument on

16   why they're wrong.  I have facts here for you as to what we

17   have learned with respect to how many documents was preserved

18   because they are the ones that wanted to talk to Your Honor

19   about our so-called destruction of evidence.

20           THE COURT:  I'm interested on the status of this.

21   We don't have to argue.

22           MR. TANNER:  Sure.  And I don't want argue, Your

23   Honor.  We have learned that there were five terabytes of data

24   related to filters that have been preserved and most of that

25   has all been preserved permanently.  I understand that five

terabytes is roughly about 17 million documents, depending on how you calculate it.

Of those documents, those include, under Cook's retention policy, key documents that are used in product liability cases.  Key documents such as the design history file, the manufacturing records, testing records, regulatory records, labeling records, engineering records.  All those types of things are permanently held.  The key documents weren't touched.  Cook has a program in place and has for many, many, many years that those don't get destroyed at all and we've listed some of those here, Your Honor.

In addition, there have been documents collected in individual cases well before the MDL.  And then Mr. Williams talked about email.  Email -- all email that an employee, including the representatives, the district managers and regional managers, that they think is important, they are to save or put in a folder.  All email that's saved or put in a folder by the employee is also saved, Your Honor.

As far as the litigation hold, there are 1,200 employees on hold; 320 of those specifically for the filter.  And for this particular case, again, the facts are, Your Honor, 92 key employees were on hold before this MDL was ever created.  With respect to the Bellwether case, a hold was in place in Mrs. Hill's case before she ever filed the case.  A hold was in place for Ms. Brand before she ever filed the

1   case.  A hold was in place for Mr. Gage before he ever filed

2   the case.  None has been lifted.  No documents have been

3   intentionally destroyed, and the plaintiffs have been given a

4   list of every hold, every employee that was put on hold, the

5   date they were put on hold and they have this information by

6   our preservation policies.

7         So just in sum, whether there's an email, a

8   hypothetical email from before 2010 that didn't get hold --

9   there's no evidence it ever existed or was destroyed or ever

10   destroyed in bad faith.  But these are the facts, Your Honor,

11   and we're very comfortable with what happened.  And if there

12   is a motion, I'll be able to get into the full argument.  But

13   these are the facts that we have determined as part of their

14   raising their questions about spoliation.

15         THE COURT:  Thank you, Mr. Tanner.

16         MR. WILLIAMS:  Your Honor, may I briefly?

17         THE COURT:  Sure.

18         MR. WILLIAMS:  There certainly have been documents

19   that have been preserved.  We don't dispute that.  The fact of

20   the matter is, what the sales representative in the Hill case

21   testified to was, "If I had an interaction with a physician, I

22   would usually send an email just letting my boss know I met

23   with such and such and detail what happened during that

24   meeting."

25         Cook has raised the learned intermediary defense.

1 Not only that, but our failure to warn claim both hinge upon

2 what Cook disclosed to these physicians, what kind of risks

3 did they disclose, how did they tout the benefits.  The only

4 evidence of that, that exists, is the communications between

5 the sales representatives and the physicians who implant the

6 devices.  The representative, in her deposition, said she

7 would send an email to her boss to tell her what happened in

8 these meetings.  That's the only evidence that would exist.

9         When we took the Rule 30(b)(6) deposition of a

10 member of the general counsel at Cook, he testified that they

11 permanently preserve what they call core documents,

12 engineering documents, the things that Mr. Tanner just

13 discussed.

14         THE COURT:  Right.

15         MR. WILLIAMS:  When I asked him, "Do you consider

16 marketing materials or more specifically, communications

17 between sales reps and doctors to be those core documents that

18 are preserved permanently?"  He said, "No, we do not."

19         I just heard that a litigation hold was put on --

20 put into place for the Hill case at the time -- or around the

21 time her lawsuit was filed, which was in 2014.  We have been

22 produced a list by Cook of all the people who were put on hold

23 and when they were put on hold.  The sales representative that

24 I just read you testimony from, she was not put on hold until

25 May 6, 2016.  That's more than 18 months after Ms. Hill's

1    lawsuit was filed.  As we have shown Judge Baker and as we

2    will continue to show him, they had knowledge of the things

3    that happened to Ms. Hill long before that.

4            So this idea -- I just want to hammer home this idea

5    that this is an insignificant issue, that these emails that

6    may not exist are not a big deal, that's far from the case

7    because it's our burden to prove that there was a failure to

8    warn and it's our responsibility to defeat the learned

9    intermediary doctrine.  And the way we do that is by

10   demonstrating and proving what Cook said to the physicians who

11   both prescribed and implanted those devices; and what we have

12   been told is those emails no longer exist and they are

13   unrecoverable.

14           So we are at a point now where we know the emails

15   don't exist.  We know we're not going to be able to get them.

16   We know we're not going to be able to use them at trial.  So

17   now what we have to determine is, was there bad faith involved

18   in removal and deletion of those emails.  Because if there

19   were, then we would come back to the Court and ask for some

20   sort of instruction, most likely.  I just wanted to disabuse

21   the Court of the fact that this is not an insignificant issue.

22   This is -- really cuts to the heart of these cases.  Thank

23   you, Your Honor.

24           THE COURT:  All right.

25           MR. TANNER:  Briefly, Your Honor, without again

getting into argument that's premature.  I respectfully

disagree with Mr. Williams' recitation of what the testimony

has been in this case, both by the district manager

Ms. Whitelock, by her boss Ms. Conners, by the doctor that

they're talking about.  The emails that they're talking about

for the learned intermediary would have been prior to

placement of the filter in 2010.  She had not had the filter

removed until 2013.  Those emails would have been destroyed

well before anyone ever thought there was an email -- excuse

me, that there was an issue with her filter.

        More to the point, however, Your Honor, there's

absolutely no evidence that those emails ever exist or that

they were ever destroyed or certainly in bad faith; and in

fact, the testimony of those witnesses is that they likely

never existed because it was not their policy to do that and

no one remembers anybody doing that.

        We will get into this in full argument.  I'm pulling

the reins back right now, Your Honor, on what I'd like to say

but just so you know, there are two sides to this story that

we think the deposition --

        THE COURT:  I assumed that there were two sides.

        MR. TANNER:  Thanks.

        THE COURT:  I appreciate that update on that issue.

Ready to go back to the Bellwether trial schedule now, No. 2?

        MS. PIERSON:  You want to go first?

1           MR. MARTIN:  Sure.

2           THE COURT:  Mr. Martin.

3           MR. MARTIN:  Thank you, Your Honor.  Hopefully, Your

4   Honor, this will not take that much time.  We have -- the

5   documents that I want to point the Court to, the Bellwether

6   trial schedule is -- will now be the second amended case

7   management order number 19.  On the books now are the original

8   case management order number 19 -- CMO 19 and then the first

9   amended.  And now what we really are presenting to the Court,

10  for the Court to help us fill in, to the extent we haven't

11  already agreed to some and we want to get the Court's approval

12  in those as well, this would be a proposed second amended case

13  management order.

14          So if I can give the Court a general background.

15  Would it help the Court if I brought forth these orders that

16  are currently in existence?

17          THE COURT:  Yes.  That would be fine.

18          MR. MARTIN:  Thank you.  There's the original and

19  the amended.

20          THE COURT:  Thank you.  The amended is 3326, the

21  original is 3015.  Okay.

22          MR. MARTIN:  Thank you.  Your Honor, if you look at

23  the amended case management order, here's what happened.

24  Trials were set -- trial settings changed a little bit.  The

25  expert -- you'll recall, Your Honor, when we came to the Court

1    asking for 30 more days for expert witness designation, that

2    happened, I think, twice.  It may have happened three times.

3    But for purposes of this, we had an original date and if the

4    the Court will look at the original case management order,

5    number 19, it will see the dates that we had.  And the reason

6    this is important is because we have a disagreement on a

7    particular important date called the fact discovery deadline.

8              Okay.  So if you look at the -- if you look at the

9    original order, we will see under expert disclosures, three;

10   and when we get back here, Your Honor, you'll see we've got

11   the Hill and Gage trial dates, the Hill and Gage witness list

12   and trial dates and things of that nature.  Some of those have

13   changed.

14             But what I want to direct the Court's attention to

15   is expert disclosures.  At that time our disclosures were due

16   in Hill and Gage January the 16th, 2017.  So if the Court will

17   then go down a little bit further, the Court closed the

18   discovery on April 20th for nonexperts -- in other words, fact

19   discovery -- and May 19th for -- April 20th, 2017 and May 19th

20   for expert discovery.

21             Fast forward.  When the Court changed the order --

22   amended the order and gave an additional 30 days for the

23   plaintiffs to provide experts on -- and now if the Court will

24   go to that order, we go to Hill and Gage.  What the Court did

25   was, Your Honor gave an additional 30 days for expert

disclosures, February 16th and April the 17th for defense.

If you go down to No. 5 -- and this is kind of getting to the important issue here -- the Court will also see that the nonexpert close of discovery was also moved consistent with its prior order that it had and moved both of those an additional 30 days.  So we've got the February 16 plaintiff designation, April 17 designation, and the Court just brought forward what it had done previously and the Court sees those to close of discovery dates.

Now, what we have not yet presented to the Court and it probably -- it would have been good maybe to have gotten this to the Court previously but we just couldn't agree on things.  What we need the Court to sign and enter are orders with respect to what the Court ordered back a month and a half ago probably.  When the Court gave us -- gave the plaintiffs, and we were given 30 more days to file the expert reports, all of which have now been filed.  That date was March the 17th, St. Patty's day.

So what we were asking is that the Court do the exact same thing that it did before.  That is, direct that St. Patty's day -- the Court has already ordered that.  It's simply not in a written order in this form.  The Court gave the opposing side their extra days for that.  So they've got 60 days from that date or thereabouts, and I believe that date is then June -- well, let's see.  Their 30 days extra would be

1   May the 17th, I believe.

2           The rub is here.  What we would suggest then is also

3   that the expert witness deadline then -- excuse me.  The close

4   of discovery for experts go an additional 30 days, just like

5   it had in the past.  Cook agrees with that.  The only thing

6   that we're having difficulty with is that Cook will not agree

7   to move that May 22, 2017 close of nonexpert discovery as has

8   been done every time before.

9           The problem that it causes is, and I have -- I can

10  give the Court great detail on the numbers of depositions and

11  when they are scheduled, but I can tell the Court that we have

12  probably -- we have six corporate defendant depositions

13  scheduled beginning April 21st and through sometime, I

14  believe -- I could be wrong -- the latter part of May.  We

15  also have some key opinion leaders' depositions which have not

16  yet been scheduled but we are trying to schedule.  Have had

17  some difficulty scheduling but we'll get it done.

18          And we believe that those depositions probably will

19  need to be in that period of that extra 30 days because they

20  could be considered fact witnesses, as well as expert

21  witnesses; and then we are taking -- and then we're taking

22  expert discovery.  So that's -- do July 22nd, that's fine.

23          But the problem is we're already into scheduling and

24  have had really agreed scheduling of fact witnesses in that

25  period that Cook does not want to push to the next period, as

1    the Court has done in the past.  We are at a loss exactly why

2    that is but I believe that Cook -- and I'll speak for them at

3    this point and Andrea, I think, may correct me or may agree

4    with me.  I think that Cook is concerned that we will schedule

5    a slew of depositions in that 30-day period of time.  And

6    we've told Cook that that's not our -- that that is not what

7    we intend to do.

8         In fact, we have the schedule pretty much laid out

9    as to which depositions are going to be taken.  Your Honor, we

10   have three more depositions that we are able to take under the

11   magistrate's ruling on the number of depositions of corporate

12   defendants to take.  In other words, the people that work for

13   Cook and a couple of other -- and a couple of other fact

14   witnesses.  Some former employees.

15        So we're just scheduling these depositions.  It

16   seems to make no sense that we don't go ahead and move the

17   date to a date that we've already exceeded being able to use.

18   So we just need to take those deadlines, just like we did last

19   time, move not only the expert close of discovery and also

20   move the nonexpert close of discovery; and it would make lots

21   more sense, since we're already in that time period anyone.

22        THE COURT:  You communicated that you agreed -- the

23   parties agreed regarding extending the expert?

24        MR. MARTIN:  Parties agreed to July the 22nd for

25   extending the close of expert discovery, yes.  So I think

1   that's -- there may be some other scheduling matters that need

2   to be discussed but as far as that goes, that's the main rub

3   right now.  I'll tell the Court.  I've talked to Matt Schultz,

4   who is coordinating with me on discovery, Julie Rhodes.  We

5   don't plan on -- they know who we're going to depose.  We're

6   holding back a couple of spots because we don't know, after

7   one of their particular witnesses is deposed, one of the

8   corporate witnesses is deposed, we've held back a couple of

9   our depositions that we're entitled to because something may

10  come out in that deposition -- or those depositions that we

11  need to reup.  And if those things happen, then we've got

12  those depositions to do and we'll certainly do them within the

13  time period of that, what we propose, the June 22nd deadline.

14  That's what we would propose.  Thank you, Your Honor.

15          THE COURT:  Thank you, Mr. Martin.  Ms. Pierson.

16          MS. PIERSON:  Thank you, Your Honor.  I won't repeat

17  any of the history that Mr. Martin covered, which I think is

18  an accurate recitation of the history of the plans.  However,

19  we told you two months ago that we would talk about other

20  deadlines and the plans -- we developed a new plan and we

21  would get that back to you.  And I'm sorry to say that despite

22  having had a few conversations about it and exchanged many

23  emails, we just weren't able to come to agreement on certain

24  aspects of the plan.

25          Based on my conversations with Mr. Martin and

1   Mr. Schultz and exchange of emails, as I'm sure you could see

2   from our Bellwether submission, we believe there are about six

3   issues that the Court needs to address.  Some of those that I

4   thought were issues that the plaintiffs had were not raised

5   today.  So maybe they've been resolved since we submitted our

6   plan to you on Tuesday.  But we did that so Your Honor would

7   have something to look at and work from as you contemplate

8   what the next Bellwether plan looked like.  May I approach

9   just one second, Your Honor?

10              THE COURT:  You may.

11              MS. PIERSON:  What I'm handing up, Your Honor, are

12  exhibits A and B to the submission we filed on Friday --

13  excuse me, on Tuesday.  Honestly, I think it's easiest to look

14  at exhibit B because it's a chart of the deadlines and

15  sometimes these things are --

16              THE COURT:  I have these, okay.

17              MR. MATTHEWS:  Judge, if I could -- I'm sorry to

18  interrupt.

19              THE COURT:  Yes.  Mr. Matthews.

20              MR. MATTHEWS:  I was traveling yesterday.  I think

21  these were filed Tuesday night at 8:30.  We have not had

22  any -- I just found out about these this morning.  As I was

23  traveling yesterday, they were filed at 8:30 again on PACER.

24  We were never given a copy of these.  I had no idea.  I tried

25  my best to read these this morning at 7:00 o'clock but we

```
 1   certainly have not responded to any of these documents.

 2           THE COURT:  Right.

 3           MR. MATTHEWS:  We were given no notice of this

 4   whatsoever and I would object to any discussion about

 5   documents that I've read this morning that were filed late

 6   Tuesday night.

 7           MS. PIERSON:  If I may, Your Honor.  We've been

 8   having this conversation about deadlines for two months.  So

 9   we came to a point a few days before the conference with you

10   where we reached an impasse.  I'd suggest that we discuss the

11   issues.  If the plaintiffs want to file something after this

12   conference, we have no objection to that.  They obviously can

13   anytime they choose.  But I think the issues aren't really

14   that complicated and they've all been discussed in detail

15   between the parties.  To the extent that that -- the

16   plaintiffs feel that's not the case, we have no objection to

17   them submitting something to Your Honor at a subsequent time.

18           THE COURT:  Everyone is here today.  Let's go ahead

19   and discuss some of this.  Of course, Mr. Matthews, you'll

20   have an opportunity to respond.  But by discussing this here

21   today with everyone, we might be able to just resolve some of

22   them.

23           MR. MATTHEWS:  Okay, your Honor.

24           THE COURT:  At least we can make an effort to do

25   that.  I understand completely your point.  It was filed late.
```

1   You're traveling.  You haven't had a chance to respond.  So

2   I'm not going to make any decisions here without seeing your

3   response.  We will make decisions if we can agree on them and

4   we may have some further discussion and I may be able to

5   express a viewpoint as well.  So Ms. Pierson.

6          MS. PIERSON:  So if I may, Your Honor.  I think that

7   there are really six issues that are in dispute between the

8   parties.  As you say, some of them we may be able to resolve

9   today, others we may not.  The first of those issues is what

10  Mr. Martin just discussed and that's the question of the close

11  of fact discovery.  So what I've given you is exhibit B, the

12  chart.  I've highlighted in green the dates that are already

13  in Your Honor's Bellwether trial plan or their dates that

14  aren't in the plan but the parties have no dispute about.

15         And Your Honor can see that the current close of

16  fact discovery is May the 22nd of 2017.  The parties discussed

17  that date.  Plaintiffs asked that the date be moved by 30

18  days.  Cook objected to moving that deadline on a blanket

19  basis for a couple of reasons.  First, as Your Honor knows

20  well, this MDL has been pending for over two years and Cook

21  has been on the receiving end of a substantial amount of

22  discovery in that time.  Back in November, Judge Baker issued

23  a discovery order where he gave the plaintiffs a certain

24  number of additional depositions and a certain number of

25  custodial files.  And in that same month we met with you and

we talked about this need to turn the page on the chapter of

discovery against Cook and instead now focus on the case

specific discovery that would be required in the Hill and Gage

cases, and that would be followed then by the expert

disclosures and expert discovery.  Like every case, even a

single individual case, there is a chapter and you largely

close the chapter and turn to the next.

We had an extensive argument about this with Your

Honor and I have the transcript with me, if it's helpful at

all, Your Honor, to review that discussion.  Mr. King was the

one who initially said we really need to find a way to end the

discovery against Cook so that we can focus on working up the

Bellwether cases.  Your Honor let each side go back and forth

and then ultimately, on page 40 of the transcript, you made

the wise decision to say "By agreement of the parties.  Other

than the discovery that was ordered by Judge Baker, discovery

against Cook would be closed."

As we explained in our papers, we believe that

hasn't actually happened.  That Cook has been on the receiving

end of a substantial amount of discovery since that time.

We're not asking you to address that issue, Your Honor.  We'll

have a long conference with Judge Baker this afternoon about

that particular issue.

I want to just give you one other thing that's

attached to our papers.  This is a list, Your Honor, of all

1  the depositions that have been scheduled, and this includes

2  the plaintiffs' experts, which we'll talk about in just a

3  moment.

4          What I heard Mr. Martin say this morning was that

5  the fact witnesses that are on this list that the plaintiffs

6  have requested, that they have no -- they've not currently

7  identified any other fact witnesses that they want to depose.

8  And as I've told Mr. Martin, we have no objection, should

9  Judge Baker order that they're entitled to this many fact

10  witness depositions, which is an issue in dispute for this

11  afternoon.  But should Judge Baker order that they're entitled

12  to this many, we have no objection to the folks on this list

13  being deposed, even if their depositions occur on a couple of

14  dates that follow the current closure of fact discovery.

15          What's problematic from our perspective, though, is

16  the notion of wholesale leaving open any discovery that the

17  plaintiffs want to do for another 30 days, when we've been

18  doing discovery for two and a half years and when this Court

19  ordered very clearly back in November that by -- after

20  substantial discussion between the parties, that other than

21  the depositions that Judge Baker allowed the plaintiffs to

22  have in the discovery order, company discovery was closed.

23          We're very jammed up on dates preparing for trial in

24  just six months from now.  Put bluntly, Your Honor, we don't

25  have time or resources to devote to doing anymore depositions

1   or producing anymore documents; and we need to be focused on

2   taking the facts that have been developed and turning those

3   into expert opinions, expert depositions and the motion

4   practice that will follow.

5           So respectfully, Your Honor, as relates to the close

6   of fact discovery, we would ask that Your Honor continue to

7   leave the close of fact discovery as May the 22nd, with the

8   provision that the plaintiffs may take the fact depositions

9   that are on this chart, should Judge Baker order this

10  afternoon that they're entitled to as many as they've listed

11  here.

12          THE COURT:  Mr. Martin, the additional nonexpert

13  discovery here, would that be case specific to Hill and Gage

14  or is that of a general nature?

15          MR. MARTIN:  Judge, nonexpert discovery, saving for

16  the fact that we have three -- three corporate defendant

17  depositions left in our list.  I mean, we have -- we have

18  scheduled -- I believe out of the 28 available, we've taken

19  18.  We've got five scheduled.  That's 23.  So we have three

20  left that we have not designated or named.  Those are the

21  ones, as the Court may recall, I had indicated that we will be

22  taking those -- I hope I indicated that we would be taking

23  those three to get us to our 28, which the magistrate ordered

24  and we've been trying to schedule for months, some of them.

25  And so we have those three left to go, okay.

1        And all I'm simply saying is we're not planning on

2   loading up during this 30-day period of time.  We don't have

3   time to do it.  With loading up with a bunch of depositions of

4   people that, quite frankly, I don't know of anybody else.

5        THE COURT:  I guess that's what I'm getting at.  If

6   I extend the nonexpert to June 22, what do you plan to do in

7   that 30 days?

8        MR. MARTIN:  Well, we certainly want to take the

9   three corporate -- we certainly want to take the three

10  corporate defendants that we're allowed to take and have not

11  yet been named.  We would want to take those three to get us

12  to our 28.  And that's -- and if there are any -- for

13  instance, there is a Dr. Timperman.  There's a doctor --

14  there's some consultants for Cook that are already -- I

15  believe already scheduled on this list.  So I guess the answer

16  is probably nobody.

17       But if -- but if we take the depositions that we're

18  taking and something comes up throughout one of those

19  depositions and we need to take another deposition, we would

20  want to.  We certainly want to take the depositions that we've

21  requested.  So I think the question is, do we want to take

22  anymore than we requested?  We don't have any in mind, save

23  for those three, Your Honor, that we're entitled to.  So -- in

24  these case specific.

25       THE COURT:  Those three would be in addition to this

```
 1   list?
 2            MR. MARTIN:  Correct.
 3            THE COURT:  Is that right?
 4            MR. MARTIN:  Yes.
 5            THE COURT:  They're not on here?
 6            MS. PIERSON:  We don't know who they are.  I don't
 7   think Ben knows who they are either.
 8            MR. MARTIN:  We've held back three out of our 28.
 9   You know what, we could name three and go fire them up.  But
10   you know what?  We may not even take those three.  May not.
11   This is -- we're not hiding behind the ball.  This may be it.
12   But we certainly are entitled to those three.  And all I'm
13   saying, Your Honor, is we have nobody else in mind.  Nobody.
14   But if there is a -- if there's a treater that needs to be in
15   that period of time or another individual, I don't want to
16   tell the Court, "Hey, it couldn't come up."  But I'm telling
17   the Court now we do not have anybody in mind and we've
18   imparted that information, I believe, in correspondence to
19   Ms. Pierson.  And so -- but we're going to need those 30 days
20   for folks for completing.
21            MS. PIERSON:  May I make a potential suggested
22   compromise, Judge?
23            THE COURT:  Sure.
24            MS. PIERSON:  On this list there are 21 or so people
25   who need to be deposed between now and the 1st of July.  This
```

 1   list doesn't include the Cook experts who will, of course,

 2   need to be deposed and there will be a substantial number of

 3   those as well; and those need to be completed by July the

 4   22nd.  So we are stretched as thin as we can possibly be

 5   stretched.  I understand what Mr. Martin is saying.  He wants

 6   to be certain that if he learns the identity of someone that

 7   he didn't know before that he really needs to depose, he wants

 8   the ability to do that.

 9           When we talked about fact discovery back in

10   November, Your Honor said it would be closed as to Cook unless

11   a party came to you and made a substantial and compelling

12   showing.  Let's say that.  Fact discovery is closed as of May

13   the 22nd, except for the people who are on this list.  And if

14   either party comes to you and makes a substantial and

15   compelling showing to need a deposition beyond the close of

16   discovery, then that will be permitted.  But absent that kind

17   of a showing, discovery is closed.

18           THE COURT:  Mr. Martin.

19           MR. MARTIN:  Here's the problem with that, Your

20   Honor.  If I'm understanding counsel correctly, what -- and if

21   I'm mistaken, please correct me.  And Ms. Pierson, you can

22   correct me.  I won't be offended.  But I think what

23   Ms. Pierson is suggesting is that the 28 depositions that have

24   been ordered that we can take, these were ordered months ago;

25   and Your Honor, I don't -- I can get into details on this but

1  those depositions which we are now taking of their corporate

2  defendants, Jen Brown, Henry Gyllun, several of the other

3  five, three of those we've been asking for for four months --

4  now four and a half months.

5           So what I'm suggesting is that this bottleneck that

6  has now been created, I would suggest that it shouldn't take

7  four, four and a half months to get depositions scheduled,

8  when we have been constantly asking for them over that four

9  and a half months and now we're bottlenecked.  These are

10 depositions that we are entitled to under court order and have

11 been trying to take for months.

12          Now -- so I do not want to suggest that we should be

13 waiving our other three opportunities for court ordered

14 depositions of Cook people that Judge Baker has ordered months

15 ago that we could take; and that the ones we've been trying to

16 get, these four or five on -- that are now finally scheduled,

17 months to try to get them to give them to us, Your Honor.  So

18 the answer would be, we don't think that we should be limited

19 to now shutting down everything on -- except for everything on

20 this list because we still have three left to go that we're

21 entitled to under court order.  And through no fault of the

22 plaintiffs, have not been able to be taken or scheduled.

23          MS. PIERSON:  Your Honor, suffice it to say we

24 disagree with what Mr. Martin just said about the description

25 of what's happened in the last few months.  I can get down in

1    the weeds and show you all the emails and explain how their

2    list of deponents changed many times.  We were dealing with

3    three and four lawyers on the plaintiffs' side who were giving

4    us different lists.  At least two people were put on the list

5    and taken off the list and one came back on then went off; but

6    honestly, I don't think that matters.  Because at the end of

7    the day, we have this problem in front of us.  That there are

8    a limited number of days until trial and there's a substantial

9    number of depositions to be taken.

10           And we're not complaining about the burden that this

11   places on us to depose or defend the depositions of all the

12   folks that are on this list, plus all of Cook's experts.

13   We're not saying that the Court should change any of that.

14   All we've asked the Court to do is to hold the parties' feet

15   to the fire with the current close of fact discovery except

16   for the people that we've already agreed to that are on this

17   list.  If either party can come to you and make a substantial

18   justification showing to add people to this list of people to

19   be deposed, then Your Honor can entertain that and I'm sure

20   will entertain it.

21           But back to the analogy of chapters.  The MDL has

22   been pending for two and a half years.  We need the ability to

23   concentrate on preparing our expert reports and then deposing

24   the plaintiffs' experts and defending our own experts.  We

25   don't have the luxury of continuing to let third-party

1   depositions be noticed or whoever these three mystery people

2   are; who, by the way, the plaintiffs could have identified

3   anytime in the last two and a half years.  And even today they

4   aren't identifying a single person that they really need to

5   have.  Our request is simple.  Because we only have six months

6   before trial, Your Honor, we ask that you close discovery as

7   Your Honor planned on May the 22nd, with the exception of the

8   folks that are on this list.  And again, if either party

9   should come to you and give you justification to add someone,

10  we add them on a case-by-case basis.

11          MR. MARTIN:  May I respond, Your Honor?

12          THE COURT:  Mr. Martin, who are these three people

13  you want to -- you want to depose?

14          MR. MARTIN:  Okay.  So Your Honor --

15          THE COURT:  If you haven't identified them yet --

16          MR. MARTIN:  Your Honor, if Jim -- Jim Smith is one

17  of the individuals at Cook whose deposition is being taken.

18  Jen Brown is one of the people at Cook whose deposition is

19  being taken.  They have unique knowledge.

20          THE COURT:  Are they on this list?

21          MS. PIERSON:  Yes.

22          MR. MARTIN:  They are.  Certain aspects of things

23  have not yet been covered and that's the case.  They're not

24  duplicative witnesses, okay.  We have not yet taken an

25  individual who actually -- and this Jim Smith, to my

understanding.  I'm not taking his deposition.  Somebody else

is -- or maybe I am.  Jim Smith is the -- Jim Smith has

dealings with the sales reps.  He is the marketing guy.  We've

taken Mr. Fleck and Mr. Talbert.  They're up here in

marketing.

        We haven't taken -- we haven't taken a marketing

individual who is kind of over the processes of training of

the sales reps and the things that have to do with

something --  Those things are going to be supremely important

in this case, especially since -- and I think people will

agree, that we don't have any documents that show what

happened with -- as between the sales rep and Dr. Zuzga

because they're all gone.

        So if we take that deposition, Your Honor, I suspect

that we may then have some information that will then lead us

to know who else to take.  And it's -- you know, these

depositions -- these depositions are not -- they're not sort

of just wishes of ours.  These were depositions that we argued

over and received with Magistrate Baker for good reason.  I

mean, we argued, they argued; and the Court believed that we

needed these extra depositions.

        So we're not asking for those depositions outside

those.  Although, I would suggest, Your Honor, that if

something were to come up, yes, we come back to the Court

under those circumstances.  But for these three, they've been

 1   ordered to be taken.

 2          And Your Honor, I know it's difficult.  I know it's

 3   difficult under a setting like this.  To me I think it's

 4   difficult and I think it's difficult for the Court.  Because

 5   you know, we've got -- we've got letters from a long time ago

 6   asking for the same -- the same people that are now being

 7   deposed.  Not Jim Gardner, who was one that was pulled down.

 8          I would suggest this.  This is going to be, I

 9   believe, tee'd up this afternoon.  We have presented, with

10   Judge Baker, these very issues about discovery and he's

11   usually the discovery guy and that's why we kind of prepared

12   ourselves to talk about these discovery matters with him.

13   It's only because that's the way it's happened.  I know that

14   this Court has to do with everything involved but that this

15   Court is the Court that will give us our trial date and

16   anything and everything in-between.

17          But I would suggest, Your Honor, that we have this

18   argument with Judge Baker that we intended to have that

19   counsel had brought up and it's a discovery argument, and

20   we're ready to -- we could have the whole thing here and Joe

21   can argue what he was going to argue.  But I think it's a

22   little bit of a waste of time for us to do it -- we're going

23   to have to do it this afternoon anyway.  We can do it all

24   here, if the Court would like to hear it; but all that's

25   really left are three depositions that we are entitled to

1    take, respectfully, under a prior order.

2           THE COURT:  All right.  The Court will extend the

3    nonexpert to June 22, 2017.  Three additional depositions will

4    be taken.  If any further depositions are requested, they have

5    to show good cause for me to allow that.

6           MR. MARTIN:  Thank you, Your Honor.

7           THE COURT:  Okay.

8           MS. PIERSON:  Thank you, Your Honor.  The second

9    issue that we addressed in our papers but I didn't hear

10   Mr. Martin mention today, so it may no longer be an issue, is

11   paragraph 8 of the Court's Bellwether trial plan, includes a

12   deadline for either party to submit to Your Honor motions to

13   bifurcate issues or claims.  In our communications, the

14   plaintiffs asked that that be stricken but I didn't hear that

15   argument today.  So I don't know if it's still an issue.

16          MR. MARTIN:  No.  And I don't mean to -- if I said I

17   didn't have any problems with some of these things, what I

18   meant to say was, the main issues that I expected that we'd be

19   arguing today were not those things that we got two nights ago

20   in the mail.  It was the stuff that was put on the agenda last

21   Friday.  But I'm certainly able and willing to argue these

22   dates now, the eight or nine or ten other dates that are not

23   in CMO 19 right now but that counsel wants to put in CMO 19.

24   They're not there now.

25          MS. PIERSON:  I'm sorry.  Maybe I wasn't clear.

1  That's not the issue.  Paragraph 8 of the Bellwether trial

2  plan includes a deadline for either party to file motions to

3  bifurcate claims or issues.

4         MR. MARTIN:  Your Honor.

5         MS. PIERSON:  In the last two months when we talked

6  about the revised Bellwether trial plan, the plaintiffs have

7  proposed that that paragraph be stricken.  We've explained

8  why -- in our papers why we think it shouldn't be stricken.

9  But I'm asking, is that still plaintiffs' position?

10         MR. MARTIN:  Your Honor, this -- this bifurcation

11  was ruled upon against Cook early in the game.  We don't have

12  a problem with Cook coming back and asking again of the Court.

13  So we're happy to allow for that to occur.

14         MS. PIERSON:  Then there's no issue as to

15  bifurcation.

16         The third issue that had been discussed as it

17  relates to the Bellwether trial plan between the parties over

18  the last couple months, is as we talk about expert reports and

19  the schedule, this very compressed schedule, I raised the

20  issue with Mr. Schultz and Mr. Martin, "Tell us what you're

21  thinking about rebuttal expert reports.  Do you think you'll

22  get them because we don't think you get them."  And it became

23  clear that we have different viewpoints on that.  So we think

24  it's important to address it in your plan, Your Honor, so that

25  we're not before you in July in a great big fight about are

1    they permitted or aren't they permitted.

2           So as Your Honor knows, the current Bellwether trial

3    plan does not provide for rebuttal reports.  It is Cook's

4    position that the plaintiffs have disclosed plenty of expert

5    reports.  There should be no more expert reports.  And we

6    raised with you the last time, Your Honor, the question of

7    supplementation of expert reports because we're facing this

8    jam on discovery and Your Honor said very clearly then that --

9    your words were something like, "Somebody better have a pretty

10   darn good reason to supplement before they do."

11          THE COURT:  Right.

12          MS. PIERSON:  And I think that's a good standard,

13   frankly.  As it relates to the expert reports under the

14   Court's current schedule, the plaintiffs disclosed their

15   reports in the middle of March.  Ours are currently due in the

16   middle of May.  In a moment I'll explain to you why we think

17   that deadline ought to be extended by about three weeks.  But

18   regardless of whether it's extended or not, if we layer on

19   another layer of reports from the plaintiffs' experts, that

20   creates a gigantic log jam and problem with respect to the

21   deadlines.

22          So as Your Honor may have read in our papers, we

23   respectfully request that the Court do one of two things.

24   One, either provide in the Bellwether trial plan that rebuttal

25   reports are not permitted; or two, provide -- and we've given

you some suggestive language in what I gave you as exhibit A

and in our brief, that the Court describe the very limited

circumstances under which they would be permitted and dictate

that they must be submitted within some very short period of

time.  We've suggested seven days because the schedule is so

compressed.

        The problem, of course, is that we're going to be

deposing the plaintiffs' experts beginning next week; and if

there is another layer of reports from them in June or July,

we likely will need to take their deposition based on whatever

the new opinions are that are disclosed in the rebuttal

reports.  And pretty soon we'll all be coming to you saying

we've got a problem with the Daubert and summary judgment

deadline because there's this extra layer of deposition.

        So Your Honor, we would request that the Court

provide that there are no rebuttal reports in the Bellwether

trial plan, or that the Court adopt the very specific language

that we proposed in exhibit A in paragraph 3; that rebuttal

expert reports are not permitted absent a showing of

substantial justification that the evidence was necessary to

contradict or rebut evidence on the same subject matter and

the evidence was not accessible prior to the defendants'

expert disclosure, and provide that they be submitted within

seven days.

        THE COURT:  I thought I was pretty clear on this

 1   last time.  There will be no supplemental or rebuttal reports

 2   unless someone can give me a good reason to do so.

 3              MR. MATTHEWS:  We agree.

 4              MR. MARTIN:  That's fine with us, Your Honor.

 5              THE COURT:  We've got to end this somewhere, folks.

 6              MR. MARTIN:  Sure.

 7              THE COURT:  You can discover this case for another

 8   five years.

 9              MR. MARTIN:  Your Honor, I think -- I think the

10   reality of it is, and I think that Ms. Pierson -- I saw an

11   email I think with Matt that addressed it.  That Ms. Pierson

12   doesn't believe -- Cook doesn't believe that there is going to

13   be any significant opinion that is going to open up new ground

14   for rebuttal testimony.  If that's the case, then this is

15   going to be a nonissue.  But if there is such, I think then

16   the language should protect us and we can come back to the

17   Court.

18              THE COURT:  Absolutely.

19              MR. MARTIN:  If we need to take one deposition over,

20   we can deal with it.  So this is fine.

21              THE COURT:  It's been done in many cases over the

22   years and there has to be some way just to --

23              MR. MARTIN:  Sure.

24              THE COURT:  -- put some parameters on all this and

25   it's provided for by the rules.

```
 1              MS. PIERSON:  Your Honor, I think we're all in

 2    agreement here.  Am I correct in reading into what you're

 3    saying, too, that if a party should believe that there is that

 4    pretty darn good reason, it ought to be raised with you fairly

 5    quickly after they receive defendants' reports?  Fair enough?

 6              THE COURT:  Well, I think you would know after

 7    reading the report.

 8              MR. MARTIN:  Yes.

 9              MS. PIERSON:  We just don't want to be in a position

10    that we're arguing about this ad nauseam in July, when we

11    really need to be preparing for trial then.

12              So Your Honor --

13              THE COURT:  What was your suggestion, seven days?

14              MS. PIERSON:  Seven days, yes.

15              MR. MARTIN:  That's fine with us.

16              THE COURT:  That makes sense to me, sure.

17              MS. PIERSON:  Your Honor, those are all the issues

18    that I --

19              THE COURT:  The case with any complex trial, either

20    party can always come to the Court and say, "Hey, Judge, this

21    has come up here and we really need to do this."  If you give

22    me a compelling reason, I'm going to let you try your case.

23    And if I think you need it or some way that you've been

24    prejudiced -- either side has been prejudiced and will be

25    prejudiced by not having this, then I'm going to let you do
```

1   it, unless you've got three days before trial.  If you can do

2   it in three days before trial, have at it.

3            We have deadlines to make sure that the pretrial and

4   discovery goes as smooth as we possibly can.  In my experience

5   over the last almost 30 years in doing this, is that things

6   come up at the last moment; and we'll allow you -- if it makes

7   sense and you need it, we'll allow you to do it.  I don't want

8   you to think that leaving here today that if something isn't

9   accomplished by a certain deadline or if something comes up

10  after a deadline, that the Court won't listen to that.  Of

11  course I will.  We'll try to accommodate as best we possibly

12  can.

13           MS. PIERSON:  We appreciate that, Judge.  Both sides

14  do.

15           THE COURT:  Sure.  I'm saying it applies to both

16  sides.

17           MS. PIERSON:  As I understand it, those were all the

18  concerns that the plaintiffs had based on our discussions.

19  There's one sort of joint topic that I related to this plan;

20  and as you see from exhibit B, the dates that are highlighted

21  in green are the dates that the parties have agreed to or that

22  the Court has otherwise ordered.  But there are a number of --

23           THE COURT:  Mr. Martin, do you have this list?

24           MR. MARTIN:  I do; but I'm confused because I can

25  see one thing in green and that is the -- I think that's the

1   expert designation deadline, Andrea.  I just want to clarify,

2   expert deposition deadlines 7/17.

3           MS. PIERSON:  Mm-hmm.

4           MR. MARTIN:  Is that agreed to by Matt?

5           MS. PIERSON:  Yes.

6           MR. MARTIN:  I'll take your word for it, certainly.

7   All these things have been agreed to by Matt Schultz?

8           MS. PIERSON:  Yes.  This is the same list I sent to

9   you and Matt on Monday.  Same highlighting.

10          MR. MARTIN:  I know.  But respectfully, did Matt get

11  back with you and say he agreed to all of them?

12          MS. PIERSON:  Anything that's in green, your side

13  has agreed to or the Court has ordered.

14          MR. MARTIN:  Okay.  I'll certainly take your word

15  for that and note no problem, if that's the case, Your Honor.

16          THE COURT:  Okay.

17          MR. MARTIN:  I was not aware of it.

18          MS. PIERSON:  Otherwise the problem is that we're

19  trying to get all the expert depositions in by the middle of

20  June and that's just not possible, given the extension of the

21  deadlines at the last hearing for expert reports.

22          Anyway continuing, Your Honor.  There are a number

23  of other deadlines that are highlighted in green that we'd

24  like Your Honor to enter.  We currently have no deadlines for

25  motions in limine.  In a case like this, where so many

54

```
 1   witnesses are likely to appear by video, we need deadlines for
 2   affirmative deposition designations, counter designations and
 3   objections, responses and objections, it's a really lengthy
 4   and laborious process.  We provided these deadlines to the
 5   plaintiffs this week, after we sort of went round and round on
 6   what should be added.
 7              THE COURT:  Sure.
 8              MS. PIERSON:  I understand Mr. Matthews' concern
 9   that he wants some time to think about this and we have no
10   problem with that.  We just ask Your Honor that maybe you give
11   us a definite deadline by say the middle of next week.  We
12   need to either agree or give you our proposal so we get some
13   things on the book.  We could talk about this another two
14   months, if you let us, but I'm urging you not to let us.
15              THE COURT:  Mr. Matthews, how much time do you need
16   to take a look at all of this and talk about -- discuss it
17   with your counsel?
18              MR. MATTHEWS:  Well, as I understand the discussion
19   in the papers that were filed Tuesday night, we probably need
20   to discuss it amongst ourselves and in a week we can certainly
21   get --
22              THE COURT:  Ten days?  Ten days?
23              MR. MATTHEWS:  Sure.  That's fine.
24              THE COURT:  If you could get with co-counsel and
25   then take a look at this and get back, have some discussion
```

```
 1  with counsel for the defendant and you can come to some type

 2  of an agreement on or before Monday the 24th.

 3            MR. MATTHEWS:  Judge, as I understand the issues

 4  that are in the filings on Tuesday, it's really considering

 5  one issue and that is the duplicative nature of some of the

 6  testimony from experts.

 7            THE COURT:  Sure.

 8            MR. MATTHEWS:  So I'm certainly willing to talk

 9  about that with the Court.  I mean, if the Court would like to

10  hear my response from papers I just read this morning, I

11  certainly will do it.

12            THE COURT:  Is ten days okay on this?

13            MR. MATTHEWS:  Yes.

14            THE COURT:  By the 24th.

15            MS. PIERSON:  Thank you, Your Honor.  So then we

16  have three other issues that were raised in our paper related

17  to the plan that I'd like to touch on.

18            THE COURT:  All right.

19            MS. PIERSON:  The first is Cook's expert discovery

20  deadline.  Under the Court's order from the last hearing, our

21  expert disclosures are due, I believe, on March the 17th.

22  We'd ask that that deadline be extended by three weeks and the

23  reason for the request is twofold, Your Honor.  First, as we

24  mentioned in our papers, the plaintiffs disclosed 13 expert

25  witnesses with 17 different expert reports.  That's a
```

1   significant volume of experts' reports and the reports total

2   something like between five and 600 pages.  A lot of opinions

3   in there to be addressed.

4          But second, and really more importantly, Your Honor,

5   we asked, just prior to the plaintiffs' disclosure of experts,

6   if we could mutually agree to exchange with one another any

7   materials on which the experts rely in their reports that

8   aren't documents that Cook produced or publically available

9   medical literature.  In other words, as an example, to the

10  extent that Dr. Rajebi, one of the plaintiffs' medical

11  experts, relies on imaging that was recently taken of

12  Mrs. Hill.  Our experts need the images and they need time to

13  digest the images.

14          THE COURT:  Well, that's standard procedure.

15          MS. PIERSON:  It is.  It is and there's been no

16  disagreement between the parties that that's standard

17  procedure.  The problem is that the materials have not been

18  quickly produced, and I know these things take time.  Experts

19  aren't always responsive when you tell them, "Give me your

20  materials."  As I stand here today, there are still materials

21  that are missing.  Most of the materials have been received

22  just in the last two days, since we filed our papers on

23  Tuesday night.  So respectfully, we would ask that our

24  deadline be extended by three weeks so that our experts have

25  time to review those materials, consider them and decide what

1  other work they need to do based on the materials and then

2  submit the reports.  I've spoken --

3         MR. MATTHEWS:  We don't have any problem with that.

4         THE COURT:  We'll show the defendants' request to

5  extend by three weeks the deadline for expert disclosure, show

6  that request as granted without objection.

7         MR. MARTIN:  So Your Honor, if I may just raise --

8  so the Court will be aware, I think we probably are all aware

9  that if we add three weeks, the 21 days to what would be 60

10 days from our expert designation deadline, which was March 17.

11 So we're looking at April, May 17, first part of June, first

12 week of June, something like that, then that -- I just want to

13 make everybody aware then that would be, of course, the first

14 time that we would then start -- start being able to begin

15 scheduling depositions for their experts.  And I don't know if

16 that's going to run into any time issues; but if it does -- I

17 just want to let the Court know if it does, we'll come back

18 and maybe try to fix that -- fix whatever that leads to.  And

19 so I do see that possibly kind of scrunches us up a little bit

20 but we'll work with counsel to get it done.

21        THE COURT:  Good.

22        MS. PIERSON:  So then the last two significant

23 issues that we've raised in our papers before you, Your Honor,

24 are first, we've asked that the Court set a deadline for

25 plaintiffs to withdraw the duplicative and cumulative expert

1   opinions.  Included in our papers was a chart that I'd just

2   like to share with Your Honor, if I may approach.

3          THE COURT:  You may.

4          MS. PIERSON:  Thirteen experts and 17 reports is a

5   lot, to say the least.  At the end of the day, when you try

6   Mrs. Hill's case or Mr. Gage's case, they are single plaintiff

7   cases.  Single injury cases.  We think 13 is a lot,

8   particularly given that four of the 13 are engineers with

9   overlapping reports, overlapping disciplines and specialties.

10  We think two medical doctors on causation is one too many,

11  particularly when you look at this chart.  The two medical

12  doctors on causation, Judge, are Rajebi and Marmureanu; and

13  you can see those blue boxes that are filled in.  That means

14  that both of those experts address each of those topics.

15          And in the case of Dr. Rajebi and Dr. Marmureanu,

16  it's obvious that their opinions are duplicative because they

17  are literally word-for-word duplicative, identical as it

18  relates to Mrs. Hill.  Page after page after page.  And we've

19  submitted that to you in our papers.  We're not complaining as

20  much about the number of experts as it is that the opinions

21  that are offered on topics addressed are overlapping,

22  cumulative and redundant.

23          There's good 7th Circuit authority that makes clear,

24  setting aside the -- your patience will be tried, the jury's

25  patience will be tried if these experts are offering opinions

1  on the same topic over and over and over again.  Setting that

2  issue aside --

3       THE COURT:  Mr. Martin, you're not intending to call

4  13 expert witnesses or Mr. Matthews.

5       MR. MARTIN:  No.

6       MR. MATTHEWS:  If you don't mind if I address this,

7  Your Honor.

8       THE COURT:  We can shortcut this a little bit.

9  That's not going to happen.

10       MR. MATTHEWS:  No.  Absolutely not.  The way we see

11  this is we're charged with presenting experts in every field

12  because we have some 2,000 plaintiffs that we represent.  We,

13  at the time of trial, anticipate four experts, maybe five.

14  However, each one of these experts has a different field of

15  specialty, whether it's regulatory affairs, surgery,

16  interventional radiology, material science, biomedical

17  engineering, every one of them has a different field of

18  expertise.  So it's incumbent upon us to have preparation for

19  not just this case but for all our cases.

20       So this first round, obviously, is the most

21  difficult and I think we have tried to be very specific to not

22  have duplicate experts in a field of expertise.  Do we

23  anticipate using all of these at trial?  Absolutely not.  In

24  fact, I don't anticipate taking all of their experts'

25  depositions because they'll have, again, some amount of

1   duplicative testimony from their experts in different fields

2   of expertise.

3           Can we short-circuit it?  I think that they have

4   have an opportunity to take these depositions.  They're

5   scheduled.  They can take these depositions prior to trial.  I

6   anticipate personally telling the other side, well in advance

7   of trial, that these are the experts that we anticipate using

8   at trial and that's how we think we should proceed.  They have

9   an opportunity to take our experts.  These experts have been

10  retained, have done the research, have done all of the work

11  for case specific, as well as generic research and generic

12  opinions concerning the litigation as a whole.  Not specific

13  to both Ms. Hill and Mr. Gage.

14          THE COURT:  I don't think I have to tell you this

15  but this is going to be a lengthy trial.  These jurors are

16  going to want this case to move along quickly without much

17  repetition.  In talking with jurors over the years --

18          MR. MATTHEWS:  I agree.

19          THE COURT:  -- "Why do these lawyers have to keep

20  repeating this testimony?  Do they think we're dumb?"  I'm

21  just telling you that.

22          MR. MATTHEWS:  I agree with the Court completely on

23  that and we will be pushing this case quickly, concisely and

24  getting to the point with these experts.

25          MS. PIERSON:  So Your Honor, our request is that

 1  instead of waiting until the eve of trial to tell us who

 2  you're really to going to call on each of these topical areas

 3  on this chart, that instead, the plaintiffs be required within

 4  ten days to say who the expert is in these areas and narrow

 5  these boxes down substantially.  We think that's required by

 6  Rule 26 and by 7th Circuit authority.

 7          But in addition to that, it just makes practical

 8  sense.  All of these experts have disclosed reports in

 9  Mrs. Hill's case and in Mr. Gage's case.  They've all been

10  disclosed by plaintiffs as though they will be called as

11  witnesses in the case.  So in turn, we're obligated to depose

12  them so we know what they're going to say at trial, and we're

13  obligated to discover all of their opinions in all of these

14  areas.

15          If, for example, Dr. Rajebi and Dr. Marmureanu are

16  not both going to testify on the same medical causation

17  opinions that they identically wrote in page after page after

18  page of their report, we ought to know that now so we don't

19  have to spend the time preparing for and deposing and then

20  briefing before Your Honor whether they should both be

21  permitted to offer those opinions.  And I think 7th Circuit

22  law is pretty clear.  There are no back-up experts.  It's not

23  as though either side can disclose a first string, second

24  string and third string.  And then if Your Honor excludes the

25  first two strings, we get the third string.

1           A great example, if you look across the boxes on

2    this chart, you'll see there are some topics, like the

3    adequacy of testing, where there are seven different experts

4    who have been proffered on that topic.  It's reasonable for

5    Cook to know who the one or two people are who will talk about

6    that.   It's reasonable for Cook to know in advance of the

7    depositions, will plaintiffs be calling both Dr. Rajebi and

8    Dr. Marmureanu on all of these topics in the first trial?

9    Because if they won't, we probably won't take their deposition

10   until a case comes up where, in fact, we need to depose them.

11   There's nothing that suggests that either party has to depose

12   all the experts for all the Bellwether cases for all time.

13           We're focused on Hill and Gage.  We've got our hands

14   full with those two cases.  So we'd ask Your Honor that you

15   order the plaintiffs within ten days to inform the Court and

16   inform Cook which expert, expert singular, will cover the

17   topics that are here.  And the Rajebi/Marmureanu example is, I

18   think, the most evident, in addition to having four

19   engineering experts on clearly duplicative and overlapping

20   topics, which by the way, the last three columns of this chart

21   are plaintiffs' engineers.  And you can see they all offer

22   opinions on the adequacy of testing.  They all offer opinions

23   on complaint reports and post-market surveillance.  They all

24   offer opinions on design.  They all offer opinions on risk.

25           We shouldn't have to spend the time and money

1    discovering all those opinions now.  We shouldn't have to

2    spend the time and money piling on our own experts to rebut

3    all of that.  And you, Your Honor, should not have to spend

4    the time addressing Daubert motions on all of these people.

5    You're going to have probably ten -- if all of these experts

6    are still on the table, at that time you'll probably have ten

7    Daubert motions from us.  And I expect the plaintiffs will

8    have many Daubert motions as to our experts as well.  That's

9    in addition to two very substantive motions for summary

10   judgment under two different states laws.

11           It's in everyone's best interests that plaintiffs be

12   required now to withdraw the cumulative and duplicative

13   testimony of these witnesses as it relates to the Hill and

14   Gage case.  They can hold these folks in reserve for other

15   cases.  We'll depose them on a different day later on, if

16   they're not going to be offered in Hill and Gage.  But in the

17   next ten days they ought to have to withdraw the duplicative

18   and cumulative opinions that have been offered to date.

19           THE COURT:  Thank you.  Mr. Martin.

20           MR. MARTIN:  Your Honor, if I may.  It would be

21   impossible and counsel's talk here on this issue, I was

22   thinking, "Okay, what if the Court were going to grant this?

23   How are we going to do this?"  I've been involved, as David

24   and Mike and Joe have been, with a little bit of all of these

25   experts.  I'll give you an example of the extraordinary

difficulty.  We do have four scientists.  We have what I call

a metallurgist, the metals expert who, of course, the Court

knows what that is and has dealt with that before.  And that

scientist is a completely different -- he gives a completely

different aspect of testimony in scientific expertise that may

well lock on over to the mathematics that, say, Dr. Bob -- or

mathematician Bob McMeeking.  Bob McMeeking is a scientist.

He also is going to use some of the -- he's going to use the

metallurgy.  He's going to use the testing that they have

performed to give certain opinions with mathematical

calculations.  That's going to deal with some of the same

topics.

        Then we have John LaDisa and we have Dr. Rob

Ritchie, who is kind of  in a different area of metallurgy.

Actually, two of these folks have signed off on the same

report, if I'm not mistaken, because they lend different areas

of testimony to those.  I can tell you, Your Honor, for those

people, for us to now go back and start chopping out their

reports, I'm telling you it's impossible.

        I'll say this with respect to even on Dr. Rajebi and

Dr. Marmureanu.  Dr. Rajebi is an interventional radiologist.

He's going to be talking about -- yes, he will be talking

about some specific causation things as to Ms. Hill and

Mr. Gage, as well as Dr. Marmureanu.  Dr. Marmureanu is a

cardiovascular surgeon.  He's going to be talking about

1   actually what goes on during certain procedures that

2   Dr. Rajebi, an interventional radiologist, is not going to go

3   through.  They have expertise and they have overlapping

4   testimony and they have overlapping reports.

5           But Your Honor, it will be absolutely impossible at

6   this stage of the game to just go and just go cut out part, I

7   guess, out of their depositions what would be necessary to get

8   there.  I think that the truth of the matter is, there is no

9   way humanly possible we could do it.  If we did that, we would

10  be butchering the reports.  They would be butchering this

11  trial.  And quite frankly, Your Honor, it is -- it is our

12  opportunity to -- and I guess our duty to make certain that we

13  do put the best experts on.  We do put -- at this stage of the

14  game so we do cover all of these things.

15          I can promise you, Your Honor, that if we didn't go

16  to the extent that we have gone at this point to get good

17  experts, solid experts who can pass Daubert, if we had three

18  or four, you know what?  I think that it would be a field day

19  for counsel then for Cook to be coming back and say, "Hey,

20  we've got them now."  Three Daubert reports, four Daubert

21  reports -- Daubert motions.  But I'm telling Your Honor it

22  would be impossible to do it.  Been involved with these

23  experts, absolutely impossible to do it this way, in my

24  opinion.

25          MS. PIERSON:  Your Honor, I know it's not impossible

because if Mr. Martin doesn't do it now, you're going to have

to do it in August.  This issue will continue.  It will go

through the depositions.  Our experts will have to respond to

duplicative opinions from duplicative disciplines, and then

this will all be in front of you on Daubert motion; and you'll

be the one who decides what's duplicative and what's not.  I

know it's not impossible because Mr. Matthews just said that

he could do it on the eve of trial.

It is not difficult and the plaintiffs, on the front

end, should have screened their experts to figure out who's

qualified to talk about what topic and who will be our one

witness on that topic on the front end.  They didn't do that.

And the consequence of not doing it is that we, in turn, have

to spend, we think, between 17 and 25 days deposing these

folks on the same opinion from five different experts.

Dr. Kessler is their FDA regulatory expert.  This is

his report, 500 pages.  But about only half of the pages in

his report have anything to do with regulatory topics.  They

have to do with engineering and medicine and a variety of

other things.  We're not suggesting that they have to go

through every single one of the expert reports.

Dr. Betensky, their statistician, is a good example

of somebody who stands alone.  But when you look at this

chart, it's pretty clear to see that there are two medical

doctors who offer word-for-word opinions.  They proffered the

same opinions, the exact same opinions on the exact same

topics in Mrs. Hill's case, page after page after page.  And

you can say the same thing with Dr. Litsky and Dr. Ritchie,

the engineers, and Dr. McMeeking and Dr. LaDisa.

          If Your Honor is inclined to do nothing, at least on

the medical causation front, the plaintiffs must pick one

person per topic.  One person so that we don't have to depose

and prepare for all of these duplicative opinions.

Ultimately, if the plaintiffs don't do the work that they

should have done before now, Your Honor will be the one who

has to do that work in August.  And in the meantime, Cook will

have spent hundreds of thousands of dollars on depositions and

investigating opinions and rebutting all of those opinions.

That's not fair and that's not an efficient process either for

us or for the Court.

          MR. MATTHEWS:  If I could respond.

          THE COURT:  Mr. Matthews.

          MR. MATTHEWS:  There is not a single expert that is

in the same field as another.  That's simply not true and I

think she specifically points to medical causation.  It is our

burden to show that the injuries that our clients suffered

were caused by the filter themselves and then the failure.  We

have a surgeon and then we have an interventional radiologist.

Those two experts come from different perspectives on the

injury itself.  We also have a pathologist that's talking

1    about a general cause of injury from these filters.

2            She is asking us, I guess, to say well, what if, in

3    fact, are they going to agree that that one expert is

4    acceptable to the Court, and the Court determines that from

5    the perspective of the surgeon that that is adequate

6    testimony, adequate background, adequate research that he can

7    or she can espouse that opinion versus an interventional

8    radiologist.  We have experts in every single field.  We have

9    done our best to give them every opinion that expert holds.

10           Now they're critical because we're giving them too

11   much opinion.  If they don't like that -- we have given them

12   reports.  We have spent a great deal -- a great deal of time,

13   energy and money getting these experts ready in every separate

14   field.

15           THE COURT:  What about this report here that

16   Ms. Pierson is saying is 500 pages?  Wouldn't it be possible

17   for you to indicate to the -- to Cook that this is all this

18   expert's going to testify to?

19           MR. MATTHEWS:  This is David Kessler.  He was the

20   head of the FDA Administration.

21           THE COURT:  Sure.

22           MR. MATTHEWS:  He has a great deal to say.  For

23   instance, not just regulatory affairs.  He's a medical doctor.

24   He also knows what decisions are made and how they're made in

25   the FDA.  A very important expert.  The fact that it's 500

1  pages, I understand it's difficult but he likes to be

2  thorough.  We've given them every single opinion he will ever

3  have in this case.

4          MR. MARTIN:  It's not 500 pages.

5          MR. WILLIAMS:  Your Honor, there's 110 -- he refers

6  to other experts' reports and analyses.  About 300 some odd

7  pages are appendices, much of which are organizational charts

8  from Cook, a hundred pages of expert reports from other

9  experts that he has reviewed.  So we're not talking about a

10 600-page actual report.

11         THE COURT:  Well, I'm certainly not going to want

12 duplicative testimony.  So what I'm going to suggest here that

13 counsel do is sit down and discuss all these -- whatever that

14 list -- whatever that chart is, and try to narrow down as to

15 what -- I don't think it's proper that in a case of this

16 complexity and this number of experts, that either side has to

17 prepare for deposition on items that are not going to come up

18 in that witness's testimony at trial.  Certainly we all know

19 expert reports can go on and on and on and on.  Many times

20 they're just two or three pages of it that actually come

21 into -- come into trial and that are relevant to a trial.  We

22 all know experts can tend to be --

23         MR. MATTHEWS:  Verbose.

24         THE COURT:  Yes.  This can tend to go on and on and

25 on, as if maybe they're getting paid by the page.  So I would

1    ask that you do that.  This goes for both sides.  That okay,

2    Dr. Kessler here is going to testify about FDA regulations.

3    The other items in his report we're probably not going to go

4    into.  See if we can narrow that down a little bit.

5            I don't want either side to go to any additional

6    expense that they don't have to in preparing and taking these

7    depositions and traveling.  So let's try to work together on

8    that.  Mr. Martin or Mr. Matthews, you've indicated to me that

9    we're not calling all these witnesses in Hill and Gage.  So

10   let's try to narrow that down as well as to this person will

11   be called to testify in Hill or Gage.  This person will not

12   be.  We don't know yet about this one.  So let's do that.

13           MR. MATTHEWS:  The reality of that, I'd just like to

14   open this up right now.  For instance, if we decide we won't

15   be using a surgeon to talk about causation, that a surgeon has

16   a great deal of specialty in not just the vasculature but also

17   about the damage and what and how to repair that in an open

18   matter, in open surgery than our interventional radiologist.

19   So if we say, "Okay.  We're willing to have an interventional

20   radiologist," does that mean the defendants then will agree

21   that they won't have a surgeon in the case?  We don't know who

22   they're going to -- we don't know who they're going to

23   designate at this point.

24           So we're going to narrow down what we have.  Is this

25   implicit then, Your Honor, if we do that, the defendants will

1  decrease the number of experts and only have corresponding

2  specialty experts in the fields in which we designate?

3           THE COURT:  That's what I'm trying to say.

4           MS. PIERSON:  We do not intend to have -- we

5  wouldn't be raising this issue with you if we weren't prepared

6  to live by the same rules that we're suggesting.

7           THE COURT:  I think I said it applies to both sides

8  here.

9           MS. PIERSON:  We may choose experts from the same or

10  from different specialties; but we think it's appropriate that

11  only one physician talk about medical causation for both

12  sides.  Theirs may be from an IR specialty.  Ours may be from

13  a vascular surgery specialty.  Whatever specialties we choose

14  and we think are best suited do address medical causation, so

15  be it.  But we agree there really should only be one expert

16  talking about that issue to the jury.  And Mr. Matthews has

17  indicated today only four or five of these people will be

18  called in Hill and only four or five in Gage.  We're happy to

19  work with him and work that out with him and happy to do the

20  same when it comes to our experts.

21           MR. WILLIAMS:  Your Honor, the danger, though, and

22  what we want to avoid is, we are happy to narrow down.  We are

23  happy to do everything to make this as efficient as possible.

24  But if we narrow down our specialties and say, "Here are the

25  ones we're going to call," prior to knowing who the defendants

 1  are going to call, puts us at a significant disadvantage

 2  because then they can tailor who they're going to call in

 3  whatever way they deem more effective to rebut the specialties

 4  that we're already tied down to.

 5          So what we don't want to have happen is like what

 6  Mr. Matthews said, we put up an IR to talk about a medical

 7  causation and they say, "You know what?  We're going to put up

 8  a vascular surgeon who can say all these other things," and

 9  now we're left with no ability to meet that evidence with

10  evidence of our own.

11          MS. PIERSON:  Let us work with Mr. Matthews on this

12  point for a few days and maybe we can all report back to you

13  in ten days or so.  I don't want to let the issue languish

14  because as you saw from that long list of depositions, we

15  start their experts' depositions next week.  If somebody's not

16  going to be called in Hill or in Gage, we shouldn't be wasting

17  our time preparing for and deposing them.  So let us work with

18  Mr. Matthews this week and early next week and see what we can

19  work out.

20          THE COURT:  If he's not going to be called in Hill

21  or Gage, then let's use our time efficiently here.

22          MR. MARTIN:  These -- by the way, Your Honor, these

23  are largely, probably, all the same experts that are going to

24  be called in Brand, which is completely -- which it's not a

25  completely different case but Brand is an open retrieval.  And

1   so we have to be looking -- those expert reports are due in

2   July and three months off, I guess.

3           Now I'm sort of thinking if we're cutting -- cutting

4   and pasting or kind of cutting out, I guess, what these

5   experts are going to have as to each other in Hill and Gage,

6   it could cause -- it seems to me that it might cause some

7   problem in a case now that we've got them on that they've

8   written their general reports on mainly for further stuff they

9   write.  Anyway, we've got another case to think about, too,

10  that's coming up after these two cases.

11          MS. PIERSON:  I've just one last issue, Your Honor,

12  and apologies for the length that this is taking but this is

13  obviously important for all the work we do for the next six

14  months.

15          THE COURT:  Sure.

16          MS. PIERSON:  The last issue that we addressed in

17  our papers before Your Honor was the part of your Bellwether

18  trial plan that dictates which case is tried first; and some

19  things have happened in the last few weeks that we think

20  dictate that the Gage case, in fact, should be the one that's

21  tried before the Hill case.  We explain those in our brief

22  beginning at page 22, but I can summarize them, I think.

23          First, to the extent that we've received materials

24  belatedly about plaintiffs' expert opinions and to the extent

25  that there are a number of experts to be deposed, that problem

is more acute in the Hill case than it is in the Gage case.
We have the things that we need -- or largely have the things
that we need to prepare our expert reports in the Gage case
and to prepare our experts for deposition.

The second point is that in the Hill case, we have a
number of treating physician depositions that remain to be
scheduled.  As I explained in our papers, the lawyer for
Mrs. Hill, his office told us that they would schedule the
treating physician depositions.  They assured us that that was
being done.  At the end of the day, by the time the
plaintiffs' expert reports were disclosed, the plaintiffs had
only scheduled one of the treating physician depositions.  We
realized in about February that this wasn't -- the plaintiffs
weren't actually going to schedule them and they asked us not
to reach out to them to schedule them.  So we began this mad
scramble to get the treaters lined up up for deposition.
We've now done that but there are a number that remain to be
taken.

A couple have been started and didn't get completed
because of restrictions on scheduling.  But in particular, the
one -- there are two key ones that haven't even been scheduled
yet in Mrs. Hill's case.  One of them is of critical
importance to our expert reports and that's Dr. Frank Lynch.
So Dr. Lynch is the physician who actually retrieved
Mrs. Hill's filter.  And key issues, according to Mrs. Hill

1  and her lawyers, are whether -- how the retrieval happened,

2  was the retrieval difficult, were there complications, was

3  there damage to the vena cava in the process of that.  And

4  hearing what the physician, who actually took the product out

5  and who saw Mrs. Hill's vena cava at the time, hearing his

6  opinions is vitally important to our experts.

7          We've tried to schedule his deposition.  In the

8  meantime, the plaintiffs served him with a subpoena and a long

9  list of request for production.  Dr. Lynch's lawyers objected

10  to that.  The plaintiffs weren't able to work that issue out

11  with Dr. Lynch's lawyers, and Dr. Lynch's lawyers ultimately

12  filed a motion to quash the subpoena in Pennsylvania, where

13  Dr. Lynch practices medicine.

14          Just within the last few days, the briefing on that

15  motion to quash has been transferred to your court.  So we

16  don't know yet what Dr. Lynch will or will not be required to

17  produce, but the plaintiffs have refused to take his

18  deposition until such time as he produces or some court says

19  he doesn't have to produce the documents that they want.

20          We want Dr. Lynch's deposition as a fact witness

21  only.  He treated Mrs. Hill.  He can tell both sides how he

22  treated her, what he observed.  It ought to be a relatively

23  short deposition and we need to get it scheduled.  I've spoken

24  to his lawyer and Dr. Lynch is now not available until early

25  June to be deposed.  And hopefully this document production

```
1   issue will get worked out between the plaintiffs and Dr.
2   Lynch's counsel between now and then.  But we have to have his
3   deposition before experts can render their reports and that
4   slows everything down, frankly.
5              I think the two sides come at Dr. Lynch's deposition
6   a little differently.  Our view is that he's a treating
7   physician and he ought to be deposed on what he knows about
8   Mrs. Hill and his care and treatment of her.  Dr. Lynch also
9   happens to be a principal investigator in an ongoing clinical
10  study that relates to Cook products called the Civics Study.
11  These request for production seek all the information that
12  Dr. Lynch has about the Civic Study and that's where the fight
13  lies.  It doesn't have anything to do with Mrs. Hill or
14  Mrs. Hill's care and treatment.
15             So we need a deposition about Mrs. Hill.  The
16  soonest we're going to be able to get it is June and that
17  delays our ability to do a whole lot of things in Hill.  And
18  we didn't really tee that issue up under the Bellwether trial
19  plan, Your Honor, because until we know when Dr. Lynch will be
20  deposed, it's hard to know what relief we need from you in
21  that regard.  That's the second reason.
22             MR. MARTIN:  Your Honor.
23             THE COURT:  Hold it.  Let her finish.
24             MR. MARTIN:  Oh sure.
25             MS. PIERSON:  The third reason, Your Honor, as you
```

probably know in your Bellwether trial plan, you have a

deadline for independent medical examinations.  Mr. Gage's

case is a very simple one.  We don't need any physical IME of

Mr. Gage.  We've asked for one IME, a psychiatric IME, and

that will involve probably one meeting with some kind of a

mental health professional and it shouldn't take more than a

few hours.  I don't think there's going to be a dispute with

Mr. Gage's counsel about that.  It ought to be relatively easy

and quick.  It will not delay our expert reports in the Gage

case.

          In contrast in Mrs. Hill's case, it's a far more

complicated allegation of injury.  She claims that both her

duodenum, her intestine, and her vena cava have been

permanently damaged by the removal of her filter, the

perforation of her filter.  And as consequence of that, her

experts have offered the opinion that today she has certain

injuries internally.  So Cook has proposed to plaintiffs an

independent medical examination protocol and we propose that

there be five things that happen with respect to Mrs. Hill

during the independent medical examination.  We've been

working with Mr. Heaviside on that proposal, and we've tee'd

the issue up for Judge Baker this afternoon.

          But until we agree on what exams will be conducted

on Mrs. Hill, even if we agree to that today, our experts

would have to schedule those IME's.  That will take a few

 1   weeks to happen.  Then they'll need to author their reports

 2   from the IME's and that delays the Hill process, too.  I hope

 3   we can get all that done by the new deadline that Your Honor

 4   has set of June the 8th; but these things make Mrs. Hill's

 5   case delayed in comparison to the Gage case.

 6           In contrast to the Gage case, the treating

 7   depositions are almost done.  We've got two next week and then

 8   Mr. Gage's treaters will be done.  There's not this

 9   complicated issue of an IME.  And the materials that related

10   to Mr. Gage's product were produced more quickly than the

11   materials that the experts relied on in Hill.

12           So for those reasons, we ask Your Honor that in

13   terms of the order of the cases to be tried, the Gage case

14   will be ready sooner.  I anticipate we'll able to disclose

15   experts sooner, briefings sooner.  We think it's more in line

16   of the case that should go first.

17           As I mentioned when we started, Your Honor, Tulips

18   make up 50 percent of the MDL currently.  Mr. Gage's claim of

19   vena cava perforation is second only to unable to be retrieved

20   right now.  You've already decided it's representative.  The

21   question is just which one do we try in October and which one

22   do we try in April.  We think it makes things substantially

23   easier for the parties and Gage is more likely to stay on

24   schedule for an October trial.

25           THE COURT:  Thank you, Mrs. Pierson.  Mr. Matthews.

1          MR. MATTHEWS:  I'm sorry.

2          THE COURT:  Mr. Matthews.

3          MR. MATTHEWS:  Yes.  This is the first I have heard

4   about the defendant wanting to change the trial schedule this

5   morning.  First I've read about it.

6          THE COURT:  Me too.

7          MR. MATTHEWS:  First, let me just say that we have

8   relied on defendant for over a year that the Hill case would

9   be tried first.  That is defense pick.  They chose the case.

10  Our lawyers are in place.  The lawyer Joe Johnson, who's in

11  Florida, has taken a month out of his schedule to come try

12  this case.  It's his case.  We have planned everybody's

13  schedule around what they wanted.  And I think suddenly at

14  this last hour, because they say, "We can't take Dr. Lynch's

15  deposition," Dr. Lynch's deposition will take place.

16         We will take that deposition.  You've seen our

17  schedule.  I'm personally going to take about a dozen

18  depositions in the next two months.  That's fine.  That's what

19  we do.  And Dr. Lynch's deposition will get taken.

20         In the Hill case, Bellingar, Marino, Zuzga, Conners,

21  Whitelock, Bidani, Santori, Lynch either have been taken or

22  are scheduled.  There are two in the Gage case, Crisostomo and

23  Goodwin both have half depositions taken.  The Hill case has

24  had a great deal more discovery taken than we have had in the

25  Gage case.  It's potential that the defendants don't like the

1   Hill case at this point but we should not suffer and be

2   prejudiced by the fact that we have scheduled all of our

3   schedules around the Hill case being tried first.

4            It is a case that a filter was removed after

5   Ms. Hill had problems, which was an issue that she couldn't

6   get it out, which is a stuck filter is what I call it.  Her

7   own physicians tried to take it out in Florida.  Her husband

8   found a doctor in the University of Pennsylvania.  They went

9   to the University of Pennsylvania and had the filter removed

10  by Dr. Lynch, who is not only a principal investigator in this

11  trial for Cook, but he's also one of their key opinion

12  leaders.  He's very much has worked with Cook for many years.

13  So we will get that deposition taken, just like we'll have to

14  take another 30 depositions.  But we will be prejudiced by

15  this.

16           THE COURT:  What about the motion to quash the

17  subpoena for the deposition -- the materials?

18           MR. MATTHEWS:  There has been a motion.

19           MS. PIERSON:  I know about that, Your Honor.

20           MR. MATTHEWS:  I think what the point is here that

21  we wanted his financial information.  That is, how much money

22  he's been paid for -- paid by Cook, either as a key opinion

23  leader; and that his lawyer, his personal lawyer, has moved to

24  quash that.  We will discuss internally if we take a

25  deposition without that information, which we'll probably have

1    to do.

2            THE COURT:  I would suggest that might be the

3    proper -- the best way to go about this.

4            MR. MATTHEWS:  And I think we're willing to do that.

5            THE COURT:  If you need something later on from him,

6    you can --

7            MR. MATTHEWS:  I think that's right.  This has been

8    happening.  There's been a lot of depositions being taken and

9    we will probably agree with that.  We'll just move forward and

10   take his deposition.  I think as an explanter, as they're

11   sometimes called, he really only saw her one time.  So it is

12   not an involved deposition, and we will get the deposition

13   taken and we will probably agree to later on try to find out

14   his financial bias, if he has one, with Cook.

15           THE COURT:  That would be my thought.

16           MR. MATTHEWS:  And we'll probably do that.

17           THE COURT:  Get the meat and potatoes here.

18           MR. MATTHEWS:  Right.

19           MR. MARTIN:  That motion has been transferred to

20   Judge Baker -- or to this Court, which I presume will be on

21   Judge Baker's.  We can get Judge Baker to rule -- to hear that

22   motion to quash maybe next week.  Not that big a deal.

23           MS. PIERSON:  I thought what I heard today, the

24   objection to the motion to quash was withdrawn and that would

25   solve the issue of can we move forward with scheduling

 1   Dr. Lynch's deposition.  If that is the case, then --

 2           THE COURT:  I thought Dr. Lynch was already

 3   scheduled.

 4           MS. PIERSON:  He's not.  And his lawyer has told us

 5   that he now does not have availability to be deposed until the

 6   first part of June.  So even with Mr. Matthews' assistance

 7   today, which is very helpful, it still has this -- it still

 8   has this issue.

 9           MR. MATTHEWS:  He's been served with subpoena,

10   Judge.  We're working this out --

11           MS. PIERSON:  He's moved to quash.

12           MR. MATTHEWS:  Working this out with Judge Baker.

13   He has been served with subpoena.  If they try to quash the

14   deposition without -- is there a date set?

15           THE COURT:  The reason they wish to quash is because

16   of the financial information, is that --

17           MR. MATTHEWS:  I believe that's correct.

18           THE COURT:  Is that your understanding as well?

19           MS. PIERSON:  My understanding is that they've asked

20   for -- anything that they've asked for that doesn't relate to

21   the care and treatment of Mrs. Hill, his attorneys have

22   objected to and said, "He'll come.  He'll be a fact witness

23   but he's not going to be anybody's expert and he's not going

24   to produce a bunch of stuff that's unrelated to his care and

25   treatment of Mrs. Hill."  We think he's right.

```
 1              THE COURT:  I think David just indicated that's
 2   really what -- all they really want to move forward now and
 3   take that testimony as to the treating.
 4              MR. MATTHEWS:  Right.  His treatment -- care and
 5   treatment.
 6              THE COURT:  And then get that done and then later on
 7   down the road, if there's anything else, then we can address
 8   that at that time.
 9              MR. MATTHEWS:  That's exactly right.
10              MS. PIERSON:  We can -- we can ask to get it
11   scheduled now.  That will help.  But the problem is he's a
12   very busy surgeon.
13              THE COURT:  He's already been served.
14              MR. MARTIN:  He was served.  I think he was served
15   in January, Your Honor.  He's under subpoena.
16              MS. PIERSON:  There is no date set for his
17   deposition.  I've spoken to his attorney in the last 24 hours.
18   He's holding no date for deposition.  There's nothing on his
19   schedule and he's got a full patient schedule.  We can get in
20   to depose him in early June but that's the soonest we're going
21   to get in.  So we have this back-up of issues.  It's not just
22   Dr. Lynch.  It's the IME issue.  It's the late production of
23   expert reliance materials.  It's all of this.
24              And again, with respect to what Mr. Matthews said
25   with having attorneys block out a month of their time, my
```

 1  understanding has been that we were all required to prepare

 2  both cases simultaneously.

 3          THE COURT:  Right.

 4          MS. PIERSON:  I assume that Mr. Gage's counsel has

 5  the same issue.  So while apologies it might be inconvenient

 6  to Mr. Johnson, I think Mr. Gallagher will probably be glad.

 7  If it is the case, though, that the plaintiffs know today that

 8  the Hill case is the only case that's going to be tried and

 9  Mr. Gallagher is not holding that date, then we all should

10  just prepare the Hill case instead of spending the hundreds of

11  thousands of dollars that we're spending to prepare two cases

12  simultaneously.

13          MR. MATTHEWS:  Judge, I would also say in the Hill

14  case, we have taken a sales rep, a very important witness

15  because it is the only person that connects the company with

16  the doctor.  That is, this sales rep saw this doctor come in

17  149 times.  That is a significant issue in this case because

18  that is the failure in our case, the failure to warn as to the

19  extent of the risk of these filters.

20          In the Gage case, the Gage sales rep has died and in

21  fact, had died prior to the defendants also picking that case

22  to be tried.  I think we're at a point where we have taken

23  three times the number of depositions in the Hill case.  I

24  think the defendants don't like the case now but the fact is,

25  that's the scheduled case that we have been scheduled to try

 1   for over a year first and that is what we have relied upon.

 2           We will get Dr. Lynch's deposition taken.  He's

 3   under subpoena.  If we need to take him in two weeks, we'll

 4   take him in two weeks.  We can subpoena him to a trial

 5   deposition whether he likes it or not.  That will not go well

 6   with us but we'll take his deposition.

 7           THE COURT:  I set my trial schedule.  We'll try Hill

 8   first.  The only reason I said prepare both of them at the

 9   same time is if one of them either gets dismissed on the eve

10   of trial or gets settled, then I've got a month out of my

11   calendar where the case is going to be tried.  I want to make

12   sure that we keep everybody focused that that October is going

13   to be -- we're going to be spending a lot of time together.

14   But the Hill case will be tried first.

15           Also, Mr. Matthews, I want you to make sure that

16   that deposition is taken before June.  Sometime mid May I

17   think will be good.  That will give you time to get that done.

18           MS. PIERSON:  I think we'll -- it does give us time,

19   Your Honor.  I think we'll just have to work with his attorney

20   to find the time, if we can.

21           MR. MATTHEWS:  I'll reach out to his attorney.

22           THE COURT:  I'm not inclined to quash any type of

23   subpoena at this point in time.  I'm not going to make any

24   ruling because I certainly want to hear from his attorney

25   about anything, but I'm not inclined to -- at this point to

1    quash anything, with the understanding that the items that

2    were objected to by Dr. Lynch's attorney were not treatment --

3             MR. MATTHEWS:  I understand.

4             THE COURT:  -- issues and then the focus of your

5    deposition.

6             MS. PIERSON:  I think if we can communicate to his

7    counsel that that's what his deposition will be focused on,

8    that topic, we're more likely to find available dates.

9             THE COURT:  Okay.

10            MS. PIERSON:  So it will take less time.

11            MR. MARTIN:  I just found -- I just found that as an

12   interesting statement, is all.  That he may become more

13   available if his deposition is more limited.

14            MS. PIERSON:  I don't know what his availability is

15   beyond what his attorney told me.  I'm sorry if you find it

16   funny.

17            MR. MARTIN:  No.

18            MS. PIERSON:  I don't.  My only point in saying that

19   was, presumably it would be a shorter deposition.

20            MR. MATTHEWS:  Absolutely.

21            MS. PIERSON:  At what Will Moody's office had told

22   Dr. Lynch's counsel was that this would be a deposition on a

23   number of topics.  If we're able to collectively, Dave, you

24   and I, to tell him it's only these topics, then there may be

25   pockets of time that he can find.  That's my only point.  I

 1  have no other issues for you, Your Honor.  Thank you very much

 2  for your time.  We appreciate it.

 3            THE COURT:  Very good.

 4            MR. MARTIN:  We'll get it all done, Your Honor.

 5  Thank you.

 6            THE COURT:  I'm counting on you.  One thing I want

 7  you to think about is maybe having this case tried in

 8  Evansville.  Certainly it's easy to travel to.  I don't want

 9  your decision.  I just want you to think about this.  My

10  courtroom down there is probably two and a half times bigger

11  than this room.  Got plenty of facilities there for counsel,

12  counsel rooms down there.  So maybe the next status conference

13  we'll have down in Evansville, and you can come down and take

14  a look at that.

15            But there are also other issues I'm sure you want to

16  think about as well.  But a trial of this number of witnesses

17  and exhibits and I'm sure demonstrative exhibits and those

18  types of things, we're probably going to need a little bigger

19  space than what we've got here.  So just something to think

20  about.  Thank you all very much.

21            MR. MATTHEWS:  Thanks, judge.

22            MR. WILLIAMS:  Thank you very much.

23            THE CLERK:  All rise.

24            (Proceedings concluded at 12:13 p.m.)

25

```
 1  **************************************************
 2                CERTIFICATE OF COURT REPORTER
 3

 4      I, Margaret A. Techert, hereby certify that the
 5  foregoing is a true and correct transcript from
 6  reported proceedings in the above-entitled matter.
 7

 8

 9

10  /S/ Margaret A. Techert                April 27, 2017
    MARGARET A. TECHERT
11  Official Court Reporter
    Southern District of Indiana
12  Evansville Division
13

14

15

16

17

18

19

20

21

22

23

24

25
```