UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | |
|---|---|
| IN RE: COOK MEDICAL, INC., | ) |
| IVC FILTERS MARKETING, SALES | ) Cause No. |
| PRACTICES AND LIABILITY, | ) 1:14-ML-2570- RLY-TAB |
| LITIGATION | ) Indianapolis, Indiana |
| | ) **April 13,** 2017 |
| | ) 2:10 p.m. |
| | ) |


**Before the Honorable
TIM A. BAKER**

OFFICIAL REPORTER'S TRANSCRIPT OF
STATUS CONFERENCE


**For Plaintiffs:**              Ben C. Martin, Esq.
                         LAW OFFICES OF BEN C. MARTIN
                         3710 Rawlins Street, Suite 1230
                         Dallas, TX  75219


                         Joseph N. Williams, Esq.
                         RILEY WILLIAMS & PIATT, LLC
                         301 Massachusetts Avenue
                         Indianapolis, IN  46204

                         Michael W. Heaviside, Esq.
                         HEAVISIDE REED ZAIC
                         910 17th Street NW, Suite 800
                         Washington, D.C.  20006

For **Defendants:**           Andrea Roberts Pierson, Esq.
                                 Andrew Campbell, Esq.
                                 Anne Ricchiuto, Esq.
                                 FAEGRE BAKER DANIELS LLP
                                 300 N. Meridian St., Suite 2700

                                 John Joseph Tanner, Esq.
                                 BAKER & DANIELS
                                 300 N. Meridian Street
                                 Indianapolis, IN  46204

Court Reporter:              Margaret A. Techert
                                 United States District Court
                                 101 NW Martin Luther King Blvd.
                                 Evansville, Indiana  47708

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

```
 1                      (In open court.)
 2            THE CLERK:  All rise.
 3            THE COURT:  Good afternoon, everybody.  It's
 4    April 13, 2017.  We're here in the Cook multidistrict
 5    litigation matter.  We'll have plaintiffs' counsel for the
 6    record introduce themselves.
 7            MR. WILLIAMS:  Joe Williams.
 8            MR. MARTIN:  Ben Martin.
 9            MR. HEAVISIDE:  Michael Heaviside.
10            THE COURT:  Thank you, counsel.  On behalf of the
11    defendants?
12            MS. PIERSON:  Andrea Pierson.
13            MR. TANNER:  Joe Tanner.
14            MR. CAMPBELL:  Andrew Campbell, Your Honor.
15            MS. RICCHIUTO:  Anne Ricchiuto.
16            THE COURT:  Sorry about your father, Mr. Tanner.
17            MR. TANNER:  Thank you, Your Honor.  And I would
18    just like to just publically express my appreciation to the
19    Court and also plaintiffs' counsel.  They've been very
20    accommodating these last couple weeks and I just want to say I
21    appreciate it.
22            MR. WILLIAMS:  Of course.
23            THE COURT:  Glad to see that.  We've got a variety
24    of discovery things to deal with today and just to kind of
25    setting the stage here.  I set this hearing because I got a
```

1  letter from Mr. Williams, which was copied to counsel, dated

2  March 27, 2017, which set forth various concerns regarding

3  deposition conduct by defendant's counsel and also concerns

4  regarding an errata sheet or multiple errata sheet changes.

5  And there has been a response from that -- response to that

6  dated April 7, 2017 from Ms. Pierson.  And so when I set this,

7  that was what was I was planning on addressing.

8          Since that time, a number of things have happened.

9  Also by letter I received a March 30, 2017 letter from

10 plaintiffs' counsel regarding concerns as it relates to

11 spoliation, and there was a response, as well, April 7, 2017

12 from Ms. Pierson.  And then finally -- and finally, on April 7

13 there was also -- there was also a letter I received from

14 Ms. Pierson setting forth a number of concerns -- I think six

15 issues regarding depositions.

16         And you can see by the volume of just the letters

17 and the attachments, which have been exchanged among counsel,

18 it's quite a lot.  My intention today, just so you know, is to

19 deal with the deposition conduct and the errata sheets, to

20 briefly touch on the other matters but I don't know that those

21 will be resolved today.

22         With respect to the deposition conduct, I think it's

23 all set forth in the letters.  I don't know that there's any

24 need to add anything.  Here's what I'm going to tell you on

25 that.  The allegation by the plaintiffs is that there's been

1   improper coaching going on here during depositions by defense

2   counsel.  A variety of statements that are made, including

3   "Answer if you know," head shaking before witness's answer,

4   just an abundance of unnecessary objections, speaking

5   objections, etcetera.  Plaintiff seeks an order that all

6   objections, except privilege, would be preserved.

7       The defendant has countered to that and indicated

8   that the parties have generally been cooperative throughout

9   discovery, and that the only limit on what can be said

10  regarding objections during a deposition is in Rule 30(c)(2).

11  And defendant also points out that the plaintiffs have made

12  what they consider to be some improper deposition -- improper

13  objections during depositions.

14      So while I appreciate the efforts that counsel have

15  made to resolve discovery disputes in depositions without

16  involving the Court, there certainly comes a time when

17  intervention is necessary and I believe now is that time.  I

18  frankly find the defendant's deposition conduct alarming.  I'm

19  going to read a couple of the instances in the letters.  I'm

20  not going to read them all.

21      "Question:  Who at Cook would know that answer?"

22  Ms. Pierson objects.  "Objection to form.  Answer if you know.

23  Answer:  I don't know."

24      I can't imagine what the problem with the form of

25  that question is and that objection suggests the answer, which

1  the witness then gives, and I know that that didn't happen

2  every time.  That just because you said, "Answer if you know,"

3  they didn't say "I don't know" every time.  I'm well aware of

4  that.  But those are suggestive answers inappropriate in a

5  deposition.

6        "Question:  Does Cook have the responsibility to

7  preserve documents and evidence related to that product?

8        Ms. Pierson:  Objection to the form of the

9  question.  That it calls for a legal conclusion as well and

10  it's beyond the scope.  You answer -- you can answer if you

11  know.

12        Mr. Williams:  Don't say 'if you know.'  We talked

13  about that last time and he is a lawyer.  He can make a legal

14  conclusion.

15        Ms. Pierson:  You seem to be under the mistaken

16  impression that I take direction from you.

17        Mr. Williams:  No.  I just want you to -- I just

18  don't want you to coach the witness.

19        Ms. Pierson:  Let me be clear, Joe.  That I do not

20  do.  Ask your next question."

21        That colloquy, even in a deposition when I know

22  tempers can rise, is inappropriate.

23        Next.  "Question:  When did Cook first reasonably

24  anticipate litigation over it's IVC filters?

25        Ms. Pierson:  Object to the form of the question.

1   You can answer.

2           Answer:  I don't know a specific date as to when

3   Cook reasonably anticipated litigation."

4           Like plaintiffs' counsel, I can't figure out what

5   the problem is with that question.  It's a perfectly

6   acceptable question.

7           Set forth in the plaintiffs' letter to me of

8   March 27, 2017 is the representation that defense counsel

9   levied 279 objections; 112 of those objections claim the

10  question was outside the scope of the Rule 30(b)(6)

11  deposition, when counsel had offered a stipulation that all

12  objections as to form would be preserved.  Seventy-eight were

13  made after Mr. Williams stopped his questioning and expressly

14  stated that he would agree to that.  There are more than 200

15  objections made during depositions of Leigh Conners, L-E-I-G-H

16  C-O-N-N-E-R-S, and more than 150 objections made during the

17  deposition of Courtney Whitelock, C-O-U-R-T-N-E-Y

18  W-H-I-T-E-L-O-C-K.  There were 120 objections made in the

19  other 30(b)(6) deposition related to allegations of spoliation

20  of Scott Blanchard, S-C-O-T-T B-L-A-N-C-H-A-R-D.

21          I find those, as I said, to be alarming.  And I will

22  point out in fairness, Ms. Pierson has noted issues in the

23  plaintiffs' response during depositions in her letter to me,

24  which is dated April 7th.

25          "Question:  So in that -- so, and that it's safe for

 1  it to be left in as a permanent implant, right?

 2          Answer:  It -- yes.  It had been cleared by the FDA

 3  to be left in as a permanent implant and by others.

 4          Mr. Martin:  Objection; nonresponsive.

 5          Question:  Given these individuals' conclusions that

 6  the Celect was not as robust, was any investigation done with

 7  respect to tilt, to see if that lack of robustness affected

 8  its fatigue testing?

 9          Answer:  No.  There was no reason because the

10  factors of safety were large.

11          Mr. Moody:  Objection; nonresponsive.

12          Question:  Yeah.  Where does he get that

13  information?  Would it be from Cook?

14          Ms. Pierson:  Object to form."

15          Answer -- he gives the answer.  I should read it for

16  the record.  "I don't know where the doctors -- I mean, they

17  go to medical school.  So they get a lot of information.

18  They're already using it.  I mean, it's not like I'm going to

19  them and saying, 'Use my filter.'  All the doctors that I

20  encounter have already used IVC filters.  They learn about

21  this in training.

22          Mr. Heaviside:  And that's -- move to strike the

23  entire answer.  That's completely nonresponsive."

24          These answers are not nonresponsive and I don't know

25  why you're moving to strike during the depositions.  These are

1   responsive depositions.  If you don't like the answers, just

2   ask another question.  They're not nonresponsive.  Now what

3   the plaintiff wants is an order prohibiting all objections

4   except for privilege.  I'm not going to issue that order

5   today.

6          If a lawyer is being truly argumentive during a

7   deposition, if a lawyer is badgering a witness, if a lawyer

8   asks the same question five times, then an objection is

9   appropriate.  And as to form, there may be select occasions

10  where a limited objection to clear up a confusing or

11  convoluted question would be acceptable.  Those should be very

12  rare, in my experience, and I took a lot of depositions as a

13  lawyer and, unfortunately, I've overseen quite a few as a

14  judge.  The best lawyers I know make very few objections

15  during depositions.

16         So I'm not going to issue that order.  What I expect

17  from this point forward, that objections during depositions,

18  except for privilege, will be extremely rare.  That there will

19  be no head shaking.  That there will be no suggestions.  That

20  objections to form will probably go away.

21         If these objections do not cease -- I want to be

22  very clear -- the aggrieved party may file a motion for

23  sanctions; and in such motion, I will consider to do the

24  following.  Requiring the deponent to return for another

25  deposition; having the offending counsel and/or their party --

1    their representative party pay for the deposition and all

2    motions practice that are associated with the improper

3    conduct; and issuing an order that the offending attorney will

4    be precluded from taking or defending additional depositions

5    in this case.  That means you, Ms. Pierson.  Do you understand

6    that?

7              MS. PIERSON:  I do, Your Honor.

8              THE COURT:  Good.  Mr. Martin?

9              MR. MARTIN:  Yes, sir.

10             THE COURT:  And again, Ms. Pierson has raised a few

11   other things about the volume of your questions.  You say

12   you're a loud talker.  Maybe you are.  But to a witness, I'd

13   be very careful.

14             MR. MARTIN:  Yes, Your Honor.

15             THE COURT:  If you're a loud talker, then talk

16   softly in a deposition.  You get more flies with honey anyway.

17             MR. MARTIN:  I understand, Your Honor.

18             THE COURT:  Good.  Now with respect to the errata

19   sheets.  Plaintiffs point out that there are multiple

20   incidents of deponents, by way of the defendants -- I guess

21   counsel, allegedly -- making improper changes to the errata

22   sheets, making substantive changes that aren't appropriate in

23   an errata sheet.  The defendant has countered that and has

24   cited to Rule 30(e) which, if you read it, does permit changes

25   to both form and substance.  So defendant is correct that

1   those changes -- a substantive change per se is not prohibited

2   by the rule.

3          However, the plaintiffs are also correct that errata

4   sheets are not a license to simply change testimony.  Now, the

5   plaintiff is not seeking at this time to strike the errata

6   sheets.  So therefore, there's no order that I'm going to

7   issue in that regard specifically.  But as you move forward, I

8   would expect that errata sheet changes would be limited and in

9   strict compliance with the rule and the case law.  If not, the

10  plaintiff or the defendant, if they think it's appropriate,

11  can file a motion to strike or what other motion you think is

12  appropriate and I will rule on it at that time.

13         So I'm not surprised to see changes and it's kind

14  of -- it's a bit of a field sport.  One change, couple

15  changes, not surprising.  Multiple changes that are

16  substantive start to look fishy.  And so if that's happening

17  and one party is concerned about it, you can file a motion.

18  You don't need to contact me.  I think that addresses the

19  issues raised in those letters.

20         Now, the next issue is set forth in the March 30,

21  2017 letter from Mr. Riley and it addresses the spoliation.

22  Plaintiffs are requesting additional 30(b)(6) depositions

23  related to Cook's legal holds, and defendants raise a number

24  of concerns about that but those include the fact that

25  plaintiffs have taken considerable depositions on that point

```
 1   so far and apparently haven't found enough to raise the issue
 2   by way of a formal motion.
 3             In any event, I'm not comfortable ruling on an issue
 4   of this magnitude by way of proceeding on letters, and I think
 5   plaintiffs' counsel noted that at the end of your letter and
 6   you said if I wanted formal briefing on that, you'd file
 7   something.  So I think that's appropriate.  I'm not making any
 8   determination today one way or the other.  Don't read anything
 9   into my remarks on that issue, that I'm leaning one way or the
10   other.  I just think we need to have a record.
11             Since you submitted these lengthy letters on both
12   sides, particularly on the defense side, I assume the brief is
13   largely written.  So I would like to expedite the briefing on
14   that and I would propose, if counsel can meet this schedule --
15   I know you've got many things going on right now -- propose a
16   simple briefing schedule.  If plaintiff files a brief within
17   seven days, we get a response seven days thereafter and a
18   reply seven days after that.  Is that something plaintiffs can
19   comply with?
20             MR. WILLIAMS:  I believe so, Your Honor.
21             THE COURT:  Can the defendants comply with that?
22             MR. TANNER:  Yes, Your Honor.
23             THE COURT:  So I'll have the minutes reflect that
24   for today and there's really nothing else on that issue I want
25   to deal with.
```

```
 1              I would like to have brief argument, though, on the

 2   six issues that the Cook defendants said they'd like to raise

 3   because I don't know that I necessarily need further briefing

 4   on this.  I would like to avoid formal briefs on that, if I

 5   can.  I'm not going to be in a position to rule on it today

 6   but I would give the defendants an opportunity to supplement

 7   their April 7 letter, if they'd like to, to flesh out their

 8   concerns just a little bit more and may have a few questions.

 9              MR. TANNER:  Any particular order of those, Your

10   Honor?

11              THE COURT:  No.  You can probably follow the order

12   that's in the letter.  It's usually easiest.

13              MR. TANNER:  That would require me to remember the

14   letter.  I apologize, Your Honor.

15              THE COURT:  The four expert witness depositions is

16   first.

17              MR. TANNER:  I can handle that one, Your Honor.  I

18   guess I'll go to the podium.

19              THE COURT:  Thank you.

20              MR. TANNER:  Thank you, Your Honor.  And hopefully

21   this isn't too complex of an issue.  As the judge well knows,

22   Rule 30(d)(1) talks about seven hours but it also talks about

23   the fact that the Court must allow additional time, if

24   necessary, to fully examine and fairly examine the deponent;

25   and the Indianapolis Airport Authority case makes this clear
```

1   that it's a nondiscretionary type of standard.  The advisory

2   committee notes make further comment that when experts are

3   involved, more often than not you do need this additional time

4   because of the nature of the experts and their reports.

5          Your Honor, I think it's important here to

6   understand for context that the plaintiffs have identified 13

7   different experts.  We are only asking for one additional day

8   on four of those experts.  Not all 13.  Just four of them and

9   one additional day for each.

10          Those experts are -- reports are voluminous.  Here,

11   for example, this is doctor -- excuse me.  Get in front of the

12   mike.  Sorry to the reporter.  This is Dr. Kessler's report

13   right here.  He was the former commissioner --

14          THE COURT:  Let me ask you.

15          MR. TANNER:  Yes.

16          THE COURT:  Because in the letter on Page 2, just

17   before the second topic, which is proportionality, it says,

18   "The complexity and scope of these witnesses' reports warrant

19   a deposition of up to 14 hours for these four witnesses."  Is

20   that what you're asking for?

21          MR. TANNER:  Yes.  I'm sorry.  I meant usually one

22   day is seven and the other day is seven.

23          THE COURT:  Two consecutive days of 14 hours.

24          MR. TANNER:  Yes.  For instance, Your Honor, here is

25   Dr. Kessler's report.  He's former commissioner of the FDA.

 1    It's a large report, wide-ranging topics and not just

 2    regulatory but also animal studies and clinical and testing.

 3    Today there's argument in front of Judge Young that

 4    Dr. Kessler's very thorough and his opinions are very broad

 5    and plaintiffs made that argument.

 6           The other experts, Dr. Rajebi, is an interventional

 7    radiologist.  He had a 51-page report just on the general

 8    issues.  He had a 13-page report on Ms. Hill and another

 9    19-page report on Mr. Gage.  Talks about the instructions for

10    use, testing, design, risk, Mr. Hill and Mrs. Gage's medical

11    histories, their causation, medical causation, broad range of

12    issues.  Dr. Marmureanu is a cardiothoracic surgeon.

13    Likewise, 37-page general report; 17 additional pages on Hill,

14    17 on Gage.  Wide-ranging theories on both cases.  And then we

15    have Dr. Levy, who's their life care planner, that provides

16    33-page report on Ms. Hill, 31 pages on Mr. Gage.  Talks about

17    medical history, full treatment, prognosis, future treatment.

18    She met with Ms. Hill for five times, Mr. Gage two times.  She

19    met with their experts.

20           We think it's fair, Your Honor, for these four of

21    their 13, that under the rules, we be allowed to examine them

22    more than the seven hours.  I represent to Your Honor that we

23    will not be redundant and I would -- and if plaintiffs do have

24    an objection with Your Honor's admonition that we keep

25    objections down but if the plaintiffs do have an objection,

1   they raise it to us, we will by, all means, abide by that and

2   not be redundant; but these are substantial experts.  Again,

3   it's only four of them of wide-ranging topics.

4           Yesterday Mr. Williams submitted a letter and me

5   paraphrasing the letter, they think one day is sufficient

6   because they only intend to use one day on experts.  That's

7   their prerogative.  If they had particular experts of ours

8   that they thought -- you know, a handful of ours that they

9   thought they might need more than one day, we may be able to

10  work out something on that.  We're not trying to say it's just

11  us and not them by any means.

12          And they made comments about Dr. Kessler being

13  deposed in other cases where he gave general opinions but here

14  he gave general opinions.  He's given specific opinions in two

15  different cases, and I don't know what happened in those other

16  cases, Your Honor.  Maybe -- maybe they were more targeted,

17  more limited.  Maybe they're better lawyers than I am.  I

18  don't know.

19          But I don't think two days -- in fact, I would

20  submit three days in typical experts' depositions is not

21  unreasonable.  But I would respectfully submit that two days,

22  14 hours, is entirely proportional for these four limited

23  witnesses, both because of the language of the rule and its

24  advisory comments but also the governing opinion of the

25  *Indianapolis Airport Authority* case that was in this

1   particular district.

2          So those are my comments and I can answer questions,

3   if you'd like, Your Honor, or turn it over to plaintiffs.

4          THE COURT:  Why don't you cover all the issues.

5          MR. TANNER:  I'm not going to handle some of the

6   other issues, if that's all right, but I'll defer to my

7   colleagues.

8          THE COURT:  All right.  Thank you.

9          MR. TANNER:  Thank you.

10         MR. CAMPBELL:  Thank you, Your Honor.  Andrew

11  Campbell for the Cook defendants.  I'd like to address the

12  second and third points in Cook's letter, and it breaks down

13  into really three issues.  There's common issue company

14  depositions, custodial file productions, and the new expansive

15  request for production under CMO 2 the plaintiffs have

16  recently served.

17         While it's true that Your Honor's November 2017

18  discovery order allowed plaintiffs to take additional

19  depositions, to request additional custodial files, and CMO 2

20  does contemplate some request for production, we don't think

21  that order in CMO 2 contemplated unlimited depositions in

22  certain critical respects, including former employees of the

23  Cook defendants and third-party consultants who work closely

24  with the Cook defendants.

25         We also don't think that November order contemplated

1    custodial file requests and production a mere 45 days or less

2    before the close of discovery.  And we don't believe that it

3    was contemplated that these depositions would be accompanied

4    by over 100 requests -- new requests for production that would

5    require hundreds of attorney hours to review and produce

6    documents and potentially thousands new documents in the case.

7              So since November, Your Honor, the landscape has

8    simply changed and we believe now is the time to revisit the

9    November discovery order and CMO 2 to make certain adjustments

10   to ensure what Your Honor has allowed is proportional to the

11   needs of the case.

12             In a bit more detail, the depositions, Your Honor.

13   What the Court permitted the plaintiffs in November of 2016

14   was a total of 26 common issue company discovery depositions

15   and our simple point is this.  Those 26-deposition limit

16   should apply regardless of whether the witness is a current

17   Cook employee, a former Cook employee, or a third-party

18   consultant to Cook whose deposition will be primarily about

19   their employment with Cook.  All of these witnesses will

20   testify about their employment with Cook and on issues of

21   common issue company discovery.

22             So the burden on Cook to prepare for, attend, in

23   many cases defend these depositions, is the same regardless of

24   the category of witness.

25             THE COURT:  How do you -- proportionality is the

1  buzz word but how do you define proportionality in a case like

2  this?

3          MR. CAMPBELL:  It's a good question, Your Honor.

4  And in a case like this, we think the depositions that have

5  been permitted to plaintiff, 26 depositions, without

6  considering the individualized nature of those depositions, is

7  proportional.  What CMO 2 also provides is if plaintiffs

8  believe that they are entitled to more depositions, then we

9  will undertake that individualized examination about

10  proportionality as it relates to that specific witness and the

11  issues that we're dealing with in the case.

12          THE COURT:  Does that mean that you -- if it was

13  limited to those 26, you would consider on an individual basis

14  a need for additional depositions?

15          MR. CAMPBELL:  Yes, Your Honor.  At this point 25

16  depositions -- well, 18 depositions have been taken.

17  Twenty-five depositions have been scheduled and noticed.  We

18  believe plaintiffs are entitled to one more that should be

19  scheduled.  That will hit the limit of 26.  Their depositions

20  in excess of those 26, we can consider those with the Court on

21  an individualized basis.

22          And Your Honor, another point on proportionality.

23  It shouldn't be lost on us that the context of this is not

24  simply fact discovery, when you take a step back and look at

25  what's happened over the course of the last few weeks.  As

```
 1   Mr. Tanner was just talking about, plaintiffs have disclosed a
 2   dozen experts.  So we are in the thick of complex and
 3   burdensome expert discovery, taking plaintiffs' experts
 4   depositions, preparing or own expert reports.  We'll be
 5   defending our own expert depositions.  So we can't lose sight
 6   of the overall picture of the litigation when we talk about
 7   the proportionality and the needs for fact discovery.
 8          THE COURT:  Part of your argument is the Hill and
 9   Gage case deadlines are looming, I guess.  Would it make a
10   difference, after those trials, in terms of allowing more
11   discovery at that point, getting back in these -- in other
12   words, we want to limit these depositions now to I think the
13   eight more.  But after those two trials occur, if there's a
14   desire to kind of have more depositions, do you know what your
15   position would be at that time?
16          MR. CAMPBELL:  Unfortunately, I can't say at this
17   point whether we would not have some objection to additional
18   depositions.  I think it would depend on who the deponent was,
19   what the issues were that were going to be raised in that
20   deposition.  If they were things that were foreseeable before
21   the Hill and Gage case that plaintiffs could have made as part
22   of their pre-Hill and Gage request, then we may have some
23   objection to that but --
24          THE COURT:  Do you have something, Mr. Williams?
25          MR. WILLIAMS:  Yes.  Your Honor, when we were in
```

1   front of Judge Young this morning, he extended the fact

2   discovery until June 22 and specifically addressed our ability

3   to take the depositions.  They've already been scheduled.  And

4   so I'm a little -- I just wanted Your Honor to know that Judge

5   Young has already addressed this issue.  That's why I stood

6   up.

7           MR. CAMPBELL:  Judge, it's my understanding that

8   Judge Young addressed the deadline within which the

9   depositions would be taken that Your Honor determined would be

10  appropriate.

11          THE COURT:  The deadline but not how many

12  depositions can be taken?

13          MR. CAMPBELL:  That's correct, Your Honor.

14          THE COURT:  What do you think he did, Mr. Williams,

15  Mr. Martin?  Whoever knows.

16          MR. WILLIAMS:  What I believe he did is we explained

17  that we needed to take the depositions that you ordered; and

18  the depositions that you ordered only apply to Cook defendants

19  or Cook 30(b)(6) defendants.  When we asked Your Honor back in

20  November, we said we needed extra Cook defendant depositions.

21  We said we had other nonparty depositions that needed to be

22  taken.  In light of all that, then Judge Young extended the

23  fact discovery deadline to June 22; and in fact, I don't think

24  he gave us --  Ben?

25          MR. MARTIN:  I don't want to interrupt you.

```
 1            MR. WILLIAMS:  No.  Ben might have a better

 2   recollection.

 3            MR. MARTIN:  If I may just borrow for a second.

 4            THE COURT:  Sure.

 5            MR. MARTIN:  If the Court --

 6            THE COURT:  I don't know what you have.  Is that

 7   something you want me to see?

 8            MR. MARTIN:  This is what I've got.  That's the list

 9   of depositions that -- those are scheduled by agreement and I

10   understand there's a schedule or to be scheduled, and I

11   understand that Cook came today to object to the scope of

12   whatever the Court ruled, the additional eight depositions,

13   okay.  This morning, I believe this was -- I guess this was

14   part of the argument because what Judge Young ordered was, he

15   extended the fact witness -- excuse me, the fact discovery.

16   He extended the expert discovery to the day that we all agreed

17   upon, July the 22nd; the fact discovery depositions to June

18   the 22nd, the close of discovery, so that these depositions

19   could be taken and I don't think I'm reading anything

20   incorrect in his ruling.

21            THE COURT:  All right.

22            MR. MARTIN:  Your Honor, we argued today that if we

23   took three more depositions of Cook defendants, in other

24   words, Cook employees, that would give us our 28 and I believe

25   that it's not simply implicit.  I believe that Judge Young
```

```
 1   said, "Take your three depositions, in addition to these other

 2   depositions that are scheduled and -- and the dates are

 3   extended."

 4           Now, that's -- I believe that this has all been

 5   handled today.  And what you're seeing, Your Honor, are very

 6   hard worked up schedules for all of these depositions,

 7   including the experts and including the additional six or

 8   so -- five or so Cook defendants, plus the three that Judge

 9   Young allowed today.  That's what I took from his --

10           THE COURT:  Okay.  Thank you, Mr. Martin.

11           MR. CAMPBELL:  Your Honor, I disagree.

12           THE COURT:  Hang on.  Apparently Mr. Tanner wants to

13   weigh in, too.

14           MR. TANNER:  I'm sorry, Your Honor.  Mr. Campbell

15   wasn't at the hearing this morning.

16           THE COURT:  He wasn't?

17           MR. TANNER:  If I may give two comments.

18           THE COURT:  Sure.

19           MR. TANNER:  First of all, with respect to the

20   Mr. Martin's comments about the schedule.  We agreed to

21   schedule the deposition with Mr. Schultz, with a reservation

22   that we would still resolve whether they're entitled to take

23   that number of depositions.  So we were trying to be

24   accommodating by going and getting him on the schedule but

25   reserving our right to say they're not entitled.
```

```
 1              To the point of today's hearing, Your Honor, the

 2   issue before Judge Young was the timing in which to take the

 3   depositions.  The plaintiffs talked about we have these three

 4   additional depositions or we have the 28 and they talk about,

 5   "Here's the depositions we want to take."  Judge Young did

 6   say, "I'm going to extend the time.  You may take --" I can't

 7   remember the number of depositions within that time.

 8              The issue about whether they were entitled to take

 9   those was never raised because that would be raised before

10   Your Honor.

11              THE COURT:  I understand.

12              MR. TANNER:  So I think the transcript may read as

13   they indicate but that's not what was decided today, I don't

14   think, by Judge Young, that he was actually deciding the issue

15   that they're entitled to more depositions.  It was within the

16   context of the timing.

17              THE COURT:  All right.  Wait a second.

18              (Off the record.)

19              THE COURT:  Andy, my courtroom deputy happened to be

20   there, too.  Please continue.

21              MR. CAMPBELL:  Your Honor, I want to bring this back

22   to what this all turns on and that is the limits that were set

23   in November 2016.  Your Honor allowed plaintiffs to take 26

24   depositions.  They've taken 18.  They have since requested ten

25   more and they believe they're entitled to an additional three.
```

Of the ten depositions that they've requested, five are current employees, two are former employees and three are consultants who worked closely with Cook.  They believe that the former employees and the third-party consultants should not count against the 26 because they're not Cook defendants. But they've made no showing why there's any difference between a former employee or a third-party consultant.  If one of the current employees was terminated from the company tomorrow, under plaintiffs' theory that would not count against the 26.

And again, from our perspective in terms of burden, the time to prepare, attend, defend the depositions are going to be the same regardless of whether they're current, former or third parties because they're all common issue depositions about company discovery and those individuals work with Cook.

The only other point I would make is to the extent that the chart that Mr. Martin handed to the Court and there are dates associated with those depositions, not all of those are agreed dates.  For example, Kim Hawkins set for June 12, 2017, that's a date that the plaintiffs just picked.  There are other objections that we have about that deposition.  So that's not an agreed date.

The date for Dr. John Kaufman, June 19, 2017, again, that's just a date the plaintiffs picked and we're working through whether that date will work or not.  So simply because there is a date associated with some of these depositions does

 1   not mean that we have agreed that it's part of the 26 or that

 2   that is the date on which it will proceed.

 3            So again, Your Honor, we believe that the November

 4   discovery order limit of 26 should be it.

 5            THE COURT:  Okay.  Can I keep this, plaintiffs'

 6   counsel?

 7            MR. WILLIAMS:  Yes, Your Honor.

 8            THE COURT:  All right.  Go ahead.  Next?

 9            MR. CAMPBELL:  Custodial files, Your Honor.  Again,

10   in November of 2016, Your Honor entitled the plaintiffs to

11   request six additional custodial files.  They made requests

12   for two files late 2016 or early 2017.  Those files have been

13   produced.  And then they waited until just in the last week or

14   so to request a third custodial file of a gentleman named Neal

15   Fiermot (phonetic).  We are currently working to collect that

16   custodial file to see what the burden will be associated with

17   him.  And then they had said that they want to hold back on

18   the three remaining custodial files that they are entitled to

19   until sometime after May 16th.

20            Again, Your Honor, we don't believe that in November

21   of 2016 it was contemplated that plaintiffs would hold back

22   their ability to request these custodial files until now or

23   even May 16th or later, when we're now looking at a June 22nd

24   discovery close date.  As Your Honor likely knows, production

25   of custodial files is a heavy lift.  We're talking about

1   thousands of documents, hundreds of hours of attorney time and

2   we simply think in this landscape, where we have close of

3   discovery June 22nd, that that be further limited.

4           So we would ask that those custodial file requests

5   occur until after the first Bellwether trial or like with

6   additional depositions, they be handled on a case-by-case

7   basis where we can consider the scope, burden and timing of

8   those productions because we even believe that understand CMO

9   2, that allows for custody file productions within 28 days, is

10  going to be difficult for the defendants to meet, given the

11  volume that we're talking about.

12          So the specific request again is for remaining

13  custodial request to be delayed until after the first

14  Bellwether or considered on a case-by-case basis.

15          THE COURT:  Just a second.  Please continue.

16          MR. CAMPBELL:  Your Honor, the last point is the

17  expansive new request for production that have been served,

18  along with the notices of deposition for these additional

19  depositions.  Under CMO 2, there is a provision that says if

20  documents are requested with a deposition, there are some

21  deadlines that the parties must comply with in terms of

22  whether they can produce those documents, how those -- any

23  issues associated therewith will be resolved, etcetera.

24          Beginning on March 21st, when we started getting

25  these notices of deposition, they included additional document

1   requests that, quite frankly, were very expansive.  For

2   example, all of the notices of deposition included a request

3   for "all communications by or to the witness in whole or in

4   part related to a variety of areas; testing, design,

5   performance, safety or efficacy associated with the filters."

6          Our primary point is this.  We don't believe that

7   CMO 2, when it was entered in April of 2015, was -- was

8   intended to be a vehicle for these kinds of new and expansive

9   discovery requests only a short time before the close of

10  discovery.

11         Now, I've been discussing this issue with Matt

12  Schultz for the plaintiffs.  We exchanged letters on this

13  point.  I had an opportunity to speak with Mr. Schultz this

14  morning before the conference.  I recognize he's not here

15  today but what I can say is that he confirmed the plaintiffs'

16  position that that is precisely their intent with CMO 2.  To

17  the extent the documents have not been produced as part of the

18  master discovery in the case, that's what these are intended

19  to pick up on.

20         And why that's problematic is because when we're

21  talking about all communications by or to a witness, and we're

22  talking about ten, potentially 13 witnesses, conceivably it

23  would require Cook to go back, reopen -- at the very least,

24  reopen the 27 custodial files it has already produced, create

25  new search terms that are keyed to the CMO 2 requests, see

1   what that returns and then review and produce potentially

2   thousands of new documents key to the CMO 2 requests.

3          We think plaintiffs' opportunity to take that kind

4   of discovery is what the master discovery was intended to do

5   and we, in fact, think in most cases that's exactly what it

6   did do.  We think most of the requests associated with CMO 2,

7   for example, all communications to or from a witness, would

8   have been captured by that master discovery.  So we told

9   plaintiffs we don't think CMO 2 is appropriate in this context

10  and that we don't have an obligation to respond.

11         However, what we will do is in response to CMO 2,

12  identify the Bates ranges of those documents that have been

13  produced in the litigation that are reasonably responsive to

14  those requests.

15         And then No. 2 is for any documents that a witness,

16  in preparation for a deposition, reviews and relies on in that

17  preparation.  That -- we'll obviously produce that in advance

18  of the deposition.

19         But again, what we don't think is proportional here

20  is reopening or collecting again or creating new search terms

21  keyed to CMO 2 requests that would then be applied against the

22  27 custodial files that have already been produced, any new

23  custodial files they may ask for; and quite frankly, given the

24  schedule that we have in the case where these depositions are

25  scheduled to begin starting April 21st, it's simply not

1  physically possible for the Cook defendants to comply with the

2  scope of these CMO 2 requests.

3           So again, Your Honor, we think the landscape has

4  changed.  While we recognize that the November discovery order

5  did entitle plaintiffs to additional depositions, to

6  additional custodial files and CMO 2, at least on its face,

7  contemplates document requests with depositions, we don't

8  believe, given the landscape now and the pending close of

9  discovery and all of the work that's going to be required for

10 experts and pretrial work on the Bellwether cases, is

11 appropriate for what plaintiffs have requested here.  With

12 that, Your Honor, I'll answer any questions.

13          THE COURT:  I think that's it.

14          MR. CAMPBELL:  Thank you.

15          THE COURT:  Okay.  Thank you.  Who's batting cleanup

16 on this one?

17          MS. PIERSON:  I am, Your Honor.

18          THE COURT:  All right.  Ms. Pierson.

19          MS. PIERSON:  Fortunately, I think we've resolved a

20 number of the issues that were named in the letter in the last

21 couple of days.  With respect to the next --

22          THE COURT:  Wait a minute.  You say you've resolved

23 a number of the issues in the letter in the last couple days?

24          MS. PIERSON:  That's correct.

25          THE COURT:  Okay.  I'll need to know what -- be sure

```
 1   what those are so I don't take the time to give you a ruling

 2   on something --

 3              MS. PIERSON:  Happy to do so.

 4              THE COURT:  Believe it or not, I do have a couple

 5   other cases around here.  Maybe you do, too.  Maybe you don't.

 6   Is this the only thing you're working on these days?

 7              MS. PIERSON:  No.

 8              THE COURT:  Go ahead.

 9              MS. PIERSON:  With respect to point 4 on page 5 of

10   the letter, Your Honor, production of expert reliance

11   materials, I think we can table that issue for purposes of

12   today, except I will mention the second bullet point on page 6

13   refers to social media records; and I'd like to address that

14   when we talk about a standing discovery in Hill.

15              But as it relates to the expert reliance materials,

16   the plaintiffs have sent us a number of materials in the last

17   two days.  There are a couple of points in our letter that

18   we're continuing to discuss with them and if we're not able to

19   resolve those, we'll address those with you separately.  No

20   need to do anything with respect to point 4 in the letter.

21              With respect to point 5, the IME protocol, we

22   received from Mr. Heaviside yesterday or the day before some

23   specific concerns with their request as to the IME's requested

24   for Ms. Hill.  We've responded to that and suggested some

25   compromises but I don't think he's had a chance to consider
```

```
 1   them yet.

 2             MR. HEAVISIDE:  I'll reply when you're done.

 3             MS. PIERSON:  I put it that way, Your Honor, because

 4   if there is, in fact, a dispute as to the suggested compromise

 5   that Cook has made, we'd like that to be addressed sooner

 6   rather than later.

 7             THE COURT:  Let's see what the plaintiffs have to

 8   say and if there is still an issue and you have something else

 9   to add on that, you can.

10             MS. PIERSON:  Thank you, Your Honor.

11             THE COURT:  Mr. Heaviside.

12             MR. HEAVISIDE:  Yes, sir.  Always a pleasure.

13             THE COURT:  Thank you.

14             MR. HEAVISIDE:  I'm just going to give a brief

15   background here, if I may.  We got a letter from defense

16   counsel March 17th merely evidencing an intent to schedule

17   IME's in both Hill and Gage.  No more, no less.  Then we got a

18   letter on March 30th telling us about the appointments they

19   want to set up, not identifying who the appointments were

20   with, for Ms. Hill.  One of them in New York, one in North

21   Carolina.  She, of course, lives in Florida.  And any number

22   of thing they wanted to explore.

23             So rather than -- last night or the night before, I

24   spoke about this particular issue with Andrea on the phone, I

25   think on April 7th, at which time I told her we had many
```

1   concerns about one, the IME protocol generally; and two,

2   specifically what we consider to be very invasive testing to

3   which they want to subject Ms. Hill.  Now, I think they might

4   have replied last night or yesterday afternoon but

5   unfortunately, I've not had a chance to consider whatever --

6          THE COURT:  So we don't know -- or you don't know at

7   this point how much or whether that's still at issue.

8          MR. HEAVISIDE:  Exactly.  And that's on the extent

9   on the invasive diagnostic testing that might be involved.  I

10   also, in the same conversation, told Andrea that we have

11   certain issues with the general protocol, one of which would

12   be to compel our client in Florida to bear the expenses of

13   going to New York and to North Carolina.  That's a general

14   protocol issue.

15          THE COURT:  Review what you received from them, talk

16   to Ms. Pierson, whoever is dealing with that, and then

17   obviously it's always great if you can work it out.  If you

18   can't, you can notify me.  I'll try to set something up.  I'll

19   just say as we get closer, obviously I'm concerned about those

20   depositions and those objections and that kind of stuff.

21   That's why I started off with that.  But with respect to these

22   other issues, I recognize you all are working hard and you are

23   working at a lot of things.  If you don't work out the IME

24   protocol, you can come back to me and I'll address it.  I'm

25   just saying as we get closer and closer to trial, the ability

1  to kind of always come back and always get a ruling, it gets

2  more and more limited.

3          MR. HEAVISIDE:  I hear you.

4          THE COURT:  So therefore, it's almost more in the

5  interest of the parties to compromise a little more than you

6  may be willing to because by the time you come back, have a

7  hearing in front of me or Judge Young, get a ruling, that may

8  create other problems if you have to wait a week or two weeks

9  or three weeks.

10          MR. HEAVISIDE:  Of course.  I guess -- apparently

11  beating a dead horse here.  Forgive me for that.  I replied in

12  terms of our objections to the specific invasive testing

13  involved in the IME's, as well as our objection to the

14  protocol generally.  Now, I've not heard a reply about the

15  protocol generally; and apparently there is a reply about this

16  other issue which I haven't seen yet.  It should be pretty

17  simple.  If we can't work it out, if you bear with us, we can

18  talk to you next week about it.

19          THE COURT:  Is that all you're addressing?

20          MR. HEAVISIDE:  That's it.

21          THE COURT:  You had something to add on the IME

22  then, Ms. Pierson?

23          MS. PIERSON:  No.  We'll come back to you in seven

24  days if we can't get it resolved, Your Honor.

25          THE COURT:  That's good.

1          MS. PIERSON:  So the last issue in the letter are a

2     number of outstanding discovery issues with respect to the

3     discovery in Mrs. Hill's case.

4          THE COURT:  Can I just -- just so we're clear, I'm

5     understanding your April 7 letter to indicate that at least

6     for today, the items raised in numbered paragraph 4,

7     production of expert reliance materials, are, at least for

8     today, resolved.  And item No. 5, the IME protocol, you're

9     still discussing with plaintiffs' counsel and if there's an

10    issue, you'll get back to me in about seven days or so?

11         MS. PIERSON:  That's correct, Your Honor.

12         THE COURT:  Proceed.

13         MS. PIERSON:  So item 6 is outstanding discovery

14    requests in the Hill case, and we've included in item 6 a

15    number of things that we've tried to work with plaintiffs on

16    but have received no response or they continue to be lingering

17    issues that we appear to be unable to get resolved without

18    Your Honor's assistance.

19         We've listed them.  I don't want to reiterate

20    everything that's in the letter, but Mr. Williams' response to

21    these things was that they'd given us a number of

22    authorizations.  And it is correct to say that they've given

23    us a number of authorizations but the authorizations that they

24    provided don't satisfy any of the bullet points that are

25    listed in our letter at pages 7 to 9.

 1              Specifically we've requested certain employment

 2   records.  We were told that there were no employment records.

 3   And then on the 17th we received Ms. Levy's report, the

 4   plaintiffs' life care planner, in which she refers to

 5   Mrs. Hill having had employment and claiming as damages the

 6   fact that she couldn't maintain that employment.  We've never

 7   received any employment records, whatever those are that

 8   Ms. Hill might have, which could be pay stubs, employment

 9   contracts, a termination letter.

10              We also, of course, can't collect records pursuant

11   to any authorization when we don't know who the employer is.

12   So with respect to that matter, the first bullet, we'd ask

13   that the Court order the plaintiffs to produce, within some

14   short period of time, whatever employment records are in

15   Ms. Hill's possession and authorization specific to any

16   employment that she's had since she last provided us

17   authorizations.

18              THE COURT:  Why is it that you don't have that

19   already?  Why wouldn't -- I'm not sure why.

20              MS. PIERSON:  I don't know.

21              THE COURT:  Kind of basic.

22              MS. PIERSON:  We've asked for it.  We haven't

23   received it.  I don't know, Your Honor.

24              MR. HEAVISIDE:  Your Honor.

25              THE COURT:  Hang on.  Let her finish.  Go ahead.

1          MS. PIERSON:  I'll move to the second bullet point,

2    if it's okay.

3          THE COURT:  Yes.

4          MS. PIERSON:  The second item is social media

5    information.  We've asked for Ms. Hill's social media

6    information in a number of different venues; the plaintiff

7    profile form, the interrogatories, the request for production.

8    And we've received a number of different answers but none of

9    those answers have included social media information.  We've

10   been told that it doesn't exist or that it's attached, that it

11   will be forthcoming; but we've received nothing until we get

12   the report of Ms. Levy and learned that she's relied upon

13   social media information of Mrs. Hill.  So we asked for it yet

14   again.

15          A couple days ago we received a 90-page print-out

16   from Mrs. Hill's Facebook account.  The print-out was

17   apparently made by Mr. Johnson's office in April of 2015.

18   There appear to be omissions from what's been printed; but

19   just having a print-out of a pdf don't satisfy the request

20   that Cook has made.  Specifically we'd ask Your Honor to order

21   that the plaintiffs provide to us the native format of the

22   information that's been provided from her Facebook account and

23   also her passwords and a list of all social media accounts.

24          THE COURT:  All her passwords for social media

25   accounts?

```
1              MS. PIERSON:  That's correct.

2              THE COURT:  I don't think so.

3              MS. PIERSON:  If I may, Your Honor, explain why we

4    make that request.  We make the request because when we first

5    asked the plaintiffs for Mrs. Hill's social media information,

6    we were told that it was attached.  Nothing was attached.

7    When we asked about it, Mrs. Hill said she provided it to her

8    attorney.  So we asked her attorney for the information and

9    received nothing in response.

10              Then we served a request for production for the

11   information and the response was something like "not

12   applicable."  Something that suggested it didn't exist at all.

13   Then we followed up again in writing on that information in

14   the form of this letter to you, Your Honor; and we received

15   information from Mrs. Hill's Facebook account that has

16   omissions.  And if I can give you a couple of examples.

17              Ms. Hill claims, through her experts and their

18   expert reports, that she has wide-ranging damages.  That she'd

19   been damaged in her gastrointestinal tract, also in her vena

20   cava, that things are paralyzing to her.  She claims that she

21   has financial damages.  That she has to sell her home.  That

22   she's unable to work.  That she has post traumatic stress as a

23   result of her vena cava filter.  So she's put at issue her

24   financial condition, her physical condition and her mental

25   condition, all of which she ties to her filter.
```

1          When you look at her social media account, or at

2    least what's been printed from a pdf and provided to us, there

3    are omissions.  She responds to messages but we don't have the

4    message to her to which she is responding.  Or in some cases,

5    we have a message from someone else to her but no response to

6    that.  I don't -- I don't care about the things that happened

7    before she received her filter in 2010.

8          THE COURT:  I was going to ask, do you have any date

9    restrictions on your request?

10          MS. PIERSON:  Our request is from the date of

11    implantation to the present date.  We're most particularly

12    interested, obviously, in the things that would relate to the

13    time from when she received her filter in 2010 until sometime

14    after her filter was retrieved.  We think we're entitled to

15    information to the present date because she claims she has

16    permanent injuries that permanently prevent her from being

17    active, from traveling, from being -- doing a variety of

18    physical activities.  She contends she has present financial

19    injuries that are essentially paralyzing to her, all as a

20    consequence of her filter.  She claims she can't work as a

21    result of her filter.

22          THE COURT:  Was her filter retrieved?

23          MS. PIERSON:  It was retrieved in October of 2013.

24          MR. HEAVISIDE:  August of 2013.

25          THE COURT:  Mr. Heaviside said August of 2013.

 1          MS. PIERSON:  He's correct; August of 2013.  She

 2  filed her lawsuit in October 2014.

 3          THE COURT:  So you want it through the present or at

 4  least until sometime after it's retrieved.  Do you have a

 5  suggestion?

 6          MS. PIERSON:  I might suggest until the end of 2015,

 7  Your Honor, to give us some window to her activity after.  And

 8  there is one other reason why this information becomes

 9  relevant.  As you noted, we've been talking with you from time

10  to time about the plaintiff's claim of spoliation of evidence,

11  and they put at issue the question of anticipating litigation

12  and when litigation was anticipated by Cook.  Of course, Cook

13  could not possibly have anticipated Mrs. Hill's lawsuit before

14  Mrs. Hill anticipated her own lawsuit.  So we have a right to

15  know when Mrs. Hill began to preserve her documents, her

16  Facebook notations, her records that relate to her filter, her

17  surgery and the litigation.

18          We can't get that information from the pdf print-out

19  that the plaintiffs have given to us and we think their

20  answers have been sufficiently inconsistent on this point, and

21  we should be entitled to go to the source.  I have the

22  print-out, if you have any interest in it, Your Honor.  It's

23  90 pages.  I wasn't planning to give it to you, unless you

24  want to see the omissions for any reason.

25          THE COURT:  I don't think I need it.  I think the

1   important part is that you got a 90-page pdf print-out.

2            MS. PIERSON:  Thank you, Your Honor.  I'll move on

3   to the next bullet.

4            THE COURT:  I don't think you need to hit every

5   bullet point here, if there's some that are particularly

6   significant or there's something that's not adequately set

7   forth in the letter.  As I said, I'm not going to be able to

8   give you a ruling today on all these; but if there's

9   something -- since I've got you, something you want to be

10  specifically heard on or emphasized, I'm happy to listen to

11  it.

12           MS. PIERSON:  I think I can address the others

13  fairly globally, Your Honor.  We've asked for a privilege log

14  and haven't received it.  We've asked for information related

15  to medical expenses or other damages.  We've received some.  I

16  don't think we've received them all.  We've asked for

17  insurance policy and subrogation information.  We've asked for

18  communications with third parties.  In response to that,

19  they've provided only her medical expenses.  We can tell, of

20  course, from her Facebook page that she has communicated with

21  third parties about her filter, about her lawsuit and about

22  her damages.  We're entitled to that information.  We've asked

23  for supplemental responses to interrogatories 11 to 16 and

24  we've asked when she first contacted an attorney.

25           Let me hold that last point for a second.  The

1  privilege log, medical expenses, insurance policy,

2  supplemental responses, plaintiffs aren't, in their letter

3  responding, objecting to those things.  They say, "See the

4  authorizations."  But we can't request what we don't know

5  exists, of course.

6          So the last two points, Your Honor, that I'll

7  address with a little specificity is in Ms. Hill's deposition,

8  we asked her the question of when she first contacted an

9  attorney and how she found her attorney.  She was instructed

10 during the deposition not to answer on the grounds of

11 privilege.  We believe the question -- she should be compelled

12 to answer the question.

13         THE COURT:  Does it matter?

14         MS. PIERSON:  When she contacted an attorney?  Yes.

15         THE COURT:  What does it matter?

16         MS. PIERSON:  For one thing, it goes to a claim of

17 spoliation.  If she had not contacted an attorney about a

18 lawsuit by, let's say, September of 2014, how could Cook

19 possibly have anticipated litigation in Mrs. Hill's case, if

20 Mrs. Hill had not even spoken to an attorney yet?

21         THE COURT:  If the company makes something that they

22 know to be faulty and puts it in the stream of commerce, even

23 though no one's been injured by that, if they take certain

24 actions anticipating they're probably going to get sued some

25 day, that's not anticipation of litigation?

1          MS. PIERSON:  I don't think the situations are

2    analogous, respectfully, Your Honor.

3          THE COURT:  The premise was there can't be any

4    anticipation of litigation until she files suit.  I'm not sure

5    that's true as a general proposition.

6          MS. PIERSON:  I agree with you.  For example, if

7    someone makes a claim to a company and says, "I'm going to get

8    a lawyer and I'm going to sue you about this," the company

9    should reasonably anticipate litigation in that circumstance.

10   But if it had not crossed Mrs. Hill's mind to file a lawsuit,

11   if she had a complication from a procedure and she was

12   proceeding on with her life normally after that and then at

13   some point she decides to get a lawyer and file a lawsuit, we

14   certainly can't be held responsible for anticipating her

15   lawsuit until she anticipates her lawsuit.  That's my point.

16         I think these are simple interrogatory answers.  We

17   don't need to redepose her.  We just need her to answer when

18   she did she first -- when did she first contact an attorney

19   and how did she find an attorney.

20         And the last point, Your Honor, in our letter is

21   there's some handwritten responses to a plaintiff fact sheet.

22   She discussed these in her deposition.  We believe we're

23   entitled to them and the plaintiffs have refused to produce

24   them.  That's all I have, Your Honor.

25         THE COURT:  So it was a handwritten response to the

```
1   fact sheet and you say in here, "Plaintiff was unsure who
2   typed the answers."  I'm just confused.  You made a reference
3   to a typed answer and then a handwritten answer.  What is it
4   you're seeking?
5           MS. PIERSON:  Mrs. Hill's testimony was that she was
6   given a list of questions.  That she -- the plaintiff fact
7   sheet.  That she completed those questions by hand.  That she
8   sent that to her lawyer, who then typed something up that
9   became her signed plaintiff fact sheet.  We're concerned that
10  there was information that was omitted in the sanitized
11  version of the plaintiff fact sheet that was provided to us.
12  We've asked for the plaintiffs to produce the handwritten
13  plaintiff fact sheet.  They've refused to produce it.
14          THE COURT:  Based on privilege?
15          MS. PIERSON:  They've not asserted any objection, to
16  our knowledge.  They've just refused to produce it.
17          THE COURT:  Handwritten note to her lawyer, you want
18  a copy of that?
19          MS. PIERSON:  I don't think it's a handwritten note
20  to her lawyer, if she's completing the answers to the
21  questions in the plaintiff fact sheet.
22          THE COURT:  All right.  Thank you, Ms. Pierson.
23          MS. PIERSON:  That's all, Your Honor.  Thank you.
24          MR. WILLIAMS:  Your Honor.
25          THE COURT:  I got a court reporter down here.  You
```

1   hanging in there?

2            THE COURT REPORTER:  Yes.

3            MR. WILLIAMS:  Unless the Court has any questions.

4            THE COURT:  I do.  I do have a couple questions.

5            MR. WILLIAMS:  I was going to say --

6            THE COURT:  So why -- it's really -- just a second.

7   Let me find it here.

8            MR. WILLIAMS:  Sure.

9            THE COURT:  Sounds like the defendants are seeing

10  references to job information or potential employers that they

11  don't have authorizations for.

12            MR. WILLIAMS:  I think they have a general

13  authorization.  To be quite frank, if you want to talk

14  specifically about Hill discovery, I'd have to see to

15  Mr. Heaviside, who's actually one of her lawyers.  Mike, you

16  want --

17            THE COURT:  Hang on.  How about the social media?

18  Is that all Mr. Heaviside?  I've never ordered someone to turn

19  over their passwords.  But at the same time, we all know

20  social media is a treasure trove of information.  So you guys

21  strike a balance.  You produced 90 pages of a pdf -- 90 pdf

22  pages?

23            MR. WILLIAMS:  That's my understanding.

24            THE COURT:  Does Mr. Heaviside want to deal with it?

25            MR. HEAVISIDE:  I'll deal with it.

```
 1                THE COURT:  Thank you.

 2                MR. WILLIAMS:  Sure.

 3                THE COURT:  Let's back up.  Are there employers that

 4    she has that no authorizations have been provided for?

 5                MR. HEAVISIDE:  Frankly, I don't think so.  I know

 6    there's been an exchange between Mr. Johnson's office and

 7    Andrea in the last few days about that.  My understanding of

 8    that is -- Mrs. Hill, by the way, is on social security

 9    disability.  My understanding is --

10                THE COURT:  She can still work, though.

11                MR. HEAVISIDE:  She can?

12                THE COURT:  A person on social security disability

13    is still allowed to work.

14                MR. HEAVISIDE:  In some test -- testing the waters

15    to get back to the work force.

16                THE COURT:  Some minimal amount.

17                MR. HEAVISIDE:  I don't believe that's the case

18    here.  I don't want to make any absolute statements to you

19    that I don't know are true, but I've seen emails back and

20    forth where apparently she tried one day to do something or

21    half a day, perhaps, and wasn't able to do it and didn't do it

22    thereafter.  That's my understanding of other employers.  And

23    I will --

24                THE COURT:  But --

25                MR. HEAVISIDE:  I'll tell you and Andrea, I'll find
```

1  out the answer but I believe that's the answer.

2        THE COURT:  If she filled out an employment

3  application, they're entitled to that.

4        MR. HEAVISIDE:  I don't know that half day thing.

5        THE COURT:  I don't either.

6        MR. HEAVISIDE:  I'll find out.

7        THE COURT:  If you're giving things in a life care

8  plan that are making references to jobs or something that she

9  had or briefly had and they don't have authorizations for

10 that, they should get all that stuff.  That's fair game.

11       MR. HEAVISIDE:  If it was a job, sure.  I agree

12 wholeheartedly.

13       THE COURT:  What about the social media?  How did

14 you come up with 90 pages?

15       MR. HEAVISIDE:  Going to be kind of hard for me to

16 answer.  That too was in the last couple of days, as I

17 understand it.  And I frankly haven't gone through them yet.

18 If there were some omissions, we'll certainly correct the

19 omissions.

20       THE COURT:  Because you all are -- you're in front

21 of me asking for -- at least they are on this issue, asking

22 for a ruling; and I don't want to rule on stuff that you are

23 still all going back and forth on.  I think it's fair to say

24 that the discovery in this case is massive.  That you're

25 seeking a lot of information of the defendant, and that's fair

 1   game for them to seek comprehensive discovery from your

 2   plaintiff.  So again, I'm not ordering passwords or anything

 3   turned over; but if you're saying it's these 90 pages, I need

 4   to know what's the basis for limiting it to those 90 pages.

 5   How did you come up with those 90 pages?  What's the date

 6   range?  Why those 90 pages?

 7          MR. HEAVISIDE:  I understand.  What I would suggest

 8   is in the same seven-day period of time where they're talking

 9   about the IME protocol, if you direct us or -- you don't have

10   to direct me but if you want to direct me to finally answer

11   those questions within those seven days, I'll certainly do it.

12          THE COURT:  Well, I don't know exactly when I'll get

13   an order on this.  I'm going to try to do it as soon as

14   possible.  It's not going to be this week.  So as you all

15   continue to discuss any of issues that we've discussed today,

16   if you reach any agreement on them, let me know.  If I get an

17   order out before the seven days, then it may be -- I may have

18   already solved the problem.  Anything else, Mr. Heaviside?

19          MR. HEAVISIDE:  I think that Mr. Williams -- I don't

20   know if he wants to but --

21          THE COURT:  He doesn't want to.

22          MR. HEAVISIDE:  I didn't follow that argument about

23   Cook could know nothing about potential litigation until --

24          THE COURT:  I think we've covered that.

25          MR. HEAVISIDE:  Okay.

 1          THE COURT:  She clarified it.  Thank you.  Did you

 2   have something else, Ms. Pierson?

 3          MS. PIERSON:  I'm sorry, Your Honor.  May I ask for

 4   one bit of interim relief on the social media issue?

 5          THE COURT:  Sure.

 6          MS. PIERSON:  What we received in this pdf

 7   print-out, it's my understanding that the way it's created is

 8   that someone who has a Facebook account asks Facebook to

 9   create an archive of their account, and Facebook does that and

10   they create a zip drive that the person then has to go to and

11   access the zip drive.  I think what we've received is a

12   print-out from that zip drive.  Someone took the zip, then

13   converted it to pdf and then printed it to us.

14          We want the original native zip drive, the native

15   form.  We can't tell from the answers that Mr. Heaviside will

16   give to us if information's been omitted or not.  But as a

17   starting point, it seems reasonable to me, just as we've given

18   the plaintiffs native versions of the documents that we've

19   produced, that they would give us a native version of this

20   document.

21          THE COURT:  Okay.  Thank you.  I've addressed the

22   deposition issues and the errata issues, to the extent I can

23   on the errata; and we're going to get briefing on the other

24   issue and then I'm going to take this last argued matter under

25   advisement, try to get you something next week, if I can.  I

1  just can't make any promises in that regard but I'll try get

2  something out.  There's a lot of issues here.  So if you do

3  reach agreement on anything I've heard under advisement,

4  please let me know.

5          MR. WILLIAMS:  Thank you.

6          THE CLERK:  All rise.

7          (Proceedings concluded at 3:20 p.m.)

8  ********************************************************

9              CERTIFICATE OF COURT REPORTER

10

11     I, Margaret A. Techert, hereby certify that the

12  foregoing is a true and correct transcript from

13  reported proceedings in the above-entitled matter.

14

15

16

17  /S/ Margaret A. Techert                    **July 17, 2017**
    MARGARET A. TECHERT
18  Official Court Reporter
    Southern District of Indiana
19  Evansville Division

20

21

22

23

24

25