UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | |
|---|---|
| IN RE: COOK MEDICAL, INC., | ) |
| IVC FILTERS MARKETING, SALES | ) Cause No. |
| PRACTICES AND LIABILITY, | ) 1:14-ML-2570- RLY-TAB |
| LITIGATION | ) Indianapolis, Indiana |
| | ) **February 9,** 2017 |
| | ) 10:09 a.m. |
| | ) |


**Before the Honorable**
**RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
STATUS CONFERENCE



**For Plaintiffs:**                David P. Matthews, Esq.
                                   MATTHEWS & ASSOCIATES
                                   2905 Sackett Street
                                   Houston, TX  77098


                                   Ben C. Martin, Esq.
                                   LAW OFFICES OF BEN C. MARTIN
                                   3710 Rawlins Street, Suite 1230
                                   Dallas, TX  75219


                                   Joseph N. Williams, Esq.
                                   RILEY WILLIAMS & PIATT, LLC
                                   301 Massachusetts Avenue
                                   Indianapolis, IN  46204

**For Defendants:**                    Douglas B. King, Esq.
                                       James McGinnis Boyers, Esq.
                                       WOODEN & MCLAUGHLIN LLP
                                       One Indiana Square, Suite 1800
                                       Indianapolis, IN  4204


                                       Andrea Roberts Pierson, Esq.
                                       John T. Schlafer, Esq.
                                       FAEGRE BAKER DANIELS LLP
                                       300 N. Meridian St., Suite 2700
                                       Indianapolis, IN  46204


                                       John Joseph Tanner, Esq.
                                       BAKER & DANIELS
                                       300 N. Meridian Street
                                       Indianapolis, IN  46204




Court Reporter:                        Margaret A. Techert
                                       United States District Court
                                       101 NW Martin Luther King Blvd.
                                       Evansville, Indiana  47708


               PROCEEDINGS TAKEN BY MACHINE SHORTHAND
            TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

```
 1                    (In open court.)
 2            THE CLERK:    All rise.  United States District
 3   Court for the Southern District of Indiana is now in session
 4   pursuant to adjournment.  The Honorable Richard L. Young
 5   presiding.  Court is in session.  Please be seated.
 6            THE COURT:  Good morning, everyone.  Winter has
 7   returned to Indiana.  I don't know how it is down in Dallas
 8   these days.
 9            MR. MARTIN:  I brought my Dallas jacket, Your Honor,
10   and it doesn't fit.
11            THE COURT:  All right.  We're here in Cook Medical,
12   Inc., IVC Filters Marketing, Sales Practices and Product
13   Liability litigation.  Our cause number is 1:14-ml-2570.  This
14   is MDL 2570.  We're here today on February 9, 2017 for our
15   regularly scheduled status conference leading up to,
16   hopefully, our Bellwether trial in October.
17            Representing the plaintiffs here, David Matthews,
18   Ben Martin and Joe Williams; and representing Cook, of course,
19   Doug King, Andrea Pierson, John Shaferly, Joe Tanner, and Jim
20   Boyers.
21            I've got your agenda here.  Judge Baker gave me an
22   update of your conference you had on, I believe, Monday and he
23   said -- gave me a report the parties are working well
24   together, being able to resolve most of their issues that have
25   come up, which is always a good thing to hear.  And so I
```

1  understand that we do have a couple items that Judge Baker

2  wanted to -- need to take a look at and make a decision.  But

3  how do we want to begin, Mr. King?  You want to start off with

4  a status here?  Or Andrea?  I'm sorry.

5          MS. PIERSON:  I will.  Thank you, Your Honor.

6  Briefly this morning, we think it's helpful to let the Court

7  know kind of the lay of the land with respect to the

8  litigation.  Our count within the MDL is 1,483 cases

9  currently.  There continue to be 21 state court cases.  There

10 are two state court cases that originate out of St. Louis,

11 Missouri, which have recently been removed to Federal Court,

12 and those are the subject of a motion to remand and some other

13 filings, motion to dismiss in Federal Court in the Eastern

14 District of Missouri.  So it's possible that the two Missouri

15 cases may get transferred here.  I think we'll know more about

16 that in the next 30 days or so.

17         THE COURT:  All right.

18         MS. PIERSON:  In the meantime, the -- there's been a

19 continued filing of cases in the MDL.  The number of state

20 court cases have remained relatively the same.  I always tell

21 you about the product breakdown in the MDL, and that product

22 breakdown continues to be about the same.  Close to 50/50.  A

23 little less Tulip than there are Celect but not substantially

24 so.

25         THE COURT:  Changing over time?

1          MS. PIERSON:  We see a slight uptick in the Tulip

2    cases but not a substantial division between the two.  So at

3    present there are 657 Tulip cases.  There are 767 Celect

4    cases.

5          Typically I tell Your Honor how the cases look in

6    terms of the injury breakdown.  You may recall from our last

7    status conference that we talked about by far the predominate

8    injury in both categories -- or alleged injury is perforation

9    of the vena cava or perforation of the vena cava and an

10   adjacent organ.  I have no new information on that because of

11   the stay on plaintiff profile forms, while the parties worked

12   out a new and simplified form.  We expect to begin receiving a

13   substantial numbers of PPF's beginning next week on February

14   the 14th, I believe.  So at the next status conference we

15   should be able to give you an idea, at least, how the claimed

16   injuries break down between the various categories that we

17   talked about before, but for now we have no new information on

18   that point.

19          I had intended to report to you, too, on the status

20   of the Bellwethers and where they are in terms of discovery;

21   but as you may have noted under the second agenda item 2C, the

22   plaintiffs have also asked that we talk about the schedule.

23   So I think I'll reserve comment for now.

24          THE COURT:  Okay.

25          MS. PIERSON:  Suffice it to say we've been doing

1    some discovery in the Bellwethers but we've hit some glitches

2    along the way, too, that we think impact the schedule that

3    Your Honor has entered.  But we'll save comment about that

4    until we get to item 2C.

5            With that, I'll let Mr. King address item 2 on the

6    agenda, which is an update on discovery.

7            THE COURT:  Very good.  Thank you, Ms. Pierson.

8    Mr. King.

9            MR. KING:  Yes, Your Honor.  I suspect the Court has

10   Judge Baker's order?

11           THE COURT:  I do.

12           MR. KING:  So I won't go into that.  I think we are

13   at the moment working on basically complying with his orders.

14   We have talked to our client as recently as yesterday -- or

15   communicated by email.  We should have the slides from this

16   VCA1 tomorrow and the others are being duplicated as we speak.

17   And the raw data -- I should mention, Your Honor -- and I know

18   this is going to come up.  So let me pre-empt it a little bit.

19           Plaintiffs will probably tell you that there's been

20   a lot of data produced fairly recently.  That's true.  Back in

21   April of 2015 is when we responded to their initial discovery

22   request and over the period of time of 2015, we produced a lot

23   of materials.  I'm not going to go into the numbers but my

24   point is, we did produce a lot of material.

25           I think in November 2016, the plaintiffs called to

1   our attention the fact that there had been a lot of imaging

2   studies associated with -- that is x-rays, if you will,

3   associated with both the large clinical study we had done

4   overseas, frequently called the OUS study, and also clinic

5   imaging studies with regard to animals.  And this -- I had

6   been under the impression, frankly, that all that imaging had

7   been produced back in 2015.  In November of 2016, they said

8   no, it hasn't been.  I thought it had been.  And in fact, I

9   learned, much to my chagrin, Your Honor, that it hadn't been.

10          And once we realized that it hadn't been, we

11  produced it.  And that's what -- that's one of the reasons

12  there's been a big volume of production fairly lately.  And I

13  think one might say there's -- "Whose fault is that?"

14  Certainly our fault that we didn't produce it to begin with.

15  We should have.  It's probably -- in terms of the timing of

16  this, I would suggest it might be plaintiffs' fault for not

17  calling it to our attention earlier.  I mean, we did this back

18  in -- I thought it had been produced in 2015.  They told me in

19  2016 it hadn't been.

20          I went ahead in January and told them I thought it

21  had been.  On January 20th, I responded to Mr. Martin's letter

22  of November 24th, which he had written in response to your

23  direction, that we produce the imaging studies -- or he asked

24  about them.  And I told him on January the -- on January the

25  20th, in a letter, that all the imaging studies for both the

1  animal studies and -- which is a VCA1, 2 and 3 and for the

2  outside the US study, which is 95 patients followed up at

3  various times.  So there's a lot of x-rays associated with

4  that, and I told him on the 20th I thought it had all been

5  produced.

6          On January the 24th, I had to admit that I had

7  learned in the intervening four days that it hadn't been.  So

8  we turned around and produced it as quickly as we could.  But

9  the plaintiffs will probably say that this late production is

10 hampering their efforts to prepare for trial.  And I'm not

11 going to steal their thunder by saying -- by talking about

12 that, other than to explain to Your Honor this is the sequence

13 of events.

14         Something else that has led to a fairly late

15 production.  Back in -- back in April of 2015, we produced

16 complaint files.  We produced quite a few at that time, and we

17 were producing the complaint files back in 2015 based on the

18 failure modes we thought were then at issue.  The plaintiffs,

19 in November of this past year, 2016, they said, "Wait a

20 minute.  You need to produce more complaint files on other

21 issues."  We've been around and around with Magistrate Judge

22 Baker and with his guidance, we produced a lot more complaint

23 files; about a thousand more complaint files than we had

24 produced back in 2015.

25         But again, because this is something that was

1   brought to our attention fairly recently, the production of

2   those complaint files, with associated imaging -- because when

3   we -- when our folks investigate a complaint, they not only

4   talk to people and so forth, but they will obtain imaging

5   studies from the hospital, if they can; and then they will

6   have a consultant look at those imaging studies.  And that

7   means there's --  So we produced a thousand more complaint

8   files in January of this year pursuant to Judge Baker's orders

9   from December of 2016.  That is another reason that there's

10  been a late production.

11          So again, the plaintiffs will suggest that this

12  requires a change in the schedule.  I'm not -- I'm not exactly

13  sure what they're going to suggest about that.  I'll leave

14  that to them, obviously.  But I guess what I wanted to say to

15  Your Honor is that yes, there has been a late production.  If

16  we had known that we hadn't done this -- if I had known we

17  hadn't done this, we would have done it sooner.  Once we

18  learned that we hadn't done it, we did it.

19          So that's kind of where we are, Your Honor.  And as

20  far as these other things on Judge Baker's order, we are in

21  the process of producing them and hopefully we'll be able to

22  stick to the schedule he ordered.  So that's where we are,

23  Your Honor.

24          THE COURT:  Mr. King, thank you very much.

25  Mr. Martin, do you have a report or some comments?

1           MR. MARTIN:  Your Honor, I'm going to address one

2    thing and that was and is Mr. King's discussion about the

3    latest production of the imaging files, and I want to explain

4    to the Court the importance of those.  We talked about this to

5    Judge Baker.  So if he has already imparted this, my apologies

6    with respect to that.

7           The two things that Mr. King had discussed, I

8    believe, was accidental.  I do absolutely believe that

9    Mr. King and Cook meant to produce those imaging files, and

10   the imaging files are literally thousands of images --

11   diagnostic images that were taken in several of the sheep

12   studies and then in the OUS or the outside United States

13   study.  That was the study that brought forth the study that

14   was discussed with the FDA by Cook, the human study that

15   ultimately was used in order to get the Celect retrievability

16   indication on the markets.

17          So the importance of those two items and the imaging

18   from those items -- from those studies, both the human and the

19   three or four sheep studies, is extraordinarily important.

20   Those happen to be the things that did probably accidentally

21   get produced late and I do believe that they thought they had

22   produced them earlier.

23          THE COURT:  I don't question that at all.

24          MR. MARTIN:  I just wanted to explain the importance

25   of them.  I don't question that either.

```
 1              MR. MARTIN:  And the numbers of them now, it
 2    literally -- I have talked to the folks who handle up on all
 3    of these things; and the way they've been produced, it
 4    literally takes about an hour to get -- to open one, find out
 5    which one it is, and which file it goes to, and then -- and
 6    then actually be able to look at it.  That's what Matt Schultz
 7    had told me and he explained it to me.  And I could go into
 8    great detail as to why it takes an hour but it takes literally
 9    one man hour in order to accomplish that.
10              So that's that scenario.  And the reason that they
11    are important is that they were the things that were brought
12    forth, the argument by Cook, that the Celect filter should
13    come onto the market.  And I won't be -- the Court will not be
14    surprised when we do provide expert reports that those two
15    things, the sheep studies and the imaging of the sheep
16    studies, as well as the OUS study, are going to take up a very
17    major part of the expert reports for the experts who do indeed
18    address these things.  So I just wanted to indicate to the
19    Court the importance of those sheep study, OUS and why the
20    imaging is so important, and how much time it will take to go
21    through those things and it is very important for our experts.
22    So thank you.
23              THE COURT:  Thank you, Mr. Martin.
24              MR. WILLIAMS:  Would you like to move on to the
25    agenda?
```

1           THE COURT:  Yes.

2           MR. WILLIAMS:  Thank you.

3           THE COURT:  Mr. Williams.

4           MR. WILLIAMS:  Items 2A, B and C are somewhat

5   co-extensive and so I'd like to just address all three of them

6   sort of in one fell swoop.  I'll start by explaining to the

7   Court what we have learned within the last couple of weeks,

8   and one of the issues that which raised with Magistrate Judge

9   Baker and let you know how that is progressing.

10          We took the deposition in the Hill case of the sales

11  representative who detailed the implanting position; and that

12  sales representative, in her deposition, testified on several

13  occasions that no one at Cook had ever told her to put a

14  litigation hold in place.  She longer has any of her e-mails.

15  She doesn't remember any of the things that she said to the

16  doctor when she visited that physician 150 times over five

17  years.

18          THE COURT:  Does she still work for Cook?

19          MR. WILLIAMS:  She does.  She testified that Cook

20  first came to get her computer approximately six months before

21  her deposition.  The Hill case was filed, Your Honor, in late

22  2014.  The importance of this -- in these cases, one of the

23  most crucial pieces of evidence that the plaintiffs will need

24  to present is the information that was given from Cook,

25  through their sales representatives, to the treating

1   physicians, to the implanters.

2           We have one spreadsheet that says that the sales

3   representative visited the implanting physician 149 times.

4   There's no detail about what was said during those visits.

5   Both she and her supervisor testified that after a sales call,

6   she would typically draft an email of what was discussed

7   during the meeting and send it to her supervisor.

8           Cook's 30(b)(6) witness a couple years ago on ESI

9   testified that things like that, things that are going on,

10  Cook business outside and out in the field with sales

11  representatives, would typically be e-mailed back to the

12  company and then loaded onto the network.  So when we heard

13  that no litigation hold had ever been communicated to her,

14  that she no longer has any e-mails, we are left in a position

15  where, at least in the Hill case, we don't have evidence of

16  the communications that Cook made to the physicians.

17          So what I suggested to Magistrate Judge Baker on

18  Tuesday --

19          THE COURT:  Are you telling me those e-mails aren't

20  in the system somewhere?  They can't be retrieved somewhere?

21          MR. WILLIAMS:  Well, the 30(b)(6) witness a couple

22  years ago said that he thinks there may be a footprint tracing

23  for deleted emails but he wasn't sure.  We've asked repeatedly

24  for the custodial file of these sales representatives and we

25  are told that there no e-mails.  That they have -- they've

1  been destroyed, deleted or something.  I don't -- I'm trying

2  to use a nonadvocacy term but removed.

3         So what I suggested to Magistrate Judge Baker, based

4  on the testimony we heard from these sales reps, what we need

5  to do at this point is take a 30(b)(6) deposition of somebody

6  at Cook who can tell us about when a litigation hold, if any,

7  was put into place, who it covered, how it was communicated,

8  what Cook was doing, and the steps that were taken to ensure

9  that these documents weren't being destroyed.  Because if --

10 if these documents were destroyed, in violation of either a

11 court order or their common law duty to preserve evidence,

12 then we'll be able to present Your Honor with a jury charge

13 asking for an adverse inference.  But we've got to build that

14 up.  We don't have the evidence to do that yet.  We need to

15 start down that path.

16        So what Judge Baker suggested was within seven days

17 of Tuesday, so next Tuesday, Cook is supposed to provide us

18 some information about -- just general information about their

19 litigation hold.  Once we receive that information, the

20 parties are going to meet and confer on next steps.

21        The importance of this really cannot be overstated

22 because it doesn't just affect the Hill case.  It affects the

23 Gage case as well, which is the second Bellwether trial that

24 is set.  And the reason it affects the Gage case is, we were

25 told in the defense fact sheet in May of 2015, that the

primary sales representative in the Gage case was a fellow by
the name of William Guthrie, who is currently employed by
Cook.  In May of 2016, Cook files its Bellwether proposals and
they advocate first on the line for the Gage case.

What they didn't say in those Bellwether papers, and
what we didn't know until three months after the Court had
selected the Gage case, was that Mr. Guthrie died in July of
2015.  So the sales rep is no longer alive.  And Cook knew
that at the time they put the Gage case up because he was
working for Cook when he died.

So we've got the Hill case, where we're told there
are no e-mails or any documentation related to what was
communicated from the sales reps to the doctors.  We've got
the Gage case, which we now have learned the sales
representative died a year before the Bellwether selections
were made.

THE COURT:  Was his deposition ever taken?

MR. WILLIAMS:  No, Your Honor.  At this point Gage
was just one of many discovery point cases.  And frankly, we
didn't know that he died until October of 2016, when the
amended fact sheet was served on the plaintiffs.

So coming full circle, when we talk about last --
last November we had our status conference and Cook said, "We
think corporate discovery should be over.  We think it should
be shut down."  In those three months, we've learned that

1   there -- and we have good grounds to believe that there may be

2   evidence of destruction that has occurred or is occurring.  We

3   need to run that down.  And I think that's -- that's corporate

4   discovery.  So I don't want to counsel that the corporate

5   discovery should be over.

6            Just as -- and to dovetail into that.  Within the

7   last three weeks, we've been produced 187,000 documents by

8   Cook.  You'll see in the order that Judge Baker issued

9   yesterday -- or I believe it was yesterday, he orders several

10  other major pieces of scientific evidence produced to the

11  plaintiffs, some of which I think Mr. King indicated would be

12  produced tomorrow.  Others of which Judge Baker gave them

13  until February 17th to produce.

14           So the problem that we now face is, we have our

15  expert reports due on February 15th.  These studies that we

16  are not even going to get, despite we asked for them in April

17  of 2015 or even earlier than that, that's when the first

18  production was made.  We're now getting these -- and we're not

19  going to get some of them until two days after our expert

20  witness disclosures are due.  We've got a number of experts.

21  They are all substantially complete -- their reports are

22  substantially completed, except for the fact that they need to

23  review the new material and work that material into their

24  reports.

25           Rather than supplement, what we'd like to do is ask

1    the Court for 30 days, until March 17th or 15th, whatever the

2    30 days is, for our experts to digest this new information and

3    incorporate it into their reports.

4            From the plaintiffs' perspective, we would not like

5    to move the trial dates.  Any delay in these cases, it affects

6    the plaintiffs far more adversely than it does Cook.  We don't

7    want to do that.  And frankly, given the fact that we're

8    getting this material -- which it was inadvertently not

9    produced but it was not produced nonetheless.  The fall for

10   that can't rest on the plaintiffs.  And so we don't -- while

11   we need the 30 days for our expert reports, we don't want to

12   have to suffer the extra prejudice of moving our Bellwether

13   trials back.

14           THE COURT:  I don't want to lose that October trial

15   date or the other trial dates --

16           MR. WILLIAMS:  Right.

17           THE COURT:  -- as well.  Considering the length of

18   the trial, it's going to be hard to find a spot.

19           MR. WILLIAMS:  Understood, Your Honor.

20           THE COURT:  A block of time for those.

21           MR. WILLIAMS:  On the same -- on the other hand,

22   though, as you know, these cases are going to be very

23   scientific.  They're going to be very expert heavy.  We

24   can't -- we simply cannot afford to allow our experts to issue

25   reports without viewing the imaging studies related to the

```
 1  two -- the OUS study and the sheep study, the two studies that
 2  Cook used to justify its release of these products.  I mean,
 3  they are the most crucial studies we have.  I know Mr. Martin
 4  already addressed that.
 5          And given that we're not even going to get some of
 6  this information until after our expert reports are currently
 7  due, we think we should be entitled and respectfully ask for
 8  an additional 30 days for our experts to get that material
 9  incorporated.  Thank you, Your Honor.
10          THE COURT:  Any response?
11          MR. KING:  Just a couple comments, if I may, and
12  then I think Ms. Pierson has some comments as well.  With
13  regard to the Hill matter, I want to make sure that the Court
14  understands that Courtney Whitelock, who is still our
15  employee, and she's the --
16          THE COURT:  The sales rep?
17          MR. KING:  Yes.  She was the sales rep who was just
18  deposed.  As I talked to -- as I explained to the plaintiffs
19  yesterday -- or Tuesday, rather, before Judge Baker, and as I
20  had told them back in January when we talked about Courtney
21  Whitelock, Courtney Whitelock's computer was changed in 2013,
22  before there was even a Hill lawsuit filed.  And the laptop
23  she had was taken and destroyed because she got a new one.
24          So any hold -- any failure to give her a hold notice
25  earlier is really academic in that particular case because any
```

discussion she had with Dr. Zuzga, the implanting physician,

prior to his implanting of the device in 2010, wouldn't have

been on the only computer she has now anyway; because again,

she got the computer in 2013.  The implant was in 2010.  The

lawsuit was filed in 2014.  So anything on her computer that

she received in 2013 is not going to be material to the

discussion she had with Dr. Zuzga before he implanted the

filter in Ms. Hill in 2010.  So they were gone anyway and they

were gone before we even knew there was a lawsuit filed, let

alone its selection as a Bellwether.

            The other comment I would make, Your Honor, is --

and I think Ms. Pierson can address Gage because I don't know

as much about that case.

            THE COURT:  So when somebody gets a new computer at

Cook, the old computer is just destroyed?

            MR. KING:  It's either destroyed or they wipe it

clean.  In this particular case, it was destroyed; only

because, as you know, technology is constantly improving.  So

one reason they give them a new laptop every few years or

several years or whatever it happens to be, is to get one with

all the new bells and whistles that have come out.  So they

get rid of the old one, basically.  And in this particular

case, Courtney Whitelock's case, that's what they did.  I

can't speak to every single sales representative but the only

one they're talking about that we have -- that is still our

1  employee that has been deposed is Courtney Whitelock and that

2  is the situation with her.  So that particular computer

3  doesn't matter.

4        THE COURT:  I find it difficult that a company like

5  Cook, considering that all information nowadays is put on a

6  computer -- there's nobody writes notes on anything anymore,

7  except me, on paper.

8        MR. KING:  I do.

9        THE COURT:  Our generation, Mr. King.  And then I'm

10 assuming Cook would think that most of the information on that

11 computer is important information.  Why would they just

12 destroy it without transferring it to the new computer?  I

13 don't understand that.

14       MR. KING:  Well, the individuals can take efforts to

15 preserve that and the major -- I guess you might say the major

16 stuff they do.  But the million documents we've produced, the

17 18 depositions I've defended, almost all of them are --

18 they're talking about e-mails from 2003, 2004, etcetera.  So

19 they haven't been destroyed.  I think what they're focusing on

20 are the e-mails back and forth between the sales

21 representative, in this particular case Courtney Whitelock,

22 and the physician.

23       THE COURT:  And the physician.

24       MR. KING:  But the stuff like -- the studies they're

25 talking about, the imaging studies, those haven't been

1    destroyed.  I mean, they're not.  They're focusing on this

2    sales representative.  And Mr. Williams has been very candid

3    in saying they don't have evidence at this juncture of some

4    mass destruction of evidence.  And that's why Judge Baker

5    said, "You guys talk between the two of you and come back to

6    me in seven days," which will be next Tuesday, "and report

7    further."

8            Because I don't think this has been resolved.  We've

9    had -- we have now looked.  There have been, I think, over 300

10   document holds issued to various people within the Cook

11   organization and some of those were back as early as 2013,

12   when -- before this MDL even began.  So there's a lot of holds

13   out there, and I don't think the destruction of e-mails that

14   he suggests is occurring is widespread by any stretch.  And I

15   understand your point, Your Honor.  Things like drafts, for

16   example, might be discarded but the major documents, they're

17   not going anywhere.

18           One other thing I wanted to add.  These two animal

19   studies -- or three, rather, that we have been directed to

20   produce in paragraph 3 of Magistrate Judge Baker's order,

21   there's a test study that's sub paragraph A, sub paragraph D

22   and sub paragraph E, the ones that we're supposed to produce

23   by next week.  Those particular studies are not part of the

24   Lyon paper, which is 2009, which is the OUS study.  And

25   they're not part of the VCA1, which is the sheep study that

 1   Dr. Smouse and his colleagues did that was also instrumental

 2   in our getting clearance from FDA.  So the VCA2 and 3, which

 3   are going to be produced by next week, those were feasibility

 4   studies that were not part of what was submitted to FDA and

 5   the other studies were not submitted to FDA either.

 6            I'm not necessarily opposing Mr. Williams' request.

 7   I'm just suggesting that those three studies are not part of

 8   what -- the OUS study that they're talking about and they're

 9   not part of the sheep study that was also so important.  So

10   they're going to get those slides tomorrow.  Thank you, Your

11   Honor.

12            THE COURT:  Ms. Pierson.

13            MS. PIERSON:  Your Honor, I want to just talk nuts

14   and bolts about the schedule and where we are.  But before we

15   do that, just one point to add on to what Mr. King was saying

16   about Ms. Whitelock.  I was present during her deposition.  I

17   defended it.  I defended the deposition of her supervisor, Lee

18   Conners.  I was also present yesterday during the deposition

19   of Dr. Mark Zuzga, the physician who actually implanted the

20   filter at issue in Hill.  And both Ms. Whitelock, her

21   supervisor, and Dr. Zuzga have now all confirmed that they

22   didn't communicate by email.

23            So this issue, in my view, is a little bit of a red

24   herring when Mr. Williams suggests that there were some emails

25   between the sales representative and the physician, when both

```
 1    parties to the email said that's not how they communicate; and
 2    that's not a surprise.  I mean, he's a busy vascular surgeon.
 3    As you might imagine, and as both of them have described, when
 4    they communicated, it would be in sort of passing.  Which he's
 5    in what's called the cath lab, which is where they stock the
 6    Cook products the vascular surgeons and interventional
 7    radiologists used.  He has said expressly, "I didn't make time
 8    to talk to Courtney or other reps.  I'm focused on my
 9    procedures and what I'm doing."  So even though all of us use
10    email quite frequently in the way that we conduct our
11    business, that's not how their relationship went.
12              We also disagree with the number of the
13    characterizations that Mr. Williams made with respect to
14    Ms. Whitelock's testimony.  One thing I want to make clear.
15    When she was questioned by Mr. Martin about a litigation hold,
16    she initially did say that she didn't receive a litigation
17    hold.  But when I questioned her, she clarified that she
18    didn't understand what a litigation hold meant and that, in
19    fact, she had received a communication from the legal
20    department about the need to preserve relevant information.
21    This issue about has Cook appropriately held Ms. Whitelock --
22              THE COURT:  The communication she received from
23    legal then, was that an email or was that a document
24    available?
25              MS. PIERSON:  Yes.  It's an email message attaching
```

```
 1   the litigation hold.  And it's my understanding from the
 2   conference with Judge Baker that this issue will be sorted out
 3   before him within the next seven days or so.  So we certainly
 4   defer to his judgment on whatever the next steps are.  But I
 5   wanted to make clear that's not how we believe the testimony
 6   went with respect to Ms. Whitelock.  And certainly Dr. Zuzga,
 7   the other potential party to any communication, has made clear
 8   that's not how they communicated at all.
 9          So setting that issue aside, kind of stepping back
10   and talking about the schedule.  Mr. Williams asked you today
11   to extend the plaintiffs' expert disclosure deadline by 30
12   days.  We think that doesn't work without moving the trial
13   date, and we think it's sort of ignoring a bigger picture on
14   where we are practically with respect to the schedule.
15          First, as you may recall, Your Honor, your schedule
16   provides for a 60-day split between the time that we receive
17   the plaintiff expert reports and the time that Cook renders
18   its expert reports.  It's important that we preserve that.
19   There are going to be many, many experts in these cases and we
20   may choose to depose the plaintiffs' experts when we receive
21   their reports.  So simply bumping the plaintiffs' expert
22   deadline, that doesn't resolve the problem.  It creates a
23   cascade effect throughout the other deadlines in Your Honor's
24   pretrial schedule.
25          I think we can debate kind of why we are where we
```

are.  The plaintiffs knew, obviously, that they're getting

late documents from Cook.  Our view is that they had our

discovery responses beginning in April of 2015, and that they

essentially sat on the responses and didn't follow-up until

November of 2016.  So I'm not here to say who's right or who's

wrong about that but there are, of course, two sides to the

story.

Unrelated to that issue, though, Your Honor -- and

even if you set aside that plaintiffs now say their experts

need 30 more days to review the documents that are produced by

Cook, setting that issue aside with a different problem and

that is, that in both Hill and Gage, the treaters' depositions

have remained largely untaken.  We were told in November of

2016 that the plaintiffs were going to take the lead on

scheduling these.  I believe they've done their best to try

and schedule the treating depositions.

But the fact of the matter remains that in the Gage

case, we've taken two depositions of treating physicians.

One, Mr. Gallagher, the lawyer for Mr. Gage, says needs to be

continued because he has more questions; and there remains to

be scheduled another one or maybe one and a half, depending on

if Dr. Crisostomo's is continued or not.  But there's nothing

on the schedule for that at all.  I know that Mr. Gallagher's

office has been trying very hard to get the physicians to give

them dates but no dates are forthcoming or there're, I think,

1    some long delays.

2           In Hill, the problem is even worse, frankly.  I'd

3    say Gage is a little bit ahead of Hill in that regard.  In the

4    Hill case, we've taken one deposition of the plaintiff's

5    primary care physician.  We started the deposition of the

6    implanting physician yesterday but weren't able to finish it,

7    and there remain to be scheduled still four other treating

8    physicians, all of whom are really central to the claims in

9    the case.

10          There are a couple of depositions scheduled in the

11   Gage case now.  The earliest time that those physicians are

12   willing to make themselves available is in the middle of

13   March.  We've got two scheduled on March the 22nd, but there

14   are no other treater depositions scheduled in the Hill case.

15          So without pointing fingers about why we are where

16   we are, I think it's highly unlikely that the key witness

17   depositions in the Hill case will be completed until at least

18   mid April.  And the fact of the matter is, we're all hostage

19   to these physicians' schedules; and this particular group of

20   physicians is very difficult to get scheduled for deposition.

21          So I reached out to the plaintiffs multiple times by

22   email and talking to Mr. Heaviside in person, and I asked that

23   we sit down and confer about how to solve this problem because

24   one thing I know we all want is that to the extent that we

25   need a new trial setting, we want to ask you for that just one

1    time; and we want not to have to come back to you and suggest

2    that other deadlines need to be moved or that a new trial

3    date --

4              THE COURT:  We'll never get finished.  I've been

5    doing this for almost 30 years.  You start moving trial dates

6    around in complex litigation, you never get -- you never get

7    it done.  I've got -- this MDL is not the only cases on my

8    docket.  I mean, I've got -- it's up to you.  If you guys want

9    to agree to move these trial dates back to 2018 or 2019 or

10   whatever, that's fine.  I've got plenty to do.

11             But I also want to try to push these cases to

12   resolution in some way.  I've got an obligation to do that not

13   only to the parties and to you but to the MDL panel, when I

14   agreed to take this.  So we start the slippery slope of

15   moving -- willy-nilly moving trial dates around, it's going to

16   be very hard to block out three weeks, I think at a minimum

17   probably, for these trials, right?

18             MS. PIERSON:  Absolutely.  I think it's three or

19   four.

20             THE COURT:  Try to block out a month of my calendar

21   and then a few months later saying, "Judge, that's not going

22   to work.  You need to find another month for us."  Not only on

23   one occasion but for three Bellwether trials.  I mean, that's

24   difficult to do just practically speaking.  So the trial date

25   here that we have for Hill of October -- is it the 27th?

```
 1              MR. KING:  23rd, Your Honor.

 2              THE COURT:  23rd, I'm not inclined to move that.  I

 3   am inclined at this point, since Mr. King admits late

 4   production, I'm inclined to give the plaintiffs an extra 30

 5   days on their expert deadlines.  That's the only fair thing to

 6   do, considering there's an admission here of late production.

 7   And you all are just going to have to work through it to get

 8   this case ready.  Now, if depositions aren't taken by the

 9   deadlines and by the time they're ready for trial, that's too

10   bad.

11              MS. PIERSON:  Here's -- we obviously respect

12   everything you're saying, Your Honor, and we certainly respect

13   your schedule and understand the inconvenience that it places

14   on you when a trial is moved.  Here's the problem, though.  If

15   we don't get the plaintiffs' reports until 30 days later, we

16   will not be able to turn around our expert reports 30 days

17   beyond that.  And the plaintiffs have already told us that to

18   the extent that these depositions occur after their disclosure

19   deadline, they intend to supplement their expert reports.

20              So you wind up with multiple supplements of

21   plaintiffs' expert reports which we, in turn, will then be

22   coming to you and saying, "Your Honor, they shouldn't be

23   entitled to belatedly supplement.  They should have scheduled

24   these depositions earlier.  Now if you're going to let them

25   supplement, then we need to supplement, too."  I absolutely
```

1  respect what you're saying, judge, but I believe if you order

2  the parties to sit down and come back --

3        THE COURT:  I hope you respect what I'm saying.

4  Some of us have been called "so-called judges" here recently

5  and there's been some concern about our branch of the

6  government.  And I appreciate your respect there, but trying

7  to move this -- unless there's an agreement among the parties

8  to move this and that your calendars are flexible in the next

9  couple of years to set aside a month for each of these trials,

10 then I'm not -- I'm not really inclined to do that.  I've

11 already blocked out my calendars for these periods of time.

12 Other trials have been set on my calendar.  So it's just going

13 to be difficult to do.

14        MS. PIERSON:  If Your Honor is not inclined to do

15 that, I think there are couple of things that we would ask of

16 Your Honor then.  One is that plaintiffs are not entitled to

17 supplement their expert reports.  Once we get the reports,

18 whatever date that is, that's the date that the expert

19 opinions are closed.

20        THE COURT:  I don't have any problem with that

21 either.

22        MS. PIERSON:  The other thing that we'd ask Your

23 Honor is that when we get back together again, I think a month

24 from now, we'll have a much clearer picture of where we are on

25 the discovery.  My belief right now, based on the depositions

```
1   that have been taken, is that Gage is farther along than the

2   Hill case is at this point and it may be more appropriate to

3   try the Gage case than the Hill case in October.  But I think

4   we --

5           THE COURT:  I've got time blocked out.  If you guys

6   want to agree to try one before the other, I have no problem.

7           MS. PIERSON:  Well, I think we'll know a lot more on

8   that point within the next 30 days.

9           THE COURT:  I'm going to try to work with you and

10  help you get this case or these cases ready for trial.  But in

11  terms of moving things around on my schedule on various

12  occasions, I'm just not -- I'm not inclined to do that.

13          MS. PIERSON:  So long as there's no supplementation

14  of the expert opinions, then I think that may be workable.

15          THE COURT:  There's no -- there would be no

16  supplementation unless somebody gives me a pretty darn good

17  reason that it needs to be done.  You've got to cut this off

18  at some time and just try the case.

19          MS. PIERSON:  Understood.

20          THE COURT:  Anything else, Mr. Williams,

21  Mr. Matthews?

22          MS. PIERSON:  I'm sorry, Your Honor.  Just one thing

23  Mr. King is reminding me.  If you're extending the plaintiffs'

24  expert deadline 30 days, we'd ask that you'd extend ours as

25  well 30 days.
```

```
 1              THE COURT:  Any position on that?

 2              MR. MATTHEWS:  No objection to that.

 3              THE COURT:  Seems to be reasonable to me.

 4              MR. MATTHEWS:  Yes.

 5              MR. WILLIAMS:  Sure.

 6              THE COURT:  So we can do that as well.

 7              MS. PIERSON:  Your Honor, that will affect the

 8  summary judgment deadline, too, as well.  That deadline will

 9  need to be extended 30 days as well.  We can confer and come

10  up with a schedule that adjusts these deadlines but it will

11  have that effect.

12              THE COURT:  Work it out leading up to a trial in

13  October.

14              MR. KING:  Understood.

15              THE COURT:  Anything else today?

16              MR. WILLIAMS:  Your Honor -- do you want to

17  address --

18              MR. MATTHEWS:  David Matthews, Your Honor.

19              THE COURT:  Sure.  How are you?

20              MR. MATTHEWS:  Good.  Thank you.

21              THE COURT:  Good.

22              MR. MATTHEWS:  There was an item on the agenda,

23  communication regarding coordination with state courts;

24  Ashcraft, Kuhn and Ellingsen.

25              THE COURT:  Yes.
```

```
 1          MR. MATTHEWS:  I will tell the judge that most of
 2   those cases are mine in state courts and I'm not sure exactly
 3   what the defendants want.  I mean, in local courts, as you
 4   know being a state court judge at one point, they have their
 5   own schedules.  They have their own sometimes state court
 6   demands and local rules that require trials.
 7          THE COURT:  I think I've said before I'm not
 8   inclined to interfere with the state court judge's docket.
 9          MR. MATTHEWS:  I really don't have anything else to
10   say about that.  It was on the agenda.  I thought we'd address
11   it if the Court wants to talk about it.
12          THE COURT:  I know other MDL's have done that but
13   I'm, at this point, not inclined to do that.  Ms. Pierson.
14          MS. PIERSON:  Thanks, Your Honor.  This issue
15   largely resolved itself.  You may recall that the parties sent
16   to you a proposed coordination order with respect to one
17   particular case in Nevada.
18          THE COURT:  Nevada.
19          MS. PIERSON:  During the time -- between when we
20   sent that a few days later, there was, in fact, a status
21   conference where the issue was discussed; and the commissioner
22   there, Commissioner Bulla, issued a schedule that now tails
23   the MDL trial so that they can take advantage of things here.
24   So that issue resolved itself.
25          THE COURT:  Great.
```

1    MS. PIERSON:  There are two other cases we noted on

2  the agenda --

3    THE COURT:  I think on the state court cases, if you

4  inform the state court judge that the MDL is going on, there's

5  1500 cases involved in the MDL, a lot of work has been going

6  on, the state court judge is going to say, "Well, you guys

7  want me to coordinate with that?  We'll be more than happy to

8  do that."  I can't believe a judge wouldn't do that.  I just

9  don't want to write a letter to a state court judge that I

10  don't know -- I mean, if it was an Indiana state court judge,

11  I'd probably just pick up the phone and say, "What do you

12  think?"  Since I know him or her.  But I'm not inclined to do

13  that to someone else.

14    MS. PIERSON:  Understood.  We noted two other cases,

15  Ashcraft and Kuhn.  Ashcraft is Judge Dreyer.

16    THE COURT:  Okay.

17    MS. PIERSON:  It currently has a trial setting that,

18  I think, is actually identical to yours or pretty close to

19  identical.  We've got a pretrial conference with him in a

20  couple weeks and we think that was just a clerk's issuance of

21  a trial date that we can work out; but we noted that case on

22  the agenda only because it's possible we may write to you

23  between this status conference and the next status conference

24  and ask you to do just that, pick up the phone and call him.

25    THE COURT:  I'd be happy to do that.

```
 1              MS. PIERSON:  I think that will resolve itself.
 2   We'll see how it goes on the 20th.
 3              THE COURT:  Okay.  Very good.
 4              MS. PIERSON:  That's all we have for today, Your
 5   Honor, unless you have anything else.
 6              THE COURT:  Tina, do we have anything else that we
 7   need to talk to counsel about?
 8              THE CLERK:  I don't believe so.
 9              THE COURT:  Anything else from plaintiffs' counsel?
10              MR. MATTHEWS:  Nothing from plaintiffs.
11              THE COURT:  Anything else from defense?
12              MS. PIERSON:  No, Your Honor.  Thank you.
13              THE COURT:  I know you're working really hard and
14   there's a lot of -- a lot of discovery.  There's a lot of
15   production here.  There's a lot of things that need to be
16   addressed by counsel and as I said, I understand that; but I
17   really -- I think it would be really detrimental to moving
18   these things along if we start going back and trying to find
19   new trial dates on these things.  So you're just going to have
20   to work among yourselves.
21              If you need to modify some dates, try to come to an
22   agreement on that.  I think both of us -- both parties want to
23   make sure that we keep that trial date in October, and we're
24   certainly going to try our best to do that.
25              So if you can resolve some of these issues on your
```

1    own -- and I know you've done a lot of that so far and Judge

2    Baker has told me you've done that so far as well -- continue

3    to do that with the understanding that the Court is not going

4    to move the trial date of October.  Okay?

5              MR. KING:  Understood.

6              THE COURT:  Great.  Thank you.

7              MR. WILLIAMS:  Thank you, Your Honor.

8              MR. KING:  Thank you, Your Honor.

9              THE CLERK:  All rise.

10             (Proceedings concluded at 10:56 a.m.)

11   *********************************************************

12                   CERTIFICATE OF COURT REPORTER

13

14       I, Margaret A. Techert, hereby certify that the

15   foregoing is a true and correct transcript from

16   reported proceedings in the above-entitled matter.

17

18

19

20   /S/ Margaret A. Techert                  **February 16, 2017**
     MARGARET A. TECHERT
21   Official Court Reporter
     Southern District of Indiana
22   Evansville Division

23

24

25