UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,     )
IVC FILTERS MARKETING, SALES   ) Cause No.
PRACTICES AND LIABILITY,       ) 1:14-ML-2570- RLY-TAB
LITIGATION                    ) Indianapolis, Indiana
                           ) **November 10,** 2016
                           ) 10:00 a.m.
                           )



**Before the Honorable**
**RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
STATUS CONFERENCE




**For Plaintiffs:**                David P. Matthews, Esq.
                              MATTHEWS & ASSOCIATES
                              2905 Sackett Street
                              Houston, TX  77098


                              Ben C. Martin, Esq.
                              LAW OFFICES OF BEN C. MARTIN
                              3710 Rawlins Street, Suite 1230
                              Dallas, TX  75219


                              Joseph N. Williams, Esq.
                              RILEY WILLIAMS & PIATT, LLC
                              301 Massachusetts Avenue
                              Indianapolis, IN  46204

**For Defendants:**                        Douglas B. King, Esq.
                                           James McGinnis Boyers, Esq.
                                           WOODEN & MCLAUGHLIN LLP
                                           One Indiana Square, Suite 1800
                                           Indianapolis, IN  4204


                                           Andrea Roberts Pierson, Esq.
                                           John T. Schlafer, Esq.
                                           FAEGRE BAKER DANIELS LLP
                                           300 N. Meridian St., Suite 2700
                                           Indianapolis, IN  46204


Court Reporter:                            Margaret A. Techert
                                           United States District Court
                                           101 NW Martin Luther King Blvd.
                                           Evansville, Indiana  47708


                    PROCEEDINGS TAKEN BY MACHINE SHORTHAND
              TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

```
 1                          (In open court.)

 2              THE CLERK:  All rise.  United States District Court

 3   for the Southern District of Indiana is now in session

 4   pursuant to adjournment.  The Honorable Richard L. Young

 5   presiding.  Court is in session.  Please be seated.

 6              THE COURT:  Good morning.

 7              MR. KING:  Good morning, Your Honor.

 8              MR. MARTIN:  Good morning.

 9              THE COURT:  We're here today in the matter of Cook

10   Medical, Inc., IVC Sales Practices and Products Liability

11   Litigation.  This is MDL-2570.  This is our monthly or

12   periodic status conference.  Ben Martin is here; Joe Williams,

13   David Matthews on behalf of the plaintiffs.  Doug King, Andrea

14   Pierson, John Schaefer and Tim Boyers are here on behalf of

15   Cook.

16              And there's been an agenda filed and I see

17   deposition protocol deadlines for Bellwether matters, report

18   on the status of MDL and discovery, close of company

19   discovery, and request to appoint PSE discovery liaisons.  If

20   there's anything else, we can address that as well.  Who wants

21   to start off and give me an update?  Andrea?

22              MS. PIERSON:  Yes, Your Honor.  Thank you.  Good

23   morning.

24              THE COURT:  Good morning.

25              MS. PIERSON:  Your Honor, the first agenda item was
```

1   the deposition protocol but there's really nothing to be done

2   on that topic this morning.  We submitted to Judge -- we

3   submitted to the Court a protocol for how Bellwether

4   depositions should be handled; and as you might imagine,

5   they're a little different than an ordinary case.  So the

6   parties worked together to develop a protocol for handling

7   those; and ultimately Judge Baker took up the issue and issued

8   a protocol that we'll be following for the depositions to

9   come.

10          So in terms of sort of where we are, we received

11  that order from Judge Baker, I believe, about a week ago, week

12  and a half ago.  Something like that.  So we're in the process

13  now of starting to schedule some of the depositions in the

14  Hill and Gage cases.

15          So that's how -- nothing for Your Honor to do.

16          THE COURT:  That's fine with me.

17          MS. PIERSON:  The second point on the agenda, Your

18  Honor, was the deadlines for Bellwether matters; and Your

19  Honor may recall that you issued two orders last month.  One

20  set the order of cases.  That the Hill case would go first,

21  the Gage case the second, and the Brand case third.  Then

22  there was a separate order that Your Honor entered that said

23  that the Hill and Gage cases would be worked up simultaneously

24  for trial in October of 2017.  The Brand case would be worked

25  up for trial in April of 2018.

1          That order indicated that there would be a schedule

2    forthcoming and we haven't received any sort of schedule from

3    Your Honor.  We wondered would it be helpful if the parties

4    got together and put together a schedule for deadlines in

5    those cases for your consideration or is there an order in the

6    works?

7          THE COURT:  Sure.  That's -- if you want to sit down

8    and try to work something up that works with all of your

9    schedules, I'd be happy to do that.  Mr. Martin?

10          MS. PIERSON:  We previously had agreed to a schedule

11    which we submitted to Your Honor.  The only disagreement

12    previously was whether the deadlines should be staggered or

13    not.  We'd agreed to spacing on those.  It will be a pretty

14    simple matter for the parties to put together --

15          THE COURT:  Okay.

16          MS. PIERSON:  -- for Your Honor and we'll go ahead

17    and do that.

18          THE COURT:  Okay.

19          MS. PIERSON:  The only thing, I think, we need in

20    addition to that from you, Your Honor, then would be a date

21    for the third Bellwether trial, assuming that neither Hill nor

22    Gage's is dismissed for any reason.  If both of those cases

23    stay on track, given Your Honor's order that Gage would go

24    second, our assumption is that Gage would substitute into the

25    April 2018 slot.  So then we'd need a date after that for the

1    Brand case.

2           We don't need deadlines for the third case because

3    we'll be working up Hill and Gage simultaneously but I do

4    think it would be helpful for planning purposes if we knew

5    what to hold.  Your Honor, spacing between the first and

6    second trial, according to your order, is really four months

7    from the conclusion of the first trial to the second trial.

8    Our view is that's appropriate between the second and the

9    third trial as well.

10          THE COURT:  Okay.

11          MS. PIERSON:  Which would put the third trial in

12   October of 2018, by my calculation.  So if that works for Your

13   Honor's schedule, if you can give us a day, we'll all plan on

14   that.

15          THE COURT:  Okay.  Mr. Martin?

16          MR. MARTIN:  Yes, Your Honor.  If I may just speak

17   from here?

18          THE COURT:  Sure.

19          MR. MARTIN:  My understanding, Your Honor, of the

20   Court's order and our understanding, after having discussion

21   amongst us, is that the Court's order on the scheduled trials

22   clearly states that on October the 2nd, the Hill case is to be

23   tried and the same date was given for the Gage case.  Those

24   are the first two picks, and I believe that the Court's -- the

25   background of that was that the Court did not want to have --

```
 1    the Court wanted a trial that day.  In other words, if Hill

 2    went away for whatever reason --

 3                THE COURT:  That's correct.

 4                MR. MARTIN:  -- then we had Gage.

 5                THE COURT:  I don't want to the have a three or

 6    four-week block in my calendar that nothing is set.  That will

 7    throw me off for a couple years.

 8                MR. MARTIN:  Absolutely.  So the Court may recall

 9    also that -- I believe that the Court very clear had ordered

10    that the Brand case was going to be tried in April, which is a

11    full six months after the first case would be tried.  And then

12    it was our understanding that if Hill got tried, Gage would be

13    next, and then Brand has been given a trial date of April of

14    2018.

15                THE COURT:  2018.

16                MR. MARTIN:  So we are -- we would disagree

17    respectfully with counsel that somehow Brand's trial date is

18    not as the Court previously entered it and that is April 2018.

19    We're coming up on two years starting trial -- take a year to

20    start the first one and so that's our take on the Court's

21    order.

22                MS. PIERSON:  If I may approach, Your Honor.  I

23    don't think we're disagreeing at all.

24                THE COURT:  Okay.

25                MS. PIERSON:  Here are two orders -- copies of your
```

1   orders.  You set trial ready dates for Hill and Gage as

2   October 2017 and a trial ready date for Brand as April of

3   2018.  You issued a second order saying that Gage would be the

4   second case.  So we will be working these cases up under the

5   assumption that either Hill or Gage will be tried in October

6   of 2017.  There's going to come a point in time if both cases

7   are still viable, that we have to say, "Okay, which case is

8   going?"  And then when will the Gage case -- the Gage case

9   subs into April of 2018, then what does that do to the Brand

10  case?  When will it be scheduled?

11          We don't have to make that decision today about when

12  Brand is set, although understood from an earlier conversation

13  with Mr. Martin that both sides thought it would be helpful to

14  know we were holding October 2018 for the third trial setting

15  if all three cases remain viable.  If that's a source of

16  substantial contention, we don't have to have a third trial

17  date.  It can remain open until we get to spring of 2017.  We

18  can make the decision then.

19          In the meantime, we'll come up with an order that

20  sets out the deadlines that the parties previously had agreed

21  to conform to Your Honor's schedule that are in those two

22  orders.

23          THE COURT:  Yes.  If Hill is tried in October '17

24  and we try Gage in April and Brand September, October,

25  whatever, of '18; but if some reason Hill goes away, then

```
 1   Gage, of course, will be tried in October, if possible.  And
 2   the parties would be ready, we could move Brand up as well.
 3   So I mean, I can be a little flexible here.
 4            But I hope you can understand, I just want to make
 5   sure that in talking to some of my MDL colleagues from around
 6   the country, some of these trial schedules disappear rather
 7   quickly as trial approaches and they're left with a big hole
 8   in their calendars.
 9            MS. PIERSON:  Yes.
10            THE COURT:  So I kind of want to avoid that, if
11   possible.  And I know these cases require a lot of work-up and
12   a lot of pressure and a lot of long hours on counsel as well.
13   But you signed up for this.  So we'll try to move it along as
14   best and as quickly as we possibly can, understanding the
15   burdens that both sides are under in trying to get it to go to
16   trial.
17            MS. PIERSON:  Understood, Your Honor.
18            THE COURT:  Hold on.  Mr. Williams?
19            MR. WILLIAMS:  Before we leave the topic, Your
20   Honor, I just wanted -- I think there's a little bit of a
21   disconnect on what the plaintiffs are looking for here.  Since
22   both Gage and Hill will be worked up for the October 2 trial
23   date, if that October 2 trial date goes forward with the Hill
24   case, meaning that the Gage case is ready, it's worked up, we
25   already have a trial date per your order for the Brand case,
```

1  which is the third case in April, I don't really see a reason

2  if Hill goes in October 2 and Gage is already worked up, that

3  we shouldn't try to try Gage early 2018, sometime in January,

4  since the case will already be worked up.

5         I mean, if we push -- if we wait and try Gage until

6  April and we try Brand then in August, September, October, I

7  mean, we're putting in a substantial amount of delay.  Both of

8  these cases are worked up simultaneously.  There really

9  shouldn't be a reason that we couldn't then try Gage just a

10  few months later in January and have the first three

11  Bellwether's completed before we even hit summer of next year,

12  which will put us in a much better position to evaluate the

13  MDL at that point.

14         MS. PIERSON:  Respectfully, Your Honor, that would

15  be contrary to the orders that you've already entered; and in

16  terms we've talked before about the time and energy it will

17  take on behalf of the Court, on behalf of the attorneys, on

18  behalf of the company and company witnesses, and on behalf of

19  the numerous experts that will be present in these cases.

20  Frankly, it's just not possible to have Bellwether trials,

21  particularly the first two trials, spaced the way Mr. Williams

22  suggests.  Logistically we couldn't make that happen, if we

23  wanted it to happen, given the number of witnesses and the

24  complexity of the specialties that they have.

25         These are not people who have nothing to do but

 1   testify in litigation.  Rather, they're experts and company

 2   witnesses whose schedules are booked many, many months in

 3   advance.  In addition, the time that will be dedicated by you

 4   and your staff in trying the cases, you and your staff will be

 5   fully occupied both -- not just during the month of trial but

 6   at least the 30 to 60 days before that in motions practice,

 7   deciding motions, considering deposition designations.  It is

 8   a very intensive process.

 9          So unless Your Honor, the company, our law firms

10   were all prepared to do nothing but this case for a block of

11   time that's a year long, it just -- it's not feasible,

12   frankly; and even if we wanted to, it wouldn't be feasible for

13   the witnesses.  The spacing that Your Honor has already

14   entered, four months, is tight.  If you look at other

15   schedules in other MDL's, you'll see that between the first

16   and second trial, that is a very tight setting.  So we'll be

17   pushing hard to get two cases ready in that span of time.

18          THE COURT:  Okay.

19          MR. MATTHEWS:  May I?

20          THE COURT:  Mr. Matthews.

21          MR. MATTHEWS:  Respectfully, Your Honor, I might

22   disagree.  To the extent the largest MDL, to my knowledge, was

23   mesh -- trans vaginal mesh that Judge Goodman had down in West

24   Virginia, I personally tried four cases in a year.  So I think

25   it's important to know that these experts are ready and will

1  be the same experts that can move right into the next case.

2  If we want to truly move this litigation forward -- and I

3  think we all do -- I don't know of a better way.  In fact, I

4  think it's the only way to move the litigation and that, in

5  fact, did move that litigation when we tried cases regularly.

6  A six-month gap, with the number of cases we have pending in

7  this Court -- and there probably will be more -- is simply not

8  something that's going to move the ball.

9         We will be ready.  This is a couple of very large

10 law firms on the other side.  We have law firms that are

11 ready.  We have trial teams ready to go.  And respectfully, I

12 completely disagree with the fact that we can't be ready from

13 a trial in October and then one in January.  And we are able,

14 these firms are able and capable of doing that and we would

15 request that.

16        THE COURT:  All right.  I previously entered orders

17 here establishing how we're going to try these cases and I'm

18 not inclined to change that at this time.

19        MS. PIERSON:  Thank you, Your Honor.  The third item

20 on the agenda is just a quick update on the status of the MDL

21 and on discovery.  I put on the PowerPoint in front of you,

22 Your Honor, just a couple of slides to update you on where we

23 are.  John, can you turn to the next slide?  Nothing

24 significant -- no significant changes in the MDL to report.

25 Not responding?

```
 1            MR. SCHLAFER:  No.

 2            MS. PIERSON:  Sometimes technology has to catch up

 3   to me but it's rare.  In the filter cases, Your Honor, just so

 4   you know what the landscape looks like in this MDL and beyond

 5   the MDL.  It's very similar to what I reported to you a couple

 6   of months ago.  Certainly the number of plaintiffs in the MDL

 7   before Your Honor has increased.  We're at about 1100 right

 8   now.  The number of plaintiffs in state court cases has

 9   remained pretty much the same and then there are plaintiffs in

10   a few other federal courts.

11            No significant changes though in the landscape

12   beyond the increasing number of cases that are in this MDL and

13   the number of filings per month, as Your Honor's probably

14   noticed, has remained pretty constant over the last three to

15   four months.

16            So then if we can turn to the next slide.  In terms

17   of the product type and what the division looks like today.

18   Your Honor made some mention of this in the order setting the

19   Gage cases.  This is the second case for trial.  Among the

20   cases that are in the MDL, the division between Tulip and

21   Celect is sort of inching closer to that 50/50 mark.  We're at

22   about 44, 45 percent Tulip and 53 percent or so Celect.  There

23   are some kind of one-off cases in the platinum and birds nest

24   buckets.

25            Then there are a number of these in the unknown --
```

1    small number of cases in the unknown, where the plaintiff

2    doesn't know what product they have and we don't yet have

3    medical records that tell us what product they have.  But I

4    think the key take-away here is that the division between

5    Tulip and Celect is pretty close to even.  A little bit

6    weighted to Celect over Tulip.

7            Then the last point that I'd make, Your Honor, as we

8    discussed last time, the plaintiffs provide to Cook a

9    plaintiff profile form, a plaintiff fact sheet; and there are

10   certain boxes they can check for the alleged malfunction of

11   the product.  In addition to that, we received -- according to

12   CMO 13, the plaintiffs send to us their statement of what

13   injury they allege or what bucket they checked, essentially,

14   as well as the medical records that show that, in fact, they

15   had that malfunction, whatever it is, migration or

16   perforation.

17           Our analysis of those records is very consistent

18   with the discussion that we had with you two months ago.  It

19   continues to be that perforation, migration, and an allegation

20   of unable to retrieve the filter are the top three injuries in

21   those buckets.  One thing that the CMO 13 responses are making

22   clear to us, too, is that there's a contingent of cases where

23   there's an allegation of malfunction; but at least to date,

24   the medical evidence doesn't prove that, in fact, that

25   malfunction occurred.  That bucket makes up about ten to

1   15 percent of the cases where we have CMO 13 responses so far.

2          As Your Honor may or may not know, we've had a pause

3   in the exchange of profile forms and CMO 13 responses due to

4   this heavy influx of cases over the last few months, while the

5   parties have been working with Judge Baker to come up with a

6   form that's really more streamlined and gets at the

7   information that the parties both need early on in the

8   litigation.

9          So our analysis of the CMO 13 responses and the like

10  is a little bit delayed.  I'd say we're missing those forms in

11  a few hundred cases now.  So I expect we'll have better --

12          THE COURT:  Have you agreed on a timetable for those

13  yet?

14          MS. PIERSON:  Yes.  Mr. Boyers and I think Matt

15  Schultz have been working diligently on the plaintiffs' side

16  to work with Judge Baker to identify a streamlined form.  I'm

17  not sure what the timetable is but this segues very nicely

18  into Mr. Boyers' report on the status of discovery.  So why

19  don't I step down and let him update you on where we are on

20  that issue and other discovery issues.

21          THE COURT:  Sure.

22          MR. BOYERS:  Your Honor, Doug King and I will cover

23  the status of discovery but specific to the issue that Andrea

24  just raised, the Magistrate Baker's ruled on what forms are

25  appropriate; and Matt Schultz and I are in the process of

```
 1   negotiating over proposed amendments to CMO 4 to set a time

 2   line going forward.

 3           We are obligated to submit a joint submission to

 4   Magistrate Baker Monday morning.  So I expect we're going to

 5   narrow issues and should have something in place very soon.

 6           THE COURT:  Very good.  Thank you.  Any comment from

 7   plaintiffs on that?

 8           MR. MARTIN:  No, Your Honor.  I think it's been set

 9   out by Mr. Boyers that we are working with them.

10           THE COURT:  Very good.

11           MR. KING:  Your Honor, if I may in terms of the

12   agenda item and general status of discovery.  I've got a

13   handout, if I may approach -- and I've got copies for the

14   plaintiffs' counsel as well.  This is basically just an update

15   of what we did the last time, Your Honor.  This is letting you

16   know where we are.

17           THE COURT:  All right.

18           MR. KING:  There's been a few changes; and I want to

19   call to the Court's attention briefly under Section 1B, we

20   have produced -- we've listed by count the number of documents

21   and so forth.  I wanted to explain one thing about that, Your

22   Honor, because plaintiffs, in some of the things they've

23   submitted to the Court, constantly compare us with the Bard

24   MDL, for example, and say, "Hey, you've produced fewer

25   documents than Bard," etcetera, as if this is important.
```

1        The 963,708 pages, that's -- we get that number by

2  the Bates stamp; but the Bates stamp is not really an accurate

3  way to show the pages because when we produce something in

4  native format, which we're obliged to do under the Court's ESI

5  order, then we are producing documents -- we might produce a

6  thousand-page Excel spreadsheet under one Bates stamp number.

7  So in other words -- and I've seen, for example, some of these

8  deposition exhibits, 30 and 40-page PowerPoint presentations,

9  if you've got one slide per page.  But when they're produced

10 in native format, it's one Bates stamp number.

11        So my point is, there's a lot more than that

12 documents.  It's probably well over a million pages, if you

13 were to print them all out in single page format.  But of

14 course, we're not really doing that because that's not what

15 the Court has ordered.  So I just wanted to clarify that.

16        Originally, dropping down to No. 4 on that Section

17 B, originally the Magistrate Judge Baker said we were only

18 obliged to produce 25 custodian files.  And we had already

19 produced 26 by their count, 29 by our count.  And if you drop

20 down to the last item on this page, Your Honor, the plaintiffs

21 had at one point awhile ago -- we had a conference call last

22 Friday afternoon with Magistrate Judge Baker.  The plaintiffs

23 had requested more than the 20 depositions he had permitted

24 under case management order No. 2, the deposition protocol;

25 and they had requested more custodian files than the 25 he had

```
 1   allowed, even though, of course, we had already produced more
 2   than that anyhow.  And Judge Baker gave them six more
 3   depositions and six more custodian files, and that's item No.
 4   3 there.  So we are -- we have a 19th and 20th deposition.
 5   Jim Gardner we've agreed will be 19.  Rob Lyles is going to be
 6   20.  I'm waiting for proposals for them for when they want to
 7   talk to these guys.
 8           The order that Judge Baker entered on Friday, there
 9   are six more company depositions plus six custodian files.
10   We're awaiting them to let us know who those people are that
11   they want to depose and what custodian files they want to be
12   produced.
13           Which leads me to another point, Your Honor and that
14   is that --
15           THE COURT:  When do you expect that?
16           MR. KING:  What?
17           THE COURT:  For them to let you know those.
18           MR. KING:  I don't know.  The better question would
19   be for them.  I don't know.
20           MR. MARTIN:  Sure.  One of the -- one of the
21   problems, Your Honor, is that because of the rolling discovery
22   and one of the reasons we asked Judge Baker for additional
23   depositions -- we asked for more than we ultimately received
24   but we were given another six depositions and another few
25   custodian files, I believe.  Another six custodian files.
```

 1          One of the problems is, and the reason -- the reason

 2    these things have changed and we needed more depositions,

 3    additional custodian files, was as this rolling discovery over

 4    the past year, year and a half has come in, then we're

 5    seeing -- we're seeing people that we didn't know about that

 6    had -- that had knowledge of certain aspects that are very

 7    necessary components.

 8          If counsel -- if Cook needs us to give them, for any

 9    reason, the names of these folks in a more immediate fashion,

10    we can certainly look at that.  But I have told -- I told

11    Andrea yesterday, we are not -- we are not seeking these

12    depositions to -- these depositions do not have to be taken

13    prior to our naming our expert witnesses.  Not these global

14    depositions.

15          So I would like -- actually, we'd like a few weeks

16    to determine with custodian files, with the deponent's -- the

17    other six deponent's, we'd like a few weeks to do that because

18    there's not going to be a lot of pressure on us, anyway, for

19    Cook to give us all these in November or give us all these in

20    December.  In fact, as indicated, we've already told -- I've

21    already told Andrea, "Hey look, we don't have to have these

22    corporate depositions completed by the time of our expert

23    deadline in January."  So -- but I would suggest that we'll

24    certainly try to do it in short-order.  Certainly try to

25    within the next four weeks to certainly give -- give Cook

1  maybe the majority of the eight depositions that are upcoming.

2          I will say this.  That we are not necessarily, on

3  these two depositions, Jim Gardner and Rob Lyle's deposition,

4  we are not necessarily going to make those our two upcoming

5  depositions or the first depositions.  With the Court's order,

6  we're going to reevaluate, make a determination as to which of

7  the eight depositions, six custodian files that we'll be

8  asking for; and as soon as we can get that information to

9  Cook, we'll do so in short fashion.

10          MR. KING:  I don't have a problem with that, Your

11  Honor.  It's just that obviously until I know who he wants to

12  depose and what custodian files he needs, I have to talk to my

13  folks about them and we have to work out the schedule.  That's

14  all.

15          MR. MARTIN:  If they want to --

16          THE COURT:  If you can get those -- a majority of

17  those names to him within four weeks, that would be --

18          MR. MARTIN:  Certainly.  And I bet I beat that.  I

19  bet we beat that time frame, Your Honor.

20          MR. KING:  And Your Honor, this leads into something

21  else that I wanted to bring up to the Court's attention.  You

22  recall that when we were here last time, both Mr. Boyers and I

23  commented that we thought company discovery was close to being

24  done; and we didn't hear any argument from plaintiffs on that.

25  Now they want more discovery and I think -- I don't want to

1  revisit that.  Judge Baker's already ruled on what they're

2  going to get.  They asked for more than they got, as one might

3  expect.

4          But what we would really be interested in, Your

5  Honor, is some deadline that would be a close on fact

6  discovery, particularly fact discovery on Cook.  So that we

7  have a -- something that we can look forward to and tell our

8  clients, and also know that we can clear our decks to refer --

9  to go forward with the case specific discovery for the

10 Bellwether trials.

11         If you look at some of the other MDL's, Your Honor,

12 in the Bard MDL, for example, and the Syngenta MDL,

13 Incretin-Based Therapies, a number of these MDL's and I

14 suspect you may have learned this from talking to other

15 courts -- and I know Judge Goodwin, because I was heavily

16 involved in the MDL out there in West Virginia that involved

17 the Cook product, and he set close of fact discovery deadlines

18 to enable everybody to learn, to have an idea when is the

19 factual record of the company discovery closed so that you

20 know what the experts are going to be looking at.  It would

21 assist, I think, both sides and the Court if at some point we

22 have a firm deadline for when that company discovery is over.

23         Now, obviously since Mr. Martin has said they're not

24 really ready to identify these eight depositions they get, six

25 more than the 20 limit and the two that they still need, those

 1  eight and they're not ready to identify that, obviously we

 2  can't set a firm deadline today.  But what I would request the

 3  Court, if that once they're done with this round of discovery,

 4  that say -- you know, that be the end -- that be the close of

 5  discovery on the company and that's what we would propose.

 6         Because otherwise it seems like every deposition --

 7  as Your Honor knows, every deposition can lead to another

 8  deposition.  You always ask a witness and the witness says,

 9  "Well, so and so knows this.  I don't."  And then they want to

10  go depose that guy.  And we'd like to be able to tell our

11  clients and know for our own trial preparations, what's the

12  end of that discovery.

13         THE COURT:  I'm being informed here on case

14  management order No. 19 of October 17, for some reason it's

15  not on the docket and we have copies of it here for you.

16         MR. KING:  Okay.

17         THE COURT:  So this might help.  We've got close of

18  discovery - nonexpert on Paragraph 5 there.

19         MR. KING:  Okay.  Great.

20         THE COURT:  April 20, 2017, expert May 19.

21         MR. KING:  My argument must have been persuasive.

22  You granted it before I even finished it.

23         THE COURT:  For some reason it wasn't on the docket

24  and I don't know why but --

25         MR. KING:  That's great.  What's the date?

```
1              MS. PIERSON:  It's April.  But that deadline, Your
2    Honor, I think is a little different than what Mr. King is
3    asking for.  That's nonexpert discovery in the three
4    Bellwether cases.  And as Mr. King articulates, company
5    discovery has been going on against Cook for a year, year and
6    a half now.  We've responded to reams of written discovery.
7    We've produced many, many witnesses for deposition.
8              THE COURT:  Right.
9              MS. PIERSON:  It is time for us to turn the page on
10   that chapter and move to this discovery that's at issue in
11   your order, the Bellwether discovery.  So what would be most
12   helpful, as Mr. King articulates, if Your Honor would enter a
13   minute entry or order noting that the discovery that Judge
14   Baker has ordered us to do, we will do.  That that's the end
15   of company discovery.  So that we aren't doing this for years
16   at a time.
17             THE COURT:  I assumed that you were talking about
18   the Bellwethers.
19             MR. KING:  No.  I'm talking about the general
20   company discovery that they had been engaged in since, really,
21   April of 2015 is when they first deposed two 30(b)(6)
22   witnesses -- actually, January was the first one, a guy named
23   Mark Breedlove, who was offered up as a 30b(6) on organization
24   structure.  So they've been conducting company general
25   discovery for well over a year now, since January of 2015.
```

1  And what we'd like is -- we thought we were close to done.

2  That's what we told you last time we were here and they didn't

3  argue with us.

4          They went ahead and asked for more.  We argued with

5  Judge Baker -- we had a discussion with Judge Baker on Friday.

6  The judge gave them some of what they wanted.  All we're

7  asking, Your Honor, is when they're with that, that a minute

8  entry or order be entered indicating that's the end of the

9  company general discovery.  That's all we're asking.

10         THE COURT:  Okay.  Mr. Martin, any thoughts on that?

11         MR. MARTIN:  Yes, Your Honor.  There are several

12  thoughts.

13         THE COURT:  I mean, there has to come a time.

14         MR. MARTIN:  I'm sorry, Your Honor?

15         THE COURT:  There last to come a time to close this

16  off.

17         MR. MARTIN:  I agree.  Some things that the Court

18  has not been made aware of up to this point.  I would actually

19  like to know when it is that Cook will complete this rolling

20  discovery and give us all of the discovery that has been

21  requested; because right now, what Cook is asking for is no

22  limitation on when the documents, these hundreds of thousands

23  of documents, are going to be completed.  So what is really

24  being requested is that without any case specific discovery --

25  and I want to address that in a minute, Your Honor, if I may.

1  Without any case specific discovery, without finishing the

2  completion of giving us the documents, we are today, after

3  this -- after this hearing, going to be talking to Judge Baker

4  about things that we believe Cook has withheld and we need

5  very urgently.

6          So the situation is, we don't know when we're going

7  to get the documents that we have requested and requested and

8  demanded that we need for our expert witnesses, the deadline

9  of which is January the 16th.  Yet Cook wants us to give them

10  a deadline for when we want to complete corporate depositions

11  and there are only eight more.  It's a problem.  It's a

12  problem.

13          And if the Court would then look at what I'll impart

14  about the case specific, the Bellwether discovery.  Your

15  Honor, we've got three Bellwethers, as the Court knows.  We

16  have an October trial setting and that's 11 months off.  The

17  Court has entered an order that says we are to take sales reps

18  depositions and then take the implanting and treating

19  physician depositions and that is extremely important

20  discovery.  We cannot create -- our experts cannot create

21  reports without case specific discovery.  It's impossible.

22          THE COURT:  Sure.

23          MR. MARTIN:  It's now November the 10th.  We have --

24  we have for months been asking for things that have not been

25  provided.  For months we've been asking that they please give

1   us some exemplars so that our experts can do destructive

2   testing on them.  We've been asking for months for Cook to

3   provide us -- for over a month we have asked Cook to give us a

4   very simple protocol for sterilization and cleaning of the

5   filters so that we can get them to our experts to look at.

6   Now it's November.  We've got two months to get expert reports

7   performed.

8           We have zero case specific discovery.  We have asked

9   for it and we're still asking for it.  To this day we cannot

10  get Cook to give us dates for the depositions of sales reps.

11  Two sales reps we've asked for weeks ago.  So on the one hand,

12  I understand that at some point, yes, Your Honor, this

13  needs -- the corporate depositions, I know they want to finish

14  them; but we don't have the documents and we don't have case

15  specific discovery, and we're put in a real bind.  And those

16  are the things that we'll be talking to this afternoon -- or

17  this morning, I think, Your Honor, with Judge Baker.  And I

18  think -- I think that at that point we can get into some great

19  detail on what the problem is.

20          THE COURT:  The depositions for the sales rep for

21  the Bellwether cases?

22          MR. MARTIN:  Yes.  So because the Brand case has

23  been put on a different track, Cook is not going to give us

24  the deposition of the sales reps in Brand until we get some

25  sort of an order on what that discovery schedule is going to

 1   be in Brand.  I would suggest, Your Honor, that when the Court

 2   is looking at that, that there's really no reason not to be

 3   able to take some of these depositions so that we don't get

 4   into a bind that we are getting into at this point, not having

 5   case specific depositions.

 6          And yes, in one of the cases, unfortunately in the

 7   Gage case, tragically one of the sales reps -- the sales rep

 8   that we've been given the name of has passed away.  So the

 9   only -- the only case -- excuse me.  The only depositions of

10   the sales representatives in Hill, the first case to be tried,

11   are two sales reps that we have been told exist.  So that's

12   what we're waiting on at this point is to have some dates for

13   those depositions.  Then we can take the depositions of the

14   treating physicians and the implanting physicians and the

15   other case specific folks but we haven't taken one.  Not one.

16          MR. KING:  Your Honor, may I speak to this?

17          THE COURT:  Yes.  Mr. King?

18          MR. MARTIN:  First of all, with regard to the sales

19   representatives, I believe Ms. Pierson is working to schedule

20   those and I think we were waiting for the deposition protocol

21   to be entered.  Now that it's been entered, they can be

22   scheduled and they will be.  So we're not withholding sales

23   representatives from depositions.

24          With regard to --

25          THE COURT:  If those can be scheduled -- or dates to

1    be provided within two weeks.

2              MR. KING:  Sure.

3              MS. PIERSON:  Oh yes.  No problem.

4              MR. KING:  No problem.  But I wanted to comment on a

5    couple of things Mr. Martin has just said because I don't want

6    the Court to get a misimpression that we're withholding

7    things.  As an illustration, we received an email at 8:16 this

8    morning from Mr. Martin in which he said there's a bunch of

9    510k documents.  The Court will recall that when we get

10   permission from the FDA to market these filters, we have to

11   submit to them what is called a 510k submission; and it

12   basically outlines why we believe the device is substantially

13   similar to a predicate device and tests and a whole bunch of

14   stuff.

15              And we had given them, back in April, Lavender's

16   deposition in April of 2015, I believe it was.  We had

17   provided to them a docket that lists all the documents that

18   were in these 510k's.  Mr. Martin sent us an email this

19   morning saying, "We're missing a lot of the documents listed

20   on that docket that was provided to us back in April of 2015."

21   He sent us this email this morning.  And we've had people

22   scurrying around and we can provide them with a Bates stamp

23   number of every single document he claims was missing.  So my

24   point -- and they were all produced to them back in April of

25   2015 in connection with Ms. Lavender's deposition.

1          For him to suggest that we're withholding thousands

2     of documents isn't true.  It just is not true.  There's

3     millions that we've produced, as I talked about before, and I

4     don't expect every lawyer to know every document within that

5     millions of pages.  But my point is, we're not withholding

6     thousands of documents.

7          The other thing I think he's alluding to has to do

8     with some complaint files.  Back in April of 2015, we

9     identified which complaint files we were producing and we

10    produced reports that listed all of those complaints; and one

11    of the things I think we're going to be talking with

12    Magistrate Baker about, when we finish here, is how those

13    complaint files that we didn't produce, that we told them we

14    weren't producing, will be produced in the future, if that's

15    what the Court is inclined to do.

16         But the point is, we're not withholding thousands of

17    documents as he suggests.  We have been very cooperative in

18    discovery, Your Honor; and I certainly resent the implication

19    that he's making that we're withholding stuff and not allowing

20    them to conduct discovery.  We've been cooperating with their

21    general discovery since January of 2015.  Well over a year

22    now.  We've produced million of pages, 250 plus hours of

23    depositions, 18 corporate witnesses.  All we're asking for is

24    that when they get done with the run that Judge Baker told

25    them on Friday they can do, that that's it.  Thank you, Your

```
 1   Honor.
 2           THE COURT:  Well, I think we all understand that
 3   there's really, at the end of the day, no such thing as
 4   withholding documents.  If they're relevant, they're going to
 5   be ordered to be produced at some point in time anyway.  So we
 6   need to make sure that we continue on with the discovery
 7   practice that's been going on here, which, by my observation,
 8   has been very cordial and very professional so far.  So we
 9   need to continue on with that.  It's silly to try to withhold
10   a document that usually ends up turning up at some point in
11   time during the litigation and that's not good.
12           I'm not saying that anybody is withholding
13   documents.  This type of litigation is very complex and
14   voluminous documents and there may be some that are lost along
15   the way or misplaced along the way, and there may be some type
16   of thought that, "Well, that probably or maybe wasn't provided
17   to us," when it actually was.  So we need to do some
18   double-checking.
19           MR. MARTIN:  May I just clarify for a second, Your
20   Honor?
21           THE COURT:  Sure.
22           MR. MARTIN:  We're not really suggesting that
23   they're withholding documents that surreptitiously -- I don't
24   know what the word is.  That's not what we're saying.
25           THE COURT:  What does withholding mean then?
```

1            MR. MARTIN:  No.  Maybe withheld.  Withholding is --

2    okay.  I'll give an example, Your Honor.  Withholding

3    complaint files.  And we're going to talk to Judge Baker this

4    afternoon.  I think withholding those particular complaint

5    files for particular disorders is certainly the proper word.

6    But in general, what we're saying is that with rolling

7    discovery, there's still a ton of documents left to produce.

8    That was -- that is the main thing we have.  But we do have

9    some important issues on whether or not they're going to

10   produce complaint files that have been withheld and it's

11   probably -- complaint files are probably one of the most

12   important things in these cases is understanding what

13   complaints they had and when they had it, so the determination

14   can then have been made whether the product should have been

15   on the market.  And I promise the Court that that is a huge

16   issue.

17            THE COURT:  Those files are certainly discoverable,

18   I would think, aren't they, Mr. King?

19            MR. KING:  Yes, Your Honor.

20            MR. MARTIN:  That's what we said.

21            MR. KING:  We told them back in April of 2015, in

22   our written responses to their written discovery request, that

23   based on what we understood to be the complaint -- or the

24   failure mode at issue, we were producing complete complaint

25   files for failure modes of migration, fracture and

1  perforation.

2          We also at that very same time produced reports from

3  our complaint data bases because we have data bases that track

4  the complaints because the FDA requires us to investigate

5  every complaint and maintain a file on, as Mr. Williams has

6  reminded me recently.  And the -- those complaint files,

7  there's thousands of them literally, and we did not produce

8  all of the complaint files, even though we've told them in the

9  reports what all the complaint files were, because of -- we

10  felt that was overly broad and a lot of those complaints, for

11  example, are not of a clinical effect.  For example, one

12  complaint I read the other day says, "Okay.  The instruction

13  for use booklet wasn't in the box."  And that's the complaint.

14          Now, do we need to produce that complaint file to

15  them?  We told them we weren't producing those complaint files

16  to them, even though, again, we did produce a report that

17  shows what all those complaints are.

18          Now, we will produce, obviously, whatever the Court

19  tells us to produce.  And I think one of the things I plan to

20  talk with Judge Baker and plaintiffs' counsel about this

21  afternoon, we have some very detailed reports and the reports

22  explain what the complaints are.  And the plaintiffs do not

23  seem to trust us in terms of producing the complaint files

24  that they think are relevant.

25          So my suggestion to Magistrate Baker and to the

 1  Court would be, here's the detail complaint -- complaint

 2  reports that we produced to you back in 2015.  You tell us

 3  what you think you want and you deserve based on that report.

 4  Because that's exactly what we'd have to do.  And then they

 5  can tell us what they think they want; and if we think some of

 6  its irrelevant or overbroad, we can talk about it

 7  specifically.  But we don't have to talk about whether they

 8  withheld them all or all these complaints.  So that's my

 9  suggestion and I think that's something we can work out.

10          My point is too, Your Honor, we're now in November.

11  Mr. Martin told us that he's thinking we're going to get some

12  of these general corporate discovery depositions and custodian

13  files, that that's probably not even going to happen this

14  calendar year.  That it might be into 2017.  I'm not arguing

15  with that.  All I'm asking is that I would think by then --

16          Let's say we complete all these eight discovery

17  depositions that they want to take on general corporate

18  witnesses and those custodian files.  Let's say we complete it

19  by the end March of 2017.  I would think by then we'd have the

20  other issues that Mr. Martin alluded to, the explant cleaning

21  protocol, the exemplars, the complaint files.  I would think

22  we'd have all that resolved by then.  So all I'm asking again

23  is some sort of entry order from the Court when the discovery

24  that Judge Baker allowed them on Friday is completed, that is

25  the end of the general corporate discovery.

1          THE COURT:  Thank you.

2          MR. MARTIN:  Will we have the documents, Your Honor?

3   I mean, I don't know if counsel is saying that by that time,

4   we will have all of their documents, the rolling production.

5   It's not finished yet.  So I would suggest this, Your Honor.

6   I would suggest -- we could certainly live with once the

7   discovery has been completed, the documents have been

8   produced, that whatever -- and motions to compel that Judge

9   Baker rules, whether it's complaint files or any other files,

10  once we have those documents and we at that point can analyze

11  and review them in very short-order and while they're coming

12  in, we can review them.

13          And then at that point then we can have -- it would

14  make some sense at that point hey, that's when it stops.  When

15  we've got the documents, then we take the depositions,

16  whatever is left on the corporate depositions and absolutely

17  that makes sense.  And absolutely we would be agreeable to

18  that.

19          But right now we don't have all the documents.

20  Rolling discovery is still occurring and we're still arguing,

21  and Judge Baker is going to hear those arguments today about

22  very important matters that deal with -- very important

23  matters about the complaints and probably other matters.  So

24  yes, after we get the documents, let's have a -- let's have

25  the depositions.  Let's get them taken and be done with it.

1   We agree.

2          MR. KING:  Your Honor, if I may.  And I guess we

3   don't need to have the conversation in front of you but I

4   guess we are since you just asked.  You keep talking about

5   rolling production and there's still documents.  I know the

6   complaint files and the six custodian files.  What else is

7   there?

8          MR. MARTIN:  Doug, I can't tell you all of this.  I

9   can't set out right now -- because Judge Baker is handling

10  discovery issues, Your Honor, Mr. Matthews is handling some of

11  that.  I don't think -- I don't think we're prepared to

12  outline each and every issue in discovery that we're asking

13  for documents on; but there are documents that we need and

14  once we've got them, then let's get the depositions taken --

15  the corporate depositions and please, we would ask that we get

16  the case specific depositions going immediately.  And then we

17  can -- we have no reason to spread this out.  As Mr. Matthews

18  has indicated, we want to go to trial.

19          THE COURT:  Right.

20          MR. MARTIN:  We want the trial ASAP.

21          THE COURT:  I want to get this to trial as well.

22  But when can you get Mr. King a list of what's still

23  outstanding?

24          MR. MARTIN:  Well, we have -- we have a hearing

25  today on the complaint file.

```
 1              THE COURT:  Okay.

 2              MR. MARTIN:  We have --

 3              MR. KING:  That's an issue.

 4              MR. MARTIN:  We have given, whether -- whether

 5   it's -- we have a disagreement on whether or not we have all

 6   the 510k patients and I hope we can get that.  As the Court

 7   has indicated, with tons of documents, yeah, we've asked for

 8   some.  We don't think we've got them.  They've sometimes will

 9   show us where they are.  That's how we work together.

10              THE COURT:  Sure.

11              MR. MARTIN:  That's easy.  But at this point, the

12   main thing is getting the complaint files.  But that's a big,

13   big issue and it is a number of documents.  So would that be a

14   month from now?

15              MR. KING:  All I want to know, Ben, we're talking

16   about the complaint files.  We'll work that out with Judge

17   Baker this afternoon.  We've got six custodian files.  And I

18   can tell you, we'll give you the Bates numbers for the 510k

19   documents that we produced a year ago that you told us this

20   morning we didn't.  But what else is there?  That's all I want

21   to know.

22              MS. PIERSON:  Your Honor, may I interject just one

23   thing respectfully?  There are -- as I hear it, there are few

24   issues here.  One is the question of, for all the discovery

25   that's been done for the last year and a half, we're hearing
```

now about alleged deficiencies and things that were produced

and responded to a year and a half ago.  At some point there

has to be a date by which if you've got a problem with what

we've done, you raise it.  After that, we can't just keep

going back to the well over and over and over and over again

on things that happened a year and a half ago.

      And Your Honor's question about when can we get a

list of whatever those things are, I think is one, appropriate

deadline; and my view it would be fair for Your Honor to say

to the plaintiffs, to the extent that there's something that

you think you're missing, tell Cook that by December the 1st,

or whatever date Your Honor chooses.  That's one deadline that

could be very helpful to all of us.

      Another deadline that could be very helpful is

really not a date but Mr. King is asking and Cook is asking

you to issue an order that says consistent with Judge Baker's

ruling, that there would be a total of 26 depositions and six

additional custodian files; that whenever those are completed,

that is all of the discovery to be done, period.  There is no

no more.  There will be no more requests for depositions or

custodian files.

      We've been under the gun of this discovery on the

receiving end for a year and a half.  It is time to turn the

page on that so that we can really focus on working these

cases up for trial.  And as it stands on a daily basis,

there's some email message asking, "Where is this" or "Where is that," that causes our professionals to search and supply information to the plaintiff.

It's common in litigation for there to be disputes about things like exemplar production or deposition protocols. We'll handle that in the ordinary course. But there must be a time at which company discovery ends and we've reached that point. We told you, and the plaintiffs confirm in their briefing, that that point had happened two months ago. And then suddenly there was this request for additional deposition and custodian files.

But what we very much need from the Court are a couple of directives. One, when does all the complaining about what's happened in the past stop; and two, these depositions and custodian files are the end of company discovery.

THE COURT: Thank you. I assume for Magistrate Judge Baker to grant plaintiffs' request for additional discovery, I assume there was meritorious argument and compelling reasons to do that. So my thought would be that once these depositions are taken and those are finished, then it would be appropriate to establish a cut-off point, with the understanding that if there's an argument for compelling additional discovery, the Court would consider that, which is always the case but -- at least in my court. So I would think

1  that once this additional discovery is finished up, that a

2  cut-off point would be appropriate.

3          MR. MARTIN:  Absolutely, Your Honor.  And to make it

4  even -- maybe even more clear, if -- if Cook has certified or

5  is certifying that we have received all of the discovery that

6  has -- you know, that has --

7          THE COURT:  I'm assuming they have records of that

8  or they wouldn't represent that.

9          MR. MARTIN:  Then what we will do is within the next

10 14 days, we will provide Cook with a list of the things that

11 we believe we do not have and we will seek -- if necessary, we

12 will give them an opportunity to produce those.  And if we

13 disagree on what they have suggested or given us, then we'll

14 get a hearing with Judge Baker on all of the different motions

15 to compel; and I think we can be finished with this before the

16 end of the year or certainly -- and Your Honor, we have again

17 a deposition -- excuse me, a report deadline of January the

18 16th.  We want it badly.

19          I'm not -- I feel uncomfortable getting in sort of

20 a -- one of those matches that I won't use the word; but Your

21 Honor, we see -- we see on the part of Cook, over the last

22 several months, when we've asked for very simple things, the

23 exemplars and the cleaning protocol so we can get those things

24 to our experts, when we ask for sales reps depositions and

25 weeks go by and we don't get any dates, we think that -- I

1    just want to leave this with the Court.  That there is another

2    side to all this and the side that we're seeing is a bit of a

3    delay; and whether it's on purpose or whether it's on

4    accident, it's really giving us difficulties in getting our

5    experts the information that they need in order to do their

6    reports and that's our perspective.  Thank you.

7         THE COURT:  All right.  Well, you'll provide within

8    14 days, then, Cook with information regarding documents you

9    think that have been ordered to be produced and you have not

10   received or misplaced.  But in any event, if you misplaced

11   them and you can't find them, you need another copy, anyway.

12   So if you can do that within 14 days.

13        And then also we have the understanding that once

14   the additional discovery has been taken here, that we'll

15   have -- by agreement we'll have a cut-off point for further

16   Cook fact discovery.

17        MR. KING:  Thank you, Your Honor.

18        THE COURT:  With the understanding, of course, that

19   if something comes up that's compelling, we'll consider it.

20        MR. KING:  Your Honor, and in that regard, just so

21   there's no misimpression.  For example, when they deposed

22   Artimogard Nielsen (phonetic) about Dr. Gunther's clot

23   trapping study, they found that there was data -- underlying

24   data that they hadn't received that they wanted to go back and

25   look and see if it was there and we did so.  We didn't need a

 1 court order.  We didn't need any intervention of the Court.

 2 So in that kind of situation, we're going to do it.

 3          THE COURT:  Sure.

 4          MR. KING:  And we will continue to.

 5          THE COURT:  It's like I said earlier, eventually

 6 these documents are going to have to be produced anyway.  So

 7 let's just it get done.  And what about the exemplar?  Can we

 8 get that?

 9          MR. KING:  We wrote a letter to them about the

10 conditions under which we'd do that and he just wrote me a

11 letter back, and I haven't frankly had time to digest it.

12          MR. MARTIN:  That's something we can handle right

13 now, Your Honor.

14          THE COURT:  If I can do it, I'll be happy to.

15          MR. MARTIN:  If I may bring it up.  Very simple

16 matter.  The last thing I am is an engineer or an expert or

17 metallurgist but I can tell the Court this.

18          THE COURT:  That's why you went to law school.

19          MR. MARTIN:  I'm sorry?

20          THE COURT:  That's why you went to law school.

21          MR. MARTIN:  Yes, sir.  But what I do know, from the

22 people that are on our PSC who are engineers and who are

23 dealing with the engineering experts and the metallurgists and

24 those people who need these exemplars, what we've asked for is

25 ten Gunther Tulip filters and ten Celect filters.  We

1  anticipate that those filters will be used in destructive

2  testing by our experts who say that they need them.  And what

3  we have -- we've been asked several things; but one of the

4  things that we do not want to do and what Mr. King has asked

5  for, is they want to know exactly what testing we're going to

6  perform.  They want to know who our experts are that are going

7  to be performing the testing.

8          We don't think that that's appropriate and we really

9  don't feel as if we need to tell them what testing we're going

10  to perform on those filters.  That's part of attorney work

11  product.  That's part of what our experts are going to do.

12  Ultimately, if those experts are used, we will name the

13  experts and we probably will.  But at this point in time,

14  telling them who our possible consulting experts or possible

15  experts who are going to be testifying, it's not necessary for

16  them.

17          We just want -- we want ten filters of the Tulip and

18  we want ten filters of the Celect; and as I've indicated, I

19  got -- I have no reason to have filters hanging around that I

20  don't need.  They'll fit probably -- they'll fit in two

21  pockets.  But you know what?  I don't care to have anymore

22  than I need.  And I'm told that's what our experts need.  I

23  can tell you this through this litigation and other litigation

24  in IVC filters.  These things are not -- it's not an expensive

25  process to make these.

 1          There may be some disagreement but it's -- we can

 2    come to some agreement if they want us to pay for some of

 3    these filters.  But we don't want to make it a profit -- we

 4    don't want to make it a profit center for these folks.  We

 5    really just want to get these things tested.  And if the Court

 6    can't give us ten each, then however many the Court can give

 7    us.  We've got to get these to our experts.  We just have to.

 8    We're hamstrung.

 9          THE COURT:  I'm surprised you haven't done that

10    already.

11          MR. KING:  Your Honor, that's part of the point.

12    They already have four.  We've already provided them with some

13    filters.  They're asking for ten more.  It's not like we

14    haven't done this.  Before this litigation even got really

15    going and as an MDL, we gave Mr. De la Monte, who's a part of

16    the plaintiffs' executive group or whatever they call it, PEC,

17    and we just gave them to him and they've had them.  The

18    question is why they need ten more.

19          MS. PIERSON:  Twenty.

20          MR. KING:  They want 20 total.  And we already gave

21    them -- was it two of each?  Yeah, two of each.  We already

22    gave them two of each.  Now they want ten more of each.  So

23    they want 20 more.

24          MR. MARTIN:  In the discovery, what we have

25    determined is that Cook has done -- I wouldn't say much bench

 1  testing but they've done bench testing on their filters.  And

 2  every one of their bench tests, which is my understanding is

 3  the test that you do actually on the filters and destructive

 4  testing.  In every instance that I've seen, and that the

 5  people who have looked at this have seen, they use many more

 6  than ten filters in performing their testing.  And with

 7  respect to the two filters and two filters, the Tulips and the

 8  Celects that have been given to us, we expect that we're going

 9  to want to show the jury a filter.

10            THE COURT:  Oh sure.

11            MR. MARTIN:  Those four filters we weren't expecting

12  to be all we got for all of our testing.  I mean, we certainly

13  would want one apiece for that.  So in effect, we've got

14  another filter to do all our testing on.  Anyway, that would

15  be my response to that.

16            THE COURT:  I'm going to -- Andrea.

17            MS. PIERSON:  I apologize.  It's very common in a

18  medical device case for there to be exhibits that are

19  essentially shared exhibits.  And when these cases are tried,

20  we will have filters that are shared exhibits that are

21  available for the jury to see.  The plaintiffs will be able to

22  use them.  We'll be able to use them.  I think that's really a

23  different issue.

24            But as Mr. King articulated in his letter to the

25  plaintiffs, these are prescription medical devices.  They're

1   controlled substances.  So it's not as though even if we

2   wanted to, we could just send 20 to Ben Martin's office and

3   that would be that.  Even if that weren't an issue, 20's not a

4   reasonable number of these and we've asked repeatedly, "Well,

5   where are the four we already gave you?"  And we're getting no

6   response to that.

7           So there are a few issues that relate to this.

8   Frankly, we thought these were issues that we thought the

9   plaintiff would respond and if there was still some dispute,

10  we would be taking this up with Judge Baker because it does

11  seem to be a discovery dispute.  But the issues relate to

12  first, cost.  These are expensive products and they're

13  therapies for patients that would be used in patients but for

14  the plaintiffs' request.

15          The second issue is that they're available by

16  prescription.  So we've asked to be able to send them to

17  whomever their medical doctor is of their choosing for their

18  expert or their engineer.

19          Then there's the third issue of what happens to

20  these at the end.  I'm not in any way impugning --

21          THE COURT:  So if they're by prescription, how did

22  they get the four original ones without a prescription?

23          MS. PIERSON:  We thought Mr. De La Monte was a

24  doctor.  No.  I'm kidding.  I'm kidding.  They really should

25  not have been released to Mr. De La Monte without some sort of

1  a protocol for this.  And if we agree upon a protocol, then we

2  can.

3  The other issue, Your Honor, that I'll raise is that

4  again, I'm not impugning these lawyers in any way but because

5  these are medical products and they're controlled.  We need to

6  be certain that at the conclusion of the litigation, that we

7  get them back.  So that they're not in some way available out

8  there so that ten years down the line, somebody says, "Oh, you

9  sold me an adulterated product."  When, in fact, it was

10  something that was used in the litigation.  These are issues

11  that the parties ought to be able to work out.

12  THE COURT:  I'm assuming that just like in any other

13  expert testing, that records are made as to what happened to

14  the device or the product or whatever.  So I'm assuming some

15  of these just may be destroyed and not able to be returned and

16  that would be reflected in the testing documents, I'm

17  assuming.

18  MS. PIERSON:  And that's another way to deal with

19  it.  But what Mr. King has proposed is that we just talk about

20  a protocol for this.  Return or destruction at the conclusion

21  of the litigation, payment of the retail price for the

22  filters; and then let's agree on a number of exemplar filters

23  that bears some relation to the actual need.

24  And when we ask what's the actual need?  This

25  reference to the testing that we had to do for FDA purposes,

1  that's a -- that's a wholly different number.  We think

2  probably three is a reasonable number, based on our

3  conversations with our engineering experts, in light of the

4  fact that they already have two of each.  So they'd have five

5  of each total.  We think that's a reasonable number and we

6  think we need an agreement on a protocol or a stipulation for

7  payment of the filters and return of the filters at the

8  conclusion of the litigation.

9        It's not that complicated but we've not yet really

10  heard back from Mr. Martin on Mr. King's proposal that this is

11  the way we ought to go.

12        MR. MARTIN:  Your Honor, I must absolutely disagree

13  with my -- with the statement that was just made.  I have told

14  Mr. King exactly that those four filters that we have -- and I

15  think he'll fess up to it.  Those four filters that we have,

16  we would think that we ought to be able to, as Mr. King is

17  able to show the Court and has the little filter in his

18  pocket, we ought to be able to do the same thing with the

19  jury.

20        So we have two of those filters.  We have two Tulips

21  and we have two Celects.  And all I know is that our experts

22  have said they need ten.  They need ten each.  And that -- and

23  secondly, I have indicated that we are going to do destructive

24  testing.  I've indicated this in correspondence and I

25  indicated that we would give back anything that we don't use;

1   and anything that is left after destructive testing, if it --

2   if it makes a difference, I will absolutely -- we will

3   absolutely agree to basically any protocol that they put in

4   front of us so that we can get these things to the experts.

5             But Your Honor, it's been three months, maybe even

6   four months, since we asked for the exemplars; and not a

7   single time have they suggested that there's some protocol,

8   except you're not getting all you want and you need to tell us

9   who your expert is.  That's their protocol.

10             THE COURT:  All right.  I'm going to order Cook to

11   provide ten exemplars of the Tulip and ten of the Celect; and

12   plaintiffs will pay for that, which would be the cost to the

13   defendant.  Not the retail price of those.  And of course, any

14   destruction needs to be documented by the experts, which I

15   know is appropriate.  And then the parties need to get

16   together to discuss any further protocol regarding these

17   exemplars.

18             MR. KING:  Your Honor, may I ask for clarification?

19   I've explained to Mr. Anderson -- or to Mr. Martin --

20   different plaintiffs' lawyer, different MDL.  Mr. Martin.

21   That the Tulips and the Celects are no longer packaged the

22   same way they were back in the day that they were put in the

23   patients.  The filters themselves, the ones that I've shown

24   the Court on numerous occasions, remain the same.

25             MR. MARTIN:  Give me that one.

1          MR. KING:  My point is if they -- I just want to

2    make sure that when we give them these ten -- sell them these

3    ten, that I don't have have to go William Cook Europe and say,

4    "Go back and resurrect the packaging and the delivery system

5    that you had back in 2008."  That I can just give them off the

6    shelf.  Because the filters themselves remain the same.  It's

7    just the delivery system and the packaging.  We have a

8    NaviLine delivery system that's different; but that isn't an

9    issue in any of these cases, to my knowledge.

10         THE COURT:  I haven't heard that.  Mr. Matthews?

11         MR. MATTHEWS:  No, I don't think that is an issue.

12   But one issue is the actual IFU during the years that our

13   clients were implanted with these filters is a very big deal.

14   So we would request that if --

15         THE COURT:  I would assume you already have that.

16         MR. WILLIAMS:  Well, we do.  We certainly do.  But

17   if there something different from 2011, assuming that it's the

18   same one, I would like to see that in a package.  At least in

19   one of the packages that we have a --

20         MR. KING:  Sure.  Like when we brought -- all I'm

21   saying is that I don't want -- the order -- your order is

22   going to say -- your minute entry is going to say that we need

23   to provide them with ten, and we'll obviously do it.  But I

24   just --

25         THE COURT:  They're going to pay for them.

```
 1              MR. KING:  Right.  But we'll just provide them with

 2   what's now on the shelf and they don't have to go back and

 3   make new ones.

 4              THE COURT:  No.

 5              MR. KING:  That's all I want to make sure.

 6              MR. WILLIAMS:  Thank you.

 7              MS. PIERSON:  Your Honor, can your order reflect or

 8   can we get an agreement that at the conclusion of the

 9   litigation, they'll be returned to us or there's some kind of

10   certification that they've been destroyed by the expert?

11              THE COURT:  Absolutely.  Makes sense.  Okay.  We got

12   that resolved.

13              MR. MARTIN:  Thank you.

14              MS. PIERSON:  Was easy, right?

15              THE COURT:  Make sure to tell Judge Baker that I'm

16   doing some of the work for him.  Anything else we need to

17   discuss?

18              MR. MARTIN:  No, Your Honor.

19              THE COURT:  Go ahead.

20              MS. PIERSON:  Your Honor, the only other thing we

21   had on the agenda, Your Honor, was a request to appoint

22   discovery liaisons.

23              THE COURT:  Sure.

24              MS. PIERSON:  You may recall, Your Honor, that we

25   made this request a couple of months ago and it was --
```

```
 1            THE COURT:  All these assumptions that I recall

 2   things probably --

 3            MR. MARTIN:  Actually, we agree and I've indicated

 4   and Andrea may not have seen it this morning.  We'll agree --

 5   I'm being appointed by our group as the discovery liaison.  I

 6   will, of course, want an assistant.  I'm not doing all the

 7   discovery work but I will be the point person for the -- as

 8   the discovery liaison because I'd like to see everything that

 9   comes in anyway.

10            MS. PIERSON:  Do you know yet who the assistant will

11   be, Ben?

12            MR. MARTIN:  I suspect Matt Schultz and probably

13   Mark -- I think Matt Schultz and Mark Chavez --

14            MR. MATTHEWS:  Yes.

15            MR. MARTIN:  -- will help me and they certainly have

16   authority for anything discovery wise.  And I'll try to limit

17   any of the Court's (inaudible) that comes to you through me.

18            THE COURT:  But you'll be the go-to person?

19            MR. MARTIN:  Yes, Your Honor.

20            MS. PIERSON:  So maybe, Your Honor, just for our

21   record, if we could record those three names as the

22   plaintiffs' discovery liaison.  I think we've got some CMO

23   where we list out who the PSC is and maybe we'll do something

24   to make that more formal.

25            All of our discovery disputes have been handled
```

1  through Mr. King and Mr. Boyers and they'll continue to be

2  that way.  But it certainly would be helpful from our

3  perspective to have those communications a little more

4  streamlined.  And those are all the items that we have for you

5  today.  Thank you.

6        THE COURT:  Very good.  Considering the scope of

7  this litigation and the amount of materials that have been

8  produced and will be produced, my observation and comment

9  would be that I think you're doing a very professional job in

10  exchanging this and moving this litigation along.  Certainly

11  there's going to be bits and stops and glitches along the way

12  but that's to be expected in any type of complex litigation.

13        I do appreciate and I know Judge Baker appreciates,

14  too, that you're working together to try to solve as many of

15  these issues as you can without the Court's intervention; and

16  that's a sign of experienced litigators that you resolve a lot

17  of these issues yourselves.

18        We're always available to help you out when

19  necessary, and so I hope these trips that you're taking up

20  here -- coming up here, Ben, and whoever else is traveling,

21  that they're a worthwhile expenditure of time for you.  And I

22  mean, we can always, if necessary, do things by telephone or

23  video conference as well.  But if these trips up here allow

24  you to get a lot of work done, that's good, too, and the Court

25  is always willing to set aside time to help you out.

1          MR. MARTIN:  Your Honor, the Court has given us the

2     option of phone conferences with the Court on these days but

3     we find that -- we find this is very, very helpful.  And last

4     month we didn't need a status conference, so we didn't have

5     it.  But I think David and I and Mike, who's at that

6     deposition in Hill today, are very -- we think this was --

7     this was a good move to have these monthly status conferences

8     and we think it's best and more helpful if we're here.  Thank

9     you.

10          THE COURT:  Okay.  Andrea?

11          MS. PIERSON:  Can I ask one question?  You said

12    something that reminded me of a housekeeping matter.  I want

13    to better understand your practice.  When the parties have

14    issues for Your Honor or for Judge Baker, there's some

15    inconsistency about how we communicate with you and your

16    staff.  Certainly our view is that communication with you and

17    your staff and Judge Baker and his staff, that those are

18    ex-parte communications.  That we want to be very careful to

19    be respectful of your boundaries and your staff's boundaries.

20          Is it your preference that when the parties have an

21    issue for you or Judge Baker, that we call together or email

22    together or do you have a preference?

23          THE COURT:  Emailing to the court staff, certainly

24    with a cc to the other side -- and this applies to both --

25    saying, "We have an issue that we'd like the Court to address

```
 1   and can we set up a phone conference?"  And then my courtroom
 2   deputy Tina Doyle would be happy to accommodate you on that.
 3   Certainly any communication with the Court needs to have a cc
 4   on the email to the other side.
 5             MS. PIERSON:  Of course.  I think that's very
 6   helpful.  Then when we have issues, Joe or I or Doug, have
 7   issues with you or Judge Baker, I think it's helpful, too, if
 8   we get on the line together to call Amy or Tina or others.  I
 9   think it's helpful for everybody to be in the loop on the
10   communication.
11             THE COURT:  Absolutely.
12             MS. PIERSON:  Sounds like that's your preference, as
13   well.
14             THE COURT:  I wouldn't talk to just one side
15   regarding anything pertinent to the litigation.
16             MS. PIERSON:  I think we can do that.  Right, Joe?
17             MR. WILLIAMS:  Sure.
18             MS. PIERSON:  Thank you.
19             MR. MARTIN:  Thank you.
20             THE COURT:  Thank you all.
21             MR. KING:  Thank you Your, Honor.
22             THE CLERK:  All rise.  Court is adjourned.
23             (Proceedings concluded at 11:15 a.m.)
24
25
```

1   **************************************************************

2                    CERTIFICATE  OF  COURT  REPORTER

3

4        I, Margaret A. Techert, hereby certify that the

5   foregoing is a true and correct transcript from

6   reported proceedings in the above-entitled matter.

7

8

9

10  /S/ Margaret A. Techert_____   **March 8, 2017**
    MARGARET A. TECHERT
11  Official Court Reporter
    Southern District of Indiana
12  Evansville Division

13

14

15

16

17

18

19

20

21

22

23

24

25