# Exhibit E

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF INDIANA
 3                  INDIANAPOLIS DIVISION
 4
 5   IN RE: COOK MEDICAL, INC.,      )
     IVC FILTERS MARKETING, SALES    ) 1:14-ML-2570-RLY-TAB
 6   PRACTICES AND PRODUCT LIABILITY ) MDL No. 2570
     LITIGATION,                     )
 7                                   )
                                     )
 8   This Document Relates to ALL    )
     ACTIONS.                        )
 9                                   )
10
11
12
13
14           VIDEOTAPED DEPOSITION of ROBERT McMEEKING,
15   Ph.D., taken on behalf of Defendants commencing at 9:30
16   a.m., Thursday, June 1, 2017, at 420 East Carrillo
17   Street, Santa Barbara, California, before
18   TARA SANDFORD, RPR, CSR #3374, Certified Shorthand
19   Reporter in the County of Santa Barbara, State of
20   California.
21
22
23
24
25
```

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 62

1  expands once it's in the vein, they are all going to
2  want to tilt?
3      A.  They are all going to want to tilt.
4      Q.  Okay.  So there is nothing unique about Celect
5  in the sense that makes it more likely to want to tilt
6  than other filters; correct?
7      A.  As far as I know, all the filters that I've --
8  I'm aware of, they have this feature that the strain
9  energy is a driving force that tends to make them want
10 to tilt.
11     Q.  Okay.
12     A.  The question is whether they can find a pathway
13 to -- to that tilting configuration.
14     Q.  What design would prevent the tilt in the
15 Celect?
16        MS. BAUGHMAN: Objection.  Form.
17     Q.  BY MR. WEBBER: You can answer.
18     A.  There are various things that would help
19 inhibit the tilt.  For example, the leaves on the Tulip
20 filter are features that from an engineering assessment
21 would tend to help, possibly help resist tilt.
22        The perforation limiters, since they help to --
23 perforation limiters which are designed in a way similar
24 to those in the platinum filter would help to limit tilt
25 because of their configuration, which, in my assessment,

Page 63

1  makes it more difficult to move the feet relative to the
2  wall of the vena cava.
3      Q.  Any other design features that you believe
4  would limit or eliminate tilt?
5      A.  Well, the -- an aspect of the perforation
6  limiters is that since perforation tends to be
7  associated with the tendency to tilt, then good
8  perforation limiters will help to reduce the extent to
9  which tilting is likely.
10     Q.  Okay.  Anything else, any other design --
11     A.  Other -- other aspects of design that help to
12 control the interaction between various components of
13 the filter are desirable.  For example, there are
14 filters which look a bit more like parallel stents and
15 they're difficult to rotate within the confines of the
16 vena cava.
17        And there are filters which have interesting
18 connections between the basket that catches clots and
19 the legs so that they have, to some extent, the ability
20 to have those features move independently, which doesn't
21 arrest tilt completely but tends to limit the extent to
22 which tilt will occur and will have other consequences
23 to the way that the filter behaves.
24     Q.  Any other design features that would limit or
25 eliminate tilt?

Page 64

1      A.  The reduction of the strain energy would be one
2  way of helping to limit the tilt since that's the
3  driving force for the tendency to tilt.
4      Q.  Okay.  But that could be done only if the
5  filter wasn't first compressed; correct?
6      A.  That's true.  But you -- for example, one way
7  of doing it would be to have different size filters for
8  different size vena cavas so that the extent of the
9  compression of the filter was reduced for any given size
10 of the vena cava.
11        One could also choose materials that are less
12 stiff and have some other features to them, such as the
13 super elasticity of nitinol, that would help to reduce
14 the strain energy that is present at any given
15 configuration of the filter.  And also because of the
16 more compliant modulus of materials such as nitinol, the
17 lower value of the modulus, that would help to reduce
18 the driving force for tilting, as well.
19     Q.  All of the design features that you just
20 mentioned that you believe would reduce or eliminate
21 tilt, have you actually tested any of them to see if
22 they would in fact reduce tilt?
23     A.  Not in a bench test.
24     Q.  Okay.  When you say not in a bench test,
25 meaning that you've -- have you tested it at all?

Page 65

1      A.  I -- I've tested it in the sense of doing
2  calculations and I have drawn conclusions from those
3  calculations.
4      Q.  Have you asked or have you investigated whether
5  any of the changes that you just mentioned that might
6  reduce tilt would have secondary effects, that is,
7  effects on other aspects of the filter if you were to
8  make the changes?
9         MS. BAUGHMAN: Objection.  Compound.
10        THE WITNESS: Well, I've -- I've taken that
11 into consideration but I have not done a comprehensive
12 study of the issue.
13     Q.  BY MR. WEBBER: Okay.  So you've not looked,
14 for example, to see if any of the things, the design
15 changes that you just mentioned that might reduce tilt,
16 might also increase the risk of migration; correct?
17        MS. BAUGHMAN: Objection.  Mischaracterizes his
18 testimony.  Compound.
19        THE WITNESS: My assessment of perforation
20 limiters is they would help to both inhibit migration,
21 inhibit tilting, inhibit perforation.  And because
22 fracture is often associated with perforation, to
23 inhibit fracture, as well.  So I see multiple benefits
24 in some designs that you could invoke for the purpose of
25 limiting tilt.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 66

1  Q. BY MR. WEBBER: Okay. But you haven't done any
2  testing, though, to see whether in fact that would have
3  the effects that you've suggested; correct?
4  A. I have not done any bench testing of the
5  filter.
6      MS. BAUGHMAN: Excuse me for a minute. I think
7  we've -- I'm not sure, I think we have been going for a
8  couple of hours. When you have a moment, can we take a
9  break at a good point?
10     MR. WEBBER: I don't think it's been a couple
11 of hours but I think we've been --
12     MS. BAUGHMAN: I don't have a watch or phone
13 with me.
14     MR. WEBBER: It's an hour and 15, but if you
15 would like to take a break, I have no problem.
16     MS. BAUGHMAN: Let's do it.
17     MR. WEBBER: Let's go off the record.
18     THE VIDEOGRAPHER: Off the record. The time is
19 10:46.
20     (Recess.)
21     THE VIDEOGRAPHER: We are back on the record.
22 The time is 11:05.
23  Q. BY MR. WEBBER: I think you had mentioned that
24 one potential design strategy to avoid or reduce tilt
25 would be to make the legs out of nitinol. Is that what

Page 67

1  you said?
2  A. That would be one strategy.
3  Q. Do you know what effect making the legs out of
4  nitinol would have on other aspects of the filter, such
5  as migration, perforation, endothelialization, et
6  cetera?
7  A. A proper design of the filter in conjunction
8  with the use of nitinol could address those things that
9  you -- you mentioned --
10  Q. Okay.
11  A. -- in ways that I've described already by
12 adding features to the -- or by ensuring that there are
13 features in the filter that have certain consequences to
14 how the filter behaves.
15  Q. But you haven't done an analysis of that in
16 terms of any calculations to see how it changed to
17 nitinol in conjunction with other design features might
18 reduce tilt while not increasing other adverse events;
19 correct?
20     MS. BAUGHMAN: Objection. Compound.
21     THE WITNESS: I've -- I've considered, for
22 example, the platinum filter and how if you used a more
23 compliant material, that that would reduce the tendency
24 to tilt, if that is present in such a filter but could
25 be inhibited by features that are already present in the

Page 68

1  platinum filter such as the penetration limiters.
2  Q. BY MR. WEBBER: But -- and I understand you're
3  saying if you used a more compliant material, it might
4  inhibit tilt. But have you done any analysis of whether
5  using a more compliant material might increase adverse
6  events such as migration or fracture or other things?
7  A. I just told you that I've -- I've made that
8  assessment in the manner that I did.
9  Q. Oh. And what was the manner in which you made
10 that assessment?
11  A. Well, that I considered the fact that by using
12 a more compliant material you reduce the driving force
13 for tilt. And if you keep everything else the same, the
14 features that inhibit migration, that inhibit
15 perforation, then you have a good likelihood that you
16 will not compromise some of the other features of the
17 filter that could lead to adverse features of its
18 behavior.
19  Q. But you say a good likelihood that you won't.
20 Is that anything that you've ever tested or calculated?
21  A. I have not tested it myself but I rely on
22 information such as one gets from Cook testing of the
23 platinum filter and other features of their testing to
24 support my assessment.
25  Q. Just so that I understand the tilt that will

Page 69

1  happen in an IVC filter, one possible source of tilt, I
2  take it, is the surgeon who places the filter inside the
3  vein might not place it exactly at a zero-degree angle;
4  correct?
5  A. I think it's essentially impossible for a
6  surgeon to place it at exactly zero because zero is
7  zero. There will be a small range of filter angles that
8  are likely to arise after the surgeon has implanted the
9  filter. And whether that degree of tilt is
10 acceptable -- acceptable or not is -- is -- is a
11 question to be addressed.
12  Q. Okay. That's not a question you've addressed;
13 correct?
14  A. I've addressed it in the sense I made an
15 engineering assessment of the consequences of tilting
16 and what that might do in terms of other aspects of the
17 filter behavior such as perforation and -- and fracture.
18  Q. You've said the tilt, tilt to a certain degree
19 can increase the chances of perforation?
20  A. That's correct, yes.
21  Q. And the tilt to a certain degree can increase
22 the chance of fracture?
23  A. That's correct.
24  Q. All right. Have you analyzed what degree of
25 tilt is necessary to increase the chances of either

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 106

1 the places where the clip gauge is attached to the wire
2 and the cross-sectional area of the wire, you would
3 convert the results to stress and strain.
4      And then from the slope of the stress/strain
5 curve, you would deduce the modulus of the -- of the
6 Elgiloy. And the best way of doing that would be to,
7 first of all, load the Elgiloy and then unload it
8 slightly. Because the unloading stage is the most
9 informative stage of the test to get an accurate value
10 of the elastic modulus.
11      The other way of doing it is to use acoustic
12 methods or wave propagation methods in which the speed
13 of the wave or the frequency of the vibration in
14 combination with knowledge of the density of the
15 material will allow you to calculate, deduce the value
16 of the modulus.
17   Q.  Are those tests that you just described to me,
18 are those well-accepted tests in the engineering
19 community?
20   A.  Both well accepted.
21   Q.  Both common tests?
22   A.  Especially the first one I described is very
23 common.
24   Q.  Okay. At the top of --
25   A.  May I say that the first method I described is

Page 107

1 one in which it's relatively easy to make mistakes and
2 get poor results.
3   Q.  Okay. Still at the top of page 21 when you
4 talk about the error in your result being ten percent,
5 you conclude that the ten percent discrepancy is very
6 reasonable; correct?
7   A.  Correct.
8   Q.  Now, down further on page 21, I guess it's in
9 the first full paragraph, you say that you
10 ". . . estimate that the force applied to the vena cava
11 wall is transmitted through an area of contact whose
12 linear dimensions are approximately the diameter of the
13 leg wire or .164 square millimeters."
14      Correct?
15   A.  Yes, I see it. Yes.
16   Q.  Okay. And that's what we talked about before,
17 that you were estimating that the area of contact with
18 the leg, between the leg and the IVC wall, is equal to
19 the surface area of the leg, if you kind of cut it in
20 the middle; correct?
21   A.  That's correct.
22      I dropped my --
23   Q.  You did. Sorry about that. And just the video
24 got it.
25      You said, "That's correct"?

Page 108

1   A.  I said, "That's correct."
2   Q.  Okay. If the inferior vena cava is actually
3 elastic and can stretch -- well, let me back up.
4      Do you agree that the inferior vena cava is
5 actually elastic and can stretch?
6   A.  The wall of the vena cava is elastic and can
7 stretch, but the extent to which that would occur
8 depends on the way it interacts with the tissues and
9 organs around it. That may limit -- it may make the
10 surroundings of the vena cava relatively stiff.
11   Q.  Is that anything you've ever measured, that is,
12 how the elasticity and the stretchiness of the inferior
13 vena cava affects the area of contact between a leg of a
14 filter and the vena cava itself?
15   A.  I have not done that assessment.
16   Q.  Would you agree if the IVC can stretch and is
17 elastic, that the force that each leg applies to the IVC
18 wall would actually be spread out over a larger area
19 than just a point?
20   A.  If the wall of the vena cava and the
21 surrounding tissue and organs are compliant, the extent
22 of contact between the leg and the wall of the vena cava
23 can be larger or would be larger than it is if the vena
24 cava walls and the surrounding tissue is completely
25 rigid.

Page 109

1      However, I point out that during circumstances
2 such as Valsalva, that the motion of what is surrounding
3 the vena cava can push the vena cava wall, perhaps, into
4 a configuration where the only contact is between the
5 leg -- sorry, the foot and the wall of the vena cava can
6 occur in the manner that I've assumed that I have
7 inferred in the calculations that we're talking about.
8   Q.  Do you know how much pressure is required to
9 perforate the vena cava?
10   A.  I don't have that figure off the top of my head
11 but it's -- it's -- it's a fraction of a megapascal is
12 my understanding.
13   Q.  Have you conducted any tests or calculations to
14 determine what the pressure is that is required to
15 perforate the inferior vena cava?
16   A.  No, I haven't carried out such calculations;
17 however, I have reviewed Cook documents in which tests
18 were carried out. They are tests of a cyclic nature and
19 they found that the leg of the Celect leg perforated the
20 vena cava wall relatively quickly in the test.
21   Q.  But you don't know what level of pressure is
22 required to perforate the vena cava compared to the
23 pressure that you've calculated here that the leg of the
24 Celect places on the vena cava; correct?
25   A.  As I said, I don't have the figure at the tip

28 (Pages 106 - 109)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 110

1  of my tongue, but my recollection is it's less than the
2  level of pressure that I estimate in these calculations.
3     Q.  And since you estimate in your calculations
4  that the stress or the pressure that the Celect places
5  on a 15-millimeter diameter vena cava --
6        And, by the way, is a 15-millimeter diameter
7  vena cava, is that considered to be sort of a standard
8  size, do you know?
9     A.  The vena cava ranges in diameter.  The average
10 diameter in adults is about 20 millimeters, so
11 15 millimeters would be on the small side.
12    Q.  Is 30 millimeters considered what they call a
13 mega cava; do you know?
14    A.  I think my understanding is mega cavas are
15 bigger than 30 millimeters, 40 millimeters.
16    Q.  So 15-millimeter diameter vena cava would be a
17 pretty small one and 30 millimeters would be a pretty
18 big one; right?
19    A.  It is my understanding that for an adult
20 15 millimeters is a small one, although adults have
21 smaller ones is my understanding.
22    Q.  Okay.
23    A.  And adults certainly have bigger ones than 30,
24 but 30 is a biggish one.
25    Q.  So you have calculated that in a 15-millimeter

Page 111

1  vena cava the Celect will put .9 megapascals of pressure
2  on the vena cava wall; correct?
3     A.  Yes.
4     Q.  If your belief is that the pressure necessary
5  to perforate the vena cava is less than .9, is it your
6  conclusion that the Celect would always perforate a
7  15-millimeter vena cava?
8     A.  If the circumstances that I've assumed arise,
9  then it is very likely that the Celect will perforate
10 the wall of the vena cava.
11    Q.  Wouldn't it do it every time if the pressure of
12 the -- if you are correct that the pressure that the leg
13 places on the vena cava is .9 and it takes less than .9
14 to perforate it, wouldn't it always perforate --
15    A.  As you said, in some circumstances the extent
16 of contact area could be less than I've assumed.  After
17 all, I'm making an assumption about worst-case
18 possibilities.  And in some circumstances the area of
19 contact can be significantly less and that would lessen
20 the likelihood of perforation taking place.
21    Q.  And then you also calculate that the Celect in
22 a 30-millimeter vena cava will exert .35 megapascals of
23 pressure on the vena cava; correct?
24    A.  Correct.
25    Q.  Do you know if that is enough to perforate the

Page 112

1  vena cava?
2     A.  As I said, I don't recall exactly but I think
3  it's -- it's still a bit higher than the value that
4  would perforate the vena cava but I can't actually -- I
5  can't be -- I can't actually be sure sitting here today.
6     Q.  Okay.  And if the pressure necessary to
7  puncture the vena cava is less than .35 megapascals,
8  isn't it your opinion, then, that the Celect will always
9  perforate a 30-millimeter vena cava?
10    A.  If the circumstances I've assumed arise, then
11 that would be the case.  But I've assumed worst-case
12 conditions and a relatively small area of contact
13 between the leg and the wall of the vena cava.  And as
14 you say, in other circumstance the extent of contact
15 could be much greater than my worst-case estimate and
16 therefore the pressure would be lower.
17    Q.  So if there are cases where the Celect filter
18 has not perforated a 15-millimeter or 30-millimeter vena
19 cava, would that be an indication that the assumptions
20 you made were inaccurate?
21    A.  No.  It would indicate that my assumptions do
22 not always apply in every patient who has a
23 15-millimeter vena cava.  But it would not contradict
24 the idea that in some circumstances this condition could
25 arise.

Page 113

1     Q.  Do you know how many circumstances that
2  condition could arise or in what percentage for each
3  size of vena cava?
4        MS. BAUGHMAN:  Objection; compound.
5        THE WITNESS:  I can't make that assessment but
6  it's possible that the fraction in which this level of
7  pressure arises could be quite small.  The fraction of
8  individuals could be quite small.
9     Q.  BY MR. WEBBER:  The fraction of individuals who
10 experience perforation could be quite small?
11    A.  No.  The fraction of patients who experience
12 the circumstances that would generate this level of
13 pressure could be quite small compared to the population
14 as a whole.
15    Q.  I see.  Do you know what the reported incidence
16 of perforation is with the Celect or the Tulip filters?
17       MS. BAUGHMAN:  Objection.  Vague as to reported
18 by whom and what context and when.
19       THE WITNESS:  I've read several papers.  Some
20 of them show fractions of the filter studied that range
21 from 20 to well over 50 percent.  And in some cases it
22 was found that all of the Celect filters that were
23 studied experienced perforation.
24    Q.  BY MR. WEBBER:  Do you know what the rate of
25 perforation is that has been reported to either the FDA

29 (Pages 110 - 113)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 118

1     Santa Barbara, California
2     Thursday, June 1, 2017
3         1:33 p.m.
4
5         THE VIDEOGRAPHER: The time is 1:33 and we are
6 back on the record.
7         THE WITNESS: May I say something? During the
8 break I reconstructed my estimate of the pressure that
9 will cause penetration -- perforation of a vena cava.
10 And I did it from a Cook document that I looked at
11 before on a test they did on a porcine vena cava.
12         And I've got the calculation laid out here on
13 this piece of -- on this page. But the end result of my
14 calculation is that the pressure that was applied, if
15 you use my estimate of the area of contact, is .6
16 megapascals, and in that test caused the Celect leg to
17 perforate the tissue within 5000 cycles of rubbing the
18 leg back and forth on the vena cava tissue.
19
20         EXAMINATION (resumed)
21 BY MR. WEBBER:
22    Q. And that was a pig vena cava?
23    A. Pig vena cava.
24    Q. So your calculation would be that it's -- that
25 .6 megapascals of force or pressure would cause the

Page 119

1 Celect leg to pierce a pig vena cava, at least?
2    A. Yes, after -- within about 5000 cycles of
3 motion.
4    Q. You said it was rubbing up against it. Does
5 that mean it wasn't just pressure, it was rubbing
6 somehow?
7    A. Presumably the motion plays a role in the
8 process by which the perforation takes place, but I -- I
9 know of no data where the -- I am not aware of any data,
10 I haven't found any data or looked for it, where the leg
11 is simply pressed through the vena cava wall.
12    Q. And we -- and you did those over the lunch
13 hour. We just got back from lunch; correct?
14    A. That's correct.
15    Q. And you had lunch with your attorneys here?
16    A. I did.
17    Q. Did they give you any of the information that
18 you needed to calculate that?
19    A. They produced a document that I asked for, that
20 I needed to refer to, to do the calculation.
21    Q. Do you recall which document that was?
22    A. It is Cook document TS110172-R, entitled "Cook
23 Nonclinical Test Report Comparison Penetration Testing."
24    Q. Okay. Why don't -- if you could hand that
25 document to me, please. I am going to put an exhibit

Page 120

1 sticker on it. I assume you're okay if we mark this.
2    A. Yes.
3    Q. Your lawyers will get a copy.
4         (Exhibit 3 was marked for identification.)
5    Q. BY MR. WEBBER: Okay. Have you ever done any
6 calculation of the pressure that it would take to pierce
7 a human inferior vena cava?
8    A. No, I haven't done such an estimate of that
9 level of pressure.
10    Q. Okay. Okay. Thank you. I'll -- if it's all
11 right, we will keep this with the original, if we need
12 to.
13         Let me direct you, if I could, to page 21 of
14 your report, which I think to me sort of represents the
15 beginning of your analysis of fracture or fatigue. And
16 I just want to make sure at the outset there are some
17 things I am understanding.
18         As I understand your analysis, you calculate
19 three types of stress that an IVC filter is subjected
20 to. One is residual stress. The second is stress due
21 to implantation in the vena cava, and the third is
22 cyclic stress. Am I right about that?
23    A. That's correct.
24    Q. Okay. Let me take those one by one, if I can,
25 and start with the residual stress. And from our

Page 121

1 earlier conversation, am I correct that residual stress
2 is the stress that exists in the device from bending the
3 legs into shape during the manufacturing process?
4    A. That's correct.
5    Q. Okay.
6    A. And it's -- you bend the legs in the
7 manufacturing process and then you take it out of the
8 jig in which the leg is being bent. And after it has
9 sprung back to the extent it is going to spring back,
10 then what's left in the wire is the residual stress.
11    Q. Is the residual stress, just for laypeople who
12 may not kind of understand the concept, is residual
13 stress kind of it's because a bent piece of wire is
14 really in a sense trying to be straight again? Is that
15 kind of what's happening?
16    A. It is trying to be straighter than it is. One
17 way of thinking about it is that it's tension and
18 compression acting together that occur because you have
19 bent the wire.
20    Q. Okay. And you in your report did, on page 21,
21 what you say at the top of Section 9, is an estimate of
22 the residual stress; correct?
23    A. Correct.
24    Q. In your estimate of residual stress you begin
25 with the assumption that Elgiloy is, as you put it,

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 314

1 my testimony, such as asking --
2     MR. DALIMONTE: Hold on.
3     MS. BAUGHMAN: Just answer the question asked.
4     THE WITNESS: Okay.
5  Q. BY MR. WEBBER: You have had a chance to
6 discuss with them your testimony; correct?
7  A. I had a chance to discuss matters related to my
8 testimony.
9     MS. BAUGHMAN: I am going to object. You are
10 asking the content.
11    MR. DALIMONTE: You're not -- you're not --
12    MR. WEBBER: I think she's defending.
13    MR. DALIMONTE: I have a privilege.
14    MS. BAUGHMAN: John. I'll object on the
15 grounds of privilege and instruct him not to answer.
16  Q. BY MR. WEBBER: Doctor, you're not testifying
17 that a medical device manufacturer has to design -- I'm
18 sorry.
19    Let me start that over. Doctor, you are not
20 testifying, are you, that a medical device manufacturer
21 has to design the device to survive the worst-case
22 scenario, are you?
23  A. I'm -- that is not my testimony. But my
24 testimony is that is something that the designer should
25 take into consideration, what the worst-case conditions

Page 315

1 are.
2  Q. Sure. But you're not testifying that the
3 designer has to design the devise to survive the
4 worst-case scenario; right?
5  A. Only if that is practically -- practicably
6 possible.
7  Q. But not in every case; correct?
8  A. It is unlikely that it would be practicably
9 possible in every case.
10  Q. Is there anything other than the penetration
11 limiters that you mentioned with respect to the Celect
12 platinum that you believe would have reduced the risks
13 of Celect and the Tulip filters without giving up any of
14 the benefits of those filters? Anything other than the
15 penetration limiters you mentioned?
16    MS. BAUGHMAN: Objection. Compound, and calls
17 for speculation.
18  Q. BY MR. WEBBER: You can answer.
19  A. The -- some of the other suggestions that I
20 made, such as changing the material and such as changing
21 the design of the shape of the limbs, would have to be
22 assessed very carefully to make sure they were not
23 compromising some risks that were otherwise relevant to
24 the filter.
25  Q. You don't know, as you sit here today, whether

Page 316

1 those changes would actually increase other risks
2 imposed by the filter; correct?
3     MS. BAUGHMAN: Objection. Vague and overbroad.
4     THE WITNESS: Without making a specific
5 assessment, I am not in a position to -- to comment on
6 that or to make that assessment.
7  Q. BY MR. WEBBER: You are not in a position
8 today, as you sit here, to say whether those changes
9 that you suggested would preserve all of the benefits of
10 the filter without any reduction of the benefits;
11 correct?
12    MS. BAUGHMAN: Objection; vague to which
13 benefits. Compound.
14  Q. BY MR. WEBBER: You can answer.
15  A. The -- since that addresses medical benefits,
16 I'm not in a position to make assessment of the
17 benefits. But I recognize that the risks may move up or
18 down when changes are made to the design of the filter.
19  Q. Is that true of the benefits, as well, they may
20 move up or down based on the design of the filter?
21    MS. BAUGHMAN: Objection. Calls for
22 speculation. Vague.
23    THE WITNESS: It is my assumption that that
24 could be the case.
25    MR. WEBBER: Thanks. That's all the questions

Page 317

1 I have.
2     THE REPORTER: Is he going to read and sign?
3     MR. DALIMONTE: We are not done yet. Go off
4 the record.
5     MS. BAUGHMAN: Off the record.
6     THE VIDEOGRAPHER: The time is 6:45 and we are
7 off the record.
8     (Recess.)
9     THE VIDEOGRAPHER: The time is 6:50 and we are
10 back on the record.
11    MS. BAUGHMAN: We have asked for 45 days to
12 read and sign, and my understanding is Cook's counsel
13 will get back to us to see if they'll agree to that. We
14 definitely want Dr. McMeeking to read and sign, and
15 having said that, pass the witness.
16    MR. WEBBER: We will -- we will do our best to
17 accommodate that.
18    MS. BAUGHMAN: Thank you so much.
19    THE VIDEOGRAPHER: We are off the record. The
20 time is 6:50.
21    (Deposition concluded at 6:50 p.m.)
22
23
24
25