**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB MDL No. 2570 |

This Document Relates to the following Actions:

*Hill v. Cook Medical, Inc. et al.,*
Case No. 1:14-cv-6016-RLY-TAB

## PLAINTIFF'S RESPONSE TO THE COOK DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

COMES NOW, Plaintiff, Elizabeth Hill, and submits this response in opposition to the motion for judgment as a matter of law filed by Defendants Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS (collectively "Cook"). Plaintiff would respectfully show the Court as follows:

## I.
## INTRODUCTION

Cook's motion for directed verdict focuses on two meritless arguments: (1) that Plaintiff has failed to offer sufficient proof of the design defect and causation elements of her strict liability claim, and (2) that defendant Cook Inc. cannot be held liable because it did not manufacture Celect IVC filters.

Cook's first argument should be denied, once again, for the same reasons the Court denied it on summary judgment – because Plaintiff's claim is amply supported by the applicable law and by the evidence presented in this case. Specifically, Plaintiff has presented evidence from which the jury may reasonably find that: (a) through its efforts,

1

including its IFU and study data, Cook created an expectation among ordinary physicians that the Celect filter would not embed or perforate and that it would be easily retrievable, and (b) the defectively designed Celect filter did precisely what Cook led physicians to believe it would not do: it became embedded, progressively perforated Plaintiff's IVC wall and duodenum, and required a complicated removal surgery.  Cook's second argument should be denied because Cook Inc. controlled the design and safety determinations for the Celect filter.  Cook Inc. also handled regulatory matters involving the Celect filter.  This evidence is more than sufficient to warrant a jury determination as to Cook Inc's liability for design defects in the Celect filter.  Accordingly, Cook's motion for a directed verdict should be denied.

## II.
## ARGUMENT

### A.    Under the Governing Standards, Cook's Motion for Directed Verdict Should Be Denied.

Of course, the standard applicable to a motion for directed verdict is akin to the standard applied to a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed. 202 (1986).  The Court has *twice* denied summary judgment on Plaintiff's strict defective design claim.[1] Because Plaintiff has presented *more* evidence in support of her design defect claim at trial than she had available to her in responding to Cook's summary judgment motions, the Court should once again decline Cook's request for a dispositive ruling.

### B.    Plaintiff Has Shown a Legally and Factually Sufficient Basis For the Jury to Find for Her on Her Strict Liability Design Defect Claim.

---

[1] *See* Entry on the Cook Defendants' Motion for Summary Judgment on Design Defect Claims, Doc. 6761, p. 2 (Oct. 10, 2017)("MSJ Order I"),  Order on the Cook Defendant's Motion to Reconsider the Court's October 10 Order Denying Their Motion for Summary Judgment on Plaintiff's Strict Liability Design Defect Claim, Doc. 6943, p.1-2 (Oct. 20, 2017)("MSJ Order II").

To prevail on a defective design claim under Florida law,[2]  Plaintiff must prove that: (1) a product designed by the defendant,[3] (2) was defective or unreasonably dangerous, and (3) caused her injury. *See* MSJ Order I, *citing, Pinchinat v. Graco Children's Products, Inc.,* 290 F.Supp.2d 1141, 1148 (M.D. Fla. 2005). The Florida Supreme Court has recently reaffirmed Florida's long history of evaluating the dangerousness of a product's design using a consumer expectations test. *Aubin v. Union Carbide Corp.*, 177 So.3d 489, 512 (Fla. 2015); *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla. 2005). Thus, under Florida law, "[a] product is unreasonably dangerous because of its design if the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer." Fla. Std. Jury Instr. (Civ.) PL 5 (2004).  Plaintiff has presented a legally sufficient claim and offered ample evidence on each of the challenged elements of her claim.

1.    **Plaintiff has Offered Expert Testimony Sufficient to Allow the Jury to Find that the Celect Filter Was Defectively Designed.**

Cook stretches the bounds of credulity by claiming that an objection made by Plaintiff's counsel to a question using the undefined term "defect" equates to an intent to disavow Dr. McMeeking's design opinions. [1102:9-1103:10].[4]  Not so.  Dr. McMeeking

---

[2] While federal evidentiary standards generally apply to cases tried in a federal court forum, state law determines the substantive requirements for proving a defective design in a product liability action. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

[3] The jury heard evidence that the Cook defendants designed and developed the Celect filter and brought it to market in the United States. [1136:1-6; 1137:3-6 (Hendriksen)]. The doctor that implanted the filter, Dr. Zuzga, also testified that the filter and its delivery catheter had not been damaged, altered or modified in any way. [Zuzga Dep. 41:8-18].

[4] Cook quotes the statement by Plaintiff's counsel that "the doctor has not offered an opinion on defect," out of context.  The full exchange involves a question from Defense counsel to Dr. McMeeking asking whether he was calling the Celect filter defective.  Plaintiff's counsel objected to the use of the word defective as having a legal meaning.  When Defense counsel responded that the doctor had previously used the word himself, Plaintiffs' counsel responded: "That is incorrect, the doctor has not offered an opinion on defect." When viewed in its correct context,, it is clear that Plaintiff was merely trying to avoid use of a word that

3

offered extensive testimony regarding problems with the design of the Celect filter, including: (1) the absence of features to Celect Filter prevent or limit perforation [1010:7-16 (McMeeking)], (2) using a metal that is too stiff resulting in an increased tendency of the filter to tilt [1006:8-1007:7 (McMeeking)],  (3) the circular shape of the secondary arms of the Celect filter which simply slide along the wall of the vena cava when the filter tilts and do not help resist the tilting of the filter  [1006:8-1007:7 (McMeeking)]. The mere fact that Dr. McMeeking did not offer a *legal* conclusion that the Celect filter was "defective" does not negate his *scientific and engineering* opinions regarding flaws in the Celect filter's design.

>    **2.     Expert testimony is not necessary to prove a design defect claim under a consumer-expectations standard.**

Cook is mistaken in taking the position that expert testimony is necessary to prove consumer expectations in a design defect case.

The most on-point, medical device case presented to this Court is *St. Clair v. Nellcor Puritan Bennett LLC,* No. CV-10-1275-PHX-LOA, 2011 WL 5331674, (D.Ariz. Nov. 7, 2011). In *St. Clair,* the court was presented with a product liability action involving a defective resuscitator bag.  When the defendant raised the absence of expert testimony regarding a design defect on summary judgment, the court noted: "No expert testimony is necessary to establish a design defect under the consumer expectations test because the test focuses on the safety expectations of an ordinary consumer rather than those of an expert." *Id.* at *6.  In considering whether "the product fail[ed] to perform as safely as an ordinary consumer would expect," the Court relied upon the testimony of the treating doctors who

---

could have a different legal meaning when submitted to the jury than it might have in a scientific/engineering context.  [1102:9-1103:11 (McMeeking)].  It was not a withdrawal of Dr. McMeeking's design opinions.

attempted to intubate the patient that the bag did not function as intended. *Id.* at *7. No expert provided testimony as to how an "ordinary" doctor would have expected the resuscitator bag to have performed. Nevertheless, the court concluded, "[e]ven disregarding expert testimony, there is sufficient evidence, when viewed in the light most favorable to Plaintiffs, for the design defect claim to proceed to trial." *Id.* Thus, *St. Clair* shows that the circumstances surrounding an incident and the testimony of a treating doctor witness are sufficient to send a design defect case to the jury under a consumer expectations test. *See also Campbell v. Gen. Motors,* Co., 32 Cal.3d 112, 124 (1982)(holding that expert testimony was not necessary to establish consumer expectations regarding the absence of handrails on a bus. The claim could go to the jury based on the plaintiff's testimony (use of the product) and photographs of the bus (establishing bus design features)); *Hutchens v. Abbott Laboratories, Inc.,* 1:14CV176, 2016 WL 5661582, at *3 (N.D. Ohio Sept. 30, 2016)( holding that expert testimony was not required under the consumer-expectations theory for design defect claim involving Depakote related birth defects); *Lawrence v. Raymond Corp.,* 2011 WL 3418324, *9 (N.D.Ohio)(expert testimony not required to prove forklift was defective under consumer-expectations theory).

Cook's efforts to distinguish *St. Clair* are misplaced. First, the fact that the *defendant* in *St. Clair* did not contemplate the consumer-expectations test when arguing a lack of evidence under a risk-utility theory is immaterial: it was still necessary for *St. Clair* to raise a fact issue through consumer expectations evidence to survive summary judgment. The issue before the Court in *St. Clair* remained the sufficiency of the plaintiff's consumer-expectations proof -- regardless of when and how the matter was raised. Second, Cook's argument that *St. Clair* applied a subjective standard to its consumer-expectations analysis

is incorrect. Cook improperly infers the existence of a subjective test from the Court's reference to "the physician who used the Nellcor resuscitator bag" as the ordinary consumer. But that reference was made in the context of asserting doctors (rather than patients) are the relevant consumer. Nowhere in *St. Clair* does the court declare that it is applying a subjective test to consumer expectations. Reading *St. Clair* as Cook suggests would set Arizona apart from virtually every other jurisdiction to adopt a consumer expectations test; all of whom have characterized it as an objective standard.[5] There is good reason for the uniformity of Court's holding that the consumer expectations test cannot be subjective. If consumer expectations were judged by a subjective standard of what the particular plaintiff or user expected, then there would be no standard whatsoever.

Cook introduces its argument that Plaintiff is required to present expert testimony by relying on cases presenting entirely different facts and theories. No one disputes that an expert is necessary to establish the standard of care in a medical malpractice action. See Cook's Memo, p. 6, citing *Sims v. Helms*, 345 So.3d 721, 723 (Fla. 1977)(medical malpractice case). Likewise, it is reasonable to require expert testimony regarding real estate appraisals in a professional negligence case. See Cook Memo p. 6, citing *AMH Appraisal Consultants, Inc. v. Argov Gavish P'ship,* 919 So.2d 580, 582 (Fla.Dist.Ct.App.2006)(negligence in real estate appraisal). Neither of these situations has any bearing on the level of proof required to establish consumer expectations.

---

[5] *E.g. Hobart Corp. v. Siegle*, 600 So.2d 503, 505, fn.3 (Fla.App. 1992); *Britton v. Electrolux Home Products, Inc.,* 2006 WL 2934271, slip op. at 2 (W.D. Okla. Oct. 13, 2006) ("Whether a product is more dangerous than would be expected by the ordinary consumer is an objective test"); *Cox v. Murray Ohio Manufacturing Co.,* 732 F.Supp. 1555, 1560 (W.D.Okla. 1987); *Calles v. Scripto-Tokai Corp.,* 864 N.E.2d 249, 254-55 (Ill. 2007); *Ballard v. Zimmer, Inc.,* 11 C 6786, 2015 WL 5144350, at *10 (N.D. Ill. Aug. 31, 2015)

Cook's argument that several jurisdictions have required expert testimony to prove a design defect claim fails to tell the whole story.  While some design defect cases have included a loose statement regarding the need for expert testimony, a careful reading of the actual facts in those cases reveals that expert testimony was being required to establish matters like engineering considerations or causation – ***not*** consumer expectations.  As an example, Cook cites *Show v. Ford Motor Co.,* as a case requiring expert testimony.  But the actual *factors* on which the *Show* court required expert testimony were: (1) the physics that caused the vehicle to rollover, and (2) the engineering factors that impacted design options.  *Id.* at 587.   *Show* did not hold that an expert was required to opine on the collective expectations of automobile users. *Accord, Malvaes v. Constellation Brands, Inc*., No. 14-21302-CIV, 2015 WL 3874815, \*2 (S.D.Fla. June 23, 2015)(stating evidence that "design defects" in general require expert testimony and referencing the need for an engineering expert; but not referencing a need for expert testimony on consumer expectations); *Koger v. Synthes North America, Inc*., 2009 WL 5110780, \*2 (D.Conn., 2009)(noting that plaintiff have failed to present evidence, "expert or otherwise" under test using risk-utility factors); *Cappellano v. Wright Med. Grp., Inc*., 838 F.Supp.2d 816, 830-31 (C.D.Ill. 2012)(applying integrated test incorporating consumer expectations element into the broader scope of the risk utility test); *Thornton v. M7 Aerospace LP,* 796 F.3d 757, 773 (7th Cir. 2015)(requiring expert testimony of defect but not addressing a need for expert testimony to prove consumer expectations).

### 3. Expert testimony concerning consumer expectations is neither commonly used nor realistically feasible.

Nor is it accurate to say consumer expectations evidence is feasible and commonly used in similar situations. Cook does not, and cannot, cite a single *products liability* case

where the plaintiff was required to have a consumer expectations survey presented by an expert.  Instead, Cook relies on a handful of cases arising in the distinguishable contexts of class actions, trademark litigation or the Fair Debt Collection Practices Act. The different contexts render the cases distinguishable.  First, in trademark and debt collection claims, court's are concerned with consumer *confusion* as an *element* of the claim – not consumer *expectation*s as a *method of proof* of a larger inquiry as to whether a product is unreasonably dangerous.  Yet, even in that context Court have held that expert surveys, while possibly helpful to show customer confusion, are not required. *Insty\*Bit, Inc. v. Poly–Tech Indus., Inc.,* 95 F.3d 663, 667 (8th Cir.1996).  If expert testimony is not required to prove an actual element of a claim, it makes even less sense to mandate expert survey evidence as a means of proving consumer expectations - which are themselves just one of the means of proving unreasonable dangerousness to a jury of consumers. A similar distinction was drawn in a case cited by Cook-- *Braun Inc. v. Dynamics Corp of America*, 975 F.2d 815 (Fed.Cir. 1992). In *Braun,* the court explained that trademark claims require proof of consumer behavior in the marketplace.  *Id.* at 828. Thus, surveys and empirical evidence are probative on marketplace trends.  *Id*. However, the *Braun* court contrasted the trademark case focus with the narrower focus of a design patent infringement claim that looks to whether an ordinary observer would be deceived. *Id*.  In the latter case, the court held that empirical evidence was not necessary to tell a group of ordinary jurors whether ordinary observers would be deceived by a device design.  *Id*. at 821.

Second, even if the product liability analysis was interchangeable with the trademark and debt collection tests (which they are not), the cases Cook cites do not support the proposition for which Cook cites them.  For example, Cook cites *Libman Co. v. Vining*

8

*Industries, Inc.,* for the proposition that surveys are often needed to establish consumer confusion. 69 F.3d 1360, 1361 (7th Cir. 1995). But while the plaintiffs in *Libman* failed to present any evidence of consumer confusion, the *Libman* court expressly stated it did not want to make a "fetish" of expert testimony, before suggesting that confusion could have been shown by (1) evidence that any one consumer was confused about the brand, or (2) a simple comparison of the confusing products, or (3) a survey. *Id.* at 1633. Thus, the *Libman* opinion takes a similar view as *St. Clair* – recognizing that the circumstances of the case and the testimony of individual consumers can establish consumer thinking. *See also, Johnson v. Revenue Management Corp.,* 169 F.3d 1057, 1063 (7th Cir. 1999)(Eschbach concurrence)(noting that the majority opinion looked to survey evidence but did not hold that survey evidence was required); *Braun Inc. v. Dynamics Corp of America*, 975 F.2d 815 (Fed.Cir. 1992)(noting that the plaintiff had presented "no surveys, quantitative evidence *or testimony*" on consumer understanding – thereby suggesting that any of those forms of evidence could have supported her claim).

Lastly, Cook's unfounded insistence on some form of quantitative expert testimony regarding physician expectations is not feasible. It is highly unlikely that Cook would be willing to share the names of its customer physicians or cooperate with a survey with the potential to reveal negative opinions of its customers. In addition, courts have noted (in the trademark context) that survey evidence can be very costly. *E.g. Lon Tai Shing Co., Ltd. v. Koch & Lowy*, 1991 WL 170734, *19 (S.D.N.Y. June 20, 1991) (noting cost of conducting proper survey in trademark and trade dress case could exceed $100,000).

### 4.   Plaintiff has offered sufficient evidence that the Celect IVC Filter was unreasonably dangerous.[6]

---

[6] For further discussion of the factors bearing upon a strict liability design defect claim (and, particularly, Florida's consumer expectation test for design defect claims), the Court is respectfully directed to (1)

The Florida Supreme Court has recently reaffirmed Florida's long history of evaluating the dangerousness of a product's design using a consumer expectations test. *Aubin v. Union Carbide Corp*., 177 So.3d 489, 512 (Fla. 2015); *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla. 2005).   In so doing, the Florida Supreme Court has made several observations bearing on the evidence that can support a strict liability design claim.  First, the Court made clear that the focus of the consumer expectations test was to be the expectations created by the manufacturer.   *Aubin*, 177 So.3d at 511("The consumer expectations test thus rightly focuses on the expectations that a manufacturer creates").  Second, the Court noted that, while a plaintiff is not *required* to present evidence of an alternative design; a plaintiff *may* offer evidence of safer design alternatives. *Aubin,* 177 So. 3d at 511-512 (nothing precludes the plaintiff in providing his or her case from showing that alternative safer designs exist…").   Third, the Court expressly stated that a plaintiff may address the risks and benefits of the product's design. *Aubin,* 177 So. 3d at 511-512 ("The parties may, in proving or defending against [design defect] claims, present evidence that a reasonable alternative design existed and argue whether the benefit of the product's design outweighed any risks of injury or death caused by the design"). The evidentiary guidelines provided in *Aubin* are similar to those applied in other states that have adopted consumer-expectations tests for strict liability design claims.   *E.g. Potter v. Chicago Pneumatic Tool, Co*., 694 A.3d 1319, 1333 (Conn. 1997)(recognizing that a consumer's expectations for a complex product may be viewed in light of various factors that balance the utility of the product's design with the magnitude of its risks);

---

"Plaintiff Hill's Opposition to Defendant's Motion for Summary Judgment," and (2)  "Plaintiff's Response in Opposition to Cook's Bench Brief on Evidence Relevant to Consumer Expectations" which are incorporated herein by reference.

In addition, to evidence regarding the risks and benefits of a product and the availability of other designs, Florida courts have recognized a range of factors that bear upon a physician's expectations may be relevant to an assessment of a product's dangerousness. Thus, the full array of evidence that courts have found relevant under a consumer expectations test includes evidence of:

(1)   ordinary physicians' (including treating physicians) expectations regarding the product,

(2)   the risks and benefits of the product,

(3)   alternative designs for the product,

(4)   the usefulness and desirability of the product.

(5)   the availability of other and safer products to meet the same need,

(6)   the likelihood of injury and its probable seriousness,

(7)   the obviousness of the danger, common knowledge and normal public expectation of danger,

(8)   the avoidability of injury by care and use of the product,

(9)   the financial cost of an improved design, and

(10)  the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

*Aubin,* 177 So. 3d at 511-512; *Hobart Corp. v. Siegle*, 600 So.2d 503, 505, fn.4 (Fla.App. 1992); *St. Clair v. Nellcor Puritan Bennett LLC,* No. CV-10-1275-PHX-LOA, 2011 WL 5331674 (D.Ariz., Nov. 7, 2011). Plaintiff has offered evidence on several of these factors.

### a.      Evidence of Physician Expectations.

Plaintiff has presented substantial, and varied, evidence from which the jury can determine what ordinary physicians expected with regard to the Celect filter.  Notably,

Plaintiffs do not contend that the subjective expectations of Dr. Zuzga, Dr. Marmureanu, or Dr. Gardner are expert opinions on the categorical views of all physicians. Their individual opinions as medical doctors, however, are some evidence of how the product is viewed in the medical community. Their collective expectations, together with the other evidence (including evidence of physician complaints and the role of the Celect IFU in shaping expectations) provide the jury a sufficient basis to conclude that physician's reasonably expected the Celect filter to perform better than it did.

- <u>Plaintiff's treating doctor, Dr. Mark Zuzga, testified as to his expectations for the Celect filter as a medical doctor:</u> Dr. Zuzga testified that the Celect filter did not meet his expectations with regard to embedment, retrievability, and perforation:

> Q.   Did you expect that this filter, this Cook filter implanted in Mrs. Hill, to become embedded such that it was not retrievable?
>
> A.   No.
>
> Q.   Did you expect this filter implanted in Mrs. Hill to perforate the IVC wall?
>
> A.   No.
>
> Q.   Did you expect this Cook filter implanted in Mrs. Hill to completely perforate the IVC wall and penetrate into the duodenum?
>
> A.   No.

[Zuzga Dep. 62:11-62:21]. Dr Zuzga had expected the Celect to be an easily retrievable filter. [Zuzga Dep. 83:7-83:10]. Dr. Zuzga had no expectation that a strut from the filter would perforate through his patients' vena cava and into their

duodenum.[7] [Zuzga Dep. 25:20-26:1; 27:17-20; 206:6-9]. Courts have held that the testimony of a treating doctor can suffice to demonstrate the expectations of physician consumers. *St. Clair v. Nellcor Puritan Bennett LLC,* No. CV-10-1275-PHX-LOA, 2011 WL 5331674 (D.Ariz., Nov. 7, 2011).

- Plaintiff's expert, Dr. Marmureanu testified to his expectations as a member of the community of physicians that have used IVC filters: Dr. Marmureanu is a cardiothoracic surgeon who has implanted over one hundred filters. Dr. Marmureanu testified that he expected the Celect filter to be as safe or safer than its predecessor product, the Gunther Tulip filter. [1636:1-3 (Marmureanu)]. Dr. Marmureanu testified that IFUs are expected to be accurate. [1616:1-6 (Marmureanu)]. Dr. Marmureanu also expected, based largely on the representations and omissions of the Celect IFU, that the Celect filter would not become embedded, would not perforate, and would not become irretrievable by the standard technique. [1636:1-10; 1623:24-1624:6; 1605:24-1606:3 (Marmureanu)].

- Cook's Medical Science Officer, Dr. Gardner, testified to physician's expectations: Cook's Medical Science Officer, Dr. James Gardner, acknowledged the role of the IFU in providing physicians information about the Celect filter. [813:24-814:5; 818:10-16 (Gardner)]. It, therefore, stands to reason that the IFU is instrumental in shaping the expectations of physicians.

---

[7] In an attempt to minimize the significance of Dr. Zuzga's expectation testimony, Cook characterizes it as dealing with expectations of *actual complications* and not expectations of *risk.* This artificial distinction is immaterial under Florida law. Florida's consumer expectation test focuses on consumer's expectations for a product's *performance. See* Fla. Std. Jury Instr. (Civ.) PL 5 (2004)(asking whether product "fail[ed] to *perform* as safely as an ordinary consumer would expect")(emphasis added). There is no reference to expectations of *risk.* If the law were as Cook suggests, a defendant that misrepresented a risk as minimal could, nevertheless, be immunized from liability by the mere fact that the risk was known -- even though the defendant actively fostered a different expectation as to the products performance (as Cook did here). Florida law should not be read as requiring such an unprincipled result.

Like Dr. Marmureanu, Dr. Gardner testified that physicians have an expectation that the IFU would accurately depict the product:

> Q:   ... Physicians use that IFU and expect it to be accurate?"
>
> A.   We certainly make it available to them, and I would think they would expect accuracy."
>
> Q.   It would certainly be reasonable for a physician to expect the IFU to be accurate, wouldn't it?
>
> A.   I would expect they would think it was accurate."

[813:5-12 (Gardner)(internal objection overruled and omitted)].   Indeed, Cook encouraged physicians to look to the IFU.  Cook's Global Project Manager, Darrell Talbert, testified that he responded to doctor's questions about the Celect filter by directing them to the IFU.  [1400:12-21 (Talbert)].   Because the IFU claims an absence of perforations and does not address the risks of complicated retrievals or irretrievability [1623:24-1624:6; 1605:24-1606:3 (Marmureanu)], the jury could find that physicians expected that the Celect filter would not perforate and would remain easily retrievable.

- Evidence of doctor's expectations as shaped by the Celect Filter IFU: Cook knows that doctors to look to the IFU for information about Celect filters and that they expect the information in the IFU to be accurate.  [813:5-12 (Gardner); 1400:12-21 (Talbert)].   Dr. Marmureanu expected that the Celect filter would not perforate based on the study information contained in the IFU.   [1721:23-1722:4 (Marmureanu)]. Dr. Marmureanu explained to the jury that the IFU not only failed to include a warning about perforations, but affirmatively referenced a study that concluded there were "No device major adverse events." [1621:15-1622:4; 1623:1-

9 (Marmureanu)].   The study defined perforation as a major adverse event. [1623:14-19 (Marmureanu)]. Thus, by defining perforation as a major adverse event and then stating there were no major adverse events, the Celect IFU fostered the expectation in doctors that the filter would not perforate.

> Q.   My question is were any perforations disclosed, disclosed in that instruction for use?
>
> A    No, sir.
>
> Q.   You're looking at this. You want to really pay close attention to the study and look at what's in the IFU. You're looking to see if this Celect filter perforates. What's it tell you?
>
> A.    It does not perforate, sir

[1623:24-1624:6 (Marmureanu)]. The jury can infer that a physician, reading the Celect IFU and reading that there were no perforations associated with the product, would expect that the filter would not perforate.

- <u>Hundreds of physicians filed complaints reflecting that the Celect filter had not met their expectations:</u> Dr. Marmureanu reviewed approximately 200 complaints from Cook's files relating to Celect filters.   [1653:2-13 (Marmureanu)].   The 200 complaints were from doctors who had problems with the performance of Celect filters, including problems with perforations, irretrievability, migration, tilt, and embedment.   [1653:14-21, 1654:3-14 (Marmureanu)].   Cook's Project Manager, Bruce Fleck confirmed that it was not uncommon for doctors to report problems with irretrievability to Cook.   [884:4-8 (Fleck)]. It stands to reason that if significant numbers of physicians were making complaints regarding the Celect filter, the product was not living up to physicians' expectations.

b.      Evidence of risk-utility.

Plaintiff presented evidence that the considerable risks of the Celect filter were disproportionate to the product's modest and unsubstantiated benefits.  Indeed, Cook's own documents repeatedly acknowledge that there is little evidence supporting their use:

- Cook stated it lacked clear evidence justifying the safety risks of the Celect: In 2006, Arne Molgarrd and the research department at William Cook Europe in Denmark prepared an Executive Summary of the Cook Celect that included a risk analysis of the Celect filter.  The document stated:

> "The risk analysis and clinical evaluation have identified some safety concerns associated with the new design of the filter. The literature has been reviewed extensively and discussions have been going on for the past three years. However, to date, *it has not been possible to find any clear evidence of the existing available that could clarify and justify the safety risks identified."* [Exhibit 6101; 861:18-862:7 (Gardner)(emphasis added)].

- Cook was concerned that "payers" would discover the lack of evidence demonstrating safety and effectiveness: Knowing the lack of evidence supporting IVC filter utility, Cook's "greatest concern" was that "payers  are going to take a good, hard look at IVC filter placement and whether any clinical evidence exists to demonstrate it really saves lives or improves patient outcomes in other ways." [Exhibit 1129; 725:19-24 (Gardner], see also [Exhibit 1124, 748:16-749:7(Gardner)("I am concerned that more tech assessment bodies (including payers) are going to look more closely at IVC filter placements... *There hasn't been a lot of good clinical research demonstrating the safety and effectiveness"* of IVC filters in situations discussed.).   In this regard, the jury heard the following statement made by a Cook employee in 2007:

"My concern, which I've shared with a couple of you over the last couple of years, is that one day the payors, Medicare, Medicaid, commercial plans, et cetera, are going to realize that they are spending an increasing amount of money on the placement and retrieval of IVC filters, and t*here's not a lot of clinical evidence that demonstrate these filters actually improve patient outcomes."* [Exhibit1122; 730:14-25 (Gardner)(emphasis added)].

- 2008 – Cook noted the lack of evidence regarding IVC filter placements: "As an advocate, to some degree of evidence-based medicine, I think it's high time -- for the *lack of evidence regarding IVC filter placements* was addressed." [Exhibit 1123; 738:9-19 (Gardner)(emphasis added)].

- 2009 – Cook recognized the "paucity of data" supporting IVC filter use: "As Cook's director of reimbursement, I've been very surprised that payers in this country haven't raised questions about whether they should pay for IVC filter placements and retrievals, given the number of procedures being performed and the *paucity of data supporting these procedures."* [Exhibit 1123, 738:24-739:3 (Gardner)(emphasis added)].

- The Effective Health Care Program (EHC) concluded that evidence of filter effectiveness was low: A 2013 email by a Cook employee summarized the findings of the Effective Health Care Program (EHC) as stating: "*The strength of evidence is low that IVC filter placement is associated with a lower incidence of pulmonary embolism* and fatal pulmonary embolism hospitalized patients with trauma compared with no IVC filter placement." [Exhibit 1127; 759:11-23 (Gardner)(emphasis added)].

- The Effective Health Care Program (EHC) concluded IVC filters are associated with increased mortality: The same 2013 noted the EHC's conclusion that filter use

was associated with increased mortality and a lack of benefits in certain contexts: (1) "Low-grade evidence supports the idea that *IVC filters with usual care are associated with increased mortality and do not decrease the risk of pulmonary embolism* in patients undergoing bariatric surgery compared with usual care alone." [Exhibit 1127; 759:25-760:4 (Gardner)(emphasis added)]. (2) "The strength of evidence is low that IVC filter placement is associated with a lower incidence of pulmonary embolism and fatal pulmonary embolism in hospitalized patients with trauma compared with no IVC filter placement." [Exhibit 1127; 759:11-23 (Gardner)(emphasis added)].

- Cook acknowledged there was not strong clinical evidence for IVC filter use:  In an email exchange in 2013, a medical scientist at Cook, Rune Wagner wrote: "Not looking too hot for the IVC filters." Dr. Gardner responded: "Thanks Rune. *There's never been strong clinical evidence supporting IVC filter use…*" [Exhibit 1127; 760:25-761:10 (Gardner)(emphasis added)].

- Dr.Marmureanu no longer uses filters because it is his opinion they do not do any good and they have many complications: Dr. Marmureanu testified that he no longer uses IVC filters because, based on the data that exists, it is his opinion that the filters do not "do any good" and there are a lot of complications associated with their use. [1476:1-16 (Marmureanu)].

- Cook did not determine safety for the Celect filter: Dr. Kessler testified that there was never a determination of safety made by Cook for the Celect filter.  [460:16-22 (Kessler)].  Cook only employed a specific process aimed at determination of

safety in connection with its Bird Nest filter.  It did not establish safety for its other filters.  [459:23-460:22 (Kessler)].

- <u>The OUS study found a high rate of perforation with the Celect filter:</u> The OUS clinical study found that the Celect filter had a 17% rate of perforation.  [549:9-22 (Kessler)].  Cook attempted to distract the jury with the low rate of "complaints" reporting Celect perforations, but Plaintiff's experts explained that low rates of complaints (that are primarily reported by Cook) are in stark contrast to the "high percentage of perforation in many of the studies." [1097:15-18 (McMeeking)].

- <u>There is no study finding IVC filters effective in decreasing the risk of death in spine surgery or orthopedic surgery patients</u>:  Dr. Lynch did not know of any study suggesting that the use of IVC filters decreases the risk of death by pulmonary embolism in a spine surgery patient or an orthopedic surgery patient. As Dr. Lynch stated: "There's no publication supporting their use in either way."  [Lynch 137:8-138:3]

        c.      **Evidence of safer alternative designs.**

    The feasibility of an alternative design is a factor to be considered when determining the expectations of an ordinary consumer.  *Seattle-Firs Nat. Bank v. Tabert,* 86 Wash 2d 145, 154 (Wash. 1975); *Potter,* 694 A.3d at 1333-1334 (same).  Here, the jury heard evidence that the Celect IVC Filter was defectively designed and unreasonably dangerous for several reasons, including the following:  (1) the metal used in the Celect Filter is too stiff causing the filter to have an increased tendency to tilt [1006:8-1007:7 (McMeeking)], (2)  the shape of the secondary arms of the Celect filter have a circular shape which simply slide along the wall of the vena cava when the filter tilts and do not

help resist the tilting of the filter. [1006:8-1007:7 (McMeeking)], and (3) the Celect Filter has no features to stop perforation. [1010:7-16 (McMeeking)]. Perforation limiters could have been added to the filter legs. Adding perforation limiters would have stabilized the filter against tilt and perforation. [1036:19-1037:1 (McMeeking)].

The jury heard substantial evidence regarding design alternatives and modifications that were considered by Cook. In particular, Plaintiff presented considerable evidence regarding perforation limiters that would have stabilized the filter and reduced the incidents of tilt and perforation. [1036:19-1037:1 (McMeeking)].

- Cook was aware that perforation limiters were effective: Cook studied design modifications in June of 2008, different modifications of the filter (perforation limiters) were tested at a hospital in Denmark called Skejby. That test revealed that a model featuring a "small extension of the leg below the anchor hook" did not perforate. [1040:10-1042:5 (McMeeking)]. Based on his review of the bench test, Dr. McMeeking concluded:

  > [The] bench test demonstrates that the perforation limiter in the form of *the slightly-extended leg below the anchoring hook is an effective perforation limiter* and is doing the job of helping to limit or limiting completely the tendency of the filter to perforate through the wall of the vena cava. [1048:8-13 (McMeeking)].

- Perforation limiters could have been added as early as 2005: Dr. McMeeking offered the expert opinion that it would have been feasible for Cook to add perforation limiters beginning in the 2005 time frame. [1052:2-6 (McMeeking)].

- The cost of adding perforation limiters would have been minimal: The jury also heard that it would cost "much less than 1 percent" of the selling price of the filter to add a perforation limiter. [1049:13-16 (McMeeking)].

- <u>The addition of perforation limiters would not have increased any other risk:</u> Cook has suggested that the Celect filter's problems with tilt and perforation are consequences of its increased retrievability.   Plaintiff's experts explained to the jury that that is not the case.   The trade-off Cook made between safety and retrievability was not necessary because Cook could have added perforation limiters without increasing any other risks.   [1062:22-24 (McMeeking)].   Dr. McMeeking offered his expert opinion that adding a perforation limiter to the Celect filter "would reduce the risk of perforation and tilting without increasing the risk of any other adverse behavior of the filter.   [1118:2-11  (McMeeking)].

> Q.     So its not an either/or situation?
> A.     Its not an either/or situation.

[1118:2-11  (McMeeking)].   Thus a jury could reasonably conclude that the use of perforation limiters would be a safer alternative design based on testimony that "the addition of penetration perforation limiters…would reduce the tendency to perforate and tilt without increasing other risks."     [1080:5-8;  1116:16-21 (McMeeking)].

- <u>Perforation limiters would have prevented Plaintiff's injury:</u> From an engineering standpoint, the jury heard expert testimony that it was "likely it [Ms. Hill's filter] would not have perforated" if there had been perforation limiters.   [1092:17-24 (McMeeking)].

Any combination (of some or all) of the evidence Plaintiff has put forth regarding physicians' expectations for the Celect filter, the risk-utility profile of the Celect filter, and the existence of safer alternative designs suffices to raise a fact issue as to whether the

Celect filter was unreasonably dangerous in its design.  Because that issue of fact warrants jury determination, Cook's motion for a directed verdict must be denied.

> **5.   Plaintiff offered sufficient evidence to allow a reasonable jury to find that the Celect filter caused her injuries.**

Plaintiff has presented sufficient evidence to raise a fact issue as to whether her injuries were caused by the Celect's design.  To establish causation, a Plaintiff must simply show that the defective design of a product directly produced or substantially contributed to producing the injury – "so that it can reasonably be said that, but for the defect, the injury would not have occurred." *Aubin*, 177 So.3d at 513.

Here, Plaintiff's strict liability design defect claim is supported by the expert causation testimony of Dr. Marmureanu and Dr. McMeeking.  Cook argues that Dr. Marmureanu's testimony is insufficient to raise a fact issue on causation because he "offered no opinion that any design defect in Plaintiff's Celect IVC filter had actually caused Plaintiff's injuries." There are several problems with Cook's argument.

First, to the extent that Cook is arguing Dr. Marmureanu's opinions are insufficient to raise a fact issue on causation because they aren't specifically phrased in terms of the defective design characteristic, Cook is mistaken.  Dr. Marmureanu's testimony is intended work in tandem with the testimony of Dr. McMeeking.  Dr. McMeeking has offered expert opinions that, to a reasonable degree of scientific and engineering possibility, adding perforation limiters to the design of the Celect filter would have reduced the problems of perforation and tilting.  [1036:19-1037:1; 1092:5-7 (McMeeking)]. Thus, Dr. McMeeking was able to testify from an engineering standpoint, that the Celect filter likely would not have perforated if it had had perforation limiters. [1092:12-24 (McMeeking)]. Meanwhile, Dr. Marmureanu informed the jury of his opinion that the Celect filter – which

Dr.McMeeking testified was defective because of its design – was the cause of Plaintiff's injury.

Furthermore, Dr. Marmureanu *has* testified that Plaintiff's injuries were caused by flaws in the design of the Celect filter:

> Q. With respect to the tendency to tilt, perforate and embed, do you have an opinion as to whether or not the design causing that was a substantial factor in the injuries sustained by Ms. Hill, including the vena cava perforation and the perforation into the duodenum and the abdominal [sic], and other IVC filter stenosis and problems she has suffered?
>
> A. Yes, sir, I agree with you.
>
> Q. What's your opinion?
>
> A. My opinion is *the design and construction gave rise to all the above issues.*
>
> Q. And finally, do you have an opinion as to whether or not her GI symptoms were caused by the filter going into the duodenum?
>
> A. Absolutely, yes.

[1635:11-20; 1783:23-1784:3 (Marmureanu)(emphasis added)].

The causation evidence in this case is equivalent to the evidence deemed sufficient to raise a fact issue on causation in a similar IVC filter case. *Tillman v. C.R.Bard, Inc.,* 96 F.Supp.3d 1307, 1349 (M.D.Fla. 2015). In *Tillman,* the court held that evidence showing tilt, perforation, and migration were known risk factors for G2 IVC filters -- coupled with evidence that no outside factor caused the complications the plaintiff experienced -- were sufficient to raise a fact issue on causation.  In other words, evidence that (1) certain complications are inherent in the design of the particular IVC filter and (2) that the plaintiff experienced those complications without any other cause would be sufficient to allow a

fact finder to conclude that the plaintiff's injuries were the result of the filter's defective design. *Id.; citing C.R. Bard, Inc. v. Mason,* 247 So.2d 471, 471-72 (Fla.2d Dist.Ct.App. 1971)(finding sufficient evidence of causation where evidence showed some devices contained defect which caused fracture, plaintiff's device fractured, and all other possible causes excluded); *Worsham v. A.H. Robins Co.,* 734 F.2d 676, 683–84 (11th Cir.1984)("Elimination of alternative causes is one of several accepted types of proof for establishing product defect."). That is precisely the evidence presented in this case. The Celect filter has a tendency to perforate and tilt, Plaintiff's Celect filter tilted and perforated and Dr. Marmureanu has testified that, after applying a differential diagnosis, it is his expert opinion that the perforation, tilt and embedment of the Celect filter caused Plaintiff's injuries. [1625:1-10; 1626:2-15 (Marmureanu)]. The evidence in this case suffices to raise a fact issue regarding causation in this case, just as it did in the *Tillman* case. [8]

The expert causation evidence is supplemented by the common-sense fact that Plaintiff suffered an injury that can *only* occur in connection with a filter implant. This is not a case where the jury is asked to determine which of several possible causes were responsible for a common condition. The only possible source of the metal filter leg that pierced Plaintiff's duodenum *is* her Celect IVC filter. [Exhibit 7002 (Hill Discharge Summary), p. 1 ("EGD done on 08/15/2013 showed the following: The presence of a wire that was penetrating through the duodenal wall and extending to the opposite duodenal wall. . .")]. Where a condition is obvious, a jury may reasonably rely on the medical records

---

[8] The case cited by Cook as requiring a connection between the defect and the injury is highly distinguishable. In *Barati v. Aero Industries, Inc.,* summary judgment was granted in *Barati* because the injured repairman was not harmed by the defective product but by the decisions he made in the process of repairing the defective product (pulling on cable while balancing on latter causing a fall). 579 So.2d 176, 177 (Fla.App. 1991). While noting that the defect is what necessitated the repair, the Court held that the "but for" cause of the injury remained the act of repair. That is a different factual situation from the one presented here.

and Dr. Marmureanu's testimony to conclude that a perforation of Plaintiff's IVC and duodenum by a metal strut was caused by a defect in the Celect filter.

The jury was presented evidence from which it could reasonably conclude that the perforation and irretrievability problems Plaintiff suffered were attributable to the defective nature of the Celect filter:

- <u>With regard to the progressive perforation of the Celect filter into Plaintiff's duodenum:</u> Plaintiff has offered evidence establishing that the Celect IVC Filter is associated with the perforation injury she suffered. Dr. Marmureanu offered the expert opinion that the Celect filter does progressively perforate and that the filter progressively perforates into other organs. [1607:19-1608:3 (Marmureanu)]. Moreover, the jury heard Dr. Marmureanu's opinion that the longer a filter stays in the body, the more and deeper the filter perforates. [1608:7-8 (Marmureanu)].

  The jury also heard about medical studies indicating that the Celect filter has complications. [1571:25-1572:3 (Marmureanu)]. Specifically, Dr. Marmureanu discussed the published and peer reviewed Zhou 1 study, entitled "Retrospective Review of 120 Celect Inferior Vena Cava Filter Retrievals: Expired at a Single Institution, which found an 86.1 percent rate of caval penetration for the Celect filter under a standard definition. [Ex. 1348; 1584:10-16; 1584:20-1585:5 (Marmureanu)]. The Zhou 2 study, entitled "Penetration of Celect Inferior Vena Cava Filters: Retrospective Review of CT Scans in 265 patients, showed an 80% penetration rate of Celect filters within 90 days of implantation (defining penetration in a way that meets the standard definition for perforation). [1596:7-

1597:15 (Marmureanu)].   The Dowell study showed a 79% perforation rate for Celect filters. [1604:9-18 (Marmureanu)]

The jury was also presented expert medical testimony that the filter perforation could not be explained by some extreme trauma [1627:12-15 (Marmureanu)(ruling out trauma as a causes of the perforation)] or by any abnormality in Plaintiff's vena cava.   [Zuzga Dep. 208:13-17 (ruling out abnormalities in Plaintiff's vena cava)].   Ultimately, the differential diagnosis arrives at the conclusion that there is no alternative explanation for the presence of a metal filter leg in Plaintiff's duodenum other than a defective filter implant.

- With regard to the irretrievability of Plaintiff's filter by standard methods:  The jury heard evidence that the Celect filter's problem with irretrievability was reflected in the medical literature.   The British Registry S.I.R.examined patients receiving Celect filters from 2007 to 2011 and found a 97% retrieval failure rate of Celect filters. [1877:2-17 [Marmureanu)].   Dr. Marmureanu offered the expert opinion that complicated retrievals were often necessary because Celect filters could not be removed by other means. [1608:14-21 (Marmureanu)].

- With regard to IVC stenosis:  Dr. Marmureaunu offered the opinion that the narrowing or stenosis of Ms. Hill's IVC was related to the placement and retrieval of the IVC filter. [1634:13-19 (Marmureanu)]. He based his opinion on his review of Plaintiff's medical records, the conclusions of her treating physician that was narrowing of the upper to mid IVC, and the fact that there was no indication of IVC stenosis prior to the filter being implanted. [1631:20-1632:3; 1807:23-1808:1 (Marmureanu)].

- With regard to Plaintiff's gastrointestinal symptoms:  Dr. Marmureanu offers the expert opinion that Ms. Hill's GI symptoms were caused by the filter going into her duodenum.  [1635:21-24 (Marmureanu)].  Dr. Marmureanu's opinion is supported by Ms. Hill's symptomology. Ms. Hill suffered nausea, vomiting and gastric pain. These are symptoms consistent with an intestinal obstruction – such as a filter perforating all the way through the duodenum.  [1620:1-8 (Marmureanu)].   It was also supported by an endoscopy report from a gastrointestinal doctor who found a wire penetrating through Ms. Hill's duodenal wall and extending to the opposite duodenal wall.  [1542:2-1543:19 (Marmureanu)].

Dr. Marmureanu performed a differential diagnosis and ruled out Plaintiff's prior back surgery and cervical fusion, her degenerative scoliosis, her prior history of esophagitis, other gastroesophagal disease, hypercholseteremia, obesity, colitis, and trauma, such as from a car accident as causes of her injuries. [1626:16-1629:10 (Marmureanu)].    Thus, adequate evidence exists to raise a fact issue as to whether Plaintiff's IVC stenosis and gastrointestinal injuries were caused by defects in the design of the Celect filter.

## D.  Defendant Cook Inc.'s argument that it cannot be held strictly liable on Plaintiff's claims is meritless.

Defendants argue that Cook Incorporated ("Cook Inc.") is entitled to judgment as a matter of law on all claims against it because Plaintiff has failed to offer any evidence that Cook Inc. had any role in the manufacture or sale of Plaintiff Hill's Celect IVC filter. Under Florida law, however, liability is not limited solely to individual defendants who manufactured or sold the defective product. Instead, Florida law allows the imposition of strict liability for a defectively designed product upon an individual defendant who had any

involvement in the *design*, manufacture, or distribution of the product. *See* Fla. Std. Jury Instr. (Civ.) PL (2015) (Notes on Use for 403.7, comment 6) (stating that: "In some cases, it may be appropriate to instruct the jury that, in addition to the *designer* and manufacturer, any distributor, importer, or seller in the chain of distribution is liable for injury caused by a defective product.")(citations omitted)(emphasis added); *see also Hernandez v. Altec Envtl. Prod., LLC*, 903 F. Supp. 2d 1350, 1357 (S.D. Fla. 2012)(granting summary judgment on plaintiff's strict liability and negligent design claims against individual defendant that did not "*design*, manufacture, or distribute" the allegedly defective product)(emphasis added); *Rivera* v. *Baby Trend, Inc.* 914 So.2d 1102, 1105 (FL DCA 2005) (reversing summary judgment ruling in favor of non-manufacturer defendant on strict product liability claims where evidence showed that entity had "some control over the design of the product to ensure compliance with safety regulations and had, at least once, in response to an unrelated complaint, taken steps to make the product safer."). An analogous situation is a component part manufacturer, who did not sell, distribute, or manufacture final defective product, but, nonetheless, may be held responsible under strict products liability for a defectively designed product if it substantially participated in the integration of the component into the design of the finished product. *See Faddish v. Buffalo Pumps*, 881 F.Supp.2d 1361, 1371 (S.D. Fla. 2012)(A component part manufacturer may found liable: "(1) where the component is itself defective or (2) *where the component part manufacturer substantially participated in the integration of the component into the design of the finished product.*")(citations omitted)(emphasis added).

In their Answer to Plaintiffs' Master Complaint, Cook admits that Cook Inc. was "involved in the design, research, development, and testing of the Cook Celect…but they

deny CI manufacturers those devices." Answer of Cook Defendants to Plaintiffs' Master Consolidated Complaint for Individuals Claims ("Cook Answer"), Doc. 456, p. 5 at ¶ 22. Defendants' admission is conclusive and Plaintiff was not required to present any evidence on the already admitted issue of Cook Inc.'s involvement in the design of the Celect.[9] Because (1) Florida Law imposes liability for defective products on individual defendants involved, not just in the manufacture and sale of the product; but also, to defendants involved in the design of the product, and because (2) Defendants conclusively admit that Cook Inc. was involved in the design of the Celect, the jury would have a legally sufficient basis to find Cook Inc. strictly liable for the defective design of the Celect IVC filter.

The Cook Defendants also admitted in their answer that Cook Inc. "acting on behalf of WCE, sought clearance from the FDA to market the Cook Celect vena cava filter pursuant to Section 510(k) of [the MDA]." Cook Answer, p. 7 at ¶ 30. Cook Inc.'s role in seeking 510(k) clearance from the FDA for the Celect makes them strictly liable for any defects found in the product. *See Bennett v. Forest Laboratories*, 99 F.Supp.3d 1360, 1364 (S.D. Fla. 2015). In *Bennett*, the court held that the defendant could be held strictly liable even though it did not manufacture or distribute the drug because it acted as the FDA sponsor for drug. *Id*. (In light of the defendant' regulatory activities, the court held that it "does not need additional roles, like designing and manufacturing Lexapro, to be potentially liable").  In light of its regulatory role, Cook Inc. may be held strictly liable for defects in the Celect IVC filter placed in Plaintiff.

---

[9] An admission in a current pleading is conclusive upon the party making it and relieves the opposing party of the duty to present evidence on that issue. *Brazier v. Maple Lane Apartments I, LLC*, 45 N.E.3d 442, 452 (Ind. Ct. App. 2015). Statements contained in a party's pleadings may be taken as true as against the party without further controversy or proof. *Lutz v. Erie Ins. Exch.*, 848 N.E.2d 675, 678 (Ind. 2006).

Lastly, even though Plaintiff was not obligated to offer any evidence on the admitted issue, Plaintiff presented evidence that Cook Inc. was substantially involved in the design of the Celect filter. Such evidence includes:

- Testimony from Hendriksen, project leader and design engineer for Cook Celect, that when he started on the design project of the Celect he worked with individuals at Cook Inc. [Hendriksen Vol. 4 1154:4-10].

- Evidence from the new product application for the Celect filter that listed design engineers Per Hendriksen, employee at William Cook Europe, and Mark Frye, employee at Cook Inc., as project leaders [Hendriksen Vol. 4 1159:4-10-23].

- Testimony from Per Hendrickson that project specification, which listed the design specifications for the redesign of the Tulip filter (Celect), was prepared by Mark Frye and himself [Hendriksen  1311:11-1312:3; see also PX 304].

- Testimony from Per Hendrickson that he worked extensively and very closely with Cook Inc. engineer Mark Frye-- talking to him every day for hours about the Celect project and worked many hours with Frye on the project. [Hendriksen 1286:23-1287:22].

- Cook internal documents that show that the project team and decision-making for the design FMEA analysis of the Celect involved participants from WCE and Cook Inc. [PX 949].

- Ultimately, as Cook Inc.'s president Kem Hawkins testified when asked about some of the risks associated with the Celect and about the risk analysis prepared for the Celect design, the decision as to whether the Celect filter needed to come on or off the market was his decision. [Hawkins 169:21-170:10; 203:4-203:12].

The evidence in this case demonstrates why the imposition of strict liability is appropriate against individual defendants like Cook Inc. (who had substantial involvement in the design of a product but perhaps did not ultimately manufacturer or distribute the product). The imposition of liability in this circumstance comports with the underlying basis for the doctrine of strict liability: placing liability upon "entities [that] are in a better position to ensure the safety of the products they market, to insure against defects in those products, and to spread the cost of any injuries resulting from a defect." *Samuel Friedland Family Enterprises v. Amoroso*, 630 So.2d 1067, 1068 (Fla.1994).

**III.**
**CONCLUSION**

Plaintiff respectfully urges the Court to deny Cook's motion for judgment as a matter of law.  Plaintiff respectfully requests all other and further relief to which she may be justly entitled.

Dated: November 5, 2017.

Respectfully Submitted,


*/s/ Joseph N. Williams*_____
Joseph N. Williams, Atty. No. 25874-49
Riley Williams & Piatt, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com
*Liaison Counsel to Plaintiffs' Steering Committee and on behalf of Plaintiffs' Steering Committee*

*/s/ Michael W. Heaviside*_____
Michael W. Heaviside, Esq.
Heaviside Reed Zaic, A Law Corporation
910 17th Street NW, Suite 800

Washington, DC 20006
Telephone: (202) 233-1993
Email: mheaviside@hrzlaw.com


*/s/ Ben C. Martin*_____
Ben C. Martin, Esq.
The Law Office of Ben C. Martin
3710 Rawlin Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 74407590
Email: bmartin@bencmartin.com


*/s/ David P. Matthews*_____
David P. Matthews, Esq.
Matthew and Associates
2509 Sackett St.
Houston, TX 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
Email:
dmatthews@thematthewslawfirm.com


*Plaintiffs' Co-Lead Counsel*


## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.


*/s/ Ben C. Martin*_____
Ben C. Martin