UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,       )
IVC FILTERS MARKETING, SALES     )
PRACTICES AND PRODUCT            )
LIABILITY LITIGATION MDL 2570,   )
                                 ) Cause No.
                                 )  1:14-ml-02570-RLY-TAB
                                 ) Indianapolis, Indiana
_____ ) **October 16, 2017**
                                 ) 2:01 p.m.
This document relates to:        )
Elizabeth Jane Hill,             )
1:14-cv-6016-RLY-TAB             )
                                 )


**Before the Honorable
RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
TELEPHONIC HEARING AND PRETRIAL CONFERENCE


Court Reporter:              David W. Moxley, RMR, CRR, CMRS
                             United States District Court
                             46 East Ohio Street, Room 340
                             Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

**APPEARANCES:**

| | |
|---|---|
| **For the MDL Plaintiffs:** | Joseph N. Williams, Esq.<br>Riley Williams & Piatt, LLC<br>301 Massachusetts Avenue<br>Indianapolis, IN  46204 |

Ben C. Martin, Esq.
Law Offices of Ben C. Martin
Suite 1230
3710 Rawlins Street
Dallas, TX  75219

Matthew D. Schultz, Esq.
Levin Papantonio Thomas Mitchell
 Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

Michael Heaviside, Esq.
Heaviside Reed Zaic
Suite 800
910 17th Street, NW
Washington, DC  20006

David P. Matthews, Esq.
Matthews & Associates
2906 Sackett Street
Houston, TX  77098

Laura Baughman, Esq.
Baron & Budd
3102 Oak Lawn Avenue
Dallas, TX  75219

**For Defendant Cook:**          Andrea Roberts Pierson, Esq.
Anna Rutigliano, Esq.
John T. Schlafer, Esq.
Faegre, Baker, Daniels, LLP
Suite 2700
300 North Meridian Street
Indianapolis, IN  46204

**APPEARANCES (CONT'D):**

John Joseph Tanner, Esq.
Baker & Daniels
300 North Meridian Street
Indianapolis, IN  46204

James Stephen Bennett, Esq.
Faegre Baker & Daniels, LLP
Suite 800
111 East Wayne Street
Fort Wayne, IN  46802

Charles F. Webber, Esq.
Faegre Baker & Daniels, LLP
90 South Seventh Street
Minneapolis, MN  55402

                                                                4

 1                          (PROCEEDINGS)

 2              THE COURT:  Good afternoon, everyone.

 3              UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

 4              UNIDENTIFIED SPEAKER:  Good afternoon, Judge.

 5              THE COURT:  All right.  Plaintiff, who is here on

 6  the phone for the plaintiff?

 7              MR. MARTIN:  Ben Martin on behalf of the plaintiff,

 8  Your Honor.

 9              MR. WILLIAMS:  We also have, Your Honor, Joe

10  Williams and Mike Heaviside, as well.

11              THE COURT:  All right.  Then who's on the phone for

12  Cook?

13              MS. PIERSON:  Good afternoon, Judge.  This is Andrea

14  Pierson.  And I have with me the same suspects I had with me

15  last week, Joe Tanner, John Schlafer, Jessica Cox, and Anna

16  Rutigliano.

17              THE COURT:  Okay.

18              MR. WEBER:  Also Charles Weber, Your Honor.

19              THE COURT:  All right.  Good.  Okay.  I hope you're

20  all doing well today.  As we discussed last week, we tried to

21  finish up the pending matters that we were not able to get to

22  because of the Court's modified schedule.  So does anyone have

23  an agenda as to how we wish to proceed today?

24              MS. PIERSON:  We do, Your Honor.  We provided --

25              THE REPORTER:  I'm sorry.  Excuse me.  This is the

5

1  court reporter.  You're going to need to identify yourself

2  each time you speak, because I have no clue who's who.

3          MS. PIERSON:  Okay.  Apologies.  Sorry.  This is

4  Andrea Pierson.

5          THE REPORTER:  Thank you.

6          MS. PIERSON:  Your Honor, we have an agenda that we

7  provided to the Court through a draft.  There are a number of

8  motions that we've worked out and that we've agreed we don't

9  need argument on.  And motions in limine from the defendant's

10 side, that we would like to address briefly, are numbers 13,

11 14, 19, 21 through 23, 24, and 28.  And it's my understanding

12 that Plaintiffs also requested argument on their empty chair

13 motion in limine and on the motion in limine pertaining to the

14 consent form.

15         THE COURT:  I also have here a motion to exclude

16 evidence of attorney advertising.

17         MR. SCHULTZ:  Yes, Your Honor.  Matt Schultz here.

18 We felt that was one that could be ruled on just based on the

19 papers, we thought it was straightforward.  But if you want

20 argument on it, of course, we would be happy to address it.

21         THE COURT:  Right.  I think that's pretty

22 straightforward.

23         Okay.  Andrea, or part of your team here, on number

24 13?

25         MS. PIERSON:  Right.  Yes, Your Honor.  Motion in

6

1  limine number 13 deals with evidence related to the scientific

2  state of the art.  And it's really related to the motion in

3  limine that we talked about last week on subsequent remedial

4  measures.  So if we were together in person, I would lay this

5  out in a visual way so that you could see it, but just by way

6  of history, in terms of the relevant dates, I would like to

7  give you a few.

8          The Celect design was completed in August of 2006.

9  It was cleared by the FDA on April the 20th of 2007.  Sales in

10  the United States began in August of 2007.  Mrs. Hill's

11  particular Celect was manufactured in May of 2010.  And on

12  November the 17th of 2010, Mrs. Hill received her Celect

13  product.

14          The Celect Platinum, the development period for the

15  product that would follow the Celect, began in October of 2007

16  and was concluded in July of 2012.  And, as I mentioned the

17  last time, we didn't know it to be the Celect Platinum design

18  until later on, and that range of dates, it's probably

19  debatable at which point it actually became the Platinum, but

20  feasibility for a new -- feasibility studies for a new product

21  design really, and discussion of a new product design, began

22  in October of 2007.  So those are the relevant dates.

23          These two concepts, the rule pertaining to

24  subsequent remedial measures Rule 407 and then the notion of

25  state of the art and admissibility of evidence that go to

1 state of the art, they really are overlapping concepts.  So

2 they told you last week, under Rule 402 and 403 and 407,

3 evidence related to feasibility for new designs should be

4 excluded, that subsequent remedial measures and the law on

5 subsequent remedial measures dictate the policy reasons why

6 such evidence is not admissible.  And it makes clear that such

7 evidence can't be offered for the purpose of proving

8 negligence or a course of conduct or culpability.  It can't be

9 offered to prove a defect in a product or its design.

10          And the law related to Rule 407, it's not entirely

11 the case law that interprets Rule 407, and there's not a clear

12 definition of when it starts, but we know from other medical

13 device cases, such as *Brady v. Zimmer*, which is 2015 WL

14 2092850, and other medical device cases, that it's typical

15 that the date of implant is the date that applies for purposes

16 of Rule 407, typically.

17          But courts have combined the concept of Rule --

18 underlying Rule 402, 403, and 407 to dictate that even

19 evidence for the date of implant that relates to a new product

20 design, and it's simply not relevant and is unfairly

21 prejudicial, because it goes to the whole question of

22 culpability negligence.  Plaintiffs offer it for the purpose

23 of culpability negligence and defect.

24          So state of the art, Your Honor, is a defense under

25 Florida law to Plaintiff's claim of design defect and

1  negligence defect, because it does not exist.  And under the

2  rule related to state of the art, we know that evidence

3  related to the state of the art that existed at the time of

4  manufacture is what's relevant.  So does killing the motion

5  that we made related to subsequent remedial measures.

6  Certainly any evidence that Plaintiffs would offer to kind of

7  show the state of the art or knowledge or ability to test

8  after the date of manufacture, that would not be relevant, and

9  the Florida statute pertaining to state of the art makes that

10  clear.

11         Now, as I understand Plaintiff's position in

12  response to this, they make a few points, but it really comes

13  down to their belief that state-of-the-art defense is not

14  absolute, and that they would offer evidence concerning the

15  technology and testing after the date of manufacture or the

16  Celect Platinum in order to prove negligence or defect.

17         Our view, Your Honor, is that such evidence is not

18  relevant and that we ought to be focusing the jury on the

19  filter the plaintiffs actually received, the Celect, and not

20  on the consideration or development of products that the

21  plaintiff didn't receive, the Platinum or any other products

22  that Cook considered or tested or considered developing or

23  discussion related to those.

24         So for the same reasons that we discussed last week,

25  as it relates to subsequent remedial measure, it's our view

1  that the Court should bar evidence of any consideration of new

2  designs, technology, state of the art, and other related

3  concepts after the date upon which the Celect design was

4  completed in, like, 2006.  Beyond that, we believe that it

5  will confuse the jury as to which product is at issue; it will

6  confuse the jury as to the standards for the two claims that

7  are remaining, negligent testing and strict liability; and

8  that it's unfairly prejudicial and inadmissible.

9        THE COURT:  All right.  Thank you, Andrea.  Who's

10  going to respond on behalf of the plaintiff?

11        MR. WILLIAMS:  This is Joe Williams, Your Honor.

12        THE COURT:  All right, Joe.

13        MR. WILLIAMS:   Thank you, Your Honor.  First, I

14  want to clear up a little bit of confusion, I think, with

15  regard to what date actually binds subsequent remedial

16  measures.  If Your Honor would take a look at the note of the

17  Advisory Committee in the 1997 amended, it says in those

18  notes, "Evidence of measures taken by the defendant prior to

19  the event causing injury or harm do not fall within the

20  exclusionary scope of Rule 407, even if they occurred after

21  the manufacture or design of the product."

22        Here, Ms. Hill's product was not manufactured until

23  May of 2010 and it wasn't implanted until November of 2010.

24  The evidence that Cook seeks to bar is evidence of Cook's

25  knowledge of the problems with the Cook Celect filter and

1  their attempts to change those problems or fix those problems

2  more than two years before Mrs. Hill's Celect filter was

3  manufactured.

4        These -- this evidence that we seek to put in would

5  demonstrate clearly that Cook had the knowledge that there

6  were safer alternative designs for this product.  And if you

7  read Florida statute, Section 768.1257, which defines

8  state-of-the art defense, it's not limited to things that have

9  been tested or cleared or approved, but states that the jury,

10 "shall consider the state of the art scientific and technical

11 knowledge and other circumstances that existed at the time of

12 manufacture."

13       And so if that's truly the standard that we're

14 working under, what Cook -- the knowledge that Cook had back

15 in 2007, when they started to redesign the Celect filter, is

16 clearly relevant to show both feasibility and knowledge of the

17 state of the art well before Ms. Hill's Celect filter was

18 manufactured.

19       And it's not going to confuse the jury, because what

20 it's going to do is demonstrate, clearly, that we're talking

21 months, not years, months after the Celect filter was cleared

22 for sale, Cook internally knew that it had a progressive

23 perforation problem.  And rather than stopping and rather than

24 not selling or continue to manufacture that device, what they

25 did was, behind the scenes, redesigned that product in an

1  attempt to fix what they knew was a progressive perforation

2  problem.

3          And because that knowledge and that redesign and

4  those efforts took place two years before the event causing

5  the injury to Mrs. Hill, which is her implant, or even

6  generously towards Cook -- to Cook, the date of manufacture,

7  because this evidence took place years before that, under the

8  explanation of the 1997 amendments from the Advisory

9  Committee, Rule 407 does not bar or exclude the evidence that

10  we seek to put in.  And so we just -- we simply ask that the

11  motion be denied.

12          THE COURT:  All right.  Thank you.

13          Andrea Pierson, respond, or reply?

14          MS. PIERSON:  Thank you, Your Honor.  Just briefly,

15  I might bring the Court's attention to a couple of things,

16  Your Honor.  There are -- there are cases on which the

17  plaintiff relies in response to the motion in limine number

18  12, dealing with subsequent remedial measures, that hold that

19  the combination of Rule 402, Rule 403, and Rule 407, that

20  those three rules combined essentially to make evidence

21  related to new product designs considered or developed

22  irrelevant, unfairly prejudicial, and probative, and

23  subsequent remedial measures.

24          In addition, as I think we cited in our papers, the

25  *Dugans* case, which is a 2016 Middle District of Florida case,

12

1  the cite is 2016 Westlaw 3936142, makes clear that

2  state-of-the-art evidence that postdates the manufacturing

3  date is inadmissible.  I mentioned the *Brady* case a second

4  ago, which refers to subsequent remedial measures, because

5  these concepts really are related in terms of what will be the

6  relevant date for evidence at trial.  The *Brady* case makes

7  clear that the time of alleged injury is the time that the

8  product is placed or implanted.

9        And, of course, that makes sense, particularly in

10  Ms. Hill's case.  You'll recall, at the last hearing, that the

11  plaintiff explained that they believed that her filter tilted

12  and embedded, and within just a few months of placement.  So

13  they can't have it both ways in the sense that they claim, for

14  purposes of this argument, that the time of injury is 2013;

15  but when they argue about a tilt or embedment, that it

16  happened -- happened much earlier.

17        At the end of the day, though, Judge, I think we

18  have to look for common sense problems to address how will

19  evidence come in at this trial.  And you have a few paths

20  forward, in my view, respectfully, Judge.

21        One path forward is to say, this case is going to be

22  tried about the Celect and the Celect only, and we'll try the

23  issues of: Is the design of the Celect defective?  And was

24  there negligence in the process of testing the Celect?  And

25  anything that postdates the work of Cook on the feasibility of

1   new designs or consideration of new designs in the Platinum,

2   all of that evidence will be excluded.  That's a different

3   trial, different product.  That's one path.

4           Another path is to say, well, it's just all going to

5   come in and we'll let the jury sort all this out.  I think

6   that's a very dangerous path, because the case in relation to

7   the Platinum has not been fully developed, and Your Honor has

8   twice limited discovery about the Platinum.  So Cook has not

9   produced many good things about the Platinum, because that

10  evidence was not discoverable, not at issue here in this

11  litigation.  You've reached that conclusion twice and/or Judge

12  Baker has.  So the second path forward, we think, is really

13  not a possibility.

14          The third path forward, it seems to me, is that the

15  Court could say there is a fact that a new product was

16  developed, and that new product was the Platinum, and the

17  Platinum was introduced in 2012, it is part of the factual

18  chronology, and that we leave it at that; that the jury knows

19  that a new product was introduced in 2012, and that other

20  things related to the product, related to the Platinum and

21  other designs, that those things are inadmissible.  They

22  become a mini trial, a confusing mini trial, on a product that

23  is simply not at issue and hasn't been developed.

24          This one last point, as it relates to what

25  Mr. Williams said, I've heard him say a few times "Cook's

14

1  knowledge," "Cook's knowledge," or "Cook's concealment," and I

2  would just like to remind us all what the legal claims are.

3  There is a legal claim of strict liability design defect.

4  There is a negligent testing claim.

5       And, although we'll discuss that in a moment and

6  what exactly that means, at the end of the day, these topics

7  are not relevant to either of those claims.  Cook's knowledge

8  doesn't go to the question of did we use reasonable care in

9  our testing?  And Plaintiff has no expert who will say we did

10  not use reasonable care in our testing.

11       You heard argument last week on Dr. McMeeking, the

12  engineering expert, and Plaintiff's counsel is quite clear

13  that he'll testify about the existence of a defect based on

14  his mathematical calculations of the radial force of

15  stiffness.  There was no claim that he would say that Cook's

16  testing somehow fell beneath the care or standards that other

17  manufacturers took.  He's analyzed our fatigue testing and

18  said some things about that.  That's not relevant to the

19  question of tilt or perforations or embedment.

20       So, at the end of the day, our view is that this

21  question that Mr. Williams raises today about knowledge of

22  concealment, those things might have been relevant to a

23  negligence per se argument or to a misrepresentation claim,

24  but those claims aren't in this case.

25       THE COURT:  All right.  Thank you, Andrea.  Okay,

1  the Court will take that under advisement.

2            14?

3            MS. COX:  Hi, Your Honor.  This is Jessica Cox for

4  Cook.  And this motion dealt with evidence concerning risks of

5  IVC filters other than those that Mrs. Hill experienced.  And

6  in response, the plaintiffs point out in their motion that a

7  blanket exclusion of evidence of other risks would not be

8  practical or appropriate, and we agree.  We are not asking for

9  a blanket exclusion of evidence dealing with risks of IVC

10 filters other than those that Mrs. Hill experienced.

11            But what we were trying to do was to avoid a trial

12 within a trial.  Specifically, we were looking at the issue of

13 fracture thrombosis and death in our motion.  From our hearing

14 earlier, counsel had made the representation that

15 Dr. McMeeking will not be spending the majority of his

16 testimony talking about fractures, because it's not relevant,

17 so I think that, from given their assertions, is a moot point.

18 They've withdrawn Dr. Garcia as a will-call list at trial, so

19 the fear that thrombosis will be a trial -- at the trial seems

20 to be alleviated at the moment.

21            So that leaves us with two specific pieces of

22 evidence that we wanted to discuss today, and first of which

23 is a designation by Plaintiffs of a Jim Carlson to be a

24 witness to testify at trial.  Plaintiffs have designated him.

25 He was a former Cook employee.  They submitted their

16

1  deposition designations.  Jim Carlson was a metallurgist.  His

2  experience was in fracture analysis and materials and fatigue.

3  The majority of the testimony they designate deals with

4  complaints about fractures.

5      Mrs. Hill did not have a fracture, so why the jury

6  needs to hear from someone about lots of different complaints

7  about fracture and someone analyzing fatigue testing and

8  fracture analysis, we think, would just be causing a trial

9  within a trial and be irrelevant and prejudicial given the

10  lack of relevance.  So we would ask that Mr. Carlson's

11  testimony not be admitted at trial due to the lack of

12  relevance and the limited probative value.

13      The second piece of evidence we would like to

14  discuss would relate to death.  And we outline in our motion

15  in limine, obviously, discussions of death is not directly

16  relevant to Mrs. Hill because, thankfully, she is still with

17  us.

18      At our *Daubert* hearing, Plaintiffs indicated that

19  Dr. Fishbein might be talking about his review of an autopsy

20  case where a perforation led to death.  In his report, he gave

21  graphic photos of an autopsy that he actually performed where

22  a filter perforation, in his opinion, led to a bleed and a

23  death.

24      Cook asked for information about that autopsy file.

25  And, unfortunately, Dr. Fishbein said he didn't keep a file

1   and could only give us redacted information about this case

2   due to HIPAA concerns and the lack of the ability to share

3   everything about this case.  But what he did give us was

4   enough for us to surmise that it was a Simon Nitnol filter

5   that was involved in this case, which is not a Cook product,

6   and it's not even a retrievable filter.

7          So, basically, our concern is we don't want a trial

8   within a trial, and this Dr. Fishbein evidence of a case of

9   death from a perforation, when it's not the Celect filter, not

10  the same kind of filter that Mrs. Hill had, not even a Cook

11  product, where we don't have enough information to even

12  cross-examine Dr. Fishbein on the elements of that case, that

13  might make it even more different than Dr. Hill's case.  And

14  Dr. Fishbein has actually testified in his deposition that he

15  doesn't have any information and doesn't -- hasn't done any

16  work on the incidence or rate at with IVC filters could cause

17  death.

18          We think this information is highly prejudicial, but

19  has very little probative value.  It shows -- it's not

20  substantially similar to what happened in Mrs. Hill's case,

21  and we would ask that the evidence, these graphic photos and

22  Dr. Fishbein's testimony about this autopsy case, be excluded

23  from trial.

24          THE COURT:  All right.  Thank you.

25          MR. MARTIN:  Your Honor, Ben Martin -- I'm sorry,

 1  sir, to interrupt.

 2          THE COURT:  Go ahead.

 3          MR. MARTIN:  Yes, sir.  As I understand their

 4  motion, Faegre's, what they're seeking and from the argument

 5  of counsel, what Cook is seeking is for us not to be able to

 6  talk about the fact that one of the complications, two of the

 7  complications, three of the complications, I guess,

 8  (inaudible) Cook's fracture, thrombosis, and death.  Well, in

 9  performing a risk/benefit analysis, if and when it possibly

10  comes to that, either in the trial or at the time the jury

11  discusses, all the complications are going to be relevant as

12  to what possibly this device can cause.

13          I will suggest that fracture, especially fracture,

14  when you have a perforation, a perforation certainly at issue,

15  when you have a perforation and a downward or a caudal

16  migration, and that strut goes outside the vena-caval wall and

17  into the duodenum -- and Dr. McMeeking, our expert, has

18  testified, and will testify at trial -- that that increases

19  the likelihood of a fracture.

20          It's just one of the pieces of the puzzle that

21  discusses the risks of this product, and I think it would be

22  rather difficult, when we've got this evidence that -- in the

23  form of what would be a risk/benefit analysis, to take out the

24  fact that these things also cause fracture.  And if it

25  fractures or if it's a perforation, a perforation can cause

1  death and thrombosis, which is a -- is something that it's

2  supposed to prevent, a pulmonary embolus, the type of

3  thrombosis, that it actually increases the risk of thrombosis

4  in certain instances.  So, Your Honor, that would be our main

5  argument as to that.  And I don't think much else needs to be

6  said on that.

7         THE COURT:  All right.  Then, on Dr. Fishbein --

8         MR. MARTIN:  It shows --

9         THE COURT:  -- an autopsy that involved a --

10        THE REPORTER:  I'm sorry.  Who's speaking?

11        THE COURT:  It's Judge Young.

12        THE REPORTER:  I apologize.

13        MR. MARTIN:  And, Mr. Court Reporter, this is Ben

14 Martin.  I don't know if you got --

15        THE REPORTER:  I did get that.  Thank you.

16        THE COURT:  Yeah -- Judge Young, again.  Yeah, Ben,

17 what about Dr. Fishbein and his graphic photos here of an

18 autopsy that didn't involve a Cook product?

19        MR. MARTIN:  Your Honor, I may have missed that in

20 the moving papers of -- and I'm not seeing it in the moving

21 papers in number 14 as to the autopsy photographs, but I can

22 speak to it.

23        I mean, I don't think we need to -- if what we're

24 talking about are autopsy photographs from another case that

25 he had, I don't think we need to bring that out at trial.  And

1  I think one of my colleagues on the phone can tell me if I

2  shouldn't, but I think that we need to -- I have no problem

3  withdrawing any suggestions that we would offer another

4  patient's autopsy photographs that he had, indeed had, as one

5  of the -- well, I keep wanting to say patients, but it's

6  not -- one of Dr. Fishbein's subjects.  We will not offer a

7  photograph of any of those autopsy slides.  That should cure

8  that.

9          MS. COX:  Your Honor, this is -- I'm sorry.

10          THE COURT:  No.  Go ahead.

11          MS. COX:  This is Jessica Cox.  Sorry.  I just

12  wanted to say it was also the photographs and actually the

13  discussion of this, because the incident was so nonsimilar.

14  It was not substantially similar to Mrs. Hill's, and the

15  prejudicial value of this is definitely not outweighed by its

16  probative value, so I think the exclusion of the evidence

17  seems to be the autopsy pictures as well as his testimony

18  about his review of this case.

19          MR. SCHULTZ:  Your Honor, this is Matt Schultz.  I

20  handled Dr. Fishbein.  And the reason for that, the inclusion

21  of that, was simply as it went to his experience.  In

22  anticipation of a challenge that, you know, he's never

23  addressed perforation or whatnot, I agree with them, there's

24  no need for that to come in.  But if they challenge his

25  experiences on cross-examination, I would expect him to

21

1  discuss the fact that he has had this and other such cases,

2  but that would really be up to them.

3       MS. COX:  This is Jessica Cox.  And I would assume

4  that there's a challenge on his experience.  A simple

5  statement that he had seen perforations in his own practice is

6  sufficient.  We don't need to mention that.

7       THE COURT:  The fact --

8       MR. MARTIN:  Your Honor, Ben Martin here again.

9  It's just -- well, throughout -- throughout the instructions

10 for use, throughout the discussion of what's in the IFU, what

11 may have been in the IFU, the discussions of the risks and

12 complications of the filter, it's -- there's about six or

13 seven of them.  There's perforation, there's fracture, there's

14 migration, there's thrombosis -- I mean, in a -- just -- and

15 there's death.  I mean, those things happen when you've got

16 these things.

17       I think that the suggestion that this is going to be

18 a mini trial seems to be a common suggestion for all of these

19 things.  It's not.  These are -- these are things contained in

20 sentences of IFUs and of documents, that perforation can

21 increase the risk of fractures and death.  And so, anyway,

22 again, I think it's been argued.

23       THE COURT:  All right.  All right.  We'll take that

24 under advisement, as well.

25       19?

1           MR. TANNER:  Your Honor, 19 -- this is Joe Tanner.

2    This is, I think, pretty straightforward, dealing with

3    references to Cook and Cook affiliate companies and employees,

4    net worth, financial information, budgets, corporate

5    acquisitions, those types of things.  From what I understand

6    from the plaintiff's responses, I understand that they have

7    agreed that they're not going to raise any of that in the

8    original case.  And only if we get to a phase two, dealing

9    with punitive damages, will any of this be raised.

10          We obviously think that phase two should include

11   both liability and damages on punitives, but at least they've

12   agreed that they won't put any of that information before the

13   jury until that phase two.  So we would say that needs to be

14   limited to net worth and only of the defendants, but it seems

15   like that could be addressed in phase two, if we ever have a

16   phase two.

17          THE COURT:  Okay.

18          MR. MARTIN:  Your Honor, Ben Martin on this one, as

19   well.  As to -- if we're talking about the argument of the --

20   that the company has a moral obligation or an ethical

21   obligation, we don't intend to use those words in our case in

22   chief.

23          The truth of the matter is, the only reason that I

24   would even bring it up is that -- what I don't want to have

25   happen -- we're going to be talking about a regional

1   manufacturer throughout this trial, what the manufacturer

2   should or should not do.  That may, in the jury's mind, go --

3   and it may be in Cook's mind -- go to some sort of a moral

4   obligation or (inaudible) obligation.  We don't intend to use

5   those words.

6           I just don't want to be hamstrung because we've

7   agreed to a motion in limine on the subject matter if we put

8   on some evidence that appears to -- that, you know, those

9   things -- then we intend to put them on, but, no.  I just

10  wanted to explain that to the Court.

11          MR. HEAVISIDE:  Judge, Mike Heaviside.  May I follow

12  that and be a little more directly responsive to number 19?

13          THE COURT:  Sure.

14          MR. HEAVISIDE:  Thank you.  I'm not aware that

15  you've ruled on this bifurcation issue yet, and so our

16  fundamental position is that evidence of the size and

17  financial condition of Cook is both relevant and admissible as

18  to the claim of punitive damages.

19          And we would point out, as we did in our moving

20  papers, that Judge Goodwin in the mesh case, the Southern

21  District of West Virginia, 2014, addressed exactly this same

22  issue, holding that under Florida law, a jury should consider

23  the financial resources of the defendant and whether the

24  wrongful conduct was motivated solely by unreasonable

25  financial gain, among other things, when determining an amount

24

1   of punitive damages.  It's citing the jury instruction.  And

2   goes on to say, "Therefore, to the extent that certain

3   financial information paints Boston Scientific as a bad actor

4   improperly motivated by profit may be relevant to the question

5   of the amount of punitive damages."

6          Similarly, in Indiana, as we pointed out in our

7   moving papers, those issues are relevant and admissible on

8   punitive damages.  The model jury instruction 741 says that

9   one of the factors for the jury to consider in deciding the

10  amount of punitive damages is the defendant's financial

11  condition.

12         Similarly, the *Apex Colors* case, Indiana case of

13  2017, confirms that the wealth of the defendant is appropriate

14  in consideration of punitive damages.  So, understanding their

15  motion -- pardon me?  Oh, understanding their motion to

16  exclude all evidence of financial condition, we would ask that

17  you deny their motion.

18         THE COURT:  Well, this is Judge Young again.  I

19  think what John was indicating is that they're not asking it

20  to be excluded if we get to a phase two, but they're asking

21  that it be excluded for phase one of the case.

22         MR. TANNER:  Your Honor, this is Joe Tanner again.

23  I'm just reading the plaintiff's papers.  "Plaintiff agrees

24  that financial information should not come in during phase

25  one."  And what we would say is, if we ever get to a phase

25

1  two, we would have to argue it, but it would be limited to net

2  worth of just the defendants, not the other affiliated

3  companies with Cook.

4        And we may have a fight over exactly what that is

5  and how to get it into evidence, but that would be a normal

6  evidence fight.  But the motion in limine is that none of this

7  is talked about at least until we get to the punitive damages

8  phase.  And then it's net worth of the defendants.

9        THE COURT:  I think everybody's on the same page --

10  this is Judge Young.  I think everybody's on the same page.

11        Okay.  Number 20, bar plaintiff from discussing

12  Cook's ethics or ethical duties.  I think, Ben, you've already

13  addressed that.

14        MR. MARTIN:  Yes, Your Honor.  I apologize if I did

15  it in anticipation a little bit early.

16        THE COURT:  That's all right.

17        MR. TANNER:  Your Honor, Joe Tanner again.  Yeah, I

18  think -- and we received an e-mail earlier, I think yesterday

19  or today, that they had agreed to that motion in limine, that

20  they're not going to raise that ethics issue that came out in

21  some of the depositions, so I think that was taken care of.

22        THE COURT:  All right.  Very good.  21, certain

23  inflammatory language?

24        MR. TANNER:  Yeah.  Your Honor, this is Joe Tanner

25  again.  And it really deals with four topics, and I'll try and

26

1    address it fairly quickly, Your Honor.  And, again, it's

2    inflammatory language that simply shouldn't belong in this

3    trial.  The first area is references to the filter and the

4    stress on the filter as "spike" or "swords" or as a "stab,"

5    things like that, that have come out in the various experts,

6    but also in deposition testimony.

7           The filter has a strut.  It's not a spike or a

8    sword.  A spike or a sword is intended to impale or cut

9    through things, and that's certainly not what this is.

10   Calling it something that it's not is inflammatory and can

11   confuse the jury, and it simply is not what a strut is.

12          The second terminology has to do with what the

13   filter is made of.  They have referred to it as being steel

14   and made of steel, and they're simply not.  It's chromium.

15   Steel has negative connotations of rusting and corrosion and

16   health risks and those types of things.  And I understand the

17   plaintiff to say, "Well, it's kind of harmless error and we

18   can use a curative instruction," but we would submit there's

19   no need to cure it if you don't do it.  It's not an accurate

20   statement as to what the filter is made out of, and it's

21   simply not something that we should even risk determining

22   whether it's harmless error or not.  We know it's been used,

23   and the best course is to not use that terminology.

24          The third area has to do with referring to the

25   product as a "weapon" or "explosive," and they've used the

27

1  word "ticking time bomb" several times.  That's not what this

2  product is, by any means.  It's simply false and inflammatory.

3  An explosive or a time bomb is intended to harm people or will

4  eventually harm.  Obviously, that's not what this is.  There's

5  nothing ticking, there's nothing on a timer, and there's

6  nothing explosive about these filters.

7          Plaintiffs, in their papers, make a comment that,

8  "Well, we need to say it as a ticking time bomb because that's

9  the type of language the jury will understand."  And my point

10 to that, Your Honor, is that's exactly the point.  A jury does

11 know what a ticking time bomb is, but that's not what an IVC

12 filter is in any way, and it's inflammatory.  And it shouldn't

13 be allowed in the case, Your Honor.

14          And, finally, a reference to what the procedure is.

15 In referring to it as "surgery," which implies or gives the

16 mental connotation that you're actually cutting somebody open

17 in a OR, et cetera, it's placement.  You're inserting it

18 through a catheter, you're placing it.  It's a procedure and

19 it's retrieval.  In their papers, they say, "Well, Cook would

20 get an unfair advantage by calling it a placement."  I don't

21 get that argument, Your Honor.  I don't get how it's an unfair

22 advantage to call it by its correct name.  And we simply would

23 submit that using the correct terms, and using them

24 consistently in this case, will substantially reduce any

25 potential for juror confusion.

1           Plaintiff's examples in their papers about the

2   different types of names they can put this -- put around this

3   type of feature amplifies exactly why we need to use

4   discipline here and use the correct terminology with this

5   jury, so that the jury understands exactly what we're talking

6   about at all times.  And so those are the four categories that

7   we've identified as needing an in limine order so that we're

8   using the accurate terms and not false or inflammatory terms.

9           MR. MARTIN:  Your Honor, Ben Martin.  I'm going

10  to -- I probably should take it kind of backwards to forwards

11  and start with the surgery, which I think is -- we've given

12  the Court three or four different definitions of what the

13  medical dictionaries call, and the dictionaries call, surgery,

14  and this is exactly a surgical procedure.  Doctors have called

15  it surgeries, doctors in depositions have called it surgeries.

16  I think most everybody who's been asked, at least at one

17  point, discusses the -- this surgery.

18          What it is, it's a cut into the jugular vein or the

19  femoral vein, and they feed this up with catheters, wires, and

20  they -- you know, there's a sedative anesthetic that's -- that

21  is used.  Sometimes these things are used under full

22  anesthesia, I've seen that in a case.  But, certainly, it has

23  all the bells and whistles of a surgery, and I think the

24  doctors called this procedure a surgery.  And that would be

25  pretty difficult to take back, you know, the things that have

29

1   been discussed in depositions.

2          And on that note, you know, one of the things that I

3   fear is that if, for instance, someone used the word "spike,"

4   and I think that was used in a deposition, and this is,

5   indeed -- and, again, looking up the definition of "spike," a

6   pointed metal object is a spike.  This is a pointed metal

7   object.  It's just -- it is.

8          You know, the thing that I guess I'm coming back to

9   is, look, if we overstate -- and we're very, I think, careful,

10  we should be careful.  And we're going to get bitten if we

11  don't, if we aren't careful.  In overstating and in being too

12  overly dramatic with the jury, that doesn't help us.

13         But the word "spike" is an accurate description, it

14  was used in a deposition, and we ought not to have to cut that

15  out of a deposition or not be able to discuss that.  And I

16  would suggest that "spike" is a terminology that's not

17  outlandish.

18         "Steel."  One of the physicians in this very case,

19  in one of the medical records, called this a steel wire going

20  through the vena cava, into the duodenum.  He calls it a steel

21  wire.  You know, that's in the medical records.  That's one of

22  the doctors, her treaters.  It's not an expert who was hired

23  afterwards.  So the word "steel" -- and that's why they don't

24  want that word used.  One of the doctors, her doctors, used

25  it.

1           And, finally --

2           THE COURT:  This is Judge Young.  Ben, this is Judge

3    Young.  But it's not steel.

4           MR. MARTIN:  It's not steel, Your Honor, yes.  I

5    wouldn't suggest that it's steel.  And I don't think that --

6    we're not suggesting that we're going to use the word "steel"

7    in our presentation of the case.  I'm simply saying I think

8    this is a medical record that is being referenced, that is a

9    medical record from one of the treating physicians.  He uses

10   probably the -- you know, I don't know exactly why he called

11   it a steel wire, but he called that strut a steel wire.  And

12   that's the only time I think it probably will even be

13   referenced.  We certainly don't need to call it a steel --

14   anything steel, because I agree it's not steel.  It just

15   happens to be that one of the doctors called it that, and I

16   think that's where this is coming from.

17          THE COURT:  This is Judge Young again.  I'm sure

18   there are many times during the trial when it will be referred

19   to as "chromium," so the jurors will understand that.

20          MR. MARTIN:  Yeah.  So -- and then, finally, on the

21   "ticking time bomb," you know, I would say this, Your Honor,

22   and, again, would preface that we have to -- we have to be

23   careful in that we don't want to -- we don't want to

24   overstate, we don't want to be overdramatic.  The jury is

25   going to hold us against -- hold it against us, not Cook, if

1  we do that.

2          But this is an analogy, and I think we should be

3  able to use an analogy.  In fact, I would disagree with Joe in

4  that this is, in fact, what is considered a ticking time bomb,

5  because what's going to happen is, Cook is going to say that

6  there's a point where you cannot -- heard it called --

7          THE REPORTER:  I'm sorry.  You're breaking up.  I

8  cannot understand you.

9          MR. MARTIN:  I'm sorry.  Yes, I'll speak

10  (inaudible).  What I'm saying is, they're going to stand up in

11  opening (inaudible) and say here's (inaudible) perforations,

12  and they're going to discuss that.  And in response to that,

13  the truth of the matter is that there's only less than a

14  1 percent complaint rate by the doctors in any institution

15  would be because the patient has -- does not yet know that the

16  patient has this strut that is going into or out of -- into

17  their duodenum or another organ or vessel.

18          We have to be able to explain that, and we also have

19  to be able to explain the harm that results.  And I do believe

20  that we should be able to say that you call it a "ticking time

21  bomb" or a "silent" -- I think it's a silent, you know, but

22  deadly, I mean, whatever.  I mean, it is, in fact -- no, it

23  doesn't (inaudible) no, it's not a bomb, but the analogy of

24  something that is not known to the victim, but is in

25  (inaudible) 6 percent of the (inaudible) --

1         THE REPORTER:  I'm sorry.  You're breaking up again.

2    I'm having trouble understanding you.

3         MR. MARTIN:  I'm sorry, Your Honor.  I (inaudible)

4    Your Honor, if I could, after this argument, I'll call back on

5    a landline and have you (inaudible) use my cell originally.

6    And if that's okay with the Court, I would like to do that,

7    but that's my argument, Your Honor.

8         THE COURT:  Okay.  Thank you.

9         MR. TANNER:  Your Honor, just real quickly, this is

10   Joe Tanner again.  Doctors don't call it a surgery.  They call

11   it a placement.  Typically, they're put in by radiologists,

12   interventional radiologists, anyway.

13        Second, the fact that Mr. Heaviside may have called

14   it "spike" or a "sword" doesn't mean they should be doing that

15   at trial.  The fact that it may be referred to as "steel" in a

16   medical record, it should be limited to that medical record.

17   We don't have to be talking about it as "steel."

18        And I'll go back to what I said.  There's nothing

19   about a filter that is ticking on a timer or a bomb or is

20   meant to impale or meant to stab or meant to cut through.  And

21   terms like that, and now a new one, "silent but deadly," or

22   "silent" -- I thought he was going with --

23        OPERATOR:  Ben Martin has left the conference.

24        MR. TANNER:  Those just simply don't belong here,

25   Your Honor, would be our submission.  Thanks.

1          THE COURT:  This is Judge Young.  I'm tending to not

2   limit what the lawyers say and how they characterize things.

3   Most lawyers understand that inflammatory language in front of

4   a jury never is beneficial in the jurors' eyes, so I'm not

5   going to limit the language here.  They can say what they want

6   to say within certain boundaries.

7          But the mention of "steel," I believe it's just

8   referring to one medical record.  As I said, there's testimony

9   that this is not steel, it's native chromium, so that will

10  take care of that.  "Spikes," that's a reference from an --

11  from Mr. Heaviside, Heaviside, not a witness?

12          MR. HEAVISIDE:  And Dr. Marmureanu, their expert,

13  Your Honor.

14          THE COURT:  Who said it?  Dr. Marmureanu or Mike

15  Heaviside?

16          MR. HEAVISIDE:  Both, Your Honor.

17          THE COURT:  Both.  I see.  Who said it first?

18          MR. HEAVISIDE:  I don't know.  I'm sorry.

19          UNIDENTIFIED SPEAKER:  Technically, I think Mr.

20  Heaviside, but Dr. Marmureanu may have said it more often.

21          THE COURT:  All right.

22          MR. HEAVISIDE:  Your Honor, I'm -- this is Mike

23  Heaviside.  I'm happy with that.  I don't know who said it

24  first.

25          THE COURT:  All right.  Well, it's not a spike.  You

34

1  know, let's not get too cute here.  It's a strut.  We'll leave

2  it at that.

3           All right.  Number 22.

4           MS. RUTIGLIANO:  Hi, Your Honor.  My name is Anna

5  Rutigliano, and I don't think we've had a chance to meet yet,

6  so it's nice to meet you officially.

7           THE COURT:  Nice to meet you, too.

8           MS. RUTIGLIANO:  So this one dovetails a little bit

9  off of the last one, but this deals with the document -- if I

10  were in front of you, I would show it to you, but it is

11  Exhibit Number 44 (inaudible).  And Cook respectfully requests

12  that the Court either bar or limit the use of this picture for

13  two reasons.

14           First, the picture has little to no probative value.

15  The only fact that you adopted (inaudible) is that Mrs. Hill

16  experienced the perforation in her duodenum, but that fact is

17  not in dispute.  Cook is not disputing that fact, none of the

18  experts are.  And, in fact, last week, both parties filed an

19  agreed stipulation of facts that includes the fact that she

20  experienced perforation in her duodenum, so, therefore, any

21  evidence on top of that would be cumulative.

22           And the second reason is that if you see the image,

23  it's very graphic, it's gory, it's colorful.  And relating to

24  the last motion in limine, when it's been described by

25  Mrs. Hill's lawyers, they indicated ways that the image could

1   be shown in prejudicial ways.

2            So I'll give you an example.  During the deposition

3   when this image was shown to a witness, it was described, and

4   I quote, "The first image looks to me much like King Arthur's

5   sword pulled from the stone."  So that's from Courtney

6   Whitelock's deposition, page 189 --

7            THE REPORTER:  I'm sorry --

8            MS. RUTIGLIANO:  And that's just from -- huh?

9            THE REPORTER:  I'm sorry.  I lost you.

10           MS. RUTIGLIANO:  Oh, that's okay.  That is from

11  Courtney Whitelock's deposition on page 189.  And so that's

12  really the basis of our concern, is that if this image is just

13  thrown up on the screen during opening or in front of a

14  witness that has no medical knowledge about it, that could be

15  describe in a way that scares the jury.  It doesn't advance

16  any facts forward.

17           So, if Your Honor were inclined to allow them to use

18  this, we would just ask that it's limited to use in medical

19  testimony with medical doctors, experts that can talk about

20  it, and to describe what the image portrays in the context.

21  So one important reason is that the image --

22           OPERATOR:  Ben Martin has joined the conference.

23           MS. RUTIGLIANO:  The image is overmagnified because

24  of the nature of the procedure, so one thing that a medical

25  doctor would be able to do is to explain what the procedure

36

1    does, what the image shows, and to put it into context for the

2    jury.

3            THE COURT:  Thank you.

4            MR. WILLIAMS:  Your Honor, Joe Williams for the

5    plaintiffs on this issue.  First, while Ms. Rutigliano didn't

6    raise it here, in their papers, they do call the image

7    unauthenticated.  And to address that just very briefly, the

8    document was attached to an e-mail from the sales rep who sold

9    the filter to Mrs. Hill's implanting physician.  She sent it

10   to her bosses.  It's included in Mrs. Hill's medical records.

11   There's really no dispute that this is what it purports to be,

12   and that's an endoscopy imaging study of her perforation.

13           This photograph is really one of the most crucial

14   issues -- or exhibits that we have in this case.  Cook has

15   taken the position that Mrs. Hill has not suffered an injury,

16   and this picture is the only thing we have to demonstrate the

17   injury that Mrs. Hill suffered, at least in a visible way to

18   the jury.  This is not a case where there's a scar, where

19   there's an amputation, where there's something that the jury

20   can visualize.  The only thing we have is this endoscopy

21   image.

22           It should be up to the jury to determine whether or

23   not this perforation through the duodenum is, in fact, an

24   injury that entitles Mrs. Hill to damages.  It's not an

25   inflammatory picture.  It's not the type of image that courts

37

1   exclude because of a prejudicial effect, and that's clearly

2   demonstrated by the cases that Cook put in their papers.

3         The best they could do is come up with two cases,

4   the *Cardesic* case and the *Toretto* case.  The *Cardesic* case

5   involved a trucking fatality, and the judge excluded some of

6   the graphic pictures and some of the autopsy pictures of this

7   terrible accident, which were, I can only imagine, horrific.

8   Yet the Court still said, "You can choose one picture out of

9   all of these terrible pictures to demonstrate an injury."

10  This photograph, unlike the *Cardesic* case, is not anything

11  like an autopsy or, you know, a fatality-type picture.

12        The second case they came up with, the *Toretto* case,

13  the judge excluded a pornographic video in a sexual harassment

14  case because of its graphic and inflammatory nature.  I don't

15  think that it -- I need to argue that this endoscopy image

16  needs to be distinguished from a pornographic video.  That

17  distinction should be obvious.

18        Again, this is a picture that demonstrates the

19  injury to Mrs. Hill, and there's nothing inflammatory about

20  it.  In fact, the majority of the jurors will have seen images

21  from a colonoscopy or something similar.  This isn't -- it's

22  not gory, it's -- there's no reason that we shouldn't be able

23  to tell and show the jury the injury that Mrs. Hill sustained.

24  We would ask that the Court deny that motion.

25        THE COURT:  This is Judge Young.  Are your experts

 1  going to testify from this image?

 2          MR. WILLIAMS:  I believe that in Dr. Zuzga's

 3  deposition and some of the other treating physicians'

 4  depositions, they reference the image, yeah.  I mean, our

 5  experts will discuss and explain what is in the endoscopy

 6  image, for sure, but we don't want to be precluded from using

 7  that at trial.

 8          THE COURT:  All right.  Well --

 9          MS. RUTIGLIANO:  Your Honor -- sorry.

10          THE COURT:  Go ahead.

11          MS. RUTIGLIANO:  Judge, this Anna again.  If I could

12  just mention that Dr. Marmureanu is their medical expert, and

13  he does not rely on the photo other -- for any other fact

14  other than to say that Mrs. Hill suffered a perforation.  He

15  doesn't talk about scarring or inflammation or bleeding or

16  anything regarding that photo.

17          Mr. Williams mentioned Dr. Zuzga, but that photo is

18  not in Dr. Zuzga's records.  He was shown the image during the

19  deposition, and the only thing that he really talked about

20  relating to the image was what it shows, which was a

21  perforation.

22          And even if Dr. Marmureanu were going to talk about

23  it, again, that's -- you know, that's one time.  It's

24  something that he can describe what the image is in context,

25  and we can cross him on that, but to show the jury and parade

39

1   it in front of them without any context is really the source

2   of our concern.

3        MR. MARTIN:  Your Honor, this is Ben Martin, and I

4   apologize to jump in, but the reason I am is that I had

5   prepared Dr. Marmureanu, who is going to be -- who is a

6   retained expert.  And, indeed, this photograph is in

7   Dr. Marmureanu's reliance list.  I believe that Dr. Marmureanu

8   testified about this duodenal puncture.

9        And, Your Honor, the Court has ruled that

10  Dr. Marmureanu can discuss the specific causation related to

11  Ms. Hill, and we do intend, with the Court's approval, of

12  course, to have Dr. Marmureanu talk about this and discuss

13  where this -- where this strut came from, and its relationship

14  to the duodenum and its relationship -- the relationship

15  between the duodenum and where it is in relationship to the

16  vena cava.  So it needs to be -- it needs to be discussed and

17  the jury needs to see it.

18        And it's not -- the Court has a copy of it.  It's

19  not a gory photograph.  It's just -- it shows the strut in the

20  duodenum, and so -- and Mr. Williams has already discussed the

21  fact that they're saying that our client is not injured.  So I

22  would add that.

23        THE COURT:  All right.  This is Judge Young.  Well,

24  if the doctor said -- referred to it in their reports, then

25  I'll allow it to come in.

1          23.

2          MS. PIERSON:  Your Honor, just one clarifying point

3   on that --

4          THE REPORTER:  I'm sorry.  Who's speaking?

5          MS. PIERSON:  -- which Ms. Rutigliano touched --

6          THE REPORTER:  I'm sorry.  Who's speaking?

7          MS. PIERSON:  This is Andrea Pierson.

8          THE REPORTER:  Thank you.

9          MS. PIERSON:  Just one clarifying point on that,

10  which Ms. Rutigliano touched upon.  First of all, as we've

11  already said, Dr. Marmureanu did not point to this in his

12  report as a basis for his opinion that there's inflammation or

13  scarring or anything else.  We understand your ruling and

14  we'll address that at the time of trial.

15          To the extent that this particular piece of evidence

16  is allowed to be discussed by someone, we believe it should be

17  limited to one person, whomever that is.  It's not part of

18  Dr. Zuzga's records, he did not review it or rely on it in his

19  care and treatment of Mrs. Hill.  So, absent one expert on

20  behalf of Plaintiffs explaining this to the jury, there's

21  really no reason to repeatedly or cumulatively place it in

22  front of the jury.

23          THE COURT:  Well, this is Judge Young.  If Dr. Zuzga

24  didn't look at it or rely on it, then how in the world could

25  they get it in in his testimony?

41

1          MS. PIERSON:  They didn't get it in in his

2     testimony, Your Honor.  This particular endoscopy photo was

3     shown to nearly every witness in this case, Cook employees,

4     doctors, the treating doctors, and it's because we've seen

5     that kind of use of the photo that we filed this motion.

6     They've attempted to influence every single witness by showing

7     this gory picture from a substantially magnified endoscopy.

8          MR. WILLIAMS:  Your Honor, this is Joe Williams,

9     very briefly.  Once the image is in and it's been admitted

10    into evidence, if there are witnesses that dispute that

11    Mrs. Hill has been injured, I mean, it's in evidence, we

12    should be able to show them the photograph and ask them if

13    they still agree with their statement that there's been no

14    injury.  I mean, at this -- once it's in --

15         THE COURT:  Well -- excuse me.  This is Judge Young.

16         MR. WILLIAMS:  Sure.

17         THE COURT:  Well, once it's in evidence, it's in

18    evidence.  You can use it for --

19         MR. WILLIAMS:  Right.

20         THE COURT:  -- for proper purposes at that time.  So

21    I'm just saying if doctors -- if it's not in evidence and

22    Dr. Zuzga didn't rely on it for any of his decision-making or

23    thoughts, then it doesn't come in.

24         MR. WILLIAMS:  I understand with regard to

25    Dr. Zuzga, but, you know, we will -- we will get the -- we

42

1  will get the evidence in with the proper foundation.  We just

2  don't want -- like Your Honor said, once it's been in and Your

3  Honor has ruled it admissible, we should be able to use it

4  then for a proper purpose and not limit it to this arbitrary

5  show it one time once it gets in.

6      MR. MARTIN:  I really would like to clear it up, if

7  I could, Your Honor, because, Your Honor, this endoscopy --

8  where this photograph of the endoscopy was taken was one of

9  the very bases for Ms. -- for her needing -- knowing she

10  needed to go get this thing taken out, and went in for a

11  complicated procedure by Dr. Lynch.

12      It also -- it also has to do with the fact that she

13  saw, Ms. Hill saw, this photograph.  She knew what was going

14  on within her system.  And it goes to -- it goes to her mental

15  anguish.

16      But, most importantly, and I don't want the Court to

17  be under the misunderstanding that this was not relied upon in

18  this -- the endoscopy, the perforation of this duodenum.  It

19  was not relied upon in the way it looked like in the

20  determination of the doctors as to what they were going to do

21  with this patient.

22      And Dr. Marmureanu -- it's Dr. Marmureanu who is

23  the -- who is the retained expert for us, Your Honor.  It's

24  not that Dr. Zuzga, of course, is -- he's one of her treaters,

25  but Dr. Marmureanu certainly had this retrospective, and

43

1  Dr. Zuzga.  Dr. Zuzga and Dr. Marmureanu, yes.  Dr. Marmureanu

2  is our expert who will talk about -- you know, talk about the

3  things including this perforated duodenum.

4          THE COURT:  All right.  I'll allow it, assuming it

5  comes into evidence.

6          23?

7          MS. PIERSON:  Judge, I'm sorry.  Just to clarify,

8  are you saying it can be used before it's admitted or it --

9          THE COURT:  No, no, no, it can't be used before it's

10  admitted, no.

11          MS. PIERSON:  Thank you, Your Honor.  Andrea Pierson

12  on motion in limine 23 --

13          THE COURT:  Unless you stipulate to that.  If you

14  want to use it in opening statement, yeah, as I said earlier,

15  you have to stipulate and agree that eventually it will come

16  into evidence, and you can use it in opening statements.  But

17  if it's not stipulated to, you can't use it until it comes in.

18          MS. PIERSON:  Okay.  Your Honor, may I move on to

19  address motion in limine 23?

20          THE COURT:  Yes.

21          MS. PIERSON:  Thank you, Your Honor.  Motion in

22  limine 23 deals with the marketing documents that's called a

23  product strategy development overview.  And as we articulated

24  in our papers, this is a document that was prepared by some

25  folks in the marketing department in advance of developing the

44

1   next product, which became the Celect.

2          We suggested in our papers that the Court exclude

3   reference to it in limine based on Rule 401 and 403.  And

4   there are a few different reasons that we believe it's neither

5   relevant nor probative of any issue and that, in fact, it

6   would be unfairly prejudicial and would confuse and mislead

7   the jury.

8          The first is that this particular document doesn't

9   deal with the Celect.  It deals with the Gunther Tulip and the

10  Bird's Nest filter.  At the time that this document was

11  drafted, obviously the Celect wasn't in existence and hadn't

12  been designed yet, so our view is that whatever the status is

13  of the market as it relates to selling the Tulip and the

14  Bird's Nest filter, that's not relevant to any issue that's

15  before the Court.

16         The second reason, though, Your Honor, that it's not

17  relevant is that the remaining legal claims that I mentioned

18  are negligent testing and strict liability.  Plaintiffs seek

19  to offer this document on the point of motive, but, of course,

20  motive isn't relevant to either of those claims.  It can't be

21  relevant -- even if it did go to motive, motive can't be

22  relevant to whether there's a defect or whether it's not a

23  defect.  It's not relevant to whether there was reasonable

24  care in the testing of the device in any respect.

25         The way that this -- there are not marketing

1  representatives from Cook designated as a witness by either

2  side in this case, but the way in which this document is

3  referenced is in the report of Dr. David Kessler.  And there

4  are multiple cases, Florida cases and Seventh Circuit cases,

5  that hold that experts are not permitted to point to defendant

6  documents to suggest that there's some evidence of motive,

7  intent, or state of mind.

8          We talked a few times about the *Traserol* case, which

9  is 210 Westlaw 4052, 141, a Southern District of Florida case

10 in 2010.  There are similar cases that reiterate this same

11 point, but the bottom line is that it's not a type of motive

12 evidence that is admissible under something like 404(b), and

13 that, instead, to offer it to suggest that a defendant was

14 motivated to gain market share or to sell a certain number of

15 products, that's simply not relevant to the question of

16 negligent design or the existence of a design defect.

17         I'd say, also, Your Honor, that on the second page

18 of this, there's a discussion of competitive analysis, a

19 discussion of numbers of products.  And, again, all of that is

20 irrelevant to the question of negligent design and testing or

21 the issue of strict liability.

22         MR. MARTIN:  Your Honor, Ben Martin.  If I may, Your

23 Honor, on this, obviously a very important document -- and the

24 marketing consultant that Ms. Pierson is talking about and

25 created this document actually is a fellow by the name of

1  Bruce Fleck, who I believe the Court has probably heard about

2  before.  He ran the program.  That's going to be our position,

3  anyway, that he ran the program at Cook concerning the Celect

4  filter.  And this was one of the first documents that

5  Mr. Fleck had sent to his -- to his compatriots at the company

6  in outlining the strategy of the -- this -- what became the

7  Celect filter.

8          And I do need to clear one thing up, and I can clear

9  it up with Ms. Bennett in the strategic overview, and clear up

10  the fact that this only applied to the Bird's Nest.  I heard

11  that this was only a Bird's Nest and a Celect -- Tulip

12  document.  I'll read one sentence.  "The purpose of this

13  project is to design a new filter that will provide longer

14  term retrievability, 60-plus days, and be less prone to

15  tilting."  Your Honor, that's the Celect filter.

16          So this is one of the beginning documents of this

17  whole concept of the Celect, and it's an operative fact in the

18  case, and not being able to discuss it, I think, would be --

19  would be wrong.  It's a strategic product overview, and it has

20  to do directly with the Celect.

21          THE COURT:  This is Judge Young.

22          Andrea, you told me it refers to the Tulip and the

23  Bird -- Bird's Nest.  What -- who -- and Ben says no.  What --

24          MS. PIERSON:  Yeah.  Apologies, Your Honor, if I was

25  less than clear.  There's no mention of the word "Celect" in

47

1   this document because, of course, it predates the development

2   of the Celect.  So Mr. Martin is correct that this is a

3   product development strategy overview that predated the

4   development and release of the Celect.  So just so there's no

5   misunderstanding, the word "Celect" does not appear in this

6   document, but it is, in fact, a product development strategy

7   overview before the Celect was developed.

8           THE COURT:  Before the Celect?

9           MS. PIERSON:  At this -- at this point in time, I

10  don't think there's evidence that it was the Celect.  It could

11  have been for any filter design.  But the purpose, the notion

12  of retrievability, we were clearly working on a product that

13  would improve retrievability, and that became the Celect,

14  which was released in 2006.

15          The more important point, Your Honor, is the

16  question of what will it be offered for.  There will be plenty

17  of testimony and other documents, engineering documents, that

18  establish when the engineers first started developing the

19  Celect and when the engineers started working on the design of

20  the Celect.

21          This is a marketing document that makes no mention

22  of design.  It's about market share and what is Cook's

23  position in the market share, and where did Cook hope to go.

24  Those are all things that the plaintiffs offered through

25  Dr. Kessler to suggest a motive, a motive of increasing market

1  share.  And motive evidence is not relevant to strict

2  liability or negligent testing.

3         MR. MARTIN:  Well, Your Honor, I believe that the

4  Court is going to hear on this possibly later today about the

5  negligent testing being the only aspect of negligence, and I

6  think the Court had sent something out today on that issue,

7  that it considers notice to be a reconsideration of the -- of

8  that very issue of negligent design, negligence, and in toto.

9         So we believe that the negligence is in the case,

10 Your Honor.  We believe it's not just strictly as to

11 negligent -- negligent testing.  And although -- I could make

12 an argument that this product -- that this product development

13 strategy would go to negligent testing if that were the only

14 point, but it's not the only point.  We've claimed negligence,

15 and when the Court's, when the jury is looking at the risk

16 versus the benefit, we think that the jury ought to be able to

17 see that -- the initial documents as to why the Celect was

18 developed.

19        THE COURT:  All right.  I'll take that under

20 advisement.

21        24, the 2006 executive summary?

22        MS. PIERSON:  Yes.  Thank you, Your Honor.  So

23 attached to our moving papers, the documents in motion in

24 limine 24, it is a document that's titled "Executive Summary

25 Cook Celect Filter."  And the plaintiffs seek to use this

1  document because it has a conclusion in it that relates to the

2  risk related to the design, but we think that's misleading and

3  it's unfairly prejudicial and that it will confuse the jury.

4          The sole risk that's discussed in this executive

5  summary is the risk of migration.  And if you look at the

6  introduction of this document, you will see the word

7  "migration" used five different times.  If you look on the

8  second page of the document, when it's talking about the

9  Celect and the Tulip, a sentence in, "required to prevent the

10 filter from migrating."  If you look at the third page, the

11 document twice mentions the risk of migration.

12         What you won't find anywhere in this document is a

13 reference to considering the risk of perforation or some

14 discussion of testing showing perforation.  Instead, it is a

15 document that's entirely about the risk of migration, and the

16 two clinical researchers who signed this document reach a

17 conclusion that there needs to be more study based on their

18 review of the evidence.

19         If this were a migration case, this document might

20 be relevant, but it's not.  It's a case about perforation.  We

21 think it would unfairly prejudice Cook and have no probative

22 value, because it doesn't go to the issue of perforation that

23 will be before the Court.

24         THE COURT:  All right.  Thank you.

25         MR. SCHULTZ:  All right.  Your Honor, Matt Schultz

50

 1  for the plaintiff.  The document -- let me kind of start at

 2  the end -- well, first of all, let me describe the document.

 3  This is February 9th of 2006.  It is a document sent by Lena

 4  Larsen, who is a clinical research specialist at Cook Europe,

 5  and they are essentially assessing the marketability and the

 6  safety of the Celect filter.

 7          The document, it is sent to a host of executives at

 8  the company, which is important in this case, because we have

 9  entitlement to punitive damages, or at least as of today we

10  do, and we have to have executive involvement or endorsement

11  or ratification of that behavior, if you will, or direct

12  participation in it, to prove entitlement to punitive damages.

13          So this is sent by Ms. Larsen to the vice president

14  of regulatory affairs; it's sent to the product development

15  engineer, Jacob Clausen; to the product development manager,

16  Jesper Thyregod; it's sent to the Celect project engineer, Per

17  Hendrickson; and the vice president and chief science officer,

18  Bill Voorhees.

19          And it is true the primary concern of the document

20  is migration, but these complications cannot be separated out

21  from one another.  The whole idea of progressive perforation,

22  which is what this case is about, as Arne Molgaard-Nielsen has

23  graphically demonstrated to us, is that perforation leads to

24  caudal migration, leads to tilt, eventually leads to fracture.

25  This is a cascade of related events, this is knowledge that

1  Cook had.  And rather than stop selling the filter when it had

2  rates as high as 15 or 18 times the perforation of Tulip, they

3  went ahead and started redesigning it and continued to sell

4  hundreds of thousands of these filters, including Ms. Hill's

5  filter.

6           So the fact that migration is the primary focus, and

7  I will concede that, does not render it irrelevant, because

8  this is a "perforation" case.  Every progressive perforation,

9  any perforation that goes as far as the duodenum, is going to

10 involve caudal migration.  And Cook's own documents tell us

11 that repeatedly.

12          With respect to Ms. Pierson's statement that there's

13 no mention of perforation, in fact, Ms. Larsen discusses a

14 study paid for by Cook, carried out at Zaragoza in Spain by

15 Dr. Alicia Laborda, who is a long-time Cook consultant, and

16 she talks about, Ms. Larsen does, about the design changes

17 that led to perforations.

18          And there's a table of perforations, what is called

19 the "Force Displacement Study" in Zaragoza, where they

20 compared six Celect filters to six Tulip filters.  They had

21 four out of six Celect perforate versus one out of six of the

22 Tulip.  There are statements like, "all legs outside the

23 wall," "legs outside the wall."  They have a description of

24 each one of the perforations, so that certainly it's relevant

25 to the perforation case.

1                And the fact is, Judge, this is before the Celect

2     filter ever went to market anywhere in the world.  It's a year

3     before, more than a year before, it went to market in the

4     United States.  The design of the filter does not change after

5     this point.

6                And we have Ms. Larsen concluding, and I quote, "To

7     date, it has not been possible to find any clear evidence of

8     the existing available data that could clarify and justify the

9     safety risks identified 'with the Celect filter.'"  There are

10    other comparisons to the Tulip.

11               They sold the Celect filter in the United States --

12    and this is part of Dr. Kessler's adulteration and misbranding

13    opinions -- as having the same features and benefits as the

14    Tulip.  They sold it as having a modified design that

15    minimized cable perforation.  And here we have a study

16    discussed within the document that shows a four-to-one

17    perforation rate.

18               So this goes, Your Honor, to -- if we were only

19    talking about negligent testing, well, this is the testing,

20    Judge, that the study at Zaragoza is one of the tests that was

21    done on the Celect filter, and it's one like many others in

22    animals that didn't turn out very well for the Celect as

23    compared to Tulip, as all of them, in fact, did not.  So, even

24    if we have nothing but a negligent testing claim in this case,

25    this document would be relevant for that.

53

1          But testing, Your Honor, goes to design.  The reason

2     for testing is because you are trying to perfect or refine the

3     design of a filter.  The outcome of negligent testing is bad

4     design.  So it goes to negligent design, it goes to negligent

5     testing, it goes to adulteration, it goes to misbranding, and

6     it's a key document, which is why, out of the million pages

7     that we've found, or what have you, we've seen three or four

8     documents put up.  This is one where the heads of the company

9     were told, before it ever went to market, that they could not

10    justify the safety risks, and they went to market anyway,

11    Judge, so it certainly is relevant and it should come into

12    evidence.

13          THE COURT:  Thank you.

14          MS. PIERSON:  Your Honor, if I may respond.

15          THE COURT:  You may.

16          MS. PIERSON:  Thank you.  It's Andrea Pierson.

17          So, Your Honor, what Mr. Schultz has just suggested

18    is exactly the reason why this document should be excluded

19    pursuant to Rule 401 and 403.  He characterizes this document

20    as a discussion of the risks, all of the risks of the Cook

21    Celect filter, yet you will find only one risk discussed in

22    this entire memo, and that's migration.  Migration appears in

23    the document many, many times.

24          But what you won't find in this, and anyplace, is

25    any discussion of perforation, progressive perforation, the

54

1   cascade that Mr. Schultz alleges.  You won't find any

2   consideration, analysis, or discussion of those things.

3           And I really encourage you to look at the document,

4   Your Honor.  The Plaintiff wants to take the conclusion and

5   mislead the jury to suggest that this was somehow an analysis

6   of risks, and in particular the risk at issue in this case,

7   perforation, and it simply is not.  Mr. Schultz (inaudible).

8           THE REPORTER:  I'm sorry.  I lost you.

9           MS. PIERSON:  You will hear more about this at

10  trial.  When the time comes that Plaintiff will introduce

11  evidence related to that animal study, we'll be objecting and

12  we'll take it up then.

13          But as a starting point, there was a study conducted

14  by an independent university in Spain, and the study was

15  conducted in 2005.  And the purpose of the study was to look

16  at the question of displacement force.  How much force does it

17  take to cause the filter to move, to migrate?

18          None of Plaintiff's experts, not Dr. McMeeking, not

19  Dr. Marmureanu, no one in this case, has suggested that

20  Mrs. Hill's filter migrated in any way.  There's no expert

21  evidence to suggest from the plaintiff's side that there's

22  been inappropriate risk of migration, that there's a defect

23  that causes it to migrate.  There's no evidence to support any

24  claim related to migration.  And it will only confuse the jury

25  to start suddenly hearing a discussion of migration, migration

1  testing, migration risks, particularly as it relates to this

2  document.

3        Mr. Schultz suggests that we filed particular

4  motions as it relates to a couple of documents because they're

5  particularly bad for us.  We filed documents as they relate --

6  we filed motions in limine as it relates to documents and

7  images that we think are inadmissible and that it would be

8  unfairly prejudicial for the plaintiffs to be able to refer to

9  these documents in opening statement or until some foundation

10 for the document is laid.

11        Respectfully, we don't think a foundation for

12 relevancy can be laid for this document even at the time of

13 trial.  And even if it could, the danger of confusing the jury

14 and unfair prejudice is sufficiently great that it should be

15 excluded.

16        THE COURT:  Thank you.  We'll take a look at it.

17 I'll take it under advisement.

18        Okay.  28?

19        MS. PIERSON:  Thank you, Your Honor.  Andrea

20 Pierson.  That's me again.

21        We've mostly agreed to this motion.  It was

22 addressed to two particular topics.  One was evidence that

23 Mrs. Hill had -- was entitled to some lost wages.  The

24 plaintiffs have agreed that they will not be introducing that

25 evidence.  But it was also addressed to damage evidence not

56

1    supported by any expert testimony.

2           And you may recall that at the very end of your

3    ruling on Dr. Marmureanu in our *Daubert* motion with respect to

4    him, the Court noted that Dr. Marmureanu would not be entitled

5    to talk about the future medical needs, medical conditions.

6           We left this motion in limine on the schedule only

7    to clarify and to be sure we understand, all the parties

8    understand, that in excluding Dr. Marmureanu's testimony as it

9    relates to future injuries or complications, that includes

10   future injuries or complications related to injuries to the

11   vena cava or to the duodenum.  And, as we explained in our

12   moving papers on Dr. Marmureanu, Dr. Marmureanu has testified

13   that he can't say that Mrs. Hill will suffer any complication

14   as a result of the alleged IVC stenosis to a reasonable degree

15   of medical certainty.  And that's his deposition at page 586,

16   lines 4 to 8.  And he also testified that he does not have

17   sufficient information to conclude that she presently suffers

18   from duodenal stenosis, he said he did not.  And that's his

19   deposition at 597, lines 10 through 14.

20          So, in our view, it flows from your ruling on

21   Dr. Marmureanu, that he also would not be able to talk about

22   future complications that a patient may or may not have from

23   those two conditions.  Simply put, he can't say that she --

24   she doesn't have them presently and he can't say, to a

25   reasonable degree of medical certainty, that she would in the

57

 1  future.

 2          MR. SCHULTZ:  Your Honor, Matt Schultz for the

 3  plaintiff.

 4          I suppose I misapprehended the purpose of the second

 5  portion of this document.  We do agree on the wage loss.

 6  That's not an issue.  The motion was to limit damages not

 7  supported by expert testimony, which, in our response, we

 8  simply said that this was vague in the written response, but I

 9  took it to mean future medical care.  Past medical bills,

10  under Florida law, a plaintiff can testify to their medical

11  expenses.  You don't have to have an expert for that.

12          And not to put anyone on the spot, but when it comes

13  to the actual need for future care and whether anyone has

14  spoken to that, I think Mike Heaviside or Ben Martin or

15  perhaps Joe Williams will probably -- all of them would know

16  more about it than I would, but I would defer if they have any

17  thoughts now that we are hearing what the motion is about.

18          MR. MARTIN:  Your Honor, if the Court needs --

19          THE REPORTER:  I'm sorry.  Who's speaking?

20          MR. MARTIN:  -- what the Court's order is --

21          THE REPORTER:  I'm --

22          THE COURT:  I think the court reporter -- I believe

23  this is Ben Martin, right?

24          MR. MARTIN:  Yes.  I'm sorry, Your Honor.  Yes, Ben

25  Martin.

1        THE COURT:  Okay.

2        MR. MARTIN:  My understanding of the Court's order,

3   and we could take a look at it, but on -- I'm certain the

4   Court probably recalls the order issued last week, I believe

5   it was, on what Dr. Marmureanu is able to testify to.  And as

6   far as the -- as far as it goes, I believe the Court is

7   allowing Dr. Marmureanu to discuss, again, the causation in

8   the case, and that the design that Dr. McMeeking will talk

9   about led to the perforation and the harm.  So I don't know

10  that there's a whole lot more to say about it.

11       I do know that the Court did disallow Dr. Marmureanu

12  talking about some of the future medical damages because she

13  did not have -- Ms. Hill did not have certain of the

14  diagnostic testing, I think that it was suggested, that she

15  would need.  So I think the Court's order is clear on what

16  Dr. Marmureanu can and cannot testify to, and we don't intend

17  to go around any of that.

18       But, as Matt had indicated, in Florida, my

19  understanding it's the same law as Texas, I suspect, and that

20  is there's no necessity for expert testimony on future

21  medicals and future medical harm, as long as you've got past

22  injury to support it, and past medicals to support it.  And I

23  hope I'm not, you know, misstating that, Matt, but from what

24  you just said, I believe that that's where we are.

25       THE COURT:  Well, future -- my understanding of the

1  law is that you need expert testimony on future medical

2  treatment and expenses to a reasonable medical certainty.  An

3  individual plaintiff can testify as to what they have incurred

4  thus far, and they can testify as to their own -- what pain

5  they've gone through and those things, but anything future

6  would have to be brought in by some type of expert.

7         MR. SCHULTZ:  Your Honor, Matt Schultz.  In Florida,

8  to clarify, I was speaking more to the damage amounts.  A

9  plaintiff is entitled to testify as to their understanding of

10 their future care needs, but to be frank, I think this is

11 probably a question of federal -- I think it's a procedural

12 issue under Erie.  But, you know, not hearing that we have the

13 testimony, I'm not sure that it's an issue.  And I apologize.

14 I'm just not the guy on the --

15        THE COURT:  Yeah.  There isn't a whole lot of

16 testimony that I've seen anywhere regarding future needs.

17        MS. PIERSON:  Your Honor --

18        MR. MARTIN:  Your Honor, the Court has made it clear

19 in the Dr. Marmureanu order, and we can ferret that out.  And,

20 again, to a large extent, the Court did disallow

21 Dr. Marmureanu from talking about certain of the future

22 damages.  I'm simply not certain -- I'm simply not sure that

23 all of her -- that because she has had pain and because she

24 does have the past medicals, that she can't discuss to some

25 extent, and that the jury could consider, that she may have

60

1   future problems, given that she has had past problems.

2          But, Your Honor, I think the Court has been very

3   clear on what Dr. Marmureanu can and cannot say about that,

4   and I'm just looking at the -- I'm just looking at the motion

5   in limine itself, and I think that we're -- I mean, I don't

6   think we're going to have a problem with it, because the Court

7   has already ruled on what Dr. Marmureanu can say.

8          And the Court is also indicating that -- does

9   indicate that Ms. Hill, as far as her testimony -- I don't

10  expect Ms. Hill to say, "Oh, I'm expecting future harm."  So I

11  think it's -- I think we may not be that far apart as far as

12  what -- as what we have here.  Dr. Marmureanu's order, the

13  order regarding him, is real clear, and we can -- and we

14  can -- we seek to -- and we'll abide by it.

15          MS. PIERSON:  Your Honor, if I may respond briefly.

16          THE COURT:  Yes, Andrea.

17          MS. PIERSON:  Thank you, Your Honor.  Just so we're

18  clear, your order does say, very clearly, that future medical

19  expenses, need for future care, and those sorts of things are

20  excluded, that they were -- did not survive the *Daubert*

21  challenge.  Your order does permit Dr. Marmureanu to say that

22  he believes that Mrs. Hill has IVC stenosis and that she had

23  inflammation of her duodenum.

24          I want to be clear that he can't go to that next

25  step, which he did in his deposition, go to the next step and

1  say, because she has -- what he said in his deposition was,

2  because she has stenosis today, it could get worse in the

3  future and she could need -- she could have thrombotic issues,

4  she could have DVTs, she could have this, she could have that,

5  or she had inflammation of her duodenum, and that could become

6  duodenal stenosis, or she may need this medical treatment or

7  that medical treatment as a consequence.

8        And I'm just reading from Dr. Marmureanu's

9  deposition at page 586, line 4:

10        Question:  "This opinion, thrombotic issue, DVT

11  cable thrombosis, you're not saying that, to a reasonable

12  degree of medical certainty, that Mrs. Hill will develop those

13  things, correct?"

14        ANSWER:  "Absolutely not."

15        And then on page 597, lines 10 to 14:

16        QUESTION:  "Is it fair to say, Doctor, that you do

17  not have sufficient information today to conclude, to a

18  reasonable agree of medical certainty, that Mrs. Hill

19  presently suffers from duodenal stenosis?"

20        ANSWER:  "That's true."

21        Now, his testimony is pretty clear on these points,

22  and your order was clear as it relates to future medical care,

23  future medical needs.  Our request is just that we're all on

24  the same page here today.  He can't say -- without addressing

25  what care she might need, he can't say she will develop some

62

1  condition in the future, whether that's a thrombotic issue as

2  a result of his alleged IVC stenosis, or whether it's duodenal

3  stenosis in the future that requires some care.

4          MR. MARTIN:  I don't think we just -- I don't

5  think -- this is Ben Martin.  I don't think we disagree with

6  anything that Ms. Pierson just said.  I do think that one area

7  that may arise is in the mental anguish associated with what

8  had occurred, that if Ms. Hill is fearful of having problems,

9  and they relate to the problems that she has had, that she

10 should be able to discuss what her fears are and what her --

11 what her -- she's -- she, you know, obviously has mental

12 anguish associated with this.

13         If it goes to future mental anguish, you know, then

14 it does, but, I mean, we're not going to have her testify as

15 to anything other than that.  And if that's the testimony, we

16 certainly think she can testify as to her fears that were

17 caused by this event, and that's it.  The Court was real

18 clear, and to kind of repeat myself, it was real clear.  We

19 don't intend to go around what the Court ordered regarding

20 Dr. Marmureanu, and (inaudible).

21         THE COURT:  I think we're in agreement here on this.

22 This is Judge Young.  She can testify that she's fearful in

23 the future of what may -- what she might experience, but

24 that's about it.  Okay?

25         MR. MARTIN:  I think we're on the same page, Your

63

1    Honor.

2            THE COURT:  Yes.  All right.  It looks like, Andrea,

3    that takes care of the Cook motions in limine.

4            Ben, we've got a plaintiff's motion to exclude

5    evidence of the empty chair?

6            MR. MARTIN:  Yes, Your Honor.

7            MR. SCHULTZ:  Matt Schultz for the plaintiff.  This

8    dovetails a bit, Your Honor, with the eggshell discussion that

9    we had back on September 25th as it pertains to Ms. Hill,

10   where Florida law could not be more clear.  And this is a

11   matter of state substantive law, that a predisposition to

12   injury is not a cause, and cannot be a superseding or

13   intervening cause, so I think it should be clear as to

14   Ms. Hill.

15           As to third parties, what we're really talking about

16   is this, Judge.  They brought an affirmative defense, in fact

17   what we call a Fabre defense, blaming nonparties, presumably

18   in a case like this, including the doctors.  They failed to

19   satisfy their burden to establish that defense.  They conceded

20   that and withdrew the defense.

21           They now are doing what is very common in these

22   situations, attempting to recast that defense as a superseding

23   intervening cause issue.  And Florida law deals with that, and

24   we cited the cases, they are very clear.  Florida law deals

25   with that by saying, look, you can't do a backdoor on your

64

1  failure to properly plead and prove the Fabre defense,

2  third-party liability defense, by pointing to an empty chair.

3          And, essentially, pointing to an empty chair means

4  suggesting to the jury fault on the part of some other party

5  or suggesting in some way that the jury should allocate fault,

6  even though these faults aren't on the verdict form, to a

7  nonparty.  And Florida law is likewise clear that the only

8  situation under which you can point to a nonparty, whether you

9  call it intervening cause or anything else, and suggest that

10  they are to blame for what happened, is if they are the sole

11  cause.

12          If you get to concurring cause, it's not enough

13  under Florida law.  Just like federal law, a plaintiff

14  prevails even if there are other concurring causes.  So they

15  have to take the position that the nonparty event that they

16  are referring to, the empty chair, was the sole cause of

17  Plaintiff's harm.

18          And Defendant's response is that they say in the

19  papers, "We do not intend to argue at trial that Plaintiff's

20  injuries are the result of the fault of some third party."

21  They do, however, intend to offer evidence that Plaintiff's

22  claimed injuries were caused by something or someone else.

23  Well, Judge, when somebody does something that causes

24  injuries, that is a nonparty liability case, and they have

25  foregone the opportunity to do that.

1           So they mention Dr. Benbrook intends to testify

2    that, for example, Plaintiff's intervening spinal surgery

3    could have caused a change in the filter's position or a

4    perforation.  That is blaming the doctor who did the surgery

5    and is blaming the surgery for the perforation.  That is a

6    nonparty liability case.  And whether it could have is not a

7    sole cause superseding intervening cause argument.

8           Their position has to be -- and they've got to pick

9    one, Judge.  They can't pull five things out and say, "It

10   could have been any of these things.  We'll throw it at the

11   wall and see what sticks."  They have to take a position as to

12   what the superseding intervening cause was, and then they are

13   entitled to point a finger at an empty chair.  And the

14   plaintiff has to live with, you know, if it's a nonparty, the

15   fact that maybe they should have put them on the verdict form

16   or brought them into the suit.

17          But the bottom line, Judge, is they're not permitted

18   to come in and throw out all sorts of speculative alternative

19   causes under the guise of a superseding intervening cause

20   when, in fact, all they're really doing is saying things like,

21   and I quote, "Dr. Zuzga's medical decision to place the

22   filter, notwithstanding the existing curvature of the

23   structure in which it was placed, may have been a cause of the

24   perforation."

25          That is Plaintiffs blaming the doctor.  They're not

1  allowed to blame the doctor unless they say that Dr. Zuzga or

2  one of these other things is the sole cause of the

3  perforation.  So we have moved to exclude all such evidence.

4  And if they want to take a position, then they're certainly

5  entitled to in terms of a sole intervening superseding cause.

6       THE COURT:  Thank you, Mr. Schultz.

7       MR. SCHLAFER:  Your Honor, this is John Schlafer for

8  the Cook defendants.

9       THE COURT:  All right.

10       MR. SCHLAFER:  What Plaintiffs are doing here is

11  taking a sideways stab at their motion for summary judgment on

12  Cook's intervening superceding cause.  They lost that motion,

13  you've already ruled on this issue.  They cite no rule of

14  evidence in their papers.

15       Their motion ignores a really crucial difference

16  between cause and fault.  As we all know, fault is determined

17  by multiple factors, and that one of those factors is cause.

18  Certainly, if we would point to a third party being at fault,

19  as we acknowledged in completing our Fabre defense, we would

20  need to prove that in order to add it to the jury form.  But

21  suggesting evidence of a superseding or intervening cause, or

22  some alternative cause, for Mrs. Hill's injury is not barred

23  under the cases the plaintiff cites and is not barred because

24  Your Honor declined to grant them the summary judgment they

25  previously moved for and lost.

67

1          The -- Ms. Hill's anatomy, the curvature of her

2   spine, and the concurring curvature of her vena cava may have

3   been one of the causes of her perforation, but that doesn't

4   mean that her spine is at fault for it.  We certainly can't

5   put her spine on the jury form -- the verdict form, and

6   certainly Ms. Hill is not at fault for it.

7          The placement of the filter at a location within the

8   curved portion of the IVC may have been one of the causes of

9   her perforation, but that doesn't mean the doctor was at fault

10  for that perforation.  It's an alternate cause.

11         I won't go on, because as I said initially, Your

12  Honor, you've already heard this issue and ruled on it in

13  Plaintiff's motion for summary judgment, so there's not too

14  much more to say about it, but the main point I want to make

15  from Mr. Schultz's argument is simply that he is conflating

16  one element of fault with fault in and of itself.

17         Your Honor, very briefly as to Ms. Hill, and I'm not

18  sure about the superseding intervening cause summary judgment,

19  but curvature of the spine is predisposition under Florida

20  law.  That's eggshell, and we would seek an instruction on it

21  if it were permitted.  But, clearly, under Florida law, it

22  should not be permitted.  And it is, I think, semantic to say,

23  look, we're not saying Dr. Zuzga is at fault.  All we're

24  saying is he made a decision to put a filter in when she had a

25  curved spine, and that led to her perforation that harmed her,

1  but we're not saying he's at fault.  Well, Judge, that's

2  precisely what the empty chair defense, as defined in Florida,

3  the case law has been developed to prevent.

4          Similarly, for Dr. Benbrook to say that the

5  intervening spinal surgery, the surgeon who performed the

6  procedure that caused a perforation of the medical device into

7  her duodenum, they can call it cause if they want.  The jury

8  will hear fault.  They certainly are suggesting it should not

9  have been done, and I think the jury will be receptive to

10  that.  And if they want to jump through those hoops

11  evidentiarily and have the burden put on them that they have

12  to prove at trial, then they're certainly free to, but they

13  chose not to, and they should not be allowed to come in

14  through the backdoor.

15          THE COURT:  Thank you.  I'll take that under advice.

16          2, Plaintiff's consent forms?

17          MR. HEAVISIDE:  Yes, sir, Judge.  This is Mike

18  Heaviside.  It's our position that the admission of these

19  documents will confuse and mislead the jury to believe that

20  Mrs. Hill assumed the risk of the product, that being

21  progressive perforation into an adjoining organ, rather than

22  the risk of the procedure in question.  We feel it's quite

23  clear that Ms. Hill had no specific appreciation for the risk

24  she is said to have assumed.

25          If you look at Exhibit B to our papers, which is

69

1   styled, "Consent for Procedure," you will see that in almost

2   every line, there is a reference to "procedure," to this

3   procedure.  It talks about this procedure, the proposed

4   procedure, the results of the procedure, willingly give

5   consent to this procedure.  So it's our position that she was

6   consenting to the procedure, but not to the risks attendant to

7   the product.  And we think it will be -- there's a grave

8   danger that the jury will perceive assumption of the risk of

9   the product.

10          Now, we know that -- you know, it's quite clear this

11  is not a product-specific consent form, and we know, and I

12  think Cook will agree, that all filters are not created equal.

13  We know, for example, that even within the Cook universe, that

14  the Celect, which is the device in question here, according to

15  their figures at a point in time, perforated 17 times more

16  frequently than did the Tulip.  So this is not a

17  device-specific consent form.

18          We know that Dr. Zuzga did not anticipate the

19  surprising abnormal result of a progressive perforation into

20  the duodenum.  And so, from our perspective, it's quite clear

21  that she was not assuming the risks attendant to the

22  characteristics of the Celect.  She was only acknowledging

23  that there were certain risks to the procedure.  If you look

24  at, you know, as I said, Exhibit B --

25          THE COURT:  Are you sure you don't -- Mike, are you

1  sure you don't mean surgery instead of procedure?

2          MR. HEAVISIDE:  I'll go surgery, sure.

3          I'll make this other point.  If you look at the

4  informed consent, which she signed around the time of her

5  failed retrieval, you'll see that it talks about --

6          THE COURT:  The form says what the form says.

7          MR. HEAVISIDE:  Right.  But at the time of the

8  retrieval, the purpose of the -- could not have been to reduce

9  the risk of pulmonary embolus, because she was there to have

10  it removed.  So I think, fundamentally, the point is, yes, she

11  thought she might get a bruise or this or that from the

12  procedure itself, but she certainly was not assuming the risks

13  attendant to prolonged indwell time or the inability to

14  retrieve, because she was unaware of those.  And, frankly, so

15  was Dr. Zuzga.  So that's our position, Judge.  Thank you.

16          THE COURT:  All right.  Thank you, Mike.

17          MS. PIERSON:  Your Honor, this is Andrea Pierson.

18          Just briefly, you have already denied the

19  plaintiff's motion for summary judgment on Cook's defense of

20  assumption of the risk, and you've addressed all these issues

21  once, and it's all this genuine issue of material fact.  The

22  things that Mr. Heaviside suggests today go to the weight of

23  the evidence and not to admissibility.

24          The facts are that Mrs. Hill is a nurse who signed

25  three different informed consents, all of which warned of the

1  risk of perforation and warned of risks even greater than

2  that, death.  Mrs. Hill knowingly assumed those risks.  And

3  whether she understood the consent form to mean some period of

4  time other than the period of her procedure, that's all a

5  question of fact that the jury is going to have to decide.

6  But, under Florida law, it's very clear that the consents are

7  evidence of a plaintiff's assumption of the risk, and we've

8  cited the cases in our papers on that point.

9          I think one of their bases for their admission,

10  aside from the assumption of risk, is consumer expectations.

11  To the extent that this Court has ruled that consumer

12  expectations is a test that the jury will be instructed on,

13  it's relevant to the question of the expectations of

14  physicians, Dr. Zuzga and physicians in his position.

15  Plaintiffs have conceded that under that test, the consumer is

16  Dr. Zuzga.  And the way Florida law reads, it's not a question

17  of just what did Dr. Zuzga know, but what did Dr. Zuzga and

18  physicians in his position know?

19          It's a fact that Dr. Zuzga gave to Mrs. Hill a

20  consent that expressly warned of the risk of vena cava

21  perforation.  It's evidence that goes to expectation, the

22  expectations of the doctor in the exact position of treating

23  Mrs. Hill.  They go to his knowledge of the risk of

24  perforation.

25          And he discussed, in some detail in his deposition,

1   the consent process and what he understood the consent to mean

2   and how he would explain the risk to patients, including

3   Mrs. Hill.  So, ultimately, we believe these consent forms

4   have a significant amount of probative value, and the issue

5   that Mr. Heaviside raises goes to weight, not admissibility.

6              THE COURT:  Anything else on this?

7              MR. HEAVISIDE:  Judge, just 30 seconds.  I -- you

8   know, it's our position that it defies common sense, frankly,

9   to say that someone has knowingly assumed the risks that they

10  are completely unaware of, so that's our position.  Thank you.

11             THE COURT:  Okay.  All right.  Under advisement.

12             Number 3, motion to exclude evidence of attorney

13  advertising?

14             MR. SCHULTZ:  Yeah, we're going to stand on the

15  papers on that, Your Honor.

16             THE REPORTER:  I'm sorry.  Who's speaking?  I'm

17  sorry.  Who was speaking?

18             MR. SCHULTZ:  Matt Schultz.

19             THE COURT:  That was Matt Schultz.

20             THE REPORTER:  Okay.  I did not get what he said.

21  Can you repeat that?

22             MR. SCHULTZ:  Yes.  We were going to stand on our

23  papers on that and not argue it orally.

24             THE COURT:  All right.  Okay, let's see.  What else

25  do we have on our agenda today?

73

1          MR. SCHULTZ:  Matt Schultz, Your Honor.  You wanted

2   to discuss the clarification/motion for reconsideration?

3          THE COURT:  Right, which I'm considering the motion

4   to reconsider.

5          MR. SCHULTZ:  Yes, sir.

6          THE COURT:  Yeah.  What's your reply to Cook's

7   response?

8          MR. SCHULTZ:  Well, Cook's response, Judge, is the

9   same position they've taken from the start.  We got

10  sideways --

11         THE COURT:  Well, they say you don't have any -- you

12  haven't proved -- provided any evidence of any causation or

13  any specific fact.  None of that was in your briefs, so I

14  guess I need you to tell me where it is --

15         MR. SCHULTZ:  Right.  Your Honor --

16         THE COURT:  -- and why it wasn't in your briefs.

17         MR. SCHULTZ:  Well, and that's -- that's what I was

18  going to try and explain.  So Cook, in its summary judgment

19  motion, said that we had a claim for negligent design and that

20  that's all we're entitled to have.  We responded that Cook's

21  view of Florida law is mistaken, that we, to the extent

22  design -- of course, we pled negligent design, negligence, and

23  development, manufacturing, marketing, and sales, so all of

24  those are at play.

25          But their attempt to limit the negligence claim to

74

1    nothing more than design is mistaken under the law.  And as a

2    matter of law, they haven't even addressed the general

3    negligence claims, so they couldn't possibly prevail on

4    summary judgment.

5         We did discuss the evidence of negligence -- excuse

6    me, negligent design under design defects, specifically

7    Dr. Marmureanu, when you permitted his opinions on

8    differential diagnosis; going to design, Dr. McMeeking, who

9    you heard a presentation on last week in his *Daubert* motion,

10   you have under advisement.  And you've heard me repeatedly,

11   Your Honor, discussing the favors and other cases that permit

12   this.

13        So the allegations and the evidence -- and we go

14   through quite a bit of the evidence in the very front of our

15   summary judgment response in terms of design and

16   development -- we pled design, we pled development.

17   Manufacture under quality system regulation, which governs

18   medical devices, isn't just, you know, there's a scratch on

19   the wire that vendors believe make it susceptible to fracture.

20   QSR, which governs all manufacturing of medical devices,

21   including these, governs CAPA, it includes CAPA, that's the

22   investigation of problems.  It includes design controls.

23   That's development of the device, which we did plead out

24   specifically.

25        But the thing of all of it, Judge, is I think where

75

1  we got sideways was, I guess we looked at the summary judgment

2  and said, "Well, all they've done is try to move for summary

3  judgment on one element of our negligence claim.  How can they

4  possibly win a summary judgment motion on our negligence

5  count, which is what the relief was sought for, when they

6  haven't addressed four-fifths of what we've pled?"  And so I

7  think that's why there was a dearth of response of evidence

8  directly to the claim of negligent design.

9          But, as Cook lumped in negligent design and design

10 defect in their papers, we did cite all of our responsive

11 evidence with respect to defective design.  And, of course, at

12 the hearing, as we pointed out in the clarification, we

13 repeatedly pointed out that negligent design is very much a

14 part of the case.

15         And negligent testing, Judge, I mentioned it earlier

16 regarding the executive summary, the whole point of testing is

17 to produce a reliable and safe design.  A claim for negligent

18 testing, that's why, as Ms. Pierson has pointed out, is

19 subsumed within a negligent design, quote/unquote, claim,

20 because that is the whole point of testing.  The reason you

21 test is so you end up with a design that's not negligent.  And

22 failure to properly test leads to bad design, and bad design

23 is what led to this injury.  And we've got expert testimony to

24 support that.  So --

25         THE COURT:  What's the specific defect?

76

 1              MR. SCHULTZ:  Well, the physical --

 2              THE COURT:  Where is the evidence of that in the

 3    briefing?

 4              MR. SCHULTZ:  Under -- well, I would have to -- I

 5    don't even know if I have our summary judgment response in

 6    front of me, Judge, but it would be with respect to

 7    Dr. McMeeking.  So we have two aspects of design,

 8    quote/unquote, defect.  That is Dr. Marmureanu's differential

 9    diagnosis eliminating all but the design.  And then we have --

10              THE COURT:  None of that was mentioned in the

11    briefing.

12              MR. SCHULTZ:  Well, let me pull the brief up, Your

13    Honor.  I apologize.  I specifically recall Dr. Marmureanu and

14    Dr. McMeeking being mentioned in that briefing.  And if it

15    pleases the Court, if defense wishes to go, I will pull that

16    up and find those citations for you.

17              THE COURT:  All right.

18              MS. PIERSON:  Your Honor, this is Andrea Pierson.

19    To address it -- do you want me to go ahead and address what

20    Mr. Schultz said or do you want to wait?

21              THE COURT:  Go ahead.

22              MS. PIERSON:  Okay.  Thank you, Your Honor.  To

23    address what Mr. Schultz has said, so you made the notation in

24    your entry on the motion for summary judgment correctly in the

25    footnote, that this negligent design was not a viable claim.

1            And as we pointed out in our reply papers on the

2    motion for summary judgment, the plaintiffs made a strategic

3    choice and they did not respond to our claim for our motion

4    for summary judgment on negligent design.  They chose,

5    instead, to say that their claim was a garden variety

6    negligence claim that, put simply, does not exist under

7    Florida law.  And because it doesn't exit, the negligent

8    design claim was appropriate for summary judgment.

9            On the last page of Your Honor's order, you note

10   that an argument that Cook believed that it properly waved --

11   properly raised in its hearing and in the reply, that we

12   hadn't done that early enough.  And we included, in our

13   response to motion for clarification, our view of that point.

14           But, put simply, if what Cook did not raise until

15   its reply and in oral argument is too late, then it's simply

16   too late for Plaintiffs to recharacterize their claim as

17   something that it wasn't.  There is no response -- you can

18   search Plaintiff's entire response, and there is no response

19   to our moving papers or to our reply, where we laid out very

20   clearly that they did not have a proper negligent design

21   claim, that there is no evidence of a defect in the product,

22   and there's no evidence of a lack of reasonable care in some

23   respect on the part of Cook.

24           Even if this is a negligent design claim -- or,

25   excuse me, a negligent testing claim, even if that's all it

1  is, as we explained in oral argument, there's no such claim

2  that's viable under Florida law in the absence of a defect.

3  And they don't have evidence of that.

4          In addition to that, there is no expert evidence

5  that would support negligence in the testing of the product.

6  We heard from Ms. Baughman last week on the *Daubert* motions

7  that related to Dr. McMeeking.  What she described was not a

8  lack of reasonable care in the testing process for this

9  product or that Cook didn't do what a reasonable manufacturer

10  would do in the testing of the product.  What she described

11  was Dr. McMeeking's calculations that somehow lead to a radial

12  force of stillness that he believes could make this product

13  prone to fracture.  That's not the issue in this case.

14          And even if -- two points here in sum, Your Honor.

15  One is, it's not in their response, period.  It's not there.

16  And you've made clear that these things have to be judged

17  based on the moving papers.  And in one case, it was

18  detrimental to my client that you made that decision.  And

19  we're respectful of your order on that point, but the same

20  should hold true for Plaintiffs.  They did not respond on this

21  issue of negligent design, and we are entitled to summary

22  judgment, continue to be entitled to summary judgment, on that

23  point, as well.

24          But, even if the Court would somehow be inclined to

25  reconsider, as Plaintiffs suggest, the fact of the matter is

1  they just don't have the evidence to support either a lack of

2  reasonable care in the testing and design process or the

3  existence of a defect.

4          MR. SCHULTZ:  Well, Your Honor, I just word-searched

5  our response, and "McMeeking" and "Marmureanu" do not appear

6  in there, so I will not suggest to you that we did put it in

7  there.  I was mistaken.  I reviewed the design defect section,

8  and I believed that to be there.

9          I would respond in this way, Your Honor.  At the

10  hearing, we brought it up, we pressed the design issue in

11  several ways, several different times.  It's properly pled.

12  Cook concedes that.

13          And having heard the *Daubert* motion, and having even

14  ruled that Dr. Marmureanu could speak to design in terms of

15  differential diagnosis, we think that it would be improper --

16  unfair, I guess, would be the right word -- for us not to be

17  entitled to pursue a claim for negligent design, particularly

18  the negligent testing as geared toward negligent design in the

19  first place, and negligent design as the result of negligent

20  testing.

21          And given that we have evidence that the Court

22  already has deemed admissible, and we have another one under

23  advisement that, if denied, would be even further admissible

24  evidence on the design defect through Dr. McMeeking.  And, you

25  know -- but I can't tell you it's in the response, because I

80

 1  just looked and it's not there.

 2          THE COURT:  That's a problem, isn't it?

 3          MR. SCHULTZ:  Well, I certainly would prefer that it

 4  be there, Your Honor, but I don't believe it would or should

 5  act as a waiver in light of the position that we took at

 6  hearing and the fact that we now have, by the Court's own

 7  rulings, admissible evidence on the subject that we're

 8  prepared to put into the case.

 9          MS. PIERSON:  Your Honor, it's Andrea Pierson.  If I

10  may add just one last thing.  I think, at the end of the day,

11  it's just not there, and the Court should grant Cook's motion

12  for summary judgment on the negligent design/testing claim

13  altogether.

14          One thing that I neglected to mention earlier, we

15  mention in our moving papers, as well, that there is no

16  evidence of causation to support any claim of negligent

17  design.  And we just reiterate that point here, as well.

18          To the extent that the plaintiffs want to suggest

19  that something that Cook did or failed to do in the process of

20  designing the product or testing the product, to the extent

21  that they intend to suggest that, there's no evidence that

22  links that to what happened to Mrs. Hill.  And in their

23  responsive papers, again, they do not address the element of

24  causation at all, at all.

25          And I know I mentioned this in the hearing, but

81

 1    there -- if you put the motion for summary judgment, the

 2    response and the reply, down side by side, the element of

 3    causation and the lack of causation, whether it went to a

 4    negligent device claim or a strict liability claim, they

 5    simply did not respond.  So, for that reason, as well, Your

 6    Honor, we respectfully request that the Court enter summary

 7    judgment on whatever you want to call this claim, negligent

 8    design or negligent testing.  If anything, this is a strict

 9    liability case.  That's all.

10            THE COURT:  Well, you still have to have causation

11    in a strict liability case.

12            MS. PIERSON:  Yes, you do.  And, frankly, that's why

13    we moved for summary judgment on strict liability, as well.

14    There's a whole section in our summary judgment, in our moving

15    papers, an entire section that deals with causation.  The

16    plaintiff has the burden of proving that a specific defect in

17    our product caused Mrs. Hill's injury, whether this is a

18    negligence case or a strict liability case.  And we reiterated

19    that in our reply brief, and we reiterated that in the

20    response.  They simply did not respond on the point of

21    causation.

22            MR. SCHULTZ:  Well, if we did, Your Honor -- Matt

23    Schultz.  In fact, we cited the *Tillman* case specifically,

24    which was a Bard IVC filter case.  It's a case that Cook

25    relied heavily on in seeking to apply risk/benefit.  But the

1   *Tillman* court, which is a Middle District of Florida case, if

2   I recall, and we quoted the decision, said that *Tillman*

3   presents evidence that the filter, as designed, has a

4   propensity to tilt, migrate, or perforate the IVC;

5   complications, which can also lead to fracture, all of which

6   is true here.  In response to this evidence, Bard fails to

7   demonstrate the absence of a question as to fact as to whether

8   the filter is as safe as current testing and research permit.

9          And we argued in the papers, Your Honor, that the

10   same logic applies here.  The Celect filter has a propensity

11   to perforate, tilt, and embed, as predicted when its design

12   was first suggested by Dr. Neuerburg; as demonstrated by

13   Cook's animal tests; as demonstrated through Cook's

14   retrievability study, that showed a propensity for

15   perforation; and as demonstrated through its complaint rates;

16   and as Cook itself concluded in 2010 when it found the

17   perforation was 17 times higher than Tulip, and that that was

18   a statistically significant difference.  We -- all of that is

19   cited in the papers.

20          What is not, and should have been, is the additional

21   evidence that the Court now is aware exists and, we would

22   contend, should be considered, although omitted from the

23   brief, given that the issue is really whether there is any

24   question, genuine issue of fact.  And, given the evidence,

25   even though it came in the context of the *Daubert* motions, the

1   Court certainly is aware of the (inaudible) questions of fact

2   on this point.

3           MR. WEBBER:  Your Honor, this is Charles Webber.  If

4   I may briefly, the Seventh Circuit has been very clear that

5   the time to come up with evidence and produce evidence in

6   response to summary judgment is at the time of the response.

7   It can't be produced later.

8           And I think the plaintiff's failure to produce the

9   evidence that Ms. Pierson described at the time of the summary

10  judgment response, so that we get a chance to reply to it,

11  frankly, means that it is too late in the day to try to do it

12  in the hearing or in the context of the *Daubert* motion later.

13  I think the Seventh Circuit has spoken on that.

14          THE COURT:  Okay.  Anything else today?

15          MS. PIERSON:  Yes, some housekeeping matters related

16  to the trial, if this is a good time.

17          THE COURT:  Sure.

18          MR. SCHULTZ:  And, I'm sorry, Your Honor.  I didn't

19  realize -- I would only point out --

20          THE REPORTER:  I'm sorry.  Who is speaking?

21          MR. SCHULTZ:  -- the testing --

22          THE REPORTER:  I'm sorry.  Who is speaking?

23          MR. SCHULTZ:  I'm sorry.  Matt Schultz.  Matt

24  Schultz.

25          Your Honor, just to put a bow on it, the testing

84

1    that I just described in response on the causation issue,

2    where we cited *Tillman* in our case -- in our brief, is laid

3    out in our statement of facts, with supporting documentation.

4    And if you look at the narrative of the sort of chronology of

5    Celect, that's where those references will be found.

6            THE COURT:  All right.  Okay, Mr. Schultz.

7            MS. PIERSON:  Your Honor, Andrea Pierson.  Before we

8    launch the housekeeping, I just encourage you to look up the

9    memo that we filed (inaudible) the motion for summary judgment

10   (inaudible).  You will see no response to these issues on

11   negligent design, to the resistance of a defect on causation

12   as a consequence of the defect.  It's simply not there, and we

13   pointed that out in our reply.

14           In terms of house --

15           THE COURT:  I understand.

16           MS. PIERSON:  Thank you, Your Honor.

17           In terms of housekeeping, we agreed with Plaintiffs

18   on a few issues, questions that the parties jointly wanted to

19   ask; and then Cook had a few, as well, that I haven't

20   discussed with Mr. Schultz, but they're all, I think, fairly

21   innocuous.

22           The first one that we have discussed is the order

23   of playing deposition designations during trial, and the

24   parties have a disagreement about how that will be handled

25   when we get to trial.  Just to sort of set the stage for you,

85

1   there are probably five witnesses in the plaintiff's case that

2   will be presented by deposition.  Cook has two or three that

3   will be presented by deposition.  I don't have the exact

4   figures in front of me.

5           But the parties have designated, counter-designated,

6   and essentially designated redirect designations.  For the

7   most part, these are physician depositions.  The physicians

8   are located in Florida, so, obviously, they won't be at trial.

9           The plaintiff has taken the position that -- I

10  shouldn't put it that way.  The parties each have portions of

11  the deposition that they want to play in their respective

12  cases.  And in some cases, the depositions were divided by

13  days, so it's a little bit easier to see what portion ought to

14  come in in the plaintiff's case and what portion ought to come

15  in in Cook's case.

16          Regardless of that, though, once we went through the

17  process of designating, counter-designating, and doing

18  redirect designations, it's Cook's position the depositions

19  have become quite choppy and really difficult to understand.

20          We think we can fairly divide it between the

21  plaintiff's case and Cook's case.  We think when it comes time

22  to play these depositions, that the portion that will be

23  played in Plaintiff's case, Plaintiff's affirmative to our

24  counters, and their redirects, that those ought to be played

25  from top to bottom in the order that the questions were asked,

1   and that we should try to divide those depositions such that

2   they would be played like a direct exam, cross-exam, and then

3   a redirect.  It just doesn't work when you're doing it in this

4   format.

5           Particularly with the doctors, we had very limited

6   time in their depositions.  It's hard to piece it together.

7   There are times where I designated questions that maybe

8   Mr. Martin asked, or he designated questions that I've asked,

9   and the depositions are really hard.  I've watched some of

10  them.  They're very hard to comprehend if they're not played

11  chronologically.

12          We're not asking that the plaintiffs be required to

13  play our designations, our affirmative designation in their

14  case, but we are asking that when it's played in Plaintiff's

15  case or Defendant's case, that it be played essentially from

16  the beginning of the deposition to the end.

17          MR. MARTIN:  I would like to address this if I

18  could.  Your Honor, this is Ben Martin.  And we didn't know

19  which housekeeping matters or what the housekeeping matters

20  were going to be, so I apologize for kind of just jumping in,

21  but it sounds like something I need to -- I need to respond

22  to.

23          Your Honor, I wholeheartedly disagree with

24  Ms. Pierson.  I've looked at every one of these lines of every

25  one of these depositions -- and there are just a handful that

1  ultimately are going to be played in this trial, given the

2  pretrial rulings on the Cook people -- but we have spent

3  numerous, dozens, if not hundreds, of hours preparing these

4  deposition designations, exactly as we were asked to do,

5  exactly as Cook appeared to have agreed to do.  And we -- and

6  if there was -- if -- and if there is a situation where there

7  was -- optional completeness was an issue, then Cook has

8  offered up optional completeness and had every opportunity to

9  do so, just as we did.

10       I believe that -- I believe that the reason that

11  these depositions are now -- they want us to play them from

12  front to back, number one, we would have to start all over.

13  And it should stop there.  And so that's my response, Your

14  Honor.  These are not choppy.  If they're choppy, that's -- if

15  they are understandable, our portion is understandable, their

16  portion is understandable, and the parts of optional

17  completeness, that the Court, I suspect, will rule upon, will

18  clear up any problems and issues with respect to that.

19       And so I do have one thing that we need to bring up

20  with respect to the depositions on housekeeping matters, Your

21  Honor, and that is on Dr. Lynch.  And if the Court could hear

22  me on that, I would like to -- I would like to address it,

23  because it is a separate issue and it is regarding the

24  depositions.  And we need to address this, and we need to, I

25  think, address it today.

1            THE COURT:  All right.  Well, let me address, first,

2   the issue that Andrea brought up.  I've had trials where we've

3   done it both ways, and usually I try not to interfere too much

4   in that.  I try to let the attorneys try the case the way they

5   want to try it.

6            So my inclination is, Ben, is to agree with you on

7   presentation here.  Based on your representation to me that

8   you've reviewed these and they're not choppy and that they're

9   easily understandable, if that's the case, it should be fine.

10  But if it's not, the jurors may ask to rehear all this in a

11  different way.  And so, based on your representation that it's

12  not choppy and that it should be easily understandable, and

13  the jurors should be able to follow it, we'll go along with

14  that.

15           MR. MARTIN:  I will have earned that, Your Honor.

16  And I have read every line, and even put in the concept of

17  what if the Court were to rule this and what if the Court were

18  to rule that.  I'm not saying I memorized every one, but I

19  looked at these very closely, and I will stand on that, Your

20  Honor.  And I certainly, certainly can't, in -- at this point,

21  if we could -- if I could deal with one other issue with

22  respect to Dr. Lynch on the deposition issues, I would like to

23  raise it.

24           THE COURT:  Go ahead.

25           MR. MARTIN:  Your Honor, there's one -- we're having

89

1   a disagreement with Cook on one matter, and it is as follows.

2   Some time ago, there was an order entered as to the scope of a

3   treating physician, Dr. Lynch, Dr. Frank Lynch, his testimony

4   by deposition in the case.  His deposition will be played by

5   us.

6          He did the complicated retrieval in Pennsylvania,

7   where Ms. Hill had to go to get that accomplished.  Dr. Lynch

8   happens to be a key opinion leader for, I believe,

9   (inaudible), but also he's been a clinical investigator,

10  principal investigator, for Cook, as well, and has a

11  consulting contract with Cook.

12         Now, Your Honor, when we -- but he happens to be the

13  person who -- the doctor who took her filter out.  And I will

14  say that when we were -- when we were getting ready to take

15  this deposition, Dr. Lynch's counsel moved to quash the

16  deposition, and Judge Baker, Magistrate Baker, heard the

17  motion to quash.

18         And though the motion to quash was not granted in

19  its entirety, essentially what Magistrate Baker did, and I've

20  got the order in front of you, is Magistrate Baker did two

21  things.  He limited the deposition of Dr. Lynch to that of a

22  treating physician, and so that -- and the concept was that,

23  you know what?  We wanted -- Your Honor, we wanted a big bunch

24  of documents to show bias on the part of -- his part on behalf

25  of Cook, et cetera, et cetera.

90

1        And Magistrate Baker said, you know what, we're

2  going to limit Dr. Lynch's expert opinions, we're going to

3  limit it to three hours.  And the parties agree that he's an

4  expert in IVC filters, but he needs to be considered an

5  ordinary nonparty witness, because he will testify as

6  Ms. Hill's treating physician.  And I'm actually reading from

7  the order.

8        And so -- and the Court concluded, on page 10, as

9  to -- as to the motion to quash, and the Court limited this in

10 modifying the subpoena, and specifically stated that

11 Dr. Lynch's testimony will be as a treating physician and not

12 as a "expert," you know, IVC filter expert.

13       Now, so what -- and I'm moving through this quickly,

14 but what happened next is, we went and took Dr. Lynch's

15 deposition.  And Ms. Pierson -- respectfully, we believe that

16 Ms. Pierson went way outside the bounds of the order that we

17 intended to live with, and did live with.  And we were not

18 prepared to ask him questions nor did we ask him very many

19 questions, just enough to defend our -- kind of defend our

20 position, that when Cook got into all these means and details

21 about, oh, these are efficacious, and these are great filters,

22 and used them for years, and I'm -- you know, all of the

23 things that we believe that Magistrate Baker had said we

24 couldn't do.

25       Therefore, in this limited three-hour deposition, we

1   were put at -- we were put at a task of what do we do?  Do we

2   ask our own questions about lack of efficacy?  Do we talk

3   about the complications of the Cook filters?  And we asked

4   some limited questions just because we kind of had to protect

5   ourselves.

6          Now, fast-forward.  We have -- we have designated

7   the deposition of Dr. Lynch.  We believe that Dr. Lynch is to

8   be -- is to be treated in trial as Judge Baker said he was to

9   be treated in discovery, and that is as a treating physician.

10  And we suggest to the Court that when the Court is ruling upon

11  the objections to Dr. Lynch's testimony that we make, and the

12  objections that on occasion they've even made, that Dr. Lynch

13  should be played as Dr. -- as Judge Baker had suggested that

14  his deposition be taken.

15         Otherwise, we are -- we are put at an unfair

16  prejudice, because we went and took his deposition as the

17  Court had ordered us to do and as a treating physician, and it

18  went wildly way outside the bounds of that.  And just in

19  discussions, even today, the position of Cook is, well, that

20  was a discovery issue, that has nothing to do with what we --

21  you know, with what evidence goes forth at trial.

22         And my response to this will be the same today, Your

23  Honor, in that, gee-whiz, so if, in our reading of the

24  deposition -- and I was there and took it, so if somebody, you

25  know, violates a court order that limits a deposition scope,

92

1  they then get the benefit of being able to play a bunch of

2  expert opinions when, you know, we were disallowed from even

3  asking those questions, supposed to be.  And so I just wanted

4  to raise that with respect to the one deposition of Dr. Lynch.

5  Thank you, Your Honor.

6           THE COURT:  Any response?

7           MS. PIERSON:  Thank you, Your Honor.  This is Andrea

8  Pierson.  I disagree with most of what Mr. Martin has said,

9  but I disagree strongly with the fact that he suggested that

10 Cook in some way violated some order of this Court.  That

11 simply isn't true.

12          And, as I say, the one thing that Mr. Martin has

13 said today, that we can agree on, is that you should judge

14 this in the context of reviewing the deposition designations.

15 The plaintiff moved to strike our nonretained expert

16 disclosure, which addressed this exact issue, and the Court

17 denied that motion and said you'd address it in the context of

18 reviewing the depositions.

19          The plaintiffs tried again by filing a *Daubert*

20 motion as it related to the treating physicians, which Your

21 Honor has not yet ruled on, and as we argued when we were with

22 you on the 25th, that's an issue that the Court ought to

23 decide in the context of reviewing Dr. Lynch's deposition.

24          But, to be clear, the motions and orders that

25 Mr. Martin is talking about was a motion for protective order

1  brought by Dr. Lynch's counsel as it related to documents and

2  what documents would be produced during the deposition.

3          We, in the deposition, asked Dr. Lynch about his

4  care and treatment of Mrs. Hill, but that necessarily includes

5  his experience with filters and the products before that.  And

6  Dr. Lynch, very early on in his deposition, explained, as is

7  true of all treating physicians, that they take care of their

8  patient based on their education, training, and experience up

9  to that point.

10         We laid out in response to the *Daubert* motion on

11  treating physicians our -- the law that supports the position

12  that we've taken with respect to the scope of the treating

13  physicians, depositions including Dr. Lynch.  But, ultimately,

14  I think this is a decision that you can only make once you're

15  looking at Dr. Lynch's testimony to evaluate its

16  admissibility.

17         But, for Mr. Martin to suggest here today that there

18  was some discovery abuse that's sanctionable by the exclusion

19  of some portion of Dr. Lynch's testimony, that is not only

20  procedurally and factually incorrect, but, frankly, I take

21  offense to it.  Dr. Lynch's attorney did not object to the

22  scope of the deposition or the questions asked.  That was his

23  objection to raise if he chose to raise it.

24         And contrary to Mr. Martin's suggestion here today,

25  they had half the time, an hour and a half, and they chose to

94

1  spend part of their time asking Dr. Lynch about his current

2  Web site and postings on his current Web site, which have

3  nothing to do with Mrs. Hill.

4        So I think we've said enough on this topic, and I'll

5  leave it there.  But, ultimately, I think you need to read

6  Dr. Lynch's deposition and pull cites designated from it.

7        MR. SCHULTZ:  Your Honor, if I may, I can read -- I

8  can read the Court the exact language in Judge Baker's order.

9  It's a ten-page order, and I would -- and I would highly

10 recommend that this language be reviewed.  I'm not suggesting

11 that anybody needs to be sanctioned.  I'm simply suggesting

12 that Judge Baker said this.  As far as --

13       THE COURT:  Excuse me.  What's the docket number on

14 that?

15       MR. SCHULTZ:  Yes, sir.  This is docket number --

16 let's see.  The docket number is contained at the top

17 left-hand corner; is that right, Your Honor?

18       THE COURT:  It should be the top --

19       MR. SCHULTZ:  Your Honor, document 15.

20       THE COURT:  Document 15?

21       MR. SCHULTZ:  Filed 5/12/17.

22       MR. WILLIAMS:  Your Honor, this is Joe Williams.

23 The problem with finding that --

24       Ben, you're going to have to give him the actual

25 cause number, because Judge Baker --

 1          When they moved to quash, Your Honor, it was placed

 2   on a separate docket, and so the docket number is not going to

 3   be on the 2570 docket.

 4          Ben, if you can read the cause number and the docket

 5   number, the Court can find it.

 6          MR. SCHULTZ:  Sure.  Yes.  The case number is

 7   1:17-mc-00022-RLY-TAB, and the filing date is 5/12/17.

 8          THE COURT:  Okay.  We'll be able to find that.

 9          MR. SCHULTZ:  All right, Your Honor.  And, Your

10   Honor, nobody is asking for anybody to be sanctioned or

11   pointing a finger at someone for anything other than what

12   actually occurred, but I do simply want to refer the Court to

13   page 8, which is limitations on Dr. Lynch's opinions.  And,

14   yes, part of the -- part of the discussion at the hearing was

15   on my subpoena, our subpoena.  And it was quashed as far as

16   getting all of those documents that we wanted.  But, quite

17   frankly, that's fine, as long as we were limited in the

18   deposition to be a treating physician.

19          And I would say in paragraph -- the bottom paragraph

20   on page 8, the parties agreed that he's an expert in IVC

21   filters, although here, Dr. Lynch is considered an ordinary

22   nonparty witness, because he will testify as Hill's treating

23   physician.

24          And they make it very clear, in the next few pages,

25   that we were not supposed to ask him, in a limited deposition,

96

1 about anything other than the treating physician and a little

2 bit of extrapolation, which, of course, because he is a

3 doctor, to discuss.  And so, anyway, that's the truth, and

4 I'll just leave it to the Court, if the Court desires, to look

5 at it.  And I think the Court will probably agree with us.

6           THE COURT:  Okay.  We'll take a look at that, but

7 certainly I wouldn't change Judge Baker's order.  He's going

8 to be treated as a treating physician, as far as I'm

9 concerned, and it would be pretty easy to determine his

10 testimony as to his treatment and why he did such treatment.

11           Okay.  What next?

12           MR. WILLIAMS:  Your Honor, this is Joe Williams.

13 Two things.  First, we have tried, over the past couple of

14 hearings, to get some time before Your Honor to deal with

15 preadmission of certain documents, and that's become even more

16 important as I heard today the Court's ruling or statement

17 that we shouldn't use documents in opening statement that

18 haven't been stipulated to.

19           We have been unable to reach a stipulation on

20 virtually everything we need to use.  And, candidly, most of

21 these documents -- for example, the picture of the

22 endoscopy -- are documents that are contained -- that are

23 either clear business records or contained in medical records,

24 things that will be coming in when witnesses are provided --

25 are proffered, to lay that foundation.  (Inaudible)

1  discussion, I believe either last hearing or two hearings ago

2  that we (inaudible) --

3          THE REPORTER:  I'm sorry.  You're breaking up.  I'm

4  having trouble understanding you.

5          MR. WILLIAMS:  Oh, I'm sorry.  I'm sorry, Mr. Court

6  Reporter.  Joe Williams for the plaintiff.

7          THE REPORTER:  No, I know who's speaking.  You're

8  breaking up.  I'm having trouble hearing what you're saying.

9          MR. WILLIAMS:  I apologize.  All of the -- to make a

10 long story short, so that we can use certain documents,

11 potentially, in our opening statement, we would like to have a

12 hearing with Your Honor where we present certain documents to

13 get an admissibility ruling on so that can be used in our

14 opening statement, because we've been unable up to this point

15 to reach a stipulation on certain documents that we know are

16 going to come in, because we've got the foundation, or the

17 foundational experts will be testifying.  And we were hoping

18 that Your Honor would have some time this week, I think Friday

19 was discussed at one of our previous hearings, to address the

20 issues.  I'm just asking if the Court had some time to bring

21 up that issue.

22         MS. PIERSON:  Your Honor, may I respond?

23         THE COURT:  You may.

24         MS. PIERSON:  Thank you, Your Honor.  So, since we

25 were with you last time, Mr. Matthews and Mr. Schultz and I

98

1    talked.  We've agreed to exchange on Wednesday of this week a

2    list of 300 exhibits that each side is likely to use at trial.

3    I think we're all in agreement that we're going to try very

4    hard to be sure that the things that we give to you and the

5    jury to consider, that those are things that come from the

6    list of 300, knowing that there are a lot of documents out

7    there in the world, and there may be some very limited

8    circumstances where something is on our long-form exhibit

9    list, but it's not on the 300.  This list, I think we all

10   agree, should be few and far between.

11          But the concept that Mr. Williams is describing is,

12   I think, something a little different than that.  What Mr. --

13   what I understand the parties have agreed to do is to exchange

14   on Wednesday these lists, and we're committed to getting back

15   to one another about whether we will stipulate to the

16   admissibility of things that are on the list.  We're committed

17   to doing that and getting back to the plaintiff very quickly,

18   and I know they agreed to do the same with us.  It's going to

19   take us some time to do that, though, frankly.  We'll get that

20   list on Wednesday and they will get our list on Wednesday.

21          What Mr. Williams seems to be describing is an

22   evidentiary hearing on exhibits and whether certain exhibits

23   are admissible or are not admissible.  And, put simply, it's

24   not possible to do that until you hear the foundation for the

25   exhibits.  If it's something that we can test the foundation

1   or the relevancy, or whether it's a business record or not a

2   business record, Your Honor will need to hear the testimony of

3   the witness to see if that's established or not.  And it's not

4   a decision that you can make based solely on the argument of

5   the attorneys.

6            So we want this process to run smoothly.  We want

7   things to go quickly for you and for the jury.  But having a

8   hearing to determine admissibility of exhibits that either

9   we've not stipulated to or the plaintiffs have not stipulated

10  to, frankly, there's not much time, and I don't know -- I

11  don't know when we would do that, and I don't know how you

12  would decide in the absence of testimony from witnesses.

13           MR. MARTIN:  Your Honor, may I be heard on this?

14  This is Ben Martin.  (Inaudible).  Okay.  Either way -- all

15  right.  Your Honor, let me just say this.  And I hope I can

16  take two minutes and get it out.

17           Number one, we have been trying for months, months,

18  to get this problem solved.  And -- and encapsulated in a

19  little -- sort of a version of what's been going on, last week

20  we -- we're talking about the Cook corporate documents.

21  Almost every one of these documents we're talking about are

22  their own documents.  And so what happened last week is, we

23  gave them a list of 25, I believe it was 25, documents, all

24  Cook's own corporate documents, I believe.

25           And we -- and the concept was two-fold.  Number one,

1   is this authentic?  Are you going to agree that your own

2   documents are authentic, that you provided in discovery?  This

3   was just a group of 25, to see what -- if we could get 25

4   done, maybe we could get 100 or 200, which is going to be the

5   real -- probably what we're going to offer at trial, something

6   more like that.  So we looked at 25 documents, number one.  We

7   agreed to their authenticity.

8         Number two, will you agree to them as a business --

9   that they are a business record, okay?  Out of those 25 or so

10  documents, I believe the total number that they would even

11  agree were business records were two.  I think -- believe one

12  was the IFU and one was another document.  These are Cook's

13  own documents.

14        Okay, so here's the bottom line.  We're not --

15  I'm -- we're not that necessarily demanding that they agree to

16  the admissibility of these documents, because admissibility

17  would go to the next step, and that would be relevance.  But

18  we must be able to get either a stipulation or we're going to

19  have to put witnesses on the stand, their own witnesses, to --

20  and call them for the sole and only purpose of their saying,

21  "Oh, this is an authentic document; oh, this is a business

22  record," when they're all their records.  That's the problem.

23        It's not -- you know, we can -- we don't need to

24  have anybody tell us -- to agree, you know, that they're

25  admissible, but certainly authentic business records is what

1  we can't even get out, you know, out of Cook for 25 of their

2  own darned documents.  That's the -- that's the problem.  And

3  my suggestion, Your Honor, would be that we've got two ways to

4  do it.  Either Cook continues to -- what I --

5          THE COURT:  Wait.  Hold on, Ben, hold on.  If

6  these -- if what you're telling me is true, that Cook produced

7  these documents, then they're authentic.  I mean, that's a

8  simple one to do.  In terms of admissibility, Andrea is

9  correct, and so are you, that they have to be relevant.  I

10 mean, Cook could produce hundreds of documents and only two of

11 them be relevant, but they're all authentic.

12         MR. MARTIN:  Sure.

13         THE COURT:  So there's no question, if a party

14 produces a document, it's pretty darn well authentic, and

15 there's no --

16         MR. MARTIN:  And a business record.  And a business

17 record, Your Honor, is really the other little chip.

18         THE COURT:  For the most part, but that's not as

19 easy, but for the most part, yes.

20         MS. PIERSON:  Your Honor, it's Andrea Pierson.  I

21 just wanted to correct the record here.  I'm getting a little

22 bit of mixed messaging between multiple lawyers on the

23 plaintiff's side.  We were given, a month ago, a list of

24 documents from the plaintiff.  We had two calls with

25 Mr. Matthews and Mr. Chavez about 25.

1             We stipulated as to the authenticity of nearly every

2    single one, and we were very clear that if it's a document

3    that Cook created and Cook produced, we would stipulate to the

4    authenticity.  And many times, even if it's not a document

5    that Cook created, we'll still stipulate to the authenticity.

6    But we've given the plaintiffs our position on authenticity.

7    We also gave Mr. Chavez and Mr. Matthews, on the first 25

8    documents, our position as to the business records exception.

9    We've done all that, we've given that.

10            Then, a week or two later, I got an e-mail from

11   Mr. Chavez asking for our position on admissibility.  And

12   we've now given the plaintiffs our position on admissibility

13   on the 25 records.  And as I discussed with Mr. Schultz and

14   Mr. Matthews after the last hearing, we'll exchange the list

15   of 300 and then we'll give one another our positions on

16   admissibility.

17            So there may be some lack of communication going on,

18   I'm not sure, but we've done the things that Mr. Martin is

19   suggesting --

20            MR. MARTIN:  No, Your Honor --

21            MS. PIERSON:  -- such as giving them our position on

22   business records and authenticity of the first 25 and

23   admissibility on the first 25.  And we've committed to giving

24   them our position on admissibility on the remaining 75 and the

25   additional 200 that we think they will identify on Wednesday.

103

1              MR. MARTIN:  They have given --

2              MS. PIERSON:  I don't know what else we can do.

3              MR. MARTIN:  -- us their position.  They have given

4    us their position, Your Honor, and their position is, "We're

5    not going to agree that it's a business record, Mr. Martin, or

6    Mr. Matthews, sorry."  That's their position.  They've given

7    it to us, and that's it.

8              So what -- our only choice, then, is to tell them

9    that we're going to have to call people to trial, and they're

10   going to have to bring people who authored these documents so

11   that we can ask them the basic business records questions.

12   That's what's happened.

13             THE COURT:  Well, you know, there could be some

14   miscommunication here.  Everybody understands the Court's

15   position on this, and the Court's desire, and, quite frankly,

16   the jury's desire not to have foundational people come through

17   and testify, "Yes, I wrote this document; yes, we keep this in

18   the ordinary course of business," those types of things.

19             So let's -- let's go forward with the attitude of

20   determining whether this is a business record.  Most of you

21   know how these rulings go if you've had any trial experience

22   over the years, and so I'm hopeful that you'll be able to come

23   up with a good agreement on Wednesday.

24             MR. MARTIN:  Thank you, sir.  We are, too.

25             THE COURT:  Okay.  What's next?  Anything next?

1          MR. WEBBER:  Your Honor, this is Charles Webber for

2  Cook, if I might.

3          THE COURT:  Yes.

4          MR. WEBBER:  I think both parties have a question --

5  I know that at least we do, so I'll let the plaintiffs speak

6  for themselves -- about the conduct of voir dire in the case

7  and just sort of some of the nuts and bolts of it.  And --

8          THE COURT:  I thought I went over this already.

9  Maybe not.

10          MR. WEBBER:  Yeah.  I'm not -- I'm not sure, and I

11  think here is the -- here is the question that we've got.

12  There's been a -- there's been a suggestion, I know the Court

13  has said -- I believe the Court's clerk told us that the Court

14  will summon 55 people into the courtroom for --

15          THE REPORTER:  I'm sorry.

16          MR. WEBBER:  -- for venire --

17          THE REPORTER:  I'm sorry.  Can you slow down some?

18  I'm starting to lose you.

19          MR. WEBBER:  I can.  I apologize.

20          I believe the Court has indicated that it will call

21  55 potential jurors into the courtroom as the venire.  And

22  then what we have -- what has been suggested is that 14 of

23  them will be put in the box, so to speak, inside the jury box,

24  that the Court and the lawyers will question those 14; and

25  that any peremptories on those 14 -- obviously, if somebody is

1  struck for cause, any peremptories would have to be exercised

2  then.  Each side would have four peremptories, but you would

3  have to marshal --

4          THE COURT:  Because we're having an alternative -- I

5  mean an alternate juror.

6          MR. WEBBER:  Right.  And the problem comes with

7  this.  What is confusing to us is, if there are only 14 in the

8  box, my understanding is the Court wants to seat eventually a

9  total of 14?

10          THE COURT:  No, no, no, no, no.

11          MR. WEBBER:  Okay.  Maybe we should -- maybe I'll

12  start there.  How many does the Court want to sit?

13          THE COURT:  Let me -- let me tell you here what --

14  how we do this.

15          MR. WEBBER:  Okay.

16          THE COURT:  In a normal jury trial, I select -- in a

17  civil trial, I select six.  Each of you, as you know, get

18  three.  If I put 14 in the jury box, I question those 14.  If

19  two are struck for cause, and then you each exercise three

20  strikes, that takes care of eight, right?

21          MR. WEBBER:  Yes.

22          THE COURT:  There are six left, and that's your

23  jury.

24          MR. WEBBER:  Yes.

25          THE COURT:  Very simple.

1            MR. WEBBER:  Then I think we're fine, because that's

2    what I was going to suggest.  My understanding, Your Honor,

3    was that the peremptories would have to be somehow

4    marshaled -- that only 14 would be in the box, but the Court

5    wanted to have a larger presence than six on the jury.  But,

6    yeah, if the Court is suggesting --

7            THE COURT:  We might want to have more than six

8    because of the anticipated length of the trial.  I think we'll

9    probably go with seven or eight.  And that's why you're

10   getting an extra peremptory challenge.

11           The reason I'm calling in the number of people for

12   the venire is because of the length of the trial.  We may get

13   several people who say, "You know, Judge, I would love to

14   serve, but I just can't for -- if I find it to be a legitimate

15   reason, I just can't --"

16           MR. WEBBER:  Yeah.

17           THE COURT:  "-- do a trial this long."  And, you

18   know, sometimes we have to go through a number of people.  But

19   sometimes, you know, we go through maybe 20 and then we've got

20   a jury.  I mean, so it just depends on the jurors, but

21   that's -- it's probably -- 55 is probably too many, but,

22   again, I don't want to run out and end up having to go out on

23   the street and grab some people.

24           MR. WEBBER:  Sure.  I understand, yeah.  And I

25   guess, actually, to boil it down, Your Honor, the question

1  would be that we assume that strikes for cause, either by the

2  Court or by the parties, would be exercised, and if that were

3  to happen, somebody else from the venire would be called up to

4  replace that juror, but at all times we will have 14 in the

5  box, and then we will exercise peremptories after that; is

6  that correct?

7            THE COURT:  That's correct.

8            MR. WEBBER:  Okay.  Very good.

9            THE COURT:  Say we have 14 in the box and seven of

10  them are struck for cause.  Well, we've got to replace those

11  people from the pool of 55, whoever --

12            MR. WEBBER:  Yes.

13            THE COURT:  -- the 40, 44 remaining.  So that's the

14  way we do that.  This is -- you know, I've been selecting

15  juries like this for years.  I used to do it differently, but

16  this is a very quick way to get a jury in these cases.

17            And what we do is we -- I talk to the jurors about,

18  you know, the basics, the tenets of a jury trial, direct

19  evidence, circumstantial evidence, burdens of proof, those

20  types of things.  And then each side will have up to 20

21  minutes to ask questions.

22            And then, once that's finished up, then you go back

23  to your tables, discuss any challenges you might have, for

24  cause or for peremptory challenges.  Then you will approach --

25  you will come up to a sidebar, and the first thing I'll ask

108

1   you, "Anyone else for cause up here?"  And you'll indicate to

2   me if you've got anybody else for cause.  And then -- unless

3   it's obvious.  If it's an obvious for cause, I'll just excuse

4   the person at that time, and we'll just -- before you approach

5   the bench, and we'll just fill that seat and you can ask them

6   questions again.

7         But, assuming there aren't any for cause, then

8   you'll exercise your peremptory strikes.  The plaintiff will

9   strike first, its first challenge.  And then the defense would

10  exercise its first challenge.  Then we just alternate.  On the

11  second challenge, the defense would go first and then the

12  plaintiff.  And then, on the third challenge, Plaintiff would

13  go first.  And if the defense has a third challenge, they

14  would go.  And then we discuss alternate jurors.  And, as I

15  said, you each have one at that time.  And we'll go from

16  there.

17        MR. WEBBER:  Very well, Your Honor.  Thank you.

18  That's very -- that's very helpful, and that is exactly the

19  way I had hoped it would go.  We -- we were not sure about

20  that.  So I appreciate the Court's input on that.

21        MR. WILLIAMS:  Your Honor, Joe Williams real quick.

22  The last time we talked about this at the hearing, you said

23  to -- that, given the importance of the trial, you would

24  consider allowing 45 minutes a side for panel questioning.

25  Are we -- is that still going to be okay?

1          THE COURT:  Well, do you think you need that much?

2          MR. WILLIAMS:  Respectfully, I would say yes.  I

3   mean, I would like more, but 45 minutes would be much more

4   preferable than 20.

5          MR. WEBBER:  Well, your Honor, the defendant, I

6   think, would support 20.  That should be sufficient.  Anything

7   beyond that --

8          THE REPORTER:  I'm sorry.  Who's speaking?

9          MR. WEBBER:  -- would be --

10          THE REPORTER:  I'm sorry.  Who's speaking?

11          MR. WEBBER:  (Inaudible.)

12          THE REPORTER:  I did not hear what you said, and I

13   don't know who is speaking.

14          MR. WEBBER:  I'm sorry.  That was Charles Webber.

15   I'm sorry, Mr. Court Reporter.

16          THE COURT:  Okay.  I think I do, Joe, I think I do

17   recall saying something along the lines of giving additional

18   time due to the complex nature of the case, so I'll give you,

19   each side, 35 minutes.  That's fine.

20          MR. WILLIAMS:  Thank you, Your Honor.

21          MR. SCHULTZ:  Your Honor, Matt Schultz here, a

22   related question.  We, I think, intended to have some

23   stipulations to you on housekeeping matters, but we're still

24   ironing those out.  One thing we have agreed in principle,

25   obviously subject to your approval, which I understand may not

1   be forthcoming, and that was, given scheduling issues into

2   Evansville with experts, what we're hoping is, if we are to

3   get a jury and finish opening statements for each side, and we

4   still had time left over on Monday, the parties have agreed

5   that we could call our first witness on Tuesday.

6          I did hear the Court's admonition earlier that we're

7   not going to have gaps, so I appreciate it if you say no, but

8   I wanted to find out, because we've got scheduling issues to

9   deal with.

10          THE COURT:  Well, there's no way you can have a

11  witness or two available on Monday?

12          MR. SCHULTZ:  Oh, we -- no question, Your Honor, if

13  we finish and we have an hour or two left, we will have a

14  witness who is available.  But, in terms of, I guess, what you

15  call long-range planning, having a definite start time gives

16  us a lot more predictability.  But whatever the Court prefers,

17  I just wanted to know either way.

18          THE COURT:  When you say, "definite start time,"

19  Matt, what are you talking about?

20          MR. SCHULTZ:  Well, meaning that if we ended at

21  3:00 and we had a couple of hours left, but we had agreed that

22  we're going to start on Tuesday morning, we could start our

23  whole trial schedule from Tuesday morning instead of a sort

24  of, well, we might have four hours on Monday or we might have

25  45 minutes on Monday, we don't know.

111

1          THE COURT:  Let's just have a couple of witnesses

2     ready to go on Monday, Monday afternoon.

3          MR. SCHULTZ:  All right.

4          THE COURT:  You know, I just hate to waste the time.

5     I mean --

6          MR. SCHULTZ:  I hear you.  I understand, Judge.

7          MS. PIERSON:  Judge, just a couple of other

8     housekeeping matters, and to keep things moving along --

9          (Off the record.)

10          MS. PIERSON:  Just a few quick things, Your Honor.

11     In the pretrial stipulation that Mr. Schultz referred to, one

12     of the things that I think we'll reach agreement on is when

13     the -- if the plaintiffs could disclose to us before 5:00 p.m.

14     the witnesses from Cook that they'll be calling on the next

15     day.  We've got witnesses coming from Lafayette, a four-hour

16     drive, and some from Bloomington, so we're working together.

17     I think we'll be able to work that out, but we need a couple

18     hours' earlier notice, either noon or 2:00, or something like

19     that, so that we can get people here without them, you know,

20     driving at night and it being pretty late.  But I think we'll

21     work that out.  If we don't, we'll send you an e-mail, but I

22     think we will.

23          Two other issues on our list are offers of proof.

24     To the extent that we have offers of proof, if we want or need

25     to make those before the court day starts, can we just let

112

1  Tina know?

2          THE COURT:  Yes.

3          MS. PIERSON:  Okay.  Particularly on the evidence

4  that's been excluded that relates to FDA, I think we'll need

5  to do something a little more formal with respect to that.

6          And then the last thing, Your Honor, there will be

7  testimony during the trial about confidential documents and

8  subject matter that's confidential to Cook.  How do you --

9          OPERATOR:  Chuck Webber has left the conference.

10         MS. PIERSON:  How do you typically handle that?

11         THE COURT:  Well, you know, we've done it various

12  ways over the years.  How would you like me to handle it?

13         MS. PIERSON:  Well, I think our view is that there

14  will be some things during the trial that we --

15         THE COURT:  It depends on how sensitive it is.

16         MS. PIERSON:  Yeah.  Discussion of things like our

17  design inputs; things that relate to the material properties

18  of the Celect; things that relate to, for example, the price

19  of the Celect; or sales figures; things like that, that are

20  confidential to Cook.  And we'd ask that the Court handle it

21  in such a way that members of the public aren't in the

22  courtroom when that discussion occurs.

23         I think we can work with the plaintiffs to

24  anticipate when those things might come up.  And if that's the

25  case, maybe there's a way to alert the Court that there's a

113

1  witness who will be testifying who we believe will touch on

2  confidential information.

3          THE COURT:  Okay.  Well, I wouldn't anticipate a

4  whole lot of members of the public or competitors sitting in.

5  This is not like a patent case, where you've got competitors

6  and media and all those types that are interested in those

7  types of bits of information there.  They could be, but I'm

8  not anticipating that.  But we'll handle that, that's no

9  problem.

10         MS. PIERSON:  All right.  Thank you, Your Honor.

11  That's all we have on our list.

12         THE COURT:  Joe?  Ben?  Anything else?

13         MR. MARTIN:  I don't think anything else from our

14  end, Your Honor.  I sure do appreciate the time this

15  afternoon.

16         THE COURT:  Hold on just a second.

17         Oh, yeah.  Also, what I need from you -- in putting

18  together my preliminary instructions to the jury, of course,

19  99 percent of them are boilerplate, but I do need something to

20  read to the jurors as to what the case is about.  So I would

21  ask each side to get together and come up with a statement of

22  the case, probably, you know, no more than three or four

23  paragraphs at the most, as to what this case is about and what

24  the claims are.

25         MS. PIERSON:  Your Honor --

114

1          THE COURT:  Can you get together and do that?

2          MS. PIERSON:  Yes.

3          MR. MARTIN:  We shall.

4          MS. PIERSON:  We have already a joint statement of

5    facts to be read to the jury.  Do you need something more than

6    that?

7          THE COURT:  No.  Just what the case is about.

8    "Ladies and Gentlemen of the Jury, this case is about Ms. Hill

9    has filed what's called a claim of," you know, however you

10   want to term it.  And then you can probably insert your

11   agreed-upon facts at that time.

12         MR. MATTHEWS:  This is Ben Martin.  I don't think it

13   will be a problem, Your Honor.

14         THE COURT:  Yeah.  Just come up with something that

15   you both can agree that you would like me to read to the

16   jurors as an introduction of what they're about to hear.

17         MR. MARTIN:  Yeah.  Ben Martin.  That will be easily

18   done.

19         THE COURT:  That will work?  Okay.  All right, very

20   good.

21         And then, also, we need to still rule on the

22   bifurcation and summary judgment.

23         MR. SCHULTZ:  Matt Schultz here.  Also Dr. Kessler's

24   *Daubert* motion, Judge.

25         THE COURT:  Yes.  And then if you could get me that

115

 1   statement of the case by Thursday, that would be great, close

 2   of business Thursday.

 3            MR. SCHULTZ:  Will do.

 4            MS. PIERSON:  Judge, we also have a motion that we

 5   argued last week pending before you, too, just because there

 6   were --

 7            THE COURT:  Right, right.  I know.  I'm trying to

 8   get to them, trying to get to them.

 9            MS. PIERSON:  Sorry, Judge.  I think it's easier --

10            THE COURT:  You don't need to be sorry.  Just --

11   we're pedaling pretty fast here, so -- I know you are, too.

12   And we'll get done what we can get done.  And if we don't get

13   something done, then we'll take care of it during the trial.

14            MR. MARTIN:  Okay.  Thank you, Judge.

15            THE COURT:  Okay.  Thank you all.

16            (Proceedings adjourned at 4:50 p.m.)

17

18

19

20

21

22

23

24

25

116

1                   CERTIFICATE OF COURT REPORTER

2

3        I, David W. Moxley, hereby certify that the

4    foregoing is a true and correct transcript from

5    reported proceedings in the above-entitled matter.

6

7

8

9    /S/ David W. Moxley                 November 14, 2017
     DAVID W. MOXLEY, RMR/CRR/CMRS
10   Official Court Reporter
     Southern District of Indiana
11   Indianapolis Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25