## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

—————————————————————

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND          Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION           MDL No. 2570

—————————————————————

This Document Relates to:

> *Brenda Helms, Bankruptcy Trustee for the*
> *Estate of Arthur Gage,*
> *v. Cook Medical, Inc. et al.,*
>
> Case No. 1:14-cv-01875-RLY-TAB

—————————————————————

### THE COOK DEFENDANTS' MEMORANDUM IN SUPPORT
### OF ITS SECOND AND RENEWED MOTION FOR SUMMARY JUDGMENT

On February 26, 2018, the Court granted the Cook Defendants' Motion for Summary

Judgment as to all claims against the Cook Defendants except one:  Mr. Gage's claim for breach

of the implied warranty of merchantability.[1]  In its Summary Judgment Order, the Court noted

the four year statute of limitations period that ordinarily applies to a breach of warranty claim.

Commercial codes throughout the United States, however, routinely grant parties the freedom to

contract for shorter limitations periods.  For example, the commercial codes in both Illinois and

Indiana allow parties to limit the statute of limitations period governing breach of warranty

claims to a period of "not less than one year."  810 Ill. Comp. Stat. 5/2-725; Ind. Code 26-1-2-

725.

Since the Court issued its Summary Judgment Order, Cook has found additional

evidence, namely, the terms and conditions governing the sale of Mr. Gage's filter.  The terms

---

[1] The Court also did not address Cook's motion as it related to Plaintiff's punitive damages claim.

and conditions demonstrate (1) that a one year and one day statute of limitations period applies to the breach of warranty claims in this action, (2) that Cook expressly and conspicuously disclaimed the implied warranty of merchantability, and (3) that Indiana law governs Mr. Gage's breach of warranty claims.  This additional, undisputed evidence disposes of any remaining breach of warranty claim.

Even if the Court were to disagree on the dispositive nature of this evidence, the Court should nevertheless grant summary judgment in Cook's favor (1) because Mr. Gage failed to provide reasonable notice of the alleged breach, and (2) because Mr. Gage cannot demonstrate that any alleged breach of warranty caused his injuries.

Additionally, even if the Court does not grant summary judgment on Plaintiff's breach of implied warranty claim, the Court should deny Plaintiff's punitive damages claim (1) because punitive damages are not recoverable in connection with his contractual breach of implied warranty claim, and (2) for the reasons set forth in Cook's original summary judgment motion.

Finally, Cook respectfully requests the Court to reconsider its ruling on evidence regarding defect in light of post-summary judgment briefing statements made by Dr. McMeeking at the *Hill* trial.

For these reasons, the Cook Defendants respectfully ask this Court to grant their Second and Renewed Motion for Summary Judgment.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

**I.      The Terms And Conditions Applicable To Cook's Sale Of Mr. Gage's Filter**

On April 6, 2011, Cook Medical LLC (f/k/a Cook Medical Incorporated) sold a Günther Tulip IVC filter to Edward Hospital for $1,050.00.  (*See* Affidavit of Kevin Briles, filed herewith as Exhibit 1 ("Briles Aff."), at ¶ 4, Exhibit C – Cook Medical Invoice and Packslip to Edward

Hospital dated April 6, 2011.)  Twenty-one days later, on April 27, 2011, Dr. Goodwin placed this filter into Mr. Gage while treating him for PE at Edward Hospital.  (*See* Cook Defendants' Memorandum in Support of Motion for Summary Judgment, at Exhibit A – Operative Report (Edward000129) [Dkt. No. 5749-2].)  Cook is able to determine that the filter placed in Mr. Gage is the same filter Cook sold to Edward Hospital on April 6, 2011, by matching the lot number identified on a peel-and-stick in Mr. Gage's medical records and confirmed by Mr. Gage's sworn discovery responses with the lot number on the Packslip sent to Edward Hospital.  (Briles Aff., at ¶¶ 3-4, Exhibit A – Mr. Gage's Peel-and-Stick, Exhibit B – Excerpts of Mr. Gage's Discovery Responses, and Exhibit C – Cook Medical Invoice and Packslip to Edward Hospital.)  The lot number on Mr. Gage's peel-and-stick is the same lot number on the Packslip: "2693770." (Briles Aff., at ¶¶ 3-4, Exhibit A – Mr. Gage's Peel-and-Stick, Exhibit C – Cook Medical Invoice and Packslip to Edward Hospital.)

As explained in the attached Briles Affidavit, Cook's invoices include terms and conditions applicable to the individual sale in question.  (*See* Briles Aff., at ¶ 5.)  The relevant terms and conditions in place at the time of the sale of Mr. Gage's filter are attached to the Briles Affidavit as Exhibit D.  (*See* Briles Aff., at ¶ 5, Exhibit D – Terms and Conditions.)

Among other things, the terms and conditions state that there are "NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE . . . ."  (Briles Aff., Exhibit D – Terms and Conditions, at ¶ 4.)[2]  They also limit the statute of limitations period to one year and one day from the delivery of the product.  The terms state: "Any lawsuit asserting any Claim or Breach by Buyer against Seller must be brought within one (1) year and one (1) day after delivery of the non-conforming Product to Buyer or such Claim or Breach shall

---

[2] The terms and conditions also provide that "Seller does not warrant either a good effect or against any ill effect following Products' use," and that "Seller makes no warranties that the Products are effective under all circumstances."  (Briles Aff., Exhibit D – Terms and Conditions, at ¶ 4.)

be forever barred." (Briles Aff., Exhibit D – Terms and Conditions, at ¶ 5.)[3]  Finally, the terms and conditions contain a choice of law provision applying Indiana law.  The provision states: "Any action brought regarding the validity, construction, termination, or enforcement of this Agreement or these Terms shall be governed in all respects by the laws of the State of Indiana …." (Briles Aff., Exhibit D – Terms and Conditions, at ¶ 11.)

## II.    Mr. Gage Did Not Provide The Cook Defendants With Notice Of Any Alleged Breach Of Warranty

As previously acknowledged by this Court, Mr. Gage "began having excruciating pain immediately after [his] April 27, 2011" placement procedure, immediately attributed his "new-onset pain to the IVC filter," and three days later "told his medical providers that he believed his new onset-pain was caused by the IVC filter."  (Entry on the Cook Defendants' Motion for Summary Judgment, at 2-3 (Feb. 26, 2018) [Dkt. No. 7715].)  Nonetheless, Mr. Gage waited until November 14, 2014—more than three-and-a-half years later—to file the present lawsuit. (*See* Plaintiff's Original Complaint [Case 1:14-cv-01875, Dkt. No. 1].)

As explained in the attached Affidavit of Rita Harden, Mr. Gage provided no pre-suit notice to Cook about his breach of warranty claims.  (*See* Affidavit of Rita Harden, filed herewith as Exhibit 2 ("Harden Aff."), at ¶ 6.)  In other words, although Mr. Gage had knowledge of his claim more than three-and-a-half years before filing his lawsuit, he did not provide notice to Cook about the alleged breach of warranty.  (Harden Aff., at ¶ 6.)  Indeed, the first time Cook received notice of Mr. Gage's breach of implied warranty claim occurred only after Mr. Gage commenced this lawsuit.  (Harden Aff., at ¶¶ 6-7.)

---

[3] Cook does not claim in this motion that the one-year-and-one-day statute of limitations in the terms and conditions controls the limitations period for Plaintiff's strict-liability and negligence claims, as to which the Court has already granted summary judgment.  Cook argues here only that the limitations period in the terms and conditions governs the contract-based breach of warranty claims.

# ARGUMENT

## I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994), *cert. denied*, 513 U.S. 821 (1994) ("[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law.").

If a plaintiff fails to establish a genuine issue of material fact as to any one of the elements of the claims asserted, the defendant is entitled to summary judgment. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). As a corollary, if an element of a plaintiff's claims requires expert testimony—such as expert testimony on causation—and that expert testimony is inadmissible under the *Daubert* standard, summary judgment must be granted. *See, e.g.*, *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 905 (7th Cir. 2007) (affirming summary judgment where exclusion of expert testimony left no evidence of causation).

## II.  Choice Of Law

Although Illinois law applied to Mr. Gage's product liability claims based in negligence and strict liability, the terms and conditions applicable to Mr. Gage's filter state that Indiana law applies to any action regarding the enforcement of the terms and conditions governing the sale of Mr. Gage's filter. (*See* Briles Aff., Exhibit D – Terms and Conditions, at ¶ 11.) Because breach of warranty claims are fundamentally brought to enforce the terms and conditions of a contract, it follows that Mr. Gage's breach of warranty claims are governed by this choice of law provision. As such, Indiana law applies to Mr. Gage's breach of warranty claims. *See R & L Grain Co. v.*

*Chicago Eastern Corp.*, 531 F. Supp. 201, 206 (N.D. Ill. 1981) (holding it is appropriate to honor a contractual choice of law provision governing breach of warranty claims provided that the chosen forum bears an appropriate relation to the transaction).

Nevertheless, the Cook Defendants analyze Mr. Gage's breach of implied warranty of merchantability claim under both Indiana and Illinois law.  Under both sets of laws the result is the same:  Mr. Gage's breach of warranty claim fails.

## III.    The Cook Defendants Are Entitled To Summary Judgment On Mr. Gage's Breach Of Implied Warranty Claim

To succeed on a breach of an implied warranty of merchantability claim under Indiana[4] or Illinois law, a plaintiff must prove that there was a sale of goods by a merchant, and that the goods were not of merchantable quality.  *Advantage Engineering, Inc. v. Burks Pumps, Inc.*, 28 F.3d 1216, at *6 (7th Cir. 1994) (unpublished table decision) (applying Indiana law and affirming an order from the Southern District of Indiana); *Brandt v. Boston Scientific Corp.*, 792 N.E.2d 296, 299 (Ill. 2003).  Additionally, a plaintiff must prove that he or she suffered damages, and that the alleged breach was the proximate cause of the plaintiff's damages.  *U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.*, 719 F. Supp. 2d 1020, 1027 (S.D. Ind. 2010); *Wheeler v. Sunbelt Tool Co., Inc.*, 537 N.E.2d 1332, 1341 (Ill. Ct. App. 1989) (requiring proof of proximate cause); *see also* Ind. Code 26-1-2-314, cmt. 13 (noting that it is "necessary to show … that the breach of the warranty was the proximate cause of the loss sustained"); 810 Ill. Comp. Stat 5/2-314, cmt. 13 (noting the same).  Indeed, a plaintiff may not recover for breach of an implied warranty where the evidence shows that there are several possible causes of the

---

[4] Under Indiana law, breach of implied warranty claims that sound in tort are subsumed under the Indiana Product Liability Act ("IPLA"), *see* Ind. Code 34-20-1-1, which is governed by a two year statute of limitations period.  Ind. Code 34-20-3-1.  Breach of warranty claims sounding in contract, on the other hand, may proceed as an independent claim under Indiana's Commercial Code.  *Heritage Operating, L.P. v. Mauck*, 37 N.E.3d 514, 520 n.2 (Ct. App. Ind. 2015) ("Whereas a breach of warranty claim that is based on contract may be raised under the UCC independently of the [IPLA], a warranty claim that sounds in tort is 'redundant with strict liability claims under the [IPLA].'").

plaintiff's alleged injury and the plaintiff cannot rule out and eliminate all the causes that are not attributable to the defendant.  *See U.S. Automatic Sprinkler*, 719 F. Supp. 2d at 1027 (citing *Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d 34, 46 (7th Cir. 1980)).

Indiana and Illinois also both recognize that parties are free to contract outside of the default rules of their respective commercial codes.  In particular, they each permit parties to limit the statute of limitations period to "not less than one year."  Ind. Code 26-1-2-725; 810 Ill. Comp. Stat. 5/2-725.  Similarly, both states recognize that implied warranties, including the implied warranty of merchantability, can be disclaimed, *see* Ind. Code 26-1-2-316; 810 Ill. Comp. Stat. 5/2-316, and that such a disclaimer is effective against third party beneficiaries.  Ind. Code 26-1-2-318, cmt. 1 ("To the extent that the contract of sale contains provisions under which warranties are excluded or modified, or remedies for breach are limited, such provisions are equally operative against beneficiaries of warranties under this section."); 810 Ill. Comp. Stat. 5/2-318, cmt. 1 (noting the same same); *Valley Forge Ins. Co. v. Hartford Iron & Metal, Inc.*, Cause No. 1:14-CV-6-RLM-SLC, 2016 WL 2755462, at *2 (N.D. Ind. May 12, 2016) (holding that a third party beneficiary to a contract "is bound by all the contract's provisions"); *Budnick Converting, Inc. v. Nebula Glass Intern., Inc.*, 866 F. Supp. 2d 976, 1001-1002 (S.D. Ill. 2012) (finding that a disclaimer of warranties runs to third party beneficiaries); *Omni-Circuits, Inc.*, No. 85 C 9081, 1987 WL 7290, at *6 (N.D. Ill. Feb. 23, 1987) ("A disclaimer of warranties is effective as to a remote purchaser when the application of the warranties to that purchaser is based on the third party beneficiary exception.") (citing *R & L Grain Co. v. Chicago Eastern Corp.*, 531 F. Supp. 201, 209 (N.D. Ill. 1981)).[5]

---

[5] *See also* 1 Owen & Davis on Prod. Liab. § 4:33 (4th ed. May 2017) (noting that "limitations on and exclusions of warranties . . . logically carry over from the buyer to third-party beneficiaries," and stating that where a "buyer never received a warranty in the first place, because it was effectively disclaimed in the sales contract between the seller

Finally, both Indiana and Illinois require an injured party to provide notice of an alleged breach within a reasonable time after its discovery.  *See* Ind. Code 26-1-2-607(3)(a); 810 Ill. Comp. Stat. 5/2-607(3)(a); *see also In re Depakote*, Case No. 14-cv-847-NJR-SCW, 2015 WL 4776093, at *11 n.9 (S.D. Ill. Feb. 14, 2015) (noting that summary judgment is appropriate where "no inference could be drawn from the evidence but that the notice was unreasonable); *Thompson Farms, Inc. v. Corno Feed Prods, Division of Nat'l Oats Co., Inc.*, 366 N.E.2d 3, 16-17 (Ind. Ct. App. 1977) (holding that reasonable "notice is a substantive condition precedent" to recovery for an asserted breach).  Failure to provide proper notice of a breach can be fatal to a claimant's breach of warranty claims.

### A.   Mr. Gage's Breach of Implied Warranty of Merchantability Claim Is Time-Barred[6]

This Court has already found that Mr. Gage's product liability claims based in negligence and strict liability are barred by Illinois's two-year statute of limitations.  (Entry on the Cook Defendants' Motion for Summary Judgment, at 3 (Feb. 26, 2018) [Dkt. No. 7715].)  A claim with a shorter limitations period must therefore also be time-barred.  Here, the limitations period governing any breach of warranty claim is shorter: one year and one day from delivery of the filter.  (Briles Aff., Exhibit D – Terms and Conditions, at ¶ 5.)  Because the filter was sold on April 6, 2011, and was implanted in Mr. Gage on April 27, 2011, the limitations period necessarily expired no later than April 28, 2012.

---

and the buyer, then a third party harmed by a defect in the product will have no warranty upon which to base a claim for breach").

[6] To the extent Plaintiff alleges that the terms and conditions include express warranties and that Cook breached those express warranties, such claims would likewise be time-barred by the one year and one day limitations period. Additionally, the limited express warranties included in the terms and conditions do not apply here because Plaintiff has identified no evidence that there is any defect in "materials and workmanship," which is construed as a manufacturing defect—not a design defect.  *See Coba v. Ford Motor Co.*, Civ. No. 12-1622 (KM) (MAH), 2016 WL 574631, at *9 (D.N.J. Sept. 20, 2016) *appeal filed* (joining "the vast weight of authority holding that a workmanship and materials warranty cannot encompass a design defect claim"); *see also Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 520, 526-27 (7th Cir. 2003). Nor does Plaintiff have any evidence that the Tulip IVC filter was adulterated or misbranded in any way.

As this Court already has indicated, Mr. Gage had knowledge of his claim almost immediately after receiving his filter.  (*See* Entry on the Cook Defendants' Motion for Summary Judgment, at 2-3 (Feb. 26, 2018) [Dkt. No. 7715].)  Mr. Gage therefore had an opportunity to bring a timely breach of warranty claim.  Mr. Gage chose to sit on his claim instead; he waited until November 14, 2014, to file his lawsuit—long after Mr. Gage's claims, including his breach of warranty claims, had expired.

**B.      The Terms and Conditions Disclaim Breach of Implied Warranty Claims**

As noted above, sellers can disclaim the implied warranty of merchantability.  Ind. Code 26-1-2-316; 810 Ill. Comp. Stat. 5/2-316.  Such disclaimers, moreover, are not limited to the immediate parties; they run to third party beneficiaries as explained above.  *See* Ind. Code 26-1-2-318, cmt. 1; 810 Ill. Comp. Stat. 5/2-318, cmt. 1; *Valley Forge Ins. Co. v. Hartford Iron & Metal, Inc.*, Cause No. 1:14-CV-6-RLM-SLC, 2016 WL 2755462, at *2 (N.D. Ind. May 12, 2016); *Budnick Converting, Inc. v. Nebula Glass Intern., Inc.*, 866 F. Supp. 2d 976, 1001-1002 (S.D. Ill. 2012); *Omni-Circuits, Inc.*, No. 85 C 9081, 1987 WL 7290, at *6 (N.D. Ill. Feb. 23, 1987).

Here, Cook expressly and conspicuously disclaimed the implied warranty of merchantability.  The terms and conditions state: "THERE ARE NO WARRANTIES OF MERCHANTABILITY . . . ."  (Briles Aff., Exhibit D – Terms and Conditions, at ¶ 4.)  This is an effective disclaimer.  As such, no breach of implied warranty claim exists—where there is no warranty to breach, there can be no breach of warranty claim.

**C.      Plaintiff Failed to Provide Reasonable Notice of the Alleged Breach**

To recover on a breach of warranty claim, both Indiana and Illinois require proof that the plaintiff provided reasonable notice of the alleged breach to the defendant.  *See* Ind. Code 26-1-

2-607(3)(a); 810 Ill. Comp. Stat. 5/2-607(3)(a).  In Indiana, "notice is a substantive condition precedent" to recovery for a breach of warranty claim.  *See Thompson Farms, Inc. v. Corno Feed Prods, Division of Nat'l Oats Co., Inc.*, 366 N.E.2d 3, 17 (Ct. App. Ind. 1977).  Because Mr. Gage never provided pre-suit notice, his breach of warranty claims are barred under Indiana law.  Indeed, Mr. Gage never even alleged that he gave the Cook Defendants notice in his Complaint, and therefore failed to properly state a claim upon which relief may be granted. (*See* Plaintiff's Original Complaint, ¶¶ 49-59 (failing to plead notice) [Case 1:14-cv-01875, Dkt. No. 1].)

Similarly, Illinois law requires that notice of the alleged breach be given to the seller within a reasonable time after it is discovered.  *See In re Depakote*, 2015 WL 4776093, at *11 n.9 (S.D. Ill. Feb. 14, 2015).  Here, Mr. Gage was aware of the alleged breach immediately after receiving his filter.  (*See* Entry on the Cook Defendants' Motion for Summary Judgment, at 2-3 (Feb. 26, 2018) [Dkt. No. 7715].)  Nevertheless, Mr. Gage did not provide notice to Cook of the alleged breach for over three-and-a-half years until after he filed his lawsuit on November 14, 2014.  (Harden Aff., at ¶¶ 6-7.)  Mr. Gage's delay is neither reasonable nor justifiable.  If the ordinary period for bringing a personal injury claim expires after two years in Illinois, *see* 735 Ill. Comp. Stat. 5/13-202, surely waiting more than three years to provide simple notice, as Mr. Gage did here, is unreasonable.  *See In re Depakote*, 2015 WL 4776093, at *11 n.9 (noting that summary judgment is appropriate where "no inference could be drawn from the evidence but that the notice was unreasonable).

Thus, under either state's law, Mr. Gage's breach of warranty claims must fail because he failed to provide notice of the alleged breach within a reasonable time after discovering it.

**D.      Plaintiff Has No Evidence that the Alleged Breach Caused Any Injury**

A necessary element of Plaintiff's breach of implied warranty of merchantability claim is proof of specific causation.   However, as discussed in Cook's original summary judgment papers, without expert testimony, Plaintiff cannot prove specific causation as to any of Plaintiff's claims, including his claim for breach of implied warranty of merchantability.   (Cook Defendants' Memorandum in Support of Motion for Summary Judgment, at 14-16, 22-24 [Dkt. No. 5749].)   Although Cook moved on this ground in its original motion, the Court's February 26, 2018 Order did not address the argument.

Because Plaintiff's claims about the filter involve complex, scientific issues, Plaintiff must present expert testimony on causation.  *Show v. Ford Motor Co.*, 697 F. Supp. 2d 975, 983 (N.D. Ill. 2010), *aff'd,* 659 F.3d 584 (7th Cir. 2011); *Henry v. Panasonic Factory Automation Co.*, 917 N.E.2d 1086, 1093 (Ill. Ct. App. 2009).   However, the only expert Plaintiff offered to opine on causation is Dr. Marmureanu.[7]  For reasons outlined in the Cook Defendants' original summary judgment papers as well as in the Cook Defendants' papers seeking to exclude the opinions of Dr. Marmureanu, Dr. Marmureanu does not, and cannot, offer the causation evidence Plaintiff needs to survive summary judgment.[8]  Dr. Marmureanu's differential etiology fails to rule out plausible alternative causes of Mr. Gage's alleged injuries.   Consequently, Plaintiff's breach of implied warranty claim must fail. *U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.*, 719 F. Supp. 2d 1020, 1027 (S.D. Ind. 2010) (requiring proof of causation);

---

[7] The Court referenced Dr. McMeeking, Plaintiff's engineering expert, in its Summary Judgment Order, but Dr. McMeeking does not opine as to causation of Mr. Gage's injuries.  Specifically, he provides no *Gage*-specific report and is offered solely as a generic engineering expert.  (*See* Cook Defendants' Memorandum in Support of Motion for Summary Judgment, Exhibit S – Expert Report of Robert M. McMeeking (March, 2017) [Dkt. No. 5749-14].) As such, he offers no opinions about whether any alleged defect caused Mr. Gage's alleged injuries.  (*See id.*)

[8] Rather than reargue these points here, the Cook Defendants adopt and incorporate by reference the arguments made in their first Memorandum in Support of Motion for Summary Judgment [Dkt. No. 5749], their Reply Memorandum in Support of Motion for Summary Judgment [Dkt. No. 6501], their Memorandum in Support of Motion to Exclude Expert Opinions of Dr. Alexander Marmureanu [Dkt. No. 5664], and their Reply Motion to Exclude Expert Opinions of Dr. Alexander Marmureanu [Dkt. No. 6395].

*Wheeler v. Sunbelt Tool Co., Inc.*, 537 N.E.2d 1332, 1341 (Ill. Ct. App. 1989) (requiring the same).

## IV.    Plaintiff's Punitive Damages Claim Cannot Survive Solely In Conjunction With A Breach Of Implied Warranty Claim

Although the Cook Defendants' original summary judgment motion moved for judgment on Plaintiff's claim for punitive damages, the Court's February 26, 2018 Order did not address that argument.  The Court's grant of summary judgment on all but the implied warranty claim, however, dictates the dismissal of Plaintiff's punitive damage claim as well.

Neither punitive nor exemplary damages are recoverable in breach of implied warranty cases sounding in contract.  *See Atkinson v. P & G-Clairol, Inc.*, 813 F. Supp. 2d 1021, 1025-26 (N.D. Ind. 2011); *Allstate Ins. Co. v. Hennings*, 827 N.E.2d 1244, 1250 (Ind. Ct. App. 2005) ("Punitive damages are not available in an action for breach of contract"); *see also Marchionna v. Ford Motor Co.*, No. 94 C 275, 1995 WL 476591, at \*6 n.14 (N.D. Ill. Aug 10, 1995) ("Under Illinois law punitive damages are generally not available for even a willful breach of contract (or warranty), unless the action causing the breach gives rise to a tort for which punitive damages are available."); *McGrady v. Chrysler Motors Corp.*, 360 N.E.2d 818, 822 (Ill. Ct. App. 1977) (finding punitive damages may only be recovered in exceptional cases involving a breach of contract when the breach amounts to an independent willful tort).  Because Mr. Gage's breach of implied warranty claim is putatively being brought to enforce a contract, Mr. Gage's punitive damages claim cannot survive solely in conjunction with his breach of implied warranty claim.

Consequently, even if the Court is not inclined to grant summary judgment as to Plaintiff's breach of implied warranty claim, the Cook Defendants nevertheless request that the Court grant summary judgment as to Plaintiff's punitive damages claim.  Not only are punitive damages not permitted, but as the Cook Defendants highlighted in their original summary

judgment papers (and hereby adopt and incorporate by reference), Plaintiff has no proof that Cook acted with the requisite conduct to succeed on such a claim.  (*See* Cook Defendants' Memorandum in Support of Motion for Summary Judgment, at 33-35 [Dkt. No. 5749].)

**V.     Cook Respectfully Request Reconsideration of the Court's Ruling On Defect In Light Of Statements Made By Dr. McMeeking At The *Hill* Trial**

Finally, Cook respectfully requests that the Court revisit its ruling concerning evidence of defect.  In its Summary Judgment Order, the Court noted that because Dr. McMeeking is permitted to testify as to his opinions, "Plaintiff does in fact have evidence of a product defect." (*See* Entry on the Cook Defendants' Motion for Summary Judgment, at 6 (Feb. 26, 2018) [Dkt. No. 7715].)   However, after Cook submitted its original summary judgment motion, Dr. McMeeking testified at the *Hill* trial, and unquestionably undermined any theory that the Cook Günther Tulip IVC filter is defective.  Indeed, he testified that it is a safer alternative to the Celect filter.  In particular, he described the Tulip's "petals" as "safety features" that serve two important functions:

1.  They function as "stoppers," "inhibiting" perforation; and

2.  They "help to stop the tendency for the filter to tilt because these little junctions have to slide along the wall of the vena cava, and it is somewhat difficult for them to do so." (Excerpts of Dr. McMeeking Hill Trial Test. (Vol. 4), at 1002:10-1004:5 (Oct. 26, 2017), attached hereto as Exhibit 3 (concluding "these petals are safety devices that were designed into the Tulip to have those benefits that I just described," that limiting perforation and tilt).)

As a result of these admissions, Dr. McMeeking cannot in good faith claim that the Cook Günther Tulip IVC filter is defective.  Moreover, none of the treaters in this case said that the filter is defective—Dr. McMeeking was Plaintiff's only option.  Plaintiff, therefore, has no

evidence of defect.  Without evidence of defect, Plaintiff cannot prove that the product was unmerchantable or otherwise defective.  For this additional reason, Plaintiff's breach of implied warranty claim must fail.

## **CONCLUSION**

The Court should grant summary judgment to Cook on Mr. Gage's breach of implied warranty of merchantability and punitive damages claims, and dismiss this case with prejudice in its entirety.

Respectfully submitted,

Dated:  March 6, 2018

/s/ Andrea Roberts Pierson
Andrea Roberts Pierson (# 18435-49)
J. Joseph Tanner (# 11856-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com
E-Mail:  joe.tanner@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

- 14 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2018, a copy of the foregoing was served electronically, and notice of the service of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.  Lead Co-Counsel for Plaintiffs will serve any non-CM/ECF registered parties.

/s/ Andrea Roberts Pierson
_____

US.116762681.02

# EXHIBIT  1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates to:

*Brenda Helms, Bankruptcy Trustee for the
Estate of Arthur Gage,
v. Cook Medical, Inc. et al.,*

Case No. 1:14-cv-01875-RLY-TAB

## DECLARATION OF KEVIN BRILES

I, Kevin Briles, upon my oath, declare and state as follows.

1.      I am currently the Supply Chain Sourcing Specialist at Cook Incorporated. Previously, I worked as a Purchasing Facilitator and Senior Buyer. My roles have included responsibilities related to purchasing and procurement by Cook Medical LLC and Cook Incorporated (together, "Cook"). I have been an employee of Cook since 1978.

2.      I am over 21 years old, I understand the nature of an oath, and I am otherwise competent to testify to matters stated in this Declaration. All statements in this Declaration are based on my personal knowledge and understanding, based on information that I have acquired in my experience working at Cook, or based on information that I obtained through review of Cook records or conversations with other Cook personnel who have personal knowledge.

3.      I reviewed certain medical records and discovery conducted to date to determine that the lot number for the Tulip IVC filter at issue in this matter is 2693770. A true and

accurate copy of the "peel-and-stick" sticker as located in Mr. Gage's medical records that I reviewed to confirm this information is attached as **Exhibit A**. A true and accurate copy of the portions of the sworn discovery responses of Mr. Gage that I also reviewed to confirm this information is attached as **Exhibit B.** The Arthur Gage lot sticker (Exhibit A) and sworn discovery responses (Exhibit B) show that Mr. Gage's filter is a "COOK® GUNTHER TULIP™ VENA CAVA FILTER SET" or "IGTCFS-65-FEM," a particular model of the Tulip IVC filter, with "LOT NO. 2693770."

4.      The Tulip IVC filter, lot 2693770, implanted in Arthur Gage was sold by Cook Medical, LLC (f/k/a Cook Medical Incorporated), on April 6, 2011 to Edward Hospital, which as stated on Exhibit B is the health care facility where Arthur Gage received the Tulip IVC filter on April 27, 2011.  On April 6, 2011, an Invoice and Cook Medical Packslip were created documenting this transaction in conformity with Cook's ordinary business practice.   A true and accurate reproduction of the Invoice and Cook Medical Packslip documenting the sale and shipment of Mr. Gage's Tulip IVC Filter to Edward Hospital are attached hereto as **Exhibit C**.

5.      As is the ordinary business practice of Cook, the Invoice included "Terms and Conditions" applicable to the sale of Mr. Gage's Tulip IVC Filter. A true and accurate copy of the Terms and Conditions in effect and provided at the time of the sale of Mr. Gage's Tulip IVC Filter is attached hereto as **Exhibit D**.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  _O5 MAR_____ , 2018                    _K· Briles_____
                                                                      Kevin Briles

# EXHIBIT  A



**This patient has received a Günther Tulip Vena Cava Filter. More information on back side.**

COOK®
GÜNTHER TULIP™ VENA CAVA FILTER SET
IGTCFS—65—FEM
LOT NO. 2693770

MR# E0990205
04/25/11
GAGE, ARTHUR L SR
DOB: 05/30/49
ATT: Braun, Lani D
E056630965

**COOK®**

www.cookgroup.com

**COOK INCORPORATED**
750 Daniels Way, P.O. Box 489, Bloomington, IN 47402-0489 U.S.A.
Phone: 812 339-2235, Toll Free: 800 457-4500
Toll Free FAX: 800 554-8335

© COPYRIGHT COOK INCORPORATED 2003
PG-GTVCF1103

**COOK®**

# EXHIBIT  B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

### MDL No. 2570
### IN RE: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCT LIABILITY LITIGATION

In completing this Plaintiff Profile Form, you are under oath and must provide information that is true and correct to the best of your knowledge. The Plaintiff Profile Form shall be completed in accordance with the requirements and guidelines set forth in the applicable Case Management Order.

### I. CASE INFORMATION

Caption: Gage, v. Cook Medical, Inc., et al.     Date: 11/14/2014
Docket No.: 1:14-cv-01875 TWP MJD
Plaintiff(s) attorney and Contact information:
Matthew McCarley with Fears | Nachawati Law Firm
4925 Greenville Ave., Suite 715
Dallas, TX 75206
(214) 890-0711

### II. PLAINTIFF INFORMATION

Name: Arthur Gage
Spouse: N/A                                     Loss of Consortium? ☐Yes ☑No
Address:                    Woodridge, IL 60517
Date of birth:
Social Security No.:

### III. DEVICE INFORMATION[1]

Date of Implant: 04/25/11
Reason for Implant: PE and DVT
Brand Name: Günther Tulip          Mfr. Cook
Lot Number: 2693770
Placement Physician: Mark J. Goodwin, M.D.
Medical Facility: Edward Hospital

[1] Note: In lieu of device information, the relevant procedure/operating records may be provided, as long as all requested information is fully legible on the face of said records.

Page 1 of 6

## AUTHORIZATIONS

Provide ONE (1) SIGNED ORIGINAL copy of the records authorization form attached in Exhibit A. The form will authorize counsel for the Cook Group Companies to obtain those records identified within this Claimant Profile Form.

## VERIFICATION

I, _Arthur Gage Jr._, declare under penalty of perjury subject to all applicable laws, that I have carefully reviewed the final copy of this Claimant Profile Form dated _4/8/2015_ and verified that all of the information provided is true and correct to the best of my knowledge, information and belief.

_____
[Signature of Claimant]

## VERIFICATION OF LOSS OF CONSORTIUM (if applicable)

I, _____, declare under penalty of perjury subject to all applicable laws, that I have carefully reviewed the final copy of this Claimant Profile Form dated _____ and verified that all of the information provided is true and correct to the best of my knowledge, information and belief.

_____
[Signature of Consortium Plaintiff]

# EXHIBIT  C

**ORIGINAL INVOICE**

**COOK**
MEDICAL

BILL TO:
EDWARD HOPSITAL
ACCOUNTS PAYABLE
801 S. WASHINGTON STREET
NAPERVILLE, IL  60540
USA

SHIP TO:
EDWARD HOSPITAL
RECEIVING DEPT
801 S. WASHINGTON
NAPERVILLE, IL  60540
USA

Page:      1 of 1

Customer No.   C22071-2                          GLN No.

| Purchase Order | Payment Terms | Invoice Date | **INVOICE NUMBER** |
|---|---|---|---|
| 000279740 | Net 30 Days | 4/6/2011 | V1313242-N |

| Quantity Ordered | Quantity Shipped | Catalog No./Description | Price | Unit | Tax | Amount |
|---|---|---|---|---|---|---|
| 1 | 1 | IGTCFS-65-FEM | 1,050.00 | EA | 0.00 | 1,050.00 |
| | | GUNTHER TULIP FEMORAL VENA CAVA FILTER SET | | | | |
| | | COOK GPN# : G33016 ,   GTIN# : 00827002330160 | | | | |
| | | PACKSLIP # :15802.N1145.1 | | | | |
| | | Price net of 0 % discount | | | | |

This invoice may be subject to a discount as noted above.  It is the buyer's responsibility to comply with all applicable requirements of law to fully and accurately report any discount on the applicable cost report, if any, and upon request by the U.S. Department of Health and Human Services or a State Agency, buyer shall provide certain information relating to the discount as described in 42 CFR Section 1001.952.

|  | | |
|---|---|---|
| GROSS: | | 1,050.00 |
| TOTAL FREIGHT: | | 0.00 |
| TAX: | | 0.00 |
| (USD)   PAY THIS AMOUNT: | | 1,050.00 |

REMIT TO:
Cook Medical Incorporated
22988 NETWORK PLACE
CHICAGO, IL  60673-1229
See Attachment for Terms and Conditions

For Accounting Call:
1-800-457-4500
For Customer Service Call:
1-800-457-4500
Inquire at: InvoiceRequests@CookMedical.com

PRODUCTS LISTED ON THIS INVOICE MAY HAVE BEEN MANUFACTURED USING 1,1,2-TRICHLORO-1,2,2-TRIFLUOROETHANGE (FREON 8) AS A CLEANING AGENT, A SUBSTANCE WHICH HARMS PUBLIC
HEALTH AND THE ENVIRONMENT BY DESTROYING OZONE IN THE UPPER ATMOSPHERE.  COOK IS PRESENTLY VALIDATING A REPLACEMENT FOR THE AGENT THAT IS NOT HARMFUL TO THE ENVIRONMENT.

Company Confidential

CookMDL2570_0118128

**Distribution Center: (Ship From)**
400 Daniels Way
Bloomington, IN 47404 USA

GLN# 0827002100015
**Customer Service: (Sold By)**
1025 Acuff Road
Bloomington, IN 47402 USA
GLN# 0827002100008
Telephone #(812)-339-2235

# COOK MEDICAL INC.

## PACKSLIP

**CUSTOMER PO#**
## 000279740

**Order# 15802.N1145.1**

Order Date: 04-06-2011
Ship Date: 04-06-2011

Ship-to:C22071-2
EDWARD HOSPITAL
RECEIVING DEPT
801 S. WASHINGTON
NAPERVILLE, IL  60540 US

**Bill-to:**
EDWARD HOPSITAL
ACCOUNTS PAYABLE
PO BOX 31239
SALT LAKE CITY, UT  84131 US

Ship Method: STANDARD OVERNIGHT
Shipping Weight: 0.00lbs.
Number of Boxes: 1

| GPN | PART# | Ordered | Unit | Lot# | Lot Qty | Ship Qty | BO |
|-----|-------|---------|------|------|---------|----------|-----|
| G33016 | IGTCFS-65-FEM GUNTHER TULIP FEMORAL VENA CAVA FILTER SET  GTIN: | 1 | EA | 2693770 | 1 | **1** | 0 |

Tracking# 455488788872

Page 1 of 1

Company Confidential

CookMDL2570_0118129

# EXHIBIT  D

# COOK INVOICE TERMS AND CONDITIONS

1. Intent. These Terms supplement and, to the extent that there are any inconsistent provisions between the terms and conditions of any Purchase Order ("PO"), these Terms supersede the PO. These Terms and the PO, as supplemented and superseded by these Terms, are collectively referred to as the "Agreement". Buyer and Seller acknowledge and agree that during the term of the Agreement, the terms and conditions of these Terms shall control over any inconsistent terms or conditions contained in the PO. Seller hereby gives notice of its objection to any terms or conditions in the PO which are inconsistent with these Terms. These Terms set forth the only terms and conditions under which Seller will sell products and related materials ("Products") to Buyer notwithstanding any conflicting term or condition contained in the PO, request for proposals, purchase agreements, or any other form submitted by Buyer (collectively "Order"). Buyer must notify Seller of its objections to any of the terms and conditions of these Terms within fifteen (15) days of receipt of this Addendum. If Buyer so objects, Seller acknowledgment and these Terms shall not operate as an acceptance or confirmation of such Order.

2. Inspection; Testing. Products are subject to Buyer's reasonable inspection at Buyer's destination. Buyer shall inspect Products at the time of delivery and accept or reject Products within twenty (20) days after the date of delivery. In the event the Buyer, after such inspection, rejects stock Products, Buyer shall have the right, at Seller's option, to return damaged Products for credit or replacement. Any claim(s) arising from any alleged defect in the quality or quantity of Products or any alleged shortages, or any failure in shipment or delivery are waived and released by Buyer unless notice of such claims is made in writing to Seller within twenty (20) business days from the date of delivery. All claims must set forth in detail the alleged basis for rejection. In the absence of such written notice, Buyer shall be deemed to have accepted Products and no claim for rejection shall be effective. Seller shall not accept any return of Products except in the case of a manufacturing or processing error by Seller relating thereto ("Seller Error Products") or ordering error of Buyer relating thereto ("Buyer Error Products"). Buyer Error Products are subject to a reprocessing charge of up to 20% of the original price of Products. Full credit or replacement, at the option of Seller, shall be given to Buyer for returned Seller Error Products.

3. Product Returns. Cook will accept return of any stock item within 90 days from invoice date of original order shipment. Cook will not accept return of special order items. Prior authorization for all returned items is required. To obtain Return Authorization Number, contact Cook Returned Goods department at 1-800-457-4500. A request for return of products must specify reason for return, order number, quantity, lot number and invoice number with date of invoice. All returned products must be received in their original, unopened packages, undamaged, packed appropriately for shipping and should not have been used or resterilized. Items must be in saleable condition and suitable for restocking. Returned products must be accompanied by original order invoice, packing slip or facsimile.

Returned sterile items are subject to a 20% reprocessing charge. Returned non-sterile items are subject to a 10% reprocessing charge. Full credit will be given for any item returned due to a processing error by Cook. No credit will be given for an item returned in unsaleable condition for restocking.

Packages returned to Cook should be marked with the Return Authorization Number on the outside of the package and shipped to Cook to the attention of Returned Goods.

4. Limited Warranty. Seller warrants only that, at the time of manufacture, Products (i) are manufactured in accordance with good manufacturing practices, as required by the United States Food and Drug Administration; (ii) are true to label; (iii) conform to specifications; (iv) are free from defects in materials and workmanship; and (v) are not adulterated or misbranded within the meaning of the Federal, Food, Drug and Cosmetic Act as amended. Seller warrants that it has clear title to Products and that Products shall be delivered free of liens and encumbrances. Seller does not warrant either a good effect or against any ill effect following Products' use. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND IN LIEU OF AND SHALL SUPERSEDE ALL OTHER WARRANTIES OF ANY KIND, WHETHER WRITTEN, ORAL, EXPRESS, OR IMPLIED. THERE ARE NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OF NONINFRINGEMENT. No representative of Seller may change any of the foregoing and Buyer accepts Products subject to all terms hereof. Seller makes no warranties that the Products are effective under all circumstances.

5. Limitation of Remedies and Damages. Buyer's sole and exclusive remedy for any claim arising by reason of or in connection with the sale, purchase, delivery or use of Products, regardless of whether such claim is based on tort law, breach of contract, breach of warranty or any other legal theory ("Claim") shall be, at Seller's option, the repair or replacement of any nonconforming Products. Buyer's exclusive remedy for any breach of the Agreement or the limited warranty set forth in Section 3 of these Terms ("Breach") is repair or replacement, at Seller's option, of any nonconforming Products. Under no circumstances shall Seller be liable for loss of use, lost profits or any other collateral, special, consequential or other damages, losses, or expenses in connection with or by reason of any Claim or Breach, whether such Claim or Breach is founded in tort or contract. The foregoing constitutes the sole and exclusive remedies of Buyer and the exclusive liability of Seller. Any lawsuit asserting any Claim or Breach by Buyer against Seller must be brought within one (1) year and one (1) day after delivery of the non-conforming Product to Buyer or such Claim or Breach shall be forever barred.

6. Insurance. Seller and Buyer shall each maintain adequate product liability, general public liability and property damage insurance against any claim or claims relating to Products that may be asserted by or on behalf of, or as a result of any claim made by or on behalf of, the ultimate user or consumer of Products. Upon reasonable request, Buyer and Seller shall each deliver to the other, an insurance certificate demonstrating the foregoing coverage, issued by an insurance company licensed to do business in the relevant state or states, and signed by an authorized agent of the insurance company.

7. Indemnification. (a) Subject to Section 4 of these Terms, Seller agrees to indemnify, defend and hold harmless Buyer from any and all liabilities, claims, lawsuits, actions, proceedings, losses, demands, damages, costs and expenses (including, without limitation, interest, penalties and reasonable attorneys' fees) and judgements (collectively "Action") arising out of bodily injury, property damage or any other damage or injury caused solely and exclusively by a breach of Seller's warranty specified herein and without fault by Buyer or any agent, employee, representative or customer of Buyer or any health care provider associated or affiliated with Buyer ("Seller Indemnification Event"). Buyer's right of indemnification in the event of a Seller Indemnification Event is subject to its compliance with the following (i) Buyer shall notify Seller in writing of said Seller Indemnification Event and send Seller a copy of all papers served promptly after receipt of notice of any Seller Indemnification Event; and (ii) Buyer shall permit Seller to retain counsel of its choosing; and (iii) Buyer shall allow Seller to retain exclusive control of such Action, and allow Seller to have full and complete authority to decide issues material to the Action, including without limitation the right to make any settlement, to determine whether to proceed to trial, and to determine whether to take an appeal after trial; and (iv) Buyer shall cooperate fully with Seller in defending such Action, including without limitation attending and giving depositions, participating in any and all trials, hearings or similar proceedings and otherwise devoting the time and attention necessary to such defense, all without cost or expense to Seller. Buyer shall make no compromise or settlement of any claim without the prior written consent of Seller.

(b) Buyer agrees to indemnify and hold harmless Seller (and any parent, subsidiary or affiliate company or corporation), their directors, officers, employees, agents and insurers from any and all Actions arising out of, or resulting from, or otherwise related to bodily injury, property damage or any other damage or injury caused in whole or in any part by (i) any fault, negligence, intentional misconduct, or malpractice of Buyer or any health care provider associated or affiliated with Buyer, including, but not limited to, the failure of Buyer or such health care provider to perform its obligations hereunder; or (ii) actions by Buyer or any health care provider associated with or affiliated with Buyer in violation of any applicable law or regulation ("Buyer Indemnification Event"). In the case of a Buyer Indemnification Event: (A) Buyer shall notify Seller in writing of said Buyer Indemnification Event and send Seller a copy of all papers served promptly after receipt of notice of any Buyer Indemnification Event; and (B) Buyer shall permit Seller to retain counsel of its choosing; and (C) Buyer shall allow Seller to retain exclusive control of such Action, and allow Seller to have full and complete authority to decide issues material to the Action, including without limitation the right to make any settlement, to determine whether to proceed to trial, and to determine whether to take an appeal after trial; and (D) Buyer shall cooperate fully with Seller in defending such Action, including without limitation attending and giving depositions, participating in any and all trials, hearings or similar proceedings and otherwise devoting the time and attention necessary to such defense, all without cost or expense to Seller. Buyer shall make no compromise or settlement of any claim without the prior written consent of Seller; and (E) Buyer shall, upon submission of invoices, reimburse or pay directly,

Seller's reasonable attorneys' fees and costs. In addition, upon notice from Seller, Buyer shall promptly pay all amounts that Seller has become legally obligated to pay by judgment, settlement or otherwise, by reason of any Buyer Indemnification Event.

8. Price. Buyer shall be responsible for all charges for taxes. Sales and use taxes, not subject to exemption, shall be stated separately in Seller's invoice. Except as specifically set forth on Seller's bid, prices are subject to change without notice and any Order calling for future delivery shall be billed according to the price in effect at the time of delivery. It is Buyer's responsibility to provide proof of tax-exempt status.

9. Payment Terms. Full payment without setoff shall be due to Seller from Buyer within thirty (30) days following delivery of Product(s) to Buyer unless otherwise agreed to in writing. Buyer shall pay to Seller interest on all amounts past due at the lesser of (i) one and one-half percent (1.50%) per month or (ii) the maximum interest rate legally permitted until payment in full has been made. Buyer shall pay Seller for all Products that are delivered as to which there is no dispute regardless of whether a dispute exists as to any other Product. In the event that Seller is required to file a lawsuit in order to collect any payment due to Seller from Buyer, Seller shall be entitled to recover, in addition to its actual damages, the costs and expenses of recovery, including reasonable attorneys' fees and expenses.

10. Shipping Terms. Except as provided below, all Products are delivered FOB: destination. Identification of the goods to the contract shall occur when the Product is placed in the hands of the carrier. Seller reserves the right to select a reasonable method of shipping, routing and carrier for all Products. For normal deliveries, the shipping company within the U.S.A. shall be Federal Express ("FEDEX"), or some reasonable alternative. So long as there is sufficient quantity of Product in inventory, Product shall be shipped using FEDEX Standard Overnight or its equivalent. Non-stock, special order items or items not in inventory will be shipped upon manufacture. Seller will pay for standard overnight shipping on orders over two hundred dollars ($200.00).

Upon special request, Seller will ship using FEDEX Priority One delivery or its equivalent if sufficient quantity of the Product is in inventory. Buyer shall be responsible for all shipping and handling fees.

Seller shall acknowledge each Order and confirm delivery dates. Seller shall not be responsible for any delays arising, directly or indirectly, from strikes, labor difficulties, riots, civil unrest, war, fire, collapse, floods, delay or defaults of common carriers, failure or curtailment of Seller's usual source of supply, governmental decrees and orders, or without limiting the foregoing, any other delay beyond Seller's control; provided, however, that Seller shall use reasonable efforts to notify Buyer of anticipated delays and to fill such orders as soon as reasonably possible. If any order for stock Products is not shipped within thirty (30) days of the date Seller received such order, or Seller notifies Buyer that any order will not be shipped within thirty (30) days from the date Seller received such order, then upon written notice to Seller prior to shipment of any delayed order, Buyer may cancel such order in whole or in part.

11. Governing Law and Venue. This Agreement and these Terms are being delivered and executed in the State of Indiana. Any action brought regarding the validity, construction, termination, or enforcement of this Agreement or these Terms shall be governed in all respects by the laws of the State of Indiana, without regard to the principles of conflicts of laws and shall in no way be subject to the United Nations Convention on Contracts for the International Sale of Goods. Venue shall be proper only in a court of competent jurisdiction located in the State of Indiana in the county of Seller's principal place of business. The parties agree that they are subject to personal jurisdiction in such court and consent to service of process issued by such court.

# EXHIBIT  2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates to:

    *Brenda Helms, Bankruptcy Trustee for the*
    *Estate of Arthur Gage,*
    *v. Cook Medical, Inc. et al.,*

    Case No. 1:14-cv-01875-RLY-TAB

## DECLARATION OF RITA HARDEN

    I, Rita Harden, upon my oath, declare and state as follows.

    1.    I am currently the Global Director of Communications at Cook Medical LLC. Previously, I was the Director of Customer Relations and Regulatory Reporting at Cook Incorporated from March 2013 until September 2017. My role as Director of Customer Relations and Regulatory Reporting involved responsibilities with respect to complaint registration at both Cook Medical LLC and Cook Incorporated (together, "Cook"), as well as complaint handling and regulatory reporting at Cook Incorporated. I have been an employee of Cook since 1983.

    2.    I am over 21 years old, I understand the nature of an oath, and I am otherwise competent to testify to matters stated in this Declaration. All statements in this Declaration are based on my personal knowledge and understanding, based on information that I have acquired in my experience working at Cook, or based on information that I obtained through review of Cook records or conversations with other Cook personnel who have personal knowledge.

US.116758226.01

3.      I understand from counsel for Cook that Plaintiff in the above referenced matter has named three distinct Cook Defendants:  Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS (collectively, "Cook Defendants").

4.      The Cook Defendants store and track complaint information in TrackWise, a global system for complaint handling.

5.      When a device complaint is reported to Cook Defendants, the complaint is registered and input into TrackWise.

6.      Cook Defendants did not receive notice from Plaintiff at any time prior to commencement of this litigation.

7.      Cook inputted Plaintiff's complaint in TrackWise on November 28, 2014.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  _March 5_____, 2018        _Rita Harden_____
                                                                          Rita Harden

- 2 -

US.116758226.01

# EXHIBIT  3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,          )
IVC FILTERS MARKETING, SALES        ) Cause No.
PRACTICES AND LIABILITY,            ) 1:14-ML-2570- RLY-TAB
LITIGATION                          ) Evansville, Indiana
                                    ) **October 26,** 2017
                                    ) 9:04 a.m.
                                    )




**Before the Honorable**
**RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL- VOLUME 4




**For Plaintiffs:**              David P. Matthews, Esq.
                                 MATTHEWS & ASSOCIATES
                                 2905 Sackett Street
                                 Houston, TX  77098


                                 Matthew D. Schultz, Esq.
                                 LEVIN PAPANTONIO THOMAS MITCHELL
                                 RAFFERTY & PROCTOR PA
                                 316 S. Baylen Street, Suite 600
                                 Pensacola, FL  32502


                                 Joseph N. Williams, Esq.
                                 RILEY WILLIAMS & PIATT, LLC
                                 301 Massachusetts Avenue
                                 Indianapolis, IN  46204

Laura Baughman, Esq.
BARON & BUDD
3102 Oak Lawn Avenue
Dallas, TX  75219


For **Defendants:**          Andrea Roberts Pierson, Esq.
                            Jessica Benson Cox, Esq.
                            FAEGRE BAKER DANIELS LLP
                            300 N. Meridian St., Suite 2700
                            Indianapolis, IN  46204


                            Charles F. Webber, Esq.
                            Bruce G. Jones, Esq.
                            FAEGRE BAKER DANIELS LLP
                            90 S. 7th Street
                            Minneapolis, MN  55402


Court Reporter:             Margaret A. Techert
                            United States District Court
                            101 NW Martin Luther King Blvd.
                            Evansville, Indiana  47708


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

1   its leg through the wall of the vena cava.

2   Q    And, Dr. McMeeking, why would the filter tend to tilt?

3   A    So the filter tends to tilt for very similar reasons.  It

4   wants to get back to its natural shape, and one way it can do

5   that -- and I'll try and let you see this more clearly.  One

6   way it can do that is by tilting, because when it tilts, the

7   distance between its feet can increase during that process.

8         If the distance between the feet is that before it

9   tilts, when it is in the tilted shape, the distance between

10  those two feet in the same vena cava is actually larger than

11  when it is in the aligned vertical position with the vena cava

12  going up and down in this direction.

13        So the process of tilting is driven by the same

14  features of the filter as the process of perforation.  It is

15  this desire of the filter to get back to its natural shape,

16  which is the one that you now see now that I've taken my

17  fingers away from the filter.

18  Q    Dr. McMeeking, in your work, have you also formed opinions

19  and done a comparison between the Celect filter and Cook's

20  Tulip filter?

21  A    Yes, I have, and I have a Tulip filter here --

22  Q    Can you hand that --

23  A    -- which I will hand to you.

24        MS. BAUGHMAN:  Your Honor, we would offer into

25  evidence Plaintiff's Exhibit 7787 as a Tulip filter.

*MCMEEKING – DIRECT/BAUGHMAN*                              1002

1          MR. WEBBER:  Can I see it momentarily?

2          No objection, Your Honor.

3          THE COURT:  7787?

4          MS. BAUGHMAN:  Yes, sir.

5          THE COURT:  Show it admitted.

6                    *(Defendant's Exhibit 7787 was received*

7   *into evidence.)*

8   A   So, what --

9   Q   If you don't mind, let me ask you a question.

10         Dr. McMeeking, can you explain the difference

11  between the Tulip filter and the Celect filter in terms of its

12  design, which would lead to a tendency or not to perforate the

13  vena cava wall?

14  A   Yes.  So I think you can see that the Tulip filter, which

15  has some features of it which are quite similar to the Celect;

16  for example, these longer legs are pretty much the same shape

17  and size and they are the same thickness as the ones in the

18  Celect filter.  But in addition, the Tulip has these loops of

19  thinner wire that come down from the top and are attached to

20  the longer legs.  And these petals, as they're called, are

21  safety features that are present in the Tulip filter.

22         And what this means is that while the filter wants

23  to tilt and perforate the wall of the vena cava in ways which

24  are quite similar to what happens with the Celect filter,

25  these petals have two functions that are very important to the

1   safety of the filter.

2            One of them is that if the long leg penetrates, if

3   it perforates through the wall of the vena cava, the petals

4   act as stoppers.  They will block any tendency of the long

5   legs to go further through the wall of the vena cava, whereas

6   in the case of the Celect, there is no blocker, there is no

7   stopper, and so when this filter tilt -- perforates the wall

8   of the vena cava, it can go through the wall of the vena cava

9   to a very great extent, almost all the way up to the top of

10  the leg; whereas in the Tulip, the perforation is inhibiting

11  it.  It's limited by the presence of these petals which will

12  tend to make the extent of perforation less so that in many

13  cases, it's only this little bit at the end which will go

14  through the wall of the vena cava.

15           Now, in addition, the shape of the petals and the

16  way that they are attached to the longer legs means that when

17  the filter is in the vena cava, and the vena cava is a

18  deformable tube, and it will tend to bend and shape itself

19  around the leg of the vena cava in many circumstances, and

20  what that means is that this little junction between the

21  petals and the long legs will interfere with the wall of the

22  vena cava.  And so that can help to stop the tendency for the

23  filter to tilt because these little junctions have to slide

24  along the wall of the vena cava, and it is somewhat difficult

25  for them to do so.

1           So those features will help to limit the extent of

2    both tilting and perforation that the Tulip filter will

3    experience.  And in that sense, these petals are safety

4    devices that were designed into the Tulip to have those

5    benefits that I just described.

6    Q    And one last question before you can take a seat back over

7    there.  Are both the Tulip and the Celect, are they both

8    conical filters?

9    A    Yes, they're both what are called conical -- cone-shaped

10   or conical filters because they're narrow at the top and they

11   come down and are wide at the bottom, and although they're not

12   exactly cones, they are very similar in shape to cones, and

13   that is the feature of both of these filters.

14   Q    So why don't you take the two filters with you in case you

15   need them for further questions to explain and -- have a seat

16   over there, if you don't mind.

17           MS. BAUGHMAN:  Why don't you take off that one,

18   yeah.

19   BY MS. BAUGHMAN:

20   Q    Dr. McMeeking, can you explain -- you've explained to the

21   jury how the tilt and perforation works, but what work did you

22   do as an engineer to figure out whether the Celect filter has

23   a tendency to tilt other than examine the filter itself?

24   A    What I did is I carried out engineering calculations of

25   how the forces and changes of shape of the filter occur, and