IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: COOK MEDICAL, INC., IVC
FILTERS MARKETING, SALES
PRACTICES AND PRODUCT LIABILITY
LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL NO. 2570

This Document Relates:

*Brand v. Cook Medical, Inc., et al*
Case No. 1:14-cv-6018-RLY-TAB

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO STRIKE DEFENDANTS' NON-RETAINED BRIAN D. CHOULES, PH.D.

COMES NOW Tonya Brand, Plaintiff in the above-styled action, by and through undersigned counsel, and hereby respectfully requests that this Court Strike Defendant's Non-Retained Expert Brian D. Choules, Ph.D., Cook's former Technical Director, and states as follows:

1. Cook disclosed Dr. Choules as an expert but did not provide an expert report. Cook characterized Dr. Choules as a non-retained expert and provided only a summary of Dr. Choules' anticipated opinions.[1]

2. As discussed in the incorporated memorandum, the vast majority of Dr. Choules' opinions concern matters he was not involved in during his employment at Cook.

3. Federal law, including decisional law from this Court, requires a report when an expert testifies regarding matters with which he was not involved.

---

[1] Dr. Choules Deposition is attached as Exhibit A.

4. Plaintiff does not object to Cook calling Dr. Choules as a fact witness in its case; but does object to expert testimony on matters with which he had no substantive involvement.

**MEMORANDUM**

**A.     The Law**

The issue here concerns Rule 26(a)(2)(C) and, specifically, whether/when a former employee may be deemed a non-retained expert witness, i.e., one who may provide only a summary of opinions rather than a full report. The rule requires a report if: (1) the expert is "retained or specially employed to provide expert testimony" or (2) the expert is "one whose duties as the party's employee regularly involve giving expert testimony."[2]

Courts have addressed the issue of when an expert who is a former employee may testify without furnishing a report: "The distinguishing characteristic between expert opinions that require a report and those that do not is <u>whether the opinion is based on information the expert witness acquired through percipient observations or whether, as in the case of retained experts, the opinion is based on information provided by others</u> in a manner other than by being a percipient witness to the events in issue."[3] Accordingly, "a former employee may be a non-retained expert for the purposes of Rule 26(a)(2) <u>if he is a percipient witness and is testifying based upon his personal knowledge of the facts or data at issue</u> in the litigation."[4]

In *Downey v. Bob's Disc. Furniture Holdings*, 633 F.3d 1 (1st Cir. 2011), the court permitted a summary disclosure because the expert opinion arose not from "enlistment as an expert" but from the witness's "ground-level involvement in the events giving rise to the litigation."[5] On the other hand, said the *Downey* court, if the expert "draws the opinion from

---

[2] Fed. R. Civ. P. 26(a)(2)(B).
[3] *In re Application of Republic of Ecuador*, 280 F.R.D. 506, 511 (N.D. Cal. 2012) (emphasis added).
[4] *Guarantee Tr. Life Ins. Co. v. Am. Med. & Life Ins. Co.*, 291 F.R.D. 234, 237 (N.D. Ill. 2013) (emphasis added).
[5] *Id.* at 6.

2

facts supplied by others, in preparation for trial, he reasonably can be viewed as retained or specially employed for that purpose, within the purview of Rule 26(a)(2)(B)," and must therefore submit an expert report.[6] The Seventh Circuit has cited *Downey* favorably,[7] and this Court has relied on *Downey* with respect to a non-retained expert treating physician:

> Whether an expert must provide a complete report under 26(a)(2)(B) or a less extensive summary under 26(a)(2)(C) depends on the expert's relationship to the issues involved in the litigation. Treating physicians, for example, often have firsthand knowledge of the events giving rise to the litigation and typically are not "retained or specially employed to provide testimony." In such cases, the treating physician need only provide a 26(a)(2)(C) summary disclosure. If the treating physician testifies beyond the scope of his observations, however, he is treated as a retained expert.[8]

This Court recognized in *Malibu Media* that "[n]umerous district courts have accepted this [*Downey*] analysis of the distinction between Rule 26(a)(2)(B) and Rule 26(a)(2)(C) expert witnesses" and concluded: "This Court likewise finds the First Circuit's [*Downey*] analysis persuasive and accordingly will consider whether [the expert's] opinion arises 'from his ground-level involvement in the events giving rise to the litigation.'"[9] The expert in *Malibu Media* was excluded altogether.[10] Failure to comply with the requirement for a report may "result[] in the exclusion of improperly disclosed witnesses…."[11]

---

[6] *Id.* at 7.
[7] *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 371 (7th Cir. 2017) (quoting *Downey*'s "ground-level involvement" test for determining whether a report is required).
[8] *Martin v. Stoops Buick*, 2016 WL 4088132 at *1 (S.D. Ind. 2016) (citing *Malibu Media, LLC v. Harrison*, 2014 WL 6474065 at *2 (S. D. Ind. 2014) (citing *Downey*, 633 F.3d at 6) (Dinsmore, M.J.); 2014 WL 7005288 (S.D. Ind. 2014) (adopting R&R) (Lawrence, D.J.)).
[9] *Malibu Media*, 2014 WL 6474065 at *2 (Dinsmore, M.J.); 2014 WL 7005288 (S.D. Ind. 2014) (adopting R&R) (Lawrence, D.J.).
[10] *Id.* at *4-5.
[11] *Martin*, 2016 WL 408813 at *3.

As demonstrated below, the great majority of Dr. Choules' opinions concern events with which he had no "ground-level involvement" while at Cook (MEDI). His testimony should be excluded based on his failure to provide a report.[12]

**B.     The Facts**

B1.     Dr. Choules' Work History

Dr. Choules worked at Cook (MEDI) from 1998-2002 as an engineer and from 2002-2004 as Preclinical Bench Testing Manager.[13] Dr. Choules left Cook for a spell in July 2004 and returned January 1, 2006.[14] He served as Technical Director over nonclinical testing until he again left Cook in July 2016.[15] He remains a former employee. Dr. Choules' was retained as an expert around March of 2017 and executed a formal retainer agreement with Faegre Baker Daniels.[16] His invoices reflect a fee rate of $350 per hour.

B2.     Dr. Choules' Disclosure

Cook provided a summary disclosure identifying the following opinions (verbatim).

1. The design, development, and testing timeline for Tulip, Celect, and Celect Platinum were robust, comprehensive and state of the art.

2. The design control procedure, specification, and design inputs for Tulip, Celect, and Celect Platinum, including all design verification activities were properly performed and documented.

3. All bench tests, animal tests, and FEA simulations for Tulip, Celect, and Celect Platinum were properly conducted and evidence the safety and efficacy of these filters.

---

[12] This matter was first raised in the Hill bellwether trial, and after a hearing on October 12, 2017 the parties reached an agreement on the limits of Dr. Choules testimony and this Court reserved ruling on specific objections until he was called at trial. (*See* Doc. 6916). Cook did not call Dr. Choules in the Hill trial. Cook had the opportunity to rectify the situation by having him provide a report with its disclosures in this bellwether trial, but it chose not to do so. Cook Defendants' Amended Rule 26(a)(2)(B) and 26(a)(2)(C) Expert Disclosures attached as Exhibit B. A similar situation occurred in *Malibu Media* and was part of the Court's reasoning in striking the expert altogether. *Malibu Media*, 2014 WL 6474065 at *5.
[13] Exh. A, Choules Dep. at 11:22-12:4.
[14] Exh. A, Choules Dep. at 15:20-16:9.
[15] Exh. A, Choules Dep. at 16:10-14 & 53:5-6.
[16] Exh. A, Choules Dep. at 7:22-8:2 (date of retention) & 8:25-9:16 (retainer agreement).

4. FEA and other Cook test methods, including set up test protocols, and interpretation of test results and end points.

5. Facts concerning the design procedures and design files for the products in question and how they were properly maintained and accurate.

6. Analyzing fracture and filter behavior for Tulip, Celect, and Celect Platinum, and his opinion that these designs are safe and effective and not prone to fracture.[17]

Although not mentioned in his disclosure, Dr. Choules testified at deposition that he intends to offer opinions rebutting Plaintiff's three engineering experts and that the omission from his disclosure "must have been an oversight."[18] He explained there were "lots of little details" and "you know, we'd have to go over each and every detail" to get his full rebuttal opinions while also confirming that had he written a report, it would have included all such details.[19]

B3. Dr. Choules' "Ground-Level Involvement" at Cook

During his time at Cook, Dr. Choules did perform or supervise testing relating to IVC filters, but his role was narrow relative to his broad disclosure. Details regarding his lack of involvement with respect to particular opinions and reliance documents are discussed below. In more general terms, Dr. Choules' "ground-level involvement" with filters was limited to preclinical testing performed at MEDI. He testified to the following.

- He never worked on clinical trials during his time at Cook.[20]

- He was not involved in IVC filter animal studies.[21]

---

[17] Exh. B at 18-19.
[18] Exh. A, Choules Dep. at 8:14-23 (oversight) & 98:21-105:11 (articulating rebuttal opinions).
[19] Exh. A, Choules Dep. at 103:10-18.
[20] Exh. A, Choules Dep. at 12:13-24.
[21] Exh. A, Choules Dep. at 14:6-22 (has never applied his engineering expertise to any animal study involving IVC filters) & 27:4-25 (not familiar with VCA1 sheep study) & 34:11-35:4 (not involved in studies at Zaragoza or Dotter Institute; was involved at Purdue but not with respect to Tulip or Celect filters) & 55:5-10 (not involved in VCA1) & 56:16-19 (not involved in Dotter animal migration test).

5

- He was not involved in Dr. Gunther's Celect vs. Tulip Cook's clot-trapping study.[22]

- He did not work on design control for the Tulip or Celect filters, which was performed at William Cook Europe ("WCE") (including design input requirements, verification/validation, and risk analysis).[23]

- He has never performed a quality system audit of WCE and has never performed a quality system audit to determine compliance with regulations.[24]

- Generally speaking, Dr. Choules was not involved in any testing or other work that was performed outside of MEDI.[25]

- He did not perform any work for Cook during his absence from mid-2004 through the end of 2005 and thus would have no involvement with events that occurred during that time frame.[26]

B4. Dr. Choules' Opinion #1: The design, development, and testing timeline for Tulip, Celect, and Celect Platinum were robust, comprehensive and state of the art.

The day before Dr. Choules' deposition, Cook produced the "testing timeline" referred to in this opinion.[27]

At deposition counsel inquired into each test identified on the Tulip Timeline.[28] Of all the tests identified, Dr. Choules only participated in: (1) bench deployment of 30 Tulip filters;[29] (2)

---

[22] Exh. A, Choules Dep. at 71:24-72-11 & 73:3-7.
[23] Exh. A, Choules Dep. at 17:4-18-2.
[24] Exh. A, Choules Dep. at 18:3-6 & 90:7-12.
[25] Exh. A, Choules Dep. at 70:10-71:1.
[26] Exh. A, Choules Dep. at 16:3-9.
[27] The Tulip Timeline is attached as Exhibit C and the Celect Timeline is attached as Exhibit D.
[28] Exh. A, Choules Dep. at 69:13-76:5.
[29] Exh. C in the Simulated Use row: "Bench Deployment: Thirty GTF with Flexible Tip Femoral Introducers: ability of access, visualization, ease of deployment, accuracy of placement, and ability of withdrawal in simulated vasculature." (2012). His involvement was that he reviewed the report. (Exh. A at 70:2-9).

bench deployment: sheath radiopacity,[30] and (3) fatigue and durability testing (involved in one of three tests).[31] Of the 49 entries under "Testing Description," Dr. Choules was personally involved in three. Seventeen of the 49 pre-date Dr. Choules' 1998 arrival at Cook. Although Dr. Choules might provide expert testimony specific to the three tests he was involved in, he was not involved in 46 other tests he intends to address. He therefore cannot opine on the Tulip "testing timeline" or that it was "robust, comprehensive, and state of the art" absent a report. The same is true for the Celect Timeline.

Of the 63 items listed under "Title/Testing Description" for Celect, Dr. Choules had direct involvement in 14: (1) bench deployment of Celect filters with flexible tip introducers;[32] (2) four flat plate fatigue tests (partial involvement);[33] (3) two of three tensile strength tests;[34] (4) six stress/strain analyses (partial involvement);[35] and (5) corrosion testing.[36] All were bench tests or FEA (finite element analysis, i.e., computer modeling). As with Tulip, Dr. Choules could testify without any report requirement as to these particular tests, but he had no involvement in testing at WCE, in animal testing, in the clot-trapping test, or any of the other 49 listed tests. His limited involvement does not support his intent to testify broadly to the Celect "testing timeline" or that the full range of Celect testing was "robust, comprehensive, and state of the art."

> B5. <u>Dr. Choules' Opinion #2</u>: The design control procedure, specification, and design inputs for Tulip, Celect, and Celect Platinum, including all design verification activities were properly performed and documented

---

[30] Exh. C in the Visibility row: "Bench Deployment: Sheath radiopacity" (2012). (Exh. A at 71:2-15).
[31] Exh. C in the Fatigue/Durability row: "14% 30 mm, 85 million cycles." (Exh. A at 73:8-16 & 73:24-74:5).
[32] Exh. D in the Simulated Use row: "Bench deployment testing Cook Celect® Vena Cava Filters with Flexible Tip Introducers." (2012) (Exh. A at 76:6-11).
[33] Exh. D. in the Fatigue/Durability row: "Flat Plate Fatigue Testing." Dr. Choules was involved in the first three and may have been involved in the fourth but it would have been completed while he was not working at Cook. (Ex. A at 77:2-11.)
[34] Exh. D in the Filter Tensile Strength row: "Tensile Test of 0.018 in and 0.010 in Diameter Elgiloy Wire" and "Force required to bend permanently bend filter leg 151 degrees." (Exh. A at 77:21-78:1).
[35] Exh. D in the Stress/Strain Analysis row. Dr. Choules was directly involved in the first test to completion ("Forming and Subsequent Flat-Plate Fatigue Analysis of a WCE Vena-Cava Filter") and would have done work on the other five, but all were completed while he was not with Cook. (Exh. A at 78:20-79:16).
[36] Exh. D in the Corrosion row: "Electrochemical Corrosion Testing" (Exh. A at 73:17-20).

Dr. Choules' had no direct involvement in any of these matters and should not be permitted to testify to them. Design control is governed by FDA's Quality System Regulation.[37] Design control activities for the Tulip and Celect were carried out at WCE and Dr. Choules had no involvement with them.[38] He cannot speak to how well "documented" these activities are because he has never performed a quality system audit to verify compliance with federal regulations.[39] With respect to this opinion, Dr. Choules testified he had not reviewed all of the documents by the time of his deposition and "anticipated doing more," i.e., he has not completed the work and as of today could not give this opinion without further document review, which obviously would post-date his time at Cook.[40]

- B6. Dr. Choules' Opinion #3: All bench tests, animal tests, and FEA simulations for Tulip, Celect, and Celect Platinum were properly conducted and evidence the safety and efficacy of these filters.

Dr. Choules identified the bench tests and FEA with which he had direct involvement in his testing timelines as identified in section B4 above. He would be required to give a report to opine on bench testing beyond these matters. As noted and cited above, Dr. Choules was not involved with animal testing. He has no basis to opine on whether testing was "properly conducted" beyond the testing he personally conducted.

Moreover, Dr. Choules may not testify to the "efficacy" of Cook filters. He confirmed that FEA analysis does not speak to efficacy.[41] He could not identify any animal study that tested a filter's ability to trap clots.[42] And he was not involved in the one clot-trapping bench (*in vitro*) test that Cook performed on the Tulip and Celect.[43]

---

[37] 21 C.F.R. Part 820.
[38] Exh. A, Choules Dep. at 17:4-18:2.
[39] Exh. A, Choules Dep. at 18:3-6 & 90:9-12.
[40] Exh. A, Choules Dep. at 88:2-89:20.
[41] Exh. A, Choules Dep. at 87:6-8.
[42] Exh. A, Choules Dep. at 87:1-5.
[43] Exh. A, Choules Dep. at 71:24-72:11.

8

This opinion should be excluded with the same exceptions discussed in section B4, i.e., excluded altogether except for the handful of tests Dr. Choules was directly involved in.

> B7. <u>Dr. Choules' Opinion #4</u>: FEA and other Cook test methods, including set up test protocols, and interpretation of test results and end points.

Plaintiff does not dispute Dr. Choules' expertise in conducting or interpreting FEA. Dr. Choules confirmed in deposition that this opinion is confined to the FEA identified in his Tulip and Celect Testing Timelines.[44] The tests he was involved with are identified above in section B4. To the extent Dr. Choules' testimony to that limited testing would be relevant, Plaintiff does not object. Otherwise, this opinion should be excluded.

> B8. <u>Dr. Choules' Opinion #5</u>: Facts concerning the design procedures and design files for the products in question and how they were properly maintained and accurate.

This opinion should be excluded in its entirety for the reasons discussed above in section B5. It is duplicative of Opinion #2 and Dr. Choules never was involved in this sort of work during his time at Cook. He admits this all is work based on materials provided to him since the time he left Cook.[45]

> B9. <u>Dr. Choules' Opinion #6</u>: Analyzing fracture and filter behavior for Tulip, Celect, and Celect Platinum, and his opinion that these designs are safe and effective and not prone to fracture.

Dr. Choules testified there were "several cases" in which he analyzed a fractured filter as part of a complaint investigation.[46] However, he also apparently intends to address cases that have arisen since he left Cook and/or similar cases where others performed the analysis.[47] When asked whether all such analyses were included in his reliance list, he equivocated but said he

---

[44] Exh. A, Choules Dep. at 87:9-88:1.
[45] Exh. A, Choules Dep. at 87:9-90:12.
[46] Exh. A, Choules Dep. at 90:13-91:1.
[47] Exh. A, Choules Dep. at 90:23-91:11.

would "anticipate that I would see as many as I can that haven't been listed yet."[48]  Any such opinions are foreclosed by his failure to provide a report.

Finally, this opinion includes the statement that filters are "safe and effective."  Try as he might, Dr. Choules could not articulate any principled basis on which fracture analysis of an explanted filter could prove filter safety or efficacy, even admitting at one point during the colloquy that "the fracture analysis has nothing to do with the efficacy."[49]

Plaintiff does not object to Dr. Choules testifying to fracture analyses of Celect filters he personally performed while at Cook to the extent such testimony is relevant, does not purport to speak to safety and efficacy, and is reflected in the reliance list provided before his deposition.  Otherwise, the opinion as stated is excludable.

      B10.  Dr. Choules' Rebuttal to Plaintiff's Engineering Experts

As explained above, Dr. Choules' disclosure includes no summary of opinions intended to rebut Plaintiff's engineering experts whose reports were served after he had stopped working for Cook.  To the extent any otherwise admissible opinion as outlined above might be responsive to testimony given by Plaintiff's experts, that is all fine and good; but it should not be posed as a direct response to something Plaintiff's experts have opined because there was no disclosure in those terms and any such direct "response" would post-date Dr. Choules' employment.  Had Cook wished to present such opinions framed in that fashion, it should have served a report.

    **C. Conclusion**

For the reasons set forth above, Plaintiff seeks an Order that limits Dr. Choules in the following ways.

---

[48] Exh. A, Choules Dep. at 91:19-92:2.
[49] Exh. A, Choules Dep. at 92:3-94:24.

1. With respect to Tulip testing, to the extent these specific tests may be relevant, Dr. Choules should be limited to testifying about: (1) the 2012 bench deployment test of 30 Tulip filters; (2) the 2012 bench deployment sheath radiopacity testing; and (3) the 2013 fatigue and durability testing. With respect to Celect testing, to the extent these specific Celect tests may be relevant, Dr. Choules should be limited to testifying about: (1) the 2012 bench deployment tests of Celect filters with flexible tip introducers; (2) the four flat plate fatigue tests identified in his timeline; (3) the two tensile strength tests identified above at footnote 32; (4) the six stress/strain analyses to the extent he was involved before leaving Cook in 2004; and (5) the July 2004 corrosion testing. Dr. Choules should not be permitted to characterize or give any opinions on the full range of Tulip and Celect tests, the vast majority of which he had no involvement with.

2. Dr. Choules' second opinion regarding QSR should be excluded entirely.

3. Dr. Choules' third opinion should be limited to the matters described in #1 above and he should not be permitted to testify to "efficacy" of Cook filters.

4. Dr. Choules' fourth opinion should be limited to the matters described in #1 above to the extent any of those tests included FEA.

5. Dr. Choules' fifth opinion should be excluded entirely.

6. Dr. Choules' sixth opinion should be limited to discussion of any post-explant fracture analyses he conducted to the extent such analyses might be relevant and appear on his reliance list. He should not be permitted to opine on "safety and effectiveness."

7. Dr. Choules should not be permitted to testify "in response" to any Plaintiff's engineering experts. To the extent any permitted opinions happen to be responsive to Plaintiff's experts, Plaintiff does not object to their admission so long as they are not framed as a direct rebuttal to her experts.

8. Dr. Choules should not be permitted to give any testimony that is cumulative of Cook's retained expert engineers (or vice versa).

Respectfully submitted this 5th day of July, 2018.

                                                          */s/ Joseph N. Williams*
Joseph N. Williams, Atty. No. 25874-49
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email:  jwilliams@rwp-law.com
*Liaison Counsel to Plaintiffs' Steering Committee and on behalf of Plaintiffs' Steering Committee*

Michael W. Heaviside, Esq.
HEAVISIDE REED ZAIC, A LAW CORPORATION
910 17th Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 223-1993
mheaviside@hrzlaw.com

Ben C. Martin, Esq.
THE LAW OFFICES OF BEN C. MARTIN
3710 Rawlins Street, Suite 1230
Dallas, TX  75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@bencmartin.com

David P. Matthews, Esq.
MATTHEWS AND ASSOCIATES
2509 Sackett St.
Houston, TX  77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
dmatthews@thematthewslawfirm.com

*Plaintiffs' Co-Lead Counsel*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on July 5, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

                                          */s/ Joseph N. Williams*
                                          Joseph N. Williams