**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND          Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                                   MDL No. 2570
_____

This Document Relates to All Actions
_____

**PLAINTIFFS' RESPONSE TO COOK DEFENDANTS'**
**MOTION FOR SCREENING ORDER AND BELLWETHER SELECTION PLAN**

Plaintiffs submit this response in opposition to the Motion for Screening Order and

Bellwether Selection Plan filed by Defendants Cook Incorporated, Cook Medical LLC (f/k/a

Cook  Medical Incorporated), and William Cook Europe ApS  (collectively "Cook").   Plaintiffs

would respectfully show the Court as follows:

**I.**
**INTRODUCTION**

Cook is attempting to sneak a broad and unprecedented case dismissal mechanism into

this MDL under the guise of a bellwether screening process.   That is, Cook has picked a number

of conditions that it has unilaterally determined to be non-injuries, labeled them "undisputed,"

and asked the Court to adopt a process that culminates in Plaintiffs' claims being dismissed *with*

*prejudice* -- without Cook having to employ any of the traditional procedures (motion to dismiss,

motion for summary judgment, etc…) that are in place to afford due process.

Cook realizes that if it simply moved for what it really wants – for thousands of

Plaintiffs' claims to be summarily dismissed prior to discovery and without the filing of any

dispositive motion – that such an outlandish request would be denied.  So Cook has re-packaged

the request as being related to the bellwether process.  In truth, Cook's motion to dramatically limit its own liability has nothing whatsoever to do with the bellwether selection process.  The bellwether selection and trial process is not impacted by restrictions on future filings. Meanwhile, the very fact that Cook presently claims to be able to identify 50% of cases as falling within its no-injury definition demonstrates that additional screening is not necessary to categorize cases for bellwether trial pools.

Ultimately, Plaintiffs agree that there are a number of cases involving injuries to Plaintiffs that (1) have not yet manifested physical symptoms, or (2) involve injuries that presently appear less severe than certain of the other filed cases.  It is these types of cases – not the "no injury" cases – that have significant numbers within the MDL.  These non-symptomatic injury cases, failed retrieval cases, irretrievable filter case, and anticoagulation cases will need to be tested (through motions to dismiss and for summary judgment) and tried (most efficiently through multi-plaintiff trials) to determine whether they involve valid and compensable injuries. Until that is done, any screening process that would bar Plaintiffs alleging such claims from participating in the MDL is, at best, premature.  Cook's motion for a screening order should be denied.

## II.
## ARGUMENT AND AUTHORITIES

### A.    Cook's Injury Definitions And Classifications Are Flawed.

Much of the problem with Cook's motion lies in its nomenclature and definitions.  Cook sorts cases into three groups:  (A) "Undisputed PIP/No Injury" ("UNI") cases, (B) "Disputed PIP/No Injury" ("DNI") cases, and (C) "Bodily Injury" cases.    [Motion, pp. 10-11].  Cook agrees that the DNI and Bodily Injury cases must be resolved through litigation and trial proceedings.  However, Cook proposes that cases falling into its Category A, the so-called UNI

cases, should be summarily dismissed.  Cook's request for summary dismissals should be denied because it is procedurally improper and because Cook's UNI definition is overly broad, unworkably vague, subjective, disputed and/or medically unsound.[1]

Cook's Category A definition for "UNI" cases is flawed for multiple reasons.  First, it is wildly inaccurate for Cook to represent that the cases described in Section A are "undisputedly" no injury cases.  Plaintiffs strongly dispute that several of the case types Cook includes in its first category do not involve injuries.

Most strikingly, Cook claims that irretrievable filters are undisputedly not an injury.  [Motion, p. 10].  Nothing could be farther from the truth.   When a Plaintiff consents to be implanted with a filter that was represented by Cook to be retrievable, and that was selected and implanted with the intent and expectation that it would be retrieved, but that, in actuality, cannot be retrieved by ordinary means – that Plaintiff has suffered an injury.  It is an insult to the Plaintiff's body to have an unwanted foreign product at place inside him or her.  Additionally, any Plaintiff that has undergone an unsuccessful removal surgery has doubtlessly suffered an insult to their body in terms of the unproductive medical procedure.  At a minimum, the expense of the failed retrieval procedure is a damage incurred by the Plaintiff.[2] A failed retrieval alone may not be the most severe or debilitating injury;  but it *is* an injury.  It is also an indicator that the progressive injury process is in motion and that further injury may exist or follow.  Cook's inclusion of (a) irretrievable filter cases, and (b) failed retrieval attempt cases, in its UNI category is inappropriate.

---

[1] Because Cook is not seeking to dismiss DNI cases or Bodily Injury cases, Plaintiffs will address the definitions used by Cook in those Categories primarily as they relate to the UNI cases that are the subject of Cook's request for a screening order.  Plaintiffs do not concede that Cook's definitions of DNI case and Bodily Injury cases are exhaustive or universally applicable in all regards.

[2] As this Court has seen in the *Hill* trial, the cost of a failed retrieval may exceed $20,000.

Second, Cook's inclusion of cases alleging "puncture marks or insignificant scarring" as UNI cases is equally unworkable. The parties cannot simply decide which Plaintiffs' scarring is "significant" (so as to allow their claims to succeed) and which Plaintiffs' scarring is "insignificant" (so as to have their claims summarily barred at the door).  That is particularly so where it is known that the body's natural response to scar tissue is to create more scar tissue resulting in progressive stenosis.   Certainly, IVC stenosis, and the need for lifetime anticoagulants due to IVC stenosis, are injuries.

Cook is also mistaken in claiming that the fear of injury and need for medical monitoring are undisputed non-injuries. Some states recognize a claim for emotional distress arising from genuine circumstances creating fear for one's health.  In such states, damages for the mental distress caused by a reasonable fear of injury may be recovered even in the absence of a physical injury.  *E.g. Potter v. Firestone Tire & Rubber Co.,* 863 P.2d 795 (Cal. 1993); *Reynolds v.* Highland Manor, Inc., 24 Kan.App.2d 859 (Kan. 1998); *Murray v. Bath Iron Works Corp.,* 867 F.Supp. 33 (D.Maine 1994).  Likewise, there are a number of states that have recognized a claim for medical monitoring -- even in the absence of a present physical injury.  *E.g. Burns v. Jaquays Mining Corp.,* 752 P.2d 28 (Ariz. Ct. App. 1987); *Potter v. Firestone Tire & Rubber Co.,* 863 P.2d 795 (Cal. 1993); *Martin v. Shell Oil Co.,* 180 F. Supp. 2d 313 (D. Conn. 2002); *Lewis v. Lead Indus. Ass'n,* 793 N.E.2d 869 (Ill. App. Ct. 2003); *Lamping v. Am. Home Prods.,* Inc., No. DV-97-85786 (Mont. 4th Dist. Ct. Feb. 2, 2000).  Cook cannot simply declare *all* Plaintiffs' fear of injury and need for ongoing medical monitoring claims to be non-injuries without analysis and consideration of the state laws applicable to each case.

Lastly, Cook's UNI definition would categorically dismiss all cases "where the filter has been successfully removed" without a symptomatic bodily injury.   [Motion, p. 11].  In effect,

Cook is treating a successful removal as a magic eraser for any injuries that preceded the removal. For instance, Cook's definition does not allow for situations where a successful retrieval was preceded by one or more failed retrieval attempts (which is a clear injury). It also is inconsistent with the position Cook itself takes with regard to DNI cases. Cook acknowledges within its DNI case definition that it is disputed whether cases of non-symptomatic filter migration, perforation, thrombosis or occlusion represent injuries and that trials will be necessary to resolve the issue. [Motion, p. 11]. If non-symptomatic filter complications may be an injury (which Cook acknowledges through its DNI definition), the fact of that injury is not erased by a subsequent removal. A successful removal might mitigate the harm (and the damages) by reducing the duration and severity of the injury – but the existence of a legally cognizable injury has been alleged and requires judicial resolution.

**B.    Cook's Flawed Definitions and Categorizations Led to Exaggerated Projections and Would Cause the Exclusion of Meritorious Cases.**

Cook claims to have determined from Plaintiffs' profile sheets that "almost half" of all cases in the Cook IVC Filter MDL are UNI cases. [Motion, p. 2]. Cook also claims that UNI cases are becoming the largest category of cases in the MDL. [Motion, p. 3]. To the extent that this is a crisis at all, it is a crisis of Cook's own making. Broadening the definition of a no-injury case will necessarily result in greater numbers of cases falling within that definition. If no-injury cases were defined in the manner Plaintiffs propose, the number would be far less than Cook suggests. Moreover, the total number of cases in this MDL (4,435) remains manageable and the pace of new filings appears to be decreasing (890 filed in the past six months, 1572 filed in the six months prior). No injury cases simply are *not* a critical problem impeding the overall management or progression of this MDL.

On the other hand, an ill-advised screening order prematurely dismissing (potentially with prejudice) nearly half of the cases in the MDL (and barring the filing of numerous others) *would* create a due process crisis.  Plaintiffs are entitled to have the factual issue of their injuries determined in accordance with the benefits and protections afforded by mutual discovery, formal summary judgment or dismissal motions, and evidentiary hearings.

A recent Cook IVC filter case illustrates the injustice that would result from premature dismissals.  In *Pavlock v. Cook Inc., et al,* Cause No. 2017-03885 (Harris County, Texas), a Texas jury awarded $1.245 million to a man whose case would have been dismissed or barred under the screening order Cook now proposes.  Jeffrey Pavlock was a fit, young firefighter in 2015 when he was implanted with a Celect filter that was intended to be retrieved once it was no longer needed.  Unfortunately, Pavlock's filter moved, became embedded and was unable to be removed. At the time he filed his case, Pavlock did not have physical symptoms.   Yet, by the time the case came to trial, legs from the Celect filter had perforated Pavlock's aorta and small intestine requiring him to undergo two unsuccessful retrieval surgeries and, ultimately, an open removal surgery to remove the dangerous filter strut from his aorta.  Pavlock's story reflects the progressive nature of IVC filter injuries and demonstrates the injustice that would occur if every non-symptomatic injury case were summarily dismissed.

**C.      The Parties' Identification of Cases For Dismissal.**

A significant portion of Cook's motion is devoted to a discussion of the 115 cases Plaintiffs put forth for dismissal ("Plaintiffs' 115") and the two sets of 115 cases Cook subsequently identified and put forth for dismissal ("Cook's First 115" and "Cook's Second 115").  It would be a mistake, however, to look to any of the "115s" as the source for a rule on what constitutes a permissible injury allegation.

1.     **Plaintiffs' 115 was determined by the listed plaintiffs' individual lawyers based on the particular facts and circumstances of each case.**

Cook seems to be under the mistaken impression that MDL Counsel for Plaintiffs had the ability and authority to simply cull the case lists and agree to the dismissal of any case they deemed lacking.  That is not the case.   The fact-specific decision as to whether or not an individual case presents a legally cognizable injury is entrusted to the attorneys retained by the particular plaintiff.   Plaintiffs' Lead Counsel enabled and assisted in the process of evaluating injury allegations by holding multiple group conference calls and individual conversations to discuss the parameters of the "no injury" issue.   But ultimately, the 113 cases identified by Plaintiffs for dismissal *without prejudice* were put forth by the individual counsel of record -- based on the particular facts known to that counsel, the wishes of the particular client as conveyed to their counsel, and the injury criteria of the plaintiff's chosen attorney.  The fact that one plaintiff without present physical symptoms chose to accept a dismissal without prejudice (that allowed for re-filing upon a future injury manifestations) does not mean that the claim of every other plaintiff without present physical symptoms is baseless.  Nor does it mean that every firm continuing to put forth the claims of a presently non-symptomatic plaintiff has been remiss in its injury analysis.

Second, the litigation landscape has changed since Plaintiffs' 115 was first put forward. The verdict for Plaintiff in the *Pavlock* case stiffened the resolve of many Plaintiffs attorneys that continuing to pursue the lower category cases is the right thing to do for their clients.  Again, Jeffrey Pavlock's medical records did not reflect physical symptoms at the time his case was filed.  Yet, the process of discovery and expert review clarified Pavlock's injury progression  -- shedding light on early signs that would not have necessarily been obvious from a single line injury summary and expanding to reflect the increased severity of his injuries over time.

Other cases are beginning to reflect a similar course of events. Cook lists Larry Conway (Cause No. 02779) as a case that should be dismissed for alleging only stress. However, Mr. Conway's initial CT scan was subsequently re-read to reveal that four prongs of the filter had perforated the IVC. [3] Charles Evans (Cause No. 01604) is another Plaintiff who Cook claims should have his case dismissed for having alleged only stress and anxiety as injuries. Again, however, additional records received after Mr. Evan' profile sheet was produced reveal partial thrombosis that developed after the filter was implanted. Deborah Fissell (Cause No. 04089) is yet another example of a Plaintiff who initially alleged fear and anxiety due to the unwanted presence of a Cook filter in her body; but who has subsequently provided additional records to her counsel showing that she had a post-filter implant DVT. Because it is becoming a common pattern for IVC filter recipients to see a progression in the filter-related complications and injury severity, it would be imprudent for Plaintiffs' counsel to advise their non-symptomatic clients to dismiss their cases.

2. **Cook's claim that there are an addition 230 cases that warrant dismissal is wildly exaggerated.**

Cook's claim that it has identified an additional 230 "undisputed no injury" cases that should be dismissed is simply false. To contrary, the largest group of cases populating "Cook's First 115" and "Cook's Second 115" lists are cases alleging irretrievable filters (106 cases). This Court has already expressly stated that the question of "whether inability to retrieve" is an injury is a matter on which the parties disagree. [Order Dismissing 113 Pending "No Injury" Cases, p. 1]. Similarly, the Court has stated that the "mere presence of clot in the filter" is a disputed issue that remains to be argued. Yet, Cook includes three cases alleging clogged filters

---

[3] Throughout this response, representations regarding specific Plaintiffs' current medical conditions are made based on investigation and communication with the individual Plaintiffs' attorneys. The confidential medical records and/or other supporting information will be provided to the Court if requested.

among those it claims should be dismissed as undisputed no-injury cases. Cook cannot seriously contend that Plaintiffs were remiss in not putting forth for dismissal 109 cases alleging injuries the Court has expressly noted will require future argument and determination.

The second largest category of cases put forth by Cook for dismissal are 86 cases where Cook claims only non-physical injuries (e.g. worry, stress, anxiety, fear of future injury) have been alleged.  As previously discussed, the ability to recover for mental distress based on the fear of future injury is a matter that must be assessed under state laws.  Furthermore, a significant number of the cases alleged by Cook to involve only stress and anxiety have either progressed to involve additional injuries or have undergone further investigation revealing additional injuries:

- Barbara Hanel (No. 01040) is listed as a "stress and anxiety" case by Cook.  But Ms. Hanel  underwent a failed retrieval procedure on September 15, 2015.  The filter could not be retrieved because the filter had tilted that the filter hook was inaccessible.

- Gregory Kesler (No. 01237) is listed as a "stress and anxiety" case by Cook.  But Mr. Kesler had two attempted retrievals (on November 4, 2014 and December 8, 2014). Both retrieval attempts failed because the filter was tilted.

- David Torre (No. 00963) is listed as a "fear of injury" case by Cook.  Mr. Torre has had an unsuccessful attempted removal procedure.  He has also been placed on long-term anticoagulation therapy because of the retained filter which is known to be thrombogenic or clot-producing.

- Wilma O'Banion (No. 00474) is listed as an "anxiety" case by Cook but has experienced filter fracture.

- Angelee Holmes (No. 03557) is listed as a "stress" only case by Cook.  Ms. Holmes has suffered filter movement and DVT subsequent to being implanted with a Cook filter.

- Deborah Foltz (No. 04673) was generically labeled a "product in place" case by Cook.  Ms. Foltz was told by her doctor that her filter was tilted and embedded and could not be removed because doing so would be dangerous to her health.

- Tanya Brandt-Beyer (No. 04425) was generically labeled a "product in place" case by Cook.  She was told by her cardiologitst that the risk of retrieval of her tilted filter outweighed the benefits of retrieval.

- Larry Conway (No. 02779) was identified as a "stress" case by Cook.  However, Mr. Conway's initial CT scan was subsequently re-read to reveal that 4 prongs of the filter had perforated the IVC.

- Charles Evans (No. 01604) is listed as a "stress and anxiety" case by Cook.  However, additional records received after Mr. Evan' profile sheet was produced reveal partial thrombosis that developed after the filter was implanted.

- Deborah Fissell (No. 04089) initially alleged "fear and anxiety" but subsequently provided additional records to her counsel showing that she had a post-filter implant DVT.

These cases, and others like them, reflect the realities that: (1) the course of filter injury is a progressive one, (2) case facts and allegations continue to evolve throughout the litigation process as investigation and discovery brings additional information to light, and (3) Cook's categorical "screening" system would cause worthy cases to be dismissed prior to a full and fair presentation of their merits.

The remaining cases Cook seeks to dismiss present a variety of conditions, including: lifetime anticoagulation (4 cases), blood clots (1 case), shortness of breath, numbness, or other physical sensations (12 cases), tilt (4 cases), and successful removals (12 cases).  The first four of these categories actually allege physical symptoms – blood clots, numbness, shortness of breath, and the need for anticoagulation.  It is inaccurate to categorize these cases as not alleging a bodily injury.   Additionally, tilt is an early stage complication in the progressive IV filter injury process.

### 3.     Cook's five examples of so-called "frivolous" cases allege cognizable injuries.

Cook specifically addresses five cases it presumably views as the most-favorable examples of baseless filings by Plaintiffs.  In truth, each of the cases Cook discusses involve cognizable injury claims.   Two of the five plaintiffs (Jaclyn Bravman and Ricky Myers) present failed retrieval cases (Plaintiff's Category 4).  Another of the five plaintiffs (Mark Cota) has been advised by his doctor that his filters is irretrievable (Plaintiffs' Category 4). Kimberly Champagne-Hernandez's endured a difficult retrieval procedure to remove her filter (Plaintiff's Category 4). And plaintiff Carl Jackson has been placed on anticoagulation due to the known thrombogenic or clot-producing nature of the filter that could not be retrieved from his body (Plaintiffs' Category 3). Simply stated, the five cases Cook chose to highlight as examples of baseless filings requiring screening actually demonstrate just the opposite:  that Plaintiffs have made meritorious filings, that the number of problematic cases is small, and that the existing procedural mechanisms for litigating injury claims Cook perceives to be questionable (e.g. discovery followed by motions to dismiss or for summary judgment) are the most appropriate tools for the job.

### D.     Existing Procedural Mechanisms Are Adequate To Deal With Cook's Concerns and Should Be Employed Instead of Cook's Unprecedented Screening Order.

It is telling that Cook does not cite a single case in support of its motion for a screening order.  Plaintiffs are unaware of any Court that has issued an order summarily deciding the individualize, fact-specific question of whether thousands of Plaintiff's injury allegations are sufficient as a matter of law – without discovery, filing of a dispositive motion, and the opportunity to make an evidentiary showing.

The closest analogy may be to Lone Pine orders – the controversial case management orders most commonly used to require plaintiffs to detail exposure to harmful substances in toxic tort cases.[4]  The Seventh Circuit has not addressed the proper role of *Lone Pine* orders, but district courts within the circuit have taken a restrictive view.  *Lone Pine* orders are viewed as extraordinary remedies that should be issued only in exceptional cases "after the defendant has made a clear showing of significant evidence calling into question the plaintiffs' ability" to produce evidence to establish the critical elements of causation and damages. *Hostetler v. Johnson Controls, Inc.,* 3:15-CV-226-JD-MGG, 2017 WL 359852, at *4 (N.D. Ind. Jan. 25, 2017); *McManaway v. KRB, Inc.*, 265 F.R.D. 384, 388 (S.D. Ind. 2009).   Furthermore, a *Lone Pine* order "should not be considered a substitute for or another species of a motion for summary judgment." *McManaway,* 265 F.R.D. at 388; *Hostetler,* 2017 WL 359852, at *4. Courts in the Seventh Circuit emphasize that "resorting to crafting and applying a *Lone Pine* order should only occur where existing procedural devices explicitly at the disposal of the parties by statute and federal rule have been exhausted or where they cannot accommodate the unique issues of the litigation. *Hostetler,* 2017 WL 359852, at *4, *citing, In re Digitek,* 264 F.R.D. at 259.

---

[4] The typical scenario where a Lone Pine order might be employed involves a toxic tort case where causation and exposure are contested issues.  That is a far different situation than is presented in this MDL.  There is no dispute that the Plaintiffs in this MDL have been implanted with Cook IVC filters and their injuries, if proven, are related to the Cook IVC filter.

Cook has not exhausted its procedural options for dealing with the cases it placed in the UNI category.   Cook could do any of the following: (1) it could enter a tolling agreement with Plaintiffs for the UNI cases – thereby dramatically reducing the number of new filings,[5]  (2) it could file motions to dismiss if it truly believes Plaintiffs' injury allegations to be deficient, (3) it could file motions for summary judgment if it believes Plaintiff's injury claims to be legally or factually deficient, and (4) it could pursue a representative group of "UNI" claims to trial and attempt to convince a jury that there were no injuries.  Any of these approaches are preferable to the entry of a categorical screening order that would prematurely bar Plaintiffs' claims without any consideration for their individual merits.

**E.     Plaintiffs' Suggested Approach to Injury Classifications.**

Cook's overbroad definition of UNI cases encompass the claims of numerous Plaintiffs with actual injuries.  Plaintiffs therefore suggest that the following classification system is more fitting:

- Category 1 – Successful First Removal Without Complication or Physical Injury Cases: Cases where the Plaintiffs' profile sheet and further follow-up shows that the filter was successfully removed on the first, routine, percutaneous retrieval attempt and no physical symptom or filter complication was alleged during the time the filter was in place or in connection with the retrieval process.

---

[5] The Argon IVC filter litigation reflects a reasonable approach to the issue of non-symptomatic injuries.  In the Pennsylvania coordinated pre-trial program for Option IVC filters, the court labeled cases that alleged injuries "not yet identified by CT scan or otherwise" as "implant only cases."  Case Management Order No. 5 Order Governing All Option Vena Cava Filter Litigation Cases Regarding Filter Restrictions, *In re Option Vena Cava Filter Litigation,* No 01600 (Phil. Ct. Cmmn. Pleas). The Court ordered that implant only cases were to be dismissed (1) *without prejudice,* and (2) with the agreement that the applicable statute of limitations had not commenced to run and would not commence to run until the plaintiff received a formal diagnosis of one of the cognizable injuries set forth in the Short Form Complaint for the litigation.  *Id.*

- <u>Category 2 – Mental Distress Cases</u>:  Cases where only non-physical injuries– such as worry, stress, or fear of future injury – have been alleged.[6]

- <u>Category 3 – Stenosis of the IVC and Anticoagulation Cases</u>:  (a) Cases where the plaintiff has alleged scarring or stenosis of the IVC caused by the Cook IVC filter, (b) Cases where the Plaintiff has alleged a need for coagulation on a permanent or long term basis because of an unretrieved or irretrievable filter.

- <u>Category 4 – Failed Retrieval or Irretrievability Cases</u>:  (a) Cases where the plaintiff has undergone one or more failed retrieval procedures (b) Cases where the Plaintiff has been advised that the Cook IVC filter is embedded, cannot be retrieved, or that the risk of retrieval outweighs to benefits of retrieval, (c) Cases where the Plaintiff's filter was retrieved but required the use of a non-routine, complicated retrieval method.

-  <u>Category 5 --  Non-Symptomatic Injury Cases</u>:  (a) Cases where the Plaintiff alleges non-symptomatic filter movement, migration, penetration, perforation, thrombosis, occlusion or the presence of a clot in the filter that has not produced physical symptoms or complications,

- <u>Category 6 – Symptomatic Injury Cases</u>: Cases where the Plaintiff alleges medical symptoms, conditions or complications caused by one or more of the following conditions: (a) IVC thrombotic occlusion – consisting of an occluding thrombus in the IVC after filter insertion( documented by imaging or autopsy) (b) filter embolization – consisting of post-deployment movement of the filter to a distant anatomic site, (c) filter fracture – consisting of any loss of a filters structural integrity documented by imaging or autopsy, (d) filter migration – consisting  of a change in filter position of more than 2 cm

---

[6] It should be noted that all Plaintiffs, including Plaintiffs who have not undergone an attempted removal, may still have warranty claims under applicable state laws.

(when compared with its deployed position) and as documented by imaging, (e) penetration or perforation – consisting of a filter strut or anchor extending 3 or more mm outside the wall of the IVC as demonstrated on imaging, (f) recurrent pulmonary embolism (PE) – consisting of PE that occurs after filter placement and is documented by pulmonary arteriography, cross sectional imaging, lung scan, or autopsy,  (g) DVT or other blood clot caused by the filter, (h)  infection, (i) bleed and (j) death.

It may be helpful to the Court to consider Plaintiffs' proposed injury categories (1 through 6) as they relate to Cook's categories (A through C).   Plaintiffs' category 6 (Symptomatic Injury Cases) is very similar in substance to Cook's category C (Bodily Injury Cases).   Both parties agree that these are cases requiring trials and this is the category from which the first pool of bellwether candidates were drawn. Plaintiffs' category 5 (Non-Symptomatic Injury Cases) is substantively akin to Cook's category B (DNI Cases).  Again, both parties agree that these are cases which should be included in the next pool of bellwether candidates.

Where Cook and Plaintiffs' categorizations diverge significantly is with regard to Cook's category A (No Injury Cases).  Plaintiff has broken the substance of Cook's category A out and expanded it into four categories:  category 1, (Successful First Removal Cases),  category 2 (Mental Distress Cases), category 3 (IVC Stenosis and Anticoagulation Cases), and category 4 (Failed Retrieval and Irretrievable Filter Cases).  It is Plaintiffs' position that *only* cases falling within category 1 may fairly be considered non-injury cases.[7]   With regard to categories 2-4, Plaintiffs suggest that cases falling in categories 2 and 3 be allowed continue in the litigation process with possible challenges by Cook based on applicable state law.  Meanwhile, Plaintiffs

---

[7] Based on the information that has been provided to Plaintiffs Lead Counsel to this point, of the 230 cases identified by Cook as UNI cases there exist approximately six (6) cases that may fall within Plaintiffs' injury category 1. Individual counsel for these Plaintiffs have been asked to review and update their clients' medical status.

propose that cases falling within the definition of Plaintiff's category 4 (Failed Retrieval and Irretrievable Filter cases) be included together with the Plaintiff's category 5/Cook's category B cases for purposes of creating the next pool of bellwether candidates.  Plaintiffs with failed retrieval and irretrievable filter cases represent one of the largest groups in this MDL.  The preparation and trial of cases in this category is necessary for the ultimate resolution of this MDL.

**F.     Plaintiffs' Proposal for Conducting Consolidated Bellwether Trials of Product-Specific Cases Falling Within Plaintiffs' Categories 4-5.**

Cook has proposed that cases from its category B (substantively the same as Plaintiffs Category 5) "should form the bulk of the initial group from which the next bellwethers will be selected." [Motion, p. 10].  Plaintiffs agree with that suggestion – with two caveats.  First, cases involving failed retrievals, complicated retrievals, or irretrievable filters (Plaintiffs category 4) should be included among the cases selected for the next bellwether pool.  Inclusion of Category 4 cases is prudent because they represent a substantial portion of the claims in this MDL and their adjudication is necessary for the ultimate resolution of the MDL.  Second, the goal of the next selection process should be to identify representative cases that are capable of efficient and cost-effective adjudication in consolidated trials.

**1.     Consolidation is necessary if Plaintiffs are to achieve a fair trial of their Category 4-5 claims in the face of Cook's superior resources.**

In the post-Vioxx era, "bellwether trials" have become the default method for MDL courts seeking to encourage a resolution to litigation as a whole.  Yet, the bellwether approach of establishing claim values through a small number of individual trials works best when the claims are all similar and the cases have sufficient economic value to warrant repeated single-plaintiff bellwether trials.  Individual bellwether trials are an impractical mechanism for achieving widespread resolution, however, in circumstances such as this, where the cases present a variety

of alleged injuries and the individual trials of lower-valued cases would allow Cook to bleed Plaintiffs of their limited resource as a tactic to force better settlement terms.

The better, and more fair, approach for handling cases falling within Plaintiffs Categories 4-5 is to create and implement a plan for consolidating limited trial groups composed of product-specific, geographically-compatible, trial-ready cases (both in this MDL and through suggestions of remand and transfers of venue). This approach allows the largest possible number of Plaintiffs to see their day in Court while simultaneously keeping the cost of litigation reasonable and moving the litigation as a whole forward toward a fair and expeditious resolution.

Each plaintiff who asserts a claim against Cook arising from the same IVC filter device is going to present a very similar liability case.  They will focus on the same central issues regarding defects in the product's design and inadequacies in the product's warnings. They will offer many of the same corporate documents obtained through discovery.  The same corporate witnesses can be expected to testify.  And the same experts will repeatedly be called to opine on product defects, general causation, and standards in the medical device industry.  The massive inefficiencies in this process were called out by Justice Starcher of the West Virginia Supreme Court in reference to the emergence of consolidated trials in asbestos litigation:

> Circuit courts started to try the cases one at a time, but quickly abandoned that route; trying each case would have required hundreds of years.  The same lawyers and the same witnesses were employed, using the same documents and evidentiary exhibits . . . Every trial involved weeks of testimony to try the same issues about the same defendants again and again and again.  Virtually everything pertaining to the defendants remained the same.  The only issue that changed concerned the plaintiffs.

*In re Tobacco Litigation*, 2018 W.Va. 301, 30708 (2005)(concurrence). The same is true in this litigation.  Requiring the parties to prepare and present the same evidence and the same experts

on the same issues in numerous individual cases would impose the very sort of burdens both the MDL process and Rule 42 aim to avoid.

Rule 42 gives district courts broad discretion to solve the problems of duplicative trials, cost-prohibitive litigation and inefficient use of judicial resources by consolidating cases.[8]  *See Arnold v. E. Air Lines, Inc.,*  681 F.3d 186, 192 (4th Cir. 1982);  *Henderson v. United States,* No. 6:07-cv-00009, 2008 WL 1711404, *5 (W.D.Va., April 11, 2008). Numerous courts have noted that "actions by different plaintiffs arising out of the same tort, such as a single accident or disaster *or the use of a common product*, frequently are ordered consolidated under Rule 42(a)." Wright & Miller, 9 Fed.Prac. & Proc. Civ. 2d § 2384 (emphasis added); *see also, In re Dow Corning Corp.,* 211 B.R. 545, 581-89 (Bankr.E.D.Mich. 1997)(consolidating cases on behalf of 588 breast implant plaintiffs);  *Todd-Stenberg v. Dalkon Shield Claimants Trust,* 48 Cal.App.4th 976 (1996)(consolidating for trial cases filed by women with injuries resulting from IUD); *Kershaw v. Sterling Drug, Inc.,* 415 F.2d 1009 (5thCir. 1969)(pharmaceutical product); *Cruickshank v. Clean Seas Co.,* 402 F.Supp.2d 328 (D.Mass. 2005)(defective paint product); *Hall v. Bavcock & Wilcox Co.*, 69 F.Supp.2d 176 (W.D.Pa. 1999)(radiation released from nuclear facility).

> ###   2.   **Plaintiffs' proposed process for multi-plaintiff bellwether trials of cases alleging Category 4-5 injuries.**

MDL Courts have regularly looked to consolidated bellwether trials when common issues, witnesses and evidence are shared across multiple cases.  *E.g., In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 349 (5th Cir. 2017)(consolidated bellwether trial of of five plaintiffs' claims involving hip implant); *In re Mentor Corp. Obtape Transobturator Sling Products Liab. Litig.,*

---

[8] Rule 42(a) provides:
> Consolidation.  If actions before the court involve a common question of law or fact, the court may (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay.

4:08MD-2004 (CDL), 2010 WL 797273, at *2 (M.D. Ga. Mar. 3, 2010) (consolidation of four plaintiffs' claims involving pelvic mesh device for  bellwether trial);  *Campbell v. Boston Sci. Corp.,* 882 F.3d 70, 73 (4th Cir. 2018)(affirming judgment for four plaintiffs in consolidated bellwether trial of claims involving pelvic mesh device); *In Re: Depuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liability Litigation,* 2017 WL 9807463, at *1 (N.D. Tex. Sept. 18, 2017)(setting forth the history of consolidated bellwether trial proceedings used throughout the Pinnacle hip implant MDL proceeding).  These courts recognize that adjudicating multiple cases in consolidated actions is a more efficient and cost-effective way to bring cases to trial.  It also provides more useful information regarding case viability and case valuations than can be obtained by trying a single case.  *See Canterbury, et al v. Boston Scientific Corp. Pelvic Repair System Prods. Liab. Litig.,* 2:12-cv-0863, MDL No. 2326  (PTO #78)(Order Consolidating Above Cases for Trial on All Issues)(S.D.W.Va. Feb 19, 2014), *Eghnayem, et al v. Boston Scientific Corp. Pelvic Repair System Prods. Liab. Litig.,* 2:13-cv-07965 (PTO # 91)(Order Consolidating Above Cases for Trial on All Issues); *Mullins, et al. v. Ethicon, Inc.* 2:12-cv-02952 (PTO 184)( Order Consolidating above Cases for Trial on Issue of Design Defect).For all of these reasons, Plaintiffs propose that the following process be used to establish two device-specific pools of bellwether candidates whose cases will be appropriate for consolidated trials.

Step 1: Each Party Nominates 24 Cases for Bellwether Consideration: Using the information provided on Plaintiffs' profile sheets, Cook and Plaintiffs will each nominate twenty four (24) cases alleging injuries falling within Plaintiffs' Categories 4 and/or 5.   The 24 cases nominated by each party shall consist of 12 Tulip cases and 12 Celect cases.

Plaintiffs propose that the parties determine the three states from which the largest number of cases originated.   Understanding that the ultimate goal of the selection process is to

conduct two consolidated multi-plaintiff trials (one of Tulip claims and one of Celect claims), the parties are encouraged to nominate representative cases from these states.   Doing so will help to minimize variances in applicable state law and increase the likelihood that the nominated case will be selected for trial.   Parties are also encouraged to nominate cases that were direct-filed in this Court by Indiana Plaintiffs.   Direct-filed cases by Indiana Plaintiffs may be tried by this Court without the need for further consent from the parties.

Step 2: Exchange of Medical Records for the 48 Bellwether Nominees:  The parties will voluntarily exchange all discoverable medical records and medical imaging in their respective possession for each of the 48 cases nominated for the bellwether selection pool.

Step 3: Lexecon Waivers:   At the time that medical records are exchanged, Plaintiffs will provide notice if any bellwether nominee refuses to waive his or her venue rights recognized under Lexecon. Should any party (Plaintiffs or Cook) refuse to waive Lexecon in a case, the opposing side will receive an additional strike for each case where Lexecon was not waived.

Step 4:  Strikes:  After review of the medical records, each side will be permitted to strike two (2)  cases from the Tulip pool and two (2) cases from the Celect Pool.    Absent any issues with Lexecon waivers, there will be a pool of twenty Tulip cases and a pool of twenty Celect cases at the conclusion of step 3.

Step 5: Selection of Cases for Consolidated Bellwether Trials:   Each party shall be permitted to submit a brief addressing the appropriateness of the remaining, unstricken cases for trial selection.  Based on the briefing and any oral argument that may be requested by the Court, the Court will then select eight (8) representative Tulip cases for a consolidated bellwether trial. The Court will also choose eight (8) representative Celect cases for a separate consolidated bellwether trial.

Step 6: Discovery and Trial Preparations:  The sixteen cases (8 Tulip cases and 8 Celect cases) will begin expedited discovery and pre-trial proceedings using case-specific schedules, deadlines and trial dates as established by the Court.

## III.
## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court deny Cook's Motion for Screening Order and Bellwether Selection Plan and adopt the Bellwether Selection Plan set forth by Plaintiffs.   Plaintiffs further request all other relief that the Court deems just and proper.

Dated: July 19, 2018.

Respectfully submitted,

*/s/ Joseph N. Williams_____*
Joseph N. Williams, Atty. No. 25874-49
Riley Williams & Piatt, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com

*Liaison Counsel to Plaintiffs' Steering Committee
and on behalf of Plaintiffs' Steering Committee*

*/s/ Ben C. Martin_____*
Ben C. Martin, Esq.
The Law Office of Ben C. Martin
3710 Rawlin Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 74407590
Email: bmartin@bencmartin.com

*/s/ Michael W. Heaviside*
Michael W. Heaviside, Esq.
Heaviside Reed Zaic, A Law Corporation
910 17th Street NW, Suite 800
Washington, DC 20006
Telephone: (202) 233-1993
Email: mheaviside@hrzlaw.com


*/s/ David P. Matthews*
David P. Matthews, Esq.
Matthew and Associates
2509 Sackett St.
Houston, TX 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
Email: dmatthews@thematthewslawfirm.com

*Plaintiffs' Co-Lead Counsel*


## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.


*/s/ Ben C. Martin*
Ben C. Martin