IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to:

>*Brand v. Cook Medical, Inc. et al.,*
>Case No. 1:14-cv-06018-RLY-TAB

**COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO EXCLUDE EXPERT OPINIONS OF DR. REBECCA BETENSKY**

The Cook Defendants move the Court under Rules 403 and 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the expert opinions of Dr. Rebecca Betensky concerning: 1) her comparison of perforation rates for Celect and Tulip filters over certain time periods, and 2) her opinion that Plaintiff's expert, a former Cook employee, and the 18 doctors who conducted the "OUS study" counted the number of perforations in the study in a statistically significantly different way.  The first opinion is based on unreliable information and would mislead the jury into a conclusion that Dr. Betensky expressly disavows.  The second opinion is useless, as it is obvious that Plaintiff's expert, a former Cook employee, and doctors applying a different definition of perforation will count the number of perforations differently (*i.e.*, the opinion would not help the jury).

**I.      Dr. Betensky's Opinions**

Dr. Rebecca Betensky is a Professor of Biostatistics at Harvard.  Her work in this case consisted mainly of calculating "odds ratios" ("ORs") for various time periods by comparing the

incidence of perforation by Celect filters to the incidence of perforation by Tulip filters. Expert Report of Rebecca Betensky, Ph.D., dated 4/30/2018, pp. 1-9 ("Betensky Rept."), attached as **Exhibit A**. An odds ratio is nothing more than the ratio of the incidence of event A to the incidence of event B. For example, if the incidence of event A is 0.3% and the incidence of event B is 0.1%, the odds ratio is 3 (*i.e.*, 0.3 divided by 0.1). Here, Dr. Betensky simply took the incidence of Celect perforations over a given time period as reflected in Cook's records and compared it to the incidence of Tulip perforations over the same time period. Dr. Betensky did this by looking at portions of Cook's complaint records that Brand's counsel had given her, and Cook's sales records for the two devices in question, and did simple division to produce ratios. She also used a computer program to calculate "p values" and "confidence intervals" (basic statistical measures of validity of the ratios) for each of the ratios. Dr. Betensky concluded that the odds ratio of Celect perforations to Tulip perforations is greater than 1 in the time periods she considered—*i.e.*, the incident rates for Celect are higher than for Tulip. Betensky Rept. at pp. 3-8.)

An odds ratio standing alone <u>might</u> demonstrate <u>correlation</u>, but it does not demonstrate <u>causation</u>, and it is crucial to remember that "correlation is not the equivalent of <u>causation</u>." *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 677 (7th Cir. 2011) (emphasis added); *see also Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 33 (1st Cir. 2012) ("Correlation is not causation . . . ."). For example, the incidence of cancer in City A may be 4% and the incidence in City B may be 2% (*i.e.*, the odds ratio is 2), but that does not necessarily mean that something about City A is causing the disparity. Excerpts from Deposition of Rebecca Betensky, Ph.D., dated 4/21/2017, at 182:19-183:5 ("Betensky Dep.") attached as **Exhibit B**. To establish causation (also called "causality"), you would need to rule out other potential causes of the

disparity in cancer rates (statisticians call these alternative causes "confounders"). *Id.* at 183:6-185:13. Perhaps City A has a higher percentage of people who have a greater genetic predisposition to cancer than those in City B, or eat a diet of rich, fatty foods with no fruits or vegetables than those in City B. If you cannot control for (*i.e.*, rule out) those possibilities, you cannot claim that living in City A causes a higher risk of developing cancer. *Id.*

Dr. Betensky acknowledged that she did not consider any factors (confounders) that might have affected the disparity between the incidence rates of perforation between Celect and Tulip, such as physician experience, patient age, medical indications for filter use, contraindications for anticoagulant drugs, surgeon-related factors, and patient-specific factors. Betensky Dep. at 202:9-203:5. And because of that, she candidly admitted at her deposition that the odds ratios she had calculated <u>did not and could not establish causation</u>—*i.e.*, could not establish that something about the Celect <u>caused</u> more perforations than the Tulip—and that it would be a misuse of her data to suggest otherwise:

> Q. If you were trying to establish causality, is the method that you used in your report - - is that the way you would choose to do it?
>
> A. <u>I can't establish causality with these data.</u>
>
> Q. Okay. If somebody were to use the results of your study, the results of your analysis, and say this establishes causality, would that be misusing your conclusions in your analysis?
> \*\*\*
> A. I think that's what I just said. . . .

*Id.* at 204:21-205:8 (emphasis added).

In addition to calculating odds ratios, Dr. Betensky was asked to look at some data generated in the "OUS study" and determine how many Celect perforations various people counted at various times using four different definitions of perforation, and to compare those counts. Betensky Rept. at pp. 11-12. To do this, Dr. Betensky relied on data provided to her by

3

one of Plaintiff's other experts. Betensky Rept. at p. 10. Unsurprisingly, she found that the "perforation counts" differed depending on how one defined perforation. Betensky Rept. at p. 11.

Dr. Betensky also compared the number of Celect perforations in the OUS study that three different people or groups counted: 1) Plaintiff's expert (Dr. Gordon), 2) a former Cook employee (Dr. Timperman), and 3) the researchers who conducted the OUS study. Betensky Rept. at p. 12. She found—again, unsurprisingly—that the likelihood of agreement between the various assessors depended on the definition of perforation applied, and that Plaintiff's expert counted more perforations than Dr. Timperman or the OUS researchers. *Id.* at pp. 12-13.

## II. The Court should exclude Dr. Betensky's opinions comparing the odds ratios of perforation between Celect and Tulip Filters.

Dr. Betensky's opinions regarding the odds ratios for perforations in Celect and Tulip filters are not admissible because her methodology is not reliable, as it depends on incomplete data hand-picked by Plaintiff's attorneys. In addition, Dr. Betensky's opinions regarding odds ratios would likely mislead the jury into reaching a conclusion that Dr. Betensky herself admitted her calculations <u>cannot support</u>. The only reason for Plaintiff to offer Dr. Betensky's testimony about the odds ratios would be to invite the jury to conclude that the Celect has a higher incidence of perforation than the Tulip <u>because of its design</u>. But Dr. Betensky specifically testified that her odds ratios <u>cannot</u> be used to reach that conclusion. Thus, the Court should exclude Dr. Betensky's testimony concerning odds ratios comparing the incidence of occurrence of perforation in Celect and Tulip filters.

### A. Dr. Betensky's odds-ratio opinion is unreliable because it relies on unverified materials selected by Plaintiff's counsel.

4

Dr. Betensky's odds-ratio opinions are unreliable because the data underlying her opinions was cherry-picked by Plaintiff's counsel, and Dr. Betensky did nothing to independently verify the data before doing her analysis. Dr. Betensky acknowledged in her deposition that Plaintiff's attorneys provided all the materials she relied on. Betensky Dep. at 54:16-20. Although Plaintiff's attorneys had access to Cook's entire database of over 2700 case files, they elected to give Dr. Betensky only pieces of that data, and she had no clue what she was missing:

> Q. Now you didn't review Cook's entire complaint database, correct?
>
> A. Correct.
>
> Q. Okay. You were given pieces of it, correct?
> ***
> A. Actually, I can't even speak to what I was given versus what I wasn't given. I was certainly given some pieces of it. I don't know what that represents.

*Id.* at 55:5-14. Such hand-picked data—particularly when the picking was done by an interested party—undermines any finding that the analysis of that data is reliable. *See, e.g., Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp.2d 870, 889 (E.D. Wis. 2010) (expert's cherry-picking of data provided "another strong reason to conclude that the witness utilized an unreliable methodology"); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F.Supp.3d 449, 461 (E.D. Pa. 2014) ("'Cherry-picking' is always a concern . . . . The fact that [the expert's] conclusions are drawn from trends she observed in a self-selected subset of [information], not the totality of the epidemiological evidence, further underscores her problematic methodology.").

In addition, Dr. Betensky did nothing to verify that the reports of perforations—the very core of her testimony—actually involved *real* perforations:

5

> Q.      … [T]hroughout your analysis you never did a separate analysis of whether a case that Cook reported as being a puncture or a penetration or a perforation really was a puncture, penetration, or perforation, correct?
>
> A.      No.  I took their designation as given.

Betensky Dep. at 138:15-21.

Many courts, including this one, have excluded expert opinion testimony as unreliable when the expert's opinion comes from data provided by counsel that the expert failed to independently verify. *See, e.g.*, *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F.Supp.2d 1031, 1039, 1049 (N.D. Ind. 2013) (adopting Magistrate Judge's recommendation that expert's statistical analysis was unreliable because she relied on data provided to her by a party and "did nothing to independently verify the reliability of this information before she used it in her calculations"); *Higgins v. Koch Dev. Corp.*, No. 3:11-CV-81-RLY-WGH, 2013 WL 6238650, at *5 (S.D. Ind. Dec. 3, 2013) (expert lacked sufficient foundation to testify because he failed to "independently verify" medication cost data provided to him by counsel); *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-CV-00341-SEB-DML, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ("when an expert relies upon information given to him by a party or counsel, he must independently verify that information before utilizing it in his calculations").

> B.      **Dr. Betensky's testimony about odds ratios for Celect and Tulip perforations would mislead rather than assist the jury.**

The Court should also exclude Dr. Betensky's testimony about the odds ratios between Celect and Tulip perforations because the testimony would mislead the jury by suggesting that the odds ratios establish causation—*i.e.*, that the difference in odds ratios is caused <u>by the different designs of the filters</u>—the very conclusion that Dr. Betensky testified her odds ratios do <u>not</u> support.

1. **Dr. Betensky admitted that she cannot establish causation through her calculation of odds ratios because she cannot account for confounding factors.**

As Cook pointed out in Section I, Dr. Betensky admitted in her deposition that her analysis of the case reports provided by Plaintiff's counsel did not permit her to establish causation—*i.e.*, that any difference in the incidence of perforation of Celect filters and Tulip filters is due to the filters' designs—and that anyone using her data to establish causation would be misusing the data.  Betensky Dep. at 204:21-205:8.  Dr. Betensky even acknowledged that she would not be willing to state in front of a group of peers that her calculations demonstrated that the design of the Celect caused a higher incidence of perforation than the design of the Tulip.  *Id.* at 190:22-191:7.  This unwillingness to subject any causation opinion to peer scrutiny confirms her stated view that such an opinion would not represent the "good science" needed to support an expert's conclusion.  *See, e.g.*, *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 n.5 (7th Cir. 1993) ("submission to the scrutiny of the scientific community is a component of 'good science'") (quoting *Daubert*, 509 U.S. at 593).

One of the primary reasons that Dr. Betensky's data does not permit her to establish causation is that the data provided by Plaintiff's attorneys is insufficient for her to identify or account for confounding factors that might affect the number of perforations for Celect or Tulip filters, and thus alter the odds ratios between them.  Dr. Betensky admitted that her analysis does not account or control for such factors as physician experience, patient age, medical indications for filter use, contraindications for anticoagulant drugs, hospital- and surgeon-related factors, and patient-specific factors, to name a few.  Betensky Dep. at 194:15-195:3; 202:9-203:5.  The case reports and adverse-event reports Plaintiff's attorneys provided to Dr. Betensky as data sources

simply do not contain the information needed to control for confounders, precluding her from establishing causation.

This failure to account for alternative causes—confounders—is one of the primary reasons courts consider causation opinions based on case reports like Dr. Betensky's here to be unreliable. *See, e.g.*, *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989–90 (8th Cir. 2001) ("Case reports make little attempt to screen out alternative causes for a patient's condition. They frequently lack analysis. And they often omit relevant facts about the patient's condition. Hence, causal attribution based on case studies must be regarded with caution." (internal punctuation omitted)); *In re Mirena IUD Prod. Liab. Litig.*, 169 F.Supp.3d 396, 451 (S.D.N.Y. 2016) ("Case reports are generally disfavored by courts as evidence of causation because they merely describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; they do not isolate and exclude potentially alternative causes; and they do not investigate or explain the mechanism of causation." (internal quotes and punctuation omitted)); *Casey v. Ohio Med. Prod.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) (similar).

### 2. Testimony about the odds ratios will invite the jury to infer causation, which Dr. Betensky admitted would be improper, and therefore would not help the jury as Rule 702 requires.

Given Dr. Betensky's admission that her calculations do not permit her to conclude causation, Cook assumes that Dr. Betensky will stay true to her word and will not offer any opinion about causation at trial. But that is just the problem: even though Dr. Betensky will not <u>directly</u> testify that Celect's different design causes a different incidence of perforation, the only possible purpose for Plaintiffs to offer Dr. Betensky's testimony about the odds ratios is to prompt the jurors to reach that improper conclusion <u>indirectly</u> on their own. For example,

testimony that the odds ratio of reported Celect perforations to reported Tulip perforations for a particular period of time is 9.5 will unavoidably suggest to a juror that something inherent in the design of the Celect filter <u>causes</u> it to perforate 9.5 times more often than the Tulip filter. This inference is certainly a natural layperson's reaction to such a fact—indeed, it is likely most <u>lawyers'</u> reaction to the same fact. But it is a <u>false</u> inference, as Dr. Betensky herself testified. Betensky Dep. at 204:21-205:8.

Plaintiffs clearly <u>intend</u> for jurors to draw this false inference from Dr. Betensky's testimony concerning the odds ratios. Indeed, there is really no reason to offer the testimony <u>other than</u> to incorrectly imply that the Celect design is more likely than the Tulip design to cause perforations. The relative incidence of adverse events between the two filters is not even relevant unless the differential is <u>caused by</u> the design of the Celect filter. Thus, Dr. Betensky's testimony is relevant—that is, the testimony tends to make a fact of consequence to the action more likely—<u>only</u> if jurors misinterpret the testimony as evidence of causation. That is obviously not helpful to the jury. Fed. R. Evid. 702; *Ervin*, 492 F.3d at 904 (for expert testimony to be admissible it "must assist the trier of fact to understand the evidence or to determine a fact in issue").

### 3. The probative value of Dr. Betensky's testimony about the odds ratios is greatly outweighed by its unfairly prejudicial impact.

Even if Dr. Betensky's opinions on odds ratios passed the Rule 702 test, their probative value is greatly outweighed by their unfairly prejudicial impact, and therefore should be excluded under Rule 403. *United States v. Sinclair*, 74 F.3d 753, 757–58 (7th Cir. 1996) (*Daubert* "does not relieve courts of the obligation to evaluate expert testimony under Rule 403").

9

As discussed above, Dr. Betensky's testimony about the odds ratios has probative value only if it can be used to infer that the design of the Celect causes more perforations. But that would be an improper inference, and where the only probative value is an improper inference, there is no probative value at all.

On the other side of the Rule 403 scale, permitting Dr. Betensky to testify about odds ratios presents real and serious risks of unfair prejudice. First, for the reasons discussed above, her testimony would almost certainly mislead or at least confuse the jury on the issue of causation. Dr. Betensky's analysis shows at most an association or correlation, and courts have excluded evidence that tries to imply causation based on mere correlation or association. *See, e.g.*, *Davis*, 651 F.3d at 677 (noting that "correlation is not the equivalent of causation" and holding that without more than a temporal connection between two events, "a rational jury would be hard-pressed to connect the two"); *Samaan*, 670 F.3d at 33-34 (excluding expert where there is "too great a divide between" odds ratios and the causation conclusions an expert tried to wring from the odds ratios).

Dr. Betensky's credentials as a biostatistician increase the risk that the jury will improperly interpret her testimony as supporting causation even if Dr. Betensky does not expressly say it. As a former judge of this Court has observed:

> To the extent that such an opinion might be minimally probative, its prejudicial effect—reliance on the expert's stature instead of intrinsic probative value of evidence—will outweigh the minimal probative effect the evidence may have. In a highly technical case like this, where a lay trier of fact cannot possibly determine the precise etiology of the injury without guidance from expert opinions, there is a risk that the jury would make an irrational finding of causation based upon the siren-like allure of opinions stated by highly qualified experts.

*Porter v. Whitehall Labs. Inc.*, 791 F. Supp. 1335, 1345 (S.D. Ind. 1992), *aff'd,* 9 F.3d 607 (7th Cir. 1993) (internal reference omitted). The same concerns apply here. Like the expert in

10

*Porter*, the limited probative value attached to Dr. Betensky's opinions is substantially outweighed by the risk that the jury will be misled by her credentials and make an irrational finding of causation.

Two other features of Dr. Betensky's testimony on this score threaten to confuse and mislead the jury. First, the odds ratios that Dr. Betensky calculates, ranging from 9.48 to 25, create the impression of a significant number of actual, real-world Celect perforations. But the odds ratios disguise the real number of perforations, which is extraordinarily tiny. Take Dr. Betensky's odds ratio of 9.48, for example. *See* Betensky Rpt. at pp. 5, 7. Although she correctly concludes that 9.48 times more perforations were reported for the Celect than for the Tulip for a particular time period, the actual <u>number</u> of Celect perforations was <u>17</u>, and the actual <u>incidence</u> of Celect perforations was 0.088% (17 out of 19,322 sales). This <u>is less</u> than <u>one in a thousand</u>. The ratios are thus seriously misleading, and plainly seek to generate jury alarm over a miniscule number of actual events. It is a fact that an American is more than three times more likely to be killed by lightning than to die in a flood, but both are highly unlikely (0.00062% versus 0.00020%), and saying that you are three times more likely to be killed by lightning than a flood obscures those extremely low odds.[1]

These are not flaws or false impressions that can be cured through mere cross examination. All of these issues, and especially the almost certain false inference of causation, are fundamental problems that undermine the proper role of the expert, and they can be addressed only through exclusion of the testimony.

---

[1] https://www.iii.org/fact-statistic/facts-statistics-mortality-risk (last visited July 17, 2018).

**III.     The Court should exclude Dr. Betensky's opinions concerning comparisons of frequencies of perforations as assessed by different people using different definitions of perforation because it will not help the jury understand anything that is not already obvious.**

Dr. Betensky's opinion that Plaintiff's expert counted perforations in the OUS study differently than Cook's former employee and the doctors who conducted the study is singularly unhelpful because it is obvious.

All of the people whom Dr. Betensky compared applied different definitions of perforation, so it is unremarkable that they would count perforations differently.  The OUS study protocol, which the OUS investigators were required to follow, defined perforation as the "[p]rotrusion of filter struts through the wall of the IVC causing hemorrhage or hematoma." OUS Study Protocol at p. 26, attached as **Exhibit C**.  Dr. Gordon, on the other hand, used a more liberal approach when he did his assessment, and he included three other definitions.  *See* Betensky Rept. at p. 10.  It is obvious that people applying different definitions would reach different results; the jury does not need Dr. Betensky to tell them that.

And Dr. Timperman's measurements present an even bigger problem.  He was asked to "measure" perforation during his deposition by using <u>handwritten marks made by Plaintiff's counsel on a business card</u>.  *See, e.g.*, Excerpts from Deposition of Paul Timperman, M.D., dated 5/3/2017, at 309:14-311:2, attached as **Exhibit D**.  Indeed, the Court ruled in the *Hill* case that the plaintiff there could not put Dr. Timperman's assessment of the OUS study into evidence based largely on the crude measurement that he was asked to make.  *See* Status Conference Trans., Sept. 14, 2017, at 26:8-24, attached as **Exhibit E**.  It is hardly a reliable measure of perforation, and thus hardly grist for an expert's opinion.  And Plaintiff here cannot skirt the Court's ruling in *Hill* by attempting to get Dr. Timperman's measurements indirectly into evidence through Dr. Betensky.  Her opinions do nothing to change the unreliable nature of Dr.

12

Timperman's measurements; she merely accepts them as they are. Any opinion grounded on Dr. Timperman's measurements is therefore equally unreliable and should be barred from trial. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) (district court did not abuse its discretion by excluding expert testimony that was based on the unreliable methodology of another expert); *Fuesting v. Zimmer, Inc.*, 362 Fed.Appx. 560, 564 (7th Cir. 2010) (upholding exclusion of expert testimony that relied on the testimony of another expert that had been excluded).

Dr. Betensky's determination that the differences between Drs. Gordon and Timperman and the OUS researchers is statistically significant adds nothing to the analysis. One would expect the counts of three people and groups using such disparate definitions and measurement methods to be nothing but statistically significant. A jury certainly does not require expert testimony to understand that the difference between 98% perforations and 0% perforations is statistically significant. *See* Betensky Rept. at pp. 11-13. Thus, her opinion in that regard is not helpful under Rule 702.

Finally, it almost goes without saying that Plaintiff's expert, a former employee of the defendant, and the OUS researchers will reach different counts of "perforation." That is neither surprising nor helpful, and thus not the proper subject of expert testimony under Rule 702.

## CONCLUSION

The Court should bar from trial the testimony of Plaintiffs' expert Dr. Rebecca Betensky concerning her calculation of odds ratios of incidence of perforation between Celect and Tulip filters, as well as her opinions regarding differences in counts of perforation in the OUS study.

13

Respectfully submitted,

Dated:  July 20, 2018

/s/ Andrea Roberts Pierson
Andrea Roberts Pierson (# 18435-49)
Victoria R. Calhoon (# 28492-49)
Anna C. Rutigliano (# 32743-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
andrea.pierson@faegrebd.com
victoria.calhoon@faegrebd.com
anna.rutigliano@faegrebd.com

Charles Webber (# 215247)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-8719
Facsimile: (612) 766-1600
chuck.webber@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, a copy of the foregoing **COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF DR. REBECCA BETENSKY** was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system. Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

/s/ Andrea Roberts Pierson

US.118942478.02