UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

_____

IN RE: COOK MEDICAL, INC. IVC FILTERS           Case No. 1:14-ml-2570-RLY-TAB
MARKETING, SALES PRACTICES AND              MDL No. 2570
PRODUCTS LIABILITY LITIGATION

_____

This Document Relates to Plaintiff

      *Tonya Brand*
      No. 1:14-cv-06018-RLY-TAB

_____

**COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO
EXCLUDE THE TESTIMONY OF DR. HARLAN KRUMHOLZ**

**INTRODUCTION**

Dr. Krumholz is health care researcher and cardiologist. Cook does not dispute that he is qualified to testify about health care research and cardiology. That said, Dr. Krumholz is not an engineer, pathologist, vascular surgeon, interventional radiologist, or interventional cardiologist. He has never designed an IVC filter; he has never placed an IVC filter; he has never retrieved and IVC filter; and he has never managed a patient with any type of complication from an IVC filter. Despite his limited experience with IVC filters, Dr. Krumholz offers a 179-page expert report and a 5-page rebuttal report filled with various opinions about IVC filters, based in critical part on his review of documents about subjects for which he has no expertise. He offers extensive opinions on all sorts of topics, many of which are outside the scope of his expertise as a health care researcher and cardiologist. Rather than proffer Dr. Krumholz within his areas of expertise, Plaintiff overreaches and attempts to make Dr. Krumholz the mouthpiece for her entire case.

It gets worse: In his own overreach, Dr. Krumholz abandons the standards and methods that govern his profession to give conclusions inconsistent with his own published work. Methodologic problems plague Dr. Krumholz's opinions.  He relies on arbitrary classifications, and he waffles back and forth between different standards of proof he applies to demonstrate efficacy, safety, causation, and comparative effectiveness.  Not surprisingly, this inconsistent approach produces contradictory and unreliable results, which will confuse and mislead the jury. Indeed, inconsistency and logical defects run rampant throughout his report and deposition.  At one point he suggests, for instance, that Cook should have included adverse event rates in the Celect IFU.  A conundrum indeed because he also says that reliable adverse event rates do not exist.  For these reasons and as discussed further, Dr. Krumholz's expert opinions fail to meet the *Daubert* standard.  Consequently, the Court should bar the testimony and opinions of Dr. Krumholz from trial.[1]

## SUMMARY OF DR. KRUMHOLZ'S OPINIONS

Although Dr. Krumholz offers opinions on multiple topics, much of his report is devoted to an assessment of the safety and efficacy of the Celect filter, and whether the risk-to-benefit profile of the Celect is favorable or unfavorable.  He summarizes his main, overarching opinion towards the end of his report, stating:

> Overall, the less confident we are about benefits of a health intervention, the more heavily we have to weigh on safety.  With respect to Celect IVC filters, there is no clear evidence of benefit but there is clear evidence of harm.  And comparative, all evidence points to a greater harm compared with alternatives.  As such, the device has an unfavorable risk to benefit profile.

---

[1] Given his background in epidemiology, Dr. Krumholz is qualified to address the literature concerning IVC filters, which includes articles written and published by him.  However, the opinions he offers in this lawsuit do not stop where his qualifications end, nor honor the limits inherent in the literature he cites. Instead, his opinions are based upon his excursion far beyond his own expertise, depend on his use of information he bears no expert qualifications to address, and stem from his adoption of methods contradictory to those inherent in his profession. For this reason, Cook moves to exclude his opinions in their entirety.  If this motion is not granted in full, Cook asks that this Court consider the separate arguments made herein.

Expert Report of Harlan Krumholz, MD, SM, dated April 30, 2018, at 141 ("Krumholz Rpt"), attached as **Exhibit A**.

For purposes of simplicity and brevity, Dr. Krumholz's testimony can be divided into seven main categories:

1. Opinions on the safety and efficacy of filters, and the Celect in particular;

2. Summaries of internal company documents that are intended to suggest that Cook knew about the issues that Dr. Krumholz raises concerning the safety and efficacy of the Celect filter;

3. Comparative effectiveness opinions and opinions about whether the design of the Celect causes it to be less safe than any other IVC filter;

4. Opinions about FDA regulations and practice;

5. Opinions about the OUS study;

6. Opinions about the Celect IFU; and

7. Opinions concerning the cause of Mrs. Brand's alleged injuries.

Although it is impossible to fully summarize all the opinions expressed in Dr. Krumholz's 179-page report and 5-page rebuttal report in the limited space available for this motion, all of his opinions fall into one of these seven categories—and there are *Daubert* problems with each of them.

## STANDARD FOR EXPERT TESTIMONY

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, the district court, as the "gatekeeper," must make the following four inquires before admitting expert testimony:

> *First*, the expert must be qualified by knowledge, skill, experience, training, or education; *second*, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; *third*, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and *fourth*, the expert must have reliably applied the principles and methods to the facts of the case.

*Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013) (emphasis added).  As the proponent of Dr. Krumholz's testimony, Plaintiff has the burden of demonstrating admissibility.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

## ARGUMENT

I.   **DR. KRUMHOLZ'S RECITATION AND INTERPRETATION OF INTERNAL COMPANY DOCUMENTS IS IMPROPER EXPERT TESTIMONY AND WILL NOT HELP THE JURY DETERMINE ANY FACT AT ISSUE.**

As noted above, a significant chunk of Dr. Krumholz's expert report is simply a recitation of Cook's internal documents.[2]  This testimony is unhelpful and prejudicial, especially where he brings no special skill, knowledge, or education to add to the jury's ability to understand such evidence.  Consequently, the Court should bar Dr. Krumholz's narrative testimony.

   A.   **Dr. Krumholz may not simply offer a factual narrative based upon record evidence.**

Courts across jurisdictions have held that an expert is not permitted to merely summarize, read from, quote, or otherwise regurgitate record evidence. *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (excluding testimony of FDA expert who offered narrative history of product and FDA submissions).[3]  Rather, when an expert bases testimony on

---

[2] The bulk of the following pages of Dr. Krumholz's report are mere recitations and summaries of Cook's internal documents: 11-18, 24-26, 71-77, 105-115, 119-121, and 126-138.

[3] *See also Ocasio v. C.R. Bard, Inc.*, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015) (expert's testimony that summarized defendant's documents was improper; "such testimony must be excluded because an expert cannot be presented to the jury for the purpose of constructing a factual narrative based upon record evidence" (internal quotations emitted)); *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1330 (M.D. Fla. March 30, 2015) (excluding expert's opinions that offered "plaintiff-slanted summaries of [manufacturer] documents," stating that it would "not permit [the expert] to testify to 'simple inferences drawn from uncomplicated facts that serve only to buttress plaintiff's theory of the case'"); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 967 (D. Minn. Aug. 19, 2009)

4

record evidence, the testimony must be limited to explaining the regulatory, scientific, or technical aspects of the evidence that would not otherwise be apparent to a lay jury. *See, e.g.*, *Baldonado v. Wyeth*, 2012 WL 1802066, at *4 (N.D. Ill. May 17, 2012). In *Baldonado*, for example, the court held that "allowing an expert to provide summary testimony 'based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself.'" *Id.* The court further held that even if the expert relied on his expertise to wade through the relevant documents, the vast majority of his testimony amounted to a summary and statement of the expert's "advocacy-based interpretation of documents in the record," and such testimony was therefore improper. *Id.*; *see also U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403.").

Likewise, in *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 192, the court excluded expert opinions that merely offered a "narrative history" of the drug at issue. The court held that to the extent such evidence is admissible, it should be presented to the jury directly, and that the expert's commentary on any documents and exhibits should be "limited to explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge." *Id.* The court further held that the expert would "not be permitted to merely read, selectively quote from, or 'regurgitate' the evidence." *Id.* This Court should reach the same conclusion with respect to the narrative testimony of Dr. Krumholz.

---

("The question is . . . whether the jury could interpret the documents that [the expert] highlights in her report without the assistance of an expert."); *In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 2015 WL 5145546, at *17 (N.D. Ill. Aug. 31, 2015) (excluding expert testimony which "simply summarize[d] internal [manufacturer] documents regarding post-market surveillance").

Dr. Krumholz's proffered testimony is replete with his own "advocacy-based interpretation of [Cook] documents in the record." *Baldano, supra*.  While he claims a right to narrate Cook documents under the guise of expertise, this claim presents the central problem: Dr. Krumholz lacks expertise in the underlying fields of study that these internal Cook documents substantively address.  He admits this, then seeks to dismiss the importance of this gap by essentially saying, "the documents speak for themselves."  For example, he says: "I'm not an engineer but I could read what they were saying . . . .  I'm not a pathologist but I can read what they were saying and I can read the result."  Deposition of Harlan Krumholz, MD, SM, dated June 28, 2018, at 269:18-21 in *Brand* ("Krumholz June Dep."), attached as **Exhibit B**.  He purports to offer only "common sense expertise" about the documents.  *Id*, at 268:11-12**.** ("So that's the kind of expertise I bring to this.  I guess it was the common sense expertise . . . .").  But that is no expertise at all.  *See* Fed. R. Evid. 702(a); *Hall*, 93 F.3d at 1343 (noting that the Seventh Circuit has previously made the point "that '[a]n expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate [his] opinion . . .'").  If only "common sense expertise" is needed, then jurors themselves can read the documents and draw their own conclusions, untainted by Dr. Krumholz.

Furthermore, if the documents do require expert interpretation, then—by Dr. Krumholz's own admission—he lacks the relevant expertise.  As he admits, he is not an engineer, and so he cannot properly evaluate design and testing documents.  Krumholz June Dep., at 64:23-65:3.  He is not a pathologist, and so he cannot properly offer opinions grounded in the field of pathology.  *Id.* at 267:1-3.  He's never done animal studies with medical devices, and so he cannot properly comment on Cook's animal studies.  *Id.* at 267:4-8.  He is not an interventional radiologist or vascular surgeon, and so he cannot properly evaluate IVC filters on venograms and CT scans.

*Id.* at 64:23-65:1. These gaps are central, given that the vast majority of Dr. Krumholz's opinions rest on his views about "perforation"—an event diagnosed through imaging or pathology, and in this case, often involving animal studies.  Similarly, because he is not an interventional radiologist or a vascular surgeon, he has no hands-on experience with IVC filters and does not subscribe to the journals these doctors read.  *Id.* at 66:8-24, 70:4-23.  He is in no way qualified to opine on IVC filter complications or their effects, how doctors trained and experienced in the use of IVC filters would interpret the Celect IFU, the OUS study, the Lyon article, or any other company marketing or business documents Dr. Krumholz references.

Either way, Dr. Krumholz has no business summarizing internal Cook documents—they either require no expertise to interpret (as he himself admits), or are outside his area of expertise. Fed. R. Evid. 702.  It also bears mentioning that internal company documents are not sources of data that he would ordinarily rely on to answer questions about comparative safety and effectiveness, and thus testimony regarding them is not admissible pursuant to Evidence Rule 703.  Indeed, the only times he has ever reviewed internal company documents from *any* company was when he was hired to do so as a litigation expert—never as an impartial health care researcher.  Krumholz June Dep, at 71:17-72:24.  As such, his reliance on these documents is of dubious value to his opinions.  *See In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, MDL No. 2342, 2015 WL 7776911, at *12 (E.D. Pa. Dec. 2, 2015) (noting that company documents are not "generally relied upon by statisticians, whether to support their conclusions or their methods").

Unnecessary summation of record evidence by an expert is also unfairly prejudicial.  *See* Fed. R. Evid. 403 (permitting exclusion of unfairly prejudicial evidence).  If the Court allows Dr.

Krumholz to walk the jury through Plaintiff's cherry-picked[4] selection of internal Cook documents, jurors may presume that his expertise offers special insight. *See Baldonado*, 2012 WL 1802066, at \*4. But by Dr. Krumholz's own admission, this would not be true. *See Krumholz June Dep.*, at 268:11-12 (referring to "common sense expertise"). Dr. Krumholz should therefore be barred from offering narrative testimony that simply regurgitates record evidence and does nothing to help the jury understand a fact or issue in the case. *Hall*, 93 F.3d at 1343 ("Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403."); *see also In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, MDL No. 2342, 2015 WL 7776911, at \*12 (E.D. Pa. Dec. 2, 2015) (finding an expert's summary of company documents could potentially be misleading to a jury, especially where the documents only report "preliminary concerns about product safety" and "not final conclusions" drawn by the company).

As a practical matter as well, Dr. Krumholz's role as narrator-in-chief for plaintiff's case would be confusing to the jury, duplicative of other witnesses with personal knowledge of the documents, and unfairly prejudicial. If permitted to do so, Cook in turn will be required to cross examine Dr. Krumholz on the myriad favorable Cook documents that Dr. Krumholz did *not* consider. This is not scientific knowledge that will help the jury to understand the evidence regarding the design of the Celect; it's a war of paper and emails presented through a witness who can simply regurgitate them.

---

[4] When asked whether he reviewed all the Cook documents that have been produced in this case, Dr. Krumholz admitted that he did not know for certain. Krumholz June Dep, 102:20-104:6 ("I don't know that I can assert that I know what the entire universe was or that I had a checklist so I can tell you for certain . . . ."). And when asked "[w]ho selected the Cook documents that were identified in [his] report," he admitted that it was supplied by the lawyers. *Id.* at 103:7-9.

**B.** **Dr. Krumholz may not opine on a defendant's state of mind or motives.**

Courts have also held that an expert may not use internal documents to testify about a company's state of mind where the jury is fully capable of reviewing the documents and coming to its own conclusion.   For example, in *Tillman*, 96 F. Supp. 3d at 1326, the plaintiff's engineering experts used an internal company memorandum that was produced in discovery to support their opinions regarding Bard's intent, state of mind, and motivations.   The court excluded these opinions as unhelpful because "a jury is fully capable of drawing its own inferences from this memorandum without assistance from an expert." *Id.* at 1327.  "Indeed, the experts [did] not appear to rely on any of their scientific expertise in drawing conclusions about the import of the cited memorandum."  *Id.*; *see also In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. April 27, 2010) (excluding an expert's "conclusory opinions regarding [the manufacturer's] and the FDA's state of mind and knowledge based on her reading of internal [manufacturer] documents and FDA correspondence" because "[t]he jury can infer intent from this evidence directly").

Here, Dr. Krumholz frequently and improperly uses Cook internal documents as a platform to testify to the company's state of mind.  For example, with respect to the clot-trapping study, Dr. Krumholz suggests that Cook "seemed" to act to purposely (and improperly) generate favorable results.  *See* Krumholz Rpt., at 62.  Similarly, with respect to the OUS study and Lyon article, Dr. Krumholz uses Cook internal documents and unpublished drafts of the Lyon article to suggest that Cook intentionally misled the public.  *See, e.g.*, Krumholz Rpt., at 71-77.  Such testimony is improper, speculative, and it is unhelpful because the jury can draw its own conclusions about Cook's state of mind from this evidence without Dr. Krumholz's unfairly prejudicial commentary.  *Hall*, 93 F.3d at 1343.

## II.   DR. KRUMHOLZ FAILS TO APPLY A RELIABLE METHODOLOGY IN HIS ASSESSMENT OF THE SAFETY AND EFFECTIVENESS OF IVC FILTERS AND WHETHER SAFER ALTERNATIVES TO THE CELECT EXIST.

Although Dr. Krumholz has the qualifications necessary to interpret medical literature, this only highlights the problem: he does not apply the same standard of professionalism and rigor in this litigation as he ordinarily would as a cardiologist and health care researcher.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting that the purpose of the district court's gatekeeping role is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").   Indeed, several times throughout the course of his deposition, Dr. Krumholz referred to the fact that because this is civil litigation, the level of rigor that he would apply is less than what he would ordinarily require as an academic.  *See, e.g.*, Krumholz June Dep., at 170:6-171:12, 266:4-19 (to conclude there is a causal relationship in his profession, he needs evidence "beyond a shadow of a doubt;" in this case he applies a "reasonable amount of certainty" standard).  By failing to bring his professional methods into the courthouse, Dr. Krumholz forfeits his pass for entry. Worse, he uses the toughest standard of his profession in evaluating efficacy data, concluding no efficacy has been established, then abandons that standard, applying less rigor when claiming the Celect has more safety issues than other filters. He also develops arbitrary definitions and classifications to get the results he's been paid to reach (at a rate of $1,000.00 per hour).  Krumholz Rpt., at 4. Not surprisingly, his flawed methodology produces contradictory and unreliable results.

### A.   Dr. Krumholz's methodology is unreliable because it is grounded in unhelpful, misleading, and arbitrary classifications.

Dr. Krumholz's opinions on the efficacy of the Celect filter turn on whether the Celect is classified as a "permanent" or a "retrievable" filter.  Based in part on his own published work,

Dr. Krumholz concedes that "permanent" filters have demonstrated some efficacy (i.e., they have been shown to significantly reduce the incidence of PE).  Krumholz Rpt., at 40-41 ("The available data show significantly reduced risk of subsequent PE with IVC filters as a class compared with no use of IVC filters." (citing Bikdeli B., *et al*.., *Inferior Vena Cava Filters to Prevent Pulmonary Embolism: Systematic Review and Meta-Analysis*, J. Am. Coll. Cardiol. 2017; 70:1587-97.) ("Bikdeli 2017"), attached as **Exhibit C**.  Dr. Krumholz, however, argues that there is no evidence supporting the efficacy of "retrievable" filters, Krumholz Rpt., at 40-41 ("The available data do not show significantly reduced risk of subsequent PE with retrievable IVC filters as a sub-class compared with no use of IVC filters." (citing Bikdeli B., *et al*., *Systematic Review of Efficacy and Safety of Retrievable Inferior Vena Caval Filters*, Thromb. Res. 2018; 165:79-82.)); *see also* Krumholz June Dep., at 137:5-7 (acknowledging "the challenges of trying to make inferences about retrievable filters because of the lack of information about them"), and he notes that there is even less evidence supporting the efficacy of the Celect filter.[5]  Krumholz Rpt., at 40-41.  Whether an IVC filter is classified as "retrievable" or "permanent" is therefore of crucial importance under Dr. Krumholz's analysis.  Here, Dr. Krumholz classifies the Celect as a "retrievable" filter.  *See id*. at 6.  However, in doing so, he wholly ignores the fact that the Celect was originally cleared as a permanent filter, and is still cleared for use as a permanent filter.  *See* Excerpts of Expert Report of Christy Foreman, MBE, dated May 30, 2018, at 32 ("Foreman Rpt."), attached as **Exhibit D,** (indicating that the first Celect 510(k) application (K061815) that was deemed Substantially Equivalent ("SE") to a predicate device was indicated for permanent use only).

---

[5] He is not saying that the data shows that "retrievable" or Celect filters are inefficacious; he is simply saying that no data exist to prove whether they are efficacious or inefficacious.

11

According to Dr. Krumholz, "[r]etrievable means that once deployed, [the filter] can be extracted from the body." Krumholz Rpt., at 5. This is an unhelpful definition: every filter—once deployed—can be extracted from the human body. Rather, what matters is how and when the extraction is done. Dr. Krumholz, however, fails to make any such distinction, perhaps because his lack of hands-on experience with IVC filters precludes him from understanding such distinctions. His definition of "retrievable" is also unhelpful because it fails to consider how designs vary across this retrievable/permanent divide that he uses in his analysis.

Dr. Krumholz presumes there is a difference in efficacy based on category, but he does not have any design or engineering expertise to support this premise.[6] Krumholz June Dep., at 64:23-65:3. Without any consistent or distinguishing design feature shared across all "permanent" or all "retrievable" filters, such a distinction is meaningless in the context in which he attempts to employ it.[7] Dr. Krumholz provides no rational basis for why the category designation would lead to differing efficacy, meaning his opinion should be excluded. *See, e.g.*, *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 458-60 (E.D. Pa. June 27, 2014) (noting that even small differences in structures can result in different effects, and that a methodology interpreting collective studies that cannot adequately account for such differences is unreliable).

Again, Dr. Krumholz applies a different standard in the courtroom than governs his professional work. He must concede that IVC filters have been shown—in a meta-analysis of randomized clinical trial and prospective observational trial data that he co-authored—to reduce

---

[6] At one point during his deposition Dr. Krumholz incorrectly suggests that there was a change in design from "permanent" to "retrievable" filters. *See* Krumholz Dep., June 28, 2018, at 186:6-7 ("And then in the retrievables … they changed the design."). Dr. Krumholz, however, fails to identify or articulate any such design change. No doubt because there is no design change that he can point to. Indeed, with respect to the Celect, nothing about its design changed when it went from being cleared as a permanent filter to a filter with the option of retrieval.

[7] Indeed, Dr. Krumholz even admitted at one point that it would only make sense to create a "retrievable class" if there was some type of "commonality among the retrievables." Krumholz June Dep., at 203:19-204:6.

by half the odds of PE and, in the indicated group of people who cannot take anticoagulants, to reduce the odds of death from PE by 80%.  *See* Krumholz June Dep., at 130:5-8, 133:20-136:7 (discussing Bikdeli 2017).   This article he wrote evaluated data for both permanent and retrievable filters.  *See* Krumholz Rpt., at 39-40 (indicating in Table 3 that some of the studies considered in the meta-analysis, which are identified in the forest plot graph on page 40 of his Report, included retrievable filters).  The major randomized trial using a retrievable filter did not show the same efficacy, *see* Krumholz Rpt., at 39-40,[8] but, using the reliable methods of his profession, there is not sufficient data available to say that there is in fact an underlying difference in efficacy based on filter category.   Excerpts from the Deposition of Harlan Krumholz, MD, SM, dated February 8, 2018, in *Pavlock* at 205:7-20, 206:19-207:11, 249:23-250:16, 264:5-21 (Krumholz Feb. Dep.) attached as **Exhibit E**.  This approach stands in stark contrast to the methods he claimed to use in cobbling together his opinions in this case.

### B.   Dr. Krumholz's selective methodological waffling is unreliable and generates conflicting and contradictory results.

If an expert is unwilling to follow his or her methodology to its logical conclusion, that is a good indication that the methodology is flawed.  Here, Dr. Krumholz is unwilling to follow his methodology to its logical conclusion.   His waffling, however, results in inconsistent and contradictory results, exactly the type of results that a reliable methodology would not generate.

First, Dr. Krumholz testifies that anytime a medical device has safety risks, the device manufacturer has a duty to prove that the device is efficacious.  *See* Krumholz June Dep., at 281:18-25 (arguing "once you know that there's a risk, then it's incumbent upon you to prove the benefit").  If proof of efficacy is not forthcoming, then the "device has an unfavorable risk to

---

[8] Note that the study identified as "Mismetti 2015" in the forest plot graph on page 40 of Dr. Krumholz's Report is the same as "PREPIC-II" identified in Table 3 on Page 39 of Dr. Krumholz's Report, which is the largest randomized trial using retrievable filters.

benefit profile." Krumholz Rpt., at 141.  When followed to its logical conclusion, this method commits Dr. Krumholz to an extreme position:  it requires that he believe that all "retrievable" filters are defective.  Because Dr. Krumholz believes all IVC filters have safety risks, Krumholz June Dep., at 162:8-10, and because Dr. Krumholz believes that no data exists that proves that "retrievable" filters are efficacious, Krumholz Rpt., at 40-41, Dr. Krumholz must believe that all "retrievable" filters are defective.

Although Dr. Krumholz is willing to accept this conclusion with respect to the Celect, *see* Krumholz Rpt., at 141 (noting the Celect has "an unfavorable risk to benefit profile"), he stops short of calling all "retrievable" filters defective.  Instead, he tries to insinuate that other "retrievable" filters, such as the Tulip, may actually be safer alternative designs.  *See* Krumholz Rpt., at 11, 63-64, 118-120 (presenting evidence intended to show that the Tulip is safer).  According to the logic of his report, however, he must hold the opinion that all "retrievable" filters are defective in the absence of proof of efficacy.  He cannot therefore logically opine that the Tulip, or any other filter that can be "extracted from the body," is a safer alternative design to the Celect.  But he does so anyhow.

Presumably, he does so because labeling all retrievable filters "defective" is an extreme position; it would necessitate removing large quantities of tools that doctors depend upon and use to treat patients at risk of suffering a life-threatening PE from the market.  It would also eliminate a large class of filters that Plaintiff could point to as potential safer alternative designs.  Dr. Krumholz waffles to avoid offering such an untenable and unpalatable position.  Instead of calling all "retrievable" filters defective, he suggests that some, like the Tulip, may be safer.  *See* Krumholz Rpt., at 11, 63-64, 118-120 (presenting evidence intended to show that the Tulip is safer).  But there is no logical consistency to this opinion.  Under Dr. Krumholz's risk-benefit,

permanent-versus-retrievable logic, the Tulip would also be "defective." Consequently, any testimony insinuating that the Tulip is safer than the Celect is undercut by Dr. Krumholz's own logic.  *See, e.g.*, *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, MDL No. 2342, 2015 WL 7776911, at *11 (E.D. Pa. Dec. 2, 2015) (noting that an expert's failure to "*consistently* apply" the expert's method—placing importance on methodological principles when they support the expert's opinion and ignoring them when they do not—"cannot be considered a valid methodology").

Dr. Krumholz erroneously picks different standards of proof for different comparisons. On the one hand, he openly admits that "there is not a comparative effectiveness study to indicate that [the Celect] is better or even non-inferior to other filters."  Krumholz Rpt., at 139.[9] He published a piece characterizing the filter literature as a "data desert" with respect to comparative effectiveness; in testimony he admitted this desert applies also to comparative safety.   Krumholz Feb. Dep., at 178:11-179:8, 206:19-207:11.  In other words, there is insufficient data to allow a scientific researcher like him – using the normal standards of his profession – to conclude that one type of filter is more or less effective than another, or to conclude that the Celect filter causes a different safety risk than any other filter. Yet he ventures to insinuate so anyways, saying "all evidence points to a greater harm [with the Celect]."  This abandonment of method does not pass muster.  *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014) ("And if [an expert] failed to follow his own stated methods, the court could reasonably conclude that he had failed to follow any reliable method.").

---

[9] *See also* Krumholz Rpt., at 118 (noting that the "available data are imperfect to make an absolutely conclusive statement" about the comparative safety between the Celect and Tulip); Krumholz Feb. Dep., at 249:23-250:16, 264:5-21 (conceding he does not have sufficient data to establish any difference in efficacy for any one retrievable filter over another or between retrievable filters and permanent filters).

**C.**   **Dr. Krumholz's opinions on whether the design of the Celect causes a higher risk for complications is based on an unreliable methodology.**

Although Dr. Krumholz's report lacks any opinion about the design of the Celect filter causing a higher risk for complications, he argues that such an opinion is implied by his report. Krumholz June Dep., at 173:11-18.  Aside from being an improperly disclosed opinion that should be stricken, *see* Fed. R. Civ. Pro. 26(a)(2)(B) and 37(c)(1), Dr. Krumholz did not use a reliable methodology to arrive at any such conclusions.

Dr. Krumholz lacks any reliable methodology to say that one filter design causes different safety risks than another design.  He openly admits that there is a "paucity of data" with respect to IVC filters and the Celect specifically.  Krumholz June Dep., at 199:13-200:10; Krumholz Rpt., at 6, 41, 44, 138.  And the data that does exist, he argues, is full of limitations. Krumholz Rpt., at 138-139 (noting limitations of available data).  He also admitted that professionals who assess causality would not be able to derive conclusions from the available data: "[T]he truth is that in the absence of randomized trials of different designs, someone who is a stickler about causation would have trouble making the connection."[10]  *See* Krumholz June Dep., at 266:4-19.

In the litigation context, however, he's willing to employ a different standard than the one applied by the professionals in his field.  Here, in this case, he is willing to discard the standard normally required by people in his profession to assign causality (he said he calls it "beyond a shadow of a doubt"), for a "reasonable amount of certainty" standard.  *See* Krumholz June Dep., at 170:6-171:12; 266:4-19.  This is unacceptable.  *See Junk v. Terminix Int'l Co.*, 628 F.3d 439,

---

[10] This admission takes place in the context of a discussion about the findings of Plaintiff's biostatistician, Dr. Betensky, whose work Dr. Krumholz cites in his report.  Dr. Betensky admitted that based on the data she reviewed she cannot comment on whether the design of the Celect causes a higher rate of perforation than the design of the Tulip, based on adverse event reports made to the company: "I can't establish causality with these data."  Excerpts of Rebecca Betensky, PhD., dated April 21, 2017, at 204:21-205:1, attached as **Exhibit F**.

448-49 (8th Cir. 2010) (upholding exclusion of an expert who admitted he did not have available the data that he would normally use to estimate exposure in his profession, so his opinions were based on extrapolations from insufficient data).   The Court should bar Dr. Krumholz from offering causality opinions in the courtroom that he would not offer outside the courtroom in his ordinary professional setting.   *Kumho Tire Co.,* 526 U.S. at 152 (noting the district court gatekeeper's role to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Higgins v. Koch Dev. Corp.*, No. 3:11-cv-81-RLY-WGH, 2013 WL 6238650, at *6 (S.D. Ind. Dec. 3, 2013) (same).

### D.   Dr. Krumholz impermissibly attempts to shift the burden of proof to defendants by suggesting a different legal standard exists.

The Court should also prohibit Dr. Krumholz from attempting to reframe the requirements of Georgia's product liability law.   Although Plaintiff bears the burden of demonstrating that a product is defective, *see, e.g.*, *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1364 (M.D. Ga. 2010) (applying Georgia law and holding "Plaintiffs must establish . . . [the] design is defective"). Dr. Krumholz shifts the burden of proof to the manufacturer to show that its product is not defective.   At his deposition he argued that once a manufacturer "know[s] that there's a risk, then it's incumbent upon [the manufacturer] to prove the benefit."   Krumholz June Dep., at 281:24-25.   No such duty exists.   If it did—and if one assumes that there is no risk-free medical device—then it would essentially require that the efficacy of every medical device needs to be established by way of a randomized controlled clinical study before it can be marketed.   Such a standard would be impossible to meet—not only because it would cost too much, but because in some instances it would be unethical—and it would stifle innovation.   This "duty" also stands directly contrary to the entire

17

system for bringing Class II devices to market, through the 510(k) process, which typically does not require randomized clinical trial data before a device is cleared.  *See* Foreman Rpt., at 14. The Court should not, therefore, permit Dr. Krumholz to mischaracterize the law in this way.

### III.   NEITHER DR. KRUMHOLZ'S QUALIFICATIONS NOR HIS METHODOLOGY PERMITS HIM TO OFFER EXPERT OPINIONS ON FDA REGULATION OF IVC FILTERS GENERALLY OR COOK FILTERS SPECIFICALLY.

The Court should also exclude Dr. Krumholz's opinion that IVC filters received approval from the FDA with little inquiry or supervision concerning the safety and effectiveness of filters. *See* Krumholz Rpt., at 23-24; Rebuttal Expert Report of Harlan Krumholz, MD, SM, dated June 18, 2018, at 1-2 ("Krumholz Rebuttal Rpt."), attached as **Exhibit G**; Krumholz June Dep., at128:13-130:4; 238:13-239:17.  Dr. Krumholz lacks the required knowledge, skill, experience, training, and education regarding the FDA approval and clearance process to offer such opinions.

Dr. Krumholz has never worked at the FDA, *see* Krumholz Curriculum Vitae (making no mention of having worked at the FDA); he has never submitted a 510(k) to the FDA, Krumholz June Dep., at 239:18-19; he has never been asked to review a 510(k) by the FDA, *id.* at 239:20-22; and he has never been involved in a decision regarding whether a device should be approved or cleared by the FDA, *id. at* 239:23-25.  Indeed, Dr. Krumholz has never even spoken to an FDA employee—current or former—about IVC filters.  Krumholz Feb. Dep., at 176:23-25.

Despite his clear lack of experience in FDA approval and clearance processes, Dr. Krumholz also holds himself out as a "regulatory scientist."  Krumholz June Dep., at 97:1-22. He bases this expertise on the fact that he has served on a "planning board," consulted with or given talks at the FDA on topics other than IVC filters or the current 510(k) process, and published papers on post-market surveillance.  *See Id.* at 97:1-100:9. However, the general experience and knowledge cited by Dr. Krumholz is not enough to qualify him to offer expert

opinions across the board on FDA regulation of medical devices.  The critical inquiry is whether the expert's expertise goes to the very matter on which he or she is to give an opinion. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994))).  Here, Dr. Krumholz's limited experience with post-market surveillance data do not qualify him to talk about FDA pre-market clearance and approval processes.

The impropriety of allowing Dr. Krumholz to testify about FDA clearance of IVC filters is reinforced by the inadequacy of the foundation for his FDA opinions.  He completely failed to address the FDA history of considering specific filters.  Krumholz Feb. Dep., at 174:3-20.  He admitted he has conducted no administrative research on the history of FDA clearance of various filters.  *Id.* at 177:25-178:3.  Dr. Krumholz does not know what Cook submitted to the FDA with respect to animal studies, or how the FDA responded to Cook's submission of animal study data. *Id.* at 191:23-192:4.  He had no information regarding Cook's investigation of complaints or reporting of complaints to the FDA.  *Id.* at 192:6-16.  He expressed no opinions related to Cook's obtaining of clearance for the Celect device, and offered no analysis of the extensive regulatory documents that Cook produced to Plaintiff in discovery.  This stands in stark contrast to the evaluation of multiple 510(k) applications of Cook's filters, FDA communications about the Celect 510(k) applications, and consideration of the regulatory history of IVC filters as a device class done by Cook's regulatory expert, Christy Foreman.  *See* Foreman Rpt., at 25-42.

In sum, Dr. Krumholz has no background or experience in FDA device approval,[11] did nothing to investigate the history of FDA approval of IVC filters generally, and did not even

---

[11] Dr. Krumholz's background and experience with FDA stand in stark contrast with FDA regulatory experts who have been considered qualified in this field within the Seventh Circuit.  *See, e.g., In re Depakote*, No. 14-CV-847-

analyze the available documents the Cook submitted to the FDA regarding the clearance of the Celect specifically.  He is not qualified to opine concerning FDA approval and his methodology for forming his opinions is deficient.  The Court should therefore exclude his proposed testimony on the subject.

## IV.   DR. KRUMHOLZ IS NOT QUALIFIED TO OFFER OPINIONS ON THE OUS STUDY, AND HE LACKS A RELIABLE METHODOLOGY FOR HIS OPINIONS.

Dr. Krumholz intensely challenges Cook's assessment of the OUS study, and its reporting on that study in the labeling and the Lyon article. *See* Krumholz Rpt., at 64-91.  Many challenges, however, are based on his recitations of Cook's internal documents along with some speculative commentary about what such documents suggest about Cook's state of mind.  *See, e.g.*, Krumholz Rpt., 71-74. These types of "opinions" should be barred for all the reasons already discussed in Part I above.  Dr. Krumholz's other OUS opinions, on the other hand, stem from a prejudicial and improper stretch beyond his own expertise. He lacks expertise in understanding of the concepts of perforation, penetration, and tenting; this gap is made apparent by his reliance on the work of Plaintiff's other experts throughout much of this section of his report.[12]  Simply put, Dr. Krumholz lacks the appropriate knowledge, skill, training, and experience to independently offer most opinions on the OUS study.

### A.   Dr. Krumholz is not qualified to re-interpret or challenge Cook's interpretation of the data from the OUS study.

Dr. Krumholz lacks the qualifications to criticize Cook's and its investigators' choice of definition for the events of "perforation" or "penetration," or their application of those

NJR-SCW, 2015 WL 4775868 *3-4 (S.D. Ill. Feb. 13, 2015) (expert worked on over 100 pre-market approvals, was interacted with FDA related to New Drug Applications, and preparing product labeling was qualified to offer opinions on labeling).
[12] Here, and elsewhere, Dr. Krumholz's opinions are often cumulative and duplicative of Plaintiff's other experts' opinions.  At trial, the Court should not permit Plaintiff to offer cumulative and duplicative testimony.  Fed. R. Evid. 403.

definitions to the images taken in the OUS study. He says the definition of perforation in the OUS study is "markedly different" from other studies. Krumholz Rpt., at 75. Not only is this factually incorrect,[13] Dr. Krumholz lacks the knowledge, experience, training, and skill necessary to make such an assessment. Fed. R. Evid. 702.

As a starting point, Dr. Krumholz opines on the proper definition of perforation, though he readily admits he is not a pathologist, Krumholz June Dep., at 267:1-3, and he is therefore unqualified to discuss what occurs at the microscopic level when filter struts press against the wall of the vena cava. Rather than confess his ignorance in this area, he instead tries to suggest that the concept is "inadequately studied and understood"—never mind the fact that this is belied by the fact that each side has put forth a pathologist (Dr. Virmani and Dr. Fishbein) to offer opinions on this very topic. *See id.* at 177:18-25. Dr. Krumholz is also inexperienced in the use of IVC filters and he is not the type of physician who would generally use and get information about IVC filters in his practice. *Id.* at 66:17-19, 68:3-5, 245:10-14. Dr. Krumholz is unqualified to critique Cook's use and understanding of the concepts of perforation, penetration, and tenting. The Court should therefore bar his opinions on the appropriateness of Cook's understanding and use of these concepts in its internal documents, the OUS study protocol, and the Lyon article.

**B.      Dr. Krumholz is unqualified to opine on OUS imaging, and he cannot cure his lack of qualifications by relying on other unreliable expert opinions.**

Dr. Krumholz readily admits that he is not a radiologist and is not qualified to interpret medical imaging. Krumholz June Dep., at 260:3-17 ("I'm not qualified. I'm not an interventional radiologist so I didn't make my own independent judgment."). Consequently, he

---

[13] See, for example, an article by Dr. Simon titled *Vena Cava Filters: Prevalent Misconceptions*, which uses a definition similar to Cook's. Simon M., *Vena Cava Filters: Prevalent Misconceptions*, JVIR 1999; 10:1021-1024 ("The word 'perforation' implies a hole in the vein wall resulting in hemorrhage or hematoma."), attached as **Exhibit H**.

relies on others to make assessments of medical imaging.  This is especially the case with respect to the imaging related to the OUS study where Dr. Krumholz relies on the assessments of the OUS investigators; Plaintiff's interventional radiology expert, Dr. Gordon; and Dr. Timperman, an interventional radiologist Cook sometimes consulted with.  *See, e.g.*, Krumholz Rpt., at 81. Dr. Krumholz's opinions concerning the assessment of the OUS imaging is therefore only reliable to the extent that each of these reviewers is qualified to review the images and employed a reliable methodology in his or her assessment of the images.  Furthermore, Dr. Krumholz brought no independent analysis to the OUS imaging, and he performed no medical, scientific, or statistical or other analysis of their results.  Instead, he merely inserted their analysis into tables from the work of Dr. Gordon and Dr. Betensky, which included results that even Dr. Gordon could not explain.  Krumholz Rpt. at pp. 84-90; Krumholz June Dep., 255:19-257:3, 260:3-24, 262:9-263:1; Excerpts from Deposition of Gregory Gordon, dated June 12, 2018, at 289:15-290:14, attached as **Exhibit I**.

Notably, this Court has already determined that Dr. Timperman's assessment of the OUS images is unreliable.  Excerpts from the Status Conference dated September 14, 2017, in front of Judge Young, at 26:8-24 ("Status Conference Trans."), attached as **Exhibit J**.  Dr. Timperman was asked at his deposition to assess whether various images from the OUS study demonstrated perforation.  To do this, Dr. Timperman used the edge of a business card on images of certain OUS patients hand-picked by plaintiff's counsel.  *See, e.g.*, Excerpts from the Deposition of Paul Timperman, MD., dated May 3, 2017, at 309:14-311:2, attached as **Exhibit K**.  As the Court noted, "there's no way that [this] would even come close to satisfying Daubert standards." Status Conference Trans., Sept. 14, 2017, at 26:19-20.  Because this Court has already excluded Dr. Timperman's assessments of the OUS images as unreliable, and because Dr. Krumholz has

done nothing to make Dr. Timperman's assessments any more reliable, the Court should therefore exclude any opinions Dr. Krumholz attempts to offer that are based on Dr. Timperman's unreliable and off-the-cuff assessments of OUS imaging.  *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) (finding district court did not abuse its discretion by excluding expert testimony that was based on the unreliable methodology of another expert); *Fuesting v. Zimmer, Inc.*, 362 Fed. Appx. 560, 564 (7th Cir. 2010) (upholding exclusion of expert testimony that relied on the testimony of another excluded expert).

The Cook Defendants also note that they are contemporaneously moving to exclude the opinions of Dr. Gordon.  If the Court agrees that Dr. Gordon's opinions on OUS imaging are unreliable, then any opinion Dr. Krumholz holds based solely on Dr. Gordon's opinions should likewise be excluded.  The Cook Defendants also assert that if anyone is allowed to comment on Dr. Gordon's analysis, it should be Dr. Gordon.  Dr. Krumholz adds nothing to Dr. Gordon's analysis, and he is not an expert in interventional radiology.

## V.   DR. KRUMHOLZ IS NOT QUALIFIED TO OPINE ON THE ADEQUACY OF THE CELECT IFU, AND HIS METHODOLOGY IS UNRELIABLE.

Dr. Krumholz lacks the education, knowledge, training, and skill needed to offer opinions on the adequacy of the Celect IFU.  It bears repeating: Dr. Krumholz is not the type of physician who uses or treats people with IVC filters and so he is not in the group of physicians who receive, review, and interpret IVC filter IFUs as part of their medical practice.  Krumholz June Dep., at 245:10-14.  He has never placed an IVC filter; he has never retrieved an IVC filter, and he has never even managed a patient experiencing a complication from an IVC filter.  *Id.* at 66:17-19, 68:3-5.  Indeed, outside of this litigation, he cannot even recall having ever read an IFU for an IVC filter.  *Id.* at 244:10-15.  His opinions about the IFU are also not grounded in any regulatory experience in reviewing or commenting on IFUs. *Id.* at 244:13-245:9; *see also*

*Mercado v. Bayer Healthcare Pharms. Inc.*, No. 14 C 6699, 2017 WL 1477939, at *2, n.1 (N.D. Ill. Apr. 25, 2017) (gynecologist not qualified to opine on regulatory compliance in IUD case). All this simply goes to show that he has no special knowledge, training, or education that would enable him to explain how physicians who regularly use IVC filters would likely be inclined to interpret the Celect IFU.  Simply possessing a medical degree does not qualify a doctor as an expert in all medical fields.  *Higgins*, 2013 WL 6238650, at *3; *Baldauf v. Davidson*, No. 1:04-cv-1571-JDT-TAB, 2007 WL 2155967, at *3 (S.D. Ind. July 24, 2007).

The question is not whether Dr. Krumholz is qualified to talk about certain areas of medicine; he is.  Rather, the question is whether his qualifications as a doctor provide sufficient foundation for him to form opinions about how interventional radiologists and vascular surgeons, such as Mrs. Brand's implanting physician Dr. Rheudasil, would interpret the Celect IFU.  Dr. Krumholz's qualifications as cardiologist and health care researcher do not provide sufficient foundation for him to form opinions on this topic.  *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723-24 (7th Cir. 1999).

In addition to lacking qualifications, he also fails to use a reliable methodology.  Indeed, it is not even clear that he relied on any method at all.  He simply asserts that Cook's warnings and marketing materials were misleading and insufficient, *see, e.g.*, Krumholz June Dep., at 246:16-24; Krumholz Rebuttal Rpt., at 2-3, but he provides no support for how he arrives at these conclusions.  When asked various questions at his deposition designed to elicit his methodology, he essentially admitted that he did nothing.  He did not identify or talk to any physician who ever received or relied on any of the Cook marketing materials.  Krumholz June Dep., at 163:25-164:6.  He did not know, or even try to determine, how doctors who use IVC filters would have reviewed and interpreted any of the marketing materials he cites.  *Id.* at

24

164:14-19.   He did not talk to—indeed he is not even aware of—any other physician who read or relied on the Lyon article.  *Id.* at 235:13-16.  He did not compare the Celect IFU to any other IVC filter manufacturer's IFU.  *Id.* at 245:25-246:3. He did not canvas any physicians with a questionnaire to find out how they would interpret the Celect IFU.  *Id.* at 246:4-12.  And he did not interview or question any physicians to determine what was commonly known in the medical community about IVC filters when Mrs. Brand's filter was placed. *Id.* at 246:25-247:19, 249:20-25.  As this Court has noted, "an 'expert's work is admissible only to the extent it is reasoned, uses methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology.'"  *Higgins*, 2013 WL 6238650, at *6 (citing *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000)).   Here, Dr. Krumholz's opinions are simply off-the-cuff statements unsupported by any data.

Unchecked and unconstrained by any methodology, Dr. Krumholz offers a series of unsound opinions about the Celect IFU.  For example, at one point he opines that Cook should include information about the rates of potential adverse events in its IFU, Krumholz June Dep., at 283:19-284:1, even though he simultaneously admits that there is insufficient data to reliably calculate such rates.  *Id.* at 86:18-87:5, 283:24-284:1.  This is an impossible standard: he wants Cook to include adverse event rates in the Celect IFU, while simultaneously admitting such rates do not reliably exist.  Such opinions are nonsense and should not be permitted.

An additional problem with Dr. Krumholz's warning opinions is that the law only requires that Cook "warn of *nonobvious* foreseeable dangers from the normal use of its product." *See Thornton v. E.I. Du Pont De Nemours & Co., Inc.*, 22 F.3d 284, 289 (11th Cir. 1994) (citing *Stovall & Co. v. Tate*, 184 S.E.2d 834, 837 (1971)) (applying Georgia law) (emphasis added). The law, in other words, does not require Cook to warn of every possible scenario in which

something could go wrong; it only requires Cook to warn of nonobvious and foreseeable dangers.  Dr. Krumholz, however, fails to explain why any particular warning that he believes is missing from the IFU would not already be obvious to a learned intermediary who is experienced, trained, skilled, and knowledgeable in the use of IVC filters.[14]

Finally, his opinion within his rebuttal report that the Celect IFU is misbranded is not something he alone could determine; only FDA can request such a finding and determination and, ultimately, it is a federal court's role to determine that a product is misbranded.  *See Nutritional Health Alliance v. FDA*, 318 F.3d 92, 100 (2d Cir. 2003) ("The adulteration provisions of the FDC Act . . . delegate authority to the FDA to delineate by regulation conditions under which a product may be deemed adulterated as a matter of law."); *Tucker v. SmithKline Beecham Corp.*, 596 F. Supp. 2d 1225, 1229 n.3 (S.D. Ind. 2008) ("The FDA does not have the authority to declare unilaterally that a label is false or misleading and thus that a drug is misbranded; it must proceed to court for a judicial determination in an enforcement action.").

## VI.  DR. KRUMHOLZ IS NOT QUALIFIED TO OPINE ON WHETHER MRS. BRAND'S ALLEGED INJURIES WERE CAUSED BY HER FILTER AND HIS METHODOLOGY IS UNRELIABLE.

### A.  Dr. Krumholz is not qualified to offer opinions about the cause of Mrs. Brand's alleged filter failure or Mrs. Brand's alleged injuries.

Dr. Krumholz is not qualified to offer medical causation opinions regarding IVC filters. "[S]imply possessing a medical degree does not qualify a [doctor] as an expert in all medical fields." *Higgins*, 2013 WL 6238650, at *3.

---

[14] As the FDA's 1999 Guidance for Cardiovascular Intravascular Filter 510(k) Submissions makes clear, learned intermediaries knew of many risks, including, but not limited to, the risks of perforation, migration, fracture, and tilt well before Mrs. Brand received her IVC filter.  *See* FDA, Guidance for Cardiovascular Intravascular Filter 510(k) Submissions, 5-9 (Nov. 26, 1999), attached as **Exhibit L**.

As a cardiologist, Dr. Krumholz is not qualified to do a differential diagnosis to determine the cause of Mrs. Brand's filter perforation and fracture. Dr. Krumholz has never placed an IVC filter. Krumholz June Dep., at 66:17-19. He has never retrieved an IVC filter. *Id.* He has never "treated a patient like Mrs. Brand who had an IVC filter fracture or perforation." *Id.* at 66:14-16. He has never interpreted imaging from a patient who had an IVC filter placed or retrieved. *Id.* at 66:20-24. He does not ever recall having ever prescribed an IVC filter. *Id.* at 67:10-24. He has never "treated a patient who had a complication from an IVC filter." *Id.* at 68:3-5. He has never monitored a filter for its placement, location, or performance. *Id.* at 70:11-13. Indeed, Dr. Krumholz admits he has no "hands-on experience treating patients with any of the complications or risks that are described in [his] report." *Id.* at 70:3-7.

Dr. Krumholz is just not the type of physician that interacts with IVC filters. He is not an interventional cardiologist or vascular surgeon, *id.* at 64:12-65:1, and he does not hold himself out to be an expert in these fields. *Id.* at 65:4-6. He is not a member of the Society of Interventional Radiology or any other professional societies that deal with vascular surgery. *Id.* at 70:14-23. Nor does he subscribe to any journals for interventional radiology, vascular surgery, or interventional cardiology. *Id.* Someone with so little experience treating patients with IVC filters has no basis for offering opinions about the cause of Mrs. Brand's alleged filter failure.

Dr. Krumholz is also unqualified to opine on whether Mrs. Brand's current or future injuries (mental and physical) are likely to stem from her filter. For instance, Dr. Krumholz is not a psychologist or psychiatrist. *Id.* at 297:17-20. It is not part of his "mainstream activity" to diagnose patients with a malingering or factitious disorder. *Id.* at 299:14-19. Nor is Dr. Krumholz a gastroenterologist. *Id.* at 65:7-16. He agreed that ruling in and ruling out potential

27

causes of abdominal pain is not something he does on a "regular basis." *Id.* at 299:20-300:8.  He also agreed that if any of his patients came to him complaining of abdominal pain or depression, he would send them to their general physician; he would not treat them for those conditions.  *Id.* at 303:4-22.

Dr. Krumholz's medical degree does not provide him with the expertise to opine on a medical product that he has never used in his practice.  *See, e.g.*, *Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 931 (S.D. Ind. Feb. 5, 2014).  Nor does his medical degree provide him with the expertise to opine on Mrs. Brand's psychiatric or gastrointestinal issues.  *Hall v. Flannery*, 840 F.3d 922, 930 (7th Cir. 2016) (holding expert physician possessing knowledge about surgery, pediatrics, and neurology nevertheless lacked specialized knowledge of cardiology and was not qualified to opine about heart-related issues).

### B. Dr. Krumholz did not perform a reliable differential etiology or diagnosis and therefore his methodology is unreliable.

Even if Dr. Krumholz were qualified to do a differential diagnosis to determine the cause of Mrs. Brand's injuries, his opinions should nevertheless be excluded because he did not employ a reliable methodology.  "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."  *Clark v. Takata Corp.*, 192 F.3d 750, 756 n.5 (7th Cir. 1999).

Dr. Krumholz recites portions of Mrs. Brand's medical records in his report, but the sum total of his opinions about her condition can be found at pages 170 to 173 of his report.  In those pages, he blanketly claims that he performed a differential diagnosis regarding the "cause of Mrs. Brand's filter perforation, fracture and related injuries."  Krumholz Rpt., at 172.  He stated that his methodology included reviewing medical records, meeting with Mrs. Brand in person,

reviewing imaging with Dr. Gordon, and reviewing other documents including Cook documents, literature, and deposition testimony.  *Id.*   Based on this review, Dr. Krumholz claims that he could rule out the following five causes: abnormal external stresses (including her April 2011 motor vehicle accident), anatomy, placement of the filter, Mrs. Brand's anterior lumbar fusion surgery (ALIF), and the retrieval attempt.  *Id.*   He concluded that the defective design of the Celect was the cause of Mrs. Brand's perforation, tilt, and fracture.  *Id.*

Dr. Krumholz's methodology is only a differential diagnosis in name, not in practice. The cornerstone of a differential diagnosis is the physician's systematic consideration of all possible causes of an ailment based on scientific evidence.  An effective differential diagnosis "must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out,'" *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007), and must explain why each cause was ruled in and then ruled out.  *See Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 705 (7th Cir. 2015) (upholding exclusion of expert opinions where report failed to identify whether other potential causes were considered and, if so, how and why they were ruled out); *Brown*, 765 F.3d at 774 (failure to meaningfully consider and rule out potential alternative causes in conducting differential etiology is "fatal to [the expert's] testimony").  An expert may not simply assert that all potential causes were considered, but must articulate the systematic and consistent scientific basis for doing so.  *In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 218 F. Supp. 3d 700, 721 (N.D. Ill. Oct. 21, 2016) (noting that expert's failure to articulate in his report the potential causes ruled in and scientific basis for exclusion was fatal because the expert "does not even explain to the court what his reasoning is, how the sources he reviewed inform his conclusion, or why he applies the method that he does.  These problems render the etiology unreliable . . . ."), *aff'd*, 884 F.3d 746 (7th Cir. 2018).   Conclusions alone, without the

explanations or support for those conclusions, are inadmissible. *Wendler v. Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008).

Here, Dr. Krumholz's methodology lacks any scientific basis or explanation.  First, Dr. Krumholz failed to provide any scientific basis for identifying the causes he ruled in.  He did not cite to a single piece of literature or any other document.  He broadly claims to have considered five causes without identifying a single basis or any explanation as to where those causes came from.  He cites no literature or other evidence that those causes can in fact lead to filter perforation or fracture.  This is not surprising, considering he testified that he "did not conduct a systematic review of all the causes of fracture because we were so dismayed by the literature that we did see, that we didn't think that it would be worth it."  Krumholz June Dep., at 278:18-24. For the same reason he did not conduct a systematic review of the literature for causes of perforation.  *Id.* at 278:25-279:3.  He also admitted that he did not produce any notes or data regarding potential causes of perforation or fracture.  *Id.* at 279:4-10.  He could only say that his methodology was based on a "detailed medical review."  *Id.* at 293:17-294:3.

Second, Dr. Krumholz failed to rule in all plausible causes of the filter failure. One need not look further than the report of Dr. Gregory Gordon, Mrs. Brand's interventional radiology expert, who also performed a differential diagnosis to recognize the lack of any scientific basis for Dr. Krumholz's case-specific opinions. *See* Excerpts from the Gregory Gordon, MD Report, dated April 30, 2018, at 42 (Gordon Rpt.) attached as **Exhibit M**.  Though his analysis also is incomplete, Dr. Gordon at least went through the motions of identifying and ruling out five possible causes of Mrs. Brand's filter failure: manipulation and harm to the IVCF and IVC from Mrs. Brand's spinal fusion, Mrs. Brand's morbidity (such as malnutrition, immunosuppression, and malignancy), osteophytes and spondylosis of the spine, normal physiologic activity, and

Mrs. Brand's April 2011 motor vehicle accident.  *Id.* at 42-3.  Dr. Gordon considered two causes that Dr. Krumholz did not: Mrs. Brand's underlying spine condition including spondylosis and osteophytes that compressed her cava and normal physiologic activities.

Most striking is Dr. Krumholz's failure to consider the effect of Mrs. Brand's osteophytes and spondylosis on her vena cava and the filter within it.  This is particularly important because Dr. Gordon acknowledges that Mrs. Brand's spondylosis "likely contributed to worsening symptoms from the fulcrum effect of the osteophyte (bony over growth) with the perforated primary legs."  Gordon Rpt., at 42.  In other words, Dr. Krumholz failed to consider the one cause that Dr. Gordon, Plaintiff's own expert, acknowledged played a part in the alleged filter failure.

Dr. Krumholz's failure to adequately consider osteophytes is all the more surprising given that Dr. Krumholz testified that "it has been noted" that osteophytes "can be associated with fracture."  Krumholz June Dep., at 277:9-278:17.  He further noted that osteophytes are "very common."  *Id.* Yet, rather than actually performing a differential diagnosis as to this known complication that can cause fracture of an IVC filter, Dr. Krumholz summarily dismissed it, suggesting it should have been included in the Celect IFU.  *Id.*  The fallacy of his analysis is clear:  when pressed on his faulty differential diagnosis, Dr. Krumholz then suggested that he omitted causes he could find in the Celect IFU, but the IFU is not the place where causes of perforation or fracture are identified.  He identifies no literature, study or even personal experience that would allow him to rule in or out Mrs. Brand's underlying spinal condition as a cause of her IVC perforation or fracture, and he has none.  As such, his alleged differential diagnosis is fundamentally flawed.[15]

---

[15] Whether Cook should have warned that patients with osteophytes may be at an increased risk for perforation or fracture is an entirely separate question from the specific cause of Mrs. Brand's filter perforation and fracture.  The

To make matters worse, even if he had considered osteophytes, his methodology would not have allowed him to rule them out.  He did not measure Mrs. Brand's osteophytes; he did not determine whether they were compressing her vena cava; he did not identify how many osteophytes Mrs. Brand had; and he did not identify the type of osteophytes she had.  *Id.* at 302:18-25.

Third, Dr. Krumholz did not reliably rule out the causes that he claims he did consider. For example, Dr. Krumholz claimed to have ruled out the ALIF procedure as a cause.  He says he could do this because he didn't see anything in medical records that would suggest the procedure caused a perforation or a fracture.  *Id.* at 285:19-286:8.  Further questioning at his deposition, however, exposed the inadequacy his reasoning.  For example, although he claims that there was nothing unusual in her procedure note, he admits that he has never performed an ALIF procedure and that he is neither a spinal nor a vascular surgeon.  *Id.* at 79:3-13.  His report includes no research or analysis regarding what Mrs. Brand's ALIF surgery entailed, how long it took, or the impact on the patient's vena cava during such procedures.  He cites no literature regarding the possibility or frequency of IVC filter complications during spinal surgery.  Report, *passim*.  In other words, he lacks the necessary experience, skill, training, and knowledge to determine whether the procedure was unusual or not, and he did nothing to educate himself on the topic.

Indeed, Dr. Krumholz admits that he does not know whether the risk of perforation can increase with the duration of the procedure, the number of retractions, or whether the IVC is even retracted during the procedure.  *Id.* at 287:1-12.  Nor did he know whether Mrs. Brand's IVC was retracted during her procedure.  *Id.* at 287:13-15.  Indeed, although he claims there was

---

question at hand, that is, whether something other than the design of the filter caused Mrs. Brand's filter to perforate and fracture.

nothing unusual about the procedure, he has no experience, education, or training to review the relevant records determine whether anything unusual occurred during the procedure.  And, as Cook's expert vascular and neurological medical experts (Dr. David Gillispie and Dr. Kenneth Renkens) will testify, based on their experience and research regarding Mrs. Brand's procedure, multiple medical and biological factors complicated it.  All this goes to show that he had no scientific basis for ruling out the ALIF as a cause of Mrs. Brand's perforation or fracture.

Dr. Krumholz also says he ruled out the ALIF procedure based on imaging taken immediately after the procedure.  *Id.* at 315:12-15.  However, when he was confronted with the fact that there was no CT or venogram showing the walls of the vena cava taken immediately after the procedure, he admitted that he "literally cannot remember" what information or image allowed him to exclude the ALIF procedure as a cause of Mrs. Brand's perforation and fracture. *Id.* at 316:17-24.  It is not surprising that he cannot recall whether an image exists, as he admitted that he did not review any imaging, and only relied "on the testimony or reports that have been submitted" by other physicians.  *Id.* at 315:20-23.  He stated that he would need to see imaging to determine a window of time when the perforation occurred, and he admitted he could not give an opinion as to the window of time during which Mrs. Brand's filter perforated—without which it is impossible to eliminate the ALIF procedure as a cause of Mrs. Brand's complications.  *Id.* at 318:9-21.

In fact, Dr. Krumholz sweepingly concluded that because the Celect allegedly has a higher risk at baseline, whether something like an ALIF procedure can increase the risk is of no matter because the higher baseline risk "echoes all the way through." *Id.* at 289:10-290:16.   Yet he neither quantified that baseline risk nor the degree to which the Celect filter allegedly exceeds the risk posed by any other filter.   He agreed that, for any filter, he does not know the exact rates

at which they cause harm.  *Id.* at 321:20-322:18.  In fact, he agreed that the rates are low, but says they are unreliable because they are "grossly unreported."  *Id.* at 322:19-24.  But without doing anything to quantify his opinions, Dr. Krumholz will essentially be asking the jury to just trust his word that regardless of any other extenuating circumstance, the Celect has a higher baseline risk and therefore must be the cause of Mrs. Brand's alleged injuries.  This is "nothing more than the *ipse dixit* of [an] expert," and the Court should not allow it.  *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) (excluding expert opinion for this reason); *see also Cunningham v. Masterwear, Inc.*, No. 1:04-cv-1616-JDT-WTL, 2007 WL 1164832, *9 (S.D. Ind. April 19, 2007) ("[N]o physician may testify to his or her opinion based solely on the expert's say so and a medical degree.").  This opinion also is impermissible because, as explained above, the reliable methods of his profession do not allow Dr. Krumholz to say that the Celect filter causes a different perforation risk than any other filter.

Finally, Dr. Krumholz failed to use a reliable methodology in determining the causes of Mrs. Brand's current or future injuries.  He opines that Mrs. Brand suffers from anxiety and depression due to her experience with the filter.  *Id.* at 295:20-296:20. Yet, he performed no differential diagnosis as to the cause of her anxiety and depression and acknowledged that Mrs. Brand had preexisting anxiety and depression unrelated to the filter.  When pressed for a scientific basis for his opinion, Dr. Krumholz could only say that even if she was already on "unstable ground," her experience with the filter "would only exacerbate and make even more difficult to manage what she was dealing with."  *Id.* at 297:21-298:17.  This is based solely on his in-person meeting with her in 2018, not any test or psychological evaluation or a differential diagnosis.  *Id.* at 297:21-298:17.  Nor did he analyze Mrs. Brand's prescription medications for

anxiety, depression, or chronic pain, and he acknowledged that he "didn't deeply dive into that" issue.  *Id.* at 299:7-13.

His analysis regarding Mrs. Brand's gastrointestinal problems is no better.   He acknowledged that Mrs. Brand may have pancreatitis, irritable bowel syndrome, colitis and other gastrointestinal issues, but he simply stated that the filter "may be still in part exacerbating those underlying conditions."  *Id.* at 301:2-22.  He also agrees that there is nothing in his report where he ruled in or ruled out causes of Mrs. Brand's abdominal or other pain.  *Id.* at 301:23-302:17. As such, his methodology is wholly lacking on this front and his opinions regarding the source of Mrs. Brand's abdominal pain should be excluded.

Dr. Krumholz also cannot opine on the likelihood that Mrs. Brand will experience any future complications.  Indeed, he admits that it is "impossible to tell" and he cannot say to a reasonable degree of medical certainty whether Mrs. Brand will or will not experience a future complication.  *Id.* at 297:3-16, 304:8-18.  In other words, he admits that any opinion about the likelihood of her suffering a future injury from the filter would be total speculation.

In sum, Dr. Krumholz is not qualified to offer his *Brand*-specific opinions and he failed to conduct a proper differential diagnosis.  Not only did Dr. Krumholz fail to rule in obvious causes of Mrs. Brand's alleged filter failure, he also failed to adequately rule out causes he considered.  For these reasons, Dr. Krumholz's *Brand*-specific opinions should be excluded in their entirety.

## CONCLUSION

For the reasons stated above, the Cook Defendants urge the Court to grant their motion and to bar from the trial in this action the testimony of Plaintiff's expert Dr. Harlan Krumholz.

Respectfully submitted,

Dated:  July 20, 2018                        */s/ Victoria R. Calhoon*
                                             Andrea Roberts Pierson (# 18435-49)
                                             Victoria R. Calhoon (# 28492-49)
                                             Anna C. Rutigliano (# 32743-49)
                                             FAEGRE BAKER DANIELS LLP
                                             300 North Meridian Street, Suite 2700
                                             Indianapolis, Indiana  46204
                                             Telephone:  (317) 237-0300
                                             Facsimile:  (317) 237-1000
                                             andrea.pierson@faegrebd.com
                                             victoria.calhoon@faegrebd.com
                                             anna.rutigliano@faegrebd.com

                                             Charles Webber (# 215247)
                                             FAEGRE BAKER DANIELS LLP
                                             2200 Wells Fargo Center
                                             90 South Seventh Street
                                             Minneapolis, MN 55402
                                             Telephone: (612) 766-8719
                                             Facsimile: (612) 766-1600
                                             chuck.webber@faegrebd.com

                                             *Counsel for the defendants, Cook Incorporated,
                                             Cook Medical LLC (f/k/a Cook Medical
                                             Incorporated), and William Cook Europe ApS*

36

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 20, 2018, a copy of the foregoing was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.  Lead Co-Counsel for Plaintiffs will serve any non-CM/ECF registered parties.

*/s/ Victoria R. Calhoon*

US.118753904.06