**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND              Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                              MDL No. 2570
_

This Document Relates to Plaintiff

    *Tonya Brand*
    No. 1:14-cv-06018-RLY-TAB

_____

**COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION TO EXCLUDE EXPERT OPINIONS OF DR. GREGORY GORDON**

# TABLE OF CONTENTS

**Page**

RELEVANT FACTUAL BACKGROUND ................................................................. 2

Plaintiff Tonya Brand ........................................................................................... 2

Plaintiff's Expert, Gregory Gordon, M.D. ............................................................ 4

ARGUMENT ........................................................................................................ 6

I.   Dr. Gordon's Opinions Regarding the Design of the Celect IVC Filter Should Be Excluded .................................................................................................... 7

    a.   Dr. Gordon Is Not Qualified to Testify Regarding the Celect's Design, Including Its Purported Lack of a "Perforation Limiter." ............................ 7

    b.   Dr. Gordon's Methodology in Deriving His Opinions on the Celect's Design Is Unreliable and Flawed. ............................................................ 10

        i.   Dr. Gordon ignored critical metrics when evaluating the Celect's design .......... 11

        ii.   Dr. Gordon has failed to identify a safer alternative design ................................ 15

    c.   Dr. Gordon's Opinions Are Duplicative of Plaintiff's Other Experts ....................... 16

II.   Dr. Gordon's Opinions Regarding Relevant Medical Literature Should Be Excluded ....... 17

III.   Dr. Gordon's Conclusions Regarding Plaintiff's Alleged Injuries Should Be Excluded ..................................................................................................... 21

    a.   Dr. Gordon Is Not Qualified to Perform the Differential Diagnosis Required in This Case .................................................................................... 23

    b.   Dr. Gordon Failed to Systematically Rule In and Rule Out Causes in His Differential Diagnosis, Rendering It Unreliable ........................................... 25

IV.   Dr. Gordon's Opinions Regarding the Design of the OUS Study Should Be Excluded ..................................................................................................... 30

    a.   Dr. Gordon Cannot Be Allowed to Critique the OUS Study's Design or Definitions ................................................................................................ 31

    b.   Dr. Gordon's Analysis of Internal Cook Documents Must Be Excluded as Unqualified, Unsupported, Irrelevant, and Not Helpful to a Jury ..................... 33

V.   Dr. Gordon's Opinions on the Adequacy of the Instructions and Warnings for the Celect IVC Filter, and the Celect's Regulatory History, Should Be Excluded .................. 36

    a.   Dr. Gordon Is Not Qualified to Offer Expert Opinion Regarding Regulatory Issues, Including Class II Device Approval and IFUs/Warnings ......................... 36

    b.   Dr. Gordon Did Not Employ a Scientifically Reliable Reasoning or Methodology in Formulating His Opinion Regarding the Instructions and Warnings ..................................................................................................... 38

VI.   Dr. Gordon's Proposed Expert Testimony Would Not Assist the Jury .............................. 45

    a.   Jurors Do Not Need Expert Testimony to Understand Cook Documents ................. 46

b.   Dr. Gordon's Testimony Does Not Reflect a Sufficient Degree of Medical
          Certainty...................................................................................................... 48

VII.   The Court Should Exclude Opinions that Dr. Gordon Did Not Disclose in His
          Expert Report.................................................................................................... 49

CONCLUSION.............................................................................................................. 50

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Baldonado v. Wyeth*,
2012 U.S. Dist. LEXIS 68691 (N.D. Ill. May 17, 2012) .................................47

*Bammerlin v. Navistar Int'l Transp. Corp.*,
30 F.3d 898 (7th Cir. 1994) .................................................................................7

*Bourelle v. Crown Equip. Corp.*,
220 F.3d 532 (7th Cir. 2000) .....................................................................passim

*Brown v. Burlington N. Santa Fe Ry. Co.*,
765 F.3d 765 (7th Cir. 2014) ............................................................................23

*C.W. ex rel. Wood v. Textron, Inc.*,
807 F.3d 827 (7th Cir. 2015) ............................................................................15

*Chapman v. Maytag Corp.*,
297 F.3d 682 (7th Cir. 2002) .....................................................................15, 20

*Ciomber v. Coop. Plus, Inc.*,
527 F.3d 635 (7th Cir. 2008) .......................................................10, 25, 27, 47

*Clark v. Takata Corp.*,
192 F.3d 750 (7th Cir. 1999) ............................................................................15

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993)....................................................................................passim

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ................................................................9, 14, 33

*Ervin v. Johnson & Johnson, Inc.*,
492 F.3d 901 (7th Cir. 2007) ..................................................................6, 23, 25

*Finley v. Marathon Oil Co.*,
75 F.3d 1225 (7th Cir. 1996) ............................................................................49

*Gayton v. McCoy*,
593 F.3d 610 (7th Cir. 2010) ....................................................................17, 23

*Hall v. Flannery*,
    840 F.3d 922 (7th. Cir. 2016) ............................................................................17

*Higgins v. Koch Dev. Corp.*,
    794 F.3d 697 (7th Cir. 2015) .............................................................................23

*Higgins v. Koch Development Corp.*,
    No. 3:11-cv-81-RLY-WGH, 2013 WL 6238650 (S.D. Ind. Dec. 3,
    2013) ..............................................................................................................23, 39

*In Re Diet Drugs Prods. Liab. Litig.*,
    2000 U.S. Dist. LEXIS 9037 (E. D. Pa. June 20, 2000)..............................34, 46

*In Re Diet Drugs Prods. Liab. Litig.*,
    2001 U.S. Dist. LEXIS 1174 (E.D. Pa. Feb. 1, 2001) ......................................34

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...............................................................34

*In re Zimmer Nexgen Knee Implant Products Liab. Litig.*,
    2015 WL 5145546 (N.D. Ill. Aug. 31, 2015) ....................................................47

*Jones v. Lincoln Elec. Co.*,
    188 F.3d 709 (7th Cir. 1999) .............................................................................17

*Kirk v. Exxon Mobil Corp.*,
    870 F.3d 669 (7th Cir. 2017) .......................................................................16, 33

*Lewis v. CITGO Petroleum Corp.*,
    561 F.3d 698 (7th Cir. 2009) ...............................................................................6

*Parker v. Brush Wellman, Inc.*,
    377 F.Supp.2d 1290 (N.D. Ga. 2005), *aff'd in pertinent part*, 230
    Fed. Appx. 878 (11th Cir. 2007)..................................................................39, 43

*Peoples State Bank v. Stifel, Nicolaus & Co., Inc.*,
    2013 WL 1024917 (S.D. Ind. Mar. 14, 2013) ...................................................45

*Salgado by Salgado v. Gen. Motors Corp.*,
    150 F.3d 735 (7th Cir. 1998) .....................................................................passim

*Sann v. Mastrian*,
    2012 WL 253088 (S.D. Ind. Jan. 26, 2012)......................................................45

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000) ...............................................................45

*State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*,
    980 F. Supp. 2d 1031 (N.D. Ind. 2013) ....................................9, 14, 33

*Talley v. Novartis Pharms. Corp.*,
    2011 U.S. Dist. LEXIS 69280 (W.D.N.C. 2011) ...............................34

*U.S. v. Duncan*,
    42 F.3d 97 (2d Cir. 1994) ...................................................................35

*U.S. v. Hall*,
    93 F.3d 1337 (7th Cir. 1996) ..............................................................47

*Wendler v. Ezra, P.C. v. Am. Int'l. Grp., Inc.*,
    521 F.3d 790 (7th Cir. 2008) ........................................................27, 34

*Wintz By and Through Wintz v. Northrop Corp.*,
    110 F.3d 508 (7th Cir. 1997) ..............................................................48

**STATE CASES**

*Banks v. ICI Americas, Inc.*,
    450 S.E.2d 671 (Ga. 1994) ........................................................7, 11, 15

*Ogletree v. Navistar Int'l Transp. Corp.*,
    500 S.E.2d 570 (Ga. 1998) ..................................................................11

**RULES**

Fed. R. Civ. P. 26 ...............................................................5, 10, 25, 47, 49

Fed. R. Civ. P. 37 ...............................................................................49

Fed. R. Evid. 402 ..........................................................................35, 39

Fed. R. Evid. 403 .......................................................16, 19, 33, 35, 47

Fed. R. Evid. 702 .....................................................................passim

Fed. R. Evid. 703 ...............................................................................35

**REGULATIONS**

21 C.F.R. § 801 ...................................................................................................37

21 C.F.R. §§ 801.1 *et seq.*..................................................................................36

21 C.F.R. § 880.6230 ...........................................................................................5

21 C.F.R. § 878.4460 ...........................................................................................5

21 C.F.R. § 872.6855 ...........................................................................................5

Defendants Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS (collectively, "Cook" or the "Cook Defendants") move this Court, pursuant to Fed. R. Evid. 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), to exclude the proffered testimony of Plaintiff's interventional radiology expert Gregory Gordon, M.D.  In support of this motion, the Cook Defendants state:

The Court should exclude Dr. Gordon's opinions in their entirety, because he repeatedly opines in areas in which he has no expertise and has done inadequate work (or no work at all) to support his conclusions.  If the Court declines to exclude Dr. Gordon altogether, the Court should limit his testimony to his personal reading of radiological studies.  Specifically, he should be excluded from opining in the following areas:

1. Regarding the design of the Celect.  Dr. Gordon is not qualified to offer opinions regarding the design of the Celect, has not used a reliable methodology in criticizing the design, and has employed a cumulative analysis that merely copies from other of Plaintiff's experts in this case;

2. Regarding the contents of published literature on IVC filters.  Dr. Gordon has not reviewed the relevant literature, rendering him unqualified and rendering his methodology unreliable;

3. Regarding the cause(s) of Plaintiff's claimed injuries.  Dr. Gordon is not qualified to conduct the differential diagnosis required in this case regarding Plaintiff's IVC filter malposition and fracture.  He is even less qualified to opine on issues outside his radiology specialty, such as depression and anxiety, pain management, gastrointestinal issues, pathology, and the like.  He further failed to perform a valid differential diagnosis, including systematically rule in and rule out causes,

1

as is evidenced by the fact that during the deposition he withdrew a majority of his Brand-specific opinions as not reached to a reasonable degree of medical certainty after, his own words, he "reviewed things further";

4.  Regarding any aspect of the so-called OUS study and related documents, other than Dr. Gordon's own review of the study's radiological images.  Dr. Gordon is not qualified to critique a clinical study's protocol, design, or definitions, and his methodology is limited to reading Cook documents that jurors can read without his help;

5.  Regarding the adequacy of Cook's warnings about the Celect filter, including but not limited to the instructions for use ("IFU"), or about the Celect's regulatory history.  Dr. Gordon is not qualified to opine on regulatory issues.  His non-regulatory opinions about Cook's alleged failure to warn do not require expert opinion at all, and he fails to offer an appropriate alternative warning;

6.  Regarding the contents of internal Cook documents, including but not limited to complaints received by Cook.  These documents either speak for themselves, without Dr. Gordon's assistance, or require expert interpretation that is outside Dr. Gordon's expertise; and

7.  Regarding opinions that were not disclosed in Dr. Gordon's report.

## RELEVANT FACTUAL BACKGROUND

### Plaintiff Tonya Brand

This case involves a Celect inferior vena cava ("IVC") filter that was inserted in Plaintiff's IVC by vascular surgeon Mark Rheudasil, M.D. on March 19, 2009.  Expert Report of Gregory I. Gordon, M.D., dated 4/30/2018 ("Gordon Rept."), p. 18, attached as **Exhibit A**. Immediately after the filter was inserted, Plaintiff underwent a six-hour, two-level anterior

lumbar interbody fusion ("ALIF") surgery.  *Id*; Expert Report of David Gillespie, M.D., dated 5/30/2018 ("Gillespie Rept."), p. 21, attached as **Exhibit B**.  ALIF surgery involves considerable manipulation of the IVC to gain access to the spine (*i.e.*, exposure) through an incision made across the front of a patient's abdomen.  Gillespie Rept., p. 33.  In Plaintiff's case, a complication during the surgery required even more manipulation of the IVC than usual. *Id.*  The Cook Defendants contend that the manipulation of Plaintiff's IVC during a six-hour abdominal surgery shortly after her filter had been inserted was a major factor, if not the sole cause, of her claimed injuries in this case.

The first imaging of Plaintiff's IVC following the March 19, 2009 spinal surgery is CT imaging taken three weeks later, on April 10, 2009.  Those images show that Plaintiff's IVC filter was perforating her IVC wall in multiple places.  Gordon Rept., pp. 19-21; Gillespie Rept., pp. 30-31.  One of the filter's struts was contacting an osteophyte (*i.e.*, a bone spur) on her spine, impeding its usual movement.  Gillespie Rept., pp. 30, 34.  The CT images do not demonstrate whether the filter became malpositioned and/or perforated before, during, or after the ALIF procedure.[1]  The filter subsequently fractured in multiple places.  Gordon Rept., p. 24; Gillespie Rept., p. 30.  One of the fragments allegedly emerged from Plaintiff's right thigh on or about June 17, 2011.  Gordon Rept., pp. 29-30; Gillespie Rept., p. 24.

Dr. Rheudasil attempted to retrieve the filter percutaneously on July 14, 2011, but was unsuccessful.  Gordon Rept., p. 31; Gillespie Rept., p. 25.  Dr. Rheudasil and Plaintiff elected to leave the filter in place until October 22, 2015, at which time Dr. Rheudasil removed it through open surgery.  Gordon Rept., p. 37; Gillespie Rept., pp. 25-26.

---

[1] Neither Dr. Gordon, an interventional radiologist, nor Dr. Gillespie, a vascular surgeon, claim that the CT images reveal exactly when the perforation occurred.

3

**Plaintiff's Expert, Gregory Gordon, M.D.**

This motion pertains to Plaintiff's expert witness, interventional radiologist ("IR") Gregory Gordon, M.D.  In general, IRs are familiar with using IVC filters and have generalized expertise that could be relevant to an IVC filter case.  This case, however, involves unusual issues (*e.g.*, the extensive caval manipulation during the ALIF surgery and compression of the vena cava) that require more than a general understanding of IVC filters.  Dr. Gordon has not participated in an abdominal surgery (ALIF or otherwise) since his residency and has never manipulated a vena cava to provide exposure for such a procedure.  Excerpts from Deposition of Gregory I. Gordon, M.D., dated 6/12/2018 ("Gordon Dep.") at 25:1-7, attached as **Exhibit C**. He has also never cut open a human IVC to remove an IVC filter, or for any other reason.  *Id*. at 24:15-25.  He has never conducted any testing on IVC filters, either in clinical trials or in an engineering context.  *Id*. at 50:18-23; 56:2-7; 173:6-8.  He has never published, in a peer-reviewed medical journal or otherwise, or presented to his peers on IVC filters. *Id*. at 112:25-113:4; 113:10-17; 115:22-24.  In short, Dr. Gordon's clinical experience as an IR does not include experience with the medical issues involved in this case, and he has no broad academic experience with IVC filters that would close that gap.

Dr. Gordon also claims to be an expert in regulatory issues and IVC filter IFUs.  He attempts to broaden his expert qualifications by citing his part ownership of medical device company Radux, claiming to have acquired "extensive experience in product development, product design, proof of concept, design failure modes, hazard and risk analysis as well as post market surveillance and the FDA process."  Gordon Rept., p. 1.  He adds that he has written IFUs and participated "in the majority of the regulatory and compliance issues related to the 510K process and FDA clearance for my company."  *Id*.  He acknowledged at his deposition,

4

however, that he has no education or expertise on engineering or regulatory issues.  Gordon Dep. at 49:21-50:7; 56:11-17.  Indeed, Radux hires outside engineering and regulatory experts rather than relying to Dr. Gordon for assistance in those areas.  Gordon Dep. at 62:13-16; 65:9-17; 105:22-106:3.  Radux's reliance on true regulatory experts is especially striking in light of the relative simplicity of Radux's products compared to an IVC filter.  Radux has only three products currently on the market, each of which is essentially a tube that extends another tube. Gordon Dep. at 57:11-24; 58:7-22.  Those products are Class I devices[2] for use exclusively outside of a human body, and they were not considered by the FDA through a 510(k) application. Gordon Dep. at 58:7-11; 59:5-12.  Radux is expected to begin selling another Class I device for external use, a disposable plastic radiation shield, in July 2018.[3]  Gordon Dep. at 58:11-16, 59:16-60:6.  None of these products has gone through the 510(k) process,[4] nor has Dr. Gordon ever submitted a 510(k) application to the FDA at any other time.  Gordon Dep. at 59:5-60:22; 95:21-25 (agreeing that his products came to market through a "much easier regulatory climate").  Class I devices include things like tongue depressors, latex gloves, and toothbrushes, which are far different than an implantable medical device.  21 C.F.R. §§ 880.6230, 878.4460, & 872.6855.

In effect, Dr. Gordon claims he is an expert in engineering and regulatory issues because he watched his company's outside engineering and regulatory consultants help bring the company's tube extenders to market through a relatively simple process.  Merely watching experts at work does not make one an expert, particularly where, as here, the opinions the

---

[2] By contrast, IVC filters are Class II devices that are inserted into the inferior vena cava, deep inside the body.

[3] Dr. Gordon also claims that Radux is in the process of bringing a Class II device to market.  However, he asserted that it was confidential and refused to discuss or even describe it at deposition.  Gordon Dep. at 58:11-16, 60:10-18; 76:10-17. Accordingly, it cannot be considered in connection with his purported expertise in this case.  *See* Fed. R. Civ. P. 26(a)(2)(B) (requiring disclosure of an expert witness' qualifications).

[4] This includes the allegedly forthcoming Class II device, for which no 510(k) application has yet been prepared.

"expert" proposes to offer address issues far more complex than he ever watched his consulting experts address for Radux.

Dr. Gordon further suggests that Plaintiff has suffered chronic abdominal pain, depression, anxiety, and other conditions with no qualification at all. He admits he holds no qualification in gastrointestinal medicine, psychiatry, or any discipline other than radiology. Gordon Dep. at 27:9-14; 47:1-6.

Dr. Gordon's limited expertise has prevented him from formulating reliable, scientifically valid opinions. In numerous areas, he completely skipped the analysis that he was not qualified to perform and instead relied on faulty assumptions, the uncritical adoption of other experts' opinions, and his own lay reading of Cook's internal emails and documents. Indeed, during his deposition, Dr. Gordon withdrew many of the opinions in his written report, conceding at deposition that he cannot support them. The Cook Defendants ask that the Court bar him from presenting his remaining, equally-flawed opinions to the jury.

## ARGUMENT

The Seventh Circuit has established three requirements in its application of the *Daubert* standard: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand evidence or to determine a fact in issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The proponent of an expert witness—here, the Plaintiff—has the burden under Rule 702 to establish admissibility by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Here, Dr. Gordon fails to satisfy any of these requirements, and the Court should exclude his testimony.

I.      **Dr. Gordon's Opinions Regarding the Design of the Celect IVC Filter Should Be Excluded**

Under Georgia law, the risk-utility balancing test governs whether a product's design is defective. *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 673-74 (Ga. 1994). Under this test, "risks inherent in a product design are weighed against the utility or benefit derived from the product." *Id.* at 673.

Dr. Gordon claims to have performed the requisite risk-benefit analysis, and concludes that "[t]he risks of the Celect filter (perforation, tilt, fracture, migration, inability to remove, pain, causation of [deep vein thrombosis]) outweigh the benefits (none proven)." Gordon Rept., p. 11. In arriving at that conclusion, however, Dr. Gordon admits that he skipped necessary steps in the analysis. For example, his claim that the Celect has no benefits is based on his belief that there is "no evidence" of benefit, but he does not even claim to have searched for evidence of benefits. Worse, his analysis completely ignored benefits of the Celect that Dr. Gordon himself saw in his clinical practice.

Dr. Gordon should be barred from discussing the Celect's design for three reasons. First, he simply is not qualified to perform the sort of analysis on which he purports to base his opinions. Second, Dr. Gordon's omission of critical steps of his analysis renders his methodology fatally unreliable. Third, his opinions are largely adopted wholesale from Plaintiff's other experts, rendering them both incompetent and duplicative.

a.      **Dr. Gordon Is Not Qualified to Testify Regarding the Celect's Design, Including Its Purported Lack of a "Perforation Limiter."**

Trial courts must ensure, "before admitting expert testimony, that the expert knows whereof he speaks." *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994). The expert has to be "qualified," in other words, whether "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

Dr. Gordon is not an engineer, biomedical engineer, metallurgist, or materials scientist. Gordon Dep. at p. 49:21-50:7. He has never designed an IVC filter, performed any bench testing on an IVC filter, or even conducted any clinical trials relating to IVC filters. Gordon Dep. at 50:15-23; 56:2-7. Dr. Gordon has never published, in a peer-reviewed medical journal or otherwise, or presented to his peers on the design or testing of medical devices. Gordon Dep. at 113:18-20; 115:25-116:2. Indeed, he has never published or presented any material regarding IVC filters. Gordon Dep. at 112:25-113:4; 113:10-17; 115:22-24. He claims to have acquired "extensive expertise" regarding product design, design failure modes, root cause analysis, and the corrective and preventive action process while working with his company, Radux. Gordon Rept., p. 1. However, the only products that Radux sells are tubes that extend other tubes. He claims they soon will sell a plastic square that will go over the hand of an IR when performing procedures, but that product is not yet commercially viable. Neither the tubes nor the plastic square shield is used inside the human body. *See supra* pp. 5-6. Even for those relatively simple products, Dr. Gordon does not perform Radux's engineering work himself but defers to outside consultants instead. Gordon Dep. at 65:9-17; 105:22-106:3.

In contrast to the Radux products, an IVC filter is an implantable medical device that must cope with a harsh environment that varies from patient to patient, attach to a dynamic, shape-shifting human IVC wall, and selectively catch clots without blocking blood flow. Gordon Rept., p. 4; Expert Report of Scott W. Robertson, Ph.D., dated 6/6/2018 ("Robertson Rept."), pp. 13, 18, attached as **Exhibit D**. Dr. Gordon's experience and training do not qualify him to discuss how specific design features of the Celect influence its performance.

Dr. Gordon's proposed design opinions bring into sharp focus the problems posed by his lack of experience in these areas. Dr. Gordon claims that the Celect IVC filter perforates at a

high rate because it lacks a "perforation limiter." *See* Gordon Rept., p. 2. In using that term, he is not describing an abstract phenomenon but a specific piece of a filter's hardware. *See, e.g.,* Gordon Dep. at 160:16-23 (identifying the "perforation limiter" of the Greenfield filter as the "different shapes, positions, and configurations of the hooks on the bottom"). However, Dr. Gordon did not personally identify the Greenfield filter's "perforation limiter," conceding that he "did not study the Greenfield filter" and that he is "ignorant" about it. Gordon Dep. at 162:7-21. He learned about it only by reading review articles about IVC filters and other materials. Gordon Dep. at 161:23-162:21. This is a classic case of an expert opining outside of his area of expertise by simply parroting what he has heard other experts say. The Court should bar him from doing so. *See State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1048 (N.D. Ind. 2013) (an expert's proffered opinion that "merely parrots information" is generally excluded.); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002).

Cook anticipates that Plaintiff will argue that Dr. Gordon's status as an interventional radiologist enables him to review the medical literature, identify complication rates for various filters, and correlate high or low rates with particular physical characteristics that correlate with higher reported rates of particular complications. That argument fails for two reasons. First, as noted, Dr. Gordon is not qualified to discuss the design features of various filters from an engineering perspective. All he can do is compare them by gross visual analysis, something that jurors are fully able to do without Dr. Gordon's help. And any testimony beyond a gross visual comparison ventures beyond his expertise and merely parrots what he read in the literature and in documents from Cook and Cook's experts.

Second, and more problematically, despite opining that Celect filters perforate at a "high rate," Dr. Gordon has not actually compared the reported complication rates for different filter designs.  His report does not identify a single filter that tilts, migrates, or fractures less frequently than the Celect.  Gordon Dep. at 149:18-151:1. His report offers no substantive discussion of any other filter's perforation rate, other than one isolated comparison between the Celect and Tulip that he read about in a deposition in this litigation.  Gordon Rept., p. 15.  Dr. Gordon thus has not actually identified complication rates for various filters (other than the Tulip) and cannot possibly engage in the visual comparison described above.  As to the Tulip, Dr. Gordon openly admits he derived his views on a perforation limiter from Cook documents, not from visual comparison.  Dr. Gordon cannot be allowed to perform at trial a lay visual analysis that he admits formed no part of the basis for his opinions.

In short, Dr. Gordon is not qualified to offer expert opinion on how specific design features impact performance, and the Court should bar any such testimony.

> **b.    Dr. Gordon's Methodology in Deriving His Opinions on the Celect's Design Is Unreliable and Flawed.**

The Court should bar Dr. Gordon from critiquing the Celect's design because his methodology is unreliable and flawed.  He completely skipped important steps in his risk-benefit analysis and in his identification of a supposed safer alternative design.  His written report fails to show his work in reaching his opinions, an omission that cannot be cured at deposition or through supplemental reports.[5]  Fed. R. Civ. P. 26(a); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (deposition testimony cannot cure deficiencies in written report); *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("Expert reports must

---

[5] Dr. Gordon generated a supplemental report in this case, but it was not provided until the day before his deposition. *See* Gordon Dep. at 233:24-234:3; 354:15-18.

include the 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.").

> ### i.   Dr. Gordon ignored critical metrics when evaluating the Celect's design.

Under Georgia's risk-benefit test for product defect, "risks inherent in a product design are weighed against the utility or benefit derived from the product." *Banks.*, 450 S.E.2d at 674.

An IVC filter presents many risks and benefits that factor into a design, and every design consideration involves tradeoffs. For example, a filter needs to catch clots to be effective, but a filter that catches clots too well can occlude and block blood flow. Robertson Rept., p. 14. Likewise, a filter needs to embed in the IVC wall in order to avoid potentially lethal migration to the heart, but minimizing migration tends to increase perforation and/or reduce filter retrievability. Gillespie Rept., p. 7; Robertson Rept., pp. 14-15. A filter can be judged based on many, many metrics, including but not limited to pulmonary embolism ("PE") prevention, migration rate, fracture rate, perforation rate, tilt rate, and retrieval success rate. Robertson Rept., pp. 13-17; U.S. Dep't of Health & Human Servs., Guidance for Industry and FDA Staff: Guidance for Cardiovascular Intravascular Filter 510(k) Submissions (1999) ("1999 FDA IVC Filter Guidelines"), attached as **Exhibit E**. As a matter of Georgia law, a product cannot be found defective based on an isolated review of one particular performance measure; in this case, perforation. *See Banks*, 450 S.E.2d at 673-74; *see also Ogletree v. Navistar Int'l Transp. Corp.*, 500 S.E.2d 570, 572 (Ga. 1998) (rejecting the "open and obvious danger" rule as inconsistent with the *Banks* risk-utility test because it focuses on "only one of many factors which affect the product's risk" and "mak[es] that single factor dispositive").

Dr. Gordon claims to have conducted a risk-benefit analysis in reaching his conclusions. Gordon Rept., pp. 12-13. However, his report contains no data on any issue other than

11

perforation and tilt.  For example, he does not consider the Celect's fracture rate, retrieval success rate, or any other issues.  The omission of any fracture rate is particularly glaring given that Plaintiff claims that the fracture of the Celect was what caused her injuries. As to tilt, Dr. Gordon relies on no peer-reviewed statistics, only statistics from his own review[6] of a single study by Cook.  Gordon Rept., p. 11.  His report does not identify a single filter that tilts, migrates, or fractures less frequently than the Celect.  Gordon Dep. at 149:18-151:3. This undercuts any claim to a reliable methodology, given his concession that all IVC filters have some risk of migration, perforation, fracture, and difficult/failed retrieval.  Gordon Dep. at 147:1-17; 149:4-13.  He also repeatedly claims that perforation "leads to tilt, further perforation, and fracture." *See, e.g.,* Gordon Rept., pp. 2, 12.  However, he admits that he never studied that connection and does not know that perforation frequently leads to downstream complications such as tilt or fracture.  Gordon Dep. at 278:22-279:23; 378:14-23; 381:23-382:5.

In short, Dr. Gordon gives statistics for only one risk metric—perforation/penetration—and claims without offering any support or employing any methodology that perforation leads to other problems.  His failure to employ a reliable methodology to test this conclusion is perhaps understandable given the lack of statistical support:  the Celect filter has less than a 1% complaint rate and boasts one of the lowest published complication rates of any filter on the market.  Gillespie Rept., pp. 11-14 (summarizing Cook complaint data and peer-reviewed medical literature); *see also* Expert Report of Harlan Krumholz, M.D. ("Krumholz Rept.") at 94-96, attached as **Exhibit F**. (noting that a study by McLoney, et al., reported a 0.8% rate of

---

[6] Notably, Dr. Gordon admits he is not an expert in statistics and did not calculate his rate of tilt himself. Gordon Dep. at 75:2-15 (regarding his lack of expertise in statistics/epidemiology). He deferred to another of Plaintiff's expert in this case to generate Table 18 of his report, which is the only place in which the statistic appears.  Gordon Dep. at 297:20-298:1.  Dr. Gordon did not even double-check the math himself.  Gordon Dep. at 297:2-7.

fracture with the Celect amongst patients who required abdominal CT imaging "for any reason"[7]).

Dr. Gordon has no sound methodology for analyzing on the benefit side of the risk-benefit analysis, because he simply never considered it.  He implausibly claims that there is "no evidence" that the Celect, or <u>any</u> retrievable IVC filter, has any benefit at all, wholly ignoring years of data from filter use dating back to the 1970s.  Gordon Rept., p. 12; Gordon Dep. at 351:16-19; *see also id.* at 125:22-24 (claiming no filter has any proven benefit).[8]

However, Dr. Gordon did not actually bother to look for evidence of the benefits of IVC filters.  As his report makes clear, he jumps to the conclusion that IVC filters offer any benefit to any patient, and then skips to his analysis of perceived risks.  That is not a scientific or medically reliable methodology.  He parrots the opinion of Plaintiff's expert cardiologist, Dr. Krumholz, on this point.  Gordon Rept., p. 12 ("As described in the Krumholz report, the benefits of the Celect filter have not been proven and are at best unknown.").  He does not claim to have performed any search for evidence himself.  Worse yet, his claim that there is "no evidence" at all indicates that he did not bother to read the analysis by Dr. Krumholz on which he relies: Dr. Krumholz himself discusses at least one randomized controlled trial in which retrievable filters were indeed found to reduce PE risk.  Krumholz Rept. at p. 39 (noting that Sharifi, et al., found a group of patients randomly assigned to receive retrievable filters had "lower rates of PE" than the control

---

[7] This was the only mention of a published fracture rate for the Celect in Dr. Krumholz's report.  *See* Krumholz Rept. at p. 96.  This was likely strategic: a registry study by Uberoi, et al., and systematic literature review by Jia, et al., reported Celect fracture rates of 0% and 0.3%, respectively. Gillespie Rept., p. 14.

[8] As a threshold matter, this is a disingenuous opinion.  At the same time he claims there is no evidence that filters provide any benefits at all, he opines that Dr. Rheudasil was within the standard of care in placing the filter.  Gordon Rept., p. 44.  If Dr. Gordon believes there has never been any evidence that the Celect offers any benefit at all, then he cannot believe Dr. Rheudasil did anything but harm Plaintiff.

group).[9]  The Court should not permit Dr. Gordon to simply echo Dr. Krumholz's opinion for the jury.  *See State Farm*, 980 F. Supp. 2d at 1048; *Dura Auto.*, 285 F.3d at 613-14.

Furthermore, Dr. Gordon's supposed analysis of the benefit side wholly ignores the Celect's lower rate of fracture, higher retrieval success rate, and other metrics on which the Celect outperforms other filters.  By the standard Dr. Gordon applies the Celect's claimed higher rate of perforation, every metric on which the Celect outperforms other filters is by definition a benefit of the Celect design.  As noted, the Celect has one of the lowest reported complication rates of any filter on the market.  Gillespie Rept., pp. 11-14 (summarizing peer-reviewed medical literature).  Dr. Gordon's methodology did not even acknowledge these benefits, much less take them into account.  In his haste to label the Celect defective, Dr. Gordon never bothers to compare the Celect to any of its peer devices on such metrics as tilt, migration, or fracture.  Gordon Dep. at 149:18-151:1.  Indeed, he admits that he cannot compare efficacy data amongst various filters because he only studied the Celect and, to lesser a degree, one other filter in preparing his report.  Gordon Dep. at 126:3-127:4.

Dr. Gordon's methodology even disregards benefits of the Celect design that he admits he has personally experienced.  For example, Dr. Gordon noted that under certain circumstances, he personally found the Celect easier to remove than other filters.  Gordon Dep. at 131:9-21; 132:14-25.  Enhanced retrievability, even only in a subset of patients, is a benefit that Dr. Gordon personally experienced in his practice and should have considered in his benefit analysis.  Instead, he performed no analysis at all; he simply jumped to the conclusion that favored his employer:  that the Celect has "no benefit" at all.  Such an *ipse dixit* opinion is inadmissible.  *See*

---

[9] Dr. Gordon also tracks Dr. Krumholz's opinion in admitting that there is evidence of efficacy for permanent filters, which is itself evidence that similarly fashioned retrievable filters are effective (absent some reason to believe otherwise, which he does not offer).  Gordon Dep. at 351:2-19; *see also* Krumholz Rept., pp. 40-41 (noting that filters in general have proven efficacy in reducing PE risk).

14

*C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 (7th Cir. 2015) (exclusion of expert's opinion is proper when there is "simply too great an analytical gap between the data and the opinion proffered"); *see also Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002); *Clark v. Takata Corp.*, 192 F.3d 750, 758-59 & n.5 (7th Cir. 1999).

In short, Dr. Gordon's methodology in evaluating the benefits of the Celect filter amounts to jumping to the risk side of the equation, without consideration of the benefits, which is no methodology at all.

### ii.    Dr. Gordon has failed to identify a safer alternative design.

Dr. Gordon also fails to offer a reliable methodology to support his supposed identification of a safer alternative design.  Under Georgia law, the existence or nonexistence of a safer and equally efficacious design is "integral to the assessment of the utility of a design." *Banks*, 450 S.E.2d at 674.  "Indeed, the reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible is considered the 'heart' of design defect cases, since it is only at their most extreme that design defect cases reflect the position that a product is simply so dangerous that it should not have been made available at all." *Id.*

Dr. Gordon acknowledges the importance of discussing safer alternative designs by proposing two of them in his report: the Gunther Tulip filter and the Greenfield filter.  Gordon Rept., pp. 12, 44.  However, he testified that he considers the Tulip itself to be "defective." Gordon Dep. at 142:16-21.  As for the Greenfield filter, he describes himself as "ignorant" on the details of the filter and explains repeatedly that he did not study it.  Gordon Dep. at 161:19-20; 162:6-7; 162:17-21.  Indeed, he cannot even rely on his bare experience regarding the Greenfield filter, as he has not used it in at least eight years.  Gordon Dep. at 130:12-14.  The Court should

not permit Dr. Gordon to bolster his unscientific criticism of the Celect by citing safer alternative designs that he either considers defective or admits he did not study.  He cannot give expert opinion on a topic of which he is admittedly "ignorant."

Moreover, as noted above, Dr. Gordon's report does not identify a single filter that tilts, migrates, or fractures less frequently than the Celect.  Gordon Dep. at 149:18-151:1.  These issues are critical to this case: as discussed above, Plaintiff's first filter-related symptom was linked to the emergence of a fracture fragment from her thigh more than two years after placement.  Yet Dr. Gordon points to other filters as safer alternative designs without even comparing fracture rates.  In ignoring such key metrics, he has failed to employ a reliable methodology in identifying a safer alternative design.

The Court should therefore bar Dr. Gordon from suggesting that any particular alternative to the Celect represents a safer alternative design.

### c.    Dr. Gordon's Opinions Are Duplicative of Plaintiff's Other Experts.

Even if the Court were to conclude that Dr. Gordon is qualified to opine on the Celect's design (which he is not) and that his opinions in that regard are admissible (which they are not), the Court should nevertheless exclude his opinions because their probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *Kirk v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017).

First, as discussed above, Dr. Gordon's proposed testimony concerning the benefits of the Celect filter simply parrots the views of Dr. Krumholz.  It is by definition duplicative of Dr. Krumholz's anticipated testimony, and thus not only lacks foundation but would be needlessly cumulative.

Dr. Gordon's unqualified analysis regarding the Celect's design similarly covers ground already covered by Plaintiff's two engineering experts, Drs. Litsky and McMeeking.  Indeed, Dr. Gordon admits that he defers to both of those experts on engineering issues.  Gordon Dep. at 49:15-20.  Dr. Gordon is not qualified to add anything to their analysis and should not be allowed to do so.

## II.    Dr. Gordon's Opinions Regarding Relevant Medical Literature Should Be Excluded

Dr. Gordon's lack of qualifications and admitted failure to study the propositions he espouses in his report also require the exclusion of his proposed testimony about the current state of the art as discussed in medical literature.  His methodology is nothing more than the regurgitation of statistics from the small subset of scholarly articles suggested to him by Plaintiff's counsel and other experts.  He cannot be allowed to opine on "what the literature says" or "what studies have shown."

In determining an expert's qualifications, the Seventh Circuit has repeatedly reminded litigants that it is not enough for an expert to be generally qualified in a particular area; the expert must be qualified to answer the *particular* question that he or she is venturing to answer. *See, e.g.*, *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723-24 (7th Cir. 1999); *Hall v. Flannery*, 840 F.3d 922, 930 (7th. Cir. 2016) (citing cases). Moreover, a methodology that relies primarily on what an expert learns about the subject in the course of litigation is suspect. *Daubert*, 43 F.3d at 1317; Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Here, Dr. Gordon is an interventional radiologist who inserts and retrieves IVC filters. However, he has never published, in a peer-reviewed medical journal or otherwise,[10] or

---

[10] Gordon Dep. at 112:25-113:4; 113:10-7.

presented to his peers on IVC filters, PE or deep vein thrombosis ("DVT"),[11] nor has he ever participated in clinical trials or bench testing of any IVC filter.[12]  Dr. Gordon may be familiar with the practical aspects of using IVC filters, but he is not a recognized expert in the field. Indeed, he is not even a *member* of the relevant academic community, let alone a leader.

Theoretically, Dr. Gordon could have made himself an expert on IVC filter literature through self-study.  However, his study in this case has been limited to the Celect and the one metric he believes he can sell to a jury: perforation.  *See, e.g.,* Gordon Dep. at 161:18-20. Indeed, he did not even study the Greenfield filter and describes himself as "ignorant" about it, despite claiming that it is a safer alternative design than the Celect.  Gordon Dep. at 162:4-21; 150:14-16.  In short, Dr. Gordon did not even take the "suspect" approach to qualification of reading up on the literature for this litigation.  *Daubert*, 43 F.3d at 1317; Fed. R. Evid. 702 advisory committee's note to 2000 amendment.  He cannot be allowed to discuss the literature at trial as though he were an expert on it.

Dr. Gordon's lack of study on critical issues undermines his methodology as well as his qualification.  His report repeatedly makes grandiose claims that sound as though they are broadly accepted in the literature, but he admits he has no idea whether there are any papers that support them at all.  For example:

- He claims that "[t]he Celect filter progressively perforates the IVC, leading to increased perforation, tilt, fracture and migration."  Gordon Rept., p. 2.  However, he cites absolutely no support for that claim in his report.  At deposition, he admitted that he is not aware of any study regarding, for example, the relationship between perforation and fracture. Gordon Dep. at 378:14-23; 381:23-382:5.  He also does not

---

[11] Gordon Dep at 115:16-24.

[12] Gordon Dep. at 50:18-23; 56:2-7; 173:6-8.

know how often perforation leads to tilt in the Celect.   Gordon Dep. at 278:25-279:23.[13]

- He claims that "[p]erforation results in symptomatic injury in a significant percentage of cases."   Gordon Rept., p. 3.   However, he cites only one paper discussing the rate of symptoms in patients with perforation.   Gordon Dep. at 275:14-17; 278:16-21. Instead of reviewing the numerous other papers that discuss the incidence of symptomatic perforation[14] and conducting a simple meta-analysis, he simply claims that "we don't know" how often perforation itself is symptomatic.   Gordon Dep. at 274:19-22.   And he somehow ascribes the industry's lack of knowledge to Cook's alleged falsification of data.   Gordon Dep. at 274:22-275:2.

- In an effort to criticize the low complaint rate (< 1%) associated with Celect filters, Dr. Gordon claims that there is an "epidemic of under-reporting."   Gordon Rept., p. 3. However, his report does not include any statistics in that regard.   Nor did he cite a single piece of literature regarding under-reporting of complaints for *medical devices*, such as IVC filters.   Gordon Dep. at 288:20-289:2.

- He claims that there is "no evidence the Celect filter confers or has conferred any benefit upon any patient."   Gordon Rept., p. 12.   As discussed above, though, he did not actually look for evidence.   Instead, he blindly adopted Dr. Krumholz's analysis without even reading it.   *See supra* p. 14.

---

[13] Dr. Gordon admitted that he did not know how often perforation leads to tilt.  However, he tried to invent a statistic on the fly by comparing one study's reported perforation rate with that same study's reported tilt rate.  He completely ignored the question of whether the perforation led to tilt and instead simply divided the tilt rate by the perforation rate.  This is the sort of impromptu, unreliable analysis that would mislead the jury and should be excluded under Rule 403, if not 702. *Id.*

[14] Dr. Gordon was aware of the existence of such papers, which he labeled "false literature" at his deposition. Gordon Dep. at 248:21-249:4.  In limiting his report's discussion to just one paper that favors the result Plaintiff desires, he neither mentions nor addresses this "false literature." *See also* Gillespie Rept., pp. 11-14 (summarizing multiple large peer-reviewed studies in which no symptomatic perforations were observed).

In addition, despite opining in his report on the state of the art concerning perforation, fracture, and comorbidities, Dr. Gordon admits in his deposition:

- He did not determine how frequently perforation leads to fracture or tilt in the Celect. Gordon Dep. at 278:22-279:11; 381:16-382:1; Gordon Rept., p. 2.

- He did not look for rates of fracture with the Celect, does not know its fracture rate, and cannot cite a study that shows any filter having a lower fracture rate than the Celect. Gordon Dep. at 198:6-200:4; Gordon Rept., p. 2.

- He did not study how frequently spinal fusion surgery, such as the one Plaintiff underwent immediately after her filter was inserted, causes perforation or fracture of an IVC filter. Gordon Dep. at 320:23-321:9; Gordon Rept., pp. 42-43.

- He did not study how frequently Plaintiff's various co-morbidities, which Dr. Gordon describes in his report, cause perforation or fracture. Gordon Dep. at 322:6-15; Gordon Rept., pp. 40-43.

- He did not study how frequently osteophytes and spondylosis, both of which were present in Plaintiff, cause perforation or fracture. Gordon Dep. at 322:16-324:1; Gordon Rept., p. 42.

Dr. Gordon repeatedly makes claims about the state of the art that he has not vetted and cannot support. He should be barred from discussing the medical literature altogether, lest the jury confuse him for an expert on what the literature says or what studies have shown. *See, e.g.*, *Chapman*, 297 F.3d at 688; *Salgado*, 150 F.3d at 741 n.6.

Even if the Court were to permit Dr. Gordon to discuss individual studies, the Court should bar Dr. Gordon from offering any opinions about the content or consensus of medical literature at large. For example, he should not be permitted to opine that perforation leads to tilt,

fracture, migration, or any other malady.  He is not qualified to make those sorts of claims, he has not done the type of literature search needed to support such claims, and his testimony would only mislead the jury.  The Cook Defendants respectfully request that the Court bar Dr. Gordon from discussing, relying on, or otherwise hinting at the content of medical literature on IVC filters.

### III.   Dr. Gordon's Conclusions Regarding Plaintiff's Alleged Injuries Should Be Excluded

The Court should also bar Dr. Gordon from testifying concerning Plaintiff's alleged injuries.  Dr. Gordon's written report blames Plaintiff's Celect filter for causing or exacerbating virtually all of the symptoms she has experienced since the filter was implanted.  *See* Gordon Rept., pp. 16, 42-46 (*e.g.*, blaming the filter for "chronic back pain and abdominal pain" since placement); *see also id.*, p. 44 & Exhibit 3 (including mental health visits, colonoscopies, multiple emergency room visits for abdominal pain, etc., among treatment "incurred in connection with the failure of Mrs. Brand's Celect filter").  According to Dr. Gordon's written report, Plaintiff has been in filter-related pain almost since the filter was placed and will continue to experience constant lifelong pain relating to the filter.  *See, e.g.*, Gordon Rept., p. 45 ("[t]he location of the foreign bodies is likely to cause lifelong pain and suffering."; "Mrs. Brand will live with continuous pain /pin pricks on her nerves for the rest of her life.").  Dr. Gordon purports to have arrived at this bleak conclusion through a detailed review of Plaintiff's medical records and a differential diagnosis.  Gordon Rept., pp. 16-42; 42-43.

At his deposition, however, Dr. Gordon abruptly changed course and admitted that he cannot link ***any*** of Plaintiff's claimed symptoms to the filter, with the exception of temporary symptoms relating to (1) the emergence of a filter fragment through her right thigh/groin in 2011 and (2) two retrieval attempts in 2011 and 2015.  Gordon Dep. at 330:1-331:19.  Among other

things, Dr. Gordon stated that he cannot link any of Plaintiff's symptoms complained of four to

six weeks after the open removal to the filter, including any symptoms she might have in the

future.   Gordon Dep. at 338:14-339:19.   His purported justification for his reversal on these

central issues is both revealing and alarming as to the unreliable nature of his methodology:

> [A.]   Now, besides that though, like on top of that, though **when I look back into all of the medical records and realize she has right lower-quadrant pain**, she has had other sources of pain, I think I probably -- maybe again being my first time I ever wrote a report I -- I thought that that was the likely source. Now, I can -- I think I should step back in this a little bit . . .

Gordon Dep. at 330:19-25 (emphasis added).

> [A.] . . . **I've reviewed things further** -- and, again, my mistake, this is the first time I've written this -- to a degree of medical probable certainty, et cetera, 51 percent, I can't say that.  **She has other reasons for pain** and I don't think I'm able to prove one way or the other."

Gordon Dep. at 336:25-337:5 (emphasis added).

In so many words, he admitted that he "reviewed things further" – the same medical

records upon which he relied for his opinions that Plaintiff had continuous pain with every breath

– and "realize[d]" that he failed to consider alternative sources for her pain in his initial review

of the medical records.  He now links only a small subset of Plaintiff's symptoms to the filter,

but this indictment of his methodology taints those opinions as well.

The Court clearly should not allow Dr. Gordon to reverse course again at trial and opine

that any of Plaintiff's symptoms are related to the filter aside from the emergence of the filter

fragment from her thigh and the two removal attempts.  More broadly, though, the Court should

bar Dr. Gordon from offering opinions about the causal relationship of Plaintiff's filter to <u>any</u> of

her symptoms.  He is not qualified to perform the requisite analysis in this nuanced case, and, as

reflected in the reversal described above, his methodology is unreliable.

a.    **Dr. Gordon Is Not Qualified to Perform the Differential Diagnosis Required in This Case.**

Dr. Gordon purported to formulate his written opinions on the causation/etiology of Plaintiff's symptoms using a differential diagnosis.  Gordon Rept., pp. 42-43; Gordon Dep. at 273:4-21.  The cornerstone of a differential diagnosis is the physician's systematic consideration of all possible causes of an ailment based on scientific evidence. An effective differential diagnosis "must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out,'" *Ervin*, 492 F.3d at 904, and must explain why each cause was ruled in and then ruled out. *See Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015) (upholding exclusion of expert opinions where report failed to identify whether other potential causes were considered and, if so, how and why they were ruled out); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 774 (7th Cir. 2014) (failure to meaningfully consider and rule out potential alternative causes in conducting differential etiology is "fatal to [the expert's] testimony").  To make the "scientifically valid decisions" on which a differential diagnosis is based, the expert must have expertise in the specific causes that are to be ruled in or out.  As this Court has noted, "simply possessing a medical degree does not qualify [a doctor] as an expert in all medical fields." *Higgins v. Koch Development Corp.*, No. 3:11-cv-81-RLY-WGH, 2013 WL 6238650, at *3 (S.D. Ind. Dec. 3, 2013). The key question is not whether the expert is qualified in general, but whether the expert's qualifications provide sufficient foundation for an opinion on a particular topic. *Gayton,* 593 F.3d at 617-618.

Dr. Gordon is not a gastroenterologist and does not keep current with the related literature in that field.  Gordon Dep. at 27:9-14; 33:10-12.  Dr. Gordon is not a surgeon, vascular or otherwise.  Gordon Dep. at 24:2-14; 33:13-17.  He has not performed abdominal surgery since he completed his residency and does not keep up to date on surgical procedures or related

23

literature.  Gordon Dep. at 25:1-4; 26:5-17; 31:16-32:25.  He has never performed an exposure for a spine surgery,  like the surgery Plaintiff underwent immediately after her filter placement. Gordon Dep. at 25:5-10.  He has never cut open a human IVC, either to retrieve an IVC filter through an open surgical procedure like Plaintiff's or for any other reason.  Gordon Dep. at 24:15-25.  He is not board certified in gastroenterology, pain management, neurology, general surgery, vascular surgery, or cardiothoracic surgery.  Gordon Dep. at 27:12-14; 41:20-22; 41:9-11; 24:2-3; 24:7-8; 24:12-14.

Dr. Gordon thus is not qualified to rule in or rule out potential causes of Plaintiff's alleged injuries, including but not limited to her pre-existing spine conditions, manipulation of the IVC during her two-level, six-hour spinal fusion surgery, and other possible causes of her filter malposition and fracture.  Dr. Gordon even admits that manipulation during a surgery is a cause that must be ruled in; it is the first item in his differential diagnosis.  Gordon Rept., p. 42. However, he purports to rule it out as a cause without so much as citing a single supporting article.  *Id*.   In short, he relies exclusively on his education and experience, neither of which qualifies him to opine on how an exposure during spine surgery might affect an IVC filter.  For example, he reasons that the surgery "was far below (6-8 cm) the level of filter placement."  *Id.* However, he has no experience that would qualify him to say whether a filter 6-8 cm from the surgical site itself might be impacted by the exposure or subsequent spinal procedure.[15]  In short, Dr. Gordon lacks relevant expertise, fails to consult the relevant literature, and ends up offering an opinion that has no scientific or medical support.

The problem of Dr. Gordon's lack of qualifications permeates his differential diagnosis: he is not qualified to opine on the multifaceted and diverse potential causes he purports to

_____

[15] In fact, the exposure was sufficiently traumatic to cause bleeding in an adjacent vessel.  Gillespie Rept.,  p. 21. Vascular surgery expert Dr. Gillespie, who is experienced in providing exposure for spine surgeries, was <u>not</u> able to rule out the surgery and exposure as a cause of Plaintiff's filter failure.  *Id.* at p. 33.

analyze, and he does not cite a single scholarly article or authoritative text by someone who *is* qualified before ruling out those causes.  Gordon Rept., pp. 42-43.  He is not qualified to perform the differential diagnosis required in this case and should not be allowed to opine on the cause of Plaintiff's filter malposition, perforation, and fracture.  Likewise, his opinions on the medical conditions that he alleges flow from the fracture are equally outside his area of expertise – *i.e.*, depression, anxiety, pain, abdominal or gastrointestinal conditions, and the like.  While he may be qualified to interpret imaging, that is the limit of his qualification.

### b. Dr. Gordon Failed to Systematically Rule In and Rule Out Causes in His Differential Diagnosis, Rendering It Unreliable.

Dr. Gordon's methodology in his purported differential diagnosis is also fatally flawed.  A true differential diagnosis rests on a physician's systematic consideration of all possible causes of an ailment and "scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out.'"  *Ervin*, 492 F.3d at 904.  Dr. Gordon did nothing like this; on the contrary, his broad reversal on causation after merely "review[ing] things further" demonstrates that he did not consider all potential causes.  Gordon Dep. at 336:24-337:5.  He now readily acknowledges that he failed to consider and rule out other causes of Plaintiff's symptoms, the core of any sound differential diagnosis.  Gordon Dep. at 330:19-25; 336:24-337:5.  The Court should bar Dr. Gordon from presenting this admittedly inadequate differential diagnosis.  His method was undeniably flawed, and he cannot save subsets of that unreliable analysis by narrowing his opinions and providing additional support at deposition.  Fed. R. Civ. P. 26(a); *Ciomber*, 527 F.3d at 642; *Salgado*, 150 F.3d at 741 n.6.

Moreover, even Dr. Gordon's now-narrowed opinions are unsupported by a reliable differential diagnosis.  He now ascribes only three transient periods of symptoms to the filter's design: (1) the emergence of a filter fragment from her right thigh, (2) the unsuccessful filter

25

retrieval attempt in 2011, and (3) the open removal surgery in 2015.  Gordon Dep. at 330:1-331:3; 333:1-19.  With respect to these symptoms, Dr. Gordon tries to distance himself from his failed differential diagnosis by claiming that one need not perform a differential diagnosis to know that symptoms accompany events such as these.  Gordon Dep. at 340:9-21; 341:18-25; 343:11-344:19.  If that were the case, however, there would be no need for any expert testimony on the issue, and Dr. Gordon's testimony about what is common knowledge would not assist the jury.  Fed. R. Evid. 702.

In fact, Dr. Gordon intends to testify beyond common knowledge and to opine that these symptom-producing events were caused by a flaw in the filter's design.   Such attribution of a symptom to a particular product design necessarily requires a reliable differential diagnosis. Here, Dr. Gordon's flawed differential diagnosis on that point is the same diagnosis that led to the myriad pain opinions he has now admitted were unsupported and has withdrawn.  Gordon Dep. at 338:18-339:14.   If that admission were not sufficient to undermine Dr. Gordon's differential diagnosis blaming Plaintiff's symptoms on the Celect's design, the flaws in his methodology render his opinions inadmissible under *Daubert*.   Dr. Gordon's differential diagnosis failed to consider and/or properly rule out the following alternative causes for the filter's failure:

**Manipulation of the IVC during spinal surgery**. As discussed above, Dr. Gordon rules this in as a possible cause but the two reasons he offers for ruling it out are fatally flawed.  First, he claims that the filter was far enough away (6-8 cm) from the site of the surgery itself that it would not have been impacted.  Gordon Dep. at 32:22-33:9.  But Dr. Gordon has never provided exposure for a spinal surgery and would not know this from experience, and he cites no authority for the proposition that the extensive manipulation of the IVC needed to expose a surgical site

would not jostle a filter sitting just 2-3 inches away.  This reason is merely an unsupported conclusion.

Second, he claims that the surgery could not have caused Plaintiff's woes because early post-operative images show perforation but no other complications,[16] but he never rules out the surgery itself as the cause of the perforation.  This is important, because he ultimately contends that perforation by the Celect leads to tilt, fracture, and migration, both generally and in Plaintiff's case.  Gordon Rept., pp. 1, 43.  Thus, he cannot rule out the surgery causing the fracture unless he also rules out the surgery causing the perforation.  He does not do so.[17]  He provides no rational, medically-supported basis on which to exclude the surgical manipulation as a cause.  Conclusions alone, without the explanations or support for those conclusions, are inadmissible. *Wendler v. Ezra, P.C. v. Am. Int'l. Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008).

**Malpositioning of the filter**.  Dr. Gordon admits that filter malpositioning on placement is a "major source of perforation."  Gordon Dep. at 326:24-25.  However, in his report, he does not consider possible filter malpositioning as a potential cause.  Gordon Rept., pp. 42-43 (omitting malpositioning from the analysis).  At deposition, he claimed that he omitted it because he believed the filter was in a normal location.  Gordon Dep. at 325:17-23.  But his deposition and supplemental report cannot cure his initial report's failure to rule out a cause he ruled in, including providing no bases for ruling out such a potential cause.  *Ciomber*, 527 F.3d at 642.  If a doctor performing a differential diagnosis rules in a possible cause, the doctor's report needs to explain how it was ruled out.  *Salgado*, 150 F.3d at 741 n.6.

---

[16] *Id.*

[17] Notably, he does not claim that perforation was absent on post-operative imaging prior to the 4/10/2009 CT. Gordon Rept., pp. 19, 41.  This is likely because the only imaging taken after the filter placement but before the CT was an x-ray on 3/19/2009. *See* Gordon Rept., pp. 18-19; Gillespie Rept.,  pp. 27, 30.  However, the walls of the IVC are generally not visible on x-rays and therefore perforation cannot be seen.. *See* Gillespie Rept., p. 46 (showing the 3/19/09 x-ray image).  Thus, Dr. Gordon effectively concedes that perforation was observed on the very earliest imaging where perforation would be visible.

**Osteophytes and spondylosis of spine**.  Both of these degenerative spinal conditions were present in Plaintiff.  Gordon Rept., p. 42.  Dr. Gordon's report lists these possible causes, but fails to rule them out or to articulate any reasonable basis for doing so.  Gordon Rept., p. 42. Again, he cites no literature that supports ruling them out, and he admits he does not know how often osteophytes or spondylosis lead to perforation or fracture.  Gordon Dep. at 323:15-324:1. Dr. Gordon's entire argument for ruling out these causes is as follows.  First, he claims that these issues are present in almost all spinal surgery patients.  He provides absolutely no support for his statement,[18] and in any event does not explain how his assertion has any bearing on whether these issues caused Plaintiff's specific filter to perforate, tilt, and fracture.  *See* Gordon Rept., p. 42.  Next, he baldly opines that the perforation was due to "the lack of rate limiters" and "the Celect propensity to perforate."  *Id.*  But this opinion skips the entire analysis and jumps to the conclusion without discussing ***how*** the osteophytes and spondylosis might have contributed. Third, despite purporting to rule ***out*** spondylosis and osteophytes as a cause, Dr. Gordon actually ***admits*** that spondylosis "likely contributed to worsening symptoms from the fulcrum effect of the osteophyte."  *Id.*  At his deposition, he reiterated that the osteophyte and spondylosis likely contributed to the filter's fracture,[19] though he was unable to provide in what proportion each contributed or whether they either was the primary or a secondary cause of the perforation and fracture.  This is a fatal and irredeemable flaw in his methodology.

Finally, Dr. Gordon adds an afterthought that the filter must have perforated in order to contact the osteophyte.  *Id.*  This is only true in the sense that the filter could not have been in

---

[18] Instead of offering support for his claim, Dr. Gordon gratuitously argues that Cook contemplated the filter being used in patients with osteophytes and spondylosis.  Gordon Rept., p. 42.  However, the question in a differential diagnosis is whether a potential cause was a factor in the outcome, not whether it was foreseeable.  This is another example of Dr. Gordon forsaking expert analysis in favor of rhetorical advocacy.

[19] Gordon Dep. at 314:17-25.

direct contact with the osteophyte before it pushed through the IVC wall. Dr. Gordon completely ignores that the osteophyte was compressing the IVC in the filter's vicinity and placing unusual stresses on the filter through the IVC wall. Gillespie Rept., pp. 30, 34. Indeed, the compression on the IVC is even visible on imaging studies taken immediately before the filter was inserted. *Id.* at p. 30. Amazingly, despite Dr. Gordon's status as an interventional radiologist and his agreement the osteophyte played a role in the filter's failure, he never discusses this compression or even mentions osteophytes in his 22-page review of Plaintiff's medical records and radiological images. *See* Gordon Rept., pp. 17-39; Gordon Dep. at 236:6-15. Once again, Dr. Gordon's lack of analysis and explanation reveals that he did not seriously consider the causes he purports to rule out.

**Physiologic activity**. Dr. Gordon discusses only "normal physiologic activity," then purports to rule it out solely because "normal" physiologic activity is present in all patients. *See* Gordon Rept., p. 43. Even as to such "normal" physiologic activity, however, Dr. Gordon admits he is not aware of any medical literature that would allow him to rule it out as a cause. Gordon Dep. at 324:22-325:5. Indeed, he acknowledges that normal physiologic activity ***did*** play a role in the fracture of Plaintiff's filter, if not the perforation, yet inexplicably rules it out as a possible cause of the perforation and fracture. Gordon Dep. at 324:16-21.

"Normal" straw man argument aside, Dr. Gordon never considers the *abnormal* physiological activity that Plaintiff *actually* experienced. He notes in his report that Plaintiff experienced considerable abnormal abdominal symptoms and was "worked up for kidney stones, appendicitis, urinary tract infection, constipation." Gordon Rept., p. 44. Dr. Gordon opines that every breath, Valsalva, and motion compresses the IVC in the location of the filter, yet he never considers the abnormal nature of the compression of Plaintiff's IVC from those conditions,

including but not limited to her longstanding, chronic constipation.  Gordon Rept., p. 4; Gillespie Rept.,  pp. 23, 40. Even though he now acknowledges all of those conditions affected Plaintiff's abdomen and caused her considerable pain, he never bothers to address whether or how those symptoms or factors might have influenced the filter (*e.g.*, how chronic constipation-induced bloating might have placed unusual pressure on the filter).

In sum, Dr. Gordon's supposed differential diagnosis/etiology:

- Ignored and failed to rule in potential causes of the filter's failure (*e.g.*, Plaintiff's abnormal physiologic activity);

- Failed to rule out potential causes that he had ruled in (*e.g.*, malpositioning of the filter);

- Ruled out potential causes without offering any basis for doing so (*e.g.*, manipulation of the IVC during spinal surgery); and

- Ruled out potential causes while simultaneously admitting that he cannot rule them out (*e.g.*, osteophytes and spondylosis of spine).

Dr. Gordon's methodology in conducting his differential diagnosis is irretrievably flawed and fails to justify admission under *Daubert*.

## IV.    Dr. Gordon's Opinions Regarding the Design of the OUS Study Should Be Excluded

The Court should bar Dr. Gordon from offering any testimony or opinions about the OUS study, a clinical study of the Celect commissioned by Cook.  Dr. Gordon's proposed testimony is improper in two ways.  First, he is unqualified to express the opinions he offers concerning the OUS study's protocol and definitions, and he has performed no work in this litigation that could reasonably support his conclusions.  Second, his opinions that that Cook's choice of definitions in the OUS study and the conduct of the study itself reveal a fraudulent effort by Cook to mislead authorities and doctors as to the Celect's risks is not proper expert testimony.  His opinions rely heavily on review of confidential Cook documents that the jury can interpret as well as Dr.

Gordon can; the documents do not require expert interpretation and are not something that would be reasonably relied on by experts.

> **a.    Dr. Gordon Cannot Be Allowed to Critique the OUS Study's Design or Definitions.**

Dr. Gordon is not qualified to opine on the OUS study's protocol, design, or definitions, and he has applied no methodology but simply copied the analysis of another of Plaintiff's experts, Dr. Krumholz.

As with other areas noted above, Dr. Gordon lacks any qualifications to offer opinions concerning the definitions for and conduct of the OUS study.  He has never published, in a peer-reviewed medical journal or otherwise,[20] or presented to his peers[21] on PE, DVT, or IVC filters. Dr. Gordon has never participated in clinical trials or bench testing of any IVC filter,[22] has no experience in critiquing clinical study protocols, has never served on an independent review board or a hospital board that reviews such protocols, nor has he had any other role in approving clinical studies.[23]  Dr. Gordon has absolutely no experience that would qualify him to critique the design of a clinical study of IVC filters or peer-reviewed papers concerning such studies.

Moreover, his opinion that the OUS study was poorly designed, repeated multiple times, is unsupported and wholly derivative.  Despite his broad assertion of poor design, Dr. Gordon's entire analysis rests on a criticism of the OUS study's definition of perforation.  Gordon Rept., pp. 5-11.[24]  This is the only specific issue in the study design that he ever discusses.  Gordon Dep. at 175:5-12.  And even this criticism is not his own: his entire analysis of the definitions

---

[20] Gordon Dep. at 112:25-113:4; 113:10-17.

[21] Gordon Dep. at 115:16-24.

[22] Gordon Dep. at 50:18-23; 56:2-7; 173:6-8.

[23] Gordon Dep. at 172:22-173:5.

[24] A simple glance at the section titles and tables in this page range shows that Dr. Gordon's analysis consists of criticizing Cook's definition of perforation, then noting that Dr. Gordon saw a different perforation rate by his own definition than Cook saw by Cook's definition.

used in various Cook documents consists of copying Table 7 of <u>Dr. Krumholz's</u> report into his own report.  Gordon Rept., pp. 5-7; Gordon Dep. at 175:18-177:7 (admitting he did not contribute in any way to creating Table 7).  Tellingly, Dr. Krumholz's table is the only place in which Dr. Gordon's report ever lists the OUS study's definition of perforation.

Dr. Gordon's sole attempt to add to the analysis of the OUS study's definition of perforation is critically flawed.  He claims that the Society of Interventional Radiology ("SIR") has defined perforation as part of a filter appearing at least 3 mm outside of the IVC wall since 1993, rendering it the accepted definition.  Gordon Rept., p. 5.  However, as any qualified expert on the subject would know, SIR has never defined perforation.  Indeed, the definition he quotes from Grassi, et al.,[25] is SIR's definition of penetration; the word "perforation" never even appears in that paper.  Gordon Rept., pp. 5-6.  This is a critical error because the OUS study drew a sharp distinction between penetration and perforation.  In fact, the OUS study's definition of penetration closely tracked SIR's definition.  *Compare* Gordon Rept., p. 6 *with* Grassi at p. 138.[26]  In short, Dr. Gordon committed the very "mistake" of which he accuses Cook: he mixed definitions to suit his ends.[27]

The Court should not permit Dr. Gordon to comment on the propriety of the OUS study's definition of "perforation" or of any other aspect of the study's protocol or design.  He is not

---

[25] Clement J. Grassi, M.D., et al., *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, 12 JVIR 137-141 (2001) ("Grassi"), attached as **Exhibit G**.

[26] As Table 7 of Dr. Gordon's report shows, the OUS study protocol defines penetration as "[p]enetration of the vein wall with transmural incorporation of the filter anchors."  Gordon Rept., p. 6.  Grassi used identical language in defining penetration as "[p]enetration of the vein wall by filter hooks with transmural incorporation."  Notably, the SIR definition notes that penetration is not reportable unless it extends more than 3 mm outside the IVC wall.  By omitting that qualification, Cook actually used a <u>more</u> inclusive definition than SIR, contrary to what Dr. Gordon suggests.

[27] Dr. Gordon also discussed the "new" PRESERVE study in his report, noting that it had a "generous" definition.  He quotes no support for that proposition whatsoever, likely because PRESERVE had not yet been conceived at the time the OUS study's protocol was finalized.  If anything, Dr. Gordon's discussion of PRESERVE simply shows that "penetration" and "perforation" are not subject to any single authoritative definition.

qualified, has employed no methodology at all before opining, and would merely be cumulative of Dr. Krumholz.  His opinions about the OUS study's protocol, design, and definitions should be excluded.  Fed. R. Evid. 403; *Kirk*, 870 F.3d at 674; *Dura Auto.*, 285 F.3d at 614; *State Farm*, 980 F. Supp. 2d at 1048.

### b.   Dr. Gordon's Analysis of Internal Cook Documents Must Be Excluded as Unqualified, Unsupported, Irrelevant, and Not Helpful to a Jury.

The Court should also bar Dr. Gordon from offering any testimony or opinions concerning how the OUS study was conducted, its results, and how the results were reported. Dr. Gordon opines that the definition of perforation found in the OUS study was not innocent, but part of Cook's nefarious scheme to hide known dangers, defraud the FDA, and obtain regulatory approval of the Celect.  *See, e.g.,* Gordon Rept., pp. 5, 7, 8.[28]  He bases this opinion on two elements:

- He reviewed the radiological images from the OUS study and analyzed them for "perforation" according to his own definition, concluding that "perforation" was far more prevalent by his own definition than was reported by Cook pursuant to the OUS study's definition.

- He reviewed the selected subset of internal Cook emails, complaints, and other documents provided to him by Plaintiff's attorneys.  Gordon Dep. at 170:20-171:10; 262:3-14.

Dr. Gordon's proposed testimony is improper for several reasons.

First, and most closely related to the OUS study, Dr. Gordon never actually cites any of the source documents on which he says he relies in criticizing the OUS study's enactment or reporting of results.  Gordon Rept., pp. 5-8.  For example, he offers the conclusion that "[o]ver 70% of patients did not follow adequate protocol."  *Id.* at p. 8.  However, he never identifies a

---

[28] This theme appears on virtually every page of his report without regard for the subject matter, except for the portion that merely summarizes Plaintiff's medical records.  For example: "Cook manipulated definitions in its clinical study to obscure perforations, thus gaining 510K clearance" (p. 7); "Cook received permanent and late retrievable clearance based on these omissions and falsified data" (p. 14); Plaintiff was injured in part by "the lack of awareness of the potential for symptoms from the Cook Celect filter, intentionally minimized by Cook" (p. 16).

single document he reviewed or shows a single calculation he made to arrive at that number.  *See id*. at pp. 8-9.  Likewise, he claims that "[t]he number of patients lost to follow-up and/or not undergoing evaluation for retrieval was also very high," yet he never cites documents, calculations, or even raw numbers that support that conclusion.  *Id*. at p. 8.  This problem is ubiquitous in his discussion of the OUS study, justifying the exclusion of that discussion. *Wendler*, 521 F.3d at 791; *Salgado*, 150 F.3d at 741 n.6.

Second, Dr. Gordon is not a psychic; regardless of his claimed qualifications, he cannot know what Cook employees or Cook as a corporation believed or intended in taking any action. "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004).  Courts have therefore consistently barred experts from opining on corporate intent or state of mind.  *See, e.g., Talley v. Novartis Pharms. Corp.*, 2011 U.S. Dist. LEXIS 69280 (W.D.N.C. 2011) (expert witness "will not be permitted to testify about Novartis' alleged 'bad faith'"); *In Re Diet Drugs Prods. Liab. Litig.*, 2001 U.S. Dist. LEXIS 1174, at *7 (E.D. Pa. Feb. 1, 2001) (excluding testimony of expert regarding "what the corporate intent of [defendant] and/or what beliefs of FDA officials were on matters upon which they spoke or acted.").

To the extent that Cook's state of mind is important to any of the issues in the trial, the jury is in as good a position as any expert to evaluate Cook's statements and conduct and to draw inferences from them about Cook's state of mind as Dr. Gordon; expert testimony is neither necessary nor appropriate.  "[T]he question of intent is a classic jury question and not one for the experts." *In Re Diet Drugs Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 9037, at *29 (E. D. Pa. June 20, 2000).  To permit Dr. Gordon to tell the jury his view of Cook's state of mind in taking any particular action would permit him to effectively usurp the jury's role as factfinder.  *See,*

*e.g., U.S. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.") (emphasis in original).

Third, Dr. Gordon's purported analysis of internal Cook documents is not his own.  As noted above, his discussion of the perforation definition found in various OUS-related materials appears to have been adopted wholesale from Dr. Krumholz, and is at the least cumulative and unnecessary.   Similarly, Dr. Gordon asserts there were "[a]t least 40 complaints related to perforation and fracture were made prior to" placement of Plaintiff's filter, citing the table in Exhibit 2 to his report.  Gordon Rept., pp. 11-12.  Dr. Gordon did not create the table in Exhibit 2 and is not sure who did.  Gordon Dep. at 256:17-257:6.  He describes it as "a sheet that was handed to me" and includes complaints "selected by the lawyers."  Gordon Dep. at 262:3-24.[29] Thus, not only are Dr. Gordon's opinions about complaints not the product of his own work, they rest on information selected by lawyers with an interest in the litigation—not the type of data or facts on which "experts in the particular field would reasonably rely" in forming medical or scientific opinions. Fed. R. Evid. 703.[30]

For all of these reasons, Dr. Gordon should be precluded from discussing internal Cook documents.

---

[29] Dr. Gordon's adoption and parroting of other experts' opinions in his own report is not limited to his interpretation of Cook documents.  *See, e.g.,* Gordon Dep. at 289:15-19 (explaining that Tables 15, 16, and 17 on pages 9-11 of his own report were generated by Dr. Krumholz).   Dr. Gordon concedes that he did not confirm the accuracy of Dr. Krumholz's work on those tables.  Gordon Dep. at 297:2-10.  He also conceded that there were multiple errors in the tables and ultimately deferred to Dr. Krumholz and consultant Dr. Bikdeli to explain them. *See, generally,* Gordon Dep. at 289:25-297:1.

[30] Additionally, with special reference to complaint data, Dr. Gordon never gives any context for the "40 complaints," *e.g.,* by identifying the number of Celect filters sold or inserted in patients, and never transforms it into a complaint *rate*.  Nor does he ever discuss any complaints or complaint rates for other IVC filters, let alone compare them to the Celect complaint rate.  Gordon Dep. at 267:24-268:7 (admitting his report does not discuss complaints about the Tulip or Greenfield, which he claims are safer alternative designs).  Thus, the "40 complaints" is not merely suspect from a methodological perspective, but also irrelevant and prejudicial to the point for which he offers it, *i.e.*, that Cook supposedly knew the Celect had a high *rate* of perforation.  It should thus be excluded under Rules 402 and 403, if not for other reasons.

V.    **Dr. Gordon's Opinions on the Adequacy of the Instructions and Warnings for the Celect IVC Filter, and the Celect's Regulatory History, Should Be Excluded**

The Court should exclude any testimony or opinions from Dr. Gordon concerning the adequacy of the Celect IFU[31] and warnings or the Celect's regulatory history.  As noted, Dr. Gordon's report alleges that Cook falsified and/or mislabeled data from the OUS study in order to improperly gain U.S. Food and Drug Administration ("FDA") approval of the Celect and downplay the risks as relayed in the Celect IFU.  *See, e.g.*, Gordon Rept., pp. 13-15.  But Dr. Gordon is completely unqualified to discuss regulatory issues.  This renders him unable to criticize not only the Celect approval process, but also the Celect IFU.  While he is arguably qualified to tell jurors what the language in the Celect IFU means to him, he is not qualified to tell jurors what language *should have been* in the Celect IFU.  Moreover, all of Dr. Gordon's criticisms of the Celect IFU cross over into the regulatory domain, call on Cook to disclose risks that do not exist, lack sufficient specificity, and/or completely ignore language that is in fact present in the Celect IFU.

a.    **Dr. Gordon Is Not Qualified to Offer Expert Opinion Regarding Regulatory Issues, Including Class II Device Approval and IFUs/Warnings.**

Cook required FDA approval in order to market the Celect,[32] and the content of the Celect IFU is subject to specific regulatory controls.  *See* 21 C.F.R. §§ 801.1 *et seq.* (imposing requirements for labeling of medical devices).  But Dr. Gordon is not a regulatory scientist and has never worked at the FDA or written any FDA guidelines, and at deposition, he was unable to cite any federal regulations that pertain to implantable medical devices.  Gordon Dep. at 56:11-17; 67:9-14.  He admitted he would "go to someone with expertise in regulatory law" to help him

---

[31] Cook Celect Filter Set for Femoral Vein Approach Instructions for Use (2008) ("Celect IFU"), attached as **Exhibit H**.

[32] Gordon Rept., pp. 7, 14-15.

on that topic. Gordon Dep. at 67:15-19. His report failed to identify any regulations that apply to the labeling of IVC filters, and he was unable to do so at deposition. Gordon Dep. at 66:23-67:8. When presented with 21 C.F.R. § 801 and FDA's regulatory guidance on labeling and asked how they define certain labels used in an IFU, he was clearly unfamiliar with them and indicated that he defers to regulatory experts to help him navigate such regulations. Gordon Dep. at 67:25-70:2. Dr. Gordon has never been formally educated on FDA regulations that apply to an IFU for an implantable device and has never conducted a study on how IFUs are interpreted by physicians. Gordon Dep. at 70:12-15; 71:6-8.

Dr. Gordon claims to have expertise regarding IFUs because he has helped write them for his medical device company, Radux. But as noted above, the only products that Radux will have on the market anytime soon are tubes that extend other tubes and plastic radiation shields, both of which are Class I devices subject to less stringent regulatory requirements than an IVC filter. *See supra* pp. 5-6. Dr. Gordon has never helped write an IFU for an implantable device and admits that Radux relies on outside experts for regulatory services, including when making submissions to the FDA. Gordon Dep. at 62:13-16; 65:9-14; 70:9-11; 105:22-106:1. Although he has written portions of IFU *content*, he defers to the expertise of regulatory specialists as to whether the IFUs are *compliant* with applicable regulations. Gordon Dep. at 69:16-70:2.

Nevertheless, Dr. Gordon's report repeatedly attempts to leverage his supposed regulatory expertise to bolster his fraud theory. For example, he discusses the regulatory background of the Celect 510(k) clearance as the supposed motive for Cook's alleged fraud. Gordon Rept., p. 7. He also cites the 1999 FDA IVC Filter Guidelines in criticizing the Celect IFU. Gordon Rept., pp. 14-15. However, this is mere puffery and an improper attempt to add

unearned clout to his opinions.  Dr. Gordon does not and cannot actually identify a single regulation with which the Celect IFU failed to comply.  Gordon Dep. at 255:5-256:14.

In short, Dr. Gordon is not familiar with the regulatory hierarchy governing IFUs.  His own company looks not to him but to outside regulatory experts for guidance on regulatory issues, including device approval and IFUs.  He cannot be allowed to comment on the Celect regulatory history or any regulatory aspects of the Celect IFU.

> **b.**    **Dr. Gordon Did Not Employ a Scientifically Reliable Reasoning or Methodology in Formulating His Opinion Regarding the Instructions and Warnings.**

Dr. Gordon failed to employ reliable methodologies in reaching his opinions concerning the adequacy of the Celect's warnings.

First, as noted above, Dr. Gordon's report provides no statistics and no detailed discussion concerning any risk or performance metric of the Celect other than perforation.  *See supra* pp. 5-6.  He has not established that perforation leads to any other risk, nor does he compare the Celect to any other filter on any other metrics.  He also faults Cook for not including risk rates in the IFU, although Dr. Gordon does not include any suggested rates in his own report.  No liability can attach for failing to warn of a risk that does not exist or to include a risk rate that Dr. Gordon does not even identify.

Second, Dr. Gordon is not qualified to criticize Cook for any omissions in the Celect IFU.  In addition to his lack of regulatory qualifications, discussed above, Dr. Gordon fails to cite any other filters' IFUs in his report,[33] and therefore cannot infer what an IFU can or should contain through a review of examples.  He faults the Celect IFU for omitting a number of things that he

---

[33] *See* Gordon Rept., pp. 13-15.

admits he has never seen in any filter's IFU, such as a warning about progressive perforation,[34] a specific recommended retrieval window,[35] or a warning about migration.[36]   If Dr. Gordon is qualified to give an expert opinion on the adequacy of the Celect's instructions and warnings simply because he has used the product, then any IR would be automatically a warnings expert as well.   That is not the law.   *See Higgins*, 2013 WL 6238650, at *3 ("simply possessing a medical degree does not qualify a [doctor] as an expert in all medical fields"). Dr. Gordon simply is not qualified to fault the IFU for any perceived omissions.

Third, Georgia law does not permit medical monitoring claims.   *See Parker v. Brush Wellman, Inc.*, 377 F.Supp.2d 1290, 1302 (N.D. Ga. 2005), *aff'd in pertinent part*, 230 Fed. Appx. 878, 882-83 (11th Cir. 2007).   Thus, a failure to warn is irrelevant unless it pertains to a risk that actually occurred in Plaintiff and caused her injury.   Here, Dr. Gordon concedes that Plaintiff experienced no symptoms relating to her filter aside from those associated with the emergence of a fragment from her thigh and with her two retrieval attempts.   Gordon Dep. At 330:1-331:3; 333:1-19.   Even the most generous reading of his theories on causation would include only perforation, tilt, fracture, migration, and inability to retrieve as having caused injury to Plaintiff.   Gordon Rept., p. 2.   To the extent that warnings do not pertain to those issues, they are irrelevant and should be excluded.   Fed. R. Evid. 402.

Finally, Dr. Gordon utterly fails to suggest alternate language that would have constituted an adequate warning.   For example, Dr. Gordon faults the IFU for failing to say that perforation leads to other issues such as migration.   However, he does not propose any adequate language in his report and <u>still</u> is "not sure how [he] would have put the statement together."   Gordon Dep. at

---

[34] Gordon Dep. at 251:15-19.

[35] Gordon Dep. at 251:20-252:2.

[36] Gordon Dep. at 253:4-9.

253:17-254:3.  This renders his methodology unreliable.  *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000) (expert's "failure to even draft a proposed alternative warning" renders opinion about inadequacy of existing warning unreliable).  Whenever he points to an alleged shortcoming but fails to suggest a specific fix, his opinions are "akin to 'talking off the cuff' and not acceptable methodology."  *Id.*

Not only does Dr. Gordon's lack of qualification broadly doom all of his opinions concerning warnings, each of his individual opinions is also fatally flawed.  Specifically:

- Dr. Gordon claims that Cook failed to warn of increasing risk and extent of perforation (and resulting tilt, fracture, and migration) from removal of the perforation limiter. Gordon Rept.,  pp. 2, 13.  However, the Celect IFU very plainly lists "[v]ena cava perforation" as a potential adverse event. Celect IFU at 5.  Moreover, as explained above, Dr. Gordon is not qualified to discuss whether a perforation limiter increases perforation.  He does not know how often, if ever, perforation results in tilt, fracture, and migration.  Dr. Gordon cannot reliably claim that Cook should have warned of risks that Dr. Gordon he cannot himself prove exist.  Moreover, he did not include suggested language in his report and is still unsure how he would phrase the warning that he says should have appeared in the Celct IFU.   Gordon Dep. at 253:17-254:3.   Thus, this opinion is based on faulty methodology.  *Bourelle*, 220 F.3d at 539.

- Dr. Gordon claims that Cook failed to completely and accurately disclose the perforation risk by not discussing penetration or defining perforation in the Celect IFU. Gordon Rept.,  6.  Again, though, the Celect IFU conspicuously lists perforation among the risks of the Celect.   Celect IFU at 5.   Dr. Gordon himself conflates the definitions of

perforation and penetration in his expert report,[37] so he cannot credibly claim that the Celect IFU should have distinguished.  Moreover, he is not qualified to opine on whether the Celect IFU should have (or even could have) included these definitions under applicable regulations.  Even if he were, he does not specify what language Cook should have included and thus does not employ reliable methodology.  *Bourelle*, 220 F.3d at 539.

- Dr. Gordon claims that Cook failed to give "a complete disclosure of the existence and extent of the risk involved, particularly as compared to Tulip."  Gordon Rept., p. 13.  First, Dr. Gordon does not even specify which risk(s) he is discussing in this passage, let alone provide adequate language Cook should have used.  His methodology is therefore unreliable.  *Bourelle*, 220 F.3d at 539.  Moreover, there is no authority in Dr. Gordon's report or elsewhere for the proposition that a product's warning may be considered inadequate simply for failing to compare the product's performance to another's. As noted, even Dr. Gordon's expert report does not actually compare the Tulip's performance to the Celect's except as to perforation, which is explicitly mentioned in the Celect IFU.  Finally, Dr. Gordon is not qualified to discuss regulatory issues, such as whether an IFU or other warnings are even allowed to refer to other products.

- Dr. Gordon claims that Cook failed to disclose complete, accurate details about the OUS study in the Celect IFU.  Gordon Rept., pp. 5, 6, 7, 15.  However, Dr. Gordon is not qualified to discuss what the Celect IFU should have said about the OUS study, or even whether Cook would have been permitted under FDA regulations to add whatever detail he believes is lacking.  Moreover, as discussed above, he is not qualified to critique the OUS study's design or definitions.  Because he is not qualified to say the OUS study's definition

---

[37] *See supra* p. 33.

of perforation was wrong, he is likewise unqualified to claim that the results reported under that definition were inaccurate.  In any event, he never comes close to providing suggested language that he would deem appropriate.   He therefore does not employ reliable methodology.  *Bourelle*, 220 F.3d at 539.

• Dr. Gordon claims that Cook failed to disclose risk of injury to neighboring organs.  Gordon Rept., p. 6.  First, it should be noted that the only mention of this risk in Dr. Gordon's report comes in Table 7, which was admittedly drafted by Dr. Krumholz without any input by Dr. Gordon and then copied from Dr. Krumholz's report.  Gordon Dep. at 175:18-177:7.  Thus, it is strictly cumulative and should not be discussed by Dr. Gordon. Moreover, this is irrelevant to the present action because Plaintiff does not claim injury to neighboring organs.

• Dr. Gordon claims that Cook failed to indicate that the Celect should be "retrieved within a certain period of time" to avoid progressive perforation, tilt and fracture.  Gordon Rept., pp. 13, 15.  However, the Celect IFU <u>does</u> include a full page of discussion of retrieval success rates at various times following insertion.  Celect IFU at 6.  Dr. Gordon never actually specifies what "certain period of time" he would deem appropriate.  Perhaps this is because he never actually discusses the Celect's retrievability in concrete terms in his report, instead merely alleging without support that it is not especially retrievable.  Regardless, he does not specify what "certain period of time" should have been included and even now remains uncertain what the Celect IFU should have said.  Gordon Dep. at 163:23-165:21. This renders his methodology unreliable.  *Bourelle*, 220 F.3d at 539.

• Dr. Gordon claims that Cook failed to recommend closely monitoring patients when the filter is left in place for an extended period of time.  Gordon Rept., pp. 13, 15.

However, Georgia law does not permit medical monitoring claims. *See Parker*, 377 F.Supp.2d at 1302, *aff'd in pertinent part*, 230 Fed. Appx. At 882-83. A failure to recommend monitoring is thus irrelevant in itself. Moreover, Dr. Gordon does not actually specify any particular "period of time" that should trigger such monitoring. This "renders his opinions akin to 'talking off the cuff' and not acceptable methodology." *Bourelle*, 220 F.3d at 539.

- Dr. Gordon claims that the Celect IFU is "inadequate and misleading through omission of adverse events, definitions and falsification of outcomes." Gordon Rept., p. 14; 15 ("perforation is classified as a potential adverse event instead of a known complication"). By failing to say what adverse events should have been included, what definitions needed changing, and which outcomes were falsified, he never comes close to proposing adequate language and thus employs unacceptable methodology. *Bourelle*, 220 F.3d at 539. Moreover, he admits he is unfamiliar with the definitions of the sections that FDA requires in an IFU and consults regulatory experts for help in deciding what information goes in which section. Gordon Dep. at 68:11-70:2. He is not qualified to criticize the Celect IFU's definitions or organization.

- Dr. Gordon claims that Cook used fraudulent data and/or omitted data in underreporting and/or misstating rates of perforation, penetration, migration, tilt, and IVC stenosis. Gordon Rept., p. 15. However, as discussed at length above, Dr. Gordon's report never discloses rates for any of these issues other than perforation and tilt. Nor does he ever identify what fraudulent numbers were ever disseminated. By failing to specify the rates that should have been disseminated, Dr. Gordon employs faulty methodology that should be excluded. *Bourelle*, 220 F.3d at 539. Moreover, this crosses over into the regulatory domain

in which Dr. Gordon is not an expert.  He never identifies any filter IFU that includes rates of any sort, nor does he cite any authority that would require or even permit complication rate information to be included.

- Dr. Gordon claims that Cook failed to mention dangers that were contemplated in design considerations, such as placing the filter in too small of an IVC (15 mm), migration, crossing of the primary legs, tilt, fracture, filter thrombogenicity, inability to retrieve the filter, and penetration of the caval wall.  Gordon Rept., pp. 14-15.  This laundry list is derived from Dr. Gordon's unqualified reading of Cook's engineering documents, specifically the Celect's dFMECA.  First, none of these are even arguably relevant to this action except tilt, migration, fracture, inability to retrieve the filter, and penetration.  However, the IFU <u>does</u> warn of migration,[38] fracture,[39] inability to retrieve the filter,[40] and penetration.[41]  It may be that Dr. Gordon means to criticize the *manner* in which those risks are relayed, but he is not qualified to do so.[42]  Tilt itself is not harmful, so it is irrelevant whether any such warning was included.  Gillespie Rept., p. 8 (citing literature showing tilt is not clinically significant). Moreover, Dr. Gordon's failure to propose adequate alternative language renders his opinions unreliable and inadmissible.  *Bourelle*, 220 F.3d at 539.  It is also worth noting that, even if the Celect IFU had failed to warn of these issues and Dr.

---

[38] The Celect IFU warns of "filter embolization," which is jargon for migration.  Celect IFU at 5; *see* Gillespie Rept., p. 16.

[39] Again, the Celect IFU warns of filter embolization.  Celect IFU at 5.  This would be sufficient to warn a qualified physician that only part of a filter might embolize, *i.e.*, following a fracture.  Gillespie Rept., p. 16.  Moreover, the Celect IFU does include fracture as a risk in its discussion of clinical studies on the same page that lists other adverse events.  Celect IFU at 5.

[40] The Celect IFU's discussion of retrievability very clearly notes that there is "an 89% probability of successful retrieval at 52 weeks" and includes a chart showing declining retrieval success thereafter.  Celect IFU at 6.

[41] Again, Dr. Gordon confuses penetration and perforation in his own report and clearly considers the two synonymous.  Thus, the Celect IFU's explicit inclusion of perforation doubles as a warning against penetration.

[42] More likely, this is just an oversight on his part.  As noted above, he completely ignored the fact that the Celect IFU explicitly lists perforation.  He also ignores the explicit warning against using the Celect in IVCs less than 15 mm.  Celect IFU at 4.

Gordon had proposed an adequate fix, that omission would be irrelevant in this case. Dr. Gordon concedes that doctors knew of all of these problems in 2009, when Plaintiff's filter was inserted. Gordon Dep. at 152:6-11. In particular, Dr. Rheudasil testified that he was aware of all of these problems when he selected Plaintiff's filter. Excerpts from Deposition of Dr. Mark Rheudasil, dated 2/28/2018, at 61:17-62:1; 62:15-63-4, attached as **Exhibit I**. Thus, Dr. Rheudasil <u>was</u> aware of these risks when he inserted Plaintiff's filter, whether the Celect IFU disclosed them to Dr. Gordon's satisfaction or not.

- Dr. Gordon claims that Cook failed to warn of possible DVT. Gordon Rept., p. 15. However, Plaintiff does not claim to have sustained a DVT. This is irrelevant.

In sum, all of Dr. Gordon's proposed opinions on the adequacy of the Celect IFU's warnings are inadmissible based on lack of qualification, lack of methodology, lack of relevance to Plaintiff's claims, and other deficiencies described above. The Court should bar him from opining on the adequacy of the Celect's warnings.

## VI.   Dr. Gordon's Proposed Expert Testimony Would Not Assist the Jury

The Court also should exclude Dr. Gordon's proposed expert testimony because his opinions simply will not assist the jury. The key question on the relevance of proposed expert testimony is whether the testimony will assist the trier of fact with its analysis of the issues. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The Court must consider whether the expert's testimony is sufficiently tied to the facts of the case so that it will help the jury in resolving a factual dispute. *Sann v. Mastrian*, 2012 WL 253088, at *3 (S.D. Ind. Jan. 26, 2012) (*citing Daubert*, 509 U.S. at 591); *see also Peoples State Bank v. Stifel, Nicolaus & Co., Inc.*, 2013 WL 1024917, at *6 (S.D. Ind. Mar. 14, 2013) (holding that suggested testimony must "fit" the issue to which the expert is testifying). Dr. Gordon's proposed testimony would not assist the jury for several reasons.

45

**a.      Jurors Do Not Need Expert Testimony to Understand Cook Documents.**

The opinions in Dr. Gordon's report regarding selected Cook documents would not be helpful because jurors can reach their own conclusions based on the same material Dr. Gordon reviewed.  Dr. Gordon's report includes no nuanced technical or medical discussion of what any Cook documents show.  Instead, he offers his two categories of opinions on the documents, both of which jurors are perfectly competent to evaluate on their own:

- Whether certain Cook documents talk about certain topics such as perforation and other product risks.  *See, e.g.*, Gordon Rept., p. 2. Jurors are certainly capable of evaluating whether documents talk about specific topics and do not need Dr. Gordon to tell them so.  Indeed, Dr. Gordon himself notes that some Cook documents "openly" discuss certain risks.  Gordon Rept., p. 14.

- His opinions about Cook's intentions and state of mind in making certain comments or taking certain actions.  As noted above, such opinions not only are not helpful to a jury, they usurp the jury's function.  *See, e.g.*, *In Re Diet Drugs*, 2000 U.S. Dist. LEXIS 9037, at *29 ("The question of intent is a classic jury question and not one for experts.").

Additionally, Dr. Gordon repeatedly makes broad claims about what the Cook documents show without ever citing specific documents.  For example, he discusses various ways in which the OUS study supposedly departed from protocol,[43] but he fails to cite a single document that supports this assertion.  *Id*.  Similarly, his narrative of the history of how the OUS study data was handled and ultimately became part of the Celect IFU cites no documents to support it.  Gordon Rept., p. 7.  These bald, unsupported assertions would not be helpful to the jury, and the Court

---

[43] Gordon Rept., p. 8.

should exclude them.  Fed. R. Civ. P. 26(a); *Ciomber*, 527 F.3d at 642; *Salgado*, 150 F.3d at 741 n.6.

Dr. Gordon also discusses Cook design documents and regulatory communications in his report without citing specific examples,[44] but has no foundation or context for the internal Cook documents and no knowledge, experience, or training to allow him to interpret documents between engineers about design, between regulatory professionals, or between other employees of Cook.  These are special cases in which he not only does not help jurors, but positively misleads them by seeming to add expert interpretation when he is unqualified to do so.

Moreover, such narrative summaries of corporate documents and communications are not proper expert testimony because such summaries do not involve the application of scientific, technical, or specialized knowledge and thus do not aid the jury in its role as the trier of fact. *See, e.g.*, *U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403."); *Baldonado v. Wyeth*, 2012 U.S. Dist. LEXIS 68691, at *15 (N.D. Ill. May 17, 2012).[45]  Such is the case with Dr. Gordon; he offers only his own advocacy-based interpretation of documents selected by Plaintiff's attorneys, which he has no qualification, training, or experience to interpret. Such testimony would not be helpful to the jury, and his references to Cook documents should be excluded.

---

[44] S*ee*, *e.g.*, Gordon Rept., pp. 2, 7.

[45] In *Baldonado*, the court held that "allowing an expert to provide summary testimony 'based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself.'" *Id.* Even if the expert relied on his expertise to wade through the relevant documents, the vast majority of his testimony amounted to a summary and statement of the expert's "advocacy-based interpretation of documents in the record," and such testimony was therefore improper. *Id.*; *see also In re Zimmer Nexgen Knee Implant Products Liab. Litig.*, 2015 WL 5145546, at *12 (N.D. Ill. Aug. 31, 2015) (excluding expert testimony which "simply summarize[d] internal [manufacturer] documents regarding post-market surveillance").

### b. Dr. Gordon's Testimony Does Not Reflect a Sufficient Degree of Medical Certainty.

Dr. Gordon's testimony would not be helpful to the jury because he cannot and does not express opinions to a reasonable degree of medical certainty or based on the consensus of the medical community. *See, e.g.*, *Wintz By and Through Wintz v. Northrop Corp.*, 110 F.3d 508, 515 (7th Cir. 1997) (applying Illinois's "reasonable degree" standard).  His report is rife with opinions that he admits are either incorrect or unsupportable, including on such basic topics as:

- How often perforation, including but not limited to what he calls "progressive perforation," leads to fracture with the Celect or any other filter.[46]

- How many pieces of Plaintiff's fractured filter remain in her body today.[47]

- The degree to which Plaintiff's pain was caused by her filter's perforation and fracture.[48]

- The degree to which Plaintiff's follow-up care and radiation exposure during same was related to her filter.[49]

- Whether Plaintiff is still experiencing any symptoms at all relating to her filter.[50]

- Whether Plaintiff will ever experience future symptoms or complications.[51]

---

[46] Gordon Dep. at 378:14-23; 381:23-382:5.  By contrast, the very first opinion he gives in his report is that the Celect "progressively perforates the IVC, leading to increased perforation, tilt, **fracture**, and migration." Gordon Rept., p. 2 (emphasis added).

[47] His report cites the opinions of Plaintiff's experts Drs. Litsky and Fishbein for the proposition that two secondary struts of the filter remain in her body, in addition to two fragments of the primary struts. Gordon Rept., p. 43.  At deposition, he openly noted that he was simply deferring to Drs. Litsky and Fishbein and would withdraw his opinion if they withdrew it first.  Gordon Dep. at 357:1-9.  He noted that he could not say to a reasonable degree of medical certainty that the arms were present.  *Id.* at 357:20-358:1.

[48] Gordon Dep. at 330:1-331:3; 333:1-19.  Notably, Dr. Gordon admitted that he could not even link Plaintiff's pain to the perforation and fracture with "51 percent certainty," despite spending over a page of his report describing the pain she experiences from the filter.  Gordon Rept., 44-46.

[49] Gordon Dep. at 363:21-365:5 (when asked which treatment and radiological studies were caused by the filter issues, he responded that he "can't separate those out").

[50] *Compare* Gordon Dep. at 333:6-334:13 (explaining that Dr. Gordon cannot say to a reasonable degree of medical certainty that any of her symptoms following her recovery from surgery in 2015 are related to her filter) *with* Gordon Rept., 44-46 (claiming that the remaining filter fragments are "likely to cause lifelong pain and suffering" and that Plaintiff will "live with continuous pain /pin pricks on her nerves for the rest of her life").

[51] Gordon Dep. at 338:14-339:14 (withdrawing the majority of his written opinions regarding pain, including his opinion that Plaintiff will continue to experience lifelong pain from the filter fragments).

**VII.    The Court Should Exclude Opinions that Dr. Gordon Did Not Disclose in His Expert Report**

Finally, even if the Court were to permit Dr. Gordon to testify on some topics, the Court should nevertheless bar Dr. Gordon from testifying to any opinions not disclosed in his expert report. At his deposition, Dr. Gordon was willing, even eager, to offer a broad array of opinions about the Celect that he did not disclose in his report.

For example, Dr. Gordon attempted at his deposition to identify filters that he claims perforate and/or fracture less than the Celect.  However, he admits he did not include those opinions in his report. Gordon Dep. at 148:4-13; 149:18-25; 150:4-151:1.  He also conceded that his report does not contain opinions about bench testing or the metals used to make the Celect filter, though he was quick to note that he does have opinions on those topics.  Gordon Dep. at 225:20-226:2. The list of opinions he raised at deposition but not in his report is lengthy indeed.[52]

Such undisclosed opinions are not part of this litigation, and the Court should exclude them. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (retained experts must furnish a report containing "a complete statement of *all* opinions the witness will express and the basis and reasons for them.") (emphasis added); Fed. R. Civ. P. 37(c)(1); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).

---

[52] As further examples, he discussed the following opinions that do not appear in his report: discussions of specific studies regarding the efficacy of IVC filters (Gordon Dep. at 122:8-123:2); the rate at which the Greenfield filter perforates (Gordon Dep. at 148:4-13); the rate at which filters fracture relative to the Celect (Gordon Dep. at 196:4-6); discussions of pathology findings of relevance to the Celect (Gordon Dep. at 227:3-228:9); discussions of clot-trapping studies (Gordon Dep. at 240:16-23); commentary on conclusions contained in Dr. Timperman's report (Gordon Dep. at 242:14-18); his opinion that 200,000 Celect patients currently have perforations that may become problematic in the future (Gordon Dep. at 249:13-250:3); and discussion of literature that is not cited in his report (Gordon Dep. at 284:11-16).

## CONCLUSION

For the reasons stated above, the Cook Defendants respectfully request that the Court exclude the opinions and testimony of Dr. Gregory Gordon entirely. His repeated use of shoddy methodology, or often no methodology at all, demonstrates that his opinions simply cannot be considered reliable. In the alternative, if Dr. Gordon is allowed to testify at trial, the Cook Defendants respectfully ask the Court to preclude him from giving any testimony and offering any opinions relating to the topics discussed herein and summarized in the bulleted list above.

Respectfully submitted,

*/s/ Andrea Roberts Pierson*
Andrea Roberts Pierson (# 18435-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com
E-Mail:  john.schlafer@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

*Counsel for the Defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

50

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2018, a copy of the foregoing was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.  Lead Counsel for Plaintiffs will serve any non-CM/ECF registered parties.

/s/ Andrea Roberts Pierson