**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

————————————————————————

IN RE: COOK MEDICAL, INC. IVC FILTERS
MARKETING, SALES PRACTICES AND                Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS  LIABILITY LITIGATION                MDL No. 2570

————————————————————————

This Document Relates to:

    *Brand v. Cook Medical, Inc. et al.,*
    Case No. 1:14-cv-06018-RLY-TAB

————————————————————————

**THE COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

Page

Statement of Material Facts Not in Dispute....................................................................3

Argument ........................................................................................................................8

I.   Cook is entitled to summary judgment on plaintiff's strict-liability and negligent failure-to-warn claims in Counts 1, 3, and 4 of the Complaint. ..........................9

    A.   Plaintiff cannot establish that any alleged failure to warn caused her any injury because Dr. Rheudasil testified that he was well aware of the risks of the Celect filter without Cook telling him......................................................10

        1.   It is undisputed that Dr. Rheudasil already knew of the risks of perforation, tilt, migration, and fracture independent of any information he received from Cook. ....................................................10

        2.   Plaintiff cannot establish that Dr. Rheudasil ever read or relied on the Celect IFU, so any deficiency in the warning did not cause Plaintiff's injury.................................................................................13

    B.   Plaintiff has failed to create a jury issue on the adequacy of the Celect IFU warnings. ........................................................................................................17

        1.   Cook's IFU warned Dr. Rheudasil of the risks of perforation, fracture, and inability to retrieve...........................................................17

        2.   Plaintiff offers no competent expert evidence that Cook's warnings were inadequate. ..............................................................................18

        3.   Cook had no duty to inform doctors of the frequency with which identified risks occurred. ......................................................................20

        4.   Cook had no duty to inform doctors of the availability of allegedly safer products. ...........................................................................................22

II.   Cook is entitled to summary judgment on plaintiff's strict-liability and negligent design-defect claims in Counts 2, 3, and 4 of the Complaint..........................................24

    A.   Plaintiff has no evidence that the Celect cannot withstand normal and foreseeable conditions in the human body...................................................25

    B.   Plaintiff has no evidence of a specific defect in the Celect that cased her filter to fracture..........................................................................................28

    C.   Plaintiff has no evidence that a different filter design would not have fractured (i.e., she cannot establish causation). ...................................29

    D.   Plaintiff cannot rule out other potential causes of her filter fracture..................32

III.   Cook is entitled to judgment on plaintiff's negligent-manufacturing claim (part of Counts 3 and 4) because plaintiff has abandoned it. ......................................36

IV.   Cook is entitled to summary judgment on any claim of negligence *per se* claim in Count 4. ....................................................................................................37

V.      Cook is entitled to summary judgment on Plaintiff's breach-of-warranty claims in Counts 5 and 6 because Georgia law requires privity for a breach-of-warranty claim, and there is undisputedly no privity between Plaintiff and Cook. ........................39

VI.     Cook is entitled to judgment on plaintiff's loss-of-consortium claim (Count 8) because only plaintiff's husband can assert such a claim, and he has voluntarily dismissed his claims against Cook. ..................................................................39

VII.    Cook is entitled to summary judgment on plaintiff's punitive-damages claim in Count 11. ..................................................................................................40

        A.      Plaintiff cannot recover punitive damages because her substantive liability claims fail. ..........................................................................................40

        B.      Plaintiff's cannot recover punitive damages because she cannot show by clear and convincing evidence that Cook committed misconduct willfully or with conscious indifference. ......................................................41

CONCLUSION ..................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aaron v. Medtronic, Inc.*,
  209 F. Supp. 3d 994 (S.D. Ohio 2016) ...................................................38

*Ali v. Allergan USA, Inc.*,
  2012 WL 3692396 (E.D. Va. 2012) ........................................................38

*Andrews v. Autoliv Japan, Ltd.*,
  228 F. Supp. 3d 1340 (N.D. Ga. 2017) ...................................................40

*Baker v. Smith & Nephew Richards, Inc.*,
  1999 WL 1129650 (N.D. Ga. Sept. 30, 1999) .........................................39

*Bourelle v. Crown Equip. Corp.*,
  220 F.3d 532 (7th Cir. 2000) ...........................................................19, 20

*Brown v. Burlington N. Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 2014) ...........................................................33, 36

*Brown v. Roche Labs, Inc.*,
  2013 WL 2457950 (N.D. Ga. June 6, 2013) ............................................11

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)........................................................................37, 38

*Dietz v. Smithkline Beecham Corp.*,
  598 F.3d 812 (11th Cir. 2010) .........................................................11, 13

*Edwards v. Wisconsin Pharmacal Co., LLC*,
  987 F. Supp. 2d 1340 (N.D. Ga. 2013)....................................................42

*Ervin*,
  492 F.3d at 904 ....................................................................................33

*Estate of Cole v. Fromm*,
  94 F.3d 254 (7th Cir. 1996) ....................................................................3

*Gunville v. Walker*,
  583 F.3d 979, 985 (7th Cir. 2009)...........................................................32

*Higgins*,
  794 F.3d at 705 ...........................................................................32, 33, 36

*Hill v. Cook Medical, Inc*
  MDL Dkt. 6660 at 6-7............................................................................13

*Henderson v. Sun Pharms. Indus., Ltd.,*
    2011 WL 4024656 (N.D. Ga. June 9, 2011) .......................................................39

*Hurley v. Lederle Labs., Div. of Am. Cyanamid Co.,*
    651 F. Supp. 993 (E.D. Tex. 1986), *rev'd on other grounds* 863 F.2d 1173
    (5th Cir. 1988) ...................................................................................................22

*In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.,*
    711 F. Supp. 2d 1348 (M.D. Ga. 2004) ......................................................... 9, 39

*Ingram v. Mylan Pharm., Inc.,*
    No. 1:08-CV-0574-WSD, 2009 WL 10665022 (N.D. Ga. Nov. 12, 2009) ..........14

*Jaurequi v. Carter Mfg. Co., Inc.,*
    173 F.3d 1076 (8th Cir. 1999) ............................................................................20

*Kapps v. Biosense Webster, Inc.,*
    813 F. Supp. 2d 1128 (D. Minn. 2011) ................................................................38

*Leonard v. Medtronic, Inc.,*
    No. 1:10-CV-03787-JEC, 2011 WL 3652311 (N.D. Ga. Aug. 19, 2011) .............38

*McDowell v. Eli Lilly & Co.,*
    58 F. Supp. 3d 391 (S.D.N.Y. 2014) ...................................................................21

*Nolley v. Greenlee Textron, Inc.,*
    No. CIVA 1:06-CV-228 MHS, 2007 WL 5369405 (N.D. Ga. Dec. 6, 2007) .......18

*Ocasio v. C.R. Bard, Inc.,*
    No. 8:13-CV-1962-T-36AEP, 2015 WL 3496062 (M.D. Fla. June 3, 2015) ... 18, 21

*Parker v. Stryker Corp.,*
    584 F.Supp.2d 1298 (D. Colo. 2008) ..................................................................38

*Percival v. American Cyanamid Co.,*
    689 F. Supp. 1060 (W.D. Okla. 1987) .................................................................22

*Reyes v. Wyeth Laboratories,*
    498 F.2d 1264 (5th Cir.1974) ....................................................................... 16, 21

*Riley v. Cordis Corp.,*
    625 F.Supp.2d 769 (D. Minn. 2009) ...................................................................38

*Silverstein v. Procter & Gamble Mfg. Co.,*
    700 F. Supp. 2d 1312 (S.D. Ga. 2009) ................................................................13

*Thornton v. E.I. Du Pont de Nemours and Co.,*
    22 F.3d 284 (11th Cir. 1994) ................................................................................9

*Wells v. Ortho Pharmaceutical Corp.*,
    615 F. Supp. 262 (N.D. Ga. 1985) ..............................................................9

*Wheat v. Sofamor, S.N.C.*,
    46 F. Supp. 2d 1351 (N.D. Ga. 1999) ................................................. 11, 13

*Wheeler v. Novartis Pharms. Corp.*,
    944 F. Supp. 2d 1344 (S.D. Ga. 2013) .............................................. 30, 39

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*,
    395 F.3d 416 (7th Cir. 2005) ...............................................................32

STATE CASES

*Atlanta Obstetrics, etc., Group v. Coleman*,
    260 Ga. 569, 398 S.E.2d 16 (1990) ......................................................29

*Avery v. Cleveland Avenue Motel*,
    239 Ga. App. 644, 521 S.E.2d 668 (1999) ..........................................36

*Banks v. ICI Americas, Inc.*,
    264 Ga. 732 (1994) ........................................................................ 24, 25

*Bodymasters Sports Indus. v. Wimberley*,
    232 Ga. App. 170, 501 S.E.2d 556 (Ga. App. 1998) ..........................30

*Bryant v. Hoffman-La Roche, Inc.*,
    262 Ga. App. 401 (Ga. Ct. App. 2003) ...............................................39

*Bud Wolf Chevrolet, Inc. v. Robertson*,
    519 N.E.2d 135 (Ind. 1988) ................................................................42

*Chrysler Corp. v. Batten*,
    264 Ga. 723 (1994) ...........................................................9, 25, 26, 27

*Cisson v. C.R. Bard, Inc.*,
    No. 2:11–cv–00195, 2013 WL 5700513 (S.D.W.V. Oct. 18, 2013) ....................21

*Crabtree ex rel. Kemp v. Estate of Crabtree*,
    837 N.E.2d 135 (Ind. 2005) ................................................................40

*Gowen v. Cady*,
    376 S.E.2d 390 (Ga. Ct. App. 1988) ...................................................39

*Joe Enterprise, LLC v. Kane*,
    341 Ga. App. 12 (2017) .......................................................................28

*Jones v. Nordictrack, Inc.*,
    274 Ga. 115 (2001) .............................................................................24

*Lamb v. Georgia Pacific Corp.*,
   194 Ga. App. 848 (1990).............................................................39

*Marzetta v. Steinman*,
   117 Ga. App. 471 (1962).............................................................40

*McCombs v. Synthes (U.S.A.)*,
   277 Ga. 252 (2003) ...................................................... 9, 10, 18

*Morris v. Pugmire Lincoln Mercury, Inc.*,
   641 S.E.2d 222 (2007) ...............................................................40

*Norman v. Jones Lang LaSalle Americas, Inc.*,
   627 S.E.2d 382 (Ga. App. 2006)..................................................37

*Ogletree v. Navistar Intl. Transp. Corp.*,
   269 Ga. 443 (1998) ....................................................................24

*Ogletree v. Navistar Intl. Transp. Corp.*,
   271 Ga. 644 (1999) .............................................................. 24, 25

*Powell v. Harsco Corp.*,
   209 Ga. App. 348, 433 S.E.2d 608 (1993)...................................13

*Rogers v. Clark Equip. Co.*,
   744 N.E.2d 364 (2001).................................................................23

*Singleton v. Airco, Inc.*,
   169 Ga. App. 662 (1984) .................................................... passim

*Slisze v. Stanley-Bostitch*,
   979 P.2d 317 (Utah 1990) ...........................................................23

*White v. Hubbard*,
   203 Ga. App. 255 (1992).............................................................40

*Wilson Foods Corp. v. Turner*,
   218 Ga. App. 74 (1995)................................................................9

*Wilson Industrial Elec. V. Cincinnati Ins.*,
   539 S.E.2d 612, 246 Ga. App. 90 (Ga. App. 2000) ....................30

*Wohlwend v. Edwards*,
   796 N.E.2d 781 (Ind. 2003) .........................................................41

*Woods v. A.R.E. Accessories, LLC*,
   --- S.E.2d ---, 2018 WL 2354925 (Ga. App. May 24, 2018) ......25, 27

*Yost v. Wabash Coll.*,
   3 N.E.3d 509 (Ind. 2014)........................................................................40

*Zeagler v. Norfolk S. Ry. Co.*,
   730 S.E.2d 657 (Ga. App. 2012)..........................................................29

**FEDERAL STATUTES**

21 U.S.C. §§ 321, 331, 352 ....................................................................37

21 U.S.C. § 337(a)............................................................................37, 38

FDCA ................................................................................................37, 38

**STATE STATUTES**

Ga. Code Ann. § 51-12-5.1(b)..............................................................41

Ind. Code § 34-51-3-1 ............................................................................41

**RULES**

Local Rule 56-1(a)....................................................................................3

**REGULATIONS**

21 C.F.R. §§ 1.21, 801, 803, 807, 820 ..................................................37

**OTHER AUTHORITIES**

Aaron S. Bos, et al., *Indwelling and Retrieval Complications of Denali and Celect
   Infrarenal Vena Cava Filters*....................................................................1

Black's Law Dictionary (10th ed. 2014) ...............................................29

Eric D. McLoney, et al., *Complications of Celect, Gunther Tulip, and Greenfield
   Inferior Vena Cava Filters on CT Follow-up: A Single-Institution Experience* .....................1

Lu Anne V. Dinglasan, MD, MHS, et al., *Complicated Inferior Vena Cava Filter
   Retrievals: Associated Factors Identified at Preretrieval CT* .........................................1, 2, 4

*Restatement (Third) of Torts*: Products Liability, § 2, cmt. m....................................25

Weiping Wang, MD, et al., *Fracture and Migration of Celect Inferior Vena Cava
   Filters: A Retrospective Review of 741 Consecutive Implantations* .......................................1

Zhongzhi Jia, et al., *Utility of Retrievable Inferior Vena Cava Filters: A
   Systematic Literature Review and Analysis of the Reasons for Nonretrieval of
   Filters with Temporary Indications*...........................................................2

This is a fracture case. Plaintiff Tonya Brand alleges that she first became aware of a problem with—and suffered injury from—her Celect inferior vena cava ("IVC") filter when she pulled part of one of the legs of the filter out of her thigh in 2011. That happened solely because the filter fractured. She alleges that she suffered further injury in 2015 when she had an "open" retrieval procedure (*i.e.*, abdominal surgery) to remove the remainder of the filter. That happened solely because the filter fractured. And she alleges that she is concerned that two fragments of the filter remain inside her body (out of harm's way, and likely not going anywhere, according to her treating physician). That too happened solely because the filter fractured.

So why is Plaintiff litigating this case as if it were another <u>perforation</u> case, like the *Hill* case that the Court tried last Fall? Because Plaintiff knows that the Celect filter is one of the best in the business when it comes to fracture resistance. Here is what scientific studies of the incidence of fracture in Celect filters have found:

| Study name (year) | # of Celect filters | # of fractures (percent) |
|---|---|---|
| Bos, et al. (2016)[1] | 158 | 0 (0%) |
| McLoney, et al. (2013)[2] | 255 | 2 (0.78%) |
| Wang, et al. (2013)[3] | 539 | 0 (0%) |
| Uberoi, et al. (2013)[4] | 359 | 0 (0.0%) |
| Dinglasan, et al. (2012)[5] | 148 | 2 (1.4%) |

Studies characterize fracture of the Celect filter as "a rarely reported complication,"[6] "rare,"[7] and "isolated,"[8] with "very few reports of filter fracture."[9] And one of the most recent studies,

---

[1] Aaron S. Bos, et al., *Indwelling and Retrieval Complications of Denali and Celect Infrarenal Vena Cava Filters*, 27 JVIR 1021-1026 (2016).

[2] Eric D. McLoney, et al., *Complications of Celect, Gunther Tulip, and Greenfield Inferior Vena Cava Filters on CT Follow-up: A Single-Institution Experience*, 24 JVIR 1723-1279 (2013).

[3] Weiping Wang, MD, et al., *Fracture and Migration of Celect Inferior Vena Cava Filters: A Retrospective Review of 741 Consecutive Implantations*, 24 JVIR 1719-1722 (2013).

[4] Raman Uberoi, et al., *British Society of Interventional Radiology (BSIR) Inferior Vena Cava (IVC) Filter Registry*, 36 CARDIOVASC INTERVENT RADIOL 1548-1561 (2013).

[5] Lu Anne V. Dinglasan, MD, MHS, et al., *Complicated Inferior Vena Cava Filter Retrievals: Associated Factors Identified at Preretrieval CT*, 266 RADIOLOGY 347-354 (2013).

[6] Bos at 1025.

[7] McLoney at Abstract

published earlier this year, canvassed studies of many brands of IVC filters to compare the incidence of various complications in each.[10] The study reported a total of 3 Celect fractures out of 1,123 filters sold—or **0.27%**. All other filters combined had 47 fractures out of 8,386 filters sold—or **0.56%**.[11] Also, none of Plaintiff's experts will testify that there is another filter that fractures less frequently than the Celect.

Celect's good track record on fracture creates a problem for Plaintiff, who must explain why a filter whose incidents of fracture are "rare," "isolated," and "very few," and in line with (if not better than) the fracture rates of competing IVC filters, is somehow <u>defective</u>. Thus, she seeks to replay the *Hill* case, focusing almost entirely on perforation, and dealing with fracture only by hypothesizing that perforation increases the odds of fracture, so it is still all about perforation when you get right down to it. But perforation did not cause Plaintiff's alleged injuries, <u>fracture</u> did,[12] and Plaintiff cannot get past the facts that Celect filters rarely fracture, and that what happened to Plaintiff was a very unusual occurrence.

"Very unusual occurrence" translates into "not defective." As the Court knows, no medical device has no complications or side effects, and the fact that a complication or side effect occurs is not enough to show that the device is defective. A plaintiff has to prove that there is something about the design or manufacture of the device—some <u>defect</u> in the design or manufacture—that makes it more susceptible to a complication or side effect than a properly designed or manufactured device would be.

---

[8] Wang at 2.
[9] Jennifer P. Montgomery, MD, PhD & John Kaufman, MD, MS, *A Critical Review of Available Retrievable Inferior Vena Cava Filters and Future Directions*, 33 SEMIN INTERVENT RADIOL 79-87 (2016).
[10] Zhongzhi Jia, et al., *Utility of Retrievable Inferior Vena Cava Filters: A Systematic Literature Review and Analysis of the Reasons for Nonretrieval of Filters with Temporary Indications*, CARDIOVASC INTERVENT RADIOL (2018) doi: 10.1007/s00270-018-1880-9.
[11] *Id.*, p. 5.
[12] Saying that "fracture caused Plaintiff's alleged injuries" does not mean that the <u>design</u> of the filter caused her alleged injuries. It did not, as Cook will explain in more detail below.

Plaintiff has not proven that here. She has abandoned any claim that a manufacturing defect caused her filter to fracture, and she cannot point to any specific defect in the design of the Celect filter that renders it more susceptible to <u>fracture</u> than a properly designed or manufactured device would be. Her apparent theory that the Celect is defective as to perforation, which leads it to fracture "too often," simply cannot be squared with the irrefutable evidence that Celect fractures are rare. Beyond that, Plaintiff has no evidence tying a specific defect to the specific complication with her filter: fracture. Cook is therefore entitled to summary judgment on Plaintiff's design-defect claims.

Plaintiff's failure-to-warn claims are no better. Cook warned doctors of fracture, and even if it had not, the doctor who implanted Plaintiff's filter testified that he knew about all of the risks of a Celect filter—including fracture and perforation—solely from his education, training, and experience, and not from anything that Cook did or did not say to him. Cook could have given all of the warnings in the world about fracture and it would not have made a difference because Plaintiff's doctor did not rely on them in the first place. Thus, Plaintiff cannot prove either a failure to warn <u>or</u> causation.

Plaintiffs' remaining claims for breach of warranty, negligence *per se*, loss of consortium, and punitive damages fall in quick order, as the law, the undisputed facts, or both defeat the claims.

Thus, Cook is entitled to summary judgment on all of Plaintiff's claims.

## <u>Statement of Material Facts Not in Dispute</u>

Cook submits under Local Rule 56-1(a) that the following facts are potentially determinative of this motion. The following facts are either undisputed or the Court may assume their truth for purposes of this motion. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996) (disputed facts must be taken in light most favorable to nonmoving party).

3

**Plaintiff Tonya Brand**

Plaintiff Tonya Brand has a long and complicated medical history, many aspects of which are relevant to the issues here. She has a history of spinal disc degeneration, pseudoarthrosis in her spine, neck pain, low-back pain, and other maladies.[13] Before receiving her filter, she had previously undergone cervical-spine fusion and lumbar-spine fusion surgeries.[14] Plaintiff's records state that she also had a deep vein thrombosis ("DVT") in 2007.[15] Plaintiff is overweight and had several prior abdominal operations before receiving her filter, including a two bladder tacks, tubal ligation, hysterectomy, scar-tissue excision, and two Caesarean sections and a ventral hernia repair.[16] She also had her gall bladder removed.[17]

**Plaintiff's 2009 IVC filter placement and spinal surgery**

Due to her worsening severe lumbar-disc disease, Plaintiff was scheduled for spinal-fusion surgery.[18] Her spinal surgeon, Dr. Thomas Morrison, sent her to Dr. Mark Rheudasil, a vascular surgeon, before her surgery so that Dr. Rheudasil could evaluate her. Dr. Rheudasil recommended an IVC filter for Plaintiff for a number of reasons, including that Plaintiff: 1) was facing a "[b]ig spine surgery," 2) was overweight, 3) had a history of DVT, 4) had a history of multiple abdominal surgeries that would complicate the spinal surgery that she was about to have, and 5) would be on bed rest or have limited mobility following the surgery, which increases the risk of DVT.[19]

---

[13] History and Physical Report, dated 2/24/2009 (Northside Hosp. 462-464), attached as **Exhibit A**.
[14] *Id.*
[15] Office Note, dated 2/16/2009 (Brand_000886), attached as **Exhibit B**.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*; Excerpts from Deposition of Dr. Mark Rheudasil, dated 2/28/2018 ("Rheudasil Dep.") at 48:6-18, attached as **Exhibit C**.

On March 19, 2009, Dr. Rheudasil implanted an IVC filter into Plaintiff.[20] He chose the Cook Celect® filter.[21] He testified that he did not recall reading or relying on the instructions for use ("IFU") for the Celect filter.[22] He also testified that at the time he implanted Plaintiff's filter, he was aware from his education, training, and experience of the possibility of all of the complications that Plaintiff ended up experiencing with her filter.[23] He testified that he knew of those risks long before he placed Plaintiff's filter.[24] The consent form that Plaintiff signed before the surgery expressly warned of risks including infection, severe loss of blood, and disfiguring scar.[25]

Plaintiff's filter was implanted immediately before her spinal-fusion surgery.[26] The surgery really involved three procedures in one. First, Dr. Rheudasil placed the Celect filter.[27] Next, Dr. Rheudasil performed vascular surgery to "open up" Plaintiff's abdomen so that Dr. Morrison could operate on her spine (he used an "anterior approach," which means that he got access to her spine through her abdomen rather than her back).[28] Finally, Dr. Morrison performed the spinal-fusion surgery.[29] The procedure was long: Plaintiff was under anesthesia for almost 7 hours, and the total amount of actual surgical time was recorded as almost exactly 6 hours.[30]

---

[20] Dr. Rheudasil Operative Report, dated 3/19/2009 (Northside Hosp. 485-486) ("Rheudasil Op. Rept."), attached as **Exhibit D**; Dr. Morrison Operative Report, dated 3/19/2009 (Northside Hosp. 487-488) ("Morrison Op. Rept."), attached as **Exhibit E**.
[21] Rheudasil Dep. at 32:5-32:15.
[22] *Id*. at 66:9-67:12.
[23] *Id*. at 59:23-60:13; 61:17-62:1; 62:15-63:16.
[24] *Id*.
[25] Informed Consent to Surgical or Diagnostic Procedures or Treatment, dated 3/19/2009 (Northside Hosp. 617), attached as **Exhibit F**.
[26] Rheudasil Op. Rept.; Morrison Op. Rept.
[27] *Id*.
[28] *Id*.
[29] *Id*.
[30] Anesthesia Record, dated 3/19/2009 (Northside Hosp. 489-491), attached as **Exhibit G**.

The procedure was difficult and complicated. Dr. Rheudasil had to excise scar tissue from multiple previous surgeries to gain exposure to her spine.[31] And during the exposure process, Dr. Rheudasil inadvertently cut into Plaintiff's peritoneum (the membrane that lines the cavity of the abdomen and contains the abdominal organs) and had to repair the damage.[32] The procedure also required the use of several retractors (metal instruments used to hold organs and tissues to one side) to give Dr. Morrison access to Plaintiff's spine.[33] Later in the procedure, two branches of an iliac vein began bleeding and required repair.[34]

After Dr. Rheudasil gained exposure to Plaintiff's spine, Dr. Morrison began his work.[35] That required Dr. Rheudasil to provide further exposure to allow Dr. Morrison to get access to another area of plaintiff's spine.[36]

After Dr. Morrison completed his work, Dr. Rheudasil stepped back in to close the large abdominal incision.[37] Dr. Rheudasil noted in his operative report that the procedure "was a little tougher exposure, again, primarily because of [Plaintiff's] size."[38]

At the time of the placement of her IVC filter, Plaintiff suffered from osteophytes (*i.e.*, bone spurs), which are bony outgrowths associated with the degeneration of cartilage at joints.[39] Some of these osteophytes were located very near Plaintiff's IVC and the site where Dr. Rheudasil placed the Celect filter, and it is undisputed that the compressed her IVC.[40] Plaintiff also suffered from spondylosis of the spine, which is the general degeneration of the spine and its

---

[31] *See* Rheudasil Op. Rept.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] Morrison Op. Rept.
[36] Rheudasil Op. Rept.
[37] *Id.*
[38] *Id.*
[39] CT Report, dated 12/29/2008 (Northside Hosp. 643), attached as **Exhibit H**.
[40] *Id.*

shock-absorbing intervertebral discs.[41] As with her bone spurs, this condition was present in Plaintiff's spine very near her IVC and the site where Dr. Rheudasil placed her filter.[42]

**Fracture of the filter**

On or about May 7, 2011, Plaintiff began to experience pain on the inside of her right thigh.[43] She had an ultrasound the following day, and it revealed "an object about the size of a toothpick" in the area where she reported having pain.[44] About six weeks later, Plaintiff reported that when she pressed on a protrusion in her right thigh, a 1.5-inch piece of metal came out of her thigh through her skin.[45] She testified that she immediately knew the wire was a piece of the filter.[46] On June 28, 2011, Plaintiff underwent x-rays "to examine the Cook Celect Filter."[47] The x-ray report stated that a "second strut had broken from the Cook Filter and migrated to a spot near Plaintiff's spine."[48]

Dr. Rheudasil attempted to remove the filter percutaneously (*i.e.*, through a small incision in a vein, as is typical with removable filters) on July 14, 2011, but was unsuccessful.[49] Dr. Rheudasil left the filter in place for more than four years, until October 22, 2015, at which time he performed an "open procedure" (*i.e.*, an abdominal incision) and successfully removed the

---

[41] IR Discogram Report, dated 1/15/2009 (Northside Hosp. 641), attached as **Exhibit I**.
[42] *Id.*
[43] Plaintiffs' First-Amended Complaint at Law for Money Damages and Demand for Jury Trial, Docket No. 16, dated 8/27/2013 ("Complaint"), ¶ 24.
[44] *Id.*, ¶ 25.
[45] *Id.*, ¶ 26. *See also* Excerpts from Deposition of Tonya Jo Brand, dated 12/10/2015, at 114:14-118:2 (testifying that she pulled the wire out of her leg on or about June 20, 2011), attached as **Exhibit J**.
[46] *See id.* at 117:8-11 ("I mean, once I saw it, I knew exactly what it was. . . . I knew it was a piece of the filter.").
[47] Complaint, ¶ 27.
[48] *Id.*
[49] *Id.*, ¶ 29.

filter.[50] Two fragments of the filter remain in Plaintiff's body; Dr. Rheudasil did not attempt to get them out because he did not think they were causing her harm.[51]

**Plaintiff's Claims**

Plaintiff claims that her filter fractured and migrated, which required its removal.[52] She also claims that her filter tilted, perforated her vena cava, and perforated her organs.[53] Plaintiff claims that she suffers from daily scar pain, frequent abdominal burning, a disfiguring scar, inner-thigh pain, post-surgical pain from the open retrieval, and mental anguish and emotional distress.[54]

### Argument

The Cook Defendants are entitled to summary judgment on all of Tonya Brand's claims. Those claims are as follows:

Count 1: Strict liability—failure to warn

Count 2: Strict liability—design defect

Count 3: Negligence

Count 4: Negligence per se

Count 5: Breach of express warranty

Count 6: Breach of implied warranty

Count 8: Loss of consortium

Count 11: Punitive damages

(Dkt. 104 in Case 1:14-cv-6018-RLY-TAB, ¶ 14.) There are no counts 7, 9, or 10 asserted in the Complaint.

---

[50] Operative Report, dated 10/22/2015 (St. Joseph Hosp. 117-119), attached as **Exhibit K**.
[51] Rheudasil Dep. at 193:9-25.
[52] Fourth Supplemental Plaintiff Profile Form, dated 3/19/2018 ("4th PPF"), p.2, attached as **Exhibit L**.
[53] *Id.* at 2.
[54] *Id.* at 3.

## I.     Cook is entitled to summary judgment on Plaintiff's strict-liability and negligent failure-to-warn claims in Counts 1, 3, and 4 of the Complaint.

Count 1 of the Complaint asserts that Cook is strictly liable for failure to warn of the risks of Plaintiff's IVC filter, while Count 3 generally asserts negligence, and Count 4 generally asserts negligence per se. Cook understands Plaintiff to intend Counts 3 and 4 to encompass a claim of negligent failure to warn. This section will address Plaintiff's entire failure-to-warn claim against Cook, regardless of the legal theory upon it rests.

Although Georgia courts have not formally merged the elements of strict-liability and negligent failure-to-warn claims, they apply the same standard to both types of claims, making them substantively indistinguishable. *See, e.g., Wells v. Ortho Pharmaceutical Corp.*, 615 F. Supp. 262, 296 (N.D. Ga. 1985) ("the elements of plaintiffs' strict liability theory are essentially the same as the elements of their theory of negligent failure to warn."); *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1994). Thus, it is appropriate to address Plaintiff's strict-liability and negligent-failure-to-warn claims in Counts 1, 3, and 4 together.

To establish a failure-to-warn claim, a plaintiff must show that: (1) the defendant had a duty to warn, (2) the defendant breached that duty, and (3) the breach was the proximate cause of plaintiff's injuries. *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1365 (M.D. Ga. 2004). Where a duty to warn arises, it may be breached (1) by failing to adequately communicate the warning to the ultimate user, or (2) by failing to provide an adequate warning of the product's potential risk. *Thornton v. E.I. Du Pont de Nemours and Co.*, 22 F.3d 284, 289 (11th Cir. 1994); *Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 75 (1995).

Georgia has adopted the learned-intermediary doctrine in failure-to-warn cases involving prescription drugs and medical devices. *McCombs v. Synthes (U.S.A.)*, 277 Ga. 252, 253 (2003).

Under this doctrine, the manufacturer of a prescription medical device is not required to directly warn the patient of dangers associated with the product's use. *Id.* Instead, the manufacturer has a duty to warn the prescribing physician of such dangers. *Id.* For the learned-intermediary doctrine to insulate the manufacturer from failure-to-warn liability, the manufacturer must provide adequate warning of the relevant risk to the prescribing physician. *Id.* If the warning provided to the prescribing physician was adequate, then the inquiry ends and the plaintiff cannot recover.

### A. Plaintiff cannot establish that any alleged failure to warn caused her any injury because Dr. Rheudasil testified that he was well aware of the risks of the Celect filter without Cook telling him.

Assume for the moment that Cook breached a duty to adequately warn of the risks of the Celect filter (*i.e.*, the second element of the claim). Plaintiff still has no failure-to-warn claim against Cook because she flunks the <u>causation</u> requirement (the third element of her claim), for two separate reasons:

1)   It is undisputed that Dr. Rheudasil already knew of all of the risks that Plaintiff claims Cook failed to warn about, and knew those risks independent of any information that he received from Cook; and

2)   Plaintiff cannot establish that Dr. Rheudasil read and relied on the IFU for the Celect filter.

Failure to establish causation means that Plaintiff cannot satisfy all three elements of a failure-to-warn claim, so Cook is entitled to summary judgment on such claims, whether resting on strict liability or negligence.

### 1. It is undisputed that Dr. Rheudasil already knew of the risks of perforation, tilt, migration, and fracture independent of any information he received from Cook.

The record shows that Dr. Rheudasil already knew—independent of information he received from Cook—of the risks of perforation, tilt, migration, and fracture at the time he placed Plaintiff's filter. Thus, even if Cook had failed to warn of risks in the Celect IFU, that

failure could not as a matter of law have caused Plaintiff's injuries, because Dr. Rheudasil already knew those risks without Cook having to tell him.

Where a learned intermediary such as Dr. Rheudasil has actual knowledge of the substance of a risk of which a manufacturer allegedly failed to warn, the plaintiff has failed to prove that the allegedly insufficient warning caused his or her injury. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 816 (11th Cir. 2010); *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351, 363 (N.D. Ga. 1999); *Brown v. Roche Labs, Inc.*, 2013 WL 2457950, at *8 (N.D. Ga. June 6, 2013). That is the case here; Dr. Rheudasil testified that he was well aware of the risks of the Celect filter—including perforation, tilt, migration, and fracture—at the time he implanted it into Plaintiff.

> Q. Dr. Rheudasil, at the time that you chose Mrs. Brand's filter in 2009, what risks were you aware of with vena cava filters or complications?
>
> A. So, again, acutely, the access-related potential complications, deployment-related complications associated with malposition or misfiring or <u>tilting</u>. And then long-term, the risks, I believe most often are slightly increased risk of DVT, cava thrombosis. And then what I consider to be a rare risk of <u>fracture</u> or <u>perforation</u>, at that time.
>
> Q. You have used the term "perforation." I want to ask you a couple of questions about that. In 2009, were you aware that a filter could <u>perforate</u> through the vena cava wall?
>
> A. Yes.
>
>                               * * *
>
> Q. … Dr. Rheudasil, at the time that you treated Mrs. Brand and placed her vena cava filter, did you know that <u>fracture</u> of a filter was a risk?
>
> A. Yes.
>
> Q. Is that true with any vena cava filter?
>
> A. Yes.
>
> Q. Not unique to the Celect or to Cook filters?

A. Correct.

* * *

[Q] In 2009, at the time that you treated Mrs. Brand, were you aware that <u>migration</u> or movement embolization of parts of a filter was a risk?

A. Well, yes. Although if I was going to talk to a patient about <u>migration</u> or movement, I would have probably been more likely to talk about the filter, itself.

Q. Was that a risk known to you in 2009 relative to all vena cava filters?

A. Yes.

Q. In 2009, were you aware that there was a risk that a filter <u>might not be able to be retrieved</u>?

A. Sure.

Q. That it could become embedded?

A. Yes.

Q. And was that true of all vena cava filters in your experience? Again, not unique to the Celect.

***

A. I know of no complications unique to the Celect filter. Yes, they -- all retrievable filters can be difficult or occasionally -- I don't want to say impossible to retrieve, because there are some advanced techniques where, probably, the majority can be. But all filters can be associated with very difficult retrievability, such that the decision may be made that it's safer to leave it in than to try to take it out.[55]

Even Plaintiff's own expert, Dr. Gordon, acknowledged that tilt, migration, perforation, fracture, inability to retrieve, bleeding, and death were all well-known risks of IVC filters in the medical community in 2009, when Plaintiff's IVC filter was placed.[56] Notwithstanding his knowledge of these risks, Dr. Rheudasil decided to go ahead with the placement of the Celect filter in Plaintiff. Thus, any failure by Cook to warn of the risks had nothing to do with Dr. Rheudasil's decision to

---

[55] Rheudasil Dep. at 59:23-60:13, 61:17-62:1, 62:15-63:16 (emphasis added).
[56] Excerpts from Deposition of Dr. Gregory Gordon, dated 6/12/2018 ("Gordon Dep.") at 151:2-7, 152:7-11, attached as **Exhibit M**.

use the Celect filter. That lack of causation defeats Plaintiff's failure-to-warn claim as a matter of law. *Dietz*, 598 F.3d at 816 (affirming summary judgment where doctor knew of risks at issue and nevertheless went ahead with prescription); *Wheat*, 46 F. Supp. 2d at 1363 (collecting similar cases under Georgia law).

This case involves essentially the same set of facts that prompted the Court to grant summary judgment on plaintiff's failure-to-warn claim last year in the *Hill v. Cook Medical, Inc.* case under identical Florida law. *See* MDL Dkt. 6660 at 6-7 ("[A]ny deficiency in the IFU could not have caused Plaintiff's injuries because he testified that he was fully aware of the risks of the surgery, including the risk of perforation of the vena cava and surrounding organs and stenosis of the vena cava"). The Court should reach the same conclusion here and grant summary judgment to Cook on Plaintiff's strict-liability and negligent failure-to-warn claims in Counts 1 and 2 of her Complaint.

### 2. Plaintiff cannot establish that Dr. Rheudasil ever read or relied on the Celect IFU, so any deficiency in the warning did not cause Plaintiff's injury.

Cook is also entitled to summary judgment on Plaintiff's failure-to-warn claims because she cannot establish that Dr. Rheudasil ever read the Celect IFU, and in any event it is undisputed that Dr. Rheudasil did not rely on that IFU for information about the risks of the Celect filter. If a plaintiff cannot establish that her doctor read the allegedly insufficient warnings, she has failed to prove causation. *See, e.g., Silverstein v. Procter & Gamble Mfg. Co.*, 700 F. Supp. 2d 1312, 1321 (S.D. Ga. 2009) ("Under Georgia law, a product user's failure to read an allegedly negligent warning is a complete bar to a product defect failure to warn claim."). This conclusion is the same where it is a third party, rather than the plaintiff, who fails to read the warnings. *See, e.g., Powell v. Harsco Corp.*, 209 Ga. App. 348, 350, 433 S.E.2d 608, 610 (1993) ("The alleged inadequacy of the installation instructions cannot be the proximate cause of

the collapse of the catwalk and [decedent's] death when the installer did not read the installation directions that [defendant's] subsidiary actually provided.").

Dr. Rheudasil testified that he could not recall whether he had ever read the Celect IFU, either before or after placing Plaintiff's filter:

> Q. Before Mrs. Brand's procedure, had you reviewed the Celect instructions for use? Do you have a memory of that?
>
> A. I don't have a memory of it. I – I typically read IFUs when I put something in for the first time, but I don't -- I don't, specifically, recall the Celect IFU.
>
> Q. As you sit here today, <u>do you know whether you read the Celect IFU prior to placing Mrs. Brand's filter</u>?
>
> ***
>
> A. <u>I don't -- I don't know</u>.[57]

Plaintiff therefore has failed to carry her burden of proving that Dr. Rheudasil read the Celect IFU, such that inadequate warnings in the IFU caused him to implant the Celect. *See, e.g., Ingram v. Mylan Pharm., Inc.*, No. 1:08-CV-0574-WSD, 2009 WL 10665022, at *5 (N.D. Ga. Nov. 12, 2009) (granting summary judgment on failure-to-warn claim, noting that "where a warning is provided, but a physician does not read it, a person receiving the drug cannot assert a failure to warn claim, even if the warning is defective.").

In addition, Dr. Rheudasil testified that whether or not he read the Celect IFU, he did not <u>rely</u> on the Celect IFU to explain the risks of the filter, because his knowledge of the risks came <u>entirely</u> from his training, education, and experience, and therefore was not based on anything that Cook did or did not say:

> [Q.] Was your knowledge of the risks of placing a vena cava filter in Mrs. Brand based on anything other than your training, education and experience?
>
> A. No.[58]

---

[57] Rheudasil Dep. at 66:25-67:12, 67:22-25 (emphasis added).

Because Dr. Rheudasil did not rely on the Celect IFU for information about the risks of placing and IVC filter, Plaintiff cannot establish that any inadequate warnings in the IFU had anything to do with Dr. Rheudasil's decision to use the filter.

Again, the circumstances here are similar to those that prompted the Court to grant summary judgment on plaintiff's failure-to-warn claim last year in the *Hill* case under identical Florida law. *See* MDL Dkt. 6660 at 6 ("Because Dr. Zuzga did not read or rely on the IFU, the content of the IFU—including any alleged misrepresentations it may have contained—had no impact on his decision to place the Celect filter in Plaintiff, and therefore, could not have caused Plaintiff's injury."). Likewise here, Plaintiff cannot establish that Dr. Rheudasil ever read or relied on the Celect IFU, and the Court should likewise grant summary judgment on Plaintiff Brand's failure-to-warn claims.

Plaintiff may try to rely on the following testimony by Dr. Rheudasil to argue that some additional warning might have caused Dr. Rheudasil to choose a different filter for her:

> Q. Let me ask you this: Hypothetically, if -- just hypothetically, if -- let's -- let's take the Celect filter, again, hypothetically. If there was clear evidence, by the existing available data, at the time you put in that filter, that the safety risks could not justify the placement of a Celect filter, and that the company knew that, okay, what would that do to your risk/benefit analysis when discussing it with the patient?
>
> ***
>
> A. I mean, as you put that question, I wouldn't even discuss that with the patient. We wouldn't choose that filter.[59]

There are two problems with Plaintiff's reliance on that single question and answer. First, it posits that Cook had a duty to inform Dr. Rheudasil that the benefits of the filter were

---

[58] Rheudasil Dep. At 67:22-25.
[59] Rheudasil Dep. at 154:20-155:7.

outweighed by the risks, but Georgia law has rejected such a duty to warn in the analogous pharmaceutical context:

> "[T]he manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use ... As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers ... Pharmaceutical companies then ... are required to warn only the prescribing physician."

*Singleton v. Airco, Inc.*, 169 Ga. App. 662, 664 (1984) (emphasis added), quoting *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.1974). This accords with one of the core purposes of the learned-intermediary doctrine in general, which is that the physician is the one best able to assess the risk-benefit analysis for any particular patient. *Id.*

Second, the hypothetical question and answer have no evidentiary value in the context of Plaintiff's failure-to-warn claim. As shown by Dr. Rheudasil's initial response ("I mean, as you put that question…"), the question answers itself:  if one assumes that it's clear that the risks outweigh the benefits, then the risk-benefit analysis is over in a hurry. In other words, the assumption answers the question, and of course Dr. Rheudasil—or any other doctor answering the same question in any context with respect to any product—would choose not to use the product. Summary judgment on a failure-to-warn claim would never be possible, because the answer to the question: "If you'd been told that the risks of the filter far outweighed the benefit, would you have used it?" will always be no. That is why no court has ever held that a manufacturer has a duty to warn doctors of a risk/benefit analysis. Their duty is only to warn of risks, and let the physician decide whether the benefits in the patient's particular circumstances outweigh those risks.

In sum, even if the Celect IFU had said exactly what Plaintiff contends it should have said, it would not have made any difference, because she cannot show that Dr. Rheudasil read

16

the IFU in the first place, and even if he had read the IFU, he testified that his knowledge of the risks of Celect was based entirely on his training, education, and experience, and not on anything Cook did or did not say. Thus, Plaintiff has failed to prove that any allegedly inadequate warning caused her any harm, so Cook is entitled to summary judgment on the failure-to-warn claim.

**B.    Plaintiff has failed to create a jury issue on the adequacy of the Celect IFU warnings.**

The discussion in the last section assumed for purposes of argument that Cook breached its duty to adequately warn of the risks of the Celect filter (*i.e.*, the second element of a failure-to-warn claim). Cook now drops that assumption and asks whether there is enough evidence in the record to support a jury determination that Cook's warnings for the Celect filter were inadequate. The answer is no, for at least two reasons. First, the IFU for the Celect filter did in fact warn of all of the risks that Plaintiff claims she experienced here: perforation, migration, tilt, and inability to retrieve the filter. Second, the testimony from Plaintiff's expert on this point is insufficient to create a triable issue of fact.

**1.    Cook's IFU warned Dr. Rheudasil of the risks of perforation, fracture, and inability to retrieve.**

Plaintiff claims that her filter perforated her vena cava, fractured, migrated, and could not be retrieved subcutaneously.[60]   But the IFU for the Celect filter warns of every one of those risks:

- Perforation: The IFU specifically states that "perforation" is a risk.[61]

- Fracture: The IFU warns of "embolization,"[62] which is a complication from fracture and a term that would warn any qualified physician that fracture was a risk (i.e., that a part of the filter might embolize, which could only happen after a

---

[60] 4th PPF, p. __.
[61] *Id.*, p. __.
[62] Cook Celect Filter Set for Femoral Vein Approach Instructions for Use (2008) ("Celect IFU"), p. 5, attached as **Exhibit N**.

17

fracture.[63])  Plaintiff's experts do not dispute this.  The Celect IFU also includes fracture as a risk in its discussion of clinical studies on the same page that lists other adverse events.[64]

- Migration: The IFU warns of "filter embolization," a medical term for including migration.[65]  Plaintiff's experts do not dispute this.

- Inability to retrieve the filter: The IFU's discussion of retrievability on page 6 notes that there is "an 89% probability of successful retrieval at 52 weeks" and includes a chart showing declining retrieval success thereafter.[66]

Because the Celect IFU warned Dr. Rheudasil of the risk of all of the complications that Plaintiff actually experienced with her filter, the warnings are adequate as a matter of law, and Cook is entitled to summary judgment. *McCombs*, 266 Ga. App. at 304, 596 S.E.2d at 780 (2004) (granting summary judgment and holding warning that "[t]hese devices can break when subjected to the increased loading associated with delayed union or nonunion" was adequate as a matter of law where plaintiff claimed that very risk occurred); *Singleton*, 169 Ga. App. at 664.

### 2.     Plaintiff offers no competent expert evidence that Cook's warnings were inadequate.

Plaintiff can offer no evidence that the Celect IFU's warnings were inadequate because her experts offer no alternative warning language that they claim would have been adequate. Absent such evidence, Plaintiff's claim of inadequate warning fails as a matter of law. *Nolley v. Greenlee Textron, Inc.*, No. CIVA 1:06-CV-228 MHS, 2007 WL 5369405, at *6 (N.D. Ga. Dec. 6, 2007) (granting summary judgment after excluding plaintiff's causation expert for failing to test alternative warnings because plaintiff lacked essential evidence as to what alternative warnings should have been given and whether such warnings would have been heeded); *see also Ocasio v. C.R. Bard, Inc.*, No. 8:13-CV-1962-T-36AEP, 2015 WL 3496062, at *5 (M.D. Fla.

---

[63] Expert Report of Dr. David Gillespie, dated 5/30/2018 ("Gillespie Rept."), p. 16, attached as **Exhibit P**; Rheudasil Dep. at 62:15-24, 84:14-18, 199:12-16.
[64] Celect IFU, p. 5.
[65] *Id.*, p. 5; *see* Gillespie Rept., p. 16.
[66] Celect IFU, p. 6.

June 3, 2015) (granting filter manufacturer's motion for summary judgment on plaintiff's warning claims because of a lack of expert testimony that the IFU was inadequate).

Plaintiff's only expert on the issue of warnings is Dr. Gregory Gordon.[67] Although Dr. Gordon pointed to three supposed deficiencies in the Celect IFU,[68] he suggested nothing that would address those deficiencies:  no alternative language, no change in location in the IFU, no alteration of typeface, type size, or color—nothing.  Indeed, although Dr. Gordon faults the IFU for failing to say that perforation leads to other issues such as migration, he does not propose any alternative language in his report, forthrightly admitting in his deposition that he is "not sure how [he] would have put the statement [in the IFU] together."[69] Likewise, other than his own belief that a different warning would have produced a different result, he has no evidence suggesting that his assumption is true. No study, test, or literature demonstrates that physicians generally would not choose a Celect filter if the warnings were different, and there is no evidence that Dr. Rheudasil would have made a different choice, given that a) he was very familiar with the risks of fracture and perforation, and b) he did not rely on the IFU or any other information from Cook in choosing the Celect.

The Seventh Circuit addressed this very situation in *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000). Plaintiffs sued a manufacturer for injuries they suffered while operating a forklift, alleging inadequate warnings. *Id*. at 533. Plaintiff's expert, Pacheco, a mechanical engineer, opined that the forklift "lacked an adequate warning regarding the risk of

---

[67] Although Plaintiff's expert Dr. Harlan Krumholz mentions the IFU briefly in his rebuttal report in the context of mislabeling and misbranding, he expresses no opinions about the adequacy of the IFU's warnings.  *See* Expert Rebuttal Report of Dr. Harlan Krumholz, dated 6/12/2018, pp. 2-3, attached as **Exhibit P**. And even if he did, like Dr. Gordon, he proposes no alternative adequate warning language.
[68] Expert Report of Dr. Gregory Gordon, dated 4/30/2018 ("Gordon Rept."), pp. 14-15, attached as **Exhibit Q**.
[69] Excerpts from Deposition of Dr. Gregory Gordon, dated 6/12/2018 ("Gordon Dep.") at 253:17-254:3, attached as **Exhibit R**; Gordon Rept., *passim*.

pallets becoming dislodged and entering the operator's compartment." *Id.* at 535. The district court excluded the expert's opinion, stating that Pacheco: "has not designed a warning for the TSP operator that would seek to ameliorate the unsafe condition he believes exists. It's just his opinion that common sense would say that a warning would be appropriate." *Id.*

On appeal, the Seventh Circuit affirmed, concluding that the expert's failure to test or even draft an alternative warning fatally undermined his reliability, making his opinion inadmissible and rendering the plaintiff's claim unsupported as a matter of law. The court stated:

> … Pacheco's failure to even draft a proposed alternative warning for the [forklift's] operation manual renders his opinion regarding the alleged inadequacy of Crown's existing warning concerning the risk of pallets entering the [forklift] operator's compartment to be unreliable.

*Id.* at 538-39. The court went beyond simply finding that the district court had acted within its discretion in excluding the opinions; it affirmatively endorsed the decision as "absolutely correct." *Id.* at 538. *See also Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (affirming summary judgment based on exclusion of expert testimony that "warnings were deficient in placement, design, orientation, and content" as unreliable because "neither [expert] had created or even designed a warning device which would have been more appropriate, much less tested its effectiveness.").

Likewise here, Dr. Gordon's failure to draft or test any warnings that he claims are adequate to cure the deficiencies he sees in the Celect IFU renders his opinion unreliable and inadmissible. Without his expert testimony, Plaintiff cannot establish that Cook's warnings were inadequate, and her strict-liability and negligent warning claims fail as a matter of law.

### 3. Cook had no duty to inform doctors of the frequency with which identified risks occurred.

Plaintiff's disclosures suggest that she intends to claim that Cook's warnings were inadequate because they failed to inform doctors of the <u>frequency</u> of various identified risks such

20

as perforation and fracture.[70] But Georgia law imposes no duty on device manufacturers to inform doctors about the <u>frequency</u> of known and listed risks of their devices; the manufacturer is only required to warn of the <u>existence</u> of such risks, and nothing in Georgia law remotely suggests that the absence of such information renders a warning inadequate or defective. Quite the contrary, in fact: Georgia holds that a manufacturer's obligation "'is limited to an obligation to advise the prescribing physician <u>of any potential dangers</u> that may result from the drug's use.'" *Singleton*, 169 Ga. App. at 664 (emphasis added), quoting *Wyeth*, 498 F.2d at 1276. The prescribing physician has "the task of weighing the benefits … against its potential dangers." *Id.* (A West Virginia federal court purportedly applying Georgia law held that this issue presented a jury question, *see Cisson v. C.R. Bard, Inc.,* No. 2:11–cv–00195, 2013 WL 5700513, at *7 (S.D.W.V. Oct. 18, 2013), but that court did not cite *Singleton* or any other supporting Georgia law and failed to engage in the analysis conducted in the cases discussed in the next paragraph.)

Indeed, other jurisdictions have expressly <u>declined</u> to impose a duty on manufacturers to inform doctors of the specific frequencies with which the known risks from drugs or medical devices occur. *See McDowell v. Eli Lilly & Co.*, 58 F. Supp. 3d 391, 405 (S.D.N.Y. 2014) ("courts have refused to graft onto the adequacy standard a requirement that a package insert must include specific adverse event frequencies") (collecting cases). A federal court in Florida declined to impose such a duty in an IVC filter case in particular. *Ocasio*, 2015 WL 3496062, at *5 (rejecting proposed expert testimony that IVC filter manufacturer "should have additionally provided quantitative comparative failure rates."). Another court declined to impose such a duty under Texas law, observing the substantial practical problems that imposing such a duty would create:

---

[70] *See, e.g.,* Gordon Rept., pp. 2, 13, 15.

21

> The plaintiff cites no authority for the proposition that a drug manufacturer has a duty to warn prescribing physicians of the rate of adverse reactions. As a practical matter, this would be extremely difficult, perhaps impossible, with respect to a drug like the DPT vaccine, which has many possible harmful side effects.

*Hurley v. Lederle Labs., Div. of Am. Cyanamid Co.*, 651 F. Supp. 993, 1002 (E.D. Tex. 1986), *rev'd on other grounds* 863 F.2d 1173 (5th Cir. 1988). And a federal court in Oklahoma adopted the exact same view in *Percival v. American Cyanamid Co.*, 689 F. Supp. 1060, 1064 (W.D. Okla. 1987).

There is no evidence that Georgia courts would depart from all this authority. In addition, none of Plaintiff's experts can point to a single medical-device manufacturer—much less an IVC filter manufacturer—that includes comparative incidence rates in its IFUs. And they point to no FDA or industry requirement to do so.[71] This Court should decline to create new Georgia law and should reject Plaintiff's attempt to expand a manufacturer's duty to warn to include an impractical and unworkable "frequency-of-risk" requirement.

### 4. Cook had no duty to inform doctors of the availability of allegedly safer products.

Plaintiff's disclosures and conduct in discovery also suggest that she intends to argue that Cook had some sort of duty to inform doctors of the existence of other IVC filters that (in Plaintiff's view) were safer than the Celect.[72] But as with her argument that Cook had to inform doctors about the frequency of occurrence of risks or comparative failure rates, this argument has no support in Georgia law, and in fact runs contrary to the Georgia court's admonition in *Singleton* that a manufacturer's obligation "'is limited to an obligation to advise the prescribing physician of any potential dangers,'" and is not to conduct a comparative analysis of its product

---

[71] The reason for this is obvious: which source would be the right source? The rate information changes depending on variable complications, applications, and products sold. Moreover, what competing manufacturer would provide sales or complication information to Cook? These are but a few reasons that Cook's regulatory and medical experts will explain that including competitive rate information is implausible.

[72] Rheudasil Dep. at 155:13-15, 157:21-158:2.

against others." *Singleton*, 169 Ga. App. at 664 (emphasis added). Other courts have expressly rejected any "comparative-analysis" requirement for a manufacturer's warnings. For example, the Utah Supreme Court held:

> We have never, nor has any other jurisdiction, recognized a duty on the part of a manufacturer to refrain from marketing a non-defective product when a safer model is available, or a duty to inform the consumer of the availability of the safer model. * * * [Plaintiff] wants this court to impose a duty on the manufacturer to inform consumers about the safer model. …[W]e are again unconvinced.

*Slisze v. Stanley-Bostitch*, 979 P.2d 317, 320 (Utah 1990) (emphasis added); *see also Rogers v. Clark Equip. Co.*, 744 N.E.2d 364, 370 (2001) (distributor had no duty to inform forklift owners or operators that a universal safety seat was available for the forklift). *Slisze* was especially concerned that "[s]uch a burden might well act as a disincentive for manufacturers in the development of safer products when such development could force the discontinuation of the less safe model," thus decreasing the safety of products. 979 P.2d at 320.

Plaintiff's argument also raises a host of problems in defining what determines "safety." Take IVC filters as an example. Is Filter A "safer" if it perforates less frequently and is easier to remove than Filter B, but fractures and migrates more than Filter B? There is no objective way to answer that question for all patients; it depends on each treating physician's preferences and each patient's personal characteristics. And more fundamentally, who will decide what the "true" rates of perforation, removal, fracture, and migration are? Different studies reach different conclusions on all of those metrics; a filter that one study finds fractures or perforates less frequently than other filters may show up in another study as doing so more frequently. It is no answer to say that the manufacturer should just disclose all studies relating to its product, because there are often hundreds, and warning labels would be ridiculous if a manufacturer had to disclose all existing information about its product.

23

\* \* \* \* \*

In sum, Cook is entitled to summary judgment on Plaintiff's failure-to-warn claims (both the strict-liability and the negligence variety) because: 1) Plaintiff cannot establish that Cook's warnings were inadequate, and 2) even if they were, she cannot establish that the inadequacy caused her any harm, as the record shows that Dr. Rheudasil made his decision to implant the Celect filter based on his own knowledge, and not anything that Cook told him. When a different warning would not have changed anything, causation is lacking, and it is here.

## II.   Cook is entitled to summary judgment on plaintiff's strict-liability and negligent design-defect claims in Counts 2, 3, and 4 of the Complaint.

Count 2 of the Complaint asserts that Cook is strictly liable for defective design of the Celect filter, while Count 3 asserts negligence, and Count 4 asserts negligence per se. Cook understands Plaintiff to intend Counts 3 and 4 to encompass a claim of negligent design. This section will address Plaintiff's entire design-defect claim against Cook, regardless of the legal theory upon it rests.

The Cook Defendants are entitled to summary judgment on Plaintiff's claims of strict-liability design defect and negligent design defect. Under Georgia law, the standards for both claims are the same, as the Georgia Supreme Court has recognized that there is no significant distinction between negligence and strict liability for purposes of a design-defect analysis. *Jones v. Nordictrack, Inc.*, 274 Ga. 115, 117 n.5 (2001); *Ogletree v. Navistar Intl. Transp. Corp.*, 269 Ga. 443, 445 (1998); *see also Ogletree v. Navistar Intl. Transp. Corp.*, 271 Ga. 644, 645 (1999) (risk-utility analysis and general negligence principles "cannot be treated as distinct theories of recovery").[73] Consequently, it is appropriate to address both theories together.

---

[73] This is largely because a "strict-liability" design-defect claim is not "strict" in the usual sense, but requires proof of negligence or unreasonable conduct by the manufacturer. *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 734 (1994) (risk-utility analysis for design-defect cases incorporates the concept of

It is well settled that a manufacturer is not required to design a product that is "'incapable of producing injury.'" *Woods v. A.R.E. Accessories, LLC*, --- S.E.2d ---, 2018 WL 2354925, at *3 (Ga. App. May 24, 2018) (quoting *Banks*, 264 Ga. at 737). Instead, the manufacturer must design a product so that it is "'reasonably safe for intended or foreseeable uses.'" *Id.* at *2 (quoting *Chrysler*, 264 Ga. at 724). "'Product sellers and distributors are not required to foresee and take precautions against every conceivable mode of use … to which their products might be put.'" *Id.* at *3 (quoting *Restatement (Third) of Torts*: Products Liability, §2, cmt. m.).

Importantly, it is not enough for Plaintiff to show that the <u>filter</u> caused her some injury—nobody doubts that. She must show that a <u>defect</u> in the filter caused her injury. She cannot do that here, for four separate reasons:

1)      Plaintiff has no evidence that the Celect cannot withstand normal and foreseeable conditions in the human body, so the Celect is not defective as a matter of law.

2)      Plaintiff has no evidence of a <u>specific</u> <u>defect</u> in the Celect that cased her filter to <u>fracture</u>.

3)      There is no admissible evidence that a different filter would not have fractured.

4)      Plaintiff cannot rule out alternate causes of the fracture.

Any one of these reasons is enough to require summary judgment for Cook.

**A.      Plaintiff has no evidence that the Celect cannot withstand normal and foreseeable conditions in the human body.**

As Cook pointed out earlier, despite all the hue and cry about perforation, this case is about <u>fracture</u>. And in her "long-form" complaint in this case, Plaintiff alleged that the Celect is "defective [because of] the design's failure to withstand the <u>normal</u> anatomical and physiological

reasonableness). In effect, the claims of negligent design defect and the statutory claim of design defect have merged, and only one theory may go to the jury. *See Ogletree*, 271 Ga. at 645.

25

loading cycles exerted in vivo."[74] That is Plaintiff's fracture allegation, and it is a typical statement of a design-defect claim. In Georgia, a manufacturer's duty is to design a product that is "reasonably safe for intended or <u>foreseeable</u> uses." *Chrysler*, 264 Ga. at 724 (emphasis added).

The problem is that there is no <u>evidence</u> that the Celect cannot "withstand the normal anatomical and physiological loading cycles exerted in vivo." The only evidence that Plaintiff has on the subject of the Celect's ability to survive anatomical and physiological loads is the opinion of Dr. Robert McMeeking, Plaintiff's expert engineer, who opined regarding fracture (also referred to as "fatigue"). But Dr. McMeeking renders no opinion about the Celect's ability to withstand <u>normal</u> loads or stress in the body. Instead, he testified repeatedly that his opinion is that Cook did not design the Celect with <u>worst-case</u> loading cycles in mind, and not that Cook failed to design the Celect to withstand <u>normal</u> loading cycles. In fact, Dr. McMeeking's opinion is even more extreme than that: his fracture analysis rests on the premise that the Celect cannot survive as many as <u>SIX worst-case scenarios imposed on the filter simultaneously</u>. Here is just a sample of Dr. McMeeking's testimony:

Q:    [I]n <u>all of the calculations you're doing</u>, you're using [1] worst-case perforation; [2] worst-case endothelialization; [3] worst-case size of vena cava; [4] worst-case stresses; [5] two millimeters below the cap, correct?

A:    Correct.

Q:    Okay. And then when you add in the effect of Valsalva in your analysis, you're using [6] the 80 percent [compression amount] again, the worst case, right?

A:    That's correct.[75]

---

[74] Plaintiffs' Complaint at Law for Money Damages and Demand for Jury Trial, dated November 13, 2014, in Case No. 1:14-cv-3669-SCJ (N.D. Ga.) ("N.D. Ga. Complaint"), ¶ 32.
[75] Excerpts from Deposition of Robert McMeeking, Ph.D., dated 6/8/2018 ("McMeeking Dep.") at 166 (emphasis added).

Dr. McMeeking repeatedly conceded that he has no idea whether that combination of worst-case scenarios existed in Ms. Brand's body—or ever existed in <u>any</u> human being's body, for that matter:

> Q:    Okay.  Do you know how many—whether there are any people for whom all five of those worst-case scenarios exist?
>
> A:    I don't know.
>
>         * * *
>
> Q:    …I think you testified before, you don't know whether all of those worst cases ever exist at once in a human being in real life, correct?
>
> A:    That's correct.
>
> Q:    And you don't know whether they existed in Mrs. Brand?
>
> A:    No, no. [76]

And Dr. McMeeking expressly disavowed any opinion that a medical device must be designed to withstand a worst-case scenario—let alone six of them piled on all at once:

> Q:    [A]m I right that the fact—<u>just the fact that a filter can fracture, if exposed to bad</u> <u>enough circumstances, worst-case circumstances, doesn't mean necessarily that</u> <u>that filter is deficiently designed</u> –
>
> MS. BAUGHMAN: Objection.  Form.
>
> Q:    --is that correct?
>
> A:    <u>Correct</u>. [77]

Dr. McMeeking's ultimate conclusion that the Celect filter would not survive four, five, or six worst-case scenarios imposed at the same time does not suffice to meet Plaintiff's burden of showing that the filter was not "reasonably safe for intended or <u>foreseeable</u> uses." *Chrysler*, 264 Ga. at 724 (emphasis added). And it does not support her own allegation that the Celect is

---

[76] *Id.* at 149 & 163.
[77] *Id.* at 89 (emphasis added).

"defective [because of] the design's failure to withstand the <u>normal</u> anatomical and physiological loading cycles exerted in vivo."[78] The fact that a product cannot withstand a six-fold worst-case onslaught hardly means that it cannot withstand <u>normal</u> and <u>foreseeable</u> conditions in the human body. And Dr. McMeeking offered no conclusion that the Celect could not withstand <u>those</u> conditions; he only opined that it could not satisfy a perfect storm of misfortunes—a perfect storm that he candidly admitted may not have ever existed in a human being.[79] Thus, Plaintiff has failed to satisfy one of the basic elements of a design-defect claim in Georgia.

**B.    Plaintiff has no evidence of a specific defect in the Celect that cased her filter to fracture.**

As Cook pointed out earlier, because Plaintiff's alleged injuries were caused by her filter's fracture case, she needs to point to a specific defect that caused that fracture. *See Joe Enterprise, LLC v. Kane*, 341 Ga. App. 12, 14 (2017) (plaintiff must identify "specific defect in the [item's] design" that caused alleged injury). She has failed to do so. Neither Dr. McMeeking nor any of Plaintiff's other experts have identified any specific flaw in the Celect's design that caused it to fracture—for example, a weakness in a particular portion of the filter leg that causes fracture, or a specific angle of a filter leg that exposes the filter to increased strain and premature fracture.

In fact, Dr. McMeeking conceded that he is <u>not</u> opining that there is a specific defect that causes the Celect to fracture, other than his opinion that it <u>perforates</u> too often.[80] But this just illustrates how Plaintiff is trying to convert this case into a perforation case, despite the fact that her alleged injuries all stem from <u>fracture</u>. Dr. McMeeking admitted that he does not know how often the Celect fractures compared to any other filter on the market, and that he would have to

---

[78] N.D. Ga. Complaint, ¶ 32 (emphasis added).
[79] McMeeking Dep. at 149 & 163.
[80] McMeeking Dep. at 88.

rely on other people to make that determination.[81] As Cook mentioned at the outset of this brief, other people have made that determination, and they have determined that on average the Celect fractures less than other filters. Thus, even if Dr. McMeeking were correct that Celect perforates "too often" (he is not, but we will assume that he is for purposes of the immediate discussion), he has not established—and cannot establish—that it <u>fractures</u> "too often."

Because Plaintiff has not identified a specific design defect that causes the Celect filter to <u>fracture</u> with unreasonable frequency (bearing in mind that it is undisputed that <u>all</u> IVC filters have some rate of fracture), she cannot meet the burden of proof on her design-defect claim.

### C.    Plaintiff has no evidence that a different filter design would not have fractured (i.e., she cannot establish causation).

Cook is entitled to summary judgment on Plaintiff's design claims because Plaintiff has identified no admissible testimony that "but for" a defect in the Celect filter's design, her filter would not have fractured.

"To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of [the] injury." *Atlanta Obstetrics, etc., Group v. Coleman,* 260 Ga. 569, 569, 398 S.E.2d 16, 17 (1990). "Proximate cause means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred." (Georgia Council of Superior Court Judges, Suggested Pattern Jury Instruction 60.200 (2016) (hereafter "GSPJI").) Similarly, "cause in fact" requires that the defect or negligence at issue be "[t]he cause without which the event could not have occurred." Black's Law Dictionary (10th ed. 2014) (equating "cause in fact" with "but for" cause); *see also Zeagler v. Norfolk S. Ry. Co.*, 730 S.E.2d 657, 661 (Ga. App. 2012)

---

[81] *Id.* at 43, 45.

(failure to provide particular training to employee is a cause-in-fact of injuries if the training would have avoided the injury or reduced the injuries ).[82]

To satisfy the element of causation for her design claims, Plaintiff must prove that her perforation, fracture, and injuries "would not have occurred" absent the claimed design defect in the Celect IVC filter. Because this is not an issue that jurors can address through their ordinary experiences, Plaintiff must prove this fact through expert testimony. *See, e.g., Wheeler v. Novartis Pharms. Corp.*, 944 F. Supp. 2d 1344, 1352 (S.D. Ga. 2013). But Plaintiff has no competent expert testimony on this subject, so she cannot prove causation, and her claim therefore fails as a matter of law.

Neither Dr. Gordon nor Dr. Krumholz, Plaintiff's two medical experts, offers any opinion that Plaintiff's perforation, fracture, and injuries "would not have occurred" had the Celect had a different design.[83] Although each expert opines generally that a design defect "caused" the sequence of events that Plaintiff experienced, neither asserts that the sequence of events would not have occurred had the Celect been designed differently. Dr. Krumholz states his causation opinion as follows:

> I conclude that it is more likely than not that the defective design of the Celect filter implanted into Ms. Brand caused the legs of her device to perforate her vena cava, to tilt, and to splay, all of which increased the forces that led to fracture, resulting in one leg migrating to her thigh and another becoming embedded in her right psoas muscle where it remains.[84]

---

[82] This "cause-in-fact" requirement is reflected in Georgia cases, where plaintiffs regularly claim that a different safety design would have prevented their injuries. *See, e.g., Bodymasters Sports Indus. v. Wimberley*, 232 Ga. App. 170, 501 S.E.2d 556 (Ga. App. 1998) (affirming denial of summary judgment on design defect claim based on absence of "dead man" lock that would have prevented plaintiff's injury); *Wilson Industrial Elec. V. Cincinnati Ins.*, 539 S.E.2d 612, 246 Ga. App. 90 (Ga. App. 2000) (noting underlying case involved claim that "the saw was defective because it was designed without a guard which would have prevented [the] injury").

[83] *See generally* Gordon Rept.; Expert Report of Dr. Harlan Krumholz, dated 4/30/2018 ("Krumholz Rept."), attached as **Exhibit S**.

[84] Krumholz Rept., p.172.

Dr. Gordon offers a similar opinion, although he attributes the sequence of events merely to the filter, and not to any defect:

> Brand's Celect filter perforated her IVC, the perforation progressed, the filter fractured, and the perforation and fracture caused her injury.[85]

At most, these opinions satisfy only the first half of Georgia's causation requirement—that is, establishing a "cause which, in a natural and continuous sequence, produces an event." GSPJI 60.200. But they do not address the second half of the requirement: "without which cause such event would not have occurred." Neither Dr. Krumholz nor Dr. Gordon asserts that a different design of Plaintiff's filter would have prevented a fracture. They do not assert with reasonable medical certainty that her filter would not have perforated or fractured; they do not claim there is a reasonable likelihood that her injuries would not have occurred; they simply do not address the issue at all. This is a crucial flaw: the absence of a safety device—like the "perforation limiters" Plaintiff's experts posit here—logically and legally cannot be the cause of an injury unless the existence of that safety device would have prevented the injury.

Plaintiff will undoubtedly turn to Dr. McMeeking to supply what she needs on this point. He opined that it is "more likely than not" that either a Cook Tulip filter or a filter with an "elongated leg" would not have fractured inside Plaintiff's body.[86] But when asked to explain the basis of those opinions, Dr. McMeeking said only that he believed that such filters would have been "less likely to perforate," and thus "less likely" to fracture.[87] "Less likely" to fracture obviously does not mean "<u>would not</u>" fracture. And when Dr. McMeeking was asked <u>how much</u> "less likely" the Tulip or a filter with an "elongated leg" would be to fracture, he answered:

---

[85] Gordon Rept., p. 43.

[86] McMeeking Dep. at 28, 37.
[87] *Id.* at 32-33, 38.

"[M]y analysis does not address that issue" and "I have not assessed the rate at which that difference will emerge."[88] Without being able to say how much "less likely" a fracture would be, Dr. McMeeking obviously cannot say that it "more likely than not" would have been avoided with a different filter.

At the end of the day, Dr. McMeeking's unexplained conclusion that a different filter "more likely than not" would not have fractured is exactly the sort of expert testimony that the Seventh Circuit holds is inadmissible. "As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (citations omitted). Because Dr. McMeeking's bald conclusions on this score would be admissible, Plaintiff cannot use them to avoid summary judgment. *See, e.g., Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("a court may consider only admissible evidence in assessing a motion for summary judgment.").

Because Plaintiff cannot establish the "cause-in-fact" element of her design-defect claim, the claim fails as a matter of law, and Cook is entitled to summary judgment.

### D.     Plaintiff cannot rule out other potential causes of her filter fracture.

The fourth fatal failing of Plaintiff's filter-fracture claim is that her experts do not and cannot exclude other potential causes of the fracture.

Drs. Gordon and Krumholz both state that they base their opinions about the cause of Plaintiff's filter fracture on a differential diagnosis.[89]   The cornerstone of a differential diagnosis

---

[88] *Id.* at 42.

[89] *See* Gordon Rept, p. 42; Krumholz Rept., p. 172 ("I have performed a differential diagnosis with regard to the cause of Ms. Brand's filter perforation, fracture and related injuries.").  In fact, what Plaintiff's expert attempted was not a differential *diagnosis*, which attempts to diagnose a condition, but a differential *etiology*, which attempts to find the *cause* of a condition.  *See Higgins*, 794 F.3d at 705 (noting distinction).  Both methods, however, use similar "rule in, rule out" methodologies.  *See id.* Because both of Plaintiff's experts describe their process as a "differential diagnosis," this memo will use that term.

is the physician's systematic consideration of all possible causes of an ailment based on scientific evidence. To be valid, a differential diagnosis "must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out,'" *Ervin*, 492 F.3d at 904, and must explain <u>why</u> each cause was ruled in and then ruled out. If an expert fails to adequately "rule out" alternative causes, the expert's opinion cannot as a matter of law support a claim of causation, and summary judgment is required. *See, e.g., Higgins*, 794 F.3d at 705 (affirming summary judgment based on failure of expert's supposed differential diagnosis to "rule in" and "rule out" other potential causes of plaintiff's respiratory problems); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 774 (7th Cir. 2014) (affirming summary judgment based on trial court's exclusion of expert's supposed "differential etiology" that failed to meaningfully consider and rule out potential alternative causes, noting that failure is "fatal to [the expert's] testimony").

And Cook is not referring to hypothetical alternative causes here; there are real ones involved. For example, Plaintiff's expert pathologist, Dr. Michael Fishbein, expressly conceded in his deposition that the filter could have perforated Plaintiff's IVC during the manipulation of the IVC (and thus the filter inside the IVC) during the lengthy process of Dr. Rheudasil "opening up" Plaintiff's abdomen for the spinal surgery, or during the spinal surgery itself, both of which immediately followed the insertion of the filter.[90] Likewise, Dr. Krumholz concedes that it is possible that an IVC filter could perforate during the initial exposure for a spinal surgery such as Plaintiff's, during the surgery itself, or during the aftermath of the surgery.[91] Dr. Gordon opines that the surgery could not have caused the filter to perforate because the site of the spine surgery

---

[90] Excerpts from Deposition of Michael Fishbein, MD, dated 6/4/2018 ("Fishbein Dep.") at 96:1-22, attached as **Exhibit T**.
[91] Excerpts from Deposition of Harlan Krumholz, MD, dated 6/28/2018 ("Krumholz Dep.") at 286:9-14, attached as **Exhibit U**.  Notably, Dr. Krumholz does not know how much an IVC is retracted during such a procedure, or even whether Plaintiff's IVC was retracted during her procedure.  *Id.* at 287:7-15.

33

itself was 6-8 centimeters (2-3 inches) from the filter.[92] But he never rules out the possibility that manipulation of the IVC during the exposure procedure may have caused the perforation.[93] Moreover, he is not qualified to offer an opinion on how the exposure or the spinal-fusion surgery affected the filter: he is not a surgeon, has never performed an exposure for a spinal surgery, and cites no authority for the proposition that exposure or surgery would not affect a filter inside the IVC.[94] In short, Plaintiff's experts agree that the exposure for the spinal surgery and/or the spinal surgery itself could cause a filter to perforate, yet they cannot rule it out in this case.

There are other alternative causes too. As Cook mentioned earlier, Plaintiff's medical records show she had both osteophytes (*i.e.*, bone spurs) and spondylosis (*i.e.*, degeneration) of the spine. Both Dr. Gordon and Dr. Krumholz agree that those conditions can cause filters to fracture, but neither provides any medical or scientific basis to rule out those potential causes, leaving the jury to speculate about the actual cause of the fracture.

Start with Dr. Gordon's analysis. He specifically "rules in" osteophytes and spondylosis as possible causes in the "Differential Diagnosis" section of his report.[95] Indeed, he readily acknowledges that osteophytes and spondylosis were "likely" causes of Plaintiff's injuries, stating that "Mrs. Brand's spondylosis, likely contributed to worsening symptoms from the fulcrum effect of the osteophyte (bony over growth) with the perforated primary legs."[96] He also agreed in his deposition that "the presence of osteophytes in the location of Mrs. Brand's filter"

---

[92] Gordon Rept., p. 42.
[93] *See id.*
[94] Gordon Dep. at 24:2-14; 25:1-10; 26:5-17; 31:16-32:25; 33:13-17; Gordon Rept., p. 42.  Dr. Gordon's opinion in this regard is the subject of a concurrently filed exclusionary motion.
[95] Gordon Rept., pp. 42-43.
[96] *Id.*, p. 42.

and "the fact that Mrs. Brand had spondylosis of her spine" both "contributed to the fracture of her filter."[97]

Having ruled those causes in as possibilities, the question is whether Dr. Gordon could rule them out. He claims that he did so based solely on his observation that spondylosis is common in patients undergoing spinal fusion and decompression.[98] But even if that were so, observing that something is "common" does not rule it out as a cause. Distracted driving is very common, but its prevalence certainly does not rule it out as a cause of a particular accident, even if many people who drive distracted do not have accidents. Likewise, if osteophytes and spondylosis are a possible cause of filter fracture—and Dr. Gordon agrees they are—then they are a possible cause of Plaintiff's filter fracture, regardless of whether other patients who have the condition do not experience filter fractures. And in any event, Dr. Gordon admits he does not know how often osteophytes or spondylosis lead to perforation or fracture,[99] so how frequently these conditions occur offers no basis to rule them out.

As for Dr. Krumholz, he also acknowledges that osteophytes can be associated with fracture,[100] and he knew that Plaintiff had osteophytes.[101] But other than his mere reference to Plaintiff's osteophytes, Dr. Krumholz's supposed differential diagnosis does not provide any basis to rule the osteophytes out as the cause of Plaintiff's fracture. Dr. Krumholz baldly asserts that he "was able to rule out … Ms. Brand's anatomy…as a cause of Ms. Brand's filter perforation, fracture and injuries," but he does not say that his reference to "Ms. Brand's anatomy" includes her osteophytes and, even if it did, he offers no explanation of how or why he

---

[97] Gordon Dep. at 314:7-25.
[98] *Id.*
[99] *Id.* at 323:15-324:1
[100] Krumholz Dep. at 277:19-24 ("it has been noted that osteophytes, for example, can be associated with fracture").
[101] *See* Krumholz Rept., pp. 158-59 (describing Dr. Timperman's notes about Plaintiff's osteophytes).

excluded Plaintiff's osteophytes as a cause of her injuries. Moreover, at his deposition, Dr. Krumholz admitted that he had not even determined how many or what type of osteophytes Plaintiff had or whether any of her osteophytes were compressing her inferior vena cava.[102] Finally, neither Dr. Krumholz's report nor his deposition mentions or addresses in any way Plaintiff's spondylosis, which Dr. Gordon rules in as a possible cause of her filter fracture.[103]

In sum, Plaintiff's causation experts rule in Plaintiff's spinal surgery, osteophytes, and spondylosis as possible causes of the fracture of her filter, but they do not offer any sound or reasoned basis for ruling them out as <u>actual</u> causes. Indeed, Dr. Gordon <u>agrees</u> that the osteophytes and spondylosis <u>contributed</u> to Plaintiff's alleged injuries. These experts offer only conclusory assertions, unsupported by analysis or authority, that some defect in the Celect filter, and not these conditions, caused Plaintiff's filter fracture. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant." *Avery v. Cleveland Avenue Motel*, 239 Ga. App. 644, 645, 521 S.E.2d 668 (1999). Plaintiff has failed to meet her burden of presenting admissible expert testimony supporting a differential diagnosis that a design defect in the Celect filter, as opposed to some other phenomenon, caused the fracture. Her design-defect claim fails as a matter of law, and Cook is entitled to summary judgment on those claims. *See Higgins*, 794 F.3d at 705; *Brown*, 765 F.3d at 774.

## III.    Cook is entitled to judgment on plaintiff's negligent-manufacturing claim (part of Counts 3 and 4) because plaintiff has abandoned it.

The only remaining negligence-related claim that Plaintiff could assert is a negligent-manufacturing claim. But Plaintiff has informed Cook that she is no longer pursuing such a claim

---

[102] *See* Krumholz Dep. at 302:18-25.
[103] *See* Gordon Rept., p. 42.

36

in this case.[104] Thus, Cook is entitled to judgment on Counts 3 and 4 (negligence and negligence

per se) to the extent they encompass such a claim.

**IV.    Cook is entitled to summary judgment on any claim of negligence *per se* claim in Count 4.**

Cook explained above why Plaintiff cannot pursue a failure-to-warn or design-defect

claim under a negligence theory, whether "ordinary" negligence or negligence *per se*. But there

is a separate and independent reason why she cannot pursue <u>any</u> claim under a negligence *per se*

theory: such a claim is preempted by federal law.

Under Georgia law, a defendant is negligent *per se* for violating a statute if the plaintiff

proves that: (1) the defendant violated the statute, (2) the injured person was in the class the

statute was intended to protect, (3) the injured person suffered the type of harm the statute

intended to guard against, and (4) the alleged negligence *per se* proximately caused the injuries.

*Norman v. Jones Lang LaSalle Americas, Inc.*, 627 S.E.2d 382 (Ga. App. 2006). Plaintiff bases

her negligence *per se* claim solely on alleged violations of the federal Food, Drug, and Cosmetic

Act ("FDCA") and its implementing regulations.[105] She does not allege that Cook violated any

Georgia law.

But federal law preempts negligence *per se* claims based on the FDCA. The FDCA

expressly provides that all actions to enforce the Act "shall be by and in the name of the United

States." 21 U.S.C. § 337(a).  Supreme Court precedent makes clear that there is no private right

of action for violations of the FDCA.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S.

341, 349 n. 4 (2001) ("The FDCA leaves no doubt that it is the Federal Government rather than

private litigants who are authorized to file suit for noncompliance with the medical device

---

[104] Email from Ben Martin to Bruce Jones, dated 7/17/2018, attached as **Exhibit V**.
[105] *See* Master Consolidated Complaint for Individual Claims, Dkt. No. 213 ¶¶ 89-92 (citing 21 U.S.C. §§321, 331, 352 and 21 C.F.R. §§1.21, 801, 803, 807, 820).

provisions."). Thus, "a private litigant cannot bring a state-law claim against a defendant when the state-law claim is in substance (even if not in form) a claim for violating the FDCA—that is, when the state claim would not exist if the FDCA did not exist." *Riley v. Cordis Corp.*, 625 F.Supp.2d 769, 777 (D. Minn. 2009). In other words, plaintiffs "cannot create a private right of action under the guise of a state law claim." *Leonard v. Medtronic, Inc.*, No. 1:10-CV-03787-JEC, 2011 WL 3652311, at *7–8 (N.D. Ga. Aug. 19, 2011).

In *Leonard*, a medical-device case, the Northern District of Georgia dismissed the a plaintiff's negligence *per se* claim under Georgia law as impliedly preempted by 21 U.S.C. § 337(a) because the "claim of negligence *per se* would not exist prior to the enactment of the FDCA misbranding and adulteration laws because the claim only alleges violation of that law." 2011 WL 3652311, at *7–8; *see also Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1152 (D. Minn. 2011) (state-law negligence *per se* claim predicated on a violation of the FDCA preempted under *Buckman*); *Parker v. Stryker Corp.*, 584 F.Supp.2d 1298, 1301 (D. Colo. 2008) (plaintiffs "cannot escape preemption by reference to provisions of the FDCA that govern the sale of adulterated and misbranded devices because there is no private right of action under the FDCA"). Other courts have recognized that "[c]onclusory allegations that the defendant violated FDA regulations in the manufacture, labeling, or marketing of the premarket approved medical device are insufficient to state a parallel state-law claim and thereby avoid preemption under § 360k(a)." *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1000 (S.D. Ohio 2016) (citing *Ali v. Allergan USA, Inc.*, 2012 WL 3692396, at *6 (E.D. Va. 2012)).

Because Plaintiff alleges only the FDCA and its regulations as a basis for her negligence *per se* claim, the claim is preempted by 21 § 337(a) and she cannot pursue it. Thus, Cook is entitled to summary judgment on that claim.

38

**V.     Cook is entitled to summary judgment on Plaintiff's breach-of-warranty claims in Counts 5 and 6 because Georgia law requires privity for a breach-of-warranty claim, and there is undisputedly no privity between Plaintiff and Cook.**

Cook is entitled to summary judgment on Plaintiff's claims of breach of express and implied warranties (Counts 5 and 6) for a simple reason: it is undisputed that there is no privity between Plaintiff and any of the Cook Defendants.

"[I]f a defendant is not the seller to the plaintiff-purchaser, the plaintiff as the ultimate purchaser <u>cannot recover on the implied or express warranty</u>, if any, arising out of the prior sale by the defendant to the original purchaser." *Lamb v. Georgia Pacific Corp.*, 194 Ga. App. 848, 850 (1990) (emphasis added); *see also Wheeler*, 944 F. Supp. 2d at 1354 ("Under Georgia law, to recover for a breach of warranty, a plaintiff must show privity between himself and the defendant."); *Gowen v. Cady*, 376 S.E.2d 390, 393 (Ga. Ct. App. 1988). This rule applies to medical devices. *Baker v. Smith & Nephew Richards, Inc.*, 1999 WL 1129650, at *8 (N.D. Ga. Sept. 30, 1999) ("Under Georgia law, the recipient of an internally implanted medical device does not have standing to bring a claim for breach of implied warranty."). [106]

There is no dispute that Plaintiff did not purchase her IVC filter directly from Cook. Instead, Cook sold the filter to a hospital, after which Dr. Rheudasil selected it from the hospital's supply and implanted it. [107] Thus, there is no privity between Plaintiff and the Cook Defendants, and Cook is entitled to summary judgment on Ms. Brand's breach-of-warranty claims in Counts 5 and 6 of her Complaint.

**VI.     Cook is entitled to judgment on plaintiff's loss-of-consortium claim (Count 8) because only plaintiff's husband can assert such a claim, and he has voluntarily dismissed his claims against Cook.**

---

[106] *See also Henderson v. Sun Pharms. Indus., Ltd.*, 2011 WL 4024656, at *7 (N.D. Ga. June 9, 2011); *In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*, 711 F. Supp. 2d at 1366; *Bryant v. Hoffman-La Roche, Inc.*, 262 Ga. App. 401, 411 (Ga. Ct. App. 2003); *Gowen*, 189 Ga. App. at 476.
[107] Rheudasil Dep. at 178:1-179:13.

Tonya Brand's husband, Allen Brand, voluntarily dismissed his claims against Cook. (Dkt. 189.) That spells the end of any loss-of-consortium claim (Count 8), because Ms. Brand cannot assert a loss-of-consortium claim when she is the one who suffered the injury. *See White v. Hubbard*, 203 Ga. App. 255 (1992) (noting "the derivative nature of loss of consortium claims to personal injury claims of injured <u>spouses</u>....") (emphasis added); *Marzetta v. Steinman*, 117 Ga. App. 471, 472 (1962) (loss of consortium claim lies only where there is "injury to the <u>spouse</u>") (emphasis added). Cook is therefore entitled to judgment on that claim as well.

## VII.    Cook is entitled to summary judgment on plaintiff's punitive-damages claim in Count 11.

Cook is entitled to summary judgment on Plaintiff's claim for punitive damages in Count 11 for two reasons: 1) as discussed above, her liability claims fail, and Georgia law does not allow punitive damages without a finding of liability by the defendant; and 2) she cannot as a matter of law meet the high threshold necessary for the imposition of punitive damages.

### A.    Plaintiff cannot recover punitive damages because her substantive liability claims fail.

A finding of liability is required for an award of punitive damages. *See Andrews v. Autoliv Japan, Ltd.*, 228 F. Supp. 3d 1340, 1347 (N.D. Ga. 2017) (citing *Morris v. Pugmire Lincoln Mercury, Inc.*, 641 S.E.2d 222, 241 (2007)); *Yost v. Wabash Coll.*, 3 N.E.3d 509, 514 (Ind. 2014) ("while punitive damages has its own prerequisite elements of proof, such elements do not establish an independent cause of action."); *Crabtree ex rel. Kemp v. Estate of Crabtree*, 837 N.E.2d 135, 137–38 (Ind. 2005) ("Successful pursuit of a cause of action for compensatory damages is a prerequisite to an award of punitive damages."). Because all of Plaintiff's substantive liability claims fail as a matter of law, as discussed above, her claim for punitive damages likewise fails as a matter of law.

40

**B.    Plaintiff's cannot recover punitive damages because she cannot show by clear and convincing evidence that Cook committed misconduct willfully or with conscious indifference.**

Even if the Court were to find that one or more of Plaintiff's liability claims survives summary judgment, Cook is still entitled to summary judgment on her punitive-damages claim because she cannot as a matter of law meet the high standard for such damages. Although Georgia law governs Plaintiff's claims for compensatory damages, the choice of the law governing her claim for punitive damages is not as simple. As discussed in Cook's forthcoming motion for bifurcation of punitive damages, the law of Indiana, the state in which all of Cook's conduct at issue occurred, should apply to Plaintiff's punitive-damages claim. But the Court need not decide the choice-of-law question to grant Cook summary judgment on Plaintiff's punitive damages claim, because Plaintiff's evidence could not sustain an award of punitive damages under either Georgia or Indiana law.

Under Georgia law, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Ga. Code Ann. § 51-12-5.1(b). Indiana law is similar: punitive damages may be awarded only when the jury could find by clear and convincing evidence that the defendant acted with malice, fraud, willful and wanton misconduct, oppressiveness "which was not the result of a mistake of fact or law, mere negligence, or other human failing." *Wohlwend v. Edwards*, 796 N.E.2d 781, 784 (Ind. 2003); Ind. Code § 34-51-3-1.

Here, even assuming that Plaintiff's product-liability claims survive summary judgment, she cannot produce evidence that could clearly and convincingly permit a jury to conclude that Cook engaged in the culpable conduct required by either of these standards. By no stretch of the

41

imagination could Plaintiff 's evidence be viewed as anything more damning than a failure to exercise reasonable care. There is no fraud, no malice, no wanton or willful misconduct, and certainly no intentional misconduct in the record. At most, Plaintiff could argue for some mistake, negligence, or human failing, but this is not enough for a punitive damage award under either state's standard. *See Edwards v. Wisconsin Pharmacal Co., LLC*, 987 F. Supp. 2d 1340, 1347 (N.D. Ga. 2013); *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137-38 (Ind. 1988).

This conclusion is particularly compelling in the specific circumstances of this case: Dr. Rheudasil testified that he <u>actually knew</u> of all the risks of the Celect filter, and that he decided to place the Celect filter notwithstanding those risks.[108] And Plaintiff's own expert Dr. Gordon concedes that Dr. Rheudasil's use of the Celect filter did not violate any standard of care.[109] The Court therefore should grant Cook summary judgment on Plaintiff's claim for punitive damages.

---

[108] Rheudasil Dep. at 59:23-60:13, 61:17-62:1, 62:15-63:16.
[109] Gordon Rept., p. 44.

## **CONCLUSION**

The Cook Defendants are entitled to summary judgment on all of Plaintiff's claims in this case.

Dated: July 20, 2018                    Respectfully submitted,

                                        /s/ *Andrea Roberts Pierson*
                                        J. Joseph Tanner (#11856-49)
                                        Andrea Roberts Pierson (# 18435-49)
                                        FAEGRE BAKER DANIELS LLP
                                        300 North Meridian Street, Suite 2700
                                        Indianapolis, Indiana 46204
                                        Telephone: (317) 237-0300
                                        Facsimile: (317) 237-1000
                                        Email: andrea.pierson@faegrebd.com
                                        Email: joe.tanner@faegrebd.com

                                        *Attorneys for Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, William Cook Europe ApS*

43

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2018, a copy of the foregoing COOK DEFENDANTS'

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT was filed

electronically, and notice of the filing of this document will be sent to all parties by operation of

the Court's electronic filing system to CM/ECF participants registered to receive service in this

matter. Parties may access this filing through the Court's system. Lead Co-Counsel for

Defendants will serve any non-CM/ECF registered parties.


*/s/  Andrea Roberts Pierson*

44