**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                    Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                            MDL No. 2570
_____

This Document Relates to the Following Actions only:

    *Brand v. Cook Medical, Inc. et al.,*
    Case No. 1:14-cv-06018-RLY-TAB


_____

**COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION**
**TO EXCLUDE EXPERT OPINIONS OF DR. ROBERT McMEEKING**

    "[E]xpert testimony must be rejected if it lacks an adequate basis in fact." *Cella v. United*

*States*, 998 F.2d 418, 423 (7th Cir. 1993). "Clearly, expert testimony does not 'help' if it is

unrelated to facts at issue or is based on factual assumptions that are not supported by the

evidence." 29 Victor James Gold, FEDERAL PRACTICE & PROCEDURE EVIDENCE (Wright &

Miller) § 6265.2 (2d ed. Westlaw ver.) (internal footnotes omitted).

    These basic principles lead to exclusion of Dr. Robert McMeeking's opinions in this case

regarding fracture of Celect filters. Dr. McMeeking concedes that his opinions regarding the

susceptibility of the Cook Celect filter to fracture are based not on any tests that he has

conducted or even on real-life conditions that the filter would likely experience inside the body,

but are based instead on a series of <u>worst-case scenarios</u>—sometimes as many as <u>six</u> of them

piled on top of one another. And Dr. McMeeking concedes that he does not know whether those

worst-case scenarios ever existed inside Ms. Brand's body, or in <u>any</u> human being's body, for

that matter.

Opining that an IVC filter will fracture if it is beaten with a hammer, run over by a bus, dropped in a vat of acid, and then attacked with a pair of pliers may be interesting, but it is irrelevant when there is no evidence that any of those things happened to it. Such an opinion does nothing to help the jury decide any fact in issue—one of the central requirements of Rule 702. The same is true of Dr. McMeeking's opinion that the Celect filter is likely to fracture when exposed to a cascade of worst-case scenarios, when there is no evidence that the filter was subject to even one of the worst-case scenarios. Thus, the Court should exclude Dr. McMeeking's opinions on fracture.

### Summary of Dr. McMeeking's Opinions

Dr. McMeeking opines that the Celect filter is deficient in its design because it is "probable" that the filter will tilt, perforate, and ultimately fracture. (Ex. A, McMeeking Report, at 69.) Dr. McMeeking opines that Cook should have redesigned the Celect to avoid those propensities. Such changes, according to Dr. McMeeking, could have included reducing the diameter of the primary legs or adding what he calls "perforation limiters" in the form of short extenders on the primary legs of the filter. (*Id.* at 70.) And he opines that it is more probable than not that the supposedly deficient design of the Celect caused Ms. Brand's filter in particular to perforate and fracture.  (Ex. B, Brand Dep. at 24.)

To form these opinions, Dr. McMeeking did a series of handwritten math calculations that purportedly analyze the stresses that the primary legs of the Celect experience. (Ex. A, McMeeking Report, at 1.) But Dr. McMeeking concedes that all of his fracture calculations are based on the assumption that the Celect was exposed to "worst-case" scenarios—sometimes as many as six worst-case scenarios occurring simultaneously.

Q:      [I]n <u>all of the calculations you're doing</u>, you're using [1] worst-case perforation; [2] worst-case endothelialization; [3] worst-case size of vena cava; [4] worst-case stresses; and [5] two millimeters below the [filter] cap, correct?

A:      Correct.

Q:      Okay. And then when you add in the effect of Valsalva in your analysis, you're using [6] the 80 percent [compression amount] again, the worst case, right?

A:      That's correct.

(Ex. B, Brand Dep. at 166 (emphasis added).) Then he addressed whether a combination of worst-case scenarios had ever occurred in Ms. Brand, or <u>any</u> human being, for that matter:

Q:      [Y]ou don't know whether all of those worst cases ever exist at once in a human being in real life, correct?

A:      That's correct.

Q:      And you don't know whether they existed in Mrs. Brand?

A:      No, no.

(*Id.* at 163. *See also id*. at 149 & 152.)

Dr. McMeeking hired a Hungarian engineer, Dr. Attila Kossa, to perform a computerized finite element analysis ("FEA") of the Celect filter. (Ex. A, McMeeking Report, at 77.) According to Dr. McMeeking, the FEA simulation confirms that his mathematical calculations are correct. (Ex. B, Brand Dep. at 236-37.) But Dr. McMeeking concedes that different assumptions were built into the FEA simulation than were built into the mathematical calculations. (*Id.* at 237-45.) Thus, comparing these two analyses is a bit like comparing apples to oranges.

## <u>Argument</u>

As the Court is well-aware, courts conduct a three-step inquiry under Rule 702 and the Supreme Court's decision *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993),

when analyzing the admissibility of an expert's opinions. To be admissible: (1) the expert must be qualified by knowledge, skill, experience, training, or education; (2) the expert's testimony must be based on sufficient facts or data, as well as reliable principles and methods, and the expert must have reliably applied those principles and methods to the facts of the case; and (3) the proposed expert testimony must assist the trier of fact to understand the evidence or determine a fact at issue in the case. *See* FED. R. EVID. 702; *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The proponent of the expert testimony has the burden of establishing admissibility by a preponderance of the evidence. *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Dr. McMeeking's opinions regarding fracture fail at all three steps.

**1.    Dr. McMeeking's analysis is based on a stacked series of worst-case scenarios that do not reflect actual conditions in Ms. Brand's body.**

In his fracture (also referred to as "fatigue") calculations, Dr. McMeeking assumed several circumstances that reflect "worst-case scenarios," not real-world conditions, or even real-world probabilities. He then combined all of these "worst-case" assumptions—sometimes as many as six of them—into his fatigue calculations. An example of the "worst case" assumptions that Dr. McMeeking used with respect to one of his calculations is as follows:

- First, Dr. McMeeking measured stress levels only at the cap of the filter, where he says the stresses (and thus the potential for fracture) are the highest. (Ex. B, Brand Dep. 58-60, 143, and 148.) But he admitted that Ms. Brand's filter did not fracture in that area, and that he is not aware of any evidence that Celect filters generally tend to fracture in that area. (*Id.* at 59-60.) He also admitted that he did no calculations of stress at the locations that Ms. Brand's filter actually fractured. (*Id.* at 169.)

- Second, Dr. McMeeking assumed that Valsalva (compression of the IVC during such events as coughing or a bowel movement) reduces the diameter of the IVC by 80%. (*Id.* at 143-46.) But he conceded that he does not know whether or how often that circumstance occurs in real-life.

- Third, Dr. McMeeking assumed that an implanted filter would not affect the amount by which the IVC diameter reduces during Valsalva and normal breathing, despite evidence (and common sense) demonstrating that an IVC without an IVC filter pushing back against it will compress more than an IVC with a filter exerting opposing force. (*Id.* at 146.)

- Fourth, he assumes that a there is a 40-millimeter span between the legs of the IVC filter. (*Id.* at 111-12, 147.) He acknowledges that 40-millimeter span is the maximum possible distance between the legs of a filter (anything wider would be rejected upon inspection as outside specifications). (*Id.* at 112.) He chose that value because it represented the worst-case scenario for fracture.

- Fifth, Dr. McMeeking assumed IVC that are either 15 millimeters or 30 millimeters wide. Those are the narrowest and widest IVC measurements that the Celect filter is cleared for use in. (*Id.* at 149, and 244-45.) Ms. Brand's IVC is approximately 22 millimeters wide. (Ex. C, Robertson (Rough) Brand Dep. 55-56).

Dr. McMeeking acknowledged that he doesn't know whether there are <u>any</u> people for whom all five of these "worst-case" assumptions would exist at the same time, as he assumed in doing his calculations. (Ex. B, Brand Dep. 149, 152.) He also acknowledged that he does not know if these conditions existed in Ms. Brand (as noted, we know for a fact they did not because her IVC is 22

millimeters wide, not 15 or 30). (*Id.* at 153.) Dr. McMeeking's other calculations of fatigue similarly rely on worst-case assumptions as to things such as tilt, endothelialization, and IVC compression. (*Id.* at 151-57.)

As Cook mentioned above, expert testimony that is not based in actual <u>fact</u> must be rejected. *Cella*, 998 F.2d at 423. Dr. McMeeking admits that he does not know whether the "worst-case-scenarios" upon which his analysis is based actually existed in Ms. Brand's body— or in <u>anyone's</u> body. (Ex. B, Brand Dep. at 152.) Georgia law provides that a product is defective if its risks outweigh its benefits when subjected to <u>foreseeable</u> conditions. *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1994). Dr. McMeeking's opinion is essentially that the Celect probably would not survive in <u>idiosyncratic</u> conditions. That is irrelevant, and therefore unhelpful to the jury in deciding the issue of defect in this case. *Cf. McClain v. Metabolife Intern'l Inc.*, 401 F.3d 1233, 1249-50 (11th Cir. 2005) (addressing inadequacy under *Daubert* of relying on an analysis based on worst-case assumptions to establish specific causation, i.e., contrasting a "public agency approach" with a "courtroom causation approach").

Because Dr. McMeeking's fracture opinions rely on conditions that he cannot say existed in Ms. Brand or in the real world in anyone, the opinions are inadmissible and should be excluded.

### 2.    Dr. McMeeking's opinions are unreliable.

When analyzing an expert's methodology, a court considers whether the evidence is genuinely scientific, as opposed to being unscientific speculation offered by a genuine scientist. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). An expert's work will be admissible only to the extent that it is reasoned, uses methods of the discipline, and is founded on data. *Lang v. Kohl's Food Stores, Inc.*, 217 F. 3d 919, 924 (7th Cir. 2000).  The Supreme Court

held in *Kumho Tire Co. v. Carmichael* that the *Daubert* factors for assessing reliability[1] may also be applicable in assessing the reliability of non-scientific expert testimony—including engineering testimony—depending upon "the particular circumstances of the particular case at issue." 526 U.S. 137, 149-50 (1999). This is because "[e]ngineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases." *Id.* at 150. Dr. McMeeking's testimony is not reliable under these standards.

### a.    Opinions developed solely for litigation are suspect.

The Federal Rules Advisory Committee states that the first reliability factor to be considered is whether the expert is proposing to testify about matters "growing naturally and directly" out of research conducted "independent of the litigation," or whether the expert has developed the proposed opinions "expressly for purposes of testifying." FED. R. EVID. 702, Advisory Committee's Note (2000 amendments) (internal quotation marks omitted). For example, when *Daubert* itself was remanded to the Ninth Circuit, that court held that the proposed experts' opinions suffered from this very flaw: they were experts in their respective medical fields, but they had never studied the specific drug at issue in that case (Bendectin) or its effects "before being hired to testify in this or related cases," and were therefore excluded. *Daubert*, 43 F.3d at 1317.

---

[1] *Daubert* sets forth a non-exclusive checklist of factors for district courts to use in assessing the reliability of scientific expert testimony. FED. R. EVID. 702, Advisory Committee's Note (2000 amends.). Those factors include: "(1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." *Id.*

Dr. McMeeking admitted that he had no experience with IVC filters before being hired to testify in this and other filter cases. Rather, all of his opinions were formulated during litigation—either this litigation or in similar litigation against C.R. Bard, another IVC filter manufacturer. That cuts against the reliability of his testimony under *Daubert*.

> **b.   Dr. McMeeking's opinions here have never been published or peer reviewed.**

As the Ninth Circuit noted post-remand in *Daubert*, "proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication" provides indicia of reliability. *Id*. at 1318 (noting that while Bendectin litigation had been pending for over a decade, none of the plaintiffs' experts had published in a scientific journal—"It's as if there were a tacit understanding within the scientific community that what's going on here is not science at all, but litigation."). The same is true here: Dr. McMeeking has not published any of his analysis of IVC Filters.  (Ex. B, Brand Dep. 8.)

> **c.   Dr. McMeeking's opinions lack appropriate controls and standards.**

With respect to his worst-case assumptions, Dr. McMeeking acknowledged that if conditions representing the worst-case scenario were rare, it may have been appropriate for Cook to proceed with the design under a risk-benefit analysis. (Ex. B, Brand Dep. 280.) That only makes sense: if the risk of worst-case scenarios that might result in a complication with a filter is quite low, that suggests that the filter is not defective even if it cannot withstand one of those worst-case scenarios. While Dr. McMeeking equivocated that it is very difficult "to assess how often worst-case conditions will arise," (*id.* at 279), it is Plaintiff's burden as the proponent of Dr. McMeeking's testimony to establish that worst-case assumptions are appropriate. Dr. McMeeking's self-characterization of his assumptions as reasonable does not make them so. (*Cf. id.*) Further, and as discussed in Section I, Dr. McMeeking's FEA was apparently performed

to validate his mathematical analysis, but certain assumptions used in the FEA vary from some of the assumptions he used in his mathematical analysis. The inconsistency suggests the absence of rigorous controls and standards.

Dr. McMeeking's safer-alternative-design opinions are likewise flawed for lack of any controls or standards. He sets forth a number of theoretical design alternatives in one paragraph in his report, but concedes that he did no analysis or testing to determine whether any of those suggestions would actually work. (*See* Ex. A, McMeeking Report, at 55; Ex. B, Brand Dep. at 182-83.) That is not nearly the rigor that is required to render an adequate opinion regarding safer alternative design, it is simply "spit-balling." Dr. McMeeking also suggests that the Tulip has less risk of perforation than the Celect, but the bulk of his opinions reflect the conclusion that the Tulip also tilts and perforates and has increased risk of fatigue fracture and is therefore defective.  (Ex. A, McMeeking Report at 4-6.) And he made no attempt to calculate or analyze whether the Celect fractures more or less often than other concial IVC filters.  (Ex. B, Brand Dep. at 169.)

In sum, Dr. McMeeking's testimony lacks basic controls and standards that would indicate sufficient scientific rigor under *Daubert* and *Kumho.*

### 3.      Dr. McMeeking's Opinions Would Not Assist the Jury.

As discussed above, Dr. McMeeking's theoretical mathematical analysis is not at all tied to the facts of the case. The case law on this point is clear.  The proffered testimony must be "sufficiently tied to the facts of the case" to aid the jury. *Daubert*, 509 U.S. at 591. Neither the mathematical calculations nor the FEA simulation account for Ms. Brand's personal physiological circumstances, despite the fact that much is known about Ms. Brand's anatomy. For example, we have multiple medical images that show that the diameter of her IVC is

approximately 22 millimeters. (*See, e.g.*, Ex. C, Robertson (Rough) Brand Dep. 55-56.) Despite that knowledge, Dr. McMeeking based his calculations on the extreme measurements of 15 and 30 millimeters, solely (on his own admission) because they represented "worst cases." But those worst cases have nothing to do with Ms. Brand's actual case, so the analysis is purely theoretical and would not help the jury.

  **4.** **Dr. McMeeking is not qualified to offer his proposed testimony on the design of the Celect filter.**

  Cook submitted to this Court in the *Hill* case that Dr. McMeeking is unqualified to offer opinions specifically related to the design of IVC filters because of his lack of experience dealing with IVC filters (Cook mentioned this point earlier as well, in connection with its discussion of the reliability of his opinions). The Court rejected Cook's position in *Hill*. Cook renews its arguments here, but will reiterate its argument in outline form simply to preserve it for the record.

  An expert has to be "qualified" whether "by knowledge, skill, experience, training, or education." FED. R. EVID. 702. In determining an expert's qualifications, the Seventh Circuit has repeatedly reminded litigants that it is not enough for an expert to be generally qualified in a particular area: the expert must be qualified to answer the *particular question* that he or she is venturing to answer. *See, e.g., Gayton v. McCoy,* 593 F.3d 610, 617 (7th Cir. 2010).

  As a general mechanical engineer, Dr. McMeeking has no prior experience with IVC filters and is therefore unqualified to offer opinions on their design. He previously testified that his experience with medical devices is principally limited to heart valves, stents, and breast implants, none of which has any relation to the IVC filters at issue here. Ex. D, Hill Dep. 10-11, 21-23, 25-28. He has published no articles on IVC filters. *Id*. at 10; Ex. B, Brand Dep 7-8. He has given no academic lectures on IVC filters. Ex. D, Hill Dep. 22-23; Ex. B, Brand Dep. 8. He

has no experience designing or working with IVC filters; indeed, he has never designed a medical device of any kind.  Ex. D, Hill Dep. 21, 27; Ex. B, Brand Dep. 8.

Expert testimony is properly excluded where the expert's conclusions are rooted in knowledge and training that the expert does not have.  *See Hall v. Flannery*, 840 F.3d 922, 930 (7th Cir. 2016) (citing cases). In the medical-device context, where engineering intersects with medicine, particularized experience is extremely important.  *See, e.g.*, *Botnick v. Zimmer, Inc.*, 484 F. Supp. 2d 715, 719-20 (N.D. Ohio 2007) (finding that a mechanical engineer lacked the qualifications necessary to testify as to alleged defects in a bone plate); *McCorvey v. Baxter Healthcare Corp.*, No. 99–1250–CIV, 2001 WL 36393134, at *4-7 (S.D. Fla. Sept. 30, 2001) (excluding as unreliable the testimony of a mechanical engineer who had never worked with Foley catheters or conducted extensive research on their construction), *aff'd in relevant part & rev'd in part on other grounds,* 298 F.3d 1253 (11th Cir. 2002); *see also Higgins v. Koch Development Corp.*, 997 F. Supp. 2d 924, 931 (S.D. Ind. 2014) (excluding testimony from medical doctor who lacked experience treating patients exposed to chlorine gas). That is the case here. The Court should exclude Dr. McMeeking's testimony.

<u>**Conclusion**</u>

Dr. McMeeking's "worst-case-scenario" analysis is not based on real-life facts and therefore cannot support his opinions. His methodology is flawed and therefore not relevant or helpful to the trier of fact. He also lacks relevant qualifications in the field of IVC filters. For these reasons, the Court should exclude Dr. McMeeking's opinions from evidence under Rule 702 and *Daubert*.

Respectfully submitted,

Dated: July 20, 2018

s/James Stephen Bennett
James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

J. Joseph Tanner (# 11856-49)
Andrea Roberts Pierson (# 18435-49)
John T. Schlafer (# 28771-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  joe.tanner@faegrebd.com
E-Mail:  andrea.pierson@faegrebd.com
E-Mail:  john.schlafer@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, a copy of the foregoing was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.  Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

s/James Stephen Bennett

US.119008822.02