UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: COOK MEDICAL, INC., IVC      Case No. 1:14-ml-2570-RLY-TAB
FILTERS MARKETING, SALES
PRACTICES AND PRODUCTS      MDL No. 2570
LIABILITY LITIGATION

This document relates to:
All cases involving Plaintiffs who received the Celect
Or Tulip filters, specifically including:
Brand (1:14-cv-06018-RLY-TAB)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION

Joseph N. Williams, Atty. No. 25874-49
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com
*Liaison Counsel to Plaintiffs Steering Committee and on behalf of Plaintiffs Steering Committee*

Michael W. Heaviside, Esq.
HEAVISIDE REED ZAIC, A LAW CORPORATION
910 17th Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 223-1993
mheaviside@hrzlaw.com

Ben C. Martin, Esq.
THE LAW OFFICES OF BEN C. MARTIN
3710 Rawlins Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@bencmartin.com

David P. Matthews, Esq.
MATTHEWS AND ASSOCIATES
2509 Sackett St.
Houston, TX  77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
dmatthews@thematthewslawfirm.com

*Plaintiffs' Co-Lead Counsel*

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    ARGUMENT ........................................................................................................4

    A.    SUMMARY JUDGMENT STANDARD ................................................4

    B.    OVERVIEW OF THE MDA AND PREEMPTION ................................4

        1.    The SMDA Of 1990 Did Not Alter the Express Preemption Clause That Has Remained In effect For Forty Years ......................................................4

        2.    The SMDA Downgraded Regulatory Controls From Device-Specific "Performance Standards" To "Special Controls" Which Do Not Always Contain Device-Specific Information ...............................................6

        3.    The Supreme Court Clearly Defined The Scope Of Express Preemption in *Lohr* and *Riegel:* 510(k) Review Does Not Set a Federal Requirement for Safety Or Effectiveness .................................................7

    C.    EXPRESS PREEMPTION AND 510(k) CLEARED MEDICAL DEVICES ......11

    D.    COOK FAILS THE TWO-PART PREEMPTION TEST BECAUSE THERE ARE NO SPECIFIC FEDERAL REQUIREMENTS, AND, EVEN IF THERE WERE, COOK HAS NOT DONE A CAREFUL COMPARISON BETWEEN ALLEGED FEDERAL REQUIREMENTS AND ALLEGEDLY PREEMPTED STATE LAW ...........................................................13

        1.    Cook Fails The First Component of 21 C.F.R. 808.1(d) Because There Are No Counterpart Regulations Or Federal Requirements Associated With Any IVC Filter ...............................................................14

            a.    Special Controls Are Not Federal Requirements ...........................14

            b.    There are no Design Controls for IVC Filters ...............................16

            i.    Menstrual Tampons – 21 C.F.R. § 801.430...................................17

            ii.    Latex Condoms – 21 C.F.R. § 801.435.........................................18

        2.    Cook Also Fails The Second Part Of 21 C.F.R. 808.1(d) because There Are No Other Federal Requirements Specific To Its Filters And Cook's FDA Communications Do Not Create A Federal Requirement ...............19

        3.    Despite Cook's Voluminous Submission To The Court, Cook Withheld

Foreign Adverse Event Reports from The FDA's Public Complaint Database While Using The Same Database To Promote the Safety Of Its Filters Over Its Competitors.................................................................23

4.      Even If There Were Specific Federal Requirements Applicable To Cook's IVC Filters Cook's Motion Fails Since There Is No "Careful Comparison" With Plaintiffs' Claims Because There Are No Federal Requirements To Which To Compare Them.............................................26

E.      COMMON LAW CLAIMS INVOLVING COOK'S IVC FILTERS ARE NOT SUBJECT TO IMPLIED PREEMPTED......................................................28

1.      Cook's Implied Preemption Argument Is Contrary To Congress's Intent, Supreme Court Case Law, And Common Sense...........................28

2.      The *Mensing* and *Bartlett* decisions involve generic drugs, which operate under a different regulatory scheme lacking an express preemption clause ...................................................................................30

III.    CONCLUSION.............................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................................................4

*Anguiano v. E.I. Du Pont De Nemours & Co., Inc.*,
    44 F.3d 806 (9th Cir. 1995) .........................................................................................14

*Arizona v. United States*,
    567 U.S. 387 (2012)....................................................................................................29

*Arvizu v. Medtronic, Inc.*,
    41 F. Supp. 3d 783 (D. Ariz. 2014) .............................................................................11

*Banks v. ICI Americas, Inc.*,
    264 Ga. 732, 450 S.E.2d 671 (1994)............................................................................28

*Bates v Dow Agrosciences*, LLC.,
    544 US 431 (2005)......................................................................................................14

*Bausch v. Stryker Corp.*,
    630 F.3d 546 (7th Cir. 2010) .....................................................................................7, 9

*Bejarano By & Through Bejarano v. Int'l Playtex, Inc.*,
    750 F. Supp. 443 (D. Idaho 1990) ...............................................................................17

*Berger v. Personal Prods., Inc.*,
    115 Wash.2d 267 (1990)..............................................................................................17

*Brooks v. Howmedica, Inc.*,
    273 F.3d 785 (8th Cir. 2001) .......................................................................................19

*Buckman Co. v. Plaintiffs' Legal Committee*,
    531 U.S. 341 (2001)....................................................................................................20

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................................4

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992)................................................................................................29, 31

*Cornelison v. Tambrands, Inc.*,
    710 F. Supp. 706 (D.Minn.1989)..................................................................................17

*Edmondson v. International Playtex, Inc.*,
   678 F. Supp. 1571 (N.D.Ga.1987) ...................................................................17

*Eghnayem v. Boston Scientific Corp.*,
   873 F.3d 1304 (11th Cir. 2017) ...................................................................2

*Elbert v. Howmedica, Inc.*,
   841 F. Supp. 327 (D. Haw. 1993) ...............................................................5, 14

*Ginochio v. Surgikos, Inc.*,
   864 F. Supp. 948 (N.D. Cal. 1994) ...............................................................14

*Horillo v. Cook, Inc.*,
   2014 WL 8186704 (S.D. Fla. 2014) ...........................................................11, 20

*Huskey v. Ethicon, Inc.*,
   848 F.3d 151 (4th Cir. 2017) .........................................................2, 5, 11, 21

*In re Bard IVC Filters Products Liab. Litig.*,
   MDL 15-02641-PHX DGC, 2017 WL 5625547 (D. Ariz. 2017)...........................8, 26, 28

*In re C.R. Bard, Inc. MDL No. 2187, Pelvic Repair System Products Liability Litigation (Cisson)*,
   810 F.3d 913 (4th Cir 2016) ...................................................10-11, 19, 20-21

*In re Depuy Orthopedics Pinnacle Hip Implant Prods.*,
   No. 3:11-cv-03590-K, 2014 WL 3557392 (N.D. Tex. July 8, 2014) ......................... 30-31

*In re Zimmer Nexgen Knee Implant Products Liab. Litig.*,
   2015 WL 5145546 (N.D. Ill. 2015) ...............................................................19

*James v. Diva Intern., Inc.*,
   803 F. Supp. 2d 945 (S.D. Ind. 2011) ...........................................5, 6, 16, 18, 22

*Krause v. Kimberly-Clark Corp.*,
   749 F. Supp. 164 (W.D.Mich.1990) ...............................................................17

*Lavetter v. International Playtex*,
   706 F. Supp. 722 (D.Ariz.1988) ...................................................................17

*Lewis v. Johnson & Johnson*,
   991 F. Supp. 2d 748 (S.D.W. Va. 2014)...........................................................19

*Lindquist v. Tambrands,* Inc.,
   721 F. Supp. 1058 (D.Minn.1989) .................................................................17

*Lulov v. Tambrands, Inc.*,
198 A.D.2d 479, 604 N.Y.S.2d 206 (App.Div.1993) ......................................................17

*Martin v. Telectronics Pacing Sys.*,
105 F.3d 1090 (6th Cir. 1997) .......................................................................................19

*Medtronic, Inc. v. Lohr*
518 U.S. 470 (1996)............................................................................................... *passim.*

*Merancio v. Smith & Nephew, Inc.*,
2017 WL 2257124 (E.D. Cal. 2017)...............................................................................18

*Meyer v. International Playtex, Inc.*,
724 F. Supp. 288 (D.N.J.1988) .......................................................................................17

*Moore v. Kimberly-Clarke*,
867 F.2d 243 (5th Cir. 1989) .............................................................................12, 17, 18

*Mullins v. Ethicon, Inc.*,
147 F. Supp. 3d 478 (S.D. W. Va. 2015)...........................................................29, 30, 31

*Murray v. Medtronic, Inc.*,
1993 WL 515741 (E.D. La. Dec. 3, 1993).........................................................................5

*Mut. Pharm. Co. v. Bartlett*,
133 S. Ct. 2466 (2013)................................................................................................30, 31

*Northrip v. International Playtex, Inc.*,
750 F. Supp. 402 (W.D.Mo.1989) ..................................................................................17

*Papike v. Tambrands Inc.*,
107 F.3d 737 (9th Cir. 1997) ..........................................................................12, 14, 17, 18

*Perez v. Nidek Co., Ltd.*,
711 F.3d 1109 (9th Cir. 2013) ..........................................................................................5

*Placencia v. I-Flow*,
2012 WL 5877624 (D. Ariz. 2012).............................................................................7, 21

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011)........................................................................................................30

*Poloney v. Tambrands, Inc.*,
412 S.E.2d 526 (Ga. 1991)..............................................................................................17

*Poole v. Hologic,*
    2010 WL 3021528 (W.D. La. 2010) ................................................................5

*Puerto Rico v. Franklin Calif. Tax-Free Trust,*
    136 S. Ct. 1938 (2016) ...............................................................................29

*Rasheed v. Church & Dwight Co.,*
    2012 WL 262619 (E.D. Tex. Jan. 12, 2012), *report and recommendation adopted,*
    2012 WL 262616 (E.D. Tex. Jan. 30, 2012) ...............................................18

*Riegel v. Medtronic, Inc.,*
    552 U.S. 312 (2008) ............................................................................ *passim.*

*Rinehart v. International Playtex, Inc.,*
    688 F. Supp. 475 (S.D.Ind.1988) ...............................................................17

*Shea v. Oscor Medical Corp.,*
    950 F. Supp. 246 (N.D. Ill. 1996) ..............................................................30

*Stewart v. International Playtex, Inc.,*
    672 F. Supp. 907 (D.S.C.1987) ..................................................................17

*Thompson v. DePuy Orthopaedics,*
    2015 WL 7888387 (S.D. Ohio 2015) ..........................................................6

**Statutes**

21 C.F.R. § 801(H) ....................................................................16, 17, 18, 19

21 C.F.R. § 801.405 ..................................................................................16

21 C.F.R. § 801.417 ..................................................................................16

21 C.F.R. § 801.420 ..................................................................................16

21 C.F.R. § 801.430 ......................................................................14, 16, 17

21 C.F.R. § 801.435 ...........................................................................16, 18

21 C.F.R. 807.87(l) .........................................................................19, 22, 23

21 C.F.R. § 807.97 ....................................................................................10

21 C.F.R. § 808.1(d) ...........................................2, 3, 5, 6, 7, 12, 13, 14, 15, 19, 31

21 C.F.R. § 820.14(b)(3)(vi) .....................................................................10

21 C.F.R. § 870.3375 ....................................................................................................6, 14

21 C.F.R. §§ 1010 – 1050 .................................................................................................16

21 U.S.C. § 360c ...............................................................................................................10

21 U.S.C. § 360c(i)(1)(A) ...................................................................................................9

21 U.S.C. § 360k ..........................................................................................................5, 10

21 U.S.C. § 360k(a) ........................................................................... 3, 5, 7-8, 11, 16

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................................5

**Other Authorities**

H.R. Rep. No. 101-808, § 13 (1990) ...................................................................................6

P. Hutt, R. Merrill, & L. Grossman, Food and Drug Law 992 (3d ed. 2007)..................7

Pub. L. No. 94-295, 90 Stat. 539 (1976)............................................................................4

Pub. L. No. 94-295, 90 Stat. 541 ........................................................................................6

Pub. L. No. 101-629, 104 STAT. 4511...............................................................................6

## I.   __INTRODUCTION__

After this Honorable Court's ruling denying Defendants' for Summary Judgment Based on Federal Preemption (Doc. 6541) as to all actions, Cook seeks to file an almost verbatim replica of its original filing again attempting to preempt not only Mrs. Brand's claims, but all Plaintiffs' claims in this MDL.  (Def. Mot., at 2).  Yet Defendants fail to cite any new law and provide no new facts. Defendants' motion is not being put forth for reconsideration based on a change in circumstances, factually or legally, and this Court's ruling issued was as to "All Actions". (Doc. 6541).  As such, and with no new legal or factual basis to find otherwise, this revisitation of Cook's preemption efforts should be denied on the same bases this Court previously provided. Nevertheless, Plaintiffs respond to Cook's second attempt at preemption as set forth below.

Cook attempts, as it did the first time it filed its motion, to persuade this Court into believing that the 510(k) process has changed so radically since *Lohr* that today it imposes requirements tantamount to premarket approval (PMA) and renders *Lohr* obsolete; no longer good law. But the statute has not changed, the governing regulations have not changed, and the Supreme Court has not receded from *Lohr*— indeed, it reiterated *Lohr* and the stark differences between 510(k) and PMA in *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323-23 (2008). Scores of decisions have rejected the notion that 510(k) clearance imposes PMA-like requirements, or even assures safety and effectiveness.

In *Medtronic, Inc. v. Lohr*, the United States Supreme Court stated that the 510(k) process "is focused on *equivalence*, not safety" and that "substantial equivalence determinations provide little protection to the public." 518 U.S. 470, 493 (1996) (emphasis in original).  *Lohr* has been cited more than 14,000 times since June 1996, including thirty-six (36) times by the Supreme Court starting a month after its ruling and almost every year since. It has been cited twice in the last year

by two circuit courts of appeal addressing issues directly on point. First, the Fourth Circuit Court of Appeals held that 510(k) "only 'tangentially' examines the safety of the product going through the process." *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 160 (4th Cir. 2017). Second, the Eleventh Circuit Court of Appeals similarly held that the 510(k) process is not a safety review, it is a method for the manufacturer to demonstrate substantial equivalence. *Eghnayem v. Boston Scientific Corp.*, 873 F.3d 1304, 1316 (11th Cir. 2017).

Cook's motion fails because the 510(k) FDA review process for its IVC filters neither created device-specific federal requirements nor came close to the rigorous pre-market safety and efficacy approval process for which express preemption may apply.  There is nothing novel about this medical device litigation or the 510(k) "substantial equivalence" review which resulted in Cook's IVC filters being cleared for sale that distinguishes this case from the many others where preemption challenges involving 510(k)-cleared devices have been nearly universally denied under longstanding Supreme Court precedent.

The burden of proof for Cook's preemption defense is heavy and well-established: state law tort claims involving 510(k)-cleared medical devices are not preempted under the express preemption clause of the Medical Device Amendments of 1976 ("MDA") to the Federal Food Drug and Cosmetic Act ("FDCA") unless (1) the federal government promulgates a specific counterpart regulation or requirement applicable to a particular device, *and* (2) state law is different from or in addition to those promulgated requirements. 21 C.F.R. § 808.1(d); *Riegel*, 552 U.S. at 321-22.  Cook's IVC filters do not meet this standard.  The federal government has not promulgated any device-specific requirements so there can be no careful comparison between the allegedly preempting federal requirement and the allegedly preempted state law to determine

whether the state law claims fall within the scope of the MDA's express preemption claims, 21 U.S.C. § 360k(a).

Nonetheless, Cook seeks complete, express preemption of all state law tort liability claims under its self-created preemption standard cobbled together from its recitation of mostly administrative, logistical, and ordinary interactions with the FDA typical of a 510(k) review. Cook attempts to demonstrate that the mundane 510(k) review processes that its IVC filters underwent were so exceptional that they somehow created device-specific requirements on par with those described in 21 C.F.R. § 808.1(d). Even if Cook could establish that the 510(k) review of its filters was abnormally rigorous or otherwise unusual (it wasn't), its flawed premise has already been rejected by the Supreme Court, which has stated unequivocally that federal requirements are neither imposed nor created during the FDA's 510(k) pre-market notification review process, as opposed to the review FDA undertakes when examining a pre-market approval (PMA) submission for which preemption has been found by some courts to apply. *See infra*, Sec. II.B.3.

Cook's motion also fails because it offers no evidence establishing that the 510(k) review processes for Cook's IVC filters—even with special controls—were equivalent to the rigorous PMA review process such that preemption applies, an argument that directly contradicts Supreme Court precedent. *See Riegel*, 552 U.S. at 322-23 (distinguishing between PMA and 510(k) review). Moreover, even if there were sufficient evidence before the Court, Cook has not explained how any allegedly preempted state laws are different from or in addition to any allegedly existing federal requirements.

Lastly, numerous courts have likewise rejected the exact implied preemption argument asserted by Cook. For these reasons, Cook's Motion should be denied.

## II.    ARGUMENT

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant also "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986).  Only disputed facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party.*" Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.  OVERVIEW OF THE MDA AND PREEMPTION

Cook's principal argument is that the well-reasoned and longstanding distinction between PMA review of medical devices (for which preemption has been found) and 510(k) clearance of medical devices (for which preemption is generally not afforded) recognized in *Lohr* and *Riegel* is no longer viable given changes to the MDA in 1990.  As the following overview demonstrates, Cook is mistaken.

1. The SMDA Of 1990 Did Not Alter the Express Preemption Clause That Has Remained In effect For Forty Years.

Congress granted the FDA authority to regulate medical devices and adopted a general prohibition on non-federal regulation by incorporating an express preemption clause into the MDA. Pub. L. No. 94-295, 90 Stat. 539 (1976). While the MDA underwent alterations with the enactment of the Safe Medical Devices Act of 1990 ("SMDA"), the express preemption clause did not and has never changed despite Congress' multiple re-reviews of the Act. *See* Chart 1, *infra*.

**Chart 1 – Express Preemption Language, Section 521a, 21 U.S.C. 360k**

| Food, Drug and Cosmetic Act of 1938 (FDCA) | Medical Device Amendments of 1976 (MDA) | Safe Medical Device Amendments of 1990 (SMDA) | FDA Modernization Act of 1997 (FDAMA) | Medical Device User Fee and Modernization Act of 2002 (MDUFMA) | Medical Device User Fee and Stabilization Act of 2005 (MDUFSA - I) | Medical Device User Fee and Stabilization Act of 2012 (MDUFSA - II) |
|---|---|---|---|---|---|---|
| ENACTED | Express Preemption Language at Section 521a (21 U.S.C. 360k) | No change. | No change. | No change. | No change. | No change. |

It has been more than four decades since the 1976 Amendments were enacted adding this express preemption language. Two Supreme Court opinions have interpreted it in the 510(k) and PMA context. The law has not changed, although it is informed by 21 C.F.R. § 808.1(d) as to its scope. *Riegel*, 552 U.S. at 322.

Additionally, in determining that the MDA is not device-specific (i.e., applies to all medical devices) and consists purely of "general controls," *Lohr* recognized the Congressional narrowing of the preemption clause via FDA regulations, stating "state requirements are pre-empted 'only' when the FDA has established 'specific counterpart regulations or . . . other specific requirements applicable to a particular device.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 498 (1996) (quoting 21 C.F.R. §808.1(d) (1995)); *see also Riegel*, 552 U.S. at 322. The limitation on the express preemption clause in § 360k(a) has been widely recognized pre- and post-*Riegel/Lohr*.[1] It is considered an implementing regulation. *Perez v. Nidek Co., Ltd*., 711 F.3d 1109, 1117 (9th Cir. 2013). In this sense, Congress has shortened the reach of the express preemption clause for 510(k)-

---

[1] *See, e.g.*, *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 736, 752 (S.D. W. Va. 2014); *James v. Diva Intern., Inc.*, 803 F. Supp. 2d 945, 951-52 (D. Ind. 2011); *Poole v. Hologic*, 2010 WL 3021528, at *3 (W.D. La. 2010); *Elbert v. Howmedica, Inc*., 841 F. Supp. 327, 330-32 (D. Haw. 1993); *Murray v. Medtronic, Inc*., 1993 WL 515741, at *1-2 (E.D. La. Dec. 3, 1993).

cleared devices.  *See James v. Diva Intern., Inc.*, 803 F. Supp. 2d 945, 950 (S.D. Ind. 2011); *see also Thompson v. DePuy Orthopaedics*, 2015 WL 7888387, at *8 (S.D. Ohio 2015).

> 2. <u>The SMDA Downgraded Regulatory Controls From Device-Specific "Performance Standards" To "Special Controls" Which Do Not Always Contain Device-Specific Information</u>

Prior to the SMDA's enactment in 1990, the MDA required the FDA to promulgate performance standards specific to all Class II devices cleared through the 510(k) process. *See* Pub. L. 94-295, 90 STAT. 541. This proved to be an onerous process that never came to fruition, as the initial House Report on the bill explained in setting forth the purpose of the legislation:

> Since the comprehensive medical device law was enacted in 1976, difficulties have persisted in the *implementation* of the law. These implementation problems appear to be the result of: (1) complexities in the law; (2) the manner in which FDA interpreted certain provisions of the 1976 law; and (3) limited resources. The purpose of this legislation is to modify the underlying law in ways that will result in greater protection of the public health.

H.R. Rep. No. 101-808, at Section 13 (1990) (emphasis added).

So the SMDA substituted "special controls" for "performance standards" for Class II devices. *See* Pub. L. 101-629, 104 STAT. 4511. These amendments created a less administratively burdensome process on the resource-limited FDA by switching from a requirement to promulgate performance standards for individual medical devices to instead assigning special controls. *Id*. Special controls do not necessarily contain device-specific or disease specific-information or performance standards associated with design or use of a product.  *Thompson v. DePuy Orthopaedics, Inc*., 2015 WL 7888387, *10 (S.D. Oh. 2015) (stating that special controls in the form of guidance documents may provide recommendations for 510(k) submissions but may not mandate any particular performance standards).  The special controls identified for IVC filters are neither device-specific nor disease specific.  21 C.F.R. 870.3375.

The SMDA's changes to the MDA, downgrading from the FDA's promulgation of device-specific performance standards to special controls undermines Cook's contention that the SMDA "dramatically shifted" the MDA.  (Mot. at 5). Instead, the pre-SMDA device-specific performance standards were *relaxed* in order to make clearance of 510(k) devices less administratively burdensome on the FDA.

The Supreme Court has recognized that the SMDA was designed to reduce the FDA's reliance on the 510(k) process, reflecting that most devices avoided PMA review by using 510(k) review.  *Lohr*, 518 U.S. at 479.  The Court also recognized, however, that six years after enactment of the SMDA the "lopsidedness has apparently not evened out." *Lohr*, 518 U.S. at 479. Eighteen years after the SMDA, the Supreme Court continued to note the imbalance between devices cleared via 510(k) substantial equivalence review and approved via PMA.[2]  The Supreme Court in *Lohr* may have been examining a record involving a pre-510(k)-cleared medical device, but it evaluated the preemption clause as it exists today unchanged since 1976, affected only by 21 C.F.R. § 808.1(d).

3.  The Supreme Court Clearly Defined The Scope Of Express Preemption in *Lohr* and *Riegel:* 510(k) Review Does Not Set a Federal Requirement for Safety Or Effectiveness.

The 510(k) review process does not set federal "requirements," even after the SMDA was enacted.  *Riegel*, 552 U.S., at 312; *Placencia v. I-Flow*, 2012 WL 5877624, at *5 (D. Ariz. 2012); *Bausch v. Stryker Corp.*, 630 F.3d 546, 551 (7th Cir. 2010) ("The section 510(k) process is less rigorous than the pre-market approval process, so much so that *Lohr* held that such generally applicable standards are not 'requirements' sufficient even to trigger preemption under section

---

[2]  "Most new Class III devices enter the market through § 510(k). In 2005, for example, the FDA authorized the marketing of 3,148 devices under § 510(k) and granted premarket approval to just 32 devices." *Riegel*, 552 U.S. at 317 (citing  P. Hutt, R. Merrill, & L. Grossman, Food and Drug Law 992 (3d ed. 2007))

360k(a).").  Where no federal requirements are found, there can be no federal preemption. *In re Bard IVC Filters Products Liab. Litig.*, MDL 15-02641-PHX DGC, 2017 WL 5625547, at *12 (D. Ariz. 2017).  That is because devices entering the market having met the substantial equivalence standard after 510(k) review "have 'never been formally reviewed under the MDA for safety or efficacy'" and do not require the strict adherence to specifications in the application that the PMA-reviewed devices do.  *Riegel*, 522 U.S. at 323.  Cook's own regulatory expert, Mr. Harvey Pellerite, confirmed the distinction in deposition:

> Q.  [The 510(k)] standard differs from PMA, wouldn't you agree, that, at least in this respect, that for PMA you have to, the manufacturer has to demonstrate independently a determination of safety and effectiveness for its intended use?
>
> A.  For a specific indication, yes.
>
> ***
>
> Q.  But [510(k) is] not an independent determination by valid scientific evidence that the device is safe and effective for its intended use?
>
> A.  Again, if you're talking about is it a PMA, *it's not a PMA. It doesn't rise to that threshold*, that's correct.

*See,* Statement of Material Facts In Dispute ("SMF"), Doc. 6149, ¶20.; *See also*, Declaration of Ben C. Martin, Doc. 6152[3].  Mr. Pellerite also agreed that the PMA requirement for "independent determination by valid scientific evidence of safety and effectiveness for intended use" is "one of the things that distinguishes the PMA standard from the 510(k) standard."  (SMF ¶21).  Lastly, Mr. Pellerite agreed that PMA is a more stringent process than 510(k) clearance.  (SMF ¶22).

In *Lohr*, the plaintiff's common law negligence and strict liability claims against the defendant were not preempted because the Court found that the 510(k) review process does not

---

[3] Plaintiffs, like Defendants, refer back to the initial filings associated with Cook's first attempt to argue that all cases in this MDL are preempted; arguments this Court rejected. Those documents include Plaintiffs' Material Facts in Dispute (Doc. 6149), and the Declaration of Ben C. Martin (Doc. 6152).

include or create federal "requirement[s]" that could conflict with state law claims. 518 U.S. at 486-87.  The Court observed that the 510(k) process, unlike the PMA review process, "is focused on *equivalence*, not safety," and therefore "substantial equivalence determinations provide little protection to the public." *Id.* at 493 (emphasis in original).  Moreover, "[n]either the statutory scheme nor legislative history suggests that the § 510(k) process was intended to do anything other than maintain the status quo, which included the possibility that a device's manufacturer would have to defend itself against state-law negligent design claims." *Id*. at 494.  Almost ten years after its decision in *Lohr*, the Court again reiterated its view that the FDA's 510(k) review is based on "substantial equivalence" and not "safety", and therefore 510(k) review did not establish device-specific-requirements supporting preemption. *Riegel*, 552 U.S. at 317, 323. The Court found:

> [E]ven though substantial-equivalence review under § 510(k) is device specific, *Lohr* also rejected the manufacturer's contention that § 510(k) approval imposed device-specific "requirements." We regarded the fact that products entering the market through § 510(k) may be marketed only so long as they remain substantial equivalents of the relevant pre-1976 devices as a qualification for an ***exemption rather than a requirement***.

552 U.S. at 322 (emphasis added).  The Seventh Circuit reiterated this holding from *Lohr* as recently as 2010. *Bausch*, 630 F.3d at 551.

In fact, "FDA regulations explicitly prohibit manufacturers of devices that have reached the market through the §510(k) process from indicating that the FDA has actually approved their device on the merits . . . ." *Riegel,* 451 F.3d 104, 112 (2d Cir. 2006), *aff'd* 552 U.S. 312 (2008).  The sole purpose and effect of the FDA's 510(k) review, as opposed to PMA approval, is to establish that the new device has the same intended use as the predicate device and has the same technological characteristics. If it does not have the same technological characteristics, it must only be "*as* safe and effective" as its predicate device. 21 U.S.C. § 360c(i)(1)(A).  The Supreme Court recognized in *Lohr* that a device may obtain 510(k) clearance even if it is unsafe and ineffective. 518 U.S. at 493 ("If the earlier device poses a severe risk or is ineffective, then the

later device may also be risky or ineffective.") PMA, on the other hand, requires "valid scientific evidence" independently demonstrating "that the device is safe and effective for its intended use." 21 C.F.R. § 820.14(b)(3)(vi); *see also* 21 C.F.R. § 807.97 (noting that FDA clearance of a 510(k) submission "does not in any way denote official approval of the device."). None of this has changed since *Lohr* and *Riegel*. Therefore, it is the general rule, not the exception, that state tort claims involving 510(k) cleared devices are not preempted.

While the goal of the MDA and its amendments is to protect public safety, it provides different levels of review which ultimately have different regulatory and legal standards. *See* 21 U.S.C. § 360c. "Thus, even though the FDA may well examine[] 510(k) applications . . . with a concern for the safety and effectiveness of the device," that review does not require the 510(k) device "to take any particular form for any particular reason." *Lohr*, 518 U.S. at 493.

Moreover, this regulatory scheme aimed at maintaining "the status quo with respect to the marketing of existing medical devices and their substantial equivalents" was reasoned by the Court to include "the possibility that the manufacturer of the device would have to defend itself against state-law claims of negligent design." *Id.* at 494. There was no change to this standard even 40 years after the MDA of 1976, 18 years after the SMDA of 1990 and 12 years post-*Lohr* when the Supreme Court re-examined express preemption under § 360k in *Riegel*. In *Riegel*, the Court reiterated that the PMA review process is in clear contrast with the purpose of the 510(k) process which imposes no device-specific "requirements" and is not a safety review. *Riegel*, 552 U.S. at 323. The FDA itself emphasizes this distinction in every substantial equivalence letter it has sent to Cook by quoting 21 C.F.R. § 807.97: Clearance of a 510(k) submission "*does not in any way denote official approval of the device*. Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding." *Id.* (emphasis added).

Following *Lohr* and *Riegel*, courts have consistently confirmed that 510(k) review does not establish federal requirements, thus refuting medical device manufacturers' arguments that the pre-1990 510(k) clearance process is outdated. *See In re C.R. Bard, Inc. MDL No. 2187, Pelvic Repair*

*System Products Liability Litigation (Cisson)*, 810 F.3d 913 (4th Cir 2016) (clearing a product through the 510(k) process is "a qualification for an exemption rather than a requirement." (citing *Riegel*)); *Horillo v. Cook, Inc*., 2014 WL 8186704, at *3 (S.D. Fla. 2014);.  This is in part because the 510(k) review "process impose[s] no requirements with respect to the design of the device." *In re C.R. Bard. Inc.*, 810 F.3d at 921. *See also Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 736, 752 (S.D. W. Va. 2014), *aff'd* 848 F.3d 151 (4th Cir. 2017) (stating that 510(k) process does not set forth "specific requirements").  *Lohr* and *Riegel* still control when reviewing preemption challenges involving 510(k) devices, as was true even when Cook previously attempted unsuccessfully to argue, as they do here, that the pre-1990 510(k) clearance process is outdated. *Horillo*, 2014 WL 8186704 at *3 (stating that where no legal authority exists beyond a law journal article and without sufficient evidence, courts cannot contradict Supreme Court express preemption rulings as to 510(k)-cleared devices). There is no legal authority to the contrary.

## C.    EXPRESS PREEMPTION AND 510(k) CLEARED MEDICAL DEVICES

The MDA only expressly preempts certain state laws:

(a)  Except as provided in subsection (b), no state or political subdivision may establish or continue in effect with respect to a device intended for human use any requirement—

  (1) which is different from, or in addition to, any requirement applicable  under this chapter to the device, and

  (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).  Thus, whether a medical device is preempted under the MDA is a two-question test: 1) Has the federal government created a federal requirement specific to a particular device, and 2) Does a state's law create requirements different from or in addition to the federal requirements?  *Riegel*, 552 U.S. at  321-24; *Arvizu v. Medtronic, Inc*., 41 F. Supp. 3d 783, 787 (D. Ariz. 2014).  The first question asks whether the federal government

11

has established requirements applicable to the device at issue: Cook's IVC filters. *Riegel*, 552 U.S. at 321-322. Such requirements are "substantially informed" by FDA regulations, specifically 21 C.F.R. § 808.1(d). *Riegel*, 552 U.S. at 322. Consequently, state law is only preempted under two circumstances:

> (d) State or local requirements are preempted ***only*** when the FDA has established ***specific counterpart regulations*** **or** there are ***other specific requirements applicable to a particular device under the act***, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

21 C.F.R. § 808.1(d) (emphasis added). The first circumstance is clear: devices subject to counterpart regulations are preempted only if the promulgated counterpart regulation speaks to the claims imposed by a state's law.[4]

As to the second circumstance under 21 C.F.R. § 808.1(d), even when there is no counterpart device-specific regulation promulgated, PMA approval imposes "requirements" under the MDA because PMA approval is not "an exemption from federal safety review" like the 510(k) review process, but rather "it *is* federal safety review." *Riegel*, 552 U.S. at 322-23 (emphasis in original). Therefore, unlike 510(k) clearance, PMA approval of a device itself creates a specific federal requirement under the second circumstance of 21 C.F.R. § 808.1(d).

Once it is determined whether a federal requirement specific to a device exists—either via a counterpart regulation or through PMA review—the second question of the preemption test

---

[4] For example, where a counterpart regulation addresses warning language that is disease-specific, failure to warn claims are subject to preemption, but where the regulation is silent as to design, design defect claims survive preemption challenges. *Papike v. Tambrands Inc.*, 107 F.3d 737, 740-41 (9th Cir. 1997) (differentiating between regulation with specific warning language as preemptive of failure to warn claims and where preemption challenge fails as to design defect claims when regulation is silent as to design); *see also Moore v. Kimberly-Clarke*, 867 F.2d 243, 246 (5th Cir. 1989).

requires a court to determine if the claims create requirements in addition to or different from any requirement applicable under the Act. *Riegel*, 552 U.S., at 322-323.

> **D.  COOK FAILS THE TWO-PART PREEMPTION TEST BECAUSE THERE ARE NO SPECIFIC FEDERAL REQUIREMENTS, AND, EVEN IF THERE WERE, COOK HAS NOT DONE A CAREFUL COMPARISON BETWEEN ALLEGED FEDERAL REQUIREMENTS AND ALLEGEDLY PREEMPTED STATE LAW.**

As discussed, whether a medical device is preempted under the MDA is a two-question test: (1) Has the federal government created a federal requirement specific to a particular device, and (2) Does a state's law create requirements different from or in addition to the federal requirements?  *Riegel*, 552 U.S. at 321-24.  The first of these questions itself has two parts as set forth in 21 C.F.R. § 808.1(d) because that regulation allows preemption of state law claims under only two circumstances: if the FDA has established specific counterpart regulations or there are "other specific requirements applicable to a particular device" under the MDA.

Cook has not shown that under 21 C.F.R. 808.1(d) there are any counterpart federal regulations that establish any federally-required warning language, design specifications, performance or testing standards or any other requirements pertaining to its IVC filters that would preempt Plaintiffs' claims. And, because the 510(k) review process does not include or create federal "requirement[s]" as defined in the express preemption clause of the MDA, Cook's preemption argument fails at the outset. *Lohr*, 518 U.S. at 486-87.

1.   <u>Cook Fails The First Component of 21 C.F.R. 808.1(d) Because There Are No Counterpart Regulations Or Federal Requirements Associated With Any IVC Filter</u>

a.   *Special Controls Are Not Federal Requirements.*

Cook's preemption argument is predicated on its contention that special controls are akin to federal requirements from which preemption may flow.  Cook is wrong.

FDA assigned three documents to serve as "special controls" for all IVC filters via 21 C.F.R. § 870.3375, which does not automatically deem them federal requirements:

- "Use of International Standards Organization's ISO '10993 Biological Evaluation of Medical Devices Part I: Evaluation and Testing;'"
- FDA's "510(k) Sterility Review Guidance and Revision of 2/12/90 (K90-1);"
- FDA's "Guidance for Cardiovascular Intravascular Filter 510(k) Submissions" (Nov. 26, 1999).

As this case illustrates, special controls are not necessarily federal "requirements" for which preemption may apply.  A "requirement" is defined as "a rule of law that must be obeyed." *Bates v Dow Agrosciences*, LLC., 544 US 431, 445 (2005).  Regulations such as 21 C.F.R. 870.3375 promulgated merely for the purposes of identification are not substantive federal requirements.  *Anguiano v. E.I. Du Pont De Nemours & Co., Inc.*, 44 F.3d 806, 810 (9th Cir. 1995) (stating "Class II devices . . . must carry some specific regulation beyond the identification regulation for preemption to apply"); *Ginochio v. Surgikos, Inc*., 864 F. Supp. 948, 953 (N.D. Cal. 1994); *Elbert v. Howmedica, Inc*., 841 F. Supp. 327, 331 (D. Haw. 1993).  Therefore, although 21 C.F.R. § 870.3375 identifies special controls for all IVC filters, it is not a device-specific counterpart regulation under 21 C.F.R. § 808.1(d).  *Cf. Papike v. Tambrands Inc*., 107 F.3d 737, 740-41 (9th Cir. 1997) (citing 21 C.F.R. § 801.430 with specific substantive warning language that is device-specific and disease-specific to tampons and TSS).

14

Cook's pre-clearance regulatory expert Dr. Elisa Harvey testified that the Guidance for Cardiovascular Intravascular Filter 510(k) Submission is *not* binding even though it is identified as a special control:

> Q. So, you're aware there's a federal regulation that identifies the special controls for intravascular, cardiovascular filters a/k/a IVC Filters, right?
>
> A. Yes.
>
> Q. And the 1999 guidance is one of those specifically identified special controls for IVC Filters, right?
>
> A.  That's true.
>
> Q. And my question is: Does the fact that that guidance has been elevated, so to speak, to the level of special control by regulation mean that it is no longer non-binding; it's now binding?
>
> A   No. It does not indicate that it's binding.  It means that companies should be aware of it and take it into account when determining what kind of testing is necessary for their device.

(SMF ¶23).

Absent device-specific counterpart regulations, federal "requirements" under 21 C.F.R. § 808.1(d) are originally described in *Lohr* as originating from two sources: 1) federal safety review established under the rigorous PMA approval process, and 2) requirements promulgated through a lawmaking process where "the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." 518 U.S. at 501. Neither is present in this 510(k)-cleared medical device litigation, and neither *Lohr* nor *Riegel* suggests any other source that might create federal requirements appropriate for express preemption.

15

*Lohr* and *Riegel* made sweeping statements about the differences between 510(k) clearance and PMA approval, and that 510(k) review does not establish federal requirements like PMA approval does.  Neither case suggested that special controls assigned to Class II devices substitute for or act as the "requirements" that might lead to express preemption under 360k(a).  In fact, *Lohr* explicitly recognized the presence of "special controls" applicable to Class II devices yet still pointed out that—in contrast to devices subject to rigorous PMA-approval—510(k)-cleared devices still "may be marketed without advance approval."  518 U.S. at 477; *see also Riegel*, 552 U.S. at 317.  Thus, even when Class II devices cleared through 510(k) pre-market notification are subject to special controls, the 510(k) process remains "one focused on equivalency rather than safety." *Riegel*, 552 U.S., at 317, 323.

> b. *There are no Design Controls for IVC Filters.*

The FDA has not promulgated design controls specific to IVC filters in any counterpart regulation.  The absence of regulatory activity for filter design is conspicuous given 21 C.F.R. §§1010 – 1050, in which FDA has promulgated design controls for multiple products. FDA has promulgated counterpart regulations that are both device and disease-specific for many 510(k)-cleared medical devices with regard to warning language, but not for IVC Filters. *See*, 21 CFR 801 Subpart H – "Special Requirements for Specific Devices"[5]. In the absence of any counterpart regulation related to Plaintiff's claims (e.g., failure to warn), courts consistently deny preemption challenges. *James v. Diva Intern., Inc.*, 803 F.Supp.2d 945 (2011).

There are rare instances where courts have found that certain claims arising from the use of Class II 510(k) cleared medical devices are preempted based on device-specific counterpart

---

[5] Examples of products with counterpart regulations: Labeling for denture products for lay use (21 C.F.R. § 801.405); Labeling for hearing aids (21 C.F.R. 801.420); Labeling for menstrual tampons (21 C.F.R. 801.430); Labeling for latex condoms (21 C.F.R. 801.435); User labeling for products containing natural rubber, i.e., latex glove (21 C.F.R. § 801.417).

regulations promulgated with specific warning language.[6]  These claims are distinguishable from the claims in this litigation and the regulatory history of Cook's IVC filters for several reasons. First, the counterpart regulations in those cases mostly involve over-the-counter non-prescription devices sold to millions of lay people that all have specific warning language under 21 C.F.R. § 801, subpart H. Here, there are no counterpart regulations or device- and disease-specific requirements.  Indeed, the differences between the two products for which preemption of warnings claims have been found, menstrual tampons and latex condoms – and Cook's IVC filters illustrate why Plaintiffs' claims are not preempted.

### i.  *Menstrual Tampons – 21 C.F.R. § 801.430*

The FDA has promulgated a specific counterpart regulation addressing user labeling for menstrual tampons regarding specific safety issues/diseases, yet silent as to design requirements. 21 C.F.R. § 801.430[7].  This counterpart regulation contains verbatim warning and labeling language for tampon products related to Toxic Shock Syndrome (TSS). Tampon manufacturers are required to comply with the specific labeling language in this regulation.  Thus, any failure to warn claims based on an allegedly incomplete or misleading label would have to be preempted. But because the counterpart regulation does not address the design or construction of menstrual

---

[6] Notably, these decisions only preempted warnings claims, not design defect claims.

[7] *Papike v. Tambrands Inc*., 107 F.3d 737, 740-41 (9th Cir. 1997) (stating where the FDA promulgated a regulation mandating specific TSS warnings on tampon boxes and the regulation is device-specific (tampons) and disease-specific (TSS) it is distinguishable from prior MDA preemption cases including [*Lohr*] where federal labeling and manufacturing requirements reflected "important but entirely generic concerns about device regulation generally"). *See also*,  *Moore v. Kimberly-Clarke*, 867 F.2d 243, 246 (5th Cir. 1989); *Bejarano By & Through Bejarano v. Int'l Playtex, Inc*., 750 F. Supp. 443, 444–45 (D. Idaho 1990);   *Krause v. Kimberly-Clark Corp*., 749 F. Supp. 164 (W.D.Mich.1990); *Northrip v. International Playtex, Inc.*, 750 F. Supp. 402 (W.D.Mo.1989); *Lindquist v. Tambrands*, Inc., 721 F. Supp. 1058 (D.Minn.1989); *Cornelison v. Tambrands, Inc*., 710 F. Supp. 706 (D.Minn.1989); *Meyer v. International Playtex, Inc.*, 724 F. Supp. 288 (D.N.J.1988); *Lavetter v. International Playtex*, 706 F. Supp. 722 (D.Ariz.1988); *Rinehart v. International Playtex, Inc*., 688 F. Supp. 475 (S.D.Ind.1988); *Edmondson v. International Playtex, Inc*., 678 F. Supp. 1571 (N.D.Ga.1987); *Stewart v. International Playtex, Inc*., 672 F. Supp. 907 (D.S.C.1987); *Poloney v. Tambrands, Inc*., 260 Ga. 850, 412 S.E.2d 526 (1991); *Lulov v. Tambrands, Inc*., 198 A.D.2d 479, 604 N.Y.S.2d 206 (App.Div.1993); *Berger v. Personal Prods., Inc*., 115 Wash.2d 267, 797 P.2d 1148 (1990), cert. denied, 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991).

tampons, those claims are not preempted. *Moore v. Kimberly-Clarke*, 867 F.2d 243, 246 (5th Cir. 1989).

In contrast, claims related to menstrual cups, having the same use and purpose as menstrual tampons and associated with the same disease (TSS), have not been subject to preemption even with regard to warnings claims because there exist no device-specific and disease-specific counterpart regulations for menstrual cups, and--like Cook's IVC filters--menstrual cups were 510(k)-cleared, not PMA-approved. *James*, 803 F. Supp. 2d at 949-52.

> ii.   *Latex Condoms – 21 C.F.R. § 801.435*

By way of further example, the FDA has also promulgated a specific counterpart regulation for latex condoms.

> Similar to tampons, latex condoms are Class II medical devices regulated by the FDA… [a]s such, labels for condoms are regulated under the same rule subpart as tampons, 21 C.F.R. § 801, subpart H. Thus, latex condoms are regulated by the very same statute for device warnings that preempted the plaintiff's inadequate labeling and warning claims in *Moore*...[b]ecause the FDA specifically regulates labels and warnings for latex condoms through 21 C.F.R. § 801.435, any claims for inadequate labeling and warning are preempted by federal law and should be dismissed with prejudice.

*Rasheed v. Church & Dwight Co.*, No. 5:11CV80, 2012 WL 262619, at *8 (E.D. Tex. Jan. 12, 2012), *report and recommendation adopted,* No. 5:11CV80, 2012 WL 262616 (E.D. Tex. Jan. 30, 2012).

Preemption of common law claims against manufacturers of Class II devices cleared via the 510(k) process predominately occurs when there are promulgated counterpart regulations set as special controls that are not only device-specific, but also disease-specific. *Merancio v. Smith & Nephew, Inc.*, No. 115CV00807DADEPG, 2017 WL 2257124, at *6 n.7 (E.D. Cal. 2017) (citing *Papike*, which held that where FDA promulgated product- and disease-specific regulations with respect to a Class II device, preemption could be found) (emphasis added). Cook does not cite to

18

any detailed counterpart federal regulation applying to IVC Filters because none exists. Therefore, unlike where specific counterpart regulations have been promulgated and are codified at 21 C.F.R. § 801 (subpart H) allowing preemptive protection for associated claims against manufacturers who follow those regulations, Cook's preemption argument fails the first prong of the 21 C.F.R. 808.1(d) test.

> 2. Cook Also Fails The Second Part Of 21 C.F.R. 808.1(d) because There Are No Other Federal Requirements Specific To Its Filters And Cook's FDA Communications Do Not Create A Federal Requirement.

Unable to establish device-specific federal requirements for its IVC filters, Cook claims that the 510(k) process through which its filters were cleared to market imposed specific requirements on its devices. This is wrong, both factually and legally. The 510(k) review process does not set federal requirements, even if it were extremely rigorous, because 510(k) review is not a safety review, but rather an exception to it. *Riegel*, 552 U.S. at 322-23.[8] Nonetheless, Cook argues that the FDA's requests for additional information made during its review of Cook's 510(k) submissions create a federal requirement as to safety and effectiveness; however, the Supreme Court is clear that such requests only amount to a determination of substantial equivalence:

> "Despite clear precedent, the 510(k) review process does not set federal requirements. *Riegel*, 552 U.S., at 312. The Supreme Court also stated:
> "The FDA is also empowered to require additional necessary information. See § 807.87(*l* ). Admittedly, the § 510(k) process lacks the PMA review's rigor: The former requires only a showing of substantial equivalence to a predicate device, while the latter involves a time-consuming inquiry into the risks and efficacy of each device. Nevertheless, to achieve its limited purpose, the § 510(k) process imposes upon applicants a variety of requirements that are designed to enable the FDA to

---

[8] *See also In re C.R. Bard, Inc. (Cisson)*, 810 F.3d 913, 921 (4th Cir. 2016) ("510(k) does not amount to a safety regulation requiring device producers to meet any established design standards."); *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 794 (8th Cir. 2001) ("A substantially equivalent device is examined in the § 510(k) process only for similarities with existing devices; safety and effectiveness are not the focus."); *Martin v. Telectronics Pacing Sys.*, 105 F.3d 1090, 1094 (6th Cir. 1997) ("[B]ecause the device was approved pursuant to the § 510(k) process, the device was never reviewed for safety and efficacy.); *In re Zimmer Nexgen Knee Implant Products Liab. Litig.*, 2015 WL 5145546 at *15 (N.D. Ill. 2015) ("In short, the FDA's finding of substantial equivalence, as a matter of law, is not a safety determination."); *Lewis v. Johnson & Johnson*, 991 F. Supp. 2d 748, 755 (S.D.W. Va. 2014) ("The 510(k) process is not a safety statute.")

make its statutorily required judgment as to whether the device qualifies under this exception."

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348-49 (2001).

Cook admits that most of its contact with FDA related to FDA's requests for more information to supplement Cook's deficient submissions. (*See* Lavender Decl., at Ex. ¶¶3-4, 7-10, 13-14, 16-22, 25, 27-37). Because Cook did not provide the information required to satisfy the 510(k) standard, FDA was required to repeatedly request still more. Cook thus turns these deficiencies on their head and characterizes them as evidence that FDA review was particularly onerous, so much so that some federal "requirement" emerged from their correspondence. But Cook cites nothing from the thousands of pages of 510(k) evidence to establish an independent review for safety and effectiveness, much less a federal requirement akin to the PMA standard. The contacts add up to hundreds of pages of exhibits only because its Tulip and the Celect filters were the subject of seven 510(k) submissions with numerous deficiencies. Two were determined not substantially equivalent and denied market clearance, one had nothing do to do with the filter but rather the delivery system, and the other four included substantial equivalence determinations with indications for permanent and later retrievable indications for each filter, hence there were four submission instead of two. (SMF ¶¶15-19).

Even if Cook's concept were true, that a higher volume of paper before the FDA and the Court signified a higher level of device review for preemption purposes, the review, at the end of the day, was limited to substantial equivalence. There simply is no precedent for a 510(k) review to set a federal requirement for a successful express preemption challenge no matter how many 510(k) submissions a manufacture submits and no matter how many times FDA has to go back to the manufacturer to get the information it requires. *See Horillo v. Cook, Inc*., 2014 WL 8186704, at \*3 (S.D. Fla. 2014); *In re: C.R. Bard, Inc. MDL No. 2187, Pelvic Repair System Products*

*Liability Litigation (Cisson)*, 810 F.3d 913 (4th Cir 2016) (clearing a product through the 510(k) process is "a qualification for an exemption rather than a requirement.") (citing *Riegel*)). The 510(k) review process does not set federal requirements. *Riegel*, 552 U.S. at 312; In *Placencia v. I-Flow*, 2012 WL 5877624, at *5 (D. Ariz. 2012). Cook provides no facts indicating that FDA's 510(k) review of its filters rose to the level of a PMA review establishing independent proof of safety and effectiveness by valid scientific evidence, i.e., a federal requirement. (SMF ¶¶1-4).

Furthermore, of the seven 510(k) submissions Cook made related to its Tulip and Celect filters, only four of those submissions are relevant to its filters at issue. (SMF ¶¶15-19). None of the exhibits associated with the other three submissions are relevant either to the test of preemption or a trial. (SMF ¶¶17-18). Cook's use of its contacts with FDA - as if it were evidence of heightened safety and effectiveness review - is precisely why plaintiffs in medical device litigation move *in limine* to exclude this sort of misleading evidence lacking in relevance consistent with similar holdings in other jurisdictions, i.e., to avoid mini-trials on voluminous FDA-related communications that have nothing to do with a safety or efficacy evaluation of the product. *See generally*, *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 160-163 (4th Cir. 2017); *In re C.R. Bard, Inc. MDL No. 2187, Pelvic Repair System Products Liability Litigation* (*Cisson*), 810 F.3d 913, 920-23 (4th Cir 2016).

Ultimately, FDA invoked its statutory power to require additional "safety and effectiveness" information from Cook as a condition for clearance based on substantial equivalence to a predicate—a routine action taken by the FDA as part of the 510(k) review process to assess substantial equivalence. (see also, Lavender Decl., at ¶¶5, 11, 38, 41). Nothing about this raises the review beyond the 510(k) substantial equivalence standard because as part of that review "[t]he FDA may also request additional information in an effort to determine whether the device

21

is substantially equivalent to a predicate device" for any medical device undergoing 510(k) review. *James v. Diva Intern., Inc.*, 803 F.Supp.2d 945, 947-48 (D. Ind. 2011); 21 CFR § 807.87 (l) (granting FDA authority to request additional information as part of the 510(k) process).

As noted, the primary reason there were so many requests for additional information is Cook's repeated failure to provide the FDA with what it requested, which resulted in Cook's submissions repeatedly being deemed deficient. Of the sixty-four (64) exhibits supporting Cook's Motion, at least forty-one (41) of them consist of the FDA requesting Cook correct deficiencies in its 510(k) submissions and Cook attempting to comply.[9] For example, a June 14, 2000 letter from FDA to Cook states that FDA cannot determine if the Gunther Tulip is substantially equivalent to a legally marketed device solely on the information provided to the agency.[10] The agency asks about clinical data and clearly indicates that the request is "necessary for us to determine whether or not this device is substantially equivalent to a legally marketed predicate device with regard to its safety and effectiveness."[11] This is exactly the basis of the decisions in *Lohr/Riegel*, having never been formally reviewed under the MDA for safety or efficacy, but rather based on substantial equivalence thereto. *Riegel*, 552 U.S. at 323.

Cook suggests FDA was in complete control of the information Cook provided during the 510(k) review process; but Cook was able to negotiate certain information it provided, a far cry from a requirement. For example, when asked to provide biocompatibility testing for the whole filter product, Cook responded that its testing involved only the materials that would be used to produce the Gunther Tulip and dictated to FDA that the testing FDA requested was "neither necessary nor warranted."[12] This is a clear example that Cook's interactions with FDA include

---

[9] (See Lavender Decl., at A4-A7, A10-A18, A20 – 21.2, A24 – A30, A32, A36 – A50; A54)
[10] (Lavender ¶3, at Ex. A4).
[11] (Lavender ¶3, at Ex. A4, at CookMDL2570_0006979).
[12] (Lavender ¶3, at Ex. A5, at CookMDL2570_0006982).

negotiations and are not requirements or rules of law. Those interactions merely show the FDA exercising its authority under the regulations interpreting the general controls of the MDA (e.g., 21 C.F.R. 807.87(l)), which are not specific to the device's warnings or design, as opposed to requiring the device "to take any particular form for any particular reason." *Lohr*, 518 U.S. at 493.

Additionally, Cook admits its interactions with the FDA regarding labeling also are negotiations where it exchanges recommendations, not requirements.[13] FDA reviewers clearly state labeling language, when negotiated between the company and the agency, is based on recommendation, e.g. "Please find the [IFU] for the Retrieval Set and the Filter, Femoral Approach I highlighted my ***recommendations*** in aqua."[14] Notably, the FDA does not direct or even recommend, nor does Cook include language in the warning, contradictions or potential adverse events sections of its IFU, anything about migration, perforation, fracture or tilt.[15]

Cook's lengthy recitation of its 510(k) interactions is nothing more than that: 510(k) reviews, and considering information withheld, incomplete ones at that. A 510(k) process remains a 510(k) substantial equivalence review no matter how many submissions it might take for the manufacturer to get it right.

3. <u>Despite Cook's Voluminous Submission To The Court, Cook Withheld Foreign Adverse Event Reports from The FDA's Public Complaint Database While Using The Same Database To Promote the Safety Of Its Filters Over Its Competitors</u>

Cook's rationale for labeling considerations – i.e. the effect of changing its label on future lawsuits - is not the only information it withheld from the FDA during its 510(k) reviews. (SMF ¶24). Missing from Cook's 510(k) submissions was pertinent information without which FDA

---

[13] (Lavender ¶8, at Ex. A13, at CookMDL2570_0007363, "Looking forward to your ***recommendations*** for the IFU.")(emphasis added).
[14] (Lavender ¶11, at Ex. A15, at CookMDL2570_0007383)(emphasis added).
[15] (Lavender ¶10, at Ex. A17, at CookMDL2570_0007420).

could not make an accurate decision as to substantial equivalence, much less safety and efficacy. The basis of the 510(k) exemption is that the device receiving 510(k) clearance *remains* substantially equivalent to its predicate:

> [E]ven though substantial-equivalence review under § 510(k) is device specific, *Lohr* also rejected the manufacturer's contention that § 510(k) approval imposed device-specific "requirements." We regarded the fact that products entering the market through § 510(k) may be marketed only *so long as they remain substantial equivalents* of the relevant pre–1976 devices as a qualification for an exemption rather than a requirement." *Riegel* 552 U.S. at 322 (emphasis added).

Yet there was no way for FDA to evaluate whether Cook's filters remained substantially equivalent because Cook chose not to report all adverse events ("complaints") related to its filters to the FDA's public database ("MAUDE"). (SMF ¶¶25-28). Specifically, Cook knew its filters marketed outside the United States had the same design as the filters it marketed in the US, but willfully withheld complaints related to its filters marketed outside the US from MAUDE. (SMF ¶¶25-28). When questioned about this issue, Tom Roberts, Cook's Vice President of Quality Assurance, testified:

> **Q**. But you knew that when report -- when foreign reports were not being reported to our FDA, that that -- those reports were not getting put into the MAUDE database, right?
> **A.** Yes.
> ***
> **Q**. "Also note that the risk assessments in TW for this PR and for current submissions are based on all Celect (total range device and manufacturing) including confirmed and unconfirmed perforations." And then you wrote back to everyone -- this is from Tom Roberts -- "Thanks for the good work here. I am fine with your suggestions. Keep us informed if further questions come up. Take care. Tom." So, you were actually complimenting her about the work that she had done on this?
> **A**. Yes. We provided the agency with the information they needed to assess their concerns.
> **Q**. You think you did that?
> **A**. Yes, I do.

24

**Q**.  And you think keeping them in the dark about how this product was performing everywhere else in the world was fulfilling your obligations to not only FDA but to doctors and patients?

**A**.  It was not --

MR. KING:  Objection.  Form.

**A**.  -- fulfilling our obligations on reporting. ***We were in error, and I've admitted that.***

(SMF ¶29)(emphasis added).

**Q**.  Just imagine telling FDA, by the way, we haven't been reporting any of our adverse events relating to the Celect filter for -- from anywhere outside of the United States, and by the way, we're not going to do it for the next five or six years until one of us gets busted with a document at a deposition.  What do you think the FDA's response would have been to that?

**A**.  If I had that attitude?

**Q**.  Yeah.

**A.**  They wouldn't like it.

**Q**.  Yeah.

**A**.  And they -- and they shouldn't.

**Q**.  ***But that's exactly what happened, though, isn't it?***

MR. KING:  Objection.  Form.

**A.**  ***That's what happened.***

(SMF ¶30)(emphasis added).

This practice proved to be especially egregious since Cook's marketing and sales practices utilized MAUDE data to promote its filters - using that data to misrepresent that its filters were safer than its competitors while knowing the data did not contain all the complaints reported directly to Cook. (SMF ¶31).  The adverse events missing from MAUDE while these marketing practices took place included serious injuries associated with its filters such as perforations, migrations, and fractures. (SMF ¶32).

4.  Even If There Were Specific Federal Requirements Applicable To Cook's IVC Filters Cook's Motion Fails Since There Is No "Careful Comparison" With Plaintiffs' Claims Because There Are No Federal Requirements To Which To Compare Them.

Because there are no counterpart regulations specific to IVC filters and because neither the back-and-forth communications with the FDA, nor special controls for all IVC filters constitute federal requirements, *see supra*, one never even gets to the second step of the *Lohr/Riegel* preemption analysis. There is simply nothing to which one can "carefully compare" Plaintiffs' state law claims. There are only general FDA requirements contained in the 510(k) regulations and "More general FDA requirements—what *Riegel* calls "federal manufacturing and labeling requirements applicable across the board to almost all medical devices"—do not preempt state law claims. *552 U.S. at 322*.

The claim-by-claim preemption analysis Cook undertakes is conclusory and misplaced. Conclusory assertions are insufficient to meet the "careful comparison" required by *Lohr. In re Bard IVC Filters Products Liab. Litig.*, MDL 15-02641-PHX DGC, 2017 WL 5625547, at *12 (D. Ariz. 2017). Cook attempts to attack each of Plaintiff Brand's causes of action as preempted and cites Georgia state law with the elements and requirements it asserts Mrs. Brand must meet in order to successfully prove her claims. There is no careful comparison. Simply stating the elements of each cause of action under Georgia law, or any other law, does not change the long-standing precedent, or the ruling of this Court, that the 510(k) process is not a device-specific review that amounts to an approval and/or finding of safety and efficacy.

**Failure to warn**: Cook argues, absent any authority[16], that the Celect IFU was subject to device-specific labeling requirements. Yet, the law is clear, the 510(k) process might be device

---

[16] Cook cites the *McMullen* and *Leonard* cases, yet both products in those cases were PMA approved products and therefore not applicable.

specific, but it does not create any federal requirements. *Riegel*, 552 U.S., at 322-23. The 510(k) process is not federal safety review, the PMA process is. *Id*.  There are no counterpart regulations applicable to IVC filters containing any requirements as to warning language as there with latex condoms and menstrual tampons. Without such regulations, and without undergoing the PMA approval process, and further since the federal government has not issued a specific mandate as contemplated under *Lohr*, Mrs. Brand's failure to warn claims are not preempted. 518 U.S., at 501. The 510(k) review process does not set federal "requirements".  *Riegel*, 552 U.S., at 312.

**Design defect**: Cook insists that the 510(k) review process for its Celect filter was a "safety and effectiveness determination". (Def. Mot., at 22). Again, this flies in the face of not only this Court's ruling, but also long-standing precedent. *See, supra*. Moreover, even with a second bite at the preemption apple, Cook provides no evidence that the FDA imposed any device specific requirements on Cook related to the design of its filters. This is, of course, because there are no specific design standards or requirements promulgated by the FDA on any IVC filter and none promulgated and imposed during its 510(k) review of Cook's Celect and Tulip filters. That review focused solely on substantial equivalence and not safety. Case law presented in Cook's argument not addressed in its previous preemption motion is Georgia specific and addresses only the elements involved in proving up the claims, i.e., the risk-utility analysis. None of the newly cited cases involve preemption, medical devices, the MDA or the 501(k) process.

**Negligence**: Again, Cook insists that he 510(k) process relates to a safety and effectiveness determination yet cites no legal authority. Such assertions do not stand up to scrutiny when faced with the holdings in both *Lohr* and *Reigel*. The 510(k) review process is "an exemption rather than a requirement" to clearance to the market and is focused on equivalence, not safety. *Reigel*, 552 U.S., at 323. Cook again cites different yet inapplicable law that neither addresses preemption,

medical devices or the 510(k) process. Therefore, Plaintiff's negligence claims should withstand a preemption challenge.

**Punitive damages**: Cook cites no relevant legal authority to preempt Plaintiff's punitive damages claims. As the punitive damage claim is derivative of Plaintiff's other claims, Plaintiff defers to arguments made *supra*. Moreover, Defendants claim that compliance with "510(k) requirements" causes her punitive damages claims to be preempted.  Without repeating Plaintiff's position stated here and last year, and without revisiting the United States Supreme Court's rulings cited *supra*, 510(k) regulations are not requirements. As to Georgia law, Cook misstates the importance of compliance with federal regulations. Whereas in Georgia one may defend himself from a punitive damage claim by putting on evidence of compliance with government regulations, it is in no way dispositive in any manner, and certainly not based on a theory of federal preemption. *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 736, 450 S.E.2d 671, 675 (1994) (stating "[w]e note that a manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its liability for its design of allegedly defective products.); *see also*, *In re Bard IVC Filters Products Liab. Litig*., CV-16-00474-PHX-DGC, 2017 WL 5625548, at 10 (D. Ariz 2017) (stating "[c]ompliance with federal regulations, however, is not sufficient to automatically preclude an award of punitive damages…[t]his is particularly true where, as in this case, the device at issue was cleared by the FDA under 510(k) review which focuses primarily on equivalence with other products, not safety.")

### E.   COMMON LAW CLAIMS INVOLVING COOK'S IVC FILTERS ARE NOT SUBJECT TO IMPLIED PREEMPTED

#### 1. Cook's Implied Preemption Argument Is Contrary To Congress's Intent, Supreme Court Case Law, And Common Sense.

Cook asks this Court to find implied impossibility preemption if it concludes that this case does not fall within the Medical Device Act's ("MDA's") express preemption provision.  No court

has accepted Cook's argument in the medical device context, and the judge responsible for a major multi-district litigation involving medical devices flatly rejected it.  The Hon. Joseph Goodwin presides over several MDLs for pelvic mesh products, which at the time of his order encompassed approximately 70,000 cases.  *Mullins v. Ethicon, Inc.*, 147 F. Supp. 3d 478, 479 (S.D. W. Va. 2015).  Judge Goodwin rejected the exact same argument implied preemption argument Cook makes here.  "[Defendants'] spin on impossibility preemption would destroy state tort liability for any product subject to even the least rigorous federal regulatory scheme. . . . Congress, the Supreme Court, and common sense counsel against such a result."  *Id.* at 481.

As a starting point, there is a long-standing presumption against implied preemption.  *See Arizona v. United States*, 567 U.S. 387, 400 (2012) (stating that "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress") (quotations omitted)).  The case law that Cook cites in claiming that there is no longer such a presumption involved in an *express* preemption clause has no applicability to its implied preemption argument.  *See Puerto Rico v. Franklin Calif. Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016).  And the Supreme Court has observed that because the "MDA's pre-emption provision is highly ambiguous, Congress must have intended that courts look elsewhere for help as to just which federal requirement pre-empt which state requirements, as well as just how they might do so." *Lohr*, 518 U.S., at 472.The presumption against implied preemption is particularly strong where, as here, Congress has spoken to the breadth of preemption through an express preemption clause.  *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.").

Congress cannot have intended to implicitly preempt every design-based claim against every medical device manufacturer when it explicitly said otherwise.  As the *Mullins* court noted, acceptance of Cook's argument would inoculate all medical device manufacturers against tort liability for defective design or negligent design, even though their products are not subject to pre-market review for safety and efficacy.  *Mullins*, 147 F. Supp. 3d at 479.  It is wholly illogical to

conclude that Congress had this intent; otherwise, the express preemption clause would have been written differently.

The Supreme Court has likewise rejected Cook's implied preemption argument.  In *Lohr*, the Court considered whether the MDA preempted state-law claims for negligence and strict liability/design defect.  518 U.S. at 474, 484.  The Court concluded that Congress intended to preserve the "status quo" of medical device manufacturer liability for state tort law claims:

> There is no suggestion in either the statutory scheme or the legislative history that the § 510(k) exemption process was intended to do anything other than maintain the status quo with respect to the marketing of existing medical devices and their substantial equivalents. **That status quo included the possibility that the manufacturer of the device would have to defend itself against state-law claims of negligent design.** Given this background behind the "substantial equivalence" exemption, the fact that "[t]he purpose of Congress is the ultimate touchstone" in every pre-emption case, and the presumption against pre-emption, the Court of Appeals properly concluded that the "substantial equivalence" provision did not pre-empt the Lohrs' design claims.

*Lohr*, 518 U.S. at 494 (emphasis added) (internal citation omitted); *see also*, *Shea v. Oscor Medical Corp.*, 950 F. Supp. 246, 249-250 (N.D. Ill. 1996).  And, as the *Mullins* court noted, although determining the purpose of Congress is, at times, difficult, "[h]ere, [the] task is made easy because the Supreme Court has already examined the purpose of the federal law at issue and determined that Congress did not intend to preempt state law design defect claims cleared through the 510(k) process."  147 F. Supp. 3d at 482 (citing *Lohr*, 518 U.S. at 494).

2. The *Mensing* and *Bartlett* decisions involve generic drugs, which operate under a different regulatory scheme lacking an express preemption clause.

Cook's final argument is to analogize this case to the Supreme Court decisions involving preemption for generic drugs.  *See Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2472 (2013); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 608 (2011).  Cook cites no case on point in support of this argument, and at least two cases have rejected it.  *See Mullins*, 147 F. Supp. 3d at 481; *In re Depuy Orthopedics Pinnacle Hip Implant Prods.*, No. 3:11-cv-03590-K, 2014 WL 3557392, at *10-11

(N.D. Tex. July 8, 2014) (holding that the manufacturer "could not have been subject to conflicting state and federal design requirements" because the FDA's 510(k) process "imposed no requirements for safety or otherwise on it").

In *Mensing* and *Bartlett*, the Court held that it was impossible, under federal law, for the manufacturer to give different warnings or to alter the drug's chemical composition from those of the brand-name manufacturer to keep the generic drug exactly the same as its brand-name counterpart. *Bartlett*, 133 S. Ct. at 2471, 2480; *Mensing*, 564 U.S. at 613, 618.   But there is no such duty of sameness here.   "The impossibility in *Mensing* arose from the unique 'duty of sameness' imposed on generic drugs, which has no corollary in the medical device context." *Mullins*, 147 F. Supp. 3d at 484.

Cook appears to claim that it could not have made any alterations to its devices or labeling because of the FDA's 510(k) clearance process.   This argument too has been rejected.   "Unlike the law imposing the duty of sameness for generics, there is no federal law prohibiting design changes to medical devices, particularly changes representing advances in safety."   *Mullins*, 147 F. Supp. 3d at 485.   "The law simply requires that manufacturers making a 'significant change' submit another 510(k) notification, which the FDA will clear if it determines the device is substantially equivalent to a device already on the market."   *Id.*   Cook could have made a safer product in the first instance, or changed the product to any alternative that would pass the FDA's 510(k) equivalency review. Because the MDA has an express preemption provision, there is a strong presumption against implied preemption in the medical device context.   *Cipollone*, 505 U.S. at 517. Because Congress has spoken through its express preemption in the MDA, there is no need to also explore implied preemption. And because Cook cannot meet the standards under 21 C.F.R. 808.1(d), its Motion should fail.

## III.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter an Order denying Defendants' Motion as to all cases in this MDL.

Respectfully submitted,


*/s/ Ben C. Martin*
Ben C. Martin
**THE LAW OFFICES OF BEN C. MARTIN**
3710 Rawlins Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@bencmartin.com

Michael W. Heaviside, Esq.
Julia Reed Zaic, Esq.
**HEAVISIDE REED ZAIC, A LAW CORPORATION**
910 17th Street, NW, Suite 800
Washington DC, 20006
Telephone: (202) 223-1993
mheaviside@hrzlaw.com


David P. Matthews, Esq.
**MATTHEWS AND ASSOCIATES**
2509 Sackett St.
Houston, TX 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
dmatthews@thematthewslawfirm.com

Joseph N. Williams, IN Atty. No. 25874-49
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, Indiana 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
jwilliams@rwp-law.com

***Liaison Counsel to Plaintiffs' Steering Committee
and on behalf of Plaintiffs' Steering Committee***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 3rd day of August, 2018, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


/s/ *Ben C. Martin*
Ben C. Martin