# EXHIBIT O

Confidential - Subject to Protective Order

```
 1                 UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF INDIANA

 3                     INDIANAPOLIS DIVISION

 4

 5   ---------------------------------------

 6   IN RE:  COOK MEDICAL, INC.,          Case No.

 7   IVC FILTERS MARKETING, SALES         1:14-ml-2570-

 8   PRACTICES AND PRODUCTS               RLY-TAB

 9   LIABILITY LITIGATION

10   ---------------------------------------

11   This Document Relates to:            MDL No. 2570

12   All Actions

13   ---------------------------------------

14

15         CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

16

17                   VIDEOTAPED DEPOSITION OF

18

19                       MELVIN KEM HAWKINS

20

21                  DATE:  October 3, 2017

22                  TIME:  9:00 a.m.

23                  PLACE: Bay Harbor Village Hotel

24                         4160 Main Street

25                         Petoskey, Michigan 49770
```

Golkow Litigation Services                    Page 1 (1)

Page 14

1  A.  In 1983 I was asked to go to Europe and serve in our plant
2     in Denmark, and there I started out in the position of
3     operations manager, and in 1985, actually, '84/'85, I was
4     managing director. Following that, I came back to the
5     United States after two years there, and I was asked to
6     take over a new division that we were starting called Cook
7     critical care. And then from Cook Critical Care we started
8     another division called Cook Surgical. And then I was
9     asked to go, in 1997, to Cook Endoscopy and serve as
10    president there for five years. And then in 2001 I was
11    asked to serve as president of Cook Group. At the end of
12    2001 I was asked to serve as president of Cook,
13    Incorporated. And then within that framework, in about
14    2000 -- I'm not sure of the date anymore, but let's --
15    let's say in that 2003 to '05 timeline, could be wrong, we
16    started a new division at that point called Cook Medical,
17    and that was primarily dedicated to the marketing sales
18    functions within Cook. So that's a pretty quick summation.
19 Q.  And when you started Cook Medical, you were president of
20    that company as well?
21 A.  That's correct.
22 Q.  And -- so just to go over your education again briefly, you
23    don't have any formal education in the medical area; is
24    that correct?
25 A.  No, that's correct.

Page 15

1  Q.  Okay. And obviously, then, you're not a medical doctor?
2  A.  That's correct.
3  Q.  Okay. Not a biomedical engineer? You don't have training
4     in that area either?
5  A.  No.
6         MR. TANNER: Interject an objection to form. Move
7     to strike the record.
8  BY MS. BAUGHMAN:
9  Q.  Do you have any education in anatomy?
10        MR. TANNER: Objection to form.
11        THE WITNESS: There's a lot of education that I've
12    had through reading journal articles, through videos,
13    attending meetings, talking with physicians, but if it's a
14    formal course that you're referring to, the answer is no.
15 BY MS. BAUGHMAN:
16 Q.  So have you had any formal course in anatomy or any --
17 A.  No, I take it back. I did have -- I did have physiology in
18    college. Yeah, that's right.
19 Q.  That was part of when you were getting your degrees in
20    music?
21 A.  Hm-hmm, yeah. It was part of the science requirements.
22 Q.  Okay.
23 A.  Been a long time ago.
24 Q.  Where did you go to school?
25 A.  Indiana University.

Page 16

1  Q.  For both undergrad and the master's?
2  A.  That's correct.
3  Q.  Okay. So you worked at Cook from -- well, let me give you
4     a document first.
5        (Deposition Exhibit Number 2 marked.)
6  BY MS. BAUGHMAN:
7  Q.  Okay. I'm going to hand you what I've marked as Exhibit 2
8     to your deposition. And it is a declaration of Kem
9     Hawkins. If you could take a look at that and let me know
10    whether the signature on page 3 is your signature.
11 A.  It is.
12 Q.  And you read this document, I presume, before you signed
13    it?
14 A.  Yes.
15 Q.  And you signed it on April 25th, 2017, earlier this year?
16 A.  That's correct.
17 Q.  Okay. And so I thought it would be easier to go over the
18    dates if we had the document in front of us. Is it correct
19    that you became president of Cook, Incorporated, in 2001?
20 A.  That's correct.
21 Q.  And that you also became president of Cook Medical,
22    Incorporated, in -- I'm sorry, that you became -- you also
23    became president of Cook Group, Incorporated, in 2001?
24 A.  That's correct.
25 Q.  Okay. And then it was 2003 when you became president of

Page 17

1     Cook Medical, Incorporated; is that correct?
2  A.  That's correct.
3  Q.  Okay. And so for Cook, Incorporated, you -- I guess, did
4     you resign in November of 2013 as president, or retire?
5     What was that? Why did you stop being president?
6         MR. TANNER: Objection to form.
7  BY MS. BAUGHMAN:
8  Q.  Well, in paragraph 3 of your declaration it says you
9     remained president of Cook, Incorporated, and Cook Medical,
10    Incorporated, until November of 2013. First, is that
11    correct?
12 A.  Where?
13        MR. TANNER: (Indicating).
14        THE WITNESS: I'm not sure of the year, but I
15    started -- I started handing off the -- the titles to the
16    future president of Cook Group, so I think -- I think those
17    dates are right. I just -- that's what was going on.
18 BY MS. BAUGHMAN:
19 Q.  And why were you --
20 A.  So Pete Yonkman -- well, we're preparing for transition.
21 Q.  For retirement purposes?
22 A.  That's correct.
23 Q.  Okay. All right, but you, with respect to Cook Group,
24    Incorporated, you remained president until July of 2015; is
25    that correct?

Confidential - Subject to Protective Order

Page 218

1  your ass committee was?
2  A. Well, if you knew Jim Alexander, Jim Alexander was, uh --
3  was the kind of person that would try to make light, and
4  not realizing this would ever be at a deposition, did
5  something very stupid.
6  Q. And that wasn't my question.
7  A. Oh.
8  Q. My question is --
9  A. Oh.
10 Q. -- do you know what the cover your ass committee was?
11 A. No, I don't.
12 Q. All right. And it says, Rob --
13 A. And I would have never had my name on it, 'cause it would
14 have not been pleasant on his end.
15 Q. It says, Rob, we might want to consider a committee for the
16 Celect submission. I'm uncomfortable with the direction we
17 are taking. Let's talk tomorrow. Did you ever talk to Jim
18 Alexander about why he was uncomfortable about submitting
19 the Celect filter?
20 A. I don't know that that's what that meant, but, no, I never
21 had a conversation with Jim.
22 Q. Why would you ever submit a filter except for regulatory
23 clearance?
24 A. I don't understand the question.
25 Q. It says that he's uncomfortable with the direction that

Page 219

1  they're taking concerning a Celect submission. Do you see
2  that?
3  A. It says, I'm uncomfortable with the direction we are
4  taking. Um, I didn't see the rest of it that you just
5  added.
6  Q. My question to you is what else would you do with the
7  Celect other than submit it to a regulatory authority?
8      MR. TANNER: Objection to form.
9  BY MR. MATTHEWS:
10 Q. You're talking about submission.
11 A. I can't speculate on what this is about. I mean, it's --
12 Q. I guess I'm asking your --
13 A. It's an absolutely stupid email, and --
14 Q. Then my question --
15 A. -- you'd have to ask Jim.
16 Q. My question is directed at your being in the industry --
17 A. Yes.
18 Q. -- of medical devices for 35 plus years. My question is
19 when at other times would you submit an issue like the
20 Celect? Where would you submit that to other than a
21 regulatory authority?
22 A. I don't understand the question. What do you mean submit
23 the issue?
24 Q. All right. I'm just using the words Celect submission.
25 A. I don't know what the issue is.

Page 220

1  Q. Has that ever been discussed with anyone in your company
2  outside of this discussion we're having today about this
3  cover your ass committee?
4  A. I have -- this is the very first I've ever seen or heard of
5  this.
6  Q. You did not review that prior to your deposition today?
7  A. No. It's a good thing. I'd have really been mad. It's
8  embarrassing. I hope you depose Jim.
9  Q. Uh, I hope so, too. Uh, Mr. Hawkins, uh, do you recall
10 that Cook paid for a study -- we just looked at a document
11 that you summarized the studies that were ongoing at a time
12 in particular to -- particular time in 2008.
13 A. I didn't summarize them, I --
14 Q. Okay.
15 A. Someone did that, April, or Merry Lee Bain back then. It
16 wasn't me. I simply got the information, passed it in the
17 email.
18 Q. Do you recall a study that Cook funded that looked at the
19 feasibility of whether Cook could actually do a randomized
20 control trial concerning the efficacy of their filters?
21 A. I don't recall.
22 Q. All right. You don't have any recollection of a study by
23 the name of Roger Sachar, a pilot study paid for by Cook to
24 see whether they could do a full-blown randomized control
25 trial? I really don't want to -- I don't want to waste

Page 221

1  everybody's time if you don't recall it. It's a study.
2  A. I don't recall.
3  Q. I want you to assume with me that a study was conducted
4  that looked at the feasibility of doing a randomized
5  control trial in 2010, and if that is conducted by Cook,
6  paid for by Cook, and they determined that, yes, Cook could
7  do a randomized control trial to see the effectiveness and
8  safety of their filters, had you been told that, would you
9  have continued on and done that randomized control trial?
10     MR. TANNER: Objection to the form.
11     THE WITNESS: I can't answer that, because there's
12 a lot more to this, and I -- I don't have the recollection
13 of speculating on what -- what you're saying. I don't know.
14 BY MR. MATTHEWS:
15 Q. Well, let me ask a different question, then. Who had the
16 authority to decide if a certain study would be done or not
17 other than you?
18 A. Oh. Well, uh, Brian Bates, um, Jim could make that
19 decision.
20 Q. Jim Gardner?
21 A. Yeah. Um, Neal Fearnot could make that decision, the SBU
22 leader could make that decision. I'm sure there are
23 others, but those ones come -- Pete Yonkman could make that
24 decision.
25 Q. Was an individual case report by the name of Sadoff ever