IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to: All Actions

## COOK DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SCREENING ORDER AND BELLWETHER SELECTION PLAN

The Cook Defendants submit this reply in support of their motion to adopt the proposed Screening Order and Bellwether Selection Plan ("Proposed Plan") (Dkt. 8449). The Proposed Plan promotes the Court's goals of (1) trying, and valuing, Product-in-Place/No Injury ("PIP/No Injury") bellwether cases and (2) ensuring that the MDL cases allege a legally cognizable injury.

PIP/No-Injury cases are a problem in this MDL. They are the largest single case type in the MDL and, based on what plaintiffs have told Cook about their cases to date, they make up more than **one half** of the entire MDL inventory. That is more than one-half of the MDL inventory where the parties profoundly differ not just on the value of the cases, but whether they have value at all. And that is, more than one half of the MDL inventory where a Cook filter remains in place and *no symptomatic bodily injury has occurred*, or where the plaintiff's filter was removed percutaneously without symptomatic injury or complication while the filter was placed or during the removal procedure. Plaintiffs continue to advertise seeking cases in which no injury is alleged or has manifested itself, collecting cases to grow this MDL. Cook's Proposed Plan provides a mechanism to ensure pending cases, and future cases, allege a cognizable injury. It also provides a mechanism to ensure that cases are properly categorized before the bellwether trial pool is selected.

**I. Screening is necessary for this Court to move forward with future bellwethers, rather than simply to dismiss cases.**

Screening cases before bellwether selection is the best use of this Court's, and the parties', resources. Attorney advertising has caused this MDL to shift aggressively from one made up of primarily perforation claims to one where PIP/No Injury cases make up the majority. Cases Cook believes are meritless continue to be filed. The parties disagree over whether some of these cases even pass muster under Rule 11, and because of that have significant disagreement over their potential settlement value.

Bellwether trials are the best way, given Plaintiffs' refusal to dismiss the PIP/No Injury cases, to explore the contours of which cases Cook believes are no injury cases have some value. The Court's best interest is in adjudicating claims that are representative of the cases where the parties' disputes over value are the most acute. Cook's Proposed Plan most effectively allows the parties to address the place where their disagreements are the most significant.

   **A. The Proposed Plan**

The goal of the Proposed Plan's is to properly categorize cases and draw bellwether cases from those categories. Screening ensures that cases are properly categorized and allows for random selection, an important part of an impartial Bellwether process. In addition, screening ensures bellwether discovery will not move forward on inappropriate cases and it increases the likelihood of useful trials by ensuring plaintiffs have determined cases are in categories this court has determined should be tried. Screening should not not difficult as Rule 11 already requires Plaintiffs to have the necessary information before filing. *In re Vioxx Prods. Liab. Litig.*, 557 F. Supp. 2d 741, 743-44 (E.D. La. 2008) aff'd by 388 Fed.Appx. 391, (5th Cir. Jul. 16, 2010); *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2010).

### B. Plaintiffs' "wait-and-see" standing

Plaintiffs' position appears to be that every person to receive an IVC filter has a claim, and should employ a "wait and see" approach: "Because it is becoming a common pattern for IVC filter recipients to see a progression in the filter-related complications and injury severity, it would be imprudent for Plaintiffs' counsel to advise their non-symptomatic clients to dismiss their cases." (Resp., 8.) This ignores that filing these cases was imprudent from the outset, and remains imprudent. Inherent in Plaintiffs' argument is the position that even where there is no present injury, dismissal is improper because of the *possibility* that a plaintiff develops an injury. Plaintiffs ignore that claims require a cognizable injury before they may be filed. The law, and Rule 11, require more than amorphous, potential future harm.

Of course, Plaintiffs disagree with the plain statistics Cook presented in its motion, and to the Court in previous hearings, when it is their position that cases with no injury whatsoever should not now, or ever, be dismissed. Plaintiffs argue "the total number of cases in this MDL (4,435) remains manageable and the pace of new filings appears to be decreasing." In reality, more than 969 new cases were filed in the MDL since the beginning of 2018, and hundreds more continue to be filed. That means the MDL, created **four years ago**, has grown **by 28% in 2018 alone**. To say filings are decreasing is demonstrably false.

### C. Plaintiffs' claim that Cook's request for a screening order is "unprecedented" and "sneak[y]" ignores both fact and law.

Plaintiffs' request that the Court ignore the plethora of law allowing, and encouraging, screening orders is disingenuous on its face. They argue that "Cook is attempting to sneak a broad and unprecedented case dismissal mechanism into this MDL." (Dkt. 8591, pp. 1, 11-12.)

First, "sneak" is an interesting choice of word given that Cook has openly and obviously requested a screening order because of the sheer volume of PIP/No Injury cases filed, and being filed:

3

Cook plainly titled its motion a request for a screening order, introduced its argument that screening is needed, has laid out the MDL as it stands today, explained why screening is necessary, and proposed a plan to effectively screen the case pool to ensure the efficacy of the upcoming bellwether selection.

Second, Plaintiffs' claim that Cook's request is "broad and unprecedented" has no basis in law or fact, and a cursory review of the law reveals these requests and orders are "routine" in the MDL setting. As an MDL judge recently said, in a decision the Fifth Circuit later affirmed, screening orders and Lone Pine Orders have become "**routine [mechanisms] to manage mass tort cases.**" *In re Vioxx*, 557 F. Supp. 2d at 743. The Third Circuit described the orders as "routine" and within the "wide latitude" afforded MDL courts in managing litigation, affirming dismissals with prejudice. *In re Avandia Marketing, Sales Practices & Products Liability Litigation*, 687 F. Appx. 210, 214 (3d Cir. April 19, 2017). That is because, as the 9th Circuit said, "[m]ultidistrict litigation is a special breed of complex litigation where the whole is bigger than the sum of its parts", affirming decisions dismissing cases for failure to comply with PFS requirements." *In re Phenylpropanolamine Prods. Liab. Litig.*, 460 F. 3d 1217, 1232 (9th Cir. 2006). And, the larger the MDL, the more compelling a screening order becomes. *Grant v. E.I. DuPont De Nemours & Co.*, 1993 WL 146634 (E.D. N.C. Feb. 17, 1993) ("In light of the magnitude of this litigation the Court finds that entry of a case management order [with Lone Pine requirements] is appropriate."). Calling screening orders and Lone Pine orders "unprecedented" is nothing short of wrong, and examples are easy to come by.[1]

More than one MDL judge has said that such orders do not even impose a burden on the plaintiffs as "it is not too much to ask a Plaintiff to provide some kind of evidence to support their claim that Vioxx caused them personal injury . . . Surely if Plaintiffs' counsel believe that such claims have merit, they must have some basis for that belief; after all this time it is reasonable to require Plaintiffs to

---

[1] In re Zimmer Nexgen Knee Implant Products Liability Litigation, 2016 WL 3281032 (N.D. Ill. June 10, 2016); Modern Holdings, LLC v. Corning Inc., 2015 WL 6482374, at *3-4 (E.D. Ky. Oct. 27, 2015); Miller v. Metrohealth Medical Center, 2014 WL 12589121, at *2 (N.D. Ohio March 31, 2014).

come forward and show the basis for their beliefs and show some kind of basic evidence of specific causation." *In re Vioxx Prods. Liab. Litig.*, 557 F. Supp. 2d at 743-44.

### D. Plaintiffs' position on their 115 no-injury cases shows the need for a screening order.

Plaintiffs have repeatedly changed their position on their 115 cases. As of their Response, Plaintiffs position is that the 115 are not representative of anything, and were one-off dismissals. But, on multiple occasions Plaintiffs represented to this Court that "the list of 115 was not pulled out of the air" and that their 115 are "product-in-place cases . . . with no injury." Plaintiffs claim that they are completely unable "cull the case lists and agree to dismissal of any case they deem[] lacking." (Resp., 7.) Their position highlights the need for a screening order. Given Plaintiffs' position that they cannot clean up the PIP/No Injury cases, the only option is to enter an appropriate screening order.

### E. Plaintiffs' argument regarding the additional 230 cases Cook identified highlights the need for a screening order too.

Plaintiffs argue that claims such as "FEAR OF THE UNKNOWN,"[2] and nothing more, amount to a cognizable injury. (Resp., 8-11.) While Plaintiffs' argument regarding the 230 no-injury cases Cook identified is difficult to follow, Plaintiffs highlight a number of individual plaintiffs in an effort to demonstrate some inaccuracy. But, Plaintiffs inadvertently highlight the need for a screening order because Cook cannot know what Plaintiffs have unilaterally chosen not to disclose. Plaintiffs demonstrate the inadequacy of their productions, and of their screening, not some overarching issue with the cases Cook has identified. Ostensibly, these are the Plaintiffs' best examples of "issues":

1. David Torre: Plaintiffs claim there was a failed retrieval. The PPS does not mentioned the failed retrieval and they've produced no medical records whatsoever. (Resp., 9.)

2. Wilma O'Banion: Plaintiffs claim the filter fractured. The PPS plaintiff produced says "N/A" as to the injury, and plaintiff produced only **3 pages of records**, the implant report. No facture was alleged or is evident from the records. (Resp., 9.)

3. Angelee Holmes: Plaintiffs claim Holmes experienced filter movement and DVT after placement. However, nothing in the PPS says that and the records say doctor is consciously

---

[2] Grimes, Joshua, 1:16-cv-02475.

US.119225382.04

leaving the filter in because of blood issues. The records show Holmes *thinking* she had a crawling feeling but reveal nothing about filter movement or migration. (Resp., 10.)

4. <u>Deborah Foltz</u>: Plaintiffs claim Foltz was told her filter is tilted and embedded. What does the PPS say regarding Foltz's injury? "None yet." (Resp., 10.) Plaintiffs correctly note a doctor has told Foltz removing the filter would be dangerous to her health, but that could easily be because **it currently protects her from pulmonary emboli.**

5. <u>Tanya Brandt-Beyer</u>: Plaintiffs claim being told the risk of removal outweighs the benefit. The PPS produced to Cook says the injury is tilt and "no current complaint." Nothing in the records produced to Cook discusses retrieval. (Resp., 10.)

6. <u>Larry Conway</u>: Plaintiffs claim a re-review of CT shows prongs have perforated. Plaintiffs are correct, documents later produced to Cook show this. (Resp., 10.)

7. <u>Charles Evans</u>: Plaintiffs argue that "**additional records received after Mr. Evans' profile sheet was produced reveal partial thrombosis that developed after the filter [was placed].**" The records do not show that, and the PPS states "worried over filter." Cook cannot know what Plaintiffs have chosen not to disclose. (Resp., 10.)

8. <u>Deborah Fissel</u>: Plaintiffs claim Fissel "initially alleged 'fear and anxiety' but subsequently provided additional records to her counsel showing that she had a post-filter implant DVT." **Plaintiffs amended Fissel's PPS on 7/11/2018,** weeks after Cook filed the instant motion. Of course, Cook could not have predicted the future, or known what Plaintiffs had not disclosed. (Resp., 10.)

It is apparent that Cook did not know, and was entirely unable to know, of many of the injuries Plaintiffs have highlighted. Indeed, to this day most of the PPSs have not been amended to include the injuries Plaintiffs highlighted, and Plaintiffs have not produced any records demonstrating their claims.

### 1. The Frivolous Five do not support Plaintiffs' arguments either.

Plaintiffs attempt to call out the five frivolous examples Cook highlighted too. As to those plaintiffs, Plaintiffs fall short again:

1. <u>Ricky Myers</u>: Plaintiffs claim he had a failed retrieval. The PPS Myers produced to Cook says no retrievals were attempted. The PPS also says the outcome was determined by a "**Legal consultation**." (emphasis added) (Resp., 11.)

2. <u>Marc Cota</u>: Plaintiffs claim Cota was advised the filter is irretrievable. PPS shows nothing related to irretrievability. Instead, the PPS Cota produced in discovery says "I am not certain … I am relying on experts retained by my lawyer …" None of the produced records show the filter cannot be retrieved either. (Resp., 10.)

3. <u>Kimberly Champagne-Hernandez</u>: Plaintiffs claim Champagne-Hernandez "endured a difficult retrieval." However, her PPS states "irretrievable," and plaintiff produced no records as to the retrieval. As far as we know, wither the removal did not occur or it was percutaneous and easy. (Resp., 10.)

6

4. <u>Carl Jackson:</u> Plaintiffs claim Jackson's filter cannot be removed and because of that he is on anticoagulants. But, the PPS mentions only anticoagulation and does not mention irretrievability. The records Jackson produced do not mention retrievability. (Resp., 10.)

5. <u>Jaclyn Bravman:</u> Plaintiffs claim Bravman is a failed retrieval case. Indeed, Cook highlighted this in its motion, (Dkt. 8449, 7-8.), and noted that Bravman is representative of many cases that allege the filter cannot be removed, along with standard boilerplate.

### F. The Proposed Plan does not offend due process.

Plaintiffs claim the screening order "*would* create a due process crisis." (Resp., 1, 6.) Their claim is perplexing given Plaintiffs provide no argument in support of that constitutional claim, and no citation to any law whatsoever (despite extensive due process law at the federal level). Plaintiffs notably ignore the constitutional prerequisite to *any* due process claim: standing. U.S. Const. Art. III, § 2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). That is, a plaintiff must have suffered a concrete and particularized injury. Without a meaningful attempt to make that argument, it is impossible for Cook to respond to Plaintiffs' amorphous "due process" rights claim. Therefore, it is axiomatic that dismissing No-Injury cases for failure to allege a cognizable injury does not lead to a due process issue, nonetheless a "due process crisis."

Plaintiffs ignore that countless other courts have entered screening orders, and Lone Pine orders, and there have not been any due process concerns. Cook cannot locate a single example of a screening order or Lone Pine order violating due process rights, or even a case discussing the issue. Examples[3] of screening orders which have been entered without due process issues, however, are easy to come by. Further, the federal Advisory Committee on the Rules of Civil Procedure is actively discussing amending the rules to codify Lone Pine provisions in the MDL context. The change, raised in April 2018, would require proof of injury upon filing. No due process concerns have been raised.

---

[3] In re Zimmer Nexgen Knee Implant Products Liability Litigation, 2016 WL 3281032, and the other cases cited above show no due process concerns, and all involved screening orders, Lone Pine orders, or both.

## II. Cook's proposed definitions are based on the parties' dispute over values – they very thing an MDL is designed to resolve..

Cook proposes three definitions: Undisputed PIP/No Injury; Disputed PIP/No Injury; and Bodily Injury.[4] Plaintiffs claim the definitions are flawed, but Plaintiffs simply break up those exact same definitions into subparts, without making changes, and label them brand new. (Resp., 13-15.) Proposed definitions aside, the point is that the MDL needs to be categorized before bellwether cases can be selected. Whether it is "Undisputed PIP/No Injury" or it is "Category 1" makes no substantive difference: these cases need to be identified and dismissed and should not be filed in the first place.

As basic logic requires, "Plaintiffs agree that there are a number of cases involving injuries to Plaintiffs that [] have not yet manifested physical symptoms." But, they believe their "fear" claims are proper. Courts, such as the United States Supreme Court, have remained skeptical of such "fear of injury" claims. *Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424, 432 (1997) ("individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring" and that fact "could threaten both a 'flood' of less important cases (potentially absorbing resources better left available to those more seriously harmed) and the systemic harms that accompany 'unlimited and unpredictable liability' (for example, vast testing liability adversely affecting the allocation of scarce medical resources)"); *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 173 (2003). The Supreme Court explained that its previous decisions explained,

> courts have restricted recovery for emotional harm to cases falling within rather narrowly defined categories[, and] militate against an expansive definition of "physical impact" here. Those reasons include: (a) special "difficult[y] for judges and juries" in separating valid, important claims from those that are invalid or "trivial," (b) a threat of "unlimited and unpredictable liability,"; and (c) the "potential for a flood" of comparatively unimportant, or "trivial," claims.

---

[4] Cook's definitions are pulled directly from published standards of practice (Caplin, et al., Quality Improvement Guidelines for the Performance of Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism, J. Vasc. Interv. Radiol. 2011; 22:1499-1506), and can be found at pages 10-12 of Dkt. 8449.

*Buckley*, 521 U.S. at 433. Even one of the cases Plaintiffs cite, *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965 (1993) restricts recovery for fear of cancer unless plaintiff is "more likely than not" to develop cancer. As the Supreme Court said, "exposure-only plaintiffs" and "plaintiffs who suffer from a[n injury]" are "sharply distinguish[ed]." *Norfolk & W. Ry. Co.*, 538 U.S. at 156. "Commentary similarly distinguishes between asymptomatic [] plaintiffs from plaintiffs who developed [a condition] and thus suffered real physical harm." *Id*. The Supreme Court went on to quote that "pleural thickening [i]s asymptomatic and observing that, unlike asbestosis sufferers, they face no "significantly increased risk of developing cancer and do not suffer current pain that serves as a constant reminder that a more serious disease may come upon them." *Id*. The Supreme Court has been skeptical of "parasitic" fear of injury, and medical monitoring, claims without a "host" claim alleging an actual physical injury.

Earlier this year, a judge in the Southern District of New York held that fear of injury from an IVC filter is not a cognizable injury. In *Perez v. Braun*, 2018 WL 2316334 (S.D.N.Y. May 9, 2018), a physician placed an IVC filter, and the CT scan showed the filter was tilted. The plaintiff alleged she was experiencing pain. She also alleged unspecific economic damages, psychological damages, and physical injuries too: "sustained serious personal injuries," "serious personal injuries, "severe injuries," "loss of enjoyment of life, disability, and other losses." She went on the allege she had "incurred substantial medical costs and expenses to treat and care for Plaintiff's injuries described herein." She also alleged she was at a greater risk of future injury because of the IVC filter. The defendants moved to dismiss and argued the complaint did not adequately allege that the plaintiff has presently suffered any cognizable injury. *Id*. at 3. The judge dismissed the case, highlighting that "[a] threat of future harm is insufficient to impose liability against a defendant in a tort context." *Id*. The court, addressing the tilt claims, said "as a characteristic throughout the complaint[], she assumes that the tilt is the injury. But, accepting that the likely tilt is an actual tilt, no more is said about it than that it may lead to a series of

9

actual injuries." *Id*. at 5. The court held fear of injury and tilt are not cognizable injuries. *Id*.

### III.  Multi-Plaintiff Trials Will Not Move This MDL Closer to Global Settlement, and Will Create Logistical Chaos

Multi-plaintiff trials will create logistical chaos. Currently, there are torrents of motions being filed ahead of the *Brand* bellwether trial: nearly **100 motions** have been filed (Plaintiffs have filed nearly 40 motions and Cook has filed nearly 60). *Brand* is, of course, a case involving only one person that had a filter placed. Combining plaintiffs is guaranteed to make the process even more cumbersome and complicated. There will be more physicians and there will be more experts. The trials will need to take longer too. Across numerous plaintiffs, it does not seem unreasonable to expect the parties to file **hundreds** of motions ahead of each bellwether. After all of that, the parties will ask the Court, and later the jury, to untangle that mess. The alternative, single-plaintiff bellwethers, is superior.

Multi-plaintiff bellwethers will not be helpful. Bellwether trials are meant to ascertain value in furtherance of settlement and multi-plaintiff trials negate that purpose. *In re Chevron U.S.A.*, 103 F.3d 1016, 1019 ("A bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants has as a core element representativeness."). Especially where the contours of various claims in a litigation are undefined, multi-plaintiff trials do not serve to advance the parties towards settlement. *In re Levaquin Prods. Liab. Litig.*, No. 08-1943, 2009 WL 5030772, at *1, 7, 9-11 (D. Minn. Dec. 14, 2009) ("the exact factual and legal contours of [the large MDL] are still undefined" and "[u]ntil enough trials have occurred so that the contours of various types of claims within the . . . litigation are known, courts should proceed with extreme caution in consolidating claims.").

MDL courts have been hesitant to consolidate bellwether trials because of the drawbacks. *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 3:09-md-2087-BTM(KSC), 2012 WL 2522859, at *50–52 (S.D. Cal. June 28, 2012) ("The selection of individual plaintiffs by the parties with oversight

from the court is similar to approaches taken by other courts in designating representative bellwether cases for trial."); *In re C.R. Bard Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL. No. 2187, Pretrial Order No. 71 at 2 (S.D. W.Va. Mar. 7, 2013) (denying motion to consolidate three plaintiffs' cases as the first bellwether trial); *In re Yasmin & Yaz*, 2010 WL 4024778, at *9 n.3 (providing that bellwether plaintiffs "must be selected . . . individually"); *In re Vioxx*, 760 F. Supp. 2d 640, 644 (E.D. La. 2010) (noting that six bellwether trials of individual plaintiffs were conducted during the course of litigation).

Bellwethers only "provide reliable information about other mass tort cases, [if] the specific plaintiffs and their claims [are] representative of a range of cases." Manual for Complex Litigation, 22.215. Consolidation may confuse juries, who are already charged with wading through complicated evidenced to determine claims that may present different issues. Multiple sets of case-specific facts can confuse the jury too. Consolidation may result in inflated plaintiffs' verdicts, and the complete inability to practically contest general causation. It may unfairly bolster any impression by the jury that the product is defective merely because multiple plaintiffs are claiming a similar injury. The goal of resolving a litigation with thousands of cases is not advanced by skewed verdicts. The result of multiple plaintiff bellwethers is predictable: In the event the Plaintiffs succeed, it would leave the Plaintiffs overvaluing the cases, and leave Cook feeling like they haven't even been valued in the first place. Bellwether trials do not produce useful information when the attorneys question verdict accuracy.

Here, the parties have been unable to agree on the contours of "injury" and "no injury" cases. As a result, the bellwether process is the most powerful value-ascertainment function at this Court's disposal to work out those contours. Combining multiple plaintiffs does not move the parties towards settlement, it injects variables into the process, could confuse the jury, and may render any verdict worthless because, of course, where one side overestimates the weight of an outcome, and the other doesn't believe the outcome is indicative of anything at all, the bellwether becomes useless.

US.119225382.04

Plaintiffs argue that the variety of alleged injuries weighs in support of consolidated trials because it could take numerous trials to untangle the issues. However, as explained, multi-plaintiff bellwether trials make *less* sense when the contours of various alleged injuries have not been defined, not *more*. (See Resp., p. 17.) Introducing more variables, and less clarity, will negate the effect of the bellwether. Plaintiffs argue that "Cook's superior resources" requires this Court to consolidate future bellwether trials. Plaintiffs' argument regarding Cook's resources is irrelevant. There is no link between the proper mechanism to resolve a large pool of claims and one party's resources. The goal is to value the cases, and combining claims with admittedly undefined contours does not do that. Even if Cook's resources in comparison to Plaintiffs' were relevant, such a claim is completely inappropriate without full and frank disclosure of Plaintiffs' resources and funding, including any third-party litigation funding. Further, the MDL mechanism allows Plaintiffs to pool resources, mitigating any of the claimed effects. Single-plaintiff bellwethers establish value and move closer to settlement. Period.

### IV.   Conclusion

For the foregoing reasons, Cook respectfully request that the Court enter the Proposed Plan, attached as Exhibit A to Cook's motion, so that the parties may reliably identify PIP/No Injury cases and establish a PIP/No Injury bellwether process.

Dated: August 8, 2018               Respectfully submitted,

/s/ J. Stephen Bennett
J. Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana 46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
E-Mail: stephen.bennett@faegrebd.com

                                            Andrea Roberts Pierson (# 18435-49)
                                            FAEGRE BAKER DANIELS LLP
                                            300 North Meridian Street, Suite 2700
                                            Indianapolis, Indiana 46204
                                            Telephone: (317) 237-0300
                                            Facsimile: (317) 237-1000
                                            E-Mail: andrea.pierson@faegrebd.com
                                            E-Mail: john.schlafer@faegrebd.com

                                            *Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

13

US.119225382.04

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2018, a copy of the foregoing Cook Defendants' Reply in Support of Their Motion For Screening Order And Bellwether Selection Plan was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system. Lead Counsel for Plaintiffs will serve any non-CM/ECF registered parties.

/s/ J. Stephen Bennett

US.119225382.04