**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to:

*Brand v. Cook Medical, Inc. et al.*,
Case No. 1:14-cv-6018-RLY-TAB

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE OR LIMIT
THE EXPERT TESTIMONY OF RAMAN UBEROI, M.D.**

Plaintiff Tonya Brand submits this Memorandum in Support of her Motion to Exclude or Limit the Expert Testimony of Raman Uberoi, M.D., and would respectfully show the Court that the challenged testimony from Cook's expert should be excluded or limited for the reasons set forth below.

**I.
INTRODUCTION AND RELIEF SOUGHT**

Dr. Uberoi is an interventional radiologist from London. Cook designated him as an expert in this case but did not provide a report. At the July 24, 2018 hearing on Plaintiff's motion to strike Dr. Uberoi, the Court ruled that "Dr. Uberoi will testify about the OUS study and the Lyon publication. He can testify about the British Registry and if that testimony tends to be cumulative, we'll strike it." Exhibit A, Transcript (July 24, 2018) at 29. Plaintiff brings *Daubert* challenges to Opinions 3 and 4 in the designation provided by Cook for Dr. Uberoi and any other opinions he has on the subject of the Celect IVC filter's, or IVC filters' in general,

1

purported efficacy, benefits vs. risks, or complication rates. Specifically, Cook designated Dr. Uberoi to testify regarding:

- The retrievability and performance of IVC filters. Dr. Uberoi will testify, based on his personal experiences in both studies and with actual patients, that filters are effective devices that are retrievable and carry an overall low risk of clinically significant complications for patients.

- His opinions regarding the Celect filter. Dr. Uberoi will testify that, based on his clinical experience and review of the medical literature, the Celect filter is highly retrievable and is associated with a low rate of clinically significant complications.

Exhibit B, Cook Defendants' Amended Rule 26(a)(2)(B) and 26(a)(2)(C) Expert Disclosures (June 6, 2018), at 22. Because Dr. Uberoi did not write an expert report for this case, and at his deposition he failed to articulate sufficient facts or data or reliable principles or methods in support of these purported efficacy and risk/benefit opinions, he should not be permitted to offer his opinions on any of these subjects at trial. In addition, because he has not published regarding his personal experience with his patients, nor has he provided a report or other description of his methodology in terms of reaching conclusions regarding same, anecdotal testimony regarding what Dr. Uberoi's patients' personal experiences were should not be permitted. Finally, Dr. Uberoi should not be allowed to testify about the state of mind of doctors in the United States, nor should he be permitted to offer cumulative testimony.

## II.
## LEGAL STANDARD

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *see, e.g.*, *McCauley v. Nucor Corp.*, No. 1:05-CV-00424TABRLY, 2007 WL 2316463, at *1-2 (S.D. Ind. Aug. 10, 2007) (Baker, M.J.) (discussing *Daubert* standard); *Griffin v. Foley*,

No. 3:05-CV-0015 RLY-WGH, 2006 WL 6886657, at *1-2 (S.D. Ind. Dec. 11, 2006) (Young, J.) (same). Specifically, (1) the expert must be qualified by knowledge, skill, experience, training, or education; (2) the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; (3) the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and (4) the expert must have reliably applied the principles and methods to the facts of the case. *Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013) (citations omitted). *See also Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012) ("Rule 702 requires that expert testimony be relevant, reliable, and have a factual basis—requirements that must be met before the jury is allowed to hear and perhaps be persuaded by the expert testimony."). As the proponent of the expert testimony at issue, Cook has the burden of demonstrating admissibility. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

In evaluating the testimony of Cook's experts under Federal Rule of Evidence 702, the Court must determine whether it is "reliable" and "relevant." *Lees,* 714 F.3d at 521 (citing *Daubert*, 509 U.S. at 588-89). To satisfy the reliability requirement, the expert must be qualified in the relevant field, and his opinion must be based on a sound methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Thus, an expert's work is admissible "only to the extent it is reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

To be relevant, the testimony must assist the trier of fact in understanding the evidence or in determining a fact in issue. *Daubert*, 509 U.S. at 591; *see also Chapman v. Maytag Corp.,* 297 F.3d 682, 687 (7th Cir. 2002) ("The second part of the *Daubert* analysis requires the district court to determine 'whether the evidence or testimony assists the trier of fact in understanding

the evidence or in determining a fact in issue.'") (quoting *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 616 (7th Cir. 1993)). "The touchstone of admissibility under Rule 702 is helpfulness to the jury." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991), *amended on unrelated grounds*, 957 F.2d 301 (7th Cir. 1992)).

As explained below, Dr. Uberoi's opinions regarding efficacy, risk/benefit and complication rates are based on insufficient facts and data and an unreliable methodology and should be excluded.

## III.
## ARGUMENT

### A. Overview of Dr. Uberoi's Limited Facts and Data and Insufficient (and Possibly Non-Existent) Methodology.

A pervasive problem underlying Dr. Uberoi's testimony is that Cook is trying to fit a square peg into a round hole. Cook claims that Dr. Uberoi is an unretained, independent physician, but Cook had had repeated communications with Dr. Uberoi regarding his opinions in the IVC filter litigation for at least nine months prior to his deposition. Exhibit C, Deposition of Raman Uberoi, M.D. (Aug. 3, 2018) at 15:24-16:8; 18:12-19:20 [hereinafter "Uberoi Dep."]. In fact, after being alerted to an issue by Cook's counsel, Dr. Uberoi – for the first time in his career – published a correction to one of his articles regarding IVC filters. *Id.* at 131:15-25; 135:2-22. Cook paid Dr. Uberoi one thousand pounds per hour (which is approximately $1300 dollars per hour) to prepare for the deposition. *Id.* at 24:6-25:8; 26:6-14. Prior to his deposition, Dr. Uberoi spent 25 to 30 hours reading expert reports from Tonya Brand's case provided to him by Cook's counsel, along with other undisclosed documents provided by Cook, and meeting with Cook's attorneys go to over the questions they planned to ask him at the deposition. *Id.* at 32:12-34:21;

45:16-21. Cook has asked Dr.Uberoi to testify live at trial, and has offered to pay for his time and travel expenses to do so. *Id*. at 365:4-366:2.

Dr. Uberoi testified that he had not reviewed the peer-reviewed literature regarding IVC filters to prepare for his deposition, and he therefore was unable to answer multiple questions about same. *Id*. at 78:8-11; *see also* 339:21-340:2 (stating he would need to look at the medical literature to be accurate, but providing defense counsel with a "ballpark" estimate of complication rates). To the extent Dr. Uberoi employed a methodology to reach the opinions Cook seeks to extract from him regarding efficacy, risk/benefit and complication rates, the method is simply reliance upon his own personal experiences along with limited data from two studies (the Lyon/OUS study and the British Registry Study). As explained below, this is an insufficient, unreliable basis for these opinions.

Tellingly, Dr. Uberoi testified that there are a lot of questions regarding IVC filters for which the answers are not known, including the very questions Cook designated him as an expert on. In Dr. Uberoi's own words, questions we do not know the answers to include: "do they [IVC filters] prevent pulmonary embolism-related mortality? Is there a – the rate of complications, does that really outweigh the benefits of placing an IVC filter? Things like what are complication rates with the different types of filters… So, there are potentially a lot of questions that would be nice to answer, I think that would be really useful as a clinician, but we haven't got that level of accuracy, lack of data." *Id*. at 78:14-79:9; *see also* 85:4-86:10.

With respect to his British Registry study, Dr. Uberoi testified that that study is not capable of answering the question as to whether IVC filters are effective in preventing pulmonary embolism or death because "[w]e didn't get enough data to kind of give us that sort of answer." *Id*. at 93:5-12; *see also id*. at 362:14-20 (registry was not set up to assess efficacy).

In terms of complication rates, Dr. Uberoi admitted that he had no follow-up data regarding 40% of the individuals in his registry, and for 1000 of the 1200 patients it is unknown whether there was an image of any kind that a doctor could have looked at to check for complications. *Id*. at 108:1-9; 110:21-111:1; 112:2-5. Participation in the British Registry was voluntary, and there was no core lab or other procedure to monitor or verify the individual doctor's observations. *Id*. at 116:1-117:24; 119:15-120:11. Dr. Uberoi explained that the purpose of a core lab "is to try and ensure that we get good quality and accurate data" but that he did not have the resources to employ such a lab for this study. *Id*. at 116:1-117:24. With respect to perforation, Dr. Uberoi testified that this was likely underreported, and that he *does not know* how many Celect filters perforated the IVC of the patients in his British Registry study. *Id*. at 125:7-126:15.

Dr. Uberoi's personal role in Cook's Lyon/OUS Study was limited. Although he is a coauthor, Dr. Uberoi testified that Cook's employee Jennifer Brown wrote the study, and he had not seen a final draft prior to preparation for his deposition for this case. *Id*. at 152:13-18; 22:14-21. Only 12 of the 95 patients discussed in the Lyon publications were Dr. Uberoi's patients. *Id*. at 153:5-9. Dr. Uberoi has never been provided with access to images of the other 83 patients in the study, all of whom were seen by other doctors. *Id*. at 154:5-21. With respect to 3 of his 12 patients, Dr. Uberoi testified that during depo prep he realized that their Celect filters had in fact protruded outside the IVC wall, but that he had reported zero to the study investigators, resulting in an error rate of at least 25%.[1] *Id*. at 164:1-165:21; 378:9-379:2.

During his deposition, Cook's counsel repeatedly elicited testimony (over Plaintiff's counsel's objection) regarding anecdotal evidence of Dr. Uberoi's personal experiences with

---

[1] The error rate is actually higher because two of Dr. Uberoi's patients were unable to complete the study and did not have their filters removed. *Id*. at 297:18-298:18. Thus, Dr. Uberoi's admitted error rate was 3 out of 10, or 30%.

6

filters. For example, Dr. Uberoi was asked about the types of filters he has used and how he decides which device to use for a patient. *Id*. at 248:6-249:4. He was asked about the rate of complications in his patients, with no explanation as to how that rate was calculated or what his follow-up procedures are. *Id*. at 329:3-330:17; 361:11-362:4; 363:8-13. Instead, Dr. Uberoi testified about what he was "aware of" and what he has "seen." *Id*. Dr. Uberoi was asked whether clots found in filters had been caught by the filter, as opposed to having formed as a result of the filter. *E.g*., 303:3-24; 363:18-20. Such testimony is speculative per Dr. Uberoi's own testimony. *E.g., id.* at 381:4-382:23 (he can't say whether the filter created the thrombus); 383:10-384:12 (Dr. Uberoi did not recall results of investigation of origin of thrombus in patients at issue). Dr. Uberoi is one doctor practicing in another country; his undocumented, anecdotal accounts of his experiences with his patients are not reliable or otherwise helpful to the jury.

### B. Because he is a Non-Retained Expert, Dr. Uberoi should not be Permitted to Testify about Facts, Data or Information Gained through Non-Percipient Observations.

As Plaintiff explained in her Motion to Strike Ramon Uberoi, MD, Docket No. 8492, the difference between retained and non-retained experts is that "non-retained experts gain their information through percipient observations, while retained experts gain their information in any other manner." *Guarantee Tr. Life Ins. Co. v. Am. Med. & Life Ins. Co.*, 291 F.R.D. 234, 237 (N.D. Ill. 2013). As the *Downey* court explained, if the expert "draws the opinion from facts supplied by others, in preparation for trial, he reasonably can be viewed as retained or specially employed for that purpose, within the purview of Rule 26(a)(2)(B)," and must therefore submit an expert report. *Downey v. Bob's Disc. Furniture Holdings*, 633 F.3d 1, 7 (1st Cir. 2011). Therefore, any opinions Dr. Uberoi purports to offer based on his review of materials in preparation for the deposition, including but not limited to the medical literature, should be

7

excluded for lack of an expert report. This includes, for example, any opinions of Dr. Uberoi based on review of the final version of the Lyon/OUS study because Dr. Uberoi testified he had not seen the final version prior to his deposition preparation with Cook's counsel. Ex. C, Uberoi Dep., at 22:14-21.

### C. Dr. Uberoi should not be permitted to testify regarding efficacy, risk/benefit, complication rates, or his patients' experiences.

1. Dr. Uberoi's efficacy, risk/benefit, complication rate and patient experience opinions are inadmissible because insufficient foundational facts or data support them.

Rule 702 explicitly requires that expert testimony be "based on sufficient facts or data." FED. R. EVID. 702. "In the quantitative sense, sufficient facts or data means that the expert considered sufficient data to employ the methodology; an opinion about an average gross sales price, for example, could not be reliably supported by evidence relating to sales to only one customer because a single observation does not provide a sufficient basis for calculating an average." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (int. quot. mark om.; quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013); further cit. om.). To be "qualitatively" adequate, "an expert must employ 'those kinds of facts or data' on which experts in the field would reasonably rely." *Gopalratnam,* at 781 (quoting *Manpower*, at 809). Where an expert cannot point to studies, records, or data on which he based his opinion, then that opinion is properly excluded because it is "not well-grounded in the scientific method." *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993).

As the Supreme Court noted, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997); *see also, e.g.*, *Stachon v. Woodward*, No. 2:12-CV-440, 2015 WL 5692109, at *6 (N.D. Ind. Sept. 28, 2015) ("Neese's

confirmation that he gave his opinions to a reasonable degree of scientific certainty is insufficient.") (citing *Gen. Elec.*, at 146). An expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elec. Corp. v. WH–T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) ("The court is not obligated to admit testimony just because it is given by an expert."). Rather, the Seventh Circuit has reiterated: "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp.*, 395 F.3d at 419 (collecting cases of reiteration).

As an unretained expert with no report, Dr. Uberoi is limited to testifying about his participation the British Registry and OUS studies. Exhibit A, Transcript (July 24, 2018) at 29. But Dr. Uberoi admitted that the British Registry study is not capable of addressing efficacy due to lack of data. Ex. C, Uberoi Dep, at 93:5-12; 362:14-20. And with regard to complication rates, the British Registry lacked images to assess this for 83% of the patients in the study (1000 out of 1200 patients). *Id.* at 108:1-9; 110:21-111:1; 112:2-5. In fact, with respect to perforation, Dr. Uberoi testified that that he *does not know* how many Celect filters perforated the IVC of the patients in his British Registry study, but he does know that his results are too low due to underreporting. *Id.* at 125:7-126:15. Because the British Registry study was not designed to assess efficacy, and the complication rates of the patients in the study are not known, it cannot be used to analyze the risks vs. the benefits of IVC filters.

Regarding the OUS Study, as set forth in Plaintiff's Motion to Strike Raman Uberoi, MD, Docket No. 8492, and in section III.B *supra*, as a non-retained expert, Dr. Uberoi should not be permitted to testify about facts, data or information gained through non-percipient observations. Dr. Uberoi had personal, percipient experience with only 12 of the 95 *Lyon*/OUS patients. *Id.* at

9

153:5-9. Dr. Uberoi has never reviewed the images of the other 83 patients in the study, all of whom are other doctors' patients. *Id*. at 154:5-21. Thus, at the most, Dr. Uberoi can base efficacy, risk/benefit and complication rate opinions from the OUS study on 12 patients. But he lacks data on 2 of the 12 because they withdrew from the study, *Id*. at 297:18-298:18, and with respect to 3 of his remaining 10 patients, Dr. Uberoi mischaracterized their status in that during the study, he failed to recognize that their Celect filters had protruded through their IVC walls.[2] *Id*. at 164:1-165:21; 378:9-379:2. Mistake(s) or no mistake(s), ten patients is not enough to reach reliable opinions on efficacy, complication rates, or risk vs. benefit.

### 2. Dr. Uberoi's Efficacy, Risk/Benefit, Complication Rate and Patient Experience Opinions are Unreliable because they are without a Methodological Foundation.

In his deposition, Dr. Uberoi did not identify any protocol that he used to reach conclusions regarding efficacy, risk vs. benefit, or complication rates, nor did he specify any methodology. "A court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter .... [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Smith v. Ford Motor Co*., 215 F.3d 713, 718 (7th Cir. 2000). An expert report and testimony is admissible "only to the extent it is reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores*, 217 F.3d 919, 924 (7th Cir. 2000). "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.' " *Lapsley v. Xtek, Inc*., 689 F.3d 802, 804 (7th Cir. 2012) (quoting Fed. R. Evid. 702).

---

[2] The error rate is actually higher because two of Dr. Uberoi's patients were unable to complete the study and did not have their filters removed. *Id*. at 297:18-298:18. Thus, Dr. Uberoi's admitted error rate was 3 out of 10, or 30%.

10

Here, Dr. Uberoi's opinions regarding efficacy, risk/benefit, complication rates, and his patients' experiences are unreliable because he used no methodology or protocol in reaching this opinion. For example, Cook has designated Dr. Uberoi to testify that IVC filters, and the Celect filter specifically, allegedly are effective in preventing pulmonary embolism. (Ex. B, Cook Expert Designation, at 22). However, he has no relevant or reliable basis for this opinion. Dr. Uberoi admits that the British Registry study was not designed to assess efficacy, and he only has knowledge regarding ten patients in the OUS Study. *Id.* at 93:5-12; 362:14-20; 153:5-9; 154:5-21; 297:18-298:18. Nowhere does Dr. Uberoi or Cook explain how Dr. Uberoi can reliably reach an efficacy opinion based on 10 patients.

Moreover, Dr. Uberoi's clinical experience cannot salvage his unfounded efficacy and related opinions because that experience is irrelevant here. The Seventh Circuit has ruled that, "an opinion about an average gross sales price, for example, could not be reliably supported by evidence relating to sales to only one customer because a single observation does not provide a sufficient basis for calculating an average." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (int. quot. mark om.; quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013); further cit. om.). Here, Dr. Uberoi's reliance on his purported clinical experience is unreliable because he did not base his opinion on any statistically significant number of cases and he did not study his patients in any relevant manner so as to elevate his experience to an admissible opinion on filter efficacy. He did not testify as to any method employed to track outcomes in his patients, nor did he provide the rates of any complication for his patients.

### 3. Dr. Uberoi's testimony regarding filters catching clots in his patients is inadmissible because it is mere speculation.

Georgia law does not recognize mere chance or speculation – which is the best that can be said of Dr. Uberoi's catching thrombus testimony – as evidence of efficacy. *See Zwiren v. Thompson*, 578 S.E.2d 862, 865 (Ga. 2003) ("expert testimony must provide a causal connection that is "'more than mere chance or speculation'") (quoting *Anthony v. Chambless*, 500 S.E.2d 402 (1998)). As explained above, for the handful of patients at issue, Dr. Uberoi does not know whether the filter caused the blood clot to form or prevented an embolus from traveling to the lung. Uberoi Dep. at 381:4-382:23; 383:10-384:12.

Similarly, the federal standards for admissible evidence do not allow the admission of opinion evidence that is speculative rather than based on facts. The Court should "rule out subjective belief or speculation." *The Peoples Bank v. Stifel, Nicolaus & Co.*, No. 1:10-cv-1640-RLY-TAB, 2013 WL 1024917, at *2 (S.D. Ind. Mar. 14, 2013) (cit. & quot. om.). "Opinions without factual support are nothing more than the subjective belief and unsupported speculation-- the *ipse dixit*—of the witness." *Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927, 939 (N.D. Ind. 1999). In short, speculative opinions, such as Dr. Uberoi's, are inadmissible. *See, e.g., Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 783 (7th Cir. 2017) (affirming district court exclusion of opinions that "were unreliable because their 'underlying bases' were improperly based upon 'speculation' and 'unfounded inferences'") (quoting district court opinion); *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (affirming the exclusion of a doctor's opinion on the grounds that it was a mere "hunch" and "lack[ed] scientific rigor").

### D. Dr. Uberoi's Descriptions of Other Doctors' Alleged Personal Knowledge Are Outside His Field of Expertise, Unreliable, and Will Not Be Helpful to the Jury.

In response to questions from Cook's counsel, Dr. Uberoi made sweeping statements purporting to read the minds of other doctors. *E.g*., Ex. C, Uberoi Dep., at 359:14-360:2. He literally purports to know what information other physicians in another country have and what information they rely upon. Not being omniscient, he lacks the qualifications to read the minds of other doctors and report on what he allegedly sees there. These opinions are without foundation.

Specifically, when questioned what doctors placing IVC filters would have known was a well-recognized complication with an IVC filter, Dr. Gillespie stated: "If you were placing IVC filters, you would almost certainly have been aware of the potential risks, and that would have been part of your training in placing filters as an interventional radiologist." *Id*. at 359:14-360:2. Dr. Uberoi failed to provide the basis for his ability to identify the knowledge and reliance of doctors other than himself who were trained and who practice in an entirely different country.

Dr. Uberoi's opinions declaring the mindset of other doctors are inadmissible. An expert is not allowed to testify regarding the knowledge that another person has or does not have. *See, e.g., Matter of Sheridan*, 57 F.3d 627, 634 (7th Cir. 1995) (court did not abuse its discretion in refusing to allow expert testimony on what debtor would have had to know regarding property values given his experience in the field); *Moore v. Positive Safety Mfg. Co*., No. CIV.A. 4:96-CV-00352, 1998 WL 35178048, at *9 (N.D. Ga. May 26, 1998) (opinion concerning defendant's knowledge was inadmissible) (citing *Sheridan*; further cit. om.).

### E. Dr. Uberoi's Efficacy, Risk/Benefit and Complication Rate Testimony is Cumulative and Will Not Be Helpful to the Jury.

Dr. Uberoi's efficacy, risk/benefit and complication rate opinions should be stricken as needlessly cumulative. *See* FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: . . . needlessly presenting cumulative evidence."). Because Dr. Uberoi would not be adding any information of probative force by addressing the same topics many of Cook's other experts will testify to, Dr. Uberoi's opinions on these subjects are properly excluded. In fact, as to efficacy of filters alone, Cook has already designated Dr. Robertson, Dr. Virmani, Dr. Gillespie, Dr. Morris and FDA expert Forman to testify. The addition of a sixth on this topic as well as the others should be disallowed on grounds of the cumulative nature of the testimony presented. *See, e.g.*, *Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609-10 (7th Cir. 2000) (finding trial judge properly excluded evidence as cumulative and explaining that, "[e]vidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates.") (cit. & quot. marks om.).

## III.
## CONCLUSION

For the reasons stated herein, Plaintiff requests that the Court grant her motion to exclude or limit the expert testimony of Raman Uberoi, MD. Specifically, Plaintiff requests that the Court exclude Opinions 3 and 4 in the designation provided by Cook for Dr. Uberoi and any other opinions he has on the subject of the Celect IVC filter's, or IVC filters' in general, purported efficacy, benefits vs. risks, or complication rates, and his purported omniscience in knowing the thoughts of other doctors, and his testimony regarding his patient's particular experiences. Plaintiff additionally requests all other and further relief to which she may be justly entitled.

Dated: Sept. 4, 2018.

/s/ Joseph N. Williams
Joseph N. Williams, Atty. No. 25874-49
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com

*Liaison Counsel to Plaintiffs' Steering Committee*

Ben C. Martin, Esq.
THE LAW OFFICES OF BEN C. MARTIN
3710 Rawlins Street, Suite 1230
Dallas, TX  75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@bencmartin.com

             Michael W. Heaviside, Esq.
             HEAVISIDE REED ZAIC, A LAW
             CORPORATION
             910 17th Street, NW, Suite 800
             Washington, DC 20006
             Telephone: (202) 223-1993
             mheaviside@hrzlaw.com

             David P. Matthews, Esq.
             MATTHEWS AND ASSOCIATES
             2509 Sackett St.
             Houston, TX  77098
             Telephone: (713) 522-5250
             Facsimile: (713) 535-7184
             dmatthews@thematthewslawfirm.com

             *Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

  I hereby certify that on September 4, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

             */s/ Ben C. Martin*_____
             Ben C. Martin