IN THE UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB MDL No. 2570 |

This Document Relates to:

*Brand v. Cook Medical, Inc. et al.*,
Case No. 1:14-cv-6018-RLY-TAB

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION…..…………………………………………………………......….…1

STATEMENT OF MATERIAL FACTS IN DISPUTE……………………….……....…….3

I. Genuine Issues of Material Fact Exist as to Ms. Brand's Strict Liability and Negligent Failure to Warn Claims in Counts 1 and 3 of the Complaint……………...……….…………………3

 A. As to Whether Cook's Failure to Warn About the Celect Filter Proximately Caused Ms. Brand's Injuries……………………………..……………………………....……..3

 B. As to Whether Celect Filter's Warning Contained in the Celect Filter's Instructions for Use ("IFU") and Conveyed Through Sales Representatives Adequately Warned Physicians……………………………………………………………………….……..4

II. Genuine Issues of Material Fact Exist as to Ms. Brand's Strict-Liability and Negligent Design Defect Claims in Counts 2, 3 and 4 of the Complaint………………………………………..6

 A. As to the Existence of Design Defects in the Celect Filter……………………………..6

 B. As to Whether the Celect Filter's Design Defects Proximately Caused Ms. Brand's Celect Filter to Fracture and Her Resulting Injuries……………………..………………7

III. Summary Judgment on Ms. Brand's Negligence Per Se Cause of Action, Count IV of the Complaint, Presents Only a Question of Law……………………..………………………..8

IV. Genuine Issues of Material Fact Exist as to Ms. Brand's Claim for Punitive Damages set Forth in Count 5 of the Complaint……………………………………………..……..…8

ARGUMENT AND AUTHORITIES……………………..……………………………..….9

I. The Appropriate Standard on Summary Judgment Requires this Court to View the Facts in the Light Most Favorable to Ms. Brand………………………….........................................................................................9

II. Genuine Issues of Material Fact Exist as to Ms. Brand's Strict Liability and Negligent Failure to Warn Claims in Counts 1 and 3 of the Complaint, Requiring Denial of Cook's Motion for Summary Judgment……………………………………………………….…………....9

 A. Ms. Brand offers evidence that Cook's inadequate warnings were the proximate cause of her injuries under the applicable Georgia Law Standard………………………………11

  1. Dr. Rheudasil and the Medical Community were not aware of risks associated with the Celect Filter……………………………..………...11

2. Dr. Rheudasil read the Celect Filter IFU……………………….……...…18

B. Ms. Brand offers evidence that Cook Breached its Duty to Adequately Warn Physicians through its IFU and Sales Representatives of the Potential Risks and Dangers Associated with the Celect Filter…………………………………………………………...……..21

    1. Cook did not adequately warn doctors about the Celect's risk of tilt, perforation and fracture, which are partially the result of the removal of the petals serving as perforation limiters found on its predecessor, the Tulip…………………………………………………………………...22

    2. In the IFU and elsewhere, Cook did not disclose risk rates or that the risks associated with the Celect were significantly higher than the risks of its predecessor filter, the Tulip……………………………………………...30

    3. Cook did not warn adequately warn doctors about the Celect's limited retrieval time period…………………………………………………..34

    4. Cook misrepresented the results of its clinical study in the Celect IFU, which made the warnings in the IFU inadequate………………………...35

III. Genuine Issues of Material Fact Exist as to Ms. Brand's Strict-Liability and Negligent Design Defect Claims in Counts 2, 3 and 4 of the Complaint, Requiring Denial of Cook's Motion for Summary Judgment on Them…………………………………………….……...37

A.  Ms. Brand offers evidence of a design defect under the applicable Georgia law Standard……………………………………………………………………..37

B. Ms. Brand offers evidence that the Celect's design defects caused her filter to fracture under the applicable Georgia standard…………………………………………………45

C. Ms. Brand offers evidence that the design defects proximately caused her injuries under the applicable Georgia standard……………………………….………47

D. Ms. Brand offers evidence ruling out other causes of her injury that were not foreseeable risks of the Celect's defective design………………………………………….……..55

IV. Federal Law Does Not Preempt the Portion of Ms. Brand's Negligence Per Se Cause of Action that Uses Federal Regulations to Provide Standards for Her Failure to Warn Causes of Action…………………………………………………………………...……………59

V. Genuine Issues of Material Fact Exist as to Ms. Brand's Claim for Punitive Damages………………………………………………………….……………...60

CONCLUSION AND REQUEST FOR RELIEF……………….………....……………63

## TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........................................................................................... 9

*Bausch v. Stryker Corp.*
630 F.3d 546 (7th Cir. 2010) ........................................................................... 59

*Brown v. Roche Labs, Inc.*
2013 WL 2457950 (N.D. Ga. June 6, 2013) ................................................... 17

*Buckman Co. v. Plaintiffs' Legal Committee*
531 U.S. 341 (2001) ......................................................................................... 59

*Cason v. C.R. Bard, Inc.*
2015 WL 9913809 (N.D. Ga. Feb. 2, 2015) ................................. 12, 22, 32, 33, 34, 61

*Cisson v. C.R. Bard, Inc.*
2013 WL 5700513 (S.D.W. Va. Oct. 18, 2013) ........................... 18, 27,28, 28, 39, 40, 43, 51, 66

*Dietz v. Smithkline Beecham Corp.*
598 F.3d 812 (11th Cir. 2010) ................................................................... 16, 20

*Gross v. Gynecare*
2016 WL 1192556 (N.J. Sup. Ct., App. Div. Mar. 29, 2016) ......................... 62

*Hammons v. Ethicon*
2018 WL 3030754 (Pa. Sup. Ct. June 19, 3018) ........................................... 62

*Hill v. Cook Medical, Inc.*
MDL Dkt. 6660 ................................................................................................. 17

*Howard v. Sulzer Orthopedics, Inc.*
382 Fed. Appx. 436 (6th Cir. 2010) ................................................................ 59

*Hughes v. Boston Scientific Corp.*
631 F.3d 762 (5th Cir. 2011) ........................................................................... 59

*In re Bard IVC Filters Products Liab. Litig.*
2017 WL 5625548 (D. Ariz. Nov. 22, 2017) ............................... 20, 22, 32, 34

*In re Bard IVC Filters Products Liab. Litig.*
2018 WL 1256768 (D. Ariz. Mar. 3, 2018) ................................. 22, 32, 34, 60

iv

*In re Bard IVC Filters Products Liab. Litig.*
2018 WL 3037161 (D. Ariz. June 19, 2018)……………………………………….………12

*In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Products Liab. Litig.*
810 F.3d 913 (4th Cir. 2016) ........................................................................................... 20

*In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*
711 F. Supp. 2d 1348  (M.D. Ga. April 22, 2010)..................................................... 15, 32, 33, 34

*Jackson v. Louisville Ladder, Inc.*
2013 WL 1729299 (M.D. Pa. Apr. 22, 2013) ............................................................... 39

*Larson v. General Motors Corp.*
391 F.2d 495 (8th Cir. 1968) ........................................................................................ 10

*Leonard v. Medtronic, Inc.*, 2011 WL 3652311
(N.D. Ga. Aug. 19, 2011)............................................................................................... 59

*Michaels v. Mr. Heater*
411 F. Supp. 2d 992 (W.D. Wis. Jan. 30 2006) ............................................................ 52

*Nolley v. Greenlee Textiron,Inc.*
2007 WL 5369405 (N.D. Ga. Dec. 6, 2007)............................................................. 21, 22

*Picken v. Louisville Ladder, Inc.,*
2013 WL 3896570 (E.D. Mich. July 29, 2013) ............................................................ 38

*Rozier v. Ford Motor Co.*
573 F.2d 1332 (5th Cir. 1978) ..................................................................................... 10

*Stengel v. Medtronic Inc.*
404 F.3d 1224 (9th Cir. 2013) (en banc), cert. denied, 134 S. Ct. 2839 (2014) .......................... 59

*Thornton v. E.I Du Pont de Nemours & Co.*
22 F.3d 284 (11th Cir. 1994) ............................................................. 10, 11, 22, 32, 37

*Trickett v. Advanced Neuromodulation Sys., Inc.*
542 F.Supp.2d 1338 (S.D.Ga. Feb. 21, 2008)............................................................. 45

*Waddy v. Globus Med., Inc.*
No. 407CV075, 2008 U.S. Dist. LEXIS 73030, at *12, 2008 WL 3861994
(S.D.Ga. Aug. 18, 2008) ............................................................................................... 45

*Watkins v. Ford Motor Co.*

190 F.3d 1213 (11th Cir. 1999) ............................................................... 10, 11, 15, 22, 25,  32, 34


*Watson v. Uniden Corp. of America*
775 F.2d 1514 (11th Cir. 1985) ............................................................... 11

*Weilbrenner v. Teva Pharmaceuticals USA, Inc.*
696 F. Supp. 2d 1329 (M.D. Ga. March 10, 2010).., ................................. 60

*Wells v. Ortho Pharm. Corp.*
615 F. Supp. 262 (N.D. Ga. 1985), aff'd in part, modified in part and remanded sub nom........10

*Wells v. Ortho Pharm. Corp.*
788 F.2d 741 (11th Cir. 1986). ............................................................... 12

*Wheat v. Sofamor, S.N.C.*
46 F. Supp. 2d 1351 (N.D. Ga. April 28, 1999)................................................. 8, 16, 17

**State Cases**

*Banks v. ICI Americas, Inc.*
264 Ga. 732 (1994) ............................................................... 9, 38, 48

*Bodymasters Sport Indus, Inc. v. Wimberely*
232 Ga. App. 170 (1998) ............................................................... 48

*Center Chemical Co. v. Parzini*
234 Ga. 868 (1975) ............................................................... 10, 22

*Chrysler Corp. v. Batten*
264 Ga. 723 (1994) ............................................................... 10. 38

*Collins v. Newman Machine Company, Inc.*
190 Ga. App. 879 (1989) ............................................................... 11, 36

*McCombs v. Synthes (U.S.A.)*
277 Ga. 252 (2003) ............................................................... 10

*R&R Insultation Servs. Inc. v. Royal Indem. Co.*
207 Ga. App 419 (2010) ............................................................... 11

*Singleton v. Airco, Inc.*
169 Ga. App. 662, 664 (1984) ............................................................... 16, 19, 34

*Williams v. Am. Med. Sys.*

248 Ga.App. 682, 548 S.E.2d 371 (Ga.Ct.App.2001) ................................................................... 45

*Woods v. A.R.E. Accessories, LLC*
2018 WL 2354925 (Ga. App. May 24, 2018).................................................. 38, 48, 56

**Federal Statutes**

21 U.S.C. § 301, 337………………………………………………………………..58
21 U.S.C. § 321, 331, 337, 352………………………………………………………..59

**Federal Regulations**

21 C.F.R. §§ 1.21, 801 803.5, 820………………………………………………………59
21 C.F.R. §§ 803, 807……………………………………………………………..60, 63

**State Statutes**

165 Ga. App. at 646; § 62.683 ......................................................................... 11, 36
O.C.G.A. § 51–1–11 ....................................................................................... 10, 11

**Other Authorities**

Charles Wright & Author Miller, Federal Practice and Procedure § 2524 (3d ed. 2008)………37
Georgia Suggested Pattern Jury Instructions, Vol. 1: Civil (5th ed. 2018) § 00.040.....……...52
Georgia Suggested Pattern Jury Instructions, Vol. 1: Civil Cases, 5th ed. § 60.200……………58
Georgia Suggested Pattern Jury Instructions, Vol. 1: Civil Cases, 5th ed. § 62.650.................... 39

## INTRODUCTION

"This is a fracture case." "So why is Plaintiff treating this case as if it were another perforation case…?" Cook begins the first two paragraphs of its Memorandum in Support of Motion for Summary Judgment (Doc. 8651) ("Memorandum" or "Def. Mem.") with these sentences. Like the rest of the Memorandum, they constitute a half-truth intended to mislead the Court.  As Cook well knows, the highly dangerous propensity of its Celect filter to tilt, perforate and fracture, an essentially indivisible failure mechanism, is one of the dangers of which it failed to warn Plaintiff Tonya Brand ("Ms. Brand") or her implanting doctor.  It is that propensity to bring on the cascade of those events that results from the filter's multiple design defects.

Indeed, James Carlson, a former Cook metallurgist testified that "…all three are related, the tilt and the wall penetration and the fracture. …. It's a related pattern." And, Brian Choules, the Cook director of bench testing, testified that, "So the fractures that I'm aware of have **always** been related to perforations." This is because perforation of the vena cava leads to tilt and further progression of the perforation, and it is the stress placed on the filter transmitted through the perforating leg or strut of the filter that causes the fracture.

Cook mischaracterizes Ms. Brand's case as just a "fracture" case so that the Court would hopefully be impressed by academic studies that purportedly show a low absolute rate of Celect filter fracture and a study purportedly showing the Celect had a lower fracture rate than the average of the other unspecified filters examined in the study. Def. Mem. at 1-2. This is a false comparison. The Celect was a modification of an earlier Cook filter, the Tulip. To hopefully increase retrievability, the primary modification was to remove "petals" on the Tulip which acted as perforation limiters. Both the Tulip and the Celect were available to Ms. Brand's surgeon when he implanted the Celect in her in 2009.

1

Crucially, as Cook's internal documents demonstrate, when the modifications to the Tulip, which became the Celect, were tested in 2004, the Celect fractured during stress tests that the Tulip passed, leading Arne Molgaard-Nielsen, Cook's Director of Research, to offer the opinion that the modification should be stopped for safety reasons if it could not be fixed to pass the tests. It was not fixed and the Tulip modification (the Celect) moved forward. And, after both the Tulip and Celect had been on the market for many years, those concerns proved to be well-founded. Cook's own reports in the years 2010 and 2016 showed the Celect had a perforation rate 18 times higher than the Tulip and a fracture rate six times higher. And, the Celect had a fracture rate 10.8 times higher than the Celect Platinum, which merely added primary leg extenders to the Celect to limit perforation, a design feature that could have and should have been included in the Celect when it was originally marketed.[1]

Ms. Brand bases her failure to warn claim, in part, on Cook's failure to warn of the Celect's significant danger of tilt, progressive perforation and fracture, and particularly to warn that its risk of this potentially deadly complication was much greater than the Tulip's risk. The Celect has never been proven to catch blood clots and Cook has performed no clinical trials that have proven it even works. Given the Celect had greater safety risks, and no proven efficacy, no physician, including Ms. Brand's doctor, Dr. Rheudasil, would have chosen the Celect over the Tulip had the truth about the Celect been told by Cook. He would have been aware of the obvious choice had

---

[1] Cook's true reason for its design change was to limit perforations. Its stated reason to the FDA and to the public for the change was so that the radio-opaque tip (the penetration limiter in actuality) could make the filter show up better on x-ray. Cook has since admitted this untruth and that the falsity was intended to get a new filter on the market to try and correct the Celect's perforation problem. At his deposition, Celect and Celect Platinum project leader Per Hendriksen was asked about the purpose of the Platinum "radiopaque marker":

Q. So the goal for the Celect Platinum was to deal with the reports of penetration in the Celect, is that correct?

A. As I said, I was asked if I could do something with the Celect to minimize the penetration. Ex. A to App.

2

Cook issued the appropriate warnings through the multiple appropriate channels of communication, because he did read the Instructions for Use ("IFU") for the Celect in which Cook was required to provide adequate warnings,  because it would have been reported in the academic literature (the OUS or Lyon study discussed below), and because it would have been communicated to him by Cook's sales representatives.

Ms. Brand primarily bases her design defect claims on the Celect's failure to include perforation limiters, whether in the form of petals like the predecessor Tulip or primary leg extenders like the successor Celect Platinum. Those are specific design features identified by Ms. Brand's experts which they opine would have prevented her fracture and resulting injuries. Critically, the issue in this case is not whether the Celect's design defects caused greater or lesser rates of fractures in its users than some unspecified group of filters caused in their users, but rather whether the Celect's design defects caused Ms. Brand's injuries, and Ms. Brand offers copious evidence of that. Further, one of Ms. Brand's experts offers the opinion that the Celect was defectively designed because the legs were not loops attached to the cap at two places so that a single fracture in a leg would not disconnect it from the filter and allow it to migrate through the body, an opinion Cook fails to address.

Finally, Ms. Brand demonstrates that the Food, Drug and Cosmetics Act does not preempt portions of her negligence per se cause of action and that genuine issues of material fact exist as to her claim for punitive damages under Georgia law.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

**I.  Genuine Issues of Material Fact Exist as to Ms. Brand's Strict Liability and Negligent Failure to Warn Claims in Counts 1 and 3 of the Complaint.**

**A. As to Whether Cook's Failure to Warn About the Celect Filter Proximately Caused Ms. Brand's Injuries.**

There is a dispute of fact as to whether Cook's failure to warn about the Celect filter proximately caused Ms. Brand's injuries that precludes summary judgment in favor of Cook. The facts supporting the dispute are described below in detail in Section II(A) of the Argument and Authorities and come from the following summary judgment evidence: Deposition of Mark Rheudasil, M.D. dated February 28, 2018 ("Rheudasil Dep.") at 24:23-25:19, 26:22-27:6, 54:1-12, 64:22-24, 66:9-67:12, 118:10-21, 122:2-5, 136:24-137:7, 147:24-148:4, 150:5-21, 152:6-23, 152:24-153:1, 153:5-20, 154:9-14, 154:20-155:7, 155:17-21, 156:2-11, 157:21-158:2, 158:3-14, 160:13-161:6, 162:21-163:3, 183:4-7, 184:16-13, 207:9-11, Ex. 1 to Appendix in Support of Plaintiff Brand's Brief in Support of Opposition to Motion for Summary Judgment (the "App."); The Efficacy and Safety of Celect IVC Filter Report for Cook IVC filter litigation dated April 2018 by Harlan M. Krumholz, M.D. ("Krumholz Rep.") at 165, Ex. A to Declaration of Harlan M. Krumholz, M.D. ("Krumholz Dec."), Ex. 2 to App; CookMDL2570_0412417, Ex. 3 to the App; CookMDL2570_0783696, Ex. 4 to the App.; CookMDL2570_0450320, Ex. 5 to the App.; CookMDL2570_0735199, Ex. 6 to the App.; CookMDL2570_0799754, Ex. 7 to the App.; CookMDL2570_0459834, Ex. 8 to the App.; CookMDL2570_0459835, Ex. 9 to the App.; CookMDL2570_0729943, Ex. 10 to the App.; CookMDL2570_0484885 at 12, Ex. 11 to the App.; Deposition of Tamara Clemmer dated June 15, 2017 ("Clemmer Dep.") at 173:1-15, 194:15-195:23, 269:13-19. 279:1-11, 279:1-20; Ex. 12 to App.

**B. As to Whether the Celect Filter's Warning Contained in the Celect Filter's Instructions for Use ("IFU") and Conveyed Through Sales Representatives Adequately Warned Physicians.**

There is a dispute of fact as to whether the warnings contained in the IFU and conveyed through Cook's sales representatives adequately warned physicians of the potential danger of the

4

Celect filter that precludes summary judgment in favor of Cook. The facts supporting the dispute are described below in detail in Section II(B) of the Argument and Authorities and come from the following summary judgment evidence: Deposition of Jesper Thyregod, dated June 1, 2016 ("Thyregod Dep.") at 314:10-315:14, Ex. 13 to App.; Deposition of Mark Rheudasil, M.D. dated February 28, 2018 ("Rheudasil Dep.") at 155:17-21, Ex. 1 to App.; Deposition of Tamara Clemmer dated June 15, 2018 ("Clemmer Dep.") at 279:1-20, 173:1-15, Ex. 12 to App.; Deposition of Gordon dated June 12, 2018 ("Gordon Dep.") 158:17-159:11, 164:12-17, 252:2-253:4, 253:6-16, 253: 17-254:4, 256:1-10, 332:4-10 at Ex.14 to App.; CookMDL2570_0799754, Ex. 7 to the App.; CookMDL2570_1276027, Ex. 15 to the App.; CookMDL2570_0064892, Ex. 16 to the App.; IVCF_003878, Ex.17 to the App.; IVCF_004157, Ex. 18 to the App.; CookMDL2570_0409795, Ex. 19 to the App; CookMDL2570_0459834, Ex. 08 to the App.; CookMDL2570_0459835, Ex. 9 to the App.; CookMDL2570_0484885 at 12, Ex. 11 to the App.; CookMDL2570_0402856, Ex. 20 to the App.; CookMDL2570_0416442, Ex. 21 to the App.; CookMDL2570_835306, Ex. 22 to the App.; Krumholz Rep. at 69, 119, 122, 165, 277, Ex. A to Declaration of Harlan M. Krumholz, M.D. ("Krumholz Dec."), Ex. 2 to App.; Gordan Rep. at 13-14, Ex. A to Declaration of Gordan ("Gordan Dec."), Ex. 23 to App.; CookMDL2570_0412417, Ex. 3 to the App.; CookMDL2570_0776519, Ex. 24 to the App.; CookMDL2570_0161696, Ex. 25 to the App.; CookMDL2570_0161684, Ex. 26 to the App.; CookMDL2570_0161707, Ex. 27 to the App.; CookMDL2570_0165984, Ex. 28 to the App.; CookMDL2570_0012328, Ex. 29 to the App.; CookMDL2570_0012350, Ex. 30 to the App.; CookMDL2570_0012362, Ex. 31 to the App.; CookMDL2570_0445420, Ex. 32 to the App.; CookMDL2570_0601063, Ex. 33 to the App.; CookMDL2570_0405122, Ex. 34 to the App.; CookMDL2570_0144641, Ex. 35 to the App.; CookMDL2570_0805597, Ex. 36 to the App.; CookMDL2570_0733001, Ex. 37 to the App;

Deposition of Harlan M. Krumholz, M.D. dated June 28, 2018 ("Krumholz Dep.") at 278:3-6, Ex. 38 to App.; Deposition of Gordan, dated June 12, 2018 ("Gordan Dep.") at 158:17-159:11, 253:17-25, Ex. 14 to App.; CookMDL2570_0601062, Ex. 39 to the App; CookMDL2570_0596478, Ex. 40 to the App.; CookMDL2570_0783696, Ex. 25 to the App.; CookMDL2570_0779775, Ex. 41 to the App.; CookMDL2570_0161684, Ex. 26 to the App.; Deposition of T. Roberts, dated May 20, 2016 ("T. Roberts Dep.") at 252:10-253:13, 254:20-255:7, 253:14-254:14, Ex. 42 to App.; CookMDL2570_0465794, Ex. 43 to the App.; CookMDL2570_0465797, Ex. 44 to the App.; CookMDL2570_0465798, Ex. 45 to the App.; CookMDL2570_1300899, Ex. 46 to the App.; CookMDL2570_0726286, Ex. 47 to the App.; CookMDL2570_0100590, Ex. 48 to the App.; FDA Guidance "Labeling: Regulatory Requirements for Medical Devices" (1989) at 4-5, Ex. 49 to App.; Deposition of Paul Timperman dated April 18, 2018 ("Timperman Dep.") at 438:10-13, 447:22-24, 448:3-8, Ex. 57 to App.; CookMDL250_0765319, Ex. 58 to App.; and Lyon Study, Ex. 59 to App.

## II. Genuine Issues of Material Fact Exist as to Ms. Brand's Strict-Liability and Negligent Design Defect Claims in Counts 2, 3 and 4 of the Complaint.

### A. As to the Existence of Design Defects in the Celect Filter.

There is a dispute of fact as to the existence of design defects in the Celect filter that precludes summary judgment in favor of Cook. The facts supporting the dispute are described below in detail in Section III(A) of the Argument and Authorities and come from the following summary judgment evidence: Mechanical analysis of Cook inferior vena cava filters, Report for Cook IVC filter litigation dated April 2018 by Robert M. McMeeking, ("McMeeking Rep.") at 1, 5-6, 29-51, 69-70 & 77-107, Exhibit ("Ex.") A to Declaration of Robert M. McMeeking, Ph.D. ("McMeeking Dec."), Ex. 50 to Appendix in Support of Plaintiff Brand's Brief in Support of Opposition to

Motion for Summary Judgment (the "App."); Rebuttal: S.W. Robertson, Ph.D., "Evaluation of Cook Medical Gunther Tulip and Celect IVC Filter Designs," dated June 6, 2018, prepared by Robert M. McMeeking and dated June 17, 2008 ("McMeeking Reb. Rep.") at 4., Ex. B to the McMeeking Dec., Ex. 50 to the App.; McMeeking Dec. ¶ 2, Ex. 50 to the App.; "Guidance for Cardiovascular Intravascular Filter 510(k) Submissions," issued by the FDA on November 26, 1999, Ex. C to the McMeeking Dec., Ex. 50 to the App.; Deposition of Expert Robert M. McMeeking, Ph.D. dated June 8, 2018 ("McMeeking Dep.") 18:25-21:15; 48:2-50:10; 51:16-52:5; 84:9-85:17; 89:8-20; 113:7-20: 147:21-149:12; 182:1-6; 276:13-278:3; 280:1-281:1; 282:24-283:6; 284:20-285:14, Ex. 51 to the App.; Expert Report on Efficacy and Safety of Celect Inferior Vena Cava (IVC) Filters by Harlan M. Krumholz, MD, SM, dated April 30, 2018 ("Krumholz Rep.") at 172, Ex. A to the Declaration of Harlan M. Krumholz, M.D., S.M. ("Krumholz Dec."), Ex. 2 to the App.; Expert Report of Gregory I. Gordon, M.D., dated April 30, 2018 ("Gordon Rep.") at 42-43, Ex. A to the Declaration of Gregory Gordon, M.D. ("Gordon Dec."), Ex. 23 to the App.

**B. As to Whether the Celect Filter's Design Defects Proximately Caused Ms. Brand's Celect Filter to Fracture and Her Resulting Injuries.**

There is a dispute of fact as to whether the Celect Filter's design defects proximately caused it to fracture in her body and injure her that precludes summary judgment in favor of Cook. The facts supporting the dispute are described below in detail in Section III(B)-(D) of the Argument and Authorities and come from the following summary judgment evidence: McMeeking Rep. at 1-6, 39-46, 50-51, 59, 68-70 & 76-77, Ex. A to McMeeking Dec., Ex. 50 to the App.; McMeeking Dep. 24:4-13; 25:2-26:12; 27:-6-12: 28:5-29: 29:24-25:1; 32:5-16: 33:24-35:5; 37:20-39:3; 87:12-18: 182:7-184:11; 224:10-225:2; 226:7-12; 227:22-228:2; 235:3-25. Ex. 51 to the App.; Krumholz

7

Rep. at 155-172, Ex. A to Krumholz De., Ex. 2 to the App; Gordon Reb Rep. At 12, 42-43, Ex. A to Gordon Dec., Ex.23 to the App.; Dr. Gordon Rebuttal to Engineering Report of Dr. Robertson dated June 11, 2018 ("Gordon Reb. Rep."), Ex. B to Gordon Dec., Ex. 23 to the App.; Deposition of James Carlson dated June 22, 2017 ("Carlson Dep.") 58:13-59:3; 68: 21-24; 79:4-80:10; 89:6-17: 155:8-17, Ex. 52 to the App.; Deposition of Brian Choules dated July 22, 2016 ("Choules Dep.") 116:2-23; 134:6-135:4; 138:11-20, Ex. 53 to the App.; CookMDL2570_0484855, Ex. 54 to the App.; CookMDL2570_1276605, Ex. 55 to the App.

### III. Summary Judgment on Ms. Brand's Negligence Per Se Cause of Action, Count IV of the Complaint, Presents Only a Question of Law

Ms. Brand does not state here genuine issues of material fact relating to her negligence per se cause of action and summarize the evidence establishing them because the basis for summary judgment argued by Cook is federal preemption which presents only a pure question of law.

### IV. Genuine Issues of Material Fact Exist as to Ms. Brand's Claim for Punitive Damages Set Forth in Count 5 of the Complaint

There is a dispute of fact as to whether Cook knew that the Celect filter tilted, perforated and fractured at rates significantly higher than the Tulip and other filters and did nothing to fix the problem or to warn about it.  All of the evidence summarized above and the facts discussed in detail below which support her failure-to-warn and design defect claims demonstrate the existence of such dispute.  In addition, the facts supporting the dispute are described below in detail in Section V of the Argument and Authorities and come from the following summary judgment evidence: McMeeking Rep. at 1 & 53-70, Ex. A to McMeeking Dec., Ex.50 to App.; Krumholz Rep. at 11-18, 23-26 & 127-143, Ex. A to Krumholz Dec., Ex. 2 to the App.

There is also a dispute of fact as to whether Cook misrepresented the safety of the Celect filters to doctors and patients. The facts supporting the dispute are described below in detail in

Section V of the Argument and Authorities and come from the following summary judgment evidence: Krumholz Rep. at 8-11 & 64-91, Ex. A to the Krumholz Dec., Ex. 2 to the App.

## ARGUMENT AND AUTHORITIES

I.     **The Appropriate Standard on Summary Judgment Requires this Court to View the Facts in the Light Most Favorable to Ms. Brand.**

Summary judgment is appropriate when no genuine issues of material fact exist and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In applying this standard, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, if a reasonable trier of fact could find in favor of the non-moving party, summary judgment is improper.  *Id.* at 248.

II.    **Genuine Issues of Material Fact Exist as to Ms. Brand's Strict Liability and Negligent Failure to Warn Claims in Counts 2 and 3 of the Complaint, Requiring Denial of Cook's Motion for Summary Judgement.**

The Supreme Court of Georgia in *Banks v. ICI Americas, Inc*. recognized that strict liability and negligence claims remain distinct and continue to have different, although sometimes only minimally different, elements. 264 Ga. 732 (1994).  To establish a negligent failure to warn claim under Georgia law, "the plaintiff must show the defendant had a duty to warn, the defendant breached that duty and the breach was the proximate cause of the plaintiff's injury." *Wheat v. Sofamor*, *S.N.C.*, 46 F. Supp. 2d 1351, 1362 (N.D. Ga. April 28, 1999) ("[A] manufacturer has a duty to warn of nonobvious foreseeable dangers from the normal use of its product*."*); *Thornton v. E.I Du Pont de Nemours & Co.,* 22 F.3d 284, 289 (11th Cir. 1994). The duty to warn arises "whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product." *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1994). Thus, the duty is a continuing

9

one and may arise "months, years, or even decades after the date of the first sale of the product." *Watkins v. Ford Motor Co.,* 190 F.3d 1213, 1218 (11th Cir. 1999).

The basis for strict products liability in Georgia is O.C.G.A. § 51–1–11. A manufacturer's failure to warn of the dangers in using a product may constitute a defect in the product for purposes of strict liability when the manufacturer "has reason to anticipate that danger may result from a particular use." *Center Chemical Co. v. Parzini*, 234 Ga. 868, 869–70 (1975) (*citing Wells v. Ortho Pharm. Corp.,* 615 F. Supp. 262, 296 (N.D. Ga. 1985), aff'd in part, modified in part and remanded sub nom. *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741 (11th Cir. 1986)).

Significantly, a manufacturer's duty to warn can arise well before it has marketed a product and received reports of adverse events, because, in Georgia, "'[t]he failure to use reasonable care in design or knowledge of a defective design gives rise to the reasonable duty on the manufacturer to warn of this condition." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1344 (5th Cir. 1978) (*quoting Larson v. General Motors Corp.*, 391 F.2d 495, 505 (8th Cir. 1968))

"Under the learned intermediary doctrine, the manufacturer of a . . . medical device does not have a duty to warn the patient of the dangers involved with the product, but instead has a duty to warn the patient's doctor, who acts as a learned intermediary between the patient and the manufacturer." *See* O.C.G.A. §51-1-11(c); *McCombs v. Synthes (U.S.A.)*, 277 Ga. 252, 253 (2003). "[U]nder the learned intermediary doctrine, the manufacturer's warnings to the physician must be adequate or reasonable under the circumstances of the case." *Id*

The duty is "breached by (1) failing to adequately communicate the warning to the ultimate user, or (2) failing to provide an adequate warning of the product's potential risks." *Watkins,* 190 F.3d at 1219 (quoting *Thornton*, 22 F.3d at 289). The plaintiff then must prove causation. For both strict liability and negligent failure to warn claims, this requires a showing that the failure to warn

10

proximately caused plaintiff's injuries; i.e., that the warning that should have been given would have addressed the cause of the plaintiff's injuries. *R&R Insultation Servs. Inc. v. Royal Indem. Co.,* 207 Ga. App 419, 705 (2010).

If a court determines that none of the three issues can be resolved as matter of law, then summary judgment for the manufacturer is inappropriate. *See Collins v. Newman Machine Company*, Inc., 190 Ga. App. 879, 883 (1989) (factual questions remained as to whether defendant manufacturer had reason to anticipate that danger might result from the use to which the product was put). In Georgia, the general rule is that the adequacy of a warning is an issue for the jury. *Thornton*, 22 F.3d at 289 (citing *Watson v. Uniden Corp. of America*, 775 F.2d 1514, 1516 (11th Cir. 1985)). "Whether adequate efforts were made to communicate a warning to the ultimate user and whether the warning if communicated was adequate are uniformly held questions for the jury." *Id.* Such matters generally are not susceptible to summary adjudication and should be resolved by a trial in the ordinary manner. *Collins*, 190 Ga. App. at 883.

### A. Ms. Brand offers evidence that Cook's inadequate warnings were the proximate cause of her injures under the applicable Georgia law standard.

#### 1. Dr. Rheudasil and the Medical Community were not aware of risks associated with the Celect Filter.

Cook argues that because Dr. Rheudasil had actual knowledge of general risks associated with IVC filters, its failure to warn of risks specific to Celect filters could not, as a matter of law, have proximately caused Ms. Brand's injuries.[2]

There is no dispute Dr. Rheudasil, along with most doctors implanting IVC filters, was aware that IVC filters, including the Celect filter he implanted in Ms. Brand, carried risks; nor is

---

[2] Cook, however, overlooks the critical fact that Dr. Rheudasil testified he was not aware of the Celect filter's risks outside of the general risks. *See* Rheudasil Dep. at 152:24-153:1, 153:5-20; 154:9-14; 154:20-155:7; 156:2-11; 157:21-158:2; 160:13-161:5; and 162:21-163-3.

there any dispute the Celect filter's IFU disclosed "vena cava perforation" and "filter embolization," as "potential adverse events." Def. Mem., Ex. N. However, Cook, like other filter manufacturers, downplayed these risks by characterizing them only them as "potential adverse events," such that this characterization may not constitute an adequate warning of risk, leaving a jury question. *See Cason v. C.R. Bard, Inc.*, 2015 WL 9913809, at *5 (N.D. Ga. Feb. 2, 2015); *Cisson v. C.R. Bard, Inc.,* No. 2:11-CV-00195, 2013 WL 5700513, at *6 (S.D.W. Va. Oct. 18, 2013), aff'd sub nom. *In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig*., 810 F.3d 913 (4th Cir. 2016). And, worse than other manufacturers (Bard and Argon) which include "fracture" in those "potential adverse events," the Celect IFU contains no mention of fracture as a risk and no warning at all about fracture. Further, the Celect IFU contains no warning of the interrelated risk of tilt, progressive perforation and fracture, or of a limited window of time in which the filter must be retrieved in order to avoid or reduce the risk of these dangers. Def. Mem., Ex. N. Nor did Cook inform physicians that the one study discussed in the IFU contained inaccurate and misleading data. *Id.* Nor did it disclose Cook created the Celect by removing the perforation limiters of the Tulip, a design change which caused the Celect to have a much higher rate of tilt, perforation and fracture than the Tulip. *Id*. Thus, genuine issues of material fact exist as to the inadequacy of Cook's "warning" and whether it proximately caused Ms. Brand's injuries.

Dr. Rheudasil's hospitals offered the Tulip and Celect filters for implantation at the time Ms. Brand received her filter: Northside offered Celect and St. Joseph's offered Tulip. Rheudasil Dep. at 150:18-21, 152:6-12, 153:5-20, Ex. 1 to App.[3] Dr. Rheudasil testified he looks at four criteria when selecting an IVC filter: deployment mechanism, retrievability, ability to catch a blood

---

[3] If the Tulip was not available for use at Northside, it is certain Dr. Rheudasil would not have used Celect had he known the true facts that Cook withheld from him. *Id.*

clot, and availability. Rheudasil Dep at 24:23-25:19, 26:22-27:6, Ex. 1 to App. When Dr. Rheudasil chose the Celect for Ms. Brand, however, two of his four criteria, retrievability and ability to catch a clot, had been compromised when Cook modified the Tulip to become the Celect filter. *Id*. CookMDL2570_0783696, Ex. 4 to App. Even more important, when Dr. Rheudasil chose the Celect for Ms. Brand, he was not aware the Tulip was a safer filter, because the risk of perforation and fracture was significantly higher for the Celect than the Tulip. Rheudasil Dep. at 152:6-23, Ex. 1 to App. Based on Cook's representations, Dr. Rheudasil wrongly assumed the Celect had the same safety profile as the Tulip and thus the two were "equivalent". *Id*. 152:24-153:1, 153:5-20; 154:9-14; 154:20-155:7; 156:2-11; 157:21-158:2; 160:13-161:5; 162:21-163-3, Ex. 1 to App.

> Q. Dr. Rheudasil, at the time that you chose Mrs. Brand's filter in 2009, what risks were you aware of with vena cava filters or complications?
>
> A. So, again, acutely, the access-related potential complications, deployment-related complications associated with malposition or misfiring or tilting. And then long-term, the risks, I believe most often are slightly increased risk of DVT, cava thrombosis. And then what I consider to be a ***rare* risk of fracture or perforation**, at that time.[4]
>
> *** *** ***
>
> Q. Were you ever informed by Cook that either one of them [Tulip and Celect] was a safer filter?
>
> A. **No**.
>
> Q. Were you ever informed by Cook that one of them had safety features that the other one didn't?
>
> A. **Not that I recall.**
>
> Q. I mean, the mere fact that you placed both the Cook and the Cook Celect and the Gunther Tulip in patients, does that tell you anything about your thoughts as to which one was safer or they were both equally safe? What was your assumption?

---

[4] Rheudasil Dep. at 152:24-153:1, Ex. 1 to App.

A. **My assumption is that we considered them equivalent.**

\*\*\*

Q: Let me ask you this: Hypothetically, if -- just hypothetically, if -- let's -- let's take the Celect filter, again, hypothetically. If there was clear evidence, by the existing available data, at the time you put in that filter, that the safety risks could not justify the placement of a Celect filter, and that the company knew that, okay, what would that do to your risk/benefit analysis when discussing it with the patient?[5]

A. I mean, as you put that question, **I wouldn't even discuss that with the patient. We wouldn't choose that filter**.[6]
\*\*\*
Q. All right. And then with respect to material risks and the discussion that you had with patients, and specifically, in this case, Mrs. Brand, would you have brought those material risks to her attention?

A. Again, if I -- **if we thought a device was not safe, no, I wouldn't have discussed it with Mrs. Brand. We wouldn't have used that filter,** so there would have been no discussion. [7]
\*\*\*
Q. Okay. If you had been made aware by Cook of any material differences in safety between the Celect and the Tulip, would you have disclosed those differences to your patient, Tonya Brand?

A. **No, I would have just used the safer filter**.[8]

\*\*\*

Q. Okay. And if you determined that there were unreported complications, then, would that go into your risk/benefit analysis even to use the filter?

A. **Yes**.

Q. And more likely than not, would you use a filter that had that issue?

A. **No**. [9]

---

[5] In a February 2006 Executive Summary, Cook concluded that "a thorough literature review and a risk analysis of the design of the Cook Celect filter have been prepared by WCE. The risk analysis and the clinical evaluation have identified some safety concerns associated with the new design of the Filter. And further, "to date it has not been possible to find any clear evidence of the existing available data that could clarify and justify the safety risks identified." Ex. 61 to App.

[6] *Id.* at 154:20-155:7, Ex. 1 to App.

[7] *Id.* 156:2-11, Ex. 1 to App.

[8] *Id.* 157:21-158:2, Ex. 1 to App.

[9] *Id.* 162:21-163:2, Ex. 1 to App.

\*\*\*\*\*

Q. And would you expect a manufacturer of medical devices to disclose to you known risks associated with their product?

A. **Yes**.[10]

From this testimony, it is clear Dr. Rheudasil was only aware of the potential deployment issues and general risks that pertain to all IVC filters. He was not aware of what Cook's internal documents make clear: Cook knew its filters had a significant propensity to tilt, perforate, and fracture, and that injuries associated with Celect are indeed *not rare* as understood by Dr. Rheudasil (Rheudasil Dep. 152:24-153:1) and argued in Cook's Memorandum at 1 and 11. In fact, 83% of Celect filters perforate (suggesting the Celect had a 17.5 higher perforation rate than the Tulip) and the Celect had a fracture rate 6 times higher than the Tulip. *See* CookMDL2570_0799754, 0459834, 0459835, 1276605 at page 28, Exs. 7, 8, 9 and 55 to App.[11]

Cook relies on the below bullet point list from the Celect IFU to support its argument that "the Celect IFU warned Dr. Rheudasil of the risks of all of the complications that Ms. Brand actually experienced with her filter":

POTENTIAL ADVERSE EVENTS
- Damage to the vena cava
- Pulmonary embolism
- Filter embolization[12]
- Vena cava perforation
- Vena cava occlusion or thrombosis
- Hemorrhage

---

[10] *Id.* at 183:4-7, Ex.1 to App.

[11] As addressed in Section B, Georgia courts have found there are genuine issues of material fact as to failure to warn claims and, specifically, as to the adequacy of warnings where the manufacturer has not disclosed that complications are not rare, that a product has a "greater propensity" to cause injury than similar products, and that the product is "associated with more severe complications" then other similar products. *In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.,* 711 F. Supp. 2d 1348, 1378 (M.D. Ga. April 22, 2010) (citing *Watkins,* 190 F.3d at 1220).

[12] Defendants falsely state that "Plaintiff's experts do not dispute" that embolization means fracture. Embolization does not equate to fracture. Embolization is movement, and its reference to "filter embolization" thus warns of movement of the entire filter. If Cook intended for this "potential adverse event" to include fracture of the filter and movement of pieces of the legs after fracture, Cook had a duty to adequately describe it for doctors to understand. *See* Krumholz Rep. at 165, Ex.A Krumholz Dec.

- Hematoma at vascular access site
- Infection at vascular access site
- Death[13]

Def. Mem. at 17-18. Instead these "warnings" demonstrate the converse; that Cook did not comply with Georgia law because it failed to advise Dr. Rheudasil and the medical community (prescribing physicians) "of *any potential dangers* that may result from" the device's use." *Singleton v. Airco, Inc.,* 169 Ga. App. 662, 664, (1984).

Specifically, and as noted above, these "warnings" do not warn of (1) the risk of tilt, progressive perforation,[14] and fracture, (2) the material safety differences between the Tulip and Celect due to the deletion from the Celect of the Tulip's perforation limiters and the resulting increased risk of complications from the Celect, (3) the limited retrieval window for Celect, (4) the filter could not be retrieved through the method in the instructions to physicians, (5) that the Celect should not be used for long-term or permanent use and that the Tulip was necessary for long-term use, and (6) that the potential benefit of the Celect does not justify sale or use of the Celect filter. Those are risks any doctors would want to know when making a risk/benefit analysis prior to deciding which filter to implant and risks that Dr. Rheudasil said would cause him not to use the Celect. Those risks were all well known to Cook and were withheld from physicians. Nothing about Cook's "warnings" conveys the detailed and numerous complaints other practitioners had made in connection with their patients experiencing extreme consequences resulting from the Celect's defects or their inability to retrieve the Celect without the additional risk and danger of an open surgical procedure - all well known to Cook before Ms. Brand's filter was implanted. CookMDL2570_1276027, CookMDL2570_0064892, IVCF 003878 at 4070,

---

[13] Def. Mem., Ex. N.

[14] It is key to note that Cook did not inform Dr. Rheudasil in the Celect IFU that perforation leads to fractures or even that there was any risk of fracture. *See* Def. Mem., Ex. N

Exs. 15, 16 and 17 to App.

Cook's citations to pharmaceutical drug label cases, *Sofamor,* 46 F. Supp. 2d at 1363, *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812 (11th Cir. 2010), and *Brown v. Roche Labs, Inc.,* 2013 WL 2457950, at *8 (N.D. Ga. June 6, 2013), are unavailing.  In these cases, the courts found that the doctors were aware of the very warning the plaintiffs contended should have been given.[15] That is simply not the case here, as Ms. Brand has established Dr. Rheudasil was not aware of the warnings she contends he should have been given.  Further, and contrary to Cook's argument, the facts in *Hill v. Cook Medical, Inc.*, are dissimilar to the issues before this Court. Unlike Dr. Zuzga, Dr. Rheudasil testified he believed the risk of fracture and perforation in all filters to be "rare" at the time Ms. Brand's filter was implanted and that if he had known that there were material differences in the risks of the Celect and Tulip, he would not have used the Celect. Rheudasil Dep. 157:21-158;2, Ex. 1 to App.

In conclusion, Cook withheld critical risk/benefit information that was not readily available to Dr. Rheudasil or the medical community. This very information would have been important to Dr. Rheudasil in making a risk/benefit choice about whether or not to use the device and/or in providing informed consent to Ms. Brand. Rheudasil Dep. at 64:22-24, 150:5-17, 154:20-155:6, Ex. 1 to App. When Dr. Rheudasil placed the IVC filter in Ms. Brand, he was not aware of the risks unique to Celect filters outside the general risks for all filters, and he certainly did not know, believe,

---

[15] In *Sofamor*, doctors and patient were both aware of the critical fact that "only the patient should activate the PCA" the plaintiff offered no alternative language or additions for the warning, instead pointing only to an updated, new label that was available after the doctor prescribed the drug to his patient. *Sofamor,* 46 F. Supp. 2d at. 363. Critically, the doctor testified the revised label would not have changed his behavior. *Id.* In *Roche Labs, Inc.*, the plaintiff did not offer an expert testimony to opine as to the inadequacies of the warning, and the doctor would have taken the same course of action even if warned. *Roche Labs,* 2013 WL 2457950 at *8. In contrast, Ms. Brand has offered appropriate expert testimony outlining the inadequacies in Cook's warnings and identified what additional risks should have been included in the warnings along with supportive testimony that if Dr. Rheudasil had been provided with information that the Celect was not as safe as the Tulip, including in relation to perforation and fracture rates, he would not have used the Celect. *See* Gordon Rep. at 13-14, 42-43 Ex.23 to App; *see also* Krumholz Rep. at 165, Ex.2 to App; Rheudasil Dep. at 154:20-155:7, 156:2-11, and 157:21-158:2, Ex. 1 to App.

understand, anticipate or expect the Celect filter would tilt, perforate, and that three struts would fracture and then migrate to other areas of her body, including that a strut would protrude and exit from her thigh. *Id.* at 183:4-7; 184:16-13, Ex. 1 to App. Contrary to Cook's assertion, Ms. Brand has established that a genuine issue of material fact exists as to whether Dr. Rheudasil's lack of awareness of risks specifically related to the Celect filter was the proximate cause of Ms. Brand's injuries.

### 2.  Dr. Rheudasil read the Celect Filter IFU.

Somewhat strangely, Cook attempts to mislead the Court into believing that Ms. Brand cannot establish a genuine issue of material fact as to whether Dr. Rheudasil read the IFU. Strangely because the deposition of Dr. Rheudasil tells a completely different story.  Failing to cite all of the applicable evidence, Cook cherry-picks Dr. Rheudasil's testimony for statements favorable to its position, leaving out clear statements by Dr. Rheudasil that show he did read the Celect IFU *See* Def. Mem. at 13. The Court must consider the totality of the testimony during which the statements were made. *Smith v. State*, 808 S.E.2d 692, 696 (2017). In context, Dr. Rheudasil's testimony raises a genuine issue of material fact as to whether he read the Celect IFU and as to whether his resulting awareness of the increased risks and dangers related to the Celect from reading an IFU containing adequate warnings would have caused him to "choose a different filter." Rheudasil Dep. at 154:20-155:7; 156:2-11, Ex. 1 to App.

In glaring contrast to the suggestion that Dr. Rheudasil did not read the Celect IFU, Dr. Rheudasil actually testified that it is his usual practice to read IFUs before implanting medical devices and that he has no reason to believe that he did not read the Celect IFU sometime before implanting Ms. Brand's Celect filter: [16]

---

[16] Q. Before Mrs. Brand's procedure, had you reviewed the Celect instructions for use? Do you have a memory of that?

Q. Now, you had indicated that it was your usual practice that, before you ever put in an IVC filter or medical device, that you would read the instructions for that device. **And do you have any reason to believe that you didn't read, at some point before you put the filter into your patient, Mrs. Brand's, body, is there any reason to believe that you didn't or wouldn't have, indeed, read the instructions**?

A. **No**.[17]

***

Q. **When you read these instructions for the first time, and that would have been some time period before placed in Mrs. Brand**, correct?

A. **Right**[18]

***

Q. **When you looked at those instructions for use, prior to ever putting in Tonya Brand's Celect filter**, did you expect that the Cook company would be truthful to you in its instructions?

A. **Yes.**[19]

  Prior to Ms. Brand's filter implant procedure, Dr. Rheudasil had implanted 20 or more Celect filters in other patients, and like most implanting doctors, Dr. Rheudasil does not re-read the IFU each time before he implants a Celect filter. *Id.* at 54:1-12, Ex. 1 to App. Ms. Brand has established through Dr. Rheudasil's testimony that at some time before Ms. Brand's implant, he read the Celect IFU. She has certainly raised a genuine issue of material fact to be decided by the jury.

  The cases Cook cites in support are distinguishable. Unlike Dr. Rheudasil, the doctors in

---

A. I don't have a memory of it. I – **I typically read IFUs when I put something in for the first time,** but I don't -- I don't, specifically, recall the Celect IFU.
Q. As you sit here today, do you know whether you read the Celect IFU prior to placing Mrs. Brand's filter?
 A. I don't -- I don't know. Id. at 66:9-67:12, Ex.1 to App.
***
Q. Does the fact that you don't remember that mean you didn't do it?
A. **No.**
Rheudasil Dep. at 207:9-11, Ex.1 to App.

[17] *Id.* at 118:10-21, Ex.1 to App.

[18] *Id.* at 122:2-5, Ex.1 to App.

[19] *Id.* at 147:24-148:4, Ex. 1 to App.

these cases had definitely not read or relied on the operative documents at issue.[20] The defendants in *In Re Bard IVC Filters Products Liab. Litig*., similar to Cook, argued that the implanter doctor's testimony about what he may or may not have done was conjecture insufficient to establish causation as a matter of law. 2017 WL 5625548, at *7 (D. Ariz. Nov. 22, 2017).[21] The MDL court, applying Georgia law, reasoned that "although it is true that Dr. D'Ayala (implanter) also made more equivocal statements during his deposition, Plaintiff must prove her case by a preponderance of the evidence, not with absolute certainty." Construing Dr. D'Ayala's testimony in the plaintiff's favor, as required at the summary judgment stage, the MDL court concluded it created a question of fact on the issue of causation. *Id.*

Dr. Rheudasil's familiarity with the IFU is only one aspect of the warnings claim. Ms. Brand's failure to warn claim is not limited to the contents of the IFU, as Cook interacts with doctors routinely through sales representatives, and it has admitted it had the ability to send a "Dear Doctor" letter, or to recall the product, at any time. Thyregod Dep.at 314:10-315:14, Ex. 13 to App. At the time of Ms. Brand's implant, no Cook sales representative ever expressed a concern to Dr. Rheudasil about the safety or effectiveness of the Celect filter—important information that might have informed his choice of whether to implant a Celect filter. Rheudasil Dep. at 155:17-

---

[20] Only two cases Defendants cite relate to the medical industry and they regard pharmaceutical labels which are read by *both* doctors and patients. It is well-known that pharmaceutical labels are vastly different from medical device information inserts in states where the learned intermediary doctrine applies. All cases Cook cited for support are distinguishable from the facts before the Court. In *Silverstein*, whether instructions on the tooth paste box were read was undisputed. *Silverstein v. Procter & Gamble Mfg. Co.*,700 F. Supp. 2d 1312, 1321 (S.D. Ga. 2009). In *Powell*, the individual never received the installation instructions for a catwalk. *Powell v. Harsco Corp.*, 209 Ga. App. 348, 350, 433 S.E.2d 608, 610(1993). In *Ingram*, the doctor testified he never read the drug label because he was aware of all risks and believed the benefits outweighed the risks. *Ingram v. Mylan Pharm., Inc.,* No. 1:08-CV-0574-WSD, 2009 WL 10665022, at *5 (N.D. Ga. Nov. 12, 2009). In *Singleton*, the court extended learned intermediary to nurses and the Plaintiff's expert agreed warning was adequate. *Singleton*, 169 Ga. App. at 664. Finally, *Reyes* is pharmaceutical case that applies Texas law. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir.1974).

[21] Under Georgia law, summary judgment is warranted on the issue of causation where the physician testifies unequivocally that he would have made the same decision despite the proposed warning. *See Dietz,* 598 F.3d at 816. Here, there is direct evidence Dr. Rheudasil read the IFU and that awareness of the increased risks and dangers related to the Celect would have caused him to "choose a different filter." Rheudasil Dep. at 154:20-155:7; 156:2-11, Ex.1 to App.

21, 158:3-14 Ex. 1 to App. Further, the OUS study results that were included in the Celect IFU read by and available to Dr. Rheudasil before he implanted Mrs. Brand's Celect filter were misleading and plain wrong[22].  If Cook had truthfully reported the results of the OUS Study showing the dangers of the Celect in the IFU, Dr. Rheudasil would not have used the Celect, as set forth above.

In summary, construing Dr. Rheudasil's testimony in Ms. Brand's favor along with the other evidence Ms. Brand offers, a genuine issue of material fact exists as to whether Cook's failure to provide warnings through its IFU, sales representatives, a "Dear Doctor" letter and the OUS/ study results referenced in the Celect IFU were the proximate cause of Ms. Brand's injures. Ms. Brand thus provides evidence sufficient to create a genuine issue of material fact as to proximate cause in connection with her failure to warn claims.

### B.   Ms. Brand offers evidence that Cook breached its duty to adequately warn physicians through its IFU and sales representatives of the potential risks and dangers associated the Celect Filter.

Whether Cook's warnings were adequate is a question of breach. *Cisson v. C.R. Bard, Inc.,* 2013 WL 5700513, at *7. Cook contends that it is entitled to summary judgment because its generic warnings were "adequate" as a matter of law and creates its own standards of Georgia law in support of its contention. First, it claims that not only must Ms. Brand's experts offer the exact wording of proposed warnings, but they must have tested them, in order to create a genuine issue of material fact as to failure to warn. *See* Def. Mem. at 18 (*citing Nolley v. Greenlee Textiron,Inc.*

---

[22] The OUS study included in the IFU available to and read by Dr. Rheudasil became the Lyon article published in 2009 in the Journal of Vascular and Interventional Radiology after the Brand filter was implanted on March 19, 2019. Ms. Brand's Celect filter fracture apparently did not fracture until 2010. Krumholz Rep. at 159.  Cook's duty to warn under Georgia law was a continuous one.  So, if the Lyon article had not been falsified, Dr. Rheudasil might have learned of the Celect's risks in that manner and retrieved the filter before its fracture.

2007 WL 5369405, at *3, 7 (N.D. Ga. Dec. 6, 2007)). Defendants misunderstand *Nolley v. Greenle Textron, Inc*. [23] That case simply does not imply or even address whether experts are required to provide specifically worded alternative warnings as Cook claims. [24] Rather, because the plaintiff had not even generally explained what warnings were missing from the IFU (what alternative warnings should have been given), the court held that there was no way for the jury to assess the adequacy. *Nolley*, 2007 WL 5369405 at *7. Ms. Brand cannot find any case in Georgia that imposes the alleged requirement that the plaintiff must provide specifically worded alternative warnings. [25]

Second, Cook argues that under Georgia law it had no duty to warn doctors that the Celect experienced significantly greater rates of complications (especially perforations and fractures) than the Tulip, despite the fact that three ***IVC filter*** cases, all applying Georgia law, determined "it is for the jury to decide whether medical device manufacturer adequately warned doctor about rates and severity of complications." [26] *Cason v. C.R. Bard, Inc.*, 2015 WL 9913809, at *6;  *see also In re Bard IVC Filters.*, 2017 WL 5625548, at *3; *In re Bard IVC Filters Products Liab. Litig.*, 2018

---

[23] The *Nolley* Court's ruling was based on a *Daubert* motion, not a motion for summary judgement. The court found the expert's "opinions were unreliable because they were not rooted in any scientific testing or methodology, as he performed no tests and offered explanations for his opinions. *Nolley v. Greenlee Textiron,Inc*. 2007 WL 5369405, at *3, 7 (N.D. Ga. Dec. 6, 2007).

[24] In re *Bard IVC Filter*, the court addressed the application of *Nolley*. In the *Booker* case, the defendants made a similar argument to Cook's here, and the court found the defendants' reliance on *Nolley* was misplaced. "The district court in that case [*Nolley*] concluded that without expert testimony as to what alternative warnings should have been given, the jury would "have no means by which to adjudge whether the existing warnings were adequate. That is not the situation in this case. Based in part on the testimony of Drs. Hurst and Muehrcke, the jury was equipped to determine whether the warnings given by Bard were adequate**.**". 2018 WL 3037161, at *3 (D. Ariz. June 19, 2018.). Likewise, jurors in Ms. Brand's case will have the testimony of Drs. Krumholz and Gordon to assess what additional information should have been included in the Celect IFU or otherwise provided to physicians and, thus, whether it was adequate without that additional information.

[25] In addition to *Nolley*, Cook cites cases outside this jurisdiction, a Florida case and Seventh and Eighth Circuit cases, to infer Ms. Brand has not met a Georgia law requirement that it concocted.

[26] Cook discusses these issues in two sections of its Memorandum, I(B)(4) and I(B)(3). Ms. Brand addresses both arguments together here.

WL 1256768, at *6 (D. Ariz. Mar. 3, 2018).[27]

As noted above, Georgia law makes the duty to communicate an adequate warning an ongoing duty that can continue long past the date of a product's sale. *Watkins*, 190 F.3d at 1218. That duty is highly significant in this case because there is a substantial period of time after the Celect filter was implanted in Ms. Brand on March 19, 2009, during which the filter might have been retrieved before it fractured and pieces of the broken legs migrated to other parts of her body. Specifically, the first time any of Ms. Brand's many CT scans and MRIs showed a fracture of the filter was in March 20, 2010. Krumholz Rep. at 159-161, Ex. A to Krumholz Dec., Ex. 2 to App. Those fractures were not seen or recognized until June 23, 2011, after the filter piece had exited Ms. Brand's thigh in 2011 and physicians began to review those films. Id. at 156. The first time a scan showed that a piece of filter leg had migrated out of the immediate vicinity was March 3, 2011. *Id.* 159-161. And, again, this movement was not recognized until years after that. *Id.* And, in June and July of 2011, the piece of a second leg still remained immediately outside the vena cava. *Id.*

Because Cook was required to warn doctors of the knowledge it gained from March 19, 2009, through at least July 2011, the danger and propensity of Cook filters to cause the very injuries Ms. Brand experienced during this time period is highly relevant to Ms. Brand's failure to warn claims. If Ms. Brand's doctors had known of these risks, they potentially could have removed the filter before it fractured and pieces migrated throughout Ms. Brand's body.

And, the significance of Cook's ongoing duty to warn continues even after mid-2011. After a standard attempt by Dr. Rheudasil to retrieve the filter on July 14, 2014 failed, he made the decision to monitor the situation rather than use an open procedure to retrieve it, which he

---

[27] The first two bellwether cases in the *In re Bard IVC Filters Products Liab. Litig* applied Georgia law.

23

eventually performed on October 22, 2015, after realizing the entire filter was coming apart and that further migration of filter pieces through Ms. Brand's body was taking place. *Id.* at 155-157. If Cook had warned of the danger of progressive perforation, fracture and migration between July 2011 and October 2015, Ms. Brand's filter could have been removed preventing further fracture and migration and the resulting pain and suffering of Ms. Brand.  Consequently, everything learned by Cook from July 2011 through October 2015 that should have caused it to warn is relevant to Ms. Brand's failure to warn claims.

As such, Cook had "reason to anticipate that <u>danger may result</u> from a particular use" of the Celect and failed "to <u>communicate the warning</u>" or "provide an adequate warning of the <u>product's potential risks</u>" to Dr. Rheudasil and the medical community, which is all that Georgia law requires.[28] In sections 1-5 *infra*, Ms. Brand provides sufficient evidence that genuine issues of material fact exist as to the adequacy of Cook's warnings and its ongoing duty to warn.

**1. Cook did not adequately warn doctors about the Celect's risk of tilt, perforation and fracture, which are partially the result of the removal of the petals serving as perforation limiters found on its predecessor, the Tulip.**

Ms. Brand's filter tilted and progressively perforated the vena cava, which resulted in the fracture of two of the legs of the filter protruding outside the vena cava and pieces of the legs traveling to and embolizing to her thigh and various places in her body. In the IFU, Cook did not warn about the risks of events experienced by Ms. Brand despite its knowledge of these risks, rendering the IFU inadequate. Further, Cook did not warn to doctors it removed the petal design on the predecessor Tulip filter, which served as perforation limiters, from the Celect filter. This failure to communicate a potential known risk and danger also renders Cook's warnings

---

[28] *Center Chemical Co.,* 218 S.E.2d at 580(citing *Wells*, 788 F.2d at 741) (emphasis added); *see also Watkins,* 190 F.3d at 1219 (quoting *Thornton*, 22 F.3d at 289) (emphasis added).

inadequate.

In 2002, Dr. Jörg Neuerburg of the University of Aachen emailed WCE's Director of Research Arne Mølgaard-Nielsen with the concept that would become the perforating, tilting, and fracture-prone Celect filter: "I think, we should consider a modification of the Tulip filter to prolong the interval of safe filter retrieval. Do we need the Tulip leafs?"  Mr. Mølgaard responded: "I will raise your request as a New product application. I do have my doubts, as one of the major issue of the 'leaves' was to avoid perforation/penetration at each breathing or collapse of the cava."[29] CookMDL2570_0783696, Ex. 4 to App. Rolf Guenther, the inventor of the Tulip filter, told Cook's WCE Director of Research Arne Mølgaard-Nielsen in 2008, long before Ms. Brand's filter was placed, "as discussed, there should be something done with the [Celect's] anchoring legs [to prevent perforation]." CookMDL2570_0779775, Ex. 41 to App.

Ms. Brand's expert, Dr. Gordon agrees with Dr. Guenther and testified:

> Q. Is it your opinion, Dr. Gordon, that Cook should have warned that the lack of a perforation limiter increases the risk of perforation, tilt and fracture?
> A. Yes.[30]

Cook never took Dr. Guenther's advice and proceeded to the market in a race to be one of the first manufacturers with a retrievable filter.

Indeed, Cook took the Celect to market despite Cook's clinical research department concluding in February, 2006, that the safety risks of the Celect were not justified.  In other words, 14 months before the Celect ever went to market, Cook had concluded that its safety risks did not justify its use.  Here is its conclusion, outlined in its executive summary:

---

[29] Ms. Brand has not corrected or noted grammatical or spelling errors of Cook's Danish officers.
[30] Gordon Dep. at 158:17-159:11, Ex. 14 to App.

**Conclusion**

The risk analysis and the clinical evaluation have identified some safety concerns associated with the new design of the filter. The literature has been reviewed extensively, and discussions have been going on for the past 3 years. ***However, to date it has not been possible to find any clear evidence of the existing available data that could clarify and justify the safety risks identified.*** If you can provide some new evidence or inputs which can clarify these safety concerns, we would be happy to take these inputs into considerations. (*Emphasis added*)

Rikke A. Sørensen & Line Hedegaard Larsen Clinical Research Department, WCE, February 9, 2006

Also before clearance of the Celect, in 2007, a Zaragoza University sheep study found 83% of Celect filters tilted and perforated. CookMDL2570_0799754; CookMDL2570_1276027, Exs. 7 and 15 to App.  When the FDA asked on April 10, 2007, whether perforations had occurred in the OUS study, not only did Cook falsely answer in the negative regarding the OUS study, it did not volunteer the relevant results of the Zaragoza study. CookMDL2570_0064892; IVCF 003878 at 4070, Exs. 16 and 17 to App. The FDA cleared the Celect as a permanent device ten days later on April 20, 2007. IVCF_004157, Ex. 18 to App.

In 2007. Cook was made aware of the risk of progressive perforation and the problem with the design of the Celect (Tulip leaves removed, allowing for unlimited perforation) by Dr. Sadaf whose patient experienced a perforation of a Celect strut into his pancreas. Ex. B to App.  Cook sent its Celect Marketing chief Bruce Fleck to meet with Dr. Sadaf and Fleck reported back to Cook about his trip.  Ex. C to App.  Cook then conducted a brainstorming session that same year to try and figure out ways to design out the perforation problem. Ex. D to App.  This all occurred before the Celect had ever been given the go ahead for marketing as a retrievable filter.  Cook had the tools at this time to know that its design was a failure, just as it had in earlier years when Nielsen had suggested stopping the Celect project and had warned about the progressive and

26

unyielding perforation problem as early as 2002. CookMDL250_0765319, Ex. 58 to App. And, crucially, Cook had all this knowledge and failed to warn about it well before Dr. Rheudasil decided to and did implant the Celect filter in Ms. Brand on March 19, 2009.

By October 2009, Cook had received an inquiry from Australia's Therapeutic Goods Administration (the Australian regency that regulates medical devices, similar to the FDA) requesting information on perforation/penetration complaints. CookMDL2570_0409795, Ex. 19 to App. At that time, Cook performed an internal investigation and concluded that the Celect's rate of perforation complaints was 15-17 times higher than the rate of the Tulip, and that this difference was statistically significant. CookMDL2570_0459834; CookMDL2570_0459835, Exs. 8 and 9 to App. Had Cook warned at that time, Ms. Brand could have had the filter removed before it fractured in approximately March 2010.

Cook's awareness of the Celect's risks, especially as compared to alternative designs, became undeniable in 2009-2010 as a result of a comparison evaluation (May 2010) of its current design with two alternative designs capable of reducing penetration/perforation (Option 2 and Option 3). In its "Pro" section for continuing to use the Celect without design changes, Cook rationalized only that "more than 50,000 filter have been sold. Some physicians are used to using Celect filters." In the "Con" section, Cook stated "penetration rate is 18 times of Tulip. The filter could continuously tilt and/or penetrate IVC wall, even cause some serious complaints." CookMDL2570_0484885 at 12, Ex. 11 to App.[31] Had Cook warned at that time, Ms. Brand's filter and the broken leg pieces could have been removed, which would have preventing them from migrating to her thigh and other places in her body.

---

[31] Further, the conclusion stated, "the animal and bench testing showed that "Option 2" hinders penetration and "Option 3" stops penetration after anchoring hook has penetrated the cava" and "stops the tilting process." *Id*. at 1 and 12.

The significance of Cook's knowledge about excessive perforation rates is that Cook knew that perforations cause fractures. Indeed, an email from a Cook employee, Tony Yoder, regarding 38 reports of fractures describes the exact scenario Ms. Brand experienced. "They start as penetrations which leads to fx (fracture), so not all are fracture yet. The obvious problem, besides penetration leading to fracture, is that penetrations cause structures adjacent to become involved, i.e. puncture the aorta, muscle, etc. As additional information, one case involved a fracture leg found by the patient as it protruded through the patient's groin."[32] Another case involved secondary legs (2) one each had fractured and were found on the chest x-ray in the patients right and left pulmonary arteries."  CookMDL2570_0412417, Ex. 3 to App.

WCE Director of Research Arne Mølgaard-Nielsen described perforation as a progressive sequence involving tilt and caudal migration that could lead to embedded filters and fracture. CookMDL2570_0601063, Ex. 33 to App. Mølgaard included a graphic representation that depicts precisely the sequence of events Ms. Brand experienced before her filter fractured, including perforation and then tilt:



Molgaard explained that "[p]erforations have been associated with caudal migration, tilting, and arm or leg extension and fracture . . . with perforation and tilting, fracture is intuitively more likely to occur."  *Id.*   In 2011, Brian Choules, Director of Non-Clinical (Bench) Testing,

---

[32] Similar to Ms. Brand's case.

created a PowerPoint describing the <u>known relationship between perforation and fracture</u>. CookMDL2570_0405122, Ex. 34 to App. Defense expert, Paul Timperman, M.D. even testified, "<u>filter fractures do not occur unless there is a perforation in the vast majority of the time…the fracture and perforation, at least in one of the fractures in this patient, are inextricably linked.</u>" Timperman Dep. at 438:10-13, 447:22-24, 448:3-8, Ex. 57. to App.

Under Georgia law, Cook had a continuing duty to warn[33] and the suggestions from Cook's Jen Brown, Director of Regulatory Affairs, to update the IFU to add in "filter fracture,[34]" "filter embolization (including embolization of fracture filter components), and penetration or perforation of the vena cava or nearby structure" to the list of "Potential Adverse Events," are particularly relevant, as those are the exact injuries Ms. Brand experienced[35]. Under "Precautions," she suggested adding the following statement: "<u>filter fracture is a known complication of vena cava filters. In some instances, retrieval of filters or filter fragments using endovascular and/or surgical techniques has been reported.</u>" CookMDL2570_0402856, Ex. 20 to App. (emphasize added). Cook never added this warning to the Celect IFU, never provided a "Dear Doctor" letter to warn doctors of these injuries, and never instructed sales representatives to educate doctors on these known dangers despite mounting evidence.

Further, Thomas Jensen, Cook's Product Manager, suggested adding to the IFU that

---

[33] Thus, the duty is a continuing one and may arise "months, years, or even decades after the date of the first sale of the product." *Watkins,*190 F.3d at 1218 (applying Georgia law).

[34] Jen Brown's proposal to add "filter fracture" to the IFU makes clear the falsity of Cook's claim it had already warned of same by warning of "filter embolization." That term means only filter movement or migration.

[35] Jen Brown's suggested IFU language, the statement and parenthetical "filter embolization (including embolization of fracture filter components)'" further belies Cook's suggestion that "filter embolization" means fracture. If embolization meant "fracture," the phrase she suggests would effectively mean: : "filter fracture" (including fracture of fractured filter components)," which, of course, is ridiculous.

"instances of filter tilting including complete fracture have been observed in the post-marketing surveillance for filters." CookMDL2570_0416442, Ex. 21 to App. In a 2015 presentation, the year Ms. Brand's filter was eventually removed, Cook acknowledged that "data currently available to physicians is quite limited." Cook then addressed challenges it was experiencing because "the information presented [in the IFU] does not correlate to how filters are used today…so we cannot best guide physicians in care of their patients; physicians asking for most recent information on the use of the device." CookMDL2570_835306 at pg. 8-9, Ex. 22 to App. The overview of proposed IFU changes includes adding the following statements to the "Precautions" section:

> Unacceptable filter tilt may result in loss of filter efficiency", "vena cava wall penetration/perforation is a known complication" and "filter fracture is a known complication. Both symptomatic and asymptomatic events have been reported. Fracture of filter leg can be due to repetitive motion on a leg in an unusual stress positions (i.e. tilt). Among other causes, filter fracture may be associated with a filter leg penetrating/perforation the IVC, [36] a filter leg being caught in a side branch (e.g. renal vein), excessive force of manipulations near an implanted filter (e.g. surgical procedure in the vicinity) of the filter or procedures that involved devices passing through filter.

*Id.* at 19.[37]

Cook discussed changing the IFUs for all of its IVC filters, Gunther Tulip, Celect and Celect Platinum, to include the following "Potential Adverse events:" "filter or filter fragment embolization", "filter fracture", "retrieval failure", "unacceptable filter tilt", "vena cava perforation", "vena cava penetration". *Id.* at 328. Plaintiff's expert Dr. Krumholz testified that "if it's of sufficient importance and if the company is aware of it, the question is why isn't it either a contraindication in the IFU, or why isn't there at least a warning in the IFU that people shouldn't

---

[36] Description of progressive perforation.

[37] Plaintiff's expert Dr. Gordan agreed Cook's warning was inadequate in regard to warning of about potential risks and dangers, "if there was a little bit more detail and if somebody wrote in the IFU to keep an eye on these guys [Celect filters]." Gordan Dep. at 332:4-10, Ex. 14 to App.

be using it." Ex. 2, Krumholz Dep. at 278:3-6.

Ms. Brand's expert supports her contention that the warnings contained in the Celect IFU were inadequate. Dr. Krumholz[38] explained in his report:

> "[I]t should be noted that they [Cook] make no reference to 'fracture' of the filter strut as a potential complication [in the IFU]. In my opinion, this detail is very important, and I will explain why. After a filter strut fractures, it can embolize, which is essentially what happened in the case of Ms. Tonya Brand. While the IFU states 'filter embolization' as a potential complication, it does not state 'filter strut fracture' and 'filter strut embolization' as potential complications.[39] As such, radiologists are not sensitized to searching for missing parts of filter struts and this complication can be missed, as occurred in the case of Ms. Tonya Brand.

Krumholz Rep. at 165, Ex. 2 to Krumholz Dec.

Further Dr. Gordon,[40] another of Ms. Brand's medical experts, opined that "the Celect filter IFU is inadequate and misleading through omission of adverse events, definitions and falsification of outcomes." He explains:

> [T]he Celect IFU does not warn physicians that the Celect filter's lack of a perforation limiter (as compared to the Tulip filter) increases the risk of perforation, tilt and fracture. The Celect IFU does not warn physicians that the Celect filter should be retrieved within a certain period of time to avoid progressive perforation, tilt and fracture or to closely monitor patients when the filter is left in place for an extended period of time. As a matter of fact, Cook's included data suggests very high retrieval rates and minimal complications.

Gordon Rep. at 13-14, Ex. 23 to Gordon Dec.

Cook's Quality Engineering Risk Report (QERA) dated December 5, 2012, defined as its scope "All CELECT filters, perforation resulting in bleeding/death." The QERA addressed the

---

[38]Dr. Haram Krumholz, M.D. is a cardiologist and health care researcher at Yale University, educated at Harvard Medical School, a founding member of the Board of the National Evaluation System for Health Technology (NEST), a private public partnership between device manufacturers and the FDA and honored as a Distinguished Scientist by the American Heart Association

[39] Defendants contend in its Memorandum that "Plaintiff's expert do not dispute" that "filter embolization" listed in the IFU refers to filter fracture. This statement is false, as Dr. Krumholz discussed *supra*. *See* Def. Mem. At 18.

[40] Dr. Gregory Gordon, M.D., trained at University of Illinois and Northwestern as an interventional radiologist with extensive experience writing IFUs and IFU updates for medical devices.

"failure mode" of "perforation of VC wall" with the "possible effect(s) of failure being "internal bleeding causing death." It stated, "In the period from l.Jan.2008 to 3.Dec.2012: <u>4 cases with death from bleeding, which may be caused by perforating filter legs</u>." CookMDL2570_0144641, Ex. 35 to App.

Cook was discussing the addition of a warning to the IFU in 2013 regarding surgery and potential for perforation. Cook's WCE Director of Research Arne Mølgaard-Nielsen stated "[w]e <u>assume that afterwards (after perforation) the risk of perforated legs moving out of vena cava, giving stress to the legs may lead to fracture</u>." [41] CookMDL2570_0805597, Ex. 36 to App. Soon after, <u>one physician</u> contacted Cook to inform it that he knew of at <u>least five cases of fractured Celect filters.</u> [42] CookMDL2570_0733001, Ex. 37 to App. The Complaint Detail Report for Ms. Brand indicates Cook had received 83 reports of injuries similar to Ms. Brand's by July 2011. CookMDL_0100590, Ex. 48 to App. "The data [evidence from Celect studies, internal documents, and MAUDE database] indicates that <u>Cook has been aware of several of these safety signals and did not to disclose several safety concerns and adverse events to the FDA, practitioners, and patients</u>." Krumholz Rep. at 122, Ex. A to Dec.

Ms. Brand's expert Dr. Gordon testified regarding the inadequacy of Cook's IFU including a warning about progressive perforation.

> Q. Are there any other changes identified in your report that you believe should have been made to the Cook Celect IFU?
> A. …I believe -- it's <u>progressive perforation, tilt and fracture</u> are things that I would discuss and migration as well since there's -- with the perforation comes inferior migration which it leads to a further cycle. So I would put -- perforation would be the main one and I think that -- if that in itself was there that would have been good

---

[41] Cook never added this warning, informed doctors about the concern, or instructed sales representatives to educate doctors on these known dangers.

[42] One physician exposed to five cases of Celect fractures is an "emerging safety signal" based on the FDA's definition. Based on this information and the plethora of examples Ms. Brand has provided, Cook had a duty to warn physicians.
https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm479248.pdf/

but, as I said, <u>I don't believe that the Cook should have been on the market, period.</u>

Q. Is it your opinion that the Cook Celect IFU did not include and should have included warnings about perforation, migration? Anything else?[43]

A. <u>I think that there was no safety data….</u>

***

I think they had to put something in there to say there is <u>a risk of progressive perforation</u>. It's something that we know. It's something you should be aware of and that these -- <u>so you should at least identify your patients, so you can take them out if it starts progressing.</u>[44]

Q. But when you say today, Dr. Gordon, that the IFU should have contained something about migration but did not, what do you mean?

A. It should say that with <u>progressive perforation leads to increased migration</u>, increased that -- I mean, I'm not sure how I would have put the statement together, but I would have clumped the statement in that <u>increased perforation itself is progressive in nature and can lead to increased tilt which can lead to increased fracture.</u>[45]

Cook knew or reasonably should have known of the danger arising from the use of its product from the above information during the time before Ms. Brand received her filter and after when it could have been retrieved before the filter tilted, progressively perforated, and fractured; yet it failed to warn of the risks. A reasonable juror could conclude that Cook's warnings were inadequate in light of all it knew about Celect potential risks and dangers for years before Dr. Rheudasil ever considered placing a filter in Ms. Brand and after while Cook had a continuing duty to warn under Georgia law and Ms. Brand's filter could have been retrieved before she suffered some or all of her injuries.

---

[43] Gordon Dep. at 252:2-253:4 Ex. 14 to App.

[44] *Id.* at 164:12-17, Ex. 14 to App.

[45] *Id*. at 253: 17-254:4, Ex. 14 to App.

**2. In the IFU and elsewhere, Cook did not disclose risk rates or that the risks associated with the Celect were significantly higher than the risks of its predecessor filter, the Tulip.**

Cook's failure to communicate the risk rates of the Celect and disclose that those rates were significantly higher than its predecessor, the Tulip, which the Celect was intended to replace, renders Cook's warnings inadequate. Cook did not advise patients or doctors of the relative rates of perforation for its filters, although its Vice President of Quality Assurance conceded doctors have a right to know and despite his admission that doctors would expect a device to be "a better device" than its predicate. Roberts Dep. at 252:10-253:13, 254:20-255:7, 253:14-254:14, Ex. 42 to App.

A clear illustration of Cook's failure to warn about the alarming rate and severity of its complications is a comparison chart Cook created of its injury rates using data from October 2008 to June 2016. For penetrations, Tulip had 40 and Celect had 165. For symptomatic penetrations, Tulip had 19 and Celect had 77. For fractures, Tulip had 28 and Celect had 105. CookMDL2570_1300899, Ex. 46 to App. This analysis provides factual data Cook was aware about the discrepancy in risk rates between the Celect and Tulip. "It is noteworthy that for relatively-similar number of sales, reported complaints for Celect were dramatically higher. Similarly, using Cook's own data in the aforementioned data summary, there are clinically and statistically significantly higher rates of reported perforation, migration, and retrieval difficulties with Celect, compared with Tulip." Krumholz Rep. at 119, Ex. A to Krumholz Dec.

In an email to Cook's Product Manager Bruce Fleck from a sales representative, the representative states a physician is concerned a Celect has perforated and wants to know what he should or shouldn't do about it.  Fleck states he worries because:

[T]he wire experiences unusual stresses that we have not adequately tested for. Therefore, strut fracture in the future is a possibility."  He also goes on to say that

he recommends the physician <u>place a Tulip instead of a Celect</u> when he knows the filter is likely to be permanent (<u>because Tulip is more robust and has better fracture resistance</u>).

CookMDL2570_0726286, Ex. 47 to App.

In February 2010, Celect team leader Jacob Clausen received complaint data indicating that, through the third quarter of 2009, <u>Celect had a complaint rate for penetration/perforation/ tenting that was 17.5 times higher than Tulip</u>. CookMDL2570_0465794, 0465797, 0465798, Exs .43, 44 and 45 to App.

MHRA's (Medicines and Healthcare Products Regulatory Agency (UK)), Mr. Graf asked Dr. Gardner, Cook's Medical Science Officer, "Doesn't Tulip have a lower occurrence rate of other failure modes (tilting/perforation)?" Dr. Gardner replied: "<u>I believe Celect does have a higher perforation rate than Tulip, but I believe our decision to keep Tulip on the market pre-dated our recognition of that issue</u>." CookMDL2570_0197378, Ex. 56 to App.

The evidence discussed above establishes that genuine issues of material fact exist as to whether Cook's warnings were inadequate because of its failure to warn about the frequency and severity of the Celect's dangers compared to those of the Tulip. Cook incorrectly suggests that "Georgia law imposed no duty on device manufactures to inform doctors about the frequency of known and listed risks of their devices." *Id.* at 21.[46] Under Georgia law, if a warning is provided (which it was not here) and it did not include a known rate or severity of potential injury, then whether the alleged warning is adequate is a question for the jury. *Thornton*, 22 F.3d at 289 (adequate warning "must provide a complete disclosure of the existence and extent of the risk involved."). Whether a device should include a warning that it carries an increased risk of a

---

[46] "Although Cook frames this argument as one of duty, it actually relates to whether Cook's warnings were adequate, which is a question of breach." *Cisson*, 2013 WL 5700513, at *7.

particular complication or greater propensity to cause injury are questions of fact for the jury. *See In re Mentor Corp. ObTape*, 711 F. Supp. 2d at 1378 (holding reasonable jury could find warnings inadequate given manufacturer "did not inform Plaintiffs' physicians of any increased risks associated with ObTape") (*citing Watkins*, 190 F.3d at 1220) (finding genuine issue of material fact on failure-to-warn claim because jury could conclude that more adequate warning was needed on vehicle that had greater propensity than other vehicles to roll over).

There are three cases involving IVC filters that apply Georgia law, *Cason,*, and two *In re Bard IVC Filters* decisions, that address the same question of fact before the Court here: whether an IVC manufacturer's IFU was inadequate when it failed to disclose the subject device had significantly higher complication rates than the rates of some of its competitors and its own predecessor filter.; *Cason,* 2015 WL 9913809, at *6; *In re Bard IVC Filters,* 2017 WL 5625548, at *3; *In re Bard.IVC Filters*, 2018 WL 1256768, at *6; *See also* CookMDL2570_1200899 (comparison summary to Argon, Boston Scientific, Braun, ALN and Crux).

In *Cason*, IFU warnings similar to the ones upon which Cook relies in this case were at issue. 2015 WL 9913809. There, as here:

> Plaintiffs concede[d] that the IFU provides a list of potential complications of which [the implanting doctor] was aware, but they argue that the warnings were inadequate because they [the warnings] failed to disclose that the frequency with which these complications occurred with the G2 Filter was significantly higher than with other IVC filters manufactured both by defendants' competitors and defendants themselves.

*Id.* at *3. Citing *In re Mentor Corp. ObTape*, Judge Shoob of the Northern District of Georgia concluded "there is a genuine issue for trial as to whether the warnings provided by Bard were adequate." *Id.* In so holding, Judge Shoob noted the evidence that (a) the G2 filter had "a significantly greater propensity to fracture, migrate, and perforate the IVC than other IVC filters," and (b) Bard "knew or should have known about the increased risks associated with the G2 Filter."

36

> Given this evidence, combined with the evidence that defendants did not warn Ms. Cason's doctor about any increased risk associated with the G2 Filter, a reasonable fact finder could conclude that the IFU did not contain an adequate warning regarding the G2 Filter.

*Id.* at **4-5

In *Cisson v. C.R. Bard, Inc.*, 2013 WL 5700513, a case involving a transvaginal mesh medical device, Avaulta Plus, Bard argued, as Cook does here, that its duty was limited to warning about potential dangers, "not their rate or severity." *Id.* at *7; Def. Memo at 21. Applying Georgia law, the court found to the contrary: the IVC filter manufacturer's, Bard's, "warnings were adequate as a matter of law only if 'a reasonable jury would not have a legally sufficient evidentiary basis' to find against Bard." *Id.* at *8. Identifying evidence that Bard knew its device "created a higher risk of complications," the court found "sufficient evidence to create a jury question as to whether Bard's warning was adequate." *Id.*

Cook claims Georgia law does not require a manufacturer to provide comparative rates of complication for its products; however, Cook cites no case law to support this claim and once again gropes for support from other jurisdictions. At the same time, it discounts the very thorough *Cisson* ruling by erroneously stating it did not rely on *Singleton*. The *Cisson* court cites *Singleton* to establish that "Bard had a duty to warn about 'any potential dangers that may result" from use of the product.'" *Id.* at *6. That is, "if [certain] characteristics caused the Avaulta Plus to be more dangerous or risky than the product's Instructions for Use suggested, then Bard had a duty to warn about the dangers associated with them, and it is for the jury to decide whether Bard breached that duty." *Id.* Cook's other authorities are not based on Georgia law and inconsistent with *Cason*, *Cisson*, *In re Bard IVC Filters*, *In re Mentor Corp. ObTape*, and *Watkins*.

Further, *In re Bard IVC Filters Liability Litigations* addressed these <u>exact</u> arguments in November 2017 and March 2018 and stated "the court is not holding, as a matter of Georgia law,

that a manufacturer must always disclose how the risks of their products compare to the risks of other products. But presumably there is a point where the risks of a product so depart from the norm that failure to disclose them constitutes an inadequate warning. Whether the point was reached in this case will be for the jury to decide." *In re Bard IVC Filters,* 2017 WL 5625548, at *3 (citing *Cason*, 2015 WL 9913809, at *6); *see also*, *In re Bard IVC Filters,* 2018 WL 1256768, at *6. Likewise, whether the Celect filter's risk compared to its predecessor, the Tulip, which had no lesser efficacy, and was an available choice to Ms. Brand's surgeon, was so significantly greater that Cook should have disclosed the relative risk rates and the failure to do so rendered the Celect's warnings inadequate constitutes a question of fact that must be left to the jury.

### 1.  <u>Cook did not adequately warn doctors about the Celect's limited retrieval time period.</u>

Cook's IFU is also inadequate as it fails to include a retrieval time for the Celect filter or that the filter could become embedded and impossible to take out.  An April 2010 power point by Mr. Molgaard addressed the issue and concluded: "<u>Small perforations will cause tilt and make snaring and retrieval difficult</u>." CookMDL2570_0601062, Ex. 39 to App. Nonetheless, the Celect was sold without any warning that its perforations (minimized as a "possible adverse event" in the instructions for use) would lead to tilt and difficult retrieval.

<u>Proposed IFU changes</u> to be made to "Optional Retrieval" section in 2015, included the following addition: the clinical study "<u>indicates that the likelihood of successful retrieval becomes more challenging with time</u>." CookMDL2570_0835306 at 326, Ex. 22 to App.

Further, Dr. Gordon, Ms. Brand's expert testified, "I think the clinical study that was added which was part of the OUS study gave a false implication of safety and also gave a false implication of a high rate of retrieval which was incorrect and again I think falsified. That hasn't turned out.

And then I also think the other issue is that there is -- about retrieval itself but that should have been in a separate body retrieval part but <u>I think something more should have been said about retrieval, about retrieving it earlier, and when it's clinically safe to remove these as soon as possible.</u>" Gordon Dep. at 253:6-16.

Cook also told physicians that the Celect filter could be retrieved through the use of the "Gunther Tulip Filter Retrieval System" —the precise method used by Dr. Rheudasil to try and retrieve the filter in his unsuccessful attempt to get it out of Ms. Brand's body in 2011.  Only years later was it retrieved, and then it took a major surgery including open laparotomy to do so. So, the Celect IFU told physicians that the filter could be retrieved through a certain methodology and that it could be used as a permanent device.[47]  Neither was true. *See* Celect IFU, Def. Mem., Ex. N. Ms. Brand has provided evidence that shows genuine issues of material facts as to whether Cook knew the risk of injury increased the longer the retrievable filter was implanted in Ms. Brand and failed to adequately warn doctors about the appropriate window of retrieval for Celect filters.

### 1. <u>Cook misrepresented the results of its clinical study in the Celect IFU which made the warnings in the IFU inadequate.</u>

Cook's misrepresentation of the OUS clinical study (later becoming the Lyon article) in the IFU failed (and still fails) to adequately communicate known dangers and risks to doctors. Cook not only failed to reveal perforations in the article published in the Journal of Vascular and Interventional Radiology about their OUS clinical study (Lyon Study), but cited the study in its IFU to purportedly demonstrate the Celect filter's safety as a medical device with respect to

---

[47] See the Fleck email referenced, *infra*, wherein Fleck says the Tulip should be used instead of the Celect for permanent use; this fact, having been left out of the Celect IFU, is another circumstance showing Cook's failure to warn physicians, including Dr. Rheudasil, of a problem with the Celect.  In Ms. Brand's case Dr. Rheudasil was completely uninformed about the need to use a Tulip filter for permanent or otherwise long-term use in this patient whose filter was in her body without an attempt to retrieve it until over two years after its implantation and then only after a piece of it came out through her thigh.

perforations.

FDA's labeling guidance gives examples of false and misleading misrepresentations. These examples include: "ambiguity, half-truths, and trade puffery" and "failure to reveal material facts, consequences that may result from use, or the existence of difference of opinion." Thus, labeling may be misbranded if it makes a misleading statement or fails to inform the consumer of facts that are relevant to those statements actually made. FDA Guidance "Labeling: Regulatory Requirements for Medical Devices" (1989) at 4-5, Ex.86 to App.

Cook used the OUS clinical study (Lyon Study) in its promotion and marketing communications, which also constitute "labeling" under the FD&C Act. 2009: CookMDL2570_0161696 at 1690; 0161684 at 1687; 0161707 at 1710; and 0165984 at 5987. 2008: CookMDL2570_ 001238 at 2342; 0012350 at 2354; 0012362 at 2366; and 0445420 at 5425, Exs. 25, 26, 27, 28, 29, 30, 31 and 32 to App. Cook cited the OUS Study in its IFUs, which accompanied every Celect sold to medical providers including Dr. Rheudasil.

The 2008 Celect IFU which Dr. Rheudasil received included the OUS Lyon Study information on 74 patients and, although its "Potential Adverse Events" section included "Vena cava perforation," the "Clinical Studies" section cited the OUS's results as: "No device related major adverse events (defined as hemorrhage, perforation, death, occlusion, filter fracture or significant filter migration) have occurred." Cook's 2009 Celect IFUs contained the same language, as did its 2012 Celect IFU. The study, however, actually showed a tilt rate of 62.1% and a penetration rate of 36%, according to Cook's own documents, and many of patients reported by Cook as having a penetration actually suffered a *perforation*, when applying the Society of Interventional Radiologists definition of perforation (i.e. strut protruding more than 3 mm beyond the IVC wall).

40

Cook's misstatements about the OUS findings proceeded to the truly disturbing level when it flat out lied to the peer reviewers of the JVIR when specifically asked about what definition it used in the OUS study; Cook's author told the peer reviewing journal editors that "strut outside the vena cava wall" was the definition used in the OUS study for "perforation" when in fact a completely different definition was used. Ex. E to App. The actual definition of perforation used by the OUS investigators required not just complete piercing of the vena cava but also bleeding. Ex. F to App. That definition, nonsensical for a study of this sort as it would be rare to see such a "perforation" under any circumstances, was not told to the peer reviewers when they asked what definition of perforation was used in the study. Instead Cook told the peer reviewers the more sensitive definition of "strut outside the wall" was used in the OUS study—a complete and absolute lie. Ex. E to App. Indeed, Cook carried its lie forward all the way to the publication of the Lyon study the same year of Ms. Brand's Celect implantation, and to this day that lie remains uncorrected and exists in the body of medical literature used by physicians. *See* Lyon Study at page 1445, Ex. 59 to App.

The significance of Cook's OUS shenanigans cannot be overstated. As Ms. Brand's expert, Dr. Krumholz, explained, "So, irrespective of the semantics, strut protrusion, which happened frequently in the OUS study, including in many of the 74 patients references in the IFU, was not at all communicated to the practitioners or patients, as a series of true adverse events that had happened (rather than a "potential" adverse event)." Krumholz Rep. at 18, Ex. A to Krumholz. Dec. Table 6 from Dr. Krumholz Report contains a chart of the OUS study adverse events not included in the IFU. Krumholz Rep. at 69, Ex. A to Krumholz Dec. [48] Dr. Rheudasil's testimony

---

[48] In 2015, at a product labeling (IFU) meeting, Cook discussed the "limitations of the data available in the current Clinicals Studies section of the Gunter Tulip, Celect and Celect Platinum. "The IFUs for the Celect filters currently includes an interim of the summary of the clinical study conducted OUS." Here, Cook is admitting the data was incomplete. CookMDL2570_835306 at pg. 8, Ex. 22 to App.

is consistent with Dr. Krumholz's opinion as to the significance of Cook's lies about the number of perforations found in the OUS Study:

> 21 Q. Okay. And if you determined that there
> 22 were unreported complications, then, would that go
> 23 into your risk/benefit analysis even to use the
> 24 filter?
> 25 A. Yes.
> 1 Q. And more likely than not, would you use a
> 2 filter that had that issue?
> 3 A. No.

Rheudasil Dep. 162:3-163;3, Ex. 1 to App. Whether Cook's misrepresentation of the results of the OUS study in the IFU rendered Cook's warnings to doctors inadequate all by itself is a question for the jury.

In conclusion, Ms. Brand has offered sufficient evidence that the "warnings" contained in Cook's IFU and conveyed through Cook's sales representatives failed to warn physicians of any potential dangers associated with the use the Celect filter.[49]  In Georgia, the general rule, is that the adequacy of a warning is an issue for the jury.  *Thornton*, 22 F.3d at 289. Such matters generally are not susceptible to summary adjudication and should be resolved by a trial in the ordinary manner. *Collins*, 190 Ga. App. at 883. Cook's internal documents, discussed *supra*, along with testimony and reports from Ms. Brand's experts, Drs. Krumholz and Gordon, establish genuine issues of material facts for a jury to decide to whether Cook's warnings for the Celect filter were adequate.

---

[49] Ms. Brand is not required to prove every fact by direct evidence. Juries can draw legitimate inferences from the evidence, and we must give the plaintiff the benefit of every legitimate inference that can be drawn from the evidence *Cisson,* 2013 WL 5700513, at *11(citing Charles Wright & Author Miller, *Federal Practice and Procedure* § 2524 (3d ed. 2008)).

**III.  Genuine Issues of Material Fact Exist as to Ms. Brand's Strict-Liability and Negligent Design Defect Claims in Counts 2, 3 and 4 of the Complaint, Requiring Denial of Cook's Motion for Summary Judgment on Them**

   **A. Ms. Brand offers evidence of a design defect under the applicable Georgia law standard.**

By taking a basic statement of Georgia law from two cases completely out of context and treating a sentence from a no longer operative complaint by Ms. Brand as a binding statement of Georgia law, Cook manufactures an incorrect and legally unsupported standard for proving a design defect as to a medical device: that Ms. Brand must prove that the Celect filter cannot withstand normal and foreseeable (by which it means average or typical) conditions in the human body. Def. Mem. at 25-26. In fact, Ms. Brand need only prove that the Celect filter was not "reasonably safe for [its] intended or foreseeable *uses:*" implantation in the inferior vena cava to trap blood clots which might cause pulmonary embolisms ("PEs").

Despite it being at odds with the plain meaning of the language, Cook treats the basic statement of Georgia law that "[a] manufacturer has a duty to exercise reasonable care in the manufacture and design of its products 'so as to make products that are reasonably safe for intended or foreseeable uses,'" *Woods v. A.R.E. Accessories, LLC,* 2018 WL 2354925, at *2 (Ga. App. May 24, 2018) (quoting *Chrysler Corp,* 264 Ga. At 724), as meaning safe for average or typical conditions encountered during that intended or foreseeable use. Def. Mem. at 25-26.  The *Woods* case Cook relies on makes clear, however, that the quoted language relates solely to the use of the product and not to the conditions encountered during use by discussing that a manufacturer need not make a product "safe for a *use* that is unintended and unforeseeable." 2018 WL 2354925, at *3 (emphasis added). Cook's "fudge" is an important one, and its use by Cook would appear to indicate its importance.

Indeed, the risk-utility test adopted by the Georgia Supreme Court in *Banks v. ICI Americas,*

*Inc.*, 264 Ga. 732 (1994), does not limit liability to cases where the risk outweighs the benefit under average or typical conditions of use. Rather, by setting forth a list of 13 non-exhaustive factors for the jury to consider, the Court left it up to the jury whether to assess the risk versus the benefit during average/typical conditions,  worst-case conditions or both (e.g., "the gravity and severity of the danger posed by the design; the likelihood of that danger;" …and the manufacturer's compliance with industry standards or government regulations). *Id*. at 736 fn. 6. *See also* Georgia Suggested Pattern Jury Instructions, Vol. 1: Civil Cases, 5th ed. § 62.650. The last condition is critical in this regard, because industry standards or government regulations may specify whether a product must be designed to withstand worst case conditions or only average/typical conditions encountered during a foreseeable or intended use.

While no court has ever directly addressed this issue under Georgia law, at least two federal district courts have addressed it under other states' laws and both firmly rejected Cook's argument. In *Picken* and *Jackson*, the exact same experts conducted mathematical stress analysis of a ladder failure under a worst-case scenario (maximum stress loading) and testified that the design of the ladder was defective because it would more likely than not fail under those worst-case conditions. *See Picken v. Louisville Ladder, Inc.*, 2013 WL 3896570, at *1 (E.D. Mich. July 29, 2013); *Jackson v. Louisville Ladder, Inc.*, 2013 WL 1729299, at *5 (M.D. Pa. Apr. 22, 2013).  In both cases, the experts testified that their use of the worst-case scenario was appropriate under engineering principles because it could happen and was reasonably foreseeable. *Picken*, 2013 WL 3896570, at *1; *Jackson*, 2013 WL 1729299, at *5-6.

In *Picken,* the defendant argued for summary judgment on causation on the basis that the experts' opinions based on a worst-case analysis constituted no evidence that the design defect proximately caused the ladder's failure and the plaintiff's resulting injury during his "normal" use

of the ladder, but the court held the experts' opinions created a genuine issue of material fact. 2013 WL 3896570, at * 1-2. And, in *Jackson,* the defendant challenged the reliability of the experts' opinion under Rule 703 and its helpfulness/fit under Rule 702, both of which challenges the court rejected. 2013 WL 1729299, at *5-6.

The similarity between this case and the *Louisville Ladder* cases is remarkable.  In this case, Dr. McMeeking also conducted mathematical stress analysis under a worst-case scenario, and based upon this analysis, he offers the opinion that the Celect filter more likely than not will fracture under those conditions during its foreseeable use of implantation in the inferior vena cava, making its design defective. *See* McMeeking Report at 1, 5-6, 29-51 & 68-70, Ex. A to the McMeeking Dec., Ex. 50 to the App.  He also testified that using worst case analysis is standard methodology in carrying out engineering assessments and design, especially those relating to safety in the face of uncertainty as to how often the worst-case scenario will occur, as guidance documents for engineers often advise.  McMeeking Dep. 276:13-19; 280:16-281:1, Ex. 51 to the App.  Further, he testified that in his real-world, non-litigation consulting for approximately 10-15 medical device companies on approximately 16 to 23 different medical devices, he almost always has performed or consulted on worst-case analyses. *Id.* 18:25-21:15; 182:1-6; 277:9-10.

Perhaps most importantly, he testified that he performed a worst-case analysis on the Celect filter because in 1999 the FDA directed medical device companies, like Cook, to perform worst-case safety analyses of the fracturing of IVC filters, like the Celect, before bringing them to market. *Id.* 276:13-278:3; 282:24-283:6; 284:20-285:14. Dr. McMeeking was referring to the "Guidance for Cardiovascular Intravascular Filter 510(k) Submissions," issued by the FDA on November 26, 1999.  McMeeking Dec. ¶2 and Ex. C thereto, Ex.69 to the App. That Guidance provides:

> 4. Filter Fracture. The filter's response to the **worst-case** respiratory and diaphragmatic movements in the vena cava under simulated respiratory cycles

should demonstrate sufficient fatigue resistance of the filter design.

*Id*. at 4 (emphasis added). Crucially, Dr. McMeeking testified that his analysis using multiple worst-case scenarios constituted exactly what the FDA required. McMeeking Dep. 284:20-285:14, Ex. 51 to App.; McMeeking Rep. at 48, Ex. A to McMeeking Dec., Ex. 50 to App.

Directly relevant to Georgia's risk-benefit test, Dr. McMeeking testified that:

Q: After assessing the worst-case scenario, do you consider how often the worst-case scenario is likely to occur?
MS. BAUGHMAN: Objection. Form.
THE WITNESS: In the best of all circumstances, one would be able to assess how often those worst-case conditions arise, but in this case, I know of no source of data on how often the worst-case conditions would arise for filters.
BY MR. WEBBER:
Q: If you were to conclude that the conditions that present the worst case-scenario are rare, very unlikely to occur, could it still be appropriate to continue forward with the proposed design?
MS. BAUGHMAN: Objection. Form.
THE WITNESS: Weighing benefits against risks can be appropriate to allow worst-case conditions to be such that they would fail the filter, but one must have an assessment of how often that is likely to occur to weigh against the benefits.
And, as I said, it is very difficult to assess how often worst-case conditions will arise, and in those circumstances, as is often advised in guidance documents for engineers in all sorts of circumstances, erring on the side of conservativeness is the appropriate thing to do.

*Id*. at 280:1-281:1.

Further, the Court should note that by selectively quoting Dr. McMeeking's honest testimony that he doesn't **know** if a single human being has ever experienced all the worst-case conditions he assumed in his analysis, Cook appears to try and mislead the Court into believing Dr. McMeeking does not have a reasoned opinion as to how likely all those conditions occur in patients.  In fact, Dr. McMeeking testified that, based upon the scientific literature he reviewed and his analysis, he expects the occurrence of all of them together would not "be very rare" and that in persons with small vena cavas where there is even a very small degree of tilting of the filter, it would almost always happen. McMeeking Dep. 84:9-85:17, Ex. 51 to the App.  So, Dr.

McMeeking, if necessary, testified not only that its design defects would cause the Celect filter to fail during reasonably foreseeable uses, such as in Ms. Brand, but also under conditions during use that were also reasonably foreseeable.

In still a further attempt to create the false perception that Dr. McMeeking's worst-case conditions do not actually exist in patients, Cook ignores that Dr. McMeeking based those "worst-case" conditions "on the allowable dimensions of Cook IVC filters and a reasonable assessment of conditions that have been demonstrated to arise in the IVC in studies in scientific literature." McMeeking Reb. Rep. at 4, Ex. B to McMeeking Dec., Ex. 50 to the App. For example, a laboratory study found the likely friction coefficient between IVC filters and vena cavas to be .001, virtually the same as Dr. MckMeeking's "worst-case" condition of a friction coefficient of zero. McMeeking Dep. 48:2-50:10; 51:16-52:5; 113:7-132;4, Ex. 51 to the App. And, he based the "worst-case" condition of a vena cava reducing 80% during a Valsalva incident on the **mean** reduction in diameter (in half the patients it was less and in half it was more) found in a medical study.  McMeeking Dep. 147:21-149:12, Ex. 51 to the App.; McMeeking Reb. Rep. at 4, Ex. B to McMeeking Dec., Ex. 50 to the App.

Significantly, calculations not based on worst-case conditions confirm Dr. McMeeking's worst-case calculations and the opinions he based on those worst-case calculations.  Initially, Cook's calculations (not based on worst-case conditions) of the stress levels on the predecessor and similar Tulip filter, which he found would more likely than not cause the Celect filter to fracture, were within 2% of his calculations.  McMeeking Rep. at 35, Ex. A to McMeeking Dec., Ex. 50 to the App.  And, an independent study calculated stresses within 10% to 12% of what he calculated. *Id*.

Most importantly, Dr. McMeeking conducted an alternative analysis of the likely stresses

on the Celect filter and its resulting likelihood to fracture not based on worst-case conditions, and that analysis confirmed his worst-case conditions calculations and opinions.  Specifically, he conducted a computerized Finite Element Analysis that did not use worst-case conditions in five different elements of his analysis that confirmed his calculations and resulting opinions based on worst-case conditions.  McMeeking Rep., Appendix E, at 77-107, Ex. A to McMeeking Dec., Ex. 50 to the App. Of course, Cook chose to completely ignore this analysis in its summary judgment argument.

Finally, as to Dr. McMeeking's bottom line opinions, Cook claims that Dr. McMeeking conceded in his deposition that the fact that a filter will fail in enough worst-case circumstances in the body doesn't mean that it is deficiently designed and that he never offers the opinion that the Celect filter's design defects will cause it to fail under "normal" conditions in the body.  Both of Cook's claims are false.

As to the first claim, when Dr. McMeeking answered (over Ms. Baughman's proper objection) that it was "correct" that "just the fact that a filter can fracture if exposed…to…enough…worst-case circumstances, doesn't mean necessarily that that filter is deficiently designed" (McMeeking Dep.89:8-16, Ex. 51 to the App.), he was not referring to worst-case circumstances in the body. Rather, he was referring to worst-case conditions in the laboratory, as the rest of his answer misleadingly omitted by Cook makes perfectly clear.  McMeeking Dep. 89:18-20 ("I would agree to that because you can always do things to any device to make it fracture."), Ex.51 to the App.

As to the second claim that he never offered the opinion that the Celect's design defects would cause it to fail under "normal" conditions in the body, Dr. McMeeking offers the opinion that:

48

> It is known that the inferior vena cava experiences changes in its span during respiration and due to various actions of the patient, such as coughing, Valsalva and evacuation of the bowels [5,6]. Such changes in span…will cause repeated changes to the stresses within the primary and secondary legs of the filter. In any material, repeated changes in the level of stress within it causes fatigue damage; if there are a large number of such repeated changes, the fatigue damage will lead to fracture of the component [7].
>
> ….
>
> I find that in almost all circumstances experienced by the Cook IVC filters after implantation that the combination of mean and cyclic stress they experience will eventually cause them to fail by fatigue fracture if they are not retrieved. … The length of time may be shorter or longer and depends on the conditions that develop *in vivo* after a successful implantation, but the likelihood of fracture in a relatively short time is entirely predictable and should have been foreseen by Cook designers and engineers.

McMeeking Rep. at 5-6, Ex. A to McMeeking Dec., Ex. 50 to App.  Simply put, he offers the reasoned opinion that under "normal" conditions (breathing, coughing, etc.), the Celect's design defects cause it to fracture.

Although Dr. McMeeking's opinions alone raise a genuine issue of material fact as to the existence of a design defect that causes fractures under "normal" conditions in the human body, the opinions of Drs. Krumholz and Gordon do as well. Specifically, using differential diagnosis (etiology), a completely different and independent methodology from that used by Dr. McMeeking, these medical doctors offer the opinion that the Celect's design defects proximately caused Ms. Brand's fixture fracture and resulting injuries.  Krumholz Rep. at 172, Ex. A to the Krumholz Dec., Ex. 2 to the App.; Gordon Rep. at 42-43, Ex. A to the Gordon Dec., Ex. 23 to the App. Inherent in those opinions are the opinions that design defects in the Celect filter in Ms. Brand's body caused it to fracture, and no one claims that the conditions in her body constituted a worst-case scenario.

In summary, under the correct Georgia risk-utility test that weighs the risks of the Celect

filter versus its benefits in a foreseeable use (implantation to catch blood clots to prevent PEs), Drs. McMeeking's, Krumholz's and Gordon's opinions create a genuine issue of material fact as to the presence of design defects in the Celect filter. And, even under Cook's false design defect standard of risk versus benefit in average or typical conditions in the human body, Drs. McMeeking's, Krumholz's and Gordon's opinions create a genuine issue of material fact as to the presence of design defects in the Celect filter. Simply put, Ms. Brand offers ample evidence to create a genuine issue of material fact as to the existence of a design defect.

### B. Ms. Brand offers evidence that the Celect's design defects caused her filter to fracture under the applicable Georgia standard.

Cook argues that Georgia law requires her to identify a specific design defect that caused her fracture and that Dr. McMeeking fails to offer such an opinion based upon a false dichotomy between perforation and fracture. Initially, Georgia law rejects that a plaintiff must identify a specific defect in the design of a product:

> Georgia law provides that in a products liability case "it is not necessary for the plaintiff to specify precisely the nature of the defect." *Trickett v. Advanced Neuromodulation Sys., Inc.,* 542 F.Supp.2d 1338, 1345 (S.D.Ga. Feb. 21, 2008); *see also, e.g., Williams v. Am. Med. Sys.,* 248 Ga.App. 682, 548 S.E.2d 371, 374 (Ga.Ct.App.2001); *Waddy v. Globus Med., Inc.,* No. 407CV075, 2008 U.S. Dist. LEXIS 73030, at *12, 2008 WL 3861994 (S.D.Ga. Aug. 18, 2008). What a plaintiff must show is that "the device did not operate as intended and this was the proximate cause of [the plaintiff's] injuries." *Trickett,* 542 F.Supp.2d at 1345.

*Cisson v. C.R. Bard, Inc.*, 2013 WL 5700513, at *4 (S.D. W. Va. Oct. 18, 2013).

Dr. McMeeking offers an opinion that provides the exact evidence required by Georgia law:

> Q. Okay. What opinions are you expressing in this case that are specific to Mrs. Brand?
> A. I am expressing the opinion that it is more probable than not that the deficiencies in the design of the Celect led to the problems that she experienced in her experience with her filter.

McMeeking Dep. 24: 8-13, Ex. 51 to the App.

Cook compounds its misstatement of Georgia law with a false dichotomy between perforation and fracture, treating them as if they were independent adverse effects of the Celect filter when they are actually highly interrelated, in that the perforation of the vena cava by the primary or secondary leg of the filter significantly increases the stress on that leg making it probable that the leg will fracture, as Dr. McMeeking explains. McMeeking Rep. at 3-6 and 68-69, Ex. A to McMeeking Dec., Ex. 50 to the App.; McMeeking Dep. 87:12-18 (after stating Celect's filter was defectively designed in terms of perforation resistance, Dr. McMeeking testified, "Well, since perforation makes fracture more probable, yes, it is my opinion that it was deficient in regard to design against fatigue fracture."), Ex. 51 to App.

For that reason, although not necessary, Dr. McMeeking did, in fact, offer his opinion as to a specific design defect that caused the Celect filter to fracture in Ms. Brand-its lack of perforation limiters:

> Tonya Brand's Celect filter perforated her IVC, tilted, and fractured. Consistent with the tendency of the filter to reduce its energy, the perforation and tilt of Ms. Brand's filter progressed over time and eventually resulted in multiple fractures. It is more likely than not that this occurred as a direct consequence of the fact that the filter was improperly designed against perforation, tilt, fatigue and fracture. In particular, the filter design does not provide sufficient safeguards against perforation (e.g., a perforation limiter), which increases the likelihood of tilting and the likelihood that limb fracture will occur. The failure of Ms. Brand's filter is more likely than not the consequence of its poor design, its poor testing prior to marketing, and its poor assessment through analysis including finite element analysis and other methods.

McMeeking Rep. at 68-69, Ex. A to the McMeeking Dec., Ex. 50 to the App. And, Dr. McMeeking specified what those perforation limiters could have been: either petals like those on Cook's Tulip filter, the predecessor to the Celect, or primary leg extensions, like those added to the Celect's successor, the Celect Platinum. *Id.* at 56, 63-64 & 70.

Cook conveniently ignores another specific design defect identified by Dr. McMeeking-the fact that the legs of the filter are attached to its cap at only one place, such that if a leg fractures, part of the leg completely separates and commences migrating through the patient's body causing injury and even death if it migrates to the heart or lungs. McMeeking Rep. at 1 & 6, Ex. A to McMeeking Dec., Ex. 50 to the App. In Ms. Brand's case, one piece migrated to and came out through the skin of her thigh and two other pieces remain lodged in her body. *Id*. at 68-69. A safer design would have been to make the leg a loop attached at both ends to the cap so that no loose migratory piece would result from a single break in the leg. *Id*. at 6.

Although Dr. McMeeking's opinions alone raise a genuine issue of material fact as to causation even in the face of Cook's attacks, the opinions of Drs. Krumholz and Gordon do as well. Initially, using differential diagnosis (etiology), a completely different and independent methodology from that used by Dr. McMeeking, these medical doctors offer the opinion that the Celect's design defects proximately caused Ms. Brand's filter fracture and resulting injuries. Krumholz Rep. at 172, Ex. A to the Krumholz Dec., Ex. 2 to the App.; Gordon Rep. at 42-43, Ex. A to the Gordon Dec., Ex. 23 to the App. And, Dr. Gordon identifies one of the same specific design defects identified by Dr. McMeeking—the lack of perforation limiters like those on the Tulip. Gordon Reb. Rep. at 12, Ex. B to the Gordon Dec., Ex. 23 to the App.

In summary, through Drs. McMeeking, Krumholz and Gordon, Ms. Brand offers the evidence of causation required by Georgia law, that the Celect filter did not operate as intended in Ms. Brand (it fractured) because of a design defect and that this proximately caused her injuries. And, although Georgia law does not require it, Drs. McMeeking and Gordon provide evidence of specific design defects that proximately injured Ms. Brand. Simply put, this evidence raises a genuine issue of material fact as to causation.

52

### C. Ms. Brand offers evidence that the design defects proximately caused Ms. Brand's injuries under the applicable Georgia standard.

For the third time, Cook makes up a standard of law unknown to Georgia jurisprudence.  This time it is the supposed requirement that Ms. Brand prove that an alternative filter design **would not** (i.e., with certainty) have fractured in her body. And, also for the third time, Cook cherry picks Dr. McMeeking's deposition to make his opinions appear both facially insufficient and unsupported by reliable methodology when nothing could be further from the truth.

Through abuse of the Georgia definition of proximate cause, which requires a tort to be a cause of the plaintiff's injury without which the injury would not have occurred, Cook concocts the fiction that Georgia law requires Ms. Brand to prove her design defect claim by proving that an alternative design to the Celect filter would not have fractured. Def. Mem. at 29-30. Notably, it cites not a single case that states this proposition or remotely stands for it.  That is because not only is that not Georgia law, it could not possibly be Georgia law given that the *existence* of an alternative design is only one factor in the *Banks* risk-utility test, such that the failure of a plaintiff to provide evidence of same does not preclude the plaintiff from prevailing. *Bodymasters Sport Indus, Inc. v. Wimberely,* 232 Ga. App. 170, 173 (1998). As the Georgia Court of Appeals explained:

> In particular, Bodymasters argues that Wimberley presented no evidence that an alternative design was possible or would have made the machine safer. However, although *Banks* identifies the existence of an alternative design as one factor affecting the risk-utility analysis, it does not indicate that such factor is controlling.

*Id*. It follows necessarily that if Ms. Brand need not even show that an alternative design to the Celect existed, she need not show that an alternative design would not have fractured in Ms. Brand's body.

Further, in those cases where plaintiffs have chosen to put on evidence of alternative safer

designs, Georgia courts have not required proof that the alternative design **would** have prevented the plaintiff's injury, but rather only that it **could** have done so or that it would have **reduced the risk** of the injury. *See Banks*, 264 Ga. at 737 (holding manufacturer can be liable where the plaintiff "adduce[s] evidence that a feasible alternative design…**could** have prevented or minimized the plaintiff's injury….") (emphasis added); *Woods*, 2018 WL 2354925, at * 3 (holding risk-utility test imposes liability "where the manufacturer has failed to adopt a reasonable alternative design that would have **reduced foreseeable risks** of harm posed by the product.") (emphasis added).

Dr. McMeeking not only offers opinions that satisfy this standard, he supports them with specific reasons supported by reliable scientific methodology and data. He does not, as Cook claims, offer nothing but his own say-so as the basis for his opinions. Those opinions are that, to a reasonable scientific certainty, it is more probable than not that: (1) if primary leg extenders had been added to the Celect implanted in Ms. Brand or (2) if the Tulip filter had been implanted in Ms. Brand, she would not have suffered a filter fracture and the resulting injuries. McMeeking Dep. 37:20-39:3; 182:7-183:3; 183:5-184:11; 224:10-225:2; 226:7-12: 227:22-228:2; 235:3-25 (Celect with primary leg extenders); 28:5-3; 32:5-16; 34:3-35:5 (Tulip), Ex. 51 to the App.

Significantly, Dr. McMeeking explains the reason why a Celect with primary leg extenders more likely than not would not have fractured in Ms. Brand: the legs with the extenders would have applied substantially less force to the wall of the vena cava, which would have made it substantially less likely to perforate the vena cava, which would have made it virtually certain that it would not have fractured. McMeeking Dep. 37:20-39:3; 182:7-183:3; 183:5-184:11; 224:10-225:2; 226:7-12: 227:22-228:2; 235:3-25, Ex. 51 to the App.; McMeeking Rep. at 59-64, Ex. A to the McMeeking Dec., Ex. 50 to the App.  In his report, he explained that he based this opinion on his own mathematical calculations of the force applied to the vena cava by the regular Celect

54

versus a Celect with primary leg extenders, bench tests of both types of filters, animal tests of both types, and limited clinical experience with the Celect Platinum, which added such primary leg extenders. *Id.* Cook does not even attempt to explain why these calculations and studies do not constitute a reliable basis for the opinion, nor could it.

Furthermore, Cook's own employees agree that reducing the rate of perforations will reduce the rate of fractures, because it is the stress placed on the filter transmitted through the leg or strut of the filter that has perforated through the vena cava that causes the fracture. *See* Carlson (Ph.D. metallurgist who worked at Cook for 10 years) Dep.  58:13-59:3; 68:21-24; 79:4-80:10; 89:6-17, Ex. 52 to App.; Choules (former Cook Director of Bench Testing) Dep. 116:2-23; 134:6-135:4; 138:11-20, Ex. 53 to App.  Indeed, Choules testified that, "So the fractures that I'm aware of have **always** been related to perforations." *Id.* 134:8 (emphasis added).

As to what would have happened had a Cook Tulip filter been implanted in Ms. Brand rather than a Celect, Dr. McMeeking testified very specifically that he had learned from Dr. Gordon (the radiologist who reviewed all the images of her filter for Ms. Brand) that one of the legs that fractured extended 10 millimeters beyond the vena cava and, more likely than not, a Tulip filter would not have fractured because: (1) a Tulip filter either would not have perforated or would not have perforated to that extent because the petals on the Tulip act as a significant perforation limiter, such that it likely would not have reached the stress level necessary for fracture, and (2) even if a Tulip had perforated to 10 millimeters outside the vena cava, its different design would have allowed less splaying of the legs, which would have helped control the stress level and made fracture less likely.  McMeeking Dep. 28:5-29:5; 29:24-25:1; 31:6-14; 32:5-16: 34:3-35:3, Ex. 51 to the App.; McMeeking Rep. at 50-51 & 56., Ex. A to McMeeking Dec., Ex. 50 to the App. So, Dr. McMeeking gave very specific bases for his Tulip opinion.

And, those bases do not rest on Dr. McMeeking's mere say-so, but rather upon very specific mathematical calculations. He calculated the stress on the filter without perforation and without endothelialization in the Report with the results given in Equations 105, 106 & 107. McMeeking Rep. at 39, Ex. A to McMeeking Dec., Ex. 50 to the App.  The most important result is in Equation 107, which indicates a stress of 15.86 MPa for each millimeter of reduction of the vena cava diameter. *Id.*  This  result  applies  for  all  sizes  of  vena  cava  diameter.  *Id.*

With full perforation and endothelialization (highly improbable with the Tulip because of the petal perforation limiters, but highly likely with the Celect), the result shown by Equation 121 is 219 MPa of stress for each millimeter of reduction of the vena cava diameter. *Id.* at 46.  This result applies for a vena cava diameter of 15 mm. *Id.*  Therefore, in full perforation in a 15 mm diameter vena cava, the stress is $219/31.72 = 6.9$, approximately 7 times higher than when the filter is not perforated. *Id.*

In addition, regarding the perforated Tulip versus the perforated Celect, both cases are represented by Equations D1 through D6 on pages 76-77 of the Report. *Id.*  The parameter l (small L) is the length of the primary leg segment that is inside the vena cava for a perforated filter and H is the vertical distance from the cap to the plane where the primary legs go through the wall of the vena cava. *Id.*  Both l (small L) and H are inversely proportional to the extent of *perforation. Id.* The combination of Equations D6 and 105 thus show that the greater the degree of perforation (the further the leg extends outside the vena cava) the greater is the stress for the same diameter change of the vena cava. *Id.*  This confirms that the petals inhibiting perforation in the Tulip stop the rising of the stress in the Tulip to the high levels suffered by the Celect at full perforation (by limiting how far outside the vena cava a leg can extend).  Another way to understand this is directly from Equation 105. *Id.*  The compliance c (flexibility and, thus, resistance to fatigue stress) in a

56

perforated filter is lower than in an unperforated filter and reduces as perforation progresses. *Id.* This means the stress increases on the filter the further a leg extends outside the vena cava, as given by Equation 105. *Id.*

Cook does not even attempt to explain why this analysis of the Tulip versus the Celect is unreliable, just as it failed to do with Dr. McMeeking's analysis of the Celect with primary leg extenders versus the Celect. Rather, without citing to any authority, Cook argues that because Dr. McMeeking forthrightly states he has not calculated the exact percentages by which the probability of fracture is reduced by the Celect with primary leg extenders and the Tulip as compared to the Celect, his opinions are somehow unreliable. Def. Mem. at 31-32 (citing McMeeking Dep. at 42). Cook conveniently ignores that Dr. McMeeking testifies that his calculations and the other data he relies upon support that the reduction in the probability of fracture for both alternative designs is greater than 50%. McMeeking Dep. 33:24-34:14 (Tulip); 225:3-25 (Celect with primary leg extenders), Ex. 51 to App. That testimony is more than sufficient given that Ms. Brand need merely prove causation and all the elements of all her causes of action (except as to liability for punitive damages) by a preponderance of the evidence (i.e., to be more likely than not, which is a greater than 50% probability). *See Michaels v. Mr. Heater,* 411 F. Supp. 2d 992, 998,1008 (W.D. Wis. 2006) (holding expert's testimony that burns received from the defendant's portable butane heater "more likely than not" caused the decedent's death without a statement of the exact probability of same was both admissible and sufficient to defeat the defendant's motion for summary judgment based on causation); Georgia Suggested Pattern Jury Instructions, Vol. 1: Civil (5th ed. 2018) § 00.040 Burden of Proof (defining "preponderance of the evidence").

Significantly, the accuracy of Dr. McMeeking's calculations are borne out by real world data collected and analyzed by Cook. For example, **2010-05-03**_CookMDL2570_0484885, is a

13-page 2010 report put together by a Cook engineer which explains in great detail how and why Cook modified the Celect into the Celect Platinum. Ex. 11 to App. On the fourth page, it shows that through the end of 2009, there had been 18 times more perforation complaints for Celect than for Tulip. *Id.* In fact, on page 12 it states "[p]enetration rate is 18 times of Tulip. The filter could continuously tilt or/and penetrate the IVC wall, and even cause some serious complaints." *Id.*

Even documents put together by Cook for outside consumption show that the Celect had a far higher rate of perforation and, crucially, fracture than the Tulip. **2016-08-24_CookMDL2570_1276605** is the 89-page report (Cook Medical IVC Filter Data Summary) Cook put together in 2016. Ex. 55 to App. On page 55, Cook's analysis of the literature reveals a 50.9% Celect penetration rate at the time of retrieval versus a 29.4% Tulip penetration rate. *Id.* Page 60 shows that at two different time points (placement and follow-up), the Celect was tilted a greater percentage of the time than the Tulip (7.3% vs 3.1% and 10.4% vs. 3.7%). *Id.* The consequence of the greater tilting and perforation of the Celect as compared to the Tulip is shown by the fracture rates set forth on page 28, which are six times higher for the Celect than the Tulip. *Id.* And, the fracture rate for the Celect was 10.8 times higher than the Celect Platinum, to which Cook added primary leg extenders, in large part to reduce the Celect's rates of perforation and fracture. *Id.*

James Carlson, the former Cook metallurgist, explained very well what Dr. McMeeking opines and what Cook's own analysis confirms:

> Q. Okay. I want to go back to the penetration issue. How did you become aware that there was an issue with Cook IVC filters penetrating the IVC?
> A. Well, it was related with the -- leg fracture.
> Q. I see. And which of Cook's IVC filters had issues with penetration of the IVC, to your
>  knowledge?
>  A. The Celect.
>  ….

58

Q. Okay.  I mean, it's relevant to why the filter fractured whether it penetrated the IVC, right?

A. Correct.

….

Q. And did the fact that the tilt -- the filter had gone outside the wall of the vena cava influence the fact that there was fracture?

A. Yes. I think all three are related, the tilt and the wall penetration and the fracture.

Q. And how are they related?

A. For whatever reason, the filter became -- it could be placed at a tilt by the doctor.  That's one possibility.  And, so, for whatever reason, it's tilted.  And so once it's tilted, you know, it puts a lot of stress on the bent leg and plus it puts the filter in a kind of an up -- a strangely loaded condition so there's more potential for a leg to kind of puncture through, like a needle, through the wall of the IVC.

Q. So, in other words, you're saying the tilt can lead to the perforation of the filter through the IVC?

A. Right, because the opposite legs are put in a situation where it's kind of like it's -- well, it's squeezed and then because of all the elastic energy that's in the wire, it pierces through the wall.

Q. And does that piercing through the wall, that's perforation, is that right?

A. Yeah.

Q. Does the perforation influence whether there's going to be a fracture of the filter?

A. Yes. They're all -- they're related.  It's a related pattern.

….

Q. So, my question is: In your experience is it more -- is it true that the Celect fractured more often than the Tulip?

A. Based on my ten-year career at Cook, yes.

Q. Do you know why?

A. Because of the tilting problem which led to a perforation of the IVC and then the high stress situation placed on either a primary or secondary leg.

Carlson Dep. 58:13-59:3; 68:21-24: 79:4-80:10; 155:8-17, Ex. 52 to App.

Notably, Cook does not challenge that the third alternative design proposed by Dr. McMeeking—attaching the legs to the cap at two places by making the leg a loop or in some other manner—would have prevented the migration of the leg pieces even after fracture and prevented Ms. Brand's injuries resulting from their migration.  For this reason alone, the Court should reject Cook's causation challenge.

In summary, Ms. Brand need not offer any evidence that an alternative design would have

59

prevented her fractured filter and resulting injuries, because she need not even prove the existence of a reasonably feasible alternative design. Further, if necessary, Dr. McMeeking offers detailed reasons based on reliable scientific methodology why two different alternative designs more likely than not would not have fractured in Ms. Brand and why a third would have prevented her injuries even if fracture had occurred.  And, real world data collected and analyzed by Cook both confirms Dr. McMeeking's opinions and independently proves causation in this manner. Simply put, Ms. Brand offers summary judgment evidence that easily creates a genuine issue of material fact as to causation.

### D. Ms. Brand offers evidence ruling out other causes of her injury that were not foreseeable risks of the Celect's defective design.

Yet again (for the fourth time), Cook cherry picks the deposition testimony and reports of Ms. Brand's experts to argue that they have failed to satisfy some aspect of causation. This time, because Drs. Krumholz and Gordon rely upon differential diagnosis (etiology) for their opinions that the Celect's design defects proximately caused Ms. Brand's Celect to fracture and her resulting injuries, Cook claims their opinions are unreliable because they failed to rule out other possible causes of Ms. Brand's Celect filter fracture. First, it claims that the doctors failed to rule out that the filter was fractured during the surgery to open up Ms. Brand's abdomen to expose the spine or during the spinal surgery itself. Mem. at 33-34. Second, it claims that the doctors failed to rule out that two of Ms. Brand's spinal conditions, osteophytes and spondylosis, caused the Celect to fracture. Def. Mem. at 34-36.

As to Cook's first claim, it conveniently ignores that in their reports, Drs. Krumholz and Gordon relied upon evidence that **definitively** ruled out the possibility that her vascular or spinal surgeons fractured her filter during either phase of her surgery on March 19, 2009.  Specifically, Dr. Krumholz relied upon expert reports by Drs. Timperman and Griffin, interventional radiologists

hired by **Cook** in connection with Ms. Brand's complaint, who reviewed all the available imaging on Ms. Brand prior and subsequent to her March 19, 2009 surgery. Krumholz Rep. at 158-161, 164 & 170, Ex. A to the Krumholz Dec., Ex. 2 to the App.   Based on imaging taken during and immediately after the surgery on March 19, 2009, a CT scan taken April 10, 2009, an x-ray taken on May 2, 2009, and an x-ray taken on July 8, 2009, all of which showed the filter unfractured, those radiologists concluded that the surgery did not fracture Ms. Brand's filter, which conclusions Dr. Krumholz reasonably relied upon. *Id*.

Dr. Gordon, a radiologist himself, similarly ruled out fracture of Ms. Brand's filter during surgery based, in part, on post-operative and follow up imaging. Gordon Rep. at 43, Ex. A to the Gordon Dec., Ex. 23 to the App. He also relied upon the fact that the distance between the spinal surgery and the filter made it very unlikely the surgery could have fractured the filter. *Id*. While Cook attacks that second basis for Gordon's opinion, it has no response to the definitive imaging as reviewed by its own consultants.

Cook may argue that the issue is not whether the surgery fractured the filter, but rather whether it caused the filter to perforate, which perforation inevitably led to fracture, and that Drs. Krumholz and Gordon do not rule out that possibility.   Such argument by Cook would be wrong in three respects. First, the Timperman and Griffin reports relied upon by Dr. Krumholz do rule out that the surgery caused the perforation; they both find that immediate post-operative scanning showed the filter was properly placed and that perforation did not appear until some weeks later in a scan on April 10, 2009.   Krumholz Rep. at 158-160, Ex. A to the Krumholz Dec., Ex. 2 to the App. Further, Dr. Krumholz adds that in Dr. Timperman's addendum to his report and his deposition, Dr. Timperman ruled out the possibility that anything about the surgery caused the later perforation (i.e., the filter was properly placed and not left tilted by the surgery). *Id*. at 160.

61

Second, as described at length above, Cook was well aware of the risk of the tilt, perforation and fracture sequence and that the tilt might initially result from the filter being implanted at a tilt. So, the risk that a surgeon might implant a tilted filter was a foreseeable risk that Cook had to design around so that the Celect would still not perforate and fracture, as opposed to some "other cause" of perforation and fracture that had to be ruled out when using differential diagnosis to offer causation opinions. At a minimum, Cook had the duty to warn physicians that if they left a tilted and perforated filter it very likely would perforate and fracture, something the IFU failed to do.

Third, absent the primary design defects of the Celect, the absence of perforation limiters like the petals of the Tulip which would have limited how far outside the vena cava the filter legs would protrude if surgery caused the perforation and design of the legs to reduce stress after perforation, more likely than not the fracture would still not have occurred. For example, as set forth above at 56, Dr. McMeeking offers the reasoned opinions that the Tulip would have been less likely to perforate as far as the Celect and that even if it had perforated the same 10 millimeters as Ms. Brand's Celect, it more likely than not would not have fractured.

The Court should reject Cook's second claim because it ignores how Georgia's risk/utility test for design defect liability works when it attempts to characterize Ms. Brand's osteophytes and spondylosis as "other causes" which must be ruled out by differential diagnosis.  Again, the risk/utility test imposes liability "where the manufacturer has failed to adopt a reasonable alternative design that would have reduced *foreseeable* risks of harm posed by the product. *Woods*, 2018 WL 2354925, at *3 (emphasis in original).  In this case, the presence of osteophytes or spondylosis or organs upon which a filter leg extending outside the vena cava following perforation could catch and increase the stress on the filter and cause it to fracture was one of those foreseeable risks that Cook had to account for in designing the Celect, not "other causes" to be ruled out during

62

differential diagnosis.

As Dr. McMeeking explained during his deposition:

> A. I have the overall opinion that if a filter
> such as the Celect is prone to having its struts
> perforate outside of the wall of the vena cava, then it
> should be designed in such a way that it takes into
> account the possibility or the probability that the
> strut can interact with something like an osteophyte
> that is present in someone's anatomy.

McMeeking Dep. 27:6-12, Ex. 51 to App.   Notably, Cook makes no attempt to rebut this

dispositive analysis by Dr. McMeeking.

Dr. Gordon elaborates on this fundamental point in his report:

> iii. Osteophytes and spondylosis of spine:
> 1. Mrs. Brand had degenerative disease of the lumbar and cervical spine, present
> in almost all patients undergoing spinal surgery and manipulation. Cook
> actively promoted prophylactic IVCF for this exact population; [patients at
> reportedly higher risk for PE with "contra indication to anticoagulation." Several
> Cook sponsored studies (e.g. Piano Study for Bariatric Surgery) supported use
> of IVCF for prophylaxis in high risk patients. To claim patient morbidity as
> source of Celect perforation essentially excludes the majority of patients Cook
> looked to capture through the expanding IVCF market. Cook also notes their
> low rate of complications with many patients having similar or worse morbidity
> to Mrs. Brand. Exclusion of IVC filter placement in patients with degenerative
> disease of the spine would exclude all patients undergoing spinal
> fusion from IVCF. The perforation was secondary to the lack of rate limiters and
> all subsequent injury and complications including leg fractures and
> embolization were directly related to Celect propensity to perforate. Although
> Mrs. Brand's spondylosis likely contributed to worsening symptoms from the
> fulcrum effect of the osteophyte (bony over growth) with the perforated primary
> legs, spondylosis is extremely common in patients, and present in almost all
> patients undergoing spinal fusion and decompression. Of course, the filter must
> have failed (i.e., perforated) to contact the osteophyte in the first place.

Gordon Rep. at 42, Ex. A to Gordon Dec., Ex. 23 to the App.

So, Cook finds itself in a Catch 22 of its own making.  Either osteophytes and spondylosis

constitute reasonably foreseeable risks of the Celect (given how common it is in high risk patients

undergoing spinal surgery) which Cook had to design the filter to handle without fracturing or, if

that was not possible, it needed to warn against the use of the Celect in spinal surgeries.  Either way, it cannot escape liability on the basis that Drs. Krumholz and Gordon did not rule them out as "other causes."

Further, independent of Drs. Krumholz's and Gordon's causation opinions based on differential diagnosis (etiology), Dr. McMeeking offers the opinion (as set forth above in detail) that the Celect's design defects proximately caused its fracture and Ms. Brand's resulting injuries without regard to the presence of her osteophytes and spondylosis (i.e., the Celect would have fractured from the stresses caused by its perforation of the vena cava even in the absence of one leg contacting an osteophyte). *See, e.g.,* McMeeking Dep. 24:4-13; 25:2-26:12, Ex.73 to the App.; McMeeking Rep. at 68-69, Ex. A to McMeeking Dec., Ex. 51 to the App. This meets the Georgia definition of proximate cause in that the design defects "…in a natural and continuous sequence produce[d] an event [fracture], and without which cause such event would not have occurred." Georgia Suggested Pattern Jury Instructions, Vol. 1: Civil Cases, 5th ed. § 60.200.  In fact, Dr. McMeeking's testimony evidences that Ms. Brand's osteophytes and spondylosis were not a proximate cause of the fracture, because it would have occurred without their presence. *Id*. And, even if they did constitute a proximate cause, that does not negate the design defects constituting a proximate cause, because "[t]here may be more than one proximate cause of an event…." *Id*.

In summary, Ms. Brand offers ample evidence creating a genuine issue of material fact as to causation because Drs. Krumholz and Gordon definitively ruled out Ms. Brand's surgery as the cause of her filter fracture and they had no need to rule out her osteophytes and spondylosis as causes of the fracture, because the risk that they would contribute to filter fracture was a foreseeable risk to Cook. Further, Dr. McMeeking's opinion creates a genuine issue of material fact as to causation regardless of whether they contributed to the fracture, because his opinion is

that the fracture would have occurred in their absence, and because there can be more than one proximate cause.

## IV. Federal Law Does Not Preempt the Portion of Ms. Brand's Negligence Per Se Cause of Action that Uses Federal Regulations to Provide Standards for Her Failure to Warn Causes of Action

21 U.S.C. § 337 of the Federal Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301, *et seq.*, providing that all violations of the FDCA shall be prosecuted in the name of the United States, preempts a negligence per se cause of action based upon violation of federal regulations implementing the FDCA that create requirements that did not exist at common law, such as fraud-on-the agency or misbranding. *See, e.g., Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348 & 352-53 (2001) (fraud-on-the-agency); *Leonard v. Medtronic, Inc.*, 2011 WL 3652311, at*7-8 (N.D. Ga. Aug. 19, 2011) (misbranding). For that reason, Ms. Brand concedes that Federal law preempts her Count IV, Negligence Per Se, to the extent it is based on misbranding in violation of 21 U.S.C. §§ 321, 331 & 352 and 21 C.F.R. §§ 1.21 & 801 and failing to maintain adequate quality systems regulation in violation of 21 C.F.R. § 820. *See* Master Consolidated Complaint for Individual Claims ("Master Comp.") (Dkt. No. 20. ) ¶ 91 (a)-(d) & (g).

However, given that negligence per se does not actually constitute a separate cause of action, but rather only a method to substitute statutory standards for parallel common law, reasonable care duties, Section 337 does not preempt a negligence per se cause of action that uses violation of federal regulations, such as manufacturing requirements or requirements to report adverse incidents to the FDA, to provide standards for pre-existing state law manufacturing defect or failure to warn causes of action. *See, e.g., Stengel v. Medtronic Inc.*, 404 F.3d 1224, 1226-33 (9th Cir. 2013) (en banc), cert. denied, 134 S. Ct. 2839 (2014) (holding Arizona law failure to warn claim based in part on defendant's failure to report adverse events to FDA pursuant to 21 C.F.R.

§ 803.50 not preempted); *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 763, 765, 771,774-75 (5th Cir. 2011) (same, except Mississippi law); *Bausch v. Stryker Corp.*, 630 F.3d 546, 553, 556-57 (7h Cir. 2010) (holding Illinois law manufacturing defect claims based on violations of FDA regulations not preempted); *Howard v. Sulzer Orthopedics, Inc.*, 382 Fed. Appx. 436, at*2-3 (6th Cir. June 16, 2010) (holding Oklahoma law manufacturing defect claims based on violation of FDA Good Manufacturing Practices (GMPs) set forth in 21 C.F.R. § 820 not preempted).

In support of her failure to warn causes of actions set forth in Counts I and III, Ms. Brand pleads negligence per se in Count IV based on Cook's violations of 21 C.F.R. §§ 803 & 807 by failing to make necessary adverse incident reports and to notify the FDA and consuming public when the Celect filter was no longer substantially equivalent based on post-marketing events and safety signals. *See* Master Complaint ¶ 91(e) & (f). Accordingly, those portions of her negligence per se cause of action are not preempted and the Court should not grant summary judgment on them.

**V. Genuine Issues of Material Fact Exist as to Ms. Brand's Claim for Punitive Damages**

"Numerous Georgia cases have held that punitive damages are available where a manufacturer knows that its product is potentially dangerous and chooses to do *nothing* to make it safer or to warn consumers." *Cisson v. C.R. Bard, Inc.*, 2013 WL 5700513, at *13 (S.D. W. Va. Oct.18, 2013) (citations omitted). So, in *Cisson*, the court found that just evidence that Bard knew of the potential dangers of making the pelvic mesh out of polypropylene and conducted no tests on its safety required denial of summary judgment on punitive damages under Georgia law. *Id.*, at *13-14. And, in *Weilbrenner v. Teva Pharmaceuticals USA, Inc.*, the court held that evidence that Teva knew of the risks of the minocycline causing pseudotumor cerebri in adolescent females but did not warn about it required denial of summary judgment on punitive damages under Georgia

law. 696 F. Supp. 2d 1329, 1344 (M.D. Ga. March 10, 2010).[50]

Notably, two courts have rejected summary judgment on punitive damages under Georgia law where plaintiffs injured by IVC filters put on evidence that the filters were failing at higher rates than competitor filters and/or another filter made by the same manufacturer and failed to correct the problem or warn about it in the IFU or elsewhere. *In re Bard IVC Filters,* 2018 WL 1256768, at *9-10; *Cason,* 2015 WL 9913809, at *6. Ms. Brand offers a veritable avalanche of evidence that Cook did exactly the same thing, in that it knew the Celect filter tilted, perforated and fractured at significantly higher rates than the Tulip and other filters and failed to fix the problem or warn about it.

Initially, Ms. Brand does so through expert opinions.  Dr. McMeeking reviewed animal and bench tests carried out by Cook, clinical data reviewed by Cook, scientific literature reviewed by Cook, post-market complaints received and analyzed by Cook and internal documents from Cook discussing the safety of the Celect in both absolute terms and compared to the Tulip and the Celect with primary leg extenders (i.e., the Celect Platinum).  McMeeking Rep. at 1 & 53-70, Ex. A to McMeeking Dec., Ex. 50 to App. Based on that review, he offers the opinion that Cook knew throughout its redesign of the Tulip into the Celect of the Celect's dangerous propensity to tilt, perforate and fracture and put it on the market anyway without fixing the problem or warning about it and, further, that the danger became even more clear after sale and use of the Celect based on reports received by Cook, but Cook nevertheless continued selling it without fixing the problem or warning of the danger. *Id*.

---

[50] Indiana law similarly allows for the imposition of punitive damages where a manufacturer knew the dangers of its product and sold the product without fixing it or warning of its danger.  *See Spangler v. Sears, Roebuck & Co.*, 752 F. Supp. 1437, 1444-48 (S.D. Ind. 1990); *Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 555-557 (Ind. App. 1999).

Based on the same types of data, set forth in even greater detail, Dr. Krumholz offers very similar opinions. Krumholz Rep. at 11-18, 23-26 & 127-143, Ex. A to Krumholz Dec., Ex. 2 to the App.  The Court may find the following portions of the Krumholz Report especially compelling as to Cook's knowledge of the dangers and refusal to correct the design defects or warn about the dangers: (1) "Table 1. Summary of Some Important Events Related to Cook Celect Filters" found at pages 11-18 of the report, and (2) the detailed review of Cook internal documents about the safety of the Celect, depositions of Cook current and former employees regarding same, Cook marketing documents and Cook's complaint/adverse incident data summaries found at pages 127 to 138 of the report.

Beyond these expert opinions and the evidence that provides their bases, Ms. Brand offers copious Cook internal documents and deposition testimony of current and former Cook employees in connection with her failure-to-warn claims and design defect claims, summarized and discussed above, which evidence that Cook knew about the dangers of the Celect and did **nothing**—neither fixed the defects nor warned about the dangers in the IFU or elsewhere. This evidence independently raises genuine issue of material fact as to punitive damages.

As one would expect, given that the knowing failure to warn alone can justify imposition of punitive damages, the misrepresentations by Cook of the dangers of the Celect to patients and their doctors in the IFU, in a published medical study and in marketing materials would also more than justify the award of punitive damages against Cook.  Indeed, two different courts found that evidence that Ethicon had affirmatively misrepresented the dangers of its pelvic mesh product supported juries' awards of punitive damages. *See Hammons v. Ethicon*, 2018 WL 3030754, at *32-33 (Pa. Sup. Ct. June 19, 3018); *Gross v. Gynecare*, 2016 WL 1192556, at *26-27 (N.J. Sup. Ct., App. Div. Mar. 29, 2016).

In this case, in addition to the evidence set forth above, Dr. Krumholz explains how Cook misrepresented the results of the Outside the United States Study ("OUS Study") concerning the safety of the Celect filter in multiple significant ways in an article about the study published in a peer-reviewed medical journal, in its marketing of the filter to doctors and, most importantly, in the IFU. Krumholz Rep. at 8-11 & 64-91, Ex. A to the Krumholz Dec., Ex. 2 to the App. The specifics of Cook's lies about this study are discussed in detail above. This evidence independently raises a genuine issue of material fact as to Ms. Brand's entitlement to recover punitive damages from Cook.

## **CONCLUSION AND REQUEST FOR RELIEF**

For the reasons stated above, Plaintiff Tonya Brand requests the Court to deny summary judgment on her causes of action for failure to warn, design defect, negligence per se based on Cook's violations of 21 C.F.R. §§ 803 & 807, and punitive damages and that it grant her all such other and further relief, general or special, legal or equitable, to which she may be justly entitled.

Dated September 14, 2018

Respectfully Submitted,

*/s/ Joseph N. Williams*_____
Joseph N. Williams, Atty. No. 25874-49
Riley Williams & Piatt, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com

*Liaison Counsel to Plaintiffs' Steering Committee and on behalf of Plaintiffs' Steering Committee*

69

/s/ Michael W. Heaviside
Michael W. Heaviside, Esq.
Heaviside Reed Zaic, A Law Corporation
910 17th Street NW, Suite 800
Washington, DC 20006
Telephone: (202) 233-1993
Email: mheaviside@hrzlaw.com

/s/ Ben C. Martin
Ben C. Martin, Esq.
The Law Office of Ben C. Martin
3710 Rawlin Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 74407590
Email: bmartin@bencmartin.com

/s/ David P. Matthews
David P. Matthews, Esq.
Matthew and Associates
2509 Sackett St.
Houston, TX 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184

*Plaintiffs' Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 14, 2018, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to the CM/ECF participants registered to receive service in this MDL.

/s/ Ben C. Martin
Ben C. Martin