**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to Plaintiff

*Tonya Brand*
No. 1:14-cv-06018-RLY-TAB

**PLAINTIFF TONYA BRAND'S MEMORANDUM IN OPPOSITION TO COOK'S
MOTION TO EXCLUDE EXPERT OPINIONS OF DR. GREGORY GORDON**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ ii

SUMMARY OF THE RESPONSE ..............................................................................1

BACKGROUND AND SUMMARY OF DR. GORDON'S
QUALIFICATIONS AND METHODS .......................................................................5

    *Cook Medical and the Celect IVC Filter* .................................................................5

    *Tonya Brand* .............................................................................................................7

    *Dr. Gordon's Investigation* .....................................................................................9

LEGAL STANDARD .................................................................................................12

ARGUMENT ..............................................................................................................13

I.     Dr. Gordon may testify to the Celect's design defect—its lack of a
perforation limiting feature—because he drew that conclusion from his
extensive review of Celect filter patient imaging, his training and
experience with IVC filters, and his review of the relevant medical
literature ...........................................................................................................14

II.    Dr. Gordon may testify on the so-called "state of the art" because has
extensively reviewed the relevant medical literature, is qualified to
interpret that literature, and relied on that literature in forming his
opinions ............................................................................................................17

III.   Dr. Gordon should be allowed to opine on Ms. Brand's injuries ........................19

    A.   Dr. Gordon properly links the filter defect to the filter failure
through differential diagnosis ..................................................................20

    B.   Whether Dr. Gordon is permitted to opine on the link between
Celect's defects and its failure in Ms. Brand or not, he should be
able to testify to the link between the Celect's failure and Ms.
Brand's pain. ...........................................................................................22

IV.   Dr. Gordon should be allowed to discuss the inconsistent and non-
standard definitions used in the OUS study because it will help the jury
understand why Cook's disclosures to physicians are so different from
the actual results of the OUS study. .........................................................23

V.    Dr. Gordon should be allowed to explain why the Celect IFU fails to adequately warn doctors of the Celect's risks revealed by the OUS study. ............................................................................................................... 27

    A.    IFUs are written for doctors so doctors are the appropriate group to testify whether the warnings in the IFU are sufficient. .......................... 27

    B.    Dr. Gordon has adequately testified to what should have been included in the IFU. ..................................................................................... 29

VI.   The Court should reject Cook's catch-all challenges to Dr. Gordon's testimony. ........................................................................................................... 32

CONCLUSION ................................................................................................................ 33

CERTIFICATE OF SERVICE ....................................................................................... 35

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) ......................................... 12

*Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000) ........................................... 30

*Calisi v. Abbott Laboratories*, 2013 WL 5441355 *7, 8-9
　　(D. Mass., September 27, 2013) ....................................................................... 28

*Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) ..................................................... 12

*Citizens Ins. Co. of the Midwest v. LG Elec., USA, Inc.*,
　　2013 WL 1857401, at *2 (S.D. Ind. May 2, 2013) .................................................. 12

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ........................................................ 12

*Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ................................................................. 13

*Huskey v. Ethicon, Inc.*, No. 2:12–cv–05201, 2014 WL 3362264,
　　at *34 (S.D.W.Va. July 8, 2014) ........................................................................ 28

*In re Bard IVC Filters Products Liab. Litig.*, 2018 WL 823277,
　　at *1 (D. Ariz. Feb. 12, 2018) ............................................................................ 28

*In re Yasmin & Yaz (Drospirenone) Prods. Liab. Litig.*, 2011 WL 6301625,
　　*11 (S.D. Ill. Dec. 16, 201l) ............................................................................... 28

*In re Yasmin and Yaz (Drospirenon) Marketing, Sales Practices and
　　Products Liab. Litigation¸* 2011 WL 6732245 at *3
　　(S.D. Ill. December 16, 2011) ....................................................................... 13, 19

*Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) ........................................... 20

*Primiano v. Cook*, 598 F.3d 558, 566 (9th Cir. 2010) ................................................................. 28

*Rebecca Dion v. The Graduate Hospital of the Univ. of Pennsylvania,
　　et. al.*, 1986 WL 501497 (Pa.Com.Pl. 1986) ....................................................... 28

*Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998) ...................................................... 27

*Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ................................................. 12, 13

*Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254 (5th Cir. 2002) ..................................... 28

iii

*Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000) ..................................... 12, 25, 26

**Rules**

Fed. R. Evid. 702 ............................................................................................................. 12, 15

Fed. R. Evid. 703 ................................................................................................................... 26

## SUMMARY OF THE RESPONSE

Dr. Gordon offers knowledge and analysis that no other expert in this case can offer. He has personally viewed and analyzed the 40,000 medical scans to study the frequency and impact of Celect filter perforations in the Vena Cava. These scans comprise the source data for Cook's OUS study and he is the only person in this case—if not the world—who has done so. Dr. Gordon concludes from this considerable analysis—along with his experience—that the Celect is a defective filter, that Cook's study data showed the Celect would progressively perforate the Vena Cava, and that Cook was dishonest both in its reporting to the FDA and in its communications with treating physicians.

Faced with Dr. Gordon's thorough preparation and devastating testimony, Cook now challenges the proverbial straw man. For some fifty-one pages, Cook's Motion to Exclude Expert Opinions of Dr. Gregory Gordon ("Cook's Motion") mischaracterizes Dr. Gordon's testimony then attacks him for providing "no support" for a position he does not hold.

The Background section of this memorandum discusses the history of the Celect, Ms. Brand's filter failure, and Dr. Gordon's qualifications and analysis. The Court will see that his analysis of the OUS study is more thorough and reliable than anything Cook has presented. The Legal Standard section reminds the Court of the familiar *Daubert* standard under Rule 702. The Argument section then explains why each of Dr. Gordon's *actual* opinions are reliable and helpful to the jury and why Cook's challenges to Dr. Gordon's testimony are wrong. In light of Dr. Gordon's considerable expertise and unmatched preparation and analysis, the Court should allow him to testify to each of the opinions offered in his report.

Briefly, here are the reasons Cook's challenges to Dr. Gordon's opinions all fail:

1.     ***The Celect's Design is Defective:*** Dr. Gordon found that more than 98% of Celect filters perforated the Vena Cava in Cook's human study (the "OUS study"). *See* Gordon Report, Exhibit A, at 7-9. This was not true of Cook's prior filter, the Tulip, or of competitor filters such as the Boston Scientific Greenfield. Gordon concludes that this failure is because the Celect lacks any feature designed to limit the extent of perforations—which those other filters have. Cook's primary challenge to this opinion is that Dr. Gordon (according to Cook) did not give due weight to certain studies that (according to Cook) demonstrate various benefits to the Celect. But a disagreement with Cook over the import of certain studies is not a flaw in methodology and is not a basis for excluding his opinion. Dr. Gordon's dim view of the benefits of IVC filters is well founded; it is based on the most comprehensive filter study to date. He is permitted to explain to the jury why he discounts the benefits of IVC filters when weighing their substantial risk. Such an explanation is reliable, helpful evidence of why the jury should do the same.

2.     ***State of the Art:*** Dr. Gordon has considered more than 300 articles, studies, and other publications in preparation for his testimony. He specifically references many of these in his report and he is fluent in the medical literature. Cook was free to question Dr. Gordon on any study at his deposition and *did* question him on several. The same goes for trial. Because Dr. Gordon has extensively reviewed the IVC filter literature and Cook is free to question him on his understanding thereof, but there is no *Daubert*-based reason that the Court should restrict Dr. Gordon's testimony about the contents of the relevant academic literature.

3.     ***Ms. Brand Suffered Injuries:*** Dr. Gordon testified at deposition that Ms. Brand experienced pain from the filter failure on three occasions: (1) when the broken filter strut protruded through her skin and had to be removed, (2) when doctors attempted to retrieve the filter through her jugular vein but failed because the filter was ingrown, and (3) when surgeons finally

2

got the filter out through an "open removal" surgery that required an incision from her sternum to her pubic area. *See* Gordon depo., Exhibit B, at 331:11-332:22. And because Dr. Gordon has concluded that the lack of a perforation limiter caused the filter failure, he links the pain of the failure with the defective design that caused it. Cook challenges this testimony primarily because Dr. Gordon previously reported that the filter failure caused other, more extensive pain, too. For example, pain near her spinal column where one of the struts still remains. The Court should not exclude Dr. Gordon's testimony about the specific pain associated with Ms. Brand's filter failure merely because he thinks—though is not quite medically certain—that the filter caused other substantial pain as well. Indeed, to exclude Dr. Gordon's testimony would merely penalize him for his conservatism.

4.    ***The OUS Definitions Are Misleading:*** One way that Cook hid the pitiful results of the OUS study from the FDA and physicians was to use inconsistent and non-standard definitions of the key terms. Dr. Gordon's testimony will clarify what actually happened in the study and show how the *reported* results under Cook's definitions compare to the *true* results of the study. This will allow the jury to determine, among other things, whether Cook complied with industry standards and regulations and whether its warnings were fair and accurate. Cook argues that Dr. Gordon is not allowed to criticize the OUS study design and reporting because he does not himself design studies. But this ignores the fact that a study's results and its definitions are interlocking. One is meaningless without the other. Dr. Gordon's testimony reliably demonstrates the true meaning of the OUS study data and his discussion of the study's terms are part and parcel to his analysis.

5.    ***The Celect's IFU was Deficient:*** The Celect Instructions For Use state that "***No device related*** major adverse events (defined as . . . ***perforation*** . . . ) ***have occurred***." *See* Cook

3

Celect Filter Set Instructions For Use ("IFU"), Exhibit C, at 5. Dr. Gordon reviewed the images in the OUS study and found that nearly 100 percent of patients experienced strut perforation through the Vena Cava wall, 90 percent of filters perforated more than three millimeters outside the wall, and roughly half of all Celect filters perforated more than five millimeters outside the wall. Cook argues that Dr. Gordon should not be allowed to expose these inconsistencies to the jury because he does not have experience drafting IFUs. But what matters is Dr. Gordon's *reading* of the IFU, not his *writing* of one. That is why courts—including another IVC-filter MDL court—permit IFU interpretations by physicians. Doctors, not regulators, are the intended audience of IFU warnings so doctors are the appropriate group to testify on whether an IFU adequately warns of the known risks of a device. Dr. Gordon has done what no one else has done—personally analyzed all the OUS images and compared the risks presented by that data with the risks that Cook communicated in the IFU. He is not only qualified to opine that the IFU fails to accurately describe the risks, he is *uniquely* qualified to do so.

Cook also raises two omnibus challenges to Dr. Gordon's testimony. First that his testimony "would not assist the jury" and also that the Court should prophylactically exclude him from testifying beyond the opinions expressed in his report. His testimony will help the jury because he will explain scientific imaging data within his field of expertise that, when properly analyzed, shows that the Celect is a defective product. That data also shows, when compared to the disclosed risks in the IFU, that Cook omitted serious risks from the IFU. Moreover, no before-the-fact restrictions on Dr. Gordon's testimony are necessary because his so-called "undisclosed" opinions are merely explanations of the opinions stated in his report.

## BACKGROUND AND SUMMARY OF DR. GORDON'S QUALIFICATIONS AND METHODS

### *Cook Medical and the Celect IVC Filter*

*For years Cook sold an IVC filter called the "Tulip."* Cook Incorporated, Cook Medical LLC, and William Cook Europe ("Cook" or the "Defendants") design and sell many types of medical devices, tools, and implants around the globe. One such type of device is known as an IVC filter. IVC filters are implanted in the Inferior Vena Cava, the largest vein in the body. Deoxygenated blood returns to the heart and lungs through veins and the Vena Cava is the final pathway before being reoxygenated. The idea behind an IVC filter is that it can catch blood clots in the IVC before they enter the heart or lungs. There is no question that blood clots entering the heart and lungs is dangerous. This condition is known as a pulmonary embolism ("PE") and it can be fatal. Recent studies indicate, however, that IVC filters are not effective at stopping PE—Cook of course disputes this.

Cook designed a filter called the Tulip and it was retrievable. Retrievable filters are valuable from a marketing perspective because they allow doctors to implant the filter prophylactically. Risk of PE is greater for some individuals while having surgery. And a filter that can be retrieved when the surgery—and thereby the risk of PE—has passed was and still is attractive to many doctors.

The Tulip filter looks like a metal spider with long, curved legs called struts meeting at a central point with a small hook that doctors can use to pull out the filter with a snare. Four sections of curved wire lay over top the struts. These sections of wire resemble flower petals, hence the name of the filter.

*The Celect filter was meant to have a longer retrievability window than the Tulip.* One problem with the Tulip was its short retrievability window. The petals often embedded into the

5

tissue of the IVC and became covered with scar tissue. Once that occurs, the filter cannot be retrieved as easily so the retrieval window for the Tulip was short. The idea behind the Celect was to lengthen the retrievability window.

The Celect filter resembles the Tulip—same long, thin struts with the same central meeting point and the same small retrieval hook. But the wires between the main struts no longer loop over the main struts as they did on the Tulip. The parties dispute the motivations for and effects of this change but suffice to say that Cook thought the new design would improve retrievability.

***Cook used the FDA's 510(k) process to get clearance to market the Celect.*** Not all medical devices reach the market through the same FDA procedure. The pre-market analysis or PMA requires human testing in a controlled trial and the testing must demonstrate the safety and efficacy of the product. This process is required to market a product as FDA "Approved." FDA "clearance" on the other hand does not require a PMA. A manufacturer can obtain clearance to market the product by demonstrating that the product is "substantially equivalent" to a product that is already on the market. This process is known as 510(k) clearance.

Cook used the 510(k) process, not the PMA. After the FDA received Cook's application to market the Celect as a retrievable filter, the FDA denied the application and sent Cook a "non substantial equivalence" letter (the "NSE letter").

***Following the NSE rejection letter, Cook conducted a human study called the OUS study.*** The study was called the Outside the United States study but it has been referred to in this litigation as the "OUS" or "OUS study" for short. The OUS study involved implanting Celect filters in patients, scanning those patients over time to see whether the Celect had perforated the Vena Cava, and sometimes attempting to retrieve the Celect. The study produced over 40,000 patient images and was the basis of the disclosures in the Celect IFU. That IFU stated that in the OUS study there

6

were "[n]o device related major adverse events (defined as hemorrhage, perforation, death, occlusion, filter fracture or significant filter migration) . . . ." The truth and sufficiency of the statements in the IFU are, for obvious reasons, hotly contested in this litigation.

The OUS study and its results are critical to this case. Cook published the OUS study results and also reported the results of the OUS study to the FDA. And those results served as the basis for FDA's ultimate clearance of the Celect for retrievability. Ms. Brand alleges that Cook used non-standard and misleading definitions for critical terms in the OUS study and that Cook changed those definitions over time to avoid detection. Cook of course denies this. Whatever Cook's motivations though, one cannot understand whether the risks present in the OUS cohorts were accurately disclosed without understanding (1) what actually occurred in the study, (2) how the critical metrics were defined, and (3) how the definitions of those terms align with the definitions as understood by the medical community and as reported by Cook.

### Tonya Brand

***Doctor Rheudasil implanted a Celect IVC filter in Ms. Brand prophylactically.*** Ms. Brand has a history of serious back pain. In 2009, her spine surgeon, Dr. Morrison, concluded that Ms. Brand needed an anterior lumbar fusion surgery. Dr. Morrison consulted Dr. Rheudasil, a vascular surgeon, about the need for an IVC filter. As a prophylactic measure, Dr. Rheudasil placed the Celect filer in Ms.Brand's Vena Cava before the fusion operation and assisted Dr. Morrison.

***Ms. Brand knew something was wrong when a broken strut of her Celect filer emerged from the skin of her inner thigh.*** Around the beginning of 2011, Ms. Brand began experiencing "new pain." That is, abdominal pain that was different and more severe than what she was experiencing before the filter implant. That pain migrated and grew worse over time. In May 2011, Ms. Brand felt what she described as a "lightning bolt" in her right thigh. Ms. Brand consulted her

7

physician who observed that something was under her skin and implored Tonya to let him remove it. She declined and a few days later a broken piece of the Celect filter protruded from Ms. Brand's skin. Her son pulled the strut out of her leg.

Following this episode, a CT scan revealed that some of the Celect filter's twelve legs were missing from the filter. One of the broken-off legs was found in the prevertebral space adjacent to Ms. Brand's spine. The filter—more precisely, what *remained* of the filter—was thought to still be in place. In consultation with Ms. Brand, her medical team, and Cook Medical, Dr. Rheudasil agreed to attempt retrieval of the Celect.

***Even after two surgeries, two struts of the failed Celect filter remain inside Ms. Brand.*** The first retrieval operation was on July 14, 2011. Dr. Rheudasil attempted a percutaneous retrieval. This means that he inserted a snare into Ms. Brand jugular vein and tried to pull the Celect out by snaring the hook on the filter. Though Dr. Rheudasil tried with multiple snares to retrieve the broken filter, he could not get it out. Given that the filter was already broken and protruding through the Vena Cava, Dr. Rheudasil did not aggressively attempt advanced techniques.

More pain, more imaging, more migration of the broken pieces and likely more fractures ensued. So in 2013 Dr. Rheudasil removed the Celect filter with a laparotomy. A laparotomy is an "open removal" surgery. Meaning that instead of going through a vein to retrieve the filter, the surgeon opens the patient's body cavity with an incision. Ms. Brand's removal incision runs roughly the length of her torso—from her upper chest to just above her pubic area. This time, Dr. Rheudasil succeeded in removing the main body of the Celect filter. Even now, though, two of the legs remain inside Ms. Brand's body because they are too dangerous to remove.

### *Dr. Gordon's Investigation*

**Dr. Gordon is a board certified Interventional Radiologist and he also owns a medical device company.** Dr. Gordon went to college at the University of Illinois Champaign-Urbana. Gordon Report, attached as Exhibit A, page 1. He then attended medical school at the University of Illinois and Abraham Lincoln School of Medicine in Chicago. *Id.* After graduating medical school, Dr. Gordon went to Northwestern University where he completed his medical internship, a diagnostic radiology residency, and an interventional radiology fellowship. *Id.*

For more than twenty years, Dr. Gordon has practiced as an interventional radiologist with full time appointments in both academic and private practices. Recently, from 2011 to 2015 he served as the Section Head of Interventional Radiology at the Veterans' Affair Medical Clinic in Omaha, Nebraska. Along the way he became board certified in both interventional radiology and diagnostic radiology.

**Dr. Gordon is the only witness to review every single patient image from the OUS study.** Though this is only the second case—and the first piece of litigation—Dr. Gordon has provided opinions in, he has taken an outsized role in the investigation of Celect filters by personally reviewing each and every image created as part of the OUS study—twice.[1] Dr. Gordon concluded from this review that Cook dramatically underreported the incidents of filter failure in the OUS study. Dr. Gordon's analysis showed that of the cohort of patients whose data was described in the IFU, **100%** of the Celect filters were protruding outside the IVC. Gordon Report at 10-11. These were not minor perforations as **100%** of the filters were protruding at least three millimeters outside

---

[1] Some he checked three times or more. *See* Gordon depo at 177:17-22 ("there were over 40,000 images [and] I reviewed each one of these at least two to three times. Probably some more."

the IVC. *Id.* Still worse, nearly half of the Celect filter for that group (48.40%) had struts protruding at least five millimeters outside the IVC. *Id.* Dr. Gordon found nearly identical results for other cohorts.

Because of this intense analysis, Dr. Gordon understands the risks of the Celect and its behavior at a level of detail that is unmatched in this case. For example, one of Cook's experts, Dr. Timperman, also reviewed images from the OUS study. And Dr. Timperman's findings are nearly identical to Dr. Gordon's with respect the presence and extent of struts protruding outside IVC, especially at the three millimeter level. *See* Gordon Report at 9-11; Gordon Deposition, attached as Exhibit B, page 185:17-25. The difference between Dr. Gordon's analysis and Dr. Timperman's analysis is that Dr. Gordon reviewed thousands of images from over one-hundred patients whereas Dr. Timperman reviewed images from just a dozen patients.

From this review, Dr. Gordon concludes that there is no way to square the values in the OUS study data with the descriptions that Cook provided to FDA and to physicians. Gordon Report at 5-6. To understand this point, one must understand the way Cook defined various terms in the OUS study and OUS reporting.

Problems occur when the struts of a filter perforate the IVC rather than merely seating against the interior wall of the IVC. According to Dr. Gordon and others, when a filter leg perforates through the IVC wall and protrudes out the other side a host of problems can arise including decreased retrievability, excessive tilt, and fracture. *See* Gordon Report at 2-5. Thus Dr. Gordon concludes that Cook was obligated to accurately disclose what the OUS study revealed about Celect's propensity to perforate through the IVC wall. *Id.* As part of his research, Dr. Gordon compared the various terms that Cook used to describe this perforating behavior. *Id.* at 6, Table 7.

The primary terms used in the medical community to describe IVC filter struts piercing and protruding through the IVC wall are "penetrate" and "perforate." *Id.* at 6. Cook used both of these terms at various times to describe the results of the OUS study. *Id.* Because these terms have been used in medical literature, Cook was not writing on a blank slate when it adopted these terms. Dr. Gordon found several problems with the way Cook used these terms to describe the OUS study. *Id.* First, Cook used different definitions at different times. *See id.* at Table 7. Second, Cook defined the terms in a way that was misleading and sometimes omitted the definitions from its publication of the results, leaving Cook's audience with no way to know about its non-standard use of the term. *Id.* Dr. Gordon provided a chart in his report, which has also been used and corroborated by Dr. Krumholz, that identifies the different ways Cook defined its terms to conceal the results of the OUS study. *Id* at 6-7.

**Dr. Gordon has studied Cook's internal and external documentation on the OUS study.** On top of his personal analysis of the OUS study data and his experience and training as an interventional radiologist Dr. Gordon has reviewed many records from this litigation, including many internal Cook communications. Gordon Report 11-15. This review was necessary because Dr. Gordon opines on the reasonability of Cook's definitions in and reporting on the OUS study. *Id.* It also allows him to opine that Cook failed to warn of known risks in the IFU because the documents demonstrate that Cook was aware of the risks when the IFU was drafted. *Id.* at 13-15. Dr. Gordon is able to interpret these documents more robustly because of his thorough review of the OUS study data—which is the same data Cook's team had available when drafting the IFU.

**Dr. Gordon has studied Ms. Brand's medical history.** He spoke with Ms. Brand by phone, spoke with some of her other doctors, and carefully reviewed her complete medical records. *Id* at 16-46. He included his opinions and key reliance records in his report, including several important

11

images taken of Ms. Brand. *Id.* Dr. Gordon has done everything necessary to gain a competent understanding of Ms. Brand's medical conditions. *Id.*

## LEGAL STANDARD

Expert testimony must meet the test of admissibility under Rule 702 and the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). To satisfy the reliability requirement, the expert rendering an opinion must be qualified in the relevant field and the opinion must be based on a sound methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "While the trial court acts as the gatekeeper for expert witnesses, . . . factual soundness and correctness of conclusions are reserved to the jury." *Citizens Ins. Co. of the Midwest v. LG Elec., USA, Inc.*, No. 3:11-cv-40-RLY-WGH, 2013 WL 1857401, at *2 (S.D. Ind. May 2, 2013) (Young, J.) (citing *Daubert* and *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000)). "Excluding expert testimony under Rule 702 is the exception, not the rule." *Id.* (citing Fed. R. Evid. 702, Advisory Comm. Note).

The first step in a *Daubert* analysis is to determine whether the person whose testimony is offered is in fact an expert though "knowledge, skill, experience, or eduction." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (quoting Fed. R. Evid. 702). The court must next decide if the experts reasoning or methodology is reliable. *Id.* at 904. Reliable testimony is drawn from knowledge and experience in the relevant discipline and not from subjective belief or unsupported speculation. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). "The court's gatekeeping function requires focus on the expert's methodology; 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.'" *In re Yasmin and Yaz (Drospirenon) Marketing, Sales Practices and Products Liab. Litigation¸* 2011 WL 6732245 at *3

(S.D. Ill. December 16, 2011) (citing *Smith*, 215 F.3d at 589-90). "Resolution of an expert's credibility or the correctness of his or her theories is left to the jury's determination after opposing counsel has cross-examined the expert at issue." *Id.* at *4.

The final requirement is that the expert's testimony "assist the trier of fact" in deciding "any issue relevant to the dispute." *Id.* "[T]he expert need not have an opinion as to the ultimate issue requiring resolution to satisfy this condition." *Id.* (citing *Smith*, 215 F.3d at 718).

## ARGUMENT

There is no true debate that Dr. Gordon is qualified to testify in this case. He is board-certified in the medical specialty—interventional radiology—that is at the core of the dispute between Ms. Brand and Cook. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (noting that even uncertified medical generalists may testify to specific conditions if their experience warrants it). Similarly, there is no true debate that Dr. Gordon's preparation was methodologically sound. He personally examined each of the patient images from the OUS study using the same sophisticated equipment he uses in his practice. Gordon Depo 168:7-18. And Cook impliedly acknowledges the propriety of Dr. Gordon's testimony about these images. *See* Cook Motion at 2 (arguing that Dr. Gordon should not be allowed to testify "[r]egarding any aspect of the so-called OUS study and related documents, ***other than Dr. Gordon's own review of the study's radiological images.***").

Because Dr. Gordon's qualification, preparation, and core testimony is beyond controversy, Cook challenges Dr. Gordon's individual opinions and in some cases subparts of his opinions. The bulk of this argument, therefore, responds point-by-point explaining why *all* of Dr. Gordon's proffered opinions are admissible. Plaintiff begins, however, by pointing out that Cook has ***not*** challenged Dr. Gordon's qualifications or method for analyzing the OUS study images nor

has Cook argued that this testimony will be unhelpful to the jury. So the admissibility of his review of those images and his statistical presentation of his conclusions are uncontroverted.

I.   **Dr. Gordon may testify to the Celect's design defect—its lack of a perforation limiting feature—because he drew that conclusion from his extensive review of Celect filter patient imaging, his training and experience with IVC filters, and his review of the relevant medical literature.**

Dr. Gordon's opinion that the Celect's design is defective is reliable because it is based on three areas within his field of expertise—direct clinical experience, literature review, and study imaging analysis.

Dr. Gordon has implanted and retrieved many IVC filters. At the height of his clinical practice he implanted 50 to 100 filters per year. Gordon depo. 79:6-11. Over time, these comprised several different types of IVC filters including the Celect (the filter at issue in this case) the Tulip (Celect's predecessor made by Cook) and the Greenfield (a competing filter made by Boston Scientific). *See* Gordon Depo. 130:1-18. Dr. Gordon testified in his deposition that both the Tulip and the Greenfield are superior to the Celect at preventing perforation through the IVC wall because they have perforation-limiting features. In the case of the Greenfield, that feature is a set of twisted "feet" that disperse the pressure points of the filter and avoid the "stable, continuous, radial force outward" that causes the Celect to perforate so frequently. *See Id.* at 162:23-163:22. In the case of the Tulip, the perforation-limiting feature is the set of Tulip "leaves" that surround the main struts and "limit[] the extent of perforation or expansion beyond the wall." *See Id.* at 159:16-160:6.

Dr. Gordon should be allowed to testify about this lack of a perforation-limiting feature and its effect on the filter because he has the appropriate knowledge-base and expertise to link those design features to the performance of the filters. He has clinical experience with each of the filters having implanted each of them many times. He has relied on the studies that establish that

the Celect progressively perforates the IVC wall leading to, among other things, fracture. Gordon Report at 2-3. And, his review of Cook's own study—the OUS study—reveals that the product perforates at unacceptable levels. *Id.* at pp. 5-7. Each of these bases are within Dr. Gordon's medical specialty and, when taken together, indicate that the Celect's lack of a perforation-limiting feature is a defect. The testimony is therefore reliable and helpful. *See* Fed. R. Evid. 702.

Dr. Gordon's method of identifying a design defect in the Celect is reliable because it combines his analysis of the OUS study data with published literature on IVC filters and Cook's own assessments of the Celect's design. Dr. Gordon concluded that the Celect is defectively designed based largely on the following observations about the Celect:

- "When designing the Celect, Cook took a known safety feature (the petals, aka perforation limiters) off of the Tulip, increasing the risk of and potential extent of perforation (and of resulting tilt, fracture and migration)." *See* Gordon Report at 2.

- "The potential risks and hazards [of removing the petals] were discussed within Cook . . . but were sacrificed and were not revealed during the 510K clearance process." *Id.*

- "Cook's prediction that the Celect would perforate the IVC was borne out" as demonstrated by Dr. Gordon's analysis of the OUS study images and multiple peer-reviewed studies. *Id.* at 2-3.

- The Greenfield filter, which has a perforation-limiting feature, perforates less frequently and less extensively than the Celect. *See* Gordon Depo. at 348:25-349:22. It likely fractures less frequently as well because excessive perforation leads to increased fracture. *Id.* at 349:23-350:15.

- The Cook Tulip filter, which has a perforation-limiting feature, has a fracture rate that is three times lower than the Celect. *Id.* at 196:15-197:4.

- The Celect has "demonstrated problems with perforation, fracture [and] other clinical complications." *See* Gordon Report at 12.

- The Celect has a "capacity to cause thromboembolic events such as DVT." *Id.*

- The Celect presents "significant difficulty or impossibility to be retrieved." *Id.*

- The Celect "cannot always be retrieved through the Gunther Tulip Filter Retrieval Set. *Id.* at 13.

15

- Cook "recognizes [Celect's] problems and internal documents show [Cook] to believe the risks of the product outweigh its benefits." *Id.*

Each of these observations was drawn from published sources, the information and communications he studied in connection with this case, or his personal experience with using the Celect, the Tulip, and the Greenfield.

To conclude that the Celect's design is defective and that its risks outweigh its benefits, Dr. Gordon compared the fracture rates of the Celect to other available filters. The perforation rate is the critical attribute of an IVC filter because, as Dr. Gordon explains in his report, excess perforation leads to tilt, migration, and fracture. *See* Gordon Report at 2. This is because perforation allows filter malpositioning which changes the force distribution on the filter struts. *See id.* Dr. Gordon refers to this process a "vicious and dangerous cycle that also increases the risk of fracture." *Id.*

In the analysis that Dr. Gordon performed of the OUS study, more than 90% of the Celect filters perforated IVC wall. *See id.* at 8-10. The Jia meta-analysis which Dr. Gordon cites throughout his report also noted very high levels of perforation for the Celect. *See* Gordon depo. at 274:19-275:13. Such levels of perforation present a high level of risk for the patient—much higher than for the safer alternative filters. According to Dr. Gordon's review of the academic literature, around nine percent of perforations become symptomatic. *Id.* Dr. Gordon coupled that literature with the results of Cook's OUS study, in which over 90 percent of the patients experienced perforation with the Celect, to conclude that more than eight percent of *all* patients that receive the Celect are now or will become symptomatic. *Id.* at 275:14-276:18.

Dr. Gordon relied on the published academic data combined with his own review of the OUS study to conclude that the removal of the perforation-limiting "leaves" in the design of the Celect is what caused the Celect to perforate so much more frequently than its predecessor, the

16

Tulip. Dr. Gordon therefore drew his conclusion that the Celect design increases the risk of using the product from sources that are well within his purview. Cook's argument about whether Dr. Gordon should have given greater consideration to other filter attributes such as migration is not an attack on the admissibility of Dr. Gordon's testimony but rather on its weight. The Court should therefore admit Dr. Gordon's opinion that the Celect is defectively designed and that its risks outweigh its benefits.

II.     **Dr. Gordon may testify on the so-called "state of the art" because has extensively reviewed the relevant medical literature, is qualified to interpret that literature, and relied on that literature in forming his opinions.**

Cook accuses Dr. Gordon of cherry-picking literature at the behest of Ms. Brand's counsel. This is false. Dr. Gordon's reliance list contains more than 300 articles, publications, and other academic sources. Cook was free at his deposition to question him about any of those articles and did so. Cook's true complaint is that Dr. Gordon draws different conclusions from his review of that science. But this is not a ground to exclude Dr. Gordon or to limit his testimony. To the extent he characterizes the academic consensus differently than Cook would prefer, that is not a failure of qualifications, reliability, or methodology. It is merely a hard truth for Cook that a qualified interventional radiologist has read all the relevant literature and characterizes the consensus quite differently than Cook would prefer.

Considering the extent of Dr. Gordon's reliance materials, Cook's argument that Dr. Gordon credits certain studies while discounting others goes only to the weight of the evidence, not the admissibility. Dr. Gordon's reliance list is extensive. It contains more than 300 references to academic papers, articles, and other publicly available information about IVC filters and the Celect. *See* Reliance list included with Gordon Report. In his report, Dr. Gordon points more specifically to the articles and sources he relied on in forming each of his opinions. *See* Gordon Report, passim. For example, following his opinion that "perforation results in symptomatic injury

in a significant percentage of cases," Dr. Gordon listed ten sources he relied on to reach that conclusion. *Id.* at 2-3. The majority of these sources are peer-reviewed medical literature.

Because Dr. Gordon included references to his sources accompanying his opinions, Cook was able to question him at deposition about those sources. And Cook took that opportunity and sometimes questioned Dr. Gordon at length about his reliance on various studies and how he incorporated that information into his opinions. *See generally* Gordon depo. at pages 274-280 (discussing a meta-analysis study, Jia Z, et al. Caval Penetration of Inferior Vena Cava Filters: A Systematic Literature Review of Clinical Significance and Management). Cook was free to similarly question Dr. Gordon on any of the dozens of sources in his report.

Cook now claims that Dr. Gordon should not be able to describe the academic literature in general terms because they disagree with what he draws from that literature. But this is a comment on the weight of the evidence, not the admissibility. If Cook disagrees with Dr. Gordon's characterization of the medical consensus at trial, they are free to cross examine him just as they did in his deposition.

Cook's also argues that Dr. Gordon is not qualified to testify about the contents of scholarly articles because he has never published a peer-reviewed paper on IVC filters. This argument has two critical flaws. The first is that Dr. Gordon was a peer reviewer for the Journal of Vascular and Interventional Radiology. *See* Gordon depo. at 108:4-108:21. This role involved reviewing and editing articles to decide "whether or not they are appropriate and of high-enough quality to be within the journal." *Id.* at 108:10-11. In other words, the Journal of Vascular and Interventional Radiology trusted Dr. Gordon to screen articles and decide their academic quality. And he performed this role through 2016. *Id.* at 108:16-20. Dr. Gordon's ability to assess academic literature is therefore good enough to earn the trust of a premier radiological journal. This

18

undercuts any basis for Cook's argument that he is unqualified to interpret academic papers because he has "never published" a peer-reviewed paper.

The second fatal flaw in Cook's argument is that it confuses qualification to *publish* an academic paper and qualification to *interpret* an academic paper. *See In re Yasmin*, 2011 WL 6732245 at *4-6 (admitting testimony of a "physician in general practice" in part because his opinions were based on relevant academic literature). Dr. Gordon's experience drafting academic publications is not at issue in this litigation. His relevant skill is the ability to read and interpret the academic publications because those publications comprise the publicly available information on which treating physicians rely. Therefore, when Dr. Gordon describes generally accepted principles from that body of literature, the jury can be confident about what doctors take away from the published literature.

## III.    Dr. Gordon should be allowed to opine on Ms. Brand's injuries.

 The full proof of Ms. Brand's injuries in this case involves two causal links. The first link is between a defect in the filter and the failure of the filter. The second is between the failure of the filter and the pain Tonya Brand experienced when a filter strut emerged from her thigh and during the filter removal procedures. Cook argues that Dr. Gordon should not be allowed to testify that the defective filter caused Ms. Brand's pain because—according to Cook—Dr. Gordon's differential diagnosis linking the defect to the failure was not adequately performed.

That argument is both wrong and misunderstands the causal nature of this portion of the case. It is wrong, and hence Dr. Gordon should be allowed to testify to the first causal link, because he has reliably used a differential diagnosis that demonstrates the defect caused failure. It misunderstands the nature of this testimony because the second link has independent relevance to the case. So regardless of whether he is permitted to testify to the link between the defect and the

failure he should be permitted to testify to the link between the failure and Ms. Brand's pain from the strut protrusion and removal surgeries.

### A. Dr. Gordon properly links the filter defect to the filter failure through differential diagnosis.

Differential diagnosis is the process of considering potential causes of a patient's symptoms other than the hypothesized diagnosis. *See Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Differential diagnosis is an accepted and valid methodology for an expert to render an opinion about on causation. *Id.* A differential diagnosis demonstrates the cause of an injury or symptoms when the other potential causes within the differential are eliminated. *Id.*

Dr. Gordon considered five potential causes other than a defect of the filter when linking the defect to the injury: (1) manipulation and harm to the IVC and the Celect filter during Ms. Brand's spinal fusion surgery; (2) morbidity of the patient; (3) osteophytes and spondylosis of the spine; (4) normal physiological activity; and (5) a motor vehicle accident in April of 2011. Gordon Report at 42-43. Dr. Gordon concluded, based on Ms. Brand's medical records, his conversations with her, and his knowledge of IVC filter placement that none of these potentialities caused Ms. Brand's Celect filter to fail. *Id.*

Dr. Gordon eliminated manipulation of the IVC and the filter during surgery as a potential cause for two reasons. *Id.* First, the filter was not placed in direct proximity to the location of the operation. The filter was placed six to eight centimeters above the location of the operation so manipulation by tools was unlikely. *Id.* Second, images of the filter taken *after* the surgery show it to be in a good position except for the perforation. *Id.* If manipulation or malpositioning at implant or during surgery had caused the fracture, the filter would be malpositioned or fractured in the post-operation images but that is not so. *Id.*

Dr. Gordon eliminated morbidity of the patient because Ms. Brand did not have any of the known morbidities that suppress healing. *Id.* If Ms. Brand had a healing or immunosuppression issue serious enough to affect the filter she would not have been cleared for major surgery. *Id.*

Dr. Gordon eliminated osteophytes and spondylosis of the spine because those conditions existed outside the IVC wall. *Id.* While it is likely that a filter strut contacted Ms. Brand's osteophytes placing additional pressure on the filter, that contact was outside the IVC wall—meaning a perforation of the IVC had already occurred. *Id.* Also, Cook never contraindicated the Celect for patients with osteophytes and actually marketed the product for patients undergoing spinal surgery. *Id.*

Dr. Gordon eliminated normal physiologic activity because to place the cause of the failure on normal physiologic activity *experienced by* all patients would be to say that the filter is *dangerous in* all patients. Cook argues in its motion to Dr. Gordon failed to consider *abnormal* physiologic activity such as Ms. Brand's constipation. But again, Cook never contraindicated the product for patients with constipation or any of Ms. Brand's other conditions.

Finally, Ms. Brand's April 2011 car wreck could not have caused the fracture because the fractures and perforations were already present and identified at that time. *Id.*

This is a reliable and systematic consideration of the possible causes of the filter failure. Cook argues in its brief that Dr. Gordon should have considered other possible causes and that Dr. Gordon was too quick to eliminate some of these causes. But those are not grounds for exclusion of the opinion; those are arguments on the weight and credibility of Dr. Gordon's testimony. Cook acknowledges that a differential diagnosis is a proper method to determine causation and acknowledges that Dr. Gordon considered and eliminated five potential causes of the filter failure

other than a design defect.  Criticisms of his individual determinations within that framework are not a credible attack on the reliability of his method and go, at most, to the weight of the evidence.

B.   **Whether Dr. Gordon is permitted to opine on the link between Celect's defects and its failure in Ms. Brand or not, he should be able to testify to the link between the Celect's failure and Ms. Brand's pain.**

At his deposition, Dr. Gordon testified that he can—to a reasonable degree of medical certainty—link three types of pain to the failure of the Celect filter implanted in Ms. Brand. First is the "lightning bolt" of pain she experienced when the broken strut migrated through her thigh, protruded from her skin, and was pulled out by hand. Second is the pain she experienced when Dr. Rheudasil attempted to retrieve the broken Celect filter percutaneously but was unable to do so because it was overly embedded in her tissue. Third is the pain she experienced from the open removal surgery where Dr. Rheudasil removed most—but not all—of the filter through two-foot-long incision through her abdominal wall.

Cook argues that Dr. Gordon should not be able to opine on this pain because he stated in his report that the failed Celect caused significantly more pain than just those three items. According to Cook, Dr. Gordon's "abrupt" change of course indicates that his methodology is unreliable. *See* Cook's Motion at 21-22. To hear Cook tell it, Dr. Gordon dramatically altered his opinion to make radical claims or lied in his report.

Quite the contrary, Dr. Gordon chose in his deposition testimony to take the conservative route. He has never testified that Ms. Brand's other post-implant pain is *not* related to the failed filter. In fact, he testified at deposition that he believes—based on conversations with Ms. Brand and a review of her medical history—that the filter has caused significantly *more* pain than just the three types he has affirmatively linked to the filter. He simply is not comfortable testifying—to a reasonable degree of *medical certainty*—that is the case. To exclude even the remaining portion of Dr. Gordon's opinion on pain would be to penalize him for his conservatism. Dr.

Gordon's unwillingness to link other forms of pain to the failed filter should, if anything, bolster his credibility because he is hewing his testimony as closely as possible to the appropriate standard.

Finally, Cook's argument that Dr. Gordon's testimony on pain should be excluded misunderstands the causal chain and the relevance of the testimony. Even if Dr. Gordon were not qualified to opine on the link between the defect in the Celect and the failure of the Celect in Ms. Brand's case, he is certainly qualified—as a physician—to testify that the filter failure was painful in the three specific ways described above. The pain caused by the filter failure is evidence of Ms. Brand's damages and the link between failure and pain is a component of causation. That pain and that link thus have independent relevance from the link between the filter's lack of a perforation limiter and its excessive perforation and fracture in Ms. Brand. Moreover, other experts in this case have opined that the Celect is defective and that those defects caused the failure. If for any reason the Court limits Dr. Gordon's testimony that the filter is defective or that the filter's defect caused it to perforate and break apart, the Court should nevertheless permit Dr. Gordon to testify that the filter's failure—for whatever reason—caused Ms. Brand significant pain.

**IV. Dr. Gordon should be allowed to discuss the inconsistent and non-standard definitions used in the OUS study because it will help the jury understand why Cook's disclosures to physicians are so different from the actual results of the OUS study.**

Dr. Gordon has analyzed the OUS images and concluded that nearly all of the Celect filters in that study perforated the IVC wall by standard industry definitions. And Dr. Timperman, one of Cook's experts, observed essentially the same result. *See* Gordon Report at 8. Yet Cook reported to physicians in the Celect IFU that no major adverse events had occurred, including perforations. The jury is thus left with an important question: how do we reconcile the actual results of the OUS study with what Cook reported to physicians? The answer to this question is found in the inconsistent and non-standard definitions that Cook used in the OUS study. Dr. Gordon has concluded and will testify that the IFU was misleading to physicians because it used terms and

23

definitions that were different than the generally accepted definitions in the industry. *Id.* at 5-11. In addition to using non-standard definitions, Dr. Gordon and others have noted that Cook's definitions of critical terms changed over time. *Id.* This, too, concealed from doctors the true risks of the Celect filter. *Id.*

Cook does not challenge the quality, reliability, or accuracy of Dr. Gordon's review of the OUS study data. *See* Cook Mem. at 2 (challenging testimony on "any aspect of the so-called OUS study and related documents, *other than Dr. Gordon's own review of the study's radiological images.*"). Cook instead argues that Dr. Gordon should not be allowed to criticize the definitions that produced the gap between the actual data and the way that data was reported to physicians. For instance, in the OUS study protocol Cook defined "Perforation" as "protrusion of filter struts through the wall of the IVC *causing hemorrhage or hematoma*." Gordon Report at 6, Table 7 (emphasis added). But when the study results were published in the Journal of Vascular and Interventional Radiology in November 2009, the definition had changed to simply "strut protruding outside of the IVC wall." *Id.* Dr. Gordon needs to be able to explain his findings in the context of these definitions. Without that context—without a definition for "perforation"—his statistics on the perforation rates will not carry their full meaning.

Cook's arguments against allowing Dr. Gordon to explain his findings by connecting the raw data to the published description is that "he has never published" a peer-reviewed article on this topic and that he relies on a summary of information first generated by another expert. *See* Cook's motion at 31-33. The first argument fails because the relevant qualification to testify about the definitions is not the design of a clinical study but rather the *interpretation* of the study data which necessarily includes an assessment of the defined terms. The second argument fails because expert witnesses are permitted to incorporate the reliable opinions of other experts especially

where, as here, the incorporated information is merely a summary chart of uncontested data and the testifying expert independently verifies the accuracy of the summary. *See Walker v. Soo Line R. Co.*, 208 F.3d 5841, 589 (7th Cir. 2000).

Cook's first argument, that Dr. Gordon cannot criticize the OUS definitions because he has never designed a clinical trial, rests on the premise that the only thing that qualifies one to opine on the definitions used in a study is to have personally conducted studies. This is false. The critical question Dr. Gordon's testimony will help answer is not whether the OUS study was well *designed*. The question is whether the risk information uncovered in the OUS study was well *communicated* to physicians through the IFU. Accordingly, the relevant knowledge bases for expert testimony are the data in the OUS study and the standard and accepted uses of the terms in the Celect IFU. *See* Gordon Report 5-7 (contrasting the definition used by Cook with the definition used, since 1993, by the Society of Interventional Radiology). Together, those pieces of information allow an informed expert such as Dr. Gordon to opine on how the IFU would be understood by physicians and whether that understanding is aligned with the OUS study data. Dr. Gordon certainly has the necessary qualifications to interpret the OUS study data. Cook does not even dispute this. He also understands the common and accepted usages of the terms in the IFU. Not only is he familiar with them as a board-certified interventional radiologist that uses those terms routinely in his practice, he cited in his report the relevant papers and guidelines establishing the accepted definitions. *See* Gordon report at 5-6.

Cook's second argument, that Dr. Gordon's opinions should be excluded because they rely on tables created by Dr. Krumholz that summarize Cook's various definitions of key terms across time is simply wrong. Experts are allowed to rely on information, documents, and summaries created by others—including other experts. *See Walker v. Soo Line R. Co.*, 208 F.3d 5841, 589

(7th Cir. 2000) (holding that physician's opinion was admissible even though based partly on information from other professionals). But Dr. Gordon did not actually rely on Dr. Krumholz to locate and verify the various definitions Cook used. Dr. Gordon only incorporated Dr. Krumholz's table summary of the definitions that are found in Cook's various OUS documents. This was made absolutely clear at his deposition:

> Q: Okay. So *the definition of "penetration" and "perforation" identified in Table 7* for all these various documents, you identified that in the documents and gave it to Dr. Krumholz?

> A: I never gave it to Dr. Krumholz. *I identified it in the documents.* Dr. Krumholz and Dr. Bikdeli probably also have done this in their document and they put this in but I – I identified all these and I had all that. Again, I didn't put this together.

> Q: Okay. *You double-checked their table against what you had*. Is that what you are saying?

> A: *Yes. That's a better way of saying it*[].

Gordon Depo. 176:24-177:11 (emphasis added).

Thus, Dr. Gordon incorporated a useful summary of Cook's inconsistent definitions in the OUS study. Dr. Krumholz created that summary and Dr. Gordon verified—or, "double checked— it. This is a permissible practice for experts. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has *been made aware of* or personally observed.") (emphasis added). Cook seeks to avoid this rule by arguing Dr. Gordon "is not qualified, has employed no methodology at all before opining, and would merely be cumulative of Dr. Krumholz." Cook Mem. at 32-33. This is patently incorrect. Dr. Gordon's review of the OUS study images gives him special context for why Cook's non-standard and inconsistent definitions created a misleading IFU. Dr. Gordon will testify that "Cook's use of unconventional definitions served to conceal potentially harmful data." Gordon Report at 6. He is qualified to testify as such because

he has knowledge of the data and knowledge of the definitions. The fact that he included a summary table of those definitions that was first created by Dr. Krumholz does nothing to undermine this opinion.

In sum, Dr. Gordon should be allowed to discuss the non-standard and inconsistent definitions used in the OUS study because such an explanation is critical to helping the jury understand Dr. Gordon's analysis and why the Celect IFU was misleading. He is qualified to discuss this because of his analysis of the OUS data, his review of the OUS protocol and definitions, and his understanding of the commonly accepted meanings of those terms within the radiological community. Cook's criticism, that Dr. Gordon "cherry-picks" studies and documents and that he has not previously designed a clinical trial are—at most—arguments to the weight of the evidence, not the admissibility.

## V.    Dr. Gordon should be allowed to explain why the Celect IFU fails to adequately warn doctors of the Celect's risks revealed by the OUS study.

Although Dr. Gordon will not opine as to whether the Celect filter's IFU conformed to FDA requirements, Dr. Gordon does offer his expertise as an interventional radiologist with regard to the warnings set forth in the IFU. Specifically, he will testify that Cook did not adequately inform physicians—through the Celect IFU—of the risks exposed by the OUS study. Dr. Gordon is qualified to testify on the adequacy of the IFU because he is part of the group to which the IFU is directed—doctors.

### A.    IFUs are written for doctors so doctors are the appropriate group to testify whether the warnings in the IFU are sufficient.

"[W]hether or not a given warning is adequate depends upon the language and the impression that it is calculated to make upon the mind of an average user of the product." *Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998). The average user of IVC filters is a physician. Thus a physician is the proper person to opine about the information that doctors

reasonably expect to receive from an IFU. This is precisely why another IVC filter MDL court denied a similar motion to exclude a doctor's warnings-related testimony in the Bard IVC filter litigation. *In re Bard IVC Filters Products Liab. Litig.*, MDL 15-02641-PHX DGC, 2018 WL 823277, at *1 (D. Ariz. Feb. 12, 2018), *citing Primiano v. Cook*, 598 F.3d 558, 566 (9th Cir. 2010).

Numerous other courts have also recognized that physicians are a proper source for testimony regarding the adequacy of a medical device warning. *See, e.g., Huskey v. Ethicon, Inc.*, No. 2:12–cv–05201, 2014 WL 3362264, at *34 (S.D.W.Va. July 8, 2014) (finding urologist qualified to testify about the risks of implanting a product and whether those risks were adequately expressed on the product's IFU); *In re Yasmin & Yaz (Drospirenone) Prods. Liab. Litig.*, 2011 WL 6301625, *11 (S.D. Ill. Dec. 16, 201l) ("[D]octors are fully qualified to opine on the medical facts and science regarding the risks and benefits of drugs and to compare that knowledge with what was provided in the text of labeling and warnings . . . ." (internal quotations omitted); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254 (5th Cir. 2002) (allowing treating physician to testify as to whether drug label adequately informed him of known risks); *Rebecca Dion, v. The Graduate Hospital of the Univ. of Pennsylvania, et. al.*, 1986 WL 501497 (Pa.Com.Pl. 1986) (because warnings are directed at physicians, physicians or those with similar education and experience are well qualified to determine whether a medical product's warning is adequate); *Calisi v. Abbott Laboratories*, 2013 WL 5441355 *7, 8-9 (D. Mass., September 27, 2013) (suggesting that a doctor would be the proper source for testimony that the label failed to provide adequate information to doctors).

Dr. Gordon is fully qualified to testify as to what information an interventional radiologist would need to have, and would consider, when deciding whether to use a Celect IVC filter to treat a particular patient. Dr. Gordon is board certified in both diagnostic and interventional radiology.

Gordon Report at 1. He received an undergraduate degree in biochemistry from the University of Illinois at Champaign. *Id.* He attended medical school at the University of Illinois-Chicago and did post-graduate research in vascular and interventional radiology at the Midwest Vascular Institute. *Id.* Dr. Gordon did a residency in diagnostic radiology at Northwestern University. *Id.* At the height of his IVC filter usage, Dr. Gordon was easily implanting 50 to 100 filters per year. Gordon Depo. 79:6-11. Dr. Gordon has trained other physicians on how to remove IVC filters. *Id* at 53:23-54:15. Thus, Dr. Gordon has both a solid academic understanding of IVC filters and substantial practical experience in counseling patients and implanting and removing IVC filters.

Cook's complaint that Dr. Gordon has not drafted an IFU or product label for a medical device misses the mark for several reasons. First, it is factually inaccurate.  Dr. Gordon has drafted an IFU. Gordon Report at 1 ("I have personally been the primary physician participating in bringing 3 medical devices to market, *writing IFUs and IFU updates*, as well as" a majority of the regulatory and compliance work.). Moreover, Dr. Gordon is familiar with IFUs because he uses them regularly in his medical practice. There is no need for Dr. Gordon to have more extensive experience in the regulatory details of drafting medical device labels because he is not offering an opinion on the regulatory requirements for the IVC filter's label. Dr. Gordon, as a practicing interventional and diagnostic radiologist, seeks to inform the jury what a reasonable and prudent physician would have wanted to consider and inform his or her patient. This information, reliably grounded in Dr. Gordon' professional education and experience, is both relevant and helpful to the jury.

**B.   Dr. Gordon has adequately testified to what should have been included in the IFU.**

Cook asks the Court to disallow Dr. Gordon's opinion that the IFU was inadequate because he did not provide a specific alternative warning. But Cook has not cited, nor is Plaintiff aware of, any drug or medical device case where a medical doctor was precluded from testifying about a

medical product's labeling merely because the doctor had not provided specific alternative warnings. Cook's only authority comes from a case involving forklift operation. *See Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000).

Even if the Court accepts Cook's faulty premise—that an expert cannot opine that a particular warning is deficient unless he or she also states a sufficient warning—Dr. Gordon's testimony should still be allowed because he *has* described what should have been in the IFU. Dr. Gordon's report states that the IFU should have warned doctors of the increased "risk of perforation, tilt and fracture" arising from "the Celect filter's lack of a perforation limiter." Gordon Report at 13. At his deposition, Cook asked Dr. Gordon why he thought the IFU should have contained such a warning. He explained that

> the lack of a perforation limiter is what led to all the perforations and extensive complications. And I think if - *if doctors would have known* the absence of a perforation limiter such as the pedals [sic] would have changed the behavior of the filter, *I think our behaviors would have been different* and the best way of changing our behaviors is by putting that through the IFU as well as other ways.

Gordon depo 158:17–159:11. (emphasis added).

Dr. Gordon also opined that the Celect IFU does not adequately warn physicians that the danger of the Celect increases the longer it remains in the patient. Quite the opposite, Cook's IFU suggests that long-term retrieval efforts are uncomplicated. Again, Dr. Gordon explained the exact problem with the IFU with respect to retrieval window:

> Q. Dr. Gordon, as you sit here today, do you hold the opinion that in 2009 the instructions for use for the Celect filter should have included a specific period of time?
>
> A. No. I think . . . if Cook knew of a specific time that would be the best, yes, they should have stated it. *If they didn't know, it should have been kind of the same thing as the first IFU—sorry, the first FDA warning to suggest taking out retrievable filters as soon as possible* . . . .

Gordon depo 165:2–165:21.

Dr. Gordon also testified that the IFU is deficient in another respect. Cook indicated the filter as a both a permanent and a retrievable device but it failed to "disclose the existence and extent of the risk involved." Gordon Report 13. This opinion overlaps significantly with Dr. Gordon's conclusions on the misleading nature of Cook's terminology in the OUS study as reported in the IFU. In relaying the results of the OUS study to doctors, the IFU states that "[n]o device related major adverse events (defined as hemorrhage, perforation, death, occlusion, filter fracture or significant filter migration) have occurred." IFU at 5.  According to Dr. Gordon's analysis, that does not accurately convey the results of the study. As discussed above, that IFU statement is not accurate in light of the way the medical community at large uses and understands the term "perforation." Dr. Gordon's testimony will help the jury by illuminating how the OUS results—when described in the commonly accepted terminology—were not accurately communicated in the IFU.

On this last opinion, Cook explains that its use of the term "perforation" was acceptable because the mountain of failures Gordon identifies are actually just "penetrations." But that term does not appear in the IFU at all. The interplay between these terms, the way they are understood in the medical community, and the substantive results of the OUS are essential to this case and Dr. Gordon is qualified—perhaps uniquely so—to testify on these points.

In sum, Dr. Gordon's criticisms of the Celect IFU are not the type of generic, unfounded complaints found in *Bourelle*. Dr. Gordon bases his critiques on his thorough review of the OUS study data, his experience and perspective as an interventional radiologist, and his knowledge of Cook's internal communications—produced in discovery—which demonstrate that Cook was aware of the very risks that Dr. Gordon says should have been included in the IFU. As a doctor,

and therefore a member of the intended audience of the IFU, he is qualified to opine on whether the IFU adequately warns of the known risks and his personal investigation of the OUS data and Cook's documents give him a clear understanding of the risks Cook knew of.

**VI.** **The Court should reject Cook's catch-all challenges to Dr. Gordon's testimony.**

In addition to the specific challenges addressed above, Cook offers two "catch-all" challenges to Dr. Gordon's opinions. First, Cook argues that Dr. Gordon's opinions will not be helpful to the jury. Second, Cook argues that the Court should prophylactically restrict Dr. Gordon from offering opinions that he "did not disclose" in his report.

Dr. Gordon's testimony will be helpful to the jury because he can bridge the gap between the OUS study data and other dense, medical data known to Cook and at the time of the implant and Cook's external presentation of that data to doctors, patients, and the FDA. If permitted, his testimony will expose the true results of the OUS study and show how those results confirmed safety warnings discussed within Cook before the release of the product. Without Dr. Gordon's testimony, the jury will not be able to see or understand the results of the OUS study other than through the lens of Cook's presentations of it. Without expert assistance, the study data is impossible for jurors to decipher. So if Cook is right and the testimony is unhelpful to the jury, the only remaining explanation of the data is Cook's explanation. It is quite specious for Cook to claim that the testimony of a doctor who analyzed Cook's data and concluded that Cook concealed known risks is not helpful to the jury when the exclusion of such testimony would eliminate all explanations from the trial except the very explanation being challenged by Plaintiff's failure to warn claim.

Dr. Gordon's so-called "undisclosed" opinions are merely discussions and explanations of opinions he expressed in his report and there is no reason to exclude that discussion. While Dr. Gordon will not opine at trial on fields unrelated to the opinions expressed in his report, it is not

32

necessary for the Court to restrict Dr. Gordon's testimony to the precise words in his report. If that were the case, there would be no need for live testimony at all.

## CONCLUSION

For the reasons stated herein, Plaintiff Tonya Brand asks that the Court permit Dr. Gordon to testify to each of the opinions expressed in his report in accordance the Federal Rules of Civil Procedure and Federal Rules of Evidence.

Dated: September 14, 2018                    Respectfully submitted

*/s/ Joseph N. Williams*
Joseph N. Williams, Atty. No. 25874-49
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com

*Liaison Counsel to Plaintiffs' Steering Committee and on behalf of Plaintiffs' Steering Committee*

Ben C. Martin, Esq.
THE LAW OFFICES OF BEN C. MARTIN
3710 Rawlins Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@bencmartin.com

David P. Matthews, Esq.
MATTHEWS AND ASSOCIATES
2509 Sackett St.
Houston, TX 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184

33

dmatthews@thematthewslawfirm.com

Michael W. Heaviside, Esq.
HEAVISIDE REED ZAIC, A
LAW CORPORATION
910 17th Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 223-1993
mheaviside@hrzlaw.com

## CERTIFICATE OF SERVICE

I certify that on September 14, 2018 a copy of the foregoing was filed electronically and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.

*/s/ Ben C. Martin*

Ben C. Martin