UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE COOK MEDICAL, INC. IVC FILTERS MARKETING, SALES PRACTICES, AND PRODUCT LIABILITY LITIGATION | Case No: 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to:

*Brand v. Cook Medical Inc., et al.*,
Case No. 1:14-cv-06018-RLY-TAB

**PLAINTIFF'S RESPONSE TO COOK DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS OF DR. REBECCA BETENSKY**

**I.     Introduction.**

In compliance with Federal Rule of Civil Procedure 26(a)(2)(B), Plaintiff has retained Rebecca Betensky, Ph.D., as an expert to "compare[] adverse event reports and sales data for Cook Celect and Cook Tulip filters for various time periods" and to "analyze[] the Outside United States (OUS) study that Cook conducted, primarily with respect to strut protrusions," including by "calculat[ing] estimated proportions of findings of perforations" and by "assess[ing] agreement between the various evaluators" of the those perforations: (1) the researchers who conducted the OUS study; (2) Paul Timperman, M.D. (a radiologist and former Cook employee), and (3) Gregory Gordon, M.D. (Plaintiff's expert diagnostic and interventional radiologist). Report of Rebecca Betensky, Ph.D. 1 [Dkt. # 8609-1] (hereinafter Defs.' Ex. A).

Defendants do not challenge Dr. Betensky's qualifications as a Stanford/Harvard-trained biostatistician to give the opinions she has given, nor do they question the accuracy of the data provided to her or the accuracy of her statistical analyses. Defendants instead seek to exclude Dr. Betensky's testimony as unreliable and unhelpful, based on three arguments. *See* Cook

1

Defendants' Motion to Exclude Expert Opinions of Dr. Rebecca Betensky [Dkt. # 8606] (hereinafter Defs.' Mot.); Cook Defendants' Memorandum in Support of Motion to Exclude Expert Opinions of Dr. Rebecca Betensky [Dkt. # 8608].

First, Defendants argue that Dr. Betensky accepted at face value "data hand-picked by Plaintiffs' attorneys" and that "she had no clue what she was missing." Defs.' Mem. 4–5. Defendants never identify any "missing" data that, if known, might have changed her opinions. Dr. Betensky performed a narrow set of calculations based on Cook's internal data for use by Harlan M. Krumholz, M.D. (Plaintiff's epidemiological expert). Deposition of Rebecca Betensky, Ph.D., July 2, 2018, at 36:10–36:17 (hereinafter Ex. 1); *see* Harlan M. Krumholz, M.D., S.A., Expert Report on Efficacy and Safety of Celect Inferior Vena Cava (IVC) Filters at 9, 11, 63, 80–81, 117–18 (discussing data analyses performed by Dr. Betensky) (hereinafter Ex. 2).[1]  She verified Cook's own statistical calculations and she calculated odds ratios for perforations based on Cook's complaint and adverse event data—the same data Cook itself used for internal analyses and for regulatory reporting. Ex. 1, at 56:10–56:19, 89:9–89:21; *see also* Defs.' Ex. A, at 1. Dr. Betensky had all the data she needed to perform the limited tasks she was asked to perform.

Second, Defendants argue that the odds ratios (ORs) that Dr. Betensky calculated are "not even relevant unless the differential [between Celect and Tulip] is *caused by* the design of the Celect filter." Defs.' Mem. 9 (emphasis in original). That is wrong. Dr. Betensky does not opine and will not testify as to *why* the Celect perforates at a higher rate than Tulip. Evidence of

---

[1] Dr. Betensky testified that she was supplied datasets from Behnood Bikdeli, M.D. Ex. 1, at 144:9–144:16. Dr. Bikdeli worked as a research assistant for and under the direction of Dr. Krumholz. Deposition of Harlan M. Krumholz, M.D., S.M., June 28, 2018, at 8:25–10:7 (Dr. Krumholz discussing his two colleagues who "acted as research assistants") (hereinafter Ex. 3.); *see also* Ex. 1, at 35:13–35:24 (Dr. Betensky discussing communications with Dr. Bikdeli and "two other colleagues"). While she may have corresponded with and received data from Dr. Bikdeli in his role Dr. Krumholz's research assistant, Dr. Betensky's expertise is offered for the benefit of Dr. Krumholz.

2

Celect's increased perforation rate is not offered to prove some technical defect in the design of the Celect filter. Rather, it is offered to support the opinions of Dr. Krumholz that the OUS study "had a flawed design, was poorly conducted, had poor outcome assessment, contained selective and misleading reporting, withheld critically important information, and misrepresented data, among other serious issues." Ex. 2, at 9. Dr. Betensky does not need to explain *why* Celect perforated more often than Tulip; the fact that it did so is all that matters. Thus, it makes no difference whether Dr. Betensky considered confounding factors or whether her calculations can establish the reason why Celect perforates more than Tulip. Perhaps aware of this, Cook additionally argues that even if Dr. Betensky is not testifying to causation, the jurors will think she is anyway. Defs.' Mem. 9–12. This is speculative at best and, if true, could easily be addressed by a limiting instruction rather than the exclusion of an indisputably qualified expert.

Finally, Defendants argue that "[t]he Court should exclude Dr. Betensky's opinions concerning comparisons of frequencies of perforations as assessed by different people using different definitions of perforation because it [sic] will not help the jury understand anything that is not already obvious." *Id.* at 12. That, too, is wrong. Plaintiff does not call upon Dr. Betensky to merely state the fact that different evaluators of the OUS data interpreted those data differently; what matters—and what would be immensely helpful to the jury—is Dr. Betensky's expert quantification of the agreement, or lack thereof, between the researchers who conducted the OUS study, Dr. Timperman, and Dr. Gordon with respect to identification of perforations, and the implications of those disagreements for Dr. Krumholz's opinions as to the failings of the OUS study.

## II. Legal Standard.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *see, e.g.*, *McCauley v. Nucor Corp.*, No. 1:05-CV-00424TABRLY, 2007 WL 2316463, at *1–2 (S.D. Ind. Aug. 10, 2007) (Baker, M.J.) (discussing *Daubert* standard); *Griffin v. Foley*, No. 3:05-CV-0015 RLY-WGH, 2006 WL 6886657, at *1–2 (S.D. Ind. Dec. 11, 2006) (Young, J.) (same).

> Essentially, the district court must make the following inquiries before admitting expert testimony: First, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case.

*Lees v. Carthage Coll.*, 714 F.3d 516, 521–22 (7th Cir. 2013).

## III. Dr. Betensky's Opinions.

In conducting her calculations for consideration by Dr. Krumholz and inclusion into his report, Dr. Betensky drew the following conclusions:

- In March 2010, a Cook (MEDI) statistician sent an email within Cook attaching a spreadsheet titled "Penetration Rate.xlsx," which is depicted below. Dr. Betensky concluded that the "perforation/penetration" complaint proportions (rates) for Celect were statistically significantly higher than those for Tulip. (The Celect rate is 16.5 times higher than Tulip.) Defs.' Ex. A, at 3 (Opinion a).

| Filter | Perforation/Penetration Rate | Exact 95% Lower Binomial Limit | Exact 95% Upper Binomial Limit |
|---|---|---|---|
| Celect | 0.1509% | 0.1172% | 0.1913% |
| Günther Tulip | 0.0091% | 0.0057% | 0.0138% |

4

- Attached to the same email was a spreadsheet titled "Perforation-Penetration Rates.rtf," depicted below. Dr. Betensky verified the accuracy of Cook's math and determined that the "perforation / penetration" proportion (rate) for Celect was statistically significantly higher than for Tulip, with an OR of 16.5 (i.e., the Celect rate is 16.5 times higher than Tulip). Defs.' Ex. A, at 3 (Opinion b).

Filter=Celect

| Perf_Pene | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 1_Yes | 68 | 0.15 | 68 | 0.15 |
| 2_No | 44982 | 99.85 | 45050 | 100.00 |

Filter=Gunther_Tulip

| Perf_Pene | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 1_Yes | 22 | 0.01 | 22 | 0.01 |
| 2_No | 240504 | 99.99 | 240526 | 100.00 |

- In February 2010, William Cook Europe Quality Engineer Lykee Iversen sent an email to the Celect filter team leader Jacob Lund Clausen and attached a spreadsheet titled "Perforationsoversigt til JLC.xlsx" (Perforations Overview for JLC), which appears below. Dr. Betensky verified the accuracy of the "occurrence rates" and determined that the Celect proportion (rate) of "perforation/penetration/tenting" was statistically significantly higher than Tulip with an OR of 18.3 (i.e., the Celect rate was 18.3 times higher than Tulip). Defs.' Ex. A, at 4 (Opinion c).

Perforation/penetration/tenting for CELECT for the period 2007 – Dec. 31, 2009

| Year | Number of cases | Sales figures | Occurrence rate |
|---|---|---|---|
| 2007 | 8 | 7,029 | 0.11% |
| 2008 | 34 | 19,322 | 0.18% (0.175%) |
| 2009 | 33 | 25,522 | 0.13% |
| Over the whole period | 75 | 51,873 | 0.14% |

Perforation/penetration/tenting for TULIP for the period 2000 – Dec. 31, 2009

| Year | Number of cases | Sales figures | Occurrence rate |
|---|---|---|---|
| 2000-2008 | 15 | 224,798 | 0.007% |
| 2009 | 8 | 34,554 | 0.02% |
| Over the whole period | 23 | 289,856 | 0.008% |

- Cook periodically produced summaries of MAUDE-reported adverse events (as distinguished from complaints to the company, on which the above analyses were based). It referred to "puncture" in early iterations of these documents but later referred to the same data as "penetration." Dr. Betensky calculated the ORs for Celect vs. Tulip for each of the years 2006–2009; for all of the years 2007–2009 cumulatively; and for the relative lifetimes of Celect and Tulip. She concluded:

    o In the single year 2006 and for the life of the products through 2006, Celect had a statistically significantly higher rate of puncture than Tulip. Defs.' Ex. A, at 4 (Opinion d).

    o Using the sales figures provided by Cook's statistician as a denominator, Celect had a statistically significantly higher rate of puncture than Tulip through the year 2009. Defs.' Ex. A, at 4–5 (Opinion e).

    o Using the sales figures provided by WCE Quality Engineer Ms. Iversen as a denominator, Celect had a statistically significantly higher rate of puncture than Tulip for the relative life of the products through the years 2008 and 2009 and in the single year 2009. Defs.' Ex. A, at 5 (Opinion f.(i)–(iii)).

    o Using the sales figures listed in Table 4 of her report, Dr. Betensky concluded the Celect puncture rate was not statistically different from Tulip in 2007 but it was statistically significantly higher than Tulip in each of the years 2008 and 2009 and for the relative life of the products through 2008 and 2009. Defs.' Ex. A, at 5–6 (Opinion g.(i)-(vi)).

- Dr. Betensky also analyzed Cook's internal inquiry into whether a "retrieval bias" could account for the higher rate of Celect perforations, i.e., whether Celect was retrieved more often and whether that would lead to discovering more perforations, thus accounting for the higher perforation rates. She analyzed the issue from two different approaches. Both confirmed that "the risk of perforation/penetration is significantly higher for Celect than for Tulip, even when accounting for potential overdetection due to retrievability." Defs.' Ex. A, at 7–8. Cook does not challenge this opinion.

All of Dr. Betensky's opinions relied exclusively on Cook documents and data, not attempts to discern the "cause" of the reported perforations. In every analysis, including Cook's own, Celect had a statistically significantly higher rate of perforation than Tulip except when one compared the rates for the single year 2007. This was true regardless of whether one reviewed complaints to the company or events reported by the company and others to the MAUDE database. Thus, by 2008, Cook had data to show that Celect perforated more frequently than Tulip by individual year and cumulatively if one compared the relative lives of the products.

6

This trend continued through 2009. And by early 2010 Cook had concluded that the complaint rate for Celect was between 16.5 and 18.3 times higher than Tulip, regardless of whether it knew why this was so.

**IV.     Point-by-Point Response to Defendants' Arguments.**

    **A.     Defendants' Argument That Dr. Betensky's Odds-Ratio Opinion is Unreliable Because it Relies on Unverified Materials Selected By Plaintiff's Counsel (Defs.' Mem. Part II.A.).**

Cook first challenges Dr. Betensky's methodology as "not reliable, as it depends on incomplete data hand-picked by Plaintiff's attorneys." Defs.' Mem. 4. Cook reiterates in the next paragraph that the data was "cherry-picked by Plaintiff's counsel" and that "Dr. Betensky did nothing to verify it." *Id.* at 5. There are several problems with this argument.

First, Cook has apparently focused their argument on Dr. Betensky's *prior* report, issued in *Hill v. Cook Medical, Inc., et al.* For example, Cook cites to portions of Dr. Betensky's deposition given on April 21, 2017, which concerned the data she reviewed to write her prior report. Defs.' Mem. 5. Nowhere in their entire motion or memorandum challenging Dr. Betensky's current report do they cite to any testimony from her more recent deposition, given on July 2, 2018.

Second, the data considered by Dr. Betensky in her current report were not picked by any attorney. Rather, she was "supplied a dataset" by Dr. Krumholz's research assistant and did review every document cited in her report. Ex. 1, at 144:9–144:13. Cook's claim that Dr. Betensky simply relied on data cherry-picked by counsel without verification is simply untrue, yet Cook proceeds to argue that many courts "have excluded expert opinion testimony as unreliable when the expert's opinion comes from data provided by counsel that the expert failed to independently verify." Defs.' Mem. 6. That may be so; but that is not this case.

7

Indeed, Cook cites *State Farm Fire & Cas. Co. v. Electrolux Home Prod.* as its lead authority. 980 F. Supp. 2d 1031 (N.D. Ind. 2013). In that case, a *defense* expert obtained data from *the defendant* and "admittedly *did nothing* to independently verify the reliability of this information before she used it in her calculations." *Id.* at 1049 (emphasis added). The court found this akin to cases in which an expert "merely parrots information provided to her by a party," which is not what occurred here (Dr. Betensky does not "parrot" what was provided and it was not provided by a party). *Id.* at 1048. Dr. Betensky relies on data supplied by an *opposing party* through litigation. If Cook found this data reliable enough to provide to regulatory authorities and in its marketing to physicians then surely it is reliable enough for Dr. Betensky's work.

Cook's remaining cited cases also are dissimilar to the facts here. *Higgins v. Koch Dev. Corp.* excluded an expert physician for plaintiff from opining on the reasonableness of medical bills based upon "a printout provided by Plaintiff's counsel detailing medications and average retail costs." 2013 WL 6238650, at *5 (S.D. Ind. 2013). This is not a situation where Plaintiff's counsel determined the facts and supplied them to the expert to regurgitate on the stand. The facts come from Cook's documents and the analyses are Dr. Betensky's. Cook also cites *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, in which the plaintiff's expert gave a damages figure "wholly based" on an estimate provided him from a plaintiff's employee (Mr. Ankney). 2009 WL 3187685 (S.D. Ind. 2009). The expert was excluded because "he simply offered Ankney's conclusions as his own" and he was in effect the plaintiff's "mouthpiece." *Id.* at *1. That is nothing like the facts of this case.

Furthermore, while Cook attacks Dr. Betensky's use of Cook complaint data as unreliable, it retained epidemiologist Dr. Jon Fryzek to opine on the rates (proportions) of complaints for Tulip and Celect, as paragraph 70 of his report states:

8

> 70. I was asked to calculate the proportion of complaints relative to the sales of Tulip and Celect filters, both overall and stratified by device type. I was given data from several global Cook databases of complaints for Tulip and Celect filter issues, and detailed global sales data, described below.

Dr. Fryzek performed a similar analysis to Dr. Betensky's in that he used complaints as the numerator and filter sales as the denominator to compare complaint proportions for Celect and Tulip, as reflected in Table 2 of his report. It is disingenuous of Cook to seek exclusion of Dr. Betensky for relying on complaint data when its expert does so as well.

Table 2. Complaint proportions from TrackWise data, Apr 2008 – Nov 2016, based on hand-coding reasons for complaint

| | Total Sales | Total Complaints | Proportion of sales without reported complication | Perforation / penetration / puncture (% of sales) | Tilt (% of sales) | Fracture (% of sales) | Difficult to Remove (% of sales) | Packaging / Device Issue (% of sales) |
|---|---|---|---|---|---|---|---|---|
| Overall | 524,418 | 4215 | 99.20% | 0.1217% (n=638) | 0.0768% (n=403) | 0.0513% (n=269) | 0.0679% (n=356) | 0.3322% (n=1742) |
| Celect only (no PT) | 223,572 | 1751 | 99.22% | 0.1758% (n=393) | 0.0854% (n=191) | 0.0935% (n=209) | 0.0890% (n=199) | 0.2008% (n=449) |
| Celect PT only (May 2013-Nov 2016) | 62,457 | 399 | 99.36% | 0.1121% (n=70) | 0.1713% (n=107) | 0.0080% (n=5) | 0.0544% (n=34) | 0.3122% (n=195) |
| Tulip only | 238,389 | 2065 | 99.13% | 0.0734% (n=175) | 0.0440% (n=105) | 0.0231% (n=55) | 0.0516% (n=123) | 0.4606% (n=1098) |

9

> **B.    Defendants' Argument That Dr. Betensky's Testimony About Odds Ratios for Celect and Tulip Perforations Would Mislead Rather Than Assist the Jury (Defs.' Mem. Part II.B.).**

Cook offers the same argument again in this section of its brief—"The relative incidence of adverse events between the two filters is relevant only if the differential is *caused by* the design of the Celect filter." Defs.' Mem. at 9. Plaintiff will not belabor this point. It is addressed above. In short, whether the increased frequency of Celect perforations is caused by the design or by one of Cook's theoretical confounders, it is happening. Cook's expert epidemiologist Dr. Jon Fryzek agrees that the Celect rate (proportion) of perforation is higher than Tulip for the period April 2008-November 2016, based on Table 2 of his report (depicted above):

> Q.    And according to these figures, Celect, therefore, has a rate of penetration or a proportion of penetration that's roughly 2.4 times as high as Tulip. Would you agree with that?
>
> A.    It appears to be about two times as high, the percentage.

Deposition of Jon Fryzek, Ph.D., July 24, 2017, at 461:22–462:2 (Ex. 4). Cook cannot deny the higher rate of perforations. That is the important fact for Dr. Betensky's analyses and Dr. Krumholz's use of them in support of his opinions.

In the second part of its argument, Cook says in effect that even if Dr. Betensky is not opining on causation, the jury is going to think that she is and therefore she should be excluded. It is a curious argument—an expert is *not* giving opinion "X" but the Court should exclude the expert because the jury might think she is giving opinion "X." The Court should not exclude a qualified expert rendering opinions on relevant subject matter because one of the parties speculates that the jury might misapprehend her opinion. The remedy for that situation would be a limiting or clarifying instruction that Dr. Betensky is not opining on *why* Celect perforates

more frequently than Tulip, she is testifying only that that it does, and the jury can give the weight it feels appropriate to that opinion in light of all the evidence in the case. *See, e.g.*, *United States v. Del Valle*, 674 F.3d 696, 703 (7th Cir. 2012) ("Generally, jurors are presumed to follow the limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds. Absent evidence of an overwhelming probability that jurors were unable to follow the instructions, they are presumed to have done so.") (internal quotations omitted).

Cook closes its argument with another claim of juror confusion. It argues that because Celect perforation rates are *so high* compared to Tulip, it will blind the jury to the fact that the complaints involve less than one percent of products sold. Defs.' Mem. 11. The documents on which these opinions are based (depicted above in the summary of Dr. Betensky's opinions) lay out the fractional percentages at issue. Cook has no basis to speculate that the jury will not see these rates and appreciate them for what they are. This is especially true when one considers that half of Dr. Fryzek's report is devoted to driving home how small these percentages are (see Table 2 above as one example). Additionally, Cook's company witnesses have been trained to mention at every opportunity how "low" the complaint and adverse event rates are. Surely its lawyers will do the same.

Cook says Plaintiff seeks "to generate jury alarm over a miniscule number of *actual events*." *Id.* (emphasis added). Perhaps the jury should be alarmed by the differences between Celect and Tulip perforation rates. Plaintiff contends Cook certainly should have been (it would be an appropriate reaction). But, competing evidentiary conclusions is precisely why we have jury trials.

Notwithstanding the workings of our adversarial system, the premise of Cook's argument here is profoundly misguided. It claims it would be prejudiced because the jury would be blinded to the number of "actual events." This argument only works if the number of *complaints* reflects the number of "actual events" in real-world patients. But there is no evidence to suggest that a complaint rate of less than one percent means that in the real world the "actual event" rate is less than one percent. Even Cook's epidemiologist Dr. Jon Fryzek could not make that connection. He testified that he doesn't know how representative complaint rates are of real-world events:

> Q. Cook, itself, reports that over 80 percent of perforations are asymptomatic in the IVC Filter data summary that's on your reliance list. Would that, again, just as a matter of common sense, do you believe that a complication that is asymptomatic more than 80 percent of the time results in a 100 percent report rate to the manufacturer?
>
> A. I didn't look at the materials. I can't comment.
>
> Q. As I take it, your testimony is you have no reason to believe that 100 percent of instances of complications out in the real world are reported to— are not reported to Cook?
>
> A. I have no idea.
>
> Q. Well, *do you have any idea, then, how representative this analysis of complaints is to the actual number of complaints or complications that occur in the real world* with IVC Filters?
>
> A. So, these are—*this analysis represents the number of complaints or proportion of complaints reported to Cook.*
>
> Q. I understand. My question is: *Is that generalizable in some way to the proportion of complaints that we would see in the total patient real world population* of folks who have Cook IVC Filters?
>
> A. I don't know.

Ex. 4, at 467:1–468:4 (emphasis added). Cook's expert pathologist Dr. Renu Virmani agreed:

> Q. Would it be true that for any complication, whether it's migration, fracture, perforation, caval, occlusion, thrombosis, post implant, pulmonary embolism, DVT, any complication you can think of for an IVC filter, you do not

12

>    have any way, do you, of even estimating the percentage of those that occur in the real world that are actually reported to Cook. True?
>
>    A.   You know, nobody knows. Even you don't know.
>
>    . . . .
>
>    Q.   And my question again is this: If Cook says we have a 0.5 percent, hypothetically, a 0.5 percent perforation complaint rate to our company, that does not mean, does it, that there is necessarily a 0.5 percent rate of that event out in the real world?
>
>    A.   I don't know any other way that I can come to a different conclusion.

Deposition of Renu Virmani, Aug. 8, 2017, at 49:21–50:6, 51:9–51:16 (Ex. 5).

    **C.   Defendants' Argument That The Court Should Exclude Dr. Betensky's Opinions Concerning Comparisons of Frequencies of Perforations as Assessed by Different People Using Different Definitions of Perforation Because it Will Not Help the Jury Understand Anything That Is Not Already Obvious.**

Cook next argues that "Dr. Betensky's opinion that Plaintiff's expert counted perforations in the OUS study differently than Cook's former employee and the doctors who conducted the study is singularly unhelpful because it is obvious."  Defs.' Mem. at 12.  "All of the people whom Dr. Betensky compared"—the researchers who conducted the OUS study, Dr. Timperman, and Dr. Gordon—"applied different definitions of perforation, so it is unremarkable that they would count perforations differently," Cook says.  *Id.*  But Cook entirely misses the point of Dr. Bentensky's observations and calculations.  Plaintiff does not call upon Dr. Betensky to merely *state the fact* that different evaluators of the OUS data interpreted those data differently; what matters—and what would be immensely helpful to the jury—is Dr. Betensky's expert quantification of the agreement, or lack thereof, between the researchers who conducted the OUS study, Dr. Timperman, and Dr. Gordon with respect to identification of perforations,

13

and the implications of those disagreements for Dr. Krumholz's opinions as to the failings of the OUS study.

"It is obvious that people applying different definitions would reach different results; the jury does not need Dr. Betensky to tell them that." *Id.* Plaintiff does not disagree, and of course does not intend for Dr. Betensky to state the obvious. Instead, the jury needs to be told, through Dr. Krumholz and based upon Dr. Betensky's expert opinion, the *nonobvious significance* of the relevant disagreement.

Cook next criticizes the methodology employed by its own hired expert, Dr. Timperman, in his perforation evaluations, suggesting that Plaintiff is trying to "get Dr. Timperman's measurements indirectly into evidence through Dr. Betensky." *Id.* No, Plaintiff is not trying to pull a fast one. Once again, the point of Dr. Betensky's opinion here is to quantify the significance of agreement and disagreement between the researchers who conducted the OUS study, Dr. Timperman, and Dr. Gordon—not necessarily to opine on the underlying data themselves.

Defendants close with the specious argument that "it almost goes without saying that Plaintiff's expert, a former employee of the defendant, and the OUS researchers will reach different counts of 'perforation,'" blithely suggesting that party affiliation so pollutes each group's operations that they could not possibly be motivated by truth. *Id.* at 13. Plaintiff does not share such a dim view of expertise and the adversarial system. Neither does Dr. Betensky, who faced down this very line argument at her recent deposition:

> Q. Wouldn't you expect that an expert hired by the plaintiffs in this litigation would have a low amount of agreement with Cook?
>
> . . . .
>
> Q. Does that not make intuitive sense?

  A. No. I believe experts are telling the truth and are doing—using their expertise as they should.

  Q. Okay. So you wouldn't consider it unsurprising that plaintiffs' expert and Cook would have different—would have a very low level of agreement on things?

  A. I don't think that that should be relevant.

Ex. 1, at 118:3–118:6, 118:9–118:18.

## V. CONCLUSION

Plaintiff respectfully requests that, for the reasons set out above, Defendants' motion to exclude Dr. Betensky be DENIED in its entirety.

Dated: September 14, 2018.   Respectfully Submitted,

 */s/ Ben C. Martin*
Ben C. Martin, Esq.
The Law Office of Ben C. Martin
3710 Rawlins Street, Suite #1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
Email: bmartin@bencmartin.com
*Plaintiffs' Co-Lead Counsel*

*/s/ Joseph N. Williams*
Joseph N. Williams, Atty. No. 25874-49
Riley Williams & Piatt, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com
*Liaison Counsel to Plaintiffs Steering Committee and on behalf of Plaintiffs Steering Committee*

*/s/ Michael W. Heaviside*
Michael W. Heaviside, Esq.
Heaviside Reed Zaic, A Law Corporation
910 17th Street NW, Suite 800
Washington, DC 20006
Telephone: (202) 233-1993
Email: mheaviside@hrzlaw.com
*Plaintiffs' Co-Lead Counsel*

>*/s/ David P. Matthews*
>David P. Matthews, Esq.
>Matthew and Associates
>2509 Sackett St.
>Houston, TX 77098
>Telephone: (713) 522-5250
>Facsimile: (713) 535-7184
>Email: dmatthews@thematthewslawfirm.com
>*Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2018, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

>*/s/ Ben C. Martin*
>Ben C. Martin