# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates:

*Brand v. Cook Medical, Inc., et al.*
Case No. 1:14-cv-6018-RLY-TAB

## COOK DEFENDANTS' AMENDED RULE 26(a)(2)(B) AND 26(a)(2)(C) EXPERT DISCLOSURES

**I.**     **Cook's Rule 26(a)(2)(B) Disclosures**

On May 31, 2018, Cook Incorporated, Cook Medical LLC, f/k/a Cook Medical

Incorporated, and William Cook Europe ApS (collectively, "Cook" or "the Cook Defendants")

disclosed its retained expert witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)

and concurrently served their reports, CVs, and other information required by Rule 26(a)(2)(B)

Cook retained or specifically employed these persons to provide expert evidence in the *Brand*

matter.  Pursuant to the scheduling extension agreed to by the parties, Cook hereby amends its

Rule 26(a)(2)(B) disclosures and discloses Scott Robertson, Ph.D., as a retained expert (*see* ¶

I.A.10).  Dr. Robertson's report, CV, and other information required by Rule 26(a)(2)(B) are

being served concurrently with this amended disclosure.

**A.**     **Rule 26(a)(2)(B) Retained Experts**

**1.**     **F. Michael Ferrante, M.D.**
UCLA Pain Management Center, Director
1245 16th Street, Suite 225
Santa Monica, CA 90404

2.  **Evan Fogel, M.D.**
    IU Health University Hospital
    550 University Blvd, Suite 1602
    Indianapolis, IN 46202-5250

3.  **Christy Foreman, MBE**
    Biologics Consulting Group, Inc.
    1555 King Street, Suite 300
    Alexandria, VA 22314

4.  **Jon P. Fryzek, Ph.D., MPH**
    EpidStat Institute
    9601 Medical Center Drive
    Rockville, MD 20850

5.  **David Gillespie, M.D.**
    Southcoast Physicians Group Vascular and Endovascular Surgery
    300A Faunce Corner Road Suite 200
    Dartmouth, MA 02747

6.  **Bennett Leventhal, M.D.**
    Professor, Department of Psychiatry
    UCSF School of Medicine
    401 Parnassus Avenue
    San Francisco, CA 94143

7.  **Timothy Morris, M.D.**
    Professor of Clinical Medicine
    University of California, San Diego
    200 West Arbor Drive
    San Diego, CA 92103-8378

8.  **Kenneth L. Renkens, M.D., FACS**
    Indiana Spine Group, PC
    13225 N. Meridian Street
    Carmel, IN 46032

9.  **Renu Virmani, MD**
    President
    CVPath Institute
    19 Firstfield Road
    Gaithersburg, MD 20878

10. **Scott Robertson, Ph.D.**
    Fathom Engineering
    600 Addison Street
    Berkeley, CA 94710

**B.      Indpendent Medical Examination pursuant to CMO 21**

The Cook Defendants further disclose the Independent Medical Examination of Plaintiff Tonya Brand conducted by Dr. William E. Turton, pursuant to CMO 21 and Federal Rule 35. The Cook Defendants certify that Dr. Turton's examination report has been served on Plaintiffs' counsel, along with Dr. Turton's CV and his notes related to the examination.  Dr. Turton's rate for his work in this case is $475/hr.

> **William E. Turton, M.D.**
> Indiana Internal Medicine Consultants
> 701 E. County Line Rd.
> Suite 101
> Greenwood, IN 46143

**II.      Cook's Rule (a)(2)(C) Disclosures**

The Cook Defendants may offer opinion testimony, as outlined below, from the following witnesses whom the Cook Defendants not retained as experts.  The disclosures below are intended, in compliance with Rule 26(a)(2)(C), to summarize the facts and opinions to which each witness is expected to testify, and they do not limit the witness's ability to testify as a fact witness, or bind the witness strictly to the facts and opinions as phrased or described below.  In addition, the disclosures below that pertain to witnesses designated as "Treating Physician" do not limit the witness's ability to testify as to anything contained in his or her medical records or deposition.  The opinions of each witness designated as "Treating Physician" are based on his or her education, training, experience, and personal examination, treatment, and care of Ms. Brand, all of which Cook expects each Treating Physician to testify about (even if it is not specifically noted with respect to each disclosure below).  For greater detail regarding the facts and opinions to which each Treating Physician may testify, please see the Treating Physician's medical records and deposition testimony.

US.118354753.02

A.   **Non-Retained Expert Testimony for the *Brand* Case**

1.   **Dr. Mark Rheudasil (Treating Physician)**
     Emory Vein Center
     5673 Peachtree Dunwoody Road, Suite 625
     Atlanta, Georgia  30342

Dr. Rheudasil may be called to testify live or by deposition in accordance with his

February 28, 2018, deposition and exhibits thereto, regarding his medical treatment of Tonya

Brand and his opinions concerning Tonya Brand and IVC filters, including Celect filters in

particular.  More specifically, Dr. Rheudasil may testify about the following facts and opinions:

- His care and treatment of Mrs. Brand, including (but not limited to) her filter insertion, the attempt to remove her filter, the open procedure to remove her filter, the informed-consent process, and his clinical judgment and observations of Mrs. Brand's condition.

- His medical records relating to Mrs. Brand's treatment.

- The symptoms that Mrs. Brand did and did not discuss during his and his staff's visits with her for treatment (including, but not limited to, abdominal pain or the lack thereof and its location), as set forth in his medical records and his deposition testimony.

- He did not rely on the IFU for the Celect or any other information provided by Cook, including other company literature and marketing, in choosing to use the filter or to inform himself of the risks associated with IVC filters. He is familiar with IVC filters, their risks, and their complications from his medical education, training, and 30 years of experience.

- Cook played no role in his decision to choose the Celect filter for Mrs. Brand.

- He has implanted hundreds of IVC filters over approximately 30 years, has used and is generally familiar with almost all filter brands and types, and believes that filters are safe and effective for patients.

- The procedures he has co-performed with Dr. Morrison, including (but not limited to) Mrs. Brand's spinal surgery, and the consultations, services, and assistance that he provides to Dr. Morrison, including (but not limited to) vascular care, exposure and closure of the surgical site, and decisions to use IVC filters, filter selection, and filter risks.

- Mrs. Brand's spinal surgery involved a major exposure.

- IVC filters reduce the rate of pulmonary embolism (PE) based on information in the medical literature and his experience of using IVC filters for 30 years with his patients.

- DVT and PE pose serious and potentially fatal risks if untreated, and he has had a patient die from PE.

- His treatment of and care for patients who have a DVT or are at risk of DVT.

- He knows the risks associated with IVC filters and knew them at the time he implanted Mrs. Brand's filter, including (but not limited to) the risks of perforation, fracture, fracture/fragment embolization, and inability to retrieve the filter, among others.

- Certain factors increase a patient's risk of developing DVT and PE, including (but not limited to) age, obesity, previous DVT/PE, undergoing surgical procedures, use of certain medications, and abnormal vein conditions, among others.

- He prescribed Mrs. Brand's IVC filter.

- Dr. Morrison likes to have IVC filters in place before he does spinal surgeries such as Mrs. Brand's.

- The reasons for placement of an IVC filter in patients generally, and Mrs. Brand specifically.

- It was necessary and medically appropriate for Mrs. Brand to receive an IVC filter prior to her spinal surgery based on several risk factors that were present in her case, including (but not limited to) the spinal surgery, obesity, previous procedures, her history of DVT, and her history of abnormal vein issues.

- All IVC filters perforate to some extent, perforation is nearly always asymptomatic and not clinically significant, and he is concerned only with clinically significant filter outcomes.

- He has used IVC filters made by numerous manufacturers, including Cook.

- The original position of Ms. Brand's IVC filter cannot be confirmed because he did not take a post-placement venogram and neither he nor Dr. Morrison took any imaging to confirm the position of the filter after Ms. Brand's six-hour spinal surgery.

- The medications that Mrs. Brand reported taking as of the time of her filter placement.

- The benefits to Mrs. Brand of using the IVC filter outweighed the risks.

US.118354753.02

- His discussion with patients about the risks of IVC filters.

- Mrs. Brand's informed consent to the procedures that he performed.

- His discussion with patients about the removal of their IVC filters and his recollection regarding any communication with Mrs. Brand regarding the removal of her filter.

- Mrs. Brand's reported symptoms (or lack thereof) following the fracture of her filter, including (but not limited to) the results of a CT scan of her abdomen in June 2011.

- Mrs. Brand's experience was a rare case in which a patient experienced a known complication that can occur with any IVC filter.

- The complication that Mrs. Brand expected was not something he expected at the time he placed her specific filter, but he always knew that it was a risk.

- Mrs. Brand did not have any pain or symptomatic conditions attributable to her IVC filter after it fractured.

- In his 30 years of implanting filters, he has not seen complications with any Cook IVC filter other than Mrs. Brand's IVC filter.

- Out of hundreds and hundreds of filter patients, he has never seen a Celect filter fracture.

- Filters made by other manufacturers have fractured.

- He implanted the Celect IVC filter before and after Mrs. Brand's surgery, and retains confidence in the filter. Nothing about Mrs. Brand's experience with the filter caused him to stop using the Celect for his subsequent patients.

- Nothing about Mrs. Brand's experience caused him to change his decision to use the Celect filter.

- He decided to leave the filter in Mrs. Brand's body during the retrieval attempt in 2011 because the filter could not be retrieved easily and Mrs. Brand was asymptomatic. There were no complications or need for follow-up visits after the filter retrieval attempt.

- He did not prescribe any medication for Mrs. Brand or give her any instructions for follow-up after his 2011 attempt to retrieve the filter.

- Mrs. Brand's open removal procedure went as planned and no complications occurred.

- Mrs. Brand does not need lifetime anticoagulation therapy for any condition related to her IVC filter or the 2015 filter removal surgery. Mrs. Brand has not required additional care since her 2015 surgery and has not complained to Dr. Rheudasil about any complications arising from that procedure.

- He has not prescribed any medication for Mrs. Brand following her open retrieval procedure in 2015.

- He does not believe that the filter fragments in Mrs. Brand's body will move.

- Mrs. Brand is not having any apparent problems relating to the filter at this time.

- All products and medical devices that he has used in his practice as a vascular surgeon, including IVC filters, have some risks and rate of complication.

- All surgeries and other medical procedures have some risks and rates of complication.

2. **Dr. Thomas J. Morrison III (Treating Physician)**
   Polaris Spine & Neurosurgery Center
   1150E Hammond Drive, Suite 400
   Atlanta, Georgia 30328

Dr. Morrison may be called to testify live or by deposition in accordance with his January 30, 2018, deposition and exhibits thereto, regarding his medical treatment of Tonya Brand and his opinions concerning Tonya Brand and IVC filters, including Celect filters in particular. More specifically, Dr. Morrison may testify about the following facts and opinions:

- His care and treatment of Mrs. Brand, including (but not limited to) the spinal surgery he performed on Mrs. Brand on March 19, 2009; his pre-surgical visits with Ms. Brand in 2008 and 2009; his post-surgical treatment of Ms. Brand from 2009-2013; and the process of obtaining Mrs. Brand's informed consent to the procedures that he performed.

- His clinical judgment and observations of Mrs. Brand's condition.

- His medical records relating to Mrs. Brand's treatment.

- The symptoms that Mrs. Brand did and did not discuss during his and his staff's visits with her for treatment (including, but not limited to, abdominal pain or the lack thereof and its location), as set forth in his medical records and his deposition testimony.

7

- Mrs. Brand's medical history regarding her back and spine, problems with her spine, and her complaints of back pain before and after the March 19, 2009, spinal surgery that he performed.

- Treatment for spine and back problems that Mrs. Brand received from Dr. Morrison and others affiliated with him or his practice.

- The various medications that Mrs. Brand has taken over the years, including (but not limited to) MS Contin, Percocet/Endocet (oxycodone), and Robaxin.

- Mrs. Brand's medical history, including (but not limited to) her history of anxiety, depression, and sleeping problems.

- The informed-consent process he uses with his patients and that he used with Ms. Brand, including (but not limited to) written consent forms, and the consent forms that Ms. Brand signed before her spinal surgery.

- His discussion with Mrs. Brand about the risks of the surgery that he performed.

- Mrs. Brand's spinal surgery lasted approximately six hours.

- The identification and location of osteophytes (sometimes known as spurs) on Mrs. Brand's spine.

- The behavior of osteophytes/spurs over time.

- His consultations and communications with Dr. Rheudasil regarding Mrs. Brand's spinal surgery, including (but not limited to) his referral and deference to Dr. Rheudasil on vascular care, exposure and closure of the surgical site, and decisions to use IVC filters, filter selection, and filter risks.

- He is not familiar with the medical literature regarding filters; does not review warnings and other information provided by filter manufacturers, including (but not limited to) the IFU for the Celect filter; and relies on Dr. Rheudasil for those matters when they arise in his practice.

- The serious risks of contracting PE as a result of spine surgery, which can be prevented only with anticoagulants or IVC filters.

- He has had a patient die from PE resulting from a spine surgery.

- The risks of administering anticoagulant medication to a patient having the surgery that he performed on Mrs. Brand.

- Mrs. Brand continued to have pain after her spine surgery and that her spine surgery was not successful in relieving her complaints. More specifically, Dr. Morrison will testify that the procedure that he performed on Ms. Brand has approximately a 70% success rate at relieving symptoms, and Mrs. Brand was

8

one of the 30% of patients for whom the procedure was not as successful as hoped.

- He did not perform any imaging after Mrs. Brand's spine surgery that would have confirmed the original position of the filter.

- He has experience with medical devices generally based on his use of various spinal products with his patients, and all medical devices (including IVC filters) have risks may fail, and fracture or breakage is one of the inherent risks of implantable medical devices such as IVC filters.

- He had no contact with any Cook employee about IVC filters.

- He has never read any instructions or literature regarding Cook IVC filters.

- His understanding of the risks and benefits of IVC filters comes solely from his training and practice.

3.    **Dr. Scott Keller (Treating Physician)**
      Mountain East Family Medicine
      4120 Five Forks Trickum Road SW, Suite 105
      Lilburn, Georgia  30047

Dr. Keller may be called to testify live or by deposition in accordance with his April 20, 2018, deposition and exhibits thereto, regarding his medical treatment of Tonya Brand and his opinions concerning Tonya Brand and IVC filters, including Celect filters in particular.  More specifically, Dr. Keller may testify about the following facts and opinions:

- His care and treatment of Mrs. Brand as her primary-care physician for many years.

- His medical records relating to Mrs. Brand's treatment.

- The symptoms that Mrs. Brand did and did not discuss during his and his staff's visits with her for treatment (including, but not limited to, abdominal pain or the lack thereof and its location), as set forth in his medical records and his deposition testimony.

- His clinical judgment and observations of Mrs. Brand's condition derived from the care and treatment he provided to her.

- Mrs. Brand has a complicated medical history with multiple surgeries, and she has had complications and problems with the procedures that she has undergone.

9

US.118354753.02

- Mrs. Brand's medical history and care, including (but not limited to) her abdominal, intestinal, and bowel-related medical history.

- Mrs. Brand has experienced epigastric and abdominal pain for many years, and long before she received her Cook IVC filter.

- Mrs. Brand's psychiatric care and conditions, including (but not limited to) her longstanding depression and anxiety, which she has suffered for many years, and long before she received her Cook IVC filter.

- Mrs. Brand is an anxious person.

- The various medications that Mrs. Brand has taken over the years, including (but not limited to) MS Contin, Percocet (oxycodone), and Valium (diazepam).

- His opinions about the dangers of taking the medications referred to in the prior point (especially opioids) at high doses long term, and his recommendations that Mrs. Brand reduce her dosage of opioids and other medications and explore less dangerous alternatives.

- Mrs. Brand had chronic urinary-tract infections, and they can cause lower-abdominal pain.

- Mrs. Brand has chronic constipation and bowel problems for a long time, starting well before she received her Cook IVC filter, and those issues can be and were caused by the pain medication that Mrs. Brand has taken.

- Pain, including (but not limited to) abdominal pain, may persist after a surgery.

- PE is a serious and potentially fatal condition, and he has had patients in his care who have experienced and died from PE.

- IVC filters are prescribed by physicians to prevent PE.

- Mrs. Brand did not tell him that she had an open removal procedure until after it occurred, and did not report to him any complications or issues from the surgery.

- Mrs. Brand never told him that she had removed a piece of her IVC filter from her leg.

- Mrs. Brand asked him to prescribe her more than a single dose of Valium per day, and he refused, as he was trying to decrease her Valium usage.

- Mrs. Brand's 2015 colonoscopy was normal.

- An examination of Mrs. Brand's duodenum showed that it was normal.

US.118354753.02

- He did not know that she had an IVC filter until she asked him to arrange for a CAT scan in March 2015.

- He never treated Mrs. Brand for any conditions relating to her filter.

- Mrs. Brand sought treatment from him for conditions varying from colds to urinary-tract infections to chronic constipation, back, and abdominal pain (among others).

    **4.**       **Dr. Phu B. Thai (Treating Physician)**
                  Kaiser Permanente – Georgia Region
                  3495 Piedmont Road, N.E., Building 11
                  Atlanta, Georgia  30305

Dr. Phu B. Thai may be called to testify live or by deposition in accordance with his April 4, 2018, deposition and exhibits thereto, regarding his medical treatment of Tonya Brand and his opinions concerning Tonya Brand and IVC filters, including Celect filters in particular. More specifically, Dr. Thai may testify about the following facts and opinions:

- His care and treatment of Mrs. Brand as her primary care physician from approximately 2008 to 2012.

- His clinical judgment and observations of Mrs. Brand's condition derived from the care and treatment he provided to Mrs. Brand.

- His medical records relating to Mrs. Brand's treatment.

- The symptoms that Mrs. Brand did and did not discuss during his and his staff's visits with her for treatment (including, but not limited to, abdominal pain or the lack thereof and its location), as set forth in his medical records and his deposition testimony.

- The reasons he refers patients for placement of an IVC filter.

- Mrs. Brand's medical records showed that she had a history of recurrent DVT.

- Mrs. Brand's medical history and care, including (but not limited to) her long-term and chronic abdominal, intestinal, and bowel-related maladies, all of which began long before Mrs. Brand received her IVC filter.

- Mrs. Brand's long history of using pain medication, opioids, narcotics, antidepressants, and anti-anxiety medication, including (but not limited to) several medications for depression, anxiety, migraine, panic disorder, pain, and nausea and vomiting. Mrs. Brand was taking all of these medications well before she received her IVC filter.

11

- Mrs. Brand has a long-term history of chronic depression and anxiety, both of which began long before Mrs. Brand received her IVC filter.

- Mrs. Brand has a long history of chronic abdominal pain and incontinence, and that she has been taking a lot of narcotics to treat her chronic pain.

- Mrs. Brand is morbidly obese.

- Abdominal pain is not unusual after undergoing back surgery that involves an abdominal incision.

- Mrs. Brand has built up a tolerance to pain medication and therefore could require more narcotics to ease her pain than the typical patient.

- The medical imaging taken of Mrs. Brand, which provided no explanation or indication that her filter was a source of her abdominal pain.

- He reduced Mrs. Brand's narcotic dosage because her pain medications were causing chronic constipation, which in turn was causing her abdominal pain.

- Mrs. Brand had a considerable amount of fecal retention in 2010 from pain medication she was taking.

- He told Mrs. Brand on April 21, 2009, to stop taking narcotics.

- Mrs. Brand reported a fall onto her right side in early January 2011 and complained of pain at a visit shortly thereafter on January 27, 2011.

- The medications that Mrs. Brand was taking and the conditions for which she was being treated before and after her spinal surgery and first filter-retrieval attempt.

- He was not aware that Mrs. Brand had an IVC filter placed and has no record of Mrs. Brand telling him about it.

- His knowledge of pulmonary embolism and that it is a medical emergency that can lead to death.

- Mrs. Brand never reported to him that she had taken a piece of metal out of her thigh.

- Mrs. Brand never discussed with him the attempt to remove her IVC filter.

US.118354753.02

5.    **Dr. Richard Reisman (Treating Physician)**
2050 Bennett Road
Grayson, Georgia  30017

Dr. Richard Reisman may be called to testify live or by deposition in accordance with his February 22, 2018, deposition and exhibits thereto, regarding his medical treatment of Tonya Brand and his opinions concerning Tonya Brand and IVC filters, including Celect filters in particular.  More specifically, Dr. Reisman may testify about the following facts and opinions:

- His care and treatment of Mrs. Brand as her pain-management physician for a number of years.

- His clinical judgment and observations of Mrs. Brand's condition derived from the care and treatment he provided to Mrs. Brand.

- His medical records relating to Mrs. Brand's treatment.

- The symptoms that Mrs. Brand did and did not discuss during his and his staff's visits with her for treatment (including, but not limited to, abdominal pain or the lack thereof and its location), as set forth in his medical records and his deposition testimony.

- Mrs. Brand has a complicated medical history with multiple surgeries, spinal procedures, and complications from those procedures and surgeries.

- Mrs. Brand's pain-management treatment, including (but not limited to) her history of using pain medication and narcotics to treat her neck and back pain.

- Mrs. Brand has a long history of lower-back pain and lumbar spinal issues, including (but not limited to) a herniated disc.

- Mrs. Brand never reported to Dr. Reisman that she believed she was unable to work because of her neck and low-back pain.

- Mrs. Brand's pain increased after her 2004 spinal surgery, and she required different treatments than before the surgery, including (but not limited to) spinal injections.

- Mrs. Brand's leg pain was caused by the spinal injections that she had received.

- From 2001 to 2005 Mrs. Brand reported having pain radiating down her legs.

- Mrs. Brand increased her dosage from six Percocet per day to 8-10 per day.

13

- Following Mrs. Brand's 2004 spinal surgery, she developed pain in her L3-4 disc, and the pain was transferred down through her thigh.

- Mrs. Brand's leg pain was consistent with scarring from her spinal surgery.

- Mrs. Brand was morbidly obese, and he recommended that she lose weight.

- The medications that he prescribed to Mrs. Brand, including (but not limited to) significant amounts of Percocet.

- When he began treating Mrs. Brand again in 2015, she was on a higher dose of pain medication that she had been when he stopped treating her in 2006.

- (If necessary): His communication with Cook Defendants' counsel before the deposition, his thoughts about and reactions to the information shared in the communication, and his lack of surprise at the results of the confirming mass spectrometry test.

6. **Paul Timperman, M.D.**
   IU Health Arnett Medical Office
   2600 Greenbush St
   Lafayette, IN 47904

Dr. Timperman is a board certified interventional radiologist who has reviewed medical records and imaging of Mrs. Brand.   The facts and opinions upon which Dr. Timperman is expected to testify are set forth in his deposition taken in this matter on April 28. 2018, as well as in the exhibits to this deposition, which include his written report and findings regarding Mrs. Brand.

7. **Dennis Griffin, M.D.**
   4501 S. Franklin
   Englewood, CO 80113

Dr. Griffin is a board certified interventional radiologist who has reviewed medical records and imaging of Mrs. Brand.  The facts and opinions upon which Dr. Griffin is expected to testify are set forth in his deposition taken in this matter on April 10, 2018, as well as in the exhibits to this deposition, which include his written report and findings regarding Mrs. Brand.

14

US.118354753.02

**B.     Financial Value Fact and Expert Testimony**

Plaintiffs' financial experts (Robert Johnson and James Mills) have stated that they are "unable, at this time, to render a complete opinion as to the financial condition" of the Cook Defendants and that any opinions they would render "would be, at best, speculation." In the event that Johnson and Mills are permitted to amend their report to include, or are otherwise permitted to express, opinions regarding the Cook Defendants' financial documents, net worth or financial condition, Cook reserves the right to designate a corporate representative or expert to address those issues.

**C.     Non-Case-Specific, Non-Retained Experts**

**1.     Jennifer Brown, Ph. D.**
Cook Research, Incorporated
1 Geddes Way
West Lafayette, IN 47906

Dr. Brown is the Director of Regulatory Affairs at Cook Research Incorporated ("CRI"). She began working at MED Institute ("MED"), which is now known as CRI, in August 2007, and prior to commencing work in her current role, she held the roles of regulatory scientist and scientific communications scientist, as well as the Director of Regulatory Science, at MED and CRI. Dr. Brown's opinions are based on her educational background, training, and relevant work experience at MED and CRI. Pursuant to Rule 26(a)(2)(C), this disclosure is intended to summarize the expert opinions to which Dr. Brown is expected to testify, and does not limit her ability to testify as a fact witness on other matters. Dr. Brown may be called to testify in accordance with her April 21, 2017 and May 8, 2017 depositions (and exhibits thereto), as well as the following:

- The process by which Cook identified, gathered and summarized the information described in the August 2016 Cook Medical IVC Filter Data Summary (CookMDL2570_1276605-6675) ("Data Summary"), which was a reliable process and summary of the information described, including the methodology used to consider the information within the Data Summary.

15

- Sections 3 through 6 of the Data Summary, which analyze Cook's IVC filters based on a review of design documentation, internal sales and complaint data, MAUDE data, and published literature, including but not limited to the fact that (1) the risk-to-benefit ratio of Cook's IVC filters is favorable; (2) patients treated with Cook IVC filters largely experience favorable outcomes; and (3) the adverse events experienced by patients with Cook IVC filters are all known potential risks associated with the use of IVC filters.

- As described in Section 4.2., the analysis of Cook's sales and complaint data reveals that from October 2008 to June 2016, a total of 477,533 Cook IVC filters were supplied world-wide; during the same time period 2,709 complaints were entered into Cook's complaint database for its IVC filters. The resulting complaint rate for the Tulip is .54% and for Celect is .59%

- The occurrence rates for Tulip can be calculated based on sales data and complaint data from October 2008 to June 2016 and are as described in Table 4.3-2. Data from that period reveals the following occurrence rates by percentage: PE .0042; fracture .011; migration .014; IVC occlusion .0061; perforation of vena cava .057; retrieval difficulties .043.

- The occurrence rates for Celect can be calculated based on sales data and complaint data from October 2008 to June 2016 and are as depicted in Table 4.3-3. Data from that period reveals the following occurrence rates by percentage: PE .0062; fracture .066; migration .030; IVC occlusion .019; perforation of vena cava .153; retrieval difficulties .084.

- Cook's analysis of the clinical need for IVC filters, history of IVC filters, and comments on IVC filters from global regulators, as summarized in sections 2.1 through 2.3 of the Data Summary.

- Cook's efforts in optimizing benefits and minimizing risks of its IVC filters, as summarized in section 2.4 of the Data Summary.

- The purpose of the Data Summary and the key questions that were to be answered based on the Data Summary, as summarized in section 1 of the Data Summary.

- Cook's post-market efforts to evaluate device performance and improve device safety and performance, as summarized in paragraph 2.5 of the Data Summary.

- As described in Section 6, there are limitations to published literature, including those listed in Section 6.1. Cook's methodology for gathering and analyzing the literature is as described in Section 6.1, and it included two literature searches in the MEDLINE database and specifically-defined criteria outlined in Section 6.1.

- The PE rates for patients with an existing filter in place in the published literature are as described in Section 6.2 and Tables 6.2.1-1 to 4. The rates for Cook's

Tulip and Celect are lower than the overall rates, equivalent or lower than the rates for anticoagulant drug studies, and lower than the SIR, CIRSE, ACR/SIR practice guidelines.

- Migration data reported in the literature is as described in Section 6.2.3 and Table 6.2.3-2. The rates for the Tulip and Celect are low and are within the ACR, SIR, and CIRSE guidelines.

- Thrombosis and occlusion data reported in the literature is as stated in Section 6.2.4. There are many different definitions of those terms in the publications as reflected in Table 6.2.4-1. The reported rates for overall data, the Tulip and Celect are as reported in Table 6.2.4-2 and 3. The data for Tulip and Celect is better than the overall rates, both in follow up and retrieval.

- Cook's analysis of the literature on perforation/penetration data is as described in Section 6.2.5 and Tables 6.2.5-1 to 3. There is no uniform definition of perforation/penetration in the literature. Published literature on IVC filters includes a number of different definitions of perforation and penetration, and there is no universal, agreed-upon definition for either term. See Table 6.2.5-1. The literature on perforations/penetrations is as described in Section 6.2.5, and analysis reveals a potential bias in patient selections. Analysis of the literature reveals that nearly all reported perforations/penetrations have no clinical sequela. Among the 62 publications, symptomatic penetration was reported in 22 publications, while .7% of all Cook IVC filters and 3.2% of reported penetrations were symptomatic. When the influence of the literature described at page 56-57 are removed, the overall, Tulip, and Celect penetration rates are as reports in Table 6.2.5-3. The choice of specific patient data collection and analysis methods have an effect on estimating penetration rates. The ACR, SIR, and CIRSE reported range of penetration rates is 0-41%.

- The published literature reports the information contained in Section 6.2.6 regarding filter tilt. ACR, SIR and CIRSE define tilt as more than 15 degrees from the IVC axis for non-self centering filters. There are many different definitions of tilt as included in Table 6.2.6-1. Reported instances of filter tilt overall, Tulip and Celect in the literature identified is as stated in Table 6.2.6.2.

- The published literature on retrieval rates is as described in Section 6.2.8. Filter retrieval is identified as a benefit and of clinical interest as described at page 63. Retrieval rates in the literature for the Tulip and Celect are as described in Table 6.2.8-1 and pages 63-64. Advanced retrieval techniques are discussed in the literature as described at pages 64-65, and Table 6.2.8-3.

- Cook's instructions for use for the Tulip, Celect, and Cook retrieval kits appropriately and accurately describe the potential adverse events with those products and the clinical studies described therein. Cook's use of the descriptions in the "Potential Adverse Events" section of the instructions for use properly warned physicians of the risks associated with use of the products. Cook's

17

description of the Clinical Studies in the instructions for use are appropriate and adequately informed physicians about the studies.

- FDA received and considered Cook's instructions for use for the Tulip, Celect, and Cook retrieval kits. Cook has appropriately communicated with FDA regarding potential changes to its IFUs.

- The OUS/Lyon study and Cook's description of the study in its instructions for use was appropriate and adequately described the study. Dr. Brown is familiar with the study and will testify to her opinions regarding the study, the Study Protocol, the Final Report, and the published Lyon study as described in detail during her depositions on April 21, 2017 and May 8, 2017.

    **2.**     **Brian D. Choules, Ph.D.**
            1805 W. Kelly Dr.
            Prescott, AZ  86305

Dr. Choules is the former Technical Director (2006-2016) and Pre-clinical Bench Testing Manager (1998-2004). His education and experience are detailed in his deposition taken on July 22, 2016. Dr. Choules's opinions are based on his educational background, training, and relevant work experience at MED and CRI. The facts and opinions to which Dr. Choules is expected to testify are those set forth in his deposition (and exhibits thereto) taken by plaintiffs in this action. Pursuant to Rule 26(a)(2)(C), this disclosure is intended to summarize the expert opinions to which Dr. Choules is expected to testify, and does not limit his ability to testify as a fact witness on other matters.

- The design, development, and testing timeline for Tulip, Celect, and Celect Platinum were robust, comprehensive and state of the art.

- The design control procedure, specification, and design inputs for Tulip, Celect, and Celect Platinum, including all design verification activities were properly performed and documented.

- All bench tests, animal tests, and FEA simulations for Tulip, Celect, and Celect Platinum were properly conducted and evidence the safety and efficacy of these filters.

- FEA and other Cook test methods, including set up test protocols, and interpretation of test results and end points.

18

- Facts concerning the design procedures and design files for the products in question and how they were properly maintained and accurate.

- Analyzing fracture and filter behavior for Tulip, Celect, and Celect Platinum, and his opinion that these designs are safe and effective and not prone to fracture.

   3.    **John A. Kaufman, M.D.**
         Dotter Interventional Institute
         3181 SW Sam Jackson Park Rd.
         Portland, OR  97239

Dr. Kaufman is the current Director of the Dotter Interventional Institute (the "Dotter Institute"), a division of the Oregon Health and Science University School of Medicine ("OHSU"). Dr. Kaufman's opinions are based on his educational background, training, and relevant work experience at the Dotter Institute and OHSU. The facts and opinions to which Dr. Kaufman is expected to testify are those that will be set forth in his upcoming deposition (and exhibits thereto) that will be taken by plaintiffs in this action. Pursuant to Rule 26(a)(2)(C), this disclosure is intended to summarize the expert opinions to which Dr. Kaufman is expected to testify, and does not limit his ability to testify as a fact witness on other matters. For the sake of fair notice and in an abundance of caution, a summary of particular facts and opinions as to which Dr. Kaufman is expected to testify includes the following:

- His relationship with Cook. Dr. Kaufman will testify that, while Cook has provided some support to the Dotter Institute, he has never and would never let any support from Cook affect his judgment, the results of any study, the accuracy of any educational content, or the mission and functioning of the Dotter Institute.

- The safety and retrievability of IVC filters. Dr. Kaufman has been involved in numerous non-clinical and clinical studies of IVC filters through the Dotter Institute, as well as in the treatment of patients with a variety of brands and models of IVC filters. He will testify, based on his personal experiences in both studies and actual patients, that IVC filters are safe devices that are retrievable for an extended period after implantation without adverse medical impact to patients. He will further testify that any study limitations in any particular study he was involved with did not adversely impact the results of any study and that the studies were, in his opinion, conducted properly in light of their purposes.

19

- The use of ovine models for testing of human vascular medical devices, particularly IVC filters. Dr. Kaufman will testify that the use of sheep to test vascular medical devices is well accepted in the field and that sheep provide accurate and predictable results for how medical devices will perform in the human IVC.

- The safety of Cook filters compared to competitors. Dr. Kaufman will testify that, in his experience, Cook filters are at least as safe as, if not safer than, competitor filters. Further, Cook filters are at least as safe as the Greenfield filter.

- The 2016 Cook Data Summary. Dr. Kaufman will testify that he was involved with the 2016 Data Summary prepared by Cook, that he is in general agreement with the information presented, and that he agrees with the information prepared by the panel.

- Filter events without clinical sequelae. Dr. Kaufman will testify that, in his experience, tilt, migration, and even penetration without clinical sequelae are not adverse events, are not of particular concern, and do not generally impact patient safety.

- The "off-label" use of filters. Dr. Kaufman will testify that, while he did not personally experience any Cook promotion of the off-label use of Tulip or Celect filters, such off-label use of IVC filters was common in medicine, was at the sole discretion of each patient's physician, and was appropriate, as the physician had determined the benefits outweighed the risks.

    **4.**    **H. Robert Smouse, M.D.**
                 Central Illinois Radiological Associates
                 114 W. Stratford Dr., Suite E
                 Peoria, IL  61614

Dr. H. Robert Smouse ("Dr. Smouse") is a physician and clinical researcher who has served as a consultant for Cook studies and presentations and has provided medical care related to IVC filters to patients in his private medical practice. Dr. Smouse will be deposed on a date to be mutually-agreed upon by the parties. While not waiving any objections to portions of said testimony, Cook states that Dr. Smouse may be called to testify with regard to his involvement with various clinical and non-clinical IVC filter studies, his observations during specific studies, and his experience with IVC filters in his medical practice, including the following:

- His relationship with Cook. Dr. Smouse will testify that, while he has been contracted as a consultant and presenter by Cook on numerous occasions, he has

US.118354753.02

never and would never let his contractual relationships with Cook affect his
judgment, the results of any study, or the accuracy of any presentation content.

- The retrievability of the Gunther Tulip IVC filter.  In several studies, Dr. Smouse
implanted filters in human patients or served as the principal investigator for the
study.  Dr. Smouse will testify, based on his personal experiences in both studies
and actual patients, that the Tulip filter is a safe device which is retrievable for an
extended period after implantation without adverse medical impact to patients.
He will further testify that any study limitations did not adversely impact the
results of any study and that the studies were, in his opinion, conducted properly
in light of their purposes.

- The use of ovine models for testing of human vascular medical devices,
particularly IVC filters.  Dr. Smouse will testify that the use of sheep to test
vascular medical devices is well accepted in the field and that sheep provide
accurate and predictable results for how medical devices will perform in the
human IVC.

- The expected compression of a human IVC.  Dr. Smouse will testify regarding
how IVC compression can be measured, the basis of Dr. Smouse's original
opinion to Cook that humans probably experience a maximum of 25 to 30%
compression of the IVC, and that Cook's ovine study of IVC compression and the
resulting compression rate used to fatigue test filters were appropriate based on
his experiences.

- Cook-sponsored non-clinical studies.  Dr. Smouse was the interventionalist for
several non-clinical studies sponsored by Cook and authored numerous articles
based on results from those studies, including peer-reviewed articles.  Dr. Smouse
will testify as to the purposes of the various studies, that the use of sheep in these
studies was appropriate and indicative of the expected performance in the human
IVC, the methods behind his subjective observations as he retrieved and
implanted filters in the studies (e.g., retrieval force, retrieval complication), and
his opinion that the results of the various non-clinical studies indicated that the
Celect was safe for both permanent and retrievable indications.

- The extended retrieval window of the Celect filter.  Dr. Smouse will testify that,
based on his experience retrieving filters in various animal studies and in human
patients, that the Tulip and Celect filters were safely retrievable for extended
periods without an adverse medical impact to patients.

- Filter events without clinical sequelae.  Dr. Smouse will testify that, in his
experience, tilt, migration, and even penetration without clinical sequelae are not
adverse events, are not of particular concern, and do not generally impact patient
safety.

- The "off-label" use of filters.  Dr. Smouse will testify that, while he did not
personally experience any Cook promotion of the off-label use of Tulip or Celect

filters, such off-label use was common in medicine, was at the sole discretion of each patient's physician, and was appropriate, as the physician had determined the benefits outweighed the risks.

5.    **Raman Uberoi, M.D.**
      Dept. of Radiology, Level 2
      John Radcliffe Hospital
      Headley Way, Headington
      Oxford OX3 9DU, UK

Dr. Raman Uberoi is an interventional radiologist who has participated in numerous studies related to IVC filters, including but not limited to the "OUS study." Dr. Uberoi may testify about his involvement with various clinical and non-clinical IVC filter studies, his observations during specific studies, and his experience with IVC filters (including Celect filters) in his medical practice, including but not limited to the following particular facts and opinions:

- His opinions about the "OUS study." Dr. Uberoi will offer opinions about the study protocol, the results of imaging from his patients, the final results of the study, and the eventual publication of a portion of the results from the "OUS study" in the IFU and medical literature.

- His participation in other studies. Dr. Uberoi will testify about the findings, conclusions, and other relevant aspects of the various studies of IVC filters in which he has participated. This includes the reports from the British Society of Interventional Radiology's Inferior Vena Cava Filter Registry published in 2011[1] and 2013,[2] as corrected.[3]

- The retrievability and performance of IVC filters. Dr. Ubeori will testify, based on his personal experiences in both studies and with actual patients, that IVC filters are effective devices that are retrievable and carry an overall low risk of clinically significant complications for patients.

- His opinions regarding the Celect filter. Dr. Uberoi will testify that, based on his clinical experience and review of the medical literature, the Celect filter is highly retrievable and is associated with a low rate of clinically significant complications.

---

[1] Uberoi, et al., *Inferior Vena Cava Filter Registry Report 2011*, BSIR (2011)
[2] Uberoi, et al., *British Society of Interventional Radiology (BSIR) Inferior Vena Cava (IVC) Filter Registry*, 36 CARDIOVASC INTERVENT RADIOL 1548-1561 (2013)
[3] Uberoi, et al., *Correction to: British Society of Interventional Radiology (BSIR) Inferior Vena Cava (IVC) Filter Registry*, CARDIOVASC INTERVENT. RADIOL [https://doi.org/10.1007/s00270-017-1865-0] (2017)

22

Dated:  June 6, 2018

Respectfully submitted,

/s/ Andrea Roberts Pierson
Andrea Roberts Pierson
John T. Schlafer
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
andrea.pierson@faegrebd.com
john.schlafer@faegrebd.com
James Stephen Bennett
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

*Attorneys for Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, William Cook Europe APS*

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2018, a copy of the foregoing COOK DEFENDANTS'

RULE 26(a)(2)(B) AND 26(a)(2)(C) EXPERT DISCLOSURES has been served by electronic

mail on all of the following:

Ben C. Martin
LAW OFFICES OF BEN C. MARTIN
3710 Rawlins Street, Suite 1230
Dallas, TX 75219
benmartin@bencmartin.com

Michael Heaviside
HEAVISIDE REED ZAIC
910 17th Street, Ste. 800
Washington, D.C. 20006
mheaviside@hrzlaw.com

Joseph N. Williams
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
jwilliamsrtprwp-law.com

/s/ Andrea Roberts Pierson

US.118354753.02