# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
                       INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,       )
IVC FILTERS MARKETING, SALES     ) Cause No.
PRACTICES AND LIABILITY,         ) 1:14-ML-2570- RLY-TAB
LITIGATION                       ) Evansville, Indiana
                                 ) November 6, 2017
                                 ) 9:00 a.m.
                                 )
```

**Before the Honorable
RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL- VOLUME 9

**For Plaintiffs:**                David P. Matthews, Esq.
                                   MATTHEWS & ASSOCIATES
                                   2905 Sackett Street
                                   Houston, TX  77098


                                   Matthew D. Schultz, Esq.
                                   LEVIN PAPANTONIO THOMAS MITCHELL
                                   RAFFERTY & PROCTOR PA
                                   316 S. Baylen Street, Suite 600
                                   Pensacola, FL  32502


                                   Joseph N. Williams, Esq.
                                   RILEY WILLIAMS & PIATT, LLC
                                   301 Massachusetts Avenue
                                   Indianapolis, IN  46204

```
                              Laura Baughman, Esq.
                              BARON & BUDD
                              3102 Oak Lawn Avenue
                              Dallas, TX  75219

                              Ben C. Martin, Esq.
                              LAW OFFICE OF BEN C. MARTIN
                              3710 Rawlins St., Suite 1230
                              Dallas, TX  75219


                              TIM K. GOSS, ESQ.
                              FREESE & GOSS, PLLC
                              3031 Allen Street, Suite 200
                              Dallas, TX  75204




For Defendants:               Andrea Roberts Pierson, Esq.
                              Jessica Benson Cox, Esq.
                              FAEGRE BAKER DANIELS LLP
                              300 N. Meridian St., Suite 2700
                              Indianapolis, IN  46204


                              Charles F. Webber, Esq.
                              Bruce G. Jones, Esq.
                              FAEGRE BAKER DANIELS LLP
                              90 S. 7th Street
                              Minneapolis, MN  55402


                              Bruce G. Jones, Esq.
                              FAEGRE BAKER DANIELS LLP
                              90 South 7th Street
                              Minneapolis, MN  55420




Court Reporter:               Margaret A. Techert
                              United States District Court
                              101 NW Martin Luther King Blvd.
                              Evansville, Indiana  47708


          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
    TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION
```

```
 1  sides that you'll be allowed to try your case.
 2          We've already -- in 20 minutes into this argument
 3  here in terms of wasting time on cumulative testimony, we
 4  could have been halfway through this.  But in any event, I'll
 5  overrule the objections on Dr. Moreno with the admonition that
 6  we don't need to hear the whole story over again, but if you
 7  do have snippets you want to play, I will allow some
 8  cumulative testimony for context, but let's not completely
 9  play the entire testimony again.
10          Regarding testimony of what Dr. Moreno and Dr. Lynch
11  generally tell their patient population, or they tell
12  Mrs. Hill, this is a consumer expectations case here, and
13  they'll be allowed to testify as to what they tell their
14  patients -- patient population regarding these issues.
15          Anything else?
16          MS. PIERSON:  Dr. Zuzga is the only -- would be the
17  next one that we would play.  I think maybe while we're
18  playing Moreno, we can -- Joe and I can talk.  Are there some
19  areas of agreement, do you think?
20          MR. JOHNSON:  A few.
21          MS. PIERSON:  Maybe we'll talk about Dr. Zuzga.
22          THE COURT:  Similar issues to Dr. Moreno?
23          MS. PIERSON:  Similar --
24          MR. JOHNSON:  Yes, sir.
25          MS. PIERSON:  Similar issues.  Dr. Zuzga's
```

1  designation is 20 minutes long.  We've cut everything that we
2  think is duplicative.  Mr. Johnson gave me his objections last
3  night.  We withdrew seven entries.  It's 20 minutes of time.
4              THE COURT:  The same as with Dr. Moreno, I'm going
5  to let you try your case, but let's not just replay the
6  testimony that was played in Plaintiffs' case.
7              MS. PIERSON:  We aren't.  We aren't replaying any
8  testimony at all that was played last week, Your Honor.  We've
9  double and triple-checked that to be certain.
10             THE COURT:  You're obviously going to have some
11 overlap, but I think what the rule is is that we just don't
12 want to unnecessarily waste time with cumulative.
13             MS. PIERSON:  Absolutely.  That's why Zuzga is only
14 20 minutes.
15             MR. JOHNSON:  Judge, we haven't met.  My name is Joe
16 Johnson.
17             THE COURT:  Nice to meet you.
18             MR. JOHNSON:  With regard to Dr. Zuzga --
19             COURT REPORTER:  Come closer to the mic.
20             MR. JOHNSON:  I'm sorry.
21             If, in fact, as this testimony is being played, we
22 feel that it is unduly cumulative, do we have the right to
23 stand up, make an objection, and address those issues at that
24 time?
25             THE COURT:  Okay.

1  Q    About the signs, the first signs of a PE.
2  A    Yes.  Oops.  How do I clear all of that?  Okay.  So this
3  is actually the scariest slide that I ever show when I'm
4  showing -- you know, teaching doctors about this, is that
5  about 25 percent or one in four patients who have a pulmonary
6  embolism die of the pulmonary embolism.  That's the first
7  presentation.  They're dead on arrival.  They arrive in the
8  hospital dead and it does -- if that's the case, then you
9  don't have a chance to diagnosis it and choose to treat it or
10 anything like that.  They just die.
11 Q    One in four people with PE?
12 A    One in four, yeah.  That's what -- this guy that wrote
13 this is this guy named Heit who -- that's his specialization
14 is to look at the current epidemiology of PE.  So that's his
15 consistent finding, yeah.
16 Q    Have you known patients who have died of PE?
17 A    I have.  My mom died of PE this way.  She died of a sudden
18 death from pulmonary embolism.  There was another case that
19 was, you know, wasn't personally heart-wrenching for me, but
20 it was a young woman who had just delivered by Caesarean
21 section, and she got home and her baby was a premature baby.
22 She was in the neonatal intensive care unit.  She came to
23 visit the baby and collapsed, and I worked my heart out on
24 her, but we couldn't save her.  So yeah, it's an -- it's a big
25 deal.  It's not just a statistic.  These people really die.

1  since?
2  A    Not a single one.
3  Q    Why not?
4  A    Well, because it was a condensing study.  So -- so, you
5  know, no doctor is going to take something that they believe
6  in and try to get people to, you know, not get that thing that
7  they think is a good thing just so that they can publish a
8  study.  That would be unethical to do that.  So most doctors
9  would be very reluctant.  I guess that's an understatement.
10          Most doctors would not do a clinical trial of not
11 giving something to somebody that they think is good for them.
12 The trials where you do that is where you're not sure whether
13 it's a good idea or not.
14 Q    I've heard the Parachute analogy.  Are you familiar with
15 that?
16 A    Yeah, yeah.  So the Parachute analogy is something that
17 was actually a publication in The Lancet, which is a journal
18 for internal medicine, and it was talking about, you know,
19 kind of the common sense analogy.  I think they were trying to
20 be a little facetious, but they said well, parachutes, like,
21 we don't have any randomized control trials of parachutes.
22 Like we don't have a trial where we throw 50 people out of a
23 plane without them and then 50 with them to see if it works.
24          It makes sense that they work.  There's a lot of
25 evidence that suggests that parachutes work.  And so we

1  body, you know.  So they'd grow these big veins; and
2  ironically, those big veins, now the blood clots would go
3  through them.  So they ended up getting pulmonary embolism
4  anyway, even after going through all that stuff.
5  Q   Okay.  I want to talk about IVC filters and the role they
6  play in your practice.  Tell me, you prescribe filters for
7  your patients?
8  A   Yes, I do.
9  Q   Tell me, how often do you do this in what kind of
10 patients?
11 A   Well, it depends on -- you know, some years, I do more ICU
12 work; and some years I do more PE work, and some years I do
13 more working in the laboratory.  But typically, about half
14 dozen or so a year I'll prescribe.
15 Q   What kinds of patients?
16 A   Well, some patients who are about to get surgery and are
17 very high risk for getting a blood clot will get that.  Some
18 people that have really bad pulmonary embolism; and if they
19 get another one, they're going to die and they're sitting
20 there in shock right in front of me.  So it's something I'll
21 do to keep a person from getting another one because there is
22 a risk of getting another one.
23          And then some people who are not quite that sick but
24 there's some reason that they can't get anticoagulated, like
25 they're going for surgery -- they have a clot and they're

1  going in for surgery or they have some other bleeding problem.
2  They bled into their head.  They bled into their
3  gastrointestinal system.  So for those people, I'll also
4  prescribe filters.  I think those are the major ones.
5  Q    When you've prescribed a filter, has insurance paid for
6  it?
7  A    As far as I know, yeah.  I see my patients afterward, and
8  they never told me they got denied for it.
9  Q    Do you believe IVC filters have helped your patients?
10 A    Oh, yeah.  I think that they've helped some patients, and
11 I think they've saved some patients' lives.
12 Q    Tell me if you can't always know if a filter catches a
13 clot by looking at it, how do you know it helped your
14 patients?
15 A    Well, I have seen times when I have looked at the area for
16 different reasons and the filter -- there was a big blood clot
17 inside the filter, which means that that filter had
18 intercepted an embolism.
19          Other times, there was somebody who would have a
20 giant mortality because of their appearance, their
21 hemodynamic, the fact that their blood clot was having on
22 their heart function; and I put the filter in, and they were
23 okay, and they were able to go home and they did well.  So
24 they didn't die.
25 Q    Have any of your patients had complications?

1  A   Well, it depends what you mean by complications.  Yeah
2  there's one that -- a patient that comes to mind.
3              MR. WILLIAMS:  Your Honor, I object to this.  It's
4  anecdotal and not even involving the Celect filter.
5              THE COURT:  Sustained.
6              MS. COX:  We can move on.
7  BY MS. COX:
8  Q   Is it -- in your patients, have you looked to see -- let
9  me rephrase.
10             Do you follow your patients that you put IVC filters
11 in?
12 A   Yes.
13 Q   And do you follow these patients years down the road?
14 A   Yes.
15 Q   Do you know if any of them had major complications?
16 A   Yeah, if --
17             MR. WILLIAMS:  Object, Your Honor, it's still not
18 tied to the filter that we brought this lawsuit over.
19             MS. COX:  We're talking about the risks and benefits
20 that were weighed when we decided to put in a filter in
21 Mrs. Hill.  I'm happy to expand it at side bar if you want
22 about the relevance.
23             THE COURT:  Overruled.
24 BY MS. COX:
25 Q   So you say you follow your patients, and I think we had

1  some discussion about complication, and you said you weren't
2  quite sure what I meant.  Tell me, what do you mean when I
3  say -- when I say complication, what -- what does that mean to
4  you?
5  A   Well, a complication, you know, when I'm explaining it to
6  a patient, a complication is something that we need to do
7  something about, something that's harming somebody that we
8  need to make a medical response to.
9  Q   Have you ever seen any of your patients with CT images or
10 radiographic findings that show legs of their filters outside
11 their cava?
12 A   Yes, I have.
13             MR. WILLIAMS:  Objection, Your Honor, if this is not
14 tied to the Celect filter, I don't know what a CT image has to
15 do with any fact of consequence in this case.
16             MS. COX:  I'm happy to approach at a side bar to
17 expound.
18             THE COURT:  Okay.
19             *(Beginning of bench conference record.)*
20             MS. COX:  What's relevant is that the expectation of
21 the risks and the benefits of a filter, and what doctors
22 consider a risk and benefit, this whole trial is about
23 perforation and weighing the risks and benefits.  He is going
24 to be giving testimony about what was known about the risks
25 and benefits at that time.

1      MR. WILLIAMS:  It's about the risks and benefits of
2  the Celect filter, not the Greenfield filter, not the ALN, not
3  a Bard filter.  We've sat here for 30 minutes listening to him
4  tell a history about filters that have nothing to do with the
5  Celect.  We don't challenge Dr. Moreno's decision to put in a
6  filter.  What we challenge is the Celect filter and its
7  defective nature.
8      MS. COX:  They have raised article after article
9  after article that don't talk about the Celect filter.
10 They've made accusations that there's no literature proving
11 any filter works.  So they've actually put this issue into
12 dispute.  If they hadn't brought all that literature in, told
13 the jury there's not a single article that supports filters in
14 general work, then we wouldn't be here.
15     MS. PIERSON:  In addition to that issue mentioned
16 earlier, Judge, Dr. Marmureanu put this directly at issue.  He
17 started by saying all filters are dangerous, all filters are
18 bad, they should never be prescribed, it's medically
19 unnecessary.  And in addition to that, for every fact witness,
20 Dr. Moreno, Dr. Zuzga, Dr. Lynch, for each one of those,
21 they've elicited testimony asking Mrs. Hill never had a PE,
22 she didn't have a PE before, she didn't have a PE after.  Even
23 when they're not saying it explicitly, they're saying it
24 implicitly by designating that testimony to suggest there was
25 never any need for it.  Mr. Williams has now given three

1  speeches to the jury on what his claims are.
2           THE COURT:  Objection overruled.
3           MR. WILLIAMS:  Thank you, Your Honor.
4           (End of bench conference.)
5  BY MS. COX:
6  Q   Dr. Morris, do you -- I think we were talking about your
7  patients with IVC filters, and whether or not you reviewed CT
8  images or radiographic findings, and seen legs of their
9  filters outside their vena cava?
10 A   Yeah.
11 Q   Have you seen those?
12 A   Yes.
13 Q   Were you surprised when you saw those?
14 A   No.  So let me explain that because the CT scans were not
15 done, I mean I didn't order the CT scans to look for that
16 finding, but the CT scans were done for other reasons.  So,
17 you know, there was -- other doctors had been worried about
18 something else that was happening in the abdomen, and then it
19 was an incidental finding that you could just see in the
20 report that says -- or you can look at the image and see one
21 of the legs had poked out from the -- from the vena cava wall.
22 And at a certain point, a certain -- you know, if it's one
23 million, then so much, and if it's two millimeter, eventually
24 they'll say it poked out for X number of millimeters.
25          I've never seen that, but I've not done CT scans to