IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: COOK MEDICAL, INC., IVC
FILTERS MARKETING, SALES
PRACTICES AND PRODUCT LIABILITY
LITIGATION                                          Case No. 1:14-ml-2570-RLY-TAB
_____             MDL NO. 2570

This Document Relates:

    *Brand v. Cook Medical, Inc., et al*
    Case No. 1:14-cv-6018-RLY-TAB
_____

**<u>PLAINTIFF'S RESPONSES TO THE COOK DEFENDANTS' OMNIBUS MOTIONS *IN LIMINE* (NEW) AND AUTHORITY IN SUPPORT</u>**

## TABLE OF CONTENTS

31.  Response in Opposition to Cook's Motion in Limine No. 31 to Exclude References to the Celect Filter being Withdrawn, Recalled, Replaced, or Discontinued ........................................... 1

   a.  Cook Has Taken Inconsistent Positions on This Issue in Internal Documents, Deposition Testimony, and Even Pleadings Submitted to This Court .......................................................... 2

   b.  FRE 407 Only Excludes Evidence of Subsequent Remedial Measures Where Such Measures Are Specifically Intended to Reduce Instances of the Alleged Injury ...................... 4

32.  Demonstrative Aids Depicting Open Retrieval Procedures Will Assist the Jury. ............... 6

   a .Cook has an overly narrow view of the "substantially similar" test in product liability cases where a Plaintiff seeks to use a demonstrative aid to assist the jury ......................................... 7

   b. Dr. Gordon's use of video depictions of IVC filter procedures is not evidence and their use during his testimony is not unduly prejudicial to Cook ............................................................ 8

33.  The Court Should Not Exclude Testimony or Evidence of Dr. Gordon and His Company's Development of a Class II Medical Device. ....................................................................... 8

34.  The Court Should Not Exclude Testimony by James Carlson, Ph.D., Regarding Evidence of a Pattern of Tilt, Perforation, and Fracture or Any Reliance on Such Testimony................... 12

   a. Dr. Carlson's testimony is relevant .................................................................... 12

   b. Dr. Carlson's testimony is not unfairly prejudicial, confusing, or a waste of time ............. 16

   c.  Conclusion. ........................................................................................... 17

35.  The Court Should Not Exclude Dr. Timperman's Testimony Regarding Perforations in OUS  Patients ............................................................................................... 17

36.  Evidence Concerning Cook's Handling of Mrs. Brand's Single Complaint Form Is Relevant, Admissible, and Does Not Constitute a Subsequent Remedial Measure. ................... 26

37.  Confidentiality Designations Are Inadmissible to Criticize Cook's Ethics, but This Information Is Admissible for Limited Probative Purposes. ........................................................ 30

38.  All Evidence Regarding Information Cook Failed to Provide the Medical Community, Including the Frequency of Specific Risks Is Relevant. ........................................................... 31

   b. The increased failure rate date withheld from the medical community was relevant to causation ........................................................................................................ 37

39.  The Court Should Admit Evidence and Argument that Cook Submitted Inadequate and Misleading Information to the FDA Regarding the IFU. ........................................................ 39

40.  The jury should be permitted to see the IVC filter that injured Plaintiff as well as photographs of that filter........................................................................................... 43

a.    The filter is authentic and reliable ....................................................... 46

b.        The actual product and photographs thereof in a products liability case are relevant ... 50

41.    The Court should not exclude from evidence photographs of Mrs. Brand's post- operative incision. .................................................................................................................. 53

42.    The Court should deny Cook's motion to exclude any testimony or argument from Plaintiff that her filter caused physical pain or injuries for which she has no expert support. ...... 57

43.    The Court Should Deny Cook's Motion to Exclude Any Testimony Purporting to Speculate as to the Migration of Filter Fragments Through Brand's Body. ................................ 58

44.    The Court Should Not Exclude Documents Mischaracterized by Defendants as Tulip IVC Filter Marketing Documents. ....................................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*,
  730 F.3d 701 (7th Cir. 2013) ...................................................................6

*Benedi v. McNeil-P.P.C., Inc.*
  66 F.3d 1378 (4th Cir. 1995) ...................................................................7

*Brazos River Auth. v. GE Ionics, Inc.*,
  469 F.3d 416 (5th Cir. 2006) ...................................................................4

*Caldwell v. Ohio Power*,
  710 F. Supp. 194 (N.D. Ohio 1989)...................................................53, 55

*Cason v. C.R. Bard, Inc.*,
  2015 WL 9913809 (N.D. Ga. Feb. 2, 2015) ................................. *passim*

*Chrysler Corp. v. Batten*,
  264 Ga. 723 (1994) ..................................................................................38

*Chrysler Corp. v. Batten*,
  450 S.E.2d 208 (Ga. 1994).......................................................................15

*Cisson v. C.R. Bard, Inc.*,
  2013 WL 5700513 (S.D. W.Va, Oct. 18, 2013) .................................34, 35, 36, 37

*Dabney v. Montgomery Ward & Co.*,
  761 F.2d 494 (8th Cir. 1985) ...................................................................55

*Dewick v. Maytag Corp.*,
  324 F. Supp.2d 894 (N.D. Ill. 2004) .........................................................7

*Food Lion v. Williams*,
  219 Ga.App. 352 (1995) ..........................................................................60

*Ford Motor Co. v. Reese*,
  684 S.E.2d 279 (Ga. Ct. App. 2009).......................................................15

*Ga. Power Co. v. Braswell*,
  48 Ga.App. 654 (1933) ............................................................................61

*Hansen v. Werner Enterprises, Inc.*,
  2016 WL 7479349 (C.D. Ca. May 18, 2016) .........................................27

iii

*Harms v. Lab. Corp. of Am.*,
  155 F. Supp.2d 891 (N.D. Ill. 2001) ...................................................................27

*Hoover v. Delaney*,
  2003 WL 22038639, No. 01 C 2372 (N.D. Ill. Aug. 28, 2003)...............................27

*In re Bard IVC Filters*,
  2017 WL 5625548 (D. Ariz. Nov. 22, 2017).......................................34, 36, 37, 38

*In re Bard IVC Filters*,
  2018 WL 1256768 (D. Ariz. Mar. 3, 2018) ...............................................34, 37, 38

*In re Chicago Flood Litigation*,
  1995 WL 437501, No. 93 C 1214 (N.D. Ill. July 21, 1995) ..................................28

*In re Depakote*,
  2015 WL 4775868 (S.D. Ill. Feb. 13, 2015) .........................................................43

*In re: Diet Drugs Prods. Liab. Litig.*,
  2000 WL 876900 (E.D. Pa. June 20, 2000) ...........................................................41

*In re Mentor Corp. ObTape*,
  711 F. Supp.2d 1348 (M.D.Ga. April 22, 2010) ..................................................34

*In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*,
  No. 3:07-CV-00101, 2010 WL 2196629 (M.D. Ga. May 28, 2010) ..........15, 35, 36

*In re Second Chance Body Armor, Inc.*,
  421 B.R. 823 (Bankr. W.D. Mich. 2010)...............................................................4

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig*,
  No. 09–md–2100–DRH–PMF, 2011 WL 6302287 (S.D. Ill. Dec. 16, 2011) .................41, 43

*Kelley v. Hedwin Corp.*,
  707 S.E.2d 895 (Ga. Ct. App. 2011) ....................................................................13

*Larson v. General Motors Corp.*,
  391 F.2d 495 (8th Cir. 1968) ...............................................................................32

*Marous v. Biomet*.
  2017 WL 784412 (N.D. Ind. March 1, 2017) .......................................................49

*McCombs v. Synthes (U.S.A.)*,
  277 Ga. 252 (2003) .........................................................................................32, 33

*Mize v. HJC Corp.*,
  2006 WL 2639477 (N.D. Ga. Sept. 13, 2006) ......................................................41

*Moore v. Kimberly Clark Corp.*,
   867 F.3d 243 (5th Cir. 1989) ................................................40

*Mowrey v. City of Fort Wayne*,
   No. 1:12-CV-121, 2013 WL 6512664 (N.D. Ind. Dec. 12, 2013)...........................................17

*Mutrie Motor Transp., Inc. v. Interchemical Corp.*,
   378 F.2d 447 (1st. Cir. 1967) ................................................7

*Padilla v. Hunter Douglas Window Coverings, Inc.*,
   No. 09 CV 1222, 2014 WL 595051 (N.D. Ill. Feb. 13, 2014) ................................................13

*Papike v. Tambrands, Inc.*,
   107 F.3d 737 (9th Cir. 1997) ................................................40

*R&R Insultation Servs. Inc. v. Royal Indem. Co.*,
   207 Ga. App 419 (2010) ................................................33

*Rinehart v. Int'l Playtex, Inc.*,
   688 F. Supp. 475 (S.D. Ind. 1988) ................................................40

*Rozier v. Ford Motor Co.*,
   573 F.2d 1332 (5th Cir. 1978) ................................................32

*Singleton v. Airco, Inc.*,
   169 Ga. App. 662 (1984) ................................................34, 35, 36

*Smith v. Ford Motor Co.*,
   215 F.3d. 713 (7th Cir. 2000) ................................................9

*Smith v. Ortho Pharm. Corp.*,
   770 F. Supp. 1561 (N.D. Ga. 1991) ................................................41

*Stewart v. Int'l Playtex, Inc.*,
   672 F. Supp. 907 (D.S.C. 1987) ................................................40

*Thornton v. Diamond Offshore Drilling, Inc.*,
   2008 WL 2315845, No. 07-1839 (E.D. La. May 19, 2008)................................................28

*Thornton v. E.I. Du Pont de Nemours & Co.*,
   22 F.3d 284 (1994) ................................................34

*Tucker v. SmithKline Becham Corp*,
   701 F. Supp 2d 1040 (S.D. Ind. 2010) ................................................9

*United States v. Burt*,
   495 F.3d 733 (7th Cir.2007) ................................................8

*United States v. Chambers*,
　　642 F.3d 588 (7th Cir. 2011) ........................................................................17

*United States v. Connelly*,
　　874 F.2d 412 (7th Cir. 1989) ........................................................................53

*United States v. Jefferson*,
　　714 F.2d 689 (7th Cir. 1983) ...................................................................46, 49

*United States v. Lampson*,
　　627 F.2d 62 (7th Cir. 1980) ....................................................................46, 49

*United States v. Lott*,
　　854 F.2d 244 (7th Cir. 1988) ...................................................................46, 48

*United States v. Loughry*,
　　738 F.3d 166 (7th Cir. 2013) ........................................................................17

*United States v. McRae*,
　　593 F.2d 700 (5th Cir.), cert. denied, 444 U.S. 862, 100 S. Ct. 128, 62 L. Ed.
　　2d 83 (1979) ...............................................................................................53

*United States v. Medina*,
　　755 F.2d 1269 (7th Cir. 1985) ......................................................................53

*Valdosta Housing Authority v. Finnesee*,
　　160 Ga.App. 552 (1981) ....................................................................60, 61, 62

*Wabash Metal Products v. AT Plastics Corp.*,
　　575 S.E.2d 683 (Ga. Ct. App. 2002) ............................................................15

*Watkins v. Ford Motor Co.*,
　　190 F.3d 1213 (11th Cir. 1999) ........................................................... *passim*

## Statutes

O.C.G.A. §51-1-11(c) .........................................................................................32

## Rules

Fed. R. Evid. 401 .................................................................................31, 39, 63

Fed. R. Evid. 403 ............................................................................8, 31, 53, 55

Fed. R. Evid. 407 .................................................................................. *passim*

Fed. R. Evid. 702 ...................................................................................................8

Fed. R. Evid. 901 ................................................................................................46

**Other Authorities**

Suggested Pattern Civil Jury Instructions, Council of Superior Court Judges, § 66.502 ..............60

Suggested Pattern Civil Jury Instructions, Council of Superior Court Judges, § 62.660 ..............61

COMES NOW Tonya Brand ("Brand"), Plaintiff in the above-styled action, by and through undersigned counsel, and hereby responds in opposition to the Omnibus Motions *in Limine* (New) by Defendants Cook Medical LLC, Cook Incorporated and William Cook Europe APS (collectively "Defendants" and/or "Cook") as follows:

### 31.   Response in Opposition to Cook's Motion in Limine No. 31 to Exclude References to the Celect Filter being Withdrawn, Recalled, Replaced, or Discontinued *(in response to Cook MIL No. 31, pp. 2-6)*

The Court has two separate grounds to deny Cook's request to exclude testimony that its defective Celect IVC Filter was withdrawn, recalled, replaced or discontinued.  First, Cook has taken inconsistent positions on this issue in internal documents, deposition testimony, and even pleadings submitted to this Court. At certain times, Cook has represented that the Celect IVC filter is still available for implantation.  At other times – when convenient to suit its purposes – Cook has represented that it has withdrawn, discontinued and replaced the defective Celect IVC filter. The Court should allow Plaintiff to present this evidence to the jury.

Second, Cook suggests this evidence should be excluded as a subsequent remedial measure, but FRE 407 only excludes evidence of subsequent remedial measures where such measures are specifically intended to reduce instances of the alleged injury. Here, Defendant represented to the FDA that the modifications were intended to make the filter more visible on radiographic scans and to help center the filter during placement. Neither of these modifications would reduce Plaintiff's injuries which arose from perforation, fracture and migration, and FRE 407 therefore does not apply. For these reasons the Court should deny Request No. 31 of Cook's Motion in Limine.

**a.**     **Cook Has Taken Inconsistent Positions on This Issue in Internal Documents, Deposition Testimony, and Even Pleadings Submitted to This Court**

As Defendant concedes in its Motion in Limine, there was a "phased discontinuation of the Celect IVC filter beginning in 2015[.]"[1]  Ironically, in the same paragraph Defendant also speculates "that Plaintiff may attempt to raise the inference that the Cook Celect IVC filter was withdrawn from the market or was (or should have been) recalled—**neither of which occurred here**." *Id*, (emphasis added).

This is doublespeak. Defendant's Motion in Limine acknowledges there was a "phased discontinuation" of the Celect Filter while simultaneously claiming the Celect Filter was not withdrawn from the market. The truth of the matter is the Celect Filter is no longer available, and Defendant admits as much in internal correspondence and deposition testimony.

For example, there is a letter dated October 1, 2014 from Cook's Senior Global Production Manager Darrell Talbert to "Valued Customer[s]" which states "**After December 31, 2014, you will only be able to order the Celect Platinum. Better yet, the Celect Platinum will have the same price and feature the same NavAlign™ delivery system.**"[2]

This letter is again referenced in a December 31, 2014 email from Bruce Fleck, Product Specialist Venous Therapies, to Cook Medical's North American team. This email states in relevant part:

> We wanted to send along a confirmation and reminder that **regular Celect filters are in the process of being turned off from orders and as communicated could be unavailable anytime now after today… it is important that we continue to work with customers to ensure they have fully transitioned to Celect Platinum…**

---

[1] Ex. ___Cook's Motion, Doc. 8894 at 2.
[2] Ex. __ [Exhibit 58 to Fleck Depo of April 10, 2018] (emphasis in original).

On Fax orders, Customer Service sends back a note on the confirmation telling them **the part number they were trying to order has been obsoleted** and updated with a new automatic replacement part number For GHX and EDI orders…

Attached is a copy of the **Celect Discontinuation letter**, and Customer Service has a copy of the letter that can be emailed or faxed to the customer.[3]

Then, on March 9, 2018, one of Cook's District Managers, Meg Donley, provided the following deposition testimony:

> Q. When did you last sell a Celect filter?
> A. I can't recall because they were still, you know, available. So some people might have had them.
>
> Q. They were still available where? Are they still available now?
> A. No, you cannot order the Celect.
>
> Q. So is Cook still manufacturing the Celect now?
> A. The Celect Platinum.[4]

On June 15, 2017, another of Cook's District Managers, Tamara Clemmer, provided similar testimony:

> Q. I understand that the Cook Celect filter is no longer on the market in the United States of America. I mean, we -- we both will have that understanding during the deposition. You understand that. And so when I ask about the placement of a Celect filter, this obviously would be when they were being placed; right?
> A. Understood, yes.
>
> Q. They've been -- they have been replaced, to use that term, by the Platinum, essentially; would that be true?
> A. Yes, sir.[5]

While Defendant's Motion in Limine is inconsistent on this point, its internal correspondence and deposition testimony make clear the Celect Filter was withdrawn from the market. If Plaintiff is not allowed to discuss and clarify this issue at trial, then Defendant's inconsistent statements have the potential to create significant confusion and prejudice the jury.

---

[3] Id at 2 (emphasis added).
[4] Ex. ___ Donely Deposition, 54:25, 55:1-9.
[5] Ex. ___ Clemmer Deposition, 112:18-24, 113: 1-6.

Further, Defendant is wrong to suggest this issue is a subsequent remedial measure barred by Rule 407.

> **b.      FRE 407 Only Excludes Evidence of Subsequent Remedial Measures Where Such Measures Are Specifically Intended to Reduce Instances of the Alleged Injury**

Federal Rule of Evidence 407 governs subsequent remedial measures, and states:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> - negligence;
> - culpable conduct;
> - a defect in a product or its design; or
> - a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407.

Courts have distinguished between design changes meant to improve a product from those meant to reduce the likelihood of harm. "The admission of evidence of changes made merely to improve a product, as distinguished from remedial measures that make an 'injury or harm less likely to occur,' is not barred by the rule [i.e. FRE 407]." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 428 (5th Cir. 2006); *see also In re Second Chance Body Armor, Inc.*, 421 B.R. 823, 835 (Bankr. W.D. Mich. 2010) ("Application of [FRE 407] outside of the context of a specific accident or occurrence is greatly problematic.").

In *Brazos River Authority*, defendant manufactured and sold to plaintiff a machine intended to de-ionize water in the Brazos River to reduce salinity. Several years later defendant approached plaintiff and indicated it could further reduce salinity with recently developed improvements to its machinery. Plaintiff accepted, but problems arose with this new machinery which reduced the water quality in the Brazos River and led to fires in the treatment plant.

Plaintiff sued for, *inter alia*, breach of the warranty of fitness for a particular purpose. At trial, the Court excluded under Rule 407 evidence of defendant's documents showing its investigations of, and recognition of problems with its improved machinery. However, the appeal court reversed holding in part:

> The injuries and/or harm to which any remedial measure might apply were the fires, but the claim for damages is for the alleged failure of the product to conform to the warranty of fitness for a particular purpose[.] *Id.*

> Thus, the court reasoned, "rule 407 would not apply in these circumstances." *Id.*

Defendant faces a similar problem because it represented to the FDA that the modifications to the Celect Platinum were only meant to improve visibility on radiographic scans and to help center the filter during placement, not to address the type of injury which Plaintiff suffered (i.e. perforation, fracture and migration). This distinction is made clear in Defendant's FDA application letter for the Celect Platinum which states:

> William Cook Europe ApS hereby submits this Special 510(k): Device Modification to request a device modification to the Cook Celect® Vena Cava Filter Set. **The proposed change consists solely of the addition of a radiopaque marker to each primary leg of the filter implant. The purpose of this modification is to enhance filter visibility on procedural imaging.** Compared to the predicate devices, there are no changes to the introducer systems. Importantly, the proposed change does not alter the intended use of the device or the fundamental scientific technology of the device.[6]

Defendant repeats this claim in the October 1, 2014 letter discussed *supra* where it indicates "[w]ith the Celect Platinum, we made modifications designed to improve visibility and to help center the filter during placement."[7]

Again, the only justification Defendant offered for the modification was improved visibility, and easier product placement. Thus, in order for FRE 407 to apply Plaintiff's injuries

---

[6] Plaintiff's Exhibit PX-2072, Cook IVCF 005009, (emphasis added).
[7] Ex. ___ Fleck Depo.

must have arisen from poor filter visibility or poor product placement, but that is not the case. Plaintiff's injuries arose from perforation, fracture and migration. Defendant never told the FDA that the Celect Platinum was intended to reduce perforation, fracture or migration, so there is no basis to exclude references to the discontinued Celect Filter under FRE 407.

<u>Conclusion</u>

Defendant wants the best of both worlds. On one hand, it never told the FDA that the Celect Platinum Filter corrected a defect in the Celect Filter, but on the other it seeks to exclude references to the discontinuation as a subsequent remedial measure. Both of these positions cannot be true. Moreover, if Plaintiff is barred from clarifying Defendant's inconsistent statements it could result in significant confusion and prejudice the jury. For these reasons Plaintiff respectfully requests the Court deny Request No. 31 of Defendant's Motion in Limine.

**32. Demonstrative Aids Depicting Open Retrieval Procedures Will Assist the Jury.** (*In Response to Cook's MIL No. 32, Doc. 8894 at 55028-33*)

Plaintiff should not be precluded *in limine* from presenting demonstrative evidence that will assist her experts in explaining her open retrieval procedure to the jury.  Any video/animation depicting surgical retrieval of an IVC filter is not evidence, will not be admitted as an exhibit, and will not go back with the jury.  *See Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 705–08 (7th Cir. 2013).  Cook seeks to exclude the use of animation and video by Dr. Gordon during his testimony on two grounds: (a) the demonstrative aids are not relevant because they do not depict Brand's surgery and are not "substantially similar" to her procedure; and (b) if relevant, the material's prejudicial effect is greater than its probative value.   The court should deny Defendants' motion *in limine* because these aids are merely demonstrative, and demonstrative evidence is admissible when it will assist the jury in understanding the issues the witness is testifying about. *Id.*  The court in *Pavlock v. Wong* allowed the use of animations

depicting implanting an IVC filter and attempted explants but excluded a video of an open removal with an aortic dissection of an individual different than the plaintiff.[8]  Plaintiff has not decided what demonstrative evidence she will use in this case, so this motion is premature.

### a .Cook has an overly narrow view of the "substantially similar" test in product liability cases where a Plaintiff seeks to use a demonstrative aid to assist the jury

At the end of the day, this motion is focused on Dr. Lumsden's video.  Whether or not the video portion of Plaintiff's expert, Dr. Gordon, should be shown to the jury is based upon the circumstances the "substantially similar" test for product liability evidence.  Cook's view of this test is overly narrow.  Federal courts, including the Seventh Circuit, have applied the substantial similarity doctrine to determine the admissibility of prior accidents and other incidents of product failures without the evidence being identical to the present case. *See, e.g., Dewick v. Maytag Corp.*, 324 F. Supp.2d 894, 901 (N.D. Ill. 2004); *Mutrie Motor Transp., Inc. v. Interchemical Corp.*, 378 F.2d 447, 450 (1st. Cir. 1967). Courts have also held that the substantial similarity doctrine is less stringent when evidence is introduced to demonstrate notice or defendant's knowledge of a dangerous defect. *See Benedi v. McNeil-P.P.C., Inc.* 66 F.3d 1378, 1386 (4th Cir. 1995).  Dr. Gordon using Dr. Lumsden's video will allow the jury to appreciate the procedure and the requirements for a physician to perform an open retrieval. Procedure videos are routinely used in MDL bellwether cases. Plaintiff intends to be judicious in her use of this video and does not plan to play any video that is "cutting open and unnecessary, you know, blood and gore."[9]

---

[8] *Pavlock v. Wong, et al*, Harris County, Texas, Cause No. 2017-03885, May 9, 2018, Transcript 70:14-18, attached as Exhibit A.
[9] Exh. A, *Pavlock* Transcript 142:12-20.

**b. Dr. Gordon's use of video depictions of IVC filter procedures is not evidence and their use during his testimony is not unduly prejudicial to Cook**

As jurors have become more visually oriented, counsel in modern trials seek to persuade them with an ever-expanding array of objects, maps, charts, displays, summaries, video reconstructions, computer simulations, and so on. See *United States v. Burt,* 495 F.3d 733, 740 (7th Cir.2007).  Dr. Gordon has complex medical terms and concepts to convey, and animations/video depictions will assist them in understanding Dr. Gordon's testimony.  As long as the procedure is being used to help explain Dr. Gordon's testimony and is not a depiction of the aorta being cut and containing unnecessary blood and gore, it is useful to the jury and not unduly prejudicial to Cook. *See* Fed. R. Evid. 403.

Accordingly, Plaintiff requests that this Court deny Cook's MIL No. 32 by holding that demonstrative videos and animations can be used by Plaintiff's experts as a demonstrative aids as long as the unnecessary and completely dissimilar portions are not played to the jury and the evidence is not admitted and sent back with jury.

**33.   The Court Should Not Exclude Testimony or Evidence of Dr. Gordon and His Company's Development of a Class II Medical Device.** (*In response to Cook MIL No. 33, Doc. 8894, 55033-35*)

Through this request, Cook is asking the Court to arbitrarily edit Dr. Gordon's resume' and diminish his credentials to the jury.  The request is unjustified and finds no support in the Federal Rules of Evidence or any applicable case authority.  Dr. Gordon's participation the regulatory process required to bring Class I and Class II medical devices to market is part of his "experience" and is a valuable element of his qualifications as an expert witness in this case.

Rule 702 of the Federal Rules of Evidence states, in part:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

> *expert* by knowledge, skill, *experience*, training, or education, may testify thereto in the form of an opinion or otherwise  . . . . [Emphasis supplied].

In *Tucker v. SmithKline Becham Corp*, 701 F. Supp 2d 1040 (S.D. Ind. 2010), the manufacturer of an antidepressant drug moved exclude the testimony of the plaintiff's experts on causation.  In his opinion denying the motion to exclude, Judge Hamilton specifically stated, "'. . . [A] court should consider a proposed *expert's* full range of practical *experience* as well as academic or technical training when determining whether that *expert* is qualified to render an opinion in a given area.'" *Id.* at 1054-55, *quoting, Smith v. Ford Motor Co.,* 215 F.3d. 713, 718 (7th Cir. 2000).  The jury is no less entitled to consider Dr. Gordon's "full range of experience" when assessing his testimony and opinions in the trial of this case.

Cook's basis for seeking to strike testimony regarding Dr. Gordon's experience with the regulatory process for bringing a medical device to market is his justifiable reluctance to discuss the details of a new medical device that is in the development stages and his failure "to mention the secret Class II device in his expert report . . . ."  Neither allegation, even if true, would warrant the remedy requested, denying the Plaintiff the opportunity to present the expert's full range of practical experience as well as his academic or technical training to the jury as an element of his qualifications to testify as an expert witness.  Cook's insistence that Dr. Gordon reveal details concerning an as yet unnamed Class II device that is still under development, matters that are purely collateral to any material issue in this case, is equivalent to Plaintiff asking the Court to prevent Dr. Morris, Cook's expert pulmonologist, from telling the jury that he has experience diagnosing and treating patients who have pulmonary embolisms unless he discloses the name and address of each such patient along with the details of the care he provided to each such patient.  It is unfortunate that HIPAA would prevent the discussion of the patients' private medical information, but the Plaintiff's counsel has no ability to cross examine him on

9

regarding the care he provided if he cannot talk specifically about each patient.  Clearly this is not the standard that governs the admission of evidence regarding an expert's experience.

The fact is Cook has more than one opportunity to cross examine Dr. Gordon with regard to his experience with what is required to in bring Class I and Class II medical devices to market. Cook first examined Dr. Gordon with regard to this issue on January 4, 2018 in *Pavlock v. Cook Incorporated*, et al., Cause No. 2017-03885, In the District Court of Harris County Texas.[10] The second opportunity was in the deposition taken in the case at bar and Cook took full advantage of that opportunity by recording no less than thirty-four (34) pages of testimony related to Dr. Gordon's participation in the development of Class I and Class II medical devices for his company Radux Devices.  For example:

Q. You've never been involved in the clearance of a Class 2 medical device?

A. I am currently working through one that's a Class 2 but I -- but I have not gone through the entire process yet with the Class 2, although our first product we worked up and we -- we -- how would I say it?  -- the regulatory burden that we used was Class 2 burden so I've done the process through 2   Class 2.  We were just fortunate enough to be able to use an equivalence of a Class 1 device for a predicate.

Q. I want to be sure I understand what you've just said.  The products that you're talking about are products that are offered by your company --

A. Yes, ma'am.

Q. -- Radux.  Am I pronouncing that correctly?

A. Radux.  Whatever sells, yes, ma'am.

Q. Dr. Gordon, is it correct to say that Radux has three products?

A. We have three products on the market that are all interrelated. We'll have another product out by the end of July and then hopefully another product out by February of next year.

Q. The product that you say will be out by the end of July is called what?

---

[10] Exhibit _____, Gordon Deposition (*Pavlock* – January 4, 2018), 39:16 to 45: 18.

A. Lock-Block box and it is a disposable radiation shield.

Q. What are the three products that are currently on the market?

A. Well, Stand Tall 25, 15 and 10.  So it's really one product, a family of one product.

Q. Of the products that your company makes and that you've been involved with, are any of those Class 2 or Class 3 devices?

A. One of our products will be a Class 2 device that we're working on.

Q. And what's the name of that product?

A. I don't have a name yet.

Q. Can you tell me what it is?

A. No, I cannot.

Q. Have you prepared a 510(k) application for that product?

A. We're working through the process so, no, I have not prepared one yet.

Q. Now, I understand that you participated in drafting the instructions for use for the products that Radux makes, correct?

A. Yes, ma'am.

Q. Have you ever participated in drafting the instructions for use for a Class 2 medical device?

A. I'm working on that now so I have not in the past. We are currently in that process.[11]

The actions of Cook's counsel in the course of the depositions that they have taken of Dr. Gordon, belie their assertion that Cook has no ability to cross-examine Dr. Gordon regarding his experience with regard to the development of Class I and Class II medical devices.

---

[11] Exhibit _____, Gordon Deposition (*Brand*: June 12, 2018), 56:18 to 57:24, 60:10 to 60:22 and 70:17 to 23.

Cook's second basis for seeking to prevent Dr. Gordon from testifying as to his full range of practical experience is because failed "to mention the secret Class II device in his expert report . . . ." is simply incorrect. Page 1 of Dr. Gordon's report in the case states:

> I have recently reduced my clinical practice (June 2017 - present) to a part time clinical role in order to focus on a medical device company I started 6 years ago, Radux Devices. I have gained extensive experience in product development, product design, proof of concept, design failure modes, hazard and risk analysis as well as post market surveillance and the FDA process. I have personally been the primary physician participating in bringing 3 medical devices to market, writing IFUs and IFU updates, as well as participating in the majority of the regulatory and compliance issues related to the 510K process and FDA clearance for my company. I have 5 patents approved and over 20 patents pending. I have also been intimately involved in commercialization over the last 6 years and have an understanding of marketing rules and regulations related to appropriateness and allowable marketing of medical devices on top of the 20 years I have worked alongside industry as a speaker, consultant and investigator. I am intimately involved in post market surveillance, adverse medical device reporting standards, root cause analysis and the corrective and preventive action (CAPA) process.[12]

There is simply no reason for the Court to exclude any testimony or evidence of Dr. Gordon's experience with the development of a Class II medical device.

Based on the foregoing, the court should deny Cook's MIL No. 33.

**34.   The Court Should Not Exclude Testimony by James Carlson, Ph.D., Regarding Evidence of a Pattern of Tilt, Perforation, and Fracture or Any Reliance on Such Testimony.** *(In response to Cook MIL 34, Doc. 8894 at 55035-55037)*

### a. Dr. Carlson's testimony is relevant

James Carlson, Ph.D, was employed by Cook from 2004 to 2014 as a senior engineer and metallurgist.[13]   As Cook's senior metallurgical engineer, Dr. Carlson "assisted Cook with trying to determine why some of the IVC filters of Cook had fractured in patients," and was responsible for performing failure analyses on fractured filters.[14] Based on that direct experience at Cook as a

---

[12] Exhibit _____, Excerpt from the Expert Report of Gregory I. Gordon, M.D., p. 1.
[13] Exhibit ___, Deposition of James Carlson, June 6, 2017, at 27:2–27:5, 33:11–33:13.
[14] *Id.* at 31:23–32:3 & 49:17–49:24.

metallurgist, Dr. Carlson testified at his deposition to, *inter alia*, the pattern he identified between tilt, perforation, and fracture of the Celect filter.[15]

Defendants move to exclude that testimony as irrelevant, arguing that Dr. Carlson did not identify this pattern until his post-2010 investigation of fracture complaints, which he performed after Brand's March 2009 filter implantation.[16]  Not so.  First, as a matter of strict-liability design defect, Dr. Carlson's testimony concerning the relationship between tilt, perforation, and fracture is admissible to prove the existence of the defective design at the time the Celect was implanted—regardless of when Cook came to know of that defect.  Cook's own verbiage is instructive on this distinction.  The premise of Cook's argument begins: "[b]ecause the alleged pattern *did not develop* until after Mrs. Brand's filter placement . . . "[17]  But, the pattern *did* develop *before* Brand's filter placement.  The pattern existed all along; from the moment the Celect filter was released to market, it did have a tendency to tilt, which led to propensity to perforate, which created a higher risk of fracture.  Even though Dr. Carlson himself may not have developed an appreciation for the fact of that pattern until after 2010, the pattern nonetheless existed—and the Celect was therefore defective—prior to Brand's implant procedure.[18]  Dr. Carlson's testimony based on his post-2010 observations is, therefore, highly relevant to prove the pre-March 2009 *existence* of the defect, as a matter of strict products liability.

---

[15] *See, e.g.*, *id.* at 78:23–79:8, 79:20–80:10, 108:6–108:11, 113:19–114:7, 115:15–115:21.

[16] Def. Mem., Dkt. # 8894, at 15.

[17] *Id.* at 15 (emphasis added).

[18] Cook cites *Padilla v. Hunter Douglas Window Coverings, Inc.*, No. 09 CV 1222, 2014 WL 595051, at *1 (N.D. Ill. Feb. 13, 2014), in support of its argument, but that case dealt with Illinois products-liability law.  Under Georgia law, the risk-utility test under which product defects are adjudicated does preclude consideration of post-manufacture knowledge of a defect when determining the actual existence of the defect at the time of manufacture *See, e.g.*, *Kelley v. Hedwin Corp.*, 707 S.E.2d 895, 898–99 (Ga. Ct. App. 2011) (discussing factors considered when employing the risk-utility test).

Second, as a matter of negligent design defect, Dr. Carlson's testimony concerning the relationship between tilt, perforation, and fracture is admissible to prove that Cook *should have known* about that relationship prior to Brand's March 2009 implant.  As early as 2002, Cook recognized the risk of perforation posed by the design of the Celect, as compared with Cook's predecessor Tulip filter, due to removal of the Tulip's perforation-limiting leaf-like design features.[19]  In 2006, before the Celect was cleared for release in the United States, Irish regulatory authorities specifically asked Cook to explain the "proposed effect that tilting will have on fatigue and lifetime of the" Celect.[20] Instead of conducting premarket testing to actually determine the effect, Cook simply surmised that "any additional stresses that may be added due to tiliting [sic] would not be significant [sic] enough to effect the fatigue life of the filter under physiologic relevant loading."[21]  Indeed, Cook never calculated, tested, or measured the loads placed on the Celect filter legs when tilted or perforated, and never performed any testing to investigate the relationship between tilt, perforation, and fracture.[22]

The fact that Cook's own senior metallurgical engineer, through his post-2010 fracture evaluations, confirmed early warning signs dating to 2002, shows that Cook could have discovered the relationship between tilt, perforation, and fracture had Cook bothered to investigate that relationship before releasing the Celect to the U.S. market.  Dr. Carlson's testimony based on his post-2010 observations is, therefore, highly relevant to prove the pre-2009 unreasonableness of Cook's design, as a matter of negligent products liability.

---

[19] *See* CookMDL2570_0765339, attached as Exhibit ___ ("I do have my doubts, as one of the major issue of the 'leaves' was to avoid perforation/penetration . . . ."); CookMDL2570_0765319, attached as Exhibit ___ ("If the 'leaves' are straight wires so they are easy to pull out, they can also easy perforate . . . .").

[20] CookMDL2570_0421290, attached Exhibit ____.

[21] *Id.*

[22] Deposition of Per Hendriksen (June 15, 2016), 118:2–121:24, 155:13–155:20, attached as Exhibit ___; Deposition of Mark Frye (June 30, 2016), 89:3–89:5, 90:22–91:19, attached as Exhibit ___; Deposition of Brian Choules (July 22, 2016), 145:13–145:16, 159:6–159:11, attached as Exhibit ___.

14

Third, as a matter of negligent failure to warn, Dr. Carlson's testimony concerning the relationship between tilt, perforation, and fracture is admissible to show that Cook breached its continuing duty to warn.  "Georgia law imposes a continuing duty upon manufacturers to warn of a danger arising from a product after its sale or distribution."  *Ford Motor Co. v. Reese*, 684 S.E.2d 279, 284 (Ga. Ct. App. 2009) (citing *Chrysler Corp. v. Batten*, 450 S.E.2d 208 (Ga. 1994); *Wabash Metal Products v. AT Plastics Corp.*, 575 S.E.2d 683 (Ga. Ct. App. 2002)). "The Georgia Supreme Court has clearly stated that a duty to warn may arise 'from a manufacturer's post-sale knowledge acquired months, years, or even decades after the date of the first sale of the product.'"  *In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*, No. 3:07-CV-00101, 2010 WL 2196629, at *1 (M.D. Ga. May 28, 2010) (quoting *Chrysler Corp.*, 450 S.E.2d at 211).

The first attempt to retrieve Brand's filter did not occur until July 2011.[23] At no time between the 2009 implant and the 2011 retrieval attempt—including after Dr. Carlson's identification of a pattern and relationship between tilt, perforation, and fracture—did Cook make any attempt to communicate its knowledge of that pattern to Brand's physicians.  Even assuming *arguendo* that Cook did not actually know about the risks of and relationship between tilt, perforation, and fracture until after 2010, and even putting aside the argument that Cook nonetheless *should* have known about those risks and that relationship long before Brand's 2009 implant, Dr. Carlson's testimony based on his post-2010 metallurgical evaluations is highly probative of Cook's failure to warn Brand's physicians of those risks and that relationship once Cook unquestionably knew about them.

---

[23] Procedure Note, attached as Exhibit ___.

A warning regarding the likelihood of continued perforation, embolization and fracture based on the relationship between tilt, perforation and fracture could have averted additional harm to Brand. After an attempt by Dr. Rheudasil to retrieve the filter on July 14, 2011 failed, he made the decision to monitor the situation rather than use an open procedure to retrieve it, which he eventually performed on October 22, 2015, after realizing the entire filter was coming apart and that further migration of filter pieces through Brand's body was taking place.[24]  If Cook had warned of the danger of tilt, perforation and fracture between July 2011 and October 2015, Brand's filter could have been removed preventing further fracture and migration and the resulting pain and suffering of Brand. The failure to warn is particularly apposite here given that Cook met in person with Dr. Rheudasil regarding Brand in the days after her filter fragment exited her thigh in July 2011.[25]  Dr. Carlson's testimony based on his post-2010 observations is therefore highly relevant to show that Cook knew that Brand had been implanted with a ticking time bomb and did nothing to snuff the fuse.

### b. Dr. Carlson's testimony is not unfairly prejudicial, confusing, or a waste of time

Cook next argues that "to refute the existence of any alleged pattern of tilt, perforation, and fracture, Cook would have to introduce evidence related to other individual cases"—a devolution into "mini-trials about these other patients' cases" that would result in "unfair prejudice, confusion, and a waste of time."[26] Dr. Carlson's testimony poses no risk of these supposed mini trials.[27]

---

[24] Exh. __, Rheudasil Dep. at 90-92, 113-15, 127-33.
[25] *Id*. at 106-07 & Exh. 20 to Rheudasil Dep., attached as Exhibit ____.
[26] Def. Mem., Dkt. # 8894, at 15–16.
[27] Cook also frames its argument "with respect to MIL #4."  In response, Plaintiff respectfully refers the Court to her argument in opposition to Motion in Limine 4.

As Plaintiff discussed in her opposition to Cook's *Daubert* motion against Dr. Carlson, the purpose of Dr. Carlson's testimony is to establish the relationship between tilt, perforation, and fracture that Dr. Carlson identified through his analyses—not to litigate the minutiae of complaints not at issue in this case.  Plaintiff does not seek to admit voluminous, confusing, complaint-specific evidence, but rather seeks to admit the conclusions Dr. Carlson drew and opinions he formed based on his experience as Cook's senior metallurgical engineer.  Requiring Cook to respond to that limited evidence would not devolve these proceedings into the sort of mini-trials envisioned by *Mowrey v. City of Fort Wayne*, in which the plaintiffs sought to admit evidence of innumerous "civil actions, citizen complaints, or discipline" against a police officer. No. 1:12-CV-121, 2013 WL 6512664, at *8 (N.D. Ind. Dec. 12, 2013).  Unfortunately for Cook, not liking the testimony of their former senior metallurgical engineer does not make the burden of responding to that testimony unfairly prejudicial.  *See United States v. Loughry*, 738 F.3d 166, 170 (7th Cir. 2013) ("'That evidence may be highly prejudicial does not compel its exclusion; the evidence must be unfairly prejudicial.'") (*quoting United States v. Chambers*, 642 F.3d 588, 595 (7th Cir. 2011)).

c.      **Conclusion.**

For the reasons discussed above, Dr. Carlson's testimony concerning the existence of a pattern between tilt, perforation, and fracture of the Celect filter, and any reliance on that testimony, is highly relevant, not unfairly prejudicial, not confusing, and not a waste of time. This testimony should therefore be admitted, and MIL No. 34 should be denied in its entirety.

**35.    The Court Should Not Exclude Dr. Timperman's Testimony Regarding Perforations in OUS Patients**  (In response to Cook MIL # 35 Doc. 8894 pgs. 16-21).

17

Cook moves to exclude May 2017 deposition testimony concerning obvious OUS study perforations given by Interventional Radiologist Dr. Paul Timperman.  Cook has depended on Dr. Timperman as a consultant for over ten years and, as evidenced by his present-day, continuing contractual agreement with Cook, much trust and faith has been placed in him as an expert adjudicator of "close to a thousand" complaints received by Cook.[28]  Never before this litigation has Cook questioned Dr. Timperman's methods or reliability.  It is only now, after Dr. Timperman has freely given honest testimony that is very bad for Cook, that his judgment as a professional is being impeached.

The Court should be aware that, different from the time of its decision on this matter for the *Hill* trial, Plaintiff has since developed evidence from two experts (one a Cook consultant and investigator in the Lyon study) corroborating Dr. Timperman's assertions.  It is simply untrue when Cook claims, "Plaintiff has done nothing between Hill and Brand to fix the fundamental flaw in Dr. Timperman's use of a business card to measure medical imaging."[29]

The "use of a business card" is the catchphrase Cook relies upon to try and steer the Court into believing Dr. Timperman had no basis for his opinions other than sticking a business card up next to an image and gauging the length of a strut outside the wall of the vena cava with that business card.  Cook's position and its suggestion as such is unreasonable and flat-out untrue. In fact there is a "constant" that Dr. Timperman used in his measurements and his calculations and Cook knows it yet nowhere in its briefing does it let the Court know that Timperman used a known length on a known portion of the Celect  IVC filter to confirm his estimate of the length of the protruding strut.  The measurement Dr. Timperman performed was easily and accurately performed by him and in every instance asked he gave his opinion as to

---

[28] Ex. __Timperman Dep. 5/3/17 at pg. 20:7-15; 85:9-11, 85:14-17.
[29] Ex. ___ Cook's Motion Doc. 8894 at 17.

whether there was a perforation.  The portion of the filter he used to measure the length of the perforation is the "hub" of the filter or its "cap."

In his measurement, nowhere suggesting it was inaccurate, Cook consulting expert Dr. Timperman, who has likely measured thousands of perforations of IVC filters, knows that the "constant" used in his analysis is exactly 4 mm and that when he views an image of a Celect filter he knows that 4 mm constant is exactly 4 mm long.  Thus there is no "business card" that was used in the actual measurement. The hub is what's used.  The side of the card is simply used as a straight edge (not a ruler) to show Dr. Timperman that his measurement of the hub corresponds with its length.  The actual measurement is made by looking at the hub of the Celect filter and comparing its length with the protruding strut.  It is no less accurate than having a ruler with a 4 mm mark on it and placing the ruler up against the image. The only difference is that for accuracy the "business card" was used to determine where the 4 mm mark would be on the straight edge was so that Dr. Timperman could gauge the accuracy of his measurement using the exact 4 mm long hub of the Celect IVC filter.

Cook, nervous about the findings of its very own consultant testifying to facts that show agreement with Plaintiff's expert interventional radiologist Dr. Gordon and Cook's "hybrid" consultant and interventional radiologist Dr. Uberoi (an actual investigator retained by Cook to participate in the Lyon study) proves that Cook misrepresented that the were no perforations in the Lyon study when it is now undisputed that there were perforations.  Cook's defense now is that the statement of "no perforations" in Lyon was just a typo.[30]

Plaintiff's expert Dr. Greg Gordon, himself an Interventional Radiologist, has rendered opinions on the same images shown to Dr. Timperman.  Dr. Gordon and Dr. Timperman are in

---

[30] See Ex. ___, Cook expert Morris deposition at 202:10-15.

100% agreement regarding the presence of perforations in the OUS images shown to Dr. Timperman.[31]  Second, Cook consulting expert interventional radiologist Dr. Raman Uberoi was recently deposed in August of 2018, specifically to discuss his involvement in the OUS study. Dr. Uberoi testified that in preparing for his deposition, he revisited the images of his OUS study patients and determined that, in stark contrast to his prior reporting (which was included in the published Lyon article), three of his OUS patients including patient 0802005 did in fact suffer a perforation of the vena cava.[32]  This admission (nearly nine years after the Lyon article was published) further corroborates the deposition testimony of Dr. Timperman, who was shown a venogram of patient 0802005 and testified as follows:

> Q. And, again, can you identify the type of image, the type of filter and any abnormality?
>
> A. Celect filter in the vena cava.  It's mildly tented but -- I mean tilted, but the hook is still open towards the center of the vessel.  All the right-sided legs are -- appear to be tenting and this –
>
> Q. Again, is this -- this is the left side?
>
> A. That's the left side.  **That one is probably perforated because it measures 4 millimeters** based on my note card here.
>
> Q. Based on your observations?
>
> A. **I can measure basically by taking the -- taking the hub length right here and marking  it with my fingernail and then measuring.  I know that's 4 millimeters.**

---

[31] Ex. ___, Gordon Dep. at 185:19-22.
[32] Ex. ___, Uberoi Dep. at 376:23-378:14; Dr. Uberoi explained that when he originally declined to report that these three patients had perforations, he did so only because he was bound by Cook's bizarre OUS protocol definition of perforation requiring hemorrhage, hematoma, or extravasation of contrast dye.  When Dr. Uberoi reinterpreted the images and applied the widely-accepted, prevailing perforation definition put forth by the Society of Interventional Radiologists (strut greater than 3 mm outside the caval wall), he admitted that three of his twelve OUS patients experienced perforations as that term is understood by IVC filter implanters generally.

Q. All right.  So, just so we are all talking about the hub, you are talking about this piece right here?

A. Yes.

Q. So, that part of the filter you call the hub?

A. Yeah.

Q. And that's 4 millimeters?

A. Yeah.

Q. And then you are taking that and comparing it to this here?

A. To that distance.[33]

In the above exchange, not only does Dr. Timperman reach the same conclusion as both Dr. Gordon and Dr. Uberoi, but he also explains how he uses a note card to assist him with his measurements.  Dr. Timperman states he *knows* that the "hub" (that cylindrical area just below the retrieval hook) of the filter measures exactly 4 millimeters.  Using that known and constant 4 mm hub measurement as a reliable reference, and by employing the 3mm outside the vena cava wall SIR definition of filter perforation, Dr. Timperman revealed that ten of the twelve OUS patient images he was shown had clear and obvious perforations.  Dr. Timperman testified that it is "not hard" to review a film or image and determine "abnormalities" of the vena cava, including a "perforation."[34]  And while he does say that in an ideal situation special software is available to him, he also testified that, "**Sometimes there is no calibration and you have to calibrate off of something that's on the image, which in the filter it's pretty easy because I know -- I know how long the hook is.  I know how long the hub is.  So, the -- but either way,**

---

[33] Ex. ___, Timperman Dep. at Pg. 166:9-167:15.
[34] Id. at 119:11-22.

**whatever you're talking about, it's not a lengthy process, no.**"[35]  This testimony sheds light

on Cook's misleading statement that Dr. Timperman "estimates that his reviews for Cook

Research, Inc. take an average of two hours per complaint."  What is intentionally omitted from

this portion of Cook's Motion is that a complete complaint review involves not only a review of

images, but also a thorough review of a given patient's (often lengthy) medical and surgical

history, and of course the actual writing of Dr. Timperman's findings in report form.  Note the

length of the Brand complaint form finally completed was over 20 pages.  Dr. Timperman

obviously does not spend anywhere near two hours reviewing a single venogram, as Cook

weakly attempts to suggest.



---

Dr. Gordon has also testified as to the reliability of Dr. Timperman's method of measurement used at his deposition:

> Q. If it's an ordinary business card, is that a tool that you use to measure perforation?
>
> A. No, ma'am. Not unless -- **with one exception.  If I knew the exact diameter or measurement.**
>
> A. **If I took a measurement and took a card and then measured the card, I would do that.**
>
> Q. Have you ever done that in your medical practice treating patients?
>
> A. Yes, that -- not just a card but I've taken pieces of paper where I've measured it and then brought that to a ruler.[36]

Dr. Gordon is describing the same methodology used by Dr. Timperman at his deposition.  Looking at a venogram and using the filter hub (which he knows is 4 mm) as a calibrating tool, Dr. Timperman found it quite easy to quickly determine whether a given filter strut was more or less than 3 mm outside the caval wall.  And, if one applies the perforation definition published by Cook in the Lyon article "(ie, strut protruding out of the IVC wall)[37]", it becomes clear why Dr. Timperman so readily and confidently offered his opinions.  With over twenty years of experience as a practicing Interventional Radiologist, Dr. Timperman (and Dr. Gordon, and Dr. Uberoi) knows perforation when he sees it.  Dr. Gordon confirms that his methodology is accurate.  And Dr. Uberoi confirms what both of them have confirmed and that is that there are perforations in the vena canvas of the patients in the Lyon study and that Cook's statements made to the medical journal peer reviewers to whom it falsified the data were in fact

---

[36] Ex. ___, Gordon Dep. at 186:8-11, 186:18-25.
[37] Cook IVCF 008298 at 302 (Published Lyon Article)

completely false.  This Court should allow this testimony—from Cook's own long time expert—confirming that there were perforations in the OUS/Lyon study to be brought to the jury.  To allow Cook to get away with its attempt to further suppress its offensive actions with respect to falsifying data to a major journal should be brought to light and not hidden for absolutely not cause.  And in *Brand* Plaintiff has secured experts that support Dr. Timperman's methodology in his measurements of the length the struts were outside of the vena cava wall of those patients in the OUS study that he reviewed.

In its Motion, Cook points out that this Court has previously stated (at the Sept. 14, 2017 status conference) that Dr. Timperman's method of measuring OUS patient perforations at his deposition would not meet the Daubert standard.  Yet Cook has never filed a Daubert motion challenging his OUS venogram interpretations as failing to meet the legal standard of reliability.  This is likely because Cook has slithered itself between a rock and a hard place.  Dr. Timperman's use of the business card as a guide during his deposition is no less accurate than his regular course of action when he sometimes reviews images given to him by Cook on his *iPhone*.  Despite Cook's insistence that fancy computer software and calipers are mandatory for adjudicating images, that simply isn't the reality of Dr. Timperman's practice.  He testified that he can simply look at "iPhone photographs of a monitor showing the imaging of a venacavagram" and  determine "abnormalities" including "perforations."[38]  Having placed all of its faith in Dr. Timperman to opine on "close to a thousand" IVC filter complaints, Cook now attempts to cast doubt (at least to this Court) on the same doctor (and his methods) who it firmly stands behind when they like his conclusions.  In other words, when Dr. Timperman makes Cook-friendly radiological determinations based on iPhone screen shots, he is simply revered as

---

[38] Ex. ___ Timperman Dep. at 118:23-119:15.

Cook's long-time interventional radiology expert.  But when the same man delivers devastating deposition testimony, further exposing the depth of the deceit present within the OUS study, the Celect IFU, and the Lyon article, he suddenly morphs into an impeachable charlatan who employs scientifically unreliable methods of measurement.

It should be noted that Dr. Timperman was never asked to use a card to assist in his perforation measurements.  Rather, he used the card on his own, without hesitation, in order to assist in the description of the images.  He was not pressured and was not hurried.  He could have declined to comment at all, citing a lack of "tools" and/or concerns about accuracy but he did not. The question and answer testimony when he was shown the first (of twelve) OUS venograms reads as follows:

> Q. What type of image are we looking at?
>
> A. Well,  it's a Celect filter and there is --it's a venacavagram . . . there is a leg, which, I mean, if I use a card here to estimate, is based on the --it's about 7 millimeters outside the vena cava on the left side, which is actually on the right side of the film.  So, that's perforated.[39]

To be clear, Cook doesn't *really* object to Dr. Timperman's methodology.  What Cook objects to is his honest conclusions and they are desperate to prevent the jury from hearing this very probative and now well-corroborated testimony.

There is no merit to Cook's request of this Court to "exclude . . . opinions from Drs. Krumholz and Gordon relying on these measurements."  Stated very plainly, there are no Plaintiff's experts that rely on Dr. Timperman's deposition testimony as the basis for their opinions.  Dr. Gordon's own reading of the OUS images forms that basis of his opinions. Dr.

---

[39] Id. at  158:5-20.

Krumholz relied upon Dr. Gordon's readings because he is not an interventional radiologist.  It is, however, fact that Dr. Timperman read the OUS images and found perforations just as Dr. Gordon did (and just as Dr. Krumholz found by looking at then OUS and Lyon data).  To suggest that either expert relied upon Dr. Timperman to determine that there were perforations in the OUS/Lyon study is off target.

For each of the above reasons, the Court should deny Cook's attempt to exclude this very relevant and probative deposition testimony, and should not limit the Plaintiff's experts from giving their opinions Cook falsely mischaracterizes as having been formed based on the deposition testimony of Dr. Timperman.

### 36. Evidence Concerning Cook's Handling of Mrs. Brand's Single Complaint Form Is Relevant, Admissible, and Does Not Constitute a Subsequent Remedial Measure. (*In Response to Cook MIL 36, Doc. 8894 at 55042-55044*)

The Court should deny this motion in limine because (1) Cook's Single Complaint Report[40] regarding Brand, including but not limited to Cook's handling of same, is relevant to Brand's failure to warn and design defect claims, and independently will be useful for impeachment purposes, and (2) Cook's creation of this report as part of its investigation of Brand's filter fracture as a matter of law does not constitute a subsequent remedial measure.

Taking the second issue first, in response to Brand's experience with her Celect filter, Cook took no action – no remedial measure at all – to attempt to address the harm she suffered.  Cook did not change its design or warnings as a result of the perforation, embolization, and fracture of Brand's filter.  Instead, Cook concluded in its Single Complaint Report that no new or different measures were required, stating as follows: "Unable to determine the exact root cause for this

---

[40] In its motion in limine, Cook refers to a "Single Complaint Form," but the document itself is titled "Single Complaint Report."  *See* Def. Ex. M.  Plaintiff therefore refers to the document as a "Single Complaint Report."

event ...  Conclusions: No evidence to suggest device failure based on information provided. Cook Medical will continue to monitor for similar reports… nothing further is initiated at this time."[41]

As a matter of law, Cook's Single Complaint Report is not a subsequent remedial measure. The Single Complaint Report constitutes Cook's investigation of the fracture of Brand's filter. An investigation is not a subsequent remedial measure.  *Hansen v. Werner Enterprises, Inc.*, 2016 WL 7479349, at *4 (C.D. Ca. May 18, 2016) ("Rule 407 applies only to remedial measures actually taken by Defendants; it does not apply to Defendants' internal investigations or reports created in the process of __determining__ the appropriate remedial actions.") (emphasis in original); *Hoover v. Delaney*, 2003 WL 22038639, No. 01 C 2372, at *2 (N.D. Ill. Aug. 28, 2003) ("an evaluation of how an accident occurred is not inadmissible under Rule 407; at most, what the Rule excludes is evidence of subsequent remedial measures resulting from the evaluation of the accident."); *Harms v. Lab. Corp. of Am.*, 155 F. Supp.2d 891, 900 (N.D. Ill. 2001) (denying motion in limine regarding post-occurrence investigation, including its adequacy and findings, because investigation was relevant and did not constitute a subsequent remedial measure).  As one court explained:

> [C]ourts have recognized the admission of the results of tests and the findings of investigations conducted after an accident is consistent with Rule 407's purpose of encouraging safety improvements.  The rule protects a party from having subsequent remedial measures used against it as evidence of its negligence in the first instance and thus helps to avoid the socially undesirable consequence of a party's reluctance to make safety improvements out of a fear of increased exposure to liability.  But to read Rule 407 as barring test results and investigative findings altogether "'goes too far and fails to credit the social value of making available for trial what is often the best source of information.'"

---

[41] Def. Ex. M, Doc. 8894-6, CookMDL2570_0100622 & CookMDL2570_0743748, attached as Exhibit __.

*Thornton v. Diamond Offshore Drilling, Inc*., 2008 WL 2315845, No. 07-1839, at *4 (E.D. La. May 19, 2008) (citations omitted).

"By its terms, Rule 407 bars evidence only of remedial action; Rule 407 does not bar evidence of a party's own analysis of events, even if those events result in the party taking remedial action."[42]  *In re Chicago Flood Litigation*, 1995 WL 437501, No. 93 C 1214, at *5 (N.D. Ill. July 21, 1995).  Here Cook's investigation (the Single Complaint Report in its various permutations) is not a remedial measure, and Cook took no other remedial action. Thus, Rule 407 does not apply.

Moreover, admission of the Single Complaint Report in this case is consistent with Rule 407, which by its terms concerns measures "taken that would have made an earlier injury or harm less likely to occur."  Fed. R. Evid. 407.  The creation of Brand's Single Complaint Report is not a measure that could have been taken prior to her incident such that it could have made the injury or harm less likely to occur.

Second, Cook's Single Complaint Report regarding Brand is relevant to her case for a variety of reasons.  First, the recitation of the events leading to Brand's filter fracturing and moving throughout her body can be used for impeachment of Cook's witnesses, including its experts. For example, Cook's testifying experts (including Dr. Gillespie) opine that Brand's surgery caused her filter perforation; but, in contrast, prior to litigation Cook reached the conclusion in the Single Complaint Report that "the filter does not appear to have migrated when the intraoperative March 19 image is compared to the next available image (CT scout view April 10, 2009) or the KUB of April 17, 2009."[43]

---

[42] It is notable that Cook cites no law to the contrary in its motion.
[43] Exh. ___, Def. Ex. M, Doc. 8894-6, CookMDL2570_0100617.

In addition, the Single Complaint Report supports Plaintiff's failure to warn and design defect claims by demonstrating Cook's knowledge of the likelihood and circumstances of fracture.  Specifically, the Report reveals Cook's awareness that perforation causes fracture; however, Cook never warned in its IFU about fracture or about the relationship between perforation and fracture.  The Single Complaint Report states that: "there are no reported cases of fracture that have occurred without first demonstrating perforation in patients not undergoing retrieval."[44] The Report continues: "[t]o the best of Cook Medicals [sic] belief reported leg fracture is secondary to filter perforation of IVC.  Changes to the filter configuration … are known to cause stress and possibly subsequent fracture to the filter wires due to e.g. respiratory movements."[45]

Under Georgia law, Cook had a continuing duty to warn. *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1218 (11th Cir. 1999).  Cook argues that the Single Complaint Report is not relevant because the file was not opened until July 26, 2011. However, a warning regarding the likelihood of continued perforation, embolization and fracture could have averted additional harm to Brand. After an attempt by Dr. Rheudasil to retrieve the filter on July 14, 2011 failed, he made the decision to monitor the situation rather than use an open procedure to retrieve it, which he eventually performed on October 22, 2015, after realizing the entire filter was coming apart and that further migration of filter pieces through Brand's body was taking place.[46] If Cook had warned of the danger of progressive perforation, fracture and embolization resulting from changes to the filter configuration between July 2011 and October 2015, Brand's filter could

---

[44] Exh. ___, Def. Ex. M, Doc. 8894-6, CookMDL2570_0100599. *See also id.* at CookMDL2570_0100604-05 (listing 82 prior fracture complaints related to the Celect filter).
[45] *Id*. at CookMDL2570_0100619.

[46] Ex. __, Rheudasil Dep. at 90-92, 113-15, 127-33.

have been removed preventing further fracture and migration and the resulting pain and suffering of Brand. The failure to warn is particularly apposite here given that Cook met in person with Dr. Rheudasil regarding Brand in the days after her filter fragment exited her thigh.[47]

Cook argues that Dr. Krumholz's criticisms of how Cook handled the investigation documented in the Single Complaint Report are not relevant.  However, the various versions of the Single Complaint Report show Cook's attempts to blame anything but its filter design for Brand's unfortunate experience.  For example, Dr. Krumholz accurately points out that in the Report Cook blamed surgeries that happened *before* her filter was implanted for the perforation and fracture.[48] Similarly, Cook inaccurately (and contrary to the opinions of its own consulting experts) blamed the filter placement for the perforation and fracture.[49] And despite acknowledging in the Single Complaint Report that Brand's filter perforated, and the relationship between perforation and fracture, Cook concluded that it was "[u]nable to determine the exact root cause for this event."[50]  Rather than warn Dr. Rheudasil and other doctors of the dangers of perforation and subsequent fracture, Cook chose to obfuscate.  These facts are relevant to Brand's failure to warn claims.

For the foregoing reasons, Plaintiff asks the Court to deny Cook's MIL No. 36.

**37.   Confidentiality Designations Are Inadmissible to Criticize Cook's Ethics, but This Information Is Admissible for Limited Probative Purposes.**  (*In response to Cook's MIL No. 37, Doc. No. 8894, 55044-53*)

Plaintiff agrees that both parties, their counsel and their experts shall generally refrain from arguing or offering any testimony concerning confidentiality designations or discovery disputes, or the parties' conduct with respect to either. Discussion of confidentiality designations are,

---

[47] *Id*. at 106-07 & Ex. __, (Ex. 20 to Rheudasil Dep.).
[48] Exh. ____, *See* Dkt. 8642-1, Krumholz Report, at 162.
[49] *Id*. at 163-64.
[50] Exh. ___, Def. Ex. M, Doc. 8894-6, CookMDL2570_0100622 & CookMDL2570_0743748.

however, relevant in one respect—the jury must be made aware that plaintiff's experts are under a confidentiality order so that they understand why the experts, some of whom are academic scholars and prolific authors, have not published what they have discovered about the complications of the Celect filter and Cook's misrepresentations in the Celect IFU and the Lyon publication.

Subject to this stipulation, Plaintiff states that her experts are entitled to opine regarding why the information, designated confidential, should have been shared with the medical community so that Brand's physicians, and physicians in general, could have made appropriate decisions when evaluating the risks and benefits of using the Celect filter.  This evidence is relevant to both her design defect and failure to warn claims. Fed. R. Evid. 401.  The fact that the Cook data is confidential should not be masked from the jury because that may mislead the jury into believing that the information Cook possessed was available to the medical community during the relevant time period at issue in this case. Fed. R. Evid. 403.  Plaintiff concedes that all witnesses should be precluded from editorializing on the propriety of the confidential designations of the Cook documents when explaining the Cook data should have been made available to the medical community.  Fed. R. Evid. 403.

**38.** **All Evidence Regarding Information Cook Failed to Provide the Medical Community, Including the Frequency of Specific Risks Is Relevant.** (*In Response to Cook's MIL No. 38, Doc. 8894 at 55053-59*)

Cook seeks to limit any evidence and argument that Cook failed to warn the medical community of the increased frequency of filter failures in the Celect filter design by repurposing its same arguments from Defendants' motion for summary judgment on Plaintiff's failure to warn claims.  This court should deny Cook's motion *in limine* because the information is relevant evidence of Cooks' notice of the increased risks of tilt, perforations, progressive

perforations, caudal migration, and fracture associated with the Celect design that it chose not to share with the medical community.  All of these complications occurred in Brand's case and all involve a cascading set of events that are particular to the Cook Celect filter as has been discussed many times in Plaintiff's briefing.  This evidence goes to Cook's breach of its duty to warn and the proximate cause of Brand's injuries.

Cook readily admits in its internal documents and under oath—at least its employees do outside of the litigation arena and inside it occasionally—that the Celect has increased frequency of known failure modes from its predicate device.[51]  Further, the design defect claim, of course, makes all of these complications relevant because all of the defects with the Celect are important for the jury to know when it is considering whether the product is defective.  It would be impossible for the court to try the case and have to essentially redact or exclude, in part, most any company document, IFU, medical article, and/or studies that might mention the Celect's complications as a whole or just some of the ones Cook doesn't like hearing about.  This evidence not being relevant and admissible is hard to imagine in a real world trial.

In Georgia, "'[t]he failure to use reasonable care in design or knowledge of a defective design gives rise to the reasonable duty on the manufacturer to warn of this condition." *Rozier v. Ford Motor Co*., 573 F.2d 1332, 1344 (5th Cir. 1978) (*quoting Larson v. General Motors Corp.*, 391 F.2d 495, 505 (8th Cir. 1968)).  "Under the learned intermediary doctrine, the manufacturer of a . . . medical device does not have a duty to warn the patient of the dangers involved with the product, but instead has a duty to warn the patient's doctor, who acts as a learned intermediary between the patient and the manufacturer." *See* O.C.G.A. §51-1-11(c); *McCombs v. Synthes*

---

[51] *See* Arne Molgaard Nielsen's oft-cited diagram of the progressive nature of the filter and Cook researcher Brian Choules' deposition testimony that he has never seen a fracture without a perforation).

*(U.S.A.)*, 277 Ga. 252, 253 (2003).  "[U]nder the learned intermediary doctrine, the manufacturer's warnings to the physician must be adequate or reasonable under the circumstances of the case." *Id.*

This duty is "breached by (1) failing to adequately communicate the warning to the ultimate user, or (2) failing to provide an adequate warning of the product's potential risks." *Watkins v. Ford Motor Company,* 190 F.3d 1213, 1219 (2011).  The pertinent risks of the Celect, most of which were occasioned upon Brand, are the subject of expert testimony and are relevant to both design defect and failure to warn.  There is no dispute that Georgia law requires—for both strict liability and negligent failure to warn claims—a showing that the failure to warn proximately caused plaintiff's injuries; i.e., that the warning that should have been given would have addressed the cause of the plaintiff's injuries. *R&R Insulation Servs. Inc. v. Royal Indem. Co.,* 207 Ga. App 419, 705 (2010).   Simply put, the evidence Cook seeks to limit goes to breach not duty, and the evidence is relevant to proximate cause under her failure to warn claims.  There is no support for Cook's position under Georgia law.

### a.  Failure rate data and the increased frequency of failure rates are relevant to failure to warn claims under Georgia medical device product liability law

Cook's failure to communicate the risk rates of the Celect and to disclose that those rates were significantly higher than its predecessor, the Tulip, which the Celect was intended to replace, renders Cook's warnings inadequate. The evidence of the higher rates of failure for known risks in IVC filters is relevant to duty, breach and causation.  There is no support for Cook's position, and the Court recognized this when it allowed in evidence of the relative risks of the Tulip and the Celect in *Hill.*  In Brand, plaintiff experts again are opining that the Tulip is safer than the Celect as it does not perforate or progressively perforate and that it does not fracture at the frequency of the Celect.

Whether a device should include a warning that it carries an increased risk of a particular complication or greater propensity to cause injury are questions of fact for the jury. *See In re Mentor Corp. ObTape*, 711 F. Supp.2d 1348, 1378 (M.D.Ga. April 22, 2010) (holding reasonable jury could find warnings inadequate given manufacturer "did not inform Plaintiffs' physicians of any increased risks associated with ObTape") (*citing Watkins*, 190 F.3d at 1220) (finding genuine issue of material fact on failure-to-warn claim because jury could conclude that more adequate warning was needed on vehicle that had greater propensity than other vehicles to roll over). Under Georgia law, if a warning is provided and it does not include a known rate or severity of potential injury, then whether the alleged warning is adequate is a question for the jury. *Thornton v. E.I. Du Pont de Nemours & Co.*, 22 F.3d 284, 289 (1994) (adequate warning "must provide a complete disclosure of the existence and extent of the risk involved."). Thus, Cook's position that Defendants had no duty under Georgia law to warn regarding the frequency of risks is incorrect.

Cook encourages the Court to ignore four holdings from other district courts which applied Georgia law on whether a medical device manufacturer's warning was inadequate by failing to disclose the subject device had significantly higher complication rates than the rates of some of its competitors and its own predicate device—three of cases involving IVC filters. *See Cisson v. C.R. Bard, Inc.,* 2013 WL 5700513 at *7 (S.D. W.Va, Oct. 18, 2013); *Cason v. C.R. Bard, Inc.,,* 2015 WL 9913809 at *6 (N.D. Ga. Feb. 2, 2015); *In re Bard IVC Filters,* 2017 WL 5625548, at *3 (D. Ariz. Nov. 22, 2017); *In re Bard IVC Filters*, 2018 WL 1256768, at *6 (D. Ariz. Mar. 3, 2018). Cook incorrectly suggests that Georgia law imposed no duty on device manufactures to inform doctors about the frequency of identified risks by citing *Singleton v. Airco, Inc.*, 169 Ga. App. 662, 664 (1984). "Although [Cook] frames this argument as one of duty, it actually relates

to whether [Cook's] warnings were adequate, which is a question of breach." *Cisson* at *7.  In *Singleton*, the expert on the warning appeared on the plaintiff's behalf and found no defect in the label. *Singleton,* 169 Ga. App at 664.  *Singleton* is not even remotely applicable to the issue directly addressed by the district courts in the cases cited *supra*.

In *Cason*, IFU warnings similar to the ones upon which Cook relies in this case were at issue. 2015 WL 9913809.  There, as here:

> Plaintiffs concede[d] that the IFU provides a list of potential complications of which [the implanting doctor] was aware, but they argue that the warnings were inadequate because they [the warnings] failed to disclose that the frequency with which these complications occurred with the G2 Filter was significantly higher than with other IVC filters manufactured both by defendants' competitors and defendants themselves. [52]

*Id.* at *3.  Citing *In re Mentor Corp. ObTape*, Judge Shoob of the Northern District of Georgia concluded "there is a genuine issue for trial as to whether the warnings provided by Bard were adequate."  *Id.*  In so holding, Judge Shoob noted the evidence that (a) the G2 filter had "a significantly greater propensity to fracture, migrate, and perforate the IVC than other IVC filters," and (b) Bard "knew or should have known about the increased risks associated with the G2 Filter."

> Given this evidence, combined with the evidence that defendants did not warn Ms. Cason's doctor about any increased risk associated with the G2 Filter, a reasonable fact finder could conclude that the IFU did not contain an adequate warning regarding the G2 Filter.

*Id.* at **4-5

---

[52] Of course this citation is a perfect example of how Cook's Lyon publication has not only misled doctors but Federal courts and possibly juries.  Here the judge was unaware that the Lyon study did not actually show zero perforations but instead showed close to 100%.  The depths of Cook's OUS and Lyon lie and its contagion has infected even the jurisprudence of the federal judicial system.

In *Cisson v. C.R. Bard, Inc.*, 2013 WL 5700513, Bard argued, as Cook does here, that its duty was limited to warning about potential dangers, "not their rate or severity." *Id.* at *7; Def. Memo at 21. Applying Georgia law, the court found to the contrary: the IVC filter manufacturer's, Bard's, "warnings were adequate as a matter of law only if 'a reasonable jury would not have a legally sufficient evidentiary basis' to find against Bard." *Id.* at *8.  Identifying evidence that Bard knew its device "created a higher risk of complications," the court found "sufficient evidence to create a jury question as to whether Bard's warning was adequate." *Id.*

Cook claims Georgia law does not require a manufacturer to provide comparative rates of complication for its products; however, Cook cites no case law to support this claim and once again gropes for support from other jurisdictions. At the same time, it discounts the very thorough *Cisson* ruling by erroneously stating it did not rely on *Singleton v. Airco, Inc.* 169 Ga. App. 662, 664 (1984).  The reason is obvious: *Singleton* has no application other than the learned intermediary restatement of Georgia law that the *Cisson* court cites to establish that "Bard had a duty to warn about 'any potential dangers that may result" from use of the product.'" *Id*. at *6. That is, "if [certain] characteristics caused the Avaulta Plus to be more dangerous or risky than the product's Instructions for Use suggested, then Bard had a duty to warn about the dangers associated with them, and it is for the jury to decide whether Bard breached that duty." *Id.* Cook's other authorities are not based on Georgia law and inconsistent with *Cason*, *Cisson*, *In re Bard IVC Filters*, *In re Mentor Corp. ObTape*, and *Watkins*.

Further, *In re Bard IVC Filters Liability Litigations* addressed these <u>exact</u> arguments in November 2017 and March 2018 and stated "the court is not holding, as a matter of Georgia law, that a manufacturer must always disclose how the risks of their products compare to the risks of other products. But presumably there is a point where the risks of a product so depart from the

norm that failure to disclose them constitutes an inadequate warning. Whether the point was reached in this case will be for the jury to decide." *In re Bard IVC Filters,* 2017 WL 5625548, at *3 (citing *Cason*, 2015 WL 9913809, at *6); *see also*, *In re Bard IVC Filters,* 2018 WL 1256768, at *6.

Thus, Cook creates its own standards of Georgia law in seeking to exclude this evidence. However, the cases discussed that actually applied Georgia law to this issue have determined "it is for the jury to decide whether medical device manufacturer adequately warned doctor about rates and severity of complications." *Cisson,* 2013 WL 5700513, at *7; *see also Cason v. C.R. Bard, Inc.*, 2015 WL 9913809, at *6;  *In re Bard IVC Filters.,* 2017 WL 5625548, at *3; *In re Bard IVC Filters Products Liab. Litig.*, 2018 WL 1256768, at *6.[53]  Accordingly, all of this information is relevant.

### b. The increased failure rate date withheld from the medical community was relevant to causation

Cook argues that the frequency of failures being included in the IFU is not relevant because Dr. Rheudasil did not read or rely on Cook's warning specific to Celect filters, and therefore, could not, as a matter of law, have proximately caused Brand's injuries.[54] Cook makes this argument based on cherry-picking testimony from Dr. Rheudasil.[55] This is contrary to the evidence because Dr. Rheudasil testified he would have chosen a different device had he known Celect had an inferior safety profile.[56]  Cook had the data, but did not share it before marketing Celect, after marketing Celect, before Brand was implanted with the Celect, before the fracture,

---

[53] The first two bellwether cases in the *In re Bard IVC Filters Products Liab. Litig* applied Georgia law.
[54] Cook, however, overlooks the critical fact that Dr. Rheudasil testified he was not aware of the Celect filter's risks outside of the general risks. *See* Rheudasil Dep. at 152:24-153:20; 154:9-158:2; 160:13-161:5; and 162:21-163-3.
[55] Dkt. 8894 at 42; Rheudasil Dep. at 3:4-13, 66:12-24, 67:7-12, 161:11-162:16.
[56] Rheudasil Dep. at 152:24-158:14.

before the fractured pieces moved, or before her open retrieval.  All of the evidence about what Cook knew and communicated to Dr. Rheudasil is relevant to causation.

Under Georgia law, Cook had a continuing duty to warn once it knew or should have known of the increased frequency of failure modes. *See Watkins*, 190 F.3d at 1220; *Chrysler Corp. v. Batten,* 264 Ga. 723, 724 (1994); *In re Bard IVC Filters,* 2017 WL 5625548, at *3 (citing *Cason,* 2015 WL 9913809, at *6); *see also*, *In re Bard IVC Filters,* 2018 WL 1256768, at *6.  Thus, the suggestions from Cook's Jen Brown, Director of Regulatory Affairs, to update the IFU to add in "filter fracture," "filter embolization (including embolization of fracture filter components), and penetration or perforation of the vena cava or nearby structure" to the list of "Potential Adverse Events," are particularly relevant, as those are the exact injuries Brand experienced.[57]  Cook never added this warning to the Celect IFU, never provided a "Dear Doctor" letter to warn doctors of these injuries, and never instructed sales representatives to educate doctors on these known dangers despite mounting evidence.  Dr. Rheudasil clearly testified that had he had any of this information he would have made a different device selection.[58]

Plaintiff expert, Dr. Krumholz, testified that "if it's of sufficient importance and if the company is aware of it, the question is why isn't it either a contraindication in the IFU, or why isn't there at least a warning in the IFU that people shouldn't be using it."[59]  Dr. Krumholz explained in his report:

> "[I]t should be noted that they [Cook] make no reference to 'fracture' of the filter strut as a potential complication [in the IFU]. In my opinion, this detail is very important, and I will explain why. After a filter strut fractures, it can embolize, which is essentially what happened in the case of Ms. Tonya Brand. While the IFU states 'filter embolization' as a potential complication, it does not state 'filter strut fracture' and 'filter strut embolization' as potential complications. As such,

---

[57] CookMDL2570_0402856
[58] Rheudasil Dep. at 152:24-158:14.
[59] Krumholz Dep. at 277

radiologists are not sensitized to searching for missing parts of filter struts and this complication can be missed, as occurred in the case of Ms. Tonya Brand.[60]

Further Dr. Gordon, another of Brand's medical experts, opined that "the Celect filter IFU is inadequate and misleading through omission of adverse events, definitions and falsification of outcomes." He explains:

> [T]he Celect IFU does not warn physicians that the Celect filter's lack of a perforation limiter (as compared to the Tulip filter) increases the risk of perforation, tilt and fracture. The Celect IFU does not warn physicians that the Celect filter should be retrieved within a certain period of time to avoid progressive perforation, tilt and fracture or to closely monitor patients when the filter is left in place for an extended period of time. As a matter of fact, Cook's included data suggests very high retrieval rates and minimal complications.[61]

"The data [evidence from Celect studies, internal documents, and MAUDE database] indicates that Cook has been aware of several of these safety signals and did not to disclose several safety concerns and adverse events to the FDA, practitioners, and patients."[62]

Cook knew or reasonably should have known of the danger arising from the use of its product from the above information during the time before Brand received her filter and after when it could have been retrieved before the filter tilted, progressively perforated, and fractured, and before its pieces began to embolize; yet it failed to warn of those risks. Thus, all of this evidence on Brand's failure to warn claims is relevant and admissible. Fed. R. Evid. 401.

For the foregoing reasons, the Court should deny Defendants' MIL No. 38.

**39.    The Court Should Admit Evidence and Argument that Cook Submitted Inadequate and Misleading Information to the FDA Regarding the IFU.** (*In Response to Cook's MIL No. 39, Doc. 8894 at 55059-66*)

---

[60] Krumholz Rep. at 165, Ex.2 to Krumholz Dec.
[61] Gordon Rep. at 13-14, Ex.32 to Gordon Dec.
[62] Krumholz Rep. at 122, Ex. 85 to Dec.

Cook bases its entire argument that federal law preempts claims and, therefore, evidence that it lied to the FDA in connection with the IFU during the process of obtaining 501(k) clearance of the Celect on a false premise: that the communications between it and the FDA regarding the IFU for the Celect during the 501(k) process for the Celect resulted in IFU contents and text approved and mandated by the FDA from which Cook could not vary.  It does not, however, cite to any statute, regulation or case authority supporting this premise, because it does not exist.[63] Indeed, its proffered regulatory expert, Christy Foreman, testified that, "I can't answer your question and say it [the Celect filter's label] was approved [by the FDA], because as part of a 510(k), labeling is not approved."[64] Of course, since the FDA did not require the IFU to contain its exact content and language and no other, there can be no conflict between Brand putting on evidence that Cook lied about it during the 501(k) process and federal law.

The exact same reasoning applies to Cook's argument that preemption bars Brand from claiming that Cook should have included a retrievability window in the IFU for the Celect. Furthermore, there would be no factual basis for this argument even if a legal basis existed. The sequence of events Cook describes where it proposed including a 25-day retrievability window in an IFU and someone from the FDA removed the reference in a draft was in connection with the 501(k) clearance of the Tulip in 2003, not with clearance of the Celect as a retrievable device in late 2007 and early 2008. Given the additional knowledge gained from the scientific literature and Cook's experience with retrieval of the Tulip and Celect and the fact that the Tulip was modified into the Celect expressly to make it more retrievable, no way exists to know if the FDA

---

[63] The four tampon cases cited by Cook in no way support its argument because the FDA had specified by regulation the specific labeling and warning to be given with tampons in regard to toxic shock syndrome. *See Papike v. Tambrands, Inc.*, 107 F.3d 737, 740-41 (9th Cir. 1997); *Moore v. Kimberly Clark Corp.*, 867 F.3d 243, 246 (5th Cir. 1989); *Rinehart v. Int'l Playtex, Inc.*, 688 F. Supp. 475, 477 (S.D. Ind. 1988); *Stewart v. Int'l Playtex, Inc.*, 672 F. Supp. 907 (D.S.C. 1987).

[64] Foreman Dep. 325:15-18.

would have rejected inclusion of a retrievability window in the Celect's IFU if Cook had proposed one. And, it certainly cannot be deemed to have rejected such language, which rejection is necessary to create the conflict necessary for any preemption.

Finally, the Court should consider meritless Cook's contention that Brand cannot present evidence that it made misrepresentations in connection with the IFU during the Celect's 501(k) clearance because it does not have a "regulatory" expert to do so.[65]  Brand offers a medical doctor, Dr. Krumholz, to present such evidence and, "doctors are "fully qualified to opine on the medical facts and science regarding the risks and benefits of [drugs] … and to compare that knowledge with what was provided in the text of labeling and warnings for FDA approved drugs."' *Yaz Litig.*, 2011 WL 6301625, at *11 (quoting *In re: Diet Drugs Prods. Liab. Litig.*, 2000 WL 876900, at *11 (E.D. Pa. June 20, 2000)) (brackets and ellipses in original).

Even if a regulatory expert is necessary, Dr. Krumholz qualifies as one. The FDA has recognized his preeminent qualifications and calls upon him for his expertise. He is a founding member of the Board of the National Evaluation System for Health Technology (NEST), a private public partnership between device manufacturers and the FDA that is advancing regulatory science.[66] He is also the Principal Investigator of a contract at Yale University by the Medical Device Epidemiology Network initiative, which is part of the Epidemiology Research Program at the FDA's Center for Devices and Radiological Health.[67] The FDA recognizes Dr. Krumholz's expertise: he has given expert talks at the FDA.[68] The United

---

[65] The cases cited by Cook merely state that expert testimony may be required in product liability cases, not that only "regulatory" experts can offer opinions on the misleading nature of communications made to the FDA. *See Mize v. HJC Corp.*, 2006 WL 2639477, at *4 (N.D. Ga. Sept. 13, 2006); *Smith v. Ortho Pharm. Corp.*, 770 F. Supp. 1561, 1565 (N.D. Ga. 1991).

[66] Expert Report on Efficacy and Safety of Celect Inferior Vena Cava (IVC) Filters by Harlan Krumholz MD, SM ("Krumholz Rep.") at 3, a true and correct copy of which is attached hereto as Exhibit. __.

[67] *Id.*

[68] *See id.*

States government also appointed Dr. Krumholz as a *founding member of the Board of Governors of the Patient-Centered Outcomes Research Institute,* an organization that funds research to improve the outcomes of patients.[69]

In his deposition, Dr. Krumholz explained exactly why he qualifies as an FDA "regulatory expert":

> A.  [by Dr. Krumholz] . . . [I]f you would consider publishing in some of the highest impact journals about regulation and safety as being an indication of being a regulatory scientist, then I would say I would qualify. I don't think anyone has published in higher impact journals around issues of medical devices, or not many have published more.
>
> I do not hold a degree in regulatory science. ***I work commonly with the FDA around regulatory science. And I design studies around regulatory science.*** So I guess, you know, there are many different types of regulatory scientists. I would consider myself one of them.
>
> Q.  Dr. Krumholz, you've consulted with the FDA from time to time?
>
> A.  Yes.
>
> . . .
>
> A.  . . . Yale University under my direction has held ***contracts with the FDA*** . . . .
>
> A.  . . . I was also on the planning board that evolved from the Institute of Medicine to report around medical devices that suggested that the current system was highly flawed . . . I'm on the board of that group, which, again, is involved with industry and patients, ***and the FDA*** . . . . I was involved in an effort that was termed MDEpiNet, which was Medical Device, Epidemiology Network that was run out of CDRH. We at Yale played a prominent role and we had a grant. It was a grant that, again, was -- where we were in the process of developing models for trying to improve the postmarket device surveillance system. Out of the course of all those efforts, and even before that we've been publishing papers about issues and opportunities to improve the postmarket surveillance systems. So those are some examples of where I've been interacting. I've also ***gone to the FDA, I've given talks***. I've given grand rounds. ***I've interacted with FDA leadership as well as -- on a wide variety of issues regarding medical devices.***[70]

---

[69] *Id.*

[70] Krumholz June Dep., 97:12-25, 98:18-19, 98:24 – 99:10, 99:20 – 100:9, a true and correct copy of which is attached hereto as Exhibit __.

Cook's claim that Dr. Krumholz cannot testify regarding FDA approval and clearance processes without having first been an FDA employee is unsupported in the jurisprudence. *See In re Depakote,* 2015 WL 4775868, at *4 & n.4 (S.D. Ill. Feb. 13, 2015) (finding that doctor with extensive interactions with FDA but no FDA employment experience was qualified to testify as an expert as to regulatory and labeling issues, including the inadequacy of the Depakote label); *see also In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig,* No. 09–md–2100–DRH–PMF, 2011 WL 6302287, at *22–28 (S.D. Ill. Dec. 16, 2011) (finding sufficient evidence in the record to conclude that same doctor was qualified to offer regulatory and labeling opinions).

For the foregoing reasons, the Court should deny Defendants MIL No. 39.

**40.   The jury should be permitted to see the IVC filter that injured Plaintiff as well as photographs of that filter.** (*In Response to Cook's MIL No. 40, Doc. 8894 at 55066-79*)

Plaintiff knows of no case in this Circuit where the actual product that caused the Plaintiff's injuries was deemed inadmissible to a jury in a products liability trial. Cook contends that this court should be the first to exclude from the view of the jury the central object at issue for two reasons.  It is important for the court to understand that there is no break in the chain of custody for IVC filter or the fractured strut from the time it they were removed from the Plaintiff's body until there were delivered to Cook's attorneys.

On June 16, 2011, Brand underwent an ultrasound of her right leg by Dr. Keith Levine, who observed "a linear structure approximately 1.5 inches in length immediately under the skin" of Mrs. Brand's upper right thigh.[71] On June 17, 2011 that same linear structure erupted from

---

[71] Record of Dr. Keith A. Levine, dated June 16, 2011, attached as Exhibit ___.

Brand's body.[72] That "linear structure" was a fractured strut from the IVC filter that had

migrated through her body from her inferior vena cava until it poked through the skin of her

inner thigh.  From June 17, 2011 until her deposition on December 10, 2015, that metal strut

remained taped to a piece of paper that Brand initially kept in her night stand and later stored in a

safety deposit box.  That metal strut was always kept in a secure location and the Plaintiff always

knew its whereabouts.  On October 22, 2015, Brand underwent an open surgery to remove the

fractured filter.[73] According to the medical records from that procedure, immediately upon

removal "the filter was retrieved and passed onto the back table."[74] The filter was examined by

Dr. C. Blake Hutchinson who provided a detailed gross description of the filter:

> Specimen A is received fresh labeled with the patient's name 'Brand, Tonya Jo'
> and 'IVC filter.' The specimen consists of a 0.5 cm in length by 0.2 cm in diameter
> J-shaped shiny metallic hook with 10 attached shiny metal, bent wires that range in
> length from 0.9 to 2.5 cm and each measure less than 0.1 cm in diameter. Separately
> received in the specimen container is a separate portion of shiny metal wire that
> measures 2.4 cm in length by less than 0.1 cm in diameter. Adherent to the base of
> the hook is a 1.5 x 0.3 x 0.2 cm portion or pink-purple fibromembranous tissue that
> is mesh with the wires. No additional soft tissue is received. No inscription is noted.
> A photograph is taken.[75]

This gross description and photograph are included in the medical records from Emory

St. Joseph's Hospital.  These records include a Certificate of Authenticity.[76] The hospital

staff gave Brand the IVC filter and the pieces removed by Dr. Rheudasil when she left

the hospital on October 30, 2015.  The removed IVC filter and struts were kept secured in

Brand's nightstand until she brought them to her first deposition at the request of Cook's

counsel.

---

[72] Deposition of Tonya Brand (June 16, 2017), 155:6-18, attached as Exhibit ____; Deposition of Tonya Brand (December 10, 2015), 117:3-11, attached as Exhibit _____.
[73] Operative Report of Emory St. Joseph's Hospital of Atlanta, dated October 22, 2015, attached as Exhibit ___.
[74] *Id.*
[75] Pathology Report of Emory St. Joseph's Hospital of Atlanta, dated October 22, 2015, attached as Exhibit ___.
[76] *See* Exh. ___ & ____.

Cook's counsel requested that Brand bring the fractured strut to her deposition. So, approximately a week prior to her deposition of December 10, 2015, Brand retrieved the preserved metal strut from her safety deposit box and placed it in the same segregated section of her nightstand as the IVC filter.[77] Brand took both the fractured strut that penetrated her thigh and the IVC filter removed from her body to her deposition for Cook's attorney to examine on December 10, 2015.[78] Immediately after the deposition, Brand returned the entire device and the fractured strut to their same places in her nightstand and kept them there until she received the packaging necessary to send the devices to the medical device preservation company Steelgate. The evidence—the IVC filter and all of the pieces removed during the open retrieval surgery along with the fractured strut pulled from her thigh—was shipped to Steelgate on January 15, 2016. From the moment the metal strut pierced Brand's thigh it was in her continuous and exclusive possession until it was delivered to Steelgate on January 15, 2016.[79] On August 16, 2017, the device was received by Cook and, to-date, has not been returned to Steelgate by Cook.

In October of 2015, Cook's trial counsel was Wooden McLaughlin. At that time, Plaintiff's counsel was in communication with Cook's counsel regarding the scheduling of depositions and those attorneys were aware that Mrs. Brand was scheduled to have the filter removed. Due to a breakdown in communication between the Plaintiff, Plaintiff's counsel, and his staff, the hospital was not sent a written request to preserve the filter pursuant to CMO 1, but Mrs. Brand did, in fact, make that request and the IVC filter was preserved. This is not a case where the product was lost due to a failure to seek preservation of the evidence. The IVC filter and all pieces that were removed by Dr.

---

[77] Exh. ___, Brand Depo. (December 10, 2015) at 28:1-5.
[78] *Id*. at 28:10-12.
[79] *See id* at 31:20-32:3.

45

Rheudasil were preserved.  In fact, the IVC filter, the pieces removed by Dr. Rheudasil, and the strut that was pulled from Mrs. Brand's thigh have been in Cook's possession since August 16, 2017.[80]

### a.    The filter is authentic and reliable

Plaintiff can demonstrate that the physical exhibit sought for admission is authentic, reliable, and maintains a clear chain of custody.

Cook defendants first argue that the filter removed from Plaintiff's body is inadmissible because its condition is unverifiable. "It is well established that the standard for the admission of exhibits into evidence is that there must be a showing that the physical exhibit being offered is in substantially the same condition as [it was at the time of the matter at issue]." *See* Cook's Memorandum at 47 (quoting *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988) (holding admission of evidence with questionable chain of custody where trace chemical compounds were at issue was not an abuse of discretion); *see also* FRE 901. In *Lott*, a criminal case, the question before the court was the admissibility of a gasoline can alleged to have traces of PCP where the charge against the defendant was distribution of that chemical. The court ultimately admitted the evidence even where there was a question as to chain of custody and even where the makeup of trace chemicals was at issue because "gaps in the chain normally go to the weight of the evidence rather than its admissibility." *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988) (citing *United States v. Jefferson*, 714 F.2d 689, 696 (7th Cir. 1983); *United States v. Lampson*, 627 F.2d 62, 65 (7th Cir. 1980). Despite the well-established rule that questions like these go to the weight of the evidence, Defendants nonetheless contend that the very product at issue should not be admitted.

---

[80] Pursuant to a strict interpretation of CMO 1 and CMO 14, Cook should have returned the evidence to Steelgate long ago.

In support of their contention, Cook presents the affidavit of one Steven M. Kurtz, Ph.D. Plaintiff objects to the affidavit as Cook has not designated Dr. Kurtz as an expert witness in this case nor was he included on Cook's Preliminary Witness list.  If the court is inclined to consider Dr. Kurtz' affidavit, Plaintiff would note that ATSM standards are "voluntary" standards and are not controlling in this court in determining the admissibility of relevant, probative evidence.

Even if the court should find Mr. Kurtz's affidavit helpful, it seems clear that the IVC filter that injured the Plaintiff has been kept according to the standard he provided.

Mr. Kurtz sets out his standard:

"15. [T]he internationally accepted standard practice outlined in ASTM F561 describes the appropriate minimum information to be collected and maintained to ensure device traceability. Some of these minimum requirements include date of implantation, date of explantation, location of device implantation and removal, device identification (manufacturer's name and device catalogue number), device lot and serial number, and intraoperative photographs.

16. In addition, a Stage I Analysis of the implant components 'should be conducted routinely on all retrieved devices[.]'

17. A Stage I examination consists of, but is not limited to, a documented chain of device custody, a written description of the device, a macroscopic examination (either with the unaided eye or a stereo-microscope), and sketches or photographs of the current state of the retrieval[.]"[81]

Brand's device date of implantation was March 19, 2009; the date of explantation was October 22, 2015; the location of implantation was at Northside Hospital in Atlanta, Georgia; the location of removal was Emory St. Joseph's Hospital of Atlanta; the device was manufactured by Cook Medical and is a Cook Celect inferior vena cava filter with Lot No. E2231661; and intraoperative imaging has been previously supplied. Further, Dr. C. Blake Hutchinson has provided a written description of the device at removal that was the product of a macroscopic

---

[81] Kurtz Affidavit, p. 4, is attached as Exhibit ____.

examination with his unaided eye as well as a photograph of the device's state at the moment of retrieval,[82] and the photograph taken by Dr. Hutchinson, e.g the "sketch or photograph of the [state of the device at] retrieval," is included as Figure 3 to Defendants' Omnibus Memorandum and as follows[83]:

Though not required by law, Plaintiff can clearly meet Mr. Kurtz' standard. The timing of



Plaintiff's compliance with relevant CMO's 1 and 14, does not call in to question the chain of custody of the device and fractured strut. First, as made clear *supra*, there exists a full chain of custody—if any question remains as to the chain of custody the appropriate remedy is cross-examination, not exclusion of the evidence. The case authority cited by Cook does not support the proposition that the IVC filter and photographs of it should be excluded. As noted by the Seventh Circuit in *Lott*, "gaps in the chain normally go to the weight of the evidence rather than its admissibility." While Cook alleges that its concerns about chain of custody go to possible degradation of the device, they present no such evidence of tampering or inconsistency beyond

---

[82] C. Blake Hutchinson gross description is attached as Exhibit _____.
[83] This also belies Defendants' common refrain that "no imaging was taken at the time of the retrieval procedure" to support their contention that comparison of the filter is impossible.

statements of "likely" degradation. *See United States v. Jefferson*, 714 F.2d 689, 696 (7th Cir. 1983) (finding that allegations of tampering without evidence were not grounds for exclusion of evidence and questions); *see also United States v. Lampson*, 627 F.2d 62, 65 (7th Cir. 1980) ("[W]hether the [proponent] has proven an adequate chain of custody goes to the weight of the evidence, rather than admissibility […] this principle is usually applied in cases where there is a question about some change in the condition of the evidence between apprehension and testing[.]).  No party, no designated expert, or expert of any kind has opined that the IVC filter or fractured strut have been adversely affected by the manner in which they have been handled or stored since they were removed from the Plaintiff's body

Defendants have cited Judge Miller's opinion in *Marous v. Biomet*.  2017 WL 784412 (N.D. Ind. March 1, 2017).  This was a decision involving six plaintiffs, five of whom failed to request preservation of their failed hip implants when they had revision surgeries. *Id.*  The sixth plaintiff, Ms. Glasser, did obtain the removed device from the hospital and kept it in her closet, but did so in a manner that did not comply with a preservation order. *Id.*  The defendants sought summary judgment as a consequence of the alleged spoliation. *Id.*  Judge Miller denied the requested relief as to all six plaintiffs including Ms. Glasser, who not only failed to comply with the preservation order, but also answered "N/A" on the "Plaintiff Fact Sheet" when asked "what is the present location of the removed components of the [device]?" *Id.* Ms. Glasser never filed an amended fact sheet to explain that she had the femoral head in her possession and only disclosed her revision surgery on the date of her deposition. *Id.* Given these facts, Judge Miller found "[t]here's no evidence of 'contumacious conduct' (willful disobedience) because she obtained the component before she was bound by the order and nothing suggests that her non-disclosure was more than an oversight." *Id.*

As with Ms. Glasser, there was no willful disobedience of the court's order by Brand. She requested preservation of the IVC filter by the retrieving hospital, notified Cook's counsel of the existence of the strut and IVC filter, and made it available for inspection soon after the filter was removed from her body.

### b.    The actual product and photographs thereof in a products liability case are relevant

It is difficult to conceive of a situation where the actual failed product in a products liability case is not relevant, but Defendants contend that is just such the case in this instance. The distinction between Plaintiff and Defendants' position is found succinctly in Defendants' memorandum at 55: "There is no question that the filter had no such appearance at time of placement because, among other things, it was 'torn' and 'cut' by Dr. Rheudasil as part of the retrieval procedure."[84] Plaintiff agrees that the medically necessary actions taken by Dr. Rheudasil altered the appearance of the device from when it was removed from its packaging, but that does not change this piece of evidence is highly relevant to the jury.  A key component of Plaintiff's claim is that this device is defective, and its IFU are inaccurate and misleading: leading to increased, unnecessary, life-threatening dangers to patients.  Cook's own documents depict a starkly

---

[84] Dkt. 8894 at 55072.

50

contrasting image as to what is needed to retrieve a filter than Brand's reality. This drastic



8. Pull back the loop until it engages the hook of the filter. (Fig. 12)
    **CAUTION:** Do not pull on the filter beyond what is required to keep tension on the loop. Doing so may cause damage to the caval wall.



9. Hold the loop wire steady with the pin vise, then push the clear Y-fitting with the catheter forward until it touches the hook. To snare the filter in this position make sure to firmly lock the screw of the clear Y-fitting on the wire loop. (Fig. 13)
    **NOTE:** If the retrieval wire loop loses its shape during the attempt to engage the hook of the filter, it can be removed and gently reshaped. After reshaping, clean loop and proceed from step 6.



10. While holding steady the retrieval loop system with the clear Y-fitting, push forward the white Tuohy-Borst sidearm adapter with the coaxial retrieval system. The filter collapses and the anchors disengage from the caval wall. (Fig. 14)



11. When the tip of the coaxial retrieval system is at the anchors, loosen the hub of the outer sheath, and advance the outer sheath forward to cover the whole filter, and retrieve the complete assembly. (Fig. 15)

**POST-RETRIEVAL CARE**
After retrieval of filter, hospital standard of care should be followed for removing the sheath and providing hemostasis to prevent bleeding at the vascular access site.

**HOW SUPPLIED**
Supplied sterilized by ethylene oxide gas in peel-open packages. Intended for one-time use. Sterile if package is unopened or undamaged. Do not use the product if there is doubt as to whether the product is sterile. Store in a dark, dry, cool place. Avoid extended exposure to light. Upon removal from package, inspect the product to ensure no damage has occurred.

**Cook IVCF 005786**

10   ENGLISH                                    I-CELECT-PERM-FEM-0804-349-01

**CookMDL2570_0012347**

contrast between what Cook represents to be the retrieval process and what occurred with

Brand's Celect filter is not only relevant but also highly probative for the jury.

Plaintiff's counsel has no intention of misleading the jury as to the appearance of the IVC

filter when it was placed, as it fractured within her body, and as it was required to remove the

device from her body.   The current condition of the IVC filter accurately depicts the drastic

measures required to remove the device in contrast with the representations, instructions, and

warnings given by Cook.  Second, it is Cook that would mislead the jury by only presenting biased imaging of the filter.  The medical records, radiological imaging, and expert testimony will explain to the jury how the condition of the filter changed from the time it was first implanted though to removal from her body on October 22, 2015.   The jury is entitled to see how the IFC filter looks after Dr. Rheudasil retrieved the filter from her body.  The IVC filter at issue, and photographs of it, are the best evidence of current condition of the filter.

Finally, Defendants contend for exclusion of the device in question because, if relevant, it would be overly prejudicial to see the mangled device or images of the device. "[R]elevant evidence is inherently prejudicial, but it is only **unfair** prejudice, **substantially** outweighing probative value, which permits exclusion under Rule 403." *United States v. Connelly*, 874 F.2d 412, 418 (7th Cir. 1989) (quoting *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir. 1985) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), cert. denied, 444 U.S. 862, 100 S. Ct. 128, 62 L. Ed. 2d 83 (1979)) (emphasis in original)). The real, authenticated depiction of the actual medical device which had to be cut or manipulated to be removed from the body is of substantial probative value which is not outweighed by any risk of unfair prejudice. *See Caldwell v. Ohio Power*, 710 F. Supp. 194, 200 (N.D. Ohio 1989) (admitting photographs of the plaintiff's injuries that were alleged to be too "graphic and gruesome" because "the photographs were instructive to the jury, and any prejudice to defendant was substantially outweighed by the photographs' probative value").

The Court should not exclude from evidence the fractured strut that was pulled from Mrs. Brand's thigh, the IVC filter, and pieces of that filter that were surgically removed from her body or any photographs of those items.

Accordingly, the Court should deny Cook's MIL No. 40.

52

**41.  The Court should not exclude from evidence photographs of Mrs. Brand's post-operative incision.** (*In Response to Cook's MIL No. 41, Doc. 8894 at 55080-85*)

In an effort to simplify matters, Plaintiff's counsel will state the obvious and confirm that they have no intention of introducing into evidence "125 photographs of abdomen with long scar and staples." [85]  Brand will offer into evidence one photograph of the stapled incision taken after the open retrieval of the broken filter.  The photograph was taken of Brand while in the hospital while recovering from the open surgery to remove the filter from her inferior vena cava and depicts the incision from that procedure.

Since that surgery took place on October 22, 2015, the photograph did not exist prior to that date and so could not be produced any earlier. The photograph was produced to the Defendants' counsel on or before December 10, 2015 as a copy was attached as Exhibit "3" to Brand's deposition taken on that date:

Q.  Okay.  Exhibit 3 is a photograph. I think I know what it is, but I'm going to let you tell me.  Do you know what that photograph depicts?

A.  That's my abdomen and my chest area.  My whole torso.

Q.  I understand. Do you know when that picture was taken?

A.  Yes, sir.

Q.  When?

A.  It was while I was in the hospital.

Q.  While you were in the hospital when?  Here, in October of this year --

A.  Yes, sir.

Q.  -- to have the filter retrieved?

---

[85] With regards to the "belated" production of these 125 images, Plaintiff's counsel would like the Court to understand that the Plaintiff did not take 125 individual photographs of her incision. These images were created as a function of how a cell phone camera functions.  The images were found by Plaintiff's counsel in a web-based archive that is not publicly accessible or readily available to the user.  Mrs. Brand had no idea these images existed. The images were supplemented as quickly as possible after their discovery.

A.   Correct.

Q.   Okay.  Do you know who took the photograph?

A.   Myself.[86]

There is no basis for asserting that this photograph was "belatedly produced" nor is there a legitimate reason to exclude it from evidence.

Contrary to  the argument made by the defendant, the probative value of photographs of injuries is not substantially outweighed by the danger of unfair prejudice.

> Although acknowledging that the photographs were a fair and accurate portrayals of plaintiff's injuries, defendant contends that the color photographs of plaintiff's burned foot were 'extremely graphic and gruesome.' The injury was severe, however, and this was a personal injury case. The photographs of the injury had substantial probative value of the fact and extent of the injury, as well as of the pain and suffering plaintiff endured. The photographs were instructive to the jury, and any prejudice to defendant was substantially outweighed by the photographs' probative value.

*Caldwell v. Ohio Power*, 710 F. Supp. 194, 200 (N.D. Ohio 1989) *citing Dabney v. Montgomery Ward & Co.,* 761 F.2d 494, 500-501 (8th Cir. 1985).  The fact that Dr. Rheudasil described his surgical procedure does not render the photograph "unnecessarily cumulative" under Rule 403.  No physician's narrative can describe or depict the Plaintiff's incision better than a photograph of the wound.  The photograph is not cumulative of the testimony but is the best evidence of it especially in a case wherein the plaintiff is alleging disfigurement claims.

Cook's assertion that the photograph can only be admitted if they are permitted to have additional discovery requiring Brand to create documents (additional photographs) which do not currently exit is without support in the Federal Rules of Evidence or case law.   The Defendants' assertion that its retained expert foresaw the need to photograph the scar during his examination

---

[86] Deposition of Tonya Brand, Vol I (December 10, 2015), 15:6-22 & Exhibit "3", attached as Exhibit ___.

of Brand defies logic.  In her second deposition, Cook's counsel specifically cross-examined her

about the incision and her continuing pain complaints associated with the incision:

Q.  Okay.  Are there any physical symptoms that you are experiencing today that
are related to that surgery?

A.  Yes, sir.

Q.  And tell me about that.

A.  My incision still hurts --

Q.  Okay.

A.  -- especially up in this vicinity.

Q.   Okay.

A.  And I've got pain radiates from, like, here, all the way to over here, which is
right under -- like, I guess, right at my ribcage area.

Q.  So the incision itself you say still hurts --

A.  Yeah.  I'm cut from here all the way down to, like, my pubic bone area.

Q.  Then the pain that you say that radiates kind of starts on, you indicated, your
left side –

A.  Right in here.

Q.  Yeah.

A.  And then it'll radiate over to, like, right here.

Q.  How often do you experience -- let's start with the incision pain, how often
does that hurt?

A.  That's pretty much every day.

Q.  Okay.  Have you sought -- have you visited any doctor or sought any
treatment for the incision pain, or told a doctor, hey, this incision is still
hurting, is there something we can do, anything like that?

A.  I've told my primary care doctor that I've still got a lot of pain up in this
vicinity.  I've not specifically said, you know, my incision.

Q.   But you were just talking about general -- because you said earlier you've got some in your lower abdomen, you've got the radiating pain, you said you've got sort of the incision pain, but you haven't talked to a doctor specifically about the incision and said, is there something we can do about that?

A.   I did show it to him because it's kind of really wide.  I forgot what he called it.

Q.   Okay.

A.   But he said some people do that, as far –

Q.   Some people do --

A.   Their body, when it heals, because it's, like, thicker and wider up here than it is from, like, here down.

Q.   The incision is?

A.   Yes, sir.[87]

On May 17, 2018, at Cook's request, William E. Turton, M.D. examined Brand.  In his report from that examination, Dr. Turton not only describes the scar from her incision, "he has three noteworthy abdominal incisions, including a 31 cm midline incision and two lower abdomen transverse," he drew a diagram of it[88]:

---

[87] Deposition of Tonya Brand, Vol II (June 16, 2017), 39:9-40:8 & 40:21-41:20, attached as Exhibit ____.
[88] Excerpts from the report of William Edward Turton, M.D., p. 5 & Diagram, attached as Exhibit _____.



Contrary to Cook's assertions, nothing prevented Dr. Turton from using a camera or his cell phone to take a picture of the scar from Brand's open retrieval procedure when he examined her on May 17, 2018. Any failure to obtain or preserve evidence of the current appearance of the scar falls on the Defendants and their experts. Clearly, the fact that Cook's expert did not take a photograph of the scar during his examination does not justify excluding evidence that has substantial probative value.

Accordingly, the Court should not exclude from evidence photographs of Brand's post-operative incision and Defendants' MIL No. 41 should be denied.

**42. The Court should deny Cook's motion to exclude any testimony or argument from Plaintiff that her filter caused physical pain or injuries for which she has no expert support.** (*In Response to Cook MIL No. 42, Doc. 8894 at 55085-89*)

For some time, Plaintiff has made clear that her claims for physical pain are limited to three specific circumstances: (1) pain associated with the Celect filter strut that fractured and exited her body; (2) pain she experienced as a result of an unsuccessful attempt to remove her filter; and (3) pain associated with the open surgical procedure that was ultimately necessary to remove portions of the fractured filter (to be clear, several portions of the filter remain as her surgeon was unable to remove all portions of the filter). That being said, the description of that pain, the

extent of that pain, and the emotional distress that Plaintiff experienced as a result is not limited to how her doctors or expert witnesses describe that pain.

Plaintiff will not offer evidence of physical pain outside of the pain she suffered resulting from the three events described above. To the extent that Cook's motion was intended to preclude Plaintiff from describing that pain and the effect of that pain, though, it should be denied.

### 43. The Court Should Deny Cook's Motion to Exclude Any Testimony Purporting to Speculate as to the Migration of Filter Fragments Through Brand's Body.  *In Response to Cook MIL 43, Doc. 8894 at 55089-55091*)

While as worded on its face this motion might seem reasonable, Cook seeks to accomplish far more than meets the eye via this motion *in limine*, including barring:  (1) Plaintiff Tonya Brand from testifying regarding her anxiety and fear related to the two filter fragments which remain in her body; and (2) Plaintiff's experts from testifying regarding the pathways that fractured filters take; the likely pathway that Brand's fractured filter took within her body from the location where it broke apart to her thigh (where it exited her body); and the likelihood of Brand having complications in the future due to the two filter fragments that remain in her body.

Cook does not dispute that Brand's Celect filter fractured multiple times, and that pieces of her filter migrated throughout her body, including one piece that punctured through her thigh more than two years after the filter was implanted.  After an unsuccessful retrieval attempt in 2011, Brand's treating physician, Dr. Rheudasil, decided it would be safer to leave the filter in her body.[89]  That turned out not to be the case.  The filter continued to migrate and fractured yet again, and in 2015, Dr. Rheudasil recommended and carried out a lengthy open surgical

---

[89] Ex. __, Rheudasil Dep. (2/28/18) at 90-92, 127-28; Ex. __, Brand Dep. (6/16/17), at 148.

procedure which resulted in the removal of most – but not all – of Brand's filter.[90]  It is undisputed that two pieces of the fractured filter remain in Mrs. Brand's body.  Cook's own consulting expert testified that, though unlikely, he cannot guarantee that these two pieces will not migrate further.[91]

In the face of the above facts – and without citation to any Georgia law – Cook seeks to prevent Brand from testifying about her fear and anxiety that the filter pieces that remain in her body may cause her future injury.  A patient whose medical implant pierces through her thigh while she is sitting on her couch at home, and who then is falsely assured that it is safer for the filter to remain in place, understandably has fear and anxiety stemming from the fact that fractured pieces of metal still remain in her body.

Under Georgia law, Brand is entitled to testify about her fear and anxiety related to her fractured implant, including fear of the extent of her injury and of future injury.  *See, e.g*., *Food Lion v. Williams*, 219 Ga.App. 352, 355-56 (1995) (holding mental pain and suffering, including fear of extent of injury and mental anguish, are an element of recoverable damages); *Valdosta Housing Authority v. Finnesee*, 160 Ga.App. 552, 570-71 (1981) (holding future mental suffering is compensable where plaintiff was bitten by a rat and 45 months later remained upset and retained her fear of rats); Suggested Pattern Civil Jury Instructions, Council of Superior Court Judges, § 66.502 (in evaluating pain and suffering, jury may consider interference with enjoyment of life; fear of extent of injury; and mental anguish, past and future).  The standard to be applied by the jury when considering fear of future injury and mental anguish is not whether the feared future injury is medically probable, but rather "'the jury are entitled to draw all such inferences from the evidence as are justified by the common experience and observations of

---

[90] Ex. __, Rheudasil Dep. at 113-15, 129, 130-33; Ex. __, Brand Dep. (12/10/15), at 120-21, 125.
[91] Ex. __, Griffin Deposition (4/10/18), at 174-75.

mankind.  The only measure of such damages is the enlightened conscience of an impartial jury.'"  *Finnesee*, 160 Ga.App. at 553 (quoting *Ga. Power Co. v. Braswell*, 48 Ga.App. 654, 660 (1933)).

Similarly, Plaintiff's experts should be permitted to testify about the pathways that fractured filters take, the likely pathway that Brand's fractured filter took within her body, and the likelihood (even if it is low) of Brand having complications in the future due to the two filter fragments that remain in her body.  According to Dr. Rheudasil, when an IVC filter fractures, "it could, theoretically, go anywhere."[92]  Blood flow through the IVC "[g]oes up through the upper abdomen toward the heart."[93]  In the Single Complaint Report regarding Tonya Brand, which was prepared by Cook, more than 80 other fractured Celect filters are identified, including filters whose pieces migrated to the heart.[94]  Thus, the Cook Celect filter presents a risk of harm from fracture that includes metallic barbs migrating to the heart.

As part of her design defect claim, Brand must convince the jury that the risk of harm from the Celect's design outweighs the utility or benefits of the design.  Suggested Pattern Civil Jury Instructions, Council of Superior Court Judges, § 62.660.  To the extent the fractured filter pieces present a risk of migration to the heart, that risk is relevant to the jury's decision in this case, and Plaintiff's experts should be permitted to discuss it. Plaintiff anticipates that that discussion will include an explanation of the anatomy, including how and why the filter pieces migrate to different locations, and documented locations where other fractured filter parts have migrated. That Brand got lucky and it is likely that her filter strut migrated away from her heart does not

---

[92] Ex. __, Rheudasil Depo. at 115.
[93] *Id*. at 116.
[94] Ex. __, Single Complaint Report.

lessen the severity of the danger posed by the design.  *Id.* (severity of the danger posed by the design is one of the factors to be considered by the jury in design defect claim).

For the foregoing reasons, Plaintiff asks the Court to deny Cook's MIL No. 43.

**44.   The Court Should Not Exclude Documents Mischaracterized by Defendants as Tulip IVC Filter Marketing Documents.**  (*In Response to Cook's MIL 44, Doc. 8894 at 55091-92*)

In yet another attempt to exclude Cook internal documents which are highly probative, instructive, and which cast a negative light on Cook and its nefarious marketing intentions of the Celect, Defendants mischaracterize a group of four documents as relating solely to "Tulip IVC Filter Marketing" when it knows quite well that characterization is completely false.  What the Defendants fail to mention to this Court is that these four documents (each authored by *Celect* product manager Bruce Fleck) contain explanations as to why Cook modified the Tulip filter into the Celect; that is, to quickly capture market share in an emerging retrievability war with its competitors.  Remarkably, Cook mischaracterizes these as non-Celect related documents when its suggestion is so easily debunked.  To make matters for Cook worse in its attempt to suggest these documents relate to some other filter's "marketing" documents, it lumps into this group an email which is as far from a marketing document as one could get.  It is, rather, an admission by Cook that the MAUDE database is fatally-flawed and unreliable for any real purpose.

Taking first the June 2003 memo from marketing and product development manager Bruce Fleck, in which the very title of the document evidences its relevance, "*New IVC Filter Product Development Strategy Overview*" (CookMDL2570_1272124), Fleck writes, "The purpose of this project is to **design a new filter** that will provide longer term retrievability (than the Tulip) . . .." (emphasis added).  In his conclusion, Fleck writes, "Cook must hit the market early with retrievability using our existing product.  It is imperative to follow quickly with a series of

product improvements that **include a new filter design** . . . solid marketing programs and aggressive sales will allow Cook to achieve the projected market share growth and revenues." (emphasis added).  This evidence is relevant and helpful to show Cook's understanding of the financial incentive to maximize penetration of the IVC filter market, Cook's competitive mindset, Cook's knowledge of the profitability inherent in a retrievable filter, Cook's plans to market the filter to targeted physician specialties within the U.S., and Cook's awareness of research, or lack thereof, on IVC filters as a whole.

The cover email which accompanies this strategy overview[95] indicates that the memo was shared with Kem Hawkins (then Cook Medical president) as well as two other high-level marketing executives (Rick Mellinger and John Brumleve).  These two documents are highly relevant under Fed. R. Evid. 401 because they speak directly to the strategy behind the introduction of the Celect filter to the market.  They are not "Tulip marketing documents", but rather Cook IVC filter marketing and strategy documents which demonstrate the relationship between the Tulip and Celect and the reasons Cook rushed the Celect to market.

A third document Cook wishes to exclude as being strictly a Tulip marketing document is an email from Bruce Fleck to all sales representatives[96] regarding the fallibility of the MAUDE database.  Included is a chart listing FDA-reported adverse events from October 2003 to March 2005 for the Tulip as well as two of its competitors.  This e-mail is extremely relevant and its probative value far outweighs the prejudicial effect it has on for Cook because this email levels harsh criticism of the MAUDE database by Celect Product Manager Bruce Fleck: "[r]eporting of device-related adverse events to the FDA through **the MAUDE system may not reflect all device related events that have occurred**."  Importantly, Fleck then goes on to admit, "because

---

[95] CookMDL2570_1272123.
[96] CookMDL2570_1300843

the total number of filter placements is not known, **this data does not permit correlation to specific device complication rates**" (emphasis added).  The reason for Cook's desperate attempt to exclude this email is obvious, yet there is no credible basis for its exclusion.  As the Court will likely recall from the *Hill* trial, one of Defendants' main arguments is that the complaint rate, as reported in the MAUDE database, is extremely low and that it is reasonable to use the number of Celect sales as the denominator when calculating Celect complication rates.  Here, in this one very probative email, Product Manager Bruce Fleck clearly states just the opposite.

The fourth and final document in this group which Defendants move to exclude is a May 2004 PowerPoint created, again, by IVC filter Product Manager Bruce Fleck.  "*Selling the Gunther Tulip in a Competitive Market*"[97] is strategically listed first no doubt in Defendants' Motion in Limine because the title suggests this document has little or nothing to do with the Celect filter at issue in this case.  However, Cook's intellectual dishonesty in its continual assertion that there is a wide line between the Tulip and Celect filters, and that the marketing and design of one has nothing probative to demonstrate about the marketing and design of the other when just the opposite is true is important—and more importantly—probative.  In actuality, the design defects and the resulting poor market share held by the Tulip is exactly why Celect was developed.  It is important for the jury to have evidence of this and the strategy Cook employed to increase its sales and profits.

Included within this PowerPoint are several important statements by Fleck, not all of which have to do with marketing.

First, Fleck gives another repudiation of Cook's claim of a low Celect complication rate, writing, **"[c]ustomer services reports are not a scientific measure and typically underreport**

---

[97] CookMDL2570_0730076

**events"** (emphasis added).  This is a very probative statement, which is often repeated internally within Cook's documents yet is denied externally as it was denied in *Hill* and will be denied in *Brand*.  In fact, Cook has hired experts that will say just that.

Second, despite being well aware of the unreliability of MAUDE and customer reports, Fleck instructs his sales reps to "[a]sk the physician if they have reviewed FDA MAUDE data on the Recovery (Bard) filter.  Make sure you know the Tulip's MAUDE record!"  This speaks directly to Cook's deceptive marketing practices and, while this particular instance refers to Tulip, this was a tactic which Cook employed with the Celect before, during, and after Brand's Celect implantation.

Third, Fleck encourages his sales reps to, "[b]lur the lines of the retrieval window", and thereby directs the sales staff to seek to confuse physicians as to the retrievability of Cook filters.  Obviously, this is a concerning statement for Cook's lawyers and likely the main reason this document is being fought against so hard in *Brand*.  Mr. Fleck was asked about this "blur the lines" language:

> Q.  Turn to -- well, you, of course, would never try to you would never try to take what is the truth and blur it into an untruth to sell a filter, would you?
>
> A.  **No.**
>
> Q.  And that would be wrong, wouldn't it?
>
> A.  **Yes, to tell an untruth, yes.**
>
> Q.  Especially since you're dealing with a product that goes into the body of the human -- into the human body, right?
>
> A.  **Exactly.**
>
> Q.  That would be extraordinarily bad to, let's say, for purposes of marketing against another company, to blur the truth for something that's false, right?

A. **For something that's false, yes.**

Q. Including the retrievability of your filter.  True?

A. **Yes.**

Q. Because that would be misleading people and misleading doctors in the case
of this situation, wouldn't it?

A. **Yes.**[98]

and then:

Q. You'd seen before today this document where you were selling against Bard and you
were telling the staff, the salespeople, that one of your goals was to have them "[b]lur
the lines of retrieval window."  Do you see that?

A. **Yes.**

Q. And you were blurring the lines of (the) retrieval window because Bard had a product
that had a longer retrieval window.  True?

A. They had -- their current retrieval data showed that it could be retrieved at a higher
percentage over a longer period of time.  **So, yes, I will characterize that as what
you said.**

Q. And, so, one of the things that you were telling your sales force in selling against
Bard was specifically for that reason to blur the lines of the retrieval window, right?

A. **Yes.**[99]

Evidence of dishonest interactions with physicians is plentiful in this case and the jury should

be allowed to see this early example of such bad conduct which would have been the seed

planted in the minds of Ms. Clemmer and Ms. Donley who sold the filters to the hospitals in

which Dr. Rheudasil was given the choice as to which filter to use on Tonya Brand.

---

[98] Fleck Dep. at 117:11
[99] Fleck Dep. at 118:23

Contrary to Defendants' claim that these documents will "mislead the jury" and that the jury will "confuse the Tulip and the Celect", Plaintiff asserts that the jury will be well-educated by the Plaintiff as to the distinction between these two filters.  In fact, the similarities and differences between these two filters are a critical part of this case.  After all, as Cook proudly proclaims, the Tulip is the predecessor to the Celect.  One cannot obtain a full understanding of the genesis (and eventual discontinuation) of the Celect without a thorough understanding of the market environment within which it was developed.

None of these four documents is unduly prejudicial, will cause any confusion, or waste the jury's or the Court's time.  Each document is probative, and for different purposes.  If these were truly irrelevant documents, instructive of nothing and wholly unrelated to the claims of this litigation, Cook would not go to such lengths to exclude them.

For all of the above reasons the Court should deny Cook's MIL #44 and find these four documents relevant, probative, and admissible.

WHEREFORE, Plaintiff requests the Court deny Defendants' Motions *in Limine* for the reasons set for *supra*.

Respectfully submitted this 24th day of September, 2018.

/s/ Joseph N. Williams
Joseph N. Williams, Atty. No. 25874-49
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email:  jwilliams@rwp-law.com
*Liaison Counsel to Plaintiffs' Steering Committee*

Michael W. Heaviside, Esq.
HEAVISIDE REED ZAIC, A LAW CORPORATION

910 17th Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 223-1993
mheaviside@hrzlaw.com

Ben C. Martin, Esq.
THE LAW OFFICES OF BEN C.
MARTIN
3710 Rawlins Street, Suite 1230
Dallas, TX  75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@bencmartin.com

David P. Matthews, Esq.
MATTHEWS AND ASSOCIATES
2509 Sackett St.
Houston, TX  77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
dmatthews@thematthewslawfirm.com
*Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on September 24, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.


*/s/ Ben C. Martin*
Ben C. Martin

1