**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                    Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                                          MDL No. 2570

_____

This Document Relates to Plaintiff

*Tonya Brand*
No. 1:14-cv-06018-RLY-TAB

_____

### COOK DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT THE EXPERT TESTIMONY OF RAMAN UBEROI, M.D.

Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, and William Cook Europe APS (collectively, "Cook" or the "Cook Defendants") hereby oppose Plaintiff's Motion to Exclude or Limit the Testimony of Raman Uberoi, M.D. ("the Motion" or "Plaintiff's Motion"). Dr. Uberoi is an impeccably credentialed, non-retained expert who was asked about his work studying the Celect filter in the OUS study and in the British Registry. He testified directly about how he saw the Celect filter perform in these two studies, his publication of the data from these two studies, and whether or not the data he collected and published in these two studies was reliable, as compared to how he saw the Celect perform in the real world and in later-published literature.

Plaintiff does not claim Dr. Uberoi is unqualified to test or opine about his testing of the Celect filter. Not only has Dr. Uberoi tested the Celect filter, he has gone through the process of

peer review and submitted two publications in leading journals about the results from this testing. His testimony and opinions here are based on his extensive use of the product, testing of the product, and later publishing the results from clinical testing in two peer-reviewed publications (methods that could be characterized as aspirational for most experts, rather than unreliable). His testimony at trial will also be limited to his testing of the Celect in the OUS study, in the British Registry, and limited related testimony necessary to establish his opinions about the reliability of the findings in these two studies. Cook has no desire to elicit cumulative testimony or cover ground that will later be covered by a retained expert. As such, Plaintiff's "*Daubert*" challenge should be rejected, cumulative objections should be reserved for trial, and the Motion should be denied.

## ARGUMENT

Though Plaintiff's Motion is styled as a motion to "exclude or limit" Dr. Uberoi, the Motion never articulates a basis for total exclusion. It attacks only two of the four categories on which Dr. Uberoi was designated: the retrievability and performance of IVC filters, and Dr. Uberoi's opinions regarding the Celect filter. Plaintiff's Memorandum in Support of Motion To Exclude or Limit the Testimony of Raman Uberoi, M.D. (Dkt. 9077, "Plaintiff's Memo.") at 1-2 & Exhibit B, filed therewith, at 22. At the outset, it should be noted that Cook does not intend to offer general testimony from Dr. Uberoi regarding the overall performance and retrievability of all IVC filters. Rather, Cook plans to elicit testimony from Dr. Uberoi about his personal testing of the Celect and the opinions he formed about the Celect as a result of his testing. As will be seen, Dr. Uberoi is well-qualified to offer those opinions and bases them on studies in which he personally participated and ultimately published in peer-reviewed journals.

2

### A. Dr. Uberoi Is Qualified To Offer Expert Testimony on IVC Filters.

Plaintiff hints in various places that Dr. Uberoi is unqualified to offer expert opinion regarding IVC filters. *See, e.g.*, Plaintiff's Memo. at 11 (criticizing Dr. Uberoi's reliance on "his purported clinical experience"). Nothing could be further from the truth. Dr. Uberoi is a highly respected, world-renowned interventional radiologist. He is a Fellow of the Royal College of Radiologists and the European Board of Interventional Radiology. Deposition of Dr. Raman Uberoi, dated August 3, 2018 ("Uberoi Dep.") at 244:5-9, 244:17-20 at Dkt. 9078-1. He has served as president of the British Society of Interventional Radiology and serves on the executive committee of CIRSE, the largest interventional radiological society in the world. *Id.* at 255:11-17; 256:2-7. He has published some 120 peer-reviewed papers in the medical literature, many of which concerned IVC filters. *Id.* at 254:8-17. Among others, this includes his publications regarding the British Society of Interventional Radiology's IVC Filter Registry, one of the largest prospectively collected datasets ever assembled on IVC filters. *Id.* at 64:2-15. He has given numerous presentations to his peers regarding IVC filters, presenting to various radiological societies around the world. *Id.* at 57:13-23. His IVC filter expertise is not limited to academic endeavors: he places filters frequently and has placed approximately 300 Cook Celect filters alone. *Id.* at 329:3-9. In short, Dr. Uberoi is likely one of the most qualified physicians in the world to opine on the clinical aspects of IVC filters.

### B. Dr. Uberoi Did Not Need To Provide an Expert Report.

Plaintiff's first argument is just an attempt to relitigate her previous motion to quash Dr. Uberoi's deposition: she claims that he is in fact a retained expert who should have provided a

written report. Plaintiff's Memo. at 4-5, 7-8. The Court, having already heard this argument and rejected it,[1] should summarily reject it once more.

Moreover, Plaintiff's argument rests squarely on her repeated twisting of the facts and Dr. Uberoi's testimony to suggest that Cook has dictated his opinions.[2] That allegation is quite untrue,[3] but it is irrelevant to this motion because it does not address the basis for Dr. Uberoi's opinions. As Plaintiff concedes, the difference between retained and non-retained experts is how they gain the information that undergirds their opinions. Plaintiff's Memo. at 7 (citing case law). Non-retained experts, i.e., those who testify based on information they gained outside of the litigation, need not provide a written report. *See generally* Cook Defendants' Response to Plaintiff's Motion To Strike Defendants' Non-Retained Expert Raman Uberoi, M.D. at Dkt. 8556.

Here, Dr. Uberoi testified that he was only "asked to comment on *my experience* of the filter and *my experience* with the study and *my knowledge and experience* of running the registry." Uberoi Dep. at 26:21-27:4 (emphasis added). Plaintiff herself concedes that Dr. Uberoi "had not reviewed the peer-reviewed literature regarding IVC filters to prepare for his

---

[1] Plaintiff cites a portion of the July 24, 2018 transcript and represents it as saying the Court limited the deposition to Dr. Uberoi's participation in the OUS study and British registry. However, as the Court will recall and as the cited passage makes clear, the deposition was allowed to proceed over Plaintiff's objection as to the lack of an expert report.

[2] For example, she claims that Cook had "repeated communications" with Dr. Uberoi for at least nine months prior to his deposition. Plaintiff's Memo. at 4. A close reading of Plaintiff's cited authority shows that Cook's counsel briefly discussed a distinct issue with Dr. Uberoi about nine months prior to his deposition, then had no further communication until shortly before the deposition. Similarly, she claims that Dr. Uberoi "spent 25 to 30 hours reading expert reports" and "other undisclosed documents provided by Cook," but that is not so: Dr. Uberoi testified that he spent 25-30 hours *in total* preparing for deposition, including refreshing his recollection of events that occurred some 10 years ago, by reference to documents that Plaintiff's counsel probed at deposition. Uberoi Dep. at 45:16-21; *see* 9:1-25 (explaining Dr. Uberoi's voluntary production of documents informally requested by Plaintiff), *e.g.* 29:19-58:17 (a portion of Plaintiff's lengthy inquiry into documents Dr. Uberoi voluntarily produced at deposition and/or reviewed prior to deposition).

[3] Though it is irrelevant to this Motion, this false allegation should not go wholly unanswered. Dr. Uberoi testified that he was never formally engaged by Cook and would have been happy to discuss the case or his experiences with Plaintiff's counsel, had they asked him. Uberoi Dep. at 258:9-259:2; 28:25-29:9. Despite Plaintiff's urging, Dr. Uberoi repeatedly confirmed that Cook had not suggested any specific testimony to him and that he was testifying as he saw fit. *E.g.*, *id.* at 59:24-60:10. And, as Plaintiff's Memorandum aptly demonstrates, Dr. Uberoi's testimony was by no means one-sided in favor of Cook.

4

deposition." Plaintiff's Memo. at 5. Indeed, Plaintiff fails to identify a single opinion that is based on information Dr. Uberoi obtained solely as part of this litigation. The closest she comes is saying that he had not seen the "final version of the Lyon/OUS study." Plaintiff's Memo. at 8. It is not entirely clear to what document Plaintiff is referring, but it is of no import: Dr. Uberoi personally participated in the study and even published a peer-reviewed article about it. Uberoi Dep. at 148:19-149:3, 219:19-22. Even if he saw a particular *arrangement* of the data for the first time during deposition preparation, that does not mean that the data itself was new to him. Tellingly, Plaintiff fails to identify any specific testimony that was based on information from the document in question rather than Dr. Uberoi's personal experience.

Cook's meeting with Dr. Uberoi prior to the deposition and agreeing to compensate him for his time in the deposition[4] in no way negates his status as a non-retained expert, just as Plaintiff's counsel's meeting with treating physicians prior to their deposition and paying them for time spent with Plaintiff's counsel did not negate their status as a non-retained expert treating physicians. *See, e.g.*, Deposition of Dr. Richard Reisman, dated February 22, 2018 ("Reisman Dep.") at 14:7-15:23 at Dkt. 8574-1 (noting that treating physician Dr. Reisman had met with Plaintiff's counsel in his home, received documents, and discussed the case ahead of his deposition); 258:10-22 (noting that Plaintiff's counsel had provided him with 1.5 inches of records *unrelated* to Dr. Reisman's care of Plaintiff); Exhibit A, Invoice from Dr. Reisman re: Meeting with Plaintiff (billing for meeting with Plaintiff's counsel ahead of deposition). Because Plaintiff cannot identify any opinion or testimony of Dr. Uberoi based on information

---

[4] Though it is irrelevant to this Motion, Cook notes that Dr. Uberoi was not paid $1,300/hour for his review of documents to refresh his recollection. That was the rate for his time spent at deposition, the cost of which should be split between the parties and is the likely subject of future motion practice. Cook compensated Dr. Uberoi for his preparatory time at half the rate of his deposition. Uberoi Dep. at 24:21-25:1.

5

he learned through litigation rather than his personal experience, her argument fails. Dr. Uberoi is a non-retained expert and did not need to provide a written report.

### C.     Dr. Uberoi's Opinions Are All Supported by Reliable Methodology.

Plaintiff's Motion suggests that Dr. Uberoi offered far-ranging opinions on filter efficacy, risk/benefit analysis, complication rates, and patient experiences as though he were broadly summarizing the content of medical literature on those subjects. The reality is that his opinions were narrowly tied to his experience in the OUS study and with the British Registry, both of which led to *peer-reviewed publications* in authoritative journals and neither of which Plaintiff challenges in this Motion. *Compare* Exhibit B of Plaintiff's Memo. at 22 (Opinions 1 and 2, discussing OUS study and British Registry, respectively) *with* Plaintiff's Memo. at 1-2 (challenging only Opinions 3 and 4).

Plaintiff does not identify any specific opinions that go beyond these two studies and should be excluded. Rather, she criticizes the methodology of those studies themselves and seeks to bar Dr. Uberoi from sharing the results of those studies in which he participated. Her effort to keep Dr. Uberoi from offering and explaining opinions that he published in peer-reviewed articles should be rejected.

### 1.  Dr. Uberoi's Opinions on Efficacy, Risk/Benefit, Complication Rate, and Patient Experience Are Based on His Published Studies and His Clinical Experience.

First, Plaintiff broadly attacks Dr. Uberoi's opinions regarding filter safety and efficacy. However, her argument concedes that his views are derived from his work with the British Registry and the OUS Study. Plaintiff's Memo. at 9. Those studies both culminated in peer-reviewed publications in authoritative journals. Uberoi Dep. at 62:24-63:18 & 336:10-19 (regarding British Registry); 148:19-149:3 & 219:19-22 (regarding Lyon publication of OUS

data). They were both registry studies conducted using the same methodology as other registry studies that Dr. Uberoi has conducted, which methodology is considered reliable and relied on by the medical community. *Id.* at 355:1-24 (responding to question about reliability of registry studies by noting "it's a recognized way, an accepted practice to look at data from registries"); 267:18-268:4 (noting that the OUS study was a registry study as well). The British Registry and OUS Study each reported results on filter efficacy and complications and drew conclusions (i.e., opinions) based on those findings. *See, e.g.*, *id.* at 346:11-349:22 (regarding British Registry); 305:12-20; 322:17-323:8 (regarding Lyon publication of OUS data). Plaintiff is free to question the weight that should be given to these findings and opinions,[5] but the industry has already determined that they are sufficiently reliable to publish notwithstanding Plaintiff's criticisms.[6] Dr. Uberoi is not barred from discussing the results and opinions found in these reliable, peer-reviewed publications simply because he happens to have authored them.

Plaintiff makes much of the fact that Dr. Uberoi only had primary responsibility for 12 patients in the OUS study and was not the primary author on the final publication. Plaintiff's Memo. at 6. She suggests that he never saw the "final draft" until preparing for deposition. *Id.*[7] A brief read of the deposition portions she cites shows that they do not support her claim. The fact is that Dr. Uberoi took an active role in editing the manuscript as it moved toward publication. Uberoi Dep. at 152:19-153:1; 313:6-13. He even presented the OUS data to his

---

[5] This is, in fact, all she does in her discussion of the limitations of the British Registry. Plaintiff's Memo. at 5-6. It bears noting that her attack is not even accurate: for example, there was in fact imaging for at least 400 patients in the British Registry, not just 200 as implied by Plaintiff's mischaracterization of Dr. Uberoi's testimony. Uberoi Dep. at 110:7-9. Plaintiff erroneously conflates testimony about the 2011 publication and the 2013 publication, between which 200 patients were added to the registry. *Id.* at 111:25-112:5.

[6] Indeed, Plaintiff cites Dr. Uberoi's deposition at 125:7-126:15 for the proposition that the British Registry likely underreported perforation. Simple reference to that passage shows that the publication itself stated "perforation is likely to be underreported."

[7] Though it only goes to weight and not to admissibility, it bears noting that Plaintiff also claims Dr. Uberoi had an "error rate of at least 25%" for his OUS patients. Plaintiff's Memo. at 6. As she very well knows, he explained that his decisions on penetration were not "erroneous" but merely different when viewing the small number of static images available today rather than the dynamic, 15-20 image real-time runs he was viewing when he first made the decisions during the OUS study. Uberoi Dep. at 164:22-165:10.

peers at the European Congress of Radiology, including data from all sites and not just his own. *See id.* at 49:3-14. He relied on his OUS colleagues' work in preparing a peer-reviewed published article and presenting to his peers, and he was personally familiar with that data long before this litigation began. It is nonsense to say he cannot base an opinion on the data now, particularly where the very same data now exists in his own peer-reviewed article on which another expert would be free to rely in forming an opinion.

Additionally, Dr. Uberoi testified that his clinical experience was consistent with the results he found in the OUS study and the British Registry. It is appropriate for an expert to rely on and share his clinical experience as *further* support for opinions that are otherwise proper. Dr. Uberoi did not opine broadly on his clinical experience in this case, as Plaintiff suggests, but discussed it in connection with his opinions derived from the OUS study and British Registry. *See, e.g.*, Uberoi Dep. at 361:19-362:4 (testifying that his clinical experience was consistent with the results he saw in the OUS study and British Registry). Moreover, Plaintiff's criticism that his clinical experience is not based "on any statistically significant number of cases," Plaintiff's Memo. at 11, is simply incorrect: he has placed some 300 Celect filters alone and scores of others as well dating back to 1993. Uberoi Dep. at 248:2-10, 329:3-9. Plaintiff further alleges that Dr. Uberoi was unable to give rates of complications in his patients, but that is likewise untrue: he testified that the rate is *zero* for multiple complications including PE, fracture, and symptomatic perforation. *Id.* at 330:1-331:5.[8] And again, that testimony is not offered in a vacuum but as further evidence that Dr. Uberoi's findings from his testing of the Celect in the OUS study and British Registry are accurate. *See, e.g.*, Uberoi Dep. at 415:14-416:4 (noting that

---

[8] Notably, Dr. Uberoi testified that he *was* aware of one of his colleague's patients experiencing a symptomatic perforation on one occasion. Uberoi Dep. at 330:23-331:5. Thus, his claim that he has never seen a symptomatic perforation in his own patients is not merely due to a lack of recollection or investigation.

the lack of Celect filter fractures in the British Registry and in the OUS study was consistent with the fact that he had never seen a Celect filter fracture).

In short, Dr. Uberoi's opinions on filter safety and efficacy are well supported by his peer-reviewed publications as well as his clinical experience, both of which he is permitted to discuss as a non-retained expert.

### 2. Dr. Uberoi's Testimony Regarding Filters Catching Clots in the OUS Study Is Not Speculative.

Plaintiff highlights one specific aspect of Dr. Uberoi's testimony about the OUS Study, i.e., his opinion that the Celect filter caught clots in two of his OUS patients, and argues that it is mere speculation. However, Dr. Uberoi was absolutely clear that he saw trapped thrombus (i.e., blood clot) in the filters of some of his OUS patients while conducting the study. *See, e.g.*, Uberoi Dep. at 300:21-301:1; 363:18-20; 381:15-382:15. He saw these and reported them because the protocol he was to follow in the OUS study required it. *Id.* at 300:14-20. He testified repeatedly that the filters had "caught" the clots. *Id.* at 303:3-24; 363:18-20; 381:15-382:15. He explained that he bases that opinion on the appearance of the clot in the filter, i.e., whether it is neatly situated in the apex or appears to extend elsewhere (e.g., past the nose cone of the filter), with the former indicating that a clot has been trapped rather than formed on the filter. *Id.* at 301:14-20; 302:11-14; 303:11-22; 382:1-15. He did testify that "I don't think I can say" whether the thrombus was created by the fact of the Celect's implantation, but his following comment proves he was merely unable to exclude that possibility *with 100% certainty*: "I think it's unlikely. On probabilities it's unlikely, but it's possible." *Id.* at 382:17-383:9.[9]

---

[9] There is one line of the testimony, cited by Plaintiff, that reads "unlikelihood is those would trap clot." Uberoi Dep. at 383:23-24. This was transcribed incorrectly. Dr. Uberoi's errata, a copy of which is attached as Exhibit B, notes that he in fact said, "in all likelihood they would be trapped clot." Note that the court reporter recently served

9

Dr. Uberoi, a highly trained interventional radiologist with decades of experience using IVC filters, looked at radiological imaging from his own patients in the OUS study and determined that they appeared to have caught clot.  He brings his considerable technical skills to bear on a very simple and straightforward inquiry:  if a clot is neatly situated inside the filter, precisely where one would expect a trapped clot to settle based on the funnel-like shape of the filter, then in all likelihood it was caught.  If, however, a clot is bound to one side of a filter, or extends beyond the portion of the filter that is meant to capture clot, then the clot is probably growing on the filter itself (or extending from a clot that was caught by the filter).  There is nothing speculative or unreliable about this methodology.  Plaintiffs cannot legitimately argue that Dr. Uberoi would be unqualified to review imaging from Celect filter patients or that his thorough analysis and reporting of what the images showed was unreliable.  These opinions are not speculative, are directly tied to his work testing the Celect prior to litigation, and should be admissible at trial.

3. **Dr. Uberoi's Opinions Regarding Common Medical Knowledge Come from His Peer-Reviewed Publication on the Subject**.

Dr. Uberoi was specifically designated to testify on his work in the OUS study.  At deposition, Plaintiff's counsel questioned Dr. Uberoi about the OUS study's decision not to use CT scans as part of the investigation.  Dr. Uberoi responded that there are risks of using CT, namely that it carries a radiation burden, and that there was thus a "risk balance" analysis weighing the risks of using CT and the benefits of investigating filter complications.  Uberoi Dep. at 150:17-151:16.  In response to later questioning by Cook, Dr. Uberoi clarified that "you need to make a judgment whether the additional information is so valuable as to potentially expose the patient to harm."  *Id.* at 356:8-357:21.  Cook followed up by asking Dr. Uberoi what

---

a revised transcript as well, which corrects this mistake and reads "on the likelihood, those would trap clot."  The relevant page of the revised transcript is attached as part of Exhibit B.

10

sorts of information would have been part of the risk/benefit analysis in deciding whether to use CT, i.e., what filter complications the medical community was aware of and may have wanted to study when the OUS study was being conducted. In response, he discussed a peer-reviewed article that he published in 2009, listing well-known complications in the years during which the OUS study was conducted. *Id.* at 358:1-360:2.

In that context, Plaintiff accuses Dr. Uberoi of "purporting to read the minds of other doctors" and opining on their knowledge of filter complications—an argument she has made in several other motions as well. Plaintiff's Memo. at 13. But Dr. Uberoi did nothing of the sort. The testimony that Plaintiff criticizes was merely Dr. Uberoi's explanation of a *peer-reviewed publication* he authored in 2009 regarding "the current knowledge for IVC filters" and a table therein summarizing "well-recognized complications with IVC filters." *Id.* at 358:1-360:2. A brief review of Dr. Uberoi's publication itself demonstrates that it is a review article that cites 30 other peer-reviewed publications as support for its statements and conclusions. *See generally* Neil J. Rane & Raman Uberoi, *IVC Filters: Indications and Evidence*, 6(6) VASC. DIS. MGMT. 171-75 (2009), filed herewith as Exhibit C. Dr. Uberoi was not abstractly claiming to know the mind of any particular physician in any particular country; he was expounding on statements about common medical knowledge that he published in a reputable journal, based on a review of the literature. Plaintiff gives the Court no reason to question the conclusions or methodology within that publication, a methodology approved by the journal's peer-review process.

The two cases cited by Plaintiff are inapposite. *Matter of Sheridan*, 57 F.3d 627, 634 (7th Cir. 1995) and *Moore v. Positive Safety Mfg. Co.,* No. CIV.A. 4:96-CV-00352, 1998 WL 35178048, at *9 (N.D. Ga. May 26, 1998), each concerned an expert's opinion of what a particular defendant knew based on that defendant's individual experiences and actions. Here,

11

though, Dr. Uberoi does not opine on what a particular physician would know based on his or her tenure in the industry and individual experience in placing IVC filters. Instead, he merely relies on his own peer-reviewed article and the methodology that led to its publication to describe common medical knowledge.

### D. Dr. Uberoi's Testimony Is Not Cumulative and Will Be Helpful to the Jury.

Plaintiff concludes by seeking to strike unspecified "efficacy, risk/benefit and complication rate testimony" as needlessly cumulative. First, objections on cumulative testimony are premature. Trial is still months away, and the Court cannot determine if evidence is cumulative before any evidence has come before it. More practically, Plaintiff's shotgun approach to striking unspecified testimony in remarkably broad categories renders her request improper. By way of example: a blanket order barring Dr. Uberoi's testimony on complication rates altogether would effectively keep him from discussing the results he saw from the OUS study. However, he is the only witness in this entire litigation who participated in the study as an investigator. He is the only person in this case who can testify, for example, about the tools and information he used in determining whether his OUS patients had a vena cava penetration. This is important, as the tools and information he had at the time of the OUS study differ substantially from those that are now used by Plaintiff's experts to critique the study's findings. Uberoi Dep. at 307:18-309:5; 310:1-14. Thus, Plaintiff's request to exclude Dr. Uberoi's "efficacy, risk/benefit and complication rate testimony" as cumulative is simply too broad and premature at this juncture.

### CONCLUSION

For the reasons stated above, the Cook Defendants respectfully request that the Court deny Plaintiff's Motion in its entirety. Dr. Uberoi is well-qualified to give the opinions Plaintiff

attacks.  His opinions are supported not only on his own considerable experience, but also by his multiple peer-reviewed publications.  Finally, Plaintiff's suggestion that his testimony is cumulative is recklessly short on specifics and threatens to put Cook in an unfair and untenable position.  Plaintiff's Motion should be denied in its entirety.

Respectfully submitted,

/s/ Andrea Roberts Pierson
Andrea Roberts Pierson (# 18435-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

*Counsel for the Defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

## CERTIFICATE OF SERVICE

      I hereby certify that on September 25, 2018, a copy of the foregoing was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system. Lead Counsel for Plaintiffs will serve any non-CM/ECF registered parties.

                                      /s/ Andrea Roberts Pierson