UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: COOK MEDICAL, INC. IVC FILTERS
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates Only to the Following Cases:

All cases involving Plaintiffs who received the Celect filters, specifically including:

Tonya Brand, 1:14-cv-06018-RLY-TAB

**COOK DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION**

**INTRODUCTION**

In their Opposition, Plaintiffs sharply criticize Cook for filing this brief on grounds that the issue was raised and decided as part of the *Hill* case.[1] Cook acknowledges that it filed a joint preemption brief in the *Hill* and *Gage* cases, which would have been dispositive of cases brought in by other plaintiffs with the same filters, and that the Court denied Cook's motion (Court's Order, Dkt. 6541). Cook, however, prevailed in those two cases (respectively, at trial and on motion for summary judgment), and Cook filed the underlying motion for the Court's consideration of the issues and to preserve the issue for potential appeal as part of the *Brand* case. Regarding the substance of Plaintiff's assertions, *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), does not control and therefore federal law *does* preempt Plaintiffs' claims for four reasons.

---

[1] *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment Based on Federal Preemption ("Opposition"), Dkt. 8834, p. 1.

1

First, the reflexive citation to *Lohr* ignores basic principles of statutory interpretation. *Lohr* analyzed the 510(k) process as it existed in 1982 – permitting a Class III device to reach the market because it was substantially equivalent to a "grandfathered" device, *i.e.*, a pre-1976 device that was permitted to remain on the market until FDA initiated and completed the requisite PMA. *See Lohr*, 518 U.S. at 477–78. However, in 1990, Congress passed the Safe Medical Devices Act ("SMDA") and "rewrote" the legislative scheme analyzed in *Lohr* to "impose more safety and effectiveness requirements on 510(k) medical devices."[2] Specifically, the SMDA closed the "grandfathering" provision that *Lohr* described as "focused on *equivalence*, not safety," *Lohr*, 518 U.S. at 493 (emphasis in original), and mandated that FDA review all grandfathered Class III devices and either "down classify" the device based on its history of safe and effective use or require a PMA. *See supra*, n. 2. Thus, at most, *Lohr* is confined to pre-SMDA "grandfathered" devices, and post-SMDA devices (like the Celect) require a fresh analysis.

Second, as required by the SMDA, FDA conducted a thorough review of IVC filters and determined that based on their history of safe and effective use they could be reclassified to Class II, subject to special controls, and not be subject to a PMA. Thus, contrary to Plaintiffs' anachronistic argument under *Lohr* that Cook's IVC filters are merely substantially equivalent to a predicate that was never reviewed for safety by FDA, the reclassification of IVC filters to Class II was a specific federal determination that IVC filters are safe and effective, as the FDA itself has said.

---

[2] Ralph F. Hall & Michelle Mercer, *Rethinking Lohr: Does "Se" Mean Safe and Effective, Substantially Equivalent, or Both?*, 13 Minn. J.L. Sci. & Tech. 737, 748 (2012); *see also* Jeffrey K. Shapiro, *Substantial Equivalence Premarket Review: the Right Approach for Most Medical Devices*, 69 Food & Drug L.J. 365, 369 (noting enactment of SMDA was a "watershed event" for 510(k) review).

Third, the FDA's 510(k) clearance of the Celect filter was exacting, unlike the expedited review analyzed in *Lohr*. Indeed, the FDA imposed a series of device-specific requirements on the Celect, including additional clinical studies and a separate 510(k) for its retrievable use. Likewise, the FDA required specific alterations to portions of the filter label. Presence of device-specific requirements such as these – found lacking in *Lohr* with respect to the pacemaker at issue there – confirm that Plaintiffs' state law claims are expressly preempted. Moreover, the fact that FDA has enforcement tools at its disposal, ranging from imposing fines to recalling devices, but has not exercised those options with respect to the Celect shows that, on balance, FDA retains confidence in the safety and effectiveness of those devices.

Finally, Plaintiffs' claims fail for the additional and independent reason that they are impliedly preempted. Implied conflict preemption provides that state law obligations that a party cannot comply with absent federal regulatory approval are preempted. Because Plaintiffs argue Cook was obligated to make substantial changes to the design and labeling of the Celect to avoid liability under state tort law, and because Cook cannot make such changes without separate 510(k) clearance from FDA, then the state law claims are in conflict with the federal regulatory scheme and are therefore preempted.

## ARGUMENT

**A.     *Lohr* Does Not Control Because Its Statutory Interpretation Is Not Applicable To Post-1990 510(k) Medical Devices**

Contrary to Plaintiffs' view, the Supreme Court's medical device preemption jurisprudence is not binary, with preemption for PMA devices under *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), and no preemption for 510(k) devices under *Lohr*, 518 U.S. 470. *See, e.g.,* Opposition, pp. 1-2 (discussing *Lohr*'s citation history). Such a black-and-white juxtaposition of the Court's jurisprudence is unwarranted because the Supreme Court has never considered

3

express preemption in the context of a 510(k) medical device brought to market under the post-SMDA 510(k) process, which is fundamentally different – and more exacting – than the process *Lohr* analyzed.

Although *Lohr* is a 1996 decision, the pacemaker at issue in *Lohr* was brought to market in 1982 through the rudimentary 510(k) clearance process as it existed at the time. *Lohr*, 518 U.S. at 479. Medtronic "took advantage of § 510(k)'s expedited process in October 1982, when it notified the FDA that it intended to market" the pacemaker and received clearance to sell it less than two months later "[when] the FDA found that the model was 'substantially equivalent to devices introduced into interstate commerce' prior to the effective date of the [Medical Device Amendments, *i.e.* 1976]." *Id.* at 480. In other words, the pacemaker in *Lohr* was a Class III device that was permitted by the MDA to go through the 510(k) process by comparison to a pre-1976 "grandfathered" predicate "merely to give manufacturers the freedom to compete." *Id.* at 494. Thus, *Lohr* is correct that the 510(k) process *at that time* was focused on "*equivalence*, not safety." *Id.* at 493 (emphasis in original). However, at its heart, *Lohr* is a statutory interpretation case and its precedential value is confined to the statutory framework it interpreted: the pre-SMDA 510(k) process as applied to the pacemaker at issue.

Two canons of statutory interpretation explain why *Lohr* does not apply to post-SMDA 510(k) devices: (1) "statutes *in parti materia* [Latin for 'in a like matter'] are to be interpreted together, as though they were one law," and (2) "if the legislature amends or reenacts a provision other than by way of a consolidating statute or restyling project, a significant change in language is presumed to entail a change in meaning." Antonia Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012), pp. 252-260; *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) ("[U]nder the *in pari materia* canon of statutory construction, statutes addressing the

same subject matter generally should be read as if there was one law.") (internal citation omitted); *Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) ("Individual sections of a single statute should be construed together, for it necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject.") As applied here, these two canons confirm that *Lohr* simply does not control.

The MDA of 1976 and the SMDA of 1990 are plainly "statutes *in parti materia*" and, thus, if the Supreme Court intended its interpretation of the pre-SMDA 510(k) process to apply to post-SMDA devices, it would have said so. It did not. Instead, although the SMDA was enacted 6 years before *Lohr* was decided, the Court did not interpret it as part of the same law as the MDA because the device at issue was a pre-SMDA device cleared in 1982. *See Lohr*, 518 U.S. at 479–80.

Moreover, the SMDA made significant changes to the MDA, including (1) defining the phrase "substantial equivalence"[3]; (2) closing the "grandfathering" provision for Class III devices analyzed in *Lohr*[4]; and (3) requiring FDA to review all "grandfathered" devices and either "down classify" the device based on its history of safe and effective use or require a PMA.[5]  Because the reenactment canon counsels that Congress does not substantively change the text of the statute without intending to make a substantive change in its meaning, it must therefore be presumed that Congress intended to change the meaning of the MDA analyzed in

---

[3] The SMDA defined "substantial equivalence" to mean a device with "the same technological characteristics as the predicate device" or the information provided "including appropriate clinical or scientific data if deemed necessary … that demonstrates that the device is as safe and effective as a legally marketed device" and "does not raise different questions of safety and effectiveness than the predicate device."  21 U.S.C. § 360c(i).
[4] *See* Pub. L. No. 101-629, § 4, 104 Stat. 4511, 4515–17 (amending, *inter alia*, 21 U.S.C. §§ 360c(f)(4), 360e(i)); *see also* Ellen J. Flannery, *The Safe Medical Devices Act of 1990: An Overview*, 46 Food, Drug, Cosm. L.J. 129, 135–36 (1991); Hall & Mercer, *supra*, at 750.
[5] *See supra*, n. 4.

*Lohr*.  Thus, Plaintiffs cannot simply assume that *Lohr* would have reached the same result in this case because the regulatory scheme applicable here is fundamentally different.

Nevertheless, courts have reflexively cited *Lohr* for the proposition that state law claims involving post-SMDA 510(k) devices are not expressly preempted.  In a thoughtful recent opinion, then-Circuit Justice Neil Gorsuch noted the "tension" between *Lohr* and the Supreme Court's holdings in *Buckman* and *Riegel*.  *See Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1339 (10th Cir. 2015)) (noting "tension" between "the notion that § 337(a) shows Congress intended the federal government to enjoy exclusive enforcement authority over the MDA and the notion that § 360k(a) permits private tort suits that do no more than parallel the MDA.") (internal citations omitted).  Judge Gorsuch correctly concluded "some of those rules warrant revisiting and reconciliation."  *Id..* at 1340.

Plaintiffs argue that because the express preemption clause, 21 U.S.C. § 360k, has not changed since its enactment in 1976, *Lohr* should therefore apply to all 510(k) devices.  *See* Opposition, pp. 4–5.  Not so.  While it is true that the text of the preemption clause has not changed, the regulatory requirements imposed on manufacturers by the SMDA certainly have. Look no further than FDA's own 510(k) Guidance that "reflects the current statutory framework" under the SMDA, including that "the principles of safety and effectiveness underlie the substantial equivalence determination in every 510(k) review."[6]

In sum, contrary to Plaintiff's knee-jerk reaction that all 510(k) devices survive preemption under *Lohr*, the reality is that *Lohr* does not control the extant preemption issue.  Instead, the Court should independently conclude that state tort law imposes requirements that

---

[6] *See* Dkt.6157-4, Ex. B, *The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)], Guidance for Industry and Food and Drug Administration Staff* ("510(k) Guidance")*,* p. 6, FDA, July 28, 2014, available at
https://www.fda.gov/downloads/MedicalDevices/.../UCM284443.pdf.

are "different from, or in addition to" the federal requirements Cook was obligated to follow when it marketed the Celect under the post-SMDA 510(k) process.

**B.   FDA Performed A Thorough Review Of Safety And Effectiveness When It Reclassified IVC Filters From Class III To Class II**

As part of the SMDA, Congress mandated that FDA review all pre-1976 Class III devices and either "down classify" them based on a history of safe and effective use or require manufacturers to submit a PMA. *See supra*, n. 4–5. In 1995, the FDA announced that IVC filters were a candidate for reclassification. 60 Fed. Reg. 41984 (Aug. 14, 1995). Manufacturers were required to submit a "summary of, and citation to, any information known or otherwise available to them respecting the devices, including adverse safety and effectiveness data." *See* 60 Fed. Reg. 41984. After a thorough review of the submissions, FDA concluded that "based upon valid scientific evidence … the probable benefits to health from use of [IVC filters] … outweigh any probable risks," and "based upon valid scientific evidence, that in a significant portion of the target population, the use of the device for its intended uses … will provide clinically significant results." *Id.*; *see* 65 Fed. Reg. 17144 (March 31, 2000) (reclassifying IVC filters to Class II); 21 C.F.R. § 870.3375 (classifying filters as Class II devices and listing special controls); Dkt. 5728-1, Ex. B, Veronica Price to Record Re: Reclassification of Cardiovascular Intravascular Filters, December 2, 1996 ("Price Memo"), at COOKFOIA 000067 (summarizing analysis of benefits and known risks).[7]

In short, the reclassification of IVC filters embodied FDA's safety review and the resulting imposition of special controls was the means to ensure safety and effectiveness of IVC filters. *Cf. Riegel*, 552 U.S. at 323 ("And [PMA review] is in no sense an exemption from

---

[7] The exhibits referenced in this Reply Brief were initially filed as part of the preemption briefing in the *Hill* and *Gage* cases, and the docket citations here are to those exhibits.

federal safety review—it *is* federal safety review"). Thus, the attributes that *Lohr* found lacking in the 510(k) process are present here. And, like the PMA review in *Riegel*, FDA's review of filters as part of the reclassification process was focused on safety and effectiveness, not on equivalence. Indeed, as part of its reclassification analysis, FDA was not considering whether any new filter design was substantially equivalent to a predicate. Instead, it was analyzing "valid scientific evidence" to conclude that the "probable benefits to health from use of [IVC filters] … outweigh any probable risks," and "in a significant portion of the target population, the use of the device for its intended uses … will provide clinically significant results." 60 Fed. Reg. 41984; *see also* 65 Fed. Reg. 17144; 21 C.F.R. § 870.3375. Put differently, the FDA reviewed the scientific evidence about IVC filters that were on the market at that time and determined they were safe and effective devices.

Although Plaintiffs contend that *Lohr* describes the 510(k) process as "'a qualification for an exemption rather than a requirement,'" Opposition, p. 9 (quoting *Riegel*, 552 U.S. at 322 (discussing *Lohr*)), in reality, the SMDA eliminated the statutory exemption analyzed in *Lohr* and mandated that FDA determine what to do with the grandfathered devices. *See supra* n. 4–5. Again, it bears mention that *Lohr*'s review of the regulatory framework was pre-SMDA. When the FDA fully implemented that mandate by reclassifying IVC filters in 2000, the 510(k) process became the *only* regulatory pathway for bringing IVC filters to market. *See* Dkt. 6156-5, Ex. E, Expert Report of Eliza Harvey, M.D. ("Harvey Report"), p. 7 (explaining that "a company [cannot] choose to submit a PMA for a Class II medical device. This is the system that United States Congress has legislated and mandated, and that FDA is bound to uphold unless and until it asks Congress to legislate a different system for the oversight of medical devices."). In other

words, even if Cook wanted to submit a PMA for the Celect, FDA would have rejected the application.

Thus, while FDA prohibits manufacturers of 510(k) "cleared" devices from marketing them as if they received FDA "approval" applicable to Class III devices, *see* 21 C.F.R. § 807.97; Opposition, p. 9, both the 510(k) and PMA processes involve safety and effectiveness review and successful passage through each regulatory pathway yields a federal determination that the device is safe and effective. The specific pathway is chosen by FDA, *not the manufacturer*, and it simply reflects FDA's determination of what type of review process is necessary to assure "the safety and effectiveness of the devices." 21 U.S.C. § 360c(a)(1). Accordingly, contrary to Plaintiff's mantra that the Celect is only as safe and effective as the predicates of its predicates that were never reviewed for safety and effectiveness, *see* Opposition, *passim*, in fact the Celect is substantially equivalent to predicates that "based upon valid scientific evidence" have "probable benefits to health" that "outweigh any probable risks" and that "in a significant portion of the target population … will provide clinically significant results." 60 Fed. Reg. 41984; *see* 65 Fed. Reg. 17144; 21 C.F.R. § 870.3375.[8]

Post-*Lohr*, the Supreme Court has acknowledged this regulatory shift, stating "the FDA simultaneously maintains the exhaustive PMA and the more limited § 510(k) process in order to ensure [] that the medical devices are *reasonably safe and effective* …." *Buckman*, 531 U.S. at

---

[8] Importantly, the FDA's safety and effectiveness determination is a decision grounded in risk-utility, not a guarantee of a specific outcome for any individual patient. *See* 21 CFR § 860.7(d)-(e) (defining safety as "reasonable assurance…that the probable benefits to health from use of the device…outweigh any probable risks" and effectiveness as "reasonable assurance that … in a significant portion of the target population, the use of the device…will provide clinically significant results"); *see also Riegel*, 552 U.S. at 326 (noting that congressional intent gleamed through "the only indication available—the text of the statute—suggests that the solicitude for those who would suffer without new medical injuries if juries were allowed to apply the tort law of 50 States to all innovations.")

349 (emphasis added). While any individual 510(k) review by FDA may be "more limited" in comparison to any individual PMA review, *see id.*, that is to be expected because of information already available to FDA from currently-marketed products and, contrary to Plaintiffs' suggestions, does not indicate that FDA considers the 510(k) process to somehow be less focused on safety and efficacy. Simply put, PMA applications are reserved for Class III devices whose safety and effectiveness FDA has determined cannot be reasonably assured with a lower classification, while 510(k) applications are reserved for Class II devices whose safety and effectiveness FDA has determined *can be* reasonably assured with a lower classification. *Riegel*, 552 U.S. at 317 (citing § 360c(a)(1)(C)(ii)). Regardless of the regulatory pathway required by FDA – PMA or 510(k) – the goal is the same: "to provide reasonable assurance of the safety and effectiveness of the device." 21 U.S.C. § 360c(a)(1).

**C.     The 510(k) Process As Applied To the Celect Filter Included Device-Specific Design And Labeling Requirements That Have Preemptive Effect**

As set forth in detail in Cook's opening brief, *see* Dkt. 8669, pp. 18–24, and the Declaration of April Lavender ("Lavender Decl."), Dkt 5737-1, Ex. 1, the FDA's special controls of IVC filters generally, and FDA's review of the Celect specifically, ensures the safety and effectiveness of the design and labeling of those devices. This process stands in stark contrast to the 2-month expedited 1980s-era review analyzed in *Lohr*. *Compare* Section A (discussing *Lohr* and 1980s 510(k) review) *with* the Price Memo, Dkt. 5728-1 (explaining reclassification focused on safety and effectiveness) and the Lavender Declaration (summarizing the post-1990 exacting 510(k) review the Celect went through). Contrary to Plaintiffs' assertions, therefore, FDA did establish specific requirements for the Celect under the MDA that have preemptive effect.

### 1. Design Requirements

The 510(k) Filter Guidance established *mandatory* standards related to filter design, including pre-clinical testing and clinical design requirements. *See* Guidance for Cardiovascular Intravascular Filter 510(k) Submissions ("Filter Guidance"), November 26, 1999, Dkt. 5728-2, Ex. C, at CookMDL2570_0202630. Indeed, the Filter Guidance states filter manufacturers "should demonstrate that the proposed device complies with *either* the specific requirements of this guidance *or* some alternate control that provides equivalent assurances of safety and effectiveness." *Id*. (emphasis added). Thus, contrary to Plaintiffs' assertion, Opposition, p. 15, the Guidance is not optional. Rather, it allows for manufacturers to establish "equivalent assurances of safety and effectiveness" through "some alternate control" as part of a pro-innovation approach. *See* Filter Guidance, at CookMDL2570_0202632. The bottom line is that manufacturers must comply with the Filter Guidance to show "safety and effectiveness" to obtain 510(k) clearance.

Moreover, FDA's clearance of the Celect constitutes a specific determination that the design of the filters comports with the standards promulgated in the Filter Guidance. While FDA could have promulgated additional design requirements as part of its down classification review, it did not. Thus, the standards in the Filter Guidance represent the level of federal requirements deemed necessary by FDA to ensure safety and effectiveness of the filters. *See* 21 C.F.R. § 870.3375 (imposing special controls for filters, including the standards promulgated in the Guidance).

Furthermore, FDA required Cook to provide clinical data supporting safety and effectiveness of the design of Celect prior to clearance. *See* Lavender Decl., ¶¶ 27, 31, 38, 39, 41. Clinical data was required for both permanent and retrieval indications. *See id*, ¶¶ 27, 31, 39. Indeed, the Celect filter were indicated for a retrieval indication under a separate 510(k)

application because the FDA imposed clinical data requirements to ensure the safety and effectiveness of retrieval. *See id.*, ¶¶ 38, 41 (Celect cleared for permanent use in April 2007 and retrievable use in March 2008).

In sum, FDA's special controls, and those controls' application to the Celect, imposed device-specific requirements to ensure the safety and effectiveness of those devices. Because these are device-specific requirements, they are entitled to preemptive effect against contradictory state requirements. *See Riegel*, 552 U.S. at 323 (explaining that "'requirements' … specific to individual devices … [were] the attributes that *Lohr* found lacking in § 510(k) review.") (citing *Lohr*, 518 U.S. at 493). In other words, because the exacting 510(k) review that Celect underwent imposed device-specific requirements such as provision of clinical data for the retrieval indications, these are the "sort of concerns regarding a specific device … [the expression provision in the MDA was] designed to protect from potentially contradictory state requirements." *Lohr*, 518 U.S. at 501. Application of *Lohr*'s legal analysis to these facts requires preemption of Plaintiffs' state law claims.

### 2. Labeling Requirements

Likewise, the Filter Guidance imposed labeling requirements that were mandatory for the same reasons outlined above. Similarly, FDA requested specific revisions to the IFUs for the Celect regarding duration of use, the clinical data to be included therein, and emphasis that the retrieval indication was optional. *See* Lavender Decl., ¶ 31 (Celect IFU). Thus, as only one example, Cook had originally proposed specific language discussing a 25-day retrieval window for the clinical data discussed in the Tulip IFU and the FDA required the duration to be removed and replaced with language that "this data indicates the device can be removed safely." *Id.*, ¶ 9. This is precisely the kind of device-specific requirement the *Lohr* court found lacking with respect to the pacemaker at issue in that case, 518 U.S. at 493, and the presence of this kind of

12

device-specific requirement here triggers the express preemption clause of the MDA. *See Lohr*, 518 U.S. at 500 (holding that "federal requirements must be 'applicable to the device' in question, and, according to the regulations, pre-empt state law only if they are 'specific counterpart regulations' or 'specific' to a 'particular device.'")

Moreover, Plaintiffs complain that "the FDA does not direct or even recommend, nor does Cook include language in the warning, contradictions, or possible adverse events sections of its IFU, anything about migration, perforation, fracture, or tilt." Opposition, p. 23. Plaintiffs seek to impose these duties through state failure-to-warn claims challenging the adequacy of Cook's filter labels. Plaintiffs' outcome-oriented analysis ignores the safety and effectiveness review that the FDA did conduct with respect to filter labeling. As FDA's down classification memorandum confirms, FDA considered the known risks including migration, tilt, penetration, and fracture – the very issues Plaintiffs claim are not adequately addressed by the filter labeling. *See* Price Memo, Dkt. 5728-1, at COOKFOIA000068 – 71. FDA concluded that "the potential … risks have been well characterized. It is possible and appropriate to minimize the risks through the use of special controls. These controls include standardized labeling as well as published guidelines." *Id.*, at COOKFOIA000068. Thus, FDA thoroughly reviewed the well-known risks and imposed as a special control the Filter Guidance that, among other things, requires certain language to be included on the label of every IVC filter. *See* Filter Guidance, at COOKMDL2570_0202641.

Because the FDA expressly studied the risks Plaintiffs complain of here, but decided not to require specific language regarding these phenomena as part of the filter labeling mandated by the Filter Guidance, the FDA's decision not to do so represents a specific federal determination that such language was not necessary in the IFU to ensure safety and effectiveness of the device.

While Plaintiffs may not like the FDA's decision, the fact that FDA could have required additional information in the labeling but specifically decided not to preempts Plaintiffs' attempt to impose such "additional" duties through state failure-to-warn law. At any time, new information may prompt FDA to revisit its regulation of filter labeling, but that decision is solely at the prerogative of the FDA's exclusive authority to enforce the MDA, and cannot be supplemented by plaintiffs through private tort suits. *See Buckman*, 531 U.S. at 352 ("In the present case, by contrast, we have clear evidence that Congress intended that the MDA be enforced exclusively by the Federal Government.") (citing 21 U.S.C. § 337(a)). Importantly, the FDA has never required Cook to change the labeling for IVC filters, including the Celect. Because the FDA has the express authority to require manufacturers to change their labeling, but has not required Cook to do so, the FDA's safety and effectiveness determination regarding the label remains in effect. Therefore, Plaintiffs' suggestion that the label should have included specific warnings about "migration, perforation, fracture, or tilt" is preempted.

Plaintiffs discuss the labeling special controls the FDA has imposed on over-the-counter tampons and latex condoms, and emphasize the strictness of these labeling requirements in comparison to the Filter Guidance. *See* Opposition, pp. 18–19 (discussing federal regulations and case law pertaining to these types of devices). These examples are not persuasive because, unlike tampons and condoms, IVC filters are prescription medical devices that can only be placed in a patient's body by a physician. Consequently, when it reclassified IVC filters, FDA understood that "these risks … are *well known to the users and are well characterized in the medical literature*." Price Memo at COOKFOIA000067 (emphasis added). Thus, the Filter Guidance does not require manufacturers to enumerate every possible complication, no matter

14

how tangential its risk, in the filter label directed to physicians. For this reason, Plaintiff should not be permitted to question FDA's expert decision making through state tort law.

### 3. Post-Market Enforcement Powers

Moreover, the FDA has specific authority to withdraw 510(k) clearance, impose fines, issue injunctions or warning letters, suspend marketing, or recall a device from the market if it determines that the device poses an undue risk to the public. *See* 21 U.S.C.A. § 333 (notification and other remedies); 21 U.S.C.A. § 360(h) (penalties); 21 C.F.R. § 810.10 (cease distribution and notification order); 21 C.F.R. § 810.13 (mandatory recall order). However, the "FDA has never found a lack of compliance in the 510(k) submissions for the Celect filter, and FDA has taken no administrative, advisory, or judicial action to remove either the Tulip or the Celect filters from the market, and they both remain on the market today." Harvey Report, p. 3. Because Cook has complied with the standards related to the design of its filters, and FDA has never exercised any of the enforcement actions available in its toolkit against Cook's filters, the FDA continues to have reasonable assurance that Cook's filters are safe and effective for use in patients.

In sum, FDA has deemed the Celect filter to be safe and effective, and has never taken any action to rescind that determination. As a result, Plaintiffs' claims that the filters are defective – *i.e.* that they are unreasonably dangerous and unsafe – or that Cook was negligent, are plain attempts to impose state law requirements "different from or in addition" to federal requirements. *See e.g., Wolicki- Gables v. Arrow Int'l., Inc.*, 634 F.3d 1296, 1301–03 (11th Cir. 2011) (Florida law) (affirming trial court's dismissal of preempted strict liability and negligence claims, including design defect); *McCutcheon v. Zimmer Holdings, Inc.*, 586 F. Supp. 2d 917, 920–23 (N.D. Ill. 2008) (dismissing plaintiff's strict liability, negligence, and warranty claims on preemption grounds).

15

**D.     Even If Not Expressly Preempted, Plaintiffs' Claims Are Impliedly Preempted Because Of The Conflict Created Between Competing Federal And State Obligations That Cannot Coexist**

As noted in Cook's opening brief, Dkt. 8669, pp. 27–29, Plaintiffs' claims are also impliedly preempted due to the conflict created by incompatible and competing obligations imposed on Cook under federal and state law. *See Buckman*, 531 U.S. at 352 ("neither an express pre-emption provision nor a saving clause bars the ordinary working of conflict pre-emption principles."). As the Supreme Court explained in a pair of decisions related to the regulation of drugs, any state law claim that imposes an obligation on a manufacturer that it cannot follow without violating federal law is preempted. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (holding that state law is preempted by federal law when it is "not lawful under federal law … to do what state law required."); *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2480 (2013) ("When federal law forbids an action that state law requires, the state law is without effect.") (internal citations omitted).

Because manufacturers of generic drugs are required by federal law to use the same label as the brand name drug, the *Bartlett* court held state failure-to-warn claims against the generic label are preempted because the generic drug manufacturer cannot change its label in response to a state court determination that it is inadequate in some respect.[9] 133 S. Ct. at 2480. Instead, the party is obligated to follow federal law, and it is the state court obligation that must give way. *See id.* at 2477–80. Conflict preemption exists in any setting where obligations under federal and state law cannot be reconciled, with the key inquiry focused on "whether the private party

---

[9] Importantly, the Supreme Court has rejected the argument that a party faced with an irreconcilable conflict between federal and state law could choose a third route and leave the marketplace altogether. *Bartlett*, 133 S. Ct. at 2480 at 2477 ("We reject this 'stop-selling' rationale as incompatible with our pre-emption jurisprudence. Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligation is not required to cease acting altogether in order to avoid liability.")

could *independently* do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (emphasis added).

Here, Cook received 510(k) clearance for the Celect, and that clearance is expressly conditioned on FDA regulations to preclude Cook from making any unilateral changes to the design of its filters that "could significantly affect the safety and effectiveness of the device." 21 C.F.R. § 807.81(a)(3)(i). More specifically, Cook cannot implement any "significant change or modification in design, material … or manufacturing process" without a new 510(k) application. By claiming that the Celect is defective in their design and labeling, Plaintiffs are seeking to impose through state law that Cook should have designed or labeled the filters differently. However, pursuant to applicable federal regulations summarized above, Cook cannot independently change or modify any aspect of its design materials, or labeling that "could significantly affect the safety and effectiveness of the device." 21 C.F.R. § 807.81(a)(3)(i); *Mensing*, 564 U.S. at 620. In other words, even if Cook could affect these changes by going to FDA, the fact it cannot make the change unilaterally triggers implied preemption.

By definition, any change that Plaintiffs argue is required to comply with state law "significantly affect[s] the safety and effectiveness of the device," because any difference that would transform a device from an unreasonably dangerous product to a safe and effective product surely "significantly affects" its safety and effectiveness. Indeed, that is the premise of Plaintiff's claim. To make significant changes, Cook would have to submit a separate 510(k) application to FDA, FDA would review the application, decide whether to grant it and under what conditions, and then regulate the changed device as a new device. In short, Cook cannot "independently" make the kind of changes Plaintiffs claim are necessary to make the devices safe under state tort law. *Mensing*, 564 U.S. at 620 (explaining that "whether the private party

17

could *independently* do under federal law what state law requires of it" is the touchstone of conflict preemption analysis) (emphasis added).  Therefore, Plaintiffs' state-law claims are impliedly preempted through the straightforward application of the Supreme Court's conflict preemption rule.  *See id.; see also Bartlett*, 133 S. Ct. at 2477–80.

Accordingly, Plaintiffs' claims are also impliedly preempted and fail as a matter of law.

## CONCLUSION

For the reasons detailed above and in Cook's opening brief, Dkt. 8669, the Court should grant judgment summary judgment on all claims against the Cook Defendants by all Plaintiffs who received the Celect, and specifically including Plaintiffs Tonya Brand, because her claims are preempted by federal law.

Respectfully submitted,

Dated: October 8, 2018                     /s/ Andrea Roberts Pierson

Andrea Roberts Pierson (# 18435-49)
Jessica Cox (# 26259-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
Email:  andrea.pierson@faegrebd.com
Email:  jessica.cox@faegrebd.com

Charles Webber (# 215247)
Bruce Jones (# 179553)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Email:  chuck.webber@faegrebd.com
Email:  bruce.jones@faegrebd.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 8, 2018, a copy of the foregoing COOK DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.  Lead Co-Counsel for Defendants will serve any non-CM/ECF registered parties.

                                                    */s/Andrea Roberts Pierson*