## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to the Following Actions only:

*Brand v. Cook Medical, Inc. et al.,*
Case No. 1:14-cv-06018-RLY-TAB

### COOK DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS OF DR. ROBERT McMEEKING

*Daubert* surely doesn't sanction "stacked-deck" calculations. But that is precisely what Dr. McMeeking relies on to support his opinion that the Celect filter is subject to perforation (notwithstanding that this is a fracture case) and suffers from a design defect. Ironically, Dr. McMeeking acknowledges in his report that one of the relevant standards for medical devices is that they should "be designed and manufactured in such a way that, during *normal conditions of use*, they are suitable for their intended purpose." Dkt. 8655-1, McMeeking Report at 11 (emphasis added). But despite this representation, Dr. McMeeking relies on a series of stacked *worst-case* assumptions—which he acknowledges may not exist in any human being—to produce a calculation that he claims supports his opinion that the Celect design is subject to perforation and other risks. His opinions are not the product of a reliable methodology, not helpful to the jury, and not based on any relevant expertise. The Court should exclude them.

### A. Cook Accurately Characterized Dr. McMeeking's Testimony in Its Motion.

Plaintiff suggests multiple times that Cook mischaracterized Dr. McMeeking's testimony, but that is patently untrue.

First, while Plaintiff denies it, Dr. McMeeking did testify that he stacked five or six worst-case assumptions in all of his mathematical calculations. Here is his discussion of using five worst-case scenarios in his calculations:

> Q: So is it correct to say that <u>your fatigue calculations are based on five worst-case scenarios</u>? One is, you're taking the stress that exists 2 millimeters below the cap, right?
> A: Correct.
> Q: Second is that Valsalva will reduce the diameter of the IVC by 80 percent?
> A: Correct.
> Q: Third is that Valsalva will compress the IVC the same amount with a filter in it as it would with no filter, correct?
> A: That's correct.
> Q: And the fourth is a 40-millimeter span between the legs of the filter, correct?
> A: That's correct.
> Q: And then the fifth is that you're taking the largest and the smallest allowable IVCs, correct?
> A: That's correct.
>
> \* \* \*
>
> Q: So we've got, if I'm counting right, <u>five worst-case scenarios employed in doing these calculations, correct</u>?
> A: <u>That's correct</u>.

Dkt. 8655-2, McMeeking Dep. at 148-49, 152 (emphasis added). Here he discusses using six of them:

> Q: [I]n <u>all of the calculations you're doing</u>, you're using [1] worst-case perforation; [2] worst-case endothelialization; [3] worst-case size of vena cava; [4] worst-case stresses; and [5] two millimeters below the [filter] cap, correct?
> A: Correct.
> Q: Okay. And then when you add in the effect of Valsalva in your analysis, you're using [6] the 80 percent [compression amount] again, the worst case, right?
> A: That's correct.

*Id.* at 166 (emphasis added).

Second, contrary to Plaintiff's position that Dr. McMeeking *is* aware of these conditions existing in the real world, Dr. McMeeking repeatedly testified that he *didn't know* whether the combination of such worst-case scenarios might ever occur in real-life:

> Q:   Do you know how many – whether there are any people for whom all five of those worst-case scenarios exist?
> A:   I don't know.
>
> * * *
>
> Q:   And again, do you know if those have ever existed together in a human being?
> A:   I don't know.
> MS BAUGHMAN: Objection. Form.
>
> * * *
>
> Q:   And again, I think you testified before, you don't know whether all of those worst cases ever exist at once in a human being in real life, correct?
> A:   That's correct.

*Id.* at 149, 152; Ex. A, McMeeking Dep. at 163.   Plaintiff's counsel even noted Dr. McMeeking's repeated testimony to this effect in her own questioning of Dr. McMeeking, starting one of her questions with: "You testified earlier that you weren't aware how often the various worst-case conditions exist in humans." Dkt. 8655-2, McMeeking Dep. at 279.   And whether theoretically possible or not in *some* human being, Dr. McMeeking conceded that he has no idea whether these worst-case scenarios existed in Ms. Brand:

> Q:   Do you know if [five identified worst-case scenarios] have ever existed in [Ms. Brand]?[1]
> A:   I do not know.
>
> * * *
>
> Q:   And you don't know whether [the worst-case scenarios being discussed] existed in Mrs. Brand?
> A:   No, no.

*Id.* at 153; Ex. A, McMeeking Dep. at 163.

Third, contrary to Plaintiff's assertion that Dr. McMeeking "*did* use the same assumptions" in his finite-element analysis (FEA) as in his mathematical analysis, Dkt. 9185,

---

[1] The transcript shows this question as being: "Do you know if they have ever existed in this brand?" Cook believes that is a mis-transcription, and that "this brand" should be "Ms. Brand."

Response at 4, Dr. McMeeking clearly conceded that he did *not*, answering "Not always" to the question "were those same worst-case scenario assumptions also built into the FEA model?" Dkt. 8655-2, McMeeking Dep. at 237.  And the next <u>ten or so pages</u> of the deposition transcript were devoted to identifying different assumptions between the FEA modelling and the mathematical analysis, *id.* at 238-45, including differences in the leg and arm spans and differences in the assumed deformation of the vena-cava wall, to take just a couple examples, *id.* at 238-39.  While Dr. McMeeking may have run multiple FEA analyses, the analysis offered to validate his "hand" mathematical calculations was plainly not based on the same assumptions.

Thus, Plaintiff's claim that Cook mischaracterized Dr. McMeeking's testimony is wrong.

**B.  Dr. McMeeking's Testimony Is Fundamentally Unreliable.**

Dr. McMeeking's opinion is essentially: "The Celect is defective because it cannot withstand multiple worst-case scenarios.  I don't know whether or not those multiple worst-case scenarios ever happen in real life, let alone how frequently, and I do not know whether any of them ever existed in Ms. Brand's body."  But "an expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions <u>must be supported by evidence</u>."  *MDG Int'l, Inc. v. Australian Gold, Inc.*, 2009 WL 1916728, at *4 (S.D. Ind. June 29, 2009) (emphasis added) (citing cases).  Dr. McMeeking concedes that he has no idea whether any (let alone whether five or more) worst-case scenarios ever occur in any real live person who has a Celect filter.  Thus, his opinions are not based on any evidence.

In permitting Dr. McMeeking to testify in the *Hill* case, this Court suggested it was satisfied by Dr. McMeeking's explanation that "one must know the worst-case conditions so that they can be taken into account when considering what is an appropriate design for a large population of patients who are going to receive the implant." Dkt. 6917, at 7 (citing McMeeking

Hill Dep. at 305). But there is a massive divide between (1) "know[ing]" and "tak[ing] into account" worst-case scenarios in the design process and (2) asserting or implying that stacked worst-case scenarios <u>actually exist</u> in <u>actual human beings</u> in the real world. Cook does not dispute that considering "worst-case assumptions" may be an appropriate exercise in the design process. But Dr. McMeeking does not limit his reliance on "worst-case assumptions" to critique the adequacy of Cook's design process. Instead, he takes a further, impermissible leap of rolling together all these worst-case assumptions—admittedly with no idea whether or how often they occur—into a mathematical analysis that he claims then supports his opinion that the product is defective <u>in the real world</u>. Such an approach fails *Daubert* standards. *MDG Int'l*, 2009 WL 1916728, at *4 (expert's assumption must be based on actual evidence); *see also Smith v. Biomet, Inc.*, 2004 WL 5499511, at *3 (N.D. Ind. Apr. 12, 2004) ("There can be no doubt that where an expert rests his opinion on certain empirical assumptions, the assumptions must be grounded in evidence." (citing cases)). "Anything less would nullify the portion of Fed. R. Evid. 702 that requires an expert's testimony to be 'based upon sufficient facts or data.'" *Smith*, 2004 WL 5499511, at *3 (quoting *Zenith Elecs. Corp. v. WH–TV Broad. Corp.*, 2003 WL 22284326, at *4 (N.D. Ill. Oct. 2, 2003), aff'd, 395 F.3d 416 (7th Cir. 2004)). Dr. McMeeking's opinions are based on assumptions that have no connection to any evidence or real-world experience.

Plaintiff misses Cook's point in arguing about Dr. McMeeking not developing or publishing his methodology outside of litigation. Dkt. 9185, Response at 8-9. Again, Cook is not quibbling with the general engineering analysis—either the mathematical calculations or the FEA—utilized by Dr. McMeeking, but rather the <u>application</u> of that analysis to purport to provide calculations and opinions relevant to the IVC filter in the real world. In relying on all of his worst-case scenarios and changing assumptions, Dr. McMeeking is at best engaged in only a

5

theoretical exercise, and the relevant question is whether his use and application of well-recognized engineering techniques in this context would be approved for publication in a medical journal or relied on outside the courtroom to assess IVC filters. Plaintiff offers no reason to suggest that they would; she simply disclaims a need to provide such proof.

In short, Dr. McMeeking's reliance on hypothetical worst-case scenarios rather than Ms. Brand's actual circumstances or anyone's actual circumstances, for that matter, flunks the requirement that expert opinions be based on evidence, not hypothesizing or mere say so. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (expert's "*ipse dixit*" is insufficient). The Court therefore should exclude his opinions.

### C. Dr. McMeeking's Safer-Alternative-Design Opinions Are Not Adequately Supported.

Dr. McMeeking's safer-alternative-design opinion rests primarily on the concept that elongated legs (with what he dubs "perforation limiters") would have increased surface area and therefore exert less pressure at the leg and thus remain in the IVC. But he concedes that he has done absolutely no testing—physical or mathematical—to determine whether his proposed alternative designs would actually: 1) perforate or fracture less often, and 2) otherwise work as well as the Celect.

> Q. Okay. And have you done any calculations or any testing to figure out how much of a reduction in fracture you believe you would get with your alternative ideas?
> MS. BAUGHMAN: Objection. Form.
> A: Only that if the perforation limiters are successful, there would be a substantial reduction in the fracture rate.
> Q. Do you know how much?
> MS. BAUGHMAN: Objection. Form.
> A: No, I do not.

Dkt. 9185-5, McMeeking Dep. 184. There is also no quantification of the "substantial reduction" in fracture that Dr. McMeeking predicted in explaining his causation opinion:

6

> Q: What's your basis for saying that [adding an "elongated leg" to the filter] more probably than not would have avoided the fracture that she had?
> A. Because the modification to the design would have made it less probable, substantially less probable that the primary legs would perforate the wall of the vena cava, and since perforation is something that makes it more likely for a fracture to occur, containing the perforation would have helped to limit the probability of fatigue fracture.
> Q. Do you know how much it would have limited the probability of fatigue fracture?
> MS. BAUGHMAN: Objection. Form.
> A: Other than it being substantial, I don't have an exact figure.

*Id.* at 224-25. And these are the passages that Plaintiff cites in support of Dr. McMeeking's testimony. Dkt. 9185, Response at 10. They show that there is nothing to support Dr. McMeeking's safer-alternative-design opinion beyond his unquantified statement that fracture would be "substantially less probable" to have occurred in Ms. Brand.[2] His opinions as to the Tulip "petal" design are similarly supported only by mathematical calculation of pressures, but no calculation or evidence about whether the difference in pressures would have avoided a fracture in Ms. Brand. Dkt. 8655-1, McMeeking Report at 48-51; Ex. A, McMeeking Dep. 28, 176. That too is inadequate. Dr. McMeeking's safer alternative-design opinions are prototypical "junk science."

Dr. McMeeking also cites non-retrievable filters, such as Boston Scientific's Greenfield filter and Braun's Vena Tech filter, as safer alternative designs. But the Celect is a retrievable filter, which means it's a whole different ballgame than the Vena Tech or Greenfield filters. And that very difference recently led a federal court to dismiss a plaintiff's design-defect claims in another IVC-filter case—ironically, a case where plaintiff claimed it was the Greenfield filter that was defective because the filter could have been made retrievable, like the Celect—and on a Rule 12 motion, no less:

---

[2] While Plaintiff suggests Dr. McMeeking did bench tests of both types of filters, he testified clearly: "I did no bench tests." (Dkt. 8655-2, McMeeking Dep. 182.)

> [B]ased upon Plaintiff's own allegations, the Greenfield Filter, which is a permanent filter, is not comparable to a retrievable filter, since the design and purpose of these two products is different. Therefore, Plaintiff's attempt to allege that the retrievable filter represents a feasible design alternative is unavailing.

*Oden v. Boston Sci. Corp.*, --- F. Supp. 3d ---, 2018 WL 3102534, at *5 (E.D.N.Y. June 4, 2018). The court cited three other federal district court cases holding that "a plaintiff cannot satisfy his burden to propose a feasible alternative design by proposing that an entirely different product could have been used." *Hilaire v. DeWalt Indus. Tool Co.,* 54 F. Supp. 3d 223, 248-49 (E.D.N.Y. 2014); *see also Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 405 (S.D.N.Y. 2013); *Pinello v. Andreas Stihl AG & Co. KG*, No. 08 CV 452, 2011 WL 1302223, at *16 (N.D.N.Y. Mar. 31, 2011).

One final point: none of Dr. McMeeking's safer-alternative-design opinions are specific to Ms. Brand's anatomy. He has done no work to show how his theoretical opinions relate to Plaintiff. Dkt. 9185-5, McMeeking Dep. 38-39; 184; 224-225. He must do that before he may testify that a different design would more likely than not have prevented fracture <u>in Ms. Brand</u>. Plaintiff cites cases for the proposition that physical testing is not required to support Dr. McMeeking's proposed alternative design, but that misses the point. Dr. McMeeking has not done physical <u>or mathematical</u> testing, or any other testing, for that matter. The Seventh Circuit has generally recognized "the importance of testing in alternative design cases." *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996). No such testing exists here.

8

### D. Dr. McMeeking's Opinions Will Not Assist the Jury.

Nothing in Plaintiff's response alters Cook's position that Dr. McMeeking's opinions will not help the jury because his analysis is not specific to Ms. Brand's circumstances. Whether or not "worst-case" scenarios are important to evaluate in the design process, and whether or not "worst-case" conditions are rare or relatively common, the bottom line is that there is no evidence that Ms. Brand represented any worst-case scenario. *Daubert* instructs that the proffered testimony must be "sufficiently tied to the facts of the case" to aid the jury. *Daubert*, 509 U.S. at 591. Dr. McMeeking has ignored "the facts of the case" in rendering his opinion that Ms. Brand <u>in particular</u> would have avoided fracture if a different filter had been used.

The ladder cases that Plaintiff cites to justify Dr. McMeeking's "worst-case" analysis pertain to situations where the "worst-case" condition assumed by the expert <u>corresponded with the plaintiffs' actual use</u> and foreseeable circumstances. *See Picken v. Louisville Ladder, Inc.*, No. 11-13044, 2013 WL 3896570, at *2 (E.D. Mich. July 29, 2013) ("Here, [plaintiff's experts] calculated the stress placed on the ladder based upon Plaintiff's weight and location on the fifth step on the ladder, and took into account Plaintiff's activity (sanding) at the time of the accident."); *Jackson v. Louisville Ladder Inc.*, No. 1:11-CV-1527, 2013 WL 1729299, at *6 (M.D. Pa. Apr. 22, 2013). These cases do not bear "remarkable" similarity to this case, as Plaintiff contends, Dkt. 9185, Response at 16, they actually underscore <u>Cook's position</u> that expert testimony must fit the facts of the case to be admissible.

### E. Dr. McMeeking Does Not Have the Right Qualifications for His Opinions in This Case.

Plaintiff spills much ink reciting Dr. McMeeking's credentials as a mechanical engineer. Dkt. 9185, Response at 4-6. Cook does not contend that Dr. McMeeking is unqualified to speak to mechanical engineering subjects within the realm of his expertise. But no matter how

9

qualified a mechanical engineer he may be, he is properly excluded if his expertise does not match the purpose for which he is offered. *See, e.g.*, *Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (excluding expert testimony because "an individual with a degree in mechanical engineering is not qualified to give expert testimony on medical questions"); s*ee also Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 977 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) (excluding engineer with wrong "engineering prowess" who used FEA rather than actual testing because FEA did not constitute appropriate validation of opinions). It surely goes without saying that opinions as to a defect in an IVC filter placed in the human body require a different level of relevant expertise—specifically biomedical engineering expertise—than might be required for opinions about a table saw, the example cited by Plaintiff. *See* Dkt. 9185, Response, at 7 (citing *Bonilla v. Rexon Indus. Corp.*, No. 1:13-cv-01830-SEB-MJD, 2015 WL 10792026, at *6 (S.D. Ind. Aug. 19, 2015). Moreover, the expert challenged in *Bonilla* actually had substantial experience with table saws, testifying as an expert in numerous table-saw cases and as an engineering consultant for 38 years on the safety of many machines, including table saws, as well as personal experience in carpentry and woodworking. *Bonilla*, 2015 WL 10792026, at *6.

As Plaintiff herself noted, the touchstone is "relevant expertise" and "a court is entitled to be skeptical about testimony by a witness outside his normal field of practice." *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 719 (7th Cir. 1998). The Court should be skeptical here and exclude Dr. McMeeking's opinions.

## CONCLUSION

Dr. McMeeking's opinions should be excluded in whole from evidence under Rule 702 and *Daubert*.

Respectfully submitted,

Dated: October 8, 2018

s/James Stephen Bennett
James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana  46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
stephen.bennett@faegrebd.com

Charles Webber (# 215247)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-8719
Facsimile: (612) 766-1600
Email:  chuck.webber@faegrebd.com

J. Joseph Tanner (# 11856-49)
Andrea Roberts Pierson (# 18435-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  joe.tanner@faegrebd.com
E-Mail:  andrea.pierson@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

11

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2018, a copy of the foregoing was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.  Lead Counsel for Defendants will serve any non-CM/ECF registered parties.

s/James Stephen Bennett