**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

---

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

---

This Document Relates to Plaintiff

    *Tonya Brand*
    No. 1:14-cv-06018-RLY-TAB

---

**COOK DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE <u>EXPERT
OPINIONS OF DR. GREGORY GORDON</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

I.    DR. GORDON'S TESTIMONY SHOULD BE EXCLUDED UNDER
RULE 37 AND WEBSTER ................................................................................. 4

II.    OPINIONS ABANDONED BY DR. GORDON OR PLAINTIFF
SHOULD BE EXCLUDED .................................................................................. 6

III.    THE COURT SHOULD EXCLUDE DR. GORDON'S REMAINING
OPINIONS UNDER RULE 702 AND *DAUBERT*. ............................................ 7

      A.    Dr. Gordon Is Unqualified To Opine on a Design Change to the
Celect's Primary Struts and Other Design Features of Filters. ................... 8

      B.    The Court Should Bar Dr. Gordon from Opining on the Celect's
Design Because He Has No Reliable Methodology. ............................... 11

      C.    The Court Should Bar Dr. Gordon from Opining on the Content of
Medical Literature.................................................................................... 15

      D.    Dr. Gordon's Opinions on Causation All Stem from an Admittedly
Flawed Differential Diagnosis and Must Be Excluded............................ 18

IV.    Dr. Gordon Fails To Apply Reliable Methodology in Linking the Filter
Design to its Perforation, Malposition, and Fracture............................................ 19

      i.    Dr. Gordon Fails To Apply Reliable Methodology in
Linking the Celect's Perforation, Malposition, and Fracture
to Plaintiff's Alleged Injuries........................................................ 22

      B.    The Court Should Bar Dr. Gordon's Opinions About the OUS
Study. ..................................................................................................... 24

      C.    The Court Should Bar Dr. Gordon from Testifying About the
Adequacy of the Celect's IFU................................................................. 26

V.    Dr. Gordon's Testimony Cannot Help a Jury. ...................................................... 32

CONCLUSION................................................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*American Computer Innovators, Inc. v. Electronic Data Systems Corp.*,
    74 F. Supp. 2d 64 (D. Mass. 1999) ....................................................................12

*Bourelle v. Crown Equip. Corp.*,
    220 F.3d 532 (7th Cir. 2000) ............................................................................31

*Bourjaily v. United States*,
    483 U.S. 171 (1987) .........................................................................................13

*Brown v. Burlington N. Santa Fe Ry. Co.*,
    765 F.3d 765 (7th Cir. 2014) ............................................................................22

*C.W. ex rel. Wood v. Textron, Inc.*,
    807 F.3d 827 (7th Cir. 2015) ............................................................................14

*Chapman v. Maytag Corp.*,
    297 F.3d 682 (7th Cir. 2002) ............................................................................14

*Ciomber v. Coop. Plus, Inc.*,
    527 F.3d 635 (7th Cir. 2008) ............................................................................30

*Claar v. Burlington Northern R.R. Co.*,
    29 F.3d 499 (9th Cir. 1994) ...................................................................3, 18, 24

*Clark v. Takata Corp.*,
    192 F.3d 750 (7th Cir. 1999) ............................................................................15

*Ervin v. Johnson & Johnson*,
    492 F.3d 901 (7th Cir. 2007) ............................................................................19

*Finley v. Marathon Oil Co.*,
    75 F.3d 1225 (7th Cir. 1996) ............................................................................30

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)..........................................................................................12

*In re Zimmer Nexgen Knee Implant Prod. Liab. Litig. (Joas v. Zimmer, Inc.)*,
    218 F. Supp. 3d 700 (N.D. Ill. 2016), *aff'd sub nom. In re Zimmer, NexGen
    Knee Implant Prod. Liab. Litig.*, 884 F.3d 746 (7th Cir. 2018)..................20, 21, 22

*Jaurequi v. Carter Mfg. Co., Inc.*,
    173 F.3d 1076 (8th Cir. 1999) ..........................................................................31

*Lennon v. Norfolk & W. Ry. Co.*,
   123 F. Supp. 2d 1143 (N.D. Ind. 2000) ........................................................3, 18

*Lewis v. CITGO Petroleum Corp.*,
   561 F.3d 698 (7th Cir. 2009) .......................................................................4, 22

*Myers v. Illinois Cent. R.R. Co.*,
   629 F.3d 639 (7th Cir. 2010) ............................................................................21

*Oden v. Boston Scientific Corp.*
   No. CV180334SJFSIL, 2018 WL 3102534, at *5 (E.D.N.Y. June 4, 2018) ..........................10

*Orion Sales, Inc. v. Emerson Radio Corp.*,
   148 F.3d 840 (7th Cir. 1998) .....................................................................1, 5, 6

*Reed v. City of Chicago*,
   No. 01 C 7865, 2006 WL 1543928 (N.D. Ill. June 1, 2006) ...................................25

*Salgado v. Gen Motors Corp.*,
   150 F.3d 735 (7th Cir. 1998) ............................................................................5

*Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*,
   No. 1:05-CV-207, 2007 WL 1850858 (N.D. Ind. June 25, 2007) .............................25

*United States v. Berkowitz*,
   927 F.2d 1376 (7th Cir. 1991) ...................................................................1, 5, 6

*Watkins v. Telsmith, Inc.*,
   121 F.3d 984 (5th Cir. 1997) ............................................................................23

*Webster v. Ctr. For Diagnostic Imaging, Inc.*,
   2018 WL 2136451 (S.D. Ind. May 9, 2018) ........................................................5

**STATE CASES**

*Banks v. ICI Americas, Inc.*,
   450 S.E.2d 671 ...............................................................................................11

*Daubert v. Merrell Dow Pharm.*
   509 U.S. 579, 589-90 (1993) ......................................................................8, 23

*Ogletree v. Navistar Int'l Transp. Corp.*,
   500 S.E.2d 570 (Ga. 1998) ...............................................................................11

*Slisze v. Stanley-Bostitch*,
   979 P.2d 317 (Utah 1990) ................................................................................29

RULES

Evidence Rule 702 ...................................................................................1, 3, 4, 7, 13, 21

Fed. R. Civ. P. 26.........................................................................1, 2, 3, 5, 6, 16, 20, 30

Fed. R. Civ. P. Rule 37 ......................................................................1, 2, 3, 4, 5, 18, 33

Local Rule 7-1.........................................................................................................5

OTHER AUTHORITIES

Harris Stutman, MD, *A Longitudinal Medical Record Is Key to Clinical Decision
Support*, CLINICAL INNOVATION+TECHNOLOGY (Nov. 5, 2010)
https://www.clinical-innovation.com/topics/ehr-emr/longitudinal-medical-
record-key-clinical-decision-support ........................................................................3

Clement J. Grassi, M.D., et al., *Quality Improvement Guidelines for Percutaneous
Permanent Inferior Vena Cava Filter Placement for the Prevention of
Pulmonary Embolism*.............................................................................14

*Quality Improvement Guidelines for the Performance of Inferior Vena Cava
Filter Placement for the Prevention of Pulmonary Embolism*, 22 J. VASC.
INTERV. RADIOL. 1499-506, 1503 (2011) .............................................17

Stedmans Medical Dictionary 512920.............................................................2

## INTRODUCTION

There are multiple grounds to strike Dr. Gregory Gordon's testimony in its entirety:

1)      His mid-deposition withdrawal of a huge number of his opinions justifies exclusion under Federal Rules of Civil Procedure 26(a)(2)(B) and 37, consistent with Chief Judge Magnus-Stinson's recent decision in *Webster v. Ctr. For Diagnostic Imaging, Inc.*, 2018 WL 2136451, at *6-8 (S.D. Ind. May 9, 2018).

2)      His lack of qualification, lack of any reliable methodology, and lack of "fit" further justify exclusion pursuant to Federal Rule of Evidence 702, Federal Rule of Civil Procedure 26(a)(2)(B), and the Seventh Circuit's application of *Daubert*.

Plaintiff has offered absolutely no argument on the first ground, so she has waived any opposition to Cook's request for exclusion.  The Court should exclude Dr. Gordon's testimony without further ado.[1]  But even if the Court were to overlook Plaintiff's failure to offer a response on the first ground of exclusion, her arguments on the second ground are meritless. Either way, the Court should exclude Dr. Gordon's testimony in its entirety.

Moreover, as Cook explains below, Dr. Gordon is unqualified to offer many of the opinions he espouses on myriad topics related to United States Food and Drug Administration ("FDA") regulations and regulatory law, design and engineering, neurosurgery and vascular surgery, epidemiology, and more.  At best, Dr. Gordon is a currently non-practicing interventional radiologist.  While that may qualify him in the limited field of interventional radiology, his opinions are otherwise precluded by the lack of any reliable methodology, which is well-documented by (1) his failure to provide any cognizable, relevant bases for many of his

---

[1] *See, e.g.*, *Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840, 843 (7th Cir. 1998) (collecting cases) ("We have noted on many occasions, however, that arguments raised for the first time at oral argument are waived."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (collecting cases) ("We repeatedly have made clear that perfunctory and undeveloped arguments . . . are waived . . . .").

opinions, and (2) his total about-face on key opinions in this case.  Dr. Gordon's opinions on the Celect's instructions for use ("Celect IFU"); the protocol and conduct of the OUS clinical study; and the definitions and outcomes in the OUS study are but a few additional examples of opinions which lack both scientific reliability and fit.

Dr. Gordon has gone from (1) saying "to a reasonable degree of medical certainty" (Gordon Report at 1, 16, 43, 45) or even "beyond a reasonable doubt" (Gordon Dep. 330:1-12) that a defect in Plaintiff's Celect filter caused her filter to fail and caused her allegedly wide-ranging injuries, to (2) the complete withdrawal of key opinions and his admission under oath that he cannot state his medical causation opinions to a reasonable degree of medical certainty at all.  *See* Expert Report of Gregory I. Gordon, M.D., dated 4/30/2018 [Dkt. No. 8664-1] ("Gordon Rept."), pp. 1, 16, 43, 45; Deposition of Gregory I. Gordon, M.D., dated 6/12/2018 [Dkt. No. 9172-1] ("Gordon Dep.") at 330:1-12; *see also* The Cook Defendants' Notice of Supplemental Authority in Support of Motion To Exclude Expert Opinions of Dr. Gregory Gordon or, Alternatively, Motion for Relief Pursuant to Rule 37(c) [Dkt. No. 9098] ("Rule 37 Motion"), pp. 2-6.  Dr. Gordon admits his new opinions contradict his report, and he admits that both his old and new opinions are based on the same flawed methodology:  reviewing medical records and "[thinking] about it."   His more-extensive thinking (apparently just before or during his deposition)[2] caused Dr. Gordon to "realize" that he (1) had never examined Plaintiff; (2) did not know her "longitudinal situation;"[3] (3) did not fully understand Plaintiff's "morbidities," of

---

[2] Dr. Gordon issued a Rule 26 report on April 30, 2018.  Plaintiff's counsel served a list of nine corrections to the Dr. Gordon's report on May 29, 2018.  Hours before Dr. Gordon's deposition, Plaintiff's counsel served a rebuttal report issued by Dr. Gordon, which is the subject of Cook Defendants' Motion to Strike Specific Rebuttal Opinions [Dkt. No. 8461].  None of these reports or corrections disclosed the sweeping changes Dr. Gordon made to his opinions at deposition.  He was deposed for seven hours on June 12, 2018, during which time he changed many of his opinions, and Plaintiff's counsel served a three-page errata sheet to Dr. Gordon's deposition transcript with still more corrections on July 25, 2018.

[3] The term "longitudinal" in this context means "studied over a period of time." Stedmans Medical Dictionary 512920.  A "longitudinal patient record" is a term used to describe the patient's health records or conditions

which there are many; and (4) failed to consider her "other sources of pain."  Gordon Dep. at 330:19-24; 343:2-10.  Dr. Gordon changed key opinions—not based on the receipt of a new test, study or record—because he "thought" about them further.  That is not science; that is an expert on a mission to reach a conclusion solely for the purpose of litigation—an expert who should be excluded under *Daubert*.  *See, e.g.*, *Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method."); *Lennon v. Norfolk & W. Ry. Co.*, 123 F. Supp. 2d 1143, 1151–52 (N.D. Ind. 2000) (relying on *Claar* in excluding expert who had based his opinion on a "very select" review that gave a "lop-sided perspective of the literature").

As to arguments in Plaintiff's Memorandum in Opposition to Cook's Motion to Exclude Expert Opinions of Dr. Gregory Gordon [Dkt. No. 9169] ("Plaintiff's Opposition" or "Opposition"), the first 11 pages are nothing more than an outline of the evidence Plaintiff hopes to present at trial, with no citations and only a handful of mentions of Dr. Gordon – an effort to obfuscate the issue of the admissibility of Dr. Gordon's opinions under Evidence Rule 702 and Rules 26(a)(2)(B) and 37(c).  However, the question is not whether counsel can point to other evidence they believe supports the expert's opinion, but rather whether the plaintiff has proven by a preponderance of the evidence that *the expert* is qualified and has employed a sufficiently reliable methodology to offer the opinion in the first place.  The opinions of an expert who is unqualified or has used unreliable methodology must be excluded.[4]

---

chronologically, in the order in which events, conditions, or treatments occurred.  *See, e.g.,* "longitudinal health record—a comprehensive clinical summary of a patient-based clinical experience, as opposed to the encounter-based, or provider-based records of the past." Harris Stutman, MD, *A Longitudinal Medical Record Is Key to Clinical Decision Support*, CLINICAL INNOVATION+TECHNOLOGY (Nov. 5, 2010) https://www.clinical-innovation.com/topics/ehr-emr/longitudinal-medical-record-key-clinical-decision-support.

[4] Plaintiff's extensive introductory discussion of her view of the case, divorced from Dr. Gordon's qualifications and methodology, is thus irrelevant to this Motion, and Cook will not address it except as it relates to proper *Daubert* issues.

As the Advisory Committee Notes to Evidence Rule 702 explain, the proponent of an expert "*has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence*."  In other words, it is not enough that Dr. Gordon boldly offers myriad opinions or says he has a methodology that he labels as a "differential diagnosis."  To survive this challenge under Rule 702, Plaintiff must prove *by a preponderance of the evidence* that (1) Dr. Gordon's testimony is based on sufficient facts or data, (2) Dr. Gordon's testimony is the product of reliable principles and methods, and (3) Dr. Gordon has reliably applied the principles and methods of his discipline to the facts of the case.  A preponderance of the evidence requires more than words; it requires actual science and expertise in the discipline that applies it. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (burden of establishing admissibility is on the proponent of the expert witness).  This is a burden Dr. Gordon cannot meet.

## ARGUMENT

## I.   DR. GORDON'S TESTIMONY SHOULD BE EXCLUDED UNDER RULE 37 AND WEBSTER.

Cook's Rule 37 Motion explains Dr. Gordon's about-face on key opinions during his deposition. In short, Dr. Gordon completely withdrew a number of opinions (essentially all but three case-specific opinions) and contradicted other opinions in his written report (on topics such as medical causation, damages, and the existence of an allegedly safer alternative design), and his deviation from his written report was neither harmless nor substantially justified.  Cook's counsel spent substantial time during the deposition attempting to discover the scope of his new

and withdrawn opinions, and counsel had to repeatedly ask Dr. Gordon to clarify his opinions after he flatly contradicted his written opinions. Rule 37 Motion, pp. 2-6.[5]

In *Webster*, Chief Judge Magnus-Stinson excluded the testimony of the defendant's medical expert under similar circumstances. Like Dr. Gordon, the expert disclosed numerous opinions for the first time in deposition and directly contradicted key opinions found in the expert's report. Adopting the Seventh Circuit's reasoning in *Salgado v. Gen Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998), Chief Judge Magnus-Stinson noted that "[t]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Webster*, 2018 U.S. Dist LEXIS 78018, *13-26; Rule 37 Motion, pp. 7-8.

Plaintiff's opposition to Rule 37 Motion was due on September 24, 2018, but she filed no opposition.[6] S.D. Ind. Local Rule 7-1(c)(3). Plaintiff's Opposition also does not address the Rule 37 Motion or *Webster*. Plaintiff has waived any argument she may have had in opposition, and Dr. Gordon's testimony should be stricken.[7] *See, e.g.*, *Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840, 843 (7th Cir. 1998) (collecting cases) ("We have noted on many occasions, however, that arguments raised for the first time at oral argument are waived."); *United States v.*

---

[5] Dr. Gordon's motivation for withdrawing his opinions is now transparently litigation-driven: Plaintiff hopes to persuade this Court that evidence of Plaintiff's extensive use of chronic pain medications during the period of time her filter was in place should be excluded from trial just because Dr. Gordon has abandoned his causation opinions (among others). Plaintiff's Omnibus Motions *in Limine* and Authority in Support [Dkt. No. 8873] ("Plaintiff's Omnibus MIL"), pp. 48-50. In other words, Plaintiff hopes that Dr. Gordon's withdrawal of major opinions will knock evidence of her use of pain medications out of the trial. But Plaintiff cannot exclude such evidence from trial because that evidence is highly relevant to more than just Dr. Gordon's opinions. *See* The Cook Defendants' Response in Opposition to Plaintiff's Omnibus Motions in Limine [Dkt. No. 9425], pp. 45-52. In any event, this late-in-the-game litigation tactic is not science and flies in the face of Rule 26(a)(2)(B)'s disclosure requirements.

[6] There is no dispute that counsel for Plaintiff received the motion and was aware of the need to respond. *See* Email from B. Martin to A. Roberts Pierson, dated 9/14/2018, attached as **Exhibit A**; Emails between B. Martin and A. Roberts Pierson, dated 9/18/2018, attached as **Exhibit B**.

[7] Pursuant to S.D. Ind. Local Rule 7-1(d), Cook simultaneously files its proposed order on the motion. Summary ruling on Cook's unopposed motion is appropriate pursuant to S.D. Ind. Local Rule 7-1(c)(5).

*Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (collecting cases) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

## II.   OPINIONS ABANDONED BY DR. GORDON OR PLAINTIFF SHOULD BE EXCLUDED.

As a preliminary matter, Plaintiff's Opposition concedes (either expressly or through failure to oppose Cook's arguments for exclusion) that the following opinions proffered by Dr. Gordon should be excluded:[8]

(1) His opinions that Plaintiff's filter caused her any symptoms (pain, emotional distress, anxiety, etc.) other than short-lived symptoms relating to the apparent extrusion of a fragment from her thigh and the two retrieval attempts (one percutaneous and one open surgery);[9]

(2) His opinions that Plaintiff's filter caused (or will cause) her to undergo past or future medical procedures, tests, physician visits, physician monitoring, and the like, other than those related to treatment for her thigh and two retrieval attempts;

(3) His opinion as to whether Plaintiff will ever experience future symptoms or complications in relation to her filter;[10]

(4) Certain opinions regarding the contents of the published medical literature;[11]

---

[8] These are opinions that have been either expressly conceded in Plaintiff's Opposition or left unaddressed. Arguments that are not raised in Plaintiff's Opposition are waived. *See, e.g.*, *Orion*, 148 F.3d at 843; *Berkowitz*, 927 F.2d at 1384.

[9] Cook Defendants' Memorandum in Support of Motion To Exclude Expert Opinions of Dr. Gregory Gordon [Dkt. No. 8635] ("Cook Memo"), pp. 25-26. Plaintiff concedes that Dr. Gordon is unable to say, to a reasonable degree of medical certainty, that any other symptoms are related to her filter. Plaintiff's Opposition at 22.

[10] *E.g.*, Cook Memo, p. 48. Plaintiff's Opposition does not argue to the contrary.

[11] Cook has raised numerous points in this regard. Cook's Memo, pp. 18-20. The following are points that Plaintiff has not addressed in her Opposition and thus concedes are improper opinions:

- His opinion that filter complications are underreported;
- His opinion that there is no evidence that the Celect filter confers a benefit on patients;
- His opinions regarding the connection between spinal fusion surgery, perforation, and fracture;
- His opinions regarding the connection between various co-morbidities, perforation, and fracture; and
- His opinions regarding the connection between osteophytes, spondylosis, perforation, and fracture.

6

(5) Any and all opinions he may have about the OUS study's design, other than the propriety of its definition of perforation;[12]

(6) Any and all opinions he may have about regulatory issues relating to the Celect, including but not limited to regulatory issues relating to its clearance by the FDA and the FDA's consideration of its IFU;[13]

(7) Numerous specific opinions about how Cook's 2009 Instructions for Use for the Celect were inadequate;[14] and

(8) Numerous specific opinions raised by Dr. Gordon at deposition but not in his report.[15]

The Court therefore should exclude these opinions from trial without further ado.

**III.** **THE COURT SHOULD EXCLUDE DR. GORDON'S REMAINING OPINIONS UNDER RULE 702 AND _DAUBERT_.**

Plaintiff's Opposition supports only the following opinions of Dr. Gordon:

---

[12] Cook Memo, pp. 31-32. Plaintiff now represents that Dr. Gordon will not criticize the design of the OUS study. Plaintiff's Opposition, p. 25 (Dr. Gordon's testimony will not help answer "whether the OUS study was well _designed._").

[13] Cook Memo, pp. 36-45. Plaintiff offers no argument that Dr. Gordon is qualified in regulatory affairs, and she affirmatively represents that he "will not opine as to whether the Celect filter's IFU conformed to FDA requirements." Plaintiff's Opposition, p. 27.

[14] Cook has challenged Dr. Gordon's opinions on the Celect IFU both globally and in specific detail. Cook Memo, pp. 38-45. Plaintiff argues that Dr. Gordon should be permitted to opine that the Celect IFU was inadequate in only four specific ways. Plaintiff's Opposition, pp. 29-32. The following is a list of warnings identified in Dr. Gordon's report and addressed in Cook's briefing but _not_ by Plaintiff, so Plaintiff concedes the point that they are improper:

- His opinion that Cook failed to disclose complete, accurate details about the OUS study in the Celect IFU;

- His opinion that Cook failed to disclose risk of injury to neighboring organs;

- His opinion that Cook failed to recommend closely monitoring patients when the filter is left in place for an extended period of time;

- His opinion that the Celect IFU is "inadequate and misleading through omission of adverse events, definitions and falsification of outcomes" (Gordon Rept., p. 14);

- His opinion that Cook used fraudulent data and/or omitted data in underreporting and/or misstating rates of perforation, penetration, migration, tilt, and IVC stenosis;

- His opinion that Cook failed to mention dangers that were contemplated in design considerations, such as placing the filter in too small of an IVC (15 mm), migration, crossing of the primary legs, tilt, fracture, filter thrombogenicity, inability to retrieve the filter, and penetration of the caval wall; and

- His opinion that Cook failed to warn of possible DVT.

[15] Cook has specifically identified 10 such opinions. Cook Memo, p. 49 & n.52. Plaintiff's does not address any of these in her Opposition and therefore concedes them.

(1) His opinion that the Celect is defective in design because Cook engineers did not make a design change to the Celect's primary struts to add so-called "perforation-limiting features." Plaintiff's Opposition, pp. 14-17.

(2) His opinion that the Greenfield filter is a safer alternative design. Plaintiff's Opposition, pp. 14, 16.

(3) His opinions regarding the state of the art in IVC filter literature in 2009, allegedly based on his review of medical literature. Plaintiff's Opposition, pp. 17-19.

(4) His opinion that Plaintiff's injuries were caused by a defect in the design of the Celect.  Plaintiff's Opposition, pp. 19-22.

(5) His opinion that Plaintiff's Celect filter caused her pain in three specific instances: when a fragment of her filter allegedly migrated out of her thigh, when Dr. Rheudasil attempted to retrieve her filter percutaneously, and when her filter was removed via open surgery. Plaintiff's Opposition, pp. 22-23.

(6) His opinion that the OUS study's definition of "perforation" was non-standard and led to inaccurate results.  Plaintiff's Opposition, pp. 23-27.

(7) His opinion that Cook's 2009 Instructions for Use for the Celect were defective in four specific ways.[16]  Plaintiff's Opposition, pp. 30-31.

The Court should exclude these opinions for a variety of reasons.

### A.    Dr. Gordon Is Unqualified To Opine on a Design Change to the Celect's Primary Struts and Other Design Features of Filters.

As noted in Cook's *Daubert* motion, Dr. Gordon is not an engineer and by his own admission has no expertise in that arena.  Cook Memo, pp. 7-10.  Plaintiff does not argue otherwise.  For this reason, the Court should exclude the design opinions of Dr. Gordon just as it excluded the design opinions of plaintiff's medical expert Dr. Alexander Marmureanu in *Hill*, where the Court held that a physician's opinions on the nature of an alleged filter defect and the material and design properties of the filter were beyond the scope of his expertise.  Entry on the

---

[16] Specifically, that the Celect IFU (1) "should have warned doctors of the increased 'risk of perforation, tilt and fracture' arising from 'the Celect filter's lack of a perforation limiter;'" (2) should have stated what the FDA told physicians in its 2014 Safety Communication: "'suggest[ing] taking out retrievable filters as soon as possible;'" (3) "failed to 'disclose the existence and extent of the risk involved;'" and (4) failed to define "perforation" in the Clinical Studies portion when describing the OUS study conducted between 2005 and 2009 and "does not accurately convey the results of the study." Plaintiff's Opposition, pp. 30-31.

Cook Defendants' Motion to Exclude Expert Opinions of Dr. Alexander Marmureanu, [Dkt. 6683] p. 5.

The only design opinions that Plaintiff attempts to save in her Opposition are Dr. Gordon's claims that (1) Cook should have implemented an engineering design change to the Celect's four primary struts by adding so-called "perforation limiters," and (2) the design of the Greenfield filter is a safer alternative design.  Plaintiff's Opposition, pp. 14-19. To support his qualifications on these two opinions, Plaintiff cites Dr. Gordon's *clinical* experience treating patients and his review of venograms from the OUS study of the Celect (without his so-called "perforation limiters") and his review of unidentified *clinical* literature without reference to any discussion of his so-called "perforation limiters."  *Id.*, p. 14.  *Notably absent* from Plaintiff's Opposition is any citation to any relevant engineering or design qualification to support knowledge or expertise on the subject of IVC filter design generally or perforation limiting features specifically.  Plaintiff identifies no study, research or education by Dr. Gordon in designing IVC filters (there is none); no experience testing IVC filters with and without Dr. Gordon's so-called "perforation limiters" (there is none); no pre-existing knowledge or research on the material properties of the Celect or any other filter (again, none exists); or any other information about how, whether, and when Dr. Gordon would have any basis for knowing if so-called "perforation limiters" can even be mechanically added to the Celect or the additional risks to patients that they may pose. *Id.*, pp. 14-16.  Even if the Court were to consider Dr. Gordon's post-litigation review of patient imaging from a single Cook study of the Celect (without his "perforation limiters") or his review of clinical literature as a potential basis for qualification, *none* of those images included his alleged "perforation limiters" and *none* of the studies to which his counsel points (though Dr. Gordon cited none in his report) discuss the risks and benefits of

his proposed "perforation limiters."[17]  Plaintiff's Opposition gives this Court no basis to believe that Dr. Gordon has ever studied or understood the complicated mechanical and engineering features of IVC filter design or possible design changes, and he has no qualification for doing so. (And his testimony on these points would be cumulative of that of Dr. McMeeking—Plaintiff's engineering expert—in any event.  *See* Cook Defendants' Memorandum in Support of Motion To Exclude Expert Opinions of Dr. Robert McMeeking, p. 2 [Dkt. No. 8654].

Dr. Gordon's opinion that the Greenfield filter is a safer alternative design equally lacks foundation because Dr. Gordon is not qualified to offer it.  Indeed, Dr. Gordon described himself as "ignorant" about the details of the so-called "perforation limiter" on the Greenfield filter. Gordon Dep. at 162:11-21 ("I'm going to be a little bit, forgive me, ignorant or vague on the— the detailed data I can give you about the Greenfield filter.").  Moreover, as the Court held in *Oden v. Boston Scientific Corp.* in dismissing a plaintiff's claim of safer alternative design, "the Greenfield Filter, which is a permanent filter, is not comparable to a retrievable filter, since the design and purpose of these two products is different." No. CV180334SJFSIL, 2018 WL 3102534, at *5 (E.D.N.Y. June 4, 2018).  As a matter of law, the Greenfield filter cannot be cited as a safer alternative design than the Celect.

Qualified physicians who use IVC filters in their practice could potentially testify about the filters from a *clinical* perspective – perhaps critiquing the filters' performance in their patients. But Dr. Gordon purports to testify about the filters' *engineering design* and how a change in that design (including addition of "perforation limiters") might affect their

---

[17] Careful review of Plaintiff's Opposition reveals that Plaintiff does not cite a single piece of scientific literature referencing "perforation limiters" for any filter, much less a retrievable IVC filter or the Celect. Plaintiff's Opposition, pp. 13-14. Nor does she cite a single piece of literature that such a filter performs differently than the Celect, or that it would have performed differently than the Celect did in Plaintiff.

performance. He is the wrong expert to talk about that, so his opinions in that regard should be excluded.

**B.**     **The Court Should Bar Dr. Gordon from Opining on the Celect's Design Because He Has No Reliable Methodology.**

There are additional reasons why the Court should not permit Dr. Gordon to opine on the design change of adding "perforation limiters" to the Celect, the status of the Greenfield filter as a "safer alternative design," or any other aspect of the Celect's design. One is that he has no reliable scientific basis for doing so.

Georgia law dictates the most fundamental elements of an expert's methodology on product design. To evaluate a design defect under Georgia law, at a minimum, the expert must weigh "risks inherent in a product design" "against the utility or benefit derived from the product." *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 674. Thus, for an expert's opinion on product design to be helpful to a jury, the expert must (1) consider all the risks and all the benefits of a product or proposed design modification, and (2) apply scientific and medical expertise to arrive at an opinion about the balance of those risks and benefits. It is that expert comparison of risk and benefit that makes an expert's opinion on design useful to a jury applying Georgia law; an opinion that pronounces a product defective without meaningfully evaluating both risks and benefits does not assist the jury with the design question before it. An expert may not ignore a product's benefits when evaluating its design, and certainly may not focus exclusively on a single factor affecting the analysis. *See Ogletree v. Navistar Int'l Transp. Corp.*, 500 S.E.2d 570, 572 (Ga. 1998) (rejecting the "open and obvious danger" rule as inconsistent with the *Banks* risk-utility test because it focuses on "only one of many factors which affect the product's risk" and "mak[es] that single factor dispositive").

But that is precisely what Dr. Gordon has done here: he has failed to consider any factor other than perforation, and thus cannot opine on the risk-benefit balance of the Celect's design, including his claim that "perforation limiters" would improve the design.  Cook Memo, pp. 11-15.  His methodology on his "perforation limiters" design change amounts to nothing more than "retrospect" and "think[ing]." Gordon Dep. at 158:17-159:11.  And even he admits that his opinions on the Greenfield filter as an alternative design lack a reliable methodology:  "I didn't study the Greenfield filter"; "I haven't looked at the data"; and "I'm going to be a little bit, forgive me, ignorant or vague on the—the detailed data I can give you about the Greenfield filter."  *Id*. at 161:8-20; 162:5-22.

Plaintiff suggests that Dr. Gordon's failure to apply a proper methodology goes only to the weight of his design defect opinion, but she is mistaken.  As detailed in Cook's original motion, his lack of proper methodology goes to *admissibility* under *Daubert*.  *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that *Daubert* focuses on methodology and principles); *American Computer Innovators, Inc. v. Electronic Data Systems Corp.*, 74 F. Supp. 2d 64, 67 (D. Mass. 1999) (under *Joiner*, court must examine an expert's methodology "in determining the threshold admissibility of expert opinion.").  Dr. Gordon's unsupported suggestions that the Celect should have included an additional design feature that he vaguely refers to as "perforation limiters," or that the Greenfield is a safer alternative design—without consideration of the risks and benefits of any design change—is not a reliable risk-benefit analysis.[18]  Even if he were permitted to discuss clinical perforation rates for the Celect,[19] the

---

[18] Occasionally, Dr. Gordon also points to the Cook Tulip filter as having "petals" that he alleges are "perforation limiters," but he also alleges that the Tulip design is also defective (Gordon Dep. at 142:16-21) and that there were risks to the design of the Tulip, including that it was harder to retrieve (*Id*. at 131:9-21).  Dr. Gordon admitted in his deposition in *Pavlock* that he actually advocated for a design change to the Tulip to make it more retrievable. *See* Excerpt from the Deposition of Gregory Gordon, M.D., dated 1/4/2018, ("Gordon Pavlock Dep.") at 71:9-13, attached as **Exhibit C**.

Court should not allow him to label the Celect's design defective or to critique the design based exclusively on his conclusory allegations as to one factor.

Plaintiff argues that Dr. Gordon did in fact discuss other risk factors, including tilt, fracture, and migration.  Cook does not dispute that Dr. Gordon included those words in his report and used them at his deposition.  But Plaintiff's response misses the point:  Dr. Gordon never offered any support for his *ipse dixit* conclusions concerning those risks, and his deposition testimony establishes that he never really considered them at all.  For example, his bald assertion that perforation leads to tilt, migration, and fracture is irrelevant to this analysis because, as he admits, he never studied that connection and does not know whether, or how often, perforation leads to downstream complications such as tilt or fracture.  Gordon Dep. at 278:22-279:23; 378:14-23; 381:23-382:5.  His subjective "belief" of a design causing a domino effect leading to fracture is not proof by a preponderance of the evidence of a reliable scientific methodology and conclusion.  *See* Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).

Indeed, by all accounts the incredibly low fracture rate of the Celect *proves* Dr. Gordon's opinion is not based on reliable science.  Dr. Gordon's report does not identify a filter that fractures less frequently than the Celect.  Gordon Dep. at 150:17-151:1.  He has identified filters made by other manufacturers that fracture excessively.  *Id.* at 152:23-153:3.  And among all of the literature Dr. Gordon purports to have reviewed, he cannot identify a single study proving the alleged "cascade" from perforation to fracture occurs with the Celect or any other filter, or occurs with any particular frequency.  *Id.* at 379:14-23; 381:23-382:5.  Moreover, Dr. Gordon's report and multiple changes/corrections never dispute that the Celect's fracture rate is well

---

[19] As discussed further below, Dr. Gordon should not be allowed to discuss "perforation" rates either.  As discussed, he has not consulted the medical literature on the subject.  *See* Cook Memo, pp. 7-21.  Even his review of the OUS study would be confusing on the subject. *See* Section III.E, *infra*; Cook Memo, pp. 31-32.

within the physician-acceptable range reported in literature[20] and well beneath the Society for Interventional Radiology's ("SIR") accepted rates of 2% to 10%[21] for filter fracture. Plaintiff's impressive list of places in which Dr. Gordon *asserted* his unsupported proposed design change or safer alternative design does not change the fact that he admits he cannot *support* them with a reliable methodology.

Plaintiff repeats Dr. Gordon's mistake in her Opposition. For example, she claims that "Dr. Gordon compared the fracture rates of the Celect to other available filters," but she cannot point to any proof. Plaintiff's Opposition, p. at 16. Indeed, the proof is to the contrary: at his deposition, Dr. Gordon *admitted* that he did not investigate the Celect's fracture rate in his work on this case, does not know its fracture rate, and cannot cite any study showing that another filter has a lower fracture rate than the Celect. Gordon Dep. at 198:6-199:16.[22] He also cannot identify a single filter that tilts, migrates, or fractures less frequently than the Celect. *Id.* at 149:18-151:1. Indeed, his report never discloses any data on fracture rates for the Celect or any other filter.[23] His opinions on non-perforation risk factors are therefore unsupported and inadmissible. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 (7th Cir. 2015); *Chapman v.*

---

[20] *See* Cook Memo, pp. 12-13 & n.7 (noting that Dr. Krumholz's report cites a paper with a 0.8% rate of fracture and that Dr. Gillespie cites numerous other papers with even lower rates).

[21] *See* Clement J. Grassi, M.D., et al., *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, 12 JVIR 137-141 (2001), cited as an authoritative statement by SIR in Dr. Gordon's report. Gordon Rept., pp. 5-6.

[22] "Q. . . .[W]hat did you do to identify studies or tests or support for the rate of fracture of the Celect? A: I don't think I separated out fracture . . .Q: My questions right now are really just about the [Celect's fracture] rate. A: And I don't have a number for you." Indeed, even when he claimed at deposition that the Tulip fractures less frequently than the Celect (a claim he did not make in his report), he was unable to cite a single study supporting that claim. Gordon Dep. at 198:6-8.

[23] *See* Cook Memo, pp. 11-12. Plaintiff's failure to identify any fracture rate information in her Opposition is revealing, as is Dr. Gordon's failure to identify any filter's fracture rate. This is surprising, given his testimony that fracture is a risk that all filters absolutely must avoid at all costs; when asked if *any* filter on the market in 2009 had an *acceptable* rate of fracture, he responded that "[o]ne fracture is too many." Gordon Dep. at 196:1-3.

*Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002); *Clark v. Takata Corp.*, 192 F.3d 750, 758-59 & n.5 (7th Cir. 1999).

Even more tellingly, Plaintiff does not dispute that Dr. Gordon failed to consider the Celect's *benefit* of protecting patients from pulmonary embolism ("PE") and does not seek to justify that omission. *See* Cook Memo, pp. 13-14 (discussing Dr. Gordon's complete lack of investigation before claiming that the Celect confers no benefit at all). Nor does she attempt to explain or justify Dr. Gordon's failure to consider the benefit of the Celect's enhanced retrievability, which he himself acknowledged in his clinical practice. *See id.* at 14 (noting Dr. Gordon's failure to address retrievability at all in his report, despite his positive clinical experience).

In short, Dr. Gordon purports to have analyzed just a single risk factor in this case: perforation. From that analysis, he claims he can offer blanket opinions about his proposed design changes and design alternatives that he admits he did not study. Because Dr. Gordon has failed to consider most of the risks or any of the benefits of the Celect filter, design changes, or his purported safer alternative design, his methodology for opining on the filter's design, including his proposed design change of so-called "perforation limiters," is fundamentally flawed and is entirely untethered to even the most basic risk-benefit analysis required by Georgia law. His opinions will not assist the jury, and the Court should bar Dr. Gordon from offering any opinions on the Celect's design.

## C.   **The Court Should Bar Dr. Gordon from Opining on the Content of Medical Literature.**

Plaintiff misconstrues Cook's argument regarding "state-of-the-art" testimony from Dr. Gordon. Cook does not contend that Dr. Gordon is *unqualified* to review the literature and opine as to what medical science has to say about filters; Cook's contention is that, *by his own*

*admission*, Dr. Gordon has not actually *done so*.  Cook Memo, pp. 17-21.  He often did not even look for support for the opinions he seeks to offer in this case, let alone conduct a comprehensive review of the literature.  Rule 26(a)(2)(B) requires the specific disclosure of the bases for all of Dr. Gordon's opinions.  Citing numerous studies on a reliance list is not the specific disclosure required by Rule 26(a)(2)(B), and his failure to identify the exact studies that support his conclusions undermines his methodology in deriving opinions as to what the literature says.  Statements that purport to do more than merely relay the findings of a specific article are in fact opinions derived from that article, and Dr. Gordon simply has not employed reliable methodology—or indeed any methodology at all—in arriving at such opinions.

As discussed at length in Cook's original motion, Dr. Gordon's report includes nothing more than unsupported *ipse dixit* conclusions about fracture, migration, retrievability, and PE.  *See* Cook's Memo at 11-14, 18-20.  Plaintiff tries to overcome this omission by pointing not to Dr. Gordon's report or deposition testimony, but to the *reliance list* compiled by counsel and attached to the report.  Response Memo, p. 17.  But Dr. Gordon's own deposition testimony establishes that he did not consult the "more than 300 articles, publications, and academic sources" on that list to find support for his opinions.  *See* Cook Memo, pp. 18-20 (citing numerous opinions that Dr. Gordon admits he did not study and cannot support from the literature).  Dr. Gordon freely admits that many of his opinions find no support in any documents of which he is aware, whether on his reliance list or not.[24]

Indeed, the only topic on which Plaintiff even attempts to justify Dr. Gordon's lack of study is his opinion that "perforation results in symptomatic injury in a significant percentage of cases."  Plaintiff's effort is misplaced; this is in fact a perfect example of Dr. Gordon improperly

---

[24] For example, despite his claim that perforation leads to fracture in the Celect, he concedes that he is "not aware of any study being conducted by myself or anybody" as to how often that occurs.  Gordon Dep. at 381:16-22; *see also* Cook Memo, pp. 18-20.

basing his opinion on his review of a single paper.  Plaintiff argues that Dr. Gordon's report *listed* 10 sources, the "majority" of which are peer-reviewed, in support of this opinion. Plaintiff's Opposition, pp. 17-18.  However, Dr. Gordon admitted at deposition that only one of those sources discusses the rate of symptoms in patients with perforation.  Gordon Dep. at 275:14-17, 278:16-21.  And even that one cherry-picked source (Jia et al.) reported that just 8% of patients with perforation had symptoms.  Gordon Rept., p. 3.  Another source cited as authoritative by Dr. Gordon—the SIR guidelines—estimates the rate of clinically significant perforation at a mere 0.4%.[25]  As Cook noted in its Motion, Dr. Gordon concedes that he disregarded other papers that discuss symptomatic perforation—such as the SIR guidelines—and ultimately admitted "we don't know" how often perforation is symptomatic.[26]  Cook's Memo at p. 19 & n.14.  Dr. Gordon thus is in no position to offer a jury a qualified opinion on the rate of symptomatic perforation.  Allowing him to testify that "perforation results in symptomatic injury in a significant percentage of cases," (Gordon Rept., p. 3) rather than that "one study found that perforation resulted in symptomatic injury in X percent of cases," gives the false impression that he has read the relevant literature and is summarizing and interpreting it for the jury—the very thing he admits he did *not* do.[27]

In sum, Dr. Gordon did not review the literature relevant to the opinions he seeks to offer, and his opinions about the medical literature are not the product of a fair, broad review of that literature.  Indeed, many of those opinions are mere litigation-driven rhetoric that Dr. Gordon

---

[25] Drew M. Caplin, et al. for the Society of Interventional Radiology Standards of Practice Committee, *Quality Improvement Guidelines for the Performance of Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, 22 J. VASC. INTERV. RADIOL. 1499-506, 1503 (2011) ("SIR Guidelines").

[26] Dr. Gordon also asserted that Cook is somehow to blame for his lack of knowledge.  Gordon Dep. at 274:22-275:2.

[27] He committed this same error in opining that there was a "10-30% or more chance [Plaintiff] would have long term complications from the Celect filter placement."  Gordon Rept. at 44.  However, he admitted at deposition that he was not actually opining on a review of the literature but relying solely on the aforementioned Jia study.  Gordon Dep. at 365:6-366:4.

*admits* find no support whatever in the literature. *See, e.g.*, Cook Memo, pp. 18-20. That is not an acceptable methodology. *See, e.g.*, *Claar*, 29 F.3d at 502-03 ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method."); *Lennon*, 123 F. Supp. 2d at 1151–52 (relying on *Claar* in excluding expert who had based his opinion on a "very select" review that gave a "lop-sided perspective of the literature.").

The Court should bar Dr. Gordon from offering opinions that purport to rely on and/or broadly summarize current medical knowledge and literature.

**D.      Dr. Gordon's Opinions on Causation All Stem from an Admittedly Flawed Differential Diagnosis and Must Be Excluded.**

Dr. Gordon opined at length in his report about the myriad symptoms and maladies that Plaintiff's filter caused her to experience. Gordon Rept., pp. 16-46. But he admitted at his deposition that he *never examined* Plaintiff, does not know her longitudinal situation, and failed to appreciate her "other morbidities." Gordon Dep. at 330:1-12. And at his deposition, he largely abandoned his opinions based solely on "thought," not a reliable methodology. *See* Rule 37 Motion, Dkt. 9098. Thus, none of his opinions on this subject are admissible.

Plaintiff argues that Dr. Gordon's methodology on causation is really two separate differential diagnoses: the first concerning the reasons for Plaintiff's perforation, malposition, and fracture, and the second concerning the consequences of these issues. But the record clearly shows that Dr. Gordon lacks relevant experience or study and has not familiarized himself with key aspects of Plaintiff's medical procedures, history, and treatment. In fact, Plaintiff's "split analysis" highlights and confirms Dr. Gordon's failure to apply a reliable methodology to support his analysis.

**IV.   DR. GORDON FAILS TO APPLY RELIABLE METHODOLOGY IN LINKING THE FILTER DESIGN TO ITS PERFORATION, MALPOSITION, AND FRACTURE.**

Plaintiff first tries to salvage Dr. Gordon's opinion that a design defect caused Plaintiff's filter to perforate, tilt, and fracture.  As a threshold matter, the Court should note that Dr. Gordon never actually considered the Celect's design as a cause of the tilt or fracture: as noted above, he did not study whether the Celect has a tendency to tilt or fracture *at all*.  *Supra* at III.A.b.  He did read literature regarding IVC filter perforation, but he admits that he did *not* study whether perforation leads to tilt or fracture.  *Id.*  (In the case of the Celect design, its low rate of fracture in all studies and the real world proves otherwise.)  Indeed, Dr, Gordon fully admits that he cannot say how frequently his alleged progression occurs and he has no idea what the fracture rate is for the Celect or any other filter.  Gordon Dep. at 381:16-382:5; 198:24-200:13.  Thus, he cannot have reached a scientifically defensible opinion on whether to rule out the Celect's design as a cause of the tilt or fracture.  This renders his differential diagnosis inadmissible.  *Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007) ("Under *Daubert*, expert opinions employing differential diagnosis must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out.'").

Indeed, neither Dr. Gordon's report nor Plaintiff's Opposition considers whether the Celect's design should have been ruled out as a potential cause of the perforation, tilt, or fracture. Rather, both documents walk through the five potential alternate causes of Plaintiff's filter issues that Dr. Gordon claims to have considered and ruled out, thus blaming the Celect's design *without ever considering whether the design should itself be ruled out*.  This failure even to consider whether the product design should be ruled out as a cause is a fundamental flaw in Dr. Gordon's methodology and goes to the admissibility of his opinion, and not (as Plaintiff urges) merely to the weight those opinions should be given.  Indeed, a differential diagnosis may not

19

even *rule in* a design defect as a mere routine matter without being deemed unreliable. *See In re Zimmer Nexgen Knee Implant Prod. Liab. Litig. (Joas v. Zimmer, Inc.)*, 218 F. Supp. 3d 700, 718 (N.D. Ill. 2016) (decision to rule in design defect as a possible cause was "problematic"), *aff'd sub nom. In re Zimmer, NexGen Knee Implant Prod. Liab. Litig.*, 884 F.3d 746 (7th Cir. 2018).

Plaintiff's attempt to justify Dr. Gordon's differential diagnosis regarding the cause(s) of perforation, tilt, and fracture does nothing to rebut the arguments presented in Cook's Motion. Her entire argument is nothing more than a slightly shortened version of Dr. Gordon's report itself. *Compare* Plaintiff's Opposition, pp. 20-21 *with* Gordon Rept., pp. 42-43. The specific deficiencies in Dr. Gordon's report (and regurgitated in Plaintiff's response) were addressed in Cook's opening memorandum, and Cook will not repeat them here. S*ee* Cook Memo, pp. 26-30.

As Cook previously explained, Dr. Gordon's report also reveals the lack of any scientific basis for ruling in or out alternate causes of her filter malposition, perforation, or fracture. *See* Cook Memo, pp. 25-30. His report identifies no experience in neurosurgery or vascular surgery upon which he draws and no studies or publications on ALIF procedures like Plaintiff's procedure and their effect on the IVC. Gordon Rept., pp. 42-43. It also identifies no testing of any sort. *Id*. And it does nothing to "rule out" the most likely cause of her filter complication: the circumstances and events surrounding Plaintiff's seven-hour spinal and vascular surgeries in 2009.[28] Cook Memo, pp. 23-30. Recall that Dr. Gordon is not a surgeon who would have expert knowledge of what Plaintiff's surgery entailed: he has not participated in an abdominal surgery since his residency and has never cut open a human IVC. Gordon Dep. at 25:1-7; 24:15-25.

---

[28] Dr. Gordon's report includes a headline claiming to rule in the manipulation. However, as Cook's Memo explains, he never actually addresses the manipulation itself. *See* Cook Memo, pp. 26-27. His analysis is strictly limited to the spinal fusion that occurred two inches below where the filter was sitting in the IVC, not to the direct handling and moving of the IVC during the procedure.

Plaintiff does not provide any reliable scientific basis for Dr. Gordon's exclusion of Plaintiff's vascular and spinal surgeries as the cause of her filter malposition and subsequent complications. Plaintiff's Opposition, pp. 19-22. Plaintiff first points to one image—a portable abdominal x-ray (plain film) taken after Plaintiff's surgery—which both Dr. Gordon and Dr. Krumholz admit cannot reveal perforation because the walls of the vena cava cannot be seen. Gordon Pavlock Dep. at 125:15-20; Deposition of Harlan M. Krumholz, MD, dated 6/28/2018 at 315:24-316:10 [Dkt. No. 8642-2]; Deposition of Mark Rheudasil, M.D., dated 2/28/2018, at 185:25-186:2 [Dkt. No. 8674-1];Dr. Gordon Rebuttal to Engineering Report of Dr. Robertson, dated 6/11/2018, attached as **Exhibit D**. And, second, Plaintiff points to the very first follow-up CT imaging that proves "early perforation and likely retroperitoneal, paravertebral hemorrhage or inflammation at the site of posterior leg perforation." Gordon Rept., p. 42. While not cited in his report as a basis for excluding Plaintiff's procedures, in other words, Plaintiff claims that Dr. Gordon can rule out the spinal fusion as a cause of Plaintiff's perforation and fracture, even though *the first follow-up image showed perforation*. This is not science. *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *In re Zimmer*, 218 F. Supp. 3d at 713, 715-16.

Similarly, Dr. Gordon *admits* that Plaintiff's spondylosis and traction and claw osteophytes at the exact location of the filter's deployment contributed to the fracture, Gordon Dep. at 314:17-25, but his report neither rules out those causes in Plaintiff nor provides any basis for doing so. Gordon Rept. at 42.

As the Advisory Committee Notes to Evidence Rule 702 make clear, Plaintiff must prove by *by a preponderance of the evidence* that (1) Dr. Gordon's testimony is based on sufficient facts or data, (2) Dr. Gordon's testimony is the product of reliable principles and methods, and (3) Dr. Gordon has reliably applied the principles and methods of his discipline to the facts of the

case. *Lewis*, 561 F.3d at 705 (burden of establishing admissibility is on the proponent of the expert witness). Dr. Gordon's statement that he considered alternate causes or used a differential diagnosis alone is not enough. *In re Zimmer*, 218 F. Supp. 3d at 713 (citing *Brown*, 765 F.3d at 773). He has to actually *do it*.

Because this "first phase" of Dr. Gordon's differential diagnosis does not rest on a reliable methodology, his opinions based on that flawed methodology are therefore inadmissible. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 774 (7th Cir. 2014).

      i.      **<u>Dr. Gordon Fails To Apply Reliable Methodology in Linking the Celect's Perforation, Malposition, and Fracture to Plaintiff's Alleged Injuries.</u>**

Although Dr. Gordon's admitted failure to consider Plaintiff's medical history undermines both "phases" of his differential diagnosis, his on-record withdrawal of his differential focused more on "phase 2," his opinion of the symptoms stemming from the filter issues. Plaintiff misses the import of that withdrawal: she claims that he merely "chose in his deposition testimony to take the conservative route." Plaintiff's Opposition, p. 22. But this was not merely a "conservative approach," and it certainly was not the approach he took in his report. What Dr. Gordon did in his deposition was to acknowledge that he failed to consider Plaintiff's medical records and appreciate their importance until *after* he rendered his opinions. Gordon Dep. at 330:19-25, 336:25-337:5.[29]

This is not "conservative" testimony to be lauded, it is an admission of a fundamental flaw in the methodology of his differential diagnosis. Dr. Gordon confessed (1) that he failed to

---

[29] Plaintiff suggests that Dr. Gordon "studied" Plaintiff's history by, among other things, speaking with some of her doctors. Plaintiff's Opposition, p. 11. That is untrue: in listing the people with whom he spoke in order to prepare his report, Dr. Gordon listed Plaintiff's experts but not a single treating physician. Gordon Dep. at 212:7-213:25. When he was asked if he spoke to anyone else, he testified that he hadn't. *Id.* at 213:22-25.

rule in potential causes,[30] and (2) once he came to appreciate that those causes should be ruled in, that he could not properly rule them out.  The methodological flaw was so critical that Dr. Gordon himself described his resulting opinions as "withdrawn."  *See* Gordon Dep. at 336:20-337:6, 338:24-339:14, 356:13-25, 360:13-16 (describing his symptom-related opinions as "withdrawn," or affirming that specific language, six times).  Having admittedly ignored possible causes for Plaintiff's symptoms in the differential etiology found in his report, Dr. Gordon cannot possibly be allowed to opine on the etiology of any of Plaintiff's symptoms based on an *ad hoc*, oral editing of that differential etiology at deposition.  *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579, 589-90 (1993); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-91 (5th Cir. 1997).

Notably, Plaintiff does not even mention Dr. Gordon's methodology for these phase 2 opinions in her Opposition.  She argues that his retraction of his opinions should improve his *credibility*, but she does not argue that his methodology was proper.  As argued by Cook, either Dr. Gordon's remaining opinions are the product of the flawed differential, or they are matters of common sense and cannot help a jury.  In the latter event, his opinions would also be unqualified and cumulative: without performing a differential diagnosis, Dr. Gordon can do nothing but parrot Plaintiff's own testimony.  *See* Gordon Dep. at 334:14-21 (deferring to Plaintiff's opinion of "exactly when she felt like she got back to her baseline" in response to a question about the duration of her symptoms after her open surgery).

---

[30] His failure to appreciate the import of Plaintiff's medical history is particularly notable inasmuch as he spent two thirds of his report discussing Plaintiff in particular.  Gordon Rept., pp 16-46.  It is also worth noting that Dr. Gordon wrote (and later recanted) that Plaintiff's filter caused her to experience new and different pain within weeks of her March 2009 spinal fusion. *Id*.., pp. 41, 45-46.  His new opinion, expressed for the first time at deposition, is that Plaintiff's first filter-related symptom was thigh pain that occurred when a piece of her filter allegedly came out of her thigh in May/June 2011.  Gordon Dep. at 339:4-14.  Plaintiff now takes a *third* position, claiming that her pain began as "different and more severe" abdominal pain in early 2011 and migrated/grew leading up to the emergence of a fragment from her thigh.  Plaintiff's Opposition, p. 7.

Regardless, Dr. Gordon's opinions are inadmissible. The Court should bar Dr. Gordon from offering any opinions as to what pain or symptoms her filter has caused her to experience.

**B.**     **The Court Should Bar Dr. Gordon's Opinions About the OUS Study.**

Dr. Gordon's opinion concerning the protocol, design, definitions, and conduct of the OUS study are unsupported in any respect and should be excluded. Plaintiff does not try to defend Dr. Gordon's methodology on those points, but instead insists merely that his opinions on those points are important to his testimony regarding his review of imaging from the OUS study.[31] Unreliable opinions do not become admissible merely because they are critical to an expert's testimony. If Plaintiff cannot meet her burden of proving that Dr. Gordon is qualified and used reliable methods, he cannot offer his opinions. Plaintiff has not met her burden here.

As to protocol, design, and definitions, Cook previously noted that Dr. Gordon repeatedly denigrates the OUS study's design, but his report raised no particular issues with that design other than its definition of the term "perforation." *See* Cook Memo, p. 31. Plaintiff does not deny this, and in fact she concedes that his testimony is not meant to discuss "whether the OUS study was well *designed*." Plaintiff's Opposition, p. 25 (emphasis in original). Plaintiff thus effectively concedes that the Court should not permit Dr. Gordon to opine on any aspect of the OUS study's design or definitions other than his opinion on the propriety of the definition of "perforation." Given this, any opinions on whether the OUS study was properly designed should be excluded.

---

[31] Even on this subject, Dr. Gordon's opinions should be excluded because they are unreliable and litigation-driven. Cook Memo, pp. 1, 6, 50; *Claar*, 29 F.3d at 502-03 ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method."). Indeed, Plaintiff's response proves that point—she would have this Court believe that the review of imaging by Dr. Gordon (and Dr. Gordon alone) led to a reliable and independent conclusion that one hundred percent of patients in the OUS study experienced perforation with the Celect, when eighteen independent clinical physician investigators concluded otherwise. Plaintiff's Opposition, pp. 9-10. Plaintiff would have the Court believe that Dr. Gordon's sweeping conclusion of one hundred percent perforation is reliable science when—by his own admission—further thought or re-review of medical records applying this methodology can cause Dr. Gordon to reach the opposite conclusion. Dr. Gordon's approach is tainted by his desire to get to one litigation-driven conclusion, and all of his opinions should be excluded as a result.

As to his opinion concerning the perforation definition, Plaintiff's argument actually proves that Dr. Gordon's opinion is *in*admissible.  She notes that "the relevant knowledge bases for expert testimony are the data in the OUS study and the standard and accepted uses of the terms in the Celect IFU."  Plaintiff's Opposition, p. 25.  Both Plaintiff and Dr. Gordon rely exclusively on SIR's reporting guidelines for "the standard and accepted uses" of the term "perforation."  But SIR has *never* defined that term in its guidelines.  Cook Memo, p. 32 & n.25. Thus, contrary to Plaintiff's assertion, Dr. Gordon's opinion on the "standard and accepted uses" of that term finds no support in any literature he cites.[32]  Nor can Dr. Gordon's own experience as a physician, by itself, establish any "standard and accepted use"; it can only establish what he personally believes the term to mean today—a fact that is irrelevant to the validity or conduct of the OUS study between 2005 and 2009.  *See Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co*., No. 1:05-CV-207, 2007 WL 1850858, at \*6-7 (N.D. Ind. June 25, 2007) (citing *Reed v. City of Chicago*, No. 01 C 7865, 2006 WL 1543928, at \*2-3 (N.D. Ill. June 1, 2006)) (opinion based on experience and industry's "custom and practice" is unreliable where the expert's experience was the sole authority offered to prove the industry's "custom and practice").  This is not a matter of weight, but of methodology.  Dr. Gordon has not cited *any* proper authority for a "standard and accepted" definition of perforation, and his opinions on the propriety or conventionality of the OUS study's definition are therefore not reliable.

Plaintiff also argues that Dr. Gordon should be allowed to opine on the "inconsistent definitions" of perforation seen in various OUS-related materials as listed in a table Dr. Gordon copied from Dr. Krumholz's report. Gordon Rept., pp. 6-7. The table lists only seven OUS-related materials, and four of them are related to the Lyon et al. publication and were previously

---

[32] Plaintiff claims that Dr. Gordon cited "the relevant papers and guidelines establishing the accepted definitions." Plaintiff's Opposition, p. 25.  Notably, though, she does not point the Court to any quotations from those papers that include a definition for "perforation."

excluded by this Court in the *Hill* trial pursuant to Cook's motion in limine, which has been renewed by Cook in this action.   The Cook Defendants' Omnibus Motions in Limine (Previously-Decided and Renewed), p. 3 [Dkt. No. 8880]; The Cook Defendants' Memorandum in Support of Omnibus Motions in Limine (Previously-Decided and Renewed), pp. 75-82 [Dkt. No. 8889].   The remaining three entries are the OUS study protocol itself and two other documents that Drs. Krumholz and Gordon admit do not define perforation at all.   Accordingly, there is no "inconsistency" in the definition of perforation among admissible documents to which Dr. Gordon seeks to point, and his opinion on the propriety of the OUS study's protocol, design, or definitions at trial thus rests on no sound methodology or other scientific basis.   The Court should bar Dr. Gordon from opining that the OUS study's definition of "perforation" was unusual, improper, or unconventional.

As to the conduct and reporting of the OUS study, Dr. Gordon's report contains numerous allegations about how the OUS study was conducted, including comments that 70% of patients did not follow the protocol or that the number of patients lost to follow-up was high. But he identifies no support whatever for those claims.  Cook Memo, pp. 33-35.  Plaintiff, who bears the burden of establishing the admissibility of Dr. Gordon's opinions, does not even address this omission in her Opposition.   Nor does she address Cook's related argument that Dr. Gordon cannot simply parrot the contents of internal Cook documents for the jury.  The Court should bar Dr. Gordon from opining on any aspect of the OUS study other than the results of his own review of the imaging.

### C.   **The Court Should Bar Dr. Gordon from Testifying About the Adequacy of the Celect's IFU.**

As explained in Cook's Motion, Dr. Gordon is not qualified to critique the content of the Celect's IFU or discuss any other regulatory issues concerning the Celect.  Cook Memo, pp. 31-

33.  Plaintiff concedes as much, representing that Dr. Gordon will not opine on whether the Celect IFU "conformed to FDA requirements"—despite that he did so explicitly in his report and at his deposition.  *Compare* Plaintiff's Opposition, p. 27 *with* Gordon Rept., pp. 13-15, Gordon Dep. at 254:20-255:19 (opining that the Celect's IFU violated FDA regulations).  In fact, Dr. Gordon went as far as saying that Cook committed *fraud* on the FDA.  Gordon Dep. at 167:5-20. At a minimum, the Court should grant Cook's unopposed request to bar Dr. Gordon from offering opinions about any regulatory aspect of the Celect's history or IFU, including but not limited to whether it conformed to applicable regulations.

Plaintiff instead argues that Dr. Gordon, as a member of the group to which the IFU is directed, should be permitted to testify as to four specific proposed design changes to the IFU, which Plaintiff must prove were appropriate warnings regarding risks known by Cook in 2009:

- Cook's IFU "should have warned doctors of the increased risk of perforation, tilt and fracture' arising from 'the Celect filter's lack of a perforation limiter.'" Plaintiff's Opposition, p. 30 (quoting Gordon Rept., p. 13);

- Cook's IFU should have stated what the FDA told physicians in its 2014 Safety Communication: "'suggest[ing] taking out retrievable filters as soon as possible.'" Plaintiff's Opposition, pp. 30-31 (citing Gordon Dep. at 165:2-165:21);

- Cook's IFU "failed to 'disclose the existence and extent of the risk involved;'" Plaintiff's Opposition, p. 31 (citing Gordon Rept., p. 13); and

- Cook's failure to define "perforation" in the Clinical Studies portion of the Celect IFU when describing the OUS Study conducted between 2005 and 2009 "does not accurately convey the results of the study."  Plaintiff's Opposition, p. 31.

Plaintiff further suggests Dr. Gordon should be permitted to testify as to how doctors in that group would have understood the Celect IFU.  She goes on to suggest that his testimony will be limited to "what information an interventional radiologist would need to have, and would consider, when deciding whether to use a Celect IVC filter to treat a particular patient." Plaintiff's Opposition, p. 28.

The problem with Plaintiff's argument is that Dr. Gordon admits that doctors knew of all the issues that could befall a Celect user when Plaintiff received her filter in 2009. He testified that "the general medical community in 2009" knew that filters could "tilt, migrate, perforate, fracture, be difficult to retrieve, cause bleeding and death."  Gordon Dep. at 152:6-11.  If his knowledge of the interventional radiology community in 2009 is the only proper basis for his opinions on the Celect IFU, as Plaintiff concedes, then he cannot rationally conclude that it failed to adequately warn doctors because he admits they already knew of the relevant risks *before* they read it.

In fact, Dr. Gordon's opinions of the Celect IFU's inadequacy are based exclusively on his improper (and foundation-less) regulatory opinions and/or his claim that Cook should have warned of additional risks that Dr. Gordon cannot prove exist.  Cook previously provided a comprehensive list of Dr. Gordon's criticisms of the Celect's IFU,[33] and Plaintiff seeks to save only the four warnings opinions listed above.  *See* Plaintiff's Opposition, pp. 27-32.  Each of these opinions relies on other inadmissible opinions as their foundation—e.g., his claim that perforation leads to tilt and fracture, which claim he admittedly has never studied and cannot support.  Cook reiterates its previous arguments and adds the following brief remarks regarding to the sole warnings opinions Plaintiff addresses in her Opposition:

- **The Celect IFU "should have warned doctors of the increased 'risk of perforation, tilt and fracture' arising from 'the Celect filter's lack of a perforation limiter.'"**   Plaintiff's Opposition, p. 30. This opinion is based exclusively on Dr. Gordon's opinions about how a "perforation limiter" affects a

---

[33] *See* Cook Memo, pp. 40-45.  Plaintiff's Opposition does not identify any warnings or criticisms that were omitted from the list.  The Court can and should view that list as the full universe of claims that Dr. Gordon seeks to offer about the Celect's IFU.

filter's performance.  As discussed at length previously, Dr. Gordon is not qualified to discuss such matters.  Moreover, as noted before, the Celect IFU explicitly warns of "***Vena cava perforation***" and "***Damage to the vena cava***."  Cook Celect Filter Set for Femoral Vein Approach Instructions for Use (2008) at 5 [Dkt. No. 8634-3].  Dr. Gordon's critique only makes sense if viewed as a demand for disclosure of comparative perforation or fracture rates between filters, *i.e.*, that a filter without a "perforation limiter" has higher perforation rates than other filters.  But as Cook has pointed out in its Motion for Summary Judgment, Cook had no duty to include comparisons to other, allegedly "safer" filters in the Celect IFU, *see, e.g., Slisze v. Stanley-Bostitch*, 979 P.2d 317, 320 (Utah 1990) ("We have never, nor has any other jurisdiction, recognized a duty on the part of a manufacturer … to inform the consumer of the availability of the safer model.");[34] but even assuming *arguendo* Cook had such a duty, the Court should bar Dr. Gordon from testifying about a "safer" model because he has not compared filters statistically and cannot say exactly what a comparative analysis in the Celect IFU should have said.

- **The Celect IFU should have stated what the FDA told physicians in its 2014 Safety Communication: "'suggest[ing] taking out retrievable filters as soon as possible.'"**  Plaintiff's Opposition, p. 30.  Dr. Gordon's report does not contain this opinion, which alone is grounds for its exclusion.  The portion of his deposition cited by Plaintiff reveals that this claim, made for the first time at deposition, was offered in response to a question about Dr. Gordon's written opinion that the Celect IFU should warn doctors to remove the filter "within a certain period of time."  *See*

---

[34] *See also* The Cook Defendants' Memorandum in Support of Motion for Summary Judgment, pp. 22-23 [Dkt. No. 8651].

Gordon Rept., p. 13; Gordon Dep. at 163:23-165:21.  The Court should bar this new opinion based on the lack of timely disclosure.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (deposition testimony cannot cure deficiencies in written report); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).  Moreover, Dr. Gordon concedes that the warning to retrieve the filter by a specific date could only have been included "if Cook knew of a specific time."  Gordon Dep. at 165:2-21.  But even today, Dr. Gordon himself cannot specify such a timeframe, despite the benefit of hindsight and his allegedly extensive review of Cook materials and the medical literature to date.  Gordon Dep. at 163:23-165:21. He has no methodology for opining that the Celect 2009 IFU should have included a specific date when he cannot say today *what* date the Celect IFU should have included.

- **The Celect IFU "failed to 'disclose the existence and extent of the risk involved.'"**   Plaintiff's Opposition, p. 31. As noted previously, whatever methodology Dr. Gordon used to reach this conclusory opinion does not supply even enough detail to specify what the "risk" is, let alone to allow a reasoned discussion of whether it was adequately disclosed.  Plaintiff argues that Dr. Gordon was referring to the Celect IFU's discussion of results from the OUS study, but this is mere argument by counsel: Plaintiff never cites Dr. Gordon's report or his deposition testimony in making this strained linkage.  On the contrary, a full reading of the relevant passage from Dr. Gordon's report indicates he was referring not to the Celect IFU, but to Cook's purported failure to warn via "a 'dear doctor' letter, product pamphlet, or

through its sales representatives."  Gordon Rept., p. 13 (Opinion 8.c.).  Notably, the entire passage fails to specify any particular "risk" involved.  *Id.*

- **Cook's failure to define "perforation" in the Clinical Studies portion of the Celect IFU when describing the OUS Study conducted between 2005 and 2009 "does not accurately convey the results of the study."**  Plaintiff's Opposition, p. 31. Again, the Celect IFU very explicitly warns of "***Vena cava perforation***" and "***Damage to the vena cava***."  Celect IFU at 5.  At no time does Dr. Gordon suggest that the information in the Celect IFU is an inaccurate transposition of the OUS study's own results; his quarrel is merely that the Celect IFU does not disclose the results of *his* OUS study imaging review using *his* definition of perforation.  And, since Dr. Gordon cannot establish that there is a "standard and accepted use" of the term "perforation," *supra* at III.E, he cannot opine that the Celect IFU's disclosure of OUS study results would have been misleading absent a definition.

Plaintiff attempts to distinguish the authority supporting Cook's position on the warnings given, *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000), on the ground that it involved forklift operation.  But *Bourelle*'s reasoning had nothing to do with the product at issue: the expert's failure to propose proper language revealed a *methodological* problem, because he could not possibly test the effectiveness of an amorphous alternate warning that he urged but had not created.  *Id.* (citing *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1084 (8th Cir. 1999)). Put differently, an expert who criticizes an IFU without drafting an adequate alternate warning is simply speculating *twice*: (1) that a more appropriate warning could be created, and (2) that it would make any difference.  That is precisely what Dr. Gordon seeks to do: having admitted that doctors already know of the *existence* of all the relevant risks, he faults the Celect IFU for failing

31

to expand on those risks by including details that he himself cannot supply and, *a fortiori*, has not tested to see if they would change doctors' behavior.

Dr. Gordon should not be permitted to opine on the adequacy of the Celect IFU.

## V.      DR. GORDON'S TESTIMONY CANNOT HELP A JURY.

Cook's argument that Dr. Gordon would not assist a jury on certain issues spans four pages of Cook's opening memorandum and cites extensive case-specific examples of support. *See* Cook Memo, pp. 45-48 & nn.43-51.  Cook specifically noted that (1) the jury does not need Dr. Gordon's help to interpret internal Cook documents, and (2) Dr. Gordon's failure to opine to a sufficient degree of medical certainty renders his opinions unhelpful.  *Id.*  Nevertheless, Plaintiff labels this argument a "catch-all" challenge and fails to respond to any of the individual criticisms made therein.  The Court should grant Cook's unopposed request on these grounds.

Plaintiff's only response notes that Dr. Gordon reviewed radiological imaging from the OUS study.  She argues that Dr. Gordon can help jurors because "he can bridge the gap between the OUS study data and other dense, medical data known to Cook and (sic) at the time of the implant and Cook's external presentation of that data to doctors, patients, and the FDA." Plaintiff's Opposition, p. 32.  But this demonstrates precisely why Dr. Gordon's testimony would be *unhelpful*: as Plaintiff's argument makes clear, she does not offer Dr. Gordon's review of the OUS data for any proper purpose.  Rather, she intends that Dr. Gordon use his review simply to narrate the content of the internal Cook documents that Plaintiff likes and to quibble with the outcome of the OUS study.  But she fails to identify a single Cook document on which Dr. Gordon could properly opine and thereby assist a jury.  She also fails to explain how Dr. Gordon's review of OUS imaging reveals "the true results of the OUS study," rather than merely different results achieved using a different definition.

Plaintiff has done nothing to rebut Cook's argument that Dr. Gordon's testimony would not help a jury.  His opinions should be excluded.

## **CONCLUSION**

For the reasons stated above, the Cook Defendants respectfully request that the Court exclude the opinions and testimony of Dr. Gregory Gordon as requested in Cook's Motion.  His opinions should be excluded in the entirety not only because of how frequently he offers unqualified opinions with unreliable or absent methodology, but also because his wholesale abandonment of his report's differential diagnosis at deposition runs afoul of Rule 37(c) as explained in Cook's supplemental briefing.  In the alternative, if Dr. Gordon is allowed to testify at trial, the Cook Defendants respectfully ask the Court to preclude him from giving any testimony and offering any opinions relating to the topics discussed in Cook's Motion and herein.

Respectfully submitted,

Dated: October 8, 2018

/s/ Andrea Roberts Pierson
Andrea Roberts Pierson (# 18435-49)
Jessica Cox (# 26259-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
Email:  andrea.pierson@faegrebd.com
Email:  jessica.cox@faegrebd.com

Charles Webber (# 215247)
Bruce Jones (# 179553)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-8719
Facsimile: (612) 766-1600
Email:  chuck.webber@faegrebd.com
Email:  bruce.jones@faegrebd.com

*Counsel for the Defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 8, 2018, a copy of the foregoing was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.  Lead Counsel for Plaintiffs will serve any non-CM/ECF registered parties.

*/s/ Andrea Roberts Pierson*