```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF TEXAS

 3                      HOUSTON DIVISION

 4   JEFFREY ALAN PAVLOCK,        ) CIVIL ACTION NO. 4-17-CV-03851
                                  )
 5                                ) JURY REQUESTED
                PLAINTIFF,        )
 6                                )
           VS.                    )
 7                                )
     ADRIAN A. WONG, M.D.;        )
 8   COOK INCORPORATED; COOK      )
     INCORPORATED A/K/A COOK      )
 9   MEDICAL INCORPORATED; AND    )
     COOK MEDICAL, LLC,           )
10                                )
                DEFENDANTS.       )
11
     - - - - - - - - - - - - - - -
12           VIDEOTAPED DEPOSITION OF GREGORY GORDON,

13   M.D., taken before Morgan M. Catania, RPR, CSR(IA),

14   General Notary Public within and for the State of

15   Nebraska, beginning at 9:00 a.m., on January 4,

16   2018, at Thomas & Thomas Court Reporters and

17   Certified Legal Video, LLC, 1321 Jones Street,

18   Omaha, Nebraska.

19

20           The amount of time used by each party at

21   the deposition is as follows:

22      MR. JOHN MANDLER:  Approx. 5 hours, 53 minutes
        MR. JOEL SPROTT:  Approx. 1 minute
23      MR. BILL BLANKENSHIP:  Approx. 1 minute

24

25   Job No. WDC-153499  Pages: 1 - 349
```

Page 70

1    Q.   When did you come to the opinion that the
2  Tulip was a defective product?
3    A.   Probably '14, '15 -- '13, '14, '15, in
4  that area.
5    Q.   And if I understand it right, you came to
6  that conclusion because of difficulties in
7  retrieving the Tulip?
8    A.   Inability to retrieve it, progressive
9  tilting.
10   Q.   Would you agree that the Celect is easier
11 to retrieve than the Tulip?
12   A.   That depends on tilting.  It all depends
13 on tilting.  I don't think we can say either/or.  I
14 think they're both -- they're both problematic.
15   Q.   Do you think one of the improvements of
16 the design of the Celect or the Tulip is that it's
17 easier to retrieve?
18   A.   Well, that was the design.  But -- and if
19 it stays straight, it was easier to retrieve because
20 there is less surface area.  But otherwise, no.
21   Q.   You would support a change of design to
22 making it easier to retrieve when comparing the
23 Tulip to the Celect; correct?
24   A.   Can you repeat that question?
25   Q.   You would support a change of design to

Page 71

1  making it easier to retrieve comparing the design of
2  the Tulip to the design of the Celect?
3    A.   I would support --
4         MR. MATTHEWS:  Object to the form.
5         THE WITNESS:  I would support having
6  something easier to retrieve.  Not necessarily the
7  Celect.
8  BY MR. MANDLER:
9    Q.   Okay.  You advocated for a change of the
10 design of the Tulip so that it would be easier to
11 retrieve; correct?
12   A.   I -- yeah.  I advocated for a change in
13 design, correct.
14              (Exhibit No. 10
15              marked for identification.)
16 BY MR. MANDLER:
17   Q.   I'll show you what we've marked as --
18   A.   Oh, this was the case.
19   Q.   -- Exhibit No. 10.
20        You testified earlier that during the time
21 period when you were in Kansas City you communicated
22 with Cook about one of the filters -- one of the
23 Tulip filters that you retrieved; correct?
24   A.   Yes, sir.
25   Q.   And if you turn to Exhibit 10 what's

Page 72

1  marked as Bates No. 379 on the bottom --
2    A.   Page --
3    Q.   -- right-hand corner?
4    A.   Page 10, you said?
5    Q.   No.
6    A.   Okay.
7    Q.   Exhibit 10, page 379.
8    A.   Okay.
9    Q.   Or Bates 379.
10   A.   Okay.  I see it.
11   Q.   Are you there?  That's a letter, in fact,
12 you wrote to Cook on January 8th of 2003; correct?
13   A.   Yeah.  Correct.
14   Q.   And it relates to some issues you had in
15 the retrieval of the Tulip filter; correct?
16   A.   Correct.
17   Q.   Although, I'm not clear if you were trying
18 to retrieve it or simply trying to move it once it
19 had been placed.  Do you recall?
20   A.   This is 2003, sir.  No, I don't.  I don't
21 recall the exact details.  I -- I -- as a matter of
22 fact, I didn't even know about this until yesterday
23 that I did this.  So, I mean, I remember that we had
24 problems in the past, but I didn't know that I went
25 so far as to write a letter.

Page 73

1    Q.   How did you learn about it yesterday?
2    A.   Well, because I was -- I was reviewing --
3  finally catching up with all the reviews of -- of
4  everything that could possibly -- I could -- that
5  you could ask me.  I'm trying to be as complete as
6  possible for you.
7    Q.   What did you do to prepare for your
8  deposition today?
9    A.   Read tons of articles.  Read some
10 depositions.  Did the OUS data.  Looked at a lot of
11 your internal data.
12   Q.   When you said "Did the OUS data," what
13 does that mean?
14   A.   So basically went through each and every
15 film and -- and re- -- just what you see here on
16 whatever the -- Exhibit 4.
17   Q.   Did you create Exhibit 4 yesterday, or was
18 that created before then?
19   A.   Oh, it was -- it was created way before
20 that.  But yesterday morning I -- it's still a draft
21 in -- I still have more to do.  So I worked it up to
22 yesterday morning and handed it in yesterday
23 morning.
24   Q.   What more do you still have to do?
25   A.   Well, I think I have to cross-check.  I

GREGORY GORDON - 01/04/2018        Pages 122..125

Page 122

1    A.   Okay.
2    Q.   With -- and -- and post-implant, do you
3  take an image?
4    A.   I don't take an X-ray after I do my
5  venogram, no.
6    Q.   So as far as the placement and assessment
7  of any tilt of placement, you rely on the venogram?
8    A.   Yes, sir.
9    Q.   All right.
10    A.   In two views.
11    Q.   All right.  And how do you within those
12  two views of the venogram after placement -- how do
13  you identify whether the product is -- is tilted?
14    A.   In general, I just do a visual
15  observation.  I don't take an exact measurement for
16  a dictation.
17    Q.   Okay.  And that was my question.
18       Do you measure at all?  Do you measure
19  percentage tilt or any of that?
20    A.   No.  I mean, this -- you know, there are
21  the guidelines of what is tilt, what is not tilt in
22  reporting.  And I think, especially now as we have
23  to start reporting things in there, I'm going to
24  be -- I will be and I am much more cognizant of
25  measuring that.

Page 123

1       But up until maybe the last year or two
2  before we had to do self-reporting, I -- it was more
3  a quick dictation.  And if there was significant
4  tilt, I would say there's significant tilt.  If it
5  was in a vein, I'd say it's in a vein.  But
6  otherwise just no.
7    Q.   All right.  On follow-up visits, if there
8  is imaging taken, how do you identify tilt?  Same?
9    A.   Measure.  Well, then, on a CT scan you can
10  do measurements.  There is internal software that's
11  easily done that we will do that with.  But it's --
12  again, it's -- the measurement is less important
13  than the location.
14    Q.   How so?
15    A.   Because if it's -- if you're measured --
16  if you're angled at 13 degrees and you're embedded
17  in the wall of the apex hook versus you're tilted
18  16 degrees but you're not embedded in the wall, even
19  though the tilt is more, if the hook is free, it's a
20  lot easier to take out.
21       So it's a combined thing.  It's not just
22  one specific.
23    Q.   Okay.  Within review of imaging either at
24  the time of placement or post placement, how do you
25  identify perforation?

Page 124

1    A.   Tines outside of the wall of the cava.
2  And that would be cross-sectional imaging.
3    Q.   And is that your definition of
4  "perforation" that you use in your practice?
5    A.   Well, 3 millimeters outside is the
6  guideline definition for SIR.  But, to me,
7  perforation is perforation.  Whether it's a
8  millimeter or 3 millimeters, that's just kind of a
9  random thought of what a consensus group of doctors
10  said this is important.
11       But if you have 2 centimeters, it's going
12  into the aorta and the patient is bleeding, what are
13  you going to say?  There is not tilt?  I mean,
14  they're still bleeding.  They're still dying.
15    Q.   Perforation, you meant?
16    A.   Perforation, yes.
17    Q.   What is the source of your definition of
18  "perforation"?
19    A.   SIR guidelines.  Was it the 2011 one, I
20  think.  Or is it -- I'd have to check.  But
21  3 millimeter tilt and -- most of the papers -- or,
22  sorry.  3 millimeter perforation outside the wall is
23  a -- is the definition that I use.
24    Q.   Okay.  And how long have you been using
25  that definition?

Page 125

1    A.   I don't know.  Since the guidelines came
2  out.
3    Q.   Do you agree that various authors and
4  medical societies have different definitions of
5  "perforation"?
6    A.   Yes.
7    Q.   How do you in reviewing images distinguish
8  between "perforation" and "tenting"?
9    A.   Tenting pushes the wall out.  Perforation
10  is where the tines are now outside.  They're not --
11  the wall is not going with it anymore.
12       And in many checks -- cases of it -- I'm
13  more than happy to show you -- you're also -- if
14  anything, you get retraction.
15    Q.   And what imaging do you typically use when
16  you diagnose perforation?
17    A.   Usually a CT scan.  Although occasionally
18  on plain film you'll see some severe tilting and the
19  tine somewhere else, and you suspect it.  And then
20  you'll go to a CT scan.
21    Q.   Can you diagnose perforation using a
22  venogram?
23    A.   Yes, you can.
24    Q.   And are there difficulties?
25    A.   If it's not a good venogram, yes.