**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                 MDL No. 2570

_____

This Document Relates to the Following Actions only:

    *Brand v. Cook Medical, Inc. et al.,*
    Case No. 1:14-cv-06018-RLY-TAB

_____

### COOK'S RESPONSE TO PLAINTIFF'S MOTION TO QUASH THE NOTICE OF VIDEO DEPOSITION OF BEHNOOD BIKDELI, M.D.

The Cook Defendants[1] (collectively, "Cook") urge the Court to deny Plaintiff's Motion to

Quash the Notice of Video Deposition of Behnood Bikdeli, M.D. (Dkt. 8941) because

exceptional circumstances exist to require Dr. Bikdeli's deposition and document production.

Specifically, at the deposition of Plaintiff's epidemiology expert – Dr. Harlan Krumholz – Cook

learned details about the substantial collaboration between Dr. Krumholz and two research

assistants – Drs. Behnood Bikdeli and Aakriti Gupta[2] – to formulate his opinions and draft his

report.  Indeed, Drs. Bikdeli and Gupta are so integral to Dr. Krumholz's work on this matter that

Dr. Krumholz insisted they be permitted to attend his deposition to provide him assistance in

responding to Cook's questions about Dr. Krumholz's lengthy report.  Plaintiff's other experts

have also directly relied on Dr. Bikdeli's work in this case.  For instance, Plaintiff's medical

causation expert – Dr. Gregory Gordon – directly reproduced charts authored by Dr. Bikdeli in

---

[1] Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS.
[2] On September 20, 2018, after the parties' meet and confer efforts failed, Cook served an identical Notice of
Deposition on Dr. Gupta.  Plaintiff has not responded to that Notice.  However, the analysis herein equally applies to
Dr. Gupta.

his own expert report, relied on Dr. Bikdeli's work to form his opinions in this case, and repeatedly deferred to Dr. Bikdeli as an authority on certain topics during his deposition. Likewise, Plaintiff's biostatistician – Dr. Rebecca Betensky – relied on Dr. Bikdeli's work and even acknowledges that Dr. Bikdeli directed portions of her work.  Finally, Dr. Krumholz admitted that there are invoices for Drs. Bikdeli's and Gupta's time, that Dr. Krumholz had written communications with Drs. Bikdeli and Gupta while working to formulate his opinions in this matter, and that there are notes, drafts, and raw data of publications and literature searches on which Dr. Krumholz relied that, under the legal analysis below, are discoverable (but have not yet been produced).

In short, exceptional circumstances exist for the requested discovery because Dr. Bikdeli was a "seamless collaborator" who worked "hand-in-glove" with Dr. Krumholz, and the "fruits of their labor are indivisible."  *See Herman v. Marine Midland Bank*, 207 F.R.D. 26, 31 (W.D.N.Y. 2002); *Derrickson v. Circuit City Stores, Inc.*, No. DKC 95-3296, 1999 WL 1456538 (D. Md. March 19, 1999); *see also Long Term Capital Holdings, et al. v. United States*, No. 01-CV-1290(JBA), 2003 WL 21269586 (D. Conn. 2003); *Estate of Manship v. United States*, No. CV 04-C-91-M2, 2008 WL 11351590 (M.D. La. Mar. 10, 2008).  Under these circumstances, a deposition is warranted to ascertain Dr. Bikdeli's participation in the preparation, drafting, editing, and/or revising of Dr. Krumholz's opinions and report, and any meetings, phone calls, or other communications between Drs. Bikdeli and Krumholz.  Similarly, document discovery of Dr. Bikdeli's invoices, written communications, and notes, drafts, and raw data of publications and literature searches should also be permitted.

-2-

## I.   <u>FACTS AND BACKGROUND</u>

1.      On June 28, 2018,[3] Cook deposed Dr. Krumholz.  When Dr Krumholz arrived at

his deposition in tow with Drs. Bikdeli and Gupta, Cook learned details about the substantial

collaboration with his research assistants Drs. Bikdeli and Gupta:

> Q.      And when you say 'they've acted as research assistants,' tell us
> what you -- what you mean?
>
> A.      My understanding of a research assistant is someone who, under
> the direction of a senior investigator or a senior member of the
> faculty, or a senior individual, assists in the development of
> research. And so what that would mean is that they were available
> to do literature reviews to assist me in obtaining articles and
> helping me to summarize information and providing the
> information that would put me in a stronger position to be able to
> do the work that I had to do. And would also enable me to delegate
> tasks that I felt that they could handle, and that would enable me to
> spend less time on the case so that the work could be completed,
> but that I wouldn't have to be spending the entire time on the case.

(6/28/18 Deposition of Harlan Krumholz, M.D. ("Krumholz Depo.") at 9:5-10:7, at Dkt. 8642-2.

2.      Indeed, Dr. Krumholz testified that his expert report was a "team effort" of "all

three of us."  (*Id*. at 152:9-14).  For instance,

> Q.      Now, throughout your report that we marked as Exhibit 1 there are
> references like we reviewed, we considered; who's the 'we'?
>
> A.      I suppose it should have said I with my research assistants
> supporting me, but in the course of writing this it was probably
> represented as we, but it meant myself and my research assistants.
>
> * * *
>
> Q.      Did anyone help you write your report?

---

[3] Expert discovery closed on June 29, 2018.  Thus, Plaintiff's argument that Cook delayed in seeking discovery related to Drs. Bikdeli and Gupta is without merit because Cook only learned on June 28, 2018, about the extent of Dr. Krumholz's collaboration with Drs. Bikdeli and Gupta.

A.      No. . . . Aside from my assistants.

(*Id*. at 47:21-48:2; 48:20-23).

3.      This substantial collaboration is borne out in one particular example, where Dr.

Krumholz testified about the creation of a nearly six page, single spaced table summarizing

"Some Important Events Related to Cook Celect Filters":

Q.      Did you create that table?

A.      Under my supervision.

Q.      And who created the table?

A.      It's combination of me and Aakriti and – Aakriti Gupta and
        Behnood Bikdeli.

Q.      Dr. Krumholz, the documents that are identified in the table, who –
        who told you what documents to include?

A.      Those were documents that – this is our report, so we – we weren't
        handed a table and – or told to include any documents. I dare say
        that there wasn't one document that was included in the report that
        somebody said to me you must include this in the report.

Q.      Did someone give to you a group of documents or identification
        for documents and say these are documents that may be interesting
        to you?

A.      I don't remember that we were pointed in a direction. Again, the --
        the way that we were able to be alerted that things were interesting
        were, again, a methodology, it's called in common parlance, a
        snowball technique where, you know, you're kind of – you'll see
        one document, it mentions another document. You see one report,
        it mentions another report. You – you're kind of beginning to
        develop your sense of what's important by what you've discovered
        on your own, but also by what other people are pointing to as being
        of interest. So – but we're independently trying to validate what it
        is that we want to do.  So what it is that the lawyers did was give
        us access to a trove of documents, but we were able – I mean, and
        there were a lot of them, and so – you know, like I said, I tried to
        look at as many as I could, but I think I looked at them all. But in
        order – this – remember, we've been working on this for a year. I
        mean, this has been a long period of going through this kind of
        document, so this – I'm very proud of this. This represents our own
        synthesis of documents that make the case.

-4-

* * *

Q.    On the portions of the documents that are quoted in table one, are
those portions that you selected or someone else selected?

A.    This was, again, a team effort because the amount of work here to
produce this required all three of us, and so this is a team effort.

Q.    Okay. No one outside of you and your – your research fellows told
you what to put in this table; fair enough?

A.    Not that I'm aware.

(*Id*. at 150:3-151:20; 152:9-18).

4.    Dr. Krumholz's sole invoice (for work performed from June 2017 through March
2018) confirms that he only spent 20 hours drafting his extensive report dated April 30, 2018,
spanning 179 pages and over 130 footnotes, including myriad charts, tables, and data analyses.
(Dr. Krumholz's April 28, 2018, Invoice, at 5, at Dkt. 9175-1; Dr. Krumholz's Expert Report
("Dr. Krumholz's Report"), at Dkt. 8642-1.

5.    Dr. Krumholz testified that between March 2018 and his June 28, 2018,
deposition, he spent "somewhere between 50 and 100 hours" more time.  (Dr. Krumholz Depo.
at 11:17-22).  Thus, even if all 50 to 100 hours were applied to drafting his April 30, 2018, report
(which certainly is not the case), at most, he spent between 70 and 120 hours on his report.

6.    Plaintiff's medical causation expert – Dr. Gordon – directly reproduced charts
authored by Dr. Bikdeli in his own expert report, (*see* Dr. Gordon's Expert Report ("Gordon
Report"), at 6-7, 9-11, at Dkt. 8463-7), relied on Dr. Bikdeli's work to form his opinions in this
case, and repeatedly deferred to Dr. Bikdeli as an authority on certain topics during his
deposition.  (*See* 6/12/18 Deposition of Gregory Gordon, M.D. ("Gordon Depo."), at 175:13-20;

289:3-297:19, at Dkt. 8664-3).  For instance, when asked to explain how certain tables[4] on pages 9-11 of his report were created, Dr. Gordon could not explain, and he repeatedly insisted that Cook would "have to ask Dr. Bikdeli." (*See id.* at 289:3-297:19).

7.     Similarly, Plaintiff's biostatistician – Dr. Betensky – relied on Dr. Bikdeli's work and was directed by him in formulating her opinions.  (*See, e.g.*, Report of Rebecca Betensky, Ph.D. ("Betensky Report"), at 10, at Dkt. 8609-1; 7/2/18 Deposition of Rebecca Betensky, Ph.D. ("Betensky Depo."), at 19:22-20:4 ("Q. Is that a decision that you made on your own . . . ?  A. Well, as I mentioned to you, this was under the instructions that Dr. Bikdeli gave to me . . . ."), attached as Exhibit A).

8.     Drs. Bikdeli and Gupta attended Dr. Krumholz's deposition to assist Dr. Krumholz in finding relevant opinions in his report.  (Affidavit of Andrea Roberts Pierson ("Pierson Aff.") at ¶ 7, attached as Exhibit B).

9.     Dr. Krumholz further confirmed that there were phone conferences and emails with Drs. Bikdeli and Gupta to formulate his opinions and report.  (Krumholz Depo. at 21:11-21).

10.    Finally, Dr. Krumholz confirmed that Drs. Bikdeli and Gupta have been compensated directly by Plaintiff's counsel, but "I haven't been involved in that."  (*Id.* at 10:13-22).  Accordingly, Cook requested production of Drs. Bikdeli's and Gupta's invoices during the deposition.  (*Id.*).

11.    On July 17, 2018, Cook wrote to Plaintiff again requesting Drs. Bikdeli's and Gupta's invoices, as well as their written communications with Dr. Krumholz.  (7/17/18 Letter, attached as Exhibit C).

---

[4] These tables are virtually identically to the Tables 15-18 in Dr. Krumholz's report.  *Compare* Dr. Gordon's Report, at 9-11 *with* Dr. Krumholz's Report, at 87-90.

12.     On July 29, 2018, Plaintiff objected to producing Drs. Bikdeli's and Gupta's invoices and communications.  (7/29/18 Email, attached as Exhibit D).

13.     Thus, on August 6, 2018, Cook served its Notice of Video Deposition for Dr. Bikdeli (the "Dr. Bikdeli Notice"), including, among other things, a request to produce his billing records and communications with Dr. Krumholz.  (Pl. Memo. in Supp. of Mot. Quash at Exhibit B (Dkt. 8942-2)).

14.     On August 14, 2018, Plaintiff filed her Motion to Quash the Dr. Bikdeli Notice (Dkt. 8941).

15.     The same day, Plaintiff requested additional discovery related to Cook's testifying vascular surgeon expert Dr. David Gillespie.  (8/14/18 Email, attached as Exhibit E).

16.     On August 17, 2018, the Court requested a phone conference to address the Motion to Quash the Dr. Bikdeli Notice. (8/17-20/18 Email, attached as Exhibit F). Cook informed the Court that the parties were continuing to meet and confer on this and other issues (*i.e.*, Plaintiff's request for discovery related to Dr. Gillespie), and they would let the Court know if they were unable to resolve the issues. (*Id*.).  Thereafter, the parties met and conferred by telephone numerous times.  (Affidavit of Andrew L. Campbell ("Campbell Aff.") at ¶ 2, attached as Exhibit G).

17.     At the conclusion of their meet and confer efforts, Cook agreed to withdraw the Dr. Bikdeli Notice in the *Brand* case (and any request to depose Dr. Gupta in *Brand*), in exchange for Plaintiff's agreement to produce Drs. Bikdeli's and Gupta's invoices and withdraw Plaintiff's request for additional discovery related to Dr. Gillespie.  (*Id*. at ¶ 3).

18.     Plaintiff generally agreed to produce the invoices and withdraw the Dr. Gillespie discovery, so long as Cook agreed to forego Drs. Bikdeli's and Gupta's depositions in any other Cook IVC filter case (not just in the *Brand* case).  (*Id*. at ¶ 4).

19.     Cook cannot agree to forego requesting Drs. Bikdeli's and Gupta's depositions in any Cook IVC filter case (other than *Brand*).  Indeed, Cook cannot anticipate what may transpire regarding expert discovery in this MDL or the numerous state court cases pending around the country.  Thus, the parties are at an impasse.

20.     Accordingly, on September 19, 2018, Plaintiff filed their Motion to Compel Discovery Related to Dr. Gillespie (Dkt. 9215).  In turn, Cook is filing this Response to Plaintiff's Motion to Quash the Dr. Bikdeli Notice.

## II.      ARGUMENT

### A.     Discovery Of A Non-Testifying Research Assistant Is Permitted When There Is Substantial Collaboration With A Testifying Expert

Under exceptional circumstances like these, discovery of a non-testifying consulting expert is permitted. Fed. R. Civ. P. 26(b)(4)(D)(ii) (permitting discovery of consulting experts under "exceptional circumstances."). Indeed, numerous cases have recognized that where there is substantial collaboration between consulting and testifying experts that renders the result of their work indivisible, discovery of the consulting expert is permitted. *See Long Term Capital Holdings,* 2003 WL 21269586; *Herman*, 207 F.R.D. 26; *Derrickson*, 1999 WL 1456538.

In *Herman*, for example, the court permitted the deposition of the testifying expert's "associate" who co-authored the expert's report.  *Herman*, 207 F.R.D. at 30.  The court found it persuasive that of the $61,305 for services rendered, $32,120 was charged to the "associate" based on 173 hours of work, and $29,185 was charged to the testifying expert for 156 hours of work.  *Id*. at 31.  Thus, the court reasoned, "the expert report submitted by [the testifying expert] was the result of substantial collaborative work by he and [the 'associate'] . . .  Under these circumstances, the fruits of [their] labor is indivisible, and defendant is entitled to explore what [the 'associate'] did." *Id*.

*Herman* relied heavily on *Derrickson*, an employment discrimination case in which the testifying expert's report presented various tables regarding compensation and promotions that were created by the expert's "assistant." *Derrickson*, 1999 WL 1456538, *7. The "assistant" created the tables "based on data that was subjected to various selection, aggregation and weighting processes." *Id*. In its analysis, the court discarded the "non-testifying" expert moniker altogether, finding,

> [The testifying expert] and his assistant worked hand-in-glove, and the fruits of their labor are indivisible. Defendant cannot properly cross-examine [the testifying expert] without first understanding how his assistant manipulated the data. . . . [The testifying expert's] opinions in this matter are the result of a seamless collaboration with his assistant. Under these circumstances, Defendant is entitled to know what [the] assistant did.

*Id*.

Moreover, the *Derrickson* court noted that even if it considered the "assistant" a "non-testifying" expert under Rule 26(b)(4)(B), exceptional circumstances existed to permit discovery "because that information is exclusively within the assistant's cognizance."[5] *Id*. at *8; *see also Long Term Capital Holdings*, 2003 WL 21269586, *4 (finding exceptional circumstances to depose two non-testifying experts who were "heavily involved" in preparing expert reports and spent an "overwhelming" number of hours working on the matter, "in order to make sure they performed their tasks competently.") (internal citations and quotations omitted); *Estate of Manship*, 2008 WL 11351590 (finding exceptional circumstances to depose a non-testifying expert as the "only means by which plaintiffs will be able to sufficiently discovery what information was provided to [the testifying expert by the non-testifying expert] during the preparation of [the testifier's] reports/options…").

---

[5] The court even went out of its way to write that "Defendant cannot only obtain the underlying data but can also depose and cross-examine [the] assistant at trial. That question, however, has not been raised by the parties, and the court does not rule on it." *Id*. at ft. nt. 1.

Accordingly, in exceptional circumstances like these, where Dr. Bikdeli and Dr. Krumholz worked hand-in-glove and their work is indivisible, Cook should be permitted to take discovery of Dr. Bikdeli.

**B.      In Light Of The Substantial Collaboration Between Drs. Bikdeli And Krumholz, Cook Should Be Permitted To Take Dr. Bikdeli's Deposition**

Like the "associate" in *Herman* and the "assistant" in *Derrickson*, Dr. Bikdeli was substantially involved in drafting Dr. Krumholz's expert report, including (among other things) "literature reviews to assist me in obtaining articles and helping me to summarize information and providing the information that would put me in a stronger position to be able to do the work that I had to do." (Dr. Krumholz Depo. at 9:24-10:3). Ultimately, Dr. Krumholz relied on Dr. Bikdeli to "enable me to delegate tasks that I felt that they could handle, and that would enable me to spend less time on the case so that the work could be completed, but that I wouldn't have to be spending the entire time on the case." (*Id*. at 10:4-7). Dr. Krumholz repeatedly described his report as a "team effort because the amount of work here to produce [the report]." (*Id*. at 152:9-14). He further testified that the report itself has "references like <u>we</u> reviewed, <u>we</u> considered," and that the "'<u>we</u>' . . . [means] myself and my research assistants." (*Id*. at 47:21-48:2) (emphasis added). In fact, Drs. Bikdeli and Gupta attended Dr. Krumholz's deposition to assist him in finding relevant opinions in his report. (Pierson Aff. at ¶ 7).

Thus, given the sheer breadth of Dr. Krumholz's report (and even under the most generous set of facts that he spent between 70 and 120 hours on his report), Dr. Krumholz likely spent a pittance of time as compared to Dr. Bikdeli. Of course, Cook cannot know this for sure because Plaintiff has compensated Dr. Bikdeli directly – which Dr. Krumholz "[hasn't] been involved in" – and Plaintiff has repeatedly objected to producing Dr. Bikdeli's invoices. (*Id*. at 10:13-22; 7/29/18 Email). These facts mirror *Long Term Capital Holdings*, where a non-

testifying expert who substantially contributed to the testifying expert's report was permitted to be deposed to ensure that he performed his work with appropriate methodological rigor.  *See Long Term Capital Holdings*, 2003 WL 21269586, *3.

Furthermore, simply taking Dr. Krumholz's deposition, or Cook's ability to rely on its own experts, does not resolve the issue.  (*See* Pl. Mot. Quash, at 4, at Dkt. 8942).  Indeed, it is impossible for Cook to discover the complete basis for Dr. Krumholz's opinions because, like *Herman* and *Derrickson*, "even if [the court] were to consider the assistant a non-testifying expert . . . the information sought by the defendant – *i.e.*, how the underlying data was analyzed – was 'exclusively within the assistant's cognizance' and discoverable [ ]." *Herman*, 207 F.R.D. at 31 (quoting *Derrickson*, 1999 WL 1456538, at *8).  It's instructive that Dr. Gordon, Plaintiff's own expert, repeatedly testified that we needed to ask Dr. Bikdeli questions if we wanted to fully understand the bases for his opinions.  (*See, e.g.*, Gordon Depo., at 291:8-9).  Dr. Gordon's right, we need to ask Dr. Bikdeli questions.  In cases such as this, "where there is evidence of 'substantial collaborative work' between a testifying expert and a non-testifying expert, 'exceptional circumstances' [] exist . . . to allow the deposition of the non-testifying expert/assistant." *Estate of Manship*, 2008 WL 11351590, at *4 n. 11 (citing *Long Term Capital Holdings*, 2003 WL 21269586, *2-3).  Similarly, Cook's own experts cannot help Cook to discover how the substantial collaboration between Drs. Bikdeli and Krumholz impacted the formulation of Dr. Krumholz's opinions and report – only Dr. Bikdeli can do that.  Accordingly, Cook should be permitted to take the deposition of Dr. Bikdeli.

**C.      Cook Should Be Permitted To Take Document Discovery Of Dr. Bikdeli, And Cook's Document Requests Are Appropriately Tailored To Dr. Bikdeli's Substantial Collaboration With Dr. Krumholz**

Cook should also be permitted to take document discovery related to Dr. Bikdeli's work because, like *Derrickson*, this is not a case where Dr. Krumholz "relied on a single, discrete

written report by a non-testifying expert." *Derrickson*, 1999 WL 1456538, at *7.  Instead, the

record confirms that there are numerous documents relevant to Dr. Bikdeli's substantial

collaboration with Dr. Krumholz, including emails, (Krumholz Depo. at 21:11-21); billing

records, (*Id*. at 10:13-22); notes and drafts of four specific publications co-authored by Drs.

Bikdeli and Krumholz and relied on in Dr. Krumholz's Report (*See* Dr. Krumholz's Report at

40-49; Dr. Krumholz Depo. at 19:18-20:1); and, raw data and communications related to

literature searches also relied on in Dr. Krumholz's Report (*See, e.g.*, Dr. Krumholz's Report at

39, 56-57, 60; Dr. Krumholz Depo. at 17:12-21:21).   Furthermore, Dr. Bikdeli directed the work

of other experts.  (*See, e.g.*, Betensky Report, at 10, at Dkt. 8609-1; Betensky Depo., at 19:22-

20:4).  As shown by this record, Cook's document requests about which Plaintiff complains –

billing records, communications with third parties related to Cook IVC filter litigation, drafts and

communications related to specific peer-reviewed publications, and raw data returned from

literature searches – are narrowly tailored to those documents that Dr. Krumholz himself testified

reflect his substantial collaboration with Dr. Bikdeli.  (*See* Pl. Mot. Quash, at 4-5, at Dkt. 8942

(objecting to Request Nos. 2, 3, 4, 6, and 18)).

Moreover, these requests are directly relevant to Cook's (and, ultimately, the jury's)

ability to assess the credibility of Dr. Krumholz's expertise.  For instance, two of the publications

that Dr. Krumholz relies for his expert qualifications (and that he co-authored with Dr. Bikdeli[6])

were published <u>after</u> Dr. Krumholz was retained as an expert in the Cook IVC filter litigation.

(*See* Dr. Krumholz's Report at 3-4).[7]  Understanding whether Drs. Krumholz and/or Bikdeli

---

[6] It is important to note that Dr. Bikdeli is not merely a "research assistant."  He is doctor and "expert" in his own
right.  Indeed, he is the lead author on several publications that Dr. Krumholz relies on in his report and he was even
temporarily disclosed by Plaintiff's counsel as an expert in a separate Texas state court case (i.e., *Pavlock*).
[7] "Among my publications in peer-reviewed journals, several are related to pulmonary embolism, venous
thromboembolism including deep vein thrombosis, and prevention of and medical therapies for those conditions. I
have written and co-authored articles related to inferior vena cava filters and their safety and efficacy, including
*Inferior Vena Caval Filters to Prevent Pulmonary Embolism: Systematic Review and Meta-analysis of Efficacy and*

revised these publications after being retained in this litigation (or in tandem with developments in this litigation) is critical to assessing Dr. Krumholz's credibility.

Similarly, anything that Dr. Krumholz considered in forming his opinions – including correspondence related to the litigation, raw data considered as part of work published during the litigation, and raw data for literature reviews relied on in the litigation – is discoverable.  *See* Fed. R. Civ. Pro. 26(a)(2)(B)(ii) (requiring production of "the facts or data *considered* by the witness informing [opinions].");  *In re Welding Fume Prod. Liab. Litig.*, 534 F. Supp. 2d 761, 765 (N.D. Ohio 2008) ("[w]here . . . the author publishes an article with a view toward litigation . . . a probability of bias exists which undermines the logic supporting the admission of this material in evidence as an exception to the rule against hearsay.") (internal quotations and citations omitted).

Finally, Dr. Bikdeli's billing records are relevant to understanding his and, ultimately, Dr. Krumholz's actual work on the case, as well as possible bias.  As shown herein, it is highly likely that most of the legwork performed by Dr. Krumholz's "team" was not done by Dr. Krumholz himself.  Cook is entitled to know how much time Dr. Bikdeli spent vis-à-vis Dr. Krumholz to prepare Dr. Krumholz's opinions and report.  *Estate of Manship*, 2008 WL 11351590, at *4 n. 13 ("courts often look to invoices/billing records relating to the respective experts to determine whether the assistant performed a disproportionate amount of the work on the collection and analysis of the data underlying the testifying expert's report.").  Indeed, a jury is entitled to know the full amount Plaintiff paid to Dr. Krumholz <u>and</u> his "team" to develop his opinions in this case.  *In re Welding Fume Prod. Liab. Litig.*, 534 F. Supp. 2d at 766 ("[the] disclosure of

---

*Safety* (Journal of the American College of Cardiology 2017;13:1587-97), *Data Desert for Inferior Vena Caval Filters: A Common Procedure with Limited Evidence, Regulatory Supervision, and Ongoing Research* (JAMA Cardiology 2017;2:3-4), and *Systematic Review of Efficacy and Safety of Retrievable Inferior Vena Caval Filters* (Thrombosis Research 2018;165:79-82)."  (Dr. Krumholz's Report, at 3-4).

possible financial bias coupled with [examination] by the parties is a[n] appropriate and fine-tuned mechanism for arriving at the truth.").  Limiting that number to only the amounts paid directly to Dr. Krumholz would paint an abstract and unfair picture.

In sum, Cook's document request to Dr. Bikdeli is appropriately tailored to his substantial collaboration with Dr. Krumholz, and Cook should be permitted to take such discovery.

### III.   <u>CONCLUSION</u>

Considering the substantial collaboration between Drs. Krumholz and Bikdeli, the fact that Drs. Gordon and Betensky relied on his work in formulating their opinions, and the fact that Dr. Bikdeli directed the work of Dr. Betensky, Cook should be permitted to take the deposition and document discovery of Dr. Bikdeli related to that collaboration.

Respectfully submitted,

Dated:  October 11, 2018

/s/ *Jessica Benson Cox*

Andrea Roberts Pierson (# 18435-49)
Andrew L. Campbell (#25516-49)
Jessica Benson Cox (#26259-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com
E-Mail:  andrew.campbell@faegrebd.com
E-Mail:  jessica.cox@faegrebd.com

Charles F. Webber (# 215247)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 S. 7th Street
Minneapolis, Minnesota  55402
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
E-Mail:  chuck.webber@faegrebd.com

*Counsel for the defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2018, a copy of the foregoing was served electronically, and notice of the service of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system. Lead Co-Counsel for Plaintiff will serve any non-CM/ECF registered parties.

<u>/s/ *Jessica Benson Cox*                    </u>

-16-