**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB MDL No. 2570 |

This Document Relates to:

*Brand v. Cook Medical, Inc. et al.,*
Case No. 1:14-cv-6018-RLY-TAB

---

**PLAINTIFF'S RESPONSE TO NEW POST-SALE WARNING ARGUMENT IN THE COOK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

On October 23, 2018, the Court ruled from the bench on Plaintiff's Motion to Strike New Post-Sale Warning Argument in the Cook Defendants' Reply in Support of Motions for Summary Judgment (Dkt. 9452), holding that Ms. Brand had 15 days from that date (November 7, 2018) to file a response to Cook's post-sale duty to warn arguments made for the first time in the Cook Defendants' Reply Memorandum in Support of Summary Judgment (the "MSJ Reply") (Dkt. 9371) at 44-52. Ms. Brand will demonstrate here that the four arguments made by Cook unique to its post-sale breach of its duty to warn are completely without merit.

### Ms. Brand Pled Cook's Post-Sale Breach of its Duty to Warn

Contrary to Cook's claim (MSJ Reply at 45-46), Ms. Brand did plead breach by Cook of a post-implantation duty to warn. In the Master Consolidated Complaint for Individual Claims ("Master Complaint") (Dkt. 213), paragraphs 3-5, 38, 45, 50, 56 & 83, she pled that, "[a]t all times

1

relevant hereto," Cook had a duty, which it breached, to provide adequate warnings and truthfully and competently advertise, label, market and promote the Celect.[1]

Given Georgia law on a manufacturer's post-sale duty to warn, "at all times relevant hereto" necessarily includes post-sale. "In failure to warn cases, the duty to warn arises **whenever** the manufacturer knows or reasonably should know of the danger arising from the use of its product." *Batten v. Chrysler Corp.*, 450 S.E.2d 208, 211 (Ga. 1994) (emphasis added). Thus, the "duty to warn is a continuing one and may arise 'months, years, or even decades after the date of the first sale of the product.'" *Watkins v. Ford Motor Co.,* 190 F.3d 1213, 1218 (11th Cir. 1999) (quoting *Batten*, 450 S.E.2d at 211). This means both that a pre-sale duty to warn based on knowledge acquired before sale continues post-sale and that a duty to warn can arise for the first time long after the sale based on knowledge acquired post-sale. *Watkins*, 190 F.3d at 1219 (holding that both Ford's knowledge of the 1986 Bronco II's rollover risk prior to sale and new information about the risk that it learned years after the sale in 1988 and 1991 gave rise to Ford's post-sale duty to warn and required denial of summary judgment on the plaintiff's failure to warn claims).

Based on this long-standing Georgia law, its employment of the Georgia products liability law "expert" attorney who argued at the summary judgment hearing and Ms. Brand's pleading that Cook failed to warn "at all relevant times," this means that, at a minimum, Cook should have known that Ms. Brand pled a breach of its post-sale duty to warn. Ms. Brand did not leave things doubtful in the least, however, because she also pled in paragraph 60 of the Master Complaint that, "Defendants had a continuing duty to warn Plaintiffs and their physicians of the dangers associated

---

[1] In her Amended Short Form Complaint (Dkt. 688) at 1 & 4, Ms. Brand incorporated the Master Complaint.

with the subject products." Based on this, Cook certainly knew that Ms. Brand pled its post-sale breach of its duty to warn, leaving its claim to the contrary highly dubious.

Indeed, its conduct **proves definitively** that it understood that Ms. Brand pled this claim. On August 7, 2018, Cook moved for an order in limine based on the premise that Ms. Brand's post-sale duty to warn should terminate on October 15, 2015, the date it says Ms. Brand's filter was retrieved through an open procedure.[2] And, on October 15, 2018, Cook asked the Court for leave to amend its limine request to move the termination of its post-sale duty to warn to July 14, 2011, the date of the unsuccessful attempt to explant the Celect from Ms. Brand.[3] If Cook truly did not believe that Ms. Brand had pled a breach of its post-sale duty to warn, why did it feel the need to ask the Court to determine the date that duty terminated?

### Ms. Brand's Post-Sale Failure to Warn Claims Do Not Constitute a Recall Claim

Cook cobbles together a disingenuous argument that a post-sale failure to warn clam constitutes a disguised recall claim and that Georgia does not impose a duty to recall. It does so by citing to FDA regulations providing that "relabeling" can constitute a recall requiring FDA involvement and then citing *Ford Motor* Co. *v. Reese*, 684 S.E.2d 279, 283-84 (Ga. App. 2009), for the proposition that Georgia does not impose a recall duty on manufacturers of defective products.

Cook fails to inform the Court that *Reese* meant "recall" in the traditional sense of buying back the products, not relabeling, as evidenced by it immediately thereafter noting that Georgia **does** impose a post-sale duty to warn. *Id.* at 284 ("It is true that Georgia law imposes a continuing

---

[2] Cook Defendants' Memorandum in Support of Omnibus Motions in Limine (Previously-Decided and Renewed) (Dkt. 8889), No. 9, at 38-40.
[3] Cook Defendants' Motion to Correct Memorandum in Support of Previously-Decided and Renewed Motion in Limine No. 9 [Dkt. No. 8889, at 38-40] (Dkt. 9407).

duty upon manufacturers to warn of a danger arising from a product after its sale or distribution.").

Thus, *Reese* holds exactly contrary to Cook's argument.

### Ms. Brand's Experts Opine Regarding Cook's Breach of Its Post-Sale Duty to Warn

Cook claims that Ms. Brand's experts never offered opinions that Cook breached its post-sale duty to warn and that as part of such opinions they were required to, but did not, provide the specific wordings of such post-sale warnings. MSJ Reply at 48-50. Both claims are false, as Ms. Brand's experts offered the opinion that Cook breached its post-sale duty to warn, and Georgia law did not require them to provide the specific wordings of such warnings.

Amazingly, Cook makes this claim:

> In any event, whatever post-sale information Plaintiff claims Cook failed to provide, Plaintiff offers no expert testimony to support her claim that Cook should have provided it. Plaintiff's warnings expert Dr. Gordon talks exclusively about what Cook should have said in the Celect IFU—*i.e., pre-sale*. Neither he nor any of Plaintiff's other experts offers any opinions about any previously undisclosed risk that Cook had a duty to warn Plaintiff or her doctor about *after* the placement of the filter, what any such warnings should have said, or how any of the allegedly missing warnings should have been communicated to Plaintiff's treating physicians. In particular, Plaintiff offers *no expert* who opines that Cook should have sent a "Dear Doctor" letter or some other regulated post-sale communications of the type that Plaintiff's *attorneys* argue in response. *See* Dkt. 9146 at 20, 21, 29.

MSJ Reply at 48-49 (empasis in original).

The **complete falsity** of this claim is demonstrated by this quote from Dr. Gordon's Report of his eighth general opinion:

> 8. **Cook failed to warn physicians about the dangers of the Celect filter.**
> a. The Celect IFU does not warn physicians that the the Celect filter's lack of a perforation limiter (as compared to the Tulip filter) increases the risk of perforation, tilt and fracture.
> b. The Celect IFU does not warn physicians that the Celect filter should be retrieved within a certain period of time to avoid progressive perforation, tilt and fracture or to closely monitor patients when the filter is left in place for extended periods of time. As a matter of fact, Cook's included data suggests very high retrieval rates and mimimal complications.

4

> c. Cook did not provide physicians a complete disclosure of the existence and extent of the risk involved, particularly as compared to Tulip, in a "dear doctor" letter, product pamphlet or through its sales representatives. To the contrary, Cook downplayed the risks and promoted the safety of the Celect filter as both a retrievable and permanent device.

Gordon Report at 13.[4]

Dr. Gordon also opined that Cook misrepresented the interim results of the OUS study in the 2008 IFU and the final results in the Lyon article published in late 2009 after Ms. Brand's implantation, making clear his opinion that Cook should have disclosed the truth about the study both before and after implantation. Gordon Rep. at 5-11 & 14-15. And, Dr. Gordon elaborated in his deposition on the substance of the warnings that should have been given.[5]

So, contrary to Cook's claims, Dr. Gordon did not "talk exclusively about what Cook should have said in the Celect IFU," he did talk about what risks Cook had a duty to warn Ms. Brand's doctor about after placement, and he did offer the opinion that Cook should have sent a "Dear Doctor" letter and other post-sale warning communications. And, given Georgia's law on the continuing duty to warn, even Dr. Gordon's opinions in Section 8(a) and (b) of his Report discussing what Cook should have warned about in the IFU should be interpreted as opinions that Cook should have warned about the same things post-sale, as Section 8(c) makes clear.

Dr. Harlan Krumholz, Ms. Brand's other warnings expert, explained the true results of the OUS study and the misrepresentations made about the interim results in the Celect IFU and the final results in the Lyon article published after Ms. Brand's implantation. Krumholz Report at 67-

---

[4] The Gordon Report is Exhibit A to the Gordon Declaration, Exhibit 23 to the Appendix in Support of Plaintiff Brand's Brief in Opposition to Motion for Summary Judgment ("App.") (Dkt. 9154-2).
[5] Gordon Dep. 158:17-159:11; 164:12-17; 252:2-254:4; 256:1-10, Ex. 14 to App (Dkt. 9151-12).

91.[6] Immediately after that, he described studies and reports demonstrating significant safety risks of the Celect. *Id.* at 91-121. Dr. Krumolz then summarized, "Collectively, the above evidence (from published safety sytematic reviews, Celect-specific studies, and analyses of the MAUDE database), indicate highly concering safety issues with the Cook Celect filters. Further, the data indicates Cook has been aware of these safety signals, and did not disclose several safety concerns and adverse events to the FDA, practitioners, and patients." *Id.* at 122. The facts that much of the data upon which Dr. Krumholz relied upon post-dated Ms. Bran's implantation and that he did not limit the the lack of disclosure to the IFU makes clear that his indictment of Cook's warnings applied both pre and post-implantation.

Dr. Krumholz went on to criticize the IFU's failure to warn of " filter strut fracture" and "filter strut embolization" and, more specifically, that " changes to the filter configuration and to the filter placement are known to cause stress and possibly fracture to the filter wires due to e.g. respitatory movement," which language he took from a Cook document regarding Ms. Brand from **2014**. *Id.* at 165-166. He then wrote that, "[g]iven that respiration is an unavoidable physiological process, complications that may result from it appear to be important enough to be metioned in the IFU *or reported to the FDA or published in literature.*" *Id.* at 166 (emphasis added). This makes clear that Dr. Krumholz opined that Cook breached its duty to warn both pre and post-implantation and that he specified the nature (and even wording) of the warning that should have been given.

Finally, Dr. Krumholz wrote, "As I have noted in several sections of my report, there was clear evidence that the Celect filter was associated with a significant rate of perforations, but Cook failed to disclose this in their IFU, *in their [post-implantation Lyon] publication in JVIR or to the*

---

[6] The Krumholz Report is Exhibit A to the Krumholz Declaration, Exhibit 2 to App. (Dkt. 9149-3).

*FDA.*" *Id.* (emphasis added). Once again, Dr. Krumholz makes perfectly clear that he holds the opinion that Cook breached its duty to warn both pre and post-implantation.

Cook claims that these opinions of Drs. Gordon and Krumholz are insufficient because they did not offer the specific wordings of the post-implantation warnings that it should have given, a repeat of an argument it made in connection with pre-implantation warnings. Once again, Cook fails to offer any authority for the existence of such a requirement under Georgia law.

In fact, the holdings of at least two Georgia cases are completely inconsistent with such a requirement. In *Hunter v. Werner Co.* and *Boyce v. Gregory Poole Equip. Co.*, the experts testified as to the substance of the post-sale warnings that should have been given, apparently without offering the specific wordings of the warnings, and the Georgia Court of Appeals reversed defense summary judgments in both. 574 S.E.2d 426, 431-32 (Ga. Ct. App. 2002); 605 S.E.2d 384, 387-88 (Ga. Ct. App. 2005).

### Although Not Necessary, Ms. Brand Presents Ample Evidence that a Post-Sale Warning Would Have Prevented or Reduced Her Injuries

Cook argues that Ms. Brand's claim based on its breach of its post-sale duty to warn fails for lack of evidence of causation because she allegedly fails to identify testimony of Dr. Rheudasil or any other evidence that a post-sale warning would have prevented any of her injuries. MSJ Reply at 50-52. Georgia law does not require such proof from Ms. Brand, however, "Although a warning may have the net effect of preventing an accident, that is not what is required by the law. The law merely requires the warning to inform the consumer of the nature and existence of the hazard, allowing him to make an informed decision whether to take on the risks warned of." *Watkins,* 190 F.3d at 1219.

If Ms. Brand were required to provide such proof, she has done so more than sufficiently. Dr. Rheudasil's testimony supports that he would have retrieved the Celect from Ms. Brand before

it fractured in approximately March 2010 or before the first fractured leg piece moved away from the vena cava in approximately March 2011 if he had received adequate warnings from Cook after the implantation on March 19, 2009.

Specifically, Dr. Rheudasil testified that, in his experience, removing the Celect filter was routine and that he believes he used it precisely because he intended to retrieve it from Ms. Brand. Rheudasil Dep. 55:20-24; 56:24-57:10, Exhibit A hereto. In fact, he testified that his favorite time to retrieve it is two to three months after implantation, which would have been May or June 2009, before the Celect fractured. *Id.* 74:1-10. The only reason he didn't retrieve it was that Ms. Brand didn't come back for retrieval, possibly because of a lack of communication. *Id. 74:19-75:1.*

Given this and given his testimony he would not have used the Celect in the first place if adequately warned, it is almost certain that if warned by Cook he would have called Ms. Brand and told her to come in for retrieval .At a minimum, this testimony certainly raises a genuine issue of material fact as to whether a post-sale warning would have caused Dr. Rheudasil to explant Ms. Brand prior to fracture in 2010 or prior to migration of a piece of strut away from the vena cava in 2011.

Further, even waring after March 2011 would likely have resulted in an earlier explantation and a reduction in Ms. Brand's injuries. In July 2011, after a piece of the filter had exited through Ms. Brand's thigh, Cook consulted directly with Dr. Rheudasil and advised him to remove it because two of the four legs had already fractured, the filter was not stable and there was a risk of migration. Rheudasil Dep. 106:18-113:21. Cook knew immediately that the July 15, 2011 retrieval was unsuccessful. CookMDL2570_0074647, Exhibit B hereto; CookMDL2570_0743737, Exhibit C hereto.

Having undertaken to investigate and advise Dr. Rheudasil regarding Ms. Brand, Cook assumed a duty to do so reasonably above and beyond its already existing duty to warn. *Boyce,* 605 S.E.2d at 389. After Dr. Rheudasil decided to not to make further intravenous retrieval attempts or perform an open retrieval because he thought that the safest course for Ms. Brand (Rheudasil Dep. at 127:7-128), Cook should have advised him that the risk of further filter fracture and migration of its parts justified him trying alternative intravenous retrieval methods and, if necessary, an open retrieval. Indeed, Cook knew of and sent articles describing alternative retrieval methods to doctors following unsuccessful attempts, but it did not send them to Dr. Rheudasil. CookMDL2570_0781427-30, Exhibit D hereto; CookMDL2570_0798081-82, Exhibit E hereto.

Retrieval of the filter in 2011 instead of 2015 would have made a significant difference to Ms. Brand because imaging from that time shows the second filter fragment remained immediately outside the vena cava and subject to retrieval and the third fracture and migration of another fragment had not yet occurred. Krumholz Report at 155-157. Plus, it would have relieved her from four years of anxiety which Dr. Rheudasil considered "appropriate" and "reasonable" given that a filter piece could potentially migrate to her heart and kill her. Rheudasil Dep. 113:22-116:25.

And, Dr. Rheudasil's testimony shows he likely would have heeded that advice from Cook if he had received it between July 2011 and 2015 given the reasons he ultimately decided to use an open retrieval in October 2015: imaging showed the filter was breaking apart, there was a small risk of a serious medical consequence and Ms. Brand was suffering reasonable anxiety. *Id.*; 128:19-133:18. In short, a post-sale warning any time between July 2011 and October 2015 by Cook would likely have caused Dr. Rheudasil to use an open retrieval to explant Ms. Brand's filter, reducing her injuries, especially her anxiety.

## Conclusion

For the reasons stated above, and for the reasons previously briefed and argued to the Court, it should deny summary judgment to Cook on any of Ms. Brand's causes of action or portions thereof, including her claims based upon Cook's breach of its post-sale duty to warn. In addition, Ms. Brand requests the Court to grant her all such other and further relief, general or special, legal or equitable, to which she may justly be entitled.

Dated:  November 11, 2018.

Respectfully Submitted,

*/s/ Joseph N. Williams*
Joseph N. Williams, Atty. No. 25874-49
Riley Williams & Piatt, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com
*Liaison Counsel to Plaintiffs' Steering Committee*
*and on behalf of Plaintiffs' Steering Committee*


*/s/ Michael W. Heaviside*
Michael W. Heaviside, Esq.
Heaviside Reed Zaic, A Law Corporation
910 17th Street NW, Suite 800
Washington, DC 20006
Telephone: (202) 233-1993
Email: mheaviside@hrzlaw.com

*/s/ Ben C. Martin*
Ben C. Martin, Esq.
The Law Office of Ben C. Martin
3710 Rawlin Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 74407590
Email: bmartin@bencmartin.com

10

*/s/ David P. Matthews*
David P. Matthews, Esq.
Matthew and Associates
2509 Sackett St.
Houston, TX 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
Email: dmatthews@thematthewslawfirm.com

*Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ Ben C. Martin*
Ben C. Martin