UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC   )<br>FILTERS MARKETING, SALES   )<br>PRACTICES AND PRODUCT   )<br>LIABILITY LITIGATION   )<br>_____   )<br>   )<br>This Document Relates to:   )<br>   )<br>Tonya Brand,   )<br>1:14-cv-06018-RLY-TAB   )<br>_____   ) | 1:14-ml-02570-RLY-TAB<br>MDL No. 2570 |

**ENTRY ON PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT THE EXPERT TESTIMONY OF DAVID GILLESPIE, M.D.**

The Cook Defendants offer the testimony of Dr. David Gillespie, a vascular surgeon, who opines on the design and efficacy of the Celect IVC filter and the cause of the filter failure after implantation in Plaintiff. Plaintiff challenges opinions 2, 5, and 7, and those found in §§ IV-VII of his Expert Report. For the reasons set forth below, the court **DENIES** Plaintiff's motion.

**I.     Background**

Since 2013, Dr. Gillespie has served as Chief of the Department of Vascular and Endovascular Surgery at Southcoast Health Systems' Cardiovascular Care Center; Medical Director of Southcoast Noninvasive Vascular Laboratories, and Medical Director of Southcoast Vein Center. (Filing No. 8615-1, Expert Report of Dr. David Gillespie, Ex. A, Curriculum Vitae at 1). In his clinical practice, he performs

1

approximately 300 major vascular procedures and 200 endovascular procedures per year. (*Id.* at 3). He has implanted hundreds of Celect filters in his patients and has even published studies based on his patients' experience with the Celect. (Filing No. 8615-2, Deposition of Dr. Gillespie ("Gillespie Dep.") at 59, 86-87) (noting that he tracked his Celect patients in studies published by Hislop, et al., and Qi, et al.)).

Throughout his career, he has been involved in many national and international medical organizations and has given over 300 presentations on medical topics, including the use, placement, and retrieval of IVC filters. (Expert Report at 2). He has published nearly 100 peer reviewed articles and currently serves as the national co-principal investigator of the FDA's ongoing PRESERVE clinical trial, a national study investigating the safety and effectiveness of IVC filters. (*Id.*; Gillespie Dep. at 46, 78, 106).

## II.    Standard for Expert Testimony

The admissibility of expert testimony is governed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Generally speaking, (1) the expert must be qualified by knowledge, skill, experience, training, or education; (2) the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; (3) the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and (4) the expert must have reliably applied the principles and methods to the facts of the case. *Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013); *see also Lapsley v. Xtek, Inc.*,

689 F.3d 802, 809 (7th Cir. 2012) ("Rule 702 requires that expert testimony be relevant, reliable, and have a factual basis—requirements that must be met before the jury is allowed to hear and perhaps be persuaded by the expert testimony."). If the proposed expert testimony satisfies the *Daubert* threshold of both relevance and reliability, "the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 689 F.3d at 805 (7th Cir. 2012) (quoting *Daubert,* 509 U.S. at 596). "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.,* 431 F.Supp.2d 918, 921 (N.D. Ind. 2006).

### III.  Discussion

#### A.  Opinion 2

Opinion 2 in Dr. Gillespie's Expert Report reads: "The filter provided protection from PE. There is no evidence in the records or imaging that Mrs. Brand ever suffered from PE while the filter was in place." (Expert Report at 32). When asked at his deposition whether he was aware of evidence that Plaintiff's filter actually caught a clot, Dr. Gillespie testified:

> Well, again, I think that IVC filters are not necessarily designed to capture clot[s], right, they're designed to break up the widow-maker, just to be clear. Patients with IVC filters have PEs all the time – not all the time, but in a number of times, and we find those – we think those are asymptomatic. So whether it caught a clot or didn't catch a clot, you know, she did receive protection from it.

3

(Gillespie Dep. at 225). Based on this testimony, Plaintiff argues Dr. Gillespie is not claiming that the filter *actually* provided protection; instead, he is saying that it *might have*. Therefore, she argues, Dr. Gillespie's opinion is based on mere speculation. The court does not agree with Plaintiff's interpretation of his testimony. Dr. Gillespie simply opined that the presence of the filter provided Plaintiff protection from a clot regardless of whether it actually intercepted one. (*Id.* at 225-26). There is nothing speculative about his testimony.

Plaintiff next claims Dr. Gillespie has no foundational facts or data to support his opinion that the Celect provided protection to Plaintiff because he could not identify a medical record or radiological image indicating that the filter caught a clot.

Dr. Gillespie testified that most PEs dissolve on their own; IVC filters are designed for the "symptomatic ones that kill [people]." (*Id.* at 226). Because clots eventually dissolve in a filter, it would be medically unethical to "continuously image [Plaintiff] to demonstrate any clot over time." (*Id.* at 226, 235). In his opinion, based on his clinical experience, training, and review of the literature, the filter worked because "she lived." (*Id.* at 235). His testimony has a sufficient foundation. Any issues Plaintiff has with his testimony may be addressed on cross-examination.

### B. Opinion 5a

Dr. Gillespie performed a differential diagnosis in which he "considered all potential causes for tilt, perforation, and fracture," and he "could not rule out the following as contributing factors": Plaintiff's anterior lumbar fusion ("ALIF") surgery, the filter's location, and her anatomy. (Expert Report at 33-34). Plaintiff attacks his

4

opinion on three grounds: (1) it is not based on any degree of medical certainty; (2) Dr. Gillespie has no relevant clinical experience that would qualify him to opine on causation; and (3) his causation opinions are not based on facts or data.

At his deposition, Dr. Gillespie testified he could not state within a reasonable medical probability that any one thing caused the filter to tilt, perforate, and fracture; however, he could state to a reasonable degree of medical certainty that it was a combination of the three—Plaintiff's surgery, the filter's location, and her anatomy—that caused the filter failure. (Gillespie Dep. at 336 ("Q: And is your opinion that the coming together of all of the different things you outline on Pages 33 and 34 of your report, that all of those things working together caused the tilt, perforation, and eventual fracture in this case? A: Likely did. Q: And have you reached your opinion to a reasonable degree of medical certainty? A: Yes.")). His testimony is permissible. *See Brown v. Burlington N. Santa Fe R.R. Co.*, 765 F.3d 765, 773 (7th Cir. 2014) ("The expert need not exclude all alternatives with certainty."); *Gayton v. McCoy*, 93 F.3d 610, 619 (7th Cir. 2010) ("[A]n expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome.").

Next, Plaintiff claims Dr. Gillespie lacks relevant clinical experience to opine on causation because he has never reached an opinion on the cause of an individual's filter to perforate or fracture. (Gillespie Dep. at 38). Whether or not he has ever addressed causation in the clinical setting as opposed to the litigation context does not mean he is unqualified to perform a differential diagnosis in this case. The method by which a doctor makes a diagnosis is basically the same method he would employ in determining

5

causation. Both require a doctor to rule in potential causes and then systematically rule out those that do not apply. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 629, 644 (7th Cir. 2010).

Lastly, Plaintiff argues there are no facts or data to include surgery, filter location, and Plaintiff's anatomy in Dr. Gillespie's differential diagnosis.

In his Expert Report, Dr. Gillespie explained why he ruled in but could not rule out Plaintiff's surgery. He viewed Plaintiff's April 9, 2009 imaging, and noted the filter had tilted and perforated Plaintiff's IVC. (Expert Report at 33). Plaintiff's two-level ALIF surgery involved manipulation of the IVC, "and especially so in [Plaintiff's] case due to the repair required on her left iliac vein." (*Id.*). Moreover, the manipulation occurred after filter placement, but before the filter had the opportunity to fibrose in place. (*Id.* at 33-34). Peer-reviewed literature supports his decision to consider Plaintiff's surgery as a possible cause of the filter failure. (*Id.* at 33 & nn. 103-05, 107-08).

Plaintiff argues Dr. Gillespie cannot opine on whether the surgery should be ruled in or ruled out because he did not perform any radiological measurements to determine the degree of perforation or tilt of the filter following Plaintiff's surgery. But quantitative measurements are not required to rule in or rule out surgery as a possible cause in this case. Dr. Gillespie testified that he determined the filter tilted and perforated based upon his review of her imaging. This is the method he uses in his clinical practice. (Gillespie Dep. at 190). Under Seventh Circuit law, his methodology is sufficiently reliable. *See Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 809 (7th Cir. 2013) (citing Rule 703

6

and noting an expert must employ "those kinds of facts or data" on which expert in the field would reasonably rely).

With respect to the location of the filter, Dr. Gillespie observed the hook of the filter was above Plaintiff's lowest renal vein, "in an area where the IVC is larger in size." (Expert Report at 34). He also observed that one of the filter struts eventually entered into her right renal vein. (*Id.*). Plaintiff criticizes his opinion because he did not measure the area of the IVC where her filter was placed, and Plaintiff's engineering expert, Dr. Robertson, testified that Plaintiff's IVC is approximately twenty-two millimeters wide which is within the width indicated for the filter's use. (*See* Filing No. 8615-9, Deposition of Scott Robertson at 57-58; Gillespie Dep. at 244).

Dr. Gillespie never said her IVC was too wide to support her filter. He explained that Dr. Rheudasil placed the filter "in a juxtarenal level, so it spanned the renal veins instead of being entirely below the renal veins." (Gillespie Dep. at 245). His opinion is supported by medical literature confirming that filter location near or in renal veins/branch vessels is known to cause perforation, tilt, and fracture. (*Id.* at 245-46; Expert Report at 33-34, nn. 103-105, 110). He provides sufficient support for his decision to rule in filter location and his inability to rule it out.

As for Plaintiff's anatomy, Dr. Gillespie relied on Dr. Rheudasil's operative report where he noted Plaintiff had a large left-sided branch in the vicinity of the filter which he thought might be an accessory renal vein. (Gillespie Dep. at 25, 34). This accessory branch, he opined, coupled with the location of the filter in an area where the IVC is larger in size, may have led the filter to tilt. (*Id.* at 34). He also relied on Plaintiff's

7

imaging studies which showed the filter was placed near a large osteophyte that compressed her IVC. (*Id.*). The communication between the strut and the osteophyte was the likely cause of the fracture of the strut. (*Id.*).

Plaintiff again argues that Dr. Gillespie did not take measurements to determine how close Plaintiff's IVC was to her osteophyte. Plaintiff does not explain why measurements are necessary. Moreover, her own expert, Dr. Gordon, did not take any measurements in his differential diagnosis. (Filing No. 8664-1, Expert Report of Dr. Gordon at 42).

Plaintiff further argues Dr. Gillespie's opinion "is demonstrably at odds with his own beliefs and conduct as a surgeon" because he does not look for osteophytes in his own patients and does not believe osteophytes to be a contraindication in his own patients. His opinion does not mean, however, that the presence of osteophytes did not contribute to Plaintiff's filter fracture. Even Dr. Gordon opined that osteophytes played a role. (*Id.*).

The court therefore finds Dr. Gillespie's Opinion 5a is sufficiently reliable. Plaintiff's objections to his testimony go to the weight, and not the admissibility, of his opinion.

  **C. Opinions 5b and 7**

Dr. Gillespie ruled out the Celect's design and performance as a cause of the filter failure (Opinion 5b), and opined that any conical filter, if implanted near an osteophyte and manipulated during an ALIF procedure, would have performed the same way

(Opinion 7). Plaintiff challenges his opinions, arguing they are outside his field of expertise and are unreliable.

Plaintiff first argues that Dr. Gillespie cannot speak to the Celect's design because he is not an engineer. Dr. Gillespie's opinion does not require engineering expertise; he is not opining on the design feature of the Celect or how the choice of materials or shape affect its radial force. Instead, he is testifying based on the Celect's clinical performance as reported in the medical literature. (Expert Report at 35-36 & nn.112-119).

Her second argument criticizes Dr. Gillespie's methodology for having failed to "conduct any engineering analysis or mathematical calculations to support his opinion on the Celect's design," and failed to review design documents, bench test studies, and documents regarding "the radial force that the primary legs of the Celect filter exert on the IVC." (Filing No. 8615, Motion at 17-18). Again, Dr. Gillespie is not an engineer and he is not giving an engineering-based opinion. His opinions are grounded in his decades of experience as a vascular surgeon.

She next argues Dr. Gillespie's opinions that tilt, perforation, and fracture are rare in the Celect are without any evidentiary basis. His opinions are sufficiently supported on pages 11-15 and 35-36 of his Expert Report and by Cook Data Summaries and the medical literature cited in footnotes 42-68 and 112-119 of his Expert Report.

The rest of Plaintiff's objections to Dr. Gillespie's methodology—i.e., he did not review any data on perforation, could not say whether patients in whom he had placed a Celect had suffered a perforation, did not know there were 82 other fractures of the

9

Celect that had been brought to Cook's attention, his opinions are belied by speeches he has given in the past—go to the weight of his testimony, not its admissibility.

### D. Opinions on Efficacy, §§ IV, VI[1] of his Report

Dr. Gillespie opines that IVC filters, and the Celect specifically, are effective in preventing pulmonary embolism. (Expert Report at 5-6, 11).

Plaintiff argues Dr. Gillespie could not cite a single study to support his opinion that the Celect is effective in preventing PE and relies solely on Dr. Morrison's report. The court does not agree. Dr. Gillespie's Expert Report cites numerous peer-reviewed articles for the proposition that the Celect is effective at preventing PE. (*Id.* at 5-6, 12, 14 & nn. 9-12).

Moreover, Dr. Gillespie has seen the Celect filter catch clots in real time during thrombolysis. (Gillespie Dep. at 58 ("Q: And you can see in imaging realtime [sic] a filter capture a clot? A: That's right. Q: How many times have you seen that happen for the Celect filter? A: Again, I used the Celect filter numerous times, and I've seen it numerous times.")). Plaintiff faults him for his inability to quantify how many times he has seen the Celect capture a clot. He explained he sees "it enough that it's not a specific or rare instance." (*Id.*). His inability to specify the exact number of times he has observed a Celect capture a clot goes to the weight, and not the admissibility, of his opinion.

---

[1] Sections IV and VI of Dr. Gillespie's Expert Report are entitled "IVC Filters Are Effective" and "The Celect Filter" respectively.

10

E.     **Opinion on Complication Rates, § V of His Report**

Dr. Gillespie opines that IVC filter complication rates are low. Plaintiff argues this opinion should be excluded because Dr. Gillespie relies solely on the flawed opinion of Dr. Frysek. As with his other opinions, Dr. Gillespie relied on numerous peer-reviewed articles to support his efficacy opinion. (*See* Expert Report at 7 & nn. 18-20). As such, it is sufficiently reliable, and any objections to his testimony may be addressed on cross-examination at trial.

### III.    Conclusion

The court finds Dr. Gillespie has the qualifications to opine on the safety and efficacy of IVC filters, and of the Celect in particular, and his differential diagnosis is sufficiently reliable to present to a jury. Accordingly, Plaintiff's Motion to Exclude or Limit the Expert Testimony of David Gillespie, M.D. (Filing No. 8614) is **DENIED**.

**SO ORDERED** this 17th day of December 2018.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.