UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: COOK MEDICAL, INC. IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |
| This Document Relates to:<br>*Brand v. Cook Medical, Inc. et al.*,<br>Case No. 1:14-cv-06018-RLY-TAB | |

## DEFENDANTS' TRIAL BRIEF

Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, and William Cook Europe APS (collectively the "Cook Defendants") respectfully submit the following trial brief to assist the Court by addressing in advance several issues that Cook believes may arise at trial. Specifically, this brief addresses:

1. The evidence relevant to Plaintiff's design-defect claim, including the focus on risk-utility and safer alternative design and the relevant government and industry safety standards.

2. Issues related to Plaintiff's claim for punitive damages, including Cook's entitlement to summary judgment, requested bifurcation procedure, and constitutional limitations on relevant evidence.

1

## I. The only claim left to try is design defect.

The only substantive claim Plaintiff has left is design defect. Her warning claims are out on summary judgment. And, although Brand alleges theories of both strict liability and negligence, those concepts cannot be treated as distinct theories of recovery in this case. *See Ogletree v. Navistar Int'l Transp. Corp.*, 500 S.E.2d 570, 572 (Ga. 1998) ("[T]he distinction between negligence and strict liability is not significant for purposes of the risk-utility analysis," which governs the determination of whether a product is defectively designed.). Brand has only one claim remaining, and that claim is design defect.[1]

The purpose of this part of Cook's trial brief is to make two basic but critical points about this single claim. The first is that under Georgia law Brand's design defect claim hinges on the risk-utility test, which in turn hinges on a determination of whether there was a safer alternative design. The second point is that while compliance with industry and governmental standards may be relevant to determining whether the design is defective, those standards must relate to the product's design, and not its warnings or other irrelevant information, including:

- adverse event reporting to the United States Food and Drug Administration,
- complaint handling information,
- information provided or allegedly not provided to the FDA,

---

[1] As explained in the Cook Defendants' Supplemental Submission in Light of Summary Judgment on Failure to Warn Claims, Dkt. 9728 pp. 1-2, the Court's summary judgment ruling on Plaintiff's failure-to-warn claims entitles the Cook Defendants' to summary judgment on Plaintiff's negligence per se claim. In her response to the Cook Defendants' motion for summary judgment, Plaintiff made clear that her negligence per se claim did not assert a separate cause of action, but merely provided an alternative means of supporting the duty underlying her failure-to-warn claim. The Cook Defendants' Supplemental Submission also discusses the effect of the Court's failure-to-warn ruling on certain evidentiary issues. *See id.* at 3-5.

- alleged concealment of facts or information,
- alleged notice or knowledge of a defect, and
- motive or "bad company" evidence.

Therefore, whenever the Court has to make an evidentiary ruling during trial, the Court should ask itself two basic questions:

1. Is the evidence relevant to a claim of design defect (as opposed to a warning claim)?

2. Will the evidence assist the jury in making the risk-utility determination?

If the evidence goes to Plaintiff's now-dismissed warning claims, or any other claim that is no longer a part of the case, it shouldn't come in. Nor should the evidence come in if it will distract the jury from its essential task: to determine whether the risks of the product design outweigh its utility.

### A. The focus of the evidence presented at trial should be on the risk-utility test, and whether there was a safer alternative design available.

Although juries may generally consider a number of factors in determining whether a product is defectively designed, those factors all come under a single umbrella: the risk-utility test. The factors are not an end unto themselves; they are relevant only insomuch as they serve a purpose, and that purpose is to help the jury "balance[e] the risks inherent in a product design against the utility of the product so designed." *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 674 (Ga. 1994).

Georgia's pattern jury instructions reflect that the purpose of considering the factors is to make a risk-utility determination:

> To determine whether a product suffers from a design defect, you must balance the inherent risk of harm in a product design against the utility or benefits of that product design. You must decide whether the manufacturer acted reasonably in choosing a particular product design by considering all relevant evidence, including the following factors:

> [listing 13 factors]
>
> If you decide that the risk of harm in the product's design outweighs the utility of that particular design, then the manufacturer exposed the consumer to greater risk of danger than the manufacturer should have in using that product design, and the product is defective. If after balancing the risks and utility of the product, you find by a preponderance of the evidence that the product suffered from a design defect, then the plaintiff is entitled to recover.

Georgia Suggested Pattern Jury Instructions - Civil 62.650.

"One factor consistently recognized as integral to the assessment of the utility of a design is the availability of alternative designs, in that the existence and feasibility of a safer and equally efficacious design diminishes the justification for using a challenged design." *Banks*, 450 S.E.2d at 674. "The essential inquiry . . . is whether the design chosen was a reasonable one from among the feasible choices of which the manufacturer was aware or should have been aware." *Id*. (citation omitted). "Indeed, the reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible ***is considered the 'heart' of design defect cases***, since it is only at their most extreme that design defect cases reflect the position that a product is simply so dangerous that it should not have been made available at all." *Id*. (citation and footnote omitted, and emphasis added).

The scope of the relevant evidence in this case is thus relatively narrow. The evidence must relate to whether the Celect's risks are outweighed by its benefits, and within that inquiry, whether the design chosen was a reasonable one based on the feasible choices available at the time the product was made.

Cook expects that Plaintiff will argue for a much broader, much more expansive view of relevance. We expect that she will point to the risk-utility factors to argue that a wide range of evidence should be heard by the jury. One prominent example is adverse event reporting evidence.

Plaintiff wants to use this "AER" evidence to paint Cook as a bad actor. But this evidence has nothing to do with whether Cook's filter is defectively designed. This evidence did not even exist at the time the product was designed; AER evidence is of necessity evidence relating to the time *after* the product was designed, manufactured, and already in use. Allowing in evidence of this nature, then, does nothing but invite the jury to forget that its principal obligation is to balance the risks of the product against its utility, and to determine whether, at the time the product was made, Cook made a reasonable choice in designing the Celect as it did.[2]

So, again, in evaluating evidence whose admissibility is disputed, Cook simply requests that the Court ask itself two basic questions:

1. Is the evidence relevant to a claim of design defect (as opposed to a warning claim)?

2. Will the evidence assist the jury in making the risk-utility determination?

If the Court cannot answer "yes" to at least these two questions, the evidence should be excluded without further inquiry. The trial should not become about whether Cook underreported adverse events, or whether the FDA is a good agency or not, or even whether a particular *Banks* factor relevant to the risk-utility analysis is met or not. The trial should be about whether the risks of the Celect outweigh its benefits. The evidence at trial will show that they do not.

### B. Government and industry safety standards are relevant only insofar as they existed at the time the filter was manufactured and relate to the particular aspect of the filter's design at issue.

In determining whether a product was defective, a jury may consider proof of a manufacturer's compliance with government and industry standards. *See Doyle v. Volkswagenwerk Aktiengesellschaft*, 481 S.E.2d 518, 521 (Ga. 1997) (government standards);

---

[2] The Cook Defendants have separately asked the Court to enter a ruling in limine excluding evidence relating to adverse event reporting. *See* Dkt. 8889, The Cook Defendants' Memo. in Supp. of Omnibus Mots. in Limine (Previously-Decided and Renewed) pp. 12-14.

*Luckie v. Piggly-Wiggly S., Inc.*, 325 S.E.2d 844, 845 (Ga. Ct. App. 1984) (private standards). Critically, however, the standards or regulations must be ***applicable***, both to the product at issue and the claim at issue. As to the former (the product at issue), a design standard that applies to a knee implant will almost certainly have no place in a case about an IVC filter. *Cf. Wise v. Tidal Constr. Co.*, 608 S.E.2d 11, 15 (Ga. Ct. App. 2004) (affirming the exclusion of building code standards that did not apply to the kind of dwelling at issue in the case). Likewise, as to the latter (the claim at issue), a standard that concerns the warnings that are to accompany an IVC filter has no place in a case that is exclusively about whether that IVC filter is defectively designed. *Cf. Aller v. Rodgers Mach. Mfg. Co.*, 268 N.W.2d 830, 832 (Iowa 1978) (affirming the exclusion of warning standards as irrelevant where "[t]here was no problem here with a poorly designed warning sign which may have contributed to plaintiff's injury," but only an alleged defect in design or manufacture). "To be applicable," then, "a standard normally [1] must have existed at the time the defendant manufactured the product and [2] must otherwise be directed to the particular aspect of the particular type of product involved in the dispute." 1 OWEN & DAVIS ON PRODS. LIAB. § 6:9 (4th ed. Westlaw 2018) (distinguishing between standards that relate to a product's design and standards that relate to a product's warnings) (footnote omitted); *cf. Banks*, 450 S.E.2d at 674–75 ("[I]n determining whether a product was defectively designed, the trier of fact may consider evidence establishing that ***at the time the product was manufactured***, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." (emphasis added)).

Therefore, to the extent that government or industry standards come into play during the trial, the evidence should be limited to standards in effect at the time of the manufacture of the

product (late 2008) and that are directed to the design of the particular aspect of the IVC filter at issue. No other standards are remotely relevant.

## II.     The question of punitive damages should not be submitted to the jury.

There is no basis for an award of punitive damages in this case. As set out in Cook's summary judgment brief, no matter whether Indiana or Georgia law applies, there is no *clear and convincing evidence* of willful misconduct or conscious indifference. Dkt. 8651, at 41-42; Ind. Code § 34-51-3-2 (requiring "clear and convincing evidence" to recover punitive damages); Ga. Code Ann. § 51-12-5.1(b) (same).[3] That was true at the time Cook moved for summary judgment, but it is even more true now that the Court has granted summary judgment to Cook on Plaintiff's failure-to-warn claim because the scope of relevant evidence in this case is now narrower.

As Cook explained in its motion for summary judgment on punitive damages, the standard of proof for a punitive-damages claim is crucial: "clear and convincing" evidence is obviously a much higher standard than mere preponderance, and a court deciding a summary-judgment motion directed at punitive damages must judge the motion against that higher standard. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) ("[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case."). The quantum of evidence that is sufficient to get most claims to a jury therefore is not nearly enough to get a punitive-damages claim to a jury.

As discussed in Cook's summary judgment brief, Plaintiff cannot possibly present "clear and convincing" evidence of the type of culpability required for an award of punitive damages.

---

[3] Cook maintains its position as set forth in its memorandum in support of bifurcation that Indiana law should apply to punitive damages in this MDL as a matter of uniformity and pursuant to the "significant relationship approach" in Restatement (Second) of Conflict of Laws (1971). Dkt. 8682, at 9-10.

Most design-defect cases in which a court has allowed a plaintiff to ask for punitive damages have involved evidence that the manufacturer purposely omitted a safety feature for economic reasons. *See, e.g.*, *Mascarenas v. Cooper Tire & Rubber Co.*, 643 F. Supp. 2d 1363, 1374 (S.D. Ga. 2009) (allowing punitive-damages claim when there was evidence that defendant knew of separation defects in its tires, but deliberately "refused to implement simple, relatively inexpensive solutions" that other manufacturers had implemented because it would have reduced profits); *Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 547, 562 (Ind. App. 1999) (upholding punitive damages when there was evidence that defendant's engineers recommended steps to reduce severe dangers discovered in testing but company rejected changes on cost grounds). There is nothing even close to that in this case. Nor has Plaintiff identified any other *clear and convincing* evidence that Cook committed "willful misconduct" or acted with "conscious indifference" with respect to the design of the Celect filter.

Rather, the evidence establishes Cook's compliance with the FDA's 510(k) process to clear the device as well as compliance with relevant ISO standards. Compliance with relevant safety standards and regulations is entirely inconsistent with "willful misconduct" or "conscious indifference." *See Stone Man, Inc. v. Green*, 435 S.E.2d 205, 206-07 (Ga. 1993) (holding that punitive damages are generally "improper where a defendant has adhered" to the relevant safety regulations and industry standards); *see also Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1356-57 (M.D. Ga. 2015) (denying summary judgment on design-defect claim because of jury questions on risk-utility, but granting summary judgment on punitive damages because of absence of evidence that manufacturer was "guilty of wrongdoing that deserves punishment" in light of compliance with industry standards and relevant regulations).

Given the narrower scope of relevant evidence related to Plaintiff's design-defect claim, the higher evidentiary burden for proof of punitive damages, and the lack of clear and convincing evidence of wrongdoing that would support an award of punitive damages, the Court should enter summary judgment on Plaintiff's request for punitive damages and not send the issue to the jury.

**III.  At minimum, the question of liability for punitive damages should be reserved for a second phase of trial as it was in *Hill*.**

If the Court declines to grant summary judgment on Plaintiff's request for punitive damages, it should reserve the question of liability for punitive damages for a second phase of the trial. This Court has discretion under Federal Rule of Civil Procedure 42(b) to control the presentation of evidence and structure the trial as it deems appropriate for convenience, to avoid prejudice, or to expedite and economize. As set forth in Cook's motion to bifurcate and corresponding brief, bifurcation offers significant benefits for this litigation. It potentially narrows the relevant evidence in the first phase of the trial. And it permits the Court to defer the choice-of-law analysis for punitive damages unless and until there is a finding of liability for a design defect. Bifurcation as requested by Cook therefore serves interests of judicial economy and will not prejudice the Plaintiff. The Court followed this approach in *Hill*—which also ultimately involved only a design-defect claim—and should repeat that approach in this case.

**IV.  Conduct unrelated to the Plaintiff's alleged cause of injury cannot support a claim for punitive damages.**

The Due Process Clause of the 14th Amendment prohibits an award of punitive damages based on evidence of conduct unrelated to the acts upon which Plaintiff bases her claim for compensatory damages. "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).

In *Campbell*, an action based on a claim of bad-faith claims handling, the defendant insurer twice moved in limine to exclude evidence of its alleged conduct in unrelated cases in other states, and the trial court denied both motions. *Id.* at 414. Instead, the court permitted the plaintiffs to introduce extensive expert testimony regarding fraudulent practices by the insurer in its nationwide operations, holding that such evidence was "'admissible to determine whether [insurer's] conduct in [this case] was indeed intentional and sufficiently egregious to warrant punitive damages.'" *Id.* at 415 (quoting *Campbell v. State Farm Mut. Ins. Co.*, 65 P.3d 1134 (Utah 2001)). This included evidence concerning the insurer's investigation of the personal life of one of its own employees and how the insurer's policies "corrupted its employees." *Id.* at 424.

The Supreme Court held that an award of punitive damages based on such evidence of conduct unrelated to the plaintiff's actual injuries was impermissible under the Due Process Clause. The Court noted that the state courts had "awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm." *Id.* at 422. Faced with this circumstance, the Court held, "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *Id.* The Court further noted that punishment for reasons unrelated to the plaintiffs' complaint created the possibility of multiple punitive awards for the same conduct and thus violated due process. *Id.* at 423.

As applied here, *Campbell* requires that any evidence Plaintiff ultimately offers in support of her claim for punitive damages must relate to the conduct she claims injured her: Cook's design of the Celect IVC filter. *See also Homestate Cty. Mut. Ins. Co. v. Logicorp Enterprises, LLC*, No. 1:12-CV-1068-CAP, 2014 WL 12647766, at *2 (N.D. Ga. July 22, 2014) ("the evidence relevant to an award of punitive damages must be related to the alleged proximate cause of the collision" (citing *Highsmith v. Tractor Trailer Serv.*, No. 04–164, 2005 WL 6032882, *9, 2005 U.S. Dist.

10

LEXIS 46156, *35 (N.D. Ga. Nov. 21, 2005))). Evidence that does *not* relate to the Celect design—including both evidence relating to the Celect's warnings and instructions and more general evidence that Cook was supposedly a "bad company"—are irrelevant. Given the Court's recent grant of summary judgment on Plaintiff's failure-to-warn claim, Cook anticipates that Plaintiff may try to "push the envelope" to offer such evidence that would have been relevant to her failure-to-warn claim by arguing that it supports her claim for punitive damages. The admission of evidence unrelated to a design defect ostensibly offered to support a claim for punitive damages would be constitutional error under *Campbell*. The Court should not allow such evidence to be admitted.

Respectfully submitted,

Dated: December 17, 2018

/s/ *Andrea Roberts Pierson*
Andrea Roberts Pierson (# 18435-49)
Jessica Benson Cox (#26259-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com
E-Mail:  jessica.cox@faegrebd.com

Charles Webber (# 215247)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-8719
Facsimile: (612) 766-1600
Email: chuck.webber@faegrebd.com

*Counsel for the Defendants, Cook Medical LLC f/k/a Cook Medical Incorporated, Cook Incorporated, and William Cook Europe ApS*

11

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

/s/ *Andrea Roberts Pierson*
Andrea Roberts Pierson (# 18435-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com