UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In Re: COOK MEDICAL, INC., IVC | ) | |
| FILTERS MARKETING, SALES | ) | |
| PRACTICES AND PRODUCT | ) | |
| LIABILITY LITIGATION | ) | 1:14-ml-02570-RLY-TAB |
| _____ | ) | MDL No. 2570 |
| | ) | |
| This Document Relates to: | ) | |
| | ) | |
| Tonya Brand, | ) | |
| 1:14-cv-06018-RLY-TAB | ) | |
| _____ | ) | |

**ENTRY ON THE COOK DEFENDANTS' MOTION TO EXCLUDE THE
TESTIMONY OF DR. HARLAN KRUMHOLZ**

Plaintiff offers the testimony of Dr. Harlan M. Krumholz, a cardiologist and health care researcher, to opine on a host of issues, including the efficacy of the Cook Celect inferior vena cava ("IVC") filter and the likely cause of Plaintiff's injuries.  (*Id.* at 173). The Cook Defendants move to exclude his opinions on numerous grounds.  For the reasons set forth below, Cook's motion is **GRANTED in part** and **DENIED in part**.

## I.    Background

Dr. Krumholz MD, SM, graduated from Harvard Medical School and is a Professor of Medicine and Epidemiology and Public Health at the Yale School of Medicine.  (Filing No. 8642-1, Expert Report of Dr. Harlan Krumholz at 1).  He is board certified in Internal Medicine and Cardiovascular Disease by the American Board of Internal Medicine.  (*Id.*).

1

Dr. Krumholz is the founder and director of the Yale Center for Outcomes Research and Evaluation, which has or has had grants and contracts with the National Institutes of Health, Agency for Healthcare Research and Quality, Centers for Medicare & Medicaid Services, the FDA, and Department of Defense. (*Id.* at 2). He is currently on the governing boards of the Patient-Centered Outcomes Research Institute and the National Evaluation System for Health Technology (NEST), a public private partnership between the FDA and industry to advance regulatory science of medical devices. (Krumholz Report at 3). He is also affiliated with the Medical Device Epidemiology Network initiative, which is part of the Epidemiology Research Program at the FDA's Center for Devices and Radiological Health. (*Id.*).

Dr. Krumholz has published over 1,000 articles in peer-reviewed journals, including articles related to pulmonary embolism, venous thromboembolism, and prevention of and medical therapies for those conditions. (*Id.* at 3). Of particular relevance here, he has written or co-authored articles related to IVC filters and their safety and efficacy; Behnood Bikdeli, MD, *et al.* [including Dr. Krumholz], *Inferior Vena Cava Filters to Prevent Pulmonary Embolism: Systematic Review and Meta-analysis of Efficacy and Safety*, 13 J. of the AMERICAN COLLEGE OF CARDIOLOGY 1587-97 (2017); Behnood Bikdeli, MD, *et al.* [including Dr. Krumholz], *Data Desert for Inferior Vena Cava Filters: A Common Procedure with Limited Evidence, Regulatory Supervision, and Ongoing Research*, 2 JAMA CARDIOLOGY 3-4 (2017); Behnood Bikdeli, MD, *et al.* [including Dr. Krumholz], *Systematic Review of Efficacy and Safety of Retrievable*

*Inferior Vena Cava Filters*, 15 THROMB. RESEARCH 79-82 (2018).  (Expert Report at 3-4).  (*Id.* at 3-4).

In his 179-page Expert Report, he opines that: (1) permanent inferior vena cava ("IVC") filters have demonstrated some efficacy, but the Cook Celect retrievable IVC filter has not (Expert Report at 40); (2) IVC filters received clearance with little inquiry or supervision concerning the safety and efficacy of filters (*id.* at 23-24); (3) Cook and its investigators adopted a definition of "perforation" in the OUS study that "is markedly different from other definitions in the literature" (*id.* at 75); and (4) it is more likely than not that the defective design of the Cook Celect IVC filter was the cause of Plaintiff's injuries.

## II.     Standard for Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  In *Daubert*, the Supreme Court held that Rule 702 imposes an obligation on the trial judge to act as a gatekeeper to ensure that all expert testimony is not only relevant, but reliable.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

A court may consider a non-exhaustive list of factors to assess the reliability of expert testimony.  They include: (1) whether the scientific theory has or can be tested; (2) whether the theory has been subject to peer review and publication; (3) whether the theory has been generally accepted in the relevant scientific, technical, or professional community.  *Am Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010)

(citing *Daubert*, 509 U.S. at 593-94).  In addition, the 2000 Advisory Committee's Notes

to Rule 702 include other factors for evaluating the reliability of expert testimony.  *Id.*

These include "whether the testimony related to 'matters growing naturally and directly

out of research conducted independent of the litigation, or whether the experts have

developed their opinions expressly for purposes of testifying'; and '[w]hether the expert

is being as careful as he would be in his professional work outside his paid litigation

consulting.'"  *Id.* (citing Fed. R. Civ. P. 702 Advisory Committee's Notes (2000

Amends.)).  Regardless of what factors the court relies upon, however, the court's

ultimate responsibility is to "make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho

Tire*, 526 U.S. at 152.

　　　　Even if an expert's testimony is reliable, it must be excluded if it is not relevant.

Expert testimony is deemed relevant if it "assist[s] the trier of fact to understand the

evidence or determine a fact in issue."  *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887,

893 (7th Cir. 2011).  If the proposed expert testimony satisfies the *Daubert* threshold of

both relevance and reliability, "the accuracy of the actual evidence is to be tested before

the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.,* 689 F.3d

802, 805 (7th Cir. 2012) (quoting *Daubert,* 509 U.S. at 596). "The burden of showing an

expert's testimony to be relevant and reliable is with the proponent of the

evidence."  *Bickel v. Pfizer, Inc.,* 431 F.Supp.2d 918, 921 (N.D. Ind. 2006).

### III.    Discussion

### A.    Opinion on Efficacy

Dr. Krumholz's report states: "The available data show significantly reduced risk of subsequent PE with IVC filters as a class compared with no use of IVC filters" but the available data do not show a significantly reduced risk of subsequent PE, PE-related mortality, all-cause mortality, and deep-vein thrombosis with the Celect compared to no use of IVC filters.  (*Id.* at 40, 42, 44, 46).  He derived these opinions from two of the scientific articles on the efficacy of IVC filters he co-authored: *Inferior Vena Cava Filters to Prevent Pulmonary Embolism: Systematic Review and Meta-analysis of Efficacy and Safety*, 13 J. of the AMERICAN COLLEGE OF CARDIOLOGY 1587-97 (2017) and *Systematic Review of Efficacy and Safety of Retrievable Inferior Vena Cava Filters*, 15 THROMB. RESEARCH 79-82 (2018).  Cook argues Dr. Krumholz's opinion is unreliable in several ways.  The court will address each in turn below.

### 1.    Classifications of IVC Filters

First, Cook argues his efficacy opinion turns on whether an IVC filter is classified as permanent or retrievable.  Such classifications, it continues, are unhelpful, misleading, and arbitrary.

The FDA classified IVC filters as permanent and retrievable.  Cook is well-aware of this; its own filters are (or were) marketed as permanent (Bird's Nest) and retrievable (Tulip and Celect).  (*See* Filing No. 9157-1, Letter from Bram Zukerman, M.D., Director, Div. of Cardiolvascular Devices, FDA, to Molly Busenbark dated March 10, 2008 (clearing Cook to market the Celect as a retrievable filter)).  Furthermore, scientific

journal articles published in peer-reviewed literature—including those Dr. Krumholz co-authored—use those distinctions.  This distinction is also recognized by the American Heart Association in issuing its concerns related to retrievable IVC filters.  (*See* Expert Report at 58-59 & n. 36).

Cook further argues that Dr. Krumholz merely "presumes" there is a difference in efficacy based on a filter's classification, and "he does not have any design or engineering expertise to support this premise."  (Filing No. 8633, Motion at 12).  The court does not agree.  As noted above, Dr. Krumholz is qualified in cardiology, epidemiology, and public health, and he published a meta-analysis in these disciplines. His report explains that based on epidemiological and public health analysis, including his meta-analysis of retrievable filters, Celect filters and retrievable filters generally are not shown to have real-world impacts of helping patients live longer.  Consequently, the court finds Dr. Krumholz's classifications of filters as permanent and retrievable are permissible.

### 2.      The Efficacy of the Celect

Next, Cook takes issue with Dr. Krumholz's opinion that the Celect is worse than the others in its classification: "With respect to Celect IVC filters, there is no clear evidence of benefit but there is clear evidence of harm.  And . . . all evidence points to a greater harm compared with alternatives."  (Expert Report at 141).

Dr. Krumholz cited Cook internal documents and peer-reviewed literature which support his opinion that the Celect has a higher rate of complication than the Tulip because the Celect lacks a perforation limiter.  (*Id.* at 12-18, 94-97).  Any disagreements

6

Cook may have with his opinions—*i.e.*, that there is insufficient data to allow a scientific researcher like him to conclude that one filter is more or less effective than another—may be addressed on cross-examination.

### B.      Opinions on FDA Regulation

In his Expert Report, Dr. Krumholz opined that IVC filters received approval with little supervision regarding the safety or efficacy of filters.  (Expert Report at 23-24 ("IVC filters were approved without a single human RCT to prove benefit in any patient subgroup"); Krumholz Dep. at 128 ("The approval came with little supervision on the efficacy of the devices, yes."); *see also* Filing No. 8644-4, Rebuttal Report of Dr. Krumholz (noting agreement with the Institute of Medicine ("IOM") committee statement that "substantial equivalence is not the same thing as safety and effectiveness" and thus, the "510(k) process pre-market (and post-market, below) do not ensure the public safety of devices including the Celect")).  He also criticizes the post-market surveillance opinions of Cook's regulatory expert, Christy Foreman.  (Rebuttal Report at 2 (noting the problems with post-market surveillance, including voluntary reporting and lack of data, and opining that "safety and efficacy and insurance of the public health cannot be established through the current regulatory process")).  According to Cook, neither Dr. Krumholz's qualifications nor his methodology permit him to offer opinions on FDA regulation of IVC filters generally or the Cook filters specifically.

In determining whether an expert is qualified to opine on FDA regulation of IVC filters, "the question we must ask is not whether the expert is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'"

*Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (quoting *Berry v. City of Detroit*, 25

F.3d 1342, 1351 (6th Cir. 1994)); *see also Carroll v. Otis Elevator Co.,* 896 F.2d 210,

212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined

by comparing the area in which the witness has superior knowledge, skill, experience, or

education with the subject matter of the witness's testimony.").

As stated above, Dr. Krumholz is a founding member of NEST and was involved

in the Medical Device Epidemiology Network initiative, both of which are affiliated with

the FDA.  (Expert Report at 3).  Under his direction, Yale "has held contracts with the

FDA" trying to improve post-market surveillance.  (Filing No. 8642-2, Deposition of Dr.

Harlan Krumholz ("Krumholz Dep.") at 97-98).  He has published articles on post-market

surveillance, "design[ed] studies around regulatory science," given expert talks at the

FDA, and "interacted with FDA leadership as well as – on a wide variety of issues

regarding medical devices."  (Expert Report at 3; Krumholz Dep. at 97-100).  Given his

background, Dr. Krumholz is qualified to testify regarding post-market surveillance.

With respect to pre-market clearance of IVC filters, Dr. Krumholz's testimony that

IVC filters were approved "with little supervision" was based on "[o]ur own assessment[1]

of what studies had been conducted" at the time filters were cleared by the FDA.

(Krumholz Dep. at 129).  His opinion was "not a comment on the approval process";

instead, it was a comment "on the existence of studies or absence of studies."  (Krumholz

---

[1] This testimony references the article he co-wrote entitled *Data Desert for Inferior Vena Cava
Filters: A Common Procedure with Limited Evidence, Regulatory Supervision, and Ongoing
Research*, 2 JAMA CARDIOLOGY 3-4 (2017).

Dep. at 129 ("Q: Okay.  You're not commenting on the approval process; you're commenting on the existence of studies or absence of studies; fair?  A: That's true, yeah.")).  He explained: "[The] entire group came when there was no requirement for medical devices to go through the FDA.  So it was prior to 1976, which was remarkable in and of itself that devices can be introduced without that level of scrutiny."  (*Id.* at 129-30).  This testimony is permissible.

In addition, his Expert Report contains a brief history of the development, submission, and clearance of the Celect.  (Expert Report at 24-26, § e2).  Cook's clearance documents are contained in Dr. Krumholz's reliance list, and he offers the opinion that Cook "failed to report important safety end-points, including strut protrusions" to the FDA during the clearance process.  (Filing No. 9156-2, Reliance List, Expert Report at 16; *see also* Expert Report at 18 ("Cook told the FDA in its Celect 510(k) application that there were *no "device related adverse events"* in the OUS study as of August 3, 2007.  However, [the] majority of the perforations in the OUS study had occurred by that time.") (emphasis in original)).

His rebuttal to Christy Foreman's pre-market opinion—*i.e.*, the clearance process does not ensure the public safety of devices—is based on his familiarity with the 510(k) clearance process and his review of the IOM report entitled "Medical Devices and the Public's Health, the 510(k) process at 35 Years."  (Rebuttal Report at 1; Krumholz Dep. at 239 ("I'm familiar with the 510(k) process and I also reviewed the [IOM] report that was the presage to the planning board.  I was on that planning board and [sic] derived from that, I was familiar with that.")).

Based on his extensive experience working with the FDA, as well as his knowledge, education, training, and experience, the court finds Dr. Krumholz is qualified to testify as an expert as to regulatory issues. Cook's objections to his "deficient methodology" may be addressed on cross-examination. *See Gayton*, 593 F.3d at 616 ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.").

### C.   Opinions on the OUS Study

According to Dr. Krumholz, the OUS study is "[t]he only major completed human investigation by Cook" of the Celect filter, and it "had a flawed design, was poorly conducted, had poor outcome assessment, contained selective and misleading reporting, withheld critically important information, and misrepresented data, among other serious issues." (Krumholz Report, 8-9). He reports that "Cook failed to report important safety end-points including strut protrusions, among many others, in their publication, Instructions for Use (IFU) and to the FDA and mischaracterized the information during the process of submission and publication in JVIR." (*Id.* at 16). And although incidents of penetrations/perforations were recorded in the OUS study, he concludes, they were not reported by Cook. (*Id.* at 17). This is because, he opines, Cook investigators used an extremely narrow and "unusual" definition of perforation[2] in the OUS study. (*Id.* at 9;

---

[2] In the OUS study protocol, Cook investigators defined the term "perforation" to mean "[p]rotrusion of filter struts through the wall of the IVC causing hemorrhage or hematoma." (Expert Report at 16). The authors of the later-published Lyon article defined perforation as "filter strut passing completely through IVC wall." (*Id.* at 17).

*see also id.* at 16 ("Such a definition is highly selective and provided the opportunity for the study to miss several instances of strut protrusions, many of which can have clinical implications as outlined in the body of the report.")).

### 1.    Qualifications

Cook first argues Dr. Krumholz lacks the qualifications to criticize Cook's (and its investigators') definition of "perforation" or "penetration," or their application of those definitions to the images taken in the OUS study, because he is neither a pathologist nor radiologist.

"Ordinarily, courts impose no requirement that an expert be a specialist in a given field." *Gayton*, 593 F.3d at 618. Dr. Krumholz is a public health expert, an epidemiologist, and is board certified in cardiology and internal medicine. He has published articles in the peer-reviewed literature about IVC filters, and his published analyses use the term "perforation." Behnood Bikdeli, MD, *et al.* [including Dr. Krumholz], *Inferior Vena Cava Filters to Prevent Pulmonary Embolism: Systematic Review and Meta-analysis of Efficacy and Safety*, 13 J. of the AMERICAN COLLEGE OF CARDIOLOGY 1587-97 (2017); Behnood Bikdeli, MD, *et al.* [including Dr. Krumholz], *Systematic Review of Efficacy and Safety of Retrievable Inferior Vena Cava Filters*, 15 THROMB. RESEARCH 79-82 (2018). (Expert Report at 3-4). He is qualified to criticize Cook's definition of perforation.

Next, Cook finds fault with Dr. Krumholz's reliance on the OUS patient imaging assessments of Dr. Gregory Gordon and Dr. Paul Timperman. Under Seventh Circuit law, an expert may testify based on the opinions of other experts with different expertise.

11

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert.").

Dr. Gordon is an interventional radiologist who is qualified by education, training, and experience to interpret the OUS radiological imaging. Therefore, Dr. Krumholz's reliance on Dr. Gordon's assessments is permissible.

Dr. Timperman is an interventional radiologist and Cook consultant. The court questioned the reliability of his testimony prior to the *Hill* trial because he used a business card at his deposition to assess whether twelve patient images from the OUS study demonstrated perforation. (Filing No. 8644-6, Deposition of Dr. Paul Timperman at 310). But Dr. Krumholz did not rely on Dr. Timperman's assessment. Instead, he compared the assessment of Dr. Gordon with the assessments of Dr. Timperman and Cook's own site investigators to show agreement among the three. (Expert Report at 8-10, 64, 85-86). The court finds no issue with Dr. Krumholz's reliance on Dr. Timperman's assessment of patient images.

### 2.    Methodology

In forming his opinions on the OUS study, Dr. Krumholz reviewed the dataset that Cook provided from the OUS study, the interpretations of the dataset by the OUS site investigators, Cook consultant Dr. Paul Timperman, and Plaintiff's expert Dr. Gregory Gordon. Cook argues Dr. Krumholz's methodology is unreliable because he "brought no independent analysis to the OUS imaging, and he performed no medical, scientific, or

statistical or other analysis of their [Dr. Gordon, Dr. Timperman, and site investigators] results." (Filing No. 8633, Motion at 22).

In his Expert Report, Dr. Krumholz reviewed the data underlying the statistical analysis of the OUS study:

> Even according to interpretations by the OUS investigators, we noted that out of 57 attempted filter retrieval venograms available for assessment, perforations were noted for at least 28% of patients if the definition in the published article was used (i.e. strut protrusion outside the wall), and 9.7% perforations were noted if the standard definition is used (i.e. more than 3mm protrusion outside the wall). Review of interpretations by other experts who reviewed the images (Dr. Gordon and Dr. Timperman) indicated higher strut protrusion (perforation). There were at least 2 cases of strut protrusion with coexisting contrast extravasation (an indication of hemorrhage). However, none of these were reported either in the published [Lyon] article, or in the IFU or to the FDA.

(Expert Report at 17-18).

Moreover, his expert report devotes twenty-seven pages to the OUS study. He includes subsections explaining the study protocol; analyses of the OUS final report, including a table of adverse events taken from that report; a description of drafts of the ultimately-published "Lyon" study and Cook's response to the peer-reviewers' questions; analyses of the Lyon manuscript and a discussion regarding what is known about Registry A and Registry B of the OUS study; conclusions regarding Cook's definition of "perforation" and withholding of relevant information, including a table cataloguing strut protrusion issues; analyses of the available dataset from the OUS study; a section on the "[m]ethodology for performing  analyses from the OUS study Data"; and his analytical results, including several tables cataloguing the strut protrusion data and the results for

the cohort.  (*Id.* at 64-91).  Given Dr. Krumholz's thorough analysis of the OUS study, the court finds his methodology is reliable.

### D.     Opinions on Causation

Dr. Krumholz performed a differential diagnosis regarding the "cause of Plaintiff's filter perforation, fracture, and related injuries."  (Expert Report at 172). He concludes that "it is more likely than not that the defective design of the Celect filter implanted in [Plaintiff] caused the legs of her device to perforate her vena cava, to tilt, and to splay, all of which increased the forces that led to fracture.  (*Id.*).  Cook challenges Dr. Krumholz's differential diagnosis on two grounds.  First, Cook argues he is not qualified to offer such an opinion because "he is not the type of physician that interacts with IVC filters," such as an interventional cardiologist or vascular surgeon.  (Motion at 27).  Second, Cook argues his differential diagnosis is unreliable.

### 1.     Qualifications

As previously stated, Dr. Krumholz is board-certified physician, a public health expert, an epidemiologist, and a cardiologist who has written peer-reviewed literature on the efficacy of IVC filters.  Although he has never used or placed an IVC filter, he has cared for patients who have had them implanted.  (Krumholz Dep. at 67).  The court finds he is qualified to determine the cause of Plaintiff's alleged injuries.  *See Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) (stating an expert need not be a specialist in a given field).

### 2.    Methodology

Differential diagnosis is an acceptable methodology for an expert to render an opinion on causation.  *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). "[E]xpert opinions employing a differential diagnosis must be based on scientifically valid decisions as to which potential cause should be 'ruled in' and 'ruled out.'"  *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  Whether a differential diagnosis is reliable under *Daubert* is made on a case-by-case basis.  *Id.* at 904.

Dr. Krumholz's methodology included reviewing Plaintiff's medical records, meeting with Plaintiff in person, reviewing the imaging of Plaintiff with Dr. Greg Gordon, and reviewing the documents on his reliance list and referenced in his report, including Cook documents, the peer-reviewed literature, and deposition testimony. (Expert Report at 172).  Based on the above, he "ruled in" and "ruled out" five potential causes other than the defect of the filter.  They are: (1) abnormal external stresses, including a car accident that occurred after the filter was placed; (2) Plaintiff's anatomy; (3) placement of the filter; (4) Plaintiff's anterior lumbar fusion ("ALIF") surgery; (5) and the retrieval attempt.  He concluded that the defective design of the Celect was the cause of Plaintiff's perforation, tilt, and fracture.  (*Id.*).

Cook's primary objections to Dr. Krumholz's differential diagnosis are: (1) his failure to provide a scientific basis for the causes he ruled in; (2) his failure to consider Plaintiff's underlying spine condition including spondylosis and osteophytes and normal physiologic activities, and (3) his failure to reliably rule out the ALIF procedure as a cause.

### a.   Scientific Basis for Ruling In Causes

Before reaching a differential diagnosis, Dr. Krumholz reviewed Plaintiff's medical records, met with Plaintiff and performed a physical examination of her. (Krumholz Dep. at 293-94).  He also relied on the expert reports of Dr. Timperman and Dr. Griffin and her accident report.  (Expert Report at 163-64).  Cook faults him for failing to cite any scientific literature.

A reliable differential diagnosis may be reached by simply reviewing the medical records of the patient.  *Tyree v. Boston Scientific Corp.*, 54 F.Supp.3d 501, 565 (S.D. W. Va. Oct. 17, 2014) (finding differential diagnosis reliable where physician relied on the records of other physicians); *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 807 (3d Cir. 1997), *as amended* (Dec. 12, 1997), ("[A] physician may reach a reliable differential diagnosis without himself performing a physical examination, particularly if there are other examination results available."); *see also Gayton*, 593 F.3d 610, 618 (7th Cir. 2010) (finding differential diagnosis based on patient's history and facts surrounding incarceration was reliable).  Accordingly, Dr. Krumholz's methodology, which relied on more than just Plaintiff's medical records, was sufficiently reliable.

### b.   Spine Conditions and Physiological Activities

Plaintiff argues Dr. Krumholz did consider Plaintiff's spine conditions and normal physiological activities.  While Dr. Krumholz did mention those conditions, he did not discuss those conditions in the section relating to his differential diagnosis.  (*See* Expert Report at 158 (discussing Dr. Timperman's report: "The left posteriorly positioned leg rested on osteophytic spurring from the disc space (Fig. 1)."); *id.* at 166 (addressing

16

Plaintiff's single complaint form: "Changes to the filter configuration and to the filter placement are known to cause stress and possibly subsequent fracture to the filter wires due to e.g. respiratory movements.")).

In general, the failure of an expert to consider and rule out all possible causes of an injury goes to the weight of the evidence, not its admissibility. *Taylor v. Union Pacific R.R. Co.*, 09-cv-123-GPM, 2010 WL 3724283, at *7 (S.D. Ill. Sept. 16, 2010); *see also In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 218 F.Supp.3d 700, 716 (N.D. Ill. 2016) ("[A]n expert need not consider *every* possible cause.") (emphasis in original); *see also Best v. Lowe's Home Centers, Inc.,* 563 F.3d 171, 181 (6th Cir. 2009) ("[D]octors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible.") (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 266 (4th Cir. 1999)).  The issue is whether an expert's failure to take account of potential causes is "so lacking that it cannot provide a reliable basis for an opinion on causation." *Taylor*, 2010 WL 3724283, at *7 (internal quotation marks and citations omitted).

Here, the subject of osteophytes came up at Dr. Krumholz's deposition.  He observed that the medical literature has identified conditions that have been associated with fracture.  (Krumholz Dep. at 277).  "[I]t has been noted that osteophytes, for example, can be associated with fracture."  (Krumholz Dep. at 277).  However, he dismissed them as a cause of fracture because they had not been "systematically studied in a way to be able to suggest it."  (*Id.* at 277-78; *see also id.* at 277 ("I think the

17

difference of saying something that can cause fracture versus something that's associated with fractures is tricky.")).

The court finds Dr. Krumholz's failure to take account of Plaintiff's spine conditions is not so lacking that it cannot provide a reliable basis for an opinion on causation. He adequately explained why osteophytes were not considered. Likewise, his failure to consider Plaintiff's physiological activities does not require the exclusion of his testimony. Cook's own expert, Dr. Gillespie, did not consider physiological activities. The court therefore finds Cook's objections to his testimony are best addressed on cross-examination.

### c.      Spinal Fusion Surgery

As for Dr. Krumholz's analysis of Plaintiff's ALIF surgery, he relied on Plaintiff's medical records. He also relied on the expert reports and depositions of Dr. Timperman and Dr. Griffin. (Expert Report at 158-61). His Expert Report further explains:

> Both Drs. Timperman and Griffin have asserted in their respective reports and confirmed in their respective depositions, that the filter was implanted in the correct position on March 19, 2009 and post-surgery X-ray confirmed that there was no change in position. In Dr. Timperman's report, the first time he noticed the filter perforation was on the April 10, 2009 CT scan, which was three weeks after the filter implant. Dr. Griffin also noted Grade 1 filter strut penetrations on the April 10, 2009 CT scan.

(Expert Report at 164; *see also id.* at 170-71). The court finds his opinion is sufficiently explained and supported.

### E.      Opinions on Plaintiff's Current and Future Injuries

Dr. Krumholz also opines on Plaintiff's current and future mental and physical injuries. Cook once again objects because, *inter alia,* his methodology is unreliable.

### 1.    Mental Conditions

Dr. Krumholz opines that two filter struts "remain in her body causing ongoing anxiety for her limiting her lifestyle and causing her to suffer from depression."  (Expert Report at 172; *see also id.* at 172-73 ("The presence of embolized filter fragments in her body continue to cause significant anxiety in [Plaintiff] as a result of which she is not able to carry out activities that she previously enjoyed for the fear that they may cause perforation of other body organs.")).

Dr. Krumholz's opinion is not based on any tests, psychological evaluation, or differential diagnosis of Plaintiff.  (Krumholz Dep. at 297-98).  Nor did he not analyze her prescription medications for anxiety, depression, or chronic pain to see if the doses have changed over time, stating he "didn't deeply dive into that issue."  (*Id.* at 298). Instead, his opinion is based on "the estimation that whatever she had before, for someone like that to experience what she went through, in my estimation would only exacerbate and make even more difficult to manage what she was dealing with; but, again, my impression as a physician."  (*Id.* at 297-98; *see also id.* at 298 ("[T]he idea that someone like that, who's on unstable ground because of a lot of issues is only – is not going to be strengthened by the set of circumstances that happen to her, it's only going to make it more difficult to manage. But, you know, what percentage of what she experiences now—what would have been the counterfactual is very difficult to say.")). Dr. Kumholz's opinion, which is based solely on his "impression," lacks a reliable foundation.

### 2. Gastrointestinal Pain

His opinion on Plaintiff's gastrointestinal pain is based on Plaintiff's medical records. (*See* Expert Report at 148 (noting that after 2011, Plaintiff "continued to present to the ED [emergency department] or office for severe abdominal pain, hip, back and leg pain")). Dr. Krumholz did not, however, consider Plaintiff's history of pancreatitis, irritable bowel syndrome, and interstitial colitis. (*Id*. at 301). Instead, he testified the filter "may be still in part exacerbating those underlying conditions." (*Id.*). He also admits he did not perform a differential diagnosis. (*Id*. at 301-02). Dr. Krumholz's opinion that the filter "may be" exacerbating her symptoms lacks a sufficient foundation regarding the source of Plaintiff's abdominal pain. His opinion is therefore excluded.

Lastly, Dr. Krumholz cannot opine on the likelihood that Plaintiff will suffer future complications. At his deposition, he admitted "it's impossible to tell" and he cannot say to a reasonable degree of medical certainty whether Plaintiff will or will not experience a future complication. (*Id.* at 297, 304).

### F. Interpretation of Internal Cook Documents and Cook's State of Mind

Cook claims Dr. Krumholz merely "regurgitates" Cook internal documents and improperly uses those documents as a means to testify on Cook's state of mind.

Based on a review of Dr. Krumholz's Expert Report, the court finds he appropriately used Cook internal documents and analyzed them based on his experience as an epidemiologist, cardiologist, internist, and public health expert in forming his opinions in this case. Cook's objection is therefore overruled.

20

IV.      **Conclusion**

Dr. Krumholz may testify with respect to (1) the efficacy of IVC filters and the

Celect in particular, (2) FDA regulations, (3) the OUS study, (4) causation, and (5)

Cook's internal documents.  He may not testify, however, regarding the source of

Plaintiff's current or future injuries as more fully explained above.  Accordingly, Cook's

Motion to Exclude the Testimony of Dr. Harlan Krumholz (Filing No. 8631) is

**GRANTED in part** and **DENIED in part**.


**SO ORDERED** this 18th day of December 2018.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.