UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In Re: COOK MEDICAL, INC., IVC | ) | |
| FILTERS MARKETING, SALES | ) | |
| PRACTICES AND PRODUCT | ) | |
| LIABILITY LITIGATION | ) | 1:14-ml-02570-RLY-TAB |
| _____ | ) | MDL No. 2570 |
| | ) | |
| This Document Relates to: | ) | |
| | ) | |
| Tonya Brand, | ) | |
| 1:14-cv-06018-RLY-TAB | ) | |
| _____ | ) | |

**ENTRY ON PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT THE EXPERT
TESTIMONY OF RAMAN UBEROI, M.D.**

The Cook Defendants offer the testimony of non-retained expert Dr. Raman

Uberoi to testify about (1) his opinions about the Outside the United States ("OUS")

study; (2) his participation in other IVC filter studies; (3) the retrievability and

performance of IVC filters; and (4) his opinions regarding the Celect filter. (Filing No.

9077-3, Cook Defendants' Amended Rule 26(a)(2)(B) and 26(a)(2)(C) Expert

Disclosures at 22). Plaintiff moves to exclude Opinions 3 and 4 primarily because his

opinions lack sufficient foundation.

In its Response, Cook clarified that it intends to limit the testimony from Dr.

Uberoi to "his personal testing of the Celect and the opinions he formed about the Celect

as a result of his testing." (Filing No. 9268, Response at 2). With that limitation in mind,

the court now turns to Plaintiff's motion.

1

## I.    Background

Dr. Uberoi is a Fellow of the Royal College of Radiologists and the European Board of Interventional Radiology. (Filing No. 9078-1, Deposition of Dr. Uberoi at 244). He served as President of the British Society of Interventional Radiology and serves on the executive committee of the Cardiovascular and Interventional Radiological Society of Europe. (*Id.* at 255). He has published over 120 peer-reviewed articles, many of which concerned IVC filters, and has given speeches on IVC filters to various radiological societies in Europe. (*Id.* at 57, 254). In his practice, he has placed approximately 300 Celect filters alone. (*Id.* at 328).

## II.    Discussion

### A.    Safety and Efficacy

Dr. Uberoi's opinions regarding filter safety and efficacy were derived from his work with the OUS study and the British Registry. (Uberoi Dep. at 93-94 (testifying he was involved in developing the datasets for the British Registry study and worked with an IT company to create the registries); *id.* at 149 (testifying he was a site investigator in the OUS study and co-author of the Lyon publication)). Those studies were registry studies (as opposed to randomized control trials) which culminated in peer-reviewed publications in authoritative journals. (*Id.* at 62-63, 336 (regarding British Registry); 148-49, 219 (regarding Lyon publication of OUS data)). The methodology employed in those registry studies was the same methodology as other registry studies Dr. Uberoi has conducted—a methodology that is considered reliable in the medical community. (*Id.* at 355 (responding to a question about reliability of registry studies by noting "it's a recognized

way, an accepted practice to look at data from registries"), 267-68 (noting the OUS study was a prospective registry study also)).

Dr. Uberoi testified that registry studies do have limitations. He explained that the British Registry, for example, was the first national registry "and it was probably at the time one of the largest datasets of prospectively collected data." (*Id.* at 64). But it was a voluntary registry, "so it's really hard to get individuals and there are a lot of people who enter data. . . and trying to chase them all to say, 'Look, we really want your follow-up data,' is a lot of effort and work." (*Id.* at 66-67). Moreover, as Plaintiff points out, neither registry was set up to assess whether filters prevented pulmonary emboli. (*Id.* at 93 (British Registry), 362 (OUS study)). He explained, "[U]nless they're symptomatic, one would not necessarily have known." (*Id.*). Notwithstanding those limitations, the British Registry and OUS study each reported results on filter efficacy and complications and drew conclusions based on those findings. (*See, e.g., id.* at 346-349 (regarding British Registry); 305, 322-23 (regarding Lyon publication of OUS data)).

Plaintiff argues Dr. Uberoi's role in the OUS study was limited because he did not see a final draft of the Lyon publication and because he had primary responsibility for only 12 of the 95 patients in the OUS study. Dr. Uberoi's testimony belies Plaintiff's claim. Dr. Uberoi edited drafts of the Lyon publication, and presented the OUS data to his peers in Vienna at the European Congress of Radiology. (*Id.* at 49). He was, therefore, familiar with the data from the OUS study and personally involved with the drafting of the Lyon publication.

Plaintiff also complains Dr. Uberoi's deposition testimony is full of anecdotal evidence of his personal experiences with filters. To the extent he shares his clinical experience as support for his opinions in this case, his testimony is admissible. (*See id*. at 361-62 (testifying that his clinical experience was consistent with the results he saw in the OUS study and the British Registry)).

Dr. Uberoi's opinions on filter safety and efficacy are supported by his peer-reviewed publications and his clinical experience. Consequently, his safety and efficacy opinions are admissible.

### B. Testimony that Filters Catch Clots

Next, Plaintiff argues Dr. Uberoi's testimony that Celect filters caught clots in two of his OUS study patients is mere speculation. (Uberoi Dep. at 300 ("Q: Did you observe any blood clots in the Celect filters of the patients in the OUS study where you retrieved their Celect filter? A: We did, in two patients, and that was reported. Patient 130, 134."); *see also id.* at 301 ("Q: Tell me, what do we see in Exhibit 20? A: So, this is a vena cavagram prior to retrieval or attempted retrieval, and there is – the IVC filter in situ, and there's thrombus or clot sitting in the apex and there's a tail that also extending [sic] above the nose cone of the filter but not quite to the hook."); *id.* at 302 ("Q: What is this [referring to Exhibit 21]? A: So, this is another vena cavagram showing the filter and, again, there appears to be some thrombus sitting in the apex, although a smaller volume.")). When asked whether the Celect caught the blood clot or whether the blood clot was caused by the filter's implantation, Dr. Uberoi testified:

> So probably, they caught thrombus, but what I can't tell you for sure that there wasn't in situ thrombus because we do know that there is increased thrombogenicity. So, the likelihood and the appearance of it suggests that probably they're trapped thrombus and the other – the one you have there certainly looks like a trapped thrombus in the cap. The other one suggests that may be some trapped thrombus, and we've got an extension of thrombus which has probably developed on the back of that in situ.

(*Id.* at 382). He did testify that "I don't think I can say" whether the thrombus was created by the fact of the Celect's implantation, but upon further questioning of whether the filter caused the clot, he testified, "On probabilities, it's unlikely, but it's possible." (*Id.* at 382-83). Given his extensive clinical background and technical expertise, the court finds Dr. Uberoi's opinions regarding whether filters catch clots is not speculative.

## III.    Conclusion

Dr. Uberoi's testimony regarding the Celect IVC filter is based on his personal experience using the device in his patients and his personal involvement with the OUS study and British Registry. Accordingly, the court finds his testimony is admissible under Federal Rule of Civil Procedure 702 and the Supreme Court's *Daubert* decision. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Plaintiff's Motion to Exclude or Limit the Expert Testimony of Dr. Uberoi (Filing No. 9076) is therefore **DENIED**.

**SO ORDERED** this 2nd day of January 2019.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.