**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND                    Case No. 1:14-ml-2570-RLY-TAB
PRODUCTS LIABILITY LITIGATION                         MDL No.  2570

_____

This Document Relates to the Following Action only:

      *Tonya Brand*
      No. 1:14-cv-06018-RLY-TAB

_____

**THE COOK DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendants Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated),

and William Cook Europe ApS (collectively, the "Cook Defendants" or "Cook") move the Court

to grant them judgment as a matter of law under Rule 50(a) as to Plaintiff's remaining claims for

compensatory damages based on strict-liability design defect and negligent design, and as to her

claim for punitive damages.[1]  Plaintiff has failed to offer sufficient evidence to permit a jury to

find in her favor on three critical elements of her design claims:  (1) design defect, (2) condition

of product, and (3) causation.  In the alternative, Cook is entitled to a partial JMOL on the issue of

damages, in that Plaintiff has failed to provide sufficient evidence to support certain categories of

damages, and has affirmatively disavowed several categories of damages.

_____

[1] Plaintiff does not dispute that if her claim for compensatory damages fails, her punitive damages
claim fails as well.  Under Georgia law, an award of compensatory damages is a prerequisite to a
determination of punitive damages.  *See Morris v. Pugmire Lincoln Mercury, Inc.*, 641 S.E.2d 222
(Ga. Ct. App. 2007) ("[P]unitive damages under O.C.G.A. § 51-12-5.1 cannot be awarded where
no actual damages are awarded.").  The present motion relies on this and does not address punitive
damages separately.

US.121782896.04

Under Georgia law, the standards for strict-liability design defect and negligent design are the same, and the Georgia Supreme Court has recognized that there is no significant difference between negligence and strict liability for purposes of a design-defect analysis. *Jones v. Nordictrack, Inc.*, 550 S.E.2d 101, 103 n.5 (Ga. 2001); *Ogletree v. Navistar Intl. Transp. Corp.*, 522 S.E.2d 467, 469 (Ga. 1999) (risk-utility analysis and general negligence principles "cannot be treated as distinct theories of recovery"). A "strict-liability" design defect claim therefore is not "strict" in the usual sense, but requires proof of negligence or unreasonable conduct by the manufacturer. *See Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 673 (Ga. 1994) (adopting a risk-utility analysis for design-defect cases and noting that the risk-utility analysis incorporates the concept of reasonableness). In effect, the claims of negligent design defect and the statutory claim of design defect have merged. *See Ogletree*, 522 S.E.2d at 469. Cook therefore discusses Plaintiff's design-based negligence and strict-liability claims together.

## I.     Standard for Judgment as a Matter of Law

Under Rule 50, a court should grant judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 886 (7th Cir. 2001). The Court must "view the evidence in the light most favorable to the nonmoving party and ascertain whether there exists any evidence upon which a jury could reach a verdict for the party producing it, upon whom the onus of proof is imposed." *Deimer v. Cincinnati Sub-Zero Prods.*, 58 F.3d 341, 343-44 (7th Cir. 1995) (internal quotation and citations omitted). A mere scintilla of evidence is not enough to defeat judgment as a matter of law. *La Montagne v. American Convenience Prods.*, 750 F.2d 1405, 1410 (7th Cir. 1984). The standard for granting judgment as

a matter of law mirrors the standard for granting summary judgment.  *Murray*, 252 F.3d at 886-87.

**II.     Plaintiff failed to offer sufficient evidence to permit a reasonable jury to conclude that the Celect IVC filter was defective in its design.**

Plaintiff has failed to provide sufficient evidence to support the defective design element of her claims for strict-liability design defect and negligent design, and the Court should grant Cook JMOL on those claims.

In his opening statement, Plaintiff's attorney identified the design defect in Celect IVC filter as the removal of the "petals" or "leaves" from the Tulip filter in the development of the Celect filter.  He first stated:

> Ladies and gentlemen, this is a design defect case, and what **the design defect in this case is that the company took a safety feature that was protecting patients off of a product when it made the new one**, and patients were harmed and Tonya was harmed. And that's what this case is about. And that is why we are here.

Tr. at 205:25-206:5 (emphasis added).  Plaintiff's attorney then identified the difference between the Tulip and the Celect as the removal of the "petals" or "leaves" on the Tulip:

> And I want to show you, actually, both filters side by side. And there they are. And you'll see the difference is the Tulip petals. And then Tulip petals were essentially taken off, and it became the Celect.

Tr. at 211:16-19.  And he made clear that Plaintiff's claim was that the omission of the Tulip petals from the Celect design was the "design defect" that removed a feature that was stopping perforation:

> So you see how the Celect doesn't have anything to -- in between the top of it and the end of the leg to the barbs? The Tulip has these what they call Tulip petals, and you'll see that there's a shorter distance between each one of those -- shorter distance from the bottom to where that filter begins to have the petals, and that served as a perforation limiter. That's the safety feature on the Tulip, was a perforation limiter, those petals. So the petals served that purpose, to hold it in the vena cava wall. But it also served a purpose as that safety feature and prevented the

perforation -- prevented perforation but, more importantly, prevented progressive perforation.

Tr. at 212:20-213:6.  Plaintiff has failed to offer evidence from which a reasonable jury could conclude that the omission of the Tulip's "petals" from the Celect was a design defect in the Celect.

**B.      Plaintiff has offered insufficient evidence to support a jury finding that the Celect filter was defective in design under the *Banks* factors.**

Plaintiff's design claims are governed by the risk-benefit analysis Georgia adopted in *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671 (Ga. 1994).  In footnote 6 of the *Banks* decision, the court identified a nonexclusive list of factors that a factfinder may consider in making the risk-benefit analysis.  *See id*. at 675 n.6.  Despite this variety of factors, however, a court may still resolve the risk-benefit question as a matter of law if the evidence permits only one result.  *See, e.g., Carmical v. Bell Helicopter Textron, Inc.*, 117 F.3d 490, 494 (11th Cir. 1997) ("Summary judgment may be appropriate in a Georgia products liability action where a defendant can show that, by balancing the equities of a product's risk against its utility, the lack of a defect is plain and indisputable.")**;** *see also Raymond v. Amada Co., Ltd.,* 925 F. Supp. 1572, 1578 (N.D. Ga. 1996).

As the Court knows well, Plaintiff offered a trial a great deal of testimony intended to make Cook look bad in its development of the Celect filter.  Almost none of that evidence, however, had any bearing on the *Banks* factors that govern the decision concerning risk-utility and whether Cook acted reasonably in developing the Celect.  A factor-by-factor examination of the evidence presented at trial, viewed in the light most favorable to Plaintiff, compels the conclusion that under the *Banks* factors, the benefits of the filter outweighed its risks at the time that Plaintiff's filter was placed, and the filter is not defective as a matter of law.[2]

---

[2] The parties agree that three of the Banks factors have no application under the circumstances of this case:  (1) the feasibility of spreading any increased cost through the product's price or by

## 1.      The usefulness of the product.

The undisputed evidence in this case establishes that IVC filters in general and Celect filters in particular are extremely useful in that they reduce the likelihood of pulmonary embolism, or PE.  All the medical witnesses, including Plaintiff's experts, agree on these three points:

1.  Pulmonary embolisms can have fatal or other "catastrophic" consequences, Tr. at 779:9-14 (Krumholz); Ct. Ex. D-6 at 21:12-14 (Rheudasil);

2.  IVC filters can reduce the incidence of PEs in certain populations, including (1) patients who cannot use blood thinners and (2) patients with recurrent PE despite blood thinners. Tr. at 786:22-787:15 (Krumholz); Tr. at 1814:9-24 (Gordon); Ct. Ex. D-6 at 37:13-38:3 (Rheudasil); *see also* Tr. at 800:7-801:5 (Krumholz noting that American College of Chest Physicians, the American Heart Association, and multiple other medical associations recommend placement of filters in certain circumstances); and

3.  Plaintiff Tonya Brand fell within the population that would benefit from IVC filters.  Tr. at 791:6-19 (Krumholz's agreement that Dr. Rheudasil's placement of the Celect filter in Plaintiff was within the range of reasonable medical practice); Ct. Ex. D-6 at 46:8-47:9 ("She had multiple risk factors for DVT.") (Rheudasil); Ct. Ex. D-6 at 48:6-48:18 (listing risk factors for Mrs. Brand) (Rheudasil); Tr. at 1971:15-24 (Gordon would not disagree with Rheudasil's decision to place a filter in Mrs. Brand).

When asked directly about this factor, Plaintiff's expert Dr. Krumholz did not dispute that the Celect was useful; he merely opined that it was not **more** useful than other filters:

> Q Dr. Krumholz, in your opinion, is the Celect filter a useful product?
> A Can you define "useful" for me?
> Q Does it provide a benefit?

---

purchasing insurance; (2) the appearance and aesthetic attractiveness of the product, and (3) the product's utility for multiple uses.  This motion therefore omits discussion of those factors.

A It doesn't provide an incremental benefit over existing filters.

Tr. at 771:6-11.[3]  In light of the seriousness of the threat of PE and the Celect's usefulness in reducing its likelihood, the usefulness factor weighs entirely in favor of the benefit side of the *Banks* analysis.

### 2.    The severity of the danger posed by the design.

The risk at issue here is the risk of the fracture that caused Plaintiff's injury.  The parties and all the experts agree that a fracture may pose serious risks, including embolization to other organs (Krumholz, Tr. 740:3-10) and death (Krumholz, Tr. 772:14-24) (Gordon, Tr. at 1741:10-1742:8) (fractured piece could migrate to the heart and cause death).  The only testimony Plaintiff's expert offered in response to a question about the severity of the danger was this:

> [Q]  And so if we talk about severity of danger in terms of the kinds of dangers that can come from use of the Celect, what is your opinion in terms of the severity of the danger that's posed by the product's design; that is, the Celect's design?
> A Well, the fracture is a foreign body, a piece of metal inside the body. It's got sharp edges that, now outside of the IVC, can cause substantial damage.
> Q And how severe was the danger posed to Tonya Brand?
> A Well, we know people have died as a result of this kind of injury.

Tr. at 772:14-24.

But although the severity of the danger of fracture is potentially severe, that severity has nothing to do with the **design** of the Celect.  Regardless of what brand of filter or how it was designed, the **severity** of the danger posed by a perforation, a fracture, or any other complication—that is, how serious the consequences would be *if the complication occurred*—is the same.  Thus, although the severity of the danger is high, that fact does not weigh against the design of the Celect

---

[3] Although Dr. Krumholz opined that he was not aware of any benefit the Celect provided to Tonya Brand, Tr. at 771:12-14, he did not opine that she received no benefit from the filter.  And in any event, the issue of defect must be viewed in terms of the product generally, not in terms of a particular plaintiff; otherwise, every injured plaintiff could simply argue that the product at issue was not useful **to them**, regardless of how many people it benefitted.

based on the absence of the Tulip leaves, for a possible fracture is just as severe whether a filter has "Tulip leaves" or not.

### 3. The likelihood of the danger.

Plaintiff offered no evidence demonstrating the likelihood of the danger of perforation and fracture resulting from the omission of the Tulip "leaves" from the design of the Celect. Although Plaintiff's attorneys and experts put up a lot of numbers, multipliers, and percentages concerning the occurrence of various complications from the Celect, none of that evidence connected those complications with the design defect Plaintiff claims—the omission of the Tulip leaves from the Celect.

Plaintiff's medical experts Dr. Krumholz and Dr. Gordon offered testimony concerning the frequency of perforations and fractures in the Celect, both separately and in comparison to other filters, *see* Tr. 682:19-683:9 (agreeing that there were 138 fractures out of 210,000 sold) (Krumholz); Tr. 772:2-8 (five times more likely than in the Tulip) (Krumholz); Tr. at 1890:18-1891:12 (representing that the perforation rate for the Celect filter is "80 to 90 percent") (Gordon); *but see* Tr. 375:9-376:2 (Krumholz unable to give a "real rate"); Tr. at 1883:14-24 (Gordon acknowledges that he does not know the rate of fracture for Celect or any other filter), but the doctors could not tie those complication rates to the design of the Celect or the omission of "tulip leaves" because they lacked the engineering expertise to do so Tr. at 763:22-764:9 (sustaining Cook's objection to testimony about defect in design causing injury because Dr. Krumholz is not an engineer); Tr. at 1577:17-21 (Ms. Baughman representing that Gordon will not offer any opinions on design). Their testimony therefore provides no assistance with the Banks "likelihood" factor; because Plaintiff's experts cannot attribute the frequency of Celect perforations or fractures

to the design of the Celect, they cannot address whether or how the design in question—the alteration of the "Tulip leaves"—affects the likelihood of the danger.

Plaintiff's engineering expert, Dr. McMeeking, did testify that the design of the Celect made it more likely to perforate and fracture than the Tulip, but he could not quantify either the likelihood that such complications would occur or the difference between the rate at which complications would occur in the Celect compared to the Tulip. Dr. McMeeking conceded that the Celect might have one more fracture than the Tulip, or it could have many. Tr. at 2287:10-22 ("It could be one more [fracture] or it could be many more.").[4]

Dr. McMeeking was thus unable to opine that the likelihood of fracture with the Celect is materially greater than the likelihood of fracture with the Tulip. With over 200,000 Celect filters used over the years, no reasonable juror could possibly view only one additional fracture as material to the likelihood that a fracture will actually occur in any particular case; an additional 1 in 200,000 equals a .0005 percent increase in likelihood of fracture. Given that Plaintiff bears the burden of proof on this issue, Dr. McMeeking's inability to quantify any increased likelihood of fracture in the Celect as compared to the Tulip undercuts any claim that the "likelihood of the danger" factor weighs against the reasonableness of the Celect design without the Tulip "leaves."

Plaintiff cannot reasonably contend that she can support her claim with an immaterial or insubstantial difference between the likelihood of perforation, fracture, or some other complication in the Celect and the Tulip. Without some material or substantial difference between the Celect and the Tulip as to likelihood of fracture, Plaintiff has not met her burden. *See, e.g.*, *Quintanilla*

---

[4] Although Plaintiff proposed several "safer alternative designs" other than the Celect, Dr. McMeeking offered no opinion concerning whether the design defect Plaintiff attributes to the Celect—the alteration of the "Tulip leaves"—made the Celect more likely to perforate or fracture than any of the other "safer alternative designs" that Plaintiff suggests. Tr. 773:22-774:1 (identifying Tulip as safer alternative) (Krumholz).

*v. Komori America Corp.*, No. 07-2375-CV, 2009 WL 320186 at \*2 (2d Cir. 2009) ("Without Stehlik's testimony, the plaintiffs failed to present evidence that, at the time the printing press was manufactured, it was feasible to design it in a **materially** safer manner.")  (emphasis added) (New York law); <u>*Metro. Lloyds Ins. Co. of Texas v. Louisiana-Pac. Corp.*</u>, No. A-16-CA-00424-SS, 2017 WL 4211025, at \*3 (W.D. Tex. Sept. 21, 2017) ("In sum, Metropolitan has failed to present an expert opinion on how any of its three proposed alternative designs are **substantially** safer than LP's TechShield product.") (emphasis added) (Texas law).  This is especially true in light of the daunting likelihood of PE, the condition that the Celect is intended to treat.  According to one of Plaintiff's own experts, Dr. Krumholz, there are approximately 1,000,000 new cases of fatal and nonfatal PE per year.  Tr. at 779:15-17.

Plaintiff also elicited testimony from Dr. Krumholz about the "risk" of the Celect to Plaintiff herself:

> Q In terms of likelihood of danger, the third factor, you've already told the jury your opinion on that. But what was the likelihood of the danger for Tonya Brand?
> A Again, for her, honestly, it was 100 percent because she experienced the -- she wasn't in the range of five times more likely; she was the person it happened to. So, for her, it was 100 percent. She experienced it.

772:24-773:6.  But this is mere sophistry, and has no bearing on the *Banks* "likelihood of the danger" factor.  Viewed in retrospect, as Dr. Krumholz did, Brand did not have a "risk" of fracture—her complications had **already** occurred.  There is no "likelihood" involved in an event that has already happened.  If Plaintiff's argument were correct, any patient who actually suffered a complication would have an overwhelming "likelihood" that the complication would occur, no matter how low the risk was at the time the plaintiff encountered the product.  In retrospect, for that injured plaintiff, the "risk" is **always** 100 percent.  The fact that Plaintiff actually experience a fracture does not affect the "likelihood of the danger" factor under *Banks*.

### 4.   The avoidability of the danger, considering the user's knowledge of the product, publicity surrounding the danger, and common knowledge or the expectation of danger; and the user's ability to avoid the danger.[5]

The avoidability of the dangers of IVC filters in the Celect filter in particular strongly supports the conclusion that the benefits of the Celect's design outweighed its risks.  Several witnesses testified that removal of an IVC filter after it is no longer needed will eliminate the risks of fracture, perforation, and other complications from an IVC filter.  *See* Tr. at 3245:1-4 ("If the filter is not there, there's no risk of the filter.") (Gillespie).  This is only logical; once the filter is no longer in the IVC, it cannot cause most of the complications at issue.  Plaintiff's expert agrees. *See* Tr. at 773:18-19 (Krumholz:  "I guess expose [the] patient to it for the least amount of time possible.").  And as demonstrated repeatedly at trial, the very design feature that Plaintiff claims is the defect—the replacement of Tulip leaves with secondary arms—increased the window of time within which the Celect filter could be removed.  *See* Tr. at 2963:21-2964:2 ("[T]he secondary struts are designed to try to prevent the hook from touching the wall, and then that would then lead to longer ability to retrieve[.]") (Breedlove).  Indeed, increasing that retrieval window was the very advantage that the Celect's design was intended to achieve.  *See* Tr. at 2227:1-4 ("[Y[ou're aware that Cook's main goal in redesigning the Tulip filter was to make it more retrievable, or at least retrievable for a longer period of time, right?") (McMeeking).  The Celect's substantial increase of the avoidability of the inherent risks posed by all filters weighs strongly in favor of the benefits of the Celect design and against the risks.

---

[5] Because the "avoidability of the danger" and the "user's ability to avoid the danger" present the same question under the circumstances here, this motion treats them together.  The *Banks* court's description of this "avoidability of the danger" factor also included "the effectiveness of warnings," but the Court has ruled that in light of the summary judgment on Plaintiff's failure to warn claim, warnings are not relevant to the *Banks* factors.  Tr. at 13:6-11.

US.121782896.04

### 6.    The state of the art when the product was manufactured.

The state of the art in 2008 when Plaintiff's Celect was manufactured does not weigh strongly either for or against the design of the Celect.  As Plaintiff will doubtless point out, there is no question that the state of the art at the time permitted the manufacture of an IVC filter with Tulip leaves—the Tulip itself had been on the market for years.  Indeed, "the Tulip" was the only technology Dr. Krumholz identified that is relevant to this factor.  Tr. at 773:20-774:1.

On the other side of the coin, the Celect was in fact an **advancement** of the state of the art over the Tulip exactly **because** it converted the Tulip leaves to secondary legs, extending the period in which the filter can be retrieved.  Although Plaintiff's witnesses opined that the Celect was more likely to perforate than some other filters, none of them denies that the redesign of the secondary legs from the Tulip was an advancement that actually increased this "retrievability window."  *See* Tr. 931:2-8 ("I certainly thought that the retrievability was a good feature of the Celect.") (Krumholz); Tr. 1872:23-1873:4 (agreeing the Celect was more retrievable than the Tulip) (Gordon).

This was new technology that responded to doctors' need for a filter with a larger retrievability window, Tr. 2963:15-17 (Breedlove), and achieved that end without sacrificing efficacy.  *See* Tr. 1534:20-1536:8 (noting that clot trapping testing showed the Celect was equivalent or better than Tulip) (Hendriksen).

### 7.    The ability to eliminate the danger without impairing the product's usefulness or making it too expensive.

This factor does not support Plaintiff's design-defect claim under the risk-benefit analysis. Although all the experts agree that Cook had no way of eliminating the danger of perforation and fracture from the Celect, *see* Tr. 1861:11-15 (agreeing the risks of fracture and perforation are inherent risks of all IVC filters) (Gordon); Tr. 2219:4-2219:6 (agreeing he is not aware of any filter

11

that does not perforate or fracture) (McMeeking), they also agree that no manufacturer had any way to eliminate the danger of perforation and fracture from **any** IVC filter.  **All** IVC filters have an inherent and unavoidable risk of perforation and fracture.  Tr. 1861:11-15 (Gordon); Tr. 2218:21-2219:9 (McMeeking); *see also* Tr. 789:17-790:6 (noting that fracture and perforation are general risks for filters as a class) (Krumholz).  Thus, although the danger of fracture in the Celect cannot be eliminated, that fact does not weigh against the design of the Celect based on the absence of the Tulip leaves:  the danger of fracture or perforation cannot be eliminated from an IVC filter **regardless** of whether a filter has "Tulip leaves" or not.

Plaintiff offered no testimony suggesting that this factor favored any finding of a design defect, and she did not offer testimony from an expert qualified to opine on the topic.  Tr. at 774:2-7 (sustaining objection to Dr. Krumholz's lack of qualification and foundation).   On the contrary, the only evidence on this point is the testimony of Dr. Scott Robertson, who testified that Cook could not have kept the petals and had the Celect turn out to be as retrievable as it was.  Tr. at 4108:21-4109:9.

### 8.      The convenience and durability of the product.

The convenience factor favors the design of the Celect.  As noted above, it intended to and did expand the window of retrievability, *see* Tr. 931:2-8 ("I certainly thought that the retrievability was a good feature of the Celect.") (Krumholz); Tr. 1872:23-1873:4 (agreeing the Celect was more retrievable than the Tulip) (Gordon), increasing convenience for both doctors and patients.  Plaintiff offered no testimony suggesting that the omission of the Tulip leaves from the Celect design made the product inconvenient or more difficult to use.  Convenience favors the Celect design.

12

As to durability, Dr. McMeeking testified that the Celect and the supposed "safer alternative design" were made of the same metal, Elgiloy.  Tr. 2287:10-2288:9.  And Dr. Gillespie testified that any conical filter would have behaved just as the Celect did under the same circumstances, regardless of whether it had the Tulip leaves that are the focus of Plaintiff's complaint.  Plaintiff offered no testimony to the contrary.  The Celect and the Tulip filters were thus equally durable, and the durability factor offers no support for Plaintiff's claim that the risks of the Celect filter outweighed its benefits.

## 9.    Alternative designs for the product available to the manufacturer.

Although Plaintiff spend considerable time at trial focusing on a supposedly safer alternative design, examination of the evidence she actually introduced finds little support for concluding that any alternative design weighed against the Celect on the risk-benefit scale.  Dr. Krumholz testified:

Q    Dr. Krumholz, was there a safer filter that was available to Dr. Rheudasil at the time of Tonya Brand's implant?
A    Yes.
Q    What was that?
A    The Tulip.
Q    And why do you believe it was safer?
A    Based on the evidence that we have from the multiple studies, the systematic review, the MAUDE database, and Cook's internal documents.

Tr. at 766:10-18.  But Dr. Krumholz is not an engineer, and so was unable to tie his claim that the Celect was safer than the Tulip to any design feature of the Celect, or in particular to the specific design defect claimed by Plaintiff, the Celect's replacement of the Tulip leaves with the secondary legs.

Dr. McMeeking, Plaintiff's expert who **is** an engineer, testified that the design of the Celect made it more likely to perforate and fracture than the Tulip, but (as noted above) he could not quantify either the likelihood that such complications would occur or the difference between the

13

rate at which complications would occur in the Celect compared to the Tulip.  He conceded that the Celect might have only one more fracture than the Tulip, or it could have many.  Tr. at 2287:10-22 ("It could be one more [fracture] or it could be many more.").  Dr. McMeeking was thus unable to opine that the Tulip is **materially** safer than the Celect with respect to perforation or fracture, and this factor does essentially nothing to support Plaintiff's claim that the risks of the Celect's design are greater than its benefits.

### 10. The manufacturer's compliance with industry standards or government regulations.

Although compliance with federal regulations is not by itself sufficient to defeat a design-defect claim, such compliance is powerful evidence in support of the reasonableness of a design.  *See, e.g., Banks*, 450 S.E.2d at 675 ("a manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate **conclusively** its liability for its design of allegedly defective products" (emphasis added)).

The uncontradicted evidence at trial established that in the process of seeking and obtaining 510(k) clearance for the Celect, Cook provided a vast volume of information to FDA, *see, e.g.*, Tr. at 2804:23-25 (Voorhees); Exhibits DX 276, 287, 320, 332, 333, 334, 342, 349, 350, 351, and 352. In contrast, although Plaintiff attempted to disparage Cook's communications with FDA by pointing out various information that Cook had not provided to FDA, *see, e.g.,* Tr. at 423:7-10, 431:24-432:3, 440:13-15, she offered no evidence that FDA **actually** required Cook to provide it with any of that supposedly omitted information, or that Cook's claimed omission of that information in its communications with FDA constituted a failure to comply with any FDA regulation.[6]   Likewise, Plaintiff offered no testimony that industry standards required the

---

[6] For example, Dr. Krumholz testified:

submission of such information to FDA.  Thus, for all the time Plaintiff spent in characterizing Cook documents as withholding information from the FDA, she never laid the foundation that would have been necessary to show whether such alleged withholding would actually have violated FDA regulations or industry standards.

In sum, Cook presented extensive testimony from Ms. Foreman that Cook complied with FDA regulations in its submissions to that agency, and—because she laid no foundation about what the FDA requires—Plaintiff offered no evidence that actually suggested the contrary.  This factor weighs heavily in favor of the reasonableness of Cook's conduct in designing the Celect.

### III.   Plaintiff failed to offer any evidence from which the jury could conclude that Plaintiff's Celect filter was in the same condition at the time of its placement as it was when it left Cook.

Plaintiff failed to offer any evidence that would permit the jury to conclude that her Celect IVC filter was in the same condition at the time Dr. Rheudasil placed the filter in her IVC as it was when it left Cook.  This "condition of product" is a necessary element of Plaintiff's claims for strict liability design defect and negligent design.  Because Plaintiff offered no evidence to satisfy this element, the Court should grant Cook JMOL on her design claims.

To succeed in her design-defect claim under Georgia law, Plaintiff must offer evidence that her Celect's "condition when sold is the proximate cause of the injury sustained."  Ga. Code Ann. § 51–1–11(b)(1).  In other words, she must demonstrate that the product was in the same condition

---

[Q] If we talk about specifically the OUS study, the only clinical study done for the Celect filter, do you have an opinion as to whether Cook complied with industry standards and governmental regulations?
A I do.
Q What's that opinion?
A That they did not.

Tr. at 774:18-24.  But neither he nor any other witness ever testified concerning what FDA regulation Cook supposedly failed to comply with.

when Dr. Rheudasil place the Celect in her IVC as it was when it left Cook's possession. *See, e.g.,* *Chaffin v. Atlanta Coca Cola Bottling Co.*, 194 S.E.2d 513, 516 (Ga. Ct. App. 1972) (affirming jury instruction that "the plaintiff must prove by a preponderance of the evidence that the product was in the same condition from the time it left the defendant['s] hands until the time of consumption"). This "condition of product" element is a requirement of design-defect claims as well as manufacturing-defect claims. *See, e.g., Mathis v. Farrel Corp.*, No. 1:09-CV-93 (WLS), 2011 WL 13185779, at *7 (M.D. Ga. Mar. 31, 2011) (granting summary judgment on negligent design claim where, even assuming defendant designed the product, plaintiff could not demonstrate that product had not been altered since it left the manufacturer). Absent proof of this element, a plaintiff's claim fails as a matter of law. *See Williams v. Mast Biosurgery USA, Inc.,* 644 F.3d 1312, 1319 (11th Cir. 2011) (affirming summary judgment "because there was no evidence of record to establish that [defendant] had sold a product that was defective at the time it was sold").

So here, Plaintiff was required to produce evidence concerning the condition of her Celect filter at the time of placement to support her claim that the fracture of the filter resulted from a defect in the design of the product (as she claims), rather than by something that happened to the filter after it left Cook. For example, Plaintiff's expert Dr. McMeeking testified that multiple factors like heat, corrosion, and chemicals may affect the susceptibility of a filter to fracture. *See* Tr. at 2309:21-2310:21. And Cook's Mark Breedlove testified that the Celect has about a 3% return rate because of problems with packaging. Tr. at 2968:7-9 (Breedlove). In the face of these possibilities, Plaintiff bore the burden of proving the unchanged condition of her Celect IVC filter remained unchanged from the time it left Cook to the time it was placed in her body.

16

Plaintiff failed to offer any evidence whatsoever from which the jury could conclude that the condition of her Celect filter at the time of its placement was the same as its condition when it left Cook's possession.  Plaintiff offered no testimony from Plaintiff's treating physician Dr. Rheudasil concerning the condition of Plaintiff's Celect IVC filter at the time he placed it in Plaintiff—no testimony that the filter kit was sealed and sterile when he opened it, no testimony that the filter appeared intact and undamaged when he placed it. Plaintiff likewise offered no evidence concerning how the hospital obtained the filters, where, how, or under what conditions such filters were stored, or what quality control measures the hospital had in place to assure the integrity of medical devices like IVC filters.  The record simply contains no evidence, direct or circumstantial, that would allow a jury to infer **anything** about the condition of the filter at the time it was placed in her body, much less that it was in the same condition as when it left Cook.

Absent such evidence, Plaintiff is left with only her bare allegation that her filter reached her "without substantial change in the defective and unreasonably dangerous condition in which [it was] manufactured and sold." Dkt. 213 ¶ 70 (Master Consolidated Complaint); Dkt. 688 (Brand Amended Short Form Complaint, incorporating Master Complaint).  This unsubstantiated allegation cannot as a matter of law satisfy Plaintiff's burden of proof on the "condition of product" element.  *See, e.g., McClendon v. Manitou Americas, Inc.*, No. CV 415-250, 2016 WL 5723671, at *3 (S.D. Ga. Sept. 29, 2016) ("[M]erely claiming that the brakes failed is not sufficient to create an issue of disputed, material fact. There is simply no evidence in the record supporting a conclusion that the forklift's brakes were defective when it left Defendant's control.").

For these reasons, Cook is entitled to judgment as a matter of law on Plaintiff's design-defect claims. *Lockman v. S.R. Smith, LLC*, No. 4:07-CV-0217-HLM, 2010 WL 11566367, at *14 (N.D. Ga. May 14, 2010) (granting summary judgment where plaintiff failed to provide

17

evidence that the product was defective when sold); *Miller v. Ford Motor Co.*, 653 S.E.2d 82, 84 (Ga. Ct. App. 2007) (affirming summary judgment where plaintiffs failed to offer evidence that products contained defect at the time they left the defendant's control); *see also Carmical v. Bell Helicopter Textron*, 117 F.3d 490, 494 (11th Cir. 1997) (affirming summary judgment on design-defect claim where product had been altered after leaving manufacturer).

**IV. Plaintiff failed to offer sufficient evidence to create a jury issue on the element of causation.**

Plaintiff has failed to provide sufficient evidence to support the causation element of her claims defective design, and the Court should grant Cook JMOL on those claims. Plaintiff's attempt to demonstrate causation at trial consisted of two steps:

1. Plaintiff offered the testimony of medical experts Drs. Krumholz and Gordon to try to establish that her Celect IVC filter caused the perforation and the subsequent fracture.

2. Plaintiff offered the testimony of engineering expert Dr. McMeeking to try to link a specific design feature of the Celect to the perforation and fracture.

These experts failed to provide sufficient testimony to create a jury issue on either of the two links in this evidentiary chain. The expert testimony that Plaintiff offered at trial failed to causally link a claimed defect in the Celect IVC filter to her injuries fails for multiple reasons:

- Plaintiff's medical experts' differential diagnoses have not properly excluded at least two possible causes of her injuries:

  o Plaintiff's spinal osteophytes (*i.e.,* bone spurs) and spinal spondylosis (*i.e.,* spinal degeneration), and

  o Plaintiff's doctors' manipulation of her vena cava during her lengthy back surgery;

18

- Plaintiff's engineering expert's testimony does not support a specific causal link between the design of the Celect and Plaintiff's perforation and fracture; and

- None of Plaintiff's experts offered any opinion that her injuries would not have occurred had the Celect had a different design—the "but for" causation requirement.

## A.   Plaintiff's medical experts failed to offer proper, reliable differential diagnoses.

Both Dr. Gordon and Dr. Krumholz testified that they based their opinions that the design of the Celect caused Plaintiff's filter fracture on a differential diagnosis.[7]  *See*  Tr. at 747:19-23 (Krumholz); Tr. at 1792:24-1793:2 (Gordon).  The cornerstone of a differential diagnosis is the physician's systematic consideration and exclusion of all possible causes of an ailment based on scientific evidence.  A sound differential diagnosis "must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out,'" *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007); *accord Robinson v. Davol Inc.*, --- F.3d ---, 2019 WL 275555, at *5 (7th Cir. Jan. 22, 2019) (affirming summary judgment on causation grounds), and must explain *why* each cause was ruled in and then ruled out.  If an expert fails to adequately "rule out" alternative causes, the expert's opinion cannot as a matter of law support a claim of causation, and the defendant is entitled to judgment as a matter of law.  *See, e.g., Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015) (affirming grant of summary judgment based on failure of expert's supposed differential diagnosis to "rule in" and "rule out" other potential causes of plaintiff's respiratory problems); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 774 (7th

---

[7] In fact, what Plaintiff's experts attempted was not a differential *diagnosis*, which attempts to diagnose a condition, but a differential *etiology*, which attempts to find the *cause* of a condition. *See Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015) (noting distinction).  Both methods, however, use similar "rule in, rule out" methodologies.  *See id.*  Because both of Plaintiff's experts describe their process as a "differential diagnosis," this memo will use that term.

US.121782896.04

Cir. 2014) (affirming grant of summary judgment based on trial court's exclusion of expert's supposed "differential etiology" that failed to meaningfully consider and rule out potential alternative causes, noting that failure is "fatal to [the expert's] testimony"); *Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 932 (S.D. Ind. 2014) (granting summary judgment, holding that because expert "did not rule out the potential causes as required by differential etiologies," expert's "methodology is not reliable" and must be excluded under *Daubert*).

Here, the testimony of Plaintiff's experts Dr. Krumholz and Dr. Gordon failed to apply the "rule out" methodology with respect to at least two acknowledged possible causes of the perforation of Plaintiff's Celect filter:  (1) osteophytes and spondylosis, and (2) manipulation of the vena cava during surgery.  To create a jury question on causation, Plaintiff's experts needed to rule out **both** of these possible causes; they ruled out **neither**.

### 1.     Plaintiff's medical experts did not properly exclude her osteophytes and spondylosis as a cause of her filter fracture and perforation.

Plaintiff failed to establish a jury issue on causation because her medical experts failed to properly rule out Plaintiff's spondylosis and osteophytes as a cause of her filter perforation and fracture.  Both Dr. Krumholz and Dr. Gordon "ruled in" osteophytes as a cause of Plaintiff's fracture.  Dr. Krumholz described the mechanism of that cause as follows:

> Q What risk is posed by a filter perforating the IVC and contacting an osteophyte?
> A Once it's through and hitting another structure, it can damage that structure. It can also -- by abutting something, it can fracture.

Tr. at 762:5-9.  Dr. Gordon similarly rules in osteophytes and spondylosis of the spine as possible causes under his "Differential Diagnosis" heading.  Tr. 1993:9-11.[8]

---

[8] The question of whether Cook should or could somehow have designed the Celect to prevent or reduce fractures resulting from contact with osteophytes is an issue that Plaintiff has not raised in this case.  The "defect" plaintiff claims is the removal of the "leaves" on the Tulip, *e.g.,* Tr. at 205:25-206:5, and none of Plaintiff's experts has offered any opinion that the removal of those

### a.      Dr. Krumholz.

Plaintiff's expert Dr. Harlan Krumholz acknowledges that osteophytes can be associated with fracture, Tr. 762:5-9, and that he knew that Plaintiff had osteophytes.  *See* Tr. 757:22-758:3. Yet other than his mere reference to Plaintiff's osteophytes, Dr. Krumholz's supposed differential diagnosis does not discuss them, and certainly does not provide any basis to rule out the osteophytes as the cause of Plaintiff's fracture.  Tr. 1163:24-1164:3; 1164:13-23.  Dr. Krumholz also admitted that he had not even determined how many or what type of osteophytes Plaintiff had or whether any of her osteophytes were compressing her inferior vena cava.  Tr. 1164:13-23; 1165:4-1166:4.  Instead, he based his opinion that Plaintiff's osteophytes had not caused her fracture on his understanding that osteophytes do not routinely cause fractures:

> Q Dr. Krumholz, in your opinion within a reasonable medical certainty, did an osteophyte cause Tonya Brand's Celect filter to fracture?
> A No.
> Q How are you able to reach that opinion? Explain that to the jury.
> A Based on my understanding of her anatomy, based on my understanding of the literature looking for evidence in the literature that would suggest that osteophytes routinely cause this….

Tr. at 761:4-762:20 (omitting objections, rulings, and stricken questions and answers).[9]

On cross examination, Dr. Krumholz admitted that he had not even considered osteophytes in his expert report, and that he did not determine whether Plaintiff's osteophytes compressed her vena cava.  Instead, he again relied on his simple impression that osteophytes do not cause fractures very often:

---

leaves had any effect on the risk or likelihood that a filter's contact with an osteophytes will cause the filter to fracture.

[9] Dr. Krumholz also declined to opine on whether an x-ray showed Plaintiff's filter was stuck on an osteophyte:  "Q You can see on the CT scan, April 10, 2009, that the filter is stuck on an osteophyte, correct?  A I think it's hard to tell in a 2-D image where exactly they are in relationship to each other because it could be in different planes. I mean, I don't know."  Tr. at 1162:12-16.

Q      Here's my question for you, Dr. Krumholz: You told this jury yesterday, under Ms. Baughman's questioning, that you considered and were able to rule out this osteophyte as the cause of Mrs. Brand's filter fracture.

Do you remember that testimony?

A Yes.

Q …Dr. Krumholz, you would agree with me that the word "osteophyte" appears nowhere in your report?

A I don't remember, but possibly.

Q Whether Mrs. Brand's osteophyte, whether it compressed her vena cava in the exact position of her filter, whether it did or it didn't, you did not reach an opinion on that in your report, did you?

A I reached an opinion about what was the likely cause of her problem. I didn't believe it was the osteophyte. We didn't comment on it.

Q In your differential diagnosis, when you were listing off for the jury the other day all of the things that you considered as causing her perforation and causing her fracture, an osteophyte wasn't on the list, was it?

A No.

***

Q Dr. Krumholz, in the course of your work, you did not determine whether Mrs. Brand's vena cava was compressed by an osteophyte or not?

A No.

Q In the course of your work in this case, you did not determine whether an osteophyte pushing on a leg of the filter caused her perforation or her fracture, did you?

A **No, because I didn't consider an osteophyte to be major cause. 50 percent of people have osteophytes. Osteophytes in the literature intermittently discussed as potential risk factors…but are not a contraindication**.

***

Q Dr. Krumholz, in the opinions in your report, you have not noted or measured Mrs. Brand's osteophytes, have you?

A No.

Q And you reached your opinion about the cause of her perforation without doing that work, didn't you?

A True.

Q In your report you did not determine or discuss whether her osteophytes were compressing her vena cava in the location of the filter, did you?

A I saw no evidence of that.

Q It's not discussed in your report. We can agree on that?

A Yes. It's 178 pages. It seemed enough.

Q Dr. Krumholz, within your report and in your deposition, at the time of both of those things, you did not know how many osteophytes Mrs. Brand had, the location of the osteophytes, or how they affected her vena cava, did you?

A I had read the operative reports, the imaging studies. No one commented on an osteophyte compressing the IVC. So it seemed to me not -- I could have commented on a million things, but this -- 50 percent of people have these. No, it's not a contradiction. No one's warning about it.

22

Q That's not my question, sir.

A So I didn't include it.

Q In your list of things on your differential diagnosis, Mrs. Brand's traction osteophyte isn't on the list, is it?

A No. Her traction osteophyte?

Q Yes.

A What do you mean by that?

Q It's a term for the osteophyte. We'll learn more about it later but that --

A You wanted to call it a compression. Okay.

Tr. at 1163:5-1166:9 (objections, rulings, and stricken questions and answers omitted, emphasis added).

### b.    Dr. Gordon.

Far from ruling out osteophytes and spondylitis as possible causes of Plaintiff's perforation and fracture, Dr. Gordon readily acknowledges that these conditions were "part of the process" that caused Mrs. Brand's filter to fracture.  Tr. 2016:21-24.   As Dr. Gordon described it, Mrs. Brand's osteophyte created a fulcrum effect, acting as a pivot point for the filter strut once it gets stuck.  Tr. 2016:25-2017:6.

Despite admitting that these conditions likely contributed to Plaintiff's filter fracture, Dr. Gordon nevertheless attempts to rule them out as a cause by observing that "because, basically, all the OUS patients had osteophytes . . . . I never really thought about it."  Tr. 1994:15-17.  Even if Dr. Gordon's premise about osteophytes being common were true—and he offers neither analysis nor authority to suggest that it is—the *frequency* of osteophytes in OUS patients has nothing to do with whether it is a *cause* of Plaintiff's filter fracture.  Distracted driving is very common, but its prevalence certainly does not rule it out as a cause of a particular accident, even if many people who drive distracted (say, by talking on their cell phones) do not have accidents.  Likewise, if osteophytes and spondylosis are a possible cause of filter fracture—and Dr. Gordon agrees they

US.121782896.04

are—then they are a possible cause of **Plaintiff's** filter fracture, regardless of whether other patients who have the condition do not experience filter fractures.

Pre-filter imaging shows that an osteophyte was *already* compressing the IVC in the IVC filter's vicinity and placing unusual stresses on the filter *through* the IVC wall even *before* the filter was placed.   Tr. 3272:8-11 (Gillespie).   In sum, Dr. Gordon acknowledges that the osteophytes and spondylosis contributed to Plaintiff's filter fracture, and he offers neither authority nor sound analysis for ruling them out as the cause of Plaintiff's filter fracture.

*****

In sum, Plaintiff's medical experts rule in Plaintiff's osteophytes and spondylosis as *possible* causes of the fracture of her filter, but neither expert offers any sound or reasoned basis for ruling them out as *actual* causes.   Indeed, Dr.  Gordon *agrees* that the conditions contributed to Plaintiff's injuries.   These experts offer only conclusory assertions, unsupported by analysis or authority, that some other defect in the Celect filter, and not these conditions, caused Plaintiff's filter fracture.   "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant."   *Avery v. Cleveland Avenue Motel*, 521 S.E.2d 668, 645 (Ga. Ct. App. 1999). Plaintiff has failed to meet her burden of presenting competent expert testimony supporting a differential diagnosis that a design defect in the Celect IVC filter caused the fracture.  Her design claims therefore fail as a matter of law, and Cook is entitled to summary judgment on those claims.  *See Higgins*, 794 F.3d at 705; *Brown*, 765 F.3d at 774.

> **2.     Plaintiff's medical experts did not properly exclude her spinal surgery
> as a cause of her filter fracture and perforation.**

24

Plaintiff also failed to establish a jury issue on causation because her medical experts failed to properly rule out Plaintiff's spine surgery as a cause of her filter perforation and fracture.  Again, both Dr. Krumholz and Dr. Gordon "ruled in" the spine surgery as a possible cause of Plaintiff's perforation and fracture. Tr. at 752:15-17, 755:1-5 (Krumholz); Tr. at 1992:19-1993:1 (Gordon).

### a.       Dr. Krumholz.

As with osteophytes, Dr. Krumholz's testimony claiming that he ruled out the spinal surgery as a cause of Plaintiff's perforation and fracture does not rely on any scientific or medical basis for exclusion, but instead simply on his impression that the filter itself was a more likely cause:

| | |
|---|---|
| Q | And is the back surgery one of the possible causes of the perforation or fracture that you considered? |
| A | It is. |
| Q | And were you able to rule the back surgery out as a cause of Tonya Brand's filter perforating and fracturing? |
| *** | |
| A | To a degree of reasonable medical certainty, I was able to rule out the back surgery as a cause. |
| Q | And can you explain how you did that? |
| A | Well, by a search of the literature, by reading deeply what happened. It was a long surgery. It was one that involved retraction of the IVC and a lot of manipulation of the internal organs. |
| | But these filters are put in people in trauma and in different circumstances. I looked for articles that would suggest that the -- that these kind of surgeries, where people are in the abdomen or in the back of the spine, that these are actually causing these things to perforate. |
| | I had to understand also whether the issue about the device -- I mean, when there's manipulation and a sharp device that's at high risk, **I mean, the question, to me, was is it the surgery or is it the device? Because these are meant to be put in preoperatively. And so I concluded, to my degree of reasonable certainty based on what I had read and what I had learned and what I read about the case, that it wasn't the surgery.** |

Tr. at 751:15-752:16 (emphasis added).  But this is not a proper "ruling out" for a differential diagnosis.  He did no independent analysis of why the surgery could not have caused the perforation; rather, he simply compared the surgery to the filter and decided that the surgery was

not the cause. He gives no explanation of **why** he ruled out the surgery—it is just his subjective, untestable opinion that it should be ruled out. He also acknowledged that he could not determine whether the perforation was present at the end of Plaintiff's surgery. Tr. at 755:15-16 ("whether the perforation was there at the end of the surgery or not, nobody knows.")

In the end, Dr. Krumholz admitted that he could not rule out Plaintiff's surgery as a cause of her perforation:

> Q Dr. Krumholz, I think I just heard you say -- we can agree, can't we, that you cannot, based on the data available to you, exclude the spinal surgery as the cause of Mrs. Brand's perforation, can you?
> A I would say something that increased her risk.
> Q But you can't rule it out?
> A No.

Tr. at 1135:20-1136:1. In sum, Dr. Krumholz cannot and did not rule out Plaintiff's spine surgery or the retraction of organs that the surgery involved as a cause of her perforation. Tr. at 1135:20-1136:1.; 1139:18-24. His testimony therefore cannot support a finding that the Celect filter caused the perforation and subsequent fracture.

### b.   Dr. Gordon

Dr. Gordon likewise failed to properly rule out Plaintiff's spine surgery as a cause of her perforation and fracture.

In his direct examination, Dr. Gordon flatly stated that he had ruled out Plaintiff's spine surgery as a possible cause of her perforation, but offered no details. *See* Tr. at 1795:2-3 ("I ruled out any possibility of surgical issues."). When pressed on cross-examination and presented with Dr. Krumholz's inability to rule out surgical issues, Dr. Gordon offered a fragmented and uncertain explanation that ended not with a conclusion but with a question:

> Q …Dr. Gordon, if Dr. Krumholz said that you could not say, based on this imaging alone, whether she had perforated the vein or not during the surgery, you wouldn't disagree with that, would you?

> A I would. I don't -- I don't see how the vein could have been perforated from surgery just from the -- between the operative reports -- and, yes, there are only two images, but between the operative reports, the location of surgery, the depositions of Dr. Morrison and Dr. Rheudasil, I think, from the combined totality of that, I don't see how it's possible for -- even if it moved just a little bit, the fact that it took almost two hours just to get exposure implies that there's a lot of adhesions, meaning that there's not a lot of movement. So whatever movement was done below, how would that transfer above if it took two and a half hours just to expose down below?

Tr. at 1987:12-1988:3.  Pressed further, Dr. Gordon revealed that, like Dr. Krumholz, he based his "ruling out" of the spinal surgery not on any objective criteria but simply on his views from the literature that it does not happen very often:

> A Right. So I guess we're reading it and -- the way I read it and the way I at least interpreted it combined with his report was that he did not think it happened, but he couldn't rule it out, as opposed to me, where I think, to a reasonable degree of medical certainty, I think that there's -- **it's very, very unlikely, especially given the 80 to 90 percent perforation rates that we saw in the OUS studies in patients with a tremendous amount of osteophytes.**

Tr. at 2011:11-18.  Yet despite this purported reliance, Dr. Gordon admitted that he had not done any research on how often manipulation of the IVC actually causes perforation.  *See* Tr. at 1995:6-11.

In sum, Dr. Gordon cannot and did not properly rule out Plaintiff's spine surgery or the retraction of organs that the surgery involved as a cause of her perforation, and his testimony therefore cannot support a finding that the Celect filter caused the perforation and subsequent fracture.

In sum, rather than actually applying differential diagnoses, Plaintiff's experts simply relied on unhelpful intuition and a "feeling" that the design of the filter caused the perforation and fracture rather than some other cause.  Plaintiff's experts' failure to conduct a proper differential diagnosis ruling out osteophyte and spondylosis and the manipulation of the IVC during her surgery means that their testimony cannot satisfy the element of causation for Plaintiff's claims.

27

**B.      Dr. McMeeking's testimony does not establish specific causation.**

Plaintiff's engineering expert, Dr. McMeeking, likewise cannot satisfy the element of proximate cause for Plaintiff's design defect claim.  According to Dr. McMeeking, the design of the Celect tends to make it perforate and fracture, and therefore any perforation or fracture in a Celect is attributable to that design.  Because Plaintiff's filter perforated and fractured, Dr. McMeeking posits, the Celect design must have caused that perforation and fracture.  The logical fallacy here is obvious and "proves" far too much.  Dr. McMeeking's analysis would permit plaintiffs to blame every perforation or fracture involving a Celect filter on his "design defect," even though every expert agrees that some risk of perforation is inherent in every IVC filter.  By definition, then, Dr. McMeeking is blaming the design of the Celect filter for perforations that have nothing to do with the design of the filter.

In effect, what Dr. McMeeking has done is supply testimony concerning **general** causation; that is, he has opined that the design of the Celect makes perforations more likely in the general population of Celect patients than they would be had Cook included "perforation limiters."  *See, e.g., Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 691 n. 2 (N.D. Ga. 2006) ("'General causation is concerned with whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease.'") (quoting *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005)).  Dr. McMeeking tries to extend his general causation observation to a conclusion that the design of the Celect caused Ms. Brand's **individual** perforation and fracture.  But he does nothing to support such a claim of **specific** causation; that is, he offered nothing to support his assertion that the **specific** perforation and fracture of Plaintiff's filter was caused by the design of the Celect, and was **not** caused instead by any of the multiple other potential causes of perforations and fractures that Dr. Krumholz and Dr. Gordon identified.

28

Indeed, unlike Dr. Krumholz and Dr. Gordon, Dr. McMeeking did not claim to have performed a differential diagnosis and does not claim to have eliminated other possible causes of the perforation and fracture.  Put simply, he did not even consider other possible causes of the perforation or fracture of Plaintiff's Celect filter.  He did not review and rule in known possible causes of perforation or fracture, and he did not analyze such **possible** alternative cause to try to rule them out as **actual** causes.  Tr. at 2340:22-2342:16 ("[Q] [Y]ou didn't consider her anatomy at all in doing your calculations? A That's correct."); *see also* Tr. at 2233:9-14 (agreeing he did not analyze how the interaction between Mrs. Brand's osteophyte and her filter affected the forces exerted on the filters).

Because Dr. McMeeking provides no basis for a jury to believe that the perforation and fracture of Plaintiff's filter were caused by a defect in the design of the filter rather than one or more of the other possible causes, he cannot establish causation.  As one Georgia court put it:

> [W]here a plaintiff seeks to carry its burden of proof by inference, that inference must not only tend in some proximate degree to establish the conclusion, but render less probable all inconsistent conclusions.

*Bunch v. Maytag Corp.*, 439 S.E.2d 676, 677 (Ga. Ct. App. 1993) (affirming summary judgment where plaintiff's expert "has not been able to rule out several possible causes of the fire which are unrelated to the design of the oven"); *see also Ogletree v. Navistar Intern. Transp. Corp.*, 535 S.E.2d 545, 550-51 (Ga. Ct. App. 2000).  Dr. McMeeking's testimony cannot create a jury question on the element of causation, and cannot prevent JMOL.

## C.   Plaintiff has identified no evidence that a different design of the Celect IVC filter would have prevented Plaintiff's injuries.

Cook is also entitled to JMOL on Plaintiff's design claims because Plaintiff has offered no expert testimony supporting the conclusion that "but for" a defect in the Celect filter's design, Plaintiff's filter would not have fractured.  Specifically, no expert has testified that Plaintiff's

29

Celect filter would not have perforated and fractured, or likely would not have perforated or fractured, if the filter had had a different design.

"To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of [the] injury." *Atlanta Obstetrics, etc., Group v. Coleman,* 398 S.E.2d 16, 17 (Ga. 1990). "Proximate cause means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred." Georgian Council of Superior Court Judges, Suggested Pattern Jury Instruction 60.200 (2016) (hereafter GSPJI). Similarly, "cause in fact" requires that the defect or negligence at issue be "[t]he cause without which the event could not have occurred." Black's Law Dictionary (10th ed. 2014) (equating "cause in fact" with "but for" cause); *see also Finney v. Machiz*, 463 S.E.2d 60, 60 (Ga. Ct. App. 1995) ("If an injury would have occurred notwithstanding alleged acts of negligence of the defendant, there could be no recovery, in an action for negligence."); *Williams v. Manitowoc Cranes, LLC,* No. 1:14CV383-HSO-JCG, 2016 WL 7670061, at *5 (S.D. Miss. Sept. 21, 2016) (applying Mississippi law, holding that "a plaintiff must offer a 'feasible design alternative which, to a reasonable probability, would have prevented what happened to him'" (quoting *Elliott v. El Paso Corp.*, 181 So. 3d 263, 272 (Miss. 2015))); *compare Zeagler v. Norfolk S. Ry. Co.*, 730 S.E.2d 657, 661 (Ga. Ct. App. 2012) (failure to provide particular training to employee is a cause-in-fact of injuries if the training would have avoided the injury or reduced the injuries).

This "cause in fact" analysis is common in Georgia tort law, where plaintiffs regularly claim that a different safety design would have prevented their injuries. *See, e.g., Bodymasters Sports Indus. v. Wimberley*, 501 S.E.2d 556 (Ga. Ct. App. 1998) (affirming denial of summary judgment on design defect claim based on absence of "dead man" lock that would have prevented

30

plaintiff's injury); *Wilson Indus. Elec. v. Cincinnati Ins.*, 539 S.E.2d 612 (Ga. Ct. App. 2000) (noting underlying case involved claim that "the saw was defective because it was designed without a guard which would have prevented [the] injury").

To satisfy this "but for" element of causation for her design claims, Plaintiff needed to offer evidence that her perforation, fracture, and injuries "would not have occurred" **but for** the claimed design defect in the Celect IVC filter. Because this is not an issue that jurors can address through their ordinary experiences, Plaintiff was required to prove this fact through expert testimony. *See, e.g., Wheeler v. Novartis Pharms. Corp.*, 944 F. Supp. 2d 1344, 1352 (S.D. Ga. 2013). She failed to offer such expert testimony, and her claim fails as a matter of law.

### 1. Plaintiff's medical experts failed to offer testimony of "but for" causation.

Neither Dr. Krumholz nor Dr. Gordon offered any opinion that Plaintiff's perforation, fracture, and injuries "would not have occurred" had the Celect had a different design. Although each of these medical experts opined in conclusory fashion that a design defect "caused" the sequence of events that Plaintiff experienced, neither offered any opinion that the sequence of events would not have occurred had the Celect had a different design. For example, Dr. Krumholz testified:

> Q    What did you, in fact, conclude caused Tonya Brand's filter to perforate and fracture?
>
> A    The primary cause was the Celect itself going through the wall.

Tr. at 764:15-18. But this opinion is purely tautological and entirely unhelpful. Dr. Krumholz opines that the filter perforated the wall because it went through the wall; in other words, it

perforated because it perforated.[10]  Moreover, it says nothing about whether another filter would not have gone through the wall, the "but for" requirement.

Dr. Gordon likewise offered no opinion concerning whether the Plaintiff's perforation and fracture would not have occurred with another design, and in fact lacked any expertise to do so. In ruling on Cook's *Daubert* motion concerning Dr. Gordon, the Court ruled that Dr. Gordon was not qualified to opine on design issues.  Dkt. 9770 at 4 (holding that Dr. Gordon "is not qualified to testify about the filters' engineering design and how a change in that design—i.e., the addition of perforation limiters—may affect their performance").  Consistent with this ruling, Dr. Gordon offered no design-related opinions at all at trial.  Tr. at 1642:17-25 (answering questions related to migration, tilt, and perforation, "without getting into the design of the filter").  He testified that the filter had caused Plaintiff's pain concerning the extrication of the filter strut from her leg and had caused the need for the open removal, Tr. 1793:9-15; 1794:15-21, but he offered no opinion that any defect in the *design* of the filter played any causal role in Plaintiff's injuries.

These opinions of Dr. Krumholz and Dr. Gordon are at best directed at the first half of Georgia's causation requirement, that is, establishing a "cause which, in a natural and continuous sequence, produces an event."  GSPJI 60.200.  They do not in any address the second half of the requirement:  "without which cause such event would not have occurred."  Dr. Krumholz offered not testimony that a different design of Plaintiff's IVC filter would have prevented Plaintiff's problems with the filter.  He did not testify assert with reasonable medical certainty that Plaintiff's filter would not have perforated or fractured; he did not testify that there is a reasonable likelihood that her injuries would not have occurred; he simply did not address the issue at all.  This is a

---

[10] Plaintiff attempted to have Dr. Krumholz testify that the design of the Celect caused the perforation, but the Court sustained Cook's objection that he lacked the engineering expertise to give such an opinion.  *See* Tr. at 763:19-764:9.

crucial flaw:  the **absence** of a safety device—like the "perforation limiters" Plaintiff's experts posit here—logically and legally cannot be the cause of an injury unless the **presence** of that safety device would have prevented the injury.

Indeed, not only have Plaintiff's medical experts failed to offer testimony supporting any claim that a filter with a different design would not have perforated or fractured, the testimony they did offer compels the conclusion that the same complications and the same injuries could easily have occurred **even if the Celect had had the design changes Plaintiff urges**.  For example:

- Plaintiff's experts agree that all IVC filters pose risks of perforation, tilt, fracture, and migration, and that such risks cannot be eliminated.  *See* Tr. 1811:18-1812:1, 1812:10-16, 1812:21-25 (agreeing that all filters, all foreign bodies carry risks, including the risks of perforation and migration) (Gordon); Tr. 789:17-790:6 (noting that fracture and perforation are general risks for filters as a class) (Krumholz); Tr. 2219:4-6 (agreeing he is not aware of any filter that does not perforate, tilt, or fracture) (McMeeking).

- Numerous studies and articles, many cited in Plaintiff's experts' reliance materials, demonstrate beyond doubt that *all* IVC filters **actually** suffer incidents of perforation, fracture, tilt, and migration, including the Tulip and the other "safer alternative designs" Plaintiff proposes—the filters that Plaintiff's experts claim have the "safety designs" that the Celect supposedly does not have.  *See, e.g.*, Anita Rajasekhar & Michael B. Streiff, *Vena Cava Filters for Management of Venous Thromboembolism: A Clinical Review*, BLOOD REV. 225, 231 (2013); Jeremy C. Durack et al., *Perforation of the IVC: Rule Rather Than Exception After Longer Indwelling Times for the Gunther Tulip and Celect Retrievable Filters*, CARDIOVASC. 35 INTERVENT. RADIOL. 299, 303 (2012).

- Dr. Krumholz acknowledged and quoted a study showing that Tulip filters—with the petals Plaintiffs' experts complain that the Celect should have—can nevertheless experience perforations.  Tr. at 883:18-885:3.

- The internal Cook complaint files Dr. Gordon and Dr. Krumholz reviewed in preparing their opinions contained multiple claims that Tulip filters had perforated, fractured, tilted, and/or migrated, despite the Tulip's inclusion of alleged "perforation limiters" absent from the Celect.  *See* Tr. 503:15-24; 505:2-13 (indicating that he had reviewed Cook complaint files, including those involving the Tulip filter) (Krumholz); PX1913 (citing Cook Complaint File PR75455, demonstrating perforation of the inferior vena cava by a Tulip filter); Tr. 1876:23-

1877:13 (discussing letter Dr. Gordon wrote to Cook regarding Tulip filter migrating to patient's heart); DX3110A (Letter from Dr. Gordon to Cook regarding migration of Tulip filter).

This undisputed evidence makes clear that the mere presence of the "petals" or "perforation limiters" that Plaintiff's experts recommend does not necessarily prevent the complications or injuries Plaintiff experienced.

Given these facts, Plaintiff's experts did not and could not opine that even if Plaintiff's Celect filter had been designed with "perforation limiters," Plaintiff would not have experienced exactly the same perforation, fracture, and injuries she experienced with the Celect. For the jury to conclude from this evidence that a change of design of the Celect would have prevented Plaintiff's perforation, fracture, or injuries would be sheer speculation. And, as noted above, "when the matter remains one of pure speculation or conjecture, … it becomes the duty of the court" to dispose of the claim as a matter of law. *Avery*, 521 S.E.2d 668 (affirming summary judgment).

Plaintiff's failure to offer any "but for" causation testimony stands in stark contrast to the testimony from Dr. Gillespie that given Plaintiff's unique circumstances, she would have had the same complications—perforation and fracture—with **any** conical filter. He testified:

> Q   Dr. Gillespie, I want to talk to you about paragraph 7A of his report -- of your report. You write, "Any conical filter placed in Mrs. Brand, if placed in the same location near an osteophyte and manipulated during ALIF exposure, would have performed the same way." Did I read that correctly?
> A   Yes.
> Q   What does that mean?
> A   It just means I believe this would have happened with any type of filter that was a cone-shaped-type filter put in the area and manipulated in the same way.

Tr. at 3334:11-21. Dr. Gillespie repeated the opinion on cross-examination:

> Q   And then -- we'll get to this in a little while, but you could rule out the design of the filter, right? That was your differential diagnosis, right?

34

| A | Well, I believe it would have happened with any conical filter if they -- |
|---|---|
| Q | Well, no, I'm just summarizing now. |
| A | But if it had been put in the same location and gone through the same surgery and wedged in an osteophyte, it would have happened to any conical filter. |

3394:4-12. And he explained why:

| Q | Dr. Gillespie, regardless of the type of conical filter that was placed in Mrs. Brand, explain to the jury why you believe there still would be a perforation and a fracture. |
|---|---|
| A | Well, it's still metal object against soft tissue being forced through the wall by pulling on it. It really doesn't quite matter too much the filter. They're relatively the same with regard to that poke point. |
| | *** |
| Q | …If a filter is fixed above the place that the physicians are pulling or retracting, will the walls of the tissue still be stretched across the anchors? |
| A | Yes. |

Tr. at 3423:10-25.

In sum, neither Dr. McMeeking nor any of Plaintiff's other experts offered any testimony that the use of the Tulip or any other filter design different from the Celect would have prevented Plaintiff's perforation or fracture; that is, no evidence that "but for" the design of the Celect without the Tulip "leaves," Plaintiff's injuries would not have occurred.  Absent such "but for" evidence of causation, especially in the face of contrary evidence from Cook's expert, Plaintiff cannot establish the element of causation.  Her claim therefore fails as a matter of law, and Cook is entitled to JMOL.  *See, e.g., Finney v. Machiz*, 463 S.E.2d 60, 60 (Ga. Ct. App. 1995).

## V.     Alternatively, Cook is entitled to partial JMOL on several categories of Plaintiff's damage claims.

In the alternative, should the Court conclude that Plaintiff has in fact created jury questions for each of the elements of liability, Cook is nevertheless entitled to partial JMOL on portions of Plaintiff's damages claim.  Plaintiff has failed to offer evidence in support of several of the

US.121782896.04

categories of damages she claims and has disavowed other categories, and the Court should grant

Cook JMOL on those categories of damages.

> **A.**   **Cook is entitled to JMOL on all claims for pain and suffering outside the two periods to which Plaintiff has limited those claims.**

Cook is entitled to partial JMOL on Plaintiff's claims of pain outside of two periods:

(1) when the filter strut came out of her thigh on June 22, 2011, and (2) when she had the open

procedure to remove her filter on October 22, 2015.

In her pleadings, Plaintiff sought broad damages for pain and suffering that she described

as "past and future pain and suffering." Dkt. 213 at 36-37 (Master Consolidated Complaint); Dkt.

688 (Brand Amended Short Form Complaint, incorporating Master Complaint). At the January 9,

2019 pretrial conference, however, Plaintiff voluntarily and unilaterally limited her claims of pain

to two specific periods. Plaintiff's attorney represented to the Court:

> I tried to -- I made a suggestion last night to Cook's counsel, which we had discussed a few months back, and what we said we planned to do at trial and **what we will do at trial is limit Ms. Brand's claims of pain to two specific instances.** One, when the filter strut came out of her thigh and her son removed it; and two, the physical pain associated with the open procedure.

1/9/2019 Tr. at 23:15-21 (emphasis added). Plaintiff's attorney explained to the Court that this

limitation of Plaintiff's pain claims was based on her inability to offer expert evidence that linked

her pain in other periods to her IVC filter:

> Throughout the case, throughout discovery and even in Mrs. Brand's deposition, she said: I've had abdominal pain that I attribute to the filter. I've had other pain that I attribute to the filter. But when we had our medical experts look at this, Dr. Gordon in particular, he said other than the two instances we're talking about, the filter strut out of the thigh and the pain related to the open procedure, he couldn't say with a reasonable degree of medical certainty that that pain is 100 percent caused by the filter. **So we're not going to make that claim at trial.**

1/9/2019 Tr. at 23:22-24:6 (emphasis added). The Court has characterized these representations

as an "oral amendment of the complaint regarding the claim for pain." Tr. at 2539:19-21.

Given this unambiguous disavowal, Plaintiff cannot recover in this action for pain in any time periods—past or future—other than the two periods her counsel identified: (1) the June 22, 2011, incident when Plaintiff removed the strut from her thigh and the period immediately following, and (2) the October 22, 2015, surgical removal of her Celect and the resulting recovery period for that surgery. Cook is therefore entitled to judgment as a matter of law as to the claims of pain and suffering alleged in Plaintiff's complaint for all other periods.

**B.     Cook is entitled to JMOL on Plaintiff's claim for past medical costs.**

Cook is entitled to partial JMOL on Plaintiff's claims for past medical costs related to her IVC filter. Plaintiff offered no evidence concerning any costs of Plaintiff's past medical care, no evidence that those costs were connected to Plaintiff's IVC filter, and no evidence that such costs were reasonable and necessary. Absent such evidence, Plaintiff has failed to create a jury question that would permit her to recover past medical costs, and Cook is entitled to JMOL on Plaintiff's claim for past medical expenses. "The law requires proof that the medical expenses arose from the injury sustained, and that they are reasonable and necessary before they are recoverable." *Allen v. Spiker*, 689 S.E.2d 326, 329 (Ga. Ct. App. 2009) (quoting *Barnes v. Cornett,* 213 S.E.2d 703 (1975)).

**C.     Cook is entitled to JMOL on Plaintiff's claim for future damages.**

Cook is entitled to JMOL on Plaintiff's claims for future damages because Plaintiff has offered no evidence that she is reasonably likely to suffer any such future damages.

**1.     Future filter-related injury.**

Cook is entitled to partial JMOL on Plaintiff's claims for future injury related to her IVC filter. *See generally* Dkt. 213 at 36-37. Neither Plaintiff's treating physicians nor her retained

US.121782896.04

experts offered any opinion that Plaintiff will or is likely to suffer any future filter-related injury. For example:

- No doctor has testified that Plaintiff needs or will need to have the two remaining filter fragments removed.  On the contrary, Dr. Rheudasil testified that the risks of removing the fragments was greater than any continuing risk the fragments pose. *See* Ct. Ex. D-6 at 197:2-197:18 (Rheudasil).

- No doctor testified that Plaintiff's remaining fragments are likely to move in her body so as to require future medical treatment.  Dr. Rheudasil testified that the fragments are in "the safest possible place" and unlikely to move.  *See* Ct. Ex. D-6 at 90:8-18, 195:4-6; 197:9-13 (Rheudasil).  Dr. Timperman testified that "filter fragments, once they are fibrosed in place, stay in place" and that he does not think the fragment "next to her spine is ever going anywhere."  Ct. Ex. D-4 at 498:19-499:2 (Timperman).  Even Plaintiff's expert Dr. Gordon, the only doctor who believes that Plaintiff's fragments have recently moved, agreed that the fragments are encased in scar tissue, and he offered no opinion that they were likely to continue moving, that they would cause Plaintiff any symptoms, or that they would require medical intervention.  *See* Tr. at 2028:13-23.

Absent evidence that Plaintiff will or is likely to suffer future injury or require future medical treatment as a result of her Celect IVC filter, that element of her damages claim fails as a matter of law, and Cook is entitled to JMOL on that element.

### 2.    Future medical expenses.

Cook is entitled to partial JMOL on Plaintiff's claims for future medical expenses arising from filter-related injuries.  *See* Dkt. 213 at 36 (seeking "future medical expenses").  Neither

US.121782896.04

Plaintiff's treating physicians nor her retained experts offered any opinion that Plaintiff will or is likely to need any future medical treatment related to her filter or that she will or is likely to incur any future medical expenses related to her filter.  Absent testimony that she will or will likely require future medical care related to her filter, Plaintiff cannot recover for future medical expenses.  *Gusky v. Candler General Hosp., Inc.*, 385 S.E.2d 698, 702 (Ga. Ct. App. 1989) ("To warrant future medical expenses, there must be evidence that the injury will require future medical attention.").   Plaintiff also cannot recover future medical expenses because she offered no testimony regarding the cost of any future medical treatment.  *See Wayco Enterprises, Inc. v. Crews*, 272 S.E.2d 745, 747 (Ga. Ct. App. 1980) (noting future medical expenses are inappropriate where there was "nothing . . . to allow the jury to compute future medical expense").  Cook is therefore entitled to JMOL as to Plaintiff's claim for future medical expenses.

### 3.      Future pain.

Cook is entitled to partial JMOL on Plaintiff's claims for future pain related to the Celect IVC filter for two reasons.

First, at the January 9, 2019, pretrial conference, Plaintiff's attorneys orally amended Plaintiff's complaint to limit her claim for filter-related pain to two periods: (1) the extrusion of the filter fragment from her leg and (2) the open surgery to remove the main filter.  1/9/19 Tr. at 23:13-24:6.  This limitation means that Plaintiff makes no claim that she will experience physical pain in the future.  Having disavowed any a claim for future filter-related pain, Plaintiff cannot submit such a claim to the jury, and Cook is entitled to JMOL on that element of Plaintiff's damage claim.

Second, even assuming for the sake of argument that Plaintiff had not voluntarily abandoned her claim for future pain, such a claim would nevertheless fail as a matter of law

because Plaintiff offered no expert testimony to support it. Although a plaintiff is certainly competent to testify to her current pain, any projection of **future** pain or injury requires expert testimony:

> [L]ay witnesses, including the plaintiff, are not competent to opine as to the permanency of the plaintiff's injuries, or whether the plaintiff will continue to experience pain and suffering in the future as a result of such injuries. Such matters are medical questions and must be addressed by competent medical testimony.

Mary Donne Peters, *The Admissibility of Expert Testimony in Georgia* § 11:6 ("Future pain and suffering and medical expenses") (Sept. 2018 update) (footnotes omitted). "The diagnosis and **potential continuance** of a disease are medical questions to be established by physicians as expert witnesses and not by lay persons." *Hunnicutt v. Hunnicutt*, 228 S.E.2d 881, 881 (Ga. 1976) (emphasis added); *see also Ray v. Wood*, 92 S.E.2d 820, 822 (Ga. Ct. App. 1956) ("the testimony of a plaintiff is not competent as to his future pain and suffering") (citing *Atlanta Street Ry. Co.* v. *Walker*, 93 Ga. 462, 465, 21 S. E. 48); *Eberhart v. Morris Brown College*, 352 S.E.2d 832, 834 Ga. Ct. App. 1987) (same, adding "'[I]t is not one of those matters which jurors must be credited with knowing by reason of common knowledge." (citations omitted)).

Here, Plaintiff has offered no expert testimony from either her treating physicians or her retained medical experts that she will or is likely to experience any filter-related pain in the future. Absent such expert evidence, any claim for future pain fails as a matter of law, and Cook is entitled to JMOL on that element of Plaintiff's damage claim.

### 4.      Fear of future pain.

Cook is entitled to partial JMOL on Plaintiff's claims for any **fear** of future pain related to the Celect IVC filter (as opposed to future pain itself, addressed in the preceding section).[11]  Again, two independent grounds support this JMOL.

First, as discussed in the previous section, Plaintiff has no claim for future pain because (1) she has voluntarily limited her claims of filter-related pain to two periods in the past, and (2) she has offered no expert testimony suggesting that she will or is likely to actually suffer future pain. Absent any claim or evidence of future physical pain, Georgia law does not permit Plaintiff to recover for future mental pain, including future fear of physical pain or injury.  *See* Suggested Pattern Civil Jury Instructions, Council of Superior Court Judges, § 66.502.  Under this standard, mental pain and anguish are limited to the period of physical injury or pain—or, with respect to future damages, to the period in the future in which a plaintiff claims that she will or is likely to suffer physical pain.  If a plaintiff suffers from no "physical injury" during a certain period, then no physical injury can "cause" any mental suffering or distress.  Put another way, "a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury."  *Ryckeley v. Callaway*, 412 S.E.2d 826, 828 (Ga. 1992).  As discussed above, Plaintiff does not claim that she will suffer any physical suffering or injury in the future, and Georgia law therefore bars her from recovering for any future *mental* suffering as well.[12]

---

[11] Cook addressed the issues raised in this section at more length in its submissions asking the Court to bar Plaintiff from offering evidence of fear of future pain, Dkts. 9898, 9971, and incorporates those arguments here rather than repeating them.

[12] Georgia law also makes clear that the mere continued presence of two filter fragments in Plaintiff's body does not constitute a "physical injury" sufficient to support a claim for fear or other mental distress; there must be actual physical symptoms.  *See, e.g., Cure v. Intuitive Surgical Inc.*, 705 F. App'x 826, 828–29 (11th Cir. 2017) (holding that "the presence of metal shavings in the plaintiffs' brains does not, under Georgia law, constitute a legally recognizable injury in itself"); *Boyd v. Orkin Exterminating Co.*, 381 S.E.2d 295, 298 (Ga. Ct. App. 1989) (rejecting claim that mere presence of elevated levels of chemical in children's blood constituted an "injury").  Likewise here, Plaintiff cannot rely on the mere presence of two filter fragments in

US.121782896.04

Second, Cook is entitled to partial JMOL on Plaintiff's claim for fear of future pain or injury because that fear is *unreasonable* as a matter of law.  Under Georgia law, fear of future injury or disease in a tort case is compensable only if the fear is *reasonable*.  *See, e.g.*, *Watson v. Augusta Brewing Co.*, 52 S.E. 152, 153 (1905); *Russaw v. Martin*, 472 S.E.2d 508, 512 (Ga. Ct. App. 1996) (affirming summary judgment where claim for fear of contracting HIV from needle stick was "per se unreasonable as a matter of law").

Plaintiff's claimed fear that the remaining filter fragments will or may migrate and injure her is unreasonable as a matter of law because she can offer no expert testimony or other evidence that such an event will or is likely to occur.  As noted in the previous section, her own expert Dr. Gordon's report offers no quantification of the likelihood that Plaintiff will suffer any future injuries or symptoms as a result of her filter.  Gordon Dep. at 234:14-17.  In addition, Plaintiff's treating physician Dr. Rheudasil has testified that Plaintiff's risk of any additional complications from her remaining filter fragments is low.  See Ct. Ex. D-5 at 192-93:5-8; 197:9-13; 195:13-17.  Absent some reasonable basis for a fear of future filter-related injury, Plaintiff cannot recover compensation for such fear.  *See Watson v. Augusta Brewing Co.*, 52 S.E. 152, 153 (Ga. 1905) (holding that plaintiff's fear of effect of glass fragments after their removal from his stomach was unreasonable as a matter of law and did not entitle him to compensation, stating that "[o]ne may not recover… for mental suffering which is not reasonable, or which is merely fanciful").

Cook acknowledges that during trial, the Court overruled Cook's objections to the admission of Plaintiff's testimony concerning her claimed fear of future pain and injury, despite the absence of any expert testimony that Plaintiff's two remaining fragments would or were like

her body to satisfy the requirement of a physical injury to support her claim of fear of future injury.

42

to move or cause complications in the future, based on Dr. Gordon's testimony that the fragments had moved in the past.  *See* Tr. at 2594:3-20.  Cook nevertheless renews its argument in support of a partial JMOL on Plaintiff's claim of future fear of pain on the ground that she still lacks any expert testimony that her filter fragments **will or are likely to** move in the future or cause any complications or pain, and her claimed fear is thus unreasonable as a matter of law.  *See Watson,* 52 S.E. at 153; *Russaw,* 472 S.E.2d at 512.

## CONCLUSION

For the reasons set forth above and in Cook's oral argument to the Court, the Cook defendants urge the Court to grant their motion and to order judgment as a matter of law on all of Plaintiff's remaining claims against them.  In the alternative, Cook asks for partial judgment as a matter of law as to the specific categories of damages described above.

Respectfully submitted,

Dated: February 1, 2019

*/s/ Andrea Roberts Pierson*
Andrea Roberts Pierson (# 18435-49)
Jessica Benson Cox (# 26259-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
Email:  andrea.pierson@faegrebd.com
Email:  jessica.cox@faegrebd.com

Charles Webber (MN # 215247)
Bruce Jones (MN # 179553)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-8719
Facsimile: (612) 766-1600
Email:  chuck.webber@faegrebd.com
Email:  bruce.jones@faegrebd.com

US.121782896.04

*Counsel for the Defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

US.121782896.04

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2019, a copy of the foregoing document was
filed electronically, and notice of the filing of this document will be sent to all parties by
operation of the Court's electronic filing system to CM/ECF participants registered to
receive service in this matter.  Parties may access this filing through the Court's system.
Lead Counsel for Defendants will serve any non-CM/ECF registered parties.


/s/ Andrea Roberts Pierson

US.121782896.04