**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

---

In Re: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

---

This Document Relates to:

*Brand v. Cook Medical, Inc. et al.,*
Case No. 1:14-cv-6018-RLY-TAB

---

**PLAINTIFF'S RESPONSE TO THE COOK DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW**

Plaintiff Tonya Brand opposes the Cook Defendants' motion for judgment as a matter of law. The jury's verdict is fully supported by the evidence at trial and should not be disturbed.

## LEGAL STANDARD

In the Seventh Circuit, the "federal standard of review governs the adjudication of a motion for a judgment as a matter of law." *Deimer v. Cincinnati Sub-Zero Prod., Inc.*, 58 F.3d 341, 343 (7th Cir. 1995). That standard is established by Fed. R. Civ. P. 50, which provides that, "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party." Fed. R. Civ. P. 50(a)(1)(A). In considering the motion, the Court "must view the evidence presented at trial in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006). "The standard for granting judgment as a matter of law 'mirrors' the standard for granting summary judgment," which the Court has already denied on Plaintiff's

1

design defect claim. *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 886-87 (7th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000)).

## ARGUMENT AND AUTHORITIES

Given the short time available for response and the quantity of evidence presented in this three-week trial, it is impossible for Plaintiff to cite and incorporate all of the evidence heard and seen by the jury. This Court will remember that evidence, however.

**I.    Plaintiff has presented legally sufficient evidence that the Celect IVC filter was defective in its design.**

As Defendants note, Plaintiff's design defect case focused on the Cook Defendants' decision to remove the perforation limiters from the Celect, which allowed Tonya Brand's IVC filter to perforate far enough out of her inferior vena cava that it fractured and the pieces migrated through her body.

Plaintiff's evidence was legally sufficient under the *Banks* factors to support the jury's verdict that the Celect IVC filter was defective in design. According to the *Banks* court, "the reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible is considered the 'heart' of design defect cases." *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 736, 450 S.E.2d 671, 674 (1994). Thus, the jury was entitled to consider "that at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." *Banks*, 264 Ga. at 736, 450 S.E.2d at 674-75.

Plaintiff presented evidence that the Tulip IVC filter was a safer alternative design that was a marketable reality and a technologically feasible; indeed, it was an alternative that Cook was selling at the time the Celect was developed and manufactured. Mark Breedlove testified that the

Tulip was available on the market at the time the Celect was being developed. Tr. at 3087:15. *See also* Tr. at 773:20-774:1 (Dr. Krumholz testified that the Tulip was an available alternative at the time of the filter's manufacture).

### 1.      The usefulness of the product

The Cook Defendants argue that IVC filters are useful for protecting against pulmonary embolism. That argument misses the point: "the issue is not about filters versus no filters, but it's about whether the Celect filter is different than the other filters and whether it is – it operates differently, it has different characteristics, properties associated with it, a different risk profile associated with it, whether there are safety issues associated with it." Tr. at 372:7-13. The evidence in this case, as Defendants admit, is that the Celect is no more useful than the Tulip in preventing pulmonary embolism. Tr. 771:6-11. And in fact, Dr. Krumholz testified that there is no scientific evidence that the Celect filter saves lives. Tr. at 689:1-690:2. In fact, Dr. Krumholz's own research has not shown that IVC filters generally save lives. Tr. at 702:22-703:4.

The fact that IVC filters are useful, assuming that they are, is a red herring. As Dr. Krumholz testified, this case is not about using IVC filters vs. not using IVC filters; it is about comparing the Celect IVC filter to other available filter designs. Tr. at 372:7-13.

Cook did argue that doctors wanted more retrievability, and the Celect had a longer retrievability window, but the evidence also showed that the Celect had nearly three times the complaints about difficult retrievals than the Tulip. Tr. at 2385:6-17. The evidence at trial does not support the conclusion that the Celect IVC filter was more useful than other available filters, and so cannot support its particular design.

### 2.      The severity of the danger imposed by the design

The evidence at trial was that IVC filter complications can be very serious and can even result in death. Tr. at 494:6-8, 503:15-508:3. In the OUS study itself, a Harvard Committee reviewing the data determined that two deaths were associated with the Celect filter. Tr. at 535:21-537:3. In fact, Ms. Brand's own complication could easily have resulted in her death because the same broken strut that moved down her vena cava and worked its way out of her thigh could easily have traveled up her vena cava in the same way a blood clot might and lodged in or otherwise damaged her heart or lungs. Tr. at 1745:6-10, 1748:1-3. Dr. Krumholz called her Celect complication "life threatening." Tr. at 745:25-746:12. Reported complications include bleeding, that sometimes results in death, and organ perforations. Tr. at 398:22-399:2 ("it can hit nerves, it can hit vessels. We've seen cases where the Celect has gone into the pancreas. We've seen cases where it's gone into -- you know, any -- almost all bets are off when you can go through the wall and start poking around in the body. So, you know, we can go into the anatomy there, but it's gone into the duodenum, the intestine.").  Dr. Krumholz described the Celect as a "higher-risk filter" and testified that "in clinical studies and in clinical reports and in a wide variety of testing, [the Celect] is a device that has a higher risk of safety issues." Tr. at 771:18-21.

The Cook Defendants admit fracture poses serious risks, but they deny that the risk has anything to do with the design of the filter. In this respect, Defendants are correct that any IVC filter has the potential to cause serious injury, but the design of the Celect makes it far more likely to do so, as Plaintiff will demonstrate below.

### 3.      The likelihood of the danger

Surprisingly, the Cook Defendants argue that there is no evidence that the difference in design of the Celect vs. the Tulip results in any difference in the likelihood of danger of perforation

or fracture. The evidence showed that the two filters had the same primary struts and the same retrieval hook. The difference between them were the Tulip "leaves" and the Celect "shoulders": the evidence showed that the Tulip leaves functioned as perforation limiters. Tr. at 390:8-25 (discussing email from Director of Research Arne Molgaard-Nielsen that noted "one of the major issues of the [Tulip] leaves was to avoid perforation/penetration"); 392:6-18; 395:8-9 (discussing email that notes "The Tulip leaves are in shape to avoid too-far penetration/perforation of the hook legs"); Tr. at 527:4-9 (difference between Tulip and Celect is that Cook "took off the safety feature"). Thus, the only difference established between the Tulip and the Celect was the presence or absence of perforation limiters (the Tulip leaves). Tr. at 2164:16-2166:8. Differences between the rates of perforation and fracture can reasonably be inferred to result from that difference.

The evidence at trial, including evidence from Cook's own witnesses, was that the Celect perforated approximately 16 times more than the Tulip; it fractured about eight times more; and it migrated approximately four and a half times more. Tr. at 2363:12-21, 2379:10-2381:15, 2383:14-19. *See also* Tr. at 372:15-16 ("fracture rates are higher for the Celect filter than they are for, say, the Tulip filter."), 664:20-23. The evidence showed that in its first two years of sales, the Celect had 68 reported perforations, while the Tulip had only 22 reported perforations over a nine-to-ten-year period. Tr. at 2366:25-2368:13. In approximately one fifth the time, the Celect perforated approximately three times as many times as the Tulip. Tr. at 2368:7-13. Cook's own employees were concerned about the reports of perforations and fractures in the Celect filter because they had "never heard anything similar with respect to Tulip." Tr. 462:11-463:4. The evidence resupports the conclusion that the design of the Celect increased the likelihood of dangerous complications over other feasible designs.

Cook presented evidence that the overall rate of reported fractures was low compared to total sales, but some studies from reputable institutions found that the Celect perforated at rated from 79% to 86%. Tr. at 651:24-656:6. Dr. Krumholz testified that the likelihood of danger from using the Celect filter was much higher than the danger of an alternative filter. Tr. at 772:2-8. And again, the likelihood of serious complications was magnitudes higher with the Celect filter than it was with the most feasible alternative design. The jury was entitled to credit this evidence and weigh it in the risk/benefit analysis.

### 4.      The avoidability of the danger

The risk of the Celect IVC filter could be minimized by prompt removal, but the filter was also approved for permanent placement, and there was no publicity or common knowledge that the Celect was dangerous to leave in long term. Dr. Krumholz testified that rhe Celect was marketed as permanent or retrievable: "leave it or retrieve it," even though Cook documents demonstrate that the Tulip was considered a safer filter for permanent placement. Tr. at 690:7-11, 690:22-691:3, 769:11-19, 775:18-20. Dr. Rheudasil, the user in this case, was not aware of any urgency about taking out Ms. Brand's filter. In fact, his testimony was that, while "ideally, [it] should be removed, … retrieval is not required." Court Exhibit D-6, Rheudasil Deposition at 74:7-13. Dr. Krumholz testified that the information he learned from Cook's documents was not available in the peer-reviewed literature. Tr. at 721:15-18.

While the risk could have been minimized, doctors like Dr. Rheudasil did not have the information they needed to minimize that risk—especially because they were deploying a filter that was first cleared for permanent placement.  Moreover, while Cook argues that the Celect's design made the complications easier to avoid by increasing the retrievability window of the filter, the evidence from Cook's own employee shows that reports of difficult retrievals were nearly three

times more common with the Celect than the Tulip. Tr. at 2385:6-17. The Celect did not represent an advance in avoiding danger.

### 5.     The state of the art

As Cook recognizes, the Tulip was an available design at the time of manufacture. And although Cook claims that it was an advancement in retrievability, such a benefit was at best highly mixed. The retrieval window might have increased, but the frequency of difficult retrievals also increased. Tr. at 2385:6-17.

At the same time, Cook employees had expressed concerns that the design change between the Tulip and the Celect risked an increase in complications by removing the perforation limiters. Court Exhibit P-2, Molgaard-Nielsen Deposition at 371:19-22, 373:14-374:13; PX 1569; Tr. at 2168:2-2170:12, 2171:3-25. So while Cook may not have decreased efficacy with its new design, it knowingly increased risk.

### 6.     The ability to eliminate the danger

Again, Cook tries to treat this as a case against IVC filters generally rather than a case about the Celect's design. All IVC filters can perforate and fracture. The point is that the Celect, because of its design, perforates, fractures and migrates at a much higher rate than the Tulip. Tr. at 2363:12-21, 2379:10-2381:15, 2383:14-19. *See also* Tr. at 372:15-16 ("fracture rates are higher for the Celect filter than they are for, say, the Tulip filter."), 664:20-23. This increased risk could have been eliminated by using a perforation limiter on the Celect. Tr. at 2173:16-22. Thus, the danger could have been, if not eliminated, brought down to the level of a safer IVC filter. This factor weighs in favor of finding a defect in the Celect's design.

### 7.     The convenience and durability of the product

Cook argues that the Celect design was more convenient because it increased the window of retrievability. On the other hand, the jury heard evidence that Cook received nearly three times as many complaints about difficulty retrieving the Celect than about the Tulip. Tr. at 2385:6-17. The jury was entitled to credit that evidence and find the Celect far less convenient than the alternative design of the Tulip.

In addition, while both filters were made of the same material, the Celect filter perforated 16 times more often. Tr. at 2363:12-21. The evidence at trial was that perforation is a precursor to fracture. Court Exhibit P-1, Carlson Deposition at 80:4-10, 113:22-114:4, 115:15-21; Court Exhibit P-2, Molgaard-Nielsen Deposition at 391:6-392:3; Tr. at 1801:14-17 ("the perforation occurred and a fracture occurred because of the perforation"). And as a result, it fractured more often, and consequently was less durable. Tr. at 2379:10-2381:15. Considerations of convenience and durability weigh in favor of finding a design defect.

### 8.     The availability of alternative designs

Substantial evidence was presented from a variety of witnesses at trial that the Tulip was a safer alternative design to the Celect for many of the reasons listed above. The use of perforation limiters on the Tulip markedly decreased rates of perforation, fracture and migration. Tr. at 2363:12-21, 2379:10-2381:15, 2383:14-19. *See also* Tr. at 372:15-16 ("fracture rates are higher for the Celect filter than they are for, say, the Tulip filter."), 664:20-23.

### 9.     Compliance with industry standards and government regulations

Plaintiff presented evidence that Cook provided misleading evidence to the FDA about studies it offered in support of its 510(k) application. When Cook presented the evidence of the VCA-1 animal study, it left out four of the sheep from the study and presented other sheep films

multiple times, giving an extremely misleading view of the evidence. The study involved 20 sheep with two filters implanted in each sheep. Although researchers had concerns about perforation in four of the sheep, films from those sheep were not presented to the FDA. Only the films of three sheep with no perforations were shown—repeatedly—to the FDA. Tr. at 2709:12-14, 2815:11-2823:19,. DX 835, PX 3006, PX 3007, PX 3008.

The FDA required clinical data to support the safety of the Celect, and while Cook provided the FDA with the definition it was using (perforation through the vena cava wall with bleeding or hematoma) when it provided the initial protocol, it did not include its non-standard definition when it later presented the results of the study. Tr. at 538:9-13, 541:1-11, 629:19-630:17. There was pressure on Cook to provide results that were only possible by using its own definition because the FDA had demanded that the study show "no perforations." Tr. at 534:15-535:1 (FDA required "no perforations"). And Cook did report no perforations. Tr. at 629:19-23. If Cook had used the SIR standard for perforation—3 mm outside the vena cava wall—it could not have reported "no perforations." *See* Tr. at 396:12-17 ("the Society of Interventional Radiology, the professional society of the people who put in these devices, has adopted this idea of more than 3 millimeters through the wall is something that we should start paying attention to"), 541:20-542:1. Instead, it would have reported 13% perforations. Tr. at 570:13-25. In addition, an FDA guidance document specified that CT scans should be used when caval penetration is suspected, but Cook used venograms. Tr. at 546:20-549:6. The FDA guidance also stated that autopsies should be performed when a study participant dies, but Cook did not perform autopsies on those who died in the OUS study. Tr. at 550:3-17.

Dr. Krumholz testified that, in his expert opinion, Cook did not comply with FDA regulations. Tr. at 774:16-24. Given the evidence that Cook misled the FDA about data that it was required to provide in support of its 510(k) application, this factor cannot support the Celect design.

Finally, Dr. Krumholz testified that the benefits of the Celect filter were "speculative at best" and the risks of the Celect were "definitive, clear." Tr. at 729:2-6. In light of this testimony, and the wealth of evidence addressing the *Banks* factors, the evidence is far more than legally sufficient to support a determination that the Celect IVC filter was defectively designed.

### III.   Plaintiff offered legally sufficient evidence from which the jury could infer that Plaintiff's Celect IVC filter was in the same condition at the time it was implanted as it was in when it left Cook's control.

Legally sufficient circumstantial evidence was presented at trial from which the jury could reasonably conclude that the Celect IVC filter was in the same condition at the time it was placed in Plaintiff's body as when it left Cook's control. Circumstantial evidence is adequate to show that a product was defective at the time it was sold or left the possession of the manufacturer. *See Folsom v. Sears, Roebuck & Co.*, 174 Ga. App. 46, 46, 329 S.E.2d 217, 218 (1985) ("Circumstantial evidence may be used to establish the existence of a manufacturing defect at the time a product left the manufacturer.").

Here, the jury heard evidence that approximately 3% of Celect filters were returned to the manufacturer prior to implantation because of problems with packaging. Tr. at 1968:7-9. Obviously, the Celect IVC filter implanted in Plaintiff was not returned. Thus, the jury can reasonably assume that the Celect filter kit was sealed and sterile and appeared intact and undamaged to Dr. Reheudasil at the time he opened it; otherwise, Dr. Rheudasil would have returned the Celect filter to Cook. Indeed, any other conclusion would be *inconsistent* with evidence the jury heard regarding the fastidious manner in which Dr. Rheudasil prepped, draped

and prepared for surgical procedures. Court Exhibit P-5, Rheudasil Deposition at 68:16-69:1. It is certainly reasonable for the jury to infer that an experienced surgeon who exercised care and caution in prepping for an IVC procedure would not have proceeded in implanting a Celect filter that appeared in any way damaged or defective.  Thus, the very fact that Dr. Rheudasil proceeded to implant the Celect filter is some evidence that the filter did not exhibit signs of abnormal use and that it was in the same condition at the time of implant that it was in when it left Cook's control.

Cook wrongly implies that Plaintiff was required to disprove every theoretical force or actor that might have impacted the Celect filter after it left Cook's control. But that is not the law. "[A] plaintiff is not required, even when relying only on circumstantial evidence, to establish his contentions to the exclusion of every other reasonable hypothesis." *Westin Hotels, Inc. v. Natkin Service Co.,* 192 Ga. App. 493, 495, 385 S.E.2d 141 (1989). *See also Harper v. Barge Air Conditioning, Inc.,* 300 Ga. App. 901, 906, 686 S.E.2d 668 (2009). Cases that fail based on the "condition-of-the-product-at-the-time-of-sale" prong typically involve third-party modifications or repairs to the product after its initial sale. The overwhelming majority of the cases cited by Cook involve this fact pattern.[1]  For example, in *Mathis v. Farrel Corporation,* the record contained direct evidence that the rotors and bearings manufactured by the defendant were "modified in-house" by the Plaintiff's employer. No. 1:09-CV-93 (WLS), 2011 WL 13185779, *7 (M.D. Ga. Mar. 31, 2011).  Similarly, in *Carmichael v. Bell Helicopter Textron*, the record included evidence that helicopter was designed and sold with an inlet screen that was subsequently removed allowing

---

[1] Other cases cited by Cook focus their analysis on whether there was an initial defect in the product – not whether there had been a post-sale change or modification.  *See, e.g., Williams v. Mast Biosurgery USA, Inc.,* 644 F.3d 1312, 1319 (11th Cir. 2011) (referencing "condition when sold" element but focusing analysis on the existence of an initial design defect), *Miller v. Ford Motor Co,* 653 S.E.2d 82, 84 (Ga. Ct. App. 2007) (holding that plaintiff had not proven an original manufacturing defect in airbags or seatbelts where plaintiffs relied solely on their own allegations that the seatbelt and airbag in used car did not work at the time of the accident).

debris to enter the lubrication system and cause the gearshift to fail. 117 F.3d 490, 494 (11th Cir. 1997).  In *Lockman v. S.R. Smith,* the record showed that the diving board at issue was designed (and instructed) for use only on "diving pools" but was installed by an independent pool contractor onto a "non-diving pool." LLC, No. 4:07-cv-0217-HLM, 2010 Wl 11566367, *14 (N.D. Ga. 2010). And in *McClendon v. Manitou Americas, Inc.,* there was evidence that forklift brakes which had met manufacturing specifications when they left the defendant's facility and had been subjected to repair by a third-party prior to the accident.  No. CV 415-250, 2016 WL 5723671, *3 (S.D. Ga. Sept. 29, 2016).  Not surprisingly, in these cases where there was evidence that the product had been manipulated or altered after leaving the defendant's control, courts have held that the existence of a design or manufacturing defect at the time of sale was not established.

That fact pattern does not exist in the case at bar. There was no evidence presented to the jury regarding modification or mishandling of the Celect filter. At most, Cook is able to point to expert testimony that factors such as heat, corrosion and chemicals could possibly impact a filter's susceptibility to fracture.  But the jury also heard expert testimony from Dr. McMeeking that those factors were material considerations that should have been accounted for in the design process. Tr. at 2310:25-2311:2. The utter absence of evidence that the Celect filter was subjected to anything other than normal use, coupled with circumstantial evidence that the filter appeared sterile and undamaged at the time it was implanted, is sufficient to allow a reasonable juror to conclude that it was more probable than not that the Celect IVC filter was in substantially the same condition  at the time it was implanted as it was in when it left the hands of Cook.

## II.     Plaintiff has presented legally sufficient evidence of proximate cause.

Cook is not arguing that the Court should enter judgment as a matter of law on its intervening cause defense. Rather, Cook points to other factors that may have contributed to

Plaintiff's injuries, but "the fact that other causes may have contributed to an injury does not absolve a negligent defendant." *Underwood v. Select Tire, Inc.*, 296 Ga. App. 805, 814, 676 S.E.2d 262, 270 (2009). There may be more than one proximate cause of an injury, and it is improper to require that only the "dominant" cause be considered the proximate cause. *Thompson v. Thompson*, 278 Ga. 752, 753-54, 605 S.E.2d 30, 32 (2004) (holding that jury instruction equating proximate cause with dominant cause was reversible error).

The evidence in this case is more than legally sufficient to support the jury's verdict that the design defect of the Celect filter was a proximate cause of Plaintiff's injuries, even if it were not the only cause or the dominant cause of the injury. Cook argues that Ms. Brand's osteophytes or her spinal surgery cannot be ruled out as the true causes of her injuries, but as Plaintiff's experts noted, even if these factors may have contributed to her injuries, the defective design of the Celect was a proximate cause of her injuries.

### A.    Plaintiff's experts have provided proper differential diagnoses.

Cook's arguments that Dr. Krumholz's and Dr. Gordon's differential diagnoses are unreliable are reprisals of the arguments they made in *Daubert* motions against these experts. The arguments were rejected then and they should be rejected now.

### 1.    Dr. Krumholz made a proper differential diagnosis.

The Court will recall that Cook made the same arguments against Dr. Krumholz—that he failed to properly rule out Ms. Brand's osteophytes and her spinal surgery as potential causes of her injuries. The Court rejected those arguments and found Dr. Krumholz's differential diagnosis sufficiently reliable to support his causation opinion. Doc. 9771 at 18. At trial, Dr. Krumholz was able to further explain his differential diagnosis.

To perform his differential diagnosis, Dr. Krumholz performed a "[r]eview of the literature, review of the medical records, review of the complaints, review of all the Cook documents, review of the surgery, a review of the doctor's notes related to the surgery, basically everything [he] could get that was in any way relevant to this." Tr. at 747:14-748:2.

Dr. Krumholz first considered whether the initial placement of the filter had caused a problem. He reviewed "people's comments about the placement of the filter, the recommendations about the placement of the filter, the idea of what might be that mechanism of how that might work, of whether there's any literature that would suggest that, given the circumstances of the way in which her filter was placed, that that might have caused the problem," and found no evidence that the placement of the filter caused Ms. Brand's injuries. Tr. at 748:6-749:6.

Dr. Krumholz then considered whether Ms. Brand's back surgery could have been the cause of her filter's perforation and fracture, but he was able to rule the surgery out as a cause "by a search of the literature, by reading deeply what happened." Tr. at 751:22-752:1. Although the surgery was long and required "etraction of the IVC and a lot of manipulation of the internal organs," and he searched for "articles that would suggest that the -- that these kind of surgeries, where people are in the abdomen or in the back of the spine, that these are actually causing these things to perforate." Tr. at 752:1-8. Dr. Krumholz noted that IVC filters "are meant to be put in preoperatively and "put in people in trauma," so that he concluded "based on what [he] had read and what [he] had learned and what [he] read about the case, that it wasn't the surgery." Tr. at 752:4-16. Dr. Krumholz also noted as part of his analysis that Cook's own consulting physicians, Drs. Timperman and Griffin, did not attribute the perforation or fracture of Ms. Brand's Celect filter "to the placement or to the surgery." Tr. at 752:17-753:8; *see also* Tr. at 757:4-8. Dr. Krumholz concluded that "the back surgery certainly didn't cause the fracture," and if the filter

perforated during the surgery, that would be a problem with the filter's design. Tr. at 755:11-18. Given that the filter is intended for preoperative implantation, it should be designed to withstand the rigors of surgical retraction and manipulation. And Dr. Rheudasil testified that there was nothing uniquely difficult about the surgery. Court Exhibit P-5, Rheudasil Deposition at 71:7-12.

Dr. Krumholz ruled out her osteophytes as a cause of her filter's perforation and fracture. Tr. at 761:4-7. Dr. Krumholz noted that approximately half of older adults have osteophytes, and he consulted with Dr. Gordon to determine whether Ms. Brand's osteophytes were particularly large or unusual. Tr. at 758:20-759:1, 759:12-760:11. Dr. Krumholz was able to find no instruction or guideline that stated Celect IVC filters should not be used "in people with osteophytes or even big osteophytes." Tr. at 1219:20-22. Dr. Krumholz also found no literature suggesting that osteophytes routinely cause problems with IVC filters. Tr. at 761:4-13. Dr. Krumholz also noted that, had Ms. Brand's Celect filter not perforated her IVC, it could not have come into contact with the osteophyte. Tr. at 762:10-20.

Finally, Dr. Krumholz concluded that Ms. Brand's Celect IVC filter itself perforated the wall of her inferior vena cava. Tr. at 763:15-18. Dr. Krumholz further testified that, at the time of Ms. Brand's surgery, the Tulip IVC filter was available and would have been a safer alternative. Tr. at 766:10-20.

## 2.    Dr. Gordon made a proper differential diagnosis.

The Court also found Dr. Gordon's differential diagnosis to be sufficiently reliable to allow him to offer a causation opinion at trial, finding that any limitations in that opinion would be for the jury to weigh. Doc. 9770 at 7.

At trial, Dr. Gordon also testified that he had performed a differential diagnosis to identify the cause of Ms. Brand's injuries. Tr. at 1799:9-12. He ruled out potential trauma, anatomical abnormality such as osteophytes and surgical issues. Tr. at 1801:7-14.

Dr. Gordon ruled out Ms. Brand's osteophytes as the cause of her injuries because he "d[id]n't know of one piece of literature that discusses not placing filters in patients with osteophytes." Tr. at 1696:19-24, 1994:10-12. Moreover, all of the patients in the OUS study also had osteophytes. Tr. at 1994:13-17. Dr. Gordon also considered the relative location of the filter legs and the osteophyte in ruling the osteophyte out as the cause of Ms. Brand's injuries. Tr. at 1721:8-21. In fact, Dr. Gordon found that the filter migrated inferiorly, moving down to the level of the osteophyte after placement. Tr. at 1726:17-1727:6, 1742:11-1743:2. Moreover, the filter could never have come into contact with the osteophyte had it not perforated the wall of the vena cava first. Tr. at 1728:16-1729:9. Dr. Gordon also testified that people who are having back surgery—circumstances under which Cook argued that an IVC filter was especially valuable— generally have osteophytes because they have back trauma or degenerative disk disease. Tr. at 1722:8-14. Dr. Gordon also noted that Cook's vascular surgeon testified at his deposition that he does not consider the presence of osteophytes when making decisions about IVC filter placement. Tr. at 1729:10-1730:2.

Dr. Gordon ruled out the surgery itself as the cause of Ms. Brand's injuries because it was "quite a bit away between where the surgery was and where the filter [wa]s even with the caudal migration." Tr. at 1727:7-11, 1734:8-25. Based on the operative reports and the amount of time the exposure portion of the surgery took, Dr. Gordon concluded that there were a lot of adhesions, which would have decreased movement and, in particular, decreased the transfer of movement from the surgical field to the IVC filter above. Tr. at 1987:17-1988:3.

On the other hand, he testified that, because of the design of the Celect IVC filter, once a leg perforates, it begins a progressive cycle and, "[t]here's nothing stopping this from happening. The legs go all the way up to the apex." Tr. at 1743:4-19. *See also* Tr. at 2167:10-17.

Plaintiff was not required to present two experts making differential diagnoses, but she did. The combined impact of Drs. Krumholz's and Gordon's analysis is far more than legally sufficient evidence of causation. And in fact, Dr. McMeeking, Plaintiff's engineering expert, also testified that "the design of the Celect filter caused Tonya Brand's filter to perforate and fracture." Tr. at 2091:2-3.

### B. The evidence is legally sufficient that the design defect increased the risk of fracture, as Georgia law requires.

Contrary to Cook's suggestion, Georgia courts have not required proof that an alternative design **would** have prevented the plaintiff's injury, but rather only that it **could** have done so or that it would have **reduced the risk** of the injury. *See Banks*, 264 Ga. at 737 (holding manufacturer can be liable where the plaintiff "adduce[s] evidence that a feasible alternative design...**could** have prevented or minimized the plaintiff's injury....") (emphasis added); *Woods v. A.R.E. Accessories, LLC*, 345 Ga. App. 887, 890, 815 S.E.2d 205, 210 (2018) (holding risk-utility test imposes liability "where the manufacturer has failed to adopt a reasonable alternative design that would have **reduced foreseeable risks** of harm posed by the product.") (emphasis added). Otherwise, a manufacturer who designs a product that fails a thousand times more often than an alternative design could never be held liable because there would always be the small chance that the product might have failed even without the defective design.

The evidence at trial provides legally sufficient evidence that an alternative design with perforation limiters could have reduced the risk of Ms. Brand's injury. Dr. McMeeking opined that "that the design of the Celect causes it to tilt, perforate, and fracture; that the Tulip filter, or the

addition of a perforation limiter to the Celect filter, are safer alternative designs." Tr. at 2090:16-20. The evidence from Cook's own complaints demonstrates that patients were many times safer from perforation, fracture and migration if they were implanted with the Tulip rather than the Celect filter. Again, the Celect perforated approximately 16 times more than the Tulip; it fractured about eight times more; and it migrated approximately four and a half times more. Tr. at 2363:12-21, 2379:10-2381:15, 2383:14-19. Dr. McMeeking testified that adding a perforation limiter to spread the area of contact—for example, as was done on the Tulip filter—would "reduce[ ] the pressure that the strut applies against the wall of the vena cava, and that is what will make it less likely for the strut to cut through the wall of the vena cava." Tr. at 2152:19-23, 2156:7-19.

**III.    Plaintiff has presented legally sufficient evidence of Tonya Brand's damages.**

The jury has already entered its verdict and awarded general damages. Because Cook's motion for judgment as a matter of law had not been heard, Cook could have asked that the Court itemize categories of damages on the verdict form to permit review of damages by category. Cook did not do so. Cook made specific objections to the instructions because they did not expressly include temporal limits to Plaintiff's physical pain and because they included future damages, but Cook did not request that the jury's damages finding be made separately for past and future damages, either. And to date, Cook has not suggested that the evidence is legally insufficient to support the jury's verdict.

Plaintiff put on evidence and argued in closing that she suffered physical pain associated with the filter strut that worked its way out of her thigh and with the open surgery to remove her broken filter. While there was evidence at trial about other pain that Ms. Brand experienced—pain that prompted her spinal surgeries—Ms. Brand did not testify and Plaintiff's counsel did not argue that her back pain or abdominal pain (aside from the surgery) was in any way associated with the

18

Celect IVC filter. No mention was made at trial of any medical expenses, and Plaintiff did not testify and her attorneys did not argue that she would suffer physical pain in the future. There is no basis from which the Court could conclude that the jury made awards for such damages.

Plaintiff did testify and Plaintiff's counsel did argue that Ms. Brand fears future injury caused by the remaining pieces of her IVC filter. This future fear is a proper and supported element of damages. Georgia law allows any plaintiff to introduce evidence of mental injury as long as they also suffer a physical injury. There is no requirement that physical suffering extend into the future along with mental anguish. Georgia follows the impact rule, and Georgia's impact rule has three elements: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress. *Lee v. State Farm Mut. Auto. Ins. Co.*, 272 Ga. 583, 586 (2000). Ms. Brand's fear is related to the physical injury caused by the filter failure. Because there was a physical injury, Ms. Brand's mental anguish claims are legitimate and cannot be limited because her physical injuries happened in the past. There is no temporal requirement between when the injury occurs and how long a plaintiff may suffer, and the physical injury and mental anguish need not coincide in time. *See Valdosta Housing Auth. v. Finnessee*, 160 Ga. App. 552, 553, 287 S.E.2d 569 (1981) (damages were not excessive because, although child bitten by rat showed no permanent physical injury, she maintained fear of rats, still cried, and was upset 45 months later).

Moreover, the evidence is legally sufficient to show that Ms. Brand's fear is reasonable. Before her open-retrieval surgery, Dr. Rheudasil felt it was completely reasonable for Ms. Brand to be considered about the filter pieces still in her body because of the filter migration she had already experienced. Court Exhibit P-5, Rheudasil Deposition at 113:22-114:8 (noting that Ms. Brand had "appropriate concern" in light of evidence her filter pieces were moving). At trial,

Dr. Gordon testified that the filter fragments in her body are still moving; he just could not say how fast they were moving. Tr. at 1797:13-24. Ms. Brand continues to carry two pieces of a Celect IVC filter in her body, and it is reasonable for her to fear what these filter fragments will do in the future.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully urges the Court to deny the Cook Defendants' motion for judgment as a matter of law.

Dated February 4, 2019.

Respectfully Submitted,

*/s/ Joseph N. Williams*_____
Joseph N. Williams, Atty. No. 25874-49
Riley Williams & Piatt, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email: jwilliams@rwp-law.com

*Liaison Counsel to Plaintiffs' Steering Committee and on behalf of Plaintiffs' Steering Committee*

*/s/ Michael W. Heaviside*_____
Michael W. Heaviside, Esq.
Heaviside Reed Zaic, A Law Corporation
910 17th Street NW, Suite 800
Washington, DC 20006
Telephone: (202) 233-1993
Email: mheaviside@hrzlaw.com

*/s/ Ben C. Martin*
Ben C. Martin, Esq.
The Law Office of Ben C. Martin
3710 Rawlins Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 74407590
Email: bmartin@bencmartin.com

*/s/ David P. Matthews*
David P. Matthews, Esq.
Matthew and Associates
2509 Sackett St.
Houston, TX 77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184

*Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ Ben C. Martin*
Ben C. Martin