# Exhibit 10

2/8/2019 Case 1:14-ml-02570-RLY-TAB Document 10129-10 Filed 02/08/19 Page 2 of 14 PageID #:
Gmail - Categorization form Latina I. Lindstrom, surviving stat. benef. Everett Fike, 1:17-cv-02921
68602

 **Baird Brown <bairdbrownlaw@gmail.com>**

## Categorization form Latina I. Lindstrom, surviving stat. benef. Everett Fike, 1:17-cv-02921
2 messages

**Baird Brown** <bairdbrownlaw@gmail.com>  Wed, Feb 6, 2019 at 4:59 PM
To: CookFilterMDL@faegrebd.com, plaintiffscoleadcounselmdl@gmail.com

Attached

Law Offices of Baird Brown, PC
3055 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90010
(213) 487-8880 telephone
(213) 487-8884 fax

 **CategorizationFormEF(closed).pdf**
3694K

**Baird Brown** <bairdbrownlaw@gmail.com>  Thu, Feb 7, 2019 at 3:28 PM
To: CookFilterMDL@faegrebd.com, plaintiffscoleadcounselmdl@gmail.com

Amended to include circled subcategories

Law Offices of Baird Brown, PC
3055 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90010
(213) 487-8880 telephone
(213) 487-8884 fax

[Quoted text hidden]

 **CategorizationFormEF(closed).pdf**
3097K

## Categorization Form

A. Plaintiff's Name: Latina I. Lindstrom, surviving statutory beneficiary of Everett Fike, deceased

B. Plaintiff's Case Number: 1:17-cv-02921

C. Plaintiff's Counsel (Lead Firm Name): Law Offices of Baird A. Brown, PC

D. Categorization (check each that applies and briefly describe):

1. Successful First Removal Without Complication or Physical Injury Cases: "Cases where Plaintiffs' profile sheet and further follow-up shows that the Gunter Tulip or Celect IVC filter was successfully removed on the first, routine, percutaneous retrieval attempt and no physical symptom or filter complication was alleged during the time the filter was in place or in connection with the retrieval process."

   Check here for Category 1: ☐

2. Cases Alleging Mental Distress and Embedment: "Cases where only non-physical injuries, such as worry, stress, or fear of future injury, have been alleged."

   Check here for Category 2: ☐

   Briefly describe claimed complication/outcome/injury: _____

3. Stenosis of the IVC and Anticoagulation Cases: "(a) Cases where the plaintiff has alleged scarring or stenosis of the IVC caused by the Cook filter; and (b) Cases where the plaintiff has alleged a need for [anti]coagulation on a permanent or long term basis because of an unretrieved or irretrievable filter."

   Check here for Category 3: ☐

   Briefly describe claimed complication/outcome/injury: _____

4. Embedded and High Risk Cases: "Cases where the Plaintiff has been advised that the Cook IVC filter is embedded, cannot be retrieved, or that the risk of retrieval outweighs the benefits of retrieval."

   Check here for Category 4: ☐

   Briefly describe claimed complication/outcome/injury: _____

5. <u>Failed Retrieval and Complicated Retrieval Cases</u>[1]: "(a) Cases where the plaintiff has undergone one or more failed retrieval procedures; and (b) Cases where Plaintiff's Filter was retrieved but required the use of a non-routine, complicated retrieval method."

   Check here for Category 5: [✓]

   Briefly describe claimed complication/outcome/injury: Unsuccessful attempt, hook embedded in IVC

6. <u>Non-Symptomatic Injury Cases:</u> "Cases where the Plaintiff alleges non-symptomatic filter movement, migration, penetration, perforation, thrombosis, occlusion, or the presence of a clot in the filter that has not produced physical symptoms or complications."

   Check here for Category 6: [ ]

   Briefly describe claimed complication/outcome/injury: _____

7. <u>Symptomatic Injury Cases</u>: "Cases where the Plaintiff alleges medical symptoms, conditions, or complications caused by one or more of the following conditions"

   Check here for Category 7: [✓]. **Circle all sub-categories that apply below:**

   (a) IVC thrombotic occlusion – consisting of an occluding thrombus in the IVC after filter insertion (documented by imaging or autopsy);

   Briefly describe claim of symptomatic injury:
   <u>IVC thrombus extended down into the leg causing client to incur a foot amputatic</u>

   (b) filter embolization – consisting of post-deployment movement of the filter to a distant anatomic site;

   Briefly describe claim of symptomatic injury:
   _____

   (c) filter fracture – consisting of any loss of a filter's structural integrity documented by imaging or autopsy;

   Briefly describe claim of symptomatic injury:
   _____

   (d) filter migration – consisting of a change in filter position of more than 2 cm (when compared to its deployed position) and as documented by imaging; Briefly describe claim of symptomatic injury:

---

[1] Plaintiffs that have undergone open removal surgery shall categorize as Category No. 7.

(e) penetration or perforation – consisting of a filter strut or anchor extending 3 or more mm outside the wall of the IVC as demonstrated on imaging;

Briefly describe claim of symptomatic injury:_____

(f) recurrent pulmonary embolism (PE) – consisting of PE that occurs after filter placement is documented by pulmonary arteriography, cross sectional imaging, lung scan, or autopsy;

Briefly describe claim of symptomatic injury:_____

(g) DVT or other blood clot caused by filter;

Briefly describe claim of symptomatic injury: clot burden in right leg

(h) infection;

Briefly describe claim of symptomatic injury:_____

(i) bleeding;

Briefly describe claim of symptomatic injury:_____

(j) death; and

Briefly describe claim of symptomatic injury: Mr. Fike ultimately died from venous issues

(k) open-removal and/or open heart surgery- any case where a plaintiff has had an open surgical procedure, including open heart surgery, to remove his or her IVC filter.

Briefly describe claim of symptomatic injury:_____

E. Certification: The undersigned counsel affirms that the categorization is based on a review of the available medical records including imaging records and reports. The submission of the specific medical record(s) attached, and submission of this form, are counsel's certification that the outcome, complication, or injury represented in Section D is the proper categorization for Plaintiff's case to the best of counsel's knowledge and belief.

Plaintiff's Counsel Name: Baird A. Brown

Plaintiff's Counsel's Firm: Law Offices of Baird Brown, PC

Plaintiff's Counsel's Signature: _____

# Radiology Report

Printed On Apr 01, 2008

TRANSCATH RETRIEVAL, FOREIGN BODY

Exm Date: DEC 17, 2007@09:46
Req Phys: BRAUN, THOMAS J                Pat Loc: S2-HEM/ONC-BRAUN (Req'g Loc)
                                          Img Loc: DENVER-ANG
                                          Service: Unknown

(Case 553 COMPLETE)   TRANSCATH RETRIEVAL, FOREIGN BODY (ANI  Detailed) CPT:37203
    Contrast Media : Non-ionic Iodinated

Clinical History:
    Mr. Fike had an ivc filtered placed 10/15/7. We would like to
    have it removed prior to 12/15/7. He is on coumadin. We need to
    discuss whether he needs a heparin window and/or US of cava
    looking for clot on filter prior to removal. He is also receiving
    chemo. Timing is important. My pager is 687-0519

Report Status: Verified                   Date Reported: DEC 18, 2007
                                          Date Verified: DEC 18, 2007
Verifier E-Sig:/ES/Stephen W. Subber, MD

Report:
    Limited inferior venacavogram and attempted IVC filter retrieval:
    Following the obtaining of informed consent and sterile
    preparation, 21G antegrade needle access was obtained into the
    right internal jugular vein, under direct ultrasound guidance
    (nonpalpable vessel; a permanent ultrasound image was obtained
    and retained), permitting wire advancement, coaxial dilatation,
    and placement of a 5-French pigtail catheter in the infrarenal
    inferior vena cava, from which point limited venacavography was
    performed. Subsequently, following venotomy dilation, the sheath
    assembly for a Gunther Tulip filter removal set was exchanged,
    the recovery snare advanced, and extensive effort invested in
    attempting to engage the filter hook, without success. A
    5-French H1 catheter was exchanged, an attempt to direct a
    guidewire along the desired perifilter course, also without
    success. A curve was placed in the coaxial sheaths, which were
    then replaced along with the snare; further attempts to engage
    the filter were also unsuccessful. A oblique filming was then
    performed over the IVC, and procedure was terminated. The
    patient tolerated the procedure well.

    Initial filming demonstrates no change in filter positioned from

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)  |  VISTA Electronic Medical Documentation

FIKE, EVERETT
5855 S. Jebel Way
CENTENNIAL, COLORADO  80015                Printed at EASTERN COLORADO HCS
236327228

Page 84

# Radiology Report

Printed On Apr 01, 2008

placement, and the tip appears well centered. No thrombus is apparent.
Oblique filming following unsuccessful attempts to snare the filter hook demonstrate the hook to be incorporated into the vein wall or mural thrombus posteriorly.

Impression:
Unsuccessful IVC filter removal due to incorporation into vein wall, see above.

Total fluoroscopy time, 21.4 minutes. Total contrast, 50 cc Ultravist 300.

Primary Interpreting Staff:
  Stephen W. Subber, MD, Imaging Service (Verifier)
/SWS

---

US GUIDED VASCULAR ACCESS

Exm Date: DEC 17, 2007@09:46
Req Phys: BRAUN,THOMAS J          Pat Loc: S2-HEM/ONC-BRAUN (Req'g Loc)
                                  Img Loc: DENVER-ANG
                                  Service: Unknown

(Case 552 COMPLETE)   US GUIDED VASCULAR ACCESS       (ANI  Detailed) CPT:76937

    Clinical History:
      Mr. Fike had an ivc filtered placed 10/15/7. We would like to
      have it removed prior to 12/15/7. He is on coumadin. We need to
      discuss whether he needs a heparin window and/or US of cava
      looking for clot on filter prior to removal. He is also receiving
      chemo. Timing is important. My pager is 687-0519

    Report Status: Verified               Date Reported: DEC 18, 2007
                                          Date Verified: DEC 18, 2007
      Verifier E-Sig:/ES/Stephen W. Subber, MD

    Report:
      Limited inferior venacavogram and attempted IVC filter retrieval:
      Following the obtaining of informed consent and sterile
      preparation, 21G antegrade needle access was obtained into the
      right internal jugular vein, under direct ultrasound guidance
      (nonpalpable vessel; a permanent ultrasound image was obtained

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

FIKE, EVERETT
5855 S. Jebel Way
CENTENNIAL, COLORADO   80015
236327228

Printed at EASTERN COLORADO HCS

Page 85

Arizona Heart Hospital
1930 E. Thomas Road
Phoenix, AZ 85016

PATIENT NAME: FIKE, EVERETT F
ACCT #: 73800278795　　　　MRN: 714129
ADMIT DATE: 06/16/2014　　　DOB: 08/07/1925
DISCHARGE DATE:　　　SEX: M
DICTATING PHYS: VENKATESH RAMAIAH, MD
ATTENDING PHYS: MOHAMMAD W BAQDUNES

Operative Report

DATE OF SERVICE: 06/17/2014

PREOPERATIVE DIAGNOSES:
1. Gangrene of the right foot with exposed bone and necrotic wounds.
2. The patient is scheduled for below knee amputation now here for limb salvage.
3. Severe comorbidities.

POSTOPERATIVE DIAGNOSES:
1. Gangrene of the right foot with exposed bone and necrotic wounds.
2. The patient is scheduled for below knee amputation now here for limb salvage.
3. Severe comorbidities.

OPERATIVE PROCEDURES:
1. Percutaneous antegrade puncture of the right common femoral artery and placement of a 6-French sheath.
2. Angiogram of the right lower extremity with runoff.
3. Cannulation of the right occluded posterior tibial long segment CTO and ballooning with a 1.5 x 2 x 210 cm and NanoCross balloon.
4. Balloon angioplasty of the distal plantar posterior tibial with a 1.5 x 20-mm Maverick balloon.
5. Completion angiogram with runoff.

OPERATING SURGEON:
Venkatesh Ramaiah, M.D.

ASSISTANT:
Dr. King.

ANESTHESIOLOGIST:
Kevin Olena, CRNA.

ANESTHESIA:
General anesthesia.

ESTIMATED BLOOD LOSS:
30 mL.

CONDITION OF THE PATIENT:
Stable but guarded.

BRIEF DESCRIPTION OF THE OPERATIVE PROCEDURE:
Everett Fike is an 88-year-old male patient who came to us because he was scheduled for a below-knee amputation on the right. The patient has

had amputation of his first and second toes. He has got a large 7 cm x 8 cm necrotic wound on the dorsum of the foot. He has bones and his metatarsal heads were exposed on the first and second. He also has a heel ulcer, but this was granulating and it is very superficial. I had a long detailed discussion with the patient's family members as well as the patient. He is at very high risk for any kind of an intervention. I did give him the option of doing a below-knee amputation, but the patient was recently ambulating and he says that taking his leg would really cause him to become dependent. The only chance was to recanalize as much as we could and then hope to do a transmetatarsal amputation. The posterior flap is viable. If we can revascularize him, then we may be able to get away with a transmetatarsal amputation. With this in mind, I had a long detailed discussion with the patient and the family members. I told them that we will try to recanalize and then do a transmetatarsal amputation, but this may take a while and nail and he may still end up with a below-knee amputation, but it is worth a chance bleeding, infection, inability to recanalize infected transmetatarsal amputation conversion to a below-knee amputation, myocardial infarction, renal failure, cardiac arrest and even death in the interim process were all explained to them. The patient was then taken to the operating room, was laid supine on the table after proper identification, was given general anesthesia and the entire leg and groins were cleaned and draped in the usual regular sterile standard fashion. A percutaneous antegrade puncture of the right common femoral artery was then performed using an 18-gauge Cook needle after introduction of a 6-French sheath. Once the 6-French sheath was introduced, heparin was given and after adequate heparinization, we did an angiogram of the right lower extremity with runoff. This basically showed that the saphenofemoral artery was widely patent. The popliteal was also patent. The patient had a peroneal that went all the way down to the level of the ankle, but this was also diffusely diseased, but did not reconstitute the plantar arch, but we did see in the distal angiogram was that there was reconstitution of the posterior tibial. This was probably the best artery that we could get to revascularize him to allow him to heal the entire wound and we decided that we should try to proceed and get into the posterior tibial. We then passed 0.014 wire right into the origin of the posterior tibial artery followed by a support catheter, which was the TrailBlazer catheter. Once we were able to get into the posterior tibial orifice, we then changed to an 0.018 system. This was a V18 wire. We were able to then get a wire down into the posterior tibial, which reconstituted right to the level of the mid leg and then was completely occluded and filled by collaterals. Using the TrailBlazer catheter and the V18 wire, we were able to get into the distal posterior tibial and even get a wire into the medial plantar artery. Selective angiogram was then performed at the level of the ankle and this showed that the posterior tibial was now opened, it was well cannulated and we could see the runoff, which filled up the medial as well as the lateral plantar vessels.

A balloon angioplasty of the right posterior tibia was then performed using a 1.5 mm x 2 x 210 mm NanoCross balloon. The entire length of the posterior tibial with this balloon right at the level of the ankle, right where it came down to the level of the calcaneum, we were not able to cross with this balloon and therefore we used a smaller length balloon 1.5 x 20-mm Maverick balloon of the distal popliteal artery. We then were able to pass the entire long balloon with a 210 mm balloon and the entire posterior tibial and the medial plantar vessel were then ballooned with this. Following this, we then did a completion angiogram and we were very satisfied with this result. We had now cannulated the posterior tibial all the way down to the level of the plantar vessels

and we were able to actually reconstitute the plantar arch. This would help him heal this wound very nicely in fact he had a very strong signal in the posterior tibial now. We were able to recanalize the entire posterior tibial right through the medial plantar artery into the foot. This was a very good result. We were satisfied with this and the wires were then removed. The sheath was left in place and will be removed once the ACT is well within normal limits. The patient tolerated the procedure very well with very good satisfying result and I think this would help him in terms of saving his leg and maybe we will be able to successfully do a transmetatarsal amputation. Based on these findings, the patient was then transferred to the recovery room. I had a long detailed discussion with the patient's family members. I explained to them the details of the procedure, showed them the pictures of the posterior tibial recanalization and revascularization.

---

VENKATESH RAMAIAH MD

VR/IN
D: 06/22/2014 22:06:59
T: 06/22/2014 22:36:08
Job#: 780146
Confirmation#: 631329
Authenticated by VENKATESH G RAMAIAH, MD on 06/23/2014 07:50:47 AM

Arizona Heart Hospital
1930 E. Thomas Road
Phoenix, AZ 85016

PATIENT NAME:   FIKE, EVERETT F
ACCT #:   73800278795         MRN: 714129
ADMIT DATE: 06/16/2014        DOB: 08/07/1925
DISCHARGE DATE: 06/23/2014    SEX: M
DICTATING PHYS:   VENKATESH RAMAIAH, MD
ATTENDING PHYS:   MOHAMMAD W BAQDUNES

Operative Report

DATE OF SERVICE:   06/19/2014

PREOPERATIVE DIAGNOSES:
1. Gangrene of the right foot.
2. Limb salvage. The patient is scheduled for a below-knee amputation.
3. Status post revascularization of the posterior tibial with good blood flow into the foot.

POSTOPERATIVE DIAGNOSES:
1. Gangrene of the right foot.
2. Limb salvage. The patient is scheduled for a below-knee amputation.
3. Status post revascularization of the posterior tibial with good blood flow into the foot.

OPERATIVE PROCEDURES:
Right transmetatarsal amputation.

OPERATING SURGEON:
Venkatesh Ramaiah, M.D.

ASSISTANT:
Dr. King.

ANESTHESIOLOGIST:
Janice Miller, CRNA.

ANESTHESIA:
General endotracheal tube anesthesia.

ESTIMATED BLOOD LOSS:
100 mL.

CONDITION OF THE PATIENT:
Stable.

BRIEF INDICATION OF THE OPERATIVE PROCEDURE:
Everett Fike is an 88-year-old male patient who came to me for possibility of limb salvage. The patient was already scheduled for a below-knee amputation and we had a long detailed discussion. We discussed the various options including the fact that all of these options and interventions may eventually lead to a below-knee amputation. We were very fortunate enough to have revascularize his leg two days earlier, we were able to not only open the peroneal which was already opened but also to open up the posterior tibial all the way down to the medial plantar arteries and we were very satisfied. He had very

good signals, not only in the dorsalis pedis but also in the posterior tibial now and we felt that we had reasonable chance of salvaging this leg at the level of the transmetatarsal amputation site. He had very large gangrenous wounds, the first metatarsal head was all bone, was already exposed as well as the second. He also had a heel ulcer on the lateral aspect, but this was very superficial and we felt that this would heal eventually and that he would be a good candidate for a transmetatarsal amputation. After having revascularized him, we felt that this would probably heal much better. With this in mind, we did have a long detailed discussion again with the patient and the family members, explained to them the plan and also the fact that this may fail and he may still end up with a below-knee amputation. Bleeding, infection, myocardial infarction, renal failure, limb loss, cardiac arrest and even death were all clearly explained to the patient's family and the family members too.

BRIEF DESCRIPTION OF THE OPERATIVE PROCEDURE:
The patient was then taken to the operating room, was laid supine on the table after proper identification, was given general anesthesia and the entire right foot and leg were cleaned and draped in the usual regular sterile fashion. The patient's wound extended almost on to the top of the metatarsal base and that was the proximal line of incision, distally on the plantar aspect, the flap was really good right up to the metatarsal head and therefore we marked out with the help of a marking pen, made a nice long posterior flap and did an anterior flap right at the level of the metatarsal heads proximally. Once we were able to mark this, the skin was then cut with a knife along the marked incision, both anteriorly as well as posteriorly. Using a periosteum retractor, we were able to retract the anterior flap and actually dissected out. We had to actually go about the metatarsal heads now and almost into the tarsal area, so this was a modified metatarsal amputation because of the skin ulcers and the wounds that extended almost to that level. Once we did this, the periosteum of the tarsal bones was shaved off, the metatarsals were completely removed and the posterior flap was now developed and the entire forefoot was then sent for histopathological examination. He had good brisk bleeding and this was a good healthy sign. Meticulous hemostasis was achieved. The posterior flap was then looked at, all calcified bunion bones were completely removed and dissected out. The flap was very healthy, tendons were pulled out completely and transected very nicely. The posterior flap was then refashioned in such a way that it would _____ very nicely. We actually had an excellent blood flow in the flap area and we were really satisfied with this result. The bony segments were completely irrigated. All bleeding points were meticulously hemostasis and cleaned out, the entire infected area had been completely removed now and we felt that this would be a good opportunity and also we felt confident also that we could close this primarily rather than leaving this open to granulate or do it a secondary closure. Thorough irrigation with antibiotic irrigation was performed, the tarsal periosteums were completely removed. Bleeding was very clean and very nicely achieved with good hemostasis. We then brought the flaps together, adjusted in such a way that there would be no dog hearing and this came together very, very nicely. We were now ready for closure. The deeper layers and the fascia were brought together in a very nice fashion using 2-0 Vicryl sutures. Once we brought this together, we knew now that the flap was looking good, healthy. There were very good pulses and signals not only in the dorsalis pedis but also in the posterior tibial. The skin was then closed with vertical mattress nylon sutures. Staying very close and approximating them very nicely. The entire area looked really good. There was really no dog hearing at all and we were really

satisfied with this result.  The wound was then thoroughly cleaned with wet-to-dry sterile dressing was applied.  The heel ulcer was also cleaned out nicely.  It was very superficial and I think with the increase in the blood supply all of this would heal very nicely.  We then placed a nice sterile dressing with plenty of fluffs and a gentle Kerlix was then wrapped around of the foot and a gentle Ace bandage was also placed.  The patient tolerated the procedure really well, recovered completely from anesthesia.  He was then sent to the recovery room where he will be followed very closely with infectious disease as well as medicine.  I had a long detailed discussion with the family members and explained the details of the procedure and the chances that hopefully we should be able to heal this at this level.

---

VENKATESH RAMAIAH MD

VR/IN
D: 06/23/2014 18:31:58
T: 06/23/2014 20:59:36
Job#: 780862
Confirmation#: 632004
Authenticated by VENKATESH G RAMAIAH, MD On 06/24/2014 08:37:35 AM

# CERTIFICATION OF VITAL RECORD

## STATE OF ARIZONA
### STATE OF ARIZONA
### DEPARTMENT OF HEALTH SERVICES - OFFICE OF VITAL RECORDS
### CERTIFICATE OF DEATH

State File NO. 102-2015-041241

| # | Field | Value |
|---|---|---|
| 1 | DECEDENT'S LEGAL NAME (FIRST, MIDDLE, LAST) | EVERETT FORREST FIKE |
| 2 | AKA'S (IF ANY) | |
| 3 | DATE OF DEATH | 10/03/2015 |
| 4 | SEX | MALE |
| 5 | SOCIAL SECURITY NUMBER | 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 |
| 6 | DATE OF BIRTH | 08/07/1925 |
| 7 | AGE | 90 |
| 12 | PLACE OF DEATH - HOSPITAL | |
| 13 | PLACE OF DEATH - OTHER THAN HOSPITAL | [X] HOSPICE FACILITY |
| 14 | FACILITY NAME (OR STREET ADDRESS IF NOT A FACILITY) | BANNER HOSPICE AT GRANDVIEW TERRACE |
| 15 | CITY, TOWN & ZIP CODE OR LOCATION OF DEATH | SUN CITY WEST 85375 |
| 16 | COUNTY OF DEATH | MARICOPA |
| 17 | BIRTHPLACE (CITY AND STATE OR FOREIGN COUNTRY) | UNKNOWN, WEST VIRGINIA |
| 18 | MARITAL STATUS AT TIME OF DEATH | WIDOWED |
| 19 | NAME OF SURVIVING SPOUSE (MAIDEN NAME IF WIFE) | |
| 20 | DECEDENT'S USUAL RESIDENCE STREET ADDRESS | 14258 W CORRINE DR |
| 21 | CITY AND COUNTY | SURPRISE, MARICOPA |
| 22 | STATE | ARIZONA |
| 23 | ZIP CODE | 85379 |
| 24 | EVER IN THE ARMED FORCES | YES |
| 25 | WAS DECEDENT OF HISPANIC ORIGIN? | [X] NO, NOT SPANISH, HISPANIC OR LATINO |
| 26 | DECEDENT'S RACE(S) | [X] WHITE |
| 28 | OCCUPATION | SENIOR MASTER SARGENT |
| 29 | FATHER'S NAME (FIRST, MIDDLE, LAST) | HOMER FIKE |
| 30 | MOTHER'S NAME (FIRST, MIDDLE, & LAST NAME PRIOR TO FIRST MARRIAGE) | NELLIE BAY KING |
| 31 | INFORMANT'S NAME | LATINA ISABEL LINDSTROM |
| 32 | RELATIONSHIP | DAUGHTER |
| 33 | INFORMANT'S MAILING ADDRESS | 14258 W CORRINE DR, SURPRISE, ARIZONA 85379 |
| 34 | NAME AND ADDRESS OF FUNERAL FACILITY | PALM VALLEY FUNERAL HOME, L.L.C. 10761 W. GRAND AVE, SUN CITY, AZ |
| 35 | FUNERAL DIRECTOR | ROBERT R BURKE, FUNERAL DIRECTOR |
| 36 | LICENSE NUMBER | F0788 |
| 37 | METHOD(S) OF DISPOSITION | CREMATION |
| 38 | NAME AND LOCATION OF 1st DISPOSITION FACILITY | REGENCY MORTUARY AND CREMATION, INC., SUN CITY, ARIZONA |
| 39 | NAME AND LOCATION OF 2nd DISPOSITION FACILITY | NONE |
| 40 | IMMEDIATE CAUSE OF DEATH | NATURAL CAUSES, UNSPECIFIED |
| 41 | APPROXIMATE INTERVAL | UNKNOWN |
| 49 | INJURY? | NO |
| 50 | INJURY AT WORK? | NO |
| 51 | MANNER OF DEATH | NATURAL DEATH |
| 52 | TIME OF DEATH | 1522 |
| 53 | WAS AN AUTOPSY PERFORMED? | NO |
| 55 | NAME OF PERSON COMPLETING CAUSE OF DEATH | LESLEY L. WILLIAMS, M.D. |
| 56 | DATE CERTIFIED | 10/05/2015 |
| 57 | CERTIFIER'S ADDRESS | 1 E APACHE ST WICKENBURG, AZ 85390-2442 |
| 58 | NAME OF REGISTRAR | MICHELE CASTANEDA-MARTINEZ |
| 59 | DATE REGISTERED | 10/15/2015 |

DATE ISSUED: 10/15/2015





69417243

This is a true certification of the facts on file with the OFFICE OF VITAL RECORDS, ARIZONA DEPARTMENT OF HEALTH SERVICES, PHOENIX, ARIZONA
Revised 11/2014

KRYSTAL COLBURN
ASSISTANT STATE REGISTRAR

Arizona Department of Health Services



This copy not valid unless prepared on a form displaying the State Seal and impressed with the raised seal of the issuing agency.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE