**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

_____

| | |
|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

_____

This Document Relates to:  All Actions
_____

**COOK DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
STEERING COMMITTEE'S MOTION TO INCREASE
<u>COMMON BENEFIT AND EXPENSE FUND</u>**

<u>**Argument**</u>

Despite this Court's order and Plaintiffs' representing to the Court that common-benefit-fund assessment in this case "shall not be altered,"[1] the Plaintiffs' Steering Committee ("the PSC") has asked the Court for a **75% raise**. They want to receive **more than twice as much** as the average common-benefit fund in similar multi-district litigation.  Their only reason for this request is that "the scope, size, duration, and cost of this litigation have outstripped the PSC's expectations at the time that they requested the current assessment percentages…." (Doc. 10442 at 1.)

---

[1] Dkt 1082-1 at 14 ("The assessment amount is 8%, which includes 6% for attorneys' fees and 2% for expenses.  The assessment represents a holdback (*In re Zyprexa Prods. Liab. Litig.*, 267 F. Supp. 2d 256 (E.D.N.Y. 2006)) and **shall not be altered**.") (emphasis added).  The Cook IVC Filter Litigation Common Benefit Participation Agreement, a voluntary agreement between plaintiffs' attorneys, allows that a motion seeking "a common benefit fee assessment in excess of 8%" may be brought, but only if it becomes "apparent that fees in excess of 6% or costs and expenses in excess of 2% are required to **reasonably and adequately advance the litigation**." *See* Dkt. 1246 at 3-4 (emphasis added).  The PSC's motion does not cite this standard, and nowhere in the motion does the PSC even attempt to argue that a 14% assessment is "reasonably and adequately required to advance the litigation."

Let us all be honest: the PSC is asking the Court to nearly double the common-benefit fund not because it <u>underestimated the scope</u> of the litigation, but because it <u>overestimated the value</u> of the litigation. The scope of the litigation, of course, was known to the PSC on the front end given that the number of cases has been driven by incessant advertising by plaintiffs' lawyers themselves—more than 170,000 TV ads at a cost of more than $70 million at present, and still going. The fact that the vast majority of those cases have turned out to involve plaintiffs who have suffered no actual injury from their IVC filter does not justify a larger cut of any ultimate resolution.

The norm in the legal business (indeed, in just about any business) is that someone who produces less value than originally anticipated makes <u>less</u> money, not <u>more</u> money, as a result. Just so here. Producing less value for MDL plaintiffs is not a reason to <u>increase</u> a PSC's compensation, it is a strong reason <u>not</u> to do so (or even to <u>decrease</u> it). Spending more than $70 million to drum up claims by plaintiffs who have no injury and thus no viable claims, then complaining to the Court that the litigation has gotten too big, is not a reason to increase a PSC's compensation, it is a strong reason not to do so. The Court should deny the PSC's motion (Dkt. 10442).

## Discussion

**I.    The Cook Defendants have standing to oppose the PSC's motion.**

The PSC has already foreshadowed an argument that the Court should ignore the Cook Defendants' opposition to their motion because it is none of Cook's business how much the Court will allow the PSC to be paid. That is incorrect for two reasons.

The first reason is that Cook has both a monetary and a "policy" interest in the PSC's compensation. The monetary interest stems from the fact that the assessment in favor of the PSC

operates as a tax on both the individual plaintiffs and the other attorneys in the MDL. *See* William B. Rubenstein, 5 Newberg on Class Actions § 15:112 (5th ed. 2018) (noting that "the lawyers not involved in undertaking common benefit work . . . are effectively taxed a portion of their attorney's fees, with the tax ultimately being distributed to the lawyers who undertook common benefit work").[2]  Any proposed increase in the assessment raises the question of tax incidence— specifically, who will ultimately bear the burden of any increased assessment?  Counsel for non-PSC plaintiffs will certainly attempt to shift the burden of any increased assessment onto the Cook Defendants in the form of larger settlement demands than they otherwise would.  In some cases, those increased demands may put settlement out of reach, but in the ones that do settle, it will be more expensive for Cook to do so.  The Cook Defendants therefore have an interest in ensuring that any proposed assessment percentage is reasonable, and that the PSC is not unjustly enriched at the Cook Defendants' expense.  Cook's "policy" interest in the PSC's compensation stems from the fact that this litigation is supposed to be conducted for the benefit of <u>plaintiffs</u>, not lawyers, and every dollar that goes into a lawyer's pocket comes out of the plaintiffs' (collective) pockets.

It's not just Cook who thinks an increase in the assessment percentage will act as an impediment to settlement.  The PSC in the Bard IVC Filters Products Liability Litigation also filed a motion seeking an assessment increase from 8% to 14%.  There, a set of plaintiffs' counsel responded in opposition to the request.  Like Cook, this set of plaintiffs' counsel believes that an increase would "hinder settlement efforts" and "alter the desirability of settlement."  *See* Response of Freese & Goss and Matthews & Associates in Opposition to Plaintiffs' Motion Seeking

---

[2] Case Management Order No. ___ (Rules, Policies, Procedures, Guidelines Relating to Establishing Common Benefit Fee and Expense Fund) (Dkt. 1246) provides that the common benefit assessment is assessed on the *gross* recovery in any settlement, and it is thus taxed on both individual plaintiffs and their counsel. Dkt 1246 at 13.

Establishment of Common Benefit and Expense Accounts Pursuant to Case Management Order No. 6 and Modification of Case Management Order No. 6, at 6-7 (attached hereto as Exhibit A).[3]

The second reason why the Court should consider Cook's views is that in common-fund cases, "'the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, [so] courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs'" and must "'act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.'" *In re Mercury Interactive Corp. Secur. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (citation omitted). This goes for MDLs as well, as "a transferee judge in [an MDL] bears a particularly heavy burden to protect the transferee plaintiffs." *In re Medtronic, Inc. Implantable Defibrillator Prod. Liab. Litig.*, 434 F. Supp. 2d 729, 730 (D. Minn. 2006); *see also In re Zyprexa Prod. Liab. Litig.*, 424 F. Supp. 2d 488, 492 (E.D.N.Y. 2006) ("[t]he judiciary has well-established authority to exercise ethical supervision of the bar in both individual and mass actions" (collecting cases). This is just a particular manifestation of the court's inherent powers to supervise the bar. *See Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982) ("Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics."). Without adversary presentation on this issue, the Court would hear only the views of the parties who seek increased compensation. This brief provides that

---

[3] Indeed, by way of example, they note that for a $50,000 settlement, the plaintiff and attorney for the plaintiff would be expected to payout an additional $3,000 into the common benefit fund, and for a $500,000 settlement, it would require an additional payout of $30,000. *See* Exhibit A, at 7. These amounts are substantial.

4

adversary presentation, and the Cook Defendants respectfully ask the Court to consider the discussion in this brief as it considers the PSC's request for more money.

**II.     The PSC's request is unreasonable and the Court should deny it.**

As Cook mentioned earlier, despite their previous vow not to ask the Court to increase their compensation (Dkt. 1082-1 at 14), the PSC does just that. They ask the Court to increase the assessment against the common fund from 8% to 14%. That represents a 75% increase in the assessment. And the PSC has failed to meet their burden of establishing that they are entitled to such a huge increase—or any increase at all, for that matter—in the compensation that this Court previously ruled was reasonable. *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (party seeking additional compensation beyond an amount established as reasonable bears burden of showing that an adjustment is necessary).

The PSC's assessment in this case is already on the high side of what courts allow in common-fund cases. A 14% assessment would be one of the highest. A recent survey evaluating data on 71 instances where a common-benefit fund was used found that the average total assessment was **6.45%**. *See* William B. Rubenstein, 5 Newberg on Class Actions §15:117, *Common Benefit Fees—Empirical Data on Frequency and Size* (5th ed., 2018).[4] The PSC's proposed 14% assessment is more than double the average assessment in such cases. And looking specifically at MDLs involving drugs and medical devices produces similar results. Attached as Exhibit C is a survey of all pending drug and medical-device MDLs since 2010 for which an order setting aside an assessment percentage has been identified. According to this survey, the average assessment was **7.48%**. Thus, the current 8% assessment in this MDL is already greater than the average assessment for comparable MDLs; it can hardly be called "conservative," as the PSC

---

[4] Attached hereto as Exhibit B.

wishes to brand it. (Dkt. 10442 at 2.) Notably, only 6 out of the 65 MDLs surveyed in Exhibit C had an assessment percentage higher than the 14% assessment that the PSC requests here.[5]

One would expect a request for a 75% increase in the assessment—and an abnormally high assessment overall—to be accompanied by an exceptionally strong rationale, but the PSC's is not. The only explanation the PSC offers is that the MDL is larger than initially anticipated. The PSC concedes that it was "fully aware of the need for substantial further discovery and eventual trials," but complains that instead of the 1,000 cases they were banking on, there are now almost 6,000. (Dkt. 10441 at 2.) But the PSC never explains why that increase in the total number of cases has required any extra work <u>by the PSC</u>. Virtually all of the cases in the MDL are stayed and require almost no work from the PSC, whose job is not to try <u>every case</u> in the MDL, but largely to serve as "administrators" of the process. Indeed, a larger pool of cases favors a <u>reduced</u> assessment percentage, not an increased one, as it spreads the cost across more cases and thus a larger settlement pool. To look at is another way, the PSC is not doing (or at least <u>should</u> not be doing) anywhere near 8% of the work in <u>every case</u> in the MDL, so it should not need a raise to 14% (which is the equivalent of the PSC doing 14% of the work in every single case, which would of course be absurd). The PSC should have invested the lion's share of their work in the MDL by now (most "company discovery" has been complete for years); additional cases provide greater spreading of the cost on a per-case basis, which would support a <u>reduced</u> assessment, not an increased one.

The PSC also complains that it had to take or defend more than 140 depositions. (Dkt. 10442 at 3.) But again, the PSC does nothing to explain why <u>its</u> members had to participate in all

---

[5] Interestingly, the PSC cherry-picks these exceedingly rare assessments to support its motion, and largely ignores the vast majority of lower assessments in other MDLs. (Dkt. 10442 at 1 n.1, 4.)

140 depositions, or how the number of depositions (or any other work that the PSC has performed to date, for that matter) has anything to do with the size of the MDL.  As Cook just pointed out, most of the depositions were taken years ago—long before the PSC filed its current motion and long before the number of cases approached anywhere near the current magnitude.  Thus, the increase in filings over the past year or two has had no effect on the number of depositions taken.  Moreover, the PSC also fails to explain why it needed to send **345 lawyers** (by Cook's count) to all the depositions taken so far, often with at least two and not infrequently more in attendance.  That was unnecessary in virtually all of the depositions, and courts deciding on fee awards in the analogous area of class-action litigation routinely deny compensation for multiple attorneys at depositions.  *See, e.g.*, *Bublitz v. E.I. duPont de Nemours and Co.*, 224 F. Supp. 2d 1234, 1249 (S.D. Iowa 2002).

> The PSC also claims (without substantiation) that it has put in lots of hours, but again nothing in the PSC's motion demonstrates that those hours were necessary to the work of the PSC, let alone that they greatly exceed the amount that they could have reasonably contemplated at the time they asked for their generous 8% assessment earlier.  In other words, the PSC has failed to meet its burden of demonstrating why any increase in the assessment would be justified, fair, or reasonable.

> The PSC has also failed to explain why any of the work it has done to date should not have been anticipated from the beginning.  The PSC complains that it has had to do extensive briefing and expert-related work in relation to two bellwether cases and one state case that have gone to trial, and that it has had to work extra hard because Cook decided to vigorously defend its products.  Dkt. 10442 at 3.  As for the first point, the Court established long ago that there would be multiple bellwether trials.  (Dkt. 51 at 6 (Case Management Plan dated November 25, 2014).)  They

7

certainly cannot claim to have been surprised by that fact and, in fact, advocated for it. And on the second point, there is no conceivable way that the PSC could have thought that Cook would not defend its products and its reputation. That argument is a complete non-starter.

Finally, the Court should put no stock in the PSC's feigned surprise about the size of the MDL. To the extent that the size of the MDL is a problem, it is a problem of the PSC's own making. As of March 20, 2018, "nearly 170,000 television advertisements soliciting claims related to alleged injuries caused by inferior vena cava (IVC) filter devices were broadcast in the United States," costing about "$64 million," and according to Cook's research that number now exceeds $70 million. (*See* Exhibit D attached hereto.) And as the Court has seen, this advertising has resulted in thousands of meritless claims being filed by people who have suffered no injury from their filter. For example, one TV advertisement that aired just two days ago—well after Cook asked the Court to start dismissing the most obviously meritless cases in the MDL—solicits people to call the prescribed toll-free number "**Even if you haven't had any complications**" (superimposed over a photo of a man desperately clutching his chest).[6] And the first online advertisement that appears when one searches "IVC filter compensation" through Google is a website with the heading: "**Injury and Non-Injury Accepted – IVC Filter Settlement Sign Up**."[7] It asks prospective plaintiffs whether they suffered any injuries after receiving the filter, and offers an option titled: "**No injury yet (still may qualify)**."[8] It is no wonder that the number of claims is as high as it is: the prospect of recovering millions of dollars (as many of the ads tout[9])

---

[6] https://www.ispot.tv/ad/INC4/ivc-filter-helpline-filter-failure at 00:19 (viewed on April 25, 2019).
[7] http://www.consumersafetywatch.com/compensation-ivc-filter-recipients/#form (viewed on April 25, 2019).
[8] *Id.*
[9] https://www.ispot.tv/ad/IM_Q/ivc-filter-helpline-lawsuit-awards at 00:07 to 00:29 (viewed on April 25, 2019).

without suffering any injury is tempting. If the PSC is concerned about the size of the MDL, it should stop spending tens of millions of dollars each month. And if this MDL has become bloated, it is because it is filled with thousands of lawsuits filed by people who have no injury and thus no viable claim.

## Conclusion

By implementing a common-benefit fee-and-expense-fund order, the Court has demonstrated an interest in ensuring that the PSC is fairly and reasonably compensated for fair and reasonable work. Cook has no objection to that. But the PSC's current motion is not a request to be fairly and reasonably compensated, it is a request that the Court help them guarantee a lucrative return on their investment. The PSC offers this Court no rationale for a 75% increase in their compensation other than the fact that they have worked hard. But hard work is part of a PSC's job, and a large part of why they get a larger percentage of the recovery than they otherwise would. The PSC has not demonstrated that they have <u>exceeded</u> what was expected of them in the first place—and by such a margin that they should receive almost double what they initially agreed to take. The Court should deny the PSC's motion in its entirety.

Dated: April 26, 2019                                Respectfully submitted,

*/s/ James Stephen Bennett*
Andrea Roberts Pierson (# 18435-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
E-Mail:  andrea.pierson@faegrebd.com

James Stephen Bennett (# 22869-02)
FAEGRE BAKER DANIELS LLP
110 W. Berry Street, Suite 2400
Fort Wayne, Indiana 46802
Telephone:  (260) 424-8000
Facsimile:  (260) 460-1700
E-mail:  stephen.bennett@faegrebd.com

*Counsel for the Defendants, Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical Incorporated), and William Cook Europe ApS*

## **CERTIFICATE OF SERVICE**

  I hereby certify that on April 26, 2019, a copy of the foregoing was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.


                */s/ James Stephen Bennett*