IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: BARD IVC FILTERS<br>PRODUCTS LIABILITY LITIGATION | No. 2:15-MD-02641-DGC |
| This Document Relates to All Actions | |

## RESPONSE OF FREESE & GOSS AND MATTHEWS & ASSOCIATES IN OPPOSITION TO PLAINTIFFS' MOTION SEEKING ESTABLISHMENT OF COMMON BENEFIT FEE AND EXPENSE ACCOUNTS PURSUANT TO CASE MANAGEMENT ORDER NO. 6 AND MODIFICATION OF CASE MANAGEMENT ORDER NO. 6.

Come now, Freese & Goss and Matthews & Associates (collectively "FG/MA"), on their own behalf and as firms representing thousands of clients who would be negatively impacted by the Plaintiffs Steering Committee's ("PSC") request to substantially increase the 8% common benefit fund assessment to a 14% assessment. FG/MA file this, their Response in Opposition to Plaintiffs' Motion Seeking Establishment of Common Benefit Fee and Expense Accounts Pursuant to Case Management Order No. 6 and Modification of Case Management Order No. 6, and would respectfully show the Court the following:

## I.
## INTRODUCTION

Freese & Goss and Matthews & Associates negotiated and executed a Confidential Settlement Term Sheet with Bard on behalf of 1,985 of their clients *prior* to the PSC's present motion to enlarge its share of that settlement (and all settlements). In arriving at that settlement, FG/MA acted in reliance on the representations of the PSC, memorialized in CMO 6, that "the [common benefit fee and cost] assessment amount is 8%" and that the assessment "shall not be

1

altered." [CMO 6, Doc 372, p. 10]. This seemingly firm pronouncement informed FG/MA's litigation choices, its expenditures, and most importantly the settlement decisions of its clients.

It is patently unfair that, *after* this MDL is on the verge of transferring cases and effectively concluding the MDL related tasks for thousands of plaintiffs, the PSC seeks to rewrite the assessment. The PSC's sudden attempt to nearly double the already substantial fee and cost assessment it was granted in CMO 6, is excessive, unwarranted, and lacking in transparency. It is particularly unfair when applied to plaintiffs who have settled, or nearly settled, their cases based on prior representations that the assessment would be 8% of the total. Because the current 8% assessment is adequate, and because the PSC has not shown that a 14% assessment is necessary for the advancement of the litigation, Plaintiffs' motion to modify CMO 6 should be denied.[1]

## II.
## ARGUMENT AND AUTHORITIES

**A. FG/MA and Others Have Reasonably Relied Upon CMO 6's Representation That the Common Benefit Assessment Would be 8% And Would Not Be Altered.**

FG/MA have already executed the resolution agreement for 1,985 Claimants and are in the process of resolving thousands of other claims. Indeed, it was announced in open Court in this MDL on February 1, 2019, almost 3 months ago. It is believed that other claimants and attorneys are in the process of resolving cases, as well. As such, FG/MA (and others) have reasonably relied upon the representation by the PSC, memorialized in CMO 6, that the common benefit assessment was 6% and that it would not be altered. CMO 6's assessment provision states that "the assessment amount is 8%, which includes 6% for attorneys' fees and 2% for expenses. The assessment

---

[1] FG/MA do not object to the portion of Plaintiffs' motion seeking establishment of common benefit accounts and the appointment of an escrow agent. FG/MA only oppose the part of the motion that seeks to increase the assessment from 8% to 14%.

2

represents a holdback (*In re Zyprexa Prods. Liab. Litig.*, 267 F.Supp.2d 256 (E.D.N.Y. 2006)) ***and shall not be altered.*** [Doc. 372, p. 10 (emphasis added).

B. **The PSC Has Not Demonstrated That An Assessment in Excess of 8% is Required to Reasonably and Adequately Advance the Litigation.**

The only document arguably providing for an increase in CMO 6's 8% assessment percentage is the Participation Agreement executed between participating attorneys and the PSC. That agreement provides that the attorney will not support a common benefit assessment in excess of 8% "unless it should become apparent that fees in excess of 6% or costs and expenses in excess of 2% *are required to reasonably and adequately advance the litigation.*" [Exhibit A to Doc. 372 (emphasis added)]. Thus, it is at the very least incumbent upon the PSC to show that any additional assessment is necessary to reasonably and adequately conduct the litigation. The PSC has hardly tried to make the required showing.

1. **The PSC has not explained or substantiated its claim that "tens of thousands" of hours have been devoted to the litigation.**

The obvious first step in showing that additional funds are necessary to reasonably and adequately advance the litigation would be to produce time records or some evidence showing the nature and amount of work that has been performed to date. The PSC has produced no such evidence. Instead, the PSC offers only the vague assertion that "tens of thousands" of hours have been devoted to the litigation. This unproven assertion means little. Even where "*hundreds* of thousands" of qualified hours have been worked, MDL courts have ordered assessments that are a mere fraction of the amount the PSC seeks here. *See e.g.* PTO # 327, *In re: Ethicon Inc. Pelvic Repair System Prod. Liab. Litig.*, MDL No. 2327, p. 6 (ordering a 5% common fund assessment in MDL where 900,000 hours were submitted for common benefit work). There simply is no way

3

for the Court to determine from such scant information that the funds produced by an 8% assessment will not be sufficient to meet the needs of this litigation.

## 2. Increases in the number of MDL participants should allow for *lower* assessments, not require substantially higher ones.

When first advocating for an 9% assessment, the PSC cited the relatively small (1,000 plaintiff) size of the MDL as a reason that the more typical 4%-6% assessment would be inadequate. According to the PSC, the Bard IVC MDL warranted a larger per-case percentage precisely because there were fewer cases: "where there are a large number of plaintiffs, a smaller percentage assessment can provide the same actual amount as a larger percentage assessment applied to a smaller number of plaintiffs." [Doc. 291, p. 4-5]. Using the PSC's own logic, the fact that the number of plaintiffs has increased nearly seven-fold should allow the costs of litigation to be spread more broadly and the per-plaintiff assessment to go *down*. At a minimum, a seven-fold increase in the number of plaintiffs from whom assessments will be collected should suffice to cover litigation fees and costs without the need for assessments to increase.

The 8% assessment provided for in CMO 6 is already excessive when compared to assessments in other similarly sized MDLs involving drugs and medical devices. *E.g. In re Baycol Prods. Liab. Litig.*, MDL 1431 (PTO 25) (6% assessment in MDL consisting of 1,253 actions); *In re Rezulin Prods. Liab. Litig.*, 2002 WL 441342 (S.D.N.Y. 2002)(PTO 67)(6% assessment in MDL consisting of "hundreds" of actions); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, MDL 1407 (Amended CMO 8)(4% assessment in MDL consisting of 900 actions); *In re Silicone Gel Breast Implants Prod. Liab. Litig.*, MDL 926 (PTO 13 and 13A)(4% assessment in MDL consisting of 1,778 actions); *In re Baush & Lomb Contact Lens Solution Prods. Liab. Litig.*, MDL 1785 (PTO 15(6% assessment in MDL consisting of over 400 actions).

### 3. The PSC has made no showing that the current 8% assessment is insufficient to fund the routine litigation tasks (discovery, motion practice, bellwether trials) that are performed in virtually every MDL – and often at lower assessment rates.

Despite receiving a larger-than-typical assessment percentage from the outset, the PSC claims that it needs still more of each plaintiff's recovery because the hours and dollars expended on common benefit work has exceeded its initial estimates. The PSC's scant evidence in support of this assertion relies primarily on generalities. For example, the PSC asserts that the litigation has involved "lengthy motion practice." Yet, the PSC offers no evidence of extraordinary briefing efforts beyond what would be expected to be performed within an MDL proceeding. Indeed, the only example Plaintiffs provide of briefing work that was "unanticipated" at the time the 8% assessment was set was a preemption response. Bard clearly asserted the doctrine of federal preemption in its Answer to Plaintiffs' Master Complaint -- which was filed prior to entry of CMO 6. [Bard's Answer to Master Complaint, ECF Doc.366, at ¶ 7, p. 44]. The PSC can hardly feign surprise at being required to refute a defense Bard has asserted from the outset of the litigation.

Similarly, the PSC's suggestion that it was caught off guard by the need to litigate three bellwether cases and the upcoming *Tinlin* trial seems doubtful. Bellwether trials are a commonplace in mass tort MDL proceedings. Indeed, two months before CMO 6 was entered, the parties were ordered to submit a written discussion of issues in the case. [Doc 174, p. 1]. At that time, Bard proposed the selection of 5 to 7 bellwether cases, while Plaintiffs indicated an expectation that "3-5 cases" would be tried as bellwethers. [Doc. 174, p. 9, 25]. Thus, the need to try (at least) three bellwether cases was well within the PSC's expectations at the time that the 8% assessment was set. It is illogical for the PSC to suggest that only 3 bellwether trials were unexpected for an MDL.

5

Nor can the near doubling of the common benefit assessment be justified due to the length of the litigation. This MDL has been efficiently managed. Fact discovery was completed on February 3, 2017. [Doc. 3685, p. 2]. Expert discovery was completed on July 14, 2017. [Doc. 3685, p. 3]. The first Bellwether trial occurred in March of 2018. Each of these litigation milestones occurred approximately one year later than the estimated schedule proposed by the PSC at the outset of the litigation. [Doc. 174, p. 24-25]. A modest one year extension in the time the PSC initially allotted for this litigation hardly seems to require a near doubling of the common benefit assessment.

Lastly, the PSC cites generally to two potential future activities as requiring additional funds: (1) the pursuit of a settlement and (2) the continued involvement of the PSC in post-remand cases. Neither of these are a proper basis for taxing plaintiff's recoveries. FG/MA is unaware of any significant movement toward a *global* settlement in this litigation; and the PSC has not claimed a global resolution is being negotiated or is forthcoming. To date, the only mass settlement has been accomplished by FG/MA and it was not a global settlement.[2] Similarly, the MDL court (and by extension the PSC created by the MDL court) concludes its role in a case once the case is remanded back to the transferor court. Additional assessments typically are not, and should not, be imposed on MDL cases to fund trial activities occurring outside of the MDL.

C.  **The PSC's Request to Nearly Double the Common Benefit Assessment Will Hinder Settlement Efforts by FG/MA and Others.**

As previously mentioned, FG/MA represent 1,985 clients who negotiated and executed a Confidential Settlement Term Sheet with Bard *prior* to the PSC's present motion to enlarge its share of that settlement (and all settlements). FG/MA (and other firms) represent thousands of

---

[2] In the event that it the opinion of the PSC that hours spent on individual settlements are compensable, FG/MA intends to seek compensation for its groundbreaking work in securing the first mass settlement with Bard.

6

additional clients for whom settlement negotiations with Bard are far advanced. Indeed, FG/MA is currently in the process of negotiating a second term sheet and expect to have to have an agreement in place in the very near future. In negotiating these settlements with Bard, and in determining potential client payouts and in negotiating referral arrangements with other counsel relating to the potential settlements, FG/MA relied upon CMO 6's representation the common benefit assessment would be 8%.

Using a hypothetical $50,000 settlement as an example, plaintiffs and their attorneys would have entered into the settlement expecting to contribute $4000 from the settlement to cover common benefit work. Under the PSC's proposed increase, each settling plaintiff and attorney would be expected to contribute an additional $3000 to the common benefit fund (for a total of $7000 per plaintiff). For a more injured client receiving a hypothetical $500,000 settlement the additional burden would be $30,000. These amounts are substantial. Having to give a near-double share to the PSC alters the desirability of the settlement for FG/MA's clients. It also devalues the work of FG/MA. Most concerningly, it threatens FG/MA's ability to secure the client releases necessary to finalize the hard-fought settlement.

While the increased assessment is excessive and unwarranted in all cases, it is particularly unfair and burdensome when applied to cases that have reached the point of settlement or near settlement under a reasonable expectation that the common benefit assessment would by 8%. At a minimum, FG/MA's clients who have entered, or will soon enter, a settlement term sheet should be excluded from any increase in the common benefit assessment above 8%.

## III.
## CONCLUSION

The PSC's Motion seeking an increased assessment from 8% to 14% is excessive and has not been shown to be necessary to the advancement of this litigation. For those reasons, and for

7

the other reasons stated herein, FG/MA prays that the PSC's motion for modification of CMO 6 is denied. Alternatively, if CMO 6 is modified to increase the common benefit assessment, FG/MA prays that its clients who have entered, or will soon enter, a settlement term sheet be excluded from any increase in the common benefit assessment above 8%. FG/MA requests any other and further relief to which they or their clients may be justly entitled.

Dated this 25th day of April, 2019.

Respectfully submitted,

/s/David P. Matthews
**MATTHEWS & ASSOCIATES**
2509 Sackett St.
Houston, Texas 77098
Telephone: 713-522-5250
Facsimile: 713-535-7184
E-mail: dmatthews@matthewslawfirm.com

Tim K. Goss
**FREESE & GOSS, PLLC**
3500 Maple Avenue, Suite 1100
Dallas, Texas 75219
Telephone: 214-761-6610
Facsimile: 214-761-6688
E-mail: tim@freeseandgoss.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of April, 2019, a copy of the foregoing pleading was filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access this filing through the Court's system and notice of this filing will be sent to these parties by operation of the Court's electronic filing system.

/s/ David P. Matthews
David P. Matthews

8