IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |
| This Document Relates to All Actions | |

## The Plaintiff Steering Committee's Reply in Support of its Bench Brief on *Lexecon* and the Bellwether Selection Process

The Plaintiffs' Steering Committee provides the following reply in support of its *Bench Brief on Lexecon and the Bellwether Selection Process* [Filing No. 10715]:

# Introduction

While the PSC replies to Cook's legal arguments below, one thing must be addressed: Cook's attack on the PCS's honesty and integrity. Cook's brief proceeds on the theory that the undersigned—and the entirety of the PSC—deliberately duped the Court by engaging in the diabolical: a "global strategy to derail this Court's Bellwether Selection Plan" and "ignore this Court's authority." Cook's invective doesn't stop there. It repeatedly accuses the PSC of being "disingenuous," acting in "bad faith," and engaging in "gamesmanship." Cook hurls these accusations based upon the alleged statements of several unnamed lawyers:

> Multiple individual plaintiffs' lawyers have represented to Cook's counsel that **they weren't even asked** by the PSC about individual case waivers, and the global refusal to waive is a "**PSC strategy decision.**"[1]

---

[1] Filing No. 10786, at ECF p. 81105 (emphasis in Cook's brief).

Not mincing words, Cook tells this Court that the undersigned lied and never asked MDL counsel whether their clients would waive *Lexecon*.

Cook initially refused to identify the lawyers who purportedly claimed they were never asked about *Lexecon* waivers. Once the lawyers were identified and contacted, however, they were shocked to learn they had been credited with such statements. Each lawyer Cook spoke with has provided a letter (attached as Exhibits A, B, and C) explaining (1) that each was asked whether their category 5 and 6 clients were willing to waive *Lexecon,* and (2) each made the independent decision not to waive. The opposite of what Cook told this Court.

The PSC concedes defeat in the *ad hominem* contest—a contest we never entered—and turns to what we did: ask every firm in this MDL whether any of their clients were willing to waive their right to try their case in its originating jurisdiction. Not two hours after the May 9, 2019, status conference concluded Plaintiffs' Leadership gave the following instruction by e-mail to every MDL Plaintiffs' lawyer:

> **Advise us by e-mail whether or not your category 5 & 6 cases waive Lexecon.[2]**

Leadership didn't tell counsel to refuse to waive *Lexecon;* we asked whether they would. Rather than masterminding some nefarious plot to "ignore this Court's authority," Leadership did precisely what we said we would do: ask MDL counsel whether their category 5 & 6 cases waived *Lexecon*. We then reported those results

---

[2] A true and correct copy of this e-mail is attached as Exhibit D. To be clear, Plaintiffs do not intend to waive any aspect of work-product protection regarding communications between the PSC and MDL counsel. This e-mail is attached to demonstrate the utter lack of basis for Cook's repeated accusations.

to the Court. Indeed, each of the lawyers Cook claims to have spoken with sent an e-mail to Leadership stating unequivocally their category 5/6 clients refused to waive *Lexecon*.[3] No matter how many times Cook's brief accuses the PSC of lying (even in bold-italicized font), nothing can change the fact that the PSC did precisely what Cook recklessly told the Court it didn't do: ask every MDL lawyer whether their clients were willing to waive *Lexecon*. This Court should be a place where we can have a reasoned argument as to whether plaintiffs have the right to try their cases at home. Cook's invective has no place there.

## Argument

The focus of the PSC's initial Bench Brief on *Lexecon* was whether Plaintiffs had clearly and unambiguously waived their *Lexecon* objection by filing their cases directly into the MDL. Most of the arguments against waiver asserted in that initial Bench Brief have gone unchallenged by Cook. Cook has not brought forth any clear and unambiguous statement of waiver by Plaintiffs.[4] Nor has Cook disputed that Plaintiffs' complaints expressly designated each Plaintiff's state of residence as a proper place of venue for trial – thereby preserving Plaintiffs' *Lexecon* objections. Thus, it appears clear that, if they possess a right to select the trial venue at all, Plaintiffs have sufficiently maintained and preserved that right.

---

[3] Each of these firms' refusal to waive *Lexecon* is attached as Exhibits E, F, and G.

[4] To the extent Cook relies upon a footnote to CMO #25 stating that waiver of *Lexecon* was confirmed, Plaintiffs have explained that the referenced "waivers" related only to the original discovery pool that generated the *Hill, Gage* and *Brand* cases, that Plaintiffs objected to the referenced footnote and expressed that no Plaintiff had waived *Lexecon* during recent status conferences. [*See* Argument *infra* at § 7, pp. 14-15].

Cook, however, takes the position that because the direct filed cases were not "transferred" into the MDL pursuant to Section 1407, no right to seek transfer for trial ever came into existence. According to Cook, an MDL litigant's right to select a proper trial forum must arise from (1) an agreement between the parties, (2) an order from the Court, or (3) the language of Section 1407(a). [*See, e.g.,* Filing No. 10786, at ECF p. 81102-81103.] The direct-filed Plaintiffs have a *Lexecon* right under each of these theories.

1. **Plaintiffs' choices not to waive their rights to try their cases in their states of residence.**

Before turning to the facts and authority supporting Plaintiffs' decision not to waive *Lexecon*, the Court deserves an explanation as to why these decisions were made. While this MDL involves the claims of more than 4,000 plaintiffs, it must be remembered that each plaintiff is entitled to individual legal advice; legal advice that does not place his claims below the interests of the MDL as a whole. Once we step back and realize that each plaintiff is entitled to such advice, the refusal to waive the right to try their cases at home becomes obvious. All other things being equal, what lawyer would advise their client to try their case less than 150 miles from the defendant's corporate headquarters if that client has a choice?

We've seen both during the *Hill* trial and the *Brand* trial how Cook has done what it can to take advantage of the home field. During *Hill* there was discussion regarding the fact that Mrs. Cook hailed from Evansville and that she and her husband started their company in an apartment in Bloomington. We heard Cook witnesses in the *Brand* trial discuss their Indiana roots. This is not to say that there is

4

anything wrong with such tactics; it is simply to point out that plaintiffs have a real reason to avoid trial in Indiana if the law supports that decision (it does, *see infra*.).

If the NCAA were to tell Archie Miller that he had to play every regular season game away, he would certainly object. Not because the referees are any less fair at an away game, and not because it is impossible for the Hoosiers to win an away game. But there is a real advantage to playing at home. If a lawyer has to advise a client on whether they should try their case in Cook's home state where there will rarely be a member of the venire who isn't familiar with Cook, or try that case outside of Indiana then that lawyer will likely advise the client to try the case at home.

2. **Cook previously acknowledged the right of direct-filed-plaintiffs to have their cases tried in their states of residence.**

Cook states there "can be no 'direct filing' without agreement between the parties and an order creating such a right," and then says that Cook never agreed to such a thing. [Filing No. 10786, at ECF p. 81101.] The problem is that early on in this MDL Cook agreed to a Short Form Complaint that expressly asked each Plaintiff to designate a "District Court and Division in which venue would be proper absent direct filing."[5] There would be no reason to request such information from direct-filed plaintiffs unless there was an expectation—on behalf of Plaintiffs **and** Cook—that the case would be transferred at the conclusion of pretrial proceedings. This language arose from arms-length negotiation between the parties and was acknowledged by the Court in its March 17, 2015, Order. [Filing No. 305, at ECF p. 1459.] Using the words

---

[5] A copy of the parties' executed agreement for the content of the Short Form Complaint is attached as Exhibit H.

from Cook's brief, there was an "agreement between the parties and an order creating such a right." Claiming the parties' agreement and the Court's order do anything less than preserve Plaintiffs' *Lexecon* rights would elevate form over substance at the expense of thousands of individual rights.

Indeed, if Cook had not intended the Short Form Complaint's alternate venue inquiry as an acknowledgement of possible future transfer then that should have been made known before thousands of Plaintiffs direct-filed their cases in reliance on agreed language seeming to preserve their *Lexecon* rights. Not once in its brief does Cook even discuss its agreement, let alone attempt to explain why it should not be held to its previous acknowledgment of Plaintiffs' rights to try their cases in their states of residence. Cook simply claims that it never made such an agreement. Defense counsel's electronic signature on the parties' Short Form Complaint agreement suggests otherwise. [*See* Ex. H.]

The importance of the parties' agreed venue question in the Short Form Complaint is further elevated by the Court's approval of the Short Form Complaint. Cook readily acknowledges that "an agreement between the parties which has been approved by court order" may preserve a plaintiff's right to seek transfer after pretrial proceedings are completed. [Filing No. 10786, at ECF p. 81101.]. That is essentially what the Short Form Complaint (and Master Complaint) represent here. The agreed language of the Short Form Complaint specifies each Plaintiff's choice of trial venue absent direct filing. The agreed language of the Master Complaint states that "the federal judicial district of each Plaintiff's state of residence" is a proper place of venue

6

"for purposes of remand and trial." [Filing No. 213, at ECF p. 1055].  Direct filing orders are just agreements between the parties that are memorialized in a court order.  The parties' agreed language in the Short Form Complaint (and Master Complaint) were likewise approved by the Court. As such, they support the right and expectation of direct-filed Plaintiffs to try their cases in their chosen forums at the close of pre-trial proceedings.

3. **Recognizing the *Lexecon* rights of direct-filed claimants would be consistent with this Court's prior actions and the actions of courts around the country.**

Throughout this litigation, the Court and the parties have acted in conformity with the view that *all* Plaintiffs have a right to try their cases in the venue of their choice following completion of consolidated pretrial proceedings. When the Court created the original discovery pool, it included both cases directly filed and those transferred in. [Filing No. 335, at ECF p. 1748.] Plaintiffs were then asked to confirm a *Lexecon* waiver for **each** of those cases. [*See, e.g., id.*, at ECF p. 1752.][6] If the direct-filed Plaintiffs had no *Lexecon* rights to begin with, then there would be no need for a waiver in those cases. By requiring confirmation that *Lexecon* was waived in **all** discovery pool cases (whether transferred or direct filed), the Court acknowledged all plaintiffs had a right to trial in their chosen venue. Simply stated, if the Court did not believe that direct-filed cases were subject to Section 1407's requirement that

---

[6] Case Management Orders in this litigation—including Amended CMO #5—expressly state that they govern both cases transferred into the MDL by the JPML and cases directly filed in the MDL. [*E.g.*, Filing No. 335, at ECF p. 1748.]

they be sent back to their originating jurisdictions for trial, there would have been no reason to require *Lexecon* waivers from direct-filed Plaintiffs.

Courts and litigants across the country have made similar, implicit, acknowledgements of direct-filed plaintiffs' *Lexecon* rights through direct filing orders. That is, if the law were as Cook suggests and direct filing into an MDL absolutely negates any right to have the case tried in Plaintiff's chosen venue, there would be no point in including a reservation of *Lexecon* rights in direct filing orders. Yet, virtually every direct filing order entered in an MDL includes language stating that direct filing is solely for the purposes of consolidated discovery and pretrial proceedings and that the direct-filing plaintiffs do not intend to waive their right to transfer the case to a court of proper venue at the conclusion of pretrial proceedings.  *E.g.,* Pretrial Order #14, *In re: Am. Med. Sys., Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2325, p. 3.[7]  Indeed, Cook's counsel acknowledged during argument that in some MDLs "there's a direct filing order that preserves things like the right to transfer back to the home jurisdiction." [May 9, 2019, Tr. at 19:3-7]. Again, there would be no reason for numerous courts to issue direct filing orders preserving the plaintiff's right of remand/transfer if the plaintiff had no right to remand/transfer in the first place. The fact that many such orders exist are an acknowledgement that all plaintiffs who take part in an MDL should retain the opportunity to have their case tried in a proper venue of their choosing.

---

[7] The relevant portion of this PTO is attached as Exhibit I.

8

4. **In the modern era of MDL litigation, Section 1407(a)'s reference to "transferred" actions should be given an expansive interpretation.**

At its core, the statutory provision creating our MDL system (28 U.S.C. § 1407(a)) grants two powers: (1) the power to consolidate cases involving common questions of fact that are pending in different federal districts, and (2) the limited power to conduct coordinated or consolidated pretrial proceedings.

> When civil actions involving one or more common questions of fact are pending in different districts, **such actions may be transferred** to any district **for coordinated or consolidated pretrial proceedings. . .** Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated.

28 U.S.C. § 1407(a)(emphasis added). Thus, Section 1407 is both a grant of powers to operate an MDL system and a limitation on the powers of that system.

Cook fixates on the fact that direct-filed Plaintiffs did not call upon the MDL system's first power (its transfer authority) as grounds for lifting the limits of the MDL court's second power (its limited authority to conduct pretrial proceedings). It should not work that way. The MDL system's consolidation power is phrased in terms of "transfers" because at the time Section 1407 was enacted over fifty years ago, transfer was the predominant means by which multiple cases could be brought to rest in a single forum. But it is not necessary to give the term "transfer" a hyper-technical meaning. A "transfer" may simply be a movement, conveyance or delivery. In modern MDL practices, direct-filing is an equally valid means of delivering (i.e. "transferring") numerous claims into a consolidated litigation as is JPML transfer. Thus, the

9

mere fact that modern plaintiffs sometimes choose to achieve the consolidation step without going through the Section 1407 transfer procedure (thereby saving the Court and Defendants effort, expense, and delay) should not enlarge the powers of the MDL court or diminish the rights of the plaintiff. Plaintiffs' traditional privilege to select where their cases will be tried after MDL proceedings are completed should not depend upon the mechanism whereby MDL consolidation was first achieved.

In the 51 years since Section 1407 was enacted,[8] MDL processes have evolved to reflect modern practice but the language of Section 1407 has remained unchanged. Other than the 1976 addition of language allowing Clayton Act cases to be consolidated for both pretrial and trial purposes, the language of Section 1407 has not been amended since it was passed in 1968. 28 U.S.C. § 1407 (Apr. 29, 1968) amended Pub. L. 94–435, title III, § 303, Sept. 30, 1976). Meanwhile, MDL processes have continued to evolve to allow for modern practices and innovations. For instance, in its early

---

[8] It is helpful to briefly consider the origins of the MDL process. In the 1960's, the government successfully prosecuted an antitrust action against manufacturers of electrical equipment. Thereafter, over 1,800 civil cases were filed in over 30 different federal court districts by municipalities and utilities against the manufacturers of electronic equipment. To deal with this "wave of litigation [that] threatened to engulf the courts" a Coordinating Committee for Multiple Litigation was created. The Coordinating Committee recommended a series of uniform pretrial and discovery orders, a centralized document depository, and "national" depositions. that each judge could apply in their respective districts. The consensus view was that these actions of the Coordinating Committee were highly successful, but it had also been cumbersome and inefficient managing the participation of 30 district court judges in the coordinated process.

The experiences and recommendations of Coordinating Committee for the electrical equipment litigation greatly influenced the MDL system ultimately enacted by Congress, *see* H.R. Rep. No. 90-1130 (Feb. 28, 1968). Section 1407 opens with a grant of power to transfer "actions pending in different districts" to a single court — thereby using a familiar procedural mechanism of that era (transfer) to solve the cumbersome problem of coordinating actions between numerous courts. Similarly, Section 1407 adopted the limited range of "pretrial" activities successfully undertaken in the electrical equipment litigation.

iterations, there was no expectation that the transferee judge would conduct bellwether trials or manage global settlements. Arguably, these tasks fall outside the initial vision and strict confines of Section 1407's grant of power to conduct "pretrial proceedings"; but they address the particular needs of large-scale product liability MDLs in a way that is consistent with the spirit, purpose, and an expansive reading of Section 1407.  Direct filing is another relatively recent innovation to the MDL process aimed at improving the efficient management of large numbers of cases. Again, a strict reading of Section 1407 does not address consolidation through direct-filing; recognizing direct filing as an effective means of "transferring" cases into the MDL is consistent with the spirit, purpose, and an expansive reading of Section 1407.

**5. Courts are moving toward recognition that direct-filed cases have an originating forum.[9]**

As Plaintiffs touched upon in their initial Bench Brief, Courts have already begun moving away from the contrived notion that just because a case was filed directly into the MDL (and therefore had no transferor court), it has no originating forum other than the MDL court. For instance, it used to be that conflict of law determinations were made using the choice-of-law rules of the transferor forum for transferred cases and the choice-of-law rules of the MDL court for direct filed cases. But more recent cases have taken the view that the substantive law of direct-filed

---

[9] This argument was first set forth in Plaintiffs' Steering Committee's Bench Brief on *Lexecon* and the Bellwether Selection Process. [Filing No. 10715, at ECF p. 80781-80783.] It is briefly reiterated here for the convenience of the Court in having all arguments together.

cases is to be determined by the choice-of-law rules of the state where the claim originated.[10]

The Seventh Circuit has adopted the modern view and holds that foreign cases filed directly in a district court as a part of ongoing MDL are to be treated as having originated outside of that district. *Dobbs v. DePuy Orthopedics, Inc.,* 842 F.3d 1045 (7th Cir. 2016) ("[D]istrict courts in our circuit have taken that approach:  foreign cases filed directly in a district court as part of an ongoing multidistrict litigation are treated as having originated outside of that district. We ratify that approach here … ." ). *See also In re Watson Fentanyl Patch Prods. Liab. Litig.,* 977 F. Supp. 2d 885, 888–89 (N.D. Ill. 2013); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices &*

---

[10] *E.g., In re Watson Fentanyl Patch Prods. Liab. Litig.,* MDL No. 2732, 2013 WL 4564927, at *2 (N.D. Ill. Aug. 27, 2013) ("Indeed, the prevailing rule in this situation is that in a case that was directly filed in the MDL transferee court but that originated elsewhere, the law (including the choice of law rules) that applies is the law of the state where the case originated."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* 2011 WL 1375011, at *6 ("[T]he Court concludes that the better approach is to treat foreign direct filed cases as if they were transferred from a judicial district sitting in the state where the case originated."); *Wahl v. Gen. Elec. Co.,* No. 3:13–CV–0329, 2013 WL 604818, at *4 (M.D. Tenn. Nov. 14, 2013) ("Most of the courts that have considered this peculiar procedural posture have stated that it is appropriate to apply the choice of law rules of the 'originating' jurisdiction (i.e., where the case would have [been] brought but for the CMO permitting direct filing), rather than the choice of law rules of the MDL Court."). *In re Bausch & Lomb Inc. Contacts Lens Solution Prods. Liab. Litig.,* MDL No. 1785, 2007 WL 3046682, at *3 (D.S.C. Oct. 11, 2007) (noting that "it would be an odd result to subject plaintiffs to [the law of the MDL forum] simply because they took advantage of the direct filing procedure—a procedure that provides benefits to all parties and preserves judicial resources"); *In re Avandia Mktg, Sales Practices & Prods. Liab. Litig.,* No. 07–MD–01871, 2012 WL 3205620, at *2 (E.D. Pa. Aug. 7, 2010) ("The Court has concluded, as have other MDL courts, that such cases should be governed by the law of the states where Plaintiffs received treatment and prescriptions for Avandia. This ruling will promote uniform treatment between those Plaintiffs whose cases were transferred into the MDL from their home states and those Plaintiffs who filed directly in the MDL."); *In re Fresenius Granuflo/NaturaLyte Dialysate Products Liability Litigation,* 76 F. Supp. 3d 294 (D. Mass. 2015).

*Prods. Liab. Litig.*, No. 3:09–MD–02100–DRH, 2011 WL 1375011, at *5 (S.D. Ill. Apr. 12, 2011).

It would be inconsistent for the Court to recognize that direct-filed cases have an "originating" jurisdiction for purposes of choice-of-law determinations while clinging to the fallacy that direct-filed cases have no "originating" jurisdiction[11] for purposes of recognizing a *Lexecon* right to remand.

### 6. The direct-filed Plaintiffs have not "clearly and unambiguously" waived their *Lexecon* objections.

It is well-established that a *Lexecon* waiver must be "clear and unambiguous." *In re DePuy Orthopaedics, Inc.*, 870 F.3d 345, 351 (5th Cir. 2017). Far from making an unambigous waiver of their *Lexecon* rights, Plaintiffs in this litigation have stated unequivocally in their Master Complaint:

> 27. **For purposes of remand and trial**, venue is proper pursuant to 28 U.S.C. § 1391 **in the federal judicial district of each Plaintiff's state of residence.**

[Filing No. 213, at ECF p. 1055.] This language is specifically incorporated into every Short Form Complaint by reference. [*See, e.g.,* Filing No. 214, at ECF p. 1087.] In addition, to further support the fact that Plaintiffs never intended direct filing to be a waiver of their *Lexecon* rights, the Short Form Complaint included a statement

---

[11] Courts have taken two different approaches to determining the "originating" jurisdiction for direct-filed cases: (1) focusing on the place the drug/device was prescribed or implanted, or (2) focusing on the court designated by the plaintiff as the place of proper venue. In a recent products liability case, the Seventh Circuit applied the latter view. *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045 (7th Cir. 2016) (noting that the case was filed in Ohio only because the MDL was located there and that the plaintiff's complaint indicated that the Northern District of Illinois as the appropriate venue when opting to apply Illinois' choice of law rules).

13

specifically identifying the "district court and division in which venue would be proper absent direct filing" and the "paragraphs in Master Complaint upon which venue and jurisdiction lie." [*Id.*]  It would take a tremendous leap to infer a clear and unambiguous *Lexecon* waiver from direct filing **in the face of express language in Plaintiffs' complaints preserving their *Lexecon* objections**. Thus, if direct-filed Plaintiffs have a *Lexecon* right to select the trial forum for their cases, even Cook does not seriously argue that Plaintiffs have waived that right.

Cook attempts to discount paragraph 27 of the Master Complaint by pointing to paragraph 28, which states that venue is proper in this District under 28 § 1391. Cook's discussion, however, omits the operative portion of paragraph 27, i.e., that venue is proper in each plaintiff's home jurisdiction, "**For purposes of remand and trial**." While Plaintiffs noted that for purposes of pre-trial discovery venue is proper in this District, they could not have been clearer: when it comes time for trial, venue is proper in the "judicial district of each Plaintff's state of residence." [Filing No. 213, at ECF p. 1055.]

7. **While not critical to the *Lexecon* analysis, it is important to recognize how we got here in the first place.**

This issue was brought to the fore when Cook inserted the following footnote in its proposed CMO #25:

> Waiver of Lexecon is confirmed by Plaintiffs for all Tulip Bellwether Pool and Celect Bellwether Pool cases only. Nothing in this Case Management Order or otherwise shall indicate a waiver of Lexecon as to the remaining cases.

[*E.g.*, Filing No. 10599, at ECF p. 80073.] Cook knew full-well that Plaintiffs had not waived *Lexecon*. During both the April 29th and May 9th status conferences, Plaintiffs' counsel made abundantly clear that no plaintiff had waived *Lexecon*. Indeed, the Court recognized this in its May 13, 2019, minute entry: "Specifically, Plaintiffs objected to footnote 1 which stated that they waived Lexecon for all Tulip and Celect bellwether pool cases, stating they have not had time to verify with counsel whether they waived Lexecon." [Filing No. 10649, at ECF p. 80452.]

Refusing to back down, Cook argued during the May 9th status conference that, "the plaintiffs have repeatedly waived Lexecon for the cases in the discovery pool," [May 9, 2019, Tr. at 17:12-13], leading the court to believe that it was the latest discovery pool—the category 5 and 6 plaintiffs—that had waived *Lexecon*. Cook made this statement despite knowing that the referenced "waivers" were related to the original discovery pool (i.e., the pool that generated the *Hill, Gage,* and *Brand* cases). Cook also knew that CMO #5, which governed that first discovery pool, specifically stated that *Lexecon* was waived for those cases only. [*See* CMO #5 (amended) at ¶ VI(C).]. Again, the opposite of what Cook told the Court.

One final thought given Cook's discussion of "gamesmanship," and that is how we got to this discovery pool in the first place. During the February 15, 2018, status conference, Cook made the following statements:

- "Product in place / no injury bucket of cases, it represents the **single largest claimed group**." [Tr. 26.]

- Fear cases "now have overtaken our MDL in large part." [Tr. 25.]

15

- No symptoms/no complications "represent the majority of cases in this MDL." [Tr. 24.]

- "Frivolous cases … now became the greatest percentage of cases in the MDL." [Tr. 30.]

We now know that these statements were not true. Based upon Cook's own case census, "fear cases" represent 5.4% of the docket. Category 5 cases, a mere 10% of the docket, and category 6 cases 19%. It's the category 7 cases—symptomatic injury cases—that represent the overwhelming majority of this docket (eclipsing the next closest category by more than 300%). By telling this Court that "no injury cases" and "fear cases" represented the majority of this MDL, Cook set into motion a bellwether process that allows the tail to wag the dog and has no hope of driving resolution of this MDL.

## Conclusion

Cook and Plaintiffs agreed that every direct-filed plaintiff identify the "District Court and Division in which venue would be proper absent direct filing," and the Court directed the parties to submit that agreement to the Court. Thousands of plaintiffs relied upon that agreement when they chose to eliminate the delay associated with the tag-along procedure and file their Short Form Complaints directly in this Court. In doing so, each plaintiff expressly preserved their right to try their case at home, and the PSC respectfully requests the Court to acknowledge those rights.

Respectfully submitted,

/s/ *Joseph N. Williams*
Joseph N. Williams, Atty. No. 25874-49
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue

16

Indianapolis, IN 46204
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
Email:       jwilliams@rwp-law.com

*Liaison Counsel to Plaintiffs Steering Committee and on behalf of Plaintiffs Steering Committee*

/s/ *Michael W. Heaviside*
Michael W. Heaviside, Esq.
HEAVISIDE REED ZAIC, A LAW CORPORATION
910 17th Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 223-1993
mheaviside@hrzlaw.com

/s/ *Ben C. Martin*
Ben C. Martin, Esq.
MARTIN BAUGHMAN, PLLC
3710 Rawlins Street, Suite 1230
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@martinbaughman.com

/s/ *David P. Matthews*
David P. Matthews, Esq.
MATTHEWS AND ASSOCIATES
2509 Sackett St.
Houston, TX  77098
Telephone: (713) 522-5250
Facsimile: (713) 535-7184
dmatthews@thematthewslawfirm.com

*Plaintiffs' Co-Lead Counsel*

## **<u>Certificate of Service</u>**

  I hereby certify that on May 30, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL. Notice will be served on any non-CM/ECF registered parties by first class U.S. Mail, postage prepaid.

            <u>/s/ *Joseph N. Williams*     </u>
            Joseph N. Williams