# EXHIBIT C

```
 1                     UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF INDIANA
 2                        INDIANAPOLIS DIVISION

 3

 4   IN RE: COOK MEDICAL, INC.,        )
     IVC FILTERS MARKETING, SALES      ) Cause No.
 5   PRACTICES AND LIABILITY,          ) 1:14-ML-2570-RLY-TAB
     LITIGATION                        ) Indianapolis, Indiana
 6                                     ) January 15, 2019
                                       ) 8:50 a.m.
 7                                     )

 8

 9

10                       Before the Honorable
                         RICHARD L. YOUNG
11
                     OFFICIAL REPORTER'S TRANSCRIPT OF
12                       JURY TRIAL - VOLUME 2

13

14   For Plaintiffs:
                                    Ben C. Martin, Esq.
15                                  Law Offices of Ben C. Martin
                                    3710 Rawlins Street, Suite 1230
16                                  Dallas, TX   75219

17

18                                  Denman H. Heard, Esq.
                                    Heard Law Firm, PLLC
19                                  2925 Richmond Ave., Suite 15
                                    Houston, TX   77098
20

21                                  Laura Baughman, Esq.
                                    Baron & Budd
22                                  3102 Oak Lawn Avenue
                                    Dallas, TX   75219
23

24

25
```

1  A    He gave us his numbers.

2  Q    And the numbers that you have from Dr. Timperman, they

3  came from Mrs. Brand's lawyers, didn't they?

4  A    From the deposition.

5          MS. PIERSON:  That's all the questions I have, Your

6  Honor.  We'd object to offering the opinion that Ms. Baughman

7  has just sought to elicit on the grounds of foundation and

8  lack of qualification.

9          MS. BAUGHMAN:  You've already ruled on this.  I

10 could approach, but we've briefed it and you issued a 20-page

11 opinion that covered this.

12         THE COURT:  It's all cross.  Overruled.

13         MS. BAUGHMAN:  Thank you, Your Honor.

14                       **DIRECT EXAMINATION**

15 BY MS. BAUGHMAN:

16 Q    So, Dr. Krumholz --

17 A    Yes.

18 Q    -- can you explain -- you've already explained the

19 concordance between Dr. Timperman and Dr. Gordon.  There's

20 obviously a discrepancy -- well, first of all, there's a big

21 discrepancy between what Cook told the FDA and what all three

22 of these sets of doctors found.  Would you agree?

23 A    That's true.

24 Q    Okay.  Now, but if we look at the OUS investigators versus

25 Timperman and Gordon, there is a difference.  And can you give

1  document where Cook explains to the FDA that, when it's saying
2  there were no incidences of perforation, they meant through
3  the wall plus hemorrhage or hematoma?
4  A   No, I don't.
5  Q   Okay.  In other documents that you reviewed, though, did
6  Cook tell the FDA that that was the definition they were using
7  for this study?  For example, in the --
8  A   No.
9  Q   Well --
10 A   I didn't see.  They submitted the protocol, but --
11 Q   And, in the protocol, the definition was provided to the
12 FDA, correct?
13 A   For perforation, that's right.
14 Q   Okay.  But when they made this representation here ten
15 days before clearance, there's no definition provided,
16 correct?
17 A   That's correct.
18 Q   Okay.
19         Let's just put on the screen for a moment
20 Plaintiff's Exhibit 1841.
21         This is a document we discussed yesterday regarding
22 the observations -- a summary of observations from the OUS
23 clinical investigators, including observations of 8, 6, 10, 5,
24 and greater than 3 millimeters outside the IVC.  In this
25 letter from April of 2007, did Cook disclose this information

1   regarding these struts outside the wall from the OUS study to
2   the FDA?
3   A   They did not.
4   Q   Are you aware, based on your review of the communications
5   between Cook and the FDA, of any communication at any time
6   where Cook revealed to the FDA that there were these multiple
7   struts outside the wall between 3 and 10 millimeters?
8   A   I'm not aware of any communication in which they told the
9   FDA that there had been these penetrations described by their
10  site investigators.
11  Q   I want to go back to Exhibit 34.  If you look at the
12  bottom of page 8, there are a couple more representations from
13  Cook.  First of all, if you see at the bottom of the page
14  where I've highlighted on the screen, you see how Cook says
15  "The results of the Celect filter animal study in which no
16  perforations were observed."
17          Which study is Cook referencing there, the animal
18  study in which there were no perforations?
19  A   I believe that was VCA1.
20  Q   VCA1?  And then, again, you see immediately after that,
21  Cook references the preliminary results of the current
22  clinical study of the Celect filter and stating, again, "in
23  which no perforations have been observed."  And that's a
24  reference to what?
25  A   To the OUS, out of United States study.

1  Q    And what did Dr. Rajasekhar and her colleagues conclude?
2  A    They concluded that such a trial would be feasible, that
3  in their -- based on what they found, they said, yeah, this
4  went around the block.  We think there's no reason to think it
5  can't work.  You could do it.
6  Q    So did Cook then sponsor or conduct a larger
7  randomized-control trial on the Celect after they determined
8  it was feasible?
9  A    Not that I'm aware.
10 Q    Dr. Krumholz, I just handed you two documents to try to do
11 them together, if I can, just to speed things up just a little
12 bit.  They're marked Plaintiff's Exhibit 1011 and Plaintiff's
13 Exhibit 867.
14           Are these documents that you reviewed as part of
15 your work on this case?
16 A    They are.
17 Q    And are they Cook documents?
18 A    They are.
19 Q    Do you rely on them?
20 A    I do.
21 Q    And is it reasonable for an expert in your field to rely
22 on these documents?
23 A    It is.
24           MS. BAUGHMAN:  Your Honor, plaintiffs move for
25 admission of Plaintiff's Exhibits 867 and 1011.

```
 1  being -- fully disclosing that difference in the definitions.
 2  Q    I want to ask you about warnings.
 3            Let me put it this way:  Under Georgia law, there is
 4  a factor called "avoidability of the danger."  And what I want
 5  to know is whether you believe that the danger with the Celect
 6  filter was avoidable, considering the user's knowledge of the
 7  product, publicity surrounding the danger, the effectiveness
 8  of warnings and common knowledge, or the expectation of
 9  danger.
10  A    I particularly believe that if -- if -- if a possibility
11  was to leave it in, and there certainly was an option to use
12  another type of filter, but even with retrievability, they
13  could have used a Celect, which can be retrieved particularly
14  in the short-term.
15            But I think the issue is that it would have been
16  impossible to make an informed choice, either by the doctor or
17  if the patient was participating in that decision, based on
18  the information that was available and that we didn't have the
19  kind of information that you would hope would be shared at
20  that time.
21  Q    Are you saying it was impossible to make an informed
22  decision, or did you say possible?
23  A    No, it's not possible to make an informed decision because
24  some of the key information was not in the public domain.
25  Q    Known to Cook, but not disclosed?
```

1  A    That's right.
2  Q    Okay.  And let me ask you this.  Did Cook at any time tell
3  doctors, including Dr. Rheudasil, to get the Celect filter out
4  as soon as possible in order to avoid the propensity of the
5  Celect filter to perforate the IVC?
6  A    I'm not aware of that.
7  Q    Had Cook provided a warning in the IFU and the Lyon study
8  or otherwise in a "Dear Doctor" letter or some other method,
9  had Cook warned doctors like Dr. Rheudasil that the Celect
10 filter has a tendency to perforate and that the doctor should
11 get the filter out as soon as possible, would that have had an
12 impact with respect to Tonya Brand?
13 A    I believe it would have.
14 Q    Why is that?
15 A    Because I think it's likely that Dr. Rheudasil might have
16 made different choices in the clinical care if he knew that
17 information and had been guided in that way.
18 Q    In the 2009 time frame, did doctors know the dangers that
19 the Celect posed in terms of perforation and -- perforation?
20 Was that disclosed by Cook?
21 A    No.
22 Q    Was there publicity in 2009 to put doctors on alert that
23 the Celect filter had this tendency to perforate the vena
24 cava --
25 A    No.

1  doctors, wouldn't it, pseudopenetration?
2  A   Well, we have -- I don't think so, because, again, you
3  want to be very sensitive, the potential for complications.
4  And, at this level, it's not clear exactly whether this was an
5  odd thing to happen, whether this happens more commonly, if it
6  happens in patients.  It was very good they were pushing
7  forward with this paper.  I mean, I think it's good for
8  scientific dialogue.
9          And, also, the FDA never saw that Celect filter
10 penetrating into the aorta.  That data was never presented to
11 the FDA.  So it would have been good to get this in the
12 medical literature.  I would have liked to have seen it
13 published.
14 Q   We're going to talk in a moment about FDA a little bit
15 more.  But, for a moment, just stick with this manuscript with
16 me, if you could, please.
17         This manuscript, this discussion of
18 pseudopenetration and tenting that's observed on imaging, what
19 the authors are reporting here is completely consistent with
20 what the FDA itself noted in 1999 about how difficult it is to
21 diagnose true perforation based on imaging, isn't it?
22 A   I agree.
23 Q   Now, you told this jury a couple of days ago, essentially,
24 that you believed the email message that attached this
25 manuscript, that it was an effort by upper management -- by

1  upper management to hide a picture of the sheep aorta that had
2  perforated, correct?
3  A    And that was my opinion.
4  Q    You have read Dr. Brown's testimony in this case, though,
5  haven't you?
6  A    Yes.
7  Q    You recall that Dr. Brown was asked about why this
8  manuscript wasn't published.
9         Do you remember that?
10 A    You have to refresh my recollection, but I remember.
11 Q    Let's take a look at Dr. Brown's testimony, then.  This is
12 page 406, lines 14, to 407, line 15.
13         MS. PIERSON:  Your Honor, I'll give you a hard copy
14 too.
15         MS. BAUGHMAN:  Your Honor, we're going to object on
16 the grounds of hearsay.  It would be appropriate to call
17 Jennifer Brown, but I don't think it's appropriate to use --
18 to read her testimony in the record.
19         And please don't put it on the screen.
20         THE COURT:  Let's take it off the screen, please.
21         MS. PIERSON:  It's reliance material.  I think we
22 can handle it just like we did Dr. Gardner's, with your
23 permission.
24         May I proceed, Your Honor?
25         THE COURT:  You may.

1  A    That's right.
2  Q    Okay.  And let me ask you this.  Did Cook at any time tell
3  doctors, including Dr. Rheudasil, to get the Celect filter out
4  as soon as possible in order to avoid the propensity of the
5  Celect filter to perforate the IVC?
6  A    I'm not aware of that.
7  Q    Had Cook provided a warning in the IFU and the Lyon study
8  or otherwise in a "Dear Doctor" letter or some other method,
9  had Cook warned doctors like Dr. Rheudasil that the Celect
10 filter has a tendency to perforate and that the doctor should
11 get the filter out as soon as possible, would that have had an
12 impact with respect to Tonya Brand?
13 A    I believe it would have.
14 Q    Why is that?
15 A    Because I think it's likely that Dr. Rheudasil might have
16 made different choices in the clinical care if he knew that
17 information and had been guided in that way.
18 Q    In the 2009 time frame, did doctors know the dangers that
19 the Celect posed in terms of perforation and -- perforation?
20 Was that disclosed by Cook?
21 A    No.
22 Q    Was there publicity in 2009 to put doctors on alert that
23 the Celect filter had this tendency to perforate the vena
24 cava --
25 A    No.

1  Q    -- at a high rate?
2  A    No.
3  Q    Do you believe that the warnings that Cook provided in its
4  IFU were effective in notifying doctors such as Dr. Rheudasil
5  of the dangers posed by the Celect filter?
6  A    No.
7  Q    Including the dangers of perforation?
8  A    No.
9  Q    Do you believe that it was common knowledge at the time,
10 in March of 2009, that the Celect filter had a higher rate of
11 perforation than any other filter and posed a danger such that
12 the filter needed to be taken out as soon as possible?
13 A    I do not.
14 Q    So were the damages that Ms. Brand incurred and endured,
15 including the fracture of her filter and open surgery, were
16 those avoidable?
17 A    Yes.
18 Q    Could they have been avoided with a warning?
19 A    Yes.
20 Q    What are the other ways a company like Cook could
21 communicate information to physicians besides an IFU?
22 A    Well, they -- I mean, publication, presentation,
23 educational materials, promotional materials.  I mean, these
24 companies have very strong arms to communicate with their
25 physicians who they, in one of the documents, called their