IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br><br>MDL No. 2570 |

This Document Relates to Plaintiffs:

Amber Taylor, Case No. 1:18-cv2549

Alicia Medford, Case No. 1:18-cv2940

Terry Deleski, Case No. 1:18-cv498

Betty Poteat, Case No. 1:19-cv-00843

## PLAINTIFFS' RESPONSE IN OPPOSITION TO COOK'S OMNIBUS MOTION FOR SUMMARY JUDGMENT

Plaintiffs Amber Taylor, Alicia Medford, Terry Deleski, and Betty Poteat (collectively, "Plaintiffs") respectfully ask this Court to deny Cook Incorporated, Cook Medical, LLC, and William Cook Europe ApS's (collectively "Defendants" or "Cook") Motion for Summary Judgment because there are genuine issues of material facts relevant to each of Plaintiffs' claims which preclude dismissal under both the law of each of Plaintiffs' original jurisdictions, as well as, under Indiana law. For the reasons stated herein, Plaintiffs Amber Taylor and Alicia Medford's claims are not time-barred under Texas law, nor are any of the Plaintiffs' claims time-barred under Indiana law. Additionally, Cook's attempt to use the Case Categorization Form as grounds for dismissal is improper given, not only that this Court established the forms were only to be used for Bellwether screening and selection, and are "not admissible and [are] not to be considered relevant for any other purpose," but also because the information therein does not provide the necessary evidence to address the legal requirements of establishing the commencement of the running of the statute of limitations.

1

## I.        <u>STANDARD OF REVIEW</u>

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, only after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex, 477 U.S.* at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts the burden to the non-moving party to show that an issue of material fact exists. *Keri v. Bd. Of Trust. Of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, judge the credibility of witnesses, or to determine the truth of the matter, but only to determine whether there is an issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

## II.     FACTUAL BACKGROUND

### A.  *Plaintiff Amber Taylor*

Cook's filter tilted in Amber Taylor's vein and multiple filter struts were noted to be outside of the vein, however her medical records note the decision not to remove the filter was *due to residual thrombus* in her IVC vein, *not because of the tilting or perforation* and no symptomatic issues are noted in the record. *See* Record from North Austin Medical Center, produced with Amber Taylor's Categorization Forms (attached as Exhibit "A") ("The filter has become tilted since its placement. Additionally, while there is less clot burden within the inferior vena cava, residual clot persists within the inferior vena cava. Multiple tines are demonstrated outside the wall of the inferior vena cava. After consultation with the patient, it was decided not to remove the inferior venacaval filter *due to the residual thrombus*.") (emphasis added). Amber Taylor recalls that her surgeon simply indicated to her that the filter could not be removed because it had become embedded in her vein, and she was not told that the filter being implanted permanently would put her at risk of harm in the future. *See* Plaintiff Taylor's Affidavit (attached as Exhibit "B"). Ms. Taylor did not learn that the filter was perforating her inferior vena cava vein until 2018. Ex. B. There has been no evidence presented from the time of the failed removal procedure indicating Ms. Taylor was aware her injuries were the result of a defective device, nor was she symptomatic as a result of the failed removal procedure to alert her to her injuries.

### B.  *Plaintiff Alicia Medford*

Alicia Medford's case also involves a failed percutaneous removal because the filter was embedded in the vein. *See* Records from Parkland Health & Hospital System, produced with Alicia Medford's Categorization Form (attached as Exhibit "C") ("Impression: 1. Infrarenal Tulip IVC filter could not be retrieved due to fibrous ingrowth. The filter is now permanent."). Like Plaintiff Taylor, Alicia Medford recalls that her surgeon simply indicated to her that the filter could not be removed because it had become embedded in her vein, something naturally occurring in the body as the result of tissue growth, she was not told that the filter being implanted permanently would put her at risk of harm in the future. *See* Plaintiff Medford's

3

Affidavit (attached as Exhibit "D"). Again, there has been no evidence presented from the time of the failed removal procedure indicating Ms. Medford was aware her injuries were the result of a defective filter design, nor was she symptomatic as a result of the failed removal procedure to alert her to her injuries.

### C.  Plaintiff Terry Deleski

Terry Deleski likewise underwent a failed removal attempt. His records note that an inferior venacavogram was performed that showed a large amount of clot was contained within the filter which precluded its removal. *See* Records from Saint Alphonsus, produced with Terry Deleski's Categorization Form (attached as Exhibit "E"). There is no evidence that Mr. Deleski knew or should have known that the filter being unable to be removed was an injury or device failure, or that it might put him at risk of harm in the future; nor is there any evidence that Mr. Deleski knew or should have known that the filter itself might have caused or contributed to causing his blood to be more prothrombotic, thus contributing to the fact that he had a large amount of clot in the filter, precluding removal. Further, there is no evidence that the clot being in the filter caused Mr. Deleski any symptoms at all.

### D.  Plaintiff Betty Poteat

Betty Poteat suffered a post-implant acute DVT on July 6, 2010, which caused her to suffer lower extremity pain and edema, however there is no evidence in the record showing that she knew or should have known that her implanted IVC filter had made her more prothombotic, and contributed to the clot formation. *See* Records from Roanoke Memorial Hospital, produced with Betty Poteat's Categorization Form (attached as Exhibit "F"). Subsequently, on September 8, 2010, she underwent a percutaneous removal attempt which failed because the retrieval hook "of the filter had become incorporated into the wall of the cava posteriorly and thus the apex [of] the filter was no longer intraluminal." Ex. F at 000056.  However, there is no evidence in the records reflecting that the failed removal caused any symptoms that she knew or should have known were being caused by the filter.  Indeed, the records specifically note that Ms. Poteat "tolerated (the) procedure without incident." Ex. F at 000055.

4

### III.   ARGUMENTS AND AUTHORITIES

Plaintiffs disagree with Defendants' assertions that the Indiana statute of limitations applies to their claims, and join the Plaintiffs' Steering Committee's responsive briefing on the issue. *See* Response of Plaintiff's Steering Committee to the Cook Defendants' Renewed Omnibus Motion for Summary Judgment on Limitations. However, regardless of the law to be applied, Cook has failed to meet its summary judgment burden.

**A. Cook Failed to Establish that Plaintiffs Taylor and Medford's Claims are Barred Under Texas Law**

*i.   Texas Applies the Discovery Rule to Medical Devices in the Body*

In Texas, the statute of limitations for personal injury claims is two years from the day the cause of action accrues. Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a). ("Except as provided … a person must bring suit for … personal injury, … not later than two years after the day the cause of action accrues."). Generally, the cause of action is considered to accrue at the time of injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur. *See S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996). However, a judicially crafted exception – the discovery rule – applies in cases where "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Computer Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996). That is, "an injury is inherently undiscoverable if by its nature, it is unlikely to be discovered within the prescribed limitation period despite due diligence." Shell *Oil co v. Ross*, 356 S.W.3d 924, 930 (Tex. 2011) (internal quotations and citations omitted)."Under this rule…a cause of action does not accrue until a plaintiff knows or, through the exercise of reasonable care and diligence, '*should have known of the wrongful act and results injury*.'" *Childs v. Haussecker*, 974 S.W.2d 31, 37 (Tex. 1998) (emphasis added). "Thus, when the discovery rule applies, accrual is tolled until a claimant discovers or in the exercise of reasonable diligence should have discovered the injury and that it was likely caused by the wrongful acts of another. But once these requirements are satisfied, limitations commences, even if the plaintiff does not know the exact identity of the wrongdoer." *Childs*, 974 S.W.2d at 40.

5

In the context of medical devices implanted or inadvertently left in the human body, Texas courts and courts applying Texas law have consistently applied the discovery rule. *See, e.g., Gaddis v. Smith*, 417 S.W.2d 577 (Tex. 1967) (surgical sponge left in patient); *Mann v. A.H. Robins Co.,* 741 F.2d 79 (5th Cir. 1984) (applying Texas law) (Dalkon Shield IUD); *Woodruff v. A.H. Robins Co.*, 742 F.2d 228 (5th Cir. 1984) (same); *Pavich v. Zimmer, Inc.*, 157 F.3d 903 (5th Cir. 1998) (per curiam) (not designated for publication) (spinal rods); *Brandau v. Howmedica Osteonics Corp.*, 439 F.App'x 317 (5 Cir. 2011) (per curiam) (not designated for publication) (knee implant); *In re Mentor Corp. Obtape Transobturator Sling Products Liability Litigation (King)*, 4:12-cv-133, 2016 WL 3248373 (M.D. Ga., June 13, 2016) (applying Texas law) (suburethral sling implant); *and Rosman v. Zimmer Dental, Inc.*, No. H-17-693, 2018 WL 2335358 (S.D. Tex., March 1, 2018) (dental implant).

### ii.   *Cook Relies on Distinguishable Case Law*

Cook relies on several cases to claim Texas courts use imaging as an "objective trigger" for the running of the statute of limitations, specifically Cook cites three unpublished opinions, *Pavich v. Zimmer, Inc.*, 157 F.3d 903 (5th Cir. 1998) (per curiam) [1], *Brandau v. Howmedica Osteonics Corp*., 439 Fed. App'x 317 (5th Cir. 2011) (per curiam)[2], and *Rosman v. Zimmer Dental, Inc.*, 2018 WL 2335358 (S.D. Tex., Mar. 1, 2018). Cook also relies on several other cases to claim that it is logically impossible under Texas law to have an accrual date later than the date of a removal surgery, specifically Cook cites *Shepherd v. Danek Med.*, 1999 WL 1129705 (S.D. Tex., Aug. 13, 1999), *Porter v. Danek Med., Inc.*, 1999 WL 1117090 (S.D. Tex., Aug. 16, 1999), and *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2016 W.L. 1493534 (M.D. Ga. Apr. 14, 2016) (applying Texas law). All cases upon which Cook relies are distinguishable on their facts and/or their application of the law. Cook stretches the meaning of these cases to their breaking point and

---

[1]  "Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4" *Pavich*, 157 F.3d, at *1, n. 1. It is unclear to counsel why this case is both cited in the Federal Reporter, but also designated as an unpublished opinion.

[2]  "Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4" *Brandau*, 439 Fed. App'x at 318, n.*.

beyond.

The "medical imaging" trigger cases cited by Cook all involved situations where the plaintiff had already been suffering unexplained symptoms and a doctor informed the plaintiff a probable or suspected connection to the implanted device at or around the time of the imaging.

In *Pavich*, the plaintiff, himself a medical doctor, began suffering increased back pain sometime after his spinal rod implant and underwent an imaging procedure. *Pavich v. Zimmer, Inc.*, 157 F.3d 903, *1 (5th Cir. 1998) (per curiam). He took the imaging to a doctor a couple days later for a consultation and the doctor told him there was evidence that the spinal rods were fractured and suggested that he follow-up with a surgeon, who confirmed the fractures using an x-ray and removed the implant, confirming the injury. *Id.* The *Pavich* court held that the discovery rule applied to Dr. Pavich's claim, but also held that the limitations period began to run on the date of his first consultation appointment because "(o)n that date [the initial doctor] reviewed the [imaging] results," and "attributed Dr. Pavich's pain to probable breaks in the [spinal implant] rods" and "recommended a consultation and an X-ray to verify the breaks," however the plaintiff failed to file his claim until the second anniversary of the follow-up appointment with the surgeon. *Id.* at *2. It is clear the *Pavich* case is distinguishable from the present cases because there was clear evidence presented showing the plaintiff was put on notice *by his doctor* that his already symptomatic injuries were probably caused by a fractured implanted medical device.

Similarly, in *Brandau*, the plaintiff began experiencing increased knee pain months after she had a complete knee replacement surgery. *Brandau v. Howmedica Osteonics Corp.*, 439 F. App'x 317, 318 (5th Cir. 2011) (per curiam). After about eight months, the plaintiff was submitted for an x-ray which showed "that the stem of on the tibial component of the [knee implant] had come loose." *Id.* This information was provided to the plaintiff because she then sought a second opinion from another doctor, who confirmed the initial doctor's diagnosis and performed a revision surgery to remove the implant, confirming the stem of the device had worked its way loose, causing instability. *Id.* The plaintiff filed suit by the second anniversary of the initial x-ray, but the defendant argued the discovery did not apply because the injury was not "inherently

undiscoverable" because it was identified in the x-ray and argued the limitations period began to run when the plaintiff first started suffering additional pain, months before the x-ray; the *Brandau* court rejected this argument, holding the discovery rule applied. *Id.* at 318-21. Beside the fact that the case clearly does not stand for what Cook claims it stands, the facts of the case make it clear that the only clear trigger was when the plaintiff, having suffered substantial symptomatic injuries, was put on notice *by her doctor* that there was a problem with the implant and that it was the likely cause of her symptoms.

The *Rosman* case, likewise, involved a situation where the plaintiff began suffering substantial symptomatic injuries after a dental device was implanted and subsequently underwent an x-ray which identified that the device was fractured. *Rosman v. Zimmer, Inc.*, No. H-17-693, 2018 WL 2335358 at *1 (S.D. Tex. Mar. 1, 2018) (slip op). The *Rosman* court, again, held that the discovery rule applied to the case because the injury's relation to the fractured implant was identified only after the x-rays were taken, but nevertheless held that the limitations period had expired because the plaintiff filed suit more than two years after the date of the x-ray. *Id.* at *2. The *Rosman* court does not mention what the doctor told the plaintiff, however it is clear there was no dispute that the plaintiff was informed of the fractured implant because the court held that on the date of the x-ray the plaintiff "acquired the knowledge he needed to discover that he had a cause of action." *Id.*

Like the "imaging" cases, the "removal trigger" cases are also distinguishable from the cases at bar. Specifically, the cases cited by Cook involve *revisions* of defective medical devices after physical anomalies such as fractures, rather than allegedly routine removal procedures of devices with no apparent structural anomalies.

The *Shepherd* and *Porter* cases, which are probably the most helpful to Cook, are nearly identical. They both involve situations where the plaintiff had a Danek Medical spinal device implanted in their spines and subsequently removed. *See Shepherd v. Danek Medical, Inc.*, No. H-96-3568, 1999 WL 1129705 at *1 (S.D. Tex., Aug. 13, 1999) ("On March 11, 1993 Dr. Andrew Kant implanted …. (the "System") in Shepherd's

spine. On March 3, 1994, Dr. William Francies removed the System from Shepherd's spine."); *Porter*[3] *v. Danek Medical, Inc.*, No. H-96-3552, 1999 WL 1117090 at *1 (S.D. Tex. Aug. 14, 1999) ("On July 11, 1989, Dr. Jeffrey Kozak implanted … (the "System") in Richard's spine. On May 30, 1991, Dr. Clark Gunderson removed the System from Richard's spine."). When the defendant moved for summary judgment in both cases, neither plaintiff filed a response. *See Shepherd*, at *1 ("Shephard did not respond to the Motion."); *Porter*, at *1 ("Richard did not respond to the Motion."). The court notes in both cases that neither plaintiff plead or presented factual support for the application of the discovery rule, but was nevertheless aware that the discovery rule would likely apply in each case and noted in passing that "any arguable application of the 'discovery rule' would terminate upon removal of the System from [the plaintiff's] spine …" *Shepherd*, at *1; *Porter*, at *1. The context of these cases make it clear these removals were revision surgeries to remove the defective medical devices after an issue had been identified, which is factually distinguishable from the cases currently before the Court.

The other case relied upon by Cook is *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.,* 2016 WL 1493534 (M.D. Ga. Apr. 14, 2016).  Here, the District Court was presiding over a multi-district litigation regarding a suburethral mesh sling product called ObTape Transobturator Tape manufactured by Mentor Worldwide LLC. Mentor's motion for summary judgment based on the statute of limitation against Plaintiff Ann Marie Bergin argued that her claim accrued in 2006, when her doctor expressed that her physical symptoms could be linked to the ObTape because it was then Bergin could have become aware that the OpTape caused her injury. Bergin argued that her claim did not accrue until 2013, when she saw a television commercial alleging that the ObTape was defective and was placed on notice to the possibility that Mentor may have committed a wrongful act. The Georgia District Court granted Mentor's motion for summary judgment. Again, this case involves a situation where the plaintiff was clearly

---

[3] Although titled *Porter*, the order cited by Cook involves the claims of Raymond Richard, who was apparently one of several plaintiffs complaining about Danek Medical's "Danek Plate and Screw spinal instrumentation system," while the *Shepherd* case also involved several plaintiffs complaining about Danek Medical's "Dyna-Lok system" with the lead plaintiff's claim at issue in that order. *See generally Porter and Shepherd*.

symptomatic *and was informed by her doctor* that the problem was probably being caused by the medical device at-issue.

### iii.    *Applicable Texas Case Law Shows Plaintiffs Taylor or Medford's Claims Are Not Barred by Limitations*

As discussed above, Plaintiffs Taylor and Medford both underwent failed removal attempts after which their doctors indicated to them that the Cook filter could not be removed due to it becoming embedded in their respective inferior vena cavae. *See* Ex. B *and* Ex. D. Plaintiffs were not aware of their injuries when their doctors informed them that the filters could not be retrieved, rather they were under the impression that leaving the IVC filters permanently in place would not cause them harm. *See* Ex. B *and* Ex. D. Plaintiffs were likewise not aware of the potential likelihood of suffering from future complications related to the permanently implanted filters. Ex. B *and* Ex. D.

The cases most analogous to the situation of these plaintiffs are *Mann v. A.H. Robins Co., Inc.*, 741 F.2d 79 (5th Cir. 1984) (applying Texas law) and *Woodruff v. A.H. Robins Co., Inc.*, 742 F.2d 228 (5th Cir. 1984). In *Mann* the plaintiff was implanted with a Dalkon shield IUD device in 1971, became pregnant in 1972, but miscarried. *Mann*, 741 F.2d at 80. She had the device removed, but then developed pain in her lower abdomen during intercourse and consulted her physician who diagnosed her with endometriosis in 1974, requiring her to undergo a total hysterectomy. *Id.* In that case there was no dispute that, although the plaintiff knew she was ill in 1974, she did not know the cause of her illness until 1982 when she discovered that the Dalkon Shield was responsible. *Id.* Applying Texas law, the Fifth Circuit noted that Texas' discovery rule applies to otherwise barred claims where "under the circumstances the plaintiff was unable to learn of the injury, *see Hays v. Hall*, 488 S.W.2d 412 (Tex. 1972) (unsuccessful vasectomy), or, as in the instant case, where the plaintiff did not discover, or in the exercise of reasonable diligence should not have discovered, the negligent cause of illness." *Mann*, 741 F.2d at 81. Similarly, in *Woodruff*, the plaintiff had a Dalkon Shield IUD implanted in 1972, and after suffering severe cramping the IUD was removed in 1973, at which time she learned she had developed a severe pelvic infection requiring a hysterectomy. *Woodruff v. A.H. Robins Co.,*

*Inc.*, 742 F.2d 228, 229 (5ᵗʰ Cir. 1984). The plaintiff, though she was aware she was ill in 1973, did not discover the possible cause of her illness until 1981, when she read a newspaper article suggesting a possible connection between the Dalkon Shield and the pelvic infection. *Id.* The Fifth Circuit noted the case was "indistinguishable from" the *Mann* case because the plaintiff filed suit shortly after she learned of the dangers of the medical device itself, rather than the date she learned of the injury. *Id.* at 230.

Like the Dalkon Shield cases, there is no evidence that either Plaintiff Taylor or Plaintiff Medford was aware, or should have been aware, of the fact that a Cook IVC filter embedded in their veins was a problem until they learned, much later, that the device itself might be defective. There is no evidence that either of their doctors treated the embedment as a problem, and they likely assumed, based on Cook's own marketing, that the devices were safe for permanent implantation in the human body. Simply put, Cook has failed to establish that there is no genuine issue of material fact that both Plaintiff Taylor and Plaintiff Medford became aware that they were injured by the IVC filter *and* that their injuries were wrongfully caused more than two years before they filed suit. As verified in their affidavits, Plaintiffs did not become aware that they were injured by the failed removal of their IVC filter until their mothers informed them that IVC filters may be defective. Ex. B *and* Ex. D. A reasonable person in Plaintiff Medford's and Plaintiff Taylor's positions could not be, or should not be, expected to be on notice that they have suffered an injury that was wrongfully caused by the device manufacturer when their own doctors treat the situation as a non-issue.

As a matter of policy, the Texas discovery rule is meant to protect "blamelessly ignorant plaintiffs". *See Childs v. Haussecker*, 974 S.W.2d at 38. These plaintiffs cannot be expected to understand that they have been injured by a product when a medical professional is indicating that leaving that product in place should not cause harm in the future, nor can they be expected to understand in such a situation that a company has acted negligently, before they have made a causal connection between the injury and the company's product.

Because Cook has failed to present evidence establishing that there is no genuine issue of material fact that these plaintiffs were on notice that they had suffered an injury wrongfully caused by Cook's IVC filters, Cook has failed to meet its burden to establish that it is entitled to judgment as a matter of law on its

statute of limitations defense. At best, Cook raises a factual question which requires further factual development, which will ultimately need to be submitted to and weighed by the jury. Therefore, Cook's Omnibus Motion for Summary Judgment should be DENIED as to Plaintiffs Alicia Medford and Amber Taylor.

**B.   Cook Has Failed to Establish that Plaintiffs' Claims Are Barred by Indiana Law**

Assuming *arguendo* that Cook is correct that Indiana's statute of limitations applies to their claims, Cook is incorrect that Plaintiffs' claims are barred by Indiana law.

**i.   *Indiana's Discovery Rule***

The Indiana Supreme Court first explicitly applied the discovery rule to a product liability case in *Barnes v. A.H. Robins Company, Inc.*, 476 N.E.2d 84 (Ind. 1985) ("*Barnes*"). Similar to the cases at bar, Barnes involved an implanted medical device, specifically the Dalkon Shield intrauterine device. *Id.* at 84. Noting that the Indiana Supreme Court is invested with "the authority and responsibility to interpret the intentions of the legislature by deciding when a cause of action accrues," *id.* at 85, the *Barnes* court went on to describe the problems increasingly facing itself and other courts in interpreting when a cause of action "accrues," noting it "is becoming increasingly difficult to apply because of the technological developments in our society," because "[l]arge numbers of chemicals and products are being introduced into our economy and workplace that have resulted in a growing number of diseases and injuries that oftentimes do not manifest themselves until long after exposure ends." *Id.* at 85. The court went on to note that "[i]n some cases damage does not follow until long after exposure ends" while "[i]n other cases the damage, in the form of progressive disease or injury, is not apparent to the extent that it can be ascertained until long after the two year statute has run." *Id.* at 85-86 (emphasis added). The *Barnes* court then went on to note that other jurisdictions responded by adopting a "discovery rule" and noted that "[t]he discovery rule provides that the statute of limitations in this type of cause runs from the date the negligence was or should have been discovered." *Id.* at 86 (emphasis added). The *Barnes* court highlighted the principle underlying the discovery rule, that "it is inconsistent with our system of jurisprudence to require a claimant to bring his cause of action in a limited

12

period in which, even with due diligence, he could not be aware a cause of action exists." *Id.*. The *Barnes* court noted that "[t]he problem comes about when the act, seemingly innocent, causes changes so subtle and latent that they are not discoverable to the plaintiff until they manifest themselves many years later." *Id.* Noting that the "rule in Indiana has been generally understood to be that a cause of action accrues when the resultant damage of a negligent act is ascertainable or by due diligence could be ascertained, the question still remained as to how ascertainable a particular injury was and what standard would be applied as to what is reasonably ascertainable." *Id.* Ultimately, the *Barnes* court held that for cases where "an injury to a plaintiff is caused by disease which may have been contracted as a result to protracted exposure to a foreign substance … a discovery type rule should be applied, and the statute of limitations begins to run from the date when the plaintiff knew or reasonably should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another." *Barnes*, 476 N.E.2d at 87-88.

While the *Barnes* court limited its holding "to the precise factual pattern related by the certified question" presented to the court, *see Barnes*, 476 N.E.2d at 87, it is clear that the logic underlying the *Barnes* decision was, and continues to be, influential on the interpretation of Indiana law. *See, e.g., Burks v. Rushmore*, 534 N.E.2d 1101, 1104 (Ind. 1989) ("In *Barnes*, this Court expressly declined the opportunity to render an advisory opinion applicable to all tort cases. While refusing to go beyond the scope of the certified question there presented, we did not in *Barnes* offer any rationale suggesting that the discovery rule was necessarily inappropriate in other contexts.") (internal cites omitted), *see also Wehling v. Citizens National Bank*, 586 N.E.2d 840, 842 (Ind. 1992) ("Although it is true that *Barnes* involved a question of the accrual date of a claim of disease from toxic exposure and that *Burks* involved the accrual date of a claim for defamation, the reasoning inherent in both decisions logically applies to all tort claims.") (underline emphasis added). Indeed, the Indiana Supreme Court went on to cite *Barnes* in *Covalt v. Carey Canada, Inc.*, 543 N.E.2d 382 (Ind. 1989) ("*Covalt*"), in which it held that claims by plaintiffs exposed to asbestos could not be barred by Indiana's 10-year statute of repose. *Id.* at 384-87. In explaining why *Barnes*, which dealt with the accrual of the statute of limitations, was relevant to application of the statute of repose, the *Covalt* court explained:

[T]his Court is not unmindful of the fact that in *Barnes* the plaintiffs discovered their diseases within ten years of the initial introduction of the Dalkon shield intrauterine device into their bodies, whereas in the present case, the discovery did not take place until more than ten years after *Covalt*'s last exposure to asbestos. Nonetheless, if a disease is the result of protracted exposure to a foreign substance, then the injury is not only ongoing and continuous in nature, but becomes compounded as time passes. **By definition, the injury begins from the moment the foreign substance is introduced into the body, even if the resultant disease does not manifest itself until many years later**. That is made clear in *Barnes*, where this Court recognized the problem as follows:

> The problem comes about when the act, seemingly innocent, causes changes so subtle and latent that they are not discoverable to the plaintiff until they manifest themselves many years later.

*Barnes*, 476 N.E.2d at 86. Accordingly, where the seeds of injury and latent disease are introduced into the body as a result of protracted exposure to a foreign substance, a plaintiff's cause of action cannot be barred by the ten year statute of repose, no matter when the plaintiff knew or should have discovered the resultant disease.

*Covalt v. Carey Canada, Inc.*, 543 N.E.2d at 384-85 (bold emphasis added). While the rule in *Covalt* was partially overturned AlliedSignal v. Ott, 785 N.E.2d 1068, 1077 (Ind. 2003) ("Ott"), on the grounds that it was superseded by statute, the  Indiana Supreme Court most recently held the statute at-issue in Ott unconstitutional for violating the Indiana Constitution's Equal Privileges and Immunities Clause and reaffirmed that the *Covalt* case was still good law in Indiana. *See Myers v. Crouse-Hinds Division of Cooper Industries, Inc.*, 53 N.E.3d 1160, 1167-68 (Ind. 2016).

### ii.     Cook Relies on Distinguishable Case Law

Cook spends much of its time citing case law that is distinguishable. Specifically, Cook cites numerous cases decided before the *Barnes* decision. *See, e.g., Neuhauser v. A.H. Robins Co.*, 573 F.Supp. 8 (S.D. Ind. 1983) (decided two years before *Barnes* was decided). Indeed, the plaintiff in *Neuhauser v. A.H. Robins Company*, was one of the litigants about whom the question in *Barnes* was certified to the Indiana Supreme Court. *Compare Neuhauser v. A.H. Robins Co.*, 573 F. Supp. 8, 9 (S.D. Ind. 1983) ("The plaintiff, Sharron Neuhauser … was fitted with a Dalkon Shield in 1972, but became pregnant with the device still in place in January 1974.") *with Barnes v. A.H. Robins Co., Inc.*, 476 N.E.2d 84, 84-85 (Ind. 1985) ("Sharon (sic) Neuhauser had a Dalkon Shield inserted on May 19, 1972. She became pregnant in January, 1974 …").

14

Cook also cites numerous cases decided by non-Indiana courts that attempt to apply Indiana law without spending time analyzing how Indiana law should be applied. *See, e.g., In re Mirena IUD Prods. Liab. Litig. (Truitt)*, 29 F. Supp. 3d 345 (S.D.N.Y. 2014); *Cossman v. DaimlerChrysler Corp.*, 108 Cal. App. 4th 370 (2003); *In re Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 3957737 (D. Ariz. Aug. 17, 2018). Cook even cites this Court's own decision in the *Graham* Bellwether case, claiming that limitations begin to run for all failed retrievability cases, "at the latest," when a removal procedure occurred. *See* Cook's Renewed Omnibus MSJ on Appl. Stat. of Limitations from Five States, at 15, 17. Of course, the *Graham* case was decided under Kansas law, not Indiana law. *See Valerie Graham v. Cook Medical, Inc.*, 1:15-cv-00764, Dkt.164 at 3 (Aug. 2, 2017) ("The court will begin with [the plaintiff's] product liability claims, which are governed by the Kansas Product Liability Act (the 'KPLA')."). The *Graham* case also involved an open abdominal removal, where Cook's victim was clearly aware of substantial, symptomatic injuries that were directly caused by the filter prior to the removal procedure. *See id.* at 2 (noting the attempted retrieval was because of "failure" and "migration," that the doctor performed the surgery "through Graham's abdominal cavity to retrieve the filter," that the victim herself "attests that not only had the Celect filter migrated, but it also had perforated her vena cava and an organ, and had caused bleeding," and that "[s]he was informed prior to the 2011 removal that 'I would die if it wasn't removed.'").

### iii.    *More Appropriate Indiana Case Law Shows Plaintiffs' Claims are Not Barred*

The problem with Cook's reliance on cases like *Graham* is that the cases now before the Court are not remotely similar, and a more in-depth factual inquiry is required. Most of these cases involve failed percutaneous removal attempts which were seemingly asymptomatic at the time of the attempt, or which involved symptoms which the average victim would not necessarily know could potentially have been caused by Cook's filter.

As the Indiana Supreme Court noted in *Barnes*, one of the many problems caused by the "[l]arge numbers of chemicals and products … being introduced into our economy…" is that they "have resulted in a growing number of diseases and injuries that oftentimes do not manifest themselves until long after the

exposure ends", while in some cases "the damage, in the form of progressive disease or injury, is not apparent to the extent that it can be ascertained until long after the two year statute has run." *Barnes v. A.H. Robins Co., Inc.*, 476 N.E.2d 84, 85-86 (Ind. 1985) (emphasis added). *Barnes* articulated the rule as being that "the statute of limitations … begins to run from the date the plaintiff knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another." *Id.* at 87-88. Further, it is clear from the *Barnes* opinion that the Indiana Supreme Court intended this rule to be applied such that the victim, with the knowledge available to them, has "a fair opportunity to investigate available sources of relevant information and to decide whether to bring their claims in court within the time limitations of the statute." *Id.* at 88.

a. Plaintiff Amber Taylor

Cook's filter tilted in Amber Taylor's vein and multiple filter struts were noted to be outside of the vein, however her medical records note the decision not to remove the filter was *due to residual thrombus* in her IVC vein, *not because of the tilting or perforation* and no symptomatic issues are noted in the record. *See* Record from North Austin Medical Center, produced with Amber Taylor's Categorization Form (attached as Exhibit "A") ("The filter has become tilted since its placement. Additionally, while there is less clot burden within the inferior vena cava, residual clot persists within the inferior vena cava. Multiple tines are demonstrated outside the wall of the inferior vena cava. After consultation with the patient, it was decided not to remove the inferior venacaval filter *due to the residual thrombus*.") (emphasis added). In her affidavit, Amber Taylor recalls that her surgeon simply indicated to her that the filter could not be removed because it had become embedded in her vein, and she was not told that the filter being implanted permanently would put her at risk of harm in the future. Ex. B. Ms. Taylor did not learn that the filter was perforating her inferior vena cava vein until 2018. Ex. B. There has been no evidence presented showing Ms. Taylor was symptomatic as a result of the failed removal attempt or that she was aware of any symptoms that she knew or should have known were caused by Cook's filter. As such, Cook has failed to meet its burden to establish there is no genuine issue of material fact that, on the date of the failed removal, Plaintiff Taylor's injuries were "apparent

16

to the extent that [they could] be ascertained", *Barnes*, at 85-86, by her to the extent that she "knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another." *Id.* at 87-88. At most, Cook's evidence simply raises the question and creates a fact question to be explored through further discovery and decided by the jury. Therefore, Cook's motion should be DENIED as to Plaintiff Taylor.

    b. <u>Plaintiff Alicia Medford</u>

   Alicia Medford's case also involves a failed percutaneous removal because the filter was embedded in the vein. *See* Records from Parkland Health & Hospital System, produced with Alicia Medford's Categorization Form (attached as Exhibit "C") ("Tip of the filter was grasped with the snare and the sheath was pushed down under fluoroscopic guidance. But even after repeated attempts, the sheath could not be pushed through the claws of the filters (sic). … Impression: 1. Infrarenal Tulip IVC filter could not be retrieved due to fibrous ingrowth. The filter is now permanent.").  Like Amber Taylor, Alicia Medford recalls that her surgeon simply indicated to her that the filter could not be removed because it had become embedded in her vein, and she was not told that the filter being implanted permanently would put her at risk of harm in the future. Ex. D. Again, there has been no evidence presented showing Ms. Medford was symptomatic as a result of the failed removal attempt or that she was aware of any symptoms that she knew or should have known were caused by Cook's filter. As such, Cook has failed to meet its burden to establish there is no genuine issue of material fact that, on the date of the failed removal, Plaintiff Medford's injuries were "apparent to the extent that [they could] be ascertained", *Barnes*, at 85-86, by her to the extent that she "knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another." *Id.* at 87-88. At most, Cook's evidence simply raises the question and creates a fact question to be explored through further discovery and decided by the jury. Therefore, Cook's motion should be DENIED as to Plaintiff Medford.

    c. <u>Plaintiff Terry Deleski</u>

   Terry Deleski likewise underwent a failed removal attempt. His records note that an inferior

17

venacavogram was performed that showed a large amount of clot was contained within the filter which precluded its removal. *See* Records from Saint Alphonsus, produced with Terry Deleski's Categorization Form (attached as Exhibit "E"). There is no evidence that Mr. Deleski knew or should have known that the filter being unable to be removed was an injury or device failure, or that it might put him at risk of harm in the future; nor is there any evidence that Mr. Deleski knew or should have known that the filter itself might have caused or contributed to causing his blood to be more prothrombotic, thus contributing to the fact that he had a large amount of clot in the filter, precluding removal. Further, there is no evidence that the clot being in the filter caused Mr. Deleski any symptoms at all. As such, Cook has failed to meet its burden to establish there is no genuine issue of material fact that, on the date of the failed removal, Plaintiff Deleski's injuries were "apparent to the extent that [they could] be ascertained", *Barnes*, at 85-86, by him to the extent that he "knew or should have discovered that [he] suffered an injury or impingement, and that it was caused by the product or act of another." *Id.* at 87-88. At most, Cook's evidence simply raises the question and creates a fact question to be explored through further discovery and decided by the jury. Therefore, Cook's motion should be DENIED as to Plaintiff Deleski.

      d. <u>Plaintiff Betty Poteat</u>

      Unlike the other plaintiffs, Betty Poteat suffered a post-implant acute DVT on July 6, 2010, which caused her to suffer lower extremity pain and edema, however there is no evidence in the record showing that she knew or should have known that the IVC filter might make her more prothombotic. *See* Records from Roanoke Memorial Hospital, produced with Betty Poteat's Categorization Form (attached as Exhibit "F"). Subsequently, on September 8, 2010, she underwent a percutaneous removal attempt which failed because the retrieval hook "of the filter had become incorporated into the wall of the cava posteriorly and thus the apex [of] the filter was no longer intraluminal." Ex. F at 000056. However, there is no evidence in the records reflecting that the failed removal caused any symptoms that she knew or should have known were being caused by the filter. Indeed, the records specifically note that Ms. Poteat "tolerated (the) procedure without incident." Ex. F at 000055. As such, Cook has failed to meet its burden to establish there is no genuine issue

18

of material fact that, on the date of the failed removal, Plaintiff Medford's injuries were "apparent to the extent that [they could] be ascertained", *Barnes*, at 85-86, by her to the extent that she "knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another." *Id.* at 87-88. At most, Cook's evidence simply raises the question and creates a fact question to be explored through further discovery and decided by the jury. Therefore, Cook's motion should be DENIED as to Plaintiff Medford.

While Cook contends categorically (literally) that any person who suffered a failed filter retrieval has sufficient information to put that person on notice that they have suffered an injury and that it was caused by Cook's product, the available facts from these cases demonstrate, it is far from clear that any of these plaintiffs had sufficient information to put them on notice, as a matter of law, that they needed to investigate and sue Cook. At best, Cook raises a factual argument that needs to either be developed further, or that will ultimately need to be submitted and weighed by a jury. Therefore, Cook's Omnibus Motion for Summary Judgment should be DENIED as to Plaintiffs Alicia Medford, Amber Taylor, Terry Deleski, and Betty Poteat.

**C. Cook's Reliance on the Categorization Form is Misplaced**

Cook cannot use the Categorization Case Form as grounds for a Motion for Judgment on the Pleadings. The Categorization Case form clearly states that it "is not admissible and is not to be considered relevant for any other purpose." The "Case Category Submission is for the purpose of complying with the Court's Order on the Cook Defendant's Motion for Screening Order and Bellwether Selection Plan only . . ." Reliance on the Categorization form is a breach of the party's agreement and such behavior should not be permitted by this Court. Therefore, Cook's Omnibus Motion for Summary Judgment should be DENIED as to Plaintiffs Alicia Medford, Amber Taylor, Terry Deleski, and Betty Poteat.

## IV.     CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that his Court deny Cook's Motion for Summary Judgment and grant Plaintiffs any relief that this Court deems appropriate.

19

Dated: October 3, 2019

Respectfully submitted,

/s/ Basil E. Adham
Basil E. Adham
TX Bar No. 24081742
**JOHNSON LAW GROUP**
2925 Richmond Ave., Suite 1700
Houston, Texas 77098
(713) 626-9336 Phone
(713) 626-3394 Fax
ivc@johnsonlawgroup.com
*ATTORNEY FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on, October 3, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the CM/ECF participants registered to receive service in this MDL.

/s/ Basil E. Adham
Basil E. Adham