# EXHIBIT B

309

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
 2                      INDIANAPOLIS DIVISION

 3

 4  IN RE: COOK MEDICAL, INC.,        )
    IVC FILTERS MARKETING, SALES      ) Cause No.
 5  PRACTICES AND LIABILITY,          ) 1:14-ML-2570-RLY-TAB
    LITIGATION                        ) Indianapolis, Indiana
 6                                    ) January 15, 2019
                                      ) 8:50 a.m.
 7                                    )

 8

 9

10                     Before the Honorable
                         RICHARD L. YOUNG
11
                  OFFICIAL REPORTER'S TRANSCRIPT OF
12                    JURY TRIAL - VOLUME 2

13

14  For Plaintiffs:
                                Ben C. Martin, Esq.
15                              Law Offices of Ben C. Martin
                                3710 Rawlins Street, Suite 1230
16                              Dallas, TX  75219

17

18                              Denman H. Heard, Esq.
                                Heard Law Firm, PLLC
19                              2925 Richmond Ave., Suite 15
                                Houston, TX  77098
20

21                              Laura Baughman, Esq.
                                Baron & Budd
22                              3102 Oak Lawn Avenue
                                Dallas, TX  75219
23

24

25
```

1  damaged a major blood vessel in the body.
2  Q    Okay.
3       So you can take the photo down now, Eric.
4       Was VCA2 a safety signal?
5  A    It was the loudest safety signal that I'd seen so far, in
6  part because of this.  I mean, in a small number of sheep,
7  this thing went through the wall and all the way into the
8  aorta.
9       So, again, concerns at the beginning, animal studies
10 that failed to show reassurance, and then they do this animal
11 study, and, holy mackerel, this thing is going through all the
12 way to the wall to the aorta.  And that's a big issue.
13 Q    So did -- did Cook submit VCA2 to the FDA?
14 A    I didn't see anywhere that anyone had shared that
15 information with the FDA.
16 Q    Do you know whether was VCA2 published in the
17 peer-reviewed literature by Cook or any of its folks?
18 A    There was a start to publish it, but it was pulled back by
19 upper management because, in an email, it said, "We wouldn't
20 really want to talk about this."
21 Q    Okay.  Dr. Krumholz, I've handed you what we've marked as
22 Plaintiff's Exhibit 1015.  Is this a document you reviewed as
23 part of your work on this case?
24 A    It is.
25 Q    And is this the document you were just referring to?

1    But I think the most important thing was -- at the
2 end was they said that "the result of this test is not
3 considered to provide any new knowledge when compared to the
4 conclusions of the clinical evaluation."
5    So what they're saying is that -- I mean, I think
6 they're being conservative.  But, to me, the bell is still
7 ringing.  They're certainly saying, "This doesn't in any way
8 reassure us.  This doesn't take us off the hook."
9    MS. PIERSON:  Objection, Your Honor.  Calls for
10 speculation.
11    THE COURT:  Sustained.
12 BY MS. BAUGHMAN:
13 Q   What did the scientists at William Cook Europe conclude
14 about the safety risks regarding the Celect in this executive
15 summary in 2006?
16 A   Well, the best summary of that can be seen on the last
17 page in the conclusion, where they start by saying, "The risk
18 analysis and the clinical evaluation have identified some
19 safety concerns associated with the new design of the filter."
20 Q   Wait.  So what are they referring to there by "new
21 design"?
22 A   Taking off the leaves, taking off the safety feature of
23 the Tulip.
24 Q   Okay.  Continue, please.
25 A   They said that "the literature has been reviewed

1  extensively in discussions within Cook, discussions have been
2  going on for the past three years.  However, to date, it has
3  not been possible to find any clear evidence of the existing
4  available data that could clarify and justify the safety risks
5  identified."
6       And then, they end by saying -- Because this is
7  being sent to others -- "If you can provide some new evidence
8  or inputs which could clarify these safety concerns, we would
9  be happy to take them into consideration."
10      But the strongest conclusion here is that they have
11 not been able to find -- and they use the word "any" -- any
12 clear evidence of the existing data that could justify the
13 safety risks that they've identified within Cook.
14 Q   Why is that important?
15 A   Well, again, this -- we should always be producing new --
16 seeking to produce new medical devices and drugs and making
17 breakthroughs and helping people in a greater way.  But
18 there's nothing more important than to make sure that they're
19 safe, that we haven't in any way inadvertently unintentionally
20 harmed people.
21      They are, in the company, by their independent
22 clinical -- within the company, the clinical research
23 department is saying that there is a design issue --
24           MS. PIERSON:  Objection, Your Honor.  Objection.
25           THE COURT:  Question.

1  A    Several years.

2  Q    And the animal testing that we've talked about so far, how
3  did that come in time compared to Tonya Brand's implant?

4  A    It occurred years before her implant.

5  Q    So, finally, have you reviewed the peer-reviewed
6  literature on the Celect filter?

7  A    I have.

8  Q    And have you, in fact, reviewed an article by Dr. Sadaf?

9  A    I have.

10 Q    What -- what was Dr. Sadaf reporting in that peer-reviewed
11 article?

12 A    Soon after the -- relatively soon after the device became
13 available, Dr. Sadaf reported a situation with a patient who
14 had one placed that perforated and also damaged surrounding
15 organs, like the pancreas, and raised a concern in the medical
16 literature that the design of the device was a problem and
17 would cause safety issues.

18 Q    Have I just handed you a copy of the article you were
19 discussing?

20 A    Yes, you have.

21 Q    Can you tell me what the title -- first of all, when did
22 Dr. Sadaf publish this article about the Celect filter?

23 A    This article was published in 2007.

24 Q    So a few years before Ms. Brand got her filter, her Celect
25 filter implanted?

1  A    That's correct.

2  Q    Which clinical study are they referring to there?

3  A    I believe they're referring to VCA1.

4  Q    For a clinical study?

5       You see there's a reference to Table 2 and the 74
6  patients. And then it says "no incidences of perforation were
7  reported."

8  A    Yeah, this is referring to the clinical study. The
9  question above was about the sheep. That's why I was
10 confused.

11 Q    Right. Okay. So what -- so what is Cook referring to
12 when it tells the FDA "no incidences of perforation were
13 reported" in this clinical study?

14 A    Well, they only did --

15       MS. PIERSON: Objection, Your Honor. It calls to
16 characterize the document and misrepresents the document.

17       THE COURT: Rephrase your question.

18 BY MS. BAUGHMAN:

19 Q    What did Cook tell the FDA in April 2007, ten days before
20 the FDA cleared the Celect filter, about the OUS clinical
21 study?

22 A    They reported that there were no perforations in the OUS
23 clinical study.

24 Q    We discussed yesterday the issue of the definition of
25 perforation. When Cook -- do you see anywhere in this

1  document where Cook explains to the FDA that, when it's saying
2  there were no incidences of perforation, they meant through
3  the wall plus hemorrhage or hematoma?
4  A   No, I don't.
5  Q   Okay.  In other documents that you reviewed, though, did
6  Cook tell the FDA that that was the definition they were using
7  for this study?  For example, in the --
8  A   No.
9  Q   Well --
10 A   I didn't see.  They submitted the protocol, but --
11 Q   And, in the protocol, the definition was provided to the
12 FDA, correct?
13 A   For perforation, that's right.
14 Q   Okay.  But when they made this representation here ten
15 days before clearance, there's no definition provided,
16 correct?
17 A   That's correct.
18 Q   Okay.
19           Let's just put on the screen for a moment
20 Plaintiff's Exhibit 1841.
21           This is a document we discussed yesterday regarding
22 the observations -- a summary of observations from the OUS
23 clinical investigators, including observations of 8, 6, 10, 5,
24 and greater than 3 millimeters outside the IVC.  In this
25 letter from April of 2007, did Cook disclose this information

1  regarding these struts outside the wall from the OUS study to
2  the FDA?
3  A   They did not.
4  Q   Are you aware, based on your review of the communications
5  between Cook and the FDA, of any communication at any time
6  where Cook revealed to the FDA that there were these multiple
7  struts outside the wall between 3 and 10 millimeters?
8  A   I'm not aware of any communication in which they told the
9  FDA that there had been these penetrations described by their
10 site investigators.
11 Q   I want to go back to Exhibit 34.  If you look at the
12 bottom of page 8, there are a couple more representations from
13 Cook.  First of all, if you see at the bottom of the page
14 where I've highlighted on the screen, you see how Cook says
15 "The results of the Celect filter animal study in which no
16 perforations were observed."
17         Which study is Cook referencing there, the animal
18 study in which there were no perforations?
19 A   I believe that was VCA1.
20 Q   VCA1?  And then, again, you see immediately after that,
21 Cook references the preliminary results of the current
22 clinical study of the Celect filter and stating, again, "in
23 which no perforations have been observed."  And that's a
24 reference to what?
25 A   To the OUS, out of United States study.