# EXHIBIT 5

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
 2                       INDIANAPOLIS DIVISION

 3

 4   IN RE: COOK MEDICAL, INC.,        )
     IVC FILTERS MARKETING, SALES      ) Cause No.
 5   PRACTICES AND LIABILITY,          ) 1:14-ML-2570-RLY-TAB
     LITIGATION                        ) Indianapolis, Indiana
 6                                     ) January 15, 2019
                                       ) 8:50 a.m.
 7                                     )

 8

 9

10                      Before the Honorable
                        RICHARD L. YOUNG
11
                   OFFICIAL REPORTER'S TRANSCRIPT OF
12                     JURY TRIAL - VOLUME 2

13

14   For Plaintiffs:
                                 Ben C. Martin, Esq.
15                               Law Offices of Ben C. Martin
                                 3710 Rawlins Street, Suite 1230
16                               Dallas, TX  75219

17

18                               Denman H. Heard, Esq.
                                 Heard Law Firm, PLLC
19                               2925 Richmond Ave., Suite 15
                                 Houston, TX  77098
20

21                               Laura Baughman, Esq.
                                 Baron & Budd
22                               3102 Oak Lawn Avenue
                                 Dallas, TX  75219
23

24

25
```

*KRUMHOLZ - DIRECT/BAUGHMAN*                                    577

1    A    He gave us his numbers.

2    Q    And the numbers that you have from Dr. Timperman, they

3    came from Mrs. Brand's lawyers, didn't they?

4    A    From the deposition.

5             MS. PIERSON:  That's all the questions I have, Your

6    Honor.  We'd object to offering the opinion that Ms. Baughman

7    has just sought to elicit on the grounds of foundation and

8    lack of qualification.

9             MS. BAUGHMAN:  You've already ruled on this.  I

10   could approach, but we've briefed it and you issued a 20-page

11   opinion that covered this.

12            THE COURT:  It's all cross.  Overruled.

13            MS. BAUGHMAN:  Thank you, Your Honor.

14                     **DIRECT EXAMINATION**

15   BY MS. BAUGHMAN:

16   Q    So, Dr. Krumholz --

17   A    Yes.

18   Q    -- can you explain -- you've already explained the

19   concordance between Dr. Timperman and Dr. Gordon.  There's

20   obviously a discrepancy -- well, first of all, there's a big

21   discrepancy between what Cook told the FDA and what all three

22   of these sets of doctors found.  Would you agree?

23   A    That's true.

24   Q    Okay.  Now, but if we look at the OUS investigators versus

25   Timperman and Gordon, there is a difference.  And can you give

```
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
2                      INDIANAPOLIS DIVISION

3

4   IN RE: COOK MEDICAL, INC.,         )
    IVC FILTERS MARKETING, SALES       ) Cause No.
5   PRACTICES AND LIABILITY,           ) 1:14-ML-2570-RLY-TAB
    LITIGATION                         ) Indianapolis, Indiana
6                                      ) January 16, 2019
                                       ) 8:20 a.m.
7                                      )

8

9

10                     Before the Honorable
                       RICHARD L. YOUNG
11
                 OFFICIAL REPORTER'S TRANSCRIPT OF
12                   JURY TRIAL — VOLUME 3

13

14  For Plaintiffs:
                              Ben C. Martin, Esq.
15                            Law Offices of Ben C. Martin
                              3710 Rawlins Street, Suite 1230
16                            Dallas, TX  75219

17

18                            Joseph N. Williams, Esq.
                              Riley Williams and Piatt, LLC
19                            301 Massachusetts Ave., Ste 300
                              Indianapolis, IN  46204
20

21                            Denman H. Heard, Esq.
                              Heard Law Firm, PLLC
22                            2925 Richmond Ave., Suite 15
                              Houston, TX  77098
23

24

25
```

1    document where Cook explains to the FDA that, when it's saying

2    there were no incidences of perforation, they meant through

3    the wall plus hemorrhage or hematoma?

4    A    No, I don't.

5    Q    Okay.  In other documents that you reviewed, though, did

6    Cook tell the FDA that that was the definition they were using

7    for this study?  For example, in the --

8    A    No.

9    Q    Well --

10   A    I didn't see.  They submitted the protocol, but --

11   Q    And, in the protocol, the definition was provided to the

12   FDA, correct?

13   A    For perforation, that's right.

14   Q    Okay.  But when they made this representation here ten

15   days before clearance, there's no definition provided,

16   correct?

17   A    That's correct.

18   Q    Okay.

19          Let's just put on the screen for a moment

20   Plaintiff's Exhibit 1841.

21          This is a document we discussed yesterday regarding

22   the observations -- a summary of observations from the OUS

23   clinical investigators, including observations of 8, 6, 10, 5,

24   and greater than 3 millimeters outside the IVC.  In this

25   letter from April of 2007, did Cook disclose this information

*KRUMHOLZ – DIRECT/BAUGHMAN*                          631

1   regarding these struts outside the wall from the OUS study to

2   the FDA?

3   A    They did not.

4   Q    Are you aware, based on your review of the communications

5   between Cook and the FDA, of any communication at any time

6   where Cook revealed to the FDA that there were these multiple

7   struts outside the wall between 3 and 10 millimeters?

8   A    I'm not aware of any communication in which they told the

9   FDA that there had been these penetrations described by their

10  site investigators.

11  Q    I want to go back to Exhibit 34.  If you look at the

12  bottom of page 8, there are a couple more representations from

13  Cook.  First of all, if you see at the bottom of the page

14  where I've highlighted on the screen, you see how Cook says

15  "The results of the Celect filter animal study in which no

16  perforations were observed."

17          Which study is Cook referencing there, the animal

18  study in which there were no perforations?

19  A    I believe that was VCA1.

20  Q    VCA1?  And then, again, you see immediately after that,

21  Cook references the preliminary results of the current

22  clinical study of the Celect filter and stating, again, "in

23  which no perforations have been observed."  And that's a

24  reference to what?

25  A    To the OUS, out of United States study.

KRUMHOLZ – DIRECT/BAUGHMAN                    709

1  Q    And what did Dr. Rajasekhar and her colleagues conclude?

2  A    They concluded that such a trial would be feasible, that

3  in their -- based on what they found, they said, yeah, this

4  went around the block.  We think there's no reason to think it

5  can't work.  You could do it.

6  Q    So did Cook then sponsor or conduct a larger

7  randomized-control trial on the Celect after they determined

8  it was feasible?

9  A    Not that I'm aware.

10  Q    Dr. Krumholz, I just handed you two documents to try to do

11  them together, if I can, just to speed things up just a little

12  bit.  They're marked Plaintiff's Exhibit 1011 and Plaintiff's

13  Exhibit 867.

14           Are these documents that you reviewed as part of

15  your work on this case?

16  A    They are.

17  Q    And are they Cook documents?

18  A    They are.

19  Q    Do you rely on them?

20  A    I do.

21  Q    And is it reasonable for an expert in your field to rely

22  on these documents?

23  A    It is.

24           MS. BAUGHMAN:  Your Honor, plaintiffs move for

25  admission of Plaintiff's Exhibits 867 and 1011.

*KRUMHOLZ - Offer of Proof/BAUGHMAN*                954

1   being -- fully disclosing that difference in the definitions.

2   Q   I want to ask you about warnings.

3           Let me put it this way:  Under Georgia law, there is

4   a factor called "avoidability of the danger."  And what I want

5   to know is whether you believe that the danger with the Celect

6   filter was avoidable, considering the user's knowledge of the

7   product, publicity surrounding the danger, the effectiveness

8   of warnings and common knowledge, or the expectation of

9   danger.

10  A   I particularly believe that if -- if -- if a possibility

11  was to leave it in, and there certainly was an option to use

12  another type of filter, but even with retrievability, they

13  could have used a Celect, which can be retrieved particularly

14  in the short-term.

15          But I think the issue is that it would have been

16  impossible to make an informed choice, either by the doctor or

17  if the patient was participating in that decision, based on

18  the information that was available and that we didn't have the

19  kind of information that you would hope would be shared at

20  that time.

21  Q   Are you saying it was impossible to make an informed

22  decision, or did you say possible?

23  A   No, it's not possible to make an informed decision because

24  some of the key information was not in the public domain.

25  Q   Known to Cook, but not disclosed?

*KRUMHOLZ - Offer of Proof/BAUGHMAN*                955

1    A    That's right.

2    Q    Okay.  And let me ask you this.  Did Cook at any time tell

3    doctors, including Dr. Rheudasil, to get the Celect filter out

4    as soon as possible in order to avoid the propensity of the

5    Celect filter to perforate the IVC?

6    A    I'm not aware of that.

7    Q    Had Cook provided a warning in the IFU and the Lyon study

8    or otherwise in a "Dear Doctor" letter or some other method,

9    had Cook warned doctors like Dr. Rheudasil that the Celect

10   filter has a tendency to perforate and that the doctor should

11   get the filter out as soon as possible, would that have had an

12   impact with respect to Tonya Brand?

13   A    I believe it would have.

14   Q    Why is that?

15   A    Because I think it's likely that Dr. Rheudasil might have

16   made different choices in the clinical care if he knew that

17   information and had been guided in that way.

18   Q    In the 2009 time frame, did doctors know the dangers that

19   the Celect posed in terms of perforation and -- perforation?

20   Was that disclosed by Cook?

21   A    No.

22   Q    Was there publicity in 2009 to put doctors on alert that

23   the Celect filter had this tendency to perforate the vena

24   cava --

25   A    No.

*KRUMHOLZ – Offer of Proof/BAUGHMAN*                    956

1   Q   -- at a high rate?

2   A   No.

3   Q   Do you believe that the warnings that Cook provided in its

4   IFU were effective in notifying doctors such as Dr. Rheudasil

5   of the dangers posed by the Celect filter?

6   A   No.

7   Q   Including the dangers of perforation?

8   A   No.

9   Q   Do you believe that it was common knowledge at the time,

10  in March of 2009, that the Celect filter had a higher rate of

11  perforation than any other filter and posed a danger such that

12  the filter needed to be taken out as soon as possible?

13  A   I do not.

14  Q   So were the damages that Ms. Brand incurred and endured,

15  including the fracture of her filter and open surgery, were

16  those avoidable?

17  A   Yes.

18  Q   Could they have been avoided with a warning?

19  A   Yes.

20  Q   What are the other ways a company like Cook could

21  communicate information to physicians besides an IFU?

22  A   Well, they -- I mean, publication, presentation,

23  educational materials, promotional materials.  I mean, these

24  companies have very strong arms to communicate with their

25  physicians who they, in one of the documents, called their

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF INDIANA
 2                       INDIANAPOLIS DIVISION

 3

 4   IN RE: COOK MEDICAL, INC.,          )
     IVC FILTERS MARKETING, SALES        ) Cause No.
 5   PRACTICES AND LIABILITY,            ) 1:14-ML-2570-RLY-TAB
     LITIGATION                          ) Indianapolis, Indiana
 6                                       ) January 17, 2019
                                         ) 8:14 a.m.
 7                                       )

 8

 9

10                     Before the Honorable
                       RICHARD L. YOUNG
11
                   OFFICIAL REPORTER'S TRANSCRIPT OF
12                   JURY TRIAL – VOLUME 4

13

14   For Plaintiffs:
                                  Ben C. Martin, Esq.
15                                Law Offices of Ben C. Martin
                                  3710 Rawlins Street, Suite 1230
16                                Dallas, TX  75219

17

18                                Joseph N. Williams, Esq.
                                  Riley Williams and Piatt, LLC
19                                301 Massachusetts Ave., Ste 300
                                  Indianapolis, IN  46204
20

21                                Denman H. Heard, Esq.
                                  Heard Law Firm, PLLC
22                                2925 Richmond Ave., Suite 15
                                  Houston, TX  77098
23

24

25
```

1  doctors, wouldn't it, pseudopenetration?

2  A   Well, we have -- I don't think so, because, again, you

3  want to be very sensitive, the potential for complications.

4  And, at this level, it's not clear exactly whether this was an

5  odd thing to happen, whether this happens more commonly, if it

6  happens in patients.  It was very good they were pushing

7  forward with this paper.  I mean, I think it's good for

8  scientific dialogue.

9          And, also, the FDA never saw that Celect filter

10 penetrating into the aorta.  That data was never presented to

11 the FDA.  So it would have been good to get this in the

12 medical literature.  I would have liked to have seen it

13 published.

14 Q   We're going to talk in a moment about FDA a little bit

15 more.  But, for a moment, just stick with this manuscript with

16 me, if you could, please.

17          This manuscript, this discussion of

18 pseudopenetration and tenting that's observed on imaging, what

19 the authors are reporting here is completely consistent with

20 what the FDA itself noted in 1999 about how difficult it is to

21 diagnose true perforation based on imaging, isn't it?

22 A   I agree.

23 Q   Now, you told this jury a couple of days ago, essentially,

24 that you believed the email message that attached this

25 manuscript, that it was an effort by upper management -- by

*KRUMHOLZ - CROSS/PIERSON*                              1080

1   upper management to hide a picture of the sheep aorta that had

2   perforated, correct?

3   A    And that was my opinion.

4   Q    You have read Dr. Brown's testimony in this case, though,

5   haven't you?

6   A    Yes.

7   Q    You recall that Dr. Brown was asked about why this

8   manuscript wasn't published.

9        Do you remember that?

10  A    You have to refresh my recollection, but I remember.

11  Q    Let's take a look at Dr. Brown's testimony, then.  This is

12  page 406, lines 14, to 407, line 15.

13       MS. PIERSON:  Your Honor, I'll give you a hard copy

14  too.

15       MS. BAUGHMAN:  Your Honor, we're going to object on

16  the grounds of hearsay.  It would be appropriate to call

17  Jennifer Brown, but I don't think it's appropriate to use --

18  to read her testimony in the record.

19       And please don't put it on the screen.

20       THE COURT:  Let's take it off the screen, please.

21       MS. PIERSON:  It's reliance material.  I think we

22  can handle it just like we did Dr. Gardner's, with your

23  permission.

24       May I proceed, Your Honor?

25       THE COURT:  You may.

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF INDIANA
2         INDIANAPOLIS DIVISION

3

4  IN RE: COOK MEDICAL, INC.,        )
   IVC FILTERS MARKETING, SALES      ) Cause No.
5  PRACTICES AND LIABILITY,          ) 1:14-ML-2570-RLY-TAB
   LITIGATION                        ) Indianapolis, Indiana
6                                    ) **January 22,** 2019
                                     ) 8:22 a.m.
7                                    )

8

9

10              **Before the Honorable**
                **RICHARD L. YOUNG**
11
         OFFICIAL REPORTER'S TRANSCRIPT OF
12            JURY TRIAL – VOLUME 6

13

14  **For Plaintiffs:**
                          Ben C. Martin, Esq.
15                        Law Offices of Ben C. Martin
                          3710 Rawlins Street, Suite 1230
16                        Dallas, TX  75219

17

18                        Joseph N. Williams, Esq.
                          Riley Williams and Piatt, LLC
19                        301 Massachusetts Ave., Ste 300
                          Indianapolis, IN  46204
20

21                        Denman H. Heard, Esq.
                          Heard Law Firm, PLLC
22                        2925 Richmond Ave., Suite 15
                          Houston, TX  77098
23

24

25

*GORDON - DIRECT/MARTIN*                    1674

```
 1   BY MR. MARTIN:

 2   Q   Doctor, you are -- did you review any notes with respect

 3   to this particular -- particular one?

 4   A   I think I did.  I don't remember the exact situation here,

 5   but I don't remember seeing anywhere about leg fractures.  I

 6   just know it was failed retrieval.

 7   Q   All right.  So can you tell if there's a leg fracture at

 8   the time of removal attempt?

 9   A   Yes, sir.

10   Q   And you've described what those are --

11   A   Yes, sir.

12   Q   -- in the picture?

13           Is there any doubt that there's a fracture?

14   A   Well, some may just be bent.  So, for example, these may

15   just be bent.  But this thing right here is an acute angle.

16   So this is fracture.  This one right here is definitely

17   fractured, and this is probably fractured.

18           As a matter of fact, you may even be able to see

19   that it might even -- I didn't mag it up enough, but it looks

20   like it might even be off.  One of these two secondary arms

21   may even be off.  But those two are definitely fractured.

22   They've created a right angle.  They've snapped.  Now, they

23   haven't dislodged yet, and they may still be attached

24   partially, but they're fractured.

25   Q   Have you read the final reported of OUS?
```

*GORDON - DIRECT/MARTIN*                                    1675

 1   A   Yes, sir.

 2   Q   Does it show fracture --

 3   A   No, sir.

 4   Q   -- that particular filter?

 5   A   It doesn't mention any fracture, sir.

 6   Q   Did they disclose that?

 7   A   No, sir.

 8   Q   Doctor, I want to discuss the 0401023 with you.  Who is

 9   that patient?

10           And, first of all, did you -- were you able to

11   review the records related to 0401023?  That's a person.

12   That's a human being.  But that's the reference to that human

13   being's patient number.

14   A   I'm sure I did, but if I could see the images.  As a

15   radiologist -- and I know it's about people -- but sometimes I

16   can remember pictures better than the patient's names here.

17   Q   Oh, I'm not fussing at you.  I know we've just been

18   talking about numbers.

19           Go to the next one, please.

20           0202014, what is 0202014?

21   A   Well, this is -- this is another OUS patient from the OUS

22   Mexico trial.  And what I showed was two images, a frontal and

23   a lateral image.  And why I thought this was important was

24   because this was a patient, if I recall, who passed away from

25   the study.