

**PLAINTIFF'S EXHIBIT**

**PX-1148**

| | |
|---|---|
| **To:** | Neal Feranot[fearnot@medinst.com] |
| **Cc:** | Per Hendriksen[p.hendriksen@cook-wce.com] |
| **From:** | Arne Mølgaard-Nielsen |
| **Sent:** | Tue 8/31/2004 9:12:18 AM |
| **Importance:** | Normal |
| **Subject:** | Statement + comments regarding the new Tulip filter. |
| **Received:** | Tue 8/31/2004 9:12:18 AM |

Hi Neal
I hope you can help us in prioritizing this project/statements.

For getting the CE mark to the filter, we need the NB approval as a filter is class III.

Our different evaluations with statements have to be based on tests and knowledge.

As the filters are exactly equal in the basis, and only have slightly different cures at the middle part of the 4 anchoring legs, it is assumed that the new filter is as safe as the current used.
The current have 10 years of use with only one complaint referring a breakage.

The original filter was tested at 50% deformation.

The new filter was tested at 50 % deformation and was ok at 15 to 7½ mm but failed at 30 to 15 mm.
The original was tested at 25 to 12½ mm.

Brian Choules stated at a telephone conversation that from a fatigue point of view, the 2 filters are equal.
It has also been notified us that the computer simulation will break the new filter at ø30 with 15 mm compression whereas from ø 30 mm to ø40, a 10 mm movement their is low risk of fatigue.

We desperately need some statement like this: The two filters are equal. Could a FAE made on both show this??....
And the results of the fatigue test validate the computer-simulation.

We need something to make us feel it is OK to have 30 mm in the IFU as we have for our current.

My personal opinion is, if the new is not considered safe, the current should be stopped, based on theoretical calculations and testing.

We are trying to get some knowledge of the movement of a cava with an implanted filter, but nobody seems to have a dynamic evaluation.

To me it is very important that we at WCE can have the same conclusion as what was send to the FDA.
We do not want to hide that the filter broke at a test at a clinical relevant diameter, but to use the result to prove the safety

Neal can you arrange that someone at Med will get a high priority to take care of this items.

We may try to talk this over later today or tomorrow.
Many regards Arne


Arne Mølgaard-Nielsen
Manager of Quality & Research
Cook  Bjaeverskov,  Denmark
Tel. Direct: +45-56868512
 Mobile: +4520276939
e-mail:    a.moelgaard@cook-wce.com

Confidentiality note: The information contained in this mail is strictly confidential, privileged and intended only for the use of the above addressee(s). All other use is strictly prohibited. If you have received this mail in error, please immediately notify William Cook Europe, phone No +45 56 86 86 86.

PLAINTIFF'S
EXHIBIT

PX-1099

exhibitsticker.com

**To:** lavender@cook-inc.com[lavender@cook-inc.com]; tbrine@cook-inc.com[tbrine@cook-inc.com]; Jacob Lund Clausen[j.clausen@cook-wce.com]; Jesper Thyregod[j.thyregod@cook-wce.com]; Per Hendriksen[p.hendriksen@cook-wce.com]; Tina Hybertz Andersen[T.Andersen2@cook-wce.com]; Voorhees@medinst.com[Voorhees@medinst.com]
**Cc:** Rikke A. Sørensen[r.soerensen@cook-wce.com]
**From:** Line Hedegaard Larsen
**Sent:** Thur 2/9/2006 9:20:11 AM
**Importance:** Normal
**Subject:** Executive Summary Celect Filter
**Received:** Thur 2/9/2006 9:20:11 AM

Executive-Summary-Celect 510k-060209.doc

Dear All,

As agreed on the videoconference on January 23, please find the enclosed executive summary of the safety concerns with the Celect Filter.

Looking forward to discuss the issues with you again on Monday February 13.

Best Regards,

Line

_____

Line Hedegaard Larsen, MSc. Pharm
Clinical Research Department
William Cook Europe Aps
Sandet 6
Dk-4632 Bjæverskov
Denmark
Direct phone +45 56 86 88 33
Email: l.larsen@cook-wce.com

Confidentiality Notice: This e-mail and any attachments are private and confidential and are the property of the sender. The information contained herein is privileged and is intended only for the use of the named addressee(s). If you are not the intended addressee, be advised that any unauthorized disclosure, copying, distribution or action in reliance on this material is strictly prohibited. If you have received this email in error, please notify us immediately by return email.

Company Confidential Attorneys' Eyes Only

Document Produced Natively

Company Confidential Attorneys' Eyes Only

CookMDL2570_0455054

## Executive Summary: Cook Celect Filter

*Introduction:*

A thorough literature review and a risk analysis of the design of the Cook Celect Filter have been prepared by WCE. The risk analysis and the clinical evaluation have identified some safety concerns associated with the new design of the Filter.

In the Celect Filter, the elongated secondary wire loop "the tulip petals" that surrounds the primary legs of the Tulip Filter has been removed. One of the primary complications associated with the existing Tulip Filter is in-growth of the "tulip petals", the in-growth of the "tulip petals" makes it difficult to retrieve the Tulip Filter after implantation. By removing the "tulip petals" in the Celect Filter, the risk of in-growth will be reduced and would thus improve the likelihood of better retrievability of the Celect Filter. Because the "tulip petals" have been removed from the design of the Celect Filter, the long-term migration history of the Tulip Filter does not reflect the long-term migration of the Celect Filter and can, therefore, not be transferred because the primary endpoint of in-growth for the Celect Filter has been changed compared to that of the Tulip. Due to removal of the loops, the Celect Filter may increase the risk of migration during use compared to the Tulip.

When this project was initiated, the question was raised, which commercially available filter would be most appropriate to use for comparison. The similarity of the Celect and the Recovery resulted in references to the Recovery as well as the Tulip. One of the major complications seen with the Recovery Filter is migration. Because the Celect Filter and the Recovery Filter have similarities in their designs, the migration experienced with the Recovery must be taken into consideration when considering safety concerns for the Celect Filter.

A suitable animal or *in-vitro* model to verify this has been discussed for the last 3 years here at WCE, and no solution has been found yet.

*Conclusion from Clinical Evaluation and Comments from Competent Authorities:*

The clinical evaluation of the Celect Filter concluded that a clinical investigation is considered necessary to demonstrate safety and performance in humans in conformity with the requirements of the characteristics and performance referred to in sections 1 and 3 of the MDD 93/42/EEC. The post-meeting letter received from Lloyds (December 20, 2004) also supports the conclusion made in the clinical evaluation. The following was mentioned in the letter from Lloyds,

"Without further detailed analysis, it was my conclusion that the new filter would be unlikely to fulfil the conformity assessment requirements unless some supportive human clinical data is established"

*Clinical Investigation and Justification for 6 Months' Follow-up*

Looking at the literature covering implantation of stents, the estimated time to reach complete embedding in the vessel wall is approximately 3 months. (Phillips-Huges et al (1996); JVIR; 7:321-333). Although a stent is not directly comparable to a filter, we have evaluated that the data is relevant for a filter as well due to the fact that the vessel reaction to an implant is expected to be comparable whether the implant is a stent or a filter.

To account for 3 months' implantation and to ensure a safety margin, we feel that 6 months' follow-up is justified. The 6 months' follow-up is also an accepted follow-up period for permanent implants in general.

Furthermore, we expect to be needing data on retrievals for up to 6-12 months to be able to support our retrieval claim:

Comments received from the MHRA when obtaining the approval for the clinical study was the following, "We are concerned that the manufacturer is planning to make claims of retrieval at any time based only on 6 months' follow-up data. The Competent Authority is of the opinion that further long-term data will be required to support this claim by means of an adequate post-market study."

### *Zaragoza Animal Study*

Despite the conclusion of the clinical evaluation, a lot of work has been put into obtaining a pre-clinical model that would be able to clarify the identified safety issues. The Zaragoza animal study was worked out to investigate whether it could be verified that the force needed to pull out the Celect and the Tulip was comparable based on the theory that only the primary legs are required to prevent the Filter from migrating.

| Subject | Animal ID: | Force 240 gf and 1 min. | Force 380 gf and 1 min. | Max force at disintegration [gf] | Note |
|---|---|---|---|---|---|
| Tulip 1 | 1592 | OK | NA[1] | 510 | 1) Legs fell out during adjustment.<br>- Legs outside the wall |
| Tulip 2 | 1597 | NA[2] | NA | 260 | 2) Legs fell out during adjustment.<br>- Filter deformed at the beginning<br>- Partially opened in the neointima around the free legs<br>- Neointimal hyperplasia nearly occluded the vena cava lumen. |
| Tulip 3 | 0951 | NA | NA | NA | - Handling error during set-up of test<br>- Circumferential stenosis |
| Tulip 4 | 0984 | OK | OK | 550 | - A small clot of thrombus in the top of the filter |
| Tulip 5 | 8889 | OK | OK | 1000 | - Tilted more than 20 degrees<br>- A small clot at the top of the filter<br>- Global vena cava stenosis<br>- Important fibrosis around the hook. The hook was outside the wall. |
| Tulip 6 | 8581 | OK | OK | 1340 | - Tilted 0-10 degrees |

| Subject | Animal ID: | Force 240 gf and 1 min. | Force 380 gf and 1 min. | Disintegration [gf] | |
|---|---|---|---|---|---|
| Celect 1 | 1592 | NA | NA | NA | - Handling error during set-up of test<br>- Tilted 0-10 degrees<br>- Legs outside the wall |
| Celect 2 | 1597 | NA | NA | NA | - Handling error during set-up of test<br>- Legs outside the wall<br>- Remodeling of the initial position |
| Celect 3 | 0951 | OK | OK[3] | 730 | 3) 360 gf in 1 min. |

| | | | | | - All legs outside the wall |
|---|---|---|---|---|---|
| Celect 4 | 0984 | OK | NA[4] | 730 | 4) Leg fell out during adjustment.<br>- Tilted 10-20 degrees<br>- One leg was rotated<br>- Filter had been repositioned |
| Celect 5 | 8889 | OK | OK | 960 | - Global vena cava stenosis<br>- Legs outside the wall |
| Celect 6 | 8581 | OK | OK | 1130 | - Tilted 0-10 degrees<br>- One leg was bent (wrong procedure) |

**Tulip**

4 measurements at 240 g, 3 at 380 g  and a max. force between 260-1340 g

**Celect**

4 measurements of  240 g, 3 at 380 g and a max force between 730-1130 g

Of the four valid measurements of the Celect, one was of a filter that had been repositioned during the 30 days of implantation and, therefore, this value is not comparable to the other numbers.

The value for the legs being pulled out during handling is not usable as the unknown factors interfering during handling are too many for the data to be used. As more legs were pulled out of the Tulip early during handling rather than of the Celect, the average max. force for the two filters does not provide us with a value that we can use for any conclusions. The data does not indicate that the filters are different, and they do not indicate that they are comparable either due to the low sample size.

The value stating the correct acceptance criteria for the gram quantity has not been determined. The use of 240 g has not been validated.

The use of a pull force test to clarify the risk of migration of a Vena Cava Filter is questionable due to the complex physiological and anatomical nature of the vena cava. We have not been able to obtain sufficient data to support the applicability to clarify migration of this model.

Therefore, the result of this test is not considered to provide any new knowledge when compared to the conclusions of the clinical evaluation.

### *Other Relevant Input from Competent Authorities and Notified Bodies*

Recently, the WCE Clinical Research Department attended a one-day course about clinical evidence. The speakers at the course were all representatives of the various Notified Bodies and Competent Authorities, and one of the take-home messages from the course was that one of the ten biggest mistakes made by the companies when performing a clinical investigation is the following:

The company agrees with the competent authorities to include a certain number of patients and to follow the included patients for a certain number of weeks. Then after initiation of the study, the company wants to CE mark after including fewer patients than originally agreed upon with the competent authorities, and the patients are not being followed for the certain number of weeks as originally agreed upon with the competent authorities. If this is not clearly defined in the protocol, this would be considered a major protocol deviation and is thus not recommended by the competent authorities.

*Conclusion*

The risk analysis and the clinical evaluation have identified some safety concerns associated with the new design of the filter. The literature has been reviewed extensively, and discussions have been going on for the past 3 years. However, to date it has not been possible to find any clear evidence of the existing available data that could clarify and justify the safety risks identified. If you can provide some new evidence or inputs which can clarify these safety concerns, we would be happy to take these inputs into considerations.

Rikke A. Sørensen & Line Hedegaard Larsen
Clinical Research Department, WCE

```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
 2                      INDIANAPOLIS DIVISION

 3

 4   IN RE: COOK MEDICAL, INC.,        )
     IVC FILTERS MARKETING, SALES      ) Cause No.
 5   PRACTICES AND LIABILITY,          ) 1:14-ML-2570-RLY-TAB
     LITIGATION                        ) Indianapolis, Indiana
 6                                     ) January 15, 2019
                                       ) 8:50 a.m.
 7                                     )

 8

 9

10                      Before the Honorable
                        RICHARD L. YOUNG
11
                  OFFICIAL REPORTER'S TRANSCRIPT OF
12                     JURY TRIAL - VOLUME 2

13

14   For Plaintiffs:

15                              Ben C. Martin, Esq.
                                Law Offices of Ben C. Martin
16                              3710 Rawlins Street, Suite 1230
                                Dallas, TX  75219

17

18                              Denman H. Heard, Esq.
                                Heard Law Firm, PLLC
19                              2925 Richmond Ave., Suite 15
                                Houston, TX  77098

20

21                              Laura Baughman, Esq.
                                Baron & Budd
22                              3102 Oak Lawn Avenue
                                Dallas, TX  75219

23

24

25
```

1   A    He gave us his numbers.

2   Q    And the numbers that you have from Dr. Timperman, they

3   came from Mrs. Brand's lawyers, didn't they?

4   A    From the deposition.

5            MS. PIERSON:  That's all the questions I have, Your

6   Honor.  We'd object to offering the opinion that Ms. Baughman

7   has just sought to elicit on the grounds of foundation and

8   lack of qualification.

9            MS. BAUGHMAN:  You've already ruled on this.  I

10  could approach, but we've briefed it and you issued a 20-page

11  opinion that covered this.

12           THE COURT:  It's all cross.  Overruled.

13           MS. BAUGHMAN:  Thank you, Your Honor.

14                       **DIRECT EXAMINATION**

15  BY MS. BAUGHMAN:

16  Q    So, Dr. Krumholz --

17  A    Yes.

18  Q    -- can you explain -- you've already explained the

19  concordance between Dr. Timperman and Dr. Gordon.  There's

20  obviously a discrepancy -- well, first of all, there's a big

21  discrepancy between what Cook told the FDA and what all three

22  of these sets of doctors found.  Would you agree?

23  A    That's true.

24  Q    Okay.  Now, but if we look at the OUS investigators versus

25  Timperman and Gordon, there is a difference.  And can you give

1   document where Cook explains to the FDA that, when it's saying

2   there were no incidences of perforation, they meant through

3   the wall plus hemorrhage or hematoma?

4   A    No, I don't.

5   Q    Okay.  In other documents that you reviewed, though, did

6   Cook tell the FDA that that was the definition they were using

7   for this study?  For example, in the --

8   A    No.

9   Q    Well --

10  A    I didn't see.  They submitted the protocol, but --

11  Q    And, in the protocol, the definition was provided to the

12  FDA, correct?

13  A    For perforation, that's right.

14  Q    Okay.  But when they made this representation here ten

15  days before clearance, there's no definition provided,

16  correct?

17  A    That's correct.

18  Q    Okay.

19            Let's just put on the screen for a moment

20  Plaintiff's Exhibit 1841.

21            This is a document we discussed yesterday regarding

22  the observations -- a summary of observations from the OUS

23  clinical investigators, including observations of 8, 6, 10, 5,

24  and greater than 3 millimeters outside the IVC.  In this

25  letter from April of 2007, did Cook disclose this information

KRUMHOLZ - DIRECT/BAUGHMAN                         631

1   regarding these struts outside the wall from the OUS study to

2   the FDA?

3   A   They did not.

4   Q   Are you aware, based on your review of the communications

5   between Cook and the FDA, of any communication at any time

6   where Cook revealed to the FDA that there were these multiple

7   struts outside the wall between 3 and 10 millimeters?

8   A   I'm not aware of any communication in which they told the

9   FDA that there had been these penetrations described by their

10  site investigators.

11  Q   I want to go back to Exhibit 34.  If you look at the

12  bottom of page 8, there are a couple more representations from

13  Cook.  First of all, if you see at the bottom of the page

14  where I've highlighted on the screen, you see how Cook says

15  "The results of the Celect filter animal study in which no

16  perforations were observed."

17          Which study is Cook referencing there, the animal

18  study in which there were no perforations?

19  A   I believe that was VCA1.

20  Q   VCA1?  And then, again, you see immediately after that,

21  Cook references the preliminary results of the current

22  clinical study of the Celect filter and stating, again, "in

23  which no perforations have been observed."  And that's a

24  reference to what?

25  A   To the OUS, out of United States study.

1   Q    And what did Dr. Rajasekhar and her colleagues conclude?

2   A    They concluded that such a trial would be feasible, that

3   in their -- based on what they found, they said, yeah, this

4   went around the block.  We think there's no reason to think it

5   can't work.  You could do it.

6   Q    So did Cook then sponsor or conduct a larger

7   randomized-control trial on the Celect after they determined

8   it was feasible?

9   A    Not that I'm aware.

10  Q    Dr. Krumholz, I just handed you two documents to try to do

11  them together, if I can, just to speed things up just a little

12  bit.  They're marked Plaintiff's Exhibit 1011 and Plaintiff's

13  Exhibit 867.

14           Are these documents that you reviewed as part of

15  your work on this case?

16  A    They are.

17  Q    And are they Cook documents?

18  A    They are.

19  Q    Do you rely on them?

20  A    I do.

21  Q    And is it reasonable for an expert in your field to rely

22  on these documents?

23  A    It is.

24           MS. BAUGHMAN:  Your Honor, plaintiffs move for

25  admission of Plaintiff's Exhibits 867 and 1011.

*KRUMHOLZ - Offer of Proof/BAUGHMAN*                954

 1  being -- fully disclosing that difference in the definitions.

 2  Q   I want to ask you about warnings.

 3        Let me put it this way:  Under Georgia law, there is

 4  a factor called "avoidability of the danger."  And what I want

 5  to know is whether you believe that the danger with the Celect

 6  filter was avoidable, considering the user's knowledge of the

 7  product, publicity surrounding the danger, the effectiveness

 8  of warnings and common knowledge, or the expectation of

 9  danger.

10  A   I particularly believe that if -- if -- if a possibility

11  was to leave it in, and there certainly was an option to use

12  another type of filter, but even with retrievability, they

13  could have used a Celect, which can be retrieved particularly

14  in the short-term.

15        But I think the issue is that it would have been

16  impossible to make an informed choice, either by the doctor or

17  if the patient was participating in that decision, based on

18  the information that was available and that we didn't have the

19  kind of information that you would hope would be shared at

20  that time.

21  Q   Are you saying it was impossible to make an informed

22  decision, or did you say possible?

23  A   No, it's not possible to make an informed decision because

24  some of the key information was not in the public domain.

25  Q   Known to Cook, but not disclosed?

KRUMHOLZ – Offer of Proof/BAUGHMAN                    955

1   A   That's right.

2   Q   Okay.  And let me ask you this.  Did Cook at any time tell

3   doctors, including Dr. Rheudasil, to get the Celect filter out

4   as soon as possible in order to avoid the propensity of the

5   Celect filter to perforate the IVC?

6   A   I'm not aware of that.

7   Q   Had Cook provided a warning in the IFU and the Lyon study

8   or otherwise in a "Dear Doctor" letter or some other method,

9   had Cook warned doctors like Dr. Rheudasil that the Celect

10  filter has a tendency to perforate and that the doctor should

11  get the filter out as soon as possible, would that have had an

12  impact with respect to Tonya Brand?

13  A   I believe it would have.

14  Q   Why is that?

15  A   Because I think it's likely that Dr. Rheudasil might have

16  made different choices in the clinical care if he knew that

17  information and had been guided in that way.

18  Q   In the 2009 time frame, did doctors know the dangers that

19  the Celect posed in terms of perforation and -- perforation?

20  Was that disclosed by Cook?

21  A   No.

22  Q   Was there publicity in 2009 to put doctors on alert that

23  the Celect filter had this tendency to perforate the vena

24  cava --

25  A   No.

1  doctors, wouldn't it, pseudopenetration?

2  A   Well, we have –– I don't think so, because, again, you

3  want to be very sensitive, the potential for complications.

4  And, at this level, it's not clear exactly whether this was an

5  odd thing to happen, whether this happens more commonly, if it

6  happens in patients.  It was very good they were pushing

7  forward with this paper.  I mean, I think it's good for

8  scientific dialogue.

9        And, also, the FDA never saw that Celect filter

10  penetrating into the aorta.  That data was never presented to

11  the FDA.  So it would have been good to get this in the

12  medical literature.  I would have liked to have seen it

13  published.

14  Q   We're going to talk in a moment about FDA a little bit

15  more.  But, for a moment, just stick with this manuscript with

16  me, if you could, please.

17        This manuscript, this discussion of

18  pseudopenetration and tenting that's observed on imaging, what

19  the authors are reporting here is completely consistent with

20  what the FDA itself noted in 1999 about how difficult it is to

21  diagnose true perforation based on imaging, isn't it?

22  A   I agree.

23  Q   Now, you told this jury a couple of days ago, essentially,

24  that you believed the email message that attached this

25  manuscript, that it was an effort by upper management –– by

KRUMHOLZ – CROSS/PIERSON                          1080

1   upper management to hide a picture of the sheep aorta that had

2   perforated, correct?

3   A    And that was my opinion.

4   Q    You have read Dr. Brown's testimony in this case, though,

5   haven't you?

6   A    Yes.

7   Q    You recall that Dr. Brown was asked about why this

8   manuscript wasn't published.

9        Do you remember that?

10  A    You have to refresh my recollection, but I remember.

11  Q    Let's take a look at Dr. Brown's testimony, then.  This is

12  page 406, lines 14, to 407, line 15.

13       MS. PIERSON:  Your Honor, I'll give you a hard copy

14  too.

15       MS. BAUGHMAN:  Your Honor, we're going to object on

16  the grounds of hearsay.  It would be appropriate to call

17  Jennifer Brown, but I don't think it's appropriate to use --

18  to read her testimony in the record.

19       And please don't put it on the screen.

20       THE COURT:  Let's take it off the screen, please.

21       MS. PIERSON:  It's reliance material.  I think we

22  can handle it just like we did Dr. Gardner's, with your

23  permission.

24       May I proceed, Your Honor?

25       THE COURT:  You may.

KRUMHOLZ - Offer of Proof/BAUGHMAN                955

1    A    That's right.

2    Q    Okay.  And let me ask you this.  Did Cook at any time tell

3    doctors, including Dr. Rheudasil, to get the Celect filter out

4    as soon as possible in order to avoid the propensity of the

5    Celect filter to perforate the IVC?

6    A    I'm not aware of that.

7    Q    Had Cook provided a warning in the IFU and the Lyon study

8    or otherwise in a "Dear Doctor" letter or some other method,

9    had Cook warned doctors like Dr. Rheudasil that the Celect

10   filter has a tendency to perforate and that the doctor should

11   get the filter out as soon as possible, would that have had an

12   impact with respect to Tonya Brand?

13   A    I believe it would have.

14   Q    Why is that?

15   A    Because I think it's likely that Dr. Rheudasil might have

16   made different choices in the clinical care if he knew that

17   information and had been guided in that way.

18   Q    In the 2009 time frame, did doctors know the dangers that

19   the Celect posed in terms of perforation and -- perforation?

20   Was that disclosed by Cook?

21   A    No.

22   Q    Was there publicity in 2009 to put doctors on alert that

23   the Celect filter had this tendency to perforate the vena

24   cava --

25   A    No.

*KRUMHOLZ – Offer of Proof/BAUGHMAN*                    956

1   Q   -- at a high rate?

2   A   No.

3   Q   Do you believe that the warnings that Cook provided in its

4   IFU were effective in notifying doctors such as Dr. Rheudasil

5   of the dangers posed by the Celect filter?

6   A   No.

7   Q   Including the dangers of perforation?

8   A   No.

9   Q   Do you believe that it was common knowledge at the time,

10  in March of 2009, that the Celect filter had a higher rate of

11  perforation than any other filter and posed a danger such that

12  the filter needed to be taken out as soon as possible?

13  A   I do not.

14  Q   So were the damages that Ms. Brand incurred and endured,

15  including the fracture of her filter and open surgery, were

16  those avoidable?

17  A   Yes.

18  Q   Could they have been avoided with a warning?

19  A   Yes.

20  Q   What are the other ways a company like Cook could

21  communicate information to physicians besides an IFU?

22  A   Well, they -- I mean, publication, presentation,

23  educational materials, promotional materials.  I mean, these

24  companies have very strong arms to communicate with their

25  physicians who they, in one of the documents, called their