# EXHIBIT 7

```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
                      INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,        )
IVC FILTERS MARKETING, SALES      ) Cause No.
PRACTICES AND LIABILITY,          ) 1:14-ML-2570-RLY-TAB
LITIGATION                        ) Indianapolis, Indiana
                                  ) January 15, 2019
                                  ) 8:50 a.m.
                                  )
```

**Before the Honorable**
**RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL - VOLUME 2

**For Plaintiffs:**
Ben C. Martin, Esq.
Law Offices of Ben C. Martin
3710 Rawlins Street, Suite 1230
Dallas, TX  75219


Denman H. Heard, Esq.
Heard Law Firm, PLLC
2925 Richmond Ave., Suite 15
Houston, TX  77098


Laura Baughman, Esq.
Baron & Budd
3102 Oak Lawn Avenue
Dallas, TX  75219

1  A   He gave us his numbers.
2  Q   And the numbers that you have from Dr. Timperman, they
3  came from Mrs. Brand's lawyers, didn't they?
4  A   From the deposition.
5           MS. PIERSON:  That's all the questions I have, Your
6  Honor.  We'd object to offering the opinion that Ms. Baughman
7  has just sought to elicit on the grounds of foundation and
8  lack of qualification.
9           MS. BAUGHMAN:  You've already ruled on this.  I
10 could approach, but we've briefed it and you issued a 20-page
11 opinion that covered this.
12          THE COURT:  It's all cross.  Overruled.
13          MS. BAUGHMAN:  Thank you, Your Honor.
14                     **DIRECT EXAMINATION**
15 BY MS. BAUGHMAN:
16 Q   So, Dr. Krumholz --
17 A   Yes.
18 Q   -- can you explain -- you've already explained the
19 concordance between Dr. Timperman and Dr. Gordon.  There's
20 obviously a discrepancy -- well, first of all, there's a big
21 discrepancy between what Cook told the FDA and what all three
22 of these sets of doctors found.  Would you agree?
23 A   That's true.
24 Q   Okay.  Now, but if we look at the OUS investigators versus
25 Timperman and Gordon, there is a difference.  And can you give

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF INDIANA
 2                        INDIANAPOLIS DIVISION

 3

 4  IN RE: COOK MEDICAL, INC.,          )
    IVC FILTERS MARKETING, SALES        ) Cause No.
 5  PRACTICES AND LIABILITY,            ) 1:14-ML-2570-RLY-TAB
    LITIGATION                          ) Indianapolis, Indiana
 6                                      ) January 16, 2019
                                        ) 8:20 a.m.
 7                                      )

 8

 9

10                       Before the Honorable
                           RICHARD L. YOUNG
11
                    OFFICIAL REPORTER'S TRANSCRIPT OF
12                       JURY TRIAL - VOLUME 3

13

14  For Plaintiffs:
                                Ben C. Martin, Esq.
15                              Law Offices of Ben C. Martin
                                3710 Rawlins Street, Suite 1230
16                              Dallas, TX   75219

17

18                              Joseph N. Williams, Esq.
                                Riley Williams and Piatt, LLC
19                              301 Massachusetts Ave., Ste 300
                                Indianapolis, IN   46204
20

21                              Denman H. Heard, Esq.
                                Heard Law Firm, PLLC
22                              2925 Richmond Ave., Suite 15
                                Houston, TX   77098
23

24

25
```

1  document where Cook explains to the FDA that, when it's saying
2  there were no incidences of perforation, they meant through
3  the wall plus hemorrhage or hematoma?
4  A  No, I don't.
5  Q  Okay.  In other documents that you reviewed, though, did
6  Cook tell the FDA that that was the definition they were using
7  for this study?  For example, in the --
8  A  No.
9  Q  Well --
10 A  I didn't see.  They submitted the protocol, but --
11 Q  And, in the protocol, the definition was provided to the
12 FDA, correct?
13 A  For perforation, that's right.
14 Q  Okay.  But when they made this representation here ten
15 days before clearance, there's no definition provided,
16 correct?
17 A  That's correct.
18 Q  Okay.
19        Let's just put on the screen for a moment
20 Plaintiff's Exhibit 1841.
21        This is a document we discussed yesterday regarding
22 the observations -- a summary of observations from the OUS
23 clinical investigators, including observations of 8, 6, 10, 5,
24 and greater than 3 millimeters outside the IVC.  In this
25 letter from April of 2007, did Cook disclose this information

1  regarding these struts outside the wall from the OUS study to
2  the FDA?
3  A   They did not.
4  Q   Are you aware, based on your review of the communications
5  between Cook and the FDA, of any communication at any time
6  where Cook revealed to the FDA that there were these multiple
7  struts outside the wall between 3 and 10 millimeters?
8  A   I'm not aware of any communication in which they told the
9  FDA that there had been these penetrations described by their
10 site investigators.
11 Q   I want to go back to Exhibit 34.  If you look at the
12 bottom of page 8, there are a couple more representations from
13 Cook.  First of all, if you see at the bottom of the page
14 where I've highlighted on the screen, you see how Cook says
15 "The results of the Celect filter animal study in which no
16 perforations were observed."
17         Which study is Cook referencing there, the animal
18 study in which there were no perforations?
19 A   I believe that was VCA1.
20 Q   VCA1?  And then, again, you see immediately after that,
21 Cook references the preliminary results of the current
22 clinical study of the Celect filter and stating, again, "in
23 which no perforations have been observed."  And that's a
24 reference to what?
25 A   To the OUS, out of United States study.

1  Q    And what did Dr. Rajasekhar and her colleagues conclude?
2  A    They concluded that such a trial would be feasible, that
3  in their -- based on what they found, they said, yeah, this
4  went around the block.  We think there's no reason to think it
5  can't work.  You could do it.
6  Q    So did Cook then sponsor or conduct a larger
7  randomized-control trial on the Celect after they determined
8  it was feasible?
9  A    Not that I'm aware.
10 Q    Dr. Krumholz, I just handed you two documents to try to do
11 them together, if I can, just to speed things up just a little
12 bit.  They're marked Plaintiff's Exhibit 1011 and Plaintiff's
13 Exhibit 867.
14      Are these documents that you reviewed as part of
15 your work on this case?
16 A    They are.
17 Q    And are they Cook documents?
18 A    They are.
19 Q    Do you rely on them?
20 A    I do.
21 Q    And is it reasonable for an expert in your field to rely
22 on these documents?
23 A    It is.
24      MS. BAUGHMAN:  Your Honor, plaintiffs move for
25 admission of Plaintiff's Exhibits 867 and 1011.

1  being -- fully disclosing that difference in the definitions.
2  Q  I want to ask you about warnings.
3         Let me put it this way:  Under Georgia law, there is
4  a factor called "avoidability of the danger."  And what I want
5  to know is whether you believe that the danger with the Celect
6  filter was avoidable, considering the user's knowledge of the
7  product, publicity surrounding the danger, the effectiveness
8  of warnings and common knowledge, or the expectation of
9  danger.
10 A  I particularly believe that if -- if -- if a possibility
11 was to leave it in, and there certainly was an option to use
12 another type of filter, but even with retrievability, they
13 could have used a Celect, which can be retrieved particularly
14 in the short-term.
15         But I think the issue is that it would have been
16 impossible to make an informed choice, either by the doctor or
17 if the patient was participating in that decision, based on
18 the information that was available and that we didn't have the
19 kind of information that you would hope would be shared at
20 that time.
21 Q  Are you saying it was impossible to make an informed
22 decision, or did you say possible?
23 A  No, it's not possible to make an informed decision because
24 some of the key information was not in the public domain.
25 Q  Known to Cook, but not disclosed?

1  A   That's right.
2  Q   Okay. And let me ask you this. Did Cook at any time tell
3  doctors, including Dr. Rheudasil, to get the Celect filter out
4  as soon as possible in order to avoid the propensity of the
5  Celect filter to perforate the IVC?
6  A   I'm not aware of that.
7  Q   Had Cook provided a warning in the IFU and the Lyon study
8  or otherwise in a "Dear Doctor" letter or some other method,
9  had Cook warned doctors like Dr. Rheudasil that the Celect
10 filter has a tendency to perforate and that the doctor should
11 get the filter out as soon as possible, would that have had an
12 impact with respect to Tonya Brand?
13 A   I believe it would have.
14 Q   Why is that?
15 A   Because I think it's likely that Dr. Rheudasil might have
16 made different choices in the clinical care if he knew that
17 information and had been guided in that way.
18 Q   In the 2009 time frame, did doctors know the dangers that
19 the Celect posed in terms of perforation and -- perforation?
20 Was that disclosed by Cook?
21 A   No.
22 Q   Was there publicity in 2009 to put doctors on alert that
23 the Celect filter had this tendency to perforate the vena
24 cava --
25 A   No.

1  Q   -- at a high rate?
2  A   No.
3  Q   Do you believe that the warnings that Cook provided in its
4  IFU were effective in notifying doctors such as Dr. Rheudasil
5  of the dangers posed by the Celect filter?
6  A   No.
7  Q   Including the dangers of perforation?
8  A   No.
9  Q   Do you believe that it was common knowledge at the time,
10 in March of 2009, that the Celect filter had a higher rate of
11 perforation than any other filter and posed a danger such that
12 the filter needed to be taken out as soon as possible?
13 A   I do not.
14 Q   So were the damages that Ms. Brand incurred and endured,
15 including the fracture of her filter and open surgery, were
16 those avoidable?
17 A   Yes.
18 Q   Could they have been avoided with a warning?
19 A   Yes.
20 Q   What are the other ways a company like Cook could
21 communicate information to physicians besides an IFU?
22 A   Well, they -- I mean, publication, presentation,
23 educational materials, promotional materials.  I mean, these
24 companies have very strong arms to communicate with their
25 physicians who they, in one of the documents, called their

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF INDIANA
 2                         INDIANAPOLIS DIVISION

 3

 4  IN RE: COOK MEDICAL, INC.,          )
    IVC FILTERS MARKETING, SALES        ) Cause No.
 5  PRACTICES AND LIABILITY,            ) 1:14-ML-2570-RLY-TAB
    LITIGATION                          ) Indianapolis, Indiana
 6                                      ) January 17, 2019
                                        ) 8:14 a.m.
 7                                      )

 8

 9

10                       Before the Honorable
                         RICHARD L. YOUNG
11
                    OFFICIAL REPORTER'S TRANSCRIPT OF
12                       JURY TRIAL - VOLUME 4

13

14  For Plaintiffs:
                                   Ben C. Martin, Esq.
15                                 Law Offices of Ben C. Martin
                                   3710 Rawlins Street, Suite 1230
16                                 Dallas, TX   75219

17

18                                 Joseph N. Williams, Esq.
                                   Riley Williams and Piatt, LLC
19                                 301 Massachusetts Ave., Ste 300
                                   Indianapolis, IN   46204

20

21                                 Denman H. Heard, Esq.
                                   Heard Law Firm, PLLC
22                                 2925 Richmond Ave., Suite 15
                                   Houston, TX   77098

23

24

25
```

1 doctors, wouldn't it, pseudopenetration?
2 A  Well, we have -- I don't think so, because, again, you
3 want to be very sensitive, the potential for complications.
4 And, at this level, it's not clear exactly whether this was an
5 odd thing to happen, whether this happens more commonly, if it
6 happens in patients.  It was very good they were pushing
7 forward with this paper.  I mean, I think it's good for
8 scientific dialogue.
9         And, also, the FDA never saw that Celect filter
10 penetrating into the aorta.  That data was never presented to
11 the FDA.  So it would have been good to get this in the
12 medical literature.  I would have liked to have seen it
13 published.
14 Q  We're going to talk in a moment about FDA a little bit
15 more.  But, for a moment, just stick with this manuscript with
16 me, if you could, please.
17         This manuscript, this discussion of
18 pseudopenetration and tenting that's observed on imaging, what
19 the authors are reporting here is completely consistent with
20 what the FDA itself noted in 1999 about how difficult it is to
21 diagnose true perforation based on imaging, isn't it?
22 A  I agree.
23 Q  Now, you told this jury a couple of days ago, essentially,
24 that you believed the email message that attached this
25 manuscript, that it was an effort by upper management -- by

```
 1  upper management to hide a picture of the sheep aorta that had
 2  perforated, correct?
 3  A     And that was my opinion.
 4  Q     You have read Dr. Brown's testimony in this case, though,
 5  haven't you?
 6  A     Yes.
 7  Q     You recall that Dr. Brown was asked about why this
 8  manuscript wasn't published.
 9            Do you remember that?
10  A     You have to refresh my recollection, but I remember.
11  Q     Let's take a look at Dr. Brown's testimony, then.  This is
12  page 406, lines 14, to 407, line 15.
13            MS. PIERSON:  Your Honor, I'll give you a hard copy
14  too.
15            MS. BAUGHMAN:  Your Honor, we're going to object on
16  the grounds of hearsay.  It would be appropriate to call
17  Jennifer Brown, but I don't think it's appropriate to use --
18  to read her testimony in the record.
19            And please don't put it on the screen.
20            THE COURT:  Let's take it off the screen, please.
21            MS. PIERSON:  It's reliance material.  I think we
22  can handle it just like we did Dr. Gardner's, with your
23  permission.
24            May I proceed, Your Honor?
25            THE COURT:  You may.
```

```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
 2                       INDIANAPOLIS DIVISION

 3

 4  IN RE: COOK MEDICAL, INC.,      )
    IVC FILTERS MARKETING, SALES    ) Cause No.
 5  PRACTICES AND LIABILITY,        ) 1:14-ML-2570-RLY-TAB
    LITIGATION                      ) Indianapolis, Indiana
 6                                  ) January 22, 2019
                                    ) 8:22 a.m.
 7                                  )

 8

 9

10                    Before the Honorable
                       RICHARD L. YOUNG
11
                 OFFICIAL REPORTER'S TRANSCRIPT OF
12                    JURY TRIAL - VOLUME 6

13

14  For Plaintiffs:
                                Ben C. Martin, Esq.
15                              Law Offices of Ben C. Martin
                                3710 Rawlins Street, Suite 1230
16                              Dallas, TX  75219

17

18                              Joseph N. Williams, Esq.
                                Riley Williams and Piatt, LLC
19                              301 Massachusetts Ave., Ste 300
                                Indianapolis, IN  46204
20

21                              Denman H. Heard, Esq.
                                Heard Law Firm, PLLC
22                              2925 Richmond Ave., Suite 15
                                Houston, TX  77098
23

24

25
```

1  BY MR. MARTIN:
2  Q   Doctor, you are -- did you review any notes with respect
3  to this particular -- particular one?
4  A   I think I did.  I don't remember the exact situation here,
5  but I don't remember seeing anywhere about leg fractures.  I
6  just know it was failed retrieval.
7  Q   All right.  So can you tell if there's a leg fracture at
8  the time of removal attempt?
9  A   Yes, sir.
10 Q   And you've described what those are --
11 A   Yes, sir.
12 Q   -- in the picture?
13         Is there any doubt that there's a fracture?
14 A   Well, some may just be bent.  So, for example, these may
15 just be bent.  But this thing right here is an acute angle.
16 So this is fracture.  This one right here is definitely
17 fractured, and this is probably fractured.
18         As a matter of fact, you may even be able to see
19 that it might even -- I didn't mag it up enough, but it looks
20 like it might even be off.  One of these two secondary arms
21 may even be off.  But those two are definitely fractured.
22 They've created a right angle.  They've snapped.  Now, they
23 haven't dislodged yet, and they may still be attached
24 partially, but they're fractured.
25 Q   Have you read the final reported of OUS?

1  A    Yes, sir.
2  Q    Does it show fracture --
3  A    No, sir.
4  Q    -- that particular filter?
5  A    It doesn't mention any fracture, sir.
6  Q    Did they disclose that?
7  A    No, sir.
8  Q    Doctor, I want to discuss the 0401023 with you.  Who is
9  that patient?
10          And, first of all, did you -- were you able to
11 review the records related to 0401023?  That's a person.
12 That's a human being.  But that's the reference to that human
13 being's patient number.
14 A    I'm sure I did, but if I could see the images.  As a
15 radiologist -- and I know it's about people -- but sometimes I
16 can remember pictures better than the patient's names here.
17 Q    Oh, I'm not fussing at you.  I know we've just been
18 talking about numbers.
19          Go to the next one, please.
20          0202014, what is 0202014?
21 A    Well, this is -- this is another OUS patient from the OUS
22 Mexico trial.  And what I showed was two images, a frontal and
23 a lateral image.  And why I thought this was important was
24 because this was a patient, if I recall, who passed away from
25 the study.