# EXHIBIT C

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
                   INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,      )
IVC FILTERS MARKETING, SALES    ) Cause No.
PRACTICES AND LIABILITY,        ) 1:14-ML-2570-RLY-TAB
LITIGATION                      ) Evansville, Indiana
                                ) January 14, 2019
                                ) 8:43 a.m.
                                )
```

**Before the Honorable
RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL - VOLUME 1

**For Plaintiffs:**         Roger L. Mandel, Esq.
                            Jeeves Mandel Law Group
                            12222 Merit Drive
                            Dallas, TX  75251


                            Ben C. Martin, Esq.
                            Law Offices of Ben C. Martin
                            3710 Rawlins Street, Suite 1230
                            Dallas, TX  75219


                            Denman H. Heard, Esq.
                            Heard Law Firm, PLLC
                            2925 Richmond Ave., Suite 15
                            Houston, TX  77098


                            Laura Baughman, Esq.
                            Baron & Budd
                            3102 Oak Lawn Avenue
                            Dallas, TX  75219

1  a new rule here.  When we have a bench conference, there's one
2  attorney from each side.  Okay?  This is driving Maggie nuts
3  and it's driving me nuts.
4              If he's not talking about osteophytes in his report,
5  then it's not coming in.  He has to have that in his report.
6              MR. MARTIN:  Your Honor, it's in his report.
7              MS. PIERSON:  It's not in his report.
8              MR. MARTIN:  It's in his rebuttal report, Your
9  Honor.
10             THE COURT:  It would have to be in his report.
11             (End of bench conference.)
12             MR. MARTIN:  May we approach, Your Honor?
13             (Beginning of bench conference record.)
14             MR. MARTIN:  It's all about osteophytes.
15             MS. PIERSON:  This is a discussion of his analysis
16 of Mrs. Brand's -- of Mrs. Brand's case and the effect of her
17 osteophyte on her -- as he analyzed it in his differential
18 diagnosis.
19             What this witness is purporting to do today is to go
20 through imaging related to the OUS study and to point out on
21 the imaging whatever his opinions are about the presence or
22 absence of osteophytes.  That is not discussed in his report.
23             He said there were over 40,000 images in the OUS
24 study that he's reviewed, yet nowhere will you find in this 46
25 pages of the report any discussion of observing osteophytes or

1  data was looking at.
2  Q   If you could listen to my question, sir.
3  A   Yes, ma'am.
4  Q   At the end of your report, when you're talking about the
5  presence of osteophytes and whether they contributed to
6  Mrs. Brand's specific filter fracture in any way, there's no
7  mention of the OUS imaging there, right?
8  A   Well, they're not put together, but there's mention of OUS
9  imaging throughout.
10 Q   Nowhere in your report do you offer any opinions about
11 osteophytes in the OUS imaging, do you?  It's a yes-or-no,
12 sir.
13 A   No, I do not.
14          MS. PIERSON:  Judge Young, we'd renew our objection.
15 This isn't an opinion that was offered in his first report or
16 second report.  There are over 40,000 images that he says he's
17 reviewed in this study.  Absent proper disclosure of this
18 opinion, it's impossible to cross-examine him on it.
19          THE COURT:  If his report didn't discuss osteophytes
20 in the OUS study, then, of course, it's not going to come in.
21 I mean, that's -- that's basic expert report requirements.  I
22 mean, differential diagnosis on Mrs. Brand doesn't equate to
23 the OUS study.
24          Let's come back in about ten minutes.
25          THE CLERK:  All rise.  Court is in recess.

1  to take place would -- would be factored into how long it
2  would take to cause the filter to break.  And, based on
3  information that I'm aware of, that might be something that
4  would take as long as a year as well.
5          So one might expect that a filter could last a
6  couple of years when it encounters conditions that is going to
7  make it fail by fatigue fracture.
8  Q   So -- so if a study -- if you wanted to conduct a study,
9  if someone came to you and said, "Dr. McMeeking, I want to
10 conduct a study to figure out what the rate of fracture is in
11 human beings, especially human beings that might be
12 experiencing the cascading effect," how long would we need to
13 follow those patients in order to get a reliable estimate of
14 fracture rates?
15 A   Well, I would say that you would need to follow --
16         MR. WEBBER:  Objection, Your Honor.  Lack of
17 foundation on this.
18         THE COURT:  Sustained.  Rephrase.
19 BY MS. BAUGHMAN:
20 Q   On average, how long does it take for filters to fracture
21 in human beings?
22         MR. WEBBER:  Your Honor, objection.  This is not in
23 his report.  He offered no opinion on this.
24         THE COURT:  Sustained.
25

```
 1  calculator -- the rate is 1.5 percent.
 2            Does that sound right to you?
 3  A    Yes.
 4  Q    That's 1.5 percent of patients with any kind of symptom
 5  from perforation, correct?
 6  A    Yes.
 7  Q    If we could put up Table 21.
 8            Counsel asked you about what studies you reviewed,
 9  and I understand that's really not why you're here to talk
10  about studies.  The jury will hear from another expert who's
11  focused on those later in the case.  But when she's asking you
12  about different studies that you didn't review and can you
13  explain, you've seen this --
14            MS. BAUGHMAN:  Your Honor, I'm going to object to
15  this.  This -- this is not from Dr. Krumholz's report.  This
16  is a reinterpretation of Dr. Krumholz's information done by
17  defense counsel.  So it is very misleading to put this in
18  front of the jury and represent that this is something that
19  Dr. Krumholz found.  This appears nowhere in his report.  So I
20  ask that it be taken down.
21            MS. PIERSON:  Dr. Krumholz said these were the
22  studies that he looked at and the rates from his studies.
23            MS. BAUGHMAN:  This is not in his report, and it
24  says right there "Krumholz report Table 21."  It doesn't
25  appear in his report.
```

```
 1                MS. PIERSON:  These are studies -- to be clear --
 2                THE COURT:  Let's take it down.  Take it down.
 3                MS. PIERSON:  -- these are the names of the studies
 4   that were in his report.
 5   BY MS. PIERSON:
 6   Q   Dr. Gillespie, are you generally aware of the low rates of
 7   fracture for the Celect in the published literature?
 8   A   Yes.
 9   Q   Counsel asked you some questions about a document called a
10   data summary.
11              Do you remember that?
12   A   Yes.
13   Q   If you could, take that document out, please, and turn to
14   the page that she asked you about, which is page 28.
15              Rich, this is 1845, the middle of the page.  Sorry.
16   It's page 28, not 25.  Apologies.  There we go.  Just the
17   middle of the page, that Table 4.3-3.
18              It's on the screen in front of you, if it's helpful,
19   Dr. Gillespie.
20   BY MS. PIERSON:
21   Q   What is the occurrence rate for pulmonary embolism with
22   the Celect?
23   A   .0062 percent.
24   Q   What is the fracture rate for the Celect?
25   A   .066 percent.
```