UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE:  COOK MEDICAL,INC.,      )  CASE NO. 1:14-ml-2570-RLY-TAB
IVC FILTERS MARKETING,          )  MDL No. 2570
SALES PRACTICES AND PRODUCTS    )  Evansville, Indiana
LIABILITY LITIGATION            )  Thursday, July 30, 2020
                                )  1:08 o'clock p.m.


Before the
HONORABLE RICHARD L. YOUNG


TRANSCRIPT OF ORAL ARGUMENT



APPEARANCES:
FOR THE PLAINTIFF          The Nations Law Firm
Eddie Clark Burrage:       By:  Alison L. Divine
                           9703 Richmond Avenue, Suite 200
                           Houston, Texas 77042


FOR THE PLAINTIFF          Baron & Budd, P.C.
Brian Giddens:             By:  Thomas Matthew Sims
                           3102 Oak Lawn Avenue, Suite 1100
                           Dallas, Texas 75219


FOR THE PLAINTIFF          O'Leary, Shelton, Corrigan, Peterson,
Gregory Denton:            Dalton & Quillin
                           By:  James Thomas Corrigan and
                           Michael Joseph Quillin
                           1034 South Brentwood Blvd.
                           Penthouse 1-A
                           St. Louis, Missouri 63117


FOR MDL PLAINTIFFS:        Martin Baughman, PLLC
                           By:  Ben C. Martin
                           3141 Hood Street, Suite 600
                           Dallas, Texas 75219


FOR MDL PLAINTIFFS:        Riley Williams & Piatt, LLC
                           By:  Joseph N. Williams
                           301 Massachusetts Avenue, Suite 300
                           Indianapolis, Indiana 46204

```
FOR MDL PLAINTIFFS:      Heaviside Reed Zaic
                         By:  Michael Heaviside (by phone)
                         910 Seventeen Street, NW, Suite 800
                         Washington, DC 20006

FOR MDL PLAINTIFFS:      The Gallagher Law Firm, PLLC
                         By:  Pamela McLemore (by phone)
                         2905 Sackett Street
                         Houston, Texas 77098

FOR THE DEFENDANTS       Faegre Drinker Biddle & Reath LLP
Cook Incorporated,       By:  Andrea Roberts Pierson and
Cook Medical LLC,        James Stephen Bennett and
and William Cook         Jessica Benson Cox (by phone)
Europe ApS:              300 North Meridian Street, Suite 2500
                         Indianapolis, Indiana 46204

COURT REPORTER:          Jean A. Knepley, RDR, CRR, CRC, FCRR
                         46 East Ohio Street, Room 309
                         Indianapolis, Indiana 46204
```

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

1                                    INDEX

2       DESCRIPTION                                    RECEIVED

3       A ............................................91

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              *(In open court.)*

2         (Off-the-record discussion.)

3              THE COURT:  Okay.  Good afternoon, again.  We are here

4    today, In re:  Cook Medical, Inc., IVC Filters Marketing, Sales

5    Practices and Products Liability Litigation.  This is MDL 2570,

6    and we are here for our monthly status conference and also to

7    address some other motions that have been pending.  And here

8    representing the Plaintiffs, the Plaintiff steering committee,

9    Ben Martin and Joe Williams.  And I see Alison Divine is here

10   on the Burrage case.

11             MS. DIVINE:  Yes, Your Honor.

12             THE COURT:  Welcome.

13             MS. DIVINE:  Thank you.

14             THE COURT:  Representing Cook, Andrea Pierson and

15   Steve Bennett, and my notes also tell me Jessica Cox is here by

16   telephone.  And Mike Heaviside, as a result —— as a member of

17   the steering committee, is here by telephone, as well.

18             You have filed agendas here.  Ms. Pierson, how do you

19   wish to proceed today?

20             MS. PIERSON:  Thank you, Your Honor.  You may recall,

21   that under the new CMO-18 that we have two hearings a month

22   now, unless they are not needed.  The first is the Cook filter

23   MDL status conference; and then, the second is the monthly

24   motions hearing.  For various reasons, we collapsed those

25   today.  So we have provided the Court with two agendas.

1    THE COURT:  Yes.

2    MS. PIERSON:  We would like to start with the agenda

3    which is the —

4    A VOICE:  Has joined the conference.

5    MS. PIERSON:  —— monthly status conference agenda,

6    Your Honor.

7    THE COURT:  Okay.  I have it.  Number 1, Cook

8    Defendants' omnibus motion for summary judgment based on

9    statute of limitations and the Giddens and Denton matters,

10   Docket No. 11921.

11   MS. PIERSON:  I am sorry, Your Honor, it is the other

12   agenda, the one that is titled July 30th status conference.

13   THE COURT:  Oh, okay.  I am sorry.

14   MR. WILLIAMS:  Your Honor, if I may?  I talked with

15   Ms. Pierson a little bit beforehand.  After —— well, maybe I

16   didn't talk to her about this —— after Ms. Divine presents the

17   Burrage stuff on the monthly status conference, we would like,

18   since we have got Mr. Sims, who is flying out of town, and Mr.

19   Corrigan and Mr. Quillin, who have individual motions; before

20   we get to the last item in the status conference, which was

21   going to be a discussion amongst all of us about where we go

22   with this MDL, I would respectfully request that they get their

23   stuff done so that they can leave.

24   I mean, I think we can go common benefit fund, the

25   Burrage motion, and then the individual motions before we get

1   into the general sort of status conference, if that is okay

2   with Your Honor.

3           THE COURT:  Makes sense to me.  Ms. Pierson?

4           MS. PIERSON:  I don't have a strong feeling about it,

5   Your Honor.  But when we, when we traded the agenda in advance

6   and presented it to the Court, our hope was that we could talk

7   about Burrage and then the bellwether plans because those two

8   issues go together.  Whether Burrage sticks in February or what

9   happens after or in lieu of Burrage, those issues are linked.

10  I don't feel strongly about it.  If people need to catch a

11  plane, we will handle it however Your Honor prefers.

12          THE COURT:  We will try to accommodate folks, and if

13  they need to get on the road, we are happy to try to

14  accommodate them.

15          MR. WILLIAMS:  Thank you, Your Honor.

16          THE COURT:  Okay.  Now that I am on the right agenda,

17  Plaintiffs' steering committee motion to amend the March 16,

18  2016, order on rules, policies, procedures guidelines relating

19  to establishing common benefit fee and expense fund.

20          MR. WILLIAMS:  Yes, Your Honor, and this has been

21  pending for some time, and there has been a lot of back and

22  forth.  I can report that there was only one objection from

23  anyone on the Plaintiffs' side, and that was Attorney Marc

24  Bern.  He filed a withdrawal of that objection, I believe, last

25  week, or it may have been this week.

1          THE COURT:  I saw that.

2          MR. WILLIAMS:  So it is my understanding that we are

3   ready to get this entered, and I will provide, based on some

4   back and forth between all involved, I need to clean up the

5   order that was originally submitted to Your Honor when we filed

6   the motion.  I should be able to have that to Your Honor early

7   next week with everything ready to go.  And I, I think that is

8   about it on that.

9          THE COURT:  All right.

10          We will show Mr. Williams indicates to the Court that

11   there is no longer an objection to the steering committee's

12   request regarding the common benefit fee and expense fund, and

13   Mr. Williams will prepare a proposed order.

14          MR. WILLIAMS:  Yes, Your Honor.

15          THE COURT:  All right.

16          Number 2, Plaintiff's motion to dismiss with prejudice

17   in the Burrage matter.

18          MS. DIVINE:  Yes, Your Honor.

19          THE COURT:  Please respond.

20          THE COURT REPORTER:  I'm sorry, you need to turn your

21   mic on.

22          MS. DIVINE:  May I approach the podium?

23          THE COURT:  I think what we are doing is just —

24   normally we do present from the podium, but I think with the

25   COVID, precautions we are taking, you can just have a seat,

1    actually, and just speak in the microphone.

2         MS. DIVINE:  Well, that makes it simple.  Thank you,

3    Your Honor.

4         THE COURT:  How about that?  All right.

5         MS. DIVINE:  Plaintiff's motion before the Court poses

6    the following issue:  Whether Mr. Burrage should be allowed to

7    dismiss his case.  The relevant facts are that our client made

8    the decision to dismiss his case for two reasons:

9         One, his case, in the current posture that it is in,

10   has negative value.  The cost of a long bellwether trial would

11   exceed anything he is likely to recover.

12        Two, he was facing a lot of hardship and difficulty to

13   have to travel for an extended period away from home for an

14   out-of-state trial.  Your Honor, even if some of the high costs

15   of putting on and defending a bellwether trial were eventually

16   partially absorbed by other Plaintiffs, and even if he were to

17   walk away with something in his pocket, at this moment in time,

18   he simply is not willing to risk his life to travel 600 miles

19   from home and spend all this time in a crowded courtroom during

20   a pandemic.

21        The relevant law controlling the issue before the

22   Court is Rule 41, which governs voluntary dismissals.  Rule

23   41(a)(2) states that, quote, an action may be dismissed at the

24   Plaintiff's request only by court order on terms that the court

25   considers proper.  If a Defendant has pleaded a counterclaim

1   before being served with the Plaintiff's motion to dismiss, the
2   action may be dismissed over the Defendants' objection only if
3   the counterclaim can remain pending for independent
4   adjudication.  Unless the order states otherwise, a dismissal
5   under this Paragraph 2 is without prejudice, close quote.

6          So this may be an issue of first impression in this
7   circuit, considering the lack of existing case law.  But under
8   Rule 41, it seems that the discretion granted is intended to
9   remedy two factual situations that might lead to legal
10  prejudice, should a Plaintiff's case be voluntarily dismissed
11  over the Defendants' objection.

12         One, when there is a counterclaim that is unable to
13  remain pending for independent adjudication; or two, when the
14  court feels that a dismissal without prejudice would otherwise
15  cause the Defendant plain legal prejudice because they would be
16  exposed to a second lawsuit from the same Plaintiff.

17         Neither of these situations exists in this case, Your
18  Honor.  Here, there is no need for this Court to exercise that
19  discretion provided by Rule 41 because Plaintiff's motion is
20  already to dismiss with prejudice.  Most reasonable Defendants
21  will stipulate to a dismissal under Rule 41(a)(1), but Cook,
22  unable to find case law in support of their argument, instead,
23  has lobbied personal attacks against the Nations Law Firm and
24  its clients, providing contradictory arguments to support their
25  opposition and citing cases that involve Plaintiffs who have

1    filed motions to dismiss without prejudice.

2          Cook, then, attempts to gaslight the Court by

3    repeating throughout their brief that this plain legal

4    prejudice standard should apply here without citing one case

5    involving a Plaintiff who moved to dismiss with prejudice under

6    Rule 41 where a court has ever applied that standard.

7          Another example of Cook's questionable attempts at

8    persuasion is their continued reference to our Category 6 cases

9    —

10         THE COURT:  Like Mr. Burrage?

11         MS. DIVINE:  — like Mr. Burrage's case, as

12   noninjury/product-in-place cases, when the actual definition on

13   the categorization form for this broad category is

14   nonsymptomatic injury cases.

15         They recently filed for judgment on the pleadings

16   against four other Category 6 cases and actually argue that

17   these check-the-box inadmissible forms are the equivalent of

18   pleadings.  In that motion, Cook repeats the same tired mantra

19   that a perforation, like Mr. Burrage has, is not an injury; and

20   therefore, all these cases should be dismissed.

21         So in making that argument, Cook is essentially

22   calling them negative value cases; but then, here, in this

23   case, they state, and I quote, Plaintiff's Counsel's claim of

24   negative value is entirely unsupported.  So which one is it?

25   If a perforation is not an injury, then, why did they argue on

1    November 13, 2015, that those Plaintiffs' claims were

2    time-barred by the statute of limitations because the clock

3    started ticking when Plaintiff, quote, learned that the filter

4    had perforated his vena cava?  They can't have it both ways,

5    and their allegation that our cases violate Rule 11 borders on

6    abusive.

7            Cook's arguments regarding negative value devolve into

8    personal attacks against the Nations Law Firm that go far

9    beyond the boundary of legitimate advocacy.  All attorneys have

10   an ethical obligation to their clients to file their cases

11   before the statute of limitations expires.

12           This case, and all the Nations Law Firm cases in

13   Category 6, have objective evidence of an actual ongoing

14   injury, and this evidence has been provided to Cook.  When this

15   case was filed, it was not a negative value case.  Plaintiff

16   had every right to believe that by filing his case directly

17   into this MDL, that he would be able to prove his claim by

18   either participating in a multiparty mini trial, along with

19   other similarly situated Plaintiffs, or at the very least, have

20   the benefit of relying on a trial package that would minimize

21   his costs.

22           The MDL process does not confer value to an individual

23   Plaintiff just because he or she was chosen as a bellwether.

24   Most disturbingly, Cook, then, attempts to justify their

25   outrageous demands for relief not only by filing a procedurally

1    improper alternative motion, but by personally attacking the

2    Nations Law Firm, and by extension, Mr. Nations and every

3    employee of our firm by alleging these cases —

4              THE COURT:  Ms. Divine, I have to stop you here.  I

5    don't know how cases are argued in your jurisdiction, but using

6    terms like "gaslighting," "outrageous," "personal attacks," I,

7    I don't —

8              MS. DIVINE:  Okay, Your Honor.

9              THE COURT:  — I don't have time for that, and I don't

10   like it when they are in briefs that I read.  And I don't like

11   it in oral argument, and the same holds true, of course, for

12   Cook, as well.  Personal attacks, those types of things are not

13   appropriate in forms of argument.

14             MS. DIVINE:  Well, I agree, and all I was attempting

15   to do was point out that that was levied against our firm.  I

16   wasn't — I, I will refrain from using those terms.

17             THE COURT:  Okay.

18             MS. DIVINE:  It is difficult to respond to an

19   opposition brief like this without being, pointing out what has

20   been said about our firm.  They allege that our website is,

21   is — it is basically incorrect, that we are misleading.  You

22   know, in order to discuss it, I have to kind of discuss what

23   they have said about us, but this website is accurate.  They

24   attack the wording we use, and they include advertisements that

25   we have nothing to do with and no connection with, at all, to

1    conflate the argument and make it seem like we are misleading

2    our clients.

3            And this is why our reply really must be unsealed for

4    the public to read, in order to counter the negative press that

5    followed the filing of Cook's opposition brief; and

6    specifically, an article published by *Law360* picked up their

7    brief and sent an e-mail out that just repeated their false

8    assumptions, misrepresentations, and misleading statements

9    about our firm as if they were fact, sent it across the

10   country.

11           So Cook should not be allowed to hide our response

12   from public view just because during discovery they designated

13   every document that makes them look bad as company

14   confidential.  Plaintiff has a pending motion to unseal the

15   document that supports the assertions on our website, as well

16   as our other arguments in the reply.  It is important that the

17   Court unseal the entirety of Plaintiff's reply so the press and

18   the public can have access to both sides of the story.

19   Ultimately, this is a smoke screen.  It is designed to obscure

20   the lack of supporting case law in their opposition brief.

21           Their outrage — or stated outrage about our firm

22   website that says, "IVC filters have a tendency to cause

23   life-threatening problems," it goes straight to the heart of

24   the underlying issue in this case, much like an IVC filter is

25   capable of malfunctioning and going straight to the heart of a

patient, resulting in death.

These individuals, they are not inventory, as Cook has labeled them.  They are people.  Every one of our clients in Category 6, including this Plaintiff, still has a piece of metal in one of the most exposed and vulnerable areas of their body.

Cook sold these products as retrievable, and that was a huge selling point for them, but here is the problem.  You can't always take them out.  That is why many of our clients still have these filters in them because they are moving.  They have pierced the vena cava, tilted, embedded, or developed an occlusion.

The body recognizes these devices as a foreign object, similar to when you have, like, a splinter in your finger, and if you don't do anything to that splinter in your finger, the body is either going to build up tissues to push it out, or it is going to encapsulate it.  When these filters move out of place or perforate, the body works to cover up the top of the filter, much like what happens to a splinter that you haven't been able to remove from your finger.

Here, when these filters malfunction, it is no longer often a simple laparoscopic procedure to remove that filter, but you have to cut these people open, and it can become a complex surgery to remove it.  So as long as you have a malfunctioning vena cava filter inside your arterial system, in

the vena system, like our clients in Category 6 do, you are

subject to further injury or complex surgical removal.

This is because the vena cava itself is the main vein

that pumps blood up to the heart.  It is an extremely dynamic

area.  So it is constantly pumping. Immediately adjacent to it

and contiguous to it is the aorta, which is how the blood flows

back down into the lower body, and it is constantly pumping.

And in addition to that, the filter is sitting right

in the middle of the chest cavity, where the lungs are

constantly pumping.  So you have got all this motion going on

at all times, 24 hours a day, seven days a week, and in the

midst of that, you have got this wire with ten or 12 little

hooks in it sitting in a very tender area and perforating the

vena cava.

Now, as long as everything is pumping like that, it is

putting additional stress on the filter, making it more likely

to fracture or break off with a piece or the entire filter

moving through the body to the heart.  It is capable of further

perforation where one of those legs not only goes through the

interior surface of the vena cava, but it starts protruding

into an adjacent organ, such as the aorta or the back or the

spine.

So once you get this perforation, like our clients in

Category 6 and like Mr. Burrage, it may not be giving you

symptoms that you can objectively feel at the moment, but it is

1  an actual injury.  At any time it could continue perforating

2  on — uproot to the aorta as you bleed to death.  This is why

3  the FDA insisted on further study in their letters and warned

4  doctors that if a patient doesn't need this device anymore,

5  take it out.  It is retrievable.

6          The problem is, people aren't able to take it out

7  because it is not doing its job.  It didn't stay in place.  It

8  is poking into the liver, or the filter hook is embedded and

9  you can't use the fancy tools designed to grab the hook and

10  pull it out.

11          The only studies that Cook did before putting their

12  IVC filters on the market were retrievability studies.  These

13  filters were not studied for safety or efficacy.  There were no

14  studies that said a person with this device, their lives have

15  been saved more, the clots have been stopped and haven't gone

16  to the heart because of this device versus them just doing

17  nothing.

18          All Cook did were retrievability studies, and then, as

19  a subset, list the failure modes like an afterthought.  That is

20  why the FDA issued the safety notice letters referenced in

21  Plaintiff's reply and motion to unseal and insisted that Cook

22  —

23          MS. PIERSON:  Your Honor?

24          MS. DIVINE:  — participate in an aftermarket study —

25          MS. PIERSON:  I apologize for objecting, but there is

1    a pending motion to seal to which Cook has not yet had an

2    opportunity to respond, and it is not on the agenda today and

3    really not proper for argument here today.

4            In addition, the Plaintiff's version of the dangers of

5    filter and the science behind that, we have heard that before

6    in trial.  It is really not relevant to the question of whether

7    Mr. Burrage's case should be dismissed or not.  So we just ask

8    that we stick to the issue that is before the Court, the motion

9    to dismiss.

10           THE COURT:  Thank you.

11           MS. DIVINE:  Your Honor, this is in our reply to their

12   30-page opposition brief to our motion to dismiss.  We wanted

13   to save the Court from having to spend its resources on this

14   issue, and we attempted by filing two motions.  And Defendants

15   insisted on filing a 30-page brief making allegations that our

16   website is incorrect because it implies that these filters lead

17   to death.  I am simply responding to the allegations in

18   Defendants' opposition brief.

19           So every expert says that if you no longer need this

20   filter, take it out.  Every expert says that — well, for Cook

21   to label these injuries asymptomatic instead of classifying

22   them as injuries or the patient simply cannot feel a physical

23   injury at the time is disingenuous, and it is a coverup.  And

24   the bottom line is, Cook should have conducted full safety and

25   efficacy studies before they put these filters on the market.

1    Our firm has been investigating these devices since

2    well before our IVC website section was published on June 5,

3    2015, at exactly 5:58 p.m.  Mr. Nations himself has put in

4    thousands of common benefit hours in other IVC filter cases.

5    So not only does our website rely on the FDA safety notices and

6    other letters, as well as the document that is under seal, that

7    will be filed under seal, but it relies on our history with

8    actual patients who have had these worse case scenarios happen

9    to them.

10    Cook insinuates that the Nations Law Firm is

11    wrongfully accepting and filing these cases.  The real

12    malpractice would be for us to turn that client away or close

13    that case and tell the client, "You are fine.  Don't worry

14    about it.  Go away.  You have no injury."

15    But here in this particular procedural posture, it is

16    not the greatest use of the Court's time or our client's time

17    or anyone's time to come try a full bellwether case on, on a

18    situation that didn't develop into one of these more serious

19    injuries that accompanied these filters.  Plaintiff does have a

20    legitimate injury, regardless of the value that might

21    ultimately be assigned to it.

22    And I think if you know you have a piece of metal in

23    your bloodstream that at any time can break loose and go to

24    your heart, I think you would probably worry about that a

25    little.  In addition to the physical injury, it is a stressful

situation to be put in.  So Cook is trying to twist this negative value argument and insinuate that we are misleading our clients and somehow failing in our duty to inform them of the true value of their cases.

Although we acknowledge these particular cases that have not developed into a more serious injury, they are not high value cases, but they are still injuries.  And these people have a right to bring their claims.

Cook argues that because we are saying this case is negative value now, that all of our Category 6 cases must, therefore, be negative value.  But this is why you have mini trials.  Every single case should get to stand on its own liability, its own causation.  So dismissal en masse of these cases where the clients have fully complied with the Court's orders, and if provided objective evidence of their filter malfunction, is simply an absurd remedy.

Cook's unprofessional attacks on Plaintiffs and the Nations Law Firm are merely a distraction and deflection from the total lack of law and fact put forth in support of the positions they take in their opposition brief and improper alternative motion.

Plaintiff respectfully requests the Court grant his motion to dismiss and disregard Cook's alternative motion as improper because it violates Local Rule 7-1(a) that states:  "A motion must not be contained within a brief, response, or reply

1    to a previously filed motion, unless otherwise ordered by the

2    Court."

3                Thank you, Your Honor.

4                THE COURT:  All right.  Thank you, Ms. Divine.  Ms.

5    Pierson?

6                MS. PIERSON:  Thank you, Your Honor.  Your Honor, if

7    you don't mind, I will just stay seated, as well.

8                THE COURT:  Yes.

9                MS. PIERSON:  In part, because my eyes have gotten bad

10   enough, I —

11               THE COURT:  Is your microphone on?

12               MS. PIERSON:  It is.

13               THE COURT:  Okay.

14               MS. PIERSON:  — I can't see my papers if I am too far

15   away.

16               There, how is that?  Better?  Okay.

17               Thank you, Your Honor.  The Burrage case is one of

18   more than 2500 product-in-place/no-injury cases that are

19   included in this MDL.  The Plaintiffs call these cases negative

20   value cases, yet they refuse to dismiss them unless and until

21   the Court sets them for trial.  The *Formaldehyde* MDL court made

22   clear that this practice cannot stand.

23               When a Plaintiff files any court case, sitting back is

24   no option.  Courts must be exceedingly wary of mass litigation

25   in which plaintiffs are unwilling to move their cases to trial.

Any individual case may be selected as a bellwether, and no Plaintiff has the right to avoid the obligation to proceed with his own suit, if so selected.

Likewise, Your Honor, the *Duke* manual addresses this, as well, when discussing best practices in MDLs, and the manual notes there that although there may be good-faith reasons for settling or for voluntarily dismissing a test case, there are also instances in which the parties do so to manipulate the takeaways from the bellwether process.

Now, in Mr. Burrage's motion to dismiss, Your Honor, Counsel would have you believe that the question the motion presents is about how much it costs to try a bellwether case, but that is not what this is about. This motion is about a pattern and practice that began two years ago when the Court expressed its intent to try representative cases from a large portion of the MDL, the Category 5 and 6 cases.

As you may recall, the Court adopted that plan in October of 2018. The Court selected the bellwether pool in early 2019, a pool that included the Burrage case. In the spring and summer of last year, 2019, you may recall that we lost several months when we were litigating the question of the Plaintiffs' repeated refusal to waive *Lexecon* as to this bellwether pool. We spent the conferences in April, May, and June, when we could have been working up bellwether cases; instead, fighting about that issue.

1       And now, more than 19 months after this Court ordered

2   that it would try Category 5 and 6 cases as the next group of

3   bellwethers, the Nations Law Firm moved to dismiss two out of

4   three of the Court's bellwethers in Johnson and Burrage.

5       What that means, Your Honor, is that for about two

6   years of this MDL, we have spent our time talking about whether

7   the Plaintiffs have the right to waive *Lexecon*, and we have had

8   two cases chosen that were belatedly dismissed.  That is the

9   pattern, and it is a pattern that should not be rewarded

10  through the dismissal of the Burrage case, particularly a

11  dismissal without terms and consequences.

12      Your Honor, Cook objected to the motion to dismiss in

13  Burrage because we believe that it is a pattern that is aimed

14  at preventing the Court from executing its bellwether plan and

15  a practice that prevents the Court from addressing important

16  legal issues that affect not just the Burrage case but all of

17  the cases that fall within this group of more than 2500 cases.

18  And that setting that aside, it effectively prevents juries

19  from hearing those cases on their merits and deciding the

20  question of whether those cases have value.

21      And one thing that is clear, based on the argument

22  today, is that there is a disagreement, an absolute

23  disagreement between the parties about whether those cases have

24  value at all.  That is the stuff that bellwether trials are

25  made of.

1    The Court should refuse to let gamesmanship stand in

2 the way of the adjudication of issues dispositive of this very

3 significant portion of the MDL.  As I mentioned before, Your

4 Honor, this group of cases makes up about 40 percent of the MDL

5 currently.  To make progress in this MDL, real progress, Your

6 Honor, the Plaintiff should dismiss the

7 product-in-place/no-injury cases, which are Categories 1 to 6,

8 and if they will not, they should be prepared to try them, just

9 as the *Formaldehyde* court addressed.  That includes Burrage.

10    Cook submits that denying the motion to dismiss in

11 Burrage and trying it and other asymptomatic cases will enable

12 the Court to consider important issues to the entire MDL; and

13 during this time, Your Honor, when we can't currently be trying

14 cases for the next few months, we have the unique opportunity

15 to make real progress through two tracks, as I have mentioned

16 before, both preparing this group of cases for bellwether trial

17 and taking up important motions practice that affects larger

18 subsets of cases, including the Category 5 and 6.  Cook is

19 prepared to try the Burrage case in February of 2021, and we

20 ask the Court to deny the Plaintiff's motion to dismiss.

21    Now, the legal standard for a motion to dismiss and

22 whether to grant the motion to dismiss is well-known to this

23 Court. It is Rule 41(a)(2), and Seventh Circuit courts have

24 interpreted and applied that rule many times.  The rule

25 provides that the Court has discretion to refuse to dismiss a

1    case or to dismiss it on terms it considers fair, and the

2    Seventh Circuit made clear as early as 1969 in the *Pace* case,

3    that a Plaintiff is not entitled to a dismissal to avoid an

4    adverse ruling, a result.

5            In the *Bayer* case in 2007, which is noted in

6    our — excuse me, 2017, which is noted in our papers and is at

7    *846 F.3d 211*, the Seventh Circuit also noted that the Court has

8    wide latitude in matters of case management to achieve

9    efficiency, and as I have shown on the screen here, other

10   circuits agree.  Motions to voluntarily dismiss under Rule

11   41(a)(2) should be denied when a Plaintiff seeks to circumvent

12   an expected adverse ruling; and that is, Your Honor, we submit

13   what is happening here.

14           The parties agree in their moving papers on the legal

15   standard to be applied to the motion to dismiss.  It is the

16   standard of plain legal prejudice.  The parties agree that if

17   Cook would suffer plain legal prejudice as a result of the

18   dismissal, the Court should deny it.  And under Seventh Circuit

19   law, there are four elements to be considered in determining

20   whether there is plain legal prejudice.  I have listed those on

21   the screen, Your Honor.

22           The first is excessive delay and lack of diligence on

23   the part of the Plaintiff.  The second is the Defendants'

24   effort and expense.  The third is the Plaintiff's — the

25   sufficiency of the Plaintiff's explanation for the dismissal,

1   and the fourth is the pendency of dispositive motions.

2          Your Honor, it --

3          THE COURT:  I don't think they are moving to dismiss

4   to avoid an adverse result.  I think they are moving to dismiss

5   because it is not worth it to try.  As we have quoted Joe

6   Williams many times in this MDL, "Judge, we are not going to

7   spend $150,000 to stand up in front of a jury and ask for

8   25,000."

9          MS. PIERSON:  Yeah.

10         THE COURT:  I think that is -- you know, we have

11  discussed this and gone over it many times.  That is the

12  problem that we have with these cases, and that is the problem

13  that -- at least my very little understanding of settlement

14  discussions -- is that, that may be what is holding up a

15  resolution that these Category 5 and Category 6 cases may be

16  what is holding up the resolution, and I can understand that.

17        So that is what we have discussed previously about

18  maybe having some mini trials or some type of court trial here

19  to determine whether these are compensable injuries or

20  circumstances; and then, once we can determine that and have a

21  discussion about that, then, we may be able to move forward in

22  terms of moving these cases down the road, these Category 5 and

23  Category 6 cases down the road somehow or some way.  So they

24  are not moving to dismiss for an adverse -- to avoid an adverse

25  ruling, they are moving to dismiss because it is just not worth

1    it to try, and I understand that completely.

2              MS. PIERSON:  May I respond, Your Honor?

3              THE COURT:  Sure.  Yes.

4              MS. PIERSON:  I do want to address the cost issue

5    because the way the issue has been framed by the Plaintiffs,

6    they would have you believe that the cost issue should be

7    analyzed in a vacuum, as though this were one individual case

8    with one Plaintiff bearing the cost, and that is simply not

9    accurate.

10             THE COURT:  Oh, no, that is not the question.

11             MS. PIERSON:  I do want to address that in just a

12   moment, Your Honor.  On the first point that you made about is

13   this an effort to avoid an adverse ruling, I, I actually think

14   it is.  And if you would let me explain, Your Honor, you know,

15   the timeline for the dismissal of both the Johnson and Burrage

16   cases is pretty revealing, frankly.  I mean, we think these

17   cases tee up legal issues that Your Honor will be asked to rule

18   on that may cause those cases to be disposed of before we ever

19   get to a jury trial.

20             There are multiple legal issues that the cases present

21   that we will ask you to consider within the context of those

22   cases.  Your Honor could decide that these are issues that can

23   be decided as a matter of law.  Your Honor could decide that

24   there is insufficient facts to proceed to a jury.  Those are

25   all things that will happen first; and of course, the

1    Plaintiffs know we have been transparent about the fact that we
2    intend to tee those issues up.

3         I would like to show you a couple of things about the
4    pattern that we are seeing, Your Honor, and why we do believe
5    this is, in fact, an attempt to avoid adverse rulings.  But
6    also, even if it weren't that, the standard of plain legal
7    prejudice and the question of are there terms and conditions
8    for the dismissal?  Are the requests to dismiss denied?

9         That turns, in part, on whether the dismissal is
10   timely, and in an MDL where I hear in merely every status
11   conference that the MDL is taking too long, taking too long
12   from the Plaintiff, the delay in dismissing two out of three
13   bellwether cases is significant and does result in plain legal
14   prejudice.

15        Your Honor, I just want to show you the —

16        THE COURT:  These issues are not uncommon in MDLs.

17        MS. PIERSON:  It is not uncommon for bellwether trials
18   to get dismissed, Your Honor.  That is correct, but that
19   doesn't make it right.

20        THE COURT:  Oh, I, I agree with that.

21        MS. PIERSON:  It doesn't mean that there is not —

22        THE COURT:  It is just a function of how the MDLs are
23   set up, when you have different categories of injury, different
24   severities of injuries, if injuries, at all.

25        And as we have discussed, you want to put before a

jury representative cases of the entire MDL, and the
practicalities come in at some point in time on, on some of
these cases that may not have much value, if any.

What do you do with them in terms of, you know,
spending time and money on bringing them to trial?  And that is
from the Plaintiff view, and of course, I understand your
argument, as well.  It is very frustrating for you, as well.
You are looking for rulings from me as to some of these cases.
Are these injuries compensable?  Is it something that should
even go forward?  Are there enough facts to support even going
forward?

But I think we will get to those at some point in
time, but you know, you're frustrated.  Plaintiffs are
frustrated.  I am frustrated, as well, as terms of trying to
get this case, this whole MDL moving.  And of course, now, with
the COVID, it has become more difficult; but as you say,
hopefully we will be able to address some significant motion
practice while we are in a little down period here on terms of
courtroom activity.

MS. PIERSON:  Yeah.  And Mr. Bennett is going to
address the bellwether plan, and he has some potential
solutions for the Court to consider that I think allows us to
make that progress that we all very much want to achieve.  But
our objection isn't just about frustration.  I mean, to be
clear, we are frustrated, Judge.  We are frustrated at the loss

1    of a whole year, when we could have been picking another case

2    and working another case up and getting down the road on the

3    plan that you laid out in October of 2018.

4         It is also expensive, expensive to be doing the things

5    that we have to do, you know, behind the scenes and in front of

6    the scenes to work up Johnson, to work up Burrage, even when

7    they are dismissed at this stage.  There is a cost in terms of

8    time, and there is a real actual cost to Cook.  And then, you

9    know, I, I hear Counsel's concerns with respect to how it feels

10   to have your name in the press as though there were cases with

11   merit, 2500 cases with merit that we can't bring to the Court

12   on motion practice or to get before the jury.

13        So there is plenty of frustration to go around,

14   obviously.  That is really not, not the point.  We oppose the

15   motion to dismiss.  We ask the Court to deny it.  We also ask

16   the Court to award fees to Cook for the work that we have had

17   to do on Burrage up to this point, and as I mentioned, the

18   standard that this Court will go through, obviously, under the

19   Seventh Circuit authority as plain legal prejudice.

20        I would just like to talk a little bit, Judge, about

21   why there is this expense and the prejudice to Cook, if I

22   could.  The timeline that I have laid out in front of you, I

23   will go through that very quickly, Your Honor.  But as you

24   know, you adopted your plan in October of 2018.  You said,

25   then, very clearly to all the parties on this MDL, if you have

1   categorized as a Category 5 or 6 case, your case can be picked

2   for bellwether selection.  Mr. Burrage's case remained.  It

3   wasn't dismissed; and let me be clear, you know, we believe

4   that these cases should not be filed in the first place.  That

5   is the first fundamental disagreement between the parties.  If

6   a case does not have merit, we wholeheartedly support dismissal

7   of that.

8        So I, I want to be clear again.  We are not opposing

9   the fact that meritless cases are dismissed.  The opposition to

10  the motion to dismiss here is the delay and the fact that the

11  Nations Law Firm waited essentially two years from the time you

12  put them on notice that this case could be tried.  That delay

13  and time, we can't get that back, Your Honor.

14       When we argued about the bellwether pool, the PSC and

15  Cook about which cases should remain in the bellwether pool and

16  which cases should be stricken in August of 2019, there was a

17  question raised then about Mr. Burrage and his ability to

18  travel.  And you may not recall this, Your Honor, but the

19  discussion in the status conference was you told the PSC to

20  talk to the Nations Law Firm and to figure that issue out.  Was

21  he capable?  Could this case be tried, essentially, if it was

22  one that was picked as a bellwether?

23       And in response to your request, the PSC spoke with

24  the Nations Law Firm and then reported, as I have shown on the

25  screen here from the e-mail to Miss Doyle, that there is

1    nothing that we know of now that would prohibit a trial of this

2    case sometime in the future.  The extent of Mr. Burrage's

3    injuries, the fact that he was an asymptomatic case, that was

4    known in August of 2019 when the Plaintiffs represented to the

5    Court, "There is nothing that we know of now that would

6    prohibit a trial of his case sometime in the future."

7            The value of the case didn't change.  Mr. Burrage's

8    health didn't change.  That was a statement that they made to

9    you, and if at that time they had told this Court they were not

10   prepared to try the case a year ago, we could have picked a

11   different case.  We, we could have been spending the time on

12   that case.

13           Burrage was actually selected on August 21.  The case

14   wasn't dismissed.  On October 25 of 2019, CMO-27 was entered,

15   and it was actually set for trial.  It wasn't dismissed then.

16   Finally, a motion to dismiss was filed in June of 2020, just a

17   few weeks ago, and the clear picture of the plain legal

18   prejudice is this, that during that time we have been

19   investigating the case, working it up, preparing it since

20   May 23rd of 2019.

21           We have gathered and summarized medical records.  We

22   have negotiated multiple case management orders.  We have

23   communicated with fact witnesses.  We have had multiple

24   conferences about the case with Mr. Burrage's Counsel, and we

25   began preparing for fact witness depositions.

1       The third factor that the Court considers under

2   Seventh Circuit law is the sufficiency of the explanation for

3   the dismissal, and in the Plaintiff's moving papers, they offer

4   two explanations; that Mr. Burrage filed his case in the MDL

5   with the anticipation that it would be resolved without a

6   costly trial, and this is a negative value case.

7       Today I heard Mr. Burrage's Counsel say that he has

8   concerns about travel, and the reply notes that their concern

9   is related to COVID.  Of course, none of us will be having a

10  trial when there is a risk to someone's health related to

11  COVID, and to the extent that that is a concern, the solution

12  there would be to file a motion for continuance, not to remove

13  the case from the trial docket entirely.  That is really all I

14  have to say about that explanation.

15      The two explanations that are consistent in the moving

16  papers, though, Your Honor, are red herrings.  The first, that

17  the Plaintiff just never thought his case would be tried.  This

18  is a clear red herring; and in fact, it defies logic.  The

19  Plaintiffs demanded a trial by jury.  As an experienced trial

20  lawyer, practicing for more than 50 years, Mr. Nations knows

21  well that any case can be tried at any time.

22      The law firm's website boasts of the firm's extensive

23  experience in mass torts dating back for decades.  This is a

24  firm that knows that when a case is picked for bellwether, any

25  case, it can be tried.  They certainly knew that more than a

year ago.

Surely Mr. Nations advised Mr. Burrage that as part of his engagement as Mr. Burrage's attorney, his case could be tried.  If he didn't tell Mr. Burrage that, then, that is an issue between Mr. Burrage and his lawyer.  But we know that this argument is a red herring because Mr. Burrage and his Counsel demanded a trial by jury.

They sought to create an MDL, saying to the JPML that there would be six bellwether trials, and they twice filed motions asking to remand cases, including directly filed cases like this one, saying that if the cases were remanded, they could get to trial sooner.  The notion that Mr. Burrage and his counsel didn't believe the case would be tried, as I said, defies logic.

The second argument that Mr. Burrage is a negative value case, this goes to the cost issue that you raised just a moment ago, Your Honor.  This too is a red herring, and it makes clear that the sufficiency of the explanation, it is, it is not — the explanation is not sufficient, and there is plain legal prejudice.

They say that this case is a negative value case, but the value of this case has not changed.  It was the same when it was filed as it is today.  Nothing about the value of that case has changed since it walked in the door.

They always knew that this was an asymptomatic,

1  no-injury case.  The Plaintiffs knew that when they submitted
2  their case categorization form and in August of 2019, when they
3  affirmed to this Court that there was no reason that the
4  Burrage case could not be tried in the future, they affirmed it
5  again.

6       By the way, in August of 2019, by that time, we tried
7  both *Hill* and *Brand*.  So the costs of trial were well-known to
8  the Plaintiff a year ago when the case was picked.  We also
9  know, though, that this argument is a red herring because they
10  have offered the Court no evidence of that, no evidence of how
11  they would try Mr. Burrage's case or what the expenses would
12  be.

13       I mean, surely, they would not choose as many experts
14  or spend three weeks putting on their case in a case like
15  Mr. Burrage.  So when Mr. Williams or others throws around
16  figures of what it could cost to try the case, this Court
17  deserves more evidence than just an assertion of that.  There
18  has to be some plan and some evidence of the cost.

19       But as I mentioned earlier, all of these arguments
20  assume that you are evaluating the Burrage case in a vacuum, as
21  though it were an individual case when we talk about negative
22  value, their label for the cases.  And that, of course, is, is
23  not true.  The common benefit order says, at page 31, "In the
24  event that a case is selected as part of an approved bellwether
25  trial process in the MDL...the time and expenses in trying the

1    case (including work performed as part of the approved

2    bellwether process) may be considered common benefit work at

3    the discretion of the Plaintiff's Co-Lead Counsel."

4         This would be the third bellwether trial in this MDL

5    if the case were tried.  Of course, the costs will not be borne

6    by Mr. Burrage alone or even by Mr. Burrage's law firm alone.

7    You know, it, if I step back, Your Honor, and think about the

8    fact that, let's say it costs $250,000 to try the Burrage case,

9    which I can't imagine.  But if it did cost that, if there are

10   2500 cases, and we know there are that are in the same bucket

11   as Mr. Burrage, that is $10 a case.

12        They have the ability to cost share for bellwether

13   plans; and in fact, Your Honor's order, the common benefit

14   order suggests that is exactly what should happen so that cases

15   that have a quote, unquote, negative value may be tried for the

16   benefit of the parties in valuing all of the cases that are

17   similarly situated.  That is a bellwether trial.

18        We noted on page 20 of our response, Your Honor, that

19   the MDL commentators, whether you are looking at the *Manual for*

20   *Complex Litigation*, the *Duke* manual, or others, that they talk

21   about there is a pooling of resources that happens for

22   bellwether trials, and that is why you need a common benefit

23   fund.

24        So it, it is not an accurate perspective to suggest

25   that we need to look at Mr. Burrage and the value of his

1    alleged damages in comparison to the cost of trying a

2    bellwether.  That is why the common benefit fund was

3    established.  We mentioned in our papers, Your Honor, but even

4    if we didn't have the common benefit fund, when you are

5    analyzing the question of the sufficiency of the explanation,

6    the cost of the trial, it is also important that you look at

7    the law firm that filed the case.

8         Does trying Mr. Burrage's case, is there an ability to

9    share costs across the law firm's inventory, and does trying

10   that case tell us something about other cases within that law

11   firm's inventory?  And we submit that it does, and that is a

12   reason to deny the motion to dismiss.  The Nations Law Firm

13   holds the third largest inventory in this MDL with 304 cases,

14   Your Honor.

15        Mr. Nations sits on the Plaintiffs' steering

16   committee, as well.  Of his inventory of cases, 63 percent,

17   63 percent, 191 cases are product-in-place/no-injury cases,

18   just like Mr. Burrage.  We know that there is a sharing of

19   resources already, of course, too, with the cases that have

20   already been tried.  Experts have already been identified.

21   Reports have been given.  There is an ability to share costs

22   there, as well.

23        So when I mentioned earlier, Your Honor, that there

24   was no evidence that there is this number that keeps being

25   thrown out to try the case, that is the point, Your Honor,

between the pooling of resources and the ability to use
materials from other trials, and the effect that a ruling or a
trial of the Burrage case would have on other cases, the
sufficiency of the explanation by the Plaintiffs just doesn't
make sense.

We know that this is a pattern, this pattern of
dismissals, and as I mentioned earlier, the serial dismissals
by the Nations Law Firm, in particular, is troublesome.  The
second slide that I showed you, Your Honor, that talked about
gamesmanship and the bellwether plan, that is why we chose to
object to the dismissal of the Burrage because we believe that
is, in fact, what this is, an attempt to derail your plan and
an intentional one.

If I look back at your plan, Your Honor, you chose
McDermitt, Johnson, and Burrage as the bellwether cases.  In
the *McDermitt* case, the *McDermitt* case involved a product that
had been in place for more than ten years.  The Plaintiff's
lawyer had a choice to stipulate to either Indiana law, which
is a ten-year statute of repose, or Ohio law, which has no
statute of repose.  The Plaintiff's filter had been in place
for more than ten years.  They elected Indiana law.

In the *Johnson* case, it, too, was a Nations Law Firm
matter.  It was picked for bellwether as part of the bellwether
pool in May of 2019, and it was dismissed by the Nations Law
Firm more than a year later.  The Plaintiff suggests in their

1   moving papers that the dismissal was based on the application

2   of Indiana statute of repose, but the Plaintiff was from

3   California.

4          Even looking at other cases outside the bellwether

5   trial picks, we see the same pattern with this firm.  The *Dixon*

6   case was filed in March of 2017.  Three years later Cook filed

7   a motion for judgment on the pleadings that included *Dixon*.

8   After briefing the issue on the eve of a conference, the *Dixon*

9   case is dismissed.

10         It isn't an accident, Your Honor, that there are more

11   than 2500 product-in-place/no-injury cases in this MDL, and

12   there is not a sufficient excuse under the law for the Nations

13   Law Firm's belated delay in dismissing this case.  We submit

14   that Burrage is representative of the Category 5 and 6 cases,

15   and that the Court should try it unless the law firm is

16   prepared to dismiss all of its Category 6 cases.

17         You have to, Your Honor, in this process, step back

18   and ask yourself if these cases are not worth the cost of

19   trial, if the value of the case on the Plaintiff's very best

20   day is exceeded by the cost of taking that case to trial, was

21   the Plaintiff counseled as to that before the case was filed?

22   I, I think there is an ethical obligation to disclose that to a

23   Plaintiff before filing the lawsuit in the first place, but

24   that is not my role to judge that.

25         What I know is that these cases were filed, and that

1    once a case is filed and picked as a bellwether trial, you

2    either need to be prepared to try it or dismiss it and dismiss

3    it promptly.  The source of these 25 —

4         THE COURT:  You know, and I agree with what you are

5    saying, that if you file a lawsuit, you need to be prepared to

6    try it.  But the practicalities of the personal injury law

7    practice is not that, that the, the business of personal injury

8    law firms — and it is a business — is to file cases and not

9    try them.  Personal injury lawyers tell me all the time,

10   "Judge, if I am in your courtroom, I am losing money."  And it

11   is to move the case, move it, move it, move it, and open the

12   next one.  Move it, open the next one; move it, open the next

13   one; move it.

14        I agree with what you are saying.  If you file a case,

15   you need to be prepared to try it.  I have told lawyers that

16   many, many times.  Don't file it unless you are willing to come

17   in and present it to a judge or a jury, but that is not the

18   practicalities of it.  And that is what is happening here, and

19   not just this MDL, but all of them is that these cases are

20   filed.  They are not screened very well.  They are not vetted

21   very well, and they end up in the MDL.  And then, they have to

22   be sorted out afterwards, after they come into the MDL, and

23   that is kind of what we are doing now.

24        I don't think the Nations Law Firm has any intention

25   whatsoever of trying any of these product-in-place cases.  I

1    may be speaking out of turn here, but I would be surprised if
2    they had any intention of doing that.  So those are the
3    practicalities here, and that is what I, I am trying to be
4    practical here and trying to please everybody as much as I can
5    and trying to get these cases either dismissed or resolved.
6        You are correct, Ms. Pierson, in your, in your
7    statement, that we have an obligation to inform our clients
8    that, look, if I file this case, we are going to be required to
9    try it at some point in time unless we settle it.  And if we
10   don't settle it, then, we either have to dismiss it or go to
11   trial.
12       MS. PIERSON:  Just because this is what happens, you
13   know, this practice results in a third or more of this MDL or
14   every other MDL across the country being filled with cases that
15   will never be tried, that we know will never be tried.  That
16   doesn't mean that, that Cook and this Court shouldn't try to do
17   something about that.
18       THE COURT:  Well, we are trying to do something about
19   it.  I mean, it is just a function of the process here of TV
20   advertising and MDLs.  They just come in and come in and come
21   in.  I have no doubt in this MDL that as a result of TV
22   advertising in the practicalities of the practice, again, that
23   as a result of TV advertising, call this 1-800 number.  The
24   number is called, they talk to a, a — what is an assistant
25   lawyer?

1          MS. PIERSON:  A paralegal.

2          THE COURT:  They talk to a paralegal.  A paralegal

3     signs them up.  Many times the lawyer hasn't even talked to

4     them.  As a matter of fact, I think I have seen that in this

5     MDL.  Oh, Judge, I haven't even talked to my client yet about

6     it.  And so that is what happens, and then it goes on and on

7     and on and on, and I have talked to many judges about this same

8     situation.  And so again, that is the practicalities of the

9     MDL.  You have to get through it.

10          MS. PIERSON:  There are ways to address it, though,

11     Your Honor.

12          THE COURT:  Right.

13          MS. PIERSON:  We saw this in NexGen, when Judge

14     Pallmeyer ordered the *Lone Pine* order.  That is one way to

15     address it.

16          THE COURT:  We talked about that, yeah.

17          MS. PIERSON:  These practicalities that you describe

18     from my side of the aisle, frankly, are pretty disheartening

19     about the state of the profession and where we are today.

20          THE COURT:  It may be disheartening, but it is what it

21     is, right?

22          MS. PIERSON:  It is, Your Honor.

23          THE COURT:  Yes.  I mean, that is just —

24          MS. PIERSON:  You are exactly right.

25          THE COURT:  — the way it is.  Some old-timer lawyers

1    hate lawyer advertising.  They think it should never have
2    happened, but too bad.  It, it is what it is.
3         MS. PIERSON:  If the Plaintiffs are not prepared to
4    dismiss this group of cases, as they have just done with
5    Burrage, then, we submit that the way to move those cases, to
6    move them to take action on the cases is to set them for trial.
7    That is the way our bellwether plan proposes and what Your
8    Honor tried to do; and again, Steve is going to talk in a
9    minute about how to make that plan effective.
10        And I am not opposed to the notion that a meritless
11   case should be dismissed.  What I am opposed to is a notion
12   that it ought to be dismissed two years after you gave a very
13   clear signal, Your Honor, to all the Plaintiffs' lawyers that
14   you intended to try cases if they weren't dismissed.
15        THE COURT:  I hope you don't think I am happy about
16   that.
17        MS. PIERSON:  I understand.  There is another step in
18   this practicality that causes us to ask you to award costs with
19   this motion to dismiss if you, if you decide to grant it, Your
20   Honor, or to give us the other step of relief, which we have
21   asked for, is that Cook have the ability to choose the case to
22   replace the Burrage case.  And the practicalities, as long as
23   we are talking about them, are these:  When we dig into this
24   pool of 2500 cases, there are some common themes in addition to
25   the fact that the Plaintiff is asymptomatic.

43

1     The common theme with many, many of these Plaintiffs

2     is, the Plaintiff is asymptomatic.  They have had an image that

3     shows that there is nothing wrong with their filter.  They hire

4     a lawyer.  I have got three examples from the Nations Law Firm,

5     but there are others with other firms.  I am not saying this is

6     unique to them, and there is a particular doctor or doctors,

7     chiropractor or an internist who prescribes a rereading of the

8     CT scan.

9     And all of a sudden the Plaintiff goes from no

10    perforation to four legs have perforated or from 1 millimeter

11    to significant tilt and perforation.  And then the case

12    languishes for two or three years and is not dismissed even

13    though there is no intention to try it.

14    In the meantime, we spent resources doing defense fact

15    sheets, categorizing cases, doing the census, reporting that to

16    the Court, investigating the cases, following up on the cases.

17    There is a cost to the park-and-ride strategy that we see here,

18    and in my experience in other MDLs and based on, you know, the

19    ones that I have shown you here today, the only way to prevent

20    that, Your Honor, is to make them try those cases or dismiss

21    them.

22    I will just say one last thing on this point, Your

23    Honor.

24    MS. DIVINE:  I am sorry, but before you move on, can

25    you give me those names of the people you just flashed up in

1  front of the Court?

2      MS. PIERSON:  Sure, Linda Becker.  Happy to go through

3  these.  Linda Becker.  Her filter was placed in 2010.

4      MS. DIVINE:  Do you have her case number?

5      MS. PIERSON:  I don't, but you have got it, I am sure,

6  right?

7      MS. DIVINE:  Well, actually, it doesn't show up in my

8  records as a case we have actively on file.

9      MS. PIERSON:  Happy to talk to you about it

10  afterwards.

11      MS. DIVINE:  I brought a list of the cases.  Who is

12  next?

13      MS. PIERSON:  Linda Becker.

14      MS. DIVINE:  Yeah.

15      MS. PIERSON:  Filter is in vivo for eight years.  The

16  complaint is filed in February of 2018.  There is a CT scan

17  that is taken before the complaint is filed.

18      MS. DIVINE:  I just need the names.

19      MS. PIERSON:  There is no —

20      MS. DIVINE:  I mean, you were just about to flip

21  through those names, and you have left this up on the screen.

22  You have left this up on the screen for everyone to look at,

23  and you didn't speak about it.  Then, you flipped through some

24  names, and you have been referring to —

25      MS. PIERSON:  Your Honor?

1          MS. DIVINE:  — clients we have, and I just would like

2     to have their names so I can look them up.

3          THE COURT:  Okay.  She will get those to Ms. Divine

4     after our hearing here.

5          MS. PIERSON:  I would be happy to.  I would be happy

6     to.

7          So Your Honor, as I started to say just a moment ago,

8     it is our view that the Burrage case should be tried.

9     Mr. Nations filed it and has no sufficient explanation for

10    dismissing it.  If the Court disagrees with us and intends to

11    grant the motion to dismiss, we would ask that the order

12    provide costs, and we have prepared an order that we can submit

13    that outlines how we would submit our records in camera for

14    review, of course.

15          We would ask that the Court award fees and costs that

16    are associated with the workup of the Burrage case.  We have

17    also asked that Cook be permitted to choose the case that

18    replaces Burrage because as we talk about these practicalities,

19    Your Honor, if the Plaintiffs know that a belated dismissal

20    will result in a trial of a case of Cook's choosing, I

21    guarantee you the serial dismissals will stop.

22          I listened today, Your Honor, to an attack on Cook, an

23    attack on filters, and the Plaintiff's view of how filters

24    don't work the way they are intended to work.  I don't intend

25    to respond to that because that is a matter that we have tried

1  and won in *Hill* and that we tried extensively in *Brand*.  That
2  is a matter for you to decide on summary judgment and a matter
3  for juries to decide.  What we would ask is for the opportunity
4  to try that issue in this case in other Category 6 cases to you
5  and to a jury.  Thank you, Your Honor.
6           THE COURT:  Thank you, Ms. Pierson.  Ms. Divine,
7  any --
8           MS. DIVINE:  Oh, I have quite a lot to respond to, and
9  I am trying to debate the order to go in, but I just have to
10 address this accusation that, this park-and-ride notion.  We
11 take these cases, yes.  We take the smaller cases because we
12 believe these people do have an injury, and they have a right
13 to, to seek redress for a filter that is malfunctioned, a
14 filter they have been told is retrievable and now is not.
15          The first name she flashed up, Linda Becker, I don't
16 have here.  But if we -- if we find that there is a mistake, we
17 find that that filter is perfect and there is nothing wrong, we
18 dismiss that case.
19          Even, you know, if, if, if we find there is a statute
20 of limitations issue, we dismiss that case.  We did that in the
21 motion for judgment on the pleadings, and that was a co-written
22 brief because I was in the middle of drafting this one.  So I
23 relied on -- it was two different firms, and we had two of
24 them.  But we found, in that case, one of our clients that they
25 wanted to dismiss on the pleadings on a simple categorization

form.  It was actually, she was a Category 4 and 5.

She had — we just didn't have all the records when we filled out that form.  Those forms — to rely on those forms in this kind of situation is very unfair.  They — she had awful injuries, but when we looked into the detail of when she might have learned about the injury in response to this, and we saw that it was prior to the statute of limitations of that case, and that is why we dismissed, not because we agreed there was no injury but because we saw that there was a statute of limitations problem that we didn't know because we didn't have those actual records when we filed that categorization form.

I have all of our Category 6 cases.  We have reviewed them all, and if, if we find someone that, that is not — we don't believe is an actual injury, we don't keep it.  We, we carefully reviewed these cases.  I know you mentioned — and first of all —

THE COURT:  Well, the concern here, and don't get me wrong.  Certainly, everyone has a right to be represented in court and have their cases prosecuted.  My concern here is what is compensable and what is not?  What is a jury going to be awarding, if anything, to some of these cases?  And that is what I want to get answered.

MS. DIVINE:  So do we.

THE COURT:  I am sure you do, and I, I know defense wants that too.  So that is my focus now on trying to get that

1  done, and I am trying to figure out.  We have discussed *Lone*
2  *Pine* style proceedings and —

3       MS. DIVINE:  I asked Mr. Nations what that was when I
4  saw, like, a reference to it.  He was, like, I haven't seen
5  that used since — maybe it was brought up back in 2003.  That,
6  you know, I didn't know what it was.

7       THE COURT:  It is an old state court case.

8       MS. DIVINE:  You know, they referenced also earlier
9  this *Duke* manual.  I think that is where it came up or in their
10  quote on the *Duke* manual, which also, when I went to look for
11  that reference was, I believe the citation was tied to class
12  actions and not MDLs, the specific cite they did.  And if you
13  don't mind —

14      THE COURT:  It is *Lone Pine* style proceeding is what I
15  am trying to get at, okay?

16      MS. DIVINE:  Thank you.  Thank you, Your Honor.  I
17  mean, is it okay if I just go through the points in response to
18  —

19      THE COURT:  Briefly.

20      MS. DIVINE:  Yeah, okay.

21      So in, in the *Formaldehyde* case, all that case was,
22  was a Plaintiff trying to dismiss his case without prejudice.
23  It might — my reply, you know, discusses it.  It was dictum.
24  At first glance it seems, like, applicable, but the quote that
25  they are citing is dictum.  It can be distinguished because of

1   the facts of that particular situation; but regardless, there

2   was an issue there, a policy concern that the court based their

3   ruling on, that he would be able to turn around and file

4   another case and ride the coattails.  That is not the case

5   here.  We are not seeking the dismissal without prejudice.  So

6   you can refer to our reply for that.

7        Number 2, as far as the costs, this — yes, we have

8   expended costs.  We, we were planning to try these cases.  The

9   insinuation — first of all, that he never thought his case

10  would be tried, that is unfair.  And we were prepared to do

11  this.  We can't — our Plaintiff made this decision, and as far

12  as the costs, the, the cases they cite are not even for this

13  type of dismissal.  The only one case they cite in support of

14  costs in a situation like this was a 1983 discrimination case.

15  They cite three other very distinguishable cases that have

16  nothing to do with the facts here.

17       Also, they want to talk about a pattern of

18  gamesmanship?  First of all, we haven't — our firm hasn't been

19  as involved in the day-to-day of this MDL so I am going to

20  defer to the Plaintiffs' committee for some of this discussion

21  about the, the fund and everything.  But, you know, this

22  pattern isn't the way they are describing it.

23       The *McDermitt* case, we were completely ready to try

24  that, and our firm worked with them on that.  Our firm has

25  worked on the other cases behind the scenes doing background

1    work on *Brand*, on, on, on the one that was done in — I am

2    forgetting the name.  But we have worked on these cases in the

3    background.  The *McDermitt* case, if anyone —

4          THE COURT:  I have heard enough on all of this.

5          MS. DIVINE:  Okay.  Let me just quickly —

6          THE COURT:  Ms. Divine, I have heard enough on this.

7          MS. DIVINE:  On everything?

8          THE COURT:  A motion to dismiss is granted.

9          MS. DIVINE:  Thank you, Your Honor.

10         THE COURT:  Next item.

11         MR. WILLIAMS:  We were hoping, Your Honor —

12         THE COURT:  I will take the costs and other fees under

13   advisement.

14         MR. WILLIAMS:  We were hoping, Your Honor, to address

15   the individual motions of the gentlemen in the back.

16         THE COURT:  Yes.  Yes.  Thank you.  Safe travels, Ms.

17   Divine.

18         MS. DIVINE:  Thank you, Your Honor.

19         (Attorney Divine leaves the courtroom.)

20         MS. PIERSON:  Your Honor, there are two — sorry.

21   Your Honor, there are two individual motions.  The first one on

22   the agenda is a motion for summary judgment based on statute of

23   limitations as to cases where there is an open procedure.  The

24   second one is an omnibus motion for summary judgment that

25   Ms. Cox intended to address.  Just knowing that the second one

1   is quick and the first one was a little longer, I suggest that

2   we take the second one first if people have travel issues.

3            THE COURT:  Doesn't matter to me.

4            MR. MARTIN:  I think Tom, here, is the one who has got

5   a —

6            MR. SIMS:  I am okay, Your Honor.  I am fine, whatever

7   works.  I didn't actually follow that, though, I am sorry.  He

8   said there are two sets of motions.

9            MS. PIERSON:  Yes, yes.

10           MR. SIMS:  There is the Giddens and the Denton

11  Plaintiffs, right?

12           MS. PIERSON:  Giddens and Denton.  That is first on

13  the agenda, and that is the open procedure, statute of

14  limitations.  The second one is the omnibus motion,

15  Bishop-Jones, and Miss Gallagher is on the phone for that,

16  Ms. Gallagher and Ms. Cox.

17           MR. SIMS:  Well, I would rather since we are here,

18  Your Honor, if it is okay with you, that we address the motion

19  with Counsel in chambers first and then turn to the telephone

20  motion, if that is okay with Defense Counsel.

21           THE COURT:  Address it in chambers?

22           MR. SIMS:  I am sorry, not in chambers but here in

23  court since we are both present, Your Honor.  My apologies.

24           THE COURT:  All right.  Okay.

25           THE COURT REPORTER:  I'm sorry, could counsel identify

1   themselves?

2           MR. SIMS:  Yes, ma'am.  Thomas Sims for the Plaintiff,

3   Brian Giddens.

4           MR. CORRIGAN:  Jim Corrigan for Plaintiff Denton.

5           MS. PIERSON:  I would agree to in chambers if it is

6   cooler.

7           THE COURT:  Believe me, it is much cooler.

8           MS. PIERSON:  Is it?  Too much?

9           THE COURT:  Too much.

10          MS. PIERSON:  I asked Tina if the HVAC came with a

11  warranty.  It seems to me you guys are entitled to your money

12  back based on the last year.

13          THE COURT:  I think the warranty is expired.

14          MS. PIERSON:  Your Honor, if we start with the open

15  procedure statute of limitations motion, it is certainly

16  shorter than Burrage, but it is a little meatier.  So okay to

17  proceed?

18          THE COURT:  That is good.  Fine.

19          MS. PIERSON:  Thank you, Your Honor.  The background

20  to this motion, Defendants' omnibus motion for summary judgment

21  based on statute of limitations is that —

22          THE COURT:  Is this Docket No. 11921?

23          MS. PIERSON:  It is, Your Honor.

24          THE COURT:  All right.

25          MS. PIERSON:  That is correct.  So the background is

1    that when Cook originally filed this motion, it addressed 26

2    cases.  Those were all cases where the Plaintiff had an open

3    procedure, and the essence of the argument was that if you

4    assumed the latest possible event for the Plaintiff, the

5    open-procedure surgery itself, if you view that as the accrual

6    of the statute of limitations, then, all of these cases are

7    barred.

8          And we have argued this issue before, Your Honor, on

9    the *Graham* case and others, what, what triggers the accrual of

10    the statute of limitations?  Our argument is, even if you take

11    the most generous approach and say, well, we will say that the

12    Plaintiff didn't know until they actually had their surgery to

13    remove the filter, that even using that very generous view, the

14    cases were barred.

15          We sent to the Court Exhibit A, which is a table of

16    the 11 cases that are ripe for ruling for Your Honor.  We have

17    asked to argue the Giddens and the Denton matters because their

18    responses are representative of the responses that were filed

19    by the other Plaintiffs in this group of 11.  So the 11

20    Plaintiffs that are on Exhibit A are the ones whose cases we

21    are asking you to rule on, and we have also given to Ms. Doyle

22    a proposed order that lays this out since it is a little bit

23    confusing because the motion originally addressed more cases.

24          This group of cases is ripe for ruling because the

25    Court already has ruled that Indiana law applies to these

1   cases, Indiana's choice—of—law rules on statute of limitations.

2   They are cases that were filed before May 31, 2017, or after

3   June 13, 2019.   There were two cases subject to the motion that

4   were withdrawn in Cook's reply, and as we have laid out in the

5   proposed order, there is no need for the Court to rule on those

6   two; and then, there is another group of 13 cases that, for

7   now, we just ask the Court to hold.   We will take those up at a

8   separate status conference.   The common theme for these 11 is

9   Indiana law applies to all of these cases, and they have all

10  had open procedures.

11          Exhibit A lists the date of the open removal and the

12  date that the complaint was filed.   Four of the 11 didn't

13  bother to respond to the motion, and we have noted that in

14  Exhibit A, as well.

15          So I, I don't intend to reargue the choice—of—law

16  issue, Your Honor, since we have argued that issue at three

17  different hearings in the past.   Your Honor has ruled that

18  Indiana's choice of law applies to cases that were filed in

19  that time frame.   I am happy to give you the authority for that

20  again, but we have included it in our papers, and we stand on

21  those.

22          What I want to focus on is why these Plaintiffs'

23  claims are time—barred, and Giddens and Denton are two good

24  examples from this group of 11.   The Plaintiffs' tort claims

25  and their implied warrant claims are time—barred under

1    Indiana's two-year statute of limitations because both

2    Plaintiffs had an open-removal surgery that occurred more than

3    two years before filing.  Actually, Giddens and Denton filed

4    their cases four years after their open procedures, as you can

5    see on Exhibit A.

6         Indiana has a two-year statute of limitations.  We

7    know from the Indiana case law interpreting that, that it

8    applies to tort claims and to implied warranty claims in

9    personal injury actions because they are treated as product

10   liability claims under Indiana law, and just one example of

11   that can be found in the *B & B Paint Corporation* case, which

12   was an Indiana Court of Appeals case in 1991, which is cited in

13   our papers.  Indiana statute doesn't define accrual, and

14   Indiana applies a limited discovery rule to determine when the

15   statute of limitations began or accrued.

16        Under Indiana case law, a claim begins to accrue when

17   a Plaintiff knows or should have known she suffered an injury

18   and it was related to a product or an act of another.  And you

19   have articulated that in your own orders, Your Honor.  So you

20   can find it in *Graham* and many others that you have entered in

21   this MDL and outside the MDL.

22        The test for whether Plaintiff knew or should have

23   known is an objective one, and Indiana courts ask whether a

24   reasonable person in the Plaintiff's position possessing the

25   information Plaintiff did, could have discovered through the

1    exercise of ordinary diligence that the product caused her

2    harm.   That comes from the *Horn* case, the Seventh Circuit in

3    1995.

4            So here, the claims of Plaintiffs Giddens and Denton

5    accrued at a minimum when the Plaintiff had the actual

6    open-removal procedure.   Now, we could argue about when they

7    were told that their filter had perforated or fractured or

8    whatever the event was that necessitated the open procedure.

9    We could argue about whether that is an accrual, but for

10   purposes of this motion, we will take what we think is the

11   latest possible date, the actual procedure itself.

12           This court and multiple other courts have already held

13   that the diagnosis or discovery of an injury, even just on

14   imaging, can trigger the statute of limitations.   In the *Graham*

15   case, you ruled, Your Honor, that at a minimum, the retrieval

16   procedure to remove the filter caused the statue of limitations

17   to accrue.   That, that order is already on the books.

18           The barred IVC filter court also has ruled, as we

19   noted in our papers, that a percutaneous procedure to retrieve

20   a filter causes the statute of limitations to accrue.   Now, the

21   bottom line is if the patient is having the filter taken out,

22   whether it is percutaneously or through an open procedure,

23   logically, that is the last point in time at which the statute

24   of limitations can accrue.   It is being removed for a reason.

25           Numerous MDL and other federal courts have held — not

1    unique to IVC filters — that the removal of a device, that
2    that triggers the statute of limitations, and the *Mirena IUD*
3    case, the *Truitt* case, which is noted in our papers, the Court
4    analyzed the statute of limitations under both Indiana and
5    Texas law.  And it held there that the removal of the IUD in
6    the Plaintiff was the accrual of the statute of limitations,
7    and the Plaintiff's case was time-barred, and summary judgment
8    was appropriate.

9         The Court noted that the statute of limitations was
10   triggered, quote, at the latest, when the Plaintiff learned
11   that the Mirena IUD perforated her uterus and would have to be
12   removed.  There, that language is, when she is told that,
13   setting aside the fact that she later had a procedure to remove
14   it.

15        We noted the *Cossman* case also in our papers, which
16   involved the Dalkon Shield, the California Court of Appeals,
17   applying Indiana law, held that the statute — I am sorry, it
18   wasn't the Dalkon Shield case.  It was an asbestos case
19   applying the Indiana law.  The California Court of Appeals held
20   that the statute was triggered when the Plaintiff was diagnosed
21   with mesothelioma, even though doctors couldn't figure out
22   where she had contracted the disease.  So diagnosis or
23   procedure, imaging, those things can all trigger the statute of
24   limitations.

25        The *Mirena* court, as I mentioned earlier, found that

1    when surgery was required to remove a device, quote, a diligent
2    individual would know, at the very least, that there was a
3    reasonable possibility that the IUD harmed her and that she,
4    therefore, should make further inquiry to determine her legal
5    rights, end quote.

6          The *Neuhauser* case is the Dalkon Shield case where the
7    court reached the same conclusion, that when the IUD was
8    removed, the statute of limitations was triggered, and it
9    wasn't triggered at some later time when she saw an
10   advertisement about the possibility of a legal claim.

11         There is also an older Indiana Court of Appeals case
12   that actually established this concept back in 1983, the
13   *Wojcik*, W-O-J-C-I-K case from the Indiana Court of Appeals in
14   1983.  It is cited in our papers, notes that product liability
15   claims accrued because when the device was removed, because it
16   would have broken at some time before the removal.  So this is
17   a long held principle in this court and in many other courts.

18         These two particular Plaintiffs, Giddens and Denton,
19   and the others who responded to it, say that the open procedure
20   did not trigger the statute of limitations because they didn't
21   learn until later that their filter was defective.  But that is
22   not the standard under Indiana law.

23         Indiana courts have specifically rejected that
24   argument that the Plaintiff needs to know the knowledge of the
25   defect, and we have cited a long list of cases in the footnote,

in Footnote 6 of our reply brief that are directly on point.
This is a commonly held principle, and it is noted in your
*Graham* opinion too, I believe.  An open-removal surgery is the
kind of objective marker required by Indiana law because the
purpose of the surgery is to remove a filter that poses a risk
to the patient.

The injury, logically, cannot accrue after the removal
has already occurred.  In the *Graham* case, the Court noted that
the injuries described in her complaint were known to her
immediately after the September 9 percutaneous surgery.
Similarly, the barred MDL in applying the Nebraska statute of
limitations found that the Plaintiff did not need to know the
exact source or cause of the problem to trigger the statute of
limitations.  The law on this point is quite clear, Your Honor,
under Indiana law.

Plaintiff's nontort claims, though, also fail, as we
note in our papers.  Their claim for a breach of express
warranty fails, as this Court ruled in 2017, because the master
complaint does not sustain the elements of an expressed
warranty claim on its own, and there are no allegations of the
existence of an express warranty.  The fact is, I am not even
sure why that is still in the master complaint.  There is no
express warranty that goes with these products.

This Court has already ruled that the allegations are
insufficient to sustain it; and in fact, most of the Plaintiffs

who respond to this motion concede that point.  The consumer
fraud claim also fails because it is not pled with
particularity, the particularity required by Rule 9(b).
Federal law requires claims sounding in fraud to be pled with
particularity, the who, what, where, when, why, how of the
alleged fraud.

And Judge Barker in the *Bridgestone/Firestone*
litigation gives us just one example where the Southern
District of Indiana Court dismissed claims sounding in fraud
from multiple states because of the failure to plead individual
reliance, and that is absent from either the master complaint
or the short-form complaint.

Footnote 14 of our brief, our opening brief, cites
various examples of many, many federal courts who have reached
the same conclusion.  And as I said, Your Honor has already
reached that conclusion when addressing these same allegations
in connection with the *Graham* case.

So that leaves Plaintiffs' loss of consortium and
punitive damages claims, and those are derivative and fail with
their other claims because they can't stand on their own, of
course.  So in response to the motion for summary judgment, the
Plaintiffs make, essentially, five arguments to try to get out
of the fact that their claims are time-barred, for lack of a
better way to say it, and the claims are these:

First, that Cook's use of the categorization forms as

61

1   evidence is improper, and just to be clear, this is a motion

2   for summary judgment, a Rule 56 motion.  Of course, we are

3   entitled to rely on things outside the pleadings, and that

4   includes the medical records that are attached to the Case

5   Categorization Forms.

6         Fundamentally though, Judge, there -- the purpose of

7   relying on those is to establish the date of the Plaintiff's

8   open procedure, and there is no dispute about the date of the

9   Plaintiff's open procedure in any of these cases.  There was

10  one case subject to the motion where there was a dispute, and

11  we withdrew it.

12        So there is -- and these two Plaintiffs' responses and

13  the others, there is no ambiguity about the date on which the

14  open procedure occurred; but importantly, Your Honor, you have

15  already rejected this argument that the Case Categorization

16  Forms and the medical records that they certify can't be used

17  in connection with the motion for summary judgment or motion to

18  dismiss.

19        You rejected that argument when you ruled on the

20  Category 1 cases and dismissed those.  You rejected that

21  argument when you granted summary judgment on Category 2 cases,

22  and you rejected the argument in denying the Plaintiffs' motion

23  to strike our omnibus motion for summary judgment at the docket

24  at 11502.

25        At the end of the day, in any event, the

62

1    categorization forms are an extension of the pleadings, and

2    they are a judicial admission.  And the Seventh Circuit has

3    made clear that in a situation like this where you have

4    certified records attached to this form, that that can fall

5    within the definition of a judicial admission, and we believe

6    it does here.

7         I remember when, when we argued this issue way back on

8    the Category 2 cases, and you made the point from the bench,

9    Your Honor.  The dates are what they are, and that is really

10   very true for this group of cases.  The dates of the open

11   procedure are what they are.

12        So the second argument the Plaintiffs make is that

13   Cook's motion is premature or untimely, and there is really no

14   basis in the federal rules or law to make that argument.  In

15   fact, Defendants are encouraged to file their motions for

16   summary judgment as soon as possible here where we see that the

17   cases are time-barred.  It is in everyone's interest that we

18   move quickly on those cases; and of course, that is why we teed

19   this issue up with you now.

20        The third argument that the Plaintiffs make is that

21   the Indiana discovery rule delays accrual of the claim until

22   the Plaintiff learns of the defect, and I think I mentioned

23   earlier, that is just inconsistent with Indiana law.  The

24   *Degussa* case cited in our papers at *744 N.E.2d at 410* says,

25   that the claim begins to accrue when injury is caused by the

1    product or act of another.  There is no requirement of

2    discovery of the defect, and the Plaintiffs can't conflate

3    discovery of the injury or discovery of the defect with

4    knowledge of the legal theory to vindicate their claims.

5          The standard is what it is.  It doesn't take knowledge

6    of the defect, and many, many Indiana courts have expressly

7    rejected that idea.  That is the *Perryman* case, the *Frey* case,

8    and a variety of others, and *Graham*, of course.

9          The fourth argument that the Plaintiffs make is that

10   the discovery rule delays accrual until the discovery of the

11   identity of the manufacturer.  In fact, the Giddens Plaintiff

12   submits an affidavit saying, I didn't know the product was

13   defective until later, and I didn't know the identity of Cook.

14   Again, that is inconsistent with Indiana's standard.  Indiana

15   law does not require knowledge of the manufacturer of the

16   product.  It requires that the Plaintiff knew or should have

17   known of the existence of an injury related to a product or an

18   act of another.  It is pretty simple.

19         So the last argument that the Plaintiffs make to

20   attempt to save their cases is fraudulent concealment, and they

21   say that fraudulent concealment and equitable tolling saved

22   their claims, but the Court has already ruled on this issue, as

23   well.  You ruled on that issue in both the *McDermitt* case and

24   the *Graham* case, and I just want to go to a section from your

25   orders on those.

1          In the *Graham* order on summary judgment, Your Honor,
2     which is Docket 5575 at pages 6 to 7.  Within that order, you
3     say that to toll the statute of limitations based on fraudulent
4     concealment, a Plaintiff must allege the use of fraudulent
5     means by the Defendants, successful concealment from the
6     Plaintiff, and that the Plaintiff did not know or by the
7     exercise of due diligence could not have known that she might
8     have a cause of action.  Stated differently, a Defendant must
9     do something of an affirmative nature designed to prevent and
10    which does prevent discovery of the cause of action.
11         And then, when you applied that standard to *Graham*,
12    you said *Graham* does not allege any affirmative conduct by the
13    Cook Defendants that was designed to prevent and did prevent
14    her from discovering her cause of action.  That is her injury.
15    Therefore, she may not rely on the doctrine of fraudulent
16    concealment to toll the statute of limitations.
17         In the *McDermitt* case on the summary judgment motion,
18    you were considering the statute of repose, but the Plaintiffs
19    argue there that fraudulent concealment tolls the statute of
20    repose, as well.  So you had to consider the same allegations
21    in the master complaint, short-form complaint, and there you
22    laid out the standard, again, citing the *Lyons* case.  And you
23    noted that to invoke the doctrine where no fiduciary
24    relationship exists between the parties, a Plaintiff must show
25    that the wrongdoer was not simply silent but committed

1  affirmative acts designed to conceal the cause of action.

2         And there, you found that the Plaintiff *McDermitt* does

3  not allege that Cook committed any affirmative act to prevent

4  him from discovering the cause of action against it.   Indeed,

5  Plaintiff has not even alleged that Cook knew before being sued

6  in this action that Plaintiff had a cause of action against the

7  company.

8         These 11 cases are identical to *Graham* and to

9  *McDermitt* in that respect, Your Honor.   There is no allegation

10  that Cook knew of — even knew the Plaintiff had a Cook filter,

11  much less that the Plaintiff had been injured in some way or

12  that Cook concealed that Plaintiff's injury from the Plaintiff.

13         It requires allegations and proof, frankly, to survive

14  Rule 56 motion, proof that Cook knew of the existence of the

15  Plaintiff, the existence of the injury, and had superior

16  knowledge of that injury to the Plaintiff and concealed that

17  from the Plaintiff.

18         There are no facts alleged to support that, and the,

19  the only affidavit that supports these motions doesn't allege

20  any kind of concealment.   Mr. Giddens says, I didn't know about

21  a defect.   I didn't know about the existence about the

22  manufacturer until some unidentified person told him later, but

23  there is no evidence to support a claim of fraudulent

24  concealment.

25         So particularity issue aside, Plaintiffs misconstrued

1   the fraudulent concealment law, and in the Denton response, I

2   believe it is, they, they regurgitate much of the argument that

3   we have heard during the *Brand* and *Hill* trial about Cook had

4   superior knowledge of the defect, and you know, didn't tell FDA

5   or didn't tell doctors.  That evidence may be relevant to the

6   question of a design defect, but it is completely irrelevant

7   to the Indiana standard for fraudulent concealment that tolls

8   the statute of limitations.

9           Indiana law requires concealment of the Plaintiffs'

10  claim, the Plaintiffs' cause of action, and there is simply no

11  evidence in these cases or any others that that existed.  So

12  for those reasons as well, Your Honor, we believe that we are

13  entitled to summary judgment based on the statute of

14  limitations.

15          Exhibit A makes it pretty clear.  They had an open

16  procedure.  They waited four years to file their lawsuit.  The

17  statute of limitations is two years.  For that reason, Your

18  Honor, we ask that you enter judgment in Cook's favor.  Thank

19  you.

20          THE COURT:  All right.  Thank you, Ms. Pierson.  On

21  behalf of Giddens?

22          MR. SIMS:  Yes, Your Honor.  Thank you.

23          I understand Cook has referenced their omnibus motion,

24  and I believe they identified 11 Plaintiffs who they are

25  currently targeting through that motion.  Today's hearing,

1    obviously, is just about these two Plaintiffs, and just wanted

2    to make sure that is clear on the record.

3              THE COURT:  It is.

4              MR. SIMS:  I think there are — one of the central

5    problems with the Defendant's briefs, both their opening brief

6    and their reply brief is, they cite cases that are applying the

7    statute of limitations that derives from other states, and that

8    is critically important because those statutes of limitations

9    are substantively different than the one that applies here, if

10   we assume, as I will, for purposes of today's argument, that

11   Indiana law applies.

12             So your earlier decision in the *Graham* case has been

13   cited frequently by Defense Counsel.  That applied Kansas law.

14   Kansas law is quite different than Indiana law.  Under Kansas

15   law the statute accrues at the date the Plaintiff discovers the

16   injury, full stop.  Under Indiana law, the statute does not

17   begin to accrue until this Plaintiff discovers both the injury

18   and the causal connection to the product or the Defendant's

19   tortuous act.  So that is a key difference.

20             That same difference applies in the *Bard* decision that

21   was cited by Defense Counsel.  In *Bard*, they were applying

22   Nebraska law.  As noted in the *Bard* decision under Nebraska

23   law, the discovery rule means the statute accrues when the

24   Plaintiff discovers the injury, full stop.

25             So I think for purposes of deciding my client's case

1    and determining whether or not it should be -- summary judgment

2    should be granted, the critical cases for the Court to consider

3    are the *Degussa* case that was cited by Defense Counsel, the

4    *Nelson* case, which has been cited by multiple parties in our

5    briefs; and then, finally, the *In re:  Mirena* case because

6    those are the three cases that were actually applying Indiana

7    law.

8         And really, more relevantly, they were applying to

9    situations like this where you are dealing with a toxic

10   exposure from either a device or a drug or some type of

11   workplace environment involving chemicals.  So we feel, like,

12   those are the foundational cases for deciding these motions.

13        With that in mind, Your Honor, I would direct the

14   Court's attention to page 14 of the Defendant's reply brief

15   because I think there is a very important assertion there that

16   is absolutely incorrect under Indiana law as confirmed by those

17   three cases I cited.

18        And on page 14 of Defendant's reply brief, the opening

19   sentence under subsection A at the top of that brief,

20   Defendants write:  "Plaintiffs' open surgical procedures to

21   remove their IVC filters necessarily established, as a matter

22   of law, that their filters were potential causes of their

23   injuries; and thus, commenced the running of the statute of

24   limitations."  The three words I would focus on, Your Honor,

25   are necessarily -- I should say three phrases -- "necessarily,"

1    "matter of law," and "potential."  Because taken together, this

2    sentence fundamentally misapprehends Indiana law, and this is

3    how it does it.

4         "Potential cause."  It is a key phrase.  As the Court

5    is aware, under the statute of limitations in Indiana, as

6    interpreted by the courts as both parties agree, the statute

7    starts to accrue when the Plaintiff basically receives

8    information that suggests there is a reasonable possibility,

9    which is a little short of a probability but a reasonable

10   possibility that their injury is related to the Defendant's

11   product.

12        That is very different than possibility.  It is not

13   the same.  They can't be used interchangeably.  How do we know

14   this?  Because *Degussa* and *Nelson* both tell us that.   In

15   *Degussa*, which was the case that involved the workplace

16   exposure, the Court may recall, this woman was exposed to

17   chemicals at work, went to her doctor, and what did her doctor

18   tell her?  It is possible.  Yeah, it is possible that your

19   injuries you're complaining of came from your workplace.

20        Did the court, did the Seventh Circuit conclude that

21   that was sufficient — I am sorry, the Indiana Supreme Court

22   conclude that that was sufficient to start their statute?  No.

23   Being told by your doctor that it is possible your injury is

24   related to the product is not sufficient in that situation.

25        The Plaintiff went back.  She went back a second time

1   to her doctor still complaining of the same symptoms, and the

2   doctor said, you know what?  Take two weeks off of work.  It is

3   possible this could be causing your injury.  Take two weeks off

4   of work.  Was that sufficient to start the statute?  No.

5         Now, why wasn't that sufficient?  Because the doctor

6   said there could be other causes too.  These are potential

7   causes the doctor said.  Your workplace is one, but there are

8   others.  So mere potential, mere possibility is insufficient to

9   trigger, as a matter of law, because that is what we are

10  talking about here; as a matter of law, being told it is a

11  possibility is not sufficient.

12        And then, in the *Nelson* case, also something very

13  similar happened.  This is a woman who took the drug Parlodel,

14  suffered a stroke, and originally her doctor told her, yeah,

15  you know what?  That is possible.  That is possible that this

16  caused your stroke.  Was that sufficient to trigger the

17  statute?  No, it was not.  The Seventh Circuit held no.  Why?

18  Because later, that same doctor said, you know what?  I don't

19  think it is possible or it is unlikely or something to that

20  effect.

21        Possibility is not sufficient.  So in that respect,

22  this statement by Cook, which is really the heart of the

23  matter.  They are saying if I give you a date, Judge, it

24  necessarily means you have to dismiss their case as a matter of

25  law if that date is outside the statute.

1          So what else is problematic about that statement?  It

2     ignores.  It ignores the role of the doctor in these cases.  We

3     know, because we have cited repeatedly, and Courts have held

4     it.  A Plaintiff's suspicion, hunch, kind of lay perspective

5     that their injury was caused by this product is not sufficient.

6     Courts have said that repeatedly.  We know that the doctor has

7     a role to play here.  If there is any doubt about that, *Degussa*

8     resolves it.

9          On page 411 of that opinion, this is what the Court

10    wrote.  The Indiana Supreme Court wrote:  Once a Plaintiff's

11    doctor expressly informs the Plaintiff that there is a, quote,

12    reasonable possibility if not a probability, end quote, that an

13    injury was caused by an act or product, then the statute of

14    limitations begins to run, and the issue may become a matter of

15    law — not a matter for the jury, but a matter for the Court.

16         So if we are going to decide at the summary judgment

17    stage whether or not this case should be dismissed based on

18    statute of limitations, we need to know what the doctor is

19    telling the Plaintiff, and that is not anywhere in their

20    briefs.

21         THE COURT:  In these cases, though, we have not only

22    had the doctor tell, but the doctor is performing surgery on

23    these folks.  Now, wouldn't that give them — would give the

24    Plaintiff a reasonable possibility that the device is what

25    caused the injury, the surgery?

1           MR. SIMS:  I am glad Your Honor raised that point

2    because I think my particular client, Mr. Giddens, goes right

3    to that issue, and it is why Cook should not — not just for my

4    case but for all of these cases, be able to supply a date in a

5    summary fashion, and then be awarded with summary judgment.

6    Here is why it is problematic, and we discussed this in our

7    opposition.

8           What happened to my client?  He was not given a

9    surgery to remove the IVC.  That is not why the doctor —

10          A VOICE:  (Inaudible) has left the conference.

11          MR. SIMS:   — the doctor was performing an

12   exploratory laparotomy to discover the source of my client's

13   abdominal pain.  He had tried CT, couldn't find it.  He had the

14   client come in — the patient come in a couple of times,

15   couldn't figure it out.  So he said, "Okay, well, let's just do

16   exploratory surgery and see if I can figure out what is going

17   on."  The patient, my client said, "Well, can you take out the

18   IVC?  Can you just take it out?"

19          This is the patient's hunch, suspicion that we alluded

20   to earlier.  The client wanted it out.  The doctor wasn't

21   saying he needed to take it out.  The doctor wasn't saying, "I

22   am going to cut you open to take it out."  He was saying, "We

23   are going to do an exploratory surgery to see if I can figure

24   out what the problem is."  In that situation, it doesn't fall

25   into the what probably everyone assumes, surgery means the

1  doctor said take it out.  That is not what happened in my
2  client's case, and it goes even further.
3          The surgical note says that the doctor advised my
4  client, hey, you need to know this isn't going to probably
5  relieve your pain.  Because the doctor clearly didn't think
6  that this IVC device was what was causing this abdominal
7  injury.  In that same surgical note the doctor made a point of
8  saying, this placement — he noticed some fluid on the CT scan,
9  suggesting some issues with the IVC.  But he said, but that is
10  not where this abdominal pain is coming from, somewhere else.
11  So in my client's case, the record, when read in the light most
12  favorable to the Plaintiff, suggests the doctor was a naysayer,
13  didn't buy into this view that the IVC was the source of the
14  injury, thought it must have been something else, and that is
15  why the surgery occurred.
16          This fact would never come out if Cook was able to
17  rely solely on a single date.  That is it.  So our position is,
18  to meet its burden under the summary judgment rules, they can't
19  just supply a date.  They have to do as *Degussa* says, because
20  they want judgment as a matter of law.  They have to talk about
21  what the doctor is saying.  Because only then can you talk
22  about triggering the statute as a matter of law.
23          In my client's case, I think there is no question that
24  a jury, upon hearing that evidence, could reasonably conclude
25  that my client was — had a basis to think, well, my doctor is

1  not really buying into my theory.  Therefore, the statute

2  doesn't run because they would have been instructed under the

3  law, it requires more than the layperson's hunch or perspective

4  or suspicion.  So we are in very dangerous territory where we

5  let a Defendant dismiss dozens, potentially hundreds of cases

6  based on a date with nothing more.

7       So for those reasons, I believe that summary judgment

8  in my client's case is improper.

9            THE COURT:  All right.  Thank you.

10            MR. SIMS:  I won't add anything further.  Thank you,

11  Your Honor.

12            THE COURT:  All right.

13            MR. CORRIGAN:  Judge, thank you.  For Mr. Denton, may

14  I?

15            THE COURT REPORTER:  No, no, you need to —

16            MR. CORRIGAN:  Am I on now?  Thank you.

17       I am going to adopt the legal arguments that were just

18  said by Counsel just because I think it would belabor the point

19  if we go over those issues again.  I don't want to —

20            THE COURT:  All right.

21            MR. CORRIGAN:  It is already warm enough in here.  I

22  have enough hot air.

23            THE COURT:  Thank you.

24            MR. CORRIGAN:  Judge, one of our issues here is that

25  summary judgment standard is to view most favorable to the

1    Plaintiff or to the nonmoving party, and summary judgment

2    should only be granted if it is supported by the pleadings, the

3    depositions, answers to interrogatories, admissions, or

4    affidavits, so evidence in this case.  What we have here is an

5    affidavit, Exhibit A to their motion, of an associate that

6    worked for the firm who reviewed documents and created a list

7    of dates.

8        And again, as Counsel was saying earlier, those dates

9    are important because you want to understand what was a doctor

10   telling our patients at the time?  What was a doctor telling

11   our client, and no depositions have been taken of my client or

12   of his treating physicians.  No evidence —— his medical records

13   that were referred to, the sheets that they relied upon were

14   not attached as exhibits to the motion for summary judgment.

15       The only evidence that was attached was actually

16   Mr. Denton's affidavit, not Mr. Giddens affidavit to our

17   summary judgment, which is uncontroverted.  So they have failed

18   to meet their burden, and we also argued that this is premature

19   because that evidence hasn't been gone through in this fashion.

20       Essentially, Cook is asking this Court to enter

21   summary judgment, a pretty drastic procedure for a Plaintiff,

22   without adducing any evidence of what was going on with those

23   particular Plaintiffs, asking to lump together.  All these

24   Plaintiffs in this instance —— they are asking today for 11

25   people to have their cases dismissed without looking at them on

1   an individual basis of what was discussed with each individual

2   client.

3           And we would suggest that the medical records, talking

4   to the doctor, taking our client's deposition may provide

5   additional evidence which could counteract the motion for

6   summary judgment.  And it is Cook's burden, not the Plaintiffs'

7   burden at this point, to adduce that evidence at this stage of

8   the case.

9           Interestingly enough, we talked a little bit about

10  what is known to the common person such as Mr. Denton or any

11  other Plaintiff who is receiving these filters at the time they

12  are received, put in place or the time the medical providers

13  are talking to them about the problems that they are having

14  with these filters.  Cook has not conceded to this Court today

15  or any other day that the filters are defective in any way.

16  Cook has not sent out literature to --

17          A VOICE:  A participant has joined the conference.

18          MR. CORRIGAN:  Sorry.  Cook has not sent that

19  information to patients or doctors discussing the problems with

20  their filters.  Cook is sitting here now asking for summary

21  judgment, saying because we can't say the product was

22  defective -- it is only when the removal occurs -- but does not

23  supply the evidence to support that position through the normal

24  rules of summary judgment.

25          The *Nelson* court, as was pointed out earlier, states

1    that when the physician suggests there are reasonable

2    possibilities, but no effort was made by Cook to discuss with

3    those physicians what was told to Mr. Denton or any of the

4    other Plaintiffs about the condition that was at issue, why

5    they are being operated on.  Was it because of the filter, or

6    was it another reason?  Those were not addressed in their

7    motion.

8           So it is my understanding since 2006, Cook has been

9    putting out into the general domain, the public, a study, OSU

10   study about filters and their efficacy and talking about the

11   problems with the efficacy of that, of those filters.  So the

12   analysis was that the filters have perforated the vena cava,

13   but Cook had not submitted, put out in the public domain that

14   there are problems with their filter, had not changed the

15   narrative so that someone like Mr. Denton, not a medical

16   professional, has to then, therefore, draw a conclusion between

17   his surgical procedure and the product.  And I just think that

18   is improper for having a Plaintiff do that.

19          We certainly believe that summary judgment based upon

20   the fact that they failed to meet their burden.  It is

21   premature without having information supplied in the motion to

22   support their case with evidence.  Summary judgment has not

23   been met and should not be granted.

24          THE COURT:  Thank you.  Ms. Pierson, any reply?

25          MS. PIERSON:  Thank you, Your Honor, just briefly.

1      What I hear Counsel saying are that there are a couple

2  of reasons that they believe the claims are not time-barred for

3  Messrs. Giddens and Denton.  And the first argument that I

4  heard was that Indiana law requires evidence of causation, that

5  the Plaintiff had some knowledge of causation, and that is

6  simply not true.  The standard is what it is.  The standard is

7  that a Plaintiff knew or reasonably should have known, could

8  have known through reasonable inquiry that they had an injury

9  that was related to a product.

10      So evidence of causation by a defect in the product is

11  simply not the standard; and of course, in these cases where,

12  where the Plaintiffs are having their open procedure because

13  they have had a perforation or a fracture, what they claim to

14  be a malfunction, regardless of knowledge of the defect, there

15  is knowledge that something has happened with the product.  And

16  frankly, it is indisputable that that puts a Plaintiff on

17  notice sufficient that they have to make an inquiry as, as to

18  their injury and whether they have a possible legal claim.

19      You have held that many times.  The Seventh Circuit

20  has held that many times.  The Indiana Court of Appeals,

21  Indiana Supreme Court, they have all reached the same

22  conclusion, that evidence of causation is not an element.  And

23  even if it were an element under Indiana's limited discovery

24  rule, the Plaintiffs have submitted no evidence in response to

25  the motion for summary judgment to suggest that they did not

1    know that the procedure was required because the Plaintiff had

2    an IVC filter.

3            You know, we have had the burden on the motion for

4    summary judgment, but once we come forward with evidence

5    showing that there is no genuine issue of material fact, the

6    burden shifts to the Plaintiffs to give to you not just

7    argument but to give to you real evidence in the form of

8    affidavits or deposition testimony or otherwise.

9            This relates too, to their second argument where they,

10   both lawyers tell you that the Plaintiffs must have knowledge

11   of probability, not a possibility that the injury was caused by

12   the product.  Again, that is also not the standard under

13   Indiana law, and the *Mirena* court states it quite clearly that

14   the standard is that the Plaintiff has knowledge.  They knew or

15   should have known of a reasonable possibility.  That is the law

16   in this jurisdiction.

17           They, they suggest to you that somehow it was Cook's

18   burden to come forward with some testimony from the doctor or

19   otherwise; and frankly, that, that is just wrong, and it is

20   irrelevant to the question of did the Plaintiff know or should

21   they have known that they have been injured at the time that

22   they had an open procedure?

23           Mr. Denton submitted an affidavit, and the affidavit

24   is at the Docket 12301-1.

25           A VOICE:  (Inaudible) has left the conference.

1          MS. PIERSON:  Nowhere in this affidavit does
2    Mr. Denton suggest that he didn't know the reason for his open
3    procedure, that the reason for the open procedure was to
4    explore the source of his pain.  He doesn't suggest that he
5    didn't know his filter was removed.  That is all evidence that
6    the Plaintiffs were required to bring to you, Judge, to sustain
7    their burden of proof once we filed the motion for summary
8    judgment.
9          So I sense that there is a shifting of the burden
10   happening in this argument that suggests that somehow Cook has
11   to depose the Plaintiff, depose the doctor before they can file
12   a motion for summary judgment.  That is simply not true.  The
13   dates are what they are, and if there is some issue of fact
14   created under Indiana's discovery rule, then, they have a
15   burden to present real evidence to you.
16         The arguments by Mr. Giddens' counsel, there was no
17   affidavit submitted by the Plaintiff at all, none.  So there is
18   no evidence before the Court on all of the things that have
19   just been described about what the doctor hypothetically might
20   have said to the Plaintiff; and of course, the Plaintiff knows
21   what the Plaintiff has been told.  So at the end of the day,
22   you have only a limited amount of material before you, and the
23   limited amount of material —
24         A VOICE:  A participant has joined the conference.
25         MS. PIERSON:  — establishes —

1          THE COURT REPORTER:  I'm sorry.

2          MS. PIERSON:  Okay — the limited amount of material

3     before you, Your Honor, establishes some very central and

4     fundamental truths.  The fundamental truth is that Indiana law

5     sets forth the standard, and this Court has applied it more

6     than once.  The fundamental truth is that the time that a

7     Plaintiff has an open procedure and their filter is retrieved,

8     it is indisputable that they know or should know, upon the

9     exercise of ordinary diligence, of the reasonable possibility

10    that their open procedure was caused by their IVC filter.

11          The fact that the *Graham* case was decided under Kansas

12    law doesn't change the fact that you have already defined what

13    constitutes a factual situation where Plaintiff knows or should

14    know; and of course, the retrieval of the filter, the removal

15    of the filter, whether it is an open procedure or percutaneous

16    procedure, indisputably establishes that duty on the part of

17    the Plaintiff to inquire.  Thank you, Your Honor.

18          MR. SIMS:  Your Honor, I think I —

19          THE COURT REPORTER:  I'm sorry, your mic.

20          MR. SIMS:  Thanks.  I do have just a couple of brief

21    points.  I think that argument is mostly couched in a vacuum,

22    trying to apply in a generic fashion, and as I alluded to, I

23    don't think that can be done on a Plaintiff-by-Plaintiff basis.

24    And I think, again, my Plaintiff demonstrates that.  My

25    Plaintiff didn't have a surgery to remove the IVC.  The surgery

1    was planned before the topic of IVC removal came up.  It was an

2    exploratory surgery.  So I think it is a fact specific —

3               THE COURT:  What Ms. Pierson is saying, is there is no

4    evidence in any of your filings about that.

5               MR. SIMS:  I do want to turn to that.

6               THE COURT:  What I have in front of me does not

7    contain that.

8               MR. SIMS:  So I do want to turn to that, Your Honor.

9    We did describe this evidence in our brief.  We did not attach

10   the accompanying record.  It is a single record, and I would

11   like to ask the Court's leave to supply the record pursuant to

12   Rule 56(e), which gives a party an opportunity to properly

13   support or address a fact that is disputed.

14          And I believe there are two reasons why I think the

15   Court, in the interest of justice, should consider granting

16   that request.  The first is that this is the first time Cook

17   has raised this issue.  It was not in their reply brief.  They

18   did not complain that our factual assertions were not

19   supported; and therefore, we couldn't file a sur-reply.  But

20   more fundamentally, the record I am referencing, and it was

21   summarized in our brief, is the same record that was attached

22   to the Case Categorization Form that serves the basis for

23   Cook's summary judgment.

24          So I think it is unfair for a party to rely on a

25   record provided in a summary form and then turn around and say

1   you, Plaintiff, can't point to factual information in that same

2   record.  So we would ask if Cook is going to challenge those

3   assertions and say they are unsupported, we simply supply the

4   record that Cook purportedly summarized in its motion.  We

5   think because this has to do with summary judgment, it is

6   important that a full and fair record be before the Court.

7          THE COURT:  Well, wouldn't it already be in the

8   record?  You can't summarize something that is not in the

9   record.

10          MR. SIMS:  Well, Your Honor, the summary itself, under

11   the rules, has to be based on admissible evidence.

12          THE COURT:  Right.

13          MR. SIMS:  The Case Categorization Form doesn't convey

14   the date of the removal.  That is not in that form.  The Case

15   Categorization Form attaches a document.

16          THE COURT:  Right.

17          MR. SIMS:  Right.  And so I would like this to be part

18   of the record because this is what Cook is relying on.

19          THE COURT:  Well, if they are relying on it and they

20   are referring to it, it has to be admissible.  And it is

21   probably already in the record.

22          MR. SIMS:  It is not, not in this summary judgment

23   motion, Your Honor.  They did not attach it.  So we would ask,

24   again, pursuant to Rule 56, that we be provided the opportunity

25   to make it part of the record.

1          THE COURT:  Okay.

2          MR. SIMS:  Is that acceptable with your Court?

3          MS. PIERSON:  Our view is that the time to do this has

4    passed.  This motion was filed months and months and months

5    ago, and even if a medical record were submitted, this is

6    Counsel's interpretation of the medical record.  The fact is,

7    by his own statements today, the Plaintiff asked to have his

8    filter retrieved.  Now — through an open procedure.  That is

9    not, that is not anywhere in the record, but he has asserted it

10   here today.

11         I mean, the bottom line is, there was a great big

12   surgery.  The filter was taken out.  There is no proof that the

13   Plaintiff didn't know the filter was taken out or know that the

14   reasons that it, that it was taken out is part of whatever the

15   procedure was.  I, you know —

16         MR. SIMS:  Your Honor?  I will read — sorry.

17         MS. PIERSON:  At this point, Your Honor, there are, as

18   I said, some indisputable facts.  There is no dispute about the

19   date of the open procedure.  There is no dispute about the fact

20   that the filter was retrieved.  If there is some other evidence

21   to suggest that the Plaintiff, that there was not a reasonable

22   possibility or the Plaintiff was not put on notice that he

23   needed to inquire, that evidence needed to be submitted to the

24   Court, and it simply hasn't been.

25         MR. SIMS:  Your Honor?  I will just read from the

1    record; and again, I believe it has been submitted in the form

2    of a summary.  We would just ask that the two-page medical

3    record actually end up in the record since that is the heart of

4    what they are relying on.  This is verbatim from that record.

5    "The patient returned to clinic with abdominal pain and really

6    wished to get this removed during his exploratory laparotomy."

7            That is the statement from the record.  It doesn't

8    come from an affidavit.  It also says that the doctor advised

9    the patient, quote, the most likely course of not relieving

10   the patient's abdominal pain, referring to the removal of the

11   IVC.  So I am not relying on anything other than the very

12   document that serves as the basis for their motion, and I would

13   ask if they are going to contest what was represented from that

14   document that the Court have the document in front of it

15   because that is all I am relying on is the very same document

16   that they are relying on for their motion.

17           MS. PIERSON:  If the Plaintiff thought it was being

18   removed for some other reason, like you know, hey, let's take

19   this out through your abdomen instead of taking it out through

20   a percutaneous procedure in your neck, which seems to be the

21   suggestion.  That if you look at this medical record that

22   suddenly you can draw that conclusion that the Plaintiff wasn't

23   put on inquiry by virtue of this procedure, if that is what the

24   Plaintiff is alleging, the Plaintiff should have submitted an

25   affidavit saying that.  There is none.

1          MR. SIMS:  We are only — we are only arguing based on
2     what is in this record, and I think it is unfair for a party to
3     move for summary judgment based on a record and then it not end
4     up in evidence.
5          THE COURT:  All right.  I will take it under
6     advisement.  I tend to agree with you on that, but I will take
7     it under advisement.
8          MR. CORRIGAN:  If I may just briefly respond too, Your
9     Honor?
10         One of my issues is with the summary judgment itself,
11    is that it fails on its face to meet its burden.  They have —
12    the only evidence they have attached to this motion, the only
13    evidence, no medical records, is an affidavit from a Cook
14    attorney who reviewed apparently 700 or so other Plaintiffs and
15    developed these 26 individuals he put on this list.
16         They have not produced any records, any information,
17    any evidence that is admissible to this Court to be reviewed
18    with their summary judgment to establish what was known by
19    Plaintiff at the time and what was said to the Plaintiff by the
20    doctors.  Therefore, on its face, because they haven't attached
21    the evidence that they are relying upon, this motion fails.
22         MS. PIERSON:  Judge, there seems to be a fundamental
23    misunderstanding or disagreement about Rule 56 and what Rule 56
24    requires, and once we file a motion for summary judgment, if
25    there is some evidence that the Plaintiffs thought you should

1    consider, a statement by the Plaintiff, a statement by the

2    doctor, some medical record, they had an obligation to submit

3    that to you.  It is not Cook's burden to scour the earth before

4    filing the motion for summary judgment and to put all the

5    evidence, the entire case in front of you.  That is not Rule

6    56.

7           Once we file a motion for summary judgment, if they

8    have evidence that creates a genuine issue of material fact,

9    they need to submit it, and they have no such evidence.  They

10   didn't file it with their response, and they have not brought

11   it to you here today.  Whether you consider an individual

12   medical record on a request to supplement or not, that does not

13   change the fact that there is no evidence or statement before

14   this Court that suggests these Plaintiffs were not put on

15   reasonable notice that they didn't have a duty to inquire once

16   they had an open procedure and their filter was removed.

17          THE COURT:  If you base your motion for summary

18   judgment on a record that was reviewed by — I am assuming an

19   associate in your firm or a partner in your firm, right?  Is

20   that — who, who submitted the affidavit?

21          MR. CORRIGAN:  Eldin, E-L-D-I-N; Hasic, H-A-S-I-C.

22          THE COURT:  Yeah.  I am assuming he has reviewed that

23   record to make that assertion in that affidavit, right?

24          MS. PIERSON:  Of course.  The assertion is we served a

25   records request.  Here is the record that we received.

1          THE COURT:  Right, yeah.

2          MS. PIERSON:  I am not suggesting that that is not

3     proper evidence that this Court can consider.  The Court can

4     consider it.  In fact, it is our position you can and should

5     consider the Case Categorization Forms and the medical records

6     that are attached to them.

7          THE COURT:  You are just saying it is too late.

8          MS. PIERSON:  I am saying that it is too late and that

9     regardless of what the medical record says, the Plaintiff

10    needed to come to you with evidence to suggest that they, they

11    didn't have a duty to inquire, that they, that they had no

12    reason to believe that, that the filter was the reason for

13    their open procedure.

14         MR. SIMS:  Your Honor?

15         MS. PIERSON:  Where is Mr. Giddens' statement or

16    Mr. Denton's statement that says that?

17         MR. SIMS:  We would just say, Your Honor, as I said in

18    the beginning, the law is clear.  Plaintiffs subjective —— or

19    subjective is not the right word but suspicion, lay belief.

20    That is not sufficient to trigger the statute.  If that is the

21    case, if that is accurate, then, the burden is with the moving

22    party to establish the absence of any disputed facts.  And they

23    can't do that because they haven't addressed the right

24    standard.

25         I agree, it is not probability.  It is reasonable

1  possibility, but the Courts have consistently said that
2  requires more than just the Plaintiff.  You have to look at the
3  whole record.  And so in that respect, we do believe it is
4  proper for the Court to consider this record.
5       MR. CORRIGAN:  Your Honor, if I may briefly?
6       THE COURT:  Well, the surgery here is, is a pretty big
7  fact.
8       MR. SIMS:  Absolutely, and that is the record that I
9  am relying on is the surgical record to show what the doctor
10  was saying and doing during this period because I think that is
11  the missing piece.
12       THE COURT:  Well, also as to what the Plaintiff knew
13  after the surgery.
14       MR. SIMS:  Yes, Your Honor.  Well, I think if we are
15  able to establish that a doctor at the time of the surgery was
16  saying IVC is not causing your problems or the record suggests
17  that, then, I think that creates a fact issue, right?  That is
18  sufficient to defeat summary judgment.  We don't have to win
19  our case at summary judgment.  We have to show that there is
20  information the jury can look to and say, "Oh, wow, the doctor
21  was saying that, wasn't he?"  That is an issue that goes to the
22  jury.  I don't think it is proper to be decided as a matter of
23  law.
24       MR. CORRIGAN:  And Your Honor, lastly, I believe,
25  again, the evidence before the Court that is creating this

record for this summary judgment is incomplete.  It only has an affidavit from an attorney for Cook who reviewed evidence that they didn't attach.  They didn't attach the 26 medical records, the 26 sheets they relied upon.  They are required to do that under the rules, and they failed to do that.  And on its face, their summary judgment fails for that alone.

THE COURT:  Anything further?

MS. PIERSON:  Nothing further, Your Honor.  Thank you for your time.

MR. SIMS:  Thank you, Your Honor.  We will file something in the record, just depending on how the Court chooses to rule that contains the actual medical record.  Thank you.

THE COURT:  All right.  Well, I, I will admit.

MR. SIMS:  Okay.  I am sorry?

THE COURT:  I will allow it to come in.

MR. SIMS:  All right, thank you.

THE COURT:  I don't need to read anything more.

MR. SIMS:  Okay.  Thank you, Your Honor.

MS. PIERSON:  You want to mark it today, Your Honor?

THE COURT:  We can.

MR. SIMS:  May I approach the clerk, Your Honor?

THE COURT:  What do you want to mark it as?

MR. SIMS:  I have a couple of copies.

THE COURT:  What is the affidavit marked as?

1    MR. SIMS:  I believe it is marked as Exhibit A.  We
2  can call it Exhibit A to our response brief —— or sorry, our
3  opposition, Your Honor?
4    MS. PIERSON:  Wait, wait.
5    THE COURT REPORTER:  I'm sorry, can you put your mic
6  on?
7    MR. SIMS:  Yes, ma'am.
8    MS. PIERSON:  Sorry.  What affidavit are we marking
9  now?
10    MR. SIMS:  We are not marking an affidavit.  I think
11  the Court was inquiring about the Denton affidavit and what
12  that was marked as.
13    MS. PIERSON:  The Denton affidavit is already before
14  the Court, Your Honor, at Docket 12301-1.
15    MR. SIMS:  May I approach the clerk, Your Honor?
16    THE COURT:  Yes.  Mark it, though.  It needs to be
17  marked.  Just write on it.
18    THE CLERK:  I have exhibit stickers if you tell me
19  what you want it marked as.
20    MR. SIMS:  If we could mark it as Gidden Exhibit A.
21  Thank you.
22    *(Gidden Exhibit A was received in evidence.)*
23    THE COURT:  Thank you.  Safe travels.
24    MR. SIMS:  Thank you.
25    MR. CORRIGAN:  Thank you very much, Your Honor.

1          (Attorney Sims and Attorney Corrigan leave the

2     courtroom.)

3          THE COURT:  Why don't we take a break here and come

4     back in about ten minutes?

5          THE CLERK:  All rise.  Court is in recess.

6       *(Recess taken.)*

7                         AFTER RECESS

8          THE COURT:  Okay.  Where are we at?

9          MS. PIERSON:  Your Honor, I think the next motion up

10    is Cook's omnibus motion that Miss Cox will address, and I

11    believe Miss Gallagher is on the phone for the Plaintiff.

12         MR. WILLIAMS:  Your Honor, if we may?  Because I spoke

13    with Pam McLemore, an attorney at the Gallagher firm, and they

14    and Miss Cox agreed to a stipulation with dismissal — or a

15    stipulation of dismissal with prejudice.  And I believe that

16    was filed either last night —

17         THE COURT:  I did see that.

18         MR. WILLIAMS:  — or this morning.  So my suggestion

19    would be, I know that there are other cases that Cook included

20    in this omnibus motion, but if the Plaintiffs don't have any

21    representative here to argue, I suggest given the dismissal, I

22    suggest we either have the Court rule on the papers or we reset

23    the argument.

24         MS. COX:  Thank you, Joe.  This is Jessica Cox, for

25    the court reporter.  Good afternoon, everyone.  And Joe is

93

1    exactly right.  We agreed on the stipulation that was entered

2    last night, and Ms. McLemore is on the phone as well.  And I

3    just wanted to state for the record that we filed this motion

4    to dismiss these 46 cases where the record submitted what the

5    Case Categorization Form failed to document a valid injury.

6         There were three cases where the record showed one of

7    three things that were subject to this motion:  A, all the

8    cases had a filter that were merely put in place with no

9    suggestion of complication; or B, it was a group of cases where

10   the filter had been successfully retrieved on the first attempt

11   without any injury while the filter was in; and C, there is a

12   third group where filter tilt was the only claimed injury.

13        And Your Honor will be happy to know that after months

14   of having this pending and going back and forth with

15   Plaintiffs' Counsel, we made a lot of progress on our own.  I

16   just wanted to point out to the Court that I have provided a

17   chart to Tina and to Joe and to others that kind of tracks the

18   status of all these motions that were subject, all the cases

19   that were subject to this motion.  And if you look at the

20   chart, we have color coded it, and it shows all the, all the

21   cases that were dismissed after our motion was filed or where

22   Cook withdrew the motion and where nothing needs to be done.

23        So the vast majority of these cases that were subject

24   to this motion have already taken care of themselves.  There is

25   a whole other group where I have color coded yellow in the

middle where the parties are still working it out, and we are

hoping to reach a resolution soon.  So there is nothing for the

Court to do.  There are just 14 cases which I had color coded

in green at the beginning that are ripe for a ruling, and Joe

is right.  Cook is going to stand on the papers.  We haven't

set any of these for oral argument, but they are ripe for

ruling.  And we would ask the Court to enter judgment in these

cases because they do fail to state a valid cognizable claim.

Now, Joe mentioned that we had intended to argue one

of these cases, the Bishop-Jones case, for oral argument today.

This is a case where the Plaintiff had a Celect filter in place

for three months before it was successfully retrieved, and her

only claim was that her filter was tilted while it was in place

before it was retrieved.  She didn't claim that the tilt caused

her any injury or symptom or problem, and originally,

Miss Bishop-Jones filed an opposition to our motion.  But after

her case was noticed for oral argument, she filed a motion to

dismiss her claim.

And yesterday, Cook agreed to dismissal of the claim,

and in the dismissal that was filed, you will read that the

parties noted the Plaintiff was persuaded to dismiss her claim

by the reasoning of the Perez case from the Southern District

of New York where the Court held a Plaintiff with an IVC filter

whose only claim was that her filter had tilted without any

accompanying injury or symptom failed to state a valid claim

1 | against an IVC filter manufacturer.

2 | So we no longer have a case to argue so we can move
3 | along very quickly, and Cook will stand on the paper as to the
4 | 14 in green on your chart. But I do want to note that we
5 | didn't pick Bishop-Jones to argue because it was special or
6 | unique. We picked it because there is nothing special about
7 | it. You know, we did a quick search of cases pending in the
8 | MDL with marked Category 6 as their injury, and I saw at least
9 | 70 other cases just like Bishop-Jones who are only alleging
10 | asymptomatic tilt or asymptomatic movement as their sole
11 | injury.

12 | So we have prepared a proposed order on our motion for
13 | summary judgment for the Court to consider. This order has a
14 | language spelling out that if a case has records that only show
15 | a filter was put in place or show that it was successfully
16 | retrieved without an injury or only claimed tilt as an injury,
17 | no matter what box they checked, if that is all the proof they
18 | have, whether it be a Category 1, 2, or 6, all these cases fail
19 | to state a cognizable claim and should be dismissed.

20 | We would just ask you to enter that order to help us,
21 | you know, maybe make a step towards sorting out some of the
22 | MDL, as you were discussing earlier this morning, and as a way
23 | to signal to other Plaintiffs to stop filing these cases that
24 | don't have any merit on the MDL moving forward. Thank you,
25 | Your Honor.

1      THE COURT:  All right.  Thank you, Ms. Cox.

2      Anything else, from — who else is on the phone?  I

3  didn't quite catch that.

4      MS. McLEMORE:  Your Honor, my name is Pam McLemore.  I

5  am with the Gallagher Law Firm.

6      THE COURT:  Okay.

7      MS. McLEMORE:  We have the Bishop-Jones case, and we

8  were able to reach an agreement with Ms. Cox, and we spoke with

9  our client.  And she was in agreement, and so that was filed.

10  The stipulation was filed last night, I think around 9:15.

11      THE COURT:  Okay.  I have seen that, and of course, we

12  will move on from that case.  And thank you for working, Ms.

13  Cox and Ms. McLemore.  Thank you for working that out.

14      MS. McLEMORE:  Thank you, Your Honor.

15      THE COURT:  All right.  So that takes care of that

16  one.  Now we are back to status conference; is that right?

17      MR. WILLIAMS:  Yes, Your Honor.

18      THE COURT:  Okay.  All right.  Plaintiffs' steering

19  committee's motion to amend the March 16, 2016, orders on

20  rules, policies, procedures guidelines relating to establishing

21  the common benefit fee and expense fund.  We have dealt with

22  that.

23      MS. PIERSON:  Correct.

24      THE COURT:  Number 2, Plaintiffs' motion to dismiss

25  with prejudice in the Burrage matter.  We have dealt with that,

1   and then, the last item I have on my agenda is amendments to

2   the second amended case management order 27 (bellwether trial

3   plan) proposed by the parties, and I read both proposals if you

4   want to briefly address them.

5            MR. BENNETT:  I am happy to start or ——

6            MR. WILLIAMS:  I can go first or second.  It doesn't

7   matter to me.

8            MR. BENNETT:  Sure.

9            THE COURT:  One of those two.

10           MR. WILLIAMS:  Mr. Bennett, go ahead.  He can go

11  ahead.

12           MR. BENNETT:  Sure.  I will try to be brief, Your

13  Honor.  It is hot in here, and it is late in the day.  So when

14  we were last together in May, I —— on the phone in May at the

15  last hearing after the series of dismissals, you charged us,

16  Your Honor, with coming up with a solution to move forward in

17  this MDL.  And we, we talked after that hearing, and we largely

18  agree on the process for bellwether selection, as you saw in

19  the papers submitted.  But the two questions and their

20  fundamental question moving forward is, how do we address the

21  Category 5 and 6 cases, not whether —— we all agree we should

22  address them, but how do we address them?  And relatedly, what

23  category of bellwether cases should be tried?

24           And in, in answering those questions, it is Cook's

25  position that we should select and address the PIP/no-injury

1   cases as intended with additional practical solutions that

2   address the concerns that the Plaintiffs raised, Joe has

3   raised, and that you have raised, Your Honor.

4           And we listened to not only the last, what you said in

5   the last hearing but what you have been saying for the last two

6   years.  We have tried three Category 7 cases, two in the MDL,

7   *Brand* and *Hill*, and one in state court in Texas.  Since the

8   inception of this MDL, to date, we have not tried a Tulip case.

9   We have not tried a PIP/no-injury case, and as you said today,

10  Your Honor, and we agree wholeheartedly, the PIP/no-injury

11  cases remain a significant, if not the most significant

12  obstacle to move this MDL forward.

13          Now, I remember sitting in here in this courthouse in

14  a cold day in February where we began this process.

15          THE COURT:  Now, that is not the same day as a cold

16  day in hell, right?

17          MR. BENNETT:  No, it is not, but it, it was a cold

18  day, and we were talking about this.  We had raised it, if I

19  remember a few months previously, and you invited us to discuss

20  this issue.  And that is when you said, Your Honor, we really

21  need to address the product-in-place cases here somehow.

22  Otherwise, we are not going to be able to make much progress.

23  And there you said, if you come up with a proposal that we

24  try —

25          THE COURT:  Well, my, my thought on that is in order

1  to get this matter moving and resolved, Cook isn't going to pay

2  a penny on any of those cases.

3         MR. BENNETT:  Right.

4         THE COURT:  Now, my understanding is, Cook is willing

5  to pay on some cases, which obviously, of course they are, but

6  until we figure out if these cases are worth anything, then,

7  nothing is going to happen.

8         MR. BENNETT:  You are absolutely right, Your Honor,

9  and this is the reason why —

10        THE COURT:  That is the hurdle I want to get over

11  before, really, we do anything else.

12        MR. BENNETT:  Yeah.  We had two to three

13  product-in-place cases.  You said, look, if you can figure out

14  a way to try two or three of these in the next two or three

15  years, I am happy to do that.

16        THE COURT:  Yeah.  Obviously, that is not going to

17  work.

18        MR. BENNETT:  Well, I have some ideas and reasons why

19  we, we may be able to make it work; and if not, at least have

20  some real traditional solutions applied to these cases that

21  will give us real answers.  We are not completely — I mean, we

22  have been going around in circles on these cases for two, three

23  years now, and this was raised after you asked us to come up

24  with a proposal.

25        We, we talked about it.  We offered some ideas, and

1   that is when we began to hear, look, it doesn't make any sense

2   to try these no-value cases.  I don't think we were using

3   negative value at the time, but basically, we heard Mr.

4   Williams say this.  And back in August of the 2019, we were

5   talking about this very issue, and you said, "I don't want to

6   try these PIP cases either, and I don't think anyone wants to

7   try these cases.  But they are 40 percent of the docket here."

8   I am reading from the transcript.

9           "And we've got to find out" — you know, I put it up

10  on the screen now — "if the jury thinks they are worth

11  nothing, then, that will tell us a lot.  If the jury thinks,

12  well, they're worth whatever, then, that will also tell us

13  something.

14          "As long as the Plaintiffs believe they have value,"

15  and we heard again today, they believe that.  "And Cook says,

16  there's no value there, we're not paying anything on that."  It

17  is just as you said, "Then, I don't know how to get through

18  that roadblock without a jury, in Indianapolis or Evansville,

19  telling us cases aren't worth anything or my saying it in

20  pretrial."

21          So we are now a year later, and the product-in-place

22  cases/no-injury cases remain the biggest obstacle in the MDL.

23  They still continue to represent roughly 40 percent of the MDL.

24  They continue to be filed.  They continue to be a roadblock in

25  this MDL, and Plaintiffs continue to claim they have value, and

1   Cook continues to say they have no value.

2          They continue to need a plan, as you said, that

3   results in a jury telling us whether the cases have some value

4   or no value or results in the Court disposing of them pretrial.

5   Our plan does that.  It does both, and it doesn't do it in a

6   half measure way.  We have a plan.  If we move forward on it,

7   I think we can avoid trial altogether, avoid the cost of trial,

8   but we need to have a plan to do that.

9          The first step is to screen the cases by statute of

10  limitations, statute of repose.  That reduces the risk of what

11  happened in *McDermitt* and *Johnson*, the last two bellwethers.

12  That takes it off as an issue entirely.  The Plaintiffs can

13  prescreen these cases before we even talk about them.  We then

14  do a dispositive motion on the fundamental question of whether

15  these cases represent a compensable injury.  That is an issue

16  that we believe is a matter of law.  That costs us nothing

17  other than briefing and an oral argument.

18          If Your Honor rules on that issue and rules in a way

19  that finds that these are not compensable injuries, we are

20  done.  We can, then, look at these cases, give you a list, and

21  we are done with this entire episode.  If you find I can't rule

22  on this as a matter of law on the papers, we move forward, but

23  there are additional steps that we can take short of trial.

24          And that includes picking a bellwether pool and having

25  early briefing, early briefing and early expert disclosures

1   before we get way down in this path, and we lay out in our
2   papers, and I won't go through it all again.  But it allows us
3   to have this expert hearing without the full bellwether process
4   going through and having you look at this and do a Daubert
5   hearing and deciding it on those papers then.

6          And if we are not able to address it that way and
7   resolve it that way, we then go through the bellwether trial
8   process, and I have some ideas that I will share with you about
9   how to make that a cheaper process but still get us the results
10  we need to tell us the value of these cases by a jury.

11         The Plaintiffs' bellwether plan, on the other hand,
12  suggests a nonbinding, single-day expert mini trial on whether
13  PIP cases present compensable injuries, and then we have a
14  frank discussion about whether these cases would have any
15  success before a jury.  I am very much concerned that is just
16  going to cause more delay.  It doesn't give us definitive
17  rulings.  It doesn't give us things that we can hold up to
18  everyone else and say, this is what these cases are worth.

19         And then, they also suggest two more Category 7
20  trials.  We have already had three.  So in comparing the plans,
21  you have, on the one hand, our plan, which has binding
22  decisions on legal merits, on PIP/no-injury cases, or a jury
23  valuation on PIP/no-injury cases.  It focuses this MDL in the
24  one area where the parties have the greatest disagreement on
25  valuation fundamentally, and it results, ultimately, in an even

1   mix of Category 7 and Category 5 and 6 trials so far.

2          The Plaintiffs' plan has no binding decision on

3   merits; and frankly, I believe it will, it will cause these

4   issues to remain in dispute until the very end.  There is no

5   jury evaluation.  It limits trials to Plaintiffs' cases which

6   have the highest perceived values, while seeking settlement on

7   all cases in the MDL, and results in no trials of any case

8   outside of Category 7 in the last five and a half years.

9          I will briefly say, these are things that we have —

10  Andrea has talked about.  So I won't go into them in great

11  detail, but the bellwether process must have — including what

12  you are doing here.  The bellwether process is not just

13  bellwether trials.  It is what we are suggesting here in its

14  entirety, and it must have a representative range of cases, not

15  just Category 7.  It is only valuable if we have a true picture

16  of the value of the entire MDL.

17         And although there may be a good faith reason for

18  dismissing these cases, and I will not go into that.  That has

19  already been brought up and addressed earlier.  There is some

20  concern that it could be manipulated as well.  The Plaintiffs

21  here admit they plan to try PIP/no-injury cases after remand

22  and transfer.  Now, I don't think they will.  I don't think you

23  think they will, but they have said they want to.  And if that

24  is the case, then, where is the best place to have these?

25         We have heard a lot about there being incentives that

1  aren't the same, that they are not incentivized to try these

2  cases.  I got to push back on that in this situation.  We have

3  thousands of cases.  The MDL is the best place to have these

4  tried where there is cost spreading.  That is the whole point

5  of the MDL.

6          Jaime Dodge, who I served on a panel with her.  She is

7  the director of mass torts at Emory University.  She said, and

8  I quote, in addition, the cost-spreading MDL enables Counsel to

9  pursue many meritorious cases that would have been

10  negative-value claims outside of an aggregative context.  That

11  is why we have a common benefit fund to spread costs and

12  compensate attorneys for performing common work.

13          The CBF itself actually says, bellwether casework is

14  eligible for compensation through the CBF.  So this is the

15  place to do that, not in 2500 different courts or in this court

16  2500 different times, individually, but here in this MDL.

17  Permitting negative value cases to remain in the MDL without

18  addressing them, truly addressing them enables park-and-ride

19  cases to persist without resolution.

20          As I said, this MDL is best suited to ease burdens on

21  trying these PIP/no-injury cases if we try them, if we get to

22  that point.  Common issue expert discovery costs can be spread

23  among all product-in-place cases.  Common issue expert

24  discovery can be used after such cases are remanded from the

25  MDL.  We do this once or twice, then everyone else can use it

1    if we don't reach resolution.  A CBF can be used to enable us
2    to actually cover those costs.
3          Finally, this is my last slide.  There are other ways,
4    again, if we get to bellwether trials.
5          MR. WILLIAMS:  We don't have your slides.
6          THE CLERK:  Are you connected to the table?
7          THE COURT:  There you go.
8          MR. BENNETT:  Sorry about that.
9          Finally, there are ways to address the expense.  I
10   have sat through two trials in this court, and they have been
11   long trials.  And I think part of the problem with the expense
12   are the many, the many days that we are trying these cases.  I
13   don't think a PIP/no-injury case ought to take as long as a
14   *Brand* or a *Hill*.
15          I suggest that we put time limits that are — we are
16   talking about incentives by the Plaintiff and by Cook, and we
17   might make these cases take a long time.  Let's even the
18   playing field.  We, we set these for a week.  We get two days
19   for the Plaintiff.  We have openings, we have two days for the
20   Plaintiff, two days for the Defense, closing, and jury
21   deliberation.  It, it is easy.
22          We can try this case in a week, and both sides get
23   equal amount of time to present their case.  Also, we should
24   consider and have in our scheduling order early briefing and
25   court rulings.  If we see an issue on a bellwether case that

1   ought to be ruled upon right away, we will do that.

2       And then, finally, you know, there are practices that

3   we can, we can pursue to make these cases cheaper too.  I mean,

4   the last trial had a shadow jury.  We don't need that kind of

5   stuff.  In the *Hill* case, one expert cost them more to pay for

6   that one expert than what they were actually asking for from

7   the jury.  There are practical solutions here.  We just need to

8   follow them.  Thank you.

9       THE COURT:  All right.  Thank you, Mr. Bennett.

10      Mr. Williams?

11      MR. WILLIAMS:  Thank you, Your Honor.  I want to start

12  by saying that I think the proposals that Cook are putting

13  forward begin with sort of a false premise.  That false premise

14  is this concept of cost sharing and using the common benefit

15  fund to spread costs.  I agree that cost spreading is a key

16  component to the MDL process, but as Judge Fallon said in a

17  Tulane law review article, that is achieved by developing trial

18  packages in the context of an MDL.

19      If you were to go to Pennsylvania right now and watch

20  a Risperdal trial, a lot of those are happening 90 percent by

21  videotape because all of the experts on general causation were

22  put in the can in the sort of aggregate litigation; and then,

23  all you have to do is play the videotape.  You don't have to

24  pay for the expert to come.  That will come out if you

25  eventually are successful in your case by settlement or

1  verdict, then, a percentage of that money goes back to the

2  common benefit fund and will reimburse the people who paid for

3  the experts in the first place.

4       The problem is, the money that is in the common

5  benefit fund comes from settled cases or cases collected on

6  judgment, and if Cook is not settling cases, there is not money

7  in the common benefit fund to be spread around on these other

8  cases.  The cost spreading occurs after remand when people can

9  try these cases with all of their experts and all of those

10  costs contained in a box, and I think Cook is going to great

11  lengths to create a false dichotomy that we never want to try

12  these cases.  That is not true.  We do want to try these cases,

13  but we want to try them in a way that can benefit the client.

14       The way the Plaintiffs' financing works is, in every

15  Plaintiffs' contract it says that the costs spent on litigation

16  and trial comes off the top of any amount you recover.  And,

17  for example, if you were to look at the *McDermitt* case, before

18  we even got to Day 1 of trial, Mr. Goldenberg spent $78,000

19  appearing at and taking all of the depositions that Cook

20  noticed, and so Mr. McDermitt, if he hadn't got poured out on

21  summary judgment and had come to try this case, and Stuart and

22  I talk about this a lot.

23       If we ask for $75,000, you are asking an individual

24  client, hey, we want you to come sit in court for three weeks,

25  away from your family.  And I have to tell you right now, that

1    there is zero chance that you will recover a dime.  This is an

2    eleemosynary activity on your part and thank you.  The clients

3    say, "No, we are not going to do that."

4         And frankly, that is what happened in the *Burrage* case

5    when he was told what was going to happen and that there was no

6    opportunity for him to make a recovery.  He said, "You know

7    what?  Forget it.  I am not going to do it."  In every scenario

8    that Cook is proposing that this Court adopt puts Plaintiffs

9    and their Counsel in that position.

10        THE COURT:  Wait a second.  On *Burrage* he was told he

11   was not going to get a recovery?

12        MR. WILLIAMS:  No.  What I am saying is, the idea is

13   — and I wasn't in that conversation, and I am not trying to

14   violate anybody's privilege, but the concept is, if we spend

15   $75,000, that is going to come off the top.

16        THE COURT:  Sure.

17        MR. WILLIAMS:  So you don't have — if we are going to

18   ask for $75,000, even if we hit a home run on your case, you

19   are not going to get anything.

20        THE COURT:  All right.

21        MR. WILLIAMS:  And make no mistake, I think that is

22   precisely the position that Cook wants to put us in.  They want

23   us to spend money and lose interest in the litigation, and

24   hopefully it will all go away.  We, we haven't lost interest.

25   What we are trying to do is provide these people with their day

1    in court in a way that actually gives them a day in court.

2        So we can dress it up.  I mean, what I am saying is,

3    what Cook is trying to do is put us in that position, and that

4    is their strategy, to bleed the Plaintiffs until they give up.

5    And I am not saying that is an illegitimate strategy, but what

6    I am —

7        THE COURT:  It goes back to *Lexecon* waivers.  I mean,

8    no one agreed you ever wanted all these cases all over the

9    country to bleed Cook.  I mean, so you know, and it is a

10   strategy.

11       MR. WILLIAMS:  And that is what I am saying, Your

12   Honor.  I am not saying it is an illegitimate strategy.

13       THE COURT:  I am just saying, what is good for the

14   goose is good for the gander here.

15       MR. WILLIAMS:  Your Honor, I agree with you.  I am

16   just saying let's not dress it up and say it is because we need

17   to try these cases.  Because there are options to do this in an

18   economically efficient way.

19       THE COURT:  Well, I think it would be helpful if we

20   could get a jury to take a look at a product—in—place/no—injury

21   case, but that is going to be hard to do.

22       MR. WILLIAMS:  It is going to be hard to do.

23       THE COURT:  Yeah.

24       MR. WILLIAMS:  And what we have proposed in the past

25   and has been shot down every time, if we are truly, if we are

1   truly trying to figure out what will a jury do with this, why
2   don't we try an issue jury?  That can be done in one day, and
3   we put up the experts, and the jury is charged with responding
4   to, you know, two special interrogatories.  Is this a
5   compensable injury; and if so, how much?

6           Then we don't have to go through and put on the
7   engineers who are talking about design defect.  We don't have
8   to go through and do all — it could be advisory.  I don't
9   really care, but it is an efficient and economical way to get
10  that issue in front of real people in the community to see what
11  they have to say.  But if we do it any other way, we are going
12  to find ourselves, I believe, in the very same position that we
13  sit here today, with somebody else who has dismissed a case
14  because it doesn't have no value, and it is not a frivolous
15  case; but tried in the bellwether context in an MDL before
16  trial packages have been developed makes it impossible for the
17  Plaintiff to make a recovery.

18          So what we are trying to do is get these people a day
19  in court but in such a way that truly gives them that day in
20  court, and our proposal, which is really — it wasn't our
21  proposal.  It was what Your Honor proposed at the May 11th
22  hearing.  I think the first start to this is — excuse me, Your
23  Honor — to do what Your Honor suggested when we are sitting
24  here in a time where we can't bring jurors in.  And even if
25  Your Honor ordered jurors to come in, I suspect that some of

1  them still wouldn't come in.

2       But if we bring our experts before Your Honor, and we

3  do a sort of quasi bench trial on this issue, we can all hear

4  what the testimony is going to look like.  And we can start to

5  talk with Your Honor and amongst ourselves about what a jury

6  would really do with that.  You know, judge, judge found in

7  that same law -- or no, this was in the *Manual for Complex*

8  *Litigation*.  It says, "Resistance to settlement arises from

9  unrealistic or unreasonable attitudes of parties and counsel,

10 in which case the judge can help them reexamine their premises

11 and assess their cases realistically."  And I am not -- there

12 may be unreasonable and unrealistic expectations on both sides,

13 but if we each bring our respective experts like Your Honor

14 suggested, put that evidence in, and then talk about it, I

15 think that Your Honor can facilitate a real discussion.

16      If, if either side remains recalcitrant and says,

17 well, we don't know what a jury can do with it, the easiest way

18 to resolve that issue is once we can start getting juries again

19 at some point hopefully in the future, we do an issue jury.  We

20 just try the issue.  Is an asymptomatic perforation, when that

21 strut sticks out of the vena cava and goes into an area of the

22 body it is not supposed to be, is that an injury?  And two, if

23 it is, if you check yes, then, what do you think it is worth?

24      And we do that, and that can be done in a day, and

25 that can be done on the cheap.  And frankly, that can be done

1    without putting an individual Plaintiff in that would have to

2    bear that cost, and we could truly spread it amongst the

3    lawyers as opposed to a client who has a contract with a lawyer

4    that governs specifically how costs and expenses are going to

5    be paid for in their case.

6          And so I think if we want any chance of moving this

7    forward, if we adopt what Cook is asking us to adopt, I can all

8    but guarantee that in 12 months we will be sitting in these

9    same chairs, and we will be talking about the same thing

10   because the same thing will happen.  It, it will, and so if we

11   want to move this forward, I think Your Honor's suggestion of

12   the mini trial is a good start.  If that does not work, or if

13   we need more, then, I suggest we try an issue or put an issue

14   in front of the jury.

15         MR. MARTIN:  Your Honor?

16         THE COURT:  Mr. Martin?

17         MR. MARTIN:  Thank you, Your Honor.

18         I want to just address two things, and the first thing

19   is the concept of whether or not a bellwether trial of a case

20   like — if the cases were not dismissed, a case like *McDermitt*,

21   case like *Burrage*, and I suggest that the same thing as Mr.

22   Williams has suggested, that in a year, realistically, we will

23   be at the same place and talking about the same things even,

24   even if there is a trial.  Because the truth of the matter is,

25   in, in this situation with this, with these cases, bellwether

1    trials or trials of any sort don't make things — haven't made

2    things happen, and I would suggest, aren't going to change the

3    picture if we have the bellwether trial as suggested in a

4    Category 5 and 6 case, however it is put together.

5          Because at the end of the case, the case is going to

6    be won, or the case is going to be lost, just like the *Brand*

7    case was won and lost.  Just like the *Pavlock* case down in

8    Houston was won by the Plaintiff, just like the first case we

9    tried in this courtroom was lost by the Plaintiff.  All of

10   those things have happened, Your Honor, and I would say this,

11   that if there have been settlements, there have been very few,

12   very far between.  And none of those bellwether trials or

13   nonbellwether trials, none of the dismissals, and none of the

14   potential trials, I would suggest to the Court, make any

15   difference.

16         We have had — I agree with Mr. Bennett, we have had

17   three, I guess, Category 7 injury cases; *Pavlock* in the first

18   one here, and then, and then *Brand*.  But the truth of the

19   matter is, is if trials were going to solve the problem, and if

20   more Category 5 and 6 cases were going to solve the problem, we

21   would have seen, we would have seen some settlements at this

22   point.

23         There are about 8,000 cases filed in this MDL, and I

24   am going to be willing to bet that less than 1 percent of 8,000

25   cases or thereabouts have resolved, and this MDL has gone on

1    for what is it, five and a half years?  I, I am just being a

2    prognosticator in that it is not going to move the ball and

3    however it is done.  And so the other thing is, and this is not

4    the day that it has not been briefed really, and it is not on

5    the table.

6         But the idea of a *Lone Pine* order has been suggested,

7    and I would say this.  Something that has never been brought up

8    is, is if we have a screening order like I think is being

9    suggested, before a case can be filed or before a case can

10   continue on, certain check boxes have to be –– boxes have to be

11   checked.  That is my understanding of kind of what is being

12   prognosticated again, and so what we, what we have not talked

13   about is, well, how would that really occur?  Would it ever

14   really occur?

15        The reason I am bringing it up now is, I, I want to

16   kind of predict what I think would, would happen in the future

17   should this be discussed and what would be some of the

18   problems.  I will be quick with this.

19        First of all, there –– we know now through the *Brand*

20   trial and through Dr. Krumholz' testimony that there was, there

21   is a major question as to whether or not the filters here are

22   efficacious, whether or not they save lives, and the Court may

23   recall the testimony and the science that, that Drs. Bikdeli

24   and Krumholz and others had written in their systematic review

25   and made analyses back in 2017 and 2018 about whether or not

1    there was any proof that filters actually save lives.

2         And the truth of the matter is, the science now is

3    that there is no quality evidence that they do, okay?  So how

4    are we going to check the box when we are screening — when

5    they are case screening about, well, is this a person who

6    received a filter that would possibly have a benefit, right?

7         So the question of benefit, unlike probably any other,

8    any other MDL or any other device or pharmaceutical litigation

9    that I know of, is we have a situation here where there is a

10   true question, and maybe the question has now pretty clearly

11   gone on the Plaintiffs' side on this that there is no proof

12   that they are efficacious, right?  So how do we check that box?

13        We are going to have to go through and analyze each

14   and every case.  Was this a prophylactic placement?  Was this a

15   bariatric surgery?  Cook is never going to agree that a

16   prophylactic placement, for instance, is not efficacious, and

17   there is no proof that it is or that maybe some indicated uses

18   are.  So how do we fashion that?

19        Secondly, how would you really fashion in one of these

20   screening orders, okay, before you can file your case, you must

21   check the injury box.  What is an injury box?  During these

22   hearings and over many, many months, now years, when sort of

23   the mantra of these Category 5 and 6 cases are no-injury cases,

24   and they are product-in-place cases.  The truth of the matter

25   is that, that is very much a misnomer because two of the things

1   that exist in these 40 percent of the cases, and I am giving

2   them a great benefit of the doubt, that 40 percent of the MDL

3   are these Category 5 and 6 — excuse me, no-injury cases.

4          The cases that, that make up that 40 percent, again,

5   giving them the benefit of the doubt, is, are cases where you

6   have got a stuck filter, a stuck filter.  These filters were

7   meant to be retrievable or permanent, safe for permanent use,

8   but they can't get them out.  Miss Divine spoke about this a

9   little bit so I won't speak any more about it except those

10  cases are what are being called part of this 40 percent

11  no-injury cases.  And I, I would suggest, Your Honor, that

12  those aren't no-injury cases.

13         THE COURT:  Well, that, that is what we have been

14  talking about for a year or more, is it a compensable injury,

15  and which would allow or recovery by law?  If it is not

16  compensable, if it is not something that can result in an award

17  of damages, then, why are we dealing with those cases?  I don't

18  know.  I, I haven't seen any law.  I haven't seen any cases.  I

19  haven't seen anything anywhere that, that addresses this —

20         MR. MARTIN:  I am just suggesting —

21         THE COURT:  — this situation where you come in front

22  of a jury.

23         MR. MARTIN:  Right.

24         THE COURT:  You say,

25         "Well, I have got this IVC filter implanted in me.

1        "Well, do you have any injury?

2        "Well, no.

3        "Do you have any pain?

4        "Well, no.

5        "Do you have any —

6        "All I have is fear of the future."

7        Well, fear of the future is not compensable.

8        MR. MARTIN:  I am not talking about just fear of the

9    future.  What I am talking about is, for instance, I can make

10   the argument and bring, bring an expert who

11   truthfully — correctly would say, all right, I — we tried to

12   get this filter, retrieve position.  We tried to get this

13   filter out, and we couldn't get it out.  Now, I can immediately

14   tell the Court — or I can immediately say, then, that there is

15   an injury there because the filter was supposed to come out.

16   There is a cost associated with it coming out, and that cost

17   was incurred, and the filter is still in the body.

18       Well, what — we will always be able to, to bring

19   forth evidence that there is a cost associated with, for

20   instance, the stuck filter cases.  We have never really gotten

21   into the means and details of that, but it, it, it kind of goes

22   just logically to say that if the filter is supposed to come

23   out and the doctor can't get it to come out and you have to go

24   to Dr. Kuo in California, for instance.

25       My clients have gone to him to get their filter out,

1   and it is well over $100,000 in costs to get a filter out by a

2   complicated procedure by Dr. Kuo in many instances.  I am

3   simply giving the Court an example that if we were to go

4   through the process of the screening order that has been

5   suggested, we have got that situation.

6          And finally, Your Honor, I would suggest this.  If

7   40 percent of the cases are indeed the type of case that has

8   been suggested, and that — there are 60 percent of the cases

9   that are, and I would just simply go back to the fact that it

10  is going do be — I just don't think that — I don't think the

11  way that the Defense is suggesting that we get there to all of

12  a sudden magically, if there are a couple of jury verdicts, one

13  way or the other, even if they are pro Plaintiff verdicts, Your

14  Honor.

15         I am just, I am just part of the game and part of the

16  process, and I just don't see that those more minor injury

17  cases really are that the point that gets this stopped, that

18  we, we are able to resolve this.  And because it really hasn't

19  happened even with the cases that are the more serious injury

20  cases.  That is all.

21         THE COURT:  Okay.

22         MR. BENNETT:  Your Honor, briefly, very briefly.  Mr.

23  Martin has made arguments against and responded against points

24  I haven't raised.  We have not talked about *Lone Pine* or a

25  screening order regarding the merits at this point.  Now, our

1  bellwether plan does —

2          THE COURT:  Your screening order proposal was —

3          MR. BENNETT:  Statute of limitations.  That's right.

4          THE COURT:  — and repose.

5          MR. BENNETT:  The plan does talk about other general

6  issue motions that we can file in 2020 while we are having the

7  COVID-19 pandemic, but that is for a different date, not for

8  today.  So setting that aside, I, I do want to address

9  something that Mr. Martin said about, you know, what is an

10 injury box?

11         And the arguments that he made, I believe, illustrate

12 exactly the issues that either the Court, through dispositive

13 motion, or a jury through a trial must decide.  He talks about

14 benefits and risk and about defect.  These are all

15 issues — and injury.  Those are all issues that either a Court

16 or a jury must decide, and this idea of this mini trial, I

17 understand.  I get the argument, but there are other ways to

18 get there without this mini trial that I think is just going to

19 add costs to all sides.  And this issue jury — again, that

20 assumes only one issue and not the entire flavor of a case.  It

21 doesn't really tell us anything, whether there is a default

22 that caused that.

23         Those just add costs and don't give us the answers we

24 need, and they jump to this trial without addressing what I

25 think are very important issues that we raised in our plan.

1   One is, first, a dispositive motion as a matter of law where we

2   argue both sides, give you the law and make the arguments on

3   whether these, these claims are compensable injuries.  And

4   then, if, if we get past that, and I say that is a big if, then

5   we have an expert Daubert-type hearing where we bring experts

6   in.  We do have a hearing where you decide that issue.

7          That is before you even get to a bellwether trial; and

8   then, finally, if we do get to a bellwether trial, it does have

9   challenges.  I don't think they are insurmountable, and we will

10  work with the other side in addressing those costs; again, time

11  limits and other approaches to allow us to have one.

12         We talk about trial packages.  I do not believe a

13  Category 7 trial package will work with a Category 5 or 6 case.

14  If you want a trial package for these thousands of cases in

15  Categories 5 and 6, these thousands of cases that are personal,

16  are PIP and no injury, you, you need a single, one or two trial

17  packages for those cases.

18         We can try the first bellwether that is a PIP or

19  no-injury case.  We can do the video deps, and then they can

20  use those for every other case.  That is the cost-effective way

21  to approach this, if we even get there.  Thank you, Your Honor.

22         THE COURT:  Is there any value to thinking about

23  splitting this MDL up with the PIP/no-injury cases with the

24  significant cases and maybe settling, settling or somehow

25  resolving the significant injury cases without having to worry

1   about the product-in-place/no-injury cases which can be dealt

2   with down the -- I am just throwing this out.

3          My understanding is from my brief discussions with

4   Magistrate Judge Baker, is that the PIP/no-injury cases are

5   what is holding up significant progress in resolving all the

6   other cases.  I am just throwing this out, food for thought.

7   We can probably get it done, just making a phone call and

8   seeing if we can split it, split it up.  I don't know, just

9   trying to --

10          MR. WILLIAMS:  Your Honor?  I, I have not given that,

11   and Ben hasn't given that any thought.  I would like to think

12   about it and report back because it is definitely -- it, it has

13   got a shot, but I want to think it through.

14          THE COURT:  I don't know, Andrea or Steve, but just

15   something to throw out there, I mean.

16          MS. PIERSON:  I, I appreciate very much --

17          THE COURT REPORTER:  I'm sorry, your microphone.

18          MS. PIERSON:  I appreciate very much, Your Honor, you

19   know, your efforts to be creative in how do we get this done.

20   I think it is fair to say everyone in this courtroom has been

21   giving those issues a fair amount of thought.  We are having a

22   number of conversations that I really can't go into right now.

23          THE COURT:  I don't want you to.

24          MS. PIERSON:  You know, suffice it to say, our goal is

25   to make progress, and it has been our goal for some time now,

122

1    and where people are reasonable, we will make progress.  And

2    where there are insurmountable logjams on case evaluation, we

3    won't make progress.  But, you know, suffice it to say that we

4    don't come to the table with a notion that there will never be

5    any settlement of cases, ever.  I mean, certainly we have shown

6    already that that is not the case.

7            THE COURT:  Oh, yes.  There is no question about that.

8            MS. PIERSON:  Thank you, Your Honor.

9            THE COURT:  I was just trying to think of some way

10   that maybe we could just separate out the cases that are really

11   causing legal issue concerns and factual concerns, obviously,

12   and the ones that have, that have a good deal of merit to them.

13           MS. PIERSON:  I believe there will come a time in this

14   MDL where the denominator of cases is at a place that real

15   progress can be made, but unfortunately, we have got some

16   fundamental disagreements with the other side and they with us

17   about certain cases.  I think I have told you before, Judge,

18   our census is that we think somewhere between ten and

19   20 percent of cases in the MDL are barred by the statute of

20   limitations or statute of repose.  If there are 7,000 cases in

21   the MDL, that is 700 to 1500 cases.  That is a lot of cases.

22           THE COURT:  Sure.

23           MS. PIERSON:  Our view is that 40 percent of these

24   cases have no value and that you can decide those cases on the

25   papers without any, anything more.  We are going to tee that

1   issue up with you, and if we are not successful there, we will
2   tee it up as a matter of law under Rule 56 motion.

3         So if we are right about that, and I am not
4   presupposing that we are, but I believe based on the law that
5   we are.  If we are right about that, that is another 2500
6   cases.  You know, that is a lot of cases.  Well, pretty soon
7   you are down to an MDL that is less than half of its current
8   size.  That is a very different MDL than the one that is before
9   you.

10        So again, I have been transparent with the Plaintiffs
11  and the Court about this.  You know, we have a plan for this
12  MDL, and we hope you will let us execute on it.  And that plan
13  is, we are going to bring before you issues that affect groups
14  of cases that move the needle on the denominator, and the goal
15  is to move that needle in a substantial way so that the entire
16  MDL, ultimately, will one day be put to bed.

17        But the plan that Steve described sets it out for this
18  most significant sector, the product-in-place cases.  We will
19  be working on the other sectors at the same time.  I am sorry,
20  that means that is a lot of paper for you and your very
21  talented staff, but I think it is the only way to address these
22  groups.

23        THE COURT:  All right, all right.

24        Within the next 30 days, and I want a report back on
25  that 30th day or before.  Counsel for Cook is to sit down with

1   the steering committee representatives, and my thought is, is
2   that the proposals submitted by Steve is something that I would
3   be interested in.  And I would like to give you, both sides, a
4   little bit of flexibility to work within those proposals, come
5   up with some dates that we can rely on and I very, very well
6   may wish to have a, a mini trial with experts, as well.

7        So these are some, some guides I am giving you, some
8   parameters I am giving you to work with to come up with
9   something that is agreeable to both of you, both sides as to
10  how we can address these 40 percent of the cases here.  Does
11  that make any sense to do that?  You know, I can say do this,
12  do this, do this, do this within, by this date and set a bunch
13  of dates.  But I am trying to let you work with your calendars
14  --

15       MR. MARTIN:  Sure.

16       THE COURT:  -- as well.  I am flexible.

17       MR. MARTIN:  Could I maybe make a suggestion, Your
18  Honor, that would fall within, I think, what Mr. Bennett, what
19  the Court has suggested and also what Mr. Williams has
20  discussed with respect to the trials in the box?  If we are
21  going to have a mini trial, for instance, might it be
22  efficient, and might it serve the causes that have been
23  discussed today for the experts to be put in the box, to then,
24  as opposed to bringing them all live, and we know we are going
25  to all do the best we can.

1     If we have a trial, we are going to bring experts, and

2  we are going to get them prepared, both sides are.  It is going

3  to cost a lot of money, and if we put them in the box, meaning

4  we put them on videotape and get their depositions taken so

5  that, then, when we have that mini trial, if that is, if that

6  is where it goes, then, we have a mini trial with these experts

7  on videotape.  And then, at that point, we have got those in

8  the box to be used for other trials.  It seems to me that would

9  be the most efficient way to do it.

10     THE COURT:  I have no problem with that if you can

11  agree to that.  I mean —

12     MR. BENNETT:  We will talk about it.  The plan as we

13  set out has it first as, it has a motion to dismiss, and then

14  it has, you know, it has also the expert presentation.  And the

15  mini trial that we had in mind was a one-week trial, and you

16  know, Your Honor, you have always said to us —

17     THE COURT:  Well, I don't know if I am going to be

18  able to get jurors in here.  I mean, I guess I could just go

19  around the courthouse and round up six or eight people,

20  nonlegal people.  I guess I could do that.

21     MR. BENNETT:  We will work with them on an idea that

22  allows us to, to be as flexible as possible in finding a

23  solution here.

24     THE COURT:  Yeah.  We have got to make some, some

25  progress here.  You know, I, I would like to hear experts on

1  these product-in-place cases and the no-injury cases as to what

2  is the concern?  I would like to hear their direct exam, and I

3  would really like to hear the cross-exam on experts from both

4  sides.

5          MR. BENNETT:  And our plan does have that in it

6  already, listening to expert testimony, as well.

7          THE COURT:  Yeah, yeah.  I mean, that would be

8  helpful, helpful to me in trying to, to resolve some of these

9  issues.  So that is my charge to you, is to sit down and give

10 me a report back in 30 days as to -- I know you are not trying

11 any cases so you should have time.

12         MS. PIERSON:  Steve is.

13         THE COURT:  You have a case going, Steve?

14         MR. BENNETT:  It is in Missouri.  My team has a case

15 going, yeah.  We asked for a continuance of the trial in

16 September, and the judge said no.

17         THE COURT:  Well.

18         MR. BENNETT:  St. Louis, Missouri.

19         THE COURT:  Good luck with that.

20         And Ben and Joe, what happened to Dave Matthews?  Is

21 he still start part of the steering committee?  If he is not,

22 do we need to replace him?

23         MR. WILLIAMS:  He is technically still a member of the

24 steering committee.  I have been having some conversations with

25 Mr. Matthews.  I can give you a definitive response within that

1    same 30 days.

2            THE COURT:  Yeah.  I mean, if he doesn't want to

3    participate, then, I am sure there are others who would be

4    willing to be helpful to you --

5            MR. WILLIAMS:  Sure.

6            THE COURT:  -- on that.

7            MR. WILLIAMS:  I will speak with Mr. Matthews and

8    report back.

9            THE COURT:  Very good.  Anything else?

10           MS. PIERSON:  Can I -- this doesn't need to be on the

11   record.

12           (Off-the-record discussion.)

13           THE COURT:  All right, folks.  Well, it is good to see

14   you and always good to work with you, and safe travels on the

15   way back.  And we will look forward to hearing from you in 30

16   days on your discussion, results of your discussions.  Thank

17   you.

18                          - - -

19

20

21

22

23

24

25

1  <u>CERTIFICATE OF COURT REPORTER</u>

2

3          I, Jean A. Knepley, hereby certify that the

4  foregoing is a true and correct transcript from reported

5  proceedings in the above-entitled matter.

6

7

8  /S/ Jean A. Knepley                      August 11, 2020
   <u>JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR</u>     <u>Date</u>
9  Official Court Reporter
   Southern District of Indiana
10 Indianapolis Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25