IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: COOK MEDICAL, INC, IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:14-ml-2570-RLY-TAB<br>MDL No. 2570 |

This Document Relates to Plaintiff(s)
  Delmar Keeton

Civil Case #  1:21-cv-313

**SPECIFIC ALLEGATIONS**

**A. Cook concealed the flawed design of the Tulip filter and the difficulties encountered in the Tulip clinical pilot study from Plaintiff and the Medical and Scientific Communities.**

1. Cook was aware that the Tulip was very difficult and dangerous to attempt to retrieve after only a very short indwell time. In September 2001, Ray Leonard, Cook Product Development Manager, wrote an email memorializing a meeting he had with Dr. Tom Vesely, who was the lead investigator for the Tulip clinical pilot study.

2. Leonard related that Dr. Vesely told him the Tulip study was "looking ugly" and he was concerned about serious adverse events seen early on in two patients. One had suffered a Tulip filter migration to the heart, and the other experienced a complete thrombosis of the IVC and iliac veins, which was attributed to the Tulip filter.

3. In this same email, Leonard writes that Sara Strickler, a Cook employee, has suggested asking study investigators to "cherry pick" and to only attempt Tulip filter retrievals in those patients who are highly likely to have successful retrieval attempts.

4. In an August 2002 email, Leonard describes a conversation with Dr. Bob Vogelsang, another Tulip clinical pilot study investigator. Dr. Vogelsang told Leonard that he had retrieved a Tulip filter after only 14 days indwell time and that it had a "chunk of (vena) cava" attached to it. Leonard writes that Cook does not have the evidence it needs to represent the Tulip as safe for retrieval beyond 14 days.

5. In September 2003, because of the difficulties encountered with Tulip retrievals, Cook abandoned its plans to follow the Tulip pilot study with a pivotal study and instead went back to the drawing board. Cook conducted a project to add paclitaxel (PTX) to the filter, which Cook thought would reduce endothelialization and improve retrievability. This project "failed miserably", so Cook decided to press forward despite the poor Tulip pilot study results.

6. In November 2003, an internal document assembled by Cook lists the results of five Tulip filter retrievability studies, several of which were sponsored by Cook. For these five studies, the mean indwell time prior to successful retrieval was a mere 11 days.

7. Cook concealed these facts from Plaintiff and the Medical and Scientific Communities.

**B. Despite the above, Cook routinely and systematically sought to convince physicians that the Tulip was safe for retrieval well beyond 14 days and was able to be safely retrieved indefinitely.**

8.  In May of 2003, Cook Regulatory Affairs Coordinator Jennifer Bosley wrote an email to Cook executives describing her intentions with the Tulip retrievability FDA submission, writing, "[t]he indication will claim a retrieval time longer than 14 days at first and we'll see what the FDA will allow."

9.  Cook did not disclose to the medical and scientific community its own internal concerns, as well as the concerns of the physicians involved in the Tulip clinical pilot study, about the safety risks involved in attempting retrieval beyond 14 days dwell time.

10. In July 2003, Cook Product Manager Bruce Fleck listed among his 2003 third quarter goals, "push (the FDA) for longest possible retrievability window."

11. In November 2003, Product Manager Fleck created a PowerPoint presentation intended to educate the Tulip sales staff.  In it he tells Cook salespeople that when talking about the Tulip to doctors they should say, "Mr./Ms. Physician, please understand that with the FDA's non-specific indication, I cannot give you a direct answer to that question." He then instructs sales staff to "blur the lines of retrieval window", and to otherwise obfuscate the facts known to Cook about the Tulip's safety limitations regarding retrievability.

12. A 2005 Tulip advertisement, intended for physicians and titled "[h]ow long?", tells them that, "[w]hen and if to retrieve the Gunther Tulip is your choice.

The IFU simply states 'the device can be safely retrieved', leaving the decision to you, the physician." This ad implies that there is no time limit to Tulip retrievability and misrepresents the Tulip as being safe to retrieve at any time after implantation. This is contrary to what Cook knew from its own Tulip clinical study, as well as several other studies it had sponsored.

13. Cook concealed these facts from Plaintiff and the Medical and Scientific Communities.

C. **Tulip's "Instructions for Use" omits important information known to Cook regarding retrievability and adverse events.**

14. The Tulip IFU is silent as to the adverse events that occurred in the Tulip clinical pilot study and claims that there were "*none*". In fact, the Tulip "IDE Pilot Study Final Report" lists more than *twenty* adverse, including three cases of IVC/femoral vein thrombosis after filter implantation, one post-placement PE, one migration of the Tulip filter to the heart, reported "major" difficulty with two retrievals and difficulty of some degree reported in 30% of retrievals, nine instances of filter tilt, three cases of significant IVC narrowing (stenosis), one patient requiring a post-retrieval blood transfusion, and four patients complaining of pain during or after filter retrieval.

15. Cook concealed these facts from Plaintiff and the Medical and Scientific Communities.

D. **Cook continued to aggressively market the Tulip filter as efficacious without any evidence of efficacy.**

16. As early as 2007, Cook's Director of Reimbursement/Medical Science Officer (James Gardner, M.D.) alerted the company that there was no evidence that IVC filters actually work: "my greatest concern at the moment is that payers are going to take a good, hard look at IVC filter placement and whether any clinical evidence exists to demonstrate it really saves lives or improves patient outcomes in other ways."

17. In 2008, Dr. Gardner again expressed that there is no evidence to demonstrate IVC filters are efficacious: "My concern, which I've shared with a couple of you over the last couple of years, is that one day the payers (Medicare, Medicaid, commercial plans, etc.) are going to realize they are spending an increasing amount of money on the placement and retrieval of IVC filters and that there's not a lot of clinical evidence that demonstrates these filters actually improve patient outcomes."

18. Dr. Gardner went on to say that the only way to make that determination would be to conduct a clinical trial, but "I'm not suggesting we go down that path." Instead, Dr. Gardner states, "I am keeping a close eye on payers' medical policies to see if/when this hits their radar screens."

19. Throughout the Tulip's time on the market and continuing today, Cook has concealed that the use of the filter is **not** associated with a significant decrease in the rate of subsequent PE, PE related mortality, or all-cause mortality.

20. Cook concealed these facts from Plaintiff and the Medical and Scientific Communities.

**E. Cook's marketing strategy was designed to stimulate sales without reference to (and, in fact, despite) safety concerns and to continue concealing important information about Tulip-related adverse events.**

21. Cook representative Rita Harden confirmed that she and others (including Tom Roberts) were aware of a series of adverse events which should have been reported to the FDA but were not – by Cook's intention and design.

22. This concealment served to depress the information available to the medical and scientific communities by lowering the number of adverse events in the MAUDE database.

23. Then, Bruce Fleck encouraged Cook's sales force to advise the medical community to access the MAUDE database and note the Tulip's adverse events were lower compared to Cook's competitors.

24. Cook then concealed that the personal income, career advancement, and personal success of its sales force was tied directly to the number of filters sold.

**F. Cook suppressed, omitted, concealed, and failed to disclose material information about the known adverse events and lack of efficacy in the Tulip "Patient Guide."**

25. The patient guide conceals the known nature, frequency, and extent of serious failure modes and associated adverse events associated with the Tulip filter.

26. The patient guide conceals the severity and frequency of embedded filters and the associated progressive injury Cook knew to be associated with the Tulip filter.

27. The patient guide conceals the know frequency of penetration and perforation into other organs associated with the Tulip filter.

28. The patient guide conceals that the reported deaths associated with use of the Tulip filter exceed that reported with some competitor products.

29. This concealment deprived Plaintiff and her physician of the data needed to perform an informed risk/benefit analysis. This concealment deprived Plaintiff of the information she needed to discover a potential cause of action against Cook.

**G. Plaintiff and her doctors relied on Cook's fraudulent concealment when deciding to implant the Tulip filter.**

30. Plaintiff's filter was implanted in August 22, 2008.

31. Plaintiff and his doctor, Dr. Scott Stevens relied on the aforementioned-concealment when deciding to implant the Tulip filter.

Respectfully submitted,

**OnderLaw, LLP**

By: /s/ Lawana S. Wichmann
Lawana S. Wichmann, #53999 MO
110 E. Lockwood, 2nd Floor
St. Louis, MO 63119
wichmann@onderlaw.com
mailto:wichmann@onderlaw.com
(314) 963-9000 telephone
(314) 963-1700 facsimile