# EXHIBIT E

THOMSON REUTERS INSTITUTE



# The Impacts of the COVID-19 Pandemic on State & Local Courts Study 2021:

A LOOK AT REMOTE HEARINGS, LEGAL TECHNOLOGY, CASE BACKLOGS, AND ACCESS TO JUSTICE



## In 2020, the United States judicial system faced unprecedented challenges



as it was required to quickly adapt to an ever-evolving virus, new health mandates, and court closures, all while ensuring that litigants had access to the court system. People are entitled to their day in court, as they say, and this has been no easy feat.

Where there is a challenge, however, there is also opportunity. Judges, court staff, and attorneys have risen to the occasion, finding new and innovative ways to keep the daily operations of civil and criminal court moving. In this "new normal", courts used short- and long-term solutions to ensure that the public has continuous access to the U.S. justice system, while also reducing the danger to public health and maintaining safety. However, these solutions still didn't meet all the needs to ensure access to justice and elimination of backlogs.

As a result, we saw an increased reliance on technology in almost all aspects of court proceedings, from virtual or remote pre-trial hearings to remote jury selection and even digital evidence sharing. Many judges found this to be challenging, but many also embraced the opportunity to act as a salve against further case backlogs. While many courts relied on social distancing and were involved in some aspect of remote hearings, they now plan to continue to do so in hybrid-fashion into the future, whether by using social media and remote meeting tools like Zoom, YouTube, Microsoft TEAMS and even Facebook Live.

Despite the COVID-inspired emergency, courts continued with most hearings, while simultaneously dealing with the growing pains of using legal technology and the rapid rise of digitalization of data.

Indeed, a key component in courts' rapid pivot to digitization is a heightened awareness of access to justice. Without equal and fair access to our courts, individuals risk the loss of liberty, property, and much more. When citizens do not have the same access to knowledge of their rights or an understanding of courts' processes, we are left with a weakened and unbalanced justice system.

To explore the impacts of the pandemic on the nation's courts further, Thomson Reuters surveyed more than 238 judges and court professionals at the State, County, and Municipal Courts level in June 2021 in order to gain insights into how the pivot to remote hearings impacted their daily processes, how well they adapted, and what they envision the future of court hearings will look like. Respondents held numerous positions including judges and chief justices, magistrates, court administrators, attorneys, and clerks of the court. More than half of the respondents were either key decision-makers or provided input on decisions related to court administration.

Courts around the nation indicated that virtual hearings increased individuals' engagement with the courts but also increased the burden of self-representation on litigants who may not have the same access to high-speed broadband networks, or even the technology necessary to meaningfully participate in court proceedings.

Overall, respondents indicated the courts' backlog would increase in some circumstances, but most felt it would stay the same. Herein lies more opportunities for change. While most respondents said they didn't believe the backlog would decrease, that backlog can act as a catalyst, propelling our more traditional legal systems towards expansion and development, resulting in a revolutionary way of conducting court business using technology platforms to get through the backlog by allowing digitization of how evidence is submitted, stored, and shared to better support remote hearings.

© 2021 Thomson Reuters. All rights reserved.

## Courts go remote

As a result of stay-at-home orders stemming from the 2020 COVID-19 pandemic, courts had to quickly decide how, when, and where they would hold hearings. In many states, judges, attorneys, and court staff immediately brainstormed ways to bring the courtroom into a virtual environment using audio or video technology to facilitate a hearing without all the participants being physically gathered in one location.

Overall, 93% of respondents in our survey said they were involved in conducting or participating in remote hearings in 2020, while 89% are currently doing so in 2021. Of those currently participating in remote proceedings, almost two-thirds are conducting trial and pre-trial hearings online. The main types of hearings being conducted are civil and criminal with a greater breakdown in the chart below:

While some courts delayed trial hearings, many actively participated in the trial process with 63% of the respondents stating they had conducted both pre-trial and trial hearings remotely. An additional 30% have been conducting only pre-trial hearings remotely but that could change if vaccine rates remain low in pockets of the U.S. and new COVID-19 variants begin to emerge.

Additionally, when asked to rate how challenging virtual hearings have been for their group, about 1-in-3 said they thought it was challenging, and 1-in-3 said they thought it was not challenging. The mixed responses here are likely due to geographic locations, differing court budgets, changing pandemic restrictions, and various levels of technical support. Several respondents said they felt that remote court hearings had worked out better for them, especially in larger counties where attorneys often must travel long distances to get to court. It made scheduling easier and avoided unnecessary delays, especially in uncontested matters, like case status updates.



**Figure 1:**
**Types of Hearings Conducted Virtually**

Source: Thomson Reuters 2021

Overall, 93% of respondents in our survey said they were involved in conducting or participating in remote hearings in 2020, while 89% are currently doing so in 2021.

© 2021 Thomson Reuters. All rights reserved.

## Court backlog: An opportunity for growth

Even in the best of times, the nation's courts consistently battle case backlogs for a variety of reasons. When you add a public health crisis into that equation, it is easy to see why the backlog situation may become much more difficult to manage. Cases continued to mount as courts dramatically altered operations to respond to the pandemic; and in almost all situations, these altered operations delayed proceedings further as courts closures, extended time for arraignments and trials to be heard; and temporarily paused jury trials all added to the backlog.

So, how bad is the backlog? According to our survey respondents, the average caseload for a court is 12,309 cases. In 2019, a year before the pandemic, the average backlog was 958 cases. During the last 12 months, the average backlog increased to 1,274 cases. On the flip side, one-third of courts saw their case backlog increase greatly, meaning more than 5%.

| Figure 2: Cases/Backlog | Total (n=238) | State (n=162) | County/ Municipal (n=76) |
|---|---|---|---|
| Average number of cases handled in a year | 12,309 | 13,888 | 9,080 |
| Average cases backlog 2019 (pre-COVID) | 958 | 1,030 | 828 |
| Average current backlog (2021) | 1,274 | 1,430 | 940 |

Source: Thomson Reuters 2021

| Figure 3: Change in Backlog Last 12 Months | Total (n=238) | State (n=162) | County/ Municipal (n=76) |
|---|---|---|---|
| Increased Greatly (>5%) | 34% | 38% | 26% |
| Increased Slightly (1%-5%) | 23% | 16% | 39% |
| No Change | 29% | 28% | 30% |
| Decreased Slightly (1%-5%) | 5% | 7% | 3% |
| Decreased Greatly (>5%) | 9% | 12% | 4% |

Source: Thomson Reuters 2021

| Figure 4: Anticipate Change in Backlog Next 12 Months | Total (n=238) | State (n=162) | County/ Municipal (n=76) |
|---|---|---|---|
| Increased Greatly (>5%) | 8% | 7% | 8% |
| Increased Slightly (1%-5%) | 18% | 20% | 16% |
| No Change | 32% | 30% | 36% |
| Decreased Slightly (1%-5%) | 29% | 28% | 32% |
| Decreased Greatly (>5%) | 13% | 14% | 9% |

Source: Thomson Reuters 2021

Moreover, only 8% of respondents said they anticipate a *great* backlog increase in their courts over the next 12 months; while half of respondents said they anticipate either a slight increase or no increase at all. And about 42% said they expect a decrease in the next 12 months.

© 2021 Thomson Reuters. All rights reserved.

## Challenges in a virtual court environment

One of the primary challenges in a virtual court environment is related to collaboration and managing documents — sharing evidence, accessing evidence and multimedia files, organizing all evidence, and communicating on annotations on evidence. While this is a serious problem in a civil case, it can be a detrimental, constitutional violation in a criminal case.

For instance, the Confrontation Clause in the Sixth Amendment guarantees the right to confront adverse witnesses, which, interpreted by the Supreme Court, includes all "testimonial" evidence, unless the witness is unavailable, and the defendant had a prior opportunity to cross-examine such witness. If the court or the parties are unable to access hearing documents, evidence, files, images, or communicate with the court about these case materials, this creates potentially serious constitutional violations that could be brought up on appeal.

**Figure 5:**
**Challenges of Virtual Court Environment**



Base = Conducted or participated in virtual hearings during the pandemic

Source: Thomson Reuters 2021

In the future, this can be solved by having better familiarity with technology solutions for ease of use. The good news is you can meet remotely; however, there are still challenges. The technology is now available to share case materials such as documents and digital evidence. As in many corporate settings, courts too can take advantage of the advances in technology, while also keeping cybersecurity concerns in mind when it comes to storing sensitive evidence or documents.

Courts and court staff will also want to consider having live and on-demand technology training sessions available to all participants so they may familiarize themselves with the technology *before* the hearing.

© 2021 Thomson Reuters. All rights reserved.

## Exhibits and hearing documents in a virtual environment

The parties most involved in collecting and providing evidence to the courts tended to be civil litigants, prosecutors, and defense counsel, according to our survey.

**Figure 6:**
**Parties Involved Collecting/Providing Evidence**



Source: Thomson Reuters 2021

As noted, the challenges of accessing exhibits and multimedia files during a hearing seem to be a sticking point. Most courts, around 72%, are currently handling proposed exhibits or hearing bundles via email submission. Part of the issue, then, may be that parties and the court have differing levels of access to the emailed submissions. If all files were submitted, shared, and stored on one, ubiquitous platform, this might ease some of the burdens and provide greater transparency, while also decreasing hearing delays.

**Figure 7:**
**How Courts Currently Deal with Proposed Exhibits/Hearing Bundles from Parties**



Source: Thomson Reuters 2021

> If all files were submitted, shared, and stored on one, ubiquitous platform, this might ease some of the burdens and provide greater transparency, while also decreasing hearing delays.

© 2021 Thomson Reuters. All rights reserved.

# Other technology-related effects: Witness credibility and translators

The finder of fact, whether a judge or jury, has the important task in determining witness credibility. Before the onset of the COVID-19 pandemic, most witnesses testified in person, giving the judge or jury a bird's eye view in assessing witnesses' testimony about the event in dispute. Often this credibility determination is described as a "common-sense determination" which includes more than just whether a witness can be believed or not. In addition to the substance of the testimony — which includes the amount of detail, the accuracy of past events, and whether witnesses are contradicting themselves — fact-finders also look to demeanor such as body language, eye contact, and whether responses are incomplete or evasive.

Remote proceedings and depositions pose new challenges for determining demeanor and body language. Overall, 35% of our survey respondents stated that virtual hearings diminished the ability to assess litigant or witness credibility, while 27% felt that there was a loss of the ability to read behavior and/or body language. Some reasons include poor camera quality, bad lighting, unstable internet connections, and, perhaps most importantly, whether someone was coaching the witness in the background.

While there are remedies, such as having the witness pan their camera around the room before testifying or asking that no one else be present, overall, these types of matters can raise appellate issues later if not dealt with at the outset.

Finally, remote hearings also further exposed the corollary problem of not having enough court-certified legal interpreters. In an open-ended question, survey respondents indicated that they needed a larger pool of certified interpreters. Most keenly in a remote hearing, they stated that it was important to have the translator and litigant in the same room to avoid translation delays or misinterpretations.

# Justice delayed is justice denied: Access to justice in a virtual environment

Access to justice is a vital part of the court process in any functioning society. We asked respondents if they felt access to justice changed overall with the use of virtual hearings. On the positive side, 77% of respondents said they felt that access to justice increased (42%) or stayed the same (35%); and within that, 49% of county and municipal court respondents said they believed access to justice increased. More than one-half of those respondents felt that access to justice increased specifically for litigants.

| **Figure 8:** Change to Access of Justice with Virtual Hearings | Total (n=238) | State (n=162) | County/ Municipal (n=76) |
|---|---|---|---|
| Access to Justice Increased | 42% | 39% | 49% |
| Access to Justice Stayed the Same | 35% | 36% | 32% |
| Access to Justice Decreased | 23% | 24% | 19% |

Specifically, among those who felt access to justice increased, the main reason cited was convenience to the parties and attorneys, better attendance (which included fewer failures-to-appear), and increased participation by the parties. Allowing hearings to go remote has eliminated the need for judges, attorneys, and litigating parties to travel to different courts in some circumstances.

> 42% of respondents felt access to justice increased with virtual hearings

© 2021 Thomson Reuters. All rights reserved.

**Figure 9:**
**How Access to Justice Changed with the Use of Virtual Hearings for Litigants – Increased**
(Open End top mentions)



Base = Conducted or participated in virtual hearings during the pandemic

Source: Thomson Reuters 2021

For the 23% of respondents who felt access to justice had decreased during the pandemic, not surprisingly, they cited lack of internet access (52%) and general delays and court backlogs (21%). Some of these challenges may be alleviated by the strategic allocation of funds from [the American Rescue Plan Act](#) (ARP), which could be used to help update technology on legacy systems, investing in digital evidence solutions and improving broadband internet connectivity, thereby increasing access to the courts.

**Figure 10:**
**How Access to Justice Changed with the Use of Virtual Hearings for Litigants – Decreased**
(Open End top mentions)



Base = Conducted or participated in virtual hearings during the pandemic

Source: Thomson Reuters 2021

© 2021 Thomson Reuters. All rights reserved.



## Self-represented litigants:
## Are they seeing the benefits of remote proceedings?

Navigating the judicial system can be tricky, even if you have a lawyer. For non-lawyers who aren't as familiar with court processes, this moment may be an inflection point for the courts.

Almost two-thirds of the respondents to our survey (63%) described video hearings as an increased burden on self-represented parties. The biggest reason cited was the inherent technology challenges individuals face including not having proper computer hardware, webcams, microphones, or access to a stable internet connection. Some also indicated that self-represented litigants' ability to access or provide evidence or documents to the courts was diminished as well.

Conversely, 35% of respondents said they believed that video hearings relieved the burden on self-represented litigants. For instance, if a criminal defendant is in custody, they can appear over video by using the jail's resources; however, if that same defendant is out of custody and wishes to represent themselves, those technology issues can surface again.

Courts have stepped up their service offerings in anticipation of the technology challenges presented by remote proceedings. Respondents from roughly 40% of the courts in our survey said they were offering some form of online mediation services or self-help services, in addition to virtual hearings.

## Virtual hearings are here to stay, in a hybrid fashion

Naturally, there are growing pains when it comes to virtual hearings, but many participants have seen the substantial benefits in this new way of working. An overwhelming majority of courts (86%) indicated that in the future they plan to use a mixture of in-person and virtual formats for courts hearings, with civil cases topping that list. Only 13% of courts said they would return to pre-pandemic, in-person operations for court hearings.

**Figure 11:**
**Types of Hearings Courts Plan to Conduct Virtually in the Future** (Top mentions)



Total (n=221)
State (n=148)
County/Municipal (n=73)

Base = Conducted or participated in virtual hearings during the pandemic

Source: Thomson Reuters 2021

© 2021 Thomson Reuters. All rights reserved.



## Challenges to overcome

As courts and administrative hearing offices continue to grapple with the uncertainty of the pandemic, one thing we know is that hybrid court proceedings — a mixture of in-person and remote hearings — will continue.

The next phase of hybrid hearings will require courts to deploy a platform of optimized, seamless technology to avoid more backlogs and disruptions. Court administrators will need to find the right technology that allows lawyers and litigants to focus on the substance of proceedings, not the procedural, audio, and visual aspects of it.

Finally, despite today's advances in legal technology, self-represented litigants still face many challenges in securing fair access to justice. And as we continue to see a rise in cases filed by non-lawyers, the hope is that legal technology will promote meaningful access to courts and encourage the increased use of plain language, process simplification, procedural fairness, and equal access.

© 2021 Thomson Reuters. All rights reserved.



**Thomson Reuters** is a leading provider of business information services. Our products include highly specialized information-enabled software and tools for legal, tax, accounting and compliance professionals combined with the world's most global news service – Reuters.

For more information on Thomson Reuters, visit **tr.com** and for the latest world news, **reuters.com**.

## THOMSON REUTERS INSTITUTE

The **Thomson Reuters Institute** brings together people from across the legal, corporate, tax & accounting and government communities to ignite conversation and debate, make sense of the latest events and trends and provide essential guidance on the opportunities and challenges facing their world today. As the dedicated thought leadership arm of Thomson Reuters, our content spans blog commentaries, industry-leading data sets, informed analyses, interviews with industry leaders, videos, podcasts and world-class events that deliver keen insight into a dynamic business landscape.

Visit **thomsonreuters.com/institute** for more details.

### About the Author:

**Gina Jurva**
Attorney & Manager Enterprise Content, Corporate & Government
Thomson Reuters Institute

Gina Jurva, Esq. is an Attorney and Manager of Market Insights and Thought Leadership for Government and Corporates at the Thomson Reuters Institute (TRI). Ms. Jurva is a litigator and former state deputy district attorney in the San Francisco Bay Area where she prosecuted misdemeanor and felony cases, and later opened a criminal defense practice.

Since joining Thomson Reuters, she has served as Senior Legal Writer and Editor focusing on courts, litigation, and justice. In her current role at TRI, Ms. Jurva leads content and multi-media thought leadership activities to highlight solutions to some of the world's most pressing government sector challenges including issues impacting courts and justice, government fraud, waste and abuse, anti-money laundering (AML), human trafficking, national security, and public safety.



© 2021 Thomson Reuters. All rights reserved.