# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,          )
IVC FILTERS MARKETING, SALES        ) Cause No.
PRACTICES AND LIABILITY             ) 1:14-ML-2570-RLY-TAB
LITIGATION,                         ) Evansville, Indiana
                                    ) **November 9,** 2021
                                    ) 10:12 a.m.
                                    )




**Before the Honorable
RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
MOTIONS AND STATUS CONFERENCE


**For Plaintiffs:**                 Joseph N. Williams, Esq.
                                    Riley Williams & Piatt, LLC
                                    301 Massachusetts Ave.
                                    Indianapolis, IN 46204


                                    Michael W. Heaviside, Esq.
                                    Heaviside Reed Zaic
                                    910 17th Street NW, Suite 800
                                    Washington, D.C.  20006


                                    David P. Matthew, Esq.
                                    Matthews & Associates
                                    2905 Sackett Street
                                    Houston, TX  77098



                                    Kelly Chermack, Esq.
                                    Fears Nachawati, PLLC
                                    5473 Blair Road
                                    Dallas, TX  75231

Thomas W. Arbon, Esq.
Martin Baughman, PLLC
3141 Hood Street, Ste. 600
Dallas, TX  75219


For **Defendants:**                     Andrea Pierson, Esq.
                                        Jessica Cox, Esq.
                                        Eldin Hasic, Esq.
                                        J. Stephen Bennett, Esq.
                                        Ben Broadhead, Esq.
                                        Faegre Drinker Biddle & Realth
                                        300 N. Meridian St., Ste. 2700
                                        Indianapolis, IN  46204


Court Reporter:                         Margaret A. Techert
                                        United States District Court
                                        101 NW Martin Luther King Blvd.
                                        Evansville, Indiana  47708


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

```
1                        (In open court.)

2            THE COURT:  Good morning, everyone.

3            (Collective greeting from attorneys.)

4            THE COURT:  None of you sound very excited this

5    morning about being on this call.  I thought I'd hear a little

6    more energy.  In any event, well, it's always good to see all

7    of you as we're moving along, however slowly, in this MDL.

8            We're on the record today.  This is MDL-2570, in re:

9    Cook Medical, Inc., IVC Filters Marketing, Sales Practices and

10   Products Liability Litigation.  We're here for our normal

11   status conference and we do have an agenda.

12           Plaintiffs' Steering Committee is here; Joe

13   Williams, Mike Heaviside and am I seeing this correctly, David

14   Matthews?

15           MR. MATTHEWS:  Yes, sir, Your Honor.

16           THE COURT:  All right.  David, good to see you

17   again.

18           MR. MATTHEWS:  Likewise.

19           THE COURT:  Also for the Defendants we have Cook,

20   Andrea Pierson, Jessica Cox, Eldin Hasic, Ben Broadhead and

21   Steve Bennett.

22           Then my notes also tell me on the motion that we're

23   arguing today regarding Carleton Amey is -- arguing for the

24   Plaintiff is Kelly Chermack, and then on the Patti Alfieri

25   case is Thomas Arbon.  I understand Ben is not with us today
```

```
 1  because his mother passed.  That's sad news.  And Tom, you're

 2  in Ben's office.  Is that right?

 3            MR. ARBON:  Yes, sir, I am.

 4            THE COURT:  Could you pass my condolences on to Ben,

 5  please?

 6            MR. ARBON:  I absolutely will, sir.

 7            THE COURT:  Thank you.  So let's start off with the

 8  Cook's motions and then we can get Kelly and Tom -- they can

 9  jump off the phone, if they want -- off the conference if they

10  want, and then we'll go on with our normal discussion and our

11  status conference.

12            First up is Cook's motion for judgment in Carleton

13  Amey's case pursuant to CMO 28.  This is docket number 20003.

14            MR. HASIC:  Thank you, Your Honor.  This is Eldin

15  Hasic.  I'm going to be arguing this particular motion.

16            THE COURT:  Okay, Eldin.

17            MR. HASIC:  Thank you.  North Carolina has a -- had

18  a six-year statute of repose until October 1st, 2009, and then

19  that statute was extended to 12 years.  The Court has ruled on

20  a prior motion addressing the statute of repose generally and

21  has held that if it applies, that the statute of repose in

22  North Carolina bars all the causes of action by Plaintiff in

23  this MDL.  So the only question that remains in this motion

24  regarding Plaintiff Amey's case is whether the six-year or the

25  12-year statute of repose applies in his case, depending on
```

1    the relevant dates.

2         Cook's position is that the six-year statute of

3    repose applies and bars the claim because North Carolina --

4    courts applying North Carolina laws have said multiple times

5    that it's the purchase date of the product that controls.  So

6    if the product was purchased before October 1st, 2009, it's

7    the six-year statute of repose that applies; and if it was

8    purchased after, then the current 12-year applies.

9         With respect to Plaintiff Amey, the product was

10   purchased in July of 2009.  So the six-year statute of repose

11   applies.  The case was not filed until January 6, 2019, which

12   is about nine and a half years later.  So because the six-year

13   version applies, the case is time barred.

14        Now, in the briefing Plaintiff has attempted to

15   distinguish some of the cases we cite.  But one thing

16   Plaintiff has not done, Plaintiff has not identified any case

17   where the Court would have, involving a product purchase

18   before October 1st, 2009, an alleged injury after that period

19   and the Court applied the 12-year statute of repose.  There's

20   no such case in the briefing.

21        Now, we rely on multiple cases, including *Cramer*,

22   where the Court states that the purchase date controls.  It

23   doesn't matter if the injury occurred after the October 1st,

24   2009, date of the extension.  So, for example, in *Cramer*, it

25   was a mesh case.  The product was purchased in 2007.  The

1  Plaintiff had an infection and alleged in the case that she

2  discovered her injury in 2017.  The Court said that didn't

3  matter.  The product was purchased in 2007.  So the six-year

4  statute of repose applies.

5          And then we also have, as we discuss in more detail

6  in our reply brief, the *In re Elk Cross Timbers* case and the

7  *Ferro* case.  Those were two cases that have the same basic

8  fact pattern in that the product was purchased before October

9  1st, 2009.  The alleged defect was discovered –– the injury in

10  the case was discovered after 2009, but the courts applied the

11  six-year statute of repose, not the 12.  So based on the cases

12  in the briefing and North Carolina courts applying this rule

13  multiple times, we would ask the Court to apply that same rule

14  and dismiss Plaintiff Amey's case.

15          THE COURT:  Thank you, Mr. Hasic.  Ms. Chermack?

16          MS. CHERMACK:  Yes, Your Honor.  It's Plaintiff's

17  position that the 12-year statute of repose should apply.  In

18  *Lackey v. DePuy* –– I apologize if I'm pronouncing that ––

19  *Orthopedics*, the Court addressed a situation in which a

20  Plaintiff had a defective hip joint installed in 1998.  He

21  didn't start experiencing symptoms from that defective hip

22  joint until January 2009.

23          Plaintiff brought a case and the Court concluded

24  that because Plaintiff's claim accrued before the effective

25  date of the new statute, Plaintiff's claim is controlled by

1  that prior statute.  However, they stated that when viewing

2  the proximate (inaudible) to the Plaintiff, Plaintiff's cause

3  of action accrued on or about January 2009, which was before

4  that October 1st, 2009 date; and that the Court determined

5  that the statute of repose applies is dictated by the accrual

6  date of the cause of action, not the date of purchase.

7      Here, Mr. Amey's cause of action accrued on or about

8  September 2019, which would be after that October 1st, 2009

9  date and therefore, this action is timely under the 12-year

10  statute of repose.

11      Further, the North Carolina general statute 1-5216

12  states that personal injury or physical damage to Plaintiff's

13  property, the cause of action shall not accrue which is bodily

14  harm to the claimant or physical damage to his property

15  becomes apparent or obstensibly apparent.  In *Robinson v.*

16  *Bridgestone*, North Carolina Supreme Court case in North

17  Carolina general statute 1-4961 applies to cause of actions

18  that accrue on or before -- I'm sorry, on or after the date of

19  October 1st, 2009, indicating that the effective date of

20  Section 1-461 is the accrual date of the cause of action.  So,

21  therefore, this action is timely under the statute of repose

22  and the motion should be dismissed.

23      THE COURT:  Ms. Chermack, how do we distinguish

24  *Cramer* here?

25      MS. CHERMACK:  Your Honor, I mean, this case is more

1   similar to *Lackey*, where there was a defective product that

2   happened -- that happened at a later date because I think you

3   don't often -- you don't often see an injury so quickly after

4   implant.  So really, it would be more towards the date of

5   injury, not the date of implant.

6           THE COURT:  What about the date of purchase?

7           MS. CHERMACK:  I apologize.  The date of purchase,

8   not the date of implant.

9           THE COURT:  Okay.  Mr. Hasic, any reply?

10          MR. HASIC:  Thank you, Your Honor.  Just a couple

11  points just very quickly.  So I think it's important when we

12  look at the *Lackey* case to just kind of understand the context

13  of the Court's statement.  I think what the Court is saying,

14  even if we had adopted the argument that the Plaintiff in that

15  case had made, the Plaintiff would still lose because in that

16  case, the injury date had been before -- before October 1st,

17  2009.  But in other portions of that opinion, there are

18  statements where the Court states that the statute of repose

19  is different from a statute of limitations and the accrual in

20  that context refers to the purchase date, not the -- not the

21  injury date, and we have that full quote in our reply brief.

22          THE COURT:  Right.

23          MR. HASIC:  And then the other point I think that

24  Your Honor raised regarding the *Cramer* case, I think it's

25  important to note that *Cramer* and *Lackey* are both from the

1  Western District of North Carolina.  So it's the same court

2  issuing that opinion ten years later.  And so I think in terms

3  of what the law is in that jurisdiction, I think we have to go

4  by *Cramer*, since it's an opinion from earlier this year and

5  it's fully consistent with the general points in *Lackey*.

6          THE COURT:  All right.  Thank you.  Defendant's

7  motion has significant merit to it.  I'll take it under

8  advisement and we'll get something out here in short-order.

9  Okay.  Thank you very much.

10         Next one up is Cook's motion for judgment in Patti

11 Alfieri's case pursuant to CMO 28.  This is docket number

12 20008.  And my understanding is Thomas Arbon is going to be

13 arguing from Ben Martin's office.  And who on behalf of Cook?

14         MR. BROADHEAD:  Good morning, Your Honor.  This is

15 Ben Broadhead.  I'll be handling this motion on behalf of

16 Cook.

17         THE COURT:  Okay.  Thank you, Ben.

18         MR. BROADHEAD:  So, Your Honor, Ms. Alfieri is from

19 Nevada and the parties agree that Nevada's two-year statute of

20 limitations for product liability claims governs this case.  I

21 want to start by providing some background on Ms. Alfieri's

22 alleged injuries.

23         On September 23, 2015, she presented to the hospital

24 with back pain and a severe burning sensation, and she told

25 her doctors that she was concerned that her Tulip filter was

breaking and migrating to her lungs.  So the next day she had

imaging taken and what diagnosed with a filter fracture.  Due

to the fracture, her filter was ultimately removed via open

surgery on April 5, 2016.

She filed this lawsuit on October 2, 2017, which is

more than two years after she was diagnosed with a filter

fracture.  And in her response brief, Ms. Alfieri concedes

that her filter fracture is time barred and instead contends

that she sustained a second injury that is not time barred.

Specifically, she's claiming that she sustained an incisional

hernia as a result of her filter removal surgery.

An incisional hernia is basically a lump that forms

at the site of the surgical incision.  She argues that this

incisional hernia gave rise to a separate cause of action with

a later accrual date than her time barred filter fracture.

But there are several issues with this argument, and the first

is that this argument could only be viable in a jurisdiction

that recognizes the two-injury rule, which Nevada does not.

The two-injury rule essentially provides that in

limited circumstances, a second injury stemming from the same

source as the original injury gives rise to a separate cause

of action with a separate and later accrual date.  So, for

example, if -- if you have an IVC filter case and a filter

causes one injury in 2015 and a second injury in 2018, a

jurisdiction that has adopted the two-injury rule could find

1  that the two injuries accrued at different times, if they are

2  sufficiently distinct from one another.

3          But here, as I said, Nevada is the governing law and

4  Nevada has not adopted or given any indication that it plans

5  to adopt the two-injury rule.  And so as a result,

6  Ms. Alfieri's argument that her incisional hernia is entitled

7  to a later accrual date than her time-barred fracture fails

8  automatically.

9          But even if we were to assume, for the sake of

10  argument, that Nevada law did require application of the

11  two-injury rule, the incisional hernia would still be subject

12  to the same accrual date as the filter fracture and would

13  still be time barred because it's not a separate and distinct

14  injury.  Courts in jurisdictions that have adopted the

15  two-injury rule have held that second injuries are only

16  entitled to a separate accrual date when they're truly

17  distinct.  That is, when they arise through different chains

18  of causation or to put it differently, as one court said,

19  where the presence of the original injury is not necessarily a

20  predicate for the second injury's development.

21          But here, Ms. Alfieri admits that her filter

22  fracture and incisional hernia are part of the same chain of

23  causation and that the fracture was, in fact, a direct

24  predicate for the incisional hernia.  Specifically, I'm

25  talking about page 3 of Ms. Alfieri's response brief where she

states that her removal surgery was "performed for the sole purpose of retrieving the fractured IVC filter."

So in other words, by Ms. Alfieri's own admission, the removal surgery would not have been performed and she would never have sustained an incisional hernia if not for the filter fracture.  And we noted in our reply brief Ms. Alfieri finds herself in a tough spot here.  It's basically a Catch-22 where if she concedes that her injuries are directly related, which she effectively did in her response, then both injuries are time barred.

On the other hand, if she argues that the injuries are separate and distinct, she's admitting that there's no causal link between the incisional hernia and her filter because the only way she can tie the incisional hernia to any alleged breach of duty by Cook is by pointing back to the time-barred fracture.

So either way, Ms. Alfieri's claims fail and Cook, therefore, requests that the Court enter judgment as a matter of law on all of her claims.  Thank you, Your Honor.

THE COURT:  All right.  Thank you, Ben.  Tom, response?

MR. ARBON:  Yes, Your Honor.  We are saying this is a two-separate injury, Your Honor.  As counsel's pointed out, while he says there's no Nevada court that has specifically adopted it, there's no Nevada case that has rejected it.  So

1  our position is it's posed with the question Nevada Superior

2  Court would adopt it.

3         What we say we face is not a circumstance -- is a

4  circumstance not unlike what the courts have faced in -- I'm

5  sorry, asbestos litigation and not unlike what courts have

6  faced in cigarette litigation.  In that regard, we cite the

7  Court to the *Poosh* case, P-O-O-S-H, out of the Supreme Court

8  of California, which was a response to a certified question

9  from the Ninth Circuit on this very issue.  And in *Poosh*, what

10 you had was a cigarette smoker who had been diagnosed with

11 COPD because of her cigarette smoking.

12        Subsequent to that diagnosis, years later she was

13 further diagnosed to have lung cancer.  The argument was made

14 that lung cancer is a separate and distinct injury from COPD,

15 and it was, in fact, related to the same operative facts,

16 those being that she smoked cigarettes.  And the Court

17 distinguished those two injuries, Your Honor, and said that a

18 new statute of limitations was initiated or cause of action

19 arose for the separate injury of cancer.  It's similar to the

20 asbestos cases, such as the *Wilson* case and -- in which the

21 courts have distinguished between asbestos diagnoses and later

22 cancer diagnoses, as long as they establish that they're

23 separate and distinct.

24        In this case, Your Honor, the fracture initially led

25 her doctor -- Ms. Alfieri's doctors to tell her that there was

no need to remove the filter; and subsequent to that, another
physician determined that there was a medical need to remove
the filter, and that filter needed to be removed through an
open surgery.  That open surgery did not take place until
April 5, 2016.

          As a result of that open surgery -- and absolutely,
Your Honor, the sole purpose of that surgery was to remove the
fractured filter.  But as a result of that surgery, which did
not even occur until April of -- April 5th, of 2016, she
sustained a separate and distinct injury, that being an
incisional hernia.  And I appreciate counsel's attempt to
minimize it but it's not a mere bump in her body.  It's
encapsulated tissue caused by scarring of the incision,
resulting in her having to have her filter removed through an
incision that went from her belly button to her -- basically
split her stomach open -- or abdomen open.  That is a separate
and distinct injury.

          And under the authorities that you see with *Poosh*,
that you see with *Wilson*, that -- which is a case that is in a
footnote in one of the cases we've cited, Your Honor.  In
*Poosh* actually, on page -- well, it's 7015 or page 793 of the
actual opinion, there's a footnote No. 1 in which they have a
string cite, Your Honor, of all the courts which have adopted
the concept that a separate and distinct disease that does
not -- a statute of limitations does not commence litigation

1  until a -- on a separate and distinct disease until that

2  disease becomes manifest.

3          Her incisional hernia could not become manifest

4  until she had the incision, which was April of 2016.  Her

5  lawsuit was filed in 2017, Your Honor; and under the

6  circumstances, it's our allegation that there is no statute

7  that's bar to the two-year statute of limitation.

8          As for the fact that there's no indication that the

9  Nevada courts would adopt this concept, Your Honor, we would

10 point to the *Price* case, which is cited in our brief; and

11 again, there is a footnote in the *Price* case, Your Honor, in

12 which the Court addresses -- and again, this is at page 5 of 6

13 as it's printed, or page -- let's see, 521 of the actual

14 opinion under footnote 3.  And what they address there is the

15 second impact theory that you see in kind of a crash case or

16 other cases, Your Honor, where you have an initial injury

17 caused by an automobile accident, as an example, and then you

18 have a second impact injury that is caused by a lack of proper

19 seat belts or a failure of an air bag which enhances and

20 increases the injury.  And what I cite that for is to show

21 that Nevada has adopted and accepted that there can be a

22 secondary injury resulting from the same objective facts.

23          You also have the *Peterson* case, Your Honor.  The

24 *Peterson* case, which is cited in the brief, it takes a little

25 to make the connection but I'll do it, is a case involving a

child of sexual assault and later diagnoses, and when does the statute of limitations begin to run in those cases.  Where the *Peterson* case is significant, Your Honor, is A, it says you have to have an injury to complete the cause of action for it to be -- to run, but it also shows that the Nevada Supreme Court takes a broad approach to statutes of limitations when they would not serve the purpose of a statute of limitation. And the serving the purpose, Your Honor, is to prevent stale claims and lack of evidence to prevent a Defendant from properly defending themselves.

And this is certainly not the circumstances of our case of this second injury type case where you have medical records documenting both the cause and effect of the existence, the date of onset of the injury, the existence of the injury, the nature of the injury, the medical care required to treat the injury, and the cause, which is in this case, the initial fractured filter.  None of the staleness aspects of that public policy adopts for it excluding a Plaintiff's right to be compensated for injury exists and the Nevada Supreme Court has, at least in the case of -- as we said, childhood sexual assault cases, demonstrated a willingness to adopt and adapt the summary judgment -- I'm sorry, the statute of limitations standards of the state to recognize those facts.

I see nothing from the available -- and the

```
 1   Defendants have cited to no authority that would indicate
 2   Nevada would reject a second injury theory, and certainly
 3   these cases that I've cited would indicate that the Nevada
 4   Supreme Court would be open to those theories.
 5           I believe, Your Honor -- but we believe that the
 6   statute of limitations has not expired on the second injury or
 7   the injury resulting from the surgery to retrieve the filter
 8   that was in April of 2016, and we would ask Defendant's motion
 9   be dismissed -- I'm sorry, denied.
10           THE COURT:  Thank you.  Tom, in your response you're
11   saying that the hernia was a complication of the open removal
12   surgery, right?
13           MR. ARBON:  Yes, Your Honor.
14           THE COURT:  How do you separate those two?
15           MR. ARBON:  Separated from the fact that it is an
16   injury that did not and could not exist but for the surgery,
17   Your Honor.
18           THE COURT:  Then it would be -- then it would be one
19   injury, right?
20           MR. ARBON:  No, Your Honor.  It's a separate and
21   distinct injury, much like but for in the case of -- and I'm
22   sorry, I've lost my mind here a minute, Your Honor.
23           THE COURT:  We don't want that.
24           MR. ARBON:  I found it.  It was rolling around here.
25   In the *Poosh* case, Your Honor, and in the asbestos cases.
```

1    It's the asbestos exposure that leads to asbestosis and then

2    in certain cases advances on to become a situation where you

3    have actual cancer arise.  In cigarette smoking, you can have

4    COPD but then later on a new and individual injury from that

5    same cause of cigarette smoking and the defects in cigarettes

6    can result in cancer.  And in those cases, those courts have

7    found that those -- where you have a separate and distinct

8    injury, there is no benefit -- public benefit to imposing a

9    statute of limitation and depriving the Plaintiffs of full

10   compensation under circumstances where a separate injury that

11   did not exist at the time within two years of the fracture

12   diagnosis or within two years of the implant or within two

13   years of the onset, those injuries simply did not exist and

14   they did not develop until later down the line.  And under

15   those circumstances, what the courts have said:  While they

16   may have a common cause, they are distinct and separate

17   injuries for which a new cause accrual date occurs.

18          If I may, Your Honor.  One of the cases that's cited

19   within the *Poosh* case, in that footnote I referenced, is a

20   case -- oh, boy.  It's always one of these.  *Pustejovsky v.*

21   *Rapid-American Corporation*.  Now, this is a case out of the

22   Supreme Court of Texas, which, as an attorney who practices in

23   personal injury in Texas, Your Honor, I may assure you is not

24   what would be considered a liberal court.  What the Court --

25   the Supreme Court of Texas found was allowing separate

limitations for separate disease processes does not betray the

purposes that limitations and the single action rule serve.

Like statutes of limitations, a single action rule is intended

to discourage stale and fraudulent claims.  A Defendant is in

no different position with respect to an asbestos Plaintiff

who may develop mesothelioma in the future than an individual

who contracts mesothelioma without ever having suffered

asbestosis.

       And basically what they hold is, a person who sues

or settles a claim for nonmalignant asbestos-related disease

with one Defendant is not precluded from a subsequent action

against another Defendant for a distinct malignant asbestos

condition.  What we are alleging, Your Honor, both of those

arise under the Texas cases and the asbestos cases, the cause

is the exposure to asbestos.

       In this case, the cause is the same.  It's the

exposure to a defective IVC filter that fractures but a new

and distinct injury arose with the open retrieval and the

onset of the hernia.  I'll just throw in, Your Honor, maybe by

way of trying to foreshadow but the Supreme Court of Nevada

has held that it is long -- long established under Nevada law

that a tortfeasor that is foreseeable, even if the claim were

that the incisional hernia was due to some negligence or

malpractice on the part of the treater, the Nevada law has

long held that a tortfeasor does not escape liability for

1  malpractice of subsequent treatment.

2       So the causation stream remains.  The new injury

3  onset is a different date, which would trigger a new and

4  different two-year limitations period.

5       MR. BROADHEAD:  Your Honor, may I respond briefly?

6       THE COURT:  Yes.

7       MR. BROADHEAD:  Your Honor, even in jurisdictions

8  that have adopted the two-injury rule, the fact that there are

9  two injuries that occur at different times is not enough to

10  entitle them to a separate accrual date.  They have to be

11  separate and distinct, which means that the first injury

12  cannot be a predicate for the second injury and that's exactly

13  what we have here.  They admit in their briefing the first

14  injury, the fracture, is what prompted the second injury

15  because the sole purpose of the removal surgery was because of

16  the fracture.

17       So in a case like this, where the original injury is

18  a predicate for the second injury, here's the result.  If

19  their incisional hernia claim were to survive summary judgment

20  here and this case would ultimately go to trial, what they

21  would do and what they would have to do is make that trial all

22  about the fracture, all about the time-barred fracture because

23  the fracture is the only way for them to tie the incisional

24  hernia back to the filter.  And so the fact that there are two

25  injuries is immaterial.

1          The question is:  Are those two injuries separate

2     and distinct.  Is the first injury a predicate for the second,

3     and because the first injury in this instance is a predicate

4     for the second, these injuries are not separate and distinct

5     and are not entitled to separate accrual dates.

6          THE COURT:  All right.

7          MR. ARBON:  If I may have one more comment, Your

8     Honor.

9          THE COURT:  Go ahead.

10          MR. ARBON:  It is not -- in the cases distinguishing

11     separate injuries, such as the ones I pointed to, the

12     causation is the same.  In those cases, they're going to have

13     to prove cigarettes were defective and caused cancer.  In

14     those cases, they're going to have to prove that asbestos

15     caused cancer.  In my case, I would have to prove that the

16     product was defective and but for that defect, she would not

17     have had a surgery that resulted in an incisional hernia.  It

18     is no different than those separate -- those second injury

19     cases.

20          The issue here, Your Honor, is if my lady had a

21     fractured filter only and did not require surgery, or let's

22     say the surgery went well and the filter was retrieved, I

23     would agree that the two years is barred.  The problem is you

24     have a new and distinct injury that arose from that surgery,

25     which is the incisional hernia.  Thank you.

```
 1            THE COURT:  Ben, you get the last word here.  It's
 2  your motion.
 3            MR. BROADHEAD:  Yes.  I would just reiterate here,
 4  Your Honor.  The surgery does not -- does not occur without
 5  the fracture.  They've admitted that in the briefing.  The
 6  removal surgery only occurred because of the fracture.  That's
 7  the key point here.  So you cannot separate the two injuries.
 8  They are indivisible in this instance and for that reason, we
 9  again request that our motion be granted.
10            THE COURT:  All right.  Thank you both very much.
11  We'll take it under advisement.  We'll get something out here
12  in short-order.  Okay.  Ben, if you want to get off the call,
13  you can.  Same with you, Tom.  And we'll go work with the
14  steering committee and defense counsel on our status.  Thank
15  you very much.
16            MR. ARBON:  Thank you, Your Honor.
17            THE COURT:  Okay.  The proposed agenda indicates
18  No. 1, asymptomatic cases.  Who wants to go ahead on that?
19            MS. PIERSON:  Your Honor, I'll start on that.  Good
20  morning.  Nice to see you again.
21            THE COURT:  Good morning.
22            MS. PIERSON:  The first two agenda items are agenda
23  items by Cook and Mr. Bennett will handle the first one and I
24  will handle the second one.  The third issue is the Bellwether
25  selection issue and that will be the last agenda item which
```

1  Ms. Cox will handle.

2          But before I let Mr. Bennett dive in to talk to you

3  about the asymptomatic cases, I just wanted to explain why we

4  have two things on the agendas, two topics that are really

5  discussion topics, and these are discussion topics that Cook

6  asked to be put on the agenda because they relate to proposed

7  orders that Cook would like the Court to consider that are

8  really docket control measures; and they result from the

9  failure of many lawyers to screen their cases prior to filing

10 under Rule 11 and a failure to screen their cases consistent

11 with the rulings of this Court.

12          We're here today with these two items to talk about

13 solutions for those two categories of cases; the asymptomatic

14 cases and the Category 7, the perforation cases.  We'll be

15 sending you two proposed orders following the hearing, Judge.

16 Both of these orders were provided to the PSC in advance of

17 the hearing and they were rejected without a counterproposal.

18          The issues that these two screening orders raise

19 really starts back in February of 2018, when this Court first

20 noted the problem with product-in-place and no-injury cases.

21 At that time, 31 percent of the cases, which was roughly 1,200

22 cases, were product-in-place/no-injury cases, the Categories 1

23 through 6.  And as you recall, the Court said then if we came

24 up with a proposal to try two or three of those cases in the

25 next year or two, you would be happy to do it.

You entered the Bellwether selection plan in October
of 2018; and as you may recall, Judge, there were eight steps
to get to the Bellwether trials.  You and we followed those
steps with the assumption that we would try the Brand case in
January of 2019 and then get to the product-in-place
Bellwether trials after that.

Unfortunately, because of protracted pushback on
Lexecon issues and then repeated dismissals of the Bellwether
picks, we effectively lost 2019 in this MDL.  The pandemic
robbed this MDL, and others like it, of most of 2020 and 2021,
as we all know well.

Nevertheless, when the pandemic hit in early 2020,
as you may recall, we set out a plan for the Court in March
and April of 2020 to try and use this time when we could not
try Bellwether cases productively.  We focused on the problem
of cases barred by the statute of limitations and statute of
repose, and the Court dismissed or entered summary judgment on
483 cases pursuant to CMO 28.

We also focused on the legal issue of the viability
of asymptomatic cases, an issue that this Court recently ruled
upon; and we identified cases from Categories 5 and 6 for
Bellwether trial.

At the same time Cook has worked on a parallel track
to resolve alleged injury cases, where possible, and that work
continues simultaneously.  Unfortunately, the new filings of

product-in-place and other no-injury cases also continued
during the pandemic.  There have been more than 1,200 new
cases files in 2021 and there were over a thousand cases filed
in 2020.  These cases ignore clear rulings by this Court on
claims of fear of future injury, statute of limitations,
statute of repose, and asymptomatic conditions; and they stand
in contrast to the serial dismissals of
product-in-place/no-injury Bellwethers.  To the extent that
this Court and the leadership of PSC are messaging to the
larger group of type of cases that are viable at a filing
stage, the larger groups of Plaintiffs' lawyers are not
listening.

       Your rulings are like a tree falling in the forest,
unless the Court enters orders requiring the Plaintiffs to
screen their existing cases and to avoid filing meritless
cases in the future.  Pandemic or not, Cook is determined to
continue to make progress in this MDL and our plan includes
doing three things on simultaneous tracks.

       First, calling the cases in the MDL to get to viable
cases in each category.  It's a best practice for MDL's noted
in the Duke manual and in other MDL's.  Second, identifying
cases for Bellwether trial; and third, teeing up issues and
deadlines that impact significant portions of the MDL.  It's a
three-tiered plan.  I've talked about it at the July status
conference.  All three tracks are essential and all three

 1   tracks are tracks that we intend to proceed on simultaneously.

 2           We made good progress in 2021, despite the pandemic,

 3   but it's our view that there's still progress to be made.

 4   This Court has the power to implement necessary docket control

 5   measures that will help to bring the MDL to a conclusion, and

 6   today we have proposals for the Court to consider for two such

 7   measures.

 8           Mr. Bennett will now address the first proposed

 9   order that we'd ask the Court to consider.

10           THE COURT:  All right.  Thank you, Andrea.  Steve?

11           MR. BENNETT:  Thank you, Ms. Pierson.  If I may,

12   Your Honor, could I share my screen?

13           THE COURT:  Sure.

14           MR. BENNETT:  Can everyone see the PowerPoint?

15           THE COURT:  I can.

16           MR. BENNETT:  Thank you, Your Honor.  It's good to

17   see everyone.  I'm looking forward to the day we can see each

18   other in person again.  I find that that's always a more

19   effective way to handle these conferences but I understand,

20   certainly, the situation.

21           We must march on and I think, Your Honor, you

22   referenced the MDL at the very top of the call and we do have

23   a methodical approach that we are working to move this MDL

24   forward.  And one of the areas, as you know and as Ms. Pierson

25   referenced, is the Category 6 cases.

1          As referenced by Ms. Pierson, Your Honor entered a

2     categorization order in November 2018, which categorized --

3     the categorization of all the cases in the MDL in future

4     filings and we had seven categories, and the seventh category,

5     which we refer to as the injury cases.  We had a subset of

6     categories like fracture or perforation or open procedure, et

7     cetera.

8          We have from the outset -- when I say *we*, I mean

9     Cook, from the outset have told this Court and told the

10    Plaintiffs' leadership that Cook believes that Categories 1

11    through 6 are what we have called in this MDL the

12    product-in-place or no-injury cases.  Category 1 was dealt

13    within Your Honor's November 2018 order and those involve

14    cases where you had a filter placed and essentially removed

15    with no injury, and Your Honor dismissed those by virtue of

16    this categorization order.

17         Sometime later in June of 2019, we presented the

18    Category 2 cases to Your Honor.  Those were what we call the

19    fear of future injury cases, and the Court ordered that the

20    Category 2 cases be dismissed as well; and if there is a

21    future compensable injury, they could refile those cases.  But

22    certainly just simply a fear of future injury, those should be

23    dismissed until there is an injury, if at all.

24         We are now looking at Categories 5 and 6 as

25    Bellwethers.  Again, Your Honor, we took the position that

1    Category 6 cases are not compensable.  They're not cognizable

2    under the second or third restatement which states follow in

3    personal injury cases, and we moved to dismiss the Category 6

4    asymptomatic perforation cases back in July of 2020.  When

5    Your Honor entered the third amended case management number

6    27, the Bellwether plan, the Court recognized Cook's position

7    and recognized that a motion was on file; and as you can see,

8    Your Honor, in paragraphs 3 and 4 of your order, you said that

9    it would be taken up whether an asymptomatic perforation

10   constitutes compensable injury as a matter of law.

11          That motion that was filed was converted to a

12   summary judgment motion on the Seitz and Parker cases.  And in

13   September of 2021, the Court found as a matter of law that

14   asymptomatic perforation does not constitute a present

15   physical harm and the Court analyzed those claims under both

16   the second and the third restatement of law.

17          After Your Honor's ruling, which we believe was the

18   correct ruling and within reason, as Ms. Pierson stated, we

19   attempted to reach an agreement with the Plaintiffs'

20   leadership on a dismissal of a Category 6 cases.  We've been

21   talking about this for some time.  This is not something that

22   just came from this order.  We've had repeated status

23   conferences where we've discussed this and discussed in the

24   context of the Bellwether plan arguments in which the

25   Category 6 cases were described by the Plaintiffs' leadership

1   as negative value cases.

2          In fact, Your Honor, in the September 2021 order

3   makes a reference to that in a positive way in a policy

4   standpoint.  Basically indicating that if -- under the single

5   action rule, if you were to proceed on a Category 6

6   asymptomatic case, even if you were to succeed and as a matter

7   of law, as you indicated, Your Honor, they couldn't proceed

8   but even if they could proceed, it would be of such minimal

9   value that if there was a judgment, it would not protect the

10  Plaintiff who might have a future injury under the single

11  action rule.  And so Your Honor allowed if there is a future

12  injury, for those Plaintiffs to refile.

13         The problem we face, Your Honor, is we can't reach

14  an agreement with the leadership, which compels us now to go

15  to the Court and seek a docket control order to address what

16  we believe is clear from the Court's September 21 order and

17  clear from everything we've talked about over the last couple

18  of years regarding asymptomatic cases.

19         The problem is we get dismissals by the drop.  We

20  get filings by the bucket.  Again, we get dismissals by the

21  drop and filings by the bucket and we need to address that.

22  Already this year we have seen more filings than last year.

23  We're heading in the wrong direction.

24         This requires docket control and here's why.  Just

25  in the last few months we've seen a continued pace of

1   asymptomatic perforation filings.  The message is not getting

2   out.  Even when we are arguing for Bellwethers and we are told

3   these are negative value cases, they're still being filed.

4   You see the Adams case.  It's a simple perforation.  No claim

5   of physical impairment.  No claim of physical harm.  Same with

6   Bumper (phonetic), strut slightly beyond the IVC wall.  I

7   believe he stated a few struts slightly beyond the wall.  No

8   claim of physical injury.

9          We have -- we have many examples.  I'm showing you

10  just a few more, but the Palmer case is particularly

11  egregious.  There appears to be tenting of the wall in this

12  location; however, perforation cannot be excluded.  That is a

13  filed case.  That is the reason why we need docket control.

14         Now, having said that, there are some good actors.

15  For example, the Gallagher Law Firm, when we approached them,

16  that firm acknowledged their Category 6 cases.  One of them

17  was a Bellwether.  Explained the reasoning that these were not

18  compensable.  The Gallagher Law Firm dismissed the Bellwether

19  case and 41 other no-injury Category 6 cases, recognizing the

20  stipulation that if there was a legally cognizable injury in

21  the future, it could be refiled in this court.

22         We have others who are not following this lead.  As

23  Ms. Pierson said, a tree is falling in the forest and no one

24  is hearing it.  Word must get out.  Here's an example of one

25  just filed this month where the Plaintiff was informed of

perforation and there was a successful percutaneous retrieval.

That's the allegation.  That's the case filed this month.

        We have others like the Dalimonte firm and the

Dalimonte firm had the two cases that were subject to the

summary judgment motion on perforation where they simply --

rather than dismiss the cases, simply recategorized into

Category 7 cases.  But the issue here, and Your Honor saw

through this when they attempted to recategorize the

(inaudible) case, was that there's still no symptom.  These

are cases that are simply asymptomatic cases.  They're

Category 6 cases with no physical impairment.

        We cannot count on the Plaintiff to simply dismiss

the cases.  They have no incentive.  Many of them have large

inventories, Category 6 cases, and they are going to hide in

plain sight until the Court does something to draw them out

and dismiss them.

        So, Your Honor, what we're proposing is a docket

control order, not unlike what you did in Category 2 because

in their essence, based on all the claims we've seen so far

and all the arguments we've heard on Category 6, what happened

if they have a future injury, these are fear of future injury

cases; and if a future injury occurs, just like in Category 2,

then they can refile.  So what we're proposing, Your Honor, is

that Plaintiffs bring their cases and voluntarily dismiss

those with no filter related of injury or harm.  They should

be consistent with your order of September 2021.  If there's a

future physical impairment that is substantiated as caused by

a filter, then they may file their cases again in this court.

          And we need some teeth, too, Your Honor.  If they

refuse to screen their cases under Rule 11, abide by the

Court's orders -- multiple orders and admonitions regarding

no-injury cases, then they should be subject to a motion to

dismiss by Cook.  And if they do not comply, they could be

subject to sanctions.  Again, Your Honor, we're just simply

asking under your inherent authority for docketing control so

that the Plaintiffs follow your previous orders and

admonition.  Thank you.

          THE COURT:  Thank you, Mr. Bennett.  Any response

from the steering committee?

          MR. WILLIAMS:  Yes, Your Honor.  I first want to

start by saying --

          THE COURT:  First of all, let me say this.

          MR. WILLIAMS:  Sure.

          THE COURT:  MDL's -- certainly there's a lot of

benefits to MDL's but one of the problems with MDL's, as we

all know, anybody who's familiar with them, is that they're --

almost all of them which contain a significant number of

cases, as does this one, there are a lot of piggyback cases.

There are a lot of meritless cases that we've tried to deal

with and that's just a problem with MDL's.  And I guess I

1    haven't followed the docket much but I'm kind of stunned that

2    in the last two years there's over 2,000 more cases that have

3    been filed in this MDL.

4            So we need to -- we've talked about this over and

5    over and over.  So we need to get some process in place where

6    these cases that you guys don't want to try -- Plaintiffs

7    don't want to try, Defendants don't want to try, I don't want

8    to try, to move them out somehow.  We've talked about this

9    many times before that these cases standing alone would never

10   be filed in a court because no attorney would want to spend a

11   whole lot of time on cases that probably have a small, if any,

12   value to them, and I think we all can probably agree to that

13   as well.

14           So we need to look -- look at those and then focus

15   on -- focus very hard on the cases that do have some merit and

16   get them settled or get them tried one way or the other.  But

17   as I said, one of the -- MDL's have many benefits but

18   certainly one of the problems in a large MDL is there's a lot

19   of -- a lot of cases that you should -- should never be filed

20   for various reasons.  So with that statement, Joe, go ahead.

21           MR. WILLIAMS:  Thank you, Your Honor.  Here's the

22   issue from the Plaintiffs' perspective and you know, when

23   Ms. Pierson spoke to me about this not too long ago and when

24   Mr. Bennett spoke to me about this not too long ago, we talked

25   to the larger PSC about what they are proposing; and we told

them that it was unworkable from the Plaintiffs' perspective

for this reason.

        Your Honor certainly entered an order back in

September that said this Court's decision that asymptomatic

perforations do not constitute an injury sufficient to confer

Article III standing.  We do not dispute that Your Honor

entered that order; but when that order was entered, I was

approached by Ms. Pierson, and then to some extent Mr. Bennett

last week, saying everyone should voluntarily dismiss their

cases.

        Well, the problem with that is -- is a couple fold.

First, the folks who had their cases dismissed are in the

process of perfecting their appeal so they can take that

decision to the Seventh Circuit.  Now, if a thousand people

dismiss their cases voluntarily and the Seventh Circuit

reverses the Court's decision, then those lawyers are going to

have a lot of clients to respond to and potentially involving

their carrier and all sorts of things.  So they can't

voluntarily dismiss them due to a District Court order when

the Circuit Court has not weighed in on the issue, and that

was the same problem with the Lexecon deal that Ms. Pierson

spoke about.

        The Plaintiffs are not shirking Rule 11.  They're

not doing all of these things unethically and amorally as

being suggested.  But when the Court enters an order and the

1   Plaintiffs, they have a right to allow the court system that

2   we have established in this country to work and everybody has

3   an appeal as a right.  And if the Seventh Circuit reverses,

4   the people who voluntarily dismissed their claims are going to

5   be in big trouble.

6          Now, if the Seventh Circuit affirms the District

7   Court's order -- affirms your order on asymptomatic

8   perforation, that's a completely different discussion.  Then I

9   think we have a real discussion to have about people

10  voluntarily dismissing their cases and doing so at the risk of

11  sanction.  But I have never been involved in a case where a

12  Plaintiff is threatened with sanctions for exercising their

13  right to appeal.  And as we have said many, many times, we

14  cannot sacrifice the rights, whether they be constitutional or

15  statutory, of individual Plaintiffs in the name of efficiency

16  as much as we want to.

17         And so when we asked all the Plaintiffs if they

18  would consider voluntarily dismissing in light of the District

19  Court's order, we were told no, because of the reasons I just

20  described.

21         Now, again, like I said, if the Seventh Circuit

22  affirms, I think then we have the ability to start talking

23  about sanctions for folks who are refusing to dismiss and

24  refusing to screen.  But it's not an issue of people refusing

25  to screen their cases.  I'm sure there are outliers.  When you

1  have 8,000 cases, you can always pick six to put on a

2  PowerPoint slide and tell us how terrible these cases are.

3  But the point is, it's not unethical to refuse to dismiss a

4  case when the Circuit Court is going to be handling the very

5  issue in the near term.  So that's our problem with this.

6          The suggestion -- and I sort of approached this

7  lightly with Steve -- that we have is:  Let's take the

8  Category 6 cases and just put them over to the side and let's

9  wait to see what the Seventh Circuit does.  Again, if the

10  Seventh Circuit affirms, then we know what we can do.  But if

11  the Seventh Circuit reverses, then we'll have to figure out

12  also what to do with these cases.  But what we can't do is

13  force people to dismiss their cases voluntarily under a threat

14  of sanctions, when the Circuit Court has not had the

15  opportunity to address the issue.

16          MR. BENNETT:  Your Honor, may I briefly respond?

17          THE COURT:  Yes.

18          MR. BENNETT:  It sounds to me -- it sounds to me

19  like Mr. Williams is suggesting that we should wait until

20  Mr. Dalimonte takes an appeal on your order before we do

21  anything, and what I -- my reaction is until the world stops

22  spinning, we should act as though it intends to spin on.

23  Mr. Dalimonte received the Court's order in September of this

24  year.  It's now been a month and a half and I've seen no

25  appeal filed.  If this was such an urgent issue where we're to

get to the bottom of it, you would think it would have been

filed within 30 days under Rule 54(b), an interlocutory

appeal.  There should be no just reason for delay in filing

one, yet we're six weeks out.

What I hear, I think, Mr. Williams saying is that we

can't voluntarily dismiss because we are concerned about some

future appeal and what it might do for a malpractice claim in

the future, which is why I think we're both suggesting -- or

at least it's consistent with a court order, they can appeal.

Either they choose not to or they believe if they do, they're

exposing themselves if they dismiss the case, which is why we

need a court order and that's the solution here.  Not to set

them aside and wait for some future appeal that may or may not

happen.  But enter an order dismissing the Category 6 cases

today.  And Your Honor, I have a draft proposed order I can

send to you after this hearing.

THE COURT:  Thank you.  Mr. Williams, anything

further?

MR. WILLIAMS:  I don't have anything else to say,

Your Honor.  Mr. Heaviside may but I do not.

THE COURT:  Mike, do you have anything you want to

add?

MR.HEAVISIDE:  I just wanted to add, for what it's

worth, I've talked to Paul Stoller and Mike Gallant with that

firm and they assured me and the PSC that they are perfecting

1  that appeal; and I think -- and maybe Steve Bennett can

2  correct me on this.  I think that they dropped the related

3  claims -- other claims so that they can perfect this appeal.

4  That's my understanding and it comes directly from the

5  Dalimonte firm.  So to the extent that informs the Court of

6  the true intentions of the parties, that's all I can say.

7           THE COURT:  Steve, do you know anything further

8  about that?

9           MR. BENNETT:  I've not seen anything; but again, I

10  don't think whether the timing of the appeal would really

11  impact this consideration.  I think Category 6 cases involving

12  asymptomatic claims ought to be dismissed.  The Court can do

13  that today with -- again, keeping in mind the policy here, the

14  single action rule.  If they have a future injury, then they

15  will be allowed to file on that future injury.  So that I

16  don't think the timing of the appeal, if there is one, makes

17  much of a difference because the reasoning is correct under

18  the second and third restatements.

19           THE COURT:  Okay.  Well, you know, I've made my

20  ruling in these cases and certainly anyone can appeal who

21  desires to file an appeal.  If these cases are compensable, if

22  the Seventh Circuit finds that, I think we can all agree

23  they're not worth very much, right?

24           MR. WILLIAMS:  I mean, I think that's fair, Your

25  Honor.  We've said since the beginning of this MDL -- I'm

1   talking about Category 6 cases –– if we had an asymptomatic

2   perforation, I would be surprised if in summation we asked for

3   more than 50, $75,000.  But yes, I tend to agree with you, and

4   we have.  And you know, part of –– part of –– I mean, we can

5   look at it as a curse or a blessing, like you had talked about

6   early on, and I'm not talking about frivolous cases but I'm

7   talking about low value cases.

8           One of the beauties of the MDL process is that it

9   allows people who have negative value cases the ability to

10  file and seek compensation because otherwise, if you've got a

11  bunch of people who have $50,000 injuries, they're still hurt

12  yet they can't get a lawyer to take their case and seek

13  compensation because there's no economically efficient way to

14  do it.  But the MDL process allows that to happen and it

15  allows those claims to get put into the same action as the

16  positive value claims so that we're not leaving people who do

17  have injuries on the sidelines with no chance of compensation.

18          But to respond to you Your Honor, yes, these cases

19  are not worth a ton of money.

20          MR. BENNETT:  Your Honor, I would just add to that.

21  We're all trying to find solutions here and we proposed a

22  solution to address the Category 6 cases to move this MDL

23  forward.  We can talk and get in the weeds all day long about

24  the policy considerations; but the solution here, after you've

25  made your ruling on the Category 6 asymptomatic cases, is to

1    dismiss those with a future filing, if there is an injury.

2           We're not talking toasters here, where it was a

3    defective toaster and someone gets a coupon.  These are people

4    who have a filter in place.  It's a product-in-place or no

5    injury at this point.  If and when they do have a future

6    injury, they can file then.  This will address once and for

7    all what we've been talking about now for the last three or

8    four years.

9           THE COURT:  You know, these -- these firms who have

10   a large inventory of cases, some I'm sure have merit and some

11   maybe not so much.  Has there been any discussion about moving

12   forward with maybe some type of settlement discussions and:

13   Here's X number of dollars for your inventory; you figure out

14   who's going to get what, if anything.  And Plaintiffs' lawyers

15   think that their cases -- these asymptomatic cases are worth

16   50 grand, then they can give them 50 grand out of that pot of

17   money.

18          I'm not asking you to do that.  I'm just asking

19   certainly that's come across your minds, right?  Andrea?

20          MR. BENNETT:  Sure.

21          MS. PIERSON:  Your Honor, I can address that, judge.

22   Certainly it has come across our minds.  We talked about this

23   a little bit in July.  But when Mr. Williams or others say

24   those cases are worth 50 or $75,000 apiece times 1,400 cases

25   in Category 6, that's a lot of cases and a lot of money.  Cook

1  is not willing to pay for cases where there's no liability and

2  no injury.  As a matter of principle, we can't do that.  It's

3  like selling your product with a coupon.

4         There are a small number of --

5         THE COURT:  No, no.  What I'm saying -- what I'm

6  saying, Andrea, is not going by category.  Is going by firm

7  inventory and:  Okay, Ben Martin, Dave Matthews, Mike

8  Heaviside, Joe Williams, you've got an inventory here, here's

9  X number of dollars; and as long as you can get 90 percent of

10  the people in your inventory to buy in on this, we'll give you

11  this money and you can divide it up however you want.

12        MS. PIERSON:  We have been able to reach inventory

13  settlements with select law firms.  We're continuing to pursue

14  inventory settlements with various firms.  Obviously those

15  negotiations are confidential and I certainly can't go into

16  them on the record in open court.

17        THE COURT:  Right.  Exactly.

18        MS. PIERSON:  Where there is a law firm that has an

19  inventory that include cases that have value, we're having

20  discussions with those firms and we understand the different

21  mechanisms for resolving cases, whether it's individual

22  inventory or global.

23        I said back in July, though, Your Honor, the people

24  that have the majority of these cases are not the lawyers that

25  are in front of you.  It's not Mike.

1          THE COURT:  Right.

2          MS. PIERSON:  It's not Joe and it's not Dave.  It's

3    other law firms who are frequent filers that you have seen and

4    yet they're not at any of the hearings, right.  So they're not

5    getting your message and they're not conveying that to their

6    clients.

7          I think Steve's point in this order said it's a

8    screening order that probably the most important element of it

9    is that it requires those Plaintiffs' lawyers then -- we're

10   not talking about the folks that are on the call today; those

11   Plaintiffs' lawyers to actually talk to their client, to have

12   a conversation and to actually review the cases.  The way

13   these cases come in, it's through the 1-800 numbers that you

14   see on TV and hear on the radio.  Many times a lawyer's not

15   even spoken to their client.  I know that because those

16   clients call us trying to find out the status of their cases.

17   That's the problem that we're dealing with.

18         THE COURT:  All right.  Let me think about it.

19   What's next on the agenda?

20         MR. BENNETT:  Your Honor, I will forward you a draft

21   of the CMO.

22         THE COURT:  That's fine.  What's next?

23         MS. PIERSON:  Your Honor, the next issue is the

24   symptomatic perforation issue, and you may recall that we

25   talked about this at the July status conference, both on and

later off the record.  Some of these statistics I gave you
when we were together in July.  So I'm going to move through
them quickly, but I did want you to be aware of the magnitude
of this category and some of the problems that we're dealing
in this category.

At a very high level, Your Honor, right now we have
case categorization forms for 3,905 cases with Category 7(e),
which is symptomatic perforation.  Just to give you a sense of
how that fits into the larger MDL, the Bellwether cases that
we've been talking about, the PIP/no injury, when we first
talked about those in February, they were 31 percent of the
MDL.  Now they're 28 percent of the MDL.  So still a sizable
portion.  But the Category 7(e) symptomatic perforation cases
make up 51 percent of the cases that are before you, and
that's 3,905 cases where symptomatic perforation is the
highest injury.

We have looked at the filings within the last nine
months to try to understand where the trends are in this MDL
in terms of filing; and of the cases that have been filed with
case categorization forms in the last nine months, 72 percent
of those are 7(e) perforation cases.  Only 7 percent of those
cases have any evidence of any symptom associated with their
perforation.  Now, one side effect of focusing on Category 6
and 5 for Bellwether trials in the last two years is that
people began to dump their cases into Category 7(e), and we

1    certainly see that in the last nine months in particular.

2            Just to give you a sense, Your Honor, of what does

3    the trajectory of filings look like.  So here's the trajectory

4    of Category 7(e) symptomatic perforation filings going back

5    roughly two months.  You can see how that category has grown

6    exponentially.  I contrast that with things like fracture and

7    open removal.  You can see the trajectory of filings for those

8    cases.  The open removals are 1.3 percent of the MDL and

9    fractures were 6.5 percent of the MDL.

10           So by definition, under the Court's case

11   categorization form, a Category 7 perforation case must have

12   evidence of three millimeters of protrusion outside the caval

13   wall plus symptoms.  The Category 7 cases are all symptomatic

14   cases.  That comes straight from your categorization form.

15   You can see here, here's 7(e) defining penetration or

16   perforation.

17           And as you may recall, the Court didn't pull that

18   definition out of thin air.  It comes because we know that the

19   imaging for IVC filters isn't perfect.  This is the kind of

20   fluoroscopic image that most Plaintiffs have -- or many

21   Plaintiffs have, and you recall the experts on both sides

22   talking about how that column of contrast or dye shows up on

23   the imaging but what doesn't show up is tissue.  You can't see

24   the caval wall.  So scientists, experts, as you'll see, have

25   defined perforation on imaging.  We don't know if it's real or

1   not unless you're actually looking at the vena cava; but on

2   imaging, they define it as three millimeters or more outside

3   the caval wall.

4          That definition in a case category form actually

5   came from the Plaintiffs' proposed case categorization form.

6   You can see here that the yellow highlighting in the bottom

7   half of that cutout, E is penetration or perforation

8   consisting of a filter strut or anchor extending three

9   millimeters or more outside of the IVC wall as demonstrated on

10  imaging.  So the definition is a definition that the

11  Plaintiffs actually proposed.

12         It's consistent with how the Society for

13  Interventional Radiology defines perforation.  It's consistent

14  with how the Plaintiffs' experts -- and these are the three

15  medical experts that you've heard from in the Bellwether

16  trials.  It's consistent with their definitions of

17  perforation.  So at the top we've got Dr. Gordon.  You

18  remember Dr. Krumholz; and then at the bottom was Dr. Kessler.

19  Three millimeters, three millimeters, three millimeters.

20         It's also consistent with much of the literature out

21  there, although there is some literature that says a more

22  modern definition is greater than five millimeters outside the

23  caval wall, but there is substantial literature to support the

24  definition that this Court chose.

25         And it's consistent with the argument that the

1  Plaintiffs made for the case categorization forms.  Mr. Martin

2  argued on behalf of the Plaintiffs that, you know, we heard

3  until the end of time about three-millimeter penetration or

4  perforation.  We have no idea if this is actually a real

5  perforation but he concedes that a two-millimeter perforation

6  probably doesn't constitute an injury itself.

7           So this group of cases, nearly 4,000 cases, should

8  be Category 7 symptomatic perforation cases.  That means they

9  should have medical evidence that they've given with their

10 case categorization form that establishes both a strut outside

11 the caval wall of three millimeters or more and some symptom.

12          We did a sampling of the cases that are in that

13 bucket.  Actually, we did two random samplings.  I talked to

14 you about one of those before the July status conference with

15 a random sampling of 200 cases.  We did a second random

16 sampling within the last month to confirm the results of the

17 first random sampling; and our data shows that 51 percent of

18 the cases in this Category 7(e) have no supporting records

19 that mention the word *perforation* and no mention of any

20 measurement beyond the caval wall.  Only 14 percent of the

21 cases state a measurement of three millimeters or more.

22 That's 14 percent.

23          Now, we see frequently some examples like what I'll

24 show you here.  Here's a case filed by the Ferrer firm where

25 the medical record notes:  Distal anchoring strut exceeds just

beyond the vessel wall.  That's it.  Here's a case from the Johnson firm.  Distal struts extend slightly through the caval wall expected finding.  Again from the Johnson Law Group, inferior vena caval filter in proper position.  Minimal strut penetration observed.

From the Bern Law Firm.  There's slight filter strut penetration beyond the confines of the IVC wall of unknown clinical significance.  Here's one from Wright and Schulte; distal struts extend slightly beyond the wall.  Here's a third from the Johnson Law Group; two millimeters, none projects more than two millimeters beyond the wall of the IVC.  One from the Curtis firm; there's evidence of mild perforation of two posterior struts beyond the wall.

The solution to this problem, Your Honor, is what we'll provide to you after this hearing, proposed case management order 30; and it's a screening order for symptomatic perforation.  At its heart, the purpose of this order is to ensure that Plaintiffs have complied with your case categorization order.  That where you defined an injury of a symptomatic perforation, that, in fact, they have symptomatic perforation.

We believe that the vast majority of these cases, if our sampling is right, 51 percent don't constitute injuries at all.  Plaintiffs' own experts note that perforation is defined as three millimeters or more.  We think that it's important

that we get to the bottom of this bucket, the largest bucket
by far of cases in the MDL.  That we screen those cases and
then when we get to really separating the wheat from the chaff
in this bucket, then it's time for us, if we can't reach
agreement on values, to try Bellwether cases from this bucket.

The proposed case management order that we provided
to the Plaintiffs, and we'll provide to the Court following
the hearing, Your Honor, really has just three simple steps.
Within 60 days, the Plaintiffs review their case
categorization form and supporting records for medical
evidence -- that could be a medical record, it could be an
expert report -- but medical evidence of a three millimeter or
more protrusion and a present physical impairment or physical
harm.

It's not enough for a lawyer to just write something
on a blank on the page.  In the vast majority of cases, even
that hasn't happened.  Your case categorization order requires
medical evidence and we know they have to be able to prove,
when these cases are ultimately tried, some physical
impairment or physical harm.

Within 90 days of the Court's order, Cook will
submit to you a list of the noncompliant Plaintiffs.  We'll
submit that to the PSC.  We'll give the PSC a chance to review
it, to make any edits or revisions, and then we'll submit to
the Court the list of noncompliant cases for potential

1   dismissal or for further consideration.

2          We've purposely left that point 3 open, Your Honor.

3   We think we need to see what the results are, once the

4   Plaintiffs get done screening their own inventories; but the

5   time has come for the Plaintiffs who have these cases to clean

6   their house.  We've waited long enough for that, Your Honor.

7   That, in a nutshell, is the proposed order on symptomatic

8   perforation.

9          I will say this, Your Honor.  Then, of course, I'm

10  interested in what Mr. Williams or others on the Plaintiffs'

11  side have to say.  We know with these docket control orders,

12  we know that the PSC has an obligation to represent all their

13  members.  We know that they can't agree to these orders.  So

14  we provided the proposed screening order to Mr. Williams for

15  consideration by the PSC but we understand that they're in a

16  very difficult position.

17         This order, Your Honor, we think is clearly within

18  the Court's power.  You have the power to enforce your case

19  categorization order.  You have the power to screen cases to

20  get to viable cases.  In fact, as I mentioned earlier, the

21  Duke manual talks about this being an important role of the

22  MDL judge to vet through Lone Pine orders or other orders, the

23  cases, so that we can get to cases that are viable.  It

24  doesn't mean that Cook concedes liability, obviously, but

25  there is a threshold that Rule 11 sets out and that this

1   Court's case categorization order set out that these

2   Plaintiffs should be required to abide by.

3            Thank you, Your Honor.

4            THE COURT:  Thank you, Andrea.  Joe, any response?

5            MR. WILLIAMS:  Yes.  So -- and I appreciate

6   everything that we said but it's sort of perceived based upon

7   a couple of false premises, and one of these I've discussed

8   with both Ms. Pierson and Mr. Bennett but it's one thing if a

9   medical record says one millimeter perforation, all right.  I

10  get it.  That doesn't fit within 7(e) and those cases need to

11  go away.  But the majority of these cases that they're talking

12  about are medical records that simply state *perforation* or

13  *penetration*.  And those words are defined by the SIR

14  guidelines as three millimeters or more outside the caval wall

15  on imaging.  And so I don't know why we would ever assume that

16  a physician would use the word *perforation* or *penetration* and

17  mean nothing other than what medicine defines it to be.

18           What Cook is saying is all of these people are,

19  again, shirking Rule 11, being amoral, burning the world down

20  because we are assuming that when a physician says

21  *perforation*, that they mean perforation as medicine defines

22  it.  That's the first big problem.  And I asked Ms. Pierson,

23  during our phone call, what percentage of cases in this bucket

24  say, you know, something like two millimeters are less and

25  what --

1          Well, I lost my headphones.  And I asked what --

2    what percentage of this bucket of cases simply says the word

3    *penetration* or *perforation* without a measurement.  And she

4    told me that:  I don't know that anybody kept track of that.

5    I asked to check on it.  I've not heard anything else.  And

6    then I heard today that apparently 14 percent of the cases

7    specifically say three millimeters or more, but we don't know

8    what percentage of this bucket just used the word *perforation*

9    or *penetration*, which medically means three millimeters or

10   more.

11          On the categorization form, here's the second

12   problem.  If you read the categorization form for Category

13   7 -- and Ms. Pierson had it up briefly -- it says:  People

14   need to have conditions, symptoms, or complications.  Or.

15   Symptoms, conditions, or complications.  The categorization

16   order did not state you have to have symptoms.  It says

17   conditions, symptoms, or complications.

18          And when a penetration exists, something three

19   millimeters outside the caval wall, that's a medical

20   complication.  And so I don't know why we're going through --

21   if only to simply, you know, put --

22          If this order gets entered, you're asking people and

23   penalizing people for doing nothing more than abiding by

24   medical terms as they're defined by the bodies that define

25   them and at hearings the categorization order as it's written.

1   I don't think we need -- there's no reason to make more work

2   and cause more trouble when what people did was adhere to both

3   of those things.

4          Now, I think -- and Mike and David can correct me,

5   if I'm wrong.  But if somebody has a medical record that says:

6   You have a one millimeter outside the caval wall on imaging

7   event, those cases likely should be dismissed without

8   prejudice.  I don't think I'm saying anything controversial

9   there, but I'll let Mike and Dave jump if they think I am.

10  But what we can't have is some order that demands under threat

11  of sanctions and something else.  As Ms. Pierson said, she

12  wanted to leave that deliberately vague to see what happened.

13  We can't have people under threat of sanction dismissing

14  cases, when all they did is follow the medicine and follow the

15  form.

16         THE COURT:  Thank you.  Any response to that?

17         MS. PIERSON:  Thank you, judge.  I mean, just to be

18  clear.  There's no threat of sanction that's in the proposed

19  order.  What we're asking people to do in the proposed order

20  is:  Show us your proof.  Show us your proof.  You said that

21  you have a perforation.  Show us your proof for that.  And

22  this Court, it's completely within your authority to control

23  your docket, to ask for people to show medical evidence.

24         You know, the part of the definition that

25  Mr. Williams is leaving out from Category 7, and I'm looking

53

at the order right here, symptomatic injury cases, "cases where the Plaintiff alleges medical symptoms, conditions, or complications."  The medical condition, a medical complication.  I mean, all of these things are words to describe a legally cognizable injury.  A person must have some symptom, condition, or complication.  This is bleeding.  It's pain.  It's organ involvement.  It's something else.  That's what you ask people to show for Category 7(e).

So it's not a hard ask or a heavy lift to say:  You saw my case categorization order; whether you didn't understand it or you don't have it, I'm telling you now, comply with my categorization order.  I really struggle with what is so difficult about asking people to do what they will have to do and what they would have to do if their cases were proceeding individually and that's put up your proof.

Again, when we talked about this issue back in July, Your Honor, at the time you made the comment -- and I thought it was a good one.  You said, you know, eventually these people, if their case is going to be tried, they're going to have to go get a CT scan or some imaging to prove to the jury that they've got true perforation.  The Plaintiffs' medical experts, even the PSC, has conceded that if there's not three millimeters with some symptoms, there's no injury.  We saw that in the quote from the transcript that I put in front of you earlier, Your Honor.

1          I don't find this to be so onerous that it's 4,000

2    people claim that they have perforation that was caused by a

3    defect of an IVC filter.  Those 4,000 people ought to have to

4    show us their proof.  Some of them have done that already.  We

5    know that 51 percent have not.  You know, Mr. Williams raises

6    the point that we should just assume that these people have

7    three millimeters or more of protrusion outside the caval

8    wall, and he did ask me that question about who uses the term

9    perforation versus perforation with some measurement, which is

10   why we went back and did the second random sampling of cases

11   to be able to answer that question.

12          As I said earlier, Your Honor, 51 percent of people

13   have no supporting records that mention the word *perforation*

14   and no mention of any measurement beyond the caval wall.

15   That's 51 percent.  This is not a small number.  Even if you

16   assumed that Mr. Williams is correct, I take issue with his

17   assumptions that the word *perforation* alone means that it's

18   three millimeters or more.  We heard from his expert

19   Dr. Gordon multiple times that these terms are word salad.

20   That they're meaningless unless you have some measurement that

21   shows the distance outside or that there's some kind of organ

22   involvement.  *Word salad*, that was his description.  We've

23   heard that in every single trial.

24          But ultimately the answer to the question that

25   Mr. Williams poses is, it's not a small number.  It's roughly

 1    2,000 cases.  Fifty-one percent out of 3,905 cases have no

 2    supporting records that mention perforation and no mention of

 3    any measurement beyond the caval wall.

 4            THE COURT:  Anything else?  Okay.  Andrea, send me a

 5    draft of that and I'll take a look at it.

 6            MS. PIERSON:  Will do, Your Honor.  Thank you.

 7            THE COURT:  Next you have oral argument on

 8    Bellwether trial selection.

 9            MS. COX:  Yes, Your Honor.

10            THE COURT:  Ms. Cox?

11            MS. COX:  Thank you, Your Honor.  So throughout our

12    process, we've strut cases and you saw the Gallagher firm

13    dismiss one of the potential Bellwether cases.  But right

14    now -- we started with 32.  We did our strikes.  We did our

15    homework.  We talked back and forth and now we're down to

16    three Category 5 cases and two Category 6 cases.  That's all

17    that remain now in the Bellwether pool for selection today.

18            You heard from Mr. Bennett and Ms. Pierson.  We've

19    had lots of discussion about what we think needs to happen on

20    the Category 6 cases.  We obviously believe that we need to

21    enter a screening order and have those cases dismissed.  And

22    if you look at your original Bellwether plan, CMO 27 that you

23    entered last October, your Bellwether plan said:  If I make

24    rulings and I find things like asymptomatic perforation are

25    not injuries as a matter of law, we'll adjust the plan and

1    move from there.

2          So our position would be that the Category 6 cases

3    are more suited to motion practice.  They should be dismissed

4    per the screening order that we would like to propose to the

5    Court; and really, for purposes today, where our job was to

6    pick two Tulip cases to try and those two cases should come

7    from the Category 5 bucket.

8          So walking through.  There are 1,724 cases pending

9    right now in the MDL that alleges a Category 5 injury.  A

10   Category 5 injury is defined as a person who has had a failed

11   retrieval attempt or a complicated retrieval.  So there are a

12   significant amount of cases.  Cook does not believe this is an

13   injury that is compensable and the Plaintiffs disagree.  So

14   this is an important issue that needs to be resolved and

15   that's why we would ask for two of the -- the two Tulip cases

16   that will be selected come from the Category 5 bucket.

17         So there are three cases in the Category 5 bucket

18   left.  Julie Wilson is the first case.  The Wilson case,

19   Ms. Wilson was a lady who had had several orthopedic

20   procedures.  She recently had a DVT and was about to undergo

21   another knee operation.  So her doctor ordered a Tulip filter

22   to be placed.  She was about 60 years old when she had her

23   filter placed.  When they went in to retrieve her Tulip

24   filter, instead of using just one snare to pull it out, they

25   used several snares and a catheter and an advanced technique.

1    So it was dubbed a complicated percutaneous retrieval.  That

2    is her sole claim.  We don't think that's an injury.  We don't

3    think that's compensable.  The Plaintiffs disagree.  So we

4    think this is a case that should be tried.

5            She's from California and she is represented by the

6    Curtis Law Firm.  We know that there are over a hundred other

7    cases in this category where a filter was successfully

8    retrieved.  They're just claiming it was a more difficult

9    retrieval.  So, unfortunately, Ms. Wilson's claim is not an

10   outlier.

11           The second case in the Category 5 bucket is the

12   Jasmine Bowen case.  This is also a pretty representative

13   case.  Ms. Bowen had a history of DVT and PE she developed

14   after having a pelvic floor surgery.  She was at risk for

15   another DVT because she was about to have an ovarian procedure

16   but she couldn't take anticoagulants.  So her doctors

17   prescribed a Tulip filter.

18           She went back to have her Tulip filter retrieved

19   shortly after it was placed.  They went in to try to retrieve

20   it and they found it had become embedded.  So they wanted to

21   pull a little harder than normal but they'd only gave her a

22   light amount of sedation.  Ms. Bowen asked them to stop and do

23   the procedure under more anesthesia.  So they stopped the

24   procedure.  They brought her back the next day.  They gave her

25   more anesthesia and successfully retrieved her Tulip filter.

1           Ms. Bowen was 35 when her filter was placed and she

2    was in Illinois at the time of her advanced -- her second

3    retrieval and her first retrieval and the time of her Tulip

4    placement.  Her product liability claims were dismissed as

5    untimely because she waited over three years after her

6    successful retrieval to bring her claims, and we briefed that

7    as part of our briefing of the Bellwether cases where Cook

8    found that claims were untimely and Your Honor found that her

9    product liability claims were untimely.  But her implied

10   warranty claim persists but the claim that is governed by

11   Illinois law, which basically, essentially, asks whether or

12   not there's a defect in the product, I don't know any case

13   that's pending right now in the MDL that doesn't have an

14   implied warranty claim.  But essentially, she'll have to prove

15   that there was a defect in her filter to prevail.

16           She was in Illinois at the time of her retrieval and

17   again, she had a Tulip filter.  It was successfully retrieved.

18   We do not think this is a compensable injury but the

19   Plaintiffs disagree.  So this is, unfortunately, one that

20   needs to be tried.

21           She also had multiple retrieval attempts, which

22   makes it pretty representative.  We have hundreds of people

23   who have had multiple retrieval attempts alleged in this

24   category.

25           The third and final Category 5 case that's left is

1   the Cheatham case.  That is a case brought by the law firm of

2   Dowd & Dowd.  Mr. Cheatham was in South Carolina when he had

3   his filter placed.  He was in a very bad motorcycle accident.

4   He suffered a traumatic brain injury.  He suffered multiple

5   pelvic fractures and long-bone fractures, and he's going to be

6   immobilized for a long period of time and unable to take

7   anticoagulants because of the severity of his injury.  So his

8   doctors felt he needed a Tulip filter to protect him from PE

9   for the time he's going to be immobilized.

10          After the time where his immobility passed, his

11  doctors attempted to take out his filter and it was unable to

12  be retrieved via simple percutaneous techniques.  Now, since

13  that time, the records show that Mr. Cheatham has struggled

14  with memory and cognitive issues because of his traumatic

15  brain injury.  He's been unable to hold down a job for these

16  reasons, and he eventually moved to the Virgin Islands and

17  lists a PO box as his only personal address.  He was 23 at the

18  time that he got his Tulip filter.

19          So if we're looking at these three cases, Cook would

20  ask the Court to pick the Wilson case and the Bowen case as

21  the two that are most representative out of the three

22  Category 5 cases that are left in our pool.  The Wilson case

23  it's pretty exemplary.  All she has is a complicated

24  retrieval, which we do not think is an injury.  Her filter

25  successfully came out.  The Plaintiffs refused to dismiss.  So

1   this will be a very clear-cut way to have a jury answer a

2   question that we think should be answered in the affirmative

3   that there's not an injury there.

4          Ms. Wilson was close to the average Tulip age.  The

5   average person who gets a Tulip is older.  She's 61.  That is

6   right at the average age of 60 of a Plaintiff in our MDL that

7   gets a Tulip filter.  She had her filter placed before an

8   orthopedic surgery.  That is one of the most common reasons

9   that we see for a prophylactic filter placement.  She's also

10  from California, where we have 600 other plaintiffs in this

11  MDL.  Almost eight percent of the MDL actually is California

12  Plaintiffs.  So having a California law apply to a Bellwether

13  case would be very instructive.

14         She is represented by the Curtis Law Firm.  The

15  Curtis Law Firm is on the PSC.  They have 90 other cases.  So

16  they're invested in the outcome of the MDL; and hopefully

17  their involvement in a Bellwether trial will help to serve to

18  move the needle forward.  So we think Wilson is a very

19  representative -- would be a perfect case to pick.

20         Bowen we also think would be a representative case

21  and should be the second case picked for a Bellwether trial.

22  Not only because there is a complicated retrieval alleged here

23  but there's multiple retrievals, and we have again over 130

24  other cases where they're claiming multiple failed retrieval.

25  So it would be very representative.

1          She was 35 when she had her filter placed.  So a

2    little younger than the average Tulip plaintiff but not quite

3    as young as Mr. Cheatham, who was in his 20's, which would be

4    an outlier, when you look at the age of our Tulip plaintiffs.

5          We would expect in the Bowen case to be filing

6    dispositive motions on the implied warranty claim, which we

7    think would be very instructive.  Again, as I mentioned, I

8    have not seen a single case that doesn't allege an implied

9    warranty issue and I think that this briefing would help --

10   would help give all the parties some clarity on what claims

11   are viable in all of the cases that are pending.  So I think

12   the briefing on this one would be -- would be very important

13   and instructive to all of the cases that are currently pending

14   in the MDL.

15         A trial would be very instructive.  We're going to

16   be looking at the standard of the fitness of the filter,

17   whether or not it was fit for its intended purpose under

18   Illinois law.  We have a lot of cases from Illinois.  And

19   finally, Ms. Bowen is represented by McSweeney Langevin and

20   they have 250 other cases pending in the MDL.  So they're a

21   large player and they're invested in the outcome, and I think

22   having them involved in a Bellwether trial would be helpful

23   and representative.

24         In terms of the Cheatham case, we believe that this

25   one should not be selected as one of the two for our next

1    Tulip trial.  The records do indicate that Mr. Cheatham has

2    had that traumatic motorcycle incident.  Traumatic motorcycle

3    incidents are not a common reason for having a filter when we

4    look at our Tulip cases.  And unfortunately, that injury left

5    him with some deficits.  His most recent records from his

6    neurologist mention he's still suffering from cognitive

7    impairments.  He has attention and memory issues that make it

8    difficult to hold down a job.  It might make it a little bit

9    more difficult for him to testify.

10            He is self -- he's asked for some mental health

11   treatment and I'm not sure about the status of his mental

12   health as well.  He's also very young.  He would be much

13   younger than the average Tulip Plaintiff, and he is recently

14   moved to the Virgin Islands.  Again, we do not -- he lists a

15   PO box but he's been there for the last two years, and I did a

16   little Googling.

17            Off the record, I would love to take the Cheatham

18   case because I really need a vacation and would love to go to

19   the Virgin Islands.  But when we look at the logistics, to get

20   to the Virgin Islands from Indianapolis, I would have to take

21   a flight with two to three stops.  It would take me a minimum

22   of 13 hours, if I got the best one.  So in order to take a

23   deposition there of Mr. Cheatham and Mr. Cheatham's current

24   treaters, this is a three-day trip.  It's a day of travel

25   there, a day of travel back.  It's very expensive.  And in

1  cases where we've heard, you know, in the Burrage case, these

2  are negative value cases that we need not to pick for cost

3  reason.  This cost issue would weigh against picking this case

4  here.

5          There's also been periods of time where Covid

6  protocol would require quarantines going in and out of the

7  Virgin Islands.  So logistically, the Virgin Islands makes

8  travel very difficult and more costly than the other two.

9  South Carolina law would most likely apply to Mr. Cheatham's

10  case and that's only two percent of the MDL.  It's not like

11  California or Illinois, where the law would be much more

12  representative.  And Mr. Cheatham is represented by Dowd &

13  Dowd, who only have two other cases in this MDL.  They're not

14  on the PSC.  They're not -- and two versus 250, they're not

15  just as invested and involved in the MDL as the other law

16  firms representing Ms. Wilson and Ms. Bowen.

17          So in terms of the most representative, Wilson and

18  Bowen are the two that are most representative.  They have

19  dates that are -- we see a lot of people from the MDL.  Their

20  injuries are representative.  They're close to our average

21  Tulip age and the law -- understanding the questions -- the

22  legal questions in those cases will be instructive to all the

23  pending Category 5 cases that remain.

24          So for that reason, we ask the next two cases be

25  picked be two Tulip cases, the Wilson case and the Bowen case.

1  Thank you.

2          THE COURT:  Thank you, Jessica.  Joe?

3          MR. WILLIAMS:  Yes.  Mike's going to help me on this

4  one but the first -- I think we need to seriously consider

5  whether plowing forward, trying two Category 5 cases does what

6  we want it to do.  I mean, at this point we should only be

7  doing things that have the potential to move the MDL toward

8  conclusion.  And I heard Ms. Cox say about ten times:  We

9  don't think this is an injury.  If they don't think this is an

10 injury, then instead of working the case up for a trial, why

11 don't we -- why isn't it handled in the same way that they've

12 been handling other cases they don't think is an injury, and

13 we brief it.

14         Cook has made clear that they are not going to put

15 up money -- settlement money on Category 5 cases and that's

16 not going to change if we win one of these trials.  We've

17 talked to the folks who have these cases and they're not going

18 to dismiss the cases.

19         At this point, given where the parties are

20 continuing to try cases as Bellwethers and taking up this

21 Court's time does not make much sense to us at this point.

22 All of our efforts should be focused on trying to resolve this

23 MDL and trying a Category 5 case doesn't get us anywhere

24 there.

25         Now, Mike was going to jump in and finish this

1    thought but --

2          MR. MATTHEWS:  I will.  Your Honor, historically, as

3    the Court recalls, we tried the Hill case some years ago,

4    which was a filter removed and it was a complex removal.  So

5    we have heard from a jury in this matter.  Of course, then

6    there's an open surgery case we tried here in Houston and

7    there was a fractured case that was tried; and if the Court

8    wants to try this case, we can certainly put forward but the

9    issue I see is one of practicality.  Plaintiffs don't have to

10   try a case at their financial peril, if the cost of trying the

11   case is greater than the potential damages of the case,

12   ethically; and I think we're just going to see further

13   dismissals as these cases are pushed to trial.

14          Like I say, we continue to communicate with all of

15   the PSC, all the lawyers within the PSC and all the lawyers

16   mentioned now by Jessica.  We also communicate the orders that

17   have been -- the Court has already spoken as to what the Court

18   believes as to the meritorious cases of asymptomatic cases.

19   So there's a lot going on here in terms of communication to

20   lawyers.  And in the meantime, law firms, as Andrea stated,

21   are talking with Cook regarding inventory settlement, which I

22   think is great to hear and certainly we will continue to

23   assist in any way we can with those discussions.

24          But I think in looking at the overall picture, the

25   benefit is just really not there for trying and pushing

1   forward with these removed or retrieved filter cases.

2           THE COURT:  Thank you, Dave.

3           MS. COX:  Your Honor, may I respond to that briefly?

4           THE COURT:  You may.

5           MS. COX:  Respectfully, we disagree.  This sounds

6   like the same thing we heard when we talked about the

7   Category 6.  That, you know, Cook thinks there's not an

8   injury, yet the Plaintiffs won't dismiss them.  So the PSC's

9   answer is:  We should do nothing.  We shouldn't enter a

10  screening order.  We should just sit back.  We shouldn't try

11  the cases.  But our position is:  No, we need to keep moving

12  and we need to do it on a three-part track which Andrea

13  outlined, which includes Bellwether trials and includes

14  screening orders.

15          You know, you told us back in February of 2018, we

16  needed to deal with these product-in-place cases to make

17  progress.  When you said that, it was 30 percent of the MDL or

18  1,201 cases.  Now we have over 2,000 cases that have the

19  product in place claim.  So the situation hasn't improved.

20  They're not stopping filing them.  They won't dismiss them,

21  when we get verdicts like Hill, when we get rulings like you

22  made.  So the only thing we can do is stick with the plan that

23  you entered three years ago that says we need to pick one for

24  a Bellwether trial.

25          And I've counted.  Since October of 2018, this Court

1  has entered ten different orders outlining its intention to

2  try a Tulip no-injury case.  Ten different orders.  And I

3  haven't counted how many times we were on the record but I'm

4  pretty sure there were at least eight or nine arguments by the

5  Plaintiffs' counsel about why we don't need to try them.  Yet

6  they won't dismiss.  So we're left with having to try them.

7          When the Court entered its first plan, again, we

8  haven't seen movement.  We see the filings that are increasing

9  and we still haven't had a Tulip case go to trial.  Dave

10 mentioned that we've tried the Hill case, we tried the Brand

11 case, and he tried a case in Texas; but we have yet to try a

12 Tulip case and that's over half of this MDL.  So Cook's

13 position is that the Court should stick to its plan that's

14 been the plan for three years, that it's entered ten orders

15 that says we need to execute, and we need to pick two Tulip

16 cases for a Bellwether trial.

17         THE COURT:  Well, Jessica, your argument makes a lot

18 of sense but I've been burned before here in this MDL in

19 setting trial dates and setting two, three weeks of my

20 calendar, where I can't put others in that I need to do, as we

21 all know and most courts -- certainly in Federal Courts around

22 the country, we haven't been trying cases the last couple

23 years because of Covid, and so the backlog is crazy right now.

24 2022 is going -- assuming we can try cases, Covid relaxes a

25 little bit, we're going to be in trial.

1          So what I'm saying here is, I don't want to pick one

2    of these -- and David kind of hinted at it, on the eve of

3    trial, it's going to be dismissed.  So then where are we?

4    That's my problem.  So give me a solution, Jessica, on that.

5          MS. COX:  Your Honor, and I'm looking at the order

6    right now but we've actually -- we got burned last time by the

7    Burrage and the Johnson dismissals; and for that specific

8    reason, when we entered into this Bellwether plan, we put some

9    teeth behind it to where if you're selected for a Bellwether

10   trial and we do have a dismissal on the eve of trial, or a

11   situation after its selected and we start working it up,

12   that -- I believe that it's Cook gets to pick the next case

13   and to give a little disincentive for that to happen again

14   because no one wants that to happen.

15         What we want to have happen, is if -- Joe mentioned

16   let's handle these cases like we're handling the Category 6.

17   We're going to brief these issues in the context of these

18   Bellwether trials.  We're going to see if there's a legally

19   cognizable claim; and if there is a dismissal on the eve of

20   trial, then there's going to be consequences that I don't

21   think any of these attorneys want to have happen.  We don't

22   want to have Cook picking -- I don't think they want to have

23   Cook picking the next case that would be up for trial.

24         But we contemplated that very situation.  We put

25   that -- we put measures in to prevent that from happening

1   again.  But the bottom line is, just like the Burrage

2   situation, if they don't want to dismiss it, they won't want

3   to try it, then they need to be dismissed as a matter of law.

4           MS. PIERSON:  Judge, if I can just add one thing.

5   You may remember when Howard Nation's firm dismissed the last

6   Bellwether, you actually entered sanctions.  You gave us costs

7   for all the work-up of the case and then the tardy dismissal.

8   Following that, Mr. Nations dismissed another hundred cases

9   that fell into this bucket.  So when you exercise the stick,

10  people listen and there are results to that.  But

11  unfortunately, they don't pay attention until you -- you know,

12  sometimes it's a carrot, sometimes it's a stick.

13          And the reality is that this plan, you know, we went

14  out of our way to work with you and the Plaintiffs and the

15  Court to set up this plan so that to the extent there were

16  statute of limitations issues, we got rid of those up-front.

17  In there's statute of repose issues, we got rid of those

18  up-front and you gave strong language to the Plaintiffs about

19  there won't be dismissals from this bucket of cases.

20          But you know, we can't be held hostage by the fact

21  that the Plaintiffs don't want to dismiss the cases.  They

22  don't want to try the cases.  And unfortunately, the PSC is

23  not able to agree to orders that would allow you to control

24  your docket.

25          We can't be paralyzed by that.  As Jess said, you

1   made your decision a couple of years ago and have reiterated

2   it ten times.  We're going to try Tulip cases and we're going

3   to try them from this bucket.  My prediction is that in the

4   course of working these cases up, that there are going to be

5   some -- you'll be asked to rule on some things that have

6   global impact on Tulip cases, which is half of the MDL, and

7   global impact on this category of cases.  But the PSC has said

8   repeatedly:  We have to do it in the context of an individual

9   case.  That's what Bellwether trials give us a vehicle to do.

10          THE COURT:  Mike, did you have some comment?

11          MR.HEAVISIDE:  Well, of course, I don't want to

12  reiterate what Joe and Dave said because I agree with them.

13  But if you're just talking about these three cases that are

14  before you, this Bowen case has absolutely nothing to

15  advancing the MDL because the only thing left is implied

16  warranty.  So that one personally to me makes no sense

17  whatsoever.

18          The other two that remain, they want Wilson because

19  it's a filter was retrieved.  In our view, Cheatham would be a

20  much more instructive case because it's a stuck filter.  And I

21  don't have the statistics in hand that they do but there are

22  many, many stuck filters, which we, of course, do consider to

23  be an injury.  So I guess the bottom line is, if we are forced

24  to try a Category 5, then we think that Cheatham would be the

25  case.  Of course, motorcycle injuries are not plentiful in the

1  MDL, obviously.

2          But what is plentiful is putting in filters for

3  people who are going to be incapacitated for a period of time.

4  That was the case in Cheatham.  Not to repeat what Joe said or

5  Dave said.  If we're forced to try a Category 5, which then we

6  would implore you to at least -- the very least pick the

7  Cheatham case.

8          THE COURT:  Okay.  I'm glad we have a lot of

9  agreement here today on things.

10          MS. COX:  Your Honor, if I may.

11          THE COURT:  Yes.

12          MS. COX:  For what it's worth, if they don't want to

13  invest in trials, our hope is to file a dispositive motion in

14  Bowen that would be instructive to all the implied -- a lot of

15  people have alleged implied warranty.  So hopefully through

16  the process of working these up and filing motions in these

17  cases, that would be instructive; and if you pick Wilson and

18  Bowen, then we would have one case with some dispositive

19  motions that would be instructive for the MDL and one case

20  that we could get prepared and ready and go to trial.

21          Cheatham, unfortunately, it's logistically very

22  challenging because of the Virgin Island issue and

23  unfortunately, he's just -- has some personal issues that I

24  think would make it just very difficult.

25          THE COURT:  If we -- if we do select one or two

1  Bellwethers, what kind of time are you going to need to work

2  these up?  When would we be able to try something like this?

3          MS. PIERSON:  We can certainly try Bowen or Wilson

4  faster because they're here, right.  With all the travel

5  issues with the pandemic and everything, I think those two

6  cases can advance more quickly than the third.  Realistically,

7  we've got all the same depositions to do that we do even in an

8  open procedure case.  So I think we're talking late to early

9  Q4 2022.  I hear your docket is pretty backed up between now

10 and then as it is.

11         THE COURT:  Joe or Dave, Mike, any thought?  Does

12 that sound reasonable to you, if we're going to try one of

13 these?  Dave?

14         MR. MATTHEWS:  If so, I think so.

15         MR. WILLIAMS:  Yes, if that's the road we're headed

16 down.

17         THE COURT:  Let's go ahead and try the Wilson case

18 first and we'll set aside two weeks for that here in

19 Evansville, and we'll try to look at the late summer, early

20 fall of next year on that; and then the Bowen case would be

21 the next one up and we would try that more than likely early

22 2023.  And once I can look at my calendar, I can get you dates

23 and we'll put those in an order.

24         MS. COX:  Thank you.

25         THE COURT:  Anything else we need to discuss today?

1    Good.

2                   MS. PIERSON:  Nothing from Cook, Your Honor.

3                   THE COURT:  Some things I've been thinking about in

4    terms of trying to move this MDL along is on some of these

5    no-injury cases, small or no value cases, is actually

6    remanding them back to their home town.  Of course, remand --

7    as I said before, remanding to myself.  But in any event, I

8    don't know -- and I would be interested in your thoughts,

9    whether that would be something that -- that's the time if you

10   have a case, as Joe has said many times:  Judge, a lot of

11   these cases, it doesn't make sense to try them.  But if

12   they're remanded back to their home base, it might generate a

13   small settlement.  It might generate:  You know, I don't want

14   to try this, this is not really worth it if it's not in the

15   MDL.  So I'm thinking about that.

16                  And then I'm also thinking about you had mentioned

17   at one point you'd like to have some informal meetings with me

18   off the record.  I don't know if that's still something you

19   want to do, to discuss whatever you want to discuss about the

20   MDL, how it's progressing, frustrations with the process,

21   frustrations with me, what's a good way to proceed, what are

22   the impediments so far on each side of resolving this.

23                  Another thing I've been thinking about is some of

24   these firms who have large inventories, say a hundred or more,

25   just bringing those firms in for some type of meeting with me

74

 1  and, of course, counsel and just going through them.  Okay,

 2  this case looks like it's worth 5,000 bucks, take it or leave.

 3  This case looks like it's worth $50,000, take it or leave it.

 4  Just to get it going.  This case has statute of limitation

 5  problems; it isn't worth anything.  This case has got repose

 6  problems; it isn't worth anything.

 7        There's perforation here but you're not telling me

 8  anything about -- there's no evidence of what the perforation

 9  is, or this is significant perforation and it's worth more.

10  I'm struggling for ways to invest my time efficiently and your

11  time as well to try to get through.  We've got a problem here

12  with these asymptomatic product-in-place cases and some of the

13  other obvious categories that are just stymieing us and we're

14  having a lot of difficulty moving forward on it,

15  notwithstanding Covid.

16        So those are just kind of things I'm thinking of

17  when I'm laying awake at night at 3:00 o'clock in the morning

18  and I can't sleep.  Anybody have any thoughts on that?  Or am

19  I -- would that just be a waste of everybody's time?

20        MR. WILLIAMS:  Your Honor, I think I can speak for

21  the PSC that I think all three of those ideas have significant

22  merit and I think have a significant opportunity to move this

23  MDL closer towards conclusion, you know, for a whole lot of

24  reasons.

25        One, if you get people -- you get someone who has a

thousand cases in and let's just assume they have a thousand

terrible cases that are worthless, it very well may make a

difference to sit in the courtroom and have that discussion

with Your Honor, as opposed to receiving orders that I email

to everybody when they come out.

On the flip side, it may also help if Cook looks at

a thousand cases and thinks:  Okay, well, maybe I don't want

to pay for all of these but I do want to get rid of them and

it may be encouraged to do so in a discussion with Your Honor.

I mean, I think that that's got the best chance to move this

closer to conclusion.

With regard to -- I think I can speak for both sides

when I think we should start setting up sort of in-chambers

conferences.  I don't think there's anything negative that

could come of that.  And as far as remanding on the Category 6

cases, you know, I see the wisdom in that.  It sort of

forces -- I know Charles Siegel said in an argument a long

time ago in response to a park-and-ride statement from Cook

was:  You remand these cases, they no longer can park-and-ride

and they have to sink or swim on their own; and if they swim

or sink will be up to that client and that lawyer but it won't

be your problem.

And so I think each of these things that you

proposed, particularly when you package them altogether, do

have significant merit and a good opportunity to move the ball

1    forward.

2         MS. PIERSON:  Your Honor, I appreciate the fact that

3    you're giving this so much thought.  When you wake up at 3:00

4    o'clock in the morning and think about this, you ought to just

5    call us because I can tell you I'm awake having the same

6    thought and I predict some of the lawyers on the other side

7    are, too.

8         THE COURT:  Yes, but I'm a lot older than you,

9    Andrea, and I get up at 3:00 o'clock in the morning for a

10   different reason than I think you're probably awake.

11        MS. PIERSON:  I'm worrying.

12        MR. BENNETT:  I'm right there with you, judge.

13        MS. PIERSON:  Well, I know that this matter weighs

14   heavily on your mind.  It does all of us, too.  The

15   protraction of progress by the pandemic only sort of increases

16   all of our frustration, right.  I do think we ought to all

17   give ourselves a bit of a pass.  These are unprecedented times

18   and we happen -- it's like somebody who started a construction

19   project at the beginning of the pandemic.  Your house is

20   probably not done but you can't really blame your contractor

21   these days and it's a little of the same with this MDL with

22   the pandemic.

23        But we agreed before that having conversations in

24   chambers is a good idea.  I thought our conversation off the

25   record in July, following the status conference, was a

 1  healthy, productive one.  I think we can all be a little more

 2  candid about where there's give-and-take when we're off the

 3  record.  And I'm certainly looking forward to the time when we

 4  can be together in person and have that kind of a conversation

 5  with you.

 6         I don't know about the rest of the folks on this

 7  call but I'm looking forward to getting my booster soon and I

 8  think as soon as we all are fully vaccinated, that's something

 9  that we should aim for.  If we want to set it in January, that

10  kind of a conversation, I think that could be a good and

11  healthy thing.

12         I totally agree with you and Joe, as it relates to

13  holding some of these larger inventory holders accountable for

14  their inventory.  For all of us, there's nothing like standing

15  in front of you and being forced to defend our position that

16  causes people to take a good hard look at the cases that they

17  file with the positions that they've taken.

18         So one of the things that Joe thought previously,

19  and Judge Baker, is for these large inventory holders that

20  have these asymptomatic cases, let's make them get involved in

21  finding a solution to this, and they're not before you on

22  purpose.  They are the park and riders.  So I like very much

23  the idea of getting them more involved in this MDL because

24  they can't create the problem and then not be part of the

25  solution, right?  That doesn't work in life in general and it

1    won't work within this MDL.

2            The first solution that you offer related to remand.

3    Eventually there will be cases to be remanded from this MDL.

4    There will be.  Even if we were able to reach a global

5    agreement tomorrow, there would still be some people who opt

6    out and those cases will have to -- will have to be remanded.

7    Like in every MDL, we all hope that number is small because

8    the burden that you feel gets shifted to courts around the

9    country when cases are remanded.  So we always hope that we

10   can reach resolution through motions practice or settlement

11   that causes that number ultimately to be a small one.

12           The practical realities, though, are that that group

13   of cases, they stop being your problem and they start being

14   the problem of a thousand other judges around the country, and

15   there's a significant cost to both sides when that -- when

16   that happens.  But even if the MDL was only made up of those

17   cases, if that's all we had were the asymptomatic cases, the

18   Category 6's, for example, or the product-in-place cases, if

19   that was all this MDL was made up of, the cases still would

20   not be ripe for remand.

21           We don't have expert reports in those cases.  We

22   don't have pretrial rulings in those cases.  We haven't taken

23   any depositions in those cases.  Those cases will get

24   dismissed when people have to start working them up.  But the

25   purpose of the MDL is to do the pretrial work-up before the

1    cases are remanded, and none of that has been done in those --

2    in those cases.

3         So practically speaking, while we're looking for

4    pressure points for both sides, I understand why you would

5    identify that as something that could create a pressure point

6    for both sides.  Practically speaking, the cases aren't ready.

7    And I mentioned the Duke manual a couple of times today.  It

8    sets out best practices for the MDL.  Like there are a number

9    of other treatises but that one talks in particular at 14A

10   that remand should not begin until the Court has taken steps,

11   one, to preside over discovery, decide on motions, and conduct

12   such trials that are needed to position the cases for

13   potential resolution.

14        Two, explore and consider all possibility to

15   resolution of the case; and three, prepare cases that do not

16   resolve for trial in the transferee court.  And guideline 14

17   talks about the transferee judge should endeavor to use the

18   MDL forum to resolve or streamline the litigation before

19   remand to the District Court through the use of Lone Pines and

20   other orders.

21        So to throw out another possibility that we all can

22   noodle on after this hearing is over.  In the NexGen MDL,

23   Judge Pallmeyer entered a Lone Pine order after a series of

24   dismissals of Bellwether cases, and the Lone Pine order

25   required the Plaintiffs in those cases to come up with

1    essentially an expert report that said that they had been

2    injured.  That they suffered a loosening of their knee

3    component.  That is work that the Plaintiffs would have to do

4    when the case is remanded.  It's not work that's made up as a

5    penalty or as a sanction.  It's a step in the process that the

6    Plaintiffs would have to undertake, no matter what court the

7    cases we're filed in.

8            The effect of that Lone Pine order was a significant

9    trimming of that category of cases.  And Steve can speak to

10   this more readily than I can, but it made a very significant

11   impact in these cases for the Plaintiffs to do the work that

12   they will have to do anyway when the cases are remanded.

13   That's an example of some of the pretrial things that an MDL

14   judge does.

15           You know, you look at Judge Goodwin and the mesh

16   MDL.  There the Plaintiffs had to provide expert reports.

17   There were depositions of Plaintiffs.  There were depositions

18   of treaters and experts for those cases.  So there's a whole

19   lot of work to be done.  And frankly, the screening orders

20   that we talked about here today, they will help to narrow that

21   group of cases significantly, we predict.

22           So I'm not saying that remand is off the table

23   forever for this group or any group.  Every MDL ultimately has

24   cases that are remanded; but what I am saying is that, in my

25   view, ought to be pretty far down the list until the work of

1   the MDL is completed as to this still fairly significant group

2   of classes, close to 2,000.

3          Steve, I don't know if you want to add anything

4   related to our experience with Judge Pallmeyer and the impact

5   that had.

6          MR. BENNETT:  I would just say that it was a tipping

7   point when Judge Pallmeyer began issuing docket control

8   orders.  Not just for the cases that are existing but also

9   sending a message about future filings.  That's the problem.

10  I said this before.  You know, we're dismissing by drops and

11  seeing filings by the bucket.  We need to stop.  Every step

12  forward is two steps back with these new filings.  We need to

13  stop the filings on these asymptomatic cases.

14         So I think an order like Judge Pallmeyer entered,

15  where it put the proof to the Plaintiffs and directed them

16  about what are compensable injuries and what are not, really

17  does take that significant step more so than any remand would

18  do.

19         MS. PIERSON:  We can send those to you after this

20  hearing, judge.  Again, we're not -- we don't have a motion in

21  front of you but we're having a candid conversation about what

22  are we all noodling on.  That's something that ought to be on

23  the list, too.

24         THE COURT:  Okay.  There's not anything else we need

25  to talk about, Tina will get in touch with you about some time

1   maybe we can get together informally and talk about going

2   forward here.  Maybe within the next month or so.  I know it's

3   a busy time with the holidays but maybe we can get that set up

4   as well.  And then I'll get some -- what we've discussed

5   today, we'll get all that -- we'll take a look at all that and

6   get out what we need to get out from there.

7             So with that, if anybody else has anything they want

8   to talk about for the good of the order.  No?  Okay.  All

9   right.  Always good to talk to you; and again, it's amazing

10  the hard work you folks put into this MDL and it's certainly a

11  pleasure to work with such good, competent professionals.  If

12  I don't talk to you before Thanksgiving, have a good

13  Thanksgiving and we'll -- Tina will be in touch with you soon

14  about further proceedings.  Thank you so much.

15            MR. MATTHEWS:  Thank you, judge.

16            MS. COX:  Thank you, Your Honor.

17            MS. PIERSON:  Thank you.

18            MR. WILLIAMS:  Thank you, Your Honor.

19            (Proceedings concluded at 12:30 p.m.)

20

21

22

23

24

25

1   **********************************************************

2                  CERTIFICATE OF COURT REPORTER

3

4        I, Margaret A. Techert, hereby certify that the

5   foregoing is a true and correct transcript from

6   reported proceedings in the above-entitled matter.

7

8

9

10  /S/ Margaret A. Techert_____   **December 13, 2021**
    MARGARET A. TECHERT
11  Official Court Reporter
    Southern District of Indiana
12  Evansville Division

13

14

15

16

17

18

19

20

21

22

23

24

25