IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

_____

In Re: COOK MEDICAL, INC.,
IVC FILTERS MARKETING, SALES          Case No. 1:14-ml-2570-RLY-TAB
PRACTICES AND PRODUCTS                MDL No. 2570
LIABILITY LITIGATION
_____

This Document Relates to:

All Actions

_____

**THE COOK DEFENDANTS' MEMORANDUM IN SUPPORT
OF MOTION FOR SCREENING ORDER
<u>REGARDING AMOUNT IN CONTROVERSY</u>**

For at least the past five years, no-value and low value cases have impeded resolution of this MDL.  Much of the MDL's focus over that span has been on weeding out meritless cases.  For example:

- In October 2018 the Court implemented a Case Categorization system to help iden-tify cases in which no compensable injury is alleged.  That system resulted in the dismissal of over 600 cases in its first year alone.

- In October 2020, the Court addressed time-barred cases in the MDL by entering Case Management Order No. 28.  Dkt. 14601.  To date, that order has led to the dismissal of over 1,000 cases.

- In July 2020, the Cook Defendants moved to dismiss *Sykes* and *Parton*—cases that alleged merely asymptomatic perforation—for failure to allege a compensable in-jury.  The Court ultimately agreed and dismissed the products liability actions in each case.  Dkt. 20031.  And the Seventh Circuit endorsed this effort, albeit on

different grounds, in holding that the two cases should never have been brought in federal court because they lacked good-faith allegations that they sought the amount in controversy necessary for diversity jurisdiction.

As these examples show, the Court has made some progress in addressing low- and no-value cases. Nevertheless, several things have prevented the Court's efforts from resolving all the problems posed by no-injury and low-injury cases. Some plaintiffs have sidestepped the Case Categorization system by miscategorizing or recategorizing their claims to avoid dismissal. Numerous plaintiffs continue to file time-barred cases, despite Cook's letter requests for dismissal and the Court's CMO-28. And, even though this Court expressed in *Sykes* and *Parton* its doubt that asymptomatic conditions are legally cognizable injuries—and even though the Seventh Circuit essentially endorsed that view—plaintiffs have continued to file product-in-place, no- and low-value cases. *See Sykes v. Cook Inc*., 72 F.4th 195, 207, 214 n.11, 216 (7th Cir. 2023) ("[W]e cannot decide whether these claims are cognizable before resolving the jurisdictional issue, but like the district court, we have doubts that Kentucky or Texas would recognize a cause of action for an asymptomatic IVC perforation."; "the record shows that based on the injuries Parton and Sykes could allege in good faith when they filed their complaints, it was legally impossible for either plaintiff to recover more than $75,000.").

As a result of impediments like these, many cases of questionable merit remain in the MDL—many thousands of them, in fact. Based on census data from the Case Categorization forms, the Cook Defendants conservatively estimate that as much as 47% of the MDL, and perhaps more, is comprised of cases of no or low value. A major reason that so many no- and low-value claims persist is that the structure of an MDL represents a relatively "safe" place for such cases to sit idle and avoid individual scrutiny. The "park-and-ride" strategy for filing in federal court— whether by filing good or bad cases—would not work if each case had to be litigated individually.

Indeed, the Plaintiffs' Steering Committee has openly touted this "park and ride" feature of the MDL as an advantage for low- and no-value cases. *See* November 9, 2021 Hearing Tr. at 39:8-17 (PSC attorney noting how MDL permits filing of "negative value" cases). The anonymity of being lost in the MDL crowd invites claimants to file and forget, hoping to settle as part of a group while attracting little individual attention. And as the Court knows from recent experience in bellwether selection, such claimants readily abandon their claims when put to their proof through actual litigation.

The Seventh Circuit's guidance in *Sykes* and *Parton* points to a solution for the significant problem that has vexed this MDL for more than five years. Indeed, the Seventh Circuit provided a clear roadmap in *Sykes* and *Parton* that assures finality and positions the MDL for resolution: a screening order that addresses the cases that were filed in federal court without a good faith basis for claiming more than $75,000 in controversy.

As the Seventh Circuit's opinion in *Sykes* and *Parton* reminds us all, "the party invoking federal jurisdiction bears the burden of proving jurisdiction." 72 F.4th at 206. And a court "has an independent obligation to ensure it has jurisdiction, and it may raise an amount-in-controversy issue even if the parties do not." *Id*. This Court should follow the Seventh Circuit's lead and test the jurisdictional underpinnings of low- and no-value cases before either addressing the merits of those claims or remanding or transferring them to remote courts that may themselves lack subject-matter jurisdiction.

The Cook Defendants therefore move the Court to enter a screening order—attached as **Exhibit A**—requiring each plaintiff in this MDL to certify whether the Court has subject-matter jurisdiction over his or her claims; specifically, whether the claim places more than $75,000 in controversy. Additionally, the Cook Defendants submit a proposed Fifth Amended Case Management Order No. 4 (**Exhibit B**; a redline showing changes relative to Fourth Amended Case

Management Order No. 4 is attached as **Exhibit C**) to complement the proposed screening order and impose the same requirement on newly filed cases.  This screening order will result in the dismissal from this MDL cases that have no business clogging this Court's docket, which were filed in federal court solely to park and ride on the MDL coattails.  These cases are not—and never were—properly before this Court "because [none of the] plaintiffs could allege injuries in good faith that satisfied 28 U.S.C. § 1332(a)'s amount-in-controversy requirement."  *Sykes*, 72 F.4th at 216.

I.   **Factual Background**

   a.   **Park-and-Ride in the Federal Judiciary and in this MDL**

In 1991, MDL cases accounted for only about one percent of all pending federal civil cases.  *See, e.g.*, Nora Freeman Engstrom, *The Lessons of Lone Pine*, 129 Yale L.J. 2, 7 (2019).  By 2020, half of all cases filed in federal court were part of an MDL.  *See, e.g.*, Elizabeth Chamblee Burch & Margaret S. Williams, *Perceptions of Justice in Multidistrict Litigation: Voices from the Crowd*, 107 Cornell L. Rev. 1835, 1838 n.2 (2022).  This growth has been due at least in part to the business model that modern MDL practice enables.  Because MDLs tend to relax normal pretrial procedures and devote fewer resources to case-specific discovery and evaluation, plaintiffs can become "no more than an unembodied cause of action." As a consequence, some plaintiff firms, "like a vacuum cleaner, suck up good and bad cases, hoping that they can settle in gross."  Hon. Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 Nw. U. L. Rev. 469, 494-95 (1994).  Indeed, a recently completed study of MDL participants confirmed that "some attorneys functioned as vac-uums by indiscriminately pulling in claims and then bullying their clients into settling."  Burch & Williams, 107 Cornell L. Rev. at 1843.  "Lawyers use TV and internet ads with slogans like 'for the people' and 'protecting people like you!' to reach and represent the masses, pledging to pursue plaintiffs' rights and hold corporations accountable."  *Id.* at 1838 & n.3.  But the plaintiffs who are

"pulled in by late-night commercials and social media campaigns . . . all paint a grim picture of how well this process works." *Id.* at 1838 & n.4.

This MDL, along with other IVC filter litigation around the country, aptly illustrates the problem. The Judicial Panel for Multidistrict Litigation created this MDL in October 2014 over Cook's objection that "the creation of an MDL will encourage plaintiffs' counsel to proliferate the litigation and file meritless claims." *In re: Cook Med., Inc., IVC Filters Mktg., Sales Pracs. & Prod. Liab. Litig.*, 53 F. Supp. 3d 1379, 1381 (U.S. Jud. Pan. Mult. Lit. 2014). Cook's prediction has unfortunately proven true. For example, an advertisement posted on the National Injury Help website on March 3, 2017, titled "Product in Place Lawsuits an Option for IVC Filter Patients with No Complications," stated:

> People who have retrievable IVC filters implanted **but haven't noticed any symptoms or complications** may still be eligible for an IVC filter claim. These claims are called Product in Place, or PIP.
>
> ***
>
> **Even if there are no complications**, people with retrievable IVC filters made by the medical device manufacturers C.R. Bard Inc., Cook Medical, or Cordis, may still be able to file a product in place claim.
>
> ***
>
> **If you were implanted with an IVC filter** made by C.R. Bard Inc., Cook Medical or Cordis, you may be able to file an IVC Lawsuit (nationalinjuryhelp.com/ivc-filter-lawsuits/).

Dkt. 7412-3 (emphasis added).

As the Court well knows, such advertisements have been highly effective. The MDL comprised just 27 cases when it was first formed. 53 F. Supp. 3d at 1380. At the time of formation, the FDA had already issued two safety communications discussing the risks and potential side-effects of IVC filters. *See* Dkt. 5697-2 (2010 FDA Safety Communication); Dkt. 5697-3 (2014 FDA Safety Communication). Thus, since the second FDA safety alert was published in 2014,

patients who allegedly had experienced complications with an IVC filter had both (1) informed treating physicians to consult and (2) an MDL available to join. Yet as of January 2017, the MDL included only 1,381 cases.[1]

Then in 2017, as litigation advertisements like the one above began in earnest, the MDL grew exponentially. The MDL added almost 1,000 new cases from January 2017 to July 2017 alone, with another 1,300 new cases added between July 2017 and January 2018.[2] Encouraged by the advertisements' call for cases "even if there are no complications," many of the new cases were so clearly meritless—because they did not allege any injury at all, or because they did not involve a Cook product, or because they were filed years after their statutes of limitation had expired— that one can only assume they were filed for the sole purpose of increasing the size (and, presumably, the value) of a lawyer's inventory for settlement purposes.

### b. The Court's Efforts to Clear the Docket in this MDL

In addressing Cook's concern that the formation of this MDL would encourage the filing of meritless claims, the JPML noted that, "if defendants believe plaintiffs' counsel are filing frivolous claims, it is incumbent upon defense counsel to bring that concern to the attention of the transferee court, and to propose a process to identify and resolve such claims." 53 F. Supp. 3d at

---

[1] *See* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-January-16-2018.pdf.

[2] *Compare id.* (1,381 total historical actions as of January 16, 2017) *with* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-July-17-2017.pdf (2,367 total historical actions as of July 17, 2017) *and* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-January-16-2018.pdf (3,698 total historical actions as of January 16, 2018)

The MDL continued to add about 900 cases every six months thereafter. *See, e.g.*, https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-July-16-2018.pdf (4,568 total historical actions as of July 16, 2018); https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-January-15-2019.pdf (5,435 total historical actions as of January 15, 2019); https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-July-16-2019.pdf (6,343 total historical actions as of July 16, 2019).

1381.  Cook has heeded that call and has proposed numerous such processes over the years, and the Court has adopted many of them.  Yet the sweeping problem created by the filing of no and low-value cases in this MDL persists.

### i.  Case Categorization Order and No-Value Cases

In October 2018, in response to Cook's motion for a screening order "to ensure pending and future filed cases allege a cognizable injury," the Court implemented a case categorization system requiring Plaintiffs to self-categorize their claims by injury.  Dkt. 9322.  The Court's Case Categorization System paid immediate dividends, resulting in the identification and dismissal of 28 "Category 1" cases that alleged nothing more than a successful removal of their filter "on the first, routine, percutaneous retrieval attempt."  Dkt. 10588.  The system also rooted out almost 350 "Category 2" cases involving "only non-physical injuries, such as worry, stress, or fear of future injury."  *See* Dkt. 10857 at 1-2 & n.3.  Nearly 300 of those plaintiffs agreed to voluntarily dismiss their cases, and the Court subsequently dismissed a number of the holdouts in June and July 2019. *Id.*; Dkts. 11131, 11377.  To date, over 400 cases have been dismissed because they alleged only a noncompensable Category 1 or Category 2 "injury."

Still, many park-and-ride plaintiffs have ignored the Court's directives.  As of February 2019, Cook had identified 736 plaintiffs—almost 14% of the cases then pending in the MDL[3]— that had yet to comply with the Court's case categorization order despite the Court's extension of the deadline to do so.  *See* Dkt. 10063.  Cook moved to dismiss those cases.  Although a number of plaintiffs subsequently complied, the Court ultimately dismissed 193 cases that still had not

---

[3] *See* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-February-15-2019.pdf (listing 5,313 pending actions as of February 15, 2019).

complied with the case categorization order as of May 2019.  Dkt. 10622; *see also*, *e.g.*, Dkt. 14628 (Oct. 2020 Order dismissing an additional 63 cases for failure to serve a case categorization form).

Other park-and-ride plaintiffs have ignored the intent of the Court's order.  For example, in September 2019 Cook moved to dismiss 42 additional Category 2 cases that had all been filed by the same law firm on or after May 20, 2019.  Dkt. 11687.[4]  Cook filed the motion only after it had demanded dismissals in August 2019—by which time the Court had issued not one, but two orders dismissing Category 2 cases for failure to state a claim—but Plaintiffs' attorneys did not respond.  *See* Dkt. 11688 at 1-2.  After Cook filed the motion, 37 of the plaintiffs agreed to dismiss their cases and the remaining five agreed to recategorize.  *See* Dkts. 12061, 12151 (dismissing 37 cases that had been included in Cook's motion, Dkt. 11687).

Still other park-and-ride plaintiffs have miscategorized their claims in apparent attempts to avoid dismissal.  For example, in October 2019 Cook moved for summary judgment in 46 cases in which the plaintiffs had submitted medical records showing that their case involved nothing more than tilt (27 cases), placement of a filter (10 cases), or successful percutaneous retrieval of a filter on the first attempt (9 cases).  Dkt. 11924 at 1-2.  These cases each belonged in Category 1 or Category 2 and would have been dismissed as like other cases in these categories, but the plaintiffs had failed to categorize them properly.  The miscategorization of the "successful retrieval" cases—i.e., those that clearly belonged in Category 1—represented a particularly bald attempt to avoid the Court's warning in the case categorization order that such cases "are subject to immediate dismissal."  Dkt. 9322 at 4.  Eighteen of those 46 plaintiffs responded by voluntarily dismissing

---

[4] The list of cases, in filing order, appears in Dkt. 11687-1.  The earliest filed case was *Smith*, 1:19-cv-1992, filed on May 20, 2019.  Although *Christmas* is listed as an earlier filing, this was in error; *Christmas* is in fact case no. 1:19-cv-2234, not 1:18-cv-2234.

their cases.  *See* Dkt. 13996 at 2-3; Dkt. 14689 at 2.  Six plaintiffs did not bother responding to the motion at all, and the Court dismissed their cases.  Dkt. 13996 at 1-2.

Plaintiffs have also actively recategorized their claims when it became clear that their initial categorizations—which counsel had already certified as "the proper categorization for Plaintiff's case" based on "a review of the available medical records" (Case Categorization Form, Dkt. 9638-1 at 4)—could lead to dismissal.  *Sykes* and *Parton* represent recent examples.  Both plaintiffs recategorized from Category 6 "asymptomatic perforation" to Category 7 "symptomatic perforation" in response to Cook's argument that asymptomatic perforation did not represent a cognizable injury under applicable law.  *See* Dkt. 19434 at 9-10; Dkt. 19557 at 2.[5]  But neither plaintiff supported that recategorization with any new medical records; indeed, Plaintiff Parton did not allege any symptoms or complications at all, let alone that perforation had caused such issues as required by a Category 7 designation.  *See* Dkt. 19557 at 2; Dkt. 9322 at 3 (requiring "medical symptoms, conditions or complications" for a Category 7 "symptomatic injury" designation).  The recategorization did not, of course, save either plaintiff's case.  Because neither plaintiff pointed to any symptoms, the Court dismissed their product liability claims despite the recategorization.  Dkt. 20031.

### ii.   Category 5 and 6 Bellwether Trials to Address Low-Value Cases

Plaintiffs with wholly meritless claims are not the only ones playing the park-and-ride game *en masse* in this MDL.  Plaintiffs' counsel has openly touted to the Court the application of the park-and-ride model to *low*-value cases.  Plaintiffs' counsel openly admitted that the MDL

---

[5] *Sykes* and *Parton* were represented by the same law firm and were just two of 47 cases that the firm recategorized from Category 6 to Category 7 in November and December 2020, after Cook pointed out that neither plaintiff had suffered a cognizable injury.  Very few of those plaintiffs submitted any new documentation in support of their recategorizations.

procedures permitted the filing of what he called "negative value" cases, that is, cases that would cost more to try than they could possibly expect to recover:

> One of the beauties of the MDL process is that it allows people who have negative value cases the ability to file and seek compensation because otherwise, if you've got a bunch of people who have $50,000 injuries, they're still hurt yet they can't get a lawyer to take their case and seek compensation because there's no economically efficient way to do it. But the MDL process allows that to happen and it allows those claims to get put into the same action as the positive value claims so that we're not leaving people who do have injuries on the sidelines with no chance of compensation.

November 9, 2021 Hearing Tr. at 39:8-17. But what is "beauty" to the PSC is the bane of the MDL process: because hiding in an MDL can convert a negative-value case into a positive-value case, plaintiffs are filing such cases in federal court even if they cannot in good faith allege injuries that would support federal jurisdiction. *Sykes* and *Parton* are prime examples; as the Seventh Circuit held, these cases were not filed in good faith in this Court because plaintiffs did not satisfy the amount-in-controversy requirement from the get-go. *Sykes*, 72 F.4th at 216.

Counsel's paean to the economics of the park-and-ride business model was not the first time that the Plaintiffs in this case have invoked the strategy of sheltering cases in this MDL below the amount-in-controversy threshold for diversity jurisdiction. By May 2019, the MDL's attention had shifted to product-in-place cases, which were proving to be an impasse and an obstacle to progress. Cook argued that Categories 1 through 6 all represented no-injury cases. April 29, 2019 Hearing Tr. at 18:18-25. Cook proposed to address the first four categories through motion practice and the latter two—Category 5 (failed/complex retrieval) and Category 6 (non-symptomatic "injury") cases—through jury trials. *Id.* Plaintiffs objected to trying Category 5 and 6 cases, noting that "if you try to set someone with a product-in-place case and they've got to spend $250,000 . . . on a case they're going to ask a jury to award approximately $50,000, they're not going to take that case to trial." April 29, 2019 Hearing Tr. at 13:6-10; *see also id.* at 14:14-16 ("I

- 10 -

cannot tell a client: Yeah, we're going to try a case that's going to cost $300,000 but we're only going to ask the jury for $50,000 or in that area"). *That was April 2019 – more than four years ago – and yet the vast majority of low and no value cases still have not been voluntarily dismissed.*

To try to address these cases, and over the plaintiffs' objection, the Court implemented a bellwether selection process with the intent of trying Category 5 (failed/complex retrieval) and Category 6 (non-symptomatic "injury") cases. Dkt. 10599 (CMO-25). In August 2019, three cases were selected for trial through that process: *McDermitt*, *Johnson*, and *Burrage*. Dkt. 11602. But two of those three cases—*McDermitt* and *Johnson*—were subsequently dismissed as time-barred. Dkt. 13187 (granting summary judgment in *McDermitt* on Indiana statute of repose grounds); Dkts. 13354, 13358, 14602 at 2 (*Johnson* voluntarily dismissing his claims and pointing to a stat-ute-of-limitations problem). And the third plaintiff—*Burrage*—moved to dismiss his own case because he had "filed his case in the MDL with the anticipation that it would be resolved without a costly trial." Dkt. 13544 at 4. In other words, he expected his claim to be paid without ever having the merits of that claim tested.

In October 2020, the Court restarted the process of selecting bellwether trials of Category 5 and 6 cases. Dkt. 14602 (Third Am. CMO-27). One bellwether-pool plaintiff was so averse to being selected for trial that he dismissed his action preemptively, along with 42 other no- or low-value cases filed by the same law firm. *See* Dkt. 19717 (stipulation of dismissal as to 43 cases, including the *Palmer* bellwether pool case, with provision for refiling "in the event [of] a Legally Cognizable Injury" [defined as an open surgical removal, filter fracture, or death related to a fil-ter]). After a number of delays, on November 9, 2021, the process culminated in the selection of *Bowen* and *Wilson* as bellwether cases for trial. Dkt. 20373. But both plaintiffs moved to dismiss their cases within months of being selected, with each plaintiff citing the "interests of judicial efficiency" and "unnecessary costs and expense." Dkt. 20461 (*Bowen*); Dkt. 21723 (*Wilson*). As

permitted by the Court's bellwether selection plan, Cook selected *Tucker* as a replacement bell-wether case for *Bowen* in February 2022. Dkt. 21236. Plaintiff Tucker's counsel, however, sub-sequently moved to withdraw, and the case was then dismissed voluntarily. Dkts. 23165, 23683.

In short, starting in August 2019, six consecutive Category 5 or 6 cases were designated for bellwether trials in an effort to break the parties' impasse over the value, if any, of such cases, and all of them were dismissed. Two were dismissed as untimely, and the others were dismissed on the plaintiffs' own motions. These park-and-ride plaintiffs were all content to sit idle in the MDL waiting for a settlement, but they were either unable or unwilling to prosecute their cases when called to do so.

### iii. Case Management Order No. 28 – Time-Barred Cases

In October 2020, after *McDermitt* and *Johnson* were dismissed and both the PSC and Cook expressed "concerns related to pending cases barred by the statute of limitations or statute of re-pose," the Court entered Case Management Order No. 28. Dkt. 14601. CMO-28 required counsel for all plaintiffs in the MDL to "conduct a reasonable screening inquiry" and, within 60 days of entry of the order, "dismiss any case barred by the applicable statute of limitations or the applicable statute of repose." *Id.* at 1-2. CMO-28 also created a system of streamlined motion practice for cases that were not voluntarily dismissed but which nevertheless appeared time-barred. *Id.* at 2-4.

CMO-28 has been a qualified success. By Cook's accounting, 442 plaintiffs voluntarily dismissed their cases pursuant to CMO-28 by the end of January 2021 alone. This represents more than 13% of all cases that have been resolved in this MDL to date.[6]

---

[6] *See* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-July-17-2023.pdf (listing 11,263 total historical actions and 7,978 actions still pending, such that 3,285 histori-cal cases are no longer pending).

But not all plaintiffs complied with the Court's order.  As of the filing of this Motion, Cook has been forced to use CMO 28's streamlined motion procedures over 100 times.  Some plaintiffs responded to Cook's motion by agreeing to dismiss their cases, but Cook has moved—and the Court has granted—over 60 CMO-28 motions on substantive grounds.  Numerous additional cases have been voluntarily dismissed since the expiration of CMO-28's 60-day deadline, including one as recently as January 2023.  *See* Dkt. 23305 (Jan. 3, 2023 dismissal of Johnson Law Group's *Miller* case "pursuant to ¶ 3 of Case Management Order 28 Screening for Time-Barred Cases (CMO 28)").[7]

Even today, Cook continues to identify time-barred cases that are newly-filed or should have been dismissed long ago.  As just one example, on June 5, 2023, Cook filed a CMO-28 motion to dismiss a case that was filed in 2016.  Dkt. 24339; *see also* Dkt. 23740 (March 2023 motion to dismiss case filed in 2018); Dkt. 23739 (March 2023 motion to dismiss case filed in 2023); *compare Bennett v. Cook Incorporated et al.*, No. 3:23-cv-01697-K at ¶ 15 (N.D. Tex. July 31, 2023) (Complaint filed by Ben Martin Law Group in July 2023, alleging injury from a Tulip filter placed in Texas on December 14, 2006 – over 16.5 years before the complaint was filed) *with, e.g.*, Dkts. 4918, 14426, 18557 (dismissing claims pursuant to Texas' 15-year statute of repose).

Overall, over 1,000 dismissals to date—representing more than a third of the cases resolved in this MDL—can be attributed to CMO-28.  But the very fact that this number continues to rise is proof that it will take stronger medicine to root out park-and-ride plaintiffs.

---

[7] Johnson Law Group filed the short form complaint in *Miller* in this Court on April 22, 2019—a year and a half before CMO-28 was entered.  *See* Doc. No. 1, Complaint, No. 1:19-cv-01596 (S.D. Ind. Apr. 22, 2019).

### iv.   Perforation Cases.

"Perforation" has commanded a substantial share of the Court's attention since the inception of this MDL.  The parties have clashed over the proper definition of the term, the clinical importance of the phenomenon (if any), and when (indeed, whether) "perforation" is a compensable injury.  In October 2020, the Court announced its intent to "consider whether an asymptomatic perforation alone constitutes a compensable injury as a matter of law." Dkt. 14602 at 3.  The Court even made allowance for a potential "mini-trial" involving expert testimony on the issue, if necessary.  *Id.* At 4.  But by that time, Cook had already filed a motion for judgment on the pleadings as to four cases—*Dixon*, *Opperman*, *Parton*, and *Sykes*—that alleged nothing other than Category 6 "non-symptomatic" perforation.  Dkt. 13728 (July 2, 2020).  Cook argued that this "injury" was not legally cognizable and that the plaintiffs' claims therefore failed as a matter of law.  Plaintiff Dixon dismissed her claims just two weeks later.  Dkt. 13803.  Plaintiff Opperman likewise voluntarily dismissed his claim without prejudice—along with 75 other plaintiffs represented by the same firm—while the motion was pending.  Dkt. 16311.

Plaintiffs Sykes and Parton argued that Cook's reliance on their Case Categorization Forms meant the motion should be converted into a motion for summary judgment; the Court granted their request, and they opposed Cook's motion in part by relying on an affidavit from cardiothoracic surgeon Dr. Muehrcke regarding the nature of "perforation."  *See* Dkt. 19434.  But the Court ultimately held that "Plaintiffs have failed to raise a genuine issue of material fact that the injury they claim—asymptomatic perforation—constitutes a present physical harm."  Dkt. 20031 at 7-8. And although the Seventh Circuit did not reach the merits of this decision on appeal, the appellate court expressed doubt that the applicable states' law "would recognize a cause of action for asymptomatic IVC perforation," and concluded that it was "legally impossible" for the cases to satisfy the $75,000 amount in controversy requirement.  *Sykes*, 72 F.4th at 207, 214 n.11.

As noted above, both *Sykes* and *Parton* recategorized their actions from Category 6 "asymptomatic perforation" to Category 7(e) "symptomatic perforation" in response to Cook's motion and then tried to rely on that new categorization to oppose Cook's dispositive motion. *See* Dkt. 19434 at 9-10; Dkt. 19557 at 2. But neither plaintiff supported her recategorization with any new medical records or case-specific physician declarations. *See* Dkt. 19557 at 2. As the Seventh Circuit aptly summarized it, "[e]ven after they submitted supplemental case-categorization forms describing their IVC perforations as symptomatic, the only symptoms they identified were the number of filter prongs that had perforated their IVCs and the maximum perforation distance." 72 F.4th at 208. The Seventh Circuit did not look kindly on plaintiffs' attempt to label this radiological finding "symptomatic" perforation, noting that "a plaintiff does not act in good faith when she bases jurisdictional allegations on injuries she has not suffered." *Id.*; *see also id.* at 209 (plaintiffs "cannot rely in good faith on those allegations to satisfy the amount-in-controversy requirement") and at 216 ("neither plaintiff could allege injuries in good faith that satisfied 28 U.S.C. § 1332(a)'s amount-in-controversy requirement").

Although *Sykes* and *Parton* are the only plaintiffs whose unsupported invocation of Category 7(e) "symptomatic perforation" has been openly called out by the Seventh Circuit, they are far from the only plaintiffs who have sought refuge in Category 7(e) in an attempt to continue their park-and-ride strategy. Indeed, Plaintiffs Sykes and Parton were represented by the same law firm and were just two of 47 cases that the firm recategorized from Category 6 to Category 7 in November and December 2020 in an obvious effort to try to thwart Cook's motion. Very few of those plaintiffs submitted any new documentation in support of their recategorization, meaning that their attorneys certified two different injury types based on review of the *same* facts and medical records. *See* Dkt. 13046 at 49 (Court-approved Categorization Form, requiring attorney certification). Like *Sykes* and *Parton*, such plaintiffs—or, more accurately, their attorneys—did not strive for

accuracy but instead checked whatever box on the Case Categorization Form gave their case the best odds of avoiding the Court's attempt to separate the wheat from the chaff in this MDL.

As of November 2021, some 3,905 plaintiffs alleged Category 7(e) "symptomatic perforation." *See* November 9, 2021 Hearing Tr. at 43:6-16. This accounted for 51% of the cases then pending in the MDL. *Id.* And nearly three quarters of newly-filed cases in the trailing nine months—all filed *after* Cook had moved to dismiss *Sykes* and *Parton* on the grounds that Category 6 asymptomatic perforation claims were not legally cognizable—had been categorized as Category 7(e) symptomatic perforation cases. *See id.* at 43:17-44:1. Those plaintiffs *alleged* symptomatic perforation, but only 7% of those newly-filed cases submitted any medical evidence in support of that categorization. *Id.* Indeed, about half of the cases in the MDL that self-categorized in Category 7(e) did not even submit a record that used the word "perforation." *Id.* at 46:12-22.

Based on this surge in Category 7(e) (re)categorizations, Cook proposed a screening order, Case Management Order No. 30, "to ensure that Plaintiffs have complied with [the Court's] case categorization order"—"[t]hat where [the Court] defined an injury of a symptomatic perforation, that, in fact, they have symptomatic perforation." *Id.* at 47:14-21. As Cook noted, "[i]t's not enough for a lawyer to just write something on a blank on the page. . . . [the] case categorization order requires medical evidence." *Id.* at 48:15-20.

In March 2022, recognizing that Category 7(e) "symptomatic perforation" represented "the largest alleged injury type in this MDL," this Court entered CMO-30. Dkt. 21704. In CMO-30, the Court ordered all plaintiffs who categorized as Category 7(e) to review the evidence submitted with their categorization form and (1) either confirm that the evidence justified the categorization, or (2) promptly submit evidence justifying the categorization. *Id.* at 2. Although this should not have required any significant effort from any Plaintiffs' attorneys who had complied with the Court's original Case Categorization order, the PSC has taken every opportunity to push back

- 16 -

against CMO-30 rather than supporting compliance.  First, the PSC moved for an extension of time to comply with CMO-30.  Dkt. 21930.  Then, it moved the Court to vacate CMO-30 or, in the alternative, to amend it.  Dkt. 22064.  Then, it filed a motion to suspend the deadline to comply with CMO-30 altogether.  Dkt. 22585.  As a result of these repeated attacks on a court order that merely instructed plaintiffs to confirm that they had complied with an earlier court order, CMO-30 has yet to expose any park-and-ride plaintiffs who are improperly hiding in Category 7(e).

## II.    Legal Standard

### a.  Screening Orders

Screening orders are both within a court's inherent authority and authorized by Federal Rule of Civil Procedure 16, which permits courts to "adopt[] special procedures for managing potential difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." Fed. R. Civ. P. 16(c)(2)(L); *see also Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 833 (9th Cir. 2011); *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340 (5th Cir.2000); Engstrom, *supra*, 129 Yale L.J. at 5, 18.  As Professor Engstrom has noted, "[t]he legality of these orders isn't much in doubt. . . . [T]here is a strong consensus that courts issuing such orders do so within the bounds of their broad discretion." Engstrom, *supra*, 129 Yale L.J. at 18.[8]

Courts in fact may "streamline litigation in complex cases involving numerous claimants" in a number of ways.  *See* Bolch Judicial Institute, Guidelines and Best Practices for Large and Mass Tort MDLS, p. 104 (2d ed. 2018) (quoting *Baker v. Chevron USA, Inc.*, No. 05-cv-227 (SSB), 2007 WL 315346, at *1 (S.D. Ohio Jan. 30, 2007)).  For example, the defendant

---

[8] One state appellate court has held that a trial court abused its discretion by *failing* to issue a *Lone Pine* order. *See In re Mohawk Rubber Co.*, 982 S.W.2d 494, 499 (Tex. App. 1998) (directing trial court to issue order requiring plaintiffs to produce information about causation of their claimed injuries).

in *In re Fosamax* argued "that cases in this MDL are more likely to be dismissed by Plaintiff as they undergo closer scrutiny" and moved for an order requiring each plaintiff to affirm that he or she was willing to pursue the case upon remand. 2012 WL 5877418, at *1. The court granted the motion and ordered each plaintiff to produce a "signed statement . . . affirming that he/she is willing to proceed with the case upon remand." 2012 WL 5877418, at *4. Similarly, the court in *In re Biomet M2a Magnum Hip Implant Products Liability Litigation* ordered each unrepresented plaintiff to submit a "Declaration of Intent" affirming intent to pursue his or her claim, with failure to timely produce such a declaration resulting in dismissal. No. 3:12-md-2391 (N.D. Ind. Dec. 14, 2016) (order regarding pro se cases).[9] *See also In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practs. and Prods. Liab. Litig.*, No. 3:09-md-02100 (S.D. Ill. Aug. 3, 2015) (Case Management Order No. 78, requiring *inter alia* that counsel for plaintiffs with certain injuries who filed suit or were transferred to the MDL after a settlement opt-in date certify that plaintiffs were unrepresented on the opt-in date)[10]; *In re Trasylol Prods. Liab. Litig.*, No. 1:08-md-01928 (S.D. Fla. Apr. 18, 2011) (Pretrial Order No. 31, creating a screening system to facilitate dismissal of unserved cases).[11] And, of course, this Court has previously issued screening orders requiring each plaintiff in this litigation to categorize his or her case according to the injury alleged (Dkt. 9322) and to screen out time-barred cases (Dkt. 14601).[12]

---

[9] https://www.innd.uscourts.gov/sites/innd/files/Lone%20Pine%20order%20for%20pro%20se%20pltfs_0.pdf.

[10] https://www.ilsd.uscourts.gov/documents/mdl2100/yazcmo78.pdf.

[11] Available at https://lonepineorders.law.stanford.edu/wp-content/uploads/Pto-31-In-Re-Trasylol-Products-Liability-Litigation-Pretrial-Order-No-31-Apr-18-2011.pdf.

[12] Screening orders may also require plaintiffs to produce substantive evidence in support of their claims. *See, e.g.*, *In re Vioxx Prod. Liab. Litig.*, 557 F. Supp. 2d at 745 (requiring plaintiffs to produce case-specific expert reports concerning causation); *In re Fosamax Prod. Liab. Litig.*, No. 06 MD 1789 JFK, 2012 WL 5877418, at *4 (S.D.N.Y. Nov. 20, 2012) (same); *In re: Zimmer NexGen Knee Implant Prod. Liab. Litig.*, 2016 WL 3281032, at *1 (N.D. Ill. June 10, 2016) (same); *In re Zostavax (Zoster Vaccine Live) Prod. Liab. Litig.*, 2022 WL 952179, at *3 (E.D. Pa. Mar. 30, 2022) (requiring plaintiffs to produce specific evidence necessary to support causation); *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2010 WL 4720335, at *1 (E.D. Pa. Nov. 15, 2010) (requiring plaintiffs to produce a physician certification regarding product

### b.  Court's Obligation and Power to Confirm Jurisdiction

Given the present posture of this MDL, the Seventh Circuit decision in *Sykes* and provided a clear roadmap that this Court is compelled to follow.  As the Seventh Circuit noted in *Sykes* and *Parton*, a court "has an independent obligation to ensure it has jurisdiction, and it may raise an amount-in-controversy issue even if the parties do not."  72 F.4th at 206 (citing *Webb v. FINRA*, 889 F.3d 853, 856 (7th Cir. 2018)); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006) (noting "courts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party"); *Buethe v. Britt Airlines, Inc.*, 749 F.2d 1235, 1238 n.3 (7th Cir. 1984) ("[I]t is axiomatic that subject matter jurisdiction cannot be waived, and that courts must raise the issue *sua sponte* when it appears that subject matter jurisdiction is lacking."); *Kanzelberger v. Kanzelberger*, 782 F.2d 774, 777 (7th Cir. 1986) (holding that "federal courts are obliged to police the constitutional … limitations on their jurisdiction").  Indeed, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

When the jurisdiction of a court is in question—as it is here in the no- and low-value cases—courts have inherent authority to exercise jurisdiction over a case for the purpose of determining whether the court ultimately has subject-matter jurisdiction over the action.  *See U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 72-73 (1988) (explaining that "a district court [has] inherent and legitimate authority to issue binding orders, including discovery orders to nonparty witnesses, as necessary for the court to determine and rule upon its own

---

usage and injury); *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, 2018 WL 6258898, at *3-4 (N.D. Ill. June 11, 2018) (requiring plaintiffs to produce, *inter alia*, all of their medical and pharmacy records since five years prior to the date of the alleged injury and expert reports supporting case-specific causation); Nora Freeman Engstrom & Amos Espeland, Lone Pine *Orders: A Critical Examination and Empirical Analysis*, 168 U. Pa. L. Rev. 91 (2019-2020) (reporting on 97 *Lone Pine* orders issued between 1986 and 2019).

jurisdiction, including subject-matter jurisdiction."); *see also Krizan v. Apfel*, 35. F. Supp. 2d 672, 677 (N.D. Ind. 1999) (citing *McGowen v. Harris*, 666 F.2d 60, 64 (4th Cir. 1981)); *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 658 (7th Cir. 1989) (explaining that "all courts, including those of federal jurisdiction, possess certain inherent authority [including …] the power to determine whether the court has jurisdiction.") (Coffey, J., dissenting). "To fulfill [its independent] obligation, this Court orders the party invoking federal jurisdiction to show cause as a matter of course whenever subject-matter jurisdiction is in doubt." *Eisenberg v. Vatican*, 2019 WL 4142888, at *1 (S.D. Ind. Aug. 30, 2019) (collecting cases); *see also Faudree v. Immediate Action Med., Inc.*, 2020 WL 13574988, at *1 (S.D. Ind. Feb. 3, 2020) (order to show cause regarding subject-matter jurisdiction); *Pool v. Simms*, 2020 WL 11193327, at *1 (S.D. Ind. Dec. 30, 2020) (same).

## III.   Argument

This Court has authority to compel a party to demonstrate that the Court in fact has subject-matter jurisdiction. Indeed, if the Court has any concerns about subject-matter jurisdiction, then it has a duty to inquire further—for example, by issuing an order to show cause. And, as the Seventh Circuit's holding in *Sykes* and *Parton* shows, there is reason for concern as to whether plaintiffs in this MDL have a good faith basis to invoke federal diversity jurisdiction.

The Master Complaint in this MDL alleges that the "Court has subject matter jurisdiction under 28 U.S.C. § 1332" and that the amount in controversy exceeds the $75,000 jurisdictional threshold because:

> Plaintiffs named in their respective Short Form Complaints have suffered permanent and continuous injuries, pain and suffering, disability and impairment. Plaintiffs have suffered emotional trauma, harm and injuries that will continue into the future. Plaintiffs have lost their ability to live a normal life, and will continue to be so diminished into the future. Furthermore, Plaintiffs have lost earnings and will continue to lose earnings into the future and have medical bills both past and future related to care because of the IVC filters' defects.

Master Complaint, Dkt. 213, ¶¶ 8, 23.  But, as in *Sykes* and *Parton*, plaintiffs whose "short-form complaint and case categorization forms contradict the master complaint's jurisdictional allegations" "cannot rely in good faith on those allegations to satisfy the amount-in-controversy requirement." *Sykes*, 72 F.4th at 207, 209.  Under *Sykes*, plaintiffs who cannot in good faith allege the sort of "permanent and continuous injuries, pain and suffering, disability and impairment" on which the Master Complaint's jurisdictional allegations are premised have "not properly invoke[d] federal diversity jurisdiction when they sued Cook because [none of those plaintiffs] could allege injuries in good faith that satisfied 28 U.S.C. § 1332(a)'s amount-in-controversy requirement." *Id.* at 216.  This arguably implicates not only every plaintiff in this MDL who should have categorized in Category 1-6 (regardless whether they categorized themselves properly), but it also implicates swaths of plaintiffs in Category 7 who either cannot support that categorization (as was the case with Plaintiffs Sykes and Parton after they recategorized) or have technically experienced symptoms but of a temporary or nagging sort that cannot in good faith support the allegations of the Master Complaint.

In short, "subject-matter jurisdiction is in doubt" for plaintiffs throughout this MDL.  *Eisenberg*, 2019 WL 4142888 at *1.  In the wake of *Sykes* and *Parton*, this Court has a duty to test Plaintiffs' assertions of diversity jurisdiction, and an MDL-wide screening order would be a proper and efficient means of doing so.  Every plaintiff in this MDL who elected to file in federal court bears the burden of proving that federal jurisdiction is proper. Given the broad, MDL-wide questions now raised as to whether plaintiffs have a good faith basis for their allegations that they have placed more than $75,000 in controversy, anything less than an MDL-wide order will not do.  As this Court has shined its light on more and more of the MDL, plaintiffs have continued to scurry to the remaining dark corners.  The Court must investigate its jurisdiction over *all* questionable

cases, not just those that are "most likely" to have a problem—i.e., those subsets of the MDL from which park-and-ride plaintiffs have not yet fled.

Cook therefore urges the Court to address the jurisdictional problems identified by the Seventh Circuit on an MDL-wide basis rather than an ad hoc basis.  Although Cook suspects that a future order may be required, compelling plaintiffs to affirmatively demonstrate that the Court has jurisdiction, a reasonable first step would be to order plaintiffs' counsel to certify (1) that they have reviewed their clients' case, (2) that they have reviewed the Seventh Circuit's opinion in *Sykes* and *Parton*, and (3) that the amount in controversy does (or does not) support federal subject matter jurisdiction.   This will not only help fulfill the Court's obligation to ensure it has jurisdiction over the actions pending before it, but will have the salutary effect of flushing from the MDL many of the park-and-ride plaintiffs who should never have been in federal court in the first place.  It will also generate information that will be useful in determining whether further orders are necessary to discharge the Court's duty to confirm jurisdiction and, if so, in crafting such orders.

Cook therefore urges the Court to enter the proposed Case Management Order No. 32 (attached as **Exhibit A**), which would require plaintiffs' counsel to certify that they have reviewed the relevant facts and law and determined whether their clients' cases actually meet the $75,000 amount in controversy, dismissing them if they do not.  The Cook Defendants also request that the Court enter a Fifth Amended Case Management Order No. 4 (**Exhibit B**) in order to impose the requirements of the proposed screening order on newly filed cases.

## CONCLUSION

This Court has taken great pains to weed out meritless cases by addressing no- and low-value cases in an effort to clear the glut of park-and-ride cases that has stalled this MDL.  Attacking those cases on their merits has yielded some progress, but the Seventh Circuit has given this Court

a mandate to do more.  This Court should lay its axe to the root of the problem—if there has never been and is no federal jurisdiction, then there is no opportunity to play the park-and-ride game in this MDL.

For the reasons stated above, the Cook Defendants urge the Court to enter a screening order (**Exhibit A**) requiring each plaintiff in this action to demonstrate that the amount in controversy is sufficient to support federal diversity jurisdiction.  Additionally, the Cook Defendants request that the Court enter a Fifth Amended Case Management Order No. 4 (**Exhibit B**) in order to comple-ment the proposed screening order.

Dated: August 31, 2023                    Respectfully submitted,

                                          /s/  *Andrea Roberts Pierson*
                                          Andrea Roberts Pierson
                                          Jessica Benson Cox
                                          Eric M. Friedman
                                          FAEGRE DRINKER BIDDLE & REATH LLP
                                          300 North Meridian Street, Suite 2500
                                          Indianapolis, Indiana  46204
                                          Telephone:          (317) 237-0300
                                          Facsimile:          (317) 237-1000
                                          andrea.pierson@faegredrinker.com
                                          jessica.cox@faegredrinker.com
                                          eric.friedman@faegredrinker.com

                                          James Stephen Bennett
                                          FAEGRE DRINKER BIDDLE & REATH LLP
                                          110 W. Berry Street, Suite 2400
                                          Fort Wayne, Indiana  46802
                                          Telephone:          (260) 424-8000
                                          Facsimile:          (260) 460-1700
                                          stephen.bennett@faegredrinker.com

                                          Bruce Jones
                                          FAEGRE DRINKER BIDDLE & REATH LLP
                                          2200 Wells Fargo Center
                                          90 S. 7th Street
                                          Minneapolis, Minnesota  55402

Telephone:      (612) 766-7000
Facsimile:      (612) 766-1600
bruce.jones@faegredrinker.com

*Attorneys for Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, and William Cook Europe APS*

**CERTIFICATE OF SERVICE**

I certify that on August 31, 2023, a copy of the foregoing **THE COOK DEFENDANTS'**

**MEMORANDUM IN SUPPORT OF MOTION FOR SCREENING ORDER REGARDING**

**AMOUNT IN CONTROVERSY** was filed electronically.  Parties may access this filing through

the Court's electronic records system.

/s/ *Andrea Roberts Pierson*
Andrea Roberts Pierson