```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF INDIANA
 2                    INDIANAPOLIS DIVISION

 3
     IN RE: COOK MEDICAL, INC.,    ) Case No. 1:14-ml-2570-RLY-TAB
 4   IVC FILTERS MARKETING,        ) Evansville, Indiana
     SALES PRACTICES AND           ) February 26, 2024
 5   PRODUCTS LIABILITY            )
     LITIGATION                    ) 11:09 a.m.
 6

 7


 8
                 BEFORE THE HONORABLE RICHARD L. YOUNG
 9
                    TRANSCRIPT OF PROCEEDINGS
10                      STATUS HEARING

11
     APPEARANCES:
12
     For the Plaintiffs:        Ben Martin
13                              Ben Martin Law Group
                                3141 Hood Street
14                              Suite 600
                                Dallas, TX  75219
15
                                Joseph N. Williams
16                              Williams & Piatt, LLC
                                1101 North Delaware Street
17                              Indianapolis, IN  46202

18                              Michael Heaviside
                                Heaviside Reed Zaic
19                              910 17th Street, NW
                                Suite 800
20                              Washington, DC  20006

21

22   For the Defendants:        Andrea Roberts Pierson
                                Jessica Benson Cox
23                              Faegre Drinker Biddle & Reath LLP
                                300 North Meridian Street
24                              Suite 2500
                                Indianapolis, IN  46204
25
```

```
 1                                    Eldin Hasic
                                     Faegre Drinker Biddle & Reath LLP
 2                                    110 West Berry Street
                                     Suite 2400
 3                                    Fort Wayne, IN  46802-2322

 4

 5   Court Reporter:                 Elizabeth T. Culiver, RPR, FCRR
                                     United States District Court
 6                                    101 N.W. MLK, Jr. Blvd.
                                     Evansville, IN  47708
 7                                    (812) 499-8782

 8

 9           PROCEEDINGS TAKEN BY MACHINE SHORTHAND
         TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          *(In open court.)*

2               THE CLERK:  All rise.  United States District Court

3     for the Southern District of Indiana is now in session

4     pursuant to adjournment.  The Honorable Richard L. Young

5     presiding.  Court is in session.  Please be seated.

6               THE COURT:  Good morning.  Good to see you all.

7     We're here today in the -- for a status conference and

8     anything else we need to discuss regarding Cook Medical MDL

9     2570.

10              Here for the plaintiffs steering committee, Joe

11    Williams, Ben Martin, Mike Heaviside.  Cook is here by Andrea

12    Pierson, Jessica Cox, and Eldin Hasic.  Is that correct?

13              MR. HASIC:  Yes, Your Honor.

14              THE COURT:  Okay.  And I have a proposed agenda here.

15    Anybody wish to step up to the plate?

16              MS. COX:  I'm happy to, Your Honor.

17              THE COURT:  All right.

18              MS. COX:  So, I think first on our agenda was the

19    updating screening process that we talked about last time that

20    we were in front you.

21              THE COURT:  Yes.  I was hopeful that I would have

22    something I could just sign.

23              MS. COX:  Well, we're pretty close.  Joe and I have

24    tried to work very hard and diligently and cooperatively.  And

25    I thought I'd start with the amended Case Categorization Form,

 1   just the plain CCF.  And I can give you a copy if you --

 2           THE COURT:  Could you, please?

 3           MS. COX:  Yeah.  Sure.

 4           THE COURT:  Thank you.  Do you have one for Katherine

 5   as well?

 6           MS. COX:  I sure do.  And, Your Honor, I have sent

 7   Word versions to Tina, so she has a Word version in this.  In

 8   the email, this is amended CCF form.  And this is just what we

 9   wanted to do to update the information.  You know, we talked

10   about trying to get accurate stats so we could know what --

11   you know, know what's in the pool here so we could make some

12   progress.

13           Joe and I have agreed on everything in the amended

14   form except for one footnote.  So this is agreed to except for

15   one footnote that I've highlighted.  Before I discuss the

16   footnote, I will also let the Court know Joe and I did discuss

17   making this a fillable PDF form, which basically means we

18   would take this Word document and my IT department is going to

19   make it something that people can type into and sign, and that

20   way, the information, when it's submitted, it'll be a little

21   bit more accurate, and we'll be able to get it a little

22   quicker, so we thought it would be a way to try to be more

23   efficient.  So we've come to that agreement as well.

24           The footnote in question is just on page 3, and it's

25   highlighted, and it says, "If imaging alone is submitted, it

1    must be clear that a physician and not a lawyer is measuring

2    the protrusion outside the IVC."

3        This is just applicable to perforation cases which

4    we've defined as, you know, three millimeters or more outside

5    the wall of the IVC.  We have --

6        THE COURT:  Well, how would a lawyer measure that?

7        MS. COX:  Exactly.  We've got --

8        MR. WILLIAMS:  I'll be able to show you, Your Honor.

9        THE COURT:  Okay.  All right.  I don't know if I'd

10   trust that if it was me.

11       MS. COX:  Yeah.  So we have just gotten some images

12   with writing on it, and it's come to our attention that

13   there's a lawyer that has bought a program and says, well,

14   I'll just measure it, and I don't need to ask a doctor.  And

15   we just need to know that it's a doctor measuring it and

16   perhaps the name and a signature.  We're not asking for an

17   expert report.  I just -- you know, we're harkening back to

18   the business card days.  Like, we just need to have an

19   accurate measurement just so we're good to go and move

20   forward.

21       THE COURT:  I don't think I'd want a doctor writing a

22   contract, and I don't think -- but I'll listen to Joe.

23       MR. WILLIAMS:  Thank you, Your Honor.  Tina, could

24   you turn this on?

25       MR. MARTIN:  That lawyer is me.

```
1              THE COURT:  Well, there you go.

2              MR. MARTIN:  If Joe needs some help on explaining

3    that, I'm happy to fill in the blanks.

4              THE COURT:  Nothing to say that you're not able to do

5    this, Ben.  It's just -- you know what I'm saying.

6              MR. MARTIN:  I get it.

7              THE COURT:  All right.  Okay.

8              MR. WILLIAMS:  All right.  So, Your Honor, a couple

9    of things.  This categorization -- to set the table, the

10   categorization form that we're amending is for one reason and

11   it's because when we did a calculation of all of the cases in

12   the MDL and Cook did a calculation of all the cases in the

13   MDL, our categories didn't line up.  So we said let's amend

14   the Case Categorization Form.

15             If we're to have a doctor do a read on every one of

16   these things, it's going to add 1,000, $2,000, to the case

17   cost of cases that are going to be difficult to settle to

18   begin with because they're low value cases.  If we saddled

19   them with additional expert fees at this point, they're going

20   to be all but impossible to settle.

21             If you look at what I've got on the screen, Your

22   Honor, this is -- the medical record for this case said filter

23   in place, and if you look, I've blown it up on the right-hand

24   side, but you see the four prongs next to the -- or

25   surrounding the IVC?
```

1              THE COURT:  Yes.

2              MR. WILLIAMS:  Okay.  So that's what the CT looks

3    like.  Now, we have a program that is used by radiologists,

4    RadiAnt DICOM Viewer 64-bit, and you'll see the measurements

5    on here.  These are not measurements with a business card.

6    They are not measurements that a lawyer is doing.  It's the

7    computer program that's making these measurements.  All you do

8    is click the outside of the IVC and click the prong of the

9    filter and the computer program calculates the distance.  And

10   on these you can see it's 6.18 millimeters and

11   5.59 millimeters.

12             If this procedure is truly just to help us get

13   ourselves -- make sure that their list of cases matches up

14   with our list of cases, then we should allow us to use this

15   program so we can save money.  I mean, obviously, if we were

16   coming into court, Ben's not going to get on the stand and

17   testify about this.  But these Case Categorization Forms, the

18   amended one, is for one purpose.  It's just so that we can

19   match up each other's inventories and make sure we're

20   operating from a shared --

21             THE COURT:  So it's just for the categorization is

22   all?

23             MR. WILLIAMS:  100 percent.  If we have to go to

24   trial on something, of course, we'd bring a doctor or a

25   radiologist to explain this.

1          MS. COX:  Can we leave this up just for a second?

2          MR. WILLIAMS:  Sure.

3          MS. COX:  Okay.  I guess the first point is, this

4    isn't -- we're not asking for a medical expert report for

5    thousands of people.  We're talking about a very small subset

6    who doesn't have a medical record that shows perforation.

7    They don't have a medical record.  They don't have anything

8    from their treating physician that documents what their injury

9    is.  So it is just the case --

10          THE COURT:  You don't have this.

11          MS. COX:  Right.  We don't have anything.  So first

12   of all, he's talking about cases where there's no reported

13   injury, no symptoms, no nothing in their medical records.  I'm

14   not sure those cases belong here to begin with.  So why would

15   we -- that's a different issue.

16          The second thing is, it's not just about a computer

17   program making a measurement.  I agree RadiAnt can tell you

18   how far apart two dots are, but if you look here, you see

19   little two red dots.  You select where the dots are.  You

20   select I'm going to measure from this point to that point.  I

21   can tell you the one on the left isn't measuring to the center

22   of the prong.  It's also not measuring to the outside of the

23   IVC.

24          You have to know what slice of the CT to measure on

25   because the views look different on each one.  You have to

1    know where to put the dots.  So I understand that Tom Arbin

2    can run a software program, put some dots on a page, and it

3    can tell you how far apart the dots are, but he's got to know

4    what slice to look at and he's got to know where to put the

5    dots.

6         I see on the -- I mean, we're not even -- we're not

7    even in the prong, and we're not even on the outside wall.

8    You have to pick the slice where you see the outside wall.  So

9    there's a reason that we have radiologists read images.  It's

10   because they know where to put the dots.

11        So if we're going to have a case where we're saying

12   there is a perforation, your order says we just need to show

13   it's an actual perforation.  Those people with perforation and

14   injuries sufficient to have $75,000 worth of damages have

15   medical records that say they have a perforation into their

16   duodenum or something to that effect.

17        There's a small subset where there's no record of any

18   injury and all they have is an image.  We're not asking for a

19   full-blown expert report.  We're just asking that a physician

20   measure it and maybe like sign -- we've seen where they just

21   sign their little name and date it if all they have is an

22   image.  We're not asking for expert reports.

23        MR. WILLIAMS:  That still costs thousands -- it's

24   going to cost thousands of dollars per plaintiff on cases that

25   are going to be difficult to settle to begin with.

1          And if you look at this image that we have up, the

2     IVC is on the left and the aorta is right there on the right.

3     This was a read that the -- the radiologist said filter in

4     place because he wasn't looking at this specific issue.  And

5     you can see right there that there's a prong in the aorta.

6     Yet, this is what the medical record says, filter in place.

7          And so if we're really just trying to get -- make

8     sure our categories are the same, I don't think that we need

9     to spend -- they've said that there are close to a thousand of

10    these cases, these perforations without symptoms.  So if those

11    -- if that's 1,000 bucks apiece, that's $2 million.  If it's

12    2,000 bucks, it's $2 million.  I mean, we're talking about

13    more than a million dollars worth of money to do something

14    that we don't need at this juncture.

15          MS. COX:  I believe the plaintiff said they saw last

16    round 600 to 700 cases with asymptomatic perforations that

17    perhaps didn't belong in the MDL.  So I agree they shouldn't

18    spend more money on those cases.  They need to be dismissed.

19          THE COURT:  It seems to me -- of course, I'm just

20    hearing about this -- but just for purposes of categorization,

21    I mean, it's not proof of really anything.  It's just almost

22    an administrative matter.  I mean, just trying to -- I'm just

23    trying to move forward a little bit here.

24          MS. COX:  Agree.

25          THE COURT:  We're not going to agree on everything to

1    get this categorization -- this amended new categorization

2    document filed and ready to go, and it may need to be adjusted

3    at some point in time later on down the road, but to just get

4    the PDF out, get -- seems to me just for categorization

5    purposes, not proving anything.

6        MS. COX:  And, Your Honor, if this is an aortic

7    perforation, it belongs in a symptomatic bucket so we can

8    assess those cases and move them forward.  But if it's not an

9    actual perforation, if a lawyer is mismeasuring and it's not

10   an actual perforation, then we can't do the second step of

11   what we need to do and make sure those cases that don't belong

12   here aren't here.

13       So it's simple -- that's why I don't think it's

14   appropriate at this juncture, since it's just for case

15   categorization purposes, to ask for a full-blown expert

16   report, even though other MDL courts in this situation have

17   said, yeah, no, you just need an expert report to support you

18   have an injury.  I think that would be an expense that's not

19   called for here, but I do think just having a doctor --

20   hopefully it wouldn't cost $2,000 for a doctor to -- and I

21   assume they've already talked to doctors before they filed a

22   complaint.

23       So, again, I hope this isn't a big lift, and I hope

24   in those cases where it was a close call and they didn't have

25   a doctor record or anything supporting there's a perforation,

 1   that those cases would probably be best suited to be

 2   dismissed.

 3          MS. PIERSON:  Judge, may I add one thing from the

 4   cheap seats back here?

 5          THE COURT:  I just like to have one person speak.

 6   You can talk -- Jessica, consult with Andrea.

 7          MS. COX:  Yes.  As Andrea was mentioning on the

 8   sideline, I mentioned the organ perf because obviously some

 9   doctor is going to have to say there's organ perforation

10   before we put that in that bucket.

11          THE COURT:  So what do you want me to do today?

12          MR. WILLIAMS:  I'd like you to enter the CCF without

13   footnote two so that we can get that out to everybody and have

14   them start filling this thing in and get information to Cook

15   so we can make sure that we're on the same page.  From your

16   perspective, I think you just need to sign the CMO and tell us

17   to take footnote two out.

18          MS. COX:  I would like to keep footnote two in.

19          THE COURT:  Well, there we go.  All right.  I think

20   -- my initial thought is to take the footnote out, but let me

21   think about that a little more and have some discussion and

22   we'll get something out either today or tomorrow on that.

23          MS. COX:  Thank you, Your Honor.  And when you --

24   when it is finalized, I'll send it to our IT folks to get it

25   into the right format to attach.

1           And that sort of brings us to the next item on the

2    screening process agenda, which is CMO4, which is the CMO that

3    outlines, you know, what people are supposed to fill out.  It

4    attaches the CCF form.  So we've got to amend that just to

5    make sure that whatever -- you know, the form, when it's

6    finalized, gets attached to that, so I will -- I have a copy

7    of that for everyone too as proposed.

8           THE COURT:  Thank you.

9           MS. COX:  The version that we have sent the Court is

10   just saved as CMO4 in the email, and this version that I've

11   given is redlined.  So you can see, you know, everything

12   that's changed from the existing CMO4.  We've just shown all

13   of the edits and updates.  I am again happy to report that we

14   agree on all the edits to CMO4 except for the section adding a

15   requirement for a plaintiff to submit an amount in controversy

16   form.

17          So the CCF part, we're all good on.  The redlines are

18   good.  It's just -- there's an objection overall to having a

19   plaintiff have to submit a form about the amount in

20   controversy or our proposed case management 32.  So that's the

21   status of this one, and I think that's probably another segue

22   to CMO32, and I'm going to go ahead and give the Court a

23   version of that if that's --

24          THE COURT:  Sure.  Jessica, is this what was emailed

25   Friday?

 1              MS. COX:  Correct.  Yes.

 2              THE COURT:  I'll be honest with you, I haven't had

 3   much of a chance to take a look at it --

 4              MS. COX:  Yes, Your Honor.  This was emailed.

 5              THE COURT:  -- other than this morning briefly.

 6              MS. COX:  Okay.  The CMO32 we've also redlined to

 7   show proposed compromise positions that Cook has proposed

 8   since the filing of our proposed CMO32.

 9              And then last -- last piece of paper, I promise -- I

10   think.  No, I have two more pieces.  I'll just hand them out

11   as I do it.

12              I've also handed the Court a redline version of the

13   actual amount in controversy certification form, and I've also

14   given a copy of a proposed new case management order number

15   33.

16              If we -- if we skip to the end here, proposed case

17   management order 33, that is simply telling people, we've

18   amended CMO4.  We've put in a new form.  Everyone needs to

19   fill out the new form even if you've already given a CCF.

20              So to the extent that all it's doing is telling

21   people we have a new CMO4, please read it and respond.

22   There's no objection from plaintiff.  So CMO33 should be good

23   to go.  There's underlying objections to CMO4, but the

24   proposed 33 is agreed to.  So we can --

25              THE COURT:  Mr. Williams?

1          MR. WILLIAMS:  Agreed.

2          THE COURT:  So the CCF is taken care of in our

3    argument.  The CMO33 is good.  So that really just leaves

4    proposed case management order 32 and the attached screening

5    form.

6          We had multiple discussions prior to today's

7    conference to try to reach a compromised position.  I believe

8    the last time that we were in front of Your Honor, the

9    plaintiffs have indicated they had found in their own work

10   probably 600 cases or so that would fall in the bucket of

11   Sykes Parton and not having an injury worth $75,000.

12         We were hopeful that we could probably just get those

13   dismissed and not need this process, but that is apparently

14   not something that they are able to do.  So this process is

15   still needed to weed out those cases.

16         THE COURT:  Well, how is that determined, Joe or Ben

17   or Mike, there's 600 some?  How did you determine that?

18         MR. WILLIAMS:  Who said it?

19         MR. MARTIN:  Your Honor, we were not sure who had

20   said that.

21         MR. WILLIAMS:  I'm trying to -- did I say that?  I

22   doubt it.

23         MS. COX:  I can look at the transcript.  I thought we

24   talked about there being several hundred in the correspondence

25   in the lower court.

1    MR. WILLIAMS:  Because we -- what I think we would

2    have said, Your Honor, and obviously the transcript is going

3    to say what we said, but our issue with this primarily is the

4    Sykes Parton decision dealt with -- and they went through the

5    law of two states, Texas and Kentucky, and they went through

6    it pretty carefully and said under these two states' laws,

7    these two cases don't meet the amount in controversy

8    requirement.  I'm not sure, though, without binding authority

9    on anything else other than Kentucky and Texas.

10    THE COURT:  Well, I think also what the Seventh

11    Circuit was telling us is that, hey, we need $75,000 here.  It

12    doesn't matter where you are.  And some of these cases doesn't

13    matter where they would file -- be filed.  Ain't going to make

14    it.  You know, you're right.  They were talking about two

15    states, exactly, but I think the message in general was, hey,

16    take a look at these before you come for -- come into our --

17    before you come into our room, you need 75,000.  It doesn't

18    matter where you are.

19    MR. WILLIAMS:  So the amount in controversy CMO asks

20    every single plaintiff in the MDL to fill this out.  So we're

21    talking about people who have open retrievals, people who have

22    fractures, people who have filters that have migrated.  Why

23    are we asking them to fill out an amount in controversy?  I

24    mean, they signed it.  They made the Rule 11 representation

25    when they filed the complaint.  Now we've got injuries that

1     are clearly over $75,000.  I don't think we should be making

2     folks who are outside of that small subset of asymptomatic

3     perforations be dealing with this in the first place.

4              THE COURT:  Jessica?

5              MS. COX:  Your Honor, as I've mentioned in the

6     briefing, I believe, and with Mr. Williams, we'd be happy to

7     say if you have already submitted a CCF with an open retrieval

8     or a fracture, you don't need to fill out this form, but we

9     can't do that across the board because, for example, in the

10    briefing, they said, well, why would we do that on a death

11    case.  And it's because we have a lot of people who filed

12    things where we get a death certificate that says the person

13    died in a car accident or of -- you know, not anything that

14    would be related to a filter.  So we do need to do it broadly,

15    but I am happy to discuss and would have been happy to add

16    something saying in the discrete category of open retrievals

17    or fracture, we can agree, we don't -- we have sufficient

18    evidence, especially if you update your CCF form.  But I think

19    there's a lot of cases where we don't have that.

20             MR. WILLIAMS:  I think it's everything but

21    asymptomatic perforations because when we had the bellwether

22    trial, there was summary judgment out recently -- he tried

23    to -- he filed a motion saying we should dismiss because I

24    don't need the Sykes Parton criteria.  And I believe the Court

25    said because there's pain and suffering that was alleged, no,

1    you're in.  And then the Court entered summary judgment.  So

2    if we're talking about anything, it should only be

3    asymptomatic perforations and nothing else.

4           MS. COX:  And, again, I would -- I think that's --

5    there's two issues there.  In the Scott case, they submitted

6    an expert report saying he had injuries from a filter.  So

7    it's -- that's a different situation than what we're talking

8    about here.  I would agree that we would only need to do it in

9    the people who are in the Category 6 bucket, but as we saw

10   from Sykes and Parton, they moved theirs into 7(e) that's

11   supposed to be symptomatic perforation, and they didn't have a

12   symptomatic perforation, so we can't just simply do one bucket

13   because we have people that are in buckets where they don't

14   belong because we literally saw that in the Sykes case.

15          And I think to Your Honor's point, what they were

16   saying in Sykes and Parton wasn't so much a state law issue as

17   these people have incorporated allegations in the master

18   complaint that say they have suffered permanent and continuous

19   injuries, pain, suffering, disability, and impairment, and the

20   evidence wasn't backing that up.

21          So this is simply -- while we're doing this, let's

22   make sure we have everyone in the right bucket so we know what

23   kind of progress we can make with what cases moving forward.

24          MR. WILLIAMS:  I'm sorry, Your Honor.  I was actually

25   listening to Ben and I missed what Ms. Cox had to say.

1          MS. COX:  It would have just -- you know, it would

2    have blown your mind.  It was fantastic.

3          MR. WILLIAMS:  I'm sure it would have.

4          MS. COX:  You missed nothing.

5          THE COURT:  But you should always listen to Ben.

6          MR. WILLIAMS:  Well, maybe not always.

7          MS. COX:  That should be off the record.

8          MR. WILLIAMS:  Depends on the subject matter, of

9    course.

10          Your Honor, if this is limited to asymptomatic

11   perforations, I mean, part of -- boy.  Part of the problem is

12   -- let me -- oh, I'm sorry.  Go ahead.

13          THE COURT:  No, go ahead.

14          MR. WILLIAMS:  So part of the problem is before Sykes

15   and Parton happened, we had people filing asymptomatic

16   perforations.  Sometimes they were filed in state court and

17   Cook would remove those to this court.  So when everybody

18   filed those, everyone had a good faith belief that these

19   things were worth $75,000.

20          Sykes and Parton comes down, gives their ruling on

21   that issue.  But if the plaintiffs are now required to sign an

22   order saying, yes, we don't meet it and you must dismiss us,

23   it's going to cause problems for people who try to re-file

24   under their journey's account statutes in state court because

25   then they would have intentionally caused the dismissal, which

1    in a lot of states would kill your ability to re-file.

2            And if our issue here isn't that they're not injured,

3    the issue is that it's not $75,000 and that wasn't brought to

4    anybody's attention until the Seventh Circuit issued its

5    ruling, I think it's patently unfair to force lawyers to try

6    and dismiss their clients' cases in such a way that would

7    prohibit them from re-filing in the future.

8            MS. COX:  I think there's three points there that I'd

9    like to respond to.  The first is, that's not what the CMO

10   did.  We actually tried to propose it after we submitted it to

11   the Court after discussing this issue with Joe because we

12   recognize that people are in a hard spot.  We did not say that

13   they needed to actually physically voluntarily dismiss their

14   case.  We said that they had an obligation to see if what they

15   have alleged in the master complaint and incorporated on

16   behalf of their plaintiff is supported by the evidence.

17   That's all we're asking them to do.

18           And the Seventh Circuit said that the Court has a

19   duty to do it and the person asserting jurisdiction has a duty

20   to do it just like if this was a one off regular case.  There

21   are things that could happen after this process, that's true,

22   but at the end of the day, we're not offering any sort of

23   alternative to having to figure out what belongs here and what

24   doesn't belong here.

25           He also mentioned the remand argument.  There are

1      12 cases in this MDL where we -- based on the allegations

2      filed in a complaint saying they had a permanent serious

3      injury, we removed.  The Seventh Circuit has said, wow, okay.

4      Everyone has made this master complaint allegation, you have

5      serious injuries, and has not supported them with evidence.

6            We are not in a position to know if they have the

7      evidence.  And I don't think it's too much to ask a lawyer

8      before they file a case to figure out the evidence.  This

9      isn't -- again, not any different than if it was -- someone

10     filed a single case.  We are just having the person in the

11     best position whose burden it is to establish jurisdiction

12     look through and make sure what they have said in their

13     allegations are supported, and it's something the Seventh

14     Circuit said that we are mandated to do.

15           THE COURT:  Well, Joe is indicating that they would

16     have no objection to the asymptomatic and also the exclusion

17     of the open retrieval and the fractures.  Maybe we could start

18     with that and make some progress with that and then see how

19     that works and take a look at some of the other categories

20     later on and just make some movement here.

21           MS. COX:  How about perforation overall since, again,

22     Sykes and Parton were categorized in 7(b).  So I think this is

23     the -- if we did Category 7, that would give us a very good

24     dataset to start.

25           THE COURT:  Joe, what do you think of that?

1          MR. MARTIN:  He was listening to me, I think.

2          MR. WILLIAMS:  I know, but I heard what Jessica said.

3    Give me 12 seconds to talk with Ben before I give you an

4    official response.

5          THE COURT:  Sounds reasonable to me.

6          MR. WILLIAMS:  So when we're talking all

7    perforations, are you including perforating into an organ or

8    another vessel?

9          MS. COX:  I am saying if we're going to order it for

10   certain categories, let's do it for Category 7(e) and

11   Category 6 because we know there's a lot in that category like

12   Sykes and Parton that actually don't have injuries.

13         MR. MARTIN:  There are just some other categories

14   that we're kind of leaving out.  Asymptomatic perforation is

15   one.  And we get that.  But then when we get into things that

16   haven't been discussed like failed retrievals and stuck

17   filters and then all the fracture and migration and stuff, the

18   category that's difficult to --

19         THE COURT:  What I'm saying, Ben, is let's agree on

20   some of this to make a start so we can make some progress and

21   then maybe later on address what you're talking about here.

22   We've got to make some progress on this, folks.  I mean, I

23   don't want to spend the rest of my career with this case.

24         MR. WILLIAMS:  I don't want to spend the rest of my

25   career doing it either.

           1            THE COURT:  I know no one does, and we need to -- we

           2    need to make some progress.  And I know I've got some things

           3    I've got to get out, too, but it's not the only case on my

           4    docket.

           5            MS. COX:  I will go back and I will redline, and I

           6    will propose that the CMO33 and the applicable ones make that

           7    change to make it applicable to category -- the two categories

           8    that we discussed.

           9            MR. WILLIAMS:  Yeah.  And as long as they run it by

          10    us with Your Honor's instruction, we'll be good.

          11            THE COURT:  Makes sense to me.  Let's just get

          12    something where we can start moving down the road on this.

          13    And it needs to be done.  I mean -- and with Sykes and Parton,

          14    I have to do it.  I don't want anything going back up there.

          15            MR. WILLIAMS:  Right.

          16            THE COURT:  Okay.  Good.  Progress.

          17            Okay.  What's up next?  Number two, motion for

          18    judgment on the pleadings on express warranty.

          19            MR. HASIC:  Good afternoon, Your Honor.

          20            THE COURT:  Good afternoon.

          21            MR. HASIC:  I have a copy of the agenda if you'd like

          22    a copy.

          23            THE COURT:  I've got one.

          24            MR. HASIC:  So I'll be arguing the express warranty

          25    motion.

1          THE COURT:  Okay.

2          MR. HASIC:  So, Your Honor, we filed this motion on

3    the back of several orders that this Court has already made

4    over the -- over the time period of this MDL.  Namely three of

5    them.  So this Court has already made three threshold rulings.

6    First, is that the master complaint by itself in paragraph 95

7    does not plead the terms of an express warranty.  It just

8    provides high level legal conclusions, and the courts ruled

9    that as early as 2017.

10          On the back of that ruling, plaintiffs and individual

11    cases latched onto language in the master complaint that says

12    the terms of the express warranty -- or the express warranty

13    itself would be found in marketing documents and IFUs.  And so

14    when we litigated individual cases, a lot of those were the

15    Texas and North Carolina, et cetera, opposed motions,

16    individual plaintiffs pointed to that language and quoted from

17    IFUs, quoted from the patient guide, documents of that sort.

18    And this Court ruled that because of the reference in the

19    master complaint, the broad reference to marketing documents

20    and IFUs, that therefore such documents are incorporated into

21    the pleadings, and so when individual plaintiffs attached the

22    patient guide or the IFU, those documents could be reviewed on

23    a 12 seat posture, and so that's the second ruling that we

24    have is that the marketing -- Cook documents are broadly part

25    of the pleadings.

And then this Court in multiple orders has reviewed the actual terms of those documents as they have been attached under the federal pleading standard, which requires plaintiffs to plead meaningful detail and to plead the terms of an actual warranty, and this Court said in one of the orders -- it made an analogy to contract law, that analyzing a warranty is like analyzing a contract, that there have to be terms. And when plaintiffs have pointed to documents such as the patient guide or to IFUs, when this Court has read those documents, the four corners of the page, the full document, the phrases and the language that the plaintiffs have pointed to such as use of the word "permanent" or use of the word "optional retrieval," things of that sort, that when those documents are read in a holistic manner, the entire document, that they don't provide an express warranty.

And so there are various cases such as the Cunningham case that we reference in the briefing and the Papian case that we reference in the briefing, those plaintiffs' express warranty claims were dismissed because of this issue and that the only thing they could rely on, because they couldn't rely on the master complaint itself, we looked to the documents, and once we look at the actual documents, they did not create express warranties. And those cases were dismissed.

So the purpose of this motion is -- that's the law of the case, these three rulings that the Court has made. When

1    you put those things together, there's only one logical

2    conclusion and that's that the master complaint, Count 5 on

3    express warranty, should be dismissed.

4         The differences in state law don't compromise this

5    motion.  We provided a chart to list out the express warranty

6    standard in every state.  There's a lot of uniformity there

7    because every state but Louisiana follows the UCC, so the

8    threshold requirement, the first step of an express warranty,

9    that there must be some kind of affirmation of fact or

10   promise, some kind of statement, that's true across the board.

11   Every state follows that.

12         And so while there may be differences in other

13   elements, on reliance or notice or other issues, it's the

14   first element that the motion is focused on, is if the

15   plaintiffs can't identify the term of a warranty and they

16   haven't been able to through the pleadings of the master

17   complaint or in the documents that have been incorporated,

18   then there is no express warranty.  There's nothing to rely on

19   if the document, when read objectively, does not create an

20   express warranty.  That's the implication of those rulings,

21   and what we're asking the Court is to extend its prior rulings

22   across the board to the rest of the MDL because there are no

23   differences that would matter, that the state law is

24   consistent on that issue, and it's required by federal

25   pleading standards.

1       We've cited to multiple examples of other MDL courts

2   that have dismissed the express warranty count in an MDL.

3   That includes the Northern District of Illinois in the

4   testosterone replacement therapy MDL about 2014 or 2015 and

5   then an MDL from Missouri.  So there are examples of courts

6   resolving the express warranty claim on the master pleadings

7   and doing it on a 12(b)(6) or a 12(c) posture, and we ask the

8   Court to do that here.

9       In review of the plaintiffs' briefing, plaintiffs

10  raised several issues.  One thing -- the most important thing

11  that they've not raised is that they don't question or point

12  out or disagree with that Court's prior rulings.  So that's

13  the law of the case, that the master complaint does not plead

14  terms and that the documents such as the patient guide and the

15  IFU don't create express warranty.  Plaintiffs don't question

16  that and, therefore, there is no bar to prevent this Court

17  from extending those individual rulings in a broader way which

18  is fully consistent with the broader goals of this Court to

19  move the MDL forward and to make progress because once we've

20  -- all of these individual cases, the CMO28 motions, they've

21  effectively been mini bellwethers on this discrete express

22  warranty issue.

23      And the actual bellwethers, none of the -- none of

24  the bellwether cases that made it to summary judgment, that

25  made it that far or that went to trial, none of those

 1    plaintiffs moved on the express warranty claim.  In three of

 2    them, it was abandoned.  In the Gauge case, that was a statute

 3    of limitations case, and so that issue went away.  And so

 4    through the prior orders this Court has had opportunity to

 5    analyze the relevant documents, that was a part of the

 6    pleadings and so there is no bar to -- procedurally for the

 7    Court to do this.  It's procedurally proper, and we ask the

 8    Court to grant the motion.

 9            THE COURT:  Thank you.  Mr. Martin?

10            MR. MARTIN:  Thank you, Judge.  So with respect to

11    the -- this is only dealing with the express warranty claims,

12    and as counsel has pointed out, there have been three cases

13    that this Court has -- three different states -- cases from

14    three different states that have been the subject of prior

15    rulings; Illinois, Texas, and North Carolina.

16            And what they -- and basically what I'm understanding

17    Cook to say today is, well, this Court has previously said in

18    those cases, those specific states, that if you're going to

19    look at the patient guide or you're going to look at the

20    instructions for use, then in those particular cases, the

21    Court is ruling that -- and this is -- this is a little

22    broader than I think the Court ordered.  But let's presume for

23    today's purposes that their argument is that, that this Court

24    has made a ruling that patient guides and IFUs cannot

25    formulate the basis of an express warranty claim.

1          Well, we would disagree that that is the ruling.  We

2    would disagree that that's the law.  If a person read their

3    patient guide or if a doctor read the IFU and the IFU says

4    these -- these filters can be made -- are made for permanent

5    use or can be taken out on a temporary basis, right, or that

6    these are safe and effective filters, right -- which we allege

7    and in some of these cases, the plaintiffs allege, that that

8    is not true, right?

9          So it all boils down to, I guess, whether or not

10   these 50 different states with their 50 different laws on

11   express warranty, if those -- if all of those states in this

12   motion and all the cases out of those states, the 7,000 of

13   them, right, if express warranty should be granted -- summary

14   judgment against the plaintiff's claim on express warranty

15   should be granted, we would simply say that that's too broad.

16         What would be the reason to do that?  If the Court

17   were to grant without really any evidence either way on what

18   is the evidence in each one of those 7,000 cases or however

19   many have brought express warranty claims, if we're going to

20   look at 7,000 cases, is it appropriate for the Court just to

21   do a signature on an order dismissing those 7,000 express

22   warranty claims even though the Court has not looked at the

23   evidence for express warranty, the evidence for a different

24   notice provisions, the law on what it takes to determine

25   whether or not there's express warranty claim, that it's just

 1    too broad.

 2            At this point, Cook has gotten summary judgment -- or

 3    excuse me, motions to dismiss were granted on these particular

 4    states cases, and it's worked fine.  It's worked fine for

 5    Cook.  It's actually worked fine for the plaintiffs, and when

 6    they have an express warranty motion to dismiss, what they

 7    ought to do is what they've done in the past and bring it up

 8    and see what the evidence is for those particular cases, and

 9    that's all we're saying, Your Honor.

10            THE COURT:  Doesn't there have to be specific

11    language for express warranty?  I mean, if you buy a

12    refrigerator, refrigerator manufacturer says, okay, we're

13    going to warrant that this refrigerator is going to work for

14    five years.  If it doesn't work after five years, too bad.

15            MR. MARTIN:  Right.

16            THE COURT:  I mean, that gives you a heads up.

17    That's pretty good language.

18            MR. MARTIN:  Right.

19            THE COURT:  But if you say something's going to be

20    safe for the remainder of your life, is that an express

21    warranty that it's going to be -- I mean, this -- this is a

22    medical device.  By definition, it's risky, right?

23            MR. MARTIN:  By definition -- I don't know that I

24    agree with that because -- but the question always comes up in

25    cross examination of experts.  You would agree that there's a

 1   risk in every device.  There's a -- a bandaid can hurt you,

 2   you know.

 3           THE COURT:  Heard it all before.

 4           MR. MARTIN:  You've heard it all before.

 5           THE COURT:  Over the years, yes.

 6           MR. MARTIN:  At least twice I know.

 7           THE COURT:  Well, more than that, but certainly

 8   twice.

 9           MR. MARTIN:  Yeah, twice in these cases at least,

10   right?  But our point is -- well, I can be a little bit more

11   specific, Your Honor, and it's cited in our briefing that in

12   fact -- well, let's say that Cook, which it has said, these

13   devices are safe and effective.  They've also said you can

14   leave it or retrieve it.  You can leave the filter in or

15   retrieve it.

16           They're basically saying -- yes, they are saying that

17   it's good for life, and they didn't have to say that this is a

18   permanent filter that's safe and effective for life.  They

19   didn't have to say that, and we would say that that's not

20   true.

21           So there are six cases that we've counted out of

22   Pennsylvania, New Mexico, Louisiana, California, New Jersey,

23   and South Dakota, each that have said, essentially, that if

24   you have made the statement that your product is safe and

25   effective, that can formulate the basis of a warranty claim.

 1    Or at least what they're saying is, those courts, we're not

 2    going to grant the motion to dismiss based upon the fact that

 3    you've said your product is safe and effective and that does

 4    formulate the basis and certainly doesn't allow the defendant

 5    to have its motion to dismiss granted.

 6         So I would have to respectfully disagree if the Court

 7    -- if what the Court is saying is, if you say something is

 8    safe and effective in your instructions for use or a press

 9    release or a patient guide, that that in and of itself is not

10    enough to formulate the basis of a plaintiff's claim for

11    breach of express warranty.  Those cases are cited on pages 10

12    and 11 of the filing Document 25238.

13         So we do believe that if the Court's ruling is that

14    -- intended ruling is to simply state in all of these cases

15    that your particular state law does not allow for a case on

16    express warranty to exist, if what you're saying is the

17    manufacturer's information says the product is safe and

18    effective or the product is good for life as a temporary

19    filter or a permanent --

20         THE COURT:  But if it's safe and effective, how long

21    is that?  How do you determine that?  Is it safe and effective

22    from fracture whatever for ten years?  For 20 years?  I just

23    don't know.  And we -- of course, we've all heard -- we've had

24    cases where, you know, the device is implanted -- a knee or a

25    shoulder or hip, whatever, and three years down the road needs

 1   -- it's not working right.  It needs to be replaced.  I mean,

 2   we've all heard of those kinds of cases.

 3          MR. MARTIN:  Right.  I mean, I think I can answer

 4   that in that -- I mean, I would suggest that the words

 5   permanent are -- by the word permanent is pretty clear, for

 6   the lifetime of the patient.  And that is one of the

 7   allegations that we made.  If they said that these were safe

 8   for either temporary or permanent use.  And we've got cases,

 9   many, many cases in this MDL, probably thousands of them,

10   where the filter was not safe for temporary or permanent use

11   because it can't be retrieved or we've got failed retrievals.

12   One, two, and three failed retrievals.  Or the doctor says

13   it's stuck and you can't get it out unless you use an off

14   label means to get it out.

15          So I mean, I think that when the manufacturer says

16   these products are safe and effective for permanent use, then

17   that is for the lifetime of the patient.  So if the patient

18   has a problem before -- if the patient has a problem anytime

19   in their life and that's the only time anybody is going to

20   bring one of these cases up is if the incident happened during

21   their lifetime, then that is enough to formulate the basis of

22   an express warranty claim.  But they get even more --

23          THE COURT:  It has to be an injury.

24          MR. MARTIN:  I'm sorry?

25          THE COURT:  Has to be an injury.

1          MR. MARTIN:  Has to be an injury, right?  So anyway,

2     that's our argument, Your Honor.

3          THE COURT:  Thank you, Mr. Martin.  Mr. Hasic?

4          MR. HASIC:  I would just like to respond just to a

5     couple of points briefly.

6          So I think one of the issues with what plaintiffs are

7     doing is that they're pointing to isolated words to say

8     permanent and they're finding those words in Cook documents,

9     at least that's how they've pled it.  But when we look at the

10    actual documents, we have to read it in a fair manner because

11    they haven't cited a single case saying that express warranty

12    is not read in an objective manner.

13         The existence of the warranty, the first term,

14    whether an affirmation of fact or promise was made would have

15    to be done objectively.  So, for example, if we look at the

16    patient guide, there's a sentence there that says filters are

17    often used as a permanently implanted device.  But the next

18    page says that rarely they -- complications may occur but --

19    and it lists various complications.  So it's not fair to read

20    the phrase permanently implanted device as a guarantee that

21    the product will last permanently for all patients and that no

22    complications would occur because the very next page lists out

23    various complications that can occur.

24         And the same thing happens with the IFU.  I mean, one

25    of the purposes of the IFU is to provides risks of the device

1   for surgeons to know about that or for that to be disclosed.

2   And so when the -- when the IFU uses the phrase optional -- or

3   that the filter is -- the retrieval is optional, it also

4   states that the likelihood of retrieval decreases over time,

5   meaning that it's not guaranteed.

6          But the point is that the Court has already ruled all

7   this.  The Court has already looked at these documents and

8   it's part of the prior orders and it's addressed in the

9   briefs.  And so the difference between the cases the

10  plaintiffs cited, the main difference in our situation, is

11  that the way the procedural history of this case has worked

12  out, the relevant documents became part of the pleadings and

13  this Court has looked at the documents in detail.  Those other

14  cases that were referenced by plaintiffs' counsel, it does not

15  appear that the courts had reviewed the actual IFU or the

16  actual patient guide or whatever the equivalent documents may

17  have been in those situations.  And there are other -- other

18  ways that we've distinguished their cases in the reply brief

19  that was filed on Friday.

20         So plaintiffs pointed to seven individual cases from

21  around the country but those additional -- short from

22  complaints and additional pleadings in there make the same

23  kind of high level statements that the master complaint did or

24  that other plaintiffs have tried.  So, for example, the Allen

25  and the Lee vs. Blanchard cases reference the select IFU,

1   which this Court has already reviewed in another case.

2          And so there -- what the plaintiffs haven't

3   established is that there are actual differences in terms of

4   documents that this Court hasn't reviewed or differences in

5   state law that would be material.  I mean, we agree that once

6   you get past that first step of whether there has -- the terms

7   of the warranty, the affirmation of fact, there may be

8   differences in how an express warranty is handled across the

9   country in other states.  But that threshold, first

10  requirement that there may be terms -- that there must be some

11  kind of representation or an actual statement.  Your Honor

12  brought up with the example of the refrigerator.  There must

13  be some language for written warranty, then we can then

14  discuss does that create a warranty or not.  That's what's

15  missing here because when they -- the only thing the

16  plaintiffs have been able to do is point to documents, and

17  when we read the documents in a holistic manner, they don't

18  create the warranty.  That's what this Court has already

19  ruled, and we've got all the citations in the briefing.

20         And so based on the procedural history of this case,

21  based on the prior orders, the logical end point is that the

22  claims should be dismissed.  There is no good basis to do this

23  one by one for 7,000 cases when the -- when those plaintiffs

24  only point to the same two or three documents and this Court

25  has already looked at them.  And if there were other issues,

1    the plaintiffs could have brought that up in their response

2    brief, but we're still talking about the same issues that this

3    Court has already ruled upon.  Thank you.

4          THE COURT:  Thank you.  Continue under advisement.

5          All right.  Next up, proposed bellwether plan.

6          MS. PIERSON:  Thank you, Your Honor.  The last issue

7    on the agenda today is really an issue to start the

8    conversation about the Court's next bellwether plan.  We

9    talked when we were with you last month about what the next

10   steps might be in the MDL, and you may recall that we provided

11   the Court with a timeline of how we could make real progress

12   in 2024.  That timeline contemplates choosing another

13   bellwether pool, and we would ask that the Court adopt a

14   bellwether plan that gets us to a number of Tulip 7(e)

15   perforation trials in particular in the next 12 months or so.

16         Ms. Cox sent to the Court on Friday the bellwether

17   plan that we provided to the plaintiffs earlier in the week.

18   If I may approach, Your Honor, I've got a hard copy of that

19   for the Court and plaintiffs.

20         THE COURT:  Thank you.

21         MS. PIERSON:  Your Honor, Cook's proposal -- before I

22   get into the specifics of that, I would say that the parties

23   historically have disagreed on the application of lexicon to

24   these cases.  As you know, there's a significant number of

25   cases that were originally filed in the Southern District of

1    Indiana, and we have over the past few years disputed how

2    lexicon might apply to those.  I think it's safe to say the

3    parties are likely still not in agreement on that point.

4           THE COURT:  I would agree.

5           MS. PIERSON:  Ideally, there would be a process by

6    which plaintiffs would agree to waive a lexicon right, if such

7    a right exists, but if we're not able to reach agreement on

8    that point -- and the plan as we've drafted it assumes that

9    we're not able to reach agreement on that point -- the reality

10   is that there is significant number of cases for which we can

11   be confident that there is no lexicon issue.  Those are cases

12   that were filed after January the 22nd of 2022.

13          And you may recall, Your Honor, that after the *Looper*

14   *Lambert* decision came down, there's a specific footnote within

15   that Seventh Circuit opinion that said that the Seventh

16   Circuit did not reach the question of lexicon, but because

17   there's discussion in that opinion about whether there can be

18   such a thing as an implied direct filing order, in an

19   abundance of caution in January of 2022, we filed with this

20   court on the public MDL docket a document that expressly made

21   clear that to the extent that anyone believed that there was

22   an implied direct filing order, we were disclaiming that.  And

23   the language of the Seventh Circuit's opinion in *Looper*

24   allowed us to do that.  So from that point on, to the extent

25   that anyone had any ambiguity about that question, Cook's

 1    position on that was crystal clear as of January the 22nd.

 2         Since January the 22nd, 341 cases have been filed

 3    into the MDL -- into this court of original jurisdiction.  And

 4    of those 341 cases filed since Cook's rejection of any implied

 5    direct filing order, 164 of those cases are Tulip cases.  So

 6    there's a significant number of cases where the attorneys, you

 7    know, well aware of this dispute and well aware of Cook's

 8    position on the issue after our filing of that document in

 9    January, chose nevertheless to file their cases with Your

10    Honor in the Southern District of Indiana.

11         Rather than spending the next months or years

12    litigating the question of lexicon, our suggestion to the

13    Court, if the plaintiffs won't voluntarily agree to waive

14    lexicon for Tulip 7(e) cases, is that the Court choose from

15    that pool.  And as you'll see in the bellwether plan that

16    we've provided to Your Honor, our suggestion is that the Court

17    randomly select 18 cases, that each side have four strikes.

18    That would leave a pool of ten cases.  And then our suggestion

19    is that this time, Your Honor, we work up the ten cases

20    simultaneously and that the Court set cases for trial in three

21    trial settings three months apart.

22         Our thinking there, Your Honor, is that given the

23    last bellwether plan that resulted in a series of dismissals

24    and then the Court and parties lost those dates on the Court's

25    trial calendar, that we need to be doing more work on this

 1    side so that there's no risk of losing a trial setting once

 2    Your Honor sets aside that time.

 3          We believe these cases can be tried in ten trial

 4    days, and that if we're working up the cases simultaneously,

 5    we will get to trials of Tulip 7(e) cases.  We've talked

 6    before about the fact that we've not had a trial of 7(e)

 7    perforation case, and we have not yet had a trial of a Tulip

 8    case.  So that's our high level thinking on a bellwether plan.

 9          You may be wondering, Your Honor, okay, well, how

10    does the amount in controversy screening order fit in with

11    that bellwether plan.  And I think it can fit in a couple of

12    ways.  I mean, one option would be to go ahead and randomly

13    select the cases from the 7(e) category and then on an

14    expedited basis to have those parties make a decision about

15    the amount in controversy and complete the form.

16          The other option would be to let the amount in

17    controversy screening take its course, and then after that, to

18    choose from the remaining cases that are filed after

19    January of 2022.

20          So I think there are a couple of ways to address

21    that, Your Honor, but at the end of the day, we're anxious to

22    get a bellwether plan in place because it is our belief that

23    the only way this MDL will come to a conclusion is if we have

24    actual trials that move the needle for both sides.  So we want

25    to start that conversation sooner rather than later.

1          We invited the plaintiffs to meet and confer about

2     the specific plan.  That didn't happen last week but, of

3     course, we're willing to do that after the hearing today if

4     it's helpful, but we're anxious to get moving on a bellwether

5     plan.  Thank you.

6          THE COURT:  Mr. Heaviside?

7          MR. HEAVISIDE:  Judge, I think I want to start, if I

8     may, with what does this plan exclude?  And it excludes each

9     and every case transferred to this Court for the past ten

10    years.  It excludes each and every case direct filed for the

11    eight years preceding January of 2022.  And it excludes every

12    Category 7 symptomatic injury but for the perforation.  And

13    that whole argument presumes that the defendant can

14    unilaterally revoke consent to the direct filing order.

15         It's in many ways an end around of the *Looper*

16    decision and actually the whole MDL process.  That bellwether

17    proposition assumes that no case transferred into this Court

18    will ever be tried, at least for the next two years as

19    contemplated by this.

20         Now, I was just handed this document today, and

21    there's a change from the one I got last week.  The one I got

22    last week has a footnote that says -- and this was -- I'm

23    sorry.  I'm just going to go to this --

24         THE COURT:  What's the difference between what he

25    received last week and -- or Ms. Cox?

 1              MS. COX:  I'm not aware of any difference so --

 2              THE COURT:  Okay.

 3              MS. COX:  I did not edit it after I sent it.  I sent

 4     the same one to the Court.

 5              MR. HEAVISIDE:  Well, the difference is the footnote

 6     on page 1.

 7              Really what I want to talk about is that revocation

 8     document in January of 2022.  There's a footnote on page 1 of

 9     that.  It says, to the extent an implied direct filing order

10     or procedure ever existed, it was revoked by Cook defendants

11     as early as May 2019 but certainly no later than June 13th,

12     2019.  Now that was before *Looper*.

13              MS. PIERSON:  I'm sorry to interrupt.  I don't know

14     what you're reading from, Mike.  That's not a version that we

15     sent to you.

16              MS. COX:  I'm going to pull up my email right now.

17              MS. PIERSON:  Oh, I'm sorry.  I thought you were

18     reading from the -- my apologies, Mike.

19              MR. HEAVISIDE:  That is what it says.

20              And maintain, I guess, that Cook defendants never

21     consented to the application of choice of law rules of the

22     plaintiff's home state, that they've never consented to any

23     direct filing, and that they have unilaterally withdrawn their

24     consent.

25              But the Seventh Circuit said that Cook at least

 1   implicitly but clearly consented to the application of

 2   originating state choice of law rules to direct filed cases,

 3   and if asking the Court to apply a certain rule where a case

 4   is not consenting to that rule, then we're not sure what would

 5   be.

 6        And Cook consented to the treatment of direct filed

 7   cases, indeed welcomed it, until it no longer benefited Cook

 8   leading to the about face against *Looper* and *Lambert*.  That

 9   reversal, of course, should not stand.

10        So we think that the *Looper* court was correct.  We

11   think it's completely improper to exclude as an end runaround

12   this, every case that's ever been filed and transferred in and

13   every case that's been direct filed until January 22nd of

14   2022, and to contend that they can unilaterally revoke

15   consent.

16        Now, the *Looper* court said that you might allow a

17   prospective change, and when they say allow, allow implies

18   permission.  It doesn't suggest a unilateral move.

19        So I don't know if this is the time -- I mean, in

20   lieu of this bellwether plan, we would prefer a kind of Bair

21   Hugger approach.  That case seems quite similar.  It was

22   created in 2015.  There's bellwether trial.  There's court

23   ordered mediation.  There was a bellwether pool, and then the

24   court remanded, I think it was 28 cases out of that bellwether

25   pool.  So we think that's far more likely to bring this

1  litigation to a conclusion.  But at the very least, we would

2  have to go back to the drawing board on this bellwether plan.

3  Thank you.

4          THE COURT:  You don't think you could prepare ten

5  cases at once?

6          MR. HEAVISIDE:  No, we don't think that Cook should,

7  in an attempt to get around *Looper*, exclude every case that's

8  been filed for the last ten years.  Now, whether we can

9  prepare the cases, that's another issue.  It may be quite

10  difficult, but as a fundamental issue here --

11          THE COURT:  I understand.

12          MR. HEAVISIDE:  All right.  Thank you.

13          MS. PIERSON:  Ms. Cox has just confirmed that the

14  document we provided to plaintiffs is the same as the document

15  that we provided to the Court today, Your Honor, just to clear

16  that up.

17          I want to be clear about one other thing, Your Honor.

18  We have no problem including Tulip 7(e) cases that were filed

19  before January of 2022.  That is not an issue.  We'd be happy

20  to have all of the Tulip 7(e) cases in this pool, but up to

21  this point, the plaintiffs have suggested that they won't

22  waive lexicon, if a lexicon right exists at all.

23          So our suggestion was let's find a way to get to a

24  pool where we can all be confident that there is no lexicon

25  issue whatsoever.  But if the plaintiffs' leadership is --

 1                THE COURT:  How do we do that?

 2                MS. PIERSON:  Well, the text of the *Looper* order

 3    makes clear that this -- to the extent there -- first of all,

 4    the *Looper* decision is addressing only choice of law.  And the

 5    Court's opinion says that very clearly.  In fact, the Court

 6    went to the trouble to drop a footnote to say that they were

 7    making no decisions as to lexicon whatsoever.

 8                So within that text of that order, it permitted

 9    exactly what Cook did, which was for Cook to say it could

10    declare that it did not agree that there was any direct filing

11    order.  We followed the text of *Looper* exactly back in

12    January 22nd intentionally so that this issue would not be

13    ambiguous anymore.  Everyone could be perfectly clear what

14    Cook's position was on this issue.

15                So the way, Your Honor, that you get to trials where

16    this is not an issue is by choosing the cases that have been

17    filed after January of 2022.

18                There are other ways to get to that, too, though,

19    Your Honor.  You know, there are other MDL courts, when faced

20    with some objection as it relates to lexicon, they, you know,

21    choose cases and bring the lawyers and plaintiffs in to ask

22    the plaintiffs that question.  Do you want your case tried

23    here?  We can try your case now.  You don't have to wait any

24    longer.  We're prepared to try your case.  There are

25    strategies that the Court can use to encourage lexicon

 1    waivers.  But if the plaintiffs' leadership is taking the

 2    position -- and maybe they're not taking the position that

 3    they will not waive lexicon in any case.  If that is the

 4    position that they're taking, then in our opinion, Your Honor,

 5    it leaves this Court with no choice, and the only remaining

 6    choice for this Court then would be to choose Tulip 7(e) cases

 7    filed after January of 2022.

 8           Hopefully, they won't put you in that position, but

 9    if they do, there is a pool from which you can draw.  And it's

10    not a small pool.  We're talking about choosing 18 cases out

11    of 167 cases.  So there are plenty of cases that are available

12    for this exercise.

13           I just want to address the last point Mr. Heaviside

14    made with respect to the Bair Hugger MDL.  You know, we should

15    not misrepresent what happened there, and there's briefing

16    before Your Honor on supplemental authority about that

17    particular MDL.

18           Judge Ericksen in the Bair Hugger MDL worked with the

19    parties to talk about how many cases did they think needed to

20    be set for trial, and both sides asked for very large

21    bellwether pools.  Ultimately, Judge Ericksen concluded there

22    should be 34 cases chosen for bellwether trials, and it was

23    her conclusion that 28 of the 34 ought to be remanded for

24    trials in other jurisdictions.  Your Honor has the ability to

25    do that, of course, as the MDL judge, but as we explained in

 1    our response to the supplemental reply regarding the Bair

 2    Hugger MDL, we don't think that's necessary or appropriate

 3    here.  We have a relatively defined group of cases.  We know

 4    the kinds of trials that we need to have.  We're not taking

 5    the position that we need 30 bellwether trials, and we know

 6    the plaintiffs aren't taking that position either, but we are

 7    taking the position that we need a pool of ten to get a

 8    sufficient quantity of trials that can give us really

 9    representative results and information.

10          It was Judge Ericksen's decision with the consent of

11    the parties to remand cases to other jurisdictions for workup

12    and for trial.  So it's not that the Court decided alone that

13    this was a good idea.  Both sides agreed that it was a good

14    idea.  Cook does not take that position.  In fact, quite to

15    the contrary, Your Honor.  We think it would be difficult for

16    another judge to catch up with you and where you are after

17    several years of litigating this.  We think the most efficient

18    trials can be had in this court.  You're already familiar with

19    the issues.  You've ruled on many of those issues already.

20    You're familiar with some of the witnesses and the evidence

21    that would be presented even in a Tulip trial.

22          So it's our position that this MDL is quite different

23    from the Bair Hugger MDL in that no one is suggesting we need

24    a pool of 30 or more bellwether cases, and we certainly are

25    not suggesting that other courts are in a better position than

1    this Court to work up and try those cases.  In fact, we think

2    quite to the contrary, that this Court is in the best position

3    to do that.

4         The other lever that's available to Your Honor for

5    trials, if you choose to order multiple trials in a very short

6    period of time, you can always use the intradistrict transfer

7    method of trying cases within this district but other judges

8    trying cases too.  So, you know, just know that that's an

9    available option out there as well.

10        But our primary point today is if we're going to get

11   moving in this MDL, we've got to have a bellwether plan.  And

12   it's not too early for us to be talking and thinking about

13   that and getting something in place.  Our goal and our plan as

14   we've presented it to the Court would have a case trial ready

15   or group of cases trial ready by the end of 2024, and that's

16   pushing it, frankly.

17        So the sooner we can get a bellwether plan in place,

18   the sooner we can get to trials and ultimately get to

19   resolution of the MDL.

20        Thank you, Your Honor.

21        THE COURT:  Mr. Heaviside?

22        MR. HEAVISIDE:  Yes, sir.  We haven't said, nor do we

23   maintain that we would never waive lexicon.  So just to make

24   that point clear.

25        I think everyone here is interested in moving this

1    MDL to its conclusion.  So we've talked about the bar

2    settlement many times where I think there were five devices.

3    They only tried two of them, remanded the cases, and it was

4    resolved.

5         This Bair Hugger approach seems to make a lot of

6    sense because ultimately what do you need to resolve a

7    litigation?  You need data points, right?

8         Now, we know that Cook has resolved many cases, many

9    Tulip cases, and I think many cases where we might have been

10   previously advised they would never be settled, so those are

11   data points.  Everything that's happened in this MDL so far is

12   a data point.  So I just don't think -- we don't think that a

13   Tulip bellwether trial, you know, win, lose, or draw is going

14   to move things.

15        We're all interested in moving the case along, and

16   then the questions is, how do you get these data points.  If

17   some of these cases are remanded like the Bair Hugger, I mean,

18   that's an immediate new set of data.  A lot of data already

19   exists and -- so that's our position.  Thank you.

20        THE COURT:  Well, Mike, the problem here is that you

21   don't think there needs to be a Tulip trial but Cook does, and

22   so that's the problem that we have.

23        MR. HEAVISIDE:  But we don't think it should be

24   selected in this end around of *Looper*.  That's another point.

25        THE COURT:  Well, what they're saying is, there needs

1    to be some waiver then somehow.

2         MR. HEAVISIDE:  Then me need to get together and

3    identify cases, and then we will get ahold of everybody and

4    some people will waive lexicon.

5         MS. PIERSON:  Your Honor, we're happy to add in a

6    couple of paragraphs into the proposed bellwether plan that

7    gives a date by which people can waive lexicon or not waive

8    lexicon.  We can work through those mechanics.  We did that in

9    the last couple of plans, too.  So that's not a problem to put

10   that language in.

11        THE COURT:  That might be the better way to approach

12   this.  I think Mike might have a point there regarding

13   excluding the pre-January '22 cases.

14        MS. PIERSON:  I think the only thing we'll want to be

15   careful of, Your Honor, is that --

16        THE COURT:  Speak up, please.

17        MS. PIERSON:  I'm sorry, Your Honor.  I think the

18   only thing we'll want to be careful of is that this doesn't

19   become an avenue for gamesmanship about waiving lexicon in

20   cases -- only cases that the plaintiffs want to try as opposed

21   to it being a broad decision by the plaintiffs of do they

22   waive lexicon or don't they.  We can work through those

23   mechanics.

24        In the last bellwether plan, we included language

25   that basically gave people an opportunity to waive lexicon,

1    and it -- my recollection is that we had some consequences or

2    some alternative if no one waived lexicon or there were other

3    off ramps that the parties and courts had.  So we'll work with

4    the plaintiffs and work through that language.  That's not a

5    problem.

6            THE COURT:  All right.

7            MR. HEAVISIDE:  Let me say, any reference to

8    gamesmanship, I mean, our view would be, this type of

9    bellwether plan, excluding cases filed since the beginning of

10   the MDL is a --

11           THE COURT:  I don't want to get into all that.

12           MR. MARTIN:  Your Honor, can I have clarification on

13   one thing because I'm not certain about even what's being

14   requested?

15           THE COURT:  Can you speak up, please?

16           MR. MARTIN:  Yes, Your Honor.  I'm sorry.  I'll be

17   real fast.

18           THE COURT:  Just trying to help the court reporter

19   out.

20           MR. MARTIN:  My understanding that we are going to --

21   if the Court agrees with the defense, that we are going to

22   actually have ten Tulip bellwether trial cases worked up and

23   then ready for trial and to ostensibly then go ahead and try

24   ten cases?

25           THE COURT:  Well, I mean, that's what's been

 1   proposed.  It's the first I've heard of this, actually.  I

 2   think preparing ten cases for trial might be difficult at

 3   once.  But I'm sure there's some agreement that can be made

 4   between you after you meet and confer on all this --

 5            MR. MARTIN:  That's what I'm --

 6            THE COURT:  -- to come up with something, but my

 7   initial thought is that having ten cases prepared for trial at

 8   one time might be a little bit difficult.

 9            MR. MARTIN:  Thank you, Your Honor.

10            THE COURT:  Ms. Pierson?

11            MS. PIERSON:  Nothing further, Your Honor.

12            THE COURT:  All right.  I think everybody knows what

13   we need to do.  You're going to meet and confer on some of

14   these items as well.

15            Tell me about -- as much as you can and as much as

16   you don't want to, are individual cases being settled?  Are

17   those discussions going on?  I'm not talking about your global

18   meetings with Judge Baker, but I'm just -- see, I don't know

19   these numbers.  Are some of these cases that have settlement

20   bones to them, are they being settled?  Are those negotiations

21   going on?  I know Dave Matthews never shows up anymore.  Is he

22   no longer part of the leadership team?  Has he settled all his

23   cases and gone on to different areas?

24            MR. MARTIN:  He has -- I know he's settled -- and I

25   could be corrected, but I think he's settled if not all of his

1    cases with Cook, the majority of them, and I think maybe

2    that's -- maybe that's the situation.  I'm not certain about

3    Mr. Matthews' docket, but I believe they settled a lot of the

4    cases.  As to whether or not he's part of the leadership team,

5    I don't know exactly what happened and morphed into the

6    scenario, but I think probably because he had settled that

7    vast majority of his cases that at that point, I think David

8    maybe sort of dropped out.

9             THE COURT:  Lost interest.

10            MR. MARTIN:  But I don't know the specifics of that.

11            THE COURT:  Do we need additions to the leadership?

12            MR. MARTIN:  I'm sorry, Your Honor?

13            THE COURT:  Do we need additions then -- if David is

14    no longer participating, do we need additional folks?

15            MR. MARTIN:  So we had talked amongst ourselves that

16    maybe Mr. Siegel could be made a part of the leadership, and I

17    think he would be willing to do that, so it would -- it would

18    be our suggestion -- not that Mr. Matthews be taken off the

19    leadership or I don't know David's situation --

20            THE COURT:  Well, if he's not going to participate, I

21    mean, why even keep him on?

22            MR. MARTIN:  Just have Mr. Siegel on would be very

23    helpful to us.

24            THE COURT:  Why don't you talk to him and get that

25    firmed up and then file something.

54

 1              MR. MARTIN:  We'll do it.

 2              THE COURT:  And we'll see if we can get him -- get

 3    him on.  And if you need anybody additional as well, let me

 4    know.

 5              MR. MARTIN:  Thank you.

 6              THE COURT:  Fresh blood is always helpful on either

 7    side and is always good to do that as well.

 8              MR. MARTIN:  Thank you, Judge.

 9              THE COURT:  I interrupted you, Andrea.  So individual

10    cases are being discussed?

11              MS. PIERSON:  The short answer to your question, Your

12    Honor, is yes.  We're happy to have an off the record

13    conversation if it's helpful to the Court in any more detail,

14    but the short answer is that we're making good progress.

15              THE COURT:  Okay.

16              MS. PIERSON:  Your Honor, we had just one other issue

17    related to the next time we might be able to be in front of

18    you.  Ms. Cox will address that.

19              MS. COX:  I think we have filed a motion for partial

20    summary judgment on a punitive damages claim, and the briefing

21    on that looks like it will be -- it will be complete

22    May 22nd'ish.  So we were wondering if we might be able to

23    schedule our next status conference sometime when that

24    briefing on the motion we just filed would be ripe for an

25    argument.  So can we look for -- we looked at our calendars,

1    and we have some availability May 28th through the 31st and

2    some other dates, but I wonder could we work with Tina to get

3    something on the calendar then?

4              THE COURT:  Sure.  Absolutely.  Is that -- would that

5    be Memorial Day?

6              MS. PIERSON:  The week after.

7              THE COURT:  The week after.  Okay.  So if we did it

8    in Indianapolis, the race is over, right?

9              MS. PIERSON:  So we're told.  No rain.  We should all

10   knock on wood for no rain.

11             THE COURT:  Exactly.  Yeah, we can do that.

12             Okay.  Katherine, anything for the order today?

13             MS. SULLIVAN:  No.

14             THE COURT:  We've been working on, as we can, pending

15   motions that are there.  We hope to have something out here

16   shortly on that.  I know you're waiting for that and -- but

17   we're trying to move as best we can on all this stuff.

18             Okay, folks.  Thank you very much.

19             THE CLERK:  All rise.  Court is adjourned.

20             (*Adjourned at 12:28 p.m.*)

21

22

23

24

25

1                    ****************************

2

3                      CERTIFICATE OF COURT REPORTER

4    I, Elizabeth Taylor Culiver, RPR, FCRR, certify that the

5    foregoing is a correct transcript from the record of

6    proceedings in the above-entitled matter.

7

8    S/s Elizabeth Taylor Culiver_____        June 5, 2024
     ELIZABETH TAYLOR CULIVER, RPR, FCRR
9    Official Court Reporter
     Southern District of Indiana
10   Evansville Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25