UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | ) ) ) ) | |
| _____ | ) | 1:14-ml-02570-RLY-TAB |
| | ) | MDL No. 2570 |
| This Document Relates to: | ) ) | |
| | ) | |
| All Cases involving Günther Tulip Filters | ) | |
| _____ | ) | |

**ENTRY ON THE COOK DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PUNITIVE DAMAGES CLAIMS**

Defendants Cook Incorporated, Cook Medical LLC (f/k/a Cook Medical

Incorporated), and William Cook Europe APS (collectively the "Cook Defendants" or

"Cook") develop, manufacture, sell, and distribute medical devices for use in medical

applications throughout the United States and the world.  The medical devices at issue in

this MDL are primarily the Cook Günther Tulip Vena Cava Filter and the Cook Celect

Vena Cava Filter.  These medical devices are used for the prevention of pulmonary

embolism ("PE") by trapping blood clots as they travel through the inferior vena cava (or

"IVC") toward the heart and lungs.

In Count XI of Plaintiffs' Master Consolidated Complaint, Plaintiffs assert a claim

for punitive damages.  In the present motion, Cook seeks partial summary judgment on

all punitive damages claims asserted by Plaintiffs who were implanted with a Tulip filter.

Plaintiffs oppose the motion.  The parties orally argued their respective positions on June 6, 2024.

The court, having read and reviewed the parties' submissions, oral argument, the designated evidence, and the applicable law, now finds Cook's motion should be **GRANTED**.

## I.    Punitive Damages Claim

Tulip Plaintiffs who assert claims for punitive damages in this MDL have uniformly asserted those claims by incorporating the punitive damage claims in the Master Complaint into their Short Form Complaints.  None of the Plaintiffs at issue have based their punitive damages claims on any other allegations, and none have supplemented the Master Complaint's punitive damage allegations in their Short Form Complaints.

In Count XI of the Master Complaint, Plaintiffs seek punitive damages based on Cook's failure to warn of the Tulip filter's risk of tilt, facture, migration, and/or perforation.  In relevant part, they allege:

> 186.    At all times material hereto, Defendants knew or should have known that their Cook IVC Filters were inherently dangerous with respect to the risk of tilt, fracture, migration and/or perforation.

> 187.    At all times material hereto, Defendants attempted to misrepresent and did knowingly misrepresent facts concerning the safety of their Cook IVC Filters.

> 188.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiffs' physicians, concerning the safety of their Cook IVC Filters. The Defendants' conduct was willful, wanton, and undertaken with a conscious

indifference to the consequences that consumers of their product faced, including Plaintiffs.

189.   At all times material hereto, Defendants knew and recklessly disregarded the fact that their Cook IVC Filters have an unreasonably high rate of tilt, fracture, migration and/or perforation.

190.   Notwithstanding the foregoing, Defendants continued to market their Cook IVC Filters aggressively to consumers, including Plaintiffs, without disclosing the aforesaid side effects.

191.   Defendants knew of their IVC Filters' lack of warnings regarding the risk of fracture, migration, and/or perforation, but intentionally concealed and/or recklessly failed to disclose that risk and continued to market, distribute, and sell their Filters without said warnings so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiffs, in conscious disregard of the foreseeable harm caused by Cook's IVC Filters.

192.   Defendants' intentional and/or reckless failure to disclose information deprived Plaintiffs' physicians of necessary information to enable them to weigh the true risks of using Cook IVC Filters against their benefits.

193.   As a direct and proximate result of Defendants' willful, wanton, careless, reckless, conscious, and deliberate disregard for the safety and rights of consumers including Plaintiffs, they have suffered and will continue to suffer severe and permanent physical and emotional injuries[.]

194.   Defendants' aforesaid conduct was committed with knowing, conscious, careless, reckless, willful, wanton, and deliberate disregard for the safety and rights of consumers including Plaintiffs, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

(Filing No. 213, Master Compl. ¶¶ 185–94).

## II.   **Factual Background**

Plaintiffs do not dispute the Cook Defendants' asserted facts, and the Cook Defendants do not dispute the Plaintiffs' asserted facts.

## A.      The Tulip Filter

The Günther Tulip Vena Cava Filter is an umbrella-shaped device made from Elgiloy or an equivalent substitute alloy.  (Filing No. 25501-7, McMeeking Expert Report at 3).  The Tulip has a top hook and four anchoring struts for fixation.  (Master Compl. ¶ 37).  It also has loops of thinner wire that attach to the struts, forming "petals." (Filing No. 25258-23, *Hill* Trial Tr. at 1002).  The Tulip has been prescribed by doctors in Europe to patients in need of protection from PE for almost forty years.  (Filing No. 25258-4, Original CE Mark).

## B.      FDA Applications and Clearances

In the 1990s, after nearly a decade of Tulip use in Europe, Cook began the process of bringing the Tulip to the United States market by submitting applications to the United States Food and Drug Administration ("FDA").  (Filing No. 25258-5, Tulip 510k Application).  On October 18, 2000, the FDA cleared the Tulip for use in the United States as a permanent filter.  (Filing No. 25258-6, Substantial Equivalence Letter for Tulip).  Cook also applied for an Investigational Device Exemption ("IDE") focused on the retrievability of the Tulip (the "Pilot Study").  (Filing No. 25310-1, IDE Application for Pilot Study).  On October 18, 2000—the same day the FDA cleared the Tulip for use as a permanent filter—the FDA conditionally approved the Pilot Study.  (Filing No. 25310-2, Conditional IDE Approval Letter).  At the FDA's request, Cook submitted a supplement to its IDE application, addressing the various questions outlined in the FDA's conditional approval letter.  (Filing No. 25310-3, Cook's Response to FDA's Conditional IDE Approval Letter).  On December 1, 2000, the FDA approved Cook's IDE

supplement, allowing the Pilot Study on retrievability to proceed.  (Filing No. 25310-4, FDA Letter Approving Cook's IDE Supplement).

On January 11, 2002, Cook asked the FDA for permission to expand the Pilot Study from 20 patients to 40 patients, which was granted the following month.  (Filing No. 25310-5, Letter from Cook to FDA Requesting Pilot Study Expansion; Filing No. 25310-6, FDA Letter Approving Pilot Study Expansion).  On June 4, 2003, Cook informed the FDA that it had completed a 40-patient clinical study evaluating the safety of the Tulip retrieval procedure in a cohort of patients in whom short-term placement of a filter was considered appropriate.  (Filing No. 25310-7, Letter to FDA).  The results revealed that "no significant adverse events have been associated with retrieval of the filter."  (*Id.*).  On June 11, 2003, the FDA instructed Cook to proceed with a 510k application that would enable Cook to market the Tulip as a retrievable filter.  (*Id.*, Record of Phone Call Between Cook and FDA).

On June 17, 2003, in anticipation of its 510k application for the retrieval indication, Cook submitted a proposed instructions for use ("IFU") for the Tulip retrieval indication to the FDA.  (Filing No. 25310-8, Cook's Submission of Proposed IFU).  It included a statement in the "Warnings and Precautions" section suggesting that the maximum implantation period of the Tulip "is currently unknown and may vary from patient to patient."  (*Id.* at 4).  The FDA instructed Cook to modify the statement in the "Warnings and Precautions" section relating to the Tulip's maximum implantation period to "indicate that the available data suggest that removal be performed no later than 25

days, and refer the reader to the 'Clinical Studies' section." (Filing No. 25310-9, Email from FDA regarding IFU).

On August 5, 2003, as part of its 510k application, Cook submitted the results of the 41-patient[1] Pilot Study to the FDA with a proposed retrieval window of 14 days, stating: "While it is designed to be suitable as a permanent implant, the Gunther Tulip Vena Cava MR*eye*™ Filter can be retrieved within 14 days using a jugular approach." (Filing No. 25310-10, Cook's 510k Application for Tulip Retrieval Indication). On October 22, 2003, the FDA informed Cook that it did not want Cook to specify a retrieval window in the IFU for the Tulip retrieval indication. (Filing No. 25310-11, Record of Telephone Contact Between Cook and FDA). On the same day, the FDA sent Cook a redlined version of Cook's proposed IFU in which Cook's original warning that "[a]vailable data suggest that removal of the filter be performed within 25 days following placement" was crossed out and replaced with the FDA's language that "[a]vailable data from retrievals in a 41-patient study suggest that the device can be safely retrieved (mean of 11.4 days, range 2-20 days)." (Filing No. 25310-12, FDA's Revisions to Cook's Proposed IFU for Tulip Retrieval Indication). On October 23, 2003, Cook submitted a revised IFU adopting the FDA's revisions. (Filing No. 25310-13, Letter from Cook to FDA Enclosing Revised IFU).

---

[1] Although the FDA approved a 40-person Pilot Study, the study apparently included 41. (Filing No. 25310-10, Cook's 510k Application for Tulip Retrieval Indication at 2).

On October 31, 2003, the FDA cleared the retrieval indication for the Tulip under section 510k. (Filing No. 25258-20, Substantial Equivalence Letter for Tulip Retrieval Indication).

### C.    Post Market Surveillance

To monitor the continued safety and effectiveness of the Tulip, Cook conducted a variety of post-market surveillance activities, including complaint tracking and investigation, reporting of adverse events to applicable regulatory authorities, corrective and preventative actions (CAPAs), deposition internal auditing, and external auditing. (Filing No. 25258-24, Iversen Dep. at 19, 282–283; Filing No. 25258-25, Roberts Dep. at 36–37). Cook's post-market surveillance activities also included using available information to calculate the Tulip's occurrence rate for adverse events. (Roberts Dep. at 36–37, 70–73.

Neither the FDA nor any other regulatory body has ever determined or offered any opinion that the Tulip is not safe for its intended use. (Filing No. 24908-15 (sealed), Christy Foreman, Expert Report, Regulatory Review for Cook IVC Filters in *Brand* case ("The FDA has taken no enforcement action against the Tulip, and has not ordered that it be recalled or withdrawn from the market at any time since its clearance.")).

### D.    Warnings About Potential Risks of the Tulip Filter

The risks associated with IVC filters generally and the Tulip IVC filter specifically have been widely known and understood in the medical and regulatory community for decades. For example, a 1999 FDA Guidance document regarding 510k submissions for IVC filters listed and discussed potential filter complications, including complications

during filter insertion, recurrent PE, migration, penetration, tilt, occlusion, embolization, and death.  (Filing No. 25258-26, Guidance for Cardiovascular Filter 510(k) Submissions at 5–9, November 26, 1999; *see also* Filing No. 25258-27, Grassi et al., *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, J. Vasc. Interv. Radiol. 137, 138–39 (2001) (listing and discussing potential filter complications and trackable events, including penetration, migration, fracture, recurrent PE, occlusion, embolization, and death)).

At the time the Tulip IVC filter was cleared for its retrievable application in 2003, the Tulip IFU listed multiple potential adverse events associated with the Tulip, including the risks of acute damage to the inferior vena cava, acute PE, extravasation of contrast material at the time of vena cavagram, hematoma at retrieval vascular access site, hemorrhage, thrombosis or stenosis at implant site, wound infection at retrieval vascular access site, and death.[2]  (Filing No. 25258-28, 2003 Gunther Tulip Vena Cava Filter Set for Femoral Vein Approach ("Tulip IFU") at 3).  The 2003 Tulip IFU also included the results of the 41-person Pilot Study.  (*Id.*) ("Time to retrieval ranged from 2-20 days with a mean implantation time of 11.4 days.").

E.      The Tulip's Retrievability

---

[2] Plaintiffs' Response notes the Tulip IFU did not include the risk of fracture, migration, or embedment in the caval wall.  (*See* Tulip IFU at 3).  Curiously, their Response never mentions this fact again.

Studies show that the Tulip filter's retrievability is reduced the longer it remains inside a patient's IVC.  A 2007 study showed that "the estimated probability of successful retrieval for the Günther Tulip™ Vena Cava Filter is greater than 99% at 4 weeks, 94% at 12 weeks, 67% at 26 weeks, and 37% at 52 weeks post-implant."  (Filing No. 25501-1, H. Bob Smouse et al., *Effect of Implant Duration on Retrieval Success Rate for the Günther Tulip™ Vena Cava Filter* 9 (2007)).  Another study that reviewed 272 Günther Tulip  and Cook Celect filters placed between July 2007 and May 2009 found:

> Perforation of at least one filter component through the IVC was observed in 43 of 50 (86%) filters on CT scans obtained between 1 and 880 days after filter placement.  All filters imaged after 71 days showed some degree of vena caval perforation, often as a progressive process.

(Filing No. 25500-4, Jeremy C. Durack et al., *Perforation of the IVC: Rule Rather than Exception After Longer Indwelling Times for the Günther Tulip and Celect Retrievable Filters*, Cardiovasc. Intervent. Radiol. 299, 299 (2011)).  The authors concluded that "[l]onger indwelling times usually result in vena caval perforation by retrievable Günther Tulip and Celect IVC filters." (*Id.*).  They recommended "filter retrieval as early as clinically indicated[.]"  (*Id.*).

### F.   Dr. Gardner's Emails Regarding Clinical Evidence of Efficacy

In an email dated January 28, 2008, Dr. James Gardner, Cook's Director of Reimbursement, noted to Cook colleagues "[his] concern . . . that one day the payers (Medicare, Medicaid, commercial plans, etc.) are going to realize that they are spending an increasing amount of money on the placement and retrieval of IVC filters and that there's not a lot of clinical evidence that demonstrates these filters actually improve

9

patient outcomes."  (Filing No. 25501-3, Email from James Gardner to Cook Colleagues).  He observed that "sponsoring and conducting clinical trials to obtain this evidence would be a huge undertaking, and I'm not suggesting we go down that path. But I am keeping a close eye on payers' medical policies to see if/when this hits their radar screen(s)."  (*Id.*).

In an email dated June 15, 2009, Dr. Gardner responded to an email from Darrell Talbert, Cook's Global Product Manager, asking for Dr. Gardner's thoughts regarding an article from the JVIR (Journal of Vascular and Interventional Radiology).  Dr. Gardner responded, in relevant part:

> Here are my thoughts.
>
> (1)     As an advocate (to some degree) of evidence-based medicine, I think it's high time the lack of evidence re: IVC filter placements was addressed.
>
> (2)     As Cook's Director of Reimbursement, I've been very surprised that payers in this country haven't raised questions about whether they should pay for filter placement (and retrievals), given the # of procedures being performed and the paucity of data supporting these procedures.
>
> (3)     I'm wondering what the next steps of this group are, and if/how Cook needs to be involved.  If we truly believe our device is better, then we want it to be studied to give the greatest potential for positive study results.

(Filing No. 25501-5, Email String Between James Gardner to Darrell Talbert).  Mr. Talbert responded, "I think we could definitely use more data for sure.  That said, until we see that fewer people are dying of PE (not to mention may have a lesser quality of life from PE), I tend to lean more to the other side when it comes to filters.  Not just because I drank the kool-aid either."  (*Id.*).

### G.    Dr. McMeeking's Opinions

Dr. Robert McMeeking is a professor of mechanical engineering and materials science at the University of California, Santa Barbara.  (McMeeking Expert Report at 1). He provided expert opinions on behalf of the plaintiffs in the *Hill*, *Brand*, and *Pavlock*,[3] all of which involved the Cook Celect IVC filter.  He was also designated as a testifying expert in *Gage* and *Kidd*,[4] both of which involved the Tulip filter.  He opines that the Cook Defendants' IVC filters, including the Tulip filter at issue in this case, have deficient designs that lead to instability, tilting, perforation of the IVC, and fatigue failure.  (*Id.* at 73 ("It is my opinion that both the Tulip and the Celect filters have deficient designs that make it probable that they will suffer tilting, perforation of the vena cava wall, and fracture caused by fatigue due to expansion and contraction of the vena cava diameter.")).  He also opines that "the procedures used by Cook for the conceptualization, design, stress analysis and bench testing of the Tulip and Celect filters were inadequate and did not meet the requisite standards of engineering, quality and governmental standards for ensuring their safety as medical implants."  (*Id.*). Nevertheless, he found that the Tulip filter is a safer alternative design than the Celect because "it has perforation limiters on its primary legs in the form of its petals."  (*Id.* at 73; *see also* Hill Trial Tr. at 1004 (opining that the "petal" design feature of the Tulip

---

[3] *Hill* (1:14-cv-6016-RLY-TAB) and *Brand* (1:14-cv-6018-RLY-TAB) were bellwether cases that were tried by jury.  The *Pavlock* case was tried in Texas state court.

[4] *Gage* (1:14-cv-1875-RLY-TAB) was a bellwether case that was dismissed on summary judgment.  The *Kidd* case was a Pennsylvania state court case.

"will help to limit the extent of both tilting and perforation that the Tulip filter will experience")).

All other facts necessary to resolve this motion will be addressed in the Discussion Section.

## III.    Legal Standard

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal quotation marks omitted).  In reviewing the record, the court must view the facts in the "light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

## IV.    Discussion

The Cook Defendants argue they are entitled to partial summary judgment on punitive damages under Indiana law for their conduct related to the Tulip filter.  Plaintiffs oppose the motion on two grounds.  First, they argue that Indiana law does not govern the punitive damages claims of all Tulip Plaintiffs in this MDL; instead, the court must engage in an individualized choice-of-law analysis for each individual Tulip Plaintiff. Second, even if Indiana punitive damages law applies to all claims for punitive damages asserted by Tulip Plaintiffs, the evidence creates a fact issue on their entitlement to such damages.

A.      **Choice of Law**

Under Indiana law, punitive damages in tort actions may only be awarded "upon a

showing of willful and wanton misconduct such that the defendant subjected other

persons to probable injury, with an awareness of such impending danger and with

heedless indifference of the consequences." *Yost v. Wabash Coll.*, 3 N.E.3d 509, 523–24

(Ind. 2014) (cleaned up).  They may also be awarded "where the defendant acted

maliciously, fraudulently, oppressively, or with gross negligence *and* the conduct was not

the result of a 'mistake of law or fact, honest error of judgment, overzealousness, mere

negligence or other such noniniquitous human failing.'" *Id.* at 524 (quoting *Bud Wolf*

*Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 136 (Ind. 1988) (emphasis in original));

*see also Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 557 (Ind. Ct. App. 1999)

(upholding punitive damages verdict where the evidence showed that "Ford engaged in a

course of action which, under existing conditions, showed an utter indifference for the

rights of consumers").  A plaintiff seeking punitive damages must prove an entitlement to

those damages by clear and convincing evidence.  *Yost*, 3 N.E.3d at 524.

Cook maintains the court has determined that punitive damages in this MDL are

governed by the substantive law of Indiana, the state where two of the Cook Defendants

reside and thus, where their "conduct" allegedly took place.  (Filing No. 25258-22, *Brand*

Trial Tr. at 4388 (Feb. 1, 2019) ("J. Williams: [D]id we ever decide what substantive law

would apply to the punitive damages phase?  The court: We're using Indiana."); *see also*

Filing No. 25258-37, *Brand* Trial Tr. (Punitive phase) at 83–87 (jury instructions based

on Indiana pattern instructions)).  Plaintiffs, whose "home" state is not necessarily

13

Indiana, disagree and argue the court must identify, and then apply, the conflict of law rules applicable to *each* Tulip Plaintiff's punitive damages claim.

Fortunately, the court need not engage in a choice-of-law analysis because, of those states that permit punitive damages in products liability cases,[5] every one of them requires more than negligence to justify a punitive damages award.  (*See* Filing No. 25655-1, State Law Requirements for the Award of Punitive Damages).  Plaintiffs conceded this point in oral argument.  (Filing No. 25693, Hearing Tr. at 18 ("The court: Well, you would agree, Mr. Siegel, that mere negligence never carries the day, right? Mr. Siegel: I would agree with that[.]")).  As explained below, Plaintiffs' evidence would only support a finding that Cook acted negligently when it designed and tested the Tulip.

## B.   Plaintiffs' Evidence

Plaintiffs cite three pieces of evidence that they claim show "'utter indifference' to the rights of consumers who were ultimately injured."  (Filing No. 15500, Pls.' Resp. at

---

[5] As Cook observes, two states—Nebraska and Puerto Rico—do not permit punitive damages at all.  *See Enron Corp. v. Lawyers Title Ins. Corp.*, 940 F.2d 307, 313 (8th Cir. 1991) (punitive damages are unconstitutional under Nebraska constitution); *Computec Sys. Corp. v. General Auto., Inc*., 599 F. Supp. 819, 827 (D. Puerto Rico 1984) ("Puerto Rico law does not sanction punitive damages.") Five other states—Michigan, Washington, Louisiana, New Hampshire, and Massachusetts—authorize punitive damages only for causes of action enumerated by statute and have not allowed such damages in products liability cases. *See, e.g.*, *Gilbert v. DaimlerChrysler Corp*., 685 N.W.2d 391, 400 (Mich. 2004) (holding Michigan permits punitive damages only where expressly authorized by statute); *Sofie v. Fibreboard Corp*., 771 P.2d 711, 726 (Wash. 1989) (en banc) (punitive damages disfavored and unavailable in products liability actions); *Brookshire Bros. Holding Inc. v. Total Containment, Inc*., 455 F. Supp. 2d 541, 543 (W.D. La. 2006) (noting Louisiana "does not authorize punitive damages" in products liability cases); N.H. Rev. Stat. Ann. § 507:16 ("No punitive damages shall be awarded in any action, unless otherwise provided by statute."); *Frady v. C.R. Bard, Inc*., No. 1:19-cv-12549-ADB, 2020 WL 2079511, at *6 (D. Mass. Apr. 30, 2020) (granting summary judgment on punitive damage claim in medical device case, noting that punitive damages may be awarded only where authorized by statute).

20).  They are: (1) Cook's knowledge that the retrievability of the Tulip decreased the longer it remained in a patient's body; (2) comments from Dr. Gardner concerning the lack of clinical evidence regarding IVC filters; and (3) the expert opinions of Dr. McMeeking.

### 1.    Plaintiffs' Evidence Concerning Cook's Conduct

#### a.    Knowledge of Decrease in Retrievability Over Time

Plaintiffs first argue that punitive damages are justified because "defendants were aware that the Tulip's retrievability greatly reduced the longer it remained in the body." (Pls.' Resp. at 20).  But there is no evidence that Cook kept this information secret.  As Plaintiffs point out, there were published studies covering that issue.

Moreover, Plaintiffs do not dispute that the FDA was aware of the time/retrievability window too.  Cook proposed during the 510k application process that the Tulip IFU state that the filter be retrieved within 25 days of placement.  (FDA's Revisions to Cook's Proposed IFU for Tulip Retrieval Indication).  The FDA redlined that portion of the IFU and proposed that Cook use the 41-person Pilot Study results instead.  (*Id.*).  Cook then revised the Tulip IFU consistent with the FDA's revisions and submitted it to the FDA.  (Letter from Cook to FDA Enclosing Revised IFU).

#### b.    Lack of Clinical Studies

Next, Plaintiffs argue Dr. Gardner "repeatedly stated that actual clinical evidence had never even supported the use of its product at all."  (Pls.' Resp. at 20).  Plaintiffs' reliance on Dr. Gardner's statements fails to support Plaintiffs' quest for punitive damages

15

for three reasons.  First, Dr. Gardner did not say IVC filters were *ineffective*.  Read in context, he was expressing concern over whether third-party payers like Medicare, Medicaid, and private insurance carriers would continue to pay for filter placement and retrieval given the "paucity" of clinical evidence of effectiveness.  (Email String Between James Gardner and Darrell Talbert (stating in a June 15, 2009 email: "I've been very surprised that payers in this country haven't raised questions about whether they should pay for IVC filter placements (and retrievals) given the # of procedures being performed and the paucity of data supporting these procedures"); *see also* Email from James Gardner to Cook Colleagues (stating in a January 28, 2008 email: "[O]ne day the payers . . . are spending an increasing amount of money on the placement and retrieval of IVC filters and that there's not a lot of clinical evidence that demonstrates these filters actually improve patient outcomes."); Filing No. 25501-4, Email from James Gardner to Rune Wagner (stating in an August 23, 2013 email: "There's never been strong clinical evidence[6] supporting IVC filter use.")).  In other words, Dr. Gardner did not say there was *no* support for filter procedures; instead, he wished there was *more* clinical evidence to present to third-party payers.

---

[6] As an interesting sidenote, Dr. Gardner explained why, in his opinion, there were no Level 1 randomized controlled trials in an IVC filter patient population during his August 14, 2017, deposition. (Gardner Dep. at 143–44).  He first observed that the use of IVC filters "is an area of medicine where practice, to some degree, got out ahead of Level 1 studies."  (*Id.* at 143–44). Physicians recognized the need for and benefits of filters even without randomized control studies such that now, "it's considered the standard of care."  (*Id.* at 44).  Second, to run a randomized control trial would mean some patients in the relevant population would receive a filter while others would not.  (*Id.*). "The – standard of care is so well established that I don't think anybody would suggest running a study on patients and not allowing those types of patients to have access to the filter."  (*Id.*).

16

Second, at the time Dr. Gardner sent his 2008 and 2009 emails, there was published clinical data from other sources that supported the efficacy and safety of filter use, and particularly the Tulip filter. *See*, *e.g.*, Riyad Karmy-Jones et al., *Practice Patterns and Outcomes of Retrievable Vena Cava Filters in Trauma Patients: An AAST Multicenter Study*, 62 J. Trauma 17 (2007), https://pubmed.ncbi.nlm.nih.gov/17215729/ (study of 152 Tulip filters finding no migration, no occlusion, 0.6% PE, and 90% retrieval success rate at 44 days average indwelling time); M. F. Given et al., *Retrievable Gunther Tulip Inferior Vena Cava Filter: Experience in 317 patients*, 52 J. Med. Imaging Radiat. Oncol. 452 (2008), https://pubmed.ncbi.nlm.nih.gov/19032390/ (study of 317 Tulip filters finding 0.31% rate of penetration, 0.3-0.5% rate of PE, and 92% rate of retrievability, with a mean time from filter insertion to attempted retrieval of 76.95 days); Alan A. Sag et al., *Analysis of Tilt of the Günther Tulip Filter*, 19  J. Vasc. Interv. Radiol. 669 (2008), https://pubmed.ncbi.nlm.nih.gov/18440454/ (study of 175 Tulip filters finding no migration, no PE, no perforation, no thrombosis, and minimal tilt-related sequelae).  Plaintiffs do not dispute that these articles and studies support the safety and efficacy of the Tulip IVC filter and that Cook knew of them.

Studies published after 2009 also supported the general safety, efficacy, and retrievability of the Tulip.  *See*, *e.g.*, Luis F. Angel et al., *Systematic Review of the Use of Retrievable Inferior Vena Cava Filters*, J. Vasc. Interv. Radiol. (2011), https://pubmed.ncbi.nlm.nih.gov/22024114/ (low rate of breakthrough PE); Zhongzhi Jia et al., *Utility of Retrievable Inferior Vena Cava Filters: A Systematic Literature Review and Analysis of the Reasons for Nonretrieval of Filters with Temporary Indications*,

17

Cardiovasc. Intervent. Radiol. (2018), https://pubmed.ncbi.nlm.nih.gov/29359241/ (low

rate of breakthrough PE); and Raman Uberoi, et al., *British Society of Interventional*

*Radiology (BSIR) Inferior Vena Cava (IVC) Filter Registry*, Cardiovasc. Intervent.

Radiol. (2013), https://pubmed.ncbi.nlm.nih.gov/23511992/ (low overall complication

rate).

Lastly, the Tulip continues to be used today by vascular surgeons, long after Dr.

Gardner sent the emails at issue.  (Gardner Dep. at 44).  And third-party payers continue

to reimburse for Tulip placement in patients.  (*Id*. at 138).

### c.    Conclusion

In conclusion, the court finds Plaintiffs have failed to offer evidence from which a

reasonable jury could find, by clear and convincing evidence, that Cook's knowledge of a

retrievability issue and knowledge of weak clinical evidence of efficacy constituted the

type of conduct for which punitive damages could be awarded.

### 2.    Plaintiffs' Expert Evidence

Plaintiffs' last piece of evidence is based on the expert opinions of Dr. McMeeking

in the *Kidd* case.  They summarize and quote parts of his lengthy expert report and then

conclude:

> All this evidence indisputably creates a fact issue on malice, fraud, and gross
> negligence and/or oppressiveness.  Cook deliberately did not test the Tulip
> in a proper manner.  It designed the Tulip poorly, in a manner it knew was
> dangerous, and then failed to consider multiple potential improvements in
> the design.

(Pls.' Resp. at 22).

Plaintiffs' reliance on Dr. McMeeking's expert opinions is insufficient to support an award of punitive damages under any state's standards.  First, Plaintiffs' punitive damages claim is based on failure to warn.  (*See*, *e.g.*, Master Compl. ¶ 191 ("Defendants knew of their IVC Filters' lack of warnings regarding the risk of fracture, migration, and/or perforation, but intentionally concealed and/or recklessly failed to disclose that risk and continued to market, distribute, and sell their Filters without said warnings[.]"); *id.* ¶ 192 ("Defendants' intentional and/or reckless failure to disclose information deprived Plaintiffs' physicians of necessary information to enable them to weigh the true risks of using Cook IVC Filters against their benefits.")).  Dr. McMeeking's opinions, however, are based on design defect.  Therefore, his opinions do not relate to the claims for punitive damages asserted by Plaintiffs.

Second, Dr. McMeeking's opinions focus on whether Cook exercised reasonable care in its design and testing of the Tulip.  He discusses the adequacy of Cook's efforts or describes what Cook "should have done":

- "Cook's engineers should have taken steps to minimize to the extent possible the risks to patients these complications posed."  (McMeeking Expert Report at 1).

- "Any prudent and knowledgeable engineer, upon inspection of the design of the Cook Gunther Tulip and Celect filters, would realize that there is a probability that these filters will tilt in the IVC after implantation . . . ."  (*Id.* at 3).

- "Therefore, Cook engineers should have come to the conclusion that tilting of the Tulip filter was a concern, that it would likely occur, and they should have investigated it thoroughly as a possible deficiency of the design."  (*Id.* at 4).

- "[T]he likelihood of fatigue fracture in a relatively short time is entirely predictable and should have been foreseen by Cook designers and engineers."  (*Id.* at 6).

19

- "In my opinion, the pre-market bench testing and stress analysis of the Cook Tulip filter was inadequate as there was no bench test for tilting, no bench test addressing perforation, the fatigue bench tests were not carried out for a long enough duration, and the fatigue bench tests were not implemented in worst case conditions."  (*Id*. at 52).

- "[T]he procedures used by Cook for the conceptualization, design, stress analysis and bench testing of the Tulip and Celect filters were inadequate and did not meet the requisite standards of engineering, quality and governmental standards for ensuring their safety as medical implants, as described above in Section 4." (*Id.* at 72).

Plaintiffs likewise frame Dr. McMeeking's opinions explicitly in terms of negligence:

> McMeeking's opinions instead support plaintiffs' argument that the Gunther Tulip filter was negligently designed and Cook failed to conduct any further testing or modifications to the Gunther Tulip despite knowing it caused harm, including but not limited to perforation, fracture, migration, tilt, and embedment.

(Pls.' Resp. at 9).

Third, Plaintiffs' assertions that "Cook *deliberately* did not test the Tulip in a proper manner," and that Cook "designed the Tulip poorly, *in a manner it knew was dangerous*," (Pls.' Resp. at 22) (emphasis added), are not supported by any citation in the record, and none of the evidence Plaintiffs offer supports an inference of such intent or knowledge.

Lastly, Plaintiffs' argument that Cook "failed to consider multiple potential improvements in the design," (*id.*), also falls short of creating a jury question on punitive damages.  Dr. McMeeking's opinions about alternatives address ways in which the Tulip could have been redesigned to provide a longer time window for retrieval.  (*Id.* at 55). One option was to redesign the loops of the petals to make them less prone to

20

endothelialization. (*Id.*).  Another option was to move the petal loops to a location nearer to the barbs on the primary legs, which would enable the petal loops to function more effectively as perforation limiters.  (*Id.*).  The relevant issue here, however, is not whether Cook's design engineers considered these alternative designs, but whether a reasonable jury could find their failure amounts to anything more than negligence.  It could not. Confirming this, both Dr. McMeeking's expert report and Plaintiffs' summary of it opens the paragraph discussing possible alternatives with language that suggests negligence and nothing more:

> It is my opinion that any prudent engineer acting in a reasonable manner when faced with trying to redesign the Tulip to make a new design that has a longer time window for retrieval than the Tulip filter would have carefully considered alternative approaches to the redesign.

(McMeeking Report at 55; *see also* Pls.' Resp. at 8).  The court therefore finds Dr. McMeeking's expert opinions may raise a jury question on negligence, but they do not raise a jury question on punitive damages under any state's punitive damages standard.

## V.   Conclusion

The undisputed facts reflect that: (1) doctors in Europe have prescribed the Tulip to patients for almost 40 years; (2) the Tulip has been cleared by the FDA and on the U.S. market for decades for both permanent and retrievable uses, with no recalls and no restrictions; (3) Cook followed the FDA's directive regarding the retrievability period in the Tulip IFU; (4) there have been multiple studies and case reports concluding that the Tulip was generally efficacious and generally could be safely retrieved after relatively long periods of time *in situ*; (5) Cook conducted post-market safety monitoring of the

Tulip's use; (6) the risks associated with the Tulip and other IVC filters have been known since at least 1999; and (7) the Tulip IFU has advised doctors of multiple risks of IVC filter placement.  Plaintiffs' competing evidence consisting of (1) Cook's knowledge of the Tulip's decreasing retrievability over time, of which the FDA was aware; (2) Dr. Gardner's emails to colleagues hoping there were more clinical studies of the Tulip; and (3) and Dr. McMeeking's opinions regarding Cook's alleged negligence regarding the design and testing of the Tulip is insufficient to support anything beyond a claim of negligence.  Consequently, Plaintiffs' evidence cannot, as a matter of law, support a claim for punitive damages under any state's standards.  The Cook Defendants' Motion for Partial Summary Judgment on [the Tulip Plaintiffs' Claims for] Punitive Damages (Filing No. 25256) is therefore **GRANTED**.

**SO ORDERED** this 16th day of August 2024.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.