## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

_____

In Re: COOK MEDICAL, INC.,
IVC FILTERS MARKETING, SALES          Case No. 1:14-ml-2570-RLY-TAB
PRACTICES AND PRODUCTS                    MDL No. 2570
LIABILITY LITIGATION

_____

This Document Relates to:

All Cases Listed on Exhibit A

_____

### COOK DEFENDANTS' MEMORANDUM OF LAW
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
### <u>ON FAILURE-TO-WARN CLAIMS GOVERNED BY ILLINOIS LAW</u>

Pursuant to Federal Rule of Civil Procedure 56, the Cook defendants[1] respectfully move the Court to grant summary judgment on the failure-to-warn claims in the 77 cases listed in Exhibit A. The Exhibit A cases are (1) governed by Illinois law and (2) feature a Plaintiff who allegedly had a Cook IVC filter placed after August 9, 2010. *See* Ex. A.[2]

### <u>INTRODUCTION AND SUMMARY</u>

Under Illinois law, a product manufacturer has no duty to warn of obvious or known dangers associated with the use of its product. *E.g.*, *Blue v. Env't Eng'g, Inc.*, 828 N.E.2d 1128,

---

[1] Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, and William Cook Europe ApS.

[2] Exhibit A includes 77 cases in which Plaintiffs allege in their Short-Form Complaints that they (1) received their filters in Illinois and (2) resided in Illinois at the time of their alleged injury. Because these Plaintiffs allege that they received their filters in Illinois and that their injuries occurred in Illinois, Illinois law should govern their claims for the reasons set forth in Section I.B. The failure-to-warn claims are set out in Plaintiffs' Master Consolidated Complaint for Individual Claims (the "Master Complaint"), Dkt. 213, Counts I & III, at ¶¶ 53-64, 85(a), and incorporated by various Plaintiffs in their respective Short-Form Complaints,

To the extent any Plaintiffs listed in Exhibit A disputes the applicability of Illinois substantive law to their failure-to-warn claim, Cook will address those arguments in its reply brief.

101-02 (Ill. 2005); *see also* Restatement (Third) of Torts § 2 cmt. j (Am. L. Inst. 1998); Restatement (Second) of Torts § 402A cmt. j. Illinois has also adopted the learned intermediary doctrine, under which the manufacturer of a prescription medical device has a duty to provide warnings *only* to treating physicians, and not to the patients who ultimately receive the device. *See Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35, 42 (Ill. 2002); *see also Aquino v. C.R. Bard, Inc.*, 413 F. Supp. 3d 770, 790 (N.D. Ill. 2019). Combining these two principles, "a prescription medical device manufacturer need not provide a warning of risks already known to the medical community." *Hansen*, 764 N.E.2d at 42. Put simply, Illinois law recognizes both (1) that the treating physician is the "prospective addressee" of a warning about a prescription medical device and (2) that the manufacturer's duty to warn is limited based on the specialized knowledge already possessed by the medical community.[3]

The Court should dismiss all failure-to-warn claims governed by Illinois law and brought by Plaintiffs who received their Cook IVC filers after August 9, 2010. The potential risks and complications associated with IVC filter use became common knowledge in the medical community—at the very latest—on August 9, 2010, when the Food and Drug Administration ("FDA") issued a medical safety communication setting forth the same potential risks and complications that Plaintiffs identify in their pleadings. *See* Dkt. 213, Counts I & III, at ¶¶ 53-64, 85(a) (alleging that Cook failed to warn physicians of the risks of tilt, perforation, fracture, migration, inability to remove, and death). Cook had no duty to warn of these risks and complications after August 9, 2010, because those risks were undisputedly known and understood in the medical community as of that date. This common knowledge is evident in FDA

---

[3] Illinois is not alone in this recognition, but the clarity of the Illinois case law on the issue and the large number of Illinois cases affected prompted Cook to focus this initial motion on Illinois Plaintiffs.

communications to all physicians, in the medical literature of the period, in the testimony of one of Plaintiffs' own experts, and in the testimony of the physicians who placed MDL bellwether Plaintiffs' Cook IVC filters. Cook is therefore entitled to summary judgment on Plaintiffs' failure-to-warn claims (Counts I & III) in all cases governed by Illinois law and filed by Plaintiffs who received their filters after August 9, 2010.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

I.    **PLAINTIFFS' ALLEGATIONS**

1.    On January 30, 2015, Plaintiffs (through the Plaintiffs' Steering Committee) filed the Master Complaint, which was "submitted to serve the administrative functions of efficiency and economy and to present certain common claims and common questions of fact and law" for all Plaintiffs in the MDL. *See* Dkt. 213 at 1.

2.    The Master Complaint asserts eleven causes action, including a strict product liability claim under a failure-to-warn theory (Count I). *Id.* at ¶¶ 53-64. In asserting this claim, the Master Complaint alleges:

### COUNT I: STRICT PRODUCTS LIABILITY – FAILURE TO WARN

53.    Plaintiffs repeat and re-allege each and every allegation of this Master Complaint as if set forth in full in this cause of action.

54.    Cook IVC filters were defective and unreasonably dangerous when they left the possession of the Defendants in that they contained warnings insufficient to alert consumers, including Plaintiffs, of the dangerous risks associated with the subject product, including but not limited to the risk of tilting, perforation, fracture and migration which are associated with and did cause serious injury and/or death.

55.    Information provided by Cook to the medical community and to consumers concerning the safety and efficacy of its IVC filters did not accurately reflect the serious and potentially fatal adverse events Plaintiffs could suffer.

56.    At all times relevant hereto, the Cook IVC Filters were dangerous and presented a substantial danger to patients who were implanted with the Cook IVC Filters, and these risks and dangers were known or knowable at the times of

distribution and implantation in Plaintiffs.  Ordinary consumers would not have recognized the potential risks and dangers the Cook IVC Filters posed to patients, because their use was specifically promoted to improve health of such patients.

57.    Had adequate warnings and instructions been provided, Plaintiffs would not have been implanted with Cook IVC Filters, and would not have been at risk of the harmful injuries described herein.  The Defendants failed to provide warnings of such risks and dangers to the Plaintiffs and their medical providers as described herein.  Neither Plaintiffs, nor Plaintiffs' physicians knew, nor could they have learned through the exercise of reasonable care, the risks of serious injury and/or death associated with and/or caused by Cooks' IVC Filters.

58.    Defendants knew or had knowledge that the warnings that were given failed to properly warn of the increased risks of serious injury and/or death associated with and/or caused by Cook IVC Filters.

59.    Plaintiffs, individually and through their implanting physicians, reasonably relied upon the skill, superior knowledge and judgement of the Defendants.

60.    Defendants had a continuing duty to warn Plaintiffs and their physicians of the dangers associated with the subject products.

61.    Safer alternatives were available that were effective and without risks posed by Cook's IVC Filters.

62.    As a direct and proximate result of the Cook IVC Filters' defects, as described herein, Plaintiffs suffered permanent and continuous injuries, pain and suffering, disability and impairment.  Plaintiffs have suffered emotional trauma, harm and injuries that will continue into the future.  Plaintiffs have lost their ability to live a normal life, and will continue to be so diminished into the future.  Furthermore, Plaintiffs have lost earnings and will continue to lose earnings into the future and have medical bills, both past and future, related to care because of the Cook IVC Filters' defects.

63.    By reason of the foregoing, Defendants are liable to the Plaintiffs for damages as a result of their failure to warn and/or adequately warn the Plaintiffs and healthcare professionals about the increased risk of serious injury and death caused by their defective IVC filters.

*Id.*

3.    Plaintiffs' negligence claim (Count III) also includes failure-to-warn allegations,

stating in pertinent part:

85.    Despite the aforementioned duty on the part of the Cook Defendants, they committed one or more breaches of their duty of reasonable care and were negligent in:

a.    unreasonably and carelessly failing to properly warn of the dangers and risks of harm associated with the Cook IVC Filters, specifically its incidents fracture, migration, perforation and other failure[.]

*Id.* at ¶ 85(a). Plaintiffs do not define or identify any "other failure" as that term is used in paragraph 85(a).[4]

4.    In other portions of the Master Complaint, Plaintiffs allege that Cook also failed to warn about the risk of a filter becoming irretrievable. *See* Dkt. 213 at ¶ 44 (alleging that Cook "failed to disclose to physicians, patients, and/or Plaintiffs that its Cook Filters were subject to breakage, tilt, inability of removal, and migration even though they knew or should have known the same was true").

5.    Taken as a whole, the Master Complaint alleges that Cook failed to warn about the risk of six possible adverse events: (a) tilt, (b) perforation, (c) fracture, (d) migration, (e) inability to remove the filter, and (f) death.

## II.    FDA GUIDANCE FOR CARDIOVASCULAR INTRAVASCULAR FILTER 510(K) SUBMISSIONS

6.    As part of its oversight of medical devices, the FDA sometimes releases guidance documents stating the agency's position on a regulatory issue. *See* FDA, *Guidance* (Dec. 21, 2023), https://www.fda.gov/industry/fda-basics-industry/guidances.   "These documents usually discuss more specific products or issues that relate to the design, production, labeling, promotion,

---

[4] To the extent Plaintiffs intended to allege failure-to-warn claims regarding these unspecified "other" risks, they have failed to adequately plead them in the Master Complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is not facially plausible unless "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

manufacturing, and testing of regulated products" but "may also relate to the processing, content, and evaluation or approval of submissions as well as to inspection and enforcement policies." *Id.*

7.      In November 1999, the FDA issued a comprehensive guidance concerning IVC filters that "are permanently implanted in the inferior vena cava." *See generally* FDA, *Guidance for Cardiovascular Intravascular Filter 510(k) Submissions – Guidance for Industry and FDA Staff* (Nov. 1999), attached as Ex. B ("1999 Filter Guidance"). This guidance was "developed in an attempt to identify important preclinical tests and clinical design considerations for cardiovascular intravascular filters" that manufacturers sought to introduce to the market through the 510(k) process. *Id.* at 2.

8.      In this 1999 guidance, the FDA described the "well documented" risks and benefits to patients of permanent IVC filters, expressly noting that the "risks [of filter use] themselves are well described in the literature." *Id.* at 5. Specifically, FDA identified the following "well documented" complications associated with filter use:

   a.   Complications during filter insertion;

   b.   Recurrent pulmonary embolism;

   c.   Death;

   d.   Filter migration;

   e.   Caval penetration;

   f.   Filter tilting and angulation;

   g.   Caval occlusion;

   h.   Filter embolization; and

i. Other risks, including "[c]omplications that occur at the puncture site such as: hematoma formation and A-V fistula, DVT at the puncture site, pneumothorax and air embolism after jugular insertion[.]"

*Id.* at 5-9.

9.    In addressing pre-clinical testing requirements and potential complications that could result from filter insertion, the 1999 Filter Guidance discussed the risk of filter fracture after insertion. *Id.* at 5-9. The guidance also noted reports of "difficulty . . . retrieving failed insertions of the device." *Id.* at 6.

10.    Concerning the warnings to be included with a filter, the FDA recommended only that "[t]he labeling should include information regarding the use of the device in patients undergoing magnetic resonance imaging (MRI)." *Id.* at 10. The FDA did not discuss whether manufacturers should provide warnings to physicians about the "well documented" complications associated with filter use identified in the guidance. *See generally id.*

11.    The FDA's 1999 Filter Guidance was issued ***before*** Cook's introduction of the Günther Tulip and Celect Filters to the U.S. market in 2000 and 2007 respectively, meaning these "well documented" complications were known to the U.S. medical community before Cook brought these filters to the U.S. market.

## III.    FDA SAFETY-RELATED COMMUNICATIONS CONCERNING RETRIEVABLE IVC FILTERS

12.    To ensure patients and providers have timely and continued access to safe and effective medical devices, the FDA conducts post-market surveillance, recognizing that new

information about a device's safety may become available once a device is more widely distributed and used under real-world conditions.[5]

13.    The FDA also sometimes issues post-approval or post-clearance Medical Device Safety Communications, which "describe the FDA's analysis of a current issue and provide specific regulatory approaches and clinical recommendations for patient management."[6]  These communications may concern a specific medical product from one manufacturer or a group of similar products from several manufacturers.

14.    The FDA issued a Medical Device Safety Communication concerning retrievable IVC filters in 2010 and issued an updated version of this communication in 2014.

### A.    The FDA's 2010 Communication Concerning Retrievable IVC Filters

15.    On August 9, 2010, the FDA issued a Medical Device Safety Communication to "implanting physicians and clinicians responsible for the ongoing care of patients with inferior vena cava (IVC) filters."  FDA, *Removing Retrievable Inferior Vena Cava Filters: Initial Communication*, at 1 (Aug. 9, 2010), attached as Ex. C ("2010 FDA Communication").

16.    The 2010 FDA Communication did not address any particular manufacturer or filter.  *See generally id.*  Rather, the FDA issued the communication due to concerns that "retrievable IVC filters, intended for short-term placement, are not always removed once a patient's risk for PE subsides."  *Id.* at 2.

17.    Although focused on retrievable filters, the 2010 FDA Communication reiterates the "[k]nown long term risks associated with IVC filters" generally, which—according to the

---

[5] FDA, *Report to Congress: Postmarket Device Safety-Related Communications*, at 1 (2023), https://www.fda.gov/media/171929/download.
[6] FDA, *Safety Communications* (Oct. 5, 2023), https://www.fda.gov/medical-devices/medical-device-safety/safety-communications.

FDA—"include but are not limited to lower deep vein thrombosis (DVT), filter fracture, filter migration, filter embolization and IVC perforation." *Id.*

18.    Ultimately, the FDA recommended "that implanting physicians and clinicians responsible for the ongoing care of patients with retrievable IVC filters consider removing the filter as soon as protection from PE is no longer needed," though the FDA made clear that physicians should only attempt to remove the filter where "feasible and clinically indicated" for any particular patient. *Id.*

**B.    The FDA's 2014 Communication Concerning Retrievable IVC Filters**

19.    On May 6, 2014, the FDA updated its 2010 safety communication regarding IVC filters, providing "[p]hysicians who implant inferior vena cava (IVC) filters and clinicians responsible for the ongoing care of patients with these devices" with additional "information on recently published research and postmarket surveillance studies with these devices." FDA, *Removing Retrievable Inferior Vena Cava Filters: FDA Safety Communication*, at 1 (May 6, 2014), attached as Ex. D ("2014 FDA Communication").  Like the 2010 communication, the 2014 communication did not address any particular manufacturer or filter.  *See generally id.*

20.    The FDA stated that it had "received reports of adverse advents and product problems associated with IVC filters." *Id.* at 1.  These reports of adverse events included "device migration, filter facture, embolization (movement of the entire filter or fracture fragments to the heart or lungs), perforation of the IVC, and difficulty removing the device."  *Id.*   The FDA additionally noted some "[o]ther long-term risks associated with IVC filters," including "lower limb deep thrombosis and IVC occlusion."  *Id.*   The 2014 Communication did not, however, identify any new potential risks associated with filter use.  *See id.* (noting that there were "no new safety concerns related to th[e] update").  Indeed, the risks identified in the 2014 Communication

had been described as "well documented" in the FDA's 1999 Guidance and "known" in the medical community in the FDA's 2010 Communication. *Compare* Exs. B, 1999 Filter Guidance & C, 2010 FDA Communication, *with* Ex. D, 2014 FDA Communication.

21.    Once again in 2014, the FDA reiterated the recommendation in its 2010 Communication: "The FDA encourages all physicians involved in the treatment and follow-up of patients receiving IVC filters to consider the risks and benefits of filter removal for each patient" and refer patients for filter retrieval "when the risk/benefit profile favors removal and the procedure is feasible given the patient's health status." Ex. D, 2014 FDA Communication, at 2.

## IV.    MEDICAL ARTICLES CONCERNING IVC FILTER RISKS PRIOR TO 2010.

22.    In addition to the FDA Communications, many physicians and researchers had investigated the potential risks of IVC filters and had published articles on the topic long before 2010 about.  For example:

23.    In 2001, the Society of Interventional Radiology published quality improvement guidelines concerning inferior vena cava filter placement in the Journal of Vascular and Interventional Radiology.  Ex. E, Clement J. Grassi *et al.*, *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, 12 J. Vasc. Interv. Radiol. 137-41 (2001).  Those guidelines discussed penetration, tilt, migration, fracture, occlusion, embolization, recurrent pulmonary embolism, and a variety of other possible complications and adverse events.

24.    In 2003, the Journal of Vascular and Interventional Radiology republished the 2001 guidelines without change.  Ex. F, Clement J. Grassi *et al.*, *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, 14 J. Vasc. Interv. Radiol. S271-75 (2003).  Among other things, the 2003 publication disclosed the same information about possible complications and adverse events.

10

25.     In 2003, a review article published in the Journal of Vascular and Interventional Radiology by Dr. Thomas B. Kinney (who has served as an expert on behalf of plaintiffs in filter litigation) included a table summarizing then-known rates of recurrent pulmonary embolism, deep vein thrombosis, IVC thromboses, and postphlebitic syndrome for various IVC filters available at the time.  Ex. G, Thomas B. Kinney, *Update on Inferior Vena Cava Filters*, 14 J. Vasc. Interv. Radiol. 425-40 (2003).  The review also discussed the potential for filters to penetrate, perforate, migrate, fracture, obstruct the IVC, and cause other identified complications and adverse events.

26.     In 2003, Dr. Charles S. Joels and colleagues published a review article in The American Surgeon addressing complications and adverse events with inferior vena cava filters, including misplacement, migration, tilt, occlusion, thrombosis, perforation (including at rates of up to 100%), recurrent pulmonary embolism, and fracture, among others.  Ex. H, Charles S. Joels, et al., *Complications of Inferior Vena Cava Filters*, 8 Am. Surg. 654-59 (2003).

27.     In 2005, a review article published in Blood Reviews by hematologists Drs. Hann and Strieff (the latter of whom has served as an expert on behalf of plaintiffs in filter litigation) included a section addressing IVC filter complications and discussed thrombosis, migration, penetration/perforation, filter tilting, strut fracture, and a host of other potential adverse outcomes with filters.  Ex. I, Christine L. Hann & Michael B. Streiff, *The Role of Vena Caval Filters in the Management of Venous Thromboembolism*, 19 Blood Reviews 179-202 (2005).

## V.    BELLWETHER PLAINTIFFS' TREATING PHYSICIANS' AND EXPERTS' TESTIMONY CONCERNING KNOWLEDGE OF MEDICAL COMMUNITY.

28.     As part of the earlier bellwether plans in this MDL, 10 cases have been selected for full discovery and bellwether trials.  Although several of those bellwether cases were dismissed before the Plaintiffs' treating physicians were deposed, depositions were taken of treating doctors in five of these cases: *Hill*, *Gage*, *Brand*, *McDermitt*, and *Scott*.

11

29.     These bellwether Plaintiffs' treating physicians testified that they learned of the potential risks of IVC filters through their medical school educations, their training, and their experience, not from IVC filter manufacturers.  *See, e.g.,* Ex. J, Deposition of Mark Zuzga ("Zuzga Dep.", dated February 8, 2017 at 75:24-76:6  (bellwether Plaintiff Hill treater, testifying that his discussion of potential risks and complications with patients was informed, not by Cook, but by his "12 years of practicing knowing what the risks of filters are"); Ex. K, Deposition of Dr. Thomas Morrison ("Morrison Dep."), dated January 30, 2018 at 57:4-18 (bellwether Plaintiff Brand treater); Ex. L, Deposition of Dr. Paul Chrisostomo ("Chrisostomo Dep."), dated January 13, 2017 at 76:17-77:2  (bellwether Plaintiff Gage treater); Ex. M, Deposition of Dr. James Larkin ("Larkin Dep."), dated April 19, 2017 at 35:15-36:19, 47:24-48:5 (Apr. 19, 2017) (bellwether Plaintiff Gage treater); Ex. N, Deposition of Dr. Mark Rheudasil ("Rheudasil Dep."), dated February 28, 2018 at 63:17-64:8; 199:12-19  (bellwether Plaintiff Brand treater).

30.     Several of those bellwether treating physicians also testified explicitly that the risks of IVC filters were well known in the medical community in the 2009-2010 period.  For example, Dr. Anton Mlikotic, the treating physician of bellwether Plaintiff Ernie Scott, testified that the risks of IVC filters had been well known in the medical community since at least 2008:

Q.     So were you aware of all the risks—the risks associated with IVC filters in 2017 when you first began treating Mr. Scott?
A.     Yes.
Q.     In 2017, did you need Cook to tell you about these risks?
A.     No.
*Q.     These risks of perforation, tilt, migration, fracture and an inability to retrieve are well known in the medical community; correct?*
*A.     That's correct.*
*Q.     How long have they been well known in the medical community?*
*A.     For a very long time.  At least a decade and a half.*

Ex. O, Deposition of Anton A. Mlikotic, M.D. (Mlikotic Dep."), dated June 15, 2023, at 33:2-16.

31.    Dr. Paul Crisostomo, bellwether Plaintiff Gage's treating physician, likewise

testified that IVC filter risks had been well known in the medical community since the early 2000s:

| | |
|---|---|
| Q. | Doctor, would you agree that all filters have known risks? |
| A. | Yes. |
| Q. | And those known risks have been well known in the medical community since you became a practicing physician, correct? |
| A. | Yes. |
| | [objection omitted] |
| Q. | Were they known risks that you learned about during your medical education and your medical training? |
| A. | Yes. |
| Q. | That would include during your medical school days in the early 2000s, your general surgery residency from 2003 to 2011 and then during your vascular surgery fellowship in 2011 to 2013, 1 correct? |
| A. | Yes. |
| | *[intervening discussion of specific risks, including penetration and perforation of the caval wall, tilting on or after deployment, migration, inability to retrieve, fracture, bleeding, and embedment]* |
| Q. | These are all known risks with any vena cava filter, correct? |
| A. | Correct. |
| Q. | Not unique to the Tulip? |
| A. | Correct. |
| Q. | Not unique to the Celect? |
| A. | Correct. |
| **Q.** | **These are known risks of all filters that were well known in the medical community in 2010, correct?** |
| **A.** | **Correct.** |

Ex. L, Chrisostomo Dep. at 76:8-77:2; 77:24-79:17 (emphasis added).

32.    Dr. James Larkin, another of Mr. Gage's treating physicians, stated that he knew of

a broad array of possible IVC filter risks at the time of Mr. Gage's 2011 filter placement, testifying:

| | |
|---|---|
| Q. | This list of risks that we just went through that you were aware of in April of 2011, you told me that you were aware of all of those risks by virtue of your training and your experience, correct? |
| A. | Yes. |
| Q. | You didn't need a manufacturer to tell you about them, for example? |
| | [objection omitted] |
| A. | No. |

Ex. M, Larkin Dep. at 43:10-44:14, 47:3-48:16.

33.     Dr. Mark Goodwin, yet another of bellwether Plaintiff Gage's treating doctors, was also presented with an array of potential IVC filter risks and likewise confirmed the medical community's knowledge of those risks:

> Q.     Dr. Goodwin, were all of these risks that we've been talking about, were all of those known risks to you in 2011?
> A.     Yes.
> Q.     And were they known risks within the medical -- the relevant medical community who places filters in April of 2011?
> A.     Yes.

Ex. P, Deposition of Dr. Mark J. Goodwin ("Goodwin Dep."), dated January 11, 2017 at 98:18-99:1.

34.     Even bellwether Plaintiff Brand's retained expert radiologist, Dr. Gregory Gordon, testified that the risks of IVC filters were well known in the medical community in 2009 and that he himself discussed those risks with his filter patients:

> Q.     … Dr. Gordon, my question is: In the general medical community in 2009 were physicians aware that filters generally can tilt, migrate, perforate, fracture, be difficult to retrieve, cause bleeding and death?
> A.     Yes.
> Q.     Dr. Gordon, did you discuss all of those risks with your patients in 2009?
> A.     Yes, I did.
> Q.     Is there anything else -- any other risks that you discussed with your patients back in 2009 that I have not identified?
> A.     Infection.
> Q.     Anything else?
> A.     Migration.
> Q.     Anything else?
> A.     And inability to remove.

Ex. Q, Deposition of Dr. Gregory Gordon ("Gordon dep."), dated June 12, 2018 at 152:6-22.

## VI.    RELEVANT PROCEDURAL HISTORY

35.     On August 16, 2024, the Court granted the Cook Defendants' motion for summary judgment on all of the MDL Plaintiffs' claims for punitive damages in all cased involving Cook Tulip Filters.  *See* Dkt. 25904.

36.     In its Order, the Court held that across the broad class of Tulip cases, Plaintiffs had failed to offer any evidence that would prove anything more than simple negligence.  And because every state that permits punitive damages requires proof of conduct that is more severe than mere negligence, the Court held that Cook was entitled to summary judgment on all Tulip Plaintiffs' claims for punitive damages.  *Id.* at 22.

37.     As part of that ruling, the Court commented on the medical community's broad knowledge and understanding of the risks of IVC filters, citing sources including FDA communications and medical literature from 1999 and 2001:

> **The risks associated with IVC filters generally and the Tulip IVC filter specifically have been widely known and understood in the medical and regulatory community for decades.** For example, a 1999 FDA Guidance document regarding 510k submissions for IVC filters listed and discussed potential filter complications, including complications during filter insertion, recurrent PE, migration, penetration, tilt, occlusion, embolization, and death. (Filing No. 25258-26, Guidance for Cardiovascular Filter 510(k) Submissions at 5–9, November 26, 1999; *see also* Filing No. 25258-27, Grassi et al., *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, J. Vasc. Interv. Radiol. 137, 138–39 (2001) (listing and discussing potential filter complications and trackable events, including penetration, migration, fracture, recurrent PE, occlusion, embolization, and death)).

*Id.* at 7-8 (emphasis added).

## ARGUMENT

Cook is entitled to summary judgment on these Illinois Plaintiffs' failure-to-warn claims, as set forth in the Master Complaint, Dkt. 213, Counts I & III, at ¶¶ 53-64, 85(a), and incorporated in their respective Short-Form Complaints.  *See* Ex. A, Plaintiff List. All of the risks and complications of filter use about which Plaintiffs allege Cook failed to warn were communicated to doctors by the FDA, well documented in the medical literature, and generally known to the medical community no later than August 9, 2010.  Under Illinois law, Cook therefore had no duty as a matter of law to warn physicians of these widely known risks.

I.    **Standard of Review and Choice of Law**

    A.    **Standard of Review**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant moving for summary judgment bears the initial burden of showing the plaintiff has failed to establish one or more essential elements of the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving defendant may discharge this initial burden "by 'showing'—that is, pointing out the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *see also Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (noting that "the purpose of summary judgment is isolate and dispose of factually unsupported claims").

The plaintiff must then "respond to the [summary judgment] motion with evidence setting forth specific facts showing that there is a genuine issue for trial." *Michael*, 259 F.3d at 845. A plaintiff "cannot rest on the pleadings alone, but must identify specific facts to establish that there is a genuine triable issue." *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In short, to successfully oppose a motion for summary judgment, a plaintiff "must do more than raise a 'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael*, 259 F.3d at 845 (internal citations omitted).

"It is well-established that a transferee court may dispose of cases in an MDL through summary judgment—and indeed, they often do." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales*

*Pracs. & Prods Liab. Litig.*, 892 F.3d 624, 648 (4th Cir. 2018).  In fact, if a summary judgment

motion involves "issues common to all the cases centralized before the MDL court, … the

transferee judge may be in the best position to rule" due to his or her familiarity with the issues.

*In re Lipitor*, 892 F.3d at 648 (quoting Manual for Complex Litig. § 22.36).  Indeed, this Court

has granted numerous motions for judgment on the pleadings and motion for summary judgment

in MDL member cases.  *See, e.g.*, Dkt. 25053 (granting summary judgment in *Scott* bellwether

case); Dkt. 25904 (granting summary judgment on punitive damage claims in all Tulip cases).

### B.    Choice of Law

This Motion is limited to 77 cases governed by Illinois substantive law.  *See* Ex. A.  These

77 Plaintiffs all either listed Illinois federal district courts as the venues in which they would have

filed their cases absent the MDL or provided another basis for the choice of Illinois law.[7]  Illinois

applies the "most significant relationship" test to choice-of-law issues in tort.  *See Townsend v.*

---

[7] Two of these cases require more specific explanation. Plaintiff Sally Schierer listed this Court—the Southern District of Indiana—as the court in which she would have filed absent the MDL.  Because Indiana is primarily a *lex loci delecti* jurisdiction, *Simon v. U.S.*, 805 N.E.2d 798, 805 (Ind. 2004), Indiana courts would presumably apply Illinois substantive law to her case because her alleged injury occurred in Illinois.  *See* Dkt. 1 at Case No. 1:15-cv-00414.

Plaintiff Debbie Swink listed both the Central District of Illinois and the Western District of Missouri as the venues in which she would have filed absent the MDL.  This creates ambiguity in the analysis because she could only file her case in one district court had she not filed directly in the MDL.  When a plaintiff in a direct-filed case leaves Paragraph 7 of the Short-Form Complaint blank or lists multiple districts, the case should be treated as if the Southern District of Indiana is the originating district of the case because an alternative venue has not been properly identified.  The plaintiff's act of filing in Indiana should therefore control the choice-of-law analysis.  Indiana courts would apply Illinois law in Plaintiff Swank's case for the same reasons as Plaintiff Schierer's case.  *See* Dkt. 1 at Case No. 1:20-cv-01537.

Regardless, like Illinois, Missouri is a "most significant relationship" jurisdiction with respect to choice-of-law issues in tort.  Plaintiff Swank alleges that she received the filter at a hospital in Decatur, Illinois and that she resided in Illinois at the time of her filter placement, at the time of her alleged injury, and at the time of filing.  *See id.*  Plaintiff Swink's Short-Form Complaint does not identify any connection to Missouri, much less suggest how that connection would be more significant than all her strong links to Illinois.  Thus, whatever state's choice-of-law rules are used for the analysis, the outcome is the same: Illinois substantive law applies to her case.

*Sears, Roebuck and Co.*, 879 N.E.2d 893, 901-02 (Ill. 2007). Among other factors, this test considers "the place where the injury occurred" and "the place where the relationship, if any, between the parties is centered." *Id.* at 901 (citing Restatement (Second) of Conflict of Laws § 145(a), (d)). Additionally, the "test points presumptively to the law of the jurisdiction in which the tort occurred (that is, the *lex loci delicti*) . . . the place where the injury was inflicted." *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 865-66 (7th Cir. 2010) (discussing *Townsend* and multiple Seventh Circuit cases applying Illinois law).

Here, Cook has included in Exhibit A all cases in which Cook's review of Short-Form Complaints alleges that the Plaintiffs (1) received their filters in Illinois, (2) resided in Illinois at the time of their placement procedures, and (3) resided in Illinois at the time of their alleged injuries. Because these Plaintiffs allege that they received their filters in Illinois and that their injured occurred in Illinois, Illinois has the "most significant relationship" to their claims and their failure-to-warn claims are governed by Illinois law. To the extent any Plaintiff in Exhibit A disputes that Illinois substantive law applies to their failure-to-warn claims, Cook will address those arguments in its reply brief. [8]

## II. Plaintiffs' Failure-To-Warn Claims Fail Because Cook Had No Duty to Warn of Potential Risks Associated With Filter Already Commonly Known in the Medical Community

Cook is entitled to summary judgment on all failure-to-warn claims governed by Illinois law asserted by Plaintiffs who received their Cook IVC filters after August 9, 2010, the date of the FDA's first safety communication concerning IVC filters. Summary judgment is warranted for

---

[8] In limiting this motion to 77 cases, Cook recognizes that there may be other cases in the MDL in which Illinois law governs the failure-to-warn claims. These 77 cases are simply the set of cases in which Cook believes the need to apply Illinois law is unarguable. Cook reserves the right to argue that other cases in this MDL should similarly apply Illinois law as more specific facts in those cases become known.

three interrelated reasons: (1) under the learned intermediary doctrine, Cook's duty to warn about the potential risks associated with IVC filter use ran only to treating physicians; (2) Cook had no duty to warn physicians of potential risks associated with IVC filter use that were already known in the medical community; and (3) the potential risks associated with IVC filter use about which Plaintiffs allege Cook did not warn were known in the medical community no later than August 9, 2010.

### A. Cook's Duty to Warn About the Potential Risks and Complications Associated with IVC Filter Use Runs Only to Treating Physicians.

Under the learned intermediary doctrine,[9] Cook's duty to warn runs only to treating physicians and not to patients or the public at large. *E.g.*, *Hansen*, 764 N.E.2d at 42; *Gravitt v. Mentor Worldwide, LLC*, 646 F. Supp. 3d 962, 968 (N.D. Ill. 2022); *see also* Dkt. 9696 at 4 (Court's discussion of same principles under Georgia law). "An adequately informed physician acts as [a] learned intermediary between the patient and the [device] manufacturer, thus breaking the chain of liability." *Ashman v. SK & F Lab Co.*, 702 F. Supp. 1401, 1404 (N.D. Ill. 1988). Based on this well-established doctrine, Plaintiffs' allegations in the Master Complaint that Cook had a duty to warn Plaintiffs directly fail as a matter of law and must be dismissed. *Compare* Dkt. 213 at ¶ 44, *with, e.g.*, *Hansen*, 764 N.E.2d at 42; *see Martin by Martin v. Ortho Pharm. Corp.*, 661 N.E.2d 352, 356-57 (Ill. 1996) (affirming dismissal of failure-to-warn claim and rejecting argument that Illinois law provides an exception to the learned intermediary doctrine that could require a medical device manufacturer to directly warn end consumers); *Hernandez v. Schering Corp.*, 958 N.E.2d 447, 454-55 (Ill. App. Ct. 2011) (similar); *see also Leesley v. West*, 518 N.E.2d

---

[9] The learned intermediary doctrine has been universally adopted in all U.S. jurisdictions. *See, e.g.*, *Dearinger v. Eli Lilly & Co.*, 510 P.3d 326, 329 (Wash. 2022) ("Every state in the country, along with the District of Columbia and Puerto Rico, has adopted the learned intermediary doctrine in some iteration.").

758, 760 (Ill. App. Ct. 1988) (noting that the learned intermediary doctrine applies with equal force

to strict liability and negligence claims).

> **B.  Cook Had No Duty to Warn Doctors of Potential Risks and Complications
> Associated with IVC Filter Use that Were Already Known in the Medical
> Community.**

Under Illinois law, Cook had no duty to warn physicians of potential risks and

complications associated with IVC filter use that were already known in the medical community.

*Hansen*, 764 N.E.2d at 42 ("[A] prescription medical device manufacturer need not provide a

warning of risks already known to the medical community."); *Aquino*, 413 F. Supp. 3d at 790

(similar).

"In general, a product seller is not subject to liability for failing to warn or instruct

regarding risks and risk-avoidance measures that should be obvious to, or generally known by,

foreseeable product users."  Restatement (Third) of Torts § 2 cmt. j; *see also Proctor v. Davis*, 682

N.E.2d 1203, 1211 (Ill. Ct. App. 1997) ("[T]here is no duty to warn of a risk that is already known

by those to be warned.").  This principle is recognized by Illinois law and by the Second and Third

Restatements of Torts, and rests on the common-sense proposition that "[w]hen a risk is obvious

or generally known, the prospective addressee of a warning will or should already know of its

existence."  *Blue*, 828 N.E.2d at 1144 (citing Restatement (Third) of Torts § 2 cmt. j); *see also*

Restatement (Second) of Torts § 402A cmt. j ("[A] seller is not required to warn … when the

danger, or potentiality of danger, is generally known or recognized.").

Applying this principle to prescription medical devices, such as the IVC filters at issue

here, the Illinois Supreme Court has recognized that a "corollary" of the learned intermediary

doctrine "is the principle that a prescription medical device manufacturer need not provide a

warning of risks already known to the medical community."[10] *Hansen*, 764 N.E.2d at 42; *see also Aquino*, 413 F. Supp. 3d at 790. In other words, because the prescription medical device manufacturer's duty to warn runs only to treating physicians, the manufacturer need not warn of risks already known to members of the medical community, i.e., the "prospective addressee[s]" of any warning under the learned intermediary doctrine. *See Blue*, 828 N.E.2d at 1144. Cook therefore had a duty only to warn physicians of risks or complications ***not*** already known to the medical community.

This Illinois rule is reenforced by federal labelling regulations, which expressly excuse medical device manufacturers from any duty to warn of risks generally known in the medical community. FDA regulations state:

> A device which, because of any potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use is not safe except under the supervision of a practitioner licensed by law to direct the use of such device, and hence for which "adequate directions for use" cannot be prepared, shall be exempt from section 502(f)(1) of the act if all the following conditions are met:
> ***
> (c) Labeling on or within the package from which the device is to be dispensed bears information for use, including indications, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and for the purpose for which it is intended, including all purposes for which it is advertised or represented: **Provided, however**, That such information may be omitted from the dispensing package if, but only if, the article is **a** device for which directions, hazards, warnings, and other information **are commonly known to practitioners licensed by law to use the device.**

---

[10] Courts applying Illinois law also have employed this principle in the context of other product liability litigation. *See Gonzalez v. Republic Tobacco Co.*, 2000 WL 343236, at *3 (N.D. Ill. Mar. 31, 2000) (citing cases and dismissing state-law failure-to-warn claim based on a failure to warn of the risks associated with smoking because "[t]he potential risks of smoking are widely known, well-publicized, and within the common knowledge of the community" and "[c]ourts have routinely declared knowledge of the risks associated with tobacco use the subject of judicial notice"); *Garrison v. Heublein, Inc.*, 673 F.2d 189, 191 (7th Cir. 1982) (noting health hazards of excessive consumption of alcohol are well known and holding that "because of the common knowledge of those dangers, the product cannot be regarded as unreasonably unsafe").

21 C.F.R. § 801.109(c) (first emphasis in original, second emphasis added).  Thus, "a warning

could be adequate even if it does not warn of certain side effects if the side effects are common

knowledge to physicians licensed to use the device."  *Robinson v. Ethicon, Inc.,* 588 F. Supp. 3d

726, 734 (S.D. Tex. 2022) (citing section 801.109(c) but declining to exclude expert's opinion on

warning where defendant had not shown actual physicians' knowledge of specific risks).[11]

 Illinois law on this point aligns both with the rationale underlying the learned intermediary

doctrine and with the nature of the medical community itself.  At its foundation, the learned

intermediary doctrine recognizes that a treating physician—by virtue of education, training, and

experience—is in the best position to evaluate a patient's needs, assess the risks and benefits of

the available treatment options, make a treatment recommendation, and provide warnings to the

patient of the relevant risks of the treatment options.  *See Kirk v. Michael Reese Hosp. & Med.*

*Ctr.*, 513 N.E.2d 387, 393 (Ill. 1987); *Hernandez*, 958 N.E.2d at 453-54 (Ill. App. Ct. 2011);

*Martin by Martin*, 661 N.E.2d at 357.  Indeed, those pursuing medicine generally must devote

roughly a decade of their lives—between education and training—to become physicians.

Moreover, the FDA directs safety communications specifically to physicians about the potential

risks and complications associated with the use of certain prescription medical products, as it did

here concerning IVC filters.  *See, e.g.*, Ex. C, 2010 FDA Communication.

 In recognition of these facts, Illinois law holds that physicians are not "ordinary"

consumers, but rather consumers who possess a significant degree of specialized knowledge.  *See,*

*e.g.*, *Hansen*, 764 N.E.2d at 42.  As a corollary, Illinois law also recognizes that physicians are

---

[11] Cook references this FDA regulation merely to show the general acceptance of the Illinois com-
mon law rule.  For purposes of this motion, the Court need not address any preemptive effect of
section 801.109(c) on Plaintiffs' failure-to-warn claims; Illinois state common law is sufficient to
dispose of those claims here.

often aware—through their education, training, and experience in the medical community—of the potential risks and complications associated with prescription medical products' use.  The law therefore holds that manufacturers like Cook have no duty to warn of risks and complications already known in that medical community.  *See id.*

In sum, under Illinois law, Cook's duty to warn is limited based on the specialized knowledge possessed in the medical community.  The relevant question here, then, is ***when*** the medical community became generally aware of the potential risks and complications associated with IVC filter use. *See, e.g.*, *Hansen*, 764 N.E.2d at 42.

### C.      All the Risks Plaintiffs Claim Cook Failed to Warn About Were Known in the Medical Community No Later than August 9, 2010.

The undisputed facts establish that all the risks that Plaintiffs claim Cook failed to warn physicians about were known to the medical community ***no later*** than August 9, 2010.  Any failure-to-warn claims that arose after that date therefore fail as a matter of law.

In November 1999, the FDA released a guidance document to the medical industry "to identify important preclinical tests and clinical design considerations for [permanent IVC filters]" sought to be introduced to the market through the 510(k) process.  Ex. B, 1999 Filter Guidance, at 3.  As part of this guidance, the FDA identified the already "well documented" risks and benefits of permanent IVC filters to patients, noting that the "risks [of filter use] themselves are well described in the literature."  *Id.* at 5.  Specifically, the FDA identified the following potential risks:

- Death;

- Filter migration;

- Filter fracture;

- Caval perforation;

- Filter tilting and angulation; and

- Difficulty in retrieving filters.

*Compare id.* at 5-9*, with* Pls.' Master Compl., Dkt. 213 at ¶¶ 44, 54, 85(a).  Because these risks were "well documented" in the medical literature by the late 1990s, the medical community necessarily knew of these potential risk and complications *before* the FDA even granted 510(k) clearance for the Cook Günther Tulip and Celect Filters in 2000 and 2007 respectively.  *See, e.g.*, *Hansen*, 764 N.E.2d at 42 (Ill. 2002); *see also* Restatement (Third) of Torts § 2 cmt. j).  Indeed, this Court has already noted that "the risks associated with the Tulip and other IVC filters have been known since at least 1999."  Dkt. 25904 at 22 (granting summary judgment on the Tulip Plaintiffs' claims for punitive damages).

Although the 1999 Filter Guidance concerned the well-known risks of permanent filters, the FDA's 2010 FDA Communication went further and discussed generally the "[k]nown long terms risks associated with IVC filters," with a primary focus on retrievable IVC filters.  Ex. C, 2010 FDA Communication, at 2.  This communication, which was addressed directly to treating physicians and related clinicians, stated that these "[k]nown long term risks of IVC filters" generally were "lower deep vein thrombosis (DVT), filter fracture, filter migration, filter embolization and IVC perforation." *Id.*  Notably, the 2010 FDA Communication restated the same risks that the FDA had described as "well documented" over a decade earlier in the 1999 Filter Guidance.  *Compare id., with* Ex. B, 1999 Filter Guidance.

In 2014, the FDA updated its information yet again with a revised communication discussing adverse event data, but the identified risks and complications remained the same. *Compare* Ex. C, 2010 FDA Communication, *with* Ex. D, 2014 FDA Communication.  The medical community thus undisputedly knew of the potential risks and complications associated with the use of both permanent and retrievable filters *no later* than August 2010, when the FDA issued its

2010 FDA Communication. *See generally* Ex. C, 2010 FDA Communication; *see also* Dkt. 25904 at 7 (where the Court observed that "[t]he risks associated with IVC filters generally . . . have been widely known and understood in the medical and regulatory community for decades").

The potential risks and complications repeatedly identified and communicated by the FDA are the same as the list of potential risks and complications that Plaintiffs allege Cook did not warn about. *Compare* Ex. C, 2010 FDA Communication at 2, *with* Dkt. 213 at ¶¶ 44, 54, 85(a). Thus, based on the FDA communications alone, Cook had no duty to warn of these well-known potential risks and complications, and Plaintiffs' failure-to-warn claims fail as a matter of law. *See, e.g.*, *Hansen*, 764 N.E.2d at 42 (Ill. 2002) (holding that "a prescription medical device manufacturer need not provide a warning of risks already known to the medical community").

But the FDA was not alone in recognizing the broad knowledge of these potential risks in the medical community. That common knowledge of the risks finds further support both in the medical literature of the period and in the deposition testimony elicited in the bellwether cases in this MDL. As detailed above, multiple medical articles published before 2010 feature detailed investigations and discussions of the potential complications and adverse events associated with IVC filters, including the six complications that the Master Complaint claims Cook failed to warn about: tilt, perforation, fracture, migration, inability to remove, and death.

Turning to the witnesses in this litigation, Plaintiff Brand's ***own expert***, Dr. Gordon, testified that the risks associated with IVC filter use were known in the medical community at the time of Ms. Brand's filter placement in 2009, Ex. Q, Gordon Dep. at 152:6-11—that is, even ***before*** the FDA issued its 2010 Safety Communication. Dr. Gordon's testimony in *Brand* aligns with the testimony of the bellwether Plaintiffs' treating physicians who placed Plaintiff's filters, laid out above, who confirmed the broad knowledge of IVC filter risk among doctors. *See, e.g.*, Ex. P,

Goodwin Dep. at 98:22-99:1 (agreeing that the relevant potential risks of filter use were known in the medical community at the time of Plaintiff Gage's filter placement in April 2011); Ex. O, Mlikotic Dep. at 33:2-16 (testifying that the relevant potential risks of filter use have been well known in the medical community for "[a]t least a decade and a half").  Indeed, all the deposed treating physicians who placed Plaintiffs' filters in the bellwether cases testified that (1) they knew about the relevant potential filter risks at the time they placed the bellwether Plaintiffs' Cook IVC Filters, and (2) the source of their knowledge concerning these potential risks was their pre-2010 medical training, education, and experience, and not information that Cook provided.  *See supra* Statement of Material Facts, § IV.

This Court has already granted summary judgment on some of the bellwether Plaintiffs' failure-to-warn claims based on the Plaintiffs' treating physicians' awareness of the commonly known risks of IVC filters.  *See, e.g.,* Dkt. 6660 at 6-8 (granting summary judgment in *Hill*, citing treating physician's "devastating testimony" that "he was fully aware of the risks of the surgery"); Dkt. 9696 at 8-9 (granting summary judgment on claim in *Brand*, noting "[t]he undisputed evidence reflects that [plaintiff's treating physician] …already knew at the time of Plaintiff's implant about all of the complications Plaintiff experienced").

Taken together, this evidence establishes beyond dispute that the potential risks and complications about which Plaintiffs allege Cook failed to warn were already known in the medical community ***no later*** than August 9, 2010.

Plaintiffs cannot avoid summary judgment on these claims by arguing that, despite the medical community's knowledge of the ***existence*** of a particular risk, Cook nevertheless had a duty to disclose the supposed ***increased risk*** of these potential risks and complications occurring with Tulip or Celect filters as compared to other IVC filters.  Illinois courts have flatly rejected

such an argument. In *Pluto v. Searle Lab'ys*, 690 N.E.2d 619, 621 (Ill. App. Ct. 1997), the court held that the manufacturer defendant was "under no duty to provide information on other products in the marketplace." *Id.* Specifically, the court held that the manufacturer had "no duty to warn physicians and patients of the increased risk" of complications when using the product as compared to other similar products. *Id.* The court further noted that the recognition of "[s]uch a duty would require drug manufacturers to rely upon the representations made by competitor drug companies," which "would only lead to greater liability on behalf of drug manufacturers that were required to vouch for the efficacy of a competitor's product" and "would raise serious implications regarding the free flow of commerce in that industry." *Id.*; *see also Ackley v. Wyeth Lab'ys, Inc.*, 919 F.2d 397, 405 (6th Cir. 1990) (applying Ohio law) ("The manufacturer is obligated to make reasonable disclosure of all the risks inherent in its own drug. It is not obligated to provide a comparison of its drug with others." (internal citation omitted)).

Plaintiffs therefore cannot defeat summary judgment by asserting that Cook had a duty to and failed to disclose the increased risk with which particular risks and complications occurred in Cook filters compared to other manufacturers' IVC filters. Under Illinois law, no such duty exists.

## **CONCLUSION**

A manufacturer has no duty to warn of risks generally known among the community of relevant product users, and a court may properly determine a date on which a manufacturer's potential failure-to-warn liability is cut off based on this community knowledge. Here, as the Court noted in granting summary judgment on Tulip punitive damage claims, "[t]he risks associated with IVC filters generally and the Tulip IVC filter specifically have been widely known and understood in the medical and regulatory community for decades." Dkt. 25904 at 7. Indeed, the undisputed facts show that the potential risks and complications about which Plaintiffs allege

Cook failed to warn were "well documented" in the literature in the 1990s, *before* Cook's IVC filters were even introduced to the U.S. market. By the time the FDA issued its 2010 communication, these potential risks and complications were already known to and appreciated by the medical community.

Because Cook had no duty to warn of potential risks and complications already known to the medical community, Cook is entitled to summary judgment on all of Plaintiffs' warning-based claims. Cook therefore urges the Court to grant summary judgment and dismiss all strict-liability and negligent failure-to-warn claims governed by Illinois law and alleged by Plaintiffs who received their Cook IVC filters after August 9, 2010, the publication date of the 2010 FDA Communication.

Dated: February 13, 2025

Respectfully submitted,

*/s/ Andrea Roberts Pierson*
Andrea Roberts Pierson
Jessica Benson Cox
FAEGRE DRINKER, BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
Telephone: (317) 237-0300
Andrea.Pierson@faegredrinker.com
Jessica.Cox@faegredrinker.com

Bruce Jones
FAEGRE DRINKER, BIDDLE & REATH LLP
90 South Seventh Street, Suite 2200
Minneapolis, Minnesota 55402
Telephone: (612) 766-7000
Bruce.Jones@faegredrinker.com

*Attorneys for Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, William Cook Europe ApS*

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2025, a copy of the foregoing Cook Defendants' Memorandum of Law in Support of Motion for Summary Judgment on Failure to Warn Claims was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter.  Parties may access this filing through the Court's system.

*/s/ Andrea Roberts Pierson*