# EXHIBIT N

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 1

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF INDIANA

3                   INDIANAPOLIS DIVISION

4    In Re:  Cook Medical, Inc.,      )

     IVC Filters Marketing, Sales     )

5    Practices and Products           )

     Liability Litigation             )

6                                     )Case No.

                                      )1:14-ml-2570-RLY-TAB

7                                     )MDL No.  2570

     _____ )

8                                     )

                                      )

9    This Document Relates:           )

     Brand v. Cook Medical,           )

10   Inc., et al.                     )

     Case No. 1:14-cv-06018-RLY-TAB   )

11

12

13

14                VIDEOTAPED DEPOSITION OF

15                 MARK RHEUDASIL, M.D.

16                 February 28, 2018

17                     1:08 p.m.

18

19                 Emory Vein Center

20            5673 Peachtree Dunwoody Road

21                    Suite 625

22                 Atlanta, Georgia

23

24        Robin K. Ferrill, CCR-B-1936, RPR

25

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 62

1    A.  Correct.
2        MR. MARTIN:  Objection; form.
3    Q.  (By Ms. Pierson) And when you talked,
4 earlier, about perforation, in your experience, is
5 perforation a risk with all vena cava filters?
6    A.  Yes.  Moreso, again, with filters of this
7 particular design, this sort of umbrella design.  But
8 that's what the majority of retrievable filters look
9 like, so, yes.
10   Q.  When you say "this design," are you talking
11 about a conical filter?
12   A.  Yes.  Yes.
13   Q.  Dr. Rheudasil, I want to ask you about a
14 few other risks.
15       In 2009, at the time that you treated
16 Mrs. Brand, were you aware that migration or movement
17 embolization of parts of a filter was a risk?
18   A.  Well, yes.  Although if I was going to talk
19 to a patient about migration or movement, I would
20 have probably been more likely to talk about the
21 filter, itself.
22   Q.  Was that a risk known to you in 2009
23 relative to all vena cava filters?
24   A.  Yes.
25   Q.  In 2009, were you aware that there was a

Page 63

1 risk that a filter might not be able to be retrieved?
2    A.  Sure.
3    Q.  That it could become embedded?
4    A.  Yes.
5    Q.  And was that true of all vena cava filters
6 in your experience?  Again, not unique to the Celect.
7        MR. MARTIN:  Objection; form.
8    A.  I know of no complications unique to the
9 Celect filter.  Yes, they -- all retrievable filters
10 can be difficult or occasionally -- I don't want to
11 say impossible to retrieve, because there are some
12 advanced techniques where, probably, the majority can
13 be.  But all filters can be associated with very
14 difficult retrievability, such that the decision may
15 be made that it's safer to leave it in than to try to
16 take it out.
17   Q.  (By Ms. Pierson) Dr. Rheudasil, when you
18 talk about things like movement of the filter,
19 fracture of the filter, perforation of the filter as
20 risks common to all filters, how do you know that?
21   A.  Literature.
22   Q.  The fact that you were aware of those risks
23 in 2009, was that a product of your education and
24 training and experience with filters?
25       MR. MARTIN:  Objection; form.  Also

Page 64

1 objection; leading.
2    A.  Yes.
3    Q.  (By Ms. Pierson) In 2009, Dr. Rheudasil,
4 your knowledge of the risks of vena cava filters,
5 what was that based on?
6    A.  Training, experience.
7        MR. MARTIN:  Objection to form.
8    A.  Reading.
9    Q.  (By Ms. Pierson) If you don't mind, just
10 wait until he finishes before you object, so I get a
11 clean answer, I would appreciate that.
12       Dr. Rheudasil --
13       MR. MARTIN:  That objection, specifically,
14 was not limited to the Celect filter.
15       MS. PIERSON:  That's fine.
16   Q.  (By Ms. Pierson) Dr. Rheudasil, I want to
17 shift gears and talk about the placement of
18 Mrs. Brand's vena cava filter.  When you placed
19 Mrs. Brand's vena cava filter, in March of 2009, were
20 there any complications, to your knowledge?
21   A.  No.
22   Q.  Prior to placing it, did you or your staff
23 provide to Mrs. Brand an informed consent?
24   A.  Yes.
25       (Exhibit 7, Northside Hospital Informed

Page 65

1        Consent Form, Bates stamped Northside Hosp. 617,
2        marked for identification.)
3    Q.  (By Ms. Pierson) Just for our record,
4 Dr. Rheudasil, is Exhibit 7 a copy of the informed
5 consent that Mrs. Brand signed prior to her filter
6 placement by you?
7    A.  Yes.
8    Q.  Does the informed consent advise Mrs. Brand
9 that there are no guarantees to the procedure, that
10 there's a risk the patient may suffer an infection,
11 an allergic reaction, a severe loss of blood, loss
12 of -- sorry, loss of function of any limb or organ,
13 paralysis or partial paralysis, paraplegia or
14 quadraplegia, disfiguring scar, brain damage, cardiac
15 arrest or death?
16       MR. MARTIN:  Given the -- given the
17 standing objection, I'm not going to object to
18 all of the leading questions that if they occur
19 in this -- regarding this particular form, I'm
20 going to let them go.
21       But I want to reiterate that we have a
22 standing objection to leading questions now, so
23 I don't have to interrupt during this
24 questioning about -- about the form.
25       Just want to make that objection on the

17 (Pages 62 - 65)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 198

1 counsel for Mrs. Brand about how you would have
2 interpreted the instructions for use or what you
3 would have thought about the instructions for use, do
4 you agree that those are all matters of speculation
5 because you don't have a memory of having reviewed
6 those previously?
7      MR. MARTIN:  Objection; form.
8    A.  Yes.
9    Q.  (By Ms. Pierson) Do you agree that the
10 instructions for use that Mr. Martin showed you do,
11 in fact, include warnings about potential adverse
12 events?
13   A.  Yes.
14   Q.  The list is on page 5 of Exhibit 21, we can
15 look at it if you want to, but based on your review
16 of the instructions for use, are all of the potential
17 adverse events or risks described in the Celect
18 instruction for use things that were known to you in
19 March of 2009?
20   A.  I don't have it, but I'm sure that all of
21 the relevant risks are mentioned.  And I suspect,
22 frankly, that this IFU, in that regard, looks almost
23 the same as every IFU for every other filter in which
24 the risks are thought to be materially the same.
25   Q.  That's an important point, Dr. Rheudasil.

Page 199

1      At the time that you placed Mrs. Brand's
2 filter, in March of 2009, had you reviewed many
3 instructions for use for filters made by other
4 manufacturers?
5      MR. MARTIN:  Object to form.
6    A.  I'm sure.
7    Q.  (By Ms. Pierson) Did you believe that the
8 risks that were included in those instructions for
9 use were common, were risks common to all vena cava
10 filters?
11   A.  Yes.
12   Q.  We talked, earlier today, about the risks
13 of perforation, fracture, and filter embolization or
14 movement of the filter, part of the filter.  Were all
15 those risks known to you in March of 2009?
16   A.  Yes.
17   Q.  Even before you read the Celect IFU, did
18 you know those to be risks for any vena cava filter?
19   A.  Yes.
20   Q.  You were asked some questions about the
21 clinical studies portion of the instructions for use
22 and -- and you made the comment that all filters
23 perforate to some extent.  Explain to the jury,
24 Dr. Rheudasil, if that's true, why do you still use
25 filters for your patients?

Page 200

1      MR. MARTIN:  Objection; form.
2    A.  So that's my personal opinion.  I don't
3 want to quote literature that all filters perforate.
4 I believe, though, that in a subclinical way, meaning
5 no adverse consequences to the patient, the majority
6 of the filters, if not nearly all, in this general
7 conical design, probably, as they grab the filter
8 wall, probably have microscopic amounts of
9 perforation.
10      I think that is, for the most part,
11 irrelevant.  I think even most macroscopic, most
12 significant perforations are generally irrelevant.
13 They do, however, have an association with an
14 increased risk of fracture.  And I believe that the
15 more perforation that you see, the more risk there is
16 for a filter-related problem of some kind.
17      So that's where I was getting into the
18 details of the hypothetical question I was being
19 asked is, I think if you are -- if you are going to
20 ask questions about the risks associated with
21 perforation, those need to be very specific
22 questions, in my mind.
23      But -- so -- so if I saw on here that there
24 was a known two-millimeter perforation incidence on
25 this filter or any other conical filter, that would

Page 201

1 not surprise me and probably would not change my
2 choice of filter, that sort of a notion.
3      A clinically evident perforation rate,
4 patients having real problems related to the
5 perforations, an increased fracture risk because of
6 it, an increased migration risk because -- that, of
7 course, would be something I would want to know.
8    Q.  (By Ms. Pierson) I think I heard you say
9 earlier today that when you said "clinically
10 significant perforation rate," you are talking about
11 perforations that involve adjacent organs or
12 perforations that result in a fracture that becomes
13 clinically significant.
14   A.  I'm talking about perforations that have
15 consequent -- negative consequences for the patient.
16   Q.  Dr. Rheudasil, you were asked some
17 questions about the Tulip filter.  Have you used
18 both, Cook's Tulip filter and Cook's Celect filter?
19   A.  Yes.
20   Q.  In your hands, have both Cook filters
21 performed equally well for your patients?
22      MR. MARTIN:  Objection to form.
23   A.  I mean, yes.  Obviously, this is a one-off
24 case, if you will, in my personal experience.  And so
25 I have not had a filter, a Tulip filter do this

51 (Pages 198 - 201)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 214

1 your experience, your own personal experience as a
2 physician, what do you call it when your personal
3 experience is -- what do you call it when your own
4 personal experience as a physician leads you to
5 believe certain things? Lay aside the studies. Lay
6 aside anything but your personal experience. Let's
7 say this. You have been a doctor placing filters for
8 many, many years, right?
9     MS. PIERSON: Object to form.
10    Q. (By Mr. Martin) And -- and you have had
11 experience with respect to patients and their
12 response to the placement of the pulmonary embolus in
13 your placement of a filter with respect to the
14 development or nondevelopment of pulmonary embolus,
15 you've got your own personal experience, right?
16    A. (Witness nodded head affirmatively.)
17    MS. PIERSON: Same objection.
18    Q. (By Mr. Martin) Would your personal,
19 experience the experience that you had in your
20 practice, would that be considered anecdotal
21 experience?
22    MS. PIERSON: Object to form.
23    A. Depends on how you define -- it would be my
24 experience.
25    Q. (By Mr. Martin) Have you ever -- have you

Page 215

1 ever kept -- kept a study yourself, and I'm just
2 talking about even a simple as looking at the number
3 of patients that you have had -- that you have placed
4 filters in and looking at the results of whether or
5 not pulmonary emboli were prevented, have you ever
6 performed your own study on your own patients?
7    A. No.
8    Q. And have you ever performed a study on your
9 own patients as to the incidence of pulmonary embolus
10 after the placement of a Cook Celect filter?
11    A. No.
12    Q. Do you know -- and I understand -- well, I
13 think I know what your answer is going to be, but let
14 me ask this: Are you aware -- are you aware of any
15 article, scientific peer-reviewed article, and I
16 would just ask if you know of one that supports that
17 a Cook Celect filter reduces the risk of death from
18 pulmonary embolus?
19    MS. PIERSON: Object to form.
20    A. No.
21    Q. (By Mr. Martin) And you don't track all
22 your patients for the results of the placement of a
23 Cook Celect filter, would that be true?
24    A. True.
25    MR. MARTIN: Okay. Thank you, pass the

Page 216

1 witness.
2    MS. PIERSON: No questions. Thank you for
3 your time, Dr. Rheudasil.
4    THE VIDEOGRAPHER: The time is
5 approximately 5:44 p.m. This concludes today's
6 videotaped deposition for Dr. Mark Rheudasil.
7 We are off video record.
8    (WHEREUPON, proceedings were concluded at
9 5:44 p.m.)

Page 217

1        C E R T I F I C A T E
2 STATE OF GEORGIA  )
3             ) ss.:
4 FULTON COUNTY    )
5
6    I, Robin Ferrill, Certified Court Reporter
7 within the State of Georgia, do hereby certify:
8        That Mark Rheudasil, M.D., the witness
9 whose deposition is hereinbefore set forth, was duly
10 sworn by me and that such deposition is a true record
11 of the testimony given by such witness.
12        I further certify that I am not related to
13 any of the parties to this action by blood or
14 marriage; and that I am in no way interested in the
15 outcome of this matter.
16        IN WITNESS WHEREOF, I have hereunto set
17 my hand this 2nd day of March, 2018.
18
19
20    ROBIN K. FERRILL, RPR
21
22
23
24
25

55 (Pages 214 - 217)