# EXHIBIT P

Confidential - Subject to the Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF ILLINOIS
 2                    INDIANAPOLIS DIVISION

 3
       ------------------------------ )
 4     In Re:  COOK MEDICAL, INC.,    )  Case No.
       IVC FILTERS MARKETING,         )  1:14-ml-2570-
 5     SALES PRACTICES AND            )  RLY-TAB
       PRODUCTS LIABILITY LITIGATION  )
 6     ------------------------------ )  MDL No. 2570
       This Document Relates To:      )
 7                                    )
             1:14-cv-01875-RLY-TAB    )
 8            Arthur Gage             )
       ------------------------------ )
 9
10        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
11      VIDEOTAPED DEPOSITION OF MARK J. GOODWIN, M.D.
12
13                     January 11, 2017
14
15                   Advocate Heart Institute
                       Naperville, Illinois
16
17
18
19
20
21               GOLKOW TECHNOLOGIES, INC.
            877.370.3377 ph | 917.591.5672 fax
22                   deps@golkow.com
23
24
```

Confidential - Subject to the Protective Order

Page 98

1    A.   Yes.
2    Q.   How about infection?
3    A.   I've never seen one. I suppose it could
4  happen.
5    Q.   Okay. Do you agree that infection is a
6  known risk of any surgical procedure?
7    A.   Yes.
8    Q.   Including filter placement?
9    A.   Yes.
10   Q.   Again, not unique to Cook or the Tulip?
11   A.   Correct.
12   Q.   And death is a known risk of any filter
13 placement?
14   A.   Correct.
15   Q.   Again, not unique to Cook or to the
16 Tulip?
17   A.   Correct.
18   Q.   Dr. Goodwin, were all of these risks
19 that we've been talking about, were all of those
20 known risks to you in 2011?
21   A.   Yes.
22   Q.   And were they known risks within the
23 medical -- the relevant medical community who
24 places filters in April of 2011?

Page 99

1    A.   Yes.
2    Q.   I want to talk with you about Mr. Gage
3  and your care and treatment of Mr. Gage.
4         First, I think you told me earlier you
5  saw him only one day. That was on April the 27th
6  of 2011, correct?
7    A.   To the best of my recollection.
8    Q.   I heard you tell Mr. Gallagher earlier
9  that it is your practice to talk to a patient
10 before you place the filter about the filter
11 placement and the risks?
12   A.   Correct.
13   Q.   Okay. So, in April of 2011 what did you
14 tell a patient before you placed a filter in their
15 vena cava?
16   A.   As a general rule of thumb what I tell a
17 patient is that they've had a clot that went to
18 their lung. We're concerned about another clot
19 going and that they can't take blood thinners,
20 because most of these are put in because a person
21 can't take blood thinners.
22        We are going to put a small device in
23 that's sort of like a screen that allows blood to
24 flow through it but would trap any clots so the

Page 100

1  clots don't go to their lungs. That it is a
2  relatively safe procedure, probably less than 1 out
3  of 5,000 chance of any complication, the biggest
4  complication being bleeding from their groin.
5    Q.   Dr. Goodwin, when a patient can't take
6  blood thinners, is a filter the best option in your
7  view to prevent recurrent PE?
8    A.   If they've had a significant PE, yes.
9    Q.   When you tell the patient about the
10 risks of a filter or the placement of the filter,
11 where are they and where are you?
12   A.   I don't understand your question.
13   Q.   Well, does the patient come to your
14 office in advance of the procedure?
15   A.   No, these are -- most of -- the vast
16 majority of these patients are hospitalized
17 patients. Normally I'm down in the cath lab. So,
18 normally they have just been put on the table.
19 It's before they receive sedation. And I just go
20 in there and explain to them what it is we're going
21 to do and why they're there.
22   Q.   Does the patient have the opportunity to
23 ask you questions?
24   A.   Yes.

Page 101

1    Q.   In the case of Mr. Gage's procedure,
2  would you have explained all of these risks to him?
3    A.   What I said is what I typically say to
4  everybody. I wouldn't have gone through every risk
5  that you said because some of those are exceedingly
6  rare. So, I generally go through the major risks.
7  What I consider the biggest risk to be bleeding.
8    Q.   Mr. Gage has testified that he was not
9  aware that a filter was being placed in his body.
10 Is there any doubt in your mind that you
11 communicated clearly to Mr. Gage that you would be
12 placing a filter in his body?
13   A.   I have 100% certainty that I had talked
14 to him and because I do as part of my practice
15 every day. I have not looked at his medical
16 records, but I assume he signed an informed consent
17 as well, but I have never looked at his records.
18   Q.   Okay. After you finish the procedure
19 with Mrs. Gage -- Mr. Gage, did you talk to him
20 again?
21   A.   Just at the end of the procedure to say
22 that it went well, went successfully.
23        And I can't remember in him
24 specifically. Most patients I traditionally say,

Page 158

1  Q. When you were on the fluoroscope --
2  A. Yeah. Normal.
3  Q. No collapse?
4  A. No.
5  Q. Normal?
6  A. Normal.
7  Q. Okay.
8  MR. GALLAGHER: I said one and I did two.
9  THE WITNESS: Right there.
10              FURTHER EXAMINATION
11 BY MS. PIERSON:
12 Q. Do you have an independent recollection
13 of that as you sit here today?
14 A. Independent recollection of what?
15 Q. Of the condition of the inferior vena
16 cava beneath --
17 A. It would have been in my note if there
18 was anything abnormal.
19 Q. Let me finish my question.
20    Do you have an independent recollection
21 as you sit here today of the condition of
22 Mr. Gage's inferior vena cava beneath the renal
23 veins?
24 A. Best of my recollection, it was normal.

Page 159

1  Q. Okay. Thank you.
2              FURTHER EXAMINATION
3  BY MR. GALLAGHER:
4  Q. And it would have been in your report if
5  it were not?
6  MS. PIERSON: Object to form.
7  BY THE WITNESS:
8  A. Yes. If I saw something grossly
9  abnormal.
10 MR. GALLAGHER: Yeah.
11 MS. PIERSON: We're off. Thanks.
12 THE VIDEOGRAPHER: We are off the record at
13 1:25 p.m. This suspends the videotaped deposition
14 of Mark J. Goodwin, MD.
15    (WHEREUPON, at 1:25 p.m. the
16     videotaped deposition of MARK J.
17     GOODWIN, M.D. was adjourned
18     sine die.)

Page 160

1
2  I, CORINNE T. MARUT, C.S.R. No. 84-1968,
   Registered Professional Reporter and Certified
3  Shorthand Reporter, do hereby certify:
       That previous to the commencement of the
   examination of the witness, the witness was duly
4  sworn to testify the whole truth concerning the
   matters herein;
5      That the foregoing deposition transcript
   was reported stenographically by me, was thereafter
6  reduced to typewriting under my personal direction
   and constitutes a true record of the testimony
7  given and the proceedings had;
       That the said deposition was taken
8  before me at the time and place specified;
       That the reading and signing by the
9  witness of the deposition transcript was agreed
   upon as stated herein;
10     That I am not a relative or employee or
   attorney or counsel, nor a relative or employee of
11 such attorney or counsel for any of the parties
   hereto, nor interested directly or indirectly in
12 the outcome of this action.
13
14 _____
   CORINNE T. MARUT, Certified Reporter
15
   (The foregoing certification of this
16 transcript does not apply to any
   reproduction of the same by any means, unless under
17 the direct control and/or supervision of the
   certifying reporter.)

Page 161

1          INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections. You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7      After doing so, please sign the errata
8  sheet and date it.
9      You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12     It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the
15 deposition transcript by you. If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.