**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

IN RE: COOK MEDICAL, INC., IVC FILTERS
MARKETING, SALES PRACTICES AND
PRODUCT LIABILITY LITIGATION

Case No. 1:14-m1-2570-RLY-TAB
MDL No. 2570

This Document Relates to
PATSY MARTIN
Civil Case No.: 1:17-cv-01770-SEB-MPB

## AFFIDAVIT OF STUART L. GOLDENBERG

I, Stuart L. Goldenberg, being duly sworn, state as follows:

1.      Attached as Exhibit A is a true and correct copy of Exhibit 1 from the Deposition of
        Laura Plunkett, PHD, DABT, the Expert Report of Dr. Laura Plunkett.

2.      Attached as Exhibit B is a true and correct copy of Exhibit 9 from the Deposition of
        Derek D. Muehrcke, M.D., the Expert Report for Dr. Derek Muehrcke.

I declare under penalty of perjury under the laws of the United States that the foregoing is true
and correct.

**GOLDENBERG LAURICELLA, PLLC**

Dated: 3/17/2025

By: */s/ Stuart L. Goldenberg*
Stuart L. Goldenberg (MN# 158719)
800 LaSalle Avenue, Suite 2150
Minneapolis MN 55402
(612) 436-5027 (Tel)
(612) 367-8107 (Fax)
slgoldenberg@goldenberglaw.com

**ATTORNEY FOR PLAINTIFF**

# EXHIBIT A

**EXPERT REPORT OF**

**Laura M. Plunkett, Ph.D., DABT**

**December 13, 2019**

### I.        Training and Qualifications

1.        I am a pharmacologist, toxicologist, United States Food and Drug Administration (FDA) regulatory specialist, and principal of Integrative Biostrategies, LLC. Integrative Biostrategies, based in Houston, Texas, is a consulting firm that works at the interface of biological science, regulatory affairs, and business decisions to provide its clients with science-based solutions to issues associated with product development and stewardship. Before joining Integrative Biostrategies in 2001, I was head of the consulting firm Plunkett & Associates.

2.        I am board-certified as a Diplomate of the American Board of Toxicology. I am a member of several professional organizations and have authored or co-authored numerous scientific publications, including a book chapter on pharmacovigilance practices in the United States and another on the regulation of food additives (listed in Appendix A). I have over thirty years of experience in the areas of pharmacology and toxicology and have worked in both government and academic research. I have taught pharmacology and toxicology at the undergraduate and postgraduate levels.

3.        I received a B.S. degree in 1980 from the University of Georgia and a Ph.D. in pharmacology from the University of Georgia, College of Pharmacy in 1984. My doctoral research was focused in the area of cardiovascular pharmacology and specifically dealt with delineating neurochemical mechanisms responsible for the cardiac toxicity of digitalis glycosides.

4.        From June 1984 through August 1986, I was a Pharmacology Research Associate Training (PRAT) fellow at the National Institute of General Medical Sciences, Bethesda, Maryland. I worked in a neurosciences laboratory of the National Institute of Mental Health. My

research focused on the role of various brain neurochemical systems involved in the control of autonomic nervous system and cardiovascular function.

5.    From September 1986 to June 1989, I was an Assistant Professor of Pharmacology and Toxicology in the medical school at the University of Arkansas for Medical Sciences, Little Rock, Arkansas, where I performed research in the areas of neuropharmacology and toxicology as well as cardiovascular pharmacology and toxicology. I taught courses for both medical students and graduate students in pharmacology and toxicology, as well as neuroscience. During this time, I studied drugs of all classes. As a pharmacologist, my work was directed towards understanding the biologic mechanisms of drug actions, including both the therapeutic effect and the toxic effects of drugs.

6.    From December 1989 to August 1997, I worked for ENVIRON Corporation, first in the Arlington, Virginia office and then in the Houston, Texas office. I worked specifically within the health sciences group, and most of my projects dealt with issues surrounding products or processes regulated by the U.S. Food and Drug Administration (FDA). During my consulting career (ENVIRON, Plunkett & Associates, and Integrative Biostrategies), I worked on a variety of projects pertaining to the regulation of products by the FDA, including human drugs, veterinary drugs, biologics, medical devices, consumer products, dietary supplements, and foods. I have advised clients, including drug and medical device manufacturers, on regulatory issues and strategies for their products (relating to both Canadian and American regulations), designed preclinical and clinical studies for both efficacy and safety, advised these clients on issues related to statements regarding efficacy and warnings for their products based on the current labeling regulations, and generally acted as a regulatory affairs staff for small companies in their early stages of product development. A tool common to all of my work as a consultant is risk assessment, including many projects where risks and benefits of human medical products, including devices, are at issue.

7.    With respect to my experience that is directly relevant to the issues in this case, I have done a great deal of work on projects related to regulation of products by the FDA. Medical devices are just one type of FDA-regulated product that my training and experience has included.

2

Although devices are not drugs, the same basic principles of toxicology are applicable to assessing the safety of such devices. For example, toxicity testing for devices includes looking at biocompatibility with tissues, *i.e.,* the interaction with the materials of the device with biological tissues that may come in contact with the device. The materials used to make the device must be biocompatible if the device is to be in direct contact with human cells or tissues. The work I have been involved with in my professional career has included working directly with medical device manufacturers on issues related to development of Premarket Approval (PMA) submissions for Class III medical devices (implantable devices), development of 510(k) submissions for Class II medical devices, and post-market surveillance for safety concerns that arose after products had been marketed. I have drafted 510(k) applications and sections of PMA applications for medical devices under development. I have served as the regulatory affairs staff for a company involved in manufacturing and marketing a device for use in repair of human dura mater where work included developing procedures for complaint handling and adverse event reporting. I have performed safety assessments for companies involved in initial product development and provided strategic advice to companies in early stage development that were considering what type of medical device submission might be needed to comply with FDA regulations. Additionally, I have designed and analyzed safety data collected for devices marketed through both the 510(k) and PMA processes. I have knowledge and expertise related to changes in the FDA regulations over the years from the initial passage of the Federal Food Drug and Cosmetic Act (FFDCA) in 1938 up to the most current amendments to the FFDCA in 2017 (the Food and Drug Administration Reauthorization Act). This experience has included understanding the differences in regulatory standards over the decades and the standards used over time to assess the safety and efficacy of medical devices, as well as the standards for establishing "substantial equivalence", the standard applied in a 510(k) submission. This knowledge resulted from courses I have taken that were offered through the Food Drug and Law Institute (FDLI), experience while working at ENVIRON under the direction of former FDA employees, and experience gained while working as a consultant to the medical device industry since 1989.

8.    As described in my curriculum vitae (attached to this report as Appendix A), I have lectured to graduate students, law students and pharmacy students on FDA regulations as they apply to human drug products and medical devices, including lectures that have covered the

3

FDA approval process, labeling of products, and post-market reporting requirements for drug and medical device manufacturers.

9.     Throughout my career I have published dozens of articles which are listed in my curriculum vitae. In litigation, I have provided expert testimony and been qualified in both state and federal courts in the areas of pharmacology, pharmacokinetics, toxicology, risk assessment and FDA regulations (Appendix B). Also attached to this report as Appendix C is a list of all documents I have reviewed in this case, in addition to or including documents referred to herein.

## II.    Information Reviewed and Methodology Employed

10.     My work on this case has included a review of the following types of materials:

a) scientific literature relating to the safety and effectiveness of inferior vena cava (IVC) filters, the medical device at issue in this litigation;

b) FDA regulations and guidance materials relating to all aspects of a medical device from initial development, to clearance or approval, and marketing;

c)  scientific literature and other documents related to medical device performance and safety, as well as the strengths and weaknesses of current medical device regulatory systems, including documents authored by the Institute of Medicine (IOM) and the medical device industry Global Harmonization Task Force;

d)  labeling and other written materials related to IVC filters manufactured and marketed by Cook Medical and its related entities;

e)  information on IVC filter devices that can be found at the medical device section of the FDA website; and

f)  confidential documents produced during the litigation (including the deposition of the plaintiff Mr. David McDermitt dated November 6, 2019 and the depositions of Mr. McDermitt's treating doctors).

It should be noted that the sources listed above are ones commonly used in my work as a pharmacologist, toxicologist, and risk assessor. At the end of this report is attached a list of the published articles cited throughout this report. All opinions expressed in this report are expressed based on my training and experience and to a reasonable degree of scientific certainty.

11.     With respect to the methodology I employed while working on this case and in forming my opinions as outlined in this report, I have used standard methods that I apply in all of my work as a pharmacologist, toxicologist and risk assessor/regulatory consultant, both in litigation and non-litigation projects. One method I used is known in the industry as human health risk assessment. Scientists, like myself, who are involved in projects where the safety of medical devices is at issue routinely assess both benefits and risks using the risk assessment process. Principles of pharmacology and toxicology are at the scientific core of risk assessment (Faustman and Omenn, 2013). Risk assessment has been used for decades by a wide variety of governmental bodies. In 1983, the National Research Council (NRC) detailed the steps for risk assessment and described the methodology that is in use today as four basic steps: hazard identification, dose-response assessment, exposure analysis, and characterization of risks (NRC, 1983). Each of the steps in a risk assessment involves assembly of available data or information, evaluation of the body of data and information, and the exercise of scientific judgement to draw conclusions about potential risks. As a result, risk assessment is a standard tool used in the scientific community and has been used in the area of medical products to understand both the benefits and risks associated with a medical product, including devices. Therefore, I used risk assessment as a tool when examining the risks associated with the IVC filters manufactured and marketed by Cook that are at issue in this case.

12.     Another method I employed in this case, singularly and in conjunction with risk assessment methods, is known as a "weight-of-the-evidence" assessment.  A weight-of-the-evidence assessment involves evaluating individual studies and determining what the studies describe, when considered as a body of work.  This methodology is discussed as being used in specific parts of the FDA medical device regulations pertaining to safety assessment (*e.g.,* 21 CFR 860.7). In the current case, I examined relevant product labeling, internal company documents and FDA documents related to performance and safety of Cook IVC filters, the scientific literature related to the benefits and risks of such devices, as well as the FDA regulations that govern the development and marketing of medical devices.

13.    I was trained in the use of these methods as part of my undergraduate, graduate and postdoctoral work in pharmacology and toxicology, as well as while working as a consultant in human health risk assessment. Weight-of-the-evidence methodology, in particular, is used as part of regulatory decision making by regulatory and scientific bodies such as the FDA[1], the U.S. Environmental Protection Agency (EPA)[2], the U.S. Occupational Safety and Health Administration (OSHA)[3], the World Health Organization (WHO) and the International Agency for Research on Cancer (IARC)[4]. Similarly, risk assessment methods are used by regulators when performing safety assessments for medical devices[5] and drugs[6], where both risks and benefits are assessed and weighed.

## III.    Summary of Opinions

14.    All opinions offered in this report are expressed to a reasonable degree of scientific certainty based on my training and experience in pharmacology, toxicology, and FDA regulation of medical devices. I reserve the right to supplement these opinions if additional information becomes available for review. Based on my training and experience as a pharmacologist and toxicologist, my experience working in the area of medical device regulatory compliance, and my review and consideration of a variety of scientific literature, information from the FDA, and the documents produced to me for review I have formed the following opinions. The opinions listed below will then be discussed in detail in the sections of my report that follow.

- The FDA regulatory process that involves submission of a 510(k) does not result in FDA making an independent determination that the device that is the subject of the submission is safe and effective. It is not an approval decision but is a clearance decision.

---

[1] e.g., https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm506679.pdf;
http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm079257.pdf;
http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm074916.pdf;
http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm079240.pdf

[2] e.g., https://www.epa.gov/sites/production/files/2015-06/documents/acephate-103301_2015-06-29_txr0057153.pdf;
https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=23160&CFID=65932199&CFTOKEN=24176705;
https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=71993&CFID=65932266&CFTOKEN=97071893

[3] https://www.osha.gov/weightofevidence/woe_guidance.pdf

[4] http://www.who.int/phe/news/events/international_conference/Session2_DrStraif.pdf

[5] https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm506679.pdf

[6] https://www.fda.gov/downloads/forindustry/userfees/prescriptiondruguserfee/ucm329758.pdf

- The 510(k) clearance process is not a finding that a device is safe and effective based on independent risk-benefit evaluation; it is limited to whether a device is as safe and effective as the predicate devices and that determination is dependent on information supplied by the device manufacturer.

- In addition to the role that FDA plays in terms of marketing of medical devices, as a manufacturer of FDA-regulated medical devices, Cook Medical has a duty to ensure that the products they sell provide physicians and their patients with devices that are safe and effective, both before they are marketed and after they are marketed.

- In the case of IVC filters, including the Tulip® IVC filter manufactured by Cook Medical, there are several predicate devices meaning that the substantial equivalence determination is not as simple as thought. Questions can be raised about whether predicate devices are appropriate and without a predicate list that is accepted by FDA, a device would be required to seek approval through a PMA process.

- Key aspects of the FDA regulations that are important for patient safety include accurate and complete reporting of all data collected to support a medical device FDA submission (*i.e.,* a 510(k) application), establishing robust complaint handling and medical device reporting systems, and performing adequate postmarket surveillance for a device based on consideration of information from a company's own complaint database and medical device reporting files, information from clinical studies sponsored by a company after a device enters the marketplace, as well as information that is found in the publicly available scientific literature and the FDA's medical device adverse event database.

- Cook Medical has a duty to provide physicians with information about the safety of their devices and to provide physicians with accurate and complete information about the safety and efficacy of their medical device. This information can be provided to physicians both through medical device labeling and through direct contact with physicians in the form of communications commonly referred to as "Dear Doctor Letters.

- Labeling for medical devices, including the Tulip, cannot be false and misleading and must contain adequate directions for use. The Tulip IFU was inadequate. Moreover, Cook

Medical failed to follow regulatory guidelines regarding labeling, including the FDA Device Labeling Guidance (#G91-1).

- In this particular case, Cook Medical had a duty to provide physicians with information about the ongoing risks associated with the Tulip IVC filter, risks that are discovered postmarketing, such as lack of efficacy, perforation, migration, and fracture. Means of such communication of risks would be accomplished through Dear Doctor Letters.

- Cook failed to act like reasonable prudent manufacturer when it failed to conduct a pivotal study to look at safety and efficacy of the filter. As part of its 510(k) process for the retrievable Tulip IVC filter device, Cook was required to perform a small clinical study (40 patients) to provide evidence for retrievability of the device. This type of clinical study is not adequate to provide independent evidence of safety and efficacy of the device. Therefore, Cook Medical had not established the efficacy or the safety of its Tulip device before the device was cleared by FDA. Despite this knowledge, Cook failed to conduct human studies to establish the efficacy of its device.

- Cook knew the Cook Tulip IVC filter lacked evidence-based medicine to establish efficacy.

- At the time that Cook's Tulip IVC filter entered the market in October of 2003, it was well-established in the medical community that serious patient safety concerns were associated with use of IVC filter devices. These patient safety concerns included but were not limited to tilt, migration, penetration, perforation, fracture, inability to retrieve the device, and thrombogenesis. Yet, physicians were not aware of the rates of such adverse events and the fact that different IVC filter device designs had different inherent risks.

- Foreign device manufacturers, as well as domestic medical device companies, are responsible for complying with medical device regulations.

- Cook's Code of Conduct specifically states: "Patient safety always comes first!"[7] Yet, Cook failed to put patient safety first in the way that they marketed their IVC filters, in

---

[7] Cook MDL_2570_0001843

the way that they monitored safety of their devices, and by failing to inform physicians of new safety information that became available.

- Cook was responsible for medical device complaint handling and medical device reporting with respect to its IVC filter devices. Yet, evidence shows that the Cook employees responsible for these functions at the company lacked the training and experience to be able to identify serious patient health concerns and properly and timely report those concerns to the FDA in accordance with their regulatory obligations. The lack of adequate medical device complaint handling and medical device reporting put patient health at risk.

- Cook failed to comply with FDA regulations and guidelines consistent with actions of a responsible medical device manufacturer in a variety of ways that included gathering of accurate and complete clinical data to support its 510(k) submission for its first IVC filter device, performing adequate medical device complaint handling and postmarket surveillance, performing adequate medical device reporting, and providing physicians with accurate and timely safety information about their IVC filter devices.

- Evidence shows that Cook failed to adequately review, evaluate and investigate complaints involving its IVC filter devices, and also failed to perform adequate medical device reporting, including foreign complaints, as required by FDA regulations. These failures by Cook put patient health at risk.

- Cook improperly used data from the FDA's MAUDE database to market their IVC filter devices. As a result, Cook failed to provide physicians with accurate information about the safety of their devices.

- Evidence shows that the labeling for Cook's IVC filters did not adequately describe the risks associated with use of their specific IVC filter devices. As a result, physicians were not fully informed about the risks posed to their patients associated with use of Cook IVC filters.

- Cook knew most filters were not being retrieved and failed to keep doctors updated about significant adverse events and the importance of retrieval once the risk of recurring

9

pulmonary embolism had passed; the importance of retrieval within a timely manner was consistent with the FDA's safety communications related to IVC filter retrieval.

## IV.    Regulation of Medical Devices by FDA

15.    With passage of the Federal Food, Drug and Cosmetic Act (FFDCA) in 1938, medical devices were defined for the first time in terms of federal law. The 1938 law authorized the FDA to establish requirements for exporting unapproved devices and for determining whether devices may be adulterated or misbranded but failed to establish authority for premarket review or assessment of safety and effectiveness of devices. It was not until 1976 that the *Medical Device Amendments* to the FFDCA established rules and standards that all manufacturers would be required to apply to new devices, including the requirement to assess safety and effectiveness before marketing. Subsequent changes to medical device regulations have been spurred by amendments to the FFDCA including but not limited to the *Safe Medical Devices Act of 1990*, the *Food and Drug Administration Modernization Act of 1997*, the *Medical Device User Fee and Modernization Act of 2002*, the 2007 amendments to FFDCA, and the more recent *Food and Drug Administration Safety and Innovation Act of 2012*, *Medical Device User Fee Amendments of 2012*, the 2016 *21st Century Cures Act*, and the 2017 *Food and Drug Administration Reauthorization Act*. As a result of passage of these laws and amendments, medical devices are subject to regulatory oversight both before and after marketing. This mandated oversight applies to all aspects of medical device development, manufacturing and marketing.

16.    The FDA Center responsible for regulation of medical devices is known as the Center for Devices and Radiological Health, often referred to simply as CDRH.    FDA regulations pertaining to medical devices are set forth at 21 CFR, Subchapter H, Parts 800 through 895. The term "medical device" is defined by FDA as *"an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including a component part, or accessory which is a) recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them, b) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or c) intended to affect the structure or any*

10

*function of the body of man or other animals, and which does not achieve any of it's primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of any of its primary intended purposes."* Medical devices are classified into three classes by FDA: Class I, Class II or Class III. In general, the level of regulatory oversight by FDA increases from Class I to Class III devices. Thus, the first step for any company developing a medical device is to determine the classification of their device. The device at issue in this case is the Gunther Tulip™ Vena Cava Filter Set (hereafter referred to as simply the Tulip or the Gunther Tulip). Such devices are currently classified as Class II devices with Special Controls (21 CFR 870.3375)[8]. As described at 21 CFR 870.3375, these devices are: *"A cardiovascular intravascular filter is an implant that is placed in the inferior vena cava for the purpose of preventing pulmonary thromboemboli (blood clots generated in the lower limbs and broken loose into the blood stream) from flowing into the right side of the heart and the pulmonary circulation."*

17.     Regardless of the classification, most medical devices[9] are subject to the regulations that pertain to quality control as it applies to manufacturing, as well as labeling regulations and adverse event reporting and post-market surveillance. Under the FDA's regulatory scheme, just because a device is cleared for marketing through submission of a 510(k) to FDA, that does not mean that the company making and selling that device is no longer required to comply with regulations that related to other aspects of the life cycle of a device. All device manufacturers must register the facility where the device is being manufactured and list the device with FDA. An important distinction between devices in the three classes mentioned above is whether the device is subject to premarket notification. Most Class I devices are subject to General Controls and are exempt from premarket notification. Many Class II devices require clearance[10] through a Premarket Notification process known as the 510(k) process. Most Class

---

[8] The Tulip IVC filter was the subject of a traditional 510(k) with respect to the original submission in 1998. The Cook Celect IVC filter was the subject of a 510(k) with Special Controls.

[9] There are some exceptions that exist in terms of parts of the regulations that apply. For example, some Class I medical devices are exempt from the Good Manufacturing Practice (GMP) regulation (*i.e.,* hospital beds, patient scales, and a variety of other devices covered the *General Hospital and Personal Use* devices). Such exceptions do not apply in this case.

[10] "Clearance" is a different term than "approval" in the context of medical devices. "Cleared" devices are ones that FDA has determined to be substantially equivalent to (similar) another legally marketed device; while "approved" devices are those devices that the FDA has approved a premarket approval (PMA) application or a Humanitarian

III devices are subject to submission of a Premarket Approval Application (PMA) and require affirmative approval by FDA before the devices can be legally marketed. This means that in the case of a PMA submission, the FDA makes an independent determination that the medical device is safe and effective for its indicated use, while *in the case of a 510(k) submission the FDA does not make such a determination of safety and efficacy*. Instead the FDA simply evaluates whether the new device is substantially equivalent to a previously marketed device based on the manufacturer's representations that a change in device design does not impact safety or efficacy of the device.

18.     Regardless of the type of device being considered, a basic tenet of the FDA regulations governing the development and marketing of medical devices is that *a company that markets a device is responsible for assuring the safety and effectiveness of the device before it is placed on the market, and after the device is marketed (21 CFR 800 through 895)*.  For example, it is the device manufacturer that develops and submits the studies and data to support FDA decisions to approve a device for marketing (PMA process) or to clear a device for marketing (510(k) process). It is also the manufacturer that is responsible for ensuring that the devices are marketed in compliance with FDA regulations that relate to device design and quality as well as device post-market experience and reporting[11]. A company marketing a device must be aware of the potential risks posed by its device and then determine whether the potential risks are those that would affect use of the product by physicians and/or consumers.

19.     Medical device manufacturing regulations are based on a concept known as "quality by design" (Jennings and Kuehn, 2017). This concept is based on the premise that quality should be a key characteristic of any product and that testing alone cannot ensure quality for any product. Therefore, regulations pertain to the entire life cycle of a medical device from design to development, testing, manufacturing and commercialization. The medical device regulations require that manufacturers establish a "Quality Management System" consistent with the Quality Systems Regulation (QSR; 21 CFR 820). The QSR specifies a framework or

---

Device Exemption (HDE) application.
(https://www.fda.gov/medicaldevices/resourcesforyou/consumers/default.htm)

[11] https://www.fda.gov/medicaldevices/deviceregulationandguidance/overview/default.htm

structure within a company that allows for tracking of compliance with Current Good Manufacturing Practices (CGMPs) and supports safety and efficacy of a product. As stated in 21 CFR 820.1: *"Current good manufacturing practice (CGMP) requirements are set forth in this quality system regulation. The requirements in this part govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use. The requirements in this part are intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act (the act)."* Helpful guidance documents provided by FDA that are available include *Design Control Guidance for Medical Device Manufacturers* (March 1997)[12], *Final Rule on CGMP for Devices* (July 1996)[13], and *Quality System Information for Certain Premarket Application Reviews: Guidance for Industry and FDA Staff* (February 2003)[14]. The QSR includes requirements related to the methods used in, and the facilities and controls used for, designing, manufacturing, packaging, labeling, storing, installing, and servicing of medical devices intended for human use, *i.e.,* pre-production controls, as well as controls that apply to production of the devices. A similar international standard also exists (http://www.imdrf.org/docs/ghtf/final/sg1/technical-docs/ghtf-sg1-n41r9-2008-principles-safety-performance-050520.pdf).

20.     QSRs include the provision to implement corrective actions if during use of the device any issue arises that relates product failure to an aspect of device performance that can be corrected to prevent further failures, and ultimately to protect public health. The need to establish such procedures is specified at 21 CFR 820.100(a): *"Each manufacturer shall establish and maintain procedures for implementing corrective and preventive action."* Also known as a "CAPA" process, the purpose of a CAPA is 1) to collect and analyze information to identify actual and potential product and quality problems, 2) to investigate product and quality problems and take appropriate and effective corrective or preventive action, and 3) to verify or validate the effectiveness of corrective and preventive actions.

---

[12] https://www.fda.gov/downloads/MedicalDevices/.../ucm070642.pdf

[13] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/QualitySystemsRegulations/ucm230127.htm

[14] https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm089767.pdf

13

21.      Compliance with the QSRs includes the need to perform adequate complaint handling and timely adverse event investigation for medical devices (21 CFR 820.198). Complaint handling and investigation which can lead to adverse event reporting (21 CFR 803) is the cornerstone of information gathering that is necessary to fully comply with the duty of a manufacturer ***to ensure that its products are safe when used as indicated in actual practice*** (*i.e.*, real-world use). The qualifications of the individuals that are responsible for these aspects of the regulations also are an important consideration; individuals involved in complaint handling and investigation are required to have adequate training (21 CFR 803.20(c)(2)[15]). Aspects of the complaint handling and investigation requirements under the QSR include:

- Each manufacturer shall maintain complaint files (21 CFR 820.198(a)).

- Each manufacturer shall establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit (21 CFR 820.198(a)).

- Each manufacturer shall review and evaluate all complaints to determine whether an investigation is necessary (21 CFR 820.198(b)).

- When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the decision not to investigate (21 CFR 820.198(b)).

- Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated, unless such investigation has already been performed for a similar complaint and another investigation is not necessary (21 CFR 820.198(c)).

- Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified (21 CFR 820.198(d)).

---

[15] This section states: *"If you are a user facility, importer, or manufacturer, you do not have to report an adverse event if you have information that would lead **a person who is qualified to make a medical judgment** reasonably to conclude that a device did not cause or contribute to a death or serious injury, or that a malfunction would not be likely to cause or contribute to a death or serious injury if it were to recur. **Persons qualified to make a medical judgment include physicians, nurses, risk managers, and biomedical engineers**. You must keep in your MDR event files (described in 803.18) the information that the qualified person used to determine whether or not a device-related event was reportable."*

14

22.    Although Cook Medical has manufactured and marketed two different IVC filter devices, known as the Tulip and the Celect®, the Tulip system is the device that is at issue in the current case and will be the focus of this report. The Tulip system was the subject of a traditional 510(k) (K983823) for both permanent and retrievable indications. The 510(k) was filed with FDA in October 1998 and was determined to be "not substantially equivalent" (NSE; final decision August 10, 1999) due to lack of substantial equivalence to cited predicate devices in terms of the retrievable indication. Cook submitted a traditional 510(k) for permanent placement only on March 15, 2000 (K000855) and the permanent Tulip filter was cleared by FDA October 18, 2000.  After collection of clinical data on retrievability, Cook submitted a traditional 510(k) for the Tulip filter on August 5, 2003 and received clearance from FDA October 31, 2003. As 510(k) devices, all aspects of the FDA regulations related to quality systems, labeling and adverse event reporting apply.[16]

23.    A 510(k) device is one that was cleared based on a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, "substantially equivalent", to a "legally marketed device" (21 CFR 807.92(a)(3)). As stated at 21 CFR 807.92(a)(3), *"a legally marketed device to which a new device may be compared for a determination regarding substantial equivalence is a device that was legally marketed prior to May 28, 1976, or a device which has been reclassified from class III to class II or I (the predicate), or a device which has been found to be substantially equivalent through the 510(k) premarket notification process".* Thus, in a 510(k), applicants must compare their device to one or more similar legally marketed devices and make and support their substantial equivalence claims.[17] As described by the FDA, *"a device is substantially equivalent if, in comparison to a predicate it: has the same intended use as the predicate; and has the same technological characteristics as the predicate;  or has the same intended use as the predicate; and has different technological characteristics and does not raise different questions of safety and effectiveness; and the information submitted to FDA demonstrates that the device is at least as safe and*

---

[16] 21 CFR 880.5725;
https://www.fda.gov/medicaldevices/deviceregulationandguidance/overview/generalandspecialcontrols/default.htm.

[17] https://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomarketyourdevice/premarketsubmissions/premarketnotification510k/default.htm.

*effective as the legally marketed device."*[18] As FDA discusses, substantial equivalence does not mean the new and predicate devices are identical, but instead that the devices have been shown to be substantially equivalent *"with respect to intended use, design, energy used or delivered, materials, chemical composition, manufacturing process, performance, safety, effectiveness, labeling, biocompatibility, standards, and other characteristics, as applicable"*.[19]

24.    In the case of IVC filter devices, FDA had issued final guidance in November 1999[20] where they provided specific advice on what type of data should be included in 510(k) submissions for these devices. This guidance addressed IVC filters that were to be permanently implanted in the inferior vena cava, not IVC filters that were to be retrieved after placement. The guidance stated that clinical testing may needed as part of the 510(k) notification. Before that time, manufacturers could use the 510(k) process if they could identify a proper predicate device. As a result, before the Final Rule was implemented in May 2000 that formally reclassified IVC filters as Class II with Special Controls, manufacturers of IVC filter devices that had not been marketed before 1976 typically used a 510(k) process without the requirement to perform pre-market clinical testing. There was one IVC filter device that was not a pre-amendment device and was approved through a PMA process (Cook Medical's Bird's Nest Filter; approved in April 1989).  As FDA stated in 1999, the guidance was to be applied to devices intended for use for the prevention of recurrent pulmonary embolism when the devices were placed in the vena cava in very specific situations only. These included: 1) pulmonary thromboembolism when anticoagulants are contraindicated; 2) failure of anticoagulant therapy in thromboembolic diseases; 3) emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced; and 4) chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated. This guidance also stated that clinical testing may be needed to establish substantial equivalence of IVC devices: *"It is anticipated that human clinical investigations could be necessary in the development of a "new"*

---

[18] https://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomarketyourdevice/premarketsubmissions /premarketnotification510k/default.htm

[19] https://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomarketyourdevice/premarketsubmissions /premarketnotification510k/default.htm

[20] https://www.fda.gov/media/71789/download; this final guidance pre-dated the finalization of the IVC re-classification Final Rule (March 31, 2000) but was published after the publication of the Proposed Rule (March 15, 1999).

*vena cava filter to establish its equivalency to currently marketed filters. Such a study may also be necessary for a modified filter design. The need for such a study should be discussed with FDA prior to submission of an investigational device exemption (IDE) application."* It should be noted that Cook was required to perform a clinical study on its retrievable Tulip IVC filter to support the clearance of its 510(k) process.[21]

25.    Like human drug products, medical devices also require labeling to be included as part of the device when they are distributed and sold. The FFDCA defines "label" as a display of written, printed or graphic materials on the immediate container of an "article", including a medical device. The term "labeling" is broader, however, and refers to any written, printed or graphic material on the medical device, or that accompanies the device, and includes promotional and advertising materials as well as information found on websites that relate to the medical device[22]. As part of 510(k) review, companies submit draft labeling **although the draft labeling is not "approved" by the FDA** (Cooper, C.M. 2017). This means that unlike human prescription drugs, FDA does not prohibit distribution of medical device labeling for 510(k) devices before FDA has approved that labeling. Even with this limitation on FDA's oversight, medical device labeling is regulated in terms of what information must be included on the labeling as well as how that information is presented (see 21 CFR 801.1 through 801.18). The regulations concerning the content of device labeling require that the labeling contain *"adequate directions for use"* (see 21 CFR 801.5 and 801.109) and that a device's labeling not be false or misleading.  If a device's labeling does not satisfy such requirements, the device is deemed "misbranded" and may not be distributed in interstate commerce.[23] If the FDA determines that information in a device label is false or misleading, the company must change the language of the label.  Thus, labeling of devices is regulated by the FDA and is important for conveying to physicians the information that will allow the device to be used safely and for its intended purpose. An example of statements that would be considered false or misleading would include

---

[21] See CookMDL2570_0183121; CookMDL2570_0183258; CookMDL2570_0180213; CookMDL2570_0182801.
[22] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/DeviceLabeling/default.htm

[23] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/GeneralandSpecialControls/ucm055910.htm#misbranding;
https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm095308.pdf

statements comparing different devices that were not an accurate reflection of the available safety or efficacy information.

26.     It should be noted that in addition to the FDA regulations related to medical device labeling, there are several other relevant documents that describe medical device labeling. The first is known as *"The Blue Book Memorandum"*[24] that was published in 1991. As stated in the document: *"The primary purpose of this memorandum is to formalize guidance to ODE [Office of Device Evaluation] reviewers concerning their review of labeling in device marketing submissions especially premarket approval applications (PhAs). This guidance is intended to ensure the adequacy of, and consistency in, device labeling information. **The guidance is also intended for industry use in preparing device labeling.**"* [text or **emphasis** added] The second relevant medical device labeling guidance document was published in 2005 by the Global Harmonization Task Force (GHTF).[25] As described in the document: *"The document was produced by the Global Harmonization Task Force, a voluntary international group of representatives from medical device regulatory authorities and trade associations from Europe, the United States of America (USA), Canada, Japan and Australia. The document is intended to provide non-binding guidance to regulatory authorities for use in the regulation of medical devices and has been subject to consultation throughout its development."* Both of these documents are important to consider when evaluating the adequacy of the Cook IVC filter labeling.

27.     The FDA database for device postmarket surveillance reporting is known as the Manufacturer and User Facility Device Experience database, or MAUDE.[26] The MAUDE database houses medical device reports submitted to the FDA by mandatory reporters (manufacturers, importers and device user facilities) and voluntary reporters such as health care professionals, patients and consumers. As mentioned above, FDA regulations require that

---

[24] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/device-labeling-guidance-g91-1-blue-book-memo

[25] http://www.imdrf.org/docs/ghtf/final/sg1/technical-docs/ghtf-sg1-n43-2005-labelling-medical-devices-050603.pdf; http://www.imdrf.org/docs/ghtf/archived/sg1/technical-docs/ghtf-sg1-n70-2011-label-instruction-use-medical-devices-110916.pdf

[26] The FDA drug postmarket surveillance database is known now as "FAERS", the FDA's Adverse Event Reporting System. This database contains both mandatory and voluntary reports of adverse health experiences associated with use of human drugs and biologics.

manufacturers keep track of adverse event reports for their devices and investigate the adverse events that are submitted (21 CFR 803 and 820). The FDA regulations require that medical device manufacturers submit the following information concerning adverse events and medical devices (21 CFR 803.10(c)):

"*If you are a manufacturer, you must submit reports (described in subpart E of this part) to us, as follows: (1) Submit reports of individual adverse events no later than 30 calendar days after the day that you become aware of a reportable death, serious injury, or malfunction. (2) Submit reports of individual adverse events no later than 5 work days after the day that you become aware of: (i) A reportable event that requires remedial action to prevent an unreasonable risk of substantial harm to the public health or (ii) A reportable event for which we made a written request. (3) Submit supplemental reports if you obtain information that you did not submit in an initial report.*"

Thus, there are requirements that relate to what is to be reported to the FDA and when it is to be reported (*e.g.,* 5-day reports versus 30-day reports). 21 CFR 803, subpart E, a separate regulation, gives additional details on medical device reporting for manufacturers (21 CFR 803.50). The FDA states:

"*(a) If you are a manufacturer, you must report to us [FDA] the information required by 803.52 in accordance with the requirements of 803.12(a), no later than 30 calendar days after the day that you receive or otherwise become aware of information, from any source, that reasonably suggests that a device that you market: (1) May have caused or contributed to a death or serious injury or (2) Has malfunctioned and this device or a similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur.*

*(b) What information does FDA consider "reasonably known" to me? (1) You must submit all information required in this subpart E that is reasonably known to you. We consider the following information to be reasonably known to you: (i) Any information that you can obtain by contacting a user facility, importer, or other initial reporter; (ii) Any information in your possession; or (iii) Any information that you can obtain by analysis, testing, or other evaluation of the device. (2) You are responsible for obtaining and submitting to us information that is incomplete or missing from reports submitted by user facilities, importers, and other initial reporters. (3) You are also responsible for*

19

*conducting an investigation of each event and evaluating the cause of the event. If you cannot submit complete information on a report, you must provide a statement explaining why this information was incomplete and the steps you took to obtain the information. If you later obtain any required information that was not available at the time you filed your initial report, you must submit this information in a supplemental report under 803.56 in accordance with the requirements of 803.12(a)."*

In 21 CFR 803.53, the FDA specifically states when a 5-day report must be submitted:

*"You must submit a 5-day report to us with the information required by 803.52 in accordance with the requirements of 803.12(a) no later than 5 work days after the day that you become aware that: (a) An MDR reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health. You may become aware of the need for remedial action from any information, including any trend analysis or (b) We have made a written request for the submission of a 5-day report. If you receive such a written request from us, you must submit, without further requests, a 5-day report for all subsequent events of the same nature that involve substantially similar devices for the time period specified in the written request. We may extend the time period stated in the original written request if we determine it is in the interest of the public health."* This requirement went into effect in 1996 with the amendments to the FFDCA (FDA, 1997).

Finally, with respect to medical device reporting, the FDA regulations specify that a tool to be used in order to assess complaints is trend analyses of individual reports (21 CFR 803.3) since FDA defines "become aware" as follows:

*"If you are a manufacturer, **you are considered to have become aware of an event** when any of your employees becomes aware of a reportable event that is required to be reported within 30 calendar days or that is required to be reported within 5 work days because we had requested reports in accordance with 803.53(b). You are also considered to have become aware of an event when any of your employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, **including any trend analysis**, that a reportable*

> *MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health." [**emphasis** added]*

Like the issue with medical device labeling, the GHTF published documents describing industry standards for postmarket surveillance.[27]

28.    It is well-established that only a very small number of adverse events are reported to manufacturers and/or the FDA relative to the actual number of adverse events which occur in the field. This problem is referred to as under-reporting. Although the exact amount of under-reporting for medical devices is unknown, an analysis of the issue by the FDA concluded that the extent of under-reporting for devices, with as few as 1 in 100 medical device adverse events reported, a number that is similar to the level of under-reporting for drugs (CDRH, 2006). Based on the FDA's conclusion that the level of medical device adverse event under-reporting is similar to the level seen with drugs, data relating to drug adverse reporting can be considered. It is well-understood that significant under-reporting of drug adverse events occurs (*e.g.,* Ahmad, S.R. 2003; Goldman, S.A. 1998; Hazell, L. and S. Shakir. 2006; Murphy, S. and R. Roberts, 2006; Rodriguez, E.M. *et al.* 2001). Review of this literature shows that on average, less than 1% of actual adverse events experienced are reported. Thus, the number of reports either reported to a company or the FDA is not an indicator of the likelihood of any particular adverse event occurring in medical practice. The issue of medical device under-reporting is particularly of importance with respect to understanding how medical device companies represent the adverse event experience for any particular medical device.

29.    In 2010, an article in the *New England Journal of Medicine* was published that publicly described the limitations of the FDA regulatory system for medical devices (Cohen, 2010). This paper is mentioned here because it discusses the limitations of the FDA regulatory process for devices that are inherent in the system. As the author discusses, the limitations on medical device regulatory oversight are not appreciated by many physicians and patients. As discussed in the paper:

---

[27] http://www.imdrf.org/docs/ghtf/final/sg1/technical-docs/ghtf-sg1-n78-2012-conformity-assessment-medical-devices-121102.pdf; http://www.imdrf.org/docs/ghtf/final/sg5/technical-docs/ghtf-sg5-n2r8-2007-clinical-evaluation-070501.pdf

"Criticisms of the FDA's scrutiny of devices center on two major claims: that the 510(k) exemption is used too freely, and that the full PMA review is not stringent enough. For instance, the FDA argued last year that under the previous administration, the 510(k) process was used inappropriately to allow the Menaflex knee implant to be marketed. And the Government Accountability Office reported that in fiscal years 2003 through 2007, more class III devices were given a 510(k) clearance than went through an original PMA process (see graph). These experiences are among the reasons why the Institute of Medicine [IOM] has convened a committee to review the 510(k) exemption."

Clearly, the regulatory process for medical devices that existed at the time the Tulip IVC filter was cleared were being questioned. The Institute of Medicine (IOM) report itself discussed that use of the "substantial equivalence" standard and the 510(k) process from device clearance by FDA (IOM, 2011). Experts that participated in the IOM review discussed that the substantial equivalence standard fails to provide assurance that devices entering the market are safe and effective because, in many cases, the predicate devices were never reviewed by FDA for safety and effectiveness (IOM, 2011).

30.    In the 2011 IOM report, experts also found that the postmarket surveillance programs at FDA and within private companies had "substantial weaknesses" (IOM, 2011) Further, "inadequate postmarketing surveillance systems, both those in the FDA and those that are privately funded, and the resulting lack of useful, consistent, and reliable data make it impossible to draw confident conclusions about the performance of medical devices that are now on the market." Finally, in a 2009 report by the Office of the Inspector General (OIG, 2009), the OIG concluded: 1) FDA received twice as many adverse event reports for medical devices in 2007 than in 2003; however, some types of reports decreased; 2) manufacturers submitted most adverse event reports on time, but many 5-day manufacturer and user facility reports were late; and 3) CDRH does not use adverse event reports in a systematic manner to detect and address safety concerns about medical devices. Therefore, relying on the existing MAUDE medical device postmarket surveillance system to provide an accurate assessment of the number of adverse events associated with use of a device is not possible. This conclusion is supported by recent scientific studies related to medical device reporting (*e.g.,* Resnic and Normand, 2012; Deso *et al.* 2016; Gagliardi *et al.* 2018). This is why rigorous complaint handling, investigation,

22

and MDR systems need to be in place within companies in order to ensure that ongoing surveillance activities identify patient safety concerns in a timely manner, without waiting for FDA to initiate actions based on analyses of their MAUDE database. Additionally, FDA has authority to require manufacturers of Class II and Class III medical devices to perform specific postmarket surveillance activities when *"[f]ailure of the device would be reasonably likely to have serious adverse health consequences."* (21 CFR 822.1; see also 21 CFR 822 generally).

31.     An important issue raised by the authors of the 2011 IOM report pertained specifically to IVC filters (see page 136 of IOM, 2011). In the 2011 report, the experts evaluated whether there was a relationship among patient safety data that might appear in the scientific literature, medical device reporting for those same devices, and whether the safety concerns were linked to device recalls. As the report stated for the case study of cardiovascular intravascular filters (IVC devices such as the Tulip device):

> *"There have been reports of device malfunctions and adverse events related to permanent and temporary (retrievable) intravascular filters (McCowan et al., 1992).* ***Data in multiple reports in the scientific literature make a strong case for believing that the adverse-event and device malfunction rates of permanent and temporary filters as cataloged by the FDA understate actual rates*** *(Dorfman, 1990; FDA, 1999a, 2010g; Nicholson et al., 2010). In August 2010, the FDA issued a medical alert noting that retrievable inferior vena cava filters could move or break and perhaps cause serious problems (FDA, 2010e). The* ***FDA cited malfunction rates that are much lower than rates cited in nearly contemporaneous reports in the scientific literature*** *(Dorfman, 1992; FDA, 2010g; Nicholson et al., 2010). No recall has been issued."*

Regardless of whether recalls result from such serious patient safety concerns that are raised by adverse event reporting, the fact that FDA databases fail to capture the rates of patient injuries that may actually be occurring is a serious patient safety issue and reinforces the need for medical device companies to be diligent in their complaint handling and medical device reporting and trend analysis activities.

32.     As eluded to by the IOM report, another aspect of medical device regulation relevant to device safety is device recalls. In the context of FDA regulations, two actions that

involve removal of products from the market include "market withdrawal" and device "recall" (see 21 CFR 7; 21 CFR 806; 21 CFR 810). Market withdrawal is removal or correction of a distributed device that involves an issue that would not be subject to legal action by FDA, or one that does not involve a violation of the regulations.[28] Examples include stock rotation, equipment adjustments, and repairs. In contrast, recall is removal or correction of a marketed product that the FDA considers to be in violation of the law and could lead to legal action, such as a product seizure. Recall is not a market withdrawal or a stock recovery action.  Most recalls are voluntary actions taken by a manufacturer. However, in order to issue a recall, the manufacturer must believe that a violation of law exists,[29] and the FDA is to be notified whenever such recalls are initiated. Recalls are classified by FDA with numerical designations to indicate the relative health hazard presented by the product subject to recall.

33.    A discussion of the difference in the levels of recalls can be found at the FDA website.[30] A Class I recall is one where there is a reasonable probability that the use of, or exposure to, the product will cause serious adverse health consequences or death. A Class II recall is one where use of, or exposure to, the product may cause temporary or medically reversible adverse health consequences, or where the probability of serious adverse health consequences is remote. A Class III recall is one where use of, or exposure to, the product is not likely to cause adverse health consequences.[31] In a 2011 publication, the issue of medical device recalls was discussed in terms of whether there was a relationship between medical device recalls and the level of premarket scrutiny a medical device received (Zuckerman *et al.* 2011). The authors looked at FDA's list of device recalls from 2005 through 2009 and compared that list with the way the recalled devices had been reviewed by FDA (PMA submission, 510(k) submission or exempt from FDA review). The authors reported that *"most medical devices that were recalled for life-threatening or very serious hazards were originally cleared for market using the less stringent 510(k) process or were considered so low risk that they were exempt*

---

[28] https://www.fda.gov/medicaldevices/deviceregulationandguidance/postmarketrequirements/recallscorrectionsandremovals/default.htm

[29] https://www.fda.gov/medicaldevices/deviceregulationandguidance/postmarketrequirements/recallscorrectionsandremovals/default.htm

[30] https://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm329946.htm

[31] https://www.fda.gov/Safety/Recalls/IndustryGuidance/ucm129259.htm

*from review (78%)"*. The authors concluded that their findings suggested a need to reform the regulatory process for medical devices in order to ensure they are safe.

34.     Regulatory actions related to medical device safety issues can result in the issuance of "Warnings Letters" by FDA. As discussed by FDA in its Regulatory Procedures Manual[32]: *"It is the Food and Drug Administration's (FDA's) practice to give individuals and firms an opportunity to take voluntary and prompt corrective action before it initiates an enforcement action. Warning Letters are issued to achieve voluntary compliance and to establish prior notice. The use of Warning Letters and the prior notice policy are based on the expectation that most individuals and firms will voluntarily comply with the law."*  Warning Letters are often issued after FDA compliance inspections of manufacturer facilities when inspectors have identified situations where the violations are of regulatory significance, where FDA defines significant violations or those violations that may lead to enforcement action if not promptly and adequately corrected.  Therefore, issuance of Warning Letters are important actions by FDA as they are providing a manufacturer with notice of corrections or changes that need to be made by the company.

35.     A tool that is available for providing important patient safety information directly to healthcare systems and physicians about medical devices is a written communication known as a "Dear Doctor" letter or "Dear Healthcare Provider" letter. FDA has recognized the usefulness of such communications related to all types of medical products, including medical devices.[33] Therefore, manufacturers have the ability, just as drug companies do, to communicate directly with physicians and hospitals that use their medical devices when there is important patient safety information to convey, as long as the information relates to a use of the device consistent with the FDA-approved labeling. FDA also has the authority to communicate directly with the public about medical device safety issues it identifies. This means that in cases where a manufacturer of a medical device identifies a patient safety concern that has not been discussed fully in the devices label, or identifies a new type of safety concern related to a labeled use of the

---

[32] https://www.fda.gov/downloads/ICECI/ComplianceManuals/RegulatoryProceduresManual/UCM074330.pdf

[33] https://www.fda.gov/media/102575/download

device, a company always has the ability to directly inform physicians without waiting for FDA to take action.

36.    As summarized above, the FDA regulations governing medical devices such as the Tulip IVC filter systems at issue in this case, codify the laws pertaining to such products. The mission of the FDA, through implementation of their regulations, is to ensure that public health is protected.[34] Therefore, the FDA regulations applicable to devices exist to protect patients. Yet, it is the responsibility of the device manufacturers such as Cook to ensure that the products they sell are safe and effective for use once they are cleared or approved by FDA.[35]  As stated by the FDA, *"Medical device manufacturers as well as other firms involved in the distribution of devices must follow certain requirements and regulations **once devices are on the market**. These include such things as tracking systems, **reporting of device malfunctions, serious injuries or deaths**, and registering the establishments where devices are produced or distributed."* *[emphasis added]* Thus, manufacturer compliance with the FDA regulations **after a product is marketed** is an integral part of the protection of public health. As discussed above, key parts of the medical device regulations that must be complied with include the QSRs (21 CFR Part 820), labeling regulations (21 CFR Part 801), and the medical device reporting regulations (21 CFR 803). In other words, a company marketing a medical device must continually update the FDA and physicians as new information becomes available that impacts the safety profile of that device.

37.    As already mentioned with respect to a 510(k) submission, clearance of a device under this regulatory pathway does not mean that FDA has made an independent determination that a device is safe and effective.[36] Instead, the FDA describes the clearance standard as follows: "***A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device (21 CFR 807.92(a)(3)) that is not subject to PMA. Submitters must compare***

---

[34] https://www.fda.gov/aboutfda/centersoffices/officeofmedicalproductsandtobacco/cdrh/ucm300639.htm

[35] https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/default.htm.

[36]
https://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomarketyourdevice/premarketsubmissions/premarketnotification510k/default.htm

*their device to one or more similar legally marketed devices and make and support their substantial equivalence claims." [emphasis added]* This description is in contrast to FDA decisions made around PMA submissions. Where FDA has pointed out: *"Unlike premarket notification, **PMA approval is to be based on a determination by FDA that the PMA contains sufficient valid scientific evidence that provides reasonable assurance that the device is safe and effective for its intended use or uses**. [emphasis added]*

## V.     What Is the Tulip IVC Filter System?

38.     On October 28, 1998, Cook submitted a 510(k) application for the Tulip for prevention of recurrent pulmonary embolism in specified circumstances (CookMDL2570_0061818). After clearance was denied, Cook resubmitted a 510(k) application, seeking clearance "for the permanent placement indication only". The Tulip was cleared for permanent placement on October 18, 2000 based on the indications for use of prevention of recurrent pulmonary embolism (PE) via placement in the vena cava in situations that included pulmonary  thromboembolism when anti-coagulant therapy is contra-indicated, failure of anti-coagulant therapy in thromboembolic diseases, emergency treatment following massive PE where anticipated benefits of conventional therapy are reduced, and chronic, recurrent PE where anti-coagulant therapy has failed or is contra-indicated.

39.     After collection of clinical data on retrievability in a small number of patients (see the 510(k) documents), Cook submitted a traditional 510(k) for the Tulip filter on August 5, 2003 and received clearance from FDA October 31, 2003. It is important to note that the clinical study on retrievability was limited to only 41 patients and the retrievability time was on average 11.4 days (range 2 to 20 days). Therefore, the limited clinical data only provided support for a short window of retrievability.  There are additional problems with this study to consider.  For example, if the filter was not removed, then the subject's participation in the study ended at that time, and no 3-month follow-up exam was required. Investigators had difficulties with retrievals (CookMDL2570_0176942; CookMDL2570_0176948), and it was thought the study "looked ugly" (CookMDL2570_0183415). Additionally, data from the study underscored concerns about tilt of the device (CookMDL2570_0178489); upon placement, nine filters (21.4%) tilted immediately. Two of the nine met the definition of significant filter tilting (> 20 degrees),

27

while the others exhibited a tilt of < 20 degrees. Of the 41 filters placed, a total of 26 filters were retrieved (CookMDL2570_0182596).

40.    Moreover, evidence in the case shows that Cook Medical intended to perform a human clinical study called a "pivotal study" to examine efficacy of its device but decided against it when they learned Bard had attempted 510(k) clearance. After abandoning the idea to perform a pivotal efficacy study before filing of the Tulip 510(k), Cook never performed such a study, or any efficacy study, on the Tulip IVC filter, or any of its IVC filters. A timeline shows that Cook decided not to do a "pivotal" study on the safety of Tulip retrievability before the "pilot" study was even over (CookMDL2570_0183121); the document states *"It was decided to try sending in a 510(k) for retrieval indication using only our pilot study and other published literature. This was based on the fact that Bard submitted a 510(k) in April for the Recovery removable filter and expects to receive clearance late this year."* In its letter of June 4, 2003 to FDA, Cook said, *"Our results reveal that no significant adverse events have been associated with retrieval of the filter. Cook believes that the completed study results in combination with current scientific peer-reviewed published clinical data may offer sufficient evidence of the safety of the retrieval procedure ... It would appear that an additional clinical study would provide no new information and is therefore not warranted."* (CookMDL2570_0183258). But in a memo dated September 27, 2002 to Ken Hawkins (Cook President) and April Lavender from Lisa Webb, Ms. Webb said *"It has been decided that Cook will not conduct a pivotal study on this device [the GT VC Filter & Retrieval Set, following the 40-patient pilot study]. Instead, the company will move forward with the Gunther PTX project."* (Gunther PTX Project (Paclitaxel Coated Retrievable Filter; CookMDL2570_0180213). Evidence shows that Cook made the decision to abandon the idea of performing a pivotal study before the pilot study was completed, and before reporting the results of the pilot study to FDA.

41.    The "predicate" devices to which Cook stated the Tulip was substantially equivalent were the stainless-steel Greenfield Vena Cava Filter and the Vena Tech filters. A "predicate" device is discussed by FDA as follows[37]:

> *"A Premarket Notification [510(k)] is a premarketing submission made to FDA to demonstrate that the device to be marketed is safe and effective by proving substantial equivalence (SE) to **a legally marketed device (predicate device)** that is not subject to Premarket Approval (PMA). Submitters must compare their 510(k) device to a similar legally marketed U.S. devices(s). **A device recently cleared under 510(k) is usually used as a predicate device.** However, any legally U.S. marketed device may be used as a predicate. This includes: a device that has been cleared through the 510(k) process; a device that was legally marketed prior to May 28, 1976 (preamendments device); a device that was originally on the U.S. market as a Class III device (premarket Approval) and later down-classified to Class II or I; or a 510(k) exempt device. The legally marketed device(s) to which equivalence is drawn is known as the predicate device(s)."* **[emphasis added]**

42.    As a consequence of being subject to clearance through a 510(k), Cook was required to comply with FDA regulations including those governing premarket clearance (21 CFR 880.5440), QSRs (21 CFR 820) and medical device reporting (21 CFR 803). Evidence in this case (depositions of the treating doctors in this case) clearly shows that none of the doctors knew the difference between FDA approval for safety and efficacy and FDA clearance. The important distinction between the level of clinical evidence needed to support clearance as opposed to approval is the lack of independent safety and efficacy evaluation of a device. This difference in the level of clinical evidence gathered on the Tulip IVC filter, which was cleared and not approved, was never communicated to doctors.

43.    At issue in the current case is the fact that the Tulip IVC filter has been linked to product failures that include endothelialization, tilt, perforation, perforation and bleed, migration of the device, caval thrombosis, and occlusion. Such product failures are a serious patient health

---

[37]

www.fda.gov/MedicalDevices/DeviceRegulationsandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm134571.htm

risk. At the time the Tulip IVC filter entered the market, it was well-established in the scientific literature that failure modes for IVC devices included lack of retrievability, migration of the device from the site of placement in the vena cava, and perforation of the vena cava (*e.g.*, Messmer and Greenfield 1985; al Zahrani, 1985; Nitatori *et al.* 1991; Millward *et al.* 1991; Becker *et al.* 1992; Ferris *et al.* 1993; Millward *et al.* 1994; Smith, 1994; Young, 1995; Matchett *et al.* 1998). Since 2000, the evidence for serious patient safety concerns being linked to use of IVC filters, including the Tulip devices, has grown (*e.g.,* Owens et al. 2009; Angel *et al.* 2011; Kuo *et al.* 2011; Wang *et al.* 2011; Iqbal *et al.* 2012; Stavraopoulos *et al.* 2015; Chauhan *et al.* 2016; Tsui *et al.* 2016; Ramaswamy *et al.* 2018). Patients being treated for prevention of recurrent pulmonary embolism who receive IVC filters suffer more complications than patients who do not receive IVC filters (Decousus *et al.* 1998; Mismetti *et al.* 2015), not only as a result of a higher rate of deep venous thrombosis but also due to the unique individual filter complications inherent to design. Specifically, the Cook conical-shaped IVC filters have been shown to have an 86% perforation rate, and all Cook conical-shaped IVC filters in place for more than 71 days after implantation demonstrated perforation of the inferior vena cava wall (Durack *et al.* 2012). The literature indicates there was little difference in the perforation rate experienced in patients implanted with the Cook Tulip IVC filters and the Cook Celect IVC filters. In the same paper, physicians reported tilt was seen with up to 40% of Cook Tulip IVC filters, with migration occurring at a rate of 12.5% (Durack *et al.* 2012). Most conical shaped filters, such as the Tulip filter, cause perforations at a rate higher than other IVC filter designs (Deso *et al.* 2016). In fact, the Tulip filter perforation rates have been described as "strikingly high" (Durack *et al.* 2012). Perforations of the blood vessel wall by an IVC filter device are problematic as the protruding parts may interfere with surrounding organs, injure organ tissue, and lead to other potentially serious complications (*e.g.,* infection, bleeding, IVC thrombosis and even death). As has been discussed in the literature, the longer a filter remains in place, the greater the extent of perforation, and the less likely it is that the device will be able to be removed (Durack *et al.* 2012). Had Cook performed studies on these adverse events before and after Mr. McDermitt's insertion, this information would have been available to doctors, information that, if available, should have been communicated to them.

44.    Evidence in this case shows that Cook Medical knew or should have known that tilt was a specific patient safety concern with the Tulip device (*e.g.,* CookMDL2570_0021600; MDL2570_0620496; MDL2570_0431674; MDL2570_0382201; MDL2570_0181797). These documents include the IDE Pilot Study (CookMDL2570_0021600) where the issue of tilt was discussed; an e-mail from Cook employee Rita Hardin (April 23, 2008) where a patient has experienced pain and a Tulip device was tilted (MDL2570_0620496); adverse events that were reported to the FDA (2004-2007; MDL2570_0431674); a document discussing how to prevent tilt in the Cook Tulip and Celect filters from November 2007 (MDL2570_0382201); and a series of e-mails from June 2006 where Cook employees discuss a label change for the Tulip regarding the issue of tilt because the IFU fails to mention the issue, as well as the when placing a filter to try and avoid tilt but also to be careful to not recommend post-implant manipulation due to the risk of migration (MDL2570_0181797). Yet, Cook Medical failed to describe any of these patient safety concerns regarding tilt in the Tulip IFU.

45.    Evidence in this case also shows that Cook Medical knew or should have known that penetration and perforation were specific patient safety concerns related to the Tulip device and that those concerns were not described in the IFU (*e.g.,* CookMDL_0021615; MDL2570_0456793; MDL3570_0431674; MDL2570_0141525). These documents include the final report of a study from November 2008 (CookMDL_0021615); a series of e-mails among Cook employees from March 2008 where the company is acknowledging the increased numbers of Celect complaints regarding perforation that leads to pain and the desire of the company to describe such complaints as "penetration" instead of "perforation" in order to downplay the risks (MDL2570_0456793[38]); Cook Medical IVC Filter Training document dated March 26, 2008 (MDL3570_0431674); and a document describing assessment of product complaints from January to March 2006 where the company was aware of life-threatening injuries and near-incidents that included incidents of perforations, migrations, and fracture, some which required surgical intervention (MDL2570_0141525). Again, Cook failed to describe such patient safety concerns in the Tulip IFU.

---

[38] Although this document deals with Celect complaints, the same issue on complaint handling would applyy to the Tulip device and demonstrate that Cook was mis-representing complaints that have the potential to lead to serious patient safety concerns.

46. Testimony of Cook employees shows that Cook could have changed the Tulip IFU to contain stronger warnings prior to FDA approval but failed to do so even though the company was aware of patient safety concerns related to use of Tulip IVC filters (see deposition testimony of Mr. Roberts at pages 98-99). In contrast, Cook employee Mr. Roberts testified that Cook sent Field Notices to physicians regarding their stent graft products after complaint investigation revealed an increasing trend in occurrence rates related to difficult deployment of the device, and also to change the labeling (see pages 48-53 of his deposition).

47. Evidence in this case shows that Cook Medical failed to properly report information to the FDA MAUDE database (Exhibit 165 of the Roberts deposition; PR4114; PR4796; PR5181; PR6047; PR6788; PR10870; CookMDL2570_0778249; CookMDL2570_0068984; PR15217; PR16264; PR28228; PR36199; PR39268; PR45335; PR48235; PR49127; PR50006; PR50728; PR60242; PR62614; PR67486; PR78942; PR83074). In the case of Exhibit 165 to the Roberts deposition, the complaint was a strut fracture that could not be retrieved, and Mr. Roberts admits that it should have been reported (see page 106 of his deposition). The other cited complaints (by "PR" number) were foreign complaints as well as US complaints that were not reported. These reports involved potentially serious patient safety concerns and adverse events that were not specifically described in connection with Tulip IVC filters in the IFU. Given the importance of complete and accurate complaint reporting to FDA in terms of post-market surveillance, the failure of Cook to properly repot its IVC filter complaints put patient health at risk.

48. These complications with IVC filters, including the Cook IVC filters, is illustrative of the problem with the 510(k) clearance process where the standard is less than the PMA process. Without robust clinical evaluation before marketing, physicians and their patients must rely on medical device manufacturers to provide complete and accurate information on the performance of their devices both before clearance and after clearance. Documents produced by Cook provide evidence of a corporate philosophy that the FDA should not be provided all of the information of which the company was aware.

## VI.    Cook Tulip IVC Filters: Regulatory Concerns and Risks to Patients

49.    Of importance in this case is the lack of medical training for the individuals that were making key complaint handling and medical device reporting decisions at Cook.[39] The FDA regulations specifically address the issue of qualifications of individuals that are responsible for complaint handling and investigation, requiring adequate training (21 CFR 803.20(c)(2)). The regulation states: "If you are a user facility, importer or manufacturer, you do not have to report an adverse event if you have information that would lead a person who is qualified to make a medical judgement reasonably to conclude that a device did not cause or contribute to a death or serious injury, or that a malfunction would not be likely to cause or contribute to a death or serious injury if it were to recur. Persons qualified to make a medical judgement include physicians, nurses, risk managers, and biomedical engineers. You must keep in your NDR event files (described in 803.18) the information that the qualified person muse to determine whether or not a device-related event was reportable." In the current case, evidence shows that Cook employees responsible for making such decisions did not have the type of training discussed by FDA (see deposition testimony of Mr. Roberts, Ms. Harden and Ms. Lavender and exhibits to those depositions). The lack of adequate training in this important area related to ensuring patient safety put patient health at risk.[40] Cook employees lacked the training and experience to assess medical reports from physicians and identify patient safety concerns. Given the importance of this postmarket complaint handling and reporting to medical device safety, the lack of adequate complaint handling and medical device reporting systems in place at Cook meant that physicians and the FDA were not informed about the risks to patients that were seen when the devices were used after clearance.

50.    The deposition testimony of Cook employees (Mr. Roberts, Ms. Harden and Ms. Lavender) and other documents in this case provide evidence that Cook did not have a good understanding of the duties and responsibilities of a medical device manufacturer under FDA regulations. Mr. Roberts testified that he was unaware of guidance documents. Even though changes were made to the device reporting regulations, Mr. Roberts, who was in charge of

---

[39] Fleck deposition dated April 10, 2018 at pages 27-29. Despite a lack of medical training, Fleck was responsible for things such as review of CT scans and cavograms related to injury complaints. He also had no training in clinical trial development for medical devices.
[40] CookMDL2570_0176942

33

quality assurance, complaint review, and also made decisions regarding reporting, was not aware of important regulatory changes. There is no indication that he was trained (see pages 11-14 of his deposition) or that he had an understanding of the details of applicable FDA regulations and guidelines (see deposition of Mr. Roberts at pages 76-80; FDA guidance on MDR reporting; 21 CFR 803). As an example, there is no evidence to show that Cook routinely performed trend analysis of its complaint system as required by FDA (21 CFR 803). Further, despite the known problem of under-reporting with the MAUDE system, as late as 2014, Cook was still using the MAUDE data to update their internal database (see deposition of Mr. Roberts at page 281; COOKMDL2570_0200620). These issues with training and complaint handling put patient safety at risk.

51.    A particularly important issue with the lack of proper complaint handling by Cook related to their IVC filter devices was their handling of foreign complaints. Mr. Roberts, the employee who dealt with Tulip MDR reporting was not aware that foreign patient adverse events for the Tulip needed to be reported to FDA when they met the reporting threshold (see deposition of Mr. Roberts at pages 79-80). Evidence in the case shows that Cook failed to properly report information to MAUDE (see deposition of Mr. Roberts at pages 85-95, 99-103, 107-108, 111-115; Roberts exhibit 165).

52.    An important method for providing patient safety information to physicians about medical devices is through medical device labeling. A key labeling document in the case of medical devices is known as the *"Instructions For Use"* or IFU; it also may be referred to as *"Directions for Use"* or DFU. I have reviewed various versions of the Tulip IVC IFUs. The FDA medical device regulations require that the labeling for prescription medical devices include adequate directions for use, even though such devices are exempt from the need to provide a layman with adequate directions for use. The labeling of prescription devices still must provide physicians with adequate information to allow the physician to use the device for its intended use. As FDA states: *"(c) Labeling on or within the package from which the device is to be dispensed **bears information for use, including indications, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can***

*use the device safely and for the purpose for which it is intended, including all purposes for*
*which it is advertised or represented*: *Provided, however, That such information may be omitted*
*from the dispensing package if, but only if, the article is a device for which directions, hazards,*
*warnings, and other information are commonly known to practitioners licensed by law to use the*
*device. Upon written request, stating reasonable grounds therefor, the Commissioner will offer*
*an opinion on a proposal to omit such information from the dispensing package under this*
*proviso."[emphasis added] (21 CFR 801.109(c))* Moreover, Section 502 of the FFDCA states
that a device is *"misbranded"* if *"its label does not bear adequate directions for use including*
*warnings against use in certain pathological conditions or by children where its use may be*
*dangerous in health or against unsafe dosage, or methods, or duration of administration or*
*application"*.[41]

53.     As mentioned already, the IFU is not the only tool available to manufacturers that
can and should be used to provide physicians with important safety information that may develop
after a medical device has been cleared through the 510(k) process. The other tool is use of direct
communications with physicians known as a "Dear Doctor" letter. As already referenced above,
the FDA has provided guidance on this issue (https://www.fda.gov/media/102575/download). In
the current case, given that Cook Medical was aware that the Tulip IVC filter had not been
demonstrated to be effective based on: 1) data collected in a controlled clinical study before
marketing[42]; 2) that fact that in the only controlled clinical studies performed on IVC filter
efficacy the risks outweighed the benefits for their use as compared to standard anti-coagulant
therapy[43]; 3) the fact that epidemiological studies have failed to demonstrate significant benefits
of IVC filters while identifying significant risks[44]; 4) the fact that the IVC filter would become
irretrievable (labeling mentions data supported retrieval within 2-20 days, mean retrieval time of
11 days)[45]; 5) the fact that after marketing began the Tulip had been linked with specific serious
patient safety concerns (*e.g.,* perforation, migration, fracture[46]). Considering these issues,

---

[41] https://www.fda.gov/medicaldevices/deviceregulationandguidance/overview/devicelabeling/generaldevicelabeling
requirements/ucm052190.htm

[42] See the clinical study for the Tulip discussed in the labeling CookMDL2570_1376718; Geerts and Shelby, 2017;

[43] Decousus *et al.* 1998; Mismetti *et al.* 2015; Bikdeli *et al.* 2017

[44] Bikdeli *et al.* 2017; Turner *et al.* 2018;

[45] CookMDL2570_1376718; Renno *et al.* 2015; Stavropoulos *et al.* 2015; Dixon and Stavropoulos, 2013;

[46] Owens *et al.* 2009; Montgomery and Kaufman, 2016; McLoney *et al.* 2013; Looby *et al.* 2007

combined with the fact that the longer the product is in place the greater the risk to user, Cook Medical could have provided physicians with information through use of direct communications (*i.e.*, Dear Doctor letters). Failure to provide physicians with such important direct communications of safety information put patient health at risk when the product was inserted and when the product was left as a permanent filter. Moreover, unlike changes to an IFU, such direct communications allow companies to focus the attention of physicians on new information that has been developed since initiation of marketing, including those physicians that may fail to read an IFU for a device with which they had and experience with in the past.

54.    Also relevant to the issue of informing physicians about IVC filter safety concerns and retrievability is the fact that the FDA issued two Safety Communications on this issue, one in 2010[47] and another in 2014[48]. Safety Communications are a tool used by FDA to describe FDA's analysis of a current issue and provide specific regulatory approaches and clinical recommendations for patient management. In 2010, FDA stated:

*"IVC filter usage has increased rapidly during the past thirty years. In 1979, 2,000 IVC filters were used, while in 2007, almost 167,000 filters were implanted, and the market for IVC filters is only expected to increase, with an estimated 259,000 IVC filters to be deployed in 2012 (Smouse and Johar, Endovascular Today, February 2010). Since 2005, the FDA has received 921 device adverse event reports involving IVC filters, of which 328 involved device migration, 146 involved embolizations (detachment of device components), 70 involved perforation of the IVC, and 56 involved filter fracture. Some of these events led to adverse clinical outcomes in patients. These types of events may be related to a retrievable filter remaining in the body for long periods of time, beyond the time when the risk of PE has subsided. The FDA is concerned that these retrievable IVC filters, intended for short-term placement, are not always removed once a patient's risk for PE subsides. Known long term risks associated with IVC filters include but are not limited to lower limb deep vein thrombosis (DVT), filter fracture, filter migration, filter embolization and IVC perforation."*

---

[47] https://2wt0853vtha23hf7qg2rwk3g-wpengine.netdna-ssl.com/wp-content/uploads/2017/12/Removing-Retrievable-Inferior-Vena-Cava-Filters.pdf
[48] http://wayback.archive-it.org/7993/20170722043342/https://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm554139.htm

FDA recommended that physicians implanting these devices should consider removing the filters as soon as protection from pulmonary embolism is no longer needed. In 2014, FDA issued a second Safety Communication where the agency announced they were requiring companies to collect additional clinical data to support the safety of the IVC filter devices. Yet, Cook Medical failed to provide physicians directly with the FDA safety communication information, such as through use of a Dear Doctor letter. In the current case, a physician involved in the treatment of Mr. McDermitt, Dr. Biggerstaff, had never heard of the FDA Safety Communications despite being a hospitalist who decides if a filter consult is necessary and formulates plans on when a patient should return to check on the filter.[49]

55.    When FDA regulations and guidance on labeling are considered in conjunction with my training and experiences and what was known in the scientific literature and was known to the company (based on review of internal company documents and deposition testimony), it is my opinion that the Cook Tulip IFUs fail to provide physicians with adequate patient safety information including but limited to the following:

- The IFU is inadequate because information fond in the Adverse Events section should have been in the Warnings section (see FDA labeling guidance #G91-1).
- The IFU fails to provide a balanced or complete description of device experience because the only studies referenced are those regarding retrievability while studies regarding other issues sch as penetration are not referenced.[50]
- The IFU lists events as 'potential" when in fact the adverse events were known to have occurred with Cook devices.
- The table in the IU is misleading because it contains information regarding other filters instead of Tulip-specific information.
- The IFU failed to tell physicians about the patient safety issues that Cook was aware of over the years.[51]

---

[49] See deposition of Dr. Biggerstaff at 99:08-101:01.
[50] See e.g., Gregorio et al. 2006; Durack et al. 2012; Hoffer et al. 2013; Deso et al. 2016; McLoney et al. 2013; Ota, 2008; Andreoli et al. 2014.
[51] MDL_2570_0384263; MDL_2570_1086200; MDL_2570_0021600; MDL2570_021615; exhibits to depositions of Mr. Roberts, Ms. Hardin and Ms. Lavender; MDL_2570_00620496; MDL_2570_0431674; MDL2570_0382201; MDL2570_0181797; MDL2570_0456793; MDL2570_0373215; MDL2570_0431674; MDL2570_0141525.

- The IFU failed in include information re: the FDA Safety Alert. For example, Cook received reports of events such as those mentioned in the FDA Safety Alert but failed to alert physicians of such reports related to the Cook devices. Such information also could have been communicated through changes to the IFU or through letters to physicians.[52]

Failing to provide physicians with important patient safety information in its IFU put patient health at risk. Plaintiff David McDermitt's implanting doctor, Dr. Sabah Butty, was actually part of a Cook retrieval study where he signed a clinical investigator's agreement indicating he understood Cook's instructions for using the device. He testified that he remembered reading Cook's IFU for the Tulip filter in 2007.[53] While he claims he did not rely on the IFU to make his decision to recommend the filter, it is the very lack of information in the IFU on efficacy and safety that is the problem. A doctor cannot communicate to a patient what he does not know. Cook needed to disclose accurate information so Dr. Butty and the subsequent treating doctors could provide this information to patient.

56.    Evidence in this case shows that Cook actively used MAUDE data as a sales and marketing tool to distinguish its devices performance from that of its competitors despite knowledge that there was no real difference in terms of clinical data to show that the IVC filters actually worked as intended (see deposition of Mr. Roberts at pages 85, 169, 200, 218, 226, 233; CookMDL2570_0143855;              IVC000001324;              CookMDL2570_0334044; CookMDL2570_0200620;      CookMDL2570_0309059;      CookMDL2570_0465938; CookMDL2570_0382810). Such actions were misleading and put patient safety at risk. The actions also should be viewed in the context of evidence that shows that MAUDE data significantly under-estimated actual rates of occurrence due to the high level of under-reporting that exists (discussed above). Cook employees were aware of the issue of under-reporting (see deposition of Mr. Roberts at pages 153-154 and 207-212).

---

[52] See deposition of Mr. Roberts at pages 48-53
[53] See deposition of Dr. Sabah Butty at page 196, line 15 to page 197, line 4.

57.     The medical device regulations include provisions for companies to properly investigate complaints and to determine if Corrective and Preventative Action (CAPA) needs to be implemented (21 CFR 820.100).  As the regulations state:

*"(a) Each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for: (1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, **complaints,** returned product, and **other sources of quality data** to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems; (2) Investigating the cause of nonconformities relating to product, processes, and the quality system; (3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems; (4) Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; (5) **Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems**; (6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and (7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for management review.*

*(b) **All activities** required under this section, and their results, **shall be documented**."* *[emphasis added]*

A review of the available documents failed to identify CAPA activities by Cook to initiate immediate actions to inform physicians or protect patients even when they became aware of the problems with their device (as discussed above). Failure to investigate these device safety issues put patient health at risk.

58.     In 2014, manufacturers were given two choices by FDA in order to investigate the safety of IVC filters, both permanent and retrievable filters. One choice was to participate in a cohort observational study initiated in 2015 known as the PRESERVE[54] study. The second

---

[54] PRESERVE is an acronym for the study name: **PRE**dicting the **S**afety and **E**ffectiveness of Inferio**R VE**na Cava Filters.

choice was to conduct postmarket surveillance on a company's specific devices. Cook is participating in the PRESERVE study. PRESERVE is still recruiting patients even though it is expected to be completed by December 2019, with results available sometime in 2020. The cohort study will be the first look at the long-term safety and effectiveness of such devices, data that had not been collected by manufacturers before the devices were first cleared for marketing, including the Cook devices. Therefore, more than 13 years after the insertion of Mr. McDermitt's Tulip IVC device, Cook Medical is only now studying the safety of the Tulip IVC Filter. The PRESERVE study still does not evaluate the efficacy of the device itself because it is not a randomized, controlled clinical study where efficacy of the device is compared to treatment without an IVC device (*i.e.,* similar to the studies described by Decousus *et al.* 1998 and Mismetti *et al.* 2015).

59.    When considering the evidence discussed above that relates to the failure of Cook to comply with FDA regulations, the evidence shows that patient safety was compromised. Evidence in the case shows that there were serious patient safety complaints in the Cook complaint system that should have led the company to investigate and to provide physicians with the important patient safety information about these risks with their devices. This information could have been communicated by various methods.

60.    After reviewing the facts and evidence in this case and based on my training and experience, it is my opinion that Cook failed to act as a reasonable prudent manufacturer when it failed to ensure that Mr. McDermitt and his physicians were provided with a Tulip IVC device that was safe and effective, both before and after it was marketed.

## VII.    Compensation

61.    My compensation in this matter is at the rate of $300.00 per hour.


_Laura M. Plunkett_

Laura M. Plunkett, Ph.D., DABT

40

## List of Published References Cited in the Report

Ahmad, S.R.  2003.  Adverse drug event monitoring at the Food and Drug Administration.  *J. Gen. Intern. Med.*  18(1):57-60.

al Zahrani, H.A. 1995.  Bird's nest inferior vena caval filter migration into the duodenum: a rare cause of upper gastrointestinal bleeding.  *J. Endovasc. Surg.*  2(4):372-375.

Angel, L.F. *et al.* 2011.  Systematic review of the use of retrievable inferior vena cava filters.  *J. Vasc. Interv. Radiol.* 22(11):1522-1530.

Becker, D.M. *et al.* 1992. Inferior vena cava filters: indications, safety, effectiveness. *Arch. Intern. Med.* 152:1985-1994.

Bikdeli, B. *et al.* 2017. Inferior vena cava filters to prevent pulmonary embolism: systematic review and meta-analysis. *J. Am. Coll. Cardiol.* 70:1587-1597.

Center for Devices and Radiological Health (CDRH).  2006.  *Ensuring the safety of marketed medical devices: CDRH's Medical Device Postmarket Safety Program. January 18.*

Chauhan, Y. *et al.* 2016.  Open removal of penetrating IVC Filter with repair of secondary aortic dissection: Case report.  *Ann. Vasc. Surg.* 32:e9-e12.

Chick, J. *et al.* 2016.  A 16-F sheath with endobronchial forceps improves reported retrieval success of long-dwelling "Closed Cell" inferior vena cava filter designs.  *J. Vasc. Interv. Radiol.*  27:1027-1033.

Cooper, C.M.  2017.  Advertising, promotion and labeling for medical devices and In Vitro diagnostics (IVDs).  In: *Fundamentals of US Regulatory Affairs*, *10th edition*.  Pamela A. Jones, Regulatory Affairs Professionals Society: Rockville, MD, chapter 26.

Decousus, H. *et al.* 1998. A clinical trial of vena caval filters in the prevention of pulmonary embolism in patients with proximal deep-vein thrombosis. *New Engl. J. Med.* 338:409-415.

Deso, S.E. *et al.* 2016. Evidence-based evaluation of inferior vena cava filter complications based on filter type. *Semin. Intervent. Radiol.* 33:93-100.

Dixon, A. and S.W. Stavropoulos. 2013. Improving retrieval rtes for retrievable inferior vena cava filters. *Expert Rev. Med. Devices* 10:135-141.

Durack, J.C. *et al.* 2012. Perforation of the IVC: rule rather than exception after longer indwelling times for the Gunther Tulip and Celect retrievable filters. *Cardiovasc. Intervent. Radiol.* 35:299-308.

Faustman, E.M. and G.S. Omenn.  2013.  Risk assessment.  In: *Casarett and Doull's Toxicology, The Basic Science of Poisons*, *8th edition*.  Curtis D.Klaassen, Ph. D., The McGraw-Hill Companies, Inc.: New York, NY, chapter 4.

Ferris, E.J. *et al.* 1993. Percutaneous inferior vena caval filters: follow-up of seven designs in 320 patients. *Radiology* 188(3):851-856.

Gagliardi, A.R. *et al.* 2018. Factors influencing the reporting of adverse medical device events: qualitative interviews with physicians about higher risk implantable devices. *BMJ Qual Saf.* 27:190-198.

Garber, A.M. 2010. Modernizing device regulation. *NEJM* 362:1161-1163.

Geerts, W. and R. Selby. 2017. Inferior vena cava filter use and patient safety: legacy or science? *Hematology 2017* pages 686-692.

Goldman, S.A. 1998. Limitations and strengths of spontaneous reports data. *Clin. Ther.* 20 Suppl C:C40-C44.

Hazell, L. and S.A. Shakir. 2006. Under-reporting of adverse drug reactions: a systematic review. *Drug Saf*. 29(5):385-396.

Institute of Medicine of the National Academies (IOM). 2011. *Medical devices and the public's health: The FDA 510(k) clearance process at 35 years.* National Academy Press: Washington, D.C.

Iqbal, S.I. *et al.* 2012. Preliminary experience with Option inferior vena cava filter. *Vasc. Endovasc. Surg.* 47(1):24-29.

Jennings, J. and C. Kuehn. 2017. Current good manufacturing practices and quality system design. In: *Fundamentals of US Regulatory Affairs*, *10th edition*. Pamela A.Jones, Regulatory Affairs Professionals Society: Rockville, MD, chapter 7.

Kuo, W.T., *et al.* 2011. Photothermal ablation with the Excimer Laser Sheath Technique for embedded inferior vena cava filter removal: Initial results from a prospective study. *J. Vasc. Interv. Radiol.* 22:813-823.

Looby, S. *et al.* 2007. Gunther Tulip retrievable inferior vena caval filters: indications, efficacy, retrieval, and complications. *Cardiovasc. Intervent. Radiol.* 30:59-65.

Matchett, W.J. *et al.* 1998. Suprarenal vena caval filter placement: follow-up of four filter types in 22 patients. *J. Vasc. Interv. Radiol.* 9(4):588-593.

McLoney, E.D. *et al.* 2013. Complications of Celect, Günther tulip, and Greenfield inferior vena cava filters on CT follow-up: a single-institution experience. *J. Vasc. Interv. Radiol*. 24:1723-1729.

Messmer, J.M. and L.J. Greenfield. 1985. Greenfield caval filters: long-term radiographic follow-up study. *Radiology* 156(3):613-618.

Millward, S.F. *et al.* 1991. LGM (Vena Tech) vena cava filter: clinical experience in 64 patients. *J. Vasc. Interv. Radiol.* 2(4):429-433.

Millward, S.F. *et al.* 1994. LGM (Vena Tech) vena caval filter: experience at a single institution. *J. Vasc. Interv. Radiol.* 5(2):351-356.

Mismetti, P. *et al.* 2015. Effect of a retrievable inferior vena cava filter plus anticoagulation vs anticoagulation alone on risk of recurrent pulmonary embolism: a randomized clinical trial. JAMA 313:1627-1635.

Mohan, P.P. *et al.* 2018. Percutaneous retrieval of IVC filters with struts penetrating the vertebral body. *Vasc. Endovasc. Surg.* 52(7):550-552.

Montgomery, J.P. and J.A. Kaufman. 2016. A critical review of available retrievable inferior vena cava filters and future directions. *Semin. Intervent. Radiol.* 33:79-87.

Murphy, S. and R. Roberts. 2006. "Black box" 101: How the Food and Drug Administration evaluates, communicates, and manages drug benefit/risk. *J. Allergy Clin. Immunol.* 117(1):34-39.

National Research Council. *Risk assessment in the Federal Government: Managing the process.* 1983. National Academy Press: Washington, DC.

Neill, M. *et al.* 2017. Factors associated with reduced radiation exposure, cost, and technical difficulty of Inferior vena cava filter placement and retrieval. *Baylor Univ. Med. Center Proc.* 30(1): 21-25.

Office of Inspector General (OIG). 2009. *Adverse event reporting for medical devices. October.* Department of Health and Human Services.

Owens, C.A. *et al.* 2009. Intracardiac migration of inferior vena cava filters: review of published data. *Chest* 136(3):877-887.

Ramaswamy, R.S. *et al.* 2018. Denali, Tulip and Option Inferior vena cava filter retrieval: A single center experience. *Cardiovasc. Intervent. Radiol.* 41:572-577.

Renno, A. *et al.* 2015. A single center experience with retrievable IVC filters. *Vascular* 23:350-357.

Resnic, F.S. and S-L.T. Normand. 2012. Postmarketing surveillance of medical devices: filling in the gaps. *New Engl. J. Med.* 366:875-877.

Rodriguez, E.M., J.A. Staffa, and D.J. Graham. 2001. The role of databases in drug postmarketing surveillance. *Pharmacoepidemiol. Drug Saf.* 10(5):407-410.

Ryu, R.K. *et al.* 2015. A comparison of retrievability: Celect versus Option Filter. *J. Vasc. Interv. Radiol.* 26:865-869.

Smith, B.A. 1994. Vena caval filters. *Emerg. Med. Clin North Am.* 12(3):645-656.

Stavraopoulos, S.W. *et al.*  2015.  Retrieval of tip-embedded Inferior vena cava filters by using the Endobronchial Forceps Technique.  *Radiology* 275(3): 900-907.

Tsui, B. *et al.* 2016.  Retrospective review of 516 implantations of Option Inferior vena cava filters at a single health care system.  *J. Vasc. Interv. Radiol.* 27:345-353.

Turner, T.E. *et al.* 2018.  Association of inferior vena cava filter placement for venous thromboembolic disease and a contraindication to anticoagulation with 30-day mortality.  *JAMA Network Open* 1(3):e180452.

U.S. Food and Drug Administration (FDA).  1997.  *Medical device reporting for manufacturers. March.*  Department of Health and Human Services.

Wang, W., J. Spain, and M.D. Tam.  2011.  Acute abdominal pain after retrievable inferior vena cava filter insertion: case report of caval perforation by an option filter.  *Cardiovasc. Intervent. Radiol.*  34(4):883-885.

Young, N.  1995.  Clinical follow-up of patients with percutaneously inserted inferior vena caval filters.  *Australas. Radiol.*  39(3):233-236.

Zuckerman, D.M. *et al.*  2011.  Medical device recalls and the FDA approval process.  *Arch. Intern. Med.* 171(11):1006-1011.

**APPENDIX A**

**Curriculum Vitae**

**APPENDIX B**

**Testimony List**

**APPENDIX C**

**Reliance List**

# EXHIBIT B

Rule 26 Report for David McDermitt
Derek Muehrcke, MD, FACS
300 Health Park Blvd, Suite 5000
Saint Augustine, Florida 32086

## Introduction

I have been asked to review records and imaging studies and provide a case report on David McDermitt who was implanted with a Gunther Tulip (GT) filter.  Mr. McDermitt had his filter placed on 1/8/2007 after suffering a left leg deep venous thrombosis (DVT), and pulmonary embolism (PE) after a chainsaw injury.   He developed a retroperitoneal bleed while anticoagulated with Coumadin which brought about the recommendation that a filter be inserted.

Before insertion, Mr. McDermitt was told by the inserting doctor what the Cook Manufacturer indicated in its IFU, literature and advertising-(1)that the benefit of the Gunther Tulip was that it helped to prevent life threatening PE's ;(2) that there were low level risks with the device; and (3) that the filter was retrievable. In follow up, Mr. McDermitt was told that the GT was as good as a permanent filter and it could be left in.

As an inserting doctor of filters, a doctor has a reasonable expectation that a manufacturer will make a product that will work for the use intended, that the manufacturer will test it for safety and efficacy and that it will accurately disclose the important risks and benefits of the device. It is then the doctor's duty to disclose those facts to a patient (such as Mr. McDermitt) so he can make an informed decision weighing the risks and benefits whether to utilize the device.   Sadly, unbeknownst to Mr. McDermitt and his doctors, these expectations were not met by Cook which made this product unreasonably dangerous to Mr. McDermitt.

A review of the Cook internal documents (not available to doctors or patients) shows Cook knew before and after they released the GT on the market that it was untested for both efficacy and safety but failed to communicate this to doctors and patients. Cook's internal documents show they were concerned about the lack of efficacy of the filter but did nothing about it. The literature has continued to show evidence that these filters do not help save lives or protect against pulmonary embolism. Despite the request by multiple authors for additional studies, Cook has not performed a controlled study on efficacy.

Cook had important data that it did not share with doctors or patients that Cook IVC filters tilt, perforate, migrate at rate far in excess of 1%. Yet they did not study these events and subsequent independent studies have shown the GT filter to have an 86% perforation rate of the IVC wall and that all Cook filters in place for more than 71 days after implantation demonstrated some degree of perforation of the inferior vena cava wall. Furthermore, filter tilt has been reported in up to 40% of Cook Gunther Tulip filters and migration was reported in 12.5% of the filters. Further, the literature confirms that patients who receive IVC filters suffer

more complications than patients who do not receive IVC filters. This includes an increased risk of DVTs and difficulty in removing filters that are in for longer than 12 days. Last, Cook knew that these adverse events would progress and worsen over time. The PRESERVE Study is only being conducted now, at the request of the FDA, that will help provide data on the safety of GT filter. This is 13 years after Mr. McDermitt had his filter inserted.

Years later, as a direct result of his filter being placed and left in as a permanent filter, Mr. McDermitt has developed bilateral leg DVTs which are likely at least partially caused by his filter being present, along with his recent surgery, older age, immobility, and prior DVT. His Gunther Tulip filter has been found to have four perforations of the IVC wall which extend through and outside the inferior vena cava wall. This is an injury to the wall. The filter is tilted 20 degrees, and has likely become endothelialized to the point that removal of this temporary filter would be difficult. Moreover, he is at risk of worsening perforation, migration, and fracture. Mr. McDermitt is also at risk for further DVTs. These risks will increase the longer the filter is in place. An open procedure would likely be necessary to try to remove the filter. This carries risks of its own, especially for the 82-year-old Mr. McDermitt. If the filter cannot be removed, then Mr. McDermitt should be monitored by way of a yearly CT scan to understand if the perforations noted above are progressing to the point of puncturing an organ or other structure and to monitor for further DVTs.

In short, the filter was designed and sold by Cook to help prevent pulmonary embolism. Yet, there is no compelling evidence that the GT filter works to prevent pulmonary embolism. Without this evidence, this filter is all risk and no benefit and it is unreasonably dangerous. When Mr. McDermitt's filter was placed, the untested and unsafe condition of the filter was not something that could have been anticipated or known by Mr. McDermitt or his doctors. The GT filter exposed Mr. McDermitt to a risk of physical harm beyond which could have been anticipated by him or his doctors. This continues into the future until his filter can be removed.

My expert opinions are based on: (1) my personal experience with IVC filters, (2) my background, education, training, and clinical experience, (3) my review and understanding of the IVC filter literature, (4) my review of Mr. McDermitt's medical records and radiology imaging, (5) recognized and accepted principles of medicine including differential diagnosis, (6) my review of depositions taken in the Cook IVC Filter litigation, and (7) my review of Cook's internal documents. This methodology allows me to testify regarding medical facts specific to this case and to render the opinions contained in this report. All of my opinions are based upon a reasonable degree of medical certainty.

## Qualifications and Background

I am a board-certified cardiothoracic surgeon and have been practicing for the past 24 years. I attended a seven-year college-medical school curriculum at Grinnell College and Rush Presbyterian St. Luke Medical Center in Chicago, Illinois. My formal specialty training took place at Harvard Medical School and Massachusetts General Hospital, where I completed my general

surgery residency and training in adult cardiothoracic surgery. I was then accepted in and completed a congenital heart surgery fellowship at Boston Children's Hospital, also at Harvard.

After completing the above-mentioned training and fellowship programs, my first position was at the Cleveland Clinic where I practiced for three years performing adult cardiac surgery. I then moved to Florida to join five former Harvard-trained cardiovascular surgeons in private practice. My current group, of which I am one of five partners, is comprised of eight heart surgeons and five vascular surgeons. We all perform cardiac, thoracic, and vascular surgery at seven hospitals in Jacksonville, Florida.

For the past 21 years, I have routinely implanted and removed (once optional filters became available) IVC filters. I have implanted and removed the Cook Gunther Tulip and Celect filters and every iteration of Bard's retrievable filters from the Recovery filter through the Denali. I have also implanted the Cordis OptEase and TrapEase filters, the Greenfield filter, and the Argon Ultra filter. I have removed Cook Gunther Tulip and Celect filters, as well as the Celect Platinum filter. I have also experienced filters that could not be removed. I currently implant few if any filters based upon the information I have now learned.

My practice is equally divided between cardiac, thoracic, and vascular surgery. I perform close to 700 cases yearly. I am the Chief of Cardiothoracic Surgery at Flagler Hospital in Saint Augustine, Florida. As a result of the recent litigation surrounding the use of retrievable IVC filters, I began following all of my hospital patients implanted with removable IVC filters. These included filters implanted by me, my partners, and the interventional radiologists at Flagler Hospital. This has resulted in patients being referred to me for retrieval of their optional IVC filters placed not only at Flagler Hospital but also at other institutions. A copy of my *Curriculum Vitae* is in appendix A.

**Prior Expert Testimony**

During the previous four years I testified as an expert at deposition or trial in the following cases:

1) Clare Austin v. C.R. Bard, Inc., In the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County Florida, case no. CACE-15-008373. Division 21

2) Wayne D. Everitt, et al., v. University Hospital Health Systems, Inc., et al., Cuyahoga County Common Pleas, Court Case CB15846895. Deposition (03/09/2017) and trial testimony (05/12/2017).

3) Carol Kruse v. C.R. Bard Inc., In re Bard IVC Filter Product Liability Litigation, MDL No. 2641, United States District Court for the District of Arizona, case no. 2:15-md-02641-DGC. (Deposition 07/24/2017)

4) Debra Mulkey v. C.R. Bard Inc., In re Bard IVC Filter Product Liability Litigation, MDL No. 2641, United States District Court for the District of Arizona, case no. 2:15-md-02641-DGC. (Deposition 07/24/2017)

5) Doris Jones v. C.R. Bard Inc., In re Bard IVC Filter Product Liability Litigation, MDL No. 2641, United States District Court for the District of Arizona, case no. 2:15-md-02641-DGC. Deposition (07/24/2017) and trial testimony (04/18/2018).

6) Lisa Hyde v. C.R. Bard Inc., In re Bard IVC Filter Product Liability Litigation, MDL No. 2641, United States District Court for the District of Arizona, case no. 2:15-md-02641-DGC. Deposition (07/24/2017) and trial testimony (09/21/2018).

7) Sherr Booker v. C.R. Bard Inc., In re Bard IVC Filter Product Liability Litigation, MDL No. 2641, United States District Court for the District of Arizona, case no. 2:15-md-02641-DGC. Deposition (07/24/2017) and trial testimony (03/29/2018).

8) Consolidated cases in Maricopa County (Arizona) Superior Court: Romero v. C.R. Bard, Inc., et al., case no. CV2017-000927,  Benzing v. C.R. Bard, Inc., et al., case No. CV2013-054323, Moore v. C.R. Bard, Inc., et al., case no. CV2014-008738, and Stesney v. C.R. Bard, Inc., et al., case no. CV2012-006103. (Deposition 03/12/2018)

9) Bianca Fraser-Johnson and Michael Johnson v. C.R. Bard, Inc., Bard Peripheral Vascular, Inc., Christiana Care Health Services, Inc., Thomas Bauer, M.D., Cynthia Heldt, M.D., In the Superior Court of the State of Delaware C.A. No: N15C-09-207 CLS.  . (Deposition 04/14/2018)

10) Consolidated cases in Maricopa County (Arizona) Superior Court: Kotter v. C.R Bard., et al., Case No: CV 2017-000927, Schimpf v. C.R. Bard et al., Case No: CV 2017-000927, and Erm v. C.R. Bard et al., Case No: CV 2017-000927. Deposition (10/18/2018).

11) Consolidated cases in Maricopa County (Arizona) Superior Court:
Tinlin v C.R.Bard., et al., Case No. MD-15-02641-PHX-DGC (Deposition January 11, 2019)

12) Alice Tabb v C.R.Bard et al., In the Circuit Court of Montgomery County, Alabama. Civil Action No. CV-15-900812 (Deposition January 11, 2019)

13) Eva Westmoreland v Medtronic, INC., Medtronic USA, INC., and Jeff Belkowski, In the United States District Court for the eastern District of Missouri, Eastern Division. Case No. 4:17-CV-01626-AGF.(Deposition March 2, 2019).

14) Joseph Grossman v C.R. Bard, INC., et al. Consolidated cases in Maricopa County (Arizona) Superior Court: Grossman v C.R Bard., et al., Case No. CV2017-13707 (Deposition January 11, 2019)

15) Beth Campbell v Timothy Bright in the court of Common Pleas of Licking County, Ohio. Case 17CV00683. Judge W. David Branstool. (Deposition 6/1/2019) (Video trial testimony 8/13/19).

16) Peter Zebrowski and Karen Zebrowski, Husband and Wife v Christiana Care Health System, INC. and Christiana Care Limestone Medical and Pediatrics. Superior Court of The State of Delaware. C.A.No. N17C-11-227 JRJ. Deposition testimony 7/27/19 for Plaintiffs.  Trial testimony 11/19/18

17) Heather Lilla, Individually and as Personal Representative of the Estate of Raymond K. Lilla, Deceased, vs. Cordis Corporation, a Florida Corporation and Cardinal Health INC., an Ohio Corporation. In the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida. Case No. 502016CA006931XXXMB. Circuit Civil Division. Deposition testimony 8/31/2019 for Plaintiffs.

18) Heather Lilla, Individually and as Personal Representative of the Estate of Raymond K. Lilla, Deceased, vs. Cordis Corporation, a Florida Corporation and Cardinal Health INC., an Ohio Corporation. In the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida. Case No. 502016CA006931XXXMB. Circuit Civil Division. Deposition testimony 8/31/2019 for Plaintiffs. Supplemental deposition 10/30/2019 for Plaintiffs.

19) Consolidated cases in Maricopa County (Arizona) Superior Court: Lisa Radzik v. C.R Bard., et al., Case No: CV 2017-006606. Hinchman v. C.R. Bard., et al. Case No: CV 2017-006605 Deposition (11/23/2019).

**Materials Reviewed and Relied Upon**
    A) **Medical records reviewed**:

1) Reid Health rehab records Admit for DVT, SSS, PCI; 8/9/19 -8/19/19
2) Reid Health hospital records for NSTEMI , Pacer 8/4/19
3) Indiana University Health; Methodist Hospital records 1/4/07 to 1/8/07
4) Radiology reports of 8/29/18 of Lumbar spine, right hip x-ray.
5) 4/21/2017 CT chest  A/P with contrast,
6) 3/16/2017 CXR PA/L.
7) 8/5/2016 US left leg
8) Brookville Family care records Dr. Andrew Diller
9) Premier Orthopedics records Dr. Jennifer Jerele
10) Dayton Interventional Radiology IVC consult Christiana Hunt, NP-C
11) Dermatologist of Southwest Ohio
12) Dayton Skin Care records
13) Dermatology and Laser Surgery Center records
14) Miami Valley Hospital Hospital
15) Miami Hospital ER visit for dehydration 6/1/19
16) American Medical Response transfer to Miami Valley Hospital 5/3/19

17) Miami Valley Hospital Radiology Department records
18) Records of James Parliament
19) Premier Orthopedics records
20) Reid Hospital & Health Care Services Radiology Department
21) Village Green Healthcare Center

**B) Images reviewed:**

09/26/06, a left leg venous Doppler.

09/26/06, a CTA of the chest with a pulmonary embolism protocol.

01/04/07, ultrasound of the gallbladder .

01/04/07, a portable chest x-ray.

01/04/07, a CT renal stone protocol.

01/04/07, a CT chest with and without contrast.

01/04/07, the report of an esophagram Gastrografin report only, no images.

01/08/07, the fluoroscopy of inferior vena cava filter placement with a 15 degree tilt.

01/08/07, a CT scan of the chest with IV contrast.

09/10/07, a left upper leg venous ultrasound.

05/05/08, two view chest x-ray.

05/19/09, two view chest x-ray.

08/31/10, two view chest x-ray.

07/12/12, a chest x-ray with two views.

08/14/12, a CT scan of the chest without contrast.

06/12/13, two views of the left hip.

06/12/13, lumbar spine films four views.

08/05/16, report of left leg venous ultrasound, no images.

03/16/17, chest x-ray PA and lateral.

04/21/17, a CT chest contrast per radiology protocol.

On 04/21/17, abdomen pelvis CT scan revealing the tip of the Günther Tulip filter at the confluence of the renal veins.  There is 20 degrees tilt to the left lateral wall.  There are grade 1 to 2 perforations of the 2 o'clock, 5 o'clock, 8 o'clock and 11 o'clock legs.

07/23/18, right hand films, three views.

08/29/18, right hip three views.

08/29/18, lumbar spine film three views.

10/01/18, MRI of the lumbar spine.

05/01/19, bilateral knee x-rays three views.

**C) Cook Documents reviewed:**

1. Articles given to doctors by Cook:
   i. CookMDL2570_0693891
   ii. CookMDL2570_0726297
   iii. CookMDL2570_0964007
2. MAUDE Adverse Event Rate Documents from Cook:

      i.        CookMDL2570_0187537
      ii.      CookMDL2570_0301804
      iii.    CookMDL2570_0302448
      iv.    CookMDL2570_0302845
      v.      CookMDL2570_0322428
      vi.    CookMDL2570_0431650
      vii.   CookMDL2570_0723255
      viii.  CookMDL2570_0730055
      ix.    CookMDL2570_1300843
      x.     IVC00001324

3. Cook Internal Email Correspondence
      i.        CookMDL2570_0379327
      ii.      CookMDL2570_0380878
      iii.    CookMDL2570_0382334
      iv.    CookMDL2570_0405333
      v.      CookMDL2570_0427098

4. Cook Sales Rep Documents regarding Time of Retrievability for Gunther Tulip:
      i.        CookIVCF_001910
      ii.      CookIVCF_006992
      iii.    CookMDL2570_0068798
      iv.    CookMDL2570_0384269
      v.      CookMDL2570_08359365.
      vi.    Relevant IFUs and Warnings (CookMDL2570_1376718-1376753)

5. Cook's Defendant Fact Sheet, and all documents produced and disclosed therein
6. PRESERVE Study update from April 2019
7. Gunther Tulip relevant IFUs and Warnings (CookMDL2570_1376718-1376753)
8. Deposition Transcripts, and all exhibits contained therein:
      i.        Dr. Sabah Butty
      ii.      Dr. Shannon Kauffman
      iii.    Dr. Todd Biggerstaff
      iv.    David Fruit
      v.      Plaintiff David McDermitt
      vi.    Bruce Fleck

**Medical Literature**
    **See list of articles attached as Appendix B.**

**D)  Fees**

1. My current fee for the following medical legal activities is $650.00 per hour.  This includes medical records review, review of depositions, literature searches, consultation time, preparation for deposition and trial testimony, oral or written

reports, all travel time (billed as portal to portal), or any miscellaneous task as requested by client.

2.  My current fee for all local deposition and trial activities is $750.00 per hour. All out of area travel that requires an overnight stay is billed at $7000.00 per day. If I have to use a half day for travel or return from the location of trial or deposition, that will be billed at 3000.00 per half day.  If I must cancel an entire office day to provide the requested services, an additional fee of $2000.00 per clinic/work day will be charged.  Trial and out of area fees must be paid in advance of the date of travel.

**Opinions**

HISTORY

Mr. McDermitt developed a deep venous thrombosis to his left leg after suffering a 6-inch long laceration from a chain saw on September 9, 2006.  On the 26th of that month he was found to have an extensive lower leg DVT on ultrasound when he presented with pain, swelling, and edema.  The following day he developed shortness of breath, was found to have an elevated d-dimer in the emergency room. He was diagnosed with bilateral pulmonary emboli on a CTA chest.  Mr. McDemitt was anticoagulated with  Coumadin therapy and heparin.  On January 4, 2007 he presented to the emergency room with the abrupt onset of right upper quadrant pain and the CT scan performed that day showed a retrocrural hematoma, felt to be due to the Coumadin therapy.

He was transferred on January 8th to the University of Indiana; Methodist hospital. There, after a consult with hospitalist Todd Biggerstaff, Dr. Sabah Butty placed a Gunther Tulip filter via the right IJ approach.  He also incidentally noted to have an acute nonocclusive thrombus on the left common iliac vein.  Before insertion, Mr. McDermitt was told by the inserting doctor what the Cook Manufacturer indicated in its literature and advertising- (1)that the benefit of the Gunther Tulip was that it helped to prevent life threatening PE's ;(2) that there were low level risks with the device; and (3) that the filter was retrievable. In follow up, two weeks after the insertion, Mr. McDermitt testified he was told that the GT was as good as a permanent filter and it could be left in. Mr. McDermitt did follow up with his family doctor who ordered a Left Venous Doppler on 9/10/07 which showed the DVT had resolved. The filter was left in place.

Approximately 10 years later after watching a commercial on television for inferior vena cava filters and their problems, Mr. McDermitt decided to have his filter evaluated. A CT scan of the abdomen and pelvis showed the filter in good position with a slight posterior tilt and the hook at the tip of the filter was close to the posterior wall of the IVC.

Mr. McDermitt was evaluated by the Dayton Intervention Radiology Group in effort to have a filter removed.  He was told that the risks and benefits of filter removal favored keeping the filter that was placed in 2007.  He was told they did not recommend removal of his filter as

it was is well epithelialized and in good position and they believed Mr. McDermitt was unable to take blood thinning medicine. He was told that if he determines, in the future he does in fact want the device removed, he would be referred to The Ohio State University for removal.

Subsequently, Mr. McDermitt fell while hunting and suffered bilateral quadriceps tears which were repaired on May 4, 2019 by Dr. Jerele. Approximately a month later in the rehab facility, he developed bilateral lower extremity deep venous thrombosis and had to be placed on Xarelto. He subsequently went on to develop on August 4, 2019 a non-ST segment elevated myocardial infarction requiring a drug eluting stent placement to the ramus intermedius artery.

Unfortunately, Mr. McDermitt is in a difficult position because he would like to have this filter removed, however the risk of removal is felt to be high after consultation with an interventional radiologist. Moreover, the risk of leaving the filter in place is also high. He remains on Xarelto and Pradaxa.

### THE LACK OF EVIDENCE OF EFFICACY AND RISKS OF INJURY

There is little evidence to show that inferior venal filters save lives or prevent pulmonary embolism long term.[1] Yet there is significant evidence that patients who receive IVC filters suffer more complications from deep venous thromboses and filter related complications than patients who do not have IVC filter implanted.[2] The Cook Corporation was aware of a lack of efficacy of their IVC filters and never tested them to ensure they were beneficial.[3] Instead they allowed them to be implanted with little to no evidence that they work.

Internal documents reveal Cook was concerned that their IVC filters did not save lives nor prevent PEs and they were concerned that Medicare or other payers would not approve payment for their IVC filter[4] Cook admitted they had little evidenced based medicine that the filters worked to prevent pulmonary embolism and save lives.[5] Furthermore, Cook never performed studies to prove the benefit of their filters, nor their long-term safety.[6] This is a

---

[1] *See*, e.g., CookMDL2570_0379327; CookMDL2570_0380878; CookMDL2570_0382334; CookMDL2570_0405333; CookMDL2570_0427098 (Jim Gardner emails); *see also* Turner, "Association of Inferior Vena Cava Filter Placement for Venous Thromboembolic Disease and a Contraindication to Anticoagulation with 30-Day Mortality; *see also* Bikdeli, "Data Desert for Inferior Vena Caval Filters, Limited Evidence, Supervision, and Research"

[2] Turner, "Association of Inferior Vena Cava Filter Placement for Venous Thromboembolic Disease and a Contraindication to Anticoagulation with 30-Day Mortality.

[3] *See* CookMDL2570_0379327; CookMDL2570_0380878; CookMDL2570_0382334; CookMDL2570_0405333; CookMDL2570_0427098 (Jim Gardner emails).

[4] *See* CookMDL2570_0379327; CookMDL2570_0380878; CookMDL2570_0382334; CookMDL2570_0405333; CookMDL2570_0427098 (Jim Gardner emails).

[5] CookMDL2570_0379327; CookMDL2570_0380878; CookMDL2570_0382334; CookMDL2570_0405333; and CookMDL2570_0427098

[6] See, e.g., CookMDL2570_0379327; CookMDL2570_0380878; CookMDL2570_0382334; CookMDL2570_0405333; CookMDL2570_0427098 (Jim Gardner emails).

serious patient safety issue, since recent evidence indicates that one in six Medicare beneficiaries with pulmonary embolism received an IVC filter for secondary prevention.[7] The global market for inferior vena cava filters exceeded 430 million dollars in 2016.[8]

There is a lack of evidence that shows the Cook GT or any IVC filters protect lives.[9] There was no way for me, as an inserter of filters, to know if they worked or didn't work to prevent PE's. All doctors and patients must rely on the manufacturer to make a product that works for the use intended. Some of the treating doctors believe they work because they have seen clots caught in other patient's filters. Simply noting a clot was caught in the filter does not mean filters help prevent PEs. There must be evidence based medicine to show it. Many experts in our field are now concluding there is not enough evidence to support the use of IVC filters.[10] In fact, these practitioners are asking for advocacy from doctors, patients, payers and the FDA to scrutinize the safety and efficacy of filters.[11]

There have been three prospective randomized trials studying the use of inferior vena cava filters. Two in patients who could be anticoagulated and one in trauma patients. None of the three studies showed a survival advantage, decreased bleeding or reduction in symptomatic pulmonary embolism in patients who received inferior vena cava filter. These studies did demonstrate however a higher rate of deep venous thrombosis in the patients who received IVC filters. Moreover, two large retrospective studies in trauma patients have shown no survival benefit to patients who received inferior vena cava filters and a higher risk of deep venous thrombosis in those patients who did receive IVC filters. This is similar to the prospective trials.

Patients who receive IVC filters suffer more complications than patients who do not receive IVC filters.[12] Not only as a result of the higher rate of deep venous thrombosis but also the unique individual filter complications inherent in their design. Specifically, the Cook IVC filters have been shown to have an 86% perforation rate.[13] And all Cook filters in place for more than 71 days after implantation demonstrated perforation of the inferior vena cava

---

[7] Bikdeli, "Data Desert for Inferior Vena Caval Filters, Limited Evidence, Supervision, and Research"

[8] *Id.*

[9] *See*, e.g., CookMDL2570_0379327; CookMDL2570_0380878; CookMDL2570_0382334; CookMDL2570_0405333; CookMDL2570_0427098 (Jim Gardner emails); *see also* Turner, "Association of Inferior Vena Cava Filter Placement for Venous Thromboembolic Disease and a Contraindication to Anticoagulation with 30-Day Mortality; *see also* Bikdeli, "Data Desert for Inferior Vena Caval Filters, Limited Evidence, Supervision, and Research"

[10] Bikdeli, "Data Desert for Inferior Vena Caval Filters, Limited Evidence, Supervision, and Research"

[11] Bikdeli, "Data Desert for Inferior Vena Caval Filters, Limited Evidence, Supervision, and Research"

[12] Durack, "Perforation of the IVC: Rule Rather Than Exception After Longer Indwelling Times for the Gunther Tulip and Celect Retrievable Filters"

[13] *Id.*

wall.[14]  There was no difference in the perforation rate between the Cook Gunther Tulip filters and Cook Celect IVC filters.[15]  Furthermore, filter tilt has been reporting up to 40% of Cook Gunther Tulip filters and migration was reported in 12.5% of the filters.[16] Most conical shaped filters, such as the Gunther Tulip filter, cause perforations more than any other IVC filters.[17] In fact, the Tulip filter perforation rates have been described as "strikingly high"[18]  Perforations are problematic as they can interfere with surrounding organs, injure them and cause complication.[19] Unwanted problems include: infection, bleeding, IVC thrombosis, and limb loss. The longer a filter is in place the greater the extent of perforation, the less likely it can removed and can cause other complications. (Dowell 2015, Avgerinos 2013, Al-Hakin 2014) I have personally reviewed a case where a patient died from a conical-designed filter that perforated the IVC. An injury to the wall of the IVC can result in death.

There is little evidence IVC filters are beneficial, let alone the Cook Tulip IVC filter.  Cook IVC filters have been shown to have a higher rate of complications, especially the longer they are in the body.[20] Internal documents also show that the Tulip Filter becomes irretrievable after 14 days. Internal document also demonstrate that Cook underreported or failed to report adverse events.[21]This information was never conveyed to doctors or patients.

Cook was aware that the vast majority of retrievable filters are not retrieved.[22] Cook was aware of the lack of efficacy and failed to study their filters prior to allowing the filters to be sold and implanted in human beings in the market place.[23] Cook never performed sufficient testing to determine a safe indwell time for its retrievable filters, including the Gunther Tulip.[24] This

---

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17] Deso, "Evidence-Based Evaluation of Inferior Vena Cava Filter Complications Based on Filter Type"

[18] Durack, "Perforation of the IVC: Rule Rather Than Exception After Longer Indwelling Times for the Gunther Tulip and Celect Retrievable Filters"

[19] McLoney, "Complications of Celect, Gunther tulip, and Greenfield inferior vena cava filters on CT scan follow-up: a single-institutional experience;" Oh, "Removal of Retrievable Inferior Vena Cava Filters with Computed Tomography Findings Indicating Tenting or Penetration of the Inferior Vena Cava Wall;" Durack, "Perforation of the IVC: Rule Rather Than Exception After Longer Indwelling Times for the Gunther Tulip and Celect Retrievable Filters"

[20] Montgomery, "A Critical Review of Available Retrievable Inferior Vena Cava Filters and Future Directions."

[21] *See* CookMDL2570_0199010

[22] Montgomery, "A Critical Review of Available Retrievable Inferior Vena Cava Filters and Future Directions."

[23] CookMDL2570_0379327; CookMDL2570_0380878; CookMDL2570_0382334; CookMDL2570_0405333; and CookMDL2570_0427098

[24] *See* CookMDL2570_0182801

prevented treating doctors from understanding the impact of placing retrievable filters for permanent or long-term use.

When Mr. McDermitt's filter was placed, the untested and unsafe condition of the filter was not something that could have been anticipated by Mr. McDermitt or his doctors. The GT filter exposed Mr. McDermitt to a risk of physical harm beyond which could have been anticipated by him or his doctors. This continues into the future until his filter can be removed. It is my opinion that the lack of efficacy evidence and the lack of testing combined with the extensive risks made this product defective to Mr. McDermitt both at the time of insertion and afterward to evaluate if it should be left in or taken out.

<u>THE IFU AND OTHER COOK PROMOTION</u>

Cook's Instructions for Use for the Gunther Tulip Vena Cava Filter state that it "is intended for the prevention of recurrent pulmonary embolism."[25]  These instructions from Cook go on to say that the filter "can be safely retrieved." Further, in the "Potential Adverse Events" section of these instructions from Cook, perforation, migration, and fracture are not listed whatsoever.[26]

In 2005, Cook was promoting the Gunther Tulip filter as a product that "works just as well as a permanent filter," and that the Gunther Tulip should be used "for permanent or temporary use."[27]  Further, into 2007, Cook continued to promote the Gunther Tulip filter as "a powerful tool in the prevention of pulmonary embolism" and a device that comes with "the option to leave it or retrieve it" that could be used as a "temporary or permanent" filter.[28]

Plaintiff David McDermitt's implanting doctor, Dr. Sabah Butty, was actually part of a Cook retrieval study where signed a clinical investigators agreement indicating he understood Cook's instructions for using the device.[29]He testified that he remembered reading Cook's instructions for use for the Gunther Tulip filter in 2007.[30]

<u>INFORMED CONSENT</u>

I have read the depositions of the treating doctors in this case. They have testified that they recommended the Tulip filter (and still do) because they believe it helps prevent PEs. It is my opinion that the only reason to recommend a filter like the GT to a patient is if it helps to

---

[25]   Cook's Gunther Tulip Vena Cava Filter Instructions for Use from May 2005, December 2005, and October 2006 (CookMDL2570_1376718; CookMDL2570_1376730; and CookMDL2570_1376742).

[26] CookMDL2570_1376722; CookMDL2570_1376734; and CookMDL2570_1376746

[27] Cook's Gunther Tulip advertisement from 2005 (CookMDL2570_0835937).

[28] Cook's Gunther Tulip promotional brochure (Cook IVCF 001910).

[29] CookMDL2570_0401007

[30] Dr. Sabah Butty Dep., 196:15-197:04.

prevent PEs where anticoagulation is contraindicated. The only reason to keep the filter inside a patient is if it continues to help to prevent PEs and a patient cannot tolerate anticoagulation. If the filter does not prevent PEs then there are no benefits and only risks. Since doctors like myself and Mr. McDermitt's doctors did not have access to the internal documents of Cook regarding increased risks and the knowledge that Cook had not studied the efficacy or safety of the device, this information could not be imparted to the patient. Therefore, a patient, such as Mr. McDermitt could not make a proper risk benefit decision to utilize the device or to decide, after it was inserted, if it should be left in place. Based upon the information I know today about efficacy and risks that I have gained from internal documents and the literature, I rarely utilize filters for the prevention of PEs. It is my opinion that Mr. McDermitt had a right to expect that his filter was tested for efficacy and safety. Both he and his doctors had a right to know if it was not. It is my opinion that neither he nor his doctors were properly given an accurate safety and efficacy profile of this device by Cook. I do not fault Dr. Butty or any of Mr. McDermitt's doctors for this. I was under the same impression as they were until I saw the internal documents in these filter litigations.

<u>MR. McDERMITT'S INJURIES FROM THE FILTER</u>

I have carefully reviewed the records and particularly the CT chest scan of 4/21/17. It is my opinion that  Mr. McDermitt has suffered injuries directly as a result of the filter including: perforation, filter tilt , DVTs, difficulty in removing the filter as well as increased risk of injury in the future.

The first injury is perforation of the IVC wall.  The images of 4/21/17 show the hook tilted to the left and the lower images clearly show the 4 legs outside the wall of Mr. McDermitt's  IVC. There is a grading scale for perforations. 0 is no perforation.  1 is < 3 mm perforation. 2 is > 3 mm perforation. Grade 3 is the stunt touching an organ. Grade 4 is the strut perforating an organ ( I have measured these perforations as Grade 1 and 2). Therefore, as of 4/17/17, the filter had four struts which had perforated the IVC and are extending outside the wall.  Perforations are problematic as they can interfere with the surrounding organs, injure them and cause complication.  Unwanted problems include: infection, bleeding, IVC thrombosis and limb loss.  There have been several reports of patients bleeding to death due to Cook filter strut perforations. There is significant literature demonstrating the progressive nature of a perforation in the Gunther Tulip filters. The longer a filter is in place; the greater the extent of perforation, the less likely it can be removed, and the risk of the other complications noted above. That is certainly true for Mr. McDermitt. After a review of the internal documents, it is clear that Cook was not reporting the true risk of its filter to implanting doctors.

The second injury is filter tilt. The filter is tilted 20 degrees to the left lateral wall of the IVC compromising  its ability to capture clots. IVC filters tilted more than 15 degrees have a significantly lower ability to capture clots compared to vertical filters.[31] Even assuming a filter

---

[31] Durack, "Perforation of the IVC: Rule Rather Than Exception After Longer Indwelling Times for the Gunther Tulip and Celect Retrievable Filters"

does help prevent PE's, the risk of this filter in Mr. McDermitt is greater than any benefit he has received from the filter. There is no evidence that the Gunther Tulip filter has ever caught any clots.  The filter is tilted and largely ineffective.[32]

The third injury is DVTs. Multiple studies have shown that filters such as the Gunther Tulip increase the risk of DVTs. One study found the risk of DVT from a filter is elevated to 40%. In evaluating Mr. McDermitt, in order to determine if his filter was a substantial contributing cause of his DVTs, it is necessary to perform a differential diagnosis. There are a number of potential risk factors that can contribute to DVTs. The most significant are trauma, age, genetics, inactivity, history of heart disease, pregnancy, being overweight, smoking, hormonal changes and cancer among others. I have eliminated the other factors but considered that  Mr. McDermitt does have risk factors of age, heart disease, elevated blood pressure, genetics, trauma and inactivity. I have also considered that he had a BMI of 31.9. He does have a prior history of blood clots when he was injured in 2006 but not since then. I have also considered that he does not have a clotting disorder and is not a smoker.  Most  of Mr. McDermitt's risk factors relate to a slowing of the blood flow. The last thing Mr. McDermitt needed was another significant risk factor of up to 40% for DVT like his tilted filter. Considering all of the factors, any one of them could cause a blood clot however, the more  factors you add, the more likely it becomes. But one must consider that a risk of DVT from the filter of up to 40% is a very significant risk factor to add to the others that would slow the blood flow.  It is my opinion that the filter was a substantial contributing cause along with his other risk factors to his recent DVTs.

The fourth injury to Mr. McDermitt is the risk of removing the filter and future risks of complications. Mr. McDermitt has now tolerated anticoagulation therapy with Xarelto and Pradaxa. While he should never have been subjected to the long term risks of the Tulip filter in the first place given the lack of efficacy evidence, he certainly does not need one now. Yet, removal for him will be difficult and subjects him to risk. I have removed many filters including the Tulip and its substantial equivalent the Celect. Perforation, tilt, endothelialization, length of time a filter is in place and the age of a patient all play a role in how difficult  a filter can be to removed.  Mr. McDermitt's Gunther Tulip filter has four perforations of the IVC wall which extend through and outside the inferior vena cava wall. The filter is tilted 20 degrees, and has likely become endothelialized. It is my opinion that removal of this filter would be difficult and likely require an open procedure for removal. It is important to note that even the IFU for retrieval indicates that excessive force should not be used to remove the filter. A tearing of the wall of the IVC can be fatal.[33] Removal of this filter carries risks of its own, especially for the 82-year-old Mr. McDermitt.  If the filter cannot be removed, then Mr. McDermitt should be monitored by way of a yearly CT scan to understand if the perforations noted above are progressing to the point of puncturing an organ or other structure and to monitor for further DVTs. Moreover, he is at risk of worsening tilt, perforation, migration, and fracture. Mr.

---

[32] *Id*.
[33] Cheaito, "Management of traumatic blunt IVC injury."

McDermitt is also at risk for further DVTs. These risks will increase the longer the filter is in place.

Mr. McDermitt's IVC filter represents a greater risk to him than any purported benefit. There is no evidence his filter ever prevented a pulmonary embolism.  Mr. McDermitt has a filter inside his IVC that has no proven efficacy to prevent PE's. It has tilted 20 degrees which makes it largely ineffective even if it did work.  Mr. McDermitt has been subjected to needless risks of the filter (perforation, tilt, loss of efficacy of the filter, and DVT) and has sustained an injury to the wall of his IVC with four perforations. These could progress over time and cause further injury to the surrounding structures; such as the aorta, kidney, lumbar vertebral bodies. He has also now suffered two DVTs which are most probably from the filter. Taking out the filter will be difficult since it is endothelialized and the legs are perforating the wall four ways.

I would recommend a complex percutaneous removal of the IVC filter as it is no longer needed and represents a threat to Mr. McDermitt including further DVTs, further perforation, tilt, and migration. This type of removal is not the way the filter was designed to be removed.  The surgeon's fees for a percutaneous removal are $1,124.  Removal could also involve a complex open removal which would have risks of bleeding, infection, death, filter fragmentation and fragment embolization. The surgeon's fees for such a procedure would be $4069, and $554.00 for the physician's assistant.  I have enquired with our hospital as to the hospital costs of each of these procedures and will forward them when I get them. If the filter must be left in, Mr. McDermitt should be monitored by CT scan of the abdomen to monitor the IVC filter for further deterioration and interaction with surrounding structures.This scan will also help to identify future complications such as further perforation, migration or fracture or even death

<u>CONCLUSIONS</u>

In short, the GT filter was designed and sold by Cook to help prevent pulmonary embolism. Yet, Cook has no compelling evidence that the GT filter works to prevent pulmonary embolism. Without this evidence, this filter is all risk and no benefit. The untested and unsafe condition of the filter when it was inserted and when it was utilized as a permanent filter was not something that could have been anticipated by Mr. McDermitt or his doctors.  The GT filter exposed Mr. McDermitt to a risk of physical harm beyond which could have been anticipated by him or his doctors. This risk continues into the future until his filter can be removed. It is therefore my opinion that the Gunther Tulip filter is unreasonably dangerous to Mr. McDermitt.

My opinions are based on my review of scientific and medical literature, Cook internal documents, depositions, expert reports, and my clinical experience, education, and training. I reserve the right to supplement these opinions if additional information becomes available for review. I did my own medical literature research and review, as well as reviewing literature provided to me by Plaintiff's counsel.  It is anticipated that I will show video material and/or cartoon representations at the time of trial for illustrative purposes to help educate the jury on

how Mr. McDermitt's IVC filter was placed, how it deteriorated within him, and the subsequent damages the IVC filter caused to him.

Appendix A
*Curriculum Vitae*
# **Curriculum Vitae**

**Name:**                    Derek David Muehrcke, M.D.

**Business:**                Cardiothoracic & Vascular Surgical Associates, P.A.
                             300 Health Park Blvd.
                             St. Augustine, FL 32086
                             (904) 494-2394

**Home:**                    973 North Griffin Shores Drive
                             Saint Augustine, Florida 32080
                             (904) 910-2343

**E-Mail:**                  dmuehrcke@aol.com

**Birthplace:**              Oak Park, Illinois

**Education:**               Grinnell-Rush Medical College Program    7/76-6/80
                             7-year College/Medical School Program
                             Grinnell College
                             Grinnell, Iowa

                             Rush-Presbyterian                        7/80-6/83
                             St. Luke's Medical Center
                             College of Medicine
                             Chicago, Illinois

**Residency:**               Intern-General Surgery                   7/83-6/84
                             Massachusetts General Hospital
                             Harvard Medical School
                             Boston, Massachusetts

                             Resident-General Surgery                 7/84-6/86
                             Massachusetts General Hospital
                             Harvard Medical School
                             Boston, Massachusetts

                             Registrar-General and Vascular Surgery   7/86-6/87
                             Plymouth Health Authority
                             National Health Service
                             Plymouth, England

| | | |
|---|---|---|
| **Residency:**<br>**(Continued)** | Honorary Senior Registrar<br>Thoracic Surgery<br>Merseyside Health Authority<br>Liverpool, England | 7/87-6/88 |
| | Senior Surgical Resident<br>Massachusetts General Hospital<br>Harvard Medical School<br>Boston, Massachusetts | 7/89-6/91 |
| | Chief Resident<br>Cardiac and Thoracic Surgery<br>Massachusetts General Hospital<br>Harvard Medical School<br>Boston, Massachusetts | 7/91-6/93 |
| | Chief Resident<br>Pediatric Cardiac Surgery<br>Harvard Medical School<br>Boston, Massachusetts | 7/93-12/93 |
| | Associate Staff<br>Thoracic and Cardiovascular Surgery<br>The Cleveland Clinic Foundation<br>Cleveland, Ohio | 1/94-6/96 |
| | Cardiothoracic and Vascular<br>Surgical Associates<br>St. Vincent's/Baptist Hospital<br>Jacksonville, Fl | 1/96-Present |
| | Chief of Cardiothoracic and<br>Vascular Surgery<br>Flagler Hospital, St. Augustine, FL | 8/03-Present |
| | Board Member Florida Society of<br>Thoracic and Cardiovascular Surgery | 2/03-Present |

|  |  |
|---|---|
| Council-Florida Society of Thoracic And Cardiovascular Surgery | 2/04-Present |
| President of Cardiothoracic and Vascular Surgical Associates | 2002-2004 |

**International Surgeon Exchange:**

With Jacksonville Florida's sister city Murmansk, Russia visiting surgeon,
United States Government Teaching Exchange Program          1997

**Research Positions:**          Research Fellow          7/88-6/89
Cardiovascular Research Institute
Department of Medicine
University of California
San Francisco, California

**Honors and Awards:**          Dean's List Student          1976-1979
Grinnell College

Grinnell Book Award          1976

Midwest Conference All Conference          1979
Football Team Selection

NCAA Academic All-American Football          1979
Team Selection

NCAA Student-Athlete Scholarship Award          1979

Phi Beta Kappa          1980

Alpha Omega Alpha          1982

Edward D. Churchill Fellow          1988
Cardiac Surgery Research

Black Belt (1st Degree)  Songahm Taekwondo  2005
Songahm Taekwondo Instructor          2007
Black Belt (2nd Degree)  Songahm Taekwondo 2007

**Certification:**

| | | |
|---|---|---|
| | Diplomat | 1983 |
| | National Board of Medical Examiners | |
| | American Board of Surgery | 4/92-7/02 |
| | #37190 | |
| | American Board of Thoracic Surgeons | 6/95-2/05 |
| | Re-Certification of American Board | 2013-2025 |
| | Of Thoracic Surgeons | |
| | # 5704 | |

**Licensure:**

| | | |
|---|---|---|
| | Temporary Medial License | 1983-1986 |
| | Commonwealth of Massachusetts | |
| | Limited Registration | 1986-1988 |
| | General Medical Council | |
| | Great Britain | |
| | Temporary Medical License | 1988-1989 |
| | State of California | |
| | Permanent Medical License | 1990-1993 |
| | Commonwealth of Massachusetts | |
| | #73403 (9/26/90) | |
| | State Medical Board of Ohio | 1993-Present |
| | #35-06-5609 (8/19/93) | |
| | Florida Medical License | 1996-Present |
| | #ME 70163 (3/27/96) | |
| | Georgia Medical License | 1999-Present |
| | #047351 | |

## Current Areas of Research:

1) Quantitative Myocardial perfusion software development for Novadeq SPY angiography.

## Areas of Expertise:

1) Adult Cardiac Surgery
2) Adult Thoracic surgery

3)  Vascular surgery

**Editorial Positions**:
Reviewer and Invited commenter for the Annals of Thoracic Surgery 1993-present

**Presentations:**

1.  Reconstructive Airway Surgery Following Irradiation.  Poster sessions at The Society of Thoracic Surgeons 30th Anniversary Meeting, January 31 – February 2, 1994 New Orleans, Louisiana.
2.  Flow Characteristics of Aortic Cannulae.  Gem Communications, Ins., October 27-30, 1994, Montreal, Canada.
3.  Combined Surgical and Long-term Antifungal Therapy for Treatment of Fungal Prosthetic Valve Endocarditis: Long-term Results.  Poster Session at the Society of Thoracic Surgeons 31st Annual Meeting, January 30 – February 1, 1995, Palm Springs, California.
4.  Valve Surgery. Cleveland Clinic Foundation Grand Rounds.  Department of Thoracic and Cardiovascular Surgery, 1994 Annual Report.  February 17, 1995.
5.  Innovative Advances in Valve Replacement.  Fifteenth Annual Dimensions in Cardiac Critical Care Nursing Symposium.  April 9-11, 1995.  Cleveland, Ohio.
6.  American Experience of Mitral Valve Repair.  The 5th Annual Meeting of Korean Society of Echocardiography.  May 26-29, 1995.  Seoul, Korea.

**Presentations Continued:**

7.  Intraoperative Echocardiography.  International Echocardiography Symposium, Kyungpook National University.  May 29, 1995.  Taegu, Korea.
8.  The Cleveland Clinic Experience with Mitral Valve Repairs.  International Echocardiography Symposium, Kyungpook National University.  May 29, 1995.  Taegu, Korea.
9.  Mitral Valve Repair.  Cardiovascular Conference at Hamot Medical Center.  August 16, 1995.  Erie, Pennsylvania.
10.  Cardiac Surgery in the Elderly.  The American Heart Association, Greater Los Angeles Affiliate's 63rd Annual Fall Symposium.  Current Controversies in Cardiology.  September 13, 1995.  Los Angeles, California.
11.  Kottke-Marchant K, Borsh, J, McCarthy P, Laasch C, Brooks L, Muehrcke DD, Platelet and coagulatin activation by heparin-coated cardiopulmonary bypass systems.  Poster presentation at the XVth Congress of the International Society on Thrombosis and Hemostasis, Jerusalem, Israel.  June 11-16, 1995.
12.  Haraski H, Benavides M, Wika K, Manos J, Fukamachi K, Muehrcke DD, Denaturation of plasma proteins during cardiopulmonary bypass.  Abstract.  Artif Organs 1995; 19

(10):1027.  (Accepted for presentation at International Society for Artificial Organs, November 14-18, 1995.  Taipai.)

13. Biopure and Corning Besselar, Inc., Investigators Meeting.  New Orleans, Louisiana. February 2, 1996.  Overview given by Dr. Muehrcke.

14. "American Correction"- Cosgrove-Edwards Annuloplasty System.  International Symposium on Mitral Valve Surgery.  February 10, 1996.  Harenberg City Center, Dortmund, Germany.

15. Valve Surgery.  Cleveland Clinic Foundation Grand Rounds.  Department of Thoracic and Cardiovascular Surgery, 1995 Annual Report.  February 16, 1996.

16. Myocardial Revascularization in the 90's and Beyond.  American Association of Critical Care Nurses Metroeast Chapter.  Collinsville, Illinois.  February 23, 1996.

17. Coronary Artery Disease:  What's New in Surgical Approaches?  Health Talks-The Latest Advances in Treating Heart Disease Today and Tomorrow Symposium.  Kent State University, Trumbull Campus-Administration Building.  February 28, 1996.

18. Procit Cardiovascular Surgery Advisory Board Meeting.  R.W. Johnson Pharmaceutical Research Institute.  New York, New York.  March 8-9, 1996.

19. Current Techniques in Mitral Valve Repair.  Lehigh Valley Hospital Regional Symposium-Series VII.  Lehigh Valley Hospital, Allentown, Pennsylvania.  March 22-23, 1996.Cardiac Surgery for Coronary Artery Disease-The BARI Trial.  Sixteenth Annual Dimensions in Cardiac Care Symposium.  Stouffer     Renaissance Cleveland Hotel, Cleveland, Ohio.  March 31-April 2, 1996.

20. Cardiovascular Surgery.  5th Annual International Congress for Fluorescence Guided Surgery. February 16- 19, 2018. Fort Lauderdale Florida

21. Cardiovascular Surgery.  6th Annual International Congress for Fluorescence Guided Surgery. February 15-18, 2019. Fort Lauderdale Florida

**Publications:**

1. Muehrcke DD, Kim SH, McCabe CJ.  Pediatric Splenic Trauma: Predicting the Success of Non-Operative Therapy.  Am J Emerg Med 1987; 5(2):109-112.

2. Muehrcke DD, Bliss BP.  Early presentation of phaeochromocytoma as acute arterial disease.  Br J Hops Med 1988; 30(6)531-535.

3. Kaplan DK, Muehrcke DD, Donnelly RJ.  Clinical results of pulmonary resections in carcinoma of the bronchus.  Br H Cancer 1987; 56:893.

4. Whyte RI, Kaplan DK, Sharpe DA, Muehrcke DD, Donnelly RJ.  Carcinoma of the bronchus with unsuspected microscopic resection-line involvement.  Cancer 1988; 62(5):1014-1016.

5. Muehrcke DD, Kaplan DK, Donnelly RJ.  Oesophagogastrectomy in patients greater than 79 years of age.  Thorax 1989; 44(2):141-145.

6.  Muehrcke DD, Donnelly RJ.  Oesophagogastrectomy in the elderly.  Ann R Coll Surg Engl 1988; 70(4):259-260.

7.  Muehrcke DD, Kaplan DK, Donnelly RJ.  Anastomic narrowing after esophagogastrectomy with the EEA stapling device.  J Thorac Cardiovas Surg 1989; 97(3): 434-438.

8.  Muehrcke DD, Donnelly RJ.  Complications after esophagogastrectomy using stapling instruments.  Ann Thorac Surg 1989; 48(2): 257-262.

9.  Muehrcke DD, Szarnicki RJ.  Use of pericardium to control bleeding after ascending aorta graft replacement.  Ann Thorac Surg 1989; 48(5): 706-708.

10.  Coggins D, Austin R, Flynn A, Aldea G, Muehrcke DD, Goto M, Hoffman JIE.  Non-uniform loss of regional flow reserve during myocardial ischemia in dogs.  Circ Res 1990; 67:253-264.

11.  Flynn AE, Coggins DL, Austin RE, Muehrcke DD, Aldea GS, Goto M, Doucette JW, Hoffman JE.  Non-uniform blood flow in the canine left ventricle.  J Surg Res 1990; 49(2):379-384.

12.  Goto M, Flynn A, Doucette J, Jansen C, Stork MM, Coggins DL, Muehrcke DD, Husseini W, Hoffman J.  Cardiac contraction affects deep myocardial vessels predominantly.  Am J Physiol 1991; 261 (5 Pt 2):H1417-1429.

13.  Flynn, AE, Coggins DL, Muehrcke DD, Austin RE, Goto M, Hoffman JIE.  Regional autoregulatory capacity in the canine left ventricle.  Circ 1989; 80; Suppl II 191.

14.  Goto M, Flynn AE, Doucette JW, Muehrcke DD, Jansen CMA, Husseini W, Hoffman JIE.  Impeding effect of myocardial contraction on regional myocardial blood flow.  FASEB J 1990; 4: A404.

15.  Ryan DP, Muehrcke DD, Doody DP, Kim SH, Donahoe PK.  Laryngotracheoesophageal cleft (Type IV): management and repair of lesions beyond  the carina.  J Pediatr Surg 1991; 26(8): 962-970.

**Publications Continued:**

16.  Donnelly RJ, Kaplan D, Whyte RI, Muehrcke DD.  Esophagogastrectomy using the EEA stapler.  [In] Current Practice of Surgical Stapling.  Eds. Ravitch MM, Steichen FM, Welter R, Lea and Febiger, Philadelphia.  1991; 37: 223-226.

17.  Muehrcke DD, Daggett WM. Survival after repair of post-infarction ventricular septal defects in patients over the age of 70.  J Cardiac Surg 1992; 7(4): 290-300.

18.  Muehrcke DD, Daggett WM, Buckley MJ, Akins CW, Hilgenberg AD, Austen WG.  Postinfarct  ventricular septal defect repair: effect of coronary artery bypass grafting.  Ann Thorac Surg 1992; 54(5): 876-883.

19.  Muehrcke DD, Torchiana DF.  Warm heart surgery in patients with cold autoimmune disorders.  Ann Thoracic Surg 1993; 55(2): 532-533.

20.  Muehrcke DD, Suen HC, Mathisen DJ, Grillo HC, Wain JC.  Surgical Treatment of thyroid cancer invading the airway.  Surgical Rounds 199; 669-675.

21.  Muehrcke DD, Grillo HC, Mathisen DJ.  Reconstructive airway operation after irradiation.  Ann Thorac Surg 1995; 59: 14-18.

22. Muehrcke DD.  Fungal prosthetic valve endocarditis.  Sem Thorac Cardiovasc Surg 1995; 7(1):20-24

23. Muehrcke DD, McCarthy PM, Stewart RW, Seshagiri S, Ogella DA, Foster RC, Cosgrove DM.  Complications of extra corporeal life support systems using heparin-bound: the risk of intracardiac clot formation.  J Thorac Cardiovasc Surg 1995; 110: 843-851.

24. Muehrcke DD, Lytle BW, Cosgrove DM.  Surgical and long-term antifungal therapy for treatment of fungal prosthetic valve endocarditis.  Ann Thorac Surg 1995; 60: 538-543.

25. Muehrcke DD, Cosgrove DM.  The Cleveland Clinic experience with mitral valve repair.  J Korean Soc Echocard 1995; 3(1): 39-43.

26.  Eckhardt WF III, Forman S, Denman W, Grillo HC, Muehrcke DD.  Another use for the laryngeal mask airway-as a blocker during tracheoplasty.  Anesth Analg. 1995 80:622-624.

27.  Harasaki H, Benavides M, Wika K, Manos J, Fukamacki K, Muehrcke DD.  Denaturation of plasma proteins during cardiopulmonary bypass.  (Abstract) Artif Organs 1995; 19(10): 1027.

28. Muehrcke DD, Grimm RA, Nissen SE, Cosgrove DM.  Recurrent cerebral vascular accidents are an indication for ascending aortic endarterectomy.  Case Report.  Ann Thorac Surg 1996; 61: 1516-1518.

**Publications Continued:**

29. Muehrcke DD, McCarthy PM, Stewart RW, Foster RC, Ogella DA, Borsh  JA, Cosgrove DM.  Extracorporeal membrane oxygenation for postcardiotomy cardiogenic shock.  Ann Thorac Surg 1996; 61: 684-691.

30. Muehrcke DD, McCarthy PM, Kandice Kottke-Marchant, Harasaki H, Yared JP, Borsh JA, Ogella DA, Cosgrove DM.  Biocompatability of heparin-coated extracorporeal bypass circuits: a randomized masked, clinical trial.  J Thorac Cardiovasc Surg 1996; 112: 472-483.

31. Groom RC, Hill AG, Akl BF, Speir AM, Massimiano PS, Lefrak EA, Muehrcke DD, Cosgrove DM.  Effect of cannula length on aortic arch flow: protection of the ateromatous aortic arch.  Letter to the Editor, Ann Thorac Surg 1996; 61: 773-774.

32. Lytle BW, Priest BP, Taylor PC, Loop FD, Sapp SK, Stewart R, McCarthy PM, Muehrcke DD, Cosgrove DM.  Surgery for acquired hear disease.  Surgical treatment of prosthetic valve disease.  J Thorac Cardiovasc Surg 1996; 111: 198-210.

33. Terezhalmy GT, Safadi TJ, Longworth DL, Muehrcke DD.  The oral disease burden impatients undergoing prosthetic heart valve implantation: A case for routine preoperative assessment.  Ann Thoracic Surgery 1997; 63: 402-404.6.

34. Muehrcke DD, Cosgrove DM, Lytle BW, Taylor PC, Burgar AM, Durnwald CP, Loop FD.  Is there an advantage to repairing infected mitral valves?  Ann Thoracic Surg 1997; 63: 1710-1724.

35. Gilinoff AM, Cosgrove DM, Lytle BW, Taylor PC, Stewart RW, McCarthy PM, Smediar NG, Muehrcke DD, Apperson-Hansen C, Loop FD.  Surgery for acquired heart disease: Reoperation for failure of mitral valve repair.  J Thorac Cardiovasc Surg 1997; 113-467-475.

36. Muehrcke DD, Vandervoort PM.  Echocardiography to assist mitral valve repair in patients with coronary artery disease.  Coronary Artery Disease, March 1996, Vol 7.  No 3.

37. Muehrcke DD, Cornhill FJ, Thomas JD, Cosgrove DM.  Flow characteristics of aortic Cannulae. J Card Surg 1995; 10:514-519.

38. Samuels L, Emery R, Lattouf O, Grosso M, AlZeerah M, Schuch D, Wehberg K, Muehrcke DD, Dowling R.  Transmyocardial Laser Therapy: A Strategic Approach.  The Heart Surgery Forum #2003-3011 7 (3), 2004 [Epub May 2004].

39. Gaudino M., Nasso G., Canosa C. Glieca F., Salica A., Alessandrini F., Possati G., Invited Commentary-D.D. Muehrcke.  Midterm Angiographic Patency and Vasoreactive Profile of Proximal Versus Distal Radial Artery Grafts. The Annals of Thoracic Surgery. June 2005. Vol. 79

**Publications Continued:**

40. Invited Commentary-D.D.Muehrcke. Clinical and Radiological Outcome of Off-Pump Coronary Surgery at Twelve Months Follow-Up—A Prospective Randomized Trial.  Ann Thoracic Surg. 2006; 80:7095-2096.

41. Muehrcke DD, Barberi P, Shimp W.  Calcium Phosphate Cements To Control Bleeding In Osteoporotic Sternums. The Annals Of Thoracic Surgery, 2007; 84:259-61.

42. Muehrcke DD, Justice K,  Leiomyosarcoma of the Left Ventricle.  The Annals Of Thoracic Surgery, 2008; 86:666.

43. Muehrcke DD, Shimp W, Aponte-Lopez, R: Calcium Phosphate Cements Improve Bone Density when used in Osteoporotic Sternums. Ann Thoracic Surgery, 2009: 88:1658-61.

**Chapters:**

1. Camacho MT, Muehrcke DD, Loop FD.  Mechanical complications of acute myocardial infarction.  [In] Management of Cute Myocardial Infarction; Editors: Julian DG, Braunwald E; London, W.B. Saunders Company Ltd, 1994; 291-314.

2. Muehrcke DD, Coagrove DM Mitral Valvuloplasty.  Cardiac Surgery in the Adult. 1997; 33:991-1024.

3. Muehrcke DD, Dagett WM.  Current surgical approach to acute ventricular septal rupture.  [In] Advances in Cardiac Surgery.  Editors:  Karp RB, Laks H, Wechsler AS; Chicago, Mosby Year Book, Inc. 1994; 6: 69-70.

4. Muehrcke DD, Loop FD.  Surgical treatment of atherosclerotic coronary heart disease.  [In] Hurst's The Heart, Arteries and Veins ed. 9; Editor: Alexander, RW; McGraw-Hill Publishing Company, 1998; 50:1437-1488.

5. Angiography during Cardiovascular Surgery (In) Video Altas of Intraoperative Applications of Near Infrared Fluorescence Imaging. Editors Aleassa, EM, El-Hayek, KM. Springer Nature, In press.

Appendix B
Articles reviewed

1) An T, Moon E, Bullen J, et al. Prevalence and clinical consequences of fracture and fragment migration of the Bard G2 filter: imaging and clinical follow-up in 684 implantations

2) Binkert, AC, Drooz, AT, JG et al., Technical Success and Safety of Retrieval of the G2 Filter in a Prospective, Multicenter Study. J Vasc Interv Radiol 2009, 20:1449-1453.

3) Bjarnason, In Vitro Metal Fatigue Testing of Inferior Vena Cava Filters

4) Cantwell, Comparison of the Recovery and G2 Filter as Retrievable Inferior Vena Cava Filters

5) Caplin, Quality Improvement Guidelines for the Performance of Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism

6) Carabasi, Complications Encountered with the Use of the Greenfield Filter

7) Carlin, Prophylactic and Therapeutic Inferior Vena Cava Filters to Prevent Pulmonary Emboli in Trauma Patients

8) Carman, Update on Vena Cava Filters

9) Charles, G2 Inferior Vena Cava Filter: Retrievability and Safety

10) Cherry, Prophylactic Inferior Vena Cava Filters: Do They Make a Difference in Trauma Patients? (abstract only)

11) Cipolla, Complications of vena cava filters: A comprehensive clinical review

12) Dato, Posttraumatic and iatrogenic foreign bodies in the heart: Report of fourteen cases and review of the literature.

13) Davison, TrapEase Inferior Vena Cava Filter Placed via the Basilic Arm Vein: A New Antecubital Access

14) Deso, Evidence-Based Evaluation of Inferior Vena Cava Filter Complications Based on Filter Type

15)  Desjardins. Fragmentation, Embolization, and Let Ventricular Perforation of a
     Recovery Filter

16)  Dinglasan, Removal of Fractured Inferior Cava Filters: Feasibility and Outcomes

17)  Douma, Wandering Wire…Where?-A heartrending report

18)  Dowell, Celect Inferior Vena Cava Wall Strut Perforation Begets Additional Strut
     Perforation

19)  Durack, Perforation of the IVC: Rule Rather Than Exception After Longer
     Indwelling Times for the Gunther Tulip and Celect Retrievable Filters

20)  Wood, "Reporting the Impact of Inferior Vena Cava Perforation By Filters"
     JOURNAL OF VASCULAR SURGERY; Vol. 55, No. 1

21)  Endovascular Today, PRESERVE Study to be a Comprehensive Evaluation of
     Inferior Vena Cava Filter use

22)  Engmann, Clinical Experience with the Antecubital Simon Nitinol IVC Filter

23)  FDA, Inferior Vena Cava (IVC) Filters: Initial Communication: Risk of Adverse
     Events with Long Term Use

24)  Ferris, Percutaneous Inferior Vena Caval Filters: Follow up of Seven Designs in
     320 Patients

25)  FDA warning letter to Mr. Timothy M Ring July 13, 2015 (BPV-17-01-
     00204231)

26)  Girard, Medical Literature and Vena Cava Filters

27)  Grassi, Quality Improvement Guidelines for Percutaneous Inferior Vena Cava
     Filter Placement for the Prevention of Pulmonary Embolism

28)  Grassi, Vena Caval Occlusion after Simon Nitinol Filter Placement: Identification
     with MR Imaging in Patients with Malignanacy

27)  Hannawa KK, Good ED, Haft JW, Williams DM. Percutaneous extraction of
     embolized intracardiac inferior vena cava filter struts using fused intracardiac
     ultrasound and electroanatomic mapping

28)  Harries, Long-Term Follow-up of the Antheor Inferior Vena Cava Filter

29) Hemmila. Prophylactic Inferior Vena Cava Filter Placement Does Not Result in a Survival Benefit for Trauma Patients

30) Hull, Retrieval of the Recovery Filters after Arm Perforation, Fracture, and Migration to the Right Ventricle

31) Hull, Bard Recovery Filter: Evaluation and Management of Vena Cava Limb Perforation, Fracture, and Migration

32) Johnson, Single Institution Prospective Evaluation of the Over-the-Wire Greenfield Vena Caval Filter

33) Johnson, Vena Cava Filter Fracture: Unplanned Obsolescence

34) Lemaire, Needle Embolus Causing Cardiac Puncture and Chronis Constrictive Pericarditis.

35) Morales, Decision Analysis of retrievable inferior vena cava filters in patients without pulmonary embolism

36) Kalva, Recovery Vena Cava Filter: Experience in 96 Patients

37) Kalva. Suprarenal Inferior Vena Cava Filters: A 20-Year Single Center Experience

38) Karmy-Jones, Practice Patterns and Outcomes of Retrievable Vena Cava Filters in Trauma Patients: an AAST Multicenter Study

39) Kaufman, Guidelines for the Use of Optional (Retrievable and Convertible) Vena Cava Filters

40) Kaufman, Guidelines for the Use of Retrievable and Convertible Vena Cava Filters: Report from the Society of Interventional Radiology Multidisciplinary Consensus Conference

41) Kaufman, Development of a Research Agenda for Inferior Vena Cava Filters: Proceedings from a Multidisciplinary Research Consensus Panel

42) Kazuya. Experience of Temporary inferior vena cava filters inserted in the perinatal period to prevent pulmonary embolism in pregnant women with deep venous thrombosis

43) Kesselman AJ, Hoang NS, Sheu AY, Kuo WT. Endovascular removal of fractured inferior vena cava filter fragments: 5- year registry data with prospective outcomes on retained fragments

44)    Kinney, Update on Inferior Vena Cava Filters

45)    Kuo, High Risk Retrieval of Adherent IVC Filters: Techniques and Management
       of Thrombotic Complications

46)    Kuo, High-Risk Retrieval of Adherent and Chronically Implanted IVC Filters:
       Techniques for Removal and Management of Thrombotic Complications

45)    Kuo WT, Robertson SW. Bard Denali inferior vena cava filter fracture and
       embolization resulting in cardiac tamponade: a device failure analysis

46)    Kuo WT, Robertson SW, Odegaard JI, Hofmann LV. Complex retrieval of
       fractured, embedded, and penetrating inferior vena cava filters: a prospective
       study with histologic and electron microscopic analysis

47)    Lynch, Modified Loop Snare Technique for the Removal of Bard Recovery, G2,
       G2 Express, and Eclipse Inferior Vena Cava Filters

48)    Lynch, Removal of the G2 filter: differences between implantation times greater
       and less than 180 days

49)    McCowan, Complications of the Nitinol Vena Caval Filter

50)    Miller, Indications for Vena Cava Filters for Recurrent DVT

51)    Milward, Reporting Standards for Inferior Vena Caval Filter Placement and
       Patient Follow-up: Supplement for Temporary and Retrievable/Optional Filters

52)    Minocha, Improving Inferior Vena Cava Filter Retrieval Rates: Impact of a
       Dedicated Inferior Vena Cava Filter Clinic

53)    Monroe, Needle embolism in intravenous drug abuse

54)    Mutyala, Realistic expectations and candidate selection for entry level vascular
       technologist in a busy laboratory

55)    Nazzal, Letter to the Editor: A Complication of a G2 Bard Filter

56)    Nazzal, Complications Related to Inferior Vena Cava Filters: A Single-Center
       Experience

56)    NBC News. Why did firm keep selling problem blood-clot filters? 2015. Available
       at: http://www.nbcnews.com/health/health-news/why-did-firm-keep-selling-
       problem-blood-clot-filters-n488166

57)    Nicholson, Long-term Follow-up of the Bird's Nest IVC Filter

58)    Nicholson, Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade

59)    Nicholson, Refrain, Recover, Replace

60)    Nicholson, Correction to Article About Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters

61)    Oh, Removal of Retrievable Inferior Vena Cava Filters with Computed Tomography Findings Indicating Tenting or Penetration of the Inferior Vena Cava Wall

62)    Oliva, Recovery G2 Inferior Vena Cava Filter: Technical Success and Safety of Retrieval

63)    Oliva, Recovery G2 vena cava filter retrievability study

64)    Owens, Intracardiac Migration of Inferior Vena Cava Filters

65)    Poletti, Long-term Results of the Simon Nitinol Inferior Vena Cava Filter

66)    Putterman, Aortic Pseudoaneurysm after Penetration by a Simon Nitinol Inferior Vena Cava Filter

67)    Ray, Complications of Inferior Vena Cava Filters

68)    Ray, Outcomes with Retrievable Inferior Vena Cava Filters: A Multicenter Study

69)    Rogers. Five-Year Follow-up of Prophylactic Vena Cava Filters in High-Risk Trauma Patients

70)    Redberg, Medical Devices and the FDA Approval Process

71)    Simon, Simon Nitinol Inferior Vena Cava Filter: Initial Clinical Experience

72)    Smith, Vena Caval Filters

73)    Singer. Modeling Blood Flow in a Tilter Inferior Vena Cava Filter: Does Tilt Adversely Affect Hemodynamics?

74)    Smouse, Is Market Growth of Vena Cava Filters Justified?

75) Stavropoulos, Embedded Inferior Vena Cava Filter Removal: Use of Endobronchial Forceps

76) Streib, Complications of Vascular Access Procedures in Patients with Vena Cava Filters

77) Tam, Fracture and Distant Migration of the Card Recovery® Filter: A retrospective Review of 363 Implantations for Potentially Life- Threatening Complications

78) Taylor, Vena Tech Vena Cava Filter: Experience and Early Follow-Up

79) Trerotola SO, Stavropoulos SW. Management of fractured inferior vena cava filters: outcomes by fragment location

80) Turba, Management if Severe Vena Cava Filter Tilting: Experience with Bard G-2 Filters

81) Stavropoulos SW, Ge BH, Mondschein JI, Shlansky-Goldberg RD, Sudheendra D, Trerotola SO. Retrieval of tip-embedded inferior vena cava filters by using the endobronchial forceps technique: experience at a single institution

82) U.S. Food and Drug Administration, FDA Safety Communication: Removing Retrievable Inferior Vena Cava Filters

83) Vijay, Fractured Bard Recovery, G2, and G2 Express Inferior Vena Cava Filters: Incidence, Clinical Consequences, and Outcomes of Removal Attempts

84) Wang W, Zhou D, Obuchowski N, Spain J, An T, Moon E. Fracture and  migration of Celect inferior vena cava filters: a retrospective review of 741 consecutive implantation

85) Zhu, Retrievability and Device-Related Complications of the G2® Filter: A Retrospective Study of 139 Filter Retrieval

86) Asch, Initial Experience in Humans with a New Retrievable Inferior Vena Cava Filter

87) Andreoli, Comparison of Complication Rates Associated with Permanent and Retrievable Inferior Vena Cava Filters:  A Review of the Maude Database

88) Angel, Systematic Review of the Use of Retrievable Inferior Vena Cava Filters

89) Al-Sahaf, An Unusual case of needle embolus presenting with delayed
spontaneous pneumothorax

90) Bikdeli, Inferior Vena Cava Filters to Prevent Pulmonary Embolism: Systemic
review and Meta-Analysis.

91) Bikdeli, Data Desert of Inferior Vena Caval Filters: Limited Evidence,
Supervision, and Research.

92) Bikdeli, Systemic Review of Efficacy and Safety of Retrievable Inferior Vena
Caval Filters

93) Bikdeli, Inferior Vena Caval Filter Utilization and Outcomes in Medicare
Beneficiaries with Pulmonary Embolism from 1999-2010

94) Bikdeli, Association of Inferior Vena Cava Filter Use With Mortality Rates in
Older Adults with Acute Pulmonary Embolism

95) Grewal, Complications of Inferior Vena Cava Filters

96) McLoney, Complications of Celect, Gunther tulip, and Greenfield inferior vena
cava filters on CT scan follow-up: a single-institutional experience

97) Durack, Perforation of the IVC: Rule Rather Than Exception After Longer
Indwell Times for the Gunther Tulip and Celect Retrievable Filters

98) Hemmila, Prophylactic Inferior Vena Cava Filter Placement Does Not Result in a
Survival Benefit for Trauma Patients

99) Sag, Analysis of tilt of the Gunther Tulip filter

100)    Ho, A Multicenter Trial of Vena Cava Filters in Severely Injured Patients

101)    Cook, Vena Cava Filter Use in Trauma and Rates of Pulmoanry
Embolism, 2003-2015.

102)    Hoffer, Safety and Efficacy of Gunther Tulip Retrievable Vena Cava
Filter: Midterm Outcomes

Derek D. Muehrcke, MD, FACS