**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| IN RE: COOK MEDICAL, INC., IVC | § | Case No. 1:14-ml-2570-RLY-TAB |
| FILTERS MARKETING, SALES | § | |
| PRACTICES AND PRODUCTS | § | MDL No. 2570 |
| LIABILITY LITIGATION | § | |
| | § | |
| This document relates to: | § | |
| | § | |
| All Cases Listed on Exhibit A | § | |
| To Doc. 26476 | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FAILURE-TO-WARN CLAIMS GOVERNED BY ILLINOIS LAW**

Come now plaintiffs and file this response to defendants' motion for summary judgment on failure-to-warn claims governed by Illinois law, and would respectfully show as follows:

**INTRODUCTION**

The Cook Defendants (collectively "Cook" or "defendants") have filed a motion for summary judgment as to failure-to-warn claims in 77 cases they contend are governed by Illinois law. For the reasons set forth below, the motion should be denied. At the outset, however, the Court should see the motion for what it is: simply another delay tactic.

This MDL is now in its eleventh year. The docket is closing in on 27,000 entries. Numerous plaintiffs have died. Not a single case has been remanded. Plaintiffs' motion for suggestion of remand has been pending for over two years.

Grimly determined to continue this MDL's existence for as long as humanly possible, Cook has now filed a motion for summary judgment as to a subset of claims pursued by roughly one percent of the plaintiffs left in this case. In a footnote on p. 2 of the motion, Cook states that this

is but an "initial" motion on the topic, and that it focused on Illinois first because of "the clarity of the Illinois case law on this issue." Defendants thus presumably intend to file 49 more motions, one for each state. Since Cook files its motions every few months now, that would take us roughly to the year 2045 at least, and then Cook would start filing motions about design defect claims. And if Illinois law on this issue is so clear, why would Cook oppose simply remanding the cases to Illinois?

Despite Cook's clear intentions, and its clear dilatory purpose, the Court should not tolerate this. The MDL needs to end. It is the oldest products liability MDL proceeding in this country, with any significant number of cases, by far. The Court cannot continue to entertain motions like this, for endless groups of a few dozen cases at a time, that could have been brought many years ago. Enough is enough.

## ARGUMENT

Plaintiffs respond below to Cook's contentions. To avoid duplicative briefing, in addition to what is set out below plaintiffs also hereby incorporate in full the responses to motions for summary judgment, including all exhibits, filed in the *Hill* case, docs. 6161-6177; the *Brand* case, docs. 9146-9168; the *Skief* case, doc. 26561, including exhibits; and the *Lech* case, doc. 26562, including exhibits.

The Court is familiar with the rules for motions for summary judgment. Cook carries the burden to demonstrate "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The Court must draw all reasonable inferences in plaintiffs' favor. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir. 1997). If any genuine

doubts remain, and a reasonable factfinder could find for the party opposing the motion, summary judgment must be denied.  *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

## I.  THE COURT CANNOT GRANT THIS MOTION ON A GLOBAL BASIS, WITHOUT REGARD FOR THE EVIDENCE IN INDIVIDUAL CASES

Cook argues that the Court should grant summary judgment as to failure-to-warn claims, brought by 77 persons whose cases it believes are governed by Illinois law, on the basis of the learned intermediary doctrine.  All of the cases subject to the motion involve non-bellwether plaintiffs, whose claims have gone through limited fact discovery to date with no depositions of the plaintiff, treating physicians, sales representatives, or other fact witnesses being permitted.

Cook does not argue that its warnings were adequate.  Its motion does not concern the adequacy of its warnings at all.  Rather, Cook asserts that "the potential risks and complications associated with IVC filter use became common knowledge in the medical community" by August 2010 at the latest.  Defendants argue that they "had no duty to warn of these risks and complications" after that date, because they "were undisputedly known and understood in the medical community as of that date."  Memorandum, doc. 26477, at 2.  Plaintiffs acknowledge that the learned intermediary doctrine exists in Illinois, and generally means that the duty to warn of a medical device's hazards is owed not to the patient but to the prescribing and treating physicians.  But the Court cannot decide this motion on a global basis, as requested by Cook, without regard to the facts in any individual case.

While the learned intermediary doctrine "is a defense used by manufacturers when sued based on its warnings….  The Illinois Supreme Court has held that, when a manufacturer fails to adequately warn doctors, the doctors cannot be considered learned intermediaries….  Moreover,

the adequacy of the warning is a question for the jury." *Green v. Ethicon, Inc*., 497 F.Supp.3d 364, 369-70 (C.D. Ill. 2020) (citations omitted).  The doctrine "is a shield against liability only where the manufacturer of a prescription drug has given adequate warning of known dangerous propensities of the drug to physicians." *McNichols v. Johnson & Johnson*, 461 F.Supp.2d 736, 749 (S.D. Ill. 2006).  See also *Wiltgen v. Ethicon, Inc*., 2017 WL 4467455, *7 (N.D. Ill. Oct. 6, 2017); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Prac. & Prods. Liab. Litig*., 2011 WL 6732245, *14 (S.D. Ill. Dec. 16, 2011).  As Judge Posner put it, "[t]he learned intermediary doctrine doesn't permit distributors to *conceal* a drug's adverse side effects from physicians, pharmacies, and consumers." *Walton v. Bayer Corp*., 643 F.3d 994, 1001 (7th Cir. 2011) (emphasis the court's).

The leading Illinois Supreme Court case relied upon by Cook is *Hansen v. Baxter Healthcare Corp*., 764 N.E.2d 35 (Ill. 2002).  There, plaintiff's decedent was injured when an IV tube became detached from a catheter.  She suffered an embolism which caused brain damage and paralysis, and eventually died.  Plaintiff obtained a verdict on products liability theories.  On appeal, the intermediate court of appeals held that the verdict could not be sustained as to plaintiff's failure-to-warn theory, but also that the evidence was sufficient to support the verdict as to plaintiff's defective design theory, and since the verdict was a general one it was upheld.  *Id*. at 37.  The Illinois Supreme Court affirmed the judgment of the court of appeals, but also reversed its holding as to the warnings claim, holding that "the record contains sufficient conflicting evidence concerning the comparative knowledge of Baxter and that of the medical community" concerning the alleged danger of Baxter's product.  *Id*. at 42.

The product at issue in *Hansen* was an IV tubing set, consisting of tubing, and a connector allowing the tubing to be connected to a catheter or other sections of tubing.  Defendant distributed

4

two types of connectors: "friction-fit" and "Luer-lock." Plaintiff's decedent was injured when a friction-fit connector came apart. As to the warnings theory, plaintiff alleged that "Baxter failed to warn of the likelihood of unintentional disconnection and the need to use tubing equipped with the Luer-locking device." *Id*. at 38.

The chief of surgery at the hospital "testified that decisions regarding the purchase of medical supplies were made by a nursing products committee. He said that Luer-locks were not used at Mt. Sinai prior to the incident, and he believed that most hospitals did not use them at that time. He stated that he assumed friction-fit connectors were safe because they were readily available in the market." The head of the nursing products committee, in turn, "testified that the hospital staff relied on product manufacturers to advise them of the appropriate uses for their products." *Id*. at 39.

The court of appeals held that the warnings claim was barred by the learned intermediary doctrine: "Baxter was not obliged to warn [decedent's] health-care providers of the risks associated with friction-fit connectors because they already knew that such risks existed." Id. at 40. The Illinois Supreme Court reversed this holding, however, after a thorough review of the competing evidence on the issue. While "the record indicate[d] that Baxter's employees knew of the inherent dangers of friction-fits and that Baxter's patent indicates that Luer-locks were designed to avoid accidental disconnections[,]… the testimony from persons on the medical staff at Mr. Sinai shows that they had significantly less knowledge." Id. at 42. In particular, "the fifth-year resident who assisted at [decedent's] surgery, was unaware of any literature describing the frequency of unintentional separation with friction-fit connectors, despite reading and subscribing to several well-known medical journals." The surgeon "who actually placed the catheter in [decedent's]

jugular vein, stated that he was unfamiliar with Luer-lock connectors and did not learn about them until after the incident." *Id*. at 42-43.

The court ultimately concluded that "Baxter gave the medical community no warning at all about the need to use Luer-locks in central line applications. Thus, this issue was properly submitted to the jury." *Id*. at 43. The court relied on *Proctor v. Davis*, 682 N.E.2d 1203 (1997), for its holding that "a drug manufacturer that only shared information about its product's toxicity with its own employees breached its duty to warn the medical community because without this information, doctors could not provide appropriate and comprehensive medical advice for their patients. This prevented them from functioning as 'learned intermediaries' to protect their patients' best medical interests.… Doctors who have not been *sufficiently* warned of the harmful effects of a drug cannot be considered 'learned intermediaries' and the adequacy of warnings is a question of fact, not law, for the jury to determine, as it did in the instant case." *Id*. at 43, quoting *Proctor, supra* (emphasis the Illinois Supreme Court's).

In *Hansen*, then, the holding turned on the testimony of the health-care providers actually involved in the procedure and use of the medical device at issue. That is the obvious problem with defendants' motion: the learned intermediary doctrine requires proof that the doctors themselves actually received adequate warnings. Again, "[d]octors who have not been sufficiently warned of the harmful effects of a drug cannot be considered 'learned intermediaries' and the adequacy of warnings is a question of fact, not law, for the jury to determine…." *Hansen, supra*, quoting *Proctor, supra*, 764 N.E. 2d at 43 (emphasis the court's). Without evidence that a particular plaintiff's doctors received sufficient warnings, those doctors cannot be considered learned intermediaries, and so Cook's duty would run to the plaintiff himself.

This is the fundamental reason that the motion must be denied. Cook asks the Court to dismiss the claims of 77 plaintiffs on the basis that their doctors were learned intermediaries, without providing a shred of evidence about what warnings the doctors in any given case actually received. But without such evidence, those doctors are not learned intermediaries at all.

Cook's answer to this problem, apparently, is to suggest that the Court first should simply deem all plaintiffs' doctors to have had the knowledge and warnings of the "medical community." Then the Court should go further and decide, as a matter of law, that that knowledge and those warnings were sufficient, such that all doctors – no matter what their individual circumstances -- magically became learned intermediaries. But that is not the way the doctrine works.

Cook's cases do not support this approach at all. *Cook does not cite a single case in which a court applied the learned intermediary doctrine to bar a claim, without any evidence of what the plaintiff's doctors actually knew or didn't know.* There is no case that dismisses a claim simply on the basis that the theoretical "medical community" knew of the risks involved, without any reference to what the real doctors in the case knew.

As detailed above, *Hansen* upheld a plaintiff's verdict against a medical device maker on warnings theories. The Illinois Supreme Court discussed decedent's doctor's knowledge at length. *Proctor*, supra, also upheld a jury verdict in plaintiff's favor.

Taking the rest of the cases at pp 19-23 of defendants' memorandum in the order cited, in *Gravitt v. Mentor Worldwide, LLC*, 646 F.Supp.3d 962 (N.D. Ill. 2022), the court dismissed plaintiff's claims on preemption grounds. *Id*. at 966-68. The statements concerning the learned intermediary doctrine, therefore, are dicta. Leaving that aside, the court specifically considered the knowledge of plaintiff's physician, noting that the evidence that the "product insert data sheet made available to … the surgeon who performed the implant surgery" stated literature regarding

the risks of the implant, and that plaintiff "offers no evidence from her physicians – in the form of an affidavit, deposition or otherwise – as to what they would have recommended had they been made aware earlier" of certain reports.  *Id*. at 969.

*Ashman v. SK&F Lab Co*., 702 F.Supp. 1401 (N.D. Ill. 1988) was decided on the basis that "plaintiffs' own expert… supports the conclusion that [plaintiff's treating physician] was adequately informed.  The learned intermediary doctrine applies where a physician is alerted to the dangerous properties of a particular drug and nonetheless decides to prescribe it."  *Id*. at 1405. The only issue in *Martin v. Ortho Pharmaceutical Corp*., 661 N.E.2d 352 (Ill. 1996), was whether Illinois would recognize an exception to the learned intermediary doctrine for cases involving oral contraceptives. "Plaintiffs [did] not dispute the continued viability of the learned intermediary doctrine in Illinois.  Nor [did] plaintiffs allege that the warnings supplied by the doctrine to Martin's prescribing physician were inadequate."  Id. at 354.

In *Hernandez v. Schering Corp*., 958 N.E.2d 447 (Ill. App. 2011), the Illinois court of appeals held that the learned intermediary doctrine still applied to plaintiffs' claims even though defendant had offered "educational classes" to patients about the drug in question.  *Id.* at 452-54. On the merits of the defense, the court affirmed the grant of summary judgment because it found that plaintiff's expert on warnings was unqualified to testify, and without such testimony, plaintiffs could not prevail.  *Id*. at 456.  *Leesley v. West*, 518 N.E.2d 760 (Ill. App. 1988), simply held that Illinois had recently recognized the learned intermediary doctrine, *id*. at 760-61, and that it protected pharmacies as well as manufacturers*.  Id*. at 762-63.  In *Aquino v. C.R. Bard, Inc*., 413 F.Supp.3d 770 (N.D. Ill. 2019), the court held only that "under the learned intermediary doctrine, a manufacturer has no duty to warn patients directly of the risks of prescription medical products so long as it provides sufficient warnings to the physician….  Accordingly, Aquino's failure to

8

warn claims fail to the extent they concern a duty running directly from Bard to Aquino."  Id. at 789-90.

Cook next cites *Robinson v. Ethicon, Inc*., 588 F.Supp.3d 726 (S.D. Tex. 2022).  It precedes this citation with the highly misleading statement that "federal labeling regulations…expressly excuse medical device manufacturers from any duty to warn of risks generally known in the medical community."  Memorandum at 21.  Cook quotes C.F.R. §801.109(c) for its language that warnings of hazards "may be omitted from the dispensing package if [such hazards] are commonly known to practitioners licensed by law to use the device."  Memorandum at 21.  But Cook omits the very next sentence, which states that "[u]pon written request…the [FDA] Commissioner will offer an opinion on a proposal to omit such information from the dispensing package under this provision."  *Robinson*, 588 F.Supp.3d at 733-34.  Cook offers no evidence that this was ever done.

Then Cook quotes *Robinson*, to the effect that "a warning could be adequate even if it does not warn of certain side effects if the side effects are common knowledge to physicians licensed to use the device."  Memorandum at 22.  But defendants' next sentence gives the game away.  It describes *Robinson's* holding as "declining to exclude expert's opinion on warning where defendant had not shown actual physicians' knowledge of specific risks."  That is the point:  such evidence, of the "actual physicians' knowledge, is necessary for purposes of the learned intermediary doctrine.[1]

In a footnote on p. 21 of its memorandum, Cook cites tobacco and alcohol cases for the proposition that when dangers of a product are widely known within "the community," summary judgment may be granted.  It goes without saying, however, that the knowledge of "the

---

[1] In a footnote, Cook states that "the Court need not address any preemptive effect of section 801.109 (c) on plaintiffs' failure-to-warn claims…."  This aside makes sense, since there is no such preemptive effect. *Mahr v. G.D. Searle & Co*., 390 N.E.2d 1214, 1229 (Ill. App. 1979) ("such compliance is only minimal and does nothing to abrogate or alter duties arising under common law.").

community," that tobacco and alcohol are potentially dangerous, is entirely different from what the "medical community" might know about the risks of a particular kind of IVC filter.

Finally, defendants cite *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387 (Ill. 1987), to the effect that "a treating physician – by virtue of education, training, and experience – is in the best position to evaluate a patient's needs, assess the risk and benefits of the available treatment options, make a treatment recommendation, and provide warnings to the patient of the relevant risks of the treatment options." Memorandum at 22. This anodyne proposition is one that plaintiffs do not dispute, but it is entirely irrelevant here. Plaintiffs acknowledge that the learned intermediary doctrine requires warnings be made only to physicians, not patients; the question here is whether the Court can simply magically hold that any inquiry into the warnings is unnecessary, because "the medical community" already knew everything there was to know. *Kirk* contains no such holding; the issue there was whether the circumstances of the plaintiff's injury – the "drug would be dispensed without warnings by the physicians,…the patient would be discharged from the hospital, drink alcohol, drive a car, lose control of his car, hit a tree, and injure the passenger…on the same day" -- were too unforeseeable to impose any duty. *Id*. at 394.

Cook cites two instances in which the Court has granted summary judgment on bellwether plaintiffs' warnings claims. In both instances, however, the Court's rulings depended on *the testimony of the individual physicians in that case as to what they each personally knew*. See Doc. 9696 at 8-9 (ruling in *Brand*) (Dr. Rheudasil "(1) did not rely on the Celect IVC filter's IFU, (2) already knew at the time of plaintiff's implant about all of the complications plaintiff experienced, and (3) would not have treated plaintiff any differently even knowing now the complications she actually suffered."); see also Doc. 6660 (*Hill*) (plaintiff's doctor didn't read the label and "testified

he was fully aware of the risks of the surgery, including the risk of perforation of the vena cava and surrounding organs and stenosis of the vena cava.").

Finally, there is no merit to Cook's argument that it can't be held liable for failing to warn of the "increased risk of … potential risks and complications occurring with Tulip or Celect filters as compare to other IVC filters." Memorandum at 26. For this proposition it cites two cases, both of which are distinguishable. The first case, *Ackley v. Wyeth Laboratories*, 919 F.2d 397 (6th Cir. 1990), was decided under Ohio law, not Illinois law.

In *Ackley*, plaintiff was injured after taking the DTP vaccine as an infant. At issue was the pertussis portion of the vaccine. Wyeth's pertussis vaccine was of the "whole cell" variety, while there were also two other designs for the vaccine: "split-cell" and "acellular." Wyeth obtained summary judgment as to plaintiff's claims, and she appealed.

As to her strict liability claims, the Sixth Circuit held that the DTP vaccine was an "unavoidably unsafe product" and thus could not be defective for strict liability purposes. *Id*. at 399-403. As to the negligence claims concerning warnings, the court first held that plaintiff's evidence failed to raise a fact question as to the adequacy of the warnings that were given. *Id*. at 405. Finally, as to plaintiff's contention that the warning should have contained statements "that other vaccine designs were safer," the court stated simply that the "relevance" of this omission was "open to question, even if true." The court also stated that defendant was "not obligated to provide a comparison of its drug with others." *Id*. (footnote omitted.).

The other case cited by defendant is *Pluto v. Searle Laboratories*, 690 N.E.2d 619 (Ill. App 1997). There, plaintiff alleged that she was implanted with an IUD manufactured by defendant, and later "contracted a sexually transmitted disease ('STD') which resulted in pelvic inflammatory disease ('PID'). Eventually the PID progressed to a point where it was determined that Pluto

required a total abdominal hysterectomy…." *Id*. at 620.  Plaintiff alleged, among other things, that

defendant "did not properly warn physicians and patients of the increased risk of contracting an

STD and/or PID when using an [IUD] as compared to other forms of birth control…." *Id* at 620.

The trial court granted summary judgment, and plaintiff appealed.

The Illinois court of appeals affirmed.  It rejected plaintiff's contention in the following

language:

> Searle had no duty to warn patients or physicians of the relative effectiveness of the
> Cu–7 *as compared to other forms of birth control*.  Initially, we note that plaintiff's
> argument is based on a faulty premise. Both Dr. Grimes and Dr. Sweet testified that
> condoms, oral contraceptives and diaphragms provide partial protection against
> STDs and/or PID. At no point did plaintiff allege that IUDs were designed to
> provide protection from disease, nor did plaintiff argue that IUDs cause disease.
> Further, no one testified to that effect. Yet, plaintiff argues that defendant had a
> duty to warn potential users of the Cu–7 about the "increased risk" of contracting
> an STD or PID while using an IUD. The term "increased risk" in this context is an
> anomaly. *Condoms, oral contraceptives, diaphragms, and IUDs are each designed
> to act as a form of contraception. However, only condoms, oral contraceptives and
> diaphragms have the added benefit of providing protection from disease. IUDs
> were not designed to protect users from STDs or PID, and IUDs do not cause
> disease. Thus, it is incorrect to argue that the use of the IUD results in an
> "increased risk" of contracting a disease.* Accordingly, we find plaintiff's
> argument unavailing.

*Id.* at 621 (emphasis added).

The obvious distinction between *Pluto* and this case is that there, plaintiff asserted a duty

to warn about the relative safety of the product in her case compared to other kinds of birth control

entirely.  More recent cases have distinguished *Pluto* on exactly this basis.  In *Schedin v. Ortho-*

*McNiel-Janssen Pharmaceuticals, Inc.*, 776 F.Supp.2d 907 (D. Minn. 2011), plaintiff sued the

maker of Levaquin, for failure to warn of the risk of ruptured tendons.  Levaquin was in a class of

drugs called "fluoroquinolones," and plaintiff contended that defendant's label was inadequate, in

part, "because it did not warn that Levaquin had higher tendon toxicity than other

fluoroquinolones." *Id* at 908. Plaintiff's suit was the first bellwether case tried in the Levaquin MDL, and he obtained a jury verdict in his favor.

Defendant brought a motion for judgment as a matter of law. One of defendant's arguments was that it had "no duty to provide information about the superiority of other drugs," citing *Pluto* and *Ackley*. The court denied defendant's motion, holding that "[t]hose cases are distinguishable from the instant case, however, since information on comparative drugs was germane to the particular issue and Levaquin has not been classified as 'unavoidably unsafe.'" *Id*. at 914.

In a more recent case applying Illinois law, *In re Depakote*, 2015 WL 4776093 (S.D. Ill. Feb. 14, 2015), plaintiffs alleged that their child was born with spina bifida due to the mother's use of defendant's drug, Depakote, while pregnant. Depakote was an anti-epilepsy drug, or "AED." Plaintiffs attacked the adequacy of the warnings on several bases, including that the label "failed to inform the reader of essential safety information, such as medical reports indicating that Depakote was associated with higher incidences of birth defects than other AEDs...." *Id*. at *4.

The court denied summary judgment as to the adequacy of the warnings. Defendant cited *Pluto* in support of its argument that the fact that the label "left out certain comparative risk information relating to teratogenicity of the drug is irrelevant because Abbott had no duty to include such information on the label under Illinois law." *Id*. at *6. The court noted, however, that "*Pluto* did 'not involve warnings that already included comparative information' and similarly, [plaintiff's] failure to warn claim 'does not arise solely from the alleged comparative information included' in the 1999 label." *Id*. at *6, quoting *J. B. by Lejeune v. Abbott Laboratories, Inc*., 2014 WL 1464204, *5 (S.D. Ill. Apr. 14, 2014). The court went on to note "plaintiffs' position that Abbott included such comparative risk information in its label, and once it did this, it assumed a duty to adequately warn by ensuring that the comparative information provided was

accurate, up-to-date, and neither false nor misleading, citing *Kasin v. Osco Drug, Inc*., 728 N.E.2d 77, 80-81 (Ill. App. 2000) (explaining that under the voluntary undertaking theory, when one voluntarily undertakes to provide a warning, the information provided in that warning must be accurate) (citing *Frye v. Medicare-Glaser Corp*., 605 N.E.2d 557 (Ill. 1992))." The court reviewed the testimony on this score and ultimately held that "[a] jury could reasonably rely on this testimony to conclude that the manner in which corporative teratogenicity was referenced on the label was misleading and insufficient." *Id*. at *6.

So too here. *Pluto* is inapplicable for the reasons stated in these cases. Plaintiffs here do not argue that Cook should have warned about the risks of filters as compared to other entirely different therapies, such as stents, continued use of heparin, etc. Rather, as the Court is well aware, plaintiffs simply maintain that Cook knew very well of the risks of its products and should have warned about them.

And as in *Depakote*, decided by the Illinois federal court, here Cook very much did compare its filters with those of its competitors, thus assuming a duty to be fully forthcoming and truthful regarding those comparisons. For instance, in the marketing document attached as exhibit A, Cook explicitly compared its filters' penetration incidence with that of other filters. In the document attached as exhibit B, an e-mail thread with the subject line of "Supporting documents to sell against Meridian filter," Cook suggests that its product is better than that of its competitor Bard. In exhibit C, another e-mail thread entitled "selling against Bard Denali v. 2," it suggests that its filters are better than Bard's Denali filter.

Cook thus is outside the limited exception to duty carved out in *Pluto*, and is fully liable for its inadequate warnings. It fully undertook the comparison with other brands of filters. Having done so, it was obliged to be fully truthful and informative.

In sum, again, Cook has cited no authority for what it asks the Court to do. Every learned intermediary case turns on evidence about the actual physicians and the actual products involved in the plaintiff's case. To quote *Proctor*, *supra*, again, "[d]octors who have not been sufficiently warned of the harmful effects of a drug cannot be considered 'learned intermediaries' and the adequacy of warnings is a question of fact, not law, for the jury to determine, as it did in the instant case." 682 N.E.2d at 1215. Under this clear statement of Illinois law, defendants' motion must be denied.

## II. THE EVIDENCE DOES NOT ESTABLISH, AS A MATTER OF LAW, THAT THE "MEDICAL COMMUNITY" KNEW OF THE RISKS OF COOK'S FILTERS

Even if the Court could decide this case in the way Cook wishes it to, Cook never provides any legal definition of the "medical community." It cites no Illinois case defining this term, or any case from anywhere for that matter. How, then, can the Court simply hold, as a matter of law, that every single doctor in Illinois can be charged with every bit of information Cook says they should have had?

It should go without saying that the "medical community" in Illinois, or anywhere else, consists of an infinite variety of doctors of differing experience, education, training, specialties, skill, and so on. It includes doctors such as "the fifth-year resident who assisted at [decedent's] surgery" in *Hansen*, who "was unaware of any literature describing the frequency" of the risk at issue, "despite reading and subscribing to several well-known medical journals." It also includes prescribing physicians of many different specialties, who are almost certainly not as familiar with IVC filters as are interventional radiologists who are typically the treating physicians in this context.

Cook relies on three documents to argue that the "medical community" knew about all of the risks of IVC filters no later than August 2010. Cook describes the first document as a

"guidance document" released to the "medical industry" in November 1999.  Memorandum at

23.  But this document, attached as exhibit B to Cook's motion, wasn't addressed to the "medical

industry," whatever that is.  It was simply entitled "Guidance for Industry and FDA

Reviewers/Staff."  As the subject of the document was "cardiovascular intravascular filter 510(k)

submissions," the "industry" to whom "guidance" was being conveyed was of course the

companies making IVC filters.

     In fact, a "guidance document" is not provided to physicians at all.  21 C.F.R. §10.115

defines "guidance documents" as follows:

> § 10.115 Good guidance practices.
>
> (a) What are good guidance practices? Good guidance practices (GGP's) are
> FDA's policies and procedures for developing, issuing, and using guidance
> documents.
>
> (b) What is a guidance document?
>
> (1) Guidance documents are documents prepared for FDA staff,
> applicants/sponsors, and the public that describe the agency's interpretation of or
> policy on a regulatory issue.
>
> (2) Guidance documents include, but are not limited to, documents that relate to:
> The design, production, labeling, promotion, manufacturing, and testing of
> regulated products; the processing, content, and evaluation or approval of
> submissions; and inspection and enforcement policies.
>
> (3) *Guidance documents do not include*: Documents relating to internal FDA
> procedures, agency reports, *general information documents provided to
> consumers or health professionals*, speeches, journal articles and editorials, media
> interviews, press materials, warning letters, memoranda of understanding, or other
> communications directed to individual persons or firms.

(emphasis added.)    This "guidance document" shows nothing about what the "medical

community" knew or didn't know, therefore, since it never went to the medical community at all.

     Next, Cook cites an "FDA Communication" in 2010, which it says was "addressed

directly" to treating physicians and related clinicians."  See Cook's exhibit C.  Again, this is highly

16

misleading language.  This "communication" was not sent to anyone.  It was simply posted on FDA's website.  The same is true for Cook's exhibit D, another "communication" which was also just a webpage.

Presumably if there were a single case, from any court anywhere, that held as a matter of law that every single doctor in the United States is deemed to know everything posted on the FDA's website, Cook would have cited it.  But there is no such case, of course.  The Court cannot dismiss cases on the basis of such a proposed rule, for obvious reasons: there simply is no support for the notion that every doctor can be deemed to have knowledge of all website postings.

Cook next insists that "multiple medical articles published before 2010" concerned the risks of which plaintiffs contend Cook should have warned.  Memorandum at 25.  In fact, Cook mentions only a grand total of five such articles, published over a period of five years.  Memorandum at 10-11.  Two of them are actually the same article.  See paragraphs 23 and 24 on p. 10.  That makes four journal articles, that Cook argues mean all doctors everywhere were somehow on notice of the risks of its filters.

Again, this is such an outlandish proposition that it is hardly surprising that Cook cites no authority for it.  It would be as if plaintiffs cited four medical journal articles about the risks of filters, and then asked the Court to hold that Cook had been negligent in designing its filters, because Cook had been on notice *as a matter of law* of their risks from those four articles.

While Cook doesn't cite any cases for its contention, we know that Illinois courts wouldn't accept it.  In *Hansen,* once again, the Illinois Supreme Court upheld a jury verdict for plaintiff, finding that the resident who assisted at decedent's surgery was not a learned intermediary because he "was unaware of any literature describing the frequency of [the hazard at issue] despite reading

and subscribing to several well-known medical journals." So too here. Four medical journal articles do not create awareness of a risk, as a matter of law, on the part of all doctors anywhere.

Finally, Cook quotes the testimony of doctors from a few bellwether cases. It states that these doctors "learned of the potential risks of IVC filters through their medical school educations, their training, and their experience, not from IVC filter manufacturers." Memorandum at 12. But because no depositions have occurred in any of the cases subject to this motion, there is no factual record of any of the treating physicians' education, training or clinical experience. This evidence, of course, is necessary to evaluate how and when, if at all, they became aware of the risks of IVC filters, including what they were told or not told by Cook. The Illinois cases cited above highlight the importance of the backgrounds, training and experience of the individual physicians involved.

The testimony quoted by Cook is cherry-picked and misleading. For example, Dr. Rheudasil, implanting physician of bellwether plaintiff Brand, testified he would not have implanted her with the Cook Celect filter, if he was informed that that filter perforated at a greater rate than the Cook Tulip filter. Rheudasil deposition, 153:2-156:11, ex. D. He also stated:

Q. Okay. If safety features had been removed from a prior generation filter by Cook, then, and the new filter was the Celect, if safety features had been removed, then would you have informed your patient, "Look, I'm about to put a filter in you, but there are some safety features that have been removed from that filter," is that something that you would disclose to the patient?

MS. PIERSON: Object to form.

A.    No. Once again, if I thought significant safety features had been removed, I would choose another filter.

*Id* at 158:3-14.  Dr. Zuzga, treating physician for bellwether plaintiff Hill, testified that the IFU should contain all information relevant to safe use:

> Q. Now, the IFU should tell you what you need to know about the safe use of device; correct?
>
> A. Yes
>
> ...
>
> Q: Okay. So you would expect the IFU to fairly tell you what risks events are associated with use of this product. That would be your expectation; right?
>
> MS. PIERSON: Object to form.
>
> A: Yes.

Zuzga deposition, ex. E, at 48:19-21, 52:32-53:3; see also pp. 55:19-56:12.

The Court should also recognize, of course, that testimony from treating doctors in other cases shows that the learned intermediary doctrine should not apply here.  In those cases, state courts denied Cook's motions for summary judgment.  For example in the *Pavlock* case in Texas state court, Dr. Wong, the treating physician, stated that he relied in part on the accuracy of the IFU.  He also testified as follows:

> Q. (BY MR. MATTHEWS) Assume with me that the Celect filter that you implanted in Jeff Pavlock on March 3rd, 2015, had perforated Jeff's IVC and then progressively perforated his aorta, his duodenum and his renal vein, assume that to be true, that was something you were never warned about either in the IFU or by Cook?

MR. MANDLER: Same objection, foundation, purports to ask an expert opinion.

A. That is a specific question. I mean, I don't think -- they would probably just, in a -- say that there is a risk of perforation about specifically those organs, you know, I -- or those structures, I don't know. But, I mean, I would assume they would discuss the risks of the product.

Q. (BY MR. MATTHEWS) My question is specific, and I think you just stated that there is mention in the IFU that you might perforate the IVC, but in terms of what happened with Jeff Pavlock, that there was a perforation of his IVC and then there was a perforation of his aorta, his duodenum and his renal vein, specific to that injury to adjacent organs, that was something you were never warned about in the IFU, correct?

MR. MANDLER: Same objection.

A. There's -- I mean specifically, I don't recall that being specifically in there. I know they talk about perforation, but specifically damage to surrounding structures and specifically those in particular, you know, I don't think that's in there.

Q. (BY MR. MATTHEWS) That's something that you would want to have known prior to implanting the Celect filter?

MR. MANDLER: Same objection.

Q. (BY MR. MATTHEWS) True?

A. That's something that is -- with the perforation, there's a lot of structures there that are -- potentially could be, I guess, touched by the filter, yes.

20

Q. But specific to perforating other adjacent organs, that's something that you would have wanted to know prior to placing the filter?

A. Sure. Yes.

Wong deposition ex F, at 24:2-7, 63:18-65:8; 63:18- 65:8.

Dr. Erich Kim, the implanting doctor for Pennsylvania state court plaintiff Kuhn, stated:

Q. (By Mr. Arbon) Do you look to the IFU for the risk and benefits that the manufacturer is aware of with regard to their IVC product?

A. Yes.

Q. Would you go to Exhibit No. 4, please. I will direct you to page 5. Under "Potential Adverse Events," Doctor, does Cook tell the physician anything about the potential for their filters to fracture?

A. I do not see it listed here.

Q. Does it say anything about the potential for their filter to tilt on deployment?

A. It does not.

Q. Does it say anything about tilt after deployment or at any time during its implementation?

A. Does not.

Q. Does it say anything about perforation increasing the risk of fracture if it occurs?

A. No.

Q. Would it be helpful to you as a physician who used to implant these to have had that information at the time you implanted them?

Object as to form.

A. It would have been helpful, yes.

Dr. Erich Kim, deposition, 183:6-184:6, attached as ex G.

This testimony shows that individual doctors were not warned adequately. Summary judgment was not granted in these cases. These doctors, of course, are just as much part of the hypothetical "medical community" as any others, and their testimony shows that summary judgment cannot be granted here, in broad-brush fashion, without regard to evidence in any individual plaintiff's case.

### III.  COOK ITSELF CORRUPTED THE MEDICAL LITERATURE AND THEREFORE CAN'T RELY ON THE LEARNED INTERMEDIARY DOCTRINE

Another reason that the Court cannot grant summary judgment across the board, on the basis of what the amorphous "medical community" knew about the risks of its filters, from the "medical literature" or from FDA statements, is that Cook itself corrupted the medical literature. In *Proctor*, *supra*, upon which Cook relies, the Illinois court of appeals held that when the defendant itself is responsible for medical literature which does not fully warn of all the risks then known to the defendant, the learned intermediary doctrine cannot shield the defendant. The court noted that defendant

> encouraged and participated in disseminating misleading information concerning the use of its drug to the "learned intermediaries," through financial support, technical assistance, and abundant supplies of the drug during the period when Upjohn was receiving adverse information concerning this use of the drug. Ironically, some of these very reports became part of the literature which was supposed to inform the "learned intermediaries" about application of the drug intraocularly.

22

*Id.* at 1214.  The court thus held that "[a]lthough it is assumed that physicians will keep abreast of current medical literature here, part of the flawed literature was generated by [defendant]."  *Id.* at 1215.

For this reason among others, the court upheld plaintiff's verdict on a failure-to-warn theory in *Proctor*.  See also *Plass v. Dekalb Eye Consultants, LLC*, 2020 WL 6391282, *3 (Ill. App. Oct. 30, 2020) (if manufacturer deceives the treating physicians, learned intermediary doctrine does not apply); *Africano v. Atrium Med. Corp.*, 2021 WL 2375994, *10 (N.D. Ill. June 10, 2021) ("Naturally, when a manufacturer or its representatives withholds crucial information about a drug or medical device, it has breached its duty to warn the medical community because without this information, doctors could not provide appropriate and comprehensive medical advice for their patients….") (quoting *Plass, supra*).

There is substantial evidence in these cases that Cook did exactly the same thing.  The assumption that Cook asks the Court to make – that all physicians who implanted IVC filters knew of all the risks of Cook filters by August 9, 2010, and specifically the Celect filter -- is belied by a recent in-depth article about the information gap between what Cook knew about its filters, and what it reported to doctors.  This article shows that "adverse events and patient deaths were misreported to FDA reviewers and were inaccurately reported in the published literature and on the device label, providing patients and clinicians with inaccurate information about the device's safety."  This peer reviewed article, published just three months ago, analyzed internal documents obtained during this litigation, that were unavailable to doctors and the public. Kadakia K, Bikdeli B, Gupta A et al., *Information Disclosure, Medical Device Regulation, and Device Safety: The Case of Cook Celect IVC Filters,* Ann. Int. Med. Dec. 2024, 177:1711-1718.

This article, published in the Annals of Internal Medicine, "compared what was known to the manufacturer and the Food and Drug Administration (FDA) and what was publicly reported." *Id* at 1711. Six authors, one of whom was a testifying expert in the *Brand* bellwether case, studied Cook's internal documents, some of which included data collected by Cook during its pivotal study known as the "OUS."

The authors performed a detailed analysis of what Cook reported to the FDA and what Cook reported about its study in the Journal of Vascular and Interventional Radiology (JVIR), as well as what Cook put in its label (IFU). This analysis showed that Cook's internal documents "describe previously undisclosed issues related to study design, conduct, and analysis" indicating that "adverse events and patient deaths occurred during the OUS study but were not reported in the FDA's decision summary, were mischaracterized in the JVIR publication, and were misreported on the device label." *Id*. at 1713-14. For example, among many others cited, the OUS study's independent academic adjudication committee ruled that two deaths were due to device complications, but "the JVIR publication's authors undermined the committee's assessment when reporting these deaths in the peer-reviewed literature." *Id*. at 1714-15.

These misrepresentations by Cook (one of the authors was employed by Cook), were not limited to the JVIR publication. In fact, Cook's "IFU states that 'one death was adjudicated as procedure related,' which mischaracterizes the committee's assessment that the death in question was related to the Celect device itself rather than being solely attributable to the procedure." *Id*. In addition, six additional suspicious deaths had occurred, while the published JVIR manuscript "does not report details of these deaths." *Id*. Outlining other mischaracterizations of the OUS data, including safety risks such as perforation and thrombosis, the authors conclude that

"uncertainty remains for the thousands of patients who had Celect filters implanted in their bodies." *Id*. at 1716.

It should also be noted that the authors discuss the 2010 and 2014 FDA communications, upon which Cook places such great reliance. They conclude that "the FDA made no specific statements about Celect despite issuing general safety communications about IVC filters [in those two FDA communications]." *Id*. at 1713. So while Cook wants the 2010 FDA communication to serve as an arbitrary date for all physicians' knowledge of the risks of its filters, that communication does not mention Cook's filters with specificity, and instead discusses some general risks of IVC filters. It says nothing about what Cook misreported, mischaracterized, or otherwise hid from doctors, patients, and the public in general.

This peer-reviewed article in the *Annals of Internal Medicine* article sums up Cook's conduct in this way: "[T]he public record indicates that adverse events and patient deaths were misreported to FDA reviewers and were inaccurately reported in the published literature and on the device label, providing patients and clinicians with inaccurate information about the device's safety." *Id*. at 1711. As noted above, when the defendant itself is partially responsible for the "flawed literature" by which it seeks to shield itself, the learned intermediary doctrine will not apply. The holding of the Illinois court of appeals on this question is worth quoting in full:

> *To conclude that the existence of literature in such a case constitutes knowledge on the part of doctors and the medical community equal to that of a drug's manufacturer, would encourage more writings of the type found in this case, fostered by the very defendant upon whom responsibility should be fixed.* Such an insidious situation as here existed should be neither countenanced, encouraged nor condoned. The evidence demonstrates that Upjohn knew or should have known of the risks and dangers attendant to the use of Depo–Medrol, thereby requiring warning.

*Proctor, supra*, 682 N.E.2d at 1215 (emphasis added). For this additional reason, the learned intermediary doctrine cannot insulate Cook here.

## CONCLUSION

Wherefore, premises considered, plaintiffs pray that Cook's motion be in all things denied.

Dated: March 17, 2025.                                Respectfully submitted,

                                               */s/ Ben C. Martin*
                                               Ben C. Martin
                                               Ben Martin Law Group
                                               3141 Hood St., Suite 600
                                               Dallas, TX  75219
                                               (214) 761-6614
                                               bmartin@bencmartin.com

Joseph N. Williams
Williams Law Group, LLC
1101 North Delaware St.
Indianapolis, IN  46202
(317) 203-9075
joe@williamsgroup.law
*Liaison Counsel to Plaintiffs'
Steering Committee and on
Behalf of Plaintiffs'
Steering Committee*

Michael Heaviside
Heaviside Reed Zaic
800 Connecticut Ave.
Suite 300
Washington, DC  20006
(202) 223-1993
mheaviside@hrzlaw.com

David P. Matthews
Matthews and Associates
2509 Sackett St.
Houston, TX 77098
(713) 522-5250
dmatthews@thematthewslawfirm.com

Charles S. Siegel
Waters Kraus & Paul
3141 Hood St.
Suite 200
Dallas, TX  75219
(214) 357-6244
siegel@waterskraus.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ Ben C. Martin*
Ben C. Martin