# EXHIBIT D

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

In Re:  Cook Medical, Inc.,        )
IVC Filters Marketing, Sales       )
Practices and Products             )
Liability Litigation               )
                                   )Case No.
                                   )1:14-ml-2570-RLY-TAB
                                   )MDL No. 2570
_____)
                                   )
                                   )
This Document Relates:             )
Brand v. Cook Medical,             )
Inc., et al.                       )
Case No. 1:14-cv-06018-RLY-TAB     )

VIDEOTAPED DEPOSITION OF

MARK RHEUDASIL, M.D.

February 28, 2018

1:08 p.m.

Emory Vein Center

5673 Peachtree Dunwoody Road

Suite 625

Atlanta, Georgia

Robin K. Ferrill, CCR-B-1936, RPR

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

APPEARANCES OF COUNSEL

On behalf of the Plaintiff
BEN C. MARTIN, Esquire
      Law Office of Ben C. Martin
      3710 Rawlins Street
      Suite 1230
      Dallas, Texas   75219
      214.761.6614
      bmartin@bencmartin.com


MICHAEL HEAVISIDE, Esquire
      Heaviside Reed Zaic
      910 17th Street, N.W.
      Suite 800
      Washington, DC   20006
      202.223.1933
      mheaviside@hrzlaw.com


On behalf of the Defendants Cook Incorporated, Cook
Medical LLC (f/k/a Cook Medical Incorporated), and
William Cook Europe ApS
ANDREA ROBERTS PIERSON, Esquire
ANNA C. RUTIGLIANO, Esquire
      Faegre Baker Daniels LLP
      300 N. Meridian Street
      Suite 2700
      Indianapolis, Indiana   46204
      317.237.0300
      andrea.pierson@faegreBD.com
      anna.rutigliano@faegreBD.com


ALSO PRESENT:
      Tonya Brand
      David Ramirez, Videographer
      Bryan Robinson, Videographer

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 3

INDEX

VIDEOTAPED DEPOSITION OF

MARK RHEUDASIL, M.D.

February 28, 2018

EXAMINATION BY                                        PAGE

Ms. Pierson                                        9, 183

Mr. Martin                                        99, 206

Mr. Heaviside                                         172


DESCRIPTION OF EXHIBITS

EXHIBIT  IDENTIFICATION                               PAGE

Exhibit 1    First Amended Notice of Videotaped    11

Deposition of Dr. Mark Rheudasil

Exhibit 2    Curriculum Vitae                      13

Exhibit 3    Document entitled, Tonya Brand -      31

Dr. Rheudasil Treatment

Exhibit 4    Vascular Institute of Georgia         38

Medical Information Sheet, Bates

number 000086 - 000089

Exhibit 5    Vascular Institute of Georgia         41

Records, 2/6/09

Exhibit 6    Letter to Morrison from Rheudasil,    49

2/16/09, Bates stamped 000163

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 4

INDEX CONTINUED

DESCRIPTION OF EXHIBITS

EXHIBIT   IDENTIFICATION                                        PAGE

Exhibit 7    Northside Hospital Informed Consent  65
Form, Bates stamped Northside Hosp. 617

Exhibit 8    Northside Hospital Operative Note,   68
Bates stamped Northside Hosp. 485 - 486

Exhibit 9    Progress Note, Bates stamped         75
Brand_000893 - 895

Exhibit 10    CT Abdomen Without Contrast,         79
6/23/11, Bates stamped Northside Hosp. 123 - 124

Ehibit 11    Vascular Institute of Georgia Office  80
Note, 6/28/11, Bates stamped Brand_000897

Ehibit 11A   Vascular Surgery Progress Note,      188
10/29/12, Bates stamped Dr. Rheudasil 10 - 12

Exhibit 12   Preoperative History and Physical,    81
Bates stamped Brand_000898 - 899

Exhibit 13    Procedure Report, 7/14/11, Bates     83
stamped SJH 30 - 31

Exhibit 14    Vascular Surgery Progress Note,      84
Bates stamped Dr. Rheudasil 10 - 12

Exhibit 15    Phone Record, 5/21/15, Bates         89
stamped 000046

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 5

INDEX CONTINUED

DESCRIPTION OF EXHIBITS

EXHIBIT  IDENTIFICATION                                PAGE

Exhibit 16    Medical Report, 7/16/15, Bates      91

stamped Dr. Rheudasil 2

Exhibit 17    Follow-up Visit Medical             94

Report, 11/12/15

Exhibit 18    Phone Message Report, 11/24/15      95

Exhibit 19    E-mail string to Clemmer and       103

Talbert from Dubois, 6/23/11, Bates stamped

CookMDL2570_00074641 - 2570_74645

Exhibit 20    E-mail string to Talbert from      105

Clemmer, 6/23/11, Bates stamped CookMDL2570_0074640

Exhibit 21    Cook Celect Filter Set Instructions 119

for  Use, Bates stamped I-Celect-Perm-Uni-0805-351-01EN

Exhibit 22    Office Note, 6/1/15, Bates stamped  137

Dr. Rheudasil 6

Exhibit 23    Perioperative Reports, 10/22/15,    141

Bates stamped St. Joseph Hosp. 117 - 119

Exhibit 24    Report from Dr. Morrison, Bates     145

stamped Polaris Spine 000032

Exhibit 25    E-mail string to Clemmer and       150

Hanson from Senker, 7/27/11

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 6

INDEX CONTINUED

DESCRIPTION OF EXHIBITS

EXHIBIT  IDENTIFICATION                              PAGE

Exhibit 26    Dennis J. Griffin, M.D. Report      166

Exhibit 27    E-mail string to Frye from Paul,    174

6/9/03, Bates stamped IVC00001396 - 1398

(Original exhibits attached to the Original transcript.)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 7

VIDEOTAPED DEPOSITION OF

MARK RHEUDASIL, M.D.

February 28, 2018

THE VIDEOGRAPHER:  We are on the record and the time is approximately 1:08 p.m.

This is the beginning of the videotaped deposition for Dr. Mark Rheudasil.  Would counsel present please identify themselves and who they represent for the record.

MR. HEAVISIDE:  Michael Heaviside for the plaintiff.

MR. MARTIN:  And Ben Martin for the plaintiff.

MS. PIERSON:  Andrea Pierson for Cook Medical.

MS. RUTIGLIANO:  Anna Rutigliano for Cook Medical.

THE VIDEOGRAPHER:  Thank you, counsel.

Would the court reporter please swear in the witness.

MARK RHEUDASIL, M.D.,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

MS. PIERSON:  Before we begin, just for our

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 8

record, I talked with Mr. Martin and Mr. Heaviside in advance of today's deposition, and we have agreed to put on the record a mutual standing objection to leading questions.

We have some difference of opinion as to who is permitted to lead and when and what's leading, but we have agreed to reserve that for another day.

Do that I have that right, Mr. Martin?

MR. MARTIN:  That's correct.  Reserve all questions as to leading and --

MR. HEAVISIDE:  Objection.

MR. MARTIN:  -- form, as well.

MS. PIERSON:  Sure.

MR. MARTIN:  Reserve all in -- other words we, will reserve all objections until the time of trial.  Excuse me, reserve all objections until the time of trial because all the other ones are already reserved.

MS. PIERSON:  I'm sorry, Ben.  I spoke just a little bit too soon.

MR. MARTIN:  Sure.

MS. PIERSON:  If you have an objection to the form of one of my questions, other than leading, I want you to make it --

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 9

MR. MARTIN:  Do you want to me to make it?  Sure.

MS. PIERSON:  -- so I can cure it, and we don't run into a problem on down the line.

MR. MARTIN:  Same here, that's fine.

MS. PIERSON:  That's good.

MR. MARTIN:  So it's just as to leading, we will reserve those objections until the time of trial.

MS. PIERSON:  Okay.  Thank you.

EXAMINATION

BY MS. PIERSON:

Q.   Would you state your name, please?

A.   James Mark Rheudasil.

Q.   Dr. Rheudasil, you are a vascular surgeon, correct?

A.   Correct.

Q.   And can you tell us where you practice medicine, please?

A.   Atlanta, Georgia.  Multiple locations in Atlanta.

Q.   Dr. Rheudasil, are we, in fact, at one of the hospitals or office buildings where you currently practice medicine?

A.   Yes, yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 10

Q.   Where are we today?

A.   This is at the Emory St. Joseph's Hospital campus.

Q.   Okay.  Do you practice at other hospitals in Georgia, other than the St. Joseph Hospital?

A.   Yes.

Q.   What are those?

A.   Well, I see patients in outpatient settings in several Emory facilities around town, including their main campus on Clifton Road, and at Johns Creek, which is one of the suburbs of town.  Also, do some work, still, at Northside Hospital across the street from here.

Q.   Okay.

MR. HEAVISIDE:  Andrea, I'm sorry to interrupt you.  But do we have a hard stop time today?

MS. PIERSON:  I understand that we have four hours with Dr. Rheudasil.  I don't know how hard your stop is, but that's what we've --

THE WITNESS:  I mean, a few minutes don't matter, but I've got another meeting to get to.

MR. HEAVISIDE:  And we have an agreement to split the time equally.

MS. PIERSON:  We do.  We do.  Any other

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 11

interruptions before we keep counting my time.

MR. MARTIN:  In protection of Mike, we needed to get that on the record.  Go ahead.

MS. PIERSON:  We will substract two minutes.

(Exhibit 1, First Amended Notice of Videotaped Deposition of Dr. Mark Rheudasil, marked for identification.)

Q.   (By Ms. Pierson) Dr. Rheudasil, I put before you what we have marked as Exhibit 1, which is a Notice of Deposition that asks that you be here today.  Do you see that?

A.   Yes.

Q.   Attached to Exhibit 1 is Schedule A that requested that you provide or -- it's on the back, Dr. Rheudasil, that you provide in advance of the deposition or provide today documents in your possession that pertain to Mrs. Brand.

Have you or your office provided all the documents that you possess regarding your care and treatment of Mrs. Brand?

A.   Yes.

Q.   Dr. Rheudasil, was Tonya Brand one of your patients?

A.   Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 12

Q.   Is it accurate to say that you cared for Mrs. Brand between March 2009 and December 2015?

A.   Yes.

Q.   Is your knowledge of Mrs. Brand's condition and her experience with her vena cava filter limited to that period of time?

A.   Yes.

Q.   Outside the period of time when you were caring for Mrs. Brand, did you do any research or perform any tests to determine the cause of Mrs. Brand's filter fracture?

A.   No.

Q.   Is your -- your knowledge of what happened to Mrs. Brand limited to what you saw and observed during course of caring for her?

A.   Yes.

Q.   Is it accurate to say, Dr. Rheudasil, that as you sit here today, you don't know why Mrs. Brand's filter fractured?

A.   That is accurate.

Q.   Is it correct to say that you have no opinion as to the cause of the fracture of her filter for those reasons?

MR. MARTIN:  Objection; leading.

A.   Correct.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 13

Q.   (By Ms. Pierson) Do you have an opinion as to the cause of her fracture?

A.   I do not.

(Exhibit 2, Curriculum Vitae, marked for identification.)

Q.   (By Ms. Pierson) Dr. Rheudasil, I've put in front of you Exhibit 2, if you could take a look at that, please.

Is Exhibit 2 a copy of your curriculum vitae?

A.   It is.

Q.   Dr. Rheudasil, does this include all of your education, training and experience?

A.   Yes.

Q.   Tell the jury, if you could, how long you have been practicing as a vascular surgeon.

A.   Finished training in 1989, so I guess that's almost 30 years.

Q.   Where did you go to school?

A.   I was raised in Texas.  All my schooling was in Texas, college and medical school.  And then I came to Atlanta in the early '80s to start surgery training at Emory, and finished training in 1989.

Went back to Texas to -- originally, to open my first practice there, and ended up back here

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 14

two years later and have been here since 1991.

Q.   Okay.  Dr. Rheudasil, have you practiced continuously as a vascular surgeon for about the last 30 years?

A.   Yes.

Q.   Are you a member of any professional societies?

A.   A bunch.

Q.   Do all of those pertain to the field of vascular surgery?

A.   Yes.

Q.   Are you an interventional radiologist?

A.   No.

Q.   Are you a member of any of the societies for interventional radiology?

A.   No.

Q.   Have you ever been?

A.   No.

Q.   Do you subscribe to any of the publications that relate to the field of interventional radiology?

A.   No.

Q.   Tell the jury, if you could, briefly, what, exactly, a vascular surgeon does.

A.   Vascular surgery takes care of problems associated with blood vessels, typically outside of

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 15

the heart and brain.

Q.    What type of procedures do you perform as a vascular surgeon?

A.    The most common procedures are dealing with hardening of the arteries, dealing with arthrosclerosis, so neck artery blockages, abdominal aneurysms, leg artery blockages, varicose veins, vein problems, usually in the legs, but ...

Q.    Dr. Rheudasil, we'll talk a little bit today about the 2009 procedure that you were involved in where Tonya Brand was the patient.  And I want to ask you some preliminary questions related to that, if I could.

First, as a vascular surgeon, are there times that you perform a portion of an operation or a procedure in conjunction with another surgeon like a spinal surgeon?

A.    Yes.

Q.    Explain to us, if you could, when you are working in an operation with a spinal surgeon, what are the circumstances?

A.    Commonly, spinal surgeons, or at least some spinal surgeons, will work with another surgeon, often a vascular surgeon, sometimes a general surgeon with vascular experience, to expose the anterior

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 16

spine, which involves going through the abdomen in some way.

And then once the spine is exposed, then they typically come in the room at that time, do the spine portion of the procedure and, then typically, whoever does the exposure, whichever surgeon does the exposure, will come back at the end of the procedure and close.

Q.   You have used the term "exposure" a couple of times.  Can you tell us what that means?

A.   Well, the spine lies in the back behind all of the abdominal structures.  So if you need to get to it from the front, you essentially have to move all of those things out of the way so that they are, hopefully, out of harm's way in order to visualize the spine and work directly on it.

So it's really just retracting and moving things, dissecting and moving things so that they will not be injured during the spine portion of the procedure, hopefully.

Q.   Why wouldn't a spinal surgeon do that him or herself?

A.   Well, a few of them do that if they happen to typically be in a training center, where that's something they learned how to do.  But most spinal

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 17

surgeons don't have the experience doing intraabdominal surgery to be comfortable doing that. And so it's typically a co-surgeon procedure.

Q.   When you say most spinal surgeons don't have the expertise to do that kind of intraabdominal procedure, I want to be sure I understand what you mean.  What is it that makes it within the field of vascular surgery as opposed to within the field of spinal surgery or some other field?

A.   Well, the structures that are most in harm's way when you expose the lower spine, are the blood vessels.  And so commonly, vascular surgeons have been involved in this exposure because it frequently involves moving, manipulating, occasionally even repairing blood vessels to try to move them out of the way because they lay right in front of some of the spine.

So those are -- those are maneuvers that neurosurgeons or spine surgeons don't normally do.

Q.   You have mentioned a couple of times the blood vessels that are in harm's way during an anterior spinal procedure.  Does that include the inferior vena cava?

A.   Not usually.

Q.   What do you mean when you say that?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 18

A.    Most of the lumbar spine exposures involve the lower levels of the spine that are -- that are below the -- what's called the bifurcation of the cava.  And so 5-1 -- I'm sorry, yes, 5-1 typically sits, sort of, underneath that triangle of the bifurcation.  4-5, as you go up a little higher, often is behind the iliac vessels.

But in the vast majority of spine exposures, you are working below the bifurcation of the cava, so you may not even visualize the cava, itself.

Q.    Dr. Rheudasil, we were talking a moment ago about the different kinds of procedures that you perform as a vascular surgeon.  Do all of those procedures have risks?

A.    Sure.

Q.    Give us some idea of the types of risks that your patients face when they are being treated for some type of vascular surgery?

A.    Well, I mean, from a vascular surgery, the risks are typically bleeding or clotting and all of the consequences that could go with either one of those things.

But also inherent is all of the risks associated with any significant surgery, anesthesia,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 19

infection, abdominal, you know, ileus, or bowel-related problems, injuring some other structure aside from the blood vessels.

Q.   Is there any procedure that you have performed over the course of your career that did not have risks?

A.   No.

Q.   Do you guarantee any result to your patients?

A.   No.

Q.   Why not?

A.   Because I don't have a crystal ball.  All procedures involve risk.  Certainly some procedures involve more risk than others, but there are no guarantees in life.

Q.   Over the course of your career, have you used a number of different implantable medical devices?

A.   Sure.

Q.   Is there any implantable medical device that you have used that has no risk or no rate of complication?

A.   No.

Q.   In the course of your practice as a vascular surgeon, have you used things like grafts

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 20

and stents, catheters, balloons, guidewires?

A.   All of the above.

Q.   Do all of those products have risks and rates of complications?

A.   Yes.

Q.   Is there any procedure that has a perfect success record in your experience?

A.   No.

Q.   Is there any physician or surgeon who has a perfect success record in your experience?

A.   No.

Q.   Is it fair to say, Dr. Rheudasil, that even when everything goes right in a procedure, it doesn't always turn out the way you plan?

MR. MARTIN:  Objection; form.  Leading.

A.   That's true.

Q.   (By Ms. Pierson) Dr. Rheudasil, in the course of your practice, particularly including the period between 2009 and 2015, did you treat patients who were at risk of developing a deep vein thrombosis or a pulmonary embolism?

A.   Yes.

Q.   How did you treat them and why did you treat them for those conditions?

MR. MARTIN:  Objection; form.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 21

A.   That's a very -- honestly, a very broad question.  Most of the significant surgeries that we do carry some risk of deep vein thrombosis.

But we also take care of patients that have deep vein thrombosis, in the absence of a surgical procedure, that get it spontaneously or for -- related to some procedure performed in another specialty.

So taking care of patients with or in hopes of prevention of DVT is a pretty routine part of the practice.

Q.   (By Ms. Pierson) Why do you treat patients who have a deep vein thrombosis or are at risk of deep vein thrombosis?

MR. MARTIN:  Objection; form.

A.   Deep vein thrombosis, in some cases, can result in pulmonary embolus and death.  So the primary reason is to try to minimize mortality, but there's also significant morbidity associated with deep vein thrombosis, too.

Q.   (By Ms. Pierson) And when you talk about the difference between, or use the terms "mortality" and "morbidity," explain to us the difference.

A.   Mortality is your incidence of dying related to that problem.  Morbidity is just short- or

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 22

long-term negative consequences of having to have a problem that you may recover from, but still suffer from.

Q.   In the course of your practice, Dr. Rheudasil, when you believe a patient is at risk of developing a DVT, how have you treated them?

A.   Depends.  Depends on the procedure they are going to have done.  Depends on what their individual risk factors are.

Q.   I want to focus for a second on the patients that you have treated during your career who are about to undergo a spinal procedure of some type. Have you had patients who you believed were at risk of DVT or pulmonary embolism that you have treated in some way before they went through a spinal procedure?

A.   I'm not sure I understand the question.

Q.   Sure.  Let me be a little more specific.

A.   Okay.

Q.   I have heard the term "anticoagulants" before.

A.   Yes.

Q.   Can you tell us what those are, please?

A.   So those are blood thinners designed to reduce the risk of clotting, and, therefore, the subsequent risk of a pulmonary embolus, which is a

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 23

clot moving to the lung or heart.

Q.    Have you prescribed blood thinners for your patients?

A.    Yes.

Q.    Over what period of time?

A.    Thirty years.

Q.    Are there other tools that you have used or therapies to prevent PE in your patients, aside from anticoagulants?

A.    Well, I mean, there are other ancillary measures you can take.  If you are talking about during surgery or in the perioperative period, we sometimes use compression devices on the legs to try to keep the blood moving a little bit.  Sometimes, we use specific patient positioning.

And then in patients who are deemed high risk, occasionally we will use a filter to prevent a PE.  A filter doesn't prevent a DVT, but a PE.

Q.    What is a vena cava filter?

A.    It's a mechanical device placed in the vena cava, the main vein of the body that is designed to catch, basically, any -- catch a clot of any significant size that would be moving toward the heart and lungs to try to minimize what is a pulmonary embolus.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 24

Q.    In the course of your career, have you placed vena cava filters?

A.    Yes.

Q.    Have you retrieved vena cava filters?

A.    Yes.

Q.    When did you first place a vena cava filter?

A.    I was probably in training.  Probably in the late '80s.

Q.    Dr. Rheudasil, have you placed vena cava filters made by different manufacturers or different brands?

A.    Yes.

Q.    Give us some idea of the types of vena cava filters that you have used over the course of your career.

A.    Some of the brands, you mean?

Q.    Yes?

A.    I have used filters by Cordis, Greenfield, Bard, Cook, Argon, Braun.  I'm probably leaving one or two out.

Q.    Okay.  Is there any filter among those that has been your filter of choice or your go-to filter over the years?

A.    Never for an extended period of time.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 25

Filters and some of the things that we like about filters have evolved over time.  And so certain filters are, sort of, popular for the period of time and then, for whatever reason, become less popular or are replaced by something else that is more popular.

In very general terms, we pick filters most often based on the deployment mechanism about how they are inserted.  More and more now, their retrieval mechanism or retrievability is also a factor in our decision.

And then in a pragmatic sense, frankly, we usually only have two or three choices available to us at any given time in the hospital.  So all of those factor into the decision about which filter to use.

Q.   I just want to be sure I got that list correct, Dr. Rheudasil.  The deployment mechanism, retrievability and availability to you.

A.   Yes.

Q.   Is the filter's ability to catch blood clots a factor that you consider in choosing filters for your patients?

A.   Well, not particularly related to the brand of the filter.  I think all filters are of roughly equal capability in that regard.  You know, a bird's

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 26

nest filter is one of the old, original filters that almost occludes the cava intentionally.  It might have a half a percent or one percent less likelihood chance of pulmonary embolus just because almost nothing can get by it, including moving blood.

But in general terms, I consider almost every available, commercially available filter equivalent in terms of their pulmonary embolus protection.

MR. MARTIN:  Objection; responsiveness. Doctor, when I object in this deposition, and you have probably given depositions before, you understand that --

THE WITNESS:  It's not going to hurt my feelings.

MR. MARTIN:  Well, not that really.  But just you may go forward with your answer.

THE WITNESS:  Right.

MR. MARTIN:  After allowing either one of the parties, either one of the parties to make their objections.

Q.   (By Ms. Pierson) Dr. Rheudasil, a moment ago, you were telling me about the things that you look for in a filter, the reason why you choose them. We were talking about deployment mechanism,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 27

retrievability and the like.

The four factors that you have just described that you consider in choosing a filter, have those been the same factors that you considered since at least 2009?

A.   Yes.

Q.   And the fact that those things are important to you, how did you reach that decision?

Maybe let me put it a different way:  When you are looking at the benefits of a filter before you choose it, are you relying on your experience, your education and your training?

A.   Yes.

Q.   Are you relying on anything else when you determine what factors are important to you in choosing a filter?

A.   Not really.

Q.   Okay.  Dr. Rheudasil, I want to talk for just a second about the things that can cause a patient to be at an increased risk of DVT.  When I'm asking these questions, I'm specifically focused on the knowledge that you had during the period of time that you treated Mrs. Brand.  If at any point in time, I ask you about something that you have only learned in the last 12 or months or so, let me know

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 28

that.

Dr. Rheudasil, if a patient has a history of -- excuse me, let me start again.

Dr. Rheudasil, if a patient has a history of DVT, does that history place them at increased risk of developing a DVT or PE in the future?

A.    Yes.

Q.    If a patient is over 40, does that increase their risk of a pulmonary embolism?

A.    Yes.

Q.    Does their risk of pulmonary embolism, increase for every decade they are over the age of 40?

MR. MARTIN:    Objection to form.

A.    Probably.

Q.    (By Ms. Pierson) Dr. Rheudasil, does a patient who has a body mass index of greater than 30, is that patient at greater risk of a PE?

A.    Yes.

MR. MARTIN:    I'm going to object.

Q.    (By Ms. Pierson) Is obesity --

MR. MARTIN:    Object to the form.

Q.    (By Ms. Pierson) -- affect the patient's risk of developing a PE?

A.    Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 29

MR. MARTIN:  Object -- object to form.  I'm going to go ahead and leave the objections to leading for a while, but just confirm that we have made the agreement that leading objections are reserved until the time of trial.

MS. PIERSON:  We did.  We put it on the record right from the get-go.

MR. MARTIN:  I got it.

Q.   (By Ms. Pierson) Dr. Rheudasil, if a patient is facing a major surgery, does that place them at greater risk of developing a pulmonary embolism?

MR. MARTIN:  Objection; form.

A.   Well, I suppose that, honestly, depends on what the major surgery is.

Q.   (By Ms. Pierson) How about a spinal surgery?

A.   Yes.

Q.   If a patient is facing a spinal surgery, are they at increased risk of developing a PE?

A.   An extensive spine surgery, I would say yes.

Q.   Dr. Rheudasil, does high blood pressure increase a patient's risk of developing PE?

A.   Not to my knowledge.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 30

Q.    How about certain chronic medical conditions, like diabetes?

A.    Diabetes, probably not.  Certain medications can predispose clotting.  Chronic steroid use, immobility, chronic illness, prolonged bed rest either before or after surgery, relative dehydration.

Q.    How about a patient with a history of varicose veins?  Does a history of varicose veins affect the risk of that patient developing a pulmonary embolism?

A.    They have an increased risk.

Q.    Okay.  Why is that?

A.    The simplest way to look at it if they have varicose veins, they have abnormal veins.  And patients that have varicose veins are at some -- they are at some increased risk of a DVT related to some of the abnormalities associated with their veins and perhaps their underlying vein anatomy.  If there's an increased risk of DVT, there's an increased risk of pulmonary embolus, too.

Q.    Dr. Rheudasil, we've just talked about things that heighten a patient's risk for PE, such as obesity, history of DVT and varicose veins.  Were all of those things known to you in 2009, before you treated Mrs. Brand?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 31

MR. MARTIN:  Objection, form.

A.    Yes.

Q.    (By Ms. Pierson) Were those factors that you considered when you evaluated whether Mrs. Brand should receive a vena cava filter?

A.    Yes.

Q.    Dr. Rheudasil, I want to talk with you about your treatment of Mrs. Brand.

(Exhibit 3, Document entitled, Tonya Brand - Dr. Rheudasil Treatment, marked for identification.)

Q.    (By Ms. Pierson) First, I'm handing you what's been marked as Exhibit 3.  And just for our record, for ease of reference, I have prepared a chart, based on my review of the records from your office and the hospital, of the times that you had some communication with Mrs. Brand, either in person or in your office by phone.

We're not going to ask you to verify that all of those are right, as you sit here today, but if you could just take a quick look at that and let me know.  Does that appear to be a list of times that you either saw or treated or talked to Mrs. Brand?

A.    That looks reasonably correct, yes.  As far as I know.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 32

Q.   The very first entry on -- on Exhibit 3 is February the 9th of 2009, and I want to start there.

MR. MARTIN:  Do you have a copy of this for us?  Oh, sorry.  Thank you.

Q.   (By Ms. Pierson) Dr. Rheudasil, you treated Mrs. Brand numerous times between 2009 and 2015, correct?

A.   Yes.

Q.   You are the doctor who prescribed her vena cava filter?

A.   Yes.

MR. HEAVISIDE:  Objection.

Q.   (By Ms. Pierson) Are you the physician who implanted her vena cava filter in 2009?

A.   Yes.

Q.   Are you the physician who retrieved Mrs. Brand's vena cava filter in 2015?

A.   Yes.

Q.   How did Mrs. Brand come to be your patient in 2009?

A.   She had had -- my recollection is that she had had previous posterior spine surgery and needed a two-level anterior spine exposure.  So given that she needed an anterior exposure, and with the fact that she needed what is, essentially, a big spine surgery

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 33

and a history of a DVT within a year or two before the procedure, Dr. Morrison wanted me to do the exposure and to consider putting a filter in her, prophylactically.

Q.    Who is Dr. Morrison?

A.    He is the neurosurgeon that did her spine procedure.

Q.    Did Dr. Morrison refer Mrs. Brand to you?

A.    I believe so.

Q.    Had you performed the kind of co-operation that you mentioned earlier with Dr. Morrison prior to meeting Mrs. Brand?

A.    Many times.

Q.    How many times had you and Dr. Morrison partnered together in surgery?

MR. MARTIN:  Objection.  No, go ahead.  No objection.

A.    I don't know.  20, 30.  I don't know.

Q.    (By Ms. Pierson) Maybe put a different way: How long have you been working in conjunction with Dr. Morrison to treat patients?

A.    I don't know how long Dr. Morrison has been in town.  I'm older than he is.  Probably since early 2000s.

Q.    Is it fair to say, Dr. Rheudasil, that Dr.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 34

Morrison wanted you to perform the access in Mrs. Brand's surgery, that is open her up, give him access to the spine and then close her at the end of the procedure?

A.    Yes.

Q.    Prior to treating Mrs. Brand, had you ever treated other patients with Dr. Morrison who required a vena cava filter?

A.    Yes.

Q.    How many times have you placed or prescribed a vena cava filter for a patient who is also being treated by Dr. Morrison?

A.    It's not a rare thing.  I would say eight or ten times a year.

Q.    Has that been the case in the last 15, 20 years --

A.    Yes.

Q.    -- that you two have worked together?

A.    Yes.

Q.    Was it Dr. Morrison's routine practice, in your experience, to send his patients to you for a vena cava filter prior to spine surgery?

MR. MARTIN:  Objection, form.

A.    Dr. Morrison, if he needed anterior exposure, would use me or maybe one or two other

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 35

surgeons, depending on the scheduling and insurance availability.  He does not recommend or, frankly, request an IVC filter prior to a standard spine surgery.

But Dr. Morrison is well-known, frankly, as being someone who does bigger spine surgeries, what I would, sort of, generally call spine-reconstructive procedures.  And it is his practice to place a filter in those patients preoperatively.

MR. MARTIN:  Objection; nonresponsive.

Q.   (By Ms. Pierson) In your experience, Dr. Rheudasil, how long has it been Dr. Morrison's practice to place vena cava filters prophylactically before spinal surgery?

A.   I don't -- honestly I don't know.  For the most part, as long as he's been at least at Northside Hospital.  We had a problem with a patient early on in his experience, when we did not do that, and I'm sure that affected his enthusiasm for this form of treatment.  But I would say, once again, the mid-2000s but that's a guess.

MR. MARTIN:  I object to form of the question; also object to the responsiveness of the answer.

MS. PIERSON:  Why don't we just show a

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 36

standing objection as to responsiveness so that we don't need to --

MR. MARTIN:  To what?

MS. PIERSON:  To responsiveness.  You can reserve that objection, use it at a different time.

Q.   (By Ms. Pierson) Dr. Rheudasil --

MR. MARTIN:  I don't have a problem having that standing objection.  Although, to reiterate some of these objections, I will likely make some, but, yes, I will agree to that.

Q.   (By Ms. Pierson) Dr. Rheudasil, just a moment ago, you mentioned that you and Dr. Morrison had a problem that affected his view or your view of using vena cava filters before spinal surgery.  Tell us what you meant.

A.   In his spine --

MR. MARTIN:  Objection to the form.  You may answer.

A.   In his spine training, it was routine, where he trained, to have filters placed prophylactically for major reconstructive spine procedures.  We did not do that fairly early on in my experience with Tom, with Dr. Morrison.  And we had a routine procedure, much like Mrs. Brand's, in my

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 37

recollection, anterior exposure, 40-ish-year-old man in good health, who died on the second or third day from surgery from a pulmonary embolus.

And so that experience certainly, sort of, reminded him, reiterated to him why they had done that in his training, and that it's really, to the best of my knowledge, been his practice since that time to -- to request these filters.

Q.    (By Ms. Pierson) Was the patient that you have just described, who passed away from a pulmonary embolism, did that happen prior to March of 2009?

A.    I believe so.

Q.    And the experience that you and Dr. Morrison had with the patient who died of a PE, did that affect your view about placing vena cava filters prior to an anterior spinal procedure like the one Mrs. Brand had?

A.    Yes.  I mean, I -- I feel quite certain we'll eventually get to filter indications or what I think about whether or not this -- was an appropriate indication or not.  But that experience, certainly, affects you a little bit, yes.

It's, in most cases, a fairly simple procedure.  It's essentially -- I view it, I tell patients that it's an insurance policy.  It's just a

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 38

way to protect a catastrophic event that is something that we now routinely perform in the absence, really, of a contraindication for the bigger spine surgeries.

Q.   When you say "it's an insurance policy," are you talking --

A.   The filter.

Q.   Thank you.

Dr. Rheudasil, were there any specific concerns about Mrs. Brand that Dr. Morrison expressed to you when he sent her to you in 2009?

A.   I don't recall.  I know that she had had a DVT in the previous couple of years.  I think that was a factor.  She had had several prior abdominal procedures.  Just another factor as to why he preferred to have someone else do the exposure.

MR. MARTIN:  Object to the form of the question.

(Exhibit 4, Vascular Institute of Georgia Medical Information Sheet, Bates number 000086 - 000089, marked for identification.)

Q.   (By Ms. Pierson) Dr. Morrison, I'm handing you what's been marked as Exhibit 4.  For our record, this is Bates 87.

Dr. Morrison, is Exhibit 4 a record from the Vascular Institute of Georgia Medical?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 39

A.   Yes.

Q.   Okay.  Is this a patient intake sheet, essentially?

A.   Yes, yes.

Q.   Is this the patient intake sheet that pertains to Mrs. Brand and her very first visit to your office?

A.   Yes.

Q.   Who completes this form?

A.   Typically done by the nurses and the patient.

Q.   On the first page, I see the reference to plus DVT.  What's that?

A.   That she had had a history of a DVT.

Q.   And if you will turn to the second page under Vascular History, there are references to pain in legs with exercise, walking.  Do you see that?

A.   Yes.

Q.   Does that mean that the patient, Mrs. Brand, reported to your nurse that she was having that pain?

A.   Presumably, yes.

Q.   And the other things that I have highlighted here, pain in legs at rest, swelling in the feet and legs.  Are those things that your nurse

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 40

reported that Mrs. Brand reported to her --

A.   Yes.

Q.   -- in 2009.

A.   Yes.

Q.   Just below that, there's a line, "Please check if you have any of the following.  If yes, indicate the approximate date and location."  And there's a check for vascular surgery.

A.   Yes.

Q.   Do you see that?  Does that mean that Mrs. Brand reported that she had had a prior vascular surgery?

A.   Yes.

Q.   And that she had had a blood clot, correct?

A.   Yes.

Q.   And then if you turn to the last page, just one more, at the top of that page, it says, "If yes, where," where meaning the blood clot, right?

A.   Yes.  I think so.

Q.   And -- I'm sorry.

And it says, "Were you hospitalized?  Yes." Does that mean that Mrs. Brand told your nurse, and your nurse reported that she had had a previous DVT and had been hospitalized?

A.   Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 41

Q.    Dr. Rheudasil, would you have received this intake sheet before you saw Mrs. Brand for the first time?

A.    Hopefully.

Q.    Handing you what's been marked as Exhibit 5.

(Exhibit 5, Vascular Institute of Georgia Records, 2/6/09, marked for identification.)

Q.    (By Ms. Pierson) If you could look at Exhibit 5 and just confirm for me, Dr. Rheudasil, are these your records from your very first visit with Mrs. Brand?

A.    Yes.  Two pages is that?

Q.    That's correct.

A.    Yes.  Yes.

Q.    I want to ask you a couple of questions about that very first office visit.

First, when Mrs. Brand came to see you, on February the 16th of 2009, did she tell you that she had a history of a DVT in her left leg in December of 2007?

A.    That's what it says, yes.

Q.    Okay.  And did she tell you anything about how long she had taken anticoagulants related to that DVT?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 42

A.   My note says six to seven months.

Q.   I see a note here that she had a previous failed back operation.  Do you recall what she told you there --

A.   No.

Q.   -- beyond that?

And there's also a notation here that she has mild leg swelling, though not much more severe in the left leg than in the right.  Did you observe that in Mrs. Brand?

A.   Honestly, I don't know.  That's a history. I don't know if I observed that on her exam or not.

Q.   And I should have asked you this earlier, Dr. Rheudasil, but we will look at a variety of your medical records today.  Do you make these at or about the time that you see the patient?

A.   It's usually the same day, not necessarily at the same time.

Q.   Do you dictate your notes from visiting with the patient?

A.   This note was dictated, yes.

Q.   Do you have an opportunity to review them and make any changes you want to make?

A.   Ideally, yes.

Q.   Dr. Rheudasil, I want to just continue and

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 43

ask you a couple of additional questions here.  After you discussed mild leg swelling, it says "She is moderately overweight and has had several prior abdominal operations through a Pfannenstiel incision."

A.    Pfannenstiel.

Q.    "Pfannenstiel's incision, including bladder tack, tubal ligation, hysterectomy, scar tissue excision, c-section, et cetera."  Why did you note that?

A.    Those are going to create, just, a little more of a challenge for me in doing her exposure, because there's going to be scar tissue associated with those procedures.

Q.    And when you say "it will create more of a challenge with the exposure," what do you mean?

A.    Well, you have to go through all that to -- to get back to the spine.  And in order -- you know, and scar tissue, essentially, sticks something to something else.  And if you have to -- if you have to get through it, it increases the difficulty and, theoretically, the risks of doing these dissections.

Q.    Understood.

Why did Mrs. Brand's weight, why was that something that you noted?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 44

A.   Well, it wasn't -- I would say, by virtue of my terminology here, it wasn't a major factor. But, again, we were -- part of the reason that Dr. Morrison asked me to see her was to consider the filter placement, and we were documenting things that I thought would increase her -- her DVT risk.

Q.   Thank you.

MS. PIERSON:  Do you mind just turning that back a little bit so I can see it?  I'm sorry, I can't tell what's on the screen.  Yes, that's good.  If you need to turn it a little more towards you, that's okay.

MRS. BRAND:  I'm sorry.  I didn't know you were looking at it.

MR. MARTIN:  Wait, wait.  What's the question?  Let me read this before anybody is chatting with my client.

MS. PIERSON:  I asked that she turn the screen.

MR. MARTIN:  It looks rather readable, but go ahead.

MS. PIERSON:  It's perfect now, Ben. Thanks.

Q.   (By Ms. Pierson) Dr. Rheudasil, just a couple of additional questions.  Under Current

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 45

Medications, are these the medications that Mrs. Brand reported to you taking at the time that she saw you?  Wellbutrin, Robaxin, naproxen, Xanax and morphine.

A.   Yes, those would have, really, been mostly discussed with the nurses, but, yes.

Q.   And then under Examination, is this section consistent with what you observed when you were performing the physical examination of Mrs. Brand?

A.   Yes.

Q.   Just one question:  What does this mean when you say, "Exam of the abdomen shows moderate size pannus?"

A.   Just --

Q.   Tissue?

A.   It's gut.  It's what I have.  A moderate size pannus.

Q.   And then there's a notation here about a healed scar.

A.   Yes.

Q.   Is that related to her prior abdominal surgeries?

A.   Yes.

Q.   And then under Impression, you have made a couple of notations that I want to ask you about.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 46

Your first impression is severe lumbar disc disease, needing an anterior exposure.

And then the second impression here, one-year-old DVT.  Did I read that correctly so far?

A.    What I really, obviously, meant, in retrospect, was DVT one year ago or whatever, yes.

Q.    Understood.

Then "Given the risk of an L4-L5 exposure, I believe she should have pre-procedure vena cava filter insertion."  What do you mean there?

A.    That we would put a filter in prophylactically to try to minimize her pulmonary embolus risk before the surgery.

Q.    Why did you believe that her spinal fusion surgery put her at risk of a pulmonary embolism?

A.    She had multiple risk factors for DVT.  She was about to have a major surgery that was going to take multiple hours under general anesthesia.  Spine procedures of this magnitude frequently necessitate a prolonged period of bed rest of some kind after the procedure.  And there is a relative contraindication to anti-coagulation after spine surgery.

Q.    What do you mean when you say "there's a contraindication to anti-coagulation?"

A.    Anti-coagulation, the primary risk of

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 47

anti-coagulation is bleeding.  She's going to have a major exposure right adjacent to the spinal cord, and bleeding that could put pressure on the spinal cord is not tolerated.

And so, frankly, that's one of the primary reasons I believe Dr. Morrison likes to have these filters in place, is that he does not like to anticoagulate these patients unless absolutely required.

Q.   Why not?

A.   Because it's associated with bleeding risk, and the bleeding can cause neurologic deficit if it's adjacent to the spinal cord.

Q.   Can it cause a patient to die?

A.   Theoretically.  I wouldn't so much be worried about bleeding resulting in death as I would bleeding result in a neurologic event that might require surgery or have a long-term deficit related to pressure on the spine.

Q.   Okay.  Are you talking about a stroke here or what are you talking about?

A.   No, I'm talking about leg neurologic --

Q.   Paralysis?

A.   If something is pressing on the spine, it can cause paralysis or neurologic deficit below that

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 48

area.  So we would, certainly, like to avoid any blood collections or things that could put pressure on the spinal cord.

MR. MARTIN:  That's a leading question. Objection.  Go ahead.  Go ahead.

Q.  (By Ms. Pierson) What were Mrs. Brand's specific risk factors that caused you to choose a vena cava filter for her?

A.  Big spine surgery.  Recent, recent or previous DVT.  Slightly overweight.  Multiple abdominal surgeries that was going to require some extra time in order to do the exposure.

Q.  Did the fact that Mrs. Brand would be sedentary during her recovery from her spine surgery, did that play any role in your decision?

A.  Well, yes, bed rest and/or even limited mobility in the days after surgery are associated with an increased DVT risk.

Q.  Did Mrs. Brand's history of high blood pressure affect your decision to choose a vena cava filter?

A.  No.

Q.  Did Mrs. Brand's history of varicose veins affect your decision to place a vena cava filter?

A.  Probably not in a major way.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 49

(Exhibit 6, Letter to Morrison from Rheudasil, 2/16/09, Bates stamped 000163, marked for identification.)

Q.   (By Ms. Pierson) I'm handing you what's been marked as Exhibit 6.  If you could just look at Exhibit 6 and confirm for me, Dr. Rheudasil, is this your letter to Dr. Morrison following the visit with Mrs. Brand?

A.   Yes.

Q.   Is this the letter in which you recommend or explain to Dr. Morrison why Mrs. Brand should have a vena cava filter?

A.   Yes.

Q.   You see the notation where it says, "As you know, she's scheduled for an L5-L2, L5-S1, ALIF on February 26th."  Is that the reference to the spinal surgery that you referred to earlier?

A.   Yes.  There's a typographical error there, but, yes.

Q.   You say, "She has had several prior abdominal operations via a lower transverse incision.  She also had a DVT in late 2007.  I would recommend, given a two-level exposure, that she have a prophylactic IVC filter placed."

Did I read that correctly?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 50

A.   Yes.

Q.   Are those some of the reasons that you believe Mrs. Brand needed a vena cava filter before her spinal surgery?

A.   Yes.

Q.   And I heard you use a term earlier that this was a "major exposure."  When you say that, are you talking about her spinal procedure or the incision to get access to the spine or both?

A.   Everything.  The time required to do the procedure, the manipulation of the blood vessels required to do the procedure, the time for the anesthesia, the risk of blood loss, the perioperative recovery time that may be required.

Q.   Did you talk with Mrs. Brand during that visit about the risks and benefits of a vena cava filter?

A.   I don't remember.  I would assume so, but I don't recall.

Q.   In 2009, what was your practice with respect to talking to patients about the risks and benefits of vena cava filters?

A.   That's what we would -- we would briefly talk about that.  I mean, frankly, most of our discussion, probably, was of more of the exposure,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 51

I'm guessing, because I don't remember our conversation.

But, you know, this -- the filter was, sort of, a -- was really a collaborative idea.  This wasn't, sort of, my idea out of the blue.  She was sent probably to me, frankly, to do her exposure in some part because Dr. Morrison knew that I did filters, too, and he thought it would be easiest to involve the same surgeon for both procedures.

That being said, if your question was what do I tell patients when I'm putting in a filter?

Q.    Yes.

A.    That the risks of filter placement are generally quite low.  Almost all filters, I put in through the groin.  And there is risks associated with bleeding or access-related problems.  That filters can misfire, can be put in the wrong place.  They can, potentially, cause damage to the blood vessel.

And that there are some other risks, theoretically, that we know are associated with long-term filters.  Clotting, other issues.  We probably didn't spend a lot of time talking about that.  I don't remember.

So, specifically, I don't know how to

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 52

answer your question as regards to Mrs. Brand.

Q.   Well, we know that it's been now nine years --

A.   Right.

Q.   -- since you had this conversation with -- with Mrs. Brand.  Nobody expects you to have a perfect memory of that.

Dr. Rheudasil, the risks that you have just described discussing with patients, is it your belief that you would have discussed those with Mrs. Brand back in 2009?

A.   I think so.

Q.   You mentioned also talking to her about the risks of the abdominal exposure and procedure.  Did you spend the majority of your time talking about those risks with Mrs. Brand?

A.   Well, I would presume so, just because that was going to be a much bigger deal, in most cases. That was going to be where much more risk was involved.

Q.   When you talked to Mrs. Brand about the procedures that she was about to undergo, did she have an opportunity to ask you questions?

A.   I hope so.

Q.   Is it your practice to give your patients

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 53

an opportunity to ask questions and to be sure that their questions are answered?

A.   Yes.

Q.   In choosing a vena cava filter for Mrs. Brand, did you rely on anything that Cook told you?

A.   No.

Q.   In choosing the filter that -- the type of filter that would be placed in Mrs. Brand, was there anything that Cook told you or gave to you that you relied upon for making that decision?

MR. MARTIN:  Objection; form.

A.   Not that I recall.

Q.   (By Ms. Pierson) Dr. Rheudasil, we know from the medical records that Mrs. Brand, ultimately, received a Cook Celect vena cava filter.  Are you familiar with that?

A.   Yes.

Q.   Prior to her filter placement, in 2009, had you used the Cook Celect filter previously?

A.   I'm sure, yes.

Q.   About how many times had you used the filter?

A.   I don't -- that would be a total guess, I don't know.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 54

Q.   The Celect vena cava filter first became available in the United States in 2007.  Knowing that, do you think you used the Celect beginning that early?

A.   I would say 20 times or more.

Q.   And following Mrs. Brand's filter placement, did you continue to use the Celect filter to treat your patients?

A.   I believe so, yes.

Q.   About how many times do you think you placed a Celect filter in the course of your career?

A.   I don't know, 50.  I don't know.

Q.   Dr. Rheudasil, have you retrieved vena cava filters in the course of your career?

A.   Yes.

Q.   About how many times?

A.   Over the course of my entire career, hundreds.

Q.   Have you retrieved the Celect vena cava filter?

A.   Yes.

Q.   Earlier today, you mentioned to me some of the factors that you looked for, in 2009, when choosing vena cava filters.  The deployment system was the first one.  In choosing Mrs. Brand's vena

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 55

cava filter, did you consider the deployment system for the Cook Celect?

A.    I'm sure.

Q.    How did you evaluate that or what was your assessment of it?

A.    It's really more, just, surgeon preference. It's whether the mechanism of deployment is something that they are comfortable with.  It may relate to the size of the catheter.  It may relate to just the mechanics of how the filter is released from the sheath.  All those things do factor into the decision.  I don't, specifically, recall why I chose a Celect filter in Mrs. Brand, though.

Q.    In 2009, was the retrievability of the Celect filter a feature that you considered?

A.    Yes, although not necessarily in preference to any other filter.  I mean, we considered retrievability, in general, but not necessarily specific to that Cook Celect.

Q.    What has been your experience with retrieving the Cook Celect filter?  Is it easy to retrieve, hard to retrieve?

MR. MARTIN:  Objection; form.

A.    It's usually routine.

Q.    (By Ms. Pierson) And what has been your

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 56

experience with the deployment system for the Celect filter?

A.    I like the old one better than the new one. You know, many devices, as you well know, go through several iterations over time.  I am someone who is more comfortable with a mechanism that's called "pin and pull" where you hold something in place and pull the sheath off of the top of the filter to let it deploy.

I think the newer mechanism involves more of a push button mechanism, which I'm, personally, not as happy with.  So if I use them less, if their availability were the same, I would probably use them less nowadays because of the deployment mechanism, not because of the retrievability.

Q.    Dr. Rheudasil, when you mentioned earlier that you look at things like the deployment mechanism, the retrievability of the filter, the availability and the filter's ability to catch blood clots, are those factors that you considered in choosing Mrs. Brand's filter?

MR. MARTIN:  Objection; form.

A.    I presume so.

Q.    (By Ms. Pierson) Dr. Rheudasil, did you intend for Mrs. Brand's filter to be left permanently

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 57

or did you intend for it to be retrieved?

A.   I believe that I intended to retrieve it. I don't know, it's not -- it's not recorded in my note, and so I don't know for sure.

Q.   Why do you think you would have chosen to retrievable filter for Mrs. Brand?

A.   You choose a retrieve -- a retrievable filter because there may be some intent to retrieve it.  So my presumption is that -- that we were going to plan to remove it.

Q.   In 2009, did you believe that retrievability was a benefit to your patients?

A.   Yes, although not as much as I might now. You know, the literature has changed a fair amount. The emphasis on retrievability has changed a fair amount in the last decade.

But even now, the majority of retrievable filters, as you know, are not retrieved.  Most retrievable filters that are left in long-term have a very low risk, in my opinion.  And so I -- I can't recall what our conversation was or was not.  I suspect, though, that I -- I would not have made -- I would not have suggested it were a big problem to leave it in.

Q.   Dr. Rheudasil, in choosing Mrs. Brand's

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 58

vena cava filter, did you rely on your medical education, training and experience?

A.    Sure.

Q.    Did you rely on anything else?

A.    No.

MR. MARTIN:  Objection; form.

Q.    (By Ms. Pierson) Dr. Rheudasil, do you agree that the prescribing physician is in the very best position to weigh the risks and benefits of a vena cava filter for their individual patient?

MR. MARTIN:  Objection; form.

A.    Yes.

Q.    (By Ms. Pierson) Do you agree that physicians should have tools available to them to choose the best treatments for their patients?

MR. MARTIN:  Objection; form.

A.    I don't, exactly, know what that means, but, yes.

Q.    (By Ms. Pierson) Sure, that's okay.  It was a confusing question, I think.

A.    I don't know what you mean by "tools."

Q.    Dr. Rheudasil, the decision to choose the Celect vena cava filter for Mrs. Brand, is that a decision that Cook played any role in?

A.    No.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 59

Q.   Is it a decision that you made or the hospital made --

MR. MARTIN:  Objection.

Q.   (By Ms. Pierson) -- on behalf of Mrs. Brand?

A.   To the best of my knowledge, that would have been a decision I made.

Q.   Did you tell Mrs. Brand what type of filter she would be receiving?

A.   I doubt it.

Q.   Did you give her the name of the filter?

A.   Prior to putting it in, I doubt it.

Q.   Have you ever told Mrs. Brand that she has a Greenfield filter?

A.   No, but I would have never told her that. But a "Greenfield filter" is a commonly used term. It -- I consider that equivalent to someone saying I'm going to have a Coke when they might mean Diet Coke or RC or Dr. Pepper.

Greenfield was probably the most commonly placed filter for the first 10 or 15 years, and it became almost synonymous with any filter.

Q.   Dr. Rheudasil, at the time that you chose Mrs. Brand's filter in 2009, what risks were you aware of with vena cava filters or complications?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 60

A.   So, again, acutely, the access-related potential complications, deployment-related complications associated with malposition or misfiring or tilting.

And then long-term, the risks, I believe most often are slightly increased risk of DVT, cava thrombosis.  And then what I consider to be a rare risk of fracture or perforation, at that time.

Q.   You have used the term "perforation."  I want to ask you a couple of questions about that.

In 2009, were you aware that a filter could perforate through the vena cava wall?

A.   Yes.

Q.   Had you seen instances where that had happened with patients with various types of filters?

A.   Yes.

Q.   Tell me, what was your experience about whether that caused your patients any harm.

A.   So I tell patients, routinely, that filters of this general design look like an umbrella with the fabric taken off.  And that if you imagine the struts of an umbrella, that there may or may not be little hooks on the end of the struts, depending on the filter design.  But that it's not uncommon for one or more of these little struts to penetrate the cava.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 61

In most cases, I believe that is a benign event.  In rare cases, it can cause problems.  But I think it's somewhat inherent in the design of that filter, in general.  And I think the closer you scrutinize filters, the more you will find what are asymptomatic cases of perforation.

In fact, I have now come to believe that the vast majority, if not nearly all of these filters may, at some level, at some depth penetrate the cava.  I think that's, in the vast majority of cases, irrelevant.

So, but have I seen -- had I seen before Mrs. Brand an occasional case of a filter perforation that caused clinical consequences?  Yes.

MR. MARTIN:  Objection.  Standing objection referred to.  Go ahead.

Q.   (By Ms. Pierson) Dr. Rheudasil, at the time that you treated Mrs. Brand and placed her vena cava filter, did you know that fracture of a filter was a risk?

A.   Yes.

Q.   Is that true with any vena cava filter?

A.   Yes.

Q.   Not unique to the Celect or to Cook filters?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 62

A.    Correct.

MR. MARTIN:  Objection; form.

Q.    (By Ms. Pierson) And when you talked, earlier, about perforation, in your experience, is perforation a risk with all vena cava filters?

A.    Yes.  Moreso, again, with filters of this particular design, this sort of umbrella design.  But that's what the majority of retrievable filters look like, so, yes.

Q.    When you say "this design," are you talking about a conical filter?

A.    Yes.  Yes.

Q.    Dr. Rheudasil, I want to ask you about a few other risks.

In 2009, at the time that you treated Mrs. Brand, were you aware that migration or movement embolization of parts of a filter was a risk?

A.    Well, yes.  Although if I was going to talk to a patient about migration or movement, I would have probably been more likely to talk about the filter, itself.

Q.    Was that a risk known to you in 2009 relative to all vena cava filters?

A.    Yes.

Q.    In 2009, were you aware that there was a

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 63

risk that a filter might not be able to be retrieved?

A.    Sure.

Q.    That it could become embedded?

A.    Yes.

Q.    And was that true of all vena cava filters in your experience?  Again, not unique to the Celect.

MR. MARTIN:  Objection; form.

A.    I know of no complications unique to the Celect filter.  Yes, they -- all retrievable filters can be difficult or occasionally -- I don't want to say impossible to retrieve, because there are some advanced techniques where, probably, the majority can be.  But all filters can be associated with very difficult retrievability, such that the decision may be made that it's safer to leave it in than to try to take it out.

Q.    (By Ms. Pierson) Dr. Rheudasil, when you talk about things like movement of the filter, fracture of the filter, perforation of the filter as risks common to all filters, how do you know that?

A.    Literature.

Q.    The fact that you were aware of those risks in 2009, was that a product of your education and training and experience with filters?

MR. MARTIN:  Objection; form.  Also

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 64

objection; leading.

A.    Yes.

Q.    (By Ms. Pierson) In 2009, Dr. Rheudasil, your knowledge of the risks of vena cava filters, what was that based on?

A.    Training, experience.

MR. MARTIN:  Objection to form.

A.    Reading.

Q.    (By Ms. Pierson) If you don't mind, just wait until he finishes before you object, so I get a clean answer, I would appreciate that.

Dr. Rheudasil --

MR. MARTIN:  That objection, specifically, was not limited to the Celect filter.

MS. PIERSON:  That's fine.

Q.    (By Ms. Pierson) Dr. Rheudasil, I want to shift gears and talk about the placement of Mrs. Brand's vena cava filter.  When you placed Mrs. Brand's vena cava filter, in March of 2009, were there any complications, to your knowledge?

A.    No.

Q.    Prior to placing it, did you or your staff provide to Mrs. Brand an informed consent?

A.    Yes.

(Exhibit 7, Northside Hospital Informed

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 65

Consent Form, Bates stamped Northside Hosp. 617,

marked for identification.)

Q.   (By Ms. Pierson) Just for our record,

Dr. Rheudasil, is Exhibit 7 a copy of the informed

consent that Mrs. Brand signed prior to her filter

placement by you?

A.   Yes.

Q.   Does the informed consent advise Mrs. Brand

that there are no guarantees to the procedure, that

there's a risk the patient may suffer an infection,

an allergic reaction, a severe loss of blood, loss

of -- sorry, loss of function of any limb or organ,

paralysis or partial paralysis, paraplegia or

quadraplegia, disfiguring scar, brain damage, cardiac

arrest or death?

MR. MARTIN:  Given the -- given the

standing objection, I'm not going to object to

all of the leading questions that if they occur

in this -- regarding this particular form, I'm

going to let them go.

But I want to reiterate that we have a

standing objection to leading questions now, so

I don't have to interrupt during this

questioning about -- about the form.

Just want to make that objection on the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 66

record, me restate the agreement.

You may proceed.

Q.    (By Ms. Pierson) Dr. Rheudasil, is Mrs. Brand advised in this consent of risks of her vena cava filter placement, including a risk as great as death?

A.    I presume so.  I don't remember the informed consent, but ...

Q.    Dr. Rheudasil, are you familiar with the term "instructions for use" or "package insert?"

A.    Yes.

Q.    In choosing Mrs. Brand's vena cava filter, did you rely on anything contained in a Celect instruction for use or package insert?

MR. MARTIN:  Objection to form.

A.    Not that I know of.

Q.    (By Ms. Pierson) In choosing Mrs. Brand's Celect vena cava filter, did you rely on any specific literature about the Celect filter?

A.    Not that I know of.

Q.    Did you rely on any marketing material or anything a representative of Cook told you in choosing her Celect filter?

A.    Not that I know of.

Q.    Before Mrs. Brand's procedure, had you

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 67

reviewed the Celect instructions for use?  Do you have a memory of that?

A.    I don't have a memory of it.  I -- I typically read IFUs when I put something in for the first time, but I don't -- I don't, specifically, recall the Celect IFU.

Q.    As you sit here today, do you know whether you read the Celect IFU prior to placing Mrs. Brand's filter?

MR. MARTIN:  Object to form; asked and answered.

A.    I don't -- I don't know.

Q.    (By Ms. Pierson) Dr. Rheudasil, the knowledge that you had of the risks of vena cava filters at the time that you placed Mrs. Brand's filter, was that something that you had independently?

MR. MARTIN:  Objection to the form.

A.    Independently what?

Q.    (By Ms. Pierson) That's a poorly phrased question.  Let me ask it a little different way.

Was your knowledge of the risks of placing a vena cava filter in Mrs. Brand based on anything other than your training, education and experience?

A.    No.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 68

MR. MARTIN:  Object to form.

Q.   (By Ms. Pierson) Dr. Rheudasil, I want to talk about the procedure that you performed, and I'll mark, as Exhibit 8, your operative note.

(Exhibit 8, Northside Hospital Operative Note, Bates stamped Northside Hosp. 485 - 486, marked for identification.)

Q.   (By Ms. Pierson) If you could, explain to the jury what you did relative to caring for Mrs. Brand on the day of her procedure.

A.   What I did in taking care of Mrs. Brand?

Q.   Yes, yes.  Just start -- start from the beginning if you could.

A.   So, in -- in the cases in which we -- we performed the filter insertion at this same time as the spine procedure, once Mrs. Brand was put to sleep, basically, I would prep the groin and gain access to the femoral vein, thread a little catheter inside the vena cava, take a picture that, you know, in general terms, looks at the vena cava, and then deploy the filter.

Once the filter was deployed, simply put a dressing on the groin.  Take all those drapes down, which were unique for that portion of the procedure, and then we would essentially start over, re-prep and

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 69

drape in preparation for the spine surgery.

Q.   Dr. Rheudasil, after you placed -- I'm sorry, let me start again.

Dr. Rheudasil, where did you place Mrs. Brand's vena cava filter?

A.   I don't know if it says that in here or not, but it's typically just at the immediate infrarenal level.

Q.   When you say "infrarenal," what do you mean?

A.   With the tip of the cone just at or below the level of the renal veins.

Q.   After you placed Mrs. Brand's vena cava filter, did you perform a post-placement venogram?

A.   No.

Q.   And at the time that you placed the filter, am I understanding you correctly that she's already in the operating room?

A.   Correct.  In this particular case, not always, but in this particular case.

Q.   There are a couple of references in the operative note that I want to ask you about.  When you describe making the incision, there's a reference to abundant subcutaneous tissue down to the fascia.

A.   Right.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 70

Q.   Is that -- tell me what that's describing.

A.   Fat.

Q.   Did Mrs. Brand's body habitus affect your ability to access her spine?

A.   No, I mean, it made that portion of the surgery a little bit more difficult, but not in any meaningful way.

Q.   I assume, with all patients, that there's some amount of retraction that happens with skin and --

A.   Yes.

Q.   -- fat and tissues.

In the case of Mrs. Brand's procedure, was it necessary to retract all those things, as well?

A.   Yes.  Sure.

Q.   There's a reference in here to moderate scarring present, inferiorly, where there had been a previous pelvic exposure.  Was it necessary to do something with that scarring in order to gain access to her spine?

A.   Well, so, again, scar tissue, when it's meaningful, just means that things stick together, and we needed to be able to retract and what we call "mobilize."  We needed to be able to move stuff away so that when we retracted it, it wouldn't be under

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 71

undo pressure.

And so I had to divide enough scar tissue to be able to retract, really, her abdominal contents, basically lower abdominopelvic contents out of the area of the field so that Dr. Morrison can do his job.

Q. You described to us, earlier, the procedure that you generally perform on patients with the kind of spinal surgery that Mrs. Brand had. Was there anything unique about her approach to access her spine as compared to other patients?

A. No.

Q. There's reference in your operative report to "retractors, repositioned as needed, allowing wide mobilization of the left common iliac artery." And then also reference to "retractors being replaced by retracting the left common iliac artery and vein."

Explain to us what you mean when you use the term "retractors" there.

A. Retractors are little metal instruments that, essentially, hold things out of the way. And in order to do the exposure, you use these instruments that are, for all practical purposes, fixed in place where you put them to hold things out of the way for the duration that it needs to be done

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 72

in order for Dr. Morrison to see what he needs to see.

For the L4-5 interspace, for that area of the spine, commonly, that retraction involves retracting iliac blood vessels.  And that retraction can be in almost any direction, just depending on the anatomy of the patient and their spine.  And so we have to not only move the abdominal and pelvic contents off to the side, but commonly, have to move the blood vessels out of the way.

Q.  Dr. Rheudasil, how many retractors were used during Mrs. Brand's procedure, and how long were things being retracted?

A.  I would say there were probably four retractors being used.  They are all connected to one device -- to one, sort of, base device.

How long, I don't know how long the surgery took.  Commonly, the retractors, though, are adjusted or repositioned a little bit at various times during the surgery.  So they weren't necessarily fixed in stone for the duration of the procedure, but I suspect things were retracted for an hour or two.

Q.  What's the name of the equipment that the retractors are connected to?

A.  The particular retractor system that I

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 73

prefer is called the Omni-Tract.  And it's just a --
essentially, a stand that's fixed to the bed and then
fixed to the railing on the bed, and then the other
retractors can be attached to the stand.

Q.   Dr. Rheudasil, there's a reference in this
same note under the Impressions section to --

A.   Under the operative note?

Q.   Yes, under the operative note, sorry, to, I
think it's the Indication section.  I'm sorry, I'll
come back to that in just a moment.

Was it your impression, Dr. Rheudasil, that
Mrs. Brand understood the risks and benefits of her
surgery and her vena cava filter and elected to
proceed?

MR. MARTIN:  Objection; form.

A.   Yes.

Q.   (By Ms. Pierson) Dr. Rheudasil, following
Mrs. Brand's surgery, did she ever come back to you
for a follow-up visit to check her incision or
anything else?

A.   Not that I can find.

Q.   Did you tell Mrs. Brand, prior to her
filter placement, that she should come back and have
it retrieved?

A.   I don't know.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 74

Q.   Would it have been your practice, in 2009, to tell patients receiving retrievable filters to come back and have them taken out?

MR. MARTIN:   Objection; form.

A.   So the normal conversation probably would be, "I'm going to put in a filter to try and minimize your risk of pulmonary embolus, that this filter, ideally, should be removed."

The -- my favorite time to do that is a couple of three months after the surgery.  As -- if it's in longer, it becomes more difficult to remove. But that removement is not -- retrieval is not required.  But that every patient, especially after a big surgery like this, recovers at a slightly different rate.  Every patient's enthusiasm to come back in for another procedure is a little different; albeit even an outpatient, minor procedure like a retrieval.

So I don't, specifically, recall any of these discussions with Mrs. Brand, but that would be my usual discussion.  I don't know what happened with her surgery or whether life got in the way or whether we didn't really have that good -- I don't know whether it was a communication -- I don't know what many of the myriad possibilities are as to why she

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 75

didn't come back to have it retrieved.

It's not -- I mean, when we do the exposures, it's not at all unusual for me not to see those patients back.  Typically, Dr. Morrison follows the recovery of the incision and that sort of thing, so ...

Q.   (By Ms. Pierson) Do you have any record of, Dr. Rheudasil, of Mrs. Brand calling you or you calling her to have her filter retrieved?

A.   I don't recall.

(Exhibit 9, Progress Note, Bates stamped Brand_000893 - 895, marked for identification.)

Q.   I gave you an unmarked copy just a second ago.  I'm handing you what's marked as Exhibit 9. This is a progress note dated June 20th, 2011.

As I look at your medical records, I don't see any communication between Mrs. Brand and your office between March 19, 2009, and June 20th of 2011 until we get to this note.

Based on your memory, is it correct to say that there's no follow-up between Mrs. Brand and your office for a period of about two years?

A.   I have no -- correct.

Q.   This progress note, the first page reports that "a patient called today to let me know that she

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 76

had pulled a piece of metal from her right thigh and she thinks it is a piece of her IVC filter."

Do you see that?

A.    Yes.

Q.    Prior to June 20th of 2011, had you ever suggested to Mrs. Brand, or to your knowledge, had anyone told her that a piece of her vena cava filter could come out of her thigh?

A.    No.

Q.    And if you turn the page to June 22nd, 2011, two days later, there's a longer note.  First, are both of these notes from your Nurse Johnson?

A.    I believe so, yes.

Q.    They were written by a nurse in your office.

A.    A nurse, yes.

Q.    The 6/22 note that's on the screen in front of you refers to a "patient calling regarding an x-ray to evaluate IVC filter.  Patient explained series of events last week where patient developed severe pain in thigh leg, right area, went to ER to evaluate for DVT."

Did I read that correctly, Dr. Rheudasil?

A.    Yes.

Q.    Then skipping down a little bit, it says,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 77

"Then on Saturday, patient felt more pain and found a piece of metal under her thigh and pulled out a piece of metal.  Patient did not seek treatment after that."

Did I read that correctly?

A.   Yes.

Q.   Does that mean that Mrs. Brand reported to your nurse that she -- she, on Saturday, pulled a piece of metal from under her thigh and did not seek treatment after that?

A.   Yes.

MR. MARTIN:  Objection; form.

Q.   (By Ms. Pierson) Was the first time that Mrs. Brand notified your office of the event the following Monday?

A.   Yes.

Q.   And there's a reference to "patient had no other symptoms or bleeding, just left object poking her skin."  Did I read that correctly?

A.   Yes.

Q.   Is that what your nurse reported Mrs. Brand told to her?

A.   Yes, yes.

Q.   Said "Patient denies any symptoms at this time."  Did I read that correctly?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 78

A.    "Patient had no other symptoms."

Q.    Does that mean that's what your nurse recorded that Mrs. Brand told her?

A.    Correct.

Q.    And then the very last line, it says, "Patient is to bring piece of metal to her KUB for further evaluation."  What does that mean?

A.    The very last line, where?

Q.    Sorry, if you turn to the next page.

A.    Patient is to bring piece of metal to -- yes, I don't know what that means.

Q.    I've got it on the screen, "Patient to bring piece of metal to her KUB for further evaluation."  Does that mean she was instructed to bring the fragment in to your visit with you?

A.    Well, no, not really, because we don't do KUBs in my office.  I can only assume this means the nurse instructed her to take it with her to have her x-ray done so that if the radiologist wanted to look at it or compare it to the x-ray report.  I don't know.

Q.    Dr. Rheudasil, did you send Mrs. Brand for any imaging following that call?

A.    Well, that's what a KUB is.  It's just an abdominal x-ray.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 79

Q.   I'm handing you what's been marked as Exhibit 10.

(Exhibit 10, CT Abdomen Without Contrast, 6/23/11, Bates stamped Northside Hosp. 123 - 124, marked for identification.)

Q.   (By Ms. Pierson) Was Exhibit 10 a copy of the CT report that you received on or around June 23rd, 2011, relative to Mrs. Brand's abdomen?

A.   Okay.

Q.   And I just want to ask you about the Impression section of this CT report.  First of all, you received this, right?

A.   I presume so.

Q.   And the Impression section records "fractured leg of the IVC filter, no significant inflammatory change seen around the fractured line. No other inflammatory change in the abdomen.  IVC filter typical at the level of the renal veins."

Did I read that correctly?

A.   Yes.

Q.   When you received this report, what was your opinion about whether Mrs. Brand had any inflammatory reaction to the fractured leg or inflammatory changes in her abdomen?

A.   That there was none.

Case 1:14-ml-02570-RLY-TAB    Document 26565-4    Filed 03/17/25    Page 81 of 267
PageID #: 159924
CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 80

Q.   628.

(Exhibit 11, Vascular Institute of Georgia Office Note, 6/28/11, Bates stamped Brand_000897, marked for identification.)

Q.   (By Ms. Pierson) Dr. Rheudasil, based on -- let me hand you Exhibit 11.

Dr. Rheudasil, based on the records we received from your office, it looks like the next contact that you had with Mrs. Brand was June 28, 2011.  Is that consistent with your memory?

A.   Generally, yes.

Q.   At that time, did Mrs. Brand come into your office to talk to you about her IVC filter?

A.   Yes.

Q.   And tell me, what did you say to her, and what did she say to you during that visit?

A.   I mean, I can only tell you what is on the note.  But told her that the filter had some fractures in it, and that while it had already been a longer period of time than is customary to wait when removing the filter, that I thought we should try to get it out if we could.  And that -- so that we should try to schedule retrieval.

Q.   At the time that Mrs. Brand came to see you on that day, was she in any physical pain?

Veritext Legal Solutions
www.veritext.com                                                      888-391-3376

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 81

A.   Not that I'm aware of, no.

Q.   Was she reporting to you any symptoms, other than the fact that she got this piece out of her thigh?

A.   No.

Q.   Was she bleeding?

A.   No.

Q.   Did you see the place in her leg where she said she pulled the piece out of her thigh?

A.   I think so, but I don't remember for sure. But I think so.

Q.   Was it swollen or red or inflamed in any way?

A.   I really can't recall.

Q.   Did you make any note of that?

A.   No.

Q.   Dr. Rheudasil, did Mrs. Brand bring the filter fragment to you on that day?

A.   I don't -- not that I recall.

(Exhibit 12, Preoperative History and Physical, Bates stamped Brand_000898 - 899, marked for identification.)

Q.   (By Ms. Pierson) I'm handing you what we have marked as Exhibit 12.  If you could just confirm, Dr. Rheudasil, is Exhibit 12 a copy of the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 82

pre-planning note and the operative?

MR. HEAVISIDE:  Did you skip 11?

MS. PIERSON:  I don't think so.

Q.   (By Ms. Pierson) Dr. Rheudasil, is Exhibit 12 a copy of the pre-planning note and the operative report from the filter retrieval attempt, in July 2011?

A.   This is really the operative note, yes, procedure note.  Not really an operation.

Q.   In July of 2011, did you perform a procedure to try and take out Mrs. Brand's vena cava filter?

A.   Yes.

Q.   And were you successful?

A.   No.

Q.   Why not?

A.   The filter, I think, had tilted a little bit, and we -- I had difficulty engaging -- you know, there's a hook on top of the filter that you have to snare in order to remove it.  And I could not successfully engage the hook.

Q.   I'm sorry.  Just so our record is clear, Dr. Rheudasil, Exhibit 12 in front of you, that's the pre-procedure planning report?  What is that?

A.   No, 12 is the procedure note.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 83

(Exhibit 13, Procedure Report, 7/14/11, Bates stamped SJH 30 - 31, marked for identification.)

Q.    (By Ms. Pierson) Let me hand you what I have marked as Exhibit 13.

A.    Same thing.

Q.    Okay.  Just two different copies of the same thing?

A.    Well, no, you're right.  You're right. Twelve is a pre-procedure note, I'm sorry.

Q.    Okay.  And then 13 is your actual procedure note, correct?

A.    Right.  What's interesting is they have different hospitals.  But, yes.  That's correct.

Q.    At the time that you performed Mrs. Brand's retrieval attempt, was she in any pain from her filter?

A.    Not that I'm aware of.

Q.    You used the term "asymptomatic" earlier, what does that mean?

A.    She wasn't having any symptoms related to the filter fracture.  No abdominal pain, no obvious issues, other than presumably the strut in her thigh.

Q.    Dr. Rheudasil, following your attempt to retrieve Mrs. Brand's filter, what did you decide to

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 84

do?

A.   Leave it alone at that time.

Q.   In 2011, when you made the decision to leave her filter alone, was the filter providing her any benefit?

A.   I think so.

Q.   What do you mean when you say that?

A.   Well, I mean, even a tilted filter does offer some protection against pulmonary embolus. Certainly, as it -- as it tilts more, presumably as a filter is fractured more, the benefit of it is probably not significant, but everything we do, you know, is a risk/benefit decision.

And so in this case, after trying to get it out with the conventional techniques, the decision was that further attempts at retrieval may actually just cause it to fracture more and be potentially more prone to embolize or cause problems.

Since she was asymptomatic at that time, the decision was the better part of valor was to leave it alone.

Q.   Was that your decision, Dr. Rheudasil?

A.   It was my decision as captain of the ship. My recollection is there was an interventional radiologist, sort of, watching this attempt at

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 85

retrieval, and that we both, sort of, had a curbside discussion about how hard to try to get it out. And our -- our opinion was that it would be better to leave it.

Q. You mentioned the term "risk/benefit." When you chose Mrs. Brand's filter, back in 2009, did you weigh the risks and benefits of filter placement for her?

A. Sure.

Q. Was it your judgment that the benefits of a vena cava filter outweighed the potential risks?

MR. MARTIN: Objection; form.

A. Yes.

Q. (By Ms. Pierson) And with respect to your choice of the Celect filter for Mrs. Brand, was it your judgment that the benefits of the Celect filter outweighed the risks when you placed it in Mrs. Brand?

A. Yes.

Q. Dr. Rheudasil, following the retrieval attempt, did you prescribe any medication for Mrs. Brand or give her any instructions on followup?

A. Honestly, I don't recall. I don't think I prescribed any medication. I don't recall our follow-up discussion.

Veritext Legal Solutions

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 86

Q.    Was the procedure performed without complication to her?

A.    Yes.

Q.    Did she need any additional medical care following that?

A.    No.

Q.    Did you believe that she needed to come back to your office at any intervals or that she needed any ongoing medical care following her retrieval attempt?

A.    No.  I think we had an obvious understanding that if she felt that she were having any problems, that I would want to see her and deal with that, but I don't specifically recall a follow-up plan.

Q.    It appears to me that the next time you treated Mrs. Brand was on October the 29th of 2012. If you could just look at Exhibit 14 and confirm I've got that right.

(Exhibit 14, Vascular Surgery Progress Note, Bates stamped Dr. Rheudasil 10 - 12, marked for identification.)

Q.    (By Ms. Pierson) Do I have the date right there, Dr. Rheudasil?

A.    Yes, October 29, 2012.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 87

Q.   Okay.   In the 16 months or so between the filter retrieval attempt and this office note, did you ever hear from Mrs. Brand?

A.   Did I -- say that again.

Q.   Did Mrs. Brand ever contact you between the retrieval attempt and this office note?

A.   Not that I'm aware of.

Q.   Did she call to report any abdominal pain, leg pain, anything else?

A.   Not that I'm aware of.

Q.   Or any concerns about her filter?

A.   Again, not that I'm aware of.

Q.   The exhibit that's in front of you, Dr. Rheudasil, says "She has done well since that time with no abdominal symptoms."  Did I read that correctly?

A.   You will have to tell me where you are reading that, but ...

Q.   Sure, I think it's on page 10.

Dr. Rheudasil, is it your recollection of your visit with Mrs. Brand, on that day, that she had done well following her retrieval attempt?

A.   Yes.

Q.   And did she report to you that she had no abdominal problems or other issues?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 88

A.   Yes.

Q.   There's a reference to "My previous note suggests that one strut of the filter is in the soft tissues.  She would like to have this followed."  Do you see that?

A.   Yes.

Q.   And then under the Summary section, it says, "Mrs. Brand would like an x-ray to reevaluate her IVC filter as it has been a year or so."  Do you see that?

A.   Yes.

Q.   "She is asymptomatic."

A.   Yes.

Q.   What does that mean?

A.   She's not having any apparent problems related to the filter.

Q.   Was Mrs. Brand returning to you for followup because you asked her to come to see you or because she wanted to be seen?

A.   I don't know, but I believe it was because she wanted to be seen at that time.

Q.   Do you have a recollection of what Mrs. Brand told you about why she wanted to be seen?

A.   No.  I could guess, but I don't have a recollection.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 89

Q.   What was your impression as to why Mrs. Brand wanted to return?

MR. MARTIN:   Objection; form.

A.   I think she was a little apprehensive just about what was happening with the filter after a year's time and that she wanted to know if that could be evaluated.

Q.   (By Ms. Pierson) There's some reference in your early records, Dr. Rheudasil, to Mrs. Brand having some issues with anxiety.  Was it your experience, when treating her, that she was a patient who had some issues with anxiety, generally?

MR. MARTIN:   Objection form.

A.   She was a little nervous.

Q.   (By Ms. Pierson) Okay.  Dr. Rheudasil, the next record that I have is May 21st, 2015, so I want to focus for a second between 2012 and 2015.  Do you have any recollection of Mrs. Brand returning to you or requiring further care between 2012 and 2015?

A.   No.

(Exhibit 15, Phone Record, 5/21/15, Bates stamped 000046, marked for identification.)

Q.   (By Ms. Pierson) Dr. Rheudasil, I'm handing you Exhibit 15.  Is Exhibit 15 a copy of a phone record regarding a call that Mrs. Brand made to your

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 90

office on May the 15th of 2015?

A.   Yes.

Q.   The note says, "Patient was called by RN to tell her that Dr. Rheudasil received the CT report about her fractured IVC filter."  Is that reflecting a -- your review of a CT in May of 2015?

A.   Presumably.

Q.   And the note says, "Dr. Rheudasil said the it was the strut was lodged in the safest possible place, the right psoas muscle and that there was nothing to do."

What does that mean?

A.   That means the separated strut was essentially lodged in the large muscle tissue of the back, and there's really nothing particularly close by that that would be likely to harm.  And that to the extent possible, that was a relatively safe place for that to be.  It didn't require attention.

Q.   Was the fragment in the psoas muscle well fixed?

A.   I don't know.

Q.   In your review of her CT and other imaging, was the -- was the fragment encased, essentially, grown in?

A.   I think -- I think -- that's my

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 91

recollection, but I don't -- I don't know.

Q.   During the time that you treated Mrs. Brand, do you believe that it posed any risk to her?

A.   No.

Q.   Was it causing her any pain or problems, in your experience?

A.   No.

Q.   Did you recommend that Mrs. Brand come back to see you after that?

A.   According to this note, I recommended that she -- that she just have it x-rayed periodically for surveillance.

Q.   Was there anything urgent or emergent about her condition in your view?

A.   No.

         (Exhibit 16, Medical Report, 7/16/15, Bates
         stamped Dr. Rheudasil 2, marked for
         identification.)

Q.   (By Ms. Pierson) I'm handing you what's been marked as Exhibit 16.  I'm going to ask you just a couple of questions.

         Is this a note from your review of records on July the 17th of 2015?

A.   Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 92

Q.   In July of 2015, did you make a decision about whether Mrs. Brand's filter needed to be retrieved or not?

A.   I think -- I think we made that decision collectively, yes.

Q.   And why did you and Mrs. Brand make the decision that her filter would be retrieved?

A.   Well, I think what we had, now, was evidence that there was more fragment displacement, and that while I still didn't think it was causing any particular symptoms or problems at that moment, we had, now, objective evidence that there was ongoing issues with fragment movement, and that I knew that she was going to be nervous or appropriately nervous about that.

I knew that we were going to have to be interrogating it more and more closely over time if we left it in.  And that at that point, I thought that it would just be in her best interest to take it out.

Q.   Were you able to retrieve her filter ultimately?

A.   Yes.

Q.   And how did you do that?

A.   We had to do an open surgery where we

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 93

exposed her vena cava and opened it and, essentially, peeled the filter out and closed the blood vessel.

Q.   The incision that you made to -- to perform the open procedure, were you able to make an incision over the same location that you previously used for her spinal surgery?

A.   No.

Q.   Tell me, where was -- where was the incision that you made for her open procedure?

A.   I believe it was up-and-down midline, what we call a midline incision.  We would do that, typically, for this exposure with the idea that we were going to, potentially, have to go fairly high, which I wouldn't have been able to do from a lower incision, in order to get above the filter so that we could -- that we could satisfactorily remove it.

Q.   Were there any complications during or after Mrs. Brand's October 15th retrieval?

A.   There were no serious complications.  She had some GI issues for a few days that took a little longer than, maybe, normal to recover, but nothing that I recall.

Q.   I take it there came a point that Mrs. Brand was discharged from the hospital --

A.   Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 94

Q.   -- in October 2015?

A.   Sure.

Q.   At the time that she was discharged, did she need to come back to you for any reason, after the procedure?

A.   Well, not specifically that I recall.  I mean, we -- I would normally see a patient after a surgery of this magnitude more than once, but not because I was expecting her to have a problem, really, just to check on her progress.

Q.   There's a reference in your records to a November 2015 visit where she came back to get her staples out.  Do you remember that?

A.   I don't remember it, no.

(Exhibit 17, Follow-up Visit Report, 11/12/15, marked for identification.)

Q.   (By Ms. Pierson) I'll hand you Exhibit 17. If you could just confirm that's her follow-up visit with you two weeks after her procedure.

A.   Right.

Q.   Correct?

A.   Right.

Q.   And, Dr. Rheudasil, when you saw her on that day, what was her condition?

A.   She was doing well.  So we removed her

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 95

abdominal staples and felt like she was reducing her pain medicine a little bit and that she should do fine, and that I would see her back in a few months for a checkup.

Q.   Dr. Rheudasil, did Mrs. Brand ever come back to you to be treated again after that?

A.   Not that I know of.

(Exhibit 18, Phone Message Report, 11/24/15, marked for identification.)

Q.   The last record that I have in your chart is what I have marked as Exhibit 18.  This is a phone call on November the 24th, 2015.  Correct?

A.   Yes.

Q.   Mrs. Brand was calling to request some pain medication, right?

A.   Yes.

Q.   Was she instructed, during that period of time, that you would give her Tylenol 3, but that she was to stop any other pain medication, like Percocet.

A.   I don't know, this is a nurse note.  I think the nurse was concerned she was taking Percocet and Tylenol Number 3 at the same time, which is not a good idea.  And so I think she asked that she just take the Tylenol 3.

Q.   Dr. Rheudasil, at any point in time since

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 96

these -- this last call, has Mrs. Brand ever reported
to you any problems related to the abdominal
surgeries that you performed?

A.    Not that I recall.

Q.    Has she ever contacted you to tell you that
she was having abdominal pain or GI symptoms or any
other medical condition that she attributed to her
filter or to the surgeries you performed?

A.    Not that I'm aware of.

Q.    Since 2015, has Mrs. Brand ever come back
to you to be treated for any kind of pain in her leg
where she says the fragment came out?

A.    No.

Q.    To your knowledge, did Mrs. Brand recover
completely from her 2015 procedure?

A.    Yes.

Q.    Did you prescribe any ongoing medications
following that procedure?

A.    No.

Q.    Did you believe that she needed any pain
medication following that -- her initial recovery
from that procedure?

A.    No.

Q.    Did you believe that Mrs. Brand needed any
anti-coagulation following that procedure?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 97

A.   No.

Q.   During the time that you treated Mrs. Brand, has there ever been a time that you prescribed anticoagulants for her?

A.   Not that I recall.

Q.   Does Mrs. Brand have any condition that you're aware of that would require her to be on lifetime anticoagulants?

A.   No.

Q.   Is there anything related to Mrs. Brand's filter fracture or procedure that you performed that, in your judgment, requires her to take ongoing anticoagulants?

A.   No.

Q.   Following Mrs. Brand's 2011 filter fracture, did you continue to use the Celect filter for your patients?

A.   I believe so.

Q.   Did you have confidence in its safety and efficacy for your patients?

MR. MARTIN:   Objection; form.

A.   I had no problem using it.

Q.   (By Ms. Pierson) Did anything about Mrs. Brand's experience, during 2009 to 2015, did anything about her experience change your decision

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 98

about using filters or the Celect filter?

          MR. MARTIN:  Objection; form.

     A.   No.  It did make me, frankly, a little more enthusiastic about filter retrieval than I probably had been previously, but not a specific reservation relative to the Cook Celect filter.

     Q.   (By Ms. Pierson) Is there anything about her experience that would cause you to change your decision to choose the Celect filter?

     A.   No.

          MR. MARTIN:  Objection; form.

     Q.   (By Ms. Pierson) Dr. Rheudasil, is it fair to say that, in your experience, you have seen filters that have fractured?

     A.   Yes.

     Q.   Other than Mrs. Brand, have you ever seen a patient that you placed a Celect in that has fractured?

     A.   Not that I recall.

     Q.   In the course of your 30-year career, have you ever seen a patient who experienced any of the things that Mrs. Brand experienced?

     A.   No.

     Q.   How many patients have you treated over the course of your career?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 99

A.   I don't know.  Hundreds and hundreds of filter patients.

Q.   Is she the only patient that you have seen with a filter fracture of a Celect filter?

A.   To my recollection, yes.

Q.   Is she the only patient that you have seen with a filter fracture that is symptomatic?

A.   So I've not -- I've not ever seen, to my knowledge, a symptomatic filter fracture that was not displaced.  I have seen symptomatic filter perforations, different subject.  But I have not -- I have not seen another filter behave like this, whether it was a Cook Celect or any other filter.

MS. PIERSON:  Thank you, Dr. Rheudasil.  That's all the questions I have for right now.

THE WITNESS:  Okay.

EXAMINATION

BY MR. MARTIN:

Q.   You have had other filter patients who have fractured filters, true?

A.   Yes.

Q.   This isn't the first fractured IVC filter that you have experienced in your time in placing them; is that true?

A.   True.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 100

Q.   In fact, do you know that there are patients -- let me back up.

The only way to know if a patient has a fractured filter is for the patient to have been diagnosed with having a fractured filter.  Would that be true?

A.   Yes.

Q.   So you can't guarantee that there aren't patients out there that you put filters in, including Celect filters specifically -- let's start over.

Can you guarantee to this jury that you do not have any patients with Celect filters that you placed into their bodies, guarantee that some of those patients do not have fractured filters?

MS. PIERSON:  Object to the form.

A.   No.

Q.   (By Mr. Martin) And the reason is why?

A.   Most of these patients are not even imaged. We don't -- most of these patients are not studied.

Q.   And if a patient does have a fractured filter, then can the things that happened to Mrs. Brand happen to the other patients?

A.   We now know that it's possible, yes.

Q.   Cook -- I want to direct your attention to ...

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 101

MS. PIERSON:  Do you need the Elmo, Ben?

MR. MARTIN:  No.

MS. PIERSON:  Do you want me to slide it over?

MR. MARTIN:  Yeah, I probably should get it.

THE VIDEOGRAPHER:  If you are going to need it, let's go off the record for a moment.

The time is approximately 3:03 p.m.  We are off the video record.

Q.   (By Mr. Martin) Could you pull the exhibit out that discusses Cook's suggestion that there could -- there would be ongoing problems and that the filter needed to be retrieved?

Do you have that in front of you?

A.   No.

Q.   I'm going to hand you what's been marked --

MR. HEAVISIDE:  I don't think he's on the record.

MR. MARTIN:  When did that happen?

MS. PIERSON:  When we said do you want the Elmo, he said let's go off the record.

MR. MARTIN:  I'm sorry, I thought we just got on the record.  I apologize.

(WHEREUPON, a recess was taken.)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 102

THE VIDEOGRAPHER:  The time is approximately 3:13 p.m.  We are back on video record.

THE WITNESS:  What do you want me to do?

THE VIDEOGRAPHER:  You don't have your microphone on.

THE WITNESS:  Thank you.

Q.   (By Mr. Martin) All right, Doctor. Dr. Rheudasil, do you remember when the -- you found out that Tonya's filters -- let me start over.

Dr. Rheudasil, do you remember when you found out that Tonya Brand's Celect filter had fractured and a piece of it had been removed by Mrs. Brand from her leg?

A.   Yes.

Q.   And how did you find that out, that Tonya's Celect filter had fractured, the one that you had put in, and it had fractured such that a piece of it had then been pulled out of her leg by her?

A.   I don't remember.  I think that was probably conveyed to me by one of my nurses.

Q.   I'm going to hand you what has been marked Exhibit Number 19.

(Exhibit 19, E-mail string to Clemmer and Talbert from Dubois, 6/23/11, Bates stamped

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 103

CookMDL2570_00074641 - 2570_74645, marked for identification.)

Q.   (By Mr. Martin) Exhibit Number 19 is a four- or five-page e-mail from Tamara Clemmer.  Do you recall, one way or the other, who Tamara Clemmer is?

A.   Sure.

Q.   And who is Tamara Clemmer?

MS. PIERSON:  Just one second before you show him the exhibit.  Has he signed the protective order?

MR. HEAVISIDE:  He has.

MS. PIERSON:  The confidentiality.

A.   Tamara is a Cook sales and support representative.  I don't know what her title is.

Q.   (By Mr. Martin) And if you will look at the final page of that exhibit.  For purposes of exhibit record, it is 74640.

A.   Okay.

Q.   Bates stamp number.  It's the last page of that Exhibit Number 19.  Do you see that exhibit there?  That e-mail?

A.   I don't have 74640.

Q.   Let me find that for you, Doctor.

MS. PIERSON:  While you do that,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 104

Mr. Martin, can we have a standing objection as to any questions related to documents that he doesn't have personal knowledge about?

MR. MARTIN:  You are welcome to make that.

MS. PIERSON:  I can keep objecting, but if you will give me a standing objection when you ask him about --

MR. MARTIN:  Sure, that's fine.

MS. PIERSON:  -- Cook documents then I won't keep --

MR. MARTIN:  That'll be a form objection and that particular form objection, certainly.

MS. PIERSON:  Thank you.

Q.   (By Mr. Martin) Handing you this, Doctor, and this Exhibit Number 19 begins:  "Hello, Darrell" in the first page.

You see it says, "Hello, Darrell.  I appreciate you jumping in to help ease their concerns and hopefully come up with an explanation once we have all of the information."

Now, that particular e-mail is actually from a fellow by the name of Marc Dubois, and then there's another e-mail below it on the same page that starts out, "Hello, Darrell.  Thank you for getting back to me quickly this morning."

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 105

Now, do you see that as being an e-mail from Tamara Clemmer?

A.   Yes.

Q.   All right.  And then Miss Clemmer ...

(Exhibit 20, E-mail string to Talbert from Clemmer, 6/23/11, Bates stamped CookMDL2570_0074640, marked for identification.)

Q.   (By Mr. Martin) I'm going to hand you Exhibit Number 20 and ask if you look at that for me.

And do you see that Exhibit Number 20 is an e-mail, dated June 23, 2011, from Tamara Clemmer to Darrell Talbert.  Do you see that document?

A.   Yes.

MS. PIERSON:  What's the Bates number that you have marked as 20?

MR. MARTIN:  That's the 640.

MS. PIERSON:  Do you have a copy for us?

MR. MARTIN:  Yes, sure do.  Here's that entire one.

MS. PIERSON:  Thank you.

MR. HEAVISIDE:  Excuse me.  Do you want to make this an exhibit?  This is the executed confidentiality agreement.

MS. PIERSON:  Sure.

MR. MARTIN:  Can we do that toward the end?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 106

Q.   (By Mr. Martin) All right.  So if you will look at Exhibit Number 20, which has been shown on the screen here, and I'll give you the original here.

Tamara Clemmer sends that e-mail, "I would jump in that early flight.  She mentioned a couple of times how he wanted to meet with us before meeting with the patient.  That would be great.  Thank you."

Did that appear to be talking about you, that you wanted to meet with Cook people before you met with the patient?

MS. PIERSON:  Object to form.  And same objection about Cook documents.

A.   I don't know.

Q.   (By Mr. Martin) You don't know who that would have been, that doctor?

A.   No, no.  I mean that may be what it says. I don't recall that, one way or the other.

Q.   Is that time period, June 23rd, 2011, is that approximately the time period that you had sent Cook a notification that there had been this incident involving their filter?

A.   Probably.

Q.   And if you look down below this e-mail, then, from Darrell Talbert, Darrell Talbert says, "Hopefully we will hear back from more from

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 107

Dr. Rheudasil and/or Lori today.  If not, let's plan on trying again together tomorrow.

"As we discussed, I think it's important that we talk with him directly to get a better sense as to where we really are at the moment. Additionally, as soon as images are available, would be great to have, as well."

And then he talks about flights.

Now, after review of that e-mail, does it appear that what they are talking about is meeting with you, Darrell Talbert coming to meet with you?

A.   Yes.

Q.   Does that refresh your recollection of actually having met with Darrell Talbert?

A.   No.

Q.   Okay.  Do you know what Darrell Talbert's position is with the company?

A.   No.  No idea.

Q.   You are not saying you didn't meet with him, you are just saying you don't recall it.

A.   Correct.

Q.   And did you know that Darrell Talbert is in the marketing department?

A.   No.

Q.   Do you have any -- did Cook ever tell

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 108

you -- let me ask you this:  Did Darrell Talbert ever tell you, to your recollection, as to why Cook was sending a salesmen down to meet with you instead of a doctor?

A.    I don't remember meeting Darrell Talbert, so I certainly don't remember anything he told me either.

Q.    Did Cook ever tell you why they weren't sending an engineer or a metallurgist down to talk to you instead of a salesmen?

A.    I have no idea, no.

Q.    Did Cook ever tell you why it was they would send a salesmen down to meet with you after you had discovered and notified Cook of the fracture of this brand filter, do you have any idea why it was that they sent a salesmen?

MS. PIERSON:  Object to form.

A.    I have no idea.

Q.    (By Mr. Martin) Would you have liked to have spoken with someone who could give you some scientific information on what happened in this case and why it happened?

MS. PIERSON:  Object to form.

A.    I mean, like anyone else, I'm sure I've got intellectual curiosity.  I think the likelihood is

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 109

that I was just interested in if they had seen this before, if they had any experience that they could help make some decisions about what we should do.

Q.    (By Mr. Martin) And the person who came down to see you was Mr. Talbert?

MS. PIERSON:  Object to form.

A.    As far as I know.

Q.    (By Mr. Martin) Do you know of anybody else that ever came down to see you or talk to you in person, other than Mr. Talbert?

A.    No.

Q.    And the substance of that conversation, you do not recall?

A.    Correct.

Q.    If you will look at Exhibit Number 11.  You recall Exhibit Number 11 having been presented to you earlier today?

A.    Right.

Q.    Do you recall that, Doctor?

A.    Yes.

Q.    All right.

Exhibit Number 11 is your record, dated June the 28th, 2011; is that right?

A.    Right.

Q.    And that's fairly close to the time that it

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 110

appears that Mr. Talbert was planning to come down and see you.  Do you see that?

MS. PIERSON:  Object to form.

A.    Yes.

Q.    (By Mr. Martin) Do you agree with the dates that I'm --

A.    Yes.

Q.    -- giving you?

And that record is out of your own files, and that record was made when it shows that it was made by you, correct?

A.    Yes.

Q.    That record says that "Tonya comes in for a discussion of her IVC filter.  A strut of the filter actually penetrated her right medial thigh a week or two ago."

Where is the right medial thigh?

A.    Inside the inner aspect of the right thigh.

Q.    Is that where she pulled it out, it appears?

MS. PIERSON:  Object to form.

A.    That's what it appears.

Q.    (By Mr. Martin) And It says, "several centimeters below the groin crease."  Where is the groin crease?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 111

A.   In the groin.

Q.   It says, "When x-ray was performed, she had a few missing pieces or fractures."  Now, did you write that?

A.   I dictated that.

Q.   And so do you have any reason to believe that she did not have, at that time --

A.   No.

Q.   -- a few missing pieces or fractures?

A.   Right.

Q.   Now, you made a note that you discussed this situation with Cook.  Would you agree with that?

A.   That's what the note says.

Q.   And you did put it in your note?  And your note says, "And after discussion with Cook, it seems that only two of the main fixation limbs are still in place."

Now what did you mean by that?

A.   I think I can only -- I can only presume from that note that we felt, at that point in time, that we didn't know how stable the filter was, and that it would be, even though it had been in place for two years, it would be worth trying to get it out.

Q.   And why would it be that you didn't know

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 112

how stable the filter was?

A.   I don't know.  I mean, I -- honestly, only two of the main fixation limbs still in place, that would have -- that would have probably been something that Cook told me.  I probably would not have known that.

Q.   Do you know how stable the filter parts that remain in her body are today?

A.   No.

Q.   She hasn't been your patient in how long? Or let me ask you:  You haven't seen her in how long?

A.   I think we said about three years.

Q.   Do you have any knowledge of her condition today except seeing her at the deposition?

A.   No.

Q.   Have you seen any films of -- her films of what has taken place over the last two or three years?

A.   I can't recall when the last x-ray that I'm aware of.

Q.   Do you know if she's having any problem with her surgical scar?

A.   I don't know.

Q.   Do you know if she's having any problems with that surgery that was performed in 2015 by you,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 113

that open retrieval, do you know if she's having any problems?

A.    I don't know.

Q.    Your note says, "Despite it having been two plus years, they feel that we should attempt to remove this filter."  And "they" would be Cook, as you're speaking in this particular note, correct?

A.    Presumably, yes.

Q.    In an effort to prevent possible migration and/or other surprises, Cook was telling you that they believed that you should attempt to retrieve the filter.

MS. PIERSON:  Object to form.

Q.    (By Mr. Martin) Is that true?

A.    I'm assuming that we had a discussion about what the best course of action would be and that -- and that the general consensus, including Cook's recommendation, was that we try to get it out.

Q.    And the consensus was amongst who besides Cook?

A.    I presume myself and Mrs. Brand and Cook.

Q.    (By Mr. Martin) And you indicated earlier today that -- you used the term "appropriate concern," that Mrs. Brand had appropriate concern about further fragmentation or movement of the filter

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 114

that led to the open retrieval.

Do you recall that testimony?

A.   Yes.

Q.   And what do you mean by "appropriate concern?"

A.   I mean, she had had a filter strut come out of her thigh.  She had at least two x-rays showing that there had been some movement in the filter and that she had -- and, frankly, I had some concerns, as well, about what was going to happen to that filter long-term, if left in place.

And that -- I mean, I think that her apprehension about that was reasonable, and we decided, collectively, to remove it.

Q.   You indicate that there is one limb of the filter which is free in the retroperitoneum, abutting the anterior aspect of the L3 vertebral body.  And you outline other things in this record.

My question is:  Has anything changed with respect to your knowledge to the location of the fractured struts that remain in her body?

A.   I don't know.

Q.   You were concerned then that they might migrate; were you not?

A.   Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 115

Q.   And why were you concerned then that they might migrate?

A.   Well, because there was already evidence of it having migrated.  She wasn't having, at least to my knowledge, medical problems related to that.  However, we did not know that she wouldn't, and I think it was a reasonable decision to take it out.

Q.   And you are a vascular surgeon who's been established, and vasculature really is the blood vessels and the blood flow.  You have knowledge of that and expertise in that; do you not?

A.   Yes.

Q.   And can you tell the jury all of the different places in the body that fractured struts like this can move that a physician, such as yourself, would be concerned about?

MS. PIERSON:  Object to form.

A.   No.  I mean, it could, theoretically, go anywhere.  Frankly, having one come out the inside aspect of the thigh is probably one of the more unusual places I have ever seen one go.

But, no, the -- where it's going to move is somewhat unpredictable.

Q.   (By Mr. Martin) Where does the vasculature go proceeding from the inferior vena cava, where is

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 116

the next place that the vasculature brings the blood?

A.   Goes up through the upper abdomen toward the heart.

Q.   And if a fractured strut of an IVC filter were to end up in the heart, is that a concern of a doctor who has expertise, such as yours, as a vascular surgeon?

MS. PIERSON:  Object to form.

A.   Yes.

Q.   (By Mr. Martin) What are the concerns that you would have about the possibility that a strut might migrate into the heart, what would be the concerns of yours, as a vascular surgeon, if that were to happen?

A.   I'm not sure I understand the question. You are asking what I would be worried about if I found a strut in the heart?

Q.   If a strut moved to the heart, what would be your concern?

A.   Concern there would be that, aside from potentially effecting the valve function or damaging the valve, it would -- the biggest risk would be perforation of the heart muscle out into the sac lining the heart and causing bleeding.  And, I mean, theoretically, a catastrophe, theoretically, death.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 117

Q.   And so it was that shortly after that, a retrieval attempt, through percutaneous retrieval methods, was scheduled, and she underwent that attempt by you.  That would be true?

A.   Right.

Q.   And that was in June 2011 or thereabouts?

A.   (Witness nodded head affirmatively.)

Q.   During -- I'm going to let you dig through your exhibits here, because they are your records. You can -- you can probably put your hands or your fingers on the attempted retrieval, can you not? Would you do that for me so I can take a look?

A.   13.

Q.   All right.  So if I could put it on the screen.  Exhibit Number 13 is referenced, Doctor.

MS. PIERSON:  7/14/11; is that right?

MR. MARTIN:  You should have a copy of it in your stack.

MR. HEAVISIDE:  Yes, I know I should.

MS. PIERSON:  What's the Bates number, Ben?

MR. MARTIN:  I'm sorry?

MS. PIERSON:  Bates number?

MR. MARTIN:  SJH 30 is what it says.

MS. PIERSON:  Thank you.

Q.   (By Mr. Martin) Doctor, does it appear that

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 118

Exhibit Number 13 is that attempted retrieval?

A.   Yes.

Q.   All right.  So, I'm going to let you read it and ask you, when you went in to take this filter out, what methodology did you use?  In other words, what set or method?

MS. PIERSON:  Object to form.

A.   I'm still not sure I understand your question.

Q.   (By Mr. Martin) Sure.  Well, let me hand you this.

Now, you had indicated that it was your usual practice that, before you ever put in an IVC filter or medical device, that you would read the instructions for that device.

And do you have any reason to believe that you didn't read, at some point before you put the filter into your patient, Mrs. Brand's, body, is there any reason to believe that you didn't or wouldn't have, indeed, read the instructions?

A.   No.

MS. PIERSON:  Object to form.

Q.   (By Mr. Martin) And so I'm going to hand you the 2008 instructions for use that would have been applicable to Mrs. Brand's filter, Celect

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 119

filter.  Do you have any reason to believe that there is another set of instructions that would apply?

A.   No.

Q.   All right.  So if you will turn to --

MS. PIERSON:  Do you have an exhibit, Ben?

MR. MARTIN:  This is on here.  Good, I've got a copy.

This is going to be Exhibit Number 21.

(Exhibit 21, Cook Celect Filter Set Instructions for Use, Bates stamped I-Celect-Perm-Uni-0805-351-01EN, marked for identification.)

Q.   (By Mr. Martin) I'm going to hand you what's been marked Exhibit Number 21, and have you turn to the third page of that exhibit.

Look at the very first sentence in Exhibit Number 21.  And if you would, for the jury, first of all, identify, does it appear that this is the instructions for use that we have just identified for the Celect filter?

A.   Yes.

Q.   By the way, you don't still use the Celect filter, do you?

A.   It's not on the shelf, I don't think anymore, but I use it -- I use another filter mostly

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 120

because of the retrievability.

Q.   Which one is that?

A.   Probably my go-to filter today is the Bard Denali.

Q.   Okay.  You can't even find the Cook Celect filter on the shelves at your hospital, either at Saint Joseph or Northside; is that right?

MS. PIERSON:  Object to form.

A.   I don't know.  I don't know.

Q.   (By Mr. Martin) Whether it's there or not, you know that you don't use it anymore, right?

A.   Correct.

Q.   The first sentence in this instruction says, "This Cook Celect" -- start over.

The first sentence in these instructions say, "The Cook Celect vena cava filter may be retrieved according to the instructions supplied in the section labeled Optional Retrieval Procedure."

Now do you see that?

A.   Yes.

Q.   And, Doctor, let's turn to optional filter retrieval.  Is that on the same page?

A.   Yes.

Q.   All right.  And in review of that section of these instructions, that it was your usual

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 121

practice to have looked at before ever placing a filter, do you see the portion that says, "Optional Filter Retrieval?"

A.   Yes.

Q.   Do you see the third bullet point under Optional Filter Retrieval, can you read that section of the instructions, please, that bullet point?

A.   "Available data from retrievals in multi-center and single-center studies demonstrate that the device can be safely retrieved.  Please refer to the Clinical Studies section."

Q.   All right.  Did you believe that the device could be safely retrieved when you went in there to retrieve it?

A.   I wasn't sure whether it could or not at the time, two years after the fact.

Q.   Okay.  Did Cook ever tell you that there were physicians who, by that time, had become experts in using complicated retrieval methods to take out embedded filters?

MS. PIERSON:  Object to form.

A.   I don't -- I don't think Cook told me that. I think I knew that probably already.

Q.   (By Mr. Martin) Okay.  When you read this -- these instructions, when you placed the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 122

filter -- start over.

When you read these instructions for the first time, and that would have been some time period before placed in Mrs. Brand, correct?

A.   Right.

Q.   Did you see that Cook told you that the filter has been designed to be retrieved with the Gunther Tulip vena cava filter retrieval set.  Would you have seen that?

MS. PIERSON:  Object to form.

A.   Presumably.

Q.   (By Mr. Martin) I'm sorry?

A.   Presumably.

Q.   And is that, in fact, the filter set that you tried to retrieve it with?

A.   I would think so.  Actually, the Cook -- the Cook retrieval system is what we used to retrieve most filters.

Q.   Okay.  Why did you try to retrieve the filter yourself instead of sending her somewhere else?

A.   Because we didn't know if it was going to be hard or easy to get out, and the notion was, "Let's try reasonable things to get it out."  We didn't -- you never know until you do it, whether

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 123

it's going to slide right out or not.

Q.   Did you try to retrieve the filter, her filter, because you had been told that the Gunther Tulip filter retrieval set was the one to use for Celect filter?

A.   No.  I mean, that's the retrieval system we use for every filter, so they didn't have to tell me to try to use that particular filter retrieval system.

Q.   Did you use -- did you try to use any other filter retrieval set to retrieve that Celect filter, other than the Gunther Tulip vena cava filter retrieval set?

A.   Yes, we attempted to use other types of snare, of lasso devices to engage the hook.  The sheath system remains in place, which was -- which was part of the original set, but we used some additional snares that were beyond the Cook system.

Q.   Doctor, do you know how long that she was in the procedure room while you were trying to get this filter out?

A.   No.

Q.   Could you take a look at your procedure report and tell us all of the methods that you used to try to get this stuck filter out of her body?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 124

A.   I think it just was a variety of different snare devices.

Q.   Okay.  Let's go look at this document.

Now, what we are looking at on the screen is, indeed, the procedure report of your attempted retrieval; is that right?

A.   Right.

Q.   What was the first thing that you did to try and retrieve it?

A.   Well, the first thing we did was take a picture of the vena cava.  After that we just put the sheath down in place and did use the standard snare that came with the Cook system.

Q.   Well, go through each and every procedure that you performed to try to get the filter out.

What's the first thing you tried, specifically, as evidenced in the -- and shown in the report?

A.   I don't know that my -- frankly, I don't know that my -- I would have to read it again.  I don't know that it's that specific.

But, typically, the snare that comes with the Cook system is a single loop snare.  We tried to get that hook engaged with that snare.  Spent a few minutes doing that, maybe 15 minutes doing that.  I'm

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 125

just guessing.

Went to another snare and then another snare to try and get it to engage. And then -- and then after giving it, really, as long as we felt that we should give it, stopped.

Q. Do you have records to indicate that this procedure took over two hours?

A. No. My note says over the course of an hour, but that's, theoretically, possible. I don't know how long it took.

Q. Would your records indicate the length of the procedure or approximately what it was?

A. That's what I said, my note says, "Over the course of the next hour or so." I don't think my note is going to have the duration of the procedure.

Q. If you're able to get a filter out with one attempt with a Gunther Tulip filter retrieval set, when you can get one out -- you have had successful retrievals, haven't you?

A. Sure.

Q. Generally, how long does it take?

A. Fifteen minutes.

Q. So if it took an hour to try and retrieve this -- I mean, let me set the stage.

Number 1: Were you able to retrieve it?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 126

A.   No.

Q.   And Number 2:  Did it take four times, at least, for the average time that it would take to take one out on the first attempt with a Gunther Tulip retrieval system?

MS. PIERSON:  Object to form.

A.   Yes, sounds like I worked pretty hard trying to get it out.

Q.   (By Mr. Martin) You worked really hard trying to get it out, didn't you?

A.   Yes.

Q.   You used multiple snares.

A.   Yes.

Q.   What's a gooseneck snare?

A.   It's just a snare that has a different shape, that's kind of shaped, has a little angle and, literally, like a goose's neck, and sometimes, just varying the angle and shape of that lasso wire will let you engage the hook.

Q.   Why did you decide to stop trying and to stop the procedure?

A.   I mean, whenever we stop procedures like this, it's because we think that we have given it our best effort and that continuing to try and get it out may end up causing more harm than it does good.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 127

Q.   You used, in your earlier -- let me start over.

Earlier in your deposition you said, quote, Everything you do is a risk/benefit decision, close quote.  Do you recall that testimony earlier today?

A.   Yes.

Q.   You had to make a risk/benefit decision the second you made a determination to stop the procedure, did you not?

A.   Sure.

Q.   What was going through your mind when you were making that decision, that risk/benefit decision?  At the very moment that you decided to stop.

A.   I mean, I don't know what was going through my mind at that time.  Honestly, I think we tried multiple snares to engage the hook.

My guess is, my limited recollection is that in order to do that, frankly, you're pushing that filter around a fair amount with wires and snares and what have you, and that it seemed pretty well stuck in place.  It didn't seem like it was out there free or loose.

And that that was a factor in the decision that, you know, we can't get the hook engaged and we

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 128

have -- you know, we have moved it around a little bit and we pushed on it a little bit, and it seems relatively stable.  And so our thought, really, at that time, was just that we were probably safer just leaving it than we were trying to try harder to get it out.

Q.   How would it be safer to leave it alone, at that time after trying to get it out like you did?  Why would it be safer to leave it alone as opposed to continuing to try to get it out?

A.   I had no evidence I was going to be able to get it out.

Q.   And what do you mean by "safer?"

A.   Well, I mean, the more you, theoretically, traumatize that cava, the more you risk perforation, the more you risk radiation issues related to prolonged fluoroscopy.  The more you risk potential, you know, getting more dye, more anesthesia time.

Q.   At some point, you determined that Mrs. Brand's filter ought to come out of her body after this attempted percutaneous retrieval attempt; would that be true?

A.   (Witness nodded head affirmatively.)

Q.   And why did you decide that it would be best or did you decide that it would be best for

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 129

Tonya to open her up and take the filter out?

A.    I think Mrs. Brand and I decided that together.  Again, I mean, we -- we did have objective evidence by x-ray criteria that there had been some additional movement in some of the pieces.  I knew that she was going to be concerned about that.

And even though at that point in time, she was not having any symptoms relative to that change, there had been some change in the appearance of the filter.  I had no reason, at that point, to believe that would not continue, and we both felt like we were going to be happier with it out than we were being -- having to follow it that much more closely or with her being concerned about what could happen.

Q.    I'm going to hand you a copy of Exhibit Number 16, and ask you if Exhibit Number 16, which is obviously already an exhibit, is something that you wrote at the time?

A.    Yes.

Q.    And what is Exhibit Number 16, Doctor?

A.    I can't tell what kind of note that is.

Q.    Okay.

A.    Looks like just an office note, but I'm not sure.  Could be related to the surgical note, I'm not sure.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 130

Q.    Take a minute to review Exhibit Number 16, and if you will just read it to yourself, I want to ask you a question or two about it.  Okay?

A.    Okay.

MS. PIERSON:  Ben, can you identify it so we can find it?  Either the date or Bates.

MR. MARTIN:  This is Exhibit Number 16.

A.    Ends in -- well, no, that's -- yes, July 17, 2015.  I think -- yes, this is an office note.

Q.    (By Mr. Martin) And you electronically signed it?

A.    Yes.

Q.    And when you make an office note like this, are you making it with knowledge of what's going on at the time?

A.    Yes.  Sure.

Q.    And did you make this office note with what you believed was going on at this time?

A.    Yes.

Q.    This note, which is now on the screen, says, "I have reviewed recent findings with Tonya's IVC filter which is known to be, essentially, coming apart."

Now, what did you mean when you said that

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 131

"Tonya's IVC filter was known to be, essentially, coming apart?"

A.   Several fractures, one or two displaced fracture segments.

Q.   You said she had a new segment lodged in the back muscle, in the region of the iliac crest. Now, what did you mean by that?

A.   That I thought -- well, there was a piece of the fragment in the -- that's the one I think that was in the psoas muscle in the back.  But that that apparently had been a change since the previous x-ray.

Q.   And if you have a change in the previous x-ray, what do you mean exactly?

A.   I mean there had been new movement in the fragments.

Q.   Okay.  And the previous x-ray was when?

A.   I'm not -- I'm not sure.  I have to go back and look at it all.

Q.   Whatever time period it was, was that evidence that this filter fractured piece had moved?

A.   Yes.

Q.   You said, "There have been several segments which had broken off and moved to a new location." What do you mean by that?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 132

A.   Well, she had one come out her thigh.  She had one in the muscle of her back and she had one anterior to the L3 vertebral body that we knew about.

Q.   You said, "I think it is clear that this is going to be an ongoing problem."

What did you think was clear that was going to be an ongoing problem?

A.   Well, I don't -- you know, I don't know exactly what I was thinking at that moment, so I can only interpret what I wrote.  But I -- I believed that we had evidence that there had been additional movement in the fragments.  And that it was going to be something that was constantly on her mind and probably on my mind, too, if it remained in place.

And that at this point, even though she wasn't having any serious medical consequences of the filter, we didn't know that she wouldn't, and that we would both be happier getting it out.

Q.   At this time, in 2015, when you made this note, what was it that was probably on your mind, to quote you?  What was probably on your mind that, among other things, led you to believe that it ought to be retrieved by opening her up and taking it out, the filter?

A.   I mean, honestly there -- I think it was

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 133

more just a gestalt.  I wasn't particularly worried that she was going to have a life-threatening complication from the filter.  We knew that to be a remote possibility, however.

We certainly knew that if we left it in place, we would both spend more time worrying about it than we wanted to.  We certainly knew that it was going to require multiple x-rays going forward to keep a close eye on it if we left it in place.

And that it would just, like I say, her life would be happier, her mental state.  My concern, albeit small, but my concern for the possibility of a serious medical consequence would all be lower if we removed it.

Q.  Did you make one of those risk/benefit decisions with Tonya to open her up and try and take the filter out?

A.  Yes.

Q.  Was it your intention, when you performed that open procedure, to only take out the body of the filter that remained as one piece, or was your intent to also try and take out the fractured struts that had been littered into her body?

MS. PIERSON:  Object to form.

A.  My intent was only to remove the filter

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 134

located in the vena cava.

Q.   (By Mr. Martin) Okay.  All right.  And why was it that you did not plan to attempt to retrieve those pieces that were left in her body from the broken filter?

A.   Because none of those pieces were causing her any problems, and because those pieces can be very difficult to find in an open surgical procedure, and you can cause more problems than you solve by trying to find things.  And so it was just a decision that it would be safer for her.

It's akin to having a bullet fragment in the back that you would leave in place rather than remove.  It's, in many cases, is just safer to leave it alone.

Q.   Are those the same pieces that you previously indicated had actually migrated since the previous x-ray?

A.   Yes.

Q.   Was there any guarantee that, from the time that that latter x-ray had occurred, in other words, the one that showed that they had already moved, was there any guarantee in your mind, at the time, that they wouldn't move again?

MS. PIERSON:  Object to form.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 135

A.   No.  No guarantees.

Q.   (By Mr. Martin) But did all of those things go into the decision to open her up and take -- try to take the filter out yourself?

A.   Yes.

Q.   Do you have that particular operative report in front of you, the open retrieval?

A.   I don't think so.

Q.   Doctor, would you tell the jury what an open retrieval is and, specifically, to the open retrieval of Mrs. Brand, what -- what is that?

A.   You have to open the abdomen, expose, move things out of the way until you can expose the vena cava above and below where the filter is located sufficient to allow you to temporarily clamp this blood vessel while you open it up, so as to try your best to minimize bleeding.  You open the vessel up, remove the filter, sew it back up.

Q.   Okay.  And is the patient under anesthesia at the time you perform that surgery?

A.   Yes.

Q.   And was she under anesthesia when you performed the surgery?

A.   Yes.

Q.   For reference, because we have got a video

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 136

here, can you show the jury approximately, on your own body, where that incision would go from and to?

A.    Probably from just under the sternum.

MS. PIERSON:  Objection to form.

A.    Down around to belly button and down to the lower abdomen.

Q.    (By Mr. Martin) Why do you -- and what do you use to cause that incision, what instrument do you use?

A.    Scalpel.

Q.    What is a scalpel?

A.    It's a knife blade.

Q.    And when you take that knife blade and you cut into Mrs. Brand's body, what layers are you going through, what layers of the skin or the dermal tissue?

A.    Got to go through the skin, got to go through the subcutaneous tissue or the fatty tissue. You go through the fascia, which is an investing layer that contains all the abdominal contents.  Once you get into the abdomen, itself, then you have to move stuff out of the way to get to the vena cava, which is closer to the back than the front.

Q.    Is it a major surgery?

A.    Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 137

Q.   What's major about it?

A.   It's a big operation.  It's a significant incision.  There's a significant dissection involved. There's significant risk for blood loss.  There are, theoretically, some risks in controlling the blood flow from the vena cava during the time that you've got it open.

So it's a -- it's a -- and it's got a risk of some significant postoperative problems, just like any other major surgical procedure.

Q.   How long did you -- back up.

How long did it take to get down to the point of being able to actually see the filter and to start working, specifically, on trying to take it out?

A.   I don't know.  I can guess, but I don't know.

(Exhibit 22, Office Note, 6/1/15, Bates stamped Dr. Rheudasil 6, marked for identification.)

Q.   Give me a minute, Doctor.

Doctor, I'm going to hand you what's been marked Exhibit Number 22, and I'll show it to you on the screen and ask if that is an office note of yours?  It's Bates stamped number Dr. Rheudasil

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 138

Number 6.

A.    Yes.

Q.    And what -- and what's the date of that?

A.    June 1, 2015.

MS. PIERSON:  You just have one?

MR. MARTIN:  Huh?

MS. PIERSON:  You just have one?  I think I've got it.

MR. MARTIN:  Yes, it's in his records. Dr. Rheudasil page 6, I'm sorry.

Q.    (By Mr. Martin) So that's when she came back to discuss her IVC filter malfunction?

A.    Right.

Q.    And you discussed it, as well?

A.    Right.

Q.    Doctor, what -- so we were talking about the surgery, itself, and what was being done during the surgery.  Could you describe to the jury how you went and got that IVC filter out of that vena cava?

A.    Once you get the cava exposed, you asked how long that takes.  That usually takes 15 to 30 minutes.  But once you get the vena cava fully dissected, that blood vessel needs to be clamped because it carries a tremendous amount of blood and needs to be clamped while you open it up.  And so you

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 139

position clamps above and below the -- area where the filter is.

You open the vena cava up, what we call longitudinally, meaning lengthways.  Literally, fold it open, sort of, like a book.  Expose the filter and then use whatever mechanism you have to -- to free it open and get it out.

Often that involves using clamps or almost like pliers, where you grab it, and sometimes, wire cutters or scissors, to cut some of these tines, cut some of the struts to make it easier to get out.

So I don't remember exactly what we used to remove it.  But once we were comfortable that we had removed it, then you sew the blood vessel back up to where it's not going to leak and you close.

Q.   Is that a difficult procedure?

A.   It can be.

Q.   Is it an intense procedure?

MS. PIERSON:  Object to form.

A.   It can be.

Q.   (By Mr. Martin) Was -- when you're in there, trying to take an IVC filter out that has broken apart, and you are going in -- are you actually going into that vena cava?

A.   Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 140

Q.   How do you get into the vena cava?

A.   Use scissors, knife.

Q.   You are actually cutting into it?

A.   Yes.

Q.   And opening that vena cava up?

A.   Yes.

Q.   That vena cava is made out of -- what's the elasticity of it?

A.   I mean, it's generally pretty pliable.  I don't know, about the size of an egg roll.  I don't know what -- I don't know how to describe to you, what it feels like.

Q.   All right.  Do you recall, Doctor, clipping any of the portions of the IVC filter before you retrieved it?

A.   I think I recall reading that in my note, yes.

MR. MARTIN:  Let's take a short break.  We have got to find this operative report.

MR. HEAVISIDE:  Did you make that an exhibit?

THE VIDEOGRAPHER:  The time is approximately 4:06 p.m.  We are off video record.

(WHEREUPON, a recess was taken.)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 141

THE VIDEOGRAPHER:  The time is approximately 4:10 p.m.  We are back on video record.

(Exhibit 23, Perioperative Reports, 10/22/15, Bates stamped St. Joseph Hosp. 117 - 119, marked for identification.)

Q.   (By Mr. Martin) Doctor, I'm going to hand you what's been marked Exhibit Number 23, and ask if you can identify that as being the report that you made after the operation that you performed to remove that filter?

A.   Yes.

Q.   And that operation, was it successful?

A.   Yes.

Q.   Were you able to retrieve the filter, itself?

A.   Yes.

Q.   And what is the purpose of creating an operative report?

A.   Just to document, to put on record what happened during the operation.

Q.   Doctor, would you take a look at that.  You can read it in silence.  And I want you to go ahead and refresh your memory of what happened during that procedure and what you did.  If you could just take a

www.veritext.com                                                        888-391-3376

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 142

minute to take a quick look, and then I'll ask you some questions about it.  Okay?

A.    Okay.  Okay.

Q.    All right.

THE VIDEOGRAPHER:  Let's go off for one second.  The time is 4:12 p.m.  We are off the video record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is approximately 4:14 p.m.  We are back on video record.

Q.    (By Mr. Martin) Would you take a look at Paragraph 2 of your operative report, Doctor?

A.    Uh-huh.

Q.    And you talk about clamping the infrarenal aorta?

A.    Yes, that should have been the inferior vena cava, but the same thing.

Q.    You said proximal and distal control was achieved with the clamps.  What exactly are you clamping.

A.    The vena cava.

Q.    And is that after you have cut into it, scissored into it?

A.    No, you clamp it before you cut into it.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 143

Otherwise, it gets pretty exciting.

Q. Once you have it clamped and once -- specifically in her case, once you clamped it, did you get better visualization?

A. Well, not immediately. Because even despite clamping it, we had a little bit of bleeding, but within a minute or so, yes.

Q. You said that multiple filter struts were teased out of the intima or pseudointima. What do you mean by that?

A. Parts of the filter were covered with, sort of, a little, thin layer of scar tissue that forms inside the vein when there's a foreign object in there. And so it's, kind of, underneath that little lining layer that you had to move away in order to really visualize the metal of the filter.

Q. Were you able to free that filter after you had gone into the vena cava, those scissors and pulled it apart out of where it was embedded?

A. Yes. I mean, it -- I'm sure that we -- I'm sure that we manipulated that filter a fair amount in getting it out, but, yes.

Q. You said, "The struts penetrating the aorta were cut." Now, what do you mean that struts were penetrating the aorta. What does that mean?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 144

A.    That means some of the -- at least one of the hooks, presumably more of the hooks were sticking through the wall of the cava into the surrounding tissue.

Q.    When you say "struts," are you talking about the legs?

A.    Yes.

Q.    And the aorta, what is the aorta?

A.    Well, the aorta was a misstatement.  We are talking about the cava.  But the aorta is the main artery next door, right next to the cava.

Q.    And are you talking about actually having clipped, you say --

A.    Again, it was a misstatement.  There was nothing penetrating the aorta.

Q.    Okay.  So what do you mean when you said you cut a strut?

A.    So the hooks were outside of the cava wall, which would have made it difficult to pull it back through the cava wall without damaging it.  So you just take wire cutters and cut the hooks off so that you can pull the straight leg back through.

Q.    All right.  If Dr. Morrison, in his deposition, sworn testimony, said that he did not make the decision to place the filter, that that was

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 145

a decision that he had left up to you, do you have any reason to dispute what he said?

MS. PIERSON:  Object to form.

A.  No, I haven't read his deposition, but I don't have any reason to dispute that, no.

Q.  (By Mr. Martin) I mean, does Dr. Morrison make the decision to actually put a filter in the body or do you make it?

A.  Well, I make it, but he wants it.  He sends those patients to us, specifically, in those cases to have filters put in.  So it's a collective decision.

I'm sure that if I felt strongly to the contrary, he would probably defer to that judgment, but ...

Q.  I'm going to hand you what is marked Polaris Number 32.  I've got one copy.

You see the -- do you see the -- and that's a report out of Dr. Morrison's chart.  Can you read the last two lines of that?

(Exhibit 24, Report from Dr. Morrison, Bates stamped Polaris Spine 000032, marked for identification.)

A.  Recommend ALIF at 4-5, 5-1.  Discuss risks and benefits.  Because of prior abdominal surgery, will be evaluated by Doctor R."

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 146

Q.    Okay.  You are Dr. R?

A.    Yes.

Q.    So anywhere in that report, does it indicate that he's recommending anything but the ALIF procedure, that back procedure?

MS. PIERSON:  Object to form.

A.    Not in that report, no.

Q.    (By Mr. Martin) Simply -- you know, you talked earlier in your deposition about Dr. Morrison and his decision-making process.

MR. HEAVISIDE:  I'm sorry.  Are you marking this --

MR. MARTIN:  No.

MR. HEAVISIDE:  Oh, you're not.

MR. MARTIN:  Not at the moment.

MS. PIERSON:  Since he's read it, if you don't mind.

MR. MARTIN:  Let's go ahead and mark it.

MS. PIERSON:  Mark it.

MR. MARTIN:  I'm going to mark this as Exhibit Number 24, Miss Pierson is actually, Doctor.

Q.    (By Mr. Martin) And so do you recall ever having a discussion with Dr. Morrison where Dr. Morrison made the decision -- or made any

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 147

decision about which filter to use?

A.   No.

Q.   Do you recall any conversation where Dr. Morrison told you that he required that a filter be used during that surgery?

A.   Not required, no.

Q.   Okay.  And so how was it that you were the decision-maker, along with Mrs. Brand, ultimately, as to the placement of an IVC filter; how did that occur?

A.   I think she was referred for exposure and for consideration of a filter, given the extent of the surgery she needed and her risk factors.

I'm sure that he, ultimately, left that decision to me, so that -- that was my decision. Although I'm sure he -- I'm sure he was preferring that I put a filter in, as well.

MR. MARTIN:  I'm going to object to the nonresponsive portion of the answer.

Q.   (By Mr. Martin) Do you rely upon a medical device manufacturer to be truthful in their communication to you?

MS. PIERSON:  Object to form.

A.   Yes.

Q.   (By Mr. Martin) When you looked at those

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 148

instructions for use, prior to ever putting in Tonya Brand's Celect filter, did you expect that the Cook company would be truthful to you in its instructions?

A. Yes.

Q. And why is that? Why did you expect that?

A. I don't have any reason to expect otherwise.

Q. You read those instructions for a purpose, didn't you?

A. Yes.

Q. And do instructions for use contain the warnings related to a device?

A. Yes.

Q. And do instructions for use contain precautions?

A. Yes.

Q. Do instructions for use, actually for that particular device, tell you how to use the device?

A. Yes.

Q. And do you have any reason to -- you know, you have looked -- you have got the instructions for use in front of you. Can you take pull those out, Doctor?

All right. So let me ask you some general questions. When you are having your conversation

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 149

with the patient -- and in this case, let's get specific.  When you are having a conversation with Tonya Brand, you had a risk/benefit conversation with her, did you not?

MS. PIERSON:  Object to form.

A.  Yes.

Q.  (By Mr. Martin) Did you have a conversation with Mrs. Brand about her filter and the risks that were associated with it and the possible benefits?

A.  I presume so.

Q.  Okay.  I mean, you do that.

A.  That's my routine.

Q.  And so if we were -- were to talk about the risk, do you -- do you try to tell the patient about material risks to the procedure?

A.  Yes.

Q.  Do you try to tell the patient material risks that you're aware of with respect to the particular device?

A.  Yes.

Q.  Okay.  And do you have any reason to believe that you did not disclose what you thought to be the material risks to Tonya Brand?

A.  No.

Q.  And at that point, once you disclosed the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 150

material risks to the patient, do you, then, leave up to the patient the ultimate decision as to whether or not she or he determines to have that procedure done?

A. Yes.

Q. What's the importance of, in your mind, the conversation with the patient as to the risk/benefit, that risk/benefit conversation, what is the importance of that?

A. I think she needs to understand our recommendation. She needs to understand what we feel, why we feel something may or may not be important, and why we are recommending what we are recommending in order to make a decision about whether that's something she wants to do or not.

She needs to be aware of what we feel the material risks are to her, and why we are recommending, therefore, what the benefits are.

Q. You, at the time, were putting in IVC filters at both Northside Hospital and St. Joseph's; is that right?

A. Right.

Q. And at St. Joseph's, which filters, Cook filters, were you able to choose from?

A. I don't -- I don't have any idea what the options were at that time.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 151

Q.   I got them right here.  All right.  We're on Exhibit Number 25.

(Exhibit 25, E-mail string to Clemmer and Hanson from Senker, 7/27/11, marked for identification.)

Q.   (By Mr. Martin) Doctor, I'm going to hand you -- actually, I'm going to tell you Exhibit Number 25 is an e-mail chain at Cook with respect to Northside Hospital and St. Joseph's Hospital and which filters they use, sell there.

Do you see that?

MS. PIERSON:  Just for the record, we renew our standing objection to questions about documents that are not to or from Dr. Rheudasil.

A.   Yes.

Q.   (By Mr. Martin) And the date of this is 7/27/2011.  Do you see that Doctor, the first page of this?

A.   Yes.

Q.   And Miss Meg Senker, Meg Donnelly, do you know who she is?

A.   Yes.

Q.   And who was that?

A.   She was one of the Cook sales representatives at that time.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 152

Q.   That called on you?

A.   Yes.

Q.   She said, "Hey, Tamara," and that's to Tamara Clemmer.

A.   Right.

Q.   "Hey, Tamara, to answer the question about which type of filter normally placed, they typically order femoral at St. Joseph's Hospital.  Since the beginning of the year, they have ordered 48 femoral and only nine jugular.

"However, do note that they," at St. Joseph's, "only use Tulip IVC filter versus the Celect used at Northside."

Now, I want to ask you:  Does that refresh your recollection that, at the time you placed the filter, that they, at Northside, were using the Celect, and at St. Joseph's, they were using the Tulip?

MS. PIERSON:  Object to form.

A.   That may be true.

Q.   (By Mr. Martin) Have you put both of them in?

A.   Yes.

Q.   Were you ever informed by Cook that either one of them was a safer filter?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 153

A.    No.

Q.    Were you ever informed by Cook that one of them had safety features that the other one didn't?

A.    Not that I recall.

Q.    I mean, the mere fact that you placed both the Cook and the Cook Celect and the Gunther Tulip in patients, does that tell you anything about your thoughts as to which one was safer or they were both equally safe?

MS. PIERSON:  Object to form.

Q.    (By Mr. Martin) What was your assumption?

A.    My assumption is that we considered them equivalent.

Q.    And if you had known that the Celect filter was -- caused a greater degree of perforation, as opposed to the Tulip, would that have been important to you to know?

MS. PIERSON:  Object to form.

A.    Yes.  I don't know that that would have changed our choice but, yes.

Q.    (By Mr. Martin) Would it, at least, have been something that you would have imparted to -- to your patient if you were aware that one of the filters was a significantly greater risk of extended perforation than another one?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 154

MS. PIERSON:  Object to form.

A.   If we thought there was one filter that clearly had more of a perforation risk than others, A, we wouldn't use that filter, more than likely, but I suppose we would consider discussing that with the patient.  Frankly, we don't typically discuss which filter we're choosing with the patient.  That gets a little too much in the weeds, but --

Q.   (By Mr. Martin) Well, but the question being, two filters that -- manufactured by the same company, you may not discuss the brand name of either one, but -- but are you presuming that they are equally safe?

A.   Yes.

Q.   Okay.  And then if you have already answered the question as to what you would do if you found out that one more had a greater perforation risk, and I will leave that answer as it is.  I want to peer into -- go to the next subject.

Let me ask you this:  Hypothetically, if -- just hypothetically, if -- let's -- let's take the Celect filter, again, hypothetically.  If there was clear evidence, by the existing available data, at the time you put in that filter, that the safety risks could not justify the placement of a Celect

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 155

filter, and that the company knew that, okay, what would that do to your risk/benefit analysis when discussing it with the patient?

MS. PIERSON:  Object to form.

A.   I mean, as you put that question, I wouldn't even discuss that with the patient.  We wouldn't choose that filter.

Q.   (By Mr. Martin) All right.

Were you ever told by Cook -- and this -- is -- I'm going to put this in hypothetical -- or actually, I'm going to put this in real time, real facts.

Were you ever told by the sales reps at Cook that the Celect filter was less safe than the Tulip?

A.   No.

Q.   Were you ever told by Cook that Cook was aware that the safety risks for the Celect filter did not justify its sale and marketing?

MS. PIERSON:  Object to form.

A.   No.

Q.   (By Mr. Martin) Had you known either one of those things, would that that have given you information of materiality.

MS. PIERSON:  Object to form.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 156

A.    Hypothetically, yes.

Q.    (By Mr. Martin) All right.  And then with respect to material risks and the discussion that you had with patients, and specifically, in this case, Mrs. Brand, would you have brought those material risks to her attention?

MS. PIERSON:  Object to form.

A.    Again, if I -- if we thought a device was not safe, no, I wouldn't have discussed it with Mrs. Brand.  We wouldn't have used that filter, so there would have been no discussion.

Q.    (By Mr. Martin) Or -- or less safe than another filter?

A.    Correct.

Q.    Could you have put a Tulip filter in Mrs. Brand had you wanted to?

A.    Not at Northside, because I don't think they stocked the Tulip filter at Northside, at that time.

Q.    Is there any reason, having practiced outside of Northside or St. Joseph's, is there any reason that you could not have performed the procedure at St. Joseph's?

A.    Yes.

Q.    So if you are looking at -- and I didn't

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 157

mean to cut you off.

MR. HEAVISIDE:  I'm sorry, I didn't hear his answer.

A.    We were doing the procedure at Northside. It was a combined procedure, so the only option was Northside, at that time.

Q.    (By Mr. Martin) When you are saying "combined procedure," you are talking about --

A.    Combined with the spine procedure.

Q.    Now, can you perform a -- the implantation of an IVC filter at a completely separate and earlier time --

A.    Yes.

Q.    -- and day than an actual surgery?

A.    Yes, yes.

Q.    So would it have been theoretically possible, then, to put a Tulip in prior to the spine surgery?

A.    In her case, no, because, at that time, her insurance wouldn't let her go to St. Joseph's.

Q.    Okay.  If you had been made aware by Cook of any material differences in safety between the Celect and the Tulip, would you have disclosed those differences to your patient, Tonya Brand?

MS. PIERSON:  Object to form.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 158

A.   No, I would have just used the safer filter.

Q.   (By Mr. Martin) Okay.  If safety features had been removed from a prior generation filter by Cook, then, and the new filter was the Celect, if safety features had been removed, then would you have informed your patient, "Look, I'm about to put a filter in you, but there are some safety features that have been removed from that filter," is that something that you would disclose to the patient?

MS. PIERSON:  Object to form.

A.   No.  Once again, if I thought significant safety features had been removed, I would choose another filter.

Q.   (By Mr. Martin) All right.

Doctor, I'm going to turn your attention to Cook Exhibit Number 21, the instructions for use. And I want you to turn to, yourself, to discussion of the clinical studies.

And if you would, it's not a long paragraph, and I don't want you to read it out loud, but I would like you to read the Clinical Studies section to yourself so I'll be able to ask you some questions about it.

Would you do that?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 159

A.    Uh-huh.  Okay.

Q.    All right.  Have you been able to read that?

A.    Uh-huh.

Q.    Now, Doctor, these are in the Celect filter's instructions for use, and I want to ask you a question about that.

Do those instructions tell you that a clinical trial regarding the Celect filter was ongoing at the time that these instruction would have been available?

MS. PIERSON:  Object to form.

A.    No.

Q.    (By Mr. Martin) It does or doesn't tell you that a clinical trial was ongoing?

A.    It tells you that a clinical trial was conducted.

Q.    Okay.

A.    I don't think it tells you that it was ongoing.

Q.    Okay.  So you read those that a clinical trial has been conducted.

A.    Has been performed, yes.

Q.    And, Doctor, reading that in the instructions, what does it tell you about whether or

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 160

not any perforation or perforations were found in that clinical trial?

A.   In those -- in that trial, no device perforations, hemorrhage, death, occlusion, fracture had occurred.

Q.   Okay.  And how many patients does it say participated in that particular trial?

A.   74.

Q.   Now, no perforations means how many?

A.   None.

Q.   Okay.  If you were to find out -- let me back up.

If when you read that instructions for use, and you were to actually understand and know that there were multiple perforations in that study, would that be important to you?

MS. PIERSON:  Object to form.

A.   Potentially, yes.

Q.   (By Mr. Martin) Okay.  And why would that be important to you to know, if it were the case, that there were multiple perforations in a study that the instructions for use are telling you are no perforations?

MS. PIERSON:  Same objection.

A.   Again, it depends on the data, but

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 161

perforations are associated with an increased risk of filter fracture.  And there's certainly -- it's certainly possible to have clinical consequences from perforations.  So if there's a significant perforation risk, sure, we would want to know.

Q.   (By Mr. Martin) And so that you could, what, impart it to your patient during the risk/benefit consultation?

A.   No, so that we could decide which filter we wanted to use.

Q.   Okay.  And I'm going to give you a hypothetical.  Let's say that out of that patient number of 74, that half the patients, as opposed to what the instructions for use said, zero perforations, but half the patients or more had actually, through that clinical trial, had perforations.

MS. PIERSON:  Object to form.

Q.   (By Mr. Martin) So the -- so the -- so the hypothetical is, instructions for use, say, were performed at clinical trial, 74 percent and no perforations.

Additional fact is that it was known by Cook that there were over half of the filter placements led to perforations, okay.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 162

So if that had been known to you, hypothetically, is that something that would be material enough for you to want to include it in talking to your patient, who is about to have one of those filters placed in her body?

MS. PIERSON:  Object to form.

A.   Again, it's a complicated question. Because I don't know what -- I don't know what "perforation" means.  I don't know how much perforation you are talking about.

And as we talked about earlier in the deposition, I think, in a microscopic sense, probably all these filters perforate, so it's probably more like 100 percent.  It would not be a factor in my discussion with Mrs. Brand about which filter I used. It would be a factor in which filter I used.

Q.   (By Mr. Martin) What would be a factor?

A.   Whether there was a significant complication rate associated with the filter that that -- that, hypothetically, had been unreported.

Q.   Okay.  And if you determined that there were unreported complications, then, would that go into your risk/benefit analysis even to use the filter?

A.   Yes.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 163

Q.   And more likely than not, would you use a filter that had that issue?

A.   No.

Q.   Doctor, when you retrieved this filter from her vena cava, did you look at it?

A.   I think so, but I suspect I'd pretty well torn it up getting it out.  So, honestly, I didn't spend a lot of time looking at it.

Q.   Look real quickly at your operative report that Miss Pierson, nicely, let us borrow today.  And see if it -- here you go.

A.   Okay.

Q.   Is there a discussion in that operative report at all about what the filter looked like once you removed it from the body?

A.   No.

Q.   Is there any indication, after review of that operative report, the filter had a clot burden in it?

A.   I don't know.  There's nothing in the report, and I don't know if that -- whether there was or there wasn't.

Q.   Doctor, pre-placement of that filter, was it damaged at all?

A.   Not to my knowledge.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 164

Q.   Okay.  Do you -- would you put a filter in a body that -- that appeared to be damaged?

A.   No.

Q.   So do you normally expect the filter to make sure that it looks okay?

A.   No.  Filters come encased in a sheath where you really can't see them except under x-ray, and you really don't, specifically, look under x-ray to inspect the filter.  But so you probably wouldn't know that, but, again, you are asking a hypothetical question.  If I knew the filter was damaged or defective in some way, of course, I wouldn't put it in.

Q.   Okay.  All right.  And did you actually look at the filter through vena cavagram when you were placing it?

A.   We looked at it under fluoroscopy, yes, under x-ray, real-time x-ray.

Q.   And when you -- would that tell you as to what the filter looked like when you placed it --

A.   Yes.

Q.   -- and where it ended up?

A.   Yes.

Q.   Cook's consultant, a Dr. Griffin, I want you to presume that he indicated that your filter,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 165

when you placed it, that you properly placed it, okay.

Do you agree with Dr. Griffin that you properly placed the filter?

MS. PIERSON:  Object to the form of the question.

A.   It was -- I think it was placed in the correct location.

Q.   (By Mr. Martin) Doctor, if you could run through your -- just look at your exhibits and see and pull out the implantation exhibit that I know was made an exhibit today.

A.   That's the original op note.

Q.   Yes, sir.

A.   Okay.

Q.   If you would, please, sir, take a look at that.  Now, you described it earlier, and I don't want to replow that ground, but when you are putting in a filter, and specifically, her filter, you talked about having fluoroscopy performed.

What is fluoroscopy and what does it tell you?

A.   Fluoroscopy is -- it's a regular x-ray, but when you turn it on, it stays on, so you are able to watch x-rays that just stay on as things move and

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 166

then -- so you can turn it on for minutes or longer or seconds or however long you need it.  And so you use that, sort of, positioning rather than doing static, single x-rays, like a chest x-ray.

Q.   And review whatever you need to in your records here, Doctor.  My question is:  Is there any reason to believe that you did not place the filter in the proper location?

A.   No.

Q.   And how do you know that you placed it in the proper location?

A.   I mean, you take a -- well, my practice is to take pictures before we place the filter to look for the relative location in the renal veins.  When we locate those renal veins relative to the surrounding anatomy, specifically the bony anatomy, and we deploy the filter, really, in relationship to the surrounding bony anatomy, and we can tell, when it deploys, whether it deploys where we intended to place it or not.

Q.   I'm going to hand you Exhibit Number 26.

(Exhibit 26, Dennis J. Griffin, M.D. Report, marked for identification.)

Q.   (By Mr. Martin) This is Dr. Griffin's report.  And I may have two copies, but I may not.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 167

So I think I, actually, may have one copy.  I'm going to hand you --

MR. HEAVISIDE:  I've got one.

Q.  (By Mr. Martin) I'm going to hand you what's been marked as Exhibit Number 26, Doctor, and tell you that that is a report by Dr. Griffin, a Cook consultant, that performed an investigation of the Brand filter fracture and looked at some films.

Can you look through that and just see that that appears to be accurate?

A.  Uh-huh.

MS. PIERSON:  And I just want to interpose an objection to other --

MR. MARTIN:  I'm sorry.

MS. PIERSON:  -- other documents the witness has never seen and doesn't have any personal knowledge of.

Q.  (By Mr. Martin)  Yes, well, I'm showing it to you now, and does it appear to be a document from a Dr. Griffin?

A.  It looks that way, yes.

Q.  And you see that it's talking about Tonya Brand?

A.  Yes.

Q.  And do you see all those films?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 168

A.   Yes.

Q.   Are you qualified to -- as an interventional radiologist to read films?

A.   Not as an interventional radiologist, no.

Q.   Well, are you qualified to -- well, let me ask you, and I'll go into other subject matter if that's the case.

But as a radiologist, are you able to look at films and interpret them?

MR. HEAVISIDE:  He's a vascular surgeon. He's a vascular surgeon, not a radiologist.

MR. MARTIN:  I called you a radiologist and I was about to say I'm sorry.

THE WITNESS:  You should.

Q.   (By Mr. Martin) Let me start over, okay, so -- and that may be the answer.

When you are performing this procedure to place the filter, then, you are able -- are you able to interpret the diagnostics that you are seeing through the fluoroscopy?

A.   Yes.

Q.   And what are those films called?

A.   I mean we do what's called a cavagram, and then it's just diagnostic fluoroscopy.  That's what it's called.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 169

Q.  Does your diagnostic fluoroscopy appear in that report of Dr. Griffin?  If you could look and let us know.

A.  Fluoroscopy, by itself, doesn't generate images.

Q.  I understand the fluoroscopy is the medium.

A.  No, the fluoroscopy is an x-ray that's occurring in real time, and so you don't -- unless you take pictures or you have a video record, then you don't have a record of those images.

Q.  All right.  So here -- here's my question: If you had placed the filter, if you testified that you placed the filter properly, what do you mean by "properly," what does that mean?

MS. PIERSON:  Object to form.

MR. MARTIN:  Well, let me back up.

A.  I mean, the filter was placed in a position that it was intended to be placed.

Q.  (By Mr. Martin) Given the objection, let me ask it again, and I'm about to pass the witness.

But question is:  When you placed the filter in Mrs. Brand, did you make a determination, before you pulled the catheter out, finished the procedure, did you make a determination as to whether or not it was sitting in a proper location?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 170

A.   Yes.

Q.   Did you make a decision as to whether or not it had any clinically significant perforations at the time?

A.   Presumably, yes.  I would -- I wouldn't have had any evidence of that, no.

Q.   And did you have any evidence, in this case, that once you placed the filter, that it was in any location or position that was anything but good?

A.   No, I thought it was in an acceptable location, yes.

Q.   If you had discovered that it was in an unacceptable position or location, what could you have been -- what could you have done?  What would be your options?

A.   Well, sometimes you can manipulate the filters where they are and try to get a limb to release or try to adjust its position a little bit. But in -- if you really thought that it was not where you wanted it to be, you can remove it and place another one or you could just place another one.

Q.   Doctor, was there anything that you did that caused or contributed to this filter failure?

MS. PIERSON:  Object to form.

A.   No.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 171

Q.   (By Mr. Martin) I'll ask it this way:  Do you have an opinion as to whether or not anything you did in placement of that filter caused or contributed to the filter failure?

MS. PIERSON:  Same objection.

A.   I do not think so.

MR. MARTIN:  Doctor, thank you for your time today.

I'm going to pass the witness.

MR. HEAVISIDE:  Could I first check --

MS. PIERSON:  Who are you passing to?

MR. HEAVISIDE:  How long had Mr. Martin been questioning this witness?

THE VIDEOGRAPHER:  The total run time for today is three hours and nine minutes.  There hasn't been a distinction for either party.

MS. PIERSON:  We had a bit of a delay with lost exhibits and went off the record a few times.  I just want to be respectful of your time.  I've got probably five minutes of stuff I want to ask.

MR. HEAVISIDE:  So the run time is 3:09, so does that mean we have, like, 50 minutes left?

MR. MARTIN:  Well, we won't take long.  Yes, we can give time up.  I mean we will give

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 172

time back.  Would you --

MS. PIERSON:  How much time do you need?

MR. HEAVISIDE:  Probably 30 minutes.

MR. MARTIN:  Oh, listen, why don't we do this?  Andrea, I'm just going to suggest this.  I passed the witness.  Why don't you let Mike ask his questions, like we usually do, and then you will have the doctor.

MS. PIERSON:  So I just want to ask you about your schedule.  If he questions you until 5:15 --

THE WITNESS:  That's fine.

MS. PIERSON:  -- can you give me until 5:30?

THE WITNESS:  Yes.

MS. PIERSON:  Good.  Okay, let's go.

THE VIDEOGRAPHER:  You need a microphone, sir.

MR. HEAVISIDE:  All right.  Ben, may I?  Thank you.

MR. MARTIN:  Yes, sir.

EXAMINATION

BY MR. HEAVISIDE:

Q.   Doctor, remember when Miss Pierson asked you about an experience that you recall of a 40 year

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 173

old dying of a pulmonary embolism?

A.   Yes.

Q.   Do you know whether or not the filter caused that pulmonary embolism?

A.   No, no, no.  That patient did not have a filter.

Q.   Okay.  So you had a -- this was a complicated orthopedic surgery.

A.   That is complicated spine procedure.  That was really the whole point is that that patient did not get a pre-prophylactic filter and died from a pulmonary embolus, which led us to using more filters for these procedures.

Q.   Can filters cause PEs?

MS. PIERSON:  Object to form.

A.   Can filters cause PEs?  Filters can lead to deep vein thrombosis.  That can lead to caval thrombosis, which can, subsequently, raise the risk of PE.  So, I mean, it's theoretically possible a filter can contribute to a PE.  Obviously, that's what it's designed to minimize.

Q.   Okay.  Let me show you a document.

MR. HEAVISIDE:  I don't know what number we are on now.

THE REPORTER:  The stickers are down there

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 174

on the floor.

(WHEREUPON, there was a discussion off the record.)

(Exhibit 27, E-mail string to Frye from Paul, 6/9/03, Bates stamped IVC00001396 - 1398, marked for identification.)

MS. PIERSON:  It should be 27.

MR. HEAVISIDE:  Yes, this is 27, Andrea. I'm sorry, I don't have a copy.

MS. PIERSON:  May I just see it, please?

MR. HEAVISIDE:  Yes.

MS. PIERSON:  I think I said this when we started, but standing objections to all documents that aren't to or from Dr. Rheudasil for lack of personal knowledge.

Q.  (By Mr. Heaviside) Right.  So, Dr. Rheudasil, you have in front of you Exhibit 27, right?

A.  It's not numbered, but I'll take your word for it.

Q.  On the bottom it says IVC 00001396, right?

A.  Yes.

Q.  And the top it says:  To Mark Frye at Cook Inc.com from Ram Paul, dated 6/9/2003, right?

A.  Right.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 175

Q.    All right.  If you go down, approximately, the middle of the page, it says, The experimental model (hemodynamic pertubations) predict very well the apparition of blood clots around the retrieval hook.  I believe this might be problematic since the snare catheter, used to retrieve the filter, attaches to the retrieval hook and might possibly cause detachment of such clots, causing a pulmonary embolism (it would be sad to create a pulmonary embolism after going that far in prevention of PE by the implantation of the filter.)  The growth of blood clots in apex as well as at junction of main struts and (petals) might also be predicted (at least partially) by hemodynamic stagnation around these structures.

So does that come as a surprise to you that filters affect the hemodynamics within the vein?

MS. PIERSON:  Object to form.

A.    No.

Q.    (By Mr. Heaviside) And that, actually, filters can cause PEs, can cause clots?

A.    Yes.

Q.    You agree with that proposition?

A.    Yes, filters -- it would be rare for a filter to cause a PE.  I don't know that I would ever

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 176

put it that way.  But a filter is associated, especially a long-term filter, is associated with an increased risk of thrombosis and theoretically, an increased risk of clot.

Q.   So a complication of longer in-dwell time would be the possibility of thromboembolic events caused by the filter?

A.   Yes.

Q.   Have you read a peer-reviewed and published article by a physician, Alkhouli, A-l-k-h-o-u-l-i, where he concludes that the greatest cause of instant in-vein thrombosis is a retained filter?

MS. PIERSON:  Object to form.

A.   I don't -- I don't know that article, no.

Q.   (By Mr. Heaviside) Okay.  It appears that you were the guest of Cook Medical in Gainesville, Florida, in February of 2009.  Do you recall that?

A.   Yes.

Q.   And was that a weekend trip or what was that?

A.   I think it was an educational trip about aortic stent grafts.

Q.   And it was sponsored by Cook?

A.   I believe.

Q.   And that means they -- and that was about

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 177

one month pre-implantation of Mrs. Brand's filter, right?

A.    Whatever -- the date's, whatever the date is.  I don't know.

Q.    Well, February of 2009 is one month preceding March of 2009.

A.    Okay.

Q.    Would you agree?

A.    Okay.

Q.    Was there any discussion at that Cook-sponsored event regarding either Tulip filters or Celect filters?

A.    No.

Q.    Have you ever been to any other event or educational event sponsored by Cook?

A.    Not that I recall.

Q.    You -- in your reply to previous questions, indicated that the elements of concern to you regarding selection of a filter are deployment, retrievability, and as a practical matter, what is available, right?

A.    Yes.

Q.    Is there a reason why you left patient safety out of that calculus?

A.    No.  Patient safety is assumed for all of

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 178

the filters.  And, frankly, for all the filters that we stock and purchase, I think, in general, we consider those filters to be roughly equivalent in terms of their safety.

Q.   And it seems, from what you testified earlier, that when Mrs. Brand had her filter put in, I think you said at Northside, that there was no other choice, it was the Celect because that's what they had at Northside?

MS. PIERSON:  Object to form.

A.   I don't know that that's true.  I don't know.  There may have been another retrievable filter available.  I don't know what they had in stock at that time.

Q.   (By Mr. Heaviside) All right.  I think you said that they had Tulip at St. Joe's and Celect --

A.   From a Cook standpoint, that's correct. But I don't know if they had another company's filter or not.

Q.   Okay.  So the decision whether to use a Celect versus a Tulip, for example, was dependent upon the facility, correct?

A.   Correct.  That wasn't an option, but I don't know what other choices that were available, I don't know.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 179

Q.  Right.  Do you know, have any idea what goes into the calculus of what filter the facility decides to stock?

MS. PIERSON:  Object to form.

A.  Well, it's a complicated process, multiple physicians are involved.  If certain physicians have a very strong preference, one over the other, that's certainly factored.  But it's cost.  It's pricing with multiple other products that the company may offer.  It's -- you know, these procedures are most often done under the budget of the radiology department, so in most cases it's ultimately their decision.

Q.  (By Mr. Heaviside) Now, Miss Pierson asked you a question before, which was did you rely on anything Cook told you in the process of selecting the filter you were going to use for Mrs. Brand.  Do you remember that question?

A.  Yes.

Q.  Okay.  And you said no.  Right?

A.  Right.

Q.  But would you agree that, by definition, you couldn't use anything that Cook did not tell you?

MS. PIERSON:  Object to form.

Q.  (By Mr. Heaviside) In other words, if there

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 180

were important matters known to Cook which they did not tell you about, that, by definition, could not be part of your decision-making process, correct?

MS. PIERSON:  Object to form.

A.    Correct.

Q.    (By Mr. Heaviside) I think you said previously that if you became aware that, in Cook's opinion, that it was not possible to find any clear evidence of the existing available data that could clarify and justify the safety risks identified regarding the Celect, that you would not use the Celect.

MS. PIERSON:  Object to form.

A.    I, honestly, did not understand that question.

Q.    (By Mr. Heaviside) Well, let me show you an exhibit here, if I may.

MR. MARTIN:  Can I talk to you?

Q.    (By Mr. Heaviside) All right.  Let's just stand on whatever you answer was when Mr. Martin asked you that question.  All right.

Did you know, would it be useful for you to know that that there was, in fact, a high perforation rate pre-launch with the Celect?

MS. PIERSON:  Object to form.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 181

A.    That may have been useful information to know if that were true, yes.  It -- that's a complex question, but perhaps.

Q.    (By Mr. Heaviside) Did you know that Cook's pre-launch -- excuse me, retrievability study in humans revealed perforation in 27 percent of the patients?

MS. PIERSON:  Object to form.

A.    No.

Q.    (By Mr. Heaviside) Is that a significant number in your mind?

MS. PIERSON:  Same objection.

A.    Once again, it depends on how you define "perforation," so it's a hard question to answer without details about what that really means.

Q.    (By Mr. Heaviside) How do you define "perforation?"

A.    Are you defining perforation as one micron or are you defining perforation as two centimeters? That's a huge difference.

Q.    Yeah, I'm asking you, how do you?

A.    If you define "perforation" as any part of the filter through the wall of the cava, I think probably almost all of these filters perforate 100 percent.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 182

Q.   How about if you define three millimeters outside the wall?

A.   That's what I mean.  You are asking a hypothetical question that's very complicated.  The more perforation is, then the more I would be concerned about it.

But it's hard for me to answer a hypothetical question about being concerned about perforation, because I think, at some level, there's -- there's a little bit of perforation in almost all of them.

Q.   What about if we define it as three millimeters outside of the vena cava?

A.   You know, at how long?  It -- it -- it -- again, it's a complex question I don't think I can give you an answer to.

The more perforation -- certainly if there is clinically relevant perforation, then I would be concerned.  If there's reports of perforation into adjacent structures causing problems, I would be concerned.  But to pull a number out of the air, I can't tell you if I would be concerned or not.

Q.   Which would be more helpful to you, to have no information on that topic whatsoever or the information, as gathered by Cook?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 183

MS. PIERSON:  Object to form.

A.   I would certainly say it's always better to have more information than less.

Q.   (By Mr. Heaviside) And would you expect a manufacturer of medical devices to disclose to you known risks associated with their product?

A.   Yes.

Q.   Are you aware of any redesigned Tulip filter which, ultimately, became the Celect filter?

A.   No.  I mean, in the vaguest terms, that sounds familiar, but I don't -- I don't know the details.

MR. HEAVISIDE:  Okay.  All right.  That's all I'm going to ask you.

EXAMINATION

BY MS. PIERSON:

Q.   Thank you, Dr. Rheudasil.  I'll try to be brief.  I just want to follow up on a few things that Mr. Martin and Mr. Heaviside have both asked you today.

First, they have shown you a number of documents that are internal Cook documents.  Had you ever seen any of those documents before?

A.   No.

Q.   Did you have any personal knowledge of the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 184

contents?

A.   No.

Q.   Did you recognize any of the authors or recipients of those documents?

A.   No.

Q.   In your practice as a medical doctor in the last 30 years, has it ever been a part of your practice to review internal company documents from any manufacturer?

A.   No.

Q.   Have you ever relied on the internal company documents of any manufacturer in making any decision about how to treat your patients?

MR. MARTIN:  Objection, form.

A.   I try not to read other people's e-mails.

Q.   (By Ms. Pierson) Dr. Rheudasil, you were asked some questions about what you -- what you expected.  And with respect to Mrs. Brand, is it fair to say that the complication she experienced is not something that you expected, but that you always knew was a risk?

MR. MARTIN:  Objection, form.

A.   Yes.  Yes.

Q.   (By Ms. Pierson) And that would be true regardless of the type of filter that you had chosen

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 185

for Mrs. Brand, correct?

A. Yes.

Q. Now, following -- I'm going to bounce around a little bit. I apologize. But that's fair warning, I'll bounce around a bit.

Dr. Rheudasil, following the 2009 surgery, where you performed the -- the opening and closing, and Dr. Morrison performed the spinal procedure, did you or anyone else perform a cavagram of Mrs. Brand's vena cava to confirm the placement of her filter?

A. No.

Q. Was there any imaging that you or Dr. Morrison performed to check the location of her vena cava filter following that procedure?

A. No. Only relevant -- I mean, she had, I believe, x-rays of her spine for followup in which the filter may or may not be visible. I don't know.

And so this may be a different answer than what you wanted. But I -- I think that, to some degree, you can go back and look at plane films and spine images and get a feel for comparing it to the bony anatomy, whether there's been a change in the filter. But she didn't have any specific imaging for her filter.

Q. Are you able to see the walls of a vena

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 186

cava on an x-ray?

A.   No.

Q.   And you mentioned, earlier, something about the flexibility or the pliability of the vena cava. Can you tell us about that?

A.   So I was thinking about that during the time out.  I don't know how to describe it.  It's -- I would akin it to, maybe, a thin piece of rubber, but the vena cava is a dynamic structure.  It moves with position.  It changes shape with breathing. Again, with position, with hydration status.

And so the notion that there are forces being applied to a filter, because the vena cava is not a rigid tube, are, I'm sure, a factor in the design and construction of these devices.

I'm not an engineer, so I don't know what that involves, but a certain degree -- I mean, a degree of motion is the norm in a cava.

Q.   Is a patient's vena cava attached to their spine?

A.   No.  Well, no.  Hopefully not.

Q.   And when we were talking about imaging, just a second ago, an x-ray, is that a -- does it show you a three-dimensional structure?

A.   No.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 187

MR. MARTIN:  Objection; form.

Q.   (By Ms. Pierson) How about a cavagram, is a cavagram able to show you a vena cava filter in three dimensions?

A.   No, it cannot.

Q.   Just in a simple terms, are you able to see the position of the filter on an x-ray or cavagram, basically, as though you were looking at the patient straight on; you can see its position, side to side, but not front to back?

A.   Correct.

Q.   You mentioned, earlier, using fluoroscopy when you were placing the procedure.  Is fluoroscopy also a type of imaging that allows you to see the position of the filter in one dimension, side to side, but not front to back?

A.   Yes.  If you -- depending on the fluoroscopy you have, if you choose to angle the x-ray tube, you can vary the angle of what you are looking at.  But you are always looking at a 2D image.  You are always looking on it -- looking at it only in one direction.

You could, theoretically, interrogate the entire circumference of it by going all the way around it with an x-ray device if you wanted to.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 188

Q.   In your practice, when you place filters, do you, typically, perform fluoroscopy in a single direction?

A.   Typically.

Q.   And in the case of Mrs. Brand and her filter placement, was it performed in -- the fluoroscopy in a single direction?

A.   I would assume so.

Q.   You were asked some questions about -- actually, I asked you some questions about a document that I failed to mark, so I'll give it to you now. It's Exhibit 11.

MS. PIERSON:  You guys already have a copy of it.

(Exhibit 11A, Vascular Surgery Progress Note, 10/29/12, Bates stamped Dr. Rheudasil 10 - 12, marked for identification.)

Q.   (By Ms. Pierson) I ask you to turn to page 2 of Exhibit 11A.  Dr. Rheudasil, Exhibit 11A is a note that I asked you about earlier that pertains to --

MR. MARTIN:  Andrea, wait until you -- they need to pull that down first.  You are not getting on screen.  And it's kind of dark.

MS. PIERSON:  I think we can fix that

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 189

later.  Let's just press on in the interest of time.

MR. MARTIN:  I think he's got it, Andrea. He's got it.  No -- sorry.

Q.    (By Ms. Pierson) Dr. Rheudasil, Exhibit 11 is the office note that I asked you about earlier from October the 29th of 2012.  And if you could take a look at the second page under the summary.

A.    Uh-huh.

Q.    I asked you about the first lines about "Mrs. Brand would like an x-ray to reevaluate her IVC, as it has been a year or so.  She is asymptomatic."  I neglected to ask you about the sentence that begins, "We also discussed that knee replacement surgery with a prior history of DVT, and we believe it would be a potentially high-risk time for recurrent thrombosis."

What are you talking about there?

A.    She had had a previous deep vein thrombosis, which was one of the factors in the decision to place the filter in the first place.  If she were contemplating another procedure that also is known to carry a significantly increased risk of deep vein thrombosis, then you could certainly make the argument that that filter being in place, it would

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 190

still be a good thing, would still offer protection for that event, too.

Q. In October of 2012, did Mrs. Brand tell you that she was about to undergo knee replacement surgery?

A. I don't -- I presume that when we mentioned it during -- for me to have put that in my note, but I don't recall what our discussion was.

Q. Your note continues and says, "It is likely that she is getting some protection from the current filter, and it is also possible that we could place a different filter if needed. I would be happy to discuss with her orthopedist when the time comes."

A. Right.

Q. What does that mean?

A. So I can't remember where we were in the process at this point. I think that we -- we already know she was having some issues with her filter. But we thought that, even though the filter was abnormal, relative to when we inserted it, that it was probably still offering her some pulmonary embolus protection.

If her -- I see patients, not uncommonly from orthopedic surgeons who refer to me or partners for the exact same issue. And that is patients with a history of a clot that are going to have a joint

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 191

replacement that carriers a significant clot risk, should we put a filter in.

My point there was simply that I think the filter that's in there now may be helping her mitigate that risk. And probably, it's not worth putting another one in or doing something in addition, but that if her orthopedist felt strongly to the criteria, we would have that discussion.

Q. Did Mrs. Brand ever come back to you and ask you to place another filter or say she needed another filter because she was undergoing knee replacement surgery?

A. No, not to my knowledge.

Q. In your experience, would a patient undergoing knee replacement surgery be able to take anticoagulants?

A. Yes, that's, in fact, the norm.

Q. And in Mrs. Brand's case, do you know if it was necessary that she take anticoagulants before her knee replacement surgery, given that she had a filter in place?

A. I would have. "Necessary" is open to the interpreter. But, again, the filter, I would answer that by saying the filter's designed to prevent pulmonary embolus, not to prevent DVT.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 192

If a patient is not at high risk to be anticoagulated, which we feel that big spine surgeries are, and knee surgery is not at high risk to be anticoagulated; in fact, that's the normal way to do it.  So even with a filter in place, I would have anticoagulated her or recommended that she been anticoagulated, because I wanted to minimizes her DVT risk as a separate issue than the pulmonary embolus risk.

Q.   Okay.  Understood.  Thank you for that explanation.

Dr. Rheudasil, Mr. Martin asked you some questions about the fragment that Mrs. Brand reports came out of her thigh.  Did you ever see that fragment?

A.   Not that I remember.

Q.   Did you ever see any evidence to suggest that a fragment had exited her thigh?

A.   Just a history.

Q.   What the patient told you?

A.   And the nurse's notes describing it, but I don't -- I never saw the fragment, so I can't be certain.

Q.   Is there any reason, based on your treatment of Mrs. Brand, is there any reason to

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 193

believe that the currently retained fragment in Mrs. Brand's body is not well fixed?

MR. MARTIN:  Objection; form.

A.  No.  I don't honestly know, though, that I can definitively answer that question.  I think the likelihood of those fragments ever causing her a problem, in my opinion, are quite low; however, that's probably not zero.  And that's my opinion.

Q.  (By Ms. Pierson) Dr. Rheudasil, the last time that you treated Mrs. Brand, back in 2015, if you had believed that the fragment posed her some ongoing risk of harm, what would you have done?

A.  Do you mean during her open surgery?

Q.  No, I mean in the follow-up visits following -- there's a single follow-up visit in October 2015.

A.  If she had fragments that I thought were causing her harm, we would try to get it out.

Q.  If you were concerned that her filter fragment would migrate or move in some way, would you have asked her to come back to you for regular scans --

A.  Sure.

Q.  -- or imaging?

A.  Sure.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 194

Q.   Did you do that?

A.   I don't think so.

Q.   If you had done that, it would be in your note, right?

A.   Presumably, yes.

Q.   Dr. Rheudasil, has Mrs. Brand or any of her attorneys asked that you perform additional scans or imaging on Mrs. Brand today?

A.   Over the course of the last few years, yes.

Q.   Tell me what you mean when you say that.

A.   I mean, Mrs. Brand has asked, occasionally, to have an x-ray so that she can see where these fragments are.

Q.   My question is a little different.  And apologies if I'm not being very clear.

Since the time that you -- you last treated Mrs. Brand in 2015, through her attorneys or -- or through your nurses, has she or her attorneys ever called and said, "We want you to do new CT scans or new imaging?"

A.   I have received a request for a CT scan, but, frankly, I don't know if that came from Mrs. Brand or her attorneys, and I don't know the exact timing of when that was.

Q.   Okay.  Have you agreed to do it or have you

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 195

ordered it?

A.   No.

Q.   Why not?

A.   And I don't mean any offense to Mrs. Brand.

I believe that the migration likelihood of these fragments is low and that we can get a pretty good look at them every now and then with a simple x-ray and compare it to the surrounding structures. A CT scan is somewhere around 400 x-rays.  And so the notion of her having serial CT scans from now on to follow these, I think is -- I think is not a good idea.

At some interval, I believe, relatively infrequently, in my mind, I don't disagree with an occasional x-ray to take a look at these.  But I, personally, don't think a CT scan is necessary unless she's having clinical symptoms.

Q.   You're aware that Mrs. Brand has had a number of spinal surgeries, aren't you?

A.   (Witness nodded head affirmatively.)

Q.   You were involved in one.

A.   Yes.

Q.   But you know she had others, right?

A.   Uh-huh.

Q.   If Mrs. Brand is being cared for by a

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 196

spinal surgeon who is regularly x-raying her spine to watch for changes as a consequence of her degenerative disc disease, would there be any reason that she needs other x-rays?

A.   Well, assuming that --

MR. MARTIN:  Objection; form.

A.   Assuming that the fragments that we are talking about is visible on those spine films, she would not need additional films.

Q.   (By Ms. Pierson) Mr. Martin, asked you some questions about a fragment from a filter, a hypothetical filter, and whether it could, hypothetically, travel to a patient's heart.  You remember those questions?

A.   Uh-huh.

Q.   During the time that you treated Mrs. Brand, did you ever have any imaging or information to suggest that any fragment from her Celect filter ever appeared in or close to her heart?

A.   I don't have any specific recollection of that.  I'm sure she had chest x-rays as part of her evaluation either for surgery.  I'm sure that she had some chest fluoroscopy trying to remove the filter.

So to my -- to my knowledge, there was never any concern that there was any fragment in her

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 197

chest.

Q.   You said, when one of Mrs. Brand's lawyers was questioning you, that you didn't intend to retrieve the fragment that she has today because it's not causing her any problem.  What did you mean by that?

A.   Risk/benefit analysis.

Q.   Okay.

A.   I think that the fragments that she still has are not in a location where they are likely to cause her any symptoms whatsoever.  And I think the chances of them becoming something that would be relevant or a concern to her health are low.

And so because they can frequently be very difficult to find, even when you know the general idea -- the general area of where they are, I thought we would potentially cause more harm going to get it than we would to leave it alone.

Q.   You were asked some questions today about instructions for use for the Celect.  Do you have any memory, as you sit here today, of ever reading or interpreting the instructions for use that Mr. Martin showed you?

A.   No.

Q.   All the questions that you were asked by

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 198

counsel for Mrs. Brand about how you would have interpreted the instructions for use or what you would have thought about the instructions for use, do you agree that those are all matters of speculation because you don't have a memory of having reviewed those previously?

MR. MARTIN:  Objection; form.

A.    Yes.

Q.    (By Ms. Pierson) Do you agree that the instructions for use that Mr. Martin showed you do, in fact, include warnings about potential adverse events?

A.    Yes.

Q.    The list is on page 5 of Exhibit 21, we can look at it if you want to, but based on your review of the instructions for use, are all of the potential adverse events or risks described in the Celect instruction for use things that were known to you in March of 2009?

A.    I don't have it, but I'm sure that all of the relevant risks are mentioned.  And I suspect, frankly, that this IFU, in that regard, looks almost the same as every IFU for every other filter in which the risks are thought to be materially the same.

Q.    That's an important point, Dr. Rheudasil.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 199

At the time that you placed Mrs. Brand's filter, in March of 2009, had you reviewed many instructions for use for filters made by other manufacturers?

MR. MARTIN:  Object to form.

A.    I'm sure.

Q.    (By Ms. Pierson) Did you believe that the risks that were included in those instructions for use were common, were risks common to all vena cava filters?

A.    Yes.

Q.    We talked, earlier today, about the risks of perforation, fracture, and filter embolization or movement of the filter, part of the filter.  Were all those risks known to you in March of 2009?

A.    Yes.

Q.    Even before you read the Celect IFU, did you know those to be risks for any vena cava filter?

A.    Yes.

Q.    You were asked some questions about the clinical studies portion of the instructions for use and -- and you made the comment that all filters perforate to some extent.  Explain to the jury, Dr. Rheudasil, if that's true, why do you still use filters for your patients?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 200

MR. MARTIN:  Objection; form.

A.   So that's my personal opinion.  I don't want to quote literature that all filters perforate. I believe, though, that in a subclinical way, meaning no adverse consequences to the patient, the majority of the filters, if not nearly all, in this general conical design, probably, as they grab the filter wall, probably have microscopic amounts of perforation.

I think that is, for the most part, irrelevant.  I think even most macroscopic, most significant perforations are generally irrelevant. They do, however, have an association with an increased risk of fracture.  And I believe that the more perforation that you see, the more risk there is for a filter-related problem of some kind.

So that's where I was getting into the details of the hypothetical question I was being asked is, I think if you are -- if you are going to ask questions about the risks associated with perforation, those need to be very specific questions, in my mind.

But -- so -- so if I saw on here that there was a known two-millimeter perforation incidence on this filter or any other conical filter, that would

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 201

not surprise me and probably would not change my choice of filter, that sort of a notion.

A clinically evident perforation rate, patients having real problems related to the perforations, an increased fracture risk because of it, an increased migration risk because -- that, of course, would be something I would want to know.

Q.   (By Ms. Pierson) I think I heard you say earlier today that when you said "clinically significant perforation rate," you are talking about perforations that involve adjacent organs or perforations that result in a fracture that becomes clinically significant.

A.   I'm talking about perforations that have consequent -- negative consequences for the patient.

Q.   Dr. Rheudasil, you were asked some questions about the Tulip filter.  Have you used both, Cook's Tulip filter and Cook's Celect filter?

A.   Yes.

Q.   In your hands, have both Cook filters performed equally well for your patients?

MR. MARTIN:  Objection to form.

A.   I mean, yes.  Obviously, this is a one-off case, if you will, in my personal experience.  And so I have not had a filter, a Tulip filter do this

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 202

before, but I have also never had any other Celect filter do this before.  So I consider them to be, again, roughly equivalent in terms of their risk analysis.

Q.   (By Ms. Pierson) In your experience, have you used filters other than Cook filters that have fractures?

A.   Yes.

Q.   What types of filters have you used that have fractures?

A.   All of them, probably.  I've seen TrapEase filters, I've seen Cordis filters, TrapEase OptEase filters fracture.  I've seen Bard filters fracture. I think I have probably seen a Greenfield filter fracture; although I think that's less likely.

But I suspect that, again, because of the dynamic motion involved in filters, the longer patients are followed, the more critically they are followed, the more you are probably going to find fractures in all devices.

Q.   You mentioned earlier that your filter of choice today is the Bard Denali filter.  Would you agree, Dr. Rheudasil, that the Bard Denali filter has a rate of fracture?

A.   It, yes.  I can't quote you that rate, but

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 203

it has a certainly has a risk of fracture.

Q.   Do you know whether the rate of fracture with the Bard Denali is greater than any Cook filter?

A.   No.  I choose it -- I don't know.  I choose it because I believe it's more easily retrievable.

Q.   Are you aware, Dr. Rheudasil, that the lawyers for Mrs. Brand have filed lawsuits against the Bard company because they say that the Denali has an unacceptably high rate of fracture?

A.   I'm not aware of that.

MR. MARTIN:  You know, you have gone well over two hours.

MS. PIERSON:  Yes, I'm just wrapping up. Give me two seconds.  I'm about done, Ben.

MR. MARTIN:  I have got questions.

Q.   (By Ms. Pierson) Mr. Heaviside asked you some questions about a risk of thrombotic event with a filter.  Is a risk of a thrombotic risk one of the rare but known risks of all filters?

A.   Yes.

Q.   Did you know that in 2009?

A.   Sure.

Q.   Is it unique to the Celect filter?

A.   No.

Q.   Is the risk of being one of a small number

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 204

of patients who experience a thrombotic event outweighed by the benefit of preventing pulmonary embolism for filter use?

A.   Yes.

Q.   In your judgment, is that true for all of the risks we have discussed today, including perforation and fracture?

A.   Yes.

Q.   That the benefit of preventing pulmonary embolism outweighs the risks of perforation or fracture?

A.   Yes.

Q.   In your experience, was Mrs. Brand's complication a rare or unusual event?

A.   I believe so.

Q.   Ever seen or heard of another patient in your practice who had a filter fracture the way that her filter did?

A.   No.

Q.   When we started today, you said that all filters have a rate of complication; it's low, but there's complications for various reasons.  Do you remember that?

A.   Yes.

Q.   Dr. Rheudasil, is that statement unique to

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 205

any particular filter brand or type?

A.   No.

Q.   Dr. Rheudasil, while treating Mrs. Brand, was it your opinion that she was one of the patients that fit within that category, a patient who had a filter, but fell within the small number of patients who experienced a rare complication?

A.   Yes.

MR. MARTIN:  I'm going to throw in a leading objection.  All of these are leading questions, but I'm just reminding that we intend to assert our leading objections at the time of trial and don't want there to be any question about it.

Go ahead.

Q.   (By Ms. Pierson) Let me rephrase the question and ask it again, since Mr. Martin interposed an objection, although I'm sure he will renew it, no matter how I phrase it.

Dr. Rheudasil, you said, earlier today, that all filters have a rate of complication, that it's low, but for various reasons, they all do.  Is it your opinion that Mrs. Brand was one of the patients who fits within that category, a patient who experienced a rare but known complication?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 206

A.   Yes.

MS. PIERSON:  Thank you.  That's all the questions I have.  I appreciate your time.

EXAMINATION

BY MR. MARTIN:

Q.   It has been suggested in Miss Pierson's questions that just because you don't -- excuse me.

It's been suggested by Miss Pierson's question that because you don't, specifically, recall reading the instruction for use, that somehow that means you didn't read them before you put Mrs. Brand's filter in her body.  I just want to make the record clear.

Once again, your testimony, earlier, was that it was your usual practice, before you ever put in an IVC filter, a particular brand, that you would read the instructions that come with that filter.  My question is simply this:  Is that still your testimony?

A.   Yes.

Q.   All right.  And this reading of the filters, the Celect filter came on the market in its non-retrievable indication in 2007, I believe it was; its retrievable indication in 2008.  That would have been 10 years ago, right?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 207

A.   Right.

Q.   Do you remember, would you expect to remember, specifically remember, sitting down at that point in time, 9 or 10 or 11 years ago, and the specificity of actually reading the Celect instructions for use; would you expect to remember that?

A.   No.

Q.   Does the fact that you don't remember that mean you didn't do it?

A.   No.

Q.   All right.  And where is the portion -- where are those portions of those fragments in her body right now; do you really even know?

A.   No.

Q.   And if you don't know where they are, are you basing your opinion that they won't go anywhere upon any current knowledge of yours, medical knowledge of yours?

MS. PIERSON:  Object to form.

MR. MARTIN:  I'll withdraw that.

Q.   (By Mr. Martin) My question is:  You've said you don't know where the fragments are.  Do you know if the fragments have moved since the last time you saw them?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 208

A.   I don't know.

Q.   Since the last time you looked at a film?

A.   No.

Q.   Is there any way that you can scientifically support that the fragments haven't moved, if it's your opinion that the fragments haven't moved since the last time that you saw them on film?

A.   No.

Q.   Miss Pierson asked you about, again, about the efficacy, I guess, of the filters and the prevention of pulmonary embolism.  Let's go through some of that.

My question is, to you:  Do you -- on the prevention by a -- by IVC filters, in general, of pulmonary embolus, do you base your opinions on the efficacy of IVC filters, in general, in prevention of pulmonary embolus on any scientific, peer-reviewed literature?  That's my question.

A.   Yes.

Q.   Okay.  What scientific, peer-reviewed literature supports that IVC filters prevent pulmonary embolus as a group?

A.   There are a thousand articles that support the fact that IVC filters reduce the incidence of

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 209

pulmonary emboli.

Q.   Can you name one?

A.   I mean, it's -- it's a well-accepted medical fact.

Q.   Would an -- would an epidemiologist be the one that you would probably want to defer to as far as --

A.   No.

Q.   If an epidemiologist has knowledge of the scientific literature regarding IVC filters and their efficacy, would you not defer to them in the determination as to whether or not IVC filters as a -- as a group --

MS. PIERSON:  Object to the form.

Q.   (By Mr. Martin) -- of medical devices prevent pulmonary embolus.

A.   I probably would not.  As I say, there is not hundreds; there's probably thousands of articles supporting the use of IVC filters.

Q.   Do you have -- are you -- do you have any support, scientific -- I just need to know for purposes of the record today, you have -- you have -- you have suggested that IVC filters, as a group of medical devices, prevent pulmonary embolus.  Okay?

A.   No.  No, I've never said that.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 210

Q.   Okay.

A.   They reduce the incidence of pulmonary embolus.  Nothing prevents pulmonary embolus.

Q.   They reduce the incident -- so the theory that IVC filters as a group prevents -- reduces the risk of pulmonary embolus?

A.   Okay.

Q.   Okay.  As we sit here today, can you point to a single piece of -- one single piece of medical literature, and let's talk about level-one studies, can you point to any level-one study that IVC filters, as a whole, prevent -- excuse me, reduce the risk of pulmonary embolus?

MS. PIERSON:  Object to form.

Q.   (By Mr. Martin) One single one.

A.   I can't give you a name.  I mean, literally this has been standard medical knowledge since the mid '80s.  So this -- this has been thousands of papers on this subject.

Q.   (By Mr. Martin) Okay.  And so -- and you have read those thousands of papers?

A.   I'm aware -- I'm aware of the content of the literature.

Q.   Okay.  Well, tell us the content of the literature.  This is an important question.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 211

A.   Content of the literature is that, in appropriate patients, IVC filters reduce the incidence of pulmonary embolus.

Q.   Which -- when you say "appropriate patients," what patients are you talking about in your definition of appropriate patients that it reduces the risk of a pulmonary embolus?

A.   Patients with classic indications for filter or patients that have -- that are thought to be high risk for PE.

Q.   Okay.  Can't name them, can't name a study as we sit here.

MS. PIERSON:  Object to form.

A.   I don't know -- no, I don't know of --

Q.   (By Mr. Martin) That's the question.

A.   I don't know of an individual study that I would quote you on that.

Q.   Have you ever read PREPIC 1?  Have you ever read the study called PREPIC 1?

A.   No.  I don't know.

Q.   Have you ever read the study PREPIC 2 with respect to retrieval of filters?

A.   I don't know PREPIC studies, no.

Q.   Are you aware that there is no study on the Cook Celect filter, level-one evidence, that supports

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 212

that the Cook Celect filter reduces the risk of pulmonary embolus?  Are you aware that there is no such study?

A.   No.

Q.   Do you know of any study -- excuse me.  Do you know of any body of literature, and I'm talking, specifically, about the Cook Celect filter now, Doctor, okay, you talked about your beliefs with respect to IVC filters as a whole, now I want to talk about the Cook Celect filters.  Okay.

Do you know of any body of literature that supports that a Cook Celect filter reduces the risk of pulmonary embolus?

A.   No, not specifically.

MS. PIERSON:  Object to form.

Q.   (By Mr. Martin) General literature for the Cook Celect filter studies.

MS. PIERSON:  Same objection.

A.   I don't know of studies that, specifically, are on the Cook filter.

Q.   (By Mr. Martin) All right.  And with respect to the case that you mentioned earlier in the deposition about Dr. Morrison, and he -- and you indicated that his theory or thoughts on the use of filters had changed.  Do you remember that?  There

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 213

was a patient that died of a pulmonary embolus.  Do
you recall that testimony earlier?

A.   Yes.

Q.   What evidence -- what evidence -- first of
all, do you know what brand of IVC filter that was --
excuse me, that would have been put in that patient?

A.   No.

Q.   Do you have -- would that be considered by
you an anecdotal case?

A.   Sure.

Q.   Is there any scientific proof that the
placement of a Cook Celect filter in that patient
would have prevented pulmonary embolus?

A.   No.

Q.   Is there any -- do you have any suggestion
that there is any scientific evidence that the
placement of a Cook Celect filter in that patient
would have prevented that patient's death?

A.   I don't know.

Q.   Do you have any such scientific proof that
a Cook Celect filter placed in that patient would
have prevented that patient's death?

A.   No.

Q.   And same question with respect to your
practice.  What -- what is it called when you -- when

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 214

your experience, your own personal experience as a physician, what do you call it when your personal experience is -- what do you call it when your own personal experience as a physician leads you to believe certain things?  Lay aside the studies.  Lay aside anything but your personal experience.  Let's say this.  You have been a doctor placing filters for many, many years, right?

MS. PIERSON:  Object to form.

Q.   (By Mr. Martin) And -- and you have had experience with respect to patients and their response to the placement of the pulmonary embolus in your placement of a filter with respect to the development or nondevelopment of pulmonary embolus, you've got your own personal experience, right?

A.   (Witness nodded head affirmatively.)

MS. PIERSON:  Same objection.

Q.   (By Mr. Martin) Would your personal, experience the experience that you had in your practice, would that be considered anecdotal experience?

MS. PIERSON:  Object to form.

A.   Depends on how you define -- it would be my experience.

Q.   (By Mr. Martin) Have you ever -- have you

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 215

ever kept -- kept a study yourself, and I'm just talking about even a simple as looking at the number of patients that you have had -- that you have placed filters in and looking at the results of whether or not pulmonary emboli were prevented, have you ever performed your own study on your own patients?

A.   No.

Q.   And have you ever performed a study on your own patients as to the incidence of pulmonary embolus after the placement of a Cook Celect filter?

A.   No.

Q.   Do you know -- and I understand -- well, I think I know what your answer is going to be, but let me ask this:  Are you aware -- are you aware of any article, scientific peer-reviewed article, and I would just ask if you know of one that supports that a Cook Celect filter reduces the risk of death from pulmonary embolus?

MS. PIERSON:   Object to form.

A.   No.

Q.   (By Mr. Martin) And you don't track all your patients for the results of the placement of a Cook Celect filter, would that be true?

A.   True.

MR. MARTIN:   Okay.   Thank you, pass the

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 216

witness.

MS. PIERSON:  No questions.  Thank you for your time, Dr. Rheudasil.

THE VIDEOGRAPHER:  The time is approximately 5:44 p.m.  This concludes today's videotaped deposition for Dr. Mark Rheudasil. We are off video record.

(WHEREUPON, proceedings were concluded at 5:44 p.m.)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 217

                    C E R T I F I C A T E

STATE OF GEORGIA   )

                   ) ss.:

FULTON COUNTY      )


     I,  Robin Ferrill, Certified Court Reporter

within the State of Georgia, do hereby certify:

          That Mark Rheudasil, M.D., the witness

whose deposition is hereinbefore set forth, was duly

sworn by me and that such deposition is a true record

of the testimony given by such witness.

          I further certify that I am not related to

any of the parties to this action by blood or

marriage; and that I am in no way interested in the

outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto set

my hand this 2nd day of March, 2018.


                    ROBIN K. FERRILL, RPR

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 218

Veritext Legal Solutions

1100 Superior Ave

Suite 1820

Cleveland, Ohio 44114

Phone: 216-523-1313

March 2, 2018

Dr. Mark Rheudasil

Emory Vein Center, 5673 Peachtree Dunwoody Rd,

Suite 625, Atlanta, GA, 30342

Case Name: Brand, Tonya v. Cook Medical,  Inc., Et Al.

Veritext Reference Number: 2816025

Deposition Date:  2/28/2018

Dear Sir/Madam:

Enclosed you will find a transcript of your deposition.

As the reading and signing have not been expressly

waived, please review the transcript and note any

changes or corrections on the errata sheet

included, indicating the page, line number, change and

reason for the change. Sign at the bottom of the sheet

in the presence of a notary and forward the errata sheet

back to us at the address shown above or email to

production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 219

                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS

          ASSIGNMENT REFERENCE NO: 2816025
          CASE NAME: Brand, Tonya v. Cook Medical,  Inc., Et Al.
          DATE OF DEPOSITION: 2/28/2018
          WITNESS' NAME: Mark Rheudasil , M.D.
          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
     my testimony or it has been read to me.
          I have made no changes to the testimony
     as transcribed by the court reporter.


     _____          _____
     Date                      Mark Rheudasil , M.D.
          Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
     the referenced witness did personally appear
     and acknowledge that:

          They have read the transcript;
          They signed the foregoing Sworn
               Statement; and
          Their execution of this Statement is of
               their free act and deed.

          I have affixed my name and official seal

     this _____ day of_____, 20____.


               _____
               Notary Public
               _____
               Commission Expiration Date

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 220

                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS

        ASSIGNMENT REFERENCE NO: 2816025
        CASE NAME: Brand, Tonya v. Cook Medical,  Inc., Et Al.
        DATE OF DEPOSITION: 2/28/2018
        WITNESS' NAME: Mark Rheudasil , M.D.
        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
        I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
        I request that these changes be entered
as part of the record of my testimony.

        I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.
_____          _____
Date                        Mark Rheudasil , M.D.

        Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
        They have read the transcript;
        They have listed all of their corrections
            in the appended Errata Sheet;
        They signed the foregoing Sworn
            Statement; and
        Their execution of this Statement is of
            their free act and deed.
        I have affixed my name and official seal
this _____ day of_____, 20_____.
                _____
                Notary Public


                _____
                Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                      888-391-3376

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Page 221

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 2/28/2018

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____    _____

Date                        Mark Rheudasil , M.D.

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

                    _____

                    Notary Public

                    _____

                    Commission Expiration Date

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[00001396 - 2570]**                                                    Page 1

| | | | |
|---|---|---|---|
| **0** | | | |

**00001396**  174:21
**000032**  5:21
  145:21
**000046**  4:23 89:22
**000086**  3:19 38:19
**000089**  3:19 38:20
**000163**  3:23 49:2
**00074641**  5:11
  103:1
**000893**  4:9 75:12
**000897**  4:13 80:4
**000898**  4:17 81:21
**0074640**  5:13
  105:7
**06018**  1:10
**0805-351-01en**
  5:15 119:11

**1**

**1**  3:12 11:6,10,14
  125:25 138:4
  211:18,19
**10**  4:10,15,21
  59:21 79:2,3,6
  86:21 87:19
  188:16 206:25
  207:4
**10/22/15**  5:18
  141:5
**10/29/12**  4:15
  188:16
**100**  162:14 181:24
**103**  5:9
**105**  5:12
**11**  3:12 4:12 80:2
  80:6 82:2 109:15
  109:16,22 188:12
  189:5 207:4
**11/12/15**  5:7 94:16

**11/24/15**  5:8 95:9
**1100**  218:1
**117**  5:19 141:5
**119**  5:14,19 141:6
**11a**  4:14 188:15,19
  188:19
**12**  4:15,16,21
  27:25 81:20,24,25
  82:5,23,25 86:21
  188:17
**123**  4:11 79:4
**1230**  2:4
**124**  4:11 79:5
**13**  3:14 4:18 83:1
  83:5,11 117:13,15
  118:1
**137**  5:16
**1398**  6:6 174:5
**14**  4:20 86:18,20
**141**  5:18
**145**  5:20
**15**  4:22 34:15
  59:21 89:21,24,24
  124:25 138:21
**150**  5:22
**15th**  90:1 93:18
**16**  5:4 87:1 91:17
  91:21 129:16,16
  129:20 130:1,7
**166**  6:4
**16th**  41:19
**17**  5:6 94:15,17
  130:9
**172**  3:8
**174**  6:5
**17th**  2:9 91:24
**18**  5:8 95:8,11
**1820**  218:2
**183**  3:6
**188**  4:14

**19**  5:9 75:18
  102:23,24 103:3
  103:21 104:15
**1936**  1:24
**1989**  13:17,23
**1991**  14:1
**1:08**  1:17 7:5
**1:14**  1:6,10

**2**

**2**  3:14 5:5 13:4,7,9
  91:18 126:2
  142:13 188:19
  211:21 218:4
**2/16/09**  3:23 49:2
**2/28/2018**  218:9
  219:3 220:3 221:2
**2/6/09**  3:21 41:8
**20**  5:12 33:18
  34:15 54:5 105:5
  105:9,10,15 106:2
  219:16 220:22
  221:22
**20006**  2:10
**2000s**  33:24 35:21
**2007**  41:21 49:22
  54:2 206:23
**2008**  118:24
  206:24
**2009**  12:2 15:10
  20:19 27:5 30:24
  32:2,6,14,20 37:11
  38:10 40:3 41:19
  50:20 52:11 53:19
  54:23 55:14 57:11
  59:24 60:11 62:15
  62:22,25 63:23
  64:3,19 74:1
  75:18 85:6 97:24
  176:17 177:5,6
  185:6 198:19
  199:2,15 203:21

**2011**  75:15,18 76:5
  76:11 79:8 80:10
  82:7,10 84:3
  97:15 105:11
  106:18 109:23
  117:6
**2012**  86:17,25
  89:17,19 189:7
  190:3
**2015**  12:2 20:19
  32:6,17 89:16,17
  89:19 90:1,6
  91:24 92:1 94:1
  94:12 95:12 96:10
  96:15 97:24
  112:25 130:9
  132:19 138:4
  193:10,16 194:17
**2018**  1:16 3:4 7:3
  217:17 218:4
**202.223.1933**  2:10
**206**  3:7
**20th**  75:15,18 76:5
**21**  5:14 119:8,9,14
  119:17 158:17
  198:14
**214.761.6614**  2:5
**216-523-1313**
  218:3
**21st**  89:16
**22**  5:16 137:18,23
**22nd**  76:10
**23**  5:18 105:11
  141:4,8
**23rd**  79:8 106:18
**24**  5:20 145:20
  146:21
**24th**  95:12
**25**  5:22 151:2,3,8
**2570**  1:6,7 5:11
  103:1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[26 - acknowledge]**                                    Page 2

**26**  6:4 166:21,22 167:5
**26th**  49:16
**27**  6:5 174:4,7,8,17 181:6
**2700**  2:17
**28**  1:16 3:4 7:3 80:9
**2816025**  218:8 219:2 220:2
**28th**  109:23
**29**  86:25
**29th**  86:17 189:7
**2d**  187:20
**2nd**  217:17

**3**

**3**  3:15 31:9,13 32:1 95:18,22,24
**30**  4:19 13:18 14:4 28:17 33:18 83:2 98:20 117:23 138:21 172:3 184:7
**300**  2:17
**30342**  218:6
**31**  3:15 4:19 83:2
**317.237.0300**  2:18
**32**  145:16
**3710**  2:3
**38**  3:17
**3:03**  101:9
**3:09**  171:22
**3:13**  102:2

**4**

**4**  3:17 38:18,22,24
**4-5**  18:6 145:23
**40**  28:8,13 37:1 172:25
**400**  195:9

**41**  3:20
**44114**  218:2
**46204**  2:18
**48**  152:9
**485**  4:7 68:6
**486**  4:7 68:6
**49**  3:22
**4:06**  140:23
**4:10**  141:2
**4:12**  142:6
**4:14**  142:10

**5**

**5**  3:20 41:6,7,10 198:14
**5-1**  18:4,4 145:23
**5/21/15**  4:22 89:21
**50**  54:12 171:23
**5673**  1:20 218:5
**5:15**  172:11
**5:30**  172:14
**5:44**  216:5,9

**6**

**6**  3:22 5:17 49:1,5 49:6 137:19 138:1 138:10
**6/1/15**  5:16 137:18
**6/22**  76:17
**6/23/11**  4:11 5:10 5:13 79:4 102:25 105:6
**6/28/11**  4:13 80:3
**6/9/03**  6:6 174:5
**6/9/2003**  174:24
**617**  4:5 65:1
**625**  1:21 218:6
**628**  80:1
**640**  105:16
**65**  4:4
**68**  4:6

**7**

**7**  4:4 64:25 65:4
**7/14/11**  4:18 83:1 117:16
**7/16/15**  5:4 91:17
**7/27/11**  5:23 151:4
**7/27/2011**  151:17
**74**  160:8 161:13,21
**74640**  103:18,23
**74645**  5:11 103:1
**75**  4:8
**75219**  2:4
**79**  4:10

**8**

**8**  4:6 68:4,5
**80**  4:12
**800**  2:9
**80s**  13:22 24:9 210:18
**81**  4:16
**83**  4:18
**84**  4:20
**87**  38:23
**89**  4:22
**895**  4:9 75:12
**899**  4:17 81:21

**9**

**9**  3:6 4:8 75:11,14 207:4
**91**  5:4
**910**  2:9
**94**  5:6
**95**  5:8
**99**  3:7
**9th**  32:2

**a**

**abdomen**  4:10 16:1 45:12 79:3,8 79:17,24 116:2 135:12 136:6,21

**abdominal**  15:6 16:12 19:1 38:13 43:4 45:21 48:11 49:21 52:14 71:3 72:8 78:25 83:22 87:8,15,25 95:1 96:2,6 136:20 145:24
**abdominopelvic** 71:4
**ability**  25:20 56:19 70:4
**able**  63:1 70:23,24 71:3 92:21 93:4 93:14 125:16,25 128:11 137:13 141:15 143:17 150:23 158:23 159:2 165:24 168:8,18,18 185:25 187:3,6 191:15
**abnormal**  30:14 190:19
**abnormalities** 30:17
**absence**  21:5 38:2
**absolutely**  47:8
**abundant**  69:24
**abutting**  114:16
**acceptable**  170:10
**accepted**  209:3
**access**  34:1,3 50:9 51:16 60:1 68:18 70:4,19 71:10
**accurate**  12:1,17 12:20 167:10
**achieved**  142:20
**acknowledge**  219:11 220:16

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[act - appropriate]**                                                    Page 3

**act**  219:14 220:20
**action**  113:16
  217:13
**actual**  83:11
  157:14
**acutely**  60:1
**addition**  191:7
**additional**  43:1
  44:25 86:4 123:18
  129:5 132:11
  161:23 194:7
  196:9
**additionally**  107:6
**address**  218:18
**adjacent**  47:2,13
  182:20 201:11
**adjust**  170:18
**adjusted**  72:18
**advance**  8:2 11:16
**advanced**  63:12
**adverse**  198:11,17
  200:5
**advise**  65:8
**advised**  66:4
**affect**  28:23 30:9
  37:15 48:20,24
  70:3 175:17
**affirmatively**
  117:7 128:23
  195:20 214:16
**affixed**  219:15
  220:21
**age**  28:12
**ago**  18:12 26:23
  36:13 46:6 75:14
  110:16 186:23
  206:25 207:4
**agree**  36:11 58:8
  58:13 110:5
  111:12 165:3
  175:23 177:8

179:22 198:4,9
  202:23
**agreed**  8:3,7
  194:25
**agreement**  10:23
  29:4 66:1 105:23
**ahead**  11:3 29:2
  33:16 44:21 48:5
  48:5 61:16 141:23
  146:18 205:15
**air**  182:21
**akin**  134:12 186:8
**al**  1:10 218:7
  219:3 220:3
**albeit**  74:17
  133:12
**alif**  49:15 145:23
  146:4
**alkhouli**  176:10
**allergic**  65:11
**allow**  135:15
**allowing**  26:19
  71:14
**allows**  187:14
**amended**  3:12
  11:6
**amount**  57:14,16
  70:9 127:20
  138:24 143:21
**amounts**  200:8
**analysis**  155:2
  162:23 197:7
  202:4
**anatomy**  30:18
  72:7 166:16,16,18
  185:22
**ancillary**  23:10
**andrea**  2:15 7:14
  10:15 172:5 174:8
  188:22 189:3

**andrea.pierson**
  2:19
**anecdotal**  213:9
  214:20
**anesthesia**  18:25
  46:18 50:13
  128:18 135:19,22
**aneurysms**  15:7
**angle**  126:16,18
  187:18,19
**anna**  2:16 7:16
**anna.rutigliano**
  2:19
**answer**  26:17
  35:24 36:19 52:1
  64:11 147:19
  152:6 154:18
  157:3 168:16
  180:20 181:14
  182:7,16 185:18
  191:23 193:5
  215:13
**answered**  53:2
  67:11 154:16
**anterior**  15:25
  17:22 32:23,24
  34:24 37:1,16
  46:2 114:17 132:3
**anti**  46:22,24,25
  47:1 96:25
**anticoagulants**
  22:19 23:9 41:24
  97:4,8,13 191:16
  191:19
**anticoagulate**  47:8
**anticoagulated**
  192:2,4,6,7
**anxiety**  89:10,12
**anybody**  44:16
  109:8

**anymore**  119:25
  120:11
**aorta**  142:16
  143:23,25 144:8,8
  144:9,10,15
**aortic**  176:22
**apart**  130:24
  131:2 139:23
  143:19
**apex**  175:12
**apologies**  194:15
**apologize**  101:24
  185:4
**apparent**  88:15
**apparently**  131:11
**apparition**  175:4
**appear**  31:22
  106:8 107:10
  117:25 119:18
  167:19 169:1
  219:11 220:15
**appearance**  129:9
**appearances**  2:1
**appeared**  164:2
  196:19
**appears**  86:16
  110:1,20,22
  167:10 176:15
**appended**  220:11
  220:18
**applicable**  118:25
**applied**  186:13
**apply**  119:2
**appreciate**  64:11
  104:18 206:3
**apprehension**
  114:13
**apprehensive**  89:4
**approach**  71:10
**appropriate**  37:20
  113:23,24 114:4

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[appropriate - bates]**                                                              Page 4

211:2,4,6
**appropriately**
  92:15
**approximate** 40:7
**approximately** 7:5
  101:9 102:2
  106:19 125:12
  136:1 140:23
  141:2 142:10
  175:1 216:5
**aps** 2:15
**area** 48:1 71:5
  72:3 76:21 139:1
  197:16
**argon** 24:20
**argument** 189:25
**arrest** 65:15
**arteries** 15:5
**artery** 15:6,7
  71:15,17 144:11
**arthrosclerosis**
  15:6
**article** 176:10,14
  215:15,15
**articles** 208:24
  209:18
**aside** 19:3 23:8
  116:20 214:5,6
**asked** 42:13 44:4
  44:18 67:10 88:18
  95:23 138:20
  172:24 179:14
  180:21 183:19
  184:17 188:9,10
  188:20 189:6,10
  192:12 193:21
  194:7,11 196:10
  197:19,25 199:20
  200:19 201:16
  203:16 208:10

**asking** 27:21
  116:16 164:10
  181:21 182:3
**asks** 11:11
**aspect** 110:18
  114:17 115:20
**assert** 205:12
**assessment** 55:5
**assignment** 219:2
  220:2 221:2
**associated** 14:25
  18:25 21:19 30:17
  43:13 47:11 48:17
  51:15,21 60:3
  63:13 149:9 161:1
  162:19 176:1,2
  183:6 200:20
**association** 200:13
**assume** 50:18 70:8
  78:17 188:8
**assumed** 177:25
**assuming** 113:15
  196:5,7
**assumption**
  153:11,12
**asymptomatic**
  61:6 83:19 84:19
  88:12 189:13
**atlanta** 1:22 9:20
  9:21 13:22 218:6
**attached** 6:13
  11:14 73:4 186:19
  220:7
**attaches** 175:6
**attempt** 82:6
  83:16,24 84:25
  85:21 86:10 87:2
  87:6,22 113:5,11
  117:2,4 125:17
  126:4 128:21
  134:3

**attempted** 117:11
  118:1 123:14
  124:5 128:21
**attempts** 84:16
**attention** 90:18
  100:24 156:6
  158:16
**attorneys** 194:7,17
  194:18,23
**attributed** 96:7
**authorize** 220:11
**authors** 184:3
**availability** 25:18
  35:2 56:13,19
**available** 25:12
  26:7,7 54:2 58:14
  107:6 121:8
  154:23 159:11
  177:21 178:13,24
  180:9
**ave** 218:1
**average** 126:3
**avoid** 48:1
**aware** 59:25 60:11
  62:16,25 63:22
  81:1 83:18 87:7
  87:10,12 96:9
  97:7 112:20
  149:18 150:15
  153:23 155:18
  157:21 180:7
  183:8 195:18
  203:6,10 210:22
  210:22 211:24
  212:2 215:14,14

**b**

**b** 1:24
**back** 11:15 13:24
  13:25 16:7,11
  42:3 43:18 44:9
  52:11 73:10,18,23

74:3,16 75:1,4
  85:6 86:8 90:15
  91:9 94:4,12 95:3
  95:6 96:10 100:2
  102:2 104:25
  106:25 131:6,10
  131:18 132:2
  134:13 135:18
  136:23 137:11
  138:12 139:14
  141:2 142:10
  144:19,22 146:5
  160:12 169:16
  172:1 185:20
  187:10,16 191:9
  193:10,21 218:18
**baker** 2:16
**ball** 19:12
**balloons** 20:1
**bard** 24:20 120:3
  202:13,22,23
  203:3,8
**base** 72:16 208:16
**based** 25:7 31:15
  64:5 67:23 75:20
  80:5,7 192:24
  198:15
**basically** 23:22
  68:17 71:4 187:8
**basing** 207:17
**bates** 3:18,23 4:5,7
  4:8,11,13,15,17,18
  4:21,22 5:4,10,13
  5:15,16,19,20 6:6
  38:19,23 49:2
  65:1 68:6 75:11
  79:4 80:3 81:21
  83:2 86:21 89:21
  91:17 102:25
  103:20 105:6,14
  117:20,22 119:10

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[bates - brand]**                                                           Page 5

130:6 137:18,25
141:5 145:21
174:5 188:16
**becoming** 197:12
**bed** 30:5 46:20
48:16 73:2,3
**beginning** 7:6 54:3
68:13 152:9
**begins** 104:15
189:14
**behalf** 2:2,14 59:4
**behave** 99:12
**belief** 52:9
**beliefs** 212:8
**believe** 22:5 33:9
37:12 46:9,14
47:6 50:3 54:9
57:2,11 60:5 61:1
61:7 76:13 86:7
88:20 91:3 93:10
96:20,24 97:18
111:6 118:16,19
119:1 121:12
129:10 132:22
149:22 166:7
175:5 176:24
185:16 189:16
193:1 195:5,13
199:7 200:4,14
203:5 204:15
206:23 214:5
**believed** 22:13
113:11 130:19
132:10 193:11
**belly** 136:5
**ben** 2:2,3 7:12
8:20 44:22 101:1
117:20 119:5
130:5 172:19
203:14

**bencmartin.com**
2:5
**benefit** 57:12 84:5
84:11,13 85:5
127:4,7,12 133:15
149:3 150:6,7
155:2 161:8
162:23 197:7
204:2,9
**benefits** 27:10
50:16,22 58:9
73:12 85:7,10,16
145:24 149:9
150:17
**benign** 61:1
**best** 37:7 58:9,15
59:6 92:19 113:16
126:24 128:25,25
135:17
**better** 56:3 84:20
85:3 107:4 143:4
183:2
**beyond** 42:6
123:18
**bifurcation** 18:3,6
18:9
**big** 32:25 48:9
57:23 74:14 137:2
192:2
**bigger** 35:6 38:3
52:18
**biggest** 116:22
**bird's** 25:25
**bit** 8:21 15:9 23:14
37:22 44:9 70:6
72:19 76:25 82:18
95:2 128:2,2
143:6 170:18
171:17 182:10
185:4,5

**bladder** 43:7
**blade** 136:12,13
**bleeding** 18:21
47:1,3,11,12,16,17
51:16 77:18 81:6
116:24 135:17
143:6
**blockages** 15:6,7
**blood** 14:25 17:12
17:15,21 19:3
22:23 23:2,14
25:20 26:5 29:23
40:14,18 48:2,19
50:11,13 51:18
56:19 65:11 72:5
72:10 93:2 115:9
115:10 116:1
135:16 137:4,5
138:23,24 139:14
175:4,11 217:13
**blue** 51:5
**bmartin** 2:5
**bodies** 100:13
**body** 23:21 28:17
70:3 112:8 114:17
114:21 115:14
118:18 123:25
128:20 132:3
133:20,23 134:4
136:2,14 145:8
162:5 163:15
164:2 193:2
206:12 207:14
212:6,11
**bony** 166:16,18
185:22
**book** 139:5
**borrow** 163:10
**bottom** 174:21
218:16

**bounce** 185:3,5
**bowel** 19:2
**brain** 15:1 65:14
**brand** 1:9 2:23
3:15 4:9,13,17
11:18,21,23 12:2,9
12:14 15:11 25:23
27:23 30:25 31:4
31:8,9,17,23 32:6
32:19 33:8,12
34:6 37:17 38:9
39:6,20 40:1,11,22
41:2,12,18 42:10
44:13 45:2,9
48:13 49:8,11
50:3,15 52:1,6,10
52:16,21 53:5,9,15
55:13 57:6 58:23
59:5,8,13 61:13,18
62:16 64:23 65:5
65:8 66:4 67:23
68:10,11,16 71:9
73:12,22 74:20
75:8,12,17,21 76:6
77:7,14,21 78:3,22
79:22 80:4,9,12,24
81:17,21 85:15,18
85:22 86:17 87:3
87:5,21 88:8,17,23
89:2,9,18,25 91:3
91:9 92:6 93:24
95:5,14 96:1,10,14
96:24 97:3,6
98:16,22 100:22
102:14 108:15
113:21,24 122:4
129:2 135:11
147:8 149:3,8,23
154:11 156:5,10
156:16 157:24
162:15 167:8,23

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[brand - cavagram]**                                                                                                                          Page 6

169:22 178:6
179:17 184:18
185:1 188:5
189:11 190:3
191:9 192:13,25
193:10 194:6,8,11
194:17,23 195:4
195:18,25 196:17
198:1 203:7 205:1
205:3,23 206:16
213:5 218:7 219:3
220:3
**brand's** 12:4,11,19
32:17 34:2 36:25
43:24 48:6,19,23
54:6,25 56:21,25
57:25 59:24 64:18
64:19 66:12,17,25
67:8,15 69:5,13
70:3,13 72:12
73:18 79:8 82:11
83:15,25 85:6
92:2 93:18 97:10
97:15,24 102:12
118:18,25 128:20
136:14 148:2
177:1 185:9
191:18 193:2
197:2 199:1
204:13 206:12
**brands** 24:12,17
**braun** 24:20
**break** 140:18
**breathing** 186:10
**brief** 183:18
**briefly** 14:22
50:23
**bring** 78:6,10,13
78:15 81:17
**brings** 116:1

**broad** 21:1
**broken** 131:24
134:5 139:23
**brought** 156:5
**bryan** 2:25
**budget** 179:11
**buildings** 9:23
**bullet** 121:5,7
134:12
**bunch** 14:8
**burden** 163:18
**button** 56:11
136:5

**c**

**c** 2:2,3,16 43:9
217:1,1
**ca** 218:25
**calculus** 177:24
179:2
**call** 35:7 70:23
78:23 87:8 89:25
93:11 95:12 96:1
139:3 214:2,3
**called** 7:22 18:3
56:6 73:1 75:25
90:3 152:1 168:12
168:22,23,25
194:19 211:19
213:25
**calling** 75:8,9
76:18 95:14
**campus** 10:3,10
**capability** 25:25
**captain** 84:23
**cardiac** 65:14
**care** 11:20 14:24
21:4,9 68:11 86:4
86:9 89:19
**cared** 12:1 195:25
**career** 19:5,16
22:11 24:1,16

54:11,14,17 98:20
98:25
**caring** 12:9,15
68:9
**carriers** 191:1
**carries** 138:24
**carry** 21:3 189:23
**case** 1:6,10 34:15
61:13 69:19,20
70:13 84:14
108:21 143:3
149:1 156:4
157:19 160:20
168:7 170:8 188:5
191:18 201:24
212:22 213:9
218:7 219:3 220:3
**cases** 21:16 37:23
52:18 61:1,2,6,10
68:14 134:14
145:10 179:12
**catastrophe**
116:25
**catastrophic** 38:1
**catch** 23:22,22
25:20 56:19
**category** 205:5,24
**catheter** 55:9
68:18 169:23
175:6
**catheters** 20:1
**cause** 12:10,22
13:2 27:19 47:12
47:14,25 51:18
61:2 84:17,18
98:8 134:9 136:8
173:14,16 175:7
175:21,21,25
176:11 197:11,17
**caused** 48:7 60:18
61:14 153:15

170:23 171:3
173:4 176:7
**causing** 91:6 92:10
116:24 126:25
134:6 175:8
182:20 193:6,18
197:5
**cava** 12:5 17:23
18:4,10,10 23:19
23:21 24:2,4,6,10
24:14 26:2 31:5
32:10,14,17 34:8
34:11,22 35:13
36:15 37:15 46:9
48:8,20,24 49:12
50:3,16,22 53:4,16
54:1,13,19,24 55:1
58:1,10,23 59:25
60:6,12,25 61:9,18
61:22 62:5,23
63:5 64:4,18,19
66:5,12,18 67:14
67:23 68:19,20
69:5,13 73:13
76:7 82:11 85:11
93:1 115:25
120:16 122:8
123:12 124:11
128:15 134:1
135:14 136:22
137:6 138:19,20
138:22 139:3,24
140:1,5,7 142:18
142:22 143:18
144:3,10,11,18,20
163:5 181:23
182:13 185:10,14
186:1,4,9,13,18,19
187:3 199:9,18
**cavagram** 164:15
168:23 185:9

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[cavagram - collective]**

187:2,3,7
**caval** 173:17
**ccr** 1:24
**celect** 5:14,15
53:16,20 54:1,3,7
54:11,19 55:2,13
55:15,19,21 56:1
58:23 61:24 63:6
63:9 64:14 66:13
66:18,19,23 67:1,6
67:8 85:15,16
97:16 98:1,6,9,17
99:4,13 100:10,12
102:12,17 118:25
119:9,11,20,22
120:5,14,16 123:5
123:11 148:2
152:13,17 153:6
153:14 154:22,25
155:14,18 157:23
158:5 159:5,9
177:12 178:8,16
178:21 180:11,12
180:24 183:9
196:19 197:20
198:17 199:17
201:18 202:1
203:23 206:22
207:5 211:25
212:1,7,10,12,17
213:12,17,21
215:10,17,23
**center** 1:19 16:24
121:9,9 218:5
**centimeters**
110:24 181:19
**certain** 25:2 30:1,3
37:18 179:6
186:17 192:23
214:5

**certainly** 19:13
37:4,21 48:1
84:10 104:12
108:6 133:5,7
161:2,3 179:8
182:17 183:2
189:24 203:1
**certificate** 220:11
**certification** 219:1
220:1
**certified** 217:6
**certify** 217:7,12
**cetera** 43:9
**chain** 151:8
**challenge** 43:12,16
**chance** 26:4
**chances** 197:12
**change** 79:16,17
97:25 98:8 129:8
129:9 131:11,13
185:22 201:1
218:15,16 220:8
221:3
**changed** 57:14,15
114:19 153:20
212:25
**changes** 42:23
79:24 186:10
196:2 218:14
219:7 220:7,9
**chart** 31:15 95:10
145:18
**chatting** 44:17
**check** 40:6,8 73:19
94:10 171:10
185:13
**checkup** 95:4
**chest** 166:4 196:21
196:23 197:1
**choice** 24:23 85:15
153:20 178:8

201:2 202:22
**choices** 25:12
178:24
**choose** 26:24
27:11 48:7,20
57:7 58:15,22
98:9 150:23 155:7
158:13 187:18
203:4,4
**choosing** 25:21
27:3,16 53:4,8
54:24,25 56:21
57:25 66:12,17,23
154:7
**chose** 55:12 59:23
85:6
**chosen** 57:5
184:25
**chronic** 30:1,4,5
**circumference**
187:24
**circumstances**
15:21
**civil** 219:5 220:5
**clamp** 135:15
142:25
**clamped** 138:23
138:25 143:2,3
**clamping** 142:15
142:21 143:6
**clamps** 139:1,8
142:20
**clarify** 180:10
**classic** 211:8
**clean** 64:11
**clear** 82:22 132:4
132:6 154:23
180:8 194:15
206:13
**clearly** 154:3

**clemmer** 5:9,13,22
102:24 103:4,5,8
105:2,4,6,11 106:4
151:3 152:4
**cleveland** 218:2
**client** 44:17
**clifton** 10:10
**clinical** 61:14
121:11 158:19,22
159:9,15,16,21
160:2 161:3,16,21
195:17 199:21
**clinically** 170:3
182:18 201:3,9,13
**clipped** 144:13
**clipping** 140:13
**close** 16:8 34:3
90:15 109:25
127:4 133:9
139:15 196:19
**closed** 93:2
**closely** 92:17
129:13
**closer** 61:4 136:23
**closing** 185:7
**clot** 23:1,22 40:14
40:18 163:18
176:4 190:25
191:1
**clots** 25:21 56:20
175:4,8,12,21
**clotting** 18:21
22:24 30:4 51:22
**coagulation** 46:22
46:24,25 47:1
96:25
**coke** 59:18,19
**collaborative** 51:4
**collections** 48:2
**collective** 145:11

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[collectively - controlling]**                                   Page 8

**collectively** 92:5 114:14
**college** 13:21
**combined** 157:5,8 157:9
**come** 16:4,7 32:19 61:7 73:10,18,23 74:3,15 75:1 76:8 80:12 86:7 88:18 91:9 94:4 95:5 96:10 104:19 110:1 114:6 115:19 128:20 132:1 164:6 175:16 191:9 193:21 206:17
**comes** 110:13 124:22 190:13
**comfortable** 17:2 55:8 56:6 139:13
**coming** 107:11 130:23 131:2
**comment** 199:22
**commercially** 26:7
**commission** 219:19 220:25 221:25
**common** 15:4 63:20 71:15,17 199:9,9
**commonly** 15:22 17:12 59:16,20 72:4,9,18
**communication** 31:17 74:24 75:17 147:22
**company** 107:17 148:3 154:11 155:1 179:9 184:8 184:12 203:8

**company's** 178:18
**compare** 78:20 195:8
**compared** 71:11
**comparing** 185:21
**completely** 96:15 157:11
**completes** 39:9
**complex** 181:2 182:15
**complicated** 121:19 162:7 173:8,9 179:5 182:4
**complication** 19:22 86:2 133:3 162:19 176:5 184:19 204:14,21 205:7,21,25
**complications** 20:4 59:25 60:2,3 63:8 64:20 93:17 93:19 162:22 204:22
**compression** 23:13
**concern** 113:24,24 114:5 116:5,19,20 133:11,12 177:18 196:25 197:13
**concerned** 95:21 114:23 115:1,16 129:6,14 182:6,8 182:19,21,22 193:19
**concerns** 38:9 87:11 104:18 114:9 116:10,13
**concluded** 216:8
**concludes** 176:11 216:5

**condition** 12:4 91:15 94:24 96:7 97:6 112:13
**conditions** 20:24 30:2
**conducted** 159:17 159:22
**cone** 69:11
**confidence** 97:19
**confidentiality** 103:13 105:23
**confirm** 29:3 41:10 49:6 81:25 86:18 94:18 185:10
**confusing** 58:20
**conical** 62:11 200:7,25
**conjunction** 15:16 33:20
**connected** 72:15 72:24
**consensus** 113:17 113:19
**consent** 4:4 64:23 65:1,5,8 66:4,8
**consequence** 133:13 196:2
**consequences** 18:22 22:1 61:14 132:16 161:3 200:5 201:15
**consequent** 201:15
**consider** 25:21 26:6 27:3 33:3 44:4 55:1 59:17 60:7 154:5 178:3 202:2
**consideration** 147:12

**considered** 27:4 31:4 55:15,17 56:20 153:12 213:8 214:20
**consistent** 45:8 80:10
**constantly** 132:13
**construction** 186:15
**consultant** 164:24 167:7
**consultation** 161:8
**contact** 80:9 87:5
**contacted** 96:5
**contain** 148:11,14
**contained** 66:13
**contains** 136:20
**contemplating** 189:22
**content** 210:22,24 211:1
**contents** 71:4,4 72:9 136:20 184:1
**continue** 42:25 54:7 97:16 129:11
**continued** 4:1 5:1 6:1
**continues** 190:9
**continuing** 126:24 128:10
**continuously** 14:3
**contraindication** 38:3 46:21,24
**contrary** 145:13
**contrast** 4:10 79:3
**contribute** 173:20
**contributed** 170:23 171:3
**control** 142:19
**controlling** 137:5

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[conventional - day]**                                                                              Page 9

**conventional**
  84:15
**conversation** 51:2
  52:5 57:21 74:5
  109:12 147:3
  148:25 149:2,3,7
  150:6,7
**conveyed** 102:21
**cook** 1:4,9 2:14,14
  2:14,15 5:14 7:14
  7:16 24:20 53:5
  53:10,16,20 55:2
  55:19,21 58:24
  61:24 66:22 98:6
  99:13 100:24
  103:14 104:9
  106:9,12,20
  107:25 108:2,8,12
  108:14 111:12,15
  112:5 113:6,10,20
  113:21 119:9
  120:5,14,16
  121:17,22 122:6
  122:16,17 123:18
  124:13,23 148:2
  150:22 151:8,24
  152:24 153:2,6,6
  155:9,14,17,17
  157:21 158:5,17
  161:24 167:6
  174:23 176:16,23
  177:11,15 178:17
  179:16,23 180:1
  182:25 183:22
  201:20 202:6
  203:3 211:25
  212:1,7,10,12,17
  212:20 213:12,17
  213:21 215:10,17
  215:23 218:7
  219:3 220:3

**cook's** 101:12
  113:17 164:24
  180:7 181:4
  201:18,18
**cookmdl2570** 5:11
  5:13 103:1 105:7
**copies** 83:7 166:25
**copy** 13:9 32:3
  65:4 75:13 79:6
  81:25 82:5 89:24
  105:17 117:17
  119:7 129:15
  145:16 167:1
  174:9 188:13
**cord** 47:2,3,13
  48:3
**cordis** 24:19
  202:12
**correct** 8:10 9:16
  9:17 12:21,25
  25:17 31:24 32:7
  40:14 41:14 62:1
  69:19 75:20,23
  78:4 83:12,14
  94:21 95:12
  107:21 109:14
  110:11 113:7
  120:12 122:4
  156:14 165:8
  178:17,22,23
  180:3,5 185:1
  187:11
**corrections** 218:14
  220:17
**correctly** 46:4
  49:25 69:17 76:23
  77:5,19,25 79:19
  87:16
**cost** 179:8
**counsel** 2:1 7:8,18
  198:1

**counting** 11:1
**county** 217:4
  219:10 220:15
**couple** 16:9 17:20
  38:12 41:16 43:1
  44:25 45:25 60:10
  69:21 74:10 91:22
  106:5
**course** 12:15 19:5
  19:16,24 20:18
  22:4 24:1,15
  54:11,14,17 98:20
  98:25 113:16
  125:8,14 164:12
  194:9 201:7
**court** 1:1 7:19
  217:6 219:7
**covered** 143:11
**crease** 110:24,25
**create** 43:11,15
  175:9
**creating** 141:18
**creek** 10:11
**crest** 131:6
**criteria** 129:4
  191:8
**critically** 202:18
**crystal** 19:12
**ct** 4:10 79:3,7,11
  90:4,6,22 194:19
  194:21 195:9,10
  195:16
**curbside** 85:1
**cure** 9:3
**curiosity** 108:25
**current** 44:25
  190:10 207:18
**currently** 9:23
  193:1
**curriculum** 3:14
  13:4,9

**customary** 80:20
**cut** 136:14 139:10
  139:10 142:23,25
  143:24 144:17,21
  157:1
**cutters** 139:10
  144:21
**cutting** 140:3
**cv** 1:10

**d**

**dallas** 2:4
**damage** 51:18
  65:14
**damaged** 163:24
  164:2,11
**damaging** 116:21
  144:20
**daniels** 2:16
**dark** 188:24
**darrell** 104:15,17
  104:24 105:12
  106:24,24 107:11
  107:14,16,22
  108:1,5
**data** 121:8 154:23
  160:25 180:9
**date** 40:7 86:23
  130:6 138:3
  151:16 177:3
  218:9 219:3,9,19
  220:3,13,25
  221:20,25
**date's** 177:3
**dated** 75:15
  105:11 109:22
  174:24
**dates** 110:5
**david** 2:24
**day** 8:8 37:2 42:17
  68:10 80:25 81:18
  87:21 94:24

**[day - difference]**                                                                                                Page 10

157:14 217:17
219:16 220:22
221:22
**days** 48:17 76:11
93:20 218:20
**dc** 2:10
**deal** 52:18 86:13
**dealing** 15:4,5
**dear** 218:10
**death** 21:17 47:16
65:15 66:6 116:25
160:4 213:18,22
215:17
**decade** 28:12
57:16
**december** 12:2
41:20
**decide** 83:25
126:20 128:24,25
161:9
**decided** 114:14
127:13 129:2
**decides** 179:3
**decision** 25:10,14
27:8 48:15,20,24
53:11 55:12 58:22
58:24 59:1,7
63:14 84:3,13,15
84:20,22,23 92:1,4
92:7 97:25 98:9
115:7 127:4,7,12
127:13,24 134:10
135:3 144:25
145:1,7,11 146:10
146:25 147:1,8,15
147:15 150:2,13
170:2 178:20
179:13 180:3
184:13 189:21
**decisions** 109:3
133:16

**deed** 219:14
220:20
**deemed** 23:16
218:21
**deep** 20:20 21:3,5
21:13,14,16,20
173:17 189:19,23
**defective** 164:12
**defendants** 2:14
**defer** 145:13 209:6
209:11
**deficit** 47:12,18,25
**define** 181:13,16
181:22 182:1,12
214:23
**defining** 181:18,19
**definition** 179:22
180:2 211:6
**definitively** 193:5
**degenerative**
196:3
**degree** 153:15
185:20 186:17,18
**dehydration** 30:6
**delay** 171:17
**demonstrate**
121:9
**denali** 120:4
202:22,23 203:3,8
**denies** 77:24
**dennis** 6:4 166:22
**department**
107:23 179:12
218:23
**dependent** 178:21
**depending** 35:1
60:23 72:6 187:17
**depends** 22:7,7,8
29:14 160:25
181:13 214:23

**deploy** 56:9 68:21
166:17
**deployed** 68:22
**deployment** 25:7
25:17 26:25 54:24
55:1,7 56:1,14,17
60:2 177:19
**deploys** 166:19,19
**deposition** 1:14
3:2,13 7:1,7 8:2
11:7,11,17 26:11
112:14 127:3
144:24 145:4
146:9 162:12
212:23 216:6
217:9,10 218:9,11
219:1,3 220:1,3
**depositions** 26:12
**depth** 61:9
**dermal** 136:15
**describe** 69:23
138:18 140:11
186:7
**described** 27:3
37:10 52:9 71:7
165:17 198:17
**describing** 70:1
192:21
**description** 3:10
4:2 5:2 6:2
**design** 60:20,24
61:3 62:7,7,10
186:15 200:7
**designed** 22:23
23:21 122:7
173:21 191:24
**despite** 113:4
143:6
**detachment** 175:8
**details** 181:15
183:12 200:18

**determination**
127:8 169:22,24
209:12
**determine** 12:10
27:15
**determined**
128:19 162:21
**determines** 150:3
**developed** 76:20
**developing** 20:20
22:6 28:6,24
29:11,20,24 30:9
**development**
214:14
**device** 19:20 23:20
72:16,16 118:14
118:15 121:10,12
147:21 148:12,18
148:18 149:19
156:8 160:3
187:25
**devices** 19:18
23:13 56:4 123:15
124:2 183:5
186:15 202:20
209:15,24
**diabetes** 30:2,3
**diagnosed** 100:5
**diagnostic** 168:24
169:1
**diagnostics** 168:19
**dictate** 42:19
**dictated** 42:21
111:5
**die** 47:14
**died** 37:2,14
173:11 213:1
**diet** 59:18
**difference** 8:5
21:22,23 181:20

**[differences - dubois]**                                                Page 11

**differences** 157:22
 157:24
**different** 18:13
 19:17 24:11,11
 27:9 33:19 36:5
 67:21 74:15,16
 83:7,14 99:11
 115:14 124:1
 126:15 185:18
 190:12 194:14
**difficult** 63:10,14
 70:6 74:11 134:8
 139:16 144:19
 197:15
**difficulty** 43:21
 82:18
**dig** 117:8
**dimension** 187:15
**dimensional**
 186:24
**dimensions** 187:4
**direct** 100:24
**direction** 72:6
 187:22 188:3,7
**directly** 16:16
 107:4
**disagree** 195:14
**disc** 46:1 196:3
**discharged** 93:24
 94:3
**disclose** 149:22
 158:10 183:5
**disclosed** 149:25
 157:23
**discovered** 108:14
 170:12
**discuss** 138:12
 145:23 154:6,11
 155:6 190:13
**discussed** 43:2
 45:6 52:10 107:3

111:11 138:14
 156:9 189:14
 204:6
**discusses** 101:12
**discussing** 52:9
 154:5 155:3
**discussion** 50:25
 74:21 85:2,25
 110:14 111:15
 113:15 146:24
 156:3,11 158:18
 162:15 163:13
 174:2 177:10
 190:8 191:8
**discussions** 74:20
**disease** 46:1 196:3
**disfiguring** 65:14
**displaced** 99:10
 131:3
**displacement** 92:9
**dispute** 145:2,5
**dissected** 138:23
**dissecting** 16:18
**dissection** 137:3
**dissections** 43:22
**distal** 142:19
**distinction** 171:16
**district** 1:1,2
**divide** 71:2
**division** 1:3
**doctor** 26:11 32:9
 102:8 103:24
 104:14 106:15
 108:4 109:19
 116:6 117:15,25
 120:21 123:19
 129:20 135:9
 137:21,22 138:16
 140:13 141:7,22
 142:13 145:25
 146:22 148:23

151:6,17 158:16
 159:5,24 163:4,23
 165:9 166:6 167:5
 170:22 171:7
 172:8,24 184:6
 212:8 214:7
**document** 1:9 3:15
 31:9 105:12 124:3
 141:20 167:19
 173:22 188:10
**documenting** 44:5
**documents** 11:17
 11:20 104:2,9
 106:12 151:14
 167:15 174:14
 183:22,22,23
 184:4,8,12
**doing** 17:1,2 43:12
 43:22 94:25
 124:25,25 157:4
 166:3 191:6
**donnelly** 151:20
**door** 144:11
**doubt** 59:10,12
**dr** 3:13,16 4:15,21
 5:5,17,20 7:7 9:15
 9:22 10:19 11:7,9
 11:16,23 12:17
 13:6,12 14:2 15:9
 18:12 20:12,17
 22:5 24:10 25:17
 26:22 27:18 28:2
 28:4,16 29:9,23
 30:21 31:7,10
 32:5 33:2,5,8,11
 33:14,21,22,25,25
 34:7,12,20,24 35:5
 35:12,12 36:7,12
 36:13,24 37:13
 38:8,9,21,24 41:1
 41:10 42:14,25

44:3,24 47:6 49:6
 49:7,11 51:7 52:8
 53:14 54:13 56:16
 56:24 57:25 58:7
 58:22 59:19,23
 61:17 62:13 63:17
 64:3,12,16 65:4
 66:3,9 67:13 68:2
 69:2,4 71:5 72:1
 72:11 73:5,11,17
 75:4,8 76:23
 78:22 80:5,7
 81:17,25 82:4,23
 83:24 84:22 85:20
 86:21,24 87:14,20
 89:9,15,23 90:4,8
 91:18 94:23 95:5
 95:25 98:12 99:14
 102:9,11 107:1
 137:19,25 138:10
 144:23 145:6,18
 145:20 146:1,9,24
 146:25 147:4
 151:14 164:24
 165:3 166:24
 167:6,20 169:2
 174:14,17 183:17
 184:16 185:6,8,13
 188:16,19 189:5
 192:12 193:9
 194:6 198:25
 199:24 201:16
 202:23 203:6
 204:25 205:3,20
 212:23 216:3,6
 218:5
**drape** 69:1
**drapes** 68:23
**dressing** 68:23
**dubois** 5:10
 102:25 104:22

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[duly - evaluation]**

Page 12

**duly** 7:22 217:9
**dunwoody** 1:20
  218:5
**duration** 71:25
  72:21 125:15
**dvt** 21:10 22:6,14
  23:18 27:20 28:5
  28:6 30:16,19,23
  33:1 38:12 39:13
  39:14 40:23 41:20
  41:25 44:6 46:4,6
  46:16 48:10,18
  49:22 60:6 76:22
  189:15 191:25
  192:7
**dwell** 176:5
**dye** 128:18
**dying** 21:24 173:1
**dynamic** 186:9
  202:17

**e**

**e** 5:9,12,22 6:5
  102:24 103:4,22
  104:21,23 105:1,5
  105:11 106:4,23
  107:9 151:3,8
  174:4 184:15
  217:1,1
**earlier** 33:11
  42:13 49:17 50:6
  54:22 56:16 62:4
  71:7 83:19 109:17
  113:22 127:1,3,5
  146:9 157:11
  162:11 165:17
  178:6 186:3
  187:12 188:20
  189:6 199:12
  201:9 202:21
  205:20 206:14
  212:22 213:2

**early** 13:22 33:24
  35:17 36:23 54:4
  89:9 106:5
**ease** 31:14 104:18
**easier** 139:11
**easiest** 51:8
**easily** 203:5
**easy** 55:21 122:23
**education** 13:13
  27:12 58:2 63:23
  67:24
**educational**
  176:21 177:15
**effecting** 116:21
**efficacy** 97:20
  208:11,17 209:11
**effort** 113:9
  126:24
**egg** 140:10
**ehibit** 4:12,14
**eight** 34:13
**either** 18:22 26:19
  26:20 30:6 31:17
  31:23 108:7 120:6
  130:6 152:24
  154:11 155:22
  171:16 177:11
  196:22
**elasticity** 140:8
**elected** 73:13
**electronically**
  130:11
**elements** 177:18
**elmo** 101:1,22
**email** 218:18
**embedded** 63:3
  121:20 143:19
**emboli** 209:1
  215:5
**embolism** 20:21
  22:14 28:9,11

29:12 30:10 37:11
  46:15 173:1,4
  175:9,10 204:3,10
  208:12
**embolization**
  62:17 199:13
**embolize** 84:18
**embolus** 21:17
  22:25 23:25 26:4
  26:8 30:20 37:3
  46:13 74:7 84:9
  173:12 190:21
  191:25 192:8
  208:16,18,23
  209:16,24 210:3,3
  210:6,13 211:3,7
  212:2,13 213:1,13
  214:12,14 215:9
  215:18
**emergent** 91:14
**emory** 1:19 10:2,9
  13:23 218:5
**emphasis** 57:15
**encased** 90:23
  164:6
**enclosed** 218:11
**ended** 13:25
  164:22
**ends** 130:8
**engage** 82:21
  123:15 125:3
  126:19 127:17
**engaged** 124:24
  127:25
**engaging** 82:18
**engineer** 108:9
  186:16
**entered** 220:9
**enthusiasm** 35:19
  74:15

**enthusiastic** 98:4
**entire** 54:17
  105:19 187:24
  219:5 220:5
**entitled** 3:15 31:9
**entry** 32:1
**epidemiologist**
  209:5,9
**equal** 25:25
**equally** 10:24
  153:9 154:13
  201:21
**equipment** 72:23
**equivalent** 26:8
  59:17 153:13
  178:3 202:3
**er** 76:21
**errata** 218:14,17
  218:20 220:7,10
  220:18 221:1
**error** 49:18
**especially** 74:13
  176:2
**esquire** 2:2,8,15
  2:16
**essentially** 16:13
  32:25 37:24 39:3
  43:19 68:25 71:21
  73:2 90:14,23
  93:1 130:23 131:1
**established** 115:9
**et** 1:10 43:9 218:7
  219:3 220:3
**europe** 2:15
**evaluate** 55:4
  76:19,22
**evaluated** 31:4
  89:7 145:25
**evaluation** 78:7,14
  196:22

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[event - fact]**                                                                                          Page 13

**event**  38:1 47:17
  61:2 77:14 177:11
  177:14,15 190:2
  203:17 204:1,14
**events**  76:20 176:6
  198:12,17
**eventually**  37:19
**evidence**  92:9,12
  115:3 128:11
  129:4 131:21
  132:11 154:23
  170:6,7 180:9
  192:17 211:25
  213:4,4,16
**evidenced**  124:17
**evident**  201:3
**evolved**  25:2
**exact**  190:24
  194:24
**exactly**  14:23
  58:17 131:14
  132:9 139:12
  142:20
**exam**  42:12 45:12
**examination**  3:5
  9:11 45:7,9 99:17
  172:22 183:15
  206:4
**examined**  7:23
**example**  178:21
**excision**  43:9
**exciting**  143:1
**excuse**  8:17 28:3
  105:21 181:5
  206:7 210:12
  212:5 213:6
**executed**  105:22
  220:10
**execution**  219:14
  220:19

**exercise**  39:17
**exhibit**  3:11,12,14
  3:15,17,20,22 4:3
  4:4,6,8,10,16,18
  4:20,22 5:3,4,6,8,9
  5:12,14,16,18,20
  5:22 6:3,4,5 11:6
  11:10,14 13:4,7,9
  31:9,13 32:1
  38:18,22,24 41:6,7
  41:10 49:1,5,6
  64:25 65:4 68:4,5
  75:11,14 79:2,3,6
  80:2,6 81:20,24,25
  82:5,23 83:1,5
  86:18,20 87:13
  89:21,24,24 91:17
  91:21 94:15,17
  95:8,11 101:11
  102:23,24 103:3
  103:10,17,17,21
  103:21 104:15
  105:5,9,10,22
  106:2 109:15,16
  109:22 117:15
  118:1 119:5,8,9,14
  119:15,16 129:15
  129:16,17,20
  130:1,7 137:18,23
  140:21 141:4,8
  145:20 146:21
  151:2,3,7 158:17
  165:11,12 166:21
  166:22 167:5
  174:4,17 180:17
  188:12,15,19,19
  189:5 198:14
**exhibits**  3:10 4:2
  5:2 6:2,13 117:9
  165:10 171:18

**existing**  154:23
  180:9
**exited**  192:18
**expect**  148:2,5,6
  164:4 183:4 207:2
  207:6
**expected**  184:18
  184:20
**expecting**  94:9
**expects**  52:6
**experience**  12:5
  13:13 15:25 17:1
  20:7,10 27:11
  34:21 35:11,18
  36:24 37:4,13,21
  55:20 56:1 58:2
  60:17 62:4 63:6
  63:24 64:6 67:24
  89:11 91:7 97:24
  97:25 98:8,13
  109:2 172:25
  191:14 201:24
  202:5 204:1,13
  214:1,1,3,4,6,11
  214:15,19,19,21
  214:24
**experienced**  98:21
  98:22 99:23
  184:19 205:7,25
**experimental**
  175:2
**expertise**  17:5
  115:11 116:6
**experts**  121:18
**expiration**  219:19
  220:25 221:25
**explain**  15:19
  21:23 49:11 68:8
  71:18 199:23
**explained**  76:19

**explanation**
  104:19 192:11
**expose**  15:25
  17:11 135:12,13
  139:5
**exposed**  16:3 93:1
  138:20
**exposure**  16:6,7,9
  17:13 32:23,24
  33:3 34:25 37:1
  38:15 43:12,16
  46:2,8 47:2 48:12
  49:23 50:7,25
  51:6 52:14 70:18
  71:22 93:12
  147:11
**exposures**  18:1,9
  75:3
**expressed**  38:9
**expressly**  218:12
**extended**  24:25
  153:24
**extensive**  29:21
**extent**  90:17
  147:12 199:23
**extra**  48:12
**eye**  133:9

**f**

**f**  2:14 217:1
**fabric**  60:21
**face**  18:18
**facilities**  10:9
**facility**  178:22
  179:2
**facing**  29:10,19
**fact**  9:22 27:7
  32:24 48:13 61:7
  63:22 81:3 100:1
  121:16 122:14
  153:5 161:23
  180:23 191:17

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[fact - filter]**                                                       Page 14

192:4 198:11
207:9 208:25
209:4
**factor**   25:10,14,21
38:13,14 44:2
55:11 127:24
162:14,16,17
186:14
**factored**   179:8
**factors**   22:9 27:2,4
27:15 31:3 46:16
48:7 54:23 56:20
147:13 189:20
**facts**   155:12
**faegre**   2:16
**faegrebd.com**
2:19,19
**failed**   42:3 188:11
**failure**   170:23
171:4
**fair**   20:12 33:25
57:14,15 98:12
127:20 143:21
184:18 185:4
**fairly**   36:23 37:23
93:13 109:25
**familiar**   53:17
66:9 183:11
**far**   31:24 46:4
109:7 175:10
209:6
**fascia**   69:24
136:19
**fat**   70:2,12
**fatty**   136:18
**favorite**   74:9
**feature**   55:15
**features**   153:3
158:3,6,8,13
**february**   1:16 3:4
7:3 32:2 41:19

49:16 176:17
177:5
**feel**   37:18 113:5
150:11,11,15
185:21 192:2
**feelings**   26:15
**feels**   140:12
**feet**   39:25
**fell**   205:6
**fellow**   104:22
**felt**   77:1 86:12
95:1 111:20 125:4
129:11 145:12
191:7
**femoral**   68:18
152:8,9
**ferrill**   1:24 217:6
217:20
**field**   14:9,20 17:7
17:8,9 71:5
**fifteen**   125:22
**filed**   203:7
**files**   110:9
**film**   208:2,8
**films**   112:16,16
167:8,25 168:3,9
168:22 185:20
196:8,9
**filter**   5:14 12:5,11
12:19,22 23:17,18
23:19 24:7,22,23
24:23 25:14,24
26:1,7,24 27:3,10
27:16 31:5 32:10
32:14,17 33:3
34:8,11,22 35:3,8
37:19 38:6 44:5
46:10,11 48:8,21
48:24 49:12,24
50:3,17 51:3,11,13
53:4,8,9,16,19,20

53:23 54:1,6,7,11
54:20 55:1,10,13
55:15,17,21 56:2,8
56:18,21,25 57:6,8
58:1,10,23 59:8,11
59:14,16,21,22,24
60:11,24 61:4,13
61:19,19,22 62:11
62:17,21 63:1,9,18
63:19,19 64:14,18
64:19 65:5 66:5
66:12,18,19,23
67:9,16,23 68:15
68:21,22 69:5,14
69:16 73:13,23
74:6,7 75:9 76:2,7
76:19 79:15,18
80:13,18,21 81:18
82:6,12,17,19
83:17,22,25 84:4,4
84:8,11 85:6,7,11
85:15,16 87:2,11
88:3,9,16 89:5
90:5 92:2,7,21
93:2,15 96:8
97:11,15,16 98:1,4
98:6,9 99:2,4,4,7,9
99:10,12,13,19,22
100:4,5,21 101:14
102:12,17 106:21
108:15 110:14,14
111:21 112:1,7
113:6,12,25 114:6
114:8,10,16 116:4
118:4,14,18,25
119:1,9,20,23,25
120:3,6,16,21
121:2,3,6 122:1,7
122:8,14,20 123:2
123:3,4,5,7,8,11
123:11,12,21,25

124:15 125:16,17
127:20 128:20
129:1,10 130:23
131:1,21 132:17
132:24 133:3,17
133:21,25 134:5
135:4,14,18
137:13 138:12,19
139:2,5,22 140:14
141:11,15 143:8
143:11,16,17,21
144:25 145:7
147:1,4,9,12,17
148:2 149:8 152:7
152:12,16,25
153:14 154:2,4,7
154:22,24 155:1,7
155:14,18 156:10
156:13,15,18
157:11 158:2,4,5,8
158:9,14 159:9
161:2,9,24 162:15
162:16,19,24
163:2,4,14,18,23
164:1,4,9,11,15,20
164:25 165:4,19
165:19 166:7,13
166:17 167:8
168:18 169:12,13
169:17,22 170:8
170:23 171:3,4
173:3,6,11,20
175:6,11,25 176:1
176:2,7,12 177:1
177:19 178:6,12
178:18 179:2,17
181:23 183:9,9
184:25 185:10,14
185:17,23,24
186:13 187:3,7,15
188:6 189:21,25

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[filter - form]**                                                                            Page 15

190:11,12,18,19
191:2,4,10,11,20
191:23 192:5
193:19 196:11,12
196:19,23 198:23
199:2,13,14,14,18
200:7,16,25,25
201:2,17,18,18,25
201:25 202:2,14
202:21,22,23
203:3,18,23 204:3
204:17,18 205:1,6
206:12,16,17,22
211:9,25 212:1,7
212:12,17,20
213:5,12,17,21
214:13 215:10,17
215:23
**filter's** 25:20
56:19 159:6
191:24
**filters** 1:4 24:2,4
24:11,15,19 25:1,2
25:3,6,21,24 26:1
35:13 36:15,21
37:8,15 47:7
50:22 51:8,14,17
51:22 54:14,24
57:18,19 59:25
60:15,19 61:5,8,25
62:5,6,8,23 63:5,9
63:13,20,24 64:4
67:15 74:2 98:1
98:14 99:20 100:9
100:10,12,14
102:10 121:20
122:18 145:11
150:19,22,23
151:10 153:24
154:10 162:5,13
164:6 170:17

173:12,14,16,16
175:17,21,24
177:11,12 178:1,1
178:3 181:24
188:1 199:3,10,22
199:25 200:3,6
201:20 202:6,6,9
202:12,12,13,13
202:17 203:19
204:21 205:21
206:22 208:11,15
208:17,22,25
209:10,12,19,23
210:5,12 211:2,22
212:9,10,25 214:7
215:4
**final** 103:17
**find** 61:5 73:21
102:16 103:24
120:5 130:6 134:8
134:10 140:19
160:11 180:8
197:15 202:19
218:11
**findings** 130:22
**fine** 9:5 64:15 95:3
104:8 172:12
**fingers** 117:11
**finished** 13:17,23
169:23
**finishes** 64:10
**first** 3:12 11:6
13:25 15:14 24:6
31:12 32:1 39:6
39:12 41:2,11,17
41:18 46:1 54:1
54:25 59:21 67:5
75:24 76:11 77:13
79:11 99:22
104:16 119:16,17
120:13,15 122:3

124:8,10,16 126:4
151:17 171:10
183:21 188:23
189:10,21 213:4
**fit** 205:5
**fits** 205:24
**five** 103:4 171:20
**fix** 188:25
**fixation** 111:16
112:3
**fixed** 71:24 72:20
73:2,3 90:20
193:2
**flexibility** 186:4
**flight** 106:5
**flights** 107:8
**floor** 174:1
**florida** 176:17
**flow** 115:10 137:6
**fluoroscopy**
128:17 164:17
165:20,21,23
168:20,24 169:1,4
169:6,7 187:12,13
187:18 188:2,7
196:23
**focus** 22:10 89:17
**focused** 27:21
**fold** 139:4
**follow** 5:6 73:19
75:21 85:25 86:15
94:15,18 129:13
183:18 193:14,15
195:11
**followed** 88:4
202:18,19
**following** 40:6
49:7 54:6 73:17
77:15 78:23 83:24
85:20 86:5,9
87:22 96:18,21,25

97:15 185:3,6,14
193:15
**follows** 7:24 75:4
**followup** 85:22
88:18 185:16
**forces** 186:12
**foregoing** 219:13
220:18
**foreign** 143:13
**form** 4:5 8:13,24
20:15,25 21:15
28:14,22 29:1,13
31:1 34:23 35:19
35:22 36:18 38:16
39:9 53:12 55:23
56:22 58:6,11,16
62:2 63:7,25 64:7
65:1,19,24 66:15
67:10,18 68:1
73:15 74:4 77:12
85:12 89:3,13
97:21 98:2,11
100:15 104:11,12
106:11 108:17,23
109:6 110:3,21
113:13 115:17
116:8 118:7,22
120:8 121:21
122:10 126:6
133:24 134:25
136:4 139:19
145:3 146:6
147:23 149:5
152:19 153:10,18
154:1 155:4,20,25
156:7 157:25
158:11 159:12
160:17 161:18
162:6 165:5
169:15 170:24
173:15 175:18

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[form - going]** Page 16

176:13 178:10 179:4,24 180:4,13 180:25 181:8 183:1 184:14,22 187:1 193:3 196:6 198:7 199:5 200:1 201:22 207:20 209:14 210:14 211:13 212:15 214:9,22 215:19

**forms** 143:12

**forth** 217:9

**forward** 26:17 133:8 218:17

**found** 77:1 102:9 102:12 116:17 154:17 160:1

**four** 10:19 27:2 72:14 103:4 126:2

**fracture** 12:11,22 13:2 60:8 61:19 63:19 83:22 84:17 97:11,16 99:4,7,9 108:14 131:4 160:4 161:2 167:8 199:13 200:14 201:5,12 202:13 202:13,15,24 203:1,2,9 204:7,11 204:17

**fractured** 12:19 79:15,16,23 84:11 90:5 98:14,18 99:20,22 100:4,5 100:14,20 102:13 102:17,18 114:21 115:14 116:4 131:21 133:22

**fractures** 80:19 111:3,9 131:3 202:7,10,20

**fragment** 78:15 81:18 90:19,23 92:9,13 96:12 131:9 134:12 192:13,15,18,22 193:1,11,20 196:11,18,25 197:4

**fragmentation** 113:25

**fragments** 131:16 132:12 193:6,17 194:13 195:6 196:7 197:9 207:13,23,24 208:5,6

**frankly** 25:11 35:2 35:5 47:5 50:24 51:6 98:3 114:9 115:19 124:19 127:19 154:6 178:1 194:22 198:22

**free** 114:16 127:23 139:6 143:17 219:14 220:20

**frequently** 17:14 46:19 197:14

**front** 13:7 16:13 17:17 76:17 82:23 87:13 101:15 135:7 136:23 148:22 174:17 187:10,16

**frye** 6:5 174:4,23

**fully** 138:22

**fulton** 217:4

**function** 65:12 116:21

**further** 78:7,13 84:16 89:19

113:25 217:12

**fusion** 46:14

**future** 28:6

**g**

**ga** 218:6

**gain** 68:17 70:19

**gainesville** 176:16

**gathered** 182:25

**gears** 64:17

**general** 15:24 25:6 26:6 46:18 55:18 60:20 61:4 68:20 113:17 148:24 178:2 197:15,16 200:6 208:15,17 212:16

**generally** 35:7 51:14 71:8 80:11 89:12 125:21 140:9 200:12

**generate** 169:4

**generation** 158:4

**georgia** 1:22 3:17 3:20 4:12 9:20 10:5 38:18,25 41:7 80:2 217:2,7

**gestalt** 133:1

**getting** 104:24 128:18 132:18 143:22 163:7 188:24 190:10 200:17

**gi** 93:20 96:6

**give** 18:17 24:14 34:2 52:25 59:11 85:22 95:18 104:6 106:3 108:20 125:5 137:21 161:11 171:25,25 172:13 182:16 188:11 203:14

210:16

**given** 25:13 26:12 32:23 46:8 49:23 65:16,16 126:23 147:12 155:23 169:19 191:20 217:11

**giving** 110:8 125:4

**go** 11:3 13:19 18:6 18:22 24:23 26:17 29:2,7 33:16 43:17 44:21 48:5 48:5 56:4 61:16 65:20 93:13 101:8 101:22 115:18,21 115:25 120:3 124:3,14 131:18 135:3 136:2,17,17 136:19 141:23 142:5 146:18 154:19 157:20 162:22 163:11 168:6 172:16 175:1 185:20 205:15 207:17 208:12

**goes** 20:13 116:2 179:2

**going** 16:1 22:8 26:14 28:20 29:2 31:19 43:11,13 46:17 47:1 48:11 52:18,19 57:9 59:18 62:18 65:17 65:20 74:6 91:21 92:14,16 93:13 101:7,17 102:22 105:8 114:10 115:22 117:8 118:3,23 119:8,13 122:22 123:1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[going - high]**                                                    Page 17

125:15 127:11,15
128:11 129:6,12
129:15 130:15,19
132:5,6,12 133:2,8
133:8 136:14
137:22 139:15,23
139:24 141:7
145:15 146:20
147:18 151:6,7
155:10,11 158:16
161:11 166:21
167:1,4 171:9
172:5 175:10
179:17 183:14
185:3 187:24
190:25 197:17
200:19 202:19
205:9 215:13
**good** 9:6 37:2
44:11 74:23 95:23
119:6 126:25
170:9 172:16
190:1 195:7,11
**goose's** 126:17
**gooseneck** 126:14
**grab** 139:9 200:7
**grafts** 19:25
176:22
**great** 66:5 106:7
107:7
**greater** 28:17,18
29:11 153:15,24
154:17 203:3
**greatest** 176:11
**greenfield** 24:19
59:14,16,20
202:14
**griffin** 6:4 164:24
165:3 166:22
167:6,20 169:2

**griffin's** 166:24
**groin** 51:15 68:17
68:23 110:24,25
111:1
**ground** 165:18
**group** 208:23
209:13,23 210:5
**grown** 90:24
**growth** 175:11
**guarantee** 19:8
100:8,11,13
134:20,23
**guarantees** 19:15
65:9 135:1
**guess** 13:17 35:21
53:24 88:24
127:18 137:16
208:11
**guessing** 51:1
125:1
**guest** 176:16
**guidewires** 20:1
**gunther** 122:8
123:3,12 125:17
126:4 153:6
**gut** 45:16
**guys** 188:13

**h**

**h** 176:10
**habitus** 70:3
**half** 26:3 161:13
161:15,24
**hand** 80:6 83:4
94:17 101:17
102:22 105:8
118:10,23 119:13
129:15 137:22
141:7 145:15
151:6 166:21
167:2,4 217:17

**handing** 31:12
38:21 41:5 49:4
75:14 79:1 81:23
89:23 91:20
104:14
**hands** 117:10
201:20
**hanson** 5:23 151:4
**happen** 16:23
37:11 100:22
101:20 114:10
116:14 129:14
**happened** 12:13
60:15 74:21
100:21 108:21,22
141:21,24
**happening** 89:5
**happens** 70:9
**happier** 129:12
132:18 133:11
**happy** 56:12
190:12
**hard** 10:16,20
55:22 85:2 122:23
126:7,9 181:14
182:7
**hardening** 15:5
**harder** 128:5
**harm** 60:18 90:16
126:25 193:12,18
197:17
**harm's** 16:15
17:11,21
**head** 117:7 128:23
195:20 214:16
**healed** 45:19
**health** 37:2 197:13
**hear** 87:3 106:25
157:2
**heard** 22:19 50:6
201:8 204:16

**heart** 15:1 23:1,24
116:3,5,12,17,18
116:23,24 196:13
196:19
**heaviside** 2:8,8 3:8
7:10,10 8:2,12
10:15,23 32:12
82:2 101:18
103:12 105:21
117:19 140:20
146:11,14 157:2
167:3 168:10
171:10,12,22
172:3,19,23
173:23 174:8,11
174:16 175:20
176:15 178:15
179:14,25 180:6
180:16,19 181:4
181:10,16 183:4
183:13,19 203:16
**heighten** 30:22
**hello** 104:15,17,24
**help** 104:18 109:3
**helpful** 182:23
**helping** 191:4
**hemodynamic**
175:3,14
**hemodynamics**
175:17
**hemorrhage** 160:4
**hereinbefore**
217:9
**hereunto** 217:16
**hey** 152:3,6
**high** 23:16 29:23
48:19 93:13
180:23 189:16
192:1,3 203:9
211:10

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[higher - increased]**                                                    Page 18

higher   18:6
highlighted   39:24
history   4:16 28:2
  28:4,5 30:7,8,23
  33:1 39:14,16
  41:20 42:11 48:19
  48:23 81:20
  189:15 190:25
  192:19
hold   56:7 71:21,24
honestly   21:1
  29:14 35:15 42:11
  85:23 112:2
  127:16 132:25
  163:7 180:14
  193:4
hook   82:19,21
  123:15 124:24
  126:19 127:17,25
  175:5,7
hooks   60:23 144:2
  144:2,18,21
hope   52:24
hopefully   16:15,20
  41:4 104:19
  106:25 186:21
hopes   21:9
hosp   4:5,7,11 5:19
  65:1 68:6 79:4
  141:5
hospital   4:4,6 10:2
  10:5,12 25:13
  31:16 35:17 59:2
  64:25 68:5 93:24
  120:6 150:19
  151:9,9 152:8
hospitalized   40:21
  40:24
hospitals   9:23
  10:4 83:14

hour   72:22 125:9
  125:14,23
hours   10:19 46:18
  125:7 171:15
  203:12
hrzlaw.com   2:11
huge   181:20
huh   138:6 142:14
  159:1,4 167:11
  189:9 195:24
  196:15
humans   181:6
hundreds   54:18
  99:1,1 209:18
hurt   26:14
hydration   186:11
hypothetical
  155:10 161:12,20
  164:10 182:4,8
  196:12 200:18
hypothetically
  154:20,21,22
  156:1 162:2,20
  196:13
hysterectomy   43:8

**i**

idea   18:17 24:14
  51:4,5 93:12
  95:23 107:18
  108:11,15,18
  150:24 179:1
  195:12 197:16
ideally   42:24 74:8
identification   3:11
  4:3 5:3 6:3 11:8
  13:5 31:11 38:20
  41:8 49:3 65:2
  68:7 75:12 79:5
  80:4 81:22 83:3
  86:22 89:22 91:19
  94:16 95:9 103:2

105:7 119:12
  137:20 141:6
  145:22 151:5
  166:23 174:6
  188:17
identified   119:19
  180:10
identify   7:8
  119:18 130:5
  141:9
ifu   67:6,8 198:22
  198:23 199:17
ifus   67:4
ileus   19:1
iliac   18:7 71:15,17
  72:5 131:6
illness   30:5
image   187:21
imaged   100:18
images   107:6
  169:5,10 185:21
imagine   60:21
imaging   78:23
  90:22 185:12,23
  186:22 187:14
  193:24 194:8,20
  196:17
immediate   69:7
immediately   143:5
immobility   30:5
impart   161:7
imparted   153:22
implantable   19:17
  19:20
implantation
  157:10 165:11
  175:11 177:1
implanted   32:14
importance   150:5
  150:8

important   27:8,15
  107:3 150:12
  153:16 160:16,20
  180:1 198:25
  210:25
impossible   63:11
impression   45:24
  46:1,3 73:11
  79:11,14 89:1
impressions   73:6
inc.com   174:24
incidence   21:24
  200:24 208:25
  210:2 211:3 215:9
incident   106:20
  210:4
incision   43:5,7
  49:21 50:9 69:23
  73:19 75:5 93:3,4
  93:9,11,15 136:2,8
  137:3
include   13:12
  17:22 162:3
  198:11
included   199:8
  218:15
including   10:9
  20:18 26:5 43:7
  66:5 100:9 113:17
  204:6
incorporated   2:14
  2:14 220:12
increase   28:8,12
  29:24 44:6
increased   27:20
  28:5 29:20 30:11
  30:16,19,19 48:18
  60:6 161:1 176:3
  176:4 189:23
  200:14 201:5,6

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[increases - ivc]**                                    Page 19

**increases** 43:21
**independently**
  67:17,19
**index** 3:1 4:1 5:1
  6:1 28:17
**indiana** 1:2 2:18
**indianapolis** 1:3
  2:18
**indicate** 40:7
  114:15 125:6,11
  146:4
**indicated** 113:22
  118:12 134:17
  164:25 177:18
  212:24
**indicating** 218:15
**indication** 37:21
  73:9 163:17
  206:23,24
**indications** 37:19
  211:8
**individual** 22:8
  58:10 211:16
**infection** 19:1
  65:10
**inferior** 17:23
  115:25 142:17
**inferiorly** 70:17
**inflamed** 81:12
**inflammatory**
  79:16,17,23,24
**information** 3:18
  38:19 104:20
  108:21 155:24
  181:1 182:24,25
  183:3 196:18
**informed** 4:4
  64:23,25 65:4,8
  66:8 152:24 153:2
  158:7

**infrarenal** 69:8,9
  142:15
**infrequently**
  195:14
**inherent** 18:24
  61:3
**initial** 96:21
**injured** 16:19
**injuring** 19:2
**inner** 110:18
**insert** 66:10,14
**inserted** 25:8
  190:20
**insertion** 46:10
  68:15
**inside** 68:19
  110:18 115:19
  143:13
**inspect** 164:9
**instances** 60:14
**instant** 176:11
**institute** 3:17,20
  4:12 38:18,25
  41:7 80:2
**instructed** 78:14
  78:18 95:17
**instruction** 66:14
  120:13 159:10
  198:18 206:10
**instructions** 5:14
  66:10 67:1 85:22
  118:15,20,24
  119:2,10,19
  120:15,17,25
  121:7,25 122:2
  148:1,3,8,11,14,17
  148:21 158:17
  159:6,8,25 160:13
  160:22 161:14,20
  197:20,22 198:2,3
  198:10,16 199:3,8

  199:21 206:17
  207:6
**instrument** 136:8
**instruments** 71:20
  71:23
**insurance** 35:1
  37:25 38:4 157:20
**intake** 39:2,5 41:2
**intellectual** 108:25
**intend** 56:25 57:1
  197:3 205:11
**intended** 57:2
  166:19 169:18
**intense** 139:18
**intent** 57:8 133:21
  133:25
**intention** 133:19
**intentionally** 26:2
**interest** 92:19
  189:1
**interested** 109:1
  217:14
**interesting** 83:13
**internal** 183:22
  184:8,11
**interpose** 167:12
**interposed** 205:18
**interpret** 132:10
  168:9,19
**interpreted** 198:2
**interpreter** 191:23
**interpreting**
  197:22
**interrogate** 187:23
**interrogating**
  92:17
**interrupt** 10:16
  65:23
**interruptions** 11:1
**interspace** 72:3

**interval** 195:13
**intervals** 86:8
**interventional**
  14:12,15,20 84:24
  168:3,4
**intima** 143:9
**intraabdominal**
  17:2,5
**investigation**
  167:7
**investing** 136:19
**involve** 18:1 19:13
  19:14 51:9 201:11
**involved** 15:10
  17:13 52:20 137:3
  179:6 195:21
  202:17
**involves** 16:1
  17:14 56:10 72:4
  139:8 186:17
**involving** 106:21
**irrelevant** 61:11
  200:11,12
**ish** 37:1
**issue** 163:2 190:24
  192:8
**issues** 51:22 83:23
  87:25 89:10,12
  92:13 93:20
  128:16 190:18
**iterations** 56:5
**ivc** 1:4 35:3 49:24
  76:2,19 79:15,17
  80:13 88:9 90:5
  99:22 110:14
  116:4 118:13
  130:23 131:1
  138:12,19 139:22
  140:14 147:9
  150:18 152:12
  157:11 174:21

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[ivc - law]**                                                          Page 20

189:12 206:16
208:15,17,22,25
209:10,12,19,23
210:5,11 211:2
212:9 213:5
**ivc00001396** 6:6
174:5

**j**

**j** 6:4 166:22
**james** 9:14
**job** 71:6
**joe's** 178:16
**johns** 10:10
**johnson** 76:12
**joint** 190:25
**joseph** 5:19 10:5
120:7 141:5
**joseph's** 10:2
150:19,22 151:9
152:8,12,17
156:21,23 157:20
**judgment** 85:10
85:16 97:12
145:13 204:5
**jugular** 152:10
**july** 82:7,10 91:24
92:1 130:9
**jump** 106:5
**jumping** 104:18
**junction** 175:12
**june** 75:15,18 76:5
76:10 79:8 80:9
105:11 106:18
109:23 117:6
138:4
**jury** 13:15 14:22
68:9 100:11
115:13 119:17
135:9 136:1
138:18 199:23

**justify** 154:25
155:19 180:10

**k**

**k** 1:24 2:14 176:10
217:20
**keep** 11:1 23:14
104:5,10 133:9
**kept** 215:1,1
**kind** 17:5 33:10
46:20 71:8 96:11
126:16 129:21
143:14 188:24
200:16
**kinds** 18:13
**knee** 189:14 190:4
191:11,15,20
192:3
**knew** 51:7 92:14
92:16 121:23
129:5 132:3 133:3
133:5,7 155:1
164:11 184:20
**knife** 136:12,13
140:2
**know** 10:19 12:18
19:1 25:25 27:25
31:22,25 33:18,18
33:22 35:15 38:11
42:11,12 43:18
44:13 49:15 51:3
51:21,25 52:2
53:14,25 54:12,12
56:4,4 57:3,4,14
57:18 58:17,21
61:19 63:8,20
66:16,20,24 67:7
67:12 68:19 69:6
72:17 73:25 74:21
74:23,24 75:25
78:11,21 82:18
84:13 88:20 89:6

90:21 91:1 95:7
95:20 99:1 100:1
100:3,23 103:15
106:13,14 107:16
107:22 109:7,8
111:21,25 112:2,7
112:21,23,24
113:1,3 114:22
115:6 117:19
120:9,9,11 122:22
122:25 123:19
124:19,20,21
125:10 127:15,25
128:1,18 132:8,8
132:17 137:16,17
140:10,11,11
146:8 148:20
151:21 153:17,19
160:14,20 161:5
162:8,8,9 163:20
163:21 164:10
165:11 166:10
169:3 173:3,23
175:25 176:14
177:4 178:11,12
178:13,18,24,25
179:1,10 180:22
180:23 181:2,4
182:14 183:11
185:17 186:7,16
190:18 191:18
193:4 194:22,23
195:23 197:15
199:18 201:7
203:2,4,11,21
207:14,16,23,24
208:1 209:21
211:14,14,16,20
211:23 212:5,6,11
212:19 213:5,19
215:12,13,16

**knowing** 54:2
**knowledge** 12:4
12:13 27:22 29:25
37:7 59:6 64:4,20
67:14,22 76:6
96:14 99:9 104:3
112:13 114:20
115:5,10 130:15
163:25 167:17
174:15 183:25
191:13 196:24
207:18,19 209:9
210:17
**known** 30:24 35:5
62:22 112:5
130:23 131:1
153:14 155:22
161:23 162:1
180:1 183:6
189:23 198:18
199:15 200:24
203:19 205:25
**kub** 78:6,13,24
**kubs** 78:17

**l**

**l** 176:10,10
**l2** 49:15
**l3** 114:17 132:3
**l4** 46:8
**l4-5** 72:3
**l5** 46:8 49:15,15
**labeled** 120:18
**lack** 174:15
**large** 90:14
**lasso** 123:15
126:18
**late** 24:9 49:22
**launch** 180:24
181:5
**law** 2:3

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[lawsuits - loop]**                                                          Page 21

**lawsuits** 203:7
**lawyers** 197:2
  203:7
**lay** 17:16 214:5,5
**layer** 136:20
  143:12,15
**layers** 136:14,15
**lead** 8:6 173:16,17
**leading** 8:4,7,11
  8:25 9:7 12:24
  20:15 29:3,4 48:4
  64:1 65:18,22
  205:10,10,12
**leads** 214:4
**leak** 139:15
**learned** 16:25
  27:25
**leave** 29:2 57:24
  63:15 84:2,4,21
  85:4 128:7,9
  134:13,14 150:1
  154:18 197:18
**leaving** 24:20
  128:5
**led** 114:1 132:22
  161:25 173:12
**left** 41:20 42:9
  56:25 57:19 71:15
  71:17 77:18 92:18
  114:11 133:5,9
  134:4 145:1
  147:14 171:23
  177:23
**leg** 15:7 41:20 42:8
  42:9 43:2 47:22
  76:21 79:15,23
  81:8 87:9 96:11
  102:14,19 144:22
**legal** 218:1 221:1
**legs** 15:8 23:13
  39:17,24,25 144:6

**length** 125:11
**lengthways** 139:4
**letter** 3:22 49:1,7
  49:10 218:21
**level** 32:23 49:23
  61:9 69:8,12
  79:18 182:9
  210:10,11 211:25
**levels** 18:2
**liability** 1:5
**lies** 16:11
**life** 19:15 74:22
  133:2,11
**lifetime** 97:8
**ligation** 43:8
**liked** 108:19
**likelihood** 26:3
  108:25 193:6
  195:5
**likes** 47:6
**limb** 65:12 114:15
  170:17
**limbs** 111:16
  112:3
**limited** 12:5,14
  48:16 64:14
  127:18
**line** 9:4 40:5 78:5
  78:8 79:16 218:15
  220:7 221:3
**lines** 145:19
  189:10
**lining** 116:24
  143:15
**list** 25:16 31:22
  198:14
**listed** 220:7,17
**listen** 172:4
**listing** 220:7
**literally** 126:17
  139:4 210:16

**literature** 57:14
  63:21 66:19 200:3
  208:19,22 209:10
  210:10,23,25
  211:1 212:6,11,16
**litigation** 1:5
**littered** 133:23
**little** 8:21 15:9
  18:6 22:17 23:14
  37:22 43:11 44:9
  44:11 60:22,25
  67:21 68:18 70:6
  71:20 72:19 74:16
  76:25 82:17 89:4
  89:14 93:20 95:2
  98:3 126:16 128:1
  128:2 143:6,12,14
  154:8 170:18
  182:10 185:4
  194:14
**llc** 2:14
**llp** 2:16
**locate** 166:15
**located** 134:1
  135:14
**location** 40:7 93:5
  114:20 131:24
  165:8 166:8,11,14
  169:25 170:9,11
  170:13 185:13
  197:10
**locations** 9:20
**lodged** 90:9,14
  131:5
**long** 13:15 22:1
  33:20,22 35:12,16
  41:24 47:18 51:22
  57:19 60:5 72:12
  72:17,17 112:10
  112:11 114:11
  123:19 125:4,10

  125:21 137:11,12
  138:21 158:20
  166:2 171:12,24
  176:2 182:14
**longer** 74:11 76:11
  80:20 93:21 166:1
  176:5 202:17
**longitudinally**
  139:4
**look** 13:7 26:24
  30:13 31:21 41:9
  42:14 49:5 56:17
  60:20 62:8 75:16
  78:19 86:18
  103:16 105:9
  106:2,23 109:15
  117:12 119:16
  123:23 124:3
  131:19 141:22
  142:1,12 158:7
  163:5,9 164:8,15
  165:10,16 166:13
  167:9 168:8 169:2
  185:20 189:8
  195:7,15 198:15
**looked** 54:23
  121:1 147:25
  148:21 163:14
  164:17,20 167:8
  208:2
**looking** 27:10
  44:14 124:4
  156:25 163:8
  187:8,20,20,21,21
  215:2,4
**looks** 31:24 44:20
  68:20 80:8 129:23
  164:5 167:21
  198:22
**loop** 124:23

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[loose - martin]**                                                                Page 22

**loose** 127:23
**lori** 107:1
**loss** 50:13 65:11
  65:11,12 137:4
**lost** 171:18
**lot** 51:23 163:8
**loud** 158:21
**low** 51:14 57:20
  193:7 195:6
  197:13 204:21
  205:22
**lower** 17:11 18:2
  49:21 71:4 93:14
  133:13 136:6
**lumbar** 18:1 46:1
**lung** 23:1
**lungs** 23:24

**m**

**m.d.** 1:15 3:3 6:4
  7:2,21 166:22
  217:8 219:4,9
  220:4,13 221:20
**macroscopic**
  200:11
**madam** 218:10
**magnitude** 46:19
  94:8
**mail** 5:9,12,22 6:5
  102:24 103:4,22
  104:21,23 105:1,5
  105:11 106:4,23
  107:9 151:3,8
  174:4
**mails** 184:15
**main** 10:10 23:21
  111:16 112:3
  144:10 175:12
**major** 29:10,15
  36:22 44:2 46:17
  47:2 48:25 50:7
  136:24 137:1,10

**majority** 18:8
  52:15 57:17 61:8
  61:10 62:8 63:12
  200:5
**maker** 147:8
**making** 53:11
  69:23 127:12
  130:15 146:10
  180:3 184:12
**malfunction**
  138:12
**malposition** 60:3
**man** 37:1
**maneuvers** 17:18
**manipulate**
  170:16
**manipulated**
  143:21
**manipulating**
  17:14
**manipulation**
  50:11
**manufactured**
  154:10
**manufacturer**
  147:21 183:5
  184:9,12
**manufacturers**
  24:11 199:4
**marc** 104:22
**march** 12:2 37:11
  64:19 75:18 177:6
  198:19 199:2,15
  217:17 218:4
**mark** 1:15 3:3,13
  7:2,7,21 9:14 11:7
  68:4 146:18,19,20
  174:23 188:11
  216:6 217:8 218:5
  219:4,9 220:4,13
  221:20

**marked** 11:8,10
  13:4 31:10,13
  38:20,22 41:5,8
  49:2,5 65:2 68:7
  75:12,14 79:1,5
  80:4 81:22,24
  83:2,5 86:22
  89:22 91:18,21
  94:16 95:9,11
  101:17 102:22
  103:1 105:7,15
  119:11,14 137:19
  137:23 141:6,8
  145:15,21 151:4
  166:23 167:5
  174:6 188:17
**market** 206:22
**marketing** 1:4
  66:21 107:23
  155:19
**marking** 146:11
**marriage** 217:14
**martin** 2:2,3 3:7
  7:12,12 8:1,9,10
  8:13,15,22 9:1,5,7
  11:2 12:24 20:15
  20:25 21:15 26:10
  26:16,19 28:14,20
  28:22 29:1,8,13
  31:1 32:3 33:16
  34:23 35:10,22
  36:3,8,18 38:16
  44:15,20 48:4
  53:12 55:23 56:22
  58:6,11,16 59:3
  61:15 62:2 63:7
  63:25 64:7,13
  65:16 66:15 67:10
  67:18 68:1 73:15
  74:4 77:12 85:12
  89:3,13 97:21

  98:2,11 99:18
  100:17 101:2,5,11
  101:20,23 102:8
  103:3,16 104:1,4,8
  104:11,14 105:8
  105:16,18,25
  106:1,14 108:19
  109:4,8 110:5,23
  113:14,22 115:24
  116:10 117:17,21
  117:23,25 118:10
  118:23 119:6,13
  120:10 121:24
  122:12 126:9
  130:7,11 134:2
  135:2 136:7 138:6
  138:9,11 139:21
  140:18 141:7
  142:12 145:6
  146:8,13,15,18,20
  146:23 147:18,20
  147:25 149:7
  151:6,16 152:21
  153:11,21 154:9
  155:8,22 156:2,12
  157:7 158:3,15
  159:14 160:19
  161:6,19 162:17
  165:9 166:24
  167:4,14,18
  168:12,15 169:16
  169:19 171:1,7,12
  171:24 172:4,21
  180:18,20 183:19
  184:14,22 187:1
  188:22 189:3
  192:12 193:3
  196:6,10 197:22
  198:7,10 199:5
  200:1 201:22
  203:11,15 205:9

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[martin - minor]** Page 23

205:17 206:5
207:21,22 209:15
210:15,20 211:15
212:16,21 214:10
214:18,25 215:21
215:25
**mass** 28:17
**material** 66:21
149:15,17,23
150:1,16 156:3,5
157:22 162:3
**materiality** 155:24
**materially** 198:24
**matter** 10:22
168:6 177:20
205:19 217:15
**matters** 180:1
198:4
**mdl** 1:7
**mean** 10:21 17:7
17:25 18:20 23:10
24:17 37:18 39:19
40:10,22 43:16
45:11 46:10,23
50:24 55:17 58:21
59:18 69:10 70:5
71:18 75:2 77:7
78:2,7,14 80:17
83:20 84:7,8
88:14 90:12 94:7
106:16 108:24
111:18 112:2
114:4,6,12 115:18
116:24 123:6
125:24 126:22
127:15 128:13,14
129:3 130:25
131:7,14,15,25
132:25 140:9
143:10,20,24,25
144:16 145:6

149:11 153:5
155:5 157:1
166:12 168:23
169:13,14,17
171:23,25 173:19
182:3 183:10
185:15 186:17
190:15 193:13,14
194:10,11 195:4
197:5 201:23
207:10 209:3
210:16
**meaning** 40:18
139:4 200:4
**meaningful** 70:7
70:22
**means** 16:10 58:17
70:22 78:11,17
90:13 144:1 160:9
162:9 176:25
181:15 206:11
**meant** 36:16 46:5
**measures** 23:11
**mechanical** 23:20
**mechanics** 55:10
**mechanism** 25:7,9
25:17 26:25 55:7
56:6,10,11,14,18
139:6
**medial** 110:15,17
**medical** 1:4,9 2:14
2:14 3:18 5:4,6
7:15,17 13:21
19:17,20 30:1
38:19,25 42:15
53:15 58:1 75:16
86:4,9 91:17 96:7
115:5 118:14
132:16 133:13
147:20 176:16
183:5 184:6

207:18 209:4,15
209:24 210:9,17
218:7 219:3 220:3
**medication** 85:21
85:24 95:15,19
96:21
**medications** 30:4
45:1,1 96:17
**medicine** 9:19,24
95:2
**medium** 169:6
**meet** 106:6,9
107:11,19 108:3
108:13
**meeting** 10:22
33:12 106:6
107:10 108:5
**meg** 151:20,20
**member** 14:6,14
**memory** 52:7 67:2
67:3 75:20 80:10
141:24 197:21
198:5
**mental** 133:11
**mentioned** 17:20
33:11 36:13 52:13
54:22 56:16 85:5
106:5 186:3
187:12 190:6
198:21 202:21
212:22
**mere** 153:5
**meridian** 2:17
**message** 5:8 95:8
**met** 106:10 107:14
**metal** 71:20 76:1
77:2,3,9 78:6,10
78:13 143:16
**metallurgist** 108:9
**method** 118:6

**methodology**
118:5
**methods** 117:3
121:19 123:24
**mheaviside** 2:11
**michael** 2:8 7:10
**micron** 181:18
**microphone** 102:6
172:17
**microscopic**
162:12 200:8
**mid** 35:21 210:18
**middle** 175:2
**midline** 93:10,11
**midwest** 218:19
221:1
**migrate** 114:24
115:2 116:12
193:20
**migrated** 115:4
134:17
**migration** 62:16
62:19 113:9 195:5
201:6
**mike** 11:2 172:6
**mild** 42:8 43:2
**millimeter** 200:24
**millimeters** 182:1
182:13
**mind** 44:8 64:9
127:11,16 132:13
132:14,20,21
134:23 146:17
150:5 181:11
195:14 200:22
**minimize** 21:18
23:24 46:12 74:6
135:17 173:21
**minimizes** 192:7
**minor** 74:17

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[minute - northside]** Page 24

minute 130:1 137:21 142:1 143:7
minutes 10:21 11:5 124:25,25 125:22 138:22 166:1 171:15,20 171:23 172:3
misfire 51:17
misfiring 60:4
missing 111:3,9
misstatement 144:9,14
mitigate 191:5
ml 1:6
mobility 48:17
mobilization 71:15
mobilize 70:24
model 175:3
moderate 45:12 45:16 70:16
moderately 43:3
moment 18:12 26:22 36:13 73:10 92:11 101:8 107:5 127:13 132:9 146:15
monday 77:15
month 177:1,5
months 27:25 42:1 74:10 87:1 95:3
morbidity 21:19 21:23,25
moreso 62:6
morning 104:25
morphine 45:4
morrison 3:22 5:20 33:2,5,8,11 33:14,21,22 34:1,7 34:12,24 35:5

36:13,24 37:14 38:9,21,24 44:4 47:6 49:1,7,11 51:7 71:5 72:1 75:4 144:23 145:6 145:20 146:9,24 146:25 147:4 185:8,13 212:23
morrison's 34:20 35:12 145:18
mortality 21:18,22 21:24
motion 186:18 202:17
move 16:13 17:16 70:24 72:8,9 115:15,22 134:24 135:12 136:22 143:15 165:25 193:20
moved 116:18 128:1 131:21,24 134:22 207:24 208:6,7
movement 62:16 62:19 63:18 92:13 113:25 114:8 129:5 131:15 132:12 199:14
moves 186:9
moving 16:17,18 17:14 23:1,14,23 26:5
multi 121:9
multiple 9:20 46:16,18 48:10 126:12 127:17 133:8 143:8 160:15,21 179:5,9
muscle 90:10,14 90:19 116:23

131:6,10 132:2
mutual 8:3
myriad 74:25

**n**

n 2:17
n.w. 2:9
name 9:13 59:11 72:23 104:22 154:11 209:2 210:16 211:11,11 218:7 219:3,4,15 220:3,4,21
naproxen 45:3
nearly 61:8 200:6
necessarily 42:17 55:16,18 72:20
necessary 70:14 70:18 191:19,22 195:16
necessitate 46:19
neck 15:6 126:17
need 16:12 36:2 44:11 86:4 94:4 101:1,7 166:2,5 172:2,17 188:23 196:9 200:21 209:21
needed 11:3 32:22 32:24,25 34:24 50:3 70:23,24 71:14 86:7,9 92:2 96:20,24 101:14 147:13 190:12 191:10
needing 46:2
needs 71:25 72:1 138:23,25 150:9 150:10,15 196:4
negative 22:1 201:15

neglected 189:13
nervous 89:14 92:14,15
nest 26:1
neurologic 47:12 47:17,22,25
neurosurgeon 33:6
neurosurgeons 17:19
never 24:25 59:15 122:25 167:16 192:22 196:25 202:1 209:25
new 56:3 131:5,15 131:24 158:5 194:19,20
newer 56:10
nicely 163:10
nine 52:2 152:10 171:15
nodded 117:7 128:23 195:20 214:16
non 206:23
nondevelopment 214:14
nonresponsive 35:10 147:19
norm 186:18 191:17
normal 74:5 93:21 192:4
normally 17:19 94:7 152:7 164:4
northside 4:4,5,6 4:7,11 10:12 35:16 64:25 65:1 68:5,6 79:4 120:7 150:19 151:9 152:13,16 156:17

**[northside - october]**                                          Page 25

156:18,21 157:4,6
178:7,9
**notary** 7:23
218:17,25 219:10
219:18 220:15,23
221:23
**notation** 42:7
45:18 49:14
**notations** 45:25
**note** 4:6,8,13,14
4:20 5:16 42:1,2
42:21 43:9 57:4
68:4,6 69:22 73:6
73:7,8 75:11,15,19
75:24 76:11,17
80:3,18 81:15
82:1,5,8,9,25
83:10,12 86:21
87:2,6 88:2 90:3,8
91:11,23 95:20
111:11,13,14,15
111:20 113:4,7
125:8,13,15
129:21,23,24
130:10,14,18,21
132:20 137:18,24
140:16 152:11
165:13 188:16,20
189:6 190:7,9
194:4 218:13
**noted** 43:25
**notes** 42:19 76:12
192:21
**notice** 3:12 11:6
11:11
**notification**
106:20
**notified** 77:14
108:14
**notion** 122:23
186:12 195:10

201:2
**november** 94:12
95:12
**nowadays** 56:14
**number** 3:19
19:17 38:19 95:22
102:23 103:3,20
103:21 104:15
105:9,10,14 106:2
109:15,16,22
117:15,20,22
118:1 119:8,14,17
125:25 126:2
129:16,16,20
130:1,7 137:23,25
138:1 141:8
145:16 146:21
151:2,8 158:17
161:13 166:21
167:5 173:23
181:11 182:21
183:21 195:19
203:25 205:6
215:2 218:8,15
**numbered** 174:19
**numbers** 220:7
**numerous** 32:6
**nurse** 39:20,25
40:22,23 76:12,14
76:16 77:8,21
78:2,18 95:20,21
**nurse's** 192:21
**nurses** 39:10 45:6
102:21 194:18

**o**

**o** 176:10
**obesity** 28:21
30:23
**object** 26:11 28:20
28:22 29:1,1
35:22,23 38:16

64:10 65:17 67:10
68:1 77:18 100:15
106:11 108:17,23
109:6 110:3,21
113:13 115:17
116:8 118:7,22
120:8 121:21
122:10 126:6
133:24 134:25
139:19 143:13
145:3 146:6
147:18,23 149:5
152:19 153:10,18
154:1 155:4,20,25
156:7 157:25
158:11 159:12
160:17 161:18
162:6 165:5
169:15 170:24
173:15 175:18
176:13 178:10
179:4,24 180:4,13
180:25 181:8
183:1 199:5
207:20 209:14
210:14 211:13
212:15 214:9,22
215:19
**objecting** 104:5
**objection** 8:4,12
8:23 12:24 20:15
20:25 21:15 26:10
28:14 29:13 31:1
32:12 33:16,17
34:23 35:10 36:1
36:5,9,18 48:5
53:12 55:23 56:22
58:6,11,16 59:3
61:15,15 62:2
63:7,25 64:1,7,13
65:17,22,25 66:15

67:18 73:15 74:4
77:12 85:12 89:3
89:13 97:21 98:2
98:11 104:1,6,11
104:12 106:12
136:4 151:13
160:24 167:13
169:19 171:5
181:12 184:14,22
187:1 193:3 196:6
198:7 200:1
201:22 205:10,18
212:18 214:17
**objections** 8:16,17
9:8 26:21 29:2,4
36:10 174:13
205:12
**objective** 92:12
129:3
**observe** 42:9
**observed** 12:14
42:12 45:8
**obvious** 83:22
86:11
**obviously** 46:5
129:17 173:20
201:23
**occasional** 61:13
195:15
**occasionally** 17:15
23:17 63:10
194:11
**occludes** 26:2
**occlusion** 160:4
**occur** 65:18
147:10
**occurred** 134:21
160:5
**occurring** 169:8
**october** 86:17,25
93:18 94:1 189:7

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[october - page]** Page 26

190:3 193:16
**offense** 195:4
**offer** 84:9 179:10 190:1
**offering** 190:21
**office** 2:3 4:12 5:16 9:23 11:19 31:16,18 39:7 41:17 75:18,22 76:15 77:14 78:17 80:3,8,13 86:8 87:2,6 90:1 129:23 130:9,14 130:18 137:18,24 189:6
**official** 219:15 220:21
**oh** 32:4 146:14 172:4
**ohio** 218:2
**okay** 9:10 10:4,14 14:2 22:18 24:22 27:18 30:12 39:2 41:23 44:12 47:20 58:19 79:9 83:7 83:11 87:1 89:15 99:16 103:19 107:16 120:5 121:17,24 122:19 124:3 129:22 130:3,4 131:17 134:2 135:19 142:2,3,3 144:16 146:1 147:7 149:11,21 154:15 155:1 157:21 158:3 159:1,18,21 160:6,11,19 161:11,25 162:21 163:12 164:1,5,14 165:2,15 168:15

172:16 173:7,22
176:15 177:7,9
178:20 179:20
183:13 192:10
194:25 197:8
208:21 209:24
210:1,7,8,20,24
211:11 212:8,10
215:25
**old** 26:1 37:1 46:4 56:3 173:1
**older** 33:23
**omni** 73:1
**once** 16:3 35:20 68:16,22 94:8 104:19 136:20 138:20,22 139:13 143:2,2,3 149:25 158:12 163:14 170:8 181:13 206:14
**ones** 8:19
**ongoing** 86:9 92:13 96:17 97:12 101:13 132:5,7 159:10,15,20 193:12
**op** 165:13
**open** 13:25 34:2 92:25 93:4,9 113:1 114:1 129:1 133:16,20 134:8 135:3,7,10,10,12 135:16,17 137:7 138:25 139:3,5,7 191:22 193:13
**opened** 93:1
**opening** 132:23 140:5 185:7
**operating** 69:18

**operation** 15:15 15:20 33:10 42:3 82:9 137:2 141:10 141:13,21
**operations** 43:4 49:21
**operative** 4:6 68:4 68:5 69:22 71:13 73:7,8 82:1,6,8 135:6 140:19 141:19 142:13 163:9,13,18
**opinion** 8:5 12:22 13:1 57:20 79:22 85:3 171:2 180:8 193:7,8 200:2 205:4,23 207:17 208:6
**opinions** 208:16
**opportunity** 42:22 52:23 53:1
**opposed** 17:8 128:9 153:16 161:13
**optease** 202:12
**option** 157:5 178:23
**optional** 120:18,21 121:2,6
**options** 150:25 170:15
**order** 16:15 43:18 48:12 70:19 71:22 72:1 82:20 93:15 103:11 127:19 143:15 150:13 152:8
**ordered** 152:9 195:1
**organ** 65:12

**organs** 201:11
**original** 6:13,13 26:1 106:3 123:17 165:13
**originally** 13:24
**orthopedic** 173:8 190:23
**orthopedist** 190:13 191:7
**ought** 128:20 132:22
**outcome** 217:15
**outline** 114:18
**outpatient** 10:8 74:17
**outside** 12:8 14:25 144:18 156:21 182:2,13
**outweighed** 85:11 85:17 204:2
**outweighs** 204:10
**overweight** 43:3 48:10

**p**

**p.m.** 1:17 7:5 101:9 102:2 140:23 141:2 142:6,10 216:5,9
**package** 66:10,14
**page** 3:5,11 4:3 5:3 6:3 39:12,15 40:16,17 75:24 76:10 78:9 87:19 103:4,17,20 104:16,23 119:15 120:22 138:10 151:17 175:2 188:18 189:8 198:14 218:15 220:7 221:3

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[pages - performed]**                                                              Page 27

pages  41:13
pain  39:16,21,24
  76:21 77:1 80:25
  83:16,22 87:8,9
  91:6 95:2,14,19
  96:6,11,20
pannus  45:13,17
papers  210:19,21
paragraph  142:13
  158:21
paralysis  47:23,25
  65:13,13
paraplegia  65:13
part  21:10 35:16
  44:3 51:7 84:20
  123:17 180:3
  181:22 184:7
  196:21 199:14
  200:10 220:9
partial  65:13
partially  175:14
participated  160:7
particular  62:7
  65:19 69:19,20
  72:25 92:11
  104:12,21 113:7
  123:8 135:6
  148:18 149:19
  160:7 205:1
  206:16
particularly  20:18
  25:23 90:15 133:1
parties  26:20,20
  217:13
partnered  33:15
partners  190:23
parts  62:17 112:7
  143:11
party  171:16
pass  169:20 171:9
  215:25

passed  37:10
  172:6
passing  171:11
patient  15:11 22:5
  23:15 27:20 28:2
  28:4,8,17,18 29:10
  29:19 30:7,9
  32:19 34:11 35:17
  37:9,14 39:2,5,11
  39:19 42:16,20
  47:14 58:10 62:19
  65:10 72:7 74:13
  75:25 76:18,19,20
  77:1,3,17,24 78:1
  78:6,10,12 89:11
  90:3 94:7 98:17
  98:21 99:3,6
  100:3,4,20 106:7
  106:10 112:10
  118:18 135:19
  149:1,14,17 150:1
  150:2,6 153:23
  154:6,7 155:3,6
  157:24 158:7,10
  161:7,12 162:4
  173:5,10 177:23
  177:25 187:8
  191:14 192:1,20
  200:5 201:15
  204:16 205:5,24
  213:1,6,12,17,21
patient's  28:23
  29:24 30:22 74:15
  186:19 196:13
  213:18,22
patients  10:8
  11:24 18:18 19:9
  20:19 21:4,9,12
  22:11,13 23:3,8,16
  25:22 30:15 33:21
  34:7,21 35:9

37:25 47:8 50:21
  51:11 52:9,25
  54:8 57:12 58:15
  60:15,18,19 70:8
  71:8,11 74:2 75:4
  97:17,20 98:24
  99:2,19 100:2,9,12
  100:14,18,19,22
  145:10 153:7
  156:4 160:6
  161:13,15 181:7
  184:13 190:22,24
  199:25 201:4,21
  202:18 204:1
  205:4,6,24 211:2,5
  211:5,6,8,9 214:11
  215:3,6,9,22
paul  6:5 174:5,24
pe  23:8,18,18 28:6
  28:18,24 29:20,24
  30:22 37:14
  173:19,20 175:10
  175:25 211:10
peachtree  1:20
  218:5
peeled  93:2
peer  154:19 176:9
  208:18,21 215:15
pelvic  70:18 72:8
penetrate  60:25
  61:9
penetrated  110:15
penetrating
  143:23,25 144:15
people  106:9
people's  184:15
pepper  59:19
percent  26:3,3
  161:21 162:14
  181:6,25

percocet  95:19,21
percutaneous
  117:2 128:21
perfect  20:6,10
  44:22 52:7
perforate  60:12
  162:13 181:24
  199:23 200:3
perforation  60:8,9
  61:6,13 62:4,5
  63:19 116:23
  128:15 153:15,25
  154:3,17 160:1
  161:5 162:9,10
  180:23 181:6,14
  181:17,18,19,22
  182:5,9,10,17,18
  182:19 199:13
  200:9,15,21,24
  201:3,10 204:7,10
perforations  99:11
  160:1,4,9,15,21,23
  161:1,4,15,17,22
  161:25 170:3
  200:12 201:5,11
  201:12,14
perform  12:10
  15:2,15 18:14
  34:1 38:2 69:14
  71:8 82:10 93:3
  135:20 157:10
  185:9 188:2 194:7
performed  19:5
  21:7 33:10 68:3
  68:15 83:15 86:1
  96:3,8 97:11
  111:2 112:25
  124:15 133:19
  135:23 141:10
  156:22 159:23
  161:21 165:20

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[performed - placed]**                                               Page 28

167:7 185:7,8,13
188:6 201:21
215:6,8
**performing** 45:9
168:17
**period** 12:6,8
20:19 23:5,12
24:25 25:3 27:22
46:20 75:22 80:20
95:17 106:18,19
122:3 131:20
**periodically** 91:12
**perioperative** 5:18
23:12 50:13 141:4
**perm** 5:15 119:11
**permanently**
56:25
**permitted** 8:6
**person** 31:17
109:4,10
**personal** 104:3
167:17 174:15
183:25 200:2
201:24 214:1,2,4,6
214:15,18
**personally** 56:11
195:16 219:11
220:15
**pertain** 11:18 14:9
**pertains** 39:6
188:20
**pertubations**
175:3
**pes** 173:14,16
175:21
**petals** 175:13
**pfannenstiel** 43:4
43:6
**pfannenstiel's**
43:7

**phone** 4:22 5:8
31:18 89:21,24
95:8,11 218:3
**phrase** 205:19
**phrased** 67:20
**physical** 4:16 45:9
80:25 81:21
**physician** 20:9
32:13,16 58:8
115:15 176:10
214:2,4
**physicians** 58:14
121:18 179:6,6
**pick** 25:6
**picture** 68:19
124:11
**pictures** 166:13
169:9
**piece** 76:1,2,7 77:2
77:2,9 78:6,10,13
81:3,9 102:13,18
131:8,21 133:21
186:8 210:9,9
**pieces** 111:3,9
129:5 134:4,6,7,16
**pierson** 2:15 3:6
7:14,14,25 8:14,20
8:23 9:3,6,10,12
10:18,25 11:4,9
13:1,6 20:17
21:12,21 26:22
28:16,21,23 29:6,9
29:16 31:3,12
32:5,13 33:19
35:11,25 36:4,7,12
37:9 38:21 41:9
44:8,18,22,24 48:6
49:4 53:14 55:25
56:24 58:7,13,19
59:4 61:17 62:3
63:17 64:3,9,15,16

65:3 66:3,17
67:13,20 68:2,8
73:17 75:7 77:13
79:6 80:5 81:23
82:3,4 83:4 85:14
86:23 89:8,15,23
91:20 94:17 97:23
98:7,12 99:14
100:15 101:1,3,21
103:9,13,25 104:5
104:9,13 105:14
105:17,20,24
106:11 108:17,23
109:6 110:3,21
113:13 115:17
116:8 117:16,20
117:22,24 118:7
118:22 119:5
120:8 121:21
122:10 126:6
130:5 133:24
134:25 136:4
138:5,7 139:19
145:3 146:6,16,19
146:21 147:23
149:5 151:12
152:19 153:10,18
154:1 155:4,20,25
156:7 157:25
158:11 159:12
160:17,24 161:18
162:6 163:10
165:5 167:12,15
169:15 170:24
171:5,11,17 172:2
172:9,13,16,24
173:15 174:7,10
174:12 175:18
176:13 178:10
179:4,14,24 180:4
180:13,25 181:8

181:12 183:1,16
184:16,24 187:2
188:13,18,25
189:5 193:9
196:10 198:9
199:7 201:8 202:5
203:13,16 205:16
206:2 207:20
208:10 209:14
210:14 211:13
212:15,18 214:9
214:17,22 215:19
216:2
**pierson's** 206:6,8
**pin** 56:6
**place** 24:6 28:5
29:10 35:8,13
47:7 48:24 51:17
56:7 69:4 71:24
81:8 90:10,17
111:17,22 112:3
112:17 114:11
116:1 123:16
124:12 127:22
132:14 133:6,9
134:13 144:25
166:7,13,20
168:18 170:20,21
188:1 189:21,21
189:25 190:11
191:10,21 192:5
**placed** 23:20 24:2
24:10 34:10 36:21
49:24 53:9 54:11
59:21 61:18 64:18
67:15 69:2,13,16
85:17 98:17
100:13 121:25
122:4 152:7,15
153:5 162:5
164:20 165:1,1,4,7

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[placed - pretty]**                                                                Page 29

166:10 169:12,13
169:17,18,21
170:8 199:1
213:21 215:3
**placement**  44:5
51:13 53:19 54:7
64:17 65:6 66:5
69:14 73:23 85:7
147:9 154:25
163:23 171:3
185:10 188:6
213:12,17 214:12
214:13 215:10,22
**placements**  161:25
**places**  115:14,21
**placing**  37:15
64:22 67:8,22
99:23 121:1
164:16 187:13
214:7
**plaintiff**  2:2 7:11
7:13
**plan**  20:14 57:10
86:15 107:1 134:3
**plane**  185:20
**planning**  82:1,5,24
110:1
**play**  48:15
**played**  58:24
**please**  7:8,19 9:13
9:19 13:8 22:22
40:5 121:7,10
165:16 174:10
218:13
**pliability**  186:4
**pliable**  140:9
**pliers**  139:9
**plus**  39:13 113:5
**point**  27:23 92:18
93:23 95:25
111:20 118:17

121:5,7 128:19
129:7,10 132:15
137:13 149:25
173:10 190:17
191:3 198:25
207:4 210:8,11
**poking**  77:18
**polaris**  5:21
145:16,21
**policy**  37:25 38:4
**poorly**  67:20
**popular**  25:3,4,5
**portion**  15:15 16:5
16:19 68:24 70:5
121:2 147:19
199:21 207:12
**portions**  140:14
207:13
**posed**  91:3 193:11
**position**  58:9
107:17 139:1
169:17 170:9,13
170:18 186:10,11
187:7,9,15
**positioning**  23:15
166:3
**possess**  11:20
**possession**  11:18
**possibilities**  74:25
**possibility**  116:11
133:4,12 176:6
**possible**  90:9,17
100:23 113:9
125:9 149:9
157:17 161:3
173:19 180:8
190:11
**possibly**  175:7
**post**  69:14
**posterior**  32:22

**postoperative**
137:9
**potential**  60:2
85:11 128:17
198:11,16
**potentially**  51:18
84:17 93:13
116:21 160:18
189:16 197:17
**practical**  71:23
177:20
**practice**  9:18,24
10:4 13:25 19:24
20:18 21:11 22:4
34:20 35:8,13
37:7 50:20 52:25
74:1 118:13 121:1
166:12 184:6,8
188:1 204:17
206:15 213:25
214:20
**practiced**  14:2
156:20
**practices**  1:5
**practicing**  13:16
**pragmatic**  25:11
**pre**  46:9 82:1,5,24
83:10 163:23
173:11 177:1
180:24 181:5
**precautions**
148:15
**preceding**  177:6
**predict**  175:3
**predicted**  175:13
**predispose**  30:4
**prefer**  73:1
**preference**  55:6
55:16 179:7
**preferred**  38:15

**preferring**  147:16
**preliminary**  15:12
**preoperative**  4:16
81:20
**preoperatively**
35:9
**prep**  68:17,25
**preparation**  69:1
**prepared**  31:14
**prepic**  211:18,19
211:21,23
**prescribe**  85:21
96:17
**prescribed**  23:2
32:9 34:11 85:24
97:4
**prescribing**  58:8
**presence**  218:17
**present**  2:22 7:8
70:17
**presented**  109:16
**press**  189:1
**pressing**  47:24
**pressure**  29:23
47:3,19 48:2,20
71:1
**presumably**  39:22
83:23 84:10 90:7
113:8 122:11,13
144:2 170:5 194:5
**presume**  52:17
56:23 66:7 79:13
111:19 113:21
149:10 164:25
190:6
**presuming**  154:12
**presumption**  57:9
**pretty**  21:10 126:7
127:21 140:9
143:1 163:6 195:6

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**prevent** 23:8,17,18
  113:9 191:24,25
  208:22 209:16,24
  210:12
**prevented** 213:13
  213:18,22 215:5
**preventing** 204:2
  204:9
**prevention** 21:10
  175:10 208:12,15
  208:17
**prevents** 210:3,5
**previous** 32:22
  38:12 40:23 42:2
  48:10 70:18 88:2
  131:11,13,17
  134:18 177:17
  189:19
**previously** 53:20
  93:5 98:5 134:17
  180:7 198:6
**pricing** 179:8
**primary** 21:18
  46:25 47:5
**prior** 33:11 34:6
  34:22 35:3 37:11
  37:16 38:13 40:11
  43:3 45:21 49:20
  53:19 59:12 64:22
  65:5 67:8 73:22
  76:5 145:24 148:1
  157:17 158:4
  189:15
**probably** 24:8,8
  24:20 26:12 28:15
  30:3 33:23 48:25
  50:25 51:6,23
  56:13 59:20 62:20
  63:12 72:14 74:5
  84:12 98:4 101:5
  102:21 106:22

112:4,5 115:20
  117:10 120:3
  121:23 128:4
  132:14,20,21
  136:3 145:13
  162:12,13 164:9
  171:20 172:3
  181:24 190:20
  191:5 193:8 200:7
  200:8 201:1
  202:11,14,19
  209:6,17,18
**problem** 9:4 21:25
  22:2 35:17 36:8
  36:14 57:23 94:9
  97:22 112:21
  132:5,7 193:7
  197:5 200:16
**problematic** 175:5
**problems** 14:24
  15:8 19:2 51:16
  61:2 84:18 86:13
  87:25 88:15 91:6
  92:11 96:2 101:13
  112:24 113:2
  115:5 134:7,9
  137:9 182:20
  201:4
**procedure** 4:18
  15:10,16 16:5,7,20
  17:3,6,22 19:4
  20:6,13 21:6,7
  22:7,12,15 33:2,7
  34:4 36:25 37:16
  37:24 46:9,21
  50:8,11,12 52:14
  65:9 66:25 68:3
  68:10,16,24 70:13
  71:7 72:12,21
  74:16,17 82:9,11
  82:24,25 83:1,10

83:11 86:1 93:4,9
  94:5,19 96:15,18
  96:22,25 97:11
  120:18 123:20,23
  124:5,14 125:7,12
  125:15 126:21
  127:9 133:20
  134:8 137:10
  139:16,18 141:25
  146:5,5 149:15
  150:3 156:23
  157:4,5,8,9 168:17
  169:24 173:9
  185:8,14 187:13
  189:22 219:5
  220:5
**procedures** 15:2,4
  18:13,15 19:13,13
  35:8 36:23 38:14
  43:14 46:19 51:9
  52:22 126:22
  173:13 179:10
**proceed** 66:2
  73:14
**proceeding** 115:25
**proceedings** 216:8
**process** 146:10
  179:5,16 180:3
  190:17
**product** 63:23
  183:6
**production** 218:19
  218:23
**products** 1:5 20:3
  179:9
**professional** 14:6
**progress** 4:8,14,20
  75:11,15,24 86:20
  94:10 188:15
**prolonged** 30:5
  46:20 128:17

**prone** 84:18
**proof** 213:11,20
**proper** 166:8,11
  169:25
**properly** 165:1,4
  169:13,14
**prophylactic**
  49:24 173:11
**prophylactically**
  33:4 35:13 36:22
  46:12
**proposition**
  175:23
**protect** 38:1
**protection** 11:2
  26:9 84:9 190:1
  190:10,21
**protective** 103:11
**provide** 11:15,16
  11:17 64:23
**provided** 11:19
**providing** 84:4
**proximal** 142:19
**pseudointima**
  143:9
**psoas** 90:10,19
  131:10
**public** 7:23 219:10
  219:18 220:15,23
  221:23
**publications** 14:19
**published** 176:9
**pull** 56:7,7 101:11
  144:19,22 148:22
  165:11 182:21
  188:23
**pulled** 76:1 77:2,8
  81:9 102:19
  110:19 143:19
  169:23

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[pulmonary - real]**                                                                      Page 31

**pulmonary** 20:21
21:17 22:14,25
23:25 26:4,8 28:9
28:11 29:11 30:10
30:20 37:3,10
46:12,15 74:7
84:9 173:1,4,12
175:8,9 190:21
191:25 192:8
204:2,9 208:12,16
208:18,23 209:1
209:16,24 210:2,3
210:6,13 211:3,7
212:2,13 213:1,13
214:12,14 215:5,9
215:18
**purchase** 178:2
**purpose** 141:18
148:8
**purposes** 71:23
103:17 209:22
**push** 56:11
**pushed** 128:2
**pushing** 127:19
**put** 8:3 11:9 13:6
27:9 29:6 33:19
46:11,15 47:3
48:2 51:14,17
67:4 68:16,22
71:24 74:6 100:9
102:17 111:14
117:10,14 118:13
118:17 124:11
141:20 145:7,11
147:17 152:21
154:24 155:5,10
155:11 156:15
157:17 158:7
164:1,12 176:1
178:6 190:7 191:2
206:11,15 213:6

**putting** 33:3 51:11
59:12 148:1
150:18 165:18
191:6

**q**

**quadraplegia**
65:14
**qualified** 168:2,5
**question** 21:2
22:16 35:23 38:17
44:16 45:11 48:4
51:10 52:1 58:20
67:21 114:19
116:15 118:9
130:3 152:6 154:9
154:16 155:5
159:7 162:7
164:11 165:6
166:6 169:11,21
179:15,18 180:15
180:21 181:3,14
182:4,8,15 193:5
194:14 200:18
205:13,17 206:9
206:18 207:22
208:14,19 210:25
211:15 213:24
**questioning** 65:24
171:13 197:3
**questions** 8:4,11
8:24 15:12 27:21
41:16 43:1 44:25
52:23 53:1,2
60:10 65:18,22
91:22 99:15 104:2
142:2 148:25
151:13 158:24
172:7,10 177:17
184:17 188:9,10
192:13 196:11,14
197:19,25 199:20

200:20,22 201:17
203:15,17 205:11
206:3,7 216:2
**quick** 31:21 142:1
**quickly** 104:25
163:9
**quite** 37:18 51:14
193:7
**quote** 127:3,5
132:21 200:3
202:25 211:17

**r**

**r** 145:25 146:1
217:1
**radiation** 128:16
**radiologist** 14:12
78:19 84:25 168:3
168:4,8,11,12
**radiology** 14:15
14:20 179:11
**railing** 73:3
**raise** 173:18
**raised** 13:20
**ram** 174:24
**ramirez** 2:24
**rare** 34:13 60:7
61:2 175:24
203:19 204:14
205:7,25
**rate** 19:21 74:15
162:19 180:24
201:3,10 202:24
202:25 203:2,9
204:21 205:21
**rates** 20:4
**rawlins** 2:3
**ray** 76:19 78:19,20
78:25 88:8 111:2
112:19 129:4
131:12,14,17
134:18,21 164:7,8

164:18,18 165:23
166:4 169:7 186:1
186:23 187:7,19
187:25 189:11
194:12 195:8,15
**rayed** 91:12
**raying** 196:1
**rays** 114:7 133:8
165:25 166:4
185:16 195:9
196:4,21
**rc** 59:19
**rd** 218:5
**reach** 27:8
**reaction** 65:11
79:23
**read** 44:16 46:4
49:25 67:4,8
76:23 77:5,19,25
79:19 87:15 118:3
118:14,17,20
121:6,24 122:2
124:20 130:2
141:23 145:4,18
146:16 148:8
158:21,22 159:2
159:21 160:13
168:3 176:9
184:15 199:17
206:11,17 210:21
211:18,19,21
219:5,6,12 220:5,6
220:17
**readable** 44:20
**reading** 64:8
87:18 140:16
159:24 197:21
206:10,21 207:5
218:12,21
**real** 155:11,11
163:9 164:18

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[real - relationship]**                                                                                   Page 32

169:8 201:4
**really**  16:17 26:16
  27:17 37:6 38:2
  45:5 46:5 51:4
  55:6 71:3 74:23
  78:16 81:14 82:8
  82:9 90:15 94:10
  107:5 115:9 125:4
  126:9 128:3
  143:16 164:7,8
  166:17 170:19
  173:10 181:15
  207:14
**reason**  21:18 25:4
  26:24 44:3 94:4
  100:17 111:6
  118:16,19 119:1
  129:10 145:2,5
  148:6,20 149:21
  156:20,22 166:7
  177:23 192:24,25
  196:3 218:16
  220:8 221:3
**reasonable**  114:13
  115:7 122:24
**reasonably**  31:24
**reasons**  12:23 47:6
  50:2 204:22
  205:22
**recall**  38:11 42:3
  50:19 53:13 55:12
  57:21 67:6 74:19
  75:10 81:14,19
  85:23,24 86:14
  93:22 94:6 96:4
  97:5 98:19 103:5
  106:17 107:20
  109:13,16,19
  112:19 114:2
  127:5 140:13,16
  146:23 147:3

153:4 172:25
  176:17 177:16
  190:8 206:9 213:2
**receipt**  218:20
**receive**  31:5
**received**  41:1
  53:16 79:7,12,21
  80:8 90:4 194:21
**receiving**  59:9
  74:2
**recess**  101:25
  140:25 142:8
**recipients**  184:4
**recognize**  184:3
**recollection**  32:21
  37:1 84:24 87:20
  88:22,25 89:18
  91:1 99:5 107:13
  108:2 127:18
  152:15 196:20
**recommend**  35:2
  49:10,22 91:9
  145:23
**recommendation**
  113:18 150:10
**recommended**
  91:11 192:6
**recommending**
  146:4 150:12,13
  150:17
**reconstructive**
  35:7 36:22
**record**  4:22 7:4,9
  8:1,3 11:3 20:7,10
  29:7 31:14 38:22
  38:24 65:3 66:1
  75:7 82:22 89:16
  89:21,25 95:10
  101:8,10,19,22,24
  102:3 103:18
  109:22 110:9,10

110:13 114:18
  140:24 141:3,20
  142:7,11 151:12
  169:9,10 171:18
  174:3 206:13
  209:22 216:7
  217:10 220:9
**recorded**  57:3
  78:3
**records**  3:21 31:15
  41:8,11 42:15
  53:15 75:16 79:14
  80:7 89:9 91:23
  94:11 117:9 125:6
  125:11 138:9
  166:6
**recover**  22:2 93:21
  96:14
**recovers**  74:14
**recovery**  48:14
  50:14 75:5 96:21
**recurrent**  189:17
**red**  81:12
**redesigned**  183:8
**reduce**  22:24
  208:25 210:2,4,12
  211:2
**reduces**  210:5
  211:7 212:1,12
  215:17
**reducing**  95:1
**reed**  2:8
**reevaluate**  88:8
  189:11
**refer**  33:8 121:11
  190:23
**reference**  31:14
  39:12 49:16 69:23
  70:16 71:13,16
  73:5 77:17 88:2
  89:8 94:11 135:25

218:8 219:2 220:2
**referenced**  117:15
  219:11 220:15
**references**  39:16
  69:21
**referred**  49:17
  61:16 147:11
**refers**  76:18
**reflecting**  90:5
**refresh**  107:13
  141:24 152:14
**regard**  25:25
  198:22
**regarding**  11:20
  65:19 76:18 89:25
  159:9 177:11,19
  180:11 209:10
**regardless**  184:25
**regards**  52:1
**region**  131:6
**regular**  165:23
  193:21
**regularly**  196:1
**reiterate**  36:9
  65:21
**reiterated**  37:5
**relate**  14:20 55:8,9
**related**  15:12 19:2
  21:7,25 25:23
  30:16 41:24 45:21
  47:18 51:16 60:1
  60:2 83:21 88:16
  96:2 97:10 104:2
  115:5 128:16
  129:24 148:12
  200:16 201:4
  217:12
**relates**  1:9
**relationship**
  166:17

Veritext Legal Solutions

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[relative - retrieval]**                                              Page 33

**relative** 30:6 46:21
  62:23 68:9 79:8
  98:6 129:8 166:14
  166:15 190:20
**relatively** 90:17
  128:3 195:13
**release** 170:18
**released** 55:10
**relevant** 182:18
  185:15 197:13
  198:21
**relied** 53:11
  184:11
**rely** 53:5 58:1,4
  66:13,18,21
  147:20 179:15
**relying** 27:11,14
**remain** 112:8
  114:21
**remained** 132:14
  133:21
**remains** 123:16
**remember** 50:18
  51:1,24 66:7
  81:10 94:13,14
  102:9,11,20 108:5
  108:6 139:12
  172:24 179:18
  190:16 192:16
  196:14 204:23
  207:2,3,3,6,9
  212:25
**reminded** 37:5
**reminding** 205:11
**remote** 133:4
**remove** 57:10
  74:11 82:20 93:16
  113:6 114:14
  133:25 134:14
  135:18 139:13
  141:10 170:20

  196:23
**removed** 74:8
  94:25 102:13
  133:14 139:14
  158:4,6,9,13
  163:15
**removement**
  74:12
**removing** 80:21
**renal** 69:12 79:18
  166:14,15
**renew** 151:12
  205:19
**repairing** 17:15
**rephrase** 205:16
**replaced** 25:5
  71:16
**replacement**
  189:15 190:4
  191:1,12,15,20
**replow** 165:18
**reply** 177:17
**report** 4:18 5:4,7,8
  5:20 6:4 71:13
  78:20 79:7,11,21
  82:6,24 83:1 87:8
  87:24 90:4 91:17
  94:15 95:8 123:24
  124:5,18 135:7
  140:19 141:9,19
  142:13 145:18,20
  146:3,7 163:9,14
  163:18,21 166:23
  166:25 167:6
  169:2
**reported** 39:20
  40:1,1,11,23 45:2
  77:7,21 96:1
**reporter** 7:19
  173:25 217:6
  219:7

**reporting** 81:2
**reports** 5:18 75:24
  141:4 182:19
  192:13
**repositioned** 71:14
  72:19
**represent** 7:9
**representative**
  66:22 103:15
**representatives**
  151:25
**reps** 155:13
**request** 35:3 37:8
  95:14 194:21
  220:9,11
**requested** 11:15
**require** 47:18
  48:11 90:18 97:7
  133:8
**required** 34:7 47:9
  50:10,12,14 74:13
  147:4,6 218:25
**requires** 97:12
**requiring** 89:19
**research** 12:9
**reservation** 98:5
**reserve** 8:7,10,15
  8:16,17 9:8 36:5
**reserved** 8:19 29:5
**respect** 50:21
  85:14 114:20
  149:18 151:8
  156:3 184:18
  211:22 212:9,22
  213:24 214:11,13
**respectful** 171:19
**response** 214:12
**responsiveness**
  26:10 35:23 36:1
  36:4

**rest** 30:5 39:24
  46:20 48:16
**restate** 66:1
**result** 19:8 21:17
  47:17 201:12
**resulting** 47:16
**results** 215:4,22
**retained** 176:12
  193:1
**retract** 70:14,23
  71:3
**retracted** 70:25
  72:13,22
**retracting** 16:17
  71:17 72:5
**retraction** 70:9
  72:4,5
**retractor** 72:25
**retractors** 71:14
  71:16,19,20 72:11
  72:15,18,24 73:4
**retrievability** 25:9
  25:18 27:1 55:14
  55:18 56:15,18
  57:12,15 63:14
  120:1 177:20
  181:5
**retrievable** 57:6,7
  57:17,19 62:8
  63:9 74:2 178:12
  203:5 206:23,24
**retrieval** 25:9
  74:12,18 80:23
  82:6 83:16 84:16
  85:1,20 86:10
  87:2,6,22 93:18
  98:4 113:1 114:1
  117:2,2,11 118:1
  120:18,22 121:3,6
  121:19 122:8,17
  123:4,6,8,11,13

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[retrieval - risks]**                                                                 Page 34

| | | | |
|---|---|---|---|
| 124:6 125:17 | **reviewed** 67:1 | 193:9 194:6 | **rigid** 186:14 |
| 126:5 128:21 | 130:22 176:9 | 198:25 199:24 | **risk** 19:13,14,21 |
| 135:7,10,11 175:4 | 198:5 199:2 | 201:16 202:23 | 20:20 21:3,13 |
| 175:7 211:22 | 208:18,21 215:15 | 203:6 204:25 | 22:5,9,13,24,25 |
| **retrievals** 121:8 | **rheudasil** 1:15 3:3 | 205:3,20 216:3,6 | 23:17 27:20 28:6 |
| 125:19 | 3:13,16,22 4:15,21 | 217:8 218:5 219:4 | 28:9,11,18,24 |
| **retrieve** 55:22,22 | 5:5,17 7:2,7,21 | 219:9 220:4,13 | 29:11,20,24 30:9 |
| 57:2,7,8 63:11 | 9:14,15,22 10:19 | 221:20 | 30:11,16,19,19,22 |
| 83:25 92:21 | 11:7,9,16,23 12:17 | **right** 8:9 17:16 | 44:6 46:8,13,15,16 |
| 113:11 121:14 | 13:6,12 14:2 15:9 | 20:13 26:18 29:7 | 46:25 47:11 48:7 |
| 122:15,17,19 | 18:12 20:12,17 | 31:20 40:18 42:9 | 48:18 50:13 52:19 |
| 123:2,11 124:9 | 22:5 24:10 25:17 | 47:2 52:4 69:25 | 57:20 60:6,8 |
| 125:23,25 134:3 | 26:22 27:18 28:2 | 76:1,21 79:12 | 61:20 62:5,17,22 |
| 141:15 175:6 | 28:4,16 29:9,23 | 83:9,9,13 86:19,23 | 63:1 65:10 66:5 |
| 197:4 | 30:21 31:7,10 | 90:10 94:20,22 | 74:7 84:13 85:5 |
| **retrieved** 24:4 | 32:5 33:25 35:12 | 95:15 99:15 102:8 | 91:3 116:22 127:4 |
| 32:16 54:13,19 | 36:7,12 38:8 41:1 | 105:4 106:1 | 127:7,12 128:15 |
| 57:1,18 63:1 | 41:10 42:14,25 | 109:18,21,23,24 | 128:16,17 133:15 |
| 73:24 75:1,9 92:3 | 44:24 49:2,6 52:8 | 110:15,17,18 | 137:4,8 147:13 |
| 92:7 101:14 | 53:14 54:13 56:16 | 111:10 117:5,14 | 149:3,14 150:6,7 |
| 120:17 121:10,13 | 56:24 57:25 58:7 | 117:16 118:3 | 153:24 154:3,18 |
| 122:7 132:23 | 58:22 59:23 61:17 | 119:4 120:7,11,24 | 155:2 161:1,5,8 |
| 140:15 163:4 | 62:13 63:17 64:3 | 121:12 122:5 | 162:23 173:18 |
| **retrieving** 55:21 | 64:12,16 65:4 | 123:1 124:6,7 | 176:3,4 184:21 |
| **retroperitoneum** | 66:3,9 67:13 68:2 | 134:2 138:13,15 | 189:16,23 191:1,5 |
| 114:16 | 69:2,4 72:11 73:5 | 140:13 142:4 | 192:1,3,8,9 193:12 |
| **retrospect** 46:6 | 73:11,17 75:8 | 144:11,23 148:24 | 197:7 200:14,15 |
| **return** 89:2 | 76:23 78:22 80:5 | 150:20,21 151:1,1 | 201:5,6 202:3 |
| **returned** 218:20 | 80:7 81:17,25 | 152:5 155:8 156:2 | 203:1,17,18,18,25 |
| **returning** 88:17 | 82:4,23 83:24 | 158:15 159:2 | 210:6,13 211:7,10 |
| 89:18 | 84:22 85:20 86:21 | 164:14 169:11 | 212:1,12 215:17 |
| **revealed** 181:6 | 86:24 87:14,20 | 172:19 174:16,18 | **risks** 18:15,17,21 |
| **review** 31:15 | 89:9,15,23 90:4,8 | 174:21,24,25 | 18:24 19:6 20:3 |
| 42:22 90:6,22 | 91:18 94:23 95:5 | 175:1 177:2,21 | 43:22 50:16,21 |
| 91:23 107:9 | 95:25 98:12 99:14 | 178:15 179:1,20 | 51:13,15,20 52:8 |
| 120:24 130:1 | 102:9,11 107:1 | 179:21 180:19,21 | 52:14,16 58:9 |
| 163:17 166:5 | 137:19,25 138:10 | 183:13 190:14 | 59:24 60:5 62:14 |
| 184:8 198:15 | 151:14 174:14,17 | 194:4 195:23 | 63:20,22 64:4 |
| 218:13 219:1 | 183:17 184:16 | 206:21,25 207:1 | 66:4 67:14,22 |
| 220:1 | 185:6 188:16,19 | 207:12,14 212:21 | 73:12 85:7,11,17 |
| | 189:5 192:12 | 214:8,15 | 137:5 145:23 |

Veritext Legal Solutions

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[risks - selecting]** Page 35

149:8,15,18,23
150:1,16 154:25
155:18 156:3,6
180:10 183:6
198:17,21,24
199:8,9,12,15,18
200:20 203:19
204:6,10
**rly** 1:6,10
**rn** 90:3
**road** 1:20 10:10
**robaxin** 45:3
**roberts** 2:15
**robin** 1:24 217:6
217:20
**robinson** 2:25
**role** 48:15 58:24
**roll** 140:10
**room** 16:4 69:18
123:20
**roughly** 25:24
178:3 202:3
**routine** 21:10
34:20 36:20,25
55:24 149:12
**routinely** 38:2
60:19
**rpr** 1:24 217:20
**rubber** 186:8
**rules** 219:5 220:5
**run** 9:4 165:9
171:14,22
**rutigliano** 2:16
7:16,16

**s**

**s** 220:8,8 221:3
**s1** 49:15
**sac** 116:23
**sad** 175:9
**safe** 90:17 153:9
154:13 155:14

156:9,12
**safely** 121:10,13
**safer** 63:15 128:4
128:7,9,13 134:11
134:14 152:25
153:8 158:1
**safest** 90:9
**safety** 97:19 153:3
154:24 155:18
157:22 158:3,6,8
158:13 177:24,25
178:4 180:10
**saint** 120:7
**sale** 155:19
**sales** 1:4 103:14
151:24 155:13
**salesmen** 108:3,10
108:13,16
**satisfactorily**
93:16
**saturday** 77:1,8
**saw** 12:14 31:23
41:2 45:3 94:23
192:22 200:23
207:25 208:7
**saying** 59:17
107:19,20 157:7
191:24
**says** 40:17,21
41:22 42:1 43:2
49:14 69:6 76:25
78:5 87:14 88:8
90:3,8 96:12
104:17 106:16,24
110:13,23 111:2
111:13,15 113:4
117:23 120:14
121:2 125:8,13
130:22 174:21,23
175:2 190:9

**scalpel** 136:10,11
**scan** 194:21 195:9
195:16
**scans** 193:22
194:7,19 195:10
**scar** 43:8,13,19
45:19 65:14 70:21
71:2 112:22
143:12
**scarring** 70:17,19
**schedule** 11:14
80:23 172:10
**scheduled** 49:15
117:3
**scheduling** 35:1
**school** 13:19,21
**schooling** 13:20
**scientific** 108:21
208:18,21 209:10
209:21 213:11,16
213:20 215:15
**scientifically**
208:5
**scissored** 142:24
**scissors** 139:10
140:2 143:18
**screen** 44:10,19
76:17 78:12 106:3
117:15 124:4
130:21 137:24
188:24
**scrutinize** 61:5
**seal** 219:15 220:21
**second** 22:10
27:19 37:2 39:15
46:3 75:13 89:17
103:9 127:8 142:6
186:23 189:8
**seconds** 166:2
203:14

**section** 43:9 45:7
73:6,9 79:11,14
88:7 120:18,24
121:6,11 158:23
**sedentary** 48:14
**see** 10:8 11:12
39:12,17 40:10
41:18 42:2,16
44:4,9 49:14 72:1
72:2 75:3,17 76:3
80:24 81:8 86:13
88:5,10,18 91:10
94:7 95:3 103:21
104:17 105:1,10
105:12 109:5,9
110:2,2 120:19
121:2,5 122:6
137:13 145:17,17
151:11,17 163:11
164:7 165:10
167:9,22,25
174:10 185:25
187:6,9,14 190:22
192:14,17 194:12
200:15
**seeing** 112:14
168:19
**seek** 77:3,9
**seen** 60:14 61:12
61:12 79:16 88:19
88:21,23 98:13,16
98:21 99:3,6,8,10
99:12 109:1
112:11,16 115:21
122:9 167:16
183:23 202:11,12
202:13,14 204:16
**segment** 131:5
**segments** 131:4,23
**selecting** 179:16

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[selection - specifically]**                                      Page 36

| | | | |
|---|---|---|---|
| **selection** 177:19 | 220:7,10,18 221:1 | **simplest** 30:13 | **societies** 14:7,14 |
| **sell** 151:10 | **shelf** 119:24 | **simply** 68:22 | **soft** 88:3 |
| **send** 34:21 78:22 | **shelves** 120:6 | 146:8 191:3 | **solutions** 218:1 |
| 108:13 | **shift** 64:17 | 206:18 | 221:1 |
| **sending** 108:3,9 | **ship** 84:23 | **sincerely** 218:22 | **solve** 134:9 |
| 122:20 | **short** 21:25 140:18 | **single** 121:9 | **somewhat** 61:3 |
| **sends** 106:4 145:9 | **shortly** 117:1 | 124:23 166:4 | 115:23 |
| **senker** 5:23 151:4 | **show** 35:25 103:10 | 188:2,7 193:15 | **soon** 8:21 107:6 |
| 151:20 | 136:1 137:23 | 210:9,9,15 | **sorry** 8:20 10:15 |
| **sense** 25:11 107:4 | 173:22 180:16 | **sir** 165:14,16 | 18:4 32:4 40:20 |
| 162:12 | 186:24 187:3 | 172:18,21 218:10 | 44:9,13 65:12 |
| **sent** 38:10 51:6 | **showed** 134:22 | **sit** 12:18 31:20 | 69:3 73:8,9 78:9 |
| 106:19 108:16 | 197:23 198:10 | 67:7 197:21 210:8 | 82:22 83:10 |
| **sentence** 119:16 | **showing** 114:7 | 211:12 | 101:23 117:21 |
| 120:13,15 189:14 | 167:18 | **sits** 18:5 | 122:12 138:10 |
| **separate** 157:11 | **shown** 106:2 | **sitting** 169:25 | 146:11 157:2 |
| 192:8 | 124:17 183:21 | 207:3 | 167:14 168:13 |
| **separated** 90:13 | 218:18 | **situation** 111:12 | 174:9 189:4 |
| **serial** 195:10 | **shows** 45:12 | **six** 42:1 | **sort** 18:5 25:3 35:7 |
| **series** 76:20 | 110:10 | **size** 23:23 45:13 | 37:4 51:3,5 62:7 |
| **serious** 93:19 | **side** 72:9 187:9,9 | 45:17 55:9 140:10 | 72:16 75:5 84:25 |
| 132:16 133:13 | 187:15,16 | **sjh** 4:19 83:2 | 85:1 139:5 143:11 |
| **set** 5:14 118:6 | **sign** 218:16 | 117:23 | 166:3 201:2 |
| 119:2,9 122:8,14 | **signature** 217:19 | **skin** 70:9 77:19 | **sounds** 126:7 |
| 123:4,11,13,17 | **signed** 65:5 103:10 | 136:15,17 | 183:11 |
| 125:17,24 217:9 | 130:12 219:13 | **skip** 82:2 | **southern** 1:2 |
| 217:16 | 220:18 | **skipping** 76:25 | **speaking** 113:7 |
| **settings** 10:8 | **significant** 18:25 | **sleep** 68:17 | **specialty** 21:8 |
| **seven** 42:1 | 21:2,19 23:23 | **slide** 101:3 123:1 | **specific** 22:17 |
| **severe** 42:8 46:1 | 79:15 84:12 137:2 | **slightly** 48:10 60:6 | 23:15 38:8 48:7 |
| 65:11 76:21 | 137:3,4,9 158:12 | 74:14 | 55:19 66:18 98:5 |
| **sew** 135:18 139:14 | 161:4 162:18 | **small** 133:12 | 124:21 149:2 |
| **shape** 126:16,18 | 170:3 181:10 | 203:25 205:6 | 185:23 196:20 |
| 186:10 | 191:1 200:12 | **snare** 82:20 | 200:21 |
| **shaped** 126:16 | 201:10,13 | 123:15 124:2,12 | **specifically** 27:21 |
| **sheath** 55:11 56:8 | **significantly** | 124:22,23,24 | 51:25 55:12 64:13 |
| 123:16 124:12 | 153:24 189:23 | 125:2,3 126:14,15 | 67:5 74:19 86:14 |
| 164:6 | **signing** 218:12,21 | 175:6 | 94:6 100:10 |
| **sheet** 3:18 38:19 | **silence** 141:23 | **snares** 123:18 | 124:17 135:10 |
| 39:2,5 41:2 | **simple** 37:23 | 126:12 127:17,21 | 137:14 143:3 |
| 218:14,16,17 | 187:6 195:7 215:2 | | 145:10 156:4 |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[specifically - subsequently]**                                    Page 37

164:8 165:19 166:16 206:9 207:3 212:7,14,19
**specificity** 207:5
**speculation** 198:4
**spend** 51:23 52:15 133:6 163:8
**spent** 124:24
**spinal** 15:17,20,22 15:23 16:21,25 17:4,9,22 22:12,15 29:16,19 35:14 36:15 37:16 46:14 47:2,3,13 48:3 49:16 50:4,8 71:9 93:6 185:8 195:19 196:1
**spine** 5:21 16:1,3,5 16:11,16,19 17:11 17:17,19 18:1,2,8 29:21 32:22,23,25 33:6 34:3,22 35:3 35:6,7 36:17,20,22 38:3 43:18 46:18 46:22 47:19,24 48:9,14 50:9 68:16 69:1 70:4 70:20 71:11 72:4 72:7 145:21 157:9 157:17 173:9 185:16,21 186:20 192:2 196:1,8
**split** 10:24
**spoke** 8:20
**spoken** 108:20
**sponsored** 176:23 177:11,15
**spontaneously** 21:6
**ss** 217:3

**st** 5:19 10:2,5 141:5 150:19,22 151:9 152:8,12,17 156:21,23 157:20 178:16
**stable** 111:21 112:1,7 128:3
**stack** 117:18
**staff** 64:22
**stage** 125:24
**stagnation** 175:14
**stamp** 103:20
**stamped** 3:23 4:5 4:7,8,11,13,15,17 4:19,21,23 5:5,10 5:13,15,16,19,21 6:6 49:2 65:1 68:6 75:11 79:4 80:3 81:21 83:2 86:21 89:22 91:18 102:25 105:6 119:10 137:19,25 141:5 145:21 174:5 188:16
**stand** 73:2,4 180:20
**standard** 35:3 124:12 210:17
**standing** 8:4 36:1 36:9 61:15 65:17 65:22 104:1,6 151:13 174:13
**standpoint** 178:17
**staples** 94:13 95:1
**start** 13:22 28:3 32:2 68:12,12,25 69:3 100:10 102:10 120:14 122:1 127:1 137:14 168:15

**started** 174:13 204:20
**starts** 104:24
**state** 9:13 133:11 217:2,7 219:10 220:15
**statement** 204:25 219:13,14 220:19 220:19
**states** 1:1 54:2
**static** 166:4
**status** 186:11
**stay** 165:25
**stays** 165:24
**stent** 176:22
**stents** 20:1
**sternum** 136:3
**steroid** 30:4
**stick** 70:22
**stickers** 173:25
**sticking** 144:2
**sticks** 43:19
**stock** 178:2,13 179:3
**stocked** 156:18
**stone** 72:21
**stop** 10:16,20 95:19 126:20,21 126:22 127:8,14
**stopped** 125:5
**straight** 144:22 187:9
**street** 2:3,9,17 10:13
**string** 5:9,12,22 6:5 102:24 105:5 151:3 174:4
**stroke** 47:20
**strong** 179:7
**strongly** 145:12 191:7

**structure** 19:2 186:9,24
**structures** 16:12 17:10 175:15 182:20 195:8
**strut** 83:23 88:3 90:9,13 110:14 114:6 116:4,11,17 116:18 144:17
**struts** 60:21,23,25 114:21 115:14 133:22 139:11 143:8,23,24 144:5 175:12
**stuck** 123:25 127:22
**studied** 100:19
**studies** 121:9,11 158:19,22 199:21 210:10 211:23 212:17,19 214:5
**study** 160:15,21 181:5 210:11 211:11,16,19,21 211:24 212:3,5 215:1,6,8
**stuff** 70:24 136:22 171:20
**subclinical** 200:4
**subcutaneous** 69:24 136:18
**subject** 99:11 154:19 168:6 210:19
**subscribe** 14:19
**subscribed** 219:10 220:14 221:21
**subsequent** 22:25
**subsequently** 173:18

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[substance - talk]**                                                    Page 38

| | | | |
|---|---|---|---|
| **substance** 109:12 | 121:15 125:20 | 92:25 93:6 94:8 | 123:6,9,16,18 |
| **substract** 11:4 | 127:10 129:24,25 | 112:25 135:20,23 | 124:13,23 126:5 |
| **suburbs** 10:11 | 130:17 131:18 | 136:24 138:17,18 | **t** |
| **success** 20:7,10 | 143:20,21 145:12 | 145:24 147:5,13 | |
| **successful** 82:14 | 147:14,16,16 | 157:14,18 173:8 | **t** 217:1,1 |
| 125:18 141:13 | 161:5 164:5 | 185:6 188:15 | **tab** 1:6,10 |
| **successfully** 82:21 | 186:14 193:23,25 | 189:15 190:5 | **tack** 43:8 |
| **suffer** 22:2 65:10 | 196:21,22 198:20 | 191:12,15,20 | **take** 13:7 21:4 |
| **sufficient** 135:15 | 199:6 203:22 | 192:3 193:13 | 23:11 31:21 46:18 |
| **suggest** 172:5 | 205:18 213:10 | 196:22 | 63:16 68:19,23 |
| 192:17 196:18 | **surgeon** 9:15 | **surgical** 21:5 | 78:18 82:11 92:19 |
| **suggested** 57:23 | 13:16 14:3,23 | 112:22 129:24 | 93:23 95:24 97:12 |
| 76:6 206:6,8 | 15:3,14,16,17,20 | 134:8 137:10 | 115:7 117:12 |
| 209:23 | 15:23,24,24 16:6 | **surprise** 175:16 | 118:4 121:19 |
| **suggestion** 101:12 | 16:21 17:3 18:14 | 201:1 | 123:23 124:10 |
| 213:15 | 19:25 20:9 51:9 | **surprises** 113:10 | 125:21 126:2,3,4 |
| **suggests** 88:3 | 55:6 115:8 116:7 | **surrounding** | 129:1 130:1 |
| **suite** 1:21 2:4,9,17 | 116:13 168:10,11 | 144:3 166:16,18 | 133:16,20,22 |
| 218:2,6 | 196:1 | 195:8 | 135:3,4 136:13 |
| **summary** 88:7 | **surgeons** 15:22,23 | **surveillance** 91:13 | 137:12,14 139:22 |
| 189:8 | 17:1,4,12,19 35:1 | **suspect** 57:22 | 140:18 141:22,25 |
| **superior** 218:1 | 190:23 | 72:22 163:6 | 142:1,12 144:21 |
| **supplied** 120:17 | **surgeries** 21:2 | 198:21 202:16 | 148:22 154:21 |
| **support** 103:14 | 35:6 38:3 45:22 | **swear** 7:19 | 165:16 166:12,13 |
| 208:5,24 209:21 | 48:11 96:3,8 | **swelling** 39:24 | 169:9 171:24 |
| **supporting** 209:19 | 192:3 195:19 | 42:8 43:2 | 174:19 189:7 |
| **supports** 208:22 | **surgery** 4:14,20 | **swollen** 81:12 | 191:15,19 195:15 |
| 211:25 212:12 | 13:22 14:10,24 | **sworn** 7:22 144:24 | **taken** 41:24 60:21 |
| 215:16 | 17:2,8,9 18:19,20 | 217:10 219:10,13 | 74:3 101:25 |
| **suppose** 29:14 | 18:25 23:12 29:10 | 220:14,18 221:21 | 112:17 140:25 |
| 154:5 | 29:15,17,19,21 | **symptomatic** 99:7 | 142:8 |
| **sure** 8:14,22 9:2 | 30:6 32:22,25 | 99:9,10 | **takes** 14:24 138:21 |
| 17:6 18:16 19:19 | 33:15 34:2,22 | **symptoms** 77:18 | 138:21 |
| 22:16,17 25:16 | 35:4,14 36:15 | 77:24 78:1 81:2 | **talbert** 5:10,12 |
| 35:19 53:1,21 | 37:3 40:8,12 | 83:21 87:15 92:11 | 102:25 105:5,12 |
| 55:3 57:4 58:3,19 | 46:13,15,17,22 | 96:6 129:8 195:17 | 106:24,24 107:11 |
| 63:2 70:15 81:10 | 47:18 48:9,14,17 | 197:11 | 107:14,22 108:1,5 |
| 85:9 87:19 94:2 | 49:17 50:4 69:1 | **synonymous** | 109:5,10 110:1 |
| 103:7 104:8 | 70:6 71:9 72:17 | 59:22 | **talbert's** 107:16 |
| 105:18,24 108:24 | 72:20 73:13,18 | **system** 54:24 55:1 | **talk** 15:9 21:21 |
| 116:15 118:8,10 | 74:10,14,22 86:20 | 56:1 72:25 122:17 | 27:18 31:7 50:15 |
| | | | 50:24 62:18,20 |

Veritext Legal Solutions

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[talk - thought]**                                                                 Page 39

63:18 64:17 68:3
80:13 107:4 108:9
109:9 142:15
149:13 180:18
210:10 212:9
**talked**   8:1 30:21
31:23 52:21 62:3
146:9 162:11
165:19 199:12
212:8
**talking**   18:12
23:11 26:25 38:5
47:20,21,22 50:8
50:21 51:23 52:13
52:15 62:10 106:8
107:10 138:16
144:5,10,12 157:8
162:4,10 167:22
186:22 189:18
196:8 201:10,14
211:5 212:6 215:2
**talks**   107:8
**tamara**   103:4,5,8
103:14 105:2,11
106:4 152:3,4,6
**teased**   143:9
**techniques**   63:12
84:15
**tell**   9:18 13:15
14:22 16:10 22:22
36:15 37:24 41:19
41:23 44:10 51:11
59:8 60:17,19
70:1 73:22 74:2
80:15,17 87:17
90:4 93:8 96:5
107:25 108:2,8,12
115:13 121:17
123:7,24 129:21
135:9 148:18
149:14,17 151:7

153:7 159:8,14,25
164:19 165:21
166:18 167:6
179:23 180:2
182:22 186:5
190:3 194:10
210:24
**telling**   26:23
113:10 160:22
**tells**   159:16,19
**temporarily**
135:15
**ten**   34:14
**term**   16:9 22:1,19
47:18 50:6 51:22
57:19 59:16 60:5
60:9 66:10 71:19
83:19 85:5 113:23
114:11 176:2
**terminology**   44:2
**terms**   21:22 25:6
26:6,8 68:20
178:4 183:10
187:6 202:3
**testified**   7:23
169:12 178:5
**testimony**   114:2
127:5 144:24
206:14,19 213:2
217:11 219:6,7
220:6,9,12
**tests**   12:10
**texas**   2:4 13:20,21
13:24
**thank**   7:18 9:10
32:4 38:7 44:7
99:14 102:7
104:13,24 105:20
106:7 117:24
171:7 172:20
183:17 192:10

206:2 215:25
216:2
**thanks**   44:23
**theoretically**
43:22 47:15 51:21
115:18 116:25,25
125:9 128:14
137:5 157:16
173:19 176:3
187:23
**theory**   210:4
212:24
**therapies**   23:8
**thereabouts**   117:6
**thigh**   76:1,8,21
77:2,9 81:4,9
83:23 110:15,17
110:18 114:7
115:20 132:1
192:14,18
**thin**   143:12 186:8
**thing**   34:13 75:5
83:6,8 124:8,10,16
142:18 190:1
**things**   16:14,18,18
18:23 19:25 25:1
26:23 27:7,19
30:22,24 39:23,25
44:5 48:2 55:11
56:17 63:18 70:14
70:22 71:21,24
72:13,22 98:22
100:21 114:18
122:24 132:22
134:10 135:2,13
155:23 165:25
183:18 198:18
214:5
**think**   25:24 37:20
38:12 40:19 52:12
54:3,10 56:10

57:5 58:20 61:3,4
61:10 73:9 81:10
81:11 82:3,17
84:6 85:23 86:11
87:19 89:4 90:25
90:25 92:4,4,8,10
95:21,23 101:18
102:20 107:3
108:25 111:19
112:12 114:12
115:7 119:24
121:22,23 122:16
124:1 125:14
126:23 127:16
129:2 130:9 131:9
132:4,6,25 135:8
138:7 140:16
147:11 150:9
156:17 159:19
162:12 163:6
165:7 167:1 171:6
174:12 176:21
178:2,7,15 180:6
181:23 182:9,15
185:19 188:25
189:3 190:17
191:3 193:5 194:2
195:11,11,16
197:9,11 200:10
200:11,19 201:8
202:14,15 215:13
**thinking**   132:9
186:6
**thinks**   76:2
**thinners**   22:23
23:2
**third**   37:2 119:15
121:5
**thirty**   23:6 218:20
**thought**   44:6 51:8
80:21 92:18

Veritext Legal Solutions

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[thought - treated]** Page 40

101:23 128:3 131:8 149:22 154:2 156:8 158:12 170:10,19 190:19 193:17 197:16 198:3,24 211:9

**thoughts** 153:8 212:24

**thousand** 208:24

**thousands** 209:18 210:18,21

**thread** 68:18

**threatening** 133:2

**three** 25:12 74:10 112:12,17 171:15 182:1,13 186:24 187:3

**thromboembolic** 176:6

**thrombosis** 20:20 21:3,5,13,14,16,20 60:7 173:17,18 176:3,12 189:17 189:20,24

**thrombotic** 203:17 203:18 204:1

**throw** 205:9

**tilted** 82:17 84:8

**tilting** 60:4

**tilts** 84:10

**time** 7:5 8:16,18 9:8 10:16,24 11:1 12:6,8 16:4 23:5 24:25 25:2,3,13 27:22,24 29:5 36:6 37:8 41:3 42:16,18 45:2 48:12 50:10,12,14 51:23 52:15 56:5 59:23 60:8 61:17

62:15 67:5,15 68:15 69:16 74:9 77:13,25 80:12,20 80:24 83:15 84:2 84:19 86:16 87:15 88:21 89:6 91:2 92:17 94:3 95:18 95:22,25 97:2,3 99:23 101:9 102:1 106:18,19 109:25 111:7,20 121:16 121:18 122:3,3 126:3 127:16 128:4,8,18 129:7 129:18 130:16,19 131:20 132:19 133:6 134:20,23 135:20 137:6 140:22 141:1 142:6,9 150:18,25 151:25 152:15 154:24 155:11 156:19 157:6,12 157:19 159:10 163:8 164:18 169:8 170:4 171:8 171:14,20,22,25 172:1,2 176:5 178:14 186:7 189:2,16 190:13 193:10 194:16 196:16 199:1 205:12 206:3 207:4,24 208:2,7 216:3,4

**times** 15:15 16:10 17:20 31:16,22 32:6 33:13,14 34:10,14 53:22 54:5,10,16 72:19 106:6 126:2

171:19

**timing** 194:24

**tines** 139:10

**tip** 69:11

**tissue** 43:8,13,19 45:15 69:24 70:21 71:2 90:14 136:16 136:18,18 143:12 144:4

**tissues** 70:12 88:4

**title** 103:15

**today** 10:1,17 11:12,17 12:18 15:10 31:20 42:15 54:22 67:7 75:25 107:1 109:17 112:8,14 113:23 120:3 127:5 163:10 165:12 171:8,15 183:20 194:8 197:4,19,21 199:12 201:9 202:22 204:6,20 205:20 209:22 210:8

**today's** 8:2 216:5

**told** 40:22 42:3 53:5,10 59:13,15 66:22 76:7 77:22 78:3 80:18 88:23 108:6 112:5 121:22 122:6 123:3 147:4 155:9 155:13,17 179:16 192:20

**tolerated** 47:4

**tom** 36:24

**tomorrow** 107:2

**tonya** 2:23 3:15 11:23 15:11 31:9 102:12 110:13

129:1 133:16 148:1 149:3,23 157:24 167:22 218:7 219:3 220:3

**tonya's** 102:10,16 130:22 131:1

**tools** 23:7 58:14,21

**top** 40:17 56:8 82:19 174:23

**topic** 182:24

**torn** 163:7

**total** 53:24 171:14

**town** 10:9,11 33:23

**track** 215:21

**tract** 73:1

**trained** 36:21

**training** 13:13,17 13:23,23 16:24 24:8 27:12 36:20 37:6 58:2 63:24 64:6 67:24

**transcribed** 219:7

**transcript** 6:14 218:11,13 219:5 219:12 220:5,11 220:17

**transverse** 49:21

**trapease** 202:11 202:12

**traumatize** 128:15

**travel** 196:13

**treat** 20:19,23,24 21:12 33:21 54:8 184:13

**treated** 18:18 22:6 22:11,14 27:23 30:25 31:23 32:5 34:7,12 61:18 62:15 86:17 91:2 95:6 96:11 97:2

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[treated - use]**                                                                                                   Page 41

98:24 193:10
194:16 196:16
**treating** 34:6
89:11 205:3
**treatment** 3:16
11:21 31:8,10
35:20 77:3,10
192:25
**treatments** 58:15
**tremendous**
138:24
**trial** 8:17,18 9:9
29:5 159:9,15,16
159:22 160:2,3,7
161:16,21 205:13
**triangle** 18:5
**tried** 122:15
124:16,23 127:16
**trip** 176:19,21
**true** 20:16 61:22
63:5 99:20,24,25
100:6 113:14
117:4 128:22
152:20 178:11
181:2 184:24
199:24 204:5
215:23,24 217:10
**truthful** 147:21
148:3
**try** 17:15 21:18
23:13,24 46:12
63:15 74:6 80:21
80:23 82:11 85:2
113:18 122:19,24
123:2,8,10,25
124:9,15 125:3,23
126:24 128:5,10
133:16,22 135:3
135:16 149:14,17
170:17,18 183:17
184:15 193:18

**trying** 84:14 107:2
111:23 123:20
126:8,10,20 128:5
128:8 134:10
137:14 139:22
196:23
**tubal** 43:8
**tube** 186:14
187:19
**tulip** 122:8 123:4
123:12 125:17
126:5 152:12,18
153:6,16 155:15
156:15,18 157:17
157:23 177:11
178:16,21 183:8
201:17,18,25
**turn** 20:14 39:15
40:16 44:11,18
76:10 78:9 119:4
119:15 120:21
158:16,18 165:24
166:1 188:18
**turning** 44:8
**twelve** 83:10
**two** 11:4 14:1
24:21 25:12 32:23
33:1 34:18,25
41:13 49:23 72:22
75:22 76:11 83:7
94:19 110:16
111:16,23 112:3
112:17 113:4
114:7 121:16
125:7 130:3 131:3
145:19 154:10
166:25 181:19
200:24 203:12,14
**tylenol** 95:18,22
95:24

**type** 15:2 18:19
22:12 53:8 59:8
152:7 184:25
187:14 205:1
**types** 18:17 24:14
60:15 123:14
202:9
**typical** 79:18
**typically** 14:25
16:4,5,24 17:3
18:4,21 39:10
67:4 69:7 75:4
93:12 124:22
152:7 154:6 188:2
188:4
**typographical**
49:18

**u**

**u** 176:10
**uh** 142:14 159:1,4
167:11 189:9
195:24 196:15
**ultimate** 150:2
**ultimately** 53:15
92:22 147:8,14
179:12 183:9
**umbrella** 60:20,22
62:7
**unacceptable**
170:13
**unacceptably**
203:9
**uncommon** 60:24
**uncommonly**
190:22
**undergo** 22:12
52:22 190:4
**undergoing**
191:11,15
**underlying** 30:18

**underneath** 18:5
143:14
**understand** 10:18
17:6 22:16 26:13
116:15 118:8
150:9,10 160:14
169:6 180:14
215:12
**understanding**
69:17 86:12
**understood** 43:23
46:7 73:12 192:10
**underwent** 117:3
**undo** 71:1
**uni** 5:15 119:11
**unique** 61:24 63:6
63:8 68:24 71:10
203:23 204:25
**united** 1:1 54:2
**unmarked** 75:13
**unpredictable**
115:23
**unreported**
162:20,22
**unusual** 75:3
115:21 204:14
**upper** 116:2
**urgent** 91:14
**use** 5:15 21:22
23:13,15,17 25:15
30:5 34:25 36:5
50:6 54:7 56:12
56:13 66:10,14
67:1 71:18,22
97:16 118:5,24
119:10,19,22,25
119:25 120:11
123:4,7,8,10,10,14
124:12 136:8,9
139:6 140:2 147:1
148:1,11,14,17,18

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[use - want]**                                                    Page 42

148:22 151:10
152:12 154:4
158:17 159:6
160:13,22 161:10
161:14,20 162:23
163:1 166:3
178:20 179:17,23
180:11 197:20,22
198:2,3,10,16,18
199:3,9,21,24
204:3 206:10
207:6 209:19
212:24
**useful** 180:22
181:1
**usual** 74:21
118:13 120:25
206:15
**usually** 15:8 17:24
25:12 42:17 55:24
138:21 172:7

**v**

**v** 1:9 218:7 219:3
220:3
**vaguest** 183:10
**valor** 84:20
**valve** 116:21,22
**varicose** 15:7 30:8
30:8,14,15,23
48:23
**variety** 42:14
124:1
**various** 60:15
72:19 204:22
205:22
**vary** 187:19
**varying** 126:18
**vascular** 3:17,20
4:12,14,20 9:15
13:16 14:3,10,23
14:24 15:3,14,24

15:25 17:8,12
18:14,19,20 19:25
38:18,25 39:16
40:8,11 41:7 80:2
86:20 115:8 116:7
116:13 168:10,11
188:15
**vasculature** 115:9
115:24 116:1
**vast** 18:8 61:8,10
**vein** 1:19 15:7
20:20 21:3,5,13,14
21:16,20 23:21
30:18 68:18 71:17
143:13 173:17
175:17 176:12
189:19,24 218:5
**veins** 15:7 30:8,8
30:14,14,15,17,23
48:23 69:12 79:18
166:14,15
**vena** 12:5 17:23
23:19,20 24:2,4,6
24:10,14 31:5
32:9,14,17 34:8,11
34:22 35:13 36:15
37:15 46:9 48:8
48:20,24 49:12
50:3,16,22 53:4,16
54:1,13,19,24,25
58:1,10,23 59:25
60:12 61:18,22
62:5,23 63:5 64:4
64:18,19 66:5,12
66:18 67:14,23
68:19,20 69:5,13
73:13 76:7 82:11
85:11 93:1 115:25
120:16 122:8
123:12 124:11
134:1 135:13

136:22 137:6
138:19,22 139:3
139:24 140:1,5,7
142:18,22 143:18
163:5 164:15
182:13 185:10,14
185:25 186:4,9,13
186:19 187:3
199:9,18
**venogram** 69:14
**verify** 31:19
**veritext** 218:1,8
221:1
**veritext.com.**
218:19
**versus** 152:12
178:21
**vertebral** 114:17
132:3
**vessel** 51:19 93:2
135:16,17 138:23
139:14
**vessels** 14:25
17:12,15,21 18:7
19:3 50:11 72:5
72:10 115:10
**video** 101:10
102:2 135:25
140:23 141:2
142:7,10 169:9
216:7
**videographer** 2:24
2:25 7:4,18 101:7
102:1,5 140:22
141:1 142:5,9
171:14 172:17
216:4
**videotaped** 1:14
3:2,12 7:1,6 11:7
216:6

**view** 36:14,14
37:15,24 91:15
**virtue** 44:1
**visible** 185:17
196:8
**visit** 5:6 39:6
41:11,17 49:7
50:16 73:19 78:15
80:16 87:21 94:12
94:15,18 193:15
**visiting** 42:19
**visits** 193:14
**visualization**
143:4
**visualize** 16:15
18:10 143:16
**vitae** 3:14 13:4,10

**w**

**wait** 44:15,15
64:10 80:20
188:22
**waived** 218:13,21
**walking** 39:17
**wall** 60:12 144:3
144:18,20 181:23
182:2 200:8
**walls** 185:25
**want** 8:25 9:1
15:11 17:6 22:10
25:16 27:18 31:7
32:2 41:16 42:23
42:25 45:25 60:10
62:13 63:10 64:16
65:21,25 68:2
69:22 79:10 86:13
89:16 100:24
101:3,21 102:4
105:21 130:2
141:23 152:14
154:18 158:18,21
159:6 161:5 162:3

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

**[want - zero]**                                                            Page 43

| | | | |
|---|---|---|---|
| 164:24 165:18 167:12 171:19,21 172:9 183:18 194:19 198:15 200:3 201:7 205:13 206:12 209:6 212:9 | **week** 76:20 110:15 **weekend** 176:19 **weeks** 94:19 **weigh** 58:9 85:7 **weight** 43:24 **welcome** 104:4 **wellbutrin** 45:3 **went** 13:24 22:15 76:21 118:4 121:13 125:2 138:19 171:18 | **worried** 47:16 116:16 133:1 **worrying** 133:6 **worth** 111:23 191:5 **wrapping** 203:13 **write** 111:4 **written** 76:14 **wrong** 51:17 **wrote** 129:18 132:10 | 207:4 214:8 |

**wanted** 33:2 34:1 78:19 88:19,21,23 89:2,6 106:6,9 133:7 156:16 161:10 170:20 185:19 187:25 192:7

**wants** 145:9 150:14

**warning** 185:5

**warnings** 148:12 198:11

**washington** 2:10

**watch** 165:25 196:2

**watching** 84:25

**way** 16:2,14,15 17:11,16,21 20:14 22:15 27:9 30:13 33:19 38:1 48:25 67:21 70:7 71:21 71:25 72:10 74:22 81:13 100:3 103:5 106:17 119:22 135:13 136:22 164:12 167:21 171:1 176:1 187:24 192:4 193:20 200:4 204:17 208:4 217:14

**we've** 10:20 30:21

**weeds** 154:8

**whatsoever** 182:24 197:11

**whereof** 217:16

**whichever** 16:6

**wide** 71:14

**william** 2:15

**wire** 126:18 139:9 144:21

**wires** 127:20

**withdraw** 207:21

**witness** 7:20,22 10:21 26:14,18 99:16 102:4,7 117:7 128:23 167:16 168:14 169:20 171:9,13 172:6,12,15 195:20 214:16 216:1 217:8,11,16 219:1,4,11 220:1,4 220:15

**word** 174:19

**words** 8:15 118:5 134:21 179:25

**work** 10:12 15:23 16:16

**worked** 34:18 126:7,9

**working** 15:20 18:9 33:20 137:14

**z**

**zaic** 2:8

**zero** 161:14 193:8

**x**

**x** 76:19 78:19,20 78:25 88:8 91:12 111:2 112:19 114:7 129:4 131:12,14,17 133:8 134:18,21 164:7,8,18,18 165:23,25 166:4,4 169:7 185:16 186:1,23 187:7,19 187:25 189:11 194:12 195:8,9,15 196:1,4,21

**xanax** 45:3

**y**

**yeah** 101:5 181:21

**year** 33:1 34:14 37:1 46:4,6 88:9 98:20 152:9 172:25 189:12

**year's** 89:6

**years** 13:18 14:1,4 23:6 24:24 34:16 38:12 52:3 59:21 75:22 111:23 112:12,18 113:5 121:16 184:7 194:9 206:25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.