# EXHIBIT E

Confidential - Subject to the Protective Order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

---------------------------------§

In Re:  COOK MEDICAL, INC., IVC  §
FILTERS MARKETING, SALES         §Case No.
PRACTICES AND PRODUCTS LIABILITY §1:14-cv-06016
LITIGATIONS                      §-RLY-TAB
-------------------------------- §


IN THE CIRCUIT COURT OF THE
SIXTH JUDICIAL CIRCUIT IN AND FOR
PINELLAS COUNTY, FLORIDA


-------------------------------- §
ELIZABETH JANE HILL,             §
    Plaintiff,                   §
vs.                              §Case No.
COOK MEDICAL INCORPORATION a/k/a §1:14-cv-06016
COOK MEDICAL, INC.; COOK         §
INCORPORATED and COOK GROUP,     §
INC.,                            §
    Defendants.                  §
-------------------------------- §
                    - - -
               February 8, 2017
                    - - -
    Confidential - Subject to the Protective Order
        Videotaped deposition of MARK ZUZGA, DO, held
    at Holiday Inn, 2580 Gulf to Bay Boulevard,
    Clearwater, Florida 33765, commencing at
    3:03 p.m., on the above date, before Tami Cline,
    Registered Merit Reporter, Certified Realtime
    Reporter, and Florida Professional Reporter.
                    - - -
           GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com

Confidential - Subject to the Protective Order

APPEARANCES:

HEAVISIDE REED ZAIC
BY:  MICHAEL W. HEAVISIDE, ESQ.
910 17th Street NW, Suite 800
Washington, DC 20006
202-223-1993
Mheaviside@hrzlaw.com
Representing Plaintiff

-and-

LAW OFFICES OF BEN C. MARTIN, LLP
BY:  THOMAS WM. ARBON, ESQ.
3710 Rawlins Street, Suite 1230
Dallas, Texas 75219
214-761-6614
Tarbon@bencmartin.com
Representing Plaintiff

FAEGRE BAKER DANIELS, LLP
BY:  ANDREA PIERSON, ESQ.
BY:  ANNA RUTIGLIANO, ESQ.
300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204
317-237-0300
Andrea.pierson@faegrebd.com
anna.rutigliano@FaegreBD.com
Representing Defendants

BUSH GRAZIANO RICE & PLATTER, P.A.
BY:  HOLLY B. PLATTER, ESQ.
101 East Kennedy Boulevard, Suite 1700
Tampa, Florida 33602
813-228-7000
Hplatter@bgrplaw.com
Representing Witness

ALSO PRESENT:
Devon Mulholland, Videographer
Mr. Jason Voelke, Assistant to Mr. Heaviside
Ms. Patty Spate, Assistant to Mr. Heaviside

Confidential - Subject to the Protective Order

                          - - -

                        I N D E X

                          - - -

   Testimony of:  MARK ZUZGA, DO

   DIRECT EXAMINATION BY MR. HEAVISIDE...............    8




                      E X H I B I T S


                  (Exhibit 12 Not Marked)

    ZUZGA EXHIBIT

   Exhibit 1   Curriculum Vitae                          10

   Exhibit 2   Cross Notice of Videotaped Deposition    16

               of Dr. Mark Zuzga

   Exhibit 3   Notice of Taking Deposition Duces        16

               Tecum Via Videotape

   Exhibit 4   Acknowledgement of Agreed Protective     17

               Order

   Exhibit 5   Courtney Whitelock District Manager      21

               Performance Review, Bates No.

               Hill_DFS_0085 - 0088 - Confidential,

   Exhibit 6   8/27/13 E-mail, Bates No.                25

               CookMDL_2570_0089352 - Company

               Confidential

Confidential - Subject to the Protective Order

E X H I B I T S

(Attached to Transcript)

ZUZGA EXHIBIT

Exhibit 7     8/20/13 Letter from Donna Deckard to     28
              Dr. Zuzga

Exhibit 8     8/20/13 E-mail Chain and Photograph,     31
              Bates No. CookMDL_2570_0720871 -
              0720872 - Company Confidential

Exhibit 9     Single Complaint Report, Bates No.       33
              CookMDL2570_0084036 - 0084046 -
              Company Confidential

Exhibit 10    Educational Presentations by             40
              Courtney Whitelock

Exhibit 11    Bruce Fleck Trip Report, Bates No.       45
              0733926

Exhibit 12    ***OMITTED***

Exhibit 13    Cook Celect Filter Set for Jugular       48
              Vein Approach Instructions for Use,
              Bates No. Cook IVCF 005801 - 005812

Exhibit 14    Celect Reportable Complaints 01 Oct      53
              2008 - 13 Sept 2013, Bates Cook IVCF
              008488 - 008500 and Bates No.
              CookMDL2570_0015049 - 0015061 -
              Company Confidential

Confidential - Subject to the Protective Order

E X H I B I T S

(Attached to Transcript)

ZUZGA EXHIBIT

Exhibit 15      12/14/12 E-mail Chain, Bates No.      56

CookMDL2570_0322470 - 0322473 -

Company Confidential

Exhibit 16      Cook Celect and Günther Tulip Vena      58

Cava Filter Patient Guide

Exhibit 17      8/23/13 E-mail Chain, Bates No.      63

CookMDL2570_0382334 - 0382336 -

Company Confidential

Exhibit 18      6/16/09 E-mail Chain, Bates No.      65

CookMDL2570_0379327 - 0379329 -

Company Confidential

Exhibit 19      Celect Vena Cava Filter Brochure,      66

Bates No. Cook IVCF 005769 -

005774

Exhibit 20      "Cook IVC Filters:  The broadest,      68

most proven line in the world"

Talking Points Document

Exhibit 21      3/21/13 E-mail Chain, Bates No.      69

CookMDL2570_0724357 - 0724359 -

Company Confidential

Confidential - Subject to the Protective Order

E X H I B I T S

(Attached to Transcript)

ZUZGA EXHIBIT

Exhibit 22     9/4/13 E-mail Chain, Bates No.          72

               CookMDL2570_0720425 - 0720426 -

               Company Confidential

Exhibit 23     10/4/10 Mark Zuzga, DO Medical          74

               Record, Bates No. W.Florida 2 - 3

Exhibit 24     11/17/10 Interventional Operative       76

               Report, Bates No. W.Florida 14 - 15

               and W.Florida 5

Exhibit 25     11/17/10 Interventional Operative       79

               Report

Exhibit 26     3/23/11 Final Report, Bates No.         81

               W.Florida 12 and W.Florida 4

Exhibit 27     8/14/13 Operative/Procedure Report,     85

               Bates No. Morton Plant 125 - 126

Exhibit 28     Pictures from EGD                       87

Exhibit 29     8/14/13 Consultation, Bates No.         87

               Morton Plant 120 - 121

Exhibit 30     8/19/13 Mark Zuzga, DO Progress         89

               Note, Bates No. Morton Plant 288 -

               289

Confidential - Subject to the Protective Order

E X H I B I T S

(Attached to Transcript)

ZUZGA EXHIBIT

Exhibit 31    8/19/13 Mark Zuzga, DO Progress        91

Note, Bates No. Morton Plant 290 -

296

Exhibit 32    8/14/13 Discharge Summary, Bates       95

No. Morton Plant 114 - 115

Confidential - Subject to the Protective Order

- - -

THE VIDEOGRAPHER:  We are now on the record.

My name is Devon Mulholland.  I'm the

videographer for Golkow Technologies.  Today's

date is February 8, 2017, and the time is

3:03 p.m.

This video deposition is being held in

Clearwater, Florida, in the matter of Hill vs

Cook Medical, Inc., et al.  The deponent is MARK

ZUZGA, DO.  Counsel will be noted on the

stenographic record.  The court reporter is Tami

Cline and will now swear in the witness.

THE COURT REPORTER:  Would you raise your

right hand, please.

Do you swear or affirm the testimony you give

in this cause will be the truth, the whole truth

and nothing but the truth?

THE WITNESS:  I do.

MARK ZUZGA, DO, called as a witness by the

Plaintiff, having been first duly sworn, testified as

follows:

DIRECT EXAMINATION

BY MR. HEAVISIDE:

Q.   Dr. -- is it Zuzga?

Confidential - Subject to the Protective Order

A.    Zuzga.

Q.    Zuzga?

A.    Yes.

Q.    Okay.  My name is Mike Heaviside.  Equally hard to pronounce, so let me -- if -- with your indulgence, let me just take care of a few kind of housekeeping matters.  All right?

A.    Sure.

Q.    One, we had this discussion briefly off the record, that there are certain time constraints here today, some imposed by Dr. Zuzga, which we completely respect, and some imposed by counsel.  So we will push on.  Those constraints are somewhat inconsistent with the federal rules, but -- so we'll adjourn at the end of the day, and if we have to reconvene, we'll reconvene.  Okay?

A.    Okay.

Q.    Number two, I'm going to show you the deposition notices that you got, and they call for your production of different materials.

A.    Uh-huh.

Q.    Right?  I can see from this constellation of documents here that there may not be documents there that respond to each and every one of the requests,

Confidential - Subject to the Protective Order

and we'll push on; but we'll just note that as part

of our issue about adjourning and perhaps

reconvening, let's preserve that issue, too, about

production of documents.  Okay?

A.    Okay.

Q.    All right.  So having said all that, you

handed to me just now your CV; right?

A.    Yes.

MR. HEAVISIDE:  And I'm going to mark that as

Exhibit 1.

- - -

(Exhibit 1, Curriculum Vitae, was marked for

identification.)

- - -

BY MR. HEAVISIDE:

Q.    And let me just ask, you have got down on

here under "Clinical Training, Positions and Studies"

the first four entries say clinical proctor.  Can you

tell me what a clinical proctor is?

A.     Proctor is more like an on-site trainer for

different procedures.  For example, I would go to

different hospitals or physicians would come to my

center to be trained either as I watch them or they

watch me.

Confidential - Subject to the Protective Order

Q.    So the first two are -- excuse me, the first one is Abbott?

A.    Abbott Endovascular.

Q.    A stent; right?

A.    Correct.

Q.    Number two says peripheral interventions for Bard.  Is that stents or --

A.    I believe they were stents.  My CV is -- I haven't updated my CV in probably six years.

Q.    Okay.

A.    When I first came out of training, I was a lot more active in training physicians.  I have kind of toned that down tremendously.

Q.    Okay.  So anything that's listed on your CV --

A.    Is old.

Q.    -- precedes today by at least six years?

A.    Yes.

Q.    Okay.  You have down here clinical proctor for venous interventions, AngioDynamics?

A.    Correct.

Q.    What devices were involved?

A.    That was a laser fiber for treatment of venous reflux disease in the peripheral veins.  So

Confidential - Subject to the Protective Order

physicians would come to my office just to watch me do cases.

Q.   Okay.  And the next one Caliber EV3?

A.   That was an on-site, again, where physicians would come out to watch me to do peripheral intervention, an atherectomy device.

Q.   And just for those of us unfamiliar --

A.   Atherectomy is more like a Roto-Rooter that goes into peripheral arteries.  Kind of like -- it's a little Pac-Man device that kind of just removes the plaque instead of mashing it like --

Q.   Okay.

A.   -- traditional angioplasty would do.

Q.   Okay.  The next two are -- one is Sapphire. One is Choices.  Both stents; is that right?

A.   Carotid stents, yes.

Q.   And the third one is carotid stents as well?

A.   Correct.

Q.   And the next one is Guidant Capture II carotid stent trial?

A.   Correct.

Q.   What did that involve?

A.   That was more or less a study comparing traditional carotid atherectomy surgery, open surgery

Confidential - Subject to the Protective Order

to carotid stenting.  And, again, that's probably at least eight years ago.

Q.   And how many subjects were in that study if you can recall?

A.   I couldn't tell you.  I was a subinvestigator, and it was eight years ago.  I don't even remember the details of the study.

Q.   Okay.  Were you the subinvestigator on all of these endeavors we have talked about so far?

A.   Yes.

Q.   Then you have a recent speaking engagement, EV3 national sales meeting.  What -- if you recall, when was that?

A.   2008 it states.  What was I speaking about?  Again, probably atherectomy devices.  It was eight years ago.  So they had a national sales meeting, and I think I gave, again, a talk on peripheral interventions.

Q.   Is EV3 a device manufacturer?

A.   EV3 was -- they were purchased by someone since that time.  I think they're actually owned by Medtronic at this point.

Q.   All right.  Is it fair to say that none of these presentations were involving IVC filters?

Confidential - Subject to the Protective Order

A.   Correct.

Q.   Have you ever published a peer-reviewed article regarding IVC filters?

A.   No.

Q.   In your practice as it's constituted today, what procedures are primary, take up most of your time?

A.   Probably peripheral interventions.  Just to summarize from the top down, I do interventional work as well as open surgery.  So carotid surgery, aneurysm surgery, bypass surgery.

THE COURT REPORTER:  I'm sorry.  I'm having a hard time hearing you.

THE WITNESS:  I'm sorry.  Carotid surgery, aneurysm surgery, peripheral bypasses, venous interventions, which are office-based procedures, filters.  Pretty much stents anywhere in the body outside of the heart would be pretty much 95 percent of what I do.

BY MR. HEAVISIDE:

Q.   Your carotid surgeries, are they percutaneous or are they --

A.   Some of them are, yes.  Some of them are open.

Confidential - Subject to the Protective Order

Q.   Okay.  How were you trained in the proper use of Cook IVC filters?

A.   How was I trained?  Specifically on the Cook I would say it's -- there's really not a huge difference in inserting an IVC filter regardless of the manufacturer.  In the same way I would answer a question is how was I trained on different stents. There's 12 different stents on the market.  More or less they pretty much do the same thing.  They go in the same parts of the body.  The only difference is you hit a button left, right, up or down.

Q.   Well, for example, the Cook Celect retrievable wasn't cleared until 2008; right?

A.   I wouldn't know.  I don't know.

Q.   Do you recall when you first started using Cook Celect filters?

A.   No.

Q.   Do you use other filters other than Cook Celect?

A.   I have used filters for the past -- most decisions are based on what our hospital purchases based on contracts.  So off the top of my head, I have used filters from Cordis and Bard.  That's probably all I can tell you for sure.

Confidential - Subject to the Protective Order

                              - - -

          (Exhibit 2, Cross Notice of Videotaped

Deposition of Dr. Mark Zuzga, was marked for

identification.)

          (Exhibit 3, Notice of Taking Deposition Duces

Tecum Via Videotape, was marked for identification.)

                              - - -

BY MR. HEAVISIDE:

     Q.    Let me just mark these two exhibits as 2 and

3.   These are the notices of deposition and one of

them is a cross notice of deposition.  Okay?  And

those have attached to them those requests for

documents.  Do you remember seeing this?

     A.    Yes.

     Q.    Schedule A.  Now, it says what it says.  I'm

not going to burden you --

     A.    Right.

     Q.     -- by going through it, but it's fair to say

that in response to the Schedule A, what you brought

with you was your CV, your office notes -- and was

there a third thing?

     A.    I think the paper that you have sent me,

correct.

     Q.    Oh, the notice itself; right?

Confidential - Subject to the Protective Order

A.    Correct.

Q.    Okay.  So responsive to Schedule A on the notice, you brought your office notes and your CV?

A.    Uh-huh.

Q.    Right?  No more, no less?

A.    Correct.

Q.    Okay.  Also a housekeeping matter, I believe that this document is your acknowledgment of the protective order entered in this case?

A.    I'd have to see it.

Q.    I'm going to mark --

A.    That's my signature.

MR. HEAVISIDE:  Okay.  I'll mark that as 4.

- - -

(Exhibit 4, Acknowledgement of Agreed Protective Order, was marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.    Doctor, do you -- do you recall a sales rep or regional salesman manager named Courtney Whitelock?

A.    Yes.

Q.    Do you still work with Courtney Whitelock?

A.    She comes in when I do cases occasionally,

Confidential - Subject to the Protective Order

yes.

Q.   And what does she do when you do cases?

A.   She watches.

Q.   Okay.  So she -- it would be a stretch to say she assists you is what you're saying?

A.   That would be accurate.  She doesn't assist me at all.  She's there to provide support if questions are needed on products, I guess I would say.  I don't rely on the reps a lot, so I don't have a lot of reps in my lab.  So to say she's there to support, I guess she supports the case, meaning if I needed a stent that we didn't have on site, she might have one in her car.

Q.   Okay.

A.   That's about the extent of it.

Q.   But she's not advising you about retrieval techniques and things like that; right?

A.   No.

Q.   Did she ever advise you that if you had any issues, questions about a Cook Celect device that you should call a gentleman by the name of Bruce Fleck or somebody named Darrell Talbert?

A.   Not that I can remember, no.

Q.   Have you ever spoken to either of those two

Confidential - Subject to the Protective Order

gentlemen?

A.   Not that I can remember, no.

Q.   We deposed Courtney Whitelock some time ago. I just wanted to ask you about a couple issues that came up there. For example, this document, just for the purposes of the record, is Bates stamped Hill_DFS_0077, and it's a performance review by Courtney Whitelock's supervisor, if you will --

A.   Uh-huh.

Q.   -- about her performance obviously. Right? So one of the comments is --

MS. PIERSON:  I'm sorry, Mike. I just need to interpose an objection. If you're going to read to him a document, we need to mark it as an exhibit. Do you have it to mark?

MR. HEAVISIDE:  I have it. I don't agree that we have to do that but --

MS. PIERSON:  Yeah. Object.

MR. HEAVISIDE:  Because I'm not asking him about the veracity of the document. I'm asking about the information contained therein.

MS. PIERSON:  We'll object to the form of the question.

MR. HEAVISIDE:  All right.

Confidential - Subject to the Protective Order

THE WITNESS:  Excuse me.  Can I send this text out?  I'm sorry.

BY MR. HEAVISIDE:

Q.   Still with me?

A.   Yes.

Q.   Okay.  So this is an analysis of Courtney Whitelock's endeavors in 2010.  And it says, "Overall Courtney had a good year.  Courtney took a large hit to her filter business this year with issues/conversions at her number one account, BayCare in Tampa."

Can you add any clarity to the circumstances surrounding that big hit to her filter business at BayCare?

MS. PIERSON:  Object to form.

THE WITNESS:  No, I can't.

BY MR. HEAVISIDE:

Q.   Were you -- was one -- BayCare one of the --

A.   BayCare is probably one of the largest hospital systems in the Tampa region.

Q.   And it's a system that you work within, so to speak?

A.   Yes.

Q.   Okay.  And you were working within them in

Confidential - Subject to the Protective Order

2010?

A.   Correct.

Q.   Okay.  But whether she did or did not take a big hit to her filter business or what the circumstances surrounding that hit were, you just don't know?

A.   No.

Q.   In another one of her evaluations, which is Bates stamped Hill_DFS_0085 -- and just to appease Ms. Pierson, I'll shoot a copy of this over to her or to you and then to her.  Okay?  This is going to be marked 5.

                         - - -

         (Exhibit 5, Courtney Whitelock District Manager Performance Review, Bates No. Hill_DFS_0085 - 0088 - Confidential, was marked for identification.)

                         - - -

BY MR. HEAVISIDE:

Q.   So this would regard Courtney Whitelock's endeavors during the year 2013.  And you see there under "Comments" on the first page?

A.   Yes.

Q.   She apparently is having another difficult year loss.  This came largely from BayCare but also

from several other customers?

A.    Uh-huh.

Q.    Her largest product loss stemmed from IVC filters.

A.    Uh-huh.

Q.    Do you have any information about the circumstances regarding that loss at that point in time?

A.    No.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.    If you would turn to the second page towards the top in the comments, it says, "I would expect Courtney to very clearly be able to explain the benefit of our product versus the competitive and how it will impact the customer's procedure" --

A.    Where are you?  I'm not seeing it.  Okay.

Q.    It's like three lines in.

A.    I gotcha.

Q.    Okay.  Do you know whether -- or how often Courtney Whitelock spoke to your staff or to people at the hospital distinguishing a Cook product versus a competitive product and laying out how that would impact customers, procedures outcomes?

Golkow Technologies, Inc.                                Page 22

Confidential - Subject to the Protective Order

A.   No.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.   I'm sorry?

A.   No.

Q.   Okay.  Do you remember Elizabeth Hill?

A.   I do not -- I do not remember much about her other than seeing her when she left Morton Plant Hospital, which is when -- before she went to Penn. I remember meeting her that day.

Q.   So that would have been, excuse me, in August of 2013?

A.   If you say the day.  I don't know the exact date.

Q.   Okay.

A.   I just remember seeing her in the room as they were making arrangements to go to Penn in Pennsylvania.

Q.   Do you ever recall seeing her before that?

A.   No.

Q.   But you know you did see her.  You just don't recall?

A.   I knew that I had some kind of -- that I had -- I had seen her before.  I had a familiarity,

Confidential - Subject to the Protective Order

but I can't tell you the details of the case or anything else other than that day.

Q.   You do recall that there was an event regarding Elizabeth Hill and perforation of her filter and penetration into the -- I say duodenum; is that incorrect?

A.   Duodenum.

Q.   Okay.  Do you recall that event?

A.   Yes.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.   How did that event first come to your attention?

A.   I can't tell you the specific details.  My assumption is she was in the hospital at Morton Plant, and I probably received a consult.

Q.   And did you have any discussion at or around that point in time, that being August 19th of 2013, about that event with anybody affiliated with Cook?

A.   No.  I don't remember.

Q.   Did anybody from Cook send you a letter making inquiry about that event?

A.   I don't recall that either.

- - -

Confidential - Subject to the Protective Order

(Exhibit 6, 8/27/13 E-mail, Bates No.

CookMDL_2570_0089352 - Company Confidential was

marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.   I want to show you a document that's marked

Exhibit 6.

Pardon my reach.

A.   Okay.  Yeah.

MR. HEAVISIDE:  Would you pass that to

Ms. Pierson.

MS. PIERSON:  Thank you.

BY MR. HEAVISIDE:

Q.   And this has been marked as Exhibit 6.

MR. VOELKE:  I just wondered if you wanted to

use the ELMO.

MR. HEAVISIDE:  No.

MR. VOELKE:  Okay.

BY MR. HEAVISIDE:

Q.   So, Doctor, you have before you what's been

marked Exhibit 6.  On the bottom it's Bates

stamped --

A.   Uh-huh.

Q.   -- 0089352; right?

Golkow Technologies, Inc.                                    Page 25

Confidential - Subject to the Protective Order

A.    Yes.

Q.    And on the top it says to mzuzga@hotmail.com.
Is that your correct --

A.    Yes.

Q.    -- e-mail address?

A.    Correct.

Q.    And it's from Courtney Whitelock; correct?
Or pardon me?

A.    Yeah.

Q.    It's from Donna Deckard?

A.    Correct.

Q.    Right?

A.    Yes.

Q.    Do you recall receiving this e-mail?

A.    No.

Q.    It says, "My name is Donna in customer
relations at Cook Medical.  I received a report from
your area rep, Courtney Whitelock, regarding an event
that took place with a Cook device.  Please accept
our apologies for any inconvenience this may have
caused."

      I assume that means you, not Ms. Hill?

A.    Yes.

Q.    "Attached is a letter for review.  Do not

Golkow Technologies, Inc.                                    Page 26

Confidential - Subject to the Protective Order

hesitate to contact your area rep or respond back if you have any questions."

Q. Did you contact anybody following receipt of this communication?

A. Not that I remember, no.

Q. Okay. Did anybody from Cook call you about this?

A. I don't believe so.

Q. Did you have any discussions or e-mail correspondence, whatever, with Courtney Whitelock about this event?

A. I think when I saw the patient, I had a discussion with her about it, but, again, I can't tell you the exact details. This is something I would probably tell her, yes. Can I tell you with certainty? Absolutely not.

Q. Okay. Would you call her or would she call you?

A. If I saw her probably that week if she -- the following week if she came in for cases, I would call her probably because I knew about it before she did.

Q. How do you know that?

A. Because if she knew -- I'm assuming that she knew the patient -- I knew the patient was in the

Confidential - Subject to the Protective Order

hospital before she would have, being the physician.

I don't think she would have any knowledge of that.

Q.   Okay.   But that's your assumption; right?

A.   Correct.

Q.   Do you see on Exhibit 6 where it says,

"PR84105.doc"?

A.   Yes.

Q.   Do you recall if that was something that you

could open when -- if, in fact, you got this e-mail?

A.   No, I don't remember that.   I don't remember

even the e-mail, so I couldn't answer that with an

educated answer.

                        - - -

        (Exhibit 7, 8/20/13 Letter from Donna Deckard

to Dr. Zuzga, was marked for identification.)

                        - - -

BY MR. HEAVISIDE:

Q.   Doctor, this will be Exhibit 7.

        MR. HEAVISIDE:   Could you pass -- I'm sorry.

    I don't want to throw it across the table.

        MS. PLATTER:   No worries.

BY MR. HEAVISIDE:

Q.   Okay.   Exhibit 7, pardon me, appears to be

another letter written to you dated August 20, 2013,

Confidential - Subject to the Protective Order

at Morton Plant Hospital in Clearwater; right?

A.   Uh-huh.

Q.   It says, "Involved device:  Celect filter. The leg of the filter penetrated the cava and is in the duodenum."

Do you remember receiving this letter?

A.   No.

Q.   This letter thanks you for taking time to provide feedback on your experience with this Cook Medical product.  Do you recall having taken the time to provide feedback to Cook?

A.   My assumption -- again, I don't know if that's the proper terminology to use -- would be my discussion with Courtney probably about the case.  If I did written feedback, I would be surprised.  But if I did, I certainly don't remember doing that.

Q.   Do you remember what the verbal feedback to Courtney was?

A.   No.

Q.   This letter here, Exhibit 7, goes on to say, "The information you have provided has been forwarded to the Cook Company responsible for the manufacture of the product and an investigation will be carried out in an effort to determine possible causes for

Confidential - Subject to the Protective Order

this occurrence.  Please be assured the results of this investigation will be reviewed by the appropriate departments, and, if required, appropriate action will be taken to prevent further occurrences of this nature."

Do you know whether or not -- were you ever advised whether or not took -- Cook took any action to prevent further occurrences of this nature?

A.   Not that I can recall, no.

Q.   This says, "Should you have any questions or if you would like to receive the results of the investigation undertaken please contact your local sales rep" -- and that would be Courtney Whitelock; right?

A.   Yes.

Q.   -- "or Cook Medical customer relations."

Did you make any inquiry of Courtney Whitelock that you would like to be advised what happens with this investigation?

A.   Not that I can remember specifically, no.

Q.   So I take that answer as maybe I did, maybe I didn't, I don't remember.  I'm not trying to be glib, but is that essentially what you're trying to say?

A.   You may be accurate, yeah.

Confidential - Subject to the Protective Order

Q.   Okay.

A.   Honestly, it was four years ago or three and a half.  I mean, I don't recall, but I possibly could have.

MR. HEAVISIDE:  Let me mark this as Exhibit 8.

- - -

(Exhibit 8, 8/20/13 E-mail Chain and Photograph, Bates No. CookMDL_2570_0720871 - 0720872 - Company Confidential, was marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.   Excuse me.  Exhibit 8 is Bates stamped 0720871.  And if you go to the bottom third of that page, you'll see it says on August 20, 2013, at 2:22 p.m., Courtney Whitelock wrote -- and this is to Bruce Fleck who's the product specialist in venous therapies.

"Celect leg is in the duodenum.  I have already placed an incident.  Filter was in two years. Patient had major back surgery.  Doc tried to get it out at four months and could not.  Patient presented with nausea and vomiting.  This was yesterday.  The

Confidential - Subject to the Protective Order

doc is sending patient to University of Pennsylvania

to have this worked on."

            And she attaches a photo, which I'll also

make a part of Exhibit 8 this photo.

    A.    Uh-huh.

    Q.    What is -- to me it's a photo.  So if you

could tell me, what is that?  What does that

describe?

            MS. PIERSON:  Object to form.

            THE WITNESS:  That's the duodenum and the

        entering the lumen, and basically this would be

        the strut or the leg of the filter that's inside

        of the duodenum.

BY MR. HEAVISIDE:

    Q.    Okay.  So this had to go through the vena

cava and through the duodenum and the --

    A.    Correct.

    Q.    -- I'm saying trench.  I know it's not a

medical word but --

    A.    Yeah.  This would be the cava over here, so

it's through there and, you know, almost through the

length of it.  You can see the strut on the end here.

So it's the end of the leg.

    Q.    Now, is it fair to say that that's not a

Confidential - Subject to the Protective Order

result that either you or Elizabeth Hill expected?

A.   Yes.

Q.   And I asked you before -- and I don't want to belabor the point, but Bruce Fleck -- may I properly assume Bruce Fleck never contacted you about this event?

A.   Not that I can remember.  I don't even recognize the name, to be honest with you.

Q.   Okay.

MR. VOELKE:  Do you need another copy?

MR. HEAVISIDE:  Yes.

MR. VOELKE:  We must not have it.  Do we have a copy of the complaint form?

MS. SPATE:  The first?

MR. VOELKE:  The first one.

MR. HEAVISIDE:  We can make a copy of this afterwards.  You have seen it.  It's part of the defendant's fact sheet.

MS. PIERSON:  It's okay.

MR. HEAVISIDE:  I'm going to mark it as Exhibit 9.

- - -

(Exhibit 9, Single Complaint Report, Bates No. CookMDL2570_0084036 - 0084046 - Company

Confidential - Subject to the Protective Order

Confidential, was marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.   And pardon me for looking over your shoulder. All right?

A.   Sure.

Q.   Have you ever seen this document before?

A.   Never.

Q.   It's, pardon me, Bates stamped 0084036.  Now, this is a Cook-generated complaint form, as you can see.  It has PR Number 84105.  I assume that means nothing to you; right?

A.   That's correct.

Q.   All right.  But it has "Customer:  Morton Plant Hospital, Dr. Zuzga."  Right?

A.   Yes.

Q.   And it has the originator Donna Deckard. Now, other than those letters from Donna Deckard that you don't recall seeing, did you have any other contact with Donna Deckart --

A.   No.

Q.   -- about this event?

A.   No.

Q.   This is on the third page of this document.

Confidential - Subject to the Protective Order

Page is numbered 0084038.  All right?  This section says "Patient Outcome."  Excuse me.  It says, "It's unknown if there have been any adverse effects at this time."

Now, wouldn't you think that piece of steel into the duodenum is an adverse effect?

MS. PIERSON:  Object to form.

THE WITNESS:  Yes.

BY MR. HEAVISIDE:

Q.   Do you know anything about a device company's responsibility if they know about an adverse event -- pardon me, their responsibility to report that event to the FDA?

A.   No.

Q.   On this same exhibit on the page that's Bates stamped 0084039, you see this language that says: "Life-threatening:  No.  Permanent impairment damage: No.  No MDR required."

And I'll represent to you that an MDR is a manufacturer's device report.

A.   Uh-huh.

Q.   So I will also represent to you that this is the first iteration of a complaint report regarding Elizabeth Hill, and this one was opened in 8/20/13,

Confidential - Subject to the Protective Order

closed on 9/19/13 without a report to the FDA.  I'll

represent to you -- and if you want me to show it to

you, I will -- that there was subsequent reports only

after suit was filed in the case which now made this

a life-threatening event and properly reported to the

FDA.

A.    Uh-huh.

Q.    Did you have any discussions with anybody at

Cook from this time, which would be 8/19/2013, at any

time thereafter about whether or not this particular

event should or should not be reported to the FDA?

A.    No.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.    Have you heard of the MAUDE database?

A.    No.

Q.    If you wanted to check and see with what

frequency this type of event occurred in a Cook

filter, how would you do that other than just asking

the sales rep?

MS. PIERSON:  Object to form.

THE WITNESS:  It's not something that I would

even consider doing, to be honest with you.

///

Confidential - Subject to the Protective Order

BY MR. HEAVISIDE:

Q.   Why?

A.   I have a full schedule.  It's a busy day.  It starts at 5:00 a.m. and ends when the sun is down.  I don't have time to research every single product that's already been approved by the FDA as to whether or not I can pick and choose which ones have already been approved.  Now, also, I don't have a full range of products available to me.  The only products that are available to me are the ones that the hospital chooses to be available to me.

Q.   And what devices -- by the way, let me back up a second.  I assume, correct me if I'm wrong, that Courtney Whitelock or somebody else from Cook represented to you that the Cook IVC filters were, in fact, approved by the FDA?

MS. PIERSON:  Object to form.

THE WITNESS:  If they were in our lab, I would imagine that they have to be approved by the FDA.

BY MR. HEAVISIDE:

Q.   Okay.  So would it be surprising to you to learn that these filters actually were never approved by the FDA?

Confidential - Subject to the Protective Order

MS. PIERSON: Object to form.

THE WITNESS: Yes.

BY MR. HEAVISIDE:

Q. Because in your mind, if a product is approved by the FDA, it's gone through sufficient efficacy and safety testing; right?

A. Yes.

Q. And if a product is cleared by the FDA but not approved by the FDA, were you aware that that product did not have to go through that same rigid testing?

MS. PIERSON: Object to form.

THE WITNESS: I didn't know there was a distinct between cleared and approved.

BY MR. HEAVISIDE:

Q. Okay.

A. Now, there are certain things that are off label, which is different, but it has nothing to do with filters.

Q. Or it doesn't?

A. I don't know.

Q. Okay. I told you, I think, when we started that we had the opportunity to depose Courtney Whitelock. It seems like an eternity, but it might

Confidential - Subject to the Protective Order

have only been two weeks.  But, nonetheless, do you recall how -- strike that.

Who was the sales rep that preceded Courtney Whitelock?

A.    I couldn't tell you.

Q.    Was there one?

A.    I imagine there was one, but I -- I don't remember if there was or even if I met them.  If you gave me a name, I may recognize it, but I couldn't tell you offhand.

Q.    Let's stick with Courtney Whitelock then.  All right?

A.    Okay.

Q.    Now, Courtney Whitelock indicated -- well, strike that.

How many educational presentations has Courtney Whitelock made to you and your staff within the last five years?

A.    I couldn't tell you.  I mean, what is -- what would you qualify as an education?  Can you be a little bit more specific on the question?

Q.    Now, see, the problem is, I don't know what she characterizes as an educational presentation.  I just know that she listed it on a document as an

Confidential - Subject to the Protective Order

educational presentation.  And I'll -- rather than

drag this out, I'll tell you that she indicated that

between March of 2010 until sometime in 2015 --

A.    Uh-huh.

Q.    -- there were 149 educational presentations

which list you, Dr. Zuzga, as the attendee.

A.    Educational presentation may be her coming

for a case.  Now, keep in mind she may be there all

day and I may be there 20 minutes scrubbing the

entire time.  So she's probably -- well, not

probably, but when she's there, she spends a

considerable bit more time with the staff than she

does with the physician, only because I'm bouncing

around rooms all day.

Q.    All right.  I'm going to just mark this.  I'm

not going to ask you to read it because -- although I

do have a magnifying glass if you want to use that

but...

                        - - -

        (Exhibit 10, Educational Presentations by

Courtney Whitelock, was marked for identification.)

                        - - -

        MR. HEAVISIDE:  I'm going to mark this as

    Exhibit 10.  Counsel, unless you have got X-ray

Confidential - Subject to the Protective Order

vision, it's not going to help you all that much,
but do you want it?

MS. PLATTER:  Sure.  Thanks.

MR. HEAVISIDE:  Andrea, you're familiar with
this document.

MS. PIERSON:  I am.

BY MR. HEAVISIDE:

Q.  At any rate, this was provided to us by
Courtney Whitelock at her deposition, and it
indicates before 11/17/10, which was the date of
implant --

A.  Uh-huh.

Q.  -- at least three educational presentations
listing Dr. Zuzga as the attendee.

A.  Yeah.

Q.  Do you remember any of those?

A.  No.

Q.  If you had -- if you had a question or if
Cook, through their sales rep, wanted to impart some
important information to you, that would have been --
I'm not saying it was --

A.  Right.

Q.  -- but it would have been an opportunity to
do so; right?

Confidential - Subject to the Protective Order

A.    Correct.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.    All right.  Now, similarly, excuse me, the date of the failed retrieval attempt was 3/23/11.

A.    Uh-huh.

Q.    So the last exhibit, 10, indicates that between the date of implant and the date of failed retrieval, there were at least nine educational presentations by Courtney Whitelock with you as an attendee.

A.    Uh-huh.

Q.    Let me ask you that same question.  Had Cook desired to impart to you important information regarding the safety, risk, complications associated with the Celect, those would have presented opportunities to do so; correct?

MS. PIERSON:  Object to form.

THE WITNESS:  Yes.

BY MR. HEAVISIDE:

Q.    And post-failed retrieval attempt on 3/23/11 through when the device was actually retrieved, which was 8/21/13, there were 100 educational presentations where Courtney Whitelock listed Zuzga as attendee.

Confidential - Subject to the Protective Order

A.    Uh-huh.

Q.    Same question.  Should Cook have desired to impart to you important information regarding the Cook Celect, those would have been opportunities to do so; correct?

        MS. PIERSON:  Object to form.

        THE WITNESS:  Yes.

BY MR. HEAVISIDE:

Q.    There's some suggestion that --

        MR. ARBON:  You talked at the same time.

BY MR. HEAVISIDE:

Q.    There was some talking over.  When I asked you those three questions about whether or not those educational presentations provided opportunities to impart knowledge or important information about Cook Celect filters, you said, yes, those would have been opportunities; right?

A.    Yes.  Yes.

        MS. PIERSON:  Objection.

        MR. HEAVISIDE:  And I know Andrea has an objection to the form of that question.

BY MR. HEAVISIDE:

Q.    All right.  Okay.  In addition to this document here which lists the educational

presentations, it appeared that you attended some kind of Cook conference in Indiana in 2015.  Do you recall that?

A.   You said 2015?

Q.   Yeah.

A.   No.  That's not right.

Q.   Okay.

A.   That's not an accurate date.

Q.   Do you recall --

A.   I recall a conference, but my -- it's not in 2015.  It's probably '11.

Q.   2011?

A.   I'm guessing.  It's a big guess.

Q.   What happened at that conference?

A.   It was more of an on-site visit just to see the company and show us products.  I can't give you details.  Maybe, you know, their research and what they were up and coming and, you know, a basic plant tour is what I'm telling you.

Q.   And who extended an invitation to you to come to Indiana to Cook?

A.   Actually, Dr. Andrew Davis, who is since deceased.  He is a -- or was one of the interventional radiologists at Countryside Hospital

Confidential - Subject to the Protective Order

and was one of the biggest Cook fans you would ever meet in your life.  He put together this trip.  I think he was involved with different research studies.  I'm not sure.  Again, it's been awhile. But he actually invited me on the trip because they had an opening.

- - -

(Exhibit 11, Bruce Fleck Trip Report, Bates No. 0733926, was marked for identification.)

- - -

MR. HEAVISIDE:  I'm going to mark this Exhibit 11.

BY MR. HEAVISIDE:

Q.   This is Bates stamped 0733926 on the bottom.

A.   Uh-huh.

Q.   Okay.  Now, this says "Bruce Fleck Trip Report."  And all I can do is read what's on here. But "3/18 to 3/20 Tampa-Fort Myers-Jackson, Mississippi."  Do you see where I am?

A.   Yeah.  Which part are you reading?  The whole part?

Q.   Well, I'm going to read right now towards the middle of the page there.

MS. PIERSON:  Do you have a copy, Mike?

Golkow Technologies, Inc.                                    Page 45

Confidential - Subject to the Protective Order

MR. HEAVISIDE:  I don't.  I'm sorry.

MS. PIERSON:  It's okay.

BY MR. HEAVISIDE:

Q.   It says, "Met with Gerald Grubbs at Sarasota Interventional Radiology."

Do you happen to know who Gerald Grubbs is?

A.   No, I don't.

Q.   Okay.  "He is interested in setting up awareness dinners for IVC filters with local orthopedic groups and bariatric surgeons."

Do you see that?

A.   Yes.

Q.   Has anybody ever contacted you about attending an awareness dinner regarding IVC filters?

A.   No.

Q.   So I can conclude fairly that you have never been to an awareness dinner about filters?

A.   Correct.

Q.   Certainly Cook filters; right?

A.   Correct.

Q.   On the top where he's talking about Tampa --

A.   Uh-huh.

Q.   -- he says, "He believes secondary struts are causing an inflammatory response in a small number of

Confidential - Subject to the Protective Order

patients that can create a stenosis.  If left untreated, an outflow obstruction may occur causing the cava to thrombose."

Now, I don't claim to be a physician.  Does that mean that if a filter was unretrieved in the vein that it affects blood flow thereby possibly causing a --

A.   Obstruction more or less, yes.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.   And an in-vein thrombosis?

A.   Correct.

Q.   Okay.  So if you have a Cook Celect filter that's unretrievable, that may occasion this event.  Is that fair to say?

A.   That is -- would be a risk, yes.

Q.   Okay.  Now, this talks about Dr. Brian Montague at St. Joseph's MC part of BayCare.  Do you know Dr. Brian --

A.   No.

Q.   -- Montague?  No?

Well, Dr. Montague is apparently interested in participating in commercial evaluations of these devices.  He's never contacted you about it --

Confidential - Subject to the Protective Order

A.   No.

Q.   -- is that fair to say?

- - -

(Exhibit 13, Cook Celect Filter Set for

Jugular Vein Approach Instructions for Use, Bates No.

Cook IVCF 005801 - 005812, was marked for

identification.)

- - -

BY MR. HEAVISIDE:

Q.   So, Doctor, I'm now going to show you a

document that's been marked as Exhibit 13.  And this

is the IFU for the Cook Celect filter; right?

A.   Uh-huh.

Q.   I'm sorry, but --

A.   Yes.

Q.   Okay.  And this is Bates stamped Cook IVCF

005801; right?

A.   Correct.

Q.   Now, the IFU should tell you what you need to

know about the safe use of device; correct?

A.   Yes.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.   So if you would go to page 3 of that

Confidential - Subject to the Protective Order

document.

A.   Yes.

Q.   And you mentioned the words to me earlier "off label."  Do you remember that?

A.   Yes.

Q.   So you see that in the -- this Cook IFU for the Celect filter -- do you see the section there that says "Intended Use"?

A.   Uh-huh.

Q.   And it says, "The Celect Filter is intended for the prevention of recurrent pulmonary embolism via placement in the vena cava in the following situations."

And it lists those situations; right?

A.   Yes.

Q.   So it's essentially for people with a history of DVTs or PE with issues with anticoagulant; correct?

A.   Correct.

Q.   Now, if you turn to the next page, which is IVCF 005804 under "Warnings."

A.   Yes.

Q.   It says "Filter Placement."  And you would expect that if you follow the appropriate filter

Confidential - Subject to the Protective Order

placement technique that there would be no problem

with this filter; right?

          MS. PIERSON:  Object to form.

          THE WITNESS:  For a placement?

BY MR. HEAVISIDE:

     Q.   Yeah.

     A.   Yes.

     Q.   And you did follow the appropriate placement

technique, correct --

     A.   Yes.

     Q.   -- with Mrs. Hill?

     A.   Yes.

     Q.   And for that matter, you followed the

retrieval technique as outlined in the IFU; correct?

          MS. PIERSON:  Object to form.

          THE WITNESS:  I have never really thoroughly

     read the IFU.  So I base my retrieval techniques

     on my training.

BY MR. HEAVISIDE:

     Q.   Well, we can go through later your technique,

but at this point in time, correct me if I'm wrong,

I'll represent to you that that technique was --

     A.   Yes.

     Q.   -- the approved in the case.  Does that sound

Confidential - Subject to the Protective Order

correct?

MS. PIERSON:  Object to form.

THE WITNESS:  That would be reasonable to say, yes.

BY MR. HEAVISIDE:

Q.  Okay.  Now, the next page, which on the bottom says 005805, at the top page it says "MR Compatibility"?

A.  Uh-huh.

Q.  The section that says "Potential Adverse Events," do you see where I am there?

A.  Yes.

Q.  By the characterization as potential adverse events, can you fairly read that to mean we don't know if any of these events have ever happened, but they are a possibility?

MS. PIERSON:  Object to form.

THE WITNESS:  I don't know if I can answer that question.  I didn't write this.

BY MR. HEAVISIDE:

Q.  Okay.  Well, does it say the following events have been observed in connection with the use of a Cook Celect Filter?

A.  It does not say that, no.

Confidential - Subject to the Protective Order

Q.   Okay.  And it doesn't say anything about perforation and penetration into an adjoining organ, does it?

MS. PIERSON:  Object to form.

THE WITNESS:  Vena cava perforation?

BY MR. HEAVISIDE:

Q.   Into an adjoining organ like the liver or the aorta or --

A.   No.  No, it does not say that.

Q.   Okay.  And, in fact, it does say as a potential adverse event perforation; right?

A.   Yes.

Q.   And if you want more information about that, you go down the page about clinical studies; right?

A.   Yes.

Q.   And in the last full paragraph third line in, it says, "No device related major adverse events (defined as hemorrhage, perforation, death, occlusion, filter fracture or significant filter migration) have occurred."

Right?

A.   Yes.

Q.   Okay.  So you would expect the IFU to fairly tell you what risks events are associated with use of

Confidential - Subject to the Protective Order

this product.  That would be your expectation; right?

MS. PIERSON:  Object to form.

THE WITNESS:  Yes.

BY MR. HEAVISIDE:

Q.   Okay.  And if they tell you here potential adverse events are vena cava perforation but here they say that actually no perforations have been identified, you might conclude that there are no perforations?

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.   Right?

A.   Based on their study at six months, yes, is what I would say.

Q.   Well, there is no other information printed on this document, is there?

MS. PIERSON:  Object to form.

THE WITNESS:  No.

MR. HEAVISIDE:  I'm going to show you another -- this will be Exhibit 14.

- - -

(Exhibit 14, Celect Reportable Complaints 01 Oct 2008 - 13 Sept 2013, Bates Cook IVCF 008488 - 008500 and Bates No. CookMDL2570_0015049 - 0015061 -

Confidential - Subject to the Protective Order

Company Confidential, was marked for identification.)

                            - - -

          MR. HEAVISIDE:  Counsel, are you interested

     in this for your scrapbook?

BY MR. HEAVISIDE:

     Q.   Okay.  Doctor, you have Exhibit 14 in front

of you; right?

     A.   Yes.

     Q.   Now, I assume, and correct me if I'm wrong,

you have never seen this document before?

     A.   Correct.

     Q.   I'm going to ask you to read this document in

the context of the IFU, which seems to suggest no

perforations.

     A.   Uh-huh.

     Q.   Okay?

     A.   Yes.

     Q.   This document, as you see, is a Cook company

confidential document, Celect reportable complaints

October 2008 through September 2013, and the Bates

stamp is 0015049.  Okay?

     A.   Okay.

     Q.   So I am not going to belabor you with going

through this whole document, but you will see that in

Confidential - Subject to the Protective Order

June of '08, 12 days after placement CT showed all four legs protruding out of the vena cava; 7/16/08, punctured IVC; 7/30/08, primary legs protruding into aorta; 8/28/08, filter was protruding through IVC into the aorta; 9/22, two secondary wires appeared to penetrate the wall of the vena cava, and so on.

A.   Yes.

Q.   So it would appear, if you go through page 5 of this document -- and the last entry on 5 -- though there are eight additional pages, but the last entry on 5 is 11/30/2010, so the preceding five pages are Celect reportable complaints, many of which are perforation into adjoining organs that were known to Cook before you implanted this device in November of 2010; right?

A.   Yes.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.   Now, you told me you have a certain expectation that the IFU would contain all of the information that would fully apprise you about the safe use of the product; right?

A.   Yes.

Q.   Now, would it be more helpful to you to know

that there were 50 or so perforations preceding your

placement of this filter in Mrs. Hill than an IFU

would suggest zero perforations?

          MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

     Q.   Which gives you a more --

     A.   I would imagine the more information I have,

the better.

     Q.   Okay.  And that would enable you to do a

reasoned risk-benefit analysis for yourself and for

your patient for that matter; correct?

     A.   Yes.

                         - - -

          (Exhibit 15, 12/14/12 E-mail Chain, Bates No.

CookMDL2570_0322470 - 0322473 - Company Confidential,

was marked for identification.)

                         - - -

BY MR. HEAVISIDE:

      Q.   This is one, I'm sorry, I don't have a copy

of this one either, but I marked it as Exhibit 15.

It's Bates stamped 0322470.

          Okay.  I see this is an e-mail from this

gentleman that I used his name previously, Bruce

Fleck.  It's dated December 14th of 2012.  It's to

Confidential - Subject to the Protective Order

these people.  I don't suppose you know any of them.

One is Darrell Tallbert.  Do you know him?

A.   No.

Q.   McGinniss, does that do anything for you?

A.   No.

Q.   O'Connell?

A.   No.

Q.   All these people are at Cook Medical.

Okay.  Anyway, this is from Bruce Fleck, and it says, "It's interesting that the penetration rate was 86 percent, which is the exact same number as the U Penn and Cleveland Clinic studies."

That information is certainly inconsistent with the information in the IFU; right?

MS. PIERSON:  Object to form.

THE WITNESS:  I don't know.  Oh, yeah.  I guess, yes, it is.

BY MR. HEAVISIDE:

Q.   Okay.  And had anybody from Cook wanted to bring this important information to your attention, they could have done so in many ways, including any number of those educational meetings; right?

A.   Yes.

Q.   The second page of this e-mail down at the

Confidential - Subject to the Protective Order

bottom it says -- it's numbered 0322471.  It's just the people are the same.

A.    Yes.

Q.    It says, "I think we should have a unified response to this issue.  If the sales team is hit with this and have no talking points, we could possibly lose a lot of business."

So I assume you have not seen this before?

A.    No.

Q.    But can you fairly conclude that a very high penetration rate like that associated with the Cook Celect Filter was perceived as a threat to business by Cook?

MS. PIERSON:  Object to form.

THE WITNESS:  Yes.

MS. PIERSON:  Can I have that last exhibit, please?

- - -

(Exhibit 16, Cook Celect and Günther Tulip Vena Cava Filter Patient Guide, was marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.    This is -- I know you're getting tired of

Confidential - Subject to the Protective Order

this; right?

A.   No.  I love this.

Q.   This is Exhibit 16.  And this is, as you can see, a Cook Celect and Günther Tulip Vena Cava Filter Placement -- Patient Guide; right?

A.   Yes.

Q.   Have you seen this document or similar documents --

A.   No.

Q.   -- previously?

A.   No.

Q.   Can I have this for just a second?

A.   Yes.

Q.   It's the same document.  I'm just going to switch which one I labelled.  All right?

But this would apparently be for patients contemplating the implantation of a Cook Celect device; right?

A.   Yes.

Q.   And you see a happy hiker on the front there?

A.   Yes.

Q.   Okay.  If you go to page 7 of that document.

A.   Yes.

Q.   It says, "The following situations can also

Confidential - Subject to the Protective Order

put you at risk for PE."  And it says, "Bariatric surgery, cancer treatments, motor vehicle accidents, gynecological surgery, orthopedic surgery."

Right?

A.   Yes.

Q.   These type -- one's for the IFU.  These type of prophylactic indications are not contained in the IFU under cleared indications; correct?

MS. PIERSON:  Object to form.

THE WITNESS:  I'd have to look at the IFU again.

BY MR. HEAVISIDE:

Q.   Remember, it was about --

A.   Well --

Q.   -- a history of PE, history of --

A.   Right.

Q.   -- deep vein thrombosis, problems with --

A.   I don't remember if it said contraindications to anticoagulation or not as one.

Q.   Yeah.

A.   That -- you know, that's what -- the main reason as far as orthopedic and bariatric surgery, mostly spine surgeries is contraindications, so anticoagulation.

Confidential - Subject to the Protective Order

Q.   Turn to the last page of this document.

It says, "Your filter may be retrieved depending on your medical condition and best judgment of your doctor.  It's possible that your filter may be in for a long time.  In this case the filter may not be retrieved.  Your doctor will decide which kind of filter is best for you and the length of time you will have the device."

Is it fair to say that a patient reviewing this patient guide would not expect this device to perforate through the vena cava wall all the way into the attendant organ, that being the duodenum?

A.   Yes.

MS. PIERSON:  Object to form.

MR. HEAVISIDE:  How long have we been going?

THE VIDEOGRAPHER:  About an hour and 5 minutes.

MR. HEAVISIDE:  Okay.

BY MR. HEAVISIDE:

Q.   Do you want to take a break for a second?

A.   No.  I'm good.

Q.   All right.  So we have been through some documents.  We have been through the IFU; right?

A.   Yes.

Confidential - Subject to the Protective Order

Q.   Based on your review of the IFU, did you expect that this Cook Celect Filter implanted in Mrs. Hill would become embedded and, therefore, not retrievable?

A.   No.

MS. PIERSON:  Object to form.

THE COURT REPORTER:  Did you say "no"?

THE WITNESS:  No.

THE COURT REPORTER:  Thank you.

BY MR. HEAVISIDE:

Q.   Did you expect that this filter, this Cook filter implanted in Mrs. Hill, to become embedded such that it was not retrievable?

A.   No.

Q.   Did you expect this filter implanted in Mrs. Hill to perforate the IVC wall?

A.   No.

Q.   Did you expect this Cook filter implanted in Mrs. Hill to completely perforate the IVC wall and penetrate into the duodenum?

A.   No.

Q.   Did you expect that this Cook filter implanted in Mrs. Hill could not be retrieved by means of any FDA-cleared retrieval technique as

Confidential - Subject to the Protective Order

contained in the IFU?

          MS. PIERSON:  Object to form.

          THE WITNESS:  No.

                              - - -

          (Exhibit 17, 8/23/13 E-mail Chain, Bates No.

CookMDL2570_0382334 - 0382336 - Company Confidential,

was marked for identification.)

                              - - -

BY MR. HEAVISIDE:

     Q.   Pardon me.  Let me show you an exhibit that's

been marked as Exhibit 17.  This is Bates stamped

0382334.  That's the document you have in front of

you?

     A.   Yes.

          MS. PIERSON:  Is this a new one?

          MR. HEAVISIDE:  What's that?

          MS. PIERSON:  What is it?  Just so I know.

          MR. HEAVISIDE:  It's one of those Gardner.

          MS. PIERSON:  Okay.

BY MR. HEAVISIDE:

     Q.   Okay.  Can I fairly assume you don't know who

Jim Gardner is?

     A.   No.

     Q.   And I'll represent to you that he's a Cook

Confidential - Subject to the Protective Order

employee and is the chief -- he's a medical doctor, chief reimbursement officer for Cook.

A.    Uh-huh.

Q.    Okay.  And as you can see, this is dated 8/23/13.  Jim Gardner is writing to Rune Wagner, somebody -- I don't know -- you don't know who that is; right?

A.    I would imagine he's someone from Europe based on the writing.

Q.    It says, "Thanks, Rune.  There's never been strong clinical evidence supporting IVC filter use.  Of course, that hasn't stopped US physicians from increasingly using them, until, of course, physician reimbursement for filter placement was dramatically reduced, resulting in a hit to the filter market in the US."

Had anyone from Cook ever advised you that as far as their knowledge base was concerned, that there was never any strong clinical evidence supporting IVC filter use?

MS. PIERSON:  Object to form.

THE WITNESS:  No.

MR. VOELKE:  He's the medical science officer.

Confidential - Subject to the Protective Order

MR. HEAVISIDE:  Okay.

- - -

(Exhibit 18, 6/16/09 E-mail Chain, Bates No. CookMDL2570_0379327 - 0379329 - Company Confidential, was marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.   Let me show you another one that's been marked Exhibit 18.  That's Bates stamped 0379327; right?

A.   Yes.

Q.   And second half of the page there it's Jim Gardner, who we just --

A.   Yes.

Q.   -- described, writing to Darrell Tallbert. And this is in June of 2009; right?

A.   Yes.

Q.   And it says:  "Thanks, Darrell.  Here are my thoughts.  As an advocate (to some degree) of evidence-based medicine, I think it's high time that the lack of evidence re: IVC filter placements was addressed.

"Two, as Cook's director of reimbursement, I've been very surprised that payers in this company

Confidential - Subject to the Protective Order

haven't raised questions about whether they should

pay for IVC filter placements (and retrievals) given

the number of procedures being performed and the

paucity of data supporting these procedures."

Okay.  Did anyone -- and this is June of

2009.  Did anyone from Cook convey to you concerns

about paucity of data regarding Cook IVC filters or

anything like that?

A.  No.

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.  Would you expect that if Cook, for example,

had information indicating that there was little or,

if any, efficacy associated with use of their

product, that it would be useful to share that

information with someone such as yourself?

MS. PIERSON:  Object to form.

THE WITNESS:  Yes.

- - -

(Exhibit 19, Celect Vena Cava Filter

Brochure, Bates No. Cook IVCF 005769 - 005774, was

marked for identification.)

- - -

///

Confidential - Subject to the Protective Order

BY MR. HEAVISIDE:

Q.   I'm going to show you, excuse me, Exhibit 19.
This is Bates stamped 0057969, and this is a Cook
brochure about the Celect filter; right?

A.   Yes.

Q.   If you go to the -- it's four pages in, Bates
stamped 005772 where it says "Retrievable."

A.   Uh-huh.

Q.   It says, "With redesigned legs and a simple
three-step retrieval process, Celect is remarkably
easy to retrieve.  Simply snare the hook, advance the
sheath to collapse the filter and remove.  Celect's
strut design centers the filter, making the hook
easier to snare."

Now, would this create in you the expectation
that if you followed the cleared retrieval technique
in the IFU that this filter for Mrs. Hill should have
been very easily removed?

MS. PIERSON:  Object to form.

THE WITNESS:  No, not in my experience.
There could be difficulty with all filters.
There is certainly a percentage of filters that I
assume are not going to come out.  If I read this
and I had never put a filter in or taken one out,

Confidential - Subject to the Protective Order

I may get that assumption.  But based on my experience, it wouldn't lead me to believe that, no.

BY MR. HEAVISIDE:

Q.   Did Cook ever give you any information about the number of Celect filters that were not retrievable?

A.   Not I can remember seeing, no.

MS. PIERSON:  Object.

BY MR. HEAVISIDE:

Q.   So you never received any useful information about the frequency --

A.   Where they can't be removed.

Q.   -- where they can't be removed --

A.   No.

Q.   -- for Cook Celect Filter; right?

MS. PIERSON:  Object to form.

                      - - -

(Exhibit 20, "Cook IVC Filters:  The broadest, most proven line in the world" Talking Points Document, was marked for identification.)

                      - - -

BY MR. HEAVISIDE:

Q.   I'll mark this as -- pardon me -- as

Confidential - Subject to the Protective Order

Exhibit 20.  This is not Bates stamped, so I can't

give you the benefit of the Bates stamp.  You can see

these are talking points for the -- associated with

the sale of Cook Celect filter.

If you go to page 3, and under Number 4, it

says, "Retrieval data for the Celect shows a

100 percent retrieval rate through 52 weeks after the

filter implant procedure."

Could a reasonable person, for example,

Mrs. Hill, having been advised of information like

that -- would she expect that her filter couldn't be

taken out three or four months later?

MS. PIERSON:  Object to form.

THE WITNESS:  I don't -- I couldn't answer

that question based on what she thought.  When I

read this, I read it differently than the

layperson would read it.  So I don't know what

she would think.  I would imagine to a layperson

that, yes, 100 percent is 100 percent.

- - -

(Exhibit 21, 3/21/13 E-mail Chain, Bates No.

CookMDL2570_0724357 - 0724359 - Company Confidential,

was marked for identification.)

- - -

Confidential - Subject to the Protective Order

BY MR. HEAVISIDE:

Q.   I'm going to show you a document that's been marked as Exhibit 21.  And that's Bates stamped 0724357; right?

A.   Yes.

Q.   This is --

MS. PIERSON:  What is it, if you don't have a copy?  Just tell me what it is.

MR. HEAVISIDE:  It's off-label retrieval.

MS. PIERSON:  Is it an e-mail?

MR. HEAVISIDE:  Yeah.

MS. PIERSON:  Okay.

BY MR. HEAVISIDE:

Q.   This is to all these people listed there.  I assume you don't know any of them, but they're all apparently Cook people; right?

A.   Yes.

Q.   And the subject is retrieval; right?

A.   Yes.

Q.   It says, "Here's another great success story of utilizing the off-label techniques we discussed at the national sales meeting.  We have been having good success in retrieving tilted or in-grown filters using the snare-over-loop guide wire."

Confidential - Subject to the Protective Order

Right?

A.   Yes.

Q.   Now, that, as far as the IFU is concerned, is an off-label technique; right?

MS. PIERSON:  Object to form.

THE WITNESS:  Yes.  Again, I didn't read the IFU, but I have not seen that in paging through it.

BY MR. HEAVISIDE:

Q.   It goes on to say, "In this case, the filter looked straight but acted like there was a pro" -- excuse me -- "postthrombotic fibrin web from the hook to the wall."

Right?

A.   Yes.

Q.   And this uses the word s-y-n-e-c-h-e-a.  Can you tell me what that --

A.   I have never -- I have never seen anybody use that word.

Q.   Okay.  This would suggest, though, that should someone encounter difficulty retrieving a Cook filter because of postthrombotic fibrin web from the hook to the wall that you could possibly get it out with this off-label technique; right?

Confidential - Subject to the Protective Order

MS. PIERSON:  Object to form.

THE WITNESS:  It's what it suggests, yes.

BY MR. HEAVISIDE:

Q.  Did anybody from Cook contact you about instructing you in any variety of off-label techniques for retrieval of --

A.  No.

Q.  -- these troublesome filters?

A.  No.

- - -

(Exhibit 22, 9/4/13 E-mail Chain, Bates No. CookMDL2570_0720425 - 0720426 - Company Confidential, was marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.  This is Exhibit 22, and it's Bates stamped 0720425; right?

A.  Yes.

MS. PIERSON:  What was it, Mike?

MR. HEAVISIDE:  It's an e-mail.

MS. PIERSON:  What's the date?

MR. HEAVISIDE:  The date is 9/04/2013.

BY MR. HEAVISIDE:

Q.  And down here in the first full paragraph, it

Confidential - Subject to the Protective Order

says --

MS. PIERSON:  Who's on it?

MR. HEAVISIDE:  Who's on it?  Bruce Fleck.

MS. PIERSON:  Who's it to?  Who's it from?

MR. HEAVISIDE:  It's to Bruce Fleck.  It's from Kerry Stafford.

MS. PIERSON:  Okay.

BY MR. HEAVISIDE:

Q.   And the subject is "Celect delivery concern." This is talking about, again, showing physicians an off-label implantation technique.

"Show them the technique for deploying the filter with the hook "and collet" still in the sheath."

What's a collet?

A.   I think that's like the little pusher that's in there.

Q.   Then it says, "This stabilizes the filter so it doesn't move during deployment.  While this technique is currently off-IFU, it is being validated by our engineering team and will be added to the IFU as an official [sic] step."

So certainly at the time you were putting this filter in, this technique was off-label and

Confidential - Subject to the Protective Order

nobody told you about this off-label technique;

correct?

    A.   Correct.

       MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

    Q.   Okay.  I know it's been awhile, but let's

just try to go through the medical reports regarding

your treatment of Elizabeth Hill.  Okay.

    A.   Okay.

                   - - -

       (Exhibit 23, 10/4/10 Mark Zuzga, DO Medical

Record, Bates No. W.Florida 2 - 3, was marked for

identification.)

                   - - -

BY MR. HEAVISIDE:

    Q.   That's been marked Exhibit 23; right?

    A.   Yes.

    Q.   And this appears to be a letter from you to

Dr. Moreno; correct?

    A.   Correct.

    Q.   "I saw Elizabeth Hill in consultation today.

She presents for evaluation" --

       THE COURT REPORTER:  I'm sorry?

       ///

Confidential - Subject to the Protective Order

BY MR. HEAVISIDE:

Q.   "She presents for evaluation of a temporary IVC filter insertion."

Correct?

A.   Yes.

Q.   "Risks and benefits were discussed with Elizabeth, including bleeding, thrombosis and need for secondary procedure."

Correct?

A.   Yes.

Q.   So the risks that you discussed with Mrs. Hill at that point in time were risks attendant to the procedure, like bleeding or bruising or that type of thing?

MS. PIERSON:  Object to form.

THE WITNESS:  That line actually means risks and benefits meaning bleeding during with -- the procedure, thrombosis of the cava, which filters can cause, and need for secondary procedures. That line covers pretty much putting the filter in and long-term complications of filters in and of themselves.

BY MR. HEAVISIDE:

Q.   Well, it covers the complications as known to

Confidential - Subject to the Protective Order

you as conveyed to you by Cook; correct?

MS. PIERSON:  Object to form.

THE WITNESS:  No.  That's me and my 12 years

of practice knowing what the risk of filters are.

That's exactly why I put that line in every

patient that I see that I put a filter in.

BY MR. HEAVISIDE:

Q.   Did you discuss with Mrs. Hill the

possibility that the Cook filter would perforate the

IVC wall and penetrate into the duodenum?

A.   That specifically, no, probably -- not that I

recall.

Q.   Okay.  And she had no history of DVT, no

history of PE; right?

A.   Correct.

Q.   So then I think probably the next time you

saw her would have been to do the implant; right?

A.   Correct.

Q.   And that would have been November 17th of

2010.  I'll give you this Exhibit 24.

                      - - -

(Exhibit 24, 11/17/10 Interventional

Operative Report, Bates No. W.Florida 14 - 15 and

W.Florida 5, was marked for identification.)

Confidential - Subject to the Protective Order

- - -

BY MR. HEAVISIDE:

Q.   All right.  Pardon me.  That's the next time you saw her, 11/17/2010; right?

A.   Yes.

Q.   And you implanted the Cook Celect Filter as for -- as per the cleared indication in the IFU?

A.   Correct.

Q.   And --

MS. PIERSON:  Just object to form.

BY MR. HEAVISIDE:

Q.   And you confirmed -- it says, "Completion venogram showed proper placement without evidence of migration."

A.   Yes.

Q.   Right?

So the conclusion was successful placement of the temporary IVC filter without complication?

A.   Correct.

Q.   Is there a third page of that document you have there?

A.   Yes.

Q.   Let me ask you about that.

A.   Yes.

Confidential - Subject to the Protective Order

Q.   This is -- on the top it says Morton Plant Mease Health Care --

A.   Correct.

Q.   -- right?

And this, I read, is kind of a -- what you have to submit to get --

A.   To book a case.

Q.   Yeah.

A.   Yes.

Q.   Right?

A.   Yes.

Q.   And where it says, "Diagnosis/chief complaint" --

A.   Yes.

Q.   -- it says "DVT"?

A.   Yes.

Q.   But she never, in fact, had a DVT; right?

A.   No.

Q.   This is just in case, associated with her upcoming back surgery, she could possibly have a DVT --

A.   Correct.

Q.   -- right?

But not that she had ever had one --

Golkow Technologies, Inc.                                    Page 78

Confidential - Subject to the Protective Order

A.   Correct.

Q.   -- previously?

- - -

(Exhibit 25, 11/17/10 Interventional Operative Report, was marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.   This would be Exhibit 25.  This is --

A.   This is the same one.

Q.   Okay.

A.   It's the same one as 24.

Q.   It just appears in a different form?

A.   A different font, yes.

Q.   Is that right?

A.   Yes.

Q.   Now, when you put this filter in in November of 2010, was your expectation you could successfully remove it in a relatively short period of time thereafter; right?

A.   Yes.

Q.   Excuse me.  Do you want me to get you some water or are you all right?

A.   No.  I'm good.

Q.   All right.  So when she went -- so she had

Confidential - Subject to the Protective Order

her back surgery in February; right?

A.    Yes.

Q.    Then she went back to you in March to take the filter out; right?

A.    Yes.

MR. VOELKE:  It's actually November.  You said February.

MS. SPATE:  No.  The surgery was December 6th.

MR. VOELKE:  It was December.

THE WITNESS:  Okay.  Sorry.

BY MR. HEAVISIDE:

Q.    Yeah.  Okay.  I have been corrected.  The surgery was in December; right?

A.    Yes.

Q.    Okay.  The implant was in November?

A.    Correct.

Q.    All right.  So she comes back to you for retrieval; right?

A.    Yes.

Q.    And at that point in time it was your expectation that this temporary filter would be easily retrieved; correct?

A.    Yes.

Confidential - Subject to the Protective Order

                            - - -

        (Exhibit 26, 3/23/11 Final Report, Bates No.

W.Florida 12 and W.Florida 4, was marked for

identification.)

                            - - -

BY MR. HEAVISIDE:

    Q.   So this is Exhibit 26.  And this -- this

concerns the events around the unsuccessful

retrieval; right?

    A.   Yes.

    Q.   So you use the retrieval technique, the

cleared retrieval technique as memorialized in the

IFU --

    A.   Yes.

    Q.   -- right?

         And you couldn't get the filter out --

    A.   Correct.

    Q.   -- right?

         Now, the IVC gram was obtained identifying

the previously placed IVC filter free of a

thrombosis -- free of thrombosis.  Right?

    A.   Where are you at?  Yes.  Free of thrombus.

    Q.   Thrombus.

         It says, "Multiple snares were used to try to

Confidential - Subject to the Protective Order

snare the previously placed filter, however, was unsuccessful probably due to fibrin present around the tip of the IVC filter."

Does that mean that the filter was embedded?

A.   No.  Usually there's a hook on the top of the filter, and what can happen sometimes is your body just has a response to it where it forms fibrin around the tip, where it can be in the lumen sitting like this, where you can lose that hook.  You lost the hook on the hanger more or less where it can't hang.

THE COURT REPORTER:  I'm sorry.  I didn't hear the end.

THE WITNESS:  Where you -- it's almost like a hanger.  That's the clothes -- the top of the hanger is covered so you can't hang it on your clothesline.

BY MR. HEAVISIDE:

Q.   So what is fibrin?

A.   Fibrin is just a body's response to almost like scar tissue.

Q.   So this would be the body's response to -- if I use the word "invasion," it's a little too strong, but to the invasion of a --

Confidential - Subject to the Protective Order

A.    Reaction.

Q.    -- foreign --

A.    Reaction.

MS. PIERSON:  Object to form.

Q.    -- object; right?

A.    Yes.

Q.    And because of that reaction, what you had anticipated as an easily retrievable filter was, in fact, unretrievable; right?

A.    Correct.

Q.    And you tried multiple times and it still remained unretrievable --

A.    Correct.

Q.    -- right?

Now, what happened next?  Did you have any further contact with Mrs. Hill?

A.    After that day?

Q.    Yeah.

A.    I -- not that I remember, no.  I don't think I saw her again until she was seen at Morton Plant.

Q.    Did you expect that subsequent to this failed retrieval there would be a progression of perforation through the vena cava wall into the duodenum?

A.    No.

Confidential - Subject to the Protective Order

MS. PIERSON:  Object to form.

BY MR. HEAVISIDE:

Q.    And so obviously she didn't expect it either; right?

MS. PIERSON:  Object to form.

THE WITNESS:  I would imagine.

BY MR. HEAVISIDE:

Q.    According to my records, the next event would be that Mrs. Hill went to -- I get the impression it's kind of an urgent care, kind of Bardmoor Outpatient?

A.    Yes.

Q.    Is this kind of an urgent care?

A.    It's a standalone ER.

Q.    Okay.  And apparently the impression there was acute inflammatory changes, maybe Crohn's.  No evidence of obstruction.  I don't even know if you have seen this report.  Have you?

A.    I don't think so.  Not that I remember, no.

Q.    Okay.  And next Mrs. Hill goes to Morton Plant on 8 -- Morton Plant Hospital on 8/13/2013 apparently complaining of vomiting green --

A.    Emesis.

Q.    -- emesis.

Confidential - Subject to the Protective Order

A.    It's vomiting.

MS. PIERSON:  Object to form.  Are you going to mark it or -- if you're going to ask him about it, we need to mark it.

BY MR. HEAVISIDE:

Q.    Have you ever seen this before?

A.    Not that I remember.  If I saw her during this admission, I probably saw that at one point. I'm not -- I don't remember the exact day I saw her at Morton Plant.

Q.    Okay.

A.    But I know I did.

Q.    And then apparently she goes from -- she's admitted for observation.  And you don't recall whether or not you saw her at that point in time or you didn't; is that right?

A.    I saw her at Morton Plant.  I don't know if it's that date.  Now, if it's the date the EGD was performed, yes, I saw her then.

Q.    All right.  Let's move forward to that.  I'll mark this as Exhibit 27.

- - -

(Exhibit 27, 8/14/13 Operative/Procedure Report, Bates No. Morton Plant 125 - 126, was marked

Confidential - Subject to the Protective Order

for identification.)

- - -

BY MR. HEAVISIDE:

Q.   This is where she sees Dr. Choudhry?

A.   Yes.

Q.   Right?

A.   Yes.

Q.   And she has a CT scan; right?

A.   Yes.

Q.   And the findings are, "Upper gastrointestinal endoscopy done in view of the above revealed the presence of a wire that was penetrating through the duodenal wall and extending to the opposite duodenal wall covering the entire lumen."

Correct?  Under "Findings."

MS. PIERSON:  Object to form.

THE WITNESS:  That's what it says, yes.

BY MR. HEAVISIDE:

Q.   Did you review those CT scans?

A.   This is an EGD.  This is --

Q.   I'm sorry.

A.   I did.  I did.  I saw the pictures when she came in, yes.

Q.   And was your review consistent with the

Confidential - Subject to the Protective Order

findings as set forth in this report?

A.   Yes.

Q.   Okay.  I'm going to show you this document which --

A.   What's that?

- - -

(Exhibit 28, Pictures from EGD, was marked for identification.)

- - -

BY MR. HEAVISIDE:

Q.   This is Exhibit 28.  So Exhibit 28 you have before you -- are these what I so recklessly referred to previously as pictures?

A.   Yes.  That's the EGD.

Q.   So this is the EGD --

A.   That's the EGD pictures.

Q.   -- that you just told me that Choudhry performed --

A.   Correct.

Q.   -- on or about 8/15/2013?

A.   Correct.

- - -

(Exhibit 29, 8/14/13 Consultation, Bates No. Morton Plant 120 - 121, was marked for

Confidential - Subject to the Protective Order

identification.)

- - -

BY MR. HEAVISIDE:

Q.   This is, pardon me, Exhibit 29.  This is Morton Plant Hospital, admit date 8/14, service date 8/16; right?

A.   Yes.

Q.   And a little more than halfway down under "Reason for Consultation" it says, "After evaluation with general surgeons, review of her CT scan was performed, and it was felt that this is likely secondary to her vena cava filter struts which have perforated through the vena cava wall into the duodenum."

Towards the bottom there it says, "Therefore, filter was left in place.  It was placed prior to her lumbar spine surgery.  She has not had any follow-up with Dr. Zuzga regarding the filter."

Now, is it at this point in time when you were, for lack of a better word, brought back into the picture?

MS. PIERSON:  Object to form.

THE WITNESS:  Yes.  This is a note from Dr. Gabriel who is a colleague of mine who we

Confidential - Subject to the Protective Order

cover each other when we're out of town.  So it

looks like he saw the patient first.  I think it

said somewhere in here he was covering for me.

Yeah.  It looks like I was gone a

couple days.  So he did -- he's a vascular

surgeon who was covering me in my absence.

- - -

(Exhibit 30, 8/19/13 Mark Zuzga, DO Progress

Note, Bates No. Morton Plant 288 - 289, was marked

for identification.)

- - -

BY MR. HEAVISIDE:

Q.   This will be Exhibit 30.  This seems to be

your progress note.  Is that fair to say?  At the

top --

A.   The first page is.  The second one is not.

Q.   All right.

A.   It's a different -- different note stapled to

mine.

Q.   This under -- see where it says "Subjective"

there?  And I guess this is your note?

A.   Yes, this is mine.

Q.   Okay.  So it says, "Patient and husband seen.

Discussed at length.  They prefer to go to Penn State

Confidential - Subject to the Protective Order

for treatment.  She is stable without complaint, mild nausea."

So who brought up Dr. Lynch?

A.    I assume Dr. Lynch is at Penn?

Q.    Yeah.

A.    They did.  One thing I remember about this entire case is the day I saw them here.  He's a -- he's an educated guy, and he did his research, is what I can tell you.  The husband.

Q.    By "guy" you mean the husband?

A.    Yes.

Q.    Yeah.  Yeah.

A.    When I came -- I think when I -- they had been there two days or one day before I had saw them. He had already done his research about, quote-unquote, Center of Excellence and which facility would be -- he thought to be the best to take care of the issue.  So he pretty much made the decision at that point where to go.  I don't recall if any radiologist in the hospital was even comfortable trying to remove this filter, and there was consults by them, I don't remember seeing it.

Q.    So is it fair to say you must have told Mr. and Mrs. Hill about the filter having perforated

Confidential - Subject to the Protective Order

the wall into the duodenum and that --

A.    I don't think I told them.  They already knew.

Q.    Okay.  Well, did you tell them that you could successfully take it out or that "I don't know what to do with this" or --

A.    I don't remember the interaction.

MS. PIERSON:  Object to form.

THE WITNESS:  My -- more than likely -- again, if there is a note in there by radiology, which I'm sure there should be -- I would imagine they probably saw the patient, because this would be an interventional radiologist more than likely removing the filter.  They may have deferred or their family may have deferred.  I don't know.

BY MR. HEAVISIDE:

Q.    Let's look at a different --

A.    This one?

Q.    No.  Go to a different exhibit, which will be 31.

- - -

(Exhibit 31, 8/19/13 Mark Zuzga, DO Progress Note, Bates No. Morton Plant 290 - 296, was marked for identification.)

Confidential - Subject to the Protective Order

                              - - -

BY MR. HEAVISIDE:

     Q.   So is this your note or --

     A.   Yeah, this is my note.

     Q.   Okay.  So let's turn to the second page if

you would.

     A.   Yeah.

     Q.   And what is the date?  This is --

     A.   8/19/13.

     Q.   Okay.  And under "Plan" it says, "Summary IVC

filter with prong eroded into duodenum.  I feel the

patient is stable to travel commercially to

Pennsylvania.  I have spoke with the IOR specialist."

     A.   Should say "IR specialist."

     Q.   Okay.  So when did you speak with Dr. Lynch?

     A.   I don't even remember speaking to Dr. Lynch.

     Q.   Oh, okay.

     A.   So I would -- as I stated earlier, I would

imagine that it was that day.

     Q.   If it happened at all?

     A.   If -- well, if I wrote it, it must have

happened.  I just -- I don't remember calling him or

speaking with him, to be completely honest with you.

     Q.   And you write there --

Confidential - Subject to the Protective Order

A.    If I did, it was probably at the request of the husband, just remembering what I remember of him, because usually it would be -- the transfer would be taken care of by the admitting physician.  I probably just did that as a courtesy to them and said, "Listen, I'll talk with him, tell him what's going on just so he knows."  But, again, I don't remember even speaking with him, so...

Q.    Okay.  Well, it goes on to say, "There is nothing else I can offer the patient."

So did you convey to Mr. and Mrs. Hill that, "This is your situation and there's nothing else I can do for you"?

A.    Yes.

Q.    So if there was some off-label technique that might enable somebody to retrieve this filter, it is not a technique of which you had been informed by Cook; correct?

A.    Correct.

Q.    We have already looked at this; is that right?

A.    Yes.  It was attached to this in the back.

Q.    Yeah.  So you convey to them, "Here's your problem.  Here's your situation.  I can't do anything

Confidential - Subject to the Protective Order

more for you."  Apparently Mr. Hill, however he did it --

A.    Right.

Q.    -- researched, located, whatever Dr. Lynch?

A.    Correct.

Q.    And for you that was essentially that?

A.    Correct.

Q.    Right?

A.    Yes.

Q.    Did you discuss the referral to Dr. Lynch with anybody from Cook?

A.    Not that I can remember, no.  And -- no, I don't.  If I did, it may have been in the passing to summarize the case with Courtney.

Q.    Because --

A.    Not specifically that she was transferred to Dr. Lynch but she was going to Pennsylvania.

Q.    Yeah.  Because we started earlier, as I recall, with an e-mail from Courtney Whitelock to Bruce Fleck attaching pictures and telling her it's perforated into the duodenum and she's going to Pennsylvania?

A.    Right.

Q.    And so to the extent you had a conversation

Confidential - Subject to the Protective Order

with Courtney Fleck [sic] about this incident, that would have been it?

A.   Yeah.

Q.   Right?

A.   Right.

Q.   Okay.

A.   You guys have got to be cold because I'm cold.

Q.   Do you want us to turn it down?

A.   I'm freezing.

MR. VOELKE:  We all have sleeves.

THE WITNESS:  I'm getting cold.

MR. HEAVISIDE:  Let's go off the record for a second.

THE VIDEOGRAPHER:  Time is 4:54 p.m.  We're off the record.

(A recess was taken from 4:54 p.m. until 4:55 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 4:55 p.m.

- - -

(Exhibit 32, 8/14/13 Discharge Summary, Bates No. Morton Plant 114 - 115, was marked for identification.)

- - -

Confidential - Subject to the Protective Order

BY MR. HEAVISIDE:

Q.   Doctor, this is Exhibit 32.  This is a discharge summary from Morton Plant, and this kind of aggregates or synthesizes these reports we have just been discussing?

A.   Right.

Q.   Yes?

A.   Yes.

Q.   So towards the bottom of the page where it says -- it says Number 3, "EGD done on 8/15/2013."

Those are the pictures --

A.   Yes.

Q.   -- that we looked at; right?

A.   Yes.

Q.   "Showed the following:  The presence of a wire that was penetrating through the duodenum wall and extending to the opposite duodenum wall, covering the entire lumen."

What is the lumen?

A.   That's probably an inaccurate statement.  I would say it's traversing the lumen.  Covering the lumen to me -- if this is the bowel, it would be this.  It completely impacts it.  I would say it's more of a traversing, where if this is the inside of

Confidential - Subject to the Protective Order

the bowel, the wire is coming through like that

unless it's septating.

Q.    Septating?

A.    Like -- yeah.

Q.    Okay.  On the second page it says, "Vascular

surgeon was consulted, Dr. Gabriel and Dr. Zuzga, and

felt the patient needed to be transferred to a

medical center where they have the capability and

experience to remove her IVC filter."

This again says that you spoke with Lynch,

although I don't suppose that refreshes your

recollection, does it?

A.    It does not.

MR. HEAVISIDE:  Okay.  All right.  Let's take

a ten-minute break.

THE VIDEOGRAPHER:  Time is 4:57 p.m.  We're

off the record.

(A recess was taken from 4:57 p.m. until 5:10 p.m.)

MR. HEAVISIDE:  We had a fascinating

discussion off the record about the temporal

limitations with which we were confronted here

today because of the doctor's schedule and

because of counsel's flight schedule, and so we

adjourned today with the understanding I may have

Confidential - Subject to the Protective Order

more questions.  There will undoubtedly be direct

questions.  Ms. Pierson will undoubtedly have

questions.  And so we are adjourning now to

subsequently reconvene.

          MS. PIERSON:  We agree.

          (Whereupon, the deposition concluded at

5:11 p.m.)

Confidential - Subject to the Protective Order

C E R T I F I C A T E

I, Tami Cline, Registered Merit Reporter,

Certified Realtime Reporter, and Florida Professional

Reporter, do hereby certify that, pursuant to notice,

the deposition of MARK ZUZGA, DO was duly taken on

February 8, 2017, at 3:03 p.m. before me.

The said MARK ZUZGA, DO was duly sworn by me

according to law to tell the truth, the whole truth

and nothing but the truth and thereupon did testify

as set forth in the above transcript of testimony.

The testimony was taken down stenographically by me.

I do further certify that the above deposition is

full, complete, and a true record of all the

testimony given by the said witness.

_____

Tami Cline, RMR, CRR, FPR

(The foregoing certification of this

transcript does not apply to any reproduction of the

same by any means, unless under the direct control

and/or supervision of the certifying reporter.)

Confidential - Subject to the Protective Order

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Confidential - Subject to the Protective Order

                          - - - - - -

                        E R R A T A

                          - - - - - -

PAGE    LINE    CHANGE

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

____    ____    _____

   REASON: _____

Confidential - Subject to the Protective Order

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby acknowledge that I have read the foregoing pages, 1 to 103, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____          _____

MARK ZUZGA, DO                                                    DATE

Subscribed and sworn to before me this

____ day of _____, 20___.

My Commission expires: _____

_____

Notary Public

Confidential - Subject to the Protective Order

LAWYER'S NOTES

PAGE    LINE

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____