**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

_____

In Re: COOK MEDICAL, INC.,
IVC FILTERS MARKETING, SALES          Case No. 1:14-ml-2570-RLY-TAB
PRACTICES AND PRODUCTS                          MDL No. 2570
LIABILITY LITIGATION

_____

This Document Relates to:

All Cases Listed on Exhibit A to Motion, Dkt. 26476-1

_____


**COOK DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
<u>ON FAILURE-TO-WARN CLAIMS GOVERNED BY ILLINOIS LAW</u>**

The Court should grant summary judgment on the failure-to-warn claims asserted by the 77 Illinois Plaintiffs to whom this motion is directed (hereafter collectively "Plaintiffs").[1] As detailed below, the arguments offered in Plaintiffs' responses do not create a genuine issue of material fact or otherwise save Plaintiffs' failure-to-warn claims.

At the threshold, however, Plaintiffs' response fails to contend with or even acknowledge the central rule of law at issue in this motion, as stated by the Illinois Supreme Court in *Hansen v. Baxter Healthcare Corp.*: "a prescription medical device manufacturer need not provide a warning of risks already known to the medical community." 764 N.E.2d 35, 42 (Ill. 2002); *see also Proctor v. Davis*, 682 N.E.2d 1203, 1211(Ill. App. Ct. 1991) ("a drug manufacturer need not provide a warning of risks known to the medical community"); *Aquino v. C.R. Bard, Inc.*, 413 F. Supp. 3d 770, 790 (N.D. Ill. 2019) ("a manufacturer's duty to warn physicians is limited and does not extend to risks already known to the medical community") (citing *Hansen*, 764 N.E.2d at 42).

The present motion does *not* concern the *adequacy* of Cook's warnings about the six risks at issue; it argues that Cook had no duty to warn physicians about these risks **at all**. Plaintiffs acknowledge in their response that "Cook does not argue that its warnings were adequate. Its motion does not concern the adequacy of its warnings at all." Dkt. 26564 at 3. Yet despite this

---

[1] Although they do not bear on the merits of this motion, Cook is obliged to respond to the PSC's *ad hominem* comments on Cook's intentions with this motion. Contrary to the PSC's assertion, Cook does not bring this motion for the purpose of delay. This motion asks this MDL court to do one of the things that an MDL court is designed to do: resolve legal issues common to multiple cases, as this Court has already done several times. *See, e.g.,* Dkt. 15907 (granting partial summary judgment on MDL plaintiffs' claims of fraudulent concealment tolling the statute of limitations); Dkt. 25589 (same on renewed motion after amendments); Dkt. 25387 (dismissing all Plaintiffs' express warranty claims as inadequately plead); Dkt. 26157 (dismissing manufacturing-related claims as to Plaintiffs in multiple states). These are the kinds of broad, useful rulings that an MDL court makes before remanding.

acknowledgement, Plaintiffs spend a great portion of their response arguing that Cook's warnings were inadequate, an argument wholly irrelevant to the issue presented here.

Under the *Hansen* rule, the legal question presented by Cook's motion is simple: Did Cook have a duty under Illinois law to warn physicians of six risks of IVC filter use that were already well-known to the medical community? Plaintiffs' response essentially concedes several elements critical to this issue. Specifically:

- Plaintiffs do not dispute that Illinois law applies to each of their failure-to-warn claims.
- Plaintiffs do not claim that Cook had a duty to warn of any risks other than the six risks listed in the Master Complaint: tilt, perforation, fracture, migration, inability to remove, and death. *See* Dkt. 213, Counts I & III.
- Plaintiffs offer no evidence disputing Cook's evidence that, as of August 10, 2010, the IVC filter risks of tilt, perforation, fracture, migration, inability to remove, and death were generally known in the medical community.

Based on these concessions, under the rule stated in *Hansen* and other Illinois cases, after August 10, 2010, Cook owed no duty to want Plaintiffs or their doctors about those known risks. The Court should therefore grant summary judgment as to Plaintiffs' failure-to-warn claims.

**I.    Cook's Motion Presents a Legal Issue Suitable for a Ruling Across All Illinois Cases Involving Filter Placements After August 10, 2010.**

Plaintiffs first argue that Cook's motion presents factual questions that must be decided on a case-by-case basis, using plaintiff-specific evidence, and is therefore unsuitable for a broad, multi-plaintiff legal ruling. *See* Dkt. 26564 at 3-15. Plaintiffs are mistaken. Cook's motion presents a question of law that applies an objective standard to a set of undisputed facts common to all Plaintiffs: the medical community's knowledge of IVC filter risks as of August 10, 2010. The motion is therefore not only suitable but ideal for a broad MDL ruling, and no Plaintiff-specific facts will affect the outcome of the motion in any individual case.

A.    The *Hansen* and *Proctor* decisions establish that a manufacturer has no duty to warn of a risk posed by a medical device that is generally known to the medical community, regardless of the *actual* knowledge of any individual treating physician.

Under Illinois law, Cook had no duty to warn doctors about risks of IVC filters already known in the medical community.[2] Contrary to Plaintiffs' assertion, the *actual* individual knowledge of individual treating physicians does not affect Cook's duty to warn of known risks, and the present motion therefore requires no plaintiff-specific determinations.

Plaintiffs' argument that Cook's motion raises plaintiff-specific facts regarding Cook's duty misframes the issue, mistakenly implying that the learned intermediary doctrine is the "defense" asserted in this motion. *See* Dkt. 26564 at 3-4. But as Plaintiffs acknowledge, the learned intermediary doctrine does not relieve a medical device manufacturer of the duty to warn; it merely shifts that duty to warn from the patient to the physician. *See, e.g., In re Zimmer, NexGen Knee Implant Prods. Liability Lit.*, 884 F.3d 746, 750 (7th Cir. 2018) ("the manufacturer of a medical device has no duty to warn the patient as long as the manufacturer provides adequate warnings to the physician").

In the present motion, the issue is not to whom a duty to warn runs but whether Cook had any duty at all to warn about known risks. Specifically, the "defense" at issue here rests on whether Cook had a duty to warn physician "learned intermediaries" about six risks of IVC filter placement that were already well known to the medical community. As noted above, Illinois law imposes no such duty. *Hansen*, 764 N.E.2d at 42; *Proctor*, 682 N.E.2d at 1211; *see also Kokoyachuk v.*

---

[2] As noted in Cook's original motion, this Illinois rule is fully consistent with the federal framework for medical device labeling: "such information may be omitted from the dispensing package if, but only if, the article is a device for which directions, hazards, warnings, and other information are commonly known to practitioners licensed by law to use the device." *See* Cook Defs.' Mot, Dkt. 26477 at 21 (quoting 21 C.F.R. § 801.109(c)).

*Aeroquip Corp.*, 526 N.E.2d 607, 610 (Ill. App. Ct. 1988) ("Where the danger is obvious and generally appreciated, nothing is gained by a warning and none is required."), *aff'd* 535 N.E.2d 402 (table).

Although Plaintiffs' response spends considerable time discussing the *Hansen* decision, it never addresses or even acknowledges the explicit rule the *Hansen* court stated: "a prescription medical device manufacturer need not provide a warning of risks already known to the medical community." 764 N.E.2d at 42. Instead, Plaintiffs argue that this Court should deny summary judgment simply because the *Hansen* court did so, ignoring the critical differences in fact and evidence that compels a different result here.[3]

In *Hansen*, the plaintiff's decedent suffered an air embolism because a "friction-fit" connector between an intravenous tube and a catheter in her jugular vein came apart, resulting in serious injury and eventually death. *Id.* at 38. The plaintiff claimed that the connector's manufacturer failed to warn doctors about the risk that the friction-fit connector could come apart, despite marketing a different threaded connector that was much less likely to separate. *Id.* at 38-

---

[3] The PSC attempts to incorporate by reference arguments made by Plaintiffs in the *Hill* and *Brand* bellwether cases, *see* Dkt. 26564 at 2, but it never states what those arguments are and never tries to apply them to the facts presented by the present motion. Even assuming that such vague, whole-sale incorporation were otherwise appropriate, Plaintiffs' arguments in *Hill* and *Brand* are unhelpful here for several reasons. First, the claims in the *Hill* and *Brand* cases were governed by Florida and Georgia law respectively, not the Illinois law on which Cook's motion is based. Second, the summary judgment motions that Cook brought in *Hill* and *Brand* did not raise the issue presented here, i.e., whether Cook owed a duty to warn of IVC filter risks generally known in the medical community. And finally, as Plaintiffs acknowledge later in their brief, the Court actually ruled *against* those Plaintiffs on the related failure-to-warn issues that those motions actually did raise, holding that the treating physician's personal knowledge of the IVC filter risks that the Plaintiff actually experienced foreclosed any finding of proximate cause as a matter of law. *See* Dkt. 6660 at 6-8 (granting summary judgment in *Hill*, citing treating physician's "devastating testimony" that "he was fully aware of the risks of the surgery"); Dkt. 9696 at 8-9 (granting summary judgment on claim in *Brand*, noting "[t]he undisputed evidence reflects that [plaintiff's treating physician] …already knew at the time of Plaintiff's implant about all of the complications Plaintiff experienced").

39. The court concluded that the manufacturer knew of the risk that friction-fit connectors could disconnect, *id.* at 42, and noted the lack of evidence that the risk was generally known in the medical community, *id.* at 40 (nurse's testimony that she did not know whether separation of friction-fit connectors "was a well-known complication in the field"). The court also noted that several of the medical professionals involved in the case did not *actually* know of the risk. *See id.* at 42-43.

Based on these observations, Plaintiffs argue that the *Hansen* court based its decision solely on the individual awareness of the care providers. In fact, the court's observations merely provide examples of the ignorance of the risk in the general medical community, and they in no way undercut the clear statements in both *Hansen* and *Proctor* focusing the rule on "risks already known *to the medical community*." *Id.* at 42 (emphasis added); *see also Proctor*, 682 N.E.2d at 1211.

This focus on the knowledge of the medical community is especially clear in *Proctor*, a decision that Plaintiffs' response mentions several times but never fully analyzes. In *Proctor*, both the court and the parties focused directly and expressly on the medical community's knowledge in determining whether the defendant had a duty to warn:

- The defendant argued it had no duty to warn because "the specialized medical community was already aware of the risks," 682 N.E.2d at 1211;

- The majority decision expressly stated the "medical community knowledge" rule, holding that "a drug manufacturer need not provide a warning of risks known to the medical community," *id.* at 277;

- The majority then concluded that the evidence in *Proctor* did not support the existence of such knowledge in the medical community, *id.* at 279 ("There is no record evidence to support the hypothesis that the medical community knew of these dangerous propensities"); and

- The dissent disagreed, arguing that the record contained sufficient evidence of such medical community knowledge, *id.* at 1291 (DiVito, J. dissenting) (arguing that defendant had "no duty to warn" because "[t]he

record … contains ample evidence that the medical community…was aware of the risks associated with periocular injection" the drug at issue").

These passages make clear that the court was actually applying the rule it stated, focusing on the general knowledge of the medical community.

Plaintiffs' response also ignores the relevant holding in the Northern District of Illinois's decision in *Aquino*, 413 F. Supp. 3d at 790 & n.13. Plaintiffs mistakenly assert that the *Aquino* court "held only that" the learned intermediary doctrine barred the plaintiff's claim that the defendant had a duty to warn the plaintiff directly. Dkt. 26564 at 8-9 (quoting *Aquino*, 413 F. Supp. 3d at 789-90). Plaintiffs are mistaken. In its very next paragraph, the *Aquino* court explicitly states the rule from *Hansen*, "a manufacturer's duty to warn physicians is limited and does not extend to risks already known to the medical community, 413 F.Supp. 3d at 790 (citing *Hansen*, 764 N.E.2d at 42), and then applies that rule to dismiss the plaintiff's warning claims for failure to allege either what the defendant had told her surgeon or "what her surgeon knew generally as a member of the medical community," *id*. And like the *Proctor* court, the Aquino court's discussion makes clear its focus on the knowledge of the medical community. *See id*. at 719 n.13 (noting that plaintiff's evidence "that the medical community was not aware of the potential for transvaginal mesh to deform, shrink, degrade or band" was contradicted by government and medical documentation that "some risks associated with transvaginal mesh were known or knowable as early as 5 years before [plaintiff's] surgery").

In short, the courts in *Hansen*, *Proctor*, and *Aquino* not only stated but actually employed the "knowledge of the medical community" standard that Plaintiffs would have this Court ignore. The key difference between *Hansen* and *Proctor* and the present case is that the defendants in *Hansen* and *Proctor* were unable to offer evidence that the medically community actually knew of the risks at issue. In contrast here, as discussed below, that knowledge is not only ample but

materially undisputed. Again, despite Plaintiffs' discussions of the *Hansen* and *Proctor* decisions, their response neither addresses nor even mentions the clear rule that the *Hansen, Proctor*, and *Aquino* courts articulated and applied.

**B.    Plaintiff's proposed subjective standard ignores the *Hansen*, *Proctor*, and *Aquino* rule, contradicts Illinois law, and is inconsistent and unworkable.**

Instead of addressing the *Hansen*, *Proctor*, and *Aquino* courts' express holdings that a manufacturer has no duty to warn doctors of risks known to the medical community, Plaintiffs argue that a duty to warn still exists if the specific doctor using the product is *actually* and *subjectively* unaware of the risk at issue, regardless of how well known that risk is in the general medical community. *See* Dkt. 26564 at 6-7. Not only does this argument ignore the *Hansen*, *Proctor*, and *Aquino* courts' explicit focus on "risks already known to the medical community," it faces several other problems: it contradicts Illinois's objective standard for evaluating known or obvious risks, it is internally contradictory, and it would render the *Hansen/Proctor* rule illusory.

First, Plaintiff' position turns Illinois law on its head by substituting a subjective standard for the established objective standard. To determine whether the common knowledge of a product risk relieves a manufacturer of the duty to warn of that risk, courts apply an objective standard, *i.e.*, a standard that is not dependent on the subjective knowledge of the person using the product.[4] *See, e.g., Lederman v. Pac. Indus., Inc.*, 119 F.3d 551, 554 (7th Cir. 1997) ("Determining whether a particular danger is open and obvious is an objective inquiry…"). As one Illinois court put it:

> The duty to warn analysis, which is an objective one, should focus on the typical user's perception and knowledge. The plaintiff's subjective knowledge is immaterial to the antecedent determination of an open and obvious danger.

---

[4] Determining whether a duty exists presents a question of law for the Court. *See, e.g., Sollami*, 772 N.E.2d at 219 ("The determination of whether a duty to warn exists is a question of law.").

*Klen v. Asahi Pool, Inc.*, 643 N.E.2d 1360, 1363 (1994). *Accord, Sollami v. Eaton*, 772 N.E.2d 215, 219 (Ill. 2002) ("The duty to warn is determined by an objective analysis, *i.e.,* the awareness of an ordinary person.") (citing *Klen*); *Bates v. Richland Sales Corp.*, 803 N.E.2d 977, 986 (Ill. 2004) ("If, from an objective point of view, the danger would be apparent, or 'open and obvious,' to an ordinary person, the seller has no duty to warn of it.") (citing *Sollami*). Framing this objective standard slightly differently, the court determines the existence of a duty to warn by looking not at what a doctor *actually* knew, but at what the doctor objectively *should have known* given the state of medical knowledge. As one court put it in framing the same standard under Indiana law:

> A manufacturer "ha[s] no duty to warn with respect to such potential [risks] ... already known to the user, the operating surgeon," or those risks *about which the surgeon should know.*

*Hammons v. Ethicon, Inc.*, 190 A.3d 1248, 1270 (Pa. Super. 2018), *aff'd*, 662 Pa. 627, 240 A.3d 537 (2020) (medical device case, applying Indiana law, emphasis added) (quoting *Phelps v. Sherwood Med. Indus.*, 836 F.2d 296, 300, 303–04, 305 (7th Cir. 1987)). Plaintiffs' assertion that a defendant's duty to warn depends on the *subjective* knowledge of an individual treating doctor contradicts this objective standard. In fact, Plaintiffs' assertion makes no sense; a court could not logically use the *subjective* knowledge of an *individual* doctor to determine—in the *Hansen* court's words—"risks already known *to the medical community*" as a whole *Hansen*, 764 N.E.2d at 42 (emphasis added). The Court should reject Plaintiffs' proposed subjective standard.[5]

---

[5] Plaintiffs also imply that the court in *Robinson v. Ethicon, Inc.*, 588 F.Supp. 3d 726 (S.D. Tex. 2022) adopted a subjective standard for medical community knowledge under 21 CFR § 801.109(c), asserting that "actual physicians' knowledge" is necessary to invoke the section. Dkt. 26564 at 9. Plaintiffs apparently misread the location of the apostrophe here, interpreting the plural "physicians' knowledge" to mean an individual "physician's knowledge." In fact, the *Robinson* decision makes clear that under section 801.109(c), the relevant inquiry is the common knowledge of the medical community, not the knowledge of any individual doctor. 588 F. Supp. 3d at 734 ("a warning could be adequate even if it does not warn of certain side effects if the side effects are *common knowledge to physicians licensed to use the device*") (emphasis added).

Second, the standard Plaintiffs propose is internally contradictory. Under *Hansen*, a product manufacturer has no duty to warn a doctor, acting as a learned intermediary, of product risks already known to the medical community. *Id.* But according to Plaintiffs' argument, a doctor is a "learned intermediary" *only* if the doctor has received sufficient warning about the risks of the product. *See* Dkt. 26564 at 6 ("Without evidence that a particular plaintiff's doctors received sufficient warnings, those doctors cannot be considered learned intermediaries…."). Thus, according to Plaintiffs, a doctor is a learned intermediary only if the manufacturer provides the doctor with a warning that the manufacturer has no duty to provide if the doctor is a learned intermediary. Put another way, Plaintiffs maintain that a manufacturer can be relieved of the duty to adequately warn the doctor only if the manufacturer has *already* adequately warned the doctor. Under this circular standard, no manufacturer could ever be excused from a duty to warn of even the most obvious risks. The Court should reject this unworkable and internally contradictory standard.

Third, changing the standard for evaluating known risks from objective to subjective (as Plaintiffs urge) would undercut the very purposes of the "known or obvious risk" doctrine and effectively eliminate the rule. Use of an objective standard, focusing on what is generally known in the medical community, promotes fairness and consistency in outcomes. The standard also helps avoid subjective variability and ensures that the assessment of risk is based on common, reasonable perceptions rather than individual sensibilities. Switching to an individual, subjective standard would undercut these goals and create a less uniform and more unpredictable legal framework. If all a plaintiff (or a plaintiff's doctor) needed to say were, "Well, the risk may be common knowledge, but I didn't personally know about it," the *Hansen* rule would essentially disappear as

an effective legal tool. The Court should reject Plaintiffs' suggested subjective standard as contrary to the goals of the rule the *Hansen* and *Proctor* courts stated.[6]

In sum, Plaintiffs offer no analysis and no case law supporting the application of a subjective standard to the question of what constitutes a "known risk," with respect to either products generally or medical devices specifically. Plaintiffs causally dismiss the Illinois cases Cook cites that hold that tobacco and alcohol present "known risks" that relieve manufacturers of a duty to warn, baldly asserting that "it goes without saying" that the knowledge of risks of alcohol and tobacco is "entirely different" from knowledge of the risks of IVC filters. But the principle is in fact exactly the same—a product manufacturer has no duty to warn of product risks that are commonly known in the community that will use the product. *See Gonzalez v. Republic Tobacco Co.*, 2000 WL 343236, at *3 (N.D. Ill. Mar. 31, 2000) (known risks of tobacco); *Garrison v. Heublein, Inc.*, 673 F.2d 189, 191 (7th Cir. 1982) (known risks of alcohol). Plaintiffs cite no

---

[6] Plaintiffs' attempts to distinguish other cases cited in Cook's motion, *see* Dkt. 26564 at 7-10, do not undercut the present motion. Cook cited those cases for general propositions concerning the existence and character of the learned intermediary doctrine. *See* Dkt. 26477 at 19-20 (citing *Gravitt v. Mentor Worldwide, LLC*, 646 F. Supp. 3d 962, 968 (N.D. Ill. 2022), *Ashman v. SK & F Lab Co.* 702 Supp. 1401, 1404 (N.D. Ill. 1988), *Martin by Martin v. Ortho Pharm. Corp.*, 661 N.E.2d 352, 356-57 (Ill. 1996), *Hernandez v. Schering Corp.*, 958 N.E.2d 447, 454-55 (Ill. App. Ct. 2011), and *Leesley v. West*, 518 N.E.2d 758, 760 (Ill. App. Ct. 1988)). Plaintiffs' response states repeatedly that they do not dispute these basic propositions. *See, e.g.,* Dkt. 26564 at 3 ("Plaintiffs acknowledge that the learned intermediary doctrine exists in Illinois, and generally means that the duty to warn of a medical device's hazards is owed not to the patient but to the prescribing and treating physicians."); *id*. at 10 ("Plaintiffs acknowledge that the learned intermediary doctrine requires warnings be made only to physicians, not patients"). As discussed in the text, the key cases on the "known risk" doctrine at issue here are *Hansen* and *Proctor*.

As to *Robinson v. Ethicon, Inc*., 588 F. Supp. 3d 726 (S.D. Tex. 2022), Plaintiffs point out that Cook did not make a written request to omit warnings based on 21 C.F.R. §801.109(c). But Cook does not argue that the federal regulation applies directly to this motion. Cook cited the regulation simply as an example to show that even FDA regulations recognize the common-sense proposition that a manufacturer has no duty to warn doctors about risks of medical devices that are already known in the medical community.

authority suggesting that the objective standard applied in those cases should not apply here as well.

### C.    Cook had no duty to warn doctors about the comparative risks of Cook filters and other manufacturers' filters.

Plaintiffs also dispute Cook's argument that it had no duty to warn doctors about the risks of Cook filters compared to other manufacturers' filters. *See* Dkt 26564 at 11-14. Plaintiffs' attempt to distinguish Cook's authorities fails, and Plaintiffs' own authorities are unhelpful and factually unsupported in the situation here.

Plaintiffs discuss Cook's citation of *Ackley v. Wyeth Lab'ys, Inc.*, 919 F.2d 397, 405 (6th Cir. 1990), but they offer no analysis distinguishing it from the situation presented here, *see* Dkt. 26564 at 11. On the contrary, Plaintiffs acknowledge the *Ackley* court's holding that the "defendant was 'not obligated to provide a comparison of its drug with others.'" *Id.* at 11 (quoting *Ackley*). And although Plaintiffs correctly note that *Ackley* was decided under Ohio law, they fail to acknowledge that the Illinois Court of Appeals adopted the relevant rule from *Ackley* as Illinois law in *Pluto v. Searle Lab.*, 690 N.E.2d 619, 621 (Ill. App. Ct. 1997) (finding *Ackley* "instructive").

Plaintiffs also address *Pluto* itself, trying to distinguish that decision on the ground that the IUD that injured the *Pluto* plaintiff differed too much from other birth control devices to require warnings about comparative risks. *See* Dkt 26564 at 11-12. But as noted immediately above, Plaintiffs ignore the *Pluto* court's direct quotation and approval of the Sixth Circuit's holding in *Ackley* that "the manufacturer is obligated to make a reasonable disclosure of all the risks inherent in its own drug[.] *It is not obligated to provide a comparison of its drug with others*." *Pluto*, 690 N.E.2d at 621 (quoting *Ackley*, 919 F.2d at 405, emphasis added). Indeed, the *Pluto* Court went further, explaining the rationale behind the rule and the difficulties that a contrary result would create for manufacturers:

> [Defendant] is under no duty to provide information on other products in the marketplace. Such a duty would require drug manufacturers to rely upon the representations made by competitor drug companies. This arrangement would only lead to greater liability on behalf of drug manufacturers that were required to vouch for the efficacy of a competitor's product. Furthermore, such a duty would raise serious implications regarding the free flow of commerce in that industry. As such, we decline to impose the duty proposed by plaintiff, and hold that [defendant] was under no duty to warn physicians and patients of the increased risk of contracting an STD and/or PID when using an IUD as compared to other forms of birth control.

*Id.* Likewise here, Cook had no duty to provide doctors with information about other companies' IVC filters or to compare the effectiveness of Cook filters to others' products.

The two cases on which Plaintiffs rely do not change this result. Plaintiffs cite *Schedin v. Ortho-McNiel-Janssen Pharmaceuticals, Inc.*, 776 F. Supp. 2d 907 (D. Minn. 2011), but Plaintiffs acknowledge that the *Schedin* court based its decision on the fact that the drug at issue "ha[d] not been classified as 'unavoidably unsafe.'" Dkt. 26564 at 13 (citing *Schedin,* 776 F.2d at 914). In contrast here, it is undisputed that IVC filters *are* unavoidably unsafe products. *See, e.g., Ebert v. C.R. Bard, Inc.*, 459 F. Supp. 3d 637, 653 (E.D. Pa. 2020) (holding that an IVC filter is an "unavoidably unsafe product" because "every IVC filter…carries risks of fracture, migration and perforation"); *Maietta v. C.R. Bard, Inc.*, No. CV 19-4170, 2022 WL 3577374, at *4 (E.D. Pa. Aug. 19, 2022) (holding filters unavoidably unsafe, noting the "'well characterized' risks of IVC filters, which include fracture, migration, tilt, and perforation"). Indeed, Plaintiffs' own experts acknowledge the unavoidable risks filters pose. *See* Ex. A, Deposition of Dr. Gregory Gordon ("Gordon dep."), dated June 12, 2018 at 147:1-23; 49:4-17; 201:4-9; 254:4-6. *Schedin* does not help Plaintiffs.

Plaintiffs also cite *In re Depakote*, 2015 WL 4776093 (S.D. Ill. Feb. 14, 2015), arguing that that decision distinguished *Pluto* on the ground that the *Depakote* defendant had voluntarily included comparative risk information on its product label and in doing so unilaterally assumed

the duty to make sure that such information was current and accurate. *See* 2015 WL 4776093 at *5-*6. Plaintiffs try to bootstrap that holding into the present case, asserting that "here Cook very much did compare its filters with those of its competitors, thus assuming a duty to be fully forthcoming and truthful regarding those comparisons." Dkt. 26564 at 14. But Plaintiffs have not pled that Cook voluntarily assumed any duties to them—they allege only common law duties of reasonable care and statutory duties to refrain from deceptive practices. *See generally* Dkt. 213 (Master Complaint).

More importantly, the circumstances here are entirely different from those in *Depakote*. As Plaintiffs note, the defendant in *Depakote* included "comparative risk information in its label." Dkt. 26564 at 13 (quoting *Depakote*). In contrast here, Plaintiffs do not and cannot claim that Cook included comparative risk information on its label. The three exhibits Plaintiffs offer to try to support their argument are *not* product labels or any other documents that would have been circulated to doctors; they are confidential *internal* Cook documents comparing Cook products' performance to that of Cook's competitors' products. *See* Dkt. 26565, Exh. A, B, C. This exclusively internal character of these documents destroys Plaintiffs' argument. The "voluntary assumption of duty" that Plaintiffs urge rests on the premise that if a manufacturer conveys information to doctors by including it on a label, the manufacturer assumes a duty to keep that information current and accurate. Dkt. 26564 at 13-14 (quoting *Depakote*). But if—as here—the manufacturer merely discusses comparative information internally and does not send it to doctors, the manufacturer logically has not assumed any such duty. Plaintiffs' response suggests they are aware of this flaw in their reliance on *Depakote*, because they have carefully worded their argument to allege only that Cook "did compare its filters with those of its competitors," *not* that

Cook actually conveyed those comparisons to doctors. *Depakote* does not assist Plaintiffs' argument, and it does not distinguish the facts in *Ackley* and *Pluto* from the facts here.

The broader Illinois case law holding manufacturers have no duty to warn of known risks also supports Cook's position here. Those cases impose no duty on a manufacturer to quantify a known risk or to compare a known product risk with the risks of other manufacturers' products. For example, Illinois courts addressing the known risks of alcohol and tobacco have imposed no duty on manufacturers of alcoholic beverages to warn consumers how risky beer is compared to wine or to vodka, *see Garrison*, 673 F.2d at 191, or on cigarette manufacturers to warn consumers what percentage of smokers will actually contract the lung cancer that smokers knowingly risk, *see Gonzalez*, 2000 WL 343236, at *3. Indeed, such a result would be wildly impractical. As the *Pluto* court implied, courts do not and cannot expect product manufacturers to revise warnings of known risks every time a new scientific or medical article suggests a higher or lower incidence of a particular product risk from its product, or from any other product to which the manufacturer's product might be compared. *Cf. Pluto*, 690 N.E.2d at 62 ("such a duty [to warn of comparative risks] would raise serious implications regarding the free flow of commerce in that industry"). And this problem would be particularly acute in a highly regulated market like medical devices, where all warnings fall under FDA scrutiny.

## II.    The Undisputed Evidence Establishes that the Risks of Tilt, Perforation, Fracture, Migration, Inability to Remove, and Death from IVC Filter Use Were Generally Known in the Medical Community Not Later Than August 10, 2010.

Because "a prescription medical device manufacturer need not provide a warning of risks already known to the medical community," *Hansen,* 764 N.E.2d at 42, the only fact relevant to the Court's determination of whether Cook had such a duty here is whether the risks Plaintiffs claim were in fact generally known to the medical community as of August 10, 2010. As discussed

15

below, the undisputed facts establish that the six IVC filter risks that Plaintiffs allege in their pleadings—tilt, perforation, fracture, migration, inability to remove, and death—were well known in the medical community not later than August 10, 2010. Indeed, the Court has already concluded as a matter of law that IVC filter risks "have been widely known and understood in the medical and regulatory community for decades." Dkt. 25904 at 7-8 (granting summary judgment on Tulip filter punitive damage claims, collecting factual authorities).

Plaintiffs did not dispute this fact in opposing Cook's punitive damage motion, and they do not dispute it here. Instead, Plaintiffs' response focuses on claimed evidence that Cook provided inadequate warnings, *see* Dkt. 26564 at 15-21, despite Plaintiffs' acknowledgement that the adequacy of warnings is not at issue here, *see* Dkt. 26564 at 3

### A. The relevant "medical community" consists of doctors who prescribe and place IVC filters.

Plaintiffs first take issue with Cook's use of the term "medical community," claiming that they don't understand what it means. *See* Dkt. 26564 at 15. "Medical community" is of course the term the *Hansen* and *Proctor* courts used, and Cook submits its meaning is obvious: it means the community of doctors who prescribe and use the specific pharmaceutical or medical device at issue. *See, e.g., Proctor*, 682 N.E.2d at 1207, 1215 (majority), 1221 (dissent) (referring to the "ophthalmic community," "the specialized ophthalmic community," and "the ophthalmologic community," *i.e.*, the doctors who would use the intraocular drug at issue). Here, the relevant "medical community" is the community of interventional radiologists and others who place IVC filters. Not coincidentally, all of the expert testimony quoted and cited by both sides in their briefs on this motion fall into this category of IVC filter users. Plaintiffs' claimed confusion over the term "medical community" is not well taken.

**B.    The evidence supporting the medical community's knowledge of the claimed risks is convincing and materially undisputed.**

In its original motion, Cook presented compelling evidence from multiple sources that the risks of tilt, perforation, fracture, migration, inability to remove, and death were well known in the medical community by no later than August 10, 2010. This evidence included:

- Three FDA documents addressing IVC filters—including a 1999 Guidance and a 2010 communication—each of which discussed the specific risks of IVC filter placement, Dkt. 26477 at 7-10 (citing exhibits);

- Multiple pre-2010 medical articles discussing the risks of IVC filter placement, *id.* at 10-11 (citing exhibits);

- Deposition and trial testimony from multiple experts, including Plaintiffs' own retained expert Dr. Gordon, that the risks of IVC filter use were known in the medical community as of 2010, *see id.* at 11-14; and

- Testimony from bellwether Plaintiffs' treating physicians that they knew of the risks of IVC filters in 2010 from sources in the medical community other than Cook and its labeling, *see id.*

Plaintiff tries to nit-pick some of this evidence, questioning whether FDA Communications actually "communicated" anything, or whether the medical articles were sufficient to create knowledge in the medical community. *See* Dkt 26564 at 16-17. But courts have recognized that such documents are just the type of evidence that properly document the medical community's knowledge. *See, e.g., Aquino*, 413 F. Supp. 3d at 790 n.13 (citing 2011 FDA Safety Communication and White Paper and 2011 ACOG/AUGS Joint Committee Opinion as evidence "that some risks associated with transvaginal mesh were known or knowable as early as 5 years before [plaintiff's] surgery"). Indeed, short of a poll of physicians, it is difficult to see how else one would document such knowledge.

Moreover, even assuming that these documents were insufficient alone to show knowledge in the medical community, when taken together with Cook's other submissions, the evidence is more than sufficient to demonstrate broad knowledge of IVC filter risks in the medical community,

as this Court held in granting the punitive damage motion. *See* Dkt. 25904 at 7 ("The risks associated with IVC filters generally and the Tulip IVC filter specifically have been widely known and understood in the medical and regulatory community for decades."). In particular, the expert testimony Cook offered alongside the FDA documents and medical articles compels the conclusion that the risks of IVC filter use were known to the medical community prior to 2010. Plaintiffs assert that the doctors' testimony that Cook quotes to support medical community knowledge is "cherry-picked and misleading." Dkt. 26564 at 18. But a review of that testimony shows that Cook's quotations from testifying doctors are not misleading in any way. Each of the doctors Cook quotes—including Plaintiffs' own retained interventional radiologist Dr. Gordon—testified directly and unambiguously that the risks of IVC filters about which Plaintiffs complain have been known in the medical community since at least 2010. *See* Dkt. 26477-15 (Ex. O - Mlikotic Dep. at 33:2-16) ("[f]or a very long time. At least a decade and a half"); Dkt. 26477-12 (Ex. L, Chrisostomo Dep. at 76:8-77:2; 77:24-79:17) (Q. These are known risks of all filters that were well known in the medical community in 2010, correct? A. Correct."); Dkt. 26477-16 (Ex. P, Deposition of Dr. Mark J. Goodwin ("Goodwin Dep."), dated January 11, 2017 at 98:18-99:1) ("Q. Dr. Goodwin, were all of these risks that we've been talking about, were all of those known risks to you in 2011? A. Yes. Q. And were they known risks within the medical -- the relevant medical community who places filters in April of 2011? A. Yes."); Dkt. 26477-17 (Ex. Q, Deposition of Dr. Gregory Gordon ("Gordon dep."), dated June 12, 2018 at 152:6-22) ("Q. … Dr. Gordon, my question is: In the general medical community in 2009 were physicians aware that filters generally can tilt, migrate, perforate, fracture, be difficult to retrieve, cause bleeding and death? A. Yes."). Thus, contrary to Plaintiffs' attempted implication, *see* Dkt 26564 at 18, the quoted testimony does *not* address what these individual doctors knew about these risks

*personally*; they contain each doctor's testimony that these risks were *generally known in the medical community since 2010 or earlier.*

The evidence Cook has presented is more than sufficient to establish that the risks of tilt, perforation, fracture, migration, inability to remove, and death from IVC filter use were well-known in the medical community not later than August 10, 2010.

> **D.    The evidence Plaintiffs offer fails to create a genuine issue of material fact concerning the medical community's knowledge of Plaintiffs' claimed risks of IVC filters.**

Neither the PSC's response nor any of the individual Plaintiffs' responses raises any issue of material fact concerning the medical community's knowledge of IVC filter risks in 2010, and Cook is therefore entitled to summary judgment.

Plaintiffs offer no testimony or declaration from any expert opining that the medical community did *not* know of the six risks of IVC filters Plaintiffs cite as of August 10, 2010. This is not surprising; Cook believes that no qualified expert in the field could truthfully make such a statement.[7] Instead of offering experts to address the medical community's knowledge of IVC filter risks in 2010, Plaintiffs offer testimony from two treating physicians, Dr. Rheudasil and Dr. Wong. *See* Dkt. 26564 at 18-22. That testimony misses the mark in several ways.

First, none of the testimony Plaintiffs quote offers any opinion about what was or was not generally known in the medical community in 2010, or at any other time. Most significantly here, nothing in either Dr. Rheudasil's or Dr. Wong's quoted testimony suggests that the medical community was unaware in August 2010 of any of the six risks at issue.

---

[7] Although treating doctors' actual personal knowledge is irrelevant to this motion, as discussed above, Cook notes Plaintiffs' responses do not identify *any* treating doctor for *any* plaintiff, past or present, bellwether or otherwise, who claims that he or she did not *actually* know in 2010 of the risks of tilt, perforation, fracture, migration, inability to remove, and death. *See* Dkt. 213, Counts I & III.

Instead, Plaintiffs quote each doctor's testimony about his own *personal* knowledge of IVC filter risks. But as discussed above, the applicable standard here is "an objective one," and "should focus on the *typical* user's perception and knowledge." *Klen,* 643 N.E.2d at 1363 (emphasis added). Any single doctor's subjective personal knowledge is therefore "immaterial" to the issue. *See id.*

Third, even assuming that an individual doctor's personal knowledge of risks were relevant to Cook's duty to warn, the passages Plaintiffs quote from Dr. Rheudasil and Dr. Wong *do not actually claim that those doctors were personally unaware* of any the six IVC filter risks of which Plaintiffs complain. The quoted passages describe only what information the doctors expected the Cook Celect IFU would provide and what that IFU actually said. *See* Dkt. 26564 at 18-22. None of the passages Plaintiffs quote suggest that either doctor was personally unaware in 2010 of any of the six IVC filter risks at issue here. The doctors' testimony thus does not create a genuine issue of material fact.

The only other material the PSC offers to try to create an issue of fact is an article coauthored by three of Plaintiffs' retained experts.[8] *See* Kadakia K, Bikdeli B, Gupta A et al., *Information Disclosure, Medical Device Regulation, and Device Safety: The Case of Cook Celect IVC Filters,* Ann. Int. Med. Dec. 2024, 177:1711-1718 (hereafter "*Information Disclosure*"). As the PSC characterizes the article,[9] the authors compared Cook internal documents to Cook FDA disclosures and found differences that the PSC (not the article's authors) call "misrepresentations." Based on this characterization, Plaintiffs argue that Cook "corrupted the medical literature" and

---

[8] Of the article's six listed authors, three "served as consulting experts on behalf of the plaintiffs" in the MDL litigation: Dr. Harlan Krumholz, Dr. Behnood Bikdeli, and Dr. Aakriti Gupta. *See* Supplemental Material to article at 6.

[9] The PSC did not attach a copy of this article to their response. Cook attaches the article as Exhibit B to this reply.

the learned intermediary doctrine should not apply, citing *Proctor*. *See* Dkt. 26564 at 22-26. This argument fails for several reasons.

First, the medical article is hearsay, and therefore inadmissible in summary judgment proceedings. *See, e.g., Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (affirming hearsay exclusion of newspaper article offered to prove defendant's conduct and representations).

More critically, however, assuming the article were admissible, it would not create a genuine issue of material fact on the only factual question material here: the medical community's knowledge of IVC filter risks in 2010. Even accepting Plaintiffs' characterization of the article as accurate,[10] Plaintiffs do not claim that the article asserts that anything Cook supposedly did—even a claimed misrepresentation or concealment—*actually* affected the knowledge of the medical community in 2010 in a way material to the failure-to-warn claims Plaintiffs assert in this litigation. Most critically, the article neither disputes nor even mentions the medical community's 2010 knowledge of the risks of tilt, perforation, fracture, migration, inability to remove, and death from IVC filter use. As to Cook, the article alleges *at most* that the Celect IFU and Celect-specific *Lyon* paper were misleading. Cook disagrees, but even assuming that were true, it would not undercut the factual basis for this motion. As Cook's evidence shows, the medical community knew in 2010 of IVC filter risks in 2010, and that knowledge came from sources unrelated to Cook, including

---

[10] In fact, contrary to Plaintiffs' implications, the article actually criticizes the FDA and its communication with the medical community and the public, not Cook's communications to the FDA. For example, the article notes that information provided by Cook to the FDA was not included in the FDA's public final decisions, *see Information Disclosure,* Ann. Int. Med. Dec. at 177:1714 ("Although no patient deaths were reported in the FDA's 2008 decision summary, court documents indicate that these deaths were reported to the FDA during premarket review"), observes that some of the FDA's review methods are opaque, *see id.* at 1715 ("the FDA can request source data from manufacturers for verification, yet it is unknown how frequently this authority is exercised"); and criticizes the FDA's low level of postmarket surveillance, *see id.* ("the FDA has authorized post-market surveillance under Section 522 for fewer than 1% of devices authorized under 510(k) like Celect").

FDA publications, independent medical articles, and physician training and experience. *See* Dkt.
26477 at 5-14. Plaintiffs do not suggest how Cook's alleged withholding of information could
undercut medical community knowledge of IVC filter risks that doctors acquired from multiple
other non-Cook sources.

As this Court made clear in its bellwether rulings based on treating doctors' actual
knowledge of risks, the physician knowledge that is material to a failure-to-warn claim is the
knowledge of the particular risk at issue, not the knowledge of a particular finding in a particular
medical article. See Dkt. 9696 at 8-9 (*Brand*) (stating Dr. Rheudasil "already knew at the time of
plaintiff's implant about all of the complications plaintiff experienced"); Dkt. 6660 (*Hill*) (stating
plaintiff's doctor "was fully aware of the risks of the surgery, including the risk of perforation of
the vena cava and surrounding organs and stenosis of the vena cava."). Here, the particular risks
at issue are those Plaintiffs allege in their pleadings: the risks of tilt, perforation, fracture,
migration, inability to remove, and death. Even assuming for the sake of argument that everything
in the article Plaintiffs cite were admissible and accurate, nothing in the article disputes the
overwhelming evidence that the risks of tilt, perforation, fracture, migration, inability to remove,
and death were well known in the medical community by 2010 at the latest.

For these reasons, Plaintiffs' invocation of *Proctor* for its "corruption of the data" argument
is misguided. In *Proctor*, the Court found no evidence supporting defendant's position on the
dispositive factual issue: whether the risk in question—the toxicity of the medication—was known
to the medical community that used it. The *Proctor* court stated:

> No physician or expert witness testified that the medical community knew what
> Upjohn knew with respect to dangerous toxicity and irremovability of this drug, but
> shared with no one except its own employees. There is no record evidence to
> support the hypothesis that the medical community knew of these dangerous
> propensities.

682 N.E.2d at 1212-13. In contrast here, the record contains not only evidence but *undisputed* evidence that the medical community that used IVC filters *was* aware in 2010 of the risks of tilt, perforation, fracture, migration, inability to remove, and death from such use. And the medical community possessed that knowledge *regardless* of what Plaintiffs may claim Cook said or did. *Proctor* thus provides no support for the Plaintiffs' argument under the facts here.

The individual Plaintiffs' responses to Cook's motion likewise fail to create a genuine issue of material fact. *See* Dkts. 26561, 26562, and 26563.[11] These responses cite a report from Dr. Laura Plunkett opining that Cook should have provided unspecified "important safety information" about product risks. Dkt. 26561 at 5.[12] But Dr. Plunkett's opinions concerning Cook's conduct are expressly based on her own lay legal opinions about Cooks' legal duties. *See, e.g.,* Dkt. 26561-1 at 7 ("Cook Medical has a duty to provide physicians with information about the safety of their devices and to provide physicians with accurate and complete information about the safety and efficacy of their medical device."), *id.* at 8 ("Cook Medical had a duty to provide physicians with information about the ongoing risks associated with the Tulip IVC filter, risks that are discovered postmarketing."). The existence of a legal duty, of course, is a question of law for the Court, and not the proper subject of opinion testimony, particularly from a non-lawyer witness. The individual Plaintiffs' responses cite no legal authority to support the existence of the duties Dr. Plunkett posits.[13]

---

[11] Other than Plaintiff names, gender references, and dates of filter placement, these three responses are identical, so this reply will treat them together by references to Dkt. 26561.

[12] Plaintiffs also cite the report of Dr. David Muehrcke, in which he asserts the lack of any evidence that IVC filters are effective and concludes that they are therefore "unreasonably dangerous." *See* Dkt. 26561 at 5. This argument, however, goes to design defect, not failure to warn, and has no bearing on this motion.

[13] The responses cite three federal cases addressing the summary judgment standard, *see, e.g.,* Dkt. 26561 at 1, but cite no substantive Illinois law concerning duty or warnings.

Equally importantly, like the PSC's evidence discussed above, the Plunkett report alleges various nefarious conduct by Cook, but it does *not* actually dispute (and these individual Plaintiffs do not challenge) Cook's evidence that the six risks at issue here were well known to the medical community in 2010. That is the only fact material to this motion.

## CONCLUSION

For the reasons discussed above and in Cook's original moving papers, Cook urges the Court to grant summary judgment and dismiss all strict-liability and negligent failure-to-warn claims governed by Illinois law and alleged by Plaintiffs who received their Cook IVC filters after August 9, 2010, the publication date of the 2010 FDA Communication.

Dated: April 7, 2025                          Respectfully submitted,

                                             */s/ Andrea Roberts Pierson*
                                             Andrea Roberts Pierson
                                             Jessica Benson Cox
                                             FAEGRE DRINKER, BIDDLE & REATH LLP
                                             300 North Meridian Street, Suite 2500
                                             Indianapolis, Indiana 46204
                                             Telephone: (317) 237-0300
                                             Andrea.Pierson@faegredrinker.com
                                             Jessica.Cox@faegredrinker.com

                                             Bruce Jones
                                             FAEGRE DRINKER, BIDDLE & REATH LLP
                                             90 South Seventh Street, Suite 2200
                                             Minneapolis, Minnesota 55402
                                             Telephone: (612) 766-7000
                                             Bruce.Jones@faegredrinker.com

                                             *Attorneys for Defendants Cook Incorporated,
                                             Cook Medical LLC f/k/a Cook Medical
                                             Incorporated, William Cook Europe ApS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2025, a copy of the foregoing Cook Defendants' Memorandum of Law in Support of Motion for Summary Judgment on Failure to Warn Claims was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.

<u>*/s/ Andrea Roberts Pierson*</u>