# EXHIBIT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

```
 1             UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF INDIANA
 2                  INDIANAPOLIS DIVISION
 3   IN RE:  COOK MEDICAL,           )
     INC., IVC FILTERS               )
 4   MARKETING, SALES PRACTICES      )
     AND PRODUCT LIABILITY           )
 5   LITIGATION,                     ) CASE NO.
                                     )
 6                                   ) 1:14-ml-2570-RYL-TAB
     This Document Relates to        ) MDL No. 2570
 7   Case No.                        )
        -cv-06018-RLY-TAB            )
 8
 9
10            ------------------------------------
11            ORAL AND VIDEOTAPED DEPOSITION OF
12                 GREGORY I. GORDON, M.D.
13                     JUNE 12, 2018
14        Confidential - Subject to Protective Order
15            ------------------------------------
16        ORAL AND VIDEOTAPED DEPOSITION OF GREGORY I.
17   GORDON, M.D., produced as a witness at the instance of
18   the DEFENDANT, and duly sworn, was taken in the
19   above-styled and numbered cause on June 12, 2018, from
20   9:26 a.m. to 7:21 p.m., before Wendy Schreiber, CSR No.
21   9383, in and for the State of Texas, reported by machine
22   shorthand, at the law offices of BARON & BUDD, 3102 Oak
23   Lawn Avenue, Suite 1100, Dallas, Texas, pursuant to the
24   Federal Rules of Civil Procedure and the provisions
25   stated on the record or attached hereto. Job No. 2933309
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 146

1 those -- again, and that in theory would go towards the
2 absolute indications -- I do not have an opinion that
3 they have any benefit.
4     Q. And that opinion that there's no benefit to
5 filters, that's not unique to the Celect or to Cook,
6 correct?
7     A. Right.  The -- the benefit -- but the dis
8 benefit or harm is different.
9     Q. Dr. Gordon, would you agree that the following
10 are risks with filter placement, any filter placement?
11 Tilt?
12     A. Not any filter but with the conical filters.
13     Q. That's a helpful clarification.  You agree that
14 tilt is a risk with any conical filter?
15     A. Yes, ma'am.
16     Q. Do you agree that migration is a risk with all
17 filters?
18     A. Potential risk.
19     Q. Is that a "yes"?
20     A. That's a -- that's a hedge and the hedge would
21 be that if you put it in an IVC that's too large, then
22 things will migrate no matter what you make it or from a
23 shape standpoint and designs of different filters I
24 think, for example, the VenaTech filter from a migration
25 standpoint is much less likely.

Page 147

1     Q. You agree that all filters have some risk of
2 migration, correct?
3     A. Yes.
4     Q. All filters have some risk of perforation of
5 the vena cava?
6     A. Again, could you define the perforation for me,
7 please?
8     Q. Sure.  Let's use the definition that I think
9 you've used in your report which is through the caval
10 wall.
11     A. So just through the caval wall itself --
12     Q. For purposes of this question -- let me ask it
13 again.
14         Dr. Gordon, if we define "perforation" as a
15 strut through the caval wall, do you believe that
16 perforation is a risk with every filter?
17     A. Yes, ma'am.
18     Q. And if we were to define it more strictly as
19 through the caval wall by three millimeters or more, do
20 you agree that all filters have that risk?
21     A. Well, I believe any foreign body has a risk of
22 perforation so in a whole general sense that -- that's a
23 yes, but from a practical sense I don't think the -- the
24 VenaTech filter has that and I think the Greenfield
25 filter demonstrates the 25 times less risk than -- than

Page 148

1 other filters.  So I think there is an observation but I
2 think there's a huge difference on the rates and the
3 extent of the different filters available.
4     Q. The opinion that you just gave, Dr. Gordon,
5 about the Greenfield filter perforating 25 percent
6 less --
7     A. 25 times less.
8     Q. 25 times less.  Thank you.
9         Dr. Gordon, the opinion that you've just
10 given about the rate of perforation with the Greenfield
11 filter, that is not contained in your report in Mrs.
12 Brand's matter, is it?
13     A. I don't believe it is.
14     Q. And where does that come from?
15     A. I believe that's the McLoney paper.  If I
16 recall, that was about -- talked about -- and I'd have
17 to check if it was the McLoney paper.  There's so many
18 papers in my head and I'd be more than happy to check at
19 a break to give you the exact name.
20     Q. You would agree with me, wouldn't you,
21 Dr. Gordon, that you're relying on the McLoney article
22 today for a lower perforation rate with a Greenfield
23 filter.  That opinion is also not contained in your
24 report, is it?
25     A. But I think it's on the reliance list.

Page 149

1     Q. Not my question.  That opinion that you've just
2 stated is not in your report, is it?
3     A. If it's not -- no, then it's not in my report.
4     Q. Dr. Gordon, we were talking about the risks
5 with all filters.  You agree all filters have a risk of
6 fracture?
7     A. Yes, ma'am.
8     Q. All filters have a risk of being unable to
9 remove it?
10     A. Yes, ma'am.
11     Q. All filters have a risk of being difficult to
12 retrieve?
13     A. A potential risk, yes.
14     Q. All filters have a risk of causing bleeding?
15     A. Yes.
16     Q. All filters have a risk of death?
17     A. Yes.
18     Q. And setting aside for a moment the opinion you
19 just gave about the Greenfield filter and the
20 perforation rate, is it accurate to say, Dr. Gordon,
21 that in your report you do not identify a filter that
22 tilts less frequently than the Celect filter?
23     A. I don't believe that I did put that in my
24 report.
25     Q. Dr. Gordon, in your report you do not identify

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 198

1  Q. Your opinion that the Tulip fractures less than
2 the Celect, are there any other bases for your opinion?
3  A. I would just say the increased rate of
4 perforation in general increases the rate of fracture so
5 that would be -- my main thing would be the 2016.
6  Q. Is there any study that you can identify that
7 shows that the Tulip fractures less than the Celect?
8  A. Not off the top of my head.
9  Q. Is there any study that you rely on to believe
10 that any filter has a lower rate of fracture than the
11 Celect?
12  A. The -- as a specific study discussing
13 fractures, no. As the Deso study which is reviews in --
14 which reviews fractures, et cetera, that also shows less
15 with the Tulip than the Celect as well as less with the
16 Greenfield, but I do not know of one study that is
17 specifically looking at fractures.
18  Q. In the course of your work in this case, what
19 did you do to identify studies or tests or support for
20 the rate of fracture of the Celect?
21  A. I don't think I separated out fracture as a
22 specific identifier. Complications were identified and
23 fracture is just one of those.
24  Q. What is the rate of fracture for the Celect?
25  A. I don't think we know. I think it's so

Page 199

1 under-reported we don't have an idea.
2  Q. What do you think it is?
3  A. I don't know. I would say it's definitely more
4 than the .1 to .5 percent that -- that Cook describes.
5 I don't know how high it is. And I think the problem is
6 it's also progressive so as perforations increase,
7 fractures will increase so it's not a static situation.
8  Q. My questions right now are really just about
9 the rate.
10  A. And I don't have a number for you.
11  Q. Have you done any testing to determine the rate
12 of fracture for the Celect?
13  A. No, and neither has Cook.
14  Q. Have you done any testing to determine the rate
15 of fracture for the Celect?
16  A. No, ma'am.
17  Q. Have you done any testing to determine the rate
18 of fracture for the Tulip?
19  A. No, ma'am.
20  Q. Have you done any testing to determine the rate
21 of fracture for the Greenfield filter?
22  A. No, ma'am.
23  Q. Have you done any testing to determine the rate
24 of fracture for any other filter?
25  A. No, ma'am.

Page 200

1  Q. Have you done any studies to compare the rate
2 of fracture between the Celect and any other filter?
3  A. No. I am not aware of a study that's been done
4 that compares the fracture rates.
5  Q. Have you done any animal testing or animal
6 studies to determine the rate of fracture between the
7 Celect and any other filter?
8  A. Well, I haven't done any IVC studies so all of
9 these questions would be no.
10  Q. Thank you. Dr. Gordon, is there an average
11 rate of fracture for filters?
12  A. I don't know if there's an average rate of
13 fracture.
14  Q. Is there a threshold rate of fractures for
15 filters?
16  A. Well, as I said, I think one is too many but
17 if -- it depends if it's posttraumatic versus if it's
18 iatrogenic and because of the default or the problem
19 with the filter itself.
20  Q. Have the societies that -- that you belong to
21 and that vascular surgeons belong to, have they
22 published threshold rate or average rates of fractures
23 for filters?
24  A. Not that I'm aware of.
25  Q. Has the FDA given any rates -- average rates or

Page 201

1 threshold rates for fracture of filters?
2  A. Average rates or threshold rates? Not that I'm
3 aware of.
4  Q. Do you agree that all medical products,
5 implantable medical products, have some rate of
6 fracture?
7  A. I would say all filters have some rate of
8 fracture. I don't know enough about all medical devices
9 to make a uniform statement.
10  Q. Do your products fracture?
11  A. As a matter of fact, they do.
12  Q. What's the rate of fracture for your products?
13  A. It's too early to tell.
14  Q. In the course of testing and developing any of
15 your products have you determined the rate of fracture?
16  A. Well, we've done ISO testing to determine it
17 but bench labs -- bench testing is not human testing and
18 so all that does is give us a -- at least on the -- my
19 devices it gives us an idea of what's safe and what's
20 not and that's why we go out and we do post-market
21 surveillance and we watch and then when we have an issue
22 that comes up we evaluate it through -- you know, we
23 evaluate that and then we figure out is there a defect
24 and how do we do a CAPA or an action plan to correct
25 that. So I don't -- I don't think we wait to find out

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 254

1 rates and, again, their data now substantiating that and
2 it's something that Cook knew about the possibility
3 since 2002.
4     Q.  This risk that you just described with
5 migration, that's a risk with all filters, correct?
6     A.  Yes.
7     Q.  Are you aware of any filter whose IFU included
8 that warning?
9     A.  No, ma'am.
10     Q.  Are you aware of any FDA or other requirement
11 to include any of the warnings that you say in your
12 report should be included in the Celect IFU?
13     A.  Well, the problem is it's not the FDA's job to
14 make the IFU.  That's the corporation's job, that's the
15 company's job so it's not something that because the FDA
16 says yes or no that that's something that Cook shouldn't
17 comply with.  Cook knew that there was -- it wasn't just
18 a risk -- potential risk, it was a known hazard.  It was
19 a high 90 percent rate of perforation.
20     Q.  My question is a little different.  My question
21 is:  Are you aware of any FDA regulation or other
22 regulation that required Cook to include the warnings
23 that you've identified in your report?
24     A.  Yeah.  Well, the only regulation I'd say the
25 FDA gave is that this is an honor system; that Cook was

Page 255

1 obligated to report the most accurate data that they
2 could and they did not.  So I guess indirectly or even
3 directly that, yes, they did not comply with the FDA
4 because they did not give honest results.
5     Q.  My question today is to identify the specific
6 regulation.  If there's a specific regulation that you
7 believe Cook's IFU violated, I'd like to know what that
8 is.
9     A.  Lying about their data.  That's a specific --
10 you said specific.  That's specific.  The clinical study
11 that they put in which is a subset of the OUS data was
12 falsified.
13     Q.  Is there an FDA regulation or requirement that
14 you can identify as you sit here today?
15     A.  That would be -- I mean, I would have to go
16 through -- I don't know it off the top of my head but I
17 think lying -- lying about a clinical study is probably
18 against the FDA.  I don't know what -- what specific law
19 that is.
20     Q.  You'd agree with me that there is no specific
21 standard or regulation that you've identified in your
22 report that you believe the Celect IFU did not comply
23 with, correct?
24     A.  No, incorrect.
25     Q.  Where is it in your report, sir?

Page 256

1     A.  And my report says that they basically -- they
2 should have warned that they were dishonest about facts.
3     Q.  Not my question.  My question is:  Where in
4 your report do you identify any standard or regulation
5 that Cook Celect IFU did not comply with?
6     A.  And that goes back to the fact that the IFU
7 itself has a -- a general format it has to follow but
8 its the responsibility of Cook to put all identifiable
9 risks, complications, et cetera, in their IFU and they
10 did not so that's the specific fact.  It's an omission.
11     Q.  Is that as specific as you're able to be as you
12 sit here today?
13     A.  That is as specific as I can be as I sit here
14 today.
15     Q.  Thank you, Dr. Gordon.
16         (Exhibit 7 was marked for identification.)
17     Q.  (BY MS. PIERSON)  Your report talks about your
18 analysis of certain complaint reports to Cook
19 specifically on page 12 of your report, and I've put in
20 front of you Exhibit 7.
21     A.  Uh-huh.
22     Q.  Exhibit 7 -- what I've marked as Exhibit 7
23 today is actually Exhibit 2 to your report, correct?
24     A.  Correct.
25     Q.  Did you prepare this?

Page 257

1     A.  No, I believe this was collated and prepared
2 for me.
3     Q.  Your report -- by the attorneys for Mrs. Brand?
4     A.  I assume, yes.  I don't know.  It was a report
5 for Mrs. Brand or if it was any of the MDL attorneys
6 themselves.
7     Q.  Does Exhibit 7 accurately list the complaints
8 that you identified that you believe Cook was aware of
9 prior to Mrs. Brand's filter placement for perforation
10 and fracture?
11     A.  I think they were aware of even more than
12 these.
13     Q.  Well, your report references Exhibit 2.
14     A.  Okay.
15     Q.  Is Exhibit 2 the listing that you prepared of
16 complaint numbers that you identified that Cook was
17 aware of related to fracture and perforation before
18 Mrs. Brand's filter placement?
19     A.  Well, part of this, yes.
20     Q.  Do you have any other lists?
21     A.  I have e-mails discussing multiple complaints.
22 I can't again off the top of my head with the tens of
23 thousands of documentation but I'd be more than happy to
24 supply them to you.
25     Q.  Can we agree, Dr. Gordon, that within your

65 (Pages 254 - 257)