UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In Re: COOK MEDICAL, INC., IVC FILTERS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

Case No. 1:14-ml-2570-RLY-TAB
MDL No. 2570

This Document Relates to: All Actions

**COOK DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO ADOPT SECOND TULIP BELLWETHER PLAN
(PROPOSED CASE MANAGEMENT ORDER # 34)**

The Cook Defendants respectfully ask this Court to grant their motion and enter the proposed Case Management Order No. 34: Second Tulip Bellwether Plan (attached as **Exhibit A** (redlined version) and **Exhibit B** (clean version)), which the Cook Defendants have revised upon review of Plaintiffs' response to the motion and redlined counterproposal. *See generally* Pls.' Response, Dkts. 26903 & 26903-1.

Although Plaintiffs maintain their position that bellwether trials in this Court are not helpful, the Court has rejected those objections to further trials and decided last year that it "would like to try a case—bellwether case … and it's up to you folks to make a proposal to me as to how we do that. Submit me a proposed order that you're talking about." Dkt. 26892-3, June 6, 2024, Hearing Tr. at 60:19-22. The Court has already laid significant groundwork to meet its goal of trying additional cases, and there has yet to be a trial involving the Tulip filter (which encompasses roughly half the MDL cases) or a perforation claim (the most common claimed injury). Building on the work accomplished through CMO-32 and CMO-33, the bellwether plan proposed by the

1

Cook Defendants provides a pathway to focus bellwether selection on these two variables and work up Tulip perforation cases for trial in Q1 and Q2 of 2026.

On the substance of the Cook Defendants' proposed plan, the parties are thankfully able to agree on the general contours and many of the terms. While the Cook Defendants cannot agree to all the proposed revisions in Plaintiffs' counterproposal, they do agree to Plaintiffs' proposed timing changes. The Cook Defendants have therefore accepted a portion of the Plaintiffs' proposed redlines, and have left in the revised version (attached as **Exhibit A**) only the redlines where there remains a disagreement for the Court's consideration. The Cook Defendants also attach a clean version of this revised plan as **Exhibit B**.

### A. The Court Should Proceed with Its Longstanding Plan to Try Additional Bellwether Cases Focused on Tulip Perforation Cases

The Court has made clear to the parties that it intends to try additional bellwether cases, and the Cook Defendants filed this motion requesting a new bellwether plan to meet that goal. *See* Cook Defs.' Mot, Dkt. 26891 (attaching as exhibits and citing excerpts of February 2024 and June 2024 hearing transcripts). The Court's intent to pick new bellwether cases and instructions to the parties were clear: "[the Court] would like to try a case—bellwether case … and it's up to you folks to make a proposal to me as to how we do that." Dkt. 26892-3, June 6, 2024, Hearing Tr. at 60:19-22. The significant work the Court completed in 2024 and early 2025 with CMO-32 and CMO-33 has paved the way for a new bellwether plan. This work addressed the jurisdictional concerns and disagreements about MDL case composition that delayed progress on selecting and litigating new bellwether cases and impeded global settlement negotiations. While the parties may dispute the reasons, the fact remains that no perforation and no Tulip case has yet been tried in this MDL.

2

Now, after the Court has gone through the CMO-32 and CMO-33 processes, Plaintiffs maintain the position that a Tulip perforation bellwether trial "isn't helpful" and "would impede rather than facilitate resolution," and ask the Court to remand cases instead. Dkt. 26903, Pls.' Resp. at 1-2. Plaintiffs' argument is self-contradictory because it rests on a false premise that thoughtful selection and trial of two representative cases in this Court "isn't helpful" while simultaneously implying that hundreds of Plaintiffs pursuing Tulip perforation claims would be willing to prosecute and try those same cases after remand.[1] If these claims actually have significant merit and settlement value—as Plaintiffs continue to claim outside the courtroom while referring to the cases as "low-value lawsuits" in this briefing—then Plaintiffs should be able to litigate a representative case through discovery and trial.[2] And if they earnestly try to do so and cannot, then that information would also be valuable to the parties and the Court going forward.

By complaining of delay but arguing against identifying and working up representative bellwether cases, Plaintiffs reenforce the Cook Defendants' concerns that many cases filed in this Court lack real, tangible injuries and grounds to impose liability.  Indeed, Plaintiffs prematurely conclude that "neither party is willing to extrapolate the result of such a bellwether trial to the docket at large," *id.* at 1, but the ramifications of a bellwether trial cannot be determined without actually conducting one.  The parties must work up bellwether cases of this type and then discuss

---

[1] Plaintiffs' Response alleges without explanation that "Plaintiffs are dying at a rate of one every three days." Resp. at 2. From the Cook Defendants' review of the docket, there have been 40 suggestions of death filed in 2025, but only four of those plaintiffs died in 2025. The Cook Defendants presume that most of the other notifications were filed as a result of counsel contacting their clients while working to comply with CMO-32 and CMO-33.

[2] Importantly, MDL cases retain their individual character as individual lawsuits. *See generally* 28 U.S.C. § 1407. If a plaintiff files a lawsuit then the plaintiff represents to the Court that he or she has a good-faith belief in the merit of the claim and a willingness to prosecute that claim through trial. If a plaintiff is filing a case without such good-faith intent and representations, then that raises serious concerns under Rule 11 and Rule 41. That direct filing and short-form pleading procedures make filing an MDL case easier does not change these obligations imposed on all parties by the Federal Rules.

3

the information learned through the bellwether process at settlement negotiations, including guidance from Magistrate Judge Baker.

In any event, it has been clear for years that the biggest disagreement between the parties concerns the disputed merit and valuation of (1) Tulip cases and (2) perforation and asymptomatic cases. A bellwether trial will put these disagreements to a test. *See* Manual for Complex Litigation (4th) (2004) § 22.315 ("Test cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis and what range of values the cases may have if resolution is attempted on a group basis."). That bellwether test is still needed and worthwhile for claims involving the Tulip filter and perforation injury claims because there have been no such trials to date.

**B.     The Court Should Adopt the Cook Defendants' Revised Bellwether Plan**

There is significant overlap between the parties' bellwether plan proposals, and the Cook Defendants have adopted Plaintiffs' revised timing terms in the attached revised plan (*see* Exhibit A for redlined version and Exhibit B for clean version). The Court should adopt the Cook Defendants' plan, including Cook's versions of the disputed provisions.

**1.     The Court should use random selection to populate the discovery pool.**

The parties agree on a bellwether pool of 24 cases, but Plaintiffs object to random selection as the initial step and propose instead that random selection be limited to eight cases and that the parties pick the remaining 16 cases (eight each). Dkt. 26903, Pls.' Resp. at 4. Plaintiffs' proposal is thus primarily an attorney-selection plan, where parties' counsel would fill two-thirds of the pool. The Cook Defendants urge the Court to use random selection to choose the initial 24 cases, as it has in bellwether selection plans going back to CMO-25 entered in 2019.

As an initial matter, Plaintiffs incorrectly label the Cook Defendants' plan as "pure random selection." *Id.* The Cook Defendants' plan proposes random selection as the initial step to populate the discovery pool of 24 cases from an agreed list of eligible cases. The overall plan, however, is a multi-step hybrid plan because it provides roles for both the parties' counsel and the Court in the selection process. Specifically, the parties' counsel would strike four cases each from the bellwether pool and brief the representativeness of the remaining cases after studying the cases drawn into the discovery pool, through attorney review and supplementation of basic discovery. *See* Exhibit B, ¶¶ 4, 8-10. The Court would then make the final selections from the remaining cases after review of the parties' written submissions. *Id.*, ¶ 10.

This process will work best if the Court uses random selection to initially draw all 24 cases for the discovery pool. The principal goal of bellwether selection is to ensure the selection of representative, middle-of-the-road cases. *See, e.g.,* Manual for Complex Litigation (4th) (2004) § 22.315 ("The more representative the test cases, the more reliable the information about similar cases will be."); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 2009 WL 2418128, at *3 (E.D. La. Oct. 13, 2009) (explaining that one of "the principal goals of the bellwether process" is to select for trial the cases of plaintiffs "who can truly be representative of the whole mass of plaintiffs in the MDL"). The Duke Law Center similarly emphasizes in its best practices guide for mass torts that "the bellwether process will be valuable only if the cases selected for trial are truly representative of the whole (or of one or more distinct categories of cases that comprise the whole)."[3]

---

[3] Bolch Judicial Institute, "Guidelines and Best Practices for Large and Mass-Tort MDLs," p. 19, Duke Law School (2nd ed. 2018) (providing best practices based on input from mass tort judges, academics, and representatives of plaintiff and defense bars), available for download at https://scholarship.law.duke.edu/bolch/5/.

The problem with selection by attorneys is that it places counsel in the inherently conflicted position of (1) serving as officers of the Court to select the most representative cases to move the MDL as a whole forward and (2) serving as zealous advocates for their clients by picking the cases they perceive their clients as having the strongest chances of winning. While counsel's input certainly has a role to play in the overall process (which the Cook Defendants' plan recognizes through strikes and briefing), this inherent conflict makes attorney selection a poor method of choosing the initial group of bellwether cases. Nothing in an attorney-selection approach would require or strongly encourage attorneys to identify and select middle-of-the road cases. *See* Manual for Complex Litigation (4th) (2004) § 22.315 ("Some judges permit the plaintiffs and defendants to choose which cases to try initially, but this technique may skew the information that is produced."); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) (commenting that a trial selected by parties' counsel is "not a bellwether trial. It is simply a trial of fifteen (15) of the 'best' and fifteen (15) of the 'worst' cases contained in the universe of claims."); Loren H. Brown, et. al., *Bellwether Trial Selection in Multi-District Litigation: Empirical Evidence in Favor of Random Selection*, 47 Akron L. Rev. 663, 674 (2014) (noting that bellwether plans that allow the parties to choose bellwethers "frequently results in a pool of outlier cases, which do not represent the vast majority of unchosen cases.").

This "barbell" problem is illustrated in the graphics on the next page, which depict the outcomes that typically occurs from an attorney-selection model—i.e. the scenario described by the Fifth Circuit in *Chevron*—and a representation of the Cook Defendants' proposal (a random group of 24 cases across the entire spectrum of merit are selected followed by the parties striking the cases they view as most unfavorable and inappropriate for bellwether trial for whatever reason):

**Figure 1: Barbell Scenario Common with Attorney-Selection Models**



**Figure 2: Cook Defendants' Proposal Designed to Avoid the Barbell Problem**



While Plaintiffs propose a mix of attorney and random selection, having counsel choose two-thirds of the bellwether pool is simply too many attorney selections to prevent a high risk of the barbell problem. The parties would have twice as many selections as the other side would have strikes, so skewed selections by the parties would still have a high likelihood of being chosen.

    **2.    The Court should retain the provisions regarding *Lexecon* strikes proposed by the Cook Defendants to reduce the risk of potential *Lexecon* objections derailing the plan.**

Plaintiffs misread the *Lexecon* case and the Cook Defendants' proposal regarding *Lexecon* objections. The Supreme Court's decision in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) prohibits a court from forcing a party to undergo trial in an improper venue.[4] The Cook Defendants' plan does not prohibit any Plaintiff with a *Lexecon* right whose case might be randomly drawn into the discovery pool from raising a *Lexecon* objection. *See*

---

[4] As the Court has noted previously, this MDL is venued in the Cook Defendants' home district and this Court is a proper venue for Cook filter cases under 28 U.S.C. § 1391(b)(1) absent a direct-filing order. The parties disagree on the implications of the *Looper* decision on *Lexecon* rights within this MDL. The Cook Defendants preserve their rights to argue that certain Plaintiffs do not have a right to assert *Lexecon* objections, but seek to avoid that disputed issue by putting a plan in place that would incentivize sparing use of *Lexecon* objections and allow meaningful bellwether selection to take place in the next few weeks.

Exhibit B, ¶ 7. But the Cook Defendants' plan recognizes the practical reality that some mechanism for handling potential *Lexecon* objections is necessary, because too many *Lexecon* objections would derail the selection process. After all, there cannot be a meaningful selection process if, for example, a dozen plaintiffs raise *Lexecon* objections.

As explained by Judge Fallon in his article on bellwether trial selection, *Lexecon* can prevent trial of representative cases, and the MDL court should encourage parties to agree to *Lexecon* waivers to make bellwether trials of representative cases possible. *See* Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tulane L. R. 2323, 2357 & n. 117 (2008) (discussing the transferee court's role in promoting waivers and "two methods of encouragement: the carrot and the stick"). The proposed provision, which treats *Lexecon* objections as strikes, incentivizes sparing use of *Lexecon* objections by Plaintiffs as a whole, but it does not prevent any individual Plaintiff from raising the objection. The plan is therefore compliant with the bounds of the *Lexecon* decision.

Practically speaking, a *Lexecon* objection must be treated as a strike as a matter of basic fairness. If it is not, Plaintiffs would be able to remove a greater number of cases from the bellwether pool—through a combination of up to four strikes and unlimited *Lexecon* objections—than the Cook Defendants, who would be limited to four strikes. The paragraphs on *Lexecon* in the Cook Defendants' proposed plan (*see* Exhibit B, ¶¶ 7-10) safeguard against this potential imbalance by treating a *Lexecon* objection as functionally equivalent to a strike and giving the Cook Defendants additional strikes if Plaintiffs raise more than four *Lexecon* objections. This provision thus ensures that the parties have equal influence on bellwether selection and to prevent backsliding into the "barbell" problem discussed above.

### 3. The Court should select four cases for full discovery workup.

Finally, the parties disagree on whether the Court should order three cases (Plaintiffs' position) or four cases (Cook Defendants' position) to be worked up fully in discovery. *See* Exhibit B, ¶¶ 10-13. The Cook Defendants urge the workup of four cases to increase the likelihood of actual trials in event of dismissals or other unforeseen developments, providing two additional cases that could be substituted as trial picks rather than just one. While there is added work and expenses for the parties from working up an extra case in discovery, this added burden is justified by the greater likelihood of trials. Moreover, all four of these cases would be Tulip perforation cases, which should provide some overlap in discovery and expert work to reduce costs and time expenses from working up a fourth case.

### CONCLUSION

For the reasons set forth herein, the Court should adopt the Cook Defendants' proposed bellwether plan (*see* **Exhibit B**).

Dated: June 11, 2025                                Respectfully submitted,

*/s/ Andrea Roberts Pierson*
Andrea Roberts Pierson
Jessica Benson Cox
FAEGRE DRINKER, BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
Telephone: (317) 237-0300
Andrea.Pierson@faegredrinker.com
Jessica.Cox@faegredrinker.com

Bruce Jones
FAEGRE DRINKER, BIDDLE & REATH LLP
90 South Seventh Street, Suite 2200
Minneapolis, Minnesota 55402
Telephone: (612) 766-7000
Bruce.Jones@faegredrinker.com

*Attorneys for Defendants Cook Incorporated, Cook Medical LLC f/k/a Cook Medical Incorporated, William Cook Europe ApS*

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2025, a copy of the foregoing document was filed electronically, and notice of the filing of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.

*/s/ Andrea Roberts Pierson*