IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,    ) Case No. 1:14-ml-2570-RLY-TAB
IVC FILTERS MARKETING,        ) Indianapolis, Indiana
SALES PRACTICES AND           ) June 12, 2025
PRODUCTS LIABILITY            )
LITIGATION                    ) 9:37 a.m.



BEFORE THE HONORABLE RICHARD L. YOUNG

TRANSCRIPT OF PROCEEDINGS
MOTIONS HEARING AND STATUS CONFERENCE


APPEARANCES:

For the Plaintiffs:         Ben Martin
                            Ben Martin Law Group
                            3141 Hood Street
                            Suite 600
                            Dallas, TX  75219

                            Joseph N. Williams
                            Williams & Piatt, LLC
                            1101 North Delaware Street
                            Indianapolis, IN  46202

                            Charles Siegel
                            The Law Office of Charles W. Siegel
                            3938 W. 111th Street, Suite 1-C
                            Chicago, IL  60655


For the Defendants:         Andrea Roberts Pierson
                            Jessica Benson Cox
                            Kip S.M. McDonald
                            Faegre Drinker Biddle & Reath LLP
                            300 North Meridian Street
                            Suite 2500
                            Indianapolis, IN  46204

2

                                        Blake Lehr
                                        Stephen Bennett
                                        Faegre Drinker Biddle & Reath LLP
                                        110 West Berry Street
                                        Suite 2400
                                        Fort Wayne, IN   46802-2322

                                        Bruce Jones
                                        Faegre Drinker Biddle & Reath LLP
                                        2200 Wells Fargo Center
                                        90 S. 7th Street
                                        Minneapolis, MN   55402


Court Reporter:                         Elizabeth T. Culiver, RPR, FCRR
                                        United States District Court
                                        101 N.W. MLK, Jr. Blvd.
                                        Evansville, IN   47708
                                        (812) 499-8782


                    PROCEEDINGS TAKEN BY MACHINE SHORTHAND
              TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

3

(In open court.)

THE CLERK: All rise. United States District Court for the Southern District of Indiana is now in session. The Honorable Richard L. Young presiding. Court is in session.

THE COURT: Please be seated. You'll have to introduce yourselves because I really don't remember any of you. It's been so long since I've seen you, but welcome. Good to be with you all again.

We're here in MDL 2570 for a motions hearing and a status conference. Usual cast of wonderful lawyers are here. Charles Siegel is here, Ben Martin, and Joe Williams on behalf of the steering committee. Andrea Pierson, Jessica Cox, Bruce Jones, Kip McDonald, Steve Bennett, and Blake Lehr is here as well. And then my notes also indicate we have some summer folks. Who are the summer folks?

MS. COX: Yes, Your Honor. We have two of our clerks here this summer, and they're really excited to be here.

MR. COOK: Turner Cook, Your Honor.

MS. WEST: Nora West.

THE COURT: Welcome. Where do you go to school?

MR. COOK: The University of Notre Dame.

MS. WEST: Indiana University.

THE COURT: All right. Okay. Good.

MS. COX: And, Your Honor, Blake has been working on briefs and motions for quite some time, and it's his first

4

opportunity to come, so he's going to argue a few motions today, but he -- but did want to make sure that you knew he was here and excited to be here.

THE COURT: Very good.

MR. WILLIAMS: And, Your Honor, on behalf of Mr. Heaviside, he came down with COVID and is laid out and wanted to make sure that Your Honor didn't think that he was skipping out on us.

THE COURT: Okay. All right. Very good.

Okay. I got some good news yesterday from Judge Baker that he had a very successful conference with the Adham's inventory. Plaintiffs steering committee aware of all that?

MR. MARTIN: In fact, we -- we had dinner with Basil Adham last night and Jessica Glitz from the Johnson Law Group who had mediated that with Judge Baker yesterday and heard the news. I didn't -- I don't know that it's completely tied up in a bow, but it sounds like there's been major progress in getting there.

THE COURT: Very close. I talked to Judge Baker, and he was very appreciative of the lawyers. He indicated Jessica did wonderful work in moving this along and also the Johnson Group and Mr. Adham did a nice job as well. So that's -- that's certainly good news. And hopefully we can continue on that track as well and maybe put this one to bed here in the

5

next decade.  I'll be gone by then so -- hopefully, we get it done.

But in any event, I see some agendas here.

MS. COX:  Yes, Your Honor.  We were able to take a motion off of the motions hearing agenda that's now moot.  We had everyone dismissed.  That was subject to one of those motions that we had sent Tina earlier.

THE COURT:  That's the Docket 26840?

MS. COX:  Yes.

THE COURT:  That's moot now?

MS. COX:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  All right.

MS. COX:  We made some progress this week on that one.  So we have one motion on the motions hearing to hear that -- you know, it's just a matter of form, and then we have three on our status conference agenda.  And I do have just -- just like four slides of an update, if it would be helpful to kind of give you an MDL update.  Maybe I could do that now.

THE COURT:  That'd be great.

MS. COX:  And I'll give you guys a copy.

So if we go to the next slide.  I just want to kind of give you -- oh, first slide.  There we go.

If you look on the docket, you'll see 7,000 some cases, but I did want to let you know that before yesterday, we had settled about 2,500 of those in principle.  You know,

6

they're still in the process of being finalized, and those cases haven't yet been dismissed off the docket, but when you pull the docket numbers, there were about 4,500 cases that we consider active, and about 2,500 that had been settled.

Filings have slowed down obviously in 2025, but we did want to let you know of the progress that you might not be able to see on your end, but those -- those -- hopefully, those dismissals will be forthcoming, and as you mentioned, after yesterday, we expect even more.

If we can go to the next slide.

THE COURT: So if we take -- go back. So if we take the 1,300 or whatever from yesterday, that brings it down to, what, 3,000?

MS. COX: If you go to slide four. So 4,500 -- Johnson Law of the filed cases was 1,279. So, yeah, so that will be a big chunk. That will be about 28 percent of that 4,500 that will also come off. So that's sort of where we look.

And then in terms of the injury breakdown, if we can go to slide three, it looks like the majority of the cases still remain Category 7 perforation cases. About 2,300 of those pending. Our perforation cases, less than 1 percent. Our open surgeries, you know, less than 1 percent. Our death, and we have, you know, 10 percent or so of fractures. So the injury cases are -- are a very small portion of the MDL, and

those Category 7 perforation cases and Category 6, you know, cases are still the bulk of the MDL, but we did just thought it would be good to give you a little -- and if we go to the next slide, as I mentioned, you know, Johnson Law was the largest inventory holder with 28 percent. So that was a good -- a good day yesterday in making significant progress. So now we have, you know, our work cut out for us on the rest, but we are continuing to do that work and hopeful to continue to make progress in that area as well.

THE COURT: Can I have a copy of these?

MS. COX: Yes, you may.

THE COURT: Thank you. Very helpful.

All right. We have Cooks defendants' notice of noncompliance, second amended case categorization forms.

MR. LEHR: Good morning, Your Honor.

THE COURT: Good morning.

MR. LEHR: It's a pleasure to be here. My name is Blake Lehr. And just a quick update. So we filed a notice of noncompliance under CMO-33, which is the case categorization order, on April 14th of this year. And on last Thursday, we entered a second amended proposed order of the plaintiffs that are still noncompliant because after filing the notice, plaintiffs' counsel reached out to us. I have a copy of the proposed order, if you would like a copy.

THE COURT: Sure. Thank you.

MR. LEHR:  And that's all.

THE COURT:  Why don't you summarize this for me.

MR. LEHR:  Summarize the proposed order?

THE COURT:  Yeah.

MR. LEHR:  Yeah.  So under CMO-33, each plaintiff in the MDL was required to categorize their injuries.  The plaintiffs listed in Exhibit A so far have not submitted any second amended case categorization form pursuant to CMO-33.  So we have five cases that are currently subject to dismissal.

And then Exhibit B, those four cases, those were originally listed on our notice of noncompliance, but plaintiffs' counsel subsequently cured the deficiencies, so the cases listed in Exhibit B, the notice is moot as to those plaintiffs.

THE COURT:  Okay.  All right.  So it's just Exhibit A then, right?

MR. LEHR:  Yes.

THE COURT:  Okay.

MR. LEHR:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Any response from the steering committee?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  All right.  We'll go ahead and issue the proposed order on -- regarding noncompliance.

All right.  And that takes care of, at least on my

9

agenda, the motions?

MS. COX:  Yes, Your Honor.

THE COURT:  All right.  Let's move on to the status conference.  Item No. 1, Cook Defendants' motion for summary judgment on failure-to-warn claims governed by Illinois law.

Mr. Bennett, how are you?

MR. JONES:  Mr. Jones?

THE COURT:  Ready to go?

MR. JONES:  I am.  Bruce Jones, Your Honor --

THE COURT:  Oh, Bruce Jones.  Yes.

MR. JONES:  -- for Cook.  This motion addresses failure-to-warn claims in 77 cases that are listed on Exhibit A to the motion.  All those cases are cases in which Illinois law provides the rule of decision on compensatory damage issues at least and that involve placement of Cook filters after August 9th, 2010.

We think the Court should grant summary judgment on these plaintiffs failure-to-warn claims for the reasons we set out in our briefing.  Under Illinois law, like all states, the -- Illinois has adopted the learned intermediary doctrine. That means the duty to warn by medical device manufacturer is owed not to the individual plaintiff, but to that plaintiff's treating physician.

Illinois also has a rule that's been stated in several different ways, but most prominently in the *Hansen vs.*

10

*Baxter Healthcare* case, which says, and I quote, "A prescription medical device manufacturer need not provide warning of risks already known to the medical community."

Now, here, plaintiffs' pleadings identify six specific risks that they claim Cook should have warned about. Tilt, perforation --

THE COURT: But isn't that a factual matter to be determined in every case as to whether it was known in the medical community?

MR. JONES: No, Your Honor. We presented evidence here that's not been disputed that these risks were, in fact, known prior to August 9th, 2010. We have the FDA communication from 1999. We have the FDA notices in 2010 and 2014 that Your Honor relied in the punitive damages motion. We have the medical articles identifying these risks specifically. We have testimony from treating physicians and from plaintiffs' own experts in the Bellwether cases that says not just that they knew about these risks but that says specifically -- and you'll note -- you'll see the quotes in our brief. It says the medical community was aware of these risks, and they've -- we listed out the risks in each of the depositions -- was aware of these six risks prior to 2010.

THE COURT: Well, I understand it was broadly known, but isn't it -- doesn't it go to the individual physician advising the individual patient? Say, he had somebody in a

small rural community going to the family doctor and the family doctor says nothing wrong with these things.  Go ahead. I mean --

MR. JONES:  It's an objective standard, Your Honor. It's not based on the individual subjective understanding of any particular doctor.  It's an objective standard based on the knowledge of the medical community as a whole and what's out there.  This is the flaw in the plaintiffs' argument, what you just made is what plaintiffs argue against this.

THE COURT:  That's why I mentioned it.

MR. JONES:  Yes, of course.  Both *Hansen* and *Proctor* show that the issue is the objective knowledge of the medical community, not the subjective knowledge of any individual doctor.  This is consistent with the Illinois state law authority on all kinds of different known and obvious risk issues.  The authority was laid out in the trial brief.  The subjective standard is -- is simply wrong.  That's not how it's -- that's not how it's done.  Contrary to the language of *Hansen* -- the subject of standard is contrary to the language of *Hansen* and *Proctor* and *Aquino*.

Illinois law -- for example, we cite the cases from the alcohol cases and the cigarette cases.  Those deal with knowledge of society as a whole, not whether any individual person might have been -- or claim to have been unaware that consuming alcohol could damage your health or smoking

cigarettes could give you lung cancer. That's not the standard. The standard is an objective one, and the standard is, here, whether or not the medical community as a whole knew.

The Indiana case -- we cite an Indiana case here, which puts it in a slightly different way, is that the medical community knew -- the medical doctors knew or should have known. That's the objective component, and that's what the standard here is.

Is there anything further I can address on that point to clarify? We're looking at -- the one thing -- let me pull up an address here, if I may.

THE COURT: So you're saying the small community rural doctor, if he didn't know, should have known, or if he didn't know, should have referred the patient to somebody who knew? Is that kind of -- is that what you're saying?

MR. JONES: That's what we're saying. We're saying the standard by which the duty that Cook had to warn as defined is based on the medical community as a whole. Anybody -- I mean, it only makes sense because anyone could get around that rule simply by saying that my individual doctor didn't know this, and that'd essentially eviscerate the rule.

THE COURT: Well, the doctor would have to get up and -- if he did know it, he'd have to get up and lie.

MR. JONES: Yes, if he did know, but say that -- say

13

that he --

THE COURT:  No doctor is going to do that.

MR. JONES:  If you look at the language of *Hansen* and of *Proctor* and of *Aquino*, for that matter, they say -- excuse me.  *Hansen* says a medical prescription medical device manufacturer need not provide a warning of risks already known to the medical community.  The *Proctor* case says a drug manufacturer --

THE COURT:  What is the medical community?

MR. JONES:  Medical community is the group of attorneys -- of doctors, not attorneys.  A group of doctors who use that particular drug or device.  That's how the Court used it in *Hansen*.

THE COURT:  So it'd be the vascular surgeons basically?

MR. JONES:  Vascular surgeons or the interventional radiologists in this situation.

THE COURT:  Right.

MR. JONES:  I mean, the case -- I've forgotten which one it is, but there's one that specifically talks about the ophthalmologists who are using this particular medical device, and that that's the community.  There's no confusion -- I mean, when we talk to -- I know there's raised a question in the plaintiffs' response about what the medical community is, but that's the term that *Hansen* and *Proctor* and *Aquino* used,

14

the medical community, and when we asked the individual doctors at their depositions, including Dr. Gordon, plaintiffs' retained expert, was -- were these risks generally known in the medical community as of 2010, they had no confusion, and there was no objection to the use of that term at the time.

Medical community means obviously the group of doctors who are using this drug or this medical device. That's the medical community that has to be measured, and it's an objective standard. And if you look at the objective evidence here, the FDA communications, the medical articles and the testimony from the doctors about what was known in the medical community at the time, it's clear that these six risks were, in fact, known as of 2010.

The other thing that's significant is that the plaintiffs themselves have offered no evidence to dispute this, dispute the knowledge in the medical community. They have not offered any declaration from one of their experts that any of these risks was, in fact, unknown as of 2010. I am confident that with the group of experts that they have assembled, if any of their experts believe that the risks were unknown at that time, they would have been able to say so in a declaration, but no such declaration was offered.

The only thing they have offered is testimony from two treating physicians from non-MDL cases. The problem is

these don't help. Number one, each of these testimony -- these testimony that they cite, cites the individual doctor's personal knowledge, not the knowledge of the medical community.

Also, if you look closely at them, the doctors themselves are not even talking about whether or not they were aware of these risks. They're talking about whether or not they believe these risks should have included in the Cook filter IFUs. So none of that testimony undercuts the undisputed evidence that we offered that, in fact, these risks -- these six risks were known to the medical community in 2010. Because they were known, they had no -- Cook had no duty to warn of them.

I urge the Court -- I understand you're concerned about the subjective versus objective standard here. I urge the Court to take a look again at the section in our reply brief where we address that issue directly, because if you look at how the language is worded in *Hansen*, in *Aquino*, in *Proctor*, and in the other cases on other nonmedical device topics that we cite, it's clear that it's an objective standard, and that a subjective standard would eviscerate the whole obvious hazard or known hazard theory because anybody could say, yes, I didn't know.

I mean, take it out of the medical context. If you say that -- you know, if you have a ladder or a car or

16

something where it's pretty much obvious that a particular danger exists, if you stand on the next to the last -- like all the ladders have a label on the top that says -- or on the second step down that says don't stand above this level.

THE COURT: Thanks to lawyers.

MR. JONES: Thanks to lawyers, right. But it's pretty obvious that if you stand on top of an eight-foot ladder, that there's a risk you're going to fall. If a particular -- and I would submit that that is sufficient, that objective knowledge that you could fall and hurt yourself is sufficient for the open and obvious dangers standard. The fact that some individual plaintiff might say, well, I didn't know that, so my subjective lack of knowledge of the risk overcomes that obvious danger objective standard, and I can go ahead with my case. That's not the -- that's not the standard, and it wouldn't make any sense if it were. The same thing applies with respect to doctors and medical devices. The standard is whether or not the medical community, as a whole, is well aware of these risks. There's no dispute in this case that they were, and Cook, therefore, had no duty to warn.

THE COURT: I still want you to try to help me understand what the medical community is here. Obviously vascular surgeons, radiologists. Who else?

MR. JONES: Well, those are the primary people who

17

would be making the decision to place -- whether or not -- placement of an IVC filter would be the appropriate course of treatment as opposed to some other means of addressing the possibility of blood clots.

THE COURT:  So are you saying that even if -- even if the small community rural doctor talks to a patient about this, that small rural community doctor wouldn't be able to perform this operation?  He'd have to refer that patient to somebody in the medical community to do that surgery, right?  Is that what you're saying?

MR. JONES:  Not necessarily.  That's what the learned intermediary document itself recognizes, that doctors, because of their training, because of their experience, are in the best position to make these judgments, and presumably doctors who have a particular specialty or lack of particular specialty or skill or set of knowledge are going to realize that and in the interest of their patients are going to consult with other doctors or refer them to someone.

THE COURT:  Small community doctor would not be a learned intermediary in this situation.  So he'd have to refer to somebody who he assumes would be, right?

MR. JONES:  Presumably if -- if he were to decide that I am competent to make the decision as to whether an IVC filter is appropriate and to go ahead and place that filter, then he would be part of the medical community because he's

assuming that role along with other interventional radiologists and specialists in that field, but if he did not and, in fact, referred it to somebody, he would be out of the picture anyway, and it wouldn't matter whether he was a learned intermediary. The learned intermediary would be the person with the specialization that would make that judgment. If he views himself as sufficiently knowledgeable, then he is the learned intermediary and that's -- that's the deference that the Court -- that the law has made to the expertise that doctors have.

THE COURT: So are you saying that this is such a specialized surgery that anyone who can perform this surgery would have to be part of the medical community that is aware of these risks?

MR. JONES: Right. That's the context. And if you look at the deposition testimony of Dr. Gordon and Dr. Mlikotic and the others, that's the context in which it's presented to them.

THE COURT: So you're not talking about the medical community in general. You're talking about the medical community that is able to perform these procedures?

MR. JONES: Exactly. Just the way that the case -- that one of the cases -- and, again, I apologize. I've forgotten which one -- talks specifically about ophthalmologists because they were the ones that were using

19

this particular medical device and constituted the medical community that was at issue in the case.

THE COURT:  Okay.

MR. JONES:  Thank you, Your Honor.

MS. PIERSON:  Your Honor, may I make one point on that last question that you asked?

THE COURT:  Sure.

MS. PIERSON:  Mr. Jones correctly describes the relevant medical community here as vascular surgeons and interventional radiologists.  That's the specialty that places these devices, and as you recall, they are prescription medical devices, so only a physician who would prescribe devices of that type would be in the relevant medical community.

You've seen the instructions for use for the Celect and the Tulip before, and within the instructions for use, it makes clear that only physicians who have been specifically trained in the use of those devices should be placing the devices.  So the relevant medical community certainly does not include a general physician or surgeon in a rural or in an urban area.  It's a much narrower medical community than that.  It's the community of physicians that would prescribe and are specifically trained to use these devices as the instructions for use make clear.

THE COURT:  Just trying to get what the definition of

20

medical community is here on this.

MS. PIERSON:  Understood.  We've got the instructions for you if it's helpful to look at them, but I think you may recall that it's for that very narrow group.

THE COURT:  No.  I'm good.

MS. PIERSON:  Thank you, Your Honor.

THE COURT:  Mr. Siegel?

MR. SIEGEL:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. SIEGEL:  I think Your Honor's questions have gone straight to the problem with this motion.  They -- what they're asking you to do is grant summary judgment in 77 individual cases with 77 different, distinct factual backgrounds, 77 different treating physicians involved, 77 maybe different referring physicians, family practitioners, internists.  We have no idea.  They don't have any idea, and they have not put forward any evidence as to any individual case.  They're simply saying you can decide as a matter of law that the community -- the abstract community was sufficiently warned by them such that it doesn't matter what happened in any individual case and who the individual doctor was and who that -- and what that individual doctor knew.  You cannot, we submit, make a decision in dozens and dozens of individual cases with fact patterns unique to each case as a matter of law.  You can't throw this claim out in each one of those

21

cases based on this sort of theoretical construct.

THE COURT:  But all these -- in all 77 cases, these procedures were performed by either vascular surgeons or interventional radiologists, right?

MR. SIEGEL:  Probably.  We're not sure about that.

THE COURT:  Well, an OB/GYN couldn't do this, right?

MR. SIEGEL:  No, I wouldn't expect that, but -- but we don't know who made the prescribing decision, nor do we know what the individual -- let's take -- let's --

THE COURT:  Would a general practitioner be able to prescribe this?

MR. SIEGEL:  A general practitioner would be -- I don't know, Your Honor.  I mean, maybe.

THE COURT:  I'm asking you.

MR. SIEGEL:  Maybe.  And Your Honor -- Your Honor brought up the situation, which is I'm sure true of some of these 77 people.  Let's take a small rural community.  A guy -- a person goes in, you know, with a chest problem or a chest complaint.  They may see a pulmonologist.  They may see an internist.  They may see their family practitioner.  Who knows.  And that person may refer them to an interventional radiologist or a vascular surgeon, or depending on the particular medical community at issue in that particular case, may not.  We don't know.  We don't know.

And each individual patient -- each individual

22

complainant is allowed to make -- ought to be allowed -- has the right to make a showing about what happened in his or her case. You can't -- from on high, they're asking you to simply deem that every single doctor involved in everyone of these cases had a certain level of knowledge about six different risks.

THE COURT: 77 cases, wouldn't we be able to go through all these cases and look who the doc is and who the surgeon -- the implanting surgeon was and see if it's someone who is part of that medical community?

MR. SIEGEL: They haven't attempted to do that, and that would be their burden. And the second part of the argument or another part --

THE COURT: But if they did that, went through these 77 cases and looked at the implanting surgeon and that surgeon in all these cases was a vascular surgeon or interventional radiologist, wouldn't that kind of tell us that this is all -- these people knew or should have known of the risks and there you go?

MR. SIEGEL: No, that wouldn't be the end of the argument. Our position is that that would be Step 1 in their burden of trying to bring a summary judgment motion.

But even if you simply narrow the lens and you assume that there is a defined medical community of, let's say, interventional radiologists and vascular surgeons and you only

23

focus on them, there is no case that says -- that grants summary judgment on the basis of any medical community's knowledge. And all Your Honor has to do to resolve this motion is look at the *Hansen* case that they rely on, the leading Illinois learned intermediary doctrine case because what happened in *Hansen*. Yes, the *Hansen* court said we recognize the learned intermediary doctrine, and under that doctrine, a manufacturer -- manufacturer's duty to warn runs to the medical community. But then what happened in that case? The plaintiff came forward with evidence that the actual treating doctor who was -- who, you know, treated the plaintiff and was operating the locking machine, the Baxter -- it was called a luer lock, that -- that doctor, who was indisputably part of the medical community at issue because he was doing the procedure, that doctor didn't know of the risks. He was insufficiently aware of the risks despite being a person who regularly read medical journals. The plaintiff was allowed to put in that kind of evidence. Just as everyone of our plaintiffs must be allowed to put in evidence that the interventional radiologist didn't, in fact, know of the risks despite reading medical journals. And by the way, I'm going to get --

THE COURT: What --

MR. SIEGEL: I'm sorry.

THE COURT: You say they didn't know, but should they

24

have known?  Is that part of the equation?

MR. SIEGEL:  That's a factual issue.  That's a factual issue.  And in *Hansen,* the case was not decided on the basis of what the resident should have known.  The case was decided by the Illinois Supreme Court, which reversed the Court of Appeals.  The Illinois Supreme Court said under this factual record with the knowledge of the individual treating physician at issue, we can't uphold this summary judgment.  That -- that is -- that *Hansen* case is dispositive of this motion.

I want to get to a few other points just briefly.  Even if you indulge the notion that -- that the medical community, however defined -- and their motion doesn't actually concretely define it, but let's assume that -- let's just call it radiologists and vascular surgeons.  Even if you just sort of assume that theoretical medical community, what is their proof that the -- that that community knew of all these risks?  They rely on a few things.  They rely on FDA communications, and they rely on some medical journal articles.  And I don't need to go through it, Your Honor.  It's in our brief as to how those FDA communications don't count for anything because they're not actually sent to the medical community.  One of them is sent to the medical industry, whatever that is.  Probably meaning filter makers.  The next one is sent -- is just posted on an FDA website.

There's no case out there that says something on an FDA web -- that sort of deems and assumes that every doctor out in the world gets on the FDA website. There's -- that doesn't count as information to the medical community. And then they rely on a few -- I think on four medical -- I think they cite five medical journal articles, two of which are the same article, so they're down to four articles. That is what they're asking you to decide as a matter of law that the community knew, those four medical journal articles.

Go right back to *Hansen*. *Hansen* says the doctor at issue, despite regularly reading medical journals, did not -- was not sufficiently aware of the -- of the -- of the risks involved. They say, well, we -- you know, we didn't put -- we could have gotten an expert affidavit about what the medical community knew.

It's important to remember that we have not been allowed to do non-case specific discovery in this case for, I think, since 2018. The only discovery that the plaintiffs' side has been able to do or been allowed to do is plaintiff specific discovery -- cases specific discovery. We have not been allowed to go take discovery about what the community knew. That's the posture of the case as it exists today.

He also said, well -- or I'm sorry, Ms. Pierson also said the Cook's IFU is directed to interventional radiologists and vascular surgeons. I want to sort of revert back to my

26

point earlier.  Cook's IFU doesn't get to decide -- I mean, that doesn't determine what the medical -- that's simply saying that every doctor that read our IFU is the relevant medical community.  That's not -- there's -- that's not the case.  You know, there's no -- their IFU doesn't define the medical community.  The medical community is simply a sort of theoretical construct out there, but in any individual case, it zeros back down to what the doctor at issue knew.

I want to -- I want to just close by making the point that -- and I said this in our brief.  They don't actually ever cite a case, because there is no case, that grants summary judgment on this basis.  Not *Hansen*, no *Proctor*, not *Aquino*, not any other Illinois case, not any case from anywhere.  There is no case that has done what they are asking you to do, which is to grant judgment against dozens of individual plaintiffs utterly without regard to their individual facts, circumstances, or the doctors in those cases simply by this theoretical construct.  Yes, there is a theoretical abstract doctrine out there that says you only have to warn the medical community, but there is no case that grants summary judgment on that basis regardless of the facts in the individual case.  And, again, all your -- all Your Honor has to do is -- I mean, we're asking you to follow *Hansen*.  We're asking you to do what the *Hansen* court did.  Thank you.

27

THE COURT:  Is the only -- the only physician that we're really concerned about here would be the implanting surgeon?

MR. SIEGEL:  We would say that --

THE COURT:  Because I'm assuming that before that surgery, that the vascular surgeon or the radiologist would have to sit down with the patient and the family and say, okay, I need your consent here to do this and this -- these are the risks.  I mean, all the other doctors would then be out, right?

MR. SIEGEL:  I don't -- I don't think we necessarily would concede that, Your Honor.  I think depending -- again, to take Your Honor's example of the -- let's say a small rural community.  The internist may be a more -- a better doctor than the vascular surgeon.  And, of course, then we're -- you get into situations -- I mean, we're familiar with situations, right, where even vascular surgeons or interventional radiologists, they lose their license.  They're addicts.  They are drunk one day.  You know, we just -- we don't know.  You can't -- you can't -- and you might say, well, yeah, they might be drunk that day, but they should know.  They're charged with knowledge of something.  That isn't the way these cases are decided, and that is not how *Hansen* was decided.

Under *Hansen,* we have the right to establish the factual circumstances in any individual case.  They cannot get

28

summary judgment without doing that.  Thank you.

THE COURT:  Thank you, Mr. Siegel.  Mr. Jones, any reply?

MR. JONES:  Yes, Your Honor.  Reply.  The plaintiffs have the burden of demonstrating the knowledge of the medical community here.  We raised the issue.  We presented evidence showing knowledge of the medical community was, in fact, in 2010, that they knew of these six risks.  Plaintiffs then, under the summary judgment standard, were required to come back and offer some evidence that the knowledge was not there.  They didn't do that.  They have not cited -- they did not offer a declaration generally about medical knowledge in the community -- excuse me, about knowledge in the medical community.  They did not offer an affidavit or a declaration from any treating physician of any of these 77 people about the medical community generally or about their -- those doctors' knowledge specifically or why they didn't know what the medical community knew.

Plaintiffs' suggestion of a hypothetical doctor who didn't know the risks does not create an issue of fact here. It's not the defendant's burden to identify the knowledge of the doctors.  It's the plaintiffs' burden.

My learned opponent also errors in saying that there are no cases in which the opposing -- excuse me, in which a Court has, in fact, granted.  He technically is correct

29

because it was not a summary judgment, but there was a dismissal granted in the *Aquino* case based on lack of allegations concerning knowledge of the medical community, and I would refer you to that case.

I'm also intrigued by the fact -- pardon me -- that both in their briefing and in the presentation you just heard, there's absolutely no mention of the actual rule of law that is at issue here. That is, as *Hansen* put it, a prescription medical device manufacturer need not provide a warning of risks already known in the medical community, and *Aquino* and *Proctor* restate that in similar language. That's what needs to be addressed here, and that's what plaintiffs have failed to do.

With respect to proof of knowledge, even if you disregard the FDA and the medical articles, as was suggested, the one piece of evidence that we offered that was not mentioned in that presentation was the testimony of the doctors themselves. We presented testimony from three treating physicians and from plaintiffs' own expert that the knowledge of the medical community was such that the -- that these risks were known. And I would direct you to pages -- where does it start -- page 12 through 14 of our original brief where we quote these doctors.

Dr. Mlikotic said, "These risks of perforation, tilt, migration, fracture and inability to retrieve are well-known

30

in the medical community, correct?"

"That's correct."

"How long have they been well-known in the medical community?"

"For a very long time.  At least a decade and a half."

Dr. Chrisosotomo.  Question:  "There are known risks of all filters that were well-known in the medical community in 2010, correct?"

"Correct."

Dr. Goodwin.  "And there were these known risks within the medical -- the relevant medical community who places filters in April of 2011?"

Yes.

Dr Gordon, their own retained expert.  My question is:  "In the general medical community in 2009, were physicians aware that filters generally can tilt, migrate, perforate, fracture, be difficult to retrieve, cause bleeding and death?"

"Yes."

That's the evidence of what the medical community actually knew.  It's firsthand testimony by experts who were in the medical community and knew what the medical community did.  That has not been addressed in plaintiffs' response, and we suggest that that is sufficient to establish the undisputed

31

fact that the medical community did, in fact, know of this.

The other question -- the other point the Court asks is, isn't this -- don't you eliminate all the other doctors from this question of the medical community?  The answer to that is yes.  You're talking about issue of warnings.  The person you warn is the person who makes the decision to put the filter in and who actually does the placement of the filter.  Nobody else matters with respect to the warning claim.  You can make other arguments for other claims, but as to warnings, it's those two people -- or one person, usually, that matters, and that's the medical community that knew about this.  Unless the Court has other questions --

THE COURT:  Okay.

MR. JONES:  -- I would ask the Court to grant the summary judgment motion.

THE COURT:  Thank you.

MR. SIEGEL:  Just very briefly, Your Honor, if I could.

THE COURT:  Sure.

MR. SIEGEL:  A couple of points, Your Honor.  They do quote individual doctors' testimony from individual case records.  We, in our brief, Your Honor, will see we say they've kind of cherrypicked that testimony.  There's other testimony from those doctors that points in the opposite direction.

32

We also cite testimony from two cases that aren't in the MDL. The *Pavlock* case in state court in Texas and *Kuhn* case in state Court in Pennsylvania. Those doctors are equally members of the medical community. They're surgeons and radiologists who are just as much a part of the medical community as the ones they quote. So there is a factual dispute there.

The other point I want to refer to for just one minute is the part in our brief where we point out that part of this doctrine or attended to the doctrine is the idea that if -- if the defendant -- if the manufacturer of the product in question -- you know, the defendant is asking the medical community to rely on its literature. Its knowledge is informed by the -- its knowledge about the risks of a product is naturally informed in some cases by the information being put out about that produced by its manufacturer. Hence -- this is a federal district court case from Illinois that we cite in our brief from 2021 called Africano, A-f-r-i-c-a-n-o, vs. Atrium Medical Corporation.

Naturally, when a manufacturer or its representatives withholds crucial information about a drug or medical device, it has breached its duty to warn the medical community because without this information, doctors could not provide appropriate and comprehensive medical advice for their patients.

We say that that, in fact, happened in this case, and that would take them out of this doctrine entirely. And we rely on this study that was published in the intels of Internal Medicine just a few months ago. It's entitled Information Disclosure Medical Device Regulation and Device Safety the Case of Cook Celect IVC Filters. It's by several authors, three of whom have testified for the plaintiffs in some aspect of this litigation, but some of whom haven't. And it goes into great detail about what they see and what they maintain is Cook's corruption of the medical literature. That's a factual issue. They don't -- of course, they dispute that, but that's a factual issue, and that takes you right into the exception to this doctrine that that Illinois federal court decision from 2021 recognizes. Thank you.

THE COURT: Thank you. Mr. Jones, any final comment?

MR. JONES: The two treating physicians I've already addressed, and it's addressed in our brief. With respect to this corruption of the literature, it's also addressed in our brief, but the main point is even if you assume that every -- that their version of events is accurate, they've made no showing and no argument that that actually changed the general knowledge of the medical community, which has been testified to by all these -- all these doctors. Thank you.

THE COURT: All right. We'll take it under advisement.

34

All right.  Number two, Cook defendants motion for a new screening order related to the amount in controversy. Docket 26849.  Mr. Lehr.

MR. LEHR:  Good morning, Your Honor.  Blake Lehr on behalf of Cook.  I'm here to argue Cook's pending motion for a new screening order concerning amount in controversy.

Cook's motion requests that the Court amend and expand CMO-32 to require all plaintiffs in the MDL, with the exception of those plaintiffs alleging death, open removal, or filter fracture injuries, to certify that the amount in controversy in their respective cases exceeds $75,000 exclusive of cost and interests.  At the outset, Cook's --

THE COURT:  Have you moved to dismiss the *Harris* case?

MR. LEHR:  Yes, Your Honor, we have moved to dismiss the *Harris* case.  That was actually the motion that spurred the Court entering the order from Ms. Harris to amend her short form complaint, and that motion to dismiss under CMO-28 is still pending.

At the outset, Cook's request is not unprecedented in this very MDL.  This Court has already required some 2,000 plaintiffs alleging asymptomatic and/or perforation injuries to certify.  Cook's request merely asks this Court to expand CMO-32's already existing requirements to other plaintiffs in the MDL.

The question then at the crux of this motion is why should the Court expand CMO-32? And to answer this question, it is first helpful to revisit the events that necessitated CMO-32 adoption in the first place. As this Court knows, subject matter jurisdiction is a fundamental requirement for maintaining an action in federal court. It cannot be waived. It cannot be forfeited, and the issue can be raised at any point in the litigation, even after a verdict has been rendered. The requirement is so fundamental that the Court can raise the issue sua sponte at any point.

The importance of subject matter jurisdiction was highlighted in June of 2023 when the Seventh Circuit decided *Sykes* and *Parton*. Despite the issue of subject matter jurisdiction not being raised by any of the parties, the Seventh Circuit held that two plaintiffs alleging only perforation injuries could not satisfy the amount in controversy requirement as a matter of law. This resulted in the *Sykes* and *Parton* cases being dismissed for lack of subject matter jurisdiction on appeal after a judgment had already been entered by this Court.

After *Sykes,* Cook proposed and the Court ultimately entered CMO-32 with the Court noting that the *Sykes* decisions, quote, potential impact on the jurisdiction of the Court and many other cases, end quote, necessitated, quote, a procedure to ensure that it has subject matter jurisdiction in every

case included in the MDL, end quote.

At the hearing for CMO-32 on February 2nd, 2024, the parties and the Court discussed the scope of CMO-32. Although CMO-32 eventually was limited to asymptomatic and/or perforation injuries, the Court made clear that the scope of CMO-32, as it was entered, was a starting point.

And, Your Honor, I have a copy of the transcript, if I may approach the bench.

THE COURT: You may.

MR. LEHR: On page 21 of the transcript, at -- starting at line 15, the Court: "Well, Joe Williams is indicating that they would have no objection to the asymptomatic and also the exclusion of the open retrieval and the fractures. Maybe we could start with that and make some progress with that and then see how that works and take a look at some of the other categories later and just make some movement here."

So as the Court indicated in February of last year, the initial scope of CMO-32 was essentially a test run, and we wanted to see how the process would play out. The current iteration of CMO-32, as I mentioned earlier, has required roughly 2,000 plaintiffs to certify, and the overwhelming majority of these plaintiffs complied without any issue.

Even in those cases where certification was proffered as an issue, the issue that prevented certification had

nothing to do with CMO-32 itself.  Counsel for several plaintiffs reached out to Cook to state that certification wasn't possible either because, one, they were unable to contact their client or, two, their client had passed away and the state -- the estate did not wish to continue litigation.

These issues have nothing to do with CMO-32 itself, rather CMO-32 brought these pre-existing issues to light. They would still be issues that would ostensively come up later in the litigation.

In the end, roughly 400 cases were voluntarily or involuntarily dismissed from the MDL as a result of CMO-32 ostensibly because these dismissed plaintiffs recognized that they could not meet the amount in controversy requirement in good faith.  In short, the current iteration of CMO-32 did its job.  It got rid of cases that do not belong in federal court.

So I return to the question, why should we expand CMO-32?  And we have three primary reasons for the expansion. First, since CMO-32's adoption, the Court has expressed concern over its subject matter jurisdiction in a case that is not currently subject to CMO-32 certification requirement.  As Your Honor mentioned earlier in the case of Paula Harris, Cook moved to dismiss Ms. Harris' claims as time barred under CMO-28 and that case involved an alleged injury based on a failed filter retrieval, which is a Category 5 injury that is not currently subject to CMO-32.  But before even considering

38

Cook's motion to dismiss, the Court entered an order in December of last year requiring Ms. Harris to amend her short form complaint to include additional jurisdictional allegations because the Court expressly stated that it was concerned, quote, whether plaintiff meets the amount in controversy requirement, end quote.  The Harris case demonstrates that concerns over subject matter jurisdiction in this MDL are not just limited to Cook.  The Court also has salient concerns over whether every case in this MDL has subject matter jurisdiction, and rightfully so.

Second, expanding CMO-32 promotes judicial efficiency and creates benefits for this Court, any potential district Court on remand, and the parties themselves.  This Court has an independent obligation to ensure that it has subject matter jurisdiction over every case in the MDL, and as just discussed, the Court still has concerns over subject matter jurisdiction in certain cases not subject to CMO-32 despite CMO-32 being in place.  Expanding CMO-32 would allow the Court to have assurance that subject matter jurisdiction exists in every case in the MDL without the need for ad hoc orders like the Court entered in Harris.  Having the Court enter individual orders in individual cases is not an efficient use of the Court's time.

Expanding CMO-32 would, likewise, resolve the jurisdictional issue at an MDL wide level before any remand.

There is simply not a better time than right now to resolve the jurisdictional issue. Leaving the issue unresolved for remand would unnecessarily burden the district courts because the issue could be efficiently resolved right now at the MDL level before any cases are remanded.

Also, expanding CMO-32 would benefit all of the parties in the litigation. As the *Sykes* decision itself demonstrates, early resolution of this jurisdictional question benefits plaintiffs because the issue would be resolved prior to any individual plaintiff devoting substantial time and resources in attempting to prove their case in federal court. Even if a plaintiff were to get a verdict in his or her favor, if a Court subsequently finds that it did not have subject matter jurisdiction, that verdict is rendered moot. Plaintiff would have -- the case would be dismissed, and the plaintiff would have to go back and try the case again in state court. So it doesn't only benefit Cook to the extent that we're ensuring that plaintiffs are properly in this MDL, but it also provides certainty for plaintiffs come time for a potential trial on remand.

My last point is, Cook's request would impose a minimal burden on plaintiffs, especially in light of the fundamental importance of subject matter jurisdiction. CMO-32 has already proven itself workable, and there is no reason to believe that expanding CMO-32's already existing requirements

to other plaintiffs in the MDL would prove any different. The process remains exactly the same. It is simply a change to who must certify, and those plaintiffs who certify must only do so once. This process does not require plaintiffs in a few years to hypothetically recertify. We're just asking them to certify that the amount in controversy requirement has been met once.

The hypothesized unworkable problems that plaintiffs raised in opposition to the initial CMO-32 simply never came to fruition throughout the process, and they've re-raised essentially the same hypothetical problems in opposing CMO-32's expansion. Plaintiffs' arguments were not availing for the initial CMO-32, and they certainly aren't availing now that we have seen the process play out, and we know that it works.

The requested expansion would also not delay the progress of this MDL. The current Bellwether plan that will be argued later this morning only includes plaintiffs who have already certified under CMO-32. So, if anything, the expansion would speed up the progress of the MDL by resolving jurisdictional issues once and for all at the MDL level in one fell swoop and not necessitate the Court entering potential individual orders like the Court did in Harris or requiring the Cook defendants to brief individual cases in the MDL in cases that we don't believe the Court has subject matter

41

jurisdiction. If the Court does not have any questions at this moment.

THE COURT: Well, what's wrong with briefing those individual cases?

MR. LEHR: There are a couple problems, Your Honor. First, Cook is not in the best position to determine whether the amount in controversy is met in a plaintiff's individual case. At this point, we have a limited set of medical records. We are operating with a short form complaint. In that limited universe of facts, it is plaintiff themselves that best understands the case and what is at issue, and that's partially why CMO-32 requires plaintiffs' counsel to reach out to plaintiff and have plaintiff themselves sign the CMO-32 certification form.

Second, we are talking about hundreds, potentially thousands of cases. For example, Paula Harris. That is a Category 5 failed retrieval case. The numbers that we provided you earlier in a slide show, off the top of my head, I believe there are approximately 200 Category 5 cases, just Category 5 cases, currently sitting in the MDL. That is a lot of briefing. That is a burden on the Cook defendants. That is a burden on the Court, and since CMO-32 has already worked for 2,000 perforation and asymptomatic plaintiffs, we know it works, and we know it's efficient, and at the end of the day, an MDL is meant to promote efficiency. And with the minimal

42

unburden that an IAC certification requires, this just seems like the common sense next step in this litigation concerning subject matter jurisdiction.

THE COURT: Thank you, Mr. Lehr.

MR. LEHR: Thank you.

THE COURT: Mr. Siegel?

MR. SIEGEL: Thank you, Your Honor. We've been groping for what exactly the issue is here. There is no issue. I mean, there's a theoretical -- yes, any Court always has its -- has the obligation to satisfy itself of subject matter jurisdiction. However long -- I guess it was over a year ago, they said, well, under *Sykes* and *Parton*, you know, there is -- the Court -- the Seventh Circuit raised this jurisdictional issue. *Sykes* and *Parton* were asymptomatic cases. They asked for a screening order that was sort of addressed to asymptomatic cases. We provided it. We opposed it, but when -- when Your Honor ordered it, it was performed.

Mr. Martin tells me that it took about -- we've sort of determined in retrospect that it took approximately three hours per case to do that, which, of course, would mean thousands and thousands and thousands of hours for plaintiffs' counsel. I'm sort of --

THE COURT: Who spends three hours on it? You? Me? I mean --

MR. SIEGEL: No. The individual that -- the

43

individual -- mostly the individual plaintiffs' lawyers.

THE COURT:  If you don't spend three hours on it, then I have.

MR. SIEGEL:  No, you don't.  With all due respect, Your Honor, I'd ask you to sort of look at what counsel was saying.  Counsel was saying you, Your Honor, should -- being the MDL judge should resolve this jurisdictional issue so that the plaintiffs don't try their case upon remand and then get thrown out for lack of subject matter jurisdiction, which could happen at the very end, and thus they would have wasted all their time.  But how does -- how does the plaintiffs' lawyer simply certifying that the amount in controversy is met solve that problem?  When the -- when the --

THE COURT:  Should have already -- as a rule of evidence, should have already certified.

MR. SIEGEL:  It was.  It was, Your Honor.  That was absolutely a certification.  Just like when they remove cases, they made that certification.  And they have never once actually moved to dismiss a single case for lack of subject matter jurisdiction.  If that were really an issue plaguing this MDL and if there were really a whole bunch of cases out there that didn't belong in federal court, why hasn't -- why haven't they ever moved to dismiss a case?

Take the Paula Harris case.  As I understand it, there was a motion to dismiss that case on the pleadings on

the basis of limitations.  Your Honor raised the amount in controversy issue.  The plaintiff went ahead and re-pled.  The facts are still what the facts are.  And maybe that case will get tried, and Paula Harris will get a verdict and maybe at that point, they'll dismiss -- move to dismiss for lack of subject matter jurisdiction because they're correct, it can't be waived.  But -- but how does the plaintiff -- how does putting us to this -- putting all the plaintiffs' lawyers out there to thousands and thousands of hours more work actually resolve the jurisdictional issue?  If they think that the plaintiff still doesn't meet the amount in controversy, they can raise it.  They can raise it at the end after a trial.  What does a certification accomplish?

And for the record, Your Honor, if you think a certification matters and somehow will solve that issue, then I will say on the record right now we as plaintiffs -- as the plaintiffs' steering committee hereby make that certification for every single plaintiff.  That's our certification.  Because -- why can we do that?  Because the lawyers who filed those cases already made it via Rule 11.  We're making it again.  That ought to obviate all the work they want to put us to.

With all respect, Your Honor, what they are trying to do -- this is to make work.  They are desperately asking Your Honor to do more and more things without remanding cases.

45

Our motion for suggestion of remand has been pending for over two years.  There still hasn't been a single case remanded in this MDL after 11 years.  We have said in our papers, Your Honor, that plaintiffs are dying in this litigation at roughly the rate of one every three days.  We have calculated that by the number of suggestions of death that are on the -- that are on the record over a certain period of time.  And, of course, that understates -- that undercounts it, right, because a lot of plaintiffs, as counsel said, sometimes -- you know, why file a suggestion of death if the survivor doesn't wish to pursue the litigation anymore.  Close the file and that's it.  You don't file a suggestion of death.  So plaintiffs are dying at a great rate.

We respectfully renew our request for suggestion of remand, and, Your Honor, just to protect our clients' rights, in view of this rate of death and attrition in the MDL and in view of the length of time that the case is pending, Your Honor, I hope will understand, that we will have to -- we're going to file a motion in front of the panel because our motion has been pending so long in this court.

So I don't think there's any amount in controversy issue, and I don't think that any certification --

THE COURT:  Wait.  I hope you don't think that I'm just not addressing your motion for remand -- your suggestion for remand.  There's a method to the madness here in this

46

case.  This has been very frustrating for the Court to have to deal with this matter for 11 years.  I've had cases -- Bellwether cases set for trial, took two or three weeks out of my calendar to block it out, and then on the eve of trial, we all know that, these cases disappear.

My discussions with the magistrate judge on this matter over the years, there has been some strategy here among the Court as to how we're proceeding here.  And as you can see from yesterday, 1,300 cases were settled in this MDL.  So you can do whatever you want in front of the panel.

MR. SIEGEL:  I don't dispute any of that, Your Honor, but our duty to our clients -- I mean, we have had this motion pending for -- for over two years and --

THE COURT:  I'll just deny it today.

MR. SIEGEL:  Thank you, Your Honor.  Then we'll -- we'll file a motion with the panel, and we'll consider our motion in front of Your Honor denied.

There are still -- after the Adham's cases, there are still over 3,000 cases pending.  We're going to talk about -- Your Honor mentioned Bellwethers.  Our position is that when those cases -- when the Bellwethers that were not tried disappeared for one reason or another, limitations or the plaintiff simply didn't want to try it, that was a win for Cook.  That was a Bellwether that accomplished its purpose.  It accomplished the exact same thing that would have been

47

accomplished had they tried it and won.

Cook now can conclude that plaintiffs don't want to try low value cases. Fine. Don't make us an offer. That's the lesson of the Bellwether. The process worked. And that is our -- that is out feeling about it. And, Your Honor, of course, I don't -- I don't mean to be at all disrespectful of the Court's stewardship of this case, but we hope Your Honor understands that we just have to protect our clients' rights, and there are still 3,000 plaintiffs who are entitled to remand. Why? I'm not going to reargue this, but because everything that sort of can be commonly done has been done.

I guess they're going to file 49 more motions on the law of learned intermediary in 49 other states law, maybe, one every few months. I mean -- anyway, that's where we are, Your Honor, and if Your Honor feels that a certification for amount in controversy is still warranted, then we hope you'll accept ours.

MR. MARTIN: Your Honor, could I add just one thing?

THE COURT: Sure, Mr. Martin.

MR. MARTIN: Practically speaking, if -- if this new screening order is granted, it's going to -- I want to speak about the settlement -- you know, the settlement discussions, right, and this is why I'm bringing it up. This is a really big burden to -- every time we have to go through every one of our files and go through -- and call every one of these

48

clients, and you finally get ahold of them, and some of them are dead, and then you dig up the family. That's a bad terminology. I'll withdraw that. I've never asked if we could leave something off the record but -- no, but it's a huge burden, and it is -- the last time that it happened, it probably took about three hours per client, and that's lawyer hours mainly, right? So I'm just suggesting that if we go through this process and then -- and I know with the numbers of cases, some of these -- some of the lawyers who do have large numbers of cases, including -- including my firm, it's going to be -- it was a six -- probably 6 or 7-month process -- 5 to 7-month process before. It's going to be the same thing if they really want accurate information. And I'm just suggesting that I think there has been some -- as of yesterday, has been some movement as far as the possibility that settlement can occur, whether it's the whole shebang or whether it's just bits and pieces, but another six months process of busy work, which is what it is, that's not going to move the ball with respect to getting this litigation settled.

Everybody has all of the information they need, and I think that Judge Baker would probably agree with that to the extent he's been made aware of what we know and what they know. I don't think this -- this is not going to do anything but really cause some significant problems, if we have to go through another form of busy work for another six months

before 3,500 cases or so get through this. And then we -- and then when are we going to go back? Is this necessary in order to go back and discuss with Judge Baker? It's not going to move the ball. It's going to pull the ball -- it's going to -- there's going to be fumbles. Thank you.

THE COURT: The easiest thing for me to do in this case, and I've -- for years is to just remand -- go to the panel and suggest a remand. I'd be done with it. Magistrate Baker would be done with it. Southern District of Indiana is one of the busiest districts per case weighted per judge in the country. I'm busy. All my colleagues are busy. Certainly Judge Baker is extremely busy. The easiest thing for me to do -- and I could have done this years ago -- is say, you know, hey, I'm tired of this. Don't want to do it anymore. But is that the right thing to do? I mean, my staff, the lawyers on my staff have devoted hours and hours of time. Ben, you talk about your staff investing hours. Mine has too.

And this was a volunteer job on my part. I got called by the chairman of the panel and said would you be willing to preside over this? There might be 400 cases or so. Well, that didn't quite work out that way.

So the complaints to me about me not addressing motions, I understand that as well, but if the -- if you go to the panel and the panel wants me to remand it all, good-bye

50

me.  Good luck to you all on that.  But this is -- you know, I wish this case had been resolved and settled 10, 15 years ago, even before the MDL was created, that all these cases had been resolved even before the MDL was created, but it wasn't, and I'm dealing with it now, and I'll continue to deal with it, assuming you want me to.  Apparently the plaintiffs' steering committee doesn't want me to, and that's fine as well.  But I have an obligation as the presiding judge in this MDL to try to move it along to get it to a resolution.  It's been frustrating.  And, of course, this is one of the larger MDLs and has been in the country for many years.  At one point we had over 10,000 cases, and what are we down to now?  4,500 or 3,000 cases or whatever.  So we're making some progress.  And as we all know, trying to resolve 10,000 cases can't happen in a short period of time.

Plaintiffs' lawyers, rightfully so and practically speaking, want to move these cases along.  I talk to plaintiffs' lawyers all the time, and I say, Mr. Smith, you're a great lawyer.  I never see you in my courtroom.  And they say to me, Judge, if you see me in your courtroom, I'm losing money and -- because they have to move their cases, and I understand that as well.

And, of course, the defense has to represent their clients as well, and they'll settle a case if the damages and the cause of action and there's causation that justifies it,

but if there's not, then I understand why they may be hesitant to go ahead and settle cases.

You know, we all know cases that have been termed nuisance value cases. Well, there's some -- some folks who don't go by that concept of getting cases resolved. So in any event, as I say, look at all the docketing in this case. Probably 50,000 docket entries maybe that our clerk's office has had to docket and spend time on and docket.

So you guys talk about spending time on things, the Court has spent an incredible amount of time on this case when I could be doing other cases. And as I said when I was frustrated, I block out two or three weeks of my calendar, and then the case disappears. Well, then I've lost because it's hard to schedule somebody in. Hey, this case just settled two weeks -- or last week, can you come in? Sorry, Judge. Can't do it. So then I've got empty time on my hands.

So plaintiffs' steering committee, do whatever you want to do with the panel, and we'll go from there on that. So that's enough of my discussion. And I know you all would like to have this matter tidied up and put to bed as well, and I know you're all working hard on it to do that, and, of course, Magistrate Judge Baker is as well, and I wish him continued success on this.

District judges, as we know, don't become involved in settlement discussions unless we have to at some point in

52

time.  I've done that over the years.  When we get to the eve of trial and there's some stubbornness on both sides, we jump in, but I'm hesitant to do that in any case as well so --

Okay.  I'll take the motion for new screening order under advisement.

All right.  Cook's defendants -- Cook defendants motions to adopt a second Tulip Bellwether plan.

MS. PIERSON:  Thank you, Your Honor.  Good morning.  Andrea Pierson on behalf of the Cook defendants.

Your Honor, we appreciate the opportunity to be heard on the request for a new Bellwether plan, specifically for Tulip trials that involve cases alleging perforation.

And I should say on -- at the outset, following up on the comments that Your Honor just made, we're very grateful for the time and attention that you and your colleagues have spent on this MDL.  We know it is no small undertaking to do that.  We share your frustration with the inability to get to Bellwether trials in this MDL over the course of these many years, and as Your Honor mentioned, and you may recall, the Court has selected ten cases for Bellwether trial.  Eight out of ten were either dismissed or summary judgment was granted on those cases over simple things like the statue of limitations.  We know that trials advance the ball in an MDL.  It's universally true.  And we know that there is clear disagreement between the parties about the perforation

53

category of cases and whether those cases have any value or what that value might be.

Your Honor also is well aware of the fact that no Tulip case has been tried in this MDL, and we discussed this issue, in fact, back in February of 2024, that based on the statistics and the MDL, over 50 percent of the cases involve Tulip -- the Tulip product, and more than the 50 percent of the cases before Your Honor involved this Category 7(e) of perforation.

In February of 2024, we presented to the plaintiffs and the Court a plan to get to Bellwether trials that would allow us to determine values of cases that allege symptomatic perforation in the Category 7(e) and simultaneously would allow us to address the Tulip product itself. That includes not just trials of those cases, but, of course, there will be crosscutting motions within those cases that can impact the whole body of Tulip cases. So there are lots of reasons relevant both to settlement considerations and relevant to determining issues that cross cases throughout the MDL that are important work that remains to be done within this MDL, and that's why we asked for a Bellwether plan back in February of 2024 to address those things.

You may recall that there was back and forth between Cook and the plaintiffs in the second and third quarter of 2024 about the Bellwether plan. The Court then adopted CMO-32

and 33 so that we could call those cases, separate the wheat from the chaff on the amount in controversy and get a clear listing of which cases fall within the 7(e) category that could be eligible for Bellwether selection.

So that work happened in the second half of 2024 and the beginning of 2025, and that work was very productive. As you heard from my colleague, Mr. Lehr, there were hundreds of plaintiffs who apparently elected not to pursue their claims. There were many plaintiffs who elected to pursue their claims and certified so that we know that they meet the amount in controversy and can be selected for Bellwether trial.

So that's really what brings us here today, Your Honor, is our request that we proceed on a track that pushes cases to trial so that we can answer those important questions, important legal questions, and important questions about the value of those categories of cases, if they have any value at all.

We submitted to Your Honor and to plaintiffs a proposed Bellwether plan that would allow us to work up four cases through discovery toward trial. I hope we would get to at least two Bellwether trials among that -- among that group, but we've suggested a broad net in terms of selection of cases and discovery workup so that hopefully we can actually get to trials this time.

The plaintiffs responded to that plan. They had some

changes that they proposed in terms of timing.  They also have some objections related to specific parts of the plan that I'd like to talk through you with you, but we did file last night, Your Honor -- and I brought a copy with me in case it's helpful -- we filed reply in support of our Bellwether plan, and Exhibits A and B to that pleading include a clean version of Cook's proposed plan, and it also includes a red line version that shows the remaining changes that the plaintiff suggested that Cook disagrees with.  I have copies of those things, if I may approach, if it's helpful, Your Honor.

THE COURT:  Okay.

MS. PIERSON:  The top copy is the clean copy, which is Exhibit A to the brief we filed last night, and then the bottom copy is the red line.

THE COURT:  I guess maybe -- and I've wondered about this before.  Why can't both sides just sit down and say, you know, this would be a really good case to try?  And pick one and let's try it.  I mean, there has to be a case there that the plaintiff thinks is really a good case, and you don't think is such a good case, or you think it's a good case for your side.  I mean, aren't there cases out there like that that, you know -- hey, this case might have some settlement value.  We think this is the value.  Other side thinks this is the value.  Let's see what a jury is going to say about this particular Tulip case.  I mean, isn't there --

56

MS. PIERSON:  I think there is an opportunity for that.

THE COURT:  And say, Judge, we picked this case.  We picked this one case.  Set aside a couple weeks and try it.

MS. PIERSON:  I believe it's going to take more than one case, Your Honor, simply because there are factual variations between the cases.  To set values and to address the legal issues that cross the Tulip cases, I think it will take more than one.  I believe it will take at least two, and that's what Your Honor previously said Your Honor would do back in February of 2024.

THE COURT:  Pick two cases.  Pick three cases.

MS. PIERSON:  To your point --

THE COURT:  Just give me some cases to try.

MS. PIERSON:  And that's what our plan gets you to, Your Honor.  To your point, we have had other MDLs where we've been able to agree on cases that are representative for trial, but that process can't happen by looking across 3,000 cases.  It's -- it's not practical, and respectfully, we'd all be mired down forever trying to reach an agreement.  That's why the random selection of 24 cases gets us to a smaller objective pool, and then among that pool, after each side strikes the cases that they would never agree were representative, that leaves us with a smaller pool.

The plan that we've proposed has us brief to you

which cases are representative for your selection, but there is a moment before that where the parties can sit down and simply try to agree, and that's happened in the past.  Many times both sides will suggest the same case or some overlapping cases.  We may be able to agree on a couple of cases, and there may be some others that we -- that we don't agree on.  But the pause that you're suggesting where the parties actually confer and see if they can reach agreements so that Your Honor doesn't have to make that decision, that can happen under this plan, but it's not practical to think that it will happen among 3,000 cases or 1,500.  It's more practical to say let's randomly select 24.  Let's go through the striking process on cases we would never agree on, and then let's have a conversation before we submit briefs to Your Honor on what's representative.  We'd love to reach agreement with plaintiffs on that.  It helps both sides to agree that the case is representative among the defined category that Your Honor intends to try so -- and we'd welcome that conversation with the plaintiffs.

THE COURT:  Well, as I said earlier here, of course, I'm not involved in settlement discussions.  I can only assume here that settlement discussions aren't going to go much further on perforation cases without Bellwether trials.  Is that --

MS. PIERSON:  On that category of cases, that's

right, Your Honor. Although we've been able to reach agreement with some of the plaintiffs or some of the inventory holders, and we continue to have conversations. That category -- that perforation category is a real sticking point in these conversations.

You know, you mentioned the plan for the MDL and for a couple of years now, we've talked about the importance of proceeding on parallel tracks in different ways in this MDL, and I think we've done a very good job of that. You know, one track is to address the crosscutting motions, which is the core of the work of any MDL that motions that affect all of the cases. That's one of the motions that Mr. Jones argued this morning. We've been doing that in spades, but we haven't done that with respect to the core issues in the Tulip cases yet, and that's an important track that has yet to be resolved and that the Bellwether plan process helps us to resolve.

We have an important settlement track, and we've been doing our darnedest to do the good work that needs to be done. We've had good cooperation from many lawyers in proceeding in that settlement track, but there is a third lever here that the Court has to pull, and that's Bellwether trials, and certainly in the case of the Tulip products and in the case of perforation alone. We have not had Bellwether trials of that -- those types of cases at all.

You know, putting -- putting our foot on the gas

59

pedal on that third lever, Your Honor, that helps the second lever, the settlement lever. It informs my client certainly, and I believe it informs the plaintiffs' lawyers too, the group who believes that there is some significant value to that bucket, that we disagree with. There's a group of plaintiffs' lawyers who believe that there is a theory of defect for the Tulip product. We disagree. That product has been on the market four decades, and, you know, the FDA has cleared it multiple times. So we welcome the opportunity to have a jury decide those very important issues if Your Honor does not decide those issues as a matter of law in the first instance, and there are key issues related to the Tulip that we will put before Your Honor that we think can be decided as a matter of law.

So I can talk about the disagreements on the plan itself, but I think the fundamental question of do we need a plan or not is very clear. This is an important third lever and how Your Honor is pushing this MDL to ultimate resolution, we're grateful for your patience in that process, but there's been a lot of hard work to get to this -- to get to this point. We are not one of the largest MDLs in the country anymore. There are other MDLs that are older than this MDL.

THE COURT: I know.

MS. PIERSON: And, you know, it's thanks to the good work of all the lawyers here on both sides --

60

THE COURT:  Absolutely.

MS. PIERSON:  -- that we've gotten to this point, and, of course, to the Court and your colleagues as well.

So let me talk about what the three areas of disagreement are on the plan itself, Your Honor.  The first is how are the cases picked, and we advocate for a random selection process.  Your Honor may remember that the very first selection of Bellwether cases was done by both sides, and it did result in this barbell affect where we had cases that Cook loved.  We had cases that the plaintiffs loved, and there was really nothing in between those cases.

Courts in the last decade have almost uniformly moved to random selection because of this barbell problem where both sides pick the cases that they love, and really, there is nothing in between that is truly representative.

So I think in the last plan, we surrendered to the random selection process.  I think it was effective.  It got to cases that were representative.  Unfortunately, those were cases that the plaintiffs chose not to pursue, by and large, but they were representative of the greater MDL.

So our view is that the Court should randomly select 24 cases, and our plan lays out a process that gets us to a smaller group, and then ultimately, to four cases for discovery and workup of the cases.

The second disagreement that the parties have relates

to Lexecon and how we should handle Lexecon strikes. And Your Honor may recall from our discussions now three years or so ago, two or three years ago, it is our view that most of the plaintiffs in this MDL do not have a Lexecon right, that they chose to directly file their cases in the Southern District of Indiana, and that as a consequence of that, there is nothing to be waived in those cases.

The parties disagree on that point, and we've crafted a plan that effectively puts that issue to the side for now so that we can move forward and get to trials.

Ultimately, as we've noted in our papers, Judge Fallon and many courts have recognized the ability to use a procedure in a Bellwether plan that preserves a plaintiff's ability to assert a Lexecon waiver, and at the same time, incentivizes plaintiffs to move their case to trial in this Court. So we proposed a process by which any plaintiff whose case is picked can refuse to waive Lexecon. They absolutely can, but we've also included a process that gives Cook an additional strike for those so that -- if there are more than four of those, so that it's not used in a way that manipulates the pool only to cases that the plaintiffs prefer.

You always have the option, of course, Your Honor, to try cases through interdistrict transfer. We think that's not necessary and that using this kind of a process, the plaintiffs in combination with the PSC can talk and

62

thoughtfully decide if there are cases where the plaintiff doesn't want to have their case tried here, but we do need a system that incentivizes us to actually move to trials here, and we think what we've proposed does just -- does just that.

The last area of disagreement, Your Honor, is the number of cases to work up in full discovery, and we're very close here.  Cook has asked for four cases to be worked up. The plaintiffs have asked to reduce that to three cases.  We think given the track record of dismissals, we're better off to work up four in the hopes that we get to two or so trials, but, you know, if we happen to have four cases that are ready for trial at the end of this, we're prepared to try those four if the cases aren't resolved.  I hope we get to at least two trials because I think that's what it will take for us to better understand the issues and values in this category, but that -- relatively speaking, that's a -- that's a pretty minor disagreement.

So that's the heart of the -- of the disagreement between the parties.  There's only one last thing I want to note, Your Honor, and this is a little bit off topic, but in the papers on the Bellwether plan that the plaintiffs submitted in their response and then also Mr. Siegel's comments today reference this need to jump to remand and dispense with the possibility of trials because people are dying, I think the statement is that plaintiffs are dying

every three days.  Your Honor, I have to set the record straight on that comment, which is just a blatant falsehood.

The calculation of that comes from the filing of 40 notices of suggestion of death filed in 2025, but of those cases, only four of those plaintiffs died in 2025.  I think it's a disingenuous representation to make to this Court that there is some need based on deaths of plaintiffs to do anything to make any decision.  So I just had to set the record straight on that point, Your Honor, because I think it is disingenuous to this Court to make that representation.

THE COURT:  Thank you.

MS. PIERSON:  Thank you, Your Honor.

THE COURT:  I need to take just about a five-minute break here.  I've got some folks in the back that I was supposed to see just a few minutes.

Mr. Childress, would you and your folks come back to the chambers, and I'll get you on your way and then give these folks an opportunity to take a little break as well?

THE CLERK:  All rise.

(Recess taken from 11:14 a.m. to 11:27 a.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  Okay.  Thanks for taking a little break there.  The United States Attorney here and some new recruits, and they've been waiting for a while, and I just wanted to move them -- move them down the road.

Plus, I'm sure everybody probably needed a break anyway, so that's all good.

All right.  Ms. Pierson, thank you for that.  Who's going to come up on the --

MR. SIEGEL:  Just very briefly, Your Honor.  I'm going to address the last sort of off topic point or comment made by Ms. Pierson and then Mr. Williams is going to argue the Bellwether motion.

THE COURT:  Okay.  Sure.

MR. SIEGEL:  In respect to her statement that this is an outright falsehood that three people are dying a day --

MR. MARTIN:  One every three days.

MR. SIEGEL:  Not three a day.  One every three days. That would be bad.  What I've -- what I've given them -- and I'm sorry.  I only have one copy of it.  I've presented it to defense counsel, and I can hand it up to the Court or we can file it, is the Pacer docket sheet for the last 90 days.  You can tell Pacer, you know, 1 year, 90 days, whatever, and I printed it out, and I highlighted all of the suggestions of death that have been filed in the last 90 days, and there are 17 of them, so it's -- it's about one every five days or one every five days and a half or something like that.  It is true that not all of those people died in 2025, but maybe they died in 2024, which would simply add to the death total -- that however many suggestions of death were filed in 2024, there

65

would be more than those.

So what we have is suggestions of death for people now as the case gets older. Of course, these are mostly implanted in older people to begin with. As the case goes on, they get older. They're dying without their day in Court.

As counsel -- as defense counsel also said when arguing the amount in controversy screening order motion, he said a lot of -- when they talked to plaintiffs' lawyers who can't fill out -- who don't supply forms or certifications for their clients, frequently it is because they died and the estate just doesn't want to pursue the litigation anymore, and they're out of contact or they simply are not going to sign the certification because they've dropped the case.

THE COURT: Sure.

MR. SIEGEL: Why even file a suggestion of death in that instance? Mr. Martin can tell you and any other plaintiffs' lawyer in this case can say why file a suggestion of death when the case is not going to go forward.

So I don't believe at all that this is a falsehood. And if we're off, and if it's four -- one every four days instead of one of every three days --

THE COURT: I'm not taking it as a falsehood. I'm taking it as a difference in interpretation.

MR. SIEGEL: Thank you, Your Honor. The point is, there are -- there are, better or for worse, the plaintiffs --

66

plaintiffs are dropping out of this case by dying that we respectfully suggest --

THE COURT: Just like that Senator from Ohio said. We're all going to die.

MR. SIEGEL: Yeah. She did say that, yes. Thank you, Your Honor.

MS. PIERSON: I object to that, just to be clear.

THE COURT: Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor. After more than a decade, this MDL has done and accomplished precisely what MDLs are designed to do, and that's avoid a duplication in discovery and coordinate pretrial proceedings. Through the work of the lawyers, and particularly the Court and its staff, we have accomplished those two goals. We've done it -- to use Ms. Pierson's phrase, we've done it in spades, Your Honor. But an MDL was not designed to keep cases perpetually locked up in a holding pattern. The Lexecon case was pretty clear. The Supreme Court said the plaintiffs are entitled -- it's a statutory right. They are entitled to try their cases before their home courts, and we're going to place aside the Lexecon issue that Ms. Pierson raised that we haven't briefed in front of Your Honor.

But after 11 years, I think it's time to recognize what the evidence has shown us, and that's the Bellwether trials have outlived their usefulness in this litigation. The

67

fundamental --

THE COURT:  As we have discussed before, this is actually two MDLs.  Tulip -- there's two devices there.

MR. WILLIAMS:  There are.

THE COURT:  Actually, three.  So it's a little different.  You know, if there wasn't a Tulip here, you know, we've done everything, basically.

MR. WILLIAMS:  There were -- in the Bard MDL, Your Honor, there were six or seven different iterations of the filter.  They tried two cases.  Judge --

THE COURT:  Campbell.

MR. WILLIAMS:  -- Campbell, thank you, Your Honor, saw the writing on the wall and remanded cases and the litigation was resolved.

The purpose of a Bellwether trial is to do a couple of things.  It's to highlight strengths and weaknesses of cases for the parties and it's to set values for the parties. But as Judge Fallon in the article that the defendant's put into their paper last night, which was filed two minutes before tip off, so I was reading -- I was reading Judge Fallon talk about Bellwethers and MDL trials last night, and one of the things that he talked about --

THE COURT:  Wait a second.  You're telling me you were reading the brief while the basketball game was on?

MR. WILLIAMS:  I had one eye on each.

68

THE COURT:  I see.  Okay.  All right.

MR. WILLIAMS:  But, Your Honor, what that article said and what Judge Fallon recognized is when parties are unwilling to extrapolate what happens in a Bellwether trial to the docket as a whole, Bellwether trials are nothing more than an exercise and wasted money, time, and resources.

And since this litigation has started, there's one thing that has been constant, and it's Cook's position when it comes to the settlement of plain old perforation cases.  They have told us since day one they're not going to pay those cases, and their reason is, well, then every time we put in a filter, we would have to essentially give a coupon to somebody to come back and get their perforation damages.  We're never going to pay those cases.

So if they're never going to settle those cases and they're never going to pay those cases, trying a Bellwether case is an exercise in futility.  It's not going to move them.

But more importantly, they settled 600 Tulip cases yesterday, Your Honor.  They don't need more information about the value of Tulip cases.  Not only did they settle 600 yesterday, they've settled hundreds before that, and if a Bellwether trial is supposed to teach us about the value of a case and the value of a case involving this specific filter --

THE COURT:  These 600 cases include perforation cases?

MR. WILLIAMS:  That, I don't know, Your Honor, but I would assume so.  I mean, just based upon the makeup that they gave us in their pie charts earlier, it looks like 50 percent or so of the cases left are perforation cases.  I would imagine that some of those 600 Tulip cases were perforation cases.

MR. MARTIN:  The answer is, yes, because I talked to Basil before they ever went up there to ask him the different categories of cases he had, and I think a majority of them were perforation cases.

MR. WILLIAMS:  And so if they're not willing to extrapolate the data, and on the other side, they're actually settling these cases, then why are we trying another one of these cases?  Why are we spending the money to do that when they already have the information that they need to settle the cases?

Given these realities, another Bellwether trial is just going to kick the can down the road another 18 months, and whether it's one every three days, four days, five days, or six days, we're losing plaintiffs at an alarming clip, and these are plaintiffs with real injuries with real cases who literally died waiting for their day in court.

And if the purposes of a Bellwether trial are not going to be satisfied in trying it, then why are we putting these people through the extra delay?  What am I supposed to

70

tell my client who has been waiting for nine years when they say, well, Joe, am I going to -- you know, what's happening next? Well, it's another 18-month pause on your case. He says, well, I have a Celect case. I have to tell him it's another 18-month pause on his case.

We've had -- as these plaintiffs die -- I had a case several -- several months ago when we were going through this. She had an open procedure. They tore her vena cava, and she suffered greatly, but she died last year, and when I talked to the family, they said, we have lawsuit fatigue. We don't want to do it. And not only are these people dying, they're dying and it's inuring -- the benefit is inuring to Cook.

After 11 years, justice delayed is justice denied, and I think the -- one of the most difficult things about this is if we go down this road and try a perforation Bellwether, whatever you want to call the value of that case, we can acknowledge that it's the lowest category of injury in the MDL at this point. So what are we doing? We're taking the people who are most severely injured who have suffered the most and we're putting them at the back of the line and saying you have to wait again another 18 months while we go through a Tulip Bellwether plan to try a case that has no bearing on the value or validity of your claim.

The Bellwether process has had its chance. It's had two trials. One was -- one was plaintiffs' verdict. One was

a defense verdict.  It didn't change the state of play.  We've had, as Mr. Siegel and Your Honor have pointed out, cases that have come and gone either by motion practice, whether it's on a limitations issue or otherwise or an attempt to dismiss. And, again, those are Bellwether data points that can inform the parties as to the value of these cases.

The only thing I think that stands between the thousands of cases that are left and a resolution is our continued insistence that we go down this Bellwether path, and I think at this point what needs to happen is we need to be talking about two things.  We need to be talking about how can we settle cases, and we need to be talking about how do we get cases back home to their home jurisdictions.  And I don't think that a Bellwether trial, particularly when we already have the data we need and the parties are unwilling to extrapolate that data to the larger docket -- and I'm not blaming Cook only.  I think that the plaintiffs bar -- you know, the people who have their cases out there are the same way.  If we lose that Bellwether trial, they're not going to suddenly dismiss hundreds of cases that have been waiting this long.

And so for those reasons, Your Honor, we ask that we do not set another Bellwether trial, and we instead try to do things that move this MDL toward a resolution.

THE COURT:  Thank you, Mr. Williams.

MR. WILLIAMS:  Thank you, Your Honor.

THE COURT:  Ms. Pierson?

MS. PIERSON:  Thank you, Your Honor.  Just briefly. I don't think I need to say any more on this point about plaintiffs dying, but I would note that there is no evidence that any group of plaintiffs in this MDL is dying at a rate that's higher or different than the population at large or any other MDL.  I think this is just a real red herring.  But, of course, there is a remedy when plaintiffs believe that they need an exigent trial setting.  They can file a motion with you asking for an exigent trial setting.  And you haven't seen a single motion like that in all of this time.  So I feel like this issue -- we've talked a little bit too much about it already.  I think you understand our position on that issue, but there's not something about the plaintiffs' health in this MDL that compels the Court to act in a way than it otherwise would in this MDL or in any other.

Setting that aside, though, focusing back on the plan, really the only argument that I heard from Mr. Williams was whether we need the Bellwether plan or not, and we've addressed that issue in our papers.  I think Cook's settlement record speaks for itself.  We've done our part to reach agreement with plaintiffs where we can.  There's a group of plaintiffs' lawyers, some of whom are on the PSC, where we don't have a meeting of the minds as to the value of certain

types of cases, that includes the Tulip cases and that includes Category 7(e) perforation cases. And just as a reminder, Your Honor, the 70 cases are symptomatic perforation cases and that includes organ perforation cases. I don't believe you've tried that kind of a case before. You certainly haven't tried a Tulip case before. We did try the *Hill* case in the very beginning, you may recall. That was an organ perforation case. We didn't have this form of categorization back then, I don't believe, so I'm not -- I'm not sure where she would have fit in the 7(e) versus the 6 bucket, but that's really neither here nor there. That was back in 2017. We certainly need to know today for the parties where there is no meeting of the minds on the legal issues or the values. We need answers to those questions, both for that injury bucket as the whole and the Tulip bucket of cases too, and there's information to be -- to be learned by both sides through that process.

Even setting that issue aside, though, Your Honor, we need Bellwether trials and that process to get the important legal issues before you that must be decided about these cases. Your Honor hasn't ruled on 702 motions related to Tulip experts. You haven't considered the question of causation, which will be important in those cases. You haven't considered the question yet of defect. You know, as I mentioned earlier, we will put before this court as a matter

74

of law the question of whether there is a defect in the design of the Tulip. We believe there is no evidence to support that. If Your Honor finds that there's a genuine issue of material fact, then that issue ought to be decided by a jury. So those are the reasons that we need a Bellwether plan.

I talked a moment ago about the three levers that this Court has pulled over the past few years, and those levers have been successful. Hundreds of case have been dismissed. Thousands of cases have been settled. We've seen real progress. Particularly in the last couple of years we've seen real progress. The one lever that we have not been able to get to to put more pressure on both sides and to give more information to both sides is the lever of Bellwether trials. And Your Honor noted in February of 2024 that you would not remand the cases, that we needed to get to a couple of trials in this bucket, and it's time. It's time.

We gave the plaintiffs our plan, you know, now going on a year and a half ago, so the delay in getting to this part is not from the defendant's side, respectfully. We want to get to Bellwether trials, and that's what our plan gets us to.

If the plaintiffs want to get to those faster, we're prepared to move faster, but we think that's an important next step and an important part of these three levers that Your Honor has been pushing under for the last few years. Thank you, Your Honor.

75

THE COURT:  Mr. Williams indicated that you yesterday settled 600 Tulip perforation cases.

MS. PIERSON:  There were Tulip perforation cases among the group of cases that we settled with Mr. Adham.  You know, we've -- the contours of that settlement are not final, Your Honor, so there's work yet to be done there, but there are cases among that group.

THE COURT:  You broke my heart there telling me that this may not be the case.

MS. PIERSON:  I believe it will be the case.  I believe it's the case.  We had a very productive day with Judge Baker, and he has been excellent in helping us.

THE COURT:  So you've been able to evaluate some of those perforation cases, Tulip?

MS. PIERSON:  We've evaluated Mr. Adham's inventory.

THE COURT:  You didn't answer my question.

MS. PIERSON:  Our settlement discussions are confidential, Your Honor.  There's only so much I can say.

THE COURT:  I understand that.

MS. PIERSON:  But I agree that there are Tulip perforation cases among the cases that we've resolved with Mr. Adham, and that's probably true for a few other inventories that we've settled too.  That's why I said, Your Honor, there is a group of plaintiffs' lawyers that we can reach a meeting of the minds on what their inventory is worth,

and that includes Tulip perforation cases.  But what remains before you in the 3,000 cases are the group of plaintiffs' lawyers where we've not been able to reach a meeting of the minds yet.  Maybe we will in the coming weeks and months.  I'm certainly hopeful and optimistic, but there is likely to be some group of lawyers, where absent more information and absent rulings on crosscutting motions that affect that group of cases, we won't be able to reach a meeting of the minds. We need your help there, Your Honor.  And the Bellwether plan gets us to that.

We talked about the work of an MDL, and as you know better than all of us, a big part of the work of the MDL is to push cases to Bellwether trials in part so that the Court can address the legal issues that those cases present in a way that can be applied to any cases that are -- that are remanded.  We haven't done that with the Tulip cases at all. So that's an important part of the work that remains to be done by the parties and by this Court, and that's why we need a Bellwether plan.

We have been ready to move quickly on the Bellwether plan.  We continue to be ready to move quickly to get to Bellwether trials, but, you know, we need a process to do that, and I didn't hear any objection to the process. Specifically, it was to -- do we try cases at all?  Our view is that we need to.  Your Honor reached that conclusion in

February of 2024. Nothing has changed since then. Thank you, Your Honor.

THE COURT: Well, I hope you -- in your further discussions with Judge Baker, that the considerations you gave in these perforation cases in the Adham's inventory, I guess that's what it is, will extend to other inventories as well.

MS. PIERSON: We are hopeful that other lawyers on the plaintiffs' side see things the way that Mr. Adham saw them.

THE COURT: And we can go from there on that and -- you know, I don't know. Maybe I'll -- maybe remand might be best. I don't know. As I said, I'm frustrated that this case has been here this long. I mean, it -- as judges, we like to move cases as we can, and this has taken up a significant amount of my time over the years and -- well --

MS. PIERSON: I understand your frustration, Your Honor, and certainly none of us can walk in your shoes and know precisely how difficult it has been over these last few years dealing with this, and for that, I'm extremely grateful. Your staff and you have spent a great deal of time on this.

To your point on remand, you know, is it easier to sign a piece of paper that says remand everything? Sure, it is, but that's inconsistent with the statute, and the statute that charged this Court, all MDL courts, with overseeing discovery and also addressing the issues that prepare the

78

cases for trial on remand.  This group of cases is not ready for trial on remand.  It's not.  There's a lot of work that we have not yet done on the perforation bucket across the two types of filters or on the Tulip bucket in particular.

You know, when Your Honor decides -- if we're not able to reach resolution through motions practice or settlements, once we get through this Bellwether plan, if Your Honor reaches the conclusion that that's the right time, then we'll come to the Court and lay out a plan that moves the cases to a place that they can be ready to be transferred to other courts if they don't properly belong here, but that's a step that happens after we try a couple of Tulip perforation cases.

Our plan gets you to those trials in the first quarter -- beginning in the first quarter of 2026.  My hope is this time next year we're having a very different conversation because the second and third lever that I told you about, settlement and trials, has been successful.  So we're not asking you to keep this MDL in perpetuity, Your Honor.  You don't want that.  We don't want that.  The plaintiffs don't want that.  But I think the proof is in the pudding in the sense that we've gone from 10,000 cases to now 3,000 cases, and much of that progress has been made in just the last two years while you've ruled on some really important motions, and we've worked hard on settlement with the lawyers that we were

79

able to reach settlement with.  So I understand the frustration.

My message to you is what you're doing is working. It's working.  We can see that in the docket.  We can see it in the dismissals.  We can see it in the resolutions.  It's working.

But there is -- we are at a pivot point I think right now in the sense that unless and until the lawyers who are holding inventories who have not yet been willing to reach a meeting of the minds, unless and until they and Cook get information about the values of what is more than 50 percent of the MDL and perforations and more than 50 percent of the MDL in Tulip cases, unless and until both sides get more information and rulings on that topic, I think we're going to have difficulty closing the deal on all of the cases.  I hope that the parties prove me wrong.  I hope that they reach a meeting of the minds before that.  We're certainly trying, Your Honor.  But I don't want to wait nine months and say, okay, that hasn't worked.  Now we need a Bellwether plan.  I think we've got to get moving on this part of your three prong strategy.  Thank you.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Your Honor, may I respond real quick?

THE COURT:  Sure.

MR. WILLIAMS:  Thank you.  Ms. Pierson has come to

80

this Court saying that we need Bellwether trials because they need data points, but when Your Honor asked her didn't you settle 600 Tulip cases yesterday, she would not give you a straight answer, and the reason she wouldn't give you a straight answer is because it cuts their argument off at the knees.  Bellwether trials are needed for data points.  They've settled, as she has just talked about or dismissed 7,000 cases, 6,000 cases, many of which are Tulips and many of which are perforation cases.

If anything, maybe it was just Judge Baker's magic yesterday.  I don't -- I don't put that possibility outside the realm, but for whatever happened yesterday, they settled 600 cases without the data points.  So maybe instead of working for nine months on spending money and time on Bellwether trials, maybe we should have meetings with Judge Baker firm by firm.  Maybe we should be talking about settling these cases that way rather than spinning our wheels on Bellwether trials that aren't going to get us any closer to the finish line.

THE COURT:  Well, thank you, Mr. Williams.  Maybe we can do both.  Maybe we can -- let me think about it -- set some Bellwethers, and then also, considering that a significant number of perforation cases were settled with one firm yesterday, maybe the firm's -- Ben and some of the other firms who have a significant number of perforation cases can

sit down with Andrea and her crew and say, okay, look.  What did you need with the Adham's cases to settle these cases, so we can look in our inventory and say we've got a case just like that, perforation case, and -- you know, I'm not telling you anything you don't know.

MR. WILLIAMS:  No.  I think -- I think that's a good idea, but what do we do, though, Your Honor, with half of this MDL that are Celect cases that have just been sitting and waiting when even Cook acknowledges in their papers that everything that's been done is -- everything that needs to be done with regard to Celect cases have been done?  And if you'll recall in our suggestion of motion -- or motion for suggestion of remand, I believe we limited it to Celect -- didn't we limit it to Celect cases?

MR. SIEGEL:  We limited it to Category 7 cases, but I recall that in the original argument on the motion, we said, Your Honor, at least you could -- if you want to pick a subset of those cases, it would be the Celect cases.

MR. WILLIAMS:  And maybe dual tracks that way, free these people who have been waiting with Celect cases for so long when there's nothing left to be done and allowing that tract to proceed as well maybe -- maybe helpful.

MR. SIEGEL:  Your Honor, I just want to pick up on something that Ms. Pierson said about how we've never moved for exigent trial settings, and she also said, well, the

82

plaintiffs aren't dying at a rate in excess of the general population. That's not our point. Our point is, the plaintiffs aren't dying at a rate in excess of the general population, but they are dying one by one, and they are -- they are lined up at this point, 3,000 of them, many of whom have completed pretrial proceedings entirely. I'm just focusing on the Celect people. So failing -- Your Honor denied our motion for remand. Maybe you're reconsidering it. But we hereby make --

THE COURT: I haven't put that in writing yet.

MR. SIEGEL: We will make -- again, on behalf of the PSC, we hereby make an oral motion for exigent trial settings of everyone in this MDL with a Celect filter -- actually, everyone in this MDL, period -- it shouldn't be limited to Celect filters -- who is over the age of 75 because they are -- there's no need for them after 11 years to sit at the back of the line while a few Tulip Bellwethers are selected. We'll follow this up with a written motion. Obviously, we think the proper alternative is to simply remand these cases, but if Your Honor doesn't want to do that and if the panel won't do that, then we're going to take Ms. Pierson up on her suggestion. Those people are entitled to some trial somewhere. I sort of believe that a plaintiff kind of has an inalienable right to try to get to court before he dies. Usually -- sometimes that can't be helped.

83

THE COURT: That's not a bad idea picking the folks who are over 75, taking them all out, presenting them to Cook. Life expectancy isn't that long anymore.

MR. SIEGEL: Nope.

THE COURT: I know. And those cases might be something that -- that particular inventory of 75 and above might be something that Cook might look at to --

MR. SIEGEL: They might, Your Honor, but only if they're set for trial. That's the reality. They're not going to settle any cases unless they're close to trial.

THE COURT: You never know.

MR. SIEGEL: Hope brings eternal, Your Honor. And there may be plaintiffs' lawyers who simply, you know, for whatever reasons properly or misproperly guided -- or misguided want to settle for different values than Cook has paid for plaintiffs' lawyers. Maybe that plaintiffs' lawyer is making a bad call. Maybe he's looking at it wrong but -- but that person is entitled to turn down that value and get to trial if all pretrial proceedings in his case have been completed, which they have at a minimum for the Celect cases. Thank you.

THE COURT: Ms. Pierson, on the --

MS. PIERSON: I don't have anything more substantive to add, Your Honor, other than the motion to remand that was filed that's in front of you is a different motion than

84

Mr. Siegel is making today. We obviously object to the motion he's making today as well and would appreciate a chance to -- he's said that they'll file something in writing. We'll, of course, respond in writing, if it's filed. But I just wanted to be clear, that's a -- that's a different motion than we've briefed and argued for the last year or so.

THE COURT: How about their thoughts that, hey, Celect is done? We're only interested in Tulip now.

MS. PIERSON: Yeah. I think there are a couple of important points, Your Honor. One, the motivation for that is that they say they want to get to trial more quickly and it's -- and as you have noted before, those plaintiffs aren't going to get to trial more quickly in another court than they will in this court, right? They go to the back of the bus in a different jurisdiction than they are here.

But second, the injury category that we're trying, the 7(e) symptomatic perforation, that's not a category that we have tried before. I don't know where *Hill* falls in the scheme of things, but that was one case that was back in 2017. So the cases that we're asking you to try and issues that we're asking you to decide apply to both the Celect cases and the Tulip cases. They're not unique to Tulip.

It so happens that the product will be Tulip trials and that will inform us on a different set of issues, but the category -- the injury category itself that both sides will

get information on applies to both types of filters.  So there is still work to be done in that category, and I think that's why Your Honor decided back in February of 2024 to handle these together.

THE COURT:  Would you be interested in that 75 and above inventory?

MS. PIERSON:  Yeah, we're happy to talk about that inventory.  We're happy to talk about any inventory.  In fact, we've talked with Judge Baker about, you know, the success of dealing with the Adham's firm yesterday.  I think that's a good model for something that we might do to address other inventories as well.  I think it's also possible that -- you know, these good lawyers represent the PSC, and it may be that there's more opportunity on a global level than there has been in the past as we've gathered additional information through inventory settlements.  So we don't set aside the possibility of reaching agreements in any way, and we will continue to work with Judge Baker diligently.  When we left yesterday, he said, okay, let's talk about what's next.

THE COURT:  I did talk with him after he sent me a note regarding your conversation.  We never talk about settlement, but from your last meeting with him, he expressed some frustration to me about where the parties were.  He was 180 degrees different today when I talked to him.  So he's hopeful, and he is more than willing.  I think yesterday's

86

meeting gave him a little bit more energy and a little bit more thought of moving these cases along, so we'll give him an opportunity to work with you guys as well on that.

MS. PIERSON:  We appreciate that, Your Honor.  Thank you, Your Honor.

THE COURT:  Okay.  Anything else today?

To the students out there, any questions about anything that went on here today?  We've got a great group of lawyers here, very experienced lawyers.  Any questions about how and why we do things?

MR. COOK:  No questions, Your Honor.  Just very fascinating to watch all of this.  Very much appreciate the opportunity.

THE COURT:  Anything?

MS. WEST:  Many questions that I will be asking afterward.

THE COURT:  Okay.  All right.  Well, good luck to you all.

THE CLERK:  All rise.

87

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CERTIFICATE OF COURT REPORTER

I, Elizabeth Taylor Culiver, RPR, FCRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


S/s Elizabeth Taylor Culiver        June 27, 2025
ELIZABETH TAYLOR CULIVER, RPR, FCRR
Official Court Reporter
Southern District of Indiana
Evansville Division