# Exhibit B

Cook Defendants' Opposition to
Plaintiffs' Motion for Suggestion of Remand of All Celect Cases

SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
UNITED STATES DISTRICT COURT

| | |
|---|---|
| IN RE: COOK MEDICAL, INC.,<br>IVC FILTERS MARKETING, SALES<br>PRACTICES AND LIABILITY,<br>LITIGATION | ) <br>) Cause No.<br>) 1:14-ML-2570-RLY-TAB<br>) Evansville, Indiana<br>) **May 2,** 2018<br>) 11:28 a.m.<br>) |

**Before the Honorable**
**RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
STATUS CONFERENCE

**For Plaintiffs:**                 Ben C. Martin, Esq.
LAW OFFICES OF BEN C. MARTIN
3710 Rawlins St., Suite 1230
Dallas, TX  75219

Joseph N. Williams, Esq.
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, IN  46204

Michael W. Heaviside, Esq.
HEAVISIDE REED ZAIC
910 17th Street NW, Suite 800
Washington, D.C.  20006

For **Defendants:**                  Andrea Roberts Pierson, Esq.
                                     FAEGRE BAKER DANIELS LLP
                                     300 N. Meridian St., Suite 2700
                                     Indianapolis, IN  46204


                                     J. Stephen Bennett, Esq.
                                     FAEGRE BAKER & DANIELS LLP
                                     110 W. Berry Street, Suite 2400
                                     Fort Wayne IN  46802




Court Reporter:                      Margaret A. Techert
                                     United States District Court
                                     101 NW Martin Luther King Blvd.
                                     Evansville, Indiana  47708

(In open court.)

THE CLERK:  All rise.  Court is in session.  Please be seated.

THE COURT:  Good morning.  We're here today in Cook Medical Inc., IVC Filters Marketing Sales Practices and Products Liability Litigation, MDL-2570.  It's case number 1:14-ml-2570.  Parties are here for a status conference.  Representing the plaintiff is attorney Mike Heaviside, Ben Martin and Joe Williams; and for Cook, Andrea Pierson and Steve Bennett are here.

The parties have filed a joint prepared agenda for our status conference and if we're ready to proceed, we can do that.  Who wishes to -- Ms. Pierson?

MS. PIERSON:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. PIERSON:  Thanks for taking us at a slightly different time than was planned and apologies for any inconvenience to you and your staff.  The first two agenda items --

THE COURT:  We just don't have as much time.

MS. PIERSON:  Understood.  First two agenda items --

THE COURT:  Ben has to get a plane and I think Joe has got to get a plane.

MS. PIERSON:  Understood.

THE COURT:  We'll get in as much as we can.

4

MS. PIERSON:  We don't need any argument on 1 and 2. We just wanted to alert the Court that they're fully briefed and ready for ruling at Your Honor's convenience.

THE COURT:  Okay.  Mr. Williams.

MR. WILLIAMS:  Thank you, Your Honor.  Just briefly. We forgot to put this on the agenda but during trial, I believe there were some motions filed regarding Dr. Jen Brown's notebooks and her notes that Cook withheld under a claim of privilege.  I believe docket numbers -- the motion was docket 7115 and plaintiff's response in opposition was docket 7140; and we just wanted to let the Court know that even though the trial ended, that's an issue that we do need resolved.

THE COURT:  Okay.

MR. WILLIAMS:  Just wanted to bring that to the Court's attention.  Thank you, Your Honor.

THE COURT:  All right.  No. 3, location of Brand trial.

MR. WILLIAMS:  Go ahead.

MS. PIERSON:  Your Honor, we're at the point in advance of Brand that we are prepared to sign contracts for hotels and things.  We didn't know if you have decided on a location for Brand or not, but it would be helpful for us to know that, if you have, so that we can make the appropriate arrangements.

THE COURT:  Okay.  What's the plaintiff's position on this?

MR. WILLIAMS:  Sure.  Your Honor, we would prefer to try the case in Indianapolis; and the reason being -- first, I want to say when we were down here for the Evansville trial, the city, the courtroom, everything worked very, very well. And so my concern is not really -- I mean, there are some logistical concerns but that's not why we want to advocate for an Indianapolis trial setting.

When Tanya Brand filed her lawsuit, she filed it in Georgia in her own community.  It got transferred to this MDL. That happens in these cases.

THE COURT:  Right.

MR. WILLIAMS:  She was placed in the discovery pool and she waived her Lexecon rights saying she would try the case within the MDL.  When she did that, though, she was under the impression, mistakenly or not, that the case would be tried in Indianapolis.  And there's a couple of reasons why that's -- that was critical in her decision making.

We saw, you know, in opening statements Ms. Pierson made a point to talk about how Mrs. Cook was born here in Evansville.  There are ties south of Indianapolis to the Cook Company that just aren't as prevalent in the Indianapolis market.  I don't think it's -- I'm saying anything that nobody doesn't already know but if you look at --

THE COURT:  Probably more people who work at Cook in the Indianapolis metropolitan area than they do south of Bloomington.

MR. WILLIAMS:  They may.  They may.  But if you look historically at jury verdicts in this part of the state, as opposed to jury verdicts in the area of Marion County and the Indianapolis Division, I mean, you're going to see that verdicts tend to be more favorable to the plaintiffs in that marketplace than --

THE COURT:  Here.  I've been trying cases in Indianapolis and Evansville for 20 years.  There's not a dime's worth of difference between the jurors that I see.

MR. WILLIAMS:  Okay.

THE COURT:  They're all Midwestern jurors.  This isn't East St. Louis.  This isn't New York.  This isn't -- and I know what you're talking about, Joe, exactly.  We can try it in Indianapolis.  It doesn't really matter to me one way or the other; but if you have some proof of that, I'd like to see that, that jury verdicts are actually more favorable to the plaintiffs in Marion County.

MR. WILLIAMS:  And that's based on looking at the Jury Verdict Reporter.  I pulled that from the ITLA's database before we tried the Hill case just to compare -- and maybe it's obviously not an epidemiological sort of analysis but just looking at verdict sizes and the amount of plaintiff or

defense verdicts, it did seem to be that Marion County was more favorable than Vanderburgh County.

THE COURT:  Well, that could be a function of a lot of things.

MR. WILLIAMS:  It could.  It could.

THE COURT:  The number of cases tried, type of case, those types of things.  But in terms of individuals being able to listen to the evidence, evaluate the evidence, follow the rules, follow the instructions, employ common sense, over the years three, four hundred jury trials, I haven't noted much difference; but if you think there is, that's a legitimate point.

MR. WILLIAMS:  Okay.  And that's why we'd prefer to have it in Indianapolis.

THE COURT:  Okay.

MR. WILLIAMS:  Thank you, Your Honor.

THE COURT:  I'll be happy to try it in Indianapolis.  Doesn't really matter to me one way or the other.  But this is the MDL and I'm assigned the MDL case and I sit in Evansville.

MR. WILLIAMS:  Right.

THE COURT:  So that would be the preferred venue, of course.  I'll have to -- my courtroom in Indianapolis, as you know, is not anywhere near as large as this.  I've tried cases up there in which there were a lot of -- several lawyers on each side.  It's cozy to say the least.  But let me see if I

can talk to one of my colleagues about maybe switching out courtrooms for a few weeks in September.  I'll try to do that. Ms. Pierson, do you have any objection to that?

MS. PIERSON:  No, Your Honor.  I mean, our view is like yours.  That it doesn't make a lot of difference whether it's in Evansville or Indianapolis.  We did have occasion on, of course, the next MDL to research this issue, question of the Lexecon waiver and what's the effect of that; and as the -- as the presiding judge, you have the ability to try the cases in either Evansville or Indianapolis and it's completely within your discretion is what our research reveals.

To us, it's really a question of facilities.  I do think your courtroom in Indianapolis is too small and based on the number of the equipment that we had during the last trial, the number of spectators --

THE COURT:  I agree.

MS. PIERSON:  -- we just can't do it if we can't find facilities.  The facilities here are quite conducive to this kind of a trial.  So if we can find similar facilities to try the case, we have no objection to trying it in Indianapolis.  I think it's just a question of space.

THE COURT:  As I said, I'll try to survey my colleagues to see what their calendars show for September and if there's some availability of courtrooms, I'm sure it will be no problem to switch out with that.  Judge Lawrence takes

senior status at the end of June and I believe he may be taking some time off after that before he resumes. So his courtroom may be available as well. I've tried cases there before. The acoustics are horrible. It's nice surroundings, don't get me wrong, but I'll check with him first and see what that works out to be.

MR. WILLIAMS: Appreciate the consideration.

THE COURT: And I can get back to you on availability, I'm sure, within the next week or two. Tina will be able to notify you about that.

MR. WILLIAMS: Thank you, Your Honor. Appreciate it.

THE COURT: Joint motion for enlargement of time in Brand. I think it was a 12-day request.

MS. PIERSON: Yes, Your Honor.

THE COURT: Sounds pretty reasonable to me.

MS. PIERSON: That was our motion, Your Honor. We reached an informal agreement to push back the plaintiff's expert deadline. The other things that we identified in our motion cascade from that. We've asked for an equivalent amount of time.

THE COURT: So there's agreement on that?

MR. MARTIN: Except for one or two things, Your Honor, which I can address. We are in agreement with most everything.

THE COURT:  Okay.  Come on up.

MR. MARTIN:  Thank you, Your Honor, and good morning.  So you know what?  This might be easier.  I'll just put these dates on something.  Use a PowerPoint.  I was going to hand it to the Court, if I may.

THE COURT:  You can put it on there, the ELMO, so Andrea can see it.

MR. MARTIN:  Good.  I wasn't sure it was working this morning.  Perfect.  So here's -- these are the proposed dates which we don't disagree with, Your Honor.  May the 7th is the date for Cook to provide us with its IME protocol; and then on May the 9th, we are to agree to -- and this does have to do with the 12-day extension.  This would also extend these dates.  May 9, the parties are to negotiate the IME protocol. I will tell the Court this is the date that kind of concerns us which leads to other issues.

May the 16th, presuming that everything goes according to Hoyle and the parties are able to negotiate the IME protocol, then seven days later Ms. Brand will go to her IME.  IME must be performed and in order for -- under the proposed order for Cook experts report to be due.  So in the Brand -- in the Brand scheduling order, exhibit C to the CMO that applies to the Brand schedule, the parties had agreed to -- I think it was April the 18th.  The Court ordered April the 18th as Brand's expert deadlines; 12 days hence made that

August the 30th.  The expert reports have been filed in accordance with our agreement.

So Cook, they've got 30 days --

THE COURT:  August the 30th?

MR. MARTIN:  Not August.  I meant May the 30th.  I'm sorry.  So May the 30th, we're totally fine with that date.  So we're really fine with everything.

Here's the problem.  That under the proposal, if the parties are agreeing -- in agreement by the May the 9th to negotiate the IME protocol, everything goes according to Hoyle, then this May 30th deadline for experts for defense comes into play and that's the deadline.

Here's the problem.  We had a big disagreement with Cook last time the parties were negotiating the IME protocol.  They wanted to do invasive testing, vena cavagram and we argued they wanted to send Ms. Brand -- Ms. Brand was going to have to go out of state, et cetera.  We just had some disagreements -- pretty significant disagreements.  We weren't able to negotiate an agreement and had to go to Judge Baker.  Okay.

If the same thing were to happen this time, what would happen is we're so close to the deadlines and plaintiffs already provided their reports on Monday, that what would happen is -- see, this May 16th deadline would be just fine, if she gets her IME performed on the 16th.

But in accordance with the proposed order, they get at least 14 days -- or they get 14 days from the time that the IME is performed until their deadline hits for the defense expert reports, and that's where we have a problem.  If we have a difficulty negotiating, that May 30th deadline could go -- or if the doctors aren't able to see her, or if there's some delay, if Judge Baker can't hear us really quickly after May the 9th, we're going to have a big problem and that expert deadline could go to feasibly until June or July and it could affect our trial setting.

So that's why I say, Your Honor, we have absolutely no problem with having the deadlines that are here, save and except for the little provision that says they get at least 14 -- or 14 days to get their expert reports filed after the IME occurs.  That's the only thing.  And we would like a little bit of guidance from the Court as to how to solve that problem.

THE COURT:  It sounds like Magistrate Judge Baker solved it for you last time.  Is that right?

MR. MARTIN:  He did.

THE COURT:  I would think he would use similar thoughts.

MR. MARTIN:  Not concerned about his thoughts.  I'm just concerned about the timing of a ruling because --

THE COURT:  In terms of your negotiations, in terms

of negotiating the IME protocol, you'd certainly keep Judge

Baker's previous thoughts in mind in trying to get an

agreement, wouldn't you?

MR. MARTIN:  Yes, we would.

THE COURT:  Because more than likely he would be

consistent.

MR. MARTIN:  I would hope.  So I would hope so and I

would hope we can negotiate that agreement on the 9th and

everything will be fine.  And it would be -- I will just tell

the Court we would prefer that she be given her IME protocol

as per the last time in her area.  And then secondly, there

not be any invasive testing.  If those two things happen this

time -- are the same this time, we're going to agree and so

just wanted to let the Court --

THE COURT:  Is that what Judge Baker ordered last

time?

MR. MARTIN:  Yes, Your Honor.

THE COURT:  I'm assuming.

MR. MARTIN:  Thank you.

MR. WILLIAMS:  Your Honor, real quick.  The

defendant's motion asking for the extension of these dates did

not specifically request the same 12-day extension for

plaintiff's rebuttal expert reports, which was included in the

original CMO.  So when Your Honor enters this order, we just

wanted to make sure that our rebuttal expert reports, which

was tied to the defendant's expert disclosures, gets pushed that 12 days as well.

THE COURT:  That would only make sense.

MR. WILLIAMS:  Okay.

THE COURT:  Ms. Pierson.

MS. PIERSON:  Thank you, Your Honor.  Sounds like we're in agreement, which is great.  We'll address with Judge Baker to the extent that there are disputes in the protocol and I think Mr. Heaviside and I worked on the protocol last time -- or he worked with someone else in my office.  We'll do the same to work cooperatively.

We did just receive the plaintiff's expert reports around midnight on Monday night.  One of the things we learned is that Mrs. Brand was able to travel to her own experts for an IME.  So we do think it's quite possible that she will need to travel for the IME's in this case; but it sounds like from talking to her counsel that she's not working and is very available.  So I think we can still make that happen within the time frame; and if we run into a problem, we'll talk to Judge Baker and work it out like good lawyers do.

THE COURT:  What kind of travel are we looking at here?  Do we have any idea?

MS. PIERSON:  I don't know because I haven't talked to our experts yet.  They got the plaintiff's expert reports on Tuesday morning.  It's possible that there won't be any

travel required.  The 14-day period is really more about getting reports to the extent that you need testing of some sort, whether that's an EGD or colonoscopy or cavogram or something else.  It's quite possible that those would be done in her local area, but we wouldn't get the reports from the local doctor until some days later.

So we're just dealing with busy professionals and I think we have to work cooperatively on these things and we're committed to doing that.

THE COURT:  So is the IME already scheduled?

MR. MARTIN:  No, it is not, Your Honor.

MR. HEAVISIDE:  Judge, last time in the last case, as you remember, the plaintiff was from Florida.

THE COURT:  Right.

MR. HEAVISIDE:  They requested an IME in New York and one in North Carolina and with -- they wanted CT scans. We agreed to everything that we felt was reasonable and Judge Baker ultimately agreed that yeah, what they agreed to is reasonable and that's what happened.

I think our only problem here today was one, that the rebuttal witness is not included in the proposed motion and we've discussed that.  The other is, I suppose, a cautionary tale.  If you read it as -- the order as written, as I recall, it says that the defense expert reports are not due until the conclusion of the last IME and receipt of the

report.  If all goes as it should and everybody acts in good faith, it shouldn't be a problem.  If there's a lot of travel, we'll object.  If there's a lot of invasive testing, we'll object and you can work through that, I'm sure.

But just as a cautionary tale, if, thereafter, the problem was the IME doctor is not available or vacationing in Europe, and then conceivably we could have our rebuttal reports due before their expert reports.  So I don't think that will happen but we just wanted -- we're concerned about that and wanted to put the Court and everybody else on notice about that; and hopefully we'll get their protocol, which I have to assume they know who they want the woman to see.  And there's tons of doctors in Atlanta.  So perhaps travel won't be necessary and perhaps there won't be a request for a lot of invasive testing and in that case, no problem.

THE COURT:  No problem.  All right.  Well, let's keep our fingers crossed that you can work all this out and get some physician availability.  That, to me, probably would be the problem is trying to work this in.  Okay.

Next item I've got is proposed order on dismissal of PIP/no injury cases.  Mr. Bennett?

MR. BENNETT:  Good morning, Your Honor.  We have about 40 minutes.  I promise to use only ten of those.  So I will make this quick.  Even though there is a PowerPoint up, we'll get through this very quickly.  And really, the bottom

line is that we're still working on a proposed order.  We want to reach an agreement on it.  I just want to give you a status as to where we stand and we'll go through it pretty quickly.

Next slide.  So Your Honor, the first slide is just where we stand now.  We're just over 4,000 cases in the MDL, about half Tulip, half Celect.  I wanted to note that since our last hearing, we had about 250 cases come in.  So we're still going at a pretty good clip.

THE COURT:  Does anybody have any idea what percentage of these are being directly filed in the Indianapolis Division or what percentage are being transferred in from other --

MS. PIERSON:  I can address that, Your Honor.

THE COURT:  Just an approximate.

MS. PIERSON:  Almost all of them are directly filed. It's very rare for us to have a transfer.

THE COURT:  I haven't seen many of them come through.  I usually get a notice on transfer.

MR. BENNETT:  Right; and I get the courthouse news dailies and about half that email is Cook filings.

Next slide, please.

THE COURT:  I have to remand these to myself, I guess.

MR. BENNETT:  Right.  So we started with the -- when we were here last time, we started with the outcomes that are

part of the PPF's and PPS's and you're very familiar with those.

Next slide.  And we discussed that what we have here, if you count all injuries -- so these are not unique cases but all injuries -- you have a large number of other, unable to be retrieved, IVC perforation, tilt and migration. Where it leads us, if we're looking at these individually, if you look at that trend individually, you see a good number of product-in-place cases and no injury cases.

Next slide.  Go ahead and click through all those. And if you would define PIP and no injury, just as tilt, unable to retrieve and/or other and you count them as unique injuries, so the highest possible complication outcome is a tilt or an other with no symptomatic bodily injury alleged in the PPS, you have about a third or 31 percent of the cases in MDL being PIP/no injury by our count.  And I know that plaintiffs will disagree on that but that's our count of those.

If you -- that's not considering asymptomatic perforation and asymptomatic migration.  If you include perforation in that count, it increases all the way up to almost half the cases in the MDL, being the PIP and no injury.

Next.  So when we were here last time, Ben Martin -- Mr. Martin stood up and had a proposal that they dismiss 115 cases voluntarily and he said there would be no future filings

19

as well regarding these types of similar cases where there's no injury.

Next slide.  Mr. Martin said there are a total of 115 cases that are product-in-place cases with no injury and he said:  What does that tell us?  It's not a huge problem and the methodology described was that they went and talked to the plaintiffs' lawyers, and they believe that based on the fact sheets, it's a fairly accurate figure regarding no injury or product-in-place cases, which obviously didn't jive with our numbers of about one-third or one-half of being no injury.  So that's a question that I think Your Honor had; where was the disconnect.

Next slide.  What we found, if you recall, we went through some of the PPS's and PPF's and what we found is a number of the cases that we saw were not included in the 115. You had the Pritchett case is a fear of migration or fracture in the future and that's the only injury alleged.

Next slide.  We have one that's Michael Fink, with the Goss firm, which is a significant firm in the leadership of this MDL, where there was tilt only and then it was removed percutaneously in seven minutes and that's the total sum of the injury.

Next slide.  You have some where they allege tilt as a complication and none as injury listed and it's been removed.

Next slide.  Clogged filter.  I think Ms. Pierson said last time that kind of shows that it's working.

Next slide.  We have one, a Mr. Charles Madison, it's a Dave Matthews case, where the Celect filter was removed years ago in '05, and what they have now is a Bard recovery filter and that's in this MDL as an injury case.

Next slide.  You have Michelle McGee.  Her filter migrated but it was removed successfully and that's the only injury.

Next slide.  Harry Johnson.  You have just simply under Current Complaints, none.

Next slide.  John Ensworth.  Again, no injury.  It says fears that the device may fracture, migrate, puncture or cause other injuries unknown at this time.  The full extent of the plaintiff's injuries unknown at this time.

Next slide.  And so this goes on.  You get the point.  These next ones here, these last three, were all submitted -- or we saw these in the last two months since the last hearing.  So they're still coming in.  We're still seeing them.  None of these are in the 115 that were identified.  So clearly, the methodology of self-selection, self-identification is not working and we need something that fully addresses this issue we have that may plague one-third to half of the cases in MDL.  And Your Honor gave a directive to Ms. Pierson and Mr. Martin, basically, let's figure this

out.  Let's figure out a way to deal with these we currently have; and if we need to do Bellwethers on what you can't agree to, we'll do that.  And you said if we try two or three of the product-in-place cases in the next year or two, you'd be happy with that.

Next slide.  So the parties exchanged proposals and I can tell you that we've agreed on some broad concepts.  A lot of disagreement but some broad concepts.  And I want to say the good news first and that is, that we agree there should be a general framework that defines injury and no injury in comparing the two proposals.  We agree that there are certain complications that are clearly injury and certain complications -- or certain allegations or lack of allegations clearly show there's no injury.

And we agree that no injury cases ought to be dismissed.  How we get there is where we disagree.  And so the major areas of disagreement are the definition and categories of injury, the definition and categories of no injury, the procedural requirement to establish that you have an injury or a certification, and the terms of dismissal and any filings in the future.

Next slide.  Plaintiff proposes that 115 no injury cases would be dismissed without prejudice.  If you recall last time, they talked about perhaps a waiver of SOL defenses.  They also propose that no additional cases should be filed

regarding the similar cases.  We don't really know what those are.  It's not really firmly defined.  And it has a very broad definition of an injury and a narrow definition of no injury.  That's fine.

If we want to go down that road, that's fine but then we're going to have some cases that Cook does not value, that Cook believes are no injury, and they're still going to result in about one-third or one-half of the cases still being in there.  It doesn't really solve the problem if we're trying to move forward and put value on cases where we're not putting any value on.

So next slide.  If you looked at this in some sort of chart that you can graphically see kind of where the disconnect is.  The inner circle is where we both agree are injury cases; and if we were in today with okay, let's go with the inner circle, we still have the outer circle where the plaintiffs say are -- are injury and we're saying are not injury, right, and that makes up a good deal of the cases.

Next slide.  Same on the flip side with the no injury.  We have some agreement on what are no injury; the mere presence of a filter without anything else, routine puncture marks, mere tilt without injury, those are all things that I think both sides would say:  Yeah, those are clearly no injury.  But what about the others ones that we're saying are no injury?  Our definition is broader than theirs and that's,

again, a disconnect. And again, if you go from narrow and not the broad, we're still going to have a number of cases we need to figure out what to do with. Maybe we can't do it through an order here but instead we have to deal with the Bellwether process, which is fine, but we need to move forward with this.

Next slide. So I'm going to be sending this PowerPoint to Your Honor, to the Court, as well as to the other side, which kind of summarizes the areas of disagreement. I'm hopeful that we can come together and do some trade-offs here and maybe we can reach an agreement on a lot of these issues. We have some work to do over the next month.

Next slide. And you'll see that there are some terms that where they clearly don't agree with us and we don't agree with them, we need to work together through those or what we'll probably do is if we can't agree to those, we'll give you competing provisions for those few areas and ask you to decide how you want to go about it. This is, after all, your CMO but we need to move forward with this in some way. We have an issue we know we need to address. It's just how we get there.

Next slide. And hopefully this PowerPoint that I'm going to share with everyone will help you outline where the broad issues of agreement and disagreement are; and by this time at the next status conference, we'll have a working CMO

that addresses the product in place and no injury cases. Thank you.

THE COURT:  Thank you, Mr. Bennett.  Mr. Martin.

MR. MARTIN:  Thank you.  If we could bring up the final three slides, I'd like to address those, please.  Here's the first one, Your Honor.  We have a large disagreement and I don't want -- I don't want to tell the Court that we are close to an agreement on this.  When we came -- when I came to the Court last time and I said that -- or two times ago, whenever it was, that we had been through this process with all the plaintiffs' lawyers in the MDL and we had gathered up what no injury cases there were, and I outlined to the Court how we had a major disagreement as to what a no injury case was, we still have that disagreement.

A case where no injury -- where there truly is no injury, we counted 115, we were ready to dismiss them then. We're ready to dismiss them now.  We're ready to agree to an order that they won't be filed and if they are filed, they'll be dismissed and we'll have something set up.

The problem is shown right here in counsel's own slide, and this is the reason why we're having great difficulty in doing this because what they're asking us to do is for the MDL to agree that cases that are filed which are alleging true injury, embedded filter, no injury, they want us to agree on behalf of all these lawyers that they can't bring

an embedded filter case where a doctor, for instance, has said:  You've got an embedded filter.  We're not able to retrieve your filter.  Or where the client has a perforation.  You know, Your Honor, a perforation is what this MDL, in effect, is all about in a lot of different respects because perforation leads to fracture.  Perforation leads to whether it's asymptomatic or symptomatic.

THE COURT:  Of course it started out to be.

MR. MARTIN:  And then it goes into other organs and vessels.  The Court has heard all of that testimony.  So being asked to take a nonsymptomatic perforation and just dismiss it, as if it's not an injury, or cases where you've got a nonsymptomatic migration of a filter, a filter migrates three millimeters closer to the heart, not an injury?  An embedded filter, inability to retrieve, they want an embedded filter or inability to retrieve a filter that that's not an injury.  So I simply want to let the Court know we have been -- we are ready to dismiss cases without prejudice and then give the -- actually dismiss with or without prejudice as long as there's something set in place where if there's an injury later, that there can be a filing.

Your Honor, when we tried that Hill case, if I'm not mistaken, and I could be mistaken but I don't think I am, Ms. Hill had a perforation that was asymptomatic into another organ or vessel.  The way they found that duodenal perforation

26

was through an endoscope and they found it, and she had no idea she had that perforation.  Your Honor, they would argue that under those circumstances, she is not an injury case because she had an asymptomatic perforation.

There are -- we simply -- without belaboring the point, we're never going to agree, never, to voluntarily dismiss those injury cases and call them what they're not.  They're not no injury cases.  We want the Court to know we're ready, willing and able right now, as we were two months ago or three months ago, to dismiss no injury cases.  But these are not no injury cases, those that are unsuccessful retrieval attempts, embedded filters.  The longer the filters are in the body, the more probability there is to then have additional injury.  We're not saying inability to retrieve or embedded filters are not injuries, an additional injury.  So thought I'd bring that up, Your Honor.  Thank you.

MR. BENNETT:  One minute.  Hill was an organ perforation case.  We're not saying anything about that should be a no injury and there was also allegations of pain.  Again, that's symptomatic.  So just to be clear, the Hill case is not what we're talking about here.  And quite frankly, we know that what we're presenting here will not be accepted completely by the other side.  We want to come together and see if there's some areas of agreement beyond what they've identified and that are in the 115 because as you saw, clearly

that didn't capture everything.  And there are a great number that are out there, whether that's epidemiology that needs to be worked on, certification or definition, we need to work together to figure that out.  But there are a lot of cases out there that really still need to be addressed beyond the 115 and hopefully within the next month, we can do that.

And if not, we'll come to agreement on where we can on definitions of no injury with a caveat that we think there's others out there that are no injury cases, and those are the cases that we're going to need to look at next -- in the next CMO whether through the Bellwether process or not. It's not rocket science.  We reached an agreement on what we know for certain but we can all agree on, feel comfortable about, certifying our no injury, get rid of those and see what's left.  Thank you.

THE COURT:  Thank you.  Mr. Martin, on the 115 cases, are you ready to go ahead and prepare dismissals on those?

MR. MARTIN:  We would like to.  We would like to actually have an agreement about the no injury cases in order to dismiss them.  That's what I was hopeful to do but I'll tell you what, Your Honor.  I can go back to the plaintiffs' lawyers and certainly wouldn't want to just dismiss them without some sort of terms being known.  But I can tell the Court if we can get -- I'll tell the Court this.  If the

process that we have proposed is agreed on those 115, and when we're agreeing to dismiss them under -- and we've got a proposal that if they are later deemed to be -- they're deemed to be an injury later, they develop a perforation or a bleed or something like that where they can be refiled, we have a proposal to put that in place. So the answer is yes, Your Honor, we're prepared to do that, as long as we have a -- in place an agreement as to what happens with those.

We obviously can't agree that if they have an injury later, that they can't come back and then file a case. But yes, we're prepared to, along with some very basic agreements as to what to do later if there's an injury, sure. We can do them and we made that proposal and it sits with Cook now. So the answer is yes.

THE COURT: Mr. Bennett.

MR. BENNETT: Your Honor, I'm not sure that written proposal is just as he describes. If he's saying --
Mr. Martin is saying that they're willing to dismiss the 115, the current claims are with prejudice but if there's any future injury, we've never asked that that be barred. Future injury, of course, is still able to be.

THE COURT: I don't know how you could bar that.

MR. BENNETT: Exactly right. We never suggested that. It's only -- what we don't want to have happen is this. You have a fear of injury allegation. That's dismissed

without prejudice and they turn around tomorrow and file that in Philadelphia or wherever.  The current allegations, as we agreed, are no injury allegations.  Those are the dismissed with prejudice.  Any future injury, that's fair game.  If that's the proposal for the 115, then let's get that in writing, at least get those done.  We still need to do the ones we're working on, but we can do baby steps and the next status conference we can address, hopefully enter a CMO on the rest of the no injury cases.

MR. MARTIN:  I'll work with them to get those 115 dismissed, Your Honor.  We can -- if we aren't able to agree on the whole thing, I bet we can agree on some protocol to make sure by the next status conference, if those are reasonable about it, we have some protocol to put into place what Mr. Bennett had just said, that these folks will be able to -- without statute of limitations problem staring them in the face, be able to file their cases once there is an injury; and our concern was that they would claim the statute a problem.  Of course, if they're no injury now, then there shouldn't be.

THE COURT:  Shouldn't be.

MR. MARTIN:  So hopefully everybody can agree to that.  If we get that agreement, literally --

THE COURT:  Seems to me if the parties would stipulate that in these cases there's no injury at this time

or the plaintiff is not aware of any injury and does not have any symptoms, is asymptomatic, it seems to me down the line there would be no statute problem because there is no awareness.

MR. MARTIN:  If we could get that stipulation, then that's what we would need.

THE COURT:  Simple.

MR. BENNETT:  Right.  That's a simple thing.  I mean, look.  We first raised this back in, I think, December or January.  We had the hearing in February.  I do want to make progress on this, Your Honor.  So I don't want another month or two where we're still working on protocols.  I think we need to get this order in place, work it out, have filed by the next hearing a proposed CMO for the rest of the no injury cases in our mind, and have a decision made at the next hearing on those as well.

THE COURT:  Let's see if we can get rid of --

MR. MARTIN:  With that stipulation, if they're able to enter that stipulation that the Court suggested and Steve had said they'd agree to, we get a stipulation like that, we can have this -- we'll be happy to enter that stipulation and happy to get these cases dismissed, the actual no injury cases that we talked about, at that hearing.

MR. BENNETT:  Your Honor, I want to be clear.  We're still interested in getting a CMO with a methodology.  As you

saw, there are a number of cases out there.  So we're going to be filing a motion for that to be addressed at the next hearing.

THE COURT:  All right.  Let's get rid of these 115 cases.

MR. MARTIN:  I'm sorry, Your Honor.

THE COURT:  Let's get rid of these 115 cases.  No sense keeping them around if everybody agrees that there's no injury and there's no awareness of any injury.  Okay.

Number 6, procedure for dismissal of cases with no PPS under third amended case management order.  Ms. Pierson.

MS. PIERSON:  Your Honor, this is a short housekeeping matter and we can skip it if Joe and Ben need to go to their plane.  Are you okay?

MR. WILLIAMS:  I don't know, Your Honor, not being from Evansville, if Ben's flight leaves at 1:23 and mine leaves at 2:00, when do you think we need to leave here?

MR. MARTIN:  I think 12:30 is fine.

THE COURT:  12:30 should be -- you should be fine. They'll start -- it's not like O'Hare or getting through there.  You can get through pretty quickly, and they'll start boarding probably 20 minutes before the flight.

MS. PIERSON:  That's a good thing.  Strive to be as different from O'Hare as much as possible.  It's a nightmare.

THE COURT:  I was just there yesterday.

MS. PIERSON:  Judge, just a simple housekeeping matter, this last one.  You remember we argued last time the question about cases where there was no plaintiff profile sheet.

THE COURT:  Right.

MS. PIERSON:  We received your orders after that hearing giving the folks another 45 days to submit their plaintiff profile sheets.  Obviously we'll wait and see where we are in 45 days in those cases.

THE COURT:  What's the problem here with these? This seems like a simple thing that they would fill those out. Why can't we get that done?

MR. WILLIAMS:  Your Honor, we can't speak for folks who aren't here who aren't getting them done, but in the same -- I get emails from somebody at Ms. Pierson's office fairly regularly saying:  Can we have another 90 days to do our defense fact sheets, whether it's firm Baker Daniels or plaintiff's firm that has a whole bunch of cases, sometimes they just fall behind.  But beyond that, I can't speak --

THE COURT:  I've given you 45 days.  Hopefully we can get a lot of this -- if they're ever going to come, I would think they would come within the next 45 days, right?

MR. WILLIAMS:  I would agree with Your Honor.

MS. PIERSON:  So in the interest of fewer filings with your office, I know your staff is inundated with these

filings, there is a CMO that Judge Baker entered.  It's docket number 4226 that sets out the timing for these things.  The CMO provides that the plaintiff profile sheet in Section G of that CMO, it's the third amended CMO, it provides that from the time that the complaint is filed, the plaintiffs have 60 days to submit their plaintiff profile sheet.  We have not been immediately sending a deficiency letter when that happens.  In the case I talked to you about last time, they've languished five, six months with no plaintiff profile sheet. We're getting better about that to sort of keep things moving along.

But under that CMO, they have 60 days to submit the plaintiff profile sheet.  Then we send a deficiency letter. The plaintiffs then have 20 days to cure under Judge Baker's CMO.  If they don't cure, then we have to send another letter telling them that we're going to file a motion to dismiss. They have five more days to cure from that letter.  Then we file a motion to dismiss.  Then they have 15 days to respond to the motion to dismiss before we can come to you, Your Honor, and say:  Hey, we're entitled to dismissal.  We've given them all these red flags and nothing has happened.

Kind of the practical effect of your recent orders is that then they get another 45 days on top of that, which if Your Honor wants to give them that additional time, we'll wait the 45 days.  Most of these folks, I think, are not going to

cure. But if it's easier for the Court for us to incorporate that time in giving the plaintiffs more time to respond to the motion to dismiss, as opposed to tacking on another 45 days and then filing another motion saying: Now we're ready for you to rule on it, we want to do that if that makes it easier for Your Honor.

Our view was that Judge Baker's order gave them a lot of chances and that that was enough. If you're inclined to give them another chance in that scenario, we just want to do it in the way that is the least amount of paperwork for your office and ours.

THE COURT: Okay. Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: I assume after this additional 45 days, if they're not filed, they're not coming and that will be it.

MR. WILLIAMS: Your Honor, I think that the plaintiffs' lawyers should follow the rules. They should follow the CMO. And if they don't, there are consequences to that. Our only concern is, and I think we've seen in some of the motion to dismiss responses, that sometimes our motions to dismiss filed and plaintiff profile forms have actually been served or plaintiffs, I think, have said they haven't received a deficiency letter; and that's our concern when we respond to these things. But if it's true that a plaintiff or their lawyer doesn't file the CMO and doesn't follow-up when the

Court gives them additional time, then there are consequences to that.

THE COURT:  Right.

MR. WILLIAMS:  They have to follow the rules.

THE COURT:  Everybody has been given due notice and pretty good heads up here.

MR. WILLIAMS:  I agree with Your Honor.

THE COURT:  We'll keep with the 45 days but after that, more than likely, at least my thought would be, that they're not going to be coming.

MS. PIERSON:  Your Honor, for future cases then, where we run into this problem because we are seeing it on a continuing basis, although I think a little less so since we had this argument at the last status conference.  For future cases, I think I'm hearing Mr. Williams say we all have agreement that Judge Baker's order ought to be enforced as written; and that if they have not responded to the motion to dismiss within 15 days of filing under CMO 4, the case should be dismissed.

Respectfully, we'd ask that future plaintiffs, who haven't heeded this warning and this conversation, that they not be given an additional 45 days, too.  The practical layer when that happens is that you give them another 45 days on top of what they've already received and we then, Cook, have to come back to you again in 45 days and file another paper to

say:  Now we want these dismissed.  That doesn't seem fair, given what we've agreed to and that we've given them three warnings under the current CMO.

MR. WILLIAMS:  Your Honor, I don't think I agreed that the other plaintiffs' lawyers should not be given 45 days that Your Honor has granted previously, given the consequence of dismissal.  I think Your Honor's procedure up to this point of allowing a final 45 days should just be continued and is appropriate given the consequence of the failure.

THE COURT:  We were pretty generous with 45 days but I certainly want to give plaintiffs every opportunity to get their ducks in a row here on this.  Hopefully there won't be much more of this not following or not being able to comply, for whatever reason, with Judge Baker's CMO; but I'm not ready yet to say no further extensions on that.  That's that on that.  It looks like my last item.

MR. WILLIAMS:  Nothing further from the plaintiffs, Your Honor.

THE COURT:  Anything else?

MS. PIERSON:  Nothing further, Your Honor.  Thank you for your time.

THE COURT:  We'll get to you as soon as we can on the courtroom availability in Indianapolis and if we have availability, we'll try it up there.

Ms. Pierson, a little bit about No. 1 here, the

motion for protective order regarding general discovery.  What your position is, in my perusal of the papers early this morning here, is that this is -- this has been the train has left the station on this a long time ago regarding discovery.

MS. PIERSON:  Your Honor, you may recall when I first became involved in this MDL, company discovery had been going on for a year and a half at that point in time, and there was a hearing that we had in Indianapolis where Mr. King said:  We just need to know what's the cut-off for company discovery as to the products in this litigation.  And there was a long list of grievances that Mr. Martin had with Cook about things that Cook had not produced, and you told the plaintiffs essentially:  Send them a list of what your grievances are and Cook, you take care of that list.  We did. That was back in 2016 and early 2017.

It's our position from that point on that company discovery was closed, and we had this issue come up in the Hill case and made the argument then company discovery is closed.  We produced millions of pages of documents.  We spent so much time and money letting the plaintiffs discover everything they wanted to discover about these products, but we ought not be responding to new things.  The issue in that motion is again, we're asking Your Honor to make clear company discovery was closed a long time ago.  We're not going back and redoing that.  But the parties have fully briefed the

issue and we stand on our papers and are prepared for you to rule whenever you're prepared to rule.

THE COURT: On the other item going back, Ms. Pierson, these cases -- litigation has been going on for quite some time, you want to assert an additional 20 defenses -- affirmative defenses?

MS. PIERSON: Thank you, Your Honor. There's some debate about what needs to be pled and what doesn't need to be pled in terms of an affirmative defense. Most of the things that we've asked to add to that are not things that are listed under the rule as affirmative defenses. I consider them additional defenses and I think it's a good idea to put each other on notice of claims and additional defenses, but many of those we're not obligated to raise. We can just argue them at the time of the individual cases.

But we have asked to amend the answer to conform to what we know are the issues in these cases.

THE COURT: Are you just finding this out now?

MS. PIERSON: No, Your Honor. The motion has been pending for quite awhile but the -- once we got through the Hill trial, certainly nothing that we did would affect the Hill trial and we were late enough in the game, in looking at the master answer, that we wouldn't have sought to amend it in the midst of the Hill trial. But once we got out of the Hill trial, then we brought this issue to the Court's attention.

These are claims that we have available to us under the law and so we want to conform our master answer to that.  Assuming some of these cases are someday remanded, this master answer will be part of the record in the remanded cases, too.

THE COURT:  Mr. Williams.

MR. WILLIAMS:  Your Honor, we only have a couple minutes so I'll try to be brief.

THE COURT:  What more discovery do you need from Cook?  I looked at some of your interrogatories.  You want information on amount spent on R&D and marketing and those type of things?

MR. WILLIAMS:  And Your Honor, the majority of things that we have been asking for, and are still asking for, are things that had been requested long ago that Cook did not provide us.  And when we're trying to follow-up on some of these items, we're getting the response:  No, no, company discovery is closed.  We're still getting some discovery from Cook and if company discovery is closed, we have no ability to follow-up on that.

We have no -- we're not being paid by the hour.  We have no incentive just to create busy work.  If we serve a discovery request, it's because we think it's imperative and that the MDL as a whole needs that information.  A lot of the things we followed up on, they do stem from requests that were made long ago and that we're trying to follow-up on; and we're

40

getting the response:  No, no, company discovery is closed.

It seems a little bit incongruous to then say:  But we want to add 20 additional affirmative defenses but company discovery is closed.  They're putting -- trying to insert issues into the case and then saying:  Now that these issues are in the case, you guys can't discover them.  So the positions seem to be incongruous.

We don't plan to do an insane amount of discovery and continue to generate paper.  But if there is something that we think we need, we're going to request that or we would like to request that, particularly if they were things that we had requested in the past that had never been produced.

THE COURT:  Okay.

MR. WILLIAMS:  Thank you, Your Honor.

MS. PIERSON:  Just one response to that, Your Honor -- a couple.  We've not objected to producing things that were previously requested.  So to the extent that it was something that the plaintiffs requested before we had that conference at the end of 2016 and we failed to identify it in our sweep of documents and we've responded to that.  We've looked for it.  If we have it, we produced it to the plaintiffs.  If we don't have it, we told the plaintiffs.

To the extent that they believe that they previously requested it and we haven't produced it, that's an issue for Judge Baker.  So far we've been able to resolve every issue

that's come up of that nature.  It's only the new requests, new things that I think are beyond the close of discovery. Clearly beyond when you say back in end of 2016:  Give them a list of everything else you need and they'll respond to that list.

THE COURT:  What about Mr. Williams' point that if we allow the amended answer to come through with the additional defenses, it may open up an area that plaintiffs feel they need some discovery?

MS. PIERSON:  None of these additional defenses, none of them are ones that are things that were not known to the plaintiff previously.  There's no surprises there.  For example, the whole notion that there's a -- under the law that we believe under many of the states in which these cases were filed, that there's a comment k defense under the restatement. That's a legal defense that was always available to us.  We could have asserted it anytime in any of these cases regardless of whether it's added as an additional defense or not.

This is really more helpful to us if, in the event some day these cases are remanded, we've got a record of: Here, you have your claims from the master complaint; we have our affirmative defenses.  If there's some discovery request that the plaintiff thinks new discovery is needed because of an additional defense that we've raised, then I think there's

an easy process for that.  They can tell us that.  We can either choose to withdraw the affirmative defense if it is, in fact, an affirmative defense and not an additional one; or we can produce to them what they think they're newly entitled to as a consequence of that. I think that's all -- those are things that we can work through.

This whole issue, for example, that Mr. Williams raises of money on R&D spending, that's not something that was previously requested, in our view.  If he believes that that is something that was previously requested, then we'll either resolve it or it goes to Judge Baker to determine was this previously requested or not.

THE COURT:  Okay.  Well, Mr. Williams, you get together with Ms. Pierson.  If you believe that some of this information has previously been requested, get her that information and hopefully you can resolve it.  If you can resolve it, let the Court know it's been resolved.  If you can't, let the Court know you can't and we'll resolve it -- get it resolved for you.  Anything else we need to talk about today?

MR. WILLIAMS:  No.

THE COURT:  We had a shortened hearing but I think we hopefully took care of as many matters as necessary.  If you have anything else you wish to discuss, we can always get together on the telephone and do that as well.  Okay?

MR. WILLIAMS:  Thank you, Your Honor.

THE COURT:  Safe travels, everyone.

MR. WILLIAMS:  Thank you, Your Honor.

MS. PIERSON:  Thank you.

THE CLERK:  All rise.  Court is adjourned.

(Proceedings concluded at 12:28 p.m.)

*******************************************************

CERTIFICATE OF COURT REPORTER

I, Margaret A. Techert, hereby certify that the

foregoing is a true and correct transcript from

reported proceedings in the above-entitled matter.

/S/ Margaret A. Techert                    **May 11, 2018**
MARGARET A. TECHERT
Official Court Reporter
Southern District of Indiana
Evansville Division