# Exhibit C

Cook Defendants' Opposition to
Plaintiffs' Motion for Suggestion of Remand of All Celect Cases

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


IN RE: COOK MEDICAL, INC.,              )
IVC FILTERS MARKETING, SALES            ) Cause No.
PRACTICES AND LIABILITY,                ) 1:14-ML-2570-RLY-TAB
LITIGATION                              ) Evansville, Indiana
                                        ) **April 29,** 2019
                                        ) 1:35 p.m.
                                        )




**Before the Honorable**
**RICHARD L. YOUNG**

OFFICIAL REPORTER'S TRANSCRIPT OF
STATUS CONFERENCE


**For Plaintiffs:**                     David P. Matthews, Esq.
                                        MATTHEWS & ASSOCIATES
                                        2905 Sackett Street
                                        Houston, TX  77098


                                        Ben C. Martin, Esq.
                                        Law Offices of Ben C. Martin
                                        3710 Rawlins Street, Suite 1230
                                        Dallas, TX  75219


                                        Joseph N. Williams, Esq.
                                        RILEY WILLIAMS & PIATT, LLC
                                        301 Massachusetts Avenue
                                        Indianapolis, IN  46204

```
                                      Michael W. Heaviside, Esq.
                                      Heaviside Reed Zaic
                                      910 17th Street NW, Suite 800
                                      Washington, D.C.   20006



For **Defendants:**                   Andrea Roberts Pierson, Esq.
                                      Jessica Benson Cox, Esq.
                                      J. Stephen Bennett, Esq.
                                      Kip S.M. McDonald, Esq.
                                      Faegre Baker Daniels, LLP
                                      300 N. Meridian St., Suite 2700
                                      Indianapolis, IN   46204




Court Reporter:                       Margaret A. Techert
                                      United States District Court
                                      101 NW Martin Luther King Blvd.
                                      Evansville, Indiana   47708


           PROCEEDINGS TAKEN BY MACHINE SHORTHAND
     TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION
```

(In open court.)

THE CLERK:  All rise.  Court is in session.  Please be seated.

THE COURT:  Good afternoon.

MR. WILLIAMS:  Good afternoon Your Honor.

MR. MATTHEWS:  Good afternoon.

THE COURT:  We're here today in matter of Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Products Liability Litigation.  This is MDL number 2570. We're here for a status conference and representing the MDL plaintiffs, Joe Williams, David Matthews Ben Martin and Mike Heaviside.  Representing Cook is Andrea Pierson, Jessica Cox and Steve Bennett.

And I see a joint proposed agenda here and assume that's how we'll proceed here today.  Is that right, Mr. Williams, Ms. Pierson?

MR. WILLIAMS:  Yes.

MS. PIERSON:  Yes.

THE COURT:  Who wants to go first?

MS. COX:  I'll start, Your Honor.  The first item on the agenda were several motions to dismiss that the Court has taken care of it for us in large part before we got here.  So we can keep this short and sweet.  There's just one that didn't make it, didn't have a ruling before we got here and that's docket number 9066.  That's a motion where Cook moved

to dismiss 25 cases for failure to submit a profile sheet. Thirteen have given us sheets, since we filed that motion, and three have been dismissed.

So I've done a proposed order dismissing without prejudice only those cases that fail to give us a fact sheet and that weren't dismissed for other reasons. And if it's okay with you, I'll hand you up a proposed order.

MR. WILLIAMS:  Thank you.

THE COURT:  Okay.  Any comment?

MR. WILLIAMS:  The only comment is that the PSC takes no position on these motions, since none of us individually represent the folks represented on this order.

THE COURT:  All right.  We'll show the proposed order on the Cook defendants motion to dismiss filing number 9066, we'll show that granted.

Next?

MS. PIERSON:  Thank you, Your Honor.  I have items 2A and B on the agenda.

THE COURT:  All right.

MS. PIERSON:  And just have about three slides for today, Judge.

THE COURT:  Are we going to be using this today, Mr. Martin?

MR. MARTIN:  Maybe it work in the interim, Your Honor.  I think last time we tried it, it didn't do anything.

THE COURT: Even if it worked --

MR. MARTIN: It would be a good try.

THE COURT: Even if it worked, you guys wouldn't follow it anyway. It's ticking.

MR. MARTIN: It just doesn't ding, as I recall.

THE COURT: Ms. Pierson?

MS. PIERSON: Thank you, Judge. So just as a reminder, it's been about a year since we first began talking about what the next step would be with regard to Bellwether trials, and we talked in some detail at the beginning of 2018 about the need to address the product-in-place cases and that there is a real need to come up with a proposal to try two or three cases from the product in place buckets. That continues to be a significant issue in this MDL.

Following the conversation that we had in the spring --

THE COURT: How else to get them resolved?

MS. PIERSON: We agree.

THE COURT: Got to see how a jury thinks about a couple of these.

MS. PIERSON: We agree, Your Honor. You may recall that on October the 2nd of 2018, you entered the order that I've got on the screen in front of you on the motion for Bellwether selection plan. They were actually two orders that Your Honor entered; one was for categorization screening of

the cases and Bellwether selection, and then there was a second order that helped us to effectuate some parts of that.

We have completed the first two steps in your October order, Your Honor, which is to categorize the cases and then Cook had an obligation to prepare a census for the Court from the categorization forms that were submitted. We've done that; and my colleague Mr. Bennett sent to the Court and to plaintiffs' counsel the compiled census once we received categorization forms from the plaintiffs.

That process, unfortunately, took longer, I think, than we all expected it would; but as usually happens when you've got a lot of cats for all of us to herd, there were some stragglers along the way.  We received additional forms and on our end there were things that we did to fine tune the process.

So we're really to Step 3 in Your Honor's order from October and that's dismissal of the Category 1 cases. Mr. Bennett is going to talk about that a little bit later in the agenda.

Your Honor, we thought it made sense to put together the categories -- discussion of the category of the cases to be dismissed.  What I want to talk to you about is Steps 5 through 8 of your Bellwether plan and we think the timeline looks like this.  Ms. Cox put a notebook on your bench, and the last tab of the notebook in front of you is Cook's

proposed plan that includes these deadlines.  We provided this to the plaintiffs earlier before the hearing last week so that they could take a look at the dates and consider them as well.

This is what we believe needs to happen in terms of the steps along the timeline to effectuate Steps 3 through 8 of your Bellwether plan, Your Honor.  And unfortunately, we've got a status conference set May the 9th, just about ten days from today, that will allow us between May the 9th to confirm the two lists of the Tulip and Celect Bellwether pool cases.  Those are from Categories 5 and 6 of your Bellwether plan.

We've already provided that list to the plaintiffs but we think it's fair to give them a deadline by which they can verify and confirm that we've got everything right on those two lists from Category 5 and 6.  They may have done that already.  In any event, we jointly put before you, Your Honor, on May the 8th the final list of Tulip and Celect Bellwether pools.  You may recall your Bellwether plan calls for two Tulip cases and one Celect case from the combined Categories 5 and 6 of your Bellwether plan.  So we give you the final list on May the 8th.  Then we'll see you in Indianapolis on the 9th.

We've provided to plaintiffs -- there's a program for random selection.  We've provided that information to them.  It's included in the Bellwether plan.  That basically we -- we put in how many cases we want from each bucket and it

randomly selects the numbers. So there's really no work for us to do but just plug in the list.

Once that happens on May the 9th, our proposal is that about eight days later, that the plaintiffs submit to Cook an updated PPS, if there are updates, authorizations, updated medical authorizations and other authorizations, and all the medical records in their possession for this discovery pool. That needs to happen in pretty short-order for us to do the work that we need to do in order to be able to present to Your Honor our strikes, which happens on July the 1st; and then our argument to you, our written papers and our argument to you on July 8th and July the 11th on which cases we believe should be selected as Bellwether trials.

The result of this plan is that by July the 25th, Your Honor would select the three Bellwether trials, two Tulip and one Celect, and then our next status conference is August the 15th of 2019. We could set pretrial deadlines at that status conference or, of course, Your Honor could decide to set those deadlines independently when you choose the Bellwether trials.

When you chose Hill, Gage and Brand, Your Honor at that time gave us the names of the cases and the order in which they would be tried; and it was subsequent to that that the parties met and we came up with the proposed deadlines for those cases as they progressed. Whatever schedule works best

for Your Honor, that is the plan that we believe gets us to three Bellwether trials choosing those by August.

You may be wondering:  Well, what happens after I choose those cases then?  How quickly can they be heard for trial?  What do we think it will take in terms of the work up?  One thing that we wanted you to be aware of, Your Honor, is this.  The state court trial settings in these cases -- and I've put on the screen in front of you all of the Celect and Tulip cases that are currently set for trial in any state court.  That's the list that you have here.

And just for your information, Your Honor, all but about two of these cases are cases that have been filed in state courts by members of the plaintiffs' steering committee. When we talked about the Bellwether trial plan last fall, we had in mind at that time, and you asked the parties -- or I asked you and at my request you asked the parties to hold June, August and October of 2019 for Bellwether trials.  We're a little off that schedule; but in light of what you see here, the number of state court cases that are being set for trial, we think it's really important that we leave here today with a common understanding of what months in 2020 would be held for the three Bellwether trials that you will pick.

Our belief, looking at this schedule, Your Honor, is that a reasonable timeline to work up the first Bellwether trial from the time that you pick it in August to trial would

be February of 2020.  We believe we could try the second Bellwether trial about four months later in July of 2020 and then we'd hope to try the third Bellwether in November of 2020.

So we'd ask, as part of this process today, that the Court's order include holding those three months for trial so that they are available.  You can see what happens on the calendar very quickly if we don't do that.

The cases that are currently set in state courts are largely cases from what your Bellwether plan calls Category 7.  They are fracture cases, open removal cases, death cases and the like.  We have tried three cases already from Category 7; the Hill case, the Brand case, and then there's a state court case called Pavlock that we tried that was also an open procedure.  So we're anxious to set Bellwether trials consistent with your plan from the Categories 5 and 6 and would like to hold dates and move toward that kind of progress in the MDL.

So that's our request, Your Honor.  Thank you.

MR. MATTHEWS:  David Matthews for plaintiff, Judge.

THE COURT:  Yes, Mr. Matthews.

MR. MATTHEWS:  First I'll -- first of all, let me just say that we think this plan is premature at best and here's why.  We look at this docket completely different.

THE COURT:  We have to start trying some of these,

David.

MR. MATTHEWS:  But let me just say this, Judge. We --

THE COURT:  We had a three-week trial in January and we're going the rest of 2019 without trying a case.

MR. MATTHEWS:  But let's look at the reality of what cases we do have on file.  Sixty percent of the cases are symptomatic injury cases; 20 percent are asymptomatic perforation cases, fracture, migration, et cetera; ten percent are failed retrieval complication.  That's 90 percent of the docket.  Less than ten percent are these what I would call no jury cases.  What it's going to take to try these cases --

THE COURT:  Product-in-place cases?

MR. MATTHEWS:  Product-in-place cases or they call them no injury.  Product in place cases, maybe it's a mental anguish claim.

THE COURT:  Somebody told me it was like a third of the filings.

MR. WILLIAMS:  That's what they told us.

MR. MATTHEWS:  It's simply not true, Judge.  Joe has actually put together this.  I'm not sure if you'd like to see it this on this ELMO.  I'm not sure if it comes up.

THE COURT:  I don't see it.

MR. WILLIAMS:  There it is.

MR. MATTHEWS:  This was an analysis of the census

that we went through, which was quite an undertaking.  As you can see, 60 percent of these cases are symptomatic injury cases, 20 percent perforation, migration, fracture, just like Mr. Pavlock was a case I tried in Houston.  His was asymptomatic as well and then it turned out they looked at it on CT and realized he needed to have surgery.  That's what Category 6 is.  5, the failed retrieval, ten percent.  So really what we're talking about on these product-in-place cases, Judge, is a very minimal part of this MDL.  Regardless of what the defendants would like it to be, this is the reality.

But here's another important part of this reality. These cases try at 300 to $800,000 a party.  They're that expensive to try to put on expert witnesses at every level. Simply trying a no injury case won't move the ball at all. That will not bring about a conclusion by settlement in any way, shape, or form.

The cases that matter are the cases of injuries and I'll tell you right now I have five trials settings and we have -- and they were put up here on the board earlier.  But we have a great many types of trials coming up; three Tulip trials, one involves a death, one involves a perforation, one involves a fracture, and actually another migration, which would be the fourth one.  We have two Celect cases coming up; one a perforation and one a fracture.

My point is we're trying all different types of cases that will move the ball. To try to say and to tell the Court that this very small diminimus portion of the MDL will have an impact on closure of this MDL, I don't believe that will ever have an impact at all. And in fact, the reality is -- and I've seen this before, Judge, if you try to set someone with a product-in-place case and they've got to spend $250,000 for -- as an example, on a case they're going to ask a jury to award approximately $50,000, they're not going to take that case to trial.

THE COURT: Right.

MR. MATTHEWS: They're going to dismiss that case and ethically they can dismiss that case or tell their client: I'm sorry, I can't do it. I do not have to try a case at my financial peril because I'm not going to try a $50,000 for $250,000. It doesn't make any sense.

Their effort to tell this Court that all of these cases are no injury cases or the majority of these cases are no injury cases is simply not true. I think that has been something that I've heard now over and over; but as we look at the census -- as we do an analysis of the census, that's simply not the case.

So when we look at what we're doing here today, what are we doing next, I think really is the question I'm asking myself and I'm sure the Court is wondering, too. The Court

has done everything they can, ruled on *Daubert* challenges, done all the pretrial discovery, done all of the rulings on limine motions, everything that needs to be done in a fashion where these cases are ready to be tried, and they're ready to be tried in a meaningful way in other places. And that part of this what we're doing here today is to talk about remand motions.

I think it's important -- it's part of this process. Obviously the cases are going to have to be remanded at some point and we feel that trying no injury cases, one, is unrealistic. Two, you won't get one to trial because I'm telling you right now, I cannot say to a client -- I don't have any of these cases; but as a lawyer that tries these cases, I cannot tell a client: Yeah, we're going to try a case that's going to cost $300,000 but we're only to ask the jury for $50,000 or in that area.

So I guess what I'm saying to the Court is -- and I have filed a motion and I'm taking this a little bit out of order, but I think all of these factors come into play when we talk about a Bellwether process, which I do not think at this time is beneficial in this MDL. We talk about what state court cases that are ready to try. That's also part of this decision. And then third, the remand motions that have been filed.

Quite frankly, the MDL cases are mature and

appropriate to remand once common fact an expert discovery has been completed.  It has been.  *Daubert* motions for noncase specific experts have been resolved.  It has been. Nonspecific dispositive motions have been ruled on.  They have been.  Your Honor has done everything you can -- this Court can.  But at this point in time to try noninjury, product in place, mental anguish only cases is simply a useless endeavor.

If we want to move this MDL to closure, we need to try cases that matter because if they don't think there's any value and we think there are not -- there are not big value cases, we will concede that.  That is not what's going to drive this litigation to closure.  That's not what's going to drive this litigation to settlement.

We disagree completely with the defendant's plan based on the reality, based on the fact that we have cases ready to try in state court.  If you look at what I have sent to the Court in papers concerning the remand motions, I have sent eight cases with different injuries, both products, different -- every one is in a different state and they're different age groups between the plaintiffs.  And what I tried to do is get a cross-section.

So what we can do, therefore, as opposed to try, you know, another one case or two case maybe if the -- if the plaintiff doesn't dismiss the case, based on the economic realities of trial, maybe in a year and a half we'll try a

case.  Maybe, maybe not.  That is not going to help this MDL.

So I guess to finalize the argument, the Court has done a lot.  I think we waste time, energy, and money trying noninjury cases.  The cases are ready to remand.  We're ready to try state court cases.  I'm personally ready.  We have cases set.  Starting in September, October, November, January, February, I have five.  Mr. Martin has three others that are ready to be set.  Ms. Pierson has alluded to other cases.  I know for certain, though, the five I just told you about are set.  They're three different Tulips, two Celects, all different injuries; and we would plead for this Court to remand cases as opposed to setting potential trial cases in the distant future.

THE COURT:  All right.  Thank you.

MS. PIERSON:  Judge, I want to talk a little bit about the census in response to what Mr. Matthews said.  But before I do that, he said something that I wrote down that I think we actually agree.  He said we need to try cases that matter and we agree.  That's why we began this conversation with you more than a year ago about trying cases from the product-in-place category.  They've made those cases matter because they won't dismiss them and because they continue to file them.  More than three out of ten of every new cases filed clearly fall in the product in place on their face.  You had us go through this census exercise --

THE COURT:  We've got -- we have a major disagreement here as to the percentage of product-in-place cases, no injury cases in this MDL.  My impression has been that it was a third, maybe even more than that of the MDL and now I find from plaintiffs' submission that it's five percent?

MS. PIERSON:  That's inaccurate, Your Honor.  I think there's a disagreement about --

THE COURT:  We need -- we need to get some accuracy here so we know what we're talking about.  I mean, if this is a third or more of the MDL, if -- somebody had mentioned 6,000 cases.  If it's 2,000 cases of product in place or no injury cases and they're not willing to dismiss them, we've got to get rid of them somehow.  But if it's only a few hundred, then maybe we need to try the serious injury cases.

MS. PIERSON:  May I approach?

THE COURT:  It's something that needs -- some kind of agreement needs to be arrived at.

MS. PIERSON:  There is no disagreement on the statistics, Judge.  It's all in how you define what is and what is not an injury.  If I may approach.  These are the numbers that Mr. Matthews just showed you.  They're the same numbers that are on the screen in front of you.  They come from the census that you ordered and Categories 1 through 6 are categories that we view as no injury cases.

You may recall that Category 1 were cases where the

plaintiff claimed nothing, no pain, no fear, no nothing at all.  Category 2 cases were the cases where the plaintiffs claimed no physical injury or product malfunction.  They claim only to have emotional distress or fear, and Mr. Bennett is going to talk about those in just a moment.

The Category 3 cases were cases where a patient had a filter and they also happened to be on blood thinner, or they have a claim that their IVC was stenosed in some way, which we've heard from plaintiffs' own expert can happen in the absence of an IVC filter or in the absence of an IVC filter malfunction.

Then Categories 4 are the categories where the filter wasn't retrieved early on.  So the filter is present and the plaintiff wants it out.

Categories 5 and 6 are the asymptomatic perforation cases, multiple retrieval attempts, and your order was that we should try cases from buckets 5 and 6.

It's our view that Categories 1 through 6 are all no injury cases, and your October order provided that the Category 1 cases would be dismissed automatically and that Categories 2, 3 and 4 could be the subject of motion practice and that's exactly what will happen, Your Honor.  Our plan is to move on two tracks that while you set Bellwether trials from Categories 5 and 6, we're going to be filing global motions that affect other -- the other no injury categories.

This Category 7, where plaintiffs have parked 2,861 cases, what drives up that number is that it has cases of perforation plus a subjective complaint of pain.  Attorney writes on the categorization form:  Medical record shows perforation; attorney writes:  Patient has pain.  That's about 1,800 of those cases in that bucket.

We've tried a number of perforation cases now.  Both Hill and Brand were perforation cases and so was Mr. Pavlock's case.  And just so the Court is not misled in Mr. Matthews' suggestion that somehow the numbers that we previously gave you from the plaintiffs' profile forms, they're self-reporting, that those numbers were somehow incorrect, we actually anticipated that and pulled our slide from the presentation and put it on the screen in front of you, Your Honor.  You can see on the left-hand side of the screen were the numbers from the plaintiff profile forms and you can see how they compare to the census that was just conducted.

Based on the plaintiff profile forms, when you include asymptomatic perforation, asymptomatic migration, you have about 1900 cases and from Your Honor's -- from the census, the results of the census, we have about 1900 cases that again are plaintiffs who say they have perforation or migration or embedded filter but no physical symptoms.  That's the product-in-place bucket that is the barrier to moving forward.

We've tried three cases now from the 60 percent that Mr. Matthews and I agree constitute people who say they have some injury.  We've tried three cases from that bucket; and you can see from the list of cases that are scheduled to be tried that I showed you earlier, we've got a number of additional trials that are coming up in that bucket.  Contrary to what Mr. Matthews told you, the three Tulip trials that are scheduled between now and the first part of 2020, one is a death and two are open procedures.  Those aren't trials of Tulips of various kind of injuries.  Those are the two most serious possible injuries someone could claim with a Tulip.

And of the Celect cases that are set, the three that are set in state courts, we've already tried three Celect cases.  We'll try three more in state courts.  One of those is a death.  The Brownlow case is a perforation and embedded filter, and the Strictland case is a perforation that was, in fact, retrieved.  The bottom line is when Mr. Matthews said we need to try cases that matter and if we don't -- if we try product-in-place cases, as Your Honor ordered over a year ago now, if we do that now, that these cases will simply be dismissed.

If that's true, then dismiss them.  Dismiss them now.  And if plaintiffs were to do that, it dramatically changes the denominator of total cases in this MDL and it moves the mark in multiple ways.  But we haven't tried any

cases from that bucket and that's why Your Honor ordered last February and again in October that's those are what the next three cases will be.  They matter to us, just like the high dollar injury cases matter to the plaintiff and the three that we've already tried.

Mr. Matthews raises the issues that we're going to talk about on the remand motion and I want to reserve argument on that issue to when we get to those motion, but I would say this, Your Honor, just briefly.  You have not ruled on *Daubert* motions for general experts that affect all of the MDL.  Up to this point our case management plans have not been global as to all cases in the MDL.  They've been individual case experts and plaintiffs have been very careful to designate their experts that way.

There may be opportunities to rule on *Daubert* motions that affect greater numbers of cases like the Tulip cases in our next round of Bellwethers but that hasn't happened yet.  And to the extent that I hear these lawyers suggest that discovery -- all discovery is over, in every state court case on the list in front of you, Your Honor, they've asked for more discovery.  Every single one.  More company discovery, more general discovery.  And of course, there's substantial discovery to be done with respect to the experts that will be designated, whether that's globally or in the individual Bellwethers that Your Honor chooses.

But at the end of the day, Your Honor, we think you made this decision a year ago in February. You made it again in October of 2018, and the census numbers that we have shown you have been entirely consistent and both are self-reported by the plaintiffs. We're not choosing what categories these cases go into. Plaintiffs are choosing what categories they go into. And this bucket of cases which we believe is no injury, plaintiffs believe it is an injury. That's the bucket we need to get our arms around. Thank you.

THE COURT: Thank you.

MR. WILLIAMS: Good afternoon.

THE COURT: If these cases are worth $50,000 and it's going to cost $200,000 to try them, why don't we dismiss them now? I mean, if I set them for a Bellwether and we get geared up for Bellwether and reserve trial dates and on the eve of trial all of a sudden: Well, this isn't worth our while. We're going to dismiss it. Everybody loses there.

So is there some mechanism that we can use here that -- I mean, if you're telling me that -- and I have no reason not to believe you. These are expensive cases to try. Why don't we get -- why don't we get realistic -- why don't we get realistic and practical.

MR. WILLIAMS: I agree.

THE COURT: And say, you know, whoever the attorney is in Altoona, say: Look, we appreciate this and we're not

going to try this case.  It's just not worth it for us.  As plaintiffs' lawyers, we're not required to lose money on cases.

MR. WILLIAMS:  Sure.

THE COURT:  I'm just throwing that out.

MR. WILLIAMS:  Let me address that question first, Your Honor.  And this is something we had suggested some time ago and it was precisely to address this issue.  If we're going to get creative, if Cook's concern is truly what do we do with these $50,000 cases, what do we do with these hundred thousand dollars cases and we've got a financial issue in that we don't want to outlay $700,000 to try a hundred thousand dollar case, the way that that gets remedied and serves both sides, both getting information about these lower value cases and making it economically feasible to try, is to try cases with multiple plaintiffs.  Try ten folks who have failed retrievals and don't -- and that way if you're asking for a hundred thousand dollars for ten people, we can make that case financially doable.  But if we don't and it's done one by one, you're never going to get -- like Your Honor said, the cases will get dismissed and we'll never get a decision on that.

I think the important -- I want to step back for a quick second.  And the reason we got to this Bellwether proposal that Cook's discussing today, and I think it's on the sheet that Ms. Pierson handed up to Your Honor, but there are

quotes from Ms. Pierson at the February 15, 2018 hearing that says "PIP cases now represent the majority of cases. Fear cases have now overtaken the MDL in large part. The product in place no injury bucket of cases represents the largest claimed group." And when Your Honor heard those statements, you said: If that's the case, then we've got to start trying these cases.

THE COURT: And there was no objection.

MR. WILLIAMS: Well, we didn't have the categories. Well --

THE COURT: So that's why I assumed --

MR. WILLIAMS: I thought we did object to that, Your Honor.

THE COURT: -- that is the case.

MR. WILLIAMS: We did not have all of the information they had at the time; and now when we got their census and I went through and all I did was divide the number in each category by the total number of cases to arrive at those percentages, fear cases, which were told have overtaken the MDL in large part, represents five percent of the docket. I mean, if we're looking to try representative cases, the census has not born that out.

But with regard to how do we try these cases economically, if we do want to try lower value cases, the only way to do it economically is to try multi-plaintiff cases,

which is done -- did Goodwin do that in mesh?

MR. MATTHEWS:  Yes.

MR. WILLIAMS:  David would know better about that than I would but it's not an uncommon way of going about this.

MS. PIERSON:  Your Honor, I think there's only really one new issue that Mr. Williams raises and this is multi-plaintiff trials.  We argued this issue in October extensively.  What I put on the screen in front of you is your order from October the 2nd.  You made very clear that the Court finds multi-plaintiff Bellwethers run the risk of confusing the jury and significantly increasing the lengths of trials.  I'm not going to -- although I brought that presentation and would be happy to give it, I know Your Honor doesn't want to hear us rearguing that issue.  But we've already made our point there and to the extent that plaintiffs contend that it's too expensive now to try cases that have no injury, then those cases should be dismissed.

Mr. Bennett's going to walk you through how we address the cases that are in Category 2, these cases that are fear cases and the cases that are in Category 1.  At the end of the day, if plaintiffs would dismiss the Category 1 through six cases, we'd move nearly 2,000 cases off this docket and then this MDL would be in a position that I think it could be resolved.  It can't right now.  They are a barrier, and you've ruled now twice in February and October of last year that this

is our path forward.  That's the path that we intend do stay on and the proposal that we gave you gets us there.

THE COURT:  Mr. Bennett.

MR. BENNETT:  Thank you, Your Honor.  What I want to do is walk through where we are as far as the May filings that occurred since I was before you asking for a motion for Bellwether selection and screening order or categorization order.  It was back in June of last year, actually, that --

Well, I should say it was -- it was back in January of last year that we first began talking about these product-in-place cases and no injury cases.  I want to make sure that we're very clear that it's a broader group of cases than just the fear cases, and we were very clear about that from Day 1.  I would constantly come up in front of you and present to you, Your Honor, examples of categorizations or PFS's that had various claimed injuries or no injuries at all. I don't want there to be a misunderstanding that we somehow tried to mislead you, Your Honor.

Certainly when we define product in place/no injury in the motion filed June 25, 2018, the definition that we were using was on the first page of that motion and it made it very clear that what we were -- what we were defining was basically the Category 1 through 6 and we were leaving out the symptomatic injury cases, which would be Category 7; and I think that our definition and what we said about it in that

motion, which became the -- what drove your order in October was a definition that I think is consistent with the census Categories 1 through 6.  And in fact, your order reflected that in that you basically set Category 7 aside, which was the injury cases, and on 1 through 6, as Ms. Pierson said, you took the two would be the largest categories, Categories 5 and 6, and said we're going to try cases from those.  And on Category 1, you said that we will dismiss those immediately. Those are the ones where you had a filter, it was removed and nothing happened; and Categories 2 through 4 would be the target of motion practice.  So this is the first step in that process.

First off, Your Honor -- I've already handed these exhibits to the PSC, but in your November 21, 2018 order, you laid out two of the first steps of your Bellwether plan and one of them was the deadline for categorization, which you had as December 22, 2018, and the other was the deadline for the census.

And then on January 17th, you extended their deadline from December 22nd to January 31st; and in that -- in that order, you made it clear, in the amended order, that if they didn't comply by January 31st with the categorization, which required a case categorization form along with a supporting medical record, that it would be dismissed without prejudice.  Meaning if they complied later, you would be open

to reinstatement, which you have done.  And then you gave us a deadline in that order of February 7th to do the census.

We filed our motion to dismiss, the original motion to dismiss, and there were some fits and starts with that motion.  We had a wrong count and we explained that to the Court.  We sent an email.  And after that point, we basically began accepting categorizations that were filed after our motion to dismiss.  So that by the time we were in front of you today, we would have an accurate count and still be fair to those people who sent the submissions in late and that's what we have today.

We have an exhibit A and an exhibit B.  May I approach, Your Honor?

THE COURT:  You may.  Thank you.

MR. BENNETT:  Exhibit A represents a smaller list of our original motion exhibit A of plaintiffs who have failed to submit categorizations.  Not just by your December deadline or your January deadline but by -- as of last Friday.  So we're now four or five months out from the deadline and we believe it is appropriate for those who still have not submitted categorizations that they be dismissed without prejudice.

THE COURT:  This is as April 26th.

MR. BENNETT:  As of April 26th.

And I sent this list to Mr. Williams on April 4th, just saying:  Hey, we should probably work out some way to get

these dismissed in advance of hearing.  Mr. Williams reached out to a number of the plaintiffs' lawyers.  We received more categorizations and we removed those people from the list.  So as of April 26th -- I think we've got to draw a line somewhere and I think the 26th of April is a fair line to draw at this point.

And exhibit B are people who have submitted categorizations but did not submit a medical record, which is also a requirement of your order for categorization.  Not that you just simply say what you have but show what you have.  And so exhibit B reflects that list of people who failed to comply with your order by April 26th.

And just -- just so we're clear, though -- so the exhibit A as of last Friday has 130 plaintiffs on it.  Exhibit B has 174.  However, a number of those are from the Curtis Law Group and we've been working with that law firm to get those dismissed on their own, rather than having you do it, Your Honor.  If you remove the Curtis law firm from that list, it goes down to 69 plaintiffs.

THE COURT:  On exhibit --

MR. BENNETT:  B.  Again, this is not a dispute about what's going to happen with their cases.  He reached out to us and asked if we could do that, and I think he was going to file that today or this week and so --

THE COURT:  So Curtis is going to dismiss?

MR. BENNETT:  Yes.  And the reason why he's going to --

THE COURT:  One hundred of these?

MR. BENNETT:  Yes.  And the reason why he's going to dismiss those, Your Honor, and it wasn't because he was -- he was failing to do his job.  It was more because many of those cases are Category 2 cases, fear of injury; and quite frankly, to find a medical record to support that was difficult to do. You alluded to that earlier.  Usually there's not a medical record that supports that fear.  So rather than have it dismissed that way, he was just going to a wait until he had an injury, if he ever had one, and then refile it.

I thought that was a very fair approach and we've agreed to follow that approach.

THE COURT:  Is that your understanding as well, Mr. Williams or Mr. Matthews?

MR. MATTHEWS:  Yes, Your Honor.  I talked to Mr. Curtis on this issue and it's my understanding that those -- the clients had not been imaged.  So he wasn't certain if there was an injury at the time and so I think that's correct.

THE COURT:  Okay.  Thank you.

MR. BENNETT:  So if we move from the people who didn't categorize, which are exhibit A's and B's --

THE COURT:  What's the timetable on Mr. Curtis

dismissing?

MR. BENNETT:  I was hoping it was done before I was in front of you today.  I would say --

THE COURT:  Tina would probably know that.  Have you seen that come through?

THE CLERK:  I have not.

THE COURT:  Shortly then.

MR. BENNETT:  Shortly.

Let's talk about the plaintiffs who did categorize. Today I am prepared to to identify for you the exhibit one -- I'm sorry, the Category 1 plaintiffs; and those again are the ones who had the filter removed and did not have any claim of an injury.  Based on your October order, Your Honor, you indicated that those would be dismissed because there was no injury.

May I approach?

THE COURT:  You may.

MR. BENNETT:  We have 30 plaintiffs on the Exhibit 1, it's the Category 1 plaintiffs.  And just a footnote, though.  There are two plaintiffs that have contacted us -- I'm sorry.  The lawyers have contacted us, that is Manning and Roberts -- I'm sorry, Manning and Robins, who have indicated that they would like to be considered not Category 1 but a different category, and we're working with the lawyers for those two plaintiffs now.  So I would ask that

you remove those from the list until we've worked through that.

So the rest of them, though, are people who have self identified. We've not identified these people as Category 1 but they've self identified as Category 1 under the order and we ask that they be dismissed as well.

Finally, Your Honor, for today I would like to invite Your Honor and the PSC to engage in a discussion about what we do with Category 2. Category 2, Your Honor, are the fear of injury cases and we've been talking about those since early last year. You've indicated from the bench that you question why are we even presenting those cases moving forward. We can -- we can have a dispute over Categories 3, 4 and 5 and whether those are injury but Category 2 are fear no injury. As the Curtis Law Group cases demonstrate, you can't find a medical record to support that.

And so I sent a letter to Mr. Williams earlier this month asking to engage in that discussion because I think that really we're happy to file a motion on all those cases, there's about 400 of those cases -- or maybe it's less than that. Once you remove the Curtis Law Group, maybe it's less than that now. But rather than file a motion where we're arguing over different states' laws and putting a lot of paper in front of Your Honor, I would like there to be some sort of resolution short of that. However, if we can't reach that

resolution now, then we'll file a motion and we'll care of

Category 2 as well.

THE COURT:  Did Mr. Williams respond to your letter?

MR. BENNETT:  To be fair to Mr. Williams, he was on vacation at the time.

MR. WILLIAMS:  And Your Honor, I think our position -- the PSC's position on this is one, we can't take necessarily a hard position one way or the other for other law firm's clients.  Just can't do it.

THE COURT:  Sure.

MR. WILLIAMS:  But my suggestion would be --

THE COURT:  Well, the steering committee can send out --

MR. WILLIAMS:  And we have.  We have.  But as far as actually controlling what happens to these other lawyers' clients, we can't really do it.

THE COURT:  Right.

MR. WILLIAMS:  If they want to dismiss these cases and they've reached out to the individual lawyers and said: Listen, you've got -- like Mr. Curtis, you've got these fear cases, let's get rid of them, if they agree to dismiss, great. If they don't, I don't know of any other mechanism to get rid of them other than a motion for summary judgment.

MR. BENNETT:  We can file that, Your Honor, and perhaps that motion in and of its will create some incentive

for dismissals, and we're happy to do that and we can do that --

MR. WILLIAMS:  If I can ask Mr. Bennett a question. Have you reached out, other than to Mr. Curtis, have you reached out to the other individual firms and said:  Hey, would you consider letting those go?

MR. BENNETT:  I have not, other than sending the list to you.

MR. WILLIAMS:  Other than sending it to me.  I would suggest that Cook contact the individual lawyers on this who have these fear cases and say:  Listen, this is what some other folks are doing.  Let's open that dialogue.

I just can't make a commitment.  We've taken the request from Mr. Bennett.  We have forwarded them to all MDL counsel but I can't just -- I can't take a position for them.

MR. BENNETT:  This is to -- that's why we have the PSC to facilitate these contacts.  It's a lot easier for me to contact you than it is to contact a number of other law firms. We can always file a motion and they'll get service of that motion, and they can either respond or not.  But this is more I wanted to invite a conversation about what you would prefer, Your Honor.

THE COURT:  Maybe what the steering committee might consider is contacting the plaintiffs' attorneys and indicating that Category 2 here, the fear cases, that Curtis

has -- Curtis law firm is dismissing and might be something that other fear cases may consider doing and to give them -- give them maybe a deadline to get back to you as to what their thoughts are on that.  And then if we don't get any response on that, then maybe summary judgment might be the way to go with that.

MR. WILLIAMS:  And Your Honor, we can do that.  I'll just -- we've sent it out once.  We'll send it out again, say there's a development.  Curtis has chosen to go that route. Why don't you consider it, reach out to Mr. Bennett.

THE COURT:  Unless you've got medical records somewhere to put into evidence, it's going to be a tough row.

MR. BENNETT:  One more thing, Your Honor, on that point.  We've worked this out with the Curtis Law Group.  We shared with them the language you used in your order of the 115 that they self selected last year, where we worked out in open court kind of the language that was going to be used, and he found that to be acceptable.  And we would just ask if you could share that same language with the other plaintiffs' lawyers so that --

MR. WILLIAMS:  Sure.

MR. BENNETT:  -- we have a standard stipulated motion that we can file together with the exact same language where it allows them to refile in this Court if they have an injury at a future date.

MR. WILLIAMS:  We'll do that.

MR. MARTIN:  If Mr. Bennett will provide us with that proposed order, what we can do is send it out to the MDL plaintiffs and if they've got -- if they've got a case on that list, then they can -- then they can respond accordingly.  And I would suggest then that they respond right directly with Mr. Bennett.  If you'll, Mr. Bennett, provide me with that proposed order, I can affirm that we will provide that to the MDL plaintiffs counsel and they can deal directly with Mr. Bennett

MR. BENNETT:  That's perfect and that's just fine. I would like a deadline, though.  If I send you the order by tomorrow, a deadline for them to respond as well.  So would two weeks be enough time?

MR. MARTIN:  I don't think -- I think you ought to give them three weeks.  We've got to get it to them and I would suggest three weeks -- give them three weeks.  We have to give them enough time so that -- there are a lot of plaintiffs' counsel and I would like this not to slip through anybody's crack to prevent this from going forward as best it can.  So I would say three weeks to four weeks would be my suggestion.

THE COURT:  Twenty-one days.

MR. BENNETT:  Thank you, Your Honor.  And I would just ask that exhibit A and exhibit B cases be dismissed

without prejudice; and Exhibit 1 cases, the Category 1 cases be dismissed with prejudice.  Thank you, Your Honor.

THE COURT:  Mr. Martin?

MR. MARTIN:  Your Honor, if I may.  One of the items on the agenda which Mr. Matthews had began to talk about -- or talked a little bit about were the motions for -- he designated them as being motions for remand.  Officially they're motions to transfer venue.

Back in October and -- I believe maybe October, November, we respectfully -- Mr. Matthews' firm and my firm filed these motions to transfer venue back to their home jurisdictions, a total of -- I believe it's 15 cases; eight by Mr. Matthews' firm and seven by my firm.  If I could outline to the Court -- well, first of all, let me outline to the Court the basis of that.

At the end of the day, we're getting to a point -- I believe it's going to be argued probably at the next status conference, the remand motion.  We've given defense counsel extra time to respond to our motion to remand all of the cases that are filed in the MDL back to their home jurisdictions. And I don't want to go forth and talk about that but it still comes back to being relevant to the argument today, which is: Should the Court remand, transfer the 15 cases subject to the motion -- our two motions to transfer back to the home jurisdictions.

And one of the things that is the reality of the situation is that once the Court -- my understanding of the law is that once the Court has conducted the global discovery and has gotten the cases in a position to be able to try, and I would suggest now that since the Court has -- this Court and another court in Houston has got to the point of being able to try three cases, that in and of itself is some indicator that the discovery has been accomplished that this Court was, I think, under an obligation to conduct and that has been accomplished.

Not to belabor the point but as pointed out in our motions -- or in the motion -- actually, it won't be heard today but I'll simply say and remind the Court that back beginning in 2016 -- towards the beginning of 2016, I believe, that Cook has reiterated time and time again when we would try to seek discovery, no, discovery is over.  Discovery is over in this MDL.

And the truth of the matter is very little, if any discovery, that I can recall, has been attempted even in many, many months.  So with the agreement and -- with the agreement that -- we agree.  That largely, if not almost completely, maybe discovery is over and the MDL court has done its job. Has tried two Bellwethers.  There's been another Bellwether tried out at state court we tried in Houston.  When it comes down to it with respect to these two motions to transfer these

15 cases, there's absolutely no reason why they shouldn't be transferred.  Discovery has been done, the global discovery.  It's time for those cases to be moved back to state courts.

And I would suggest, Your Honor, that if these -- if these cases, which I'll show to the Court, if these cases are remanded, then those will be another 15 cases that the Court can -- the courts can begin trying to --so these are cases that can be tried to assist the process of ending this litigation.  And we know now that there are -- I believe there are 18 state court cases filed, many of which have trial settings this or next year; and I know that the majority of the rest of them, if not all of them, will probably have trial settings next year at the latest.

So you've got 18 state court cases that are going back to be tried.  We will have, if the Court remands these, another 15 cases going back to their federal home jurisdictions to be tried, and they're all different kinds of cases that we have asked be remanded.  So I think, Your Honor, that it would help the process more than anything to have more cases sent back to be prepared and tried.

And the truth of the matter is, I'm going to guess that with that situation on hand, that may bring people back to the table.  And I know that Mr. -- I know that Mr. Williams is going to talk today about -- at least to some extent, where we stand with respect to settlement negotiations of this case.

And I don't know how detailed the Court wants to get but he'll address that.

I simply think that there's absolutely no reason why it is that this -- these 15 cases that are the subject of our two motions for remand -- these are Mr. Matthews' cases here, eight of them. And I'll give this to the Court before I sit down. And these are, Your Honor, respectfully, my cases and they're all different kind of cases. Mr. Matthews has a bit more diversity with his, but there's 15 cases and I would suggest that the basis for these being transferred back are for the convenience of the parties, and they would go directly back to the Court with this Court's order and officially to transfer venue and we've got -- I don't know if there are any -- any of these were, for instance, maybe there's a Northern District which would get two of them; but I think these will be distributed around to the different courts and be very efficient to assist in getting this litigation handled. So we'd move that these 15 cases, the subject of these two motions were filed I believe in October, that these transfer motions be granted.

THE COURT: All right.

MR. MARTIN: Thank you. Oh, Your Honor, promised to give you this and I didn't. May I approach?

THE COURT: Sure.

Ms. Pierson.

MS. PIERSON:  Thank you, Your Honor.  Your Honor, as we noted in the agenda, there are two specific motions to remand before the Court today.  Those are dockets 9694 and 9602.  There's a third motion to remand that affects all of the cases that was recently filed.  Cook will respond to that motion.  We were given an extension of time to respond to it and I believe that will be heard in June or July of this year.  So as an initial matter, our suggestion was that we defer argument on motions to remand so Your Honor could hear all of those at, once just to be a little more efficient.

Since Mr. Martin has argued the motions, I'll go ahead and respond but I believe we'll be revisiting this potentially again on a third motion that they filed.

What I didn't hear Mr. Martin mention, though, was a standard for remanding these cases and the standard is quite high, as you may be familiar with, Your Honor.  The standard for transfer under Section 1404(a), it puts the burden on the plaintiff, the moving party seeking remand, and it requires the plaintiffs to prove to you that venue is proper and the transfer or district that venue and jurisdiction are proper in the transferee district, and that transfer will serve the convenience of witnesses and parties and the interest of justice.  And that, of course, is the *Berry Plastics* case that the Seventh Circuit decided in 2013.

As we pointed out in our responsive papers to both

of these motions, it's not enough for the plaintiffs to just make conclusory allegations of convenience of parties or things -- depositions being taken.  They have to give you actual evidence of that.  That's what the *Berry Plastics* case requires.  Evidence of increased convenience, evidence of venue and jurisdiction and of course, evidence not just that it's more convenient but both the *Berry Plastics* case and the *Elanco* case in the Southern District of Indiana say that the movant has to show you that it is clearly more convenient for whatever the next steps are for the case to be transferred. And as I said, the burden is on the movant.

We articulated in our papers three or four reasons why transfer is not proper at this time and I want to take those in a little bit of a reverse order from what we did in our written papers, Your Honor.  The last point we made in our written papers really relates to how did the cases get before Your Honor in the first place.  We believe that remand is not a possibility for many of the cases that are included in the two motions that are before you because they weren't transferred to this Court in the first place.  They never went through the JPML process to be transferred to the Court. Instead, they were filed in the Southern District of Indiana, which is, in fact, a preferred venue.

There is no direct filing order in this MDL, and there are examples of what direct filing orders look like in

other MDL's like the Vioxx MDL, Metal Reaction MDL.  We can send those to you if helpful.  But at the end of the day, a direct filing order is a stipulation between parties that's approved by the Court where the parties agree to direct filing for consolidated discovery and for pretrial purposes.

Typically with a direct filing order, the defendants stipulate that they won't object to improper venue.  They reach that agreement and the parties affirmatively preserve their rights to seek transfer and remand under lexecon.  That never happened in this MDL.  The plaintiffs never sought a direct filing order from you and quite to the contrary, chose to place their cases in the preferred venue of the Southern District of Indiana.

And there are papers that they filed with the JPML to create the MDL in the first place would be why.  In those papers the plaintiffs themselves articulate that the location of most of the witnesses and most convenient location for these trials is in the Southern District of Indiana because, of course, Cook is in Bloomington; and the majority of the witnesses that you've heard from have been from Indiana, even in the Brand trial most recently.  We had witnesses from all over the world but the majority of the witnesses that you heard from were, in fact, folks who work and live in Bloomington.  Bloomington of course is the place where the product is sold, where the regulatory filings take place, and

where the product is marketed from among other things.  But those are all arguments that the plaintiffs themselves made when they sought to create a MDL in this jurisdiction.

A direct filing order -- within a direct filing order the parties affirmatively preserve their rights to seek transfer and remand.  That did not happen here.  And a direct filing order confirms that the cases will be treated for choice of law as though they were transferred to the Court under Section 1407.  Again, there is no such order in this MDL and for most of the cases that are listed in these two motions, they were filed in a preferred venue.

So Section 1407 provides no support to the plaintiffs, no opportunity to remand those cases in the first instance.  They are properly here under Section 1404(a).

THE COURT:  So these motions are not remand motions; they're actually transfer motions.

MS. PIERSON:  A portion of these, that's correct, the ones that were -- were directly filed here, Your Honor, which is the majority of the cases that are on the list.

So let's talk about the standard for transfer then, under 1404(a).  I mentioned it briefly just a moment ago but as we articulated in our papers, Your Honor, there's no evidence to support the very first element that 1404(a) requires, which is that the transferee districts that the plaintiffs seek to transfer to, whether it's Texas or Florida

or someplace else, that they can support personal jurisdiction against the Cook defendants that are named in the cases.

Again, plaintiffs burden in their paper was to provide you with evidence that Texas or Alabama, or some other state is a state in which there's personal jurisdiction over all of the Cook defendants and they just haven't done it, Judge.  It's not anywhere in their papers.

They also make no showing that venue exists for any of the defendants in any of the transferee courts.  It's just not there, much less evidence to support it.

Secondly, Your Honor, transfer is inappropriate under 1404(a) because the plaintiffs haven't demonstrated that the transferee courts are clearly more convenient courts for these 15 cases in the two motions.  And it's the *Rapier v. Capital One* case that we cited in our papers from the Southern District of Indiana, 2007 case, that sets out four factors on convenience.

First, what forum did the plaintiffs choose.  Second, the situs of material events.  Third, the ease of access to sources of proof and the Court's power to compel attendance of witnesses at trial.  And then fourth, the convenience of the parties and their ability to bear the expense of trial in a particular forum.

Mr. Martin very briefly touched on convenience but none of their papers cite any evidence to support any of those

factors, and he certainly didn't today address any of the other factors that are articulated by the case law to determine convenience.

The first factor, though, the plaintiff's choice of forum, weighs in favor of leaving cases here. Of not transferring them. It's the *Alcon* case from the Southern District of Indiana that sets out when a plaintiff chooses a forum, that that's one of the things that you consider in deciding what's convenient. Not only did the plaintiffs choose the Southern District of Indiana themselves, they explained to the JPML why this was the most convenient forum for the cases. They themselves elected this preferred venue. And there's no evidence that I can find in either of their motions to articulate any evidentiary basis to suggest otherwise. This is the place that they chose for these cases.

The *Alcon* case notes that where the plaintiff chooses to sue outside their home state, that choice is given deference. Where the plaintiff chooses to sue outside their state, the plaintiff's choice is given deference, and the location of the defendant's residence is given priority in determining convenience of the parties. Of course, as you've heard now, Judge, through two trials that you've heard the evidence of Cook's location in Bloomington, of the location where many of the facts that are at issue in these cases have taken place, including things like FDA submissions and other

things which have occurred in the Southern District of Indiana.

Material witnesses are -- the material witnesses in these cases are largely here or are frequently here to the extent there are some that are in Denmark.  When they come to the United States, the place that they're coming to work is here in Bloomington, and you've seen firsthand your ability to compel attendance of key witnesses at trial -- in trials is here in the Southern District of Indiana.

The Southern District of Indiana is the place where events material to the case have taken place.  Defendants' master complaint also notes, and I quote, "A substantial amount of activity giving rise to claims in this case occurred in this district and defendants are located in this district." Plaintiffs' own master complaint also says Cook's headquarters in Bloomington are, "The center of the accused activity."  I'm sorry.  That's not what their master complaint says.  The master complaint notes, as I've said, that Cook's headquarters are here in Bloomington and the case law talks about the center of the accused activity, what took place in terms of selling the product.  Those things occurred in Indiana.  In the Southern District of Indiana to be specific.

The third factor.  Plaintiffs concede that the third factor in a motion to transfer -- in their motion to transfer to this MDL on page eight, the plaintiffs note that the

evidence necessary in these matters will be found within this district.  That's their motion to create the MDL in the first place, on page eight.  And they say, "Many and perhaps most of the corporate witnesses and documents will be located in the district."  Again those are their words.  Not mine.

Plaintiffs' general allegations of convenience alone in other states because a plaintiff happens to live there, whether it's Texas or Florida or someplace else, under the case law that's insufficient grounds to transfer the cases. They have to identify specific witnesses and provide specific sufficient evidence for the Court to determine how important that testimony will be in the context of the cases and what the witnesses will testify.

The case law supports that where witnesses have to travel either way to a trial, whether it's Cook's witnesses traveling to another jurisdiction or the plaintiff traveling here for a trial, the law does not favor transfer in that instance and that's the *Berry Plastics* and *Alcon* case as well.

The plaintiffs cannot dispute, after two trials in this Court, that testimony from witnesses located in Indiana were critical parts of the trial; and certainly to Cook that testimony was critical to Cook's defense in both trials and will be in trials in any of the cases that are listed on the motions to transfer.  Key records and access to records are here in Indiana.

The last factor under this section of convenience of the parties, for that last factor, the convenience factor, the plaintiffs have provided no evidence that they would be unable to bear the expense of a trial in Indiana for these cases that are subject to the motion to transfer, or that financial hardship would result if required to litigate outside their home forums.

Again, conclusory allegations aren't enough or statements of counsel from the podium are not enough. On a motion to transfer, they're obligated to come forward with actual evidence of that for you to consider, Judge, and it's simply not there in either of their four-page motions. They chose to sue in Indiana, and the expense of lawsuits in these cases isn't born by any single plaintiff or any individual. As we've seen from their motion on the common benefit fund, this is a shared expense in the course of this litigation.

1404(a) provides for transfer to a more convenient forum. Not a forum likely to be inconvenient or equally convenient. So absent compelling evidence that clearly proves to you, Judge, that another forum is not just equally convenient or more convenient for the plaintiff and less convenient for Cook, they must prove to you by clear evidence that the convenience of the parties weighs in favor of transfer and that hasn't happened here.

We explained in our papers that 1404(a) and the case

law under it also provides three factors to consider regarding the interests of justice. And of course, the legal standard -- one of the legal standards in their 1404 -- under 1404 is that the plaintiffs or the movant has to prove the interest of justice favor transfer. That factor focuses on the transferee court's familiarity with governing law, local interest in deciding local controversies and congestion in alternative courts. That also comes from the *Berry Plastics* case, Your Honor.

As we explained in our papers, however, consolidation continue to lead these cases in the southern district and in this MDL. It is favored for multiple reasons under the case law. The consistency and results in pretrial proceedings, avoiding duplicitous litigation; and as the plaintiffs themselves articulated, when seeking creation of the MDL, because it eliminates duplicative discovery, prevents inconsistent pretrial rulings, and reserves the resources of parties, counsel, and the judiciary.

I note, Your Honor, that among cases in which they've sought remand in this case, there are a number of Tulip cases on that list as well. As you know, we've not had a Tulip case that's gone to trial, nor have we had any substantive motions decided in any Tulip case. We had Mr. Gage's case, which ultimately resulted in summary judgment, but it was before Your Honor had the opportunity to

rule on substantive *Daubert* motions, motions in limine, and the like applicable to the Tulip cases.  They stand in a particularly unique position among the cases that are on this list.

But setting that aside, as I alluded to earlier, Your Honor, the order setting discovery in the Hill case and the Brand case, and setting things like expert deadlines, those were case specific experts.  Your Honor has not ruled on any general causation *Daubert* motions.  It's quite possible that in the course of addressing the Tulip cases that Your Honor will choose as Bellwether trials, that we may do some of that.  We may come to the Court and ask Your Honor to address things like general causation for all Tulip cases, for example.

But there are other issues that cross all the cases or many groups of the cases that we'll be bringing before Your Honor over the course of the next few months to address. Another example is statute of repose.  As we look at the categorization forms, the responses that we're getting from the plaintiffs, there may be hundreds of cases that are barred by the statute of repose.  These are products that have been sold for 30 years.  Tulip product has been on the market since 1999 and it appears that there's been minimal screening done with respect to issues like that.

The issue that Mr. Bennett mentioned, how do we deal

with cases where the only claim is emotional distress, those are hundreds of cases. That's not one or two or five cases. So we'd submit to you, Your Honor, that the work of this MDL is not done. And regardless of the product that we're talking about, Your Honor, we've had two Bellwether trials, just two. In MDL's, that's uncommon before we get to the stage of remand. We do need more trials.

The two cases that we've tried, one was a perforation with organ perforation. A fairly significant injury among those alleged in this MDL, and that was a Celect case. The other case that we tried, Brand, as you know, was an open procedure, perforation and a fracture case. That group of cases, organ perforation and open procedure fractures, that's a very, very small part of this MDL; and there's a significant amount of common work to be done in terms of motion practice, experts and the like that we've really only just begun. That's what the next Bellwether plan, the plan that you adopted in October, achieves and we'd submit, Your Honor, that we've got to see your plan through before we can even get to the point of talking about --

THE COURT: One of the problems we have is our second trial that we just had in January didn't tell us much about design defect, unfortunately.

MR. MARTIN: About what, Your Honor? I just didn't hear.

THE COURT:  Excuse me.

MR. MARTIN:  I didn't hear the Court.

THE COURT:  I'm sorry.  Our second trial didn't tell us much about design defect, unfortunately.  It was more failure to warn.

MS. PIERSON:  Yes.  We agree, frankly.

THE COURT:  It's what the jurors said.

MS. PIERSON:  Your Honor, I mentioned that the plaintiffs are required in these motions to talk with you about congestion of the alternative courts.  We know your court is congested.  We are sensitive to that fact.  You're not alone in terms of courts that have MDL's feeling the pinch of congestion.  There was a recent compilation of statistics for the Lawyers of Civil Justice that 52 percent of all civil cases today are part of an MDL.  So any court that has an MDL will certainly feel that congestion.

Part of what our papers in response to the motion to remand showed, though, was remarkably despite that docket, among the jurisdictions that the plaintiffs seek remand to, our jurisdiction, Southern District of Indiana, has one of the fastest times to trial of any of the jurisdictions on that list.  We included a chart in our response to the motion to remand that shows the time to trial.  There's only one other jurisdiction where you get to trial more quickly than you do in the Southern District of Indiana.  That's obviously a point

54

to be proud of but more importantly, it mitigates against their argument that somehow it's more convenience to transfer these cases to another jurisdiction.

So ultimately, Your Honor, we believe that this motion is premature.  There may come a time when it's appropriate to remand cases but that time is not now.

THE COURT:  Hope so.

MS. PIERSON:  We've really only begun our work in these cases with two trials of two very specific injury cases on one product.  There are hundreds of cases in the Categories 1 through 6 yet to be tried.  And even when we talk about perforation with symptoms but no other injury, there are hundreds of cases there, too.  So we believe that there is good work to be done and we intend to do that as I've just outlined.  Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Martin, just briefly because I know we'll be revisiting this issue down the road.

MR. MARTIN:  You know what, Your Honor, I'm going to let Mr. Matthews finish.  He's got cases on this remand -- or transfer motion and I'd like to give him an opportunity.

MR. MATTHEWS:  I'll be very brief, Judge.  I get it.

THE COURT:  Yes.

MR. MATTHEWS:  Let me just say --

THE COURT:  We'll talk again.

MR. MATTHEWS:  I hear you.  I hear you.  Thank you.

I just wanted to say that Judge Campbell, as you know, in Bard is remanding cases in May; and I would suggest to this Court that we put in the can, so to speak, the experts in deposition where we are then prepared, upon remand, to try cases in different jurisdictions with expert deposition testimony already taken in the MDL that can be used.

THE COURT:  Should already be in the can, right?

MR. MATTHEWS:  I think they are mostly but I think we may have to take two or three to put them in a can.  But getting back just very briefly to the point that the convenience of the parties being at issue, all of these sales are made in the local hospitals where the plaintiffs live.  All the warnings are given in the local hospitals.  All the family members are there.  All the treaters are there.  All the plaintiffs are there, of course.  The convenience is obviously in those venues where the plaintiff resides, as evidenced by the multitude of remands that are occurring as we speak in MDL's throughout the country.  So it's not really a matter of evidence.

This Court has tried a defense pick and a plaintiff's pick, and there are going to be many trials that take place in the next eight months in state courts.  There will be a variety of injuries tried, a variety of failure modes, if you will, of the filter -- of the Cook filters; and

we strongly believe that trying a low injury case is not going -- is not going to bring closure to this litigation. That it's going to take a variety of different injury cases. Otherwise, we would let the tail wag the dog.  Thank you.

THE COURT:  If discovery has been completed, quote/unquote, completed and these cases, as you say, Mr. Matthews, are ready to be remanded or transferred, I don't know why -- if we're ready to go to trial, why we can't just try one every other month.  I can fit it in.  I've got trials set every week but as we all know, the majority of them don't go.  Even criminal cases anymore.  Penalties are so severe, people don't even want to roll the dice anymore in a criminal case.  We can get cases tried.  If you're saying discovery is finished up and there's not much left to do, let's set them for trial.

We can -- we can consider remand or transfer but I would imagine that a District Court, wherever in Alabama or Texas or wherever, would have to gear up as well.  I mean, I'm here just to help you guys get this matter across the finish line.  I'll try as many cases as you want to try.  I'll resolve as many motions that you file.  I'm here to help you do that.  That's my job.

Obviously I would have much of an easier time getting through my docket if I didn't have this MDL, as would other judges; but when we're asked to do something like this

by the panel, we have an obligation to -- unless there's something that is really a cause of concern, to accept their offer and do our job as district judges, and that's kind of the way I look at it and I know most of my colleagues who have MDL's look at it.  We've got other things to do when these MDL's come on our dockets but the panel asks and unless there's other compelling circumstances, most of us agreed.

MR. MARTIN:  May I address that, Your Honor?  I'll go up.

THE COURT:  We're very high tech here now, Mr. Martin.

MR. MARTIN:  I see that.

THE COURT:  Push a button.

MR. MARTIN:  Push a button and you'll be heard.

If I could address that very question.  I think at this point I would sort of compare this -- this MDL now to the stage of the Bard MDL and the West Virginia MDL regarding the mesh litigation.

THE COURT:  Those haven't tried as many cases.

MR. MARTIN:  Haven't tried as many but we've got three under the belt, two year here and one somewhere else. In fact, Judge Campbell tried just three cases in the Bard MDL and has -- and is getting ready to -- has actually ordered the remand subject to getting some things accomplished that I believe remand orders are going to come -- to some extent some

remand has already come.  Judge Campbell remanded ten cases back, gosh, probably six months ago, some of which were my cases.  He's remanded those cases.  I don't think that -- and now we've got the wave situation.  With the wave situations with Judge Goodwin in mesh and so in Bard we've got three cases that have been tried and that court -- I think that litigation is at a similar spot that this litigation is.  And not to belabor but we have -- we have -- Cook having said two years ago, this discovery is over.

I don't consider this -- I consider that this Court has -- and the lawyers have moved this litigation along.  It's been four and a half years, if I'm not mistaken, as to when this was transferred.  So I think it's -- it's less of a situation with respect to we're not doing our job or the Court's not doing its job, if I can say that I do have that response to the Court's suggestion.

We've got another situation where we've got lexecon is probably the reason why it is that we couldn't only do the let's try a case every other month or whatever that would be.  But we have -- it's pretty clear law and whether it's a direct filed or not direct filed cases, the law is real clear that lexecon, unless there's a waiver of lexecon, has to be followed and that means cases must go back to their home jurisdiction.

So I don't see that -- not that the Court was

suggesting a failure of the MDL but if that is any sort of a suggestion that it would harm the process or not be a completion of the process to have other district courts be remanded in accordance with lexecon just as has been --

THE COURT:  These 15, the home district is here.

MR. MARTIN:  Well, it's not, though, Your Honor, and we'll get into this when we have this other discussion probably next status conference or the conference after that. But when Judge Campbell issued his remand order, there was no direct filing order -- there was no waiver of lexecon in that case.  There's no waiver of lexecon in this case.

In that case, in case management order number 42, ordered that it will transfer directly filed cases to the proper district.  That was -- that was not the Bard case.  In the Bard case, Your Honor, Judge Campbell remanded the cases without any direct filing order.

THE COURT:  Sounds like a lot of these cases I'd be transferring these cases to myself.

MR. MARTIN:  I'm saying, Your Honor, and we've cited -- we've cited some law in the motion that the Court will be reviewing when we address the issue of the complete remand.  But in addressing these 15 cases, the law is not that absent some waiver -- let me see.  If you have -- if you have a direct filed case and if the Court were to review the short form complaint that was agreed upon by Cook, as well as the

plaintiffs, if you look at every short form complaint that has been filed, there is a blank for which absent direct filing into this Court, which would be the proper venue for this -- for this case.

And the truth of the matter is unless you have a specific waiver of lexecon, the Court must send the cases back to their, quote/unquote, home jurisdiction. Just because the cases were filed here does not mean that they are allowed to be here for trial. And I've cited -- and we've cited in our motion in the other matter that that's the situation.

But I know -- I know it's been raised a couple of times but unless there's a waiver of lexecon, whether direct filed or filed in their home jurisdictions, we believe the law is really clear that they must be remanded. And so -- anyway, we'll get into that but the Court does not have to be trying --

THE COURT: I'll have to check. I don't know if that's correct but I'll check that.

MR. MARTIN: If I could, Your Honor, I can -- well, it's cited in our briefing.

THE COURT: Okay. All right. I've heard enough.

MR. MARTIN: Thank you.

THE COURT: Why don't we take ten minutes or so.

THE CLERK: All rise. Court is in recess.

(A recess was taken at this time.)

THE CLERK:  All rise.  Court is in session.

THE COURT:  Are we ready to proceed on item No. 5?

MS. PIERSON:  Judge, I have just one housekeeping matter on 2b.  We ask that the Court -- the categorization order only dealt with cases that were existing as of October 2018.  So for any cases filed since October of 2018, we're not consistently receiving categorization forms and medical records from those cases.  So we would ask that you amend your order, which is docket 9322, and require a categorization form and medical record for any cases filed after the entry of that order.

That for existing cases, that we receive categorization information within 15 days.  And for newly filed cases, that we receive categorization information within 30 days of filing.  We made this request informally to the plaintiffs before the hearing today but to my knowledge, didn't receive their position on that.

MR. MARTIN:  I would suggest this, Your Honor.  The reason why I think the Court had ordered categorization was for the purposes of setting the Bellwethers and considering all that.  I don't -- I don't know what the purpose would be of going forward having this categorization for cases filed, what good it's going to do anybody; but if the Court is inclined to order categorization for newly filed cases since whatever date counsel is suggesting, we need very specific

62

dates by which those categorization forms are to be filed. Because let's say a case is filed today and the Court enters an order saying: You've got to categorize your case, then we certainly need -- that counsel is going to need some lead time after he or she files a case to get that form in.

So whether it's 90 days or something like that, whatever the Court's suggestion is -- or order is, we just need to have some lag time so cases filed within 90 days or so, I would suggest then the categorization be filed because we're already filing plaintiff fact sheets and profile forms. Now there's another form to be filed for what real purpose, I'm not certain, given that we've got these -- but if the Court does it please give us some time to -- some lag time to file it after the filing of the case.

MS. PIERSON: We've asked for 15 days for existing cases. We think those lawyers should have known from your order that, in fact, they were to continue to submit these forms. But to the extent they didn't, two weeks, three weeks, four weeks, whatever the period of time is, is fine. Remember that the forms -- the form is really simple. They just have to check a box as to what injury they have and fill in a blank if they want to add some detail to the pain or whatever the injury is that the person has had; plus a medical record that shows that they have the injury, which presumably they have or they wouldn't have filed a case against us in the first place.

So this isn't difficult and I think at this point it's helpful for us to know along the way, for however long this MDL lasts, what the content of the cases are.  Whether Your Honor picks more Bellwether cases after the next set of three or for other purposes for the parties so that we understand what the MDL is comprised of.  This kind of a census can serve multiple purposes.  Even before we had it, we used the PFS for that process.  According to the plaintiffs, that self reporting was unreliable, which is how we got to the census process through categorization in the first place.

Whatever time period you choose, Your Honor, is fine.  Respectfully, we'd ask for 30 days for newly filed cases and two weeks for existing cases, but any time period would be helpful.

MR. MARTIN:  We'd like to have, for existing cases, at least that 30-day period of time, Your Honor.

THE COURT:  Okay.  Item 5.

MR. WILLIAMS:  This is on the Common Benefit Fund, Your Honor.  After Cook filed its response on Friday, we received an objection from a plaintiff's firm, Mark J. Burn and Associates up in New York.  Up until that point, we had received no objections to this.  And so I've already discussed this with Ms. Pierson but we'd like to put this off until the next status conference so we can get in touch with Mr. Burn and try to get you something without objection.

64

THE COURT:  Okay.  All right.  That was easy.  Thank you.

Next item 6, update on state court litigation.  Have we already discussed that pretty much?

MR. WILLIAMS:  Yes, we have.

THE COURT:  Just a question.  Why are these state court cases not in the MDL?

MR. MATTHEWS:  I think all of these state court cases are filed as individual cases outside of the MDL all in state district court.

THE COURT:  Okay.

MR. WILLIAMS:  A lot of times, Your Honor -- not all the time but a lot of times, there are malpractice allegations against the doctors.  There's no complete diversity.  In the cases of Indiana residents, obviously there's no complete diversity.  So they would have to be filed in state court too.  It's usually a jurisdictional issue.

MR. MARTIN:  One other sort of fact would be if the sales representative is brought into the case and that sales rep is within the home jurisdiction for that state would be the third category, Your Honor.

THE COURT:  Thank you.  Then looks like the last item I have, item 7, update on settlement discussion.  I don't know what you want to discuss.  I'm not real privy to -- I know Magistrate Judge Baker has been meeting with you.  I do

not inquire as to figures or any of that type of thing.

I'm interested in -- I want to make sure that the parties are participating -- both sides are participating in good faith and cooperating with the Magistrate Judge.  If that's the case, then I'm happy.  If it's not the case, then I'm not real happy.

MR. WILLIAMS:  Understood, Your Honor.  Part of the reason that I wanted to bring this up, and since Your Honor is not interested in specific figures, I'm not going to use specific figures.

THE COURT:  I don't know what I could do.

MR. WILLIAMS:  I understand that.

THE COURT:  If I knew specific figures, I really don't --

MS. PIERSON:  Your Honor, just for the record, we did ask that this item not be -- not be heard today because our conversations with the plaintiffs and with Magistrate Baker of course are subject to Rule 408.  We think your decision to maintain your impartiality but not inquiring more specifically of Judge Baker is appropriate and obviously, our conversations with Judge Baker --

THE COURT:  408 is trial setting.

MR. WILLIAMS:  It's admissibility rule.

The reason I wanted to bring this up, Your Honor, is because Cook wants to talk about Bellwether settings.  And as

we know, Bellwether trials are for the purpose of setting values that will help guide us in terms of settlement and getting us to that finish line that we're all talking about and trying to get to.

We've reached a point in the settlement negotiations, after many conversations with Judge Baker, who has tirelessly, and I can't overemphasize that, worked on this and Amy as well. We've gotten to point where Cook has said: We have X amount of dollars and that's all the dollars we have to pay. We have --

MS. PIERSON: Your Honor, I'm sorry; but this conversation is subject to a specific confidentiality agreement that we've executed with Judge Baker and conversation with Judge Baker --

MR. WILLIAMS: I'm not talking about numbers.

MS. PIERSON: I object that we have any further conversation about this on the record or publicly until we can get Judge Baker involved.

MR. WILLIAMS: That's why I'm not talking about specific figures, Your Honor.

THE COURT: As long as we don't get into specifics, that's fine.

MS. PIERSON: If he's disclosing the subject --

What Mr. Williams has just alluded to is disclosing information that was shared with the plaintiffs subject to a

confidentiality agreement and shared with Judge Baker subject to a confidentiality agreement.  My last call with Judge Baker lead me to believe that there would be more calls with him. So respectfully, Judge, I would ask that we not have this conversation until we have an opportunity to talk with Judge Baker.

We inquired as to what would be discussed today before we got in this hearing to assure that we didn't have this kind of disclosure of confidential negotiations on the record and that's exactly what's happening.

MR. WILLIAMS:  And I explained when she said to me: What are you going to talk about?  I explained precisely what I'm going to talk about and I'm not going to mention specifics.

THE COURT:  Go ahead.

MR. WILLIAMS:  Thank you, Your Honor.  They said: We have X amount of dollars and that's all the dollars we have to pay for settlement.

We have taken that to the PSC.  We've taken it to other plaintiffs' counsel and we have determined that we cannot settle the litigation for the amount that Cook says is their final amount.  Because that's the case, it makes little sense to continue to try Bellwether cases.  I mean, the whole -- the Bellwether was the Bellwether goat that wore the bell so all the sheep followed that goat.  That's where we get

68

Bellwether from and if we know --

THE COURT:  Did you Google that?

MR. WILLIAMS:  Guilty.  And if we know that the top dollar is not what's going to get this case done, then there's really no utility in continuing to try, quote/unquote, Bellwether cases because the cases aren't going to follow.  We know -- we have been told in no uncertain terms:  No matter what happens, this is what we have to offer and that's it.  I believe we were told if that's -- if that's not good enough, we'll try all the cases.

Well, we've had 4,000 some odd people waiting for their day in court for a very long time and part of the reason they do that in an MDL procedure is because in some cases, when the Bellwethers work out and settlements are done, it's a benefit to everyone.  It's a benefit to the defendants.  It's a benefit to the plaintiffs who have been waiting for their day in court.

If we know that the total amount of dollars is not sufficient to settle the cases, then there's quite a detriment to the folks who have been waiting years for their day in court and there's no reason to continue to try Bellwethers.  What should happen is these individuals should be able to go home and have their day in court after waiting for so long.

I truly appreciate trying a case every other month here and I know the strain that it would be put on Your Honor

and Your Honor's court; but trying six out of 4,000 a year is not going to move us any closer to the finish line that we're all trying to get to.

And so my point in raising the settlement negotiations is, we've got to the point where we now know from Cook's own mouth that we're done; and because we know that, we don't think there's any utility in continuing to try, quote/unquote, Bellwether cases because the -- in the very literal sense, there's no utility.

THE COURT:  And I understand what you're saying but say I remanded all these cases back and closed out the MDL. How in the world do you think you're going to get these cases tried?  Andrea's team here is only so big.  Are you saying that Cook would have to hire lawyers all across the country to defend on these cases?  And starting -- say they started 1st of May, they get this file and defense lawyer's offices, it's going to be two or three years before you get that case tried. Practicalities come in here.  I'm just trying to see how -- I want to get it done as well.

MR. WILLIAMS:  I know.  Your Honor, we've seen --

THE COURT:  But I just don't know how.

MR. WILLIAMS:  Sure.

THE COURT:  Say remand it back and we'll have all these tried within the next year or so.  I don't think so.

MR. WILLIAMS:  And I completely understand Your

Honor's pragmatism, but I think the state court dockets that we were talking about earlier are really kind of a microcosm of how this would work.

We still have the same defense team and we're getting trial setting after trial setting in state court and that will advance this ball and push it closer to the finish line; and while there may be some cases when they get remanded that if they go to a busier docket, maybe it does take a year or two for that individual to get to trial.  But there will be more than six cases that we can get to trial if these 4,000 cases are sent back.

THE COURT:  Well, what I'm saying is, I don't think Andrea and the Faegre team would be able to defend these.  So what would happen is Cook would have to hire additional counsel.  Additional counsel would to get up to speed on these cases.  I don't know --

MR. WILLIAMS:  I'm sure in some situations that may be the case.  In others --

THE COURT:  I don't know what the timetable would be on that as well.

MR. WILLIAMS:  But if we've got it in multiple different courts moving that ball forward, I think it goes that -- or it follows that some of those cases will get to trial faster.  I think Your Honor is right.  There may be some that continue to languish on the docket, but I think it does

help us move that ball forward.

THE COURT:  Okay.  That wasn't too bad, was it, Andrea?

MS. PIERSON:  It wasn't.  Compared to other things that I've heard Joe say, that really wasn't.

THE COURT:  I really don't know much more about your settlement than I did five minutes ago.

MS. PIERSON:  Respectfully, we obviously disagree about why we are where we are on settlement.  My understanding of where we are in communications with Judge Baker appears to be very different than Joe's understanding of where we are, but we'll address that with Judge Baker following the conference.

At the end of the day, Judge, you are moving cases on your docket.  I mean, just in the span of the last week we've had something like 75 cases dismissed.  So to the extent that there's some concern that cases are not moving in the MDL, that's not the case.  And in fact, today you dismissed 30 more cases that are Category 1 cases.

As I alluded to earlier, we will bring to you common issue motions that allow you to move chunks of cases that are in this MDL.  And respectfully, the parties will be a lot closer together in resolution when we reduce the denominator of cases that are in the MDL.  And I've explained that to the plaintiffs directly.  I've explained it to Judge Baker and I'm

sure it comes as no surprise to you.  We've been saying, and as you found back in February, there are hundreds of cases that we believe the plaintiffs have suffered no injury at all and that's what the categorization order and the Bellwether plan are designed to address.  That's really the next step in the process.

I've heard lawyers talk today about the Bard MDL as an example.  Judge Campbell picked five Bellwether cases. He'll be trying four out of five of those cases.  One case there was summary judgment.

We talk about the pelvic mesh litigation.  That litigation started in 2012, the MDL was created.  It's two years older than we are and they've tried many, many more cases than we have.

We talked today multiple times about the state court docket and how the state court docket can help or hinder this process.  And if I may approach, Your Honor, at the very first hearing that I attended on behalf of Cook, we filed a motion asking for state court coordination and we'll renew that motion and file it with you today, Your Honor.

As you can see, and as lawyers for the plaintiffs have alluded to, there are 13 state court cases that are set in the next 12 months, essentially.  We want you to set three more Bellwether trials as you ordered that you would do back in October.  Mr. Williams today is asking that you set trials

every other month.  It's not possible for Cook to try that many cases.

And the whole point of a coordination order is that courts state and federal might work together to be able to do things like controlling discovery but also controlling the setting of trials to be sure that the parties are hearing about the right kinds of cases to set values that allow them to resolve the whole body of cases, state and federal.

The sheet that I showed you earlier of state court cases, there's a huge number of open procedure, fracture cases.  These are cases that the plaintiffs prefer to try in state court high damages cases.  It's not a coincidence that they've named the doctor in those cases, but that doesn't do anything to tell us about the overall portfolio cases that are in the MDL.

So ultimately, if there's some solution that you're contemplating, Your Honor, that's something other than setting three Bellwether trials as you ordered doing back in October of 2018, we think that a coordination order is appropriate and that you and the other judges confer on what the next steps might be.  You denied my request for it a couple of years ago and we'd renew it again today, if you're contemplating something else.

In the meantime, we've got 13 cases set in state court that we're working really hard on, and we're prepared

and want to try three product-in-place/no injury cases with you because they are not those cases set in the state courts and we haven't had those in this MDL yet.

So as I started this day saying, we'd respectfully request, Your Honor, that you enter our proposal to effectuate your Bellwether case management plan and let's get to the business of this MDL, which right now is hindered by addressing this group of Category 1 through 6 cases.  Thank you.

THE COURT:  Thank you.  Okay.  Anything else we need to talk about today?

MR. WILLIAMS:  I don't think so, Your Honor.

MR. MATTHEWS:  No.

MS. PIERSON:  Nothing further, Your Honor.  Thank you.

THE COURT:  Okay.  We'll work on what we've discussed today and I guess I'm going to see you next week or two weeks.

MR. WILLIAMS:  Two weeks, Your Honor.

THE COURT:  Okay.  Thanks for all your hard work and preparation for our hearing today.  The Category 1 through 6 cases, your cases that you're trying in state court, what category would they be in, Mr. Matthews?

MR. MATTHEWS:  I would say they're a combination of 5, 6 and 7.

THE COURT:  5, 6 and 7?

MR. MATTHEWS:  Mostly 7.

THE COURT:  Mostly 7.  That's what I was thinking.  All right.  Very good.  Safe travels, everyone.

THE CLERK:  All rise.  Court is adjourned.

(Court proceedings concluded at 3:42 p.m.)

**********************************************************

CERTIFICATE OF COURT REPORTER


     I, Margaret A. Techert, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.




/S/ Margaret A. Techert                    **May 13, 2019**
MARGARET A. TECHERT
Official Court Reporter
Southern District of Indiana
Evansville Division